# **EXHIBIT A**

PLAN AND SUPPORTING EXHIBITS

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## SIXTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone:  (787) 764-8181
Facsimile:  (787) 753-8944

*Attorneys for the Financial Oversight and Management Board
as Representative for the Debtors in their Title III Cases*

Dated: July 27, 2021

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS ..................................................................................................1

1.1   2011 CW Bond Claim ..........................................................................................1
1.2   2011 CW Bond Claim (Assured) ..........................................................................1
1.3   2011 CW Bond Claim (Taxable Election) ............................................................1
1.4   2011 CW Bond Recovery .....................................................................................1
1.5   2011 CW Bonds....................................................................................................1
1.6   2011 CW Guarantee Bond Claim..........................................................................2
1.7   2011 CW Guarantee Bond Claim (Taxable Election)............................................2
1.8   2011 CW Guarantee Bond Recovery .....................................................................2
1.9   2011 CW Guarantee Taxable Bond Distribution ....................................................2
1.10  2011 CW Series D/E/PIB Bond Claim ..................................................................2
1.11  2011 CW Series D/E/PIB Bond Claim (Assured) ..................................................2
1.12  2011 CW Series D/E/PIB Bond Claim (Taxable Election) ....................................2
1.13  2011 CW Series D/E/PIB Bond Recovery .............................................................3
1.14  2011 CW Series D/E/PIB Bonds ...........................................................................3
1.15  2011 CW Series D/E/PIB Taxable Bond Distribution ...........................................3
1.16  2011 CW Taxable Bond Distribution .....................................................................3
1.17  2011 PBA Bond Claim...........................................................................................3
1.18  2011 PBA Bond Recovery......................................................................................3
1.19  2011 PBA Bonds ...................................................................................................3
1.20  2012 CW Bond Claim............................................................................................4
1.21  2012 CW Bond Claim (Assured) ...........................................................................4
1.22  2012 CW Bond Claim (Taxable Election) ..............................................................4
1.23  2012 CW Bond Recovery .......................................................................................4
1.24  2012 CW Bonds......................................................................................................4
1.25  2012 CW Guarantee Bond Claim ...........................................................................5
1.26  2012 CW Guarantee Bond Claim (Taxable Election).............................................5
1.27  2012 CW Guarantee Bond Recovery ......................................................................5
1.28  2012 CW Guarantee Taxable Bond Distribution ....................................................5
1.29  2012 CW Taxable Bond Distribution ......................................................................5
1.30  2012 PBA Bond Claim............................................................................................5
1.31  2012 PBA Bond Recovery......................................................................................5
1.32  2012 PBA Bonds ...................................................................................................6
1.33  2014 CW Bond Claim............................................................................................6
1.34  2014 CW Bond Claim (Taxable Election) ..............................................................6
1.35  2014 CW Bond Recovery .......................................................................................6
1.36  2014 CW Bonds......................................................................................................6
1.37  2014 CW Guarantee Bond Claim ...........................................................................6
1.38  2014 CW Guarantee Bond Claim (Taxable Election).............................................6
1.39  2014 CW Guarantee Taxable Bond Distribution....................................................7
1.40  2014 CW Taxable Bond Distribution .....................................................................7
1.41  5.5% SUT................................................................................................................7

**Table of Contents**
**(Cont'd)**

**Page**

| | | |
|---|---|---|
| 1.42 | AAFAF | 7 |
| 1.43 | ACR Order | 7 |
| 1.44 | Act 106 | 7 |
| 1.45 | Act 106 Board | 7 |
| 1.46 | Active and Retired Employee Benefit Claim | 7 |
| 1.47 | Active ERS Participant Claim | 7 |
| 1.48 | Active JRS Participant Claim | 7 |
| 1.49 | Active Participant | 7 |
| 1.50 | Active TRS Participant Claim | 8 |
| 1.51 | Administrative Claim Bar Date | 8 |
| 1.52 | Administrative Expense Claim | 8 |
| 1.53 | ADR Order | 8 |
| 1.54 | ADR Procedures | 8 |
| 1.55 | Affiliate | 8 |
| 1.56 | AFSCME | 8 |
| 1.57 | AFSCME CBAs | 8 |
| 1.58 | AFSCME Claims | 8 |
| 1.59 | AFSCME Plan Support Agreement | 8 |
| 1.60 | AFSCME Term Sheet | 9 |
| 1.61 | Allowed | 9 |
| 1.62 | Allowed Claim | 9 |
| 1.63 | Ambac | 9 |
| 1.64 | Ambac Action | 9 |
| 1.65 | Ambac Certificates | 9 |
| 1.66 | Ambac Commutation Consideration | 9 |
| 1.67 | Ambac Commutation Treatment | 9 |
| 1.68 | Ambac CW/HTA Bond Claims | 10 |
| 1.69 | Ambac Escrow Account | 10 |
| 1.70 | Ambac Insured Bond Claims | 10 |
| 1.71 | Ambac Insured Bonds | 10 |
| 1.72 | Ambac Insurance Policies | 10 |
| 1.73 | Ambac Plan Consideration | 10 |
| 1.74 | Ambac Trust | 10 |
| 1.75 | Ambac Trust Assets | 10 |
| 1.76 | Ambac CW/Convention Center Claims | 10 |
| 1.77 | Ambac CW/HTA Bond Claims | 10 |
| 1.78 | Ambac CW/PRIFA Rum Tax Claims | 10 |
| 1.79 | AMPR: Collectively, the American Federation of Teachers, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical. | 11 |
| 1.80 | Appointments Related Litigation | 11 |
| 1.81 | Assets | 11 |
| 1.82 | Assured | 11 |
| 1.83 | Assured Acceleration Price | 11 |

**Table of Contents**
**(Cont'd)**

**Page**

1.84     Assured Acceleration Price Payment Option .................................................... 11
1.85     Assured Bondholder Elections ........................................................................... 11
1.86     Assured Bondholder Elections Form ................................................................. 12
1.87     Assured CVIs ..................................................................................................... 12
1.88     Assured CW/Convention Center Claims ........................................................... 12
1.89     Assured CW/HTA Bond Claims ........................................................................ 12
1.90     Assured CW/PRIFA Rum Tax Claims ............................................................... 12
1.91     Assured Election ................................................................................................ 12
1.92     Assured Election Notice .................................................................................... 12
1.93     Assured Insurance Policies ................................................................................ 12
1.94     Assured Insured Bond Claim ............................................................................. 12
1.95     Assured Insured Bondholder .............................................................................. 13
1.96     Assured Insured Bonds ...................................................................................... 13
1.97     Assured New GO Bonds .................................................................................... 13
1.98     Assured New Securities ..................................................................................... 13
1.99     Assured Treatment ............................................................................................. 13
1.100    Avoidance Actions ............................................................................................ 13
1.101    Avoidance Actions CW Interests ...................................................................... 13
1.102    Avoidance Actions ERS Interests ..................................................................... 14
1.103    Avoidance Actions Trust ................................................................................... 14
1.104    Avoidance Actions Trust Agreement ................................................................ 14
1.105    Avoidance Actions Trust Assets ....................................................................... 14
1.106    Avoidance Actions Trust Beneficiaries ............................................................ 14
1.107    Avoidance Actions Trust Board ........................................................................ 14
1.108    Avoidance Actions Trust Interests .................................................................... 14
1.109    Avoidance Actions Trustee ............................................................................... 14
1.110    Ballot Date ........................................................................................................ 14
1.111    Ballot/Election Form ......................................................................................... 14
1.112    Bankruptcy Code ............................................................................................... 15
1.113    Bankruptcy Rules .............................................................................................. 15
1.114    Bar Date ............................................................................................................ 15
1.115    Bar Date Orders ................................................................................................. 15
1.116    Base Contribution .............................................................................................. 15
1.117    Benefit Reduction Date ..................................................................................... 15
1.118    Benefit Restoration ........................................................................................... 15
1.119    Bond Claim ....................................................................................................... 15
1.120    Bond Recovery Category ................................................................................... 16
1.121    Bondholder Election .......................................................................................... 16
1.122    Business Day ..................................................................................................... 16
1.123    Capital Improvements ....................................................................................... 16
1.124    Cash ................................................................................................................... 16
1.125    Causes of Action ............................................................................................... 16
1.126    CCDA ................................................................................................................ 16
1.127    CCDA Bonds ..................................................................................................... 16

**Table of Contents**
**(Cont'd)**

**Page**

| | | |
|---|---|---|
| 1.128 | CCDA Bond Claims | 17 |
| 1.129 | CCDA Consummation Costs | 17 |
| 1.130 | CCDA Restriction Fee Creditors | 17 |
| 1.131 | CCDA Restriction Fee Percentage | 17 |
| 1.132 | CCDA Trustee | 17 |
| 1.133 | Charging Lien | 17 |
| 1.134 | Christmas Bonus | 17 |
| 1.135 | Claim | 17 |
| 1.136 | Class | 18 |
| 1.137 | Clawback Actions | 18 |
| 1.138 | Clawback CVI Indenture | 18 |
| 1.139 | Clawback CVIs | 18 |
| 1.140 | Clawback Recovery | 18 |
| 1.141 | COFINA | 18 |
| 1.142 | COFINA Bonds | 18 |
| 1.143 | COFINA Bonds Indenture | 18 |
| 1.144 | COFINA Bonds Legislation | 19 |
| 1.145 | COFINA Confirmation Order | 19 |
| 1.146 | COFINA Plan | 19 |
| 1.147 | Committee Agreement | 19 |
| 1.148 | Commonwealth | 19 |
| 1.149 | Commonwealth Constitution | 19 |
| 1.150 | Commonwealth Election | 19 |
| 1.151 | Commonwealth Instrumentality Plan | 19 |
| 1.152 | Commonwealth Legislature | 19 |
| 1.153 | Commonwealth Petition Date | 19 |
| 1.154 | Commonwealth Title III Case | 19 |
| 1.155 | Comprehensive Cap | 19 |
| 1.156 | Confirmation Date | 19 |
| 1.157 | Confirmation Hearing | 19 |
| 1.158 | Confirmation Order | 20 |
| 1.159 | Constitutional Debt Group | 20 |
| 1.160 | Constitutional Debt Group Members | 20 |
| 1.161 | Consummation Costs | 20 |
| 1.162 | Convenience Cap | 20 |
| 1.163 | Convenience Claim | 20 |
| 1.164 | Creditor | 20 |
| 1.165 | Creditors' Committee | 21 |
| 1.166 | CUSIP | 21 |
| 1.167 | Custodial Trust Documents | 21 |
| 1.168 | CVIs | 21 |
| 1.169 | CVI Indenture | 21 |
| 1.170 | CVI Legislation | 21 |
| 1.171 | CVI Payment Reserve | 21 |

**Table of Contents**
**(Cont'd)**

**Page**

1.172   CVI Trustee ................................................................................21
1.173   CW Appropriations Claims ................................................................22
1.174   CW Bond Claims ................................................................................22
1.175   CW Bond Claims (Insured) ................................................................22
1.176   CW Fiscal Plan ................................................................................22
1.177   CW General Unsecured Claim ................................................................22
1.178   CW Guarantee Bond Claims ................................................................23
1.179   CW Guarantee Bond Claims (Insured) ................................................23
1.180   CW GUC Recovery ................................................................................23
1.181   CW/Convention Center Claim ................................................................23
1.182   CW/Convention Center Clawback Recovery ................................23
1.183   CW/HTA Claim ................................................................................23
1.184   CW/HTA Clawback Recovery ................................................................24
1.185   CW/MBA Claim ................................................................................24
1.186   CW/MBA Clawback Recovery ................................................................24
1.187   CW/PRIFA Rum Tax Claim ................................................................24
1.188   CW/PRIFA Rum Tax Clawback Recovery ................................24
1.189   Dairy Producer Claim ................................................................24
1.190   Dairy Producer Settlement ................................................................24
1.191   Debt ................................................................................................24
1.192   Debt Management Policy ................................................................24
1.193   Debtors ................................................................................................25
1.194   Debt Policy Period ................................................................25
1.195   Debt Policy Revenues ................................................................25
1.196   Debt Related Objections ................................................................25
1.197   Debt Responsibility Act ................................................................26
1.198   Debt Service Fund ................................................................26
1.199   Debtors ................................................................................................26
1.200   Deemed Issuance Date ................................................................26
1.201   Definitive Documents ................................................................26
1.202   Disallowed ................................................................................27
1.203   Disbursing Agent ................................................................27
1.204   Disclosure Statement ................................................................27
1.205   Disclosure Statement Hearing ................................................................27
1.206   Disclosure Statement Order ................................................................27
1.207   Disputed Claim ................................................................27
1.208   Distribution Date ................................................................27
1.209   Distribution Record Date ................................................................27
1.210   Effective Date ................................................................28
1.211   Eminent Domain Claim ................................................................28
1.212   Eminent Domain Proceeding ................................................................28
1.213   Energy Incentive Act ................................................................28
1.214   Energy Incentive Claims ................................................................28
1.215   Entity ................................................................................28

## Table of Contents
### (Cont'd)

**Page**

1.216   ERS ................................................................................................ 28
1.217   ERS Bond Claim ............................................................................ 28
1.218   ERS Bond Recovery ....................................................................... 28
1.219   ERS Bonds ...................................................................................... 29
1.220   ERS Fiscal Agent ............................................................................ 29
1.221   ERS General Unsecured Claim ...................................................... 29
1.222   ERS GUC Pool ............................................................................... 29
1.223   ERS Litigation ................................................................................ 29
1.224   ERS Participant Claim .................................................................... 30
1.225   ERS Petition Date ........................................................................... 30
1.226   ERS Portfolio Price ........................................................................ 30
1.227   ERS Private Equity Portfolio ......................................................... 30
1.228   ERS Recovery Actions .................................................................... 30
1.229   ERS Resolution ............................................................................... 31
1.230   ERS Stipulation .............................................................................. 31
1.231   ERS Takings Action ........................................................................ 31
1.232   ERS Title III Case ........................................................................... 31
1.233   ERS Trust ........................................................................................ 31
1.234   Excess Cash Surplus ....................................................................... 31
1.235   Executory Contract ......................................................................... 31
1.236   Federal Claims: Collectively,  any and all Claims  of the United States of
         America, its agencies, departments or agents, including,  without
         limitation,  the United States Department Housing and Urban
         Development, the United States Department of Homeland  Security and the
         United States Department of Labor. ............................................... 31
1.237   FGIC ............................................................................................... 31
1.238   FGIC Action .................................................................................... 31
1.239   FGIC Certificates ............................................................................ 31
1.240   FGIC CW/Convention Center Claims ............................................ 32
1.241   FGIC CW/HTA Bond Claims ......................................................... 32
1.242   FGIC CW/PRIFA Rum Tax Claims ................................................ 32
1.243   FGIC Escrow Account ..................................................................... 32
1.244   FGIC Insured Bond Claims ............................................................ 32
1.245   FGIC Insured Bonds ....................................................................... 32
1.246   FGIC Insured PRIFA Bond Claims ................................................ 32
1.247   FGIC Insurance Policies .................................................................. 32
1.248   FGIC Plan Consideration ................................................................ 32
1.249   FGIC Rehabilitation Plan ................................................................ 32
1.250   FGIC Treatment ............................................................................... 32
1.251   FGIC Trust ...................................................................................... 32
1.252   Final Order ...................................................................................... 33
1.253   Fiscal Plan ....................................................................................... 33
1.254   Fiscal Plan Surplus ......................................................................... 33
1.255   FY ..................................................................................................... 33

**Table of Contents**
**(Cont'd)**

1.256 GDB ....................................................................................................33
1.257 GDB HTA Loans ................................................................................33
1.258 GDB Loan Priority Determination ...................................................33
1.259 General Fund ......................................................................................33
1.260 General Unsecured Claims ................................................................34
1.261 GO Bonds ...........................................................................................34
1.262 GO CVIs .............................................................................................34
1.263 GO CVI Indenture .............................................................................34
1.264 GO Group ...........................................................................................34
1.265 GO/PBA Annex Agreement ..............................................................34
1.266 GO/PBA Consummation Costs .........................................................34
1.267 GO/PBA Joinder Agreement .............................................................34
1.268 GO/PBA Joinder Creditors ...............................................................34
1.269 GO/PBA Joinder Deadline ................................................................34
1.270 GO/PBA Plan Support Agreement ....................................................34
1.271 GO/PBA PSA Creditors ....................................................................35
1.272 GO/PBA PSA Restriction Fee ..........................................................35
1.273 GO/PBA Restriction Fee Percentage ................................................35
1.274 Government Entity .............................................................................35
1.275 Government Parties ............................................................................35
1.276 Government Released Claims ............................................................35
1.277 Government Releasees .......................................................................36
1.278 Gracia Gracia Claim ..........................................................................36
1.279 Gracia Gracia CW Action .................................................................36
1.280 Gracia Gracia Federal Action ...........................................................36
1.281 Gracia Gracia Settlement ..................................................................36
1.282 GSA Helicopter Loan ........................................................................36
1.283 GUC Recovery Cap ...........................................................................36
1.284 GUC Reserve .....................................................................................37
1.285 HTA .....................................................................................................37
1.286 HTA 68 Bonds ...................................................................................37
1.287 HTA 98 Bonds ...................................................................................37
1.288 HTA 98 Senior Bonds .......................................................................37
1.289 HTA 98 Sub Bonds ...........................................................................38
1.290 HTA Bonds .........................................................................................38
1.291 HTA/CCDA Annex Agreement .........................................................38
1.292 HTA/CCDA Joinder Agreement .......................................................38
1.293 HTA/CCDA Joinder Deadline ..........................................................38
1.294 HTA/CCDA Joinder Creditors ..........................................................38
1.295 HTA/CCDA Plan Support Agreement ..............................................38
1.296 HTA/CCDA PSA Creditors ...............................................................39
1.297 HTA/CCDA PSA Restriction Fee Period .........................................39
1.298 HTA/CCDA PSA Threshold Attainment ..........................................39
1.299 HTA Clawback CVI ..........................................................................39

**Table of Contents**
**(Cont'd)**

**Page**

1.300   HTA Confirmation Order ....................................................................39
1.301   HTA Distribution Conditions .............................................................39
1.302   HTA Effective Date ............................................................................40
1.303   HTA Fiscal Agent ...............................................................................40
1.304   HTA Plan .............................................................................................40
1.305   HTA Title III Case ..............................................................................40
1.306   Initial PSA Creditors ..........................................................................40
1.307   Initial GO/PBA PSA Creditors ..........................................................40
1.308   Initial GO/PBA PSA Restriction Fee Creditors.................................40
1.309   Initial HTA/CCDA PSA Creditors .....................................................40
1.310   Initial PSA .........................................................................................40
1.311   Initial PSA Joinder Creditors .............................................................40
1.312   Initial PSA Threshold Attainment .....................................................40
1.313   Insured Bond Claim ...........................................................................41
1.314   Invalidity Actions ..............................................................................41
1.315   IRC ......................................................................................................41
1.316   IRS ......................................................................................................41
1.317   JRS ......................................................................................................41
1.318   JRS Participant Claim ........................................................................41
1.319   LCDC ..................................................................................................41
1.320   LCDC Holders ....................................................................................41
1.321   Lien .....................................................................................................41
1.322   Lien Challenge Actions ......................................................................41
1.323   Lift Stay Motions ...............................................................................41
1.324   List of Creditors .................................................................................42
1.325   Local Bankruptcy Rules .....................................................................42
1.326   Maximum Annual Debt Service.........................................................42
1.327   Maximum Taxable Bond Election Amount ........................................42
1.328   Measured SUT .....................................................................................42
1.329   Med Centers ........................................................................................42
1.330   Med Center Claims .............................................................................43
1.331   Med Center Litigation ........................................................................43
1.332   Med DC Action: The litigation  styled Rio Grande Cmty. Health Ctr. Inc.,
         et al. v. Commonwealth  of Puerto Rico, et al.„ Case No. 03-1640 (GAG),
         currently pending  in the United States District  Court for the District of
         Puerto Rico. ........................................................................................44
1.333   Medical Insurance Benefit ..................................................................44
1.334   Medicine Bonus ..................................................................................44
1.335   Monolines.............................................................................................44
1.336   Monthly Base Pension ........................................................................44
1.337   Monthly Benefit Modification ...........................................................44
1.338   Monthly Christmas Bonus ..................................................................45
1.339   Monthly Medicine Bonus ...................................................................45
1.340   Monthly Summer Bonus......................................................................45

**Table of Contents**
**(Cont'd)**

**Page**

| | | |
|---|---|---|
| 1.341 | National | 45 |
| 1.342 | National Action | 45 |
| 1.343 | National Acceleration Price | 45 |
| 1.344 | National Certificates | 45 |
| 1.345 | National Commutation Consideration | 45 |
| 1.346 | National Commutation Treatment | 45 |
| 1.347 | National CW/HTA Bond Claims | 45 |
| 1.348 | National Escrow Account | 46 |
| 1.349 | National Insurance Policies | 46 |
| 1.350 | National Insured Bond Claims | 46 |
| 1.351 | National Insured Bonds | 46 |
| 1.352 | National Non-Commutation Treatment | 46 |
| 1.353 | National Plan Consideration | 46 |
| 1.354 | National Treatment | 46 |
| 1.355 | National Trust | 46 |
| 1.356 | Net Allowed ERS Bond Claims | 46 |
| 1.357 | Net CW Cash Consideration | 46 |
| 1.358 | Net Tax-Supported Debt | 47 |
| 1.359 | New GO 5.0% CABs | 47 |
| 1.360 | New GO 5.375% CABs | 47 |
| 1.361 | New GO Bonds | 47 |
| 1.362 | New GO Bonds Indenture | 47 |
| 1.363 | New GO Bonds Legislation | 47 |
| 1.364 | New GO Bonds Trustee | 47 |
| 1.365 | New GO CIBs | 47 |
| 1.366 | New GO Refunding Bonds | 48 |
| 1.367 | New HTA Bonds | 48 |
| 1.368 | New HTA Bonds Indenture | 48 |
| 1.369 | Notas de Ahorro | 48 |
| 1.370 | OGP | 48 |
| 1.371 | Ordinary Course Employee Claim | 48 |
| 1.372 | Outperformance Condition | 48 |
| 1.373 | Outstanding | 48 |
| 1.374 | Oversight Board | 48 |
| 1.375 | Participant | 49 |
| 1.376 | PayGo | 49 |
| 1.377 | PBA | 49 |
| 1.378 | PBA Administrative Expense Claim | 49 |
| 1.379 | PBA Bond Claims | 49 |
| 1.380 | PBA Bond Distribution | 49 |
| 1.381 | PBA Bonds | 49 |
| 1.382 | PBA Cash | 49 |
| 1.383 | PBA/DRA Secured Claim | 49 |
| 1.384 | PBA/DRA Unsecured Claim | 49 |

# Table of Contents
## (Cont'd)

| | | |
|---|---|---|
| 1.385 | PBA General Unsecured Claim | 49 |
| 1.386 | PBA Litigation | 49 |
| 1.387 | PBA Petition Date | 50 |
| 1.388 | PBA Property | 50 |
| 1.389 | PBA Title III Case | 50 |
| 1.390 | Pension Reserve Deed of Trust | 50 |
| 1.391 | Pension Reserve Trust | 50 |
| 1.392 | Person | 50 |
| 1.393 | PFC | 50 |
| 1.394 | Plan | 50 |
| 1.395 | Plan Supplement | 50 |
| 1.396 | Ports | 50 |
| 1.397 | PRASA | 50 |
| 1.398 | PREPA | 51 |
| 1.399 | PRIDCO | 51 |
| 1.400 | PRIFA | 51 |
| 1.401 | PRIFA BANs | 51 |
| 1.402 | PRIFA BANs Commonwealth Guaranty | 51 |
| 1.403 | PRIFA BANs Litigation | 51 |
| 1.404 | PRIFA BANs Trustee | 51 |
| 1.405 | PRIFA Bond Claims | 51 |
| 1.406 | PRIFA Bonds | 51 |
| 1.407 | PRIFA Clawback CVI | 51 |
| 1.408 | PRIFA Distribution Conditions | 51 |
| 1.409 | PRIFA Order | 52 |
| 1.410 | PRIFA Plan | 52 |
| 1.411 | PRIFA Plan Support Agreement | 52 |
| 1.412 | PRIFA PSA Creditors | 52 |
| 1.413 | PRIFA Trust | 52 |
| 1.414 | Professional | 52 |
| 1.415 | Professional Claim | 52 |
| 1.416 | PROMESA | 52 |
| 1.417 | Pro Rata Share | 53 |
| 1.418 | PSA Creditors | 53 |
| 1.419 | PSA Restriction Fees | 53 |
| 1.420 | Puerto Rico Investor | 53 |
| 1.421 | QTCB Group | 53 |
| 1.422 | Reduction Percentage | 53 |
| 1.423 | Related Persons | 53 |
| 1.424 | Released Claims | 53 |
| 1.425 | Released Parties | 54 |
| 1.426 | Releasing Parties | 54 |
| 1.427 | Reorganized Commonwealth | 54 |
| 1.428 | Reorganized Debtors | 54 |

**Table of Contents**
**(Cont'd)**

1.429   Reorganized Debtors' By-Laws ....................................................................55
1.430   Restriction Fee Creditors ...........................................................................55
1.431   Retail 2011 CW Bond Claim ......................................................................55
1.432   Retail 2011 CW Series D/E/PIB Bond Claim .............................................55
1.433   Retail 2011 PBA Bond Claim .....................................................................55
1.434   Retail 2012 CW Bond Claim ......................................................................55
1.435   Retail 2012 PBA Bond Claim .....................................................................55
1.436   Retail 2014 CW Bond Claim ......................................................................55
1.437   Retail CW Bond Claims .............................................................................55
1.438   Retail Investor ..........................................................................................55
1.439   Retail PBA Bond Claims ...........................................................................55
1.440   Retail Support Fee ....................................................................................55
1.441   Retail Support Fee Return .........................................................................56
1.442   Retail Vintage CW Bond Claim .................................................................56
1.443   Retail Vintage PBA Bond Claim ................................................................56
1.444   Retired ERS Participant Above-Threshold Claim ........................................56
1.445   Retired ERS Participant Below-Threshold Claim .........................................56
1.446   Retired JRS Participant Above-Threshold Claim .........................................56
1.447   Retired JRS Participant Below-Threshold Claim ..........................................56
1.448   Retired TRS Participant Above-Threshold Claim ........................................56
1.449   Retired TRS Participant Below-Threshold Claim .........................................56
1.450   Retiree .....................................................................................................57
1.451   Retiree Claim ...........................................................................................57
1.452   Retiree Committee ....................................................................................57
1.453   Retiree Committee Plan Support Agreement ..............................................57
1.454   Rum Tax CVI ...........................................................................................57
1.455   Rum Tax CVI Indenture ...........................................................................57
1.456   Sales Tax ..................................................................................................57
1.457   SCC Action ..............................................................................................57
1.458   SEC .........................................................................................................57
1.459   Section 510(b) Subordinated Claim ...........................................................57
1.460   Securities Act ...........................................................................................57
1.461   Solicitation Agent .....................................................................................58
1.462   SPU ........................................................................................................58
1.463   Substitute Measured Tax ...........................................................................58
1.464   Summer Bonus .........................................................................................58
1.465   Syncora ....................................................................................................58
1.466   Syncora Acceleration Price ........................................................................58
1.467   Syncora Certificates ..................................................................................58
1.468   Syncora Commutation Consideration .........................................................58
1.469   Syncora Commutation Treatment ..............................................................58
1.470   Syncora Escrow Account ...........................................................................58
1.471   Syncora Insured Bond Claims ....................................................................58
1.472   Syncora Insured Bonds .............................................................................59

**Table of Contents**
**(Cont'd)**

1.473   Syncora Insurance Policies ..........................................................................59
1.474   Syncora Non-Commutation Treatment.......................................................59
1.475   Syncora Plan Consideration .......................................................................59
1.476   Syncora Treatment ......................................................................................59
1.477   Syncora Trust ..............................................................................................59
1.478   System 2000 ................................................................................................59
1.479   System 2000 Participant Claim ...................................................................59
1.480   Taxable Bond Distributions ........................................................................59
1.481   Taxable Election CW Claims ......................................................................59
1.482   Taxable New GO Bonds ..............................................................................59
1.483   Tax Credit Claims .......................................................................................60
1.484   Tax-Supported Debt ....................................................................................60
1.485   Threshold ....................................................................................................60
1.486   Title III .......................................................................................................60
1.487   Title III Cases .............................................................................................60
1.488   Title III Court ..............................................................................................60
1.489   Total Monthly Benefit .................................................................................60
1.490   TRS ..............................................................................................................61
1.491   Trustee Fiscal Agent ...................................................................................61
1.492   TRS Participant Claim .................................................................................61
1.493   Trust Documentation ...................................................................................61
1.494   Unclaimed Distribution ...............................................................................61
1.495   Underwriter Actions ....................................................................................61
1.496   Unexpired Lease ..........................................................................................61
1.497   Uniformity Litigation ..................................................................................61
1.498   UPR ..............................................................................................................61
1.499   Vintage CW Bond Claim .............................................................................61
1.500   Vintage CW Bond Claim (Ambac) .............................................................62
1.501   Vintage CW Bond Claim (Assured) ............................................................62
1.502   Vintage CW Bond Claim (FGIC) ................................................................62
1.503   Vintage CW Bond Claim (National) ...........................................................62
1.504   Vintage CW Bond Claim (Syncora) ............................................................62
1.505   Vintage CW Bond Claim (Taxable Election) ..............................................62
1.506   Vintage CW Bond Recovery .......................................................................62
1.507   Vintage CW Bonds ......................................................................................63
1.508   Vintage CW Guarantee Bond Claim ...........................................................64
1.509   Vintage CW Guarantee Bond Claim (Ambac) ............................................64
1.510   Vintage CW Guarantee Bond Claim (Assured) ..........................................64
1.511   Vintage CW Guarantee Bond Claim (FGIC) ..............................................64
1.512   Vintage CW Guarantee Bond Claim (National) ..........................................64
1.513   Vintage CW Guarantee Bond Claim (Syncora)...........................................64
1.514   Vintage CW Guarantee Bond Claim (Taxable Election) .............................65
1.515   Vintage CW Guarantee Bond Recovery ......................................................65
1.516   Vintage CW Guarantee Taxable Bond Distribution ....................................65

## Table of Contents
### (Cont'd)

**Page**

1.517   Vintage PBA Bond Claim ................................................65
1.518   Vintage PBA Bond Claim (Ambac) ................................65
1.519   Vintage PBA Bond Claim (Assured) ..............................65
1.520   Vintage PBA Bond Claim (FGIC) ...................................65
1.521   Vintage PBA Bond Claim (National) ..............................65
1.522   Vintage PBA Bond Claim (Syncora) ..............................66
1.523   Vintage PBA Bond Recovery ..........................................66
1.524   Vintage PBA Bonds ..........................................................66
1.525   Vintage Taxable Bond Distribution................................67
1.526   Voting Record Date ..........................................................67
1.527   VTP Payroll Participant:  A person who, based on the current records of ERS and OGP, is receiving payment through the payroll of the Commonwealth or its agencies arising from participation in the Voluntary Transition Programs under Act 70-2010 or Act 211-2015 which allowed certain members to receive pensions or other forms of payment through their former employer's payroll, subject to transition to PayGo upon satisfying necessary age and service eligibility requirements...........................67
1.528   VTP Payroll Participant Claim:  A Claim on account of being a VTP Payroll Participant for payments arising through Act 70-2010 or Act 211-2015 through the payroll of the Commonwealth or its agencies..........................67
1.529   VTP Payroll Participant Above-Threshold Claims:  A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is greater than the Threshold. ........................................67
1.530   VTP Payroll Participant Below-Threshold Claims:  A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is less than or equal to the Threshold. ........................................67
1.531   Other Definitions ............................................................67
1.532   Rules of Interpretation....................................................67

ARTICLE II COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES ...............................................68

2.1      Litigation Resolution.......................................................68
2.2      Allowance of Bond Claims..............................................69
2.3      Releases, Injunctions and Exculpation ...........................69
2.4      Purchase and Sale of Certain ERS Assets.......................69

ARTICLE III PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS .................................................................70

3.1      Administrative Expense Claims ......................................70
3.2      Professional Compensation and Reimbursement Claims ....70
3.3      GO/PBA Consummation Costs........................................70
3.4      AFSCME and AMPR Professional Fees .........................71

**Table of Contents**
**(Cont'd)**

3.5    GO/PBA PSA Restriction Fee ....................................................71
3.6    Retail Support Fee.................................................................72
3.7    ERS Restriction Fee ..............................................................72
3.8    CCDA Consummation Costs ...................................................73
3.9    CCDA Restriction Fee ...........................................................73
3.10   Non-Severability ..................................................................74

ARTICLE IV CLASSIFICATION OF CLAIMS .........................................74

4.1    Claims are classified as follows ..............................................74

ARTICLE V PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
        CLAIMS (CLASS 1)...........................................................77

5.1    Treatment of Vintage PBA Bond Claims ....................................77

ARTICLE VI PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
        CLAIMS (ASSURED) (CLASS 2) ........................................78

6.1    Treatment of Vintage PBA Bond Claims (Assured).......................78

ARTICLE VII PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
        CLAIMS (NATIONAL) (CLASS 3).......................................78

7.1    Treatment of Vintage PBA Bond Claims (National) ......................78

ARTICLE VIII PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
        CLAIMS (AMBAC) (CLASS 4) ...........................................78

8.1    Treatment of Vintage PBA Bond Claims (Ambac) ........................78

ARTICLE IX PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
        CLAIMS (FGIC) (CLASS 5)................................................78

9.1    Treatment of Vintage PBA Bond Claims (FGIC)...........................78

ARTICLE X : Subject to the terms and provisions  of Section 75.4 hereof, on the
        Effective Date, each holder of an Allowed  Vintage PBA Bond Claim
        (FGIC) shall be entiled to receive, in full consideration,  satisfaction,
        release and exchange of such holder's  Allowed Vintage PBA Bond
        Claim (FGIC), such holder's  Pro Rata Share of the Vintage  PBA Bond
        Recovery. ........................................................................78

ARTICLE X PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
        CLAIMS (SYNCORA) (CLASS 6) ........................................79

10.1   Treatment of Vintage PBA Bond Claims (Syncora).......................79

ARTICLE XI PROVISIONS FOR TREATMENT OF RETAIL  VINTAGE PBA
        BOND CLAIMS (CLASS 7) ................................................79

**Table of Contents**
**(Cont'd)**

**Page**

11.1    Treatment of Retail Vintage PBA Bond Claims ...................................................79

ARTICLE XII PROVISIONS FOR TREATMENT OF 2011 PBA BOND CLAIMS
(CLASS 8)................................................................................................79

12.1    Treatment of 2011 PBA Bond Claims ...............................................................79

ARTICLE XIII PROVISIONS FOR TREATMENT OF RETAIL 2011 PBA BOND
CLAIMS (CLASS 9)...............................................................................79

13.1    Treatment of Retail 2011 PBA Bond Claims .....................................................79

ARTICLE XIV PROVISIONS FOR TREATMENT OF 2012 PBA BOND CLAIMS
(CLASS 10)..............................................................................................80

14.1    Treatment of 2012 PBA Bond Claims ...............................................................80

ARTICLE XV PROVISIONS FOR TREATMENT OF RETAIL 2012 PBA BOND
CLAIMS (CLASS 11).............................................................................80

15.1    Treatment of Retail 2012 PBA Bond Claims .....................................................80

ARTICLE XVI PROVISIONS FOR TREATMENT OF PBA/DRA SECURED
CLAIMS (CLASS 12).............................................................................80

16.1    Treatment of PBA/DRA Secured Claims ...........................................................80

ARTICLE XVII PROVISIONS FOR TREATMENT OF PBA GENERAL
UNSECURED CLAIMS (CLASS 13) ...................................................81

17.1    Treatment of PBA General Unsecured Claims ...................................................81

ARTICLE XVIII PROVISIONS FOR TREATMENT OF PBA/DRA UNSECURED
CLAIMS (CLASS 14).............................................................................81

18.1    Treatment of PBA/DRA Unsecured Claims .......................................................81

ARTICLE XIX PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (CLASS 15).............................................................................81

19.1    Treatment of Vintage CW Bond Claims.............................................................81
19.2    Right of Election to Vintage CW Bond Claims (Taxable Election)....................81

ARTICLE XX PROVISIONS FOR TREATMENT OF RETAIL VINTAGE CW
BOND CLAIMS (CLASS 16) ...............................................................82

20.1    Treatment of Retail Vintage CW Bond Claims .................................................82
20.2    Right of Election to Retail Vintage CW Bond Claims (Taxable Election)..........82

ARTICLE XXI PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (ASSURED) (CLASS 17) ......................................................82

**Table of Contents**
**(Cont'd)**

**Page**

    21.1    Treatment of Vintage CW Bond Claims (Assured) ............................................ 82

ARTICLE XXII PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
    CLAIMS (NATIONAL) (CLASS 18) ................................................................ 83

    22.1    Treatment of Vintage CW Bond Claims (National) ......................................... 83

ARTICLE XXIII PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
    CLAIMS (AMBAC) (CLASS 19) .................................................................... 83

    23.1    Treatment of Vintage CW Bond Claims (Ambac) ........................................... 83

ARTICLE XXIV PROVISIONS FOR TREATMENT OF VINTAGE  CW BOND
    CLAIMS (FGIC) (CLASS 20) ......................................................................... 83

    24.1    Treatment of Vintage CW Bond Claims (FGIC) ............................................. 83

ARTICLE XXV PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
    CLAIMS (SYNCORA) (CLASS 21) ................................................................ 83

    25.1    Treatment of Vintage CW Bond Claims (Syncora) ......................................... 83

ARTICLE XXVI PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
    CLAIMS (TAXABLE ELECTION) (CLASS 22) ............................................ 84

    26.1    Treatment of Vintage CW Bond Claims (Taxable Election) .............................. 84

ARTICLE XXVII PROVISIONS FOR TREATMENT OF VINTAGE CW
    GUARANTEE BOND CLAIMS (CLASS 23) .................................................. 84

    27.1    Treatment of Vintage CW Guarantee Bond Claims .......................................... 84
    27.2    Right of Election to Vintage CW Guarantee Bond Claims (Taxable
    Election) ......................................................................................................... 84

ARTICLE XXVIII PROVISIONS FOR TREATMENT OF VINTAGE CW
    GUARANTEE BOND CLAIMS (ASSURED) (CLASS 24) ............................. 84

    28.1    Treatment of Vintage CW Guarantee Bond Claims (Assured) .......................... 84

ARTICLE XXIX PROVISIONS FOR TREATMENT OF VINTAGE CW
    GUARANTEE BOND CLAIMS (NATIONAL) (CLASS 25) .......................... 85

    29.1    Treatment of Vintage CW Guarantee Bond Claims (National) .......................... 85

ARTICLE XXX PROVISIONS FOR TREATMENT OF VINTAGE CW
    GUARANTEE BOND CLAIMS (AMBAC) (CLASS 26) ............................... 85

    30.1    Treatment of Vintage CW Guarantee Bond Claims (Ambac) ........................... 85

ARTICLE XXXI PROVISIONS FOR TREATMENT OF VINTAGE CW
    GUARANTEE BOND CLAIMS (FGIC) (CLASS 27) ..................................... 85

**Table of Contents**
**(Cont'd)**

**Page**

31.1 Treatment of Vintage CW Guarantee Bond Claims (FGIC) .............................. 85

ARTICLE XXXII PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (SYNCORA) (CLASS 28) ............................ 85

32.1 Treatment of Vintage CW Guarantee Bond Claims (Syncora) ........................... 85

ARTICLE XXXIII PROVISIONS FOR TREATMENT OF VINTAGE CW
GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS
29) .................................................................................................................. 86

33.1 Treatment of Vintage CW Guarantee Bond Claims (Taxable Election) ............. 86

ARTICLE XXXIV PROVISIONS FOR TREATMENT OF 2011 CW BOND
CLAIMS (CLASS 30) ...................................................................................... 86

34.1 Treatment of 2011 CW Bond Claims ................................................................. 86
34.2 Right of Election to 2011 CW Bond Claims (Taxable Election) ......................... 86

ARTICLE XXXV PROVISIONS FOR TREATMENT OF RETAIL 2011 CW
BOND CLAIMS (CLASS 31) ........................................................................... 86

35.1 Treatment of Retail 2011 CW Bond Claims ....................................................... 86
35.2 Right of Election to Retail 2011 CW Bond Claims (Taxable Election) .............. 87

ARTICLE XXXVI PROVISIONS FOR TREATMENT OF 2011 CW BOND
CLAIMS (ASSURED) (CLASS 32) .................................................................. 87

36.1 Treatment of 2011 CW Bond Claims (Assured) ................................................. 87

ARTICLE XXXVII PROVISIONS FOR TREATMENT OF 2011 CW BOND
CLAIMS (TAXABLE ELECTION) (CLASS 33) .............................................. 87

37.1 Treatment of 2011 CW Bond Claims (Taxable Election) ................................... 87

ARTICLE XXXVIII PROVISIONS FOR TREATMENT OF 2011 CW
GUARANTEE BOND CLAIMS (CLASS 34) .................................................. 87

38.1 Treatment of 2011 CW Guarantee Bond Claims ................................................. 87
38.2 Right of Election to 2011 CW Guarantee Bond Claims (Taxable Election) ......... 88

ARTICLE XXXIX PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE
BOND CLAIMS (TAXABLE ELECTION) (CLASS 35) ................................... 88

39.1 Treatment of 2011 CW Guarantee Bond Claims (Taxable Election) .................. 88

ARTICLE XL PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB
BOND CLAIMS (CLASS 36) ........................................................................... 88

40.1 Treatment of 2011 CW Series D/E/PIB Bond Claims ........................................ 88

**Table of Contents**

**(Cont'd)**

Page

40.2 Right of Election to 2011 CW Series D/E/PIB Bond Claims (Taxable Election) ...................................................................................................88

ARTICLE XLI PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (ASSURED) (CLASS 37) ......................................................89

41.1 Treatment of 2011 CW Series D/E/PIB Bond Claims (Assured) ........................89

ARTICLE XLII PROVISIONS FOR TREATMENT OF RETAIL 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 38) ............................................................89

42.1 Treatment of Retail 2011 CW Series D/E/PIB Bond Claims .............................89
42.2 Right of Election to Retail 2011 CW Series D/E/PIB Bond Claims (Taxable Election) ...................................................................................................89

ARTICLE XLIII PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (TAXABLE ELECTION) (CLASS 39) ..................................90

43.1 Treatment of 2011 CW Series D/E/PIB Bond Claims (Taxable Election) ...........90

ARTICLE XLIV PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (CLASS 40) ..........................................................................................................90

44.1 Treatment of 2012 CW Bond Claims ................................................................90
44.2 Right of Election to 2012 CW Bond Claims (Taxable Election) ........................90

ARTICLE XLV PROVISIONS FOR TREATMENT OF RETAIL 2012 CW BOND CLAIMS (CLASS 41) ............................................................................................90

45.1 Treatment of Retail 2012 CW Bond Claims ......................................................90
45.2 Right of Election to Retail 2012 CW Bond Claims (Taxable Election) ..............91

ARTICLE XLVI PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (ASSURED) (CLASS 42) ......................................................................................91

46.1 Treatment of 2012 CW Bond Claims (Assured) ...............................................91

ARTICLE XLVII PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 43) ............................................................91

47.1 Provisions for Treatment of 2012 CW Bond Claims (Taxable Election) ............91

ARTICLE XLVIII PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE BOND CLAIMS (CLASS 44) ...................................................................91

48.1 Treatment of 2012 CW Guarantee Bond Claims ...............................................91
48.2 Right of Election to 2012 CW Guarantee Bond Claims (Taxable Election) .........92

ARTICLE XLIX PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 45) ...................................92

**Table of Contents**
**(Cont'd)**

49.1    Treatment of 2012 CW Guarantee Bond Claims (Taxable Election) .................. 92

**ARTICLE L PROVISIONS FOR TREATMENT OF 2014 CW BOND CLAIMS
(CLASS 46)** ............................................................................... 92

50.1    Treatment of 2014 CW Bond Claims ............................................... 92
50.2    Right of Election to 2014 CW Bond Claims (Taxable Election) ......................... 92

**ARTICLE LI PROVISIONS FOR TREATMENT OF RETAIL 2014 CW BOND
CLAIMS (CLASS 47)** ..................................................................... 93

51.1    Treatment of Retail 2014 Bond Claims ............................................ 93
51.2    Right of Election to Retail 2014 CW Bond Claims (Taxable Election) .............. 93

**ARTICLE LII PROVISIONS FOR TREATMENT OF 2014 CW BOND CLAIMS
(TAXABLE ELECTION) (CLASS 48)** ................................................ 93

52.1    Provisions for Treatment of 2014 CW Bond Claims (Taxable Election) ............ 93

**ARTICLE LIII PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE
BOND CLAIMS (CLASS 49)** ........................................................... 94

53.1    Treatment of 2014 CW Guarantee Bond Claims .................................. 94
53.2    Right of Election to 2014 CW Guarantee Bond Claims (Taxable Election) ........ 94

**ARTICLE LIV PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE
BOND CLAIMS (TAXABLE ELECTION) (CLASS 50)** .................................. 94

54.1    Treatment of 2014 CW Guarantee Bond Claims (Taxable Election) .................. 94

**ARTICLE LV PROVISIONS FOR TREATMENT OF ACTIVE AND RETIRED
EMPLOYEE RETIREMENT BENEFIT CLAIMS (CLASS 51A
THROUGH 51L)** ......................................................................... 94

55.1    Treatment of Retired ERS Participant Below-Threshold Claims (Class
51A) ..................................................................................... 94
55.2    Treatment of Retired JRS Participant Below-Threshold Claims (Class
51B) ..................................................................................... 95
55.3    Treatment of Retired TRS Participant Below-Threshold Claims (Class
51C) ..................................................................................... 95
55.4    Treatment of Retired ERS Participant Above-Threshold Claims (Class
51D) ..................................................................................... 95
55.5    Treatment of Retired JRS Participant Above-Threshold Claims (Class
51E) ..................................................................................... 96
55.6    Treatment of Retired TRS Participant Above-Threshold Claims (Class
51F) ..................................................................................... 96
55.7    Treatment of Active ERS Participant Claims (Class 51G) ......................... 96
55.8    Treatment of Active JRS Participant Claims (Class 51H) .......................... 97
55.9    Treatment of Active TRS Participant Claims (Class 51I) ......................... 97

**Table of Contents**
**(Cont'd)**

**Page**

55.10 Treatment of System 2000 Participant Claims (Class 51J) .................................99

55.11 Treatment of VTP Payroll Participant Below-Threshold Claims (Class 51K): .................................................................................................... 100

55.12 Treatment of VTP Payroll Participant Above-Threshold Claims (Class 51K): .................................................................................................... 100

ARTICLE LVI PROVISIONS FOR TREATMENT OF AFSCME CLAIMS (CLASS 52) .................................................................................................... 100

56.1 Treatment of AFSCME Claims ........................................................... 100

ARTICLE LVII PROVISIONS FOR TREATMENT OF DAIRY PRODUCER CLAIMS (CLASS 53) .................................................................................. 101

57.1 Treatment of Dairy Producer Claims .................................................. 101

ARTICLE LVIII PROVISIONS FOR TREATMENT OF CW EMINENT DOMAIN CLAIMS (CLASS 54) ...................................................................... 101

58.1 Treatment of Eminent Domain Claims .............................................. 101

ARTICLE LIX PROVISIONS FOR TREATMENT OF ENERGY INCENTIVE CLAIMS (CLASS 55) .................................................................................. 102

59.1 Treatment of Energy Incentive Claims .............................................. 102

ARTICLE LX PROVISIONS FOR TREATMENT OF MED CENTER CLAIMS (CLASS 56) .................................................................................................... 102

60.1 Treatment of Med Center Claims ....................................................... 102

60.2 Dismissal of Med Center Litigation ................................................... 102

ARTICLE LXI PROVISIONS FOR TREATMENT OF TAX CREDIT CLAIMS (CLASS 57) .................................................................................................... 103

61.1 Treatment of Tax Credit Claims.......................................................... 103

ARTICLE LXII PROVISIONS FOR TREATMENT OF CW GENERAL UNSECURED CLAIMS (CLASS 58) .................................................... 103

62.1 Treatment of CW General Unsecured Claims .................................... 103

62.2 Limitation on Recovery ...................................................................... 104

62.3 GUC Reserve ...................................................................................... 104

ARTICLE LXIII PROVISIONS FOR TREATMENT OF CW/HTA CLAIMS (CLASS 59) .................................................................................................... 104

63.1 Treatment of CW/HTA Claims ........................................................... 104

63.2 Distribution of the CW/HTA Clawback Recovery ............................. 105

**Table of Contents**
**(Cont'd)**

Page

ARTICLE LXIV PROVISIONS FOR TREATMENT OF CW/CONVENTION
          CENTER CLAIMS (CLASS 60) .................................................. 105

    64.1    Treatment of CW/Convention Center Claims ................................ 105

ARTICLE LXV PROVISIONS FOR TREATMENT OF CW/PRIFA RUM TAX
          CLAIMS (CLASS 61) ............................................................ 106

    65.1    Treatment of CW/PRIFA Rum Tax Claims ................................ 106
    65.2    Distribution of the Beneficial Interests in the PRIFA Trust ............... 106
    65.3    : Notwithstanding anything contained in the Plan to the contrary, (a) on
            the Effective Date, the Commonwealth shall take such actions as are
            necessary to deposit (i) the PRIFA Clawback CVI and the Rum Tax CVI,
            and all payments to be made in connection therewith, and (ii) One
            Hundred Ninety-Three Million Five Hundred Thousand Dollars
            ($193,500,000.00) into the PRIFA Trust, each for the benefit of holders of
            PRIFA Bond Claims (including the Monolines), and (b) upon satisfaction
            of the PRIFA Distribution Conditions, cause the distribution of the
            beneficial interests of the PRIFA Trust to holders of PRIFA Bond Claims
            (including the Monolines); provided, however, that the beneficial interests
            in the PRIFA Trust on account of the FGIC Insured PRIFA Bond Claims
            shall be treated and distributed in a manner consistent with the treatment
            of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as
            applicable. ....................................................................... 106

ARTICLE LXVI PROVISIONS FOR TREATMENT OF CW/MBA CLAIMS
          (CLASS 62) ...................................................................... 106

    66.1    Treatment of CW/MBA Claims ............................................. 106

ARTICLE LXVII PROVISIONS FOR TREATMENT OF CW APPROPRIATIONS
          CLAIMS (CLASS 63) ........................................................... 107

    67.1    Treatment of CW Appropriations Claims ................................... 107

ARTICLE LXVIII PROVISIONS FOR TREATMENT OF SECTION 510(b)
          SUBORDINATED CLAIMS (CLASS 64) ..................................... 107

    68.1    Treatment of Section 510(b) Subordinated Claims ......................... 107

ARTICLE LXIX PROVISIONS FOR TREATMENT OF ERS BOND CLAIMS
          (CLASS 65) ...................................................................... 107

    69.1    Treatment of ERS Bond Claims ............................................. 107
    69.2    ERS Private Equity Portfolio ............................................... 107
    69.3    Dismissal of Litigation ...................................................... 108

ARTICLE LXX ................................................................................ 109

**Table of Contents**
**(Cont'd)**

Page

PROVISIONS FOR TREATMENT OF ERS GENERAL UNSECURED CLAIMS
(CLASS 66) ............................................................................................. 109

70.1   Treatment of ERS General Unsecured Claims .................................. 109
70.2   Limitation on Recovery .................................................................... 109

ARTICLE LXXI .......................................................................................... 109

PROVISIONS FOR TREATMENT OF GRACIA GRACIA CLAIMS (CLASS
67) ....................................................................................................... 109
71.1   Treatment of Gracia Gracia Claims ................................................. 109

ARTICLE LXXII  PROVISIONS FOR TREATMENT OF CONVENIENCE
CLAIMS (CLASS 68) ............................................................................ 110

72.1   Treatment of Convenience Claims ................................................... 110

ARTICLE LXXIII  PROVISIONS FOR TREATMENT  OF FEDERAL CLAIMS
(CLASS 69) ........................................................................................... 110

73.1   Treatment of Federal Claims:  On the later to occur of (a) the Effective
Date and (b) the date on which a Federal Claim shall become an Allowed
Claim, the Reorganized Debtors shall (i) in their sole and absolute
discretion,  and in full consideration, satisfaction, release and exchange of
an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal
Claim, in Cash, the full amount of such Allowed Federal Claim, (2) satisfy
and discharge such Allowed Federal Claim in accordance with the terms
and conditions  of such documents evidencing such Allowed Federal
Claims or (3) pay to each holder of an Allowed Federal Claim, in Cash,
the full amount of such Allowed Federal Claim in forty (40) equal amount
installments,  with such payments commencing on the third (3rd)
anniversary of the Effective Date and continuing  on each anniversary
thereafter, or (ii) satisfy and discharge such allowed Federal Claims on
such terms as the Reorganized Debtors and the holder of any such
Allowed Federal Claim shall agree. ................................................... 110

ARTICLE LXXIV PROVISIONS REGARDING NEW GO BONDS, CVIS AND
ADDITIONAL INDEBTEDNESS .................................................... 110

74.1   Issuance and Distribution of the New GO Bonds ............................. 110
74.2   Issuance and Distribution of the CVIs .............................................. 114
74.3   Tax-Exempt Treatment of the New GO Bonds ................................. 115
74.4   Comprehensive Cap on All Net Tax-Supported Debt........................ 116
74.5   Adoption and Maintenance of a Debt Management Policy ................ 117

ARTICLE LXXV PROVISIONS REGARDING ASSURED INSURED BONDS,
NATIONAL INSURED BONDS, SYNCORA INSURED BONDS,
AMBAC INSURED BONDS AND FGIC INSURED BONDS....................... 118

**Table of Contents**
**(Cont'd)**

**Page**

| | | |
|---|---|---|
| 75.1 | Treatment of Assured Insured Bond Claims | 118 |
| 75.2 | Treatment of National Insured Bond Claims | 121 |
| 75.3 | Treatment of Syncora Insured Bond Claims | 123 |
| 75.4 | Treatment of FGIC Insured Bond Claims | 125 |
| (a) | FGIC Insured Bond Claims Treatment: | 125 |
| 75.5 | Treatment of Ambac Insured Bond Claims:  In the even that Classes 4, 19, and 26 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all Ambac Insurance Policies and related agreements related to Ambac Insured Bonds are in full force and effect, with no outstanding payments defaults by Ambac with respect to such Ambac Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of Ambac Insured Bond Claims shall receive the following treatments, which treatments shall be selected by the Ambac, in its sole and absolute discretion, not later than twenty-one (21) days prior to the Ballot Date: | 126 |

ARTICLE LXXVI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 129

| | | |
|---|---|---|
| 76.1 | Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases | 129 |
| 76.2 | Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases | 130 |
| 76.3 | Inclusiveness | 130 |
| 76.4 | Cure of Defaults | 130 |
| 76.5 | Insurance Policies | 130 |
| 76.6 | Rejection Damage Claims | 131 |
| 76.7 | Indemnification and Reimbursement Obligations | 131 |
| 76.8 | Nonoccurrence of Effective Date | 131 |
| 76.9 | Reservation of Rights | 131 |
| 76.10 | Collective Bargaining Agreements | 131 |

ARTICLE LXXVII PROVISIONS GOVERNING DISTRIBUTIONS ... 131

| | | |
|---|---|---|
| 77.1 | Time and Manner of Distribution | 131 |
| 77.2 | Timeliness of Payments | 133 |
| 77.3 | Distributions by the Disbursing Agent | 133 |
| 77.4 | Manner of Payment under the Plan | 133 |
| 77.5 | Delivery of Distributions | 133 |
| 77.6 | Cancellation of Notes, Instruments, Certificates, and Other Documents | 133 |
| 77.7 | Undeliverable/Reserved Distributions | 134 |
| 77.8 | Withholding and Reporting Requirements | 135 |
| 77.9 | Time Bar to Cash Payments | 135 |
| 77.10 | Distributions After Effective Date | 135 |
| 77.11 | Setoffs | 136 |

**Table of Contents**
**(Cont'd)**

**Page**

77.12 Allocation of Plan Distributions Between Principal and Interest....................... 136
77.13 Payment of Trustee Fees and Expenses ........................................................... 136
77.14 Beneficial Owner ............................................................................................. 136
77.15 Value of Distributions ...................................................................................... 137

ARTICLE LXXVIII AVOIDANCE ACTIONS TRUST ......................................................... 137

78.1 Execution of Avoidance Actions Trust Agreement .......................................... 137
78.2 Purpose of the Avoidance Actions Trust .......................................................... 137
78.3 Avoidance Actions Trust Assets ....................................................................... 137
78.4 Administration of the Avoidance Actions Trust................................................ 138
78.5 The Avoidance Actions Trustee ........................................................................ 138
78.6 Role of the Avoidance Actions Trustee ............................................................ 138
78.7 Avoidance Actions Trustee's Tax Power for Debtors ...................................... 138
78.8 Transferability of Avoidance Actions Trust Interests ...................................... 138
78.9 Cash.................................................................................................................... 138
78.10 Distribution of Avoidance Actions Trust Assets .............................................. 139
78.11 Funding, Costs and Expenses of the Avoidance Actions Trust ........................ 139
78.12 Compensation of the Avoidance Actions Trustee ............................................. 139
78.13 Retention of Professionals/Employees by the Avoidance Actions Trustee ........ 139
78.14 Federal Income Tax Treatment of the Avoidance Actions Trust ....................... 140
78.15 Indemnification of Avoidance Actions Trustee and Members of
        Avoidance Actions Trust Bond ........................................................................ 142

ARTICLE LXXIX PROSECUTION AND EXTINGUISHMENT OF CLAIMS
        HELD BY THE DEBTORS ........................................................................ 143

79.1 Prosecution of Claims ...................................................................................... 143

ARTICLE LXXX ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
        REJECTION BY ONE OR MORE CLASSES OF CLAIMS ........................... 143

80.1 Impaired Classes to Vote................................................................................... 143
80.2 Acceptance by Class of Creditors .................................................................... 143
80.3 Cramdown.......................................................................................................... 143

ARTICLE LXXXI RIGHTS AND POWERS OF DISBURSING AGENT ............................ 144

81.1 Exculpation........................................................................................................ 144
81.2 Powers of the Disbursing Agent........................................................................ 144
81.3 Fees and Expenses Incurred From and After the Effective Date ...................... 144

ARTICLE LXXXII PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
        AND CLAIMS SUBJECT TO ACR PROCEDURES.................................... 144

82.1 Objections to Claims; Prosecution of Disputed Claims ................................... 144
82.2 Estimation of Claims.......................................................................................... 145
82.3 Payments and Distributions on Disputed Claims ............................................. 146

**Table of Contents**
**(Cont'd)**

**Page**

82.4    Authority to Amend Lists of Creditors ............................................. 146

82.5    Non-Accrual of Interest.................................................................. 146

82.6    Disallowance of Claims.................................................................. 147

82.7    Claims Subject to ACR Procedures: To the extent not already transferred as of the Effective Date in accordance with the terms and conditions of the ACR Order, the Debtors or the Reorganized Debtors, as the case may be, shall transfer Claims in accordance with the terms and conditions of the ACR Order, and, upon transfer, all such Claims shall (a) be reconciled pursuant to the applicable regulatory and administrative procedures of the Debtors and the Reorganized Debtors, as the case may be, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the Plan, shall not be included in CW General Unsecured Claims to be satisfied from the CW GUC Recovery or Convenience Claims. Notwithstanding the foregoing, (y) the Oversight Board may remove a claim from the ACR process in the event that it was improperly transferred into the ACR process because it did not qualify in accordance with the terms and provisions of the ACR Order, including, without limitation, bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the Plan) and (z) claims that are eligible to be transferred to or administered through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 54, Class 58, Class 66, or Class 68 under the Plan and shall be administered through the ACR process, in accordance with the terms of the ACR Order and subsections (a) and (b) of this Section 82.7. .......................................................... 147

ARTICLE LXXXIII GOVERNANCE AND PROVISIONS REGARDING PENSION RESERVE ..................................................... 147

83.1    Formation and Responsibilities of the Pension Reserve ................................... 147

83.2    Funding of the Pension Reserve Trust.............................................................. 147

83.3    Non-Impairment Covenant .............................................................................. 148

ARTICLE LXXXIV IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN AND NOT IMPAIRED BY THE PLAN........................................ 148

84.1    Impaired Classes............................................................................................. 148

84.2    Unimpaired Class............................................................................................ 148

ARTICLE LXXXV CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN........................................................................................ 149

85.1    Conditions Precedent to Confirmation of the Plan ........................................... 149

85.2    Waiver of Conditions Precedent to Confirmation ............................................ 150

ARTICLE LXXXVI CONDITIONS PRECEDENT TO THE EFFECTIVE DATE................. 150

**Table of Contents**
**(Cont'd)**

**Page**

| | | |
|---|---|---|
| 86.1 | Conditions Precedent to the Effective Date | 150 |
| 86.2 | Waiver of Conditions Precedent | 154 |
| 86.3 | Effect of Non-Occurrence of Conditions to Effective Date | 154 |

ARTICLE LXXXVII  MODIFICATION, REVOCATION, OR WITHDRAWAL OF
THE PLAN ............... 154

| | | |
|---|---|---|
| 87.1 | Modification of Plan | 154 |
| 87.2 | Revocation or Withdrawal | 154 |
| 87.3 | Amendment of Plan Documents | 155 |
| 87.4 | No Admission of Liability | 155 |

ARTICLE LXXXVIII  CORPORATE GOVERNANCE AND  MANAGEMENT OF
REORGANIZED DEBTORS ............... 155

| | | |
|---|---|---|
| 88.1 | Corporate Action | 155 |
| 88.2 | Dissolution of ERS | 156 |
| 88.3 | Officers of Reorganized Debtors | 156 |
| 88.4 | PBA and CCDA Governance Structure | 156 |

ARTICLE LXXXIX  PROVISIONS REGARDING OVERSIGHT BOARD AND
COMPLIANCE WITH PROMESA ............... 156

| | | |
|---|---|---|
| 89.1 | Effect of Confirmation | 156 |
| 89.2 | Ongoing Role of the Oversight Board | 156 |
| 89.3 | Preemption of Laws | 156 |

ARTICLE XC PROVISIONS REGARDING COMMITTEES ............... 157

| | | |
|---|---|---|
| 90.1 | Dissolution of Committees | 157 |

ARTICLE XCI RETENTION OF JURISDICTION ............... 157

| | | |
|---|---|---|
| 91.1 | Retention of Jurisdiction | 157 |

ARTICLE XCII MISCELLANEOUS PROVISIONS ............... 159

| | | |
|---|---|---|
| 92.1 | Title to Assets | 159 |
| 92.2 | Discharge and Release of Claims and Causes of Action | 160 |
| 92.3 | Injunction on Claims | 162 |
| 92.4 | Integral to Plan | 162 |
| 92.5 | Releases by the Debtors and Reorganized Debtors | 162 |
| 92.6 | Injunction Related to Releases | 163 |
| 92.7 | Exculpation | 163 |
| 92.8 | Appointments Related Litigation/Uniformity Litigation | 165 |
| 92.9 | Bar Order | 165 |
| 92.10 | No Waiver | 166 |
| 92.11 | Supplemental Injunction | 166 |
| 92.12 | Post-Effective Date Fees and Expenses | 167 |

**Table of Contents**
**(Cont'd)**

**Page**

| | | |
|---|---|---|
| 92.13 | Securities Act Exemption | 167 |
| 92.14 | Severability | 167 |
| 92.15 | Governing Law | 167 |
| 92.16 | Closing Case | 168 |
| 92.17 | Section Headings | 168 |
| 92.18 | Inconsistencies | 168 |
| 92.19 | Document Retention | 168 |
| 92.20 | Immediate Binding Effect | 168 |
| 92.21 | Additional Documents | 168 |
| 92.22 | Reservation of Rights | 169 |
| 92.23 | Successors and Assigns | 169 |
| 92.24 | Notices | 169 |
| 92.25 | Term of Injunctions or Stays | 171 |
| 92.26 | Entire Agreement | 171 |
| 92.27 | Plan Supplement | 171 |

The Financial Oversight and Management Board for Puerto Rico, as Title III representative of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority pursuant to Section 315(b) of the *Puerto Rico Oversight, Management and Economic Stability Act*, hereby proposes the following joint plan of adjustment.

# ARTICLE I

# DEFINITIONS

As used in the Plan, the following terms have the respective meanings set forth below and are equally applicable to the singular and plural of the terms defined:

1.1     **2011 CW Bond Claim:** A Claim against the Commonwealth on account of 2011 CW Bonds, other than a 2011 CW Bond Claim (Assured) or a Retail 2011 CW Bond Claim.

1.2     **2011 CW Bond Claim (Assured):** A Claim against the Commonwealth on account of 2011 CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.3     **2011 CW Bond Claim (Taxable Election):** A 2011 CW Bond Claim or Retail 2011 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Bond Claim shall be a 2011 CW Bond Claim (Taxable Election) up to such 2011 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 CW Bond Claim.

1.4     **2011 CW Bond Recovery:** The aggregate recovery by holders of Allowed 2011 CW Bond Claims, Allowed 2011 CW Bond Claims (Assured), and Allowed Retail 2011 CW Bond Claims on account of any such Claims, consisting of (a) One Hundred Forty-Eight Million Eight Hundred Thirty-Three Thousand Seven Hundred Thirty Dollars and Ninety-Five Cents ($148,833,730.95) in Cash, (b) One Hundred Seventy-Nine Million One Hundred Ninety-Three Thousand Four Hundred Twenty-Five Dollars ($179,193,425.00) in original principal amount of New GO CIBs, (c) Eleven Million Eight Hundred Sixty-Four Thousand Five Hundred Ten Dollars and Ninety-Five Cents ($11,864,510.95) in original principal amount of New GO 5.375% CABs, (d) Seven Million Seven Hundred Twenty-Eight Thousand Three Hundred Sixty Dollars and Thirty-Five Cents ($7,728,360.35) in original principal amount of New GO 5.0% CABs, and (e) two and four hundred seventy-nine one thousandths percent (2.479%) of the GO CVIs.

1.5     **2011 CW Bonds:** Collectively, (a) the Public Improvement Refunding Bonds, Series 2011 C, issued by the Commonwealth in the original principal amount of Four Hundred Forty-Two Million Fifteen Thousand Dollars ($442,015,000.00), and (b) Notas de Ahorro issued in 2011 in the aggregate outstanding principal amount of Fifty-Three Thousand Eight Hundred Dollars ($53,800.00).

1

1.6      **2011 CW Guarantee Bond Claim:**  A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation, or resolution of the Commonwealth Legislature, of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2011 up to and including December 31, 2011, and (b) the 2011 PBA Bonds; provided, however, that, solely for purposes of distribution in accordance with, but not voting with respect to, the Plan, the amount of a holder's 2011 CW Guarantee Bond Claim with respect to the Commonwealth's guarantee of such 2011 PBA Bond Claim shall be calculated as the amount of such holder's 2011 PBA Bond Claim minus the amount of such holder's 2011 PBA Bond Recovery.

1.7      **2011 CW Guarantee Bond Claim (Taxable Election):**  A 2011 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Guarantee Bond Claim shall be a 2011 CW Guarantee Bond Claim (Taxable Election) up to such 2011 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 CW Guarantee Bond Claim.

1.8      **2011 CW Guarantee Bond Recovery**:  The aggregate recovery by holders of Allowed 2011 CW Guarantee Bond Claims, consisting of (a) Three Hundred Twenty-Three Million Five Hundred Twenty-Three Thousand Nine Hundred Two Dollars and Fifty Cents ($323,523,902.50) in Cash, (b) Three Hundred Eighty-Nine Million Five Hundred Seventeen Thousand Five Hundred Ninety-Two Dollars ($389,517,592.00) in original principal amount of New GO CIBs, (c) Twenty-Five Million Seven Hundred Ninety Thousand Two Hundred Eight Dollars and Forty-Six Cents ($25,790,208.46) in original principal amount of New GO 5.375% CABs, (d) Sixteen Million Seven Hundred Ninety-Nine Thousand Three Hundred Forty-Six Dollars and Seventy-Seven Cents ($16,799,346.77) in original principal amount of New GO 5.0% CABs, and (e) seven and five hundred fifty-two one thousandths percent (7.552%) of the GO CVIs.

1.9      **2011 CW Guarantee Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 39.1 hereof.

1.10     **2011 CW Series D/E/PIB Bond Claim:**  A Claim against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds, other than a 2011 CW Series D/E/PIB Bond Claim (Assured) or a Retail 2011 CW Series D/E/PIB Bond Claim.

1.11     **2011 CW Series D/E/PIB Bond Claim (Assured):**  A Claim against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market policy.

1.12     **2011 CW Series D/E/PIB Bond Claim (Taxable Election):**  A 2011 CW Series D/E/PIB Bond Claim or Retail 2011 CW Series D/E/PIB Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution;

2

_provided_, _however_, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Series D/E/PIB Bond Claim shall be a 2011 CW Series D/E/PIB Bond Claim (Taxable Election) up to such 2011 CW Series D/E/PIB Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 Series D/E/PIB CW Bond Claim.

1.13     **2011 CW Series D/E/PIB Bond Recovery:** The aggregate recovery by holders of Allowed 2011 CW Series D/E/PIB Bond Claims, Allowed 2011 CW Series D/E/PIB Bond Claims (Assured) and Allowed Retail 2011 CW Series D/E/PIB Bond Claims on account of such Claims, consisting of (a) Two Hundred Eleven Million Three Hundred Fifty-Five Thousand Thirty-Five Dollars and Seventy-Four Cents ($211,355,035.74) in Cash, (b) Two Hundred Fifty-Four Million Four Hundred Sixty-Eight Thousand Seventy-Four Dollars ($254,468,074.00) in original principal amount of New GO CIBs, (c) Sixteen Million Eight Hundred Forty-Eight Thousand Four Hundred Ninety-Three Dollars and Eighty-Four Cents ($16,848,493.84) in original principal amount of New GO 5.375% CABs, (d) Ten Million Nine Hundred Seventy-Four Thousand Eight Hundred Fifty Dollars and Thirty Cents ($10,974,850.30) in original principal amount of New GO 5.0% CABs, and (e) three and five hundred fourteen one thousandths percent (3.514%) of the GO CVIs.

1.14     **2011 CW Series D/E/PIB Bonds:** Collectively, (a) the Public Improvement Bonds of 2011, issued by the Commonwealth in the original principal amount of Three Hundred Four Million Dollars ($304,000,000.00), (b) the Public Improvement Refunding Bonds, Series 2011D, issued by the Commonwealth in the original principal amount of Fifty-Two Million One Hundred Ninety Thousand Dollars ($52,190,000.00), and (c) the Public Improvement Refunding Bonds, Series 2011E, issued by the Commonwealth in the original principal amount of Two Hundred Forty-Five Million Nine Hundred Fifteen Thousand Dollars ($245,915,000.00).

1.15     **2011 CW Series D/E/PIB Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 40.1 hereof.

1.16     **2011 CW Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2011 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 34.1 hereof.

1.17     **2011 PBA Bond Claim:** A Claim against PBA on account of the 2011 PBA Bonds, other than a Retail 2011 PBA Bond Claim.

1.18     **2011 PBA Bond Recovery:** The aggregate recovery by holders of Allowed 2011 PBA Bond Claims and Allowed Retail 2011 PBA Bond Claims totaling Three Hundred Six Million Seven Hundred Sixty-Eight Thousand Nine Hundred Eleven Dollars and Seventy-Two Cents ($306,768,911.72) in Cash.

1.19     **2011 PBA Bonds:** Collectively, (a) the Government Facilities Revenue Bonds, Series R, (Qualified School Construction Bonds), issued by PBA in the original principal amount of Seven Hundred Fifty-Six Million Four Hundred Forty-Nine Thousand Dollars

3

($756,449,000.00), (b) the Government Facilities Revenue Bonds, Series S, issued by PBA in the original principal amount of Three Hundred Three Million Nine Hundred Forty-Five Thousand Dollars ($303,945,000.00), and (c) the Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds), issued by PBA in the original principal amount of One Hundred Twenty-One Million Five Hundred Twenty-Eight Thousand Dollars ($121,528,000.00), the repayment of which is guaranteed by the Commonwealth.

1.20 **2012 CW Bond Claim:** A Claim against the Commonwealth on account of 2012 CW Bonds, other than a 2012 CW Bond Claim (Assured) or a Retail 2012 CW Bond Claim.

1.21 **2012 CW Bond Claim (Assured):** A Claim against the Commonwealth on account of 2012 CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy**.**

1.22 **2012 CW Bond Claim (Taxable Election):** A 2012 CW Bond Claim and Retail 2012 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2012 CW Bond Claim shall be a 2012 CW Bond Claim (Taxable Election) up to such 2012 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2012 CW Bond Claim.

1.23 **2012 CW Bond Recovery**: The aggregate recovery by holders of Allowed 2012 CW Bond Claims, Allowed 2012 CW Bond Claims (Assured), and Allowed Retail 2012 CW Bond Claims on account of any such Claims, consisting of (a) Nine Hundred Nine Million Nine Hundred Twelve Thousand Six Hundred Seventy-Nine Dollars and Seventy-Three Cents ($909,912,679.73) in Cash, (b) One Billion Ninety-Five Million Five Hundred Twenty Thousand Two Hundred Seventy-Seven Dollars ($1,095,520,277.00) in original principal amount of New GO CIBs, (c) Seventy-Two Million Five Hundred Thirty-Five Thousand Ninety-Six Dollars and Ninety-Six Cents ($72,535,096.96) in original principal amount of New GO 5.375% CABs, (d) Forty-Seven Million Two Hundred Forty-Eight Thousand Two Hundred Fifty-One Dollars ($47,248,251.00) in original principal amount of New GO 5.0% CABs, and (e) fifteen and one hundred fifty-seven one thousandths percent (15.157%) of the GO CVIs.

1.24 **2012 CW Bonds:** Collectively, (a) the Public Improvement Refunding Bonds, Series 2012 A, issued by the Commonwealth in the original principal amount of Two Billion Three Hundred Eighteen Million One Hundred Ninety Thousand Dollars ($2,318,190,000.00), (b) the Public Improvement Refunding Bonds, Series 2012 B, issued by the Commonwealth in the original principal amount of Four Hundred Fifteen Million Two Hundred Seventy Thousand Dollars ($415,270,000.00), (c) the GSA Helicopter Loan, (d) Hacienda loans (Loan ID Nos. 200017-215-001-003-47, 200017-215-001-003-48, 200017-215-001-003-53 and 200017-215-001-003-56), which, as of the Commonwealth Petition Date, were in the aggregate outstanding principal amount of One Hundred Sixty-Nine Million Four Hundred Thirty-Eight Thousand Thirty-Seven Dollars and Seventy-Six Cents ($169,438,037.76) and (e) Notas de Ahorro issued in 2012 in the outstanding principal amount of Two Million Five Hundred Thirty-Three Thousand Fifty Dollars ($2,533,050.00).

1.25    **2012 CW Guarantee Bond Claim:**  A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation or resolution of the Commonwealth Legislature, of (a) an affiliate, agency or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2012 up to and including December 31, 2013, and (b) the 2012 PBA Bonds; provided, however, that, solely for purposes of distribution under, but not voting with respect to, the Plan, the amount of a holder's 2012 CW Guarantee Bond Claim in respect of the Commonwealth's guarantee of such 2012 PBA Bonds shall be measured as the amount of such holder's 2012 PBA Bond Claim minus the amount of such holder's PBA Bond Distribution on account of 2012 PBA Bonds.

1.26    **2012 CW Guarantee Bond Claim (Taxable Election):**  A 2012 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2012 CW Guarantee Bond Claim shall be a 2012 CW Guarantee Bond Claim (Taxable Election) up to such 2012 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2012 CW Guarantee Bond Claim.

1.27    **2012 CW Guarantee Bond Recovery**: The aggregate recovery by holders of Allowed 2012 CW Guarantee Bond Claims, consisting of (a) One Hundred Forty-Nine Million Seven Hundred Thousand Twenty-Seven Dollars and Twenty-Four Cents ($149,700,027.24) in Cash, (b) One Hundred Eighty Million Two Hundred Thirty-Six Thousand Four Hundred Thirty-Four Dollars ($180,236,434.00) in original principal amount of New GO CIBs, (c) Eleven Million Nine Hundred Thirty-Three Thousand Five Hundred Sixty-Nine Dollars and Fifty-Four Cents ($11,933,569.54) in original principal amount of New GO 5.375% CABs, (d) Seven Million Seven Hundred Seventy-Three Thousand Three Hundred Forty-Four Dollars and Thirty Cents ($7,773,344.30) in original principal amount of New GO 5.0% CABs, and (e) three and five hundred ninety-four one thousandths percent (3.594%) of the GO CVIs.

1.28    **2012 CW Guarantee Taxable Bond Distribution**: The distribution to be made to each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 49.1 hereof.

1.29    **2012 CW Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed 2012 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 46.1 hereof.

1.30    **2012 PBA Bond Claim:**  A Claim against PBA on account of 2012 PBA Bonds, other than a Retail 2012 PBA Bond Claim.

1.31    **2012 PBA Bond Recovery:**  The aggregate recovery by holders of Allowed 2012 PBA Bond Claims, and Allowed Retail 2012 PBA Bond Claims on account of such Claims, One Hundred Fifty-Four Million Eight Hundred Ninety-Nine Thousand Nine Hundred Two Dollars and Twenty-Three Cents ($154,899,902.23) in Cash.

1.32     **2012 PBA Bonds:** Collectively, the Government Facilities Revenue Refunding Bonds, Series U, issued by PBA in the original principal amount of Five Hundred Eighty-Two Million Three Hundred Forty-Five Thousand Dollars ($582,345,000.00).

1.33     **2014 CW Bond Claim:** A Claim against the Commonwealth on account of the 2014 CW Bonds, other than a Retail 2014 CW Bond Claim.

1.34     **2014 CW Bond Claim (Taxable Election):** A 2014 CW Bond Claim and Retail 2014 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2014 CW Bond Claim shall be a 2014 CW Bond Claim (Taxable Election) up to such 2014 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2014 CW Bond Claim.

1.35     **2014 CW Bond Recovery:** The aggregate recovery by holders of Allowed 2014 CW Bond Claims, Allowed 2014 CW Guarantee Bond Claims and Allowed Retail 2014 CW Bond Claims on account of any such Claims, consisting of (a) One Billion Two Hundred Thirteen Million Four Hundred Seventy-Eight Thousand Eight Hundred Seventy-Seven Dollars and Thirty-Five Cents ($1,213,478,877.35) in Cash, (b) One Billion Four Hundred Sixty-One Million Nine Thousand One Hundred Twelve Dollars ($1,461,009,112.00) in original principal amount of New GO CIBs, (c) Ninety-Six Million Seven Hundred Thirty-Four Thousand Three Hundred Forty-Six Dollars ($96,734,346.00) in original principal amount of New GO 5.375% CABs, (d) Sixty-Three Million Eleven Thousand Two Hundred Seventy Dollars and Ninety-One Cents ($63,011,270.91) in original principal amount of New GO 5.0% CABs, and (e) twenty and two hundred sixty-six one thousandths percent (20.266%) of the GO CVIs.

1.36     **2014 CW Bonds:** Collectively, the General Obligation Bonds of 2014, Series A, issued by the Commonwealth in the original principal amount of Three Billion Five Hundred Million Dollars ($3,500,000,000.00).

1.37     **2014 CW Guarantee Bond Claim:** A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation or resolution of the Commonwealth Legislature, of (a) an affiliate, agency or instrumentality, which guarantee was executed, delivered or enacted during the period from January 1, 2014 up to, but not including, the Commonwealth Petition Date, (b) the Ports bond, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of Two Hundred Twenty-Five Million Five Hundred Thirty-Three Thousand Seven Hundred Dollars and Forty-Five Cents ($225,533,700.45), and (c) PRIFA BANs, Series 2015, which, as of the Commonwealth Petition Date, were in the outstanding principal amount of Seventy-Eight Million One Hundred Forty-Five Thousand Dollars ($78,145,000.00).

1.38     **2014 CW Guarantee Bond Claim (Taxable Election):** A 2014 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in

excess of the Maximum Taxable Bond Election Amount, such 2014 CW Guarantee Bond Claim shall be a 2014 CW Guarantee Bond Claim (Taxable Election) up to such 2014 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2014 CW Guarantee Bond Claim.

1.39 **2014 CW Guarantee Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 54.1 hereof.

1.40 **2014 CW Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2014 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 52.1 hereof.

1.41 **5.5% SUT:** The present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

1.42 **AAFAF:** Autoridad de Asesoría Financiera y Agencia Fiscal, a public corporation and instrumentality of the Commonwealth, whose name in English is the Puerto Rico Fiscal Agency and Financial Advisory Authority.

1.43 **ACR Order:** That certain Order (A) Authorizing Administrative Reconciliation of Claims, (B) Approving Additional Form of Notice, and (C) Granting Related Relief, dated March 12, 2020 [Case. No. 17-3283-LTS, ECF No. 12274].

1.44 **Act 106:** Act 106 of 2017, which created the pay-as-you-go pension system known as "PayGo" and established a defined contribution retirement system to replace the retirement benefit plan pursuant to Act No. 12 of October 19, 1954, as amended, Act 3-2013, as amended, and Act 160-2013, as amended.

1.45 **Act 106 Board:** The board created in accordance with Act 106.

1.46 **Active and Retired Employee Benefit Claim:** A Retired ERS Participant Below-Threshold Claim, a Retired JRS Participant Below-Threshold Claim, a Retired TRS Participant Below-Threshold Claim, a Retired ERS Participant Above-Threshold Claim, a Retired JRS Participant Above-Threshold Claim, a Retired TRS Participant Above-Threshold Claim, an Active ERS Participant Claim, an Active JRS Participant Claim, an Active TRS Participant Claim, a System 2000 Participant Claim, a VTP Payroll Participant Below-Threshold Claim, and a VTP Payroll Participant Above-Threshold Claim.

1.47 **Active ERS Participant Claim:** An ERS Participant Claim held by an Active Participant, expressly excluding, however, any Participant benefitting from the provisions of either Act 70-2010 or Act 211-2015.

1.48 **Active JRS Participant Claim:** A JRS Participant Claim held by an Active Participant.

1.49 **Active Participant:** A Participant that is not a Retiree.

1.50     **Active TRS Participant Claim:**  A TRS Participant Claim held by an Active Participant.

1.51     **Administrative Claim Bar Date:**  Unless otherwise ordered by the Title III Court, the date established by the Title III Court and set forth in the Confirmation Order as the last day to file proof of Administrative Expense Claims, which date shall be no more than ninety (90) days after the Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Title III Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim or (b) is a Professional Claim.

1.52     **Administrative Expense Claim:**  A Claim against the Debtors or their Assets constituting a cost or expense of administration of the Title III Cases asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code arising during the period up to and including the Effective Date, and otherwise complying with applicable Puerto Rico law, including, without limitation, subject to the occurrence of the Effective Date, and except as provided in Section 3.5 hereof, Consummation Costs and PSA Restriction Fees; provided, however, that, under no circumstances shall an Administrative Expense Claim include the PBA Administrative Expense Claim.

1.53     **ADR Order:**  That certain Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief, dated April 1, 2020 [Case. No. 17-3283-LTS, ECF No. 12576].

1.54     **ADR Procedures:**  The alternative dispute resolution procedures authorized pursuant to the ADR Order.

1.55     **Affiliate:**  With respect to any specified Entity, any other Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

1.56     **AFSCME:**  American Federation of State, County and Municipal Employees, for itself and on behalf of its two local chapters, SPU, AFSCME Council 95 and Capitulo de Retirados de SPU and their fourteen affiliated local unions in Puerto Rico.

1.57     **AFSCME CBAs:**  Those certain collective bargaining agreements between AFSCME and the Commonwealth, and listed on Exhibit "G" hereto.

1.58     **AFSCME Claims:**  A Claim arising from or related to the AFSCME CBAs.

1.59     **AFSCME Plan Support Agreement:**  That certain Plan Support Agreement, dated as of June 7, 2019, by and among the Oversight Board, the Commonwealth and AFSCME, as may be amended from time to time.

1.60     **AFSCME Term Sheet:**  The term sheet annexed as Exhibit  "A" to the AFSCME Plan Support  Agreement.

1.61     **Allowed:**  With respect to any Claim,  such Claim or portion  thereof (a) proof of which was filed on or before the applicable  Bar Date or (b) if no proof of Claim has been timely filed, which has been or hereafter is listed by the Debtors in the List of Creditors and is not listed thereon as "disputed",  "contingent",  or "unliquidated"  or (c) allowed pursuant to (i) section 502(h) of the Bankruptcy Code, applicable  to the Title III Case pursuant to Section 301 of PROMESA, (ii) the terms of the Plan or (iii) a Final Order; provided,  however, that, with respect to any Claim described in clause (a) or (b) above, such Claim  shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable  period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection  has been interposed  and such Claim has been allowed in whole or in part by a Final Order. For purposes of determining  the amount of an "Allowed Claim" with respect to distributions  within a Class, there shall be deducted therefrom an amount equal to the amount of any, original issue discount not accrued as of the date immediately  prior to the Commonwealth Petition Date and any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable  bankruptcy and non-bankruptcy law. Notwithstanding  anything to the contrary herein (x) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Title III Court shall not be considered "Allowed" hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the Plan, "Allowed"  shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, and (z) "Allowed"  shall not include any Claim  subject to disallowance  in accordance with section 502(d) of the Bankruptcy Code.

1.62     **Allowed Claim:**  A Claim,  to the extent it is or has become Allowed.

1.63     **Ambac:**  Ambac Assurance Corporation  or its successor or designee.

1.64     **Ambac Action:**  The litigation  styled Ambac Assurance Corp. v. Merrill  Lynch, Pierce, Fenner & Smith Inc., et al., currently  pending  in the Estado Libre  Asociado de Puerto Rico, Sala Superior de San Juan, Civil  No. SJ2020CV01505.

1.65     **Ambac Certificates:**  The certificate(s) or receipt(s) to be issued by Ambac to beneficial holders of GO Bonds which are deposited into the Ambac Trust.

1.66     **Ambac Commutation Consideration:**  A combination  of some or all of the following  selected at Ambac's sole discretion no later than twenty-one (21) days prior to the Ballot Date: (a) some or all of a holder's Pro Rata Share of the Ambac Plan Consideration; (b) a percentage,  to be determined at Ambac's sole discretion,  of the Consummation  Costs and/or the PSA Restriction  Fee allocable  to Ambac in accordance with the terms and provisions  of Article III hereof; and (c) Cash in an amount to be determined by Ambac in its sole discretion.

1.67     **Ambac Commutation Treatment:**  The treatment set forth in Section 75.5(a) hereof.

1.68     **Ambac CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from the HTA Bonds insured by Ambac.

1.69     **Ambac Escrow Account:** A single escrow account that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, as the case may be, for the benefit of the beneficial holders of Ambac Insured Bonds whose Ambac Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.70     **Ambac Insured Bond Claims:** Collectively, the Claims against the Commonwealth or PBA, as applicable, arising from the Ambac Insured Bonds, including, any Vintage CW Bond Claims (Ambac), Vintage CW Guarantee Bond Claims (Ambac), and Vintage PBA Bond Claims (Ambac).

1.71     **Ambac Insured Bonds:** Collectively, the Vintage CW Bonds and the Vintage PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Ambac, including, without limitation, pursuant to a secondary market insurance policy.

1.72     **Ambac Insurance Policies:** The existing insurance policies issued by Ambac (or a predecessor in interest thereof) relating to the Ambac Insured Bonds, together with any and all agreements and other documents related thereto.

1.73     **Ambac Plan Consideration:** The consideration allocable or distributable to holders of Allowed Ambac Insured Bond Claims, the CW/HTA Clawback Recovery allocable to holders of the Allowed Ambac CW/HTA Claims, the CW/CCDA Clawback Recovery allocable to holders of Allowed Ambac CW/CCDA Claims, and the CW/PRIFA Clawback Recovery allocable to holders of Allowed Ambac CW/PRIFA Rum Tax Claims, as the case may be.

1.74     **Ambac Trust:** With respect to each class of Ambac Insured Bonds, a separate trust or custodial arrangement that will be formed, on or prior to the Effective Date, by the Commonwealth, at the sole cost and expense of Ambac and for the benefit of the beneficial holders of such Ambac Insured Bonds.

1.75     **Ambac Trust Assets:** Collectively, the assets to be deposited into the Ambac Trust(s), consisting of (a) the Ambac Insured Bonds, (b) distributions to be made in respect of such Ambac Insured Bonds, and (c) the Ambac Insurance Policies.

1.76     **Ambac CW/Convention Center Claims:** Collectively, the CW/Convention Center Claims arising from CCDA Bonds insured or otherwise owned (by subrogation or otherwise) by Ambac, including pursuant to a secondary market insurance policy.

1.77     **Ambac CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured or otherwise owned (by subrogation or otherwise) by Ambac, including pursuant to a secondary market insurance policy.

1.78     **Ambac CW/PRIFA Rum Tax Claims:** Collectively, the CW/PRIFA Rum Tax Claims arising from PRIFA Bonds insured or otherwise owned (by subrogation or otherwise by Ambac including pursuant to a secondary market insurance policy.

1.79    **AMPR:** Collectively, the American Federation of Teachers, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical.

1.80    **Appointments Related Litigation:** Collectively, the litigation styled (a) Pinto Lugo, et al. v. United States Adv. Proc. No. 18-00041-LTS, currently pending in the United States Court of Appeals for the First Circuit, (b) Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. United States, Case No. 19-2243 (appealed from Adv. Proc. No. 18-00066), currently pending in the United States Court of Appeals for the First Circuit, (c) Hernandez-Montanez, et al. v. Financial Oversight & Management Board for Puerto Rico, Adv. Proc. No. 18-00090, currently pending in the Title III Court, and (d) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or Causes of Action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

1.81    **Assets:** With respect to the Debtors, (i) all "property" of the Debtors, including, without limitation, such property as it may be reflected on the Debtors' books and records and the Confirmation Order as of the Effective Date and (ii) all Causes of Action, and any subsequent proceeds thereof, that have been or may be commenced by the Debtors or other authorized representative for the benefit of the Debtors and its Creditors, unless modified or released pursuant to the Plan or a Final Order, including, without limitation, any Avoidance Action.

1.82    **Assured:** Assured Guaranty Corp. and Assured Guaranty Municipal Corp., together with their respective successors or designees.

1.83    **Assured Acceleration Price:** A price equal to the outstanding principal amount of an Assured Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof.

1.84    **Assured Acceleration Price Payment Option:** Assured's option in accordance with Section 75.1 hereof, if either (a) at or prior to the time of pricing of Assured New GO Bonds with respect to which Assured has exercised the Assured Election, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (b) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, to elect, in its sole discretion, to pay the applicable Assured Acceleration Price to the holders of any Assured Insured Bonds with respect to which Assured has exercised the Assured Election and to receive, on the Effective Date, the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash or other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it.

1.85    **Assured Bondholder Elections:** Collectively, the elections provided to Assured Insured Bondholders pursuant to Section 75.1 hereof in the event Assured does not exercise the Assured Election.

1.86     **Assured Bondholder Elections Form:** The "Form of Election Notice for Certain Bondholders with Respect to Classes 2, 17, 24 and 42" attached as Schedule 5(a) to the Disclosure Statement Order.

1.87     **Assured CVIs:** Collectively, the CVIs allocable to holders of Assured Insured Bond Claims.

1.88     **Assured CW/Convention Center Claims:** Collectively, the CW/Convention Center Claims arising from CCDA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.89     **Assured CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.90     **Assured CW/PRIFA Rum Tax Claims:** Collectively, the CW/PRIFA Rum Tax Claims arising from PRIFA Bonds insured by Assured including pursuant to a secondary market insurance policy.

1.91     **Assured Election:** Assured's rights, as set forth in Section 75.1 hereof, to receive the Cash and the CVIs allocable to holders of Assured Insured Bonds, and to cause all or any portion of the Assured Insured Bonds selected by Assured to be paid, in full, on the Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of Assured Insured Bonds, which Assured New GO Bonds shall be (i) insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12 and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Acceleration Price, cause amounts equal to such deficiency to be paid by Assured in accordance with the Assured Insurance Policies insuring the Assured Insured Bonds.

1.92     **Assured Election Notice:** The "Assured Election Notice" attached as Schedule 5(b) to the Disclosure Statement Order.

1.93     **Assured Insurance Policies:** The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with any and all agreements and other documents related thereto.

1.94     **Assured Insured Bond Claim:** A Claim against the Commonwealth or the PBA, as applicable, on account of an Assured Insured Bond, including a Vintage CW Bond Claim (Assured), 2011 CW Bond Claim (Assured), 2011 CW Series D/E/PIB Bond Claim (Assured) 2012 CW Bond Claim (Assured), Vintage CW Guarantee Bond Claim (Assured), or a Vintage PBA Bond Claim (Assured).

1.95     **Assured Insured Bondholder:** The beneficial holder of an Assured Insured Bond.

1.96     **Assured Insured Bonds:** Collectively, the GO Bonds and the PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Assured, including, without limitation, pursuant to a secondary market insurance policy; provided, however, that, for the avoidance of doubt, "Assured Insured Bonds" shall include the bonds identified on Exhibit "A" to the Assured Election Notice and Exhibit "A" to the Assured Bondholder Elections Form

1.97     **Assured New GO Bonds:** The New GO Bonds allocable to holders of Assured Insured Bond Claims.

1.98     **Assured New Securities:** Collectively, the Assured New GO Bonds and the Assured CVIs.

1.99     **Assured Treatment:** The treatment of Assured Insured Bond Claims set forth in Section 75.1 hereof.

1.100     **Avoidance Actions:** Collectively, (a) those avoidance, recovery, subordination or other actions or remedies identified on Exhibit "A" hereto, as such Exhibit "A" may be amended or modified up to and including the Effective Date in accordance with the terms and conditions of the Committee Agreement, against any Entity that have been brought by or on behalf of the Debtors against an Entity under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, or applicable non-bankruptcy law, (b) such other actions that have been brought by or on behalf of the Debtors seeking affirmative recoveries, and which actions are set forth on Exhibit "B" hereto, as such Exhibit "B" may be amended or modified up to and including the Effective Date in accordance with the terms and conditions of the Committee Agreement, and (c) all similar Causes of Action that are currently subject to tolling agreements with the Commonwealth and/or ERS; provided, however, that under no circumstances shall "Avoidance Actions" include (x) any Claim or Cause of Action against any Entity relating to CW Bond Claims, PBA Bond Claims, CW Guarantee Bond Claims, or PRIFA BANs (other than the Claims and Causes of Action in the SCC Action and the related tolling agreements), (y) any Claim or Cause of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, which shall terminate upon entry of the Confirmation Order, or (z) any Claim or Cause of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entitles Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, which shall terminate upon entry of the Confirmation Order.

1.101     **Avoidance Actions CW Interests:** The tranche of beneficial interests in the Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the CW GUC Recovery and relating only to net recoveries attributable to Avoidance Actions relating to the Commonwealth Title III Case.

1.102    **Avoidance Actions ERS Interests:** The tranche of beneficial interests in the Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the ERS GUC Pool and relating only to net recoveries attributable to Avoidance Actions relating to the ERS Title III Case.

1.103    **Avoidance Actions Trust:** The trust to be created on or prior to the Effective Date into which on the Effective Date shall be transferred the authority to litigate or compromise and settle the Avoidance Actions.

1.104    **Avoidance Actions Trust Agreement:** The agreement to be executed and delivered on or prior to the Effective Date providing for, among other things, the ongoing litigation of the Avoidance Actions, which agreement shall be in form and substance reasonably acceptable to the Creditors' Committee.

1.105    **Avoidance Actions Trust Assets:** Collectively, (a) the Avoidance Actions, (b) funds held in escrow as of the Effective Date relating to the compromise and settlement of certain avoidance actions prior to the Effective Date (net of expenses incurred by the escrow agent with respect thereto), and (c) such other actions that have been brought by or on behalf of the Debtors seeking affirmative recoveries, and which actions are set forth in the respective litigations listed on Exhibit "B" hereto.

1.106    **Avoidance Actions Trust Beneficiaries:** Collectively, the holders of Avoidance Actions CW Interests and Avoidance Actions ERS Interests.

1.107    **Avoidance Actions Trust Board:** The three (3) member board appointed as of the Effective Date to govern the Avoidance Actions Trust, with (a) two (2) directors selected by the Creditors' Committee and (b) one (1) director selected by the Oversight Board.

1.108    **Avoidance Actions Trust Interests:** Collectively, the Avoidance Actions CW Trust Interests and the Avoidance Actions ERS Trust Interests.

1.109    **Avoidance Actions Trustee:** The trustee appointed by the Avoidance Actions Trust Board, by a simple majority vote of such board, on or prior to the Effective Date in accordance with the terms and provisions of the Avoidance Actions Trust Agreement, including, without limitation, any successor thereto.

1.110    **Ballot Date:** The deadline(s) established by the Title III Court and set forth in the Disclosure Statement Order for the submission of Ballots/Election Forms and the election of alternative treatments pursuant to the terms and provisions of the Plan.

1.111    **Ballot/Election Form:** The ballot and election form, the form of which is approved by the Title III Court, distributed to each holder or insurer, as the case may be, of an impaired Claim entitled to vote on, or otherwise make an election with respect to, the Plan, on which form is to be indicated, among other things, (a) acceptance or rejection of the Plan and/or (b) to the extent applicable, an election of distribution and treatment which may be required in accordance with the provisions of the Plan.

1.112    **Bankruptcy Code:** The Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases.

1.113    **Bankruptcy Rules:** The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as applicable to the Title III Cases.

1.114    **Bar Date:** The respective dates established by the Title III Court by which proofs of Claim must have been filed with respect to such Claims against a Debtor, pursuant to (a) the Bar Date Orders, (b) a Final Order of the Title III Court, or (c) the Plan.

1.115    **Bar Date Orders:** The orders of the Title III Court establishing the dates by which proofs of Claim against the Debtors or their Assets must have been filed, including, but not limited to, that certain (a) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 2521], (b) Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 3160], and (c) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 19-5523-LTS, ECF No. 55].

1.116    **Base Contribution:** One Hundred Seventy-Five Million Dollars ($175,000,000.00), the amount the Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve in accordance with the terms and provisions of Section 83.2 of the Plan; provided, however, that, in the event that, for any of (a) the FY in which the Effective Date occurs and (b) the following seven (7) FYs, the projected Fiscal Plan Surplus as set forth in the Fiscal Plan in effect as of the Effective Date is equal to or greater than One Billion Seven Hundred Fifty Million Dollars ($1,750,000,000.00), such contribution amount shall increase to an amount equal to twenty-five percent (25%) of the projected Fiscal Plan Surplus for such FY.

1.117    **Benefit Reduction Date:** The date that is the later to occur of (a) July 1, 2022 and (b) the first July 1st following the Effective Date; provided, however, that, in the event that the period between the Effective Date and the first subsequent July 1st is less than one hundred eighty (180) days, then the **"Benefit Reduction Date"** shall be the first day of the first calendar month one hundred eighty (180) days after the Effective Date.

1.118    **Benefit Restoration:** During the period from the Benefit Reduction Date up to and including the conclusion of FY 2033, in the event that, in a particular FY, the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00), ten percent (10%) of such Excess Cash Surplus shall be (a) allocated and applied pro rata to each Participant based on the amount of total reductions experienced by each such Participant during such FY in accordance with the terms and provisions of Articles LV and LVI hereof and (b) paid to any such Participant on or prior to October 1st following the conclusion of such FY; provided, however, that such Benefit Restoration shall be capped at the Monthly Benefit Reduction times twelve (12) for each Participant for a particular FY.

1.119    **Bond Claim:** A Claim on account of a GO Bond, a PBA Bond, a CW Guarantee Bond Claim, or an ERS Bond with the amount of such Claim being calculated as the outstanding

principal amount of such bonds plus any, accrued and unpaid interest thereon, up to, but not including, the respective Petition Date for (a) a GO Bond, the Commonwealth Petition Date, (b) a PBA Bond, the PBA Petition Date, (c) a CW Guarantee Bond Claim, the Commonwealth Petition Date, and (d) an ERS Bond, the ERS Petition Date.

1.120    **Bond Recovery Category:** Collectively, the categories set forth on Exhibit "L" hereto relating to the respective Classes of Claims and the distributions to be made thereto pursuant to the terms and provisions of the Plan.

1.121    **Bondholder Election:** The right of holders of Allowed ERS Bond Claims to purchase the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the provisions of Section 69.2(b) hereof.

1.122    **Business Day:** A day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required to close by law or executive order.

1.123    **Capital Improvements:** Any project or projects funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities, including, without limitation, buildings, park facilities, infrastructure, information technology systems or other equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit.

1.124    **Cash:** Lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

1.125    **Causes of Action:** All claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) that are pending or may be asserted against any Entity whether arising on or before the Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the Effective Date.

1.126    **CCDA:** Puerto Rico Convention Center District Authority.

1.127    **CCDA Bonds:** Collectively, the non-recourse bonds issued by CCDA, in the original principal amount of Four Hundred Sixty-Eight Million Eight Hundred Thousand Dollars ($468,800,000.00), in accordance with the terms of that certain Trust Agreement, dated as of

16

March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee, as supplemented and amended from time to time.

1.128 **CCDA Bond Claims:** Collectively, the Claims against CCDA arising from or relating to the CCDA Bonds.

1.129 **CCDA Consummation Costs:** Collectively, the amounts set forth in Section 3.8 hereof to be paid, in Cash, on the Effective Date, or as soon as practicable thereafter, but in no event later than ten (10) Business Days following the Effective Date, to the applicable Initial HTA/CCDA PSA Creditors in accordance with the terms and conditions of the HTA/CCDA Plan Support Agreement, Article III hereof and the Confirmation Order.

1.130 **CCDA Restriction Fee Creditors:** Collectively, the Initial HTA/CCDA PSA Creditors and the HTA/CCDA Joinder Creditors holding and/or insuring (without duplication) CCDA Bond Claims that execute, or have executed, the HTA/CCDA Plan Support Agreement, the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement relating thereto at or prior to the expiration of the HTA/CCDA PSA Restriction Fee Period; provided, however, that all entities executing an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement on the date the HTA/CCDA Threshold Attainment is reached with respect to CCDA Bond Claims shall be considered CCDA Restriction Fee Creditors.

1.131 **CCDA Restriction Fee Percentage:** The percentage equal to (a) Fifteen Million Dollars ($15,000,000.00) minus such amount as may be payable on account of CCDA Consummation Costs divided by (b) the aggregate amount of CCDA Bond Claims held, or in the case of Assured, holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by CCDA Restriction Fee Creditors.

1.132 **CCDA Trustee:** The Bank of New York Mellon, solely in its capacity as successor trustee with respect to the CCDA Bonds.

1.133 **Charging Lien:** A lien or right to priority of payment to which any Trustee/Fiscal Agent may be entitled pursuant to an applicable governing resolution, trust agreement, or other document or instrument against distributions to be made in accordance with the terms and provisions of the Plan for payment of reasonable compensation, indemnification, fees, expenses and disbursements incurred prior or subsequent to the Effective Date.

1.134 **Christmas Bonus:** The bonus, if any, payable to current, former, active, inactive and disabled employees in accordance with Act No. 98-1980, reproduced in 3 L.P.R.A. §761, as amended by Act No. 3-2013, 3 L.P.R.A §761.

1.135 **Claim:** Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses,

liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

1.136 **Class:** A category of holders of Claims set forth in Article IV of the Plan.

1.137 **Clawback Actions:** Collectively, the litigation styled (a) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00004-LTS, currently pending in the Title III Court, (c) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00003-LTS, currently pending in the Title III Court, and (d) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

1.138 **Clawback CVI Indenture:** The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Clawback CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

1.139 **Clawback CVIs:** Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, including, without limitation, Exhibit "J" hereto, the Confirmation Order, the Clawback CVI Indenture and the CVI Legislation.

1.140 **Clawback Recovery:** The aggregate recovery by holders of Allowed CW/Convention Center Claims, Allowed CW/HTA Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, consisting of Clawback CVIs distributed to holders of such Claims hereunder and subject to the Annual Payment Waterfall, as defined in Exhibit "J" hereto and as set forth in Section 74.2(a) hereof and Exhibit "J" hereto.

1.141 **COFINA:** Puerto Rico Sales Tax Financing Corporation, a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth.

1.142 **COFINA Bonds:** Collectively, the securities issued by COFINA pursuant to the COFINA Plan, the COFINA Confirmation Order, the COFINA Bonds Legislation and the COFINA Bonds Indenture.

1.143 **COFINA Bonds Indenture:** The trust indenture pursuant to which COFINA issued the COFINA Bonds, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions.

1.144 **COFINA Bonds Legislation:** Act 241 of the Legislative Assembly of Puerto Rico, approved November 15, 2018, amending Act 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended.

1.145 **COFINA Confirmation Order:** That certain Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated February 5, 2019 [Case No. 17-3284-LTS, ECF. No. 561].

1.146 **COFINA Plan:** That certain Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated January 9, 2019 [Case No. 17-3284-LTS, ECF. No. 436].

1.147 **Committee Agreement:** That certain letter agreement, dated July 12, 2021, between the Creditors' Committee and the Oversight Board.

1.148 **Commonwealth:** The Commonwealth of Puerto Rico.

1.149 **Commonwealth Constitution:** The Constitution of the Commonwealth of Puerto Rico.

1.150 **Commonwealth Election:** The right of the Commonwealth to purchase the Private Equity Portfolio and the interest in the ERS Trust in accordance with the provisions of Section 66.2(a) hereof.

1.151 **Commonwealth Instrumentality Plan:** A plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan of adjustment or Title VI Qualifying Modification for HTA, CCDA, or PRIFA.

1.152 **Commonwealth Legislature:** The Legislative Assembly of Puerto Rico.

1.153 **Commonwealth Petition Date:** May 3, 2017.

1.154 **Commonwealth Title III Case:** The Title III case under PROMESA pending for the Commonwealth in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al., Case No. 17-3283-LTS (D.P.R.).

1.155 **Comprehensive Cap:** The limitation on Maximum Annual Debt Service payable on Net Tax-Supported Debt, established pursuant to the Debt Responsibility Act and the Debt Management Policy, which shall apply in addition to the limitation imposed on the incurrence of public Debt established pursuant to the Article VI, Section 2 of the Commonwealth Constitution.

1.156 **Confirmation Date:** The date on which the Clerk of the Title III Court enters the Confirmation Order on the docket.

1.157 **Confirmation Hearing:** The hearing conducted by the Title III Court pursuant to section 1128(a) of the Bankruptcy Code and Section 314 of PROMESA to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

19

1.158    **Confirmation Order:** The order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 the Bankruptcy Code, made applicable in the Title III cases in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to the Initial PSA Creditors.

1.159    **Constitutional Debt Group:** The Ad Hoc Group of Constitutional Debtholders consisting of the Constitutional Debt Group Members, as such membership may change from time to time.

1.160    **Constitutional Debt Group Members:** BlackRock Financial Management Inc., Brigade Capital Management, EMSO Asset Management Limited, Mason Capital Management, LLC, Silver Point Capital, L.P., and VR Advisory Services Ltd., each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.161    **Consummation Costs:** Collectively, the CCDA Consummation Costs and the GO/PBA Consummation Costs.

1.162    **Convenience Cap:** Sixty-Five Million Dollars ($65,000,000.00), the aggregate amount of consideration to be made available to holders of Allowed Convenience Claims (whether against the Commonwealth or ERS), unless such limitation is otherwise waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing.

1.163    **Convenience Claim:** An Allowed CW General Unsecured Claim or Allowed ERS General Unsecured Claim (a) that is equal to or less than Twenty Thousand Dollars ($20,000.00) or (b) the holder of which, at such holder's option, has elected to reduce the amount of such Allowed CW General Unsecured Claim or Allowed ERS General Unsecured Claim, as the case may be, to Twenty Thousand Dollars ($20,000.00) in accordance with terms and provisions set forth in Section 72.1 hereof; provided, however, that, notwithstanding the foregoing, a holder of multiple Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claims that are greater than Forty Thousand Dollars ($40,000.00) may elect to reduce all such Claims to an aggregate amount of Forty Thousand Dollars ($40,000.00); and, provided, further, that the aggregate amount of consideration to be made available to Convenience Claims (whether against the Commonwealth or ERS) shall be Sixty-Five Million Dollars ($65,000,000.00), which Convenience Cap may be waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing in its sole and absolute discretion; and, provided, further, that, in the event that such Convenience Cap is exceeded and not waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing, holders of Allowed Convenience Claims shall receive a Pro Rata Share of the Convenience Cap.

1.164    **Creditor:** Any Entity holding a Claim against the Debtors or any Debtor's Assets or, pursuant to section 102(2) of the Bankruptcy Code, against any other property of the Debtors, including, without limitation, a Claim against the Debtors of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, solely in such Entity's capacity as such.

20

1.165     **Creditors' Committee:** The statutory committee of unsecured claimholders appointed in, among other cases, the Commonwealth Title III Case, the ERS Title III Case and the HTA Title III Case.

1.166     **CUSIP:** The Committee on Uniform Securities Identification procedures nine-digit numeric or nine-digit character alphanumeric code.

1.167     **Custodial Trust Documents:** Collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of (a) the HTA Effective Date and relating to (i) the HTA Bonds insured by Assured and National, if applicable, and the distributions to be made in accordance with the HTA Plan and the Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board, Assured, and National, as the case may be, and (ii) the HTA Bonds insured by FGIC and Ambac and the distributions to be made in accordance with the HTA Plan and the Plan, which trust agreements shall be in form and substance satisfactory to the Oversight Board, FGIC, and Ambac, as the case may be, and (b) the PRIFA Effective Date and relating to (i) the PRIFA Bonds insured by Ambac, Assured and FGIC, if applicable, and the distributions to be made in accordance with the PRIFA Plan and the Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board, Ambac, and FGIC.

1.168     **CVIs:** Collectively, GO CVIs and the Clawback CVIs.

1.169     **CVI Indenture:** Collectively, the GO CVI Indenture and the Clawback CVI Indenture.

1.170     **CVI Legislation:** The legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the GO CVIs and the Clawback CVIs, which legislation may be part of, or included in, the New GO Bonds Legislation.

1.171     **CVI Payment Reserve:** To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims in accordance with the terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall of the Settlement Summary annexed to the HTA/CCDA Plan Support Agreement as Exhibit "J", pending entry of a Final Order with respect to the GDB Loan Priority Determination, Cash payable from the HTA Clawback CVI to be held in reserve by the Clawback CVI paying agent or the CVI Trustee, as the case may be, pursuant to the Trust Documentation and the Clawback CVI Indenture in an amount equal to the difference of (a) the amount of Cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds <u>minus</u> (b) the amount of Cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.

1.172     **CVI Trustee:** The trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the CVI Indenture.

1.173   **CW Appropriations Claims**: Collectively, the Claims against the Commonwealth arising from or related to indebtedness only payable from appropriations of the Commonwealth Legislature under existing loans or legislative resolutions, including, without limitation, (a) notes from the Commonwealth or its agencies or instrumentalities held by PFC for the repayment of PFC indebtedness and (b) loans only payable from appropriations by the Commonwealth Legislature under existing laws or legislative resolutions held by the GDB Debt Recovery Authority or the GDB Public Entity Trust; provided, however, that "CW Appropriations Claims" shall not include the PBA Administrative Expense Claim.

1.174   **CW Bond Claims**: Collectively, the Claims against the Commonwealth arising from or relating to the GO Bonds, including the Vintage CW Bond Claims, the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the CW Bond Claims (Insured), and the Retail CW Bond Claims.

1.175   **CW Bond Claims (Insured)**: Collectively, the Vintage CW Bond Claims (Ambac), the Vintage CW Bond Claims (Assured), the Vintage CW Bond Claims (National), the Vintage CW Bond Claims (FGIC), the Vintage CW Bond Claims (Syncora), the 2011 CW Bond Claims (Assured), the 2011 CW Series D/E/PIB Bond Claims (Assured), and the 2012 CW Bond Claims (Assured).

1.176   **CW Fiscal Plan**: That certain Fiscal Plan of the Commonwealth, certified by the Oversight Board on May 27, 2020.

1.177   **CW General Unsecured Claim**: A Claim against the Commonwealth, including without limitation, such portion of an Eminent Domain Claim in excess of accounts on deposit with the Clerk of the Court of First Instance; provided, however, that, under all circumstances, "CW General Unsecured Claim" shall not include (a) a PBA Bond Claim, (b) a CW Bond Claim, (c) a CW Guarantee Bond Claim, (d) an Active and Retired Employee Benefits Claim, (e) an AFSCME Claim, (f) a CW/HTA Claim, (g) a CW/Convention Center Claim, (h) a CW/PRIFA Rum Tax Claim, (i) a CW/MBA Claim, (j) an Energy Incentive Claim, (k) an Eminent Domain Claim (solely to the extent of the amount on deposit with the Clerk of the Court of First Instance), (l) a Med Center Claim, (m) a Dairy Producer Claim, (n) a Tax Credit Claim, (o) a CW Appropriations Claim, (p) a Section 510(b) Subordinated Claim, (q) a Gracia Claim, (r) a Late-Filed Claim, (s) a Convenience Claim, (t) a Federal Claim, (u) any Claim that is eligible to be transferred into or through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed), (v) the Proof of Claim No. 161091 filed by Concilio Nacional de Policias Inc. and any related proofs of claim asserting claims related to the litigation styled Frente Unido de Policias Organizados, et al. v. Puerto Rico Police Department, Case No. KAC-2007-4170, (w) all claims for retiree benefits (including, without limitation, those portions of Proofs of Claim Nos. 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 and 130091), regardless of whether such claims are asserted by retirees or active employees and regardless of whether of such claims are asserted through litigation or administrative proceedings, but excluding claims for any increased pension payments that would have been payable prior to adjudication of such claims (i.e., pension "back pay") and only up to the amount related to unpaid pensions, (x) all Claims against the Commonwealth by any Governmental Unit (as defined in section 101 of the Bankruptcy Code), including the United States government, any State government, foreign government, any municipality (whether of the

Commonwealth or otherwise), the Commonwealth, any instrumentality of the Commonwealth (including GDB), whether asserted directly by such Governmental Unit or indirectly or derivatively by any other entity, including, without limitation, any Claims by the GDB asserted by or though the GDB Debt Recovery Authority, (y) any unsecured deficiency claims with respect to asserted priority and/or secured claims, or (z) such other Claim determined by the Title III Court not to be a CW General Unsecured Claim.

1.178   **CW Guarantee Bond Claims:** Collectively, the Vintage CW Guarantee Bond Claims, the 2011 CW Guarantee Bond Claims, the 2012 CW Guarantee Bond Claims, the 2014 CW Guarantee Bond Claims and the CW Guarantee Bond Claims (Insured).

1.179   **CW Guarantee Bond Claims (Insured):** Collectively, the Vintage CW Guarantee Bond Claims (Ambac), the Vintage CW Guarantee Bond Claims (Assured), the Vintage CW Guarantee Bond Claims (National), the Vintage CW Guarantee Bond Claims (FGIC), and the Vintage CW Guarantee Bond Claims (Syncora).

1.180   **CW GUC Recovery:** The aggregate recovery available to holders of Allowed CW General Unsecured Claims, consisting of (a) Net CW Cash Consideration (funded in accordance with the terms and provisions of Section 62.3 hereof) plus (b) the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.

1.181   **CW/Convention Center Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.

1.182   **CW/Convention Center Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.183   **CW/HTA Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.

1.184     **CW/HTA Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths percent (68.6%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.185     **CW/MBA Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order.

1.186     **CW/MBA Clawback Recovery:** The aggregate recovery by holders of Allowed CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.187     **CW/PRIFA Rum Tax Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee.

1.188     **CW/PRIFA Rum Tax Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.189     **Dairy Producer Claim:** Collectively, the Claims of Suiza Dairy, Inc. and Vaquería Tres Monjitas, Inc. arising from and relating to the Dairy Producer Settlement, which, as of the Effective Date, shall be (a) allowed in the aggregate amount of Sixty-One Million Nine Hundred Ninety-Nine Thousand Nine Hundred Ninety-Nine Dollars ($61,999,999.00), and (b) allocated to Suiza Dairy, Inc. and Vaquería Tres Monjitas, Inc. in the amounts of Forty-Four Million Eight Hundred Thirty-Two Thousand One Hundred Ninety-Nine Dollars and Twenty-Eight Cents ($44,832,199.28) and Seventeen Million One Hundred Sixty-Seven Thousand Seven Hundred Ninety-Nine Dollars and Seventy-Two Cents ($17,167,799.72), respectively.

1.190     **Dairy Producer Settlement:** The Final Settlement Agreement and Memorandum of Understanding Between the Parties, filed October 29, 2013, in the litigation styled <u>Vaquería Tres Monjitas, Inc. and Suiza Dairy, Inc. v. Naftali Soto Santiago, et al.</u>, Civil Case No.: 04-1840 (DRD), then pending in the United States District Court for the District of Puerto Rico.

1.191     **Debt:** Collectively, bonds, notes, loans and other evidences of indebtedness for borrowed money.

1.192     **Debt Management Policy:** The policy developed by AAFAF, relating to the issuance of indebtedness, as more fully described in the Debt Responsibility Act and herein.

1.193   **Debtors:** Collectively, the Commonwealth, ERS and PBA.

1.194   **Debt Policy Period:** The period commencing on the first (1st) calendar day immediately following the Effective Date and ending on the date on which there are no New GO Bonds Outstanding.

1.195   **Debt Policy Revenues:** Collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Commonwealth Legislature, including, without limitation, any such revenue assigned to, or owned by, COFINA or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan, (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further, that, for purposes of illustration, with respect to FY2020, and as reflected in the CW Fiscal Plan, "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six Hundred Thousand Dollars ($15,146,600,000.00).

1.196   **Debt Related Objections:** Collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through Its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [Case No. 17-3283-LTS, ECF No. 4784], (b) Omnibus Objections of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [Case No. 17-3283-LTS, ECF No. 7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [Case No. 17-3283-LTS, ECF No. 8141], (d) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [Case No. 17-3283-LTS, ECF. No. 9730], (e) Official Committee of Unsecured Creditors Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of

Case:17-03283-LTS   Doc#:17517-1   Filed:07/27/21   Entered:07/27/21 07:25:40   Desc:
Exhibit A   Page 55 of 285

Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Case No. 17-3283-LTS, ECF No. 9735], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [Case No. 17-3283-LTS, ECF No. 10638], (g) Objection of Official Committee of Unsecured Creditors to Claim of Government Development Bank for Puerto Rico Against Commonwealth of Puerto Rico (Claim Number 29,485) [Case No. 17-3283-LTS, ECF No. 8000], solely as it relates to the CW Bond Claims and the CW Guarantee Bond Claims, and (h) any other (i) litigations or actions, including, without limitation, litigations or actions commenced to recover principal and/or interest with respect to the GO Bonds, the PBA Bonds and/or the PRIFA BANs, and (ii) any other objections or joinders to these or other such objections or joinders to these or such other objections or notices of participation that support the relief requested in such objections filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Bond Claims, the CW Guarantee Bond Claims, and the PBA Bond Claims.

1.197    **Debt Responsibility Act:** Act No. 101-2020, as the same may be amended, modified or supplemented to the extent necessary to provide, among other things, for a Comprehensive Cap consistent with the terms of the GO/PBA Plan Support Agreement.

1.198    **Debt Service Fund:** The fund to be created pursuant to the New GO Bonds Indenture, and held by the New GO Bonds Trustee in trust for the benefit of the holders of the New GO Bonds, into which the Commonwealth shall deposit monthly such amounts equal to (a) one-sixth (1/6) of the semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (b) one-twelfth (1/12) of the annual obligation with respect to the payment of principal and accreted value on the New GO Bonds.

1.199    **Debtors:** Collectively, the Commonwealth, ERS and PBA.

1.200    **Deemed Issuance Date:** The earlier to occur of (a) July 1, 2021 and (b) the Effective Date.

1.201    **Definitive Documents:** Collectively, the definitive documents and agreements contemplated by the Plan, including, without limitation, (a) the Plan (including any amendments, modifications and supplements thereto) and any documentation or agreements related thereto, (b) the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, and pleadings in support of entry thereof, (c) the New GO Bonds Indenture and documents or agreements related thereto, (d) the form of bonds for the New GO Bonds, (e) the CVI Indenture and documents or agreements related thereto, (f) the form of the CVIs, (g) the documents or agreements related to the Pension Reserve and the governance thereof, and (h) each other document that will comprise the Plan Supplement, in all cases, the form and substance of which shall be acceptable to the Oversight Board in its sole and absolute discretion, and reasonably acceptable to AAFAF, the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Assured, National, Ambac, FGIC, and

Syncora, and, in the case of clauses (a) and (b) above, reasonably acceptable to the Creditors'
Committee.

1.202 **Disallowed:** With respect to any Claim, a Claim or any portion thereof that is not
Allowed and (a) has been disallowed by a Final Order, (b) is zero, contingent, disputed, or
undisputed and as to which no proof of claim or request for payment of an Administrative Expense
Claim has been timely filed or deemed timely filed with the Title III Court, (c) has been withdrawn
by agreement of the applicable Debtor and the holder thereof, or (d) has been withdrawn by the
holder thereof.

1.203 **Disbursing Agent:** Such Entity or Entities designated by the Oversight Board,
upon consultation with AAFAF, on or prior to the Effective Date to make or to facilitate
distributions in accordance with the provisions of the Plan.

1.204 **Disclosure Statement:** The disclosure statement relating to the Plan and
approved by the Title III Court pursuant to section 1125 of the Bankruptcy Code, applicable to the
Title III Cases pursuant to Section 301 of PROMESA.

1.205 **Disclosure Statement Hearing:** The hearing held by the Title III Court to
consider the adequacy of the information contained in the Disclosure Statement in accordance with
section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of
PROMESA.

1.206 **Disclosure Statement Order:** The order of the Title III Court (a) approving the
form of the Disclosure Statement as containing adequate information in accordance with the
provisions of section 1125 of the Bankruptcy Code, applicable to the Title III Cases pursuant to
Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of
solicitation of (i) acceptances and rejections to the Plan, and (ii) elections, if applicable, of
distributions hereunder, which order shall be in form and substance reasonably satisfactory to the
Initial PSA Creditors.

1.207 **Disputed Claim:** A Claim against the Debtors or their Assets, to the extent the
allowance of such Claim is the subject of a timely objection or request for estimation in
accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order,
or is otherwise disputed by the Debtors in accordance with applicable law, and which objection,
request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final
Order.

1.208 **Distribution Date:** Except as otherwise set forth herein, the date or dates
determined by the Commonwealth, on or after the Effective Date, upon which the Disbursing
Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under
the Plan.

1.209 **Distribution Record Date:** The Ballot Date or such other date as may be
established by a separate order of the Title III Court, including the Confirmation Order; provided,
however, that the "Distribution Record Date" shall not apply to any publicly held securities that
will receive a distribution pursuant to the Plan through The Depository Trust Company.

1.210    **Effective Date:** The first (1st) Business Day on which (i) all the conditions precedent to confirmation of the Plan specified in Section 85.1 of the Plan shall have been satisfied or waived, as provided in Section 85.2 of the Plan, and (ii) all the conditions precedent to the substantial consummation of the Plan and occurrence of the Effective Date specified in Section 86.1 of the Plan shall have been satisfied or waived as provided in Section 86.2 of the Plan.

1.211    **Eminent Domain Claim:** A Claim arising from or related to an Eminent Domain Proceeding and a Final Order entered therein for an amount in excess of the amount deposited by the condemnor in accordance with the terms and provisions of 32 L.P.R.A. §2907, including, without limitation, interest accrued with respect thereto.

1.212    **Eminent Domain Proceeding:** A condemnation action or proceeding commenced by the Commonwealth or an agency or entity thereof in the Court of First Instance in accordance with the terms and provisions of 32 L.P.R.A §2905 to obtain title to real property located on Puerto Rico.

1.213    **Energy Incentive Act:** The Puerto Rico Green Energy Incentives Act, Act No. 83-2010, as incorporated under the New Incentives Code, Act 60-2019.

1.214    **Energy Incentive Claims:** Collectively, any and all Claims arising from or related to the Energy Incentive Act, also known as the Puerto Rico Green Energy Incentives Act, in connection with promoting the production of the renewable energy.

1.215    **Entity:** A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

1.216    **ERS:** Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

1.217    **ERS Bond Claim:** A Claim arising from or related to the ERS Bonds, including, without limitation, interest accrued thereon during the period up to, but not including, the ERS Petition Date.

1.218    **ERS Bond Recovery:** The aggregate recovery by holders of Allowed ERS Bond Claims, consisting of (a) Three Hundred Seventy-Three Million Dollars ($373,000,000.00), (b) the right to receive the proceeds of the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in the event the Commonwealth or one or more holders of Allowed ERS Bond Claims purchases the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in accordance with the terms and provisions of Section 69.2 hereof, and (c) in the event the Commonwealth does not elect to purchase such assets in accordance with Section 69.2(a) hereof, the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio.

1.219     **ERS Bonds:** Collectively, (a) the non-recourse Senior Pension Funding Bonds, Series A, issued by ERS in the original principal amount of One Billion Five Hundred Eighty-Eight Million Eight Hundred Ten Thousand Seven Hundred Ninety-Nine Dollars and Sixty Cents ($1,588,810,799.60), (b) the non-recourse Senior Pension Funding Bonds, Series B, issued by ERS in the original principal amount of One Billion Fifty-Eight Million Six Hundred Thirty-Four Thousand Six Hundred Thirteen Dollars and Five Cents ($1,058,634,613.05) and (c) the non-recourse Senior Pension Funding Bonds, Series C, issued by ERS in the original principal amount of Three Hundred Million Two Hundred Two Thousand Nine Hundred Thirty Dollars ($300,202,930.00), which, as of the ERS Petition Date, inclusive of compounded amounts, were in the aggregate outstanding principal amount of Three Billion One Hundred Sixty-Eight Million Six Hundred Ninety-Eight Thousand Seven Hundred Seventy-Six Dollars and Fifty-Five Cents ($3,168,698,776.55).

1.220     **ERS Fiscal Agent:** The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the ERS Bonds.

1.221     **ERS General Unsecured Claim:** A Claim against ERS other than an ERS Bond Claim.

1.222     **ERS GUC Pool:** The sum of (a) Five Hundred Thousand Dollars ($500,000.00) in Cash <u>plus</u> (b) the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests; <u>provided</u>, <u>however</u>, that, under no circumstances, shall such aggregate amount of consideration, including, without limitation, net recoveries from the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, exceed Five Million Dollars ($5,000,000.00); and, <u>provided</u>, <u>further</u>, that, in the event that the aggregate amount of the ERS GUC Pool (y) exceeds the aggregate amount of Allowed ERS General Unsecured Claims or (z) would exceed Five Million Dollars ($5,000,000.00) but for the limitation on recovery above, such excess amount or Avoidance Actions ERS Interests, as the case may be, shall be reallocated, on a pro rata basis, for the benefit of holders of Allowed CW General Unsecured Claims.

1.223     **ERS Litigation:** Collectively, the litigation styled (a) <u>Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Andalusian Global Designated Activity Co., et al.</u>, Case Nos, 19-1699, 19-1700 (appealed from Adv. Proc. No. 17-00213), currently pending in the United States Court of Appeals for the First Circuit, (b) <u>Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, et al. v. Andalusian Global Designated Activity Co., et al.</u>, Adv. Proc. No. 19-00366, currently pending in the Title III Court, (c) Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico, dated March 12, 2019 [Case No. 17-3283-LTS, ECF No. 5580], currently pending in the Title III Court, (d) Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth, dated April 23, 2019 [Case No. 17-3283-LTS, ECF No. 6482], currently pending in the Title III Court, (e) <u>Special Claims Committee of the Financial Oversight & Management Board for Puerto Rico, et al., v. Jefferies, LLC, et al.</u>, Adv. Proc. No. 19-00355, currently pending in the Title III Court, (f) Objection of Financial Oversight

and Management Board, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth by the Bank of New York Mellon, as Fiscal Agent (Claim No. 16775), dated May 22, 2019, and as supplemental on January 6, 2020 [Case No. 17-3283-LTS, ECF Nos. 7075 and 9700], currently pending in the Title III Court, (g) Andalusian Global Designated Activity Co., et al., v. Financial Oversight & Management Board for Puerto Rico, et al., Case No. 20-1065, currently pending in the United States Court of Appeals for the First Circuit, (h) Administración de los Sistemos de Retiro de los Empleados del Gobierno y la Judicatura de Puerto Rico v. UBS Fin. Servs. Inc. of Puerto Rico, Civ. No. KAC-2011-1067 (803), currently pending in the Commonwealth of Puerto Rico Court of First Instance, San Juan Part, (i) Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, et al. v. Glendon Opportunities Fund, L.P. et al., Adv. Proc. No. 19-00367, currently pending in the Title III Court, (j) Objection of Financial Oversight and Management Board Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007 to Proof of Claim Against ERS by The Bank of New York Mellon, as Fiscal Agent (Claim No. 16777), dated January 6, 2020 [Case No. 17-3283-LTS, ECF No. 9701], currently pending in the Title III Court, (k) Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00219, currently pending in the Title III Court, (l) Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00220, currently pending in the Title III Court, and (m) ERS Bondholders' Motion and Request for Allowance and Payment of Post-Petition and Administrative Expense Claims, dated November 21, 2019, as joined by The Bank of New York Mellon [Case No. 17-3283-LTS, ECF Nos. 9285, 9294, and 9298], currently pending the Title III Court.

1.224    **ERS Participant Claim:** A Claim on account of being or having been a participant in ERS for retiree benefits that accrued through the date of implementation of Act 106; provided, however, that "ERS Participant Claim" shall not include Claims held by a Participant in ERS, whose hire date was on or after January 1, 2000, based on participation in System 2000.

1.225    **ERS Petition Date:** May 21, 2017, the date on which the ERS Title III Case was commenced.

1.226    **ERS Portfolio Price:** Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), the base price to be paid for the ERS Private Equity Portfolio.

1.227    **ERS Private Equity Portfolio:** Collectively, the portfolio of private equity interests held by ERS as of the Effective Date.

1.228    **ERS Recovery Actions:** Collectively, the litigations styled: (a) Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Jefferies LLC, et al., Adv. Proc. No. 19-00355; (b) Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1M, et al., Adv., Proc. No. 19-00356; (c) Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Stoever Glass & Co., et al., Adv. Proc. No. 19-00357; (d) Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1F et al., Adv. Proc. No. 19-00358; (e) Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1H et al., Adv. Proc. No. 19-00359; (f) Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Wells Fargo

<u>Securities, LLC et al.</u>, Adv. Proc. No. 19-00360; and (g) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1G, et al.</u>, Adv. Proc. No. 19-00361 each pending in the Title III Court.

1.229 **ERS Resolution:** That certain Pension Funding Bond Resolution, adopted January 24, 2008, relating to the issuance of the ERS Bonds.

1.230 **ERS Stipulation:** That certain Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment, dated April 2, 2021.

1.231 **ERS Takings Action:** The litigation styled <u>Altair Global Credit Opportunities Fund (A) LLC v. United States</u>, Case No. 21-1577, currently pending in the United States Court of Appeals for the Federal Circuit.

1.232 **ERS Title III Case:** The Title III case under PROMESA pending for ERS in the Title III Court, captioned as <u>In re Financial Oversight & Management Board for Puerto Rico, as representative of the Employee Retirement System of the Government of the Commonwealth of Puerto Rico</u>, Case No. 17 3566-LTS (D.P.R.).

1.233 **ERS Trust:** The trust created in accordance with the terms and provisions of the ERS Stipulation to hold ERS' interests in the ERS Private Equity Portfolio and pursuant to which ERS shall continue to manage such assets up to and including the purchase thereof in accordance with the terms and provisions of Section 69.2 hereof.

1.234 **Excess Cash Surplus**: The amount of actual cash surplus above and beyond the projected Fiscal Plan Surplus contained in the Fiscal Plan for the Commonwealth certified by the Oversight Board and being in effect as of the Effective Date.

1.235 **Executory Contract:** A contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection in accordance with section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.236 **Federal Claims:** Collectively, any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department Housing and Urban Development, the United States Department of Homeland Security and the United States Department of Labor.

1.237 **FGIC:** Financial Guaranty Insurance Company or its successor or designee.

1.238 **FGIC Action:** The litigation styled <u>Financial Guaranty Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV06383.

1.239 **FGIC Certificates:** With respect to each FGIC Trust, the certificate(s) or receipt(s) to be issued by such FGIC Trust to the beneficial holders of the FGIC Insured Bonds which are deposited into the FGIC Trust.

31

1.240    **FGIC CW/Convention Center Claims:** Collectively, the CW/Convention Center Claims arising from the CCDA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.241    **FGIC CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from the HTA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.242    **FGIC CW/PRIFA Rum Tax Claims:** Collectively, the CW/PRIFA Rum Tax Claims arising from the PRIFA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.243    **FGIC Escrow Account:** The escrow account(s) that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, for the benefit of the beneficial holders of FGIC Insured Bonds whose FGIC Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.244    **FGIC Insured Bond Claims:** Collectively, the Claims arising from the FGIC Insured Bonds, including, for the avoidance of doubt, any Vintage CW Bond Claims (FGIC), Vintage CW Guarantee Claims (FGIC), and Vintage PBA Bond Claims (FGIC).

1.245    **FGIC Insured Bonds:** Collectively, the GO Bonds and the PBA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.246    **FGIC Insured PRIFA Bond Claims:** Collectively, the Claims, arising from the PRIFA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.247    **FGIC Insurance Policies:** The existing insurance policies issued by FGIC (or a predecessor in interest thereof) relating to the FGIC Insured Bonds, together with any and all agreements and other documents related thereto, in each case as the same may have been modified by the FGIC Rehabilitation Plan.

1.248    **FGIC Plan Consideration:** The consideration allocable or distributable in accordance with Sections 9.1, 24.1 and 31.1 of the Plan to holders of Allowed FGIC Insured Bond Claims.

1.249    **FGIC Rehabilitation Plan:** The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

1.250    **FGIC Treatment:** The treatment of FGIC Insured Bond Claims set forth in Section 75.4(a) hereof.

1.251    **FGIC Trust:** With respect to each FGIC Insured Bond, the trust(s) which may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, the sole cost and expense of which, including, without limitation, the formation and maintenance thereof (including

trustee fees and expenses), shall be satisfied from the assets of the respective trust(s), and for the benefit of the beneficial holders of the FGIC Insured Bonds that are deposited in each trust and FGIC, the terms of which shall be set forth in the Plan Supplement.

1.252   **Final Order:**  An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

1.253   **Fiscal Plan:**  A "Fiscal Plan" as defined by Section 5(10) of PROMESA.

1.254   **Fiscal Plan Surplus:**  The amount set forth on the line entitled **"Surplus/ (Deficit) Post Measures (excl. Debt Payments)"** of the Fiscal Plan for the Commonwealth certified by the Oversight Board and being in effect as of the Effective Date.

1.255   **FY:**  A fiscal year of the Commonwealth, commencing on July 1st and concluding on June 30th of the following calendar year.

1.256   **GDB:**  The Government Development Bank for Puerto Rico.

1.257   **GDB HTA Loans:**  Collectively, the loans, if any, made to HTA by GDB and now held by the Governmental Development Bank Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

1.258   **GDB Loan Priority Determination:**  The determination, in either the Commonwealth Title III Case or the HTA Tile III Case, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the Government Development Bank Debt Recovery Authority does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans.

1.259   **General Fund:**  The Commonwealth's primary operating fund.

1.260     **General Unsecured Claims:** Collectively, CW General Unsecured Claims and ERS General Unsecured Claims.

1.261     **GO Bonds:** Collectively, the currently outstanding general obligation bonds issued by the Commonwealth.

1.262     **GO CVIs:** Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the GO CVI Indenture and the CVI Legislation.

1.263     **GO CVI Indenture:** The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the GO CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

1.264     **GO Group:** The Ad Hoc Group of General Obligation Bondholders consisting of Aurelius Capital Management, LP, and Autonomy Capital (Jersey) L.P., each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the Plan Support Agreement.

1.265     **GO/PBA Annex Agreement:** That certain Annex Agreement annexed as Exhibit "G" to the GO/PBA Plan Support Agreement pursuant to which certain holders of CW Bond Claims, CW Guarantee Bond Claims, and PBA Bond Claims may become GO/PBA PSA Creditors.

1.266     **GO/PBA Consummation Costs:** Collectively, the amounts set forth in Section 3.3 hereof to be paid, in Cash, on the Effective Date, or as soon as practicable thereafter, but in no event later than ten (10) Business Days following the Effective Date, to the Initial GO/PBA PSA Creditors in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, Article III hereof and the Confirmation Order.

1.267     **GO/PBA Joinder Agreement:** That certain Joinder Agreement annexed as Exhibit "F" to the GO/PBA Plan Support Agreement pursuant to which certain holders of CW Bond Claims, CW Guarantee Bond Claims and PBA Bond Claims may become GO/PBA PSA Creditors.

1.268     **GO/PBA Joinder Creditors:** Collectively, those GO/PBA PSA Creditors that executed and delivered either the GO/PBA Joinder Agreement or the GO/PBA Annex Agreement prior to the GO/PBA Joinder Deadline.

1.269     **GO/PBA Joinder Deadline:** July 30, 2021.

1.270     **GO/PBA Plan Support Agreement:** That certain Amended and Restated Plan Support Agreement, dated as of July 12, 2021, by and among the Oversight Board and the

34

GO/PBA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.271 **GO/PBA PSA Creditors:** Collectively, the parties to the GO/PBA Plan Support Agreement, other than the Government Parties.

1.272 **GO/PBA PSA Restriction Fee:** Collectively, the fee to be paid, in Cash, on the Effective Date in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, Section 3.5 hereof and the Confirmation Order, in an amount equal to the product of (a) the Restriction Fee Percentage <u>times</u> (b) the outstanding principal amount of GO Bonds and PBA Bonds, plus interest accrued thereon during the period up to, but not including the Commonwealth Petition Date and the PBA Petition Date, respectively, (i) tendered for exchange in accordance with the terms and provisions of Section 2.2 of the GO/PBA Plan Support Agreement, in the case of GO/PBA PSA Creditors required to tender and exchange their bonds pursuant to the terms and provisions of Section 2.2 of the GO/PBA Plan Support Agreement, (ii) constituting Assured Insured Bonds, in the case of Assured, and (iii) constituting National Insured Bonds, in the case of National.

1.273 **GO/PBA Restriction Fee Percentage:** One and three hundred twenty-one thousandths percent (1.321%).

1.274 **Government Entity:** Any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority, or municipality of the Government of Puerto Rico.

1.275 **Government Parties:** Collectively, (a) the Oversight Board, as the representative of the Debtors, (b) committees and subcommittees of the Oversight Board, including, without limitation, the Special Claims Committee of the Oversight Board, (c) the Debtors, including, without limitation, any of its agencies, and (d) AAFAF; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, for the avoidance of doubt, "Government Parties" shall not include CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities.

1.276 **Government Released Claims:** Collectively, any and all Claims, demands, rights, liabilities, or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Person, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with the Debtors, Claims (including, without limitation, Claims arising from or relating to the PBA Bonds and the GO Bonds), the Debt Related Objections, the PBA Litigation, and the ERS Litigation, and arising prior to the Effective Date; <u>provided</u>, <u>however</u>, that "Government Released Claims" shall not include any and all rights, privileges, Claims, demands, liabilities, or Causes of Action of any and every kind, character or nature whatsoever (a) against (i) the Debtors (or their successors, including Reorganized Commonwealth) or COFINA arising from or relating to the Debtors' obligations pursuant to the Plan or the securities to be issued pursuant to the Plan or that were issued pursuant to the COFINA Plan, or (ii) a Government Releasee unrelated to the Debtors or the Claims discharged pursuant to the terms and provisions of the Plan, (b) arising from or

related to any act or omission that constitutes intentional fraud or willful misconduct or (c) arising from or related to claims or bonds issued, or contracts or leases entered into, by CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and the CW Appropriations Claims.

1.277 **Government Releasees:** Collectively, the Government Parties and the Debtors, including all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Cases in their capacities as such; provided, however, that, notwithstanding the foregoing, "Government Releasees" shall not include CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and related to the CW Appropriations Claims.

1.278 **Gracia Gracia Claim:** A Claim of a member of the class of vehicle owners who purchased private insurance after paying the compulsory insurance premium, certified in the Gracia Gracia CW Action and Gracia Gracia Federal Action.

1.279 **Gracia Gracia CW Action:** The litigation styled García Rubiera, et al. v. Asociación de Subcripcion Conjunta del Seguro de Responsabilidad Obligatorio, et al., Civil Núm.: KDP2001-1441(801), currently pending in the Puerto Rico Court of First Instance.

1.280 **Gracia Gracia Federal Action:** The litigation styled García Rubiera, et al. v. Fortuño, et al., Case No.: 02-1179-GAG, currently pending in the United States District Court for the District of Puerto Rico.

1.281 **Gracia Gracia Settlement:** Collectively, the settlement reached and approved in (a) the Gracia Gracia CW Action pursuant to that certain Joint Motion on Partial Agreement and Stipulation, dated March 29, 2016, as approved pursuant to that certain Partial Judgment, dated July 8, 2016 and (b) the Gracia Gracia Federal Action pursuant to that certain Stipulation for Permanent Injunction, dated February 29, 2016, as approved pursuant to that certain Judgment, dated March 1, 2016.

1.282 **GSA Helicopter Loan:** The loan extended pursuant to that certain Credit Agreement, dated as of December 26, 2013, between the General Services Administration of the Commonwealth and Scotiabank de Puerto Rico, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of approximately Twenty-Three Million Seven Hundred Sixty-Four Thousand Six Hundred Seven Dollars ($23,764,607.00).

1.283 **GUC Recovery Cap:** Forty percent (40%); provided, however, that, for purposes of calculation, any net recoveries by the Avoidance Actions Trust shall not count towards attaining the forty percent (40%) cap.

1.284     **GUC Reserve:** The reserve to be created on or prior to the Effective Date, and held by an independent, non-Commonwealth government entity selected jointly by the Oversight Board and the Creditors' Committee, solely for the benefit of holders of Allowed CW General Unsecured Claims and Allowed Eminent Domain Claims (to the extent such Allowed Eminent Domain Claims exceed amounts on deposit with the Clerk of the Court of First Instance).

1.285     **HTA:** Puerto Rico Highways and Transportation Authority.

1.286     **HTA 68 Bonds:** Collectively, the following bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter: (a) the Highway Revenue Bonds, Series Y, issued by HTA in the original principal amount of Eight Hundred Ninety Million Two Hundred Thirty-Five Thousand Dollars ($890,235,000.00), (b) the Highway Refunding Bonds, Series Z, issued by HTA in the original principal amount of One Hundred Eighty-Five Million Forty Thousand Dollars ($185,040,000.00), (c) the 2003 Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00), (d) the 2003 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars ($65,275,000.00), (e) the 2005 Highway Revenue Refunding Bonds, Series BB, issued by HTA in the original principal amount of One Hundred One Million Six Hundred Twenty-Five Thousand Dollars ($101,625,000.00), (f) the 2007 Highway Revenue Refunding Bonds, Series CC, issued by HTA in the original principal amount of Four Hundred Thirty-One Million Nine Hundred Fifty-Five Thousand Six Hundred Nine Dollars and Five Cents ($431,955,609.05), (g) the 2010 Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00), (h) the 2010 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars ($65,275,000.00), and (i) the Series FHA Bonds issued by HTA in the original principal amount of Nine Hundred Forty-Five Thousand Dollars ($945,000.00).

1.287     **HTA 98 Bonds:** Collectively, the HTA 98 Senior Bonds and the HTA 98 Sub Bonds.

1.288     **HTA 98 Senior Bonds:** Collectively, the following bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998: (a) the 1998 Transportation Revenue Bonds, Series A, issued by HTA in the original principal amount of One Billion One Hundred Twenty-Nine Million Six Hundred Forty-Three Thousand Seven Hundred Forty Dollars ($1,129,643,740.00), (b) the 2002 Transportation Revenue Bonds, Series D, issued by HTA in the original principal amount of Seven Hundred Million Eight Hundred Fifty-Five Thousand Dollars ($700,855,000.00), (c) the 2002 Transportation Revenue Refunding Bonds, Series E, issued by HTA in the original principal amount of Two Hundred Eighty-Four Million Four Hundred Five Thousand Dollars ($284,405,000.00), (d) the 2003 Transportation Revenue Bonds, Series G, issued by HTA in the original principal amount of Five Hundred Sixty-Three Million Six Hundred Fifty Thousand Dollars($563,650,000), (e) the 2003 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Seventy-Two Million Thirty-Five Thousand Dollars ($72,035,000.00), (f) the 2004 Transportation Revenue Refunding Bonds, Series I, issued by HTA in the original principal amount of Eighty-Two Million Three Hundred Forty

Thousand Dollars ($82,340,000.00),  (g) the 2004 Transportation Revenue Refunding Bonds, Series J, issued by HTA in the original principal amount of Four Hundred Five Million  Nine Hundred Eighty-Five  Thousand Dollars ($405,985,000.00), (h) the 2005Transportation  Revenue Refunding Bonds, Series K, issued by HTA in the original  principal amount of Eight Hundred Million  Dollars ($800,000,000.00), (i) the 2005 Transportation Revenue Refunding Bonds, Series L, issued by HTA in the original  principal amount of Five Hundred Ninety-Eight Million  Two Hundred Eighty-Five  Thousand Dollars ($598,285,000.00), (j) the 2007 Transportation Revenue Refunding Bonds, Series M, issued by HTA in the original  principal  amount of Two Hundred Fifty Million  Dollars ($250,000,000.00), (k) the 2007 Transportation Revenue Refunding Bonds, Series N, issued by the HTA in the original  principal amount of One Billion  Five Hundred Two Million Nine Hundred Four Thousand Nine Hundred Fifty-Three Dollars and Ninety-Five Cents ($1,502,904,953.95),  and (l) the 2010 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original  principal amount of Forty-Four Million  Two Hundred Seventy-Five Thousand Dollars ($44,275,000.00).

1.289     **HTA 98 Sub Bonds:** Collectively, the following  subordinated bonds issued by HTA pursuant to Resolution  98-06, adopted February 26, 1998, as amended and supplemented thereafter: (a) the Subordinated  Transportation Revenue Bonds, Series 1998, issued by HTA in the original principal amount of Seventy-Five Million  Fifty Thousand Dollars ($75,050,000.00),  and (b) the Subordinated  Transportation Revenue Bonds, Series 2003, issued by HTA in the original principal amount of Three Hundred Twenty Million  Five Hundred Forty-Five Thousand Dollars ($320,545,000.00).

1.290     **HTA Bonds:** Collectively,  the HTA 68 Bonds, the HTA 98 Senior Bonds, and the HTA 98 Sub Bonds.

1.291     **HTA/CCDA Annex Agreement:** That certain Annex Agreement annexed as Exhibit "I" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds may become HTA/CCDA PSA Creditors.

1.292     **HTA/CCDA Joinder Agreement:** That certain Joinder Agreement annexed as Exhibit "H" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds may become HTA/CCDA PSA Creditors.

1.293     **HTA/CCDA Joinder Deadline:** With respect to (a) HTA 68 Bond Claims and CCDA Bond Claims, May 17, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) HTA 98 Senior Bond Claims, July 15, 2021, at 11:59 p.m. (Eastern Daylight Time), or in either case, such later date and time as may be requested by Assured and National, but in no event later than the commencement of the hearing to consider confirmation of the Plan.

1.294     **HTA/CCDA Joinder Creditors:** Collectively, those entities holding  HTA Bonds or CCDA Bonds that execute and deliver either the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement prior to the HTA/CCDA Joinder Deadline.

1.295     **HTA/CCDA Plan Support Agreement:** That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the

HTA/CCDA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.296    **HTA/CCDA PSA Creditors**: Collectively, the parties to the HTA/CCDA Plan Support Agreement, other than the Oversight Board.

1.297    **HTA/CCDA PSA Restriction Fee Period**: The period from May 5, 2021 up to and including the earlier to occur of (a) the HTA/CCDA PSA Threshold Attainment and (b) the applicable HTA/CCDA Joinder Deadline.

1.298    **HTA/CCDA PSA Threshold Attainment**: The date on which HTA/CCDA PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Assured and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, (a) with respect to HTA 68 Bonds, eighty-five percent of the aggregate amount of HTA 68 Bond Claims, inclusive of principal and interest as of the HTA Petition Date, (b) with respect to HTA 98 Senior Bonds, sixty-seven percent (67%) of the aggregate amount of HTA 98 Senior Bond Claims, inclusive of principal and interest as of the HTA Petition Date, and (c) with respect to CCDA Bonds, seventy percent (70%) of the aggregate amount of CCDA Bond Claims, and in each case, without duplication and, to the extent any such claims are insured, to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

1.299    **HTA Clawback CVI**: The CVI to be issued on account of Allowed CW/HTA Claims in accordance with the terms and provisions of the Plan, the CVI Indenture, the HTA/CCDA Plan Support Agreement and the Settlement Summary annexed thereto as Exhibit "J".

1.300    **HTA Confirmation Order**: The order of the Title III Court confirming the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the HTA Title III Case in accordance with Section 301 of PROMESA.

1.301    **HTA Distribution Conditions**: Collectively, (a) the Effective Date shall have occurred, (b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents (solely as they relate to Assured and National) shall have been agreed upon by the Oversight Board, Assured and National, (c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 68 Bonds shall have executed the HTA/CCDA Plan Support Agreement (or an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement with respect thereto), and (d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least sixty-seven (67%) of the outstanding principal amount of HTA 98 Senior Bonds shall have executed the HTA/CCDA Plan Support Agreement (or a Joinder Agreement or an Annex Agreement with respect thereto); provided, however, that, upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) above shall be deemed satisfied.

1.302 **HTA Effective Date:** The date on which the transactions contemplated by the HTA Plan and authorized by the Title III Court pursuant to the HTA Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the HTA Plan have been satisfied or waived in accordance with its terms.

1.303 **HTA Fiscal Agent:** The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the HTA Bonds.

1.304 **HTA Plan:** The plan of adjustment to be filed by the Oversight Board, as representative of HTA in the HTA Title III Case, in form and substance reasonably acceptable to Assured and National, and consistent with the terms of the Settlement Summary annexed to the HTA/CCDA Plan Support Agreement as Exhibit "J", and, with respect to HTA Bonds insured by FGIC and Ambac, containing provisions consistent with the terms and provisions set forth in Sections 71.4 and 71.5 hereof, respectively.

1.305 **HTA Title III Case:** The Title III case under PROMESA pending in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of the Puerto Rico Highways & Transportation Authority, Case No. 17-3567-LTS (D.P.R.).

1.306 **Initial PSA Creditors:** Collectively, the Initial GO/PBA PSA Creditors and the Initial HTA/CCDA PSA Creditors.

1.307 **Initial GO/PBA PSA Creditors:** Collectively, those creditors that executed the Initial PSA on February 22, 2021.

1.308 **Initial GO/PBA PSA Restriction Fee Creditors:** Collectively, the Initial GO/PBA PSA Creditors and the Initial GO/PBA PSA Joinder Creditors that executed and delivered the Initial PSA, a joinder or annex agreement, as applicable, at or prior to the Initial PSA Threshold Attainment.

1.309 **Initial HTA/CCDA PSA Creditors:** The "Initial PSA Creditors" as defined in the HTA/CCDA Plan Support Agreement.

1.310 **Initial PSA:** That certain Plan Support Agreement, dated as of February 22, 2021, by and among the Oversight Board and the Initial GO/PBA PSA Creditors.

1.311 **Initial PSA Joinder Creditors:** Collectively, those Entities holding GO Bonds or PBA Bonds, that executed and delivered a Joinder Agreement or an Annex Agreement to the Initial PSA, the forms of which were annexed to the Initial PSA as Exhibits "F" and "G", respectively, prior to the Initial PSA Threshold Attainment.

1.312 **Initial PSA Threshold Attainment:** The date and time which the Initial GO/PBA PSA Restriction Fee Creditors owned or had due investment management responsibility and authority for funds or accounts which owned, or, with respect to Assured, Syncora and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, seventy percent (70%) of the

aggregate amount of CW Bond Claims, CW Guarantee Bond Claims, and PBA Bond Claims (without duplication and, to the extent such claims are Insured Bond Claims, to the extent a PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law).

1.313    **Insured Bond Claim:** Collectively, the Bond Claims, the principal and interest payments of which have been insured by a Monoline, including, without limitation, pursuant to a secondary market insurance policy.

1.314    **Invalidity Actions:** Collectively, the adversary proceedings challenging the validity of certain GO Bonds, PBA Bonds, and PRIFA BANs listed on Exhibit "C" hereto.

1.315    **IRC:** The United States Internal Revenue Code of 1986, as amended from time to time.

1.316    **IRS:** The Internal Revenue Service, an agency of the United States Department of Treasury.

1.317    **JRS:** Judiciary Retirement System.

1.318    **JRS Participant Claim:** A Claim on account of being or having been a Participant in JRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in JRS from and after the Effective Date.

1.319    **LCDC:** The LCDC Holders, as such membership may change from time to time.

1.320    **LCDC Holders:** The Lawful Constitutional Debt Coalition consisting of Aristeia Capital, LLC, Farmstead Capital Management, FCO Advisors LP, GoldenTree Asset Management LP, Monarch Alternative Capital LP, Taconic Capital Advisors L.P., and Whitebox Advisors L.L.C., each on behalf of itself or certain of its respective managed funds and, in each case, their respective successors GO/PBA and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.321    **Lien:** Any charge against or interest in property to secure payment of a debt or performance on an obligation.

1.322    **Lien Challenge Actions:** Collectively, the adversary proceedings listed on Exhibit "D" hereto.

1.323    **Lift Stay Motions:** Collectively, the litigation styled (a) Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, filed in the HTA Title III Case [Dkt. No. 673], (b) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10104], (c) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10602], (d) AmeriNational Community Services, LLC, et al. v. The Financial Oversight Management Board of Puerto Rico, filed in the HTA Title III Case [Dkt. No. 591], (e) Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1930, currently pending in the United States Court of Appeals for the

First Circuit, (f) <u>Ambac Assurance Corporation, et al, v. Commonwealth of Puerto Rico, et al.</u>, Case No. 2—1931, currently pending in the United States Court of Appeals for the First Circuit, (g) <u>Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.</u>, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (i) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with section 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

1.324    **List of Creditors:** The Creditor List (together with all summaries, notes, and schedules) attached as Exhibit A to the (a) *Notice of Filing of Creditor List for the Commonwealth of Puerto Rico* filed in the Commonwealth Title III Case [Case No. 17-3283-LTS, ECF No. 1215], (b) *Notice of Filing of Creditor List for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* filed in the ERS Title III Case [Case No. 17-3566-LTS, ECF No. 207], and (c) *Notice of Filing of Creditor List for The Puerto Rico Public Buildings Authority* filed in the PBA Title III Case [Case No. 19-5523-LTS, ECF No. 34] pursuant to sections 924 and 925 of the Bankruptcy Code, as such lists, summaries, notes, or schedules have been or may be amended, restated, supplemented or otherwise modified by the Debtors.

1.325    **Local Bankruptcy Rules:** The Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico and, to the extent applicable to the Title III Case, the Local District Court Rules for the District of Puerto Rico, each as amended from time to time.

1.326    **Maximum Annual Debt Service:** The maximum scheduled annual debt service (including principal and interest payments due and payable on bonds bearing current interest and, in the case of capital appreciation bonds or similar instruments, the maturity value due and payable on such instruments) for any FY on Net Tax-Supported Debt; <u>provided</u>, <u>however</u>, that, in the case of variable rate Debt, the calculation shall assume that such Debt bears interest at the maximum annual rate permitted by law; and, <u>provided</u>, <u>further</u>, that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in Section 74.4 hereof, the Debt Management Policy may establish additional provisions or clarifications regarding the calculation of the Maximum Annual Debt Service consistent with the principles and objectives set forth therein.

1.327    **Maximum Taxable Bond Election Amount:** The amount of New GO Bonds required, after consultation with Section 103 tax counsel and determination by Internal Revenue Service, to be issued as non-exempt for federal income tax purposes.

1.328    **Measured SUT:** The 5.5% SUT, <u>less</u> CINE funds of Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00), as set forth in the Settlement Summary annexed as Exhibit "I" to the GO/PBA Plan Support Agreement.

1.329    **Med Centers:** Collectively, the following federally qualified health centers: (a) Atlantic Medical Center, Inc.; (b) Camuy Health Services, Inc.; (c) HPM Foundation, Inc.; (d) Centro de Salud de Lares, Inc.; (e) Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc.; (f) Ciales Pumay Health Care Services, Inc.; (g) Concilio de Salud Integral de Loiza, Inc.; (h) Corporacion de Servicios Medicos Primarios Prevencion de Hatillo, Inc.; (i) Corporacion de Servicios de Salud y Medicina de Avandaza; (j) NeoMed Center, Inc.; (k) Hospital Center

Castaner, Inc.; (l) Migrant Health Center, Inc.; (m) Morovis Community Health Center, Inc.; (n) Centro de Servicios Primarios de Salud de Patillas, Inc.; (o) Costa Salud, Inc.; (p) Salud Integral en la Montana, Inc. (SIM), f/k/a Corporacion de Servicios Integrales de Salud del Area de Barranquitas, Comerro, Corozal, Narajito y Orocovis; (q) Med Center, Inc., f/k/a Consejo de Salud de la Comunidad de la Playa de Ponce, Inc.; (r) Community Health Foundation of Puerto Rico, Inc.; (s) Corporacion SANOS; (t) San Juan Comprehensive Health Care for the Homeless Program; (u) Centro de Servicios Primarios de Salud de Florida (v) Puerto Rico Community Network for Clinical Research (CONCRA); and (w) Rio Grande Community Health Center, Inc.

1.330    **Med Center Claims:** Collectively, any and all Claims of the Med Centers arising from or relating to the Medicaid Act, 42 U.S.C. § 139 6a(bb), including, without limitation, (a) any claims and causes of action asserted or which could have been asserted in the Med Center Litigation against the Commonwealth, (b) any amounts asserted to be due and owing by the Commonwealth, or which could have been asserted as due and owing by the Commonwealth, in the Med Center proofs of claim, and (c) any amounts asserted to be owing by the Commonwealth and relating to the period from the Commonwealth Petition Date up to and including the Effective Date.

1.331    **Med Center Litigation:** Collectively, the litigation styled (a) Asociacion de Salud Primaria de Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, et al., Civil No. KPE02-1037 (2002), currently pending in the Commonwealth Court of First Instance, together with the following appeals therefrom: (i) Appeal No. KLCE2017-0147; (ii) Appeal No. KLCE2017-00094; and (iii) Appeal No. KLCE2017-00105, but, expressly excluding therefrom any claims asserted in the foregoing litigation by any Med Centers against the Municipality of San Juan, (b) Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al., Case No. 03-1640(GAG), currently pending in the United States District Court for the District of Puerto Rico, together with following appeals therefrom: (i) Case No. 17-1731; (ii) Case No. 17-1812; (iii) Case No. 17-1822; (iv) Case No. 18-1083; and (v) Case No. 19-1336, (c) Atlantic Medical Center Inc. et al. v. The Commonwealth of Puerto Rico, et al., Case No. 06-1291, currently pending in the United States District Court for the District of Puerto Rico, (d) Consejo de Salud de la Communidad de la Playa de Ponce, Inc., et al. v. Gonzalez-Feliciano, Case No. 06-1260, currently pending in the United States District Court for the District of Puerto Rico, (e) Asociacion de Salud Primaria de P.R., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00227, currently pending in the Title III Court, (f) Atlantic Med. Ctr., Inc., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00278, currently pending in the Title III Court, (g) Corporacion de Servicios Integrales de Salud del Area de Barranquitas, Comerio, Corozal, Naranjito y Orocovis v. Commonwealth of Puerto Rico, Adv. Pro. No. 17-00292, currently pending in the Title III Court, (h) Corporacion de Servicios Integrals de Salud del Area de Barranquitas, Comerio, Corozal, Naanjito y Orocovis v. Commonwealth of Puerto Rico, Adv. Proc. No. 17-00298, currently pending in the Title III Court, (i) Motion of Salud Integral en la Montana, Corporacion de Servicios de Salud y Medicina Avanzada, Neomed Center, Mgmt. Health Center, HPM Foundation, Morovis Community Health Center and Concilio de Salud Integral de Loiza for Allowance and Payment of Administrative Expense Claim, or in the Alternative, Relief from the Automatic Stay, filed in the Commonwealth Title III Case [ECF No. 13582], (j) Motion of Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv.

Medicos Primarios y Prevencion de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc. and Hospital General Costoner, Inc. Seeking (I) Enforcement of the Court's Prior Order and (II) Relief from the Automatic Stay, filed in the Commonwealth Title III Case [ECF. No. 12918], (k) Motion for Relief from Stay, filed in the Commonwealth Title III Case [ECF No. 13748], and (l) any litigation, adversary proceeding or motion with respect to the Med Center Claims at issue in the Commonwealth Title III Case or any of the above-referenced Med Center Litigations.

1.332    **Med DC Action:** The litigation styled Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al.,, Case No. 03-1640 (GAG), currently pending in the United States District Court for the District of Puerto Rico.

1.333    **Medical Insurance Benefit:** The monthly allowance of One Hundred Dollars ($100.00) provided to all pre-Act No. 3-2013 eligible ERS, JRS and TRS Participants who have a government approved health insurance policy, which allowance is paid directly to the insurance company.

1.334    **Medicine Bonus:** The bonus, if any, payable to current, former, active, inactive and disabled employees in accordance with Act No. 155-2003, codified at 3 L.P.R.A. §757j, as amended by Act No. 3-2013, 3 L.P.R.A. §761.

1.335    **Monolines:** Collectively, Ambac, Assured, FGIC, National and Syncora, as insurers of GO Bonds, PBA Bonds, HTA Bonds, CCDA Bonds, PRIFA Bonds or other Claims or securities issued by the Debtors, as applicable.

1.336    **Monthly Base Pension:** The amount of the monthly pension payment made, or to be made, to a Participant, but expressly excluding all other benefits, including, without limitation, the Christmas Bonus, the Summer Bonus, the Medicine Bonus and the Medical Insurance Benefit.

1.337    **Monthly Benefit Modification:** The modification, commencing on the Benefit Reduction Date, of Total Monthly Benefit payments that exceed $1,500.00 per month as follows: (a) by reduction of the Monthly Christmas Bonus until the $1,500.00 per month threshold is reached or the Reduction Percentage is reached, or the Monthly Christmas Bonus is entirely eliminated, whichever occurs first as the Participant's Total Monthly Benefit is reduced; (b) in the event that the Participant's Total Monthly Benefit is still in excess of the $1,500.00 per month threshold and the Reduction Percentage has not been attained following elimination of the Monthly Christmas Bonus, by reduction of the Monthly Summer Bonus until the $1,500.00 per month threshold is reached or the Reduction Percentage is reached, or the Summer Bonus is entirely eliminated, whichever occurs first as the Participant's Total Monthly Benefit is reduced; (c) in the event that the Participant's Total Monthly Benefit is still in excess of the $1,500.00 per month threshold and the Reduction Percentage has not been attained following elimination of the Monthly Christmas Bonus and the Monthly Summer Bonus, by reduction of the Monthly Medicine Bonus until the $1,500.00 per month threshold is reached or the Reduction Percentage is reached, or the Monthly Medicine Bonus is entirely eliminated, whichever occurs first as the Participant's Total Monthly Benefit is reduced; and (d) in the event that the Participant's Total Monthly Benefit is still in excess of the $1,500.00 per month threshold and the Reduction Percentage has not been attained

after elimination of the Monthly Christmas Bonus, Monthly Summer Bonus, and Monthly Medicine Bonus, by reduction of the Monthly Base Pension until the Reduction Percentage is attained; provided, however, that application of the remaining Reduction Percentage to the Monthly Base Pension shall not reduce a Participant's Total Monthly Benefit below the $1,500.00 per month threshold; and, provided, further, that (i) adjustments for Social Security and the receipt thereof, and (ii) the Monthly Medical Benefit shall be excluded from the calculation of the foregoing; and, provided, further, that, notwithstanding anything contained herein to the contrary, accrued pension benefits earned by Participants from and after May 4, 2017, shall not be subject to reduction.

1.338    **Monthly Christmas Bonus:** The amount equal to one-twelfth (1/12) of the annual Christmas Bonus, if any.

1.339    **Monthly Medicine Bonus:** The amount equal to one-twelfth (1/12) of the annual Medicine Bonus, if any.

1.340    **Monthly Summer Bonus:** The amount equal to one-twelfth (1/12) of the annual Summer Bonus, if any.

1.341    **National:** National Public Finance Guarantee Corporation.

1.342    **National Action:** The litigation styled National Public Finance Guarantee Corp., et al. v. UBS Financial Services, Inc., et al., currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2019CV07932.

1.343    **National Acceleration Price:** With respect to any National Insured Bonds, an amount equal to the outstanding principal amount of such National Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date.

1.344    **National Certificates:** With respect to each National Trust that is formed for the benefit of the beneficial holders of National Insured Bonds, the certificate(s) or receipt(s) to be issued by such National Trust to beneficial holders of such National Insured Bonds that are deposited into the National Trust.

1.345    **National Commutation Consideration:** A combination of some or all of the following, to be selected at National's sole discretion prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the National Plan Consideration; (ii) a percentage, to be determined at National's sole discretion, of the Consummation Costs and/or the PSA Restriction Fee allocable to National in accordance with the terms and provisions of Article III hereof; and (iii) Cash in an amount to be determined by National in its sole discretion.

1.346    **National Commutation Treatment:** The treatment set forth in Section 72.2(a) hereof.

1.347    **National CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured by National.

45

1.348    **National Escrow Account:** A single escrow account that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, for the benefit of the beneficial holders of National Insured Bonds whose National Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.349    **National Insurance Policies:** The existing insurance policies, including secondary market insurance policies, initially issued by (a) MBIA Insurance Corporation and subsequently novated to National or (b) FGIC and subsequently novated to National, and relating to the National Insured Bonds, together with any and all agreements and other documents related thereto.

1.350    **National Insured Bond Claims:** Collectively, the Claims arising from the National Insured Bonds, including any Vintage CW Guarantee Bond Claims (National).

1.351    **National Insured Bonds:** Collectively, the GO Bonds and the PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by National, including, without limitation, pursuant to a secondary market insurance policy.

1.352    **National Non-Commutation Treatment:** The treatment set forth in Article 72.2(b) hereof.

1.353    **National Plan Consideration:** The consideration allocable or distributable to holders of Allowed Vintage PBA Bond Claims (National), Allowed Vintage CW Bond Claims (National), and Allowed Vintage CW Guarantee Bond Claims (National), as the case may be.

1.354    **National Treatment:** With respect to each Class of National Insured Bond Claims, the treatment set forth in Article LXXV hereof.

1.355    **National Trust:** The trust(s) which may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, the sole cost and expense of which, including, but not limited to, the formation and maintenance of the trust(s) (including trustee fees and expenses), shall be satisfied from the assets of the National Trust, and for the benefit of beneficial holders of such National Insured Bonds, the terms of which shall be set forth in the Plan Supplement.

1.356    **Net Allowed ERS Bond Claims:** Collectively, (a) Allowed ERS Bond Claims minus (b) the amount of adequate protection payments received by a holder of such Allowed ERS Bond Claims from and after the ERS Petition Date, calculated on a CUSIP-by-CUSIP basis.

1.357    **Net CW Cash Consideration:** The amount of Cash equal to Five Hundred Seventy-Five Million Dollars ($575,000,000.00) in Cash, minus (a) up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing in its sole and absolute discretion, as necessary to fund the administration and operation of the Avoidance Actions Trust, (b) such amounts paid to compensate the Creditors' Committee appointees to the Avoidance Actions Trust Board and their counsel in connection with their review and analysis of the claims reconciliation process in accordance with Article LXXIX of the Plan, which under all circumstances shall not exceed, on an annual basis, Three Million Dollars

($3,000,000.00), and (c) such amount of Cash as is necessary to satisfy the payment of Allowed Convenience Claims in accordance with Article LXXII of the Plan,

1.358    **Net Tax-Supported Debt:** Any Tax-Supported Debt, excluding any (a) Debt guaranteed by the full faith, credit and taxing power of the Commonwealth that is not payable from or secured by Debt Policy Revenues requiring its continued payment from non-Debt Policy Revenues, to the extent that the Commonwealth's guarantee has not been drawn upon in the five (5) most recently completed FYs, (b) Debt being refinanced through the proceeds of the proposed bond or note issuance, and (c) Debt and obligations expressly excluded from the calculation of the Comprehensive Cap in Section 70.5 hereof.

1.359    **New GO 5.0% CABs:** Collectively, the series of general obligation capital appreciation bonds, accreting interest at the rate of five percent (5%) per annum, to be issued pursuant to the Plan as components of New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.360    **New GO 5.375% CABs:** Collectively, the series of general obligation capital appreciation bonds, accreting interest at the rate of five and three hundred seventy-five one thousandths percent (5.375%) per annum, to be issued pursuant to the Plan as components of New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.361    **New GO Bonds:** Collectively, (a) New GO CIBs, (b) New GO 5.375% CABs, and (c) New GO 5.0% CABs, issued as general obligation bonds, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the New GO Bonds Indenture, and the New GO Bonds Legislation, including, without limitation, any refunding bonds which may be issued in accordance with the New GO Bonds Indenture and the New GO Bonds Legislation.

1.362    **New GO Bonds Indenture:** The indenture to be executed and delivered as of the Effective Date pursuant to which the Commonwealth shall issue the New GO Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

1.363    **New GO Bonds Legislation:** The legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the New GO Bonds consistent with the terms set forth herein and in the GO/PBA Plan Support Agreement.

1.364    **New GO Bonds Trustee:** The trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the New GO Bonds Indenture.

1.365    **New GO CIBs:** Collectively, the series of general obligation current interest bonds to be issued pursuant to the Plan as components of the New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.366     **New GO Refunding Bonds:** The securities which may be issued by Reorganized Commonwealth from and after the Effective Date, for the purpose of refinancing, in whole or in part, New GO Bonds or securities previously issued to refinance New GO Bonds, provided that, (a) the final maturity date on any such refinancing securities shall not be later than thirty (30) years from the original scheduled final maturity date of the New GO Bonds, and (b) upon the issuance of any such securities, the annual debt service due in the then-current and each future fiscal year on all New GO Bonds and New GO Refunding Bonds outstanding after the issuance of the New GO Refunding Bonds shall be equal to or less than the annual debt service due in the then-current and each future fiscal year through FY 2046, respectively, on all New GO Bonds and New GO Refunding Bonds outstanding prior to such issuance.

1.367     **New HTA Bonds:** Collectively, the bonds to be issued on the HTA Effective Date by HTA in accordance with the terms and conditions of the HTA Plan, the HTA Confirmation Order, and the New HTA Bonds Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New HTA Bonds Indenture.

1.368     **New HTA Bonds Indenture:** The indenture or resolution to be executed and delivered as of the HTA Effective Date pursuant to which HTA shall issue the New HTA Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions, which indenture or resolution shall be reasonably satisfactory to Assured and National.

1.369     **Notas de Ahorro:** Collectively, savings notes issued by the Commonwealth pursuant to Act No. 7 of the Legislature of Puerto Rico, the payment of which is backed by the full faith and credit of the Commonwealth.

1.370     **OGP:** The Office of Management and Budget of the Commonwealth.

1.371     **Ordinary Course Employee Claim:** A Claim held by an employee of the Debtors related to ordinary course employment matters, including, without limitation, a Claim related to termination, holiday pay, vacation, sick leave, back-pay, or other similar Claims; provided, however, that, an "Ordinary Course Employee Claim" shall not include Claims related to retiree benefits.

1.372     **Outperformance Condition:** The amount that Measured SUT exceeds the "Outperformance Metric", as defined in the Settlement Summary annexed as Exhibit "I" to the GO/PBA Plan Support Agreement, in any FY.

1.373     **Outstanding:** Debt that (i) has not been paid in full in accordance with its terms or (ii) has not been legally defeased in accordance with the defeasance requirements set forth in the applicable definitive issuance documents.

1.374     **Oversight Board:** The Financial Oversight and Management Board for Puerto Rico established pursuant to Section 101 of PROMESA, as the Debtors' representative in their respective Title III Cases pursuant to Section 315(b) of PROMESA.

1.375     **Participant:**  A current, former, active, inactive, or disabled employee who holds an accrued claim for one or more retirement benefits on account of being or having been a participant in ERS, JRS, or TRS, together with its beneficiaries, if any.

1.376     **PayGo:**  The pay-as-you-go pension system created in accordance with Act 106 of 2017.

1.377     **PBA:**  Puerto Rico Public Buildings Authority.

1.378     **PBA Administrative Expense Claim:**  The Claim of PBA against the Commonwealth relating to the Commonwealth's use and occupancy of PBA Property during the period from the commencement of the Commonwealth's Title III Case up to and including the Effective Date.

1.379     **PBA Bond Claims:**  Collectively, the Claims against PBA arising from or relating to the PBA Bonds, including the Vintage PBA Bond Claims, the Vintage PBA Bond Claims (Ambac), the Vintage PBA Bond Claims (Assured), the Vintage PBA Bond Claims (National), the Vintage PBA Bond Claims (FGIC), the Vintage Bond Claims (Syncora), the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the Retail PBA Bond Claims.

1.380     **PBA Bond Distribution:**  The distribution of Cash to holders of Allowed PBA Bond Claims in an amount equal to the Allowed PBA Administrative Expense Claim.

1.381     **PBA Bonds:**  Collectively, the 2011 PBA Bonds, the 2012 PBA Bonds and the Vintage PBA Bonds.

1.382     **PBA Cash:**  One Billion Seventy-Three Million Dollars ($1,073,000,000.00), the amount paid by the Commonwealth in connection with the compromise and settlement of the Allowed PBA Administrative Expense Claim.

1.383     **PBA/DRA Secured Claim:**  Collectively, the loans allegedly made by GDB to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of Sixty-Six Million Two Hundred Twenty-Two Thousand Twenty-Eight Dollars ($66,222,028.00), the repayment of which is asserted to be secured by the proceeds of the sale or disposition of certain PBA Property and subordinated to all rights and recoveries with respect to the PBA Bonds.

1.384     **PBA/DRA Unsecured Claim:**  Collectively, the subordinated loans allegedly made by GDB, to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of One Hundred Thirty-Four Million Three Hundred Fifty-Seven Thousand Four Hundred Ninety-Seven Dollars ($134,357,497.00).

1.385     **PBA General Unsecured Claim:**  A Claim against PBA, other than a PBA Bond Claim, a PBA/DRA Secured Claim and a PBA/DRA Unsecured Claim, but including Ordinary Course Employee Claims against PBA.

1.386     **PBA Litigation:**  The adversary proceeding styled <u>The Financial Oversight & Management Board of Puerto Rico v. Puerto Rico Public Buildings Authority</u>, Adv. Proc. No. 18-00149, currently pending in the Title III Court.

49

1.387    **PBA Petition Date:** September 27, 2019, the date on which the PBA Title III Case was commenced.

1.388    **PBA Property:** All property for which any right, title or interest currently resides in PBA, including, without limitation, the buildings and other facilities owned or leased by PBA.

1.389    **PBA Title III Case:** The Title III case under PROMESA pending in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of Puerto Rico Public Buildings Authority, Case No. 19-5523-LTS (D.P.R).

1.390    **Pension Reserve Deed of Trust:** The deed of trust to be executed and delivered on or prior to the Effective Date, reasonably acceptable to the Government of Puerto Rico, the Retiree Committee, and labor organizations party to plan support agreements for the Plan, substantially in the form included in the Plan Supplement, providing for, among other things, creating the Pension Reserve Trust and providing for the terms for the deposit and withdrawal of monies in the Pension Reserve Trust for the benefit of the Retirees.

1.391    **Pension Reserve Trust:** The reserve trust to be created in accordance with the terms and conditions of Article LXXXIII hereof, which reserve trust shall be utilized for payment of the Commonwealth's pension obligations under Act 106.

1.392    **Person:** An individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political subdivision thereof, or any other form of legal entity.

1.393    **PFC:** Puerto Rico Public Finance Corporation.

1.394    **Plan:** This Sixth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules hereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms hereof.

1.395    **Plan Supplement:** A separate volume, to be filed with the Clerk of the Title III Court, including, among other documents, forms of the New GO Bonds and the CVIs and, if not previously enacted, the draft of the New GO Bonds Legislation and the CVI Legislation, respectively, which, in each case, shall be in form and substance reasonably satisfactory to AAFAF, the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Ambac, Assured, FGIC, National, and Syncora and, solely with respect to the provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee. The Plan Supplement (containing draft or final versions of the foregoing documents) shall be filed with the Clerk of the Title III Court as soon as practicable (but in no event later than seven (7) days) prior to the Ballot Date, or on such other date as the Title III Court establishes. The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full.

1.396    **Ports:** Ports of the Americas Authority.

1.397    **PRASA:** Puerto Rico Aqueduct and Sewer Authority.

50

1.398     **PREPA:** The Puerto Rico Electric Power Authority.

1.399     **PRIDCO:** Puerto Rico Industrial Development Company.

1.400     **PRIFA:** Puerto Rico Infrastructure Financing Authority.

1.401     **PRIFA BANs:** Collectively, the PRIFA Bond Anticipation Notes, Series 2015, issued pursuant to that certain Trust Agreement dated March 2015, between PRIFA and the PRIFA BANs Trustee.

1.402     **PRIFA BANs Commonwealth Guaranty:** That certain Guaranty Agreement, dated as of March 1, 2015, made by the Commonwealth to and for the benefit of RBC Municipal Products, LLC, as initial purchaser, and for the benefit of the PRIFA BANs Trustee.

1.403     **PRIFA BANs Litigation:** The litigation styled The Financial Oversight and Management Board for Puerto Rico v. The Bank of New York Mellon, et al., Adv. Pro. No. 19-AP-269-LTS, currently pending in the Title III Court.

1.404     **PRIFA BANs Trustee:** The Bank of New York Mellon, solely in its capacity as trustee, paying agent, and registrar with respect to the PRIFA BANs.

1.405     **PRIFA Bond Claims:** Collectively, the Claims against PRIFA arising from or relating to the PRIFA Bonds.

1.406     **PRIFA Bonds:** Collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and (d) Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

1.407     **PRIFA Clawback CVI:** The CVI to be issued on account of Allowed CW/PRIFA Rum Tax Claims in accordance with the terms and provisions of the Plan, the CVI Indenture, the PRIFA Plan Support Agreement and the Settlement Summary annexed thereto as Exhibit "F".

1.408     **PRIFA Distribution Conditions:** Collectively, (a) the Effective Date shall have occurred, (b) the documentation of the PRIFA Plan, the PRIFA Order, the CVI Indenture, the PRIFA Trust Documentation and the Custodial Trust Documents, as applicable, shall have been agreed upon by the Oversight Board, Ambac, and FGIC, and (c) holders of, or insurers entitled to vote with respect to the PRIFA Bonds, holding or insuring, as the case may be, at least seventy percent (70%) of the outstanding principal amount of the PRIFA Bonds shall have executed the PRIFA Plan Support Agreement or a Joinder Agreement or an Annex Agreement with respect

thereto; provided, however, that, upon entry of a Final Order with respect to the PRIFA Order, the condition set forth in subsection (c) shall be deemed satisfied.

1.409 **PRIFA Order:** The order of the Title III Court either (a) confirming a plan of adjustment for PRIFA in the event a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, or (b) approving a qualifying modification under Title VI of PROMESA on behalf of PRIFA.

1.410 **PRIFA Plan:** As determined by the Oversight Board, upon consultation with AAFAF, either (a) in the event that a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, the plan of adjustment filed by the Oversight Board and confirmed by the Title III Court pursuant to the PRIFA Order, or (b) in the event that Ambac or FGIC propose to the Oversight Board a modification of the PRIFA Bonds under Title VI of PROMESA consistent with the terms and conditions set forth in the Settlement Summary annexed as Exhibit "F" to the PRIFA Plan Support Agreement, the application to approve such qualifying modification filed by the Oversight Board.

1.411 **PRIFA Plan Support Agreement:** That certain PRIFA Related Plan Support Agreement, dated as of July 27, 2021, by and among the Oversight Board and the PRIFA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.412 **PRIFA PSA Creditors:** Collectively, the parties to the PRIFA Plan Support Agreement, other than the Oversight Board.

1.413 **PRIFA Trust:** The trust to be created on or prior to the Effective Date in accordance with the applicable Trust Documentation and (a) into which, on the Effective Date, the Commonwealth shall deposit, among other consideration, the PRIFA Clawback CVI, the Rum Tax CVI, and all distributions to be made in connection therewith, and One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00), and (b) upon satisfaction of the PRIFA Distribution Conditions, the beneficial interests of which shall be distributed to holders of PRIFA Bond Claims pursuant to the terms and conditions of the PRIFA Plan.

1.414 **Professional:** An Entity (a) to be compensated for services rendered prior to or on the Effective Date pursuant to Sections 316 and 317 of PROMESA, and (i) employed in the Title III Cases by the Government Parties (in the Government Parties' sole discretion); (ii) employed in the Title III Cases by the Oversight Board (in the Oversight Board's sole discretion); or (iii) a committee appointed in accordance with section 1103 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been Allowed by the Title III Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.415 **Professional Claim:** A Claim by a Professional seeking an award by the Title III Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 316 and 317 of PROMESA.

1.416 **PROMESA:** The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

1.417   **Pro Rata Share:**  With respect to Allowed Claims (a) among and within Classes within the same Bond Recovery Category set forth in Exhibit "L" hereto, the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class (or within all Classes within such Bond Recovery Category, as applicable), taking into account, and reducing for, unmatured interest thereon as of the Commonwealth Petition Date or the PBA Petition Date, as the case may be, with respect to individual bonds within such Class, and (b) among more than one Class, but not within the same Bond Recovery Category, the proportion that Allowed Claims within such Class of Claims receive in consideration bears to the sum of consideration received by all Claims within all applicable Classes.

1.418   **PSA Creditors:**  Collectively, the GO/PBA PSA Creditors and the HTA/CCDA PSA Creditors.

1.419   **PSA Restriction Fees:**  Collectively, the GO/PBA Restriction Fee and the CCDA Restriction Fee.

1.420   **Puerto Rico Investor:**  A holder of a CW Bond Claim, a PBA Bond Claim, or a CW Guarantee Bond Claim that is, or that is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole and absolute discretion); provided, however, that "Puerto Rico Investor" shall not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Ambac, Assured, FGIC, National, or Syncora.

1.421   **QTCB Group:**  The QTCB Noteholder Group consisting of Canyon Capital Advisors LLC, Sculptor Capital LP, and Davidson Kempner Capital Management LP, each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.422   **Reduction Percentage:**  The lesser of (a) eight and one-half percent (8.5%) of the Total Monthly Benefit and (b) the reduction of the Total Monthly Benefit to One Thousand Five Hundred Dollars ($1,500.00) per month.

1.423   **Related Persons:**  With respect to any Entity (including for the avoidance of doubt, the Commonwealth and the Government Parties), its predecessors, successors and assigns (whether by operation of law or otherwise) and their respective current and former employees, managers, elected or appointed officials, directors, officers, board members, principals, members, equity holders (whether such interests are held directly or indirectly), partners, financial advisors, attorneys, accountants, consultants, agents and professionals (including, without limitation, any and all Professionals retained by the Debtors and AAFAF), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them (including their respective officers, directors, managers, shareholders, partners, employees, members and professionals), each in its respective capacity as such.

1.424   **Released Claims:**  Collectively, (a) with respect to those Entities party to the GO/PBA Plan Support Agreement and the HTA/CCDA Plan Support Agreement, Claims and

Causes of Action released hereunder and in accordance with the GO/PBA Plan Support Agreement and the HTA/CCDA Plan Support Agreement, (b) Claims and Causes of Action that arise in, are related to or have been or could have been asserted against the Debtors or their Assets in the Title III Cases, (c) Claims and Causes of Action that have been or could have been asserted by the Debtors (with respect to releases given by the Debtors) and by Creditors or the Government Parties relating to Claims they have against the Released Parties (with respect to releases given by Releasing Parties), (d) Claims and Causes of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, and Claims and Causes of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Government Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, and (e) Claims that otherwise arise from or relate to the Title III Cases, the Plan, the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, Retiree Committee Plan Support Agreement, the AFSCME Plan Support Agreement, any plan support agreement with AMPR, the ERS Stipulation, the Committee Agreement, and the compromises set forth herein, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations, or property; provided, however, that, "Released Claims" is not intended to include, nor shall it have the effect of including, Claims or Causes of Action unrelated to the Debtors or Claims or Causes of Action for gross negligence, willful misconduct or intentional fraud asserted, or that could have been asserted, whether sounding in contract or tort; and, provided, further, that "Released Claims: is not intended to release, nor shall it have the effect of releasing, any Entity in its capacity as a defendant in any Avoidance Action, including a party to a tolling agreement with the Commonwealth and/or ERS related to such Cause of Action; and, provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any party from the performance of its obligations in accordance with the Confirmation Order or the Plan, including, without limitation, performance of obligations arising from or related to New GO Bonds, the New Refunding Bonds, the CVIs or under any policy of insurance or related documents issued by a Monoline; and, provided, further, that "Released Claims" shall not include claims against CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA.

1.425    **Released Parties:** Collectively, solely to the extent provided in the Plan, (a) the Government Parties, (b) the PSA Creditors, (c) the Retiree Committee, (d) the Creditors' Committee, (e) AFSCME, and (f) with respect to the foregoing clauses (a) through (e), each of their respective Related Persons.

1.426    **Releasing Parties:** Collectively, solely to the extent provided in the Plan, (a) all holders of Claims against the Debtors or their Assets; (b) such holders' current and former Affiliates and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former Related Persons.

1.427    **Reorganized Commonwealth:** The Commonwealth, from and after the Effective Date.

1.428    **Reorganized Debtors:** The Debtors, from and after the Effective Date.

1.429    **Reorganized Debtors' By-Laws:** The by-laws of the Debtors, to the extent applicable, from and after the Effective Date.

1.430    **Restriction Fee Creditors:** Collectively, the CCDA Restriction Fee Creditors and the Initial GO/PBA PSA Restriction Fee Creditors or the GO/PBA Creditors, as applicable.

1.431    **Retail 2011 CW Bond Claim:** A 2011 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.432    **Retail 2011 CW Series D/E/PIB Bond Claim:** A Claim of 2011 CW Series D/E/PIB Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.433    **Retail 2011 PBA Bond Claim:** A 2011 PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.434    **Retail 2012 CW Bond Claim:** A 2012 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.435    **Retail 2012 PBA Bond Claim:** A 2012 PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.436    **Retail 2014 CW Bond Claim:** A 2014 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.437    **Retail CW Bond Claims:** Collectively, the Retail Vintage CW Bond Claims, the Retail 2011 CW Bond Claims, the Retail CW Series 2011 D/E/PIB Bond Claims, the Retail 2012 CW Bond Claims and the Retail 2014 CW Bond Claims.

1.438    **Retail Investor:** An individual who purchased GO Bonds, PBA Bonds and/or CW Guarantee Bond Claims for his or her own brokerage account, trust account, custodial account or in a separately managed account, with aggregate holdings in an amount less than One Million Dollars ($1,000,000.00); provided, however, that "Retail Investor" shall not include any individual in his or her capacity as a holder of a GO Bond or a PBA Bond (a) the payment of principal and interest of which is insured by Ambac, Assured, FGIC, National or Syncora, or (b) who tendered for exchange such GO Bond or PBA Bond in accordance with the terms and provision of Article II of the GO/PBA Plan Support Agreement.

1.439    **Retail PBA Bond Claims:** Collectively, the Retail Vintage PBA Bond Claims, the Retail 2011 PBA Bond Claims, and the Retail 2012 PBA Bond Claims.

1.440    **Retail Support Fee:** Collectively, that portion of the fees to be made available to Retail Investors, in accordance with the terms and provisions of the GO/PBA Plan Support

Agreement, the Plan, and the Confirmation Order, which fees, in the aggregate, shall not exceed Fifty Million Dollars ($50,000,000.00); provided, however, that, notwithstanding the foregoing, in accordance with the provisions of the GO/PBA Plan Support Agreement, Section 3.6 hereof and the Confirmation Order, such aggregate amount may be decreased on account of the Retail Support Fee Return, with the aggregate amount of the Retail Support Fee Return being redistributed in accordance with the provisions of the GO/PBA Plan Support Agreement, Section 3.6 hereof and the Confirmation Order.

1.441 **Retail Support Fee Return:** Collectively, that portion of the Retail Support Fee not allocated to classes of Retail Investors, which portion is then payable and reallocated to Initial GO/PBA PSA Restriction Fee Creditors and members of Retail Investor Classes that voted to accept the Plan in accordance with the provisions of Section 3.6 hereof and the Confirmation Order.

1.442 **Retail Vintage CW Bond Claim:** A Vintage CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.443 **Retail Vintage PBA Bond Claim:** A Vintage PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to be less than One Million Dollars ($1,000,000.00).

1.444 **Retired ERS Participant Above-Threshold Claim:** An ERS Participant Claim held by a Retiree (a) with respect to whom (i) the Total Monthly Benefit as of April 1, 2021 or (ii) the future benefit payable under Act 70-2010 or Act 211-2015 is greater than the Threshold, or (b) who benefits from Act 127-1958.

1.445 **Retired ERS Participant Below-Threshold Claim:** An ERS Participant Claim held by a Retiree (a) with respect to whom (i)the Total Monthly Benefit as of April 1, 2021 or (ii) the future benefit payable under Act 70-2010 or Act 211-2015 is equal to or less than the Threshold, or (b) who does not benefit from Act 127-1950.

1.446 **Retired JRS Participant Above-Threshold Claim:** A JRS Participant Claim held by a Retiree with respect to whom the Total Monthly Benefit as of April 1, 2021 is greater than the Threshold.

1.447 **Retired JRS Participant Below-Threshold Claim:** A JRS Participant Claim held by a Retiree with respect to whom the Total Monthly Benefit as of April 1, 2021 is equal to or less than the Threshold.

1.448 **Retired TRS Participant Above-Threshold Claim:** A TRS Participant Claim held by a Retiree with respect to whom the Total Monthly Benefit as of April 1, 2021 is greater than the Threshold.

1.449 **Retired TRS Participant Below-Threshold Claim:** A TRS Participant Claim held by a Retiree with respect to whom the Total Monthly Benefit as of April 1, 2021 is equal to or less than the Threshold.

1.450     **Retiree:** A person who, as reflected in the records of ERS, JRS, or TRS, as applicable, as of April 1, 2021, receives a pension or annuity as a Participant in ERS, JRS or TRS; provided, however, that, under no circumstances shall a "Retiree" include a former employee of the Government of Puerto Rico who left public service before vesting in any pension benefits and who was not reimbursed for such person's contributions to ERS, JRS or TRS up to and including the date of separation.

1.451     **Retiree Claim:** An ERS Participant Claim, a JRS Participant Claim or a TRS Participant Claim held by a Retiree.

1.452     **Retiree Committee:** The committee of retired former employees of the Commonwealth, its agencies and instrumentalities appointed by the Office of the United States Trustee in the Commonwealth Title III Case.

1.453     **Retiree Committee Plan Support Agreement:** That certain Plan Support Agreement, dated as of June 7, 2019, by and between the Debtor, by and through the Oversight Board, pursuant to Section 315(b) of PROMESA, and the Retiree Committee, as may be amended or supplemented by the parties thereto.

1.454     **Rum Tax CVI:** The contingent value instrument, as more fully described in the Settlement Summary annexed as Exhibit "F" to the PRIFA Plan Support Agreement, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the PRIFA Plan, the Confirmation Order, the PRIFA Order, and the Rum Tax CVI Indenture.

1.455     **Rum Tax CVI Indenture:** The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Rum Tax CVI, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

1.456     **Sales Tax:** The sales and use tax, including any replacement or similar sales and use tax, imposed by the government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

1.457     **SCC Action:** The litigation styled Special Claims Committee v. Barclays Capital, et al., Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court.

1.458     **SEC:** The United States Securities and Exchange Commission,

1.459     **Section 510(b) Subordinated Claim:** Any Claim, to the extent determined pursuant to a Final Order, against the Debtors' or their Assets arising from or relating to (a) rescission of a purchase or sale of an existing security of a Debtor or an Affiliate of a Debtor, (b) purchase, sale or retention of such a security, or (c) reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.460     **Securities Act:** The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

1.461     **Solicitation Agent:** Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Title III Cases by Title III Court order.

1.462     **SPU:** Servidores Publicos Unidos.

1.463     **Substitute Measured Tax:** All or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Legislation and the CVI Indenture.

1.464     **Summer Bonus:** The bonus, if any, payable to current, former, active, inactive and disabled employees in accordance with Act No. 37-2001 codified at 3 L.P.R.A. §757g, as amended in accordance with Act No. 3-2013, 3 L.P.R.A. §761.

1.465     **Syncora:** Syncora Guarantee Inc., or its successor or designee.

1.466     **Syncora Acceleration Price:** With respect to any Syncora Insured Bonds, an amount equal to the outstanding principal amount of such Syncora Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date.

1.467     **Syncora Certificates:** With respect to each Syncora Trust that is formed for the benefit of the beneficial holders of a Syncora Insured Bonds CUSIP, the certificate(s) or receipt(s) to be issued by such Syncora Trust to beneficial holders of such Syncora Insured Bonds CUSIP that are deposited into such Syncora Trust.

1.468     **Syncora Commutation Consideration:** A combination of some or all of the following, to be selected at Syncora's sole discretion prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the Plan Consideration; (ii) a percentage, to be determined at Syncora's sole discretion, of the Consummation Costs and/or the PSA Restriction Fees allocable to Syncora; and (iii) Cash in an amount to be determined by Syncora in its sole discretion.

1.469     **Syncora Commutation Treatment:** The treatment set forth in Section 75.3(a) hereof.

1.470     **Syncora Escrow Account:** A single escrow account that will be formed, on or prior to the Effective Date by the Commonwealth or PBA, at the sole cost and expense of Syncora, and for the benefit of the beneficial holders of Syncora Insured Bonds whose Plan Consideration is deposited therein.

1.471     **Syncora Insured Bond Claims:** Collectively, the Bond Claims arising from the Syncora Insured Bonds, including, for the avoidance of doubt, any Vintage CW Guarantee Bond Claims (Syncora).

1.472     **Syncora Insured Bonds:** Collectively, the GO Bonds and the PBA Bonds that have been insured by Syncora, including, without limitation, pursuant to a secondary market insurance policy.

1.473     **Syncora Insurance Policies:** The existing insurance policies issued by Syncora relating to the Syncora Insured Bonds, together with any and all agreements and other documents related thereto.

1.474     **Syncora Non-Commutation Treatment:** The treatment set forth in Section 72.3(b) hereof.

1.475     **Syncora Plan Consideration:** The consideration allocable or distributable to holders of Allowed Vintage PBA Bond Claims (Syncora), Allowed Vintage CW Bond Claims (Syncora), and Allowed Vintage CW Guarantee Bond Claims (Syncora), as the case may be.

1.476     **Syncora Treatment:** With respect to each Class of Syncora Insured Bond Claims, the treatment set forth in Article LXXV hereof.

1.477     **Syncora Trust:** With respect to each Syncora Insured Bonds CUSIP, a separate trust or custodial arrangement that will be formed, on or prior to the Effective Date, by the Commonwealth or PBA, at the sole cost and expense of Syncora and for the benefit of the beneficial holders of such Syncora Insured Bonds CUSIP.

1.478     **System 2000:** The pension contribution system implemented in accordance with Act No. 305-1999, codified at 3 L.P.R.A. §§786-1, et seq, or Act 3-2013.

1.479     **System 2000 Participant Claim:** A Claim that accrued under System 2000 or Act 3, by a Participant whose hire date was on or after January 1, 2000.

1.480     **Taxable Bond Distributions:** Collectively, the Vintage Taxable Bond Distribution, the 2011 CW Taxable Bond Distribution, the 2011 CW Series D/E/PIB Taxable Bond Distribution, the 2012 CW Taxable Bond Distribution, the 2014 CW Taxable Bond Distribution, the Vintage CW Guarantee Taxable Bond Distributions, the 2011 CW Guarantee Taxable Bond Distribution, the 2012 CW Guarantee Taxable Bond Distribution, and the 2014 CW Guarantee Taxable Bond Distribution.

1.481     **Taxable Election CW Claims:** Collectively, the Vintage CW Bond Claims (Taxable Election), the Vintage CW Guarantee Bond Claims (Taxable Election), the 2011 CW Bond Claims (Taxable Election), the 2011 CW Guarantee Bond Claims (Taxable Election), the 2011 CW Series D/E/PIB Bond Claims (Taxable Election), the 2012 CW Bond Claims (Taxable Election), the 2012 CW Guarantee Bond Claims (Taxable Election), the 2014 CW Bond Claims (Taxable Election) and the 2014 CW Guarantee Bond Claims (Taxable Election).

1.482     **Taxable New GO Bonds:** Collectively, the portion of the New GO Bonds in the aggregate amount deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel, to be issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of the IRC, which New GO Bonds shall be issued as CIBs with an interest rate of five percent (5.0%), payable semi-annually in arrears, and having a maturity of July 1, 2041 and be

made available to Puerto Rico Investors with respect to the first One Million Dollars ($1,000,000.00) of aggregate holdings of (a) PBA Bond Claims, (b) CW Bond Claims, and (c) CW Guarantee Bond Claims (without duplication).

1.483   **Tax Credit Claims:** Collectively, Claims, other than Energy Incentive Claims and Claims related to the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, as amended, or an economic incentive law, in each case, resulting in corporate income tax credits, deductions or carryforwards.

1.484   **Tax-Supported Debt:** Collectively, without duplication, (a) direct Debt of the Commonwealth for the payment of which the full faith, credit and taxing power of the Commonwealth has been pledged (including the New GO Bonds and CVIs), (b) Debt issued by any Entity and guaranteed by the full faith, credit and taxing power of the Commonwealth, (c) Debt issued by any Entity (including the COFINA Bonds), whether or not guaranteed by the Commonwealth, that is secured by or payable from (i) Debt Policy Revenues or (ii) lease agreements with the Commonwealth or any agency thereof, whether or not subject to annual or periodic legislative appropriations, and (d) any other Debt identified as Tax-Supported Debt in the Debt Management Policy; provided, however, that the following shall not be considered Tax Supported Debt: (1) tax and revenue anticipation notes with a final maturity occurring within the same FY of their issuance; and (2) Debt issued to respond directly to damage or destruction and associated risks to the health, safety and welfare of the people of Puerto Rico caused by hurricanes, earthquakes or other natural disasters, pandemics, terrorism and similar emergencies; and, provided, further, and without limiting the foregoing, "Tax-Supported Debt" excludes (y) revenue bonds of an Entity payable solely from user charges or securitization and transition charges imposed upon customers or former customers of a utility or transportation system, including, without limitation, the self-supporting Debt of PRASA, PREPA, HTA or any related securitization entity, (z) any other Debt that is not payable from Debt Policy Revenues, pursuant to the Debt Management Policy, in each case, to the extent such Debt is not guaranteed by the full faith, credit and taxing power of the Commonwealth; and, provided, further, that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in Section 74.4 hereof, the Debt Management Policy may contain additional provisions and clarifications regarding which Debt is considered Tax-Supported Debt consistent with the principles and objectives set forth therein.

1.485   **Threshold:** One Thousand Five Hundred Dollars ($1,500.00) per month.

1.486   **Title III:** Title III of PROMESA.

1.487   **Title III Cases:** Collectively, the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case.

1.488   **Title III Court:** The United States District Court of the District of Puerto Rico or such other court having jurisdiction over the Title III Cases.

1.489   **Total Monthly Benefit:** The amount of monthly pension benefits equal to the sum of (a) the Monthly Base Pension (or, in the case of VTP Payroll Participants, the monthly payment made from the payroll of the Commonwealth or its agencies under Act 211-2015 or Act

70-2010), (b) the Monthly Christmas Bonus, if any, (c) the Monthly Summer Bonus, if any, and (d) the Monthly Medicine Bonus.

1.490 **TRS:** Teachers Retirement System.

1.491 **Trustee Fiscal Agent:** Each of the CCDA Trustee, the ERS Fiscal Agent, the HTA Fiscal Agent, and the PRIFA BANs Trustee.

1.492 **TRS Participant Claim:** A Claim on account of being or having been a Participant in TRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in TRS from and after the Effective Date.

1.493 **Trust Documentation:** Collectively, the documentation required, if necessary, to establish and maintain the trust into which (a) with respect to HTA, the HTA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of Allowed CW/HTA Claims (including the applicable Monolines) pursuant to the terms of the HTA/CCDA Plan Support Agreement, or (b) with respect to PRIFA, the PRIFA Clawback CVI and the Rum Tax CVI, among other assets, shall be deposited pending, and which shall provide for, the distribution thereof to holders of Allowed CW/PRIFA Rum Tax Claims (including the applicable Monolines) pursuant to the terms of the PRIFA Plan Support Agreement, which documentation in all cases shall be agreed upon by the Oversight Board and the applicable Monolines.

1.494 **Unclaimed Distribution:** Any distribution to a Creditor that has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to the Debtors of an intent to accept a particular distribution, (c) responded to the Debtors' requests for information necessary to facilitate a particular distribution or (d) taken any other action necessary to facilitate such distribution.

1.495 **Underwriter Actions:** Collectively, the Ambac Action, the FGIC Action, the National Action, and the SCC Action.

1.496 **Unexpired Lease:** A lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.497 **Uniformity Litigation:** Collectively, (a) the litigation styled Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al., Adv. Pro. No. 20-000068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

1.498 **UPR:** Universidad de Puerto Rico.

1.499 **Vintage CW Bond Claim:** A Claim against the Commonwealth on account of Vintage CW Bonds, other than a Vintage CW Bond Claim (Ambac), a Vintage CW Bond Claim

(Assured), a Vintage CW Bond Claim (FGIC), a Vintage CW Bond Claim (National), a Vintage CW Bond Claim (Syncora), or a Retail Vintage CW Bond Claim.

1.500    **Vintage CW Bond Claim (Ambac):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Ambac.

1.501    **Vintage CW Bond Claim (Assured):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.502    **Vintage CW Bond Claim (FGIC):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by FGIC, including pursuant to a secondary market insurance policy.

1.503    **Vintage CW Bond Claim (National):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by National.

1.504    **Vintage CW Bond Claim (Syncora):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Syncora.

1.505    **Vintage CW Bond Claim (Taxable Election):**  A Vintage CW Bond Claim or a Retail Vintage CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such Vintage CW Bond Claim shall be a Vintage CW Bond Claim (Taxable Election) up to such Vintage CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Vintage CW Bond Claim.

1.506    **Vintage CW Bond Recovery:**  The aggregate recovery by holders of Allowed Vintage CW Bond Claims, Allowed Vintage CW Bond Claims (Ambac), Allowed Vintage CW Bond Claims (Assured), Allowed Vintage CW Bond Claims (National), Allowed Vintage CW Bond Claims (FGIC), Allowed Vintage CW Bond Claims (Syncora), and Allowed Retail Vintage CW Bond Claims, consisting of (a) One Billion Nine Hundred Forty Million Four Hundred Thirteen Thousand Five Hundred Seventy-Two Dollars and Sixty-Eight Cents ($1,940,413,572.68) in Cash, (b) Two Billion Three Hundred Thirty-Six Million Two Hundred Twenty-Six Thousand Eight Hundred Thirty Dollars ($2,336,226,830.00) in original principal amount of New GO CIBs, (c) One Hundred Fifty-Four Million Six Hundred Eighty-Three Thousand Seventy Dollars and Twenty-Five Cents ($154,683,070.25) in original principal amount of New GO 5.375% CABs, (d) One Hundred Million Seven Hundred Fifty-Eight Thousand One Hundred Eighty-Two Dollars and Ninety-Five Cents ($100,758,182.95) in original principal amount of New GO 5.0% CABs, and (e) thirty-two and two hundred forty-four one thousandths percent (32.244%) of the GO CVIs.

1.507     **Vintage CW Bonds:** Collectively, the following bonds issued by the
Commonwealth: (a) the Public Improvement Bonds of 1998, issued in the original principal
amount of Five Hundred Million Dollars ($500,000,000.00); (b) the Public Improvement Bonds of
1999, issued in the original principal amount of Four Hundred Seventy-Five Million Dollars
($475,000,000.00); (c) the Public Improvement Bonds of 2001, Series A, issued in the original
principal amount of Two Hundred Seventy-Four Million One Hundred Thirty-Five Thousand
Dollars ($274,135,000.00); (d) the Public Improvement Bonds of 2002, Series A, issued in the
original principal amount of Four Hundred Fifty-Five Million Dollars ($455,000,000.00); (e) the
Public Improvement Bonds of 2003, Series A, issued in the original principal amount of Four
Hundred Sixty Million Dollars ($460,000,000.00); (f) the Public Improvement Bonds of 2004,
Series A, issued in the original principal amount of Four Hundred Fifty-Seven Million One
Hundred Seventy-Five Thousand Dollars ($457,175,000.00); (g) the Public Improvement Bonds of
2005, Series A, issued in the original principal amount of Four Hundred Forty Million Four
Hundred Sixty Thousand Dollars ($440,460,000.00); (h) the Public Improvement Bonds of 2006,
Series A, issued in the original principal amount of Five Hundred Million Dollars
($500,000,000.00); (i) the Public Improvement Bonds of 2006, Series B, issued in the original
principal amount of Thirty-Nine Million Three Hundred Eighty Thousand Dollars
($39,380,000.00); (j) the Public Improvement Bonds of 2007, Series A, issued in the original
principal amount of Four Hundred Eight Million Eight Hundred Thousand Dollars
($408,800,000.00); (k) the Public Improvement Bonds of 2008, Series A, issued in the original
principal amount of Two Hundred Fifty Million Dollars ($250,000,000.00); (l) the Public
Improvement Refunding Bonds, Series 2011A, issued in the original principal amount of Three
Hundred Fifty-Six Million Five Hundred Twenty Thousand Dollars ($356,520,000.00); (m) the
Public Improvement Refunding Bonds, Series 1998, issued in the original principal amount of Five
Hundred Three Million Nine Hundred Sixty-Three Thousand Two Hundred Sixty-Four Dollars
($503,963,264.00); (n) the Public Improvement Refunding Bonds, Series 2000, issued in the
original principal amount of Fifty-Five Million Nine Hundred Ten Thousand Nine Hundred
Ninety-Three Dollars ($55,910,993.00); (o) the Public Improvement Refunding Bonds, Series
2001, issued in the original principal amount of Three Hundred Thirty-Seven Million Two
Hundred Thirty-Five Thousand Dollars ($337,235,000.00); (p) the Public Improvement Refunding
Bonds, Series 2002A, issued in the original principal amount of Eight Hundred Thirty-Seven
Million Nine Hundred Sixty Thousand Dollars ($837,960,000.00); (q) the Public Improvement
Refunding Bonds, Series 2003A, issued in the original principal amount of Eighty-Nine Million
Six Hundred Ten Thousand Dollars ($89,610,000.00); (r) the Public Improvement Refunding
Bonds, Series 2003C-7, issued in the original principal amount of One Hundred Ninety-Four
Million Six Hundred Ten Thousand Dollars ($194,610,000.00); (s) the Public Improvement
Refunding Bonds, Series 2006A, issued in the original principal amount of One Hundred One
Million Six Hundred Ninety-Five Thousand Dollars ($101,695,000.00); (t) the Public
Improvement Refunding Bonds, Series 2006B, issued in the original principal amount of Three
Hundred Thirty-Five Million Six Hundred Fifty Thousand Dollars ($335,650,000.00); (u) the
Public Improvement Refunding Bonds, Series 2007A, issued in the original principal amount of
Nine Hundred Twenty-Six Million Five Hundred Seventy Thousand Dollars ($926,570,000.00);
(v) the Public Improvement Refunding Bonds, Series 2007A-4, issued in the original principal
amount of Ninety-Three Million Eight Hundred Thirty-Five Thousand Dollars ($93,835,000.00);
(w) the Public Improvement Refunding Bonds, Series 2008A, issued in the original principal
amount of Seven Hundred Thirty-Five Million Fifteen Thousand Dollars ($735,015,000.00); (x)

the Public Improvement Refunding Bonds, Series 2008C, issued in the original principal amount of One Hundred Ninety Million One Hundred Thirty-Five Thousand Dollars ($190,135,000.00); (y) the Public Improvement Refunding Bonds, Series 2009A, issued in the original principal amount of Three Million Four Hundred Twenty-Five Thousand Dollars ($3,425,000.00); (z) the Public Improvement Refunding Bonds, Series 2009B, issued in the original principal amount of Three Hundred Seventy-Two Million Six Hundred Eighty-Five Thousand Dollars ($372,685,000.00); (aa) the Public Improvement Refunding Bonds, Series 2009C, issued in the original principal amount of Two Hundred Ten Million Two Hundred Fifty Thousand Dollars ($210,250,000.00), and (bb) Notas de Ahorro issued prior to 2011 in the outstanding principal amount of Two Hundred Forty-Two Thousand Six Hundred Fifty Dollars ($242,650.00).

1.508    **Vintage CW Guarantee Bond Claim:**  A Claim, other than a Vintage CW Guarantee Bond Claim (Ambac), a Vintage CW Guarantee Bond Claim (Assured), a Vintage CW Guarantee Bond Claim (National), a Vintage CW Guarantee Bond Claim (FGIC), and Vintage CW Guarantee Bond Claim (Syncora) on account of the Commonwealth's guarantee of Vintage PBA Bonds; provided, however, that, solely for purposes of distribution under the Plan, the amount of a holder's Vintage CW Guarantee Bond Claim in respect of the Commonwealth's guarantee of Vintage PBA Bonds shall be measured as the amount of such holder's Vintage PBA Bond Claim minus the amount of such holder's PBA Bond Distribution on account of Vintage PBA Bonds; and, provided, further, that Vintage CW Guarantee Claims may include an obligation, other than a Vintage PBA Bond Claim, for which the Commonwealth has pledged its good faith, credit and taxing power as authorized by the Commonwealth Legislature on or prior to December 31, 2012.

1.509    **Vintage CW Guarantee Bond Claim (Ambac):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which has been insured by Ambac.

1.510    **Vintage CW Guarantee Bond Claim (Assured):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.511    **Vintage CW Guarantee Bond Claim (FGIC):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which have been insured by FGIC, including pursuant to a secondary market insurance policy.

1.512    **Vintage CW Guarantee Bond Claim (National):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which have been insured by National.

1.513    **Vintage CW Guarantee Bond Claim (Syncora):**  A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, of the payment of principal and interest of which has been insured by Syncora, including pursuant to a secondary market insurance policy.

1.514   **Vintage CW Guarantee Bond Claim (Taxable Election):** A Vintage CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such Vintage CW Guarantee Bond Claim shall be a Vintage CW Guarantee Bond Claim (Taxable Election) up to such Vintage CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Vintage CW Guarantee Bond Claim.

1.515   **Vintage CW Guarantee Bond Recovery**: The aggregate recovery by holders of Allowed Vintage CW Guarantee Bond Claims, Allowed Vintage CW Guarantee Bond Claims (Ambac), Allowed Vintage CW Guarantee Bond Claims (Assured), Allowed Vintage CW Guarantee Bond Claims (National), Allowed Vintage CW Guarantee Bond Claims (FGIC), and Allowed Vintage CW Guarantee Bond Claims (Syncora), consisting of (a) Six Hundred Fifty-Three Million Seven Hundred Eighty-Two Thousand One Hundred Seventy-Three Dollars and Eighty-One Cents ($653,782,173.81) in Cash, (b) Seven Hundred Eighty-Seven Million One Hundred Forty-Three Thousand Two Hundred Fifty-Six Dollars ($787,143,256.00) in original principal amount of New GO CIBs, (c) Fifty-Two Million One Hundred Seventeen Thousand Two Hundred Fifty-Seven Dollars and Fifty Cents ($52,117,257.50) in original principal amount of New GO 5.375% CABs, (d) Thirty-Three Million Nine Hundred Forty-Eight Thousand Three Hundred Eighty-Three Dollars and Seventeen Cents ($33,948,383.17) in original principal amount of New GO 5.0% CABs, and (e) fifteen and one hundred ninety-four one thousandths percent (15.194%) of the GO CVIs.

1.516   **Vintage CW Guarantee Taxable Bond Distribution:** The distribution to be made to such holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 30.1 hereof.

1.517   **Vintage PBA Bond Claim:** A Claim against PBA on account of Vintage PBA Bonds, other than a Vintage PBA Bond Claim (Ambac), a Vintage PBA Bond Claim (Assured), a Vintage PBA Bond Claim (National), a Vintage PBA Bond Claim (FGIC), a Vintage PBA Bond Claim (Syncora) or a Retail Vintage PBA Bond Claim.

1.518   **Vintage PBA Bond Claim (Ambac):** A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Ambac.

1.519   **Vintage PBA Bond Claim (Assured):** A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.520   **Vintage PBA Bond Claim (FGIC):** A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by FGIC, including pursuant to a secondary market insurance policy.

1.521   **Vintage PBA Bond Claim (National):** A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by National.

1.522     **Vintage PBA Bond Claim (Syncora):**  A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Syncora, including pursuant to a secondary market insurance policy.

1.523     **Vintage PBA Bond Recovery**: The aggregate recovery by holders of Allowed Vintage PBA Bond Claims, Allowed Vintage PBA Bond Claims (Ambac), Allowed Vintage PBA Bond Claims (Assured), Allowed Vintage PBA Bond Claims (National), Allowed Vintage PBA Bond Claims (FGIC), Allowed Vintage PBA Bond Claims (Syncora), and Allowed Retail Vintage PBA Bond Claims on account of such Claims, consisting of Six Hundred Eleven Million Three Hundred Thirty-One Thousand One Hundred Eighty-Six Dollars and Five Cents ($611,331,186.05) in Cash.

1.524     **Vintage PBA Bonds:**  Collectively, (a) the Government Facilities Revenue Refunding Bonds, Series C, issued by PBA in the original principal amount of One Hundred Eighty-Five Million Two Hundred Ninety Thousand Dollars ($185,290,000.00), (b) the Government Facilities Revenue Bonds, Series D, issued by PBA in the original principal amount of Five Hundred Fifty-Three Million Seven Hundred Thirty-Three Thousand Seven Hundred Ninety-Four Dollars and Ninety Cents ($553,733,794.90), (c) the Government Facilities Revenue Refunding Bonds, Series F, issued by PBA in the original principal amount of One Hundred Thirty-One Million Four Hundred Forty-Five Thousand Dollars ($131,445,000.00), (d) the Government Facilities Revenue Bonds, Series G, issued by PBA in the original principal amount of Sixty-Two Million Dollars ($62,000,000.00), (e) the Government Facilities Revenue Refunding Bonds, Series H, issued by PBA in the original principal amount of Two Hundred Seventy-Two Million Seven Hundred Seventeen Thousand Four Hundred Eighteen Dollars and Ten Cents ($272,717,418.10), (f) the Government Facilities Revenue Bonds, Series I, issued by PBA in the original principal amount of Eight Hundred Thirty-Two Million Three Hundred Eighty-Five Thousand Dollars ($832,385,000.00), (g) the Government Facilities Revenue Refunding Bonds, Series J, issued by PBA in the original principal amount of Three Hundred Thirty-Five Million Five Hundred Eighty Thousand Dollars ($335,580,000.00), (h) the Government Facilities Revenue Refunding Bonds, Series K, issued by PBA in the original principal amount of Three Hundred Forty-Seven Million Sixty-Five Thousand Dollars ($347,065,000.00), (i) the Government Facilities Revenue Bonds, Series L, issued by PBA in the original principal amount of Six Million Seven Hundred Ninety-Five Thousand Dollars ($6,795,000.00), (j) the Government Facilities Revenue Refunding Bonds, Series M-1, issued by PBA in the original principal amount of Two Hundred Eighty-Three Million Five Hundred Fifty Thousand Dollars ($283,550,000.00), (k) the Government Facilities Revenue Refunding Bonds, Series M-2, issued by PBA in the original principal amount of One Hundred Twenty-Nine Million Three Hundred Thousand Dollars ($129,300,000.00), (l) the Government Facilities Revenue Refunding Bonds Series M-3, issued by PBA in the original principal amount of One Hundred Fifty Million Dollars ($150,000,000.00), (m) the Government Facilities Revenue Bonds, Series N, issued by PBA in the original principal amount of Three Hundred Twenty-Nine Million Four Hundred Fifteen Thousand Dollars ($329,415,000.00), (n) the Government Facilities Revenue Bonds, Series O, issued by PBA in the original principal amount of Three Million Twenty-Five Thousand Dollars ($3,025,000.00), (o) the Government Facilities Revenue Refunding Bonds, Series P, issued by PBA in the original principal amount of Three Hundred Thirty Million Nine Hundred Thirty-Five Thousand Dollars ($330,935,000.00), and (p) the Government Facilities Revenue Refunding Bonds Series Q, issued

by PBA in the original principal amount of One Hundred Fifty-Two Million Five Hundred Forty Thousand Dollars ($152,540,000.00), the repayment of which is guaranteed by the Commonwealth.

1.525    **Vintage Taxable Bond Distribution**: The distribution to be made to each holder of an Allowed Vintage CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 19.1 hereof.

1.526    **Voting Record Date**: The date(s) established by the Title III Court with respect to an entitlement to vote to accept or reject the Plan and set forth in the Disclosure Statement Order.

1.527    **VTP Payroll Participant:** A person who, based on the current records of ERS and OGP, is receiving payment through the payroll of the Commonwealth or its agencies arising from participation in the Voluntary Transition Programs under Act 70-2010 or Act 211-2015 which allowed certain members to receive pensions or other forms of payment through their former employer's payroll, subject to transition to PayGo upon satisfying necessary age and service eligibility requirements.

1.528    **VTP Payroll Participant Claim:** A Claim on account of being a VTP Payroll Participant for payments arising through Act 70-2010 or Act 211-2015 through the payroll of the Commonwealth or its agencies.

1.529    **VTP Payroll Participant Above-Threshold Claims:** A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is greater than the Threshold.

1.530    **VTP Payroll Participant Below-Threshold Claims:** A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is less than or equal to the Threshold.

1.531    **Other Definitions:** Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in PROMESA or the Bankruptcy Code shall, if defined in PROMESA, have the meaning assigned to that term in PROMESA or, if not defined in PROMESA, but defined in the Bankruptcy Code, shall have the meaning ascribed thereto in the Bankruptcy Code. Unless otherwise specified, (a) all section, schedule, or exhibit references in the Plan are to the respective section in, article of, or schedule or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America. The words, "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. In computing any period prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.532    **Rules of Interpretation:** For purposes of the Plan, (a) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that

such document shall be substantially in such form or substantially on such terms and conditions; (b) unless otherwise specified, any reference herein to a definition, an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it was, or is amended, modified, or supplemented, including, without limitation, updated to conform to the Definitive Documents; (c) unless otherwise specified, all references herein to distributions being made in an "amount" shall be calculated using the principal amount of any bonds issued on the Effective Date pursuant to the Plan plus the amount, if any, of Cash so distributed; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (f) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (g) unless otherwise specified, references to docket numbers of documents filed in the Title III Cases are references to the docket numbers under the Title III Court's CM/ECF system; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) any immaterial effectuating provisions may be interpreted by the Oversight Board in such a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Title III Court or any other Entity.

## ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES

2.1   **Litigation Resolution:** The Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, MBA and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation.

2.2 **Allowance of Bond Claims:** For purposes of confirmation and consummation of the Plan and distributions to be made hereunder, unless otherwise allowed pursuant to an order of the Title III Court, on the Effective Date, among other Claims, (a) the Vintage PBA Bond Claims, the Vintage PBA Bond Claims (Ambac), the Vintage PBA Bond Claims (Assured), the Vintage PBA Bond Claims (National), the Vintage PBA Bond Claims (FGIC), and the Vintage PBA Bond Claims (Syncora) shall be deemed allowed in the aggregate amount of $2,661,239,877.05, (b) the 2011 PBA Bond Claims shall be deemed allowed in the aggregate amount of $1,335,422,892.78, (c) the 2012 PBA Bond Claims shall be deemed allowed in the aggregate amount of $674,308,470.06, (d) the Vintage CW Bond Claims, the Vintage CW Bond Claims (Ambac), the Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (FGIC), and Vintage CW Bond Claims (Syncora) shall be deemed allowed in the aggregate amount of $5,843,252,912.91, (e) the ERS Bond Claims shall be deemed allowed in the aggregate amount of $3,168,698,776.55, (f) the 2011 CW Bond Claims and the 2011 CW Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $476,498,325.06, (g) the 2011 CW Series D/E/PIB Bond Claims and the 2011 CW Series D/E/PIB Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $645,673,111.48, (h) the 2012 CW Bond Claims and the 2012 CW Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $2,934,427,459.40, (i) the 2014 CW Bond Claims shall be deemed allowed in the amount of $3,836,611,111.11, and (j) the 2014 CW Guarantee Bond Claims shall be deemed allowed in the amount of $346,242,219.86.

(a) Solely for purposes of confirmation and consummation of the Plan and the distributions to be made hereunder, unless otherwise allowed pursuant to a Final Order of the Title III Court, on the Effective Date, the CW/Convention Center Claims, the CW/HTA Claims, the CW/MBA Claim and the CW/PRIFA Rum Tax Claims shall be deemed allowed in the amounts of $383,862,878.90, $6,257,585,807.42, $30,106,786.87, and $1,928,867,051.00, respectively.

2.3 **Releases, Injunctions and Exculpation:** The releases, injunctions and exculpation provided in Article XCII herein are integral to obtaining the value provided hereunder and constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan.

2.4 **Purchase and Sale of Certain ERS Assets:** On the Effective Date, (a) the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey to the Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without limitation, such Assets subject to a valid and perfected lien or security interest for an aggregate purchase price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and (b) in accordance with the terms and provisions of Section 69.2 hereof, (i) the Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option, pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

# ARTICLE III

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the Title III Case pursuant to Section 301(a) of PROMESA, Administrative Expense Claims and Professional Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article IV of the Plan.

3.1     **Administrative Expense Claims:** On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan.

3.2     **Professional Compensation and Reimbursement Claims:** All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; provided, however, that, except as provided herein, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date. The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

3.3     **GO/PBA Consummation Costs:** Notwithstanding anything contained in the Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora and National, including positions that it holds or has

insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (EST) on February 22, 2021.

3.4     **AFSCME and AMPR Professional Fees:** Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, (a) AFSCME shall be reimbursed its reasonable professional fees and expenses incurred in order to compensate AFSCME for the cost of negotiation, confirmation and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions, and (b) in the event that, on or prior to September 30, 2021, (i) AMPR notifies the Oversight Board, in writing, that the Active TRS Participants have ratified the terms set forth in the term sheet annexed hereto as Exhibit "F-2", and (ii) AMPR executes an agreement with the Oversight Board wherein AMPR agrees to, among other things, support confirmation and consummation of the Plan, AMPR shall be reimbursed its reasonable professional fees and expenses incurred with respect to confirmation and consummation of such plan support agreement, including any term sheets, and the resolution of issues pertaining to pensions.

3.5     **GO/PBA PSA Restriction Fee:** Notwithstanding anything contained in the Plan to the contrary, in exchange for executing and delivering the GO/PBA Plan Support Agreement (or the GO/PBA Joinder Agreement or GO/PBA Annex Agreement, as applicable, in connection therewith) on or prior to the GO/PBA Joinder Deadline, and, agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the GO/PBA Plan Support Agreement, subject to the entry of the Confirmation Order, each of the GO/PBA PSA Creditors (including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-insured GO Bond or PBA Bond insured by Ambac, Assured, FGIC, Syncora or National, as the case may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC, Syncora and National, to the extent Ambac, Assured, FGIC, Syncora or National, as the case may be, is authorized to vote such Claims in accordance with Section 301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to receive the GO/PBA PSA Restriction Fee, in the form of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (without duplication and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac, Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims, CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) for which it would have been entitled to receive the GO/PBA PSA Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive the GO/PBA PSA Restriction Fee on account thereof; and, provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated pursuant to the terms of Sections 7.1(b)(iii) (subject to the extension provided for in

Section 7.1(b) thereof), (c)(i) or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan Support Agreement for any reason other than (i) a breach of the GO/PBA Plan Support Agreement by a non-Government Party, (ii) the denial of confirmation of the Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Plan, and such modification would have a material adverse effect on the Oversight Board and the GO/PBA PSA Creditors' ability to consummate the Plan on terms consistent with the GO/PBA Plan Support Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed thereto as Exhibit "I"), (iii) the New GO Bonds Legislation, the CVI Legislation, and the Debt Responsibility Act are not enacted prior to the commencement of the Confirmation Hearing, or (iv) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) of the GO/PBA Plan Support Agreement, the aggregate GO/PBA PSA Restriction Fee and Consummation Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in Cash, as an allowed administrative expense claim under a plan of adjustment for the Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

3.6 **Retail Support Fee:** In accordance with the terms and provisions set forth herein, in the event that a Class of Retail Investors (Classes 7, 9, 11, 16, 31, 38, 41, and 44) votes to accept the Plan, the members of such Class shall be entitled to receive their Pro Rata Share of such Class's allocable share of the aggregate Retail Support Fee of up to Fifty Million Dollars ($50,000,000.00) in an amount equal to the GO/PBA Restriction Fee Percentage times the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, held by such accepting Class of Retail Investors, as the case may be, as of the date the Title III Court enters the Confirmation Order; provided, however, that, (a) in the event that, after allocating the Retail Support Fee to Retail Investors in the Classes that voted to accept the Plan, the entire Fifty Million Dollars ($50,000,000.00) is not fully allocated, the balance of the Retail Support Fee shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan based upon the aggregate amount of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication) held by such Initial GO/PBA PSA Restriction Fee Creditor and Retail Investor as of the date the Title III Court enters the Confirmation Order, and (b) the Retail Support Fee allocated to any Class of Retail Investors that fails to vote to accept the Plan shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan.

3.7 **ERS Restriction Fee:** Notwithstanding anything contained in the Plan to the contrary, in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be

entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00).

3.8 **CCDA Consummation Costs:** Notwithstanding anything contained in the Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

3.9 **CCDA Restriction Fee:** Notwithstanding anything contained in the Plan to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured, FGIC or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; provided, however, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and

applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, _provided_, _further_, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, _provided_, _further_, that, in all circumstances, the sum of the aggregate CCDA Restriction Fees _plus_ the CCDA Consummation Costs attributable to a holder's CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, _provided_, _further_, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Section 7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

3.10    **Non-Severability**: The allowance and payment of the Consummation Costs and PSA Restriction Fees as set forth in this Article III compensate the Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

## ARTICLE IV

## CLASSIFICATION OF CLAIMS

4.1    **Claims are classified as follows:**

(a)          **Class 1:**          Vintage PBA Bond Claims

(b)          **Class 2:**          Vintage PBA Bond Claims (Assured)

(c)          **Class 3:**          Vintage PBA Bond Claims (National)

(d)          **Class 4:**          Vintage PBA Bond Claims (Ambac)

(e)          **Class 5:**          Vintage PBA Bond Claims (FGIC)

(f)          **Class 6:**          Vintage PBA Bond Claims (Syncora)

(g)          **Class 7:**          Retail Vintage PBA Bond Claims

(h)          **Class 8:**          2011 PBA Bond Claims

(i)          **Class 9:**          Retail 2011 PBA Bond Claims

(j)          **Class 10:**          2012 PBA Bond Claims

(k)          **Class 11:**          Retail 2012 PBA Bond Claims

(l)          **Class 12:**          PBA/DRA Secured Claims

(m)          **Class 13:**          PBA General Unsecured Claims

(n)         **Class 14:**     PBA/DRA Unsecured Claims

(o)         **Class 15:**     Vintage CW Bond Claims

(p)         **Class 16:**     Retail Vintage CW Bond Claims

(q)         **Class 17:**     Vintage CW Bond Claims (Assured)

(r)         **Class 18:**     Vintage CW Bond Claims (National)

(s)         **Class 19:**     Vintage CW Bond Claims (Ambac)

(t)         **Class 20:**     Vintage CW Bond Claims (FGIC)

(u)         **Class 21:**     Vintage CW Bond Claims (Syncora)

(v)         **Class 22:**     Vintage CW Bond Claims (Taxable Election)

(w)         **Class 23:**     Vintage CW Guarantee Bond Claims

(x)         **Class 24:**     Vintage CW Guarantee Bond Claims (Assured)

(y)         **Class 25:**     Vintage CW Guarantee Bond Claims (National)

(z)         **Class 26:**     Vintage CW Guarantee Bond Claims (Ambac)

(aa)        **Class 27:**     Vintage CW Guarantee Bond Claims (FGIC)

(bb)        **Class 28:**     Vintage CW Guarantee Bond Claims (Syncora)

(cc)        **Class 29:**     Vintage CW Guarantee Bond Claims (Taxable Election)

(dd)        **Class 30:**     2011 CW Bond Claims

(ee)        **Class 31:**     Retail 2011 CW Bond Claims

(ff)        **Class 32:**     2011 CW Bond Claims (Assured)

(gg)        **Class 33:**     2011 CW Bond Claims (Taxable Election)

(hh)        **Class 34:**     2011 CW Guarantee Bond Claims

(ii)        **Class 35:**     2011 CW Guarantee Bond Claims (Taxable Election)

(jj)        **Class 36:**     2011 CW Series D/E/PIB Bond Claims

(kk)        **Class 37:**     2011 CW Series D/E/PIB Bond Claims (Assured)

(ll)        **Class 38:**     Retail 2011 CW Series P/E/PIB Bond Claims

| (mm) | **Class 39:** | 2011 CW Series D/E/PIB Bond Claims (Taxable Election) |
|------|---------------|-------------------------------------------------------|
| (nn) | **Class 40:** | 2012 CW Bond Claims |
| (oo) | **Class 41:** | Retail 2012 CW Bond Claims |
| (pp) | **Class 42:** | 2012 CW Bond Claims (Assured) |
| (qq) | **Class 43:** | 2012 CW Bond Claims (Taxable Election) |
| (rr) | **Class 44:** | 2012 CW Guarantee Bond Claims |
| (ss) | **Class 45:** | 2012 CW Guarantee Bond Claims (Taxable Election) |
| (tt) | **Class 46:** | 2014 CW Bond Claims |
| (uu) | **Class 47:** | Retail 2014 CW Bond Claims |
| (vv) | **Class 48:** | 2014 CW Bond Claims (Taxable Election) |
| (ww) | **Class 49:** | 2014 CW Guarantee Bond Claims |
| (xx) | **Class 50:** | 2014 CW Guarantee Bond Claims (Taxable Election) |
| (yy) | **Class 51:** | Active and Retired Employee Benefits Claims |

| (i) | **Class 51A:** | Retired ERS Participant Below-Threshold Claims |
|-----|----------------|------------------------------------------------|
| (ii) | **Class 51B:** | Retired JRS Participant Below-Threshold Claims |
| (iii) | **Class 51C:** | Retired TRS Participant Below-Threshold Claims |
| (iv) | **Class 51D:** | Retired ERS Participant Above-Threshold Claims |
| (v) | **Class 51E:** | Retired JRS Participant Above-Threshold Claims |
| (vi) | **Class 51F:** | Retired TRS Participant Above-Threshold Claims |
| (vii) | **Class 51G:** | Active ERS Participant Claims |
| (viii) | **Class 51H:** | Active JRS Participant Claims |
| (ix) | **Class 51I:** | Active TRS Participant Claims |
| (x) | **Class 51J:** | System 2000 Participant Claims |
| (xi) | **Class 51K:** | VTP Payroll Participant Below-Threshold Claims |
| (xii) | **Class 51L:** | VTP Payroll Participant Above-Threshold Claims |

| (zz) | **Class 52:** | AFSCME Claims |
| (aaa) | **Class 53:** | Dairy Producer Claims |
| (bbb) | **Class 54:** | Eminent Domain Claims |
| (ccc) | **Class 55:** | Energy Incentive Claims |
| (ddd) | **Class 56:** | Med Center Claims |
| (eee) | **Class 57:** | Tax Credit Claims |
| (fff) | **Class 58:** | CW General Unsecured Claims |
| (ggg) | **Class 59:** | CW/HTA Claims |
| (hhh) | **Class 60:** | CW/Convention Center Claims |
| (iii) | **Class 61:** | CW/PRIFA Rum Tax Claims |
| (jjj) | **Class 62:** | CW/MBA Claims |
| (kkk) | **Class 63:** | CW Appropriations Claims |
| (lll) | **Class 64:** | Section 510(b) Subordinated Claims |
| (mmm) | **Class 65:** | ERS Bond Claims |
| (nnn) | **Class 66:** | ERS General Unsecured Claims |
| (ooo) | **Class 67:** | Gracia Gracia Claims |
| (ppp) | **Class 68:** | Convenience Claims |
| (qqq) | **Class 69:** | Federal Claims |

**ARTICLE V**

**PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (CLASS 1)**

5.1     **Treatment of Vintage PBA Bond Claims:** On the Effective Date, each holder of an Allowed Vintage PBA Bond Claim shall be entitled to receive in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim, such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

# ARTICLE VI

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (ASSURED) (CLASS 2)

6.1 **Treatment of Vintage PBA Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Assured) shall be entitled to receive in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Assured), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

# ARTICLE VII

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (NATIONAL) (CLASS 3)

7.1 **Treatment of Vintage PBA Bond Claims (National)**:  Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (National), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

# ARTICLE VIII

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (AMBAC) (CLASS 4)

8.1 **Treatment of Vintage PBA Bond Claims (Ambac)**:  Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Ambac), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

# ARTICLE IX

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (FGIC) (CLASS 5)

9.1 **Treatment of Vintage PBA Bond Claims (FGIC)**:  Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (FGIC) shall be entiled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (FGIC), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

# ARTICLE X

## PROVISIONS FOR TREATMENT OF VINTAGE
## PBA BOND CLAIMS (SYNCORA) (CLASS 6)

10.1     **Treatment of Vintage PBA Bond Claims (Syncora):** Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Syncora) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Syncora), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

# ARTICLE XI

## PROVISIONS FOR TREATMENT OF RETAIL
## VINTAGE PBA BOND CLAIMS (CLASS 7)

11.1     **Treatment of Retail Vintage PBA Bond Claims:** On the Effective Date, each holder of an Allowed Retail Vintage PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail Vintage PBA Bond Claim, such holder's Pro Rata Share of (a) the Vintage PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail Vintage PBA Bond Claims; provided, however, that, in the event that Class 6 votes to reject the Plan in accordance with section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail Vintage PBA Bond Claim shall be entitled to receive such holder's Pro Rata Share of the Vintage PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail Vintage PBA Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

# ARTICLE XII

## PROVISIONS FOR TREATMENT OF 2011 PBA BOND CLAIMS (CLASS 8)

12.1     **Treatment of 2011 PBA Bond Claims:** On the Effective Date, each holder of an Allowed 2011 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 PBA Bond Claim, such holder's Pro Rata Share of the 2011 PBA Bond Recovery.

# ARTICLE XIII

## PROVISIONS FOR TREATMENT OF RETAIL 2011
## PBA BOND CLAIMS (CLASS 9)

13.1     **Treatment of Retail 2011 PBA Bond Claims:** On the Effective Date, each holder of an Allowed Retail 2011 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 PBA Bond Claim, such holder's Pro Rata Share of (a) the 2011 PBA Bond Recovery and (b) the Retail

Support Fee allocable to holders of Allowed Retail 2011 PBA Bond Claims; provided, however, that, in the event that Class 9 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail PBA Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2011 PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 PBA Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

## ARTICLE XIV

## PROVISIONS FOR TREATMENT OF 2012 PBA BOND CLAIMS (CLASS 10)

14.1    **Treatment of 2012 PBA Bond Claims:** On the Effective Date, each holder of an Allowed 2012 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 PBA Bond Claim, such holder's Pro Rata Share of the 2012 PBA Bond Recovery.

## ARTICLE XV

## PROVISIONS FOR TREATMENT OF RETAIL 2012 PBA BOND CLAIMS (CLASS 11)

15.1    **Treatment of Retail 2012 PBA Bond Claims:** On the Effective Date, each holder of an Allowed Retail 2012 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2012 PBA Bond Claim, such holder's Pro Rata Share of (a) the 2012 PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2012 PBA Bond Claims; provided, however, that, in the event that Class 11 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2012 Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2012 PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2012 Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

## ARTICLE XVI

## PROVISIONS FOR TREATMENT OF
## PBA/DRA SECURED CLAIMS (CLASS 12)

16.1    **Treatment of PBA/DRA Secured Claims:** On the Effective Date, each holder of an PBA/DRA Secured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA/DRA Secured Claim, payment, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA/DRA Secured Claim.

## ARTICLE XVII

## PROVISIONS FOR TREATMENT OF PBA GENERAL UNSECURED CLAIMS (CLASS 13)

17.1    **Treatment of PBA General Unsecured Claims**:  On the Effective Date, each holder of an Allowed PBA General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA General Unsecured Claim, (a) payment of the Allowed amount of such holder's Claim, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA General Unsecured Claim, on, or as soon as practicable after the latest to occur of (1) the Effective Date, (2) the date on which such PBA General Unsecured Claim becomes Allowed, (3) the date on which such Allowed PBA General Unsecured Claim is otherwise due and payable, and (4) such other date as may be mutually agreed to by such holder of such PBA General Unsecured Claim and the Debtor or the Reorganized Debtor, as the case may be, or (b) such other treatment as may be mutually agreed to by and among such holder of a PBA General Unsecured Claim and the Debtor or the Reorganized Debtor, as the case may be.

## ARTICLE XVIII

## PROVISIONS FOR TREATMENT OF PBA/DRA UNSECURED CLAIMS (CLASS 14)

18.1    **Treatment of PBA/DRA Unsecured Claims**:  On the Effective Date, each holder of an PBA/DRA Unsecured Claim shall be entitled to, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA/DRA Unsecured Claim, payment, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA/DRA Unsecured Claim.

## ARTICLE XIX

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (CLASS 15)

19.1    **Treatment of Vintage CW Bond Claims**:  On the Effective Date, and subject to the right of election set forth in Section 19.2 hereof, each holder of an Allowed Vintage CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim, such holder's Pro Rata Share of the Vintage CW Bond Recovery.

19.2    **Right of Election to Vintage CW Bond Claims (Taxable Election)**:  Notwithstanding the provisions of Section 19.1 of the Plan, each holder of an Allowed Vintage CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 26.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board;

provided, however, that under no circumstance may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XX

## PROVISIONS FOR TREATMENT OF RETAIL VINTAGE
## CW BOND CLAIMS (CLASS 16)

20.1     **Treatment of Retail Vintage CW Bond Claims**: On the Effective Date, each holder of an Allowed Retail Vintage CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail Vintage CW Bond Claim, such holder's Pro Rata Share of (a) the Vintage CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail Vintage CW Bond Claims; provided, however, that, in the event that Class 16 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail Vintage CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail Vintage CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

20.2     **Right of Election to Retail Vintage CW Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 20.1 of the Plan, each holder of an Allowed Retail Vintage CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 26.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstance may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XXI

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (ASSURED) (CLASS 17)

21.1     **Treatment of Vintage CW Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (Assured), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

# ARTICLE XXII

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (NATIONAL) (CLASS 18)

22.1   **Treatment of Vintage CW Bond Claims (National)**:  Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (National), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

# ARTICLE XXIII

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (AMBAC) (CLASS 19)

23.1   **Treatment of Vintage CW Bond Claims (Ambac)**:  Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (Ambac), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

# ARTICLE XXIV

## PROVISIONS FOR TREATMENT OF VINTAGE
## CW BOND CLAIMS (FGIC) (CLASS 20)

24.1   **Treatment of Vintage CW Bond Claims (FGIC)**:  Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (FGIC) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage CW Bond Claim (FGIC), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

# ARTICLE XXV

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (SYNCORA) (CLASS 21)

25.1   **Treatment of Vintage CW Bond Claims (Syncora)**:  Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Syncora) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed Vintage CW Bond Claim (Syncora), such holder's Pro Rata Share of the Vintage CW Bond Recovery.

## ARTICLE XXVI

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 22)

26.1     **Treatment of Vintage CW Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed Vintage CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage CW Bond Claim (Taxable Election), its Pro Rata Share of the Vintage CW Bond Recovery, as modified by its Pro Rata Share of the Vintage Taxable Bond Distribution.

## ARTICLE XXVII

## PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (CLASS 23)

27.1     **Treatment of Vintage CW Guarantee Bond Claims:** On the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim, each holder of an Allowed Vintage CW Guarantee Bond Claim shall receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

27.2     **Right of Election to Vintage CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 27.1 of the Plan, each holder of an Allowed Vintage CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 30.1 and 74.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstance may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XXVIII

## PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (ASSURED) (CLASS 24)

28.1     **Treatment of Vintage CW Guarantee Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Assured), each holder of an Allowed Vintage CW Guarantee Bond Claim (Assured) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXIX

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (NATIONAL) (CLASS 25)

29.1    **Treatment of Vintage CW Guarantee Bond Claims (National)**:  Subject to the terms and provisions  of Section 75.2 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its allowed Vintage CW Guarantee Bond Claim (National), each holder of an Allowed  Vintage CW Guarantee Bond Claim (National) shall be entitled  to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXX

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (AMBAC) (CLASS 26)

30.1    **Treatment of Vintage CW Guarantee Bond Claims (Ambac)**:  Subject to the terms and provisions  of Section 75.5 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Ambac), each holder of an Allowed  Vintage CW Guarantee Bond Claim (Ambac) shall be entitled  to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXI

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (FGIC) (CLASS 27)

31.1    **Treatment of Vintage CW Guarantee Bond Claims (FGIC)**:  Subject to the terms and provisions  of Section 75.4 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (FGIC), each holder of an Allowed  Vintage CW Guarantee Bond Claim (FGIC) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXII

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (SYNCORA) (CLASS 28)

32.1    **Treatment of Vintage CW Guarantee Bond Claims (Syncora)**:  Subject to the terms and provisions  of Section 75.3 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Syncora), each holder of an Allowed  Vintage CW Guarantee Bond Claim (Syncora) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

# ARTICLE XXXIII

## PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 29)

33.1 **Treatment of Vintage CW Guarantee Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the Vintage Taxable Bond Distribution.

# ARTICLE XXXIV

## PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (CLASS 30)

34.1 **Treatment of 2011 CW Bond Claims**: On the Effective Date, and subject to the right of election set forth in Section 34.2 hereof, each holder of an Allowed 2011 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Bond Claim, such holder's Pro Rata Share of the 2011 CW Bond Recovery.

34.2 **Right of Election to 2011 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 34.1 of the Plan, each holder of an Allowed 2011 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 37.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

# ARTICLE XXXV

## PROVISIONS FOR TREATMENT OF RETAIL 2011 CW BOND CLAIMS (CLASS 31)

35.1 **Treatment of Retail 2011 CW Bond Claims**: On the Effective Date, each holder of an Allowed Retail 2011 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 CW Bond Claim, such holder's Pro Rata Share of (a) the 2011 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2011 CW Bond Claims; provided, however, that, in the event that Class 31 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2011 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2011 CW Bond Recovery and (z) the Retail Support

Fee otherwise allocable to holders of Allowed Retail 2011 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

35.2     **Right of Election to Retail 2011 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 35.1 of the Plan, each holder of an Allowed Retail 2011 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 37.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

# ARTICLE XXXVI

## PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (ASSURED) (CLASS 32)

36.1     **Treatment of 2011 CW Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed 2011 CW Bond Claim (Assured), such holder's Pro Rata Share of the 2011 CW Bond Recovery.

# ARTICLE XXXVII

## PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 33)

37.1     **Treatment of 2011 CW Bond Claims (Taxable Election)**: On the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Taxable Bond Distribution.

# ARTICLE XXXVIII

## PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE BOND CLAIMS (CLASS 34)

38.1     **Treatment of 2011 CW Guarantee Bond Claims**: On the Effective Date, and subject to the right of election set forth in Section 38.2 hereof, each holder of an Allowed 2011 CW Guarantee Bond Claim shall be entitled to receive, in full consideration, satisfaction, release

and exchange of such holder's Allowed 2011 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2011 CW Guarantee Bond Recovery.

38.2     **Right of Election to 2011 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 38.1 of the Plan, each holder of an Allowed 2011 CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 39.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XXXIX

## PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 35)

39.1     **Treatment of 2011 CW Guarantee Bond Claims (Taxable Election)**: On the Effective Date, each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Guarantee Taxable Bond Distribution.

## ARTICLE XL

## PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 36)

40.1     **Treatment of 2011 CW Series D/E/PIB Bond Claims**: On the Effective Date, and subject to the right of election set forth in Section 40.2 hereof, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim, such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery.

40.2     **Right of Election to 2011 CW Series D/E/PIB Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 40.1 of the Plan, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 43.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLI

## PROVISIONS FOR TREATMENT OF 2011 CW SERIES
## D/E/PIB BOND CLAIMS  (ASSURED) (CLASS 37)

41.1     **Treatment of 2011 CW Series D/E/PIB Bond Claims (Assured)**: Subject to the
terms and provisions  of Section 75.1 hereof, on the Effective Date, each holder of an Allowed
2011 CW Series D/E/PIB Bond Claim (Assured) shall be entitled to receive, in full consideration,
satisfaction, release, and exchange of such holder's Allowed  2011 CW Series D/E/PIB Bond
Claim (Assured), such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery.

## ARTICLE XLII

## PROVISIONS FOR TREATMENT OF RETAIL 2011
## CW SERIES D/E/PIB BOND CLAIMS (CLASS 38)

42.1     **Treatment of Retail 2011 CW Series D/E/PIB Bond Claims:** On the Effective
Date, each holder of an Allowed  Retail 2011 CW Series D/E/PIB Bond Claim shall be entitled to
receive, in full consideration, satisfaction, release and exchange of such holder's Allowed  Retail
2011 CW Series D/E/PIB Bond Claim, such holder's Pro Rata Share of (a) the 2011 CW Series
D/E/PIB Bond Recovery and (b) the Retail Support Fee allocable  to holders of Allowed  Retail
2011 CW Series D/E/PIB Bond Claims; provided, however, that, in the event that Class 38 votes to
reject the Plan in accordance with the provisions  of section 1126 of the Bankruptcy Code, (y) each
holder of an Allowed  Retail 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive such
holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery and (z) the Retail Support
Fee otherwise allocable  to holders of Allowed  Retail 2011 CW Series D/E/PIB Bond Claims shall
be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are
members of Classes that voted to accept the Plan and be distributed  in accordance with the terms
and provisions  of Section 3.6 hereof.

42.2     **Right of Election to Retail 2011 CW Series D/E/PIB Bond Claims (Taxable
Election)**: Notwithstanding  the provisions  of Section 42.1 of the Plan, each holder of an Allowed
Retail 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor shall, at such holder's
option,  be entitled to elect to receive distributions  pursuant to the terms and provisions  of Sections
43.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the
Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed
acceptance of the Plan by such holder.  Any election  made after the Ballot  Date shall not be
binding  upon the Commonwealth  unless the Ballot Date is expressly waived, in writing, by the
Oversight Board; provided,  however, that under no circumstances may such waiver by the
Oversight Board occur on or after the Effective Date.

## ARTICLE XLIII

### PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (TAXABLE ELECTION) (CLASS 39)

43.1     **Treatment of 2011 CW Series D/E/PIB Bond Claims (Taxable Election):**  On the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Taxable Bond Distribution.

## ARTICLE XLIV

### PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (CLASS 40)

44.1     **Treatment of 2012 CW Bond Claims:**  On the Effective Date, and subject to the right of election set forth in Section 44.2 hereof, each holder of an Allowed 2012 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim, such holder's Pro Rata Share of the 2012 CW Bond Recovery.

44.2     **Right of Election to 2012 CW Bond Claims (Taxable Election):**  Notwithstanding the provisions of Section 44.1 of the Plan, each holder of an Allowed 2012 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 47.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLV

### PROVISIONS FOR TREATMENT OF RETAIL 2012 CW BOND CLAIMS (CLASS 41)

45.1     **Treatment of Retail 2012 CW Bond Claims:**  On the Effective Date, each holder of an Allowed Retail 2012 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2012 CW Bond Claim, such holder's Pro Rata Share of (a) the 2012 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2012 CW Bond Claims; provided, however, that, in the event that Class 41 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2012 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2012 CW Bond Recovery and (z) the Retail Support

Fee otherwise allocable to holders of Allowed Retail 2012 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

45.2     **Right of Election to Retail 2012 CW Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 45.1 of the Plan, each holder of an Allowed Retail 2012 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 47.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLVI

## PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (ASSURED) (CLASS 42)

46.1     **Treatment of 2012 CW Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Assured) shall be entitled to received, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim (Assured), such holder's Pro Rata Share of the 2012 CW Bond Recovery.

## ARTICLE XLVII

## PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 43)

47.1     **Provisions for Treatment of 2012 CW Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2012 CW Bond Recovery, as modified by its Pro Rata Share of the 2012 CW Taxable Bond Distribution.

## ARTICLE XLVIII

## PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE BOND CLAIMS (CLASS 44)

48.1     **Treatment of 2012 CW Guarantee Bond Claims:** On the Effective Date, and subject to the right of election set forth in Section 48.2 hereof, each holder of an Allowed 2012 CW Guarantee Bond Claim shall be entitled to receive, in full consideration, satisfaction, release

and exchange of such holder's Allowed 2012 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2012 CW Guarantee Bond Recovery.

48.2 **Right of Election to 2012 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 48.1 of the Plan, each holder of an Allowed 2012 CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 49.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLIX

## PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 45)

49.1 **Treatment of 2012 CW Guarantee Bond Claims (Taxable Election)**: On the Effective Date, each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2012 CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the 2012 CW Guarantee Taxable Bond Distribution.

## ARTICLE L

## PROVISIONS FOR TREATMENT OF 2014 CW BOND CLAIMS (CLASS 46)

50.1 **Treatment of 2014 CW Bond Claims**: On the Effective Date, and subject to the right of election set forth in Section 50.2 hereof, each holder of an Allowed 2014 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Bond Claim, such holder's Pro Rata Share of the 2014 CW Bond Recovery.

50.2 **Right of Election to 2014 CW Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 50.1 of the Plan, each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 52.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE LI

## PROVISIONS FOR TREATMENT OF RETAIL 2014
## CW BOND CLAIMS (CLASS 47)

51.1 **Treatment of Retail 2014 Bond Claims**: On the Effective Date, each holder of an Allowed Retail 2014 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2014 CW Bond Claim, such holder's Pro Rata Share of (a) the 2014 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2014 CW Bond Claims; provided, however, that, in the event that Class 47 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2014 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2014 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2014 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

51.2 **Right of Election to Retail 2014 CW Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 51.1 of the Plan, each holder of an Allowed Retail 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 52.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE LII

## PROVISIONS FOR TREATMENT OF 2014
## CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 48)

52.1 **Provisions for Treatment of 2014 CW Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2014 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2014 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2014 CW Taxable Bond Distribution.

## ARTICLE LIII

### PROVISIONS FOR TREATMENT OF
### 2014 CW GUARANTEE BOND CLAIMS (CLASS 49)

53.1 **Treatment of 2014 CW Guarantee Bond Claims:** On the Effective Date, subject to the right of election set forth in Section 53.2 hereof, each holder of an Allowed 2014 CW Guarantee Bond claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2014 CW Bond Recovery.

53.2 **Right of Election to 2014 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 53.1 of the Plan, each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 54.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE LIV

### PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE
### BOND CLAIMS (TAXABLE ELECTION) (CLASS 50)

54.1 **Treatment of 2014 CW Guarantee Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2014 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2014 CW Guarantee Taxable Bond Distribution.

## ARTICLE LV

### PROVISIONS FOR TREATMENT OF ACTIVE AND RETIRED
### EMPLOYEE RETIREMENT BENEFIT CLAIMS (CLASS 51A THROUGH 51L)

55.1 **Treatment of Retired ERS Participant Below-Threshold Claims (Class 51A):**

(a) _Adjustment of Benefits_. Each holder of an Allowed Retired ERS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired ERS Participant Below-Threshold Claim his or her benefits as modified pursuant to the Monthly Benefit Modification, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.2      **Treatment of Retired JRS Participant Below-Threshold Claims (Class 51B):**

(a)      Adjustment of Benefits.  Each holder of an Allowed Retired JRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired JRS Participant Below-Threshold Claim his or her benefits as modified pursuant to the Monthly Benefit Modification including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that remodified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.3      **Treatment of Retired TRS Participant Below-Threshold Claims (Class 51C):**

(a)      Adjustment of Benefits.  Each holder of an Allowed Retired TRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Below-Threshold Claim his or her benefits as modified pursuant to the Monthly Benefit Modification, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date.

(b)      Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.4      **Treatment of Retired ERS Participant Above-Threshold Claims (Class 51D):**

(a)      Adjustment of Benefits.  Each holder of an Allowed Retired ERS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired ERS Participant Above-Threshold Claim his or her benefits as modified pursuant to the Monthly Benefit Modification, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date, subject to the Benefit Restoration.

(b)      Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require or enforce employee pension and other benefits that re modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.5     **Treatment of Retired JRS Participant Above-Threshold Claims (Class 51E):**

(a)     Adjustment of Benefits.  Each holder of an Allowed Retired JRS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired JRS Participant Above-Threshold Claim his or her benefits as modified pursuant to the Monthly Benefit Modification, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date, subject to the Benefit Restoration.

(b)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statues, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.6     **Treatment of Retired TRS Participant Above-Threshold Claims (Class 51F):**

(a)     Adjustment of Benefits.  Each holder of an Allowed Retired TRS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Above-Threshold Claim his or her benefits as modified pursuant to the Monthly Benefit Modification, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date, subject to the Benefit Restoration.

(b)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive order, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.7     **Treatment of Active ERS Participant Claims (Class 51G):**

(a)     Adjustment of Benefits.  Each holder of an Allowed Active ERS Participant Claim shall be entitled to receive on account of such Allowed Active ERS Participant Claim his or her benefits as modified pursuant to the Monthly Benefit Modification, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date, subject to the Benefit Restoration; provided, however, that, notwithstanding the foregoing, Active ERS Participant Claims of Active ERS Participants hired prior to January 1, 2000, but which accrued after June 30, 2013 pursuant to Act 3-2013, shall not be subject to reduction in accordance with the Plan.  Benefits which accrued after June 30, 2013 pursuant to Act 3-2013 for Active ERS Participants hired prior to January 1, 2000 shall include the full accumulated contribution value with interest up to, but not including, the Commonwealth Petition Date and such Participants' balances shall have a four percent (4%) interest rate applied to them upon conversion of the balances to an annuity.  Each holder of an Active ERS Participant Claim (who is actively employed by an employer within the ERS as of the Effective Date) shall also receive a one-time payment in the amount of Two Thousand Six Hundred Dollars ($2,600.00), to be deposited into the defined contribution accounts established under Act 106, and the administrator of the Act 106 defined contribution plan shall direct all such deposits to be invested in target retirement date funds closest to the year in which each Participant will reach age 65, unless any such Participant has

affirmatively elected different investment options.  Holders of Allowed Active ERS Participant Claims who have already retired as of April 1, 2021 and who have converted their contributions to a system paid annuity, either through PayGo or through the payroll of the Commonwealth or its agencies under a Voluntary Transition Program (e.g. Act 211-2015 or 70-2016), are not eligible for the treatment described in this Section 55.7(a) and shall not receive a cash payment, and will be subject to the pension reduction applicable to other Participants in accordance with the terms and provisions of Section 55.1, 55.4, 55.11, or 55.12 of the Plan, as applicable.

(b)     Preemption:  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active ERS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

(c)     Payroll Deductions:  As further consideration to assure active Participants' future contributions and benefits, an active employee working for the central government of the Commonwealth shall have his, her or their payroll deductions for contributions to their individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deducted from such Participant's payroll distribution.

55.8     **Treatment of Active JRS Participant Claims (Class 51H):**

(a)     Adjustment of Benefits.  Each holder of an Allowed JRS Participant Claim shall be entitled to receive on account of such Allowed Active JRS Participant Claim (i) his or her benefits that accrued as of May 3, 2017, as modified pursuant to the Monthly Benefit Modification and the terms set forth on Exhibit "E" hereto, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date, subject to the Benefit Restoration, and (ii) such additional benefits for service on or after May 4, 2017, frozen as of the date as set forth on the term sheet attached as Exhibit "E" hereto, as applicable, to such holder of an Allowed Active JRS Participant Claim, including the social security benefits defined therein.

(b)     Rejection.  To effectuate the freeze of contractual rights of Active JRS Participants to accrue pension benefits under Puerto Rico law as set forth on Exhibit "E" hereto, the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the statutes set forth in Part III of Exhibit "K" hereto, shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code.

(c)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, including, without limitation, statutes set forth in Part III of Exhibit "K" hereto, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active JRS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

55.9     **Treatment of Active TRS Participant Claims (Class 51I):**

(a)          <u>Adjustment of Benefits</u>.

(i)          Each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (i) his or her, as applicable, benefits that accrued as of May 3, 2017, as modified pursuant to the Monthly Benefit Modification, as applicable, and the terms set forth on Exhibit "F-1" hereto, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date, subject to the Benefit Restoration, and (ii) such additional benefits for service on or after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the Effective Date as set forth on the term sheet attached as Exhibit "F-1" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein; provided, however, that, notwithstanding the foregoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

(ii)          Notwithstanding the terms and provisions of Section 55.9(a)(i) hereof, in the event that, on or prior to September 30, 2021, AMPR (A) notifies the Oversight Board, in writing, that the terms set forth in the term sheets annexed hereto as Exhibit "F-2" have been ratified, and (B) executes a plan support agreement with, among others, the Oversight Board, on behalf of the Commonwealth, that incorporates the terms set forth on Exhibit "F-2" hereto, each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (1) his or her benefits that accrued as of May 3, 2017, as modified pursuant to the Monthly Benefit Modification and the terms set forth on Exhibit "F-2" hereto, including, without limitation, the elimination of any cost of living adjustments from and after the Effective Date, and subject to the Benefit Restoration, (2) such additional benefits for service during the period from and after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the six (6) month anniversary of the Effective Date as set forth on the term sheet attached as Exhibit "F-2" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein, and (3) the benefits of the terms of a new collective bargaining agreement and all other terms as set forth on the term sheet attached hereto as Exhibit "F-2", in which case any existing collective bargaining agreement(s) with AMPR shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code. Without limiting the foregoing, on or as soon as reasonably practicable from and after the Effective Date, the Active TRS Participants shall receive the additional payments and distributions as set forth on Appendix II to Exhibit "F-2" hereto. Notwithstanding the forgoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

(b)          <u>Rejection</u>. To effectuate the freeze of the contractual rights of Active TRS Participants to accrue pension benefits under Puerto Rico law as set forth on Exhibit "F-1" or "F-2" hereto, as applicable, the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the statutes set forth in Part III of Exhibit "K" hereto, shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code.

(c)          <u>Preemption</u>. All provisions of the Commonwealth Constitution, Commonwealth statutes, including, without limitation, the statutes set forth in Part III of Exhibit "K" hereto, executive orders, rules, regulations, and policies in effect as of the Confirmation Date

that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active TRS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

(d)     Payroll Deductions.  As further consideration to assure Active TRS Participants' future contributions and benefits, such Participants shall have his, her or their payroll deductions for contributions to the Participant's individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deducted from such Participant's payroll distribution.

### 55.10     Treatment of System 2000 Participant Claims (Class 51J):

(a)     System 2000 Benefits:  Except as set forth in Sections 55.7(b), 55.8(c) and 55.9(c) hereof, holders of Allowed System 2000 Participant Claims shall receive the amount of their contributions to these plans from 2000 through June 30, 2017, plus interest accrued thereon pursuant to applicable law for the period up to, but not including, the Commonwealth Petition Date, which amount shall be deposited into the defined contribution accounts established under Act 106, and the administrator of the Act 106 defined contribution plan shall direct all such deposits to be invested in target retirement date funds closest to the year in which each participant will reach age 65 applicable to each participant unless any such participant has affirmatively elected different investment options.  If the total amount of contributions, plus accrued interest thereon as described above, is less than or equal to One Billion Five Hundred Million Dollars ($1,500,000,000.00), on the Effective Date, each holder of an Allowed System 2000 Participant Claim shall receive such holder's Pro Rata Share of such aggregate amount.  If the total amount of contributions described in this Section 55.10(a), plus accrued interest thereon as described above, exceeds One Billion Five Hundred Million Dollars ($1,500,000,000.00), the Oversight Board and AFSCME shall develop a payment plan mutually acceptable to both parties to pay out the remaining balance of the contributions (for the avoidance of doubt, the amount in excess of One Billion Five Hundred Million Dollars ($1,500,000,000.00)) described in this Section 55.5(a).  In all events, the full amount of contributions described in this Section 55.5(a) will be paid to all holders of Allowed System 2000 Participant Claims not later than December 31, 2025.  As of the Effective Date, holders of Allowed System 2000 Participant Claims with System 2000 contributions from 2000 through June 30, 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability benefits.  Holders of Allowed System 2000 Participant Claims who have already retired and converted their contributions to a system paid annuity, either through PayGo or through the payroll of the Commonwealth or its agencies under a Voluntary Transition Program (e.g., Act 211-2015 or Act 70-2010) are not eligible for the treatment described in this Section 55.5(a) and shall not receive a cash payment, but will be subject to the pension reduction applicable to other Participants in accordance with the terms and provisions of Section 55.1 of the Plan.

(b)     Preemption:  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment afforded pursuant to Section 55.5(a) hereof, are preempted as inconsistent with PROMESA.

(c)     Payroll Deductions:  As further consideration  to assure active participant's future contributions  and benefits, an active employee working for the central government of the Commonwealth shall have his, her or their payroll deductions for contributions  to a participant's individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following  the month in which the contributions  were deposited from such participant's payroll distribution.

55.11     **Treatment of VTP Payroll Participant  Below-Threshold Claims (Class 51K):**

(a)     Adjustment of Benefits.  Each holder of a VTP Payroll Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed VTP Participant Claim his or her benefits as modified  pursuant to the Monthly Benefit Modification.

(b)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies  that create, require, or enforce employee pension and other benefits that are modified  and/or preserved in whole or in part herein, to the extent inconsistent  with the treatment of Allowed VTP Payroll Participant Below-Threshold Claims hereunder, are preempted as inconsistent  with PROMESA.

55.12     **Treatment of VTP Payroll Participant  Above-Threshold Claims (Class 51K):**

(a)     Adjustment of Benefits.  Each holder of a VTP Payroll Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed VTP Participant Claim his or her benefits as modified  pursuant to the Monthly Benefit Modification,  subject to the Benefit Restoration.

(b)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth  statutes, executive orders, rules, regulations,  and policies  that create, require, or enforce employee pension and other benefits that are modified  and/or preserved in whole or in part herein, to the extent inconsistent  with the treatment of Allowed VTP Payroll Participant Above-Threshold Claims hereunder, are preempted as inconsistent  with PROMESA.

### ARTICLE LVI

### PROVISIONS FOR TREATMENT OF
### AFSCME CLAIMS (CLASS 52)

56.1     **Treatment of AFSCME Claims:**

(a)     Modified  AFSCME Collective  Bargaining  Agreements:  The existing collective bargaining  agreements between the Commonwealth,  its applicable  agencies and instrumentalities,  on the one hand, and AFSCME and its related union affiliates, on the other hand, shall be deemed rejected pursuant to section 365 of the Bankruptcy Code and replaced with modified  collective  bargaining  agreements to be entered into in accordance with the terms and conditions  agreed to by AFSCME and the Oversight Board, as set forth on Exhibit "G" hereto. Without limiting  the foregoing, such modifications  shall include, among other matters, (a) a term of five (5) years, commencing as of the Effective Date, (b) provisions  regarding layoffs and

downsizing, (c) terms regarding System 2000 and (d) provisions for sharing Excess Cash Surplus. Each holder of an Allowed AFSCME Claim shall be entitled to receive the treatment set forth in Sections 56.1(a), (b), (c) and (d) hereof in full consideration, satisfaction, release, and exchange of such holder's Allowed AFSCME Claim resulting from such rejection. The Commonwealth shall have no obligation to bargain with AFSCME over terms of a new or modified collective bargaining agreements throughout the term of such modified collective bargaining agreements and the failure to bargain during such period shall not constitute, nor shall it be construed to be, an unfair labor practice under any Puerto Rico law. No adjudicative forum shall take into consideration prior practices or bargaining history when interpreting the terms of the modified collective bargaining agreements set forth on Exhibit "G" hereto.

(b)     Additional AFSCME Distribution. On or as soon as reasonably practicable after the Effective Date, AFSCME and its member employees, as applicable, shall receive the additional payments and distributions as set forth on Appendix II to Exhibit "G" hereto.

(c)     Pre-Petition Arbitration and Grievance Claims. Any distributions on account of Claims for liquidated damage amounts resulting from the disposition of pre-petition actions brought pursuant to the grievance and arbitration procedures arising under the collective bargaining agreements between the Commonwealth and AFSCME shall be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) thirty (30) days after such disposition and (ii) sixty (60) days after the Effective Date.

(d)     Preemption. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified herein, to the extent inconsistent with the treatment afforded in this Section 56.1, are preempted as inconsistent with PROMESA and shall be of no further force or effect.

## ARTICLE LVII

## PROVISIONS FOR TREATMENT OF
## DAIRY PRODUCER CLAIMS (CLASS 53)

57.1     **Treatment of Dairy Producer Claims:** On the Effective Date, each holder of a Dairy Producer Claim be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Dairy Producer Claim, an amount equal to fifty percent (50%) of such Allowed Dairy Producer Claim, with such amount being payable by the Commonwealth in five (5) equal installments commencing on the Effective Date and each subsequent payment thereof being made on July 1st of each FY.

## ARTICLE LVIII

## PROVISIONS FOR TREATMENT OF CW
## EMINENT DOMAIN CLAIMS (CLASS 54)

58.1     **Treatment of Eminent Domain Claims:** From and after the Effective Date, (a) to the extent not modified prior thereto, the automatic stay extant pursuant to section 362 of the

Bankruptcy Code shall be deemed modified in order to permit the holder of an Eminent Domain Claim to (i) liquidate such Eminent Domain Claim in such holder's Eminent Domain Proceeding and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property, and (b) the holder of an Allowed Eminent Domain Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain Claim, such holder's Pro Rata Share of the CW GUC Recovery.

## ARTICLE LIX

## PROVISIONS FOR TREATMENT OF
## ENERGY INCENTIVE CLAIMS (CLASS 55)

59.1    **Treatment of Energy Incentive Claims:** From and after the Effective Date, (a) the Commonwealth shall (i) continue the energy incentive program set forth in the Energy Incentive Act, and (ii) in connection therewith, assume Allowed Energy Incentive Claims and the instruments and reservation agreements in existence as of the Effective Date, and, consistent with the terms of the Energy Incentive Act, and (b) to the extent that respective projects have been completed in accordance with the Energy Incentive Act and terms and provisions of the instruments and reservation agreements entered into in connection therewith, the holders of Allowed Energy Incentive Claims shall be permitted to exercise and claim the tax incentives created thereunder.

## ARTICLE LX

## PROVISIONS FOR TREATMENT OF
## MED CENTER CLAIMS (CLASS 56)

60.1    **Treatment of Med Center Claims:** On the Effective Date, and provided that Class 56 votes to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, each holder of a Med Center Claim shall (a) receive an Allowed Med Center Claim in the amount set forth in Column "A" on Exhibit "H" hereto, and (b) be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Med Center Claim, an amount equal to fifty percent (50%) of such Allowed Med Center Claim; provided, however, that, in the event that Class 56 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, each holder of a Med Center Claim shall (y) receive an Allowed Med Center Claim in the amount set forth in Column "B" set forth on Exhibit "H" hereto, and (z) be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Med Center Claim, an amount equal to fifty percent (50%) of such Allowed Med Center Claim set forth in Colum "B" set forth on Exhibit "H" hereto, with either such amount being payable by the Commonwealth in three (3) equal annual installments, commencing on the Effective Date and each subsequent payment thereof being made on the anniversary thereof.

60.2    **Dismissal of Med Center Litigation**: On the Effective Date, the Med Center Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of the Commonwealth and the respective Med Centers shall take such action as is necessary to notify the applicable court of such dismissal, including, without limitation, within ten (10) Business Days of

the Effective Date, filing notices with the clerk of such court setting forth the resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action), with prejudice; provided, however, that all appeals taken from the Med DC Action shall be dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such appeals shall take such action as is necessary to notify such appellate courts of appeal of such dismissal; and, provided, further, that the Commonwealth and the Med Centers shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all actions in connection with the Med DC Action shall be stayed, and (b) in the event that, from and after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the Medicaid Act, 42 U.S.C. § 139 6a(bb), such stay shall be lifted and the Med Centers may pursue relief and the Commonwealth may present any and all defenses with respect to such alleged defaults.

## ARTICLE LXI

## PROVISIONS FOR TREATMENT OF
## TAX CREDIT CLAIMS (CLASS 57)

61.1 **Treatment of Tax Credit Claims:** From and after the Effective Date, the Commonwealth shall assume Allowed Tax Credit Claims and the instruments and agreements in existence as of the Effective Date with respect thereto and the holders of Allowed Tax Credit Claims shall be permitted to exercise and claim the tax benefits and entitlements with respect thereto in accordance with the terms and provisions of such documents, instruments, and applicable law.

## ARTICLE LXII

## PROVISIONS FOR TREATMENT OF CW
## GENERAL UNSECURED CLAIMS (CLASS 58)

62.1 **Treatment of CW General Unsecured Claims:**

(a) Treatment of CW General Unsecured Claims. Subject to the election set forth in Section 62.1(b) hereof, on the Effective Date, each holder of an Allowed CW General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed CW General Unsecured Claim, such holder's Pro Rata Share of the CW GUC Recovery up to the GUC Recovery Cap.

(b) Election to be Treated as Convenience Claim. Notwithstanding the provisions of Section 62.1(a) of the Plan, any holder of an Allowed CW General Unsecured Claim, other than a CW General Unsecured Claim that is a component of a larger CW General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, may elect to be treated as the holder of an Allowed Convenience Claim. Such election must be made on Ballot and be received by the Debtors on or prior to the Ballot Date. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances may such waiver by the Debtors occur on or after the Effective Date.

62.2     **Limitation on Recovery:** Notwithstanding anything contained herein to the contrary, in the event that distributions with respect to Allowed CW General Unsecured Claims and Allowed Eminent Domain Claims (to the extent such Allowed Eminent Domain Claims exceed amounts on deposit with the Clerk of the Court of First Instance) from the Net CW Cash Consideration equal the GUC Recovery Cap, without consideration of any net recoveries by the Avoidance Actions Trust, any funds (other than any net recoveries by the Avoidance Actions Trust) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to the Commonwealth for general purposes.

62.3     **GUC Reserve:** The GUC Reserve shall be funded as follows: (a) Two Hundred Million Dollars ($200,000,000.00) on the later to occur of December 31, 2021 and the Effective Date, (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2022, (c) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2023, (d) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024, and (e) Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025; provided, however, that amounts necessary (a) to fund the Avoidance Actions Trust in accordance with Section 78.11 hereof shall be funded directly to the Avoidance Actions Trust and not into the GUC Reserve, and (b) to satisfy Allowed Convenience Claims shall be funded directly to the Disbursing Agent and not into the GUC Reserve; and provided, further, that, in the event that the Avoidance Actions Trust ceases pursuit of Avoidance Actions, including, without limitation, pursuant to settlement or dismissal of all Avoidance Actions, all funds in the Avoidance Actions Trust (including amounts necessary to fund the administration and operation of the Avoidance Action Trust) shall be transferred to the GUC Reserve for distribution to holders of Allowed CW General Unsecured Claims and Allowed Eminent Domain Claims (to the extent such Allowed Eminent Domain Claims exceed amounts on deposit with Clerk of the Court of First Instance); and, provided, further, that, in accordance with Section 62.2 hereof, in the event recoveries on account of Allowed CW General Unsecured Claims and Allowed Eminent Domain Claims (to the extent such Allowed Eminent Domain Claims exceed amounts on deposit with the Clerk of the Court of First Instance) from the Net CW Cash Consideration equal the GUC Recovery Cap, (a) any funds (other than any net recoveries by the Avoidance Actions Trust) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to the Commonwealth for general purposes, or (b) to the extent such GUC Recovery Cap is reached prior to a future funding obligation, the Commonwealth shall be relieved of such future funding obligation.

## ARTICLE LXIII

## PROVISIONS FOR TREATMENT
## OF CW/HTA CLAIMS (CLASS 59)

63.1     **Treatment of CW/HTA Claims:** On the Effective Date, and subject to the satisfaction of the HTA Distribution Conditions, each holder of an Allowed CW/HTA Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/HTA Claim, such holder's Pro Rata Share of the CW/HTA Clawback Recovery; provided, however, that, upon satisfaction of the HTA Distribution Conditions, Assured and National shall receive their respective shares of the CW/HTA Clawback Recovery on account of

the Assured CW/HTA Bond Claims and National CW/HTA Bond Claims, respectively; and provided, further, that, upon satisfaction of the HTA Distribution Conditions, the CW/HTA Clawback Recovery allocable to the FGIC CW/HTA Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

63.2 **Distribution of the CW/HTA Clawback Recovery**: Notwithstanding anything contained in the Plan to the contrary, upon satisfaction of the HTA Distribution Conditions, the Commonwealth shall take such actions as are necessary to distribute the CW/HTA Clawback Recovery to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit "J" annexed hereto; provided, however, that, until receipt of the GDB Loan Priority Determination, (a) Cash payable with respect to the HTA Clawback CVI and allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (b) the CW/HTA Clawback Recovery otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any undistributed CW/HTA Clawback Recovery shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (y) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (z) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit "J" annexed hereto. Notwithstanding the foregoing, the HTA Clawback CVI to be issued and distributed pursuant to this Article LXIII and any payments made thereunder shall be held in a reserve or trust, the form and substance of which shall be reasonably acceptable to Assured and National, up to and including the date on which the HTA Distribution Conditions are satisfied, and, in the event the HTA/CCDA Plan Support Agreement is terminated by the Oversight Board, Assured and/or National, the HTA Clawback CVI and any distributions on account thereof shall be released from such reserve or trust as the case may be, and distributed to creditors in accordance with the terms set forth on Exhibit "J" annexed hereto.

## ARTICLE LXIV

### PROVISIONS FOR TREATMENT OF
### CW/CONVENTION CENTER CLAIMS (CLASS 60)

64.1 **Treatment of CW/Convention Center Claims:** Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed CW/Convention Center Claim (including the Monolines) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/Convention Center Claim, such holder's Pro Rata Share of the CW/Convention Center Clawback Recovery; provided, however, that Ambac and Assured shall receive their respective share of the CW/Convention Center Clawback Recovery on account of the Allowed Ambac CW/Convention Center Claims and the Allowed Assured CW/Convention Center Claims, respectively; and, provided, further, that the CW/Convention Center Clawback Recovery on account of the Allowed FGIC CW/Convention

Center Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

## ARTICLE LXV

## PROVISIONS FOR TREATMENT OF
## CW/PRIFA RUM TAX CLAIMS (CLASS 61)

65.1    **Treatment of CW/PRIFA Rum Tax Claims:**  On the Effective Date, subject to the satisfaction of the PRIFA Distribution Conditions, each holder of an Allowed CW/PRIFA Rum Tax Claim (including the Monolines) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/PRIFA Rum Tax Claim, such holder's Pro Rata Share of the CW/PRIFA Clawback Recovery; provided, however that, upon satisfaction of the PRIFA Distribution Conditions, Ambac and Assured shall receive their respective share of the CW/PRIFA Clawback Recovery on account of Allowed Ambac CW/PRIFA Rum Tax Claims and the Allowed Assured CW/PRIFA Rum Tax Claims, respectively; and, provided, further, that the CW/PRIFA Clawback Recovery on account of the Allowed FGIC PRIFA Rum Tax Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

65.2    **Distribution of the Beneficial Interests in the PRIFA Trust**:  Notwithstanding anything contained in the Plan to the contrary, (a) on the Effective Date, the Commonwealth shall take such actions as are necessary to deposit (i) the PRIFA Clawback CVI and the Rum Tax CVI, and all payments to be made in connection therewith, and (ii) One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00) into the PRIFA Trust, each for the benefit of holders of PRIFA Bond Claims (including the Monolines), and (b) upon satisfaction of the PRIFA Distribution Conditions, cause the distribution of the beneficial interests of the PRIFA Trust to holders of PRIFA Bond Claims (including the Monolines); provided, however, that the beneficial interests in the PRIFA Trust on account of the FGIC Insured PRIFA Bond Claims shall be treated and distributed in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

## ARTICLE LXVI

## PROVISIONS FOR TREATMENT OF
## CW/MBA CLAIMS (CLASS 62)

66.1    **Treatment of CW/MBA Claims:**  On the Effective Date, each holder of an Allowed CW/MBA Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/MBA Claim, such holder's Pro Rata Share of the CW/MBA Clawback Recovery.

## ARTICLE LXVII

## PROVISIONS FOR TREATMENT OF
## CW APPROPRIATIONS CLAIMS (CLASS 63)

67.1     **Treatment of CW Appropriations Claims:** CW Appropriations Claims shall not receive a distribution pursuant to the Plan and each holder of a CW Appropriations Claim shall be deemed to have rejected the Plan with respect to such CW Appropriations Claim.

## ARTICLE LXVIII

## PROVISIONS FOR TREATMENT OF
## SECTION 510(b) SUBORDINATED CLAIMS (CLASS 64)

68.1     **Treatment of Section 510(b) Subordinated Claims:** Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan with respect to such Section 510(b) Subordinated Claims.

## ARTICLE LXIX

## PROVISIONS FOR TREATMENT OF
## ERS BOND CLAIMS (CLASS 65)

69.1     **Treatment of ERS Bond Claims:** On the Effective Date, each holder of an Allowed ERS Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed ERS Bond Claim, such holder's Pro Rata Share of the ERS Bond Recovery, without setoff or deduction for taxes; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.

69.2     **ERS Private Equity Portfolio:**

(a)     Commonwealth Election to Purchase. From the Effective Date up to and including April 10, 2023, the Commonwealth shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price. In the event the Commonwealth determines to the exercise the Commonwealth Election, the Commonwealth shall provide notice thereof by publication to holders of Allowed ERS Bond Claims on or prior April 10, 2023, and shall consummate the purchase thereof on or prior to April 25, 2023, with the proceeds thereof being distributed, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(b)     Bondholder Election to Purchase. In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period

from April 2, 2021 up to and including the purchase thereof pursuant to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023. In the event that one or more holders of Allowed ERS Bond Claims determine to exercise the Bondholder Election, such electing holder(s) shall pay such purchase price, on a pro rata basis calculated with respect to the amount of such holders' Allowed ERS Bond Claims, to the Commonwealth no later than April 20, 2023. Upon payment thereof, the Commonwealth shall distribute such proceeds, net of the amounts necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio that have not been previously reimbursed to the Commonwealth, and without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(c)     <u>Commonwealth Obligation to Purchase</u>. In the event that neither the Commonwealth Election nor the Bondholder Election shall have been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price, and (ii) the Commonwealth shall distribute the proceeds thereof, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(d)     <u>Quarterly Reporting</u>. From the Effective Date up to, but not including, the sale of ERS Private Equity Portfolio in accordance with the terms and provisions of this Section 69.2, the Commonwealth shall provide quarterly portfolio summaries to holders of Allowed ERS Bond Claims that execute and deliver a non-disclosure agreement, with the understanding that any information provided thereto shall not be subject to public disclosure.

(e)     <u>Tax Accounting</u>. From the Effective Date up to, but not including, the sale of the ERS Private Equity Portfolio in accordance with the terms and provisions of this Section 69.2, ERS shall be deemed the owner of the ERS Private Equity Portfolio and the ERS Trust for all applicable tax purposes, and that no items of taxable income, gain, loss or deduction attributable to the ERS Private Equity Portfolio or the ERS Trust, as the case may be, shall be allocated to holders of Allowed ERS Bond Claims unless and until such holder(s) have purchased the interests in the ERS Trust pursuant to the Bondholder Election and Section 69.2(b) hereof.

69.3     **Dismissal of Litigation:** On the Effective Date, (a) the ERS Litigation and the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, the Creditors Committee, and the ERS Bondholders (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action as may be reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions, with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate the dismissal and/or denial of the ERS Takings Action, with prejudice.

## ARTICLE LXX

## PROVISIONS FOR TREATMENT OF
## ERS GENERAL UNSECURED CLAIMS (CLASS 66)

70.1    **Treatment of ERS General Unsecured Claims:**

(a)    Treatment of ERS General Unsecured Claims.  On the Effective Date, and subject to the election set forth in Section 70.1(b) hereof, each holder of an Allowed ERS General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed ERS General Unsecured Claim, such holder's Pro Rata Share of the ERS GUC Pool.

(b)    Allowed Claims of Twenty Thousand Dollars ($20,000.00) or More/Election to be Treated as a Convenience Claim.  Notwithstanding the provisions of Section 70.1(a) of the Plan, any holder of an Allowed ERS General Unsecured Claim, other than an ERS General Unsecured Claim that is a component of a larger ERS General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, whose Allowed ERS General Unsecured Claim is more than Twenty Thousand Dollars ($20,000.00), and who elects to reduce the amount of such Allowed ERS General Unsecured Claim to Twenty Thousand Dollars ($20,000.00), or, if a holder of multiple Allowed ERS General Unsecured Claims, elects to reduce the amount of such multiple Allowed ERS General Unsecured Claims to an aggregate amount of Forty Thousand Dollars ($40,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed ERS General Unsecured Claim as so reduced, distributions pursuant to Section 72.1 hereof.  Such election must be made on Ballot/Election Form and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances may such waiver by the Debtors occur on or after the Effective Date.

70.2    **Limitation on Recovery**: Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to holders of an Allowed ERS General Unsecured Claim in accordance with the provisions of Section 72.1 hereof, in the event that the sum of the distributions of Cash and Cash received on account of Avoidance Actions net recoveries are equal to or in excess of one hundred percent (100%) of such holder's Allowed ERS General Unsecured Claim, the Avoidance Actions Trust Interests allocable to the ERS GUC Pool and Cash otherwise distributable to such holder on account of net recoveries from the Avoidance Actions Trust shall be deemed redistributed, on a pro rata basis, to the benefit of holders of Allowed CW General Unsecured Claims.

## ARTICLE LXXI

## PROVISIONS FOR TREATMENT OF
## GRACIA GRACIA CLAIMS (CLASS 67)

71.1    **Treatment of Gracia Gracia Claims:**  On the Effective Date, the Gracia Gracia Settlement shall be deemed assumed and (a) the members of the class certified in the Gracia

Gracia CW Action and the Gracia Gracia Federal Action and the counsel to such classes shall be entitled to receive funds in accordance with the terms and provisions of the Gracia Gracia Settlement and (b) pursuant to the Confirmation Order, all pending motions, applications, litigations and appeals with respect to the Gracia Gracia CW Action and the Gracia Gracia Federal Action shall be deemed withdrawn with prejudice.

## ARTICLE LXXII

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 68)

72.1     **Treatment of Convenience Claims:**  On the later of the Effective Date and the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Convenience Claim, in Cash, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Convenience Claim.

## ARTICLE LXXIII

## PROVISIONS FOR TREATMENT
## OF FEDERAL CLAIMS (CLASS 69)

73.1     **Treatment of Federal Claims:**  On the later to occur of (a) the Effective Date and (b) the date on which a Federal Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) in their sole and absolute discretion, and in full consideration, satisfaction, release and exchange of an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim, (2) satisfy and discharge such Allowed Federal Claim in accordance with the terms and conditions of such documents evidencing such Allowed Federal Claims or (3) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim in forty (40) equal amount installments, with such payments commencing on the third (3rd) anniversary of the Effective Date and continuing on each anniversary thereafter, or (ii) satisfy and discharge such allowed Federal Claims on such terms as the Reorganized Debtors and the holder of any such Allowed Federal Claim shall agree.

## ARTICLE LXXIV

## PROVISIONS REGARDING NEW GO BONDS,
## CVIS AND ADDITIONAL INDEBTEDNESS

74.1     **Issuance and Distribution of the New GO Bonds:**  On the Effective Date, Reorganized Commonwealth shall issue the New GO Bonds, consisting of New GO CIBs, New GO 5.375% CABs and New GO 5.0% CABs, as more particularly described herein. The maturities, interest rates and amortization schedules for the New GO Bonds are annexed hereto as Exhibit "I". All debt service on the New GO Bonds which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid. Interest shall accrue on such overdue debt service at the regular coupon rate (accretion rate for CABs), compounding semiannually, until the applicable New GO Bonds are paid or satisfied in

full in accordance with their terms. Interest on the New GO Bonds shall be calculated on a 30/360 basis. To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New GO Bonds, the Government Parties shall use their commercially reasonable best efforts to obtain ratings on the New GO Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with up to two (2) Initial GO/PBA PSA Creditors, jointly designated by the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Syncora, Assured (solely to the extent that it has not terminated the GO/PBA Plan Support Agreement as to itself), and National (solely to the extent that it has not terminated the GO/PBA Plan Support Agreement as to itself), each of which shall have executed a confidentiality agreement, in form and substance satisfactory to the Oversight Board and restricting such Initial GO/PBA PSA Creditors from trading New GO Bonds, including based upon the Government Parties' judgment with respect to expected benefits. After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings. Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable New GO Bonds are issued, such Taxable New GO Bonds shall be distributed to holders of Allowed Claims in the following order of priority: (1) first, to holders of Allowed Taxable Election CW Claims and (2) second, pro rata to all other holders of Allowed Claims and recipients of New GO Bonds, without duplication.

      (a)     **New GO CIBs:** Subject to any adjustments provided for herein, the New GO CIBs shall have the original principal amount, interest rate, maturity date and taxable status as follows: (a) Seven Hundred Forty-Five Million Fifty Thousand Dollars ($745,050,000.00), five percent (5.0%), July 1, 2023, and tax exempt, (b) Seven Hundred Forty Million Eight Hundred Twenty Thousand Dollars ($740,820,000.00), five percent (5.0%), July 1, 2025, and tax-exempt, (c) Seven Hundred Twenty-Nine Million Five Hundred Sixty-Five Thousand Dollars ($729,565,000.00), five percent (5.0%), July 1, 2027, and tax exempt, (d) Seven Hundred Ten Million Forty Thousand Dollars ($710,040,000.00), five percent (5.0%), July 1, 2029, and tax-exempt, (e) Six Hundred Eighty Million Eight Hundred Thirty-Five Thousand ($680,835,000.00), five percent (5.0%), July 1, 2031, and tax-exempt, (f) Six Hundred Thirty-Seven Million Forty Thousand Dollars ($637,040,000.00), four percent (4.0%), July 1, 2033, and tax-exempt, (g) Four Hundred Forty-Eight Million Five Hundred Eighty Thousand Dollars ($448,580,000.00), four percent (4.0%), July 1, 2035, and tax-exempt, (h) Two Hundred Fifty-Five Million Six Hundred Sixty Thousand Dollars ($255,660,000.00), four percent (4.0%), July 1, 2037, and tax-exempt, (i) Two Hundred Four Million Six Hundred Thousand Dollars ($204,600,000.00), four percent (4.0%), July 1, 2041, and tax-exempt, (j) Eight Hundred Twenty-Two Million Two Hundred Sixty Thousand Dollars ($822,260,000.00), five percent (5.0%), July 1, 2041, and taxable, and (k) Seven Hundred Eight Million Eight Hundred Sixty-Five Thousand Dollars ($708,865,000.00, four percent (4.0%), July 1, 2046, and tax-exempt. New GO CIBs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrue on all overdue debt service, at the regular coupon rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

      (b)     **New GO CABs:** Subject to any adjustments provided for herein, the New GO CABs shall have the original principal amount, accretion yield, maturity date and taxable status as follows: (a) Two Hundred Eighty-Eight Million Two Hundred Forty-One Thousand Nine

Hundred Eighty-Nine Dollars and Seventy-Five Cents ($288,241,989.75), five percent (5.0%), July 1, 2024, and tax-exempt, and (b) Four Hundred Forty-Two Million Five Hundred Six Thousand Five Hundred Fifty-Three Dollars and Fifty Cents ($442,506,553.50), five and three hundred seventy-five one thousandths percent (5.375%), July 1, 2033, and tax-exempt. New GO CABs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

(c)      **Deemed Issuance Date:** Notwithstanding the timing of the Effective Date, interest on the New GO Bonds shall commence to accrue or accrete, as applicable on the earlier to occur of (i) July 1, 2021 and (ii) the Effective Date, which date shall be designated as the "dated" date of the New GO Bonds.

(d)      **Call Provisions/Optional Redemption:** The New GO Bonds shall be callable, in whole or in part, in any order of maturity, at par (or at the accreted value for the 2033 CABs) plus accrued interest thereon, upon thirty (30) day's prior written notice as follows:

2023 CIBS:   Non-Callable
2024 CABS:  Non-Callable
2025 CIBS:   Non-Callable
2027 CIBS:   Non-Callable
2029 CIBS:   Non-Callable
2031 CIBS:   Non-Callable
2033 CIBS:   Callable as follows:

| Date | Price |
| --- | --- |
| July 1, 2031 through June 30, 2032 | 103% of Par |
| July 1, 2032 through June 30, 2033 | 102% of Par |

2035, 2037, 2041 and 2046 CIBS (Taxable and Tax-Exempt): Callable as follows:

| Date | Price |
| --- | --- |
| July 1, 2031 through June 30, 2032 | 103% of Par |
| July 1, 2032 through June 30, 2033 | 102% of Par |
| July 1, 2033 through June 30, 2034 | 101% of Par |
| July 1, 2034 and thereafter | 100% of Par |

2033 CABS: Callable as follows:

| Date | Price |
| --- | --- |
| July 1, 2031 and thereafter | 100% of Accreted Value |

If less than all of the New GO Bonds of a particular series are called for prior redemption, Reorganized Commonwealth will select the maturity or maturities of such series of the New GO Bonds to be redeemed, and, if less than all of the New GO Bonds within a maturity have been called for redemption, the Depository Trust Company, on behalf of the New GO Bonds Trustee, will select the New GO Bonds within the same maturity of such series to be redeemed by means of a random lottery.

(e)  **Deemed Annual Allocation:** Pursuant to the New GO Bonds Legislation, the Reorganized Commonwealth shall covenant that, until the New GO Bonds have been paid or satisfied in full in accordance with their terms, each FY, the Reorganized Commonwealth shall satisfy its obligations to holders of New GO Bonds, by allocating to the payment of principal and interest (and accreted value) with respect to the New GO Bonds issued to such holders, first, the 1.03% property tax levied pursuant to Act 83-1991 and collected by the Municipal Revenues Collection Center of the Reorganized Commonwealth with respect to the New GO Bonds until the total amount of such property taxes shall have been paid to holders of the New GO Bonds, second, the monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution until the total amount of such monies shall have been paid to holders of the New GO Bonds, and third other resources of the Reorganized Commonwealth.

(f)  **Monthly Deposits of Interest and Principal:** From and after the Effective Date, until the New GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st) Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's annual obligation with respect to the payment of principal (or accreted value) on the New GO Bonds. Upon deposit thereof, pursuant to the New GO Bonds Legislation, the New GO Bonds Trustee, on behalf of the holders of New GO Bonds, shall have a valid and perfected statutory lien and security interest on such monies deposited with the New GO Bond Trustee, which monies shall be held in trust for the benefit of holders of the New GO Bonds. Without limiting the foregoing, on the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.

(g)  **Covenants for New GO Bonds:** On the Effective Date, the Definitive Documents, including the New GO Bonds Indenture, New GO Bonds Legislation and/or the Confirmation Order, will contain customary terms, conditions and covenants for similarly structured and supported bonds, including, without limitation, the following covenants and other provisions with respect to New GO Bonds:

(i)  **Non-Impairment Covenant:** Pursuant to the New GO Bonds Legislation and the New GO Bonds Indenture, the Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of New GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Reorganized Commonwealth will take no action that would (1) impair the monthly deposits of interest and principal referred to in Section 74.1(f) hereof, (2) limit or alter the rights vested in the Debtors or Reorganized Debtors in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the New GO Bonds or (3) impair the rights and remedies of the holders of the New GO Bonds.

(ii)  **Tax-Exemption Covenant:** Pursuant to the New GO Bonds Indenture, the Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of federally tax-exempt New GO Bonds that, until all obligations with respect

thereto have been paid or satisfied in full in accordance with their terms, Reorganized Commonwealth will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any federally tax-exempt New GO Bonds shall be and remain excludable from gross income for federal income tax purposes.

(h)　　**Rights of Acceleration:** The New GO Bonds shall not have rights of acceleration.

(i)　　**Residual Interest of the Commonwealth:** Pursuant to the New GO Bonds Indenture, and subject to such additional rights and obligations as provided therein, any funds held by the New GO Bonds Trustee in excess of the required deposits pursuant to the New GO Bonds Indenture shall be released by the New GO Bonds Trustee to, or at the direction of, the Reorganized Commonwealth, upon payment or satisfaction in full of the New GO Bonds in accordance with their terms, such amounts shall revert and be distributed to, or at the direction of, the Reorganized Commonwealth.

(j)　　**Direct Right of Action:** Pursuant to the New GO Bonds Indenture, and subject to such additional rights as provided therein, the New GO Bonds Trustee shall have a direct right of action to enforce the terms of the New GO Bonds Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and seeking specific performance and other available remedies for any breach of covenants in the New GO Bonds Indenture.

(k)　　**Governing Law:** The New GO Bonds Indenture and the New GO Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law.

74.2　　**Issuance and Distribution of the CVIs:**

(a)　　**Issuance of GO CVIs:** On the Effective Date, Reorganized Commonwealth shall issue the GO CVIs, in the aggregate original notional amount of Three Billion Five Hundred Million Dollars ($3,500,000,000.00), having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and, subject to the provisions set forth in the CVI Indenture, the CVI Legislation, the Confirmation Order, and as more fully set forth on Exhibit "J" hereto.

(b)　　**Issuance of Clawback CVIs:** On the Effective Date, Reorganized Commonwealth shall issue the Clawback CVIs, in the aggregate original notional amount equal to Five Billion Three Hundred Eighty-Four Million One Hundred Twenty-Seven Thousand Seven Hundred Sixty-Four Dollars ($5,384,127,764.00), having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051, and, subject to the provisions set forth in the CVI Indenture, the CVI Legislation, the Confirmation Order, and as more fully set forth on Exhibit "J" hereto.

(c)　　**Payment Waterfall and Redemption Provisions:** The GO CVIs shall be subject to mandatory redemption in accordance with priorities set forth in the "Subject to Waterfall Annual Mandatory Redemption Payments" provisions set forth on Exhibit "J" annexed hereto, subject to the provisions set forth in Annex 1 thereto and the allocation set forth in Annex 3

thereto. The Clawback CVIs shall be subject to mandatory redemption in accordance with the "Mandatory Redemption Payments to Subject to Waterfall Clawback CVI" and "Mandatory Redemption Payments to Not Subject to Waterfall Clawback CVI" provisions set forth on Exhibit "J" annexed hereto, subject to provisions set forth in Annex 2 thereto, the allocation set forth in Annex 4 thereto and the priorities set forth in Annex 6 thereto.

(d) **Direct Right of Action**: Pursuant to the CVI Indenture, and subject to such additional rights as provided therein, the CVI Trustee shall have a direct right of action to enforce the terms of the CVI Indenture, including, without limitation, with respect to payments in respect of the CVIs and seeking specific performance and other available remedies for any breach of covenants in the CVI Indenture.

(e) **Full Faith and Credit**: For payment of the CVIs, the Commonwealth shall pledge its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law.

(f) **Non-Impairment Covenant**: The Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect thereto have been paid or otherwise satisfied in accordance with their terms, the Reorganized Commonwealth will not: (a) take any action that would impair the rights and remedies of the holders of the CVIs; (b) limit or restrict the rights or powers of the appropriate officers of the Reorganized Commonwealth to fulfill the terms of any agreements made with respect to the CVIs; (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT; provided, however, that the foregoing shall not preclude the Reorganized Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of CVIs from such elimination or replacement reducing the likelihood that Outperformance Condition will be satisfied; and, provided, further, that the CVI Indenture shall include a mechanism for public disclosure by the Reorganized Commonwealth of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, as defined and reflected in Exhibit "J" annexed hereto or (d) not now or in the future, subject payments or redemptions made with respect to the CVIs to any Commonwealth tax or withholding obligation imposed by the Commonwealth regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

(g) **Governing Law**: The CVI Indenture and the CVIs issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of laws.

74.3 **Tax-Exempt Treatment of the New GO Bonds:** Notwithstanding the terms and provisions of Sections 74.1 and 74.2 hereof, in the event that the Government Parties obtain a determination from the IRS or an opinion from Section 103 Bond Counsel (collectively, a "Favorable Determination") that the ratio of the aggregate amount of all taxable New GO Bonds to be issued on the Effective Date (the "New Ratio") to the total aggregate amount of all New GO

Bonds is less than thirteen percent (13%) (the "Existing Ratio"), (i) in the event that the Favorable Determination is obtained on or prior to the Effective Date, the holders of any Claims receiving New GO Bonds pursuant to the Plan shall receive the benefit of such Favorable Determination in the form of tax-exempt New GO Bonds issued pursuant to the Plan with coupons for all maturities equal to the coupons on the tax-exempt New GO Bonds set forth on Exhibit "I" hereto, and, to the extent that the Government Parties and the Initial GO/PBA PSA Creditors determine during the period up to and including the Effective Date to modify the coupons set forth on Exhibit "I" hereto, the amount of par New GO Bonds will either increase or decrease, on a dollar-for-dollar basis, depending upon the coupon structure, subject to the amount of the maximum annual debt service provided for in Exhibit "I" hereto, and any such modification being applied to creditors pro rata on a post-application of GO/PBA PSA Restriction Fee and GO/PBA Consummation Costs recovery basis as described in footnote 8 to Annex 2-A to Exhibit "I" of the GO/PBA Plan Support Agreement, (ii) in the event that the Favorable Determination is obtained subsequent to the Effective Date and the New Ratio is less than the Existing Ratio, then the holders of the Taxable Bonds affected by such determination (the "Invited Bonds") shall be invited to exchange such bonds for converted bonds (the "Exchange Offer") and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such Exchange Offer, the interest rate on the converted bonds shall be the same as the interest on Invited Bonds of the same type, interest rate, series and maturity; provided, however, that, such converted bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such converted bonds, and on the Invited Bonds exchanged for such converted bonds from the original date of delivery of such Invited Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from U.S., state, Commonwealth and local income taxation; and (iii) in the event that neither of the foregoing determinations are obtained, the covenants to seek such determinations shall terminate upon the earlier to occur of (1) December 15, 2021, (2) notification by the IRS to the Commonwealth that IRS is unable to issue a favorable private letter ruling, closing agreement or other type of IRS determination with respect to the matters addressed by this subsection, and (3) the amendment of the New GO Bonds Indenture following receipt of a favorable determination and consummation of an Exchange Offer.

74.4    **Comprehensive Cap on All Net Tax-Supported Debt:** During the Debt Policy Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive Cap on all Net Tax-Supported Debt of Article IV of the Debt Responsibility Act, which cap shall be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date. Debt service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of

bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap. For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date. The Secretary of Treasury's certification of compliance with the Debt limit pursuant to this Section 74.4 shall be conclusive and binding absent manifest error; provided, however, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

74.5 **Adoption and Maintenance of a Debt Management Policy:** During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated. While the Reorganized Commonwealth may revise and update its Debt Management Policy to reflect changing bond market conditions and standards, the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

(a) **Long-Term Borrowing for Capital Improvements Only:** To ensure the Reorganized Commonwealth achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Tax-Supported Debt issued after the Effective Date may only be incurred to finance Capital Improvements, as determined by the issuer of such Debt and approved by AAFAF, or to refinance Tax-Supported Debt in accordance with the terms and provisions of Section 74.5(d) hereof. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in the issuer's reasonable discretion, are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself.

(b) **30-Year Maturity Limitation on All Tax-Supported Borrowing:** No Tax-Supported Debt issued on or after the Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation; provided, however, that, the foregoing shall not apply to (a) Tax-Supported Debt issued to finance public housing facilities, subject to the limitation established in the Commonwealth Constitution or (b) Tax-Supported Debt issued to refinance Debt that was Outstanding prior to the Effective Date and had a legal maturity of more than thirty (30) years, subject to terms and provisions of Section 70.5(d) hereof.

(c) **Required Principal Amortization:** No series of Tax-Supported Debt issued from and after the Effective Date may be issued unless its principal commences to amortize within two (2) years of its original issuance date, or such other period not to exceed five (5) years from original issuance as may be permitted under the U.S. Internal Revenue Code for tax exempt financings of new construction or reconstruction of Capital Improvements, and continues amortizing in each and every year until such Debt is no longer outstanding.

117

(d)      **Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year:** Refinancings of Tax-Supported Debt are permitted only if (i) there is no increase in the amount of bond principal and interest payable in any fiscal year and (ii) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Reorganized Commonwealth in its Debt Management Policies; provided, however, that, refinancings without cash flow savings in every FY are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future FY does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

(e)      **Fiscal Plan Debt Service:** Any post-Effective Date Fiscal Plan shall include provisions for the payment, in each FY of (a) principal and interest (and accreted value) with respect to the New GO Bonds, including, without limitation, sinking fund payments due in such FY and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

Notwithstanding the foregoing, nothing contained herein shall prohibit the Reorganized Commonwealth from adopting, maintaining and complying with a Debt Management Policy that is more restrictive than the requirements set forth above. The Debt Management Policy shall be in addition to any other limitations imposed by law and nothing contained herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## ARTICLE LXXV

## PROVISIONS REGARDING ASSURED INSURED BONDS, NATIONAL INSURED BONDS, SYNCORA INSURED BONDS, AMBAC INSURED BONDS AND FGIC INSURED BONDS

75.1      **Treatment of Assured Insured Bond Claims:** In the event that Classes 2, 17, 24, 32, 37, and 42 vote to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all Assured Insurance Policies and related agreements relating to Assured Insured Bonds are in full force and effect, with no outstanding payment defaults by Assured with respect to such Assured Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, holders of Assured Insured Bond Claims shall receive the following treatments:

(a)      **Assured Election:** With respect to the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice, Assured shall receive the Cash and CVIs allocable to holders of such Assured Insured Bonds, and such Assured Insured Bonds selected by Assured shall be paid, in full, on the Effective Date, at an Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds, plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of such Assured Insured Bonds, which Assured New GO Bonds shall be (i) insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to

118

Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12, and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Acceleration Price, amounts equal to such deficiency paid by Assured in accordance with the Assured Insurance Policies insuring the relevant Assured Insured Bonds; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself any such deficiency amount with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise. The principal amounts, maturities and interest rates on such Assured New GO Bonds allocated on account of the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice shall be determined by Assured in consultation with applicable underwriter(s), such that the interest rates on such Assured New GO Bonds shall be the lowest interest rates necessary for such Assured New GO Bonds to be issued with increased par amounts relative to other New GO Bonds and otherwise result in the Assured New GO Bonds being issued at the lowest aggregate yield; provided, however, that the annual debt service on the Assured New GO Bonds due in any FY shall not be greater than the annual debt service that would have been due in such FY if such Assured New GO Bonds had the same terms as the other New GO Bonds. If either (i) at or prior to the time of pricing of Assured New GO Bonds, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (ii) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, then, in either case, Assured (A) may elect, in its sole discretion, to exercise the Assured Acceleration Price Payment Option by paying the applicable Acceleration Price to the holders of any Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself any such deficiency amount with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and (B) shall receive, on the Effective Date the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash and other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it. Payment of the applicable Acceleration Price with respect to any Assured Insured Bond, including in accordance with the Assured Election or the Assured Acceleration Price Option, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(b)      **Assured Insured Bondholder Elections:** Each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of the following two Assured Bondholder Elections, in each case on terms acceptable to Assured; provided, however, that, in the event that an Assured Insured Bondholder eligible to make an Assured Bondholder Election fails to make such an Assured Bondholder Election, such Assured Insured Bondholder shall be deemed to have elected Assured Bondholder Election 2:

(i)      **Assured Bondholder Election 1:** Each Assured Insured Bondholder who elects Assured Bondholder Election 1 shall receive from Assured the applicable Acceleration Price on the Effective Date in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive the Cash and Assured New Securities allocable to such holder under the Plan, which

Assured New Securities, in the case of Assured New GO Bonds, may, at Assured's selection, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it, but at no cost or premium to the Commonwealth; or

(ii)        **Assured Bondholder Election 2:**  Each Assured Insured Bondholder who elects Assured Bondholder Election 2 will opt into a custodial trust, escrow arrangement, or similar structure established by Assured that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policy and (B) certain Assured New Securities in accordance with terms acceptable to Assured.  The interests granted in a custodial trust, escrow arrangement, or similar structure established in connection with Assured Bondholder Election 2 must be DTC eligible.

Pursuant to the terms and provisions of Section 75.1(c) hereof, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Acceleration Price of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  Without limiting the foregoing, pursuant to the applicable Assured Insurance Policies, (A) Assured may elect, in its sole and absolute discretion, to make any principal payment, in whole or in part, on any date on which such principal payment is due by reason of acceleration or other advancement of maturity, and (B) in the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the Effective Date upon thirty (30) days' prior written notice to the relevant holders.  Assured's retention of this right will be reflected in the applicable custodial trust or escrow documentation.  From and after payment of the Acceleration Price on the Effective Date or other date of payment selected by Assured, with thirty (30) days' prior written notice, interest on such Assured Insured Bonds shall cease to accrue and be payable.  Payment of the applicable Acceleration Price with respect to any Assured Insured Bond in accordance with any of the provisions above shall satisfy and discharge all of Assured Guaranty's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(c)        **Acceleration of Assured Insured Bonds:**  Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d)        **Assignment of Redemption Rights:**  Notwithstanding any other provision of the Plan, on the Effective Date, the Commonwealth, PBA and CCDA shall be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were the Commonwealth, PBA and CCDA for such purpose, and any amounts due in connection

with such redemption shall be equal to the lesser of the applicable redemption price and the Assured Acceleration Price.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of Assured Insured Bond Claims shall be made by the Oversight Board to Assured in accordance with the provisions of Section 301(c)(3) of PROMESA.

75.2 **Treatment of National Insured Bond Claims:** In the event that Classes 3, 18, and 25 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of National Insured Bond Claims shall receive the following treatments, which treatments shall be selected by National, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing:

(a) **National Commutation Treatment:** Each holder of an Allowed National Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, and (ii) National shall receive the National Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed National Insured Bond Claim. If a holder of an Allowed National Insured Bond Claim (1) fails to timely and validly elect the National Non-Commutation Treatment or (2) submits an election for less than all of its National Insured Bond Claims (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the National Commutation Treatment set forth in this subsection (a), to commute the National Insurance Policies, to release and discharge National's obligations under the National Insurance Policies, and to receive distributions in accordance with this subsection (a). A holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed National Insured Bond Claim cancelled.

(b) **National Non-Commutation Treatment:** In the event that a holder of an Allowed National Insured Bond Claim timely and validly elects not to receive the National Commutation Treatment in accordance with the provisions Section 75.2(a) hereof, such holder of an Allowed National Insured Bond Claim shall receive one or more of the following treatments, at National's election, which election shall be exercised by National at or prior to the commencement of the Disclosure Statement Hearing:

(i) **Custodial Trusts:** Such holder of an Allowed National Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration and the National Insured Bonds allocable to such electing holder into the applicable National Trust, (B) be deemed to have received its Pro

Rata Share of the National Plan Consideration and National Certificates in consideration therefor and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

(ii)     **Escrow:** Such holder of an Allowed National Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration in the National Escrow Account and such deposited National Plan Consideration shall be held as security for National's obligations to the holders of the National Insured Bonds whose National Plan Consideration was deposited in the National Escrow Account under the National Insurance Policies.

(iii)     **Payment of Accelerated Amounts:** National shall receive the National Plan Consideration that would be otherwise allocable to such holder of an Allowed National Insured Bond Claim and National shall fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the National Acceleration Price.

(iv)     **Alternative Treatment:** The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, National may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of National Insured Bonds.

(c)     **Acceleration of National Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d)     **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

(e)     **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of National Insured Bond Claims and National CW/HTA Bond Claims shall be made by the Oversight Board to National in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing documents, and (b) the election to choose between the National Commutation Treatment and the National Non-Commutation Treatment as set forth in Section 75.2(a) hereof shall be made by the beneficial holders of National Insured Bonds; provided, however, that the form of the National Non-Commutation Treatment shall be selected by National in accordance with Section 75.2(b) hereof.

(f)     **Deemed Election**: Each holder of an Allowed Vintage PBA Bond Claim (National) and an Allowed Vintage CW Guarantee Bond Claim (National) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.2 as described above; provided, however, that holders making an election pursuant to Section 75.2 with respect to such holders' Allowed Vintage PBA Bond Claim (National) shall be deemed to have made the same election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claim (National) pursuant to Section 75.2 hereof.

75.3     **Treatment of Syncora Insured Bond Claims:** In the event that Classes 6, 21, and 28 vote to accept the Plan in accordance with Section 1126 of the Bankruptcy Code, on the Effective Date, notwithstanding any other provision of the Plan, Syncora Insured Bond Claims shall receive the following treatments, which treatments shall be selected by Syncora, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing:

(a)     **Syncora Commutation Treatment:** Each holder of an Allowed Syncora Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the Syncora Commutation Consideration, distributable by or at the direction of Syncora, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable Syncora Insurance Policy or any Syncora Trust or Syncora Escrow Account and (ii) Syncora shall receive the Syncora Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Syncora Insured Bond Claim. If a holder of an Allowed Syncora Insured Bond Claim (1) fails to timely and validly elect the Syncora Non-Commutation Treatment or (2) submits an election for less than all of its Syncora Insured Bond Claims (in which case, such election shall be void and of no force of effect), such holder shall be deemed to have elected to receive the Syncora Commutation Treatment set forth in this subsection (a), to commute the Syncora Insurance Policies, to release and discharge Syncora's obligations under the Syncora Insurance Policies, and to receive distributions in accordance with this subsection (a). A holder of an Allowed Syncora Insured Bond Claim that does not validly elect to receive the Syncora Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the Syncora Insured Bonds, including the obligations of Syncora under the related Syncora Insurance Policies, underlying such holder's Allowed Syncora Insured Bond Claim cancelled.

(b)     **Syncora Non-Commutation Treatment:** In the event that a holder of an Allowed Syncora Insured Bond Claim timely and validly elects not to receive the Syncora Commutation Treatment in accordance with the provisions Section 75.3(a) hereof, such holder of an Allowed Syncora Insured Bond Claim shall receive one or more of the following treatments, at

Syncora's election, which election shall be exercised by Syncora at or prior to the commencement of the Disclosure Statement Hearing.

        (i)     **Custodial Trusts:** Such holder of an Allowed Syncora Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration and the Syncora Insured Bonds allocable to such electing holder into the applicable Syncora Trust, (B) be deemed to have received its Pro Rata Share of the Syncora Plan Consideration and Syncora Certificates in consideration therefor, and (C) have no recourse to Syncora or the Syncora Insurance Policies other than as provided for under the terms of the Syncora Trust.

        (ii)     **Escrow:** Such holder of an Allowed Syncora Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration in the Syncora Escrow Account and such deposited Syncora Plan Consideration shall be held as security for Syncora's obligations to the holders of the Syncora Insured Bonds whose Syncora Plan Consideration was deposited in the Syncora Escrow Account under the Syncora Insurance Policies.

        (iii)     **Payment of Accelerated Amounts:** Syncora shall receive the Syncora Plan Consideration that would be otherwise allocable to such holder of an Allowed Syncora Insured Bond Claim and Syncora shall fully and completely discharge its obligation to such holder of an Allowed Syncora Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the Syncora Acceleration Price.

        (iv)     **Alternative Treatment:** The Oversight Board and Syncora reserve the right to formulate an alternative election or implementation option with respect to the Syncora Insured Bonds that is mutually acceptable to the Oversight Board and Syncora, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, Syncora may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of Syncora Insured Bonds.

        (c)     **Acceleration of Syncora Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

        (d)     **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to Syncora any and all rights to redeem and call the Syncora Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Syncora as if it

were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Syncora Acceleration Price.

(e)  **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Syncora Insured Bond Claims shall be made by the Oversight Board to Syncora in accordance with the provisions of Section 301(c)(3) of PROMESA, and (b) the election to choose between the Syncora Commutation Treatment and the Syncora Non-Commutation Treatment as set forth in Section 75.3(a) hereof shall be made by the beneficial holders of Syncora Insured Bonds; provided, however, that the form of the Syncora Non-Commutation Treatment shall be selected by Syncora in accordance with Section 75.3(b) hereof.

(f)  **Deemed Election:** Each holder of an Allowed Vintage PBA Bond Claim (Syncora) and an Allowed Vintage CW Guarantee Bond Claim (Syncora) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.3 as described above; provided, however, that holders making an election pursuant to Section 75.3 with respect to Allowed Vintage PBA Bond Claim (Syncora) shall be deemed to have made the same election with respect to corresponding Allowed Vintage CW Guarantee Bond Claim (Syncora) pursuant to Section 75.3 hereof.

75.4  **Treatment of FGIC Insured Bond Claims**: In the event that Classes 5, 20, and 27 vote to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all FGIC Insurance Policies and related agreements relating to FGIC Insured Bonds are in full force and effect, as may have been modified pursuant to the FGIC Rehabilitation Plan, then, notwithstanding any other provision of the Plan, holders of FGIC Insured Bond Claims shall receive the following treatments:

(a)  **FGIC Insured Bond Claims Treatment:** Each holder of an Allowed FGIC Insured Bond Claim (except as provided in Section 75.4(b) hereof) shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the FGIC Plan Consideration and the FGIC Insured Bonds and related FGIC Insurance Policies allocable to such holder into the applicable FGIC Trust, and (B) be deemed to have received its Pro Rata Share of the FGIC Plan Consideration and FGIC Certificates in consideration therefor. All rights and remedies under and in accordance with FGIC Insured Bonds deposited into a FGIC Trust and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the applicable FGIC Insurance Policies (solely as they apply and relate to such FGIC Insured Bonds) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating to such FGIC Insured Bonds under the applicable FGIC Insurance Policy, subject to the provisions of this Plan and except as may be provided in the terms of the applicable FGIC Trust. For the avoidance of doubt, each distribution made by a FGIC Trust to the holders of interests therein shall automatically and simultaneously reduce on a dollar-for-dollar basis the outstanding principal amount of the FGIC Insured Bonds held in such FGIC Trust and shall result in a corresponding reduction in FGIC's obligations under the applicable Insurance Policies.

(b)     **FGIC Insured Bond Claims Owned By FGIC:** With respect to all Allowed FGIC Insured Bond Claims owned by FGIC, on the Effective Date, FGIC shall be entitled to receive, in full consideration, satisfaction, release and exchange of such Allowed FGIC Insured Bond Claims, the full proportionate share of the FGIC Plan Consideration allocable to such Allowed FGIC Insured Bond Claims.

(c)     **Acceleration of FGIC Insured Bonds:** Notwithstanding any other provision of the Plan or the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(d)     **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive insurance documents and the applicable FGIC Insurance Policy, on the Effective Date, the Commonwealth and PBA, shall be deemed to have assigned to FGIC any and all rights to redeem and call the FGIC Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by FGIC as if it were the Commonwealth or PBA, as applicable, for such purpose.

(e)     **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of FGIC Insured Bond Claims and FGIC CW/HTA Bond Claims shall be made by the Oversight Board to FGIC in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents.

75.5     **Treatment of Ambac Insured Bond Claims:** In the even that Classes 4, 19, and 26 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all Ambac Insurance Policies and related agreements related to such Ambac Insured Bonds are in full force and effect, with no outstanding payments defaults by Ambac with respect to such Ambac Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of Ambac Insured Bond Claims shall receive the following treatments, which treatments shall be selected by the Ambac, in its sole and absolute discretion, not later than twenty-one (21) days prior to the Ballot Date:

(a)     **Ambac Commutation Treatment:** Each holder of an Allowed Ambac Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the Ambac Commutation Consideration, distributable by or at the direction of Ambac, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable Ambac Insurance Policy or any Ambac Trust(s) or Ambac Escrow Account(s), and (ii) Ambac shall receive the Ambac Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Ambac Insured Bond Claim. A holder of

an Allowed Ambac Insured Bond Claim that validly elects to receive the Ambac Commutation Treatment, or makes an improper election as described in Section 75.5(f) hereof, shall be deemed to have had, on or after Effective Date, the applicable Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policies, underlying such holder's Allowed Ambac Insured Bond Claims cancelled.

        (b)    **Ambac Non-Commutation Treatment:** In the event that a holder of an Allowed Ambac Insured Bond Claim timely and validly elects to receive the Ambac Non-Commutation Treatement, such holder of an Allowed Ambac Insured Bond Claim shall receive one or more of the following treatments, at Ambac's election, which election shall be exercised by Ambac not later than twenty-one (21) days prior to the Ballot Date;

        (i)    **Custodial Trusts:** Such holder of an Allowed Ambac Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Ambac Plan Consideration and the Ambac Insured Bonds allocable to such electing holder into the applicable Ambac Trust(s), (B) be deemed to have received its Pro Rata Share of the Ambac Plan Consideration and Ambac Certificates in consideration therefor, and (C) have no recourse to Ambac or the Ambac Insurance Policies other than as provided for under the terms of the Ambac Trust(s). The terms of the Ambac Trust(s) shall be set forth in a trust agreement or trust agreements which shall be filed as part of the Plan Supplement, but shall include the following terms, without limitation: (i) Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the applicable Ambac Insurance Policy as provided therein and in the agreement governing the Ambac Trust(s); (ii) Ambac shall be deemed the sole holder of the Ambac Insured Bonds in the Ambac Trust(s) with respect to voting, amendment, acceleration, events of default, and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings; and (iii) the agreement governing the Ambac Trust(s) will provide that (a) all rights of a holder of Ambac Insured Bonds held by the Ambac Trust(s) (whether as to amendments and consents, direction of remedies or otherwise) shall be exercisable solely by Ambac and no holder of the Ambac Certificates shall be entitled to any right with respect to the Ambac Insured Bonds (other than as otherwise described in the Ambac Trust(s)), and (b) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying Ambac Insured Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust(s); such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to receive the same treatment.

        (ii)    **Escrow:** Such holder of an Allowed Ambac Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Ambac Plan Consideration in the applicable Ambac Escrow Account(s) and such deposited Ambac Plan Consideration shall be held as security for Ambac's obligations to the holders of the Ambac Insured Bonds whose Ambac Plan Consideration was deposited in the applicable Ambac Escrow Account(s) under the Ambac Insurance Policies.

        (iii)    **Payment of Accelerated Amounts:** Ambac shall receive the Ambac Plan Consideration that would be otherwise allocable to such holder of an Allowed Ambac Insured Bond Claim and Ambac shall fully and completely discharge its obligation to such holder

of an Allowed Ambac Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the Ambac Acceleration Price.

(iv) **Alternative Treatment:** The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Ambac Insured Bonds that is mutually acceptable to the Oversight Board and Ambac, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, not later than twenty-one (21) days prior to the Ballot Date.

Notwithstanding the foregoing and for the avoidance of doubt, Ambac may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of Ambac Insured Bonds.

(c) **Deemed Acceleration of Ambac Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date. Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (Sections 75.5(b)(i)-(iv)) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds. For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable Ambac Insurance Policy, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to Ambac any and all rights to redeem and call the Ambac Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Ambac as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Ambac Acceleration Price.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Ambac Insured Bond Claims and Ambac CW/HTA Bond Claims shall be made by the Oversight Board to Ambac in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents, and (b) the election to choose between the Ambac Commutation Treatment as set forth in Section 75.5(a) hereof and the Ambac Non-Commutation Treatment as set forth in Section 75.5(b) hereof shall be made by the beneficial

holders of Ambac Insured Bonds; provided, however, that the form of the Ambac Non-Commutation Treatment shall be selected by Ambac in accordance with Section 75.5(b) hereof.

(f)  **Improper Election:** If a holder of an Allowed Ambac Insured Bond Claim (1) fails to timely and validly elect either the Ambac Commutation Treatment or the Ambac Non-Commutation Treatment pursuant to Section 75.5(a) or 75.5(b) hereof, or (2) submits an election for less than all of its Ambac Insured Bond Claims in a particular class (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the Ambac Commutation Treatment set forth in Section 75.5(a) hereof with respect to such Ambac Insured Bond Claims, to commute the applicable Ambac Insurance Policies, to release and discharge Ambac's obligations under such Ambac Insurance Policies, and to receive distributions in accordance with Section 75.5(a) hereof. In addition, a holder of an Allowed Ambac Insured Bond claim that does not validly elect to receive either the Ambac Commutation Treatment or the Ambac Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be deemed to have had, on or after the Effective Date, the applicable Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policies underlying such holder's Allowed Ambac Insured Bond Claim, cancelled.

(g)  **Deemed Election:** Each holder of an Allowed Vintage PBA Bond Claim (Ambac) and an Allowed Vintage CW Guarantee Bond Claim (Ambac) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.5 as described above; provided, however, that holders making an election pursuant to Section 75.5 with respect to such holder's Allowed Vintage PBA Bond Claim (Ambac) shall be deemed to have made the same election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claim (Ambac) pursuant to Section 75.5 hereof.

# ARTICLE LXXVI

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

76.1  **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**: Pursuant to sections 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Sections 76.5 and 76.7 hereof, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) of PBA and relating to the lease or sublease of PBA Property, (b) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (c) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement or (d) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected,

assumed, or assumed and assigned as of the Effective Date. The Debtors shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of this Section 76.1, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of this Section 76.1, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtors that such document is an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.

76.2     **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**: Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Section 76.1 of the Plan.

76.3     **Inclusiveness**: Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

76.4     **Cure of Defaults**: Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to Section 76.1 of the Plan, the Debtors shall, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the Confirmation Hearing, file with the Title III Court and serve by first class mail on each non-Debtor party to such Executory Contracts and Unexpired Leases to be assumed pursuant to Section 76.1 of the Plan, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned. The parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtors. If there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court. Notwithstanding the terms and provisions of Section 76.1 of the Plan, each of the Debtors shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

76.5     **Insurance Policies**: Subject to the terms and provisions of Section 76.7 hereof, each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan; provided, however, that, such treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect to its respective obligations to holders of Claims under policies of insurance and applicable law and governing documents with respect thereto.

76.6     **Rejection Damage Claims**: If the rejection of an Executory Contract and Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

76.7     **Indemnification and Reimbursement Obligations**: For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as the case may be, shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as the case may be, shall be Administrative Expense Claims; provided, however, that, under no circumstances shall the Debtors or the Reorganized Debtors, as the case may be, be responsible for any indemnification obligation, cost, or expense associated with the gross negligence, intentional fraud or willful misconduct of their respective officers or directors.

76.8     **Nonoccurrence of Effective Date**: In the event that the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

76.9     **Reservation of Rights**: Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors, Reorganized Debtors or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

76.10     **Collective Bargaining Agreements**: Except as provided in Articles LV and LVI hereof, none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain in effect subject, in all instances, to Puerto Rico law and Articles LII and LIII regarding the payment and ongoing treatment of pension and related claims and obligations.

## ARTICLE LXXVII

## PROVISIONS GOVERNING DISTRIBUTIONS

77.1     **Time and Manner of Distribution**: Except as otherwise provided herein, distributions under the Plan shall be made to each holder of an Allowed Claim as follows:

(a)   **Distributions to Holders of PBA Bond Claims**:  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed PBA Bond Claim, and in each case consistent with the terms hereof, such Creditor's Pro Rata Share, if any, of the PBA Bond Distribution, GO/PBA PSA Restriction Fee, Retail Support Fee, Retail Support Fee Return, and GO/PBA Consummation Costs, if applicable; provided, however, that, distribution of the Retail Support Fee, if any, to a holder of an Allowed PBA Bond Claim is subject to the delivery, on the prior to the Ballot Date, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

(b)   **Distributions to Holders of CW Bond Claims and CW Guarantee Bond Claims**:  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed CW Bond Claim or an Allowed CW Guarantee Bond Claim, such Creditor's (i) applicable recovery provided hereunder, (ii) the GO/PBA PSA Restriction Fee, (iii) the Retail Support Fee, (iv) the Retail Support Fee Return, and (v) the GO/PBA Consummation Costs, in each case, to the extent applicable; provided, however, that, distribution of the Retail Support Fee, if any, to a holder of an Allowed CW Bond Claim is subject to the delivery, on or prior to the Ballot Date, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

(c)   **Distributions to Holders of ERS Bond Claims**:  Except as otherwise provided herein, (i) within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed ERS Bond Claim, such Creditor's Pro Rata Share of the ERS Bond Recovery, calculated based upon the amount of Net Allowed ERS Bond Claims, and (ii) upon making distributions in accordance with the provisions of this Section 77.1(c), including, without limitation, the distribution of any proceeds from the sale of the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the terms and provisions of Section 69.2 hereof, the ERS Fiscal Agent shall close and terminate the original CUSIPs with respect to the ERS Bonds and shall have no further distribution obligations thereafter.

(d)   **Distributions with Respect to General Unsecured Claims**:  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, (i) to each holder of an Allowed CW General Unsecured Claim and Allowed ERS General Unsecured Claim such Creditor's Pro Rata Share, if any, of the CW GUC Recovery and the ERS GUC Pool, respectively, and (ii) to each holder of an Allowed PBA General Unsecured Claim distributions in accordance with the terms and provisions of Section 17.1 hereof.

(e)   **Distribution of Cash to Holders of Allowed Administrative Expense Claims**:  Except as otherwise provided herein, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, Cash in the amount of such Allowed Claim.

77.2     **Timeliness of Payments**: Any payment or distribution to be made pursuant to the Plan shall be deemed to be timely made if made within ten (10) Business Days after the date specified in the Plan. Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due, including, without limitation, deeming distributions made pursuant to Section 77.1(a) hereof to have been made on the Effective Date.

77.3     **Distributions by the Disbursing Agent**: Except as otherwise provided herein, all distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

77.4     **Manner of Payment under the Plan**: Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payment shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

77.5     **Delivery of Distributions**: Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Confirmation Order or herein, distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that initial distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the respective governing documents for such obligations; and, provided, further, that the Disbursing Agent may make distributions of PSA Restriction Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent. The trustee or fiscal agent for each such obligation shall, in turn, deliver the distribution to holders in the manner provided for in the applicable governing documents. The Debtors, its agents and servicers, and the Disbursing Agent shall have no obligation to recognize any transfer of Bond Claims after the Distribution Record Date; provided, however, that the New GO Bonds and the CVIs will be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

77.6     **Cancellation of Notes, Instruments, Certificates, and Other Documents**: Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 76.1 hereof), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtors

without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained herein to the contrary, the PBA Bonds, ERS Bonds and GO Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, (v) to allow Assured and National to exercise the redemption or call rights assigned to Assured and National pursuant to the provisions of Sections 75.1 and 75.2 hereof, respectively, or (vi) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline  and the Oversight Board shall request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims.  Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtors or Reorganized Debtors, as the case may be.

      77.7     **Undeliverable/Reserved Distributions**:

      (a)     **Holding of Undeliverable Distributions by the Disbursing Agent:**  If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address.  Subject to the terms and provision of Section 77.7(b) hereof, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable.  All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals thereon of any kind.  Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

      (b)     **Failure to Claim Undeliverable Distributions:**  If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those

Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against Reorganized Debtors, the trustees, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to existing securities, as the case may be, shall be released to Reorganized Debtors for use to discharge operating expenses of Reorganized Debtors and (2) the New GO Bonds and the CVIs in the possession of the Disbursing Agent or trustee with respect to existing securities shall be released to Reorganized Debtors for cancellation or deposit into the treasury of Reorganized Debtors, as determined by Reorganized Debtors in their sole and absolute discretion.

77.8    **Withholding and Reporting Requirements**: Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

77.9    **Time Bar to Cash Payments**: Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

77.10    **Distributions After Effective Date**: Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XCII of the Plan.

77.11    **Setoffs**: Except as otherwise provided in the Plan or in the Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided, further, that nothing in this Section 77.11 shall affect the releases and injunctions provided in Article XCII of the Plan.

77.12    **Allocation of Plan Distributions Between Principal and Interest**: Unless otherwise specified herein, to the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first, to interest accrued and unpaid as of the date immediately preceding the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, second, to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; provided, however, that the Debtors or Reorganized Debtors' treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

77.13    **Payment of Trustee Fees and Expenses**: The distributions to be made pursuant to the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses which may be allegedly due and owing by the Commonwealth, ERS and PBA with respect to amounts discharged pursuant to the Plan. The Plan does not, nor shall it be construed to, limit the rights of each Trustee/Fiscal Agent to payment of such amounts from the distributions to be made hereunder, including, without limitation, the imposition of any Charging Lien.

77.14    **Beneficial Owner**: For all purposes of the Plan, including, without limitation, for purposes of distributions pursuant to the terms and provisions of this Article LXXVII, except with respect to Claims arising from bonds insured by Syncora, the "holder" of a Claim shall mean any Entity who, directly or indirectly, has investment power with respect to any Claim, which includes the power to dispose or to direct the disposition of such Claim; provided, however, that, for purposes of Article LXXVI hereof and section 1126 of the Bankruptcy Code, (a) National shall constitute the "holder" of any National Insured Bond Claims and any National CW/HTA Bond Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the National Insured Bond Claims and the National CW/HTA Bond Claims, (b) Assured shall constitute the "holder" of any Assured Insured Bond Claims, any Assured CW/Convention Center Claims, any Assured CW/HTA Bond Claims, and any Assured CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Assured Insured Bond Claims, the Assured CW/Convention Center Claims, the Assured CW/HTA Bond Claims,

and the Assured CW/PRIFA Rum Tax Claims, (c) Ambac shall constitute the "holder" of any Ambac Insured Bond Claims, any Ambac CW/Convention Center Claims, any Ambac CW/HTA Bond Claims, and any Ambac CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Ambac Insured Bond Claims, the Ambac CW/Convention Center Claims, the Ambac CW/HTA Bond Claims, and the Ambac CW/PRIFA Rum Tax Claims, (d) FGIC shall constitute the "holder" of and FGIC Insured Bond Claims any FGIC CW/Convention Center Claims, and FGIC CW/HTA Bond Claims, and any CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the FGIC Insured Bond Claims, the FGIC CW/Convention Center Claims, the FGIC CW/HTA Bond Claims, and the FGIC CW/PRIFA Rum Tax Claims, and (e) the "holder" of any other Insured Bond Claims shall be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Insured Bond Claims.

77.15    **Value of Distributions**: For purposes of calculating the value of distributions made to holders of Allowed Claims, (a) Cash shall be valued in the amount distributed and (b) the New GO Bonds and CVIs shall be valued at the original principal amount thereof.

## ARTICLE LXXVIII

## AVOIDANCE ACTIONS TRUST

78.1    **Execution of Avoidance Actions Trust Agreement**: On or before the Effective Date, the Debtors and the Avoidance Actions Trustee shall execute the Avoidance Actions Trust Agreement, and shall take all other necessary steps to establish the Avoidance Actions Trust and the Avoidance Actions Trust Interests therein, which shall be for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed before, on or after the Effective Date. The Avoidance Actions Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Avoidance Actions Trust as a "liquidating trust" for United States federal income tax purposes.

78.2    **Purpose of the Avoidance Actions Trust**: The Avoidance Actions Trust shall be established for the sole purpose of Avoidance Actions and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

78.3    **Avoidance Actions Trust Assets**: The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets. On the Effective Date, the Debtors shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust. The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Avoidance Actions Trust Agreement. Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code. Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to

Section 88.2 hereof shall be discharged and released from all liability with respect to the delivery of such distributions.

78.4    **Administration of the Avoidance Actions Trust**: The Avoidance Actions Trust shall be administered by the Avoidance Actions Trustee according to the Avoidance Actions Trust Agreement and the Plan. In the event of any inconsistency between the Plan and the Avoidance Actions Trust Agreement, the Avoidance Actions Trust Agreement shall govern.

78.5    **The Avoidance Actions Trustee**: In the event the Avoidance Actions Trustee dies, becomes incapacitated, is terminated, or resigns for any reason, the Avoidance Actions Trust Board shall designate a successor; provided, however, that under no circumstance shall the Avoidance Actions Trustee be a director or officer with respect to any Affiliate of the Avoidance Actions Trust.

78.6    **Role of the Avoidance Actions Trustee**: In furtherance of and consistent with the purpose of the Avoidance Actions Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Avoidance Actions Trust Agreement, and the oversight of the Avoidance Actions Trust Board, the Avoidance Actions Trustee shall, among other things, have the following rights, powers and duties, (i) to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust, (ii) to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, (iii) in the Avoidance Actions Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, or litigation of the Avoidance Actions Trust, (iv) to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Avoidance actions Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust, (v) in the Avoidance Actions Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Avoidance Actions Trustee will be responsible, (vi) to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority and (vii) to not unduly prolong the duration of the Avoidance Actions Trust. In all circumstances, the Avoidance Actions Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

78.7    **Avoidance Actions Trustee's Tax Power for Debtors**: From and after the Effective Date, the Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns or other tax information statements required to be filed or that the Avoidance Actions Trustee otherwise deems appropriate.

78.8    **Transferability of Avoidance Actions Trust Interests**: The Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law

78.9    **Cash**: The Avoidance Actions Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within

the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

78.10     **Distribution of Avoidance Actions Trust Assets**: The Avoidance Actions Trustee shall distribute to the holders of Allowed Claims on account of their Avoidance Actions Trust Interests, on a semi-annual basis, all unrestricted Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 75.10), except (i) Cash reserved pursuant to the Avoidance Actions Trust Agreement to fund the activities of the Avoidance Actions Trust, (ii) such amounts' as are allocable to or retained on account of Disputed Claims in accordance with Section 83.3 hereof to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); provided, however, that the Avoidance Actions Trustee shall not be required to make a distribution pursuant to this Section 78.10 if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such that it would make the distribution impracticable as reasonably determined by the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, in accordance with applicable law, and so long as such aggregate amount is less than Twenty-Five Million Dollars ($25,000,000.00); and, provided, further, that the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, may decide to forego the first quarterly distribution to those holders of Avoidance Actions Trust Interests with respect to which the Avoidance Actions Trustee, in its reasonable judgment, is not administratively prepared to make such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Avoidance Actions Trustee is administratively prepared to do so.

78.11     **Funding, Costs and Expenses of the Avoidance Actions Trust**: On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing. The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets. Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Actions Trust.

78.12     **Compensation of the Avoidance Actions Trustee**: The individual(s) serving as or comprising the Avoidance Actions Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the Title III Court.

78.13     **Retention of Professionals/Employees by the Avoidance Actions Trustee**: Subject to the approval and consent of the Avoidance Actions Trust Board, the Avoidance Actions Trust may retain and compensate attorneys, other professionals, and employees to assist the Avoidance Actions Trust Board on such terms as the Avoidance Actions Trustee deems appropriate without Title III Court approval.

78.14    **Federal Income Tax Treatment of the Avoidance Actions Trust:**

(a)    Avoidance Actions Trust Assets Treated as Owned by Creditors.  For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Avoidance Actions Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (1) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) directly to the Avoidance Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are allocable to Disputed Claims, to the Avoidance Actions Trust Claims Reserve, followed by (2) the transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to the Avoidance Actions Trust Claims Reserve) in exchange for Avoidance Actions Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the deemed grantors and owners of their respective share of the Avoidance Actions Trust Assets (other than such Avoidance Actions Trust Assets as are allocable to the Avoidance Actions Trust Claims Reserve, discussed below). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(b)    Tax Reporting.

(i)    The Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Section 78.14. The Avoidance Actions Trustee also will annually send to each holder of an Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns. The Avoidance Actions Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

(ii)    The Avoidance Actions Trustee will then in good faith value all other Avoidance Actions Trust Assets, and shall make all such values available from time to time, to the extent relevant, and such values shall be used consistently by all parties to the Avoidance Actions Trust (including, without limitation, the Debtors, the Avoidance Actions Trustee, and Avoidance Actions Trust Beneficiaries) for all United States federal income tax purposes.

(iii)    Allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to the Avoidance Actions Trust Claims Reserve) shall be determined by reference to the manner in which an amount of cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Avoidance Actions Trust Claims Reserve) to the holders of the Avoidance Actions Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, taxable loss of the

Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. The tax book value of the Avoidance Actions Trust Assets for purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

        (iv)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Avoidance Actions Trustee of a private letter ruling if the Avoidance Actions Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Avoidance Actions Trustee), the Avoidance Actions Trustee shall (A) timely elect to treat any Avoidance Actions Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Avoidance Actions Trustee and the Avoidance Actions Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

        (v)     The Avoidance Actions Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the trust or its assets, including the Avoidance Actions Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Avoidance Actions Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets of the Avoidance Actions Trust Claims Reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Avoidance Actions Trustee as a result of the resolution of such Disputed Claims.

        (c)     <u>Tax Withholdings by Avoidance Actions Trustee</u>. The Avoidance Actions Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests for all purposes of the Avoidance Actions Trust Agreement, and it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution. The Avoidance Actions Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the Avoidance Actions Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Avoidance Actions Trust Agreement. In order to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests shall be required to identify themselves to the Avoidance Actions Trustee and provide tax information and the specifics of their holdings, to the extent the Avoidance Actions Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Avoidance Actions Trustee for these purposes.

This identification requirement generally applies to all holders of Avoidance Actions Trust Interests, including those who hold their securities in street name. The Avoidance Actions Trustee may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Avoidance Actions Trust Interests as disputed; provided, however, that, if such information is not furnished to the Avoidance Actions Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest; and, provided, further, that, upon the delivery of such information by a holder of a Avoidance Actions Trust Interest, the Avoidance Actions Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, provided, further, that, if the Avoidance Actions Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Avoidance Actions Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Avoidance Actions Trustee for such liability (to the extent such amounts were actually distributed to such holder).

(d)     The Avoidance Actions Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Avoidance Actions Trust Assets have been distributed pursuant to the Plan and the Avoidance Actions Trust Agreement, (ii) the Avoidance Actions Trustee determines, with the consent of the Avoidance Actions Trust Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit, and (iii) all distributions required to be made by the Avoidance Actions Trustee under the Plan and the Avoidance Actions Trust Agreement have been made; provided, however, in no event shall the Avoidance Actions Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Avoidance Actions Trustee and the Avoidance Actions Trust Board that any further extension would not adversely affect the status of the trust as an Avoidance Actions Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets. If at any time the Avoidance Actions Trustee determines, in reliance upon such professionals as the Avoidance Actions Trustee may retain, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Avoidance Actions Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, and (D) that is unrelated to the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, and any insider of the Avoidance Actions Trustee, and (iii) dissolve the Avoidance Actions Trust.

78.15    **Indemnification of Avoidance Actions Trustee and Members of Avoidance Actions Trust Bond**: The Avoidance Actions Trustee or the individual(s) comprising the Avoidance Actions Trustee, as the case may be, the Avoidance Actions Trust Board, the members

of the Avoidance Actions Trust Board and their respective employees, agents and professionals, shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Avoidance Actions Trustee, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board and the other parties entitled to indemnification under this subsection shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets. The Avoidance Actions Trustee, the Avoidance Actions Trust Board, and the members of the Avoidance Actions Trust Board shall be entitled to rely, in good faith, on the advice of their retained professionals.

## ARTICLE LXXIX

### PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTORS

79.1     **Prosecution of Claims**: Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Bankruptcy Court. The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

## ARTICLE LXXX

### ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

80.1     **Impaired Classes to Vote**: Each holder, as of the Voting Record Date, of a Claim in an impaired Class not otherwise deemed to have rejected or accepted the Plan in accordance with Sections 17.1, 59.1, 61.1, 67.1, 68.1, and 71.1 of the Plan shall be entitled to vote separately to accept or reject the Plan.

80.2     **Acceptance by Class of Creditors**: An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

80.3     **Cramdown**: In the event that any impaired Class of Claims shall fail to accept, or be deemed to reject, the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (i) request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) subject to the consent of the GO/PBA PSA

Creditors, in accordance with the provisions of the GO/PBA Plan Support Agreement, amend the Plan.

## ARTICLE LXXXI

## RIGHTS AND POWERS OF DISBURSING AGENT

81.1      **Exculpation**: From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

81.2      **Powers of the Disbursing Agent**: Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

81.3      **Fees and Expenses Incurred From and After the Effective Date**: Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court.

## ARTICLE LXXXII

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
## AND CLAIMS SUBJECT TO ACR PROCEDURES

82.1      **Objections to Claims; Prosecution of Disputed Claims**:

(a)      Except with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto. All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in

consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court. Unless otherwise ordered by the Title III Court, to the extent not already objected to by the Debtors, Reorganized Debtors shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred eighty (180) days following the Effective Date or such later date as may be approved by the Title III Court. Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, any Bond Claim filed by any Entity, for amounts due under existing securities, shall be deemed satisfied and expunged and the Oversight Board shall instruct Prime Clerk LLC, its court-appointed representative, to remove such Bond Claims from the claims registry maintained for the benefit of the Title III Court; provided, however, that, in the event that an order reversing or vacating the Confirmation Order with respect to Bond Claims becomes a Final Order, such Bond Claims shall be reinstated on the claims registry.

(b) The two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019. With respect to the foregoing obligations and responsibilities, such appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), which amounts shall be funded from the GUC Reserve.

82.2 **Estimation of Claims**: Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, including, without limitation, the ACR Order, and the ADR Order, Reorganized Debtors, by and through the Oversight Board, may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Title III Court, in the event that the Title III Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; provided, however, that, if the estimate constitutes the maximum limitation on such Claim, Reorganized Debtors, by and through the Oversight Board, may elect to pursue

supplemental proceedings to object to any ultimate allowance of such Claim; and, provided, further, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

82.3 **Payments and Distributions on Disputed Claims**:

(a) **Disputed Claims Holdback:** From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized Debtors shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized Debtors; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above. To the extent that any of the Reorganized Debtors retains any New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or CVIs are distributed, such Reorganized Debtors shall exercise voting or consent rights with respect to such obligations.

(b) **Allowance of Disputed Claims:** At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized Debtors shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any earnings that have accrued thereon (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgement of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter.

82.4 **Authority to Amend Lists of Creditors**: Except with respect to Bond Claims, and subject to the limitations in Section 82.1(b) hereof, the Debtors shall have the authority to amend the List of Creditors with respect to any Claim and to make distributions based on such amended List of Creditors without approval of the Title III Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtors will provide the holder of such Claim with notice of such amendment and such holder will have twenty (20) days to file an objection to such amendment with the Title III Court. If no such objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

82.5 **Non-Accrual of Interest**: Unless otherwise specifically provided for herein or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as the case may be, on any Claim or right. Additionally, and without limiting the foregoing, interest shall

not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

82.6     **Disallowance of Claims**: All Claims of any Entity from which property is sought by the Debtors under sections 550, or 553 of the Bankruptcy Code or that the Debtors alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

82.7     **Claims Subject to ACR Procedures:** To the extent not already transferred as of the Effective Date in accordance with the terms and conditions of the ACR Order, the Debtors or the Reorganized Debtors, as the case may be, shall transfer Claims in accordance with the terms and conditions of the ACR Order, and, upon transfer, all such Claims shall (a) be reconciled pursuant to the applicable regulatory and administrative procedures of the Debtors and the Reorganized Debtors, as the case may be, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the Plan, shall not be included in CW General Unsecured Claims to be satisfied from the CW GUC Recovery or Convenience Claims. Notwithstanding the foregoing, (y) the Oversight Board may remove a claim from the ACR process in the event that it was improperly transferred into the ACR process because it did not qualify in accordance with the terms and provisions of the ACR Order, including, without limitation, bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the Plan) and (z) claims that are eligible to be transferred to or administered through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 54, Class 58, Class 66, or Class 68 under the Plan and shall be administered through the ACR process, in accordance with the terms of the ACR Order and subsections (a) and (b) of this Section 82.7.

## ARTICLE LXXXIII

## GOVERNANCE AND PROVISIONS REGARDING PENSION RESERVE

83.1     **Formation and Responsibilities of the Pension Reserve**: On or prior to the Effective Date, the Commonwealth shall take all necessary steps to establish the Pension Reserve Trust, including, without limitation, by execution and delivery of the Pension Reserve Deed of Trust.

83.2     **Funding of the Pension Reserve Trust**: On the Effective Date, the Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars ($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve Trust. From and after the FY in which the Effective Date occurs up to and including the conclusion of the seventh (7th) FY following the FY in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be made, annual (but in no event later than

147

October 1st following the conclusion of each FY) contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b) such additional amount calculated as the lower of the actual primary surplus for such FY and the projected Fiscal Plan primary surplus for such FY, minus the sum of (i) the Base Contribution for such FY, plus (ii) the Commonwealth debt service obligation pursuant to the plan for such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to applicable laws, including, without limitation, Titles I and II of PROMESA, such additional amounts as the Reorganized Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust. The Pension Reserve Trust will be managed by an independent entity whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations.

83.3    **Non-Impairment Covenant**: The Commonwealth will covenant in the Pension Reserve Deed of Trust for the benefit of all Participants that, with respect to payments and other obligations owed to Participants pursuant to the Plan, including, without limitation, PayGo obligations and all components of the Total Monthly Retirement Benefit after any adjustment pursuant to the Plan, all such obligations shall remain in place and not otherwise be altered, modified or amended until all such obligations have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents and the New GO Bonds Legislation, enforceable by any and each of the Oversight Board, and any affected Retirees and, with respect to any such provision, the Pension Reserve Deed of Trust shall not be amended or modified by the Commonwealth except (i) with the express prior written consent of the Oversight Board (if in existence), and a majority in number of the Retirees receiving benefits pursuant to the Plan who are affected by such amendment or modification, or (ii) pursuant to a new or re-opened Title III case for the Commonwealth and a confirmed new or modified, and effective, plan of adjustment.

## ARTICLE LXXXIV

## IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN AND NOT IMPAIRED BY THE PLAN

84.1    **Impaired Classes**: The Claims in Classes 1 through 12, 14 through 50, 51D through 51J, 51L, 54, 56, 58 through 62, 65, 66 and 69 are impaired and receiving distributions pursuant to the Plan, and are therefore entitled to vote to accept or reject the Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Classes 22, 29, 33, 35, 39, 43, 45, 48, 50, and 68 are deemed to have accepted the Plan. The Claims in Classes 63 and 64 are impaired and not receiving a distribution pursuant to the Plan and, therefore, Classes 63 and 64 are deemed to have rejected the Plan.

84.2    **Unimpaired Class**: Claims in Classes 13, 51A through 51C, 51K, 55, 57, 67, and 68 are unimpaired pursuant to the Plan, are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

## ARTICLE LXXXV

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

85.1    **Conditions Precedent to Confirmation of the Plan**: Confirmation of the Plan is subject to satisfaction of the following conditions precedent:

(a)    **Fiscal Plan Certification:** The Oversight Board shall have certified a Fiscal Plan consistent with the Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.

(b)    **Required Orders:** The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and the Confirmation Order providing for the following:

(i)    Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii)    Authorizing the solicitation of votes and elections with respect to the Plan;

(iii)    Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

(iv)    Confirming and giving effect to the terms and provisions of the Plan, including the releases set forth in Article XCII of the Plan;

(v)    Determining that the compromises and settlements set forth in the Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

(vi)    Determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, the Debtors and the Plan;

(vii)    Approving the documents in the Plan Supplement, other than the New GO Bonds Legislation and the CVI Legislation (to the extent included in the Plan Supplement) and the Reorganized Debtors By-Laws, and determining that such documents are valid and binding on parties with respect thereto;

(viii)    Determining that the New GO Bonds Legislation and the CVI Legislation, to the extent enacted, are a valid means for the implementation of the Plan and the issuance of the New GO Bonds and the CVIs, respectively; and

(ix)    Authorizing the Reorganized Debtors to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions

149

otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, and the documents in the Plan Supplement.

(c) **Form of Orders:** The Confirmation Order and the Plan are each in form and substance reasonably acceptable to the Oversight Board, the Debtors, the Initial GO/PBA PSA Creditors and, solely with respect to provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee.

(d) **Confirmation Order:** The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations and injunctions set forth in Article XCII of the Plan and (iii) the applicable provisions set forth in Section 85.2 (b) hereof.

85.2 **Waiver of Conditions Precedent to Confirmation**: Subject to the terms and provisions of the GO/PBA Plan Support Agreement and the Committee Agreement, and to the extent practicable and legally permissible, each of the conditions precedent in Section 85.1 hereof may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Debtors, the Initial PSA Creditors and, solely with respect to provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee, which consent shall not be unreasonably withheld. Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

## ARTICLE LXXXVI

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

86.1 **Conditions Precedent to the Effective Date**: The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a) **Fiscal Plan Certification:** The Oversight Board shall have determined that the Plan is consistent with the Debtors' Fiscal Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA. The Fiscal Plan certified as of the Effective Date shall include provisions for the payment of principal and interest with respect to the New GO Bonds, including, without limitation, sinking fund payments and the mechanisms and procedures for payment of the CVIs in the event that the Outperformance Condition is satisfied and payment is due in accordance with the CVI Indenture.

(b) **Entry of the Confirmation Order:** The Clerk of the Title III Court shall have entered the Confirmation Order in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Cases pursuant to Section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, the Initial PSA Creditors, and the Creditors' Committee and the Confirmation Order shall provide for the following:

(i)        Authorize the Debtors and the Reorganized Debtors, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)        Decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii)        Authorize the Debtors and Reorganized Debtors, as the case may be, to (1) make all distributions and issuances as required under the Plan and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv)        Authorize the implementation of the Plan in accordance with its terms;

(v)        Determine the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York and federal law;

(vi)        Determine that, the Commonwealth shall have pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest on the New GO Bonds and payment on the CVIs;

(vii)        Determine that, pursuant to the New GO Bonds Legislation and other applicable law, upon deposit of monies in the Debt Service Fund, there shall be statutory first liens on such monies for the purposes of securing payment of the New GO Bonds, which statutory first liens on such monies shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms;

(viii)        Determine the Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtors, (2) Reorganized Debtors, (3) the Commonwealth and its instrumentalities, (4) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (5) any other Entity, and (6) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(ix)        Provide that the Fiscal Plan, certified as of the Effective Date, and any post-Effective Date Fiscal Plan include provisions for the payment in each FY of (a) principal

151

and interest payable on the New GO, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture;

(x)      Determine that the statutory first lien on funds once deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights herein and in the Confirmation Order);

(xi)      Provide that the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to monies on deposit in the Debt Service Fund as of the commencement thereof;

(xii)      Determine that, for purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth as determined in accordance with modified accrual accounting standards;

(xiii)      Provide that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding;

(xiv)      Determine that the Plan is consistent with the Debtors' Fiscal Plans and satisfies Section 314(b)(7) of PROMESA;

(xv)      Provide that, in consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and upon satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims;

(xvi)      Provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA Plan Support Agreement, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively;

(xvii)      Provide that neither the Governor nor the Legislature shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan;

(xviii)      Provide that the Governor and the Legislature, individually and jointly, as appropriate, shall take any and all actions necessary to consummate the transactions contemplated by the Plan; and

(xix)      Provide that payments or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

(c)      **No Injunction:** The Confirmation Order shall not be stayed in any respect.

(d)      **Authorizations:** All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, including, without limitation, the New GO Bonds Legislation and the CVI Legislation, have been obtained or enacted or entered and not revoked or reversed, and (2) except to the extent expressly provided herein and not inconsistent with any other provision of the Plan, unless otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the Plan.

(e)      **Execution of Documents; Other Actions:** All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, the New GO Bonds Legislation and the CVI Legislation, necessary to implement the terms and provisions of the Plan, including the Definitive Documents, the New GO Bonds Legislation and the CVI Legislation, are effected or executed and delivered, as applicable, and are in full force and effect.

(f)      **Opinions:** Usual and customary legal opinions for issuances of the type similar to the New GO Bonds and the CVIs by outside counsel to the Debtors covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the Initial GO/PBA PSA Creditors, have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan.

(g)      **Constitutional Claims:** The Title III Court shall have entered an order finding that any Claim asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall be determined to be a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and shall be dischargeable and discharged pursuant to the Plan or Confirmation Order and the Debtors and the Reorganized Debtors shall have no liability on account of such Claims.

(h) **Lift Stay Motions and Clawback Actions**: The clawback funds at issue in the Lift Stay Motions and the Clawback Actions have been determined by the Title III Court to constitute property of the Commonwealth.

86.2 **Waiver of Conditions Precedent**: Subject to the provisions of the GO/PBA Plan Support Agreement, the Oversight Board may waive any of the conditions to the Effective Date set forth in Section 86.1 hereof at any time without any notice to any other parties in interest, other than the Initial GO/PBA PSA Creditors, the Creditors' Committee and the Government Parties, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan; provided, however, that, subject to the terms and provisions of Committee Agreement, each of the conditions precedent in Section 86.1 hereof with respect to provisions affecting Classes 54, 58, 66 and 68 may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

86.3 **Effect of Non-Occurrence of Conditions to Effective Date**: If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in any order of the Title III Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of the Debtors, the Oversight Board, the Creditor's Committee, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the Oversight Board, the Creditor's Committee, or any other Entity.

## ARTICLE LXXXVII

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

87.1 **Modification of Plan**: Subject to (a) Sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, and (b) the terms and provisions of the GO/PBA Plan Support Agreement, the AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, the Committee Agreement, and the HTA/CCDA Plan Support Agreement, the Oversight Board may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

87.2 **Revocation or Withdrawal**:

(a) Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, the Committee Agreement, and the HTA/CCDA Plan Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Oversight Board.

(b)      If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by the Debtors or any other Entity, or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceeding involving the Debtors.

87.3      **Amendment of Plan Documents**: From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan and their respective attachments, as the case may be.

87.4      **No Admission of Liability:**

(a)      The submission of this Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this Plan.

(b)      None of this Plan (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with this Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized Debtors, the Debtors, or any other Entity with respect to the validity of any Claim.  None of this Plan or any settlement entered, act performed or document executed in connection with this Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this Plan, and except that, once confirmed, any Entity may file this Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

## ARTICLE LXXXVIII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED DEBTORS

88.1      **Corporate Action**: On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds

155

Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by Reorganized Debtors, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule. Without limiting the foregoing, from and after the Confirmation Date, the Debtors and Reorganized Debtors shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable.

88.2    **Dissolution of ERS**:  On or as soon as practicable subsequent to the Effective Date, ERS shall be dissolved and all existing directors and officers of ERS shall be relieved of any further duties and obligations.  Upon such dissolution, all remaining assets of ERS shall be transferred to the Commonwealth.

88.3    **Officers of Reorganized Debtors**:  To the extent applicable, the board of directors of Reorganized Debtors shall elect officers of Reorganized Debtors as of or after the Effective Date.

88.4    **PBA and CCDA Governance Structure**:  No changes to the PBA governance structure or PBA collective bargaining agreements will be implemented during or following the PBA Title III Case, unless any such changes are approved by the Oversight Board and AAFAF.

# ARTICLE LXXXIX

## PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA

89.1    **Effect of Confirmation**:  Nothing in this Plan or the Confirmation Order shall discharge, substitute, alter or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of each Reorganized Debtor under PROMESA. From and after the Effective Date, the Reorganized Debtors shall continue to have all of their obligations pursuant to PROMESA, including, without limitation, the terms and conditions of Titles I and II thereof.

89.2    **Ongoing Role of the Oversight Board**:  Nothing in the Plan or the Confirmation Order shall discharge any or all obligations of each Debtor under PROMESA and, from and after the Effective Date, the Oversight Board's powers and responsibilities under PROMESA shall continue, and the Debtors' duties and obligations shall continue and be unaffected by the Plan and the consummation thereof.

89.3    **Preemption of Laws**:  As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, all laws of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, are preempted.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016,

that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, and such laws shall not be enforceable to facilitate payment of such indebtedness, directly or indirectly, and shall not be enforceable if enforcement thereof would be inconsistent with any provision of PROMESA having continuing applicability and effectiveness. Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on Exhibit "K" hereto and (b) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on Exhibit "K" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.

## ARTICLE XC

## PROVISIONS REGARDING COMMITTEES

90.1    **Dissolution of Committees**: On the Effective Date, each of the Creditors' Committee and the Retiree Committee shall be (a) dissolved and be deemed to have satisfied all of its respective duties and obligations, and (b) released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Cases; provided, however, that (x) in the event that an appeal of the Confirmation Order is taken, neither the Creditors' Committee nor the Retiree Committee shall be dissolved until the Confirmation Order becomes a Final Order, (y) the Creditors' Committee shall not be dissolved with respect to its duties and obligations in connection with the HTA and PREPA Title III cases, and (z) each of the Creditors' Committee and the Retiree Committee shall be entitled to defend applications for allowance of compensation and reimbursement of expenses of their respective professionals. To the extent that, as of the date immediately prior to the Effective Date, either the Creditors' Committee or the Retiree Committee was a party to a contested matter or adversary proceeding in connection with the Title III Cases, including, without limitation, the Debt Related Objections, the PBA Litigation, the Invalidity Actions, the Lien Challenge Actions, the ERS Litigation, the Appointments Clause Litigation, the Uniformity Litigation, the Clawback Actions, the Lift Stay Motions, and any objection to claim, from and after the Effective Date and to the extent not already a party thereto, the Reorganized Debtors or the Avoidance Actions Trustee shall be deemed to have assumed such role and responsibility in connection with such contested matter and, upon such assumption, the Creditors' Committee or the Retiree Committee, as the case may be, shall be relieved of any role, responsibility or obligation with respect thereto; provided, however, and, for the avoidance of doubt, in no event shall the Avoidance Actions Trustee assume any role with respect to the Debt Related Objections, the PBA Litigation, the Invalidity Actions or the Lien Challenge Actions, which litigation shall be settled as set forth in Section 2.1 hereof and the Confirmation Order.

## ARTICLE XCI

## RETENTION OF JURISDICTION

91.1    **Retention of Jurisdiction**: The Title III Court shall retain and have exclusive jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Cases and the Plan, or that relates to the following:

(a)      to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim not compromised or settled hereby, including, without limitation, the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims not compromised or settled hereby;

(b)      to resolve any matters related to Executory Contracts or Unexpired Leases, including, without limitation, (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(c)      to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)      to adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors or Reorganized Debtors that may be pending on the Effective Date or brought thereafter;

(e)      to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the Plan or orders entered by the Title III Court;

(f)      to enter and implement such orders as may be necessary or appropriate to execute, implement, consummate or enforce the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Cases and (b) the Plan, the Confirmation Order, Definitive Documents and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the Plan,

(g)      to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, Definitive Documents or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)      to approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections

945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

(i)     to adjudicate, decide or resolve any matters relating to the Debtors' compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

(j)     to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, Definitive Documents, or any contract, instrument, security, release or other agreement or document created, entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(k)     to enter and implement other orders, or take such other actions as may be necessary or appropriate to enforce or restrain interference by any Entity with consummation or enforcement of the Plan or the Confirmation Order, including, without limitation, the provisions of Section 92.2 and 92.3 hereof;

(l)     to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan or Confirmation Order, including, without limitation, issuance of the New GO Bonds and the CVIs, and enter any necessary or appropriate orders or relief in connection with such adjudication;

(m)     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     to enter an order or final decree concluding or closing the Title III Cases pursuant to section 945(b) of the Bankruptcy Code;

(o)     to resolve disputes that may arise between the Oversight Board or AAFAF, as the case may be, and the two (2) Creditors' Committee's appointees to the Avoidance Actions Trust Board in connection with the settlement of Claims in accordance with the provisions of Section 79.1(b) of the Plan;

(p)     to enforce and clarify any orders previously entered by the Title III Court in the Title III Cases; and

(q)     to hear any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## ARTICLE XCII

## MISCELLANEOUS PROVISIONS

92.1     **Title to Assets**: Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in

Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order).

 92.2 **Discharge and Release of Claims and Causes of Action:**

 (a) Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Released Parties that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of Action. Upon the Effective Date, the Debtors and Reorganized Debtors shall be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan. For the avoidance of doubt, nothing contained herein or in the Confirmation Order shall release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity. Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

 (b) Except as expressly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets and property, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities. In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtors or Reorganized Debtors and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability. As of the Effective Date, and in consideration for the value provided under the Plan, each holder of a Claim in any Class under this Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtors and Reorganized Debtors, and their respective Assets and property and all such Claims.

160

(c)        Notwithstanding any other provisions of this Section 92.2, in accordance with the provisions of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 92.2.

(d)        <u>SEC Limitation</u>.  Notwithstanding anything contained herein or in the Confirmation Order to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

(e)        <u>United States Limitation</u>.  Notwithstanding anything contained herein or in the Confirmation Order to the contrary, no provision shall (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release, enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United States arising from and after the Effective Date, (B) any liability to the United States that is not a Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (D) the continued validity of the obligations of the United States, the Debtors or the Reorganized Debtors, as the case may be, under any United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized Debtors' obligations arising under federal police or regulatory laws, including, but not limited to, laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, (F) any environmental liability or obligation to the United States that the Debtors, the Reorganized Debtors, any successors thereto, or any other Person or Entity may have as an owner or operator of real property arising during the period from and after the Effective Date, including, without limitation, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil or other penalties, and (G) any liability to the United States on the part of any non-debtor.  Without limiting the foregoing, nothing contained herein or in the Confirmation Order shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any entity, including, but not limited to, the Debtors and the Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to grant any relief to any Entity that the Court is

161

prohibited from granting the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f) **Underwriter Actions**. Notwithstanding anything contained herein or in the Confirmation Order to the contrary, including, without limitation, Sections 92.2, 92.3 and 92.11 of the Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions.

92.3   **Injunction on Claims**: Except as otherwise expressly provided in the Plan, the Confirmation Order or such other Final Order of the Title III Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 92.2 hereof or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 92.2 hereof are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

92.4   **Integral to Plan**: Each of the discharge, injunction, exculpation and release provisions provided in this Article XCII is an integral part of the Plan and is essential to its implementation. Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in this Article XCII.

92.5   **Releases by the Debtors and Reorganized Debtors**: Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, and for good and valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against

any Released Party that are Released Claims or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event or other circumstance relating to the Title III Cases or the Debtors taking place or existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection therewith or alleged or that could have been alleged, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees.

92.6    **Injunction Related to Releases**: As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to Section 92.5 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims: (i) commencing, conducing or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 92.5 hereof; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order. For the avoidance of doubt, the following stipulations will terminate upon the entry of the Confirmation Order: the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transpiration Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 173283-LTS, ECF No. 15854], as amended; and the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case NO. 17-3283-LTS, ECF No. 17394], as amended.

92.7    **Exculpation:**

(a)    **Government Parties**: The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 89.7 shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct. Nothing in the foregoing provisions of this Section 89.7(a) shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each

of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

(b)      **PSA Creditors**: Each of the PSA Creditors solely in its capacity as a party to the GO/PBA Plan Support Agreement and/or the HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive Documents, or any other contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 92.7(b) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c)      **Retiree Committee**: Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; provided, however, that, the foregoing provisions of this Section 92.7(c) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)      **Creditors' Committee**: Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the Petition Date up to and including the Effective and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 92.7(d) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)      **AFSCME**: Each of AFSCME solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, as applicable, from the Petition Date up to and

including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement; provided, however, that, the foregoing provisions of this Section 89.7(e) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(f)   **Monoline Insurers:** Ambac, Assured, FGIC, National, Syncora, and their Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan, including, without limitation, in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims, FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the voting procedures, the election procedures, and any release of obligations under the applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National Insurance Policies, or Syncora Insurance Policies: provided, however, that, notwithstanding anything contained herein to the contrary, the terms and provisions of the Plan shall not, and shall not be construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds, Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance with its terms solely to the extent of any failure of such holder to receive the Ambac Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies, Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as applicable).

92.8   **Appointments Related Litigation/Uniformity Litigation**: Notwithstanding anything contained herein to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of the Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made in accordance with the terms and provisions of the Plan and documents and instruments related hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the Plan, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan and the Confirmation Order, including, without limitation, the releases, exculpations and injunctions provided pursuant to Article XCII of the Plan.

92.9   **Bar Order**: To the limited extent provided in the Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative,

whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the GO/PBA Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Cases, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Cases, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

92.10    **No Waiver**: Notwithstanding anything to the contrary contained in Sections 92.5 and 92.6 hereof, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized Debtors, the PSA Creditors or the Avoidance Actions Trust to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

92.11    **Supplemental Injunction**: Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)    Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)    Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)    Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)    Except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity,

contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order, provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

92.12     **Post-Effective Date Fees and Expenses**: From and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized Debtors related to implementation and consummation of the Plan without further approval from the Title III Court. Without limiting the foregoing, from and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to the Reorganized Debtors, pay the reasonable and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the Plan.

92.13     **Securities Act Exemption**: Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New GO Bonds and the CVIs pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

92.14     **Severability**: Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the Committee Agreement, and Section 3.7 hereof, if, prior to the Confirmation Date, (a) any term or provision of the Plan shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted or (b) the Oversight Board determines to modify or amend the Plan, including, without limitation, to remove a Debtor (other than the Commonwealth and PBA) from the treatments set forth in the Plan, the Plan provisions applicable thereto shall be deemed severed and to be of no force or effect.

92.15     **Governing Law**: Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not

167

inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

92.16    **Closing Case**: The Oversight Board shall, promptly upon the full administration of the Title III Cases, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court. Notwithstanding the closing of the Title III Cases, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XCI of the Plan.

92.17    **Section Headings**: The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

92.18    **Inconsistencies**: To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern and (b) the terms and provisions of the Plan and the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and be deemed a modification of the Plan; provided, however, that under no circumstances shall the Confirmation Order modify the economic terms set forth herein absent consent of the Oversight Board.

92.19    **Document Retention**: From and after the Effective Date, the Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors.

92.20    **Immediate Binding Effect**: Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the Plan and whether or not such holder has accepted the Plan. The releases, exculpations, and settlements effected under the Plan shall be operative, and subject to enforcement by the Title III Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

92.21    **Additional Documents**: On or before the Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

92.22    **Reservation of Rights**: Except as expressly set forth herein, the Plan shall have no force or effect unless the Title III Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims prior to the Effective Date. Except as expressly set forth herein, the rights and powers of the government of Puerto Rico under the Commonwealth Constitution and PROMESA, including, without limitation, under Sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

92.23    **Successors and Assigns**: Except as expressly provided otherwise in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

92.24    **Notices**: All notices, requests to, demands or other document(s) required by the Plan or the Confirmation Order to be served on or delivered to the Oversight Board, the Debtors or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Oversight Board, to:    Financial Oversight and Management Board for Puerto Rico
268 Muñoz Rivera Ave, Suite 1107
San Juan, PR 00918-1813
Attn: Natalie A. Jaresko, Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:  Hermann Bauer, Esq.
Tel:  (787) 764-8181
Fax:  (212) 753-8944

If to the Debtors, to:          The Commonwealth of Puerto Rico
                                c/o Fiscal Agency and Financial Advisory Authority
                                Roberto Sánchez Vilella (Minillas) Government Center
                                De Diego Ave. Stop 22
                                San Juan, Puerto Rico 00907
                                Attn: Office of the Executive Director

                                – with a copy to –

                                PROSKAUER ROSE LLP
                                Eleven Times Square
                                New York, NY 10036
                                Attn:  Martin J. Bienenstock, Esq.
                                       Brian S. Rosen, Esq.
                                Tel:  (212) 969-3000
                                Fax:  (212) 969-2900

                                – and –

                                O'NEILL & BORGES LLC
                                250 Muñoz Rivera Ave, Suite 800
                                San Juan, PR 00918-1813
                                Attn:  Hermann Bauer, Esq.
                                Tel:  (787) 764-8181
                                Fax:  (212) 753-8944

                                – and –

                                O'MELVENY & MYERS LLP
                                Seven Times Square
                                New York, NY 10036
                                Attn:  John Rapisardi, Esq.
                                       Peter Friedman, Esq.
                                       Maria J. DiConza, Esq.
                                Tel:  (212) 326-2000
                                Fax:  (212) 326-2061

If to AAFAF, to:                Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907

– with a copy to –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn: John Rapisardi, Esq.
       Peter Friedman, Esq.
       Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061

92.25     **Term of Injunctions or Stays**: Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

92.26     **Entire Agreement**: Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

92.27     **Plan Supplement**: All documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from [https://cases.primeclerk.com/ puertorico/] or the Title III Court's website, available via PACER. Unless otherwise ordered by the Title III Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control; provided, however, that, with respect to matters governed by the New GO Bonds Indenture or the CVI Indenture, to the extent that any provisions of the Plan are inconsistent with the New GO Bonds Indenture or the CVI Indenture, the New GO Bonds Indenture or the CVI Indenture, as the case may be, shall control.

Dated: San Juan, Puerto Rico
         July 27, 2021

THE COMMONWEALTH OF PUERTO RICO, by
and through the Financial Oversight and
Management Board for Puerto Rico as its
representative

By: /s/ Natalie A. Jaresko
    Name: Natalie A. Jaresko
    Title: Executive Director

EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH
OF PUERTO RICO, by and through the Financial
Oversight and Management Board for Puerto Rico
as its representative

By: /s/ Natalie A. Jaresko
    Name: Natalie A. Jaresko
    Title: Executive Director

PUERTO RICO PUBLIC BUILDINGS
AUTHORITY, by and through the Financial
Oversight and Management Board for Puerto Rico
as its representative

By: /s/ Natalie A. Jaresko
    Name: Natalie A. Jaresko
    Title: Executive Director

# **EXHIBIT A**

SCHEDULE OF AVOIDANCE ACTIONS

Remaining  Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| ALEJANDRO  ESTRADA  MAISONET | Adversary | 19-00059 |
| AMBASSADOR VETERANS  SERVICES  OF PR LLC | Adversary | 19-00048 |
| APEX  GENERAL  CONTRACTORS | Adversary | 19-00062 |
| BIO NUCLEAR  OF P R INC | Adversary | 19-00091 |
| BRISTOL /MYERS  SQUIBB  P R INC | Adversary | 19-00042 |
| CARIBBEAN  EDUCATIONAL  SERVICES  INC | Adversary | 19-00098 |
| CARIBE GROLIER  INC | Adversary | 19-00051 |
| CCHPR HOSPITALITY, INC | Adversary | 19-00116 |
| CENTRO  DE DESARROLLO  ACADEMICO INC. | Adversary | 19-00053 |
| CITIBANK N A | Adversary | 19-00265 |
| CLINICA  DE TERAPIAS  PEDIATRICA | Adversary | 19-00054 |
| COMMUNITY  CORNESTONE  OF P R | Adversary | 19-00043 |
| COMPUTER  LEARNING  CENTERS,  INC. | Adversary | 19-00055 |
| COMPUTER NETWORK SYSTEMS CORP | Adversary | 19-00150 |
| Core Laboratories N.V.  d/b/a Saybolt | Adversary | 19-00381 |
| CREATIVE  EDUCATIONAL  & PSYCHOLOGICAL  SER | Adversary | 19-00152 |
| DIDACTICOS,  INC. | Adversary | 19-00161 |
| DISTRIBUIDORA  LEBRON | Adversary | 19-00167 |
| Ecolift Corp. | Adversary | 19-00172 |
| EDWIN CARDONA & ASOC | Adversary | 19-00056 |
| EMPRESAS  ARR INC | Adversary | 19-00084 |
| ENTERPRISE  SERVICES  CARIBE LLC | Adversary | 19-00060 |
| EVERTEC  INC | Adversary | 19-00044 |
| EXPLORA  CENTRO  ACADEMICO Y TERAPEUTICO | Adversary | 19-00143 |
| FACSIMILE  PAPER CONNECTION  CORP | Adversary | 19-00092 |
| FAST ENTERPRISES  LLC | Adversary | 19-00266 |
| FIRST HOSPITAL PANAMERICANO | Adversary | 19-00093 |
| FP+1,LLC | Adversary | 19-00148 |
| GF SOLUTIONS,  INC. | Adversary | 19-00063 |
| GILA  LLC | Adversary | 19-00354 |
| GIRARD  MANUFACTURING INC DBA/BANCO DE | Adversary | 19-00103 |
| GM SECURITY  TECHNOLOGIES | Adversary | 19-00273 |
| GREAT  EDUCATIONAL  SERVICE,  CORP. | Adversary | 19-00277 |
| GUIMERFE  INC | Adversary | 19-00182 |
| HEWLETT  PACKARD PR BV | Adversary | 19-00183 |
| HOSPIRA | Adversary | 19-00186 |
| I.D.E.A. INC. | Adversary | 19-00268 |
| INSTITUCION  EDUCATIVA  NETS, LLC | Adversary | 19-00067 |
| INTERNATIONAL  SURVEILLANCE  SERV CORP | Adversary | 19-00202 |
| INTERVOICE  COMMUNICATIONS  OF PR INC | Adversary | 19-00068 |
| JOSE SANTIAGO INC | Adversary | 19-00075 |
| JUNIOR BUS LINE, INC. | Adversary | 19-00229 |

| L.L.A.C., INC. | Adversary | 19-00122 |
|---|---|---|
| LAW OFFICES WOLF POPPER, INC | Adversary | 19-00236 |
| MACAM S.E. | Adversary | 19-00255 |
| MANAGEMENT, CONSULTANT & COMPUTER SERV | Adversary | 19-00081 |
| MANPOWER | Adversary | 19-00088 |
| MERCK SHARP & DOHME | Adversary | 19-00276 |

Remaining  Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| MICHICA  INTERNATIONAL  CO INC | Adversary | 19-00238 |
| MICROSOFT  CORPORATION | Adversary | 19-00290 |
| N. HARRIS  COMPUTER  CORPORATION | Adversary | 19-00102 |
| NATIONAL COPIER | Adversary | 19-00251 |
| NELSON  D. ROSARIO GARCIA | Adversary | 19-00125 |
| NETWAVE EQUIPMENT  CORP | Adversary | 19-00253 |
| NEXT LEVEL  LEARNING,  INC | Adversary | 19-00129 |
| ORACLE  CARIBBEAN  INC | Adversary | 19-00112 |
| PCPS - Professional Consulting Psychoeducational Services, LLC | Adversary | 19-00188 |
| PERFECT  CLEANING  SERVICES  INC | Adversary | 19-00249 |
| POSTAGE BY PHONE RESERVE  ACCOUNT | Adversary | 19-00181 |
| PROSPERO  TIRE EXPORT INC | Adversary | 19-00196 |
| Puerto Nuevo Security Guard | Adversary | 19-00384 |
| PUERTO RICO SUPPLIES  GROUP INC | Adversary | 19-00199 |
| PUERTO RICO TELEPHONE  COMPANY | Adversary | 19-00127 |
| QUEST DIAGNOSTICS | Adversary | 19-00440 |
| Ready & Responsible Security, Inc | Adversary | 19-00387 |
| REYES  CONTRACTOR  GROUP | Adversary | 19-00220 |
| RICARDO  ESTRADA  MAISONET | Adversary | 19-00227 |
| ROCK  SOLID  TECHNOLOGIES  INC | Adversary | 19-00230 |
| ROCKET  LEARNING  INC | Adversary | 19-00232 |
| ROCKET  TEACHER  TRAINING | Adversary | 19-00235 |
| RODRIGUEZ  PARISSI VAZQUEZ  & CO PCS | Adversary | 19-00155 |
| ROSSO  GROUP INC | Adversary | 19-00239 |
| S H V P MOTOR CORP | Adversary | 19-00134 |
| SEGUROS  COLON  INC | Adversary | 19-00130 |
| SESCO  TECHNOLOGY  SOLUTIONS  LLC | Adversary | 19-00162 |
| ST. JAMES SECURITY  SERVICES,  INC. | Adversary | 19-00145 |
| TACTICAL EQUIPMENT  CONSULTANTS  INC | Adversary | 19-00222 |
| TALLER  DESARROLLO  INFANTIL CHIQUIRIMUNDI | Adversary | 19-00049 |
| Total Petroleum Puerto Rico Corp. | Adversary | 19-00114 |
| TRANSPORTES  SONNEL INC | Adversary | 19-00149 |
| TRINITY METAL ROOF AND STEEL  STRUC CO | Adversary | 19-00187 |
| TRUENORTH  CORP | Adversary | 19-00160 |
| WF COMPUTER  SERVICES | Adversary | 19-00200 |
| XEROX  CORPORATION | Adversary | 19-00218 |

## <u>EXHIBIT B</u>

SCHEDULE OF AFFIRMATIVE RECOVERY ACTIONS

<u>Special Claims Committee v. Barclays Capital, et al.</u>, Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court

# **EXHIBIT C**

SCHEDULE OF INVALIDITY ACTIONS

## Invalidity Actions

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, Adv. Proc. No. 19-00288

# **EXHIBIT D**

SCHEDULE OF LIEN CHALLENGE ACTIONS

## Lien Challenge Actions

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd., Adv. Proc. No. 19-00291

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro t Credito de Rincon, Adv. Proc. No. 19-00292

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta, Adv. Proc. No. 19-00293

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez, Adv. Proc. No. 19-00294

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, Adv. Proc. No. 19-00295

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman, Adv. Proc. No. 19-00296

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt., Adv. Proc. No. 19-00297

## **<u>EXHIBIT E</u>**

MODIFICATIONS TO JRS LEGISLATION

## MODIFICATIONS FOR JRS CLAIMS

The following is a summary of modifications with respect to outstanding benefits of the Judiciary Retirement System for the Commonwealth of Puerto Rico ("JRS") as it applies to judges serving without a fixed tenure.

JRS members hired (a) prior to July 1, 2014 are currently accruing benefits under a defined benefit ("DB") formula and (b) on or after July 1, 2014 are currently accruing benefits pursuant to an alternative DB formula and paired with a hybrid defined contribution ("DC") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the JRS plan benefit accrual shall be modified. In doing so, JRS members will retain the benefits they have accrued up to and including the Effective Date, as defined in the Plan; provided, however, that benefits accrued up to and including May 3, 2017 shall be subject to the Monthly Benefit Modification pursuant to the Plan. Benefits accrued from and after the Effective Date shall be based on contributions and earnings in new segregated DC retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.

| Definitions | |
|---|---|
| **Pension System** | The terms of this document and references to Pension System pertain to the freeze of pension obligations of JRS members. |
| **Retirement Eligibility Age** | The age at which a member may commence receipt of a monthly pension benefit. |
| **Freeze Date** | The Effective Date. |
| **Retirement Benefit** | The amount of benefit payable to a JRS member each month. |
| **Creditable Service** | For purposes of calculating Creditable Service, the years and months (where fractional months are counted as full months of service) begin on the Credit Date. Years and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| **Credit Date** | The Credit Date for JRS members with less than eight (8) years of Creditable Service as a judge as of the effective date of the freeze, or for those hired on or after July 1, 2014, is the date of appointment as a judge, and for all other JRS members shall be the date first employed by the Government of Puerto Rico (provided that accumulated contributions for prior government service are transferred to the Pension System). |

| Definitions | |
|---|---|
| **Highest Salary** | The highest salary received as a judge.  Compensation earned after the effective date of the freeze will not be considered. (Applicable for JRS members hired prior to July 1, 2014) |
| **Average Compensation** | The average of the last sixty (60) months of salary that a JRS member has received for Creditable Service. (Applicable for JRS members hired on or after July 1, 2014) |
| **Defined Contribution Account** | The notional individual account established for each new JRS member on or after July 1, 2014.  Such accounts shall be credited with JRS member contributions and interest.  New accounts will be established effective as of the Effective Date for JRS members hired prior to July 1, 2014, in connection with the freeze of the JRS pension. |
| **Basic Retirement Eligibility Age** | Age at which the JRS member attains age sixty (60) and ten (10) years of Creditable Service. (Applicable for JRS members hired prior to July 1, 2014) |
| **Optional Retirement Eligibility Age** | For judges with at least eight (8) years of Creditable Service as a judge, the attainment of either:<br><br>a.     Thirty (30) years of total Creditable Service, or<br><br>b.     Age fifty-five (55) with eighty-two (82) combined years of age plus Creditable Service ("Points")<br><br>(Applicable for JRS members hired prior to July 1, 2014) |

| Timing | |
|---|---|
| **Pension Freeze** | JRS pension benefit accrual freeze becomes effective as of the Effective Date. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits that would have been earned under and paid by the plan on or after the Freeze Date, also subject to the Monthly Benefit Modification set forth in the Plan. |

| Provisions of the Modification | |
|---|---|
| **Freeze of Benefit Accruals and** | Accrued benefits frozen as of freeze date.  New DC account balances shall be funded with employee contributions to be established in connection with the freeze. The minimum employee contribution shall be eight and one-half percent (8.5%), as defined by Article 3.4 of Act |

| Provisions of the Modification | |
|---|---|
| **Implementation of DC Account** | 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Retirement Eligibility Enhancement If Within Six (6) Months of Unreduced Retirement Eligibility** | For JRS members hired prior to July 1, 2014, if not already eligible for retirement as of the freeze, JRS members hired prior to July 1, 2014 will be permitted to grow into eligibility for retirement provided the JRS member reaches any of the following within six (6) months of the Freeze Date: <br><br> a.     Basic Retirement Eligibility Age, <br> b.     Optional Retirement Eligibility Age, or <br> c.     Attainment of 20 years of creditable service |
| **Delay in Retirement Eligibility for All Others** | For individuals hired prior to July 1, 2014 who do not meet the criteria listed above, retirement eligibility is delayed up to three (3) years. Retirement is also delayed for terminated JRS members that have not yet commenced. |
| **Elimination of Cost-of-Living Adjustment (COLA)** | The statutory three percent (3%) COLA which has been granted every three (3) years since 2002 will be eliminated for all JRS members effective as of the Freeze Date. |
| **Elimination of Bonuses** | Christmas, Summer and Medicine bonus will no longer be paid to JRS members who retire after the freeze date. Further, the Medical Insurance Plan contribution will also be eliminated for retirements taken after the freeze date. |
| **Elimination of Enhanced Disability Benefits** | JRS members terminating due to disability on or after the Freeze Date will be eligible for the same benefits as other terminated JRS members. |
| **Elimination of Occupational and One Year of Salary Death Benefits for Future in-Service Deaths** | Terminations due to death would be eligible for a refund of accumulated contributions. |
| **Elimination of Free Post-Retirement Death Benefit** | The normal form of payment for annuity benefit provided for future retirements will be a single life annuity. JRS members will be able to elect a joint and survivor benefit that will be the actuarial equivalent benefit to the normal form of payment. |

E-4

| **More detailed provisions of the Modifications** | |
|---|---|
| **Specific Implications on Retirement Eligibility Age if Hired Prior to July 1, 2014** | A.     JRS members who are eligible to retire prior to the Freeze Date will continue to be eligible to retire at any time.<br><br>B.     JRS members who would attain either any of the following on or prior to the date that is six (6) months following the Freeze Date had service continued to accrue past the freeze date will continue to be eligible to retire at any time:<br><br>a.     Basic Retirement Eligibility Age<br>b.     Optional Retirement Eligibility Age<br>c.     Attainment of 20 years of Creditable Service<br><br>C.     JRS members who are not eligible to retire as of the Freeze Date and will not meet the criterion listed in B. above as of six (6) months after the Freeze Date will be eligible to retire upon the date the JRS member would have attained ten (10) years of Creditable Service had the freeze not occurred and reaching the ages shown in the following table:<br><br><table><tr><th>Attained Age as of the Freeze Date</th><th>Retirement Eligibility Age Six Months After the Freeze Date</th></tr><tr><td>57 and up</td><td>61</td></tr><tr><td>56</td><td>62</td></tr><tr><td>55 or under</td><td>63</td></tr></table> |
| **Specific Implications on Retirement Benefit if Hired Prior to July 1, 2014** | **Retirements on or before the date that is six (6) months following the Freeze Date:**<br><br>A.     If a JRS member attains the Optional Retirement Eligibility Age, the benefit payable will be equal to seventy-five percent (75%) of Highest Salary (sixty percent (60%) of Highest Salary if hired after December 24, 2013).<br><br>B.     If a JRS member attains the Basic Retirement Eligibility Age, but has not yet attained the Optional Retirement Eligibility Age, the benefit payable share equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).<br><br>C.     If a JRS member has attained age seventy (70) with fewer than ten (10) years of Creditable Service at retirement, the benefit payable is twenty-five percent (25%) of Highest Salary, pro-rated for each year of Creditable Service less than ten (10). |

| **More detailed provisions of the Modifications** |
| --- |

D.      If a JRS member has attained at least twenty (20) years of Creditable Service, but has not attained either the Basic Retirement Eligibility Age or the Optional Retirement Eligibility Age, the benefit payable is twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary sixty percent (60%) of highest salary if hired after December 24, 2013), actually reduced to current retirement age from the earlier of the date the JRS member would have attained either age sixty (60) or the Optional Retirement Eligibility age based on their service at retirement.

**Retirements after Six Months After the Freeze Date:**

A.      If a JRS member has attained Optional Retirement Eligibility as of the Freeze Date (or would have attained Optional Retirement Eligibility by the date that is six (6) months after the Freeze Date), the benefit payable equals seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

B.      If a JRS member has attained Basic Retirement Eligibility as of the Freeze Date (or would have attained Basic Retirement Eligibility as of the six (6) month anniversary of the Freeze Date), the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

C.      If a JRS member has attained at least twenty (20) years of Creditable Service as of the Freeze Date (or would have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date) and the JRS member has attained at least seven and one-half years (7.5) of Creditable Service as a judge on the Freeze Date, the benefit payable equals seventy five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013) actuarily reduced to the benefit commencement date from the earlier of the date the JRS member would have attained either age sixty (60) and the Optional Retirement Eligibility Age based on their service as of the Freeze Date.

D.      If a JRS member has attained at least twenty (20) years of Creditable Service as of the Freeze Date (or would have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date) and the JRS member has not attained at least seven and one-half years (7.5) of Creditable Service as a judge on the Freeze Date, the benefit payable equals seventy-five percent (75%)

| More detailed provisions of the Modifications | |
|---|---|
| | of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013) actuarially reduced to the benefit commencement date from age sixty (60).<br><br>E.    If a JRS member has attained at least ten (10) years of Creditable Service as of the Freeze Date and would not have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date, the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).<br><br>F.    If a JRS member has not attained at least ten (10) years of Creditable Service at the Freeze Date, and retires after the date the participant would have earned ten (10) years of service had the freeze not occurred the benefit payable equals twenty-five percent (25%) of Highest Salary, pro-rated for each year of Creditable Service less than ten (10). |
| **Specific Implications on Retirement Eligibility Age if Hired on or After July 1, 2014** | A.    JRS members that are eligible to retire or would have been eligible to retire prior to the date six (6) months after the Freeze Date will remain eligible to retire at any time.  Current eligibility is attainment of age fifty-five (55) with twelve (12) years of Creditable Service.<br><br>B.    JRS members who would not meet retirement eligibility by the date six (6) months after the Freeze Date will become retirement eligible upon attainment of age sixty-five (65) with twelve (12) years of Creditable Service. |
| **Specific Implications on Retirement Benefit Amount if Hired on or After July 1, 2014** | A.    JRS members will continue to receive a benefit of one and one-half percent (1.5%) of Average Compensation plus the annuitized value of the balance of the DC Hybrid Account at the time of retirement.<br><br>B.    JRS members who would have attained retirement eligibility prior to the date six (6) months after the Freeze Date and who have not yet attained age sixty (60) will receive a benefit of one and one-half percent (1.5%) of Average Compensation reduced by 1/180 for each of the first sixty months (60) months and by 1/360 for each of the next sixty (60) months by which the retirement date precedes age sixty-five (65), plus the annuitized value of the DC Hybrid Account. |
| **Social Security** | The Oversight Board and the Government will take appropriate actions to provide that all members hired after the Freeze Date and all judges under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current judges 45 and older as of |

| More detailed provisions of the Modifications |
| --- |
| the Freeze Date may choose to be enrolled in Social Security on a voluntary basis, and will use reasonable efforts to provide that such enrollment in Social Security for such members will be effective as of the Freeze Date or as soon as practicable thereafter. Enrollment in Social Security is defined as the remittance of employee and employer Social Security payroll taxes such that they are reported and creditable to Social Security.<br><br>Elections by current judges 45 and older to enroll must be completed within the sixty (60) days after the Effective Date. By default, current judges age 45 or older will be assumed to have opted out of Social Security coverage. |

## EXHIBIT F-1

MODIFICATIONS TO TRS PENSION BENEFITS
(WITHOUT AMPR PSA)

## MODIFICATIONS FOR FREEZE OF TRS BENEFIT OBLIGATIONS[1]

The following is a summary of modifications with respect to a freeze of pension benefits accrued under the TRS.

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual shall be frozen as of the Effective Date of the Plan (the "Freeze Date") Such freeze shall apply to all members of TRS, regardless of title or job classification. TRS members will retain the benefits they have accrued to date, subject to the Monthly Benefit Modification formula set forth in the Plan. Future benefits shall be based on contributions and earnings in new segregated defined contribution ("DC") retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.

| Definitions | |
|---|---|
| **Pension System** | The terms of this document and references to Pension System pertain to the freeze of pension obligations of TRS members. |
| **Retirement Eligibility Age** | The age at which a member may commence receipt of a monthly pension benefit. |
| **Retirement Benefit** | The amount of benefit payable to a member each month. |
| **Creditable Service** | The years and months of plan participation, during which contributions have been made, beginning on the date of the first original appointment for rendering services. For purposes of calculating Creditable Service, fifteen (15) calendar days of a school year month shall be equal to one (1) calendar month worked during the school year for teachers; and twenty-one (21) calendar days of a month shall be equal to one (1) calendar month worked for all other members. Days and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| **Average Compensation** | The average of the thirty-six (36) highest months of compensation that the member has received for Creditable Service. Compensation earned after the effective date of the freeze will not be considered. |
| **Defined Contribution Account** | The notional individual account established for each new member as of August 1, 2014, and later. Such accounts are credited with member contributions and interest and have been segregated into Act 106 Defined Contribution accounts as of June 2020. New accounts will be |

---

[1] Milliman actuarial valuation report as of June 30, 2017, using July 1, 2016, Census data collection, which is the latest dataset currently available. If a new dataset from 2017 or 2018 becomes available, the values will be updated accordingly.

| Definitions | |
|---|---|
| | established as soon as administratively feasible and effective after the Freeze Date for members hired prior to August 1, 2014, in connection with the freeze of the DB formula. |

| Timing | |
|---|---|
| Pension Freeze | TRS pension benefit accrual freeze shall become effective on the Freeze Date. |
| Pension Benefits Date | The data set used to calculate the freeze of pension benefits required is based on the July 1, 2016, retiree dataset provided by the Pension Systems, which is the latest dataset currently available. [If a new dataset from 2017 or 2018 becomes available, the values will be updated accordingly.] |
| Implementation | The freeze in the benefit amount described below will apply to benefits that would have been earned under and paid by the plan on or after the Freeze Date also subject to the Monthly Benefit Modification formula set forth in the Plan. |

| Provisions of the Modification | |
|---|---|
| Freeze of Benefit Accruals and Implementation of DC Account | Accrued benefit frozen as of Freeze Date, as noted below. New DC account balances to be funded with employee contributions will be established in connection with the freeze. The minimum employee contribution shall be 8.5%, as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| Delay in Retirement Eligibility for all Others | For members hired prior to August 1, 2014, who are not eligible for retirement at the freeze date, retirement eligibility is delayed three (3) years. Retirement is also delayed for terminated members that have not yet commenced. |
| Elimination of Minimum Benefit | The $400 monthly minimum benefit for members hired before August 1, 2014, will be eliminated for members retiring on or after the Freeze Date. |
| Elimination of Service Purchase | Active members hired prior to August 1, 2014, with eligible service from prior employment have been able elect to purchase service in TRS. This has been accomplished via transfer of assets or through contributions payable by the member. This provision will eliminate future service purchases on or after the Freeze Date. |

| Provisions of the Modification | |
| --- | --- |
| **Elimination of Enhanced Disability Benefits** | Active members hired prior to August 1, 2014 who terminate employment due to disability have been able to receive an immediate monthly benefit equal to the unreduced accrued benefit of 1.8% of Average Compensation per year of Creditable Service. Terminations due to disability on or after the Freeze Date will be eligible for the same benefits as other terminated participants (i.e., deferred retirement benefits without enhancement). |
| **Suspension of Benefits** | Retirees from TRS who are in receipt of pension benefits that return to the Department of Education or a charter school as a teacher will have their pension benefits suspended during their reemployment. |
| **Defined Contribution Transfer from Prior Plans** | After the Freeze Date, active new hires with pension benefits eligible for rollover from a previous employer will be eligible to transfer these amounts to their DC account, either as a single transfer upon enrolling in the plan or through an initial election defer compensation through payroll, subject to tax considerations. |

| More Detailed Provisions of the Modification | |
| --- | --- |
| **Specific Implications on Retirement Eligibility Age if Hired Prior to August 1, 2014** | A.       Members who meet the following age and service combinations prior to the Freeze Date, will continue to be eligible to retire at any time:<br><br>a.       At least age 60 with at least ten (10) years of Creditable Service<br>b.       At least age 47 with at least twenty-five (25) years of Creditable Service<br><br>B.       Members who are not eligible to retire as of the Freeze Date, will be eligible to retire upon attaining ten (10) years of Creditable Service and reaching the age 63. |
| **Specific Implications on Retirement Benefit if Hired Prior to August 1, 2014** | **Retirements on or after the Freeze Date:**<br><br>Minimum benefits will no longer apply to future retirees.<br><br>The freeze also eliminates accelerated payment of benefits due to future disabilities and the ability to purchase additional service.<br><br>A.       If a member is at least age 50 and has attained at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals seventy-five percent (75%) of Average Compensation as of the Freeze Date. |


| More Detailed Provisions of the Modification | |
|---|---|
| | B.     If a member is under age 50 and has attained at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals sixty-five percent (65%) of Average Compensation as of the Freeze Date.<br><br>C.     If a member is at least age 50 as of the Freeze Date and does not attain at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date.<br><br>D.     If a member is under age 50 as of the Freeze Date and does not attain at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals ninety-five percent (95%) of 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |

| Miscellaneous | |
|---|---|
| Social Security | The Oversight Board and Government will take appropriate actions to provide that all members hired after the Freeze Date and all teachers under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current teachers 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis, and will use reasonable efforts to provide that such enrollment in Social Security for such members will be effective as of the Freeze Date or as soon as practicable thereafter. Enrollment in Social Security is defined as the remittance of employee and employer Social Security payroll taxes such that they are reported and creditable to Social Security.  AFT, AMPR and AMPR-LS will take appropriate actions to support efforts by the Commonwealth and its agents to enroll in Social Security within sixty (60) days of the Effective Date all members who are eligible to accrue Social Security credits; those members age 45 and older may choose whether to enroll.<br><br>Elections by current teachers 45 and older to enroll must be completed within the 60 days after the Effective Date of the Plan of Adjustment. By default, current teachers age 45 or older will be assumed to have opted out of Social Security coverage. |
| Law 160 | For the avoidance of doubt, any contributions made to Law 160 accounts will not be subject to any pension benefit cut. |

## **EXHIBIT F-2**

### **SUMMARY OF SUPPLEMENTAL MODIFICATIONS TO TRS PENSION BENEFITS AND COLLECTIVE BARGANING AGREEMENT WITH AMPR PSA**

# APPENDIX I

## MODIFICATIONS TO AFT COLLECTIVE BARGAINING AGREEMENTS

The following is a summary of material terms included in the new collective bargaining agreement (the "AFT Operative CBA") between AFT and the Commonwealth. For the duration of the AFT Operative CBA, there shall be no changes in base pay, other compensation, leaves, holidays, or benefits without the express written agreement of AFT, AMPR and AMPR-LS. Nothing contained herein shall prohibit changes to the AFT Operative CBA by mutual written agreement of the unions, the FOMB, and the Department.

| Definitions | |
|---|---|
| Administration | The management for the division (agency/grouping) in which the employee is assigned. |
| Department | The division (agency/grouping) in which the employee is assigned (Department of Education). |
| Union Affiliates | ▪ American Federation of Teachers ("AFT"),<br>▪ Asociacion de Maestros de Puerto Rico ("AMPR"),<br>▪ Asociacion de Maestros de Puerto Rico -Local Sindical ("AMPR-LS") |

| Timing | |
|---|---|
| Terms | Five (5) year CBA effective as of the effective date of the Commonwealth Plan. AFT Operative CBA start date will be retroactive to the beginning (i.e. July 1) of the Commonwealth Fiscal Year in which the POA becomes effective. Final version of the AFT Operative CBA will be attached to the contemplated plan support agreement among AFT, AMPR, AMPR-LS, and the Oversight Board.. |
| Implementation | Commonwealth Plan of Adjustment |

| More Detailed Provisions of the Proposal | |
|---|---|
| Healthcare plan / Medical services | The Administration shall cover the cost of Basic Coverage, equal to $170.00 per month or such greater amount that the Administration may lawfully authorize, including Pharmacy services and all employees, including transitory employees, regardless of marital status or relationship, shall be entitled to the contribution. The Administration shall recognize a single employer contribution per employee. |

| More Detailed Provisions of the Proposal | |
|---|---|
| **Sick leave** | **Section 1** When a member of the Appropriate Unit covered by the Operative CBA is using his / her sick leave, he / she shall be entitled to the accrual of regular and sick leave for the time that he / she is enjoying sick leave, as long as he / she is reinstated to his / her job once such enjoyment is finished.

**Section 2**

   A. **Leave for Parents with Children with Physical and / or Mental Disabilities.** In an effort to project itself as an exemplary agency in the treatment of persons with disabilities, the Administration will authorize as official time one (1) day per month to the parents of children with disabilities in order for them to take their children to their appointments and treatments. The parents must notify the date of the appointment or treatment as soon as they become aware of it and in turn must provide a certificate from the health and / or therapeutic services provider of the minor who officially classifies him as a person with disabilities.

     They must also submit a medical certificate that proves that the employee accompanied their child to the appointment or medical treatment. In case both parents or custodians are members of the Appropriate Unit, the license shall be shared between both, in the way that they prefer to do it.

   B. **Leave for Elderly Persons.** In the same way, the Administration shall authorize that this same day can be used for appointments and treatments for Elderly Persons. The person in charge must notify the date of the appointment or treatment as soon as he / she becomes aware. The employee in turn must provide a certificate of birth of the elderly person evidencing that he / she is sixty (60) years or more. They must comply with Section 3's provisions.

**Section 3** The Administration shall authorize the father or mother of children with disabilities to stay with them when they are hospitalized. The father or mother must submit evidence of the hospitalization and the duration of the hospitalization. The Administration shall authorize that the days that the employee takes to take care of his / her sick child are discounted from his / her sick leave. So that the licenses are not affected in a dangerous manner, the member of the Appropriate Unit that requests |

| More Detailed Provisions of the Proposal | |
|---|---|
| | this special license must leave accrue fifteen (15) or more days due to illness. |
| **Additional Language for Holidays, Sick and Vacation Leaves** | **Section 1** For the avoidance of doubt, to the extent there are inconsistencies between this Agreement and the provisions of Act 26-2017 regarding Holidays, Vacation Leave, Sick Leave and other Leaves, the provisions of Act 26 as enacted in 2017 shall apply for the duration of this Agreement, except that Union members shall retain Funeral Leave and Teachers' Day as provided in the existing CBA. Amendments to Act 26-2017 to improve Holidays, Sick, Vacation and other leaves leave benefits shall be incorporated into this Agreement if lawfully adopted by the Government. |
| **Bonuses** | To comply with the Fiscal Plan in force and during the term of this Agreement, employees shall be entitled to those bonuses that are provided for in the certified Budget for the Commonwealth or otherwise lawfully granted by the Administration. |
| **Institutional representation** | **Section 1** The Administration will provide for appointment of a Union labor representation board, consisting of 4 individual members, appointed by the Union to represent labor.<br><br>**Section 2** The members may be appointed for terms of 12 months, and may be reappointed by the Union.<br><br>**Section 3** The members will meet with representatives of the Department management three (3) times a year to discuss and share perspectives on Department status, actions and proposed future plans, to include school closures, restructuring actions and future identification and development of new schools and transition plans.<br><br>**Section 4** For the avoidance of doubt, these three (3) meetings a year with the Department are not a substitution for collective bargaining.<br><br>**Section 5** The members will meet with representatives of the Financial Oversight and Management Board on an annual basis to discuss and share perspectives on the Commonwealth fiscal plan and budget.<br><br>**Section 6** The three (3) meetings with the Department and annual meeting with representatives of the Oversight Board will be provided for members by allowing members to attend with a half day of paid time off, in addition to their normal vacation time. |

| More Detailed Provisions of the Proposal | |
|---|---|
| | |
| **Medicare** | The oversight board and the government will take appropriate actions with the social security administration to facilitate access and enrollment into Medicare for those members who are eligible. |
| **Dues Deduction, Charges** | **Section 1** The Department shall inform new employees of the right conferred by Act No. 45-1998 as amended at the moment the employee is named to a position included in the Appropriate Unit and shall provide the union with an opportunity to meet with new employees or, at the union's option, with a welcome document prepared by the Union in which are explained the rights of union members under Act 45-1998, as amended. The Administration shall not discourage union membership<br><br>**Section 2** In the event the Union ceases to be the exclusive representative of the Appropriate Unit, the deductions withheld from employees for dues shall automatically stop on the date the Union is no longer the exclusive representative.<br><br>**Section 3** The Department shall resume the deduction of dues for employees whose positions are included in the Appropriate Unit once they return from their unpaid leave and notify the Human Resources Office so that it can make the change in payroll and include said deduction within a period not greater than thirty (30) working days from the employee's return date.<br><br>**Section 4** In the event the Union requests the deduction of dues and it is determined that the dues are unlawfully set and/or deducted, the Union shall relieve the Department of any liability and make any orderly refund as soon as it is required. If it is determined that the error is attributable to the Department, the Union shall only reimburse what is erroneously deducted and will not be responsible for expenses and fees incurred. |
| **Improvement of terms** | If the Commonwealth government proposes more beneficial economic terms of employment for unrepresented employees, or employees represented by an exclusive representative certified in accordance with Act 45, and such more beneficial economic terms are lawfully implemented, expressly including but not limited to more beneficial pension terms or benefits, such more beneficial economic terms shall be provided to AFT, AMPR, and AMPR-LS bargaining unit employees. |

# APPENDIX II
## PROPOSED TERMS FOR TRS SYSTEM BENEFITS

This is a summary of proposed indicative terms for a freeze of the outstanding benefits of the Teachers Retirement System for the Commonwealth of Puerto Rico ("TRS").

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual will be frozen upon the six (6) month anniversary of the Effective Date of the Plan of Adjustment (the "Freeze Date")

| Definitions | |
|---|---|
| **Pension System** | The terms of this document and references to Pension System pertain to the freeze of pension obligations of the Teachers Retirement System (TRS). |
| **Eligibility for Membership** | This applies to all active participants of TRS ("Member" or "Members"), regardless of title or job classification.  Members will retain the benefits they have accrued to date, subject to the benefit reduction formula. |
| **Retirement eligibility age** | Retirement Eligibility Age is the age at which a member may commence receipt of a monthly pension benefit. |
| **Retirement benefit** | The Retirement Benefit is the amount of benefit payable to a member each month. |
| **Creditable service** | The years and months of plan participation, during which contributions have been made, beginning on the date of the first original appointment for rendering services.  For purposes of calculating Creditable Service, 15 calendar days of a school year month shall be equal to 1 calendar month worked during the school year for teachers; and 21 calendar days of a month shall be equal to 1 calendar month worked for all other members. Days and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| **Average compensation** | The average of the 36 highest months of compensation that the member has received for Creditable Service. Compensation earned after the effective date of the freeze will not be considered. |
| **Defined contribution account** | The individual account established under Act 106-2017 for each new member hired on or after August 1, 2014. These accounts have been credited with member contributions to the prior hybrid benefit plan in which they were enrolled, with interest. New accounts will be established for members hired prior to August 1, 2014, in connection with the freeze of the DB formula, and in accordance with the provisions of Appendix IV. |

| Timing | |
|---|---|
| **Pension freeze** | TRS pension benefit accrual freeze becomes effective upon the Freeze Date. |
| **Pension benefits date** | The data set used to calculate the freeze of pension benefits required is based on the July 1, 2017 dataset provided by the Pension System actuary, which is the latest dataset currently available. If a new dataset becomes available, the values will be updated accordingly. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits earned under and paid by the plan on or after the Freeze Date, also subject to the benefit reduction formula discussed in the separate benefit cut term sheet and as clarified in this document. |

| Provisions of the proposal | |
|---|---|
| **Freeze of benefit accruals and implementation of DC account** | Accrued benefit frozen as of the Freeze Date. New DC account balances to be funded with employee contributions will be established in connection with the freeze. The minimum employee contribution will be 8.5%, as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Maintaining retirement eligibility for individuals over age 50** | Members hired prior to August 1, 2014 who were over age 50 as of the Freeze Date, but not eligible for retirement at the Freeze Date will have the opportunity to achieve the previous milestones for retirement eligibility (i.e. age 60 with 10 years of service, age 47 with 25 years of service or 30 years of service) and then would be eligible to retire upon achieving those milestones. The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service as of the Freeze Date, not inclusive of service after the freeze. |
| **Maintaining retirement eligibility for individuals under age 50 and within 3 years of retirement eligibility** | Members hired prior to August 1, 2014 who were under age 50 and within 3 years of achieving the age 47 and 25 years of service milestone for retirement eligibility will have an opportunity to achieve the milestone for retirement eligibility. Members who achieve that milestone would then be eligible to retire such that they will not be subject to any delay in retirement eligibility and corresponding early retirement benefit reduction. The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service at the Freeze Date, not inclusive of service after the freeze. |

| | |
|---|---|
| **Delay in retirement eligibility for all others** | For members hired prior to August 1, 2014, who are not eligible for retirement at the Freeze Date, not within 3 years of retirement eligibility as of the Freeze Date, and were under age 50 at the Freeze Date, retirement eligibility is delayed to age 63 (or later upon completion of 10 years of service). Retirement is also delayed for terminated members that have not yet commenced.<br><br>For members whose retirement eligibility was delayed as a result of this proposal, an "Early Retirement Option" will be added that allows the member to commence their benefit at their original eligibility date; however that benefit will be reduced by 7.00% per year (0.5833% per month) in which their commencement date under this option precedes their revised retirement eligibility date. |
| **Benefit formula upon achieving 30 years of service** | Members hired prior to August 1, 2014 who had not earned 30 years of service as of the Freeze Date will be eligible to receive a modified benefit enhancement upon reaching 30 years of service regardless of the Creditable Service at the Freeze Date. The enhancement will provide members the following:<br>    a. Members age 50 and over at the Freeze Date: Benefit multiplier will be increased from 1.8% to 2.0%<br>    b. Members under age 50 at the Freeze Date: Benefit multiplier will be increased from 1.8% to 2.0% but will continue to be reduced by a 95% factor.<br>The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service at the Freeze Date.<br><br>Under no circumstances shall any member who is not subject to the benefit reduction formula trigger a benefit cut by virtue of achieving 30 years of service and the corresponding benefit enhancement described in this section. This provision is an explicit modification to any pension benefit reductions provisions of the Commonwealth Plan of Adjustment, as applicable. |
| **Elimination of minimum benefit** | The $400 monthly minimum benefit for members hired before August 1, 2014, will be eliminated for members retiring on or after the Freeze Date. |
| **Elimination of service purchase** | Active members hired prior to August 1, 2014, with eligible service from prior employment have been able elect to purchase service in TRS. This has been accomplished via transfer of assets or through contributions payable by the member. This provision will eliminate future service purchases on or after the Freeze Date. Service purchased through a payment plan will be granted for payments made up to the Freeze Date. |

| | |
|---|---|
| **Elimination of continued contributions under age 55** | Employee contributions that were required of pensioners under age 55 will be eliminated after the Freeze Date. |
| **Separation from service** | The Oversight Board and Government will take appropriate actions to support efforts to afford teachers with frozen defined benefits access to their defined contribution plan accounts upon early retirement or separation of service at age 55 or over under the same conditions as if distributions were taken at age 62. |
| **Suspension of benefits** | Retirees from TRS who are in receipt of pension benefits that return to the Department of Education or a charter school as a teacher will have their pension benefits suspended during their reemployment. |
| **Defined contribution transfer from prior plans** | After the Freeze Date, active new hires with pension benefits eligible for rollover from a previous employer will be eligible to transfer these amounts to their DC account, either as a single transfer upon enrolling in the plan or through an initial election to defer compensation through payroll, subject to tax considerations. |
| **Disability benefits for DB plan participants** | Active members hired prior to August 1, 2014 who terminate employment due to disability will continue to be eligible to receive an immediate monthly benefit equal to the unreduced accrued benefit of 1.8 percent of Average Compensation per year of Creditable Service with both determined as of the Freeze Date.  Eligibility requirements and compensation averaging periods for Occupational and Non-Occupational disabilities will also be preserved. |
| **More detailed provisions of the proposal** | |
| **Specific implications on retirement eligibility age if hired prior to August 1, 2014** | **Retirements after the Freeze Date**: <br><br> A. Members who meet the following age and service combinations as of the Freeze Date, will continue to be eligible to retire at any time and members age 50 or older as of the Freeze Date, will become eligible once they meet the following age and service combinations: <br>      a. At least age 60 with at least 10 years of Creditable Service <br>      b. At least age 47 with at least 25 years of Creditable Service <br>      c. At least 30 years of Creditable Service |

| | |
|---|---|
| | B. Members under age 50 as of the Freeze Date who will attain any of the age/service conditions listed below within 3 years of the Freeze Date will become eligible to retire once they meet the age/service criterion listed below:<br><br>    a. At least age 47 with at least 25 years of Creditable Service<br>    b. At least 30 years of Creditable Service<br><br>C. Members under age 50 as of the Freeze Date who are not eligible to retire within 3 years of the Freeze Date will be eligible to retire upon attaining 10 years of Creditable Service and reaching the age 63.<br><br>For members whose retirement eligibility was delayed as a result of this proposal, an "Early Retirement Option" will be added that allows the member to commence their benefit at their original eligibility date, however that benefit will be reduced by 7.00% per year (0.5833% per month) in which their commencement date under this option precedes their revised retirement eligibility date. |
| **Specific implications on Retirement Benefit if hired prior to August 1, 2014** | **Retirements after the Freeze Date**:<br><br>A. Minimum benefits will no longer apply to future retirees.<br><br>B. The freeze also eliminates the ability to purchase additional service.<br><br>C. If a member is at least age 50 as of the Freeze Date and has attained at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals 75 percent of Average Compensation as of the Freeze Date.<br><br>D. If a member is under age 50 as of the Freeze Date and has attained at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals 65 percent of Average Compensation as of the Freeze Date.<br><br>E. If a member is at least age 50 as of the Freeze Date, has not attained 30 years of Creditable Service as of the Freeze Date, and would not have attained 30 years of Creditable Service absent the freeze, the accrued benefit equals 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |

| | |
|---|---|
| | F.  If a member is under age 50 as of the Freeze Date, has not attained 30 years of Creditable Service as of the Freeze Date, and would not have attained 30 years of Creditable Service absent the freeze, the accrued benefit equals 95 percent of 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |
| | G.  If a member is at least age 50 with less than 30 years of Creditable Service as of the Freeze Date and continues to work and has attained 30 years of Creditable Service by retirement, the accrued benefit equals 2.0 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. The amount of benefit subject to the benefit reduction formula (the "cut") will be determined utilizing a 2.0 percent multiplier as if it had been in place on the PROMESA filing date, with the exception that members not subject to the cut prior to the utilization of the 2.0 percent multiplier shall remain unaffected by the cut. |
| | H.  If a member is under age 50 with less than 30 years of Creditable Service as of the Freeze Date and continues to work and has attained 30 years of Creditable Service by retirement, the accrued benefit equals 95 percent of 2.0 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. The amount of benefit subject to the benefit reduction formula (the "cut") will be determined utilizing a 2.0 percent multiplier as if it had been in place on the PROMESA filing date, with the exception that members not subject to the cut prior to the utilization of the 2.0 percent multiplier shall remain unaffected by the cut. |
| **Implications if hired on or after August 1, 2014** | These members have been enrolled in the new defined contribution accounts under Act 106-2017. Any balances from the prior hybrid benefit plan have been deposited in these teachers' Act 106 accounts and will not be impacted by the Pension Freeze. |
| **Miscellaneous** | |
| *Asociacion de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de* | Nothing in this term sheet or the Plan of Adjustment shall impact the precedential effect of this decision. |

| *Puerto Rico* 190 D.P.R. 854 (2014) | |
|---|---|
| **Recognition Payment** | One-time payment of $3,000 to each of the Union represented participants (expressly including Transitory Participants) to be made upon the effective date of a confirmed Plan of Adjustment for the purpose of recognizing the outstanding service of the teachers of Puerto Rico and their importance to Puerto Rico's future, and of acknowledging the challenges resulting from the freeze of the teachers' TRS defined benefit accruals.<br><br>Payable 60 days after the Effective Date of the Plan of Adjustment. |
| **Social Security** | The Oversight Board and Government will take appropriate actions to provide that all teachers hired after the Freeze Date and all current teachers under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current teachers 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis. Alternatively, current teachers 45 and older may choose not to be enrolled in Social Security by electing to contribute 8.5% of compensation to the defined contribution plan. Enrollment in Social Security will be effective in accordance with Appendix IV. Teachers enrolled in Social Security will contribute 2.3% of compensation to the defined contribution plan and will have elective deferrals capped so that the total contribution made to the defined contribution plan remains below 7.5%. AFT, AMPR and AMPR-LS will take appropriate actions to support efforts by the Commonwealth and its agents to enroll in Social Security all teachers who are eligible to accrue Social Security credits in accordance with Appendix IV; those members age 45 and older may choose whether to enroll.<br><br>Elections by current teachers 45 and older to enroll must be completed within the 60 days after the Effective Date of the Plan of Adjustment. By default, current teachers age 45 or older will be assumed to have elected to contribute 8.5% to the defined contribution plan and thus opted out of Social Security coverage. |
| **Law 160** | For the avoidance of doubt, any contributions made to Law 160 accounts will not be subject to any pension benefit cut. |
| **JRS Defined Benefit Plan** | The Oversight Board will not propose a plan or enter into agreements that would impose a freeze of the TRS defined benefit plan but not of the JRS defined benefit plan. |

## APPENDIX III
## PROPOSED TERMS FOR UPSIDE FISCAL PLAN SURPLUS SHARING AGREEMENT

Below is a summary of proposed indicative terms for AFT, AMPR and AMPR-LS Upside Fiscal Plan Surplus Sharing Agreement.

| Definitions | |
|---|---|
| **Fiscal Plan Surplus Sharing Agreement** | Agreement with AMPR and AMPR member participants (expressly including participants with transitory status in the same status as other participants (the "Transitory Participants")) for each fiscal year of the AFT Operative CBA to provide participation of AMPR in sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. |
| **Unions** | AFT, AMPR and AMPR-LS ("Union") |
| **Union Member Participants** | All active Union members and employees in union represented bargaining units on record at the beginning of the fiscal year with continued employment and active status at the time of payment. |
| **Independent Agent** | Certified Public Accounting firm licensed to provide accounting services. |
| **Cash Basis** | Fiscal Plan surplus calculation will use recorded income and expenses as received or paid. |
| **Excess Cash Surplus Formula** | Excess Cash Surplus is defined as excess cash surplus above and beyond the projected Fiscal Plan surplus contained in the Certified Fiscal Plan in effect as of the Effective Date for the Plan of Adjustment for the Commonwealth.<br><br>If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool. |

| Timing | |
|---|---|
| **Implementation** | To be aligned with the implementation of the AFT Operative CBA, currently targeted for implementation with the Effective Date of the Plan of Adjustment. |

| Timing | |
|---|---|
| **Annual Measurement** | Fiscal Plan surplus to be calculated on a cash basis no later than September 30th of each fiscal year by an Independent Agent. |
| **Payment Period** | **For Upside Participation Bonus:**  Payable December 1st to Union represented participants, based upon calculations from the prior period and completed by the Annual Measurement date. |

| Provisions of the proposal | |
|---|---|
| **Upside Participation Bonus** | For the term of the AFT Operative CBA, if Excess Cash Surplus formula is met or exceeded, a distribution will be made to all Union represented participants (expressly including Transitory Participants) and all rank-and-file Commonwealth employees each year from the Upside Participation Bonus pool.  All recipients of this Upside Participation Bonus will have the choice to allocate any portion of their Upside Participation Bonus, up to a 7.5% total Defined Contribution cap in total for the year, to their Defined Contribution account; any remainder will be distributed in cash. The 7.5% cap is a requirement to ensure participants maintain continued enrollment in Social Security. |

F-18

**APPENDIX IV**
**SOCIAL SECURITY/DEFINED CONTRIBUTION PLAN IMPLEMENTATION**

Below is a summary of procedures for enrollment of teachers into Social Security and, as applicable, defined contribution accounts under Act 106-2017 (the "Defined Contribution Plan"), and enforcement thereof.

| Provisions of the proposal |
| --- |

| | |
| --- | --- |
| **Timing of Pension Freeze** | a. The Pension Freeze will take effect six (6) months following the Effective Date of the Commonwealth Plan of Adjustment.<br>b. The order confirming the Plan (the "Confirmation Order") will provide that the Commonwealth will fully implement enrollment in Social Security and the Defined Contribution Plan such that in the first full pay period following the Pension Freeze, the Commonwealth will withhold payroll contributions and remit said contributions to Social Security and the Defined Contribution Plan in a timely manner.<br>   i. With respect to the Defined Contribution Plan, full implementation includes the transfer of funds in a timely manner, as described in Section (b)(iii)(1) in "Penalties for Noncompliance" below, from withholding of payroll contribution to individual accounts over which participants have investment direction rights.<br>   ii. Failure by the Commonwealth to act in accordance with this section (b) will be deemed a violation of the provisions of the Plan and the Confirmation Order and will give rise to enforcement remedies set forth herein but will not affect the Freeze Date noted above.<br>   iii. If timing is not met, penalties for noncompliance, as described in the next section, "Penalties for Noncompliance," will apply.<br>c. Prior to the Freeze Date, the Commonwealth will provide notice to the Puerto Rico Social Security State Administrator and the applicable administrator of the New York Region of the Social Security Administration that teachers will no longer be covered by a qualified replacement plan as of the Pension Freeze effective date. At that time, the Commonwealth will send such parties a data file containing a list of all affected teachers who will be eligible for Social Security coverage as of the Pension Freeze effective date. |

| | |
|---|---|
| **Penalties for Noncompliance** | a. Three Groups<br>    i. Group 1 – Members who experience a delay in the withholding and remittance of their Social Security contributions<br>    ii. Group 2 – Members who experience a delay in the withholding and remittance of their Social Security contributions and suffer a loss of benefits as a result of delay upon applying for Social Security benefits. For avoidance of doubt, these are members who retire prior to full implementation of Social Security and are otherwise eligible to retire under Social Security (whether: (a) they have enough quarters of prior Social Security service without counting post-freeze service; or (b) they only have enough Social Security creditable service on account of post-freeze service .<br>    iii. Group 3 – Members who experience a delay in the withholding and remittance of defined contributions.<br>b. Remedies<br>    i. Group 1 – Members will be held harmless for the failure of the Commonwealth to contribute Social Security taxes by retroactively making contributions to Social Security on behalf of affected members to the extent necessary.<br>        1. Will include tax gross up on contributions so member earnings net of taxes is not impacted<br>    ii. Group 2 – In addition to Group 1 remedy, the Commonwealth will pay reconciliation damages to members whose actual Social Security benefits are affected in an amount to be determined as follows:<br>        1. Payment will be in the form of one-time cash damages payment<br>        2. No payment shall be less than $1,500<br>        3. Payment is based on two (2) key tiers impacting the size of lost income<br>            a. Whether or not individuals have enough quarters of prior Social Security service (i.e., with another employer) to qualify for Social Security benefits without counting post-freeze service<br>            b. Proximity of retirement date to |

F-20

Freeze Date based on the assumption, for the sole purpose of calculating payments, of a 3-year assumed delay period.

c. Schedule is as follows (single one-time payment only):

**40 or more quarters from previous employer**

|  | Yes | No |
|---|---|---|
| Year 1 | $1,500 | $9,000 |
| Year 2 | $1,500 | $7,200 |
| Year 3 | $1,500 | $3,600 |

4. Will include tax gross up on damages payment, if any, so member earnings net of taxes is not impacted
5. One-time payments will no longer be made for any future Social Security retirements once Social Security recognizes post-freeze service for determining retirement benefits

iii. All Groups – Members will be held harmless for the failure of the Commonwealth to contribute defined contributions in a timely manner by the Commonwealth retroactively making contributions and compensatory earnings to Defined Contribution Plan on behalf of affected members.

1. Timely manner defined as within 30 days of the payroll withholding date when funds are taken out of the employee payroll and held by employer, unless otherwise defined by Alight agreement
2. Compensatory earnings to be calculated using the greater of 0% or the return on the T. Rowe Price Retirement Blend 2045 (Tr-B) fund.
3. Compensatory earnings to be calculated from Freeze Date for pre-2014 hires, to the month end prior to full Defined Contribution Plan implementation.
4. Members who are enrolled in Defined Contribution Plan prior to the Freeze Date will not be covered under this remedy.

| | |
|---|---|
| **Enforcement Incentive** | a. This Section will take effect immediately upon the Plan Effective Date.<br>b. FOMB will establish a budget appropriation under the custody of Hacienda immediately following the Plan effective date. If the Commonwealth does not fully implement either Social Security or the Defined Contribution Plan by the Freeze Date, as determined by the Funds Committee, then the appropriated funds will be segregated into a separate account at Hacienda to be administered by the Funds Committee.<br>   i. Appropriation will be held in place with initial funding until Commonwealth has withheld and remitted funds on behalf of Social Security and/or defined contribution accounts as described in (III)(d)(ii) below.<br>   ii. Social Security withholding defined as Commonwealth withholding 6.2% from teacher payroll<br>   iii. Defined contribution withholding defined as Commonwealth withholding 2.3% or 8.5% from teacher payroll, dependent on applicable plan selected by a teacher.<br>c. Hacienda will support the Funds Committee (see Section (h)(i) below) to use funds to address penalties for noncompliance and pay Group 1, Group 2, and Group 3 remedies.<br>d. Agreement will include required Appropriation level based upon meeting Social Security and defined contribution milestones. The Appropriation shall be replenished as described in section (d)(iii) below.<br>   i. The Commonwealth will make an initial appropriation of $77 million<br>   1. $77 million protects employee Social Security and defined contribution amounts for approximately 1 year ($900m payroll * 8.5% = $77m)<br>   2. Commonwealth will appropriate employer 6.2% Social Security contribution for exclusive use in PRDE budget<br>   ii. Staggered release of appropriated funds<br>   1. Upon Commonwealth withholding and transferring funds to Social Security Administration, the fund balance will be reduced to no more than $50 million ($27 million released).<br>   2. Upon Commonwealth withholding and transferring 95% of defined contributions to |

individual accounts, the fund balance will be reduced to no more than $30 million ($20 million released). When 100% of teachers are properly enrolled, the fund balance will be no more than $25 million ($5 million released).

3. A minimum amount of $25 million will be held in the segregated account for a period of two (2) years following the release of 100% of the defined contribution portion of funds or of 100% of the Social Security portion of the fund, whichever is later, for the exclusive purpose of settling outstanding noncompliance claims. Once the two (2) year period ends, the remaining balance will be released out of the segregated account.

iii. Replenishment of budget appropriation

1. For each year of delay following the Pension Freeze date in which the Commonwealth fails to fully implement Social Security and/or the Defined Contribution Plan, the Commonwealth will make an annual additional appropriation to maintain a balance of $77m (as modified by (3)(d)(ii) above) in the segregated account.

2. The appropriation shall not affect funding levels available to the Department of Education or any other program for targeted for public education or students.

e. In addition to appropriation, FOMB will use the Confirmation Order, Fiscal Plan and all legal actions available to reasonably enforce timely implementation of both Social Security and Defined Contribution accounts for members. In addition, all parties in interest, including AMPR/AFT, retain their rights to seek enforcement of the timely implementation of both Social Security and the Defined Contribution accounts whether by seeking enforcement of the provisions of the Confirmation Order and/or by exercising any other available legal remedies.

f. Commonwealth will also face federal liability to the extent the new Defined Contribution plan is not a qualified retirement replacement plan and Social Security is not implemented.

g. The Commonwealth/FOMB will provide a monthly written report to AMPR/AFT on progress made toward implementation of Social Security and DC plan enrollment that details the status of payroll withholdings, remittances to Social Security and the DC plan, and the funding of individual defined contribution accounts until enrollment is fully implemented.

h. Appropriation would be administered with support of a Funds Committee
   i. Funds Committee will be comprised of five (5) members to include two (2) appointees by FOMB, two (2) appointees by AMPR, one of which will serve as Committee Chair, and one appointee by AAFAF.
   ii. The Commonwealth will establish a recurring annual budget appropriation for the Funds Committee in the amount of $300,000 until such time as the Commonwealth has satisfied the conditions set forth in Section (d)(ii)(2) above. Initial funding will be made available at the Plan Effective Date. For the next two years after satisfaction of the conditions set forth in Section (d)(ii)(2) above, the Commonwealth will establish a $150,000 annual budget for the Funds Committee. At the end of any fiscal year, unspent funds will carry over into the next fiscal year, except in the second year following satisfaction of the conditions set forth in Section (d)(ii)(2) above.
   iii. A portion of the Funds Committee appropriation will be used to create a teacher-facing Ombudsman with responsibility for educating teachers about noncompliance issues and shepherding teachers with individual claims through the Funds Committee claims process.
   iv. Funds Committee structure to be further detailed, with dispute resolution options
   v. Funds Committee would be charged with:
      1. Determining if the Commonwealth has fully implemented Social Security and the Defined Contribution Plan prior to the Freeze Date in accordance with Section (b) of "Timing of Pension Freeze" above.
      2. Determining when the Commonwealth has satisfied the aforementioned conditions for the incremental release or increase of the Enforcement Incentive funds. The Funds Committee will be entitled to such documentation as requested to validate compliance, including without limitation payroll records, defined contribution account records, and forms submitted to Social Security/IRS. Documentation will not contain personal identifiable information. To the extent the Funds Committee requires any documentation containing

| | |
|---|---|
| | personal identifiable information, the Funds Committee must obtain waivers from each individual and present those to the Commonwealth prior to receipt of personal identifiable information.<br>3. Reviewing claims and approving/disallowing claims for damages<br>4. Determining compensatory earnings as a result of any delay in the funding of individual Defined Contribution Plan accounts<br>5. Identifying and pursuing resolution of issues and communicating same with Commonwealth, FOMB, AMPR and Social Security/defined contribution Implementation team, including an Ombudsman if appointed<br>vi. FOMB will use best efforts to bind Hacienda to the decisions of the Funds Committee through the Plan. |
| **Group Annuity Contracts** | The FOMB will use best efforts to require the Commonwealth to adhere to ERISA/U.S. Department of Labor fiduciary requirements when entering into any annuity contracts in the future through language in the Plan |

# **EXHIBIT G**

SUMMARY TERMS OF AFSCME COLLECTIVE BARGAINING AGREEMENT

## MODIFICATIONS TO AFSCME COLLECTIVE BARGAINING AGREEMENTS

The following is a summary of agreed upon modifications to the collective bargaining agreements (collectively, the "AFSCME CBAs") between AFSCME and the Commonwealth. Provisions of existing AFSCME CBAs not in conflict with terms and conditions set forth below shall remain unchanged and remain in full force and effect in the new AFSCME CBAs. Only those AFSCME CBAs listed below shall be modified at this time.

| Definitions | |
|---|---|
| **Administration** | The management for the division (agency/grouping) in which the employee is assigned. |
| **Department** | The division (agency/grouping) in which the employee is assigned. |
| **Union Affiliates** | <ul><li>Parole Board and Local 3584 / United Public Servants</li><li>Department of Consumer Affairs and Local 3986 / United Public Servants</li><li>Department of Correction and Rehabilitation and Local 3500-Unit B Correctional Officers (ACU) / United Public Servants</li><li>Department of Correction and Rehabilitation / Bureau of Juvenile Institutions and Local 3559 (ACU) / United Public Servants</li><li>Department of Education and Local 3840 covering only employees within the AFSCME jurisdiction of PASO</li><li>Department of Natural and Environmental Resources and Local 2082-Unit A / United Public Servants</li><li>Department of Natural and Environmental Resources and Local 3647 (Ranger Corps) / United Public Servants</li><li>Department of Transportation and Public Works and Local 3889 / United Public Servants</li><li>Department of Labor and Human Resources / Vocational Rehabilitation Administration and Local 3251 / United Public Servants</li><li>Department of the Family and Local 3227-Unit A / United Public Servants</li><li>Department of the Family and Local 3234-Unit B (UPETEC) / United Public Servants</li><li>Bureau of Forensic Sciences and Local 2099 / United Public Servants</li><li>Department of Correction and Rehabilitation / Pretrial Services Program and Local 3573 (ACU) / United Public Servants</li><li>Bureau of Transport and Other Public Services and Local 3897 / United Public Servants</li></ul> |

| Timing | |
|---|---|
| **Terms** | Five (5) year CBAs effective as of the effective date of the Commonwealth Plan. |
| **Implementation** | The Plan. |

| More detailed provisions of the proposal | |
|---|---|
| **Terminations / Layoffs** | **Section 1** In order to avoid the involuntary layoff of personnel and to give personnel adequate notice of reassignments or relocations, the Union and the Oversight Board agree to discuss modifying the regulations implementing Act 8-2017 with the Government.<br><br>**Section 2** In the event that the Administration needs to carry out downsizing of personnel (layoffs) to comply with the provisions of the approved Fiscal Plan, the parties agree to the following:<br><br>A.     **Temporary Suspension**. The immediate commencement of the layoff plan will entail the automatic suspension of any clause, precept and/or provision applicable to employees and/or positions covered by this agreement, contained in laws, collective bargaining agreements, agreements, supplementary agreements, policies, employment handbooks, circulars, contract letters, certifications, regulations, rules and conditions of employment, regulatory letters, classification plans and/or retribution plans that conflict with this Article<br><br>The suspension of the clauses and provisions provided herein will be for a term of five (5) years, and the Administration may reduce this period after the Oversight Board certifies compliance with the objectives of the Administration and/or Department's Fiscal Plan.<br><br>B.     **Reassignment and Relocation**. The Administration may implement any reassignment of positions and relocation of personnel when its budgetary interests so require to avoid layoffs. If reassignments and/or relocations are necessary and budgetary feasible, the Administration shall reassign/relocate the most qualified volunteer(s) who would otherwise be subject to layoff. If there are insufficient qualified volunteers, the least senior qualified employee will be involuntary reassigned/relocated. An employee who has been involuntarily relocated because her/his position has been eliminated may request the position she/he previously held, if the Administration creates it again within the term of two (2) years following the relocation. The employee must make the corresponding request to the Human Resources Division. Seniority shall be the determining criteria to the extent that the position is requested by more than one relocated employee. This provision shall establish the order of voluntary and involuntary employee reassignment, relocation and mobility but shall not be interpreted |

| More detailed provisions of the proposal | |
|---|---|
| | as a limitation to the Administration's right to implement mobility plans pursuant to Act 8-2017.<br><br>**C.      Layoffs.**<br><br>a.      In view of the state of fiscal emergency, the scarcity of fiscal resources, the gravity of the problems that the Administration faces, and the urgency required to correct the fiscal problems, it is exempted from exhausting measures such as retraining employees, the enjoyment of accrued vacations, the enjoyment of unpaid leave, a reduction in work hours, or demotions, prior to implementing the layoffs.<br><br>b.      The Administration will notify in the first place the termination to all employees of the appropriate unit who as of the date of effectiveness of this Agreement have a temporary or irregular appointment, so that it will not be necessary to observe, with respect to these employees, the criterion of seniority.  The notification will be made by hand delivery or by certified mail, return receipt requested, to the address that appears in the Administration's files.<br><br>c.      The layoffs of employees with permanent or career appointment will be carried out observing exclusively the criterion of seniority by occupational classification affected by the layoff and consonant with the need to ensure the continuity and quality of Administration services, so that those who have less seniority in each affected occupational classification will be laid off in the first place.<br><br>d.      In order to determine the seniority of affected employees, all of the services provided by the employees affected in the public service will be considered, regardless of the provisions of the collective bargaining agreements, regulations, circulars, and other normative documents.<br><br>e.      The Administration will notify the layoffs at least thirty (30) calendar days in advance of the date of effectiveness, through written communication addressed to the employee and to the Union, indicating the date of effectiveness thereof.<br><br>f.      The affected employee and Union may request a review of the final determination made by the Administration, only as to their seniority and the occupational classification, within a period no greater than thirty (30) calendar days from receipt of the notification from the Administration. |
| **Healthcare plan / Medical services** | **Section 1** The Administration shall cover the cost of Basic Coverage, equal to $170.00 per month or such greater amount that the Administration may lawfully authorize, including Pharmacy services and all employees, regardless of marital status or relationship, shall be entitled to the |

| More detailed provisions of the proposal |
|---|

|  | contribution.   The Administration shall recognize a single employer contribution per employee.

**Section 2** Employees have opted for syndication and shall be entitled to have an exclusive representative negotiate on their behalf regarding all matters concerning health benefits and the contracting of a health plan. The exclusive representative shall designate a Health Plans Evaluating Committee to represent the different sectors and interests of the members. Such committee shall be responsible for the analysis and evaluation of all health plans in the market in order to select those that offer the lowest and most reasonable premiums, the best coverage and health services benefits and the best medication coverage.

**Section 3** The exclusive representative shall call the members to an Assembly in which he/she shall present the health plans selected by the Committee, so that the Assembly, by the express vote of the majority constituting quorum to such effects, selected the health plan that better suits its needs. Once the health plan has been selected in a legally convened Assembly, it shall be compulsory for all the members represented by said exclusive representative, except as provided by Act 95-1963, as amended. |
|---|---|
| **Holidays** | **Section 1** Holidays shall include all twenty-four (24) hours, after midnight, of the calendar day in question.

**Section 2** The Administration recognizes that the days listed below shall be paid holidays for employees covered by the AFSCME CBAs; <u>provided</u>, <u>however</u>, that the Administration shall have the right to assign work to the members of the Appropriate Unit in any of them, when the need for service so requires. The time worked shall be compensated in time and a half (1½) of the time worked. On years where general elections shall be held, Election Day shall be considered as included among the holidays listed below. |

|  | Date | Holiday |
|---|---|---|
| 1 | January 1st | New Year's Day |
| 2 | January 6th | Three Kings' Day |
| 3 | Third Monday of January | Dr. Martin Luther King Day |
| 4 | Third Monday of February | George Washington / Presidents' Day |
| 5 | March 2nd | American Citizenship Day |
| 6 | March 22nd | Abolition of Slavery Day |
| 7 | Movable | Good Friday |

**More detailed provisions of the proposal**

| 8 | Last Monday of May | Memorial Day |
|---|---|---|
| 9 | July 4th | Independence Day |
| 10 | First Monday of September | Labor Day |
| 11 | October 12th | Race Day (Discovery of America) |
| 12 | November 11th | Veteran's Day |
| 13 | November 19th | Discovery of Puerto Rico |
| 14 | Fourth Thursday of November | Thanksgiving |
| 15 | December 25th | Christmas |

**Section 3** The Administration recognizes that holidays that fall on a Sunday shall be enjoyed during the next day and holidays that fall on a Saturday shall be enjoyed on the previous business day.

**Section 4** Days or half days that by proclamations of the Governor of Puerto Rico or the President of the United States are declared as holidays to be observed in Puerto Rico, shall also be considered paid holidays and included as part of the previous list, as long as they are not discounted from ordinary leave.

**Sick leave**

**Section 1** All members of the Appropriate Unit covered by the AFSCME CBAs, which were hired prior to February 4, 2017 shall have the right to accrue sick leave at the rate of one and a half days (1½) for each month of service. Members hired on or after February 4, 2017 shall accrue at the rate of one (1) day for each month of service.

**Section 2** Sick leave may be accrued up to a maximum of ninety (90) business days at the end of each calendar year. Accrual shall commence once the employee has provided services for a period of three (3) months, and will be effective retroactively until the date when the employee began in the public service.

**Section 3** Accrued sick leave days that have not been enjoyed shall not be liquidated in any way.

**Section 4** Sick leave shall be used:

A.      When the employee is sick, physically or mentally incapacitated, or exposed to a contagious disease which requires his/her absence from work to protect his/her or other persons' health.

| **More detailed provisions of the proposal** |
| --- |

B.      A maximum of five (5) days a year may also be used for the following, provided that the employee has accrued a minimum balance of twelve (12) days:

a.      The care and attention of his/her sick children.

b.      Management of sick, elderly or disabled persons within his/her familial nucleus, within the fourth degree of consanguinity, second of affinity, persons that live within the same household, persons over which employee has legal custody or guardianship.

c.      First appearance of any petitioner, victim or complainant before the Department, Agency, Corporation or Public Instrumentality of the Commonwealth of Puerto Rico, in matters regarding alimonies, domestic violence, sexual harassment in the workplace or gender-based discrimination.

C.      The employee shall present evidence issued by the competent authority which credits such appearance.

D.      For the purposes of this Section, the following definitions shall apply:

a.      "Elderly person": any person sixty (60) years or older.

b.      "Person with disabilities":  any person with a physical, mental or sensory disability that substantially limits one (1) or more essential activities in his/her life.

**Section 5** Only in sickness absences for more than three (3) consecutive days shall the employee submit a medical certificate justifying such absences. Notwithstanding, the employee or any of his/her relatives must notify his/her immediate supervisor of his absence. This shall be applied or interpreted in a manner consistent with the Americans with Disabilities Act, better known as ADA, the Family Medical Leave Act of 1993, or any other applicable law.

**Section 6** In the event that the employee exhausts his/her sick leave and remains ill, he/she may use the leave he/she has accrued, in accordance with the provisions of this Collective Agreement.

**Section 7** Sick leave charges shall be made on the basis of the working day's daily work assigned to the employee, it being understood that it shall not be charged for days off in cases where the employee works rotating shifts or for holidays.

**Section 8** When a member of the Appropriate Unit covered by the AFSCME CBAs is using his / her sick leave, he / she shall be entitled to

| More detailed provisions of the proposal | |
|---|---|
| | the accrual of regular and sick leave for the time that he / she is enjoying sick leave, as long as he / she is reinstated to his / her job once such enjoyment is finished.<br><br>**Section 9** The Administration may advance sick leave up to a maximum of eighteen (18) working days, to any member of the Appropriate Unit covered by these CBAs which requests it by presenting proper justification. He/she must have worked for the Administration for one (1) year or more. Advanced leave may only be granted after the accrued sick and regular leave have been exhausted.<br><br>**Section 10**<br><br>A. **Leave for Parents with Children with Physical and / or Mental Disabilities**. In an effort to project itself as an exemplary agency in the treatment of persons with disabilities, the Administration will authorize as official time one (1) day per month to the parents of children with disabilities in order for them to take their children to their appointments and treatments. The parents must notify the date of the appointment or treatment as soon as they become aware of it and in turn must provide a certificate from the health and / or therapeutic services provider of the minor who officially classifies him/her as a person with disabilities.<br><br>They must also submit a medical certificate that proves that the employee accompanied their child to the appointment or medical treatment. In case both parents or custodians are members of the Appropriate Unit, the license shall be shared between both, in the way that they prefer to do it.<br><br>B. **Leave for Elderly Persons**. In the same way, the Administration shall authorize that this same day can be used for appointments and treatments for Elderly Persons. The person in charge must notify the date of the appointment or treatment as soon as he / she becomes aware. The employee in turn must provide a certificate of birth of the elderly person evidencing that he / she is sixty (60) years or more. They must comply with Section 11's provisions.<br><br>**Section 11** The Administration shall authorize the father or mother of children to stay with them when they are hospitalized. The father or mother must submit evidence of the hospitalization and the duration of the hospitalization. The Administration shall authorize that the days that the employee takes to take care of his / her sick child are discounted from his / her sick leave. An employee that requests this leave must have an accrued sick leave balance of fifteen (15) or more days. |
| **Vacation Leave** | **Section 1** All members of the Appropriate Unit covered by the AFSCME CBAs shall have the right to accrue regular vacation leave at the rate of |

| More detailed provisions of the proposal |
| --- |

one and a quarter (1¼) days for each month of service. Employees with reduced or part-time regular working hours will accumulate vacation leave proportionally to the number of hours they regularly provide service in. Accrual shall commence once the employee has provided services for a period of three (3) months, and will be effective retroactively until the date when the employee began in the public service.

**Section 2** Regular vacation leave shall be accrued up to a maximum of sixty (60) business days at the end of each calendar year.

**Section 3** Every employee shall have the right to enjoy his accrued vacation leave for a period of fifteen (15) business days during each calendar year, of which no less than ten (10) days shall be consecutive. By agreement between the Director and / or Supervisor and the employee, he may be granted periods of less than ten (10) business vacation days, but never less than five (5) days.

Employees, who, due to the need for service and at the request of the Administration, cannot enjoy their vacation leave during a specific calendar year, shall be exempt from this provision. In this case, the Department is required to make the necessary adjustments so that the employee is able to enjoy at least leave accrued in excess of the sixty (60)-day limit at the earliest date possible within the first three (3) months of the following calendar year.

**Section 4** The enjoyment of regular vacation leave shall not be interrupted nor rescheduled for any member of the Appropriate Unit covered by these CBAs. The only exceptions are clear and unavoidable emergencies related to the need for the service. The Administration shall replenish the time used by the employee.

**Section 5** The Administration shall formulate a Vacation Plan each calendar year, according to the need of service and in coordination with the employees of the Appropriate Unit covered by this Collective Agreement and their respective supervisors, which establishes the period (s) within of which each employee shall enjoy their vacations. The Plan must be established by December 31st of each year so that it becomes effective the first (1st) of January of each year. Both parties agree to comply with the Plan. By agreement between the Director and / or Supervisor and the employee, he / she may enjoy a maximum of two (2) vacation periods per calendar year.

**Section 6** The Administration shall formulate and administer the Vacation Plan harmonizing the observations, recommendations and preferences of the employees with the needs of service, so that they do not lose their

| More detailed provisions of the proposal |
|---|

vacation leave at the end of the calendar year and enjoy their regular vacation leave annually without affecting the service.

If there is a conflict between two (2) or more employees regarding the date to take vacations, the Director and / or Supervisor shall determine, according to the need of service, which employee shall leave first.  In case the only conflict is that both chose the same date and cannot leave at the same time, the employee with the most seniority will leave first and from then on it will be done alternately.

**Section 7** The Administration shall inform the accrued vacation leave balance to all Appropriate Unit members covered by these CBAs, a total of three (3) times a year.  In case of any calculation error, the information may be corrected at the initiative of any of the Parties.  Any request for review by the employee must be made in writing within fifteen (15) working days before the Director of the Human Resources Division of the Administration.   The Director shall have fifteen (15) working days to answer the request.  If the employee is not satisfied, he/she may use the Complaint and Grievance Procedure established in this Collective Agreement.

**Section 8** The Administration shall evaluate, if so requested by the employee, granting regular leave in excess of fifteen (15) days in a calendar year, up to a maximum of fifty (50) days in any calendar year to those employees who have accrued leave.  The employee shall maintain a minimum of five (5) days of regular vacation leave.  When granting said leave, the Administration shall consider the needs of service and any other factor established in applicable law.

**Section 9** When a member of the Appropriate Unit covered by CBAs is using his / her regular leave, he / she shall be entitled to the accrual of regular and sick leave, for the time that he / she is enjoying said leave, as long as he / she is reinstated to his work when he / she finishes such enjoyment.

**Section 10** Due to special circumstances, the Administration may advance regular leave to any member of the Appropriate Unit covered by CBAs who requests it and has worked for the Administration for more than one (1) year, up to a maximum of fifteen (15) work days, provided that the employee shall return to service.   The Administration shall evaluate said request according to the needs of service.

**Section 11** Any employee who has been granted advanced vacation leave and separates from service, voluntarily or involuntarily, before rendering services for the period needed to accrue the full amount of unearned

| **More detailed provisions of the proposal** | |
|---|---|
| | advanced leave thus granted shall be required to refund the Government of Puerto Rico any amount paid to him/her for said advanced leave.<br><br>**Section 12** At the option of the Appropriate Unit member covered by CBAs, the payment of regular scheduled vacations shall be effective before beginning to enjoy them. Said request must be submitted forty-five (45) calendar days in advance of the date on which the vacation begins.<br><br>**Section 13** In those cases in which a proclamation or administrative order of the Governor of Puerto Rico is issued, granting official time without charge to vacations, the same shall be applicable to all members of the Appropriate Unit covered by CBAs who are in use of regular leave. When the employee is enjoying his/her regular vacation leave, the period of his/her vacation will be extended for the official time granted.<br><br>**Section 14** Any member of the Appropriate Unit covered by CBAs who becomes ill while enjoying regular leave may request that the period of illness be credited to his / her accrued sick leave. The employee must certify his/her illness in conjunction with his/her request.<br><br>**Section 15** The members of the Appropriate Unit covered by CBAs shall have the right to authorize the Administration to assign five (5) days per month of their accumulated vacation license, in favor of other employees of the agency. It shall be in accordance with the provisions established by Act No. 44 of May 22, 1996, as amended, known as the "Holiday License Assignment Act". |
| **Additional Language for Holidays, Sick and Vacation Leaves** | **Section 1** For the avoidance of doubt, to the extent there are inconsistencies between this Agreement and the provisions of Act 26-2017 regarding Holidays, Vacation Leave, Sick Leave and other Leaves, the provisions of Act 26 as enacted in 2017 shall apply for the duration of this Agreement. Amendments to Act 26-2017 to improve Holidays, Sick, Vacation and other leaves leave benefits shall be incorporated into this Agreement if lawfully adopted by the Government. |
| **Bonuses** | **Section 1** To the extent that bonuses not otherwise provided for in CBAs are lawfully provided to similarly situated Commonwealth employees, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees. |
| **Institutional Representation** | **Section 1** The Administration will provide for appointment of a Union labor representation board, consisting of four (4) individual members, appointed by the Union to represent labor. |

| **More detailed provisions of the proposal** | |
|---|---|
| | **Section 2** The members may be appointed for terms of twelve (12) months, and may be reappointed by the Union.<br><br>**Section 3** The members will meet with representatives of the Oversight Board on an annual basis to discuss and share perspectives on the Commonwealth fiscal plan and budget.<br><br>**Section 4** Annual meetings with representatives of the Oversight Board will be provided for members by allowing members to attend with a half day of paid time off, in addition to their normal vacation time. |
| **Full Agreement** | **Section 1** The provisions of this term sheet, combined with the most recent CBAs, shall constitute the CBAs commencing on the effective date of the Commonwealth Plan; provided, however, that the provisions of this term sheet control if there is any conflict with the most recent CBAs. For the duration of the Agreement, there shall be no changes in base pay, other compensation, leaves, holidays, or benefits without the express agreement of the Union. In addition, no other changes inconsistent with the terms of the term sheet shall be implemented without the express agreement of the Union. Nothing in this Agreement shall be interpreted in a manner to preclude employees represented by the Union from receiving any benefit that is lawfully granted by the Governor or Administration to other employees of the Government. |
| **Dues Deduction, Charges** | **Section 1** During the term of these agreements and during any extension thereof, the Department shall deduct from the salary of each bargaining unit employee who authorizes payroll deduction of union dues or payments on a form provided by the union the regular dues that the Union certifies in accordance with its regulations and the applicable provisions of Act 45 as amended. The dues amount shall be reported to the Department by the Union. For such purposes, the Department shall notify the Department of the Treasury of dues charges to be deducted from employees included in the Appropriate Unit within thirty (30) working days from the date on which the Union informs the Department regarding the amount to be deducted.<br><br>**Section 2** The Department shall send a copy to the Union on a monthly basis of the list provided by the Department of the Treasury, reflecting the name of each employee included in the Appropriate Unit, with Social Security number and amount deducted for dues charges.<br><br>**Section 3** The Department shall inform new employees of the right conferred by Act No. 45 as amended at the moment the employee is named to a position included in the Appropriate Unit and shall provide the union with an opportunity to meet with new employees or, at the union's option, |

| **More detailed provisions of the proposal** |
|---|

with a welcome document prepared by the Union in which are explained the rights of union members under Act 45 of February 25, 1998, as amended. The Administration shall not discourage union membership

**Section 4** The Department shall have fifteen (15) working days to inform the Union in writing of the name, Social Security number, position, date of employment and salary of newly recruited employees and that come to occupy positions included in the Appropriate Unit.

**Section 5** The authorization to deduct membership dues is in effect and irrevocable pursuant to the terms stated on the employee authorization, but employees must be permitted to rescind their authorization prior to any renewal at least annually.

**Section 6** In the event the Union ceases to be the exclusive representative of the Appropriate Unit, the deductions withheld from employees for dues shall automatically stop on the date the Union is no longer the exclusive representative.

**Section 7** The Department shall resume the deduction of dues for employees whose positions are included in the Appropriate Unit once they return from their unpaid leave and notify the Human Resources Office so that it can make the change in payroll and include said deduction within a period not greater than thirty (30) working days from the employee's return date.

**Section 8** In the event the Union requests the deduction of dues and it is determined that the dues are unlawfully set and/or deducted, the Union shall relieve the Department of any liability and make any orderly refund as soon as it is required. If it is determined that the error is attributable to the Department, the Union shall only reimburse what is erroneously deducted and will not be responsible for expenses and fees incurred.

## APPENDIX I

## PROPOSED TERMS FOR ERS SYSTEM BENEFITS

The following is a summary of indicative terms for the Puerto Rico Government Employees Retirement System ("ERS") for:

1.      System 2000 members;

2.      participants who participated exclusively in the Act 3 benefit but not in Act 1 or Act 447 benefit tiers; and

3.      Act 3 participants who participated in Act 1 or Act 447 benefit tiers.

These terms do not address benefits earned under Act 1 and Act 447.

| Definitions | |
|---|---|
| **Pension System** | The Puerto Rico Government Employees Retirement System (ERS). |
| **System 2000 Members** | Generally, those members hired on or after January 1, 2000 and on or before June 30, 2013.  In addition, for purposes of this Agreement, employees hired on or after July 1, 2013 and on or before June 30, 2017 shall be treated the same as System 2000 members. |
| **Type of Plan** | System 2000 and Act 3 plans are contributory, hybrid defined benefit plans. |
| **Effective date of the Plan** | The Pension System was established in 1951 by Act 447 to be effective January 1, 1952.  The Plan was last amended under Act 3, approved April 4, 2013. |
| **Eligibility for Membership** | Members of the ERS and its Instrumentalities include all regular full-time and non-municipal temporary employees who are not contributing to other Retirement Systems (Articles 1-104 and 1-105). |
| **Contributions** | Contributions to System 2000 and Act 3 benefits are made exclusively from mandatory employee payroll deductions of 8.275 percent until 2013 and 10 percent of pay thereafter (starting with the passage of Act 3-2013). |

| Timing | |
|---|---|
| **Effective date** | Commonwealth Plan Effective Date. |
| **Implementation** | Applies to benefits earned under the Plan on or before June 30, 2017. |

| Provisions of the proposal |
|---|

| | |
|---|---|
| **Segregate cash upfront** | Segregate full System 2000 contributions from 2000 through 2013 (no reduction ), full System 2000 participant Act 3-2013 contributions, and full Act 3 participant (who had not participated in either Act 1 or Act 447) contributions through 2017 (no reduction), with interest through the Commonwealth Petition Date. Roll balances into Defined Contribution accounts currently being set up under Act 106-2017 and invested by default into a target date life-cycle fund. As of the Effective Date, participants with System 2000 contributions from 2000 through 2013, and Act 3-2013 contributions through 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability provisions, etc.<br><br>Participants who had not participated in either Act 1 or Act 447 retirement plans and who have already retired and converted their System 2000 or Act 3 contributions to a system paid annuity are not eligible for the treatment described in this section. They will not receive a cash payment and they will be subject to the Monthly Benefit Modification applicable to other retirees. |
| **Exempt from Reduction Formula** | Pay up to full accumulated contributions value, with interest up to, but not including, the Commonwealth Petition Date, for all Act 1 and Act 447 contributions made in Act 3 after July 1, 2013 annuitized upon retirement in accordance with applicable law and not subject to any reduction pursuant to the Plan. Act 1 and Act 447 benefits accrued prior to July 1, 2013 remain subject to the Monthly Benefit Modification pursuant to the Plan. |

## More detailed Provisions of the Proposal as of July 1, 2015

| | System 2000 | | | |
|---|---|---|---|---|
| | **Active members** | **Retired members** | **Disabled members** | **Beneficiaries in payment** |
| Count | 65,605 | 273 | 72 | 81 |
| Average age | 42.7 | 67.8 | 54.2 | 62.5 |
| Average salary | $24,891 | | | |
| Average creditable service | 9.5 | | | |
| Average monthly basic system benefit | | $758 | $853 | $997 |
| Average monthly system administered benefit | | $16 | $9 | $8 |

# APPENDIX II
## PROPOSED TERMS FOR UPSIDE FISCAL PLAN SURPLUS SHARING AGREEMENT

Below is a summary of proposed indicative terms for AFSCME Upside Fiscal Plan Surplus Sharing Agreement.

| Definitions | |
|---|---|
| **Fiscal Plan Surplus Sharing Agreement** | Agreement with Unions and Union member participants for each fiscal year of this Agreement to provide participation of Unions on sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. |
| **Unions** | AFSCME |
| **Union Member Participants** | All active Union members and employees in union represented bargaining units on record at the beginning of the fiscal year with continued employment and active status at the time of payment. |
| **Independent Agent** | Certified Public Accounting firm licensed to provide accounting services. |
| **Cash Basis** | Fiscal Plan surplus calculation will use recorded income and expenses as received or paid. |
| **Excess Cash Surplus Formula** | If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool. |

| Timing | |
|---|---|
| **Implementation** | To be aligned with the implementation of proposed changes to CBAs, as well as the overall agreement with AFSCME, currently targeted for the Effective Date. |
| **Annual Measurement** | Fiscal Plan surplus to be calculated on a Cash basis no later than September 30th of each fiscal year by an Independent Agent. |
| **Payment Period** | **For signing bonus:** Payable to Union represented participants upon the Effective Date of the Plan of Adjustment.<br><br>**For Upside Participation Bonus:** Payable December 1st to Union represented participants, based upon calculations from the prior period and completed by the Annual Measurement date. |

| Timing | |
|---|---|
| | **For Support Fee:** Payable to Union on the Effective Date of the Commonwealth Plan of Adjustment.<br><br>**For Additional Fee:** Payable to Union on the Effective Date of the Commonwealth Plan of Adjustment. |

| Provisions of the proposal | |
|---|---|
| **Signing Bonus (see Summary of bonuses)** | Upon the Effective Date, a one-time signing bonus of Five Hundred Dollars ($500.00) to each of the Union represented participants. |
| **Upside Participation Bonus** | For the term of the CBA, if Excess Cash Surplus formula is met or exceeded, a distribution will be made to all Union represented participants and all other eligible Commonwealth employees designated by the Oversight Board each year from the Upside Participation Bonus pool. All recipients of this Upside Participation Bonus will have the choice to allocate any portion of their Upside Participation Bonus to their Defined Contribution account and any remainder will be distributed in cash. |
| **Support Fee** | One-time payment of Five Million Dollars ($5,000,000.00) to the Union, as compensation for its efforts serving as the lead negotiator of and as a signatory to this Agreement. |
| **Additional Fee** | One-time payment of Five Million Dollars ($5,000,000.00) to the Union, to be disbursed as a cash bonus to its represented participants. Accordingly, the bonuses that Union represented participants are receiving pursuant to this Agreement are a one-time $1000 bonus (approximate) and any Upside Participation Bonus. In addition, to the extent that similarly situated Commonwealth employees lawfully receive a bonus, such as a Christmas bonus, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees. |
| **Payment of Pre-petition Arbitration and Grievance Claims** | Any distributions under and pursuant to the Plan on account of claims for liquidated damage amounts resulting from the disposition of pre-petition actions brought pursuant to the grievance and arbitration procedures arising under the CBAs between the Commonwealth and AFSCME's local affiliate(s) in Puerto Rico shall be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) 30 days after such disposition or (ii) 60 days after the Effective Date of the Plan. |

# **EXHIBIT H**

SCHEDULE OF MED CENTER CLAIMS

| Claim Numbers | Facility | Group | Column "A" | Column "B" |
|---|---|---|---|---|
| 27630, 30530, 166265 | Centro De Salud Familiar Dr. Julio Palmieri Ferri Claims: 166265 Facility: Arroyo | AMC Group | $12,639,331.92 | $11,871,346.29 |
| 158091 | Atlantic Medical Center, Inc. Claims: 158091 Facility: Barceloneta | AMC Group | $11,518,922.99 | $3,030,376.45 |
| 167114 | Camuy Health Services, Inc. Claims: 167114 Facility: Camuy | AMC Group | $31,349,345.60 | $13,470,273.43 |
| 146462 | Hospital General Castaner, Inc. Claims: 146462 Facility: Castaner | AMC Group | $5,489,636.26 | $1,506,047.44 |
| 137070 | Ciales Primary Health Care Services, Inc. Claims: 137070 Facility: Ciales | AMC Group | $6,155,787.47 | $3,036,743.77 |
| 167361 | Corporacion De Servicios Medicos De Hatillo Claims: 167361 Facility: Hatillo | AMC Group | $11,948,076.45 | $4,507,785.17 |
| 166254 | Centro De Salud De Lares, Inc. Claims: 166254 Facility: Lares | AMC Group | $28,276,675.12 | $10,296,151.19 |
| 158138 | Centro De Servicios Primarios De Salud De Patillas Claims: 158138 Facility: Patillas | AMC Group | $19,497,267.19 | $19,596,454.39 |
| 157161 | Costa Salud Community Health Center Claims: 157161 Facility: Rincon | AMC Group | $12,310,505.80 | $5,931,865.47 |
| 93971 | Rio Grande Community Health Center Claims: 93971 Facility: Rio Grande (1) | AMC Group | $9,949,732.57 | $1,735,779.32 |
| 114996, 176157 | Migrant Health Center, Inc. Claims: 114996,176157 Facility: Migrant | Migrant Group | $17,691,291.17 | $9,772,993.70 |
| 98437, 108527 | HPM Foundation Inc. Claims: 98437,108527 Facility: Belaval | Morovis Group | $4,918,873.90 | $(2,405,967.79) |
| 34436, 122862 | Corporacion De Servicios De Salud Y Medicina Avanzada Claims: 34436,122862 Facility: Cossma | Morovis Group | $25,655,184.64 | $5,737,364.38 |
| 20254, 20301, 20392, 52387, 111373 | NeoMed Center, Inc Claims: 20254, 20301, 20392, 52387, 111373 Facility: Gurabo | Morovis Group | $29,258,557.90 | $36,253,807.51 |
| 101569, 108464, 139655 | Salud Integral De La Montana Inc. Claims: 101569,108464,139655 Facility: La Montana | Morovis Group | $33,906,988.74 | $2,525,918.30 |
| 20756, 20794, 39401, 130107 | Concilio De Salud Integral De Loiza, Inc Claims: 20756, 20794, 39401, 130107 Facility: Loiza | Morovis Group | $27,119,329.96 | $16,658,798.02 |
| 34431, 110999 | Morovis Community Health Center Claims: 34431,110999 Facility: Morovis | Morovis Group | $5,898,265.08 | $2,456,721.37 |
| | | Total | $293,583,772.78 | $145,982,458.41 |

(1) – Rio Grande Community Health Center provided actual data for period 1997 – 2000 asserting liabilities of approximately $7.6 m. They asserted additional liabilities related to 2001 which does not provide sufficient data to determine averages. A&M is not able to validate the asserted amounts and recommends further discussions with the FQHC related to this period.

# **EXHIBIT I**

SCHEDULE OF CASH FLOWS OF NEW GO BONDS

Tax-Exempt and Taxable Current Interest Bonds Debt Service

| Fiscal Year (7/1) | Tax-Exempt Annual Debt Service Cash Flows | | | Taxable Annual Debt Service Cash Flows | | | Aggregate Annual Debt Service Cash Flows | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total Debt Service | Principal | Interest | Total Debt Service | Principal | Interest | Total Debt Service |
| Total | $5,861,055,000 | $2,465,605,650 | $8,326,660,650 | $822,260,000 | $698,096,750 | $1,520,356,750 | $6,683,315,000 | $3,163,702,400 | $9,847,017,400 |
| 2022 | $372,660,000 | $270,505,300 | $643,165,300 | | $41,113,000 | $41,113,000 | $372,660,000 | $311,618,300 | $684,278,300 |
| 2023 | 372,390,000 | 251,872,300 | 624,262,300 | | 41,113,000 | 41,113,000 | 372,390,000 | 292,985,300 | 665,375,300 |
| 2024 | 371,350,000 | 233,252,800 | 604,602,800 | | 41,113,000 | 41,113,000 | 371,350,000 | 274,365,800 | 645,715,800 |
| 2025 | 369,470,000 | 214,685,300 | 584,155,300 | | 41,113,000 | 41,113,000 | 369,470,000 | 255,798,300 | 625,268,300 |
| 2026 | 366,675,000 | 196,211,800 | 562,886,800 | | 41,113,000 | 41,113,000 | 366,675,000 | 237,324,800 | 603,999,800 |
| 2027 | 362,890,000 | 177,878,050 | 540,768,050 | | 41,113,000 | 41,113,000 | 362,890,000 | 218,991,050 | 581,881,050 |
| 2028 | 358,030,000 | 159,733,550 | 517,763,550 | | 41,113,000 | 41,113,000 | 358,030,000 | 200,846,550 | 558,876,550 |
| 2029 | 352,010,000 | 141,832,050 | 493,842,050 | | 41,113,000 | 41,113,000 | 352,010,000 | 182,945,050 | 534,955,050 |
| 2030 | 344,740,000 | 124,231,550 | 468,971,550 | | 41,113,000 | 41,113,000 | 344,740,000 | 165,344,550 | 510,084,550 |
| 2031 | 336,095,000 | 106,994,550 | 443,089,550 | | 41,113,000 | 41,113,000 | 336,095,000 | 148,107,550 | 484,202,550 |
| 2032 | 325,990,000 | 90,189,800 | 416,179,800 | | 41,113,000 | 41,113,000 | 325,990,000 | 131,302,800 | 457,292,800 |
| 2033 | 311,050,000 | 77,150,200 | 388,200,200 | | 41,113,000 | 41,113,000 | 311,050,000 | 118,263,200 | 429,313,200 |
| 2034 | 294,385,000 | 64,708,200 | 359,093,200 | | 41,113,000 | 41,113,000 | 294,385,000 | 105,821,200 | 400,206,200 |
| 2035 | 154,195,000 | 52,932,800 | 207,127,800 | $121,695,000 | 41,113,000 | 162,808,000 | 275,890,000 | 94,045,800 | 369,935,800 |
| 2036 | 137,290,000 | 46,765,000 | 184,055,000 | 118,735,000 | 35,028,250 | 153,763,250 | 256,025,000 | 81,793,250 | 337,818,250 |
| 2037 | 118,370,000 | 41,273,400 | 159,643,400 | 115,625,000 | 29,091,500 | 144,716,500 | 233,995,000 | 70,364,900 | 304,359,900 |
| 2038 | 97,300,000 | 36,538,600 | 133,838,600 | 112,360,000 | 23,310,250 | 135,670,250 | 209,660,000 | 59,848,850 | 269,508,850 |
| 2039 | 64,880,000 | 32,646,600 | 97,526,600 | 117,980,000 | 17,692,250 | 135,672,250 | 182,860,000 | 50,338,850 | 233,198,850 |
| 2040 | 29,640,000 | 30,051,400 | 59,691,400 | 123,880,000 | 11,793,250 | 135,673,250 | 153,520,000 | 41,844,650 | 195,364,650 |
| 2041 | 12,780,000 | 28,865,800 | 41,645,800 | 111,985,000 | 5,599,250 | 117,584,250 | 124,765,000 | 34,465,050 | 159,230,050 |
| 2042 | 130,875,000 | 28,354,600 | 159,229,600 | | | | 130,875,000 | 28,354,600 | 159,229,600 |
| 2043 | 136,110,000 | 23,119,600 | 159,229,600 | | | | 136,110,000 | 23,119,600 | 159,229,600 |
| 2044 | 141,555,000 | 17,675,200 | 159,230,200 | | | | 141,555,000 | 17,675,200 | 159,230,200 |
| 2045 | 147,220,000 | 12,013,000 | 159,233,000 | | | | 147,220,000 | 12,013,000 | 159,233,000 |
| 2046 | 153,105,000 | 6,124,200 | 159,229,200 | | | | 153,105,000 | 6,124,200 | 159,229,200 |

*Deemed Issuance Date is 7/1/2021.

Detail on Tax-Exempt Current Interest Bonds

| | | | Detailed Summary of Tax-Exempt Term Bonds | | | | Tax-Exempt Annual Debt Service Cash Flows | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year (7/1) | Maturity | Term Maturity | Mandatory Sinking Fund Amortization | Term Principal | Coupon | 1st Call Date** | Fiscal Year (7/1) | Principal | Interest | Total Debt Service |
| Total | | | $5,861,055,000 | $5,861,055,000 | | | | $5,861,055,000 | $2,465,605,650 | $8,326,660,650 |
| 2022 | 7/1/22 | 2023 | $372,660,000 | | 5.000% | | 2022 | $372,660,000 | $270,505,300 | $643,165,300 |
| 2023 | 7/1/23 | 2023 | 372,390,000 | $745,050,000 | 5.000% | | 2023 | 372,390,000 | 251,872,300 | 624,262,300 |
| 2024 | 7/1/24 | 2025 | 371,350,000 | | 5.000% | | 2024 | 371,350,000 | 233,252,800 | 604,602,800 |
| 2025 | 7/1/25 | 2025 | 369,470,000 | $740,820,000 | 5.000% | | 2025 | 369,470,000 | 214,685,300 | 584,155,300 |
| 2026 | 7/1/26 | 2027 | 366,675,000 | | 5.000% | | 2026 | 366,675,000 | 196,211,800 | 562,886,800 |
| 2027 | 7/1/27 | 2027 | 362,890,000 | $729,565,000 | 5.000% | | 2027 | 362,890,000 | 177,878,050 | 540,768,050 |
| 2028 | 7/1/28 | 2029 | 358,030,000 | | 5.000% | | 2028 | 358,030,000 | 159,733,550 | 517,763,550 |
| 2029 | 7/1/29 | 2029 | 352,010,000 | $710,040,000 | 5.000% | | 2029 | 352,010,000 | 141,832,050 | 493,842,050 |
| 2030 | 7/1/30 | 2031 | 344,740,000 | | 5.000% | | 2030 | 344,740,000 | 124,231,550 | 468,971,550 |
| 2031 | 7/1/31 | 2031 | 336,095,000 | $680,835,000 | 5.000% | | 2031 | 336,095,000 | 106,994,550 | 443,089,550 |
| 2032 | 7/1/32 | 2033 | 325,990,000 | | 4.000% | 7/1/31 | 2032 | 325,990,000 | 90,189,800 | 416,179,800 |
| 2033 | 7/1/33 | 2033 | 311,050,000 | $637,040,000 | 4.000% | 7/1/31 | 2033 | 311,050,000 | 77,150,200 | 388,200,200 |
| 2034 | 7/1/34 | 2035 | 294,385,000 | | 4.000% | 7/1/31 | 2034 | 294,385,000 | 64,708,200 | 359,093,200 |
| 2035 | 7/1/35 | 2035 | 154,195,000 | $448,580,000 | 4.000% | 7/1/31 | 2035 | 154,195,000 | 52,932,800 | 207,127,800 |
| 2036 | 7/1/36 | 2037 | 137,290,000 | | 4.000% | 7/1/31 | 2036 | 137,290,000 | 46,765,000 | 184,055,000 |
| 2037 | 7/1/37 | 2037 | 118,370,000 | $255,660,000 | 4.000% | 7/1/31 | 2037 | 118,370,000 | 41,273,400 | 159,643,400 |
| 2038 | 7/1/38 | 2041 | 97,300,000 | | 4.000% | 7/1/31 | 2038 | 97,300,000 | 36,538,600 | 133,838,600 |
| 2039 | 7/1/39 | 2041 | 64,880,000 | | 4.000% | 7/1/31 | 2039 | 64,880,000 | 32,646,600 | 97,526,600 |
| 2040 | 7/1/40 | 2041 | 29,640,000 | | 4.000% | 7/1/31 | 2040 | 29,640,000 | 30,051,400 | 59,691,400 |
| 2041 | 7/1/41 | 2041 | 12,780,000 | $204,600,000 | 4.000% | 7/1/31 | 2041 | 12,780,000 | 28,865,800 | 41,645,800 |
| 2042 | 7/1/42 | 2046 | 130,875,000 | | 4.000% | 7/1/31 | 2042 | 130,875,000 | 28,354,600 | 159,229,600 |
| 2043 | 7/1/43 | 2046 | 136,110,000 | | 4.000% | 7/1/31 | 2043 | 136,110,000 | 23,119,600 | 159,229,600 |
| 2044 | 7/1/44 | 2046 | 141,555,000 | | 4.000% | 7/1/31 | 2044 | 141,555,000 | 17,675,200 | 159,230,200 |
| 2045 | 7/1/45 | 2046 | 147,220,000 | | 4.000% | 7/1/31 | 2045 | 147,220,000 | 12,013,000 | 159,233,000 |
| 2046 | 7/1/46 | 2046 | 153,105,000 | $708,865,000 | 4.000% | 7/1/31 | 2046 | 153,105,000 | 6,124,200 | 159,229,200 |

*Deemed Issuance Date is 7/1/2021.

**Callable on 7/1/2031 @ 103; Callable on 7/1/2032 @ 102; Callable on 7/1/2033 @ 101; Callable on 7/1/2034 @ 100

Detail on Taxable Current Interest Bonds

| Fiscal Year (7/1) | Maturity | Detailed Summary of Taxable Term Bonds | | | | | Taxable Annual Debt Service Cash Flows | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Term Maturity | Mandatory Sinking Fund Amortization | Term Principal | Coupon | 1st Call Date** | Fiscal Year (7/1) | Principal | Interest | Total Debt Service |
| **Total** | | | **$822,260,000** | **$822,260,000** | | | | **$822,260,000** | **$698,096,750** | **$1,520,356,750** |
| 2022 | 7/1/22 | | | | | | 2022 | | $41,113,000 | $41,113,000 |
| 2023 | 7/1/23 | | | | | | 2023 | | 41,113,000 | 41,113,000 |
| 2024 | 7/1/24 | | | | | | 2024 | | 41,113,000 | 41,113,000 |
| 2025 | 7/1/25 | | | | | | 2025 | | 41,113,000 | 41,113,000 |
| 2026 | 7/1/26 | | | | | | 2026 | | 41,113,000 | 41,113,000 |
| 2027 | 7/1/27 | | | | | | 2027 | | 41,113,000 | 41,113,000 |
| 2028 | 7/1/28 | | | | | | 2028 | | 41,113,000 | 41,113,000 |
| 2029 | 7/1/29 | | | | | | 2029 | | 41,113,000 | 41,113,000 |
| 2030 | 7/1/30 | | | | | | 2030 | | 41,113,000 | 41,113,000 |
| 2031 | 7/1/31 | | | | | | 2031 | | 41,113,000 | 41,113,000 |
| 2032 | 7/1/32 | | | | | | 2032 | | 41,113,000 | 41,113,000 |
| 2033 | 7/1/33 | | | | | | 2033 | | 41,113,000 | 41,113,000 |
| 2034 | 7/1/34 | | | | | | 2034 | | 41,113,000 | 41,113,000 |
| 2035 | 7/1/35 | 2041 | $121,695,000 | | 5.000% | 7/1/31 | 2035 | $121,695,000 | 41,113,000 | 162,808,000 |
| 2036 | 7/1/36 | 2041 | 118,735,000 | | 5.000% | 7/1/31 | 2036 | 118,735,000 | 35,028,250 | 153,763,250 |
| 2037 | 7/1/37 | 2041 | 115,625,000 | | 5.000% | 7/1/31 | 2037 | 115,625,000 | 29,091,500 | 144,716,500 |
| 2038 | 7/1/38 | 2041 | 112,360,000 | | 5.000% | 7/1/31 | 2038 | 112,360,000 | 23,310,250 | 135,670,250 |
| 2039 | 7/1/39 | 2041 | 117,980,000 | | 5.000% | 7/1/31 | 2039 | 117,980,000 | 17,692,250 | 135,672,250 |
| 2040 | 7/1/40 | 2041 | 123,880,000 | | 5.000% | 7/1/31 | 2040 | 123,880,000 | 11,793,250 | 135,673,250 |
| 2041 | 7/1/41 | 2041 | 111,985,000 | $822,260,000 | 5.000% | 7/1/31 | 2041 | 111,985,000 | 5,599,250 | 117,584,250 |

*Deemed Issuance Date is 7/1/2021.

**Callable on 7/1/2031 @ 103; Callable on 7/1/2032 @ 102; Callable on 7/1/2033 @ 101; Callable on 7/1/2034 @ 100

Capital Appreciation Bonds: 5.000% July 1, 2024 Maturity

| Date | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|
| 7/1/22 | $100,862,061.30 | $105,968,971.50 | $116,970,000.00 |
| 7/1/23 | 96,003,057.15 | 105,969,766.35 | 111,335,000.00 |
| 7/1/24 (1) | 91,376,871.30 | 105,970,000.00 | 105,970,000.00 |
| Total | $288,241,989.75 | $317,908,737.85 | $334,275,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.

Capital Appreciation Bonds: 5.375% July 1, 2033 Maturity*

| Date | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|
| 7/1/29 | $98,129,013.00 | $149,997,523.50 | $185,450,000.00 |
| 7/1/30 | 93,059,851.80 | 149,997,764.30 | 175,870,000.00 |
| 7/1/31 | 88,252,614.90 | 149,998,089.75 | 166,785,000.00 |
| 7/1/32 | 83,694,073.80 | 149,998,937.80 | 158,170,000.00 |
| 7/1/33 (1) | 79,371,000.00 | 150,000,000.00 | 150,000,000.00 |
| Total | $442,506,553.50 | $749,992,315.35 | $836,275,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.
*Callable on 7/1/2031 and thereafter at accreted value.

I-5

## **EXHIBIT J**

DESCRIPTION OF CVI TERMS AND WATERFALL PROVISIONS

**Exhibit J**
**General Terms Applicable to Both GO CVI and Subject to Waterfall Clawback CVI**

| TERM | DESCRIPTION |
|---|---|
| **Outperformance Metric** | ▪ See Annex 5 |
| **Structure** | ▪ Attachment Point: 100% of CW Fiscal Plan projections as included in Annex 5 (the "Baseline SUT") of this exhibit<br>▪ The Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the GO CVI, Subject to Waterfall Clawback CVI, and Not Subject to Waterfall Clawback CVI<br>   ○ See Annex 1 for terms specific to GO CVI<br>   ○ See Annex 2 for terms specific to Clawback CVI<br>▪ For the avoidance of doubt, when the term "Clawback CVI" is used on its own throughout this exhibit, the term encompasses both the Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI, defined as follows<br>   ○ **Subject to Waterfall Clawback CVI**: Represents portion of payments to Clawback CVI made from the Subject to Waterfall Outperformance Amount,<br>   ○ **Not Subject to Waterfall Clawback CVI**: Represents portion of payments to Clawback CVI made from the Not Subject to Waterfall Outperformance Amount<br>▪ Security provisions as described in Section 4.10 (b) of the CW Plan Support Agreement<br>▪ Amounts paid to various CVI instruments are subject to applicable caps, including GO CVI Maximum Annual Payment, GO CVI Lifetime Cap, Clawback CVI Maximum Annual Payment, and Clawback CVI Lifetime Cap (as defined throughout this exhibit) |
| **Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **Subject to Waterfall Outperformance Amount** | ▪ Lesser of, on an annual basis (the "Subject to Waterfall Outperformance Amount"):<br>   ○ (i) 50% of cumulative outperformance relative to the 5.5% SUT Baseline in Annex 5 (which, for the avoidance of doubt, includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to GO CVI and Subject to Waterfall Clawback CVI<br>      ▪ For the avoidance of doubt, amounts paid to Clawback CVI will first be allocated to Subject to Waterfall Clawback CVI (from Subject to Waterfall Annual |

| TERM | DESCRIPTION |
|---|---|
|  | Payments, as defined below) for purposes of calculation of payments previously made<br>   ○ (ii) 75% of annual outperformance (which, for the avoidance of doubt, includes both outperformance and underperformance)<br>▪ For the avoidance of doubt, the Subject to Waterfall Outperformance Amount may not be less than $0 in a given year |
| **Subject to Waterfall Annual Mandatory Redemption Payments** | ▪ <u>Years 1-22</u>: From the Subject to Waterfall Outperformance Amount, annual payment waterfall is as follows (the "Annual Payment Waterfall"):<br>   ○ (a) First $100,000,000 to GO CVI<br>   ○ (b) Next $11,111,111 to Subject to Waterfall Clawback CVI<br>   ○ (c) Thereafter, pro rata sharing as follows:<br>      ▪ 90% to GO CVI<br>      ▪ 10% to Subject to Waterfall Clawback CVI<br>▪ To the extent that the GO CVI Lifetime Cap (as defined below) is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Subject to Waterfall Clawback CVI beginning in the following year<br>▪ <u>Years 23-30</u>: 100% of Subject to Waterfall Outperformance Amount to Subject to Waterfall Clawback CVI |
| **SUT True-Up** | ▪ No adjustment required:<br>   ○ Exemptions / holidays included in the Puerto Rico Internal Revenue Code as of the date of the Plan Support Agreement (sections 4030.01 through 4030.27)<br>▪ Baseline SUT Reduced (the "Baseline SUT Reduction"):<br>   ○ Exemptions/Holiday during U.S. Presidential Declaration of Disaster for a period not to exceed 30 days and only for emergency-related categories of spend. If Exemptions/Holiday exceed 30 day period, the amount of any exemptions beyond such 30 day period will be included under the SUT True-Up mechanism defined below<br>▪ In-Year SUT Revenue Increased ("SUT True-Up"):<br>   ○ Any other exemption implemented by the Government under applicable law<br>▪ For the calculation of either the Baseline SUT Reduction or SUT True-Up, the calculation will be determined by the Treasury Secretary and validated by an independent third party and will be publicly disclosed. Validation of independent third party binding on both the Government and Creditors |

| TERM | DESCRIPTION |
|------|-------------|
|      | <ul><li>Documentation in a separate agreement on the methodology the independent third party will use to verify the Treasury Secretary's calculation</li><li>To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, a formulaic adjustment to be agreed upon by the Board and Initial PSA Creditors to maintain the same amount of outperformance had the Measured SUT remained at 5.5%. Further protections provided in Section 4.10 (b)(xi) of the CW Plan Support Agreement</li></ul> |

**ANNEX 1: GO CVI-SPECIFIC TERMS**

| TERM | DESCRIPTION |
|---|---|
| **GO CVI Lifetime Cap** | ▪ $3,500 million (the "GO CVI Lifetime Cap") |
| **GO CVI Term** | ▪ 22 years (FY2043)<br>▪ Deemed issuance date of July 1, 2021 |
| **Payments to GO CVI** | ▪ As referenced within (a) and (c) of Annual Payment Waterfall, subject to the GO CVI Maximum Annual Payment and the GO CVI Lifetime Cap |
| **GO CVI Maximum Annual Payment** | ▪ Maximum annual payment of $200 million for the GO CVI plus any unused amounts from previous years, subject to annual payment not being greater than $400 million for the GO CVI. For the avoidance of doubt, the GO CVI Maximum Annual Payment is calculated as the lesser of the (i) the sum of GO CVI Carryforward Balance (see below) and $200 million and (ii) $400 million<br>▪ The GO CVI Carryforward Balance shall be calculated as follows:<br>  ○ (a) In year 1, an amount equal to $0<br>  ○ (b) For each year thereafter, the Annual GO CVI Carryforward Amount (see below) shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance.<br>    ▪ The Annual GO CVI Carryforward Amount shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $200 million and (z) CVI payments (if any) made to the GO CVI in the prior fiscal year<br>▪ To the extent there is a positive GO CVI Carryforward Balance remaining at the end of the 22-year term, the Commonwealth will not owe any further amount to GO CVI |
| **GO CVI Call Structure** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI |
| **GO CVI Allocation** | ▪ See Annex 3 |

**ANNEX 2: CLAWBACK CVI-SPECIFIC TERMS**

| TERM | DESCRIPTION |
|---|---|
| **Clawback CVI Lifetime Cap** | ▪ $3,697,668,995 for Allowed CW/HTA Claims, $217,228,391 for Allowed CW/Convention Claims, $22,580,090 for Allowed CW/MBA Claim, and $1,301,525,288 for Allowed CW/PRIFA Rum Tax Claims[2] (in total, $5,239,002,764)<br>  o Applies to aggregate Clawback CVI payments, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI |
| **Clawback CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **Mandatory Redemption Payments to Subject to Waterfall Clawback CVI** | ▪ <u>Years 1-22</u>: As referenced within (b) and (c) of Annual Payment Waterfall, subject to the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap<br>▪ <u>Years 23-30</u>: From 100% of the Subject to Waterfall Outperformance Amount, subject to the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap<br>  o To the extent that GO CVI Lifetime Cap (as defined above) is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Clawback CVI beginning in the following year subject to applicable Clawback CVI Maximum Annual Mandatory Redemption Payment (as specified below) and Clawback CVI Lifetime Cap |
| **Not Subject to Waterfall Outperformance Amount** | ▪ Lesser of, on an annual basis (the "Not Subject to Waterfall Outperformance Amount"):<br>  o (i) 40% of cumulative outperformance relative to the 5.5% SUT Baseline in Annex 5 (which, for the avoidance of doubt, includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to Not Subject to Waterfall Clawback CVI<br>  o (ii) 95% of annual outperformance (which, for the avoidance of doubt, includes both outperformance and underperformance), less amounts paid to GO CVI and Subject to Waterfall Clawback CVI for the corresponding fiscal year<br>▪ For the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount may not be less than $0 in a given year |

---

[2] Per the PRIFA Plan Support Agreement, both (i) Clawback CVI Payments on account of Allowed CW/PRIFA Rum Tax Claims, and (ii) Rum Tax CVI Annual Payments (as defined in Exhibit "F" to the PRIFA Plan Support Agreement) will be paid to the PRIFA Trust. Distributions on account of Allowed CW/PRIFA Rum Tax Claims from the PRIFA Trust will be subject to a $1,301,525,288.00 lifetime cap, which amount shall be reduced based on the decision of holders of Allowed PRIFA Bond Claims to opt out of recovering there pro rata share of distributions from the PRIFA Trust.

| TERM | DESCRIPTION |
|---|---|
| **Mandatory Redemption Payments Not Subject to Waterfall Clawback CVI** | ▪ 100% of Not Subject to Waterfall Outperformance Amount, subject to any applicable caps, including both Clawback CVI Maximum Annual Payment and Clawback CVI Lifetime Cap |
| **Clawback CVI Maximum Annual Payment** | ▪ <u>Years 1-22</u>: Maximum annual payment of $175 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $350 million) for the Clawback CVI, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during this period is calculated as the lesser of (i) the sum of Clawback CVI Carryforward Balance (see below) and $175 million and (ii) $350 million<br>    ○ The Clawback CVI Carryforward Balance shall be calculated as follows:<br>        ▪ (a) In year 1, an amount equal to $0<br>        ▪ (b) For each year thereafter, the Annual Clawback CVI Carryforward Amount shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance. The Annual Clawback CVI Carryforward Amount during this period shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $175 million and (z) aggregate CVI payments made to the Subject to Waterfall Clawback CVI (if any) and the Not Subject to Waterfall Clawback CVI (if any) in the prior fiscal year<br>▪ <u>Years 23-30</u>: Maximum annual payment of $375 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $750 million) for the Clawback CVI, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during this period is calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance (see below) and $375 million and (ii) $750 million.<br>    ○ The Annual Clawback CVI Carryforward Amount during this period shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $375 million and (z) aggregate CVI payments made (if any) to the Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI in the prior fiscal year<br>    ○ Such Annual Clawback CVI Carryforward Amount will be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance<br>▪ To the extent that GO CVI Lifetime Cap is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, the $375 million annual payment cap – and annual payment cap up to $750 million to the extent sufficient Clawback CVI Carryforward Balance is available – for the |

| TERM | DESCRIPTION |
|---|---|
| | Clawback CVI, including CVI payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI, would begin in the following year<br>▪ To the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the 30-year term, the Commonwealth will not owe any further amount to Clawback CVI<br>▪ For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted |
| **Clawback CVI Call Structure** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVI |
| **Clawback CVI Allocation** | ▪ See Annex 4 |

## ANNEX 3: GO CVI ALLOCATION SUMMARY

| Claim | GO CVI Allocation % |
|---|---:|
| Vintage CW Bond Claim | 32.244% |
| 2011 CW Series D/E/PIB Bond Claim | 3.514% |
| 2011 CW Bond Claim | 2.479% |
| 2012 CW Bond Claim[3] | 15.157% |
| 2014 CW Bond Claim[4] | 20.266% |
| Vintage CW Guarantee Claim | 15.194% |
| 2011 CW Guarantee Bond Claim | 7.552% |
| 2012 CW Guarantee Bond Claim | 3.594% |

---

[3] 2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA Helicopter Loan.
[4] 2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports bonds.

## ANNEX 4: CLAWBACK CVI ALLOCATION SUMMARY

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[5] | 68.6% |
| Allowed CW/Convention Claims | 4.0% |
| Allowed CW/PRIFA Rum Tax Claims | 27.0% |
| Allowed CW/MBA Claims | 0.4% |

---

[5] See Annex 6 for details of priority distribution waterfall of CVI payments from Clawback CVI allocation to Allowed CW/HTA Claims.

**ANNEX 5: 5.5% SUT BASELINE**[6]

*($ USD)*

| 5.5% SUT Baseline | | | |
|---|---|---|---|
| Fiscal Year | Amount | Fiscal Year | Amount |
| 2022 | $1,282,901,069.30 | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | 2039 | 1,495,355,971.13 |
| 2025 | 1,315,295,083.41 | 2040 | 1,518,089,898.19 |
| 2026 | 1,345,037,783.09 | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | 2050[4] | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | 2051[4] | 1,810,682,942.40 |

[6] May 2020 Fiscal Plan contains projections through FY2049. FY2050 and FY2051 baseline calculated using FY2049 projections and the average growth rate from FY2045-FY2049.

**ANNEX 6: PRIORITY DISTRIBUTION WATERFALL FROM CLAWBACK CVI ALLOCATION TO ALLOWED CW/HTA CLAIMS**

| TERM | DESCRIPTION |
|---|---|
| **HTA Clawback CVI Priority Distribution Waterfall[7]** | ▪ <u>First</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, Clawback CVI payments, if any, to the HTA 68 Bond Claims up to $179,462,539<br>▪ <u>Second</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to HTA 98 Senior Bond Claims up to $1,833,405,578<br>▪ <u>Third</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to HTA 98 Sub Bond Claims up to $207,294,178<br>▪ <u>Fourth</u>, after paying the permitted amounts above in full, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to the GDB HTA Loans up to $1,477,506,700<br>▪ Waterfall implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination |

---

[7] Capitalized terms used but not otherwise defined within Annex 6 shall have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement.

# **EXHIBIT K**

SCHEDULE OF PREEMPTED STATUTES

## List of Main Statutes Preempted by PROMESA[8]

I.   **Commonwealth good faith and credit pledge statutes**
   A.  General Obligation Bonds
      1.  Act 33 approved December 7, 1942.
      2.  Act 2 approved October 10, 1985.
      3.  Act 1 approved June 26, 1987, as amended.
      4.  Act 47 approved June 30, 2013.
      5.  Act 242 approved December 13, 2011.
      6.  Act 45 approved June 30, 2013.
      7.  Act 34 approved March 4, 2014.
      8.  Act 79 approved June 1, 2011.
      9.  Act 243 approved August 9, 2008.
      10. Act 74 approved July 23, 2007, as amended.
      11. Act 43 approved August 1, 2005, as amended.
      12. Act 216 approved August 19, 2004.
      13. Act 100 approved July 12, 2002, as amended.
      14. Act 161 approved July 5, 2003.
      15. Act 149 approved August 9, 2002, as amended.
      16. Joint Resolution No. 57 approved July 12, 1993.
      17. Act 54 approved July 6, 2001.
      18. Act 118 approved July 13, 2000.
      19. Act 153 approved July 16, 1999.
      20. Act 219 approved August 9, 1998.
      21. Act 81 approved August 14, 1997.
      22. Act 119 approved August 9, 1995.
      23. Act 46 approved July 28, 1994.
      24. Act 39 approved May 13, 1976, as amended
      25. Act 83 approved August 30, 1991.

   B.  General Obligation Loans
      1.  GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
      2.  GDB Loans to the Commonwealth
         1.  Act 33 approved December 7, 1942.
         2.  Act 47 approved June 30, 2013.
         3.  Act 242 approved December 13, 2011.
         4.  Act 45 approved June 30, 2013. [$245 million loan for the Fiscal Reconstruction Fund.]
         5.  Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
         6.  Joint Resolution No. 96 approved November 27, 2013. [$30 million line of credit].

---

[8] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.

   C.  Commonwealth Guaranty – Public Buildings Authority Bonds
      1.  Act 17 approved April 11, 1968, as amended.

   D.  Commonwealth Guaranty – APLA
      1.  Act 409 approved September 22, 2004.

   E.  Commonwealth Guaranty – PRIFA-BANs
      1.  Act 1 approved January 1, 2015.

   F.  [Commonwealth Guaranty – PRASA
      1.  Act 45 approved July 28, 1994.]

## II.   Statutes appropriating Commonwealth revenues

   A.  HTA
      1.  Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021 [motor vehicle license fees]
      2.  13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
      3.  13 L.P.R.A. § 31751(a)(3). [cigarette tax]
   B.  PRIFA
      1.  Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum cover over]
   C.  PRIFA BANs
      1.  Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum products]
   D.  MBA
      1.  13 L.P.R.A. § 31751(a)(4). [cigarette tax]
   E.  PRITA
      1.  13 L.P.R.A. § 31751(a)(5). [cigarette tax]

   F.  CCDA
      1.  13 L.P.R.A. § 2271v(a). [hotel room tax]
   G.  Act 147 enacted June 18, 1980, as amended
      1.23 L.P.R.A. § 104.[9] [judiciary appropriation]
   H.  UPR
      1.18 L.P.R.A. § 621-1.[10]
   I.  Act 83 approved August 30, 1991, as amended
      1.21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[11]
   J.  Act 221 approved May 15, 1948, as amended

---

[9] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.

[10] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not preempted.

[11] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted. In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.

K-3

     1.15 L.P.R.A. § 74(d).[12]

  K. Act 18 approved January 24, 2014, as amended
     1.21 L.P.R.A. § 6742.[13]

  L. Act 214 approved August 18, 2004, as amended
     1.23 L.P.R.A. § 695

  M. Act 41 approved July 22, 2011, as amended
     1.12 L.P.R.A. §8105

  N. Act 1 approved January 31, 2011, as amended
     1.13 L.P.R.A. § 33231(l)

## III. TRS and JRS Statutes

  A. Act 106 approved August 23, 2017
  B. Act 160 approved December 24, 2013
  C. Act 91 of March 24, 2004
  D. Act 12 approved October 19, 1954
  E. Act 162 approved December 24, 2013

---

[12] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.

[13] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.

## EXHIBIT L

BOND RECOVERY CATEGORIES

| Bond Recovery Category | Classes Included |
| --- | --- |
| Vintage PBA Bond Claims | 1, 2, 3, 4, 5, 6 and 7 |
| 2011 PBA Bond Claims | 8 and 9 |
| 2012 PBA Bond Claims | 10 and 11 |
| Vintage CW Bond Claims | 15, 16, 17, 18, 19, 20, 21, and 22 |
| 2011 CW Series D/E/PIB Bond Claims | 36, 37, 38, and 39 |
| 2011 CW Bond Claims | 30, 31, 32, and 33 |
| 2012 CW Bond Claims | 40, 41, 42, and 43 |
| 2014 CW Bond Claims | 46, 47, 48, 49 and 50 |
| Vintage CW Guarantee Bond Claims | 23, 24, 25, 26, 27, 28, and 29 |
| 2011 CW Guarantee Bond Claims | 34 and 35 |
| 2012 CW Guarantee Bond Claims | 44 and 45 |