**Hearing Date for motion: August 4, 2021, at 9:30 a.m. (AST)**
**(Per #17199, Oral Argument will be August 18, 2021)**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

--------------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

        Debtors.

--------------------------------------------------------------------x

    PROMESA
    Title III

    No. 17 BK 3283-LTS
    (Jointly Administered)


**[Reply to Docket#17420, relating to motion at Docket#17221]**

**REPLY IN FURTHER SUPPORT OF MOTION OF INDIVIDUAL BONDHOLDER FOR
AN ORDER DIRECTING THE APPOINTMENT OF A COMMITTEE TO REPRESENT
RETAIL INVESTORS IN THE EIGHT RETAIL INVESTOR CLASSES IN
CONNECTION WITH THE PROPOSED PLAN AND IN PROCEEDINGS RELATED
TO CONFIRMATION**


Dated: July 27, 2021

## TABLE OF CONTENTS

**Page**

REPLY IN FURTHER SUPPORT OF MOTION ........................................................................1

    A.    FOMB's argument that ad hoc groups provide "zealous representation" of
the interests of all GO and PBA bondholders, including Retail Investors,
ignores that adjudication of merits issues has been stayed in favor of a
confidential negotiation-mediation process. ...........................................................1

    B.    FOMB identifies no other impaired classes comprised of substantial
numbers of unrepresented and unorganized individuals, and fails to show
how the appointment of a committee to represent Retail Investors would
open the door to an unworkable proliferation of committees. .................................6

    C.    Other individual creditors — in particular public employees and retirees
— are represented by committees or other organizations whose fees are
paid by Debtors to ensure their interests are protected. ..........................................8

    D.    FOMB's complaint about the "juncture" at which the current motion was
made ignores my repeated reiteration of the need for a committee to
represent individual bondholders since my April 2019 motion was denied. ...........9

    E.    FOMB ignores how appointment of a Retail Investor committee benefits
the Court, which otherwise must proceed mindful of the fact that there are
eight classes comprised of thousands of unrepresented individual
bondholders. ............................................................................................................9

    F.    Even if the additional disclosures this Court ordered FOMB to make are
made in full, the complexity of the proposed Plan and Disclosure
Statement will remain well beyond the capabilities of the typical Retail
Investor to evaluate. ..............................................................................................11

        1.    Quantifying and assessing the potential benefits of the Retail
Support Fee. ...............................................................................................11

        2.    Voting procedures and restrictions on transfer. .........................................14

        3.    Guidance concerning the consequences of objecting (or not) or
voting (yes or no, or not voting) .................................................................14

    G.    FOMB does not provide legal support for its position that unofficial, ad
hoc bondholder committees, which owe no fiduciary duty to individual
bondholders, satisfy the "adequate representation" standard of 11 U.S.C.
§1102(a)(2). ..........................................................................................................15

CONCLUSION..................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Beker* (*see In re Beker Indus. Corp.*)

*Dana* (*see In re Dana Corp.*)

*Garden Ridge* (*see In re Garden Ridge Corp.*)

*Hills Stores* (*see In re Hills Stores*)

*In re Beker Indus. Corp.*,
    55 B.R. 945 (Bankr. S.D.N.Y. 1985) ...................................................................................2

*In re Dana Corp.*,
    344 B.R. 35 (Bankr. S.D.N.Y. 2006) .................................................................................15

*In re Garden Ridge Corp.*,
    2005 WL 523129 (Bankr. D. Del. Mar. 2, 2005).................................................................15

*In re Hills Stores*,
    137 B.R. 4 (Bankr. S.D.N.Y. 1992).....................................................................................15

*In re Pub. Serv. Co. of New Hampshire*,
    89 B.R. 1014 (Bankr. D.N.H. 1988) ..................................................................................15

*In re Residential Cap., LLC*,
    480 B.R. 550 (Bankr. S.D.N.Y. 2012) ...........................................................................2, 15

*In re Sharon Steel Corp.*,
    100 B.R. 767 (Bankr. W.D. Pa. 1989) ...........................................................................2, 15

*In re Wang Lab'ys, Inc.*,
    149 B.R. 1 (Bankr. D. Mass. 1992) ...................................................................................15

*Public Service.* (*see In re Pub. Serv. Co. of New Hampshire*)

*Residential Capital* (*see In re Residential Cap., LLC*)

*Sharon Steel* (*see In re Sharon Steel Corp.*)

*Slattery Co.* v. *United States*,
    231 F.2d 37 (5th Cir. 1956) ..................................................................................................9

*United States* v. *Contra Costa County Water District*,
    678 F.2d 90 (9th Cir. 1982) ..................................................................................................9

*Wang (see In re Wang Lab'ys, Inc.)*

**Statutes**

11 U.S.C. §1102(a) ..................................................................................................15

11 U.S.C. §1102(a)(2) .............................................................................................15

48 U.S.C. §2141(b)(1)(C) ........................................................................................10

48 U.S.C §2141(b)(1)(N) .........................................................................................10

48 U.S.C. §2151(b)(3) ..............................................................................................10

**Rules**

F.R. Evid. 408 ...........................................................................................................9

**Legislative Reports**

H.R. Rep. 114-602, 114th Cong., 2d Session (June 3, 2016) ................................11

## TABLE OF ABBREVIATIONS AND CITATIONS

| # | Docket entries are referred to in the form of "#__" |

## REPLY IN FURTHER SUPPORT OF MOTION

Peter C. Hein submits this reply in further support of his motion for an order directing the appointment of a committee to represent Retail Investors (Docket #17221).

**A.**     **FOMB's argument that ad hoc groups provide "zealous representation" of the interests of all GO and PBA bondholders, including Retail Investors, ignores that adjudication of merits issues has been stayed in favor of a confidential negotiation-mediation process.**

FOMB argues that "adequate representation of the interests of holders of GO Bonds and PBA Bonds is provided through the zealous representation of such holders by ad hoc groups formed over the past several years" (#17420-page-6,7-to-9,15-to-16-of-27); and that smaller bondholders are "equally benefitted" by ad hoc groups' "vigorous pursuit of their interests" (#17420-page-16-of-27).  FOMB also notes that a premise of the Court's April 24, 2019 ruling was that other bondholders with sophisticated counsel and professionals were "aligned with the interests" of individual GO holders (#17420-page-10-of-27).

As discussed in Section G, *none* of FOMB's cited cases are even claimed to hold that "adequate representation" can be satisfied by the existence of *un*official ad hoc committees which movant was not a member of and which owed no fiduciary duty to movant.  But even if one puts aside that overarching flaw in FOMB's position, adequacy of representation cannot be shown.

Were this case proceeding with litigation-to-decision of the priority and secured status of GO and PBA bondholders, perhaps one could argue that interests of Retail Investors are "aligned" with some — but, as discussed below, clearly not all — of the ad hoc groups regarding how the priority and secured status issues are decided.  If the case were in that posture, one could understand a desire to avoid attorneys for a Retail Investor committee duplicating work of some of the ad hoc groups in briefing and arguing the priority and secured status issues.

But the priority and secured status of GO and PBA bondholders are *not* being litigated to decision.  The Court chose a different course (over my objection, *e.g.*, #9508-page-14-to-23-of-24 and prior papers and argument cited; #9683-page-2-of-3; #11284-page-3,6-to-10-of-12):  The

Court stayed litigation of the priority and secured status issues in favor of a confidential
negotiation-mediation process.  As a result, the Plan reflects ***not*** adjudications on a public record
of the relative rights of GO and PBA bondholders and other creditors, but instead the Plan
incorporates the results of a completely opaque closed-door process where deals were cut outside
the view of Retail Investors who FOMB admits did not participate in structuring the Plan
(#17420-page-19-of-27) .  There was no "zealous" (#17420-page-6-of-27) — or even adequate-
—representation of Retail Investors in that confidential negotiation-mediation process.

Members of an official committee — whatever their individual interests — owe a
fiduciary duty to *all* creditors represented by the committee.  *E.g.*, *In re Beker*, 55 B.R. 945, 949
(Bankr. S.D.N.Y. 1985); *Sharon Steel*, 100 B.R. 767, 779 (Bankr. W.D. Pa. 1989); *Residential
Capital*, 480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012).  That is why one can have creditors with
differing interests on an official committee.

FOMB does ***not*** claim that the ad hoc groups of hedge funds and other institutions, who
negotiated the bondholder treatment under the Plan, were acting as fiduciaries of all GO and
PBA bondholders, including Retail Investors.  Nor could FOMB claim that:

- What fiduciaries would bargain for hundreds of millions of dollars of fees for
  themselves, but only a much lower — about 75% lower (as discussed, below) —
  potential fee for its represented party (to be paid only if the represented party
  accepted such a deal)?  Here, the hedge funds and other institutions who negotiated
  bondholder treatment under the Plan end up with hundreds of millions of dollars in
  fees and other special benefits that Retail Investors do not receive — including
  Consummation Costs of 1.5% of par paid pro rata in proportion to holdings as of
  February 22, 2021, GO/PBA Restriction Fees (1.321% of par) and a potential $100
  million termination fee.  *See, e.g.*, #17308-page-49,395-to-396-of-615; #17308-1-
  page-64-to-65,92-to-96-of-274 §§1.293, 1.294, 1.297, 3.1-to-3.3, 3.5, 3.10; #17308-2-
  page-19-of-134 §2.3.

- What fiduciary would structure a deal with a proliferation of splitter bonds, such that a Retail Investor who holds a single 100,000 par position ends up with 13 non-marketable splinters?  (#16908-page-26-to-27,30-of-178; #16977-page-7-to-9-of-20).

FOMB does not identify anyone who owed a fiduciary duty to members of the Retail Investor classes who participated in the negotiation of the Plan.  *Cf.* #17221-page-16-of-34.  To the contrary, FOMB acknowledges that there was ***no*** participation of Retail Investors in negotiating the Plan, seeking to twist this fact into a justification for the disparate treatment of Retail Investors.  *See* #17420-page-19-of-27.  As I have noted in prior papers, individuals have been excluded from meaningful and effective participation in the confidential negotiation-mediation process.  *E.g.*, #9508-page-21-to-22-of-24; #11284-page-3,7-to-9,10-of-12.

Furthermore, FOMB points to nothing where these ad hoc groups themselves claim to represent the interests of Retail Investors — it is FOMB that makes that claim, not the ad hoc groups.  Indeed, LCDC and other ad hoc group have expressly ***disclaimed*** any fiduciary or other duties to other bondholders, and have *disclaimed* representing other bond holders.  *E.g.*, LCDC (#17382-page-5-of-7); QTCB (#17296-page-3-of-11); Ad Hoc GO (#17397-page-4-to-5-of-11).

One can assume, for purposes of this motion, that the conduct of the ad hoc groups was lawful conduct in their own self-interest.  Nevertheless, the conduct of the ad hoc groups contradicts FOMB's argument that these groups are providing "zealous representation" (#17420-page-6-of-27), or even "adequate representation" (#17420-page-6-of-27), of Retail Investors.

Let's start with the Lawful Constitutional Debt Coalition ("LCDC"), which FOMB discusses in its papers (#17420-page-9-of-27).  On January 8, 2020, LCDC filed a claims objection to the GO bonds held by thousands of Retail Investors, including me.  *See* #9730, #10417-1.  According to LCDC, certain of my GO bonds "were issued in violation of the debt service limit contained in article VI, section 2 of the Puerto Rico Constitution" (#10417-1-page-3-of-9).  Am I nevertheless to believe that, in the confidential negotiation-mediation process, LCDC was behind-the-scenes a "zealous" (or even "adequate") representative of the interests of Retail Investors whose bonds they challenged?  The fact that LCDC members actually bought

3

bonds of the very series they attacked likewise hardly gives one confidence that LCDC was, behind closed-doors in the negotiations, the "zealous" representative of the interests of Retail Investors. *Compare, e.g.,* #9730-page-7-of-25 *with* #13554-pages-8-to-9-of-42.

In addition, while LCDC members held a total of about $1.904 billion of GO and PBA bonds as of 2/22/2021, after the February 22, 2021 date on which entitlement to Consummation Costs turns (#17308-page-49-of-615), it appears LCDC members sold $706 million (over 37% of their 2/22/2021 holdings), because the 7/15/2021 filing FOMB cites shows holdings of GO and PBA bonds of only $1.197 billion (*see* Ex. D hereto).

QTCB members sold over $415 million (or 21% of holdings) after 2/22/2021, Ad Hoc GO members sold over $718 million (or 84% of holdings) after 2/22/2021,and Ad Hoc Constitutional sold over $606 million (or 20% of holdings) after 2/22/2021. *See* Ex. D hereto.

Put aside the fact these ad hoc groups are to receive Consummation Costs on bonds sold before consummation, and Restriction Fees despite being able to sell (collectively) over $2.447 billion of GO and PBA bonds since 2/22/2021 — facts which underscore that "Consummation Costs" and "Restriction Fees" are just labels attached to pro rata additional distributions to be made with respect to bonds of certain parties, independent of the amount of costs (if any) they incurred and independent of whether a party continues to hold its 2/22/2021 positions. For current purposes, how can a party's negotiation of fees for itself, followed by a disposition of a significant portion of its holdings, be consistent with "adequate representation" of the interests of Retail Investors who do not get equal treatment and, specifically, do not also receive pro rata Consummation Costs and Restriction Fees amounting to 2.821% of par?

Notably, LCDC, along with QTCB, played a lead role in the confidential negotiation-mediation process and reached the initial agreement with FOMB on a plan of adjustment, announced on September 27, 2019. *See* 9-27-2019 FOMB media release (annexed as Ex. A).

Since FOMB struck its initial deal with these two hedge fund groups in September 2019, FOMB — using the confidential negotiation-mediation process — has leveraged that initial deal to procure the agreement of other institutional bondholders and bond insurers — none claiming

to represent Retail Investors, but rather each acting in its own interests and benefitting in its own ways, as deals are cut, by receiving consideration and benefits that Retail Investors do not receive.  Among the benefits these institutions negotiated — for themselves — are significant cash payments allocated in proportion to their bond holdings that Retail Investors do not share, such as the 1.5% of par Consummation Costs and the now 1.321% of par GO/PBA Restriction Fee.  *See, e.g.*, #17308-page-49,395-to-396-of-615; #17308-2-page-19-of-134 §2.3; #17310-page-4-of-8; #17310-1-page-60,94-to-96,98-of-280 and §§1.259, 3.1 to 3.3, 3.5, 3.10.  The total, 2.831% of par — all allocated pro rata based on par holdings, not based on whether one incurred any costs or did any "work" negotiating a Plan — is significant, and particularly so for hedge funds who acquired bonds post-PROMESA at distressed prices.  Any institutional investor who entered into a PSA with FOMB, even as late as February 2021, is treated as an "Initial GO/PBA PSA Creditor" (#17306-page-63-of-273 §1.293).

Compounding the disadvantageous treatment of the eight Retail Investor classes, in the iteration of the Plan rolled out the night before this Court's July 13, 2021 Disclosure Statement hearing, the institutions negotiating bondholder treatment chose to increase the fees going to non-Retail Investors in exchange for giving up the Debt Service Reserve Fund that would have protected all bondholders, including Retail Investors.  At 10 pm on July 12, 2021, FOMB filed a Notice of Filing that stated "The Fifth Amended Plan eliminates the Debt Services Reserve Fund and the corresponding Debt Service Reserve Fund Requirement, previously proposed for the benefit of holders of New GO Bonds."  (#17310-page-6-of-8).  Two weeks earlier, the Fourth Amended Plan had provided for a Debt Service Reserve Fund in the amount of $211,940,194.30 (#17194-page-48,127-to-128-of-244 §§1.186, 1.187, 70.1(h)).

A Debt Service Reserve Fund would seem obviously prudent, particularly when dealing with an issuer that has not paid one penny of principal or interest on its Constitutional "first claim" GO debt since filing this case in May 2017.  The recent adoption by the Puerto Rico legislature and signing into law of Act 7 — which proposes to increase pension commitments to public employees by $17 billion, even while seeking to pay even less on Puerto Rico's

Constitutional "first claim" debt than the partial recoveries FOMB proposes in the Plan (#17211-page-10,22-of-33) — further underscores Puerto Rico's unwillingness to pay and the need for a Debt Service Reserve Fund.  But, we were told at the July 13, 2021 hearing, the institutions who negotiated the PSA agreed to give up the Debt Service Reserve Fund so that the GO/PBA Restriction Fee  could be increased, now 1.321% of par (on top of the 1.5% of par Consummation Costs already committed to Initial GO/PBA PSA Creditors).

Despite Plan negotiators giving up the Debt Service Reserve Fund, the maximum of $50 million for the coercive, contingent and not predictable Retail Support Fee stays the same (#17310-1-page-80-of-280 §1.418).  So non-retail investors receive added upfront fees, while the basic common sense protection for Retail Investors of a debt service reserve fund is given up.  Again, not "zealous" (or even "adequate") representation of Retail Investors.

### B.   FOMB identifies no other impaired classes comprised of substantial numbers of unrepresented and unorganized individuals, and fails to show how the appointment of a committee to represent Retail Investors would open the door to an unworkable proliferation of committees.

FOMB, citing the Court's April 24, 2019 bench ruling, argues appointment of a committee to represent members of the eight impaired Retail Investor classes would open the door to the appointment of committees to represent the interests of "subgroups" of practically every type of debt issued by Debtors and be "unworkable" (#17420-page-5-to-6-of-27).  However, whether that was the case in 2019 (I do not believe it was), it is not the case today.

One cannot now dismiss Retail Investors as a "subgroup".  Under the Plan, Retail Investors comprise eight classes.  *See* #17221-page-14-of-34; 17420-page-12&n.5-of-27.  FOMB's opposition (Docket#17420) does not dispute that Commonwealth sold its bonds to individual investors nationwide, including in the 50 states, years before PROMESA was even in prospect, and that there are thousands of unrepresented individual Retail Investors in these eight classes.  *See* #17221-page-13-of-34 (and cited papers).

Furthermore, appointing a committee for these eight classes does ***not*** open the door to a proliferation of committees.  FOMB does not point to ***any*** other proposed classes that (i) are

comprised of individuals, (ii) impaired, and (iii) do not already have a committee or other arrangements in place to represent them.  There is a committee for retired employees; two unions are represented on the UCC; and two other unions have agreed to their own PSAs (providing, *inter alia*, for debtors to pay their legal expense).  *See* #17221-page-14-to-15-of-34; #17306-page-92-of-273 §3.4.  Indeed, the Retired Employees committee and one of those unions (AFSCME) entered into the earliest PSAs.  #11947-3 (Retiree Committee – 6/7/2019); #11947-4 (AFSCME – 6/7/1019).  Likewise, individual unsecured claimants are represented by the UCC (#17221-pages-14-to-15-of-34).

FOMB points to the Court's prior denials of requests for additional committees (#17420-page-16,22-of-27), but in no case did the Court leave classes of unrepresented and unorganized individuals to their own devices:  **[1]** This Court denied a request to appoint an additional committee of government employees and active pension plan participants.  But, as this Court noted, two existing statutory committees already existed to protect their interests:  the Retirees' Committee and the UCC (#1013-page-2-to-3-of-3); **[2]** A motion pertaining to the representation of PREPA retirees was opposed on the grounds a majority of PREPA's retirees wished to be represented by the Board of Trustees of PRS, and was denied without prejudice, to see how things ripen and what issues are raised (#3270; #3278-page-76-to-78,82-of-174); **[3]** A committee for Puerto Rico municipalities was denied because the concerns prompting the motion were "not concerns that arise from creditor status" (#1014-page-2-of-4); **[4]** A motion early in the case to either change membership of the UCC or direct the appointment of an official committee of constitutional debtholders was denied because the moving GO bondholders claimed the protection of a statutory lien (and thus asserted they were not unsecured) and already had retained sophisticated counsel — very different from the current situation where individual Retail Investors are placed in eight separate classes and have no committee or "retained sophisticated counsel" (#1010-page-2-to-3-of-4).

**C.**   **Other individual creditors — in particular public employees and retirees — are represented by committees or other organizations whose fees are paid by Debtors to ensure their interests are protected.**

The eight retail classes are the only impaired classes of individuals without a committee or other organization (such as a union) representing them and, indeed, the only significant group of creditors who do not have counsel whose costs are being directly or indirectly paid by Debtors (such as through provision for administrative expense claims or cash payments on the Effective Date agreed through PSAs, *e.g.*, #17306-page-91-to-95-of-273; #17308-page-49,394-to-398-of-615; #17308-2-page-43-to-45-of-134 (§6.1(a),(b))). *See* #17221-page-14-to-16-of-34.

It is no answer to say that typically everyone is expected to pay their own expenses in litigation.  That has not been, and certainly is not now, the case in these proceedings.  Individual retired public employees have not been expected to pay their own expenses, but rather are represented by the Retiree committee.  Individual public employees are represented by unions, whose professional fees are being reimbursed by Debtors.  Individual unsecured creditors have been represented through the UCC, whose members include two unions representing public employees.  Even major hedge funds and other institutional bondholders are receiving hundreds of millions of dollars of fees that more than compensate for any expenses (albeit the fees are not dependent upon whether any expenses are incurred).  *See* #17221-page-14-to-16-of-34.

The notion that unorganized individual bondholders should be left to their own devices places individual bondholders in a uniquely disadvantaged position in these cases.  As a result, Retail Investors are slated to receive less than other bondholders who hold the same series of bonds (but are paid significant fees pro rata as a percentage of holdings), and markedly less as a percentage of their claims than public employees and retirees who lack the Constitutional priority and statutory security of the GO and GO guaranteed bonds — a priority and secured status that has never been successfully challenged.  *See, e.g.*, #17308-page-34-to-38,49,54-to-62-of-615; #16908-page-12-to-20-of-178; #17221-page-27-of-34.

**D.      FOMB's complaint about the "juncture" at which the current motion was made ignores my repeated reiteration of the need for a committee to represent individual bondholders since my April 2019 motion was denied.**

FOMB complains about the "juncture" at which this motion was made.  However, even after my April 2019 motion to appoint a committee was denied (#6128, #6487, #6534), I repeatedly reiterated the need to appoint such a committee and to level the playing field.  *E.g.*, #7540-page-6,9-to-11-of-19; #9508-page-13-of-24; #10029-page-8-of-9; #11150-page-3-to-4-of-4; #16387-page-17-of-21; *see also* #8308-page-13-of-17; #7961-page-17-of-19.

**E.      FOMB ignores how appointment of a Retail Investor committee benefits the Court, which otherwise must proceed mindful of the fact that there are eight classes comprised of thousands of unrepresented individual bondholders.**

My motion noted that, from the Court's point of view, the spectre of leaving thousands of individual bondholders unrepresented, in the face of obvious issues about whether they are being fairly treated in comparison to others who have a committee or professionals directly or indirectly being paid for by Debtors, could be at least partially addressed if there was a committee with its own professionals who had fiduciary duties to act in the interests of members of the eight Retail Investor classes.  #17221-page-29-of-34.  FOMB offers no direct response.

The negotiation-mediation process has been confidential — at this Court's direction. *E.g.*, #1841.  In addition, under applicable law, what settling bondholders agreed to is not admissible on the questions of the validity, "first claim" priority and secured status of the bonds or on whether bond claims should be valued at less than full value, including all accrued interest to date.  *See*, *e.g.*, F.R. Evid. 408; *U.S.* v. *Contra Costa*, 678 F.2d 90, 92 (9th Cir. 1982) (citing 408); *Slattery* v. *U.S.*, 231 F.2d 37, 41 (5th Cir. 1956) ("prices paid in settlement … inadmissible").  Thus, there is not and can never be a showing that the deals cut were the product of some judicious weighing of the strength of legal positions, as distinct from other factors, ranging from short-term maneuvering for profit by funds who bought GO and PBA bonds post-PROMESA at distressed price levels to local Puerto Rico political considerations favoring Puerto Rico public employees and retirees.  How else does one explain:

- Public employees (even if not owed money) receive $1000 or even $3000 cash payments, plus the prospect of sharing multi-billion dollar "upside performance bonuses" (*e.g.*, #16908-page-15-to-18,20-of-178; #17308-page-56-to-62-of-615).

- Retirees (unsecured creditors in the absence of funded plans) are paid every penny of their pensions during the 4+ years from May 2017 through June 2021 (during which bondholders are paid absolutely nothing) and then have either no reduction in benefits (for most), or at most reductions of perhaps 0.5% to 8.5%, with the likelihood that those reductions will by one means or another disappear.  #16908-page-18-to-20-of-178; #17308-page-37-to-38,54-to-62-of-615.

This reversal of the priorities established by Puerto Rico's Constitution and statutes  has occurred even though Commonwealth now has more indisputably unrestricted cash on hand than would be required to pay all past due principal and interest on Commonwealth's GO and GO guaranteed bonds.  This significant fact is nowhere disclosed in the narrative text of the Disclosure Statement (as of this writing, #17308).  But it is the case:  The June 30, 2018 year end audited financials released on July 1, 2021 show the "past due balance of principal and interest" "as of May 31, 2021" as $5.536 billion for Commonwealth GO and $1.256 billion for PBA, for a total of $6.792 billion (#17308-13-page-107-of-471).  Yet on 7-9-2021 Commonwealth had $11.744 billion unrestricted cash on hand — despite paying out billions of pay-go pension benefits over four years since May 2017 (excerpts from TSA filing annexed as Ex. B).

This reversal of priorities established by Puerto Rico's Constitution and statutes flies in the face of PROMESA.  While under 48 U.S.C. §2141(b)(1)(C) the Fiscal Plan shall "provide adequate funding for public pension systems," §2151(b)(3) provides the analysis of pensions "shall" include "a review of the existing benefits and their sustainability."  And under §2141(b)(1)(N) the Fiscal Plan "shall" "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016".  As explained in the House Report on PROMESA (page 45):

The Committee acknowledges the concern as to the ambiguity of the language regarding the funding of public pension systems.  To clarify, Section 201(b)(1)(C) tasks the Oversight Board with ensuring fiscal plans "provide adequate funding for public pension systems."  ***This language should not be interpreted to reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders as established under the territory's constitution, laws, or other agreements.***  While this language seeks to provide an adequate level of funding for pension systems, it does not allow for pensions to be unduly favored over other indebtedness in a restructuring (excerpts annexed as Ex. C, emphasis added).

As evidenced by statements on July 13, 2021 by Mr. Antonio Martin Cervera, the 82 year old architect, public employees are not the only retirees in this case:  Individual bondholders — throughout the entire country — may also be retired and may have been counting upon investments in Puerto Rico bonds for a portion of their retirement income.  The rule of law requires priorities and liens under Puerto Rico's Constitution and statutes be respected.

Without a Retail Investor committee to evaluate what has been negotiated in a confidential process by others who owe no duty to Retail Investors — indeed, who expressly disclaim any duty to others — individual investors are left to conclude the worst.

**F.      Even if the additional disclosures this Court ordered FOMB to make are made in full, the complexity of the proposed Plan and Disclosure Statement will remain well beyond the capabilities of the typical Retail Investor to evaluate.**

I appreciate that the Court did order certain additional disclosures (#17387-page-3-to-5-of-7), albeit not all of those I urged.  But complexities beyond the capability of the typical Retail Investor remain that support the need for a Retail Investor committee to provide information and guidance to Retail Investors.  Furthermore, disclosures do not solve the problem of Retail Investors being disadvantaged by economic terms imposed through a confidential negotiation-mediation process in which they were not represented.  Examples follow:

**1.      Quantifying and assessing the potential benefits of the Retail Support Fee.**

Retail Investors need to evaluate the potential benefits of the Retail Support Fee, and weigh the tactical dilemma posed by the fact that whether the Retail Support Fee is received

depends upon the vote of each Retail class.  This requires information that is either not supplied in the Disclosure Statement or that requires analysis and calculations beyond the capabilities of the typical Retail Investor.  A Retail Investor committee is necessary in order to obtain all of the necessary information, potentially negotiate modifications of the treatment of Retail classes, and present a distillation of the pertinent information that is comprehensible to Retail Investors.

Since the Retail Support Fee is capped at $50 million (#17306-page-94-of-273 §3.6), and any re-allocation of amounts forfeited because a majority in a Retail class votes 'no' is to be split in proportion to holdings between Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors whose classes voted to accept the Plan (#17306-page-94-of-273), the first step for a Retail Investor, who seeks to quantify and assess the potential benefits of the Retail Support Fee, is to figure out what portion of bond claims are those of Retail Investors and what portion are held by Initial GO/PBA PSA Restriction Fee Creditors

The total amount of GO and PBA bond claims is not stated, as a total, in the Disclosure Statement (as of this writing, #17308).  After laboriously adding the bondholder claim amounts in the dozens of bondholder classes listed at #17308-page-399-to-435-of-615, I get a total of $22.352 billion in GO and GO guaranteed bond claims.  After subtracting the approximately $0.499 billion in non-GO/PBA CW guarantee claims, I arrive at about $21.853 billion of GO and PBA bond claims over all.

The amount of bond claims held by Initial GO/PBA PSA Restriction Fee Creditors is also not stated in the Disclosure Statement.  It depends in part on the amount held by Initial GO/PBA PSA Creditors, however that number, too, is not in the Disclosure Statement.  That number is known – FOMB posted a document in the data room with that number – but FOMB has improperly claimed confidential treatment for this document.  Because this number is not set out in the Disclosure Statement, the typical Retail Investor will not be able to ascertain this number on their own.  *See* Doc ID 230822, at p.2 DS-065361, right column, 3d bullet, on chart provided to UCC, in confidential data room category "Information disclosed to official committee".

The amount held by Initial GO/PBA PSA Restriction Fee Creditors also depends in part on the amount held by Initial GO/PBA PSA Joinder Creditors (#17306-page-63-of-273 §1.294) but the later term does not appear to be defined in the latest version of the Plan (#17306).

To illustrate why this analysis is important to a Retail Investor, assume hypothetically Initial GO/PBA PSA Creditors hold 50% of claims in the GO and GO guaranteed bondholder classes, or $11.176 billion.  That would suggest a high likelihood that Retail Investors hold much more than $3.785 billion of claims – the maximum that Retail Investors collectively could own and still get the maximum possible Retail Support Fee of 1.321% (assuming all Retail classes were to vote to accept).  If, again hypothetically, Retail Investors account for $6.705 billion (or 30%) of GO and GO guaranteed bond claims, the maximum Retail Support Fee percentage, if all Retail classes vote to accept, would be 56.45% of 1.321% or 0.746% of par.  [$3.785 billion/$6.705 billion = 56.45%].  In this circumstance, an Initial GO/PBA PSA Creditor would receive total fees of 2.821% of par [1.5% + 1.321%], whereas – if all Retail classes accept the Plan – Retail Investors would only get about one-quarter as much (and be subject to the splinter bond problem that greatly diminishes the value of what they receive, *see* #16908-page-30-of-178, #16977-page-7-to-9-of-20).  (As noted above, both the 2.821% of par to Initial GO/PBA PSA Creditors and the 0.746% of par to Retail Investors are paid as a percentage of bond claims; this is simply pro rata consideration given special names.  Retail Investors — who own the same bonds — should receive the same 2.821% additional pro rata consideration.)

If one of the Retail Investor classes rejects, the (undisclosed) size of holdings of the Initial GO/PBA PSA Restriction Fee Creditors dictates what portion of the forfeited Retail Support Fee those parties get as distinct from what portion Retail Investors in the accepting classes receive.  Assume hypothetically one or more classes of Retail Investors representing 33.33% of the Retail Investor holdings reject (i.e., 10% of all holdings, assuming Retail Investors hold 30% of all holdings), and that Initial GO/PBA PSA Restriction Fee Creditors account for 60% of all holdings.  In this example, 75% of the forfeited "Retail Support Fee" amount is re-

allocated to Initial GO/PBA PSA Restriction Fee Creditors, and only 25% to the accepting Retail classes.

Given the complexities that have been built into this Plan, a committee is needed to do this type of analysis and communicate the results to Retail Investors.

### 2.    Voting procedures and restrictions on transfer.

Mr. Rosen's explanation at the July 14 hearing of the discrepancy in voting procedures and restrictions on transacting between institutional investors and Retail Investors reinforces the need for a Retail Investor committee.  Mr. Rosen said that if a Retail Investor class rejects the Plan, and thus its members are not entitled to the Retail Support Fee, restrictions on transfer will be lifted.  *First*, that is *not* what the notice says.  *See*, *e.g.*, 17309-1-page-52-to-53-of-302 (all Retail Investors are restricted through the Effective Date, yet, institutions get their bonds back immediately after voting, unless they are Puerto Rico investors who elect the taxable bond distribution option).  *Second*, if Mr. Rosen is correct — and the procedures provide (1) if retail classes reject, the Retail Investors in those classes are not entitled to the Retail Support Fee (instead institutions who negotiated the Plan with FOMB get some or all of the money), yet Retail Investors in rejecting classes get relieved of transfer restrictions, whereas (2) if a Retail class accepts the Plan, Retail Investors in the class will be entitled to the fee but (unlike institutional investors) will have their bonds restricted through the Effective Date — this reflects the fact there was zero input from fiduciaries representing Retail Investors and instead the structure was devised by institutions (who benefit from the rejection of the Plan by Retail classes) and FOMB.

### 3.    Guidance concerning the consequences of objecting (or not) or voting (yes or no, or not voting)

These matters were described in my objections (#16908-page-38-to-39-of-178), but have not been addressed with additional disclosures.  A Retail Investor committee could help Retail Investors understand the practical consequences of these actions by an individual.

G.   **FOMB does not provide legal support for its position that unofficial, ad hoc bondholder committees, which owe no fiduciary duty to individual bondholders, satisfy the "adequate representation" standard of 11 U.S.C. §1102(a)(2).**

*None* of FOMB's cited cases are even claimed to hold that "adequate representation" would be satisfied by the existence of unofficial, ad hoc committees which the movant was not a member of and which owe no fiduciary duty to the movant.  Members of such ad hoc committees lack a fiduciary duty to non-members, so the essential premise for why an official committee can represent a multiplicity of interests is missing (*see* cases cited in Section "A", above).  Moreover, FOMB does not claim one of the existing committees appointed pursuant to 11 U.S.C. §1102(a) represents, much less adequately represents, Retail Investors.  And FOMB does not dispute that the Court has the power under §1102(a)(2) to order the appointment of a Retail Investor committee.  *See* #17221-page-30-to-31-of-34; *cf.* #17420-page-14-of-27.

FOMB's cited cases do not support denial of this motion.  A number of them are already discussed in the moving papers (#17221).  Other cited cases include: **[1]** off-point equity committee cases (albeit in some, e.g., *Wang*, an equity committee was ordered), and **[2]** cases where moving creditors already had representatives on an official committee (*Hills Stores*; *Sharon Steel*; *Dana*; *Residential Capital*; *Garden Ridge*; *Public Service*) – *not* the case here.

FOMB argues that the Court should give deference to the U.S. Trustee's determination (#17420-page 15-of-27).  But the U.S. Trustee's letter declining to take action on the request to appoint a committee to represent individual bondholders was in March 2019 – much has transpired since then.  Furthermore, the Court makes the "adequate representation" determination without regard to what the U.S. Trustee did or did not do.  *See* #17221-page-30-to-31-of-34.

## CONCLUSION

The appointment of a committee to represent Retail Investors should be ordered.

July 27, 2021

Respectfully Submitted,


/s/ Peter C. Hein
Peter C. Hein, pro se
101 Central Park West, Apt. 14E
New York, NY  10023
petercheinsr@gmail.com
Claim 10696
GO Bonds:  500,000 par amount, plus
unpaid interest to date
[5 separate CUSIPS:   74514LVX2
74514LWA1
74514LWM5
74514LWZ6
74514LB63]
Claim 174229
PBA Bonds:  200,000 par amount, plus
unpaid interest to date
[CUSIP:  745235M24]


**Declaration pursuant to 28 U.S.C. §1746**


I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge and belief.


Executed on this 27th day of July 2021.



/s/ Peter C. Hein
Peter C. Hein

**Certificate of Service**

I, Peter C. Hein, certify that I have caused the foregoing "Reply in further support of motion of

individual bondholder for an order directing the appointment of a committee to represent Retail

Investors in the eight Retail Investor classes in connection with the proposed Plan and in

proceedings related to confirmation" to be served via the Court's CM/ECF system.

July 27, 2021

/s/ Peter C. Hein
Peter C. Hein



**Financial Oversight and Management Board for Puerto Rico**

**MEDIA RELEASE**

**OVERSIGHT BOARD PROPOSES PLAN OF ADJUSTMENT TO RESTRUCTURE
COMMONWEALTH OF PUERTO RICO DEBT AND OTHER CLAIMS**
*Would lift Puerto Rico out of Bankruptcy; Reduces Debt to Sustainable Levels; Includes
Agreements with Certain Bondholders, Retirees, and Union*

*San Juan, PR – September 27, 2019 –* The Financial Oversight and Management Board for Puerto Rico today filed its proposed Plan of Adjustment to restructure $35 billion of debt and other claims against the Commonwealth of Puerto Rico, the Public Building Authority (PBA), and the Employee Retirement System (ERS); and more than $50 billion of pension liabilities.

The Plan provides a framework to reduce the Commonwealth of Puerto Rico's debt to sustainable levels and provides a path to exit bankruptcy. It reduces the Commonwealth's $35 billion of total liabilities –bonds and other claims – by more than 60%, to $12 billion. Combined with the restructuring of COFINA debt earlier this year, the Plan reduces the Commonwealth's annual debt service to just under 9% of own-source revenues, down from almost 30% of government revenues prior to PROMESA.

The Oversight Board had reached agreements with the Official Committee of Retired Employees of the Government of Puerto Rico (COR), the Lawful Constitutional Debt Coalition (LCDC) and QTCB Noteholder Group (QTCB) representing certain general obligation bondholders, and the Public Servants United of Puerto Rico (SPU)/AFSCME Council 95 who have come together understanding the financial situation on the island and support the Plan as a compromise to achieve stability for Puerto Rico.

"Today we have taken a big step to put bankruptcy behind us and start envision what Puerto Rico's future looks like under fiscal stability and economic sustainability," said José Carrión, the Oversight Board's Chairman. "Three years after Congress passed PROMESA and two years after the most severe Hurricane in more than 100 years hit Puerto Rico, after more than a decade of economic decline and fiscal disarray, after tens of thousands of Puerto Ricans left their island to find prosperity elsewhere, we have now reached a turning point."

1

0001

Exhibit A

"The Plan of Adjustment we proposed today begins our march out of bankruptcy. We are not there yet. We need court approval, and it will take time to get there. A Plan that has the support of certain bondholders, retirees and public employees is the best Plan to remove the cloud that has been hanging over Puerto Rico's economy" Carrión said.

Further, the Oversight Board published a comprehensive independent analysis of the Government of Puerto Rico's pension systems, as required under Section 211 of PROMESA. The report by Ernst & Young evaluates the fiscal and economic impact of the pension cash flows, including the pension liabilities and funding strategy, sources of funding, existing benefits and their sustainability, and the system's legal structure and operational arrangements.

The Plan of Adjustment delivers meaningful reductions from bondholders, providing, on average, a more than 60% blended reduction in total Commonwealth liabilities. The Plan strengthens pensions by establishing an independent pension reserve trust to ensure PayGo benefits can be paid regardless of the economic or political situation. It includes an 8.5% pension reduction for retirees earning over $1,200 per month, so 60% of retirees would not face any cut.

In 2016, when the Oversight Board began its work, Puerto Rico's government and public corporations like PREPA and COFINA had amassed more than $70 billion in debt they could not pay and owed Puerto Rican retirees over $50 billion in unfunded pension benefits. The Puerto Rico government alone had to spend almost $3 of every $10 dollars in tax revenue just to service its debt.

This Plan, combined with the completed COFINA debt restructuring, reduces the maximum annual amount of government net-tax supported debt service from $4.2 billion to $1.5 billion. The combined debt service of the Commonwealth and COFINA debt falls from $82 billion to $44 billion over a 30-year period, ensuring long-term sustainability.

Local retail bondholders have the opportunity to receive taxable bonds with monthly interest payments.

"Restructuring debt and putting Puerto Rico on a solid fiscal footing are the Oversight Board's core mandates under PROMESA," said Natalie Jaresko, the Oversight Board's Executive Director. "The Plan of Adjustment we filed and the support we negotiated with retirees, unions and certain bondholders is an important first step towards restoring solvency and creating the kind of certainty businesses need to invest and the kind of stability the people of Puerto Rico need to achieve prosperity."

"The Plan of Adjustment, together with the fiscal discipline PROMESA mandates and the significant structural reforms outlined in the Fiscal Plan that will enhance Puerto Rico's

2

quality of life and economic competitiveness, allow us to work towards stable and sustainable growth," Jaresko said.

The Plan restructures general obligation (GO) bonds; claw back claims against the Commonwealth; PBA bonds; ERS bonds; general unsecured claims against the Commonwealth, PBA, and ERS; and the Commonwealth's pension liabilities. It includes the following specific recovery terms:

- A 36% reduction for holders of GO bonds issued before 2012
- A 28% reduction for holders of PBA bonds issued before 2012
- A 87% reduction for holders of ERS bonds

The Plan also provides an option for holders of bonds issued after 2011, which debt has been challenged as unconstitutional as a result of the independent review of Puerto Rico's debt by Kobre & Kim and other professionals.

The settlement offer includes the following terms for settling bondholders:

- A 55% to 65% reduction for holders of challenged GO bonds and Commonwealth guaranteed claims
- A 42% reduction for holders of challenged PBA bonds

This settlement mechanism reduces litigation expenses for the Commonwealth and accelerates resolution of these claims.

The Plan builds on the Plan Support Agreement announced in June and negotiated with holders of approximately $3 billion in claims. As of the filing date, the Plan includes support from holders of approximately $4 billion in claims, representing 54% of claims from PBA bonds issued before 2012 and 22% of all GO and PBA claims, making the Plan Support Agreement effective.

As contemplated in the Plan Support Agreement, the Oversight Board approved and certified the filing of a voluntary petition under PROMESA's Title III for PBA, to enable the restructuring of the PBA claims through the Plan.

The Oversight Board filed the Plan with the U.S. District Court for the District of Puerto Rico, which has jurisdiction over Puerto Rico's bankruptcy-like cases under PROMESA.

For further information about the Plan of Adjustment, visit the Oversight Board's website at https://oversightboard.pr.gov/plan-of-adjustment/

### 

3

This press release is neither an offer to restructure, purchase, or sell debt of any kind, nor a solicitation of votes to accept or to reject the proposed Plan of Adjustment. Contemporaneously with the filing of the proposed Plan of Adjustment, the Oversight Board filed a proposed disclosure statement.  In due course the Court will consider whether the proposed disclosure statement contains adequate information, and if so, will approve it. Only after a disclosure statement is approved by the Court will the debtors request creditors to accept the proposed Plan of Adjustment by executing and returning written ballots.  The decision to accept or reject the proposed Plan of Adjustment should be made based on reading the approved disclosure statement and the Plan of Adjustment itself.

About the Oversight Board

The Financial Oversight and Management Board for Puerto Rico was created under the bipartisan Puerto Rico Oversight, Management and Economic Stability Act (PROMESA) of 2016. The purpose of the Oversight Board is to provide a method for Puerto Rico to achieve fiscal responsibility and access to the capital markets.

Website: www.oversightboard.pr.gov


Contact:
Edward Zayas
edward.zayas@promesa.gov
787-641-0001

Matthias Rieker
matthias.rieker@promesa.gov
787-641-0001

Forculus Strategic Communications
José Luis Cedeño
jcedeno@forculuspr.com
787-400-9245

4

0004



# GOVERNMENT OF PUERTO RICO
PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY

## Municipal Secondary Market Disclosure Information Cover Sheet
## Municipal Securities Rulemaking Board (MSRB)
## Electronic Municipal Market Access System (EMMA)

### Additional / Voluntary Disclosure
### Financial / Operating Data

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:  **Commonwealth of Puerto Rico**

Other Obligated Person's Name (if any):

Six-digit or Nine-Digit CUSIP number(s):  **Commonwealth of PR - 745145, 74514L; PRASA (Guaranteed by the Commonwealth of PR) - 745160QD6, 745160QE4, 745160QF1, 745160PP0, 745160PQ8, 745160PR6; PRHTA - 745181, 745185, 745190; PRIFA - 745220; PBA - 745235; PR Convention Center District Authority - 745266; PRMFA - 745277.**

**TYPE OF INFORMATION PROVIDED:**

A.  ☐ Quarterly / Monthly Financial Information
B.  ☐ Change in Fiscal Year / Timing of Annual Disclosure
C.  ☐ Change in Accounting Standard
D.  ☐ Interim / Additional Financial Information / Operating Data
E.  ☐ Budget
F.  ☐ Investment / Debt / Financial Policy
G.  ☐ Information Provided to Rating Agency, Credit / Liquidity Provider or Other Third Party
H.  ☐ Consultant Reports
I.  ☒ Other Financial / Operating Data:  Puerto Rico Department of Treasury, Treasury Single Account ("TSA") Fiscal Year 2022 Cash Flow as of July 9, 2021.

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.


_/s/ Manuel González del Toro_
Manuel González del Toro
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth

Dated: July 21, 2021

Roberto Sánchez Vilella (Minillas) Government Center, De Diego Ave. Stop 22, San Juan, PR 00907  |  PO Box 42001, San Juan, PR 00940-2001

 787.722.2525      contact@aafaf.pr.gov      aafaf.pr.gov

0005 Exhibit B



*Puerto Rico Department of Treasury*

*Treasury Single Account ("TSA") FY 2022 Cash Flow*

*As of July 9, 2021*

As of July 9, 2021

**Puerto Rico Department of Treasury | AAFAF**
*Executive Summary - TSA Cash Flow Actual Results*
*(figures in Millions)*

| TSA Bank Cash Position | SURI Sweep Account Balance | Weekly Cash Flow | YTD Net Cash Flow |
|---|---|---|---|
| $11,744 | $201 | $29 | $73 |

Fiscal Year 2022 began on July 1, 2021. The FY22 Liquidity Plan is currently being developed based on the Certified Fiscal Plan, Certified Budget and other inputs. Once the Liquidity Plan is completed, the weekly TSA cash flow report will report actual results against the Liquidity Plan and include all of the detailed supporting receipts and disbursements schedules. In the meantime, an abridged version of the TSA cash flow report will be published weekly with a comparison to the same period from FY21 to help contextualize results. Please note that on July 31, 2021, AAFAF will publish the 1(A) report for June 30, 2021 that shows TSA cash flow results relative to the FY21 Liquidity Plan for June FY21, Q4 FY21, and the full year FY21.

Source: DTPR

**Puerto Rico Department of Treasury | AAFAF**
*TSA Cash Flow Actual Results for the Week Ended July 9, 2021*

| (figures in Millions) | FY22 Actual 7/9 | FY22 Actual YTD | FY21 Actual YTD (a) | Variance YTD FY22 vs YTD FY21 |
|---|---|---|---|---|
| **State Collections** | | | | |
| 1  General fund collections (b) | $89 | $182 | $197 | ($15) |
| 2  Other fund revenues & Pass-throughs (c) | – | – | 7 | (7) |
| 3  Special Revenue receipts | 6 | 7 | 14 | (7) |
| 4  All Other state collections (d) | 23 | 25 | 5 | 20 |
| 5  Sweep Account Transfers | – | – | – | – |
| 6  Subtotal - State collections (e) | $118 | $214 | $223 | ($8) |
| **Federal Fund Receipts** | | | | |
| 7  Medicaid | – | – | – | – |
| 8  Nutrition Assistance Program | 71 | 92 | 71 | 20 |
| 9  All Other Federal Programs | 41 | 44 | 41 | 4 |
| 10  Other | 1 | 13 | 52 | (39) |
| 11  Subtotal - Federal Fund receipts | $112 | $149 | $165 | ($16) |
| **Balance Sheet Related** | | | | |
| 12  Paygo charge | 2 | 4 | 15 | (11) |
| 13  Other | – | – | – | – |
| 14  Subtotal - Other Inflows | $2 | $4 | $15 | ($11) |
| 15  **Total Inflows** | **$233** | **$367** | **$403** | **($35)** |
| **Payroll and Related Costs (f)** | | | | |
| 16  General fund (i) | (10) | (25) | (70) | 45 |
| 17  Federal fund | (2) | (6) | (10) | 4 |
| 18  Other State fund | (2) | (4) | (8) | 4 |
| 19  Subtotal - Payroll and Related Costs | ($14) | ($35) | ($89) | $54 |
| **Operating Disbursements (g)** | | | | |
| 20  General fund (i) | (40) | (56) | (49) | (7) |
| 21  Federal fund | (14) | (25) | (36) | 11 |
| 22  Other State fund | (15) | (23) | (25) | 3 |
| 23  Subtotal - Vendor Disbursements | ($69) | ($104) | ($110) | $6 |
| **State-funded Budgetary Transfers** | | | | |
| 24  General Fund (i) | (0) | (1) | (119) | 118 |
| 25  Other State Fund | (8) | (8) | (22) | 15 |
| 26  Subtotal - Appropriations - All Funds | ($8) | ($9) | ($141) | $133 |
| **Federal Fund Transfers** | | | | |
| 27  Medicaid | – | – | – | – |
| 28  Nutrition Assistance Program | (71) | (92) | (73) | (19) |
| 29  All other federal fund transfers | (5) | (5) | – | (5) |
| 30  Subtotal - Federal Fund Transfers | ($77) | ($98) | ($73) | ($25) |
| **Other Disbursements - All Funds** | | | | |
| 31  Retirement Contributions | (6) | (12) | (19) | 8 |
| 32  Tax Refunds & other tax credits (h) (i) | (28) | (34) | (21) | (13) |
| 33  Title III Costs | (3) | (3) | (10) | 7 |
| 34  State Cost Share | – | – | – | – |
| 35  Milestone Transfers | – | – | – | – |
| 36  Custody Account Transfers | – | – | – | – |
| 37  Cash Reserve | – | – | – | – |
| 38  All Other | – | – | – | – |
| 39  Subtotal - Other Disbursements - All Funds | ($36) | ($49) | ($51) | $2 |
| 40  **Total Outflows** | **($204)** | **($294)** | **($464)** | **$170** |
| 41  **Net Operating Cash Flow** | **$29** | **$73** | **($61)** | **$135** |
| 42  Bank Cash Position, Beginning (j) | 11,715 | 11,671 | 7,701 | 3,970 |
| 43  **Bank Cash Position, Ending (j)** | **$11,744** | **$11,744** | **$7,640** | **$4,104** |

*Note:* *Refer to the next page for footnote reference descriptions.*

Source: DTPR

0008    6

**Puerto Rico Department of Treasury | AAFAF**

*FY21 TSA Cash Flow Actual Results - Footnotes*

Footnotes:

(a) Represents FY2021 actual results through July 10, 2020.

(b) Represents gross tax collections received and deposited from all Hacienda Collection Posts, through the Hacienda Colecturia Virtual (online) and/or SURI. Additionally, as of the date of this report, the "General Fund Collections" line item includes unreconciled collections due to DTPR transition to collecting various gross tax receipts through the new SURI system. The transition from the Hacienda Colecturia collections system to SURI is ongoing and as such, revenue concept detail for the general tax SURI collections is not available at this time for the portion of collections received by the new general tax SURI account.  This resulted in timing-related unreconciled gross collections which will be retroactively allocated to "General Collections" as appropriate once this information becomes available.

(c) These revenues are collected by DTPR and immediately appropriated.

(d) Inflows related to the State Insurance Fund, the Department of Labor and Human Resources, the Commissioner of Financial Institutions, interest earned on TSA bank accounts and others. As of the date this report the TSA has received $303k in interest income in FY21 from earnings on the TSA cash balance.

(e) As of July 9, 2021, there are $201M in collections in the SURI sweep account pending reconciliation and transfer to the TSA.

(f) Represents total gross payroll. Gross payroll includes net payroll disbursed to government employees, cash transfers to the Police Department for payroll costs, and other payroll related costs (employee withholdings, social security, insurance, and other

(g) Includes payments to third-party vendors as well as intergovernmental payments to agencies with separate Treasuries.

(h) Includes Federally Funded Employee Retention Credits.

(i) These line items include transfers out of the TSA related to the COVID-19 Emergency Measures Support Package. Total TSA outflows related to the COVID-19 Emergency Measures Support Package are approximately $533M as of July 9, 2021. Of this amount, $459M was disbursed in FY2020 and $75M in FY2021.

(j) Excludes BPPR Clawback Accounts (for clawback revenues prior to June 2016) of $147M.

**Puerto Rico Department of Treasury | AAFAF**

*Sales and Use Tax Collections Summary*

**Key Takeaways / Notes**

1.) The proceeds from the Puerto Rico 10.5% SUT rate are allocated as follows: Of the 10.5%, 5.5% is deposited into a COFINA BNY Mellon account until the PSTBA cap is reached, and 4.5% is deposited into the General Fund. The remaining 0.5% is remitted to FAM. The PSTBA cap for FY22 is $473 million.



YTD Gross SUT Collections - General Fund and PSTB ($M) (a) (b)

Footnotes

(a) This schedule reflects gross cash activity and is subject to revision based on periodic reconciliations and accounting adjustments.

(b) As of July 9, 2021 there is $64M in SUT collected pending verification and allocation. The verification process includes matching receipts with the appropriate returns and reconciling government account information. Once this process is complete, SUT funds are distributed in accordance with the COFINA Plan of Adjustment based on the ownership of funds and otherwise based on the limits on distributions established therein.

**Puerto Rico Department of Treasury | AAFAF**
*Federal Funds Net Cash Flow Summary (a)(b)*

**Key Takeaways / Notes**

1.) Receipts for the Nutritional Assistance Program (NAP) and Medicaid (ASES Pass-through) are received in advance of the subsequent pass through disbursements. Federal Funds received for Payroll and Vendor Payments are typically reimbursed following disbursement. Currently, there may be temporary surplus / (deficit) due timing differences relating to prior year carryover. Puerto Rico received $2.24 billion from the Coronavirus Relief Fund (CRF) established under the CARES Act and $2.5 billion of federal Coronavirus State & Local Fiscal Recovery funds (CSFRF). These funds are held in a separate account outside of TSA. Some of the measures funded by the accounts are initially paid out through TSA, and later reimbursed from the respective external account.

| Weekly FF Net Surplus (Deficit) | FF Inflows | FF Outflows | Net Cash Flow |
|---|---|---|---|
| Medicaid (ASES) | $  - | $  - | - |
| Nutritional Assistance Program (NAP) | 71 | (71) | (0) |
| Payroll / Vendor Disbursements / Other Federal Programs | 41 | (15) | 26 |
| COVID-19 Federal Funds (CRF & CSFRF) | 1 | (7) | (6) |
| Federally Reimbursable Tax Credits | - | - | - |
| **Total** | **$  112** | **$  (93)** | **$  19** |

| YTD Cumulative FF Net Surplus (Deficit) | FF Inflows | FF Outflows | Net Cash |
|---|---|---|---|
| Medicaid (ASES) | $  - | $  - | $  - |
| Nutritional Assistance Program (NAP) | 92 | (92) | (1) |
| Payroll / Vendor Disbursements / Other Federal Programs | 44 | (27) | 17 |
| COVID-19 Federal Funds (CRF & CSFRF) | 13 | (9) | 4 |
| Federally Reimbursable Tax Credits | - | - | - |
| **Total** | **$  149** | **$  (129)** | **$  20** |



YTD Federal Funds Net Cash Flows ($M)

Footnotes

(a) Please note that federal fund classification as represented here is based on the fund classification at the point of transaction. Agencies regularly review cash transactions and make accounting adjustments that result in fund reclassifications.

| 114TH CONGRESS | | REPT. 114–602 |
|---|---|---|
| 2d Session | HOUSE OF REPRESENTATIVES | Part 1 |

## PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT

––––––––––

JUNE 3, 2016.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

––––––––––

Mr. BISHOP of Utah, from the Committee on Natural Resources, submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 5278]

[Including cost estimate of the Congressional Budget Office]

The Committee on Natural Resources, to whom was referred the bill (H.R. 5278) to establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Effective date.
Sec. 3. Severability.
Sec. 4. Supremacy.
Sec. 5. Definitions.
Sec. 6. Placement.
Sec. 7. Compliance with Federal laws.

TITLE I—ESTABLISHMENT AND ORGANIZATION OF OVERSIGHT BOARD

Sec. 101. Financial Oversight and Management Board.
Sec. 102. Location of Oversight Board.
Sec. 103. Executive Director and staff of Oversight Board.
Sec. 104. Powers of Oversight Board.
Sec. 105. Exemption from liability for claims.
Sec. 106. Treatment of actions arising from Act.
Sec. 107. Budget and funding for operation of Oversight Board.

59–006

Exhibit C                                                0012

45

TITLE II—RESPONSIBILITIES OF OVERSIGHT BOARD

*Section 201. Approval of Fiscal Plans*

This section establishes the method for developing Fiscal Plans for territorial governments and instrumentalities that provide the appropriate elected officials with the autonomy to develop such Fiscal Plans with guidance from the Oversight Board. To initiate the process, the Oversight Board determines a schedule by which the Governor must provide an approvable and certifiable Fiscal Plan. If the Governor fails to draft an acceptable Fiscal Plan as determined by the Oversight Board by the deadlines set forth in the schedule, then the Oversight Board will develop and adopt the Fiscal Plan, which shall be deemed approved by the Governor.

Each Fiscal Plan serves as the cornerstone for the structural reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards "fiscal responsibility and access to capital markets." These documents incorporate requirements including any recommendation made by the Oversight Board pursuant to Section 205, the elimination of structural deficits, as well as the improvement of fiscal governance, accountability, and internal controls. Importantly, Fiscal Plans ensure the protection of the lawful priorities and liens as guaranteed by the territorial constitution and applicable laws, and prevent unlawful inter-debtor transfers of funds.

The Committee acknowledges the concern as to the ambiguity of the language regarding the funding of public pension systems. To clarify, Section 201(b)(1)(C) tasks the Oversight Board with ensuring fiscal plans "provide adequate funding for public pension systems." This language should not be interpreted to reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders as established under the territory's constitution, laws, or other agreements. While this language seeks to provide an adequate level of funding for pension systems, it does not allow for pensions to be unduly favored over other indebtedness in a restructuring.

*Section 202. Approval of budgets*

This section outlines the process for developing annual budgets. Similar to the development of Fiscal Plans, the Oversight Board will establish a schedule the Governor and Legislature must meet for the development of territory and territorial instrumentality budgets. All budgets developed under this section must be developed in accordance with the appropriate Fiscal Plan. If the Governor and Legislature fail to develop certifiable budgets within the established deadline, then the Oversight Board is required to develop the budget for the territory or territorial instrumentality for that fiscal year.

*Section 203. Effect of finding of noncompliance with budget*

This section requires the Governor to submit a report at the end of each fiscal quarter to the Oversight Board describing the actual revenues, expenditures, and cash flow of the government for the previous quarter, as well as any other information the Oversight Board may request. If the revenues, expenditures, or cash flow is not in accordance with the certified budget, then the Oversight Board will alert the Governor of the inconsistency and provide an

50

*Section 312. Filing of plan of adjustment*

This section permits only the Oversight Board to file a plan of adjustment, once the Oversight Board has issued a certification pursuant to Section 104(j).

*Section 313. Modification of plan*

This section allows the Oversight Board to repeatedly change or modify a plan of adjustment, as submitted per Section 312, before such plan is confirmed, so long as such modification meets the requirements of Title III.

*Section 314. Confirmation*

This section outlines the conditions necessary to having a plan confirmed by a court. Under this section, the court shall confirm a plan if: (1) the plan complies with the referenced statutes in Section 301; (2) the plan complies with Title III; (3) the debtor is not prohibited by law from undertaking any of the actions of the plan; (4) unless otherwise agreed to, the holders of claims specified in 11 U.S.C. 507(a)(2) will receive cash equal to the allowed amount of such claim; (5) the debtor has secured the necessary legislative, regulatory, or electoral approval of such plan, or such provision is expressly conditioned on the securing of such actions; (6) the plan is in the best interest of the creditors and is feasible, which must include a consideration as to whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided; and (7) the plan is consistent with the Fiscal Plan as established under Title II of PROMESA.

By incorporating consistency with the Fiscal Plan into the requirements of confirmation of a plan of adjustment, the Committee has ensured lawful priorities and liens, as provided for by the territory's constitution, laws, and agreements, will be respected in any debt restructuring that occurs.

*Section 315. Role and capacity of Oversight Board*

This section designates the Oversight Board as the representative of the debtor and authorizes the Oversight Board to take any action necessary on behalf of the debtor including the filing of a petition under Section 304, the submission or modification of a plan of adjustment, or the submission of other filings as required by the court.

*Section 316. Compensation of professionals*

This section permits the court to authorize the debtor's reasonable payment of professionals, such as attorneys, paralegals or others connected with a Title III proceeding. This ensures these professionals will receive compensation for services rendered during the Title III case.

*Section 317. Interim compensation*

This section authorizes the court to permit payment to professionals while the Title III case is ongoing.

**Exhibit D to Reply  -  Holdings of certain ad hoc bondholder groups referred to in FOMB's opposition brief**

**LCDC**

| Date of holdings | Docket # reference | GO and PBA bonds held |
|---|---|---|
| 1/4/2021 | #15635-page-4-to-5-of-7<br>#15635-1-page-2-to-3-of-5 | $1,904,434,950 |
| 2/22/2021 | #15892-page-4-to-5-of-8<br>#15892-1-page-2-to-3-of-5 | $1,904,434,950 |
| 7/9/2021 | #17382-page-4-of-7<br>#17382-1-page-2-to-3-of-5 | $1,197,507,250 |

Amount of holdings as of 2/22/2021 sold by July 2021: **$706,927,700**.

Percent of holdings as of 2/22/2021 sold by July 2021: **37%**

**QTCB**

| Date of holdings | Docket # reference | GO and PBA bonds held |
|---|---|---|
| 10/16/2020 | #14708-page-7-of-13 | $1,985,099,920 |
| 3/3/2021 | #15968-page-6-of-13 | $1,926,709,615 |
| 7/6/2021 | #17296-page-6-of-11 | $1,569,221,000 |

Amount of holdings most recently reported as of 2/22/2021 sold by July 2021: **$415,878,920**.

Percent of holdings most recently reported as of 2/22/2021 sold by July 2021: **21%**

Note:  subtotals and totals of GO and PBA holdings are not provided in filings and must be manually added.

0016

**Ad Hoc Group of General Obligation bondholders**

| Date of holdings | Docket # reference | GO and PBA bonds held |
|---|---|---|
| 12/8/2020 | #15435-page-6-to-9-of-10 | $859,725,489 |
| 3/9/2021 | #16034-page-7-to-10-of-11 | $402,130,405 |
| 7/9/2021 | #17397-page-9-to-10-of-11 | $140,873,112 |

Amount of holdings most recently reported as of 2/22/2021 sold by July 2021: **$718,852,377**.

Percent of holdings most recently reported as of 2/22/2021 sold by July 2021: **84%**

Note:  subtotals and totals of GO and PBA holdings are not provided in filings and must be manually added.

0017

**Ad Hoc Constitutional Debtholders**

| Date of holdings | Docket # reference | GO and PBA bonds held |
|---|---|---|
| 10/6/2020 | #14520-page-5-to-12-of-12 | $2,964,226,797 |
| 3/1/2021 | #15993-page-5-to-12-of-12 | $2,796,526,500 |
| 7/12/2021 | #17342-page-5-to-12-of-12 | $2,358,192,500 |

Amount of holdings most recently reported as of 2/22/2021 sold by July 2021:  **$606,034,297**.

Percent of holdings most recently reported as of 2/22/2021 sold by July 2021:  **20%**

Note:  subtotals and totals of GO and PBA holdings are not provided in filings and must be manually added.

0018

**Commonwealth Bondholders Group**

| Date of holdings | Docket # reference | GO and PBA bonds held |
|---|---|---|
| 6/24/2020 | #13549-page-6-to-12-of-12 | (See note below) |

Note:  #13549 (filed 7/3/2020) appears to be the last filing of any papers in this case by "Commonwealth Bondholder Group".  The members of the group appear to have filed thereafter as the "QTCB Noteholder Group".  *Compare* #13549-page-8-to-12-of-12 *with* #14708-page-9-to-13.

0019