| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF PUERTO RICO |

| | | | |
|---|---|---|---|
| 3 | | | |
| 4 | In Re: | ) | Docket No. 3:17-BK-3283(LTS) |
| | | ) | |
| | | ) | PROMESA Title III |
| 5 | The Financial Oversight and | ) | |
| | Management Board for | ) | |
| 6 | Puerto Rico, | ) | (Jointly Administered) |
| | | ) | |
| 7 | *as representative of* | ) | |
| | | ) | |
| 8 | The Commonwealth of | ) | |
| | Puerto Rico, *et al.* | ) | July 29, 2021 |
| 9 | | ) | |
| | Debtors, | ) | |
| 10 | | | |
| 11 | _____ | | |
| 12 | In Re: | ) | Docket No. 3:17-BK-3566(LTS) |
| | | ) | |
| 13 | | ) | PROMESA Title III |
| | The Financial Oversight and | ) | |
| 14 | Management Board for | ) | |
| | Puerto Rico, | ) | (Jointly Administered) |
| 15 | | ) | |
| | *as representative of* | ) | |
| 16 | | ) | |
| | The Employees Retirement | ) | |
| 17 | System of the Government | ) | |
| | of the Commonwealth of | ) | |
| 18 | Puerto Rico, | ) | |
| | | ) | |
| 19 | Debtors, | ) | |
| 20 | _____ | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

```
 1

 2   _____

 3   In Re:                     )        Docket No. 3:19-BK-5523(LTS)
                                )
 4                              )
                                )        PROMESA Title III
 5   The Financial Oversight and )
     Management Board for       )
 6   Puerto Rico,               )        (Jointly Administered)
                                )
 7   as representative of       )
                                )
 8   The Puerto Rico Public     )
     Buildings Authority,       )
 9                              )
                  Debtors,      )
10   _____

11

12                FURTHER DISCLOSURE STATEMENT HEARING

13     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

14               UNITED STATES DISTRICT COURT JUDGE

15     AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

16               UNITED STATES DISTRICT COURT JUDGE

17   _____

18
     APPEARANCES:
19
     ALL PARTIES APPEARING TELEPHONICALLY
20
     For The Commonwealth
21   of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                              Mr. Brian S. Rosen, PHV
22                            Ms. Laura Stafford, PHV
                              Mr. Steven Ma, PHV
23
     For Puerto Rico Fiscal
24   Agency and Financial
     Advisory Authority:      Mr. John Rapisardi, PHV
25
```

```
 1   APPEARANCES, Continued:

 2

 3   For The Official
     Committee of Retired
 4   Employees:              Mr. Robert Gordon, PHV

 5   For Peter Hein:         Mr. Peter Hein, Pro Se

 6   For AmeriNational
     Community Services:     Mr. Nayuan Zouairaban, Esq.
 7                           Mr. Arturo J. Garcia Sola, Esq.

 8   For Cantor-Katz
     Collateral Monitor:     Mr. Douglas Mintz, PHV
 9

10   For Financial Guaranty
     Insurance Company:      Mr. Martin A. Sosland, PHV
11
     For Ambac Assurance
12   Corporation:            Ms. Atara Miller, PHV

13
     For U.S. Bank Trust
14   National Association:   Mr. Ronald J. Silverman, PHV

15
     For Suiza Dairy Corp.:  Mr. Rafael A. Gonzalez Valiente, Esq.
16
     For Finca Matilde:      Mr. Eduardo Capdevila Diaz, Esq.
17

18

19

20

21

22

23

24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

4

| 1 | I N D E X |
| 2 | WITNESSES: | PAGE |
| 3 | None. |
| 4 | |
| 5 | EXHIBITS: |
| 6 | None. |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
1                                    San Juan, Puerto Rico

2                                    July 29, 2021

3                                    At or about 10:30 AM

4                    *     *     *

5         THE COURT:  Good morning.  This is Judge Swain

6   speaking.

7         MS. NG:  Good morning, Judge.  This is Lisa, your

8   courtroom deputy.  Everyone is here.

9         THE COURT:  Thank you.  Would the courtroom deputy in

10  San Juan please announce the case?

11        COURTROOM DEPUTY:  Good morning, Your Honor.

12        The United States District Court for the District of

13  Puerto Rico is now in session.  The Honorable Laura Taylor

14  Swain presiding.  Also present, Magistrate Judge Judith Dein.

15  God save the United States of America and this Honorable

16  Court.

17        In re: The Financial Oversight and Management Board

18  for Puerto Rico, as representative of the Commonwealth of

19  Puerto Rico, et al., in Case Nos. 17-BK-3283, 17-BK-3566, and

20  19-BK-5523.

21        THE COURT:  Thank you, Ms. Tacoronte.

22        Buenos dias, and welcome, counsel, parties in

23  interest, and members of the public and press.  Today's

24  hearing is a continuation of the hearing that began on July

25  13th and 14th, 2021, concerning the Oversight Board's request
```

1    for approval of a Disclosure Statement for the Title III Joint

2    Plan of Adjustment of the Commonwealth of Puerto Rico, the

3    Employees' Retirement System of the Government of the

4    Commonwealth of Puerto Rico, and the Puerto Rico Public

5    Buildings Authority, as well as discovery and solicitation

6    procedures, deadlines, submission requirements, and hearing

7    dates related to the Disclosure Statement and the proposed

8    Plan of Adjustment.  The Disclosure Statement now before the

9    Court is the Amended Disclosure Statement for the Sixth

10   Amended Plan of Adjustment.

11           To ensure the orderly operation of today's telephonic

12   hearing, all parties on the line must mute their phones when

13   they are not speaking.  If you are accessing these proceedings

14   on a computer, please be sure to select "mute" on both the

15   Court Solutions dashboard and your phone.  When you need to

16   speak, you must unmute on both the dashboard and the phone.

17           I remind everyone that consistent with court and

18   judicial conference policies and the orders that have been

19   issued, no recording or retransmission of the hearing is

20   permitted by any person, including but not limited to the

21   parties, members of the public, and members of the press.

22   Violations of this rule may be punished with sanctions.

23           I will be calling on each speaker during the

24   proceedings.  When I do, please identify yourself by name for

25   clarity of the record.  After the speakers listed on the

1   Agenda for today's matters have spoken, I may provide an

2   opportunity for other parties in interest to address briefly

3   any issues raised during the course of the presentations that

4   require further remarks.

5        If you wish to be heard under these circumstances,

6   please state your name clearly at the appropriate time.  Don't

7   just use the wave feature on the Court Solution dashboard,

8   because you might not be noticed.  I will call on the speakers

9   if more than one person wishes to be heard.

10        Please do not interrupt each other or me during the

11  hearing.  If we interrupt each other, it is difficult to

12  create an accurate transcript of the proceeding, but having

13  said that, I apologize in advance for breaking the rule,

14  because I may interrupt if I have questions.  If anyone has

15  any difficulty hearing me or another participant, please say

16  something right away.

17        The Agenda, which was filed at docket entry no. 17567

18  in case no. 17-3283, is available to the public at no cost on

19  Prime Clerk for those who are interested.  I encourage each

20  speaker to keep track of his or her own time allotment.  The

21  Court will also be keeping track of the time, and will alert

22  each speaker when there are two minutes remaining with one

23  buzz, and when time is up, with two buzzes.

24        Here is an -- Ms. Ng, what happened there?  Ms. Ng,

25  can you still hear me?

1          MS. NG:  Yes, I can still hear you.

2          THE COURT:  All right.  Ms. Tacoronte, can you still

3   hear me?

4          COURT REPORTER:  Yes, Judge.  Good morning.  We can

5   hear you.

6          THE COURT:  All right.  I think I heard the voices

7   from San Juan there.

8          Mr. Rosen, from Proskauer, can you hear me?  Please

9   unmute and say something.

10          MR. ROSEN:  Yes.  Yes, Your Honor.  I can hear you.

11          THE COURT:  All right.  Then it seems that our

12   connections weren't interfered with by whatever happened.

13          So, now here is an example of the buzz sound.

14          (Sound played.)

15          THE COURT:  If your allocation is two minutes or

16   less, you will just hear the final double buzz.

17          This morning we are scheduled to proceed from now

18   until 12:30 in the afternoon.  If we take any breaks, I will

19   direct everyone to disconnect and dial back in at a specified

20   time.

21          In light of the filing of the Sixth Amended Plan of

22   Adjustment and the Sixth Amended Disclosure Statement on

23   Sunday, I now invite counsel for the Oversight Board to

24   provide an overview of the amendments and the associated

25   settlements with Ambac and FGIC that are reflected in those

9

1    documents.

2         MR. ROSEN:  Thank you very much, Your Honor.  This is

3    Brian Rosen from Proskauer Rose.  With me is Mr. Martin

4    Bienenstock, and also on the phone from Proskauer with

5    potential speaking roles are Ms. Laura Stafford and Steven Ma,

6    for items which are a little farther down on the Agenda.

7         Your Honor --

8         THE COURT:  Good morning.

9         MR. ROSEN:  Your Honor, first I'd like to thank you

10   for your granting of the urgent motion last week and the

11   extension by two days.  Those two days were extremely

12   necessary for us to finish the documentation of the -- what's

13   referred to as the PRIFA Related Plan Support Agreement and

14   the Sixth Amended Plan, as well as the corresponding

15   Disclosure Statement.

16        I would like to also thank the FGIC and Ambac teams

17   led by Martin Sosland and Atara Miller, respectively, for

18   their assistance in helping us get to that point, and getting

19   to that point very cooperatively, and because it was a very

20   seamless effort on all parts.  And we were able to achieve

21   something, which I believe, Your Honor, every day brings us

22   closer and closer to a total consensus in the case, and the

23   FGIC and Ambac Plan Support Agreement is a key component of

24   it.

25        With that, Your Honor, we are going to be able to

1   complete or resolve the revenue bond litigation that is out

2   there, and that, as you know, Your Honor, is currently

3   scheduled for hearing in September.  There would be additional

4   filings, but with that, Your Honor, we're not going to be

5   making those additional filings, as all the parties have now

6   requested a stay of those proceedings.

7          Pursuant to the Plan Support Agreement, Your Honor,

8   there will be certain amounts paid by the Commonwealth on

9   account of the PRIFA bond claims.  And specifically, Your

10  Honor, there will be a Rum Tax CVI that will be issued as part

11  of the Plan, as well as a cash component of approximately 193

12  million dollars.

13         That will be deposited into a PRIFA trust, along with

14  the clawback CVI that is already, or was already included in

15  the Plan.  Those will be all deposited into a PRIFA trust, and

16  that will break, Your Honor, upon the satisfaction of certain

17  distribution conditions, including an order being entered

18  either in connection with a Title III for PRIFA, or a Title VI

19  qualifying modification.

20         I say the "or", Your Honor, but pursuant to the Plan

21  Support Agreement that was entered into, both Ambac and FGIC

22  have a deadline to propose to the Oversight Board a Title VI

23  qualifying modification consistent with the terms of the Plan

24  Support Agreement.  That, Your Honor, would probably be

25  connected to a corresponding Title VI proceeding for CCDA,

1   because we understand that the monoline insurers would prefer

2   that as well.

3            And all of those, Your Honor, would be done at the

4   same time, to bring about a contemporaneous approval and

5   closure of the Commonwealth Title III case, the PRIFA Title VI

6   Qualifying Modification, and the CCDA Title VI Qualifying

7   Modification.

8            We feel comfortable, Your Honor, with respect to

9   those latter two.  CCDA is a situation where 100 percent of

10  the bonds are subject to monoline support and, therefore, we

11  know that we will have approval of that Qualifying

12  Modification by the pool that will be put together.

13           Likewise, in connection with PRIFA, Your Honor, we

14  have over a majority already of those bonds who will be

15  supporting a Title VI, and so we are very hopeful that the

16  balance of those that vote will help us get approval of that

17  Title VI Qualifying Modification for PRIFA.

18           Your Honor, with that, that is the bulk of what the

19  change is, and that was incorporated into the Sixth Amended

20  Plan.  There are a few other items that will need to be

21  modified in the Title VI Plan.  And specifically, Your Honor,

22  subsequent to the filing of it, we've received a lot of

23  informal communications from people who said, Brian,

24  Mr. Rosen, could you please -- I'm sorry, Title III Plan --

25  excuse me.  The Sixth Amended Plan.  It was asked, you know,

1    could you please make this corresponding change or that

2    corresponding change.  And we are cataloging all of those,

3    Your Honor, and we will make those.

4         Just an example of those, Your Honor, would be in

5    connection with Section 72.4 of the Plan, which is the FGIC

6    treatment of claims pursuant to the Plan, there have been

7    suggested changes that we have agreed to with FGIC, as well as

8    certain holders of FGIC-related bonds, and we will make that

9    change.

10        Section 92.2(e) of the Plan deals with the federal

11   claims limitation for release, and we've received

12   communications from the DOJ, the IRS, and the EPA to make

13   certain changes, and we will be doing that.

14        There was a slight blip in connection with the

15   definition of the CW General Unsecured Claims, and we've

16   worked that out with the Unsecured Claims Committee.  And

17   we'll be making a modification there.

18        In connection with the dairy producers, Your Honor,

19   I'm happy to report that last evening we reached an agreement

20   with one of the two dairy producers on a modification to the

21   treatment, and we are currently awaiting a response from the

22   second dairy producer.  But due to the Peruvian Independence

23   Day holiday, we are unable to get word back from their -- the

24   company, the principals, at this point in time.  And I know

25   that Suiza's counsel is on the phone, and they will be making

1    a very short statement on the record.

2          So with that, Your Honor, we are left with just the

3    five responses -- I'm sorry.

4          THE COURT:  May I just -- I just have a question.

5    With these, you know, modifications, will you make

6    corresponding -- well, are they ones that will call for

7    corresponding changes in the text of the Disclosure Statement?

8    Is it your representation that they are modifications that,

9    you know, would not be -- that would have a material effect on

10   disclosures as to other parties?

11         MR. ROSEN:  Yes, Your Honor.  Some of these were

12   already reflected in the Omnibus Reply that we filed last

13   evening, in the change pages that were annexed to that Omnibus

14   Reply.  None of these changes are in any way a material

15   change.  They are actually just clarifications.

16         The only change that actually goes to the treatment

17   of claims would be the dairy producers, and, specifically,

18   what we have been discussing with VTM, which is one of the

19   two, and Suiza, which we are waiting word back, would be a

20   reduction of the timeframe for a payout on the claim from five

21   years to three years, Your Honor.  But, again, that would not

22   represent in any way a material modification.  These are

23   really just -- the balance of them are just clarifications

24   that we will make.

25         We've chosen not to burden the Court with another

1   version prior to this hearing, Your Honor, because we wanted

2   to understand whether or not there would be any additional

3   changes that the Court would request us to make, and that we

4   would include those in a global modification of the Plan, as

5   well as Disclosure Statement, and affix that form of

6   Disclosure Statement then to any order that the Court would

7   enter approving the form of the Disclosure Statement.

8          THE COURT:  Thank you for making that clear.

9          Does the current Sixth Amended Plan agreement with

10  Ambac include resolution of the bankruptcy clause uniformity

11  litigation?

12         MR. ROSEN:  It will, Your Honor, yes.

13         THE COURT:  I had interrupted you, so --

14         MR. ROSEN:  Your Honor, what that does is it takes us

15  to the few responses that had been interposed to the amended

16  Disclosure Statement.  As the Court knows, pursuant to your

17  Order, parties had until 12:00 noon yesterday to file either a

18  response or an objection to the language that was in the

19  amended Disclosure Statement.

20         There were several responses filed.  One was by

21  Ms. Rosario in connection with Vieques, and it was truly a

22  recommendation, Your Honor, consistent with what she had been

23  informing us about last week.  My understanding is that

24  Ms. Rosario is unavailable to be on the phone today, but I

25  don't think that is anything that we need to address in

1   connection with the Disclosure Statement itself.

2        There were -- there was a response filed by Suiza

3   Dairies, and that was with respect to the reiteration of the

4   reservation of rights in connection with the takings claims

5   arguments that they had.  And there was a similar filing made

6   by Finca Matilde.  Both of those, Your Honor, were

7   reiterations of issues that had been argued by Mr. Bienenstock

8   at last week's hearing, and were subject to the Court's

9   determination that they were not issues that would stand in

10  the way of approval of the Disclosure Statement, and, rather,

11  would be items that would be taken up at the time of

12  confirmation.

13       So, Your Honor, I know that both counsel are on the

14  phone, and they can state their position, but our position,

15  Your Honor, is that those have already been dealt with once

16  already, and should be taken up with -- the result of that

17  should be the same as at the prior hearing, Your Honor, which

18  is, matters to be dealt with at confirmation.

19       There was also a reply filed by the DRA parties, and

20  they had requested certain language to be inserted into the

21  Disclosure Statement to make clear that the positions that

22  were being taken in the Disclosure Statement itself were the

23  positions of the Oversight Board and not fact or law.  And

24  that they wanted to have a corresponding position stated that

25  they disagreed with that.

1        And as reflected, Your Honor, in the sheets that were

2   annexed to the Omnibus Reply, we have inserted the language,

3   or we will formally insert when we refile the Disclosure

4   Statement the language that the DRA parties requested.  And we

5   believe that that has been taken care of.

6        There was a reservation of rights that was also filed

7   by Assured, but as I said, Your Honor, it was purely a

8   reservation of rights, and there was nothing to be responding

9   to there.

10       The last item that was filed was an objection by

11  Mr. Hein, who wanted to point out a few things that he

12  believed had not been addressed in the amended Disclosure

13  Statement.  We believe, your Honor, that we have included

14  those items, and we set forth in the chart, which is annexed

15  to the Omnibus Reply that we filed yesterday, a response to

16  each and every one of Mr. Hein's comments.

17       The only thing I would note, Your Honor, is that one

18  of the things that Mr. Hein asked for yesterday, and it was

19  really a repeat of his prior request, was a much more complete

20  chart that shows the actual recoveries that are going to be

21  made by holders of Commonwealth Bonds, whether they be in one

22  class or another.

23       We have now finished that chart, Your Honor, and

24  although that was not included in the materials that we filed

25  yesterday, because it was still in the process of preparation,

1    we will be including that either in the formal text of the

2    Disclosure Statement, or as part of an exhibit to the

3    Disclosure Statement.  So Mr. Hein's last request will be

4    taken care of, Your Honor, as part of that filing.

5            THE COURT:  So will that chart be formatted so that

6    it is showing the distributions per a round number, as he put

7    it, of par value, basically, as a proxy for showing what a

8    small bondholder would actually get for that small bondholder

9    type of holding of the --

10           MR. ROSEN:  Yes, Your Honor, it would be.

11           THE COURT:  Thank you.

12           MR. ROSEN:  With that, Your Honor, I don't think that

13   there's anything more that I need to respond to at this point

14   in time.  I will let -- if you want Mr. Hein to address

15   things, and then we can -- I and Mr. Bienenstock can respond

16   after the fact, to the extent that anybody makes any

17   additional comments.

18           THE COURT:  Well, I do have a couple of more

19   questions for you that relate, actually, to Mr. Hein's

20   submission.  So you may be able to at least clarify some of

21   the responses for me, and that may or may not help with

22   Mr. Hein's own remarks.

23           So, first, in my July 16th Order, I required

24   supplementation to include an explanation of any effect on the

25   marketability of the bonds arising from the distribution of

18

1    multiple bond issues to investors.  In your reply chart, you

2    quoted language that offers a rationale for the distribution

3    of multiple maturities.

4            Is there disclosure language addressing the effect of

5    fractional distributions of multiple maturities in respect of

6    the existing maturities?

7            MR. ROSEN:  Well, Your Honor, we did include -- and I

8    appreciate the fact that you've had an opportunity to review

9    the chart.  If you see, on the subsequent page, we try to

10   address the fractional -- or the fractional aspect of it with

11   the second insert there, and the need for differing

12   maturities, and, therefore, having differing bonds, and,

13   therefore, people getting smaller pieces of those bonds,

14   rather than one giant bond like Mr. Hein was requesting us to

15   do.

16           THE COURT:  Yes.  I saw that you did include in that

17   second excerpt an explanation of, again, the rationale for

18   taking someone across the potential pars and maturities --

19           MR. ROSEN:  Right.

20           THE COURT:  -- rather than doing one particular bond.

21           Is there anything that you believe you can or would

22   say about the difference to someone in terms of going to the

23   market and trying to sell these things between selling one

24   bond and having to sell multiple smaller bonds?  For example,

25   transaction costs may differ, or anything along those lines?

1          It seemed to me that was what Mr. -- at least as I

2    understood Mr. Hein on this, this is the sort of thing he was

3    looking for, what could happen as opposed to why is this

4    happening, which he also asked, why is this happening, but --

5          MR. ROSEN:  Your Honor, it's -- I mean, obviously the

6    marketability of the bonds is not something we can

7    specifically address.  You're right, there might be a

8    transaction cost if, in fact, somebody does have multiple

9    pieces of bonds, but the fact is that we need to issue the

10   multiple bonds themselves.

11         We thought one of his main concerns based upon the

12   fractionality was actually one of the aspects of the rounding

13   down, and we tried to show that that was --

14         THE COURT:  I have another question about that.

15         MR. ROSEN:  Yes.  We tried to show, Your Honor, the

16   effect of that.  There's a difference between what we're doing

17   here and what we did in COFINA.  There the denominations that

18   were issued, Your Honor, were much greater.  I believe they

19   were one thousand or greater, and here we've -- to try to take

20   into account the concern that Mr. Hein and others expressed

21   previously was, we're doing denominations of one dollar.

22         So the effect of rounding down is de minimis.  And

23   what we tried to show is, at most it could be -- I think it

24   was 13 dollars was what we reflected in the chart that we

25   included, Your Honor.

1            So we can't really say what the marketability could

2    be.  There might be, obviously, a result and effect of selling

3    a smaller piece, but we are limited as far as what we can do

4    based upon the maturities that we're doing them, that we are

5    issuing.  And the fact is that we do have to issue multiple

6    bonds in order to satisfy the distribution scheme that is laid

7    out.

8            THE COURT:  Thank you.

9            Now, I have on the Agenda remarks by supporting

10   parties before remarks by objecting parties, and so I have

11   five minutes for Ambac's representative, and then five minutes

12   for FGIC's representative.  I would propose to follow the

13   Agenda, and then call on the objecting parties, and then come

14   back to the movant.

15           Any objection to that, Mr. Rosen?

16           MR. ROSEN:  No, Your Honor.  The only thing I would

17   say is at some point I'd like to come back to Mr. Bienenstock

18   to add something to the record.  If you wanted to do that now

19   or later, please let us know.

20           THE COURT:  Now would be fine.

21           MR. ROSEN:  Okay.

22           MR. BIENENSTOCK:  Thank you, Your Honor.  This is

23   Martin Bienenstock for Proskauer Rose for the Oversight Board.

24           THE COURT:  Good morning, Mr. Bienenstock.

25           MR. BIENENSTOCK:  Your Honor, I just wanted to

1    address the addition we've made to the Disclosure Statement at

2    Your Honor's direction concerning what was referred to at the

3    last hearing as plan B.

4         As everyone has had an opportunity to see, the

5    Oversight Board has provided many so-called plan Bs that would

6    be possible if the government does not provide the legislation

7    required by the Plan Support Agreement with GO creditors.  And

8    I'm not going to repeat it all now.  It's not the purpose of

9    why I needed to take a few minutes to refer to this.  But we

10   provided a host of legal authorities for proceeding without

11   legislation, and we also, in the course of our research and

12   investigation, discovered that the Commonwealth has actually

13   enacted legislation back in 1944, which legislation authorizes

14   refinancings of general obligation debt.  And the Commonwealth

15   has been using and relying on that legislation in more recent

16   years to issue new debt.

17        And generally, Your Honor, the Oversight Board is

18   confident that while, as we said the last time, we hope to

19   reach an accord with the two houses of the legislature and the

20   Governor to provide the legislation that would be ideal, there

21   are many, many different ways we feel the Plan in effect can

22   be confirmed, whether we accomplish that or not.  And we

23   thought that was all good news, and we're still confident that

24   we'll be able to accomplish or satisfy the requirements for

25   confirmation, with or without the legislation.

1          That said, the identification by the Oversight Board

2   of the 1944 legislation caused a concern on behalf of the PSA

3   GO creditors.  And the concern that they had was they need to

4   know in advance, from their point of view, whether, if they

5   accept the Plan, the Oversight Board would later contend that

6   if it can't get new legislation from the Commonwealth, that

7   the existing legislation suffices such that their votes to

8   accept, which they are required to provide under the PSA,

9   would be counted as votes to accept the Plan that relies on

10  the 1944 legislation.

11         This, in turn, introduces a fair amount of intrigue

12  and game theory, because there are various scenarios under

13  which the PSA creditors and the Board might want to rely on

14  the 1944 legislation, and there are scenarios under which they

15  wouldn't.  And they all, in turn, depend on what the

16  alternatives are.

17         So although the Oversight Board believes that it is

18  not required to say in advance everything that might satisfy

19  the PSA agreement, there is really no reason for the Oversight

20  Board not to advise the PSA creditors, in advance of the

21  deadline for voting, whether the Oversight Board would contend

22  that the 1944 legislation does satisfy the requirement.

23         So the most important thing I want to say on the

24  record, Your Honor, is the Oversight Board will advise the PSA

25  creditors before their voting deadline as to whether we would

1    make that contention.  And I just want to reiterate that it's

2    quite possible that when we get to that point where we'll have

3    to advise them, that they may want us to rely on it, or not,

4    or we might want to rely on it, but, in any event, we will

5    tell them, so they will know when they vote whether the

6    Oversight Board would contend that the 1944 legislation

7    satisfies the PSA agreement.  And that's the most important

8    point.

9         And subject to any questions the Court has, that's

10   the only point I wanted to add.  Again, reiterating that we

11   hope to strike a deal with the government, but it is not

12   essential to ultimate confirmation we believe.  And we hope,

13   also, that it -- in any way we end up proceeding to get debt

14   issued under the Plan, we hope the PSA creditors will be on

15   board, because it's obvious to everyone, but just so as not to

16   avoid it, that if they terminate the agreement, then that

17   opens up litigation over their priority.  There's risk,

18   there's uncertainty, there's expense to all parties, you know,

19   to the Commonwealth side, the Board side, and the PSA

20   creditors.  And I think all parties would like to avoid that,

21   because it could result in either side ending up in a much

22   worse or better situation, but the much worse is the thing to

23   focus on.

24        So bottom line, we will advise the PSA creditors in

25   advance of the voting deadline whether we think the

1    legislation that exists already would satisfy their deal.

2    That does not mean -- now, we might say it does not.  We don't

3    believe it will satisfy their deal.  And we're going to look

4    at things like whether reputable law firms would opine that

5    that legislation covers the new debt, and its acceptance in

6    the municipal market, and all sorts of relevant

7    considerations.  But if we say it doesn't satisfy their deal,

8    I want to be clear, that does not mean that we will not want

9    to rely on it.  It will simply mean that they have not

10   accepted the Plan, and we would have to be asking the Court

11   for a cramdown.

12          And in that regard, I also want to point out that the

13   way this plan is being proposed and it's constructed, if the

14   Oversight Board determines at the end of the day that cramdown

15   is necessary in various cases, it may well require that we ask

16   the Court for an adjournment of the commencement of the

17   confirmation hearing, so that we can modify the Plan to

18   provide for one or more cramdowns that we would have to

19   request.  We hope things won't get to that, but I did want to

20   flag for the Court that that is a built-in possibility which

21   we disclose in the additions to the Disclosure Statement.

22          So with that, Your Honor, you know, I'd like to

23   respond to any questions the Court has, and if it doesn't have

24   questions, that's all I wanted to say.

25          THE COURT:  Thank you, Mr. Bienenstock.  I don't have

1   further questions for you on these matters.

2         MR. RAPISARDI:  Your Honor, this is John Rapisardi of

3   O'Melveny & Myers for AAFAF.  May I be heard for a couple

4   minutes on Mr. Bienenstock's comments?

5         THE COURT:  Yes, Mr. Rapisardi.

6         MR. RAPISARDI:  Thank you, Your Honor.  Good morning.

7   This is John Rapisardi of O'Melveny & Myers on behalf of

8   AAFAF.

9         Your Honor, first I would like to thank the Oversight

10  Board for including the government's requested statement

11  regarding its position on the Plan and the Sixth Amended

12  Disclosure Statement.

13        I would also like to congratulate the Board and

14  mediation team on reaching a final agreement with Ambac and

15  FGIC over the last two weeks.  Although AAFAF has no further

16  material objections to the amended Disclosure Statement, I do

17  want to make a few brief remarks, especially in light of what

18  Mr. Bienenstock just covered.

19        Your Honor, reviewing the Oversight Board's

20  supplemental disclosure on their plan B to achieve

21  confirmation of a plan without legislation, we are struck by

22  all of the uncharted and novel legal preemption theories

23  advanced by the Board's counsel.

24        Now, at the same time, in dispensing with its

25  expansive preemption argument in an inconsistent and confusing

1    fashion, which quite frankly, Your Honor, has my head

2    spinning, the Board now ties the Plan's fate to legislation

3    passed in -- it's 1942, not 1944 -- and other extraneous laws.

4         It seems as though the Board cannot make up its mind

5    either to completely eviscerate Puerto Rico law through

6    preemption, or instead cherry-pick inapplicable local

7    provisions which questionably gives the Board cover under

8    existing legislation.  This uncertain legal and potentially

9    expensive hedge is not what we should be striving for, nor is

10   it what creditors bargained for, or how the successful Puerto

11   Rico restructurings have proceeded to date.

12        And one has to question, Your Honor, if there is a

13   potentially easier way to ensure confirmation through

14   legislation, why does the Board seem so determined in the

15   first instance to take the risky and uncertain path through an

16   overly broad meaning and interpretation of preemption?

17   Perhaps it's because the Board now believes its newly

18   manufactured supplemental disclosure that creditors are

19   definitively better off without legislation, but this post hoc

20   rationalization is very hard to take and understand at face

21   value.  After all, as Mr. Bienenstock has alluded to, the

22   Board agreed to allow bondholders the option to terminate the

23   PSA and collect a 100 million dollar fee if legislation is not

24   enacted before confirmation.

25        As we have previously stated, the fact of the matter

1    remains that this plan is built on the progress made in the

2    restructurings of COFINA and GDB, each of which enjoyed

3    enabling legislation and broad support from the government,

4    the Oversight Board, and creditors.

5         This, Your Honor, is the gold standard we should all

6    be striving for, and is the logical foundation upon which a

7    durable solution for Puerto Rico should be built.  Over the

8    past four years, at every step of the way, we have heard the

9    Board's mantra that Puerto Rico and its constituencies must

10   live within the parameters or solutions for each major

11   constituency, because of a legitimate concern over the

12   uncertain outcome of litigation concerning highly novel and

13   complex issues and inordinate delay.

14        The government, Your Honor, while believing in the

15   strength of legal arguments asserted against many of these

16   selling parties, agreed with the Board's approach, and

17   actively cooperated with the Board in bringing these

18   settlements to fruition.  To date, the settlements achieved

19   with many of the previously objecting parties, which we

20   thought were not possible, is why Puerto Rico is on the

21   threshold of successfully emerging from Title III.

22        Why has not that same practical approach been applied

23   to the interest of the government to protect the most

24   vulnerable in Puerto Rico society, and to the government's

25   proper role in --

1            (Sound played.)

2            MR. RAPISARDI:   -- exercising its government

3    functions?

4            I respectfully submit that the answer to this

5    important question, Your Honor, should be addressed within

6    the confines of a condensed and dedicated negotiation process

7    as promptly as possible, and not left unresolved as a

8    potentially dangerous, lingering uncertainty, which

9    Mr. Bienenstock alluded to earlier.  The reality is that

10   pension cuts and freezes are neither necessary nor required as

11   a matter of fundamental fairness.  The obligations owed to the

12   pensioners are inherently different than those owed to other

13   creditors.

14           The retirees have seen their pensions, which they

15   earned through years of prior dedicated service, steadily

16   eroded through the various cost-saving measures over the last

17   15 years, such as the elimination of cost-of-living

18   adjustments, or freezes of benefits.  Indeed, the pensioners

19   have no recourse in the markets to sell their claims at

20   appreciated values and levels, which makes the circumstances

21   of their situation even more precarious.

22           AAFAF and its advisors have closely worked with this

23   Board and its advisors for over four years now in steadily

24   moving these cases forward through extraordinary times and

25   challenges.  At the last hearing, while listening to

1   Mr. Bienenstock's unfortunate and desperate attacks on the

2   government, we were given the strong impression that the Board

3   would properly engage with the government in seeking a

4   resolution of the pension-related issues.

5          Other than being dismissively told, in the context of

6   the amended Disclosure Statement, that the government's Title

7   solution that was proposed does not work, no outreach by the

8   Board, Your Honor, since then or its advisors to the

9   government has yet occurred.  We disagree with the Board's

10  argument that our Title II solution does not work, and would

11  welcome the opportunity to discuss it, overcome any

12  self-evident challenges.

13         In that regard, Your Honor, the government today is

14  prepared to affirmatively reach out to the Board to advance

15  settlement discussions and resolution of the pension issues

16  that will finally bring these cases to a successful end and

17  benefit the people of Puerto Rico.

18         Thank you, Your Honor.

19         THE COURT:  Thank you, Mr. Rapisardi.

20         I do encourage the Board and the government to engage

21  in and continue to engage in good faith discussions.

22         So at this point I will call on Ambac's

23  representative, who has been allotted five minutes.

24         MS. MILLER:  Good morning, Your Honor.  Atara Miller

25  from Milbank on behalf of Ambac Assurance Corporation.

 1              THE COURT:  Good morning, Ms. Miller.

 2              MS. MILLER:  So it's unusual for me to not be among

 3    the most passionate people at one of these hearings, but I am

 4    happy to be in that position where really all I would say is

 5    that, in light of Mr. Rosen's summary of the terms of the

 6    agreement that we've reached with the Oversight Board, which

 7    was comprehensive and accurate from our perspective, and

 8    Mr. Bienenstock's representation that the Board will at least

 9    advise creditors in advance of voting whether there will be

10    new legislation, or whether they intend to rely on the

11    existing 1942 statute, I don't have anything to add this

12    morning other than to again thank the Court for your

13    flexibility, and various adjournments of this hearing, and the

14    filing deadlines that gave us the time to reach the agreement

15    and to finalize the documentation.  And also to thank the

16    Oversight Board and their cooperation in getting it done in a

17    productive and fairly quick way.

18              So with that, unless Your Honor has any questions

19    that you'd like us to answer, I would cede my time.

20              THE COURT:  Thank you, Ms. Miller.  I don't have any

21    further questions.

22              So now I will call on Mr. Sosland for FGIC.

23              MR. SOSLAND:  Good morning, Your Honor.  Martin

24    Sosland of Butler Snow for Financial Guaranty Insurance

25    Company.

1          I join Mr. Rosen and Ms. Miller in thanking the Court

2   for your flexibility in allowing us to reach the bargain that

3   we've reached.  And I am pleased to be before the Court today,

4   after four years of hard-fought litigation in this Court,

5   following several years in other courts before the passage of

6   PROMESA, to finally reach the resolution of our debt issues

7   with the Oversight Board.  And it was a -- it was a tough,

8   arm's-length negotiation, and we are happy to have reached it,

9   and now to be moving forward arm-in-arm with the Oversight

10  Board and to consummate these deals.

11         I would punctuate one point that Mr. Rosen made in

12  addition to proceeding toward confirmation of the Commonwealth

13  Plan and this Title III case, that we will be moving promptly

14  to proceed under Title VI, with respect to PRIFA and CCDA, to

15  try to keep the resolutions embodied in the various plan

16  support agreements that have been executed, keep those on the

17  same pace with the Commonwealth Plan.

18         Finally, just as a point of information, among the

19  items resolved by the settlements that we've reached are the

20  3018 motion that FGIC had filed, originally set August 4th,

21  but the last time we were before you at the commencement of

22  the disclosure hearing, you asked the parties to meet and

23  confer on a hearing date.  That hearing date will no longer be

24  necessary, as the agreement with respect to voting will be

25  embodied in the order proposed by the Oversight Board, and the

1 | proposed amended order on solicitation procedures and voting

2 | includes the resolution of our 3018 motion.

3 | We will be filing an informative motion related to

4 | that once the Court has entered the order that the Oversight

5 | Board has proposed, assuming that you do.  I do want, however,

6 | to just note one point related to that.

7 | Following the filing of FGIC's 3018 motion, the Ad

8 | Hoc Group of FGIC Insured Bondholders had filed an informative

9 | motion noting an inadvertent error in an exhibit that we had

10 | included in the 3018 motion.  It doesn't change the voting

11 | rights under 301(c)(3)(B) of PROMESA that FGIC holds, but it

12 | did overstate the amount of bonds that FGIC owns --

13 | (Sound played.)

14 | MR. SOSLAND:  -- which is insured in three different

15 | CUSIPs.  And there is an exhibit to the order that the Board

16 | has proposed that includes the correction that was requested

17 | by the Ad Hoc Group of FGIC Bondholders.

18 | That concludes my remarks, Your Honor.  Thank you.

19 | THE COURT:  Thank you.

20 | I just have a question regarding this reconciliation

21 | or resolution of the 3018 motion with the new proposed order.

22 | So am I to understand that the order on the Disclosure

23 | Statement and Solicitation Procedures that the Board will

24 | provide will also specifically provide for termination or

25 | withdrawal of the 3018 motion, or will there be a separate

1    filing that -- and, frankly, I'm asking you this in part so

2    that we can keep this incredibly complex docket clear and

3    accurate.  Will you be filing something that withdraws the

4    3018 motion and permits the clerk's office to terminate that

5    as an active contested matter?

6         MR. ROSEN:  Your Honor, this is Brian Rosen.

7         If I could just briefly say, I note that in some of

8    your other orders that you've entered, you include usually a

9    last provision that says that, this order resolves all matters

10   associated with, and then you cite the specific ECF number.

11   We can include that type of language in the Solicitation

12   Procedures Order, that it will resolve the 3018 motions.

13        THE COURT:  That would be very helpful indeed.

14        While you're back on, Mr. Rosen, with respect to the

15   revenue bond adversaries, I think the last urgent motion or

16   stipulation that I find in respect of those put out filing

17   deadlines, but kept the scheduled argument date on the

18   supplemental summary judgment provisions for the middle of

19   September.  So will you be making a further filing that either

20   withdraws those motions or has them adjourned sine die?

21        MR. ROSEN:  Your Honor, we're not dismissing the

22   motion itself, but we will be adjourning those, yes.

23        THE COURT:  Okay.  Very good.  I just wanted to be

24   clear as to what to expect in that regard.

25        MR. ROSEN:  Yes, Your Honor.

1           THE COURT:  Thank you so much.  Thank you all.  So --

2           MR. SILVERMAN:  Your Honor, this is -- excuse me.

3   This is Ronald Silverman from Hogan Lovells on behalf of U.S.

4   Bank.

5           May I briefly make a clarification regarding what

6   Mr. Sosland said and Mr. Rosen said earlier?

7           THE COURT:  Yes, you may.

8           MR. SILVERMAN:  Thank you, Your Honor.

9           Speaking on behalf of U.S. Bank with respect to its

10  role as the PRIFA Trustee, now that there has been a global

11  deal with respect to the PRIFA Rum Tax Bonds and the most

12  recent Sixth Amended Plan does now for the first time allow

13  those claims in the full amount that the FOMB is estimating

14  them at, I want to -- I thought it was helpful, as you said,

15  to make the docket efficient and not to clutter it, to make it

16  clear that, because there's an aggregate allowed amount of

17  claims for the PRIFA Rum Tax claims, that all holders of those

18  claims, whether they're monoline or non-monoline, potential

19  holders are entitled to vote their pro rata share of the

20  aggregate allowed claims.

21          And the reason I say that is the Disclosure Statement

22  Order, as I read it, does provide for that, because the claim

23  has been allowed in the Plan.  But there's another part of it

24  that said if your claim has been objected to, then you have to

25  file a 3018.  That's, of course, why FGIC and Ambac filed

1    3018s.  But now that that's resolved, and the claim has been

2    allowed, I just wanted to get confirmation from the FOMB that

3    ballots will -- that ballots will be sent to beneficial

4    holders, just to clarify that no one needs to worry that they

5    need to actually file a 3018 in order to get their claim

6    allowed in the pro rata share of the allowed amount of the

7    aggregate PRIFA claim.

8            MR. ROSEN:  Your Honor, this is Brian Rosen again.

9            That is correct.  The ballots will be distributed

10   through the DTC, I believe, to all of the uninsured

11   bondholders, and they will be permitted to vote their PRIFA

12   Bond claims.

13           MR. SILVERMAN:  Thank you very much.

14           THE COURT:  Thank you both.

15           Is there anyone else who wanted to be heard before I

16   call on the objecting parties to speak?  If so, say your name

17   now.

18           MR. GORDON:  Yes, Your Honor.  Robert Gordon of

19   Jenner & Block on behalf of the Retiree Committee.  May I be

20   heard?

21           THE COURT:  Good morning, Mr. Gordon.

22           MR. GORDON:  Thank you, Your Honor.

23           I just wanted to comment very briefly in response to

24   the colloquy, as it were, of Mr. Bienenstock and

25   Mr. Rapisardi.  As the Court knows, back in June of 2019, the

1   Retiree Committee entered into one of the very first plan

2   support agreements with the Oversight Board, which we would

3   submit was a very important document establishing a very

4   important baseline for further negotiations of the Plan that

5   is before the Court today.  And we certainly -- the Retiree

6   Committee recognizes and respects its obligations under the

7   current Plan Support Agreement it has with the Board.

8          At the same time, I just want to make the record

9   clear that over the course of these past two years, we have

10  had our share of conversations with the legislature, the

11  Governor, and the Oversight Board to offer our assistance, our

12  expertise, our resources to bridge gaps and to provide

13  analysis, as needed, with respect to the issue of the

14  pensions.  And we continue to stand by and stand ready to

15  provide that assistance, and hope that conversations, dialogue

16  will progress, and that the parties will reach out to us and

17  avail themselves of our perspectives and our analysis as those

18  discussions continue.

19         Thank you, Your Honor.

20         THE COURT:  Thank you, Mr. Gordon.

21         Now I will call on counsel for the DRA parties

22  objecting, who have been allotted three minutes.

23         MR. MINTZ:  Thank you, Your Honor.  Doug Mintz from

24  Schulte Roth.  Can you hear me okay?  I don't have my usual

25  set-up unfortunately.

1          THE COURT:  I can hear you just fine.  Good morning,

2    Mr. Mintz.

3          MR. MINTZ:  Good morning.  Doug Mintz of Schulte Roth

4    on behalf of Cantor-Katz, along with McConnell Valdes on

5    behalf of AmeriNat for the DRA parties.  I think I'll be

6    filling the entire time, although I don't know that I'll need

7    three minutes.

8          As the Court knows, you asked the Oversight Board

9    last week to explain their proposed treatment of the DRA's

10   secured PBA claim.  As Mr. Rosen noted, they did add a

11   footnote, footnote 373, that purported to address it.

12         We reached out to them to flag our concerns about the

13   language, that it was stating as fact what we believe to be

14   their view.  We asked them to make a few modifications and to

15   note our disagreement.

16         Resolution was not reached until after we had filed

17   our objection, but, as Mr. Rosen noted, they have modified the

18   language essentially along the lines we requested.  That's

19   attached to their reply brief, which is, I believe, 17552 on

20   the docket.  Those changed pages --

21         (Sound played.)

22         MR. MINTZ:  -- that are attached to the reply brief

23   are satisfactory to the DRA parties, so our objection has been

24   addressed.

25         And, finally, we note that the Court has heard and

1  addressed a number of the concerns we raised last week with

2  respect to the discovery process.  Our concerns, of course,

3  remain.  The timeline is extremely tight, but we'll work

4  within the confines identified by the Court and raise any

5  issues for Judge Dein, should they arise.

6          So with that, unless you have any questions, I'll

7  step down.

8          THE COURT:  Thank you very much, Mr. Mintz.

9          MR. MINTZ:  Thank you, Your Honor.

10         THE COURT:  And now counsel for Finca Matilde.

11         MR. CAPDEVILA DIAZ:  Good morning, Your Honor.  For

12  the record, Eduardo Capdevila on behalf of Finca Matilde.

13         THE COURT:  Good morning, Mr. Capdevila.

14         MR. CAPDEVILA DIAZ:  First of all, I would like to

15  thank Libbie Osaben from Proskauer for taking her time and for

16  her patience for doing the Agenda today and late last night.

17  Thank you very much.

18         Now, as for our position, our client at this point is

19  not questioning the feasibility of the proposed plan.  Our

20  client is challenging the legality of the actions that the

21  Disclosure Statement proposes that the Board and the debtor

22  will do.  That is not a factual matter, but a straightforward

23  issue of law:  Can section 944 of the Bankruptcy Code, as

24  applicable to PROMESA, discharge or modify the debtors'

25  obligation to pay just compensation.

1           The Supreme Court has specifically stated that such

2    obligation to pay just compensation is irrevocable.  My client

3    is not requesting damages, but, at this point, can PROMESA or

4    section 944 of the Bankruptcy Code modify the obligation to

5    pay just compensation of the 5th and 14th Amendment?

6           That is our position.  If the Court would like, we

7    can address any questions or --

8           (Sound played.)

9           THE COURT:  I do understand that that is your

10   position, and as I ruled last week, I have determined that

11   that position, including any question as to what constitutes

12   just compensation within the meaning of the constitutional

13   provisions and the effect of the Bankruptcy Code with respect

14   to that are matters properly taken up in connection with

15   confirmation.

16          So I do understand your legal position and your

17   argument.  Thank you, Mr. Capdevila.

18          MR. CAPDEVILA DIAZ:  Okay.  Thank you.

19          THE COURT:  Next I have counsel for Suiza Dairy for

20   one minute.

21          MR. GONZALEZ VALIENTE:  Yes.  Hi.  Good morning, Your

22   Honor.  Rafael Gonzalez Valiente in representation of Suiza

23   Dairy.  We won't take long of the Court's time.

24          First, I would like to confirm Mr. Rosen's comments

25   that we are in conversations to try to settle our differences,

1    but we still need time for that.  I also would like to -- Your

2    Honor, we simply want to make a reservation of rights and make

3    sure that the record shows our objections.

4         Since the treatment for Suiza Dairy didn't change in

5    the amended Disclosure Statement, we just wanted to restate

6    our objections that were raised to the prior Disclosure

7    Statement, and that both our written and oral objections be

8    deemed stated or reaffirmed before this Disclosure Statement.

9         Unless the Court has any questions for us, we are --

10   that's the only thing we wanted to say, Your Honor.

11        THE COURT:  Thank you.  Your objections and

12   reservation of rights are clear and as of record, and to the

13   extent that I overruled any objections as going to the

14   Disclosure Statements, I also made clear that arguments can be

15   made in respect of the application to confirm the Plan.

16        MR. GONZALEZ VALIENTE:  Thank you, Your Honor.

17        And we understand -- we understand, and we just

18   wanted to make that reservation for the record.  That's it.

19   Thank you, and that's it.

20        THE COURT:  Very well.  Thank you.

21        Now, Mr. Hein.

22        MR. HEIN:  Yes.  Your Honor, can you hear me?

23        THE COURT:  Yes, I can.

24        MR. HEIN:  Thank you.

25        THE COURT:  Good morning, Mr. Hein.

41

1          MR. HEIN:   Thank you.  Good morning, Your Honor.

2          I will start with a significant new development that

3     Mr. Rosen did not mention.  I learned yesterday afternoon that

4     the Oversight Board had posted on EMMA a notice to all holders

5     of uninsured GO and PBA bonds, telling all bondholders,

6     expressly including retail beneficial holders, they could join

7     the PSA by tendering their bonds for exchange into new CUSIPs.

8     And also telling all bondholders, including retail investors,

9     that unless they joined the PSA by 5:00 PM on Friday, August

10    13th, they would not be eligible to receive the PSA

11    restriction fee.

12         There was no prior disclosure that a PSA joinder

13    solicitation would go to retail investors.  This PSA joinder

14    solicitation is not accompanied by the Disclosure Statement.

15    There's a link to the proposed Disclosure Statement, but of

16    course the Court has not approved that yet.  And as Mr. Rosen

17    has acknowledged, the Disclosure Statement is going to change.

18         As Your Honor discussed with Mr. Rosen, the Oversight

19    Board has agreed, in response to my objections, to add to the

20    Disclosure Statement an illustrative chart showing the

21    distributions of each maturity of the new GO bonds and CVIs

22    that are going to be made to each bond class under the Plan,

23    presumably the same type of chart that they had in the COFINA

24    Offering Statement, so that investors can see what securities

25    they're actually going to receive per some round number, like

1    a hundred thousand par.

2            As I hear Mr. Rosen, the Oversight Board also appears

3    to agree that holders can retain their fractional one dollar

4    denomination bonds, and, respectfully, the Disclosure

5    Statement should be modified to state that expressly, that the

6    fractional one dollar denomination bonds can be retained by

7    investors.

8            This was a problem in the COFINA situation where

9    there were forced involuntary sales of fractional bonds

10   distributed in increments of less than one thousand par.  So

11   they were fractional bonds, but they were forced sold.  If the

12   Oversight Board has solved that problem that occurred with

13   COFINA, that's great.  But the Disclosure Statement should be

14   clear on the point.

15           There's also a contradiction in the documents that is

16   not disclosed in this PSA joinder solicitation that just went

17   out.  The new PSA joinder solicitation states it's open to all

18   bondholders, including retail bondholders, but the attached

19   PSA still provides in section 2.3 of the PSA, titled

20   Additional Parties, for -- the opportunity to join the PSA to

21   be extended only to holders in excess of one million par.

22           So the PSA joinder solicitation is inconsistent with

23   the terms of the PSA, limiting joinders to people with a

24   million par or more, and also inconsistent with the plan

25   structure that sets up eight retail classes for those holding

1   one million or less.

2        The PSA joinder solicitation states it's not a

3   solicitation of acceptance of the Plan, but anyone who joins

4   the PSA is, under section 5.1 of the PSA, committed to support

5   confirmation of the Plan.  So this, in substance, is a

6   solicitation of acceptance of the Plan.

7        If a retail investor joins, does the Oversight Board

8   say that the retail investor can still vote no?  By setting

9   this August 13th deadline for retail investors to join the

10  PSA, the Oversight Board seeks to require a decision by retail

11  investors who do not even have an approved Disclosure

12  Statement, before the Court even considers my pending and

13  fully briefed renewed motion to have a committee appointed for

14  the eight retail classes.

15       I ask that any deadline for joinder of the PSA should

16  be put off to a future date after the motion to appoint a

17  retail investor committee is heard.  It's currently scheduled

18  for August 18th, because I had a travel issue at the time it

19  was scheduled.  My travel plans have changed, and if it helps

20  Your Honor, I'd be willing to have this heard on August 4th,

21  in order to permit Your Honor to address that motion before

22  this August 13th deadline given to retail investors on the

23  joinder of the PSA.

24       Your Honor, there is just no reason for an August

25  13th deadline, no reason to force individuals to be making

1   that decision before there's even a disclosure statement

2   approved by the Court, before the Disclosure Statement is

3   finalized and distributed.  And, you know, also, this joinder

4   solicitation should not go forward --

5        (Sound played.)

6        MR. HEIN: -- until the PSA is clarified as to whether

7   or not retail investors being solicited to join actually can

8   consistent with the terms of the PSA.

9        Turning to the additional objections in docket 17536

10  that have not been addressed, item ten in the Court's Order

11  required the Oversight Board, as Your Honor noted, to disclose

12  any effect on marketability, as well as the rationale.  Yet,

13  still, nothing is said in the Disclosure Statement on the

14  subject of marketability.

15       And, secondly, the Court's Order specifically

16  instructed in item 10 there be a disclosure of the rationale

17  for structuring distributions using multiple kinds and

18  maturities of bonds.  That, too, has been ignored.  The

19  Oversight Board says the new bonds will be term bonds with

20  mandatory Sinking Fund, but the critical question is, why not

21  just distribute to the investors in the 50 states one term

22  bond with the Sinking Fund that would be marketable.  One term

23  bond with the Sinking Fund is what is being given to Puerto

24  Rico investors who elect the Puerto Rico investor option.

25  There is no disclosure or rationale for why 12 splinter bonds

1    are being issued to investors in the 30 states.

2         The fact that an existing bondholder may have, for

3    example, one 2033 maturity, that one bond position, the fact

4    that there might be out there a bunch of different maturities,

5    if the investor has one maturity, say, 2033, why should they

6    be receiving 12 splinter bonds each with its own maturity

7    ranging from 2023 to 2046, as opposed to one term bond with

8    the Sinking Fund.  There's no disclosure of the rationale for

9    that.

10         Finally, briefly on the subject of the tax

11   treatment --

12         (Sound played.)

13         MR. HEIN:  -- I appreciate -- if I may just finish

14   the thought, Your Honor?

15         THE COURT:  Yes.

16         MR. HEIN:  I appreciate the Oversight Board's

17   willingness to provide an update at the confirmation hearing,

18   but there is no reason given for why the Oversight Board can't

19   provide public updates through EMMA or its website as

20   information becomes available, including information becoming

21   available before the confirmation hearing.

22         Thank you, Your Honor.

23         THE COURT:  Thank you, Mr. Hein.

24         And now I return to the Oversight Board's counsel to

25   respond.

1           MR. ROSEN:  Thank you very much, Your Honor.  This is

2     Brian Rosen again from Proskauer Rose.

3           First let me address the retailer investor comment,

4     and that was expressly put in at the request of Mr. Hein,

5     because of some of the things that he made at the prior

6     hearing about retail investors not having an opportunity to do

7     something.  He misinterprets for the Court what is actually

8     being done.

9           Your Honor, as part of the Amended and Restated Plan

10    Support Agreement that was done with the GO PBA holders, we

11    made available to everyone, the retail investors as well,

12    through a change in the terms of what is referred to as the

13    PSA restriction fee, the opportunity for people to

14    participate.  And by no means, however, does this tender and

15    exchange preclude retail investors from participating in the

16    PSA restriction fee.

17          Specifically, Your Honor, the need to do the tender

18    and exchange is because we need to be able to create an

19    alternate CUSIP number that can be tracked and that we can

20    actually understand who is going to be the recipient of a PSA

21    restriction fee.  By including retail investors, which is

22    something that Mr. Hein asked for, we're providing for them

23    the opportunity to do that as well.

24          What the Plan that was filed the other day does is it

25    says that anybody, any retail investor who decides to do the

1    tender and exchange pursuant to section 2.2 of the Amended and
2    Restated Plan Support Agreement, they will no longer be
3    considered to be a retail investor for purposes of the Plan.
4    They will instead then be included in the overall class.

5          Taking as an example a vintage Commonwealth Bond
6    claim, if they were a retail investor in that class, they
7    would then become an actual member of that larger grouping,
8    but that does not mean that those that do not respond to the
9    tender and exchange will lose out on the opportunity to be a
10   recipient of the restriction fee.

11         Specifically, Your Honor, the plan that was filed on
12   Tuesday morning still includes the opportunity for those
13   retail investors to receive the PSA restriction fee, in the
14   event that their retail investor class votes to accept the
15   Plan.  In the event that they do not, then the amount of PSA
16   restriction fee that otherwise would be allocable to that
17   retail investor class will revert to the initial PSA
18   creditors.

19         And that, Your Honor, has been, as part -- it was in
20   the Fifth Amended Plan, but we modified it in the sixth to
21   make sure that retail investors had that opportunity to get in
22   now in the first instance, as Mr. Hein had requested in his
23   prior objection to the Disclosure Statement.

24         So there has been no change.  There has been no
25   preclusion.  And Mr. Hein can certainly still seek to

1   represent or have appointed a retail investor class at that

2   August 18th hearing, Your Honor.  There is nothing that has

3   changed.

4       We're doing this because we needed to deal with the

5   tender and exchange, and the creation of the alternate CUSIPs,

6   and have that done in a time frame so that we can then

7   continue the actual solicitation of votes pursuant to the

8   Commonwealth Plan of Adjustment, Your Honor.  Because until

9   you do that, you cannot actually send out the solicitation

10  materials.

11      So we had to stagger and have the tender and exchange

12  done first, and that will be done by August 13th.  And I think

13  the settlement date is then August 17th.  And then the Plan

14  solicitation materials will be sent out by Prime Clerk

15  subsequent to that settlement date.

16      You cannot have one without first achieving the

17  tender and exchange, Your Honor.  So that is why they are

18  staggered.  There is no prejudice to retail investors.  They

19  can still do it.  If they don't do it in the first instance,

20  they can still vote in support of the Plan.  And if that class

21  votes, they get their allocable share of the PSA restriction

22  fee, Your Honor.

23      I hope that addresses the concern.

24      THE COURT:  Well, what do you say to Mr. Hein's

25  argument that by asking people to join the PSA and do this

1    CUSIP tender, you are effectively requiring them to vote early

2    on the basis of documents that are not final or approved by

3    the Court?

4            MR. ROSEN:  Your Honor, that's the same sort of

5    provision -- I mean, it is what is in the current, amended,

6    and the stated Plan Support Agreement, Your Honor,

7    specifically Article 5.  It talks about -- or section 5.2 of

8    that Plan Support Agreement, it talks about it not being a

9    solicitation.

10           But yes, Your Honor, if people do want to get that

11   solicitation -- excuse me, that restriction fee, they do need

12   to support the Plan.  That is a standard provision, and it is

13   in all the plan support agreements.

14           THE COURT:  The solicitation that will go out under

15   the new CUSIP will still require the filing of a ballot by

16   someone who tenders for the new CUSIP, so there will still be

17   a separate vote?  If they vote negatively, they won't get the

18   additional fees; is that correct?

19           MR. ROSEN:  That is correct, Your Honor.  We will

20   know, because we -- if they had tendered an exchange pursuant

21   to the notice that is out there on EMMA and they are receiving

22   through DTC, we will be able to track that CUSIP.  We will

23   know if, in fact, they continue to comply, and if they don't,

24   then their vote won't count and they will not be entitled to

25   the restriction fee.

50

1           THE COURT:  All right.  So they still have the

2   opportunity to vote against the Plan, but they wouldn't be

3   getting the restriction fee, because they're not supporting

4   the Plan?

5           MR. ROSEN:  Yes, Your Honor.  Yes.

6           THE COURT:  Thank you.

7           MR. HEIN:  Your Honor.

8           THE COURT:  Let me let Mr. Rosen make any further

9   responses to the objections, and then I will hear you again,

10  Mr. Hein.

11          MR. ROSEN:  Yes, Your Honor.  The balance of

12  Mr. Hein's comments are things that we've already addressed,

13  including the jumbo note that he is looking for.  We really

14  -- as we indicated in the reply, that is just something that

15  we cannot do, and we think it would be inappropriate based

16  upon the circumstances.

17          We have done everything that we think possible to

18  address Mr. Hein's concerns, either in the modifications that

19  we've already reflected in the Disclosure Statement, as well

20  as the chart that I indicated we will be including.  It is

21  some -- I don't want to say it's a voluminous chart, but it

22  does provide all of the information that Mr. Hein has been

23  asking for, and it is consistent with the chart that was

24  included in the COFINA Disclosure Statement.

25          With that, Your Honor, I would turn it back to you

1  and to Mr. Hein.

2            THE COURT:   Thank you.

3            Mr. Hein.

4            MR. HEIN:   Yes.   I think, Your Honor, respectfully,

5  the fact that retail investors are being forced to make a

6  decision by August 13th, without a Disclosure Statement, is

7  just not appropriate.   It renders this whole process we've

8  been going through on the Disclosure Statement totally

9  academic, if that is permitted to stand.

10           And there is no earthly reason that, first, this

11  should not have been surfaced, and beyond my having to

12  belatedly notice that they were posting something on EMMA.

13  And, secondly, people are entitled to a full Court approved

14  Disclosure Statement before they're forced to make that

15  decision.

16           An individual is effectively being told, if you want

17  to be sure to get the 1.321 percent that other investors are

18  getting, you have to make your decision by August 13.   If you

19  don't, you run the risk you aren't going to get that.   And if

20  you do opt to join the PSA, you now are -- voted yes.

21           This is not giving people a choice.   It's not giving

22  them full disclosure.   It's not giving me full disclosure.

23  But also, many, many thousands of individuals are being forced

24  into this rushed choice by August 13th without full

25  disclosure, and this has never been on the table before.   It

1    is certainly not something I, in any way, requested, forcing

2    people into making a decision without full disclosure with an

3    August 13th deadline.

4         And respectfully, I think, Your Honor, the proper

5    approach here would be to address my motion to have a retail

6    investor committee.  I am willing to have that argued August

7    4th in order to get it resolved on a timely basis.  And I

8    think that this is the type of issue -- this is exactly why we

9    need a retail investor committee in this case, so that there

10   is a body that has a fiduciary duty to these thousands of

11   individuals who can address issues, and have a dialogue on

12   issues like this, and hopefully reach some resolution that is

13   fair and appropriate to these thousands and thousands of

14   individuals, including me.

15        Thank you, Your Honor.

16        THE COURT:  Thank you.

17        Mr. Rosen, would you explain again the voting

18   procedure for people who elect to get the new CUSIP?  Does

19   that automatically vote their interest in favor of the Plan or

20   do they still have to cast a ballot?

21        MR. ROSEN:  Your Honor, by tendering and exchanging,

22   they essentially are signing the joinder to the Amended and

23   Restated Plan Support Agreement, which says that they will

24   vote in favor.  That does not, however, actually cast the

25   ballot.  They then still have the opportunity to cast the

1    ballot.  And if they decline to do so in the way that they've

2    agreed pursuant to the joinder agreement, we will take note of

3    that.  And as I indicated, Your Honor, they then would not be

4    entitled to the fee itself.

5         The benefit of doing the tender and exchange is that

6    we will be able to track those, just like we will be able to

7    track the countless other people who have signed joinders

8    already to that Plan Support Agreement and who want to be

9    included in that PSA restriction fee.  We're able to track it.

10   Because in the absence of the tender and exchange, Your Honor,

11   if there were subsequent trades made, we wouldn't be able to

12   track who was the actual holder, who was entitled to the PSA

13   restriction fee.

14        It's a necessity to create the alternate CUSIP, and

15   so that's why we've gone through this process, Your Honor, to

16   effectively monitor who is entitled to the fees.

17        MR. HEIN:  Your Honor, this is Peter Hein.

18        THE COURT:  Hi.

19        MR. HEIN:  If I may just -- you know, what you're

20   basically doing, first, is if someone, in order to ensure they

21   get the fee that they certainly should get, accepts by August

22   13th, that then means that they would be violating their

23   contract if they vote no.  So if -- they don't have the choice

24   of violating the contract and voting no.  That's not a choice.

25        Secondly, what Mr. Rosen just said is that you're

54

 1  going to have separate CUSIPs.  So if, hypothetically, John

 2  Smith accepts by August 13th, gets the new CUSIPs on August

 3  17th, and then on August 20th, John Smith -- and, you know,

 4  you've got thousands of individuals.  They're not going to be

 5  focused on stuff like this.  John Smith sells that CUSIP to

 6  Mary Jones, and down the line the Oversight Board is saying

 7  that if John Smith ends up voting no, Mary Jones, who has the

 8  new CUSIP, is going to have her fee taken away.

 9          I mean, this is -- we're talking thousands of

10  individuals here of not being adequately informed, and

11  certainly not being told what we're discussing now.  I mean,

12  this is going to be just really inappropriate for these

13  individuals.  It's exactly why we need a retail investor

14  committee, to have a discussion with the Oversight Board, to

15  have a coherent procedure that is accepted by somebody who can

16  actually speak for these thousands of individuals.

17          Thank you.

18          THE COURT:  Thank you.

19          Anything further, Mr. Rosen?

20          MR. ROSEN:  No, Your Honor, other than to say that I

21  think Mr. Hein misunderstands the process.  And that's all

22  I'll say, Your Honor.

23          THE COURT:  Thank you.

24          I will take under advisement the request to move up

25  the argument date for the retail investor committee.

1          Mr. Rosen, did you want to say anything about that in

2   particular?

3          MR. ROSEN:  Your Honor, we -- as Mr. Hein indicated,

4   we had scheduled it for April 18th to --

5          THE COURT:  August 18.

6          MR. ROSEN:  I'm sorry.  August 18th.  Thank you, Your

7   Honor.  To accommodate him in his travel plans.  If, in fact,

8   the Court wants to do it on August 4th at the Omnibus Hearing

9   date, we're happy to do that as well.

10         THE COURT:  I will take that under advisement and

11  issue an order as promptly as possible indicating whether it

12  is to be added next week or not.

13         All right.  Now, we turn to the confirmation --

14  sorry, yes, the confirmation procedures motion, except

15  actually there was one -- yes, there was one further -- we

16  turn to the Solicitation Procedures Motion, and before I hear

17  argument on the solicitation procedures aspect of the motion,

18  I want to note that I had directed the Oversight Board to

19  include a provision that, on a request for a paper copy of the

20  Disclosure Statement or Plan, Prime Clerk had to, within one

21  business day of receiving the request, deposit them with a

22  postal or shipping service on second day delivery at the

23  slowest.  I did not see that in the current version of the

24  proposed order approving the solicitation procedures.

25         MR. ROSEN:  Your Honor, this is Brian Rosen.  I

1  apologize.  I thought that was included.

2       I have Mr. Ma on the phone as well, who can verify if

3  it was or was not included, but if it was not included, we

4  certainly will make that change.

5       THE COURT:  All right.  Then, Mr. Ma?

6       MR. MA:  This is Steve Ma with Proskauer Rose.  Good

7  morning, Your Honor.

8       THE COURT:  Good morning.

9       MR. MA:  I apologize.  I understood that your Order

10  directing the Oversight to do so was the Order itself, but we

11  can include in the Disclosure Statement Order that language.

12       THE COURT:  Very good.  Please do so.

13       Now the Oversight Board is allocated six minutes for

14  remarks in respect of the solicitation procedures.

15       MR. ROSEN:  Your Honor, again, this is Brian Rosen,

16  and I'll turn it to Mr. Ma in a second.  But it is our

17  understanding that no additional objections had been

18  interposed to the Solicitation Procedures Order, and that we

19  had addressed all of these issues last week.  And we had made

20  corresponding changes based upon the Court's Order to the

21  Solicitation Procedures Order.

22       And with that, I'll turn it to Mr. Ma.

23       THE COURT:  Thank you.

24       MR. MA:  Again, for the record, Steve Ma of Proskauer

25  Rose.

 1          The major changes to the Disclosure Statement Order

 2    are to, first, conform to the new Plan of Adjustment with

 3    respect to the Ambac and FGIC voting and elections, including

 4    new ballots and election notices as applicable.  We also made

 5    certain changes regarding the UCC Committee's letter to be

 6    distributed in paper format to the applicable classes.

 7          We also made some changes to clarify that the

 8    claimants in the ADR process would be eligible to vote, while

 9    maintaining the provision that those under the ACR process

10    would not, including providing notice to those individuals in

11    the ADR process and those individuals for whom we've filed

12    claim objections.

13          We've also provided a form of Rule 3018 motion, which

14    will be available on the Prime Clerk website.

15          And with those changes, we believe we've addressed

16    the Court's and various parties' comments, and I'll end there

17    unless the Court has any further questions.

18          THE COURT:  I do not.  Thank you, Mr. Ma.

19          So now the Confirmation Procedures Motion.  I have 13

20    minutes requested by the Oversight Board for remarks.

21          MR. ROSEN:  Your Honor, again, this is Brian Rosen

22    for Proskauer Rose.

23          Your Honor, we did receive your comments with respect

24    to the Confirmation Discovery Procedures Order.  I will turn

25    it over to Ms. Stafford in a moment, but just to say that we

1   have not seen any further responses or objections to what we

2   have done and in response to what the Court requested.

3          So, Your Honor, with that, I will turn it over to

4   Ms. Stafford just to go through the changes, just like Mr. Ma

5   did.

6          THE COURT:  Thank you.

7          Ms. Stafford.

8          MS. STAFFORD:  Thank you, Your Honor, and thank you

9   Mr. Rosen.  This is Laura Stafford at Proskauer Rose on behalf

10  of the Financial Oversight and Management Board for Puerto

11  Rico.

12         I wanted to start by thanking Your Honor for your

13  guidance and your patience with us as we work to implement the

14  Court's guidance in the Revised Procedures Order over the past

15  week and change.  In compliance with the Court's most recent

16  order on July 27th, we filed a Further Amended Confirmation

17  Procedures Motion yesterday afternoon -- or, apologies, our

18  Further Amended Confirmation Procedures Order yesterday

19  afternoon.  That order reflects various of the changes the

20  Court had requested, including the addition of

21  interrogatories, the addition of the notice of intent to

22  participate in discovery, as well as the discovery notices,

23  and the various other changes to the schedule that the Court

24  had requested in an Order from July 15th and July 20th.

25         As Mr. Rosen noted, no further objections were

1   received, and we understand Ambac and FGIC will not be

2   advancing their objections today.  And so we'd request the

3   Court enter the proposed order as filed yesterday, unless the

4   Court has any further questions or modifications that it

5   requests at this time.

6           THE COURT:  Thank you.  I have no further questions

7   at this time.

8           Is there anyone else who wishes to be heard on these

9   matters before we all take just two minutes of quiet while I

10  reflect in advance of making a ruling?  If you want to say

11  something, say your name now.

12          (No response.)

13          THE COURT:  All right.  So I'm just asking that

14  everybody sit quietly, and shortly I will make the ruling.

15          Thank you for your patience.  I will now make my

16  rulings concerning the two motions, and this ruling will

17  include the direction for one clarification in the Amended

18  Proposed Confirmation Procedures Order.

19          I will now make the rulings concerning the two

20  motions before the Court, the *Amended Joint Motion of the*

21  *Commonwealth of Puerto Rico, the Employees Retirement System*

22  *of the Government of the Commonwealth of Puerto Rico, and the*

23  *Puerto Rico Public Buildings Authority for an Order (I)*

24  *Approving Disclosure Statement, (II) Fixing Record Dates,*

25  *(III) Approving Confirmation Hearing Notice and Confirmation*

1    *Schedule, (IV) Approving Solicitation Packages and*

2    *Distribution Procedures, (V) Approving Forms of Ballots, and*

3    *Voting and Election Procedures, (VI) Approving Notice of*

4    *Non-Voting Status, (VII) Fixing Voting, Election, and*

5    *Confirmation Deadlines, and (VIII) Approving Vote Tabulation*

6    *Procedures* (Docket Entry No. 16756 in Case No. 17-3283, and

7    I'll refer to that as the "Disclosure Statement Motion"), and

8    the second motion is the *Motion of Debtors for an Order*

9    *Establishing, Among Other Things, Procedures and Deadlines*

10   *Concerning Objections to Confirmation and Discovery in*

11   *Connection Therewith*, (Docket Entry No. 16757 in Case No.

12   17-3283, which I'll refer to as the "Confirmation and

13   Discovery Motion").

14         The Court previously made rulings concerning these

15   two motions on the record on July 14th, 2021, and those

16   rulings have been memorialized, clarified, and amended by

17   certain written orders issued by the Court.  I assume

18   familiarity with those rulings and will not repeat them today.

19         The Court has reviewed carefully the Sixth Amended

20   Plan of Adjustment and the Disclosure Statement for the Sixth

21   Amended Plan of Adjustment, as well as the objections filed

22   with respect to the revisions, and the Court has listened

23   carefully to all of the remarks and arguments made here today.

24         The Disclosure Statement Motion requires the Court to

25   address two questions:  The first question is, in short,

1   whether the proposed Disclosure Statement provides information

2   sufficient to permit a hypothetical creditor or investor to

3   make an informed judgment about the proposed Plan of

4   Adjustment.  That standard is laid out in section 1125 of the

5   Bankruptcy Code, 11 U.S.C. § 1125.  With the revisions

6   reflected in the Disclosure Statement for the Sixth Amended

7   Plan of Adjustment that the Oversight Board filed on July 27,

8   and the additional correction and supplementation that have

9   been discussed on the record today and were outlined in the

10  exhibit to the reply papers of the Oversight Board, the Court

11  is satisfied that the Disclosure Statement provides adequate

12  information subject to such supplementation and correction as

13  has been laid out on the record earlier this morning.  The

14  second question is whether the proposed Plan of Adjustment is

15  patently unconfirmable on its face.  The Court addressed and

16  preliminarily overruled objections concerning the

17  confirmability of the Plan of Adjustment on the record on July

18  14th.

19        Accordingly, the Court now, for the reasons and to

20  the extent stated on the record at the July 14th hearing,

21  overrules the objections to the Disclosure Statement Motion,

22  and to the extent that certain objections were sustained on

23  July 14th, the issues raised in those objections have been

24  satisfactorily addressed such that any remaining objections

25  are now overruled, and the Disclosure Statement is approved

1  subject to the filing of further revised materials addressing
2  the issues discussed on the record today.

3      The Court has also carefully considered the various
4  procedural aspects of the Disclosure Statement Motion and the
5  Confirmation and Discovery Motion.  On July 14th and July
6  27th, the Court directed the Oversight Board to amend those
7  procedures to address certain issues, and with one exception,
8  the Oversight Board has done so in accordance with the Court's
9  Orders or undertaken to complete doing so.

10      Today, the Oversight Board has undertaken to include
11  a provision for rapid delivery of requested paper materials in
12  the revised order, and the Court will look forward to that
13  addition in the revised order.

14      The Court has one further revision to the Amended
15  Proposed Confirmation Procedures Order that was filed by the
16  Oversight Board at Docket Entry Number 17548-1 in Case Number
17  17-3283.  Paragraph 5 of the proposed order strikes the Court
18  as rather unclear and confusing in its current iteration, and
19  so I am directing that paragraph 5 be revised to state as
20  follows:  "Eligible Creditors who File a Notice of Intent to
21  Participate in Discovery on or before October 19, 2021, shall
22  be able to access documents in the Plan Depository.  Eligible
23  Creditors who File a Notice of Intent to Participate in
24  Discovery on or before August 15th, 2021, shall also be able
25  to participate in other discovery, including serving their own

1    discovery requests, as set forth below in the schedule listed

2    above -- I'm sorry, as set forth in the schedule listed above

3    and in paragraphs 10 through 16 below.  Eligible Creditors who

4    do not file a Notice of Intent to Participate in Discovery may

5    still file an Objection to confirmation of the Plan on or

6    before October 19, 2021."

7            That is the revision of paragraph 5.

8            The Court will enter appropriate orders approving the

9    Disclosure Statement and the related procedures and granting

10   the Confirmation and Discovery Motion upon the filing of a

11   further revised Disclosure Statement satisfactorily addressing

12   the issues discussed earlier and orders reflecting the

13   revisions that have been directed and undertaken.  Counsel to

14   the Oversight Board must provide Word versions of its proposed

15   orders to chambers promptly via e-mail once the final

16   revisions have been settled -- have been made.

17           Are there any other matters that need to be addressed

18   today?  I will wait 30 seconds for anyone to state their name.

19           I hear someone unmuting.  So who is that?

20       MR. ROSEN:  Your Honor, this is Brian Rosen.  I

21   unmuted just to say thank you very much, and we have nothing

22   further to be handled today.

23           THE COURT:  Thank you, Mr. Rosen.

24           Anyone else?

25           (No response.)

1          THE COURT:  Very well.  This concludes the hearing

2    Agenda for this hearing.  I thank all counsel for their

3    arguments, their remarks, and all of the work with each other

4    and with their clients that have brought us to this very

5    significant day.

6          The next hearing is the August 4th Omnibus Hearing,

7    which is scheduled for August 4th, 2021.  The hearing will

8    begin at 9:30 AM Atlantic Standard Time.  Dial in and other

9    instructions have been provided in a procedures order filed

10   earlier this week, and I will indicate by an order filed quite

11   soon whether Mr. Hein's motion for a committee will be

12   considered as a part of that Omni Hearing.  And the Omni

13   Hearing is scheduled for August 4th to 5th.

14         As always, I thank the court staff for their

15   continuing excellence and dedicated work, and I wish everyone

16   safety and good health.  We are adjourned.

17         Thank you.

18         (At 12:13 PM, proceedings concluded.)

19                        *      *      *

20

21

22

23

24

25

```
 1  U.S. DISTRICT COURT    )

 2  DISTRICT OF PUERTO RICO)

 3

 4      I certify that this transcript consisting of 65 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge Laura Taylor Swain, and the

 8  Honorable United States Magistrate Judge Judith Gail Dein on

 9  July 29, 2021.

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```