## **EXHIBIT D**

PRIFA RELATED PSA

EXECUTION VERSION

## PRIFA RELATED PLAN SUPPORT AGREEMENT

PRIFA RELATED PLAN SUPPORT AGREEMENT, dated as of July 27, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), (b) certain holders of PRIFA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of PRIFA Bond Claims on behalf of such holder as set forth on Exhibit "A" hereto, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**PRIFA Holders**"), (c) Ambac Assurance Corp., solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds, as defined below, ("**Ambac**"), and (d) Financial Guaranty Insurance Company, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds ("**FGIC**", and collectively with the PRIFA Holders and Ambac, the "**Initial PSA Creditors**" ). The signatories hereto are referred to hereafter collectively as the "**Parties**" or individually as a "**Party**". Capitalized terms used but not otherwise defined herein shall have the meanings set forth below or in the Plan (as defined below), as applicable.

## RECITALS

A.      Pursuant to the authority granted pursuant to Act No. 44 of June 21, 1988, as amended, the Puerto Rico Infrastructure Financing Authority ("**PRIFA**") was created for the purpose of, among other things, providing financial, administrative and other types of assistance to the Commonwealth, its public corporations and instrumentalities responsible for developing and operating infrastructure facilities.

B.      In accordance with (i) Act No. 44 of the Legislative of Puerto Rico, approved June 21, 1988, as amended, (ii) that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as Successor Trustee, (iii) with respect to Series 2005 bonds, that certain resolution of PRIFA, adopted on June 2, 2005, and (iv) with respect to Series 2006 bonds, that certain resolution of PRIFA, adopted on September 14, 2006, PRIFA issued the following bonds: (A) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35); (B) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00); (C) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80); and (D) Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00) (collectively, the "**PRIFA Bonds**").

C.      In connection with the issuance of certain of the PRIFA Bonds, Ambac and FGIC issued certain insurance policies and PRIFA entered into insurance agreements with respect thereto.

1

124682228v5

D.      On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187) ("**PROMESA**").

E.      PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process with respect to, among others, the Commonwealth and its instrumentalities, all as provided for in PROMESA.

F.      Pursuant to Act 2-2017, Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**") was appointed as the agent of, and advisor to, the Government of the Commonwealth of Puerto Rico (the "**Government**"), and granted authority with respect to the restructuring of any indebtedness issued by the Commonwealth and any governmental entity of the Commonwealth.

G.      On May 3, 2017 (the "**Commonwealth Petition Date**"), the Oversight Board filed a Title III petition on behalf of the Commonwealth (the "**Commonwealth PROMESA Proceeding**") in the United States District Court for the District of Puerto Rico (the "**Title III Court**").

H.      The Oversight Board is the representative of the Commonwealth in the Commonwealth PROMESA Proceeding pursuant to Section 315(b) of PROMESA.

I.      On February 22, 2021, certain of the Parties, among others, executed a Plan Support Agreement (the "**Initial CW PSA**"), regarding the restructuring of general obligation bonds issued by the Commonwealth and bonds issued by the Puerto Rico Public Buildings Authority ("**PBA**"), which agreement remains subject to certain conditions, including, without limitation, confirmation and consummation of a plan of adjustment in the Commonwealth PROMESA Proceeding.

J.      On May 5, 2021, certain of the Parties, among others, executed that certain HTA/CCDA Related Plan Support Agreement (the "**HTA/CCDA PSA**") which agreement is subject to certain conditions precedent, including, without limitation, the negotiation and agreement as to the terms of securities to be issued in accordance with a plan of adjustment with respect to the Puerto Rico Highways and Transportation Authority ("**HTA**").  Pursuant to separate Joinder Agreements, dated as of July 15, 2021, Ambac and FGIC each joined the HTA/CCDA PSA, subject to the right, among others, to terminate the HTA/CCDA PSA, solely as to themselves, on or prior to July 26, 2021, at 5:00 p.m., New York City time.

K.      On July 12, 2021, certain of the Parties, among others, executed that certain Amended and Restated Plan Support Agreement (the "**A&R CW PSA**"), amending and restating the Initial CW PSA and modifying, among other terms, the provisions relating to the payment of certain fees and expenses to the parties thereto.  The A&R CW PSA remains subject to certain conditions, including, without limitation, confirmation and consummation of a plan of adjustment in the Commonwealth PROMESA Proceeding.

L.      On July 12, 2021, the Commonwealth, PBA, and the Employee Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**") filed that certain Fifth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the

"**Fifth Amended Plan**") [Dkt. No. 17306], in the Title III Court, which plan of adjustment contained the material terms set forth in the A&R CW PSA and the HTA/CCDA PSA, but also included subsequent agreements reached by the Oversight Board, and a corresponding disclosure statement.

M.      With the assistance of the Title III Court-appointed mediation team, the Parties have engaged in good faith, arm's-length negotiations, including, without limitation, regarding the terms of a proposed restructuring of the PRIFA Bonds and claims against the Commonwealth and PRIFA arising from or related to the PRIFA Bonds to be implemented in a manner as set forth in (a) Sixth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., as it may be amended, modified or supplemented (the "**Plan**"), which Plan shall be consistent with the terms and provisions of this Agreement, including, without limitation, Exhibit "F" hereto, the form of which shall be filed with the Title III Court as soon as practicable following the date hereof, but in no event later than July 27, 2021, at 9:00 a.m., New York City time, and, upon filing thereof, shall amend and supersede the Fifth Amended Plan, and (b) the PRIFA Plan, as defined below.

N.      The Oversight Board consents to the execution and delivery of this Agreement by the Commonwealth and to the Commonwealth's performance and exercise of rights under this Agreement, including, without limitation, the right to terminate this Agreement and right to consent to any waiver or amendment, in each case, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described and for other good and valuable consideration, acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

ARTICLE I

DEFINITIONS

Section 1.1      Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2      Definitions.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"*Agreement*" shall mean this PRIFA Related Plan Support Agreement, and each exhibit annexed hereto or thereto, including, without limitation, upon filing, the PRIFA Plan as each may be amended, supplemented, or otherwise modified in accordance with the terms hereof or thereof.

"*Ambac Insured Bonds*" shall mean, collectively, the PRIFA Bonds that are insured by Ambac.

***"Appointments Related Litigation"*** shall mean, collectively, the litigation styled (a) <u>Rene Pinto Lugo, et al. v. The Government of the United States of America, et al.</u>, Adv. Pro. No. 18-041-LTS, currently pending in the United States Court of Appeals for the First Circuit, (b) <u>Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. Government of the United States of America, et al.</u>, Case No. 19-2243, currently pending in the United States Court of Appeals for the First Circuit, (c) <u>Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico</u>, Adv. Pro. No. 18-090-LTS, currently pending in the Title III Court, and (d) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the PRIFA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

***"Bankruptcy Code"*** shall mean Title 11 of the United States Code, as amended, §§101, et seq.

***"Bankruptcy Rules"*** shall mean the Federal Rules of Bankruptcy Procedure.

***"Business Day"*** shall mean a day other than a Saturday, a Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

***"Clawback Actions"*** shall mean, collectively, the litigation styled (a) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00004-LTS, currently pending in the Title III Court, (c) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00003-LTS, currently pending in the Title III Court, and (d) <u>The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al.</u>, Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

***"Confirmation Order"*** shall mean the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to each Party.

***"Covered Borrowers"*** shall mean, collectively, the Commonwealth, and, as of the PRIFA Filing Date, PRIFA.

***"CUSIP"*** shall mean the Committee on Uniform Securities Identification Procedures nine-digit numeric or nine-digit character alphanumeric code which, for purposes of this Agreement, identifies the series of PRIFA Bonds for the purposes of facilitating clearing and settlement of trades.

***"Custodial Trust Documents"*** shall mean, collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of the Effective Date and relating to the Ambac Insured Bonds and the FGIC Insured Bonds and the distributions to be

4

made in accordance with the Plan or, to the extent necessary, a qualifying modification for the PRIFA Bonds in accordance with Title VI of PROMESA.

*"CVI Indenture"* shall mean the indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue, among other securities, the PRIFA Clawback CVI (or PRIFA Clawback CVIs to the extent that one or more holders of PRIFA Bond Claims opts out of the PRIFA Trust for such purposes), and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions; underlined, however, that the CVI Indenture may include the Rum Tax CVI.

*"CVI Legislation"* shall mean, the legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, this Agreement and the Plan, including, without limitation, legislation authorizing the issuance of, among other securities, the PRIFA Clawback CVI (or PRIFA Clawback CVIs to the extent that one or more holders of PRIFA Bond Claims opts out of the PRIFA Trust for such purposes), which legislation may be part of the New GO Bonds Legislation.

*"Debt Related Objections"* shall mean, collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through its Special Claims Committee, and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General Obligation Bonds, dated January 14, 2019 [Dkt. No. 4784], (b) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011 Commonwealth General Obligation Bonds, dated May 21, 2019 [Dkt. No. 7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July 18, 2019 [Dkt. No. 8141], (d) Omnibus Objection of the Lawful Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the Commonwealth, dated January 8, 2020 [Dkt. No. 9731], (e) Official Committee of Unsecured Creditors' Omnibus Objection on Constitutional Debt Limit Grounds to (I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by Port of the Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658] Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and (III) Claims Filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Dkt. No. 9735], solely as it relates to the PRIFA BANs, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other Commonwealth Unsecured Creditors, dated February 3, 2020 [Dkt. No. 10638], and (g) any other objections or joinders to these or such other objections that may be filed pertaining to the same form and counts of requested relief challenging, among other things, the validity and related rights of the 2011 GO Bonds, the 2012 GO Bonds, the 2014 GO Bonds, the PBA Bonds, and/or the PRIFA BANs.

*"**Debt Responsibility Act**"* shall mean Act No. 101-2020, as the same may be amended, modified or supplemented to the extent necessary to provide, among other things, for a Comprehensive Cap consistent with the terms and provisions of the Plan and the CW PSA.

*"**Definitive Documents**"* shall mean, collectively, the documents, including, without limitation, any related agreements, instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Settlement Summary, the Plan (including any amendments, modifications and supplements thereto), the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, and bond resolutions, as amended or as repealed and replaced, each having terms and conditions consistent with this Agreement, the Settlement Summary, and PROMESA, in all respects and otherwise be in form and substance reasonably satisfactory to each party to the A&R CW PSA, the HTA/CCDA PSA and this Agreement, as applicable.

*"**Disclosure Statement**"* shall mean the disclosure statement filed with respect to the Plan with the Title III Court by the Oversight Board in the PROMESA Proceedings in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party.

*"**Disclosure Statement Order**"* shall mean the order of the Title III Court (a) approving the form of Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the Plan, and (ii) elections, if applicable, of distributions thereunder, which order shall be in form and substance reasonably satisfactory to each Party.

*"**Discovery Related Actions**"* shall mean, collectively, the litigation arising from (a) Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth's Assets, dated October 28, 2019, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 9022], (b) Ambac Assurance Corporation's Motion for Entry of Order Authorizing Discovery Under Bankruptcy Rule 2004 Concerning Commonwealth's Cash Restriction Analysis, dated October 28, 2019, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 9023], (c) Ambac Assurance Corporation's Motion for Entry of Order Directing Cash Rule 2004 Discovery from the Financial Oversight and Management Board for Puerto Rico, dated November 20, 2020, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 15220], (d) Ambac Assurance Corporation's Motion for an Order Authorizing Discovery Under Rule 2004 Concerning Commonwealth Assets, dated February 4, 2021, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 15802], (e) Ambac Assurance Corporation's Urgent Motion for Entry of Order Authorizing Third-Party Discovery Under Bankruptcy Rule 2004 Concerning Pension Liabilities, dated December 4, 2020, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 15342], and (f) Joint Status Report of Ambac Assurance Corporation, the Financial Oversight and Management Board for Puerto Rico, as Sole Representative of the Commonwealth of Puerto Rico, the Official Committee of Retired Employees of the Commonwealth of Puerto Rico Appointed in the Commonwealth's Title III Case, the Official Committee of Unsecured Creditors, and the Puerto

Rico Fiscal Agency and Financial Advisory Authority Regarding the Schedule for Litigation Concerning Pension-Related Claims Pursuant to the Court's June 22, 2021 Order, dated July 6, 2021, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 17225].

*"Distribution Conditions"* shall mean, collectively, (a) the Effective Date shall have occurred, (b) the documentation of the PRIFA Plan, the PRIFA Order, the CVI Indenture, the Rum Tax CVI Indenture, the PRIFA Trust Documentation and the Custodial Trust Documents shall have been agreed upon by the Oversight Board, Ambac, and FGIC, and (c) holders of, or insurers entitled to vote with respect to the PRIFA Bonds, holding or insuring, as the case may be, at least seventy percent (70%) of the outstanding principal amount of the PRIFA Bonds shall have executed this Agreement or a Joinder Agreement or an Annex Agreement with respect hereto; provided, however, that, upon entry of a Final Order with respect to the PRIFA Order, the condition set forth in subsection (c) shall be deemed satisfied.

*"Effective Date"* shall mean the date on which the transactions contemplated by the Plan and authorized by the Title III Court pursuant to the Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms.

*"EMMA"* shall mean the website of the Municipal Securities Rulemaking Boards Electronic Municipal Market Access.

*"Face Amount"* shall mean, solely for purposes of Article II hereof and the signature pages affixed hereto, (a) with respect to current interest PRIFA Bonds, insured or uninsured, the outstanding principal amount of such PRIFA Bonds as of the date of this Agreement, and (b) with respect to capital appreciation PRIFA Bonds, insured and uninsured, the accreted value of such PRIFA Bonds during the period up to, but not including, the date hereof.

*"FGIC Insured Bonds"* shall mean, collectively, the PRIFA Bonds that are insured by FGIC.

*"Final Order"* shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of certiorari, new trial reargument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed or reversed in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the applicable local Bankruptcy Rules.

124682228v5

*"Fiscal Plan"* shall mean a "Fiscal Plan" as defined by Section 5(10) of PROMESA.

*"Fiscal Year"* shall mean a fiscal year of the Commonwealth commencing on July 1st and concluding on June 30th of the following calendar year.

*"General Fund"* shall mean the Government's primary operating fund.

*"Government Parties"* shall mean, collectively, the Oversight Board, AAFAF, the Commonwealth, ERS, PBA, HTA, CCDA and PRIFA.

*"Government Released Claims"* shall mean, collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with PRIFA, the PRIFA Bonds, and the PRIFA Bond Claims, and arising prior to the Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) the Commonwealth or PRIFA arising from or relating to the Plan or the PRIFA Plan, the securities to be issued pursuant to the Plan or the PRIFA Plan, or (ii) a Government Party unrelated to the PRIFA Bonds, or the PRIFA Bond Claims, or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct; and, provided, further, that, for the avoidance of doubt, "Government Released Claims" includes all Government Released Claims pursuant to the A&R PSA and the HTA/CCDA PSA.

*"Government Releasees"* shall mean the Government Parties, together with their respective current or former board members, directors, principals, special committees, agents, officers, employees, advisors and professionals, in each case, in their capacities as such, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the PROMESA Proceedings, in their respective capacities as such.

*"Insured PRIFA Bond Claims"* shall mean, collectively, those PRIFA Bond Claims, the principal and interest payments of which have been insured by a Monoline, including pursuant to secondary market policies.

*"Invalidity Actions"* shall mean, collectively, those litigations set forth on Exhibit "G" hereto.

*"IRC"* shall mean the Internal Revenue Code of 1986, as amended from time to time.

*"Joinder Creditors"* shall mean, collectively, those entities holding PRIFA Bonds that execute and deliver either the Joinder Agreement or the Annex Agreement, the forms of which are annexed hereto as Exhibits "D" and "E", respectively, prior to the Joinder Deadline.

*"Joinder Deadline"* shall mean the earlier to occur of (a) August 15, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) the date on which holders or insurers of PRIFA Bond Claims, with the right to vote or direct to vote such PRIFA Bond Claims in accordance with Section

301(c)(3) of PROMESA, definitive insurance documents and applicable law, holding or insuring, without duplication, PRIFA Bond Claims having a Face Amount in excess of seventy percent (70%) of the outstanding principal amount of PRIFA Bonds are parties to this Agreement or have executed and delivered a Joinder Agreement with respect hereto.

"***Lift Stay Motions***" shall mean, collectively, the litigation styled (a) <u>Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico</u>, filed in the HTA Title III Case [Dkt. No. 673], (b) <u>Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board</u>, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10104], (c) <u>Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board</u>, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10602], (d) <u>AmeriNational Community Services, LLC, et al. v. The Financial Oversight and Management Board for Puerto Rico</u>, filed in the HTA Title III Case [Dkt. No. 591], (e) <u>Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) <u>Ambac Assurance Corporation, et al. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 20-1931, currently pending in the United States Court of Appeals for the First Circuit, (g) <u>Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.</u>, Adv. Pro. No. 17-00151-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, (h) <u>Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.</u>, Adv. Pro. No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (i) any motion or adversary proceeding seeking to lift the automatic stay provided for in accordance with sections 362 and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those at issue in the above-referenced Lift Stay Motions.

"***Measured SUT***" shall mean the 5.5% SUT, <u>less</u> CINE funds of Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00), as set forth in the Settlement Summary annexed as Exhibit "J" to the HTA/CCDA PSA.

"***Miscellaneous Litigation***" shall mean, collectively, the litigation styled (a) <u>Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 20-1657, currently pending in the United States Court of Appeals for the First Circuit, (b) <u>Ambac Assurance Corp. v. Puerto Rico Highways and Transportation Authority</u>, Case No. 16-cv-01893, currently pending in the United States District Court for the District of Puerto Rico, (c) <u>Ambac Assurance Corp. v. U.S. Department of Treasury, et al.</u>, Case No. 17-cv-00809, currently pending in the United States District Court for the District of Puerto Rico, (d) <u>Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 17-cv-01567, currently pending in the United States District Court for the District of Puerto Rico, (e) <u>Ambac Assurance Corp. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 17-cv-01568, currently pending in the United States District Court for the District of Puerto Rico, and (f) <u>Financial Guaranty Insurance Company v. Garcia-Padilla, et al.</u>, Case No. 16-cv-01095, currently pending in the United States District Court for the District of Puerto Rico.

"***Monolines***" shall mean Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., and Financial Guaranty Insurance Company, as insurers of PRIFA Bonds.

124682228v5

*"New GO Bonds"* shall mean, collectively, the general obligation bonds to be issued pursuant to the Plan and consistent with the terms and conditions set forth in the Settlement Summary annexed to the A&R CW PSA as Exhibit "I".

*"New GO Bonds Legislation"* shall mean, legislation to be enacted on or prior to the Effective Date authorizing the transactions contemplated by, and consistent with the Plan, including, without limitation, legislation authorizing the issuance of New GO Bonds consistent with the terms of the A&R CW PSA and which may include authorization relating to the transactions contemplated by the HTA/CCDA PSA and this Agreement.

*"Outperformance Condition"* shall mean the amount that the Waterfall General Fund Rum Tax Collections exceeds the Outperformance Metric, both as defined in the Settlement Summary annexed hereto as Exhibit "F", in any Fiscal Year.

*"Plan Supplement"* shall mean the volume(s) of documents, agreements and instruments, including, without limitation, the Definitive Documents, which shall be filed with the Title III Court in connection with the Plan and consummation of the transactions contemplated therein, and each of which shall be in form and substance reasonably satisfactory to each of the Parties.

*"PRIFA Bond Claims"* shall mean, collectively, the claims against PRIFA arising from or relating to the PRIFA Bonds, which shall be calculated, for the purposes of the Plan, as the outstanding principal amount of the PRIFA Bonds plus accrued, but unpaid, interest up to, but not including, July 1, 2021.

*"PRIFA Clawback CVI"* shall mean, collectively, the security (or securities to the extent that one or more holders of PRIFA Bond Claims opts out of the PRIFA Trust for such purposes), the payment for which the Commonwealth shall have pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, including, without limitation, Exhibit "J" thereto, the Confirmation Order, the CVI Indenture and the CVI Legislation.

*"PRIFA Definitive Documents"* shall mean, collectively, the documents, including, without limitation, any related agreements, instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Settlement Summary, the PRIFA Plan (including any amendments, modifications and supplements thereto), the PRIFA Disclosure Statement, the PRIFA Disclosure Statement Order, the PRIFA Order, and bond resolutions, as amended or as repealed and replaced, each having terms and conditions consistent with this Agreement, the Settlement Summary, and PROMESA, in all respects and otherwise be in form and substance reasonably satisfactory to each party to the A&R CW PSA, the HTA/CCDA PSA and this Agreement as applicable.

*"PRIFA Disclosure Statement "* shall mean, in the event the Oversight Board commences a Title III case on behalf of PRIFA in the Title III Court, the disclosure statement filed with respect to the PRIFA Plan with the Title III Court by the Oversight Board in the PRIFA PROMESA Proceeding in accordance with section 1125 of the Bankruptcy Code, made

10

**EXECUTION VERSION**

applicable in the PROMESA Proceedings in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party

"*PRIFA Disclosure Statement Order*" shall mean, in the event the Oversight Board commences a Title III case on behalf of PRIFA in the Title III Court, the order of the Title III Court (a) approving the form of PRIFA Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the PROMESA Proceeding in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the PRIFA Plan, and (ii) elections, if applicable, of distributions thereunder, which order shall be in form and substance reasonably satisfactory to each Party.

"*PRIFA Effective Date*" shall mean the date on which the transactions contemplated by the Settlement Summary annexed hereto as Exhibit "F" and, to the extent applicable, authorized by the Title III Court have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the transactions contemplated by the Settlement Summary annexed hereto as Exhibit "F" have been satisfied or waived in accordance with its terms.

"*PRIFA Filing Date*" shall mean the date upon which the Oversight Board files (a) a Title III petition on behalf of PRIFA in the Title III Court or (b) an application in the Title III Court to approve a qualifying modification under Title VI of PROMESA on behalf of PRIFA.

"*PRIFA Order*" shall mean, the order of the Title III Court either (a) confirming a plan of adjustment for PRIFA in the event a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, or (b) approving a qualifying modification under Title VI of PROMESA on behalf of PRIFA.

"*PRIFA Plan*" shall mean, as determined by the Oversight Board, upon consultation with AAFAF, either (a) in the event that a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, the plan of adjustment filed by the Oversight Board and confirmed by the Title III Court pursuant to the PRIFA Order, or (b) in the event that Ambac or FGIC propose to the Oversight Board a modification of the PRIFA Bonds under Title VI of PROMESA consistent with the terms and conditions set forth in the Settlement Summary annexed hereto as Exhibit "F", the application to approve such qualifying modification filed by the Oversight Board.

"*PRIFA Plan Supplement*" shall mean the volume(s) of documents, agreements and instruments, including, without limitation, the PRIFA Definitive Documents, which shall be filed with the Title III Court in connection with the PRIFA Plan and consummation of the transactions contemplated therein, and each of which shall be in form and substance reasonably satisfactory to each of the Parties.

"*PRIFA PROMESA Proceeding*" shall mean the Title III case commenced by the Oversight Board on behalf of PRIFA in the Title III Court or, in the event that Ambac and FGIC propose to the Oversight Board a modification of the PRIFA Bonds under Title VI of

11

PROMESA, the application to approve a qualifying modification filed by the Oversight Board on behalf of PRIFA.

*"PRIFA Restriction Fee Percentage"* shall mean, the percentage equal to (a) Ten Million Dollars ($10,000,000.00) underlined by (b) the aggregate amount of PRIFA Bond Claims held, or in the case of Ambac and FGIC, either held or insured with authority to vote or direct the vote of, in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by PSA Restriction Fee Creditors.

*"PRIFA Trust"* shall mean the trust to be created on or prior to the Effective Date in accordance with the terms and conditions of the PRIFA Trust Documentation and (a) into which the Commonwealth shall deposit, among other consideration, the PRIFA Clawback CVI, the Rum Tax CVI, and all distributions to be made in connection therewith, and (b) the beneficial interests of which shall be distributed to holders of PRIFA Bond Claims pursuant to the terms and conditions of the Plan, the PRIFA Plan and this Agreement.

*"PRIFA Trust Documentation"* shall mean, collectively, the documentation required, if necessary, to establish and maintain the trust into which, among other consideration, the Rum Tax CVI and the PRIFA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of PRIFA Bond Claims (including the Monolines) pursuant to the terms of this Agreement, the Plan and the PRIFA Plan.

*"PROMESA Proceedings"* shall mean, collectively, the Commonwealth PROMESA Proceeding and the PRIFA PROMESA Proceeding.

*"PSA Creditors"* shall mean, collectively, (a) the Initial PSA Creditors and (b) those entities holding PRIFA Bonds that execute and deliver either the Joinder Agreement or the Annex Agreement, the forms of which are annexed hereto as Exhibits "D" and "E", respectively, in accordance with the terms and provisions of this Agreement.

*"PSA Restriction Fees"* shall mean, collectively, the fees payable in accordance with Sections 6.1 hereof and the PRIFA Order, which fees, in the aggregate, shall not exceed Ten Million Dollars ($10,000,000.00).

*"PSA Restriction Fee Creditors"* shall mean, collectively, the Initial PSA Creditors and the Joinder Creditors that execute this Agreement, the Joinder Agreement, or the Annex Agreement prior to the expiration of the PSA Restriction Fee Period; provided, however, that notwithstanding anything contained herein to the contrary, all entities executing a Joinder Agreement or an Annex Agreement on the date the PSA Threshold Attainment is reached shall be considered PSA Restriction Fee Creditors.

*"PSA Restriction Fee Period"* shall mean the period from the date hereof up to and including the earlier to occur of (a) the PSA Threshold Attainment and (b) the Joinder Deadline.

*"PSA Threshold Attainment"* shall mean the date on which PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Ambac and FGIC, either holds or insures and is authorized to vote or direct the vote of in accordance with Section 301(c)(3) of PROMESA, the

definitive insurance documents and applicable law, seventy percent (70%) of the aggregate amount of PRIFA Bond Claims, inclusive of principal and interest as of the CW Petition Date, in each case, without duplication and, to the extent any such claims are Insured Bond Claims, to the extent a PSA Creditor is authorized to vote or direct the vote of any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

*"Qualified Marketmaker"* shall mean an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the PRIFA Bonds or enter with customers into long and short positions in debt securities such as the PRIFA Bonds, in its capacity as a dealer or market marker in such PRIFA Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to PRIFA Bonds, is registered with Securities and Exchange Commission and financial institutions regulatory authority.

*"Rum Tax CVI"* shall mean the contingent value instrument, the payment for which the Commonwealth shall have pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, as more fully described in the Settlement Summary annexed hereto as Exhibit "F", to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the PRIFA Plan, the Confirmation Order, the PRIFA Order, the Rum Tax CVI Legislation, and the Rum Tax CVI Indenture.

*"Rum Tax CVI Indenture"* shall mean the indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Rum Tax CVI, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

*"Rum Tax CVI Legislation"* shall mean the legislation to be enacted on or prior to the PRIFA Effective Date authorizing certain transactions contemplated by, and consistent with, this Agreement, the Plan, and the PRIFA Plan, including, without limitation, legislation authorizing the issuance of the Rum Tax CVI which may be part of the New GO Bonds Legislation.

*"Rum Tax Revenues"* shall mean, collectively, the General Fund collections associated with rum federal excise taxes transferred to the Commonwealth including, without limitation, the sum of all three "General Fund" lines in the Rum Tax Waterfall, as set forth in the Settlement Summary annexed hereto as Exhibit "F".

*"Rum Tax Structuring Fees"* shall mean, collectively, the amounts set forth in Section 6.2 hereof to be paid, in cash, on the PRIFA Effective Date, but in no event later than ten (10) Business Days following such date, to Ambac and FGIC in accordance with the terms and provisions of this Agreement, including, without limitation, Article VI hereof.

*"Sales Tax or SUT"* shall mean, the sales and use taxes, including any replacement or similar sales and use tax, imposed by the government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

13

***"Section 926 Motion"*** shall mean, the litigation arising from (a) the Urgent Motion for Bridge Order, and Motion for Appointment of Trustee Under 11 U.S.C. §926 of Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, and National Public Finance Guarantee Corporation, dated July 17, 2020, filed in the HTA Title III Case [Dkt. No. 871] and the Commonwealth PROMESA Proceeding [Dkt. No. 13708], (b) Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1847, currently pending in the United States Court of Appeals for the First Circuit, (c) any other motion or adversary proceeding pending as of the date hereof seeking appointment of a trustee for HTA in accordance with 11 U.S.C. §926, and (d) all claims and causes of action asserted in the Proposed Complaint, as defined in the Section 926 Motion and annexed thereto as Exhibit "C".

***"Settlement Summary"*** shall mean the summary of the key economic terms to be included in the Plan as set forth in Exhibit "F" annexed hereto.

***"Substitute Measured Tax"*** shall mean, all or a portion of tax of general applicability throughout the Commonwealth that, through a change in law is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Legislation and the CVI Indenture

***"Underwriter Action"*** shall mean the litigation styled (a) with respect to Ambac, Ambac Assurance Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc. et al., Civil No. SJ2020CV01505, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, and (b) with respect to FGIC, Financial Guaranty Ins. Co. v. Merrill Lynch, Pierce Fenner & Smith Inc., et al., Civil No. SJ2020CV06383, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan.

***"Uniformity Litigation"*** shall mean, collectively, (a) the litigation styled Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al., Adv. Pro. No. 20-00068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

***"Voting Motions"*** shall mean, collectively, that certain (a) Motion of Ambac Assurance Corporation Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of its Claims for Voting Purposes, dated July 13, 2021, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 17313], and (b) Financial Guaranty Insurance Company's Motion (I) Asserting the Right to Vote Certain Claims Pursuant to Section 301 of PROMESA and (II) Seeking Temporary Allowance of the Clawback Claim for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018, dated July 13, 2021, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 17315].

Section 1.3    Other Terms.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.  As used in

124682228v5

this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include", "includes", and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar impact refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited,

Section 1.4    Interpretations.  The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.5    Exhibits.  Each of the exhibits, annexes, signature pages and schedules annexed hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes and schedules.

ARTICLE II

GENERAL PROVISIONS

Section 2.1    A&R CW PSA and HTA/CCDA PSA.  Notwithstanding anything contained in this Agreement to the contrary, the terms and conditions of the A&R CW PSA and the HTA/CCDA PSA remain in full force and effect, including, without limitation, the legal protections, and are not intended, nor shall they be construed to be, amended or modified by any of the terms set forth herein.  Without limiting the foregoing, the agreements, terms and conditions set forth herein, including, without limitation, the exhibits annexed hereto, are intended to supplement the terms and conditions of the A&R CW PSA and the HTA/CCDA PSA for the benefit of holders of PRIFA Bond Claims.

Section 2.2    Financial Information.  The Oversight Board acknowledges and agrees that (a) the financial information set forth on signature pages affixed to this Agreement and the CUSIP numbers for the PRIFA Bonds, provided by the Parties pursuant to Section 2.3 hereof are proprietary, privileged, and confidential, and (b) unless otherwise ordered by the Title III Court, shall not disclose to any third party and shall otherwise use its reasonable best efforts to protect the confidential nature of such financial information and CUSIP numbers, including, without limitation, in filings to be made in the Title III Court or any other public release.

Section 2.3    CUSIP Information.  Unless the then-current information has previously been provided to the Oversight Board, within two (2) Business Days after the date hereof, each Initial PSA Creditor shall provide the Oversight Board, in writing, the Face Amount and CUSIP numbers for each of the PRIFA Bonds, if any, such Party owns, insures or has due investment management responsibility and authority for funds or accounts which own such PRIFA Bond.  In addition, within five (5) Business Days of each calendar month or upon the request of the

15

Oversight Board, which request shall be made no more frequently than monthly from and after the date hereof, each PSA Creditor shall provide the Oversight Board, in writing, the Face Amount and CUSIP numbers for each of the PRIFA Bonds, if any, such Party then owns, insures or has due investment management responsibility and authority for funds or accounts which own such PRIFA Bonds.

Section 2.4    Additional Parties.  Within two (2) Business Days from the date hereof, the Oversight Board shall request that AAFAF provide, through the prompt issuance on EMMA, a notice regarding the execution and delivery of this Agreement and the opportunity for all entities or persons holding and/or insuring PRIFA Bonds to execute and deliver to counsel to the Oversight Board, the form of Joinder Agreement annexed hereto as Exhibit "D", and to become a party hereto in accordance with the terms and conditions set forth herein and in the Joinder Agreement.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

Section 3.1    Representations and Warranties of the Oversight Board.  The Oversight Board hereby represents and warrants that: (a) it is duly created in accordance with the terms and provisions of PROMESA with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval, power and authority to execute and deliver and to perform its obligations under this Agreement and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it or any law, rules or regulations applicable to it; and (c) except with respect to the Appointments Related Litigation and the Uniformity Litigation, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.2    Representations and Warranties of the Commonwealth.  The Commonwealth, through its Title III representative, the Oversight Board, hereby represents and warrants that, subject to entry of an order of the Title III Court: (a) it is duly organized and validly existing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby: (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has

16

**EXECUTION VERSION**

been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.3 <u>Representations and Warranties of PRIFA.</u> To the extent enforceable, PRIFA hereby represents and warrants that, subject to entry of an order of the Title III Court: (a) it is duly organized and validly existing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.4 <u>Representations and Warranties of the PRIFA Holders.</u> Each of the PRIFA Holders, severally and not jointly, hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the PRIFA Bonds of no less than the Face Amounts set forth on the signature pages affixed to this Agreement as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than potentially with respect to the Insured PRIFA Bond Claims, and that, as of the date hereof, subject to any liens or encumbrances permitted by Section 4.4(a), it has not sold, transferred, pledged, hypothecated or assigned such PRIFA Bonds or any voting, consent or direction rights related to such PRIFA Bonds to any person or entity, that would prevent or adversely affect in any way such PRIFA Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; <u>provided</u>, <u>however,</u> that each of the Parties acknowledges that each Insured PRIFA Bonds Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect.

17

Case:17-03283-LTS   Doc#:17628-4   Filed:07/30/21   Entered:07/30/21 19:10:36   Desc:
Exhibit D   Page 19 of 69

EXECUTION VERSION

Section 3.5    <u>Representations and Warranties of Ambac.</u>  Ambac hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.6    <u>Representations and Warranties of FGIC.</u>  FGIC hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.7    <u>Representations of the Parties to this Agreement.</u>  Each Party, severally and not jointly, represents and acknowledges that: (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as stated in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; and (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein.  Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more PRIFA Holders, on the one hand, and a Monoline, on the other hand, or prevent any such parties from voluntarily entering into any commutation or similar separate agreement or instrument from and after the date hereof.

18

EXECUTION VERSION

Section 3.5    <u>Representations and Warranties of Ambac.</u>  Ambac hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.6    <u>Representations and Warranties of FGIC.</u>  FGIC hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.7    <u>Representations of the Parties to this Agreement.</u>  Each Party, severally and not jointly, represents and acknowledges that: (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as stated in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; and (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein.  Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more PRIFA Holders, on the one hand, and a Monoline, on the other hand, or prevent any such parties from voluntarily entering into any commutation or similar separate agreement or instrument from and after the date hereof.

EXECUTION VERSION

<u>ARTICLE IV</u>

<u>COVENANTS</u>

Section 4.1 <u>Covenants of the Oversight Board.</u> The Oversight Board shall take, and cause the Commonwealth, and following, the commencement of the PRIFA PROMESA Proceeding, PRIFA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the PRIFA Plan, the Disclosure Statement, the PRIFA Disclosure Statement, the approval of the Disclosure Statement and the PRIFA Disclosure Statement, the entry of the Confirmation Order, and the entry of the PRIFA Order and the consummation, implementation and administration of the Plan and the PRIFA Plan, including the execution and delivery of the Definitive Documents and the PRIFA Definitive Documents provided that the Disclosure Statement, the PRIFA Disclosure Statement, the Plan, the PRIFA Plan (and their consummation, implementation and administration) and the other Definitive Documents and the PRIFA Definitive Documents are consistent with the terms herein and in the Plan including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof; <u>provided</u>, <u>however</u>, that, in the event that Ambac and FGIC (including, as the case may be, jointly with other holders or insurers of PRIFA Bond Claims) propose to the Oversight Board a modification of the PRIFA Bonds in accordance with Title VI of PROMESA, the Oversight Board shall consider such proposal, to the extent consistent with the terms set forth in the Settlement Summary annexed hereto as Exhibit "F", and make such determination as it deems appropriate. Such actions shall include, but not be limited to, (a) commencing the PRIFA PROMESA Proceeding, (b) filing the Plan, PRIFA Plan, Disclosure Statement, and the PRIFA Disclosure Statement in form and substance consistent with this Agreement and reasonably acceptable to the Parties, with the Title III Court (to the extent applicable), and requesting that the Title III Court establish hearing dates for the expeditious consideration of the Disclosure Statement, the PRIFA Disclosure Statement, the Plan, and the PRIFA Plan, (c) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan, and, to the extent applicable, the approval of the PRIFA Disclosure Statement and confirmation of the PRIFA Plan, at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (d) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against any Initial PSA Creditors (or their respective trustees, fiscal agents, or paying agents) relating to the PRIFA Bonds and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, (e) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan and the PRIFA Plan, (f) at least one (1) day prior to such filing, delivering to counsel for each of Ambac and FGIC copies of the Disclosure Statement, the Plan, the Plan Supplement, the Confirmation Order, and the other Definitive Documents and all other documents related to any of the foregoing, and the PRIFA Disclosure Statement, the PRIFA Plan, the PRIFA Plan Supplement, the PRIFA Order, and the other PRIFA Definitive Documents and all other documents related to any of the foregoing, and (g) in the event that a party (i) files a notice of

19

appeal from the entry of the Confirmation Order or the PRIFA Order and (ii) seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the PRIFA Order. In addition to the foregoing, the Oversight Board, (w) in accordance with the terms and provisions of Section 6.2 hereof, on the PRIFA Effective Date, shall take such action as may be necessary to cause the Commonwealth to make payments to Ambac and FGIC, in cash, in the amounts of Thirty-Four Million Seven Hundred Fifty Thousand Dollars ($34,750,000.00), and Twenty-One Million Seven Hundred Fifty Thousand Dollars ($21,750,000.00), respectively, in consideration of the structuring of payments to be made to holders of PRIFA Bond Claims in accordance with the PRIFA Plan, (x) to the extent proposed by Ambac and FGIC, shall use its reasonable best efforts to cause PRIFA to take all actions necessary to file, or cause the filing of, a qualifying modification in accordance with Title VI of PROMESA consistent with the terms set forth on Exhibit "F" annexed hereto, and shall use its reasonable best efforts to achieve approval thereof by the Title III Court, (y) on the Effective Date, shall take such action as may be necessary to deposit, in cash, One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00) into the PRIFA Trust, for the benefit of holders of the PRIFA Bond Claims, which payment shall, upon satisfaction of the Distribution Conditions, reduce and be applied as a reduction of the outstanding principal amount of the PRIFA Bonds, and (z) upon satisfaction of the Distribution Conditions, shall take such action as may be necessary to cause the distribution of the beneficial interests of the PRIFA Trust to holders of PRIFA Bond Claims.

Section 4.2   Covenants of the Commonwealth. The Commonwealth shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the PRIFA Plan, the Disclosure Statement, the PRIFA Disclosure Statement, the approval of the Disclosure Statement, and the PRIFA Disclosure Statement, the entry of the Confirmation Order, and the entry of the PRIFA Order and the consummation, implementation and administration of the Plan and the PRIFA Plan, including, without limitation, the execution and delivery of the Definitive Documents and the PRIFA Definitive Documents provided that the Disclosure Statement, the PRIFA Disclosure Statement, the Plan and the PRIFA Plan, (and their consummation, implementation and administration) and the other Definitive Documents and the PRIFA Definitive Documents are consistent with the terms herein and in the Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof. Such actions shall include, but not be limited to, (a) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan, and, to the extent applicable, the approval of the PRIFA Disclosure Statement and confirmation of the PRIFA Plan, at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (b) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the PROMESA Proceedings, (c) refraining from directly or indirectly commencing (or continuing to prosecute) any action or proceeding or asserting any claim or objection against any Initial PSA Creditor (or their respective trustees, fiscal agents or paying agents) relating to the PRIFA Bonds and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, (d) refraining from directly or indirectly commencing (or continuing

20

to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan and the PRIFA Plan, and (e) in the event that a party (i) files a notice of appeal from the entry of the Confirmation Order or the PRIFA Order and (ii) seeks a stay pending appeal in connection therewith, using reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the PRIFA Order.  In addition to the foregoing, (y) in accordance with the terms and provisions of Section 6.2 hereof, upon the satisfaction of the Distribution Conditions, the Commonwealth shall take such action as is necessary to make payments on the PRIFA Effective Date, in cash, to Ambac and FGIC in the amounts of Thirty-Four Million Seven Hundred Fifty Thousand Dollars ($34,750,000.00) and Twenty-One Million Seven Hundred Fifty Thousand Dollars ($21,750,000.00), respectively, in consideration of the structuring of payments to be made to holders of PRIFA Bond Claims in accordance with the PRIFA Plan, and (z) the Commonwealth shall take such actions as are necessary to distribute the PRIFA Clawback CVI and the Rum Tax CVI to the PRIFA Trust for the benefit of holders of PRIFA Bond Claims (including the Monolines) and to make payments on account thereof to the PRIFA Trust in accordance with the terms of the PRIFA Plan, the CVI Indenture, and the Rum Tax CVI Indenture; provided, however, that, until satisfaction of the Distribution Conditions, payments made on account thereof shall be held in trust by the PRIFA Trust.

Section 4.3    Covenants of PRIFA.  To the extent enforceable, PRIFA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan, the PRIFA Plan, the Disclosure Statement, the PRIFA Disclosure Statement, the approval of the Disclosure Statement and the PRIFA Disclosure Statement, the entry of the Confirmation Order, and the entry of the PRIFA Order and the consummation, implementation and administration of the Plan and the PRIFA Plan, including the execution and delivery of the Definitive Documents and the PRIFA Definitive Documents, provided that the Disclosure Statement, the PRIFA Disclosure Statement, the Plan and the PRIFA Plan (and their consummation, implementation and administration) and the other Definitive Documents and the PRIFA Definitive Documents are consistent with the terms herein and Plan, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof; provided, however, that, in the event that Ambac and FGIC (including, as the case may be, jointly with other holders or insurers of PRIFA Bond Claims) proposes to the Oversight Board a modification of the PRIFA Bonds in accordance with Title VI of PROMESA, including as an alternative to inclusion of PRIFA in the Plan as a debtor under Title III of PROMESA, if approved and authorized by the Oversight Board, PRIFA shall use its reasonable best efforts and take such actions as necessary to obtain approval of such qualifying modification consistent with the terms set forth on Exhibit "F" annexed hereto.  Such actions shall include, but not be limited to, (a) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan, and, to the extent applicable, the approval of the PRIFA Disclosure Statement and confirmation of the PRIFA Plan, at hearings in accordance with applicable orders entered in the PROMESA Proceedings, (b) providing the Oversight Board with such financial information as shall be reasonably requested to be necessary to prosecute the PRIFA PROMESA Proceeding, (c) refraining from directly or indirectly commencing (or continuing to prosecute)

124682228v5

**EXECUTION VERSION**

any action or proceeding or asserting any claim or objection against any Initial PSA Creditor (or their respective trustees, fiscal agents or paying agents) relating to the PRIFA Bonds and taking all reasonable efforts to prevent any other person or entity (private or governmental) from directly or indirectly commencing (or continuing to prosecute) any such action or proceeding or asserting any such claim or objection, and (d) refraining from directly or indirectly commencing (or continuing to prosecute) or taking any legal position in any action or proceeding, including, without limitation, asserting any claim or objection, that is inconsistent with the compromises and settlements described herein or set forth in the Plan and the PRIFA Plan; provided, however, that, none of the foregoing is intended, nor shall it be construed, to apply to any action taken or to be taken with respect to claims or objections with respect to "clawbacks" or other claims, in each case, asserted by holders or insurers of PRIFA Bonds not party to this Agreement, including, without limitation, motion practice, the taking of discovery, the filing of memoranda, the presentation of oral argument, and trial.

Section 4.4    Covenants of the PRIFA Holders. Subject to the terms and conditions hereof, each of the PRIFA Holders, severally and not jointly, hereby covenants and agrees as follows:

(a)    None of the PRIFA Holders shall sell, transfer, pledge, hypothecate or assign (except as may be required in accordance with Section 301(c)(3) of PROMESA, the definitive insurance or other governing documents and applicable law with respect to a Monoline-insured bond) (a "**Transfer**") any of the PRIFA Bond Claims, or any voting, consent, or direction rights or participations or other interests therein (collectively, the "**PRIFA Interests**") during the period from the date hereof up to and including the earlier to occur of (i) Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 7.1 hereof; provided, however, that, notwithstanding the foregoing, each of the PRIFA Holders may transfer any PRIFA Interests to (1) another PSA Creditor or (2) in the event that the transferee is not a PSA Creditor at the time of Transfer, such transferee that executes and delivers, within five (5) calendar days after execution thereof, to counsel for the Oversight Board and AAFAF, the Joinder Agreement attached hereto as Exhibit "D" (a "**Qualified Transferee**"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein, including, without limitation, with respect to any additional PRIFA Bonds held by such Qualified Transferee at the time it joins this Agreement, and shall assume all of the rights and obligations hereunder, and (z) on or after the effective date of the Transfer, such PRIFA Holder shall be deemed to have relinquished its rights, and be released from its obligations (other than as set forth in Section 4.4(c) hereof) on or after the effective date of the Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.4(a), it shall be void ab initio and the applicable PRIFA Bond Claims and the PRIFA Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the PRIFA Holders from acquiring additional PRIFA Bond Claims; provided, however, that any such PRIFA Bond Claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a PRIFA Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.4(a) shall not apply to the grant of any liens or encumbrances in

22

favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the PRIFA Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth (including secured, unsecured, administrative or substantial contribution claims), on account of any PRIFA Bonds or PRIFA Bond Claims or provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such PRIFA Holders' aggregate holdings of PRIFA Bond Claims, (ii) except as permitted by Section 4.4(d) below solely with respect to the Monolines, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of its PRIFA Bonds or PRIFA Bond Claims (and each such PRIFA Holder agrees to such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims, or (iii) aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.4(b); provided, however, that, to the extent consistent with its obligations hereunder, a PRIFA Holder may amend a proof of claim solely to change the claimant's name, address or similar information.

(c)     Each of the PRIFA Holders, solely in its capacity as holder of PRIFA Bonds or PRIFA Bond Claims, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the Plan and the PRIFA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement and the PRIFA Disclosure Statement and the entry of the Confirmation Order and the PRIFA Order and the consummation, implementation and administration of the Plan and the PRIFA Plan, including the execution and delivery of the Definitive Documents and the PRIFA Definitive Documents, provided that such Disclosure Statement, PRIFA Disclosure Statement, the Confirmation Order, PRIFA Order, Plan, PRIFA Plan (and their consummation, implementation and administration) and the other Definitive Documents and the PRIFA Disclosure Statement are consistent with the terms herein and the Plan, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan or the PRIFA Plan unless such modification is proposed or supported by the Oversight Board, AAFAF, the Commonwealth, and PRIFA and was made in accordance with the provisions of Section 8.1 hereof, and (B) not vote for or support any PRIFA or Commonwealth plan of adjustment not proposed or supported by the Oversight Board, AAFAF, the Commonwealth, and PRIFA, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that each of the Parties acknowledges that each Insured PRIFA Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, and (iii) in the event that a party (A) files a notice of appeal from the entry of the Confirmation Order or the PRIFA Order and (B) seeks a stay pending appeal in connection

124682228v5

therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedeas bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order or the PRIFA Order.

(d)     Subject to the terms set forth herein, none of the PRIFA Holders shall be limited or prohibited from (i) taking any action that any such PRIFA Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents, (ii) taking any action to defend itself against the claims and causes of action asserted in the Debt Related Objections, the Invalidity Actions or the Lien Challenge Actions, to the extent such litigation is not otherwise stayed, or against the claims and causes of action asserted in any other litigation that is not stayed, (iii) asserting any claims or causes of action against any Party that breaches this Agreement, or (iv) taking any action such holder shall deem necessary or appropriate as against a Monoline to preserve, protect or defend any of its rights under any policy of insurance issued by a Monoline with respect to any Monoline-insured bond.  Without in any way limiting the foregoing, to the extent the Plan and the Definitive Documents are consistent with this Agreement and the exhibits hereto, none of the PRIFA Holders shall take any action to oppose confirmation of the Plan with respect to the Covered Borrowers, including, without limitation, voting to reject the Plan with respect to any other claims held against the Commonwealth or PRIFA (with respect to a Monoline-insured bond, other than an Ambac Insured Bond or a FGIC Insured Bond, to the extent such PRIFA Holder is authorized to vote or direct the vote of such claim in accordance with Section 301(c)(3) of PROMESA, any definitive insurance documents and applicable law); provided, however, that nothing in this Agreement shall limit or prohibit a PRIFA Holder, in connection with any matter relating to the Monolines and with respect to any Monoline-insured bond, from taking any action, or asserting any claims or causes of action, against a Monoline necessary to maintain the benefits of the applicable Monoline insurance policy (including, without limitation, voting of claims, subrogation or acceleration or commutation).

Section 4.5     Covenants of Ambac.  Ambac hereby covenants and agrees as follows:

(a)     Ambac shall not, except as expressly provided herein or in accordance with any order of the Title III Court regarding the filing of proofs of claim in a PRIFA PROMESA Proceeding, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth, HTA, PBA or ERS (including secured, unsecured, administrative or substantial contribution claims) on account of any Ambac Insured Bonds or any PRIFA Bond Claims, provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Ambac's aggregate holdings of PRIFA Bond Claims, (ii) upon entry of a stay of litigation, solely with respect to Ambac, in the Commonwealth PROMESA Proceeding in which Ambac is a plaintiff, defendant or respondent, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of any Ambac Insured Bonds or any of its PRIFA Bond Claims in the Commonwealth PROMESA Proceeding, (and Ambac agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Clawback Actions and the Lift

Stay Motions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.5(a). Without limiting the foregoing, within four (4) Business Days from the date hereof, (A) Ambac and the Oversight Board shall file joint urgent motions, in form reasonably acceptable to Ambac and the Oversight Board, to stay the Clawback Actions, the Lift Stay Motions, the Section 926 Motion, the Uniformity Litigation, the Discovery Related Actions, the Miscellaneous Litigation, the Voting Motions as to Ambac, and, to the extent of intervention or joinder, that certain litigation styled Assured Guaranty Corp., et al. v. The Commonwealth of Puerto Rico, et al., Adv. Pro. No. 18-00059-LTS, currently pending in the Title III Court (the "**Adversary**"), and (B) Ambac shall take, or cause to be taken, any and all actions necessary, including, without limitation, serving notice thereof upon all affected parties, to cause the stay of discovery propounded solely by Ambac in connection with the Clawback Actions, the Lift Stay Motions, the Uniformity Litigation, and the Discovery Related Actions, including, without limitation, all such subpoena, deposition notices, requests for production of documents, and any joinders by Ambac to requests for discovery filed in accordance with Bankruptcy Rule 2004.

(b)     Ambac shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein, or impede or preclude, the filing of the Plan, the PRIFA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement, the entry of the Confirmation Order and the entry of the PRIFA Plan and the consummation, implementation and administration of the Plan and the PRIFA Plan Order, including the execution and delivery of the Definitive Documents, provided that the Disclosure Statement, the Confirmation Order, the Plan, the PRIFA Plan (and their consummation, implementation and administration), and the Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, and otherwise consistent with the terms herein, and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that Ambac acknowledges that each Insured PRIFA Bond Claim insured by Ambac shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, (iii) in the event a party (A) files a notice of appeal from the entry of the Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedes bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order, and (iv) on or prior to August 15, 2021, propose to the Oversight Board a modification of the PRIFA Bonds under Title VI of PROMESA, consistent with the terms and conditions set forth on the Settlement Summary annexed hereto as Exhibit "F".

(c)     Subject to the terms set forth herein, including, without limitation, the stay of litigation as required in accordance with Section 4.5(a) hereof, Ambac shall not be limited or prohibited from (i) taking such action that Ambac shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, the PRIFA Plan, or

25

the other Definitive Documents, or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(d)     Notwithstanding anything contained herein to the contrary, Ambac may continue to litigate to judgment pursuant to a Final Order all claims and causes of action contained in the Underwriter Action; provided, however, that, in the event that any such judgment or Final Order gives rise to claims for indemnification or otherwise against any of the Covered Borrowers, (i) the Covered Borrowers agree to vigorously defend against any claims asserted against them arising out of the Underwriter Action and will allow Ambac to participate in such defense, and (ii) Ambac agrees to (A) reduce the amount of any such judgment or amount set forth in any Final Order to the extent of any such claim against any of the Covered Borrowers, and (B) reimburse the Covered Borrowers for all fees and expenses incurred in connection with the defense against any such claims.

Section 4.6     Covenants of FGIC.  FGIC hereby covenants and agrees as follows:

(a)     FGIC shall not, except as expressly provided herein or in accordance with any order of the Title III Court regarding the filing of proofs of claim in a PRIFA PROMESA Proceeding, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against the Commonwealth, HTA, PBA or ERS (including secured, unsecured, administrative or substantial contribution claims) on account of any FGIC Insured Bonds or any PRIFA Bond Claims, provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, FGIC's aggregate holdings of PRIFA Bond Claims, (ii) upon entry of a stay of litigation, solely with respect to FGIC, in the Commonwealth PROMESA Proceeding, in which FGIC is a plaintiff, defendant or respondent, file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter on account of any FGIC Insured Bonds or any of its PRIFA Bond Claims in the Commonwealth PROMESA Proceeding, (and FGIC agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Clawback Actions and the Lift Stay Motions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.6(a).  Without limiting the foregoing, within four (4) Business Days from the date hereof,  (A) FGIC and the Oversight Board shall file joint urgent motions, in form reasonably acceptable to FGIC and the Oversight Board, to stay the Clawback Actions, the Lift Stay Motions, the Section 926 Motion, the Discovery Related Actions, the Miscellaneous Litigation, and the Voting Motions as to FGIC, and the Adversary, and (B) FGIC shall take, or cause to be taken, any and all actions necessary, including, without limitation, serving notice thereof upon all affected parties, to cause the stay of discovery propounded solely by FGIC in connection with the Clawback Actions, the Lift Stay Motions, and the Discovery Related Actions, including, without limitation, the withdrawal of all subpoena, deposition notices, requests for production of documents, and any joinders by FGIC to requests for discovery filed in accordance with Bankruptcy Rule 2004.

(b)     FGIC shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the

124682228v5

terms herein, or impede or preclude, the filing of the Plan, the PRIFA Plan, the administration of the PROMESA Proceedings, the approval of the Disclosure Statement, the entry of the Confirmation Order and the entry of the PRIFA Order, and the consummation, implementation and administration of the Plan and the PRIFA Plan, including the execution and delivery of the Definitive Documents, provided that the Disclosure Statement, the Confirmation Order, the Plan and the PRIFA Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein, (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, and otherwise consistent with the terms herein and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement; provided, however, that FGIC acknowledges that each FGIC Insured Bond Claim shall be voted in accordance with Section 301(c)(3) of PROMESA and such other applicable law and governing documents, so long as this Agreement remains in effect, (iii) in the event a party (A) files a notice of appeal from the entry of the Confirmation Order and (B) seeks a stay pending appeal in connection therewith, use reasonable best efforts to oppose such stay request, including, without limitation, seeking the posting of a supersedes bond in an amount commensurate with potential losses resulting from any delay caused by any appeals or petitions for review of the Confirmation Order, and (iv) on or prior to August 15, 2021, propose to the Oversight Board a modification of the PRIFA Bonds under Title IV of PROMESA, consistent with the terms and conditions set forth on the Settlement Summary annexed hereto as Exhibit "F".

(c)     Subject to the terms set forth herein, including, without limitation, the stay of litigation as required in accordance with Section 4.6(a) hereof, FGIC shall not be limited or prohibited from (i) taking such action that FGIC shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(d)     Notwithstanding anything contained herein to the contrary, FGIC may continue to litigate to judgment pursuant to a Final Order all claims and causes of action contained in the Underwriter Action; provided, however, that, in the event that any such judgment or Final Order gives rise to claims for indemnification or otherwise against any of the Covered Borrowers, (i) the Covered Borrowers agree to vigorously defend against any claims asserted against them arising out of the Underwriter Action and will allow FGIC to participate in such defense, and (ii) FGIC agrees to (A) reduce the amount of any such judgment or amount set forth in any Final Order to the extent of any such claim against any of the Covered Borrowers, and (B) reimburse the Covered Borrowers for all fees and expenses incurred in connection with the defense against any such claims.

Section 4.7     Covenants of the Parties.  Subject to the terms and conditions hereof, each of the Parties, severally and not jointly, hereby covenants and agrees as follows:

(a)     Coordination.  The Parties shall coordinate and use their reasonable best efforts to obtain the consent and joinder of AAFAF prior to consummation of the transactions contemplated herein.  Any representations, warranties, covenants, or other obligations of

AAFAF and PRIFA contemplated herein shall not be effective until an authorized signature for such entity has been affixed hereto.

(b)   <u>Legal and Other Protections</u>.  The Plan, the Confirmation Order, the PRIFA Plan, the PRIFA Order, the Rum Tax CVI Legislation, the Debt Responsibility Act, and the Rum Tax CVI Indenture, to the extent applicable, in a manner to be agreed to by the Oversight Board, Ambac and FGIC, shall include the following legal protections:

(i)   For payment of the Rum Tax CVI, the Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law;

(ii)   Pursuant to the Rum Tax CVI Indenture, the Rum Tax CVI trustee shall have a direct right of action to enforce the Rum Tax CVI Indenture, including seeking specific performance as a remedy for any breach of covenants in the Rum Tax CVI Indenture; <u>provided</u>, <u>however</u>, that, upon an event of default under the Rum Tax CVI Indenture, and, in the absence of action by the Rum Tax CVI trustee, holders of beneficial interests in the PRIFA Trust of not less than twenty-five percent (25%) in principal amount of the Rum Tax CVI then outstanding shall be entitled to institute any suit, action, mandamus or other proceeding in equity or at law, or for the protection or enforcement of any right or remedy under the Rum Tax CVI Indenture;

(iii)   The Fiscal Plan for the Commonwealth certified as of the Effective Date, and any Post-Effective Date Fiscal Plan will include provisions for the payment in each Fiscal Year to the extent that the Outperformance Condition is satisfied in the prior Fiscal Year, any amounts due and owing on the Rum Tax CVI in accordance with the terms of the Rum Tax CVIs Indenture;

(iv)   The PRIFA Order shall provide for the retention of jurisdiction by the Title III Court or, in the event the Title III Court declines such retention of jurisdiction or the PROMESA Proceedings have been closed in accordance with the terms and provisions of PROMESA, designation of the United States District Court for the District of Puerto Rico, to enforce the terms of the certified Fiscal Plans and the obligations contemplated pursuant to this Agreement, the Rum Tax CVI and the Rum Tax CVI Indenture;

(v)   The Rum Tax CVI, including, without limitation, any Rum Tax CVI issued in accordance with the terms and provisions of Section 4.7(c) hereof shall bear a stamp or similar legend stating that the United States District Court for the District of Puerto Rico has determined that such bonds and securities are valid, legally binding and enforceable pursuant to the Confirmation Order or the PRIFA Order;

(vi)   The compromises and settlements embodied in this Agreement and set forth in the Plan, the Confirmation Order, the PRIFA Plan, and the PRIFA Order shall not be binding on any Party (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding with respect to the priority of the Rum Tax CVIs under PROMESA, the Puerto Rico Constitution or other applicable law;

(vii)   The Commonwealth shall covenant for the benefit of all initial and subsequent holders of the PRIFA Clawback CVI and the Rum Tax CVI that, until all obligations

28

with respect thereto have been paid or otherwise satisfied in accordance with their terms, the Commonwealth will not: (a) take any action, or suggest to any other party to take any action, that would impair the rights and remedies of the holders of the PRIFA Clawback CVI or the Rum Tax CVI; (b) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to fulfill the terms of any agreements made with the holders of the PRIFA Clawback CVI or the Rum Tax CVI; or (c) impair the ability of the holders of the PRIFA Clawback CVI or the Rum Tax CVI to track performance of the Measured SUT or the Rum Tax CVI; provided, however, that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect, among others, holders of the PRIFA Clawback CVI from such elimination or replacement reducing the likelihood that, or the amount by which, the Outperformance Condition (as defined in the Plan) shall be satisfied; and, provided, further, that the foregoing shall not preclude the United States of America from exercising its power, through a change in law or inaction, to eliminate Rum Tax Revenues; and, provided, further, that the Rum Tax CVI Indenture shall include a mechanism for public disclosure by the Commonwealth of (y) the amounts of the Measured SUT, the SUT collections, and the calculation of any SUT True-Up or Baseline SUT Reduction, each as defined and reflected in the Settlement Summary annexed as Exhibit "J" to the HTA/CCDA PSA, and (z) the amounts of the Rum Tax Revenues, and the Supplemental Cover-Over, and the calculation of any Rum Tax CVI Annual Payment, as defined and reflected in the Settlement Summary annexed hereto as Exhibit "F";

(viii) The Rum Tax CVI Indenture and the Rum Tax CVI shall be governed by New York law; provided, however, that the authorization of the CVI Indenture and the Rum Tax CVI Indenture, if any, and the issuance of the securities thereunder shall be governed by the laws of the Commonwealth, PROMESA, the Confirmation Order and the PRIFA Order; and, provided, further, that the holders of such securities shall be entitled to such rights and remedies set forth therein, including, without limitation, Sections 2 and 8 of Article VI of the Commonwealth Constitution;

(ix) The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Commonwealth, (2) PRIFA, (3) each person or entity asserting claims or other rights against the Commonwealth, PRIFA, or any of their respective instrumentalities or agencies, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds by the Commonwealth, or any of its or their instrumentalities or with respect to any trustee, collateral agent, indenture trustee, fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Plan and, if impaired, whether or not such person or entity accepted the Plan, (4) any other person, and (5) each of the foregoing's respective heirs, successors, assigns, trusted, executors, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(x) The PRIFA Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Commonwealth, (2) PRIFA, (3) each person or entity asserting claims or other rights against the Commonwealth, PRIFA, or any of their respective instrumentalities or agencies, including a

beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds by the Commonwealth, or any of its or their instrumentalities or with respect to any trustee, collateral agent, indenture trustee, fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the PRIFA Plan and, if impaired, whether or not such person or entity accepted the PRIFA Plan, (4) any other person, and (5) each of the foregoing's respective heirs, successors, assigns, trusted, executors, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(xi)    The Confirmation Order shall provide that, in consideration for the agreements set forth herein, on the Effective Date, the Commonwealth shall make a payment through a deposit into the PRIFA Trust, for the benefit of holders of PRIFA Bond Claims, in the amount of One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00), in cash, which distribution shall be subject to distribution in accordance with the PRIFA Trust Documentation and the satisfaction of the Distribution Conditions, and shall reduce the outstanding principal amount of the PRIFA Bond Claims;

(xii)    The Confirmation Order shall provide that, in consideration for the structuring of payments to be made to holders of PRIFA Bond Claims, and in accordance with the terms and provisions of Section 6.2 hereof, on the PRIFA Effective Date, the Commonwealth shall make payments of the Rum Tax Structuring Fees to Ambac and FGIC in the amounts of Thirty-Four Million Seven Hundred Fifty Thousand Dollars ($34,750,000.00) and Twenty-One Million Seven Hundred Fifty Thousand Dollars ($21,750,000.00), respectively.

(xiii)    The Confirmation Order shall provide that, in consideration for the agreements set forth herein, on the PRIFA Effective Date, holders of PRIFA Bond Claims shall release any and all claims reserved by such holders under that certain Findings of Fact, Conclusions of Law, and Order Approving the Qualifying Modification for the Government Development Bank for Puerto Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight Management, and Economic Stability Act, including, without limitation, any claim under PROMESA Section 407.

(c)    Tax-Exempt Treatment of the Rum Tax CVI.  The Oversight Board and PRIFA shall use their reasonable best efforts to cause the payment of principal and interest with respect to the Rum Tax CVI to be treated as tax-exempt for applicable local tax and/or territorial laws and federal income tax purposes.

Section 4.8    Qualified Marketmaker.  Notwithstanding anything contained in this Article IV to the contrary, (a) a PSA Creditor may Transfer any PRIFA Interests to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a PSA Creditor; provided, however, that, in the event that a Qualified Marketmaker acquires such PRIFA Interests, on or before August 15, 2021, such Qualified Marketmaker may retain such PRIFA Interests, for a period of one hundred twenty (120) days following such Qualified Marketmaker's acquisition of such PRIFA Interests; and (b) to the extent that a PSA Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any PRIFA Interests; Qualified Marketmaker acquires from a holder of the PRIFA Interests that is not a PSA Creditor without the requirement that the transferee be or become a

30

PSA Creditor.  A Qualified Marketmaker may, with the consent of the Government Parties, which consent shall not be unreasonably withheld, join this Agreement solely on behalf of a specific trading desk.

Section 4.9    Appointments Related Litigation/Uniformity Litigation.  Except as expressly provided below, or unless otherwise required to comply with an order of a court of competent jurisdiction that has not been vacated, reversed, or otherwise stayed, no Party which is a plaintiff in an Appointments Related Litigation or the Uniformity Litigation shall take further action in connection with such litigation but, under all circumstances, such Party hereby covenants and agrees (a) to perform all other duties and obligations as set forth in this Agreement, including, without limitation, the other duties and obligations set forth in Articles IV and V hereof, and (b) that, no matter the determination and the entry of a Final Order in connection with the Appointments Related Litigation or the Uniformity Litigation, with such determination and Final Order being entered either prior to consideration of approval of, or confirmation of, the Plan by the Title III Court or subsequent to entry of the Confirmation Order, such Party (i) shall not urge or argue that such determination and Final Order reverses, affects, or otherwise modifies the transactions contemplated herein and in the Plan as the case may be, and (ii) in the event that such determination and Final Order occurs prior to approval of, or confirmation of, the Plan, such Party shall urge and request, in writing, that the Oversight Board, as it may be modified, reconstructed or reappointed, (1) enforce the terms and conditions of this Agreement and the Plan, and (2) promptly seek confirmation of the Plan by the Title III Court. Notwithstanding the foregoing, during the period (i) prior to the Effective Date, a Party which is a plaintiff in an Appointments Related Litigation or the Uniformity Litigation shall be under no obligation hereunder to inform a court considering such litigation of the execution and pendency of this Agreement, and (ii) from and after the Effective Date, any Party to the Appointments Related Litigation or the Uniformity Litigation shall seek the dismissal, with prejudice, of such litigation.

Section 4.10    Right to Vote.  Each Party acknowledges that, for purposes of this Agreement, and any Plan or PRIFA Plan solicited in accordance with the provisions of this Agreement, and so long as this Agreement remains in effect and is not otherwise terminated by Ambac and FGIC as to themselves, (a) Ambac and FGIC shall have the right to vote to accept or reject the Plan or the PRIFA Plan solely to the extent provided by the terms and provisions of Section 301(c)(3) of PROMESA and such other applicable law and governing insurance documents on account of any existing PRIFA Bonds that it insures, (b) it shall not object to Ambac's or FGIC's right to vote to accept or reject the Plan or the PRIFA Plan, in accordance with subsection (a) above, and (c) within five (5) Business Days of the date hereof, Ambac, FGIC and the Oversight Board shall file a stipulation and proposed order with the Title III Court consistent with the foregoing and disposing of the Voting Motions.  For the avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Ambac's, FGIC's and their respective insured bondholders' rights to vote to accept or reject any Plan or PRIFA Plan.

124682228v5

## ARTICLE V

## PLAN AND PLAN SUPPORT

Section 5.1    Plan Support Commitment.  From and after the date hereof, provided that (a) this Agreement has not been terminated and (b) none of the Disclosure Statement, the Plan, or any of the proposed Definitive Documents have been filed, amended or modified in a manner inconsistent with the provisions of this Agreement:

(a)    Commonwealth Plan:  Each of the PSA Creditors (to the extent remaining a Party), shall (i) support (A) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, (C) unless otherwise ordered by the Title III Court, upon a motion filed by Government Parties, a stay of all proceedings and determinations in connection with the Invalidity Actions, the Lien Challenge Actions, the Debt Related Objections, the Clawback Actions, the Lift Stay Motions, the Section 926 Motion, the Uniformity Litigation, the Discovery Related Actions, the Miscellaneous Litigation, the Voting Motions, and the Adversary, through a date no earlier than the Effective Date, solely with respect to Ambac and FGIC; provided, however, that a PSA Creditor shall only be required to support the Plan with respect to those PRIFA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Ambac or FGIC, that they either hold or insure and are entitled to vote or direct the vote of in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing insurance documents; and, provided, further, that, nothing herein shall limit or prohibit any PSA Creditor from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the Monolines or prohibit Ambac and FGIC from or asserting any claims or causes of action, in connection with any matter relating solely to the holders of Insured PRIFA Bond Claims that are insured by Ambac or FGIC, as the case may be, and (D) a stay of any joinders by Ambac or FGIC to requests for discovery served pursuant to Bankruptcy Rule 2004, (ii) subject to receipt of the Disclosure Statement and/or other solicitation materials in respect of the Plan, to the fullest extent permitted by law, timely vote, or cause to be voted, to accept the Plan in its capacity as PRIFA Holder, or insurer of Insured PRIFA Bond Claims with rights of acceptance in accordance with the Disclosure Statement Order; provided, however, that a PSA Creditor shall only be required to vote, or cause to be voted, to accept the Plan with respect to those PRIFA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Ambac or FGIC, that Ambac or FGIC either holds or insures and is entitled to vote or direct the vote of in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote, (iv) not consent to or vote for any modification of the Plan unless such modification is (Y) not adverse to the PRIFA Holders, Ambac and FGIC, and (Z) not inconsistent with the terms provided herein and the Plan, and (v) not vote for or support any Commonwealth plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement; provided, however, that each of the Parties acknowledges that each Insured PRIFA Bond Claim shall be voted in accordance with the terms of Section 301(c)(3) of PROMESA and such other applicable law and governing insurance documents, so long as this Agreement remains in effect.

(b)     PRIFA Plan: Each of the PSA Creditors (to the extent remaining a Party), shall (i) support (A) to the extent applicable, approval of the PRIFA Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the PRIFA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, (C) unless otherwise ordered by the Title III Court, upon a motion filed by Government Parties, a stay of all proceedings and determinations in connection with the Invalidity Actions, the Lien Challenge Actions, the Debt Related Objections, the Clawback Actions, the Lift Stay Motions, the Section 926 Motion, the Uniformity Litigation, the Discovery Related Actions, the Miscellaneous Litigation, the Voting Motions, and the Adversary, through a date no earlier than the Effective Date, solely with respect to Ambac and FGIC; provided, however, that a PSA Creditor shall only be required to support the PRIFA Plan with respect to those PRIFA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Ambac or FGIC, that they either hold or insure and are entitled to vote or direct the vote of in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing insurance documents; and, provided, further, that, nothing herein shall limit or prohibit any PSA Creditor from asserting any claims or causes of action, in connection with any matter relating solely to the Monolines or prohibit Ambac and FGIC from taking any action, or asserting any claims or causes of action, in connection with any matter relating solely to the holders of Insured PRIFA Bond Claims that are insured by Ambac or FGIC, as the case may be (including, without limitation, voting of claims, subrogation, acceleration, commutation, or any act necessary to maintain the benefits of, and rights under, the applicable Monoline insurance policy), and (D) a stay of any joinders by Ambac or FGIC to requests for discovery served pursuant to Bankruptcy Rule 2004, (ii) subject to receipt of the PRIFA Disclosure Statement and/or other solicitation materials in respect of the PRIFA Plan, to the fullest extent permitted by law, timely vote, or cause to be voted, to accept the PRIFA Plan in its capacity as PRIFA Holder, or insurer of Insured PRIFA Bond Claims with rights of acceptance in accordance with the PRIFA Disclosure Statement Order; provided, however, that a PSA Creditor shall only be required to vote, or cause to be voted, to accept the PRIFA Plan with respect to those PRIFA Bond Claims that such PSA Creditor beneficially owns or controls, or, with respect to Ambac or FGIC, that Ambac or FGIC either holds or insures and is entitled to vote in accordance with the terms of Section 301(C)(3) of PROMESA and such other applicable law and governing documents, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote, (iv) not consent to or vote for any modification of the PRIFA Plan unless such modification is (Y) not adverse to the PRIFA Holders, Ambac and FGIC, and (Z) not inconsistent with the terms provided herein and the PRIFA Plan, and (v) not vote for or support any PRIFA plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement; provided, however, that each of the Parties acknowledges that each Insured PRIFA Bond Claim shall be voted in accordance with the terms of Section 301(c)(3) of PROMESA and such other applicable law and governing insurance documents, so long as this Agreement remains in effect.

Section 5.2     Solicitation Required in Connection with Plans.  Notwithstanding anything contained in this Article V or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan or PRIFA Plan, as the case may be. Each of the Parties, severally and not jointly, acknowledges and agrees that (a) the votes on the Plan or PRIFA Plan, as applicable, will not be solicited until the Title III Court has approved the disclosure statement and related solicitation materials, and

such disclosure statement and solicitation materials have been transmitted to parties entitled to receive same and (b) this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.  NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA, THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

Section 5.3    Custodial Trusts/Acceleration/Commutation of Insurance.  Subject to (a) the terms and provisions set forth in Article VII hereof, including, without limitation, the termination of this Agreement by Ambac and/or FGIC, and (b) all insurance policies and related agreements relating to Ambac Insured Bonds and FGIC Insured Bonds being in full force and effect, with no outstanding payment defaults by Ambac or FGIC with respect to such Ambac Insured Bonds and FGIC Insured Bonds, respectively, up to and including the Effective Date, (i) the Plan shall contain a provision providing that, to the extent permitted in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents or applicable law, (A) the payment of the principal of the GO Bonds, PBA Bonds, PRIFA Bonds, and CCDA Bonds insured by Ambac is accelerated as of the  Effective Date, (B) the GO Bonds, PBA Bonds, PRIFA Bonds, and CCDA Bonds insured by Ambac are payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that, for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by Ambac under any insurance policy, unless Ambac elects, in its sole and absolute discretion, to make such payment, and upon such payment, Ambac's obligations under the applicable insurance policy shall be fully satisfied and extinguished, notwithstanding any provision of the applicable insurance policy of other documents related to Ambac Insured Bonds, (C) the payment of the principal of the GO Bonds, PBA Bonds, PRIFA Bonds, and CCDA Bonds insured by FGIC is accelerated as of the Effective Date, and (D) the GO Bonds, PRIFA Bonds, CCDA Bonds, and PBA Bonds insured by FGIC are payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that, for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under any insurance policy, unless FGIC elects, in its sole and absolute discretion, to make such payment, and (iii) the Plan and the PRIFA Plan shall include provisions relating to, as applicable (A) the implementation of custodial trusts in connection with distributions to be made to the holders of Ambac Insured Bonds and FGIC Insured Bonds, and (B) a proposal to the applicable holders of Ambac Insured Bonds and FGIC Insured Bonds regarding the resolution of such holders' claims in respect of applicable policies of insurance, which provisions shall be in the form and substance satisfactory to the Oversight Board and, to the extent applicable, Ambac and FGIC.  Such proposals may take the form of one or more commutation transactions; provided, however, that no holder of Ambac Insured Bonds or FGIC

34

**EXECUTION VERSION**

Insured Bonds shall be required to accept any such proposal to commute the respective policies of insurance.

## ARTICLE VI

### PSA RESTRICTION FEES AND STRUCTURING FEES

Section 6.1     PSA Restriction Fees.  Subject to the terms and conditions herein, the PSA Restriction Fees, which shall be fully earned as of the date hereof or the date of execution of a Joinder Agreement for Initial PSA Creditors or Joinder Creditors, as the case may be, shall be paid on the PRIFA Effective Date in accordance with the terms and conditions set forth in the PRIFA Order.  Without limiting the foregoing, in exchange for executing this Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of this Agreement, subject to the entry of the PRIFA Order, each PSA Restriction Fee Creditor holding or insuring PRIFA Bonds (including Ambac and FGIC, to the extent Ambac or FGIC, as applicable, is authorized to vote or direct the vote of such Insured PRIFA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the PSA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the PRIFA Plan in an amount equal to the Restriction Fee Percentage multiplied by the aggregate amount of PRIFA Bond Claims (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Restriction Fee Creditor is authorized to vote or direct the vote of any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Ambac or FGIC held or insured, by such PSA Restriction Fee Creditor as of the expiration of the PSA Restriction Fee Period; provided, however, that each PSA Restriction Fee Creditor who acquires any PRIFA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured PRIFA Bond (other than a Monoline-insured PRIFA Bond insured by Ambac or FGIC, as the case may be), to the extent such PSA Restriction Fee Creditor is authorized to vote or direct the vote of the claim with respect to such Monoline-insured PRIFA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac or FGIC, to the extent Ambac or FGIC, as applicable, is authorized to vote or direct the vote of such Insured PRIFA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such PSA Restriction Fee equal to the Restriction Fee Percentage multiplied by the aggregate amount of PRIFA Bond Claims (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a PSA Creditor is authorized to vote or direct the vote of any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such PSA Restriction Fee Creditor as of the earlier to occur of the PSA Threshold Attainment attributable to the PRIFA Bond Claims and the entry of the PRIFA Order; and, provided, further, that, if a PSA Restriction Fee Creditor sells any PRIFA Bonds or for which it would have been entitled to receive the PSA Restriction Fee, the purchasing party shall not be entitled to receive the PSA Restriction Fee on account thereof and such entitlement shall remain with the selling party unless the purchasing party is a Monoline and a PSA Restriction Fee Creditor that has paid a claim on the PRIFA Bonds purchased and is assigned or subrogated to the selling party's rights; and, provided, further, that, in all circumstances, the sum of the PSA Restriction Fees shall not exceed Ten Million Dollars ($10,000,000.00); and, provided, further, that, in the event

35

this Agreement is terminated pursuant to the terms of Sections 7.1(b)(iii) or (c) hereof (subject to the extension provided for in Sections 7.1(b) or (c) hereof), or the Oversight Board terminates this Agreement for any reason other than (i) a breach of this Agreement by a non-Government Party, (ii) the denial of confirmation of the Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Plan, and such modification would have a material adverse effect on the Parties ability to consummate the Plan on terms consistent with this Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed hereto as Exhibit "F", (iii) the Rum Tax CVIs Legislation and the Debt Responsibility Act are not enacted prior to the commencement of the hearing to consider confirmation of the Plan, or (iv) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) hereof, the aggregate PSA Restriction Fee, in the amount of One Million Dollars ($1,000,000.00) shall be paid, ratably, in cash, as an administrative expense claim under a plan of adjustment for PRIFA to the Initial PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances, upon termination of this Agreement, including, without limitation, termination of this Agreement in accordance with other provisions of Section 7.1 hereof, no PSA Restriction Fee shall be due and payable to the Party unless the purchasing party is a Monoline and a PSA Restriction Fee Creditor that has paid a claim on the PRIFA Bonds purchased and is assigned or subrogated to the selling party's rights to this Agreement terminating this Agreement or against the Party to this Agreement as to which this Agreement is terminated.

Section 6.2    Structuring Fees.  In exchange for executing this Agreement, agreeing to all of its terms and conditions, and structuring the payments to be made in accordance with the Settlement Summary annexed hereto as Exhibit "F", subject to the entry of the PRIFA Order, on the PRIFA Effective Date, Ambac or FGIC in  shall be entitled to receive, and the Commonwealth shall pay, in cash, the Rum Tax Structuring Fees to Ambac and FGIC in the amounts of Thirty-Four Million Seven Hundred Fifty Thousand Dollars ($34,750,000.00) and Twenty-One Million Seven Hundred Fifty Thousand Dollars ($21,750,000.00), respectively.  In the event that this Agreement is terminated by either Ambac or FGIC in accordance with the provisions of Article VII hereof, such Party shall not be entitled to the payment of a Rum Tax Structuring Fee.

ARTICLE VII

TERMINATION

Section 7.1    Termination of Agreement.

(a)    This Agreement may be terminated by any PSA Creditor, solely as to itself, at its sole option and discretion and upon written notice to the other Parties, in the event that (i) the Oversight Board fails to comply with any of its respective covenants in Article IV hereof or any of its undertakings in this Agreement (except for the failure of the Oversight Board to agree with Ambac and FGIC with respect to the PRIFA Order, the Rum Tax CVI Indenture, the PRIFA Trust Documentation and the Custodial Trust Documents prior to the PRIFA Effective Date provided that the Oversight Board used its reasonable best efforts and negotiated in good faith in a timely manner in connection therewith), if such failure to comply has or would have an adverse

economic or legal impact on such PSA Creditor, including an adverse economic impact in the treatment afforded to such PSA Creditor under the Plan (including any applicable settlement under the Plan or changes to the legal protections set forth in Section 4.7(b) hereof), the terms and structure of the Rum Tax CVI set forth in the PRIFA Plan, or to the definition or calculation of PSA Restriction Fees that would have an adverse economic or legal impact on such PSA Creditor, (ii) the Oversight Board files any motion or pleading with the Title III Court, in each case, that is inconsistent with this Agreement, including the Plan or the PRIFA Plan in any adverse economic or legal respect (including treatment under the Plan or the PRIFA Plan or any applicable settlement under the Plan or the PRIFA Plan the terms and structure of the Rum Tax CVIs set forth in the Plan, or to the definition or calculation of PSA Restriction Fees) before the earlier to occur of (y) five (5) Business Days after the Oversight Board receives written notice from another Party (in accordance with the notice provisions set forth in Section 8.11 hereof) that such motion or pleading is inconsistent with this Agreement in such adverse economic or legal respect and (z) entry of an order of the Title III Court approving such motion or pleading, (iii) the entry of a Final Order in the PROMESA Proceedings has a material adverse effect on the confirmability of the Plan or the PRIFA Plan, (iv) the Rum Tax CVIs Legislation and the Debt Responsibility Act are not enacted prior to the commencement of the hearing to consider confirmation of the Plan, (v) the A&R CW PSA has been terminated as to all parties thereto, (vi) the HTA/CCDA PSA has been terminated as to all parties thereto, or (vii) the Commonwealth fails to make the payment provided for in Section 4.7(b)(xii) hereof.

(b)     This Agreement may be terminated at any time prior to the PRIFA Effective Date as to all Parties hereto by the Oversight Board, or by joint action of Ambac and FGIC in the event that (i) any other Party has failed to comply with any of its respective covenants set forth in Article IV hereof or any of its other undertakings in this Agreement, and such non-compliance has a material adverse effect on confirmability of either the Plan or the PRIFA Plan, as the case may be (as determined jointly by the Government Parties, Ambac and FGIC), (ii) a court order shall be entered, and such order shall not be reversed or otherwise consensually resolved in a manner satisfactory to the Government Parties, and such order in the light of the totality of circumstances, has a material adverse effect on the confirmability of the Plan or the PRIFA Plan or renders consummation of the PRIFA Plan or the Plan impracticable; provided, however, that, in the event that the treatment to be provided with respect to PRIFA Bond Claims renders the Plan unconfirmable, the Oversight Board may delete PRIFA and the treatment of PRIFA Bond Claims from the Plan, so long as the Oversight Board, Ambac and FGIC have agreed upon an alternative methodology to provide the same economic treatment contemplated for the PRIFA Bond Claims in this Agreement and the Settlement Summary annexed hereto as Exhibit "F", and such action shall not give rise to a right of termination of this Agreement as to any Party, (iii) the A&R CW PSA has been terminated as to all parties thereto, (iv) the HTA/CCDA PSA has been terminated as to all parties thereto, (v) the Title III Court or such other court of competent jurisdiction enters a Final Order denying confirmation of the Plan, (vi) the economic situation of the Commonwealth suffers a material adverse change which, in light of the totality of the circumstances, renders the confirmation of the Plan and/or the PRIFA Plan not feasible or consummation of the Plan and/or the PRIFA Plan impracticable, (vii) the Rum Tax CVI Legislation and the Debt Responsibility Act are not enacted prior to the commencement of the hearing to consider confirmation of the PRIFA Plan; provided, however, that the Oversight Board's right to terminate this Agreement pursuant to the subsection (vii) may not be exercised earlier than December 31, 2021, or (viii) a court of competent jurisdiction issues a ruling,

**EXECUTION VERSION**

judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan, which ruling, judgment, or order has not been reversed or vacated within sixty (60) calendar days after such issuance and is not subject to a stay.

(c)    The automatic stay under sections 362 and 922 of the Bankruptcy Code, made applicable to the PROMESA Proceedings pursuant to Section 301 of PROMESA, shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

(d)    This Agreement shall automatically terminate as to all Parties upon the occurrence of the PRIFA Effective Date except with respect to any actions of the Parties that are expressly set forth herein to occur after the PRIFA Effective Date.

provided, however, that, for all purposes of this Section 7.1, the treatment to be afforded to all classes of claims other than those described in Exhibit "F" hereto shall not constitute an adverse economic or legal impact on any PSA Creditor; and, provided, further, that, in the event that either Ambac or FGIC terminates this Agreement solely as to itself, neither Ambac nor FGIC may object to confirmation of the Plan or the PRIFA Plan or otherwise oppose any motion or application on the basis of the payment of the PSA Restriction Fees provided by Article VI hereof and the Plan.

Section 7.2    Effect of Termination. Except as otherwise provided herein, in the event of the termination of this Agreement as to any Party, (a) this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of such Party or any of its affiliates (or of any of their respective directors, officers, employees, consultants, contractors, advisory clients, agents, legal and financial advisors or other representatives of such Party or its affiliates), (b) such Party shall not have any obligations to any other Party arising out of, and shall have no further rights, benefits or privileges under, this Agreement (including, without limitation, any rights to the PSA Restriction Fee, except as provided in accordance with the provisions of the Plan and the PRIFA Plan), except for the obligations and/or provisions set forth in Sections 2.1, 6.1, 7.1, 7.3, 8.3, 8.4, 8.8, 8.13 and 8.15 hereof and this clause (b) of Section 7.2, which provisions are intended to survive the expiration or termination of this Agreement and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement prior to the date of such expiration or termination shall survive such expiration or termination, and (c) such Party shall have all the rights and remedies that it would have had, and be entitled to take all actions that it would have been entitled to take, had it not entered into this Agreement and no such rights shall be deemed waived pursuant to a claim of laches or estoppel, and the Parties agree to waive, and not raise as a defense, the applicable statute of limitations for any claim, litigation, proceeding, action or matter against another Party barred by this Agreement as though such statute of limitations had been tolled during such time that this Agreement was binding on the Party then asserting such claim, litigation, proceeding, action, or matter; provided, however, that in no event shall any such termination relieve such Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such expiration or termination; and, provided, further, that, unless otherwise ordered by the Title III Court, upon notice to such terminating Party, any and all consents, ballots and votes tendered by such Party prior to such expiration or termination shall be deemed to be, for all purposes, automatically null and void *ab*

124682228v5

*initio,* and shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, the PRIFA Plan, this Agreement or otherwise; and, provided, further, that, termination of this Agreement shall have no effect on any rights provided pursuant to the A&R CW PSA, the HTA/CCDA PSA or any related right or entitlement in accordance with the Plan. Except in connection with a dispute concerning a breach of this Agreement or the interpretation of the terms hereof upon termination, (y) neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein were the result of negotiations and compromises of the respective positions of the Parties and (z) no Party shall seek to take discovery concerning this Agreement or admit this Agreement or any part of it into evidence against any other Party hereto.

Section 7.3    Post-Effective Date Obligations.  In addition to the surviving obligations and provisions listed in Section 7.2(b) hereof, the obligations and/or provisions set forth in Sections 4.1(e), 4.1(f), 4.2(d), and 4.2(e) shall survive the automatic termination of this Agreement pursuant to Section 7.1(e) hereof.

ARTICLE VIII

MISCELLANEOUS

Section 8.1    Amendments.  This Agreement, may not be modified, amended, or supplemented except by a written agreement executed by the Government Parties that are Parties hereto, Ambac and FGIC; provided, however, that any modification, amendment, or supplement that has an adverse economic or legal impact on a PSA Creditor, including by changing the treatment afforded to such PSA Creditor under the PRIFA Plan (including any applicable settlement under the PRIFA Plan) or changing the cash flows or proposed legal protections for the Rum Tax CVIs or definition or calculation of PSA Restriction Fee in a way that would have an adverse economic impact on such PSA Creditor, must be agreed to in writing by each of the Initial PSA Creditors.  Notwithstanding the foregoing and the terms and provisions of Sections 4.5(a) and 4.6(a) hereof, and without the consent or approval of Ambac and FGIC, from and after the date hereof until the Joinder Deadline, the Oversight Board may solicit additional parties to become signatories hereto subject to all of the terms herein, including, without limitation, the terms and conditions set forth in the exhibits, annexes and schedules hereto; provided, however, that, notwithstanding the provisions of this Section 8.1, unless a modification, amendment or supplement has an adverse economic or legal impact on a PSA Creditor, the Oversight Board may amend or otherwise modify the terms herein without the consent of such additional parties provided that the prior written consent of Ambac and FGIC is obtained; and, provided, further, that each additional party must execute and deliver to counsel to the Oversight Board the form of Annex Agreement attached hereto as Exhibit "E"; and, provided, further, that, under no circumstances may the provisions of Section 6.1 be modified, amended, or supplemented without the express written consent of the Initial PSA Creditors as of the date of this Agreement.

Section 8.2    Most Favored Nations.  Notwithstanding anything contained herein to the contrary, in the event that the Oversight Board enters into any agreements which provide (or the Plan or the PRIFA Plan does provide) for the settlement or Plan or the PRIFA Plan treatment that

39

**EXECUTION VERSION**

is more economically favorable to any PRIFA Bond Claim than the treatment set forth in the Settlement Summary for any other PRIFA Bond Claims, then the treatment set forth in the Settlement Summary shall be modified to equal that provided to such PRIFA Bond Claim provided, however, that treatment of customary "Convenience Claims", as defined in the Plan, and any indebtedness of PRIFA other than the PRIFA Bonds shall be exempt from this provision; and, provided, further, that Custodial Trust Documents for the Monolines shall be exempt from this provision; and, provided, further, that, more economically favorable treatment of PRIFA Bond Claims, required by a Final Order resulting from a determination by litigation (but excluding an order approving a settlement, pursuant to Bankruptcy Rule 9019 or otherwise) of the Title III Court or such other court of competent jurisdiction shall be exempt from this provision.

Section 8.3    No Admission of Liability.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Agreement.

(b)    None of this Agreement (including, without limitation, the Recitals and Exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in the Debt Related Objections, the Invalidity Actions, the Lift Stay Motions, the Section 926 Motion, the Clawback Actions, the Lien Challenge Actions, the Uniformity Litigation, the Discovery Related Actions, the Miscellaneous Litigation, the Underwriter Action, or of any wrongdoing or liability of any Party; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against the Commonwealth, with respect to the validity of any of the PRIFA Bond Claims.  None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement.

Section 8.4    Good Faith Negotiations.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement; the negotiations related to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; and each Party knows all of the relevant facts and his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement. The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement. The Parties further acknowledge and agree that, in connection with the PROMESA Proceedings

124682228v5

**EXECUTION VERSION**

and the negotiation and consummation of this Agreement, including, without limitation, the Plan, the Parties, at all times, acted (a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.

Section 8.5    Third Party Beneficiary.  Other than funds and/or accounts which are holders of PRIFA Bonds, and whose advisors or managers are Parties hereto, and Ambac and FGIC, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any person (including, without limitation, any Monoline other than Ambac and FGIC) other than the Parties hereto, and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 8.6    Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York and applicable federal law, without giving effect to the principles of conflicts of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Title III Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, subject to a Party's rights pursuant to applicable law. In the event any such action, suit or proceeding is commenced, each of the Parties hereby (a) agrees and consents that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 8.11 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 8.11 hereof and (b) waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising from or relating to this Agreement and the representations, covenants and other obligations set forth herein.

Section 8.7    Headings.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 8.8    Binding Agreement; Successors and Assigns.  This Agreement is intended to, and shall be effective and binding only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to, and shall be deemed to, bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and

41

none shall be responsible for the performance or breach of this Agreement by another. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic and legal substance of the transactions contemplated herein or in the Plan are not affected in any manner materially adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated herein are consummated as originally contemplated to the greatest extent possible.  Notwithstanding the foregoing, unless otherwise agreed to by the Parties, provisions herein providing payment of the PSA Restriction Fees and the Rum Tax Structuring Fees are integral parts of this Agreement and cannot be severed.

Section 8.9    Entire Agreement.  This Agreement, including, without limitation, the Plan, constitutes the full and entire agreement among the Parties with regard to the subject hereof and the Plan, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof.  No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement.

Section 8.10    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 8.11    Notices.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid- return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

(a)    If to the Oversight Board or the Commonwealth, to:

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq.
Email: mbienenstock@proskauer.com
Brian S. Rosen, Esq.
Email: brosen@proskauer.com
Facsimile: 212-969-2900

EXECUTION VERSION

(b)        If to AAFAF, to:

O'MELVENY & MEYERS LLP
Seven Times Square
New York, NY 10036
Attn: John Rapisardi, Esq.
Email: jrapisardi@omm.com
Maria J. DiConza, Esq.
Email: mdiconza@omm.com
Facsimile: 212-326-2061

(c)        If to Ambac, to:

MILBANK LLP
55 Hudson Yards
New York, NY 10001
Attn: Dennis Dunne, Esq.
Email: DDunne@milbank.com
Atara Miller, Esq.
Email: AMiller@milbank.com
Facsimile: 212-530-5219

(d)        If to FGIC, to:

BUTLER SNOW LLP
2911 Turtle Creek Boulevard, Suite 1400
Dallas, TX 75219
Attn: Martin A. Sosland, Esq.
Email: martin.sosland@butlersnow.com
Facsimile: 469-680-5501

Section 8.12   Non-Waiver of Remedies.  Except as expressly provided in this Agreement, nothing contained herein is intended, nor shall it be construed in any manner, to waive, limit, impair or restrict any right or ability of the Parties to protect and preserve each of their rights, remedies and interests, contractual or otherwise, under the Bond Resolutions, Title III or any other provision of PROMESA or any other law or regulation.

Section 8.13   Several, Not, Joint Obligations.  The agreements, representations, covenants and other obligations of the Parties set forth in this Agreement are, in all respects, several and not joint.

124682228v5

Section 8.14   Remedies Cumulative.  All rights, powers and remedies provided in accordance with the terms and provisions of this Agreement or otherwise available in respect hereof of law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the contemporaneous or later exercise of any other such right, power or remedy by any such Party.

Section 8.15   Specific Performance.  Each of the Parties agrees and understands that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other similar relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement; provided, however, that, in the event the Agreement is terminated in accordance with the terms and provisions of Section 7.1 hereof, the sole remedy (other than to enforce provisions of this Agreement that survive termination hereof) shall be the payment of the fees set forth in Section 6.1 hereof, as applicable.

Section 8.16   Further Assurances.  Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, such instruments, and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**

By:   /s/ Natalie A. Jaresko
Name:  Natalie A. Jaresko
Title:  Executive Director

**THE COMMONWEALTH OF PUERTO RICO**

By: Financial Oversight and Management
Board for Puerto Rico, as representative
of the Commonwealth of Puerto Rico

By:   /s/ Natalie A. Jaresko
Name:  Natalie A. Jaresko
Title:  Executive Director

45

**AMBAC ASSURANCE CORP.**

By:  /s/ David P. Barranco
Name:  David P. Barranco
Title:   Senior Managing Director, Head of Risk Management


Holder or Insurer of Principal Amount of PRIFA Bonds: ██████████

124682228v5

**FINANCIAL GUARANTY INSURANCE COMPANY**

By:  /s/ Derek M. Donnelly
Name:  Derek M. Donnelly
Title:   Senior Managing Director


Holder or Insurer of Face Amount of PRIFA Bonds: ██████████

124682228v5

**WHITEHAVEN CREDIT OPPORTUNITIES MASTER FUND, LTD.**

By:  /s/ Scott Richman
Name:  Scott Richman
Title:  Managing Partner and CIO

Holder of Face Amount of PRIFA Bonds: ███████

## **EXHIBIT A**

LIST OF PRIFA HOLDERS

Whitehaven Credit Opportunities Fund, Ltd.

124682228v5

## **EXHIBIT B**

SCHEDULE OF PRIFA BONDS

## SCHEDULE OF PRIFA BONDS

| CUSIP | Series | Maturity | Issuance |
|-------|--------|----------|----------|
| 745220DW0 | SERIES 2005A | 7/1/16 | 6/16/05 |
| 745220DX8 | SERIES 2005A | 7/1/17 | 6/16/05 |
| 745220DY6 | SERIES 2005A | 7/1/18 | 6/16/05 |
| 745220DZ3 | SERIES 2005A | 7/1/19 | 6/16/05 |
| 745220EA7 | SERIES 2005A | 7/1/20 | 6/16/05 |
| 745220EB5 | SERIES 2005A | 7/1/21 | 6/16/05 |
| 745220EC3 | SERIES 2005A | 7/1/22 | 6/16/05 |
| 745220ED1 | SERIES 2005A | 7/1/23 | 6/16/05 |
| 745220EE9 | SERIES 2005A | 7/1/24 | 6/16/05 |
| 745220EF6 | SERIES 2005A | 7/1/25 | 6/16/05 |
| 745220EG4 | SERIES 2005A | 7/1/26 | 6/16/05 |
| 745220EH2 | SERIES 2005A | 7/1/27 | 6/16/05 |
| 745220EJ8 | SERIES 2005A | 7/1/28 | 6/16/05 |
| 745220EK5 | SERIES 2005A | 7/1/29 | 6/16/05 |
| 745220EL3 | SERIES 2005A | 7/1/30 | 6/16/05 |
| 745220EM1 | SERIES 2005A | 7/1/31 | 6/16/05 |
| 745220EN9 | SERIES 2005A | 7/1/32 | 6/16/05 |
| 745220EP4 | SERIES 2005A | 7/1/33 | 6/16/05 |
| 745220EQ2 | SERIES 2005A | 7/1/34 | 6/16/05 |
| 745220ER0 | SERIES 2005A | 7/1/35 | 6/16/05 |
| 745220ES8 | SERIES 2005A | 7/1/36 | 6/16/05 |
| 745220ET6 | SERIES 2005A | 7/1/37 | 6/16/05 |
| 745220EU3 | SERIES 2005A | 7/1/42 | 6/16/05 |
| 745220EV1 | SERIES 2005A | 7/1/43 | 6/16/05 |
| 745220EW9 | SERIES 2005A | 7/1/44 | 6/16/05 |
| 745220EX7 | SERIES 2005A | 7/1/45 | 6/16/05 |
| 745220EY5 | SERIES 2005B | 7/1/37 | 6/16/05 |
| 745220EZ2 | SERIES 2005B | 7/1/41 | 6/16/05 |
| 745220FF5 | SERIES 2005C | 7/1/16 | 6/16/05 |
| 745220FG3 | SERIES 2005C | 7/1/17 | 6/16/05 |
| 745220FH1 | SERIES 2005C | 7/1/18 | 6/16/05 |
| 745220FJ7 | SERIES 2005C | 7/1/19 | 6/16/05 |
| 745220FK4 | SERIES 2005C | 7/1/20 | 6/16/05 |
| 745220FL2 | SERIES 2005C | 7/1/21 | 6/16/05 |
| 745220FM0 | SERIES 2005C | 7/1/22 | 6/16/05 |
| 745220FN8 | SERIES 2005C | 7/1/23 | 6/16/05 |
| 745220FP3 | SERIES 2005C | 7/1/24 | 6/16/05 |
| 745220FQ1 | SERIES 2005C | 7/1/25 | 6/16/05 |

124682228v5

| | | | |
|---|---|---|---|
| 745220FR9 | SERIES 2005C | 7/1/26 | 6/16/05 |
| 745220FS7 | SERIES 2005C | 7/1/27 | 6/16/05 |
| 745220FT5 | SERIES 2005C | 7/1/28 | 6/16/05 |
| 745220FU2 | SERIES 2005C | 7/1/28 | 6/16/05 |
| 745220JX2 | SERIES 2006 | 7/1/16 | 9/28/06 |
| 745220JY0 | SERIES 2006 | 7/1/17 | 9/28/06 |
| 745220JZ7 | SERIES 2006 | 7/1/18 | 9/28/06 |
| 745220JD6 | SERIES 2006 | 7/1/19 | 9/28/06 |
| 745220KA0 | SERIES 2006 | 7/1/19 | 9/28/06 |
| 745220JE4 | SERIES 2006 | 7/1/20 | 9/28/06 |
| 745220JF1 | SERIES 2006 | 7/1/21 | 9/28/06 |
| 745220JG9 | SERIES 2006 | 7/1/22 | 9/28/06 |
| 745220JH7 | SERIES 2006 | 7/1/23 | 9/28/06 |
| 745220JJ3 | SERIES 2006 | 7/1/24 | 9/28/06 |
| 745220JK0 | SERIES 2006 | 7/1/25 | 9/28/06 |
| 745220JL8 | SERIES 2006 | 7/1/26 | 9/28/06 |
| 745220JM6 | SERIES 2006 | 7/1/27 | 9/28/06 |
| 745220JN4 | SERIES 2006 | 7/1/31 | 9/28/06 |
| 745220JP9 | SERIES 2006 | 7/1/37 | 9/28/06 |
| 745220JQ7 | SERIES 2006 | 7/1/46 | 9/28/06 |

124682228v5

## **EXHIBIT C**

LIST OF INVALIDITY ACTIONS

## INVALIDITY ACTIONS

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC, Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-73D, Adv. Proc. No. 19-00288

124682228v5

# **EXHIBIT D**

FORM OF JOINDER AGREEMENT

124682228v5

## FORM OF JOINDER AGREEMENT

JOINDER AGREEMENT TO THE PRIFA RELATED PLAN SUPPORT AGREEMENT (modified from time to time, the "**PSA**" as amended, supplemented or otherwise), dated as of July 25, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), (b) certain holders of PRIFA Bond Claims, as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of PRIFA Bond Claims on behalf of such holders as set forth on Exhibit "A" to the PSA, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**PRIFA Holders**"), (c) Ambac Assurance Corp., solely in its capacity as insurer, and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds, (d) Financial Guaranty Insurance Company, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds ("**FGIC**" and, collectively with the PRIFA Holders, and Ambac, the "**Initial PSA Creditors**") and (e) the other PSA Creditors from time to time party thereto, is executed and delivered by _____ (the "**Joining PSA Creditors**") as of _____ 2021. Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

      1.     Agreement to be Bound.  The Joining PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA.  The Joining PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "PRIFA Holder" for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any PRIFA Bond Claims held by the Joining PSA Creditor as of the date of this Joinder Agreement (other than any PRIFA Bond Claims, held in a Qualified Marketmaker capacity).

      2.     Representations and Warranties and Covenants.  With respect to the aggregate principal amount of any PRIFA Bond Claims held by the Joining PSA Creditor, including, without limitation, upon consummation of any pending Transfer of any PRIFA Bond Claims, to the Joining PSA Creditor, the Joining PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "PRIFA Holder" set forth in Section 3.4 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "PRIFA Holder" set forth in Section 4.4 of the PSA, to each of the other Parties to the PSA.

      3.     Governing Law. Section 8.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Joinder Agreement.

      4.     Notice of Joinder.  The Joining PSA Creditor agrees to provide a copy of the Joinder Agreement to counsel to the Oversight Board and AAFAF in accordance with Section 4.4 of the PSA and the notice provisions set forth in Section 8.11 of the PSA.

124682228v5

5.        <u>Acquisition of Non-PSA Bonds</u>.  To the extent that the Joining PSA Creditor (a) as of the date hereof, holds PRIFA Bond Claims not subject to the PSA and/or (b) from and after the date hereof, acquires PRIFA Bond Claims in addition to those PRIFA Bond Claims acquired pursuant to this Joinder Agreement, the Joining PSA Creditor shall, within five (5) calendar days of the date hereof or, to the extent of after-acquired PRIFA Bond Claims from the date of such subsequent acquisition, deliver to counsel for the Oversight Board, financial information required in accordance with the provisions of  Section 2.2 of the PSA with respect to such PRIFA Bond Claims.

IN WITNESS WHEREOF, the Joining PSA Creditor has caused this Joinder Agreement to be executed as of the date set forth above.

[NAME OF QUALIFIED TRANSFEREE]

By: _____
         Name:
         Title:

Holder or Insurer of Face Amount of PRIFA Bonds:

124682228v5

## **EXHIBIT E**

FORM OF ANNEX AGREEMENT

124682228v5

## FORM OF ANNEX AGREEMENT

ANNEX AGREEMENT TO THE PRIFA RELATED PLAN SUPPORT AGREEMENT (modified from time to time, the "**PSA**" as amended, supplemented or otherwise), dated as of July 25, 2021, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), as representative of the Commonwealth of Puerto Rico (the "**Commonwealth**"), (b) holders of PRIFA Bond Claims, as defined in the PSA, which may include the advisors or managers who are advising or managing a holder of PRIFA Bond Claims on behalf of such holders as set forth on Exhibit "A" to the PSA, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**PRIFA Holders**"), (c) Ambac Assurance Corp., solely in its capacity as insurer, and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds ("**Ambac**"), and (d) Financial Guaranty Insurance Company, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds ("**FGIC**" and, collectively, with the PRIFA Holders and Ambac, the "**Initial PSA Creditors**"), and (e) the other PSA Creditors from time to time party thereto, is executed and delivered by _____ (the "**Annex PSA Creditor**") as of _____ 2021.  Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

       1.      <u>Agreement to be Bound</u>.  The Annex PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA.  The Annex PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "PRIFA Holder" for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any PRIFA Bond Claims held by the Annex PSA Creditor as of the date of this Annex Agreement (other than any PRIFA Bond Claims held in a Qualified Marketmaker capacity).

       2.      <u>Representations and Warranties and Covenants</u>.  With respect to the aggregate principal amount of any PRIFA Bond Claims held by the Annex PSA Creditor, the Annex PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "PRIFA Holder" set forth in Section 3.4 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "PRIFA Holder" set forth in Section 4.4 of the PSA, to each of the other Parties to the PSA.

       3.      <u>Governing Law</u>. Section 8.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Annex Agreement.

       4.      <u>Notice of Annex</u>.  The Annex PSA Creditor agrees to provide a copy of this Annex Agreement to counsel to the Oversight Board and in accordance with the notice provisions set forth in Section 8.11 of the PSA; <u>provided</u>, <u>however</u>, that, except with respect to counsel to the Oversight Board, the Annex PSA Creditor may delete the face amount of PRIFA Bonds set forth below.

124682228v5

5.      Rejection of Annex Agreement.  Notwithstanding the execution and delivery of this Annex Agreement to counsel to the Oversight Board, the Oversight Board may, in its sole and absolute discretion, determine not to accept such Annex Agreement and, in such event, (a) the Oversight Board shall provide written notice of such determination to the Annex PSA Creditor within fifteen (15) Business Days of receipt of the Annex Agreement and (b) the Annex PSA Creditor shall have no rights or entitlements pursuant to the PSA including, without limitation, rights to receive a PSA Restriction Fee.

IN WITNESS WHEREOF, the Annex PSA Creditor has caused this Annex Agreement to be executed as of the date set forth above.

[NAME OF ANNEX PSA CREDITOR]

By: _____
        Name: _____
        Title: _____
        Address: _____
                       _____
                       _____

Holder or Insurer of Face Amount of PRIFA Bonds:

# **EXHIBIT F**

SETTLEMENT SUMMARY

**SUMMARY OF KEY ECONOMIC TERMS:**

| TERM | DESCRIPTION |
|---|---|
| **Consideration** | |
| **1) Cash** | |
| **a) Amount** | ▪ $193,500,000 distributed as described in Section 4.1 of the PRIFA Related Plan Support Agreement |
| **2) Rum Tax CVI** | |
| **a) Outperformance Metric** | ▪ See Annex 1, which is equivalent to 100% of general fund rum tax collections (i.e., aggregation of Items B, E, and I in Annex 2) per Rum Tax Waterfall (see Annex 2) within CW 2021 Fiscal Plan projections (the "Outperformance Metric") |
| **b) Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **c) Rum Tax CVI Notional / Lifetime Cap** | ▪ See PRIFA Trust section below |
| **d) Rum Tax CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **e) Call Structure for Rum Tax CVI and Clawback CVI** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining aggregate maximum payments of the (i) Rum Tax CVI and (ii) Clawback CVI to Allowed CW/PRIFA Rum Tax Claims, subject to the remaining PRIFA Trust Lifetime Cap at the time call is exercised<br>▪ If called, Rum Tax CVI and Clawback CVI to Allowed CW/PRIFA Rum Tax Claims must be called simultaneously, such that PRIFA Trust Lifetime Cap will be reduced proportionately for any amounts called. |

| TERM | DESCRIPTION |
|---|---|
| **f) Supplemental Cover Over** | ▪ Amount per proof-gallon that the U.S. Treasury can cover-over to the Commonwealth of Puerto Rico on account of rum taxes, less $10.50, for the applicable fiscal year |
| **g) Supplemental Cover Over Revenues** | ▪ The amount of Supplemental Cover Over Revenues is calculated as the product of (i) the ratio of Supplemental Cover Over divided by the sum of (a) the Supplemental Cover Over and (b) $10.50 (the "Base Cover Over") and (ii) total rum tax collections received by the Commonwealth as documented within the U.S. Department of Treasury monthly detailed activity report of net excise tax due to the Government of Puerto Rico and certified by Hacienda ("Commonwealth Rum Tax Revenues")<br>    ○ For purposes of calculating the Rum Tax CVI Annual Payment based on outperformance of Waterfall General Fund Rum Tax Collections (as defined below) relative to the Outperformance Metric, the maximum amount of Supplemental Cover Over Revenues in each applicable fiscal year is $88,000,000 ("Supplemental Cover Over Revenues Cap") |
| **h) Waterfall Supplemental Cover Over Revenues** | ▪ The amount of Waterfall Supplemental Cover Over Revenues is calculated as the lesser of (i) Supplemental Cover Over Revenues and (ii) Supplemental Cover Over Revenues Cap |
| **i) Base Cover Over Revenues** | ▪ The amount of Base Cover Over Revenues is calculated as the product of (i) the ratio of the Base Cover Over divided by the sum of (a) the Supplemental Cover Over and (b) the Base Cover Over and (ii) Commonwealth Rum Tax Revenues |
| **j) Waterfall Cover Over Revenues** | ▪ The amount of Waterfall Cover Over Revenues is calculated as the sum of (i) Waterfall Supplemental Cover Over Revenues and (ii) Base Cover Over Revenues |
| **k) Rum Producer Incentive** | ▪ The permitted incentive percentage ("Rum Producer Incentive Percentage", included in calculations of Items D and H in Annex 2) that is utilized in calculating amounts paid to rum producers ("Rum Producer Incentive Payments") is subject to the following constraints:<br>    ○ For the first 10 years (i.e. FY2022-2031), maximum of 46%<br>    ○ For the next 5 years (i.e. FY2032-2036), maximum of 48% |

| TERM | DESCRIPTION |
|---|---|
| |      ○  For the following 15 years (i.e. FY2037-2051), maximum of 50%<br>  ■  For the avoidance of doubt, any increase in Rum Producer Incentive Percentage within the limits set forth above will not affect the Outperformance Metric<br>  ■  Notwithstanding the limits for the purposes of the Rum Tax Waterfall calculation as set forth in this section 2(k), the Rum Producer Incentive Percentage may be increased beyond the limits set forth above at the Commonwealth's discretion, subject to those increases not impacting the Outperformance Condition calculation and payment |
| **l)  Permitted Rum Tax Waterfall Deductions** | Permitted Rum Tax Waterfall Deductions are calculated as the sum of the following:<br>  ■  <u>Science and Technology Trust</u> (i.e., Item C in Annex 2)<br>     ○  $5 million transferred to the Puerto Rico Science, Research, and Technology Trust Fund account<br>  ■  <u>Rum Producer Incentive Payments</u> (i.e., Items D and H in Annex 2)<br>     ○  As described above in section 2(k)<br>  ■  <u>Conservation Trust</u> (i.e., Item F in Annex 2)<br>     ○  Calculated as the product of (a) Supplemental Cover Over Revenues and (b) $1/6^{th}$<br>     ○  Amount transferred to Puerto Rico Conservation Trust account<br>  ■  <u>PRIDCO</u> (i.e., Item G in Annex 2)<br>     ○  Calculated as the lesser of (i) $5 million and (ii) (a) 2.5% multiplied by (b) Commonwealth Rum Tax Revenues<br>     ○  Amount transferred to Puerto Rico Industrial Development Company account |
| **m)  Waterfall General Fund Rum Tax Collections** |   ■  Waterfall General Fund Rum Tax Collections are calculated as (i) Waterfall Cover Over Revenues less (ii) Permitted Rum Tax Waterfall Deductions |
| **n)  Rum Tax CVI Annual Payment** |   ■  On an annual basis, the lesser of the following:<br>     ○  (i) 40% of cumulative outperformance of Waterfall General Fund Rum Tax Collections above the Outperformance Metric, starting on July 1, 2021, less payments made to the PRIFA Trust on account of previous Rum Tax CVI Annual Payments |

| TERM | DESCRIPTION |
|------|-------------|
| | ○ (ii) 50% of annual outperformance of Waterfall General Fund Rum Tax Collections above the Outperformance Metric, measured at the conclusion of each fiscal year<br>○ (iii) $30 million |
| **o) <u>Reporting</u>** | ▪ Reporting obligations and audit rights related to the Rum Tax Revenues and calculation of the Rum Tax CVI Annual Payment to be agreed upon by no later than the PRIFA Effective Date |
| **3) <u>PRIFA Trust</u>** | |
| **a) Payments to PRIFA Trust** *(as defined within the PRIFA Related Plan Support Agreement)* | ▪ Rum Tax CVI Annual Payment<br>▪ Clawback CVI payments to Allowed CW/PRIFA Rum Tax Claims, as described in Exhibit J to the Fifth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico<br>▪ $193,500,000 distributed as described in Section 4.1 of the PRIFA Related Plan Support Agreement |
| **b) Structure of PRIFA Trust** | ▪ The Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of distributions from the PRIFA Trust<br>▪ Security provisions as described in A&R CW PSA Section 4.10(b) |
| **c) PRIFA Trust Distributions** | ▪ Rum Tax CVI Annual Payments and Clawback CVI payments distributed on a pro rata basis to PRIFA Trust interests<br>▪ All CVI distributions from the PRIFA Trust are subject to a $1,301,525,288 lifetime cap for Allowed CW/PRIFA Rum Tax Claims[1] ("PRIFA Trust Lifetime Cap"), which amount shall be reduced on a pro rata basis for any Opt-Out PRIFA Rum Tax Claims (as defined below)<br>▪ After the PRIFA Trust Lifetime Cap has been met, the Clawback CVI payments to Allowed CW/PRIFA Rum Tax Claims will be cancelled and future Rum Tax |

---

[1] Amount herein supersedes Clawback CVI Lifetime Cap for Allowed CW/PRIFA Rum Tax Claims as specified within Exhibit J to Fifth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, notwithstanding anything herein to the contrary.

| TERM | DESCRIPTION |
|---|---|
| | CVI Annual Payments would revert to the Commonwealth and not to the PRIFA Trust |
| **d) Opt-Out Decision** | <ul><li>Any holder of Allowed CW/PRIFA Rum Tax Claims (other than claims insured by FGIC or Ambac) shall be permitted to elect to opt out of recovering its pro rata share of distributions from the PRIFA Trust and will be entitled to distributions under the Plan, but will have no right to receive any Rum Tax CVI or any Rum Tax CVI Annual Payment</li><li>Any holder of Allowed CW/PRIFA Rum Tax Claims who elects to opt-out of recovering its pro rata share of distributions from the PRIFA Trust must meet the following requirements before its holdings of Allowed CW/PRIFA Rum Tax Claims can qualify as Opt-Out PRIFA Rum Tax Claims:<ul><li>Must be determined to be a Qualified Institutional Buyer (QIB), which determination is at the sole discretion of the FOMB</li><li>Must provide documentation demonstrating that it is a QIB to the Financial Oversight and Management Board for Puerto Rico ("FOMB")</li></ul></li><li>The Rum Tax CVI Annual Payment to the PRIFA Trust will not be affected or impacted by any opt-out decision</li></ul> |

**ANNEX 1: OUTPERFORMANCE METRIC**

*($ in USD)*

| Fiscal Year | Amount | Fiscal Year | Amount |
|---|---|---|---|
| 2022 | $208,569,215.76 | 2037 | $208,781,748.91 |
| 2023 | 200,354,469.05 | 2038 | 209,289,240.57 |
| 2024 | 201,031,406.80 | 2039 | 209,788,269.00 |
| 2025 | 201,692,902.40 | 2040 | 210,278,694.61 |
| 2026 | 202,348,675.07 | 2041 | 210,749,432.35 |
| 2027 | 202,998,555.87 | 2042 | 211,211,199.81 |
| 2028 | 203,632,157.16 | 2043 | 211,674,906.69 |
| 2029 | 204,259,404.03 | 2044 | 212,129,474.13 |
| 2030 | 204,869,786.20 | 2045 | 212,574,772.82 |
| 2031 | 205,473,363.12 | 2046 | 213,021,852.71 |
| 2032 | 206,059,507.07 | 2047 | 213,459,499.22 |
| 2033 | 206,627,882.49 | 2048 | 213,898,852.55 |
| 2034 | 207,188,744.83 | 2049 | 214,339,919.35 |
| 2035 | 207,731,302.94 | 2050 | 214,782,706.32 |
| 2036 | 208,265,935.46 | 2051 | 215,227,220.15 |

*Table title: Outperformance Metric*

# ANNEX 2: RUM TAX WATERFALL[2]

*($ in USD millions)*

| Fiscal Year | Item | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Projected Rum Tax** | A | $383 | $341 | $344 | $346 | $348 | $350 | $353 | $355 | $357 | $359 | $361 | $363 | $365 | $367 | $369 |
| General Fund | B | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) |
| Remaining | | $266 | $224 | $227 | $229 | $231 | $233 | $236 | $238 | $240 | $242 | $244 | $246 | $248 | $250 | $252 |
| Science and Technology Trust | C | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $261 | $219 | $222 | $224 | $226 | $228 | $231 | $233 | $235 | $237 | $239 | $241 | $243 | $245 | $247 |
| Incentive Pay. to Rum Producers | D | (120) | (101) | (102) | (103) | (104) | (105) | (106) | (107) | (108) | (109) | (110) | (111) | (112) | (113) | (113) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $141 | $118 | $120 | $121 | $122 | $123 | $124 | $126 | $127 | $128 | $129 | $130 | $131 | $132 | $133 |
| General Fund | E | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) |
| Remaining | | $93 | $70 | $72 | $73 | $74 | $75 | $77 | $78 | $79 | $80 | $81 | $82 | $83 | $84 | $85 |
| Conservation Trust | F | (8) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Remaining | | $86 | $70 | $72 | $73 | $74 | $75 | $77 | $78 | $79 | $80 | $81 | $82 | $83 | $84 | $85 |
| PRIDCO | G | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $81 | $65 | $67 | $68 | $69 | $70 | $72 | $73 | $74 | $75 | $76 | $77 | $78 | $79 | $80 |
| Rum Producers | H | (37) | (30) | (31) | (31) | (32) | (32) | (33) | (33) | (34) | (34) | (35) | (35) | (36) | (36) | (37) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $44 | $35 | $36 | $37 | $37 | $38 | $39 | $39 | $40 | $40 | $41 | $42 | $42 | $43 | $43 |
| General Fund | I | (44) | (35) | (36) | (37) | (37) | (38) | (39) | (39) | (40) | (40) | (41) | (42) | (42) | (43) | (43) |
| Remaining | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Outperformance Metric** | | $209 | $200 | $201 | $202 | $202 | $203 | $204 | $204 | $205 | $205 | $206 | $207 | $207 | $208 | $208 |

| Fiscal Year | Item | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Projected Rum Tax** | A | $370 | $372 | $374 | $375 | $377 | $379 | $380 | $382 | $383 | $385 | $386 | $388 | $389 | $391 | $392 |
| General Fund | B | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) |
| Remaining | | $253 | $255 | $257 | $258 | $260 | $262 | $263 | $265 | $266 | $268 | $269 | $271 | $272 | $274 | $275 |
| Science and Technology Trust | C | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $248 | $250 | $252 | $253 | $255 | $257 | $258 | $260 | $261 | $263 | $264 | $266 | $267 | $269 | $270 |
| Incentive Pay. to Rum Producers | D | (114) | (115) | (116) | (117) | (117) | (118) | (119) | (119) | (120) | (121) | (122) | (123) | (123) | (124) | (124) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $134 | $135 | $136 | $137 | $138 | $139 | $139 | $140 | $141 | $142 | $143 | $144 | $144 | $145 | $146 |
| General Fund | E | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) |
| Remaining | | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 | $94 | $95 | $96 | $96 | $97 | $98 |
| Conservation Trust | F | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Remaining | | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 | $94 | $95 | $96 | $96 | $97 | $98 |
| PRIDCO | G | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $81 | $82 | $83 | $84 | $85 | $86 | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 |
| Rum Producers | H | (37) | (38) | (38) | (39) | (39) | (39) | (40) | (40) | (41) | (41) | (41) | (42) | (42) | (42) | (43) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $44 | $44 | $45 | $45 | $46 | $46 | $47 | $47 | $48 | $48 | $49 | $49 | $49 | $50 | $50 |
| General Fund | I | (44) | (44) | (45) | (45) | (46) | (46) | (47) | (47) | (48) | (48) | (48) | (49) | (49) | (50) | (50) |
| Remaining | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Outperformance Metric** | | $209 | $209 | $210 | $210 | $211 | $211 | $212 | $212 | $213 | $213 | $214 | $214 | $214 | $215 | $215 |

---

[2] For the avoidance of doubt, to the extent the Supplemental Cover Over is extended, payments to annual Conservation Trust will be calculated as set forth in section 2(l) above.