**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS<br><br>Re: ECF Nos. 16820, 16833, 16950, 16952, 17169, 17170, 17403, 17404 and 17414 in Case No. 17 BK 3283-LTS and ECF Nos. 2498, 2499, 2517, 2521, 2533, 2534, 2558 2559 and 2561 in Case No. 17 BK 4780-LTS<br><br>**This Motion Relates Only to PREPA and Shall Only Be Filed in Case No. 17 BK 4780-LTS** |

**MOTION TO SUBMIT CERTIFIED ENGLISH TRANSLATION OF SPANISH-LANGUAGE CASE LAW AND SECOND REQUEST FOR EXTENSION OF TIME TO FILE CERTIFIED TRANSLATIONS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

COMES NOW, the Puerto Rico Electric Power Authority[2], by and through the undersigned counsel, and respectfully states and prays as follows:

1. On July 19, 201, the Puerto Rico Electric Power Authority (PREPA) filed *PREPA's Opposition to Verified Motion of Foreman Electric Services Inc. for Allowance of Administrative Expense Claim* (the "Opposition"). (ECF No. 17403)[3]

2. On that same day, PREPA filed *Motion of PREPA for Leave to Cite Spanish-Language Case Law and for Extension of Time to File Certified Translations* (the "Request for Extension"). (ECF No. 17404). In the Request for Extension, PREPA informed the Honorable Court that it had cited several authorities in the Spanish language in support of the arguments raised in the Opposition (the "Spanish-Language Case Law"). Further, PREPA informed the Court that due to time constraints, despite diligent efforts, PREPA was unable to obtain certified English-language translations of the Spanish-Language Case Law prior to today's filing. Accordingly, PREPA sought leave from this Court to rely on Spanish-Language Case Law in its original language and requested until August 2, 2021, to file a certified English-language translation pursuant to Local District Rule 5(g).

3. On July 19, 2021, the Court entered the *Order Granting Motion of PREPA for Leave to Cite Spanish-Language Case Law and for Extension of Time to File Certified English Translations* granting PREPA's requests. (ECF No. 17414). Therefore, the deadline to submit certified English translations of the Spanish-Language Case Law cited in the Opposition expires today, August 2, 2021.

---

[2] The Financial Oversight and Management Board for Puerto Rico, as PREPA's representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act*, has authorized PREPA to file this motion on its behalf.
[3] References to Case No. 17-03283-LTS.

4.   In partial compliance with the Order, PREPA herein submits the certified English translation of the Puerto Rico Supreme Court decision entered in the matter of *Alco Corp. v. Mun. de Toa Alta*, 183 D.P.R. 530 (2011). *See* certified English translation attached as Exhibit A-1 and original Spanish version attached as Exhibit A-2.

5.   Despite diligent efforts, PREPA is unable to submit the rest of the certified English translations within the deadline ordered by the Court. The Federally Certified Court Interpreter (the "Interpreter") retained to translate the Spanish-Language Case Law notified PREPA that, due to the length of the documentation submitted for translations and unforeseen circumstances, it needs some additional time to complete the same.

6.   Based on discussions with the Interpreter, PREPA herein request this Honorable Court to grant until August 20, 2021 at 11:59 pm, to submit the remaining certified English translation of the Spanish-Language Case Law that was not submitted today.

7.   The undersigned discussed the request made herein with counsel for Foreman Electric Services, Inc. and they informed that they do not have any objection.

WHEREFORE, PREPA respectfully requests the Court to enter the Proposed Order, attached hereto as Exhibit B, granting an extension of eighteen (18) days, to and including August 20, 2021 at 11:59 pm, to submit certified English translation of the Spanish-Language Case Law that was not submitted today, and granting such other and further relief as is just and proper.

Dated: August 2, 2021
     San Juan, Puerto Rico

s/ *Katiuska Bolaños-Lugo*
Katiuska Bolaños-Lugo
USDC-PR No. 231812
kbolanos@diazvaz.law

DÍAZ & VÁZQUEZ LAW FIRM, P.S.C
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 803
San Juan, PR 00918
Tel.: (787) 395-7133
Fax: (787) 497-9664

**EXHIBIT A-1**

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

Distinguished by *Industrial Chemicals Corporation v. Electric Power Authority*, TCA, June 30, 2016

183 D.P.R. 530, 2011 WL 6310212 (P.R.), 2011 TSPR 180

**ALCO Corporation, petitioner,**

**v.**

**Municipality of Toa Alta, appellee.**

**In the Supreme Court of Puerto Rico.**
*Number*: **CC-2010-11**

## Synopsis

Certiorari to request review of a Judgment issued by *Emmalind García García, Aleida Varona Méndez and Gretchen I. Coll Martí*, Js. of the Court of Appeals, which confirmed the Trial Court, and concluded that ALCO Corporation was not entitled to charge for the work performed, since claim for collection filed against the Municipality of Toa Alta arises from certain services rendered prior to the term of the contract introduced into evidence. *Jugment issued by the Court of Appeals is confirmed.*

*José A. Sánchez Álvarez* and *Christian O. Cintrón Pérez*, from *Nevares & Sánchez-Álvarez,* attorneys for the petitioner; Ricardo Robles Caraballo, attorney for respondent.

Associate Judge Mr. Martínez Torres issued the Court's opinion.

This recourse allows us to analyze whether it is feasible, in light of the 1991 Law of Autonomous Municipalities for the Commonwealth of Puerto Rico (Autonomous Municipalities Act), Law No. 81-1991 *(21 LPRA sec. 4001 et seq.),* that a contractor perform work prior to the execution of the written contract, and still collect payment for his services, if the contract is subsequently awarded.

In view of the compelling interest that we have acknowledged for the protection of public funds, it is necessary that the **\*533** execution of the written contract occur before the contractor starts to carry out the work. In this manner, we reaffirm the "rigorousness of the legal precepts which control commercial relations between private entities and municipalities, that aspire to promote a sane and proper public administration, a matter vested with the highest public interest." *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 829 (1999). See also, *Cordero Vélez v. Mun. de Guánica*, 170 D.P.R. 237, 248 (2007).

1

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

# I

Petitioner ALCO Corporation (ALCO) is engaged in the supply, sale, pouring and delivery of asphalt concrete. In 2002, ALCO appeared at a bidding process for the carrying out of a resurfacing project in Lajas ward, Los Rivera Marrero sector, in the municipality of Toa Alta. On June 4th of stated year, the bidding board for the municipality notified Mr. Alfonso Rodríguez García, president of ALCO, through letter, about the awarding in his favor of Bid ## 02-030. *Certiorari* Appendix, p. 45. Thus, ALCO began to pave the corresponding area between June 25th and 28th of 2002, without the contract having been yet awarded. It was not until July 16th, 2002, that same was executed. On that date, the contract was registered in the municipal books, and a copy was sent to the Comptroller's Office. The contract provided within clause eighteenth that the term for carrying out the work-tasks was an essential element of the contract, and that ALCO was supposed to initiate the project on, or prior to five days after same was awarded. *Certiorari* Appendix, p. 49. Furthermore, in clause fourteenth, same stated that the contract was to be valid for thirty days as of July 16th, 2002 through August 14th of that same year. *Certiorari* Appendix, p. 48. In other words, the contract had a term of thirty days for the works to be executed. It should be noted that this was not the **\*534** first time that ALCO had contracted with the Municipality of Toa Alta. It surfaces from the file that in 2000, it was also awarded a bid for another resurfacing work-task.

ALCO, once work was completed, proceeded to request payment of $ 29,500. For that, it presented receipts which reflected that work was carried out from June 25th to the 28th of 2002. After several unsuccessful attempts with the municipality, ALCO filed a lawsuit for collection of monies. It subsequently filed a motion for summary judgment, and several motions for reconsideration that were pronounced as "denied."

The municipality then filed a motion for summary judgment. ALCO opposed. In its motion, the municipality argued that "[ALCO's] claim was inadmissible since same is supported by an alleged contractual obligation unrelated to the claim for work performed." *Certiorari* Appendix, p. 28. ALCO, for its part, indicated that "[t] he fact that the works have been carried out in no way responds to fraudulent machinations, or misappropriation of funds, or favoritism, or any other matters confronted by the Supreme Court." *Certiorari* Appendix, p. 38. It added that, contrary to wanting to collect money for work which is unrelated to the claim for work performed, "the information in the contract, as well as that for the bid, is fully related to the invoices submitted by ALCO for work performed at Lajas ward." *Certiorari* Appendix, p. 39.

The Trial Court summarily dismissed the complaint in favor of the municipality. It deemed that the work carried out and the dates of such work are unrelated to the claims submitted. It reasoned that, given the rigorousness of the contracting requirements with municipalities,

2

2011 TSPR 180

> ... no contract granted by a Municipality may have an effective date after the
> date of completion of the work. **535** In other words, ALCO cannot attempt to charge the
> Municipality for work carried out prior to the award date for the contract under dispute. It is
> clear from the evidence presented by Claimant itself, that work which Alco attempts to
> collect from the Municipality, were carried out on dates prior to the date when contract was
> awarded. Such action has [sic] no place within our legal system. *Certiorari* Appendix, p. 84.

In turn, it reasoned that in view of the requirements of form required by law to enter into contracts with municipalities, contracts cannot be awarded to cover events which have previously occurred. *Certiorari* Appendix, p. 85.

Dissatisfied, ALCO appealed to the Court of Appeals. Said forum confirmed the Trial Court. It concluded that it was improper for ALCO to charge for the work effected, since the collection claim filed against the municipality arises from certain services rendered prior to the term of the contract introduced into evidence. *Certiorari* Appendix, p. 169. It concluded that

> [r]uling otherwise would disrupt the established public funds disbursement control system, as
> it would lend itself to validating agreements reached between contractors and municipalities,
> failing to comply with the process established by our legal system. ...

> ... [I]n view of the interest that public funds represent, we are not willing to impose upon the
> Municipality the responsibility of complying with payment of a debt allegedly acquired for
> services received on a date when no contract was in force. Id., p. 170.

Again dissatisfied, ALCO appears before us. It points out that the intermediate appellate forum erred by concluding that the doctrine of unfair enrichment does not apply in this case. They explained that several courts in other jurisdictions of the United States have imposed liability on municipalities that unfairly profit from their own *ultra vires* actions. They also indicated that concluding that payment was not due since work had been carried out prior to the awarding of the contract, discourages contracting **536** with the Government, since its credibility as a contracting entity results impaired. They added that amendments made to Art. 8.016 of the Autonomous Municipalities Act, 21 L.P.R.A. sec. 4366, and of Art. 1 of Act No. 18 of October 30th, 1975, by Act No. 127-2004 (2 LPRA sec. 97) made contracting requirements with the municipalities more flexible and "seek to establish fair and valid rules which prevent the government, including its municipalities, from losing credibility whenever hiring." *Certiorari*, p. 6.

ALCO likewise argues that in *Cordero Vélez v. Mun. de Guánica*, *supra*, we held that if an auction is awarded and formally notified, and the contractor initiates work without having signed a contract, charging for such work are contingent to the signing of a contract, even if at a later time. In conclusion, ALCO deems that since the contract was awarded after the completion of work, it was registered in the municipality's books and sent to the Comptroller's Office, this situation is different from the casuistry which we have resolved relating to governmental contracting. The municipality, in its opposition, repeated that it is not responsible to pay for work carried out prior to the awarding of the contract. He added that the determination of the Trial Court by dismissing the complaint was result of the evidence presented by ALCO with which it demonstrated that such work was executed prior to granting of the Contract. We ruled to issue the Writ of Certiorari.

3

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

The case was formally submitted. On November 12th of 2010.

## II

**[1]** From our first pronouncements regarding contracts with municipalities, we have made it clear that unlike contracts between private parties, **\*537** "the legal precepts which control economic relations between private entities and municipalities are vested with huge public interest and aspire [to] advance a sound and correct public management." _Hatton v. Mun. de Ponce_, 134 D.P.R. 1001, 1005 (1994). For said reason, in _Quest Diagnostics v. Mun. San Juan_, 175 D.P.R. 994, 1000 (2009), we point out that "through special statutes, the legislator has imposed requirements and conditions upon contracting with municipalities. Contracts with government entities are examined for their validity in accordance with special statutes, instead of resorting to general contractual theories." See also; _Johnson & Johnson v. Mun. de San Juan_, 172 D.P.R. 840, 854-855 (2007); _Cordero Velez v. Mun. Guánica_, supra, p. 252. For this reason, it is crucial that the municipalities have acted "in accordance with procedures established by law and our interpretative jurisprudence" whenever disbursing public funds for the payment of contracted obligations. _Colon Colon v. Mun. de Arecibo_, 170 D.P.R. 718, 725 (2007).

**[2]** In _Ocasio v. Alcalde Mun. de Maunabo_, 121 D.P.R. 37, 54 (1988), we list for the first time the formal requirements which must be observed whenever entering into agreements with municipalities. These are: (1) that the agreement has been registered in writing; (2) that an accurate record is kept as to establish existence of the contract; (3) that a copy of stated contract be forwarded to the Comptroller's Office, and (4) that correctness of time be accredited, to wit, that the contract was awarded fifteen days prior. See also: _Mun. Quebradillas v. Corp. Salud Lares_, 180 D.P.R. 1003 (2011); _Colon Colon v. Mun. de Arecibo_, supra, pp. 726-727; _Cordero Velez v. Mun. Guánica_, supra, pp. 248–249. We point out that it is necessary for each of these requirements to be rigorously fulfilled, since "they reflect the legislative interest in avoiding fraudulent or illegal payments and claims, by creating a means of verification **\*538** to memorialize such contracts, circumstantially and chronologically." _Ocasio v. Alcalde Mun. de Maunabo_, supra, pp. 53–54.

**[3]** The need for municipal contracts to be in writing is based on a requirement of formal or substantive nature. The written contract is

> ... the best evidence of the reciprocal obligations contracted by the parties. It frees the parties from future spurious controversies [sic] regarding the originally agreed to terms, since these are objectively reflected in the written agreement. Therefore, this requirement protects the rights of both the Municipality and of the contractor in the eventuality of any non-compliance. _Colon-Colon v. Mun. de Arecibo, supra,_ p. 726.

4

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

**[4]** Consequently, "we courts must look with caution upon well-founded claims and in accordance with contracts, in which the executing authorities have not complied with this mandate. Only so can the legislative sentiment and adjudicative judicial conscience regarding disbursement of public funds be fully satisfied." *Ocasio v. Mayor of Maunabo*, *supra*, p. 54. Thus, "[o]nce these have met the requirements set forth, contracts are valid, enforceable, and enjoy the disclosure required by our legal system for the sound administration of public policy, insofar as municipal contracting is concerned." *Johnson & Johnson v. Mun. of San Juan*, *supra*, p. 853. Therefore, *"municipalities should not demand execution of services without having certified to the private party that the agreement was narrowed into a written contract, that same* was registered, and that a copy of same was sent to the Comptroller's Office, as provided for by the law." (Emphasis added.) *Lugo v. Municipio de Guayama*, 163 D.P.R. 208, 217 (2004), citing *Las Marías v. Municipio de San Juan*, 159 D.P.R. 868, 879-880 (2003). It's clear,

> ... with the approval of Law No. 127 of May 31st, 2004 (2 LPRA Sec. 97), failure to comply with the requirement that **\*539** all contracts be registered and sent to the Comptroller's Office as required in Art. 1 of Law No. 18, *supra*, and Art. 8.016 of the Autonomous Municipalities Act of 1991, *supra*, do not have the effect of voiding the contract under dispute, although it hinders that entitlements be demanded up until the agreement is registered and remitted to the Comptroller's Office. *Mun. Quebradillas v. Corp. Salud Lares*, *supra*, p. 1013.

**[5–6]** Art. 1.003 (v) of the Autonomous Municipalities Act, 21 L.P.R.A. sec. 4001 (v), defines obligation as "any legally valid commitment which is represented through a purchase order, contract or similar document, pending payment, duly signed and authorized by officials qualified to encumber allocations and which are or may become debt due." Art. 8.004 of the same law, 21 L.P.R.A. sec. 4354, orders that the liabilities and disbursement of funds be made only to obligate or pay for services authorized by law, ordinance or resolution approved for such purpose, and by those regulations adopted by virtue of same. 21 L.P.R.A. sec. 4354. Likewise, Art. 8.004, id., dictates that whenever credits are authorized to address matters for a specific fiscal year, *same be applied exclusively for payment of legally and duly contracted obligations established within the municipality's books during stated year.* Id. This means that funds earmarked for a fiscal year can only be used for obligations legally contracted during that year, not for obligations contracted in previous or subsequent years. In other words, "in general, a municipality cannot agree to future payment of amounts in excess of the budgeted allocation for a particular contract." *Johnson & Johnson v. Mun. de San Juan, supra*, p. 854.

As we may see, there will be an obligation on the municipality's part, only when there is a contract through virtue of a legally valid commitment. That is why it is required that municipalities maintain

5

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

"a record of all contracts, deeds and related documents that they grant, *540 as well as any amendment to same, decision, acknowledgment or action which resolves same or renders it void." See: Art. 8.016 of the Autonomous Municipalities Act, *supra*; Art. 1 of Law No. 18 dated October 30th, 1975, as amended, *supra*. See also Art. 4 of Regulation No. 33 regarding Registration of Contracts, Deeds and Related Documents and Forwarding of Copies to the Comptroller's Office, Regulation No. 5743, Department of State, January 28th, 1998, p. 3.

The content of that record must include the following information:

(1) Governmental entity. (2) Number of the contract, deed or related document. ... (3) *Grant date*. (4) Contractor. (5) Federal social security number or employer account. (6) Value or amount involved [sic] by total or monthly fashion. Same can be estimated. (7) Volume and registration page. (8) Purpose of the contract, deed or related document. (9) *Term. Initiation and ending dates must be indicated*. (10) Exempted. Whether or not the contract is exempted from filing [sic], as provided in Article 9-a of these Regulations must be indicated. If exempted, the reason for not filing [sic] it shall be identified by using the exemption number, as indicated in Article 9-a. (11) Approval or waiver. It will be indicated whether or not it is a contract which requires prior approval or waiver by some entity for its granting. (Emphasis added.) Art. 5 of Regulation No. 5743, pp. 3–4.

The obligation to register the contract in municipal books and the requirement that the contract be in writing serve different ends. We so explained it in *Colón Colón v. Mun. de Arecibo*, *supra*, p. 730:

> There exists a marked difference between certain requirements and others. The requirement that a signed contract be noted into the municipal log-book and its copy be sent to the Puerto Rico Comptroller's Office is aimed towards providing disclosure in view of third-parties, insofar as municipal contracting. In this manner, third parties oversee same. Nevertheless, to demand that a signed contracts be narrowed into writing bears an unavoidable dimension of sound public management, insofar as same allows **\* 541** the safeguarding for the interests of the contracting parties against non-compliance, allowing for the orderly use of municipal funds, avoiding uncertainty in the drafting of municipal budgets, and makes possible an adequate identification of the item against which public disbursements shall be made in compliance with the law. In other words, the former are mostly procedural and of an orderly process, but the latter [that the contract be in writing] is substantive, due to its direct relationship with sound public administration. In view of which, we must conclude that non-compliance with the requirement to narrow municipal contracts into writing, adversely affects the effectiveness of those obligations thus contracted.

[7] In summary, "the purpose of statutes which regulate execution of work-tasks and the acquisition of goods and services for the State, its agencies and dependencies and of municipalities, is to protect the interests and fiscal resources of the people. In this manner, favoritism, waste, prevarication and risks of non-compliance are avoided." *Johnson & Johnson v. Mun. de San Juan, supra*, p. 852. See also: *Mun. Quebradillas v. Corp. Salud Lares, supra*; *Colon Colon v. Mun de Arecibo, supra*, p. 725; *Lugo v. Municipio de Guayama, supra*, p. 214; *Hatton v. Mun. de Ponce, supra*, p. 1005.

6

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

"To said effects, we have indicated that [the rules outlined by law and case-law] must be *rigorously* observed, even under emergency circumstances." (Emphasis within the original.) *Ríos v. Municipio Isabela, 159 D.P.R. 839, 846 (2003).* See also: *Fernández & Gutiérrez v. Mun. de San Juan, supra*, p. 833; *Hatton v. Mun. de Ponce, supra*, pp. 1005–1009.

[8] Finally, we reaffirm that it is not permissible for "private persons to invoke remedies in equity against municipalities with which they enter into contracts, since it is a reaffirmed doctrine that said remedies shall not be applied when same are contrary to clear public policy embodied in a statute or in the Constitution'." *Mun. Quebradillas v.* **542** *Corp. Salud Lares, supra*, p. 1020, citing *Las Marías v. Municipio de San Juan, supra*, pages. 875-876.

### III

[9] As arises from the outlined facts, the works were completed two weeks prior to execution of the written contract. ALCO argues that the municipality asked it to initiate work before date when the written contract was granted. However, that fact could not be proven by ALCO. Furthermore, even if we start from the premise that such was the case, this does not validate the legal transaction effected. Let us recall what we once again need to repeat: "'private parties must exercise a more active role upon contracting with municipalities.'" *Lugo v. Municipio de Guayama, supra*, p. 217. What is prudent is for contractors to demand that municipalities have the agreement in writing, and it be certified that same was registered and forwarded to the Comptroller's Office. Id.

Therefore, ALCO performed the work in late June of 2002 without having a written contract allowing it to perform such work. The only thing it had was the letter which awarded them the bid of auction as to carry out the project. Same was insufficient, since,

> ... for more than three decades we have established that in our legal system "an agency has the right to revoke adjudication of an auction before the corresponding contract is formalized." The social end pursued by the faculty to reject bids or to cancel an auction once same has been awarded is to grant a certain degree of discretion and flexibility which allows the administrative entity to adequately protect its interests .... (Citations omitted.) *Cordero Vélez v. Mun. de Guánica, supra*, p. 248.

In accordance with the foregoing, although ALCO won the bid in good faith of the auction held, this did not assure ALCO that the municipality would eventually grant them the contract. In that sense, guaranteeing that ALCO carried out the work without **\*543** availing itself of a written contract would void the authority which municipalities have to revoke awarding of an auction before the contract is signed.

On the other hand, we must bear in mind that "the municipality's faculty to commit public funds for payment of an obligation, is subject to following procedures established by law." *Cordero Velez v. Mun. Guánica, supra*, p. 248. Due to this, we have opted for restrictive ruling as to municipal contracting. Id.

7

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

In this case, work was effected during fiscal year 2001-2002, but the contract was awarded in the following fiscal year. This action committed funds from one fiscal year for the payment of an obligation contracted unlawfully in a prior fiscal year. All of this was done in clear violation of Article 8.004 of the Municipalities Act, *supra*. However, the foregoing does not mean that there are no legally contracted obligations that can be paid in a subsequent fiscal year. Provided that an obligation has been legally contracted in a fiscal year, its payment is justified even if it occurs in another fiscal year. The justification is that such funds were set aside for those particulars. Likewise, actions are not validated because both events were processed within the same fiscal year. Prior issuance of the contract in writing becomes necessary.

Although reality is nobler than imagination, if we validate the contracting effected in this case, in the future a situation may arise in which a contractor deliberately carries out work beforehand, as a means of pressure, to guarantee a future awarding of the contract. Likewise, it may happen that a contractor who carried out work before the contract was awarded waits for the municipal administration to change, and attempt to validate its actions by undersigning the agreement. Consequently, a contractor would be allowed to undertake governmental powers by building during critical periods without a formal contract, such as for example by the end of a fiscal year or **\*544** in a transition stage of a new municipal administration. That is, validating the theory proposed by ALCO would be a reward for those who conspire with a corrupt municipal official as to not follow the rules of any sound public administration, conscious that as soon as work is completed, they shall have the right to claim compensation, regardless of the fact that the law was not followed upon the contracting. In summary, there are numerous possibilities for corruption that could arise if we allow disbursement of public funds for work carried out prior to the awarding of the written contract.

On the other hand, endorsing the actions of the parties would entail, in this particular case, granting a retroactive lifespan to an action which did not happen as actually stated within the contract. Let us recall that clause eighteen of the contract in question provides that "the term to carry out work-tasks is an essential element of the contract, and that [ALCO] was supposed to initiate the project on or before five days after the contract was awarded." In other words, ALCO could begin to execute the project five days *after* the contract was awarded or before, *but always after it was awarded*. Additionally, that same contract states in its fourteenth clause that validity of same is thirty days as of July 16th of 2002, to August 14th of that same year. ALCO claims payment for construction work built prior to the formal period of the contract.

In its argument, ALCO mentions Art. 1 (d) of Law No. 18, *supra*, and Art. 8.016 of the Autonomous Municipalities Act, *supra*, to propound that with the amendments made to these laws, requirements for the remittance of contracts to the Comptroller were flexed, and it was established that non-compliance with these requirements is not cause for a competent court to declare nullity of any legally valid contract or legal business. That is why ALCO deems that, in this case, it is not appropriate to declare the legal business carried out by the parties as void, even if the contract was awarded after work was carried out. **\*545**

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

ALCO argues that these amendments were done for the purpose of promoting credibility from the government as a contracting entity, upon establishing fair and valid rules which prevent municipalities from losing their credibility whenever contracting. Notwithstanding, from a reading of the transcribed sections, we see that what Article 1 (d) of Law No. 18, *supra*, refers to, is the registry which municipalities must maintain for all contracts which they grant —including its amendments— and the forwarding of a copy of same to the Comptroller's Office. The law sets forth that a court will not declare a contract or its amendments null and void, because these were not recorded in the municipal records, or because they were not forwarded to the Comptroller's Office. From those sections it cannot be interpreted that the legislator's intent was to retroactively authorize a contract which is awarded after work has been performed.

A review of the Positive Report regarding said measure (H.B. 4243) rendered by the Government Committee of the House of Representatives, confirms this conclusion. There it was explained that the amendment arose from the need to revoke the case *Las Marías v. Municipio de San Juan*, *supra*. In that case, this Court ruled that contracts not registered in the Comptroller's Office Contract Registry, were null and void. The Government Commission explained:

> Among the unjust consequences of the rule established in the *Las Marías* case, it stands out that who has control of the process within the Comptroller's Registry is the agency or municipality and that, if the agency fails to comply with this requirement either due to carelessness, negligence or intentionally, the contract turns void, and the private entity cannot charge for services or goods. Positive Report in H.R. 4243 dated Nov. 11th, 2003, 6th Ordinary Session, 14th Legislative Assembly, p. 2.

Finally, the House Government Commission pointed out that the amendment, *"without violating the rigorous requirements of governmental contracting*, protects the contractor who relies on the legal and adequate processing by the **\*546** governmental agencies and entities of the requirements demanded by law." (Emphasis added.) Id., P. 3.

As can be noticed, the main reason that prompted the Legislative Assembly to amend Article 1 (d) of the Law was that contractors are not the ones in charge of submitting contracts to the Comptroller's Office. This is an action that does not depend on a contractor's diligence, rather on the municipality or the contracting agency. Therefore, the legislator considered it unfair to penalize the contractor for something which did not depend on his volition. Nevertheless, the Government Commission emphasized that the amendment was meritorious since it did not violate the strict requirements which prevail within government contracting. One of those requirements is, precisely, the existence of a written contract.

Requiring contractors to ensure themselves that there is a written contract before work is executed does not depend on another party. Nor does it place them in a disadvantaged position as contracting parties. To the contrary, it guarantees that they will be able to charge for such work, since they have the utmost guarantee by the existence and scope of a contracted obligation: the written contract. Let us recall that in the past we have stated that "that private party which crosses its arms and renders services without demanding reliable proof that the Government fulfilled its duty, risks assuming the responsibility for its own losses." *Lugo v. Municipio Guayama*, *supra*, p. 218. See also, *Colón Colón v. Mun. de Arecibo*, *supra*, p. 729.

9

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

On the other hand, ALCO assures that in *Cordero Vélez v. Mun. de Guánica*, *supra*, we held that if a bid is formally awarded and notified and the contractor begins work without having signed a contract, charges for such work is contingent upon a contract being signed, even if it is at a later time. *Certiorari*, p. 7. It is incorrect.

The controversy we had was whether the action for breach of contract and damages against **\*547** the municipality was proper by virtue of an auction that was not formally awarded, and which did not conclude in granting of a written contract either. We ruled with a no.

In *Cordero Vélez*, the Municipality of Guánica held a first auction for purchase of fuel on April of 2001, and until June 30th of that same year. This auction was attended by Mr. Cordero Vélez, who was subsequently notified by letter that he was awarded the bid to supply the fuel. However, a contract was never signed. Notwithstanding the foregoing, the municipality obtained the fuel from Mr. Cordero Vélezs' gas station. Subsequently, another auction was held for the period from July of 2001 to June 30th, 2002. Mr. Cordero Vélez was the only one who appeared at the auction. According to him, he alleged that the Municipal Clerk told him that they were going to award him the auction, since he had been the sole bidder. However, he never received written notice informing him about adjudication of the auction. After several procedures, Mr. Cordero-Vélez learned that the municipality was also buying fuel from another retailer. Thus, he inquired the municipality about the reason for non-exclusivity in the fuel purchase. The municipality informed him that he had not been awarded an auction, so the municipality proceeded to discontinue payments, and purchase of fuel at his station.

Dissatisfied, Mr. Cordero Vélez filed an action for collection of money and breach of contract, alleging that with the second bidding a contractual relationship was established between the municipality of Guánica and himself. The Trial Court concluded that the municipality of Guánica awarded Mr. Cordero Vélez the second auction (2001–2002). It deemed that the municipality, through its Municipal Clerk, had indicated to Mr. Cordero Vélez that it had awarded him the bid. Therefore, it concluded that a contractual relationship between both parties was initiated from the bidding process.

The Court of Appeals partially confirmed the Trial Court. The intermediate court concluded **\*548** that it lacked elements of judgment to intervene with the determination by the Trial Court. However, it acknowledged that payment of a municipal debt through public funds is conditioned upon following procedures set forth by law. For this reason, it ordered that a written contract be executed, registered in the municipal registry of contracts, and notified to the Comptroller's Office, along with a copy of the judgment.

After an analysis of the controversy before us, we highlight with regards to the first auction that

> ... [a]lthough it was appropriate to execute a written contract and comply with the legal formalities so that the municipality could disburse public funds in accordance with applicable law, there exists no controversy regarding compliance with the terms of this auction.
>
> The controversy in the present case revolves around another auction, the one held in May 2001 for the 2001–2002 fiscal year. By applying the precepts set forth above upon the procedure for holding and adjudicating municipal auctions, it is indisputable to hold that -

10

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

> contrary to the previous one - the auction in question was not awarded. *Cordero Velez v. Mun. de Guánica, supra*, p. 250.

From what is transcribed it is noticed that in *Cordero Vélez v. Mun. de Guánica*, *supra*, we did not state that completion of work prior to awarding the contract validates same. We did not go into elucidating the merits of the first auction. We only point out that, in effect, the bid was awarded to Mr. Cordero Vélez, since the Bidding Board sent him a letter informing him that he had won the bid, and that the parties should have contracted in writing. Consequently, we cannot conclude that this Court validated in Cordero Vélez that the works can be carried out prior to the awarding of the contracts, since we did not even analyze that aspect. We only resolved that the second auction was not awarded to Mr. Cordero Vélez, since the fact that the Municipal Secretary verbally commented that the auction was going to be awarded to him was not enough to force the municipality to **\*549** formally grant that auction and perfect a written contract.

Contrary to the interpretation by ALCO, in *Cordero Vélez v. Mun. de Guánica*, *supra*, we indicated that there was no ratification of the bidding award due to the fact that the municipality made purchases at the station of Mr. Cordero Vélez. We emphasize that,

> [i]n this case, a written contract was never executed. Neither were *any* of the formalities applicable to municipal contracts, which are rigorously required with the purpose of protecting the public interest, been satisfied. The exception established by the aforementioned Act No. 127 in that a valid contract that has not been registered or sent to the Comptroller's Office will not be null and void, does not have the effect of altering the public policy that permeates the regulations regarding the municipal contracting or exempts from compliance with the requirements described above that make enforceable agreements that are not legally valid. Furthermore, the aforementioned provision starts from the premise that a contract was perfected, and that it is valid. Since, in the present case, the relationship between Mr. Cordero Vélez and the municipality never reached the obligation of a bilateral agreement, we resolve that since there was no contract, it was not appropriate to order the fulfillment of any formality, contrary to what was resolved by the Appeals Court. (Emphasis in original.) Id., p. 252.

Finally, we point out that "in view of the interest represented by public funds, we are not willing to impose liability on the municipality to comply with a contract that was never perfected." Id., p. 253.

ALCO argues that from our language it can be indirectly concluded that if the contract for the second bid had been awarded, payment would have been appropriate. That analysis extends too much what was said in *Cordero Vélez v. Mun. of Guánica*, *supra*, which is a case on the validity of the award of an auction and not on whether a work can be carried out prior to the written award of the contract. Contrary to what ALCO alleges, in the same case we rejected the solution suggested by the intermediate appellate court, which ordered that a written contract be granted, **\*550** be registered in the municipal registry of contracts, and the Office of the Comptroller be notified together with a copy of the sentence to then validate the legal business. Had we understood that what was done could be validated, we would have confirmed as remedy that the contract was awarded retroactively, but we did not.

We are not endorsing that a municipality benefit from work or a service without paying. Nor are we in view of a judicial claim upon the municipal official who urged ALCO to carry out such work without a written contract. Therefore, as far as the municipality is concerned, we abide by applicable law reaffirm

11

that the contractor should have required a written contract before committing its resources and carried out the work. ALCO, like any commercial company, should have known the legal requirements to contract with a municipality, and should have actively demanded compliance. See, *Lugo v. Municipio de Guayama*, *supra*, p. 217. Ignorance of those legal requirements does not excuse their non-compliance. To conclude otherwise would inadvertently promote "favoritism, corruption, waste, prevarication, extravagance, carelessness and the risks of non-compliance within public administration." *Lugo v. Municipio de Guayama*, *supra*, p. 220.

> "Corruption and the undue or illegal disbursement of public funds —in their varied forms, oftentimes blatant and other times refined— are actions incompatible with the democratic government system consecrated in our Constitution, and reinforced through respect for human dignity and people's monies as sole sovereign." *E.L.A. v. Soto Santiago*, 131 D.P.R. 304, 322 (1992), citing *A.E.E. and A.A.A. v. P.N.P.*, *128 D.P.R. 294, 294–295 (1991)*, concurring vote by Associate Judge Mr. Negrón García, who was joined by Associate Judges Mr. Rebollo López and Andréu García.

At present, Section 6 of Chapter IX of the Municipal Administration Regulations for the Office of the Commissioner for Municipal Affairs (O.C.A.M.), applicable to all municipal governments, establishes the following: **551**

> Section 6: *Construction, Works and Public Improvement Contracts*
>
> Any contract for construction of works and improvements must be effected after a public auction has been held, whenever the total cost of such work exceeds one hundred thousand ($100,000) dollars. If this amount were not exceeded, contracting of the work may be carried out by soliciting no less than three (3) quotes.
>
> The *contract* must stipulate the maximum amount of the cost for the work and the form of payment, and identify the manner in which the monitoring or inspection of said work would be carried out. It must also provide for the retention of ten percent (10%) of each partial payment, until work is completed or is substantially completed, in accordance with the requirements under the Law, and same is duly inspected and accepted by the municipality.
>
> Municipalities must include within their contracts resolution clauses for cases of non-compliance, and penalty clauses or liquidation of damages for tardy performance. They must also stipulate clauses which regulate job subcontracting for the work-tasks, and release from liability, among others. They must comply with the permits as required by the pertinent agencies, and with the requirements established within these Regulations.
>
> Contracts for the construction work and improvements financed through federal funds "Community Development Block Grant" (CDBG), must comply with the requirements of applicable federal regulations and within the guidelines of the Office. (Emphasis added.) Regulations for Municipal Administration, Office of the Commissioner for Municipal Affairs, Regulation No. 7539, Department of State, July 18th, 2008, p. 159.

From a reading of this section, it results inescapable to conclude that the written contract has to be signed prior to the execution of any work. *Otherwise, it would be ignoring the public interest in*

12

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

*regulating inspection the work, and restrict the parameters for subcontracting, among other precautionary measures contemplated in the section quoted.*

That rule is not new. By referring to the previous Regulation on Basic Standards of O.C.A.M., we find an express prohibition to the retro-activeness of the contract. Section 5 (17) of Chapter I specified that the obligation is "a commitment which is represented by a purchase order, *contract,* or similar document pending **\*552** payment, which must be signed by the official authorized to encumber the allocations in the municipality *and which may become a receivable debt in the future*." (Emphasis added.) Revised Regulation on Basic Rules for the Municipalities of Puerto Rico, Regulation No. 3052 for the Office of the Commissioner of Municipal Affairs, June 30th, 1995, p. 4. The result we arrived at today is consistent with those regulations.

In view of this instance, it results inescapable that, in any municipal public work or improvement, a written contract must be intercede, prior to its execution. We must not excuse compliance with those regulations which impose upon the municipal government to establish certain contractual guarantees and protections of the public interest. Performing work before signing such clauses would deprive the municipal government and constituents of protecting themselves from illegal subcontracting or performance of work without inspection or supervision, among other deficiencies.

In this case, the doctrine of unjust enrichment does not apply either. The exception that allows a governmental body to invoke the remedies in equity as to avoid results contrary to public policy set forth in a law or in the Constitution, fails to operate here. See, *Mun. Quebradillas v. Corp. Salud Lares, supra.* To the contrary, "allowing an action in equity against a municipality to demand a benefit resulting from a void contract would violate the public policy set forth in the Municipal Law." Id., P. 1018.

For this reason we reject the possibility of drawing in the approach from other jurisdictions, under which a public obligation is validated without a written contract, through application of outlines in equity, including the doctrine of unjust enrichment. For a proposal in this regard see, L. Muñiz Argüelles and J. Alvarado Vázquez, *Obligaciones y Contratos*, 77 (No. 2) Rev. Jur. U.P.R. 645 (2008). **\*553**

In spite of the above, we understand that it may seem fair in this case to compensate the contractor. In this regard a renowned author, distinguished professor on the subject, has proposed an alternative: "Should not the official answer for the patrimonial damage suffered by the contractor who, in good faith, provides a service due to the official's misleading representation that he has been awarded a contract? These obligations by officials would become more effective tools to tackle governmental corruption, but they certainly must arise from actions from the Legislature." *Muñiz Argüelles*, id., pages. 650–651.

## IV

Based on the above grounds, the judgment issued by the Court of Appeals is confirmed. Said forum acted in accordance with the law by validating the summary judgment handed down in favor of the

13

Municipality of Toa Alta. The intermediate appellate forum correctly identified the danger of validating actions like the one which arose here, regardless of the good intentions by whoever proposed same. "Ruling differently would disrupt the established public funds disbursement control system, as same would lend itself to validate agreements reached between contractors and municipalities, without complying with the process established by our laws." *Certiorari*, p. 170. Our non-delegable task of ensuring legality in the disbursement of our People's monies, compels us to not admit this type of retroactive contracting. Ruling in a different manner would undermine the rigorous regulations which the Legislative Assembly has imposed upon municipal contracting.

*A judgment in conformance will be rendered.*

Associate Judge Mrs. Rodríguez Rodríguez concurred with the result without any written opinion. Associate Judge **\*554** Mrs. Fiol Matta dissented with a written opinion, to which Presiding Judge Mr. Hernández-Denton joined.

**--O--**

Dissenting opinion issued by Associate Judge Fiol-Matta, joined by Presiding Judge Hernández Denton.

The Court's Opinion in this case starts from the mistaken premise that the entire provision of the petitioning party was made before the contract was awarded in writing. In so doing, it does not discuss nor specify the characteristics and constituent elements of the type of contract agreed to in this case. Same being a work execution contract, in which the main rendering takes place when the agreed work-task is delivered, what corresponded that we determine was whether prior to that delivery, the requirements for the perfecting of the obligation established within the regulations on municipal contracts, was fulfilled. The majority opinion adds, unnecessarily, a formal constitutive requirement to municipal contracts that is not contemplated by the 1991 Autonomous Municipalities Act for the Commonwealth of Puerto Rico (Autonomous Municipalities Act), Law No. 81-1991 (21 LPRA sec. 4001 et seq.), be it deemed, to have the contract set in writing before the requested work is carried out. I feel obligated to disagree, since I do not concur with the majority's analysis.

**I**

On June 4th, 2002, the municipality of Toa Alta notified petitioner, ALCO Corporation (ALCO) that it received approval on bid 02-030, for a resurfacing project in the Lajas ward of stated municipality. The contract for the execution of such work was executed on July 16th, **\*555** 2002, date in which *it was set in writing, registered within the municipal log-books and copy sent to the Comptroller's Office.* Costs for stated work was $29,5000.  The contract was for an approximate one

14

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

duration (1) There exists no controversy as to whether this contract met the four formal requirements demanded by the Autonomous Municipalities Act, for municipal contracts.

According to the petitioner, the municipality of Toa Alta requested to start resurfacing work prior to the date in which the contract would be formally executed.(2) There is no controversy about the fact that by the end of June of 2002, ALCO effected resurfacing work, as described in bid 02-030 and eventually, in the work execution contract of July 16th.(3) In other words, it effected its work-tasks before the contract was executed.(4) However, the final certification for the  work, in order for it to be accepted and received by the municipality of Toa Alta, was carried out on July 31st, 2002, that is, during the term of said contract.(5) Nevertheless, the municipality refused to certify such work, and did not disburse any payments in ALCO's favor.

After unsuccessful collection efforts, ALCO filed a lawsuit for collection of monies against the municipality of Toa Alta, claiming $29,500 for the work performed as an overdue, liquid and enforceable debt. Both parties requested summary judgment. The municipality alleged **556** that the claim filed against it was "inadmissible because it was supported by an alleged contractual obligation which is not related to the claim for the work performed (6) before the contract was set in writing, as required by regulations for municipal contracts, same not being binding.(7)

The Trial Court declared the motion for summary judgment filed by the municipality as "granted" and dismissed the claim. In summary, it determined that ALCO could not charge for work performed before execution of the work-task contract was executed. Dissatisfied, ALCO appealed to the Court of Appeals. The intermediate forum, as to what was pertinent, confirmed the ruling by the Trial Court. The Court of Appeals determined that the contract effected on July 16th did not mention that work had begun prior to the effective date of the contract, and ordered that any changes to it must be made in writing, ALCO could not claim any payment for work carried out before same was executed.

Dissatisfied, ALCO appealed to this Court. Regarding this matter, it alleged that the Court of Appeals erred by concluding that ALCO could not claim payment for the work performed, because work on the site was done before the contract was effected. In particular, ALCO questioned whether it is possible to "dismiss a claim for collection of monies for work  which was duly bid for, budgeted, carried out under governance of a written contract **557** and signed, filed within the Municipality's log-books, and remitted to the Comptroller's Office, [due to the fact that] the contractor responded to the request [by the] Municipality to advance work a few days."(8) By this, the petitioner alleges, credibility of the government as a contracting entity would result damaged. The municipality, on its part, focuses upon the fact that "the works in question were carried out prior to execution [sic] of the [contract]." (9) Furthermore, it alleged that it was not demonstrated that the municipality requested an early initiation of said work. Finally, it argues that the contracts "cannot be awarded to cover events that occurred before [same] were executed."(10)

15

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

## II

The faculty of municipalities to enter into contracts, and the consequential right of contractors to demand that these comply with its provisions, is conditioned upon the agreed to contract complying with some formal requirements. (11) Those are: (1) that the agreement was agreed to in writing,(2.) that a reliable record is retained in order to establish the existence of the contract, (3) that a copy of it is sent to the Comptroller's Office, and (4) that the certainty as to the time is accredited, to wit, that the contract was awarded no more than fifteen days prior.(12) These requirements must be strictly complied with "since lack thereof deprives the agreement with the municipality of *effectiveness and validity*." (Emphasis **\*558** added.) (13) That is, "no municipality may pay for any debt which does not arise from a contract appearing in writing, and that in turn, has been registered and remitted to the Comptroller's Office." (Emphasis suppressed.)(14) For contracts entered into by a municipality to turn valid and therefore, binding between the parties, must comply with these formal requirements. (15) Any agreement running counter to these norms, is ineffective. (16)

As the majority Opinion properly states, these requirements and their rigorous observance, are aimed towards a sound and strict public administration.(17) We have affirmed that this objective is "of the highest public interest." (18) The purpose of this policy is not to favor the municipality, but to protect public funds. (19) We have constantly stated that the good administration of a government is a virtue of democracy, and part of a optimal management implies carrying out its duties as a purchaser with efficiency, honesty and correctness, as to protect the interests and money of the People represented by said government.(20) In this way, "favoritism, corruption, waste, prevarication, extravagance and carelessness in granting contracts is avoided, and the risks of **\*559** non-compliance is minimized."(21) Therefore, it is the duty of the courts to avoid that legal provisions be circumvented, as to protect public funds and integrity in government management.(22)

Compliance with the aforementioned formal requirements has a "*constituent* characteristic with respect to the *effectiveness* of the obligations contracted." (Emphasis added.)(23) A contractor that enters into an agreement with a municipality without meeting these requirements assumes the risk of not being able to demand that the municipal entity comply with the obligation. As long as non-compliance exists, the contractor will have no cause of action.(24) In particular, we have insisted upon the need for municipal contracts to be set *in writing*, an element that we have described as "indispensable… for the agreement to have a binding effect." (Emphasis removed.)(25)

Now, once formal contracting requirements are met, contracts between the municipal entity and the contractor are valid and enforceable.(26) In those cases, what remains to analyze is the legal business agreed to and obligations accepted, as were the case with any other contractual relationship.(27) In *De Jesús González v. A.C.*, we stated **\*560** that "[w]hen the State contracts, the contract must be interpreted as if it were a contract between two private persons .... This means that once the State signs a contract with a private person, both are bound by the general rules relating to contracts, and their corresponding interpretations in light of our applicable pronouncements." (Citations omitted.) (28)

16

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

Of course, it shall be from fulfillment of requirements regarding form by which the municipality becomes obligated towards the contractor, and the latter may require payment of the price agreed to. The Court's Opinion accepts that, in this case, all four requirements of Law No. 81(29) were met, but adds a fifth requirement as to form which is not established in the Autonomous Municipalities Act: that the contract be set in writing before a contractor's work begins. This, with the purpose of avoiding, according to the majority, that a contractor carry out work without a contract, and then demand payment from the municipality. Notwithstanding, the majority overlooked that, since signing of the contract is a *sine qua non* requirement, if the contractor carries out the work and a contract were not signed, the contractor *will not be in a position to demand anything from the municipality*. Moreover, in a work execution situation as is this one, nothing obligates the municipality to sign the contract and pay for said work. Now, if the municipality voluntarily decides to be bound after the work is carried out, in compliance of any requirements within the Autonomous Municipalities Act, there is nothing within same that prohibits it from so doing. (30) **\*561**

### III

Even if we do agree with the majority that the contract must be completed in writing before the requested work is carried out, that does not resolve the controversy raised for us in this case. We cannot lose from perspective that we are in view of a *construction lease contract.* Therefore, to determine when the contract should have been executed in this case, it is thus necessary to examine this contractual concept, prior to setting the point when formal requirements of the Autonomous Municipalities Act should have been met, including the newer requirement of non-retroactivity established by the court. I am not proposing that special statutes be ignored, and exclusively resort to the general theory of contracts. Rather, I am reminded that as a Court, it behooves us to examine the interactions between the special law and the assorted concepts of our contract law, since not all contracts are identical.

Through a work lease contract, also known as a *work contract, company contract or work execution contract*, (31) a party agrees to perform work in exchange for a previously established price.(32) In particular, as Puig Brutau explained to us, this "is the contract by which one of the parties ... becomes obligated towards the other ... *to produce a certain result* with its independent activity, in exchange **\*562** for a certain agreed to price."(Emphasis added.) (33) The correlation between the work lease contract and production of a result, is a feature universally accepted by the doctrine. (34) The Supreme Court of Spain has consistently reached that same conclusion.(35)  As can be seen from the term itself, emphasis on the result necessarily points to a temporal element: same deals with the culmination of a productive process. (36)

A. In the work lease contract, the main obligations of the contractor are: (1) *to perform the work* and 2.) *to deliver same*.(37) For its part, the owner of the site work has two essential obligations: 1.) to receive the work (38) and 2.) to pay the **\*563** price in the form, amount and time agreed to. (39) It is now up to us to analyze the obligations separately, and discuss how these interact with each other.

17

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

Although the fundamental feature of the work lease contract is to produce a result, the process that this product entails is composed, in turn, of an initial work and a final delivery. However, given the importance of the result, the initial work is only an initial step in fulfilling that performance to which the contractor becomes bound. In other words, it is not an issue of two independent services - initial work and final delivery – rather, a single obligation to produce a result that, although same starts with certain work, same culminates with its delivery.(40) On the other hand, *delivery constitutes the definitive point in which the contractor complies with his obligation*. If a contractor executes the work but fails to deliver same, he would not have fulfilled his performance. Therefore, solely performing the work is insufficient.(41)   *Delivery of the completed work constitutes the definite compliance of its rendering by the contractor*. For stated reason, the doctrine has considerably emphasized the element of delivery whenever discussing the concept of the work lease contract, as a central element of the obligation **\*564**.(42)   Likewise occurs in case law at the Supreme Court of Spain.(43)

As consequence of the importance of the results in this contract, some commentators have emphasized that rather than executing the work-task, the main service of a contractor is precisely to deliver the executed works. Castán Tobeñas explains to us that "the rendering of the object (readily made ), that is, *its transfer* , appears as the main provision, the fulfillment of such object being only the means to make the latter possible." (Emphasis added.)(44) To wit, work on the site is the means, but its delivery is its goal. For Martínez-Mas, delivery of the work is an inherent part of its completion and, therefore, for fulfillment of the contractor's obligation.(45) The commentator tells us that *"[t]he ultimate obligation of the builder in the final phase of fulfilling the contract, is delivery of the work to the promoter."* (Emphasis added.)(46) It should be noted that the owner's obligation to pay *does not arise when the contractor finishes executing the work, but, effectively, when it is delivered and the owner receives it.* **\*565**

The work lease contract is "a bilateral contract. That is, the persons who enter into same impose reciprocal obligations upon themselves."(47) By their very nature, considerations within the work lease are temporary in nature. First, the contractor needs to execute and deliver said work. Only then is the owner obligated to receive and pay for same. As Lete del Río and Lete Achirica explain, the receipt of the work is "another one of the obligations of the client, *correlated* to that of the contractor to deliver the work." (Emphasis added.)(48) The Supreme Court of Spain reached that same conclusion:

> [T]he leasing of the work ... is a bilateral contract that originates reciprocal obligations, in which the contractor's credit is not strictly geared towards providing payment of the price by the principal, rather, a consideration, that is, towards the obligation to collect the price in *exchange for its obligation to deliver the executed work.* (Emphasis added.) (49)

18

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

B. As we have stated, the key performance of the contractor within the work lease contract is production and delivery of a certain *result*.(50) This is precisely what distinguishes it from a service lease contract. In this regard, Vélez-Torres illustrates that in the service lease contract "what is promised by the contractor is the *energy of the work*, while in [the works lease] what is promised is the work or *final result of the work*." (Emphasis added.) (51) Puig-Peña is of the same opinion:

"[T]he contractor does not promise only his work, but the result of **\*566** same." (52) This corresponds to the consideration by the owner of such work since he must, in addition to paying the agreed price, *receive* the work. In other words, more than payment of a certain price in exchange for an effort made, in the work lease contract the owner makes a payment to the contractor for a result delivered and received. The scientific doctrine unanimously differentiates the work lease contract from the service lease contract, clearly establishing the difference between the result to be delivered and the effort executed. (53) The same occurs with Spanish case-law. (54)

The foregoing is the product, as Puig-Brutau explains that under the work lease contract the contractor performs his work "independently." (55) Therefore, what he owes to the owner is not efforts made but rather, a final result. This is compatible with what **\*567** Castán-Tobeñas points out in that performance of a work is merely the means for its delivery.(56)

In a congruent manner, Puig-Brutau explains to us that the work lease contract and the sale contract are distinguishable since in the first, the result delivered is "something new" or "*recently done*". (Emphasis added.)(57) In other words, in the work lease contract the result delivered cannot be a generic prefabricated work (piece), but must be the product of a particular commission. (58) *But same does not necessarily have to be carried out either, after the completion of the contract;* it will suffice for it to be newly manufactured work. The fundamental thing is that the main obligation of delivering the result is made after the contract is perfected. It will be with the delivery of the commissioned result, receipt of the work and payment of the agreed price, that the respective obligations will be extinguished, provided that what is delivered agrees with what is commissioned in the contract. (59)

The foregoing is in tune with the independent nature of the work performed by the contractor. For this reason, the Civil Code sets forth that, if work is destroyed prior to delivery, the loss will be at the expense of the contractor and not of the owner, unless the latter has incurred into a delay in receiving **\*568** the work, or the owner has supplied defective materials.(60) Prior to delivery and receipt, *work* carried out by the contractor is *his own*, and only in very specific cases may the contractor claim payment from the owner of said work. (61) As González-Poveda explains: "*[I]t is understood that as long as delivery does not take place, the object is property of the contractor*, so he must bear the risks for same in accordance with the general principle of law that things perish for their *owner*." (Emphasis supplied.) (62). According to Martínez-Mas, the discussion of risk is tied to the very nature of the work lease contract, which, as we have seen, is based more upon the result delivered, than on the work (effort) employed. The commentator states the following: The reason that the builder assumes risks for [the] perishing of the work before its delivery is that, in the work contract, the builders pay is not for work (effort) used or for materials used for work, rather for its

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

conclusion, wherefore it seems logical that he bear the risk of his failure or loss of an almost completed work (task) or *finished and unconcluded,* but even *without it being delivered.* (Emphasis provided.) (63)

If any of the parties fails to comply with its respective conditions, they may exercise the powers granted them by contractual law, such as requesting termination or **\* 569** specific compliance with the obligation, among others.(64) As we state in *Master Concrete Corp. v. Fraya, S.E.,* "[o]nce the work lease contract is completed —as in all sorts of contracts— the parties are bound by what is expressly agreed."(65)  If, for example, work does not conform to what is specified in the contract, it falls upon the Trial Court to determine the adequate remedy, depending on the seriousness of the breach. (66) The same occurs if a certain condition of the contract, such as the period to perform said work, is of an essential nature.

## IV

In the instant case, the work lease contract was executed, according to regulations applicable for municipal contracts, on July 16th, 2002. There exists no doubt that same complied with all form requirements set forth in the Autonomous Municipalities Act and in case law. The contractor had from July 16th through August 14th of 2002, to fulfill its contractual obligation. That is, the contractor had to fulfill the obligation of delivering work within that period of time. Indeed, on July 31st, the contractor attempted to deliver his work. **\*570**

The independent work carried out by the contractor before delivering the works to the Municipality was done between June 25th and 28th of 2002, approximately two weeks before the contract was executed. As alleged in the lawsuit, the work carried out on those days corresponds to work-tasks indicated in bid 02-30, award that was notified on June 4th, and in the contract executed on July 16. (67) It was also alleged that such work corresponds to what the doctrine classifies as "recently done" work, given the proximity in time between the work performed and completion of the contract, as well as the fact that work performed was that one specifically commissioned in the bid and within the contract, and not a generic work, as occurs in the sale.

The consideration to which the contractor was bound on July 16th, as part of a work lease contract, was *delivery of work already completed*. It was not necessary, as a constitutive element for the cause of action, that work produced such construction be carried out after completion of the contract. It was sufficient for said work to be "recently done." (68)  In this case, work was done shortly before the contract was completed. On July 31st, during term of the contract, the contractor fulfilled his obligation: he delivered the commissioned work. It was the responsibility of the **\*571** owner of the work to fulfill his obligations: to receive said work and to pay the agreed price.

The complaint in the captioned case was summarily dismissed, being alleged that same did not justify granting of a remedy. The Trial Court of First did not see evidence about the parties intent or about the essential nature of the term established in the contract. The majority errs upon entering on

20

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)
2011 TSPR 180

the merits of the controversy and ruling that, as a question of fact, the contractor breached an essential element of the contract, when no evidence was introduced to said effects.

In light of the facts that the requirement of non-retroactivity is not established within the Autonomous Municipalities Act, that the fulfillment of the obligation occurred after the written contract was executed in writing, and that no evidence was introduced regarding the intent of the parties which would allow to conclude that an essential condition of the contract was breached, I would reverse summary judgment, and remand the case to the Trial Court, for a trial on its merits.

## Footnotes

1    The contract provides that same would be valid from July 16th of 2002, through August 14th, 2002.

2    The lower courts did not make a factual determination on this allegation, since the Trial Court dismissed the claim through summary judgment.

3    Work was carried out on June 25th, 26th, 27th and 28th, of 2002.

4    The contract signed on July 16th provided for delivery of partial certifications that needed to be approved by a representative of the Municipality. However, as in this case, there was no trial or evidence on the merits; it is not known whether this contractual obligation was essential by nature.

5    Also presented was an additional certification claiming 10% of the agreed price be reserved by the Municipality as to cover potential flaws and defects in the work.

6    Judgment by the Court of Appeals, p. 2; Certiorari Appendix, p. 160.

7    The fact that the work was carried out two weeks in advance was identical to the one agreed to in the July 16th contract, was not contested either. Likewise, ALCO acknowledges that if the contract had not been perfected on July 16th, complying with the formal requirements of the municipal contract ordinance, it would not have been able to demand payment for work executed. Its argument focuses upon the fact that once the written contract was executed and all other formal requirements were met, it could demand the corresponding consideration from the Municipality, as to pay ALCO for such work effected in advance.

8    Certiorari, p. 5.

9    Opposition to Certiorari, p. 4.

10   Id., P. 5.

11   21 L.P.R.A. sec. 4051; *Johnson & Johnson v. Mun. de San Juan*, 172 D.P.R. 840, 852 (2007); *Cordero Velez v. Mun. de Guánica*, 170 D.P.R. 237, 248 (2007); *Colon Colon v. Mun. de Arecibo*, 170 D.P.R. 718, 725 (2007).

12   *Mun. Quebradillas v. Corp. Salud Lares*, 180 D.P.R. 1003 (2011); *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 830 (1999); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001, 1006 (1994).

13   *Mun. de Quebradillas v. Corp. Salud Lares*, *supra*, p. 1013. The requirement to send copy of the contract to the Comptroller does not void the legal transaction, but it prevents that benefits be required until same is fulfilled. Id. See also *Lugo v. Municipio de Guayama*, 163 D.P.R. 208, 215 (2004).

14   *Mun. de Quebradillas v. Corp. Salud Lares*, *supra*, p. 1014.

21

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

15    *Colon Colon v. Mun. de Arecibo*, *supra*, pp. 725–726.

16    *Fernández & Gutiérrez v. Mun. San Juan*, *supra*, p. 833.

17    Majority Opinion, p. 538; *Colon Colon v. Mun. de Arecibo*, *supra*, p. 724.

18    *Mun. de Quebradillas v. Corp. Salud Lares*, *supra*, p. 1015; *Johnson & Johnson v. Mun. de San Juan*, *supra*, p. 852. See, further, *Hatton v. Mun. de Ponce*, *supra*, p. 1005. "[T]he legal precepts which control economic relations between private entities and municipalities are blanketed by a huge public interest, and aspire to promote sound and proper public administration."

19    *Mun. de Quebradillas v. Corp. Salud Lares*, *supra*, p. 1017.

20    *Cordero Velez v. Mun. de Guánica*, *supra*, p. 245; *Mar-Mol Co., Inc. v. Adm. Servicios Gens.,* 126 D.P.R. 864, 871 (1990).

21    *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, *Supra*, p. 871.

22    *Mun. of Quebradillas v. Corp. Salud Lares*, *supra*, p. 10; *Hatton v. Mun. de Ponce*, *supra*, p. 1006.

23    *Colon Colon v. Mun. de Arecibo*, *supra*, p. 727.

24    See id., P. 731.

25    Id., P. 726, citing *Cordero Vélez v. Mun. Guánica*, *supra*, p. 248; *Quest Diagnostics v. Mun. San Juan*, 175 D.P.R. 994 (2009). Controversies relating to verbal contracts with municipal entities have been the main inceptors of our jurisprudence within this area, and we have consistently refused to make these agreements effective. See, for example: *Mun. de Quebradillas v. Corp. Salud Lares*, *supra*; *Colon Colon v. Mun. de Arecibo*, *supra*; *Fernández & Gutiérrez v. Mun. San Juan*, *supra*; *Morales v. Municipality of Toa Baja*, *supra*. On the other hand, in those cases where contracts are in writing and all other formal requirements are met, we have upheld those obligations agreed to. See, for example, *Johnson & Johnson v. Mun. de San Juan*, *supra*.

26    *Johnson & Johnson v. Mun. de San Juan*, *supra*, p. 853. See, furthermore, *Fernández & Gutiérrez v. Mun. San Juan*, *supra*, p. 833.

27    *Johnson & Johnson v. Mun. of San Juan*, *supra*, p. 855

28    *From Jesús González v. A.C.*, 148 D.P.R. 255, 267 (1999).

29    Majority Opinion, p. 533.

30    Nothing prevents that by way of regulation, formal elements be added to municipal contracting. However, such is not the case under our consideration. The dispute in the proceedings was limited to interpretation of Law No. 81, and the constitutive requirements established within said statute.
The majority opinion proposes that the principle of non-retroactiveness can be inferred from Section 6 of Chapter IX of the Municipal Administration Regulations of the Office of the Commissioner for Municipal Affairs (O.C.A.M.). Majority Opinion, pp. 550–551. However, the majority itself recognizes that it was the previous Regulation, Regulation on Basic Standards of O.C.A.M., which contained this express prohibition. In other words, the current regulation eliminated the absolute prohibition on retroactive contracting established by the one repealed. I do not believe that this record allows us to claim that the current regulation contains any similar prohibition.

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

31      J.M. Lete del Río and J. Lete Achirica, Law of Obligations: Contracts, Navarra, Ed. Thomson / Aranzadi, 2006, Vol. II, p. 515; F. Martínez Mas. The work contract analyzed for builders and developers, Valencia, Ed. Cisspraxis, 2000, p. 15.

32      *Master Concrete Corp. v. Fraya*, S.E., 152 D.P.R. 616, 623 (2000). The work lease contract is included in Articles 1480 to 1492 of the Civil Code, 31 L.P.R.A. secs. 4121-4133.

33      J. Puig Brutau, Fundamentals of Civil Law, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, p. 438. See, further, J.R. Vélez Torres, Civil Law Course: contract law, San Juan, Ed. Rev. Jur. U.I.P.R., 1990, T. IV, Vol. 2, p. 326.

34      See: M. Albadalejo, Civil Law, 8th ed., Barcelona, T. II, Vol. 2, p. 309 ("[I]n the [construction contract] a result is promised" (emphasis in original)); J.M. Manresa Navarro, Commentary on the Spanish Civil Code, 5th ed., Madrid, Ed. Reus, 1950, T. X, p. 894; J. Santamaría Ansa, Commentary on the Civil Code, Madrid, Ed. Rev. Der. Private, 1958, T. II, p. 637; P. González Poveda in I. Sierra Gil de la Cuesta, Commentary on the Civil Code, Barcelona, Ed. Bosch, 2000, T. IV, p. 620; M. Medina De Lemus, Civil Law: obligations and contracts, Madrid, Ed. Dilex, 2005, T. II, Vol. 2 ,, p. 145 (who emphasizes that this result entails something "completed and finished, regardless of the work or time it took to perform same"); Lete del Río and Lete Achirica, op. cit., p. 515; R. Hernández Bobadilla, The work contract and its regulation in Guatemalan legislation, Guatemala, Ed. U. San Carlos, 1966, p. 17; Martínez Mas, op. cit., p. 18 (which emphasizes that same is a "determined result").

35      See: Judgment of May 10, 1997; Judgment of January 30, 1997, No. 845/1997 Repertorio de Jurisprudencia Aranzadi 1320; Judgment of November 4, 1989; Judgment of May 30, 1987; Judgment of November 6, 1982; Judgment of December 19, 1964, No. 5900/1964 Repertorio de Jurisprudencia Aranzadi 3600; Judgment of November 23, 1964, No. 5453/1964 Repertorio de Jurisprudencia Aranzadi 3294, where the concept of result is connected with stated purpose.

36      According to the Royal Spanish Academy, the word *result* means "[e]ffect and consequence of an event, operation or deliberation." Royal Spanish Academy, Dictionary of the Spanish Language, 22nd ed., Madrid, Ed. Espasa Calpe, 2001, T. II, p. 1962.

37      *Master Concrete Corp. v. Fraya, S.E.*, *supra*, p. 624. See also Albadalejo, op. cit., p. 317.

38      Puig Brutau, op. cit., p. 468; F. Puig Peña, Treaty of Spanish Civil Law, Madrid, Ed. Rev. Der. Private, 1951, T. IV, Vol. 2, p. 302.

39      *Master Concrete Corp. v. Fraya, S.E.*, *supra*, p. 624, citing Albaladejo, Civil Law, op. cit., p. 49. Article 1491 of the Civil Code provides: "If there exists no agreement or custom to the contrary, the price of a work must be paid upon delivery." (Emphasis supplied.) 31 L.P.R.A. sec. 4132. As may be seen, within the work lease contract, the crucial point of services is upon delivery and receipt of the work, not the point when work was performed.

40      Martínez Mas, op. cit., p. 45: "The two fundamental obligations of the builder are: to carry out the work in accordance with the agreement and to deliver it." See also Hernández Bobadillo, op. cit., p. 17.

41      As Medina de Lemus explains: "The first obligation of the contractor is to effect work within the agreed conditions." (Emphasis supplied.) Medina de Lemus, op. cit., p. 146. See also: Albaladejo, op. cit., p. 317; Hernández Bobadillo, op. cit., p. 17 ("[The promise of the results] consists, first of all, in an act producing or creating in its proper sense, to wit ... in the carrying out a work" (Emphasis supplied.)

42      González Poveda, op. cit., p. 666: "Once the work is finished, the contractor is obligated to deliver same in the manner and within the to agreed terms"; Medina of Lemus, op. cit., p. 149: "Obviously, the work must be delivered once it is finished"; Albaladejo, op. cit., p. 317; Manresa and Navarro, op. cit., p. 918, emphasizing the importance of delivery; Santamaría, op. cit., pp. 636-637.

43      Judgment of April 18, 1979, No. 1406/1979 Repertorio de Jurisprudencia Aranzadi 1156, explaining that the owner's obligation to pay for the work is "in exchange for [the] provision [of the contractor] for the delivery of the executed work." (Emphasis supplied.) Judgment of October 26, 1978, No. 3286/1978 Repertorio de Jurisprudencia Aranzadi, where the highest Spanish forum ruled that there is no duty to receive, if the contractor failed to comply with "the obligation of delivering [the work] within the agreed time and manner." Judgment of February 5, 1975, No. 330/1975 Repertorio de Jurisprudencia Aranzadi 252: "[The contractor] did not comply with its obligation to deliver the work within the agreed period." (Emphasis supplied.) See also: Judgment of January 30, 1997, No. 845/1997 Repertorio de Jurisprudencia Aranzadi; Judgment of June 1, 1982, No. 3401/1982 Repertorio de Jurisprudencia Aranzadi.

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

44      J. Castán Tobeñas, Spanish Civil Law, common and provincial, 9th ed., Madrid, Ed. Reus, 1961, T. IV, p. 455.

45      Martínez Mas, op. cit., p. 50.

46      Id.

47      Id.

48      Lete del Río and Lete Achirica, op. cit., p. 521.

49      Judgment of April 18, 1979, No. 1406/1979 Repertorio de Jurisprudencia Aranzadi 1156.

50      Puig Peña, op. cit., p. 299.

51      See, Vélez Torres, op. cit., p. 325.

52      Puig Peña, op. cit., p. 299.

53      Santamaria, op. cit., p. 637: "The most important difference between the leasing of works (locatio operis) and that of services (locatio operatum) is in its economic aspect, since in the work contract time is paid for, and in the works contract it isthe result." (Emphasis supplied.) Lete del Río and Lete Achirica, op. cit., p. 515: "What characterizes this contract is that the employer or contractor undertakes to render not the work as such, but the its results (the work), without regards to the efforts required to obtain same." (Emphasis supplied.) The author even points out that, except in particular cases where personal characteristics of the contractor were the main factor in his selection, it is not necessary that the work be performed by him; Castán Tobeñas, op. cit., p. 454: "The true distinctive note of a company contract is, as we have already seen, that what is promised and what constitutes its object, is not the impulse of work or the work as such (as it is in leasing services) , but rather the work (itself) or the result of such work. " (Emphasis in original.) See also: Albaladejo, op. cit., p. 309; Manresa and Navarro, op. cit., p. 923.

54      Judgment by the Supreme Court of Spain of June 10th, 1975, No. 3265/1975 Repertorio de Jurisprudencia Aranzadi 2407. According to the high Spanish forum, the difference between the service lease contract and a work lease contract:
"... lies in the immediate object of the landlord's obligation, so that if the lessor is obliged to provide services or work, or an activity proper, not the result that said provision produces, the lease is for services and, on the other hand, whether it is obligated to provide a result, regardless of the work which created same, then, the lease is for work. " See, furthermore, Judgment of February 10, 1987, Aranzadi Case Law 703.

55      Puig Brutau, op. cit., p. 439.

56      Castán Tobeñas, op. cit., p. 455.

57      Puig Brutau, op. cit., p. 439 The doctrine has delved into the differences, but especially to similarities between the sale contract and the lease contract for work. Many writers emphasize the fact that more importance is given to materials used for the work, and the less importance is given to the work performed; the rules for the sale contract shall apply, particularly when materials used, are the contractor's own. See M. Medina de Lemus, op. cit., p. 145. In these cases, many talk about a mixed contract for the lease and sale of work. See: Manresa and Navarro, op. cit., p. 914; Castán Tobeñas, op. cit., pp. 454-455; J. Santamaria, op. cit., p. 637. In particular, Castán-Tobeñas explains that a certain portion of the doctrine believes "that the contract by which the worker provides materials is, in general, sale of a future object, but it shall be an industrial lease if the materials are only same as an accessory." (Emphasis supplied.) Castán Tobeñas, op. cit., p. 455. Vélez Torres points out that the differentiating line between a contract for the execution of work, and the sale contract, is "quite blurred". Velez Torres, op. cit., p. 326.

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530(2011)

2011 TSPR 180

58    Velez Torres, op. cit., p. 327.

59    Id., P. 332.

60    Arts. 1481-1482 of the Civil Code, 31 L.P.R.A. secs. 4122-4123.

61    One of these scenarios is whenever the owner releases work while it is being performed. In these cases, the owner must pay for all
      of a contractor's expenses, work and profit that he would obtain from said work. Art. 1486 of the Civil Code, 31 L.P.R.A. sec.
      4127.

62    González Poveda, op. cit., p. 625 This idea arises from the maxim *res perit domino*. C. Gómez Estrada, On the Principal Civil
      Contracts, 3rd ed., Bogotá, Ed. Temis, 1999, p. 322. It should be clarified that, in cases of work upon real estate owned by the
      principal, ownership of the contractor is limited to the work itself and not to the property upon which same was made. On the
      other hand, if it is a question of movable property created entirely by the contractor, regardless of ownership of materials used,
      ownership of the entire property will fall upon the contractor.

63    Martínez Mas, op. cit., p. 27 See also Santamaría, op. cit., pp. 636–637, Castán Tobeñas, op. cit., p. 459; Hernández Bobadilla,
      op. cit., p. twenty.

64    Id. *Exceptio non adimpleti contractus and exceptio non rite adimpleti contractus* fenders will also be available. See Puig Peña,
      op. cit., p. 308. The receipt of work by the owner requires that same be "well finished". Id., P. 303. See also González Poveda, op.
      cit., p. 687; Judgment of the Supreme Court of Spain of April 18, 1979, Aranzadi Repertory of Jurisprudence 1406.

65    *Master Concrete Corp. v. Fraya, S.E.*, *supra*, pp. 624–625.

66    In the instant case, it would be up to the Trial Court, after interpreting the contract and examining the intent of the parties, to
      determine whether the failure to deliver partial certifications constitutes a substantial breach of the contract, and whether, in
      effect, work conforms to what is specified in the contract. For these purposes, see Martínez Mas, op. cit., p. 63, and his discussion
      of partial certifications. See also the Judgment of the Supreme Court of Spain of July 22, 1997, No. 5806/1997 Repertorio de
      Jurisprudencia Aranzadi. It will also be up to one to determine whether, indeed, such work conforms to what is specified within
      the contract.

67    This does not remove any claim which the municipality may have as to whether the contractor's performance is defective,
      incomplete or has deviated from what was agreed upon. At this time we limit ourselves to analyzing whether there is any cause of
      action. It is up to the initial forum to elucidate the merits of this particular case.

68    We know of the problems which can arise in cases where a contractor carries out his work before a contract is set in writing. No
      doubt that municipalities have an important interest in being able to regularly inspect any work while same is being carried out, to
      ensure that contractual specifications are being complied with, and to prevent work from being illegally subcontracted, among
      other issues. Nevertheless, protection of this interest does not require a conclusion, first and foremost, that there is no cause of
      action in favor of the contractor. What does correspond is to examine the merits of the case in a plenary trial, as to determine
      what, how and when said work was carried out, what were the intentions of the parties, and what relationship exists between what
      was contracted and what was executed. None of the foregoing presumes that the contractor should prevail on the merits, but
      merely that he is entitled to his day in court,  and  prove that he delivered what was commissioned.


End of Document

# **<u>CERTIFICATION</u>**

**<u>CERTIFIED</u>**: That the attached document(s) is (are) true and correct translation(s) of the original document(s) from *<u>Spanish</u>* into English.

Moreover, that I am a Federally Certified Court Interpreter & Translator for the Administrative Office of the U. S. Courts within the active list of Certified Interpreters and Translators at the U.S. District Court, for the District of Puerto Rico.

*Carlos T. Ravelo*
**AOUSC Certification # 95-063**



**EXHIBIT A-2**

KeyCite Yellow Flag - Negative Treatment
Distinguished by Industrial Chemicals Corporation v. Autoridad De Energia Electrica, TCA, June 30, 2016

183 D.P.R. 530, 2011 WL 6310212 (P.R.), 2011 TSPR 180

ALCO Corporation, peticionaria,
v.
Municipio de Toa Alta, recurrido.

En El Tribunal Supremo De Puerto Rico.
*Número:* CC-2010-11

**Synopsis**

*Certiorari* para solicitar la revisión de una Sentencia de *Emmalind García García, Aleida Varona Méndez* y *Gretchen I. Coll Martí*, Js. del Tribunal de Apelaciones, que confirmó al Tribunal de Primera Instancia y concluyó que a ALCO Corporation no le correspondía cobrar por la obra efectuada, ya que la reclamación de cobro presentada contra el municipio de Toa Alta proviene de unos servicios prestados antes de la vigencia del contrato presentado en evidencia. *Se confirma la sentencia emitida por el Tribunal de Apelaciones.*

*José A. Sánchez Álvarez* y *Christian O. Cintrón Pérez*, de *Nevares & Sánchez-Álvarez*, abogados de la parte peticionaria; *Ricardo Robles Caraballo*, abogado de la parte recurrida.

El Juez Asociado Señor Martínez Torres emitió la opinión del Tribunal.

Este recurso nos permite analizar si es viable, a la luz de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (Ley de Municipios Autónomos), Ley Núm. 81-1991 (21 L.P.R.A. sec. 4001 *et seq.*), que un contratista realice una obra con anterioridad a la otorgación del contrato por escrito y aun así, cobre por sus servicios si el contrato es otorgado posteriormente.

En vista del interés apremiante que le hemos reconocido a la protección de los fondos públicos, es necesario que la **\*533** otorgación del contrato por escrito ocurra antes de que el contratista empiece a realizar la obra. De esta forma, reafirmamos la "rigurosidad de los preceptos legales que rigen las relaciones comerciales entre entes privados y los municipios, que aspiran a promover una sana y recta administración pública, asunto que está revestido del más alto interés público". *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 829 (1999). Véase, además *Cordero Vélez v. Mun. de Guánica*, 170 D.P.R. 237, 248 (2007).

# I

La peticionaria ALCO Corporation (ALCO) se dedica al suplido, venta, riego y entrega de hormigón asfáltico. En 2002, ALCO compareció a una subasta para la realización de un proyecto de repavimentación en el barrio Lajas, sector Los Rivera Marrero, del municipio de Toa Alta. El 4 de junio del mismo año, la junta de subastas del municipio le notificó al Sr. Alfonso Rodríguez García, presidente de ALCO, mediante carta, la adjudicación a su favor de la subasta ## 02-030. Apéndice del *Certiorari*, pág. 45. Así las cosas, ALCO comenzó a pavimentar el área correspondiente entre los días 25 y 28 de junio de 2002, sin haberse otorgado el contrato. No fue hasta el 16 de julio de 2002 que este se otorgó. En esa misma fecha se registró en los libros municipales y se envió copia a la Oficina del Contralor. El contrato disponía en la cláusula decimoctava que el término para realizar la obra era un elemento esencial del contrato y que ALCO estaba supuesta a comenzar el proyecto en o antes de cinco días luego de otorgado. Apéndice del *Certiorari*, pág. 49. Además, en la cláusula decimocuarta se consignó que la vigencia del contrato sería de treinta días a partir del 16 de julio de 2002 hasta el 14 de agosto del mismo año. Apéndice del *Certiorari*, pág. 48. En otras palabras, el contrato tenía un término de treinta días para realizar la obra. Cabe señalar que esta no era la **\*534** primera vez que ALCO contrataba con el municipio de Toa Alta. Surge del expediente que en el 2000 ganó también la buena pro para otra obra de repavimentación.

Finalizada la obra, ALCO procedió a solicitar el pago de $29,500. Para ello presentó unos comprobantes que reflejaban que la obra se realizó de 25 a 28 de junio de 2002. Tras varios intentos infructuosos con el municipio, ALCO procedió a presentar una demanda para el cobro de dinero. Posteriormente, presentó una moción de sentencia sumaria y varias reconsideraciones que fueron declaradas "no ha lugar".

Luego, el municipio presentó una moción de sentencia sumaria. ALCO se opuso. En su moción, el municipio alegó que "era improcedente la reclamación [de ALCO] toda vez que está sustentada en una obligación contractual supuesta que no guarda relación alguna con la reclamación del trabajo realizado". Apéndice del *Certiorari*, pág. 28. ALCO, por su parte, señaló que "[e]l hecho de que los trabajos hayan sido adelantados en nada responde a maquinaciones fraudulentas, ni malversación de fondos, ni favoritismos, ni cualquier otro asunto de los enfrentados por el Tribunal Supremo". Apéndice del *Certiorari*, pág. 38. Añadió que, contrario a querer cobrar por una obra que no guarda relación alguna con la reclamación del trabajo realizado, "la información del contrato, así como la de la subasta, guardan completa relación con las facturas presentadas por ALCO por los trabajos realizados en el Barrio Lajas". Apéndice del *Certiorari*, pág. 39.

El Tribunal de Primera Instancia desestimó la demanda sumariamente a favor del municipio. Entendió que la obra realizada y las fechas de los trabajos no guardaban relación con las reclamaciones presentadas. Razonó que, ante la rigurosidad de los requisitos de contratación con los municipios,

> ... ningún contrato otorgado por un Municipio puede tener fecha de vigencia posterior a la

fecha de realización de la obra. **\*535** En otras palabras, ALCO no puede pretender cobrarle al Municipio por unas obras realizadas anterior a la fecha de otorgación del contrato en controversia. Claramente se desprende de la prueba presentada por la propia Demandante que las obras que Alco intenta cobrar al Municipio se realizaron en fechas anteriores a la fecha de otorgación del contrato. Dicha acción no haya [sic] cabida en nuestro ordenamiento jurídico. Apéndice del *Certiorari*, pág. 84.

A su vez, razonó que ante los requisitos de forma que exige la ley para contratar con los municipios, no se pueden otorgar contratos para cubrir hechos ocurridos con anterioridad. Apéndice del *Certiorari*, pág. 85.

Inconforme, ALCO recurrió al Tribunal de Apelaciones. Ese foro confirmó al Tribunal de Primera Instancia. Concluyó que a ALCO no le correspondía cobrar por la obra efectuada, ya que la reclamación de cobro presentada contra el municipio proviene de unos servicios prestados antes de la vigencia del contrato presentado en evidencia. Apéndice del *Certiorari*, pág. 169. Concluyó que

> [r]esolver de otra manera trastocaría el sistema de controles de desembolso de fondos públicos establecido, pues se prestaría para que se convalidaran acuerdos llegados entre contratistas y municipios sin cumplir con el proceso establecido por nuestro ordenamiento. ...
>
> ... [E]n vista del interés que representan los fondos públicos, no estamos dispuestos a imponerle al Municipio la responsabilidad de cumplir con el pago de una deuda alegadamente contraída por servicios recibidos en una fecha en la que no se encontraba vigente contrato alguno. Íd., pág. 170.

Insatisfecha nuevamente, ALCO acudió ante nos. Señaló que erró el foro apelativo intermedio al concluir que en este caso no aplica la doctrina de enriquecimiento injusto. Explicó que varios tribunales en otras jurisdicciones de Estados Unidos han impuesto responsabilidad a los municipios que se benefician injustamente de sus propios actos *ultra vires*. También señaló que concluir que no procedía el pago por haberse realizado la obra con anterioridad a la otorgación del contrato desalienta que con el Gobierno, pues se lesiona su credibilidad **\*536** como ente contratante. Añadió que las enmiendas realizadas al Art. 8.016 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4366, y al Art. 1 de la Ley Núm. 18 de 30 de octubre de 1975, por la Ley Núm. 127-2004 (2 L.P.R.A. sec. 97) flexibilizaron los requisitos de contratación con los municipios y "persiguen establecer unas reglas justas y válidas que eviten que el gobierno, incluyendo sus municipios, pierdan credibilidad a la hora de contratar". *Certiorari*, pág. 6.

Asimismo, ALCO arguye que en *Cordero Vélez v. Mun. de Guánica*, supra, sostuvimos que si una subasta es adjudicada y notificada formalmente, y el contratista comienza a trabajar sin haber suscrito un contrato, el cobro de los trabajos queda supeditado a que se firme un contrato, aunque sea en ocasión posterior. En fin, ALCO entiende que como el contrato se otorgó con posterioridad a la realización de la obra, se registró en los libros del municipio y se remitió a la Oficina del Contralor, esta situación es distinta de la casuística que hemos resuelto relacionada con la contratación gubernamental.

El municipio, en su oposición repitió que no le corresponde pagar por una obra realizada con anterioridad a la otorgación del contrato. Añadió que la determinación del Foro de Primera

Instancia al desestimar la demanda se debió a la prueba que ALCO presentó, con la que se demostró que las obras fueron realizadas con anterioridad a la otorgación del contrato. Decidimos expedir el auto de *certiorari*. El 12 de noviembre de 2010 el caso quedó formalmente sometido.


## II

[1] Desde nuestros primeros pronunciamientos en cuanto a la contratación con los municipios, hemos dejado claro que a diferencia de la contratación entre partes privadas, **537** "los preceptos legales que rigen las relaciones económicas entre entidades privadas y los municipios, están revestidos de un gran interés público y aspiran [a] promover una sana y recta administración pública". *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001, 1005 (1994). Por esa razón, en *Quest Diagnostics v. Mun. San Juan*, 175 D.P.R. 994, 1000 (2009), señalamos que "mediante estatutos especiales, el legislador ha impuesto requisitos y condiciones a la contratación con los municipios. A los contratos con entidades gubernamentales se les examina su validez de acuerdo con los estatutos especiales, en lugar de acudir a las teorías generales de contratos". Véanse, además: *Johnson & Johnson v. Mun. de San Juan*, 172 D.P.R. 840, 854–855 (2007); *Cordero Vélez v. Mun. de Guánica*, supra, pág. 252. Por ello, es crucial que los municipios hayan actuado "acorde con los procedimientos establecidos por ley y nuestra jurisprudencia interpretativa" al momento de desembolsar fondos públicos para el pago de las obligaciones contraídas. *Colón Colón v. Mun. de Arecibo*, 170 D.P.R. 718, 725 (2007).


[2] En *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 54 (1988), enumeramos por primera vez los requisitos de forma que deben observarse al momento de pactar acuerdos con los municipios. Estos son: (1) que el acuerdo se haya hecho constar por escrito; (2) que se mantenga un registro fiel con miras a establecer la existencia del contrato; (3) que se remita una copia de este a la Oficina del Contralor, y (4) que se acredite la certeza de tiempo, esto es, que el contrato se otorgó quince días antes. Véanse, además: *Mun. Quebradillas v. Corp. Salud Lares*, 180 D.P.R. 1003 (2011); *Colón Colón v. Mun. de Arecibo*, supra, págs. 726–727; *Cordero Vélez v. Mun. de Guánica*, supra, págs. 248–249. Puntualizamos que es necesario que cada uno de estos requisitos se cumpla rigurosamente, pues "refleja[n] el interés legislativo de evitar pagos y reclamaciones fraudulentas o ilegales, al crear un mecanismo **538** de cotejo para perpetuar circunstancial y cronológicamente dichos contratos". *Ocasio v. Alcalde Mun. de Maunabo*, supra, págs. 53–54.


[3] La necesidad de que los contratos municipales consten por escrito tiene su base en un requisito de carácter formal o sustantivo. El contrato escrito es

l... a mejor evidencia de las obligaciones recíprocas que contraen las partes. Libra a las partes de futuras controversias espúreas [sic] sobre los términos acordados originalmente, pues éstos quedan plasmados de forma objetiva en el acuerdo escrito. Por lo tanto, este requerimiento

protege los derechos tanto del municipio como del contratista, en caso de incumplimiento. *Colón Colón v. Mun. de Arecibo*, supra, pág. 726.

**[4]** Por consiguiente, "los tribunales debemos mirar con cautela reclamaciones fundadas y de acuerdo con contratos, en los cuales las autoridades ejecutantes no han dado cumplimiento a este mandato. Solamente así puede quedar plenamente satisfecho el sentir legislativo y la conciencia judicial adjudicativa sobre desembolsos de fondos públicos". *Ocasio v. Alcalde de Maunabo*, supra, pág. 54. Así pues, "[u]na vez se cumplen [sic] con los requisitos expuestos, los contratos son válidos, exigibles y gozan de la publicidad requerida por nuestro ordenamiento jurídico para la sana administración de la política pública, en cuanto a la contratación municipal se refiere". *Johnson & Johnson v. Mun. de San Juan*, supra, pág. 853. Por ello, "*los municipios no deben exigir la ejecución de servicios sin haber certificado a la parte privada que el acuerdo se redujo a un contrato escrito*, que se registró y que se remitió copia de éste a la Oficina del Contralor según lo dispone la ley". (Énfasis nuestro.) *Lugo v. Municipio Guayama*, 163 D.P.R. 208, 217 (2004), citando a *Las Marías v. Municipio San Juan*, 159 D.P.R. 868, 879–880 (2003). Claro está,

> ... con la aprobación de la Ley Núm. 127 de 31 de mayo de 2004 (2 L.P.R.A. sec. 97), el incumplimiento con el requisito de que **\*539** todo contrato sea registrado y remitido a la Oficina del Contralor tal como lo exigen el Art. 1 de la Ley Núm. 18, *supra* y el Art. 8.016 de la Ley de Municipios Autónomos de 1991, *supra*, no tiene el efecto de anular el contrato en controversia, aunque impide que puedan exigirse las prestaciones hasta tanto el acuerdo se registre y se remita a la Oficina del Contralor. *Mun. Quebradillas v. Corp. Salud Lares*, supra, pág. 1013.

**[5–6]** El Art. 1.003(v) de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4001(v), define *obligación* como "todo compromiso contraído legalmente válido que esté representado por orden de compra, contrato o documento similar, pendiente de pago, debidamente firmado y autorizado por los funcionarios competentes para gravar las asignaciones y que es o puede convertirse en deuda exigible". El Art. 8.004 de la misma ley, 21 L.P.R.A. sec. 4354, ordena que las obligaciones y los desembolsos de fondos se hagan solo para obligar o pagar servicios autorizados por ley, ordenanza o resolución aprobada al efecto, y por los reglamentos adoptados en virtud de estas. 21 L.P.R.A. sec. 4354. Asimismo, el Art. 8.004, íd., dictamina que cuando se autorizan créditos para atender los asuntos de un año fiscal específico, *estos sean aplicados exclusivamente al pago de obligaciones legalmente contraídas y debidamente asentadas en los libros del municipio durante dicho año*. Íd. Esto significa que los fondos destinados para un año fiscal solo pueden ser utilizados para obligaciones legalmente contraídas durante ese año, no para obligaciones contraídas en años anteriores o posteriores. Es decir, "un municipio por lo general no puede pactar el pago futuro de cantidades en exceso de la asignación presupuestada para un contrato en particular". *Johnson & Johnson v. Mun. de San Juan*, supra, pág. 854.

Como vemos, habrá una obligación por parte del municipio *únicamente cuando exista un contrato en virtud de un compromiso legalmente válido*. Por eso es que se exige que todos los

municipios mantengan "un registro de todos los contratos, escrituras y documentos relacionados que otorguen, **\*540** así como de cualquier enmienda a los mismos, determinación, constancia o acción que lo resuelva, o deje sin efecto". Véanse: Art. 8.016 de la Ley de Municipios Autónomos, *supra*; Art. 1 de la Ley Núm. 18 de 30 de octubre de 1975, según enmendada, *supra*. Véase, además, Art. 4 del Reglamento Núm. 33 sobre Registro de Contratos, Escrituras y Documentos Relacionados y Envío de Copias a la Oficina del Contralor, Reglamento Núm. 5743, Departamento de Estado, 28 de enero de 1998, pág. 3.

El contenido de ese registro debe incluir la información siguiente:

(1) Entidad gubernamental. (2) Número del contrato, escritura o documento relacionado. ... (3) *Fecha de otorgamiento.* (4) Contratista. (5) Número de seguro social federal o de cuenta patronal. (6) Valor o cuantía envuelta [sic] de manera total o mensual. Puede ser estimada. (7) Tomo y página del registro. (8) Propósito del contrato, escritura o documento relacionado. (9) *Vigencia. Deberán indicarse las fechas de comienzo y terminación.* (10) Exento. Se indicará si el contrato está exento o no de radicación [sic], según dispone el Artículo 9-a de este Reglamento. Si está exento, se identificará la razón para no radicar [sic] el mismo, utilizando el número de la excepción, según se indica en el Artículo 9-a. (11) Aprobación o dispensa. Se indicará si es o no un contrato que requiere una aprobación previa o dispensa de algún organismo para su otorgamiento. (Énfasis nuestro.) Art. 5 del Reglamento Núm. 5743, págs. 3–4.

La obligación de registrar el contrato en los libros municipales y el requisito de que el contrato conste por escrito responden a propósitos distintos. Así lo explicamos en *Colón Colón v. Mun. de Arecibo*, supra, pág. 730:

Existe una marcada diferencia entre unos requisitos y otros. La exigencia de que un contrato suscrito se anote en la bitácora municipal y su copia se remita a la Oficina del Contralor de Puerto Rico va encaminada a ofrecerle publicidad, frente a terceros, a la contratación municipal. De esta forma los terceros pueden fiscalizarla. Sin embargo, exigir que los contratos suscritos se reduzcan a escrito tiene una insoslayable dimensión de sana administración pública, en la medida que permite **\*541** salvaguardar los intereses de las partes contratantes frente a un incumplimiento, permite la ordenada utilización de los fondos municipales, evita la incertidumbre en la confección del presupuesto municipal y hace posible la adecuada identificación de la partida contra la cual se harán los desembolsos públicos en cumplimiento con la ley. Es decir, los primeros son más que nada de carácter procesal y de ordenada tramitación, mas el último [que el contrato conste por escrito] es sustantivo por su directa relación con la sana administración pública. En atención a lo cual, debemos concluir que el incumplimiento con el requisito de reducir a escrito el contrato municipal por fuerza afecta adversamente la eficacia de las obligaciones contraídas.

**[7]** En resumidas cuentas, "el propósito de los estatutos que regulan la realización de obras y la adquisición de bienes y servicios para el Estado, sus agencias y dependencias, y los municipios, es la protección de los intereses y recursos fiscales del pueblo. De esta forma se evita el favoritismo, el dispendio, la prevaricación y los riesgos del incumplimiento". *Johnson & Johnson v. Mun. de San Juan*, supra, pág. 852. Véanse, además: *Mun. Quebradillas v. Corp. Salud Lares*, supra; *Colón Colón v. Mun de Arecibo*, supra, pág. 725; *Lugo v. Municipio*

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530 (2011)
2011 TSPR 180

*Guayama*, supra, pág. 214; *Hatton v. Mun. de Ponce*, supra, pág. 1005. "A tales efectos, hemos señalado que [las normas esbozadas por la ley y la jurisprudencia] deben ser *rigurosamente* observadas aun en circunstancias de emergencia." (Énfasis en el original.) *Ríos v. Municipio Isabela*, 159 D.P.R. 839, 846 (2003). Véanse, además: *Fernández & Gutiérrez v. Mun. de San Juan*, supra, pág. 833; *Hatton v. Mun. de Ponce*, supra, págs. 1005–1009.

[8] Por último, reiteramos que no es permisible que "personas privadas invoquen remedios en equidad frente a los municipios con los que contratan, porque 'es doctrina reiterada que dichos remedios no se aplicarán cuando resulte(n) contrario(s) a una clara política pública plasmada en un estatuto o en la Constitución' ". *Mun. Quebradillas v.* **\*542** *Corp. Salud Lares*, supra, pág. 1020, citando a *Las Marías v. Municipio San Juan*, supra, págs. 875–876.

# III

[9] Como se desprende de los hechos reseñados, el trabajo se terminó dos semanas antes de la otorgación del contrato por escrito. ALCO aduce que el municipio le solicitó que iniciara la obra antes de la fecha cuando se otorgó el contrato por escrito. Sin embargo, ese hecho no pudo ser probado por ALCO. Más aún, aunque partiéramos de la premisa de que así fue que ocurrió, ello no valida el negocio jurídico efectuado. Recordemos lo que una vez más tenemos que repetir: " 'las partes privadas deben ejercer un rol más activo al contratar con los municipios.' " *Lugo v. Municipio Guayama*, supra, pág. 217. Lo prudente es que los contratistas exijan de los municipios que el acuerdo se pacte por escrito, y se certifique que se registró y se remitió a la Oficina del Contralor. Íd.

Por lo tanto, ALCO realizó el trabajo a finales de junio de 2002 sin tener un contrato escrito que le facultara a realizar esa obra. Con lo único que contaba era con la carta que le adjudicaba la buena pro de la subasta para realizar el proyecto. Eso no era suficiente, pues

> ... desde hace más de tres décadas establecimos que en nuestro ordenamiento "una agencia tiene el derecho de revocar la adjudicación de la subasta antes de que se formalice el contrato correspondiente" .... El fin social que persigue la facultad de rechazar las licitaciones o de cancelar la subasta una vez adjudicada es conceder cierto grado de discreción y flexibilidad que le permita al ente administrativo proteger sus intereses adecuadamente .... (Citas omitidas.) *Cordero Vélez v. Mun. de Guánica*, supra, pág. 248.

Conforme a lo anterior, a pesar de que ALCO ganó la buena pro en la subasta celebrada, ello no le aseguraba que el municipio le concedería el contrato eventualmente. En ese sentido, avalar que ALCO realizara la obra sin contar **\*543** con un contrato por escrito anularía la facultad que tienen los municipios para revocar la adjudicación de una subasta antes de que se celebre el contrato.

Por otra parte, debemos tener en cuenta que "la facultad del municipio de obligar fondos

públicos para el pago de una obligación, está supeditada a que se sigan los procedimientos establecidos por ley". *Cordero Vélez v. Mun. de Guánica*, supra, pág. 248. Por ello, nos hemos inclinado a una norma restrictiva en la contratación municipal. Íd. En este caso la realización de la obra ocurrió en el año fiscal 2001-2002, pero la otorgación del contrato ocurrió en el próximo año fiscal. Esta actuación comprometió los fondos de un año fiscal, para el pago de una obligación contraída ilegalmente en un año fiscal anterior. Todo ello se hizo en clara violación del Art. 8.004 de la Ley de Municipios, *supra*. Ahora bien, lo anterior no significa que no hay obligaciones contraídas legalmente que se puedan pagar en un año fiscal subsiguiente. Siempre que una obligación se haya contraído legalmente en un año fiscal, se justifica su pago aunque este ocurra en otro año fiscal. La justificación es que esos fondos fueron separados para este particular. De la misma manera, tampoco se convalida lo actuado porque ambos eventos se procesaron en el mismo año fiscal. Es necesaria la otorgación previa del contrato por escrito.

Aunque la realidad es más rica que la imaginación, si validamos la contratación efectuada en este caso, en el futuro se podría dar la situación en que un contratista realice deliberadamente la obra con anterioridad, como medida de presión para garantizar la otorgación futura del contrato. Asimismo, podría ocurrir que un contratista que realizó la obra antes de la otorgación del contrato espere a que cambie la administración del municipio para tratar de convalidar su acto, suscribiendo el acuerdo. En consecuencia, se permitiría que un contratista asuma poderes gubernamentales construyendo en épocas críticas sin un contrato formal, como por ejemplo, al concluir un año fiscal o **\*544** en una etapa de transición de una nueva administración municipal. Es decir, validar la teoría que propone ALCO, premiaría a quien se confabule con un funcionario corrupto del municipio para no seguir las normas de una administración pública sana, consciente de que tan pronto culmine la obra tendrá derecho a reclamar compensación sin importar que no se siguió la ley al contratar. En fin, son múltiples las posibilidades de corrupción que se podrían suscitar si permitimos el desembolso del fondo público por una obra realizada antes de la otorgación del contrato por escrito.

Por otra parte, avalar la actuación de las partes acarrearía, en este caso en particular, darle vida retroactiva a un acto que no ocurrió como realmente se expuso en el contrato. Recordemos que la cláusula decimoctava del contrato en cuestión dispone que "el término para realizar la obra es un elemento esencial del contrato y que [ALCO] estaba supuesta a comenzar el proyecto en o antes de cinco días luego de otorgado el contrato". Es decir, ALCO podía comenzar a realizar el proyecto cinco días luego de otorgado el contrato o antes, *pero siempre después de otorgado*. Además, ese mismo contrato señala en su cláusula décimo- cuarta que su *vigencia* es de treinta días *a partir del 16 de julio de 2002* hasta el 14 de agosto del mismo año. ALCO reclama el pago de una obra construida antes de la vigencia del contrato formal.

En su alegato, ALCO hace mención del Art. 1(d) de la Ley Núm. 18, *supra*, y del Art. 8.016 de la Ley de Municipios Autónomos, *supra*, para exponer que con las enmiendas realizadas a estas leyes se flexibilizaron los requisitos de remisión de contratos al Contralor y se estableció que el incumplimiento con esos requisitos no es causa para que un tribunal competente declare la nulidad de cualquier contrato o negocio jurídico legalmente válido. Por eso ALCO entiende que no corresponde en este caso declarar nulo el negocio jurídico efectuado por las partes, aunque el contrato se haya otorgado después de realizada la obra. **\*545**

ALCO argumenta que estas enmiendas se realizaron con el propósito de promover la credibilidad del gobierno como ente contratante, al establecerse unas reglas justas y válidas que eviten que los municipios pierdan su credibilidad a la hora de contratar. Sin embargo, de una lectura de las secciones transcritas vemos que a lo que se refiere el Art. 1(d) de la Ley Núm. 18, *supra*, es al registro que los municipios deberán mantener de todos los contratos que otorguen —incluyendo sus enmiendas— y del envío de copia de estos a la Oficina del Contralor. La ley establece que un tribunal no declarará nulo un contrato o sus enmiendas, porque no consten en los registros municipales o porque no se remitan a la Oficina del Contralor. De esas secciones no se puede interpretar que la intención del legislador fue autorizar retroactivamente un contrato que se otorgue después de realizada la obra.

Un estudio del Informe Positivo sobre la medida (P. de la C. 4243) que rindió la Comisión de Gobierno de la Cámara de Representantes nos confirma esta conclusión. Allí se explicó que la enmienda surgió de la necesidad de revocar el caso *Las Marías v. Municipio San Juan*, supra. En ese caso, este Tribunal resolvió que los contratos no registrados en el Registro de Contratos de la Oficina del Contralor eran nulos e inexigibles. La Comisión de Gobierno explicó:

> Entre las consecuencias injustas de la norma establecida en el caso *Las Marías*, se destaca que quien tiene control del trámite en el Registro del Contralor es la agencia o municipio y que, si la agencia incumple con este requisito, ya sea por descuido, negligencia o intencionalmente, el contrato es nulo y el ente privado no puede cobrar por los servicios o mercancías. Informe Positivo del P. de la C. 4243 de 11 de noviembre de 2003, 6ta Sesión Ordinaria, 14ta Asamblea Legislativa, pág. 2.

Finalmente, la Comisión de Gobierno de la Cámara señaló que la enmienda, "*sin vulnerar los requisitos rigurosos de la contratación gubernamental*, protege al contratante que descansa en la tramitación legal y adecuada por las **\*546** agencias y entidades gubernamentales de los requisitos exigidos por ley". (Énfasis nuestro.) Íd., pág. 3.

Como se puede apreciar, la razón principal que motivó a la Asamblea Legislativa a enmendar el Art. 1(d) de la Ley fue que los contratistas no son los encargados de remitir los contratos a la Oficina del Contralor. Ese es un acto que no depende de la diligencia del contratista, sino del municipio o la agencia contratante. Por ende, el legislador consideró injusto penalizar al contratista por algo que no dependía de su voluntad. Sin embargo, la Comisión de Gobierno enfatizó que la enmienda era meritoria porque no vulneraba los requisitos estrictos que imperan en la contratación gubernamental. Uno de esos requisitos es, precisamente, la existencia de un contrato escrito.

Exigirles a los contratistas que se aseguren de que haya un contrato escrito antes de realizar la obra no depende de otra parte. Tampoco los coloca en una posición desventajosa como partes contratantes. Por el contrario, les garantiza que podrán cobrar por la obra, ya que cuentan con la garantía más segura de la existencia y alcance de la obligación contraída: el contrato escrito. Recordemos que ya en el pasado hemos dicho que "aquella parte privada que se cruce de brazos y preste servicios sin exigir prueba fehaciente de que el Gobierno cumplió con su deber, se arriesga a asumir la responsabilidad por sus pérdidas". *Lugo v. Municipio Guayama*, supra, pág. 218. Véase, además, *Colón Colón v. Mun. de Arecibo*, supra, pág. 729.

Por otro lado, ALCO asegura que en *Cordero Vélez v. Mun. de Guánica*, supra, sostuvimos que

si una subasta es adjudicada y notificada formalmente, y el contratista comienza a trabajar sin haber suscrito un contrato, el cobro de los trabajos queda supeditado a que se firme un contrato aunque sea en ocasión posterior. *Certiorari*, pág. 7. No tiene razón.

La controversia que tuvimos fue si procedía la acción por incumplimiento contractual y daños y perjuicios contra **\*547** el municipio, en virtud de una subasta que no se adjudicó formalmente y que tampoco culminó en el otorgamiento de un contrato escrito. Resolvimos que no.

En *Cordero Vélez*, el Municipio de Guánica celebró una primera *subasta* en abril de 2001 para la compra de combustible hasta el 30 de junio del mismo año. A esa subasta asistió el señor Cordero Vélez, a quien posteriormente se le notificó por carta que había obtenido la buena pro para el suministro de combustible. Sin embargo, nunca se celebró contrato. No obstante lo anterior, el municipio adquiría el combustible del garaje del señor Cordero Vélez. Posteriormente, se celebró otra subasta para el periodo de julio de 2001 hasta el 30 de junio de 2002. El señor Cordero Vélez fue el único que asistió a la subasta. Según alegó, el Secretario Municipal le indicó que le iban a adjudicar la subasta ya que había sido el único licitador. No obstante, nunca recibió notificación por escrito informándole la adjudicación de la subasta. Luego de varios trámites, el señor Cordero Vélez se enteró de que el municipio también le compraba combustible a otro detallista. Así pues, auscultó con el municipio la razón de la no exclusividad en la compra de combustible. El municipio le comunicó que él no tenía una subasta adjudicada, por lo que procedió a descontinuar el pago y la compra de combustible en su estación.

Inconforme, el señor Cordero Vélez presentó una acción de cobro de dinero e incumplimiento de contrato. Alegó que con la segunda subasta se estableció una relación contractual entre el municipio de Guánica y él. El Foro de Primera Instancia concluyó que el municipio de Guánica le adjudicó al señor Cordero Vélez la segunda subasta (2001–2002). Entendió que el municipio, por voz de su Secretario Municipal, le indicó al señor Cordero Vélez que le había adjudicado la subasta. Por ello, concluyó que de la subasta nació una relación contractual entre ambas partes.

El Tribunal de Apelaciones confirmó parcialmente al foro de primera instancia. El tribunal intermedio concluyó **\*548** que carecía de elementos de juicio para intervenir con la determinación del Foro de Primera Instancia. No obstante, reconoció que el pago de una obligación municipal con fondos públicos está condicionado a que se sigan los procedimientos establecidos por ley. Por ello, ordenó que se otorgara un contrato por escrito, se inscribiera en el registro municipal de contratos y se notificara a la Oficina del Contralor junto con copia de la sentencia.

Tras un análisis de la controversia que tuvimos ante nos, señalamos con relación a la primera subasta que

> ... [a]unque procedía otorgar un contrato escrito y cumplir con las formalidades legales para que el municipio pudiera desembolsar fondos públicos conforme al derecho aplicable, no existe controversia respecto al cumplimiento con los términos de esta subasta.

La controversia en el caso de autos gira en torno a otra subasta, la celebrada en mayo de 2001 para el año fiscal 2001–2002. Al aplicar los preceptos antes expuestos sobre el procedimiento para la celebración y adjudicación de subastas municipales, resulta indiscutible sostener que — contrario a la anterior— la subasta en cuestión no se adjudicó. *Cordero Vélez v. Mun. de*

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530 (2011)
2011 TSPR 180

*Guánica*, supra, pág. 250.

De lo transcrito se puede apreciar que en *Cordero Vélez v. Mun. de Guánica*, supra, no dijimos que la realización de una obra con anterioridad a la otorgación del contrato la convalida. No entramos a dilucidar los méritos de la primera subasta. Solo señalamos que, en efecto, se le adjudicó la subasta al señor Cordero Vélez, pues la Junta de Subastas le envió una carta en la que le informaba que había ganado la buena pro y que las partes debieron haber contratado por escrito. Por consiguiente, no podemos concluir que este Tribunal validó en *Cordero Vélez* que las obras se pueden realizar con anterioridad a la otorgación de los contratos, pues ni tan siquiera analizamos esa vertiente. Solo resolvimos que la segunda subasta no se le adjudicó al señor Cordero Vélez, pues el hecho de que el Secretario Municipal le comentara verbalmente que la subasta se le iba a adjudicar no era suficiente para obligar al municipio a **\*549** otorgar formalmente esa subasta y perfeccionar un contrato escrito.

Contrario a la interpretación que ALCO hace, en *Cordero Vélez v. Mun. de Guánica*, supra, indicamos que no hubo una ratificación del otorgamiento de la subasta por el hecho de que el municipio comprara en la estación del señor Cordero Vélez. Enfatizamos que

[e]n este caso, nunca se otorgó un contrato por escrito. Tampoco se satisfizo *ninguna* de las formalidades aplicables a los contratos municipales, las cuales se exigen rigurosamente con miras a proteger el interés público. La salvedad que establece la referida Ley Núm. 127 en cuanto a que no será nulo un contrato válido que no haya sido registrado o remitido a la Oficina del Contralor, no tiene el efecto de alterar la política pública que permea la normativa en torno a la contratación municipal ni exime del cumplimiento con los requisitos antes descritos que hacen exigibles acuerdos que no son legalmente válidos. Es más, la referida disposición parte de la premisa de que se perfeccionó un contrato y de que éste es válido. Puesto que, en el caso de autos, la relación entre el señor Cordero Vélez y el municipio nunca alcanzó la obligatoriedad de un pacto bilateral, resolvemos que al no haber contrato, no procedía ordenar el cumplimiento de ninguna formalidad, contrario a lo resuelto por el Tribunal de Apelaciones. (Énfasis en el original.) Íd., pág. 252.

En fin, señalamos que "en vista del interés que representan los fondos públicos, no estamos dispuestos a imponerle al municipio la responsabilidad de cumplir con un contrato que nunca se perfeccionó". Íd., pág. 253.

ALCO aduce que de nuestro lenguaje se puede concluir indirectamente que si se hubiese otorgado el contrato para la segunda subasta, habría procedido el pago. Ese análisis extiende demasiado lo dicho en *Cordero Vélez v. Mun. de Guánica*, supra, que es un caso sobre la validez de la adjudicación de una subasta y no sobre si una obra puede ser realizada con anterioridad a la otorgación por escrito del contrato. Contrario a lo que ALCO alega, en el mismo caso rechazamos la solución sugerida por el foro apelativo intermedio, que ordenó que se otorgara un contrato por escrito, **\*550** se inscribiera en el registro municipal de contratos y se notificara a la Oficina del Contralor junto con copia de la sentencia para entonces validar el negocio jurídico. De haber entendido que se podía convalidar lo hecho, habríamos confirmado el remedio de que el contrato se otorgara retroactivamente, pero no lo hicimos.

No estamos avalando que un municipio se beneficie de una obra o un servicio, sin pagar. Tampoco estamos ante un reclamo judicial al funcionario municipal que instó a ALCO a realizar

la obra sin que mediara un contrato escrito. Por consiguiente, en lo que al municipio respecta, nos ceñimos al derecho aplicable y reiteramos que el contratista debió exigir un contrato por escrito antes de comprometer sus recursos y realizar la obra. Como toda empresa comercial, ALCO debía conocer los requisitos de ley para contratar con un municipio y debió exigir su cumplimiento de manera activa. Véase *Lugo v. Municipio Guayama*, supra, pág. 217. La ignorancia de esos requisitos de ley no excusa su incumplimiento. Concluir lo contrario propiciaría sin quererlo, "el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia, el descuido y los riesgos de incumplimiento en la administración pública". *Lugo v. Municipio Guayama*, supra, pág. 220.

> "La corrupción y el desembolso indebido o ilegal de fondos públicos —en sus formas múltiples, a veces burdas y otras sofisticadas— son actos incompatibles con el sistema de gobierno democrático consagrado en nuestra Constitución y apuntalado en el respeto a la dignidad humana y los dineros del pueblo como único soberano." *E.L.A. v. Soto Santiago*, 131 D.P.R. 304, 322 (1992), citando *A.E.E. y A.A.A. v. P.N.P.*, 128 D.P.R. 294, 294–295 (1991), voto concurrente del Juez Asociado Señor Negrón García, al cual se unieron los Jueces Asociados Señores Rebollo López y Andréu García.

Al presente, la Sec. 6 del Capítulo IX del Reglamento de Administración Municipal de la Oficina del Comisionado de Asuntos Municipales (O.C.A.M.), aplicable a todos los gobiernos municipales, establece: **\*551**

> Sección 6: *Contratos de Construcción, Obras y Mejoras Públicas*
>
> Todo contrato para la construcción de obras y mejoras, debe realizarse luego de celebrada una subasta pública, cuando el costo total de la obra exceda de cien mil ($100,000) dólares. De no exceder dicha cuantía, la contratación de la obra podrá realizarse mediante la solicitud de por lo menos tres (3) cotizaciones.
>
> El *contrato* debe estipular la cuantía máxima del costo de la obra y la forma de pago e identificar la manera en que se llevará a cabo el monitoreo o la inspección de la obra. Debe proveer además, para la retención de un diez por ciento (10%) de cada pago parcial, hasta que termine la obra o esté sustancialmente terminada, conforme los requisitos de Ley, y sea debidamente inspeccionada y aceptada por el municipio.
>
> Los municipios deben incluir en sus contratos las cláusulas resolutorias en casos de incumplimiento y cláusulas penales o de daños líquidos por cumplimiento tardío. También deben estipular cláusulas que regulen la sub-contratación de trabajos para la obra y de relevo de responsabilidad, entre otras. Deben cumplir con la permisología requerida por las agencias concernientes y con los requisitos establecidos en este Reglamento.
>
> Los contratos de construcción de obras y mejoras sufragados con fondos federales "Community Development Block Grant" (CDBG), deben cumplir con los requerimientos de la regulación federal aplicable y con las directrices de la Oficina. (Énfasis suplido.) Reglamento para la Administración Municipal, Oficina del Comisionado de Asunto Municipales, Reglamento Núm. 7539, Departamento de Estado, 18 de julio de 2008, pág. 159.

De una lectura de esta sección, resulta inescapable concluir que el contrato escrito tiene que suscribirse previo a la ejecución de la obra. *En caso contrario, se ignoraría el interés público de*

*regular las inspecciones de la obra y restringir los parámetros de subcontratación, entre otras medidas cautelares contempladas en la citada sección.*

Esa norma no es nueva. Al acudir al anterior Reglamento sobre Normas Básicas de O.C.A.M. nos encontramos con una prohibición expresa a la retroactividad del contrato. La Sección 5(17) del Capítulo I precisaba que la obligación es "un compromiso que esté representado por orden de compra, *contrato*, o documento similar pendiente **\*552** de pago, que deberá estar firmado por el funcionario autorizado para gravar las asignaciones en el municipio y *que puede convertirse en el futuro en deuda exigible*." (Énfasis nuestro.) Reglamento Revisado sobre Normas Básicas para los Municipios de Puerto Rico, Reglamento Núm. 3052 de la Oficina del Comisionado de Asuntos Municipales, 30 de junio de 1995, pág. 4. El resultado al que llegamos hoy es cónsono con esa reglamentación.

Ante ese cuadro, resulta inescapable que, en toda obra o mejora pública municipal tiene que mediar un contrato por escrito, previo a su ejecución. No debemos excusar el cumplimiento de la normativa que impone al gobierno municipal establecer unas garantías contractuales y protecciones del interés público. Realizar una obra antes de firmar esas cláusulas privaría al gobierno municipal y a los constituyentes de protegerse de subcontrataciones ilegales o de la realización de trabajos sin inspecciones ni supervisiones, entre otras deficiencias.

En este caso tampoco aplica la doctrina de enriquecimiento injusto. Aquí no opera la excepción que permite a un organismo gubernamental invocar los remedios en equidad para evitar un resultado contrario a una política pública estatuida en una ley o en la Constitución. Véase *Mun. Quebradillas v. Corp. Salud Lares*, supra. Por el contrario, "permitir una acción en equidad contra un municipio para exigir una prestación producto de un contrato nulo violaría la política pública establecida en la Ley Municipal". Íd., pág. 1018.

Por esa razón rechazamos la posibilidad de importar el enfoque de otras jurisdicciones, bajo el cual se convalida la obligación pública sin contrato escrito, mediante la aplicación de figuras en equidad, incluyendo la doctrina de enriquecimiento injusto. Véase, para una propuesta al respecto, L. Muñiz Argüelles y J. Alvarado Vázquez, *Obligaciones y Contratos*, 77 (Núm. 2) Rev. Jur. U.P.R. 645 (2008). **\*553**

A pesar de lo anterior, comprendemos que puede que en este caso parezca justo compensar al contratista. Al respecto, un reconocido autor, profesor distinguido en la materia, ha planteado una alternativa: "¿No debería responder el funcionario por el daño patrimonial que sufre el contratista que de buena fe provee un servicio por su representación engañosa de que se le ha adjudicado un contrato? Estas obligaciones de los funcionarios serían herramientas más efectivas para atajar la corrupción gubernamental, pero ciertamente deben surgir de acción por parte de la Legislatura". Muñiz Argüelles, íd., págs. 650–651.

## IV

Por los fundamentos expuestos, se confirma la sentencia emitida por el Tribunal de Apelaciones. Ese foro actuó conforme a derecho al convalidar la sentencia sumaria dictada a favor del

municipio de Toa Alta. El foro apelativo intermedio correctamente identificó el peligro de validar actos como el que aquí se suscitó, no importa las buenas intenciones de quien lo proponga. "Resolver de otra manera trastocaría el sistema de controles de desembolsos de fondos públicos establecidos, pues se prestaría para que se convalidaran acuerdos llegados entre contratistas y municipios sin cumplir con el proceso establecido por nuestro ordenamiento." *Certiorari*, pág. 170. Nuestra labor indelegable de velar por la legalidad en el desembolso del dinero de nuestro Pueblo, nos compele a no admitir este tipo de contratación retroactiva. Resolver de otra forma menoscabaría la normativa rigurosa que la Asamblea Legislativa le ha impuesto a la contratación municipal.

*Se dictará sentencia de conformidad.*

La Juez Asociada Señora Rodríguez Rodríguez concurrió con el resultado sin opinión escrita. La Jueza Asociada **\*554** Señora Fiol Matta disintió con una opinión escrita, a la que se unió el Juez Presidente Señor Hernández Denton.


**--O--**


Opinión disidente emitida por la Jueza Asociada Señora Fiol Matta, a la que se une el Juez Presidente Señor Hernández Denton.

La Opinión del Tribunal en este caso parte de la premisa equivocada de que la totalidad de la prestación de la parte peticionaria se hizo antes de otorgarse el contrato por escrito. Al hacerlo, no discute ni precisa las características y elementos constitutivos del tipo de contrato acordado en este caso. Tratándose de un contrato de ejecución de obra, en el cual la prestación principal tiene lugar al *entregarse* la obra acordada, lo que nos correspondía determinar era si antes de esa entrega se habían dado los requisitos para el perfeccionamiento de la obligación establecidos en la normativa sobre contratos municipales. La Opinión mayoritaria añade, innecesariamente, un requisito formal constitutivo a los contratos municipales que no está contemplado por la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (Ley de Municipios Autónomos), Ley Núm. 81-1991 (21 L.P.R.A. sec. 4001 *et seq.*), entiéndase, el tener que plasmar el contrato por escrito antes de que se lleve a cabo la obra solicitada. Por no coincidir con el análisis mayoritario, me veo en la obligación de disentir.


**I**

El 4 de junio de 2002, el municipio de Toa Alta notificó a la peticionaria ALCO Corporation (ALCO) que recibió la buena pro de la subasta 02-030 para un proyecto de repavimentación en el barrio Lajas de ese municipio. El contrato de ejecución de obra se perfeccionó el 16 de julio de **\*555** 2002, fecha en la que *se puso por escrito, se registró en los libros municipales y se*

*envió copia a la Oficina del Contralor.* El costo de la obra ascendía a $29,500. El contrato tendría una duración de aproximadamente un mes.[1] No hay controversia en cuanto a que ese contrato cumplió con los cuatro requisitos formales que exige La Ley de Municipios Autónomos para los contratos municipales.

Según la peticionaria, el municipio de Toa Alta le solicitó que *iniciara* el trabajo de repavimentación *antes* de la fecha en la que se perfeccionaría formalmente el contrato.[2] De lo que no hay controversia es que a finales de junio de 2002, ALCO llevó a cabo el trabajo de repavimentación según descrito en la subasta 02-030 y, eventualmente, en el contrato de ejecución de obra de 16 de julio.[3] Es decir, realizó su trabajo antes de perfeccionarse el contrato.[4] Sin embargo, la certificación final de la obra, con miras a que ésta fuera aceptada y recibida por el municipio de Toa Alta, se hizo el 31 de julio de 2002, es decir, durante el término de vigencia del contrato.[5] No obstante, el municipio rehusó certificar la obra y no desembolsó pago alguno a favor de ALCO.

Tras unas gestiones de cobro infructuosas, ALCO presentó una demanda para cobro de dinero contra el municipio de Toa Alta, reclamando $29,500 por el trabajo realizado como una deuda vencida, líquida y exigible. Ambas partes solicitaron sentencia sumaria. El municipio alegó **\*556** que era "improcedente la reclamación presentada en su contra por estar sustentada en una supuesta obligación contractual que no guarda relación alguna con la reclamación por el trabajo realizado".[6] Adujo, en particular, que como el trabajo de repavimentación se llevó a cabo antes de que el contrato se pusiera por escrito según exige la normativa relativa a los contratos municipales, no estaba obligado a cumplirlo.[7]

El Tribunal de Primera Instancia declaró "con lugar" la moción de sentencia sumaria presentada por el municipio y desestimó la demanda. En síntesis, determinó que ALCO no podía cobrar por un trabajo realizado antes de que se perfeccionara el contrato de ejecución de obra. Inconforme, ALCO recurrió al Tribunal de Apelaciones. El foro intermedio, en lo pertinente, confirmó el fallo del tribunal de instancia. El Tribunal de Apelaciones determinó que, como el contrato perfeccionado el 16 de julio no hacía mención de que la obra había comenzado antes de la fecha de vigencia del contrato y disponía que cualquier cambio al mismo debía hacerse por escrito, ALCO no podía reclamar pago alguno por los trabajos realizados antes del perfeccionamiento.

Inconforme, ALCO recurrió ante este Tribunal. En lo pertinente, alegó que el Tribunal de Apelaciones erró al concluir que ALCO no podía reclamar el pago por la obra ejecutada, porque el trabajo sobre la obra se hizo antes de haberse perfeccionado el contrato. En particular, ALCO cuestiona si se puede "desestimar una demanda sobre cobro de dinero de unos trabajos debidamente subastados, presupuestados, realizados al amparo de un contrato escrito **\*557** y firmado, archivado en los libros del Municipio y remitido a la Oficina del Contralor, [por el hecho de que] el contratista respondió a la petición [del] Municipio de adelantar los trabajos unos días".[8] Con ello, alega la peticionaria, se lesionaría la credibilidad del gobierno como ente contratante. Por su parte, el municipio se centra en el hecho de que "las obras en cuestión fueron realizad[a]os con anterioridad a la prestación [sic] del [contrato]".[9] Además, alegó que no se demostró que el municipio solicitara que se adelantara la obra. Finalmente, argumenta que los contratos "no pueden ser otorgados para cubrir hechos ocurridos antes de la otorgación [de los mismos]".[10]

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530 (2011)
2011 TSPR 180

## II

La facultad de los municipios para contratar, y el consiguiente derecho de los contratistas a reclamar que éstos cumplan con sus prestaciones, está condicionada a que el contrato acordado cumpla con unos requisitos formales.[11] Éstos son: (1) que el acuerdo se haya hecho constar por escrito, (2) que se mantenga un registro fiel con miras a establecer la existencia del contrato, (3) que se envíe copia de éste a la Oficina del Contralor y (4) que se acredite la certeza del tiempo, esto es, que el contrato se otorgó no más de quince días antes.[12] Estos requisitos deben ser observados rigurosamente "ya que su ausencia priva de *eficacia* y *validez* el acuerdo con el municipio". (Énfasis **\*558** suplido.)[13] Es decir, "ningún municipio podrá satisfacer deuda alguna que no surja de un contrato que conste por escrito y que a su vez haya sido registrado y remitido a la Oficina del Contralor". (Énfasis suprimido.)[14] Para que los contratos otorgados por un municipio sean válidos y tengan, por lo tanto, efecto vinculante entre las partes, tienen que cumplir con estos requisitos formales.[15] Un acuerdo en contravención a estas normas es ineficaz.[16]

Como bien dice la Opinión mayoritaria, estos requisitos, y su rigurosa observancia, tienen como objetivo la sana y recta administración pública.[17] Hemos afirmado que este objetivo es "del más alto interés público".[18] El propósito de esta política no es favorecer al municipio, sino proteger los fondos públicos.[19] Constantemente hemos manifestado que la buena administración de un gobierno es una virtud de la democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficiencia, honestidad y corrección para proteger los intereses y el dinero del Pueblo al cual ese gobierno representa.[20] De esta manera se evita "el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido de otorgarse los contratos, y minimizar los riesgos de **\*559** incumplimiento".[21] Por lo tanto, es deber de los tribunales evitar que se burlen las disposiciones legales que protegen los fondos públicos y la integridad en la gestión gubernamental.[22]

El cumplimiento con los requisitos formales mencionados tiene un "carácter *constitutivo* respecto a la *eficacia* de las obligaciones contraídas". (Énfasis suplido.)[23] Un contratista que pacte con un municipio sin que se cumplan estos requisitos asume el riesgo de no poder exigirle a la entidad municipal el cumplimiento de la obligación. Mientras haya incumplimiento, el contratista no tendrá causa de acción.[24] En particular, hemos insistido en la necesidad de que los contratos municipales se pongan *por escrito*, elemento que hemos descrito como "indispensable ... para que lo convenido tenga efecto vinculante". (Énfasis suprimido.)[25]

Ahora bien, una vez se cumplen los requisitos formales de contratación, los contratos entre la entidad municipal y el contratista son válidos y exigibles.[26] En esos casos, lo que resta es analizar el negocio jurídico pactado y las obligaciones asumidas, como ocurre con cualquier otra relación contractual.[27] En *De Jesús González v. A.C.*, manifestamos **\*560** que "[c]uando el Estado contrata, la interpretación del contrato debe hacerse como si se tratara de una contratación entre dos personas particulares .... Ello significa que una vez el Estado suscribe un

contrato con una persona privada, ambos están obligados por las normas generales relativas a los contratos y sus correspondientes interpretaciones a la luz de nuestros pronunciamientos aplicables". (Citas omitidas.)[28] Claro está, será a partir del cumplimiento con los requisitos de forma que el municipio quedará obligado frente al contratista y éste podrá requerirle el pago del precio acordado.

La Opinión del Tribunal acepta que, en este caso se cumplieron los cuatro requisitos de la Ley Núm. 81[29] pero añade un quinto requisito de forma que no está establecido en la Ley de Municipios Autónomos: que el contrato se ponga por escrito antes de que comiencen las labores del contratista. Esto con el propósito de evitar, según la mayoría, que un contratista realice una obra sin contrato y luego exija el pago al municipio. Sin embargo, la mayoría olvida que, como la firma del contrato es requisito *sine qua non*, si el contratista lleva a cabo la obra y no se firma un contrato, *no podrá exigirle nada al municipio.* Es más, en una situación de ejecución de obra, como la presente, nada obliga al municipio a firmar el contrato y pagar la obra. Ahora bien, si el propio municipio *decide voluntariamente* obligarse después de realizada la obra, observando los requisitos de la Ley de Municipios Autónomos, no hay nada en esta que le prohíba hacerlo.[30]
**\*561**

# III

Aun si coincidiéramos con la mayoría en que el contrato debe perfeccionarse por escrito antes de que se lleve a cabo el trabajo solicitado, ello no resuelve la controversia que nos plantea este caso. No podemos perder de perspectiva que estamos ante un contrato *de arrendamiento de obra.* Por lo tanto, para determinar cuándo debió haberse perfeccionado el contrato en este caso, es necesario examinar esta figura contractual antes de fijar el momento en que debieron cumplirse los requisitos de forma de la Ley de Municipios Autónomos, incluso el nuevo requisito de irretroactividad establecido por el Tribunal. No propongo que se ignoren los estatutos especiales y se recurra exclusivamente a la teoría general de los contratos. Más bien, recuerdo que, como tribunal, nos corresponde examinar la interacción entre la ley especial y las diferentes figuras de nuestro derecho contractual, pues no todos los contratos son iguales.

Mediante el contrato de arrendamiento de obra, también conocido como *contrato de obra, contrato de empresa* o *contrato de ejecución de obra*,[31] una parte se obliga a ejecutar una obra a cambio de un precio establecido previamente.[32] En particular, como nos explica Puig Brutau, éste "es el contrato por el que una de las partes ... se obliga frente a la otra ... a la producción *de un determinado resultado* con su actividad independiente, a cambio **\*562** de un precio cierto". (Énfasis suplido.)[33] La correlación entre el contrato de arrendamiento de obra y la producción de un resultado es una característica universalmente aceptada por la doctrina.[34] A igual conclusión ha llegado, consistentemente, el Tribunal Supremo de España.[35] Como se desprende del propio término, el énfasis en el resultado apunta, necesariamente, hacia un elemento temporal: se trata de la culminación de un proceso productivo.[36]

A. En el contrato de arrendamiento de obra, las obligaciones principales del contratista son: (1)

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530 (2011)

2011 TSPR 180

realizar la obra y (2) *entregarla.*[37] Por su parte, el dueño de la obra tiene dos obligaciones esenciales: (1) *recibir* la obra[38] y (2) pagar el **\*563** precio en la forma, la cuantía y el tiempo convenidos.[39] Nos corresponde ahora analizar por separado estas prestaciones para luego discutir cómo interactúan entre sí.

Si bien la característica fundamental del contrato de arrendamiento de obra es la producción de un resultado, el proceso que conlleva ese producto está compuesto, a su vez, de un trabajo inicial y una entrega final. Ahora bien, dada la importancia del resultado, el trabajo inicial es únicamente un primer paso en el cumplimiento de la prestación a la que se obliga el contratista. Es decir, no se trata de dos prestaciones independientes —trabajo inicial y entrega final— sino una sola obligación de producir un resultado que, aunque comienza con el trabajo, culmina con su entrega.[40] Por otra parte, *la entrega constituye el momento definitivo en que el contratista cumple con su obligación.* Si un contratista ejecuta la obra pero no la entrega, no habrá cumplido con su prestación. Por lo tanto, realizar la obra únicamente resulta insuficiente.[41] *La entrega de la obra completada constituye el cumplimiento definitivo de la prestación por parte del contratista.* Por tal razón, la doctrina ha enfatizado considerablemente el elemento de la entrega al discutir la figura del contrato de arrendamiento de obra como elemento central de la obligación **\*564** del contratista.[42] Igual ocurre en la jurisprudencia del Tribunal Supremo de España.[43]

Como consecuencia de la importancia del resultado en este contrato, algunos tratadistas han enfatizado que, más que ejecutar la obra, la prestación *principal* del contratista es, precisamente, *entregar* la obra ejecutada. Nos explica Castán Tobeñas que "la prestación de la cosa (debidamente confeccionada), eso es, su *enajenación*, aparece como la *prestación principal*, siendo la *realización* de la cosa únicamente el *medio* para hacer posible aquélla". (Énfasis suplido.)[44] Es decir, el trabajo sobre la obra es el medio, pero su entrega es el fin. Para Martínez Mas, la entrega de la obra es parte inherente de su terminación y, por lo tanto, del cumplimiento de la obligación por parte del contratista.[45] Nos dice el tratadista que "[l]a *última obligación del constructor en la fase final del cumplimiento del contrato, es la entrega de la obra al promotor*". (Énfasis suplido.)[46] Es de notar que la obligación del dueño de pagar *no surge cuando el contratista termina de ejecutar la obra, sino, efectivamente, cuando la entrega* y el dueño la recibe. **\*565**

El contrato de arrendamiento de obra es "un contrato bilateral. Es decir, que las personas que lo celebran se imponen obligaciones recíprocas".[47] Por su propia naturaleza, las contraprestaciones en el contrato de arrendamiento de obra tienen un orden temporal. Primero, hace falta que el contratista ejecute y entregue la obra. Sólo entonces el dueño tiene la obligación de recibirla y pagar. Como explican Lete del Río y Lete Achirica, la recepción de la obra es "otra de las obligaciones del comitente, *correlativa* a la del contratista de *entregar* la obra". (Énfasis suplido.)[48] A igual conclusión llegó el Tribunal Supremo de España:

> [E]l arrendamiento de obra ... es un contrato bilateral originador de obligaciones recíprocas, en el que el crédito del contratista no se dirige escuetamente a la prestación de pago del precio por parte del comitente, sino a una contraprestación, eso es, a la prestación del cobro del precio *a cambio de su prestación de entrega de la obra ejecutada.* (Énfasis suplido.)[49]

B. Como hemos dicho, la prestación principal del contratista en el contrato de arrendamiento de

obra es la producción y entrega de determinado *resultado*.[50] Esto es, precisamente, lo que lo distingue del contrato de arrendamiento de servicios. Al respecto, nos ilustra Vélez Torres que en el contrato de arrendamiento de servicios "lo prometido por el contratista es la *energía del trabajo*, mientras que en [el arrendamiento de obras] lo que se promete es la obra o *resultado final del trabajo*". (Énfasis suplido.)[51] Puig Peña acoge el mismo criterio: "[E]l contratista no promete sólo su trabajo, sino el resultado del **\*566** mismo."[52] Esto corresponde a la contraprestación que debe realizar el dueño de la obra, pues éste debe, además de pagar el precio pactado, *recibir* el la obra. En otras palabras, más que el pago de un precio cierto a cambio de un esfuerzo realizado, en el contrato de arrendamiento de obra el dueño realiza un pago al contratista por un resultado entregado y recibido. La doctrina científica distingue unánimemente el contrato de arrendamiento de obra del contrato de arrendamiento de servicio, estableciendo claramente la diferencia entre el resultado a entregarse y el esfuerzo realizado.[53] Lo mismo ocurre con la jurisprudencia española.[54]

Lo anterior es producto, como nos explica Puig Brutau, de que en el contrato de arrendamiento de obra el contratista realiza su trabajo "de manera independiente".[55] Por lo tanto, lo que éste debe al dueño no es un esfuerzo realizado sino un resultado final. Esto es compatible con lo que **\*567** señala Castán Tobeñas de que la realización de la obra es meramente el medio hacia el fin de su entrega.[56]

De manera congruente, nos explica Puig Brutau que el contrato de arrendamiento de obra y el contrato de compraventa se distinguen porque en el primero el resultado entregado es una "cosa nueva" o "*recién hecha*". (Énfasis suplido.)[57] En otras palabras, en el contrato de arrendamiento de obra el resultado entregado no puede ser una obra prefabricada genéricamente, sino que debe ser producto de un encargo particular.[58] *Pero tampoco tiene que efectuarse, necesariamente, después del perfeccionamiento del contrato*, bastará con que sea una obra de recién fabricación. Lo fundamental es que la prestación principal de la entrega del resultado se haga después de perfeccionado el contrato. Será con la entrega del resultado encargado, la recepción de la obra y el pago del precio acordado que se extinguirán las respectivas obligaciones, siempre que lo entregado se ajuste a lo encargado en el contrato.[59]

Lo anterior está en sintonía con la naturaleza independiente del trabajo realizado por el contratista. Por eso, el Código Civil establece que, si la obra se destruye antes de su entrega, la pérdida será a costa del contratista y no del dueño, salvo que éste haya incurrido en mora en la recepción **\*568** de la obra o que el dueño haya suplido materiales defectuosos.[60] Antes de la entrega y recepción, el *trabajo* realizado por el contratista es *suyo* y solamente en casos muy específicos podrá reclamar el pago al dueño de la obra.[61] Como explica González Poveda: "[S]e entiende que, *en tanto no se produce la entrega, la cosa es propiedad del contratista*, por lo que éste debe correr con los riesgos de la misma de acuerdo con el principio general de derecho de que las cosas perecen para su *dueño*." (Énfasis suplido.)[62] Según Martínez Mas, la discusión del riesgo está atada a la naturaleza propia del contrato de arrendamiento de obra, que, como hemos visto, se basa más en el resultado entregado que en el trabajo empleado. Nos dice el tratadista:

> La razón de que el constructor asuma los riesgos por [el] perecimiento de la obra antes de su entrega, radica en que, en el contrato de obra, la remuneración del constructor no es por el trabajo empleado y por los materiales incorporados a la obra, sino por la conclusión de la

misma, por lo que parece lógico que soporte el riesgo de su fracaso o la pérdida de la obra casi terminada *o incluso acabada*, pero aún *sin ser entregada.* (Énfasis suplido.)[63]

Si alguna de las partes incumple con sus respectivas prestaciones, podrán ejercer aquellas facultades que les otorga el derecho contractual, como pedir la resolución o el **\*569** cumplimiento específico de la obligación, entre otras.[64] Como manifestamos en *Master Concrete Corp. v. Fraya, S.E.*, "[u]na vez perfeccionado el contrato de arrendamiento de obras —como en todo tipo de contrato— las partes están obligadas por lo expresamente pactado".[65] Si, por ejemplo, la obra no se ajusta a lo especificado en el contrato, corresponde al tribunal de instancia determinar el remedio adecuado, dependiendo de la gravedad del incumplimiento.[66] Igual ocurre si determinada condición del contrato, como el periodo para llevar a cabo la obra, es de naturaleza esencial.

# IV

En el caso de autos, el contrato de arrendamiento de obra se perfeccionó, según la normativa aplicable a los contratos municipales, el 16 de julio de 2002. No hay duda de que cumplió con todos los requisitos de forma dispuestos en la Ley de Municipios Autónomos y la jurisprudencia. El contratista tenía desde el 16 de julio hasta el 14 de agosto de 2002 para cumplir con su obligación contractual. Es decir, el contratista tenía que realizar la prestación de *entregar la obra* en ese período tiempo. En efecto, el 31 de julio, el contratista intentó entregar su obra. **\*570**

El trabajo independiente realizado por el contratista antes de entregar la obra al Municipio se llevó a cabo entre los días 25 y 28 de junio de 2002, aproximadamente dos semanas antes de perfeccionarse el contrato. Según se alegó en la demanda, el trabajo realizado en esos días corresponde a la obra señalada en la subasta 02-30, cuya buena pro se notificó el 4 de junio y en el contrato perfeccionado el 16 de julio.[67] Se alegó también que la obra corresponde a lo que la doctrina clasifica como obra "recién hecha", dada la proximidad temporal entre el trabajo realizado y el perfeccionamiento del contrato, así como el hecho de que el trabajo realizado fue el que se encargó específicamente en la subasta y en el contrato, y no una obra genérica como ocurre en la compraventa.

La prestación a la que se comprometió el contratista el 16 de julio, como parte de un contrato de arrendamiento de obra, era *la entrega de la obra ya finalizada.* No era necesario, como elemento constitutivo de la causa de acción, que el trabajo que produjo esa obra fuera realizado después del perfeccionamiento del contrato. Bastaba con que la obra sea "recién hecha".[68] En este caso, el trabajo se hizo poco antes de perfeccionado el contrato. El 31 de julio, durante la vigencia del contrato, el contratista cumplió con su obligación: entregó la obra encargada. Correspondía al **\*571** dueño de la obra cumplir las suyas: recibir la obra y pagar el precio acordado.

La demanda en el caso de autos fue desestimada sumariamente, habiéndose alegado que no justificaba la concesión de un remedio. El Tribunal de Primera Instancia no vio prueba sobre la intención de las partes o sobre la naturaleza esencial del plazo establecido en el contrato. Se

equivoca la mayoría al entrar en los méritos de la controversia y resolver que, como cuestión de hecho, el contratista incumplió con un elemento esencial del contrato, cuando no se presentó prueba a esos efectos.

Ante los hechos de que el requisito de irretroactividad no está establecido en la Ley de Municipios Autónomos, que el cumplimiento de la obligación se dio después de otorgado el contrato por escrito y que no se pasó prueba sobre la intención de las partes que permitiera concluir que se incumplió una condición esencial del contrato, revocaría la sentencia sumaria y devolvería el caso al Tribunal de Primera Instancia para la celebración del juicio en sus méritos.

## Footnotes

1   El contrato dispone que éste estaría vigente del 16 de julio de 2002 al 14 de agosto de 2002.

2   Los tribunales inferiores no hicieron determinación de hecho sobre esta alegación, dado que el Tribunal de Primera Instancia desestimó la demanda mediante sentencia sumaria.

3   Los trabajos fueron realizados los días 25, 26, 27 y 28 de junio de 2002.

4   El contrato firmado el 16 de julio proveía para la entrega de certificaciones parciales que debían ser aprobadas por un representante del Municipio. No obstante, como en este caso no hubo desfile de prueba ni juicio en sus méritos, no se sabe si esa obligación contractual era de naturaleza esencial.

5   También presentó una certificación adicional reclamando el 10% del precio convenido reservado por el municipio para cubrir posibles desperfectos y vicios de la obra.

6   Sentencia del Tribunal de Apelaciones, pág. 2; Apéndice del *Certiorari*, pág. 160.

7   Tampoco fue controvertido el hecho de que el trabajo realizado con dos semanas de adelanto fue *el mismo* que se pactó en el contrato del 16 de julio. De igual forma, ALCO reconoce que, si no se hubiera perfeccionado el contrato el 16 de julio, cumpliéndose con los requisitos formales del ordenamiento sobre contratos municipales, no podría exigir el pago por la obra ejecutada. Su argumento se centra en que, una vez se perfeccionó el contrato por escrito y se cumplió con los demás requisitos de forma, podía exigir la contraprestación correspondiente al municipio, de pagarle por el trabajo hecho anticipadamente.

8   *Certiorari*, pág. 5.

9   Oposición al *Certiorari*, pág. 4.

10   Íd., pág. 5.

11   21 L.P.R.A. sec. 4051; *Johnson & Johnson v. Mun. de San Juan*, 172 D.P.R. 840, 852 (2007); *Cordero Vélez v. Mun. de Guánica*, 170 D.P.R. 237, 248 (2007); *Colón Colón v. Mun. de Arecibo*, 170 D.P.R. 718, 725 (2007).

12   *Mun. Quebradillas v. Corp. Salud Lares*, 180 D.P.R. 1003 (2011); *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 830 (1999); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001, 1006 (1994).

13   *Mun. de Quebradillas v. Corp. Salud Lares*, supra, pág. 1013. El requisito de remitir una copia del contrato al Contralor no anula el negocio jurídico, pero impide que se puedan exigir las prestaciones hasta tanto se cumpla. Íd. Véase, además, *Lugo v. Municipio Guayama*, 163 D.P.R. 208, 215 (2004).

14   *Mun. de Quebradillas v. Corp. Salud Lares*, supra, pág. 1014.

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530 (2011)

2011 TSPR 180

15   *Colón Colón v. Mun. de Arecibo*, supra, págs. 725–726.

16   *Fernández & Gutiérrez v. Mun. San Juan*, supra, pág. 833.

17   Opinión mayoritaria, pág. 538; *Colón Colón v. Mun. de Arecibo*, supra, pág. 724.

18   *Mun. de Quebradillas v. Corp. Salud Lares*, supra, pág. 1015; *Johnson & Johnson v. Mun. de San Juan*, supra, pág. 852. Véase, además, *Hatton v. Mun. de Ponce*, supra, pág. 1005. "[L]os preceptos legales que rigen las relaciones económicas entre entidades privadas y los municipios están revestidos de un gran interés público y aspiran promover una sana y recta administración pública".

19   *Mun. de Quebradillas v. Corp. Salud Lares*, supra, pág. 1017.

20   *Cordero Vélez v. Mun. de Guánica*, supra, pág. 245; *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990).

21   *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, supra, pág. 871.

22   *Mun. de Quebradillas v. Corp. Salud Lares*, supra, pág. 10; *Hatton v. Mun. de Ponce*, supra, pág. 1006.

23   *Colón Colón v. Mun. de Arecibo*, supra, pág. 727.

24   Véase íd., pág. 731.

25   Íd., pág. 726, citando a *Cordero Vélez v. Mun. Guánica*, supra, pág. 248; *Quest Diagnostics v. Mun. San Juan*, 175 D.P.R. 994 (2009). Controversias relacionadas con contratos *verbales* con entidades municipales han sido la principal generadora de nuestra jurisprudencia en esta área y consistentemente hemos rechazado darle eficacia a estos acuerdos. Véanse, por ejemplo: *Mun. de Quebradillas v. Corp. Salud Lares*, supra; *Colón Colón v. Mun. de Arecibo*, supra; *Fernández & Gutiérrez v. Mun. San Juan*, supra; *Morales v. Municipio de Toa Baja*, supra. Por otro lado, en aquellos casos donde el contrato consta por escrito y se cumplieron los demás requisitos formales, hemos sostenido las obligaciones pactadas. Véase, por ejemplo, *Johnson & Johnson v. Mun. de San Juan*, supra.

26   *Johnson & Johnson v. Mun. de San Juan*, supra, pág. 853. Véase, además, *Fernández & Gutiérrez v. Mun. San Juan*, supra, pág. 833.

27   *Johnson & Johnson v. Mun. de San Juan*, supra, pág. 855.

28   *De Jesús González v. A.C.*, 148 D.P.R. 255, 267 (1999).

29   Opinión mayoritaria, pág. 533.

30   Nada impide que, por vía de reglamentación, se añadan elementos de forma a la contratación municipal. No obstante, ese no es el caso ante nuestra consideración. La controversia de autos se limitó a la interpretación de la Ley Núm. 81 y los requisitos constitutivos establecidos en ese estatuto.
La Opinión mayoritaria propone que el principio de irretroactividad se puede inferir de la Sección 6 del Capítulo IX del Reglamento de Administración Municipal de la Oficina del Comisionado de Asuntos Municipales (O.C.A.M.). Opinión mayoritaria, págs. 550–551. Sin embargo, la propia mayoría reconoce que era el Reglamento *anterior*, Reglamento sobre Normas Básicas de O.C.A.M., el que contenía esa prohibición expresa. Es decir, que el reglamento actual *eliminó* la prohibición absoluta a la contratación retroactiva que establecía el derogado. No creo que este historial nos permita afirmar que el reglamento actual contiene una prohibición similar.

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530 (2011)

2011 TSPR 180

31    J.M. Lete del Río y J. Lete Achirica, *Derecho de Obligaciones: Contratos*, Navarra, Ed. Thomson/Aranzadi, 2006, Vol. II, pág. 515; F. Martínez Mas, *El contrato de obra analizado para constructores y promotores*, Valencia, Ed. Cisspraxis, 2000, pág. 15.

32    *Master Concrete Corp. v. Fraya, S.E.*, 152 D.P.R. 616, 623 (2000). El contrato de arrendamiento de obra está recogido en los Artículos 1480 a 1492 del Código Civil, 31 L.P.R.A. secs. 4121–4133.

33    J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, pág. 438. Véase, además, J.R. Vélez Torres, *Curso de Derecho Civil: derecho de contratos*, San Juan, Ed. Rev. Jur. U.I.P.R., 1990, T. IV, Vol. 2, pág. 326.

34    Véanse: M. Albaladejo, *Derecho Civil*, 8va ed., Barcelona, T. II, Vol. 2, pág. 309 ("[E]n el [contrato de obra] se promete un *resultado*" (énfasis en original)); J.M. Manresa Navarro, *Comentario al Código Civil español*, 5ta ed., Madrid, Ed. Reus, 1950, T. X, pág. 894; J. Santamaría Ansa, *Comentario al Código Civil*, Madrid, Ed. Rev. Der. Privado, 1958, T. II, pág. 637; P. González Poveda en I. Sierra Gil de la Cuesta, *Comentario del Código Civil*, Barcelona, Ed. Bosch, 2000, T. IV, pág. 620; M. Medina De Lemus, *Derecho Civil: obligaciones y contratos*, Madrid, Ed. Dilex, 2005, T. II, Vol. 2,, pág. 145 (quien enfatiza en que ese resultado conlleva algo "completo y acabado, independientemente del trabajo o tiempo que costó obtenerlo"); Lete del Río y Lete Achirica, *op. cit.*, pág. 515; R. Hernández Bobadilla, *El contrato de obra y su regulación en la legislación guatemalteca*, Guatemala, Ed. U. San Carlos, 1966, pág. 17; Martínez Mas, *op. cit.*, pág. 18 (quien recalca que se trata de un "determinado resultado").

35    Véanse: Sentencia de 10 de mayo de 1997; Sentencia de 30 de enero de 1997, Núm. 845/1997 Repertorio de Jurisprudencia Aranzadi 1320; Sentencia de 4 de noviembre de 1989; Sentencia de 30 de mayo de 1987; Sentencia de 6 de noviembre de 1982; Sentencia de 19 de diciembre de 1964, Núm. 5900/1964 Repertorio de Jurisprudencia Aranzadi 3600; Sentencia de 23 de noviembre de 1964, Núm. 5453/1964 Repertorio de Jurisprudencia Aranzadi 3294, en donde se conecta el concepto del resultado con el de finalidad.

36    Según la Real Academia Española, la palabra *resultado* significa "[e]fecto y consecuencia de un hecho, operación o deliberación". Real Academia Española, *Diccionario de la Lengua Española*, 22da ed., Madrid, Ed. Espasa Calpe, 2001, T. II, pág. 1962.

37    *Master Concrete Corp. v. Fraya, S.E.*, supra, pág. 624. Véase, además, Albaladejo, *op. cit.*, pág. 317.

38    Puig Brutau, *op. cit.*, pág. 468; F. Puig Peña, *Tratado de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1951, T. IV, Vol. 2, pág. 302.

39    *Master Concrete Corp. v. Fraya, S.E.*, supra, pág. 624, citando a Albaladejo, *Derecho Civil, op. cit.*, pág. 49. El Artículo 1491 del Código Civil dispone: "Si no hubiere pacto o costumbre en contrario, el precio de la obra deberá pagarse al hacerse la *entrega*." (Énfasis suplido.) 31 L.P.R.A. sec. 4132. Como puede notarse, en el contrato de arrendamiento de obra el momento crucial de las prestaciones es la entrega y recepción de la obra, no el momento cuando se realizó el trabajo.

40    Martínez Mas, *op. cit.*, pág. 45: "Las dos obligaciones fundamentales del constructor son: la realización de la obra conforme a lo pactado y la entrega de la misma." Véase, además, Hernández Bobadillo, *op. cit.*, pág. 17.

41    Como explica Medina de Lemus: "La *primera obligación* del contratista es realizar la obra en las condiciones pactadas." (Énfasis suplido.) Medina de Lemus, *op. cit.*, pág. 146. Véanse, además: Albaladejo, *op. cit.*, pág. 317; Hernández Bobadillo, *op. cit.*, pág. 17 ("[La promesa del resultado] consiste, en *primera forma*, en un acto de producción o creación en sentido propio, o sea ... en la realización de una obra" (énfasis suplido).

42    González Poveda, *op. cit.*, pág. 666: "Finalizada la obra, el contratista viene obligado a entregarla en el modo y dentro del plazo convenidos"; Medina de Lemus, *op. cit.*, pág. 149: "Evidentemente la obra debe ser entregada una vez hecha"; Albaladejo, *op. cit.*, pág. 317; Manresa y Navarro, *op. cit.*, pág. 918, enfatizando la importancia de la entrega; Santamaría, *op. cit.*, págs. 636–637.

43    Sentencia de 18 de abril de 1979, Núm. 1406/1979 Repertorio de Jurisprudencia Aranzadi 1156, explicando que la obligación del dueño de pagar la obra es "a cambio de [la] *prestación* [del contratista] de *entrega* de la obra ejecutada". (Énfasis suplido.) Sentencia de 26 de octubre de 1978, Núm. 3286/1978 Repertorio de Jurisprudencia Aranzadi, en donde el alto foro español resolvió que no hay deber de recibir si el contratista no cumplió "la obligación de entregar [la obra] en el tiempo y forma convenidos". Sentencia de 5 de febrero de 1975, Núm. 330/1975 Repertorio de Jurisprudencia Aranzadi 252: "[El contratista] no cumplió con su *obligación* de *entregar la obra* en el plazo convenido." (Énfasis suplido.) Véanse, además: Sentencia de 30 de enero de 1997, Núm. 845/1997 Repertorio de Jurisprudencia Aranzadi; Sentencia de 1 de junio de 1982, Núm. 3401/1982 Repertorio de Jurisprudencia Aranzadi.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   23

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530 (2011)

2011 TSPR 180

---

44     J. Castán Tobeñas, *Derecho Civil español, común y foral*, 9na ed., Madrid, Ed. Reus, 1961, T. IV, pág. 455.

45     Martínez Mas, *op. cit.*, pág. 50.

46     Íd.

47     Íd.

48     Lete del Río y Lete Achirica, *op. cit.*, pág. 521.

49     Sentencia de 18 de abril de 1979, Núm. 1406/1979 Repertorio de Jurisprudencia Aranzadi 1156.

50     Puig Peña, *op. cit.*, pág. 299.

51     Véase Vélez Torres, *op. cit.*, pág. 325.

52     Puig Peña, *op. cit.*, pág. 299.

53     Santamaria, *op. cit.*, pág. 637: "La diferencia de mayor relieve entre el arrendamiento de obra (*locatio operis*) y el de servicios (*locatio operarum*) está en su aspecto económico, pues en el contrato de trabajo se retribuye el *tiempo* y en el de obras el *resultado*." (Énfasis suplido.) Lete del Río y Lete Achirica, *op. cit.*, pág. 515: "Lo que caracteriza a este contrato es que *el empresario o contratista se obliga a prestar no el trabajo como tal, sino el resultado del mismo (la obra)*, sin consideración al esfuerzo necesario para obtenerlo." (Énfasis suplido.) Incluso, el autor señala que, salvo casos particulares donde las características personales del contratista fueron el factor principal en su selección, no es necesario que el trabajo haya sido realizado por éste; Castán Tobeñas, *op. cit.*, pág. 454: "La verdadera nota distintiva del contrato de empresa es, como ya vimos, la de que lo prometido y qué constituye su objeto no es la energía del trabajo o el trabajo como tal (al modo que lo es en el arrendamiento de servicios), sino la obra o *resultado* del trabajo." (Énfasis en original.) Véanse, además: Albaladejo, *op. cit.*, pág. 309; Manresa y Navarro, *op. cit.*, pág. 923.

54     Sentencia del Tribunal Supremo de España de 10 de junio de 1975, Núm. 3265/1975 Repertorio de Jurisprudencia Aranzadi 2407. Según el alto foro español, la diferencia entre el contrato de arrendamiento de servicios y el contrato de arrendamiento de obra: "... radica en el objeto inmediato de la obligación del arrendador, de manera que si éste se obliga a la prestación de servicios o de trabajo o de una actividad en sí mismo, no del resultado, que aquella prestación produce, el arrendamiento es de servicios y, en cambio, si se obliga a la prestación de un resultado, sin consideración al trabajo que lo crea, el arrendamiento es de obra." Véase, además, Sentencia de 10 de febrero de 1987, Repertorio de Jurisprudencia Aranzadi 703.

55     Puig Brutau, *op. cit.*, pág. 439.

56     Castán Tobeñas, *op. cit.*, pág. 455.

57     Puig Brutau, *op. cit.*, pág. 439 La doctrina ha profundizado en las diferencias, pero sobre todo las similitudes, entre el contrato de compraventa y el contrato de arrendamiento de obra. Muchos tratadistas enfatizan el hecho de que mientras más importancia se dé al material utilizado en la obra y menos importancia al trabajo realizado aplicarán las reglas del contrato de compraventa, particularmente cuando el material utilizado *es del propio contratista*. Véase M. Medina de Lemus, *op. cit.*, pág. 145. En estos casos, muchos hablan de un contrato mixto de arrendamiento de obra y compraventa. Véanse: Manresa y Navarro, *op. cit.*, pág. 914; Castán Tobeñas, *op. cit.*, págs. 454–455; J. Santamaria, *op. cit.*, pág. 637. En particular, Castán Tobeñas explica que cierto sector de la doctrina opina "que el contrato por el cual el trabajador proporciona la materia es, por lo general, una venta de *cosa futura*, pero será arrendamiento de industria si los materiales sólo son lo accesorio". (Énfasis suplido.) Castán Tobeñas, *op. cit.*, pág. 455. Señala Vélez Torres que la línea diferenciadora entre el contrato de ejecución de obra y el de compraventa es "muy borrosa". Vélez Torres, *op. cit.*, pág. 326.

---

Alco Corp. v. Mun. de Toa Alta, 183 D.P.R. 530 (2011)

2011 TSPR 180

58    Vélez Torres, *op. cit.*, pág. 327.

59    Id., pág. 332.

60    Arts. 1481–1482 del Código Civil, 31 L.P.R.A. secs. 4122–4123.

61    Uno de estos escenarios es cuando el dueño desiste de la obra mientras ésta se está realizando. En estos casos, el dueño deberá abonar todos sus gastos, trabajos y utilidad que pudiera obtener de la obra. Art. 1486 del Código Civil, 31 L.P.R.A. sec. 4127.

62    González Poveda, *op. cit.*, pág. 625 Esta idea surge de la máxima *res perit domino.* C. Gómez Estrada, *De los Principales Contratos Civiles*, 3ra ed., Bogotá, Ed. Temis, 1999, pág. 322. Cabe clarificar que, en casos de obras sobre bienes inmuebles propiedad del comitente, la titularidad del contratista se limita a la obra en sí y no al bien sobre el que se hace. Por otro lado, si se trata de bienes muebles creados en su totalidad por el contratista, independientemente de la titularidad de los materiales utilizados, la titularidad del bien completo recaerá sobre éste.

63    Martínez Mas, *op. cit.*, pág. 27 Véase, además, Santamaría, *op. cit.*, págs. 636–637, Castán Tobeñas, *op. cit.*, pág. 459; Hernández Bobadilla, *op. cit.*, pág. 20.

64    Íd. También estarán disponibles las defensas de *exceptio non adimpleti contractus y exceptio non rite adimpleti contractus.* Véase Puig Peña, *op. cit.*, pág. 308. La recepción de la obra por parte del dueño requiere que ésta esté "bien terminada". Íd., pág. 303. Véase, además, González Poveda, *op. cit.*, pág. 687; Sentencia de Tribunal Supremo de España de 18 de abril de 1979, Repertorio de Jurisprudencia Aranzadi 1406.

65    *Master Concrete Corp. v. Fraya, S.E.*, supra, págs. 624–625.

66    En el caso de autos, le correspondería al Tribunal de Primera Instancia, después de interpretar el contrato y auscultar la intención de las partes, determinar si el incumplimiento con *la entrega de certificaciones parciales* constituye un incumplimiento sustancial del contrato y si, en efecto, la obra se ajusta a lo especificado en el contrato. A esos efectos, véase Martínez Mas, *op. cit.*, pág. 63, y su discusión sobre las certificaciones parciales. Véase también la Sentencia del Tribunal Supremo de España de 22 de julio de 1997, Núm. 5806/1997 Repertorio de Jurisprudencia Aranzadi. También le corresponderá determinar si, en efecto, la obra se ajusta a lo especificado en el contrato.

67    Esto no quita cualquier reclamación que pueda tener el municipio en cuanto a si el cumplimiento por parte del contratista es defectuoso, incompleto o si se desvió de lo pactado. En estos momentos nos limitamos a analizar si hay causa de acción. Le corresponde al foro primario dilucidar los méritos de este caso en particular.

68    Conocemos los problemas que pueden generarse en casos en los que un contratista realice su obra antes de que su contrato se ponga por escrito. Sin duda, los municipios tienen un interés importante de poder inspeccionar regularmente la obra mientras se está realizando, de velar por que se esté cumpliendo con las especificaciones del contrato y de evitar que se subcontrate ilegalmente el trabajo, entre otros asuntos. No obstante, la protección de este interés no requiere concluir, de entrada y de manera absoluta, que *no existe una causa de acción a favor del contratista.* Lo que corresponde es examinar los méritos del caso en un juicio plenario determinar qué, cómo y cuándo se llevó a cabo el trabajo, cuáles eran las intenciones de las partes y qué relación hay entre lo contratado y lo ejecutado. Nada de lo anterior supone que el contratista debe prevalecer en los méritos, sino, meramente, que tiene derecho a su día en corte para demostrar que entregó lo que se le encargó.

---

End of Document                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT B**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS |

## [PROPOSED] ORDER ON PREPA'S MOTION TO SUBMIT CERTIFIED ENGLISH TRANSLATION OF SPANISH-LANGUAGE CASE LAW AND SECOND REQUEST FOR EXTENSION OF TIME TO FILE CERTIFIED TRANSLATIONS

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

Upon consideration of the *Motion to Submit Certified English Translation of Spanish-Language Case Law and Second Request for Extension of Time to File Certified English Translations* (the "Motion"), filed by PREPA[2], for an order granting PREPA an extension of eighteen (18) days, to and including August 20, 2021 at 11:59 pm, to file certified English-language translations of the Spanish-Language Case Law, as more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and to grant the relief requested therein pursuant to PROMESA section 306(a); and venue being proper pursuant to PROMESA section 307(a); and notice of the Motion being adequate and proper under the circumstances, and no other or further notice being required; and finding good cause for the requested relief, it is hereby ORDERED that:

1. The Motion is GRANTED as set forth herein.

2. PREPA's certified English-language translation of the Spanish-Language Case Law shall be due on or before August 20, 2021 at 11:59 pm.

Dated: August __, 2021

_____
LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.