## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                         Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**Re:  ECF No. 17362** |

## BRIEF SUMMARIZING PRIMARY PROOF THAT MAY BE OFFERED IN SUPPORT OF CONFIRMATION OF PLAN OF ADJUSTMENT

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Summary Brief ...........................................................................................................1

    A.      Settlement of Claims and Causes of Action. ...........................................3

    B.      The releases, injunctions, and exculpation provisions in the Plan are reasonable and appropriate, integral to the Plan. ....................................22

    C.      PROMESA preempts the following Commonwealth Laws. ................................22

    D.      The Plan does not unfairly discriminate and is fair and equitable with respect to any Class of Claims that votes to reject or is deemed to have rejected the Plan. .......................................................................................39

    E.      The Debtors have obtained all necessary legislative, regulatory, or electoral approval, if any are necessary. ..................................................41

    F.      The Plan is feasible and consistent with the Fiscal Plans. .....................42

    G.      The Plan is in the best interests of creditors. .........................................45

    H.      Reservation of Rights. ...........................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*City Sanitation, LLC v. Allied Waste Serves. Of Mass., LLC (In re Am. Cartage, Inc.),*
  656 F.3d 82 (1st Cir. 2011)..............................................................................................3

*In re C.P. del Caribe, Inc.,*
  140 B.R. 320 (Bankr. D.P.R. 1992)..................................................................................3

*In re Indian Motorcycle Co.,*
  289 B.R. 269 (B.A.P. 1st Cir. 2003).................................................................................3

*In re Laser Realty, Inc. v. Fernandez (In re Fernandez),*
  2009 Bankr. LEXIS 2846 (Bankr. P.R. Mar. 31, 2009)..................................................3

*Jeffrey v. Desmond,*
  70 F.3d 183 (1st Cir. 1995)..............................................................................................3

STATUTES

11 U.S.C. § 105(a)..............................................................................................................42

11 U.S.C. § 365(d)(3).........................................................................................................11

11 U.S.C. § 503(b)(1).........................................................................................................11

11 U.S.C. § 507(a)(2).........................................................................................................11

11 U.S.C. § 510..................................................................................................................40

11 U.S.C. § 552.......................................................................................................3, 45, 50

11 U.S.C. § 943(b)(7).........................................................................................................42

11 U.S.C. § 1122..................................................................................................................2

11 U.S.C. § 1123..................................................................................................................2

11 U.S.C. § 1123(a)(5)(J)...................................................................................................42

11 U.S.C. § 1126..................................................................................................................2

11 U.S.C. § 1129..................................................................................................................2

11 U.S.C. § 1129(b)......................................................................................................40, 41

48 U.S.C. §§ 2101-2241 .................................................................................................................1

PROMESA § 4 ..............................................................................................................................42

PROMESA § 201 ..........................................................................................................................42

PROMESA § 202 ..........................................................................................................................42

PROMESA § 301(a) ........................................................................................................................2

PROMESA § 305 ..........................................................................................................................42

PROMESA § 314(b)(6) .................................................................................................................45

PROMESA § 510(b) ......................................................................................................................39

3 L.P.R.A. § 1914 .........................................................................................................................37

9 L.P.R.A. § 2021 .........................................................................................................................37

12 L.P.R.A. § 8105 .......................................................................................................................37

13 L.P.R.A. § 2271v(a) .................................................................................................................37

13 L.P.R.A. § 31625 .....................................................................................................................37

13 L.P.R.A. § 31627a ....................................................................................................................37

13 L.P.R.A. § 31751(a)(1) ............................................................................................................37

13 L.P.R.A. § 31751(a)(3) ............................................................................................................37

13 L.P.R.A. § 31751(a)(4) ............................................................................................................37

13 L.P.R.A. § 31751(a)(5) ............................................................................................................37

13 L.P.R.A. § 31751a(a) ...............................................................................................................37

13 L.P.R.A. § 33231(l) ..................................................................................................................37

15 L.P.R.A. § 74(d) .......................................................................................................................37

18 L.P.R.A. § 621-1 ......................................................................................................................37

21 L.P.R.A. § 5002 .......................................................................................................................37

21 L.P.R.A. § 5004 .......................................................................................................................37

21 L.P.R.A. § 5006 .......................................................................................................................37

21 L.P.R.A. § 5815 ..................................................................................................... 37

21 L.P.R.A. § 6742 ..................................................................................................... 37

23 L.P.R.A. § 104 ....................................................................................................... 37

23 L.P.R.A. § 695 ....................................................................................................... 37

**CONSTITUTIONAL PROVISIONS**

P.R. Const. art. VI, § 2 ................................................................................................. 7

P.R. Const. art. VI, § 7 ................................................................................................. 8

P.R. Const. art. VI, § 8 ............................................................................................ 9, 37

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"),

as the sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"),

the Employees Retirement System of the Government of the Commonwealth of Puerto Rico

("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), pursuant to section 315(b) of

the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA")[2] (the

Oversight Board, in its capacity as Title III representative of the Commonwealth, ERS, and PBA,

is referred to as the "Debtors"), respectfully submits this brief (this "Summary Brief") in

accordance with paragraph 4 of the *Order Directing the Oversight Board to File an Amended*

*Confirmation Procedures Order* [ECF No. 17362] (the "Order").[3]  In support of this Summary

Brief, the Debtors respectfully state:

## Summary Brief

1.     The Court's Order directed the Oversight Board to "file an opening summary brief

explaining what they expect to prove at confirmation, and their initial witness list, including the

topics about which each witness is expected to testify, at the outset of the discovery period."  Order

¶ 4.[4]  Set forth below are the primary confirmation requirements for which the Oversight Board

will establish facts enabling the Court to confirm the *Seventh Amended Title III Joint Plan of*

*Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (as it may be amended,

---

[2]      PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[3]      The Debtors are filing contemporaneously herewith the *Debtors' Preliminary List of Witnesses to Be Offered in Support of Confirmation of Plan of Adjustment*.

[4]      At the hearing on the motion to approve the adequacy of the disclosure statement for the Plan and the Debtors' proposed confirmation procedures, the Court stated that "[t]he Debtors will be required to file an opening summary brief describing what they . . . expect to prove at confirmation, and their initial witness list, including the topics for which each witness is expected to testify, and that is to be done at the outset of the discovery period, which is expected to commence on or about August 3rd, 2021."  Hr'g Tr. at 96:2–7 (July 14, 2021).

modified, or supplemented, the "Plan").[5]  This brief summarizes the Debtors' *prima facie* cases

for the primary confirmation requirements.  It does not cover facts or issues raised by confirmation

objections filed hereafter.

2.      The Oversight Board will prove at confirmation that each of the provisions of

PROMESA Title III, and the provisions within Bankruptcy Code sections 1122, 1123, 1126, and

1129, made applicable to these Title III cases by section 301(a) of PROMESA, are satisfied.[6]

Specifically, the Oversight Board will prove primarily that (i) each of the settlements entered into

by the Debtors and incorporated into the Plan, inclusive of all payments required by the

settlements, is fair and reasonable and should be approved, (ii) the releases, injunctions, and

exculpation provisions in the Plan are reasonable and appropriate and integral to the Plan, (iii) the

Commonwealth laws identified in connection with the Plan are inconsistent with PROMESA and

the carrying out of the Plan and are preempted, (iv) the Plan does not unfairly discriminate and is

fair and equitable with respect to any Class of Claims that votes to reject or is deemed to have

rejected the Plan, (v) any legislative, regulatory, or electoral approval necessary under applicable

law, if any, to carry out any provision of the Plan is enacted, or such provision is expressly

conditioned on such approval, (vi) the Plan is feasible, including that the Plan is consistent with

the fiscal plans certified by the Oversight Board for each of the Debtors, and (vii) the Plan is in the

best interests of the creditors of the Debtors.

---

[5]      Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan or Disclosure
Statement, as applicable.

[6]      The Oversight Board will prove each of the following provisions is satisfied:  PROMESA sections 314(b)(1)
(including Bankruptcy Code sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b)(1),
1123(b)(2), 1123(b)(3), 1123(b)(4), 1123(b)(5), 1123(b)(6), 1123(d), 1126(c), 1129(a)(2), 1129(a)(3), 1129(a)(6),
1129(a)(8) (if applicable), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), and  1129(b)(2)(B)), 314(b)(2), 314(b)(3),
314(b)(4), 314(b)(5), 314(b)(6), and 314(b)(7).

2

A. **Settlement of Claims and Causes of Action.**

3.      The Oversight Board will demonstrate that each of the settlements entered into was fair and reasonable and should be approved, as well as that any consummation costs or other expense or restriction fees paid in connection with such agreements are also fair and reasonable in light of the obligations undertaken and the fees and obligations incurred by the parties thereto, and should be approved.  The evidence will show the main legal and factual allegations in dispute, the estimated value of each settlement, and that each settlement described below and in the Plan was reached (i) at arm's–length with highly sophisticated parties each represented by counsel (and often financial and other advisors) and (ii) after due consideration by the Oversight Board, after consultation with its legal, financial, and other professional advisors, and consideration of many factors including likely impacts of settling and not settling, potential consequences of losing, and the best interests test analyses.  The evidence will also show each settlement falls at or above the "lowest point in the range of reasonableness" required for such settlement to be approved.[7]

4.      <u>ERS Stipulation</u>.  The ERS Stipulation provides a global resolution for the various claims and causes of action relating to the ERS Bonds, each of which, if resolved adversely to the Oversight Board, could have resulted in allowance of a $3 billion or greater secured or administrative claim filed by the fiscal agent for the ERS bonds against the Commonwealth and/or ERS.  The evidence will include the parties' respective pleadings following the final rulings

---

[7] A settlement should generally be approved unless it "falls below the lowest point in the range of reasonableness." *City Sanitation, LLC v. Allied Waste Serves. Of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91 (1st Cir. 2011) *(citing Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)).

In determining the reasonableness of a settlement, courts in the First Circuit consider the following four factors: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. *Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995); *see also In re Indian Motorcycle Co.*, 289 B.R. 269, 283 (B.A.P. 1st Cir. 2003); *In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, 2009 Bankr. LEXIS 2846, at *9 (Bankr. P.R. Mar. 31, 2009); *In re C.P. del Caribe, Inc.*, 140 B.R. 320, 325 (Bankr. D.P.R. 1992).  This Summary Brief will discuss some, but not necessarily all, of the foregoing factors.

3

regarding Bankruptcy Code section 552, which ruling confirmed the application of section 552 to prevent the ERS Bondholders' security interest from attaching to Employers' Contributions (as defined in the ERS Enabling Act) generated after the ERS Petition Date.  Specifically, the ERS Stipulation resolves the following actions:

(a)     *Lien-Scope Adversary Proceedings*.  In the Lien-Scope APs, the Oversight Board asserted the ERS Bondholders do not hold valid and enforceable security interests in ERS's assets or the proceeds thereof (other than the Accounts Receivable).  ERS assets include (i) cash and investments, (ii) accounts receivable and collections with respect to Additional Uniform Contributions, and (iii) certain loans made to ERS participants, and repayments thereof.  The ERS Bondholders filed counterclaims in the Lien-Scope APs asserting their valid and enforceable security interests in ERS assets are much broader, and could cover collateral with a value of over $2 billion.

(b)     *ERS Bondholders' PayGo Challenge Action*.  In the PayGo Challenge Action, certain ERS Bondholders sought a judgment that the Commonwealth's enactment of Joint Resolution 188 and Act 106 violated the Taking and Contracts Clauses of the United States and Puerto Rico Constitutions and asserted damages in the full amount of the Fiscal Agent ERS Proof of Claim, and that such judgment cannot be impaired in a plan of adjustment.  If successful, that action could have created a nondischargeable liability of over $3 billion against the Commonwealth.

(c)     *Oversight Board's* Ultra Vires *Objections*.  In the *Ultra Vires* objections, the Special Claims Committee of the Oversight Board and the official committees appointed in these cases sought a determination that the issuance of the ERS Bonds was *ultra vires*, and accordingly, ERS was not obligated to make payments with respect thereto.  The Special Claims

4

Committee also sought to recover as voidable transfers certain interest payments made to holders
of ERS Bonds prior to the commencement of the ERS Title III Case.

(d)   *ERS Bondholders' Administrative Expense and Pre-Petition Claims*.   In
various motions and Proofs of Claim, the ERS Bondholders argued they were entitled to an
administrative expense claim against the Commonwealth and/or ERS in the full amount of the
Fiscal Agent ERS Proof of Claim, and in the alternative, that such amounts should be allowed
prepetition claims against the Commonwealth and/or ERS based on the Commonwealth's
enactment of Joint Resolution 188 and Act 106 as discussed above in paragraph 4(b).  If successful,
these actions could have resulted in a more than $3 billion administrative expense claim against
the Commonwealth, rendering unconfirmable any plan of adjustment for the Commonwealth or
ERS which did not pay such claim in full.  Alternatively, these actions could have resulted in an
over $3 billion unsecured claim against the Commonwealth, diluting recoveries to other holders
of unsecured claims against the Commonwealth, and making agreement with the unsecured
creditors' committee significantly more difficult.

(e)   *ERS Bondholders' Federal Circuit Action Against the U.S. Government*.  In
this action, certain ERS Bondholders brought claims against the United States for allegedly
"taking" their property in violation of the Fifth Amendment of the U.S. Constitution through the
enactment of PROMESA and acts taken pursuant to PROMESA.  If successful, the U.S.
government could have sought reimbursement from the Commonwealth or ERS of amounts owed
to satisfy claims by the ERS Bondholders or otherwise reduced payments to the Commonwealth.

5.   While the Oversight Board believes the risk of a materially adverse outcome in
connection with the forgoing actions was less than fifty percent, a final resolution on the issues
settled pursuant to the ERS Stipulation provides certainty to the Oversight Board with respect to

the claims held by ERS Bondholders, and frees up cash and other assets at ERS not otherwise part of the ERS Stipulation.

6.      In exchange for the settlement of such actions, ERS and the Commonwealth agreed to allow the Fiscal Agent ERS Proof of Claim against ERS in an aggregate amount of $3,168,698,776.55, with all other Proofs of Claim filed by ERS Bondholders expunged.  The holders of allowed Claims with respect to the ERS Bonds shall receive (i) $373,000,000 in cash distributions and (ii) the rights to the proceeds from the sale of the Private Equity Portfolio, which proceeds will be no less than $70,750,000.

7.      In addition to the consideration available to all ERS Bondholders pursuant to the ERS Stipulation, the Oversight Board agreed to provide the ERS Bondholders signatory to the ERS Stipulation with a $75,000,000 ERS Restriction Fee, paid ratably to such signatories.  The Oversight Board will show the ERS Restriction Fee is fair and reasonable in light of the proportion of ERS Bonds held by the bondholder parties to the ERS Stipulation, the obligations undertaken and the fees and obligations incurred by such parties, and should be approved.  For instance, the bondholders agreed to restrict their trading in ERS Bonds to persons who will assume the obligations under the ERS Stipulation.  Accordingly, the Oversight Board believes, and will prove at confirmation, that such obligations incurred by the ERS Bondholders party to the ERS Stipulation justify the payment of the ERS Restriction Fee, and should be approved by the Court.

8.      GO/PBA Plan Support Agreement.  The Oversight Board will prove (i) that the settlements embodied in the GO/PBA Plan Support Agreement and incorporated into the Plan are fair and reasonable and should be approved and (ii) that the GO/PBA Consummation Costs (as described in Section 3.3 of the Plan) and the GO/PBA Restriction Fee (as described in Section 3.5 of the Plan) are fair and reasonable in light of the proportion of GO and PBA Bonds held by the

creditor signatories thereto, the obligations undertaken and the fees incurred by the bondholder parties thereto, and the payment thereof by the Debtors should be approved.  The evidence will include the parties' respective pleadings filed in connection with the challenges to the validity, priority and secured status of the GO and PBA Bonds.

9.      The GO/PBA PSA provides for the proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico constitutional debt limit, as set forth in Article VI, section 2 of the Commonwealth Constitution (the "Constitutional Debt Limit")[8]  and disputes regarding the priorities and  liens claimed by holders of the GO Bonds.

10.      The agreement also provides for the resolution of disputes between the Commonwealth and PBA regarding (i) the characterization of purported leases between PBA and the Commonwealth as disguised financing transactions, (ii) the amount, if any, of administrative rent the Commonwealth may owe PBA for the use and occupancy of PBA facilities following the commencement of the Commonwealth Title III Case, and (iii) the ownership of certain PBA facilities and property as between the Commonwealth and PBA (collectively, the "PBA Litigation").

11.      Finally, the GO/PBA PSA provides for the resolution of disputes regarding the PRIFA BANs.

12.      As discussed below, these disputes involve complex issues of fact and law, billions of dollars in claims, and numerous proceedings spanning years of litigation.

---

[8] Specifically, Article VI, section 2 of the Commonwealth Constitution provides for a cap on obligations of the Commonwealth backed by its good faith, credit and taxing power, is colloquially referred to as "general obligation" or "constitutional" debt.

7

13.   *Debt Related Objections*.[9]   The Commonwealth's approximately $13 billion in outstanding GO Bonds is among the largest components of Puerto Rico's debt burden.  As a result of investigations, parties have prosecuted objections to bondholders' claims on the basis that certain GO bond issuances violated the limit established by the Commonwealth Constitution and accordingly were null and void (such objections together, the "Bond Claim Objections").

14.   Disputes exist over the calculation of the Constitutional Debt Limit, which bonds the limit applies to, and when the limit was violated (if at all).  It has been argued by the GO Group, Constitutional Debt Group, and Assured that if the PBA is a "sham designed to circumvent" the Constitutional Debt Limit, its bonds should be held entirely invalid.  Others such as Peter Hein have argued that a holding that bonds are invalid would violate the U.S. Constitution, among other reasons because it would be an unlawful taking under the Fifth Amendment.  Additional disputes involve violation of the balanced budget provision of Article VI, section 7 of the Commonwealth Constitution, the interpretation of the translation of the Commonwealth Constitution, and whether the Commonwealth Constitution permits deficit financing.  In connection therewith, the Special Claims Committee of the Oversight Board commenced eight adversary proceedings to "claw back" principal and interest payments on the bonds that had been paid  to  bondholders on the basis that such bonds and payments (i) were *per se* unlawful and are recoverable under Puerto Rico law, and (ii) are avoidable as fraudulent transfers pursuant to the Bankruptcy Code and Puerto Rico law.

15.   To date, several bondholders and groups thereof have filed motions to dismiss the Bond Claim Objections and related memoranda (the "Motions to Dismiss Bond Claim Objections").  The Motions to Dismiss Bond Claim Objections articulate defenses to the Bond

---

[9] The "Debt Related Objections" includes objections, joinders, and counts of requested relief challenging, among other things, the validity and related rights of the 2011 GO Bonds, the 2012 GO Bonds, the 2014 GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Guarantee Bond Claims, or CW Bond Claims.

Claim Objections based upon equitable theories such as estoppel and unjust enrichment.  The
Oversight Board anticipated that bondholders may also raise defenses under Article 8 of the
Uniform Commercial Code, adopted in Puerto Rico.

16.     The mere litigation of these disputes, regardless of the outcome, imposes burdens
on the Commonwealth and its stakeholders.  The procedures for resolving the Bond Related
Objections are complex and costly.  Just to identify the holders of affected bonds, for example, the
Title III Court heard and approved a procedures order, which resulted in bondholders filing over
one thousand notices of participation.  Moreover, if the GO Bondholders are successful in asserting
liens or priority against the Commonwealth revenues and resources, the ability of the
Commonwealth to make payments to other creditors or provided services to its citizens could be
significantly impaired.

17.     *Lien Challenge Actions*.    The Lien Challenge Actions were filed by the
Commonwealth against more than 450 Defendant holders of bonds issued or guaranteed by the
Commonwealth who asserted consensual and statutory liens.  The Defendant bondholders asserted
their bond claims, totaling more than $17.5 billion,[10]  are secured by one or more of the following:
(1) the Commonwealth's "good/full faith, credit and taxing power," (2) the Commonwealth's
"available resources" (as referenced in the Commonwealth Constitution Article VI, section 8),
(3) certain   monies   historically   conditionally   appropriated   to   the   Commonwealth's
instrumentalities under Puerto Rico law (the "Allocable Revenues"), and (4) property tax revenues
authorized under Puerto Rico Act 83-1991.   In response, the Oversight Board, filed seven
complaints seeking declarations the Defendant bondholders have entirely prepetition unsecured

---

[10] Including approximately $13 billion of GO Bonds and approximately $4.59 billion of Commonwealth-guaranteed
bonds and notes.

claims (to the extent their claims are valid at all), and do not possess liens against any of the Commonwealth's property on the asserted bases above.

18.     While the Oversight Board believes the risk of a materially adverse outcome in connection with the forgoing actions is less than fifty percent, in the event the bondholders obtained a favorable ruling, it is possible that they would have received 100% recovery on more than $17.5 billion in claims and established precedence to some of the money needed to fund the Commonwealth's certified fiscal plan.  This result could have rendered impossible the creation of a sustainable economy with market access, depleted the Debtors' resources available for other creditors and in practical terms, unraveled years of critical restructuring efforts.  A final resolution on the issues settled pursuant to the GO/PBA PSA provides certainty to the Oversight Board with respect to the claims held by the various bondholders and the funds available to provide services to the people of Puerto Rico.

19.     In the event the request sought in the Invalidity Actions were sustained, recipients of payments of principal and interest on account of the bonds challenged as being issued in excess of the Constitutional Debt Limit  may have been required to return such payments to the respective issuers.  However, prosecution of these actions would require a monumental undertaking, requiring countless hours of litigation and significant costs, possibly over the course of years and delaying restructuring efforts.  Even if the Oversight Board were to prevail in litigation, it is unclear what amounts could actually be collected.

20.     *PBA Litigation*.   The PBA Litigation centers around a dispute regarding the characterization of purported leases entered into by PBA with departments, agencies, instrumentalities, authorities, public corporations, and municipalities of the Commonwealth. Jointly with the UCC, the Oversight Board filed a complaint against the PBA that contends the

PBA has no right under PROMESA or the Bankruptcy Code to receive post-petition rent payments from, or assert administrative claims against, the Debtors because the purported leases are not rental transactions, but rather disguised financing transactions.  The complaint seeks declarations that: (1) the leases between PBA and various governmental agencies are not subject to treatment in accordance with Bankruptcy Code section 365(d)(3), which requires the performance of all obligations of the debtor under any unexpired lease of nonresidential real property until such lease is assumed or rejected, and thus the Debtors have no obligation to make payments to PBA under the leases, and (2) PBA is not entitled to a priority administrative expense claim pursuant to Bankruptcy Code sections 503(b)(1) and 507(a)(2).

21.     Although the Oversight Board believes its characterization of the purported leases is correct, an adverse judgment represents significant risk of administrative expense treatment for approximately $401.6 million in annual rent payments under the leases, which the Debtors would be obligated to pay in cash and in full.

22.     *PRIFA BANs Stipulation*.  The GO/PBA PSA incorporates the settlements embodied in the *Amended and Restated Stipulation (A) Allowing PRIFA BANs Guarantee Claim, (B) Authorizing Escrow of PRIFA Funds and (C) Directing the Dismissal of Litigation with Prejudice*, dated as of February 22, 2021 (the "PRIFA BANs Stipulation").[11]   As of the Commonwealth Petition Date, approximately $78 million of PRIFA BANs were outstanding, which bonds were guaranteed by the Commonwealth.  The PRIFA BANs Stipulation settles two outstanding actions with respect to the PRIFA BANs.

23.     First, certain holders of PRIFA BANs (the "PRIFA BANs Holders") filed a complaint in the U.S. Court of Federal Claims asserting a claim against the United States

---

[11] Available on EMMA at https://emma.msrb.org/P11474580-P11142944-P11556489.pdf.

government for alleged violations of the Takings Clause.  According to the PRIFA BANs Holders, the United States government, acting by and through the Oversight Board, "planned, directed, and implemented legislative action" that reallocated funds away from PRIFA, resulting in a taking of the PRIFA BANs Holders' property.

24.     Second, the Special Claims Committee of the Oversight Board commenced an action against holders of PRIFA BANs, arguing that the Commonwealth's guarantee of such bonds may have violated the Constitutional Debt Limit.  In addition, the Special Claims Committee contended that the guarantees may be avoided because the Commonwealth was insolvent at the time the guarantees were made and did not receive reasonably equivalent value in exchange for its extension of a guarantee because the obligors of the debts did not use the debt proceeds in a manner that provided any benefit to the Commonwealth.

25.     In exchange for settling the disputes above surrounding the PRIFA BANs, the Commonwealth has agreed that in satisfaction of PRIFA's obligations with respect to the PRIFA BANs, PRIFA would deposit $12,657,508.81 in cash into a segregated interest-bearing escrow account for the payment of principal and accrued but unpaid interest on the PRIFA BANs, to be released, on the effective date, to the trustee for the benefit of the holders of the PRIFA BANs. Further, on the effective date, the "Trustee PRIFA/CW Claim" would be deemed an "Allowed CW Guarantee Bond Claim" in the aggregate amount of $83,589,101.69.

26.      If the Commonwealth's guarantee of the PRIFA BANs was upheld, the obligations could dilute the recoveries of other bondholders holding debt validly issued or guaranteed by the Commonwealth.  And, regardless of the ruling in the proceedings listed above, it is almost certain that multiple appeals would follow.

12

27.     The reality of protracted litigation of the multitude of issues described above, potentially for years, comes at a substantial cost to the Commonwealth, both as a result of the significant expenses that would be incurred and because its ability to exit Title III would be hindered and further delayed.  The Plan, as a result of the GO/PBA PSA, eliminates the uncertainty regarding the allowance and amount of the affected bonds.  The settlement also ensures that PRIFA, which is not a debtor under Title III, contributes to the payment of a portion of the claims arising from PRIFA BANs, which are guaranteed by the Commonwealth.  If the Plan is confirmed, the Oversight Board believes no further litigation of any dispute regarding the validity, priority, or secured status of the CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims is necessary as the Plan will effect a global settlement of any such disputes, binding on all parties in interest in the Title III Cases.

28.     In economic terms, the GO/PBA PSA is an instrumental component of the Plan, which proposes to reduce the Commonwealth's approximately $35 billion in outstanding claims by approximately 80%, to $7.4 billion in future debt.  It also ensures there are funds available for other creditors and to provide vital public services.

29.     In exchange for executing and delivering the GO/PBA PSA and agreeing to all its terms and conditions, including the agreement to "lock-up" its bonds, subject to the entry of the Confirmation Order, each of the GO/PBA PSA Restriction Fee Creditors will be entitled to receive the GO/PBA Restriction Fee.  To compensate certain parties for the cost of negotiation, confirmation, and consummation of the GO/PBA PSA and the Plan, each Initial GO/PBA PSA Creditor will be entitled to receive a pro rata share of cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to 1.50% of the aggregate amount of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims.  If the Effective Date does not

13

occur by January 31, 2022, parties to the GO/PBA PSA may terminate the GO/PBA PSA and assert payment of the PSA Restriction Fee and Consummation Costs in an aggregate amount of $100,000,000.00 as an administrative expense claim.  Such consideration is reasonable given the benefits conferred by the creditor signatories thereto, including their agreement to restrict trading to only those persons who agree to be bound by the GO/PBA PSA.

30.    *HTA/CCDA Plan Support Agreement*.  The Oversight Board will prove facts showing (i) the settlements embodied in the HTA/CCDA Related Plan Support Agreement (the "HTA/CCDA PSA") and incorporated into the Plan are fair and reasonable, and should be approved and (ii) the CCDA Consummation Costs (as described in Section 3.8 of the Plan) and the CCDA Restriction Fee (as described in Section 3.9 of the Plan) are fair and reasonable in light of the proportion of CCDA and HTA Bonds held by the creditor signatories thereto, the obligations undertaken and the fees incurred by the creditor parties thereto, and the payment thereof by the Debtors should be approved.  The evidence will include the parties' respective pleadings filed in connection with the challenges to the validity, priority, and secured status of the CCDA and HTA bonds.

31.    The HTA/CCDA PSA provides a global resolution for the various claims and causes of action relating to the HTA Bonds and the CCDA Bonds, each of which, if resolved adversely to the Oversight Board, the Commonwealth, and/or HTA, could have resulted in significant liability of the Commonwealth and HTA that would have to be satisfied in cash.

32.    The HTA actions resolved pursuant to the HTA/CCDA PSA (the "Resolved HTA Clawback Actions") resolved the fundamental disputed issue as to whether HTA and CCDA bondholders had any secured or unsecured rights against the Commonwealth for monies the Commonwealth was supposed to appropriate to HTA and CCDA.  They involved questions as to

14

the existence, scope and/or perfection of asserted ownership interests, statutory liens and security interests in over $1 billion of Commonwealth revenues, among other things.  Specifically, the bondholder parties asserted in proofs of claim that they were beneficial owners of and/or possessed a valid, first priority lien against all excise tax revenues and license fees historically appropriated to HTA from, at least, the moment those tax revenues and license fees are collected by the Commonwealth.  The bondholder parties also asserted they possessed a valid, first priority security interest in all revenues held by HTA, regardless of where those revenues are deposited.

33.     In all, the Resolved HTA Clawback Actions could have required the use of over $1 billion of Commonwealth funds to pay HTA bondholders, and rendered all HTA revenues, regardless of where they are deposited, subject to a valid, first priority lien in favor of its bondholders.  The Resolved HTA Clawback Actions could have resulted in the requirement that excise taxes and license fees continue to be transferred to HTA, rendering them unavailable for distribution to Commonwealth creditors or use by the Commonwealth.  Moreover, the bondholders further contended the retention of the excise tax and license fee revenues gave rise to nondischargeable administrative expense claims and/or nondischargeable Takings Clause claims, which could have exceeded $1 billion.  Such claims would have rendered any plan of adjustment not providing for their full payment unconfirmable.

34.     While the Oversight Board believes the risk of a materially adverse outcome in connection with the foregoing actions was less than fifty percent, a final resolution on the issues settled pursuant to the HTA/CCDA PSA provides certainty to the Oversight Board with respect to the claims held by HTA bondholders, and frees up cash and other assets at the Commonwealth.  In exchange for the settlement of such Resolved HTA Clawback Actions, the Commonwealth has agreed to provide HTA Bondholders with consideration pursuant to the Plan in the form of

contingent value instruments based on potential outperformance of Puerto Rico's 5.5% Sales and Use Tax relative to projections in the 2020 Certified Fiscal Plan.

35.     In addition to the consideration available to all HTA bondholders pursuant to the HTA/CCDA PSA, the Oversight Board has agreed to provide the signatories to the HTA/CCDA PSA with a $140 million restriction fee, pro rata (the "HTA Restriction Fee").  The Oversight Board believes such HTA Restriction Fee is fair and reasonable in light of the proportion of HTA Bonds held by the bondholder parties to the HTA/CCDA PSA, obligations undertaken and the fees incurred by the bondholder parties thereto, and should be approved.  Furthermore, such bondholders have agreed to restrict their trading in HTA Bonds to persons who will assume the obligations under the HTA/CCDA PSA.  Accordingly, the Oversight Board believes, and will prove at confirmation, that such obligations incurred by the HTA bondholders party to the HTA/CCDA PSA justify the payment of the HTA Restriction Fee, and should be approved by the Court.

36.     With respect to CCDA, the HTA/CCDA PSA likewise provides for a global resolution of the various claims and causes of action relating to the CCDA Bonds (the "Resolved CCDA Actions").  It resolved the fundamental disputed issue as to whether HTA and CCDA bondholders had any secured or unsecured rights against the Commonwealth for monies the Commonwealth was supposed to appropriate to HTA and CCDA.  Among other things, the Resolved CCDA Actions involved questions as to the existence, scope, and/or perfection of asserted ownership interests, liens, and security interests in hundreds of millions of dollars of Commonwealth revenues.  Specifically, the CCDA bondholder parties asserted they were the beneficial owners of and/or possessed a valid, first-priority lien against and perfected security interest over all hotel occupancy taxes historically appropriated to CCDA but, since late 2015,

16

retained by the Commonwealth.  Moreover, the CCDA bondholder parties contended the alleged diversion of hotel occupancy taxes from payment of their bond claims gave rise to nondischargeable administrative expense claims and/or nondischargeable Takings Clause claims. The Resolved CCDA Actions involved claims that could have required the use of hundreds of millions of dollars of Commonwealth funds to pay the CCDA bondholder parties.  Such claims, if vindicated, would have rendered any plan of adjustment not providing for full payment to the CCDA bondholder parties unconfirmable.  The Resolved CCDA Actions could have resulted in the requirement that hotel occupancy fees continue to be transferred to CCDA, rendering them unavailable for distribution to Commonwealth creditors or use by the Commonwealth.

37.    While the Oversight Board believes a materially adverse outcome in connection with the Resolved CCDA Actions was less than fifty percent, a final and global resolution of those issues pursuant to the HTA/CCDA PSA provides certainty to the Oversight Board with respect to the claims asserted by the CCDA bondholder parties, and frees up cash at the Commonwealth necessary for a confirmable plan of adjustment.  In exchange, the Commonwealth has agreed to provide CCDA bondholder parties with consideration pursuant to the HTA/CCDA PSA in the amount of $97 million in cash.  In addition, the Commonwealth has agreed to provide certain initial PSA creditors with consummation costs (the "CCDA Consummation Costs") for fees and expenses, and/or a CCDA Restriction Fee, incurred as an administrative expense in an aggregate amount not to exceed $15 million under the terms of the HTA/CCDA PSA.  As insurers of every CCDA Bond are party to the HTA/CCDA PSA, the CCDA Consummation Costs will be shared ratably among all parties receiving distributions.  The CCDA bondholder parties incurred significant expenses in negotiating the HTA/CCDA PSA and the Plan's incorporation thereof. Furthermore, such bondholders have agreed to restrict their trading in CCDA Bonds.  The

17

Oversight Board believes, and will prove at confirmation, the HTA/CCDA PSA is reasonable, and
was negotiated in good faith and at arms' length.

38.     *The PRIFA Plan Support Agreement.*  The PRIFA Related Plan Support Agreement
("PRIFA PSA") provides a global resolution for the various claims and causes of action relating
to the PRIFA Bonds, each of which, if resolved adversely to the Oversight Board or the
Commonwealth, could have resulted in significant liability of the Commonwealth.  Specifically,
the PRIFA PSA resolves various litigations and actions relating to the PRIFA Bonds ("Resolved
PRIFA Actions").  The evidence will include the parties' respective pleadings filed in connection
with the challenges to the validity, priority and secured status of the PRIFA Bonds.

39.     The Resolved PRIFA Actions involved the fundamental disputed issue as to
whether PRIFA bondholders had any secured or unsecured rights against the Commonwealth for
monies the Commonwealth was supposed to appropriate to PRIFA.  They involve questions as to
the existence, scope and/or perfection of asserted ownership interests, statutory liens, and security
interests in hundreds of millions of dollars of Commonwealth revenues, among other things.
Specifically, the PRIFA bondholder parties asserted they were beneficial owners of and/or
possessed a valid, first priority lien against all federal rum tax revenues remitted to the
Commonwealth and historically conditionally appropriated to PRIFA but, since 2015, retained by
the Commonwealth.  The Resolved PRIFA Actions could have resulted in the requirement that
federal rum taxes continue to be transferred to PRIFA, rendering them unavailable for distribution
to Commonwealth creditors or use by the Commonwealth.  Moreover, the PRIFA bondholder
parties contended the alleged diversion of the rum taxes from payment of their bond claims gave
rise to nondischargeable administrative expense claims and/or nondischargeable Takings Clause
claims.  The Resolved PRIFA Actions involved claims that could have required the use of hundreds

18

of millions of dollars in Commonwealth funds to pay the PRIFA bondholder parties. Such claims would have rendered any plan of adjustment not providing for full payment to PRIFA bondholder parties unconfirmable.

40.     While the Oversight Board believes a materially adverse outcome in connection with the foregoing actions was less than fifty percent, a final resolution on the issues settled pursuant to the PRIFA PSA provides certainty to the Oversight Board with respect to the claims asserted by PRIFA bondholder parties, and frees up cash at the Commonwealth necessary for a workable plan of adjustment. In exchange for the settlement of the Resolved PRIFA Actions, the Commonwealth has agreed to provide PRIFA bondholder parties with consideration pursuant to the PRIFA PSA.

41.     The Oversight Board believes, and will prove at confirmation, that the PRIFA PSA is reasonable. The Oversight Board will prove that the PRIFA PSA was negotiated in good faith, at arms' length, and should be approved.

42.     Plan Support Agreement with AFSCME and Local Affiliates. The Plan provides for the consensual rejection of existing collective bargaining agreements (CBAs) with the American Federation of State, County and Municipal Employees, for itself and on behalf of its two local chapters, SPU, AFSCME Council 95 and Capitulo de Retirados de SPU and their fourteen affiliated local unions in Puerto Rico (collectively, "AFSCME") and treatment of any claims arising from these CBAs, including any rejection damage claims, through the execution of replacement five-year CBAs having the terms summarized in Exhibit G of the Plan. The rejection of the existing prepetition CBAs and the treatment set forth in the Plan were agreed to between AFSCME and the Oversight Board in a Plan Support Agreement executed on June 7, 2019 (the "AFSCME PSA").

19

43.     The AFSCME PSA was one of the first two plan support agreements achieved by the Oversight Board and therefore provided a basis to negotiate with other parties, including AMPR.  The proposed new CBA terms also provide the Commonwealth flexibility to achieve fiscal plan targets during the five years the new CBAs will be in effect.  The AFSCME PSA and the Plan also settle the claims of all participants in the System 2000 hybrid defined contribution plan by returning to them all contributions made by them into the System 2000 plan, plus interest, which will actually result in material savings to the Commonwealth in the long term by liquidating the claims now so they do not accrue into larger liabilities by the time each participant retires.  The AFSCME PSA also provides union support for the pension reform measures set forth in the Plan. The Oversight Board asserts, and will prove at confirmation, this settlement is a reasonable resolution of potential disputes with AFSCME regarding the confirmation of the Plan, the need to reject the existing AFSCME CBAs to achieve fiscal plan targets, and disputes over the claims of System 2000 participants.  The Oversight Board will also prove the AFSCME Professional Fees (as described in Section 3.4 of the Plan) are fair and reasonable in light of the obligations undertaken and the fees incurred by the parties thereto, and the payment thereof by the Debtors should be approved.

44.     Settlement with AMPR (Subject to Ratification).  The Plan provides for treatment of active teachers employed by the Commonwealth (Class 51I) who are participants in the defined benefit plan of the Teachers Retirement System ("TRS") and/or members of the local teachers' unions Asociación de Maestros de Puerto Rico and Asociación de Maestros de Puerto Rico – Local Sindical (each affiliated with the national union American Federation of Teachers, and collectively "AMPR") that is consistent with a settlement in principle agreed to among AMPR and the Oversight Board on behalf of the Commonwealth, as summarized in Exhibit F-2 of the Plan, under

20

which AMPR would support the Plan and the treatment of its members.  This settlement remains

subject to ratification by vote of AMPR's members on or before September 30, 2021.  If AMPR's

members do not ratify this settlement, members of this class will receive the treatment set forth in

Section 55.9 and Exhibit F-1 of the Plan.

45.     The settlement with AMPR consist of two primary components:  (a) a new 5-year

collective bargaining agreement to commence (retroactively) as of July 1, 2021, and (b) the unions'

consent to a freeze of the defined benefit plan of the TRS under terms that are more favorable than

the freeze structure set forth in Exhibit F-1 of the Plan.  The unions would also consent to the

modification of accrued pension benefits under the terms agreed to with the Retiree Committee.

The settlement further provides that all teachers under 45 will be enrolled in Social Security, and

those 45 and over will have the option to enroll in Social Security.  All teachers currently in the

defined benefit plan will also be enrolled in the defined contribution plan established by Act 106-

2017.

46.     The Oversight Board estimates the freeze of pension benefit accruals under the TRS

plan and new collective bargaining agreement will generate approximately $3.6 billion in net

savings to the Commonwealth over the thirty-year period following the effective date of the TRS

pension freeze.[12]  This sum is net of the cost to the Commonwealth of paying its share of Social

Security for teachers (who are not currently enrolled in Social Security) and the bonuses and

increased healthcare contributions to be paid by the Commonwealth under the terms of the new

CBA.  This settlement therefore provides ample financial benefits to the Commonwealth while

providing teachers contractual protections for five years and the potential to share in future excess

---

[12] This figure reflects the Oversight Board's estimate based on data as of July 1, 2015, and is subject to change, including as a result of as additional data becoming available.

surpluses if the Commonwealth's economic performance exceeds current fiscal plan projections. The Oversight Board asserts, and will prove at confirmation, this settlement is a reasonable resolution of potential disputes with AMPR regarding the confirmation of the Plan and its treatment of AMPR's members (including, most importantly, the freeze of the TRS defined benefits). The Oversight Board will also prove the AMPR Professional Fees (as described in Section 3.4 of the Plan) payable if the AMPR's members ratify the settlement are fair and reasonable in light of the obligations undertaken and the fees incurred by the parties thereto, and the payment thereof by the Debtors and should be approved.

**B.   The releases, injunctions, and exculpation provisions in the Plan are reasonable and appropriate, integral to the Plan.**

47.   A summary of the release, injunction, and exculpation provisions in the Plan can be found in Article II.G. of the *Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 17628] (the "Disclosure Statement"). In connection with confirmation of the Plan, the Oversight Board will prove the releases, injunctions, and exculpation provided in the Plan are reasonable and integral to the Plan.

**C.   PROMESA preempts the following Commonwealth Laws.**

48.   The Oversight Board will prove that Commonwealth laws identified in the Plan are inconsistent with Titles II and III of PROMESA and the carrying out of the Plan, would frustrate the purpose of the debt restructuring, and/or would frustrate Congress's reorganizational and budgetary purposes embodied in PROMESA.

49.   All statutes that either require approval from the Government of Puerto Rico for the issuance of new debt, or to issue, exchange, or modify debt or enter into similar transactions, or create, require or enforce payment obligations or appropriations, are preempted because they either (i) conflict with the provisions of PROMESA conferring sole and exclusive authority over

22

Commonwealth finances to the Oversight Board, (ii) conflict with Title III of PROMESA, as they require payment in full of prepetition obligations or appropriations not afforded priority under PROMESA, and/or (iii) would incur debt inconsistent with Title II of PROMESA and the certified Fiscal Plan.  Further, such statutes create an obstacle to accomplishment of the purposes and objectives of PROMESA to enable Puerto Rico to regain fiscal responsibility and access to capital markets.  Statutes requiring action by the Government to issue new debt are preempted because PROMESA Title III authorizes the issuance of new debt without approval from the Government of Puerto Rico.  Statutes authorizing or requiring the Government to appropriate funds, or to direct the payment of debt, are also preempted because they are inconsistent with the Oversight Board's budgetary authority over Commonwealth finances pursuant to Title II of PROMESA.  In light of the foregoing, the following statutes are among those preempted because they are each, in part or in their entirety, inconsistent with, among other PROMESA sections, sections 108, 201, 202, 207, or PROMESA Title III:

| Statute | Brief Description |
| --- | --- |
| Act 2 approved October 10, 1985 | Act 2-1985 authorizes the Secretary of the Treasury to issue refinancing bonds to refinance any outstanding bonds, and to cover any costs related to the sale and issue of the refinancing bonds.  Act 2-1985 further authorizes and directs the Secretary of the Treasury to pay the principal and interest on such refinancing bonds.  A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. |
| Act 1 approved June 26, 1987, as amended | Act 1-1987 authorizes the Secretary of the Treasury to issue up to $800 million in notes in advance of taxes and revenues of the Commonwealth, to pay in advance the budgetary appropriations covered by those taxes and revenues, and to cover any expenses related to the sale of the notes.  The taxes and revenues which correspond to the notes are deposited in a special fund. |
| Act 47 approved June 30, 2013 | Act 47-2013 authorizes the Secretary of Treasury to issue bonds and bond anticipation notes in an amount not to exceed $100 million.  The purpose of the bonds and bond anticipation notes is to cover the cost of certain public improvements and associated costs.  Act 47-2013 further guarantees |

23

| Statute | Brief Description |
|---|---|
|  | repayment of the bonds and bond anticipation notes and directs the Secretary of the Treasury to pay the principal and interest on bonds and notes, as they become due, from any funds available in the treasury.  A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. |
| **Act 242 approved December 13, 2011** | Act 242-2011 authorizes the Secretary of the Treasury to issue bonds and bond anticipation notes in an amount not to exceed $290 million. The purpose of the bonds and bond anticipation notes is to cover the cost of certain public improvements and associated costs. Act 242-2011 further directs the Secretary of the Treasury to pay the principal and interest on bonds and notes, as they become due, from any funds available in the treasury.  A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. |
| **Act 45 approved June 30, 2013** | Act 45-2013 creates the Fiscal Reconstruction Fund (the "Fund") under the custody of the Department of Treasury, and authorizes the GDB "to transfer to such Fund two hundred forty-five million dollars ($245,000,000)," either from its own funds or from private financing.  The purpose behind creating the Fund is "to keep providing direct services to the people, address [Puerto Rico's] current economic situation, and lead [Puerto Rico] towards a path of fiscal recovery."  Under Act 45-2013, $200 million of the money deposited in the Fund is appropriated to the Municipal Revenues Collection Center as part of the Municipal Revenues Matching Fund, and $45 million of the money deposited in the Fund is appropriated to the Municipal Revenue Collections Center "as part of the payment of the Exemption Fund to compensate Municipalities for any tax not collected as a result of the property tax exemption."  The source of payment for the loan are Commonwealth bonds and notes. Act 45-2013 authorizes and directs the Secretary of the Treasury "to pay the principal and interest on such bonds, notes, promissory notes, or other evidence of indebtedness as they mature, from any funds available for such purposes in the Treasury of the Commonwealth . . . ."  The Secretary of the Treasury is authorized to "negotiate and enter into with any bank, investment institution, or any other financial institution, such loan agreements, purchase agreements, or other financing agreements needed for the financing authorized under this Act . . . ."  A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. |
| **Act 34 approved March 4, 2014** | Act 34-2014 authorizes the Secretary of the Treasury to issue and sell up to $3.5 billion in Commonwealth bonds for the purpose of financing Commonwealth debt, COFINA bonds, GDB bonds, PBA operation costs, and other purposes.   A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act.  Act 34-2014 also authorizes the Secretary of the Treasury to borrow money and issue bond anticipation notes, and authorizes and directs |

| Statute | Brief Description |
|---|---|
| | the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 79 approved June 1, 2011** | Act 79-2011 authorizes the Secretary of the Treasury to issue and sell up to $304 million in Commonwealth bonds for the purpose of financing certain public works and improvements.  A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act.  Act 79-2011 also authorizes the Secretary of the Treasury to borrow money and issue bond anticipation notes, and authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 243 approved August 9, 2008** | Act 243-2008 authorizes the Secretary of the Treasury to issue and sell up to $250 million in Commonwealth bonds for the purpose of financing certain public improvements.  A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act.  The Act also authorizes the Secretary of the Treasury to borrow money and issue bond anticipation notes, and authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 74 approved July 23, 2007, as amended** | Act 74-2007, authorizes the issuance of bonds and bond anticipation notes of the Government of the Commonwealth of Puerto Rico in a principal amount not to exceed $500 million in order to cover the cost of necessary public improvements.  The Act authorizes the Secretary of the Treasury, with approval of the Governor, to pay the principal and interest on the bonds as they mature from any funds available for such purposes in the Treasury in the fiscal year in which such payment is required.  In addition, the Act provides that the provisions concerning payment are to be deemed a continuing appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds, and authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 43 approved August 1, 2005, as amended** | Act 43-2005 authorizes the issuance of bonds and bond anticipation notes of the Government of the Commonwealth of Puerto Rico in a principal amount not to exceed $575 million in order to cover the cost of necessary public improvements.  The Act authorizes the Secretary of the Treasury, with approval of the Governor, to pay the principal and interest on the bonds as they mature from any funds available for such purposes in the Treasury in the fiscal year in which such payment is required.  In addition, the Act provides that the provisions concerning payment are to be deemed a continuing appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds. |

| Statute | Brief Description |
|---|---|
| **Act 216 approved August 19, 2004** | Act 216-2004, authorizes the issuance of bonds and bond anticipation notes of the Government of the Commonwealth of Puerto Rico in a principal amount not to exceed $50 million in order to cover the cost of necessary public improvements. The Act authorizes the Secretary of the Treasury, with approval of the Governor, to pay the principal and interest on the bonds as they mature from any funds available for such purposes in the Treasury in the fiscal year in which such payment is required. In addition, the Act provides that the provisions concerning payment are to be deemed a continuing appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds. |
| **Act 100 approved July 12, 2002, as amended** | Act 100-2002 authorizes the Secretary of the Treasury to issue and sell up to $500 million in Commonwealth bonds for the purpose of financing certain public improvements. A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. The Act also authorizes the Secretary of the Treasury to borrow money and issue bond anticipation notes, and authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 161 approved July 5, 2003** | Act 161-2003 authorizes the Secretary of the Treasury to issue and sell up to $540 million in Commonwealth bonds for the purpose of financing certain public improvements. A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. Act 161-2003 also authorizes the Secretary of the Treasury to borrow money and issue bond anticipation notes, and authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 149 approved August 9, 2002, as amended** | Act 149-2002 authorizes the Secretary of the Treasury to issue and sell up to $110 million in Commonwealth bonds for the purpose of financing certain public improvements, which would were to be payable from contributions received from the GDB Act 149-2002 created a special fund, into which the GDB's contributions would be deposited. A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under Act 149-2002. Further, Act 149-2002 authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from funds available in the special fund. |
| **Joint Resolution No. 57 approved July 12, 1993** | Joint Resolution No. 57-1993 authorizes the Secretary of the Treasury to issue Refinancing Bonds of the Commonwealth of Puerto Rico pursuant to Act No. 2 of October 10, 1985, as amended. |

| Statute | Brief Description |
|---|---|
| **Act 54 approved July 6, 2001** | Act 54-2001, authorizes the issuance of bonds and bond anticipation notes of the Government of the Commonwealth of Puerto Rico in a principal amount not to exceed $475 million) in order to cover the cost of necessary public improvements. The Act authorizes the Secretary of the Treasury, with approval of the Governor, to pay the principal and interest on the bonds as they mature from any funds available for such purposes in the Treasury in the fiscal year in which such payment is required. In addition, the Act provides that the provisions concerning payment are to be deemed a non-lapsing appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds. |
| **Act 118 approved July 13, 2000** | Act 118-2000 authorizes the issuance of bonds and bond anticipation notes of the Government of the Commonwealth of Puerto Rico in a principal amount not to exceed $425 million in order to cover the cost of necessary public improvements. The Act authorizes the Secretary of the Treasury, with approval of the Governor, to pay the principal and interest on the bonds as they mature from any funds available for such purposes in the Treasury in the fiscal year in which such payment is required. In addition, the Act provides that the provisions concerning payment are to be deemed a non-lapsing appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds. |
| **Act 153 approved July 16, 1999** | Act 153-1999 authorizes the Secretary of the Treasury to issue and sell up to $475 million in Commonwealth bonds for the purpose of financing certain public improvements A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. Act 153-1999 also authorizes the Secretary of the Treasury to borrow money and issue bond anticipation notes, and authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 219 approved August 9, 2008** | Act 219-1998 authorizes the Secretary of the Treasury to issue and sell up to $475 million in Commonwealth bonds for the purpose of financing certain public improvements. A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. The Act also authorizes the Secretary of the Treasury to borrow money and issue bond anticipation notes, and authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 81 approved August 14, 1997** | Act 81-1997 authorizes the Secretary of the Treasury to issue and sell up to $500 million in Commonwealth bonds for the purpose of financing certain public improvements. A continuing appropriation is authorized for the Secretary of the Treasury to make payments on the principal and interest of bonds issued under the Act. The Act also authorizes the Secretary of the |

27

| Statute | Brief Description |
|---|---|
| | Treasury to borrow money and issue bond anticipation notes, and authorizes and directs the Secretary of the Treasury to pay the principal and interest on the bonds, from any funds available. |
| **Act 119 approved August 9, 1995** | Act 119-1995 authorizes the issuance of bonds and bond anticipation notes of the Government of the Commonwealth of Puerto Rico in a principal amount not to exceed $355 million in order to cover the cost of necessary public improvements. The Act authorizes the Secretary of the Treasury, with approval of the Governor, to pay the principal and interest on the bonds as they mature from any funds available for such purposes in the Treasury in the fiscal year in which such payment is required. In addition, the Act provides that the provisions concerning payment are to be deemed a continuous appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds. |
| **Act 46 approved July 28, 1994** | Act 46-1994, authorizes the issuance of bonds and bond anticipation notes of the Government of the Commonwealth of Puerto Rico in a principal amount not to exceed $325 million in order to cover the cost of necessary public improvements. The Act authorizes the Secretary of the Treasury, with approval of the Governor, to pay the principal and interest on the bonds as they mature from any funds available for such purposes in the Treasury in the fiscal year in which such payment is required. In addition, the Act provides that the provisions concerning payment are to be deemed a continuous appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds. |
| **Act 39 approved May 13, 1976, as amended** | Act 39-1976 provides for the monthly transfer to the "Special Fund for the Amortization and Redemption of General Obligations Evidenced by Bonds and Promissory Notes" necessary funds for the payment of the principal of and interest on bonds and promissory notes issued by the Commonwealth of Puerto Rico. The funds transferred into the Special Fund are to be kept in trust by the Government Development Bank or another depositary agent and are to have a combined capital and surplus of not less than $25 million that the Secretary of the Treasury may designate to make the disbursements. |
| **Act 83 approved August 30, 1991** | Act 83-1991, adopts the "Municipal Property Tax Act of 1991" and transfers to the Municipal Revenue Collection Center all powers, faculties, and functions relative to real and personal property taxes in Puerto Rico, including credit rights and ratings and preferred liens, previously held and exercised by the Secretary of the Treasury. Act 83-1991 provides for the appraisal, levy, notification, determination and collection of property taxes, as well as the classification, valuation, and appraisal of the property and the releases and exemptions granted by law. Further, Act 83-1991 provides for an appropriation of an amount equal to that of the taxes not collected pursuant to |

| Statute | Brief Description |
|---------|------------------|
| | certain tax exemptions granted by the Act, which funds shall be transferred to the GDB for payment of the Commonwealth's general obligation funds. |
| **Joint Resolution No. 99-2013 approved December 9, 2013** | Joint Resolution No. 99-2013 ("JR 99") authorizes the General Services Administration "to take money on loan during Fiscal Year 2013-2014 . . . up to the sum of thirty-four million dollars ($34,000,000.00)," either through the GDB or a private bank.  The purpose of this line of credit is to purchase four helicopters for use by the Puerto Rico Police.  JR 99 further authorized the Puerto Rico Police to negotiate the terms of a lease for the helicopters with the General Services Administration.  The conditions of the loan and the lease must be approved by the OMB.  The source of payment for this $34 million loan is rents the Puerto Rico Police pays to the General Services Administration for its lease of the helicopters.  Further, JR 99 authorizes the Secretary of the Treasury "to pay the principal and interest on the obligations authorized hereby, as they become due, from any funds available for such purpose in the Puerto Rico . . . ." |
| **Act 242 approved December 13, 2011** | Act 242-2011, authorizes the issuance of bonds and bond anticipation notes of the Government of the Commonwealth of Puerto Rico in a principal amount not to exceed $290 million in order to cover the cost of necessary public works and improvements.  The Act authorizes the Secretary of the Treasury, with approval of the Governor, to pay the principal and interest on the bonds as they mature from any funds available for such purposes in the Treasury in the fiscal year in which such payment is required.  In addition, the Act provides that the provisions concerning payment are to be deemed a continuing appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds.  Specifically, proceeds of the bond issue are to be appropriated to the Highways and Transportation Authority or through joint resolution.  The Act provides that the Secretary of the Department of Transportation and Public Works ("DTOP") and the Infrastructure Financing Authority ("IFA") are authorized to enter into agreements with municipalities, provided that the municipality has trained technical personnel and the proper equipment to carry out the works and improvements authorized under the Act. |
| **Act 45 approved June 30, 2013** | Act 45-2013 created the Fiscal Reconstruction Fund (the "Fund"), under the custody of the Department of the Treasury.  Pursuant to the Act, the GDB shall transfer to the Fund $240 million to cover budget appropriations provided for in the Act.  The Act provides that the loan is to constitute an obligation of the Commonwealth backed by bonds and notes and authorizes the Secretary of the Treasury (the "Secretary") to pay the principal and interest on any bonds, notes, promissory notes, or other evidence of indebtedness issued under the Act.  The Secretary, with approval of the Governor, may negotiate and enter into loan agreements, purchase agreements, or other financing agreements with any financial institution |

| Statute | Brief Description |
|---|---|
| | needed for the financing.  In addition, the Act provides that the provisions concerning payment are to be deemed a continuing appropriation and payments are to be made pursuant to the provisions of the laws of the Commonwealth which regulate the disbursement of public funds. |
| **Joint Resolution No. 104 approved December 13, 2013** | Joint Resolution No. 104-2013 ("JR 104") authorizes the Office of the Superintendent of the Capitol "to establish during Fiscal Year 2013-2014 a credit line . . . up to the sum of fifteen million dollars ($15,000,000.00 ), under such terms and conditions agreed to between the [GDB] and the [OMB]."  The purpose of this line of credit is "to carry out permanent works and improvements in the Capitoline District, including the expenses connected therewith."  JR 104 also authorizes the GDB to sound out alternatives for the financing . . . with private banks."  The source of payment for this $15 million loan is "annual budgetary allocations from the General Fund, as of Fiscal Year 2014-2015 and ending in the Fiscal Year 2023-2024, according to the amount agreed upon by the [GDB] and the [OMB], taking into consideration in each year the balance of principal owed and interest."  In addition, "for Fiscal Years 2014-2015 to 2023-2024, consigned in the Expenditures Budget of the Commonwealth . . . will be the amount agreed upon with the [GDB] for the amortization of the [loan] . . . and the payment of interest accrued each year." |
| **Joint Resolution No. 96 approved November 27, 2013** | Joint Resolution No. 96-2013 ("JR 96") amends Joint Resolution No. 22-2013 ("JR 22").  Specifically, JR 96 amends section 1 of JR 22 to allocate $100 million from the 2013 Public Improvements Fund to certain public agencies and instrumentalities so they can carry out purposes that include the development of:  the San Juan Linear Walk project, the Salinas Boardwalk project, the Patillas Boardwalk project, the Santa Isabel Boardwalk project, the Arroyo Boardwalk project, the Cataño Boardwalk project, the Naguabo Boardwalk project, the Boquerón Town project, and the La Parguera Town project.  Such development involves "the revitalization of recreational areas on the coast where various amenities and concessions are incorporated to promote tourism, economic, cultural, and social development."  JR 96 also amends section 7 of JR 22 to allocate $15 million "through Joint Resolution determined by the Puerto Rico Senate."  In addition, JR 96 amends section 8 of JR 22 "to authorize the [GDB] to advance to the Secretariat of the Treasury the sum of thirty million dollars ($30,000,000), through the granting of a loan as authorized in Article 5 of Law 47-2013, to address the works determined by the Governor." |
| **Act 17 approved April 11, 1968** | Act 17-1968 authorizes PBA to issue up to $27 million in bonds for any of PBA's purposes authorized by law.  The Act further authorizes the Secretary of the Treasury to draw from the fund established by Act 269-1949 or the |

30

| Statute | Brief Description |
|---|---|
| | Treasury of Puerto Rico the funds necessary to cover any deficiency in PBA's ability to pay the principal and interest of bonds issued under the Act. |
| **Act 409 approved September 22, 2004** | Act 409-2004 provides that the Commonwealth of Puerto Rico guarantees the payment of principal and interest on outstanding bonds that are issued by the Port of Americas Authority for any of the purposes authorized by Act No. 171 of August 11, 2002, for which the total amount of the principal does not exceed $250 million. The Act further directs the Secretary of the Treasury make payments of principal and interest on bonds issued by the Port of Americas Authority whenever the Port of Americas Authority lacks the funds to make such payments. |
| **Act 1 approved January 1, 2015** | Act 1-2015 allows PRIFA to assume or repay certain debts of HTA, creates a fund, the Infrastructure Financing Authority Special Economic Assistance Fund, and authorizes PRIFA to issue bonds to finance the assumed debts of HTA. Under the Act, the Commonwealth guarantees the payment of the principal and interest of the bonds issued under the Act, up to $2.95 billion. The Act authorizes the Secretary of the Treasury, under certain conditions, to withdraw from the Treasury of Puerto Rico the remaining funds necessary to pay the principal and bonds issued under the Act. Act 1-2015 further directs the Secretary of the Treasury to "establish a payment mechanism whereby any Pledged Revenues . . . shall be paid" to the trustee for HTA bonds. |
| **Act 45 approved July 28, 1994** | Act 45-1994 provides that the Commonwealth of Puerto Rico guarantees the payment of principal and interest on outstanding bonds issued by the Aqueducts and Sewers Authority of Puerto Rico, and any bonds that may be issued by the Aqueducts and Sewers Authority of Puerto Rico to refinance any of the outstanding bonds. The Act also directs the Secretary of the Treasury to "cosign or advance, from any available funds in the Commonwealth Treasury, those sums of money that are needed to cover the deficiencies in the amount required for the payment of said principal, premiums, if any, and interest . . ." in respect of bonds issued by PRASA. |

50.     In addition, certain provisions of Act 33, approved December 7, 1942 ("Act 33-1942"), are preempted by PROMESA. To the extent Act 33-1942 authorizes refinancing of GO bonds, and is not inconsistent with Title II or PROMESA or the Plan, it is not preempted. Otherwise, PROMESA Title III authorizes the issuance of new debt without approval from the Government of Puerto Rico, and accordingly, provisions of Act 33-1942 requiring action by the Government to issue new debt are preempted. PROMESA also requires prior approval of the

31

Oversight Board for the Government of Puerto Rico to issue, exchange or modify debt, or enter into similar transactions, so provisions of Act 33-1942 authorizing the Government to issue new debt are preempted. Such provisions are preempted by PROMESA because (i) they conflict with the provisions of PROMESA conferring sole and exclusive authority over Commonwealth finances to the Oversight Board, (ii) require payment in full of prepetition obligations that are not afforded priority under Title III of PROMESA, and/or (iii) would incur debt inconsistent with Title II of PROMESA and the certified Fiscal Plan. Further, such provisions create an obstacle to accomplishment of the purposes and objectives of PROMESA to enable Puerto Rico to regain fiscal responsibility and access to capital markets.

51.    In addition, statutes requiring the Commonwealth to appropriate moneys to instrumentalities are preempted under sections 201 and 202 because they are inconsistent PROMESA sections 201 and 202 granting the Oversight Board's budgetary authority. Such statutes are inconsistent with Title III because, for instrumentalities not in Title III, they would create obligations that would need to be paid in full when there is no such priority in PROMESA. Further, such statutes are preempted because compliance would frustrate Congress's reorganizational and budgetary purposes embodied in PROMESA. In light of the foregoing, parts or all of each of the following statutes are among those preempted:

| Statute | Brief Description |
|---|---|
| **Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021** | 9 L.P.R.A. § 2021, which was approved on August 12, 1982, authorizes HTA to pledge proceeds of the "the fifteen-dollar ($15) increase in the fees to be paid for the public and private automobile licenses . . . to the payment of the principal and interest on bonds and other obligations of [HTA], or for any other legal purpose of [HTA] . . . subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico." Section 2021 also provides that the proceeds "shall be covered into a Special Deposit in behalf and for the benefit of [HTA], to be used by [HTA] for its corporate purposes." Further, the Commonwealth committed to HTA bondholders not to reduce the license fees. |

32

| Statute | Brief Description |
|---|---|
| Act 43; 13 L.P.R.A. § 31751(a)(1) | Act 43-1971 authorizes HTA to pledge proceeds of the gasoline taxes "to the payment of the principal of and the interest on bonds or other obligations of [HTA] or for any other lawful purpose of [HTA], . . . subject to the provisions of section 8 of Article VI of the Constitution of Puerto Rico." Act 43 also provides for such taxes to be "deposited in a Special Fund . . . for the benefit of [HTA] to be used by [HTA] for its corporate purposes." Further, the Commonwealth committed to HTA bondholders not to reduce or eliminate the gasoline taxes. |
| 13 L.P.R.A. § 31751(a)(3) | 13 L.P.R.A. § 31751(a)(3) provides that up to $20 million in revenues collected from the tax on cigarettes established pursuant to § 31625 of this title per fiscal year shall be covered into a special deposit account in favor of HTA for its corporate powers and purposes.<br><br>The Secretary shall pay such $20 million in monthly contributions of up to $2,500,000, and if said excise tax revenues are not sufficient to make the monthly contribution, the Secretary shall cover such deficiency using any excess of the monthly payment collected on previous or subsequent months of the same fiscal year.<br><br>HTA is authorized to encumber the proceeds from the cigarette excise tax for the payment of principal and interest on any bonds issued by it, subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution. |
| Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914 | Act 44-1988 establishes PRIFA to provide financial, administrative, and other assistance to instrumentalities of Puerto Rico tasked with developing infrastructure facilities. PRIFA is authorized to issue bonds as necessary to provide sufficient funds to finance infrastructure projects. Bonds are payable from all or any part of PRIFA's gross or net revenues and other income by PRIFA, which, subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution, may include the proceeds of any tax or other funds which may be made available to PRIFA by the Commonwealth.<br><br>3 L.P.R. § 1914 directs the first proceeds of the federal excise taxes remitted to Puerto Rico, in increasing amounts, to be deposited into a Special Fund labeled the Puerto Rico Infrastructure Fund on PRIFA's behalf. Starting in fiscal year 2009-10 until fiscal year 2056-57, the annual deposit may not exceed $117 million. If the excise taxes collected are insufficient to cover appropriated amounts, the Treasury is authorized to cover deficiency with any funds available. |
| Act 1 approved January 1, 2015; 13 L.P.R.A. § | Act 1-2015 directs PRIFA to assume or repay certain debts of HTA. Act 1-2015 redirects funds transferred to HTA by Acts No. 30-2013 (licensing fees) and 31-2013 (oil tax revenue) to PRIFA to act as a repayment source. The |

33

| Statute | Brief Description |
|---|---|
| 31751a(a) | repayment of up to $2.950 billion of bonds issued by PRIFA to cover HTA debt is guaranteed with the full faith, credit and taxing power of Puerto Rico.<br><br>13 L.P.R. § 31751a(a) provides that tax revenue collected pursuant to 13 L.P.R. § 31627a (tax on crude oil and oil products) shall be covered into a special deposit in favor of HTA and may be used to repay principal and interest on bonds issued by HTA. |
| 13 L.P.R.A. § 31751(a)(4) | 13 L.P.R. § 31751(a)(4) provides that up to $10 million in cigarette tax revenue shall be covered over into an account for the MBA. The MBA is to use the tax revenue to cover the payment of principal and interest on MBA bonds and other obligations.<br><br>The MBA's $10 million interest is second priority and contingent on the Highways and Transpiration Authority receiving $20 million dollars, from the same source.<br><br>The Secretary shall pay such $10 million in monthly contributions of up to $800,000, and if said excise tax revenues are not sufficient to make the $800,000 monthly contribution, the Secretary shall cover such deficiency using any excess of the $800,000 payment collected on previous or subsequent months of the same fiscal year. |
| 13 L.P.R.A. § 31751(a)(5) | 13 L.P.R. § 31751(a)(5) provides that up to $36 million in cigarette tax revenue shall be covered over into an account for the PRITA. The PRITA is to use the tax revenue to cover the payment of principal and interest on PRITA bonds and other obligations.<br><br>The PRITA's $36 million interest is third priority and contingent on the Highways and Transpiration Authority receiving $20 million, and the MBA receiving $10 million, from the same source.<br><br>The Secretary shall pay such $36 million in monthly contributions of up to $3,000,000, and if said excise tax revenues are not sufficient to make the monthly contribution, the Secretary shall cover such deficiency using any excess of the monthly payment collected on previous or subsequent months of the same fiscal year. |
| 13 L.P.R.A. § 2271v(a) | 13 L.P.R.A. § 2271v(a) authorizes CCDA, "with the prior written consent of the [Tourism] Company, to pledge or otherwise encumber the . . . [room occupancy] tax collected which is to be deposited in the [specified] special account . . . as security for the payment of the principal and interest on" bonds issued by CCDA.  With respect to the room occupancy taxes, the statute provides the Tourism Company will appropriate a portion of such taxes to CCDA by depositing the amount into a "special account to be |

34

| Statute | Brief Description |
|---|---|
|  | maintained by [GDB] in the name of [CCDA] for the benefit of the bondholders," subject to § 8 of Article VI of the Constitution of Puerto Rico. Further, the Commonwealth committed to CCDA bondholders not to reduce or eliminate the taxes. |
| **Act 147 enacted June 18, 1980, as amended, 23 L.P.R.A. § 104** | Act 147-1980 requires the Governor to submit the Commonwealth's annual budget to the Legislative Assembly at the beginning of each regular session. It also requires the Governor to "submit the appropriations and income-generating draft bills, in agreement with the recommended Budget during the Regular Session of the Legislature, within the term prescribed by law." Section 104(c) establishes the priorities of payment for "when the available funds for a specific fiscal year are not sufficient to cover the appropriations approved for that year." Further, Act 147 identifies the powers of the Governor with respect to the administration and control of the budget, which can be deleted to the Management and Budget Director.<br><br>23 L.P.R.A. § 104 provides that, beginning in Fiscal Year 2003-2004, "the Judicial Branch shall be appropriated a sum equal to 3.3% of the average of the total amount of the annual revenues earned in accordance with the provisions of the Laws of the Commonwealth of Puerto Rico, and covered into the General Fund of the Treasury of Puerto Rico during the two (2) fiscal years preceding the current year, and those covered into" certain funds supported by tax and non-tax revenues. Further, the statute provides mandatory percentage increases in appropriations to the Judicial Branch, until a maximum of 4% of General Fund revenues. |
| **18 L.P.R.A. § 621-1** | 18 L.P.R. § 621-1 appropriates to the University of Puerto Rico funds equal to 9.60 percent of the average total amount of annual revenues deposited into the General Fund of the Commonwealth Treasury, plus deposits into any special funds created prior to July 1st, 1993 that hold funds generated by taxation. |
| **Act 83 approved August 30, 1991, as amended, 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[13]** | The Municipal Property Tax Act of 1991, Act 83 of 1991 (Act 83-1991), establishes the administrative responsibilities and procedures for CRIM to collect property tax.<br><br>21 L.P.R. § 5002 creates a special 1.03 % tax on the appraised value of all personal and real property in Puerto Rico for the amortization and redemption of the general obligations of the Commonwealth. Municipalities are authorized to levy an additional surtax on real property for the amortization and redemption of the general obligations of the Commonwealth. There is a residential property exemption of up to $150,000. |

[13] In addition to the bases for preemption outlined in paragraph 50 above, this statute is also preempted to the extent it authorizes payment of general obligation debt, which is inconsistent with the certified Fiscal Plan.

| Statute | Brief Description |
|---|---|
| | 21 L.P.R. § 5004 directs proceeds from the taxes levied by §§ 5001 and 5002 to be deposited into a general trust established by CRIM and the Government Development Bank. The funds generated by the surtax on property imposed by § 5002 shall be deposited into a trust called the Commonwealth Debt Redemption Fund. The fund is solely for the payment of the principal and interest on existing and future Puerto Rican bonds or notes. 21 L.P.R. § 5006 directs the Treasury to compensate municipalities for uncollected property taxes resulting from the tax exemption provided in § 5002 under limited circumstances. 21 L.P.R. § 5815 provides that starting in the fiscal year 1991-92 the following funds shall be transferred to the municipalities: (1) total amount of funds from the basic tax levied by the Commonwealth and municipalities to the limits established by § 5001; (2) a percentage of net revenues from the Lottery System; (3) a percentage of the net internal revenues of the General Fund; and (4) 2% of the revenues collected for violations of vehicle and traffic laws. |
| **Act 221 approved May 15, 1948, as amended, 15 L.P.R.A. § 74(d)** | Act 221-1948 authorizes the Treasurer to issue gambling licenses and authorize gambling activities. 15 L.P.R. §74(d) establishes the method for calculating the annual net income derived from slot machines. This section further directs that income from slot machines shall be covered into a special fund in the Tourism Company. |
| **Act 18 approved January 24, 2014, as amended, 21 L.P.R.A. § 6742** | Act 18 of 2014 ("Act 18-2014") creates the Municipal Administration Fund ("MAF") governed by the Government Development Bank. Act 18-2014 directs state sales and use tax revenue received by the Commonwealth to be deposited in the MAF. 21 L.P.R. § 6742 establishes the manner in which funds held by MAF will be distributed to municipalities: (a) 40 percent of the sales and use tax deposited in the MAF shall be transferred to the Municipal Development Funds of each municipality; (b) 40 percent of the tax deposited in the MAF shall be transferred to the Municipal Redemption Funds of each municipality; and (c) 20 percent of the tax deposited in the MAF shall be transferred to the Municipal Improvement Fund of each municipality. |
| **Act 214 approved August 18, 2004, as amended, 23 L.P.R.A. § 695** | Act 214 of 2004 ("Act 214-2004") establishes, *inter alia*, the Puerto Rico Science, Technology, and Research Trust Fund ("Research Trust Fund"). Act 214-2004 further provides that the Research Trust Fund is funded by, *inter alia*: (i) 20% of the moneys covered into the Economic Development Special Fund administered by PRIDCO; (ii) funds not disbursed by PRIDCO to UPR |

| Statute | Brief Description |
|---|---|
| | pursuant to Resolution No. 2003-18; and (iii) $5 million per year, payable either from certain excise taxes or from the General Fund. |
| 12 L.P.R.A. §8105 | Act 41-2011, creates the Proper Scrap Tire Management Fund (the "Fund") "under the responsibility, jurisdiction, and administration of the [Environmental Quality] Board." The Fund is to be "nourished primarily from the revenues of the [Environmental Quality] Board on account of the Scrap Tire Management and Disposal Fee . . . which shall be charged to tire importers and manufactures." Act 41 provides, "for Fiscal Year 2014-2015, the sum of five million dollars ($5,000,000) shall be transferred from this Fund to the Legal Liability Fund"; "for Fiscal Year 2015-2016, the sum of nine million dollars ($9,000,000) . . . shall be transferred to the 2015-2016 Municipal Support Fund"; and "the sum of one hundred fifty thousand dollars ($150,000) . . . shall be transferred to the Special Education Students Service and Therapy Fund." Further, the statute allows the Fund to be used to "to hire skilled personnel, purchase or lease equipment, materials, services, and to defray other expenses" in order to address "[e]mergencies related to tires that pose a risk to the human health, the environment, and the property." |
| Act 41 approved July 22, 2011, as amended | Act 41-2011 creates the Historical Archive of the Legislative Assembly of Puerto Rico. The Act provides that the Legislative Assembly "shall appropriate the necessary funds for the acquisition of equipment as required to outfit and operate the Historical Archive of the Legislative Assembly for Puerto Rico." |
| Act 1 approved January 31, 2011, as amended, 13 L.P.R.A. § 33231(l) | Act 1-2011 directs the Secretary of Treasury "to set aside, in a Special Account, up to twenty-five percent (25%) of the amounts that the . . . United States covers over to the Treasury of the Government of Puerto Rico on account of the tax on rum bottled in Puerto Rico or shipped in bulk from Puerto Rico to the United States and sold to consumers in the United States." Act 1 further provides "that on an annual recurring basis, beginning Fiscal Year 2015-2016, . . . the Secretary shall transfer two point five percent (2.5%) of the total amount that the . . . United States covers over to the Treasury of the Government of Puerto Rico on account of the excise tax on rum bottled in Puerto Rico or shipped in bulk from Puerto Rico to the United States and sold to consumers in the United States, to the Industrial Development Company." The maximum funds transferred per year is limited to $10 million. Such appropriation "shall be used to defray the operating expenses of the Rums of Puerto Rico Program, including among others, the promotion of local rum industries, in addition to the development of the sugarcane industry." Act 1 also "empowers" the GDB "to incur obligations and/or issue bonds, in order to finance the implementation of the purposes, programs, and activities contemplated in this subsection and to pledge the funds set apart under this |

| Statute | Brief Description |
|---|---|
| | subsection to secure payment of the principal and interest concerning such obligations and/or bonds." |

52.     Lastly, all Commonwealth statutes that create, require, or enforce employee pensions and benefits, to the extent inconsistent with the Plan, are preempted as inconsistent with Title III of PROMESA because they would require payment in full of prepetition obligations that are not afforded priority under PROMESA.  Such statutes are also preempted because they would incur debt that is inconsistent with Title II of PROMESA and the certified Fiscal Plan.  Further, such statutes create an obstacle to accomplishment of the purposes and objectives of PROMESA, which is to enable Puerto Rico to regain fiscal responsibility and access to capital markets.

| Statute | Brief Description |
|---|---|
| Act 106[14] approved August 23, 2017 | Act 106 -2017 declares that the Retirement System for Employees of the Government of Puerto Rico, the Judiciary Retirement System and the Teachers' Retirement System are in a state of fiscal emergency.  Act 106-2017 directs the General Fund, through the Accumulated Pension Benefits Payment Accounts to assume payments in full of the amount of participants' pension benefits, because the three Retirement Systems are unable to make such payments. |
| Act 160 approved December 24, 2013 | Act 160-2013 creates a new teachers' retirement system ("TRS"), and repeals Act 91-2004.  TRS is an independent government entity and will use funds for the payment of pensions and other benefits.  Act 160-2013 further provides the framework to determine contributions and payments into and from the retirement system.  To make up the system's cash flow deficit, Act 160-2013 states that TRS will receive an Annual Additional Contribution from fiscal year 2018-19 to 2041-42.  The Annual Additional Contribution is a contribution to prevent the value of the projected gross assets of TRS from falling below $300 million. The Office of Management and Budget is directed by Act 160-2013 to earmark funds for the Annual Additional Contribution. |

---

[14] Act 106 is partially preempted, solely to the extent it is inconsistent with PROMESA, the certified Fiscal Plan, and the Plan.

| Statute | Brief Description |
|---|---|
| Act 91 of March 24, 2004 | Act 91-2004 creates a new TRS.  The Puerto Rican government is obligated to contribute into the system 8.5% of the total amount of the salaries of all teachers who are employed by the Commonwealth and participate in the TRS. |
| Act 12 approved October 19, 1954 | Act 12-1954 creates a retirement system for the Commonwealth's judiciary ("JRS").  The act defines the structure and operations of the retirement system and the benefits provided.  Every participant's contribution is equal to 7.5% of his/her salary.  Act 12-1954 further obligates the government to contribute to the system to cover maintenance and administration costs as necessary. |

**D.  The Plan does not unfairly discriminate and is fair and equitable with respect to any Class of Claims that votes to reject or is deemed to have rejected the Plan.**

53.     PROMESA requires that, for each Class of Claims that rejects the Plan, including Classes 63 (CW Appropriations Claims) and Class 64 (Section 510(b) Subordinated Claims), which are deemed to have rejected the Plan, the Oversight Board must prove the Plan does not unfairly discriminate and is fair and equitable with respect to each such Class.  The Oversight Board will demonstrate that the Plan satisfies these requirements for those Classes that are deemed to reject the Plan, as well as any Class(es) that vote to reject the Plan.

54.     _Fair and Equitable (Unsecured Claims)_.  Outside of Title III, the "fair and equitable" requirement generally requires, among other things, that unless a dissenting class of unsecured claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims.  This is known as the "absolute priority rule."  Few published opinions have addressed the meaning of the "fair and equitable" requirement in chapter 9 cases. Courts that have addressed this requirement in the context of a chapter 9 case have indicated that, because there are no equity holders in chapter 9 cases (who, in theory, would be junior in priority to a debtor's general unsecured claimholders), the absolute priority rule cannot be applied in chapter 9 cases and, thus, in such cases, the "fair and equitable" requirement should not be interpreted as synonymous with the absolute priority rule.

39

Instead, courts have held that the "fair and equitable" requirement in chapter 9 requires that, where a debtor seeks nonconsensual confirmation of a plan of adjustment, the impaired creditors of such debtor, under the proposed plan, will receive what is reasonable under the circumstances.  In these Title III Cases there may well be classes of unsecured claims junior to other classes of unsecured claims based on Bankruptcy Code section 510.  In those situations, the fair and equitable requirement will be the absolute priority rule.  Because of the many settlements embodied in the Plan, fair and equitable can also be satisfied based on arm's–length settlements with accepting Classes.

55.     The Debtors will prove the Plan is "fair and equitable" with respect to holders of Claims against the Debtors because it provides such holders of Claims with reasonable distributions in light of the best interests analysis and Puerto Rico's need to upgrade its basic education and healthcare systems, among others.  The commencement of the Title III Cases was precipitated by the Debtors' untenable debt burden, a severe cash shortage, and the economic decline and outmigration eroding the Debtors' revenues.  The Debtors will prove the Plan is "fair and equitable" with respect to each rejecting Class of Claims because the creditor recoveries proposed therein have been calculated—and, in certain cases, negotiated—to reasonably compensate holders of such Claims while enabling the Debtors to (i) avoid a recurrence of the financial difficulties that led to the commencement of the Title III Cases and (ii) institute desperately-needed reinvestment initiatives to ensure the Commonwealth has a sustainable economy providing hope and opportunity to Puerto Rico's people to stop the out-migration of the past.

56.     <u>Fair and Equitable (Secured Claims)</u>.  Section 1129(b) of the Bankruptcy Code requires that each holder of an impaired secured claim (a) retain its liens on the property to the

extent of the allowed amount of its secured claim and receive deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, (b) have the right to credit bid the amount of its claim if its property is sold and retain its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (c) receive the "indubitable equivalent" of its allowed secured claim.  The Oversight Board will prove that at least one of the elements of section 1129(b) of the Bankruptcy Code applies to any rejecting class of Secured Claims.

57.    <u>Unfair Discrimination</u>.  A plan of adjustment does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims.  The Debtors will prove the Plan does not discriminate unfairly against any rejecting class of claims.  If any creditor claims it is unfairly discriminated against because retirees are being paid higher percentages of their claims, the Oversight Board will prove the payments to retirees are necessary to provide minimally acceptable standards of living and the current and future retirees have each suffered other losses of benefits over the years and currently.

## E.   **The Debtors have obtained all necessary legislative, regulatory, or electoral approval, if any are necessary.**

58.    The Oversight Board will prove that any legislative, regulatory, or electoral approval, to the extent necessary under non-preempted applicable law, to carry out any provision of the Plan has been obtained, or such provision is expressly conditioned on such approval.  The Oversight Board believes PROMESA Title III authorizes issuance of all new debt without any legislation under Commonwealth law.  Additionally, there is already legislation that authorizes refinancings of the general obligation debt being restructured.  The Commonwealth has relied on that legislation for other debt issuances.  If, however, for some reason the existing legislation is insufficient or any plan support agreement with certain debtholders requires other legislation, the

41

Debtors will modify the Plan before confirmation to eliminate the need for legislation and may need to request an adjournment of the confirmation hearing to do so and to allow time for any supplemental disclosures and voting, if required.  Currently, the Oversight Board plans on proving (i) the Commonwealth has already enacted or will enact prior to the Effective Date, (a) the New GO Bonds Legislation, providing for the issuance of the New GO Bonds and (b) the CVI Legislation, providing for the issuance of the CVIs, or (ii) the provisions of the Plan may be carried out without such enactments by the Commonwealth.  The Oversight Board submits that, pursuant to Sections 4 and 305 of PROMESA, and Bankruptcy Code section 105(a), the Court may enter an order approving the transactions contemplated by the Plan, including providing for the issuance of the New GO Bonds, the CVIs, and the related transaction documents, either pursuant to existing Commonwealth law, or independent of existing Commonwealth law pursuant to Bankruptcy Code section 1123(a)(5)(J).  As the Oversight Board represented at the disclosure statement hearing, it will advise creditors prior to the voting deadline as to whether it believes now-existing Commonwealth statutes satisfy the Commonwealth's plan support agreements requiring legislation.

**F.  <u>The Plan is feasible and consistent with the Fiscal Plans.</u>**

59.     Like section 943(b)(7) of the Bankruptcy Code, PROMESA imposes a feasibility requirement on the plans of Title III debtors.  Courts have interpreted the feasibility requirement in chapter 9 to mean the municipality will be viable, and the plan offers a reasonable prospect of success and is workable.  In sum, the debtor must show it can satisfy the obligations in its plan.  Unlike chapter 9, Title III also contains a requirement that the Plan be consistent with the applicable certified fiscal plans.  The Debtors will prove the Plan is consistent with the debt sustainability analyses in the applicable certified fiscal plans and is not inconsistent with such fiscal plans.

42

60.    <u>Confirmation of the Plan is not likely to be followed by the need for further
financial reorganization</u>.  The Oversight Board will prove that the obligations contemplated to be
owed by the Reorganized Debtors are within their capacity to pay from and after the Effective
Date, which is the conventional feasibility test in reorganization cases.

61.    *Commonwealth*.  The current Fiscal Plan shows the Commonwealth will run a
deficit starting fifteen years from now, from FY 2036 onward.  The Oversight Board will prove
the Commonwealth can adopt measures allowing the Debtors to service their obligations.  The
Oversight Board will also show the current Fiscal Plan does not build in the new investments in
Puerto Rico that are likely to occur after a restructuring is completed based on such investments
having followed restructurings in other municipalities.  The Government will be required to take
additional measures that go beyond the FY2022–26 framework of the 2021 Fiscal Plan, as the
Puerto Rico Constitution requires the Government to operate within a framework of fiscal balance.
Accordingly, what follows are a set of options the Oversight Board will show the Commonwealth
can adopt to avoid future fiscal deficits.

(i)    Securing additional permanent federal funding for Medicaid of ~$1
billion per year (and growing with inflation) is projected to increase the FY2022–
51 surplus by ~$20 billion if begun in FY2031 and ~$10 billion if begun in FY2041.

(ii)    Imposing a cap on total healthcare expenditure growth at 2% above
standard inflation is projected to result in savings of ~$14 billion by FY2051 if
implemented in FY2031 and ~$2.4 billion if implemented in FY2041.

(iii)    Private sector labor reform, generating an additional 0.50% GNP
growth over two years, by repealing Law 80 of May 30, 1976, which would make
Puerto Rico an employment at-will jurisdiction, similar to its principal competitor
mainland states, such as Florida. This would reduce the cost of hiring workers on
the Island, improving the environment for local businesses and potentially
attracting additional investment from the mainland into Puerto Rico. The reform is
projected to increase the FY2022-51 surplus by ~$13 billion if implemented in
FY2031 and by ~$4 billion if implemented in FY2041.

(iv)    Ease of doing business reform, generating an additional 0.15% GNP growth, based on instituting trading across borders reform, and repealing restrictive and inefficient regulations, and implementing a comprehensive reform of the Transportation system, similar to the one described in Chapter 11, which would contribute to unlock greater impact across all other ease of doing business initiatives, allowing Puerto Rico to better compete for new investments with jurisdictions around the world.  The FY2022–51 surplus is projected to increase by ~$4 billion if implemented in FY2031 and by ~$1 billion if implementation takes place in FY2041.

(v)    Overhaul of the tax system of Puerto Rico to stimulate growth by lowering the statutory marginal tax rates and broadening the tax base by eliminating many exemptions, deductions, credits, and incentives. This would simplify the tax paying structure and process, improving the business environment and delivering long-term growth benefits up to 0.5% spread over five years.   The reform is projected to increase the FY2022–51 surplus by ~$11 billion if implemented in FY2031 and by ~$3 billion if implementation takes place in FY2041.

(vi)    Growing the pharmaceutical and medical devices manufacturing sector given the unique opportunity for Puerto Rico to be a center of excellence and play a leading role in the national portfolio of locations for expanded domestic manufacturing in this sector. The physical infrastructure, human capital, and regulatory processes are already established and well positioned. Previous analyses published by the Board had shown the potential value on economic growth and employment that this effort could have.

62.    *ERS.*  Pursuant to the Plan, ERS will no longer be responsible for the payment of pension obligations or debt service. ERS's pension obligations are now expenditures within the Commonwealth's May 2021 Fiscal Plan through the PayGo system to be funded from Commonwealth sources of revenue and municipal and other contributions.  ERS continues to have operating expenses of approximately $70 million per year, which amounts are projected to decrease.  Based upon the amount of ERS's assets not encumbered by the ERS Bondholders' security interests or otherwise being used in connection with the ERS Stipulation and the Plan, ERS will be able to pay its operating expenses and satisfy its obligations as they come due. Therefore, pursuant to the Plan, ERS will not have material future payments, and accordingly, the Oversight Board will prove the Plan is feasible with respect to ERS.

44

63.   *PBA*.   Pursuant to the Plan, PBA will not have material future payments. Accordingly, the Oversight Board will prove the Plan is feasible with respect to PBA.

### G.  **The Plan is in the best interests of creditors.**[15]

64.   Comparison of range of Best Interests Test Analyses recoveries of creditors as a whole outside Title III to the gross recoveries under the Plan.   The Oversight Board believes the "best interests of creditors" test, in a Title III case, requires only that the debtor prove creditors as a whole either receive an equal or higher percentage recovery on their claims than creditors as a whole would receive outside of Title III or that the smaller recoveries in Title III are reasonably based on the Commonwealth's needs for its people and sustainability or on the lesser recoveries being due to Commonwealth priorities not adopted in Title III, allowability of postpetition interest being barred by Title III, or the lack of attachment and enforcement of certain liens in Title III due to, for example, Bankruptcy Code section 552.   The Oversight Board will prove that creditors of each Debtor, in the aggregate, receive a percentage recovery on their claims not materially less than in the "base case"[16] of assumptions outside of Title III, and that such recovery is within the range of recoveries in other scenarios presented in the best interests tests analyses, which are attached as Exhibit P to the Disclosure Statement.

(a)   *Commonwealth*.   Pursuant to the Plan, the following categories of bonds issued or guaranteed by the Commonwealth will receive the following recoveries on their petition date claims (*i.e.*, exclusive of all postpetition interest and fees):

---

[15] PROMESA section 314(b)(6) requires that the Plan be "in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."   The Oversight Board will prove the Plan treatment of creditors is fair in light of the best interests test analyses.

[16] In each scenario, the Oversight Board has assumed that the Title III case for the respective Debtor is dismissed on June 30, 2021, at which point creditors commence or recommence their actions to recover on account of their claims in accordance with applicable non-bankruptcy law.

  (i)   Vintage CW Bond Claims:  77.6%

  (ii)   2011 CW Series D/E/PIB Bond Claims:  76.5%

  (iii)  2011 CW Bond Claims:  70.3%

  (iv)  2012 CW Bond Claims:  72.4%

  (v)   2014 CW Bond Claims:  67.8%

  (vi)  Vintage CW Guarantee Bond Claims:  74.5%

  (vii)  2011 CW Guarantee Bond Claims:  73.5%

  (viii)  2012 CW Guarantee Bond Claims:  67.3%

65. The foregoing Commonwealth bond recovery percentages are exclusive of any additional recoveries available on account of litigation claims, CVIs to be distributed to certain claimants, restriction fees or consummation costs, or otherwise.  General Unsecured Claims of the Commonwealth, excluding pension claims and claims arising from rejected collective bargaining agreements, among others, will receive $560 million, for a recovery of approximately 20.4%, which could increase up to 40% if additional monies are recovered from the Avoidance Action Trust.  Including the foregoing claims as well as others not enumerated herein, the aggregate recovery for such holders of claims against the Commonwealth is projected to be 70.3%.[17]

66. In the best interests test analysis for the Commonwealth, GO Bondholders are projected in the base case (where GO Bonds issued in or after 2012 are considered invalid) to receive an aggregate recovery of $6.2 billion to $6.6 billion.[18]  As of the Commonwealth Petition Date, the total debt outstanding is estimated at $13.5 billion (including those GO Bonds assumed

---

[17] In addition to the bondholder and guarantee claims classes set forth above, the aggregate recovery set forth herein includes claims from Classes 53 (Dairy Producer Claims), 56 (Med Center Claims) 57 (Tax Credit Claims), 58 (CW General Unsecured Claims), 67 (Gracia Gracia Claims), 68 (Convenience Claims), and 69 (Federal Claims).

[18] All recoveries referenced from the best interests test analyses are presented as the net present value of recoveries as of the effective date of the best interests test analyses.

to be invalid), implying a 46% to 49% overall recovery.  This compares to an 89% to 95% recovery for GO Bonds considered valid in the base case of the best interests test analysis.  Claims *pari passu* with GO Bondholders in the base case of the best interests test analysis (where debt issued in or after 2012 is considered invalid), such as claims of PBA Bondholders and other holders of debt guaranteed by the Commonwealth, receive an aggregate recovery between $2.8 billion and $3.3 billion.  This implies a recovery of 54% to 62% for all bond claims (including debt assumed to be invalid), and 66% to 76% for debt considered valid in the base case.

67.    Other eligible claims, which total $6.0 billion and include litigation claims against the Commonwealth, claims to be settled through the Administrative Claims Process, GDB Debt Recovery Authority (the "DRA") claims, Puerto Rico intragovernmental claims, critical industries claims, employee union claims, trade payables, convenience class claims, Gracia-Gracia insurance overpayment litigation claims, tax-related claims, and other miscellaneous claims, receive between $0.7 billion and $1.2 billion for a recovery between 12% and 20%.  Many of these eligible claims, including, for example, employee union claims, intragovernmental claims, convenience class claims, and Gracia-Gracia claims, are being resolved pursuant to the Plan and accordingly removed from the class of general unsecured Claims therein; outside of Title III, such claims are general unsecured claims and thus dilute the unsecured claims pool.

68.    In the aggregate, outside of Title III, holders of claims against the Commonwealth receive an aggregate recovery of $9.7 billion to $11.0 billion in the base case.  This implies a recovery of 39% to 45% for all claims (including those considered invalid), which is substantially less than the projected recovery under the Plan.  The estimated recovery for all claims considered valid in the best interests test analysis base case is 56% to 64%. The Oversight Board will prove that the legal and factual assumptions made in connection with the Commonwealth best interests

47

test analysis, including the resource envelope available for all creditors of the Commonwealth, and the assumptions regarding the amount of unsecured claims, the treatment of the DRA's claims and the PRIFA BANs claims, and the litigations surrounding the validity of GO Bonds and Commonwealth guarantees of debt and other obligations in light of the Commonwealth constitutional debt limit being settled pursuant to the GO/PBA Plan Support Agreement and the Plan are reasonable, and thus the Plan satisfies the best interests of creditors test with respect to the Commonwealth.

(b)     *ERS*.  Pursuant to the Plan, ERS Bondholders are projected to receive a recovery of 14.0%, and ERS General Unsecured Claims are projected to receive a recovery of 100% on approximately $300,000 of claims, for an implied aggregate recovery of 14.0%.  In the best interests test analysis for ERS, ERS Bondholders are projected to receive a recovery of only 4%, while ERS General Unsecured Claims recover 100%, for an aggregate recovery of 5%, which is substantially less than the projected recovery under the Plan.  The Oversight Board will prove that the legal and factual assumptions made in connection with the ERS best interests test analysis, including the resource envelope available for all creditors of ERS, and the assumptions regarding outstanding litigation being settled pursuant to the ERS Stipulation and the Plan, are reasonable, and thus the Plan satisfies the best interests of creditors test with respect to ERS.

(c)     *PBA*.  Pursuant to the Plan, all PBA Bondholders are projected to receive a recovery of 23.0%, exclusive of any additional recoveries available on account of guarantee claims, CVIs to be distributed to certain claimants, or otherwise.  PBA/DRA Secured Claim are projected to receive a recovery of 10.0%.  PBA General Unsecured Claims, including the PBA/DRA Unsecured Claims, are projected to receive a recovery of 10.0%.  Accordingly, all holders of clams against PBA are projected to receive an implied aggregate recovery of 21.5%.

48

69.     In the PBA best interests test analysis (where PBA Bonds issued in or after 2012 are considered invalid), PBA Bondholders are projected to receive an aggregate recovery of $258 million from PBA in the base case, which is exclusive of any additional recoveries available on account of guarantee claims, CVIs to be distributed to certain claimants, or otherwise.  All PBA Bond claims (including those assumed to be invalid) total $4.7 billion as of the PBA Petition Date, for an overall recovery of 5.5%.  Total PBA Bonds considered valid in the best interests test analysis base case are estimated to be $4.0 billion as of the PBA Petition Date, which implies a 6.4% recovery.  In the PBA best interests test analysis, there are no payments available to the projected $447 million of PBA General Unsecured Claims.[19]  Therefore, total claims against PBA as of the PBA Petition Date amount to $5.1 billion, implying a recovery of 5.0%.  The estimated recovery for all claims considered valid in the best interests test analysis base case is 5.8%.  This is substantially less than the projected recovery under the Plan.

70.     The Oversight Board will prove that the legal and factual assumptions made in connection with the PBA best interests test analysis, including the resource envelope available for all creditors of PBA, and the assumptions regarding the amount of unsecured claims, the treatment of the DRA Parties' claims, and the litigations surrounding the validity of certain Commonwealth guarantees of PBA Bonds in light of the Commonwealth constitutional debt limit litigations being settled pursuant to the GO/PBA Plan Support Agreement and the Plan are reasonable, and thus the Plan satisfies the best interests of creditors test with respect to PBA.

71.     Comparison of range of Best Interests Test Analyses recoveries to each class of creditors outside Title III to recoveries of each class under the Plan.  Even if the Court determines

---

[19] The $447 million of estimated unsecured claims against PBA is exclusive of any claims that might be asserted by the DRA.  The Oversight Board believes that such claims would not receive any recovery in a best interests test analysis.

that the "best interests of creditors" test applies to each class of claims under the Plan, the Oversight Board will prove that every Class receives an equal or greater percentage recovery on their Claims than such Class would have received outside of Title III, or that lower recoveries are due to factors such as PROMESA's requirement that the Commonwealth attain economic sustainability and/or the lower recoveries are due to Commonwealth priorities not adopted in Title III, allowability of postpetition interest being barred by Title III, or the lack of attachment and enforcement of certain liens in Title III due to, for example, Bankruptcy Code section 552.

72.     <u>Significant reserves are required to be established for the Commonwealth and its instrumentalities</u>.  The Plan calls for the Commonwealth to have an unrestricted cash balance on the effective date of $2.5 billion dollars.  Such funds are to be used for, among other things, working capital for the Commonwealth's governmental operations and other liquidity needs.

73.     The Oversight Board will prove this minimum liquidity balance is reasonable.  It will prove the $2.5 billion conforms with the recommendations of authoritative third-party sources on matters of municipal finance (e.g., the Government Finance Officers Association, the Pew Charitable Trusts, and the US Department of Treasury) as well as the approach used in Detroit's bankruptcy, taking into account:  (i) the Commonwealth's cash management practices, funding, and liquidity needs; (ii) the requirements of certain federal government aid programs; and (iii) the particular risks and challenges faced by the Commonwealth.

74.     In addition to the minimum liquidity balance described above, the Plan also provides for the Commonwealth to set aside appropriations annually into an emergency reserve (in the total amount of up to $1.3 billion).  The emergency reserve is designed specifically to ensure the government has adequate funds available to respond rapidly to emergency situations, such as natural disasters.  The emergency fund can only be used for such purposes.

75.     The Oversight Board will prove the funding of the emergency reserve is reasonable. It will prove the amount to be funded is consistent with International Monetary Fund ("IMF") guidance provided to other Caribbean islands, taking into account the particular experiences of Puerto Rico with respect to disaster-related funding needs and the IMF's view that the Caribbean region's already high vulnerability to natural disasters is likely to be exacerbated as the frequency and severity of disasters increase from climate change effects.

76.     Certain cash accounts are legally restricted in accordance with non-preempted applicable law.  Certain cash held in Commonwealth accounts is subject to one or more legal restrictions that prevent the Commonwealth from using the cash to, among other things, fund creditor recoveries under the Plan.  For example, some accounts contain cash received by the Commonwealth from the federal government on the condition that it be put to specific uses only (such as low income housing project support funds from the U.S. Department of Housing and Urban Development).  For another example, certain accounts hold funds deposited and held on behalf of third parties (such as child support payments held in accounts under the custody of the Child Support Administration).  For another example, certain accounts hold funds required to be paid pursuant to a court-ordered settlement.  Such funds are required to be paid only to the beneficiaries of the settlement.

77.     The Debtors will prove they instructed the persons or entities calculating available cash to include restricted cash accounts unless they were restricted due to legal restrictions of the type described above.  Cash accounts labeled restricted only due to the Government's desire, intent, or statute providing the restriction were included in available cash.

51

**H.** **<u>Reservation of Rights.</u>**

78.     The Debtors reserve their rights to prove other facts necessary for confirmation. This Summary Brief provides the primary areas of evidence the Debtors anticipate proffering at the confirmation hearing in their direct case, prior to any rebuttal.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE** the Debtors respectfully request the Court take notice of the foregoing.

Dated: August 3, 2021
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*