```
 1             UNITED STATES DISTRICT COURT

 2               DISTRICT OF PUERTO RICO

 3
     In Re:                    )      Docket No. 3:17-BK-3283(LTS)
 4                             )
                               )      PROMESA Title III
 5   The Financial Oversight and )
     Management Board for       )
 6   Puerto Rico,              )      (Jointly Administered)
                               )
 7   as representative of      )
                               )
 8   The Commonwealth of       )
     Puerto Rico, et al.       )      August 4, 2021
 9                             )
               Debtors,        )
10
     _____
11
12   In Re:                    )      Docket No. 3:17-BK-4780(LTS)
                               )
13                             )      PROMESA Title III
     The Financial Oversight and )
14   Management Board for       )
     Puerto Rico,              )      (Jointly Administered)
15                             )
     as representative of      )
16                             )
     Puerto Rico Power         )
17   Authority,                )
                               )
18               Debtor,        )
     _____
19
20
21
22
23
24
25
```

```
 1  _____

 2  In Re:                        )        Docket No. 3:17-BK-3567(LTS)
                                  )
 3                                )        PROMESA Title III
                                  )
 4  The Financial Oversight and  )
    Management Board for          )
 5  Puerto Rico,                  )        (Jointly Administered)
                                  )
 6  as representative of          )
                                  )
 7  Puerto Rico Highways and      )
    Transportation Authority,     )
 8                                )
                        Debtor,   )
 9
10  _____

11                          OMNIBUS HEARING

12   BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

13               UNITED STATES DISTRICT COURT JUDGE

14    AND THE HONORABLE U.S. MAGISTRATE JUDGE JUDITH GAIL DEIN

15               UNITED STATES DISTRICT COURT JUDGE

16  _____

17
    APPEARANCES:
18
    ALL PARTIES APPEARING TELEPHONICALLY
19
    For The Commonwealth
20  of Puerto Rico, et al.:  Mr. Martin J. Bienenstock, PHV
                             Mr. Brian S. Rosen, PHV
21                           Ms. Laura Stafford, PHV
                             Mr. Joshua A. Esses, PHV
22                           Mr. Scott P. Cooper, PHV

23
    For Puerto Rico Fiscal
24  Agency and Financial
    Advisory Authority:      Mr. Matthew P. Kremer, PHV
25                           Mr. Luis C. Marini Biaggi, Esq.
```

```
 1 ||  APPEARANCES, Continued:
    ||
 2 ||
    ||  For The Official
 3 ||  Committee of Unsecured
    ||  Creditors of all
 4 ||  Title III Debtors:       Mr. Luc A. Despins, PHV
    ||
 5 ||  For Peter Hein:          Mr. Peter Hein, Pro Se
    ||
 6 ||  For AmeriNational
    ||  Community Services:      Mr. Arturo J. Garcia Sola, Esq.
 7 ||
    ||  For Cantor-Katz
 8 ||  Collateral Monitor:      Mr. Douglas Mintz, PHV
    ||
 9 ||  For Financial Guaranty
    ||  Insurance Company:       Mr. Martin A. Sosland, PHV
10 ||
    ||  For Puerto Rico Land
11 ||  Administration:          Mr. Carlos E. Cardona Fernandez, Esq.
    ||
12 ||  For Sky High Elevators
    ||  Corporation:             Mr. David W. Roman, Esq.
13 ||
    ||  For Group Wage
14 ||  Claimants:               Ms. Ivonne Gonzalez Morales, Esq.
    ||
15 ||
    ||
16 ||
    ||
17 ||
    ||
18 ||
    ||
19 ||
    ||
20 ||
    ||
21 ||
    ||
22 ||
    ||
23 ||
    ||  Proceedings recorded by stenography.  Transcript produced by
24 ||  CAT.
    ||
25 ||
```

```
 1                           I N D E X

 2   WITNESSES:                                        PAGE

 3        None.

 4

 5   EXHIBITS:

 6        None.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                                    San Juan, Puerto Rico

2                                    August 4, 2021

3                                    At or about 9:36 AM

4                              *     *     *

5           THE COURT:  Good morning.  This is Judge Swain

6   speaking.

7           MS. NG:  Good morning, Judge.  This is Lisa, your

8   courtroom deputy.  Everyone's here and ready.

9           THE COURT:  Thank you.

10          Would the deputy in San Juan please call the case?

11          COURTROOM DEPUTY:  Good morning.  The United States

12  District Court for the District of Puerto Rico is now in

13  session.  The Honorable Laura Taylor Swain presiding.  Also

14  present is Magistrate Judge Judith Gail Dein.  God save the

15  United States of America and this Honorable Court.

16          In re:  The Financial Oversight and Management Board

17  for Puerto Rico, as representative of the Commonwealth of

18  Puerto Rico, et al., in case no. 2017-BK-3283, for Omnibus

19  Hearing.

20          THE COURT:  Thank you, Ms. Tacoronte.

21          Buenos dias, good morning, and welcome to counsel,

22  parties in interest, and members of the public and press.

23  Despite the great difficulties of this past year, and with a

24  cautious eye on the coming months, the Court is encouraged by

25  the recovery efforts, the continued attention to public health
```

1  measures, both in Puerto Rico and on the mainland, and our

2  movement toward another confirmation hearing in these Title

3  III proceedings.

4         To ensure the orderly operation of today's telephonic

5  hearing, all parties on the line must mute their phones when

6  they are not speaking.  If you are accessing these proceedings

7  on a computer, please be sure to select "mute" on both the

8  Court Solutions dashboard and your phone.  When you need to

9  speak, you must unmute on both the dashboard and the phone.

10        I remind everyone that consistent with court and

11 judicial conference policies, and the orders that have been

12 issued, no recording or retransmission of the hearing is

13 permitted by anyone, including but not limited to the parties,

14 members of the public, or the press.  Violations of this rule

15 may be punished with sanctions.

16        I will be calling on each speaker during these

17 proceedings.  When I do, please identify yourself by name for

18 clarity of the record.  After the speakers listed on the

19 Agenda for each of today's matters have spoken, I may permit

20 other parties in interest to address briefly any issues raised

21 during the course of the presentations that require further

22 remarks.  If you wish to be heard under these circumstances,

23 please state your name clearly at the appropriate time.  Don't

24 just use the "wave" on the Court Solutions dashboard.  I will

25 call on the speakers if more than one person wishes to be

1    heard.

2          Please don't interrupt each other or me during the

3    hearing.  If we interrupt each other, it is difficult to

4    create an accurate transcript of the proceedings, but having

5    said that, I apologize in advance for breaking this rule, as I

6    may interrupt if I have questions or if you go beyond your

7    allotted time.  If anyone has difficulty hearing me or another

8    participant, please say something right away.

9          The Agenda, which was filed at docket entry no. 17676

10   in case no. 17-3283, is available to the public at no cost on

11   Prime Clerk for those interested.  I encourage each speaker to

12   keep track of his or her own time.  The Court will also be

13   keeping track of the time, and will alert each speaker when

14   there are two minutes remaining with one buzz and, when time

15   is up, with two buzzes.  Here is an example of the buzz sound.

16          (Sound played.)

17          THE COURT:  If your allocation is two minutes or

18   less, you will just hear the final two buzzes.

19          If we need to take a break, I will direct everyone to

20   disconnect and to dial back in at a specified time.  This

21   morning we will run from now until 11:50 AM, that is, ten

22   minutes before 12:00, and then we will resume as necessary

23   from 10 past 1:00 to 5:00.

24          The first Agenda item is, as usual, status reports

25   from the Oversight Board and AAFAF.  As I requested in the

8

1    Procedures Order, these reports have been made in writing in

2    advance of this telephonic hearing, and are available on the

3    public docket at docket entry nos. 17657 and 17658 in case no.

4    17-3283, respectively.

5            I thank the Oversight Board and AAFAF for the care

6    and detail reflected in their reports, which, as always, are

7    comprehensive and cover important matters.  I do not have

8    further questions for the parties in connection with these

9    reports.

10           Do counsel for the Oversight Board wish to make any

11   remarks further to their report?

12           MR. BIENENSTOCK:  Good morning, Your Honor.  This is

13   Martin Bienenstock of Proskauer Rose, LLP, for the Oversight

14   Board.  We do not have additional comments this morning, Your

15   Honor.

16           THE COURT:  Thank you.  Good morning,

17   Mr. Bienenstock.

18           Do counsel for AAFAF have any further comments?

19           MR. MARINI BIAGGI:  Good morning, Your Honor.  This

20   is Luis Marini, counsel for AAFAF.  I do not have any further

21   comments to make today.

22           THE COURT:  Thank you.  Good morning, Mr. Marini.

23           MR. MARINI BIAGGI:  Good morning.

24           THE COURT:  I will wait 30 seconds in case anyone

25   else is on the line who has a question or comment that they

1  wish to make in connection with the status report.  If you do,

2  state your name clearly now, and then wait for me to call on

3  you to speak.

4          (No response.)

5          THE COURT:  All right.  Thank you.  Since no one has

6  indicated that they wish to speak, we will move to the next

7  section of the Agenda, which is II, the contested matters.

8  The first contested matter is the DRA Parties' Stay Relief

9  Motion, and, in particular, the contention of the Oversight

10  Board that the DRA parties do not have standing to pursue

11  their motion to lift the stay and for adequate protection.

12          I have as speaking first for 17 minutes on behalf of

13  the DRA parties Mr. Mintz and/or Mr. Garcia Sola.

14          MR. MINTZ:  Good morning, Your Honor.  It is Doug

15  Mintz of Schulte Roth.  Can you hear me?

16          THE COURT:  Yes, I can.  Good morning, Mr. Mintz.

17          MR. MINTZ:  Good morning.  Doug Mintz of Schulte Roth

18  for Cantor-Katz Collateral Monitor, LLC, along with Mr. Garcia

19  from McConnell Valdes for AmeriNational Community Services, as

20  the DRA parties.  I'll speak for a few minutes, and then

21  Mr. Garcia will continue the discussion, if that's okay with

22  Your Honor.

23          THE COURT:  Yes.  Thank you.

24          MR. MINTZ:  Okay.  Thank you, Your Honor.

25          The DRA parties have standing to file this Adequate

1    Protection and Lift Stay Motion.  The standard to proceed on

2    an adequate protection and lift stay motion is simple:  The

3    movant must have a colorable claim to the property with

4    respect to which it is seeking relief.  And that's from this

5    Court at 618 B.R. 619, quoting and citing *Grella* from the

6    First Circuit at 42 F.3d 26.

7            In *Grella*, the First Circuit expounds on this at some

8    length, citing to about a dozen cases that focus in on the

9    colorable claims standard.  The standard is pretty straight

10   forward.  A party has a colorable claim to the assets when

11   there is a reasonable likelihood a movant has a, quote,

12   legitimate claim or lien as to a debtor's property.  And

13   that's from *Grella*, at 33.

14           It's also not hard to satisfy.  This Court has

15   previously held that the colorable claims standard is a,

16   quote, low threshold.  Here, the DRA parties easily satisfy

17   the colorable claims standards.  As set forth in the

18   substantive motion, starting on page 22, the security

19   agreement grants the DRA a lien in the incremental Acts 30 and

20   31 HTA revenues, quote, wherever located.

21           We note for the Court that the government parties do

22   not dispute the DRA parties' colorable claim here.  They

23   devote every page in both briefs to the asset restrictions,

24   which Mr. Garcia will discuss at length shortly.  So they seem

25   to have waived their argument regarding that colorable claim.

1   And in the Monolines' Lift Stay litigation, the Oversight

2   Board conceded that standing and any substantive argument

3   regarding the liens are coextensive.

4         That should end the discussion.  It's a simple

5   standard.  It's easy to meet, no dispute, but, of course, it

6   doesn't, or we wouldn't be here.

7         Now, before we --

8         THE COURT:  I'm sorry, Mr. Mintz.

9         MR. MINTZ:  Go ahead.

10        THE COURT:  Just to be clear, in the Monolines'

11  litigation, there was not a contention that there was any sort

12  of contractual provision or other restriction that disabled

13  those movants from actually seeking relief on the substantive

14  claim of a security interest; is that correct?

15        MR. MINTZ:  I believe that's correct.  There was no

16  contractual dispute like this one, yes.

17        THE COURT:  Thank you.

18        MR. MINTZ:  So before proceeding, we want to note,

19  while the parties have briefed the asset restrictions

20  extensively, the DRA parties argue that the asset restrictions

21  question is actually not suitable to hear today.  That's

22  because there's an important distinction between standing in

23  the Lift Stay and standing to proceed on the underlying case.

24  The Court need not determine if the DRA Parties would have

25  standing to proceed on the ultimate merits case here, probably

1  a Commonwealth law foreclosure action, if Your Honor chooses

2  to lift the stay.

3         The Bankruptcy Court for the District of Maine in *In*

4  *re Farr*, 2015, Westlaw 658743, explicitly distinguished

5  between the two standards.  The Court held that a creditor

6  holding a valid security interest sufficed to prevail on the

7  colorable claims standard, and reserved the debtor's arguments

8  about the creditors' standing to foreclose for the merits.

9  Similarly, the asset restrictions may limit, although they

10  don't, the DRA's ability to foreclose, but do not impact the

11  colorable claims standard and should be considered only later.

12         Now, with no other argument at this stage, the

13  government parties are left to try and conjure a standing

14  argument from the asset restrictions.  In their reply brief,

15  the government parties take a tact we haven't seen before,

16  arguing the asset restrictions are akin to a no-action clause

17  and somehow impact standing, but there's no connection in

18  their argument.  They cite the three cases of no held.  Two of

19  them don't even refer to a lift stay or adequate protection

20  motion.  The fact that parties were denied standing in other

21  matters, this is no relevance given the unique colorable

22  claims standard.

23         As for the PREPA case they cite, the Court did hold

24  that the no-action clause left the movant with no standing to

25  lift the stay, but that case doesn't help much.  We weren't

1  there, of course, but the transcript doesn't yield any

2  discussion of the colorable claims standard.

3       And when we dug a bit deeper, we saw the bond trustee

4  raised a no-action clause argument, not the government.  So

5  this was a debate among the creditors, rather than with the

6  government, which was focused on setoff rights.  The colorable

7  claim standard wasn't before the Court.

8       In any event, even if the Court found the asset

9  restrictions do relate to standing here, the plain language,

10  as Mr. Garcia will now show, does not prohibit the proposed

11  action.  So, with that, I'll turn it over to Mr. Garcia.

12       THE COURT:  Thank you, Mr. Mintz.

13       Mr. Garcia, you need to unmute on both your phone and

14  the Court Solutions dashboard, please.

15       MR. GARCIA SOLA:  Okay.  Sorry about that.   Sorry

16  about that, Your Honor.

17       THE COURT:  That's fine.  Good morning, Mr. Garcia.

18       MR. GARCIA SOLA:  Good morning.  Arturo Garcia-Sola

19  on behalf of AmeriNational Community Services, LLC.

20       I first ask the Court to accept into evidence the

21  demonstrative chart that we submitted with our informative

22  motion at docket no. 17647.

23       THE COURT:  No objection was filed to that

24  demonstrative, and so it is accepted as part of the record of

25  this contested matter.

1        MR. GARCIA SOLA:  Thank you, Your Honor.

2        I now then turn to the asset restrictions, by stating

3  first that they are statutory in nature and do not prohibit

4  the filing of the DRA's Lift Stay Motion.  Contrary to the

5  government parties' position, the asset restrictions language

6  in the Transfer Agreement is framed within and consonant with

7  the GDB Restructuring Act, as amended.

8        Under either the GDB Restructuring Act or the

9  Transfer Agreement, and pursuant to Puerto Rico's statutory

10  and construct construction principles, the result is the same.

11  The DRA is not precluded by the asset restrictions to file the

12  request to lift the stay.

13        With respect to the GDB Restructuring Act, it sets

14  forth the obligations of the delivery to, and I quote,

15  "maximize the value of the assets for the bank to mitigate the

16  impact that its restructuring may have."  And -- and I

17  underscored the "and" -- the recovery value for distribution

18  to the corresponding stakeholders.  That appears in the

19  statement of a piece of the law.

20        In furtherance thereof, the restructuring statute

21  sets forth the obligations of the DRA, which include the

22  protection of the restructuring property for purpose of

23  realizing on or preserving the value of the restructuring

24  property or the process therefrom, including, without

25  limitation, by initiating necessary legal action and/or any

1    other necessary or convenient actions with respect to

2    realizing the maximum value of the restructuring property.

3              You can find that in Articles 204 and 205 of the

4    statute.  A strict, literal reading of the Restructuring

5    Statute leads to the conclusion that the DRA has the power and

6    right to enforce and protect the restructuring property, in

7    accordance with the ancillary agreement, and for the sole

8    purpose of realizing on or preserving or maximizing the value

9    of the restructuring property, subject only to the asset

10   restrictions.

11             I now turn to the asset restrictions contained in

12   Article 207(b) of the GDB Restructuring Act, which are framed

13   within those general obligations, the language of which is

14   clear and unambiguous, and allows the DRA to file the Lift

15   Stay Motion.

16             Statutory construction, pursuant to Puerto Rico Law

17   and jurisprudence, quote, begins with the text of the

18   underlying statute, and ends there as well, if the text is

19   unambiguous.  *In re Plaza Resort*, 741 F.3d 269, 2014.

20             Article 14 of the Puerto Rico Civil Code provides

21   that, "when a law is clear and free from all ambiguity, the

22   letter of the same shall not be disregarded in a pretext of

23   fulfilling the spirit thereof."

24             A Court's interpretive function's limited to the

25   law's clear text and should not rely on the intrinsic reasons

1    that modulated the legislatures to draft or write the law in

2    the way they did.  Courts should abstain from substituting the

3    legislature's criteria with their own.  Preconceptions of what

4    is just, reasonable, or even desirable, or include scenarios

5    in the statute which do not fall within the reasons underlying

6    or motivating the same, *Comite Sante v. CEE*, 197 D.P.R. 914,

7    2017.

8         Regarding the two asset restriction clauses in the

9    GDB Restructuring Act, the plain language of Article 207

10   clearly and unequivocally provides, and the Court can follow

11   this with the demonstrative evidence, it clearly and

12   unequivocally provides, first, that the DRA and servicer have,

13   quote, all rights and powers to do what is necessary to

14   preserve, protect, or defend any security, or pledge rights

15   benefiting, end quote, the DRA's non-municipal portfolio.

16   That's called the preserve and protect powers.  You can see it

17   in the demonstrative chart in the language that's highlighted

18   in yellow.

19        There are no limitations --

20        THE COURT:  Thank you.

21        MR. GARCIA SOLA:  Yes.  You're welcome, Your Honor.

22        There are no limitations on what -- these preserve

23   and protect powers, nor do they confine the DRA and servicer

24   to a particular set of remedies to perform under them.  The

25   DRA's amended motion literally seeks to protect the DRA's

1    interest in its collateral, which is clearly permitted under

2    the preserve and protect powers of Article 207 of the

3    Restructuring Act.

4           Article 207 further provides that the third clause,

5    the so-called Title III treatment powers, is "in furtherance

6    of the foregoing," that is, of the DRA's preserve and protect

7    powers under the second clause of the asset restrictions,

8    which are triggered in very specific circumstances, where,

9    one, the obligor is in a Title III or Title VI proceeding,

10   which is met here; and -- and I underscore again "and" -- two,

11   there are no -- there are other creditors with the same legal

12   priority and security rights as the DRA.  This language is

13   highlighted in blue in the demonstrative chart.  Unless these

14   two conditions are met, the third clause does not come into

15   effect.

16          Rather than having said "notwithstanding the

17   foregoing", the framers of the statute chose to go with "in

18   furtherance of the foregoing."  So the use of "in furtherance

19   of the foregoing," as a means of relating the Title III

20   treatment powers to the general preserve, protect, or defend

21   powers of the second clause showcases that these two

22   provisions are not mutually exclusive.

23          "Furtherance" is defined as, "the process of helping

24   something to develop or make progress."  Whereas "foregoing"

25   is defined as "involving what has just been mentioned or

1   described."  The quotes come from the Cambridge English

2   Dictionary.

3            Therefore, "in furtherance of the foregoing" means

4   that the third clause's language constitutes a means to

5   fulfill the end that was described in the sentence immediately

6   preceding it.  That is, quote, to preserve --

7            THE COURT:  If --

8            MR. GARCIA SOLA:  Yes, Your Honor.

9            THE COURT:  So you're --

10           MR. GARCIA SOLA:  That is --

11           THE COURT:  Yes.  You can finish your sentence,

12   please.

13           MR. GARCIA SOLA:  That is to preserve, protect, or

14   defend any security or other pledge rights benefiting the

15   non-municipal loans.

16           Yes, Your Honor.

17           THE COURT:  So is it your position that the second

18   sentence, the sentence that's highlighted in yellow and that

19   refers to powers to preserve, protect, or defend any security

20   or other pledge rights, is broad enough that even without the

21   third clause, the DRA and the servicer would have been able to

22   challenge disparate treatment in a Title III plan of the

23   obligor?

24           MR. GARCIA SOLA:  In the context of --

25           THE COURT:   In other words, what does three add in

1    terms of powers, if the second clause, the yellow clause, is

2    as broad as you say it is?

3         MR. GARCIA SOLA:  Well, first of all, yes, Your

4    Honor, we interpret number three as very broad -- I'm sorry,

5    number two as very broad.  Number three is for the very

6    specific case of a Title III proceeding in which a debtor,

7    like HTA, has other creditors with the same legal priority and

8    security rights as DRA.  Here in this case, Your Honor, there

9    are no such creditors.

10        So we are allowed to go under clause 2, because

11   clause 3 is not triggered, or has not been triggered at the

12   moment.  In fact, as the Court knows, the FOMB is leading the

13   DRA as subordinated in the Plan, in the Commonwealth Plan.

14   And while there is no HTA plan at the moment, the Commonwealth

15   Plan is funded to a large extent with the DRA's assets

16   constituted by the Act 30 and 31 revenues.

17        So to the extent that even the FOMB understands and

18   has -- and has alleged that we are subordinated, that the DRA

19   parties are subordinated, there are no creditors in the view

20   of the FOMB, which we disagree with, but there are, at the

21   moment, no creditors that have the same credit or security as

22   the DRA parties.  And, therefore, clause 3 is not implicated,

23   and we are left with clause 2.

24        And that's what the DRA parties are doing.  They're

25   trying to protect, preserve their collateral from -- from

1  being used, and that's why they're asking for adequate
2  protection, which is exactly what our Lift Stay Motion is
3  asking for.
4        I don't know if that answers the question, Your
5  Honor.
6        THE COURT:  Yes.  It is an answer to my question.  I
7  have another question for you.
8        Since clause 3 speaks in terms of the Title III
9  proceeding of the obligor on the instruments, in your view, is
10 there any scenario in which, with respect to these HTA loans,
11 clause 3 could be triggered in and applicable in the Title III
12 case of the Commonwealth?
13       MR. GARCIA SOLA:  Yes, Your Honor.  There were --
14       (Sound played.)
15       MR. GARCIA SOLA:  -- other creditors -- yes, Your
16 Honor.  There were other creditors that had similar security
17 or interest in property, specifically the Act 30, 31 revenues,
18 but that's not the case here.
19       THE COURT:  Thank you.  You may go on.
20       MR. GARCIA SOLA:  Okay.  I now turn to the Transfer
21 Agreement, Your Honor, which the government parties understand
22 is the relevant and key document for the analysis.
23       The asset restrictions language in the Transfer
24 Agreement and other ancillary agreements is consistent with
25 the statutory language, and supports the DRA parties' position

1    in lifting -- in filing the Lift Stay.  The government parties

2    have admitted that the terms of the asset restrictions in the

3    Transfer Agreement are plain -- are clear, plain and

4    unambiguous.  And I refer the Court to the standing objections

5    at paragraphs three, four, six and 19.

6          In light of that admission, it is improper for the

7    government parties to try to move the Court to rely on

8    anything other than the plain language in the contract to

9    resolve this dispute.  It is fact, or law in Puerto Rico that

10   when the terms of a contract are unambiguous, courts are duty

11   bound to interpret them as reflecting the will of the parties

12   at the time of the agreement, and must refrain from further

13   speculation as to their alleged contractual intentions.

14         I refer to the case of *In re N-500L Cases*, 517 F.

15   Supp. at 816, D.P.R. 1981.  A literal reading of the asset

16   restrictions in the Transfer Agreement shows that, as if the

17   case in the GDB Restructuring Statute, the preserve and

18   protect powers and the Title III treatment powers are not

19   mutually exclusive.  Due to the joinder of these clauses

20   through the use of the conjunction, and I refer you to the

21   demonstrative chart, the language in blue in the second

22   column --

23         (Sound played.)

24         THE COURT:  You may wrap up your point.

25         MR. GARCIA SOLA:  Okay.  So the contractual

 1   interpretation -- I'm sorry.  Just as the asset restrictions

 2   in the GDB Restructuring Act, the Transfer Agreement does not

 3   preclude the DRA and/or servicer from being able to preserve,

 4   protect, or defend any security or other pledge rights

 5   benefiting the DRA's HTA obligations in the context of HTA and

 6   CWs.  Any other reading, as far as proposed by the government

 7   parties, where an obligor commenced a Title III case such as

 8   HTA, the only action the DRA parties can take is pursuant to

 9   the Title III powers is flawed, because the contractual

10   provisions and the statutory restrictions are devoid of any

11   language that can lead to the conclusion that the only action

12   in the context of an HTA Title III proceeding is under the

13   third clause.

14        THE COURT:  Thank you.

15        MR. GARCIA SOLA:  I'm afraid I don't have any more

16   time, so unless you have any questions --

17        THE COURT:  Thank you, Mr. Garcia.

18        MR. GARCIA SOLA:  You're welcome.

19        THE COURT:  I have no further questions for you at

20   this time.  Thank you very much.

21        MR. GARCIA SOLA:  Thank you.

22        THE COURT:  And now we will turn to counsel for

23   AAFAF, who's been allocated 14 minutes.

24        MR. KREMER:  Good morning, Your Honor.  Matthew

25   Kremer of O'Melveny & Myers on behalf of AAFAF.  Can you hear

1    me?

2         THE COURT:  Yes, and good morning, Mr. Kremer.  You

3    may continue.

4         MR KREMER:  Good morning.  Your Honor, last time I

5    was before you was in the fall of 2018, where we assembled

6    actually in person in San Juan to present to you approval of

7    the GDB Qualifying Modification.  As you know, that day marked

8    a momentous occasion for Puerto Rico.  It was the first

9    successful restructuring in Puerto Rico's decade-long fiscal

10   crises, resolving 5 billion of Puerto Rico's more than 72

11   billion in outstanding debt.

12        Now, in entering into that Qualifying Modification,

13   one of the fundamental aspects was ensuring that the

14   non-performing intergovernmental bonds transferred to DRA

15   would be subject to extensive enforcement restrictions as set

16   forth in the Master Transfer Agreement.

17        The asset restrictions are particularly restrictive

18   when it comes to an entity in Title III, such as HTA, and this

19   was to ensure that the DRA would not destruct a pending Title

20   III case or, alternatively, force an entity into Title III.

21   The basic idea was we would transfer these loans to DRA, but

22   they would largely remain a passive actor in Title III.

23        So, Your Honor, you can imagine the Government's

24   surprise when less than six months, it wasn't six months when

25   they turned around and moved to lift the stay against HTA in

1  blatant violation of the asset restrictions.

2         And I think it's important at this point, Your Honor,

3  to underscore they did that move to lift the stay based on

4  some new facts and circumstances that occurred after the

5  Qualifying Modification, but they did so based on the historic

6  clawback of the Act 30 and 31 revenues, which was occurring

7  years before the Qualifying Modification was approved by this

8  Court.

9         So under the DRA theory, they were authorized

10  immediately.  Right.  Immediately upon you approving the

11  Qualified Modification and it being consummated, to turn

12  around and lift the stay with respect to billions of dollars

13  of non-performing loans, notwithstanding the excessively

14  negotiated asset restrictions, this, Your Honor, is of course

15  not what the asset restrictions provide, nor was it the

16  intention of the parties.

17         So before I turn to those asset restrictions, let me

18  just take a moment to respond to Mr. Mintz' argument that

19  consideration of the asset restrictions is premature.  Your

20  Honor, this argument highlights the DRA's repeated pattern of

21  agreeing to one thing in these cases and then doing another.

22         Here, after extensive discussions with the DRA, the

23  parties agreed to bifurcate these proceedings to first address

24  application of the asset restrictions.  Yes, we referred to

25  this issue generally in the joint motion as the standing

1    issue, but it was always understood between the parties that

2    the standing issue was the issue of application of the asset

3    restrictions.

4           Now, after seeing our briefing on this issue and

5    understanding the full weight of the asset restriction, the

6    DRA said, the asset restrictions are irrelevant to standing,

7    and is premature, and I only need to show a colorable claim.

8    Your Honor, you should reject this strained attempt upon

9    consideration of the asset restrictions.

10          As Your Honor knows, in prior lift stay litigation,

11   this Court bifurcated the issue of standing to first determine

12   whether certain monolines had a contractual right to proceed

13   under a bond indentures no-action clause.  Here, the asset

14   restriction functioned in precisely the same manner,

15   contractually limiting the circumstances in which the DRA can

16   seek certain types of relief.  Thus, there is absolutely no

17   reason to delay adjudication of this gating issue, and it

18   would be a tremendous waste of this Court's resources to do

19   so.

20          Let me just make clear that we will be in a position

21   to brief the issue of whether or not we have a colorable claim

22   at the appropriate time, but that is not for today's hearing.

23          Your Honor, next I want to briefly respond to the

24   argument that the Court should only look to the language in

25   the GDB Restructuring Act and ignore the asset restrictions

1    later agreed to by the parties in the Transfer Agreement. I

2    want to make clear, the GDB Restructuring Act was an enabling

3    statute that provided a broad framework for this

4    restructuring, and the act expressly provides, at Article 404,

5    that the restructuring property, which includes the

6    non-municipal loans in question, shall be transferred in

7    accordance with the Transfer Agreement.  And the Transfer

8    Agreement goes on to confirm this.  Right.  It speaks that it

9    embodies the entire agreement between parties.

10           And just to provide a little additional context to

11   the Court, the Restructuring Act was enacted by the

12   legislative assembly, and then several months elapsed until

13   this Court considered the Qualifying Modification, and the

14   documents, including the Transfer Agreement, were ultimately

15   entered into.

16           During these months, the definitive documents were

17   extensively negotiated.  There were hours and hours and hours

18   of phone calls negotiating every provision of these documents,

19   and substantially final forms of those documents were filed

20   with this Court.  And now the DRA says we should just ignore

21   all those words.

22           There is no legal basis to do so.  That is between

23   the parties to the contract.  There is no legal justification

24   or enabling legislation to override the contract that these

25   parties freely entered into.

1           THE COURT:  Now, there seems to be --

2           MR. KREMER:  Your Honor, now --

3           THE COURT:  I'm sorry.  Conclude your point there.

4           MR. KREMER:  No.  Please go ahead.

5           THE COURT:  Focusing on the provisions of the asset

6  restrictions in the contract and the statutory language that

7  the DRA parties claim is parallel, do you see any material

8  difference in the operation of those specific restrictive

9  provisions between the statute and the Transfer Agreement?

10          MR. KREMER:  Your Honor, I don't.  I understand the

11 distinctions that they highlighted in the demonstrative.

12 There are certainly differences in the language.  Right.  The

13 act was enacted by the legislative assembly, who is not a

14 party to this agreement, and it's merely familiar with the

15 terms that were agreed to by the parties and then ultimately

16 set forth in the Transfer Agreement.

17          And I think that the language that the DRA focuses on

18 is, you know, in the further support of.  And while this

19 language they say supports them, I think that there can be an

20 alternative reading of this language as well.  Right.

21          You know, first off, I don't think that we need to

22 focus on any further supportive language whatsoever, because

23 it sits in the Restructuring Act and not in the Transfer

24 Agreement.  But if we were to look at it, the act acknowledges

25 that the DRA generally had this right to protect its lien

1  outside of Title III.  And then it says, in furtherance of

2  that right, that in Title III it can exercise that right as

3  set forth therein.

4       I read this to mean that, yes, outside of Title III,

5  they have rights to preserve their lien.  And that in Title

6  III, where the automatic stay is in place and where it's

7  generally understood that the ability for a creditor to

8  enforce the rights are more limited due to the stay in a court

9  process, that they can exercise that right in these limited

10  circumstances as set forth in the final sentence there.

11       So that's how I read both the act and the Transfer

12  Agreement.  I think the Transfer Agreement is more clear on

13  this point, and I would submit that it's really among one of

14  the ambiguities that the parties negotiated in entering into a

15  transfer agreement.  And I also think it's important to know

16  that the case, Your Honor, that they cite for the proposition

17  that we should look to the Act and not the Transfer Agreement

18  is *Luis Santiago v. Santiago*, and that is 731 F. Supp. 2d, at

19  206.

20       So this case they cite for the proposition that under

21  Puerto Rico law, the Transfer Agreement must be read to be

22  consistent and not contrary to law, that case actually stands

23  for the proposition that a contract is valid when it is not

24  contrary to the law, more or less, or public order.  In that

25  case, the contract was unenforceable, as the subject matter of

1   the contract pertained to illegal activity.

2         Here, the DRA parties are not alleging the contract

3   is illegal or unenforceable.  They argue that a contract

4   executed under or in line with legislation, must be reduced to

5   the terms of that legislation.  They say no story for that

6   point, Your Honor, because that is not the law.  As is well

7   established, parties can agree among themselves on terms more

8   restrictive than legislation.

9         So, Your Honor, hopefully that answers the question

10  that I think, even if you look to the Act, we still prevail

11  here, but there is no need to do so.  We should be focusing on

12  the Transfer Agreement.

13        THE COURT:  Thank you.

14        MR. KREMER:  Now, Your Honor, let me actually turn to

15  the Transfer Agreement and the Act set forth therein.  So the

16  DRA parties have tried to make a lot of noise here on

17  complicated matters, but it really is quite straightforward.

18  Right.

19        In order for the DRA parties to prevail here, they

20  would have to overcome at least three separate hurdles, each

21  of which independently lead to the conclusion that the DRA

22  parties lack standing.  So let me just set those out, and then

23  we can go through them in more detail.

24        First, starting with the plain language, with which

25  of course this Court must start its analysis.  At least three

1　commonly used tools of statutory interpretation lead to the

2　conclusion that only Clause 3 applies when an obligor such as

3　HTA is in Title III.

4　　　　Second, they would have to overcome the intention of

5　the parties.  If this Court finds that the asset restrictions

6　are ambiguous, then we'll move to the intention of the

7　parties, which undoubtedly support the conclusion that the DRA

8　parties are not authorized to bring a lift stay motion.

9　　　　And then, finally, Your Honor, if you disagree with

10　us on both of those points, right, on both the plain language

11　and the intention of the parties, the Lift Stay Motion is

12　still not authorized, and this is not an action to preserve,

13　protect, and defend.  This is an action to continue to

14　affirmatively strike down and invalidate Commonwealth laws,

15　interfere with certified Commonwealth and HTA fiscal plans,

16　collect payments, and potentially foreclose on DRA-supported

17　collateral.

18　　　　So, Your Honor, if you agree with the government

19　parties on any one of these three points, any one of them, the

20　Lift Stay Motion should be dismissed for lack of standing.

21　　　　Now, let me turn to the first point, the plain

22　language.  With respect to the plain language, as set forth in

23　our papers, and I won't belabor it here, there's multiple

24　tools of statutory interpretation that support the view that

25　only Clause 3 applies.  And the DRA parties, thus, can only

1  exercise rights and remedies to ensure that they are being

2  treated equally, compared to creditors of equal priority.

3       Your Honor, at this point --

4       THE COURT:  Now, let me -- I'm sorry.  I want to

5  raise with you a question I raised with Mr. Garcia as well.

6  Clause 3 speaks in terms of the Title III proceedings of the

7  obligor and treatment in such proceedings.  Is it your

8  position that Clause 3 is not only exclusive, but that when an

9  obligor is in Title III, it precludes any attempt to exercise

10  or protect the loans from third parties, from actions of other

11  entities, like the Commonwealth, that may be in Title III

12  proceedings whatsoever?

13       MR. KREMER:  Well, Your Honor, I think that the

14  automatic stay -- right, so I think it can be read coextensive

15  with the automatic stay, which should provide that protection

16  from third-party actions when an obligor is in Title III.  So

17  to the extent we find it -- that Clause 2 should logically

18  apply to and end up being Clause 3, I think that you can read

19  that to -- you know, to not need to apply, because the

20  automatic stay otherwise protects it from those third-party

21  actions.

22       So, Your Honor, unless I -- if that answers your

23  question, I can go on to the three statutory tools of

24  interpretation and how that supports us that the plain

25  language clearly provides that only the Clause 3 applies in

1    this case.

2              THE COURT:  Yes, you may.

3              MR. KREMER:  First of all, if we look at the

4    structure of the asset restrictions paragraph, it precludes

5    the DRA's interpretation.  Right.  Clauses 1 and 2 align to

6    reference to non-municipal loans which precede those clauses.

7    And, in contrast, Clause 3 repeats that phrase.  So if Clauses

8    1, 2 and 3 were intended to be a conjunctive series, Clause 3

9    would have a parallel structure and refer back to

10   non-municipal loans that precede Clause 1.

11             THE COURT:  But Clause 3 doesn't --

12             MR. KREMER:  Second, Clause 2 --

13             THE COURT:  But clause 3 doesn't include the rights,

14   remedies and powers language.

15             MR. KREMER:  That is correct, Your Honor, but there

16   are different tools that I think support this reading.  Right.

17   And one we pointed out in your previous questioning, that --

18             (Sound played.)

19             MR. KREMER:  -- the DRA parties' reading of Clause 2,

20   Clause 3 is entirely superfluous to Clause 2.  Right.  In

21   other words, if in a Title III case the DRA parties have the

22   unfettered right to preserve, protect, and defend in its

23   securities or other pledge rights, there is actually no reason

24   to further specify that the DRA can exercise such rights to

25   ensure that they receive the same treatment provided to other

1    creditors, the same legal priorities.

2           And the third cannon, Your Honor, is that the

3    specific treatment over the general -- and this is set forth

4    in our brief.  I want to quickly just get to my next point,

5    which should be intention of the parties.  If this Court finds

6    that any of this is ambiguous, we look to the intention of the

7    parties.  And I will take -- this point of the intention of

8    the parties, clearly shows that they intended Clause 3 to only

9    apply to Title III.

10          Let me lay out some undisputed facts.  First, we can

11   all agree that the asset restrictions were designed to help

12   protect public entities.  We can also agree that among those

13   public entities, the largest is HTA, or just to give some

14   context, HTA owed more than 1.7 billion dollars, with the next

15   largest public entity debtor was the Ports Authority at 270

16   million.  And clause 3 was specifically included for HTA, as

17   HTA was the only entity that was in Title III, other than the

18   Commonwealth, at the time the Qualifying Modification was

19   entered into.

20          So we can all agree that this third clause was put in

21   place because of HTA.  We can also agree that the Qualifying

22   Modification was consummated at a time when the 30 and 31

23   revenues were being retained by the Commonwealth.

24          And, finally, we can agree that the Qualified

25   Modification provided that there was no projected recovery on

 1    these loans.

 2            So based on these undisputed facts, Your Honor, to

 3    find that the filing, that the Lift Stay Motion, is consistent

 4    with the intention of the parties, the Court would have to

 5    find, first, that the parties intended to allow the DRA to

 6    immediately enforce the laws based on facts and circumstances

 7    that predated the transfer of those loans, and to do so

 8    notwithstanding that each of these loans is classified as

 9    non-performing and was attributing no recovery value.  And

10    would --

11            (Sound played.)

12            MR. KREMER:  -- asset restrictions.

13            THE COURT:  You can wrap up your point, Counsel.

14            MR. KREMER:  Your Honor, that concludes the first two

15    points that --

16            COURT REPORTER:  Counsel.  Counsel.

17            THE COURT:  Hold on one moment.  I think the court

18    reporter may have had some difficulties.

19            Ms. Walker, were you trying to say something?

20            COURT REPORTER:  Yes.  I'm sorry, Your Honor.  If

21    counsel could repeat his sentence, or the end of it, when the

22    buzzer sounded.  It was over the top of his --

23            THE COURT:  So if you go back to just before the

24    buzzer sounded, your sentence --

25            MR. KREMER:  Sure, Your Honor.

1          THE COURT:  Conclude those remarks.

2          MR. KREMER:  Yes.  I was saying that, so based on all

3   of these facts, to find that the Lift Stay Motion was

4   consistent with the parties, this Court would have to find

5   that the parties -- that the parties intended to allow the DRA

6   to immediately enforce these loans based on facts and

7   circumstances that predated the transfer of those loans, and

8   to do so notwithstanding that each of these loans was

9   classified in a qualifying modification as non-performing and

10  attributed no recovery value, and that they could exercise

11  such remedies notwithstanding the carefully negotiated asset

12  restrictions.

13         And, Your Honor, I will conclude here that that

14  addresses both the plain language and the intention of the

15  parties.  And as they implied at the beginning, this Lift Stay

16  Motion also fails, because it's not an action to preserve and

17  protect, even if you disagree with us on those first two

18  points.

19         THE COURT:  Thank you, Mr. Kremer.  We will now

20  return to Mr. Mintz or Mr. Garcia.

21         MR. KREMER:  And, excuse me, Your Honor, I believe

22  the Oversight Board now has five minutes.

23         THE COURT:  Oh, I'm so sorry.  You're absolutely

24  right.  So five minutes for the Oversight Board.

25         MR. ESSES:  Thank you, Your Honor.  Can you hear me

1    okay?

2              THE COURT:  Yes, I can.  Is that Mr. Esses?

3              MR. ESSES:  It is.  Your Honor, Joshua Esses of

4    Proskauer Rose for the Oversight Board.

5              Your Honor, when the Oversight Board approved the GDB

6    Title VI restructuring, it was very important to the Board not

7    only that the restructuring was successful, but also that the

8    Board was not simply exchanging GDB-related litigation with

9    litigation in another entity, to then be a disrupting force

10   across the Commonwealth, as the Oversight Board seeks to

11   return both the Commonwealth and its instrumentalities to

12   fiscal responsibility and access to capital markets.

13             This was particularly true with respect to Title III

14   proceedings, which, as Your Honor knows, are hardly bereft of

15   litigation.  That is why the asset restrictions in the

16   Transfer Agreement were so important to the Oversight Board.

17   They were designed to limit the activity the DRA could take in

18   a Title III case.

19             Accordingly, under (iii) of the asset restrictions in

20   a Title III case, the DRA is limited to taking actions, "to

21   ensure that the issuer receives treatment of such proceedings,

22   but is the same as that provided to other creditors with the

23   same legal priority, security, or pledge rights."

24             And, here, the DRA will be able to protect the

25   treatment of its claims.  This means treatment under a plan.

1    The bargain struck by --

2         THE COURT:  A plan of what entities?  A plan of HTA,

3    so it can't do anything about its claims with respect to

4    monies being allocated and disposed of under the Commonwealth

5    Plan?

6         MR. ESSES:  A plan of the debtor entity of which it

7    claims it is a creditor of.  And, Your Honor, I think to

8    address this -- I think the hypothetical that you posed is not

9    appropriate here, where the Oversight Board, as a matter of

10   fact, is simply not going to run roughshod over whatever

11   rights the DRA believes it has on various HTA and

12   DRA-Commonwealth claims.

13        Rather, the Oversight Board has allowed the DRA to

14   protect the treatment of their claims in a Title III case, and

15   we can see this in the Seventh Amended Joint Plan of

16   Adjustment.  Whether or not there are creditors of the

17   Commonwealth of equal priority to the DRA parties, the Plan

18   before Your Honor queues up for resolution the DRA-HTA

19   bondholder, intercreditor issues by defining the GDB loan

20   priority determination that's a defined term in the Plan at

21   section 1.258, is a decision with respect to the relevant

22   rights and interests of the GDB-HTA loans and the HTA bonds.

23        The Plan also holds in reserve, in section 63.2,

24   consideration available to holders of the GDB-HTA loans and

25   the HTA --

1          (Sound played.)

2          MR. ESSES:  -- bonds, subject to the termination of

3    these intercreditor issues.  It would be wholly incongruous

4    with the purpose of the GDB Qualifying Modification, as

5    Mr. Kremer has also observed, for the DRA to be permitted to

6    commence a barrage of actions against the Oversight Board and

7    the debtors the day after the GDB Title VI was complete.  The

8    Oversight Board did not agree to give birth to a brand new

9    litigation partner.

10         Now, as a practical matter, many, if not all of the

11   issues raised in the Lift Stay Motion are being resolved

12   elsewhere.  So denial of the motion for lack of standing, as a

13   result of the asset restrictions, in addition to being legally

14   correct, would also avoid duplication of litigation with

15   respect to DRA-HTA bondholder intercreditor issues, as well as

16   the DRA's assertion that they are the only party with a

17   security interest in the Act 30, 31 revenues.

18         Specifically, in addition to the motion before you,

19   the DRA has separately commenced an adversary proceeding

20   against the HTA monolines, asserting an interest in the Acts

21   30, 31 revenues, and seeking a determination there that their

22   loan claims are not subordinated to the HTA bonds, among other

23   things.

24         As set forth in the Joint Status Report, to which the

25   Oversight Board is a signatory, the Board intends to intervene

1    on the counts there unrelated to intercreditor issues.  And

2    the DRA will be able to fight out subordination with the

3    monolines in the adversary proceeding.  They've also filed an

4    administrative expense motion, which the status report sets

5    out a briefing schedule with respect thereto.

6         To conclude, the Oversight Board agrees that the DRA

7    parties lack standing to bring the motion, because of the

8    asset restrictions, and respectfully requests the Court deny

9    the motion.  And I'd be happy to address any remaining

10   questions in the time left, Your Honor.

11        THE COURT:  Thank you, Mr. Esses.  I have no further

12   questions for you.

13        So there is one minute allocated for counsel for the

14   Unsecured Creditors' Committee, Mr. Despins.

15        MR. DESPINS:  Good morning, Your Honor.  Based on the

16   remarks today, this morning, we don't have anything to add,

17   and again yield our time to AAFAF or the Board if they want to

18   use it.

19        Thank you, Your Honor.

20        THE COURT:  Thank you.

21        Did counsel for the Oversight Board or AAFAF want to

22   say anything for 50 seconds?

23        (No response.)

24        THE COURT:  Is that someone trying to speak?

25        MR. KREMER:  No, Your Honor, not from AAFAF.

1        THE COURT: Okay. Thank you.

2        So now we will return to the DRA parties for three

3 minutes.

4        MR. GARCIA SOLA: Yes. Again, Your Honor, for the

5 record, Arturo Garcia-Sola on behalf of AmeriNational, the

6 moving party here.

7        So I have very little time, so let me first say that

8 it is not the DRA's argument that the Court needs to look only

9 at the statute. Our argument is that the statute and the

10 Transfer Agreement can co-exist and are -- and they are

11 actually -- they present the same or very similar language in

12 answer to the question.

13        Actually, the Transfer Agreement uses the conjunction

14 "and", which makes it even clearer that the DRA parties can

15 exercise the preserved and protect powers, as well as the

16 treatment powers, should this -- the clause 3 be implicated,

17 which, as I said before, it is not implicated here.

18        The other thing I want to say is that the counsel for

19 AAFAF alludes to a lot of extrinsic evidence, which is not

20 before the Court, excepting their, you know, brief. But

21 they -- if they wanted to make this clearer, as I said before

22 in my initial remarks, instead of saying in the statute "in

23 furtherance of the foregoing," they could have said, "not

24 withstanding the foregoing" --

25        (Sound played.)

41

1          MR. GARCIA SOLA:  -- and then that would have meant

2     that there was only one way to go, which is as per the

3     treatment powers.

4          That is not what the statute says.  That is not what

5     the Transfer Agreement says.  The Transfer Agreement is

6     broader in scope.  And our position is that the DRA parties

7     definitely can proceed to protect their collateral, because it

8     is actually being used to fund the Commonwealth Plan, and

9     there is actually no HTA plan at the moment.

10          And lastly, Your Honors, the Plan, the seventh

11     amended Plan, I believe now they're going on an eighth amended

12     Plan, was prepared without any intervention by the DRA

13     parties.  We tried to get included in the discussions.  We

14     were always left out.  The Plan was -- assumed that the DRA

15     parties are subordinated.  Yes -- now, yes, they have the

16     reserve for the DRA loan priority determination, but the fact

17     of the matter is that the Act 30, 31 revenues were used to

18     fund that plan.  Absolutely no participation given to the DRA

19     Parties.  And that's where we are today, because we were never

20     heard.

21          And with that, Your Honor, I'm afraid I'm out of

22     time.  Unless you have any further questions, I rest.  Thank

23     you very much.

24          THE COURT:  Thank you.

25          MR. MINTZ:  Your Honor.

```
 1              THE COURT:  Yes.

 2              MR. MINTZ:  It's Doug Mintz again.

 3              THE COURT:  Yes.

 4              MR. MINTZ:  May I have just 30 seconds to help answer

 5    your prior question to Mr. Garcia about clause 3?

 6              THE COURT:  Yes.

 7              MR. MINTZ:  Thank you, Your Honor.

 8              So an example where you'd be in a Title III, and the

 9    obligor has creditors with the same legal priority, is, for

10    example, the DRA owns a number of HTA '98 bonds.  If we were

11    treated differently on those HTA '98 bonds, vis-a-vis other

12    HTA non-'98 bondholders, then we would have the right to

13    complain.  But assuming we are treated the same, under clause

14    3, we would be required to stay silent.

15              THE COURT:  Yes.  I'm not exactly sure which question

16    you were meaning to respond to with that, because that I get.

17              MR. MINTZ:  Okay.  I think you had asked --

18              THE COURT:  I remember asking a question as to

19    whether clause 2 would have let you do the same thing, bring

20    the same challenge in a situation where same bonds were being

21    treated differently.

22              MR. MINTZ:  Yes.  So I don't think it -- if we were

23    being treated the same, I don't think Clause 2 would supersede

24    Clause 3, because Clause 3 has two limits:  One, to Title III,

25    and a -- alone in Title III, and, two, we have other -- there
```

1    are other creditors with the same legal priority.  So you

2    would satisfy both of the triggering provisions, and then you

3    would be only under Clause 3.

4        THE COURT:  Yes.  That's all that you would need, so

5    there wouldn't be any question of whether -- you know, unless

6    there was some other controversy about that, there wouldn't be

7    any question of whether you would need to resort to clause 2.

8        So that doesn't really present the exclusive remedy

9    argument or situation that the government parties are trying

10   to project, if I follow what you're talking about here.

11       MR. MINTZ:  Yeah.  I think in the plain language,

12   those -- that's the situation that clause 3 would limit.  We

13   weren't here at the drafting so, you know, aside from the fact

14   that it's not in evidence, we really don't know what the

15   various parties intended in the drafting, to be candid.  But

16   it's clear that the plain language of clause 3, that's what

17   clause 3 would prohibit, it would prohibit us from

18   complaining, as long as we're being treated the same as other

19   people of the same priority.

20       THE COURT:  Thank you.

21       So I will just ask everyone's indulgence for a couple

22   of minutes while I gather my thoughts, and then I will make an

23   oral ruling.

24       Thank you for your patience.  I will now make an oral

25   ruling.

1      Before the Court is *The DRA Parties' Amended Motion*

2    *and Memorandum of Law in Support of their Request for Adequate*

3    *Protection or Relief from the Automatic Stay*, (Docket Entry

4    No. 16276 in Case No. 17-3283, and I'll refer to it as the

5    "Motion").  Pursuant to the stipulation approved by the Court

6    at Docket Entry No. 16866, and the Order entered by the Court

7    at Docket Entry No. 17463, the hearing today concerns only

8    whether the DRA parties have standing to bring the motion.

9        The Court has carefully reviewed the relevant

10    pleadings and listened to the arguments today.  The Court now

11    makes its oral ruling as to the Motion, and reserves the right

12    to make non-substantive corrections in the transcript of the

13    ruling.

14        As a threshold matter, the Court rejects the DRA

15    Parties' argument that the Government Parties' objection

16    should not be considered by the Court because it does not

17    address issues of standing.  The Government Parties' objection

18    concerns whether the terms of the contract bar the DRA Parties

19    from seeking relief, which may be construed as a standing

20    issue.  See Black's Law Dictionary (11th ed. 2019) (defining

21    standing as "A party's right to make a legal claim or seek

22    judicial enforcement of a duty or right." ).

23        While the question of whether the DRA Parties have a

24    "colorable claim" could also implicate issues of standing

25    insofar as it inquires as to the nature and ownership of the

1   alleged collateral, that standard is applicable to the Court's

2   ultimate review of the merits of the Motion and not to the

3   threshold issue of standing as framed here, which is whether

4   there is a contractual bar to the DRA Parties' pursuit of the

5   relief sought here.

6          Additionally, it is worth noting that the parties

7   have already spent substantial time briefing the Government

8   Parties' objections after having continuously pushed out the

9   applicable briefing schedule since July of 2019.  Moreover,

10  the Court has spent time reviewing those submissions in

11  preparation for this hearing.  There is no benefit to be

12  gained from postponing consideration of the arguments raised

13  by the Government parties to another day, and no prejudice

14  will result if those issues are addressed today.

15         Accordingly, the Court will address the Government

16  Parties' objections to the Motion that turn on the issue of

17  standing to pursue the motion practice.  This aspect of the

18  parties' dispute principally focuses on section 1(b) of the

19  Master Transfer Agreement dated November 29, 2018 (I'll refer

20  to that as the "Transfer Agreement") and a related definition

21  in that agreement.

22         Section 1(b) of the Transfer Agreement provides, in

23  relevant part, that "the Issuer shall comply and shall direct

24  the servicer to comply with the asset restrictions with

25  respect to the transferred property...."  Accordingly, the

1    DRA, as the "Issuer," and AmeriNational as the "Servicer," are

2    required to comply with the Asset Restrictions, which are

3    defined in Schedule I to the Transfer Agreement.

4    Subparagraphs (b)(ii) and (b)(iii) of the "Asset Restriction"

5    definition, which applies in pertinent part to the

6    non-municipal loans at issue in the instant motion practice,

7    will be referred to in this oral decision as the "Transfer

8    Agreement Asset Restrictions," and I will refer to those

9    specific subparagraphs as "Clause 2" and "Clause 3"

10   respectively.

11         Combined with its prefatory stem, Clause 2 provides

12   that "with respect to any Non-Municipal Loan, rights,

13   remedies, and powers in respect of such non-municipal loan may

14   be exercised solely to the extent necessary...to preserve,

15   protect, or defend any security or other pledge rights

16   benefiting such Non-Municipal Loan."  Combined with its

17   prefatory stem, Clause 3 provides that "with respect to any

18   Non-Municipal Loan, rights, remedies, and powers in respect to

19   such non-municipal loan may be exercised solely to the extent

20   necessary...in the case of a Non-Municipal Loan where the

21   applicable Obligor is in a proceeding under Title III or Title

22   VI of PROMESA, and such Obligor has other creditors with the

23   same legal priority, security or pledge rights as the Issuer,

24   to ensure that the Issuer receives treatment in such

25   proceedings that is the same as that provided to other

1  creditors with the same legal priority, security, or pledge

2  rights."

3        The Government Parties' objection first argues that

4  where an obligor such as HTA has commenced a Title III case,

5  Clause 3 of the Transfer Agreement Asset Restrictions confines

6  the DRA Parties' freedom of action such that they may only

7  ensure that they receive the same treatment as other creditors

8  within that obligor's Title III case with the same legal

9  priority, security, or pledge rights.  Moreover, the Oversight

10  Board argues that no such other creditors exist, and that the

11  DRA Parties are, therefore, barred from taking any action,

12  even in the Commonwealth separate Title III action, or

13  elsewhere to preserve any rights that they claim arise out of

14  the Non-Municipal's Loans.

15        I do note that the Government Parties have pointed

16  out a provision in the Seventh Amended Plan that would permit

17  the DRA Parties and other HTA creditors to litigate priority

18  issues with respect to certain funds that are being dealt with

19  within that proposed Commonwealth Plan, that there is that

20  specific provision within that plan, but the Government

21  Parties do not appear to concede that the DRA Parties would

22  have an independent right to cue up the sort of litigation

23  that seems to be contemplated by the instant motion, absent

24  some specific plan mechanism within the Commonwealth Plan.

25        The DRA Parties contend that similar but different

1    asset restrictions imposed by the GDB Restructuring Act

2    overcome the Transfer Agreement Asset Restrictions such that

3    the Court should reject the Government Parties' arguments

4    entirely.  The DRA Parties provide no textual basis for the

5    argument that the statutory asset restrictions govern,

6    notwithstanding any constraints imposed by the Transfer

7    Agreement Asset Restrictions.

8         Furthermore, as noted by the Government Parties,

9    Section 404 of the GDB Restructuring Act specifically

10   contemplates that additional terms and conditions may be

11   imposed by the Transfer Agreement, and, as a practical matter,

12   today, in oral argument, the representatives of the DRA took

13   the position that, fundamentally, there is not a material

14   difference between the effect that they contend the statutory

15   provision has and the reading that they are proposing of the

16   Transfer Agreement Asset Restrictions.

17        But the Court will point out that even if the GDB

18   Restructuring Act permits the DRA to exercise certain rights,

19   nothing precludes the DRA from agreeing to contractual

20   limitations on such rights, and as the DRA Parties have noted,

21   the GDB Restructuring Act specifically permits the DRA to

22   enter into contracts and to use its property in accordance

23   with the ancillary agreements, such as the Transfer Agreement.

24        Accordingly, the Court next turns to the proper

25   interpretation of the Transfer Agreement Asset Restrictions.

1  The parties agree that interpretation of the Transfer

2  Agreement is governed by Puerto Rico law, and that under

3  Puerto Rico Law, the plain text of a contract is controlling

4  "[i]f the terms of a contract are clear and leave no doubt as

5  to the intention of the contracting parties."  31 L.P.R.A. §

6  3471.

7          The Government Parties' interpretation of Clause 3 is

8  not supported by the Transfer Agreement's plain text.  The

9  basic premise of the Government Parties' argument is that when

10  Clause 3 is triggered, the limited rights contained in Clause

11  3 are the sole rights that the DRA Parties may exercise.  The

12  Government Parties, however, focus their attention exclusively

13  on the first condition of Clause 3, even though Clause 3

14  presents two conditions.  Specifically, Clause 3 applies where

15  the applicable Obligor is in a proceeding under Title III or

16  Title VI of PROMESA, and such Obligor has other creditors with

17  the same legal priority.  Both the Government Parties and the

18  DRA Parties appear to be in agreement that there are no other

19  creditors in the HTA case with the same legal priority as the

20  DRA, at least with respect to these loans.  Accordingly, even

21  if the Government Parties are correct that Clause 3 provides

22  the exclusive remedy available to the DRA Parties when it is

23  triggered, Clause 3 has not been triggered and is, therefore,

24  inapplicable to the present circumstances.  There is no

25  textual indication that the existence of the HTA Title III

1    case in and of itself limits the DRA Parties' rights.

2          To be clear, the Court is not ruling on the

3    Government Parties' contention that if Clause 3 conditions are

4    met, Clause 2 is no longer applicable.  Rather, the parties

5    agree that Clause 3's conditions have not been triggered, and

6    the Court need not address what would happen if hypothetically

7    Clause 3's conditions were satisfied.

8          The Government Parties' other arguments concerning

9    Clause 3 would all have the Court attempt to discern the

10   parties' intentions based on the circumstances in which the

11   Transfer Agreement was executed, or with reference to other

12   extrinsic evidence, none of which is relevant in light of the

13   Transfer Agreement's facial lack of ambiguity.  As such, the

14   Government Parties' standing objection based on Clause 3 is

15   overruled.

16         The Government Parties' alternative argument for lack

17   of standing is that Clause 2 of the Transfer Agreement Asset

18   Restrictions bars filing the motion, because the motion

19   ultimately seeks to collect on the proceeds of a security

20   interest, rather than to preserve, protect, or defend any

21   security or other pledge rights.

22         The Government Parties' argument concerning Clause 2

23   ignores the fact that Clause 2 is not a complete sentence.

24   The DRA Parties are not limited to preserving, protecting, or

25   defending the DRA's rights.  Rather, the stem of the provision

1    makes it clear that they are authorized to exercise rights,

2    remedies, and powers to preserve, protect, or defend the

3    security or pledge rights benefiting the non-municipal loans.

4          The Government Parties have shown no textual basis

5    for their claim that Clause 2 limits the DRA's Parties'

6    remedies so severely that the DRA Parties may, at most, seek a

7    determination that they have a property right or pledge.  The

8    determination of the existence of a property right or pledge

9    is potentially only one aspect of a remedy capable of

10   preserving, protecting, or defending security or pledge

11   rights.

12         Section 361 of the Bankruptcy Code provides a method

13   by which a secured creditor may apply to the Bankruptcy Court

14   to protect its interest against the diminution in value of its

15   security during a bankruptcy proceeding.  In re WestPoint

16   Stevens, Inc., 600 F.3d 231, 257 (2nd Cir. 2010).

17         The adequate protection contemplated by section

18   321 -- I'm sorry, 361, protects a creditor's security interest

19   so as to maintain the benefit of the bargain that the secured

20   creditor originally made with the debtors.  In re Dynaco

21   Corp., 162 B.R. 389, 393 (Bankr. D.N.H. 1993).

22         Thus, adequate protection allows a secured creditor

23   to protect the security or other pledge rights benefiting its

24   claims against the diminution in value of the creditors'

25   collateral.

1          The premise of the Motion is that the Commonwealth

2    "has continuously depleted the value of the DRA's collateral

3    and has indicated that it will continue to do so for the

4    duration of the Commonwealth's Title III cases."  (I cite the

5    Motion at 2.)  And the Motion is thus framed as one that seeks

6    to exercise the DRA's rights, remedies, and powers by

7    requesting adequate protection pursuant to section 361 of the

8    Bankruptcy Code.

9          The Government Parties disagree with the merits of

10   the motion, and dispute whether the revenues at issue are the

11   DRA's collateral.  They also contend that the Commonwealth's

12   retention and use of the disputed revenues is not unlawful,

13   but those are merits issues and, as presented in the Motion,

14   the DRA's Parties request for adequate protection seeks a

15   remedy for the alleged diversion of collateral.  As such, the

16   government parties have failed to demonstrate that the DRA

17   Parties are prohibited by the asset restrictions from seeking

18   adequate protection.

19         The DRA parties have also requested relief from the

20   automatic stay pursuant to sections 362(d)(1) and 362(d)(2) of

21   the Bankruptcy Code.  The motion presents that request as an

22   alternative to adequate protection, and the pleadings so far

23   have not described in much detail the claims and remedies that

24   the DRA parties would pursue if that aspect of the motion were

25   granted.

1          Accordingly, there is not a sufficient basis for the

2     Court to determine whether the relief sought in that aspect of

3     the motion exceeds the scope of the Transfer Agreement asset

4     restrictions.  Accordingly, the Court overrules the Government

5     Parties' standing objection insofar as it relates to the

6     aspect of the motion that seeks adequate protection, and

7     defers consideration of the standing objection insofar as the

8     motion requests relief from the automatic stay, pending

9     further clarification of the nature and scope of the stay

10    relief that the DRA Parties seek.

11         The parties are directed to meet and confer

12    concerning the next steps with respect to litigation of the

13    Motion, and to submit a joint status report by August 11th,

14    including, to the extent possible, a stipulation or agreed

15    proposed order addressing the nature and timing of such

16    litigation, and the scope of activity for which the DRA

17    parties seek authorization by way of the request for relief

18    from the automatic stay.

19         That concludes the oral ruling with respect to the

20    standing issue.  Thank you all very much.

21         The next Agenda item is the Cobra Acquisitions

22    motion --

23         MR. QURESHI:  Thank you, Your Honor.

24         THE COURT:  Thank you.

25         The Cobra Acquisitions, LLC's, Motion to Lift the

54

```
1   Stay Order.  I have speaking for Cobra for the first five

2   minutes Mr. Qureshi or Mr. Heimberg, and/or Mr. Heimberg.

3            MR. QURESHI:  Good morning, Your Honor.  Abid Qureshi

4   from Akin Gump Strauss Hauer & Feld on behalf of Cobra, and I

5   will address the Court initially, Your Honor.

6            THE COURT:  Good morning, Mr. Qureshi.

7            MR. QURESHI:  Good morning.  May I proceed, Your

8   Honor?

9            THE COURT:  Yes, you may.

10           MR. QURESHI:  Thank you very much.  And let me start,

11  Your Honor, by noting that we and the government parties did

12  file a joint status report in response to Your Honor's request

13  in advance of the last hearing, at which our stay motion had

14  been scheduled.  So I am more than happy to answer any

15  questions that the Court may have with respect to the

16  responses that we submitted to the Court's five specific

17  questions.  Otherwise, I will proceed with the argument on our

18  Motion to Lift the Stay.

19           THE COURT:  Thank you.

20           I have reviewed the status report, and I would prefer

21  that you go into your argument.  I may have follow-up

22  questions then.

23           MR. QURESHI:  Oh, okay.  Thank you very much, Your

24  Honor.

25           As Your Honor is aware, the standard to lift the stay
```

1   is, of course, in the Court's discretion based upon the

2   existence of any material change in circumstances.  As Your

3   Honor is also aware, we have asked the Court now multiple

4   times to lift the stay that has been in effect for almost two

5   years.

6         And this time around, Your Honor, we believe that

7   there are two material change in circumstances upon which we

8   rely.  First is what appears to be an indefinite adjournment

9   to the ongoing criminal proceedings.  As Your Honor may

10  recall, when the Stay Order was initially entered back in

11  October of 2019, at that time the criminal trial was scheduled

12  to commence in early December of 2019.  Since then, there have

13  been a number of adjournments.

14        And, Your Honor, the latest information that we have,

15  as reflected in the status report, is that a trial date has

16  been held in abeyance for reasons that were not identified by

17  the criminal court.  There is no pretrial conference that has

18  been set.  And so from our vantage point, Your Honor, we

19  simply don't have any information as to when that criminal

20  proceeding may ultimately go forward.

21        The second reason, Your Honor, for us to move to lift

22  the stay at this point relates to FEMA's analysis of the cost.

23  Your Honor, again, at the time that we submitted our initial

24  motion to lift the stay, Cobra had no information as to when,

25  in fact, FEMA would complete its analysis.

1            As Your Honor is now aware, on May 26, FEMA issued

2    its so-called determination memorandum with respect to what we

3    now know to be only the first contract.  Now that FEMA has

4    completed that portion of its analysis, and Your Honor will

5    also note from the status report a total of approximately 40

6    or so million dollars was disallowed in that report out of a

7    total of 945 million dollars.  PREPA has appealed FEMA's

8    determination of that ruling with, of course, the full support

9    of Cobra.

10           But, Your Honor, nonetheless, it was our view, it is

11   our view that the completion of that FEMA cost report is also

12   a change in circumstances that merits lifting the stay.  And,

13   Your Honor, what I would note in particular in the status

14   report is the following.

15           PREPA says that FEMA's ongoing analysis -- and now

16   FEMA, we are told in the status report by the government

17   parties, is in the course of reviewing the second contract,

18   which of course it is pursuant to the --

19           (Sound played.)

20           MR. QURESHI:  -- second contract that the majority of

21   amounts remain unpaid.  But, Your Honor, with respect to 135

22   million dollars yet to be validated, PREPA points out that

23   that is for reasons, including deficient documentation,

24   duplicative invoices, head count discrepancies and the like.

25           Your Honor, Cobra has literally been begging PREPA

1   for more than two years to engage with us with respect to

2   those very issues, so we can identify specifically what

3   records it is that they need and can finally resolve the

4   issues.  PREPA has been using the stay as an excuse to

5   literally do nothing to try to resolve these open issues while

6   a never-ending FEMA process unfolds.

7          Respectfully, Your Honor, we think it's enough.  The

8   case law that we've cited stands for the very clear

9   proposition that indefinite stays are disfavored by courts.

10  Here the stay has morphed into something that is indefinite.

11  It is causing great prejudice to Cobra.  And we think it is in

12  the interest not only of Cobra, but of all of the parties to

13  this proceeding, given the size of the claim and the ongoing

14  interest accrual, that the parties finally move forward, agree

15  on a sensible discovery schedule, and start to engage on the

16  substance, so that we can hopefully resolve most of the

17  issues, and if not, be prepared to litigate whatever issues

18  remain.

19         And with that, Your Honor, I'm happy to take any

20  questions.

21         THE COURT:  Only one.  Do you agree that a plan of

22  adjustment can be confirmed without resolution of the

23  administrative expense motion, as long as a sufficient cash

24  reserve is set aside --

25         MR. QURESHI:  Yes, Your Honor.  In theory -- I'm

1  sorry, Your Honor.

2          (Sound played.)

3          MR. QURESHI:  Yes, Your Honor.  In theory, I

4  certainly agree that it is possible to confirm a plan of

5  adjustment if there is an adequate disputed claims reserve.

6  However, here, the aggregate amount of the Cobra claim,

7  inclusive of interest, is approximately 300 million dollars

8  and growing.  And, therefore, it may raise a question of

9  feasibility of the Plan of Adjustment, and whether, in fact,

10 it is feasible, if that size of a cash reserve is required.

11         So from our point, Your Honor, having at the time of

12 confirmation a litigation concerning feasibility, as well as a

13 litigation concerning the size of the disputed claim reserve

14 that ought to be set aside, is judicially inefficient, and not

15 in the interest of any of the parties.

16         Everybody would be served better if there were

17 certainty as to what the size of the claim is at the time that

18 a plan of adjustment is confirmed.

19         THE COURT:  Thank you.

20         So next I have, for the Oversight Board, Mr. Cooper

21 for seven minutes.

22         MR. COOPER:  Yes, Your Honor.  Good morning.  Scott

23 Cooper of Proskauer Rose, LLP, for the Oversight Board on

24 behalf of the government parties.

25         Your Honor, the stay should remain in place, because

1   the FEMA review process is the best path forward for the

2   parties to narrow and hopefully resolve their disputes.

3   Cobra's been paid approximately 1.1 billion of the

4   approximately 1.3 billion dollars it invoiced to PREPA.

5           It is not a contractor that has generally gone

6   unpaid.  Unlike other PREPA contractors, Cobra's former CEO

7   and a key FEMA official involved in overseeing Cobra's

8   contracts with PREPA have been indicted on criminal fraud and

9   bribery charges related to the same contracts for which Cobra

10  seeks to obtain the remaining portion of those contracts that

11  have not yet been paid.

12          The criminal indictments of Cobra's CEO and two FEMA

13  employees charged with overseeing its work were unprecedented

14  in seismic developments when they occurred in 2019, and they

15  naturally caused FEMA to pause its reimbursement and review

16  process, and, we understand, to instruct COR3 to suspend any

17  additional payments to Cobra pending FEMA's further review.

18  Then, starting in March last year, the process was further

19  slowed by the onset of the worldwide pandemic.

20          Nevertheless, that review process has since moved

21  forward significantly, and continues to offer by far the best

22  and most efficient path for resolving the remaining disputes.

23          With respect to Cobra's first contract, PREPA's first

24  contract with Cobra, FEMA's joint recovery office issued its

25  eligibility determination memorandum in May, and, again, has

1    approved the large majority of the funds for public assistance

2    funding, and determined just over 46 and a half million are

3    not eligible and deobligated that amount.  PREPA already has

4    appealed that disallowance to FEMA's regional office seeking

5    allowance for the full amount.

6            THE COURT:  And so PREPA doesn't --

7            MR. COOPER:  FEMA's review process -- go ahead, Your

8    Honor.

9            THE COURT:  PREPA doesn't dispute the 46 million in

10   costs that were disallowed?

11           MR. COOPER:  PREPA has taken the position that the

12   disallowance of those funds is incorrect, and together with

13   Cobra, has submitted both arguments with respect to contract

14   interpretation and additional documentation.  PREPA has

15   reserved the right to contest the amounts that were disallowed

16   by FEMA in this proceeding in the event that the appeal is

17   unsuccessful.

18           But, currently, Cobra and PREPA are attempting to

19   maximize the amount of funds available from FEMA for a payment

20   of the remainder of the sums claimed by Cobra under the first

21   contract.

22           THE COURT:  Thank you.

23           MR. COOPER:  FEMA's review process also is under way

24   regarding the second Cobra contract.  As detailed in our July

25   20 joint status conference -- or status report, PREPA is

1    advised that the cost validation review on what FEMA has

2    designated project worksheet 466 is currently being performed

3    by FEMA.

4           We understand PREPA has recently received a request

5    for information seeking substantial additional information in

6    support of the eligibility of costs under the second contract.

7    PREPA also understands FEMA is in the early phases of

8    developing its views and understanding of the scope of work

9    performed under what it has deemed as project worksheet 49831.

10   An additional request for information from the CRC relating to

11   those invoices are likely.

12          PREPA understands that FEMA's internal target is to

13   have work completed on both of those project worksheets

14   relating to the second contract by December 31, 2021, so by

15   the end of this year.  The parties currently are cooperating

16   in connection with FEMA's review to maximize the amounts FEMA

17   will fund for payment to Cobra, and we think that's the most

18   effective way to narrow their disputes, forcing PREPA actively

19   to assert its defenses to Cobra's remaining claims in this

20   proceeding to work against that collective effort.

21          FEMA's determination for the remaining invoice

22   amounts also will inform the parties of FEMA's position on the

23   validity and reasonableness of Cobra's invoices and the

24   availability of federal funds for payment.  We expect FEMA's

25   determinations will facilitate --

1         (Sound played.)

2         MR. COOPER:  -- voluntary resolution of the dispute

3    by the parties.  FEMA's process, therefore, provides the best

4    path forward for facilitating resolution of the remaining

5    issues.

6         Requiring the parties to proceed with discovery at

7    this time seems, thus, likely to be the least efficient way to

8    proceed.  It would impose an unnecessary burden on the Court

9    and be a waste of limited time, money, and other PREPA

10   resources to conduct discovery, and probably be productive

11   with -- counterproductive with respect to its submission of

12   additional information to FEMA.  Continuing to advance the

13   FEMA review process of the second contract will be the most

14   productive thing the parties can do.

15        The parties all agree, under the controlling law,

16   that continuing the stay is well within the discretion of the

17   Court.  We think it's clear that the continuation of the stay

18   is in the best interest of the Court, all of the parties, and

19   the orderly adjudication of the issues.

20        We have been making progress, Your Honor --

21        THE COURT:  Does that --

22        MR. COOPER:  Go ahead.

23        THE COURT:  Cobra has referred to the 135 million

24   dollars as to which PREPA has questioned the sufficiency of

25   documentation from Cobra, and Cobra's counsel today said

1  they'd like to be engaged on that, they'd like to know what it
2  is you think you're missing.  Wouldn't at least that limited
3  sort of engagement, whether in connection with a formal
4  lifting of the stay or more informally assist PREPA in moving
5  along both with FEMA and in its own internal deliberations as
6  to whether there really are problems or not?
7          MR. COOPER:  Your Honor, I -- PREPA and Cobra have
8  engaged in -- we understand that PREPA and Cobra have engaged
9  in substantial back and forth communications with regard to --
10         (Sound played.)
11         MR. COOPER:  -- the outstanding invoices.  And there
12  certainly have been disagreements between the two parties with
13  respect to which costs are payable under those invoices.  We
14  understand that PREPA has been asked again to review those
15  invoices that involve invalidated costs, to provide more
16  detailed information on what costs are approved, and what
17  costs are disapproved.  And we understand that PREPA has begun
18  that process again, and will be moving forward with it.
19         So we don't believe that a lifting of the stay is
20  necessary for that process to proceed.  It's something that is
21  in the joint interests of PREPA and Cobra in order to maximize
22  the amount of money that's available from FEMA with respect to
23  those invoices.
24         THE COURT:  Thank you.  So your time has run out, and
25  I will return to Cobra's counsel for two minutes.

1           MR. QURESHI:   Thank you, Your Honor.   Again, Abid

2   Qureshi, Akin Gump, on behalf of Cobra.

3           Your Honor, what counsel just said with respect to

4   the 135 million dollars and PREPA engaging with Cobra, let me

5   say very categorically and clearly, it is simply not true.

6   There has been absolutely no substantive engagement by PREPA

7   with respect to those outstanding invoices.

8           What counsel is saying is that the FEMA review

9   process should substitute as -- should substitute for the work

10  that PREPA should be doing.   But, Your Honor, our contract,

11  Cobra's contract is with PREPA, not with FEMA.   While Cobra

12  has been and will continue to be fully supportive of PREPA's

13  efforts to get as much funding as possible from FEMA, at the

14  end of the day, the contractual liability is PREPA's and

15  PREPA's alone.

16          So, Your Honor, we think it is inappropriate for

17  PREPA to continue to drag its feet under the cover of a stay

18  that has been indefinite, to let a FEMA process with no end

19  date in sight preclude Cobra from bringing this matter to

20  resolution.   So, Your Honor, we again respectfully request the

21  stay be lifted formally, not just informally, so that the

22  parties can agree upon a schedule to get the open issues,

23  which we don't believe are that broad, finally resolved.

24          And, lastly, with respect to the criminal

25  proceedings, PREPA's rights would, of course, be fully

1    reserved to argue whatever they would like to further down the

2    road when a resolution is reached in that proceeding.

3              Thank you, Your Honor.

4              THE COURT:  Thank you.  So I will again ask

5    everybody's indulgence and a couple of minutes to gather my

6    thoughts.

7              Thank you for your patience.  Pending before the

8    Court is the *Motion to Lift the Stay Order*, which is Docket

9    Entry No. 16328 in Case No. 17-3283, and Docket Entry No. 2428

10   in Case No. 17-4780, which I'll refer to as the "Lift Stay

11   Motion" filed by Cobra Acquisitions, LLC, which I'll refer to

12   as "Cobra."

13             The Court has reviewed the relevant pleadings

14   carefully and now makes its oral ruling as to the Lift Stay

15   Motion, and reserves the right to make non-substantive

16   corrections in the transcript of this ruling.

17             For the following reasons, the Lift Stay Motion is

18   denied.  Cobra requests termination of the litigation stay

19   imposed by the Court in October 2019, and continued since that

20   time, so that the parties may litigate Cobra's Administrative

21   Expense Motion, which is Docket Entry No. 8789 in Case No.

22   17-3283.

23             The Court originally imposed the litigation stay,

24   which was requested by the government parties, based on its

25   conclusions that factual and legal questions that could affect

1    the outcome of the Administrative Expense Motion would likely

2    be addressed in connection with the criminal proceedings, and

3    that the then pending FEMA investigation could also affect the

4    parties' rights and obligations with respect to the amounts

5    for which Cobra seeks administrative expense treatment.

6           The power to stay proceedings is incidental to the

7    power inherent in every Court to control the disposition of

8    the cases on its docket with economy of time and effort for

9    itself, for counsel, and for litigants.  Landis v. North

10   American Company, 299 U.S. 248, 254, a 1936 decision.

11          As this Court noted in its Order imposing the Stay,

12   "Federal Courts possess the inherent power to stay proceedings

13   for prudential reasons."  I'm quoting there the Order Granting

14   Joint Urgent Motion of the Oversight Board, PREPA, and AAFAF

15   to extend all applicable deadlines to Cobra Acquisition, LLC's

16   Motion for Allowance and Payment of Administrative Expense

17   Claims, which is Docket Entry No. 8886 in Case No. 17-3283,

18   which I'll refer to as the "First Stay Order".  And that was

19   quoting Microfinancial, Inc., v. Premier Holidays

20   International, Inc., 385 F.3d 72, 77 (1st Cir. 2004).

21          It follows from these principles that after

22   imposition of a stay for prudential reasons, the Court retains

23   the ability to modify or dissolve the stay, Green v. Crosby,

24   177 F. Supp 3d 673, 681 (D. Mass. 2016).

25          Such circumstances include material changes in the

1    circumstances that the Court originally determined warranted

2    the Stay.  Cobra contends that such material changes have

3    occurred.

4         First, the criminal trial is no longer imminent in

5    that no trial date is scheduled.  Second, Cobra characterizes

6    the expected cost analysis and determination from FEMA is

7    incomplete insofar as it only analyzes the first of two

8    contracts between Cobra and PREPA, and Cobra asserts that

9    further delay pending an examination of the second of its two

10   contracts with PREPA is unwarranted.

11        Cobra argues that it will be unduly prejudiced by

12   continuation of the Stay pending FEMA review of the second

13   contract and any administrative appeals that PREPA pursues,

14   because the ultimate resolution of the claim will require

15   further litigation, and the continuing financial uncertainty

16   is harmful to Cobra's business interests.

17        Separately, Cobra argues that PREPA effectively is

18   limited to two options to satisfy the feasibility condition

19   for confirmation of a plan of adjustment.  One, liquidate

20   Cobra's claim in advance of the confirmation, or, two,

21   establish a cash reserve in the aggregate amount of Cobra's

22   asserted claim.  The government parties argue that the outcome

23   of the criminal matter may be determinative of Cobra's

24   entitlement to administrative expense treatment of its claim,

25   because it could trigger additional contract defenses or FEMA

1    cost disallowances under 2 CFR § 200.339.

2         The government parties also argue that the Stay

3    should remain in place until a cost analysis and determination

4    memorandum can be issued by FEMA concerning the second

5    contract, asserting that the memorandum concerning the review

6    of the first contract demonstrates the utility of such FEMA

7    scrutiny.  The government parties argue that the FEMA cost

8    analysis mitigates the need for costly discovery and motion

9    practice.

10        Finally, the government parties argue that the

11   liquidation of Cobra's administrative expense claim is not

12   necessary in advance of PREPA's plan confirmation process,

13   because a plan of adjustment can be confirmed with an adequate

14   reserve held in abeyance until Cobra's claim is adjudicated.

15        The Court has considered these arguments carefully.

16   The Court has previously held in this matter that the

17   adjournment of the criminal trial alone does not justify

18   modification of the Stay Orders.  See In re Financial

19   Oversight and Management Board for Puerto Rico, 617 B.R. 173,

20   180 (D.P.R. 2020).

21        Here, although a trial date is not currently

22   scheduled, the Court is satisfied that the ongoing discovery

23   motion practice and conferencing indicates that the criminal

24   case is moving forward toward resolution, and that such

25   resolution may be significant in the resolution of the

1 │ Administrative Expense Motion.

2 │      The lack of a trial date does not, accordingly,

3 │ warrant termination of the litigation stay.  As the Court

4 │ recognized in its February 3rd, 2020, Order, the Court must

5 │ evaluate all aspects of the current factual and procedural

6 │ landscape in considering whether the Stay should be lifted or

7 │ maintained.  It is undisputed that FEMA's cost analysis and

8 │ determination memorandum concerning the first contract was a

9 │ comprehensive review of expenses that are contemplated in the

10 │ Administrative Expense Motion.

11 │      FEMA's administrative process allows for an

12 │ investigation into Cobra's expenses, a cost analysis with the

13 │ issuance of a determination memorandum, and an avenue for

14 │ administrative appeal of any adverse finding.  Thus, FEMA's

15 │ investigation reduces the need for extensive discovery to

16 │ resolve disputed amounts for which Cobra seeks administrative

17 │ expense treatment.

18 │      While it is true that the timeline of the criminal

19 │ prosecution and the anticipated timeline of the FEMA

20 │ investigation have changed, Cobra has not demonstrated that

21 │ there has been a material change warranting modification of

22 │ the stay of litigation in connection with any aspect of the

23 │ Administrative Expense Motion.  Rather, the Court concludes

24 │ that the relevant factors weigh in favor of maintaining the

25 │ Stay of this matter.

1         The parties agree that if Cobra's administrative

2 expense claim has not yet been allowed or is disputed as of

3 the Plan of Adjustment's effective date, PREPA could satisfy

4 confirmation requirements, including feasibility, by

5 establishing a disputed claims reserve for the administrative

6 expense claim.

7         The Court agrees that a plan of adjustment can be

8 feasible absent the liquidation of an administrative expense

9 claim.  However, at the time of confirmation, PREPA's claims

10 reserve must contain sufficient assets to allow creditors to

11 recover on their claims and ensure equal treatment for

12 similarly situated creditors.  *Plan Committee of Northwestern*

13 *Corporation v. Northwestern Corporation* from *In re*

14 *Northwestern Corporation*, 362 B.R. 131, 134-35 (D. Del. 2007).

15         Importantly, PREPA has not filed a proposed plan of

16 adjustment at this time.  PREPA's ability to fund a reserve or

17 resolve the claim, and issues regarding the appropriate

18 magnitude of the claim, can be addressed in the context of

19 confirmation, by which time further developments in the

20 criminal case and the FEMA investigation may have helped to

21 narrow the issues and the need for extensive discovery.

22         I note, however, that I am disturbed by the

23 discontinuity between the views of counsel regarding whether

24 there is ongoing informal interaction that -- in terms of

25 information exchange and requests for specific information

1    that can help to move this process along, even while the

2    formal litigation stay is in place.

3              I do expect of the parties that there will be genuine

4    engagement of the sort, and that that will be an element of

5    the next status report.  Accordingly, the Court will enter an

6    appropriate order denying the motion, and the parties are

7    directed to file a status report by January 19, 2022, at 5:00

8    PM Atlantic Standard Time.

9              Thank you.

10             MR. QURESHI:  Thank you, Your Honor.

11             THE COURT:  The next item on the Agenda is argument

12   of the Individual Bondholders Motion for Appointment of a

13   Committee to Represent Retail Investors in Connection with the

14   Confirmation of the Plan, and I have as first speaker for

15   seven minutes the movant, Mr. Peter Hein, who is representing

16   himself.

17             MR. HEIN:  Yes, Your Honor.  Can you hear me?

18             THE COURT:  Yes, I can.  Good morning, Mr. Hein.

19             MR. HEIN:  Thank you.  Good morning.

20             I want to start with the Oversight Board's PSA

21   joinder solicitation, because this is a new development

22   occurring after I submitted my reply papers.  I submitted

23   exhibits pertinent to this in docket 17649 yesterday.

24             The Oversight Board has doubled down on its coercion

25   of retail investors that my motion papers have complained of.

1   The new PSA joinder solicitation expressly states it extends

2   to individual retail investors.  For retail investors, the

3   deadline is effectively next Tuesday, August 10, 3:00 PM, as

4   shown on my Exhibit A.

5          This new development shows both why a retail investor

6   committee is needed now, and the need for additional relief to

7   provide an opportunity for a retail investor committee to be

8   constituted and engaged.  The Court had set a timetable that

9   was intended to provide over 60 days for creditors, including

10  individual retail investors, to review the Court-approved

11  Disclosure Statement and its exhibits -- there was about 2,700

12  pages in materials in total -- and for creditors to consider

13  whether to object to the Plan, and how to vote.

14         The Oversight Board is now unilaterally telling

15  retail investors, if you want to be sure to get the full 1.321

16  percent fee, as opposed to just having the possibility that

17  you might get a retail support fee that is not certain and

18  likely, as best I can tell, only half as much, the Oversight

19  Board is telling investors, you must decide now, like in four

20  business days.

21         Given the logistics of tendering bonds to a retail

22  broker, the deadline is Tuesday, August 10, at 3:00 PM, four

23  business days from now, not even the August 13th date in the

24  solicitation.  And that assumes individuals even learn about

25  this PSA joinder solicitation before the deadline.  To my

1  knowledge, the Oversight Board has not mailed or even e-mailed
2  this PSA joinder solicitation to individual investors.
3  Pursuant to the PSA, section 5.1, joinder of a PSA expressly
4  commits one to vote for the Plan.
5       This is like in section 5.1.  You are committed to
6  vote for the Plan and support for confirmation.  An individual
7  cannot join the PSA and then change their mind.  By joining,
8  the individual also commits to the terms of the -- terms of
9  the PSA itself.
10      The Oversight Board has unilaterally adopted this
11  course of process and effectively short-circuited the 60 plus
12  day process the Court has just ordered.  The Court -- the
13  Oversight Board did not move the Court for permission to do
14  this.  There was no advanced Court approval for this.  There
15  is nothing about the PSA joinder solicitation in the orders
16  the Court has just signed concerning the Disclosure Statement,
17  voting, and confirmation procedures.
18      The Oversight Board -- excuse me.  The Oversight
19  Board's solicitation of individual retail investors to join
20  the PSA is also contrary to the very terms of the PSA itself.
21  The PSA provisions do not contemplate that retail investors
22  will be subjected to a coercive joinder solicitation.  And PSA
23  excerpts are in Exhibit D of my submitted exhibits, and I
24  direct Your Honor in particular to docket 17649, page 22 of
25  29.  That's 22 of 29.

1          PSA section 2.2(a)(i), concerning exchange into new

2    CUSIPs, states in the provided, however, clause that GO bonds

3    and PBA bonds held by retail investors "need not be tendered

4    and exchanged."

5          PSA section 2.3 provides that a PSA joinder

6    solicitation would be directed to those with in excess of one

7    million face amount of bond.  And the PSA provides that the

8    Proposed Plan, based on the PSA, will provide for separate

9    retail classes defined -- for retail investors defined as

10   holding one million dollars or less.

11         Now, last week, Mr. Rosen said that if retail

12   investors do not join the PSA, well, they still get the retail

13   support fee, but the Oversight Board has still not provided

14   the information required to calculate the potential retail

15   fee, including the size of holdings of PSA creditors versus

16   retail investors.  And, as best I can tell, as I said, I think

17   that fee is going to be only about half as much, and is

18   contingent on the retail class vote.  For any part that the

19   retail class rejects, the PSA creditors end up getting roughly

20   three quarters of the fee, as best I can tell.

21         (Sound played.)

22         MR. HEIN:  Mr. Rosen last week said, oh, we have to

23   exchange CUSIPs, but there's been no showing that the CUSIP

24   exchanges must occur by August 13th.  The Oversight Board

25   itself expressly reserves the right to extend, and the PSA

1   does not contemplate a CUSIP exchange for individuals before

2   the date for voting and confirmation.

3           This type of coercive maneuver would never have

4   occurred if there was a retail investor committee.  To ensure

5   a level playing field for retail investors, the Court needs

6   to, first, order the appointment of such a committee, and,

7   second, to effectuate the objective supply function, order

8   that the August 13th deadline for retail investors to respond

9   to this PSA joinder solicitation be pushed back at least to

10  confirmation.  This would allow the retail investor committee

11  to be organized and to engage with the Oversight Board.

12          With every other group in this case, there's been a

13  dialogue, the retirees, the unions, the institution

14  bondholders and hedge funds, and all of them have either

15  received tens of millions of dollars, or had their fees paid

16  or provided as an administrative expense under the Plan. But

17  with retail investors, eight classes under the Plan, there's

18  been no committee and no dialogue.  There's been no one

19  representing the retail investors as part of the Plan

20  negotiations.

21          So, respectfully, Your Honor, I would ask the Court

22  order the appointment of a retailer investor committee, and

23  direct the Oversight Board to push back the August 13th PSA

24  joinder solicitation deadline, so the retail investor

25  committee can be constituted and play its role to make sure

1   retail investors are represented.

2          Thank you, Your Honor.

3          THE COURT:  Thank you, Mr. Hein.  I now have in

4   opposition Mr. Bienenstock or Mr. Rosen for the Oversight

5   Board for eight minutes.

6          MR. ESSES:  Good morning, Your Honor.  Joshua Esses

7   from Proskauer Rose.  I will be beginning the opposition, if

8   not finishing it as well.

9          THE COURT:  Good morning.  Good morning, Mr. Esses.

10  You may proceed.

11         MR. ESSES:  Thank you, Your Honor.  Your Honor,

12  Joshua Esses of Proskauer Rose for the Oversight Board.

13         Your Honor, I'll start with a very brief overview,

14  and then I'll go to the issue that Mr. Hein has raised in his

15  discussion today and in his papers.  Briefly, the Oversight

16  Board opposes the motion and believes it should be denied, as

17  a retail committee is not necessary to ensure adequate

18  representation of retail creditors.

19         The standard before a Court reviewing a motion to

20  appoint a statutory committee is permissive and provides that

21  a Court may order the additional appointment of a committee if

22  necessary to assure adequate representation of creditors.

23  This is a high standard, and it's not met here.

24         The motion and Mr. Hein's discussion relitigates many

25  of Mr. Hein's issues with these Title III cases, the Plan, and

1  the Disclosure Statement, the latter of which an order has

2  been entered with respect to its provision of adequate

3  information as provided for by the Bankruptcy Code.

4       I'll try to go through these concerns one by one to

5  explain why none should trouble the Court, nor any retail

6  bondholder, let alone give rise to concerns about adequate

7  representation of the retail investor classes.  I'll start

8  with the PSA, and the consummation costs, and the joinder,

9  which is discussed just now and in a motion.

10       Mr. Hein objects to basically the entire structure

11 with respect to the PSA and the payments of restriction fees

12 to parties to the Plan Support Agreements, but we think not

13 only is this process fair with respect to retail holders --

14 retail holders are actually advantaged as compared to

15 institutional holders, because they get two bites at the apple

16 with respect to restriction fees.

17       First, retail holders agree to exchange their bonds

18 by the August 13th exchange offer date, can receive the same

19 exact restriction fee being received by the bondholder parties

20 to the GO-PBA Plan Support Agreement, but if they don't make a

21 decision by that point, they have a second opportunity to get

22 the restriction fee by having their class vote to accept the

23 Plan and receiving their allocable share of the retail support

24 fee.

25       You know, Mr. Hein objects that this fee is coercive

78

1    and contingent, because the amounts paid to any retail holder

2    will depend on how many holders are entitled to such fee,

3    among other concerns.  This is a normal construct in

4    bankruptcy proceedings, and the Oversight Board will show that

5    the retail support fee is permissible under PROMESA and

6    applicable law.

7            And for what it's worth, Mr. Hein can always object

8    to the payment of these fees in the manner the Oversight Board

9    contemplates in connection with Plan confirmation.  He does

10   not need a committee to do so.

11           On the timing of the tender offer, bondholders are

12   given 17 days to determine whether or not they desire to sign

13   up to the PSA and receive the correlative restriction fees.

14   You know, Mr. Hein points out that these documents weren't

15   mailed to individuals.  Well, they were posted on EMMA, and

16   included there a summary of the exchange offer for investors

17   to review, as well as for the PSA itself.

18           Further, it is traditionally the role of the broker,

19   dealer, or other financial advisor to the investors, who is a

20   fiduciary for those bond investors, to explain the options

21   available to retail holders, and that's who Mr. Hein and other

22   holders should look to in understanding their options with

23   respect to the PSA, the financial advisors, you know, looking

24   for them, or who they've been using.

25           With respect to pushing out the date for the PSA

1   joinders, I'll say only that, you know, the date set forth is

2   the date that all the parties understand.  It's the date

3   that's gone out in the marketplace to investors, and, you

4   know, we don't want to move that date.

5        And as I'm sure you can understand, in these cases

6   and in any other, Your Honor, there's a real desire for

7   finality.  We want to move this process along fairly, and

8   efficiently, and without confusion, and one delay often begets

9   another.  And we do not believe it's appropriate to move the

10  August 13th deadline.

11       I'll talk a little bit about some of the other

12  concerns raised in the motion and the reply.  First, with

13  respect to bond splintering, the motion complains that retail

14  investors are receiving splintered bonds in return for single

15  bond claims, and this harms the marketability of the bond.  A

16  couple thoughts on this.  First, every bondholder, large or

17  small, is receiving splinter bonds, and this was done to

18  maximize returns to all bondholders.  It is explained in the

19  Oversight Board's Supplemental Omnibus Reply in Support of

20  Approval of the Disclosure Statement.

21       Municipal governments, unlike, you know, corporate

22  debt issuers, issue amortizing debt, not both -- maturity

23  debt.  And this is on a regularly scheduled basis over a

24  duration that varies generally between 20 to 40 years.  And

25  they do this both to satisfy bond investors' appetites for

1    different maturity dates of the bonds they are investing, as

2    well as to smooth out the cash flow the municipality has

3    available to pay debt service. And it's, you know, our belief

4    that by structuring the bonds this way pursuant to the Plan --

5              (Sound played.)

6              MR. ESSES: -- it oversees at least recoveries by

7    about two percent for all bondholders.

8              Second, at the dollar amounts discussed here at the

9    retail investor level, whether it's 13 bonds back or one,

10   100,000 or 7, these are already trading at lower values than

11   larger blocks, because of the nature of the bond market. You

12   know, retail investors bought into this relative trading

13   deficit when they bought at the beginning. They're not being

14   further disadvantaged by this splintering.

15             A couple other points in my remaining time. Mr. Hein

16   laments that the various ad hoc groups are not fiduciaries to

17   the retail investor committee, and that they don't have a

18   fiduciary, but that standard is not found in the Bankruptcy

19   Code. In the case law, fiduciary obligation is not necessary

20   for holders of PBA and GO bonds to have benefited from the

21   various ad hoc groups' vigorous representation of their

22   interests, even the interests of holders like Mr. Hein, who is

23   not paying any legal fees in connection with their work and

24   would seek to undue the settlements, and to which those groups

25   and their members have entered. And we think that the

1    interests of retail bondholders and institutional bondholders

2    for PBA and GO are almost, if not completely, coextensive as

3    far as increasing recoveries to all holders, be they large or

4    small.

5           I think I'll pause there to see if there's any

6    concern the Court would like me to address that we haven't

7    specifically gone through.

8           THE COURT:  The consummation fees, and I'm forgetting

9    the other -- the consummation costs and restriction fees, are

10   those going to be treated as administrative expenses so that

11   the parties will be required to demonstrate that they are

12   actually and necessarily incurred?

13          (Sound played.)

14          MR. ROSEN:  Your Honor, this is Brian Rosen.  If I

15   could address that?

16          THE COURT:  Yes.

17          MR. ROSEN:  Sorry, Mr. Esses.

18          The answer is yes, Your Honor.  Just like we did in

19   connection with COFINA, there will be a presentation regarding

20   the consummation of costs that have been incurred.

21          But I would also like to just address one specific

22   question that was raised earlier, or stated by Mr. Hein.  The

23   reason for the deadline for the actual tender and exchange is

24   so that we can then continue with the actual solicitation of

25   acceptances and rejections to the Plan.

1          By having the closing date or the settlement date for

2     the tender and exchange, that allows us to lock in those

3     CUSIPs, Your Honor, and make sure that we are getting the

4     votes from the people who are appropriate to accept or reject

5     the Plan.  So it's a day follows night or a night follows day

6     thing, Your Honor, where we have to close the tender and

7     exchange prior to the actual commencement of the solicitation

8     to -- the acceptances and rejections to the Plan itself.

9          THE COURT:  Thank you.  Thank you both.

10         At this point, I will turn to Mr. Despins for two

11    minutes.

12         MR. DESPINS:  Thank you, Your Honor.  Good morning

13    again.  Luc Despins with Paul Hastings for the Official

14    Committee.

15         The Official Committee objects to the motion seeking

16    the appointment of a committee for retail holders, and we -- I

17    think that there's a practical way to resolve the issues here.

18    I think that there clearly are maybe communication issues,

19    because of the number of retail holders and all that, but I

20    think the Court has the power, for example, to direct the

21    Oversight Board to delegate to their claims agent a team

22    there, or a person, the job of answering calls and responding

23    to e-mails from retail holders, so that there's one central

24    point of communication, because I think that most of what

25    Mr. Hein is raising are communication issues and

1    implementation issues.

2         To the extent he is seeking a committee to fight

3    confirmation, we obviously object to that, but I think the

4    Court has the power here to alleviate the concerns that he

5    raised, which may very well be accurate, about the fact that

6    many retail holders don't have the information they need on a

7    timely basis.  And I think that the Oversight Board's claim

8    agents, you know, if they designate one person to do that,

9    could very well alleviate those concerns.  So that would be

10   our suggestion.  But obviously on the merits, we believe that

11   no official committee should be appointed.

12        Thank you, Your Honor.

13        THE COURT:  Thank you.

14        Before I call Mr. Hein back, it's my impression and

15   understanding that there is a phone line to Prime Clerk that

16   is publicized for people who have questions, and I work on the

17   assumption that on the other end of that phone line would be

18   people who could supply appropriate information or connect

19   with someone who can supply appropriate information.

20        Counsel for the Oversight Board, will you tell me

21   whether I'm right or wrong on that?

22        MR. ROSEN:  Your Honor, it's Brian Rosen again.

23        You are absolutely correct, Your Honor.  We do have

24   that available for anyone and everyone who seeks or has any

25   questions.  Likewise, Your Honor, we frequently post FAQs,

1   frequently asked questions, to try and be responsive to

2   something that -- perhaps if Mr. Hein raised a question, to

3   make sure that not only Mr. Hein knows the answer, but the

4   greater population knows it as well.

5        We post those FAQs and their answers online so that

6   people can get access to them, and we try to promote those

7   through EMMA, sometimes DTC, but certainly on the websites,

8   Your Honor.

9        THE COURT:  Thank you.

10       Now I'll turn back to Mr. Hein for three minutes.

11       MR. HEIN:  Yes, Your Honor.  Thank you, Your Honor.

12       I heard no response at all to my point that this

13  coercive solicitation to retail investors is contrary to the

14  terms of the PSA itself.  There was no response on that.

15       There was no response to my point that the coercive

16  deadline of August 10th effectively is not something the Court

17  has authorized.

18       There's no response to the fact that this is contrary

19  to the 60 day plus process with the Disclosure Statements so

20  people have an opportunity to obtain, through the Disclosure

21  Statement and otherwise, the information they need to make an

22  informed decision.

23       The notion that retail brokers are going to solve

24  this problem is completely unrealistic.  Those retail brokers

25  are in the same boat as individuals not having an adequate

1    opportunity to inform themselves.

2         The notion that the debtors' claims agent and a phone

3    line will solve the problem, Your Honor, I think is just not

4    realistic.  For example, on basic questions of --

5         (Sound played.)

6         MR. HEIN:   -- what will be the amount of the retail

7    support fee, as compared to the restriction fee, what is the

8    probability that someone will actually get the retail support

9    fee, the phone representative is not going to be able to

10   answer that question.  That information hasn't been provided.

11        Tellingly, Your Honor, there has been absolutely no

12   response to the point I made in my papers that the Oversight

13   Board has not cited any case where adequate representation was

14   satisfied by the existence of ad hoc committees that a movant

15   was not a member of and which hold no fiduciary duty to the

16   members.

17        There's also been no response to the fact that there

18   is no other class comprised of individuals that is impaired

19   and that does not have a committee or other arrangements in

20   place to represent the members of that class.  The Oversight

21   Board talks about the vigorous representation by ad hoc

22   groups, but as I point out in my reply, that vigorous

23   representation ended up with the ad hoc groups.  It impedes

24   probably four times what are potentially being offered to

25   retail investors, even on something like the debt service

1    fund.

2          You have the debt service fund removed from the Plan

3    provisions at the last minute in order to pay additional fees

4    to the people that were in effect negotiating with the

5    Oversight Board.  Fundamentally, what is necessary here is for

6    a retail committee that can engage.

7          The retirees have a committee that's engaged.  The

8    unions have a committee that's engaged.  The institutional

9    investors and the hedge funds are receiving the consummation

10   costs and restriction fees pro rata.

11         (Sound played.)

12         MR. HEIN:  These are pro rata, simply prepared as a

13   percentage.  There is no reason retail investors should not,

14   likewise, have a committee and be able to engage with the

15   Oversight Board.

16         Thank you, Your Honor.

17         THE COURT:  Thank you.  I have one question for you.

18   Is it your expectation that a committee counsel would provide

19   individualized answers and legal advice to bondholders, to

20   individuals bondholders?

21         MR. HEIN:  No.  The committee counsel -- the

22   committee would be fiduciaries representing the members of the

23   retail investor class.  And I think that they would be

24   providing information that would be appropriate for people in

25   that class, but they're not -- they're not acting as

1    individual attorneys for any member of that class, anymore so

2    than with the Retirees Committee or the UCC.

3              I don't think the UCC's counsel views themselves as

4    representing the interests of particular individual unsecured

5    creditors.

6              THE COURT:  Thank you for making your understanding

7    clear on that.  As you've noted, there are a number of classes

8    of bondholders.  You're proposing one committee.  Wouldn't

9    some constituents of the committee have diametrically opposed

10   interests to those of other members of the committee,

11   depending on which bond issues they hold?

12             MR. HEIN:  I respectfully don't think that is the

13   case for a couple of reasons.  One, the case law, which I've

14   cited, recognizes that the members of the committee may have

15   some differing interests, but, nevertheless, because the

16   members of the committee have a fiduciary duty to the overall

17   constituency, that that is something where, you know, it

18   works.

19             And clearly here the purpose of the committee would

20   not be to be fighting issues as to the priority of one

21   particular series of bonds over another, because clearly there

22   would be attention, and it is not something the committee

23   should be attempting to do.  The purpose of the committee

24   would be to address those matters that are of common interest

25   to retail investors.

1              And frankly, Your Honor, and I think what's happened

2    here with this, really, I think this PSA joinder thing, even

3    contrary to the terms of the PSA -- it's not even authorized

4    by the PSA, that people are being asked to join.  Something

5    like this would never have happened if there was a retail

6    investor committee in place that could be like other

7    committees engaged in the dialogue with the Oversight Board,

8    where they would have to be dealt with because they're

9    recognized.

10             One individual, like myself, no matter how vocal, can

11   just be brushed aside, but a committee would have to be dealt

12   with.  Their concerns would have to be addressed.  If they

13   weren't worked out, they would come to the Court obviously.

14   But I think that one reason one has had these ongoing problems

15   in this case with retail investors is because no one is

16   representing them.

17             And, again, because these ad hoc committees -- as I

18   point out in my papers, the ad hoc committees disclaim,

19   expressly disclaim, they say they have no fiduciary duty to

20   others.  They have no responsibility to others.  They've been

21   very up front with that.

22             And so we've had a situation here where issues that

23   are important and retail investors -- it's eight classes here.

24   There are thousands and thousands of individuals.  And I also

25   think just from, frankly, the appearance of justice in this

1   case, if one does not have a situation where retail investors

2   are appropriately represented as part of the process, I think

3   that creates serious appearance issues as well.

4          Hedge funds who expressly disclaim any responsibility

5   to the retail investors cannot be held out as vigorous

6   representatives of those individuals they've disclaimed

7   responsibility for.  And I think that a retail investor

8   committee here, frankly, and I understand where Your Honor's

9   predilections are, but I think this actually could be a very

10  constructive force.  I think it could be implemented promptly.

11  A very constructive force in putting the individual components

12  of these cases on a basis that is sounder and more

13  appropriate, and, frankly, for everybody's benefit.

14          THE COURT:  Thank you, Mr. Hein.

15          We have now reached the time where we need to break

16  for lunch, and so I will make my ruling on this motion when we

17  reconvene.  Please be back on the phone lines and ready to

18  proceed with the remaining matters at 10 past 1:00, that is,

19  1:10 Atlantic Standard Time, which is the same as Eastern

20  Daylight Time.  I thank you all.

21          Make sure that you disconnect from the Court

22  Solutions system and call back in again for 1:10.  Thank you.

23          We are adjourned.

24          (At 11:49 AM, recess taken.)

25          (At 1:09 PM, proceedings reconvened.)

1            THE COURT:  Good afternoon.  This is Judge Swain

2    speaking.

3            MS. NG:  Good afternoon, Judge.  This is Lisa.

4    Everybody's here.

5            THE COURT:  Thank you.

6            This is the continuation of the August Omnibus

7    Hearing in the cases jointly administered under the lead

8    number 2017-3283, *In re: Financial Oversight and Management*

9    *Board*.  So I am now prepared to rule on Mr. Hein's Motion for

10   the Appointment of a Committee.

11           Before the Court is the *Motion of Individual*

12   *Bondholder for an Order Directing the Appointment of a*

13   *Committee to Represent Retail Investors in the Eight Retail*

14   *Investor Classes in Connection with the Proposed Plan and in*

15   *Proceedings Related to Confirmation* (Docket Entry No. 17221 in

16   Case No. 17-3283.  And I'll refer to it as the "Motion").

17           The Motion requests entry of an order directing the

18   appointment of an official committee of holders of

19   Commonwealth and PBA bonds, and I'll refer to the proposed

20   committee as the "Bondholder Committee".  Movant's proposed

21   Bondholder Committee would be comprised of individuals who

22   each hold up to one million dollars in the aggregate of such

23   bonds.

24           The Court has carefully considered the pleadings

25   submitted by the parties concerning the Motion, as well as the

1    arguments earlier today.  For the reasons that follow, the

2    Motion is denied.

3           Section 1102(a) of the Bankruptcy Code governs the

4    formation of committees of creditors.  Section 1102(a)(1)

5    provides that "the United States Trustee shall appoint a

6    committee of creditors holding unsecured claims and may

7    appoint additional committees of creditors . . . as the United

8    States trustee deems appropriate."  11 U.S.C. § 1102(a)(1).

9    Section 1102(a)(2) provides that a Court may also appoint

10   additional committees of creditors "if necessary to assure

11   adequate representation of creditors."  11 U.S.C. §

12   1102(a)(2).  A movant seeking appointment of an additional

13   committee must demonstrate that the committee is "necessary"

14   for adequate representation.  This is "a high standard that is

15   far more onerous than if the statute merely . . . [required]

16   that a committee be useful or appropriate."  In re SunEdison,

17   Inc., 556 B.R. 94, 103 (Bankr. S.D.N.Y. 2016).  In excercising

18   their discretion, courts also consider practical

19   considerations, such as the complexity of a case and the costs

20   that would be associated with appointing additional

21   committees.  In re Wang Labs, Inc., 149 B.R. 1, 2 (Bankr. D.

22   Mass. 1992).  In particular, courts are sensitive to the

23   reality that the "appointment of additional committees is

24   closely followed by applications to retain" lawyers and other

25   professionals.  In re Wang Labs, 149 B.R. at 4.

1          Movant has not met the high burden of demonstrating

2     that the appointment of a Bondholder Committee is "necessary"

3     as required by section 1102(a)(2), nor that the court should

4     exercise its discretion to direct appointment of a Bondholder

5     Committee.  Although these Title III cases are complex,

6     sophisticated parties represented by able counsel hold the

7     same bonds owned by Mr. Hein and other retail investors, and

8     through the course of the Title III cases, those parties have

9     vigorously defended the validity and value of those bonds.

10    Although Movant is correct that active ad hoc groups and

11    institutional investors with significant Commonwealth and PBA

12    bond holdings have settled their disputes and now support the

13    proposed Plan of Adjustment, Movant has failed to demonstrate

14    that their support arises out of anything other than a

15    calculated cost benefit analysis that takes into account the

16    risks and burdens of litigating the validity and priority of

17    their claims, including the resolution of complex

18    intercreditor disputes that have been queued up in a host of

19    contested matters and adversary proceedings.  Even if the

20    supporting creditors do not purport to represent the interests

21    of retail bondholders and do not have fiduciary duties towards

22    retail bondholders, their support for the proposed Plan of

23    Adjustment implies their belief that the Plan maximizes value

24    for the benefit of bondholders.

25          The existence of "Consummation Costs" and

1   "Restriction Fees" in the plan support agreements and proposed

2   Plan of Adjustment do not demonstrate that the creditors'

3   interests are not aligned with those of Retail Investors.  The

4   Plan contemplates that payment of these amounts will

5   compensate creditors for contributions they have made and

6   obligations they have incurred in furthering the progress of

7   these Title III cases, and the Oversight Board will be

8   required in connection with the Plan confirmation process to

9   demonstrate that these amounts are justified as administrative

10  expenses that are properly payable under the Bankruptcy Code.

11  Putting aside such administrative expenses, Movant does not

12  appear to contend that the Plan contemplates treatment of the

13  claims of institutional investors in a manner different than

14  or superior to the treatment proposed for Retail Investors.

15        Movant also objects to the structure of the bonds

16  that would be issued under the proposed Plan of Adjustment,

17  takes issues with the fact that each of the Retail Investor

18  classes in the proposed Plan would not receive retail support

19  fees if that class votes to reject the Plan, and also takes

20  issue with several other substantive provisions of the

21  proposed Plan of Adjustment.  However, the existence of Plan

22  provisions that the Movant disagrees with or objects to does

23  not demonstrate that the creditors involved in negotiating the

24  Plan did not use their best efforts to maximize value for the

25  benefit of bondholders.  Movant is free to raise objections to

1   these provisions in connection with Plan confirmation, and the

2   Court will consider such objections in due course.

3            Movant's references to the complexity of the

4   Disclosure Statement and solicitation materials are also

5   insufficient to demonstrate a lack of adequate representation.

6   The Disclosure Statement has already been reviewed carefully

7   by the Court, and consistent with certain objections raised by

8   Mr. Hein, the Court required certain changes to enhance the

9   disclosure proposed by the Oversight Board before approving

10  the Disclosure Statement and solicitation materials.

11  Moreover, Committee counsel do not act as lawyers to each

12  creditor who is a constituent, and Movant has not explained

13  how the appointment of a Bondholder Committee at this point

14  would meaningfully affect bondholders' understanding of the

15  disclosure and solicitation materials.

16            [Nor do the Movant's objections today concerning the

17  Debtors' offer to permit retail bondholders to become parties

18  to the Amended and Restated Plan Support Agreement demonstrate

19  inadequate representation or the necessity of a committee for

20  retail investors.  The Movant can raise his objections to the

21  manner in which support was solicited in connection with Plan

22  confirmation proceedings if he so desires.]

23            Accordingly, the Motion is denied, and the Court will

24  enter an appropriate order.

25            Thank you.  The next set of Agenda items are

1    objections to claims.  The first one that was originally on

2    the list was the 314th Omnibus Objection, and I understand

3    that that proof of claim has been withdrawn.

4          I'd ask that counsel for the Oversight Board come on

5    at this point and tell me where we need to start with this

6    section of the Agenda.

7          MS. STAFFORD:  Good afternoon, Your Honor.  This is

8    Laura Stafford of Proskauer Rose on behalf of the Financial

9    Oversight and Management Board for Puerto Rico.

10         As Your Honor noted, the proof of claim that was

11   originally objected to via the 314th Omnibus Objection was

12   withdrawn, and we noted Your Honor's Order entering the

13   stipulation and agreed order regarding the withdrawal of that

14   proof of claim this morning.

15         There are additional pro se respondents who have

16   responded to the 314th Omnibus Objection.  I understand that

17   those responses will be taken up at a later time.  And so at

18   this stage, Your Honor, I think it would be most important to

19   begin with the 321st Omnibus Objection, which is the next item

20   on the Agenda.

21         THE COURT:  Very well.  Thank you.

22         That is docket entry no. 16647 in case 17-3283; is

23   that correct?

24         MS. STAFFORD:  That is correct, Your Honor.

25         THE COURT:  Very well.  Please proceed, Ms. Stafford.

1          MS. STAFFORD:  Thank you, Your Honor.

2          As Your Honor noted, the 321st Omnibus Objection is

3     filed at ECF no. 16647, and this objection seeks to disallow

4     in their entirety proofs of claim associated with either

5     deposits held by the Government Development Bank but

6     transferred to the Public Entity Trust pursuant to the

7     Qualifying Modification, or bonds issued by the Government

8     Development Bank that were subject to the Qualifying

9     Modification and, accordingly, have been canceled and

10    released.

11         One response to this objection was received.  It was

12    filed by the Puerto Rico Land Administration at ECF no. 17207,

13    and it addresses Proofs of Claim Nos. 50438 and 73021.

14         The response does not dispute that Proof of Claim No.

15    73021 asserts the deposits which are designated deposits

16    pursuant to the Qualifying Modification, and that they are,

17    therefore, no longer a liability of the Commonwealth.

18         With respect to Proof of Claim No. 50438, the Puerto

19    Rico Land Administration states that it continues to receive

20    deposits, account statements, statements from the Economic

21    Development Bank of Puerto Rico reflecting that certain funds

22    are deposited with the Economic Development Bank in favor of

23    the Puerto Rico Land Administration.  In support of that

24    assertion, the Puerto Rico Land Administration has filed

25    several account statements reflecting deposits held by the

1    Puerto Rico Land Administration at the Economic Development

2    Bank.

3           As set forth in the Commonwealth reply, however,

4    documents shown submitted in connection with Proof of Claim

5    No. 50438 state that that claim asserts liabilities associated

6    with funds that were initially deposited at the Economic

7    Development Bank, but was subsequently returned to the GDB.

8    Neither the claim itself, nor the claimant's response provides

9    any indication that the funds deposited at the Economic

10   Development Bank are the same funds asserted by Proof of Claim

11   No. 50438.

12          In any event, as is also set forth in the

13   Commonwealth reply, the Economic Development Bank is not a

14   Title III debtor, and is, instead, a separate entity legally

15   distinct from the Commonwealth and each of the other Title III

16   debtors. Accordingly, irrespective of whether Proof of Claim

17   No. 50438 asserts funds deposited at the Economic Development

18   Bank or funds previously deposited at the GDB, the

19   Commonwealth is simply not liable for this claim.

20          Thank you, Your Honor. And I'd reserve the remainder

21   of my time for rebuttal.

22          THE COURT: Thank you.

23          The Agenda allocates six minutes now to Carlos

24   Cardona Fernandez to speak for the Puerto Rico Land

25   Administration.

1           Mr. Cardona, are you there?  Mr. Cardona Fernandez?

2    Please unmute your phone and also unmute the dashboard if you

3    are also following along on a computer.

4           (No response.)

5           THE COURT:  I am not hearing a voice.

6           Ms. Ng, is Mr. Cardona Fernandez muted?

7           MS. NG:  Judge, is that Carlos Cardona?

8           THE COURT:  Carlos E. Cardona Fernandez.

9           MS. NG:  Okay.  I have a Carlos Cardona.  I just

10   unmuted him.

11          MR. CARDONA FERNANDEZ:  Yes.  Your Honor, can you

12   hear me now?

13          THE COURT:  Yes, I can hear you now.

14          MR. CARDONA FERNANDEZ:  Good afternoon, Your Honor.

15   This is Carlos Cardona Fernandez on behalf of the Puerto Rico

16   Land Administration.

17          Our response is pretty straight forward.  Our

18   position is that the uncontested evidence on the record

19   establishes that the funds in connection with claim no. 50438,

20   in the amount of $1,129,800.76, that those funds are deposited

21   with the Economic Development Bank, and, hence, the objection

22   raised by the Commonwealth is incorrect in that sense.

23   Because of that, those monies are deposited in favor of the

24   Puerto Rico Land Administration, and are not subject to Title

25   III.

1          That is our contention, and that's what we argued in

2    our latest motion that we filed on Monday requesting that the

3    motions be ruled on the papers, the issue be ruled on the

4    papers.  That is our position, Your Honor.

5          THE COURT:  Let me ask you a matter of clarification,

6    because the Objection to Claim, as asserted by the Oversight

7    Board, doesn't argue who the money ultimately belongs to.  It

8    is a question of whether the Commonwealth of Puerto Rico, as

9    opposed to some other entity that's not a debtor in these

10   Title III proceedings, would be the entity that you would need

11   to look to for satisfaction of your claim for that money.

12         So, as I understand her, Ms. Stafford is saying that

13   the Economic Development Bank is not the Commonwealth, it's

14   not a debtor in these proceedings, and, similarly, the GDB is

15   a separate entity.  So what the Oversight Board is looking for

16   here is a ruling that says 50438 and 73021 are not proper

17   claims as against the Commonwealth in the Commonwealth Title

18   III proceeding.

19         Do you disagree with that proposition of the

20   Oversight Board?

21         MR. CARDONA FERNANDEZ:  Yeah, Your Honor -- we have

22   to agree with that, because that's what they argued in the

23   latest reply.  That's why we requested that the issue be ruled

24   on the papers when we filed our motion, our motion on Monday,

25   Judge.  Precisely why we stated that.

1          THE COURT:  Thank you.  That was not completely clear

2     to the Court from the Monday filing, and so --

3          MR. CARDONA FERNANDEZ:  Uh-huh.

4          THE COURT:  -- also that request was submitted so

5     late, we'd already prepared for this argument.  So that is why

6     I required that the argument go forward.  So if you have

7     nothing further to say in that respect, with respect to this

8     objection, I'll turn back to Ms. Stafford.

9          So, Ms. Stafford, I think you can come back.  Thank

10    you.

11         MS. STAFFORD:  Thank you, Your Honor.

12         I think if I understood Mr. Cardona correctly, I

13    think he's in agreement that these claims are not liabilities

14    of the Commonwealth, and so far the Proof of Claim 50438

15    asserts funds deposited at the Economic Development Bank,

16    which is not a part of the Commonwealth.  And in light of

17    that, I think we are in agreement that these funds are -- that

18    this claim is not a liability of the Commonwealth.

19         THE COURT:  Thank you.

20         MR. CARDONA FERNANDEZ:  That is correct, Your Honor.

21    I have to agree on that, yeah.

22         THE COURT:  Thank you for making that clear,

23    Mr. Cardona Fernandez.

24         Now, I have references here in my notes on the

25    pleadings that 50438 is in issue, and that the Commonwealth is

1   also seeking to disallow 73021.  Ms. Stafford, can you explain

2   what the status is as to 73021?

3         MS. STAFFORD:  That's correct, Your Honor.  73021,

4   it's our understanding that this claim asserts deposits which

5   are designated deposits pursuant to the Qualifying

6   Modification, and I don't believe that that was disputed by

7   Mr. Cardona in his response.  I believe he noted both claims

8   were a part of the objection, but his only response related to

9   50438.

10        THE COURT:  And so --

11        MR. CARDONA FERNANDEZ:  That is correct, Your Honor.

12  I'm sorry.  I'm sorry.

13        THE COURT:  I was just going to ask you to tell me

14  whether you agreed with that.  So --

15        MR. CARDONA FERNANDEZ:  No, Your Honor.  That's what

16  I was going to say.  As to 73021, we didn't file a response,

17  because we consent to what the Commonwealth argued with

18  respect to that claim.  That is a non-issue.

19        The issue was with 50438, the information that we had

20  and the deposit account statement that we were receiving from

21  the Economic Development Bank.  So our response is only as to

22  50438, not 73021.

23        THE COURT:  On 50438, you now agree with the

24  Oversight Board?

25        MR. CARDONA FERNANDEZ:  I agree with the Oversight

1    Board that if the monies are deposited in favor of the Puerto

2    Rico Land Administration with the Economic Development Bank,

3    that they are not subject to Title III, and, hence, the Court

4    should disallow obviously 50438, the proof of claim, then.

5            THE COURT:  Thank you.

6            So the Court now rules that the 321st Omnibus

7    Objection is sustained as to claim nos. 50438 and 73021 of the

8    Puerto Rico Land Administration.  Those claims are disallowed

9    in their entirety, because they do not state a legal theory or

10   basis on which liability could attach to a debtor in these

11   Title III proceedings.

12           Ms. Stafford, does this ruling complete the

13   resolution of all of the elements of the 321st Omnibus

14   Objection?

15           MS. STAFFORD:  It does, Your Honor.  No additional

16   responses were received.

17           THE COURT:  Thank you.  So would you submit a

18   comprehensive proposed order disallowing the claims resolved

19   by the Omnibus Objection?

20           MS. STAFFORD:  We would be pleased to do so, Your

21   Honor.  Thank you.

22           THE COURT:  Thank you.

23           Thank you, Mr. Cardona Fernandez.

24           MR. CARDONA FERNANDEZ:  Thank you very much, Your

25   Honor.

1          Thank you, Counsel.

2          MS. STAFFORD:  Thank you.

3          MR. CARDONA FERNANDEZ:  Have a good afternoon.

4          THE COURT:  Good afternoon.

5          So what is the next Omnibus Objection that we're

6    going to address, Ms. Stafford?

7          MS. STAFFORD:  Of course, Your Honor.  The next

8    Omnibus Objection is the 335th Omnibus Objection, which was

9    filed at ECF No. 17104.  This objection seeks to disallow in

10   their entirety proofs of claim that are duplicative of other

11   proofs of claim asserted against the debtors.

12         One response was received.  It was filed by Genesis

13   Security Services at ECF No. 17408 with respect to Proof of

14   Claim No. 174424.  The response acknowledges that Proof of

15   Claim No. 174424 is duplicative of another proof of claim

16   filed against the debtors, and states that Genesis Security

17   Services does not object to the disallowance of its claim.

18         And for that reason, Your Honor, we would ask the

19   Court grant the objection and disallow the claim,

20   notwithstanding the response.

21         THE COURT:  Thank you.

22         Having reviewed the objection and response, the Court

23   sustains the 335th Omnibus Objection as to claim no. 174424 of

24   Genesis Security Services, Inc., and that claim is disallowed

25   in its entirety as duplicative of claim no. 174436.

1          Ms. Stafford, are you in a position to do a

2     comprehensive proposed order at this point as to the 335th

3     Omnibus Objection?

4          MS. STAFFORD:  We are, Your Honor.  We will do so.

5          THE COURT:  Thank you.  Let's go to the next Agenda

6     item.

7          MS. STAFFORD:  Yes, Your Honor.

8          The next item on the Agenda is the 340th Omnibus

9     Objection, which was filed at ECF No. 17087.  This objection

10    also seeks to disallow in their entirety proofs of claim that

11    were duplicative of other proofs of claim asserted against the

12    debtors.

13         Two claimants filed responses, and the first on the

14    Agenda was filed by Sky High Elevators Corporation.  Two

15    responses were filed, one at ECF No. 17295, and another at ECF

16    No. 17459, both with respect to Proof of Claim No. 173732.

17    The responses contend that Proof of Claim No. 173732 is not

18    duplicative of Proof of Claim No. 173742.  Neither of the

19    responses, however, identifies any relevant differences

20    between the two proofs of claim, nor does it explain what

21    different liabilities 173732 seeks to refer that Proof of

22    Claim 173742 does not.  Instead, the response contends that

23    the debtors' request for additional information regarding

24    Proof of Claim 173742 suggests that the debtors cannot have

25    determined that the two claims are duplicative.

1    As set forth in our reply, however, Proofs of Claim

2  173732 and 173742 were determined to be duplicative, because

3  they assert the exact same liabilities in the exact same

4  amount, and are based on the same exact documentation.  The

5  fact that debtors contacted counsel for Sky High Elevators to

6  obtain additional documentation does not alter the fact that

7  the two claims assert the same liabilities.  Indeed, as stated

8  earlier, claimants themselves have not provided any basis for

9  the assertion that the claims are not duplicative.

10    And I would reserve the rest of my time for rebuttal,

11  Your Honor, unless you'd like to hear the other response

12  before we turn to counsel for claimant.

13    THE COURT:  We will turn to counsel for Sky High

14  Elevators, for whom we've allocated six minutes.  Mr. David

15  Roman, would you please unmute?

16    So you need to unmute your phone and the computer

17  dashboard, if you're using the computer interface as well.

18    Ms. Ng, would you see if you can unmute Mr. Roman?

19    MS. NG:  Judge, he's not on.

20    THE COURT:  Oh.  So David W. Roman is not on?

21    MS. NG:  No.  I don't see him on.  He was on this

22  morning, but not now.

23    THE COURT:  All right.  Ms. Stafford, would you then

24  go on to discuss the second response?

25    MS. STAFFORD:  Of course, Your Honor.

1     The second response was also filed by Genesis

2   Security Services with respect to ECF -- with respect to Proof

3   of Claim No. 174317, and it was filed at ECF No. 17408.  The

4   response, again, acknowledges that Proof of Claim No. 174424

5   is duplicative of -- I'm sorry, 174317 is duplicative of

6   another proof of claim filed against the debtors, and it

7   states that Genesis Security Services does not object to

8   disallowance of its claim.

9     Accordingly, we'd ask the Court to grant the

10  objection and disallow the claim, notwithstanding the

11  response.

12     THE COURT:  Thank you.

13     Having reviewed the submissions, and on the basis of

14  the presentation here, and in the absence of any additional

15  oral response, the 340th Omnibus Objection is sustained as to

16  claim nos. 173732 of Sky High Elevators Corporation, and

17  174317 of Genesis Security Services; and those claims are

18  disallowed in their entirety, because the claimants have not

19  disputed that the claims are duplicative of claim nos. 173742

20  and 174436 respectively.

21     Are we at the point where the debtor can prepare a

22  comprehensive proposed order with respect to the 340th

23  objection?

24     MS. STAFFORD:  We are, Your Honor.  We would be happy

25  to do so.

1          THE COURT:  Thank you, Ms. Stafford.

2          So let us go on to the next, which is the 345th I

3  believe?

4          MS. STAFFORD:  That is correct, Your Honor.

5          The 345th Omnibus Objection was filed at ECF No.

6  17108, and it seeks to reclassify certain proofs of claim that

7  asserted an incorrect or otherwise improper priority.  We

8  received a number of responses, three of which have been

9  scheduled for hearing today.

10          The first of those was filed by or on behalf of

11 Gisela Vazquez Rodriguez at ECF No. 17281 with respect to

12 Proof of Claim No. 34338.  Proof of Claim No. 34338 asserts

13 liabilities purportedly arising out of confiscation of a

14 vehicle.  The claim attaches as supporting documentation a

15 complaint initiating a lawsuit with respect to the intended

16 vehicle, and a portion of a judgment in that lawsuit.

17          In response to the objection, Ms. Vazquez Rodriguez

18 states that the judgment alone constitutes prima facie

19 evidence of a secured claim.  I have explained in the debtors'

20 reply, however, judgments themselves are unsecured claims, and

21 neither the claim nor the response provides evidence that

22 claimants either filed or obtained a judicial means of

23 securing the judgment.

24          Accordingly, we would ask the Court grant the

25 objection and disallow the claim, notwithstanding the

1    response.  And I understand that counsel did not intend to

2    appear today, so unless the Court has questions, I would

3    propose to move on to the next response on the Agenda.

4             THE COURT:  So it was Counsel Ivonne Gonzalez

5    Morales?

6             MS. STAFFORD:  I believe she's here to address the

7    third response on the Agenda, which was filed on behalf of the

8    Group Wage Claimants.

9             THE COURT:  Okay.  Very well.  So I will rule on the

10   Gisela Vazquez Rodriguez element of the 345th Omnibus

11   Objection.

12            Based on the submissions and the additional oral

13   remarks here, the Court sustains the 345th Omnibus Objection

14   as to claim no. 34338 of Gisela Vazquez Rodriguez, and that

15   claim is reclassified as a general unsecured claim, because

16   the claimant has cited no factual or legal basis for

17   overcoming the presumption that the judgment obtained gives

18   rise to a pre-petition general unsecured claim.

19            So you may now go on to the next one.

20            MS. STAFFORD:  Thank you, Your Honor.

21            The second response that was received and scheduled

22   for hearing today was filed by Rosa I. Orengo Rohena at ECF

23   No. 17290 with respect to Proof of Claim No. 167999.  I'm

24   pleased to report for the record that the parties have reached

25   an agreement to resolve this claim.  A stipulation and agreed

1  order resolving the claim was filed last night, and I noted

2  the Court's entry of that stipulation this morning.

3       And, accordingly, I think at this time, unless the

4  Court has further questions, we can move on to the third

5  response on the Agenda, which was filed by the Group Wage

6  Claimants.

7       THE COURT:  Thank you.  The Rohena claim has been

8  resolved through the so-ordered stipulation, so we can move on

9  to the response of the Group Wage Claimants.

10      MS. STAFFORD:  Thank you very much, Your Honor.  This

11 response on behalf of the Group Wage Claimants --

12      (Sound played.)

13      MS. STAFFORD:  -- was filed at ECF No. 17423, and it

14 addresses Proofs of Claim Nos. 1845, 136186, 39906, 27602,

15 45321, 12337, 36519, 29885, 10442, 35710, 129809, 90365,

16 12312, 12345, 2252, 28152, 4821, 2414, 145627, and 41069.

17 Each of the claims identified asserts the claim is either

18 secured or entitled to 503(b)(9) priority.

19      The response does not contest the debtors' assertion

20 that none of the claims identified are secured.  In addition,

21 the response agrees with the debtors that the claims are not

22 entitled to 503(b)(9) priority.  Claimants instead contend

23 they are entitled to priority pursuant to 11 USC 503(b)(1)(A).

24      As we explained in our reply, however, 11 USC

25 503(b)(1)(A) provides an in-service priority to wages and

 1    salary attributable to periods of time occurring after

 2    commencement of a Title III case.  Your Honor, here are

 3    plaintiffs in three employee, wage-related litigations

 4    initiated in the period between 2005 and 2009.  Because these

 5    litigations assert pre-petition claims with respect to periods

 6    of time that predate the filing of these Title III

 7    litigations, they are not entitled to the priority asserted.

 8            Excuse me, Your Honor.  Claimants also contend the

 9    Commonwealth alleged adoption of a policy that considers

10    paying employees --

11            (Sound played.)

12            MS. STAFFORD:  Apologies, Your Honor.  May I finish

13    my sentence?

14            THE COURT:  Yes, you may.

15            MS. STAFFORD:   Thank you, Your Honor.

16            The policy discontinued paying employee wages and

17    benefits in the ordinary course for unfairly discriminate

18    against claimants, but as explained in the debtors' reply,

19    whether claimants were unfairly discriminated against is an

20    issue to be addressed in connection with confirmation.

21            Thank you.

22            THE COURT:  Thank you.

23            So, Ms. Gonzalez Morales, would you like to speak in

24    response?  You'll have to unmute your phone and the dashboard.

25            MS. GONZALEZ MORALES:  Okay.  Thank you.

1          THE COURT:  Good afternoon.

2          MS. GONZALEZ MORALES:  Good afternoon, Your Honor.

3     This is Ivonne Gonzalez speaking regarding the Omnibus

4     Objection.

5          We disagree with the government about the --

6     reclassifying the employee wages as a general unsecured claim,

7     because that is in conflict with the literal language of

8     section 503(b)(1)(A).  These appearing claimants have final

9     judgment for back wages since was determined that does violate

10    state and federal minimum wage laws, also, because the reality

11    that under section 105(a), and under section 503(b)(1)(A),

12    this Honorable Court has the flexibility necessary to deal

13    with extraordinary situations if justice so requires.

14          In this case, the government ignores that the

15    government, when it filed the Title III petition, voluntarily

16    adopted a policy to continue payment of the employee wages and

17    benefits under the regular conduct of business.  That, Your

18    Honor, we think is a prayer for priority payment of wages.

19    Also, because this Honorable Court must guarantee claimants

20    adequate protection and afford the same treatment as the other

21    employees that are being paid fully their claims through these

22    procedures, and also because the government has enacted the

23    claim resolution process, and under that process also the

24    employees will have 100 percent recovery, so we disagree with

25    the treatment they are trying to give the claimants here.  And

1  we request to deny the Omnibus Objections 345 and 347

2  regarding our claimant.  Thank you.

3         THE COURT:  Thank you.

4         Ms. Stafford?

5         MS. STAFFORD:  Thank you, Your Honor.

6         In response to Ms. Gonzalez Morales' claim regarding

7  503(b)(1)(A), as I noted earlier and as we noted in the reply,

8  the language in 503(b)(1)(A) claims that it addresses final

9  judgments or wage claims that accrue in the period of time

10 following the commencement of the case.  And as noted, these

11 claimants hold pre-petition claims for pre-petition

12 liabilities related to wages and benefits purportedly earned

13 prior to the -- many years prior to the commencement of this

14 case.

15        With respect to the comments that Ms. Gonzalez now

16 has made regarding the determination to continue to pay

17 employee wages and benefits in the ordinary course, again, to

18 the extent that Ms. Gonzalez Morales believes that her

19 client's claims are being unfairly discriminated against, that

20 argument is appropriately addressed in connection with the

21 confirmation, and it doesn't -- is not within the scope of the

22 Omnibus Objection before the Court today.  And so we would

23 request the Court sustain the objection, notwithstanding this

24 response.

25        THE COURT:  Thank you.  I have a question for you.

1    There was one claim number at least that didn't appear in your

2    reply, although it was listed in the Omnibus Objection, which

3    is claim no. 20773 of Zoraida Chevere Fraguada.  Do you know

4    the reason for the discrepancy?

5          MS. STAFFORD:  I believe that -- I don't know

6    offhand.  I believe that it may have been addressed by the --

7    or filed by the claimant themselves.  But I can double check

8    and provide the Court with any supplemental filings that may

9    be necessary.

10          THE COURT:  Very good.  So you will follow-up and

11    reconcile the situation as to that claim?

12          MS. STAFFORD:  Of course, Your Honor.

13          THE COURT:  Very well.  Thank you.

14          So having considered the submissions and the remarks

15    of counsel, the Court sustains the 345th Omnibus Objection as

16    to claim nos. 1845, 136186, 39906, 27602, 45321, 12337, 36519,

17    29885, 10442, 35710, 129809, 90365, 12312, 12345, 2252, 28152,

18    4821, 2414, 145627, and 41069; and these claims are

19    reclassified as unsecured claims, because the claimant's

20    asserted basis for administration expense priority under

21    section 503(b)(1)(A) of Title 11 only extends to claims

22    arising from events that occur after the commencement of a

23    bankruptcy case, and all of these claimants are asserting

24    claims that long predate the debtors' Title III petitions.

25          Any objections as to the treatment of these unsecured

1    claims in relation to other unsecured claims can be pursued in

2    the context of the confirmation proceedings.  The claims are

3    reclassified as unsecured claims.

4          Ms. Stafford, am I correct in understanding that

5    there are further matters that will need to be addressed as to

6    the 345th Objection, so this is not the right time for a

7    comprehensive proposed order?

8          MS. STAFFORD:  That is correct, Your Honor.  Thank

9    you.

10          THE COURT:  Thank you.  So we will go on to the next

11    matter.

12          MS. STAFFORD:  Thank you, Your Honor.

13          The next item on the Agenda combines the 347th, the

14    349th, and the 351st Omnibus Objections, which both the

15    objection and the response addressed all three together.  Your

16    Honor, I'd suggest that we proceed individually with respect

17    to each of these Omnibus Objections, since there are

18    distinctively slightly different issues.

19          THE COURT:  Very well.

20          MS. STAFFORD:  Thank you, Your Honor.

21          The first of these objections is the 347th Omnibus

22    Objection, which was filed at ECF no. 17109.  This objection

23    seeks to reclassify certain proofs of claim that asserted an

24    incorrect or otherwise improper priority, and it also seeks to

25    reduce the amount of claims that were improperly logged on the

1   registry by Prime Clerk as a result of the way that Prime

2   Clerk processes proof of claim forms.

3        One response was received and scheduled for hearing

4   today.  However, additional pro se responses remain

5   outstanding.  The response that was scheduled for hearing

6   today was filed by the Group Wage Claimants at ECF no. 17425,

7   and it addresses Proof of Claim Nos. 109157, 66935, 29547,

8   105171, and 42138.

9        And, Your Honor, this response raises many of the

10  same issues that were just addressed in connection with the

11  345th Omnibus Objection.  Again, as with the 345th Objection,

12  the response does not dispute that the claims in question are

13  not entitled to secured status or priority pursuant to

14  503(b)(9), but does assert that claimants are entitled to

15  priority pursuant to 503(b)(1)(A) of the Bankruptcy Code.

16       And for the same reasons, Your Honor, we would submit

17  that those objections should be sustained and the claims

18  reclassified, because as just discussed, 503(b)(1)(A) does not

19  provide priority for wage claims based on judgments issued --

20  or litigations initiated many years in the past.

21       THE COURT:  Thank you.

22       Ms. Gonzalez Morales, did you wish to be heard as to

23  this group of claims?

24       MS. GONZALEZ MORALES:  Which ones?  I'm sorry.  I

25  didn't hear very well.

1          THE COURT:  So this group of claims -- actually,

2    Ms. Stafford, would you just repeat and sum up your position?

3          MS. STAFFORD:  Certainly, Your Honor.  This is with

4    respect to the 347th Omnibus Objection, which sought to

5    reclassify certain proofs of claim on the basis that asserted

6    secured status or priority pursuant to 503(b)(9), and as with

7    the prior objection, we believe that these claims should be

8    reclassified and are not entitled to priority pursuant to

9    503(b)(1)(A).

10          THE COURT:  And would you just cite again the claim

11    numbers?

12          MS. STAFFORD:  Oh, of course, Your Honor.  Proof of

13    Claim Nos. 109157, 66935, 29547, 105171, and 42138.

14          THE COURT:  Thank you.

15          And now, Ms. Gonzalez Morales?

16          MS. GONZALEZ MORALES:  Yes, Your Honor.  Ivonne

17    Gonzalez for the record.

18          We submit the argument by this prior one, because

19    it's the same type of objection.

20          THE COURT:  Thank you.

21          Anything further, Ms. Stafford?

22          MS. STAFFORD:  Nothing further, Your Honor.

23          THE COURT:  Thank you.

24          Having reviewed the submissions and listened to the

25    arguments, the Court sustains the 347th Omnibus Objection as

1    to claim nos. 109157, 66935, 29547, 105171, and 42138.  Those

2    claims will be reduced, because the claimants do not dispute

3    that the claims should be reduced in the manner described by

4    the Oversight Board.  The claims are also reclassified as

5    unsecured, because the asserted basis for administrative

6    expense priority, which was section 503(b)(1)(A) of Title 11,

7    only extends to claims arising from events occurring after the

8    commencement of a bankruptcy case, and these claims all assert

9    claims that predate the debtors' Title III petitions.

10            So what do we need to address next, Ms. Stafford?

11            MS. STAFFORD:  Thank you, Your Honor.  The next item

12   to be addressed is the 347th Omnibus Objection, which was

13   filed at ECF No. -- I'm sorry, the 349th Omnibus Objection,

14   which was filed at ECF No. 17092.  This objection seeks to

15   disallow in their entirety certain proofs of claim that are

16   duplicative of master proofs of claim filed on behalf of all

17   plaintiffs in certain pending litigation.

18            One response was received and scheduled for hearing

19   today.  Additional responses were filed by pro se litigants

20   and will be addressed at a later date.  The one response that

21   was received was filed by the Group Wage Claimants at ECF No.

22   17425 with respect to Proof of Claim Nos. 30608 and 96586.

23            Since the filing of our reply last week, I've had the

24   opportunity to discuss both this objection and the next

25   objection with Ms. Gonzalez Morales, which has clarified and I

1    believe narrowed --

2         (Sound played.)

3         MS. STAFFORD: -- and hopefully resolved the issues

4    that were in dispute.  And I believe we are in agreement that

5    both of the claims that are subject to the 349th Omnibus

6    Objection should be disallowed as duplicative.

7         The first of those is Proof of Claim No. 30608 filed

8    by Ms. Sonia Acevedo Rosario.  This claimant is identified in

9    the verified statement filed on behalf of all plaintiffs in

10   the Acevedo Camacho litigation.  It appears on page one of

11   Exhibit A of ECF No. 3406, and is claimant 14.

12        With respect to the second claim that is the subject

13   of this Omnibus Objection, which is Proof of Claim No. 96586,

14   the response and the reply has asserted this claim was filed

15   by Maria Gonzalez Reyes.  Further, the response contends is a

16   member of the Augusto Maldonado plaintiffs group.  However,

17   Proof of Claim No. 96586 was also actually filed by Irma

18   Gonzalez Reyes, not Maria Gonzalez Reyes.  Irma Gonzalez Reyes

19   appears on the verified statement of the Acevedo Camacho

20   plaintiffs group and does not appear on the verified statement

21   of the Augusto Maldonado plaintiffs group.

22        And so it's my understanding, and Ms. Gonzalez

23   Morales will I'm sure correct me if I'm wrong, we are in

24   agreement that these two claims are duplicative and may be

25   disallowed.

1          THE COURT:  Thank you.

2          Ms. Gonzalez Morales?

3          MS. GONZALEZ MORALES:  Yes, Your Honor.  We came to

4  an agreement that all duplicate claims were going to be

5  disallowed, but the remainder claims that the plaintiff filed

6  on the case of Augusto Maldonado or Carmen Sacoro Cruz

7  Hernandez will remain.

8          THE COURT:  So this disallowance will only affect

9  claim nos. 30608 and 96586; is that your understanding,

10  Ms. Gonzalez Morales?

11          MS. GONZALEZ MORALES:  Yes, Your Honor.

12          THE COURT:  Very well.  Based on the parties'

13  clarification and agreement on the record, the 349th Omnibus

14  Objection is sustained as to claim nos. 30608 and 96586, and

15  those claims are disallowed as duplicative of the master claim

16  filed in the Acevedo Camacho litigation captioned as Madeline

17  Acevedo Camacho v. Puerto Rico Department of Family Affairs,

18  no. 2016-05-1340.  Thank you.

19          Ms. Stafford, what is the next matter?

20          MS. STAFFORD:  The next matter, Your Honor, is the

21  351st Omnibus Objection, which was filed at ECF No. 17112.

22  This objection seeks to partially disallow certain proofs of

23  claim that are duplicative of master proofs of claim filed on

24  behalf of all plaintiffs in certain pending litigations.

25          One response was received and calendared for argument

1    today, with additional responses to be argued at a later date.

2    The one response calendared for today was filed on behalf of

3    the Wage Claimants at ECF No. 17425, and it addresses Proof of

4    Claim Nos. 17965, 9440, 9647, 15550, 9210, 17033, 9322, 9127,

5    10825 --

6              (Sound played.)

7              MS. STAFFORD:  -- 23567, 22296, 9346, 23816, 75583,

8    10368, 9423, 40644, 9645, 9454, 10427, 9625, 9056, 11097,

9    10898, 17619, 11951, 12662, 9451, and 9617.  And, Your Honor,

10   I --

11             THE COURT:  And was --

12             MS. STAFFORD:  I'm sorry, Your Honor.

13             THE COURT:  I'm sorry to distract you.  There was

14   another claim, 23166, that was mentioned in the response and

15   listed in the objection that was not in the list that you just

16   recited, also, 47278, and so I guess I will just ask that you

17   undertake to follow-up on both of those.

18             MS. STAFFORD:  We would be pleased to do so, Your

19   Honor.  I don't know if they may have been filed, those claims

20   as well, but we will certainly investigate and follow-up on

21   those.

22             THE COURT:  Thank you.  For your reference, the 47278

23   is identified with an individual called Josefina Concepcion

24   Quinones, and the 23166 is identified to Maria Rosado Cruz.

25             MS. STAFFORD:  Thank you, Your Honor.

1        So with respect to the claims that I just read off, I

2   am pleased to report that we have had conversations with

3   Ms. Gonzalez Morales, and I believe we have reached an

4   agreement on this matter as well.  But --

5        (Sound played.)

6        MS. STAFFORD:  -- we are only seeking partial --

7        Apologies, Your Honor.  May I finish my sentence?

8        THE COURT:  Yes.

9        I would just ask that the timekeeper stop beeping,

10  because we're doing all right.  Thank you.

11       You may finish.

12       MS. STAFFORD:  Thank you.  With respect to the claims

13  that are subject to this objection and that I just read off

14  previously, we've reached an agreement with Ms. Gonzalez

15  Morales with respect to these claims in so far as we are only

16  seeking the partial disallowance of these claims to the extent

17  that they assert either the Beltran Cintron litigation or the

18  Acevedo Camacho litigation as set forth in our objections.

19       To the extent that they assert the Augusto Maldonado

20  litigation or the Cruz Hernandez litigation, those portions of

21  the claims will be unaffected by this Omnibus Objection, and

22  will be further explored at determination.  And I would of

23  course invite Ms. Gonzalez Morales to tell me if I have gotten

24  our agreement correct.

25       THE COURT:  Thank you.

1          Ms. Gonzalez Morales?

2          MS. GONZALEZ MORALES: Yes, I am -- I agree with

3    Laura Stafford, for what she said. We are in agreement.

4          THE COURT: Thank you.

5          With that confirmation of the agreement and the

6    explanation of Ms. Stafford, the Court sustains the 351st

7    Omnibus Objection as to claim nos. 17965, 9440, 9647, 15550,

8    9210, 17033, 9322, 9127, 10825, 23567, 22296, 9346, 23816,

9    75583, 10368, 9423, 40644, 9645, 9454, 10427, 9625, 9056,

10   11097, 10898, 17619, 11951, 12662, 9451, and 9617. Those

11   claims are partially disallowed as duplicative of the master

12   claims filed in the Acevedo Camacho litigation captioned as

13   *Madeline Acevedo Camacho v. Puerto Rico Department of Family*

14   *Affairs*, no. 2016-05-1340, and in the Beltran Cintron

15   litigation captioned as *Francisco Beltran Cintron v. Puerto*

16   *Rico Department of Family Affairs*, case no. KAC-2009-0809, but

17   only to the extent that those claims are duplicative of the

18   claims asserted in the Acevedo Camacho and Beltran Cintron

19   litigations.

20         Thank you. So let us go to the next matter,

21   Ms. Stafford.

22         MS. STAFFORD: Thank you, Your Honor.

23         The next item on the Agenda is the 352nd Omnibus

24   Objection, which was filed at ECF No. 17093. This objection

25   seeks to disallow, among others, certain proofs of claim that

1    are duplicative of master proofs of claim filed by either

2    trustees or fiscal agents on behalf of all holders of certain

3    types of bonds, including bonds issued by PBA.

4          A response was filed with respect to this objection,

5    and it was filed by Mr. Hein and Ms. Farley with respect to

6    Proof of Claim Nos. 174229, 174231, and 174264.  And the

7    response was filed at ECF No. 17332, for the record.  The

8    response does not dispute that each of these proofs of claim

9    asserts the right to payment in full of principal and interest

10   on Mr. Hein and Ms. Farley's PBA bonds.  The PBA Master Proof

11   of Claim asserts precisely the same right to payment, the

12   right to payment in full of principal and interest on bonds

13   issued by PBA.  The response also does not identify any

14   additional rights to payment asserted by Mr. Hein or Ms.

15   Farley, aside from the right to payment of principal and

16   interest on their bonds.

17         The First Circuit's recent decision upholding this

18   Court's dismissal of Mr. Hein's claim against COFINA,

19   therefore, fully dispenses of this issue and the issues in the

20   response.  The facts before the First Circuit were precisely

21   the same as the facts here today.  Because Mr. Hein and Ms.

22   Farley's claims assert the same rights of payment as the PBA

23   Master Bond claim, they are duplicative and should be

24   disallowed.

25         Instead of identifying any additional rights to

1    payment, the response purports to identify four key

2    distinctions between the current scenario and the facts before

3    the First Circuit.  None of those distinctions, however, make

4    any difference.

5         To begin, Mr. Hein and Ms. Farley contend that the

6    COFINA decision is distinguishable, because here U.S. Bank is

7    acting as a fiscal agent, whereas in COFINA, Bank of New York

8    Mellon acted as a trustee.  But Mr. Hein and Ms. Farley do not

9    explain why this distinction makes any difference, because in

10   both instances, the master proof of claim still asserts the

11   right to payment of principal and interest on PBA bonds on

12   behalf of all bondholders.

13        Mr. Hein and Ms. Farley contend that they have

14   asserted additional theories of liability that U.S. Bank did

15   not -- that the First Circuit squarely addressed and rejected

16   the contention that that should entitle their claims to a

17   determination that it is not duplicative.  Mr. Hein and

18   Ms. Farley remain free to raise these additional theories of

19   liability in connection with confirmation, regardless of the

20   outcome of this objection.

21        Mr. Hein and Ms. Farley also contend the *COFINA*

22   decision is distinguishable, because it was litigated after

23   COFINA's confirmation proceedings, but Mr. Hein does not

24   explain why the timing of the litigation should make any

25   difference or why the timing of the litigation will impact

1   whether the two proofs of claim assert the same rights to

2   payment.

3          Mr. Hein and Ms. Farley also contend the objection

4   should be denied, because their claim was filed prior to U.S.

5   Bank's claim being filed, but, again, no explanation was

6   provided as to why the timing of the filing should make a

7   difference or have any impact on whether the two claims assert

8   the same rights to payment.

9          Finally, Mr. Hein and Ms. Farley contend the claims

10  cannot only -- be disallowed upon litigation of an act before

11  proceeding to final judgment.  As we explained in our papers,

12  however, they simply misunderstand what this objection seeks

13  to do.  The objection does not resolve any of their assertions

14  that they enjoy priority and secured status, and they retain

15  the right to make any arguments relating to that, their

16  allegations, in connection with confirmation.  It is only

17  resolving whether two claims assert the same rights to

18  payment, and, again, no evidence has been presented that

19  there is any additional rights to payment that Mr. Hein and

20  Ms. Farley seek to assert against any of the debtors.

21         And with that, Your Honor, I would again reserve my

22  time following the conclusion of Mr. Hein's argument.

23         THE COURT:  I have a couple of questions for you

24  before I call on Mr. Hein.  So for clarity, what is your

25  position as to Mr. Hein and Ms. Farley's ability to object to

1    the Plan and vote on the proposed Plan of Adjustment with

2    respect to the PBA bond claims if I disallow their individual

3    claims as duplicative of the master claim?

4         MS. STAFFORD:  They will retain the right to vote

5    through the DTC system, and they will retain the right of

6    parties in interest to -- rights to payment have been asserted

7    by the -- by U.S. Bank as the fiscal agent, to raise any

8    objections that they wish.  I don't believe that this

9    objection and the disallowance of their individual claim would

10   have any impact on those rights to vote or to object to

11   confirmation.

12        THE COURT:  Will it have any impact on their right to

13   receive a distribution if I confirm the Plan of Adjustment?

14        MS. STAFFORD:  Certainly not, Your Honor.

15   Distributions would be made to them regardless of the

16   disallowance of this claim.  They'll be made in respect for

17   their PBA Master Proof of Claim, and will be distributed to

18   Mr. Hein and Ms. Farley.

19        THE COURT:  Thank you.

20        I'll now hear from Mr. Hein.

21        MR. HEIN:  Yes, Your Honor.  Peter Hein.  Can you

22   hear me?

23        THE COURT:  Yes, I can.  Good afternoon.

24        MR. HEIN:  Thank you.

25        So, to begin, I just want to make clear that our

1    response was timely filed.  The Oversight Board's Reply states

2    that supposedly, per the Court approved notice attached to the

3    352nd Objection as Exhibit C, any response disputing the 352nd

4    Objection was due on June 16th.  The Oversight Board then

5    points out our Response was filed on July 14th, implying that

6    our Response missed the deadline.

7         Perhaps this is likely just an error in the Oversight

8    Board's papers, but so there's no doubt left on the point,

9    docket 17093, the 352nd Objection, states expressly on the top

10   of the cover page, as well as in Exhibit C, that the response

11   deadline is July 19, 2021.  Our Response at docket 17332 was

12   timely.

13        Next, let me address this claim that the First

14   Circuit decision in the *COFINA* case is dispositive.

15   Respectfully, it's equally lacking in merit.  The posture was

16   completely different in the First Circuit in *COFINA* than we

17   are here.  First, it absolutely does matter that in the *COFINA*

18   case, the master proof of claim was filed by Bond Trustee,

19   whereas here, the master proof of claim was filed by U.S.

20   Bank, acting as debtors' agent.

21        Bankruptcy Rule 3003(c), which we -- I discussed in

22   our opposition, but was ignored in the Oversight Board's

23   Reply, and ignored this morning -- or this afternoon as well,

24   authorizes an indentured trustee to file a master proof of

25   claim.  U.S. Bank is not an indentured trustee.  Per U.S.

1   Bank's communication to holders of PBA bonds, and I attached

2   it as Exhibit C to our opposition, U.S. Bank is, and I'm

3   quoting, "solely the agent of PBA," the debtor.

4        The Oversight Board does not dispute that U.S. Bank

5   was solely the agent of PBA, and that U.S. Bank -- unlike the

6   trustee in the *COFINA* case, U.S. Bank is not an indentured

7   trustee.  There is no authorization under the bankruptcy

8   statutes or rules for an agent of the debtor, which is what

9   U.S. Bank is here, to file a proof of claim where the creditor

10  has already filed its proof of claim, as we did here, because

11  under Rule 3003(c)(1), only a creditor or indentured trustee

12  is authorized to file a proof of claim.

13        There is no plausible basis to disallow our claims,

14  and supposedly duplicative of a claim thereafter submitted by

15  the debtor's own agent.  Now, I realize that the Bar Date

16  Order does have language authorizing fiscal agents or any

17  similar agent or nominee to file a master proof of claim.

18  Perhaps the role of U.S. Bank as being solely that of an agent

19  for PBA was not focused on at the time the debtor prepared the

20  proposed Bar Date Order, but the Bar Date Order did not

21  override the Bankruptcy Rules, which do not authorize a

22  debtor's agent to submit a proof of claim if the creditor has

23  put in its own.

24        I would note there's one nuance under Rule 3004.  If

25  the creditor does not timely file a proof of claim, the debtor

1    may do so within 30 days.  Here we did file proofs of claim,

2    filed them before U.S. Bank.  Rule 3004 clearly does not apply

3    to this case.

4          Second, it also most certainly does matter that the

5    Court is being asked to rule prior to confirming a plan.  In

6    *COFINA*, regardless of when the objection was filed, this Court

7    and the First Circuit were ruling after the Plan had already

8    been confirmed.  Pre-confirmation, which is the status here,

9    PBA claims assert valid and fully secured claims against the

10   debtor and Commonwealth entitled to constitutional priority,

11   with protections under the U.S. and Puerto Rico Constitutions.

12         The Oversight Board does not dispute that due process

13   and Rule 7001(2) require an adversary proceeding against each

14   bondholder to resolve claims where there's an issue as to

15   validity, priority with the extent of a lien or other interest

16   in property.  And, in essence --

17         THE COURT:  You say that they are not seeking to

18   obliterate your validity or priority arguments by seeking to

19   --

20         MR. HEIN:  Oh, I understand they say that -- I'm

21   sorry, Your Honor.

22         THE COURT:  By seeking to disallow the claim as

23   duplicative.  Please go on.

24         MR. HEIN:  I understand they say that, but we are

25   pre-confirmation.  We do have a right.  They -- you cannot use

1   a claim objection to challenge a claim where the claim asserts

2   a validity, priority or extent of a lien, so it just -- again,

3   post-confirmation I acknowledge, as in *COFINA*, there would be

4   a different situation, but we're pre-confirmation.

5          It also does not help for them to argue that the

6   issues of validity and priority were compromised and settled

7   by debtors.  We weren't part of those negotiations.  We didn't

8   agree to the settlement.  Absent a confirmation order, we

9   can't be bound by that settlement.

10         I understand that if the Plan is confirmed in its

11  current form, debtors may argue that confirmation overrides

12  our entitled to priority and secured status, and also

13  overrides our constitutional property rights.  So I understand

14  that, and that's why I think this is premature to be raised

15  prior to confirmation.  But for the Oversight Board to press

16  its position prior to confirmation, they must bring an

17  adversary proceeding.  They cannot press this position by

18  objection to a claim.

19         Third, a question presented here as to whether

20  there's any showing of risk of duplicative payment to the DTC

21  system was not addressed in the COFINA situation, because

22  there again, the claim objection to COFINA was decided

23  post-confirmation, after distributions had already occurred,

24  after the effective date.

25         The Oversight Board does not dispute that

1   distributions will be made here pursuant to the DTC system.

2   They do not identify any reason to believe that somehow

3   duplicative distributions will be issued to me and my wife on

4   our bonds under the DTC system.

5           A fourth point, we do have constitutional and other

6   claims that were not asserted by U.S. Bank.  We set those out

7   in our Response, docket 17332, pages 19 to 22 of 187.

8           A fifth point, I -- respectfully, the claimed

9   objection here was wholly conclusory.  For that reason alone,

10  it should fail.

11          To sum up, the debtors' objection to our claim I

12  submit should be denied.  I mean, simply the fact that there

13  is no authorization under Rule 3003(c) for the debtors' agent

14  to submit a claim to trump the claim of a creditor who has

15  previously submitted a claim, simply -- Rule 3003(c) itself

16  simply requires that the claims objection should be denied.

17          The Court cannot, under the Rules, disallow our claim

18  based on a subsequent fugitive claim by the debtors' own

19  agent, but at the very least, any ruling I respectfully submit

20  should be deferred until after confirmation, or at least be

21  expressly contingent upon and not effective until a

22  confirmation order is entered.

23          And I think that, frankly, Your Honor, just the

24  practical course here is to simply defer ruling until after

25  confirmation, or at least make any ruling provisional and

1  contingent upon and not effective until confirmation.  Thank

2  you.

3          THE COURT:  Thank you.

4          Ms. Stafford?

5          MS. STAFFORD:  Thank you, Your Honor.  I just want to

6  respond briefly to a couple of the points that Mr. Hein just

7  made, and I'll start with the points relating to U.S. Bank's

8  status as a fiscal agent and what the Bankruptcy Rules permit

9  in terms of Trustee's ability to file master proofs of claim.

10         As I think Mr. Hein acknowledged in his remarks, and

11  as we noted in our papers, the Bar Date Order expressly

12  authorized the filing of master bond claims by stipulation,

13  and so we don't see that there's any reason to think that that

14  master proof of claim is not a valid master proof of claim in

15  light of the fact that they were expressly authorized by the

16  Bar Date Order.

17         THE COURT:  I guess Mr. Hein's point seems to be that

18  he reads 3003(c) as exclusive and not permitting expansion via

19  a bar date order.

20         MS. STAFFORD:  Then I think that is an argument he

21  should have raised previously when the Bar Date Order was

22  being considered, but at this stage, I think, Your Honor, that

23  that -- that argument has largely been waived as a result of

24  not raising it earlier in time when that Bar Date Order was

25  being considered.

1     And with respect to Mr. Hein's points with regard to

2  the claim objection seeking to resolve the priority unsecured

3  status, again, Your Honor, as we stated in our papers and

4  previously, our objection is not seeking to resolve any

5  priority and secured status points raised by Mr. Hein and

6  Ms. Farley.  They are entitled to continue to raise those

7  points throughout confirmation.  And their contention that the

8  Bankruptcy Rules require us to initiate individual adversary

9  proceedings as to each and every individual bondholder is

10  simply infeasible, and would complicate an already complicated

11  docket.

12     And with respect to the risk of duplicative payments,

13  Your Honor, Mr. Hein is incorrect that this was solely

14  resolved in *COFINA* post confirmation.  That was certainly an

15  issue that was raised in our Omnibus Objections which were

16  filed while -- before confirmation, and I believe some of

17  those objections were resolved prior to the confirmation of

18  the Plan.  And, in any event, there's just no reason to leave

19  on the docket proofs of claim that run the risk of resulting

20  in duplicative payments because they assert the same right to

21  payment.

22     And, for the same reason, there is no reason to defer

23  determination, because Mr. Hein hasn't identified any reason

24  why he would be prejudiced by the disallowance of this claim

25  at this time, given every -- he will retain the right to both

1    assert priority, and secured status, and continue to vote,

2    that's to confirmation, and to receive distribution pursuant

3    to the Plan.

4         Unless Your Honor has any questions, we respectfully

5    request the objection be granted.

6         THE COURT:  Thank you.  I have no further questions

7    for you.

8         Having reviewed the submissions and listened to the

9    arguments, the Court sustains the 352nd Omnibus Objection as

10   to claim nos. 174231, 174264, and 174229 of Peter Hein and

11   Anne Farley as duplicative of the PBA master claim logged as

12   Proof of Claim 62833.  They seek the same relief as that

13   asserted by the PBA master claim.  I cite you to the First

14   Circuit's *COFINA* decision, *In re Financial Oversight and*

15   *Management Board for Puerto Rico*, 987 F.3d 173, 187-88 (1st

16   Cir. 2021).

17        The striking of the individual claims as duplicative

18   does not preclude Mr. Hein and Ms. Farley from pursuing their

19   priority contentions, and their constitutional contentions,

20   and other theories with respect to their rights in connection

21   with the claims for the full amount of the bond liability that

22   has been lodged on their behalf by the fiscal agent pursuant

23   to the authorization set out by this Court in the Bar Date

24   Order.  The Court finds the other distinctions asserted by

25   Mr. Hein are not meaningful distinctions in this context from

1    the issues and determinations underlying the *COFINA* decision.

2            Accordingly, the objection to those three proofs of

3    claim is sustained.  Thank you.

4            MS. STAFFORD:  Thank you, Your Honor.

5            THE COURT:  Are there any other matters that need to

6    be addressed today?  Ms. Stafford, for the Oversight Board?

7            MS. STAFFORD:  No, not on behalf of the Oversight

8    Board, Your Honor.  Thank you.

9            THE COURT:  Thank you.

10            I am going wait 30 seconds, and if anyone else has an

11    issue that needs to be raised today, please unmute yourself,

12    and say your name, and I'll call on you.

13            (No response.)

14            THE COURT:  Thank you.  No one else has spoken up,

15    and so this concludes the Hearing Agenda for this Omnibus

16    Hearing.  The next Omnibus Hearing is currently scheduled to

17    begin on October 6, 2021, at 9:30 AM Atlantic Standard Time.

18    The Court's hope is to be able to preside over that hearing

19    from a courtroom in San Juan, but due to ongoing pandemic

20    concerns and related physical distancing requirements, even if

21    it is possible for me to conduct my responsibilities --

22            MS. NG:  Judge.

23            THE COURT:  Yes.

24            MS. NG:  I'm sorry to interrupt.  Mr. Roman is

25    raising his hand.

1          THE COURT:  Okay.  Sorry, Mr. Roman.  I don't have

2    the dashboard in front of me, and so that's why I asked people

3    to speak.

4          So would Mr. Roman please unmute himself and speak?

5          MR. ROMAN:  Okay.  Can you hear me?

6          THE COURT:  Yes, I can.

7          MR. ROMAN:  Okay.  Thank you, Judge.

8          Judge, my name is David Roman.  I was having trouble

9    connecting, and I fear I may have missed the discussion on my

10   Response to an objection.  It's number seven on the Agenda.

11   It relates to the 345th Omnibus Objection.

12         And I'm sorry for the technical glitch, but by the

13   time I got connected, I think you were well past me.

14         THE COURT:  Yes.  That is the Sky High Elevators?

15         MR. ROMAN:  That is correct, madam.

16         THE COURT:  Yes.  So we had discussed that, but we

17   can -- and I had ruled, but I will listen to argument on that

18   matter again.  So --

19         MR. ROMAN:  I appreciate that.

20         THE COURT:   -- Ms. Stafford, thank you, due to the

21   technical difficulty that Mr. Roman encountered.

22         So, Ms. Stafford, would you go back to your four

23   minutes of opening remarks regarding the 340th Omnibus

24   Objection?

25         MS. STAFFORD:  Of course, Your Honor.

1          The 340th Omnibus Objection, it was filed at ECF No.

2     17087, and it seeks to disallow in their entirety proofs of

3     claim that are duplicative of other proofs of claim asserted

4     against the debtors.

5          The one response to be considered at this time is

6     filed by Sky High Elevators Corporation with respect to Proof

7     of Claim No. 173732.  And for clarity of the record, this

8     addresses responses filed at ECF Nos. 17295 and 17459.

9          The response contends that Proof of Claim 173732 is

10    not duplicative of Proof of Claim No. 173742, but it does not

11    identify any relevant differences between the two proofs of

12    claim, nor does it explain what different liabilities 173732

13    seeks to assert that Proof of Claim 173742 does not.

14         Instead, the response asserts the debtors' request

15    for additional information regarding Proof of Claim 173742

16    suggests that the debtors cannot have determined that the two

17    claims are duplicative.  As our reply explains, however,

18    Proofs of Claim 173732 and 173742 were determined to be

19    duplicative, because they assert the exact same liabilities in

20    the exact same amounts, and are based on the same exact

21    documentation.

22         The fact that debtors requested additional

23    documentation to enable them to better understand Claim 173742

24    does not alter the fact the two claims assert the same

25    liabilities.  Indeed, as noted earlier, claimants themselves

1    have not provided any basis for an assertion the two claims

2    are not duplicative.  And for those reasons, Your Honor, we

3    would request the objection be sustained.

4            THE COURT:  Thank you.

5            Mr. Roman, would you like to unmute and respond?

6            MR. ROMAN:  Yes, Your Honor.  Thank you.

7            May it please the Court, this claim is for services

8    that were rendered to the Public Buildings Authority, and they

9    were invoiced.  All of those invoices are in the possession of

10   the debtor, and the basis for it is exactly that.  These are

11   unpaid invoices.

12           We received the objection, that, after a careful

13   review, the Board was requesting that it be dismissed, because

14   it was duplicative, yet at the time they provided no

15   documents.  And shortly before that we received a -- we were

16   in contact with a Mr. Emmett McNulty, who responded to us that

17   they were still identifying the specific invoices and the

18   purchase order relevant to claim 173742.  However, they never

19   did get back to us, and so we have not had the benefit of

20   reviewing that and -- to be able to rebut their conclusion

21   that this is -- that it should not be allowed.

22           And, again, the point being that the allegation is

23   that -- the objection is that it's duplicative, and yet the

24   documents that would establish that are not on the record and

25   have not been provided to us.  So that's the basis of our

1    objection -- or our opposition to the objection I should say.

2        THE COURT:  So, Ms. Stafford, as I hear Mr. Roman,

3    he's saying that you're saying that the claims are

4    duplicative, but you have not provided documentation showing

5    how you made that determination, and to the extent you

6    consider whatever Mr. Roman has provided insufficient, you

7    should have shared with him what you have.

8        MS. STAFFORD:  Understood, Your Honor.  But I think,

9    as we noted in our reply, that the basis on which we

10   determined the two claims are duplicative are the documents

11   themselves that were filed with the Proof of Claim, which,

12   again, is exactly the same as between the two Proofs of Claim.

13       I understand that Sky High Elevator is intending to

14   assert a claim in respect of unpaid invoices, and he will

15   retain a claim relating to those unpaid invoices regardless of

16   the outcome of this objection, because we are intending to

17   preserve one of these claims related to those unpaid invoices,

18   and we will continue to do the work necessary to reconcile

19   that claim.

20       But the determination that the two claims are

21   duplicative was made on the faces of the claims themselves,

22   which clearly identify the same liabilities in the same exact

23   amount, and are based on the same exact supporting

24   documentation.  And so since there is no, you know, indication

25   that these two claims sought to assert any different

1   liabilities, or any different amounts, or invoices, or

2   anything of that nature against the debtors, it's our

3   understanding that these two claims are duplicative, and that

4   one should be disallowed.

5       THE COURT:  So, Mr. Roman, at the risk of being

6   repetitive --

7       MR. ROMAN:  Yes.

8       THE COURT:  -- I hear Ms. Stafford saying that what

9   you submitted is exactly the same on both claims.  They intend

10  to deal appropriately with what is represented by that set of

11  papers, but only once, which is why they want to disallow the

12  identical second set of papers as duplicative.  Why shouldn't

13  I grant that request?

14      MR. ROMAN:  Your Honor, then I would need to know if

15  it's the same claim number, will -- it will proceed under the

16  same claim number, but with only one set of papers?  Is that

17  what they're saying?

18      THE COURT:  Well, I think what they're saying is it

19  will proceed under one of the claim numbers with that set of

20  papers.

21      MR. ROMAN:  Okay.  So --

22      THE COURT:  So, Ms. Stafford -- I'm sorry.

23  Mr. Roman.

24      MR. ROMAN:  No.  No.  Go ahead.  I'm sorry, Your

25  Honor.

1          THE COURT:  I was just going to ask Ms. Stafford if I

2     said that correctly.

3          MS. STAFFORD:  Yes, that's correct.  We will continue

4     to process and reconcile the proof of claim asserting unpaid

5     invoices under a single claim number without the need to do

6     that twice across two duplicative claims.

7          MR. ROMAN:  May I ask, Your Honor, if the Court would

8     indulge me, is it the same claim number or are they proceeding

9     under two different claim numbers?

10          THE COURT:  Ms. Stafford?

11          MS. STAFFORD:  The goal of the objection is so that

12     we can proceed under only one claim number.  There are two

13     claim numbers currently outstanding that seem to seek the same

14     amount of money on the basis of the same unpaid invoices, and

15     so the intent is to clarify the record by removing one of

16     those two duplicative claim numbers so that we can proceed

17     with respect to only one claim number.

18          THE COURT:  Okay.

19          MR. ROMAN:  Your Honor.

20          THE COURT:  To be very specific -- hang on one

21     second, Mr. Roman.

22          So to be very specific, the debtor, Ms. Stafford, is

23     saying that claims 173742 and 173732 are exactly the same in

24     every respect, and so what you want to do is expunge 173732 as

25     duplicative, but you will respond appropriately to and process

1  claim 173742, which you say is exactly the same as the 32

2  claim; is that correct?

3          MS. STAFFORD:  That's correct, Your Honor.  And the

4  one additional piece that I would note is that 173742 includes

5  additional documentation, in that it attaches, in addition to

6  an exact copy of the documentation that is attached to 173732,

7  another completed copy of the Proof of Claim.  And that is why

8  we wanted to maintain 173742, because it appears to assert

9  exactly the same liabilities, in exactly the same amount, on

10  the basis of the exact same documentation, plus one additional

11  piece of documentation.

12          MR. ROMAN:  Yes.

13          THE COURT:  Thank you.

14          Mr. Roman.

15          MR. ROMAN:  Yes.  I understand.  That's fine.  That's

16  fine with us.

17          THE COURT:  Okay.  Very well then.  Based on the

18  submissions, and the record, and this colloquy on the record,

19  the Court sustains the 340th Omnibus Objection as to Claim No.

20  173732 of Sky High Elevators Corporation, and that claim is

21  disallowed in its entirety, because that claim is duplicative

22  of Claim No. 173742, which remains on the books.

23          MR. ROMAN:  Yes, Your Honor.

24          THE COURT:  Thank you.

25          Thank you, Ms. Stafford.

1          MR. ROMAN:  Permission to withdraw, Your Honor.

2          THE COURT:  Yes.  Thank you, Mr. Roman.  Keep well.

3          MR. ROMAN:  Thank you.  Have a good afternoon.

4          THE COURT:  So going back to my closing remarks, the

5     next scheduled hearing is the October Omnibus, which is

6     scheduled to begin on October 6, 2021, at 9:30 AM Atlantic

7     Standard Time.  It is my hope to be able to be physically in

8     San Juan to preside over that hearing.  That is, of course,

9     subject to whatever pandemic regulations and restrictions are

10    in place at that time.

11         Even if I can be there, it is not clear at this point

12    whether physical distancing requirements within courtrooms

13    will permit everybody who wants to appear at the Omni to be in

14    that same courtroom.  So we may also have to use some

15    presentations from New York and use some telephonic

16    presentations through Court Solutions.

17         So we're too far out for me to know now exactly how

18    this is all going to work, and I'll undertake to keep the

19    parties updated through procedure orders and any related

20    notices as we get closer to the time.  In a moving landscape,

21    that's about the best undertaking I can make at this point.

22         So, as always, I'd like to thank the court staff in

23    Puerto Rico, Boston, and New York for all of their work in

24    connection with these cases and each of these hearings.  We

25    are adjourned.  Stay safe and keep well, everyone.  Thank

1    you.

2              (At 2:46 PM, proceedings concluded.)

3                              *        *        *

```
 1   U.S. DISTRICT COURT    )

 2   DISTRICT OF PUERTO RICO)

 3

 4       I certify that this transcript consisting of 145 pages is

 5   a true and accurate transcription to the best of my ability of

 6   the proceedings in this case before the Honorable United

 7   States District Court Judge Laura Taylor Swain, and the

 8   Honorable United States Magistrate Judge Judith Gail Dein on

 9   August 4, 2021.

10

11

12

13   S/ Amy Walker

14   Amy Walker, CSR 3799

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```