## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, <u>et al</u>.<br><br>Debtors. [1] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>Case No. 17 BK 4780-LTS<br><br>Re: ECF Nos. 16820, 16833, 16950, 16952, 17169, 17170, 17403, 17404, 17414, 17637 and 17650 in Case No. 17 BK 3283-LTS and ECF Nos. 2498, 2499, 2517, 2521, 2533, 2534, 2558 2559, 2561, 2579 and 2581 in Case No. 17 BK 4780-LTS<br><br>**This Motion Relates Only to PREPA and Shall Only Be Filed in Case No. 17 BK 4780-LTS** |

## MOTION TO SUBMIT CERTIFIED ENGLISH TRANSLATION
## OF SPANISH-LANGUAGE CASE LAW

---

[1]      The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

COMES NOW, the Puerto Rico Electric Power Authority[2], by and through the undersigned counsel, and respectfully states and prays as follows:

1. On July 19, 201, the Puerto Rico Electric Power Authority (PREPA) filed *PREPA's Opposition to Verified Motion of Foreman Electric Services Inc. for Allowance of Administrative Expense Claim* (the "Opposition"). (ECF No. 17403)[3]

2. On that same day, PREPA filed *Motion of PREPA for Leave to Cite Spanish-Language Case Law and for Extension of Time to File Certified Translations* (the "Request for Extension"). (ECF No. 17404). In the Request for Extension, PREPA informed the Honorable Court that it had cited several authorities in the Spanish language in support of the arguments raised in the Opposition (the "Spanish-Language Case Law"). Further, PREPA informed the Court that due to time constraints, despite diligent efforts, PREPA was unable to obtain certified English-language translations of the Spanish-Language Case Law prior to the filing. Accordingly, PREPA sought leave from this Court to rely on Spanish-Language Case Law in its original language and requested until August 2, 2021, to file a certified English-language translation pursuant to Local District Rule 5(g).

3. On July 19, 2021, the Court entered the *Order Granting Motion of PREPA for Leave to Cite Spanish-Language Case Law and for Extension of Time to File Certified English Translations* granting PREPA's requests. (ECF No. 17414). Therefore, the deadline to submit certified English translations of the Spanish-Language Case Law cited in the Opposition expired on August 2, 2021.

---

[2] The Financial Oversight and Management Board for Puerto Rico, as PREPA's representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act*, has authorized PREPA to file this motion on its behalf.
[3] References to Case No. 17-03283-LTS.

4.   On August 2, 2021, PREPA presented a *Motion to Submit Certified English Translation of Spanish-language Case Law and Second Request for Extension of Time to File Certified English Translations* (the "August 3 Motion"). (ECF No. 17637). With the August 3 Motion, PREPA submitted the certified English translation of the Puerto Rico Supreme Court decision entered in the matter of *Alco Corp. v. Mun. de Toa Alta*, 183 D.P.R. 530 (2011). Further, in the August 3 Motion, PREPA requested the Court to grant until August 20, 2021, to submit the remaining certified English translations of the Spanish-Language Case Law that was not submitted that day.

5.   That same day, the Court entered an *Order Granting Motion to Submit Certified English Translation of Spanish-language Case Law and Second Request for Extension of Time to File Certified English Translations*, by which it granted PREPA's request as made in the August 3 Motion.

6.   Wherefore, in compliance with the orders of the Court and Local District Rule 5(g), PREPA herein submits the certified English translation of the following Spanish-language Case Law:

a.   *Colón-Colón v. Mun. de Arecibo*, 170 D.P.R. 718 (2007). Exhibit A.

b.   *Genesis Security Services, Inc. v. Departamento del Trabajo y Recursos Humanos*, 204 D.P.R. 986 (2015). Exhibit B.

c.   *Mun. of Quebradillas v. Corp. Salud Lares*, 180 D.P.R. 1003 (2011). Exhibit C.

d.   *Ortiz v. Guayama Municipality*, 163 D.P.R. 208 (2004). Exhibit D.

e.   *Quest Diagnostics v. Mun. San Juan*, 175 D.P.R. 994 (2009). Exhibit E.

f.   *Rodríguez-Ramos v. ELA*, 190 D.P.R. 448 (2014). Exhibit F.

RESPECTFULLY SUBMITTED.

Dated: August 19, 2021
San Juan, Puerto Rico

s/ *Katiuska Bolaños-Lugo*
Katiuska Bolaños-Lugo
USDC-PR No. 231812
kbolanos@diazvaz.law

DÍAZ & VÁZQUEZ LAW FIRM, P.S.C
290 Jesús T. Piñero Ave.
Oriental Tower, Suite 803
San Juan, PR 00918
Tel.: (787) 395-7133
Fax: (787) 497-9664

**EXHIBIT A-1**

**Colon Colon v. Mun. Arecibo, 170 D.P.R. 718 (2007)**

2007 TSPR 61

KeyCite Yellow Flag - Negative Treatment
Distinguished by Rosario Rivera v. Soto, TCA, October 15, 2008

170 D.P.R. 718, 2007 WL 1283093 (P.R.), 2007 TSPR 61

Félix Colón-Colón, respondent,
v.
Municipio de Arecibo, petitioner.

In the Puerto Rico Supreme Court.
*Number:* CC-2005-994

**Synopsis**

*Certiorari* petition to review a judgment by *Guillermo Arbona-Lago, José Miranda de Hostos* y *Mildred G. Pabón-Charneco*, Justices for the Court of Appeals which revoked one issued by the Trial Court, ruling that a fact that a contract was not in writing nor was registered at the Comptroller's Office, did not vitiate in nullity the contractual relationship between the parties, since same was a remediable defect. *Judgment is rendered revoking that one issued by the Appeals Court, and the complaint for collection of money filed by Mr. Colon is dismissed since, in accordance to law, no contractual relationship existed between himself, and the Municipality of Arecibo.*

*Sheila Torres-Delgado, Simone Cataldi-Malpica* y *Rosa Campos-Silva*, from the *Aldarondo & López Brás Law Firm*, attorneys for the Municipality of Arecibo, petitioning party; *Amarilys González-Alayón*, attorney for respondent. **\*721**

Associate Justice Mrs. Rodríguez-Rodríguez rendered the Court's opinion.

On this occasion it behooves us to determine whether a non-written agreement concerted to between a municipal official and a contractor for rendering of services to the municipality is valid and binding or, to the contrary, same lacks full efficacy, for not having been narrowed into writing. We rule, in view of the discussion below, that stated verbal agreement did not bind the parties, precisely for not having been narrowed in writing, and since same is constitutive in nature, for efficacy of those obligations incurred into.

**I**

Mr. Félix Colon-Colon (Mr. Colon) is the owner of "Garaje Colon-Colon", located in the Municipality of Morovis, Puerto Rico. The Garage specializes in repairing diesel engine machinery, and heavy equipment. In the year 2000, Mr. Edgardo Rivera (Mr. Rivera), Public Works Director for the Municipality of Arecibo (Municipality), proposed to Mr. Colon whether he could provide heavy diesel equipment repair services on credit for vehicles, property of the Municipality.

Mr. Colón verbally accepted the offer tendered by the municipal official. Subsequently, the Municipality began turning over its machinery and heavy equipment to Mr. Colon. Mr. Colon would repair the Municipality's equipment by financing the purchase of spares and parts, later returning same to the Municipality's satisfaction, and the latter would process payment for services rendered. It must be pointed out that the verbal agreement between Mr. Colon and the Municipal Public Works Director, was never embodied into a written contract, wherefore neither was same registered at the Puerto Rico Comptroller's Office.

In 2002, the Municipality requested that Mr. Colon return all equipment needing repairs which he kept at his shop, **\*722** and informed him that the contractual relationship between them had not been legally registered. Mr. Colon did not concur with the Municipality's request until the latter paid for the repair services which he had performed. The Municipality, in response to the above, filed a writ of injunction against Mr. Colon, requesting return of its property. Mr. Colon, after several procedural incidents, agreed to return the equipment to the Municipality, and to take the pertinent legal and extra-judicial steps to collect for the unpaid repair services rendered.

Things so being, Mr. Colon, his wife Mrs. Carmen M. Martinez-Marrero, and the joint legal community property formed by both, filed a complaint against the Municipality for collection of monies, alleging that the latter owed them $220,974.15 for the purchase of parts, and for repairs to heavy equipment property of the Municipality. The Municipality answered said writ by denying the allegations. It adduced that the delivery and receipt of municipal heavy equipment was unlawfully executed, since what was agreed to did not appear within any written contract. Moreover, it alleged that Mr. Colon was not an amateur in his business lines, wherefore he knew that the services he rendered could not be performed without existence of purchase orders and certifications to prove the existence of a legally formal contractual relationship between the parties.

The Municipality, after several procedural incidents, requested that summary judgment be rendered against Mr. Colon. They sustained that the alleged contract between Mr. Colon and the Municipality was void, since it was not produced in any document nor registered at the Puerto Rico Comptroller's Office in accordance with Law No. 18, dated October 30th of 1975, as amended (Law No, 18), 2 L.P.R.A. Sec. 97, and Law No. 81 dated August 30th of 1991, as amended, known as the Commonwealth of Puerto Rico **\*723** Autonomous Municipalities Act (Autonomous Municipalities Act), 21 L.P.R.A. sec. 4001 et seq.

Mr. Colon opposed the Municipality's request in a timely manner by alleging that Law No. 18 was amended by Law 127, dated May 31st of 2004 (Law No, 127) for purposes of establishing that the fact that the contract of not registered with the Puerto Rico Comptroller's Office, shall not be cause to decree its nullity. In the alternative, he invoked the unfair enrichment doctrine, as to recover

what he was owed by the Municipality.

The Trial Court issued a summary judgment dismissing the money collection complaint filed by Mr. Colon and his wife. Displeased, plaintiffs then appealed the above ruling to the Appeals Court, alleging that the primary forum dismissed his complaint without considering the effects which Law No. 127 had upon Law No. 18. Moreover, they alleged that it was improper to dismiss the remedy by means of summary judgment, since there existed no disputes in fact or in law.[1]

The Appellate Court revoked the ruling from the Trial Court. Same concluded that the fact whereby the contract was not in writing or registered at the Puerto Rico Comptroller's Office, did not vitiate by nullity the contractual relations between the parties, since same dealt with a remediable defect. It based stated decision on what is provided for within Law No. 127. Moreover, it determined that rendering summary judgment was improper, since there existed a dispute regarding facts which needed to be elucidated in depth. It reasoned that the trial court **724** had to receive and weigh evidence as to determine if a service contract was executed between Mr. Colon and the Municipality, or not. Same deemed that it was necessary to determine what stated contractual terms were, if any, and then proceed to transcribe and register same, in accordance to law.

The Municipality, in a timely manner, unsuccessfully requested reconsideration to the ruling from the appeals court. Disagreeing, the Municipality comes before us, stating the commission of the following errors:

The Honorable Appeals Court erred upon revoking judgment by the trial court, under consideration for provisions of above quoted Law No. 127.

The Honorable Appeals Court erred by concluding that "the fact that the contract was not in writing... *per se,* does not void same."

The Honorable Appeals Court erred upon obviating the rule in *Fernández & Gutiérrez v. Municipio de San Juan, 147 D.P.R. 824 (1999)* and initiated a legal obligation over the Municipality of Arecibo, based upon actions by a municipal officer not empowered to so act.

The Honorable Court of Appeals erred by concluding that there were disputed facts which hinders the instant case from being solved in summary fashion. *Certiorari* petition, at page 4.

We therefore publish. Being in a position to rule we proceed to so do, lacking the benefit of respondent's appearance.

## II

**[1–2]** We have consequently reaffirmed that "proper management of government is a democratic virtue, and part of proper management implies performing its duties as a buyer with efficiency, honesty and correctly, to protect the interests and monies of the People which stated government represents". *Lugo v. Municipio Guayama, 163 D.P.R. 208, 214 (2004),* quoting **725** Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 871 (1990). Also see: Cordero Vélez v. Mun.

de Guánica, 170 D.P.R. 237 (2007); *Ríos v. Municipio Isabela, 159 D.P.R. 839 (2003)*. Statutes which control and order performance of work and purchase of goods and services for the State, its agencies, institutions and municipalities, bear the purpose of protecting the People's interests and financial resources against waste, fraud, cronyism and risks of non-compliance. *Lugo v. Municipio Guayama*, supra; Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973).

[3–4] The faculty of municipalities to disburse public funds to pay for obligations they have entered into, is contingent on having such public institutions act in accordance with procedures established under law, and our interpretative jurisprudence. In accordance with the above, we have repeatedly expressed ourselves in favor of restrictive rulings, insofar as contracts signed between private institutions and municipalities. *Cordero Vélez v. Mun. Guánica*, supra; *Lugo v. Municipio Guayama*, supra. It has to be pointed out that particularly when dealing with municipalities controlled by the Autonomous Municipalities Act, validity of same has to be determined by considering all pertinent provisions in this special statute, and not be drawn by the Civil Code's general theory of contracts and obligations. *Cordero Vélez v. Mun. Guánica*, supra; Mun. de Ponce v. A.C. et al., 153 D.P.R. 1 (2000).

[5] In accordance with the previously discussed rules, and considering the statutes which control municipal contracting,[2] we established that for contracts issued by municipalities to become valid and therefore have **726** a binding effect upon the parties, then several formal and procedural requisites have to be complied with. Thus, in first place, *"it is indispensable"* that the contract be in writing, so what was agreed to have a binding effect". (Emphasis in the original). *Cordero Vélez v. Mun. de Guánica*, supra, pág. 248. See, Municipio Mayagüez v. Lebrón, 167 D.P.R. 713 (2006). This requisite needs to be complied with *with no exceptions whatsoever,* so that which is agreed to, be valid between the parties. *Ríos v. Municipio Isabela*, supra; *Fernández & Gutiérrez v.* Mun. San Juan, 147 D.P.R. 824, 830–833 (1999); Hatton v. Mun. de Ponce, 134 D.P.R. 1001 (1994).

The requirement of a written contract, is both formal and substantive in nature. Same establishes preventive means, in the attempt to avoid disbursement of fraudulent or unlawful payments and claims. A written contract is the best evidence of reciprocal obligations contracted by the parties. It relieves the parties from future spurious disputes with regards to the terms originally agreed to, since these are established in an objective manner within the written agreement. Therefore, said requirement protects the rights of the municipality as well as those of the contractor, in case of non-compliance.

[6] Be it further forewarned that prior to undersigning a contract, the municipality must have identified those funds with which they will pay for the goods or services which they purchase. A written contract is what allows the disbursement amount to be determined with certainty so as to, in turn, identify the corresponding item within the municipal budget, with which such disbursements will be effected. 21 L.P.R.A. sec. 4354(b). See, also: *Hatton v. Mun. de Ponce*, supra; Morales v. Municipio de Toa Baja, 119 D.P.R. 682 (1987). Consequently, this prudent requirement **727** bears an inescapable substantive dimension of sound public management. *Then,*

*necessarily, the demand that all municipal contracts be in writing has a constitutive feature with respect to the efficacy of obligations entered into.* See Legal Principles for Sound Management which Control the Contracting of Professional & Consulting Services within the Public Sector, Office of the Comptroller, July 2006.

[7] On the other hand, we acknowledged that in accordance with Article 8.016 of the Autonomous Municipalities Act 21 L.P.R.A. sec. 4366, and of Article 1 of Law No, 18 (2 L.P.R.A. sec. 97), municipalities must maintain a faithful registry of the contracts which they undersign, and remit copies of same to the Puerto Rico Comptroller's Office within fifteen days after same are granted. *Cordero Vélez v. Mun. de Guánica*, supra; *Lugo v. Municipio Guyama*, supra; *Ríos v. Municipio Isabela*, supra. Such requirements advance a sound and transparent public management, since same serves as a *means for the collation and publicizing of the contracts issued by the municipalities.*

[8] We had, in the past, ruled that non-compliance with requirements regarding registration and remittance of a municipal contract to the Comptroller, vitiated the contract so signed, into nullity. See, among others: Las Marías v. Municipio San Juan, 159 D.P.R. 868 (2003); *Ríos v. Municipio Isabela*, supra; *Fernández & Gutierrez v. Mun. San Juan*, supra, page 833. Things so being, the Legislative Assembly approved Law No. 127, to clarify that such non-compliance without anything else, did not entail nullity of contracts, rather, that same prohibited disbursement of public funds or services from being requested, until it was registered, as provided for by law and applicable regulations.[3] That is, that the Legislative Assembly provided **\*728** that the procedural requirement (to wit: registry and remittance of a municipal contract, to the Puerto Rico Comptroller's Office) can be rectified. Nullity of the contract can only be pursued, presumably, only if this does not occur.

[9] In *Lugo v. Municipio Guayama*, supra, page 219, we confronted for the first time the provisions of Law No. 127, and acknowledged that stated law ushered "the effect of radically changing rulings evolved by this Court with respect to municipal contracts". (Emphasis excluded.) In virtue of same, *"the courts may not decree nullity of a municipal contract for the mere fact that same has neither been registered or remitted to the Comptroller's Office.* (Emphasis in the original.) Id.

[10] Notwithstanding this, we clearly stated that quoted amendment *did not have the effect of altering public policy with regards to municipal contracting.* Sound and proper public management demands that the Government, upon acting as purchaser of goods and services, always procure "the utmost efficiency for purposes of protecting the interests and monies of the People". (Emphasis omitted.) *Lugo v. Municipio Guayama*, supra, page 219. After all, the State carries the obligation, through affirmative action, of avoiding waste and fraud when managing public funds. Thus, and in accordance with the highest public interest involved therein, there is no placing within these cases, for remedies in equity. *Las Marías v. Municipio San Juan*, supra.

**[11]** Such is why private parties must exercise a more active role when contracting with a municipality, since these **\*729** are not exempted from complying with applicable laws. *Cordero Vélez v. Mun. de Guánica*, supra; *Lugo v. Municipio Guayama*, supra. Thus, "the private party which remains idle and renders services without demanding reliable proof that the government complied with its duty, risks taking on responsibility for its own losses". *Lugo v. Municipio Guayama*, supra, page 218.

### III

Having explained and discussed the rules applicable to the instant case, we now proceed to resolve the dispute under our consideration.

Mr. Colon provided heavy equipment and machinery repair services to the Municipality after Mr. Rivera, the Municipality's Public Works Director, requested such services from him. Their *agreement was never put into writing, wherefore, neither could it be registered within the Municipality's logbooks, nor much less could any copy of same be remitted to the Puerto Rico Comptroller's Office.* The Trial Court summarily dismissed the complaint for collection of money filed by Mr. Colon, concluding that he had not complied with the requirements of registry and remittance of copy to the Puerto Rico Comptroller's Office.

Notwithstanding, the Appeals Court revoked the prior ruling by concluding that the fact that the contract was not evidenced in writing and copy of same not been remitted to the Puerto Rico Comptroller's Office, "*per se* did not void same", since the above was a remediable defect. The court deemed that, in view of that provided for under Law 127, failure to comply with the written contract requirement was not a reason for a court to decree nullity of same. This is incorrect. As previously indicated, Law No. 127 amended Law No. 18 to establish that non-forwarding copy of a municipal contract to the Puerto Rico Comptroller's Office, or the lack of its registry into the municipality's books, did not vitiate the undersigned contract in nullity. This does not entail, as the intermediate forum so concluded, that this same principle applies when what was dealt with was an agreement which was never set into written format. It is our opinion that Law 127 had not contemplated such a scenario.

**[12]** There exists a marked difference between certain requirements, and others. The demand that a written contract be registered in the municipal log-book, and copy of same be remitted to the Puerto Rico Comptroller's Office, is geared towards publicizing for review of municipal contracts by third parties. In this manner, third parties may oversee same. Notwithstanding, demanding that written contracts be submitted in writing bears an inescapable breadth of sound public management in whatever measure same allows for safekeeping the interests of the contracting parties in view of any failure to comply, allows for an orderly use of municipal funds, avoids uncertainties when drafting a municipal budget, and provides for adequate identification of the items from which public funds will be disbursed, in compliance with law. To wit, the former are more than anything else, of a procedural sort and of an orderly process; however, the latter is substantive due to its direct relationship with sound public management. We thus state that such, and concluding therein, that non-compliance with the requirement of reducing the municipal

contract into written format, forcefully and adversely affects the efficacy of those obligations contracted to therein.

**[13]** So then, even though within our jurisdiction verbal contracting is admitted as one perfectly binding, whenever it deals with a contract undersigned by a municipality and involves disbursement of public funds, the general rule must be set aside. Sound public management so demands this.

We had already expressed ourselves under stated terms, prior to and after **\*731** the approval of Law No. 127. *V.g.*: *Municipio Mayagüez v. Lebrón*, supra; *Ríos v. Municipio Isabela*, supra; *Hatton v. Mun. de Ponce*, supra. It is our opinion that Law No. 127 did not intend to vouch for verbal contracts by municipalities. Indeed, within the law's Statement of Reasons it indicated that its purpose was to "maintain and support a system in which the interests of the contracting parties is protected" - 2004 (Part 1) Laws of Puerto Rico 589 – and truly, the best way to attain such objective is by insuring oneself that the terms and conditions in the contract are clearly stated; therefore, it is indispensable that the contract be drafted in writing. Same cannot be left in hands of municipal officer's or the contractor's best recollection, in a decision as to what they had wished to agree on.

It is important to emphasize, such as we have so done in the past, that municipal contractors need to be more diligent in their relationships with the municipality. Therefore, Mr. Colon should have displayed greater diligence in this matter by taking affirmative steps to verify that the verbal agreement which he set with Mr. Rivera, had been produced in writing, prior to initiating the rendering of his services. He can no longer avoid the consequences for his flawed observance of the rules which regulate municipal contracting. Stated in another way, Mr. Colon took a risk, and bore the responsibility for his own losses.

Finally, since there exists no dispute as to non-existence of a valid contract between the parties which would bind the Municipality, it is proper to render summary judgment as a matter of law, dismissing Mr. Colon's claim for collection of monies. It surfaces from the docket file to be a non-disputed fact that the parties had verbally agreed to have said services provided, and that whatever was agreed to was never placed into a written contract. Taking into account all of the above, and since Law No. 127 makes no reference to situations in which the agreement between a municipality **\*732** and a private entity is not set in writing, as is in the instant case, (then) nothing hindered the Trial Court from rendering summary judgment. See: Freire Ayala v. Vista Rent, 169 D.P.R. 418 (2006); Vera v. Dr. Bravo, 161 D.P.R. 308 (2004).

Due to the above stated grounds, *it is proper to render judgment and revoke the ruling issued by the Appeals Court, and dismiss the complaint for collection of money submitted by Mr. Colon, since there existed no contractual relationship, according to law, between himself and the Municipality.*

*Judgment shall be rendered therein.*

Chief Justice Mr, Hernández-Denton acknowledges the following: "Chief Justice Mr. Hernández-Denton concurs, since he deems that in view of the rules recently established in Cordero Vélez v. Mun. de Guánica, 170 D.P.R. 237 (2007), it is indispensable that contracts undersigned by a municipality with a supplier be done in writing, so that whatever is agreed to be binding to such effects." Associate Justice Mr. Fuster-Berligeri issued an agreeing opinion. Associate Justice Mr. Rivera-Perez did not intervene.

## --O--

Opinion in conformity issued by Associate Justice Mr. Fuster-Berlingeri.

I am satisfied with the Court's opinion in the instant case.

Notwithstanding, I believe it is necessary to issue this brief opinion and to point out that we had already specifically ruled, **\*733** that the formal requirement of *narrowing into a writing* agreements with the municipality *"is constitutive in nature with respect to their efficacy"*. (Emphasis provided.) *Fernández & Gutiérrez v. Mun. San Juan, 147 D.P.R. 824, 830 (1999)*. In this case we quoted our previous pronouncements about stated particulars, and in Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37, 54 (1988), in which we for the first time decreed on the questioned formal requirement, and indicated that same needs to be rigorously complied with. We reaffirmed in *Fernández & Gutiérrez v. Mun. San Juan*, supra, that which had been previously decided in *Ocasio v. Alcalde Mun. de Maunabo*, supra,

and we expanded our opinion to establish that the alluded formal requirement bore a constitutive trait. We are thus dealing with a rule, clearly established by this Forum, which the Legislative Assembly has not changed by means of Law No. 127, of May 31st of 2004, as the majority opinion so well explains.

## Footnotes

1   *Mr. Colon, in the appeal remedy filed with the Appeals Court, argumented that "dismissing the complaint was improper due to the legal grounds propounded in the judgment [by the Trial Court] and within the request for summary judgment filed by the Municipality, since the contracts although not becoming formal nor were notified to the Comptroller's Office, there existed ample documentary evidence regarding the existence of a contractual relationship which benefitted the Municipality". (Emphasis provided.) Appendix, page 79.*

2   *We specficially referto Art. 8.016 of the 1991 Autonomous Municipalities Act for the Commonwealth of Puerto Rico, as amended, 21 L.P.R.A. sec. 4366, which establishes that*

Colon Colon v. Mun. Arecibo, 170 D.P.R. 718 (2007)

2007 TSPR 61

> "[t]he municipalities shall retain a registry of all contracts granted, including their amendments, and will remit copy of same and of purchase deed and disposition of assets to the Puerto Rico Comptroller's Office, in accordance with _sects. 97 et seq._ of Title 2 and its Regulations."

Moreover, Art. 1 of Law No. 18 dated October 30th of 1975, as amended, _2 L.P.R.A. sec. 97_, which establishes the following, applies: "...municipal entities of the Commonwealth of Puerto Rico, without exceptions, shall maintain a contract registry for all contracts that are granted, including amendments to same, and must remit copy of same to the Comptroller's Office within fifteen (15) days following the date of issuance of the contract or the amendment".

3    Specifically, Law No. 127 dated May 31st of 2004, amended Law No. 18, supra, as to add the following subsection:
> "(d) Non-compliance with that provided for in this section or with the equivalent provision relating to registry of contracts included in _sect. 4366_ of Title 21, part of the law known as the 'Commonwealth of Puerto Rico Autonomous Municipalities Act'
shall not per se be cause for any competent court to declare the nullity of any legally valid contract or legal transaction. Notwithstanding, no performance or consideration subject to a contract may be demanded until what has been provided for in this section, has been complied with." (Emphasis provided.) _2 L.P.R.A. sec. 97(d)_.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

**EXHIBIT A-2**

Colon Colon v. Mun. Arecibo, 170 D.P.R. 718 (2007)

2007 TSPR 61

KeyCite Yellow Flag - Negative Treatment
Distinguished by Rosario Rivera v. Soto, TCA, October 15, 2008

170 D.P.R. 718, 2007 WL 1283093 (P.R.), 2007 TSPR 61

Félix Colón Colón, recurrido,

v.

Municipio de Arecibo, peticionario.

En El Tribunal Supremo De Puerto Rico.
*Número:* CC-2005-994

**Synopsis**

Petición de *Certiorari* para revisar una Sentencia de *Guillermo Arbona Lago, José Miranda de Hostos* y *Mildred G. Pabón Charneco,* Js. del Tribunal de Apelaciones, la cual revocó la emitida por el Tribunal de Primera Instancia y resolvió que el hecho de que el contrato no constara por escrito ni estuviese inscrito en la Oficina del Contralor no viciaba la nulidad de la relación contractual entre las partes, pues se trataba de un defecto subsanable. *Se dicta sentencia revocando la emitida por el Tribunal de Apelaciones y se desestima la demanda en cobro de dinero presentada por el señor Colón, ya que entre éste y el Municipio de Arecibo no existía una relación contractual conforme a derecho.*

*Sheila Torres Delgado, Simone Cataldi Malpica* y *Rosa Campos Silva,* del *Bufete Aldarondo & López Brás,* abogados del Municipio de Arecibo, parte peticionaria; *Amarilys González Alayón,* abogada de la parte recurrida. **\*721**

La Juez Asociada Señora Rodríguez Rodríguez emitió la opinión del Tribunal.

Corresponde determinar en esta ocasión si es válido y vinculante un acuerdo no escrito convenido entre un funcionario municipal y un contratista para prestar servicios al municipio, o si por el contrario, éste carece de toda eficacia por no haberse reducido a escrito. Resolvemos, a la luz de la discusión que procede, que dicho arreglo verbal no vinculó a las partes, precisamente por no haberse reducido a escrito y por ello ser de carácter constitutivo para la eficacia de las obligaciones contraídas.

**I**

El señor Félix Colón Colón (señor Colón) es dueño del "Garaje Colón Colón" localizado en el Municipio de Morovis, Puerto Rico. El Garaje se especializa en la reparación de maquinaria y equipo pesado con motores "diesel". En el año 2000 el Sr. Edgardo Rivera (señor Rivera), Director de Obras Públicas del municipio de Arecibo (Municipio), le propuso al señor Colón que prestara a crédito servicios de reparación de equipo pesado "diesel" para los vehículos propiedad del Municipio.

El señor Colón aceptó verbalmente la oferta realizada por el funcionario municipal. Posteriormente, el Municipio comenzó a entregarle al señor Colón su maquinaria y equipo pesado. El señor Colón reparaba el equipo del Municipio financiando la adquisición de piezas y repuestos, luego lo devolvía a satisfacción del Municipio y éste procesaba el pago por los servicios prestados. Cabe señalar que el acuerdo verbal entre el señor Colón y el Director de Obras Públicas municipal nunca se redujo a un contrato escrito, por lo que tampoco se registró en la Oficina del Contralor de Puerto Rico.

En el 2002, el Municipio solicitó al señor Colón la devolución del equipo pendiente de reparación que éste tenía en *722 su taller y le informó que la relación contractual entre ambos no se había formalizado legalmente. El señor Colón no accedió a la solicitud del Municipio hasta tanto éste le pagara los servicios de reparación que había realizado. En respuesta a lo anterior, el Municipio presentó una demanda de *injuction* contra el señor Colón ante el Tribunal de Primera Instancia, Sala Superior de Arecibo, solicitando la devolución de su propiedad. Luego de varios incidentes procesales, el señor Colón acordó devolver el equipo del Municipio y hacer las gestiones judiciales y extrajudiciales pertinentes para el cobro de los servicios de reparación prestados y no pagados.

Así las cosas, el señor Colón, su esposa, señora Carmen M. Martínez Marrero, y la Sociedad de Gananciales compuesta por ambos, presentaron una demanda en cobro de dinero contra el Municipio, alegando que éste le adeudaba $220,974.15 en concepto de reparaciones al equipo pesado propiedad del Municipio y compra de piezas. El Municipio contestó el recurso negando las alegaciones. Adujo que la entrega y el recibo del equipo pesado municipal se realizó ilegalmente, ya que lo pactado no constaba en un contrato escrito. Más aún, alegó que el señor Colón no era un neófito en su negocio, por lo que sabía que los servicios que prestó no podían realizarse sin que existieran órdenes de compra y certificaciones que evidenciaran que existía una relación contractual legalmente formalizada entre las partes.

Luego de varios incidentes procesales, el Municipio solicitó que se dictara sentencia sumaria contra el señor Colón. Sostuvo que el alegado contrato entre el señor Colón y el Municipio era nulo, ya que no fue plasmado por escrito ni registrado en la Oficina del Contralor de Puerto Rico conforme a la Ley Núm. 18 de 30 de octubre de 1975, según enmendada (Ley Núm. 18), 2 L.P.R.A. sec. 97, y la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, conocida como la Ley de Municipios Autónomos del Estado Libre *723 Asociado de Puerto Rico de 1991 (Ley de Municipios Autónomos), 21 L.P.R.A. sec. 4001 *et seq.*

El señor Colón se opuso oportunamente a la solicitud del Municipio, alegando que la Ley Núm. 18 fue enmendada por la Ley Núm. 127 de 31 de mayo de 2004 (Ley Núm. 127) con el propósito de establecer que el hecho de no registrar un contrato en la Oficina del Contralor de Puerto Rico no será causa para decretar su nulidad. En la alternativa, invocó la doctrina de

enriquecimiento injusto para recobrar del Municipio lo adeudado.

El Tribunal de Primera Instancia dictó sentencia sumaria desestimando la demanda en cobro de dinero presentada por el señor Colón y su esposa. Dicho foro concluyó que no se había cumplido con la Ley Núm. 18. Inconformes, los demandantes apelaron la determinación anterior ante el Tribunal de Apelaciones alegando que el foro de instancia desestimó su demanda sin considerar los efectos de la Ley Núm. 127 sobre la Ley Núm. 18. Además, alegaron que no procedía desestimar el recurso mediante el mecanismo de sentencia sumaria, ya que existían controversias de hechos y de derecho.[1]

El tribunal apelativo revocó el dictamen del Tribunal de Primera Instancia. Concluyó que el hecho de que el contrato no constara por escrito ni que estuviese inscrito en la Oficina del Contralor de Puerto Rico, no viciaba de nulidad la relación contractual entre las partes, pues se trataba de un defecto subsanable. Fundamentó esta determinación en lo dispuesto en la Ley Núm. 127. Más aún, determinó que no procedía decretar sentencia sumaria porque existían controversias de hechos que tenían que dilucidarse en un juicio en su fondo. Razonó que el tribunal de instancia tenía **\*724** que recibir y aquilatar prueba para determinar si entre el señor Colón y el Municipio se formalizó o no un contrato de servicios. Entendió que era necesario determinar cuáles eran los términos del contrato, si alguno, para que se procediera entonces a transcribirlo y registrarlo conforme a derecho.

Oportunamente, el Municipio solicitó sin éxito la reconsideración de la determinación del tribunal apelativo. En desacuerdo, el Municipio acudió ante nosotros señalando la comisión de los errores siguientes:

Erró el Honorable Tribunal de Apelaciones al revocar la sentencia del tribunal de instancia en consideración a las disposiciones de la Ley Núm. 127, antes citada.

Erró el Honorable Tribunal de Apelaciones al concluir que, "el hecho que el contrato no conste por escrito ... per se no lo anula."

Erró el Honorable Tribunal de Apelaciones al obviar la normativa de *Fernández & Gutiérrez v. Municipio de San Juan*, 147 D.P.R. 824 (1999) y crear una obligación jurídica del Municipio de Arecibo a base de la actuación de un funcionario municipal sin facultad para ello.

Erró el Honorable Tribunal de Apelaciones al concluir que existe controversia de hechos que impide resolver el caso de marras por la vía sumaria. Petición de *certiorari*, pág. 4.

Expedimos. Estando en posición de resolver, procedemos a hacerlo sin contar con el beneficio de la comparecencia de la parte recurrida.


## II

**[1–2]** Consecuentemente hemos reiterado que "la buena administración de un gobierno es una virtud de democracia, y parte de su buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa". *Lugo v. Municipio Guayama*, 163 D.P.R. 208, 214

(2004), citando a **725** *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990). Véanse, además: *Cordero Vélez v. Mun. de Guánica*, 170 D.P.R. 237 (2007); *Ríos v. Municipio Isabela*, 159 D.P.R. 839 (2003). Los estatutos que regulan y ordenan la realización de obras y adquisición de bienes y servicios para el Estado, sus agencias y dependencias, y los municipios, tienen como propósito la protección de los intereses y recursos fiscales del Pueblo contra el dispendio, la prevaricación, el favoritismo y los riesgos del incumplimiento. *Lugo v. Municipio Guayama*, supra; *Cancel v. Municipio de San Juan*, 101 D.P.R. 296, 300 (1973).

**[3–4]** La facultad de los municipios de desembolsar fondos públicos para el pago de las obligaciones que contraen está supeditada a que estas entidades públicas actúen acorde con los procedimientos establecidos por ley y nuestra jurisprudencia interpretativa. Conforme a lo anterior, reiteradamente nos hemos expresado a favor de una norma restrictiva en cuanto a los contratos suscritos entre entes privados y los municipios. *Cordero Vélez v. Mun. Guánica*, supra; *Lugo v. Municipio Guayama*, supra. Cabe señalar que cuando se trata de contratos municipales regidos especialmente por la Ley de Municipios Autónomos, la validez de éstos tiene que determinarse considerando las disposiciones pertinentes de este estatuto especial, y no a la luz de la teoría general de obligaciones y contratos del Código Civil. *Cordero Vélez v. Mun. Guánica*, supra; *Mun. de Ponce v. A.C. et al.*, 153 D.P.R. 1 (2000).

**[5]** En conformidad con la normativa anteriormente discutida, y considerando los estatutos que regulan la contratación municipal,[2] hemos establecido que para que los contratos otorgados por un municipio sean válidos y tengan **726** por lo tanto efecto vinculante entre las partes, tienen que cumplirse varios requisitos formales y procesales. Así, en primer lugar, "es *indispensable* que el contrato conste por escrito para que lo convenido tenga efecto vinculante". (Énfasis en el original.) *Cordero Vélez v. Mun. de Guánica*, supra, pág. 248. Véase *Municipio Mayagüez v. Lebrón*, 167 D.P.R. 713 (2006). Este requisito tiene que cumplirse *sin excepción alguna* para que lo acordado tenga validez entre las partes. *Ríos v. Municipio Isabela*, supra; *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 830–833 (1999); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001 (1994).

El requisito de contrato escrito es de carácter formal o sustantivo. Constituye un mecanismo profiláctico tendiente a evitar pagos y reclamaciones fraudulentas e ilegales. El contrato escrito es la mejor evidencia de las obligaciones recíprocas que contraen las partes. Libra a las partes de futuras controversias espúreas sobre los términos acordados originalmente, pues éstos quedan plasmados de forma objetiva en el acuerdo escrito. Por lo tanto, este requerimiento protege los derechos tanto del municipio como del contratista, en caso de incumplimiento.

**[6]** Adviértase, además, que previo a suscribir un contrato, el municipio tiene que haber identificado los fondos de donde se van a pagar los servicios o bienes que se adquieren. El contrato escrito es lo que permite determinar con certeza el monto del desembolso para, a su vez, identificar la partida correspondiente del presupuesto municipal contra la cual se van a hacer tales desembolsos. 21 L.P.R.A. sec. 4354(b). Véanse, además: *Hatton v. Mun. de Ponce*, supra; *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682 (1987). En consecuencia, este

requerimiento prudencial **\*727** tiene una insolayable dimensión sustantiva de sana administración pública. *Necesariamente, entonces, la exigencia de que todo contrato municipal sea por escrito tiene un carácter constitutivo respecto a la eficacia de las obligaciones contraídas.* Véase Principios Legales y de Sana Administración que Regulan la Contratación de Servicios Profesionales y Consultivos en el Sector Público, Oficina del Contralor, julio 2006.

[7] Por otra parte, hemos reconocido que conforme al Art. 8.016 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4366, y el Art. 1 de la Ley Núm. 18 (2 L.P.R.A. sec. 97), los municipios deben mantener un registro fiel de los contratos que suscriben y remitir copia de éstos a la Oficina del Contralor de Puerto Rico dentro de los quince días siguientes a su otorgamiento. *Cordero Vélez v. Mun. de Guánica*, supra; *Lugo v. Municipio Guyama*, supra; *Ríos v. Municipio Isabela*, supra. Estos requisitos promueven una sana y transparente administración pública, ya que sirven como *mecanismos de cotejo y publicidad de los contratos otorgados por los municipios.*

[8] En el pasado habíamos dispuesto que el incumplimiento con los requisitos de registro y de remisión al Contralor de un contrato municipal, viciaba de nulidad el contrato suscrito. Véanse, entre otros: *Las Marías v. Municipio San Juan*, 159 D.P.R. 868 (2003); *Ríos v. Municipio Isabela*, supra; *Fernández & Gutierrez v. Mun. San Juan*, supra, pág. 833. Así las cosas, la Asamblea Legislativa aprobó la Ley Núm. 127 para aclarar que dicho incumplimiento, sin más, no acarreaba la nulidad de los contratos, sino que prohibía el desembolso de fondos públicos o que se requirieran servicios hasta tanto éstos se registraran conforme dispone la ley y la reglamentación aplicable.[3] Es decir, la Asamblea Legislativa dispuso que **\*728** el requisito de tramitación (a saber: registro y remisión a la Oficina del Contralor de Puerto Rico de un contrato municipal) puede ser subsanado. Sólo si ello no ocurre, presumiblemente, cabría hablar de la anulación del contrato.

[9] En *Lugo v. Municipio Guayama*, supra, pág. 219, nos enfrentamos por primera vez a lo dispuesto por la Ley Núm. 127 y reconocimos que dicha ley tenía "el efecto de variar de forma radical la normativa desarrollada por este Tribunal en torno a los contratos municipales". (Énfasis suprimido.) En virtud de ésta, "*los tribunales no podrán decretar la nulidad de un contrato municipal por el solo hecho que éste no haya sido registrado ni remitido a la Oficina del Contralor*". (Énfasis en el original.) Íd.

[10] Ello no obstante, dejamos claro que la referida enmienda *no tuvo el efecto de alterar la política pública en torno a la contratación municipal.* La sana y recta administración pública exige del Gobierno que al actuar como adquirente de bienes o servicios, procure siempre "la mayor eficacia a los fines de proteger los intereses y el dinero del pueblo". (Énfasis suprimido.) *Lugo v. Municipio Guayama*, supra, pág. 219. Después de todo, el Estado tiene la obligación de evitar con actos afirmativos la corrupción, el dispendio y la prevaricación en la administración de los fondos públicos. Así, y conforme el alto interés público involucrado, no hay cabida en estos casos para los remedios en equidad. *Las Marías v. Municipio San Juan*, supra.

[11] Es por ello que las partes privadas deben ejercer un rol más activo al contratar con un municipio, pues éstas **\*729** no están exentas de cumplir con las leyes aplicables. *Cordero Vélez v. Mun. de Guánica*, supra; *Lugo v. Municipio Guayama*, supra. Así, "aquella parte privada que se cruce de brazos y preste servicios sin exigir prueba fehaciente de que el gobierno cumplió con su deber, se arriesga a asumir la responsabilidad por sus pérdidas". *Lugo v. Municipio Guayama*, supra, pág. 218.


## III

Habiendo expuesto y discutido la normativa aplicable al caso de autos, pasamos a resolver la controversia ante nuestra consideración.

El señor Colón prestó servicios de reparación de maquinaria y equipo pesado al Municipio luego que el señor Rivera, Director de Obras Públicas del Municipio, le solicitara estos servicios. El acuerdo entre éstos *nunca se consignó por escrito, por lo que tampoco pudo ser registrado en los libros del Municipio ni, mucho menos, remitirse copia de éste a la Oficina del Contralor de Puerto Rico.* El Tribunal de Primera Instancia desestimó sumariamente la demanda en cobro de dinero presentada por el señor Colón, concluyendo que no se había cumplido con el requisito de registro y remisión de copia del contrato a la Oficina del Contralor de Puerto Rico.

El Tribunal de Apelaciones, sin embargo, revocó el dictamen anterior al concluir que el hecho de que el contrato no constara por escrito y no se hubiese remitido copia de éste a la Oficina del Contralor de Puerto Rico, "per se, no lo anula[ba]", ya que lo anterior era un defecto subsanable. El tribunal estimó que, en virtud de lo dispuesto en la Ley Núm. 127, el incumplimiento con el requisito de contrato escrito no era causa para que un tribunal decretase su nulidad. No tiene razón.

Como se indicó previamente, la Ley Núm. 127 enmendó la Ley Núm. 18 para establecer que la no remisión de copia **\*730** de un contrato municipal ante la Oficina del Contralor de Puerto Rico o la falta de registro de éste en los libros del municipio, no viciaba de nulidad el contrato suscrito. Ello no comporta, como concluye el foro apelativo intermedio, que el mismo principio aplique cuando de lo que se trata es de un acuerdo que nunca se redujo a escrito. Somos del criterio que la Ley Núm. 127 no contempló este escenario.

[12] Existe una marcada diferencia entre unos requisitos y otros. La exigencia de que un contrato suscrito se anote en la bitácora municipal y su copia se remita a la Oficina del Contralor de Puerto Rico va encaminada a ofrecerle publicidad, frente a terceros, a la contratación municipal. De esta forma los terceros pueden fiscalizarla. Sin embargo, exigir que los contratos suscritos se reduzcan a escrito tiene una insoslayable dimensión de sana administración pública, en la medida que permite salvaguardar los intereses de las partes contratantes frente a un incumplimiento, permite la ordenada utilización de los fondos municipales, evita la incertidumbre en la confección del presupuesto municipal y hace posible la adecuada

identificación de la partida contra la cual se harán los desembolsos públicos en cumplimiento con la ley. Es decir, los primeros son más que nada de carácter procesal y de ordenada tramitación, mas el último es sustantivo por su directa relación con la sana administración pública. En atención a lo cual, debemos concluir que el incumplimiento con el requisito de reducir a escrito el contrato municipal por fuerza afecta adversamente la eficacia de las obligaciones contraídas.

[13] Así pues, aun cuando en nuestra jurisdicción se admite la contratación verbal como perfectamente vinculante, cuando se trata de un contrato suscrito por un municipio que involucra el desembolso de fondos públicos, la norma general debe dejarse a un lado. Una sana administración pública así lo exige.

Ya nos habíamos expresado bajo estos términos, antes y **\*731** después de la aprobación de la Ley Núm. 127. *E.g.*: *Municipio Mayagüez v. Lebrón*, supra; *Ríos v. Municipio Isabela*, supra; *Hatton v. Mun. de Ponce*, supra. Somos del criterio que la Ley Núm. 127 no pretendió avalar la contratación verbal de los municipios. De hecho, en la Exposición de Motivos de la ley se indicó que su propósito era "mantener y apoyar un sistema donde se protejan los intereses de las partes contratantes" —2004 (Parte 1) Leyes de Puerto Rico 589— y ciertamente, la mejor forma de lograr ese objetivo es asegurándose que los términos y las condiciones del contrato consten con claridad, para lo que es indispensable que el contrato se reduzca a escrito. No se puede dejar en manos del mejor recuerdo del funcionario municipal o de un contratista la determinación de qué fue lo que se quiso pactar.

Es importante recalcar, como lo hemos hecho en el pasado, que el contratista municipal debe ser más diligente en su relación con el municipio. Así, el señor Colón debió prestar mayor presteza a este asunto, tomando medidas afirmativas para cerciorarse que el acuerdo verbal al que llegó con el señor Rivera se redujera a un contrato escrito, antes de comenzar a ofrecer sus servicios. No puede ahora evadir las consecuencias de la inobservancia de las normas que regulan la contratación municipal. Dicho de otra forma, el señor Colón se arriesgó y asumió la responsabilidad por sus pérdidas.

Finalmente, por no haber controversia sobre la inexistencia de un contrato válido entre las partes que vinculara al Municipio, procedía dictar sentencia sumaria, como cuestión de derecho, desestimando la reclamación en cobro de dinero presentada por el señor Colón. Del expediente se desprende que era un hecho no controvertido que las partes habían acordado la prestación de los servicios de forma verbal y que lo pactado nunca se redujo a contrato escrito. Habida cuenta de lo anterior y ya que la Ley Núm. 127 no se refiere a situaciones en que el acuerdo entre un municipio **\*732** y un ente privado no se recoge por escrito, como en el presente caso, nada impedía que el Tribunal de Primera Instancia dictara sentencia sumariamente. Véanse: *Freire Ayala v. Vista Rent*, 169 D.P.R. 418 (2006); *Vera v. Dr. Bravo*, 161 D.P.R. 308 (2004).

## IV

Por los fundamentos expuestos anteriormente, *procede dictar sentencia para revocar la sentencia dictada por el Tribunal de Apelaciones y desestimar la demanda en cobro de dinero presentada por el señor Colón, ya que entre éste y el Municipio no existía una relación contractual conforme a derecho.*

*Se dictará sentencia de conformidad.*

El Juez Presidente Señor Hernández Denton hace constar lo siguiente: "El Juez Presidente Señor Hernández Denton concurre por entender que a la luz de la normativa establecida recientemente en *Cordero Vélez v. Mun. de Guánica*, 170 D.P.R. 237 (2007), es indispensable que el contrato suscrito por un municipio con un suplidor conste por escrito para que lo convenido tenga efecto vinculante." El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad. El Juez Asociado Señor Rivera Pérez no intervino.

## --O--

Opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri.

Estoy conforme con la opinión del Tribunal en el caso de autos.

No obstante, creo menester emitir esta breve opinión para puntualizar que ya habíamos resuelto específicamente **\*733** que el requisito formal de *reducir a contrato escrito* los acuerdos con municipios "*tiene carácter constitutivo con respecto a la eficacia de éstos*". (Énfasis suplido.) *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 830 (1999). En este caso citamos nuestros pronunciamientos previos sobre el particular en *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 54 (1988), en el cual pautamos por primera vez el requisito formal en cuestión e indicamos que éste debía observarse rigurosamente. Reiteramos en *Fernández & Gutiérrez v. Mun. San Juan*, supra, lo decidido antes en *Ocasio v. Alcalde Mun. de Maunabo*, supra, y ampliamos nuestro dictamen para precisar que el requisito formal aludido tenía carácter constitutivo.

Se trata, pues, de una norma claramente establecida de este Foro, que la Asamblea Legislativa no ha alterado mediante la Ley Núm. 127 de 31 de mayo de 2004, como bien se explica en la opinión mayoritaria.

Footnotes

1    En el recurso de apelación presentado ante el Tribunal de Apelaciones, el señor Colón argumentó que "no procedía desestimar la demanda por el fundamento de derecho expuesto en la sentencia [del Tribunal Primera Instancia] y en la solicitud de sentencia sumaria que radicó el Municipio, pues los contratos aunque *no fueron formalizados* ni notificados a la Oficina del Contralor, había amplia evidencia documental de la existencia de una relación contractual que benefició al Municipio". (Énfasis suplido.) Apéndice, pág. 79.

2    Específicamente, hacemos referencia al Art. 8.016 de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, según enmendada, 21 L.P.R.A. sec. 4366, que establece que

Colon Colon v. Mun. Arecibo, 170 D.P.R. 718 (2007)

2007 TSPR 61

"[l]os municipios mantendrán un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos y enviarán copia de éstos y de las escrituras de adquisición y disposición de bienes a la Oficina del Contralor de Puerto Rico, conforme las secs. 97 et seq. del Título 2 y su Reglamento."

Además, aplica a la contratación municipal el Art. 1 de la Ley Núm. 18 de 30 de octubre de 1975, según enmendada, 2 L.P.R.A. sec. 97, que establece lo siguiente:

"... las entidades municipales del Estado Libre Asociado de Puerto Rico, sin excepción alguna, mantendrán un registro de todos los contratos que otorguen, incluyendo enmiendas a los mismos, y deberán remitir copia de éstos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha de otorgamiento del contrato o la enmienda."

3    Específicamente, la Ley Núm. 127 de 31 de mayo de 2004 enmendó la Ley Núm. 18, *supra*, para añadir el inciso siguiente:

"(d) El incumplimiento con lo dispuesto en esta sección o con la disposición equivalente relacionada a registros de contratos incluidos en la sec. 4366 del Título 21, parte de la ley conocida como 'Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico', de por sí *no será causa para que un tribunal competente declare la nulidad de cualquier contrato o negocio jurídico legalmente válido.* No obstante, ninguna prestación o contraprestación objeto de un contrato podrá exigirse hasta tanto se haya dado cumplimiento a lo dispuesto en esta sección." (Énfasis suplido.) 2 L.P.R.A. sec. 97(d).

**End of Document**                                      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT B-1**

204 D.P.R. 986, 2020 WL 5215460 (P.R.), 2020 TSPR 84

Génesis Security Services, Inc., respondent,

v.

Departamento del Trabajo y Recursos Humanos y Estado Libre Asociado de Puerto Rico,
petitioners.

In the Puerto Rico Supreme Court
*Number:* CC-2019-360
*Resuelto:* 18 de agosto de 2020
Aug. 18th, 2020

Constitutional Law—General Provisions—In General -
1. Art. VI, Sect. 9, of the Constitution for Puerto Rico, LPRA, Volume 1, establishes the properties and public funds shall only be disposed of for public purposes and for the support and functioning of State institutions and, in every case, through authority of the law.

2. Puerto Rico—Commonwealth—Assets, Contracts & Responsibilities—Authority or Power of the ELA (CPR) to Contract—Requirements for Contracts.
Every governmental contract must comply with the following requirements: (1) be produced in writing; (2) registry regarding the existence of same needs to be kept; (3) remit a copy to the Puerto Rico Comptroller's Office, and (4) attest that same was executed and granted fifteen days prior.

3. Id.—Id.—Id.—Authority or Power of the CPR (ELA) to Purchase.
The Puerto Rico Government Accounting Act provides that any acquisition or purchase of goods or non-professional services effected by or through the General Services Administration (GSA), shall be exempt from the process through which the Government of Puerto Rico pre-intervenes in all financial transactions of its public branches, for purposes of guaranteeing their exactness, correction, need and legality. Consequently, the Treasury Department delegated upon the GSA said duty of supervising and overseeing acquisition and purchasing transactions, according to their competence, upon the entities of the Executive Branch. **\*987**

4. Id.—Id.—Id.—Id.
The General Services Administration (GSA) was established for purposes of centralizing the purchasing and acquisition process for Executive Branch units. Thus, same processes all purchases and acquisitions for public agencies, in favor of facilitating, streamlining and standardizing such procedures. In so being entrusted, the GSA acts as a facilitating and negotiating entity, and as a liaison between the agencies and their suppliers.

5. Id.—Id.—Id.—Id.

2020 TSPR 84

The 2001 Puerto Rico General Services Administration Plan establishes that, ordinarily, all Executive Branch units and entities have to carry out their purchases through the General Services Administration (GSA). Notwithstanding, there exist entities which are not mandated to process same through the latter, although this does not imply that they would not benefit from purchases carried out by the GSA. Quite the contrary, those entities have the option to adopt and voluntarily benefit from those systems which shall be developed for the purchasing of goods, professional and non-professional services, devised by GSA. Purchasing entities must, on such occasions, comply with rules applicable to the procedures executed by the GSA.

6. Id.—Id.—Id.—Id.

The General Services Administration's Purchasing Regulation, Regulations No. 3381 for the General Services Administration dated November 24th of 1986, provides that all purchases made by the General Services Administration shall be effected through one of the following procedures: (1) formal auction; (2) informal auction; (3) open market, or (4) special procedures.

7. Id.—Id.—Id.—Id.—Auction.

In accordance with the General Services Administration's Purchasing Regulations, Regulation No. 3381 for the General Services Administration dated November 24th of 1986, formal auctions proceed whenever an asset, project or services is acquired and which exceeds $4,000, whenever same is a contraction project exceeding $25,000, or an ancillary services to same which exceeds $10,000.

8. Id.—Id.—Id.—Id.—Id.

The General Services Administration's Purchasing Regulations, Regulation No. 3381 for the General Services Administration dated November 24th of 1986, provides that the General Services Administration (GSA/ASG, Spanish acronym.) will hold formal auctions for the benefit of the units of the Executive Branch. Upon adjudicating the auction, a contract shall be drafted between the GSA and the successful bidder (or successful bidders) and the GSA, for the purposes of qualifying same for *988 the rendering of services to any unit or entity of the Executive Branch.

9. Id.—Id.—Id.—Id.—Id.

The General Services Administration's Purchasing Regulations, Regulations No, 3381 for the General Services Administration dated November 24th of 1986, provides that the offer by the successful bidder in the auction papers constitutes the contract between the parties and, jointly with all other requirements as to form in Government contracts, shall compose the contract file, which shall be retained at the Office. Copies of orders issued regarding the contract shall be attached to the record file. Thus, it is presumed that purchase orders shall be issued in reference to the contract resulting from the auction thus held.

10. Id.—Id.—Id.—Id.—Id.

The General Services Administration's Purchasing Regulations, Regulations No, 3381 for the General Services Administration dated November 24th of 1986, establishes that once a formal auction is held and the General Services Administration qualifies a bidder through a contract, then governmental entities interested in acquiring the services agreed to, shall do so through a process called direct purchase against contract.

11. Id.—Id.—d.—Id.—Id.

A *direct purchase* is when a public agency issues a purchase order against the current contract agreed to by the General Services Administration, and the successful bidder. In this fashion, the successful bidder is notified that stated government entity shall be using their services.

12. Id.—Id.—Id.—Id.

The General Services Administration's Purchasing Regulations, Regulation No. 3381 for the General Services Administration dated November 24th of 1986, provides that contracts are awarded as the end of any purchasing procedure within the Government. Purchases or requirements made against contracts shall be effected through the issuance of orders.

13. Id.—Id.—Id.—Id.

As a general rule, direct purchases are effected without participation by the General Services Administration, and through issuance of a purchase order against the contract in force. Persons empowered to issue purchase orders are purchasing delegates or deputy delegates, who are employees of the government entity, explicitly authorized to exercise stated responsibilities. The process for issuing purchase orders is discussed in the opinion. **\*989**

14. Id.—Id.—Id.—Id.

Circular Letter No. 2014-14, published by the General Services Administration on June 25th of 2014, explains that the enabling law and the General Services Agreement Regulations, Regulation No. 3381 dated November 24th, 1986, do not require as a condition prior to the service and subsequent payment, that another contract be granted between the petitioning agency or unit, and the successful provider. It is solely required that the auction or purchasing procedure executed be current, and that the petitioning agency or unit issue a purchase order against the qualifying contract between the agency or petitioning unit, and the supplier of the goods or services.

15. Id.—Id.—Id.—Id.

The Statement of Reasons of the Multiple Selection Contracts Act provides that it is established

in the General Services Administration's purchasing regulations, that multiple selection contracts be issued to several bidders at a time, insofar that the petitioning agencies issue purchasing orders against the line and bidder which most adequately comply with those specifications which they require. In this manner, these means of purchase has been described as very valuable and participatory.

16. Id.—Id.—Id.—Id.

The statutes and regulations discussed in the Opinion do not demand that, after issuance of a contract between the General Services Administration and a successful bidder, any subsequent mandatory contract be executed between the public entity and the provider of the services or goods. Quite the contrary, applicable rulings explicitly validate that only one purchase order be issued for such purposes. Nevertheless, it is demanded, within this direct purchasing procedure by issuance of a purchase order, that certain assurances be complied with, for purposes of protecting the treasury and the public interest.

17. Id.—Id.—Id.—Id.

The rules by the General Services Administration provide that every purchase order be issued prior to the successful bidder providing the services, as to thus avoid that there be retroactive contracting. There does not exist any obligation, *per se,* between the government entity and the successful bidder, until a purchase order is issued.

18. Id.—Id.—Id.—Id.

The voluntary and deliberate agreement demanding more requirements than those provided for within the statutes and regulations of the General Services Administration is not unlawful, immoral nor contrary to public order. Actually, the rules do not demand issuance of a contract **\*990** between the governmental unit and the successful bidder. Nevertheless, this does not hinder that the parties agree to additional protections, for purposes of advancing and more ethical and efficient management of public funds.

**Synopsis**

Writ of *Certiorari* for Judgment by *Migdalia Fraticelli-Torres, Juan R. Hernández-Sánchez* y *Misael Ramos-Torres*, Judges for the Appeals Court, revoking the one issued by the Trial Court upon sustaining that the primary forum did not have before it all of the facts needed as to adjudicate the controversy. In particular, it ruled that there remained several factual disputes which hindered summary dismissal of the litigation. *Ruling by the Appeals Court is revoked, and opinion by the Trial Court is reinstated, although due to different grounds.*

*Isaías Sánchez Báez*, attorney general, and *Eric. O. de la Cruz-Iglesias*, deputy attorney general,

lawyers for petitioning party; *Irma E. Castro-Dieppa*, from *Castro-Dieppa Law Offices, PSC*, attorney for respondent.

Associate Judge, Mr. Estrella-Martínez, issued the Court's opinion.

**\*\*1** On numerous occasions, this Court has needed to rule with regards to assorted disputes relating to ordinary governmental contracting, whereby typically a government entity and a supplier undersign a direct contract. On this occasion we confront a different contractual style, in which the General Services Administration holds an auction and undersigns a multiple choice contract with different qualified bidders, which could eventually be selected as contractors by assorted entities of the Government of Puerto Rico. With this in mind it becomes proper to rule whether our legal system requires some subsequent formal procedure to the multiple choice contract, to wit: a purchase order or a direct contract between the public agency and the contractor. Let us see. **\*991**

## I

On December 23rd of 2015, the corporation Genesis Security Services, Inc., (Genesis) filed a complaint for money collection against the Department of Labor & Human Resources (Department of Labor) and the Government of Puerto Rico. Genesis alleged that during the previous twelve years it had obtained a good pro in an auction for security services held by the General Services Administration (Administration). As result of the above, they explained that the Administration and Genesis agreed to a contract titled Contract No. 13-01C of Multiple Choice of Security Services for the Government of Puerto Rico (Multiple Choice Contract). They expressed that Genesis and other successful bidders were qualified as to provide security services to Puerto Rico Government Agencies. The contract remained in force from September 25th of 2012, through September 24th of 2015.

Genesis indicated that, the Department of Labor, in virtue of the Multiple Choice Contract, used its security services for approximately twelve years. Nevertheless, it alleged that the Labor Department did not issue any payments whatsoever during fiscal year 2013-2014, for the services provided by Genesis. This in spite of the fact that the Department of Labor regularly requested its services in writing, and that Genesis adequately invoiced same.

Notwithstanding, Genesis acknowledged that it did not sign a contract directly with the Labor Department for the disputed year. As to stated purposes it adduced that this was not necessary since the applicable legislation, regulations and circular letters did not require same. Genesis indicated that the Administration was established as to centralize governmental purchasing procedures, and that multiple choice contracts allowed to facilitate and streamline **\*992** that

process. Therefore, it sustained that from applicable law it was evident that once the Administration retains a contract as to qualify certain successful bidders to provide services to the government, then agencies wanting to use same only had to issue a purchase order for said purpose. In view of the above, they stated that they were not obligated to retain a second contract, directly with the Department of Labor.

Genesis, due to the above, requested that the Trial Court order the Department of Labor to issue the pertinent purchase order, and to pay for services rendered. It sustained that the Labor Department's debt totaled $1,798,000.34, plus $43,186.75 in accumulated interest.

The Department of Labor, on its part, requested dismissal of the complaint, since it alleged that a claim to justify granting of a remedy, was raised. Thus, it argued that the Multiple Choice Contract executed between the Administration and Genesis did not bind the Labor Department. Likewise, it pointed out that Genesis and the Department of Labor did not undersign any contract with each other during fiscal year 2013-2014. The Labor Department, in consideration of the governmental contracting doctrine, affirmed that Genesis' claim could not be validated. Therefore, it concluded that Genesis erred upon continuing to provide its services without executing a second contract.

In view of this, Genesis opposed and alleged that a dismissal at this stage was improper. It adduced that the evidence needed to weigh the disputed facts in the case had not yet been presented and that, if certain allegations in the complaint were proven true, then it was entitled to a remedy. Likewise, Genesis reaffirmed that the Department of Labor had requested its services in view of the Multiple Choice Contract, wherefore, executing a second contract was unnecessary. **\*993**

Nevertheless, Genesis attached a copy of the Multiple Choice Contract to its motion. In same it was specified that any governmental entity interested in obtaining services from Genesis or from any other security company must undersign a second contract directly with the successful bidders. In accordance with the Multiple Choice Contract: *"[t]he agencies shall execute a contract with the selected Security Company;* this process is what gives rise to the term of the contract, between the petitioning agency and the contractor".(Emphasis in the original).[1] Moreover, Genesis attached a copy of another multiple choice contract agreed to between the Administration and Genesis, which was current during the three years prior to the Multiple Choice Contract under our consideration. In that previous contract, the parties were bound under the same terms and conditions within the Multiple Choice Contract at hand, including the requirement to execute a second contract directly between the governmental entity and the successful bidder.[2]

On the other hand, the Labor Department submitted a response, in which it reaffirmed the compulsory aspect of executing a second contract. In particular, it sustained that principles of governmental contracting barred retroactive acknowledgment of any obligation not produced in written form. The same as Genesis, it attached the Multiple Choice Contract to its motion.

Genesis, on its part, filed a response in which it alleged that there was dispute insofar as the existence of a valid, current and binding contract, since the multiple choice contract complied

with all of the requirements for governmental contracting. It highlighted that the Department of Labor requested and received services from Genesis **944** for many years, in view of said contract. Therefore, it pointed out that the Labor Department knew that applicable law only demanded that a purchase order be issued. According to Genesis, a purchase order was an internal administrative document for governmental agencies, which was not a requirement prior to contracting. It alleged that as a result of this, there was not hindrance whatsoever for the Department of Labor to issue a purchase order and proceed to pay for the services provided during fiscal year 2013-2014. Due to the above, it requested the primary forum to deny the motion for dismissal.

The Trial Court, in view of such situation, addressed the motion for dismissal submitted by the Labor Department, as a request for summary judgment. This then concluded that the Department of Labor submitted several subjects not contained within the rebutted allegation, with sufficient evidence to sustain same. Through this standard, the primary forum dismissed the complaint, although because of grounds different than those submitted by the parties.

Specifically, the Trial Court acknowledged that the Multiple Choice Contract provided that agencies interested in using services from security companies qualified by the Administration should grant a direct contract with the successful bidder. Nevertheless, it determined that Circular Letter No. 2014-14, issued by the Administration subsequent to execution of the Multiple Choice Contract, indicated that this was not necessary. Consequently, it ruled that once the Administration the auction was adjudicated in favor of Genesis and a contract was executed with same, then the Department of Labor did not need to undersign a contract directly with Genesis. Now then, the primary forum determined that although a second contract was unnecessary, applicable law did demand that the Labor Department issue a purchase order. The Trial Court interpreted that through a **995** purchase order was when the obligations between Genesis and the Labor Department actually arose. It ruled that since the Department of Labor did not issue any purchase order for such purposes, disbursement of the funds requested by Genesis was improper. Moreover, the primary forum concluded that the Department of Labor could not issue a purchase order in that stage, since same would constitute a retroactive obligation contrary to to governmental contracting rules. The Trial Court, in view of these grounds, the Trial Court dismissed the complaint filed by Genesis.

Dissatisfied, Genesis proceeded to the Appeals Court through an appeals remedy. In same, Genesis argued that the primary forum erred upon ruling that a purchase order was a constitutive requisite of governmental contracts. It insisted, within stated line, that purchase orders were agency internal documents that were unnecessary for enforcing an obligation. In the alternative, they reaffirmed that the Department of Labor consequently requested services from Genesis, in writing. As a result of same, it argued that the complaint should not be dismissed at that stage, since evidence regarding stated requirements was pending, as to determine whether same constituted a purchase order, in accordance with applicable law.

On the other hand, the Department of Labor opposed and argued that the primary forum had acted correctly by summarily dismissing the litigation. This, since there was no dispute with regards to the Multiple Selection Contract, about the services provided by Genesis during fiscal year 2013-

2014, and the non-existence of a purchase order issued for said purposes. Due to the above, it alleged that Genesis was not entitled to any remedy whatsoever, since a purchase order could not be issued retroactively.

The Court of Appeals, having pondered arguments by the parties, the Appeals Court revoked the judgment by the Trial Court. In essence, the appeals forum sustained that the primary forum **996** did not have in its presence all of the facts necessary for adjudicating the controversy.   In particular, it ruled that the following disputes existed and which hindered a summary dismissal of the case: Does the Administration manage or not, Multiple Selection Contracts?; what effect does the Circular Letter issued in the last month of fiscal year 2013-2014 have over the rendering of services by Genesis, during that same period?; what does the stated purchase order consist of: is it a unilateral or bilateral form?; does the order constitute a a formal requirement for governmental contracting, able to foil a claim for money collection?; is it an internal means for fiscal controls?; is its non-compliance curable?[3] The Labor Department, in view of this opinion, filed a motion for reconsideration, which the appellate forum *Denied.*

After several procedures related to an automatic stay of the litigation in view of the *Puerto Rico Oversight, Management, and Economic Stability Act*, 48 USC sec. 2101 et seq., which are not necessary to extensively review, the Department of Labor appears before this Court through a writ of *certiorari.*[4] In essence, it argues that the Appeals Court, due to lack of any actual and material controversy of should have reviewed the conclusions in law by the Trial Court. Further, it challenged the Appeals Court considering that evidence had to be reviewed regarding the written requirements it allegedly made, upon the request for services from Genesis. This, since they alleged that Genesis first made that argument at the appellate level.[5] *997*

Genesis, on its part, appeared and reaffirmed the arguments raised before the forums appealed to. They in turn argue that the motion to dismiss submitted by the Labor Department should not have been adjudicated in accordance with the standards for summary judgment.

On June 28th of 2019, the Full Court agreed to issue the writ under our consideration. Counting the benefit of appearance by both parties, this Court now proceeds to resolve the dispute before us.

## II

[1] The Puerto Rico Constitution establishes that "[p]roperties and public funds may solely be disposed of for public purposes and for the support and functioning of State institutions and, in any case, by virtue of law." Art. VI, Sec. 9, Const. PR, LPRA, Volume 1, Ed. 2016, page 444. In view of this constitutional mandate, we have been consequent upon demanding appropriate and ethical management of public funds. Vicar Builders v. ELA et al., 192 DPR 256 (2015); Rodríguez Ramos et al. v. ELA et al., 190 DPR 448 (2014); Jaap Corp. v. Depto. Estado et al., 187 DPR 730 (2013). This in observance that "[t]he optimal management of government is a democratic

virtue, and part of good management implies performing its duties as a purchaser efficiently, honestly and correctly, as to protect the interests and monies of the People which stated government represents". Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 DPR 864, 871 (1990). The Legislative Assembly has, for stated purposes, developed a setup of different statutes purpose of which is to guarantee fiscal control and regulate governmental contracting **998.** *Vicar Builders v. ELA et al.*, supra, page 262. Likewise, this Court has fine-tuned the precepts of sound public management through our jurisprudence *Jaap Corp. v. Depto. Estado et al.*, supra, page 741. Consequently, the faculty of the Government of Puerto Rico and of its entities to contract and commit public funds is limited by stated rules.

[2] In view of the above, we have determined that every governmental contract needs to comply with the following requirements: (1) be set in writing; (2) maintain a registry which establishes its existence; (3) remit copy to the Puerto Rico Comptroller's Office, and (4) attest that is was executed and granted fifteen days prior. ALCO Corp. v. Mun. de Toa Alta, 183 DPR 530, 537 (2011); Ocasio v. Alcalde Mun. de Maunabo, 121 DPR 37, 54 (1988). Governmental contracts have to rigorously comply with each one these demands, since they serve as a means to collate and register those contracts circumstantially and chronologically and, therefore, avoid fraudulent claims and payments". *Vicar Builders v. ELA et al.*, supra, page 264.

[3] On the other hand, and as a general rule, the Puerto Rico Treasury Department (Treasury Department), bears the responsibility of designing and managing the accounting systems plus income and payment procedures for governmental entities and units. Puerto Rico Accounting Act, Law No. 230 dated July 23rd 1974 (3 LPRA sec. 283 *et seq.*). The Government of Puerto Rico upon exercising these duties, intervenes in advance to all financial transactions of their public units, for purposes of guaranteeing their exactness, correctness, need and legality. 3 LPRA sec. 283e. Nevertheless, this does not apply to the Administration. It is expressly provided within said statute that "all purchases of goods and non-professional services performed by or through the General Services Administration **999** shall be exempted from this process". 3 LPRA sec. 283e(b). Consequently, the Treasury Department delegated this duty supervise and oversee purchase and acquisition transactions for Executive Branch entities under its competence, upon the Administration.

[4] B. The Administration was established for the purpose of centralizing the acquisitions and purchasing process for units of the Executive Branch. Art. 2 of the 2001 Puerto Rico General Services Administration Reorganization Plan, Law No. 3-2011 (3 LPRA App. XIX).[6] This, since "it was found that currently most of the agencies carry out their purchases separately, which implies that there exists duplicity of duties". Positive report regarding Reorganization Plan No. 11, General Services Administration, Government Commission, House of Representatives, June 24th, 2011, 5th Ordinary Session, 16th Legislative Assembly, page 3. In view of the above, it was determined that the Administration would process purchases and acquisitions for public agencies, fostering to facilitate, standardize and streamline these procedures. The Administration, in stated charge, acts as "a facilitating and negotiating entity, and as a liaison between agencies and suppliers." 3 LPRA App. XIX, Art.

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

22.

**[5]** The 2011 Puerto Rico General Services Administration's Reorganization Plan establishes that, ordinarily, all Executive Branch agencies and institutions have to perform their purchases through the Administration. 3 LPRA App. XIX, Articles 3 and 26. Notwithstanding, there are particular entities which are not mandated to process them **\*1000** through the Administration.[7] Now, this does not imply that those Executive Branch exempted agencies and all other government entities cannot benefit from purchases effected by the Administration. On the contrary, they have "the option of voluntarily adopting and benefiting themselves from the systems to be developed for acquiring goods, professional and non-professional services", elaborated by the Administration. 3 LPRA App. XIX, Art. 3. On such occasions, purchasing entities must comply with the rules applicable to procedures carried out by the Administration.

**[6–7]** Likewise, the Legislative Assembly explicitly delegated upon the Administration the responsibility to establish, by regulations, the rules and means needed to carry out acquisitions and purchases. 3 LPRA App. XIX, Art. 23. The General Services Administration's Purchasing Regulations, Regulation No. 3381, General Services Administration, November 24th of 1986, (Purchasing Regulations), provides that any purchase made by the Administration shall be done through one of the following procedures: (1) formal auction; (2) informal auction; (3) open market, or (4) special procedures. Id., Art. 64. In the case of formal auctions, which is the process at hand, same are carried out whenever an asset, labor or a service in excess of $4,000 is acquired, when same deals with construction work exceeding $25,000, or any ancillary service that exceeds $10,000. Id. Art. 65.

**[8]** The General Services Administration's Auctions Regulations, Regulation No. 3380, General Services Administration, November 24th of 1986 **\*1001** (Auctions Regulations), provides that the Administration shall hold formal auctions in benefit for Executive Branch units. Id. Art. 3. In such tasks, the Administration shall publish an auction form, within which all conditions and specifications are stated, and which interested bidders must comply with. Id. Art. 32. Upon adjudicating the auction, a contract between the Administration and the successful bidder shall be awarded, for purposes of qualifying them to provide services to any Executive Branch entity or unit. Id. Art. 75.

**[9]** Article 75(4) of the Auctions Regulations, *supra,* at page 91, provides as follows:

The offer by the successful bidder within the auction form [,] constitutes the contract between the parties and, jointly with all other requirements as to form for Government contracts, shall constitute the contract file, which shall be maintained at the Office. Joined to stated file shall be *copies of the orders issued against stated contract.* There shall exist a contract file for each successful bidder. (Emphasis provided.)

As can be observed, it is assumed that purchase orders shall be issued against the contract resulting from the auction held. Let us then expand upon the concept of purchase orders against the contract. We proceed.

**[10–12]** Art. 69 of the Purchasing Regulations, supra, page 85, establishes that once a formal

auction is held and the Administration qualifies a bidder through contract, then those governmental entities interested in purchasing the services agreed to, shall do so through a means called "direct purchase against contract". In essence, a direct purchase consists in that a public agency issues *"a purchase order against the current contract"* agreed to by the Administration and the successful bidder. (Emphasis provided.) Id. In this manner, the successful bidder is notified that stated government entity will use their services. Same is so affirmed in Art. 87 of the Purchasing *1002 Regulations, above, at page 107, which provides that "[t]he contracts are awarded as the culmination of any purchasing process within the Government. *Purchases or requisitions against same shall be effected through the issuance of orders."* (Emphasis provided).

**[13]** As a general rule, direct purchases "are made *directly without participation by the Administration,* through issuance of a purchase order against the contract in force."[8] (Emphasis provided.) Art. 69(2) of the Purchasing Regulations, *supra,* page 85. These regulations indicate that the persons empowered to issue stated purchase orders are named purchasing delegates or deputy delegates, who are employees of the governmental entity explicitly authorized to execute stated responsibilities. Id. See also, Regulations for Purchasing Delegates of the General Services Administration, Regulation No. 3383, General Services Administration, November 24th of 1986 (Purchasing Delegates Regulations).

Purchasing Delegates or Deputy Delegates, prior to issuance any purchase order for stated purposes, bear the responsibility of corroborating that the agency have the funds necessary to so do. Art. 32 of the Purchasing Delegate Regulations, *supra,* pages 30-31. Purchase orders "are issued by using the form provided for same, assuring to properly complete same, by containing the specifications, terms, certification of funds, and all other necessary information".

Art. 69(5) of the Purchasing Regulations, *supra,* page 86.  Once the purchase order is signed it is forwarded to the successful bidder, the agency's official receiver, the property in-charge, the purchasing delegate or deputy delegate, the agency's finance chief, the Treasury Department and to the Administration. Art. 69 of the Purchasing Regulations, *supra.* Art 33 of the Purchasing Delegate Regulations, *supra.*

**[14]** The described format is clearly summarized within Circular Letter No, 2014-14, published by the Administration on June 25th of 2014, pages 2-3, in the following manner:

As we see, once the Auctions Board issues an Adjudication Notice, the [Administration] proceeds to undersign a qualification contract with all assorted successful bidders in the auction or pertinent procedures, and the agency, public corporation or municipality which wishes to benefit from the prices and conditions bid for in the auction, shall select from among the successful bidders, the one which better provides for their particular needs.

The Agency's Purchasing Delegate or Deputy Delegate or petitioning unit may perform diverse types of purchases, among others, direct purchases against the contracts […] The current contract is the qualification contract which turns formal between the [Administration] and the successful bidder. Stated purchase order is issued by using the form provided for same, the Purchasing Delegate or Deputy Delegate making sure to complete it fully and adequately. Same must contain, among other items, specifications regarding the goods to be purchased, price, terms of delivery, conditions, certification of funds, and must be signed by the authorized

officials.

In accordance to that indicated above, the purchase of goods and non-professional services through auction and all other means effected by the [Administration], are processed through purchase orders. *Our chartered law and the Purchasing Regulations, supra, do not require, as a condition prior to the service and subsequent to payment, that another* **\*1004** *contract be awarded between the petitioning agency or unit and the supplier. It is only required that the auction or purchasing procedure effected be current, and that the petitioning agency or unit issue a purchase order against the qualification contract awarded between the [Administration] and the successful bidder.* Once the agency or unit issues the purchase order against the qualification contract is when the contractual obligations between the petitioning agency or unit and the provider of the goods or services, begins, (Emphasis omitted from the original, emphasis provided and square brackets omitted).

**[15]** Likewise, this setup has been directly approved and validated by the Legislative Assembly. The 2011 Puerto Rico General Services Administration Reorganization Plan, *supra,* provides that all purchasing and acquiring procedures have to comply with a series of statutes; among these, the Purchasing Process Multiple Choice Contracts Act, Law No, 253-2006 (*3 LPRA sec. 8661 et seq.*). This law validated the following within its statement of reasons:

[…] It is provided within the purchasing regulations of the General Services Administration that multiple choice contracts are awarded to several bidders at once, insofar that the petitioning agencies issue purchase orders against the item and bidders which most adequately meets the specifications required by them. 2006 (Part 2) Laws of Puerto Rico 1317.

Thus, this purchasing tool was described as "highly useful and participationa[l]." Id.

Considering the mentioned juridical framework, we now proceed to rule in the dispute before us.

### III

We must, as a threshold issue, resolve whether, once the Administration qualifies a successful bidder to provide goods or services to the Government of Puerto Rico through a contract, those governmental entities that are interested in receiving same become obligated to execute a second \*1005 contract directly with the bidder, or if it suffices with the issuance of a purchase order for stated purposes. Let us see.

As we propounded, the Administration is the entity charged with processing acquisitions and purchases for Executive Branch entities. For that, the Administration may process the purchase of goods or services in several manners, among these, through a formal bid procedure. Art. 64 of the Purchasing Regulations, *supra.* After the Administration adjudicates an auction and awards a

contract to the successful bidder or bidders, then the public agencies may benefit from those qualified services through a process of "direct purchases against the contract". Id. Art. 69, page 85. Direct purchase against a contract is precisely the issuance of a purchase order, through which the governmental unit request goods or services from the successful bidder.

**[16]** Consequently, as can be seen, the indicated statutes and regulations *do not* demand that after issuance of a contract between the Administration and a successful bidder, any subsequent contract between the public entity and the provider of the goods or services be *necessarily* executed. To the opposite, applicable rules explicitly validate that only one purchase order be issued for such purposes.

Nevertheless, it is proper to point out that in this process of direct purchase through issuance of a purchase order, compliance with certain warranties is demanded, foreseeing the protection of the treasury and of the public interest.

For example, in these cases it is necessary that there exist a valid and enforceable contract between the Administration and the successful bidder, which complies with all governmental contracting requirements within our system. Such is demanded within Art. 69 of the Purchasing Regulations, supra, which provides that direct purchasing through purchase order are only proper in cases where there is a current contract between the Administration and the successful bidder. Likewise, **\*1006**, Art. 36 of the Purchasing Delegates Regulations, supra, forbids delegates and deputy delegates from undersigning purchase orders prior to executing a contract. Therefore, the described ruling does not validate that governmental units issue purchase order in a void. Such would impact the firm principles of sound public management, consequently reaffirmed by this Court.

**[17]** Likewise, the Administration's rules foresee that every purchase order for said purposes be issued *before* the successful bidder performs the services, as to thus avoid that there be retroactive contracting. Due to the above, there exists no obligation that *per se* between the government entity and the successful bidder, until the purchase order is issued. Such as is propounded within Circular Letter 2014-14, supra, page 3: "[o]nce the petitioning agency or unit *issues a purchase order* against the contract *is when the contractual obligation begins* between the petitioning agency or unit, and the provider of the goods or services." Emphasis provided. Through this rule greater fiscal control for the disbursement of public funds by government agencies, is fostered. Moreover, the above is in agreement with the basic principle within our (legal) system which prohibits any attempt towards retroactive contracting within the governmental realm. *Jaap Corp. v. Depto. Estado et al.*, *supra*, page 748.

However, in the case under our consideration, the parties agreed to protections in addition to those foreseen by the Administration's rules. As we propounded, the parties agreed to, within the Multiple Choice Contract rendered between the Administration and Genesis that *"[t]he agencies shall execute a contract with the chosen Security Company,* this process is what shall initiate the term of the contract between the contractor and the petitioning agency." **\*1007** (Emphasis in the original).[9] Likewise, the contract specifies that *"[a]s soon as this process[ i]s executed, the Purchasing Delegates or Deputy Delegates ma[y] issue a purchase order."* (Emphasis provided.)[10] Indeed, Genesis filed   at the primary forum a copy of the contract which was in

force prior to the Multiple Choice Contract, through which the Administration and Genesis likewise agreed that any agency interested in obtaining services from Genesis would have to have a contract directly with the latter.

Thus, it is concluded that Genesis explicitly agreed, on more than one occasion, that governmental agencies interested in obtaining their security services would need to execute a contract them. Moreover, the Multiple Choice Contract specifies that issuance of that contract is necessary for the subsequent issuance of a purchase order. Therefore, although the Administration and Genesis was not so obligated, they *voluntarily* agreed that governmental units interested in Genesis' services would have to execute a contract directly with the latter.

It is therefore concluded that Genesis explicitly agreed, on more than one occasion, that governmental entities interested in obtaining their security services would have to execute a contract with same. Moreover, the Multiple Choice Contract specifies that execution of the contract is necessary for the subsequent issuance of a purchase order. Therefore, in spite of the fact that neither Genesis nor the Administration were obligated to so do, these *voluntarily* agreed that governmental units interested in services from Genesis would have to execute a contract directly with the latter.

**[18]** This voluntary and weighed agreement of demanding additional requirements than the ones contemplated by the Administration's regulations and statutes, is not unlawful, immoral nor contrary to public order. Certainly, the rules promoted by the Administration do not demand issuance of a contract between the government entity and the successful bidder. Nevertheless, same is not a hindrance for the parties to pact additional protections, for purposes of advancing the utmost efficient and ethical management of public funds. Same is in tune with our pronouncements regarding governmental contracting. Same is so acknowledged **\*1008** likewise, in Circular Letter 2014-14, *supra*, page 3, upon explaining the following:

In spite of that indicated, the unit or agency may, and it has always been our recommendation to execute an Agreement which references the essential terms and        conditions   of   the auction or process effected, and in which the particular terms of the contracting are agreed to, that is, detailing the need for the services required by stated petitioning unit or agency.

As becomes noticeable, the Administration itself suggests other means, beyond those foreseen within its rules, to guarantee a sound public management.

In closing, we need to bear in mind that all contracts with the Government of Puerto Rico are vested in the public interest. Therefore, at minimum, we must demand that parties in a government contract comply with the agreed terms and conditions. Moreover, whenever the agreement has implications regarding public funds. Consequently, in view of the indicated grounds, it is forcefully concluded that Genesis was bound by the terms that it agreed to wit the Administration, wherefore it should have undersigned a contract directly with the Department of Labor prior to granting its services. Therefore, dismissal of the captioned case is proper.

In view of the above, we conclude that the Trial Court erred upon determining that Circular Letter 2014-14, supra, allowed the parties to obviate stated explicitly agreed requirement. Likewise, the Appeals Court erred upon ruling that there remained disputed facts to be addressed. The disputed facts adduced by the appellate forum constitute controversies in law, answers to which are found

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                14

in the rulings interpreted herein. Consequently, it erred upon determining that the case needed to be remanded to the primary forum as to elucidate whether the written requirements which **1009** the Labor Department effected, did or did not constitute a purchase order, sine same would not cure the lack of a contract.

## IV

Under tutelage of the herein enunciated grounds, *we revoke the ruling by the Appeals Court and reinstate the ruling by the Trial Court, although due to different grounds.*
*Judgment shall be pronounced thereof.*
Associate Justice, Mrs. Rodriguez-Rodriguez concurred without a written opinion.
Footnotes

1    *Instruction regarding the use of Contract Number 13-01C for Multiple Choice for Security Services to Puerto Rico Government Agencies, Appendix of the Writ certiorari, page 19.*

2    *The previous contract is titled Contract Number 10-7C-227 for Multiple Choice  for Security Services to Puerto Rico Government Agencies, Appendix of the Writ certiorari.*

3    *Judgment, Appendix to Writ of certiorari, page 194.*

4    *On February 15th of 2019, judge Laura Taylor-Swain approved an agreement between Genesis Security Services, Inc. (Genesis) and the Government of Puerto Rico, through which the automatic stay of the case was lifted and continuation of the proceedings was allowed. Eighth Omnibus Order Granting Relief from the Automatic Stay, Appendix to the writ of certiorari page 251.*

5    *From researching the file it is concluded that stated contention is incorrect. From its complaint, Genesis alleged that the Department of Labor & Human Resources (Department of Labor) requested their services in writing. Appendix to the Writ of certiorari, Complaint, page 86. Genesis consequently so reaffirmed it in other documents presented before the judicial forums. See Duplicate to answer opposing motion for request to dismiss, in accordance with R. 10.2 of Civil Procedure, Appendix to the  Writ of certiorari, page 116.*

6    *Recently, the 2011 Puerto Rico General Services Administration Reorganization Plan, Law No. 3-2011 (3 LPRA App. XIX), was repealed by the 2019 General Services Administration Act for Centralizing Government of Puerto Rico purchases, Law No. 73-2019, http://www.oslpr.org/2017–2020/leyes/pdf/ley-73-23-Jul-2019.pdf. Nevertheless, the statute does not show substantial changes with regards to the controversy under our consideration.*

7    *Specifically, the Puerto Rico Department of Labor & Human Resources Enabling Act. Law No. 15 dated April 14th of 1931 (3 LPRA sec. 308a), provides that the Department of Labor is not obligated to do purchases through the Administration.*

8    *The General Services Administration (Administration) as an exception, shall be responsible for issuing purchase orders in the particular cases in which the Administration itself is who directly manages the contract. It is so specified in Circular Letter No. 2014-14, published by the Administration on June 25th, 2014, providing for the following: "[i]n that selection process, the Purchasing Delegate or Deputy Delegate for the petitioning agency or unit may carry out assorted types of purchases, among others, direct purchases against contracts, except against those contracts which the [Administration]". directly manage. (Emphasis in the original). Likewise, Circular Letter No. 2014-14, supra, page 2, specifies the contracts which the  Administration directly managed at the time of the facts under our consideration. Contract Number 13-01C for Multiple Choice for Security Services for Puerto Rico Government Agencies executed between the Administration and Genesis Security, Inc. was not among these.*

9    *Instructions regarding the use of Contract Number 13-01C for Multiple Choice for Security Services to Puerto Rico Government Agencies, Appendix of the Writ certiorari, page 19.*

10   *´Id.*

**Genesis Security Services, Inc. v. Departamento del Trabajo..., 204 D.P.R. 986 (2020)**

2020 TSPR 84

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government
Works.

**EXHIBIT B-2**

204 D.P.R. 986, 2020 WL 5215460 (P.R.), 2020 TSPR 84

Génesis Security Services, Inc., recurrida,
v.
Departamento del Trabajo y Recursos Humanos y Estado Libre Asociado de Puerto Rico, peticionarios.

En El Tribunal Supremo De Puerto Rico.
*Número:* CC-2019-360
*Resuelto:* 18 de agosto de 2020
Aug. 18, 2020

**1. Derecho Constitucional—Disposiciones Generales—En General.**
El Art. VI, Sec. 9, de la Constitución de Puerto Rico, LPRA, Tomo 1, establece que solo se dispondrá de las propiedades y los fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso, por autoridad de ley.

**2. Puerto Rico—Estado Libre Asociado—Bienes, Contratos y Responsabilidades—Autoridad o Poder del ELA para Contratar—Requisitos de los Contratos.**
Todo contrato gubernamental debe cumplir con los requisitos siguientes: (1) reducirse a escrito; (2) mantener un registro que establezca su existencia; (3) remitir una copia a la Oficina del Contralor de Puerto Rico, y (4) acreditar que se realizó y otorgó quince días antes.

**3. Íd.—Íd.—Íd.—Autoridad o Poder del ELA para Comprar.**
La Ley de Contabilidad del Gobierno de Puerto Rico dispone que toda compra o adquisición de bienes o servicios no profesionales realizada por, o a través de, la Administración de Servicios Generales (ASG) estará exenta del proceso en el que el Gobierno de Puerto Rico preinterviene en todas las transacciones financieras de sus dependencias públicas, con el propósito de garantizar su exactitud, corrección, necesidad y legalidad. En consecuencia, el Departamento de Hacienda delegó en la ASG este deber de supervisar y de fiscalizar las transacciones de compra y adquisiciones, según su competencia, de las entidades de la Rama Ejecutiva. **\*987**

**4. Íd.—Íd.—Íd.—Íd.**
La Administración de Servicios Generales (ASG) fue creada con el propósito de centralizar el proceso de compra y adquisición de las entidades de la Rama Ejecutiva. Así, esta tramita las adquisiciones y compras de las agencias públicas, en pro de facilitar, uniformar y agilizar esos procedimientos. En esa encomienda, la ASG funge como un ente negociador y facilitador, y como enlace entre las agencias y suplidores.

**5. Íd.—Íd.—Íd.—Íd.**

El Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011 establece que, de ordinario, todas las entidades y agencias de la Rama Ejecutiva tienen que realizar sus compras a través de la Administración de Servicios Generales (ASG). Sin embargo, hay entidades que no están obligadas a tramitarlas mediante esta última, aunque esto no implica que no pueden beneficiarse de las adquisiciones realizadas por la ASG. Al contrario, esas entidades tienen la opción de acogerse y beneficiarse de forma voluntaria de los sistemas que habrán de desarrollarse para adquirir bienes, servicios profesionales y servicios no profesionales elaborados por la ASG. En esas ocasiones, las entidades compradoras deberán cumplir con la normativa aplicable a los procedimientos ejecutados por la ASG.

6. Íd.—Íd.—Íd.—Íd.
El Reglamento de Adquisición de la Administración de Servicios Generales, Reglamento Núm. 3381 de la Administración de Servicios Generales de 24 de noviembre de 1986, dispone que toda adquisición que haga la Administración de Servicios Generales se realizará mediante alguno de los procedimientos siguientes: (1) subasta formal; (2) subasta informal; (3) mercado abierto, o (4) procedimientos especiales.

7. Íd.—Íd.—Íd.—Íd.—Subastas.
De acuerdo con el Reglamento de Adquisición de la Administración de Servicios Generales, Reglamento Núm. 3381 de la Administración de Servicios Generales de 24 de noviembre de 1986, las subastas formales procederán cuando se adquiera un bien, una obra o un servicio que exceda de $4 000, cuando se trate de una obra de construcción que exceda de $25 000 o de un servicio anexo a esta que exceda de $10 000.

8. Íd.—Íd.—Íd.—Íd.—Íd.
El Reglamento de Subastas de la Administración de Servicios Generales, Reglamento Núm. 3380 de la Administración de Servicios Generales de 24 de noviembre de 1986, provee que la Administración de Servicios Generales (ASG) celebrará las subastas formales en beneficio de las dependencias de la Rama Ejecutiva. Al adjudicar la subasta, se otorgará un contrato entre la ASG y el licitador agraciado (o los licitadores agraciados) con el propósito de cualificar a estos para **988** proveer servicios a cualquier entidad o dependencia de la Rama Ejecutiva.

9. Íd.—Íd.—Íd.—Íd.—Íd.
El Reglamento de Subastas de la Administración de Servicios Generales, Reglamento Núm. 3380 de la Administración de Servicios Generales de 24 de noviembre de 1986, dispone que la oferta del licitador agraciado, en el pliego de la subasta, constituye el contrato entre las partes, y junto a los demás requisitos de forma de los contratos en el Gobierno, constituirán el expediente del contrato, el cual se mantendrá en la Oficina. A ese expediente se le unirán las copias de las órdenes emitidas contra el contrato. Así, se presupone que se emitirán órdenes de compra contra el contrato resultante de la subasta celebrada.

10. Íd.—Íd.—Íd.—Íd.—Íd.

El Reglamento de Adquisición de la Administración de Servicios Generales, Reglamento Núm. 3381 de la Administración de Servicios Generales de 24 de noviembre de 1986, establece que, una vez se celebra una subasta formal y la Administración de Servicios Generales cualifica a un licitador mediante contrato, las entidades gubernamentales interesadas en adquirir los servicios pactados lo harán mediante un mecanismo llamado compra directa contra contrato.

11. Íd.—Íd.—Íd.—Íd.—Íd.

Una *compra directa* consiste en que una agencia pública emite una orden de compra contra el contrato vigente pactado entre la Administración de Servicios Generales y el licitador agraciado. De este modo, se le notifica al licitador agraciado que esa entidad gubernamental utilizará sus servicios.

12. Íd.—Íd.—Íd.—Íd.

El Reglamento de Adquisición de la Administración de Servicios Generales, Reglamento Núm. 3381 de la Administración de Servicios Generales de 24 de noviembre de 1986, provee que los contratos se otorgan como culminación de cualquier procedimiento de adquisición en el Gobierno. Las compras o los requerimientos que contra los contratos se efectúen se harán mediante expedición de órdenes.

13. Íd.—Íd.—Íd.—Íd.

Las compras directas, como norma general, se realizan sin la intervención de la Administración de Servicios Generales, mediante la expedición de una orden de compra contra el contrato vigente. Las personas facultadas para emitir las órdenes de compra son los delegados o subdelegados compradores, quienes son empleados de la entidad gubernamental, autorizados expresamente para ejercer tal responsabilidad. El proceso para emitir las órdenes de compra se discute en la opinión. **\*989**

14. Íd.—Íd.—Íd.—Íd.

La Carta Circular Núm. 2014-14, publicada por la Administración de Servicios Generales el 25 de junio de 2014, explica que la ley orgánica y el Reglamento de Adquisición de la Administración de Servicios Generales, Reglamento Núm. 3381 de la Administración de Servicios Generales de 24 de noviembre de 1986, no requieren, como condición previa al servicio y al posterior pago, que entre la agencia o dependencia peticionaria y suplidor agraciado se otorgue otro contrato. Solo se requiere que la subasta o el procedimiento de adquisición realizado esté vigente y que la agencia o dependencia peticionaria emita una orden de compra contra el contrato de cualificación otorgado entre la Administración de Servicios Generales y el postor agraciado. Cuando la agencia o dependencia peticionaria emite la orden de compra contra el contrato de cualificación, surge la obligación contractual entre la agencia o dependencia peticionaria y el suplidor del bien o servicio.

15. Íd.—Íd.—Íd.—Íd.

La Exposición de Motivos de la Ley de Contratos de Selección Múltiple dispone que, en la

reglamentación de compras de la Administración de Servicios Generales, se establece que los contratos de selección múltiple se otorguen a varios licitadores a la vez, de suerte que las agencias peticionarias expidan las órdenes de compra contra el renglón y licitador que más adecuadamente reúna las especificaciones que ellas requieren. De esta manera, se caracterizó este mecanismo de compra como altamente útil y participativo.

16. Íd.—Íd.—Íd.—Íd.

Los estatutos y reglamentos discutidos en la Opinión no exigen que, luego de la otorgación de un contrato entre la Administración de Servicios Generales y un licitador agraciado, se celebre obligatoriamente un contrato posterior entre la entidad pública y el proveedor del bien o servicio. Al contrario, la normativa aplicable valida expresamente que se emita únicamente una orden de compra con esos propósitos. No obstante, en este procedimiento de adquisición directa mediante emisión de orden de compra, se exige el cumplimiento de ciertas garantías, en miras de proteger el fisco y el interés público.

17. Íd.—Íd.—Íd.—Íd.

Las normas de la Administración de Servicios Generales disponen que toda orden de compra se emita antes de que el licitador agraciado realice los servicios, para así evitar que se contrate retroactivamente. No existe una obligación propiamente entre la entidad gubernamental y el licitador agraciado hasta que se otorgue una orden de compra.

18. Íd.—Íd.—Íd.—Íd.

El pacto voluntario y deliberado de exigir más requisitos de los dispuestos por los estatutos y reglamentos de la Administración de Servicios Generales no es ilegal, inmoral ni contrario al orden público. Ciertamente, las normas no exigen el otorgamiento de un contrato **\*990** entre la entidad gubernamental y el licitador agraciado. Sin embargo, esto no impide que las partes pacten protecciones adicionales con el propósito de promover la administración más eficiente y ética de los fondos públicos.

**Synopsis**

Recurso de *Certiorari* de una Sentencia de *Migdalia Fraticelli Torres, Juan R. Hernández Sánchez* y *Misael Ramos Torres*, Js. del Tribunal de Apelaciones, que revocó la emitida por el Tribunal de Primera Instancia al sostener que el foro primario no tuvo ante sí todos los hechos necesarios para adjudicar la controversia. Particularmente, resolvió que subsistían varias controversias de hecho que impedían la desestimación sumaria del pleito. *Se revoca la determinación del Tribunal de Apelaciones y se reinstala el dictamen del Tribunal de Primera Instancia, aunque por fundamentos distintos.*

*Isaías Sánchez Báez*, procurador general, y *Eric. O. de la Cruz Iglesias*, procurador general

auxiliar, abogados de la parte peticionaria; *Irma E. Castro Dieppa*, de *Castro Dieppa Law Offices, PSC*, abogada de la parte recurrida.


El Juez Asociado Señor Estrella Martínez emitió la opinión del Tribunal.

**\*1** En múltiples ocasiones, este Tribunal ha tenido la necesidad de pautar en torno a diversas controversias relacionadas con la contratación gubernamental ordinaria, donde típicamente una entidad gubernamental y un suplidor suscriben directamente un contrato. En esta ocasión nos enfrentamos a una modalidad contractual distinta, en la cual la Administración de Servicios Generales celebra una subasta y suscribe un contrato de selección múltiple con distintos licitadores cualificados, los cuales eventualmente pueden ser seleccionados como contratistas por diversas entidades del Gobierno de Puerto Rico. Con ello en mente, procede pautar si nuestro ordenamiento jurídico requiere algún procedimiento formal ulterior al contrato de selección múltiple, a saber: una orden de compra o un contrato directo entre la agencia pública y el contratista. Veamos. **\*991**


# I

El 23 de diciembre de 2015, la corporación Génesis Security Services, Inc. (Génesis) presentó una demanda de cobro de dinero contra el Departamento del Trabajo y Recursos Humanos (Departamento del Trabajo) y el Gobierno de Puerto Rico. Génesis alegó que durante los últimos doce años había obtenido la buena pro en una subasta de servicios de vigilancia celebrada por la Administración de Servicios Generales (Administración). A raíz de lo anterior, explicó que Génesis y la Administración otorgaron un contrato titulado Contrato Número 13-01C de Selección Múltiple para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico (Contrato de Selección Múltiple). Expresó que en este se cualificó a Génesis y a otros licitadores agraciados a rendir servicios de vigilancia a entidades del Gobierno de Puerto Rico. El contrato estuvo vigente desde el 25 de septiembre de 2012 hasta el 24 de septiembre de 2015.

Génesis indicó que, en virtud del Contrato de Selección Múltiple, el Departamento del Trabajo utilizó sus servicios de vigilancia durante aproximadamente doce años. Sin embargo, alegó que el Departamento del Trabajo no emitió pago alguno por los servicios provistos por Génesis durante el año fiscal 2013–2014. Ello, a pesar de que el Departamento del Trabajo regularmente solicitaba sus servicios por escrito y de que Génesis los facturó adecuadamente.

No obstante, Génesis reconoció que no suscribió un contrato directamente con el Departamento del Trabajo para el año en controversia. A esos fines adujo que ello fue innecesario debido a que la legislación, los reglamentos y las cartas circulares aplicables no lo requerían. Génesis indicó que la Administración fue creada para centralizar el procedimiento de las compras gubernamentales y que los contratos de selección múltiple permitían agilizar y facilitar **\*992** ese

proceso. Por lo tanto, sostuvo que del derecho aplicable se desprendía que, una vez la Administración celebra un contrato para cualificar a ciertos licitadores agraciados para proveer servicios al Gobierno, las agencias interesadas en utilizarlos solo debían emitir una orden de compra con ese propósito. A raíz de lo anterior, señaló que no estaba obligada a celebrar un segundo contrato directamente con el Departamento del Trabajo.

Debido a lo anterior, Génesis solicitó al Tribunal de Primera Instancia que ordenara al Departamento del Trabajo a emitir la orden de compra correspondiente y que pagara por los servicios rendidos. Sostuvo que la deuda del Departamento del Trabajo ascendía a $1 798 000.34, más $43 186.75 en intereses acumulados.

Por su parte, el Departamento del Trabajo solicitó la desestimación de la demanda, pues alegó que no expuso una reclamación que justificara la concesión de un remedio. Así, arguyó que el Contrato de Selección Múltiple celebrado entre la Administración y Génesis no obligaba al Departamento del Trabajo. Asimismo, señaló que Génesis y el Departamento del Trabajo no suscribieron un contrato entre ellos durante el año fiscal 2013–2014. En consideración a la doctrina de contratación gubernamental, el Departamento del Trabajo aseveró que no se podía validar el reclamo de Génesis. Por lo tanto, concluyó que Génesis erró al continuar proveyendo sus servicios sin la celebración de un segundo contrato.

Ante ello, Génesis se opuso y alegó que una desestimación en esa etapa era improcedente. Adujo que aún no se había presentado la prueba necesaria para aquilatar las controversias de hecho del caso y que, de darse por ciertas las alegaciones de la demanda, esta tenía derecho a un remedio. De igual modo, Génesis reiteró que el Departamento del Trabajo solicitó sus servicios, en virtud del Contrato de Selección Múltiple, por lo que era innecesaria la celebración de un segundo contrato. **\*993**

Sin embargo, Génesis anejó a su moción una copia del Contrato de Selección Múltiple. En este se especificaba que toda entidad gubernamental, interesada en adquirir los servicios de Génesis o de cualquier otra compañía de vigilancia, debía suscribir un segundo contrato directamente con los licitadores agraciados. Según el Contrato de Selección Múltiple: "[*l*]*as agencias perfeccionarán un contrato con la Compañía de Vigilancia seleccionada*, este proceso es lo que dará inicio a la vigencia del contrato entre el contratista y la agencia peticionaria". (Énfasis en el original).[1] Además, Génesis anejó una copia de otro contrato de selección múltiple pactado entre la Administración y Génesis, el cual estuvo vigente durante los tres años anteriores al Contrato de Selección Múltiple ante nuestra consideración. En ese contrato anterior, las partes se obligaron a los mismos términos y condiciones que en el Contrato de Selección Múltiple que nos ocupa, incluyendo el requerimiento de otorgar un segundo contrato directamente entre la entidad gubernamental y el licitador agraciado.[2]

Por otro lado, el Departamento del Trabajo presentó una réplica en la cual reiteró la obligatoriedad de la celebración de un segundo contrato. Particularmente sostuvo que los principios de contratación gubernamental impedían el reconocimiento retroactivo de una obligación que no se redujo a escrito. Al igual que Génesis, anejó a su moción el Contrato de Selección Múltiple.

Por su parte, Génesis presentó una dúplica en la cual alegó que no había controversia sobre la existencia de un contrato válido, vigente y vinculante, pues el Contrato de Selección Múltiple

cumplió con todos los requisitos de contratación gubernamental. Destacó que el Departamento del Trabajo solicitó y recibió los servicios de Génesis por **994** muchos años en virtud de ese contrato. Por lo tanto, señaló que el Departamento del Trabajo conocía que el derecho aplicable solo exigía que se emitiera una orden de compra. Según Génesis, una orden de compra era un documento administrativo e interno de las agencias gubernamentales que no era un requisito previo a la contratación. A raíz de ello, alegó que no había impedimento alguno para que el Departamento del Trabajo emitiera una orden de compra para que procediera el pago por los servicios provistos en el año fiscal 2013–2014. Debido a lo anterior, solicitó que el foro primario denegara la moción de desestimación.

Ante este cuadro, el Tribunal de Primera Instancia atendió la moción de desestimación presentada por el Departamento del Trabajo como una solicitud de sentencia sumaria. Ello, pues concluyó que el Departamento del Trabajo presentó materias no contenidas en la alegación impugnada con evidencia suficiente para apoyarlas. A través de ese estándar, el foro primario desestimó la demanda, aunque por fundamentos distintos a los presentados por las partes.

Específicamente, el Tribunal de Primera Instancia reconoció que el Contrato de Selección Múltiple disponía que las agencias interesadas en utilizar los servicios de las compañías de vigilancia cualificadas por la Administración debían otorgar un contrato directo con el licitador agraciado. Sin embargo, determinó que la Carta Circular Núm. 2014-14, emitida por la Administración con posterioridad a la celebración del Contrato de Selección Múltiple, precisaba que ello era innecesario. En consecuencia, resolvió que, una vez la Administración adjudicó la subasta a favor de Génesis y suscribió un contrato con esta, el Departamento del Trabajo no tenía que suscribir un contrato directamente con Génesis. Ahora bien, el foro primario determinó que, a pesar de que un segundo contrato era innecesario, el derecho aplicable sí exigía que el Departamento del Trabajo emitiera una orden de compra. El Tribunal de Primera Instancia interpretó que, mediante una **995** orden de compra, nacía propiamente una obligación entre el Departamento del Trabajo y Génesis. Debido a que el Departamento del Trabajo no emitió una orden de compra a esos fines, resolvió que no procedía el desembolso de los fondos solicitados por Génesis. Además, el foro primario concluyó que el Departamento del Trabajo no podía emitir una orden de compra en esa etapa, pues constituiría una obligación retroactiva contraria a las normas de contratación gubernamental. A la luz de esos fundamentos, el Tribunal de Primera Instancia desestimó la demanda presentada por Génesis.

Insatisfecha, Génesis acudió al Tribunal de Apelaciones mediante un recurso de apelación. En este, Génesis arguyó que el foro primario erró al determinar que una orden de compra era un requisito constitutivo de los contratos gubernamentales. En esa línea insistió en que las órdenes de compra eran documentos internos de las agencias que eran innecesarios para la exigibilidad de una obligación. En la alternativa, reiteró que el Departamento del Trabajo solicitó consecuentemente por escrito los servicios de Génesis. A raíz de ello, arguyó que no se debió desestimar la demanda en esa etapa, pues restaba pasar prueba en torno a esos requerimientos para determinar si estos constituían una orden de compra, conforme al derecho aplicable.

Por otra parte, el Departamento del Trabajo se opuso y arguyó que el foro primario actuó correctamente al desestimar sumariamente el pleito. Ello, pues no había controversia en torno al Contrato de Selección Múltiple, a los servicios provistos por Génesis durante el año fiscal

2013–2014 y a la inexistencia de una orden de compra emitida a esos fines. Debido a lo anterior, alegó que Génesis no tenía derecho a remedio alguno, pues no se podía emitir retroactivamente una orden de compra.

Ponderados los argumentos de las partes, el Tribunal de Apelaciones revocó la sentencia del Tribunal de Primera Instancia. En esencia, el foro apelativo sostuvo que el foro **\*996** primario no tuvo ante sí todos los hechos necesarios para adjudicar la controversia. Particularmente, resolvió que subsistían las controversias de hecho siguientes que impedían la desestimación sumaria del pleito: ¿administra o no la Administración el Contrato de Selección Múltiple?; ¿qué efecto tiene la Carta Circular emitida en el último mes del año fiscal 2013–2014 sobre la prestación de servicios de Génesis durante ese mismo período?; ¿en qué consiste la referida orden de compra: es un formulario unilateral o bilateral?; ¿la orden constituye un requisito formal de la contratación gubernamental, capaz de frustrar una reclamación de cobro de dinero?; ¿es un mecanismo interno para fines de controles fiscales?; ¿es subsanable su incumplimiento?[3] Ante este dictamen, el Departamento del Trabajo presentó una moción de reconsideración, la cual el foro apelativo declaró *no ha lugar.*

Luego de varios trámites relacionados a la paralización automática del pleito en virtud de la *Puerto Rico Oversight, Management, and Economic Stability Act*, 48 USC sec. 2101 *et seq.*, que son innecesarios reseñar extensamente, el Departamento del Trabajo comparece ante este Tribunal mediante un recurso de *certiorari.*[4] En esencia, arguye que, ante la falta de una controversia real y material de hechos, el Tribunal de Apelaciones debió revisar las conclusiones de derecho del Tribunal de Primera Instancia. Además, impugnó que el Tribunal de Apelaciones considerara que se debía pasar prueba sobre los requerimientos escritos que alegadamente hizo, en solicitud de los servicios de Génesis. Ello, pues alegó que Génesis presentó ese argumento por primera vez a nivel apelativo.[5] **\*997**

Por su parte, comparece Génesis y reitera los argumentos elaborados ante los foros recurridos. A su vez, arguye que la moción de desestimación presentada por el Departamento del Trabajo no se debió adjudicar conforme al estándar de sentencia sumaria.

El 28 de junio de 2019, el Pleno de este Tribunal acordó expedir el recurso ante nuestra consideración. Con el beneficio de la comparecencia de las partes, este Tribunal procede a resolver la controversia ante nos.

# II

**[1]** A. La Constitución de Puerto Rico establece que "[so]lo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Art. VI, Sec. 9, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 444. En virtud de este mandato constitucional, hemos sido consecuentes al exigir el manejo ético y apropiado de los fondos públicos. *Vicar Builders v. ELA et al.*, 192 DPR 256 (2015); *Rodríguez Ramos et al. v. ELA et al.*, 190 DPR 448 (2014); *Jaap Corp. v. Depto. Estado et al.*, 187 DPR 730 (2013). Ello, en miras de que "[l]a buena administración de

un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa". *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 DPR 864, 871 (1990).

A esos fines, la Asamblea Legislativa ha desarrollado un andamiaje de distintos estatutos que tienen como propósito garantizar el control fiscal y regular la contratación **\*998** gubernamental. *Vicar Builders v. ELA et al.*, supra, pág. 262. De igual modo, este Tribunal ha afinado los preceptos de una sana administración pública mediante nuestra jurisprudencia. *Jaap Corp. v. Depto. Estado et al.*, supra, pág. 741. En consecuencia, la facultad del Gobierno de Puerto Rico y de sus entidades para contratar y comprometer fondos públicos está limitada por estas normas.

**[2]** A la luz de lo anterior, hemos determinado que todo contrato gubernamental debe cumplir con los requisitos siguientes: (1) reducirse a escrito; (2) mantener un registro que establezca su existencia; (3) remitir copia a la Oficina del Contralor de Puerto Rico, y (4) acreditar que se realizó y otorgó quince días antes. *ALCO Corp. v. Mun. de Toa Alta*, 183 DPR 530, 537 (2011); *Ocasio v. Alcalde Mun. de Maunabo*, 121 DPR 37, 54 (1988). Los contratos gubernamentales deben cumplir rigurosamente con cada una de estas exigencias, "ya que sirven como mecanismo de cotejo para perpetuar circunstancial y cronológicamente esos contratos y, así, evitar pagos y reclamaciones fraudulentas". *Vicar Builders v. ELA et al.*, supra, pág. 264.

**[3]** Por otra parte, como norma general, el Departamento de Hacienda de Puerto Rico (Departamento de Hacienda) tiene la responsabilidad de diseñar y administrar los sistemas de contabilidad y los procedimientos de pago e ingresos de las dependencias y entidades gubernamentales. Ley de Contabilidad del Gobierno de Puerto Rico, Ley Núm. 230 de 23 de julio de 1974 (3 LPRA sec. 283 *et seq.*). En el ejercicio de estas funciones, el Gobierno de Puerto Rico preinterviene en todas las transacciones financieras de sus dependencias públicas, con el propósito de garantizar su exactitud, corrección, necesidad y legalidad. 3 LPRA sec. 283e. No obstante, ello no aplica a la Administración. Expresamente, se dispone en tal estatuto que "toda compra o adquisición de bienes o servicios no profesionales realizada por o a través de la Administración de Servicios Generales estará **\*999** exenta de este proceso". 3 LPRA sec. 283e(b). En consecuencia, el Departamento de Hacienda delegó en la Administración este deber de supervisar y de fiscalizar las transacciones de compra y adquisiciones, bajo su competencia, de las entidades de la Rama Ejecutiva.

**[4]** B. La Administración fue creada con el propósito de centralizar el proceso de compra y adquisición de las entidades de la Rama Ejecutiva. Art. 2 del Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011, Ley Núm. 3-2011 (3 LPRA Ap. XIX).[6] Ello, pues "se encontró que en la actualidad la mayoría de las agencias realizan sus compras de forma separada lo cual implica que hay una duplicidad en las funciones". Informe positivo sobre Plan de Reorganización Núm. 11 Administración de Servicios Generales, Comisión de Gobierno, Cámara de Representantes, 24 de junio de 2011, 5ta Sesión Ordinaria, 16ta Asamblea Legislativa, pág. 3. A la luz de lo anterior, se determinó que la Administración tramitaría las adquisiciones y compras de las agencias públicas, en pro de facilitar, uniformar y agilizar esos procedimientos. En esa encomienda, la Administración funge como "un ente negociador y facilitador, y como enlace entre las agencias y suplidores". 3 LPRA Ap. XIX, Art.

22.

**[5]** El Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011 establece que, de ordinario, todas las entidades y agencias de la Rama Ejecutiva tienen que realizar sus compras a través de la Administración. 3 LPRA Ap. XIX, Arts. 3 y 26. No obstante, hay entidades particulares que no están obligadas a tramitarlas **\*1000** a través de la Administración.[7] Ahora bien, ello no implica que esas agencias exentas de la Rama Ejecutiva y las demás entidades gubernamentales no pueden beneficiarse de las adquisiciones realizadas por la Administración. Al contrario, tienen "la opción de acogerse y beneficiarse de forma voluntaria de los sistemas que habrán de desarrollarse para adquirir bienes, servicios profesionales y servicios no profesionales" elaborados por la Administración. 3 LPRA Ap. XIX, Art. 3. En esas ocasiones, las entidades compradoras deberán cumplir con la normativa aplicable a los procedimientos ejecutados por la Administración.

**[6–7]** De igual modo, la Asamblea Legislativa le delegó expresamente a la Administración la responsabilidad de establecer, mediante reglamento, las normas y los mecanismos necesarios para efectuar las compras y adquisiciones. 3 LPRA Ap. XIX, Art. 23. El Reglamento de Adquisión de la Administración de Servicios Generales, Reglamento Núm. 3381, Administración de Servicios Generales, 24 de noviembre de 1986, (Reglamento de Adquisición), dispone que toda adquisición que haga la Administración se realizará mediante alguno de los procedimientos siguientes: (1) subasta formal; (2) subasta informal; (3) mercado abierto, o (4) procedimientos especiales. Íd., Art. 64. En el caso de las subastas formales, que es el procedimiento que nos ocupa, estas procederán cuando se adquiera un bien, una obra o un servicio que exceda de $4 000, cuando se trate de una obra de construcción que exceda de $25 000 o de un servicio anexo a esta que exceda de $10 000. Íd., Art. 65.

**[8]** El Reglamento de Subastas de la Administración de Servicios Generales, Reglamento Núm. 3380, Administración de Servicios Generales, 24 de noviembre de 1986 **\*1001** (Reglamento de Subastas), provee que la Administración celebrará las subastas formales en beneficio de las dependencias de la Rama Ejecutiva. Íd., Art. 3. En esa tarea, la Administración publicará un pliego de subasta, en el cual se expondrán las condiciones y especificaciones que los licitadores interesados deberán cumplir. Íd., Art. 32. Al adjudicar la subasta, se otorgará un contrato entre la Administración y el licitador agraciado o los licitadores agraciados, con el propósito de cualificar a éstos para proveer servicios a cualquier entidad o dependencia de la Rama Ejecutiva. Íd., Art. 75.

**[9]** A esos fines, el Art. 75(4) del Reglamento de Subastas, *supra*, pág. 91, dispone lo siguiente:
> La oferta del licitador agraciado, en el pliego de la subasta[,] constituye el contrato entre las partes y junto a los demás requisitos de forma de los contratos en el Gobierno constituirán el expediente del contrato, el cual se mantendrá en la Oficina. A dicho expediente se le unirán las *copias de las órdenes emitidas contra dicho contrato*. Por cada licitador agraciado, habrá un expediente de contrato. (Énfasis suplido).

Como puede apreciarse, se presupone que se emitirán órdenes de compra contra el contrato resultante de la subasta celebrada. Abundemos, pues, sobre el concepto órdenes de compra contra contrato. Veamos.

**[10–12]** El Art. 69 del Reglamento de Adquisición, *supra*, pág. 85, establece que, una vez se

celebra una subasta formal y la Administración cualifica a un licitador mediante contrato, las entidades gubernamentales interesadas en adquirir los servicios pactados lo harán mediante un mecanismo llamado "compra directa contra contrato". En esencia, una compra directa consiste en que una agencia pública emite "*una orden de compra contra el contrato vigente*" pactado entre la Administración y el licitador agraciado. (Énfasis suplido). Id. De este modo, se le notifica al licitador agraciado que esa entidad gubernamental utilizará sus servicios. Así lo reitera el Art. 87 del Reglamento **\*1002** de Adquisición, *supra*, pág. 107, el cual provee que "[l]os contratos se otorgan como culminación de cualquier procedimiento de adquisición en el Gobierno. *Las compras o requerimientos que contra ellos se efectúen se harán mediante expedición de órdenes*". (Énfasis suplido).

[13] Las compras directas, como norma general, "se hacen *directamente sin la intervención de la Administración*, mediante la expedición de una orden de compra contra el contrato vigente".[8] (Énfasis suplido). Art. 69(2) del Reglamento de Adquisición, *supra*, pág. 85. Este Reglamento precisa que las personas facultadas para emitir las referidas órdenes de compra son los llamados delegados o subdelegados compradores, quienes son empleados de la entidad gubernamental autorizados expresamente para ejercer tal responsabilidad. Id. Véase, también, Reglamento de Delegados Compradores de la Administración de Servicios Generales, Reglamento Núm. 3383, Administración de Servicios Generales, 24 de noviembre de 1986 (Reglamento de Delegados Compradores).

Antes de emitir cualquier orden de compra con estos propósitos, los delegados o subdelegados compradores tienen la responsabilidad de corroborar que la agencia cuente con los fondos necesarios para ello. Art. 32 del Reglamento de Delegados Compradores, *supra*, págs. 30–31. Las órdenes de compra "se emiten utilizando el formulario provisto para ello, asegurándose de cumplimentarlo completo y **\*1003** adecuadamente, conteniendo las especificaciones, condiciones, términos, certificación de fondos y demás información necesaria". Art. 69(5) del Reglamento de Adquisición, *supra*, pág. 86. Una vez suscrita la orden de compra, se dirige al licitador agraciado y se notifica al receptor oficial de la agencia, al encargado de la propiedad, al delegado o subdelegado comprador, al jefe de finanzas de la agencia, al Departamento de Hacienda y a la Administración. Art. 69 del Reglamento de Adquisición, *supra*; Art. 33 del Reglamento de Delegados Compradores, *supra*.

[14] El esquema descrito se resume acertadamente en la Carta Circular Núm. 2014-14, publicada por la Administración el 25 de junio de 2014, págs. 2–3, del modo siguiente:

> Como vemos, una vez la Junta de Subastas emite su Aviso de Adjudicación, la [Administración] procede a suscribir el contrato de cualificación con los diversos licitadores agraciados en la subasta o procedimiento de que se trate y la agencia, corporación pública o municipio que desee beneficiarse de los precios y condiciones licitados en la subasta selecciona, de entre los licitadores agraciados, a aquél que mejor supla sus necesidades particulares.
>
> En ese proceso de selección, el Delegado o Subdelegado Comprador de la agencia o dependencia peticionaria puede realizar diversos tipos de compras, entre otras, compras directas contra contratos [...] El contrato vigente es aquel contrato de cualificación que se formaliza entre la [Administración] y el postor agraciado. La referida orden de compra se

emite utilizando el formulario provisto para ello, asegurándose el Delegado o Subdelegado Comprador de cumplimentarla completa y adecuadamente. Ésta debe contener, entre otras cosas, las especificaciones del bien a adquirirse, el precio, los términos de la entrega, condiciones, certificación de fondos y debe estar firmada por los funcionarios autorizados.

Conforme a lo señalado, la adquisición de bienes y servicios no profesionales, a través de las subastas y demás mecanismos realizados por la [Administración], se tramitan por conducto de órdenes de compra. *Nuestra ley orgánica y el Reglamento de Adquisición, supra, no requieren, como condición previa al servicio y al posterior pago, que entre la agencia o dependencia peticionaria y suplidor agraciado se otorgue otro* **\*1004** *contrato. Sólo se requiere que la subasta o el procedimiento de adquisición realizado esté vigente y que la agencia o dependencia peticionaria emita una orden de compra contra el contrato de cualificación otorgado entre la* [*Administración*] *y el postor agraciado.* Una vez la agencia o dependencia peticionaria emite la orden de compra contra el contrato de cualificación es que nace la obligación contractual entre la agencia o dependencia peticionaria y el suplidor del bien o servicio. (Énfasis en el original suprimido, énfasis suplido y escolio omitido).

[15] Asimismo, este andamiaje ha sido aprobado y validado directamente por la Asamblea Legislativa. El Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011, *supra*, provee que todo procedimiento de adquisición y compra tiene que cumplir con una serie de estatutos, entre estos, la Ley de Contratos de Selección Múltiple en los Procesos de Compras, Ley Núm. 253-2006 (3 LPRA sec. 8661 *et seq.*). Esta ley, en su Exposición de Motivos, validó lo siguiente:

> [...] En la reglamentación de compras de la Administración de Servicios Generales, se dispone que los contratos de selección múltiple se otorguen a varios licitadores a la vez, de suerte que las agencias peticionarias expidan las órdenes de compra contra el renglón y licitador que más adecuadamente reúna las especificaciones requeridas por parte de ellas. 2006 (Parte 2) Leyes de Puerto Rico 1317.

Así, se caracterizó este mecanismo de compra como "altamente útil y participativ[o]". ´Id.

En consideración al marco jurídico enunciado, procedemos a resolver la controversia ante nos.


### III

Como cuestión de umbral, debemos resolver si, una vez la Administración cualifica a un licitador agraciado para proveer bienes o servicios al Gobierno de Puerto Rico mediante contrato, las entidades gubernamentales interesadas en recibirlos están obligadas a celebrar un segundo **\*1005** contrato directamente con el licitador o si basta con emitir una orden de compra con ese propósito. Veamos.

Como expusimos, la Administración es la entidad responsable de tramitar las compras y las adquisiciones de las entidades de la Rama Ejecutiva. Para ello, la Administración podrá tramitar la adquisición de bienes o servicios de distintas maneras, entre ellas, mediante el procedimiento de subasta formal. Art. 64 del Reglamento de Adquisición, *supra*. Luego de que la

Administración adjudica una subasta y otorga un contrato con el licitador o licitadores agraciados, las agencias públicas pueden beneficiarse de los servicios cualificados a través de un procedimiento de "compras directas contra contrato". Íd., Art. 69, pág. 85. La compra directa contra contrato es, precisamente, la emisión de una orden de compra mediante la cual la dependencia gubernamental solicita los bienes o servicios al licitador agraciado.

[16] En consecuencia, como puede apreciarse, los estatutos y reglamentos reseñados *no* exigen que, luego de la otorgación de un contrato entre la Administración y un licitador agraciado, se celebre *obligatoriamente* un contrato posterior entre la entidad pública y el proveedor del bien o servicio. Al contrario, la normativa aplicable valida expresamente que se emita únicamente una orden de compra con esos propósitos.

No obstante, es menester destacar que, en este procedimiento de adquisición directa mediante la emisión de una orden de compra, se exige el cumplimiento de ciertas garantías, en miras de proteger el fisco y el interés público. Por ejemplo, en estos casos, es imprescindible que exista un contrato válido y exigible entre la Administración y el licitador agraciado que cumpla con todos los requisitos de contratación gubernamental de nuestro ordenamiento. Así lo exige el Art. 69 del Reglamento de Adquisición, *supra*, el cual provee que las compras directas, mediante órdenes de compra, solo proceden en los casos que tienen un contrato vigente entre la Administración y el licitador agraciado. De **\*1006** igual modo, el Art. 36 del Reglamento de Delegados Compradores, *supra*, prohíbe que los delegados o subdelegados compradores suscriban órdenes de compra previo a la formalización de un contrato. Por lo tanto, la normativa descrita no valida que las dependencias gubernamentales emitan órdenes de compra en un vacío. Ello laceraría los firmes principios de sana administración pública reiterados consecuentemente por este Tribunal.

[17] De igual modo, las normas de la Administración contemplan que toda orden de compra a estos fines se emita *antes* de que el licitador agraciado realice los servicios, para así evitar que se contrate retroactivamente. Debido a lo anterior, no existe una obligación propiamente entre la entidad gubernamental y el licitador agraciado hasta que se otorgue una orden de compra. Tal como se expone en la Carta Circular 2014-14, *supra*, pág. 3: "[u]na vez la agencia o dependencia peticionaria *emite la orden de compra* contra el contrato de cualificación *es que nace la obligación contractual* entre la agencia o dependencia peticionaria y el suplidor del bien o servicio". (Énfasis suplido). Mediante esta norma, se promueve un mayor control fiscal en el desembolso de fondos públicos por parte de las agencias gubernamentales. Además, lo anterior es cónsono con el principio básico de nuestro ordenamiento que prohíbe todo intento de contratación retroactiva en el ámbito gubernamental. *Jaap Corp. v. Depto. Estado et al.*, supra, pág. 748.

Ahora bien, en el caso ante nuestra consideración, las partes pactaron protecciones adicionales a las contempladas por las normas de la Administración. Como expusimos, en el Contrato de Selección Múltiple otorgado entre la Administración y Génesis, las partes acordaron que "[*l*]*as agencias perfeccionarán un contrato con la Compañía de Vigilancia seleccionada, este proceso es lo que dará inicio a la vigencia del contrato entre el contratista y la agencia **\*1007** peticionaria". (Énfasis en el original).⁹ De igual modo, el contrato especifica que "[*t*]*an pronto este proceso* [*s*]*e formalice, los Delegados o Subdelegados Compradores podrá*[*n*] *emitir orden*

*de compra*". (Énfasis suplido).[10] De hecho, Génesis presentó ante los foros primarios una copia del contrato que estuvo vigente antes que el Contrato de Selección Múltiple, mediante el cual la Administración y Génesis acordaron, de igual forma, que toda agencia interesada en obtener los servicios de Génesis tendría que celebrar un contrato directamente con esta.

Así, se concluye que Génesis pactó expresamente, en más de una ocasión, que las entidades gubernamentales interesadas en obtener sus servicios de vigilancia tendrían que celebrar un contrato con esta. Más aún, el Contrato de Selección Múltiple especifica que la otorgación de ese contrato es necesaria para la posterior emisión de una orden de compra. Por lo tanto, a pesar de que la Administración y Génesis no estaban obligados a ello, estas *voluntariamente* acordaron que las dependencias gubernamentales interesadas en los servicios de Génesis tendrían que otorgar un contrato directamente con esta.

[18] Este pacto voluntario y deliberado de exigir más requisitos de los contemplados por los estatutos y reglamentos de la Administración no es ilegal, inmoral ni contrario al orden público. Ciertamente, las normas promovidas por la Administración no exigen el otorgamiento de un contrato entre la entidad gubernamental y el licitador agraciado. Sin embargo, ello no es óbice para que las partes pacten protecciones adicionales, con el propósito de promover la administración más eficiente y ética de los fondos públicos. Ello es cónsono con nuestros pronunciamientos en torno a la contratación gubernamental. Así lo reconoce, **\*1008** de igual modo, la Carta Circular 2014-14, *supra*, pág. 3, al explicar lo siguiente:

> A pesar de lo señalado, la agencia o dependencia peticionaria puede, y siempre ha sido nuestra recomendación, formalizar un Acuerdo en el que se haga referencia a los términos y condiciones esenciales de la subasta o del proceso llevado a cabo y en el que se convengan los términos particulares de la contratación, es decir, el detalle de la necesidad de los servicios requeridos por dicha agencia o dependencia peticionaria.

Como puede apreciarse, la propia Administración sugiere otros mecanismos, más allá de los contemplados en su normativa, para garantizar una sana administración pública.

En fin, debemos tener presente que todo contrato con el Gobierno de Puerto Rico está revestido de interés público. Por lo tanto, como mínimo, debemos exigir que las partes en un contrato gubernamental cumplan con los términos y las condiciones pactadas. Más aún, cuando el acuerdo tiene implicaciones en los fondos públicos. En consecuencia, a la luz de los fundamentos expuestos, resulta forzoso concluir que Génesis estaba obligada por los términos que pactó con la Administración, por lo que debió suscribir un contrato directamente con el Departamento del Trabajo previo a la concesión de sus servicios. Así, procede la desestimación del caso de epígrafe.

En virtud de lo anterior, concluimos que el Tribunal de Primera Instancia erró al determinar que la Carta Circular 2014-14, *supra*, permitía que las partes obviaran tal requisito expresamente pactado. De igual modo, el Tribunal de Apelaciones erró al resolver que restaban controversias de hecho que atender. Las controversias de hecho aducidas por el foro apelativo constituyen controversias de derecho, cuyas respuestas se encontraban en la normativa aquí interpretada. En consecuencia, erró al determinar que se debía devolver el caso al foro primario para dilucidar si los requerimientos por escrito que realizó el **\*1009** Departamento del Trabajo constituyen o no una orden de compra, pues ello no subsanaría la falta de un contrato.

# IV

Al amparo de los fundamentos enunciados, *revocamos la determinación del Tribunal de Apelaciones y reinstalamos el dictamen del Tribunal de Primera Instancia, aunque por fundamentos distintos.*
*Se dictará sentencia en conformidad.*
La Juez Asociada Señora Rodríguez Rodríguez concurrió sin opinión escrita.

## Footnotes

[1]  Instrucciones sobre uso del Contrato Número 13-01C de Selección Múltiples para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico, Apéndice del Recurso de *certiorari*, pág. 19.

[2]  El contrato anterior se titula Contrato Número 10-7C-227 de Selección Múltiple para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico.

[3]  Sentencia, Apéndice del Recurso de *certiorari*, pág. 194.

[4]  El 15 de febrero de 2019, la jueza Laura Taylor Swain aprobó un acuerdo entre Génesis Security Services, Inc. (Génesis) y el Gobierno de Puerto Rico, mediante el cual se levantó la paralización automática del pleito y se permitió la continuación de los procedimientos. Eighth Omnibus Order Granting Relief from the Automatic Stay, Apéndice del Recurso de *certiorari* pág. 251.

[5]  De un estudio del expediente se concluye que tal contención es incorrecta. Desde la demanda, Génesis alegó que el Departamento del Trabajo y Recursos Humanos (Departamento del Trabajo) solicitó los servicios de esta por escrito. Apéndice del Recurso de *certiorari*, Demanda, pág. 86. Así lo reiteró Génesis consecuentemente en otros documentos presentados ante los foros judiciales. Véase Dúplica a réplica a oposición a moción en solicitud de desestimación a tenor de la R. 10.2 de Procedimiento Civil, Apéndice del Recurso de *certiorari*, pág. 116.

[6]  Recientemente, el Plan de Reorganización de la Administración de Servicios Generales de Puerto Rico de 2011, Ley Núm. 3-2011 (3 LPRA Ap. XIX), fue derogado por la Ley de la Administración de Servicios Generales para la Centralización de las compras del Gobierno de Puerto Rico de 2019, Ley Núm. 73-2019, http://www.oslpr.org/2017–2020/leyes/pdf/ley-73-23-Jul-2019.pdf. Sin embargo, el estatuto no presenta cambios sustanciales en torno a la controversia ante nuestra consideración.

[7]  Específicamente, la Ley Orgánica del Departamento del Trabajo y Recursos Humanos de Puerto Rico, Ley Núm. 15 de 14 de abril de 1931 (3 LPRA sec. 308a), dispone que el Departamento del Trabajo no está obligado a realizar sus compras a través de la Administración.

[8]  A modo de excepción, la Administración de Servicios Generales (Administración) tendrá la responsabilidad de emitir órdenes de compra en los casos particulares en los que la propia Administración es quien maneja directamente el contrato. Así se especifica en la Carta Circular Núm. 2014-14, publicada por la Administración el 25 de junio de 2014, al proveer lo siguiente: "[e]n ese proceso de selección, el Delegado o Subdelegado Comprador de la agencia o dependencia peticionaria puede realizar diversos tipos de compras, entre otras, compras directas contra contratos, *excepto aquellos contratos que administra directamente la* [*Administración*]". (Énfasis en el original). De igual modo, la Carta Circular Núm. 2014-14, *supra*, pág. 2, especifica los contratos que la Administración manejaba directamente al momento de los hechos ante nuestra consideración. El Contrato Número 13-01C de Selección Múltiple para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico otorgado entre la Administración y Génesis Security, Inc. *no* se encontraba entre estos.

[9]  Instrucciones sobre uso del Contrato Número 13-01C de Selección Múltiples para el Servicio de Vigilancia para las Agencias del Gobierno de Puerto Rico, Apéndice del Recurso de *certiorari*, pág. 19.

[10]  Id.

**Genesis Security Services, Inc. v. Departamento del Trabajo..., 204 D.P.R. 986 (2020)**

2020 TSPR 84

**End of Document**                                                                    © 2021 Thomson Reuters. No claim to original U.S. Government
Works.

**EXHIBIT C-1**

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

180 D.P.R. 1003, 2011 WL 833446 (P.R.), 2011 TSPR 27

Municipio de Quebradillas, petitioner,

v.

Corporación de Salud de Lares Et Al, respondents.

In the Puerto Rico Supreme Court.
*Number:* CC-2009-280

**Synopsis**

Petition for *Certiorari* for of review Judgment, by *Guillermo Arbona-Lago, Nydia Cotto-Vives* and *Andrés Salas-Soler*, Justices for the Appeals Court, which confirmed one issued by the Trial Court, which dismissed the action filed by the Municipality of Quebradillas for collection of monies against the Corporación de Salud de Lares, and the counterclaim filed by the Corporacion against the Municipality, for that same cause of action. *Judgment by the Appeals Court is revoked, and case is remanded to the primary forum for subsequent proceedings, in accordance with what has been ruled herein.*

*Fernando L. Torres-Ramírez* and *Aida Liz Murphy-Lugo*, attorneys for petitioner; *Manuel Martínez-Umpierre*, attorney for respondent; *Irene S. Soroeta-Kodesh*, attorney general, and *Lizette Mejías-Avilés*, deputy attorney general, attorneys for the Commonwealth.

Associate Justice Mr. Martínez-Torres, rendered the Court's opinion.

We are asked to review a judgment issued on January 28th of 2009 by the Appeals Court, Utuado Judicial Region. In stated judgment, the intermediate appeals court dismissed the action filed by the Municipality of Quebradillas against the Corporacion de Salud de Lares, and the counterclaim filed by the Corporacion against the Municipality, for the same cause of action.

The Appeals Court confirmed the judgment by the initial forum, since it deemed that the provisions included within the Autonomous Municipalities Act of 1991 (Autonomous Municipalities Act), Law No. 18 dated August 30th of 1991, as amended, *21 L.P.R.A. sec. 4001 et seq.*, interpreted in Colón Colón v. Mun. de Arecibo, 170 D.P.R. 718 (2007), are clear when same sustain that in absence of a written contract that complies with the formalities demanded by law, verbal agreements between the parties are void.

Consequently, we are compelled to determine whether, in absence of a written contract between

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

the parties as provided for under the Autonomous Municipalities Act and by interpretive jurisprudence **\*1007** to said effects, the action for collection of monies raised by the Municipality against the Corporation, is proper. The dispute therefore evaluated, and due to the utmost public interest which public funds entail, we rule in the affirmative.

# I

In 1994, the Municipality of Quebradillas (Municipality) verbally agreed with the *Corporación de Salud de Lares,* to have the latter manage the Quebradillas Diagnostic & Treatment Center (Quebradillas DTC, *CDT*, Spanish acronym). As adduced by the Municipality, among the verbal agreements with the Corporation as to manage the Quebradillas DTC, the Municipality compelled the retention certain municipal employees working at the Quebradillas DTC, under the commitment that the Corporation would reimburse the Municipality for those monies disbursed in the payroll payments. Nevertheless, as alleges the Municipality, the Corporation solely disbursed three payments for same.

On June 4th of 2002, after some years had elapsed, the Municipality filed complaint against the Corporation. In the complaint, the Municipality alleged that the Corporation owed it a sum totaling $1,435,078, corresponding to payrolls disbursed from August of 1997 through 2001, for ambulance maintenance and services, and for payment of electric power bills for usage at the DTC facilities in Quebradillas. The Municipality filed a motion for summary judgment. In same, it adduced that the Corporation did not deny that it was in charge of managing the Quebradillas DTC ever since 1996. Thus, upon same so managing it, part of the obligations and duties of said Corporation was to pay for stated services and salaries. Moreover, the Municipality indicated that the Corporation was a for-profit institution or legal entity, wherefore condoning such debt would allow them to use public funding for private purposes, contrary to the constitutional mandate contained in Art. VI, Sect. 9 of the Puerto Rico Constitution, L.P.R.A. **\*1008** Volume I. And last, it pointed out that the Corporation did not provide any evidence whatsoever which proved the alleged agreement between the parties, and through which the Municipality would be charged for such payments.

The Corporation opposed the motion for summary judgment, and denied it was a for-profit institution. Much to the contrary, it affirmed it was not a for profit entity, and that it was established to provide free services for the populace. The Corporation also adduced that the monies which Municipality provided for payment of employee payroll were used for public services since with same, free medical services were provided to the people of Quebradillas. Moreover, the Corporation, jointly with its motion for rendering of a summary judgment attached a certificate of incorporation from the Department of State, as well as a sworn statement signed by Mr. Rigoberto Hernandez-Nieves, the Corporation's Director. In said statement he refuted the allegation from the Municipality, that it would be the Corporation that would be charged with paying for employee payrolls, for ambulance services, and for electric power services.

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

The Trial Court issued a ruling in which it "denied" the motion for summary judgment submitted by the Municipality. It concluded that there existed a dispute as to whether the Corporation was or was not a for-profit institution.

Subsequently, the Municipality amended its complaint. It repeated practically all of the same allegations in its original complaint. Notwithstanding, it included as defendants Hon. Rosa Perez-Perdomo the then Health Secretary, and the Commonwealth of Puerto Rico. Likewise, it substituted as defendant Corporacion de Salud de Lares and included the Corporacion Centro de Salud de Lares, Inc., in its place. The Municipality, in the amended complaint, indicated that on August 12th of 1995, the then Mayor of the Municipality of Quebradillas wrote to the Chairman of the Corporation's Board of Directors **1009** to clarify and formalize the agreements, commitments and procedures which would allow the Corporation to manage the Quebradillas DTC. As a result of stated correspondence, the Municipality added steps were taken to hold a meeting between Municipal officials and Corporation representatives, whereby aspects regarding functioning of the Quebradillas DTC would be discussed. From the minutes drafted at the meeting it surfaces that, allegedly, the Municipality was committed to provide ambulance services with the appropriate staff at the Health Center, twenty four hours a day, seven days a week; to pay for the Corporation's and the Asylum's electric power bill in equal parts, and to pay the employees' payroll. Nevertheless, all of these agreements were subject to approval by the municipal legislature. Stated approval was never granted. Indeed, the Municipality alludes to the certification issued by Quebradillas' Acting Municipal Legislature's Secretary, which revealed that no resolution or ordinance which authorized the then Mayor, Hon. Juan I. Rivera -Vargas, to reach any agreement with the Corporation, had existed.[1]

On October 24th of 2008, the Trial Court rendered judgment. In same, after interpreting the Autonomous Municipalities Act and its interpretive jurisprudence, the initial forum concluded that the demand that every municipal contract be in writing is of a constitutive nature and due to that, since such requirement was not complied with, "no valid and enforceable contract between the parties has been initiated". To wit, the court concluded that the agreement between the parties was totally void. Wherefore, it dismissed the Municipality's complaint. The initial forum, in turn, dismissed the Corporation's counterclaim **1010** under the same grounds. Likewise, the complaints against the former Secretary, Perez-Perdomo, and against the Commonwealth of Puerto Rico, were also dismissed.

The Appeals Court confirmed. First, the intermediate forum insofar as petitioner's indication that the dispute should not be resolved summarily, deemed that there did not exist any actual substantial controversy insofar as any key fact, and that as a matter of law, it was appropriate that summary judgment be passed against both parties, as the primary forum had done.

The Appeals Court, insofar as the fact that transactions sustained between the Municipality and the Corporation were verbal, deemed -like the initial forum- that the 1991 Autonomous Municipalities Act and the case of *Colón Colón v. Mun. de Arecibo*, supra, are clear when sustaining that in absence of a written contract which complies with all formalities demanded by

Case:17-03283-LTS   Doc#:17898   Filed:08/19/21   Entered:08/19/21 20:20:24   Desc: Main
Document   Page 63 of 148

law, verbal agreements between the parties are void. Consequently, it indicated that speaking about unfair enrichment was improper in its reverted applicability, since by there not existing any written contractual relationship between the parties, "any relationship is vitiated in nullity, wherefore same does not generate any rights whatsoever for the parties [involved]". Judgment by the Appeals Court, page 10. Last, the Appeals Court concluded that the "forum of instance exercised its discretion correctly and reasonably". Id.

Again dissatisfied, the Municipality filed a writ of *Certiorari* to this Court. It deemed that the scope of our ruling in *Colon Colon v. Mun. de Arecibo, above,* reaffirms the obligation by the courts to be zealous guardians of the public interest. It further added that the Appeals Court also erred by not ruling on the motions for summary judgment, in view of the unfair enrichment doctrine.  On October 19th of 2009, we issued the instant writ, and in the presence of both parties, we proceed to rule. **\*1011**

## II

**[1]** The Municipality, as a first indication of error, alleges that the interpretation which the lower courts have made of the Autonomous Municipalities Act of 1991 and in the case of *Colon Colon. v. Mun. de Arecibo,* above, has not such attained scope and, worse off, that such interpretation ignores the obligation by the courts to be zealous guardians of public funds.

It is appropriate to state, flat out, that Article 2.001(r) of the 1991 Autonomous Municipalities Act, (21 L.P.R.A. sec. 4051(r)), empowers municipalities to:

*[c]ontract with any public agency and with any natural or legal person for development, management and joint, coordinated or delegated operation of facilities, as to render public services,* and for the construction, repair or maintenance of municipal facilities. Stated activities shall include contracting of joint projects with public or private entities, for profit or not, for construction and development of social interest housing, and for the operation of municipal facilities or programs, plus any others ones where the municipality requires participation by outside natural or legal persons for the feasibility of such projects and programs. Formal contracting shall require prior approval from the municipal legislature. (Emphasis provided.)

**[2]** Likewise, Article 8.004 (21 L.P.R.A. sec. 4354) indicates, in what is pertinent, that "[o]bligations and disbursements of municipal public funds may solely be effected to commit or pay for services, supplying of materials and equipment, claims, or any other concepts authorized by law, ordinance or ruling approved for stated effects, and by the regulations adopted under virtue of same".

**[3]** Consistent with same, "[t]he assorted statutory provisions which regulate execution of works and the contracting of services by the State and its agencies and entities, have the goal of protecting

the monies and interests **1012** of the people against waste, fraud, favoritism and risks of non-compliance". Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973). We have on repeated occasions, and due to its crucial importance, indicated that "sound management by a government is a democratic virtue, and part of its optimal management implies carrying out its duties as a buyer with efficiency, honesty and correctness...". Lugo v. Municipio Guayama, 163 D.P.R. 208, 214 (2004), quoting Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 871 (1990). Also see: Quest Diagnostic v. Mun. San Juan, 175 D.P.R. 994 (2009); Ríos v. Municipio Isabela, 159 D.P.R. 839 (2003); Fernández & Gutierrez v. Mun. San Juan, 147 D.P.R. 824, 829 (1999); Hatton v. Mun. de Ponce, 134 D.P.R. 1001, 1005 (1994).

**[4]** In Cordero Vélez v. Mun. de Guánica, 170 D.P.R. 237, 249 (2007), we were emphatic when we indicated "that the courts must oversee compliance with legal provisions geared towards protecting public disbursements, since these rules bear the purpose of protecting the public interest upon monies of the People, and not that of the contracting parties". Therefore, contracting with a municipality requires certain formalities and specific procedures which are pursued, precisely as to protect the treasury. For said reason "the faculty by the municipality to commit public funds for payment of any commitment is contingent upon following all procedures established under the law". Id*., page 248.

**[5–6]** Article 8.016 of the Autonomous Municipalities Act of 1991, (21 L.P.R.A. sec. 4366), also imposes upon municipalities an obligation to "maintain a register of all contracts issued, including amendments to same, and copy of these and of acquisition deeds and for disposition of assets shall be sent to the Puerto Rico Comptroller's Office, in accordance with sections 97, *et seq.* of Title 2, and its Regulations. See Art. 1 of Law No. 18, dated October 30th of 1975, as amended, **1013** 2 L.P.R.A. sec. 97. To wit, when contracting with a municipality it is necessary that: (1) the agreement has been issued in writing; (2) a faithful registry be kept for purposes of establishing existence of the contract; (3) copy of same be remitted to the Comptroller's Office, and (4) the time period be attested to, that is, that the contract was granted fifteen days prior. See *Colón Colón v. Mun. de Arecibo*, supra, pages. 725–726; *Lugo v. Municipio Guayama*, supra, pages 215–216; Las Marías v. Municipio San Juan, 159 D.P.R. 868, 878 (2003); *Ríos v. Municipio Isabela*, supra, pages. 845–846; Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37, 53–54 (1988). These requirements need to be rigorously observed, since absence therein deprives stated agreement with the municipality of its efficacy and validity. *Lugo v. Municipio Guayama*, supra, page. 216. Notwithstanding, we clarify that after approval of Law No. 127 dated May 31st of 2004 (2 L.P.R.A. sec. 97), compliance with the requirement that every contract be registered and remitted to the Comptroller's Office, such as is demanded by Article 1 of Law No. 18, supra, and in Article 8.016 of the 1991 Autonomous Municipalities Act, supra, does not bear the effect of voiding the disputed contract, although same hinders that performance be demanded until such agreement is registered and remitted to the Comptroller's Office. Id. Also see, *Quest Diagnostics v. Mun. San Juan, supra.*

[7] Whenever a municipal contract is dealt with, we need to keep present that clear, prevailing and reigning public policy which favors application of restrictive rules. *Cordero Vélez v. Mun. de Guánica*, supra, page 248; *Lugo v. Municipio Guayama*, supra, page 215. All of the above, insofar that a sound and proper public management is a matter vested by the utmost public interest. *Quest Diagnostics v. Mun. San Juan*, supra; *Cordero Vélez v. Mun. de Guánica*, supra, page 248; *Fernández & Gutierrez v. Mun. San Juan*, supra. In view of such significant interest, we have ensured that in cases of a municipal contracting, private parties need to exercise a more active role, insofar that **\*1014** these are not exempted from complying with the law. *Quest Diagnostics v. Mun. San Juan*, supra; *Cordero Vélez v. Mun. de Guánica*, supra, page 251; *Las Marías v. Municipio San Juan*, supra, page 880; *Lugo v. Municipio Guayama*, supra, page 215.

[8] Now then, compliance with the provisions of the Autonomous Municipalities Act does not solely befall upon private parties. The courts "dissuade the practice of not complying with the procedures established within the Municipalities Act, whenever granting municipal contracts". *Cordero Vélez v. Mun. de Guánica*, supra, page 253. Therefore, *no municipality may pay any debt whatsoever which does not arise from a written contract and which, in turn, has been registered and remitted to the Comptroller's Office.* The insistence that contracts with municipalities be in writing responds to a requirement of constitutive type which the legislator included for purposes of establishing a preventive measure which addresses to avoid fraudulent and unlawful claims and payments". *Colón Colón v. Mun. de Arecibo*, supra, page 726.

### III

Unquestionably, when the Municipality agreed with the Corporation in 1995 to manage the DTC in Quebradillas, there existed no additional verbal agreements between the parties. This is why the Trial Court indicated in its ruling that, since contracting requirements with municipalities are of a constitutive nature that were not fulfilled, a valid and enforceable contract did not legally arise between the parties. Therefore, the Trial Court concluded that, in accordance with *Colón Colón v. Mun. de Arecibo*, supra, upon not existing any written contract, the action for collection of money filed by the Municipality was improper. The Appeals Court erred by confirming such conclusion and ruling.

[9] Throughout all of the jurisprudence which we have **\*1015** evaluated in cases such as this, we have underscored that "demanding that contracts be narrowed into writing bears an insurmountable dimension of sound public management". *Colón Colón v. Mun. de Arecibo*, supra, page 727. Also see: *Fernández & Gutierrez v. Mun. San Juan*, supra, page 829; *Ríos v. Municipio Isabela*, supra, page 845. That is, our reaffirmed conclusion responds to the underlying principle

whenever contracting with the government: our People's trust upon the correct use of public monies. Consequently, whenever we observe disputes in which public funds are involved, we courts must mainly oversee that proper use of our People's monies are not placed into query.

Thus, although in *Colón Colón v. Mun. de Arecibo*, supra, we determined that the action for collection of money raised by Mr. Colon-Colon for services provided to the Municipality of Arecibo was improper in the absence of a written contract by the parties, our conclusion to stated effects was not geared towards favoring municipalities, lacking due reason. Our approach has always been more so towards safekeeping public funds. In such manner we honor the key values which, for years, we have been observing. In last instances, not so doing would jeopardize the interests of our citizenry.

In the contract cases where we have evaluated in purview of the Autonomous Municipalities Act, the injured party was a private entity. The factual situation at hand now, in turn, claiming disbursement of monies, is not a private person but rather, the Municipality. Stated contrast is crucial. The Corporation sustains that the Municipality "contends that this ...Court ...contend and rule that any null action by a Municipality, cannot be enforced [sic] if it is [in] against the interests of the Municipality, but, *a contrario sensu,* can be enforced [sic] if it benefits the Municipality". Allegation by the respondent, at page 5. Such conclusion is erred. This does not deal with favoring of the Municipality. As we have stated, same deals with protecting the monies **\*1016** of the People. If the Municipality incorrectly disbursed public monies through a void agreement, it is entitled to recover same. If we conclude the opposite, we would be leaving in private hands, funds which are not due them.

For this reason, if the agreement between the parties is inefficient, it is improper that the Municipality disburse any money at all, through a contract which never took hold. After all, adequate oversight for use by the treasury is of vital importance to retain the citizen's trust in their government, and the well-being of our democracy. See, RBR Const., S.E. v. A.C., 149 D.P.R. 836 (1999).

On the other hand, the Corporation affirms that it would be an "unlawful, anti-juridic and immoral" approach that the Municipality pretend that a different rule can be created whenever a municipality so demands same, since "*a carte blanche* would be tendered to municipalities to not comply with Municipal Laws, and in such manner they decide, *ex parte,* which contracts they wish to comply with and which they do not wish to comply with". Allegations by respondent, at pages 10-11. Said reasoning does not convince us. Not making said distinction when whomever claims such is a public entity, would allow that any unscrupulous official favor certain contractors, pay for certain services in advance but, without a written contract, with the intention that once the money collection legal process is initiated, a defense may be raised that the contract does not comply with formal requirements demanded by law, and the contractor not need to return whatever it was unlawfully paid. Such would undermine the public policy of "protecting the People's monies and interests against waste, fraud, favoritism and the risks of non-compliance". *Cancel v. Municipio de San Juan*, supra, at page 300.

Therefore, in *Colón Colón v. Mun. de Arecibo*, supra, upon protecting the treasury, we did not validate the action for collection of monies by an individual against the municipality. For that **\*1017** same reason, a reversed collection action from a municipality against a private party is appropriate. Such is demanded by the pressing values which our legal system grants upon the sound management of public funds.

> Corruption and improper or unlawful disbursement of public funds – in it assorted fashions, - at times coarsely and in others sophisticated- are actions incompatible with the democratic government system, consecrated within our Constitution, and with underpins of respect to human dignity and the monies of the People, as a sole sovereign. Regardless of the modality which is adopted, or the hierarchy of the official involved, these are intolerable. In last instance who is actually hurt, not only financially but further morally, is the citizenry at large, regardless of their political affiliation, It is thus an obligation by the Courts to vindicate these fundamental values. E.L.A. v. Soto Santiago, 131 D.P.R. 304, 322 (1992), quoting *A.E.E. y A.A.A. v.* P.N.P., 128 D.P.R. 294, 294–295 (1991), concurring vote by Associate Justice Mr. Negron-Garcia, joined by Associate Justices Mr.  Rebollo López and Mr. Andréu García.

**[10]** We cannot, undoubtedly, indiscriminately validate the expenditure of public funds. Use of same needs to be cautious. E.L.A. v. Cole, 164 D.P.R. 608, 643 (2005). It is our duty to oversee that public funds respond directly to the citizenry's needs. Id.

> We have specifically stated within the context of governmental contracting that same is vested of the utmost public interest insofar as use of public assets and funds is involved. That is why rules regarding contracts and disbursement of such funds need to be rigorously applied, in protecting the interests and money of the People. Mostly, it must not be ignored that each governmental body is obligated to faithfully comply with the essence of all constitutional provisions, since public funds may only be spent for legitimate public purposes. Art. VI, Sec. 9, Const. E.L.A., L.P.R.A., Volume 1; De Jesús González v. A.C., 148 D.P.R. 255    (1999). C.F.S.E. v. Unión de Médicos, 170 D.P.R. 443, 452 (2007). **\*1018**

## IV

It remains to be determined what remedy blankets the Municipality to obtain reimbursement for funds which were unlawfully disbursed. With respect to that, the Municipality indicates that the intermediate forum erred by not ruling on the motions for summary judgment, in view of the unfair enrichment doctrine, in its negative slant. The respondent, on their part, denies the usage of such concept, since:

> [a] throughout jurisprudence, numerous citizens and private parties have provided services to municipalities in the hundreds of thousands of dollars, and have been unable to collect for their services due to a statutory requirement that contracts have to be in writing. Improperly the municipality now contends that, having incurred into the same fault which deprived all those

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

citizens and corporations from collecting for their services, that the letter of law not be applied, and the Municipality be allowed to continue its claim. Allegations by respondent, at page 11.

In *Colón Colón v. Mun. de Arecibo*, supra, page 728, we indicated that "in accordance with the utmost public interest involved, there exists no spot within these cases for remedies in equity". Now though, we must not lose from sight that we effected stated analysis grounding ourselves on the principle of allowing an action in equity against a municipality for demanding a provision resulting from a void contract, which would violate public policy established in municipal law.

[12] Nevertheless, in *E.L.A. v. Soto Santiago*, supra,  we ruled that the prescriptive term to initiate an action for collection of money for the purpose of returning unlawfully obtained public funds is fifteen years, provided for in Art. 1864 of the Civil Code, 31 L.P.R.A. sec. 5294. We then indicated that "in depth, we are dealing here with a situation which allows one to invoke the legal principle that no one should unfairly enrich themselves at the expense of another". *E.L.A. v. Soto Santiago*, supra, page 317.

It is thus proper to invoke that same principle here. Since there does not exist any **\*1019** explicit legislative provision within the 1991 Autonomous Municipalities Act which directly addresses this type of legal action by municipalities when no written contract between the parties exists, then it is proper that we rule in accordance with equity. Art. 7 of the Puerto Rico Civil Code, 31 L.P.R.A. Sec. 7.[2]

[12] "The unfair enrichment doctrine is as old as Law itself." *E.L.A. v. Cole*, supra, page. 632. "This concept is subsumed within the concept of quasi-contracts." Id. "Quasi-contracts generate obligations based on the principle that no one should enrich himself or obtain profit unequally, at the expense of, or harm to another." C.J. Irrizary-Yunque, *Responsabilidad civil extracontractual: un estudio basado en las decisiones del Tribunal Supremo de Puerto Rico* (Extra-contractual civil liability: a research based upon the rulings of the Puerto Rico Supreme Court), 6th ed., 2007, page 3. "[I]t is a general law principle grounded upon equity which responds to the legal system as a whole." Ortiz Andújar v. E.L.A., 122 D.P.R. 817, 822 (1988). "It is a corollary to the concept of equity, which is equal to stating that same is a corollary to the concept of justice." *E.L.A. v. Cole*, supra, page 632. Also see, Silva v. Comisión Industrial, 91 D.P.R. 891 (1965).

We resort to this concept whenever "the law has not foreseen a situation in which a patrimonial displacement which cannot find any reasonable explanation in the current system, takes place", *Ortiz Andújar v. E.L.A.*, supra. Véanse: Garriga, Hijo, Inc. v. Cond. Marbella, 143 D.P.R. 927, 933 (1997); *E.L.A. v. Soto Santiago*, supra, page 319. Also see, J. Puig Brutau, *Fundamentos de derecho civil*, Barcelona, Ed. Bosch, 1983, T. II, Vol. 3, page 44.

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

[13] For such, unfair enrichment is solely established whenever the following requisites occur: (1) existence of an enrichment; (2) any corresponding **\*1020** impoverishment; (3) a nexus between stated impoverishment and the enrichment; (4) lack of a cause which justifies said enrichment, and (5) non-existence of any legal provision which excludes applicability of an enrichment without cause. *Hatton v. Mun. de Ponce*, supra, page 1010; *Ortiz Andú jar v. E.L.A.*, supra, page 823.

[14] The doctrine has pointed out that unfair enrichment can occur in two modalities. *E.L.A. v. Cole*, supra, page 634. "[T[he positive, or an increase of assets (*lucrum emergens*), and the negative, or decrease in assets (*damnum cessans*)." Id. Whenever we mention a negative unfair enrichment (*damnun cessans*), or in its opposite, we refer to a case in which "a non-expense becomes equivalent to an income. In other words, within the measure under which someone suffers a loss which someone else could ordinarily have suffered, the former frees the latter from an expense. This situation has no place within a system in which what is fair prevails, and needs to be remedied". Id. Pages 634-635, quoting *Ortiz Andújar v. E.L.A.*, supra, pages 826–827.

We have not, in the past, allowed private parties to invoke remedies in equity in sight of the municipalities with which they contract, since "it is a reaffirmed doctrine that stated remedies shall not apply whenever these result contrary to a clear public policy embodied within a statute, or in the Constitution". *Las Marías v. Municipio San Juan*, supra, pages 875–876. Also see: *Hatton v. Mun. de Ponce*, supra, page 1010; Morales v. Municipio de Toa Baja, 119 D.P.R. 682, 684–685 (1987). Likewise, we shall as an exception pave way for remedies in equity, when not doing so would equally result contrary to the public policy provisioned within law or in the Constitution.

Precisely in this particular case under our consideration, the exception to the general rule of not permitting remedies in equity, has been set. Not allowing the action of unfair enrichment would result contrary to a public policy of sound management of public funds, as provisioned within the 1991 Municipalities Act. **\*1021**

We have not allowed private parties to invoke remedies in equity for recovery of their investments, since such would breach the objectives pursued through the formal contracting requirements imposed by the Autonomous Municipalities Act of 1991. To wit, endorsing it would run counter to "the huge interest by the State towards promoting sound and proper public management [which deters] wastage, corruption and cronyism within governmental contracting". *Las Marías v. Municipio San Juan*, supra, page 875. See: *Fernández & Gutierrez v. Mun. San Juan*, supra, page 832; *Hatton v. Mun. de Ponce*, supra, 1006; Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37, 54 (1988); *Morales v. Municipio de Toa Baja*, supra, page 693. Likewise, not applying this concept when the one so claiming is a municipality, would be the opposite to sound public management by leaving in private hands, public funds which were disbursed to them, contrary to law. "[I]ts effect would be the breach of hugely important principles, embodied within the

Constitution and the laws of the country." *E.L.A. v. Cole*, supra, page 634. See, *Colón Colón v. Mun. de Arecibo*, supra; *Hatton v. Mun. de Ponce*, supra.

All the indicated doctrines having been evaluated, we conclude that the action for money collection filed by the Municipality against the Corporation under auspices of the unfair enrichment concept, is appropriate. As we pointed out in the past, "[t]he rules applicable to [contracting with Municipalities] pursues protection of the public interest, and not that of the contracting parties". *Morales v. Municipio de Toa Baja*, supra, page 697. In this manner, greater transparency within public management is attained, and whereby stability, certainty and credibility is advanced within municipal contracting. The greatest beneficiary therefore is the public interest. *Las Marías v. Municipio San Juan*, supra, page 881. **\*1022**

## V

Due to the indicated grounds, *the judgment issued by the Appeals Court is revoked and the case is remanded to the primary forum for subsequent proceedings which are in accordance with what has been ruled herein.*

*Judgment shall be decreed in compliance.*

Associate Justice Mrs. Rodriguez-Rodriguez dissented, without written opinion. Associate Justice Mrs. Pabon-Charneco did not intervene.

Footnotes

[1] *From the report on the preliminary conference between counsels, the parties stipulated that the Corporation is a non-profit legal entity. The meeting held between Municipal officials and the Corporation held on January 8th of 1998, was in turn stipulated to. Last, it was acknowledged, among the stipulations and certification by the Municipal Clerk, which reflected that there existed no ordinance or ruling by the municipal legislature, which authorized the Mayor to a contract with the Corporation.*

[2] *Which provides that "[w]henever there does not exist any law applicable to the case, the Court shall rule in accordance with equity, which means that the natural reason for the agreement with general principles in law plus established and accepted usage and customs, shall be taken into account".*

End of Document © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT C-2**

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

180 D.P.R. 1003, 2011 WL 833446 (P.R.), 2011 TSPR 27

Municipio de Quebradillas, peticionario,

v.

Corporación de Salud de Lares y otros, recurridos.

En El Tribunal Supremo De Puerto Rico.

*Número:* CC-2009-280

**Synopsis**

Petición de *Certiorari* para revisar una Sentencia de *Guillermo Arbona Lago, Nydia Cotto Vives* y *Andrés Salas Soler*, Js. del Tribunal de Apelaciones, que confirmó la emitida por el Tribunal de Primera Instancia y desestimó la acción presentada por el municipio de Quebradillas para el cobro de dinero contra la Corporación de Salud de Lares y la reconvención presentada por la Corporación contra el municipio por la misma causa de acción. *Se revoca la sentencia del Tribunal de Apelaciones y se devuelve el caso al foro primario para procedimientos ulteriores que sean acordes con lo resuelto aquí.*

*Fernando L. Torres Ramírez* y *Aida Liz Murphy Lugo*, abogados de la parte peticionaria; *Manuel Martínez Umpierre*, abogado de la parte recurrida; *Irene S. Soroeta Kodesh*, procuradora general, y *Lizette Mejías Avilés*, procuradora general auxiliar, abogadas del Estado Libre Asociado.

El Juez Asociado Señor Martínez Torres emitió la opinión del Tribunal.

Se nos solicita la revisión de una sentencia emitida el 28 de enero de 2009 por el Tribunal de Apelaciones, Región Judicial de Utuado. En esa sentencia, el foro apelativo intermedio desestimó la acción presentada por el Municipio de Quebradillas en cobro de dinero contra la Corporación de Salud de Lares y la reconvención presentada por la Corporación contra el Municipio por la misma causa de acción.

El Tribunal de Apelaciones confirmó la sentencia del foro primario porque entendió que las disposiciones incluidas en la Ley de Municipios Autónomos de 1991 (Ley de Municipios Autónomos), Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. sec. 4001 *et seq.*, interpretadas en *Colón Colón v. Mun. de Arecibo,* 170 D.P.R. 718 (2007), son claras al sostener que en ausencia de un contrato por escrito que cumpla con las formalidades exigidas por la ley, los acuerdos verbales entre las partes son nulos.

Por consiguiente, nos corresponde determinar si en ausencia de un contrato escrito entre las

partes, según dispone la Ley de Municipios Autónomos y la jurisprudencia **1007** interpretativa al respecto, procede la acción en cobro de dinero incoada por el Municipio contra la Corporación. Evaluada la controversia y por el alto interés público que ostentan los fondos públicos, resolvemos en la afirmativa.

# I

En 1994, el municipio de Quebradillas (Municipio) convino verbalmente con la Corporación de Salud de Lares para que esta última administrara el Centro de Diagnóstico y Tratamiento de Quebradillas (CDT de Quebradillas). Según aduce el Municipio, entre los acuerdos verbales con la Corporación para la administración del CDT de Quebradillas, el Municipio se comprometió a mantener unos empleados municipales trabajando en el CDT de Quebradillas con el compromiso de que la Corporación le reembolsara al Municipio el dinero desembolsado para el pago de la nómina. Sin embargo, según alega el Municipio, la Corporación sólo realizó tres pagos por ese concepto.

Pasados unos años, el 4 de junio de 2002, el Municipio presentó una demanda contra la Corporación. En la demanda, el Municipio alegó que la Corporación le adeudaba una cantidad ascendente a $1,435,078 correspondiente a nóminas pagadas desde agosto de 1997 hasta el 2001, al mantenimiento y servicio de ambulancias y al pago de facturas de energía eléctrica por el uso de las instalaciones del CDT de Quebradillas.

El Municipio presentó una moción de sentencia sumaria. En ésta adujo que la Corporación no negó que era la encargada de la administración del CDT de Quebradillas desde 1996. Por lo tanto, al ser la administradora, parte de las obligaciones y los deberes de la Corporación era pagar por esos servicios y salarios. Además, el Municipio señaló que la Corporación era una institución o persona jurídica con fines de lucro, por lo que condonarle la deuda permitiría el uso de fondos públicos para fines privados en contravención al mandato constitucional contenido en el Art. VI, Sec. 9 de la Constitución de Puerto Rico, L.P.R.A., **1008** Tomo 1. Por último, apuntó que la Corporación no presentó prueba alguna que acreditara el supuesto acuerdo entre las partes mediante el cual el Municipio se haría cargo de esos pagos.

La Corporación se opuso a la moción de sentencia sumaria. Negó ser una institución con fines de lucro. Por el contrario, afirmó ser una institución sin fines de lucro que fue constituida para dar servicio gratuito a la población. La Corporación adujo también que los fondos que el Municipio aportó para el pago de la nómina de los empleados fueron usados para fines públicos, ya que con ellos se brindaron servicios médicos sin costo alguno al pueblo de Quebra dillas.

Además, con la moción en oposición a que se dictara sentencia sumaria la Corporación acompañó su certificado de incorporación del Departamento de Estado, así como una declaración jurada suscrita por el Sr. Rigoberto Hernández Nieves, Director de la Corporación. En esta declaración se rebatió la alegación del Municipio de que sería la Corporación quien se haría cargo del pago de las nóminas de los empleados, del servicio de ambulancia y del servicio de energía eléctrica.

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

El Tribunal de Primera Instancia emitió una resolución en la que declaró "no ha lugar" la moción de sentencia sumaria presentada por el Municipio. Concluyó que existía controversia sobre si la Corporación era o no una institución con fines de lucro.

Posteriormente, el Municipio enmendó su demanda. Repitió prácticamente las mismas alegaciones que en la demanda original. Sin embargo, incluyó como partes demandadas a la Hon. Rosa Pérez Perdomo, la entonces Secretaria de Salud y al Estado Libre Asociado de Puerto Rico. Asimismo, sustituyó como parte demandada a la Corporación de Salud de Lares para incluir en su lugar a la Corporación Centro de Salud de Lares, Inc. En la demanda enmendada el Municipio señaló que el 2 de agosto de 1995 el entonces alcalde del municipio de Quebradillas le escribió al presidente de la Junta de Directores de la Corporación **\*1009** para aclarar y formalizar los acuerdos, compromisos y procedimientos que le permitieran a la Corporación administrar el CDT de Quebradillas. Como consecuencia de esta comunicación, añadió el Municipio, se hicieron gestiones para la celebración de una reunión entre funcionarios del Municipio y representantes de la Corporación en la que se discutirían aspectos relacionados con el funcionamiento del CDT de Quebradillas. De la minuta que se redactó de la reunión, alegadamente, surge que el Municipio se comprometió a proveer el servicio de ambulancias con el personal necesario en el Centro de Salud las veinticuatro horas al día, los siete días de la semana; a pagar la factura de luz de la Corporación y del Asilo Municipal en partes iguales, y a pagar la nómina de los empleados. Sin embargo, todos estos acuerdos estaban sujetos a que la legislatura municipal los aprobara. Esa aprobación nunca se llevó a cabo. Incluso, el Municipio hace alusión a la certificación emitida por la Secretaria Interina de la legislatura municipal de Quebradillas que revela que no existía resolución u ordenanza que autorizara al entonces alcalde, Hon. Juan I. Rivera Vargas, a llegar a acuerdos con la Corporación.[1]

El 24 de octubre de 2008, el Tribunal de Primera Instancia dictó sentencia. En ésta, luego de interpretar la Ley de Municipios Autónomos y su jurisprudencia interpretativa, el foro primario concluyó que la exigencia de que todo contrato municipal sea por escrito tiene un carácter constitutivo y por ello, al no haberse cumplido con ese requisito, "no nace a la vida jurídica un contrato válido y exigible entre las partes". Es decir, el tribunal concluyó que el acuerdo entre las partes era completamente nulo. Por consiguiente, desestimó la demanda del Municipio. A su vez, el foro primario desestimó la reconvención de la Corporación **\*1010** por los mismos fundamentos. Igualmente, se desestimaron las demandas contra la ex Secretaria Pérez Perdomo y contra el Estado Libre Asociado de Puerto Rico.

El Tribunal de Apelaciones confirmó. Primero, en cuanto al señalamiento del peticionario de que no debía resolverse sumariamente la controversia, el foro apelativo intermedio entendió que no existía controversia real sustancial en cuanto a ningún hecho medular y que como cuestión de derecho procedía que se dictara sentencia sumaria contra ambas partes como lo hizo el foro primario.

En cuanto al hecho de que las transacciones realizadas entre el Municipio y la Corporación fueron verbales, el Tribunal de Apelaciones entendió, al igual que el foro primario, que la Ley de Municipios Autónomos de 1991, y el caso *Colón Colón v. Mun. de Arecibo*, supra, son claros al sostener que en ausencia de un contrato por escrito que cumpla con las formalidades exigidas por la ley, los acuerdos verbales entre las partes son nulos. Por consiguiente, señaló que no

procedía hablar de enriquecimiento injusto en su aplicación inversa, ya que al no existir una relación contractual por escrito entre las partes, "toda relación está viciada de nulidad, por lo que no genera derecho alguno a las partes [involucradas]". Sentencia del Tribunal de Apelaciones, pág. 10. Por último, el Tribunal de Apelaciones concluyó que el "foro de instancia ejerció su discreción con corrección y razonabilidad". Íd.

Inconforme nuevamente, el Municipio presentó ante este Tribunal un recurso de *certiorari*. Entiende que el alcance de nuestra decisión en *Colón Colón v. Mun. de Arecibo*, supra, reafirma la obligación de los tribunales de ser celosos guardianes de los intereses públicos. Añade que el Tribunal de Apelaciones erró también al no resolver las mociones de sentencia sumaria a la luz de la doctrina de enriquecimiento injusto.

El 19 de octubre de 2009 expedimos el auto. Con la comparecencia de ambas partes procedemos a resolver. **\*1011**

## II

**[1]** Como primer señalamiento de error, el Municipio alega que la interpretación que los foros inferiores han hecho de la Ley de Municipios Autónomos de 1991 y del caso *Colón Colón v. Mun. de Arecibo*, supra, no tiene el alcance dado y, peor aún, que esta interpretación ignora la obligación de los tribunales de ser celosos guardianes de los fondos públicos.

De entrada, es menester señalar que el Art. 2.001(r) de la Ley de Municipios Autónomos de 1991 (21 L.P.R.A. sec. 4051(r)), da el poder a los municipios para

> [c]ontratar con cualquier agencia pública y con cualquier persona natural o jurídica, para el desarrollo, administración y operación conjunta, coordinada o delegada de instalaciones para brindar servicios públicos y para la construcción, reparación y mantenimiento de instalaciones municipales. Tales actividades incluirán la contratación de proyectos conjuntos con entidades públicas o privadas, con o sin fines de lucro, para la construcción y el desarrollo de viviendas de interés social, el desarrollo y la operación de programas o instalaciones municipales y cualesquiera otras donde el municipio requiera la participación de personas naturales o jurídicas externas para la viabilidad de los proyectos y programas. *La formalización de la contratación requerirá la aprobación previa de la legislatura municipal.* (Énfasis suplido.)

**[2]** Igualmente, el Art. 8.004 (21 L.P.R.A. sec. 4354) señala, en lo pertinente, que "[l]as obligaciones y [los] desembolsos de fondos públicos municipales sólo podrán hacerse para obligar o pagar servicios, suministros de materiales y equipo, reclamaciones o cualesquiera otros conceptos autorizados por ley, ordenanza o resolución aprobada al efecto y por los reglamentos adoptados en virtud de las mismas".

**[3]** Cónsono con esto, "[l]as distintas disposiciones estatutarias regulando la realización de obras y contratación de servicios para el Estado y sus agencias e instrumentalidades tienen por meta la

protección de los intereses y **\*1012** dineros del pueblo contra el dispendio, la prevaricación, el favoritismo y los riesgos del incumplimiento". *Cancel v. Municipio de San Juan*, 101 D.P.R. 296, 300 (1973). Por tan crucial importancia, en reiteradas ocasiones hemos señalado que "la buena administración de un gobierno es una virtud de democracia, y parte de su buena administración implica llevar a cabo sus funciones como comprador con eficacia, honestidad y corrección ...". *Lugo v. Municipio Guayama*, 163 D.P.R. 208, 214 (2004), citando a *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990). Véanse, además: *Quest Diagnostic v. Mun. San Juan*, 175 D.P.R. 994 (2009); *Ríos v. Municipio Isabela*, 159 D.P.R. 839 (2003); *Fernández & Gutierrez v. Mun. San Juan*, 147 D.P.R. 824, 829 (1999); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001, 1005 (1994).

[4] En *Cordero Vélez v. Mun. de Guánica*, 170 D.P.R. 237, 249 (2007), fuimos enfáticos cuando señalamos "que los tribunales debemos velar por el cumplimiento con las disposiciones legales dirigidas a proteger los desembolsos públicos, ya que esta normativa tiene como fin proteger el interés público en los dineros del pueblo y no a las partes contratantes". Por ende, la contratación con un municipio requiere de unos formalismos y procedimientos específicos que persiguen, precisamente, proteger el erario. Por esta razón, "la facultad del municipio de obligar fondos públicos para el pago de una obligación, está supeditada a que se sigan los procedimientos establecidos por ley". Íd., pág. 248.

[5–6] El Art. 8.016 de la Ley de Municipios Autónomos de 1991 (21 L.P.R.A. sec. 4366), también le impone a los municipios la obligación de mantener "un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos y enviarán copia de éstos y de las escrituras de adquisición y disposición de bienes a la Oficina del Contralor de Puerto Rico, conforme a las secs. 97 *et seq.* del Título 2 y su Reglamento". Véase el Art. 1 de la Ley Núm. 18 de 30 de octubre de 1975, según enmendada, **\*1013** 2 L.P.R.A. sec. 97. Es decir, para contratar con un municipio es necesario que: (1) el acuerdo se haya hecho constar por escrito; (2) se mantenga un registro fiel con miras a establecer la existencia del contrato; (3) se remita copia de éste a la Oficina del Contralor, y (4) se acredite la certeza de tiempo, esto es, que el contrato se otorgó quince días antes. Véanse: *Colón Colón v. Mun. de Arecibo*, supra, págs. 725–726; *Lugo v. Municipio Guayama*, supra, págs. 215–216; *Las Marías v. Municipio San Juan*, 159 D.P.R. 868, 878 (2003); *Ríos v. Municipio Isabela*, supra, págs. 845–846; *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 53–54 (1988). Estos requisitos deben ser observados rigurosamente, ya que su ausencia priva de eficacia y validez el acuerdo con el municipio. *Lugo v. Municipio Guayama*, supra, pág. 216. Sin embargo, aclaramos que con la aprobación de la Ley Núm. 127 de 31 de mayo de 2004 (2 L.P.R.A. sec. 97), el incumplimiento con el requisito de que todo contrato sea registrado y remitido a la Oficina del Contralor tal como lo exigen el Art. 1 de la Ley Núm. 18, *supra*, y el Art. 8.016 de la Ley de Municipios Autónomos de 1991, *supra*, no tiene el efecto de anular el contrato en controversia, aunque impide que puedan exigirse las prestaciones hasta tanto el acuerdo se registre y se remita a la Oficina del Contralor. Íd. Véase, además, *Quest Diagnostic v. Mun. San Juan*, supra.

**[7]** Cuando se trata de una contratación municipal, debemos tener en mente la clara política pública que impera a favor de la aplicación de una normativa restrictiva. *Cordero Vélez v. Mun. de Guánica*, supra, pág. 248; *Lugo v. Municipio Guayama*, supra, pág. 215. Todo esto responde a que la sana y recta administración pública es un asunto revestido del más alto interés público. *Quest Diagnostic v. Mun. San Juan*, supra; *Cordero Vélez v. Mun. de Guánica*, supra, pág. 248; *Fernández & Gutierrez v. Mun. San Juan*, supra. En vista de tan trascendental interés, hemos asegurado que en los casos de una contratación municipal, las partes privadas deben ejercer un rol más activo, toda vez **\*1014** que no están exentos del cumplimiento de la ley. *Quest Diagnostic v. Mun. San Juan*, supra; *Cordero Vélez v. Mun. de Guánica*, supra, pág. 251; *Las Marías v. Municipio San Juan*, supra, pág. 880; *Lugo v. Municipio Guayama*, supra, pág. 215.

**[8]** Ahora bien, el cumplimiento con las disposiciones de la Ley de Municipios Autónomos no corresponde únicamente a las personas privadas. Los tribunales "desalentamos la práctica de incumplir con los procedimientos establecidos en la Ley de Municipios para el otorgamiento de contratos municipales". *Cordero Vélez v. Mun. de Guánica*, supra, pág. 253. Por lo tanto, *ningún municipio podrá satisfacer deuda alguna que no surja de un contrato que conste por escrito y que, a su vez, haya sido registrado y remitido a la Oficina del Contralor.* La exigencia de que los contratos con los municipios consten por escrito responde a un requisito de carácter constitutivo que el legislador incluyó con el propósito de crear un "mecanismo profiláctico tendiente a evitar pagos y reclamaciones fraudulentas e ilegales". *Colón Colón v. Mun. de Arecibo*, supra, pág. 726.

### III

Sin lugar a dudas, cuando el Municipio acordó con la Corporación en 1995 la administración del CDT de Quebradillas, no hubo más que acuerdos verbales entre las partes. Por ello, el Tribunal de Primera Instancia señaló en su sentencia que, como los requisitos de contratación con los municipios son de carácter constitutivo y no se cumplieron, no nació a la vida jurídica un contrato válido y exigible entre las partes. Por ende, el Tribunal de Primera Instancia concluyó que según *Colón Colón v. Mun. de Arecibo*, supra, al no existir un contrato escrito, no procedía la acción en cobro de dinero presentada por el Municipio. El Tribunal de Apelaciones erró al confirmar esa conclusión y dictamen.

**[9]** A través de toda la jurisprudencia en la que hemos **\*1015** evaluado casos como éstos, hemos recalcado que "exigir que los contratos se reduzcan a escrito tiene una insoslayable dimensión de sana administración pública". *Colón Colón v. Mun. de Arecibo*, supra, pág. 727. Véanse, además: *Fernández & Gutierrez v. Mun. San Juan*, supra, pág. 829; *Ríos v. Municipio Isabela*, supra, pág. 845. Es decir, nuestra conclusión reiterada responde al principio subyacente en la contratación con el gobierno: la confianza de nuestro pueblo en la correcta utilización del peculio público. Consiguientemente, cuando nos enfrentamos a controversias que involucren

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

fondos públicos, los tribunales debemos vigilar principalmente que no se ponga en tela de juicio la utilización correcta del dinero de nuestro pueblo.

Así, aunque en *Colón Colón v. Mun. de Arecibo*, supra, determinamos que la acción en cobro de dinero incoada por el señor Colón Colón por los servicios brindados al Municipio de Arecibo no procedía ante la ausencia de un contrato por escrito entre las partes, nuestra conclusión a esos efectos no iba dirigida a favorecer sin razón alguna a los municipios. Más bien nuestro proceder siempre ha sido salvaguardar los fondos públicos. De esa forma honramos el valor cardinal que por años les hemos otorgado. En última instancia, de no hacerlo serían los intereses de nuestros ciudadanos los que se verían lesionados.

En los casos sobre contratación que hemos evaluado a la luz de la Ley de Municipios Autónomos, la parte perjudicada es un ente privado. En cambio, en la situación de hechos que hoy nos ocupa quien reclama el reembolso de dinero no es una persona privada sino el Municipio. Esa distinción es crucial. La Corporación sostiene que el Municipio "pretende que este ... Tribunal ... entienda y resuelva que una actuación nula de un Municipio, no puede enforzarse [sic] si es [en] contra de los intereses del Municipio pero, *a contrario sensu*, puede enforzarse [sic] si beneficia al Municipio". Alegato de la parte recurrida, pág. 5. Esta conclusión es errada. Aquí no se trata de favorecer a un municipio. Se trata, como hemos dicho, de proteger el dinero **\*1016** del pueblo. Si el Municipio desembolsó dinero público incorrectamente mediante un acuerdo nulo, tiene el derecho a recobrarlo. Si concluyéramos lo contrario, estaríamos dejando en manos privadas unos fondos públicos que no le corresponden.

Por esta razón, si el acuerdo entre las partes carece de eficacia, no procede que el Municipio desembolsara dinero alguno mediante un contrato que nunca advino a la vida. Después de todo, la fiscalización adecuada de los usos del erario resulta de vital importancia para mantener la confianza del ciudadano en el gobierno y la salud de nuestra democracia. Véase *RBR Const., S.E. v. A.C.*, 149 D.P.R. 836 (1999).

Por otra parte, la Corporación afirma que constituye una salida "ilegal, antijurídica e inmoral" que el Municipio pretenda que se cree una norma distinta para cuando es un municipio quien reclama, ya que "se estaría dando carta abierta a los municipios para que no cumplieran con la Ley Municipal y de esta manera decidieran *ex parte* qué contratos quieren cumplir y cuáles no quieren cumplir". Alegato de la parte recurrida, págs. 10–11. Ese razonamiento no nos convence. No hacer la distinción cuando es un ente público el que reclama permitiría que un funcionario inescrupuloso favorezca a ciertos contratistas, pagándoles de antemano por unos servicios, pero sin un contrato escrito, con la intención de que cuando se inicie el proceso legal de cobro de dinero, se pueda presentar como defensa que el contrato no cumple con los requisitos formales exigidos por ley y el contratista no tenga que devolver lo que se le pagó ilegalmente. Eso socavaría la política pública de "protección de los intereses y dineros del pueblo contra el dispendio, la prevaricación, el favoritismo y los riesgos del incumplimiento". *Cancel v. Municipio de San Juan*, supra, pág. 300.

Por consiguiente, en *Colón Colón v. Mun. de Arecibo*, supra, en protección del erario, no validamos la acción en cobro de dinero de un individuo contra un municipio. Por **\*1017** esa misma razón procede la acción de cobro a la inversa, de un municipio a un ente privado. Así lo

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

exige el valor apremiante que nuestro sistema jurídico le otorga a la sana administración de los fondos públicos.

> La corrupción y el desembolso indebido o ilegal de fondos públicos —en sus formas múltiples, a veces burdas y otras sofisticadas— son actos incompatibles con el sistema de gobierno democrático consagrado en nuestra Constitución y apuntalado en el respeto a la dignidad humana y los dineros del pueblo como único soberano. No importa las modalidades que adopten ni la jerarquía del funcionario involucrado, las mismas son intolerables. En última instancia, quien verdaderamente se perjudica, no sólo en lo económico sino en lo moral, es la ciudadanía en general independientemente de su afiliación política. Es, pues, obligación de los tribunales reivindicar esos valores fundamentales. *E.L.A. v. Soto Santiago*, 131 D.P.R. 304, 322 (1992), citando *A.E.E. y A.A.A. v. P.N.P.*, 128 D.P.R. 294, 294–295 (1991), voto concurrente del Juez Asociado Señor Negrón García, al cual se unieron los Jueces Asociados Señores Rebollo López y Andréu García.

[10] Sin duda, no podemos validar la erogación de fondos públicos indiscriminadamente. Su utilización debe ser cuidadosa. *E.L.A. v. Cole*, 164 D.P.R. 608, 643 (2005). Es nuestro deber y responsabilidad velar por que los fondos públicos respondan directamente a las necesidades de la ciudadanía. Íd.

> Específicamente, en el contexto de la contratación gubernamental, hemos dicho que la misma está revestida del más alto interés público en cuanto involucra el uso de bienes o de fondos públicos. Por eso deben aplicarse rigurosamente las normas sobre los contratos y el desembolso de esos fondos para proteger los intereses y el dinero del Pueblo. Principalmente, no se puede ignorar que todo organismo gubernamental está obligado a observar cabalmente la esencia de las disposiciones constitucionales porque los fondos públicos sólo pueden gastarse para fines públicos legítimos. *Art. VI, Sec. 9, Const.* E.L.A., L.P.R.A., Tomo 1; *De Jesús González v. A.C.*, 148 D.P.R. 255 (1999). *C.F.S.E. v. Unión de Médicos*, 170 D.P.R. 443, 452 (2007). **\*1018**

## IV

Nos resta determinar qué remedio ampara al Municipio para obtener el reembolso de los fondos que fueron desembolsados ilegalmente. Al respecto, el Municipio indica que el foro intermedio erró al no resolver las mociones de sentencia sumaria a la luz de la doctrina de enriquecimiento injusto en su vertiente negativa. Por su parte, la parte recurrida niega la utilización de esta figura pues

> [a] través de la jurisprudencia innumerables ciudadanos y personas particulares han brindado servicios a los municipios por cientos de miles de dólares y no han podido cobrar sus servicios por el requisito estatutario de que los contratos tienen que ser por escrito. Mal puede ahora el Municipio de Quebradillas pretender que habiendo incurrido en la misma falla, que privó a todos estos ciudadanos y corporaciones de cobrar por sus servicios, no se aplique la

letra de la ley y se permita que el Municipio continúe su reclamación. Alegato de la parte
recurrida, pág. 11.

En *Colón Colón v. Mun. de Arecibo*, supra, pág. 728, señalamos que "conforme al alto interés
público involucrado, no hay cabida en estos casos para los remedios en equidad". Ahora bien, no
podemos perder de perspectiva que ese análisis lo hicimos fundamentándonos en el principio de
que permitir una acción en equidad contra un municipio para exigir una prestación producto de
un contrato nulo violaría la política pública establecida en la ley municipal.

[11] Ahora bien, en *E.L.A. v. Soto Santiago*, supra, resolvimos que el término prescriptivo para
instar una acción para el cobro de dinero con el objetivo de restituir unos fondos públicos
obtenidos ilícitamente, es el de quince años dispuesto en el Art. 1864 del Código Civil, 31
L.P.R.A. sec. 5294. Señalamos entonces que, "en su fondo, tratamos aquí con una situación que
permite invocar el principio de derecho de que nadie debe enriquecerse injustamente a costa de
otro". *E.L.A. v. Soto Santiago*, supra, pág. 317.


Procede invocar el mismo principio aquí. Como no existe **\*1019** disposición legislativa expresa
en la Ley de Municipios Autónomos de 1991 que atienda directamente este tipo de acción legal
por parte de los municipios cuando no existe un contrato escrito entre las partes, procede que
resolvamos conforme a equidad. Art. 7 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 7.[2]

[12] "La doctrina de enriquecimiento injusto es casi tan antigua como el Derecho mismo."
*E.L.A. v. Cole*, supra, pág. 632. "Esta figura se encuentra subsumida en la figura de los
cuasicontratos." Íd. "Los cuasicontratos generan obligaciones a base del principio de que nadie
debe enriquecerse u obtener lucro inequitativamente a costa del perjuicio de otro." C.J. Irizarry
Yunqué, *Responsabilidad civil extracontractual: un estudio basado en las decisiones del
Tribunal Supremo de Puerto Rico*, 6ta ed., 2007, pág. 3. "[E]s un principio general del derecho
fundado en la equidad que informa todo el ordenamiento jurídico." *Ortiz Andújar v. E.L.A.*, 122
D.P.R. 817, 822 (1988). "Es un corolario del concepto de equidad, lo cual equivale a decir que
es un corolario del concepto de justicia." *E.L.A. v. Cole*, supra, pág. 632. Véase, además, *Silva v.
Comisión Industrial*, 91 D.P.R. 891 (1965).


Recurrimos a esta figura cuando "la ley no ha previsto una situación en la que se produce un
desplazamiento patrimonial que no encuentra una explicación razonable en el ordenamiento
vigente". *Ortiz Andújar v. E.L.A.*, supra. Véanse: *Garriga, Hijo, Inc. v. Cond. Marbella*, 143
D.P.R. 927, 933 (1997); *E.L.A. v. Soto Santiago*, supra, pág. 319. Véase, además, J. Puig Brutau,
*Fundamentos de derecho civil*, Barcelona, Ed. Bosch, 1983, T. II, Vol. 3, pág. 44.

[13] Por eso, el enriquecimiento injusto se configura únicamente cuando concurren los
requisitos siguientes: (1) la existencia de un enriquecimiento; (2) un empobrecimiento **\*1020**
correlativo; (3) una conexión entre el empobrecimiento y el enriquecimiento; (4) falta de causa
que justifique el enriquecimiento, y (5) inexistencia de un precepto legal que excluya la
aplicación del enriquecimiento sin causa. *Hatton v. Mun. de Ponce*, supra, pág. 1010; *Ortiz Andú
jar v. E.L.A.*, supra, pág. 823.


[14] La doctrina ha señalado que el enriquecimiento injusto puede darse en dos modalidades.

Mun. de Quebradillas v. Corp. Salud Lares, 180 D.P.R. 1003 (2011)

2011 TSPR 27

*E.L.A. v. Cole*, supra, pág. 634. "[E]l positivo o aumento en el patrimonio (*lucrum emergens*), o el negativo o disminución del patrimonio (*damnum cessans*)." Íd. Cuando hablamos de enriquecimiento injusto negativo (*damnun cessans*) o a la inversa nos referimos al caso en el que " 'un *no gasto* equivale a un ingreso. En otras palabras, en la medida en que alguien sufre una pérdida que ordinariamente debería padecer otro, el primero le ahorra un gasto al segundo. Esta situación no tiene cabida en un sistema donde impera lo justo y debe ser remediada' ". Íd., págs. 634–635, citando a *Ortiz Andújar v. E.L.A.*, supra, págs. 826–827.

En el pasado no hemos permitido que personas privadas invoquen remedios en equidad frente a los municipios con los que contratan, porque "es doctrina reiterada que dichos remedios no se aplicarán cuando resulte[n] contrario[s] a una clara política pública plasmada en un estatuto o en la Constitución". *Las Marías v. Municipio San Juan*, supra, págs. 875–876. Véanse, además: *Hatton v. Mun. de Ponce*, supra, pág. 1010; *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 684–685 (1987). Del mismo modo, como excepción, sí le daremos paso a los remedios en equidad cuando no permitirlos resulte igualmente contrario a una política pública estatuida en una ley o en la Constitución.

Precisamente en el caso particular ante nuestra consideración se configura la excepción a la regla general de no permitir los remedios en equidad. No permitir la acción de enriquecimiento injusto sería contrario a la política pública de sana administración de los fondos públicos estatuida en la Ley de Municipios de 1991. **\*1021**

No hemos permitido que personas privadas invoquen remedios en equidad para recuperar sus inversiones porque eso violaría el objetivo que se persigue con los requisitos formales de contratación que impone la Ley de Municipios Autónomos de 1991. Es decir, avalarlo iría contra el "gran interés del Estado en promover una sana y recta administración pública, [que prevenga] el despilfarro, la corrupción y el amiguismo en la contratación gubernamental". *Las Marías v. Municipio San Juan*, supra, pág. 875. Véanse: *Fernández & Gutierrez v. Mun. San Juan*, supra, pág. 832; *Hatton v. Mun. de Ponce*, supra, 1006; *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 54 (1988); *Morales v. Municipio de Toa Baja*, supra, pág. 693. De igual modo, no aplicar esta figura cuando quien reclama es un municipio, estaría opuesta a una sana administración pública, al dejar en manos privadas los fondos pblicos que le fueron desembolsados contra la ley. "[S]u efecto sería violentar principios de suma importancia encarnados en la Constitución y las leyes del país." *E.L.A. v. Cole*, supra, pág. 634. Véanse, *Colón Colón v. Mun. de Arecibo*, supra; *Hatton v. Mun. de Ponce*, supra.

Evaluada toda la doctrina reseñada, concluimos que procede la acción por cobro de dinero incoada por el Municipio contra la Corporación, al amparo de la figura de enriquecimiento injusto. Como hemos señalado en el pasado, "[l]as normas aplicables [a la contratación con los Municipios] persiguen proteger el interés público y no a las partes contratantes". *Morales v. Municipio de Toa Baja*, supra, pág. 697. De este modo se logra una mayor transparencia en la administración pública, a la vez que se promueve la estabilidad, certeza y credibilidad en la contratación municipal. El beneficiario mayor es, por consiguiente, el interés público. *Las Marías v. Municipio San Juan*, supra, pág. 881. **\*1022**

# V

Por los fundamentos expuestos, *se revoca la sentencia emitida por el Tribunal de Apelaciones y se devuelve el caso al foro primario para procedimientos ulteriores que sean acordes con lo resuelto aquí.*
*Se dictará sentencia de conformidad.*
La Juez Asociada Señora Rodríguez Rodríguez disintió sin opinión escrita. La Jueza Asociada Señora Pabón Charneco no intervino.

## Footnotes

1   Del informe sobre la conferencia preliminar entre abogados las partes estipularon que la Corporación es una persona jurídica sin fines de lucro. Se estipuló, a su vez, la reunión celebrada entre funcionarios del Municipio y la Corporación el 8 de enero de 1998. Por último, se hizo constar entre las estipulaciones la certificación de la Secretaría Municipal que reflejaba que no había ordenanza o resolución por parte de la legislatura municipal que autorizara al alcalde a contratar con la Corporación.

2   Dispone que "[c]uando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos".

End of Document                                                    © 2021 Thomson Reuters. No claim to original U.S. Government
Works.

**EXHIBIT D-1**

163 D.P.R. 208, 2004 WL 2496752 (P.R.), 2004 TSPR 166

Ismael Lugo Ortiz, Plaintiff & Respondent,

v.

Municipality of Guayama, Defendant & Petitioner.

In the Puerto Rico Supreme Court
*Number:* CC-2003-431

**Synopsis**

Petition for *Certiorari* to review a Judgment by *Carmen A. Pesante Martínez, Frank Rodríguez García* and *Andrés A. Salas Soler*, Js. from the Appeals Court, through which Judgment by the Trial Court was confirmed that "Granted" a complaint for breach of contract, and ordered Petitioner herein to pay the amount of $96.973.10. *Judgment is rendered and which confirms, although under different grounds, that one issued by the Appeals Court. The Municipality of Guayama is ordered to comply with the requirement of registering and remitting to the Comptroller's Office the herein questioned contract, so that Respondent can demand payment of what had been agreed to.*

*José M. Colón Pérez*, attorney for petitioner; *Roberto J. Torres Antommattei*, attorney for respondent.

Associate Judge Mr. Rebollo-López, issued the Court's opinion.

Mr. Ismael Lugo-Ortiz and the Municipality of Guayama (Municipality), represented by its Mayor, Héctor L. Colón-Mendoza, undersigned a professional services contract through which Lugo-Ortiz was bound to provide consulting services with regards to the preparation of proposals geared towards obtaining external resources for the benefit of stated municipality. The Municipality, in turn, agreed to pay Lugo-Ortiz ten percent of the total amount of funds obtained through stated proposals.

On March 15th of 1996, Lugo-Ortiz prepared a proposal addressed to the Federal Department of Justice, in accordance with the *C.O.P.S. Universal Hiring Program.*[1] This proposal was signed by Héctor L. Colón-Mendoza, Municipal Mayor, Mr. Ruben Cruz-Berrios, Municipal Police Commissioner, and Lugo-Ortiz as a consultant in charge of preparing stated proposal. **\*211**

The Federal Justice Department, several months after receipt of stated proposal, notified the Municipality that a certification titled

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.          1

*Certification Regarding Lobbying, Debarment, Suspension, and Other Responsibility Matters* was missing in the documents sent. This certification consisted of a standard pre-printed form which would bear the Mayor's name and signature.[2]

The Municipality, allegedly, took several steps for the purpose of locating and informing Lugo-Ortiz about the required documentation. Upon said steps resulting fruitless, it resorted to approach Mr. Alcides López-Miranda -an accountant with whom the Municipality held a contractual relationship- and the person who took care of obtaining and forwarding the required certification to the Federal Department of Justice.[3]

On January 29th of 1998, the Federal Department of Justice approved the submitted proposal, granting the Municipality the sum of $969,731. Lugo-Ortiz found out about said approval through a press release issued by the office of the then Resident Commissioner Carlos Romero-Barceló, and billed the Municipality for ten percent of the funds obtained, as agreed to in the above indicated contract. Lugo-Ortiz later found out that the professional services contract executed with the Municipality was never registered with, nor remitted to the Puerto Rico Comptroller's Office, and requested to meet with the Municipality's Finance Director, who confirmed stated information to him.

On April 21st of 1998, Lugo-Ortiz, after numerous demands for payment, filed a complaint for breach of contract, collection of monies and torts against the Municipality at the Trial Court, Guayama Superior Court. He claimed the amount of **212** ninety-six thousand seventy-three dollars, equal to ten percent of the total amount raised, ten thousand for financial damages and mental anguish, and a sum of not less than five thousand dollars to cover costs and attorney fees. The Municipality, in their answer to complaint, alleged nullity of the legal relationship between the parties, and failure to comply with the obligations contracted therein. Later on, it filed a motion for summary judgment, which the trial court *denied.*

Trial on the merits was held on August 28th of 2001. The Municipality, upon the conclusion of presentation of evidence by plaintiff, submitted a motion for *non-suit* under grounds that the contract in this controversy was not registered, as demanded under the Autonomous Municipalities Act for the Commonwealth of Puerto Rico (Autonomous Municipalities Act), Law No. 18 dated August 30th of 1991, within its Art. 8.016 (21 L.P.R.A. sec. 4366).

The initial forum, after defendants presented their evidence, rendered judgment in which it *granted* the complaint filed by Lugo-Ortiz. Upon so ruling, it sustained that "[t]he mere fact of the contract not having been registered, *per se*, does not void same" and that "[i]n such cases, the Court's obligation is to cautiously observe all facts relevant to the issuance, execution and compliance with the obligations contained within same".

This forum deemed that the herein questioned contract substantially complied with all of the requirements under law, that there is no fraudulent claim or payment involved, nor does there exist any indication that same deals with any case of favoritism, corruption, waste or risk of non-compliance. Moreover, it concluded that Lugo-Ortiz "complied with all of his obligations under the Professional Services Contract, except for filing of the above indicated Certification, which he would have so done without any greater difficulties if he would **213** have been notified regarding such a problem by the Municipality of Guayama."

State forum, safeguarded under stated arguments and citing the doctrines of proprietary acts and unjust enrichment concluded that, in the instant case, no important principle within public order was breached, wherefore, the Municipality needed to comply with its part of the agreement. The Municipality, displeased with the primary forum's decision, approached the intermediate appellate forum through a writ of appeal. In summary, it alleged that the services signed to by the parties was inefficient, since same had not been registered in accordance with the quoted law.[4]

The Appeals Court, trough judgment to stated effects, *confirmed* the appealed ruling. Upon so ruling, it expressed that the fact that if the contract under contention was neither registered nor sent to the Comptroller's Office, does not necessarily entail that same becomes void. It deemed that the instant case does not deal with unlawful or inappropriate use of public funds, and since same dealt with consignment of Federal funds, "disbursement of municipal funds itself" was not required. Finally, it indicated that in this type of case "both contracting parties must be equally required to register the contract" or, in the alternative, that the party contracting with the municipality verify that the contract has been registered.

Still dissatisfied, the Municipality appealed -through *certiorari*- to this Court, alleging that the Appeals Court influenced upon

> ...concluding, as the Trial Court so did, that plaintiff-respondent complied with his contractual obligation, by providing adequate technical assistance for approval of the C.O.P.S. Universal Hiring Program proposal, this being an essential element of his contractual obligations. **\*214**

> ...ruled (just as Trial Court did), that the contract between the Municipality of Guayama and plaintiff-respondent was efficient, in spite of non-compliance with pertinent provisions of the Autonomous Municipalities Act, Law No. 81 of August 30th, 1991, as amended. Certiorari petition, page 10.

Petition for *Certiorari* having been thus examined, as well as its attachments, we then granted the plaintiff-respondent a period of time to show cause as to why this Court should not issue the requested order, and render the Judgment to revoke which was issued by the Appeals Court in the instant case. Both parties having appeared, thus and being in a position to rule on the remedy submitted therein, we now proceed to so do.

# I

**[1]** This Court has, on repeated occasions, expressed that "[t]he sound management of government is a democratic virtue, and part of such sound management implies carrying out their duties as a buyer with efficiency, honesty and correctness in protecting the interests and monies of the People which such government represents". Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 871 (1990). See: *Ríos v.* Municipio Isabela, 159 D.P.R. 839 (2003); *Fernández & Gutiérrez v.* Mun. San Juan, 147 D.P.R. 824, 829 (1999); Hatton v. Mun. de Ponce, 134 D.P.R. 1001, 1005 (1994). As to these particulars in Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973), we pointed out that

[t]he asserted statutory provisions [which] regula[te] execution of work and the contracting of services for the State, its agencies and entities, has the goal of protecting the interests and monies of the People against waste, fraud, favoritism and risk of non-compliance.

**[2]** The above serves as a guideline to understand **\*215** the reasons why this Court has repeatedly expressed itself in favor of a restrictive rule, insofar as contracts undersigned between private entities and municipal entities. In such manner,

...we have highlighted the rigorousness of legal precepts which govern business relationships between private entities and municipalities, that aspire to advance sound and proper public management, a matter which is vested of the utmost public interest. *Fernández Gutiérrez v. Mun. San Juan*, supra, page. 829.

**[3]** Of particular relevance and pertinence to the matter reviewed for our consideration today, is stated Art. 8.016 of the Autonomous Municipalities Act, which establishes that municipalities must

...maintain a registry for all contracts granted, including amendments to same [,] and shall send copies of same and of acquisition deeds and disposition of assets to the Puerto Rico Comptroller's Office, in accordance with sec[t]. 97, *et seq,* of Title 2 and its Regulations. 21 L.P.R.A. sec. 4366 (ed. 2000).

**[4]** Likewise, and subject to certain exceptions[5] Law No. 18 dated October 30th of 1975, as amended, imposes upon municipalities, departments, agencies, entities, offices and any other body **\*216** of the Commonwealth of Puerto Rico, *without any exception whatsoever,* the obligation to

...maintain a registry of all contracts granted, including amendments to same, and shall remit copy of same to the Comptroller's Office within fifteen (15) days following the issuance date of the contract or amendment. 2 L.P.R.A. Sec. 97.

Upon the occasion of interpreting stated statutory provision in Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37, 53–54 (1988), this Court established certain formal requirements which need to be rigorously followed whenever municipal contracts are executed. Same are: (i) that the agreement be executed in writing; (ii) *that faithful register be kept for purposes of establishing existence of the contract;* (iii) *that a copy be forwarded to the Comptroller's Office* and (iv) that assurance with regards to time period be certified, to wit, that it was executed and granted fifteen days prior.

On the other hand, in *Fernández Gutiérrez v. Mun. de San Juan*, supra, page 833, after reaffirming the above stated requirements, we indicated that same must be rigorously complied with, and that their absence therein deprived efficacy and validity to the stated municipal agreement. Likewise, we pointed out that:

[t]hese precepts regarding a sound public management policy reflect the legislative intent *of creating a means for collating and publicizing granting of contracts by municipalities, which bear a constituent feature with respect to the effectiveness of same.* (Emphasis provided) *Fernández Gutiérrez v. Mun. San Juan*, *supra*, at page 830.

Regarding this same subject, in *Ríos v. Municipio de Isabela*, supra, this Court applied the above indicated rule by concluding that the Isabela Municipal Assembly lacked the authority to grant effectiveness to a municipal contract which was voidable for not having been drafted through a

**\*217** written contract, not having been registered within the Municipal log-books, nor copy of same being forwarded to the Comptroller's Office. In tune with the above, in Las Marías v. Municipio San Juan, 159 D.P.R. 868, 874 (2003), this Court was emphatic when sustaining that "no Municipality may settle any debt whatsoever, which arises from an agreement which has not been registered and remitted to the Comptroller's Office." Upon so ruling, this Court expressed that non-demands within municipal contracts not forwarded to the Comptroller, answers to the fact that same are not considered to be legally perfected. In stated sense, we were clear when stating that any agreement effected between a private party and a municipality which does not follow the procedures provided for by law, is void. *Las Marías v. Municipio San Juan*, *supra*. See as well, *Hatton v. Mun. de Ponce*, *supra*, page 1007.

In this same case we outlined the criteria that needs to be followed in all municipal contracting. We indicated as to stated effects:

> First, municipalities must not demand performance of services without having certified to the private party that the agreement was narrowed into a written contract, that same was registered, and that copy was forwarded to the Comptroller's Office, as provided for by law. Stated certification should minutely detail all procedures effected, particularly forwarding of the contract to the Comptroller's Office and would specify, at minimum, the date, time and registration number for the document at stated office. Said procedures need to be accounted for, even in emergency cases. (Hyphens omitted.) *Las Marías v. Municipio San Juan*, supra, pages 879–880.

**[5]** Likewise, we emphasize the fact that "private parties need to exercise a more active role whenever contracting with the municipalites, [i]nsofar that non-governmental entities which contract with municipalities are not exempted from complying with the law". *Las Marías v. Municipio San Juan*, supra, page 880.

We emphasize that it would be prudent that they demand stated certification from the municipalities prior to providing any service. In this manner, **\*218** that any private party which idles by and renders services without demanding reliable proof that the Government complied with its duty, risks taking on liability for its (own) losses.

**[6]** The above indicated legal rule was *radically affected* by the passing of Law No. 127, dated May 31st of 2004.[6] As arises from the Statement of Reasons in the indicated legal provision, the end pursued by the Legislative Assembly upon approving this law, was to establish that failure to comply with what is established within stated Law No. 18 "shall not be cause for a competent court to declare that the contract or legal transaction in question is void, but same shall be sufficient insofar that disbursement for a payment or rendering contained within such contract be paid for, until all requirements of stated Article 1, are complied with." In this manner, and as to what is pertinent herein, Art. 1 of Law No. 18, *supra,* was amended for purposes of adding two new subsections, which were named (d) and (e).[7]

Stated subsections provided for the following:

> (d) Non-compliance with what is provided for in Article 1 of this Law, or with the equivalent provision regarding contract registry encompassed in Article 8.016 of Law No. 81, dated August 30th of 1991, as amended[,] known as the "Commonwealth of Puerto Rico

Autonomous Municipalities Act" *shall not, per se, be cause for a competent Court to void any contract or legally valid legal transaction. Notwithstanding, no rendering or consideration object of this contract may be demanded, **219** until compliance with what is provided for within Article 1 of this Law, is complied with.*

> (e) It shall be stated within each contract subject to registry, in accordance to Article 1 of this Law, in a clear and conspicuous manner, an admonishment which will read as follows: "No performance or consideration subject of this contract may be demanded until same has been submitted for registry at the Comptroller's Office, in accordance with the provisions of Law No. 18, dated October 30th of 1975, as amended. (Emphasis provided.) Law No, 127, dated May 31st of 2004.

Likewise, within Article 2 of quoted Law No. 127 (2004 Laws of Puerto Rico 592), it was provided that stated law would come into force immediately after its approval, and would be applicable to all governmental or municipal contracts executed on or prior to approval of such law.

[7] As we may see, *the above mentioned amendments bear the effect of changing, in a radical manner, the rulings developed by this Court insofar as municipal contracts.* As is expressly provided for in stated Law No. 127, after its approval, *the courts may not decree nullity of a municipal contract for the mere fact that same has not been registered nor remitted to the Comptroller's Office.* The sole *exception* made in these cases is to the effect that the contracting parties *cannot demand any of the performances or considerations object of the contract, until same has been registered and remitted to the Comptroller, such as is demanded by Art. 8.016 of the Autonomous Municipalities Act, supra, and by Law No. 18, as amended, supra.*

It is important to emphasize that the above mentioned amendments *do not bear the effect of altering public policy established within our legal system, to the effect that sound management by a government entails carrying out its functions as a purchaser with utmost efficiency, for purposes of protecting the interests and monies of the People.* This responds to a great interest by the State towards promoting sound and proper public management **220** avoiding waste, corruption and cronyism within governmental contracting.[8]

In view of the above, *we stress* the importance of registry and remittance of municipal contracts to the Comptroller's Office, and behoove the parties to immediately comply with stated requirements for purposes of insuring that stated means of collating complies with its main purpose: to prevent favoritism, corruption, waste, fraud, extravagances, negligence, and the risks of non-compliance with public management.

## II

As we stated before, the professional services contract undersigned between Mr. Ismael Lugo-Ortiz and the Municipality was not registered nor remitted to the Comptroller's Office, such as is explicitly demanded in the quoted Art. 8.016 of the Autonomous Municipalities Act, and in Art. 1 of Law No. 18. As we had previously indicated, prior to the approval of Law No, 127, supra,

not registering or remitting copy of a municipal contract to the Comptroller's Office was cause sufficient for a court to decree nullity of the agreed to pact. Notwithstanding, after stated legislative piece was passed, non-compliance with stated requirements does not have the effect of voiding the questioned contract, although it impedes that the services agreed to can be demanded, until and when the contract has been registered and remitted to the Comptroller's Office.

Insofar as the approach submitted by the Municipality to the effect that Lugo-Ortiz failed to comply with his contractual obligation in providing adequate technical assistance for approval of the proposal to the *C.O.P.S. Universal Hiring Program*, suffice it to indicate that the Municipality has not **221** demonstrated to us that upon issuing its ruling, the trial court incurred in passion, prejudice or manifest error.

**[8]** To stated effects we have to recall the rule of deference which appellate forums must follow, insofar as determinations of fact and weighing of evidence, which a trial courts ensue. In the absence of passion, prejudice and manifest error or partiality, this Court will not intervene as to determinations of fact and weight of the evidence pondered by trial courts. Trinidad v. Chade, 153 D.P.R. 280 (2001); Argüello v. Argüello, 155 D.P.R. 62 (2001).

In the instant case the ruling court, after evaluating all evidence submitted, deemed that Mr. Lugo-Ortiz complied with his contractual obligation by providing all technical assistance required by the Municipality. Likewise, it concluded that the steps followed by the Municipality for purposes of informing Lugo-Ortiz about the document requested by the Federal Department of Justice were insufficient, and that he would have submitted such document -without major difficulty- if he would have been notified about the need for same. Not having been demonstrated that the ruling court acted with prejudice, passion or partiality, or that it committed manifest error, we see no reason whatsoever to intervene with its decision.

# III

In merit of that indicated above, and *although because of different grounds,* it is appropriate to confirm the judgment issued by the Appeals Court, confirming the one rendered by the Trial Court. In virtue of which, and considering that the herein disputed contract was never registered or remitted to the Comptroller's Office, it is moved that the Municipality be ordered to comply with stated requirements **222** for purposes that Mr. Ismael Lugo-Ortiz may demand the payment thus agreed to.

*Judgment shall be issued therein.*

Associate Justice Fuster-Berlingeri did not intervene.

Footnotes

1   Through this proposal, federal funds were requested to cover for seventy five per cent of salaries and fringe benefits for twenty five police officers to be recruited by the Municipality of Guayama (Municipality).

Ortiz v. Municipality of Guayama, 163 D.P.R. 208 (2004)

2004 TSPR 166

2    *Except for that document, the proposal submitted was correct and contained all information required for its processing.*

3    *Mr. López-Miranda did not earn fees for the services he rendered regarding the proposal.*

4    *It further alleged that upon presenting an inadequate and incomplete proposal, Mr. Lugo-Ortiz did not comply with one of the essential service contract obligations, wherefore, that the Municipality could unilaterally terminate all contractual obligations.*

5    *In accordance with what the law provides, it shall not be necessary to send to the Comptroller, copy of the following contracts:*
*(1) For personal services of a sporadic nature, for periods of less than six months, non-extendable, and costing below two thousand dollars.*
*(2) Personal professional services for a term of one year or less, non-extendable, and services which do not entail any employment or post, and costs of which do not exceed five thousand dollars.*
*(3) For construction work, costs of which do not exceed two thousand dollars.*
*(4) Those granted through public bids, except those not related to construction works or projects.*
*(5) For professional services by physicians and health professionals, granted by governmental entities, key purpose of which is the rendering of medical services.*
*(6) Any other type of contract which the Comptroller, through regulations to stated effects, determines these not be sent to him.*

6    *This law accepted the theory proposed in* Mun. de Ponce v. A.C. et al., 153 D.P.R. 1 (2000) *—and abandoned by this Court in its subsequent pronouncements— to the effect that the consequence of non-compliance with registry and remittance requirements for the municipal contract, is not nullity as is established in Art. 8.016 of the Autonomous Municipalities Act for the Commonwealth of Puerto Rico,* 21 L.P.R.A. sec. 4366, *rather, the one provided for in Art. 8.004, which establishes that "[n]o disbursement whatsoever relating to contracts, lacking verification that stated contract was forwarded to the Puerto Rico Comptroller's Office, shall be authorized ...".* 21 L.P.R.A. sec. 4354.

7    *Moreover, subsection (c)(5) was added, and the previous subsection was newly numbered as (c)(6).*

8    *Fernández Gutiérrez v. Municipio San Juan*, ante, pág. 829; *Hatton v. Mun. de Ponce*, supra, page 1006; Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R 37, 54 (1988); Morales v. Municipio de Toa Baja, 119 D.P.R. 682, 693 (1987).

---

End of Document                                      © 2021 Thomson Reuters. No claim to original U.S. Government

**EXHIBIT D-2**

163 D.P.R. 208, 2004 WL 2496752 (P.R.), 2004 TSPR 166

Ismael Lugo Ortiz, demandante y recurrido,
v.
Municipio de Guayama, demandado y peticionario.

En El Tribunal Supremo De Puerto Rico.
*Número:* CC-2003-431

**Synopsis**

Petición de *Certiorari* para revisar una Sentencia de *Carmen A. Pesante Martínez, Frank Rodríguez García* y *Andrés A. Salas Soler*, Js. del Tribunal de Apelaciones, mediante la cual se confirmó una Sentencia del Tribunal de Primera Instancia que declaró "con lugar" una demanda por incumplimiento de contrato y ordenó al aquí peticionario pagar la cantidad de $96,973.10. *Se dicta sentencia en la que se confirma, aunque por fundamentos distintos, la emitida por el Tribunal de Apelaciones. Se le ordena al Municipio de Guayama que cumpla con el requisito de registrar y remitir a la Oficina del Contralor el contrato aquí en cuestión, para que el aquí recurrido pueda exigir el pago de lo pautado.*

*José M. Colón Pérez*, abogado parte peticionaria; *Roberto J. Torres Antommattei*, abogado parte recurrida.

El Juez Asociado Señor Rebollo López emitió la opinión del Tribunal.

El Sr. Ismael Lugo Ortiz y el Municipio de Guayama (Municipio), representado por su alcalde Héctor L. Colón Mendoza, suscribieron un contrato de servicios profesionales mediante el cual Lugo Ortiz se obligó a prestar servicios de consultoría con relación a la preparación de propuestas dirigidas a obtener recursos externos en beneficio del mencionado municipio. Por su parte, el Municipio se obligó a pagarle a Lugo Ortiz el diez por ciento del total de los fondos recaudados a través de las referidas propuestas.

El 15 de marzo de 1996, Lugo Ortiz preparó una propuesta dirigida al Departamento de Justicia federal, en conformidad con el *C.O.P.S. Universal Hiring Program.*[1] Esta propuesta la firmó el Sr. Héctor L. Colón Mendoza, Alcalde del Municipio, el Sr. Rubén Cruz Berríos, comisionado de la Policía Municipal, y Lugo Ortiz como consultor a cargo de la preparación de la propuesta.
**\*211**
A pocos meses de recibida la mencionada propuesta, el Departamento de Justicia federal le notificó al Municipio que en los documentos enviados faltaba una certificación titulada

*Certification Regarding Lobbying, Debarment, Suspension, and Other Responsability Matters.* Esta certificación consistía en una forma preimpresa uniforme en la que se debía incluir el nombre y firma del Alcalde.[2] Alegadamente, el Municipio realizó varias gestiones con el objetivo de localizar e informar a Lugo Ortiz sobre el documento requerido. Al resultar esas gestiones infructuosas, se recurrió al Sr. Alcides López Miranda —contable con el cual el Municipio mantenía una relación contractual— persona que se encargó de obtener y enviar la certificación requerida al Departamento de Justicia federal.[3]

El 29 de enero de 1998, el Departamento de Justicia federal aprobó la propuesta sometida, asignándole al Municipio la suma de $969,731. Lugo Ortiz se enteró de esa aprobación a través de un comunicado de prensa que emitió la oficina del entonces Comisionado Residente Carlos Romero Barceló, por lo que le facturó al Municipio el diez por ciento de los fondos obtenidos, según lo acordado en el contrato antes mencionado. Más adelante, Lugo Ortiz se enteró que el contrato de servicios profesionales suscrito con el Municipio nunca se registró ni se remitió a la Oficina del Contralor de Puerto Rico, por lo que solicitó una reunión con el Director de Finanzas del Municipio, quien le confirmó la información.

Luego de múltiples requerimientos de pago, el 21 de abril de 1998 Lugo Ortiz presentó ante el Tribunal de Primera Instancia, Sala Superior de Guayama, una demanda sobre incumplimiento de contrato, cobro de dinero y daños y perjuicios en contra del Municipio. Reclamó la suma de **\*212** noventa y seis mil novecientos setenta y tres dólares, equivalente al diez por ciento del total recaudado, diez mil dólares en concepto de daños económicos y angustias mentales, y una suma no menor de cinco mil dólares para cubrir las costas y los honorarios de abogado. En su contestación a la demanda, el Municipio alegó la nulidad de la relación jurídica entre las partes y el incumplimiento de la obligación contraída. Más adelante, presentó una moción de sentencia sumaria que el foro de instancia denegó.

El juicio en sus méritos se celebró el 28 de agosto de 2001. Al culminar la presentación de la prueba de la parte demandante, el Municipio formuló una moción de insuficiencia de la prueba (*non-suit*) bajo el fundamento de que el contrato aquí en controversia no se registró según lo exige la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico (Ley de Municipios Autónomos), Ley Núm. 81 de 30 de agosto de 1991, en su Art. 8.016 (21 L.P.R.A. sec. 4366).

El foro de instancia, luego de que los demandados presentaran su prueba, dictó una sentencia en la cual declaró con lugar la demanda presentada por Lugo Ortiz. Al así resolver, sostuvo que "[e]l mero hecho de no haberse registrado el contrato, por sí solo, no lo convierte en nulo" y que "[e]n tales casos la obligación del tribunal es mirar con cautela todos los hechos relevantes al otorgamiento, ejecución y cumplimiento con las obligaciones contenidas en el mismo".

Entendió ese foro que el contrato aquí en cuestión cumplió sustancialmente con todos los requisitos de ley; que no está involucrado un pago o reclamación fraudulenta ni existen indicios de que se trate de un caso de favoritismo, corrupción, despilfarro o riesgos de incumplimiento. Asimismo, concluyó que Lugo Ortiz "cumplió con todas sus obligaciones bajo el Contrato de Servicios Profesionales excepto por la radicación de la Certificación antes mencionada, lo cual hubiese hecho sin mayor dificultad de haber **\*213** sido notificado de tal problema por el Municipio de Guayama".

Amparado en tales argumentos, y citando las doctrinas de actos propios y enriquecimiento injusto, el referido foro concluyó que en el caso de autos no se vulneró ningún principio importante de orden público, por lo que el Municipio debía cumplir con su parte del acuerdo. Inconforme con la determinación del foro primario, el Municipio acudió ante el foro apelativo intermedio mediante un recurso de apelación. En síntesis, alegó que el contrato de servicios suscrito entre las partes era ineficaz porque no se registró de acuerdo con la citada ley.[4]

Mediante sentencia a esos efectos, el Tribunal de Apelaciones *confirmó* el dictamen recurrido. Al así resolver, expresó que el hecho de que el contrato aquí en controversia no haya sido registrado ni enviado a la Oficina del Contralor no acarrea, necesariamente, su nulidad. Entendió que el presente caso no versa sobre un uso ilegal o inapropiado de fondos públicos, pues, tratándose de una asignación de fondos federales, no se requiere "el desembolso de fondos municipales propiamente". Finalmente señaló que en este tipo de caso "se le debe requerir a ambas partes contratantes por igual que se registre el contrato" o, en la alternativa, que la parte que contrata con el municipio se cerciore de que el contrato se haya registrado.

Aún inconforme, el Municipio recurrió —vía *certiorari*— ante este Tribunal, alegando que incidió el Tribunal de Apelaciones al

> ... concluir, igual que el Tribunal de Instancia, que el demandante-apelado, cumplió con su obligación contractual de proveer asistencia técnica adecuada para la aprobación de la propuesta C.O.P.S. Universal Hiring Program, siendo ello un elemento esencial de su obligación contractual. **\*214**

> ... resolver, (igual que el Tribunal de Instancia), que el contrato entre el Municipio de Guayama y el demandante-apelado, era eficaz, a pesar de no cumplirse con las disposiciones pertinentes de la Ley de Municipios Autónomos, Ley Núm. 81 de 30 de agosto de 1991, según enmendada. Petición de *certiorari*, pág. 10.

Examinada la Petición de *certiorari*, así como sus anejos, le concedimos a la parte demandante recurrida un término para mostrar causa por la cual este Tribunal no debía expedir el auto solicitado y dictar Sentencia para revocar la que emitió en el presente caso el Tribunal de Apelaciones. Contando con la comparecencia de ambas partes, y estando en posición de resolver el recurso presentado, procedemos a así hacerlo.

# I

**[1]** En reiteradas ocasiones este Tribunal ha expresado que "[l]a buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficiencia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa". *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990). Véanse: *Ríos v. Municipio Isabela*, 159 D.P.R. 839 (2003); *Fernández & Gutiérrez v. Mun. San Juan*, 147 D.P.R. 824, 829 (1999); *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001, 1005 (1994). Sobre este particular, en *Cancel v. Municipio de San Juan*, 101 D.P.R. 296, 300 (1973), señalamos que

[l]as distintas disposiciones estatutarias [que] regul[an] la realización de obras y contratación de servicios para el Estado y sus agencias e instrumentalidades tienen por meta la protección de los intereses y dineros del pueblo contra el dispendio, la prevaricación, el favoritismo y los riesgos del incumplimiento.

**[2]** Lo antes expuesto sirve de pauta para entender **\*215** las razones por las cuales este Tribunal reiteradamente se ha expresado a favor de una normativa restrictiva en cuanto a los contratos suscritos entre entes privados y entidades municipales. De este modo,

... hemos resaltado la rigurosidad de los preceptos legales que rigen las relaciones comerciales entre entes privados y los municipios, que aspiran a promover una sana y recta administración pública, asunto que está revestido del más alto interés público. *Fernández Gutiérrez v. Mun. San Juan*, ante, pág. 829.

**[3]** De particular pertinencia y relevancia al asunto hoy ante nuestra consideración es el citado Art. 8.016 de la Ley de Municipios Autónomos, el cual establece que los municipios deberán

... manten[er] un registro de todos los contratos que otorguen, incluyendo las enmiendas a los mismos[,] y enviarán copia de éstos y de las escrituras de adquisición y disposición de bienes a la Oficina del Contralor de Puerto Rico, conforme a l[a] se[c]. 97 et seq. del Título 2 y su Reglamento. 21 L.P.R.A. sec. 4366 (ed. 2000).

**[4]** Del mismo modo, y con sujeción a ciertas excepciones,[5] la Ley Núm. 18 de 30 de octubre de 1975, según enmendada, le impone a los municipios, departamentos, agencias, instrumentalidades, oficinas y todo otro organismo **\*216** del Estado Libre Asociado de Puerto Rico, *sin excepción alguna*, la obligación de

... mantener un registro de todos los contratos que otorguen, incluyendo enmiendas a los mismos, y deberán remitir copia de éstos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha del otorgamiento del contrato o la enmienda. 2 L.P.R.A. sec. 97.

En ocasión de interpretar la antes mencionada disposición estatutaria, en *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37, 53–54 (1988), este Tribunal estableció ciertos requisitos formales que deben ser observados rigurosamente siempre que se otorguen contratos municipales. Estos son: (i) que el acuerdo se haya hecho constar por escrito; (ii) *que se mantenga un registro fiel con miras a establecer la existencia del contrato*; (iii) *que se remita una copia a la Oficina del Contralor*, y (iv) que se acredite la certeza de tiempo, esto es, que fue realizado y otorgado quince días antes.

Por otra parte, en *Fernández Gutiérrez v. Mun. de San Juan*, ante, pág. 833, tras reiterar los requisitos antes mencionados, expresamos que éstos debían ser rigurosamente observados y que su ausencia privaba de eficacia y validez el acuerdo municipal en cuestión. Asimismo, señalamos que

[e]stos preceptos, de sana política administrativa pública, reflejan la intención legislativa *de crear un mecanismo de cotejo y publicidad de los contratos* otorgados por los municipios, *que tiene carácter constitutivo con respecto a la eficacia de éstos.* (Énfasis suplido.) *Fernández Gutiérrez v. Mun. San Juan*, ante, pág. 830.

Sobre este mismo tema, en *Ríos v. Municipio de Isabela*, ante, este Tribunal aplicó la normativa antes discutida al concluir que la Asamblea Municipal de Isabela carecía de autoridad para darle eficacia a un contrato municipal que adolecía de nulidad por no haber sido formulado mediante

**\*217** un contrato escrito, no estar registrado en los libros del Municipio ni su copia enviada a la Oficina del Contralor.

A tono con lo anterior, en *Las Marías v. Municipio San Juan*, 159 D.P.R. 868, 874 (2003), este Tribunal fue enfático al sostener que "ningún Municipio podrá satisfacer deuda alguna que emane de un acuerdo que no se haya registrado y remitido a la Oficina del Contralor". Al así resolver, este Tribunal expresó que la inexigibilidad de los contratos municipales no remitidos al Contralor responde al hecho de que éstos no se consideran legalmente perfeccionados. En ese sentido fuimos claros al expresar que será nulo todo pacto realizado entre una parte privada y un municipio en que no se siga el trámite dispuesto por ley. *Las Marías v. Municipio San Juan*, ante. Véase, además, *Hatton v. Mun. de Ponce*, ante, pág. 1007.

En este mismo caso delineamos los criterios que debían ser observados en toda contratación municipal. A esos efectos, señalamos:

> Primeramente, los municipios no deben exigir la ejecución de servicios sin haber certificado a la parte privada que el acuerdo se redujo a un contrato escrito, que se registró y que se remitió copia de éste a la Oficina del Contralor según lo dispone la ley. La referida certificación detallaría minuciosamente el trámite efectuado, especialmente lo pertinente a la remisión del contrato a la Oficina del Contralor, y especificaría, como mínimo, la fecha, la hora y el número de registro del documento en esa oficina. Este proceder debe observarse incluso en casos de emergencia. (Escolios omitidos.) *Las Marías v. Municipio San Juan*, ante, págs. 879–880.

**[5]** Asimismo, enfatizamos en el hecho de que "las partes privadas deben ejercer un rol más activo al contratar con los municipios[, t]oda vez que las entidades no gubernamentales que contratan con los municipios no están exentas del cumplimiento de la ley". *Las Marías v. Municipio San Juan*, ante, pág. 880. Destacamos que sería prudente que éstas exijan de los municipios la referida certificación antes de realizar alguna prestación. De este modo, **\*218** aquella parte privada que se cruce de brazos y preste servicios sin exigir prueba fehaciente de que el Gobierno cumplió con su deber, se arriesga a asumir la responsabilidad por sus pérdidas.

**[6]** La norma jurisprudencial antes reseñada fue *radicalmente afectada* con la aprobación de la Ley Núm. 127 de 31 de mayo de 2004.[6] Según surge de la Exposición de Motivos de la referida disposición legal, el propósito perseguido por la Asamblea Legislativa al aprobar esta ley fue establecer que el incumplimiento con lo establecido en la citada Ley Núm. 18 "no será causa para que un tribunal competente declare la nulidad del contrato o negocio jurídico en cuestión, pero sí será suficiente para que no se tenga que realizar el desembolso por el pago o la prestación contenida en dicho contrato hasta que se cumpla con los requisitos de este Artículo 1".

De este modo, y en lo aquí pertinente, se enmendó el Art. 1 de la Ley Núm. 18, *supra*, a los fines de añadir dos nuevos incisos, los cuales fueron denominados (d) y (e).[7] En los referidos incisos se dispuso lo siguiente:

> (d) El incumplimiento con lo dispuesto en el Artículo 1 de esta Ley o con la disposición equivalente relacionada a registros de contratos incluidos en el Artículo 8.016 de la Ley Núm. 81 de 30 de agosto de 1991, según enmendada [,] conocida como "Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico" *de por sí no será causa para que un*

*Tribunal competente declare la nulidad de cualquier contrato o negocio jurídico legalmente válido. No obstante, ninguna prestación o contraprestación objeto de un contrato podrá exigirse hasta* **\*219** *tanto se haya dado cumplimiento a lo dispuesto en el Artículo 1 de esta Ley.*

(e) En todo contrato sujeto a registro conforme el Artículo 1 de esta Ley se consignará en forma clara y conspicua un aviso que leerá como sigue: "Ninguna prestación o contraprestación objeto de este contrato podrá exigirse hasta tanto el mismo se haya presentado para registro en la Oficina del Contralor a tenor con lo dispuesto en la Ley Núm. 18 de 30 de octubre de 1975, según enmendada." (Énfasis suplido.) Ley Núm. 127 de 31 de mayo de 2004.

Asimismo, en el Art. 2 de la citada Ley Núm. 127 (2004 Leyes de Puerto Rico 592), se dispuso que la ley comenzaría a regir inmediatamente luego de su aprobación y que aplicaría a todo contrato gubernamental o municipal otorgado en o antes de aprobada la ley.

**[7]** Como vemos, *las enmiendas antes mencionadas tienen el efecto de variar de forma radical la normativa desarrollada por este Tribunal en torno a los contratos municipales.* Según se dispone expresamente en la referida Ley Núm. 127, a partir de su aprobación, *los tribunales no podrán decretar la nulidad de un contrato municipal por el solo hecho de que éste no haya sido registrado ni remitido a la Oficina del Contralor.* La única *salvedad* que se hace en estos casos es a los efectos de que los contratantes *no podrán exigir ninguna de las prestaciones o contraprestaciones objeto del contrato hasta tanto éste haya sido registrado y remitido al Contralor, tal y como exige el Art. 8.016 de la Ley de Municipios Autónomos, ante, y la Ley Núm. 18, según enmendada, ante.*

Es importante recalcar que las enmiendas antes discutidas *no tienen el efecto de alterar la política pública establecida en nuestro ordenamiento jurídico a los efectos de que la buena administración de un gobierno conlleva el realizar sus funciones como comprador con la mayor eficacia a los fines de proteger los intereses y el dinero del pueblo.* Ello responde al gran interés del Estado en promover una sana y recta administración pública, previniendo **\*220** el despilfarro, la corrupción y el amiguismo en la contratación gubernamental.[8]

En vista de lo anterior, *recalcamos* la importancia del registro y la remisión a la Oficina del Contralor de los contratos municipales e instamos a las partes a dar cumplimiento inmediato a dichos requisitos a los fines de asegurar que este mecanismo de cotejo cumpla con su propósito principal: evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia, el descuido y los riesgos de incumplimiento en la administración pública.


## II

Como expresáramos anteriormente, el contrato de servicios profesionales suscrito entre el Sr. Ismael Lugo Ortiz y el Municipio no fue registrado ni remitido a la Oficina del Contralor, tal y como lo exigen expresamente los citados Art. 8.016 de la Ley de Municipios Autónomos y Art. 1 de la Ley Núm. 18. Tal y como señaláramos anteriormente, previo a la aprobación de la Ley

Núm. 127, ante, el no registrar o remitir copia de un contrato municipal a la Oficina del Contralor eran causas suficientes para que un tribunal decretara la nulidad del acuerdo pactado. Sin embargo, luego de aprobada la mencionada pieza legislativa, el incumplimiento con estos requisitos no tiene el efecto de anular el contrato en controversia, aunque impide que puedan exigirse las prestaciones pactadas hasta tanto el contrato haya sido registrado y remitido a la Oficina del Contralor.

En cuanto al planteamiento presentado por el Municipio, a los efectos de que Lugo Ortiz no cumplió con su obligación contractual de proveer asistencia técnica adecuada para la aprobación de la propuesta *C.O.P.S. Universal Hiring Program*, basta con señalar que el Municipio no ha **\*221** demostrado ante nos que al emitir su dictamen el juez de primera instancia hubiese incurrido en pasión, prejuicio o error manifiesto.

[8] A esos efectos, debemos recordar la norma de deferencia que deben tener los foros apelativos en cuanto a las determinaciones de hecho y la apreciación de la prueba que realiza un tribunal de instancia. En ausencia de pasión, prejuicio, error manifiesto o parcialidad, este Tribunal no intervendrá con las determinaciones de hecho y la apreciación de la prueba que realizan los foros de instancia. *Trinidad v. Chade*, 153 D.P.R. 280 (2001); *Argüello v. Argüello*, 155 D.P.R. 62 (2001).

En el caso de autos, el tribunal sentenciador, luego de evaluar la prueba desfilada, entendió que el señor Lugo Ortiz cumplió con su obligación contractual de proveer la asistencia técnica requerida por el Municipio. Asimismo, concluyó que las gestiones realizadas por el Municipio, a los fines de informarle a Lugo Ortiz sobre el documento requerido por el Departamento de Justicia federal, fueron insuficientes y que éste hubiese sometido el documento —sin mayor dificultad— de haber sido notificado sobre la necesidad de éste. No habiéndose demostrado que el tribunal sentenciador actuó con prejuicio, pasión o parcialidad, o que cometió error manifiesto, no vemos razón alguna para intervenir con sus determinaciones.

### III

En mérito de lo anteriormente expuesto, *y aunque por fundamentos distintos*, procede confirmar la sentencia emitida por el Tribunal de Apelaciones, confirmatoria de la emitida por el Tribunal de Primera Instancia. En tal virtud, y considerando que el contrato aquí en controversia nunca fue registrado ni remitido a la Oficina del Contralor, procede ordenarle al Municipio que cumpla con tales requisitos **\*222** a los fines de que el Sr. Ismael Lugo Ortiz pueda exigir el pago pactado.

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri no intervino.

Footnotes

1    Mediante esta propuesta, se solicitaron fondos federales para cubrir el setenta y cinco por ciento de los salarios y beneficios marginales de veinticinco policías a ser reclutados por el Municipio de Guayama (Municipio).

Ortiz v. Municipio Guayama, 163 D.P.R. 208 (2004)

2004 TSPR 166

2    *A excepción de ese documento, la propuesta sometida estaba correcta y contenía la información necesaria para su tramitación.*

3    El señor López Miranda no devengó honorarios por los servicios prestados relacionados con la propuesta.

4    Alegó, además, que al presentar una propuesta inadecuada e incompleta, el señor Lugo Ortiz incumplió con una de las obligaciones esenciales del contrato de servicios, por lo que el Municipio podía resolver unilateralmente la obligación contraída.

5    A tenor con lo dispuesto en la ley, no será necesario enviarle al Contralor una copia de los contratos siguientes:
(1) De servicios personales de naturaleza esporádica, por un término menor de seis meses, no prorrogable, y un costo menor de dos mil dólares.
(2) De servicios personales de naturaleza profesional por un término de un año o menos, no prorrogable, y cuyos servicios no constituyan un puesto o empleo y su costo no exceda de cinco mil dólares.
(3) Para obras con un costo que no exceda de dos mil dólares.
(4) Los que se otorguen mediante subasta pública con excepción de aquellas relacionadas con proyectos u obras de construcción.
(5) De servicios profesionales de médicos y profesionales de la salud otorgados por entidades gubernamentales, cuyo objetivo principal sea brindar servicios médicos.
(6) Cualquier otro tipo de contrato que el Contralor por reglamentación al efecto determine que no le sea enviado.

6    Esta ley acogió la tesis expuesta en *Mun. de Ponce v. A.C. et al.*, 153 D.P.R. 1 (2000) —y abandonada por este Tribunal en sus subsiguientes pronunciamientos— a los efectos de que la consecuencia del incumplimiento de los requisitos de registro y remisión del contrato municipal no es la nulidad que establece el Art. 8.016 de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico, 21 L.P.R.A. sec. 4366, sino lo dispuesto en el Art. 8.004, el cual establece que "[n]o se autorizará desembolso alguno relacionado con contratos sin la constancia de haberse enviado el contrato a la Oficina del Contralor de Puerto Rico ...". 21 L.P.R.A. sec. 4354.

7    Además, se añadió el inciso (c)(5) y se reenumeró el inciso anterior como (c)(6).

8    *Fernández Gutiérrez v. Municipio San Juan*, ante, pág. 829; *Hatton v. Mun. de Ponce*, ante, pág. 1006; *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R 37, 54 (1988); *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 693 (1987).

---

**End of Document**                              © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT E-1**

175 D.P.R. 994, 2009 WL 1456730 (P.R.), 2009 TSPR 77

Quest Diagnostics of Puerto Rico, Inc., Respondent,

v.

Municipality of San Juan & Hon. Jorge Santini, in his role as Mayor
for the Municipality of San Juan, Petitioners.

In the Supreme Court of Puerto Rico.
*Number:* CC-2007-565

**Synopsis**

*Certiorari* requesting that a judgment by the Appeals Court be revoked, which confirmed ruling by the Trial Court which "Granted" a complaint for collection of monies against the Municipality, through Summary Judgment. *Judgment appealed and rendered by the Appeals Court is revoked. The request for summary judgment filed by the Municipality of San Juan is "Granted"and judgment is issued therein, dismissing the instant complaint.*

Associate Judge, Mr. Rivera-Perez issued the Court's opinion.

It is requested in this appeal that we revoke a judgment rendered by the Appeals Court, whereby a ruling by the Trial Court was confirmed. The initial forum "Granted" through a summary judgment, a complaint for collection of money for $283,063.15, against the Municipality of San Juan.

# I

On February 16th of 2000, the Municipality of San Juan (Municipality) presented a bid for acquiring the referenced lab services for the Department of Health's Health Centers. Las Marias Reference Lab. (Las Marias), won adjudication for this bid. Las Marias and the Municipality undersigned a two-year contract for stated services, with a term dated until March 27th of 2002. Subsection (10) of stated contract provides for the following:

> Constituting *an essential element for adjudication of this bid,* is an analysis with regards to the moral and financial firmness of the bidder, *wherefore the chosen bidder is prohibited*

*from transferring, conveying, granting, selling, assigning* or in any other way disposing of the of the rights and duties, including credits, which the bidder or contractor acquires to his favor through this contract, to wit, credit extensions, industrial and commercial repair contracts, among others, to any natural or legal person *without prior written consent from the Bids Board.* The bidder guarantees, upon submitting its signed proposal **\*998** that their financial status is solid, and that their credit is excellent. (Our emphasis.)

On December 26th of 2001, the contract being current, Quest Diagnostics of Puerto Rico, Inc. (Quest), acquired several assets from Las Marias, among which was the above described contract. Las Marias did not request nor obtain consent from the Municipality for stated transfer. Moreover, the contract was not amended in any way whatsoever as to substitute in Quest for Las Marias.

On October 8th of 2002, and after the original contract had lapsed, the Municipal Health Department's supervisor for the bids and purchases section requested, through letter, an extension of the contract, until December 31st of 2002. The contract was likewise extended on four occasions -until July 31st of 2003- this, after more than a year since the original contract had lapsed. Municipal officers expressed during the latter two occasions that the requested extensions had been approved by the Bids Board at meetings held for stated effects. Nevertheless, no evidence regarding stated agreements exists.

On February 18th of 2004, Quest filed a judicial action for collections of money against the Municipality for $283,063.15. The Municipality subsequently filed a request for summary judgment. The initial forum determined that the letters extending the contract constituted a tacit consent by the Municipality. Moreover, it "Granted" the request for summary judgment, sentencing the Municipality to pay $283,063.15. It grounded stated ruling in that an amendment to applicable rules allows a correction for not having executed a written contract. The Municipality did a timely appeal to stated decision to the Appeals Court, which confirmed the initial forum's judgment.

The Municipality, dissatisfied with this decision, appeals to us, and indicate the following errors: **\*999**

*The Appeals Court erred upon confirming the sentence issued by the Trial Court and concluding that legal obligations were initiated between Quest and the* <u>Municipality</u> *of San Juan, in addressing the transfer or ceding of the Las Marias Reference Lab contract, although Quest never undersigned any written contract whatsoever with the Municipality. The Appeals Court erred upon confirming judgment issued by the Trial Court, and concluding that the contract between Las Marias Reference Lab and the Municipality of San Juan was validly extended by means of the letters undersigned by municipal employees, without a legal faculty to undersign contracts in name of the Municipality.*

Allegations duly submitted by the parties, we thus proceed to rule, without further procedures.

## II

The key issue to be resolved is determining whether the transfer and length of the stated contract, binds the Municipality to terms established therein. We do not so deem.

[1] A. The Civil Code states the mandatory feature of legal relations effected by contract.[1] Art. 1213, on its part, demands that for execution of a valid contractual relationship, certain essential elements must concur, to wit, object, consent and cause.[2] Art. 1214 provides that consent is manifested through tendering of an offer and acceptance over the item and cause of the contract.[3]

[2] These requirements are essential, thus that lacking of same hinders existence of the contract.[4] Consent covers "two fundamental and well differentiated aspects: one relating to capacity for consent, and another referring to *1000 rendering of the consent."[5] Art. 1216 of our civil code acknowledges potential restrictions of the capability to consent which may be established under law.[6] This provision covers legal bars which affects given persons, independent of their strictly personal conditions.[7] This legal precept   refers to contractors "upon whom the law prohibits them from rendering their consent in specific cases due to morality grounds or for convenience."[8]

[3] The legislator, by special statutes to stated effects, has imposed requirements and conditions when contracting with municipalities. Validity of contracts with governmental entities is examined in accordance to these special statutes, instead of addressing the general theory of contracts. *Mun. de Ponce v. A.C. et al, 153 DPR 1 (2000).*

[4] Law No. 81 dated August 30th of 1991, better known as the Commonwealth of Puerto Rico Autonomous Municipalities Act (Autonomous Municipalities Act), provides a series of requirements for adjudication of bids and subsequent contracting with the municipalities.[9] This law delegates upon the Board the duty to evaluate and adjudicate all bids required by law. All agreements and rulings by the Board have to be by a majority of its members, excepting that something else is provided for.[10]

[5] In matters of contracting with municipalities, it is demanded that the written contract be forwarded to the Comptroller's Office, limited exceptions existing therein, and that certainty as to time period be certified *1001, *Ocasio v. Alcalde Mun. de Maunabo, 121 D.P.R. 37 (1988).* Law No. 127 dated May 31st of 2004 amended Law No. 18 of October 30th, 1975 (Law 18), to provide that no municipal contract be voided *for the mere fact that same was not registered or remitted to the Comptroller's Office.*[11]   This amendment did not change the public policy which pursues all other requirements established by law and jurisprudence, since its execution continues to be necessary and indispensable for   validity of the contract, its conclusion, and that same be verified in writing. *Cordero Vélez v. Mun. de Guánica, 170 D.P.R. 237 (2007)*; *Colón Colón v. Mun. de Arecibo, 170 D.P.R. 718 (2007).*   The written contract requirement is one of formal or substantive nature, which serves as a preventive measure to avoid payment of unlawful or fraudulent claims. *Colón Colón v. Mun. de Arecibo*, supra.

In *Las Marías v. Municipio San Juan, 159 D.P.R. 868, 878 (2003)*, the contracts were declared void, since same relied upon letters written for the renewal of contractual relationships with the Municipality. Stated case was examined prior to amendment of Law 18, above, wherefore same was resolved under the absence of the registry for the objected contracts.

The legal rule formulated in *Fernández & Gutiérrez v. Mun. de San Juan, 147 D.P.R. 824 (1999)*, is current and has not been affected by the amendment to Law 18, above. On said occasion, the plaintiff claimed payment for rental fees which she owed to the Municipality. The parties had validly underwritten a lease contract which had lapsed. It was alleged that stated contract had been extended through letters sent to plaintiff, by the Municipality. Without needing to resolve whether stated letters reflected an unconditional commitment to contract, we concluded that the Municipality was not obligated to comply with stated extension. We based our decision in that the letters were not drafted by the Mayor or the person by him delegated **\*1002** to take on obligations in name of the Municipality. Moreover, we ruled that even if the letters had been made by the person so empowered under law, same did not bind the Municipality, since such commitment did not appear within any written contract.

[6] Art. 3.009 of the Autonomous Municipalities Act assigns to the Mayor, all faculties and functionsas to represent the Municipality, and to delegate to another officer, in writing, those duties and functions which are assigned them under stated law.[12]

[7] These legal precepts and interpretative jurisprudence pursue and foster efficiency, honesty and correction to protect the people's interests. *Cordero Vélez v. Mun. de Guánica*, supra. The established principle provides that to commit public funds, it is necessary to follow procedures established under aw, thus advancing a sound and appropriate public management. *Cordero Vélez v. Mun. de Guánica*, supra. The courts are called to oversee all legal provisions geared to protect public disbursements, since it protects public interest, and not the contracting parties. *Hatton v. Mun. de Ponce, 134 D.P.R. 1001 (1994)*.

[8] We have repeatedly stated that private entities have a duty to insure compliance with the law when contracting with municipalities, or risk assuming liability for their own losses. *Colón-Colón v. Mun. de Arecibo, supra.* Therefore, we have ruled to be not applicable, any remedy under equity for damages suffered for not adhering to established rules. *Las Marías v. Municipio San Juan, supra.*

[9] B. Rule 36.2 of Civil Procedure is the procedural method for requesting a summary judgment.[13] This method is extraordinary in nature, and applies solely in cases in which holding a trial **\*1003** is not required for a ruling. *González Aristud v. Hosp. Pavía, 168 D.P.R. 127 (2006)*. The party which promotes stated request has to clearly establish its right, and demonstrate that there does not exist a substantial controversy regarding any material fact. *Id.* The party opposing stated request must argue against evidence presented, and should not idle by, or it runs the risk of being ruled against. Luan Invest. Corp. v. Rexach Const. Co., 152 D.P.R. 652 (2000). Notwithstanding, the mere fact that the respondent fails to oppose does not necessarily imply that same must go forth, since it must proceed under law. *Corp. Presiding Bishop CJC of LDS v. Purcell, 117 D.P.R. 714 (1986)*.

[10] To evaluate a summary judgment request, all allegations within the case file have to be considered; interrogatories (and) admissions jointly with the sworn statements, to verify whether or not there exists any actual controversy regarding a material fact. *Corp. Presiding Bishop CJC of LDS v. Purcell*, *supra*. Any question regarding existence of a controversy over pertinent and material facts must be resolved against the party which requests the summary judgment. *Mgmt. Adm. Servs. Corp. v. E.L.A., 152 D.P.R. 599 (2000)*. Such means must not  be used for complex cases, or those involving the public interest. *González Aristud v. Hosp. Pavía*, supra.


### III

With the above described legal benefit, we now proceed to review the instant controversy. The Appeals Court confirmed the primary forum, and ruled that the Municipality knew about the transfer of the contract to Quest, wherefore, its transfer and extension was valid. Furthermore, it supported stated forum's rulings *a quo,* as to the law which allows that unwritten contracts be correctable, and with regards to tacit consent from the Municipality to extend the contract. We deemed that it erred upon so doing. **\*1004**

A. The Municipality alleges that no contract ever existed between themselves and Quest. Furthermore, they argue that the contract undersigned with Las Marias was not validly conveyed to Quest, for purposes of binding them.

Quest on its part, sustains its assertion in the general principles of contractual law, without considering special regulations which were not complied with, and which pursue advancing adequate oversight of public expenditures. Quest, in its allegations, states that "the letters extending the contractual terms, the request for additional services and the admissions from Municipal officers, unequivocally demonstrate the Municipality's consent to stated transfer.[14]
Quest sustains that our pronouncements in *Cordero Vélez v. Mun. de Guánica*, supra, do not apply, since in stated facts, a there never existed a contract. It proclaims that the letters sent by the Bids & Purchases Division Supervisor, the Provisions & Purchases Deputy Director and Acting Municipal Officer Manager were sufficient for consenting to the transfer, and for extending the contract. Subsection (10) of the contract undersigned with Las Marias explicitly prohibited transfer of the contract without *prior written consent by the Bids Board.* Our statements in *Cordero Vélez v. Mun. de Guánica*, supra, are applicable since same deal with consent from the Bids Board. Law 81, supra, provides the manner in which the Board issues its agreements and rulings. Quest relies upon a letter sent to all clientele of Las Marias, informing about stated transfer. The reason for demanding prior authorization by the Board intends to insure that persons who render services to municipalities are adequate ones to comply with all requirements under law. Quest has not demonstrated that it obtained prior written consent from the Board for stated transfer, wherefore, such transfer does not bind

the Municipality. **\*1005**

Quest Diagnostics v. Mun. San Juan, 175 D.P.R. 994 (2009)
2009 TSPR 77

B. In its own defense, Quest argues that from the Municipality's conduct, tacit consent to contract was derived. It once again overlooks that general principles within contractual subject matter are insufficient within this type of contracting, whenever requirements imposed by applicable special laws, are not complied with.

The letters to extend the contract were undersigned by municipal employees *not* authorized by law to encumber the municipality, wherefore, it did not become bound therein.[15] Moreover, the letter to extend the term of the legal relationship between the parties cannot be considered a contract between such parties, since same does not comply with legal requirements as to constitute a written contract which binds the Municipality.

The amendment to Law 18, *supra*, in no way changes the result expressed herein, since in the amendment, only remittance of the contract to the Comptroller's Office was solely considered, and compliance with the indispensable requirement of drafting a written contract, was still enforceable. Ruling otherwise would open the door to unlawful actions, in detriment to public funds. It is improper to impose upon the Municipality compliance with an ineffectual contract by not adhering to law. Same is indispensable for sound management, and adhesion to established rules. Quest knew or should have known that the letters sent to them as to extend the contract were inefficient and in no way bound the Municipality. Private parties which contract with the Government must have oversight of faithful compliance with all laws, or they risk suffering financial losses due to their carelessness.

**[11]** Once again, we firmly dissuade non-observance of the law, and the actions by the Municipality's employees. It is the duty of every municipality to insure that all **\*1006** their officials adhere to procedures established within the Autonomous Municipalities Act. Nevertheless, "[a] proper governmental management is a democratic virtue, and part of proper public management implies carrying out their duties as a buyer efficiently, honestly and correctly, to protect the interests and monies of the People..." *Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 871 (1990)*.

## IV

Since no actual controversy regarding any material fact exists, it is thus appropriate to render a summary judgment, and dismiss the claim against the Municipality.

Due to the above stated grounds, *the sentence appealed and issued by the Appeals Court is revoked. The request for summary judgment filed by the Municipality is hereby "Granted", and judgment is rendered therein, dismissing the instant complaint.*

Associate Judge, Mrs. Rodríguez-Rodríguez concurred with the results, without any  written opinion.

Footnotes

Quest Diagnostics v. Mun. San Juan, 175 D.P.R. 994 (2009)
2009 TSPR 77

1   [31 L.P.R.A. sec. 2994](#).

2   [31 L.P.R.A. sec. 3391](#).

3   [31 L.P.R.A. sec. 3401](#).

4   J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1985, T. II, Vol. 1, page 41.

5   Puig Brutau, *op. cit.*, pág. 43.

6   [31 L.P.R.A. sec. 3403](#).

7   Puig Brutau, *op. cit.*, pág. 44.

8   J.R. Vélez Torres, *Derecho de Contratos*, T. IV, Vol. II, 1990, pág. 1.

9   *[21 L.P.R.A. sec. 4001 et seq.](#)*

10  [21 L.P.R.A. sec. 4505](#).

11  [2 L.P.R.A. sec. 97](#).

12  [21 L.P.R.A. sec. 4109](#).

13  32 L.P.R.A. App. III.

14  Quest's Contention in Opposition, page 12.

15  So evidenced by the certification of Executive   Order signed by the Mayor. Appendix to appeal writ, page 514.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT E-2**

**175 D.P.R. 994, 2009 WL 1456730 (P.R.), 2009 TSPR 77**

**Quest Diagnostics of Puerto Rico, Inc., recurrida,**
v.
**Municipio de San Juan y Hon. Jorge Santini, en su capacidad de Alcalde del Municipio de San Juan, peticionarios.**

**En El Tribunal Supremo De Puerto Rico.**
*Número:* CC-2007-565

**Synopsis**
*Certiorari* para solicitar la revocación de una sentencia del Tribunal de Apelaciones que confirmó el dictamen del Tribunal de Primera Instancia, el cual declaró "ha lugar" una demanda en cobro de dinero contra el municipio de San Juan por vía de sentencia sumaria. *Se revoca la sentencia recurrida y emitida por el Tribunal de Apelaciones. Se declara "con lugar" la solicitud de sentencia sumaria presentada por el Municipio de San Juan y se dicta sentencia de conformidad desestimando la demanda de autos.*

El Juez Asociado Señor Rivera Pérez emitió la opinión del Tribunal.

En este recurso se nos solicita la revocación de una sentencia emitida por el Tribunal de Apelaciones, por la cual se confirmó el dictamen del Tribunal de Primera Instancia. El foro primario por vía de sentencia sumaria declaró "ha lugar" una demanda en cobro de dinero por $283,063.15 contra el municipio de San Juan.

**I**

El 16 de febrero de 2000, el municipio de San Juan (Municipio) realizó una subasta para adquirir servicios de laboratorios de referencia para sus Centros de Salud del Departamento de Salud. Las Marías Reference Lab. (Las Marías), obtuvo la adjudicación de esta subasta. El 27 de marzo de 2000, el Municipio y Las Marías suscribieron un contrato para dichos servicios por dos años con fecha de vigencia hasta el 27 de marzo de 2002.
El inciso (10) del referido contrato dispone lo siguiente:
Constituye *elemento esencial para la adjudicación de esta subasta* el análisis de solidez económica y moral del licitador *por lo que se prohíbe expresamente al licitador agraciado,*

*traspasar, transferir, conceder, vender, asignar* o de otra forma disponer de los derechos y deberes incluyendo los créditos que el licitador o contratista adquiera a su favor por este contrato, entiéndase cesiones de crédito, contrato de refacción industrial y comercial entre otros, a ninguna persona natural o jurídica *sin el consentimiento previo y por escrito de la Junta de Subasta*. El licitador garantiza al someter su propuesta firmada **\*998** que su situación financiera es sólida y su crédito es excelente. (Énfasis nuestro.)

El 26 de diciembre de 2001, vigente el contrato, Quest Diagnostics of Puerto Rico, Inc. (Quest) adquirió varios activos de Las Marías, entre los cuales se encontraba el contrato antes descrito. Las Marías no solicitó ni obtuvo el consentimiento del Municipio para dicho traspaso. Además, el contrato no fue enmendado en forma alguna para sustituir a Las Marías por Quest.

El 8 de octubre de 2002, y luego de vencido el contrato original, la supervisora de la sección de compras y subastas del Departamento de Salud del Municipio, mediante una carta, solicitó la extensión del contrato hasta el 31 de diciembre de 2002. De igual forma, el contrato fue extendido en cuatro ocasiones —hasta el 31 de julio de 2003— esto a más de un año del vencimiento del contrato original. En las últimas dos ocasiones los funcionarios del Municipio expresaron que las extensiones solicitadas habían sido aprobadas por la Junta de Subastas mediante reuniones celebradas a tales efectos. Sin embargo, no existe prueba sobre tales acuerdos.

El 18 de febrero de 2004, Quest presentó una acción judicial en cobro de dinero contra el Municipio por $283,063.15. Posteriormente, el Municipio presentó una solicitud de sentencia sumaria. El foro primario determinó que las cartas para extender el contrato constituyeron un consentimiento tácito por parte del Municipio. Además, declaró "con lugar" la solicitud de sentencia sumaria a favor de Quest y condenó al Municipio al pago de $283,063.15. Basó su decisión en que una enmienda a la normativa aplicable permite subsanar el no haber realizado un contrato escrito. El Municipio apeló oportunamente dicho dictamen al Tribunal de Apelaciones, quien confirmó la sentencia del foro primario.

Inconforme con esta determinación, el Municipio recurrió ante nos y señaló los errores siguientes: **\*999**

> Erró el Tribunal de Apelaciones al confirmar la sentencia emitida por el Tribunal de Instancia y concluir que entre Quest y el Municipio de San Juan se crearon obligaciones jurídicas en atención a la cesión o traspaso del contrato con Las Marías Reference Lab., a pesar que Quest nunca suscribió con el Municipio contrato escrito alguno.
>
> Erró el Tribunal de Apelaciones al confirmar la sentencia emitida por el Tribunal de Instancia y concluir que el contrato entre Las Marías Reference Lab. y el Municipio de San Juan se extendió válidamente a través de cartas suscritas por empleados municipales sin facultad legal para suscribir contratos a nombre del Municipio.

Debidamente sometidos los alegatos de las partes, procedemos a resolver sin ulterior trámite.

## II

El asunto central a resolver es determinar si la cesión y extensión del contrato en cuestión vinculan al Municipio a los términos allí establecidos. Entendemos que no.

[1] A. El Código Civil expone el carácter obligatorio de las relaciones jurídicas realizadas mediante contrato.[1] Por su parte, su Art. 1213 exige que para la perfección de una relación contractual válida concurran sus elementos esenciales, a saber, objeto: consentimiento y causa.[2] El Art. 1214 dispone que el consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y causa en el contrato.[3]

[2] Estos requisitos son esenciales, de manera que su falta impide la existencia del contrato.[4] El consentimiento comprende "dos aspectos fundamentales y bien diferenciados: el relativo a la capacidad para consentir y el que se **1000** refiere a la prestación del consentimiento".[5] El Art. 1216 de nuestro Código Civil reconoce las posibles restricciones a la capacidad para consentir que pueden establecerse mediante la ley.[6] Esta disposición comprende las prohibiciones legales que afectan a determinadas personas con independencia de sus condiciones estrictamente personales.[7] Este precepto legal se refiere a los contratantes "a quienes la ley les prohíbe prestar su consentiento en determinados casos por razones de moralidad o conveniencia".[8]

[3] A estos efectos, mediante estatutos especiales, el legislador ha impuesto requisitos y condiciones a la contratación con los municipios. A los contratos con entidades gubernamentales se les examina su validez de acuerdo con los estatutos especiales, en lugar de acudir a las teorías generales de contratos. *Mun. de Ponce v. A.C. et al.*, 153 D.P.R. 1 (2000).

[4] La Ley Núm. 81 de 30 de agosto de 1991, mejor conocida como Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico (Ley de Municipios Autónomos), dispone una serie de requisitos para la adjudicación de subastas y su posterior contratación con los municipios.[9] Esta ley delega a la Junta de Subasta el deber de evaluar y adjudicar todas las subastas requeridas por ley. Todos los acuerdos y resoluciones de la Junta deben ser por mayoría de sus miembros, salvo que otra cosa se disponga.[10]

[5] En materia de contratación con municipios se exige que el contrato escrito se remita a la Oficina del Contralor, salvo determinadas excepciones, y que se acredite **1001** certeza de tiempo. *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37 (1988). La Ley Núm. 127 de 31 de mayo de 2004 enmendó la Ley Núm. 18 de 30 de octubre de 1975 (Ley 18) para disponer que no se declarará nulo un contrato municipal *por el sólo hecho de que no haya sido registrado o remitido a la Oficina del Contralor*.[11] Esta enmienda no alteró la política pública que persigue los demás requisitos establecidos por ley y jurisprudencia, ya que sigue siendo necesario e indispensable para la validez del contrato su perfeccionamiento y que conste por escrito. *Cordero Vélez v. Mun. de Guánica*, 170 D.P.R. 237 (2007); *Colón Colón v. Mun. de Arecibo*, 170 D.P.R. 718 (2007). El requisito de contrato escrito es de carácter formal o sustantivo que sirve como mecanismo profiláctico para evitar pagos y reclamaciones fraudulentas e ilegales. *Colón Colón v. Mun. de Arecibo*, supra.

En *Las Marías v. Municipio San Juan*, 159 D.P.R. 868, 878 (2003), por descansar en cartas escritas para renovar relaciones contractuales con el Municipio, se declararon nulos los contratos. Dicho caso fue examinado antes de la enmienda a la Ley 18, *supra*, por lo que fue resuelto bajo la ausencia del registro de los contratos impugnados.

La norma formulada en *Fernández & Gutiérrez v. Mun. de San Juan*, 147 D.P.R. 824, (1999), está vigente y no ha sido afectada por la enmienda a la Ley 18, *supra.* En aquella ocasión, la demandante reclamaba el pago por cánones de arrendamiento que adeudaba el Municipio. Las partes habían suscrito válidamente un contrato de arrendamiento que expiró. Se alegaba que dicho contrato había sido extendido mediante cartas enviadas por el Municipio a la demandante. Sin tener que resolver si las referidas cartas reflejaban el compromiso incondicional para contratar, concluimos que el Municipio no estaba obligado a cumplir con la extensión. Basamos nuestra decisión en que las cartas no las hizo el Alcalde o la persona delegada por éste **\*1002** para asumir obligaciones a nombre del Municipio. Además, resolvimos que aún si las cartas las hubiera hecho la persona facultada en ley, no responsabilizaban al Municipio, pues el compromiso no constaba en un contrato escrito.

[6] El Art. 3.009 de la Ley de Municipios Autónomos designa en el Alcalde la facultad y función de representar al Municipio, y de delegar por escrito a otro funcionario las funciones y los deberes que se le asignan en dicha ley.[12]

[7] Estos preceptos legales y su jurisprudencia interpretativa persiguen fomentar la eficacia, honestidad y corrección en protección de los intereses del pueblo. *Cordero Vélez v. Mun. de Guánica*, supra. El principio establecido dispone que para obligar fondos públicos es necesario seguir los procedimientos establecidos en ley, promoviendo así la sana y recta administración pública. *Cordero Vélez v. Mun. de Guánica*, supra. Los tribunales están llamados a velar por las disposiciones legales dirigidas a proteger desembolsos públicos, ya que protegen el interés público y no el de las partes contratantes. *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001 (1994).

[8] Reiteradamente, hemos expresado que los entes privados tienen el deber de asegurar el cumplimiento de la ley al contratar con los municipios o se arriesgan a asumir la responsabilidad por sus pérdidas. *Colón Colón v. Mun. de Arecibo*, supra. Por consiguiente, hemos determinado la inaplicabilidad de cualquier remedio en equidad por los daños sufridos por no adherirse a la normativa establecida. *Las Marías v. Municipio San Juan*, supra.

[9] B. La Regla 36.2 de Procedimiento Civil es el mecanismo procesal adecuado para solicitar sentencia por la vía sumaria.[13] Este mecanismo es de carácter extraordinario y aplica sólo en casos en que no se requiere la celebración **\*1003** de un juicio para resolver. *González Aristud v. Hosp. Pavía*, 168 D.P.R. 127 (2006). La parte que promueve dicha solicitud debe establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. Íd. La parte que se opone a dicha solicitud debe controvertir la prueba presentada y no debe cruzarse de brazos o se corre el riesgo de que se resuelva en su contra. *Luan Invest. Corp. v. Rexach Const. Co.*, 152 D.P.R. 652 (2000). Sin embargo, el mero hecho de que el promovido no se oponga, no implica necesariamente que ésta proceda, ya que debe proceder en derecho.

*Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986).

**[10]** Para evaluar una solicitud de sentencia sumaria se deben considerar todas las alegaciones en el expediente, interrogatorios, admisiones, en unión a las declaraciones juradas y verificar si hay o no controversia real sobre algún hecho material. *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra. Cualquier duda sobre la existencia de una controversia de hechos pertinentes y materiales debe ser resuelta contra la parte que solicita la sentencia sumaria. *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 D.P.R. 599 (2000). No se debe utilizar este mecanismo en casos muy complejos o que involucren el interés público. *González Aristud v. Hosp. Pavía*, supra.

### III

Con el beneficio del Derecho antes descrito, pasamos a revisar la presente controversia. El Tribunal de Apelaciones confirmó al foro primario y decidió que el Municipio conocía del traspaso del contrato a Quest, por lo que era válida su cesión y extensión. Además, avaló las determinaciones del foro *a quo* sobre que la ley permite que los contratos que no estén por escrito sean subsanables y sobre el consentimiento tácito del Municipio para extender el contrato. Entendemos que erró al así hacerlo. **\*1004**

A. El Municipio alega que entre Quest y éste nunca existió un contrato. Además, arguye que el contrato que suscribió con Las Marías no fue válidamente trasferido a Quest al fin de obligarle.

Por su parte, Quest sustenta su contención en principios generales de derecho contractual sin considerar las regulaciones especiales que no se cumplieron y que persiguen propiciar una adecuada fiscalización de los gastos públicos. En su alegato, Quest expresa que "las cartas extendiendo el término del contrato, la solicitud de servicios adicionales y las admisiones de funcionarios municipales inequívocamente demuestran el consentimiento del Municipio a dicha cesión".[14]

Quest sostiene que nuestros pronunciamientos en *Cordero Vélez v. Mun. de Guánica*, supra, son inaplicables, pues en aquellos hechos nunca existió un contrato. Manifiesta que las cartas enviadas por la Supervisora de la División de Compras y Subastas, el Director Auxiliar de Compras y Suministros y el Gerente Interino de la Oficina del Municipio eran suficientes para consentir la cesión y para extender el contrato. El inciso (10) del contrato suscrito con Las Marías expresamente prohibía la cesión del contrato a no ser por el *consentimiento previo y por escrito de la Junta de Subasta.* Nuestras expresiones en *Cordero Vélez v. Mun. de Guánica*, supra, aplican, pues tratan acerca del consentimiento de la Junta de Subasta. La Ley 81, *supra*, dispone la forma en que la Junta emite sus resoluciones y acuerdos. Descansa Quest en una carta enviada a todos los clientes de Las Marías informando la cesión. La razón para exigir una previa aprobación de la Junta pretende asegurar que las personas que brindan servicios a los municipios sean adecuadas y cumplan con los requisitos de ley. Quest no ha demostrado que obtuvo el consentimiento previo y por escrito de la Junta para dicha cesión, por lo que la cesión no vincula

al Municipio. **1005**
B. Arguye Quest en su defensa que de la conducta del Municipio se deduce su consentimiento tácito para contratar. Olvida, una vez más, que los principios generales en materia de contratos no son suficientes en este tipo de contratación cuando no se cumple con los requisitos que imponen las leyes especiales aplicables.

Las cartas para extender el contrato fueron suscritas por empleados municipales no autorizados en ley para comprometer al Municipio, por lo que no le obligaron.[15] Además, las cartas para extender el término de vigencia de la relación jurídica entre las partes no puede considerarse un contrato entre estas partes, pues no cumplen con los requisitos de ley para constituir un contrato escrito que vincule al Municipio.

La enmienda a la Ley 18, *supra*, en nada cambia el resultado aquí expuesto, pues en la enmienda sólo se considera la remisión del contrato a la Oficina del Contralor, siendo aún exigible cumplir con el requisito indispensable de hacer un contrato escrito. Decidir lo contrario abriría las puertas a actuaciones ilegales en detrimento de los fondos públicos. No procede imponerle al Municipio el cumplimiento de un contrato ineficaz por no ceñirse a la ley. Es imprescindible para la sana administración el apego a las normas establecidas.

Quest sabía o debía saber que las cartas que se le enviaron para extender el contrato eran ineficaces y en nada vincularon al Municipio. Las partes privadas que contratan con el Gobierno deben velar por el fiel cumplimiento de las leyes o se arriesgan a sufrir pérdidas económicas por su descuido.

**[11]** Una vez más, desalentamos firmemente la inobservancia de la ley y la actuación de los empleados del Municipio. Es deber de todo municipio asegurar que todos **1006** sus funcionarios se ajusten a los procedimientos establecidos en la Ley de Municipios Autónomos. No empece, "[l]a buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficiencia, honestidad y corrección para proteger los intereses y dineros del pueblo ...". *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990).

Por no haber alguna controversia real sobre algún hecho material, procede dictar sentencia sumaria para desestimar la reclamación contra el Municipio.

## IV

Por los fundamentos antes expuestos, *se revoca la sentencia recurrida y emitida por el Tribunal de Apelaciones. Se declara "con lugar" la solicitud de sentencia sumaria presentada por el Municipio y se dicta sentencia de conformidad desestimando la demanda de autos.*
La Jueza Asociada Señora Rodríguez Rodríguez concurrió con el resultado sin opinión escrita.

Footnotes

2009 TSPR 77

1    31 L.P.R.A. sec. 2994.

2    31 L.P.R.A. sec. 3391.

3    31 L.P.R.A. sec. 3401.

4    J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1985, T. II, Vol. 1, pág. 41.

5    Puig Brutau, *op. cit.*, pág. 43.

6    31 L.P.R.A. sec. 3403.

7    Puig Brutau, *op. cit.*, pág. 44.

8    J.R. Vélez Torres, *Derecho de Contratos*, T. IV, Vol. II, 1990, pág. 1.

9    21 L.P.R.A. sec. 4001 *et seq.*

10   21 L.P.R.A. sec. 4505.

11   2 L.P.R.A. sec. 97.

12   21 L.P.R.A. sec. 4109.

13   32 L.P.R.A. Ap. III.

14   Alegato en Oposición de Quest, pág. 12.

15   Así lo demuestra la certificación de Órdenes Ejecutivas firmadas por el Alcalde. Apéndice del recurso, pág. 514.

---

**End of Document**                          © 2021 Thomson Reuters. No claim to original U.S. Government
Works.

---

**EXHIBIT F-1**

190 D.P.R. 448, 2014 WL 997549 (P.R.), 2014 TSPR 32

Ramiro Rodriguez Ramos et al, respondents,

v.

ELA de PR et al, petitioners.

In the Puerto Rico Supreme Court.
*Number:* CC-2013-234
*Resolved:* March 6th, 2014
March 6th, 2014.

1. Obligations—Establishment, Existence & Effect—Initiation and Sources—Contracts.
Art. 1044 of the Civil Code, 31 LPRA sect. 2994, provides that obligations which arise from contracts, are lawfully enforceable between the contacting parties, and need to be complied with in accordance to same. Consequently, a contract exists from when one or several persons render their consent in becoming bound to provide something or to render a service, and shall be valid if three elements thus concur: consent, object and cause.

2. Contracts—In General—Requirements and Validity—Parties, Proposals or Offers & Acceptance—Offer and Acceptance—Freedom to Contract.
Within our legal system, the contractual autonomy principle allows contracting parties to establish agreements, clauses and conditions that these deem to be convenient. Notwithstanding, the contract shall be void and non-existent if same is contrary to law, morals or public order. In such cases, any of the contracting parties may challenge the contract, even though they may have benefited from same.

3. Puerto Rico—Commonwealth—Goods, Contracts & Responsibilities—Authority or Powers of the CPR/ELA to Contract.
Sect. 9, Art. VI of our Constitution, LPRA, Volume 1, establishes that properties and public funds may only be disposed of for public services and for the support and functioning of State institutions and, in any case, under the authority of law. The Legislature, in complying with this constitutional mandate, has passed laws which impose fiscal controls and governmental contracting. This being so, then any contract between a private party and State that fails to comply with such laws, is null and non-existent.

4. Id.—Id.—Id.—In General.
The Puerto Rico Government's Accounting Act establishes that all consignments and funds authorized for use within a fiscal year, shall be exclusively applied for the payment of expenses which have been legitimately incurred into during the respective year **\*499**, or for payment of legally contracted obligations, duly registered within the log-books.

Rodriguez Ramos v. ELA, 190 D.P.R. 448 (2014)

2014 TSPR 32

5. Id.—Id.—Id.—Id.

Art. 9(a) of the Puerto Rico Government Accounting Act, 3 LPRA sec. 283h(a), demands that units shall order disbursements of their public funds and commitments, solely to pay for or to bind services, provide materials and equipment, claims or other notions that are authorized by law. The Secretary shall take account of such commitments, and shall effect and account for disbursements through the documents submitted by said units. The head of the corresponding unit or the officer or employee by him appointed as his authorized representative shall approve, beforehand, those documents for their payment or commitment.

6. Id.—Id.—Id.—

Power or Authority of the CPR/ELA to Contract – Contractual Requirements.

The Government of Puerto Rico Accounting Act clearly establishes that for a contract executed between the State and a private party to be valid and enforceable, same needs to appear in writing, prior to rendering of a corresponding service.

7. Id.—Id.—Id.—Id.—Id.

A governmental contract for the rendering of professional or consulting services, to become valid, has to comply with requirements of Law 237-2004. Legal services are covered under the definition which this law provides regarding the concept of "professional or consulting services", to wit, those which main service of which consists of any result of intellectual, creative or artistic work or the handling of highly technical or specialized skills.

8. Id.—Id.—Id.—Id.—Id.

Art. 2 of Law No. 237-2004, (3 LPRA sect. 8612) establishes that governmental contracting of professional services must be the exception, and that it shall solely be used when the government entity does not have or is unable to utilize internal resources, or whenever the *expertise,* skill or experience of the contractor is necessary for attaining the goals for which they are contracted. This article further demands that at the point when services of a contractor are contracted, the State take into account the actual need for the services to be contracted, its financial situation, and the contracting governmental agency's budget.

9. Id.—Id.—Id.—Id.—Id.

Art. 3 of Law No. 237-2004 (3 LPRA sect. 8613) enumerates a series of requirements both substantive as well as to form, which each contract between the State and a contractor has to comply with. This article specifically requires: (1) execution of a professional services or consulting contract between the Government and a contractor must be prospective, and (2) its execution in writing and **\*450** inclusion within its text, with regards to the legal provision which empowers the government entity to render contracts.

10. Id.—Id.—Id.—Id.—Id.

Law No. 237-2004 establishes that all consulting or professional services contracts, a category

which includes rendering of legal services, shall only be valid if same is acknowledged in writing and includes a prospective term. No question that Law 237-2004 forbids verbal and retroactive contracting of professional and consulting services.

11. Id.—Id.—Id.—Id.—Id.

For a contract between a private entity and the State to bear a binding effect between the parties, same must be stated in writing. This requirement has to be met without any exceptions whatsoever.

12. Id.—Id.—Id.—Id.—Id.

Performing work prior to having a written contract breaches government contracting rules. Validating a contract retroactively would foster corruption, since a contractor could perform work prior to issuance of the written contract to pressure its future granting therein, be this either with the current administration or any subsequent one.

13. Id.—Id.—Id.—Id.—Id.

Retroactive government contracting makes any control prior to the government taking on an obligation, inoperable. Such practice further hinders that third parties such as the Comptrollers Office, comply with the public policy within the Government of Puerto Rico Accounting Act, and that citizens gain access to the written contract so as to pass judgment regarding stated contracting, since the contract is drafted and publicized after its execution, and all of the obligations provided for, are consummated.

14. Id.—Id.—Id.—Id.—Id.

The parties which contract with a government entity without complying with governmental contracting requirements risk taking on liability for their losses. Same, since the courts have consequently rejected the applicability of any remedy in equity such as unfair enrichment, to validate such a public commitment without a written contract, and to so indemnify damages suffered by a private party upon stated requirements not being complied with.

15. Id.—Id.—Id.—Id.—Id.

In addition to the clear demand that a government contract be prospective and in writing, Art. 1 of Law No. 18-1975 (2 LPRA sect. 97(a)), provides that governmental and municipal entities of the Commonwealth of Puerto Rico, with no exception whatsoever, shall retain a registry of all contracts issued including amendments to same, and shall remit copy *451 of same to the Comptroller's Office within 15 days following the date of issuance of such contract or amendment.

16. Id.—Id.—Id.—Id.—Id.

Sound public management requires that contracts with the Government comply with the following requirements: (1) be produced in writing; (2) a faithful registry be kept as to, *prima facie, e*stablish its existence; (3) a copy be remitted to the Comptroller's Office as duplicate

verification of its issuance, terms and existence, and (4) certainty about its term be attested to, to wit, same having been executed and issued fifteen days prior.

17. Id.—Id.—Id.—Id.—Id.

Law No. 127-2004 amended Art. 1 of Law No. 18 dated October 30th of 1975 (2 LPRA sect. 97(a)), to clarify that non-compliance with the requirement of registering and remitting a contract to the Puerto Rico Comptroller's Office can be cured, and same does not entail nullity of same. In turn, it was provided that failure to comply with this requirement has the effect of prohibiting disbursement of public funds, or that services be requested until so registered in accordance with the applicable law and the regulations. Notwithstanding, these radical changes in legal rulings regarding government contracting do not bear the effect of altering public policy established within our legal system, to the effect that proper management of government entails performing its duties as a purchaser with the utmost efficiency, and to protect the interests and monies of the People.

18. Statutes, Customs and Equity—Interpretation and Applying the Law—Statutes in Particular—Executive Orders.

Executive orders issued by the First Executive cannot infringe applicable laws.


**Synopsis**

Petition for *Certiorari* of a Judgment by *Carlos López-Feliciano, Sixto Hernández-Serrano, Olga Birriel-Cardona* and *Roberto Rodríguez-Casellas*, Judges of the Appeals Court, confirming the one issued by the Trial Court, and ordering defendant to undersign a retroactive contract with the plaintiff, to cover for legal services which attorney provided during fiscal year 2006-2007. *Judgment issued by the Appeals Court is revoked.*


*Margarita Mercado-Echegaray*, solicitor general, *Amir Cristina Nieves-Villegas*, deputy solicitor general; *Miguel A. Rangel-Rosas*, from the law firm of *Maymí, Rivera & Rotger, PSC, Grace Santana-Balado*, attorney for the Department of Transportation & Public Works; *Ivette M. Berríos-Hernández*, from the law office of *Vázquez Graziani & Rodríguez, Oficina Legal, C.S.P., Ineabelle Santiago-Camacho* y *Beatriz Annexy-Guevara*, **\*452** attorneys for the law firm of *Reichard & Escalera*, attorneys for petitioning party; *Hilda M. Arriaga-Correa, Ramiro Rodríguez-Peña* y *Reynaldo Rodríguez-Peña*, from the law firm of *Ramiro Rodríguez-Ramos Law Offices*, attorneys for respondent.


Chief Justice Mr. Hernández-Denton issued the opinion of the Court.

On this occasion we must determine whether a verbal contract between a legal services provider and the Government can be validated by issuance of a retroactive contract. We rule it cannot, upon deeming that the contract is void and same cannot be retroactively validated, and that the provider cannot claim from the government for services rendered. We thus revoke judgment issued by the Appeals Court.

# I

Attorney Ramiro Rodriguez-Ramos did professional services for the Department of Transportation and Public Works (DTOP, Spanish acronyms) and for the Roads and Transportation Authority (ACT, Spanish acronyms), from 1990 to July 2nd of 2007. ACT is a public corporation assigned to the DTOP.

On February 18th of 2006, attorney Rodriguez-Ramos turned over to attorney Manuel Camara-Montull, Director for DTOP's and ACT's Legal Affairs Office, the documents necessary for renewal of his contract for fiscal year 2006-2007. On May 16th of 2006, Alberto Castro, Esq., the Special Assistant to DTOP's Secretary, informed the attorney that ACT would renew his contract, submitted the contract draft and requested that he submit, for a second time, those documents necessary for the appropriate renewal. Attorney Rodriguez-Ramos so did.

ACT prepared the professional services contract for fiscal year 2006–2007, and the certification for its registry **453** at the Comptroller's Office. Attorney Rodriguez-Ramos undersigned both documents, and turned them over to attorney Camara-Montull so that these in turn be signed by the agency and registered with the Comptroller's Office. Nevertheless, attorney Camara-Montull limited himself to register the contract's draft at the Finance Area, and did not process same.

On December 22nd of 2006, attorney Rodriguez-Ramos again submitted in writing the documents needed for renewal of the contract. Afterwards, he informed attorney Camara-Montull and to attorney Ivette Cancel, ACT's Executive Director's Legal Advisor, that they needed to pay him for services rendered through a resolution acknowledging debt, since ACT and DTOP had authorized him to continue rendering his services.

In June of 2007, attorney Grace Santana-Balado took charge of the Legal Affairs Office and requested a report from attorney Rodriguez-Ramos regarding the matters which had been referred over to him.

The attorney turned over the requested report and the documents needed for granting the contracts for the following fiscal year, 2007-2008. Afterwards, he informed attorney Santana that the contracts for that year had not been renewed, wherefore he requested to be informed in writing, whether they would authorize him to continue to legally represent the agency before the courts. On July 2nd of 2007, attorney Santana indicated to him that the contract for stated fiscal year would not be extended, and that they would not be paying for services rendered since same were not covered by a written contract. Consequently, she asked him to resign from legally

representing ACT and DTOP before the Courts, and to turn over the files for those cases assigned to him.

Things being such, stated attorney filed the captioned complaint on September 4th of 2007. He alleged that ACT owed him $106,910.16 for services rendered during fiscal years 2004-2005 and 2005-2006, as well as $264,786.70 for **454** fiscal year 2006-2007. On the other hand, he claimed $11,521.61 from DTOP for legal services rendered during fiscal year 2004-2005, $2,343 for fiscal year 2005-2006, and $46,323.76 for fiscal year 2006-2007. In 2010 ACT and DTOP paid the sums of monies corresponding to the first two periods, but not those corresponding to fiscal year 2006-2007.

Attorney Rodriguez-Ramos filed a motion for summary judgment. He alleged that ACT and DTOP should pay him the services remaining since it was they who hindered that the contract be set in writing. ACT and DTOP, on their part, alleged that the requirement that contracts be produced in writing was indispensable for any obligation to arise between the services provider and the State.

The Trial Court ruled through a partial summary judgment that once attorney Rodriguez-Ramos signed the contracts with ACT and DTOP for fiscal year 2006-2007, the corresponding officials bore the obligation to sign and register same with the Comptroller's Office. Due to that, it ordered defendant to sign a retroactive term contract as to cover for professional services rendered during fiscal year 2006-2007, to register same with the Comptroller's Office, and to pay the attorney for services rendered during stated period. In summary, it based its ruling on the general doctrine of contracts, in Law No. 18 dated October 30th of 1975, known as the Puerto Rico Comptroller's Office Contracts Registry Act, as amended, (Law No. 18-1975), 2 LPRA sec. 97(a), and on Executive Order OE-2006-23, *infra*. The primary forum sustained its ruling after a motion for reconsideration.

Dissatisfied, the Commonwealth of Puerto Rico (ELA) appealed to the Appeals Court. Stated forum confirmed the Trial Court. Still dissatisfied, **455** the CPR/ELA proceeds now before us. They argue that the intermediate appellate forum erred by ordering defendant to undersign a retroactive contract to cover for legal services which the attorney rendered during fiscal year 2006-2007. They sustained that "[s]aid mandate runs counter to the provisions of Law No. 237 dated August 31st of 2004, jurisprudence [...] within the subject pf government contracts, and public policy of constitutional stature which orders the most adequate and responsible disbursement of public funds". C*ertiorari petition at* page 8. We ordered plaintiff to show cause as to why we should not revoke the appealed ruling. It so did. Counting upon the benefit of both parties appearing, we issue the remedy and proceed to rule.

## II

A. *General Rules of Contracts*

[1] Art. 1044 of the Civil Code, 31 LPRA sec. 2994, provides that "obligations which arise from contracts have legal enforcement between the contracting parties and must be complied with, in accordance to same". See further: VDE Corporation v. F & R Contractors, 180 DPR 21, 34 (2010); López v. González, 163 DPR 275, 281 (2004). Consequently, a contract exists as soon as one or several persons render their consent in becoming bound to provide something or render a certain service".Art. 1206 of the Civil Code, 31 LPRA sec. 3371. Unisys v. Ramallo Brothers, 128 DPR 842, 852 (1991).

Same shall turn valid whenever three elements concur: consent, object and cause. Art. 1213 of the Civil Code 31 LPRA sec. 3391. In fact, Art. 1230 of that same Code, 31 LPRA sec. 3451, clearly establishes that "[t]he contracts shall become mandatory, regardless of the form in which same were executed, if and when the essential conditions for their validity".

[2] The contractual autonomy principle allows, within our legal system, that the contracting parties establish those pacts, clauses and conditions that they deem to be convenient. Art. 1207 of the Civil Code, 31 LPRA sec. 3372. See: Torres, Torres v. Torres et al., 179 DPR 481, 493 (2010); Oriental Financial v. Nieves, 172 DPR 462, 470–471 (2007). However, the contract becomes void and non-existent if same is contrary to laws, morals or to public order. Pepsi-Cola v. Mun. Cidra et al., 186 DPR 713, 752 (2012); Oriental Financial v. Nieves, supra; Morales v. Municipio de Toa Baja, 119 DPR 682, 692–693 (1987). this, regardless of the type of contract involved and the importance that same implies for the contracting parties. De Jesús González v. A.C., 148 DPR 255, 263–264 (1999). Véase, además, Morales v. Municipio de Toa Baja, supra. In such cases, any of the contracting parties may challenge the contract, although it may have benefitted from same. De Jesús González v. A.C., supra, pág. 264; Rasa Eng. Corp. v. Daubón, 86 DPR 193, 198 (1962). De Jesús González v. A.C., supra, pág. 264; Rasa Eng. Corp. v. Daubón, 86 DPR 193, 198 (1962).

B. *Government Contracting*

[3] With respect to Government contracting, the State is bound, due to a constitutional imposition, to handle public funds with the utmost ethical and fiduciary principles. *Jaap Corp. v. Depto.* Estado et al., 187 DPR 730, 739 (2013); C.F.S.E. v. Unión de Médicos, 170 DPR 443, 452 (2007). Sect. 9 del Art. VI of our Constitution establishes, in particular, that "[p]roperties and public funds shall only be disposed of, for public purposes and for the support and functioning of State institutions and in any case, by authority of law". Art. VI, Sect. 9, Const. ELA, LPRA, Volume 1, ed. 2008, page 429.

The Legislature, in compliance with this constitutional mandate, has passed laws which impose fiscal controls for governmental contracting. *Jaap Corp. v. Depto. Estado et al.*, supra. This being so in accordance with the above indicated provisions of the Civil Code, so any contract between a private **457** party and the State which fails to comply with these laws shall be non-existent and void. Art. 1207 of the Civil Code, *supra.* With this in mind, let us now see the legal provisions which apply to the contract before us.

C. *Government of Puerto Rico Accounting Act*

[4] Law No. 230 dated July 23rd of 1974, as amended, known as the Puerto Rico Government Accounting Act, *3 LPRA sec. 283 et seq.* (Law No. 230-1974), was passed for purposes of

planning the budget and pertinent government programs. (Emphasis provided). Art. 2(e) of Law No. 230-1974 (3 LPRA sec. 283a(e)). This law establishes, to stated effects that "[a]ll consignments and funds authorized to address a fiscal year shall be *exclusively* applied for payment of *expenses legitimately incurred into* during the respective year, of for payment of commitments *legally contracted and duly registered within the logbooks".* (Emphasis provided). Art. 8(a) of Law No. 230-1974 (3 LPRA sec. 283g(a)). It is pertinent to highlight that Art. 3(k) of this law, 3 LPRA sec. 283b(k), defines "obligation" as "[a] commitment contracted which is represented by a purchase order, *contract  or similar document*, pending payment, *signed by an authority competent* to lien consignment, *and which may in the future become a debt due.* (Emphasis provided).

**[5–6]** Likewise, Art. 9(a) of that same legal body, 3 LPRA sec. 283h(a), demands that:

[t]he units shall order commitments and disbursement from their public funds, *solely to commit* or pay for services, supplying of materials and equipment, claims or other matters *which are authorized by law.* The secretary shall effect accounting of such commitments and shall account for disbursements through *documents* submitted by their units, which shall have *prior approval for such payment or commitment* from the chief of the corresponding unit, or from **\*458** the officer or employee who the latter designates as his authorized representative. (Emphasis provided).

Thus, Law No. 230-1974 clearly establishes that for any contract executed by the State and a private party to become valid, same must be drafted in writing, prior to the corresponding rendering.

D. *Law for Establishing Standard Parameters within the Procedures for Contracting Professional of Professional or Consulting Services for Government Agencies and Entities*

**[7]**  In what is pertinent to the case we are evaluating, the Legislative Assembly approved Law No. 237 dated August 31st of 2004, known as the Law for Establishing Uniform Parameters in the Contracting of Professional or Consulting Services for Governmental Agencies or Entities, as amended. 3 LPRA sects. 8611–8615 (Law No. 237-2004). A governmental contract for the rendering of professional or consulting services to be valid, same must comply with the requirements of this law. Id. Legal services are covered under the definition which this law gives about the concept of "professional or consulting services", to wit, "those which their chief rendering consists in a product of intellectual, creative or artistic type, or the handling of highly technical or specialized skills". Art. 1 of Law No. 237-2004. (3 LPRA sec. 8611).

**[8]** From the start, Art. 2 of Law No. 237-2004 (3 LPRA sec. 8612) clearly establishes that government contracting of professional services needs to be the exception, and shall solely be used "whenever the governmental entity does not have [or] cannot use internal resources to be contracted, or whenever the contractor's *expertise*, skill or experience is necessary for pursuing the ends for which he is contracted". This article also demands that, at the time of contracting

services of a contractor, the State take into account "the actual need **\*459** for those services to be contracted, the financial situation and budget of the contracting government entity". Id.

**[9]** In addition to establishing that government contracting of professional services needs to be exceptional, Law No, 2372007 enumerates, within its Art. 3, a series of requirement, both substantive and as to form, with which every contract between the State and a contractor, needs to comply with.
3 LPRA sec. 8613. Specifically, this article requires:

   (a) The granting of a consulting or professional services contract between a contractor and the Government must be *prospective.* Every government entity shall solely pay for services rendered.
   (b) Same must be made formally *in writing,* and include within its text the legal provision which empowers the government entity to issue contract. (Emphasis provided). Id.

The remaining subsections of this legal provision detail the information which the contract for the contractor has to contain, the services to be rendered, the term of the contract, the maximum amount to be paid, and the manner of payment. Id. Later on, Art. 5 of this same Law, 3 LPRA sec. 8615, requires that the contract include an extensive list of mandatory clauses.

**[10]** We see, then, that Law No. 2327-2004 establishes that every professional or consulting services contract, category which includes rendering of legal services, shall only be valid if same is set in writing, and is for a prospective time period. No doubt that Law No. 237-2004 forbids verbal and retroactive professional and consulting services.

E. *Jurisprudence regarding governmental contracting.*

**[11]** We have, on our part, reaffirmed that for any contract between a private entity and the State to have a binding effect **\*460** between the parties, same must appear in writing. *Cordero Vélez v. Mun. de Guánica, 170 DPR 237, 248 (2007); Municipio Mayagüez v. Lebrón, 167 DPR 713, 719–720 (2006). This requirement has to be complied with "without any exception whatsoever". (*Emphasis in the original). *Fernández & Gutiérrez v. Mun. San Juan, 147 DPR 824, 833 (1999),* quoting *Hatton v. Mun. de Ponce, 134 DPR 1001 (1994).*

**[12]** Indeed, in ALCO Corp. v. Mun. de Toa Alta, 183 DPR 530 (2011), we confronted a dispute whereby a contractor began to render his services without having yet obtained a written contract, he completed his task and, subsequently, the parties executed a written contract. Id. Once the contractor attempted to charge his bill to the municipality, he submitted it, unsuccessfully to the judicial forum. Id. The case having arrived for our consideration, we vehemently reject the validation of verbal municipal contracts through issuance of retroactive formal written contracts. Id, page 540. We conclude that performing work prior to having a written contract violates government contracting rules. Id. Further, we reason that retroactive validation of a contract would foster corruption, since the contractor could perform the task prior to a written contract as

to pressure its future issuance, either by the current or any future administration. Id., page 543.

**[13]** Likewise, we recently ruled that retroactive contracting regarding lease of an asset breaches the rules regarding governmental contracting. *Jaap Corp. v. Depto. Estado et al.*, supra. In this case we indicated that:

> […] retroactive governmental contracting makes any *prior controls* to establishment of a commitment by the Government inoperable, and which is contrary to public policy established in Art. 2(e) of Law No. 230, *supra.* Such practice, moreover, hinders that third parties such as the Comptroller's Office, comply with the public policies of Law No. 230, and that citizens may obtain said contract in writing and pass judgment about such contracting, since the contract is drafted and published after the commitments provided for therein, had been executed and completed. (Emphasis in the original). Id., page 748.

**[14]** Thus, we have reaffirmed that parties which contract with any government entity without complying with governmental contracting requirements risks assuming liability for their own losses. Quest Diagnostics v. Mun. San Juan, 175 DPR 994, 1002 (2009); Colón Colón v. Mun. de Arecibo, 170 DPR 718, 728–729 (2007). This, since we have consequently rejected applying any remedy in equity, such as is unjust enrichment, to validate a public commitment lacking a written contract, and therefore indemnify damages suffered by a private party, by failing to comply with such requirements. *ALCO Corp. v. Mun. de Toa Alta*, supra, page 552; Las Marías v. Municipio San Juan, 159 DPR 868, 875 (2003).

F. *Registry at the Comptroller's Office.*

**[15]** Moreover, from the pristine demand that the governmental contract be prospective and set in writing, Art. 1 of Law No. 18-1975 (2 LPRA sec. 97(a)) provides in what is pertinent, as follows:

> Government entities and municipal entities of the Commonwealth of Puerto Rico, without any exceptions, shall retain a registry of all contracts that they issue, including amendments to same, and must remit copy of same to the Comptroller's Office within fifteen (15) days after the execution date of such contract or amendment.

**[16]** We summarize, upon interpreting this provision, that sound public management requires that Government contracts comply with the following requirements: (1) they be set in writing; (2) a faithful register be kept for purposes of establishing, *prima facie,* the existence of same; (3) copy be remitted to the Comptroller's Office as a means of duplicate verification regarding its execution, terms and conditions, and (4) that certainty regarding time periods be attested to, to wit, having been executed and issued 15 days prior. *CMI Hospital v. Depto.* Salud, 171 DPR 313, 320 (2007); Ocasio v. Alcalde Mun. de Maunabo, 121 DPR 37, 54 (1988).

Moreover, we have pointed out that the intent by the legislator is evident when creating, through this legislative piece, a means for collating and publishing governmental contracts. *CMI*

*Hospital v. Depto. Salud*, supra; *Fernández & Gutiérrez v. Mun. San Juan*, supra, page 830. These rigorous provisions respond to the State's interest in avoiding waste, corruption and cronyism within government contracting, and thus foster sound and proper public management, Id.

**[17]** Subsequently, Law No. 127-2004 amended Art, 1 of Law No. 18-1975, as to clarify that failure to comply with the requirement of registering and remitting a contract to the Puerto Rico Comptroller's Office can be cured, and does not entail its nullity. *Colón Colón v. Mun. de Arecibo*, supra, pages 727–729; Lugo v. Municipio Guayama, 163 DPR 208, 219 (2004). In turn, it was provided that not complying with this requirement has the effect of prohibiting disbursement of public funds, or that services not be demanded until same are registered in accordance to applicable law and regulations. Id.

Nevertheless, we have reaffirmed that these radical changes within legal rules regarding governmental contracting *"do not bear the effect of altering the public policy established in or legal system, to the effect that sound management by a government entails performing its duties as a purchaser with the utmost efficiency, for purposes of protecting the interests and monies of the People".* (Emphasis in the original). *Lugo v. Municipio Guayama*, supra, pág. 219. See also, *Colón Colón v. Mun. de Arecibo*, supra. In particular, we clarify that **\*463**

> [...] Law No. 127 amended Law No. 18, to establish that not remitting copy of the municipal contract to the Puerto Rico Comptroller's Office, or the lack of its registry within the municipality's log-books, did not vitiate into nullity the contract so undersigned. This does not result, as the intermediate appellate forum concluded, *that this same principle applies whenever what is dealt with is an agreement which was never set in writing. It is our opinion that Law No. 127, never contemplated such a scenario.*
> There exist marked differences between certain requirements and others. The demand that a written contract be noted into the municipal logbook and copy of same remitted to the Puerto Rico Comptroller's Office is directed towards rendering publicity regarding municipal contracting, in view of third parties. In this manner, third parties can have oversight. Notwithstanding, *demanding that signed contracts be set in writing bears the inescapable dimension of sound public management,* in a manner that allows for safekeeping the interests of the contracting parties, avoids uncertainty in preparing the municipal budget, and makes possible an adequate identification of the item against which public disbursement shall be made, in compliance with the law. That is, the first ones are more of a procedural type and of an orderly process, however the last one is substantive due to its direct relationship with a sound public management. In addressing of which we must conclude that *non-compliance with the requirement of setting the municipal contract into writing, forcefully, adversely affects the efficacy of obligations contracted therein.* (Emphasis provided). *Colón Colón v. Mun. de Arecibo*, supra, pages 729–730.

*G. Executive Order*

Lower courts also based their decision on Executive Order OE-2006-23, *infra,* as to order the

State to undersign a retroactive term contract with the plaintiff, as to cover for professional services rendered during fiscal year 2006-2007, register it at the Comptroller's Office, and pay counsel for those services rendered. Let us examine applicable rules regarding executive orders.

**[18]** First of all, it is proper to indicate that the Governor's faculty to issue executive orders is not **\*464** regulated, justified or explained by any statutory or constitutional provision. Vázquez Irizarry, Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas, (The powers of the Governor of Puerto Rico and Use of Executive Orders), 76 Rev. Jur. UPR 951, 1020 (2007). On our part, we have been clear in reaffirming that executive order issued by the First Executive cannot breach applicable laws. See, Otero de Ramos v. Srio. de Hacienda, 156 DPR 876, 892 (2002), quoting Soto v. Adm. Inst. Juveniles, 148 DPR 810 (1999).

With respect to that, Prof. William Vazquez-Irizarry sustains that the classic case in which using these means undermines legislative functions is when "the executive order which attempts to attain objectives which have been rejected in a manifest manner by the legislative power, wherefore the sole legal ground which might sustain the Governor's pretensions are its constitutional faculties or either, claiming inherent powers". Vázquez-Irizarry, *supra*, page 1047. It is worthy to highlight that Sect. 4 of Art. IV of our Constitution does not confer upon the First Executive the power to regulate governmental contracting with private entities. See Art. IV, Sec. 4, Const. ELA, LPRA, Volume 1.

An executive order may also undermine the administrative regulatory process. Vázquez Irizarry, *supra*, page 1051. These types of regulations are a classic function which administrative forums have, whenever the Legislature has delegated upon them authority to regulate, in which case the procedural time period provided for under the Commonwealth of Puerto Rico Uniform Administrative Procedures Act, would apply. (LPAU, Spanish acronyms.) Law  No. 170 dated August 12th of 1988 (3 LPRA sects. 2101–2201). Id. Within this context, use of executive orders could raise problems in the measure that same attempt to establish rules which affect third parties, lacking the legitimacy displayed by requirements of citizen participation, provided for under the LPAU. Id., page 1053. Professor Irizarry, in its pertinent part, affirms the following: **\*465**

> It may be adduced that this problem should not exist, since one of the principles which define the use of executive orders is that same are mandates applicable "within the executive branch", wherefore there are no third parties to be affected. Nevertheless, the truth is some orders procure to establish public policies or programs with a level of detail which places its effects close to the citizenry. *That is the case of those orders which, although directed towards public entities, affect the relations which these have with third parties, particularly within the ambiance for purchasing of goods or services.* (Emphasis provided). Id., page 1054.

In the captioned case, lower courts based their respective rulings on the "Executive Order by the Governor of the Commonwealth of Puerto Rico to Regulate payment of services rendered to agencies and entities of the Executive Branch without use of a formal contract duly registered at the Comptroller's Office", Executive Order OE-2006-23 (Executive Order),

signed by the then Governor Anibal Acevedo-Vila on June 22nd of 2006. Specifically, same were based on statement of reasons of the Executive Order establishes that "[t]he mere fact that a service has been rendered in accordance with a verbal agreement between the CPR/ELA and the contractor, does not impede that the CPR/ELA subsequently produce stated agreement into writing, and honor fair payment for the services rendered". Executive Order, page 3.

As we have seen, although the Governor does have the faculty to issue executive order as part of those faculties conferred him by the laws or inherent power of his post, he/she cannot issue executive orders in a manner contrary to that provided for by law. *Otero de Ramos v. Srio. de Hacienda*, supra. Law No. 237-2004 demands that alle legal services government contract be effected in writing and with prospective terms. Which is that this law prohibits verbal contracting for such services, as well as any retroactive written contracts. Similarly, Law No. 230-1974 requires that governmental contracts, to become valid, need to be in writing. **\*466** Likewise, the demand that the contract be registered at the Comptroller's Office, as established by Law No. 18-1975, presupposes that same be prospective and in writing.

On the other hand, the Legislative Assembly has not delegated upon any administrative agency the power to regulate new governmental contracting rules which run counter to that established within the legal provisions discussed in the above subsections. Consequently, the Executive Order is not valid in the measure that same allows validation of verbal contracts with the State, through formal retroactive contracts, contrary to that provided for by law.

## III

There exists no dispute, in the captioned case, that the parties never undersigned a written contract for fiscal year 2006-2007. As we propounded, quoted laws as well as their interpretative jurisprudence forbid disbursement of public funds for services renders in lack of there existing a valid government contract which complies with all of the strict requirements regarding governmental contracting. Indeed, same provide that any contract which is not executed according to these rules, is void. Likewise, we saw that the Executive Order which may have allowed to retroactively validate the questioned contract, is not valid since same runs counter to laws regarding governmental contracting.

Last, we have been consequent upon firmly rejecting applicability of any remedy in equity as to validate a verbal public commitment and have the private party be indemnified, for damages suffered for rendering their services without complying with government contracting rules. See: *ALCO Corp. v. Mun. de Toa Alta*, supra; *Las Marías v. Municipio San Juan*, supra.

Upon applying this normative framework to the case we now are considering, it is forcefully concluded that the claim by **\*467** attorney Rodriguez-Ramos is not enforceable. He rendered his legal services knowing that there did not exist any written contract binding the State. So being,

the verbal contract upon which he intends to ground his claim is null. In view of stated reality, neither does a remedy in equity apply at all. Attorney Rodriguez-Ramos risked himself by bearing the responsibility for his losses, such as we have warned all of those who contract with any governmental entity without complying with government contracting requirements. See: *Quest Diagnostics v. Mun. San Juan*, supra; *Colón Colón v. Mun. de Arecibo*, supra.

Therefore, the lower courts erred by ordering the DTOP and ACT to undersign a contract with retroactive terms to cover for professional services rendered during fiscal year 2006-2007, register same at the Comptroller's Office, and pay the attorney for services provided during stated period.

## IV

Due to the above stated grounds, *judgment issued by the Appeals Court is revoked. Judgment shall be rendered accordingly.*

Associate Justice Mrs. Pabon-Charneco issued an individual opinion agreeing, joined by Associate Justice Mr. Rivera-Garcia. Associate Justice Mrs. Rodriguez-Rodriguez did not intervene.

## --O--

Individual opinion in agreement issued by Associate Justice Mrs. Pabón-Charneco, who is joined by Associate Judge, Mr. Rivera-García.

I agree with the above Opinion. The controversy we heard today, specifically as to whether a private party **\*468** and the State can execute a contract retroactively to validate a prior rendering of certain professional services without having complied with the formalities related to governmental contracts, has been the subject of analysis by this Court, within contexts similar to this case.

As is well pointed out in the Opinion, as recently as in *Jaap Corp. v. Depto.* Estado et al., 187 DPR 730, 748–749 (2013), we dictaminated that rules regarding government contracting whenever issuing a retroactive contract to validate a lease that was being executed between a municipality and a private entity without the existence of a written contract between the parties. Also see, ALCO Corp. v. Mun. de Toa Alta, 183 DPR 530 (2011). I take this opportunity to reaffirm that the rule which prohibits retroactive government contracting, is in tune with the most basic principles of sound public management and adequate control for the disbursement of public funds. *Jaap Corp. v. Depto. Estado et al.*, supra, page 744. The above applies to municipalities as well as to the central government and its

units.

Lastly, it becomes pertinent to express myself regarding the use of Executive Orders as a means to usurp duties of the legislative Branch proper, such as has happened with Executive Order No. OE-2006-23 dated June 22nd of 2006, promoted by the then Governor of Puerto Rico, Anibal Acevedo-Vila, purpose of which was to authorize retroactive government contracting. Without passing judgment as to the validity of stated Executive Order, already in *Jaap Corp. v. Depto. Estado et al.*, supra, page749 sec. 11, we had highlighted the inconveniences prompted by such retroactive governmental contracting both at the Comptroller's Office, as well as in the Justice Department. Lacking any constitutional or legislative delegation upon the Executive Branch regarding the power to regulate government contracting, the actions of the then Governor breaches the basic constitutional principles of separation *469 of powers.[1] Art. I, Sec. 2, Const. ELA, LPRA, Volume 1. Ruling the opposite would result in validating a clear intrusion of the Executive Branch into powers delegated upon the Legislative Branch by our Constitution. Things being such, this Court acted correctly by invalidating Executive Order No. OE-2006-23, *supra.*

For all of the above I concur with the Opinion rendered today.

Footnotes

1    *Same results as being even more disconcerting, in view of the results of the General Elections held on November 2nd of 2004, which gave rise to a shared government between the main political parties of Puerto Rico.*

End of Document    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT F-2**

190 D.P.R. 448, 2014 WL 997549 (P.R.), 2014 TSPR 32

Ramiro Rodríguez Ramos y otros, recurridos,

v.

ELA de PR y otros, peticionarios.

En El Tribunal Supremo De Puerto Rico.

*Número:* CC-2013-234

*Resuelto:* 6 de marzo de 2014

March 6, 2014.

1. Obligaciones—Creación, Existencia y Efecto—Nacimiento y Fuentes—Contratos..

El Art. 1044 del Código Civil, 31 LPRA sec. 2994, dispone que las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de los mismos. Consecuentemente, un contrato existe desde que una o varias personas prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio y será válido si concurren tres elementos: consentimiento, objeto y causa.

2. Contratos—En General—Requisitos y Validez—Partes, Proposiciones u Ofertas y Aceptación—Oferta y Aceptación—Libertad de Contratación.

En nuestro ordenamiento, el principio de autonomía contractual permite que las partes contratantes establezcan los pactos, las cláusulas y las condiciones que entiendan convenientes. Ahora bien, el contrato será nulo e inexistente si es contrario a las leyes, a la moral o al orden público. En tales casos, cualquiera de las partes contratantes puede impugnar el contrato, aunque se haya beneficiado del mismo.

3. Puerto Rico—Estado Libre Asociado—Bienes, Contratos y Responsabilidades—Autoridad o Poder del ELA para Contratar.

La Sec. 9 del Art. VI de nuestra Constitución, LPRA, Tomo 1, establece que solo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley. Para cumplir con este mandato constitucional, la Legislatura ha aprobado leyes que imponen controles fiscales y de contratación gubernamental. Siendo así, un contrato entre una parte privada y el Estado que no cumpla con estas leyes será nulo e inexistente.

4. Íd.—Íd.—Íd.—En General.

La Ley de Contabilidad del Gobierno de Puerto Rico establece que todas las asignaciones y los fondos autorizados para las atenciones de un año económico se aplicarán exclusivamente al pago de los gastos en que se haya incurrido legítimamente durante el respectivo año **449** o al pago de obligaciones legalmente contraídas y debidamente asentadas en los libros.

5. Íd.—Íd.—Íd.—Íd.
El Art. 9(a) de la Ley de Contabilidad del Gobierno de Puerto Rico, 3 LPRA sec. 283h(a), exige que las dependencias ordenarán las obligaciones y los desembolsos de sus fondos públicos únicamente para obligar o pagar servicios, suministros de materiales y equipos, reclamaciones u otros conceptos que estuvieren autorizados por ley. El Secretario contabilizará las obligaciones y efectuará y contabilizará los desembolsos a través de los documentos que sometan las dependencias. El jefe de la dependencia correspondiente, o el funcionario o el empleado que este designe como su representante autorizado, aprobará previamente estos documentos para obligación o pago.

6. Íd.—Íd.—Íd.—Autoridad o Poder del ELA para Contratar—Requisitos de los Contratos.
La Ley de Contabilidad del Gobierno de Puerto Rico establece claramente que, para que un contrato otorgado por el Estado y una parte privada sea válido y exigible, este debe constar por escrito previo a las prestaciones correspondientes.

7. Íd.—Íd.—Íd.—Íd.—Íd.
Un contrato gubernamental para la prestación de servicios profesionales o consultivos tiene que cumplir con los requisitos de la Ley 237-2004 para que sea válido. Los servicios legales están cobijados por la definición que esta ley hace del concepto "servicios profesionales o consultivos", a saber, aquellos cuya prestación principal consista del producto de la labor intelectual, creativa o artística, o en el manejo de destrezas altamente técnicas o especializadas.

8. Íd.—Íd.—Íd.—Íd.—Íd.
El Art. 2 de la Ley Núm. 237-2004 (3 LPRA sec. 8612) establece que la contratación gubernamental de servicios profesionales debe ser la excepción y que solo se utilizará cuando la entidad gubernamental no cuente o no pueda utilizar los recursos internos, o cuando el *expertise*, la destreza o la experiencia del contratista sea necesario para la consecución de los fines para lo cual es contratado. Este artículo también exige que, al momento de contratar los servicios de un contratista, el Estado tome en cuenta la necesidad real de los servicios a contratarse, la situación económica y el presupuesto de la entidad gubernamental contratante.

9. Íd.—Íd.—Íd.—Íd.—Íd.
El Art. 3 de la Ley Núm. 237-2004 (3 LPRA sec. 8613) enumera una serie de requisitos, tanto de forma como sustantivos, con los cuales debe cumplir todo contrato entre el Estado y un contratista. En específico, este artículo requiere: (1) el otorgamiento de un contrato de servicios profesionales o consultivos entre un contratista y el Gobierno deberá ser prospectivo, y (2) la formalización por escrito y la **\*450** inclusion en el texto de la disposición legal que faculta a la entidad gubernamental a otorgar contratos.

10. Íd.—Íd.—Íd.—Íd.—Íd.
La Ley Núm. 237-2004 establece que todo contrato gubernamental de servicios profesionales o

consultivos, categoría que incluye la prestación de servicios legales, solo será válido si se hace constar por escrito y tiene vigencia prospectiva. Sin lugar a dudas, la Ley Núm. 237-2004 prohíbe la contratación verbal y retroactiva de servicios profesionales y consultivos.

11. Íd.—Íd.—Íd.—Íd.—Íd.

Para que un contrato entre un ente privado y el Estado tenga efecto vinculante entre las partes debe constar por escrito. Este requisito tiene que cumplirse sin excepción alguna.

12. Íd.—Íd.—Íd.—Íd.—Íd.

Realizar una obra antes de tener un contrato escrito viola las normas de contratación gubernamental. Validar un contrato retroactivamente fomentaría la corrupción, pues un contratista podría realizar la obra antes de otorgar el contrato escrito para presionar su otorgamiento futuro, ya sea por la administración de turno o la siguiente.

13. Íd.—Íd.—Íd.—Íd.—Íd.

La contratación gubernamental retroactiva hace inoperante todo control previo a la formación de una obligación del Gobierno. Esta práctica impide, además, que terceros como la Oficina del Contralor cumplan con la política pública de la Ley de Contabilidad del Gobierno de Puerto Rico y que los ciudadanos puedan obtener el contrato escrito para pasar juicio sobre la contratación, pues el contrato se escribe y publica luego de la ejecución y consumación de las obligaciones allí dispuestas.

14. Íd.—Íd.—Íd.—Íd.—Íd.

Las partes que contratan con cualquier entidad gubernamental sin cumplir con los requisitos de contratación gubernamental se arriesgan a asumir la responsabilidad por sus pérdidas. Esto, pues los tribunales han rechazado consecuentemente la aplicación de cualquier remedio en equidad, como el enriquecimiento injusto, para convalidar la obligación pública sin contrato escrito y así indemnizar los daños sufridos por una parte privada al no cumplir con estos requisitos.

15. Íd.—Íd.—Íd.—Íd.—Íd.

Además de la clara exigencia de que el contrato gubernamental conste por escrito y sea prospectivo, el Art. 1 de la Ley Núm. 18-1975 (2 LPRA sec. 97(a)) dispone que las entidades gubernamentales y las entidades municipales del Estado Libre Asociado de Puerto Rico, sin excepción alguna, mantendrán un registro de todos los contratos que otorguen, incluyendo las enmiendas a estos, y deberán remitir copia   **\*451** de estos a la Oficina del Contralor dentro de los 15 días siguientes a la fecha de otorgamiento del contrato o la enmienda.

16. Íd.—Íd.—Íd.—Íd.—Íd.

La sana administración pública requiere que los contratos con el Gobierno cumplan con los requisitos siguientes: (1) se reduzcan a escrito; (2) se mantenga un registro fiel para establecer su existencia prima facie; (3) se remita copia a la Oficina del Contralor como una doble constancia de su otorgamiento, términos y existencia, y (4) se acredite la certeza de tiempo, es

decir, haber sido realizado y otorgado quince días antes.

17. Íd.—Íd.—Íd.—Íd.—Íd.

La Ley Núm. 127-2004 enmendó el Art. 1 de la Ley Núm. 18 de 30 de octubre de 1975 (2 LPRA sec. 97(a)) para aclarar que el incumplimiento con el requisito de registrar y remitir un contrato a la Oficina del Contralor de Puerto Rico puede ser subsanado y no acarrea la nulidad del mismo. En cambio, se dispuso que incumplir con este requisito tiene como efecto prohibir el desembolso de fondos públicos o que se requirieran servicios hasta tanto estos se registren conforme a la ley y la reglamentación aplicable. Sin embargo, estos cambios radicales en la normativa jurisprudencial sobre contratación gubernamental no tienen el efecto de alterar la política pública establecida en nuestro ordenamiento jurídico a los efectos de que la buena administración de un gobierno conlleva el realizar sus funciones como comprador con la mayor eficacia para proteger los intereses y el dinero del pueblo.

18. Estatutos, Costumbres y Equidad—Interpretación y Aplicación de la Ley—Estatutos en Particular—Órdenes Ejecutivas..

Las órdenes ejecutivas emitidas por el Primer Ejecutivo no pueden contravenir las leyes aplicables.

**Synopsis**

Petición de *Certiorari* de una Sentencia de *Carlos López Feliciano, Sixto Hernández Serrano, Olga Birriel Cardona* y *Roberto Rodríguez Casellas*, Js. del Tribunal de Apelaciones, que confirmó la emitida por el Tribunal de Primera Instancia y ordenó a la parte demandada a suscribir con el demandante un contrato con vigencia retroactiva para cubrir los servicios legales que el abogado prestó durante el año fiscal 2006–2007. *Se revoca la sentencia emitida por el Tribunal de Apelaciones.*

*Margarita Mercado Echegaray*, procuradora general, *Amir Cristina Nieves Villegas*, procuradora general auxiliar; *Miguel A. Rangel Rosas*, del bufete *Maymí, Rivera & Rotger, PSC, Grace Santana Balado*, abogada del Departamento de Transportación y Obras Públicas; *Ivette M. Berríos Hernández*, del bufete *Vázquez Graziani & Rodríguez, Oficina Legal, C.S.P., Ineabelle Santiago Camacho* y *Beatriz Annexy* **\*452** *Guevara*, abogadas del bufete *Reichard & Escalera*, abogados de la parte peticionaria; *Hilda M. Arriaga Correa, Ramiro Rodríguez Peña* y *Reynaldo Rodríguez Peña*, del bufete *Ramiro Rodríguez Ramos Law Offices*, abogados de la parte recurrida.

El Juez Presidente Señor Hernández Denton emitió la opinión del Tribunal.

En esta ocasión debemos determinar si un contrato verbal entre un proveedor de servicios legales y el Gobierno se puede validar mediante el otorgamiento de un contrato retroactivo. Resolvemos en la negativa. Por entender que el contrato es nulo, que no puede validarse retroactivamente y que el proveedor no puede reclamar al gobierno por los servicios prestados, revocamos la sentencia emitida por el Tribunal de Apelaciones.

# I

El Lcdo. Ramiro Rodríguez Ramos prestó sus servicios profesionales como abogado al Departamento de Transportación y Obras Públicas (DTOP) y a la Autoridad de Carreteras y Transportación (ACT) desde 1990 hasta el 2 de julio de 2007. La ACT es una corporación pública adscrita al DTOP.

El 18 de febrero de 2006 el licenciado Rodríguez Ramos entregó al Director de la Oficina de Asuntos Legales del DTOP y la ACT, el Lcdo. Manuel Cámara Montull, los documentos necesarios para la renovación de sus contratos para el año fiscal 2006–2007. El 16 de mayo de 2006 el Ayudante Especial del Secretario del DTOP, el Lcdo. Alberto Castro, informó al abogado que la ACT le renovaría el contrato, le sometió el borrador del contrato y le solicitó que suministrara por segunda vez los documentos necesarios para la renovación correspondiente. El licenciado Rodríguez Ramos así lo hizo.

La ACT preparó el contrato de servicios profesionales para el año fiscal 2006–2007 y la certificación para registrarlo **453 en la Oficina del Contralor. El licenciado Rodríguez Ramos suscribió ambos documentos y los entregó al licenciado Cámara Montull para que fueran a su vez suscritos por la agencia y registrados en la Oficina del Contralor. Sin embargo, el licenciado Cámara Montull se limitó a registrar el borrador del contrato en el Área de Finanzas y no lo procesó.

El 22 de diciembre de 2006 el licenciado Rodríguez Ramos sometió nuevamente los documentos necesarios para renovar los contratos por escrito. Luego, informó al licenciado Cámara Montull y a la Asesora Legal del Director Ejecutivo de la ACT, la Lcda. Ivette Cancel, que tenían que pagarle los servicios prestados mediante una resolución de reconocimiento de deuda, pues la ACT y el DTOP lo habían autorizado a continuar prestando sus servicios.

En junio de 2007 la Lcda. Grace Santana Balado asumió la dirección de la Oficina de Asuntos Legales y solicitó al licenciado Rodríguez Ramos un informe sobre los asuntos que le habían sido referidos. El abogado entregó el informe solicitado y los documentos necesarios para otorgar los contratos para el próximo año fiscal 2007–2008. Luego, este informó a la licenciada Santana que no le habían renovado los contratos para ese año, por lo que le solicitó que le informaran por escrito si lo autorizaban a continuar representando legalmente a la agencia ante los tribunales. El 2 de julio de 2007 la licenciada Santana le indicó que no le iban a otorgar contrato para el referido año fiscal y que no le pagarían los servicios prestados que no estaban cubiertos por contrato escrito. Consecuentemente, le pidió que renunciara a la representación legal de la ACT y DTOP ante los tribunales y que le entregara los expedientes de los casos que

tenía asignados.

Así las cosas, el abogado presentó la demanda de epígrafe el 4 de septiembre de 2007. Alegó que la ACT le debía $106,910.16 por servicios prestados durante los años fiscales 2004–2005 y 2005–2006, así como $264,786.70 por el **\*454** año fiscal 2006–2007. Por otra parte, reclamó a DTOP $11,521.61 por los servicios legales prestados durante el año fiscal 2004–2005, $2,343.75 por el año fiscal 2005–2006 y $46,323.76 por el año fiscal 2006–2007. En 2010 la ACT y el DTOP pagaron las sumas de dinero correspondientes a los primeros dos periodos, pero no las correspondientes al año fiscal 2006–2007.

El licenciado Rodríguez Ramos presentó una moción de sentencia sumaria. Alegó que la ACT y el DTOP debían pagarle los servicios restantes porque fueron estos quienes impidieron que el contrato fuera llevado a escrito. Por su parte, la ACT y el DTOP alegaron que el requisito de que los contratos se reduzcan a escrito es indispensable para que nazca la obligación entre el proveedor de los servicios y el Estado.

El Tribunal de Primera Instancia resolvió mediante sentencia sumaria parcial que, una vez el licenciado Rodríguez Ramos firmó los contratos con la ACT y el DTOP para el año fiscal 2006–2007, los funcionaros correspondientes tenían la obligación de firmarlos y registrarlos en la Oficina del Contralor. Por ello, ordenó a la parte demandada a suscribir con el demandante un contrato con vigencia retroactiva para cubrir los servicios profesionales prestados durante el año fiscal 2006–2007, registrarlo en la Oficina de Contralor y pagar al abogado los servicios prestados durante dicho periodo. En síntesis, fundamentó su dictamen en la doctrina general de los contratos, en la Ley Núm. 18 de 30 de octubre de 1975, conocida como Ley de Registro de Contratos en la Oficina del Contralor de Puerto Rico, según enmendada (Ley Núm. 18-1975), 2 LPRA sec. 97(a), y en la Orden Ejecutiva OE-2006-23, *infra*. El foro primario sostuvo su dictamen tras una moción de reconsidera ción.

Insatisfecho, el Estado Libre Asociado de Puerto Rico (ELA) acudió ante el Tribunal de Apelaciones. Ese foro confirmó al Tribunal de Primera Instancia. Todavía inconforme, **\*455** el ELA acudió ante nos. Argumenta que el foro apelativo intermedio erró al ordenar a la parte demandada suscribir un contrato retroactivo para cubrir los servicios legales que el abogado prestó durante el año fiscal 2006–2007. Sostiene que "[e]se mandato contraviene las disposiciones de la Ley Núm. 237 de 31 de agosto de 2004, la jurisprudencia [...] en materia de contratos gubernamentales y la política pública de rango constitucional que ordena la más adecuada y responsable erogación de los fondos públicos". Petición de *certiorari*, pág. 8. Ordenamos al demandante que mostrara causa por la cual no debemos revocar el dictamen recurrido. Así lo hizo. Contando con el beneficio de la comparecencia de ambas partes, expedimos el recurso y procedemos a resolver.

## II

A. *Norma general de los contratos*

**[1]** El Art. 1044 del Código Civil, 31 LPRA sec. 2994, dispone que "las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de los mismos". Véanse, además: *VDE Corporation v. F & R Contractors*, 180 DPR 21, 34 (2010); *López v. González*, 163 DPR 275, 281 (2004). Consecuentemente, un contrato existe desde que una o varias personas prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 LPRA sec. 3371. *Unisys v. Ramallo Brothers*, 128 DPR 842, 852 (1991). Este será válido si concurren tres elementos: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 LPRA sec. 3391. Incluso, el Art. 1230 del mismo Código, 31 LPRA sec. 3451, establece claramente que "[l]os contratos serán obligatorios, cualquiera que sea la forma en que se hayan celebrado, siempre que en ellos concurran las condiciones esenciales para su validez".

**[2]** En nuestro ordenamiento, el principio de autonomía **\*456** contractual permite que las partes contratantes establezcan los pactos, las cláusulas y las condiciones que entiendan convenientes. Art. 1207 del Código Civil, 31 LPRA sec. 3372. Véanse: *Torres, Torres v. Torres et al.*, 179 DPR 481, 493 (2010); *Oriental Financial v. Nieves*, 172 DPR 462, 470–471 (2007). Ahora bien, el contrato será nulo e inexistente si es contrario a las leyes, a la moral o al orden público. *Pepsi-Cola v. Mun. Cidra et al.*, 186 DPR 713, 752 (2012); *Oriental Financial v. Nieves*, supra; *Morales v. Municipio de Toa Baja*, 119 DPR 682, 692–693 (1987). Esto, sin importar el tipo de contrato del que se trate y la importancia que este merezca para las partes contratantes. *De Jesús González v. A.C.*, 148 DPR 255, 263–264 (1999). Véase, además, *Morales v. Municipio de Toa Baja*, supra. En tales casos, cualquiera de las partes contratantes puede impugnar el contrato, aunque se haya beneficiado del mismo. *De Jesús González v. A.C.*, supra, pág. 264; *Rasa Eng. Corp. v. Daubón*, 86 DPR 193, 198 (1962).

B. *Contratación gubernamental*

**[3]** Respecto a la contratación gubernamental, el Estado está obligado, por imperativo constitucional, a manejar los fondos públicos con los principios fiduciarios y éticos más altos. *Jaap Corp. v. Depto. Estado et al.*, 187 DPR 730, 739 (2013); *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 452 (2007). En particular, la Sec. 9 del Art. VI de nuestra Constitución establece que "[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley". Art. VI, Sec. 9, Const. ELA, LPRA, Tomo 1, ed. 2008, pág. 429.

Para cumplir con este mandato constitucional, la Legislatura ha aprobado leyes que imponen controles fiscales y de contratación gubernamental. *Jaap Corp. v. Depto. Estado et al.*, supra. Siendo así, conforme a las disposiciones del Código Civil antes citadas, un contrato entre una parte **\*457** privada y el Estado que no cumpla con estas leyes será nulo e inexistente. Art. 1207 del Código Civil, *supra.* Con ello en mente, veamos las disposiciones legales que aplican al contrato ante nos.

C. *Ley de Contabilidad del Gobierno de Puerto Rico*

**[4]** La Ley Núm. 230 de 23 de julio de 1974, según enmendada, conocida como Ley de Contabilidad del Gobierno de Puerto Rico, 3 LPRA sec. 283 *et seq.* (Ley Núm. 230-1974), se

aprobó con el propósito de lograr el "control *previo* de todas las operaciones del gobierno" para que sea posible planificar el presupuesto y programas de gobierno correspondientes. (Énfasis suplido). Art. 2(e) de la Ley Núm. 230-1974 (3 LPRA sec. 283a(e)). A esos efectos, esta ley establece que "[t]odas las asignaciones y los fondos autorizados para las atenciones de un año económico, serán aplicados *exclusivamente* al pago de gastos *legítimamente incurridos* durante el respectivo año o al pago de obligaciones *legalmente contraídas y debidamente asentadas en los libros*". (Énfasis suplido). Art. 8(a) de la Ley Núm. 230-1974 (3 LPRA sec. 283g(a)). Cabe destacar que el Art. 3(k) de esta ley, 3 LPRA sec. 283b(k), define "obligación" como "[u]n compromiso contraído que esté representado por orden de compra, *contrato o documento similar*, pendiente de pago, *firmado por autoridad competente* para gravar las asignaciones, *y que puede convertirse en el futuro en deuda exigible*". (Énfasis suplido).

[5–6] De igual manera, el Art. 9(a) del mismo cuerpo legal, 3 LPRA sec. 283h(a), exige que [l]as dependencias ordenarán obligaciones y desembolsos de sus fondos públicos *únicamente* para obligar o pagar servicios, suministros de materiales y equipos, reclamaciones u otros conceptos *que estuvieren autorizados por ley*. El Secretario contabilizará las obligaciones y efectuará y contabilizará los desembolsos a través de *documentos* que sometan las dependencias, los cuales serán *previamente aprobados para obligación o pago* por el jefe de la dependencia correspondiente o por **458** el funcionario o empleado que éste designare como su representante autorizado. (Énfasis suplido).

Así pues, la Ley Núm. 230-1974 establece claramente que, para que un contrato otorgado por el Estado y una parte privada sea válido y exigible, este debe constar por escrito previo a las prestaciones correspondientes.

D. *Ley para Establecer Parámetros Uniformes en los Procesos de Contratación de Servicios Profesionales o Consultivos para las Agencias y Entidades Gubernamentales*

[7] En lo pertinente al caso que evaluamos, la Asamblea Legislativa aprobó la Ley Núm. 237 de 31 de agosto de 2004, conocida como Ley para Establecer Parámetros Uniformes en los Procesos de Contratación de Servicios Profesionales o Consultivos para las Agencias y Entidades Gubernamentales, según enmendada, 3 LPRA secs. 8611–8615 (Ley Núm. 237-2004). Para que un contrato gubernamental para la prestación de servicios profesionales o consultivos sea válido, tiene que cumplir con los requisitos de esta ley.́ Id. Los servicios legales están cobijados por la definición que esta ley hace del concepto de "servicios profesionales o consultivos", a saber, ""aquellos cuya prestación principal consista del producto de la labor intelectual, creativa o artística, o en el manejo de destrezas altamente técnicas o especializadas". Art. 1 de la Ley Núm. 237-2004 (3 LPRA sec. 8611).

[8] De entrada, el Art. 2 de la Ley Núm. 237-2004 (3 LPRA sec. 8612) establece claramente que la contratación gubernamental de servicios profesionales debe ser la excepción y que solo se utilizará "cuando la entidad gubernamental no cuente [o] no pueda utilizar los recursos internos a ser contratados, o cuando el *expertise*, destreza o experiencia del contratista sea necesario para la consecución de los fines para lo cual es contratado". Este artículo también exige que, al

momento de contratar los servicios de un contratista, el Estado tome en cuenta "la necesidad **\*459** real de los servicios a contratarse, la situación económica y el presupuesto de la entidad gubernamental contratante".´Id.

**[9]** Además de establecer que la contratación gubernamental de servicios profesionales debe ser excepcional, la Ley Núm. 237-2004 enumera en su Art. 3 una serie de requisitos, tanto de forma como sustantivos, con los cuales debe cumplir todo contrato entre el Estado y un contratista. 3 LPRA sec. 8613. En específico, este artículo requiere:
> (a) El otorgamiento de un contrato de servicios profesionales o consultivos entre un contratista y el Gobierno deberá ser *prospectivo.* Toda entidad gubernamental pagará únicamente por servicios rendidos.
> (b) Debe formalizarse *por escrito* e incluirse en el texto del mismo la disposición legal que faculta a la entidad gubernamental a otorgar contratos. (Énfasis suplido).´Id.

El resto de los incisos de esta disposición legal detalla la información que debe contener el contrato sobre el contratista, los servicios que prestará, la vigencia del contrato, la cuantía máxima a pagarse y la forma de pago.´Id. Más adelante, el Art. 5 de la misma ley, 3 LPRA sec. 8615, requiere que se incluya en el contrato una lista extensa de cláusulas mandatorias.

**[10]** Vemos, pues, que la Ley Núm. 237-2004 establece que todo contrato gubernamental de servicios profesionales o consultivos, categoría que incluye la prestación de servicios legales, solo será válido si se hace constar por escrito y tiene vigencia prospectiva. Sin lugar a dudas, la Ley Núm. 237-2004 prohíbe la contratación verbal y retroactiva de servicios profesionales y consultivos.

E. *Jurisprudencia sobre contratación gubernamental*

**[11]** Por nuestra parte, hemos reiterado que, para que un contrato entre un ente privado y el Estado tenga **\*460** efecto vinculante entre las partes, este debe constar por escrito. *Cordero Vélez v. Mun. de Guánica*, 170 DPR 237, 248 (2007); *Municipio Mayagüez v. Lebrón*, 167 DPR 713, 719–720 (2006). Este requisito tiene que cumplirse "*sin excepción alguna*". (Énfasis en el original). *Fernández & Gutiérrez v. Mun. San Juan*, 147 DPR 824, 833 (1999), citando a *Hatton v. Mun. de Ponce*, 134 DPR 1001 (1994).

**[12]** De hecho, en *ALCO Corp. v. Mun. de Toa Alta*, 183 DPR 530 (2011), nos enfrentamos a una controversia donde un contratista comenzó a prestar sus servicios sin todavía obtener un contrato escrito, terminó su trabajo y, posteriormente, las partes otorgaron el contrato escrito.´Id. Una vez el contratista intentó cobrar su acreencia al municipio, acudió sin éxito al foro judicial.´Id. Llegado el caso ante nuestra consideración, rechazamos tajantemente la validación de contratos verbales municipales mediante el otorgamiento por escrito de contratos formales retro activos.´Id., pág. 540. Concluimos que realizar una obra antes de tener un contrato escrito viola las normas de contratación gubernamental.´Id. Además, razonamos que validar un contrato retroactivamente fomentaría la corrupción, pues un contratista podría realizar la obra antes de otorgar el contrato escrito para presionar su otorgamiento futuro, ya sea por la administración de

turno o la siguiente. ́Id., pág. 543.

**[13]** Asimismo, resolvimos recientemente que la contratación retroactiva sobre el arrendamiento de un bien viola la normativa sobre contratación gubernamental. *Jaap Corp. v. Depto. Estado et al.*, supra. En este caso, expresamos que

> [...] la contratación gubernamental retroactiva hace inoperante todo *control previo* a la formación de una obligación del Gobierno, lo cual es contrario a la política pública establecida en el Art. 2(e) de la Ley Núm. 230, *supra*. Esta práctica impide, además, que terceros como la Oficina del Contralor cumplan con la política pública de la Ley Núm. 230 y que los ciudadanos **\*461** puedan obtener el contrato escrito para pasar juicio sobre la contratación, pues el contrato se escribe y publica luego de la ejecución y consumación de las obligaciones allí dispuestas. (Énfasis en el original). ́Id., pág. 748.

**[14]** Así, hemos reiterado que las partes que contratan con cualquier entidad gubernamental sin cumplir con los requisitos de contratación gubernamental se arriesgan a asumir la responsabilidad por sus pérdidas. *Quest Diagnostics v. Mun. San Juan*, 175 DPR 994, 1002 (2009); *Colón Colón v. Mun. de Arecibo*, 170 DPR 718, 728–729 (2007). Ello, pues hemos rechazado consecuentemente la aplicación de cualquier remedio en equidad, como el enriquecimiento injusto, para convalidar la obligación pública sin contrato escrito y así indemnizar los daños sufridos por una parte privada al no cumplir con estos requisitos. *ALCO Corp. v. Mun. de Toa Alta*, supra, pág. 552; *Las Marías v. Municipio San Juan*, 159 DPR 868, 875 (2003).

F. *Registro en la Oficina del Contralor*

**[15]** Además de la clara exigencia de que el contrato gubernamental conste por escrito y sea prospectivo, el Art. 1 de la Ley Núm. 18-1975 (2 LPRA sec. 97(a)) dispone, en lo pertinente, lo siguiente:

> Las entidades gubernamentales y las entidades municipales del Estado Libre Asociado de Puerto Rico, sin excepción alguna, mantendrán un registro de todos los contratos que otorguen, incluyendo enmiendas a los mismos, y deberán remitir copia de éstos a la Oficina del Contralor dentro de los quince (15) días siguientes a la fecha de otorgamiento del contrato o la enmienda.

**[16]** Al interpretar esta disposición, resumimos que la sana administración pública requiere que los contratos con el Gobierno cumplan con los requisitos siguientes: (1) se reduzcan a escrito; (2) se mantenga un registro fiel con miras a establecer su existencia prima facie; (3) se remita copia a la Oficina del Contralor como medio de una doble **\*462** constancia de su otorgamiento, términos y existencia, y (4) que se acredite la certeza de tiempo, es decir, haber sido realizado y otorgado 15 días antes. *CMI Hospital v. Depto. Salud*, 171 DPR 313, 320 (2007); *Ocasio v. Alcalde Mun. de Maunabo*, 121 DPR 37, 54 (1988).

Además, hemos señalado que es evidente la intención del legislador de crear mediante esta pieza legislativa un mecanismo de cotejo y publicidad de los contratos gubernamentales. *CMI*

*Hospital v. Depto. Salud*, supra; *Fernández & Gutiérrez v. Mun. San Juan*, supra, pág. 830. Estas disposiciones rigurosas responden al interés del Estado de prevenir el despilfarro, la corrupción y el amiguismo en la contratación gubernamental y así promover una administración pública sana y recta. Id.

[17] Posteriormente, la Ley Núm. 127-2004 enmendó el Art. 1 de la Ley Núm. 18-1975 para aclarar que el incumplimiento con el requisito de registrar y remitir un contrato a la Oficina del Contralor de Puerto Rico puede ser subsanado y no acarrea la nulidad del mismo. *Colón Colón v. Mun. de Arecibo*, supra, págs. 727–729; *Lugo v. Municipio Guayama*, 163 DPR 208, 219 (2004). En cambio, se dispuso que incumplir con este requisito tiene como efecto prohibir el desembolso de fondos públicos o que se requirieran servicios hasta tanto estos se registren conforme a la ley y la reglamentación aplicable. Id.

Sin embargo, hemos reiterado que estos cambios radicales en la normativa jurisprudencial sobre contratación gubernamental "*no tienen el efecto de alterar la política pública establecida en nuestro ordenamiento jurídico a los efectos de que la buena administración de un gobierno conlleva el realizar sus funciones como comprador con la mayor eficacia a los fines de proteger los intereses y el dinero del pueblo*". (Énfasis en el original). *Lugo v. Municipio Guayama*, supra, pág. 219. Véase, además, *Colón Colón v. Mun. de Arecibo*, supra. En particular, aclaramos que **\*463**

> [...] la Ley Núm. 127 enmendó la Ley Núm. 18 para establecer que la no remisión de copia de un contrato municipal ante la Oficina del Contralor de Puerto Rico o la falta de registro de éste en los libros del municipio, no viciaba de nulidad el contrato suscrito. *Ello no comporta, como concluye el foro apelativo intermedio, que el mismo principio aplique cuando de lo que se trata es de un acuerdo que nunca se redujo a escrito. Somos del criterio que la Ley Núm. 127 no contempló este escenario.*
>
> Existe una marcada diferencia entre unos requisitos y otros. La exigencia de que un contrato suscrito se anote en la bitácora municipal y su copia se remita a la Oficina del Contralor de Puerto Rico va encaminada a ofrecerle publicidad, frente a terceros, a la contratación municipal. De esta forma los terceros pueden fiscalizarla. Sin embargo, *exigir que los contratos suscritos se reduzcan a escrito tiene una insoslayable dimensión de sana administración pública*, en la medida que permite salvaguardar los intereses de las partes contratantes frente a un incumplimiento, permite la ordenada utilización de los fondos municipales, evita la incertidumbre en la confección del presupuesto municipal y hace posible la adecuada identificación de la partida contra la cual se harán los desembolsos públicos en cumplimiento con la ley. Es decir, los primeros son más que nada de carácter procesal y de ordenada tramitación, mas el último es sustantivo por su directa relación con la sana administración pública. En atención a lo cual, debemos concluir que *el incumplimiento con el requisito de reducir a escrito el contrato municipal por fuerza afecta adversamente la eficacia de las obligaciones contraídas.* (Énfasis suplido). *Colón Colón v. Mun. de Arecibo*, supra, págs. 729–730.

G. *Orden ejecutiva*

Los foros inferiores también fundamentaron su decisión en la Orden Ejecutiva OE-2006-23,

Rodríguez Ramos v. ELA, 190 D.P.R. 448 (2014)

2014 TSPR 32

*infra*, para ordenar al Estado a suscribir con el demandante un contrato con vigencia retroactiva para cubrir los servicios profesionales prestados durante el año fiscal 2006–2007, registrarlo en la Oficina del Contralor y pagar al abogado los servicios prestados. Examinemos la normativa aplicable sobre las órdenes ejecutivas.

[18] En primer lugar, es menester señalar que la facultad del Gobernador para emitir órdenes ejecutivas no **464** está regulada, justificada o explicada por alguna disposición estatutaria o constitucional. W. Vázquez Irizarry, *Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas*, 76 Rev. Jur. UPR 951, 1020 (2007). Por nuestra parte, hemos sido claros al reiterar que las órdenes ejecutivas emitidas por el Primer Ejecutivo no pueden contravenir las leyes aplicables. Véase *Otero de Ramos v. Srio. de Hacienda*, 156 DPR 876, 892 (2002), citando a *Soto v. Adm. Inst. Juveniles*, 148 DPR 810 (1999).

Al respecto, el Prof. William Vázquez Irizarry sostiene que el caso clásico en que el uso de este mecanismo menoscaba la función legislativa es cuando "la orden ejecutiva que pretenda lograr objetivos que han sido rechazados de forma manifiesta por el poder legislativo, por lo que la única base legal que podría sustentar la pretensión del Gobernador son sus poderes constitucionales o bien un reclamo de poderes inherentes". Vázquez Irizarry, *supra*, pág. 1047. Valga destacar que la Sec. 4 del Art. IV de nuestra Constitución no confiere al Primer Ejecutivo el poder de reglamentar la contratación gubernamental con entes privados. Véase Art. IV, Sec. 4, Const. ELA, LPRA, Tomo 1.

Una orden ejecutiva también podría menoscabar el proceso de reglamentación administrativa. Vázquez Irizarry, *supra*, pág. 1051. Este tipo de reglamentación es una función clásica que tienen los foros administrativos cuando la Legislatura les ha delegado autoridad para reglamentar, en cuyo caso aplicarían los términos procesales dispuestos en la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico (LPAU), Ley Núm. 170 de 12 de agosto de 1988 (3 LPRA secs. 2101–2201). Id. En este contexto, el uso de órdenes ejecutivas podría presentar problemas en la medida en que pretenda establecer reglas que afectan derechos de terceros sin contar con la legitimidad que imprimen los requisitos de participación ciudadana dispuestos por la LPAU. Id., pág. 1053. En lo pertinente, el profesor Vázquez Irizarry asevera lo siguiente: **465**

> Se puede aducir que este problema no debiera existir puesto que uno de los principios que definen el uso de las órdenes ejecutivas, es que las mismas son mandatos de aplicación "dentro de la rama ejecutiva", por lo que no hay terceros que se puedan ver afectados. Lo cierto, sin embargo, es que algunas órdenes procuran establecer programas o políticas públicas a un nivel de detalle que sitúa sus efectos muy cerca de la ciudadanía. *Ese es el caso de las órdenes que aunque están dirigidas a entidades públicas, afectan las relaciones que éstas tienen con terceros, particularmente en el ámbito de la adquisición de bienes o servicios.* (Énfasis suplido). Id., pág. 1054.

En el caso de epígrafe, los foros inferiores fundamentaron sus respectivos dictámenes en la "Orden ejecutiva del Gobernador del Estado Libre Asociado para reglamentar el pago por servicios prestados a las agencias e instrumentalidades de la Rama Ejecutiva sin mediar un contrato formal debidamente registrado en la Oficina del Contralor", Orden Ejecutiva

OE-2006-23 (Orden Ejecutiva) firmada por el entonces gobernador Aníbal Acevedo Vilá el 22 de junio de 2006. En específico, se basaron en que la exposición de motivos de la Orden Ejecutiva establece que "[e]l mero hecho que un servicio se haya prestado de acuerdo con un entendido verbal entre el ELA y el contratista no impide que el ELA decida reducir tal acuerdo a escrito posteriormente y honrar el pago justo por los servicios prestados". Orden Ejecutiva, pág. 3.

Como hemos visto, si bien el Gobernador tiene la facultad de emitir órdenes ejecutivas como parte de los poderes que le confieren las leyes o de los poderes inherentes a su cargo, este no puede emitir órdenes ejecutivas de forma contraria a lo dispuesto por ley. *Otero de Ramos v. Srio. de Hacienda*, supra. La Ley Núm. 237-2004 exige que todo contrato gubernamental de servicios legales se haga por escrito y con vigencia prospectiva. Es decir, esta ley prohíbe la contratación verbal de estos servicios, así como la contratación por escrito con vigencia retroactiva. De igual forma, la Ley Núm. 230-1974 requiere que los contratos gubernamentales consten previamente por escrito para ser **\*466** válidos. Asimismo, la exigencia de que el contrato sea registrado en la Oficina del Contralor establecida por la Ley Núm. 18-1975 supone que este conste por escrito y sea prospectivo.

Por otro lado, la Asamblea Legislativa no ha delegado a ninguna agencia administrativa el poder de reglamentar normas nuevas de contratación gubernamental que vayan en contra de lo establecido en las disposiciones legales discutidas en los acápites anteriores. Consiguientemente, la Orden Ejecutiva es inválida en la medida que permite validar contratos verbales con el Estado mediante contratos formales retroactivos, contrario a lo dispuesto por ley.

### III

En el caso de epígrafe, no está en controversia que las partes nunca suscribieron un contrato escrito para el año fiscal 2006–2007. Como expusimos, las leyes citadas, así como su jurisprudencia interpretativa, prohíben el desembolso de fondos públicos por servicios prestados sin que medie previamente un contrato gubernamental válido que cumpla con todos los requisitos estrictos sobre contratación gubernamental. Incluso, disponen que todo contrato que no se formalice conforme a estas normas es nulo. Asimismo, vimos que la Orden Ejecutiva que permitiría validar retroactivamente el contrato en cuestión, es inválida porque contraviene las leyes sobre contratación gubernamental.

Por último, hemos sido consecuentes en rechazar firmemente la aplicación de cualquier remedio en equidad para convalidar la obligación pública verbal y poder indemnizar a la parte privada los daños sufridos por prestar sus servicios sin cumplir con las normas de contratación guberna mental. Véanse: *ALCO Corp. v. Mun. de Toa Alta*, supra; *Las Marías v. Municipio San Juan*, supra.

Al aplicar este marco normativo al caso ante nuestra consideración, es forzoso concluir que la reclamación del **\*467** licenciado Rodríguez Ramos no es exigible. Este prestó sus servicios legales conociendo que no existía un contrato escrito que vinculara al Estado. Siendo así, el

contrato verbal en el cual pretende basar su reclamación es nulo. Ante esta realidad, tampoco procede aplicar remedio en equidad alguno. El licenciado Rodríguez Ramos se arriesgó a asumir la responsabilidad por sus pérdidas, tal y como hemos advertido a todo aquel que contrata con cualquier entidad gubernamental sin cumplir con los requisitos de contratación gubernamental. Véanse: *Quest Diagnostics v. Mun. San Juan*, supra; *Colón Colón v. Mun. de Arecibo*, supra.

Por lo tanto, los foros inferiores erraron al ordenar a la DTOP y la ACT a suscribir un contrato con vigencia retroactiva para cubrir los servicios profesionales prestados durante el año fiscal 2006–2007, registrarlo en la Oficina del Contralor y pagar al abogado los servicios prestados durante dicho periodo.

## IV

Por los fundamentos antes expuestos, *se revoca la sentencia emitida por el Tribunal de Apelaciones.*

*Se dictará sentencia de conformidad.*

La Jueza Asociada Señora Pabón Charneco emitió un voto particular de conformidad, al cual se unió el Juez Asociado Señor Rivera García. La Juez Asociada Señora Rodríguez Rodríguez no intervino.

## --O--

Voto particular de conformidad emitido por la Jueza Asociada Señora Pabón Charneco, al cual se une el Juez Asociado Señor Rivera García.

Estoy conforme con la Opinión que antecede. La controversia que enfrentamos hoy, específicamente si una parte **\*468** privada y el Estado pueden otorgar un contrato retroactivo para validar la previa prestación de servicios profesionales sin haber cumplido con las formalidades relativas a la contratación gubernamental, ha sido objeto de análisis por este Tribunal dentro de contextos análogos al de autos.

Como bien se señala en la Opinión, tan recientemente como en *Jaap Corp. v. Depto. Estado et al.*, 187 DPR 730, 748–749 (2013), resolvimos que es contrario a las normas sobre contratación gubernamental el otorgar un contrato con efecto retroactivo para validar un arrendamiento que se estaba llevando a cabo entre un ente privado y un municipio sin mediar contrato escrito entre las partes. Véase, además, *ALCO Corp. v. Mun. de Toa Alta*, 183 DPR 530 (2011). Aprovecho esta ocasión para reiterar que la norma que prohíbe la contratación gubernamental con efecto retroactivo es cónsona con los principios más fundamentales de sana administración pública y un adecuado control en los desembolsos de fondos públicos. *Jaap Corp. v. Depto. Estado et al.*, supra, pág. 744. Lo anterior aplica tanto a los municipios como al gobierno central y sus

dependencias.

Por último, resulta pertinente expresarme en cuanto a la utilización de Órdenes Ejecutivas como mecanismo para usurpar funciones propias de la Rama Legislativa, tal y como ocurrió con la Orden Ejecutiva Núm. OE-2006-23 de 22 de junio de 2006, promulgada por el entonces Gobernador de Puerto Rico, Aníbal Acevedo Vilá, cuyo propósito era autorizar la contratación gubernamental retroactiva. Sin pasar juicio sobre la validez de la referida Orden Ejecutiva, ya en *Jaap Corp. v. Depto. Estado et al.*, supra, pág. 749 esc. 11, resaltamos los inconvenientes que había causado la contratación gubernamental retroactiva tanto en la Oficina del Contralor como en el Departamento de Justicia. A falta de delegación constitucional o legislativa a la Rama Ejecutiva del poder de reglamentar la contratación gubernamental, la actuación del otrora Gobernador violenta principios constitucionales básicos sobre separación de **\*469** poderes.[1] Art. I, Sec. 2, Const. ELA, LPRA, Tomo 1. Resolver lo contrario resultaría en darle validez a una clara intromisión del Poder Ejecutivo en los poderes delegados por nuestra Constitución al Poder Legislativo. Así las cosas, este Tribunal actuó correctamente al invalidar la Orden Ejecutiva Núm. OE-2006-23, *supra*.

Por todo lo anterior, estoy conforme con la Opinión emitida el día de hoy.

Footnotes

[1]  Ello resulta aún más preocupante ante los resultados de las Elecciones Generales celebradas el 2 de noviembre de 2004, que dieron lugar a un gobierno compartido entre los dos principales partidos políticos de Puerto Rico.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.