Response Deadline: September 20, 2021, at 4:00PM (Atlantic Standard Time)
Hearing Date:  October 6, 2021, at 9:30AM (Atlantic Standard Time)

> **PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO TO DETERMINE WHETHER THE OBJECTION AFFECTS YOUR CLAIM(S).**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**This filing relates to the Commonwealth, HTA, ERS, COFINA, and PBA.** |

**THREE HUNDRED EIGHTY-FOURTH OMNIBUS OBJECTION (SUBSTANTIVE) OF THE COMMONWEALTH OF PUERTO RICO, THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, THE PUERTO RICO SALES TAX FINANCING CORPORATION, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY TO DEFICIENT, DUPLICATE, AND NO LIABILITY BOND CLAIMS**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, COFINA, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Highways and Transportation Authority ("HTA"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), the Puerto Rico Public Buildings Authority ("PBA"), and the Puerto Rico Sales Tax Financing Corporation ("COFINA," and together with the Commonwealth, HTA, ERS, and PBA, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Debtors pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] file this three hundred eighty-fourth omnibus objection (the "Three Hundred Eighty-Fourth Omnibus Objection") to the proofs of claim listed on **Exhibit A** hereto, each of which is based, in part, on (*a*) bond claims that are duplicative of one or more master proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*b*) an ownership interest in bonds issued by the Government Development Bank of Puerto Rico ("GDB"), (*c*) bond claims that assert liabilities associated with secondarily insured bonds that are duplicative of proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*d*) one or more investments in mutual funds, which in turn may have invested in bonds issued by the Debtors; (*e*) bonds issued by COFINA, and/or (*f*) an ownership interest in bonds issued by the Puerto Rico Aqueducts and Sewers Authority ("PRASA") and/or notes issued by the Puerto Rico Public Finance Corporation ("PRPFC"), which are not Title III Debtors, for amounts for which the Debtors have not guaranteed repayment.  In addition, the remaining portions of certain of the proofs of claim listed on **Exhibit A** hereto are deficient because they (1) fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim and/or (2) assert liabilities

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

arising from bonds issued by the Debtors that the claimant(s) held at one time, but have since sold or liquidated. In support of the Three Hundred Eighty-Fourth Omnibus Objection, the Debtors respectfully represent as follows:

## JURISDICTION

1. The United States District Court for the District of Puerto Rico has subject matter jurisdiction to consider this matter and the relief requested herein pursuant to PROMESA section 306(a).

2. Venue is proper in this district pursuant to PROMESA section 307(a).

## BACKGROUND

**A. The Bar Date Orders**

3. On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "Commonwealth Title III Case"). On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "COFINA Title III Case"). On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA and ERS, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (respectively the "HTA Title III Case" and the "ERS Title III Case"). On September 27, 2019, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for PBA pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "PBA Title III Case," and together with the Commonwealth Title III Case, the COFINA Title III Case, the HTA Title III Case, and the ERS

Title III Case, the "Title III Cases").  On October 9, 2019, the Court entered an order granting the joint administration of the Title III Cases for procedural purposes only.  ECF No. 8829.[3]

4.      On January 16, 2018, the Commonwealth, COFINA, HTA, and ERS filed their *Motion for Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2255] (the "Commonwealth, COFINA, HTA, and ERS Bar Date Motion").  Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Commonwealth, COFINA, HTA, and ERS Initial Bar Date Order"), the Court granted the relief requested in the Bar Date Motion and established deadlines and procedures for filing proofs of claim in the Commonwealth Title III Case, the COFINA Title III Case, the HTA Title III Case, and the ERS Title III Case.  Upon the informative motion of certain creditors, and the support of the Commonwealth, COFINA, HTA, and ERS, the Court subsequently entered the *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with the Commonwealth, COFINA, HTA, and ERS Initial Bar Date Order, the "Commonwealth, COFINA, HTA, and ERS Bar Date Orders"), extending these deadlines to June 29, 2018 at 4:00 p.m. (Atlantic Time).

5.      On February 11, 2020, PBA filed its *Motion for Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 36 in 19-BK-5523-LTS] (the "PBA Bar Date Motion").  Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 55 in 19-BK-5523-LTS] (the "Initial PBA Bar Date Order"), the Court granted the relief requested in the PBA Bar Date Motion and established deadlines and

---

[3] Unless otherwise stated herein, ECF citations refer to documents filed in Bankruptcy Case No. 17 BK 3283-LTS.

procedures for filing proofs of claim in the PBA Title III Case.  The Court subsequently extended

these deadlines to July 29, 2020 at 4:00 p.m. (Atlantic Time).  *See Order (A) Extending Deadlines*

*for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No.

13403] (together with the PBA Initial Bar Date Order, the "PBA Bar Date Orders," and together

with the Commonwealth, HTA, ERS, and COFINA Bar Date Orders, the "Bar Date Orders").

**B.      Bond Debt Master Proofs of Claim – Commonwealth Title III Case**

6.      Pursuant to the Bar Date Orders, indenture trustees, fiscal agents, or any similar

agent or nominee for each respective series of bonds issued by one of the Debtors or a non-debtor

may file a master proof of claim against the applicable debtor on behalf of themselves and all

holders of bond claims for the respective series of bonds for obligations arising under the

respective trust agreements, resolutions, or similar bond documents.  Commonwealth, COFINA,

HTA, and ERS Initial Bar Date Order, ¶ 5(a).  As explained below, master proofs of claim

(collectively, the "Commonwealth Master Claims") have been filed in the Commonwealth Title

III Case on behalf of the holders of certain bonds or notes issued by the Puerto Rico Infrastructure

Financing Authority ("PRIFA").

7.      ***PRIFA***—PRIFA is an affiliate of the GDB and is a government instrumentality of

the Commonwealth.  PRIFA was created in 1988 by Act No. 44-1988 (the "PRIFA Enabling Act").

PRIFA provides financial, administrative and other types of assistance to the Commonwealth, its

public corporations and other instrumentalities responsible for developing and operating

infrastructure facilities.  On behalf of the holders of various bonds and notes issued by PRIFA

(collectively, the "PRIFA Bonds"), master proofs of claim were asserted against the

Commonwealth (collectively, the "PRIFA Master Claims") by BNYM, US Bank, and UMB Bank,

N.A.  First, BNYM asserted three master proofs of claim: Proof of Claim No. 16759, asserting, on

behalf of holders of Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 15 (the "PRIFA

Notes"), a "contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Trustee or the Owners may have against the Commonwealth arising at law or in equity based upon or relating to the Trust Agreement, the Noteholder Agreement, the Notes, or the Pledged Revenues . . . "; Proof of Claim No. 19814 asserting, on behalf of holders of PRIFA Notes, claims for principal and unpaid interest, in addition to fees and expenses of the trustee; and Proof of Claim No. 103718, asserting, on behalf of holders of revenue bonds issued by PRIFA, including Revenue Bonds (Port Authority Project), Series 2011A, "a secured, contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Trustee or the holders of the Bonds has or may have against the Commonwealth arising at law or in equity . . . ."

8.     Additionally, US Bank filed a master proof of claim with respect to certain PRIFA Bonds, which was logged by Prime Clerk, LLC, as Proof of Claim No. 13386, on behalf of holders of PRIFA Rum Tax Bonds (Special Tax Revenue Bonds, Series 2005A, 2005B, 2005C, and Series 2006B), asserting "claims for contingent, unliquidated amounts for interest payable in the future, interest accrued and accruing in the future as to past due principal and interest, fees and costs and indemnity claims of the Trustee to be incurred in the future under the Bond Documents, and all other amounts owed on account of any and all claims the Trustee has or may have relating to the outstanding Bond obligations, amount not less than $249,099,446.17, which course of conduct continues . . . ."  Rider to Proof of Claim No. 13386, ¶ 26.

C.    **Bond Debt Master Proofs of Claim – ERS Title III Case**

9.    ERS is a trust established by the Commonwealth in 1951 for the economic well-being of public employees.  ERS is an agency of the government, separate and apart from the Commonwealth government and its other instrumentalities.  *See* 3 L.P.R.A § 775.

10.    Purportedly pursuant to that certain *Pension Funding Bond Resolution*, adopted on January 24, 2008, and certain supplemental resolutions, ERS issued senior and subordinate pension funding bonds (the "ERS Bonds") in the aggregate original principal amount of approximately $2.9 billion.

11.    BNYM serves as the fiscal agent with respect to the ERS Bonds.  On behalf of the holders of the ERS Bonds, BNYM filed a master proof of claim in the ERS Title III Case with respect to the ERS Bonds, asserting approximately $3.8 billion in liabilities plus unliquidated amounts, which was logged by Prime Clerk as Proof of Claim No. 16777 (the "ERS Master Proof of Claim").

D.    **Bond Debt Master Proofs of Claim – HTA Title III Case**

12.    HTA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 74-1965 of the Legislative Assembly of the Commonwealth ("HTA Enabling Act").  HTA is responsible for the construction, operation, and maintenance of highways and other transportation systems in the Commonwealth.  *See* 9 L.P.R.A § 2002.

13.    The HTA Enabling Act authorizes HTA to issue bonds.  *See* 9 L.P.R.A. §§ 2004(g), (h), (l).  Pursuant thereto, HTA issued several series of bonds under two different resolutions (the "HTA Resolution Bonds"): (a) Resolution No. 68-18, adopted June 13, 1968 (the "1968 Resolution"), and (b) Resolution No. 98-06, adopted February 26, 1998 (the "1998 Resolution").  As of the Petition Date, approximately $830 million in principal amount of bonds issued under the

1968 Resolution remain outstanding, and approximately $3.4 billion in principal amount of bonds issued under the 1998 Resolution remain outstanding.

14.     BNYM serves as fiscal agent with respect to the HTA Resolution Bonds.  On behalf of the holders of the HTA Resolution Bonds, BNYM filed three master proofs of claim in the HTA Title III Case (collectively, the "<u>BNYM Master Proofs of Claims</u>," or the "<u>HTA Master Proofs of Claims</u>"): Proof of Claim No. 37245, asserting on behalf of holders of bonds issued under the 1968 Resolution approximately $847 million in liabilities plus unliquidated amounts; Proof of Claim No. 38574, asserting on behalf of holders of bonds issued under the 1998 Resolution approximately $3.2 billion in liabilities plus unliquidated amounts; and Proof of Claim No. 32622, asserting on behalf of holders of subordinated bonds issued under the 1998 Resolution approximately $279 million in liabilities plus unliquidated amounts.

**E.     Bond Debt Master Proofs of Claim – PBA Title III Case**

15.     ***PBA***—On behalf of the holders of the PBA Bonds, US Bank and US Bank Trust, as fiscal agents for certain revenue bonds issued by PBA, filed a master proof of claim in the PBA Title III Case for all outstanding amounts owed (the "<u>PBA Master Claim</u>," and together with the Commonwealth Master Proofs of Claim, HTA Master Proofs of Claim and the ERS Master Proofs of Claim, the "<u>Master Proofs of Claim</u>"), which was logged by Prime Clerk, LLC, as Proof of Claim No. 174834.  The PBA Master Claim asserts liquidated claims for approximately $4 billion in allegedly unpaid principal, $160 million in allegedly unpaid interest, and reimbursement for fees and expenses of the fiscal agents, in addition to unliquidated and contingent claims for any and all amounts owed "on account of any and all claims the Fiscal Agent has or may have relating to the outstanding Bond obligations, whether known or unknown against PBA and all those purporting to act on the PBA's behalf . . . ."  Rider to PBA Master Claim, ¶ 24(d).

16.     Certain bonds or notes issued by PBA have been insured by one of several municipal bond insurers, either on the primary market or on the secondary market.  Municipal bond insurance is obtained on the primary market when the municipality issuing the bonds engages an insurance company to underwrite an insurance policy for that series of bonds.  In the event that a bond is not insured on the primary market, holders of such uninsured bonds may elect to obtain insurance via the secondary market.  Holders of uninsured bonds who seek to obtain insurance in the secondary market contract directly with a municipal bond insurer and the original issuer is not part of this contract process.  When a holder of an uninsured bond obtains an insurance policy on the secondary market, a new CUSIP number is issued which corresponds to the original CUSIP numbers assigned to the bonds at the time of issuance.  Certain bonds issued by PBA have been insured on the secondary market and, accordingly, have been issued new CUSIP numbers which correspond to bonds issued by PBA bearing original CUSIP numbers (the "Secondarily Insured Bonds").

**F.     Bond Debt Issued by the Puerto Rico Public Finance Corporation**

17.     PRPFC is a subsidiary corporation of GDB created pursuant to Resolution No. 5044 of the Board of Directors of GDB, as amended ("Resolution No. 5044"), adopted pursuant to the authority granted under Act No. 17 of the Legislature of Puerto Rico, approved September 23, 1948, as amended.  PRPFC provides government agencies, instrumentalities, municipalities and other subdivisions of the Commonwealth with alternative mechanisms to meet their financing needs.  PRPFC is authorized to borrow money and issue debt through the issuance of bonds and other obligations.

18.     In 1998, PRPFC issued Commonwealth Appropriation Bonds, 1999 Series A (the "1998 Commonwealth Appropriation Bonds"), in the aggregate amount of $345,370,000.00, in order to fund the purchase of a GDB promissory note of the Office for the Improvement of Public

Schools of Puerto Rico.  The 1998 Commonwealth Appropriation Bonds were issued pursuant to a trust agreement between PRPFC and Banco Popular de Puerto Rico, as trustee.  The 1998 Commonwealth Appropriation Bonds are limited obligations of PRPFC, payable solely from pledged revenues consisting of payments of principal and of interest on the promissory note and other amounts deposited to the credit of a sinking fund established pursuant to the trust agreement, with principal and interest payable solely from legislative appropriations made pursuant to Act No. 85-1998.   The offering statement issued in connection with the 1998 Commonwealth Appropriation Bonds states on its cover page that the "[1998 Commonwealth Appropriation Bonds] will not constitute an obligation of the Commonwealth or any of its political subdivisions or public instrumentalities (other than [PR]PFC), and neither the Commonwealth nor any of its political subdivisions or public instrumentalities (other than [PR]PRC) shall be liable thereon." *See, e.g.*, Puerto Rico Public Financing Corporation, Official Statement, Commonwealth Appropriation Bonds, Series 1998A, *available at* https://emma.msrb.org/MS145212-MS120520-MD233589.pdf (the "1998 PRPFC Official Statement").  The 1998 PRPFC Official Statement also states "[t]he Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of, redemption premium, if any, and interest due on the Bonds. There is no assurance that sufficient funds will be appropriated by the Legislature of Puerto Rico or otherwise made available to make such payments on the Bonds." *Id.* at 11.

19.     In 2001, PRPFC issued Commonwealth Appropriation Bonds, 2001 Series E (the "2001 Commonwealth Appropriation Bonds), in the aggregate amount of $1,095,845,000.00, in order to fund the purchase of certain GDB promissory notes issued in connection with the restructuring of certain outstanding loans made by GDB to certain departments, agencies, instrumentalities and public corporations of Commonwealth.   The 2001 Commonwealth Appropriation Bonds are limited obligations of PRPFC payable solely from payments of principal

of and interest on those promissory notes, which are payable solely from budgetary appropriations made pursuant to Act No. 164-2001. The official statement issued in connection with the 2001 Commonwealth Appropriation Bonds states on its cover page that the "[2001 Commonwealth Appropriation Bonds] will not constitute an obligation of the Commonwealth or any of its political subdivisions or public instrumentalities (other than [PRPFC]), and neither the Commonwealth nor any of its political subdivisions or public instrumentalities (other than [PRPFC]) shall be liable thereon." *See, e.g.*, Puerto Rico Public Financing Corporation, Official Statement, Commonwealth Appropriation Bonds, Series 2001E, *available at* https://emma.msrb.org/MS27394-MS250735-MD486120.pdf. (the "2001 PRPFC Official Statement"). The 2001 PRPFC Official Statement also states "[t]he Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of, redemption premium, if any, and interest due on the Bonds. There is no assurance that sufficient funds will be appropriated by the Legislature of Puerto Rico or otherwise made available to make such payments on the Bonds." *Id.* at 13.

20.    In 2012, PRPFC issued Commonwealth Appropriation Bonds, 2012 Series A (the "2012 Commonwealth Appropriation Bonds," and together with the 1998 Commonwealth Appropriation Bonds and the 2001 Commonwealth Appropriation Bonds, the "PRPFC Bonds"), in the aggregate amount of $410,665,000.00, in order to refund certain of PRPFC's outstanding bonds. The 2012 Commonwealth Appropriation Bonds are limited obligations of PRPFC payable solely from payments of principal of and interest on certain promissory notes issued by certain Commonwealth departments, agencies, instrumentalities, and public corporations. Those promissory notes are payable solely from budgetary appropriations made by the Legislature of Puerto Rico pursuant to legislation adopted by the Legislature of Puerto Rico. The official statement issued in connection with the 2012 Commonwealth Appropriation Bonds states on its

11

cover page that the "[2012 Commonwealth Appropriation Bonds] will not constitute an obligation of the Commonwealth or any of its political subdivisions or public instrumentalities (other than [PRPFC]), and neither the Commonwealth nor any of its political subdivisions or public instrumentalities (other than [PRPFC]) shall be liable thereon."   *See, e.g.*, Puerto Rico Public Financing Corporation, Official Statement, Commonwealth Appropriation Bonds, Series 2012 A, *available at* https://emma.msrb.org/ER602315-EA371499-EA768292.pdf.  (the "2012 PRPFC Official Statement," and together with the 1998 PRPFC Official Statement and the 2001 PRPFC Official Statement, the "PRPFC Official Statements").  The 2012 PRPFC Official Statement also states "[t]he Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of, redemption premium, if any, and interest due on the Bonds.  There is no assurance that sufficient funds will be appropriated by the Legislature of Puerto Rico or otherwise made available to make such payments on the Bonds."  *Id.* at 18.

G.     **The COFINA Title III Case and Resolution of the Commonwealth-COFINA Dispute**

21.     COFINA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 91 of the Legislative Assembly of the Commonwealth.  Pursuant to that certain Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 19, 2009, and pursuant to certain supplemental resolutions, COFINA issued a series of bonds in aggregate approximate amount of $17 billion, to, among other things, defray certain debt obligations of the Puerto Rico Government Development Bank and the Puerto Rico Public Finance Corporation (the "COFINA Bonds").  Bank of New York Mellon serves as Trustee with respect to the COFINA Bonds.

22.     The Oversight Board filed that certain *Third Amended Title III Plan of Adjustment of the Puerto Rico Sales Tax Financing Corporation* (the "Plan") [ECF No. 4652] on January 9,

2019.  The Court considered confirmation of the Plan and any objections thereto at a hearing on

January 16-17, 2019.

23.    On February 4, 2019, the Court confirmed the Plan, which incorporated the

compromise and settlement of the dispute over whether, after considering all procedural and

substantive defenses and counterclaims, including constitutional issues, the sales and use taxes

purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA

under applicable law (the "Commonwealth-COFINA Dispute"). *See Order and Judgment

Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing

Corporation* [ECF No. 5048].  On the same day, the Court approved the compromise and

settlement of the Commonwealth-COFINA Dispute pursuant to the *Memorandum Opinion and

Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax

Financing Corporation* [ECF No. 5045] (the "Settlement Order").  On February 5, 2019, the Court

issued an *Amended Order and Judgment Confirming the Third Amended Title III Plan of

Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 5055] (the "Amended

Confirmation Order").  The Plan became effective on February 12, 2019 (the "Effective Date"),

when the transactions contemplated therein were consummated.  *See Notice of (A) Entry of Order

Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing

Corporation Pursuant to Title III of PROMESA and (B) Occurrence of the Effective Date* [Case

No. 17 BK 3284-LTS, ECF No. 587].

**H.    Bond Debt Issued by the Puerto Rico Aqueducts and Sewers Authority**

24.    PRASA was established pursuant to Act Number 40 of May 1, 1945.  PRASA is a

"public corporation and an autonomous government instrumentality" created for the purpose of

providing water and sewer services on the island.  22 L.P.R.A. § 142, 144.

25.     The PRASA Enabling Act authorizes PRASA to issue bonds.  22 L.P.R.A. § 144(g).
Pursuant thereto, the PRASA governing board has adopted resolutions authorizing PRASA to issue
bonds, including Resolution No. 1583, as amended and restated as of March 7, 2008 ("Resolution
No. 1583").  In 2012, PRASA issued $295,245,000 principal amount of Series 2012 B revenue
bonds (the "2012 Senior Series B Bonds," or the "PRASA Senior Lien Bonds").

26.     Holders of PRASA Senior Lien Bonds have received and continue to receive all
payments owed to holders of the PRASA Bonds in full as they become due and owing.
Accordingly, EMMA reflects that PRASA has not posted any notices of default with respect to the
PRASA Senior Lien Bonds.[4]  In addition, the Commonwealth has not guaranteed repayment of
the Senior Lien Bonds.  Accordingly, the offering statements for the PRASA Senior Lien Bonds
state that they are "not a debt of the Commonwealth of Puerto Rico or any of its municipalities or
other political subdivisions, other than [PRASA], and neither the Commonwealth of Puerto Rico
or any such municipalities or other political subdivisions, other than [PRASA], shall be liable for
the payment of the principal of or interest on said Bonds."[5]

27.     On July 20, 2021, the Oversight Board approved a proposed refunding transaction
wherein PRASA would issue a series of 2121ABC and 2022A Senior Lien Bonds to refinance
$1.8 billion of PRASA's outstanding 2012AB Senior Bonds (the "PRASA Refinancing
Transaction").   The effective date for the PRASA Refinancing Transaction has not been
determined.

---

[4] *See, e.g.*, https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

[5] *See, e.g.*, Offering Statement for PRASA Revenue Bonds, Series B (Senior Lien), February 15,
2012, available at https://emma.msrb.org/ER584465-ER454076-ER856857.pdf.

I.      **The GDB Title VI Proceedings and Qualifying Modification**

28.     GDB is a public corporation and governmental instrumentality of the Commonwealth, which was created by the Legislative Assembly in 1948 to aid the government of the Commonwealth (the "Government") in performing its fiscal duties and in more effectively carrying out its responsibility to develop the economy of the Commonwealth.  On April 28, 2017, the Oversight Board unanimously certified that certain February 2017 GDB Fiscal Plan, which contemplated an orderly wind-down of the operations of GDB based upon the determination that there was no clear path for the long-term viability of GDB based on its then-current financial condition.

29.     On July 12, 2017, the Oversight Board issued a resolution authorizing GDB, pursuant to Section 601(e) of PROMESA, to avail itself of Title VI of PROMESA.  On August 10, 2018, GDB filed an application for approval of a qualifying modification, pursuant to PROMESA section 601(m)(1)(D) (the "Qualifying Modification"), in the United States District Court for the District of Puerto Rico.

30.     On November 7, 2018, the Court approved the Qualifying Modification pursuant to PROMESA section 601(m)(1)(D).  *See* ECF No. 270 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Nov. 7, 2018).  The Qualifying Modification provides for, among other things, (i) the issuance of new bonds by the newly-created GDB Debt Recovery Authority in exchange for the cancellation of, among other things, certain participating bonds and guaranteed bond claims (collectively, the "GDB Bonds"); (ii) the extinguishment of the Commonwealth's guarantee of the guaranteed bonds upon the exchange and cancellation of the guaranteed bonds; and (iii) the release of claims of the holders of GDB Bonds against GDB and its affiliates relating to, among other things, any investment with GDB or the purchase, sale, or transfer of any security or interest of GDB, and any action or omission with respect to any

indebtedness or loans to GDB (including any notes issued or deposits held by GDB) or from GDB. *Solicitation Statement*, at 57-60, ECF No. 1-15 in *Government Development Bank for Puerto Rico*, Case No. 18-1561 (D.P.R. Aug. 10, 2018).

31.    On November 29, 2018, GDB announced the consummation of the Qualifying Modification for GDB.  Press Release, *Government of Puerto Rico Announces Consummation of the GDB Qualifying Modification*, Governor of Puerto Rico (Nov. 29, 2018), *available at* http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

**J.    Proofs of Claims Filed, Omnibus Objection Procedures, and Claim Objections**

32.    To date, approximately 180,483 proofs of claim have been filed against the Debtors and logged by Prime Clerk, LLC.  Such proofs of claim total approximately $43.6 trillion in asserted claims against the Debtors, in addition to unliquidated amounts asserted.

33.    Of the proofs of claim filed, approximately 117,009 have been filed in relation to, or reclassified to be asserted against, the Commonwealth.  Approximately 53,214 proofs of claim have been filed in relation to, or reclassified to be asserted against, ERS.  Approximately 3,095 proofs of claim have been filed in relation to, or reclassified to be asserted against, COFINA. Approximately 391 proofs of claim have been filed in relation to, or reclassified to be asserted against, PBA.  Additionally, approximately 2,268 proofs of claim have been filed in relation to, or reclassified to be asserted against, HTA.  In accordance with the terms of the Bar Date Orders, many of these claims need not have been filed at all, or suffer from some other flaw, such as being subsequently amended, not putting forth a claim for which the Debtors are liable, being duplicative of other proofs of claim, or failing to provide information necessary for the Debtors to determine whether the claim is valid.

34.     To efficiently resolve as many of the unnecessary proofs of claim as possible, on

October 16, 2018, the Debtors filed with this Court their *Motion for Entry of an Order (A)*

*Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy*

*Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4052] (the "Omnibus Procedures

Motion").  The Court granted the relief requested in the Omnibus Procedures Motion by order

dated November 14, 2018.  *See Order (A) Approving Limited Omnibus Objection Procedures, (B)*

*Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF

No. 4230]; *Omnibus Objection Procedures* [ECF No. 4230-1] (collectively, the "Initial Omnibus

Objection Procedures").   On November 29, 2018, the Court approved English and Spanish

versions of the forms of notice for omnibus objections to be filed in accordance with the Initial

Omnibus Objection Procedures.  *See Order Approving the English and Spanish Versions of the*

*Form of Notice for Omnibus Objections* [ECF No. 4381] (the "Notice Order").

35.     In the continued interest of resolving any unnecessary proofs of claim in an efficient

manner, on May 23, 2019, the Debtors filed an amended procedures motion seeking, among other

things, to allow the Debtors to file omnibus objections on substantive bases, to further expand the

number of claims that may be included on an objection, and to approve additional forms of notice.

*Notice of Hearing with Respect to an Order (A) Approving Amended Omnibus Objection*

*Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional*

*Forms of Notice, and (D) Granting Related Relief* [ECF No. 7091].  On June 14, 2019, the Court

granted the requested relief, by the *Order (A) Approving Amended Omnibus Objection Procedures,*

*(B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice,*

*and (D) Granting Related Relief* [ECF No. 7440] (the "Amended Omnibus Objection

Procedures").

36.     Pursuant to the Initial Omnibus Objection Procedures and Amended Omnibus Objection Procedures, to date the Court has held over 15 hearings and entered orders on over 310 omnibus objections filed by the Commonwealth, HTA, ERS, COFINA and/or the Puerto Rico Electric Power Authority ("PREPA").  Based upon rulings and orders of the Court to date, approximately 100,649 claims asserting $43.0 trillion in liability against the Commonwealth, COFINA, HTA, PREPA, and ERS have been disallowed and expunged from the claims registry in the Title III proceedings.

37.     This Three Hundred Eighty-Fourth Omnibus Objection is filed in accordance with the Court's Amended Omnibus Objection Procedures.

**OBJECTIONS TO PROOFS OF CLAIM**

38.     Claims that are "unenforceable against the debtor and property of the debtor, under any agreement or applicable law" should be disallowed.  11 U.S.C. § 502(b)(1).  While a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity of the claim, *see* Fed. R. Bankr. P. 3001(f), made applicable to this case by PROMESA section 310, the objecting party may overcome this *prima facie* evidence with evidence which, if believed, would refute at least one of the allegations essential to the claim.  *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.), *aff'd*, 242 F.3d 367 (2d Cir. 2000); *see also Factors Funding Co. v. Fili (In re Fili)*, 257 B.R. 370, 372 (1st Cir. B.A.P. 2001) ("[A] claim is presumed valid until an objecting party has introduced evidence sufficient to rebut the claimant's prima facie case." (citation omitted)).

39.     The Amended Omnibus Objection Procedures allow the Debtors to file an omnibus objection to multiple proofs of claim on any basis provided for in Federal Rule of Bankruptcy Procedure 3007(d)(1)-(7), in addition to other substantive bases set forth in the Amended Omnibus Objection Procedures.

18

40.    The Three Hundred Eighty-Fourth Omnibus Objection seeks to disallow in their entirety, in accordance with the Amended Omnibus Objection Procedures, proofs of claim listed on **Exhibit A** hereto (collectively, the "Claims to Be Disallowed"), each of which is based, in part, on (*a*) bond claims that are duplicative of one or more master proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*b*) an ownership interest in bonds issued by GDB, (*c*) bond claims that assert liabilities associated with secondarily insured bonds that are duplicative of proofs of claim filed against the Debtors on behalf of the holders of certain bonds; (*d*) one or more investments in mutual funds, which in turn may have invested in bonds issued by the Debtors; (*e*) bonds issued by COFINA, and/or (*f*) an ownership interest in bonds issued by PRASA and/or notes issued by PRPFC, which are not Title III Debtors, for amounts for which the Debtors have not guaranteed repayment.  In addition, the remaining portions of certain of the proofs of claim listed on **Exhibit A** hereto are deficient because they (1) fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim and/or (2) assert liabilities arising from bonds issued by the Debtors that the claimant(s) held at one time, but have since sold or liquidated.  **Exhibit A** hereto further specifies why each of the Claims to Be Disallowed should be disallowed in their entirety.

### A.  No Liability for GDB Bondholder Claims

41.    As identified in **Exhibit A** hereto, certain Claims to Be Disallowed purport to assert, in whole or in part, claims based on the alleged ownership of bonds issued by GDB (collectively, the "GDB Bondholder Claims").

42.    Each of the GDB Bondholder Claims purports to be based, in whole or in part, on the ownership of GDB Bonds that were subject to the Qualifying Modification, which provided for the issuance of new securities in exchange for the cancellation of the GDB Bonds and the extinguishment of the Commonwealth's guarantee of certain GDB Bonds, and thus the

Commonwealth is no longer liable for these claims.  Accordingly, each of the Partial GDB

Bondholder Claims has been released pursuant to the approval and consummation of the

Qualifying Modification.  As noted above, the Qualifying Modification provides, among other

things, that holders of GDB Bonds shall release GDB and its affiliates from claims relating to the

GDB Bonds and any action or omission of GDB and its affiliates with respect to any indebtedness

of or loan to GDB.  GDB is a public corporation and instrumentality of the Commonwealth.  The

Commonwealth, thus, is an affiliate of GDB within the scope of the release pursuant to the

Qualifying Modification.  Accordingly, the GDB Bondholder Claims were released upon the

consummation of the Qualifying Modification on November 29, 2018.

43.    Because the GDB Bondholder Claims are unenforceable against the

Commonwealth and its property pursuant to Bankruptcy Code § 502(b)(1), these claims should be

disallowed, because they seek recovery of amounts for which the Commonwealth is not liable.

**B.  No Liability for Duplicate Bond Claims**

44.    As set forth in **<u>Exhibit A</u>** hereto, certain Claims to Be Disallowed purport to assert

liability, in part, on the basis of bonds issued by PRIFA (collectively, the "<u>Partial Duplicate Bond</u>

<u>Claims</u>").

45.    Each of the Partial Duplicate Bond Claims purport to assert, in whole or in part,

liability against the Debtors associated with one or more bonds that is duplicative of one or more

Master Claims, which as described above were filed in the Title III Cases on behalf of the holders

of certain bonds issued by PRIFA.  Any failure to disallow the Partial Duplicate Bond Claims will

result in the applicable claimants potentially receiving an unwarranted double recovery against the

Debtors, to the detriment of other stakeholders in the Debtors' Title III Cases.  The holders of the

Partial Duplicate Bond Claims will not be prejudiced by the disallowance of their claims because

the liabilities associated with the Partial Duplicate Bond Claims are subsumed within one or more

Master Claims.

### C. No Liability for Secondarily Insured Bond Claims that Are Duplicative of Master Claims

46.     As set forth in Exhibit A hereto, certain of the Claims to Be Disallowed purport to

assert liability, in part, with Secondarily Insured Bonds, which correspond to PBA Bonds that are

duplicative of liabilities asserted by one or more Master Claims (collectively, the "Partial

Secondarily Insured Bond Claims").

47.     Each of the Partial Secondarily Insured Bond Claims asserts liabilities associated

with Secondarily Insured Bonds.  The CUSIP numbers associated with such Secondarily Insured

Bonds correspond to bonds issued by PBA and/or bearing original CUSIP numbers. Those original

CUSIP numbers, which reflect bond issuances in which the claimants hold ownership interests,

are listed in one or more Master Claims.  Therefore, the Partial Secondarily Insured Bond Claims

assert liabilities associated with bonds issued by PBA that are duplicative of liabilities asserted by

one or more Master Claims.

48.     Any failure to disallow the Partial Secondarily Insured Bond Claims will result in

the applicable claimants potentially receiving an unwarranted double recovery against the Debtors,

to the detriment of other stakeholders in the Title III Cases.  The holders of the Partial Secondarily

Insured Bond Claims will not be prejudiced by the disallowance of their claims because the

liabilities associated are subsumed within one or more Master Claims.  This Three Hundred

Eighty-Fourth Omnibus Objection in no way constitutes an objection to any claims held by the

insurer of the Secondarily Insured Bonds, but rather to the holder of the Secondarily Insured

Bonds, which are subject to the Master Claims.

### D. No Liability for Claims Based on Investments in Mutual Funds

49.     As set forth in Exhibit A hereto, certain of the Claims to Be Disallowed purport to assert liability, in part, on investment(s) in one or more mutual funds that, in turn, may have invested in bonds issued by the Debtors (collectively, the "Partial Mutual Funds Claims").

50.     A claimant bears the burden of establishing standing to file a proof of claim.  *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y. 2010).  It is well-established that only a creditor or the creditor's authorized agent has standing to assert a claim.  Fed. R. Bankr. P. 3001(b); 11 U.S.C. §§ 501(a) ("A creditor or an indenture trustee may file a proof of claim."); *In re Melillo*, 392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Only a creditor or indenture trustee may file a proof of claim.").  Parties with merely derivative interests lack standing to assert a claim against a debtor's estate.  *Matter of Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (finding party with "relationship with Debtor [that] is not direct, but rather derivative" was "a stranger to Debtor's bankruptcy proceedings," with "no claim against the estate's assets," and "as a general rule has no standing in Debtor's bankruptcy proceedings"); *see also In re Tower Park Properties, LLC*, 803 F.3d 450, 462-63 (9th Cir. 2015) (holding a trust beneficiary was not a party in interest); *In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("To the extent that the rights of a party in interest are asserted, those rights must be asserted by the party in interest, not someone else."); *In re Lopez*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (to establish oneself as a party in interest "the moving party must be asserting its own rights and not those belonging to or derivative of a third party"); *In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (recognizing the "general principle that 'party in interest standing does not arise if a party seeks to assert some right that is purely derivative of another party's rights in the bankruptcy proceeding'" (quoting *In re Refco*, 505 F.3d at 115 n. 10)).

51.     "A creditor, under the [Bankruptcy] Code, is one who has a claim *against the debtor* or the estate," rather than "a creditor of one of the debtor's creditors."  *S. Blvd., Inc. v. Martin*

*Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997).  Because, at most, the Partial Mutual Funds Claims were filed based on the claimant's status as an alleged creditor of an alleged creditor of the Commonwealth, the Partial Mutual Funds Claims were not filed by an actual creditor of the Commonwealth.  *See In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (holding receiver lacked standing to file a proof of claim because it was not a creditor or an authorized agent of a creditor).  Instead, the Partial Mutual Funds Claims are derivative of claims that must be asserted by the mutual funds directly for any claimed recovery to be considered by the Court.  *See Matter of Goldman*, 82 B.R. at 896 (finding party with "derivative" relationship has "no claim against the estate's asset" and "as a general rule has no standing in Debtor's bankruptcy proceedings").  Moreover, it is unknown whether the mutual fund still retains ownership of the suspect bonds.

52.     Indeed, under nearly identical circumstances, this Court previously disallowed claims filed against COFINA by investors in mutual funds that in turn allegedly invested in COFINA bonds for "lack of an individual interest in COFINA securities."  *Tr. of March 13, 2019 Hr'g Before the Hon. Laura Taylor Swain* [ECF No. 5969], at 64:01-10 ("THE COURT: So just so that I understand, his documentation shows that he is a mutual fund investor.  To the extent any of those mutual funds actually holds COFINA bonds, the mutual fund would be the appropriate claimant, and so he has provided no evidence of a valid direct claim as against COFINA?  MS. STAFFORD: Correct, your Honor.  THE COURT: The objection to the claim is sustained and the claim is disallowed for lack of an individual interest in COFINA securities."); *see also Order Granting Sixty-Fourth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico to Claims Based on Investments in Mutual Funds* [ECF No. 9099]; *Memorandum Order Denying Motion to Alter or Amend Order Sustaining Objection (Dkt. 8297) to Claims No. 152470 & No. 152283* [ECF No. 9121].  The First Circuit has upheld that determination.  *See* Case No. 19-2231, Doc. No. 00117746322, dated May 27, 2021.  Accordingly, the claimants are not creditors of the

Commonwealth and lack standing to assert derivative claims.  Because the Commonwealth cannot

be held liable for the Partial Mutual Funds Claims, these portions of the Claims to Be Disallowed

should be disallowed in their entirety

**E.  No Liability for Claims Based on PRPFC Bonds**

53.     As identified in Exhibit A hereto, certain portions of the Claims to Be Disallowed

purport to assert claims based on an alleged ownership interest in PRPFC Bonds issued by PRPFC,

which is not a Title III debtor, and whose liabilities are not guaranteed by the Commonwealth or

any other Debtor (collectively the "Partial PRPFC Bondholder Claims").

54.     Each of the Partial PRPFC Bondholder Claims purports to assert, in part, liabilities

against the Debtors associated with PRPFC Bonds not guaranteed by any of the Debtors.  PRPFC

is not a Title III debtor, and is a separate, legally distinct entity from the Debtors.  *See, e.g.,* 3

L.P.R.A. § 9081(c) (referring to PRPFC as an "independent juridical entity" separate from the

Commonwealth).  Moreover, each of the PRPFC Official Statements issued in connection with the

PRPFC Bonds states that (1) the PRPFC Bonds are not a debt of the Commonwealth or any of its

political subdivisions, other than PRPFC, and that the Commonwealth does not guarantee

PRPFC's debts *see. e.g.*, 2012 PRPFC Official Statement at 1, and (2) the "[t]he Legislature of

Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of,

redemption premium, if any, and interest due on the Bonds.  There is no assurance that sufficient

funds will be appropriated by the Legislature of Puerto Rico or otherwise made available to make

such payments on the Bonds" *id.* at 18.

55.     Moreover, even though the PRPFC Bonds were payable, in part, from legislative

appropriations, they do not create a binding liability against the Commonwealth, because as set

forth in the PRPFC Official Statements, the Legislature was not obligated to, and did not guarantee

that appropriations sufficient to pay principal and interest on the bonds will be made.  The

jurisprudence is clear that where the legislature is free to decide whether or not to make appropriations to pay a bond, there is no "constitutionally cognizable debt *because [the bonds] do[] not impose any enforceable duty or liability*" on the government to make such appropriations. *See ACA Financial Guaranty Corporation v. City of Buena Vista, Virginia*, 298 F. Supp.3d 834, 848 (W.D. Va. 2018) (citing *Dykes v. N. Virginia Transp. Dist. Comm'n*, 242 Va. 357, 375, 411 S.E.2d 1 (Va. 1991)); *see also, Application of Oklahoma Capitol Imp. Authority*, 958 P.2d 759, 768 (Okla. 1998) (bonds which were only payable to the extent the legislature chose to make appropriations to pay them did not constitute debt of the state); *In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S-1005,* 814 P.2d 875, 889 (Colo. 1991) (same). To the extent the Legislature decides not to appropriate funds for payments on the bonds, the bondholders do not have a claim against the Debtors. *See ACA Financial Guaranty Corp. v. City of Buena Vista, Virginia*, No. 18-1268, 2019 WL 758292, at *2 (4th Cir. Feb. 21, 2019) (finding that the city of Buena Vista, VA was not legally obligated to make rent payments "when the obligation is expressly subject to the City's annual decision to appropriate funds."). Such obligations are, therefore, not legally enforceable. *See ACA Financial Guaranty Corporation v. City of Buena Vista, Virginia*, 298 F. Supp. 3d at 839, 848 ("when a locality promises to pay subject to its future decision to allocate those payments, it has not made a legally enforceable promise to pay at all"); *see also Lonegan v. Stat*e, 174 N.J. 435, 451, 453-54 (2002) ("a projected or anticipated future legislative appropriation is not a present day debt or liability . . . [because a] future legislature is not bound to make the appropriation"). That is exactly the situation here: the Commonwealth is under no obligation to appropriate money to pay the bonds, and, indeed, the official statements themselves state the Commonwealth is not liable with respect to the bonds. As a result, claims asserting liability relating to PRPFC Bonds against the Commonwealth must be disallowed, as the Commonwealth has no such liability.

56.    Accordingly, the Debtors are not liable for each of the Partial PRPFC Bondholders

Claims.

**F.  No Liability for COFINA Bondholder Claims**

57.    As set forth in Exhibit A hereto, certain of the Claims to Be Disallowed purport to

assert liability, in part, based on an alleged ownership interest in bonds issued by COFINA

(collectively the "Partial COFINA Bondholder Claims").

58.    As explained above, the Settlement Order resolved the Commonwealth-COFINA

Dispute, and, pursuant to Paragraph 55 of the Settlement Order, all claims against the

Commonwealth arising from or relating to the relationship of the Commonwealth and COFINA

have been released.  Additionally, pursuant to Paragraph 3(c) of the *Settlement Agreement* [ECF

No. 5045-1], dated October 19, 2018, and attached to the Settlement Order (the "Settlement

Agreement"), and Paragraph 7 of the Amended Confirmation Order, the adversary proceeding

between the Commonwealth and COFINA concerning the Commonwealth-COFINA Dispute has

been dismissed with prejudice following the approval of the compromise and settlement of the

Commonwealth-COFINA Dispute.  Furthermore, pursuant to Paragraph 29(f) of the Amended

Confirmation Order, claims, such as the Partial COFINA Bondholder Claims, that arose from or

relate to the relationship of the Commonwealth and COFINA were released.  Amended

Confirmation Order, ¶ 29(f).[6]  For all of these reasons, the Partial COFINA Bondholder Claims

---

[6] Pursuant to the Plan, "Claim" is defined as "[a]ny right to payment or performance, whether or
not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,
unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or
asserted or unasserted; or any right to an equitable remedy for breach or enforcement of
performance, whether or not such right to an equitable remedy is reduced to judgment, fixed,
contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits,
damages, rights, remedies, losses, liabilities, obligations, judgments, actions, causes of action,
demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise."  Plan
§ 1.53.

should be disallowed because these claims based on an apparent alleged ownership interest in

COFINA Bonds have been satisfied, released, and/or discharged pursuant to the Settlement Order,

Settlement Agreement, Amended Confirmation Order, and Plan.

### G. No Liability for PRASA Senior Lien Bonds

59.     As set forth in Exhibit A hereto, certain of the Claims to Be Disallowed purport to

assert liability, in part, based on the alleged ownership of bonds issued by PRASA (the "Partial

PRASA Senior Lien Bondholder Claims").

60.     The Partial PRASA Senior Lien Bondholder Claims assert liabilities associated

with PRASA Senior Lien Bonds issued by PRASA, which is not a Title III Debtor, and is a

separate, legally distinct entity from the Debtors.  In addition, the Debtors have not guaranteed

repayment for the Senior Lien Bonds.  The Partial PRASA Senior Lien Bondholder Claims do not

assert a basis for asserting a claim against the Debtors for bonds issued by PRASA that are not

guaranteed by the Debtors.  Because of this failure to comply with the applicable rules, neither the

Debtors nor the Court are able to determine the validity of the Partial PRASA Senior Lien

Bondholder Claims.

### H. Claims Asserting Investment Losses and Cash

61.     As set forth in Exhibit A hereto, certain of the Claims to Be Disallowed purport to

assert liability, in part, based on liabilities arising out of alleged investment losses and/or claims

for certain "cash" positions held in claimants' brokerage account (collectively, the "Partial

Deficient Claims").

62.     None of the Partial Deficient Claims, however, assert any potential causes of action

against the Debtors that might render the Debtors liable for alleged damages incurred as a result

of the claimants' decision to sell their bonds at a loss.  Accordingly, the Debtors are not liable for

the losses asserted in the Partial Deficient Claims.  *See English v. Energy Future Holdings (In re*

*Energy Future Holdings)*, 2018 U.S. Dist. LEXIS 49952, at *7 (D. Del., March 27, 2018) (holding bankruptcy court's order disallowing proof of claim was proper where claimant had sold bonds issued by the debtor and, thus, neither had any right to payment with respect to the bonds, nor did claimant show it had any potential cause of action against the debtor for the alleged damages incurred by the claimant in selling the debtor's bonds at a loss); *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992) (citing *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 L. King, *Collier on Bankruptcy* § 502.02, at 502-22 (15th ed. 1991)) ("Initially, the claimant must allege facts sufficient to support the claim").

63.     Further, certain of the Partial Deficient Claims assert a claim for "cash" positions held in claimants' brokerage account.  Claimants, however, failed to provide any evidence demonstrating a loss of these cash positions.  Claimants also failed to provide any basis for asserting a claim against the Debtors for these cash positions purportedly held by the claimant. Because of this failure to comply with the applicable rules, neither the Debtors nor the Court are able to determine the validity of the Partial Deficient Claims.

**I.   Deficient Bondholder Claims**

64.     Lastly, certain of the Claims to Be Disallowed purport to assert liability, in part, based on "Bond de la Autoridad de Eddifios Publicos de P.R," "investment," "I want my money," or other similar terms asserting liabilities associated with investments in government-issued bonds (the "Deficient Bondholder Claims").

65.     In some instances, the Deficient Bondholder Claims did not contain any supporting documentation indicating which bonds claimants contended gave rise to liabilities owed by the Debtors.   In other instances, the Deficient Bondholder Claims provided as supporting documentation a copy of a brokerage statement, or other supporting documentation containing information regarding bonds purportedly held by the claimant, but the amounts of the bonds

included in that supporting documentation did not match the amount on the claimant's proof of claim.

66.     On August 13, 2019, the Court entered the *Order Granting in Part and Adjourning in Part Debtors' Motion for Entry of An Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 8453] (the "Authorized Mailings Order"), which authorized the Debtors to send mailings "to any claimant who has not provided sufficient information to enable Debtors to process their claim."  Authorized Mailings Order, ¶ 3.

67.     Pursuant to the Authorized Mailings Order, "[i]f the Debtors mail the Proposed Mailing to a claimant, and the claimant either does not respond or responds but fails to provide sufficient information to permit Debtors to reconcile their claim, the Debtors are authorized to object to the claim as deficient."  *Id.*

68.     In accordance with the Authorized Mailings Order, the Debtors have sent at least one letter, substantially in the form of Exhibit 1 to the Authorized Mailings Order, to each claimant associated with the Deficient Bondholder Claims.  Each Mailing provided, in relevant part:

> Additional information is required in order for the Debtors to continue with assessing your claim. The Debtors are unable to determine from the information you provided the basis for the claim you are attempting to assert against one or more of the Debtors.  In responding to this letter, please ensure that you provide all of the information requested and as much detail as possible about your claim.  The descriptions you put on your proof of claim were too vague for the Debtors to understand the claim you are trying to assert, so please provide more detail and do not simply copy over the same information.
> *See* ECF No. 8453-1 at 2, 7.

The Mailings received by the claimants associated with the Deficient Bondholder Claims directed the claimants to respond within thirty dates of the date of the letter.  *See id*.  Furthermore, the Mailings cautioned the claimants that "[i]f you do not respond to this request and do not provide

the requested information and documentation in support of your claim, the Debtors may be forced to object to your claim." *Id.*

69.     Each of the Deficient Bondholder Claims either failed to respond to the Mailings, or submitted a response that still did not contain information necessary to enable the Debtors to reconcile the claim.  Accordingly, the Debtors reviewed the documentation submitted with the proofs of claim or with the Mailings for assertions of investments related to government-issued bonds issued by the Commonwealth or its agencies and instrumentalities.  To the extent each of the Deficient Bondholder Claims purport to assert additional liabilities not associated with the government-issued bonds identified in the proof of claim, the supporting documentation, or a Mailing response, those portions of each of the proofs of claim listed on Exhibit A hereto are deficient because they fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim.

70.     In support of the foregoing, the Debtors rely on the *Declaration of Jay Herriman in Support of the Three Hundred Eighty-Fourth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico, Puerto Rico Highways and Transportation Authority, Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Puerto Rico Sales Tax Financing Corporation, and Puerto Rico Public Buildings Authority to Deficient, Duplicate, and No Liability Bond Claims*, dated August 20, 2021, attached hereto as **Exhibit B**.

## NOTICE

71.     In accordance with the Amended Omnibus Objection Procedures and the Court's Notice Order, the Debtors are providing notice of this Three Hundred Eighty-Fourth Omnibus Objection to (a) the individual creditors subject to this Three Hundred Eighty-Fourth Omnibus Objection, (b) the U.S. Trustee, and (c) the Master Service List (as defined by the *Fifteenth Amended Case Management Procedures* [ECF No. 17127-1]), which is available on the Debtors'

case website at https://cases.primeclerk.com/puertorico.  The notice for this Three Hundred Eighty-Fourth Omnibus Objection is attached hereto as **Exhibit C**.  Spanish translations of the Three Hundred Eighty-Fourth Omnibus Objection and all of the exhibits attached hereto are being filed with this objection and will be served on the parties.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### RESERVATION OF RIGHTS

72.     This Three Hundred Eighty-Fourth Omnibus Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtors or the rights of any other party in interest in the Title III Cases to object to the Claims to Be Disallowed or any other claims on any ground whatsoever.  The Debtors expressly reserve all further substantive or procedural objections.  Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the rights of the Debtors or any other party in interest in the Title III Cases to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (e) a waiver of the rights of the Debtors or any other party in interest in the Title III Cases under PROMESA, the Bankruptcy Code or any other applicable law.

### NO PRIOR REQUEST

73.     No prior request for the relief sought in this Three Hundred Eighty-Fourth Omnibus Objection has been made to this or any other court.


[*Remainder of Page Intentionally Left Blank*]

WHEREFORE the Debtors respectfully request entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit D**, (1) granting the relief requested herein, and (2) granting such other and further relief as is just.

Dated: August 20, 2021
San Juan, Puerto Rico

Respectfully submitted,

/s/ *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Carla García-Benítez
USDC No. 203708
Gabriel A. Miranda
USDC No. 306704
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

/s/ *Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, Puerto Rico Highways and Transportation Authority, Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Puerto Rico Sales Tax Financing Corporation, and Puerto Rico Public Buildings Authority*

**Fecha límite para responder: 20 de septiembre de 2021 a las 4:00 p.m. (AST)**
**Fecha de la vista: 6 de octubre de 2021, a las 9:30 a.m. (AST)**

---

**REVISE DETENIDAMENTE ESTA OBJECIÓN Y LOS DOCUMENTOS ADJUNTOS PARA DETERMINAR SI LA OBJECIÓN AFECTA A SU(S) RECLAMACIÓN(ES).**

---

**TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO**

| | |
|---|---|
| *In re*:<br><br>JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>    como representante del<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO *et al.*,<br><br>                 Deudores.[1] | PROMESA<br>Título III<br><br>Núm. 17 BK 3283-LTS<br><br>(Administrado Conjuntamente)<br><br>**La presente radicación guarda relación con el ELA, la ACT, el SRE, COFINA y la AEP.** |

**TRICENTÉSIMA OCTOGÉSIMA CUARTA OBJECIÓN GLOBAL (SUSTANTIVA) DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, DE LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO, DEL SISTEMA DE RETIRO DE LOS EMPLEADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO, DE LA CORPORACIÓN DEL FONDO DE INTERÉS APREMIANTE DE PUERTO RICO Y DE LA AUTORIDAD DE EDIFICIOS PÚBLICOS DE PUERTO RICO A RECLAMACIONES POR BONOS DEFICIENTES, DUPLICADAS Y EN LAS QUE NO EXISTE RESPONSABILIDAD**

---

[1] Los Deudores en los presentes Casos de Título III, junto con el respectivo número de caso de Título III y los últimos cuatro (4) dígitos del número de identificación contributiva federal de cada Deudor, en su caso, son i) el Estado Libre Asociado de Puerto Rico (el "ELA") (Caso de Quiebra Núm. 17 BK 3283-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3481); ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17 BK 3284-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 8474); iii) la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT") (Caso de Quiebra Núm. 17 BK 3567-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3808); iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE") (Caso de Quiebra Núm. 17 BK 3566-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 9686); v) la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE") (Caso de Quiebra Núm. 17 BK 4780-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3747); y vi) la Autoridad de Edificios Públicos de Puerto Rico (la "AEP", y junto con el ELA, COFINA, la ACT, el SRE y la AEE, los "Deudores") (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3801) (Los números de los casos de Título III están enumerados como números de Casos de Quiebra debido a ciertas limitaciones en el programa informático).

A la atención de su señoría, Juez del Tribunal de Distrito de los Estados Unidos, Laura Taylor Swain:

El Estado Libre Asociado de Puerto Rico (el "ELA"), la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT"), el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE"), la Autoridad de Edificios Públicos de Puerto Rico (la "AEP") y la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA", y junto con el ELA, la ACT, el SRE y la AEP, los "Deudores"), a través de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como el único representante de Título III de los Deudores conforme a la sección 315(b) de la *Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radican esta tricentésima octogésima cuarta objeción global (la "Tricentésima octogésima cuarta objeción global") a las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento, cada una de las cuales se basa parcialmente en *a*) reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra los Deudores en nombre de determinados bonistas, *b*) una participación patrimonial en bonos emitidos por el Banco Gubernamental de Fomento para Puerto Rico (el "BGF"), *c*) reclamaciones por bonos que alegan responsabilidades vinculadas con unos bonos asegurados en el mercado secundario que constituyen duplicados con respecto a evidencias de reclamaciones radicadas contra los Deudores en nombre de determinados bonistas; *d*) una o más inversiones en fondos mutuos que a su vez pudieron haber invertido en bonos emitidos por los Deudores; *e*) bonos emitidos por COFINA; y/o *f*) un interés patrimonial en bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico (la "AAA") y/o en pagarés emitidos por el Fondo Fiduciario de Conservación de

---

[2] PROMESA ha sido codificada en el Título 48 U.S.C., §§ 2101-2241.

Puerto Rico (el "FFCPR"), que no son Deudores de Título III, por unos montos por los que los Deudores no han garantizado el reembolso. Además, las partes restantes de algunas de las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento son deficientes porque 1) no brindan información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones y/o 2) alegan responsabilidades que surgen de unos bonos emitidos por los Deudores que el/los reclamante(s) poseían en algún momento, pero que ya han vendido o liquidado. En apoyo de la Tricentésima octogésima cuarta objeción global, los Deudores manifiestan respetuosamente lo siguiente:

## JURISDICCIÓN

1.        El Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico tiene jurisdicción sobre la materia para atender la presente causa y el remedio en ella solicitado conforme a la sección 306(a) de PROMESA.

2.        La sede judicial de este distrito es la competente conforme a la sección 307(a) de PROMESA.

## ANTECEDENTES

**A.        Órdenes de Fecha Límite**

3.        El 3 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el ELA conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "Caso de Título III del ELA"). El 5 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para COFINA conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "Caso de Título III de COFINA"). El 21 de mayo de 2017, la Junta de Supervisión emitió una

certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó

una petición voluntaria de remedio para la ACT y el SRE conforme a la sección 304(a) de

PROMESA, iniciando un caso conforme al Título III del referido cuerpo legal (respectivamente,

el "Caso de Título III de la ACT" y el "Caso de Título III del SRE"). El 27 de septiembre de 2019,

la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones

104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para la AEP conforme a

la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal

(el "Caso de Título III de la AEP", y junto con el Caso de Título III del ELA, el Caso de Título III

de COFINA, el Caso de Título III de la ACT y el Caso de Título III del SRE, los "Casos de Título

III"). El 9 de octubre de 2019, el Tribunal dictó una orden por la que concedió la administración

conjunta de los Casos de Título III únicamente con fines procesales. ECF núm. 8829.[3]

4.      El 16 de enero de 2018, el ELA, COFINA, la ACT y el SRE radicaron su *Moción

de una orden que A) fije fechas límite y procedimientos para radicar Evidencias de reclamaciones

y B) apruebe la forma y la manera de su notificación* [ECF núm. 2255] (la "Moción de Fecha

Límite del ELA, de COFINA, de la ACT y del SRE"). Conforme a la *Orden que A) fija fechas

límite y procedimientos para radicar evidencias de reclamaciones y B) aprueba la forma y la

manera de su notificación* [ECF. núm. 2521] (la "Orden Inicial de Fecha Límite del ELA, de

COFINA, de la ACT y del SRE"), el Tribunal concedió el remedio solicitado en la Moción de

Fecha Límite y fijó fechas límite y procedimientos para radicar evidencias de reclamaciones en el

marco del Caso de Título III del ELA, el Caso de Título III de COFINA, el Caso de Título III de

la ACT y el Caso de Título III del SRE. Luego de la moción informativa de determinados

acreedores, y del apoyo del ELA, COFINA, la ACT y el SRE, el Tribunal dictó a continuación la

---

[3] Salvo disposición en contrario contenida en el presente documento, las citas ECF harán referencia a documentos radicados en el marco del Caso de Quiebra Núm. 17 BK 3283-LTS.

*Orden que A) extendió fechas límite para radicar evidencias de reclamaciones y B) aprobó la forma y la manera de su notificación* [ECF núm. 3160] (conjuntamente con la Orden Inicial de Fecha Límite del ELA, de COFINA, de la ACT y del SRE, las "Órdenes de Fecha Límite del ELA, de COFINA, de la ACT y del SRE"), extendiendo dichas fechas límite hasta el 29 de junio de 2018, a las 04:00 p.m. (AST).

5.    El 11 de febrero de 2020, la AEP radicó su *Moción de una orden que A) fije fechas límite y procedimientos para radicar evidencias de reclamaciones y B) apruebe la forma y la manera de su notificación* [ECF núm. 36 en 19-BK-5523-LTS] (la "Moción de Fecha Límite de la AEP"). Conforme a la *Orden que A) fija fechas límite y procedimientos para radicar evidencias de reclamaciones y B) aprueba la forma y la manera de su notificación* [ECF. núm. 55 en 19-BK-5523-LTS] (la "Orden Inicial de Fecha Límite de la AEP"), el Tribunal concedió el remedio solicitado en la Moción de Fecha Límite de la AEP y fijó fechas límite y procedimientos para radicar evidencias de reclamaciones en el marco del Caso de Título III de la AEP. El Tribunal extendió posteriormente estas fechas límite hasta el 29 de julio de 2020 a las 4:00 p.m. (AST). *Véase la Orden que A) extiende fechas límite para radicar evidencias de reclamaciones y B) aprueba la forma y la manera de su notificación* [ECF núm. 13403] (junto con la Orden Inicial de Fecha Límite de la AEP, las "Órdenes de Fecha Límite de la AEP", y junto con las Órdenes de Fecha Límite del ELA, la ACT, el SRE y COFINA, las "Órdenes de Fecha Límite").

**B.    Evidencias de reclamaciones principal relativas a la deuda de los bonos: Caso de Título III del ELA**

6.    Conforme a las Órdenes de Fecha Límite, fiduciarios autorizados, agentes fiscales o cualquier otro agente o apoderado similar en relación con cada serie respectiva de bonos emitidos por uno de los Deudores o por un no deudor, podrán radicar una evidencia de reclamación principal contra el deudor pertinente, en su propio nombre y en el de todos los titulares de reclamaciones

por bonos para la respectiva serie de bonos en relación con las obligaciones surgidas de los respectivos acuerdos de fideicomiso, resoluciones o documentos similares vinculados con los bonos. Orden Inicial de Fecha Límite del ELA, de COFINA, de la ACT y del SRE, ¶ 5(a). Como se explica más adelante, se han radicado evidencias de reclamaciones principales (conjuntamente, las "Reclamaciones Principales del ELA") en el marco del Caso de Título III del ELA en nombre de los tenedores de determinados bonos o pagarés emitidos por la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico (la "AFI").

7.    **_AFI_**: la AFI es una filial del BGF y constituye una instrumentalidad del Gobierno del ELA. La AFI fue creada en 1988 mediante la Ley núm. 44-1988 (la "Ley para crear la AFI"). La AFI brinda asistencia financiera, administrativa y de otro tipo al ELA, a sus corporaciones públicas y a otras dependencias encargadas del desarrollo y del funcionamiento de las infraestructuras. En nombre de los tenedores de varios bonos y pagarés emitidos por la AFI (conjuntamente, los "Bonos de la AFI"), se radicaron evidencias de reclamaciones principales contra el ELA (conjuntamente, las "Reclamaciones Principales de la AFI") por parte de BNYM, US Bank y UMB Bank, N.A. En primer lugar, BNYM alegó tres evidencias de reclamaciones principales: la Evidencia de reclamación núm. 16759 alegando, en nombre de los tenedores de los Pagarés de anticipación de bonos relativos a rentas de fondo de impuestos dedicado, serie 15 (los "Pagarés de la AFI"), una "reclamación contingente y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas, derechos y/o remedios que el Fiduciario o los Propietarios puedan tener contra el ELA, en virtud de la ley o equidad, sobre la base del Acuerdo de fideicomiso (o en relación con este), el Acuerdo de tenedores de pagarés, los Pagarés o las Rentas pignoradas". . . "; la Evidencia de reclamación núm. 19814 alegando, en nombre de los tenedores de los Pagarés de la AFI, reclamaciones por el principal y los intereses impagados, además de las tarifas y los gastos del fiduciario; y la Evidencia de reclamación núm. 103718

alegando, en nombre de los tenedores de los bonos de renta emitidos por la AFI, incluidos Bonos

de Renta (Proyecto de la Autoridad Portuaria), serie 2011A, "una reclamación garantizada,

contingente y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas

radicadas, derechos y/o remedios que el Fiduciario o los tenedores de los Bonos tengan o puedan

tener contra el ELA, en virtud de la ley o equidad". . . ."

   8.  Además, US Bank radicó una evidencia de reclamaciones principal en relación con

determinados Bonos de la AFI, que fue registrada por Prime Clerk, LLC, como Evidencia de

reclamaciones núm. 13386, en nombre de los tenedores de los Bonos de la AFI relativos a

impuestos sobre el ron (Bonos relativos a rentas de impuestos especiales, series 2005A, 2005B,

2005C y serie 2006B), alegando "reclamaciones por montos contingentes y no liquidados en

relación con los intereses pagaderos a futuro, intereses acumulados y que se acumulen en el futuro

en lo referente al principal adeudado en el pasado y las reclamaciones por intereses, tarifas, costos

e indemnización del Fiduciario en los que se incurra en el futuro en virtud de los Documentos de

Bonos, así como por la totalidad de los montos adeudados en razón de todas las reclamaciones que

tenga o pueda tener el Fiduciario en relación con las Obligaciones de Bonos pendientes, monto

mínimo de $249,099,446.17, cuyo curso de conducta continúa". . . ."  Cláusula Adicional de la

Evidencia de reclamación núm. 13386, ¶ 26.

## C.  Evidencias de reclamaciones principal relativas a la deuda de los bonos: Caso Título III del ELA

   9.  El SRE es un *trust* establecido por el ELA en 1951 para fomentar el bienestar

económico de los empleados públicos. El SRE es una agencia gubernamental, aparte e

independiente del Gobierno del ELA y de sus demás instrumentalidades. *Véase* 3 L.P.R.A § 775.

   10.  Supuestamente, conforme a la Resolución sobre bonos para el financiamiento de

pensiones, adoptada el 24 de enero de 2008, y ciertas resoluciones complementarias, el SRE emitió

unos bonos preferentes y subordinados para el financiamiento de pensiones (los "Bonos del SRE"),

por un monto total del principal de aproximadamente $2900 millones.

11.    BNYM actúa como agente fiscal con respecto a los Bonos del SRE.  Actuando en

nombre de los tenedores de los Bonos del SRE, BNYM presentó una evidencia de reclamación

principal en el marco del Caso de Título III del SRE en relación con los Bonos del SRE,

reclamando aproximadamente $3800 millones en concepto de responsabilidades más montos no

liquidados, que fue registrada por Prime Clerk como Evidencia de reclamación núm. 16777 (la

"Evidencia de Reclamación Principal del SRE").

**D.    Evidencias de reclamaciones principales relativas a la deuda de los bonos: Caso de
Título III de la ACT**

12.    La ACT es una corporación pública e instrumentalidad del ELA, que constituye

una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley núm.

74-1965 de la Asamblea Legislativa del ELA (la "Ley para crear la ACT"). La ACT se encarga de

la construcción, operación y mantenimiento de carreteras y otros sistemas de transportación en el

ELA. *Véase* 9 L.P.R.A § 2002.

13.    La Ley para crear la ACT autoriza a la ACT a emitir bonos. *Véase* 9 L.P.R.A. §§

2004(g), (h), (l). Conforme a dicha normativa legal, la ACT emitió varias series de bonos al amparo

de dos resoluciones diferentes (los "Bonos de la ACT relativos a resoluciones"): a) la Resolución

núm. 68-18, adoptada el 13 de junio de 1968 (la "Resolución de 1968"), y b) la Resolución núm.

98-06, adoptada el 26 de febrero de 1998 (la "Resolución de 1998"). Desde la Fecha de Petición,

aproximadamente $830 millones del monto principal de los bonos emitidos conforme a la

Resolución de 1968 quedan pendientes de pago, y aproximadamente $3400 millones del monto

principal de los bonos emitidos conforme a la Resolución de 1998 quedan igualmente pendientes

de pago.

14. BNYM actúa como agente fiscal con respecto a los Bonos de la ACT relativos a resoluciones. Actuando en nombre de los tenedores de Bonos de la ACT relativos a resoluciones, BNYM radicó tres evidencias de reclamaciones principales en el marco del Caso de Título III de la ACT (conjuntamente, las "Evidencias de Reclamaciones Principales del BNYM"): la Evidencia de reclamación núm. 37245, por la que se reclama, en nombre de los tenedores de los bonos emitidos conforme a la Resolución de 1968, aproximadamente $847 millones en concepto de responsabilidad más montos no liquidados; la Evidencia de reclamación núm. 38574, por la que se reclama, en nombre de los tenedores de los bonos emitidos conforme a la Resolución de 1998, aproximadamente $3200 millones en concepto de responsabilidad más montos no liquidados; y la Evidencia de reclamación núm. 32622, por la que se reclama, en nombre de los tenedores de los bonos subordinados emitidos conforme a la Resolución de 1998, aproximadamente $279 millones en concepto de responsabilidad más montos no liquidados.

**E. Evidencias de reclamaciones principales relativas a la deuda de los bonos: Caso de Título III de la AEP**

15. ___AEP___: actuando en nombre de los tenedores de los Bonos de la AEP, US Bank y US Bank Trust, como agentes fiscales en relación con determinados bonos de renta emitidos por la AEP, radicaron una evidencia de reclamación principal en el marco del Caso de Título III de la AEP por todos los montos pendientes de pago adeudados (la "Reclamación Principal de la AEP", y junto con las Evidencias de Reclamaciones Principales del ELA, las Evidencias de Reclamaciones Principales de la ACT y las Evidencias de Reclamaciones Principales del SRE, las "Evidencias de Reclamaciones Principales"), que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 174834. La Reclamación Principal de la AEP alega reclamaciones liquidadas por aproximadamente $4000 millones en concepto de principal supuestamente impagado, $160 millones en concepto de intereses supuestamente impagados y reembolso de

comisiones y gastos de los agentes fiscales, además de reclamaciones no liquidadas y contingentes por la totalidad de los montos adeudados "en razón de la totalidad de las reclamaciones que el Agente Fiscal tenga o pueda tener en relación con las obligaciones de Bonos pendientes, conocidas o por conocer, contra la AEP y aquellos que pretendan actuar en nombre de la AEP". . . ."  Cláusula Adicional de la Reclamación Principal de la AEP, ¶ 24(d).

16.     Determinados bonos o pagarés emitidos por la AEP han sido asegurados por una o más aseguradoras de bonos municipales en el mercado primario o en el secundario. El seguro de bonos municipales se obtiene en el mercado primario cuando el municipio emisor de los bonos contrata una compañía de seguros para suscribir una póliza de seguro en relación con dicha serie de bonos. En el caso de que un bono no se asegure en el mercado primario, los tenedores de tales bonos no asegurados podrían optar por obtener un seguro a través del mercado secundario. Los tenedores de los bonos no asegurados que busquen obtener un seguro en el mercado secundario entran en una relación contractual directamente con una aseguradora de bonos municipales, por lo que el emisor original no es parte en dicho proceso de contratación. Cuando un tenedor de un bono no asegurado obtiene una póliza de seguro en el mercado secundario, se emite un nuevo número CUSIP que corresponde a los números CUSIP originales asignados a los bonos en el momento de su emisión. Determinados bonos emitidos por la AEP han sido asegurados en el mercado secundario y, en consecuencia, se han emitido nuevos números CUSIP que corresponden a los bonos emitidos por la AEP que llevan números CUSIP originales (los "Bonos asegurados en el mercado secundario").

## F.     Deuda de los bonos emitidos por la Corporación para el Financiamiento Público de Puerto Rico

17.     La CFP es una corporación subsidiaria del BGF creada conforme a la Resolución núm. 5044 de la Junta Directiva del BGF, en su versión enmendada (la "Resolución núm. 5044"),

adoptada de conformidad con la autoridad concedida en virtud de la Ley núm. 17 de la Asamblea Legislativa de Puerto Rico, aprobada el 23 de septiembre de 1948, en su versión enmendada. La CFP proporciona a las agencias públicas, instrumentalidades, municipios y a otras subdivisiones del ELA mecanismos alternativos para que puedan satisfacer sus necesidades de financiamiento. La CFP está autorizada a tomar en préstamo fondos y emitir deuda a través de bonos y otras obligaciones.

18.    En 1998, la CFP emitió Bonos de Asignación del ELA, de 1999, Serie A (los "Bonos de Asignación del ELA de 1998"), por un monto total de $345,370,000.00, para financiar la compra de un pagaré del BGF de la Oficina para el Mejoramiento de las Escuelas Públicas de Puerto Rico. Los Bonos de Asignación del ELA de 1998 fueron emitidos conforme a un acuerdo de fideicomiso entre la CFP y Banco Popular de Puerto Rico, como fiduciario. Los Bonos de Asignación del ELA de 1998 son obligaciones limitadas de la CFP, pagaderos únicamente desde ingresos pignorados que se integran por pagos del principal y los intereses sobre los pagarés y otros montos depositados en el saldo de un fondo de amortización creado conforme al acuerdo de fideicomiso, siendo el principal y los intereses pagaderos únicamente de asignaciones legislativas realizadas conforme a la Ley núm. 85-1998. La declaración de oferta emitida en relación con los Bonos de Asignación del ELA de 1998 dispone en su portada que los "[Bonos de Asignación del ELA de 1998] no constituirán una obligación del ELA ni de ninguna de sus subdivisiones políticas o instrumentalidades públicas (salvo la CFP[de PR]), y ni el ELA ni ninguna de sus subdivisiones políticas o instrumentalidades públicas (salvo la CFP[de PR]) será responsable de su pago". Véase, por ejemplo,  Corporación para el Financiamiento Público de Puerto Rico, Declaración Oficial, Bonos de Asignación del ELA, Serie 1998A, disponible en https://emma.msrb.org/MS145212-MS120520-MD233589.pdf (la "Declaración Oficial de la CFP de 1998"). La Declaración Oficial de la CFP de 1998 también dispone lo siguiente: "[l]a Asamblea Legislativa de Puerto Rico no

11

tiene obligación jurídica para asignar montos suficientes para un pago en los plazos establecidos del principal, de la prima de reembolso (si la hubiere) ni de los intereses vencidos sobre los Bonos. No hay garantía de que la Asamblea Legislativa de Puerto Rico asigne, o ponga a disposición de otro modo, fondos suficientes para realizar dichos pagos sobre los Bonos". *Id.* en 11.

19.     En 2001, la CFP emitió Bonos de Asignación del ELA, de 2001, Serie E (los "Bonos de Asignación del ELA de 2001"), por un monto total de $1,095,845,000.00, para financiar la compra de unos pagarés del BGF emitidos en relación con la reestructuración de determinados préstamos pendientes de pago concedidos por el BGF a ciertos departamentos, agencias, instrumentalidades y corporaciones públicas del ELA. Los Bonos de Asignación del ELA de 2001 son obligaciones limitadas de la CFP, pagaderos únicamente desde los pagos del principal y los intereses sobre dichos pagarés, los cuales son pagaderos únicamente desde asignaciones presupuestarias realizadas conforme a la Ley núm. 164-2001. La declaración oficial emitida en relación con los Bonos de Asignación del ELA de 2001 dispone en su portada que los "[Bonos de Asignación del ELA de 2001] no constituirán una obligación del ELA ni de ninguna de sus subdivisiones políticas o instrumentalidades públicas (salvo la [CFP]), y ni el ELA ni ninguna de sus subdivisiones políticas o instrumentalidades públicas (salvo la [CFP]) será responsable de su pago". *Véase, por ejemplo*,   Corporación para el Financiamiento Público de Puerto Rico, Declaración  Oficial,  Bonos  de  Asignación  del  ELA,  Serie  2001E,  *disponible  en* https://emma.msrb.org/MS27394-MS250735-MD486120.pdf. (la "Declaración Oficial de la CFP de 2001"). La Declaración Oficial de la CFP de 2001 también dispone lo siguiente: "[l]a Asamblea Legislativa de Puerto Rico no tiene obligación jurídica para asignar montos suficientes para un pago en los plazos establecidos del principal, de la prima de reembolso (si la hubiere) ni de los intereses vencidos sobre los Bonos. No hay garantía de que la Asamblea Legislativa de Puerto

Rico asigne, o ponga a disposición de otro modo, fondos suficientes para realizar dichos pagos sobre los Bonos". *Id.* en 13.

20.     En 2012, la CFP emitió Bonos de Asignación del ELA, de 2012, Serie A (los "Bonos de Asignación del ELA de 2012", y junto con los Bonos de Asignación del ELA de 1998 y los Bonos de Asignación del ELA de 2001, los "Bonos de la CFP"), por un monto total de $410,665,000.00, para reembolsar determinados bonos pendientes de pago de la CFP. Los Bonos de Asignación del ELA de 2012 son obligaciones limitadas de la CFP, pagaderos únicamente desde los pagos del principal y los intereses sobre determinados pagarés emitidos por ciertos departamentos, agencias, instrumentalidades y corporaciones públicas del ELA. Dichos pagarés son pagaderos únicamente desde asignaciones presupuestarias realizadas por la Asamblea Legislativa de Puerto Rico conforme a la legislación que la Asamblea Legislativa de Puerto Rico adopte. La declaración oficial emitida en relación con los Bonos de Asignación del ELA de 2012 dispone en su portada que los "[Bonos de Asignación del ELA de 2012] no constituirán una obligación del ELA ni de ninguna de sus subdivisiones políticas o instrumentalidades públicas (salvo la [CFP]), y ni el ELA ni ninguna de sus subdivisiones políticas o instrumentalidades públicas (salvo la [CFP]) será responsable de su pago". *Véase, por ejemplo*, Corporación para el Financiamiento Público de Puerto Rico, Declaración Oficial, Bonos de Asignación del ELA, Serie 2012 A, *disponible en* https://emma.msrb.org/ER602315-EA371499-EA768292.pdf. (la "Declaración Oficial de la CFP de 2012", y junto con la Declaración Oficial de la CFP de 1998 y la Declaración Oficial de la CFP de 2001, las "Declaraciones Oficiales de la CFP"). La Declaración Oficial de la CFP de 2012 también dispone lo siguiente: "[l]a Asamblea Legislativa de Puerto Rico no tiene obligación jurídica para asignar montos suficientes para un pago en los plazos establecidos del principal, de la prima de reembolso (si la hubiere) ni de los intereses vencidos sobre los Bonos.

13

No hay garantía de que la Asamblea Legislativa de Puerto Rico asigne, o ponga a disposición de otro modo, fondos suficientes para realizar dichos pagos sobre los Bonos". *Id.* en 18.

G.   **Caso de Título III de COFINA y resolución de la controversia entre el ELA y COFINA**

21.   COFINA es una corporación pública y organismo del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley núm. 91 de la Asamblea Legislativa del ELA. Conforme a la Resolución enmendada y modificada sobre los bonos del fondo de interés apremiante, adoptada el 13 de julio de 2007, en su versión enmendada del 19 de junio de 2009, y de conformidad con otras resoluciones complementarias, COFINA emitió una serie de bonos por un monto total de aproximadamente $17,000 millones para, entre otras cosas, sufragar determinadas obligaciones de deuda del Banco Gubernamental de Fomento para Puerto Rico y de la Corporación para el Financiamiento Público de Puerto Rico (los "Bonos de COFINA"). El Bank of Nueva York Mellon actúa como fiduciario con respecto a los Bonos de COFINA.

22.   La Junta de Supervisión radicó el *Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* (el "Plan") [ECF núm. 4652] el 9 de enero de 2019. El Tribunal examinó la confirmación del Plan y las objeciones formuladas a este en una vista celebrada los días 16 y 17 de enero de 2019.

23.   El 4 de febrero de 2019, el Tribunal confirmó el Plan que incorporaba el pacto y la conciliación de la controversia sobre si, luego de examinar todas las contestaciones y reconvenciones sustantivas y procesales, incluidas cuestiones constitucionales, los impuestos sobre la venta y uso supuestamente empeñados por COFINA para garantizar la deuda son propiedad del ELA o de COFINA conforme a la normativa legal aplicable (la "Controversia entre el ELA y COFINA"). *Véase la Orden y la Sentencia que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF núm. 5048]. Ese

mismo día, el Tribunal aprobó el pacto y la conciliación de la Controversia entre el ELA y COFINA conforme al *Dictamen abreviado y orden que aprueba la conciliación entre el Estado Libre Asociado de Puerto Rico y la Corporación del Fondo de Interés Apremiante de Puerto Rico* [ECF núm. 5045] (la "<u>Orden de Conciliación</u>"). El 5 de febrero de 2019, el Tribunal dictó una *Orden y Sentencia enmendadas que confirman el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III* [ECF núm. 5055] (la "<u>Orden de Confirmación Enmendada</u>"). El Plan entró en vigor el 12 de febrero de 2019 (la "<u>Fecha de Entrada en Vigor</u>"), una vez consumadas las transacciones en él contempladas. *Véase Notificación de A) emisión de orden por la que se confirma el Tercer plan enmendado de ajuste de la Corporación del Fondo de Interés Apremiante de Puerto Rico elaborado conforme al Título III, según el Título III de PROMESA, y B) acontecimiento de la Fecha de Entrada en Vigor* [Caso núm. 17 BK 3284-LTS, ECF núm. 587].

**H.    Deuda de los bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico**

24.    La AAA fue creada de conformidad con la Ley núm. 40, de 1 de mayo de 1945. La AAA es una "corporación pública e instrumentalidad gubernamental autónoma", creada para la prestación de los servicios de suministro de agua y alcantarillado en la isla. 22 L.P.R.A. § 142, 144.

25.    La Ley para crear la AAA autoriza a la AAA a emitir bonos. 22 L.P.R.A. § 144(g). Conforme a dicha Ley, la junta directiva de la AAA adoptó resoluciones que autorizan a la AAA emitir bonos, lo que incluye la Resolución núm. 1583, en su versión enmendada y modificada el 7 de marzo de 2008 (la "<u>Resolución núm. 1583</u>"). En 2012, la AAA emitió unos bonos de renta, Serie 2012 B, por un monto del principal de $295,245,000 (los "<u>Bonos Prioritarios Serie B de 2012</u>" o los "<u>Bonos de Gravamen Prioritarios de la AAA</u>").

26.     Los tenedores de los Bonos de Gravamen Prioritarios de la AAA han recibido, y siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de la AAA, a medida que estos vencen y se vuelven pagaderos. En consecuencia, el EMMA refleja que la AAA no ha publicado ninguna notificación de incumplimiento en relación con los Bonos de Gravamen Prioritarios de la AAA. [4]   Además, el ELA no ha garantizado el reembolso de los Bonos de Gravamen Prioritarios. En consecuencia, las declaraciones de oferta relativas a los Bonos de Gravamen Prioritarios de la AAA indican que "no constituyen deuda del Estado Libre Asociado de Puerto Rico ni de ninguno de sus municipios u otras subdivisiones políticas, con la excepción de [la AAA], por lo que ni el Estado Libre Asociado de Puerto Rico ni ningunos de dichos municipios u otras subdivisiones políticas, con la excepción de [la AAA], será responsable por el pago del principal o de los intereses sobre los referidos Bonos". [5]

27.     El 20 de julio de 2021, la Junta de Supervisión aprobó una transacción de reembolso propuesta conforme a la cual la AAA emitiría unos Bonos de Gravamen Prioritarios, de series 2121ABC y 2022A, para refinanciar unos Bonos Prioritarios 2012AB pendientes de pago de la AAA por un monto de $1800 millones (la "Transacción de Refinanciamiento de la AAA"). La fecha de entrada en vigor de la Transacción de Refinanciamiento de la AAA todavía no se ha determinado.

## I.     Procedimientos conforme al Título VI del BGF y modificación calificada

28.     El BGF es una corporación pública y e instrumentalidad gubernamental del ELA, creada por la Asamblea Legislativa en 1948 para ayudar al Gobierno del ELA (el "Gobierno") a llevar a cabo sus tareas fiscales y a desempeñar su responsabilidad con mayor eficacia en relación

---

[4] *Véase, por ejemplo*, https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

[5] *Véase, por ejemplo,* Declaración de Oferta relativa a los Bonos de Renta de la AAA, Serie B (Gravamen Prioritario), 15 de febrero de 2012, disponible en https://emma.msrb.org/ER584465-ER454076-ER856857.pdf.

con el desarrollo de la economía del ELA. El 28 de abril de 2017, la Junta de Supervisión aprobó

por unanimidad el Plan fiscal del BGF de febrero de 2017, que contemplaba una terminación

ordenada de las actividades del BGF sobre la base de la determinación de que el BGF no era viable

a largo plazo dadas sus condiciones financieras vigentes en ese momento.

29.     El 12 de julio de 2017, la Junta de Supervisión dictó una resolución por la que se

autorizaba al BGF, conforme a la sección 601(e) de PROMESA, a ampararse en el Título VI de

PROMESA. El 10 de agosto de 2018, el BGF radicó una solicitud de aprobación de una

modificación calificada, conforme a la sección 601(m)(1)(D) de PROMESA (la "Modificación

Calificada"), ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico.

30.     El 7 de noviembre de 2018, el Tribunal aprobó la Modificación Calificada

conforme a la sección 601(m)(1)(D) de PROMESA. *Véase* ECF núm. 270 en *Banco*

*Gubernamental de Fomento para Puerto Rico*, Caso núm. 18-1561 (D.P.R. 7 de nov. de 2018). La

Modificación Calificada dispone, entre otras cosas, i) la emisión de nuevos bonos por la recién

creada Autoridad de Recuperación de Deuda del BGF (GDB Debt Recovery Authority) a cambio

de la cancelación (entre otras cosas) de determinados bonos de participación y reclamaciones de

bonos garantizados (conjuntamente, los "Bonos del BGF"). ii) la extinción de la garantía del ELA

de los bonos garantizados tras el intercambio y cancelación de los bonos garantizados; y iii) la

liberación de reclamaciones de los tenedores de Bonos del BGF contra el BGF y sus afiliados en

relación con (entre otras cosas) cualquier inversión con el BGF o la compra, venta o transferencia

de cualquier título valor o participación del BGF, y cualquier acción u omisión con respecto a un

endeudamiento o préstamo al BGF (incluidos cualesquiera pagarés emitidos o mantenidos por el

BGF) o del BGF. *Declaración de Solicitud,* en 57-60, ECF núm. 1-15 en *Banco Gubernamental*

*de Fomento para Puerto Rico*, Caso núm. 18-1561 (D.P.R. 10 de ago. de 2018).

31.     El 29 de noviembre de 2018, el BGF anució la consumación de la Modificación Calificada del BGF. Nota de prensa, *el Gobierno de Puerto Rico anuncia la consumación de la Modificación Calificada del BGF*, Gobernador de Puerto Rico (29 de nov. de 2018), *disponible en* http://www.aafaf.pr.gov/assets/gov-pr-announces-consummation-gdb-qualifying-modification.pdf.

**J.     Evidencias de reclamaciones radicadas, procedimientos relativos a objeciones globales y objeciones a reclamaciones**

32.     Hasta la fecha, se han radicado aproximadamente 180,483 evidencias de reclamaciones contra los Deudores, que han sido registradas por Prime Clerk, LLC. Dichas evidencias de reclamaciones ascienden a un total aproximado de $43.6 billones en reclamaciones radicadas contra los Deudores, además de los montos no liquidados reclamados.

33.     De las evidencias de reclamaciones radicadas, aproximadamente 117,009 han sido radicadas en relación con el ELA, o reclasificadas como radicadas contra el ELA. Aproximadamente 53,214 evidencias de reclamaciones han sido radicadas en relación con el SRE, o reclasificadas como radicadas contra el SRE. Aproximadamente 3,095 evidencias de reclamaciones han sido radicadas en relación con COFINA, o reclasificadas como radicadas contra COFINA. Aproximadamente 391 evidencias de reclamaciones han sido radicadas en relación con la AEP, o reclasificadas como radicadas contra la AEP. Además, aproximadamente 2,268 evidencias de reclamaciones han sido radicadas en relación con la ACT, o reclasificadas como radicadas contra la ACT. De conformidad con las condiciones de las Órdenes de Fecha Límite, muchas de estas reclamaciones no deberían haber sido radicadas en absoluto o adolecen de otro tipo de vicios; por ejemplo, haber sido enmendadas posteriormente, no alegar una reclamación por la que los Deudores sean responsables, estar duplicadas en relación con otras evidencias de

18

reclamaciones o no aportar información necesaria para que los Deudores determinen si la reclamación es válida.

34.     Para resolver eficazmente el mayor número posible de las evidencias de reclamaciones innecesarias, el 16 de octubre de 2018 los Deudores radicaron ante este Tribunal su *Moción para que se dicte una orden que A) apruebe procedimientos limitados relativos a objeciones globales, B) exima el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) conceda el remedio relacionado* [ECF núm. 4052] (la "Moción de Procedimientos Globales"). El Tribunal concedió el remedio solicitado en la Moción de Procedimientos Globales mediante la orden de fecha 14 de noviembre de 2018. *Véase la Orden que A) aprueba procedimientos limitados relativos a objeciones globales, B) exime el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) concede el remedio relacionado* [ECF núm. 4230]; *Procedimientos relativos a Objeciones Globales* [ECF núm. 4230-1] (conjuntamente, los "Procedimientos Iniciales relativos a Objeciones Globales"). El 29 de noviembre de 2018, el Tribunal aprobó las versiones en inglés y en español de los formularios de notificación relativos a las objeciones globales a efectos de radicarlas de conformidad con los Procedimientos Iniciales relativos a Objeciones Globales. *Véase Orden por la que se aprobaron las versiones en inglés y en español de los formularios de notificación relativos a objeciones globales* [ECF núm. 4381] (la "Orden de Notificación").

35.     En aras del interés constante por resolver eficazmente cualesquiera evidencias de reclamaciones innecesarias, el 23 de mayo de 2019 los Deudores radicaron una moción relativa a procedimientos enmendados en la que solicitaron, entre otras cosas, que se les permitiera radicar objeciones globales sobre unas bases sustantivas, aumentar el número de reclamaciones que pudieran incluirse en una objeción y aprobar formas de notificación adicionales. *Notificación de vista en relación con una Orden que A) apruebe Procedimientos Enmendados relativos a*

19

*Objeciones Globales, B) exima los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) apruebe formas de notificación adicionales y D) conceda el remedio relacionado* [ECF núm. 7091]. El 14 de junio de 2019, el Tribunal concedió el remedio solicitado por medio de la *Orden que A) aprueba Procedimientos Enmendados relativos a Objeciones Globales, B) exime los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) aprueba formas de notificación adicionales y D) concede el remedio relacionado* [ECF núm. 7440] (los "Procedimientos Enmendados relativos a Objeciones Globales").

36.     Conforme a los Procedimientos Iniciales relativos a Objeciones Globales y los Procedimientos Enmendados relativos a Objeciones Globales, el Tribunal ha celebrado hasta la fecha más de 15 vistas y ha dictado órdenes sobre más de 310 objeciones globales radicadas por el ELA, la ACT, el SRE, COFINA y/o la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE"). Sobre la base de las resoluciones y órdenes del Tribunal dictadas hasta la fecha, aproximadamente 100,649 reclamaciones que reivindicaban $43.0 billones en responsabilidad contra el ELA, COFINA, la ACT, la AEE y el SRE fueron rechazadas y retiradas del registro de reclamaciones en el marco de los procedimientos radicados conforme al Título III.

37.     Esta Tricentésima octogésima cuarta objeción global se radica de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales del Tribunal.

## OBJECIONES A EVIDENCIAS DE RECLAMACIONES

38.     Las reclamaciones que sean "inejecutables contra el deudor y los bienes de este, en virtud de cualquier contrato o normativa legal aplicable" deben rechazarse. Título 11 U.S.C., § 502(b)(1). Aunque una evidencia de reclamación debidamente formalizada y radicada constituye una prueba *prima facie* de la validez de la reclamación, *véase* R. del Proc. de Quiebr. 3001(f), aplicable a este caso en virtud de la sección 310 de PROMESA, la parte objetante podrá superar dicha evidencia *prima facie* con pruebas que, de creerse, refutarían al menos una de las alegaciones

20

esenciales para la reclamación. *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.), *aff'd*, 242 F.3d

367 (2d Cir. 2000); *véase también Factors Funding Co. c. Fili (In re Fili)*, 257 B.R. 370, 372 (1st

Cir. B.A.P. 2001) ("[S]e presume que una reclamación es válida hasta que una parte objetante haya

introducido evidencias suficientes para refutar el caso *prima facie* del reclamante". (se omite cita)).

39.     Los Procedimientos Enmendados relativos a Objeciones Globales permiten a los

Deudores radicar una objeción global a varias evidencias de reclamaciones sobre cualquiera de las

bases recogidas en las reglas 3007(d)(1) a (7) de las Reglas Federales del Procedimiento de

Quiebra (*Federal Rule of Bankruptcy Procedure*), así como sobre otras bases sustantivas

establecidas en los Procedimientos Enmendados relativos a Objeciones Globales.

40.     La Tricentésima octogésima cuarta objeción global pretende que se rechacen en su

totalidad, conforme a los Procedimientos Enmendados relativos a Objeciones Globales, las

evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento (conjuntamente,

las "Reclamaciones que han de ser rechazadas"), cada una de las cueles se basa, en parte, *a*) en

reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de

reclamaciones principales radicadas contra los Deudores en nombre de determinados bonistas, *b*)

en una participación patrimonial en bonos emitidos por el BGF, *c*) en reclamaciones por bonos

que alegan responsabilidades vinculadas con unos bonos asegurados en el mercado secundario que

constituyen duplicados con respecto de las evidencias de reclamaciones radicadas contra los

Deudores en nombre de determinados bonistas, *d*) en una o más inversiones en fondos mutuos que

a su vez pudieron haber invertido en bonos emitidos por los Deudores, *e*) en bonos emitidos por

COFINA y/o *f*) en una participación patrimonial en bonos emitidos por la AAA y/o pagarés

emitidos por la CFP, que no son Deudores de Título III, por montos por los que los Deudores no

han garantizado el reembolso. Además, las partes restantes de algunas de las evidencias de

reclamaciones que aparecen en el **Anexo A** del presente documento son deficientes porque 1) no

brindan información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones y/o 2) alegan responsabilidades que surgen de unos bonos emitidos por los Deudores que el/los reclamante(s) poseían en algún momento, pero que ya han vendido o liquidado. El **Anexo A** especifica además por qué cada una de las Reclamaciones que han de ser rechazadas debe ser rechazada en su totalidad.

## A. Ausencia de responsabilidad por reclamaciones de los bonistas del BGF

41.    Conforme a lo identificado en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar reclamaciones basadas, total o parcialmente, en una supuesta participación patrimonial en bonos emitidos por el BGF (conjuntamente, las "Reclamaciones de los Bonistas del BGF").

42.    Cada una de las Reclamaciones de los Bonistas del BGF pretende basarse, total o parcialmente, en la propiedad de los Bonos del BGF objeto de la Modificación Calificada, que dispuso la emisión de nuevos títulos valores a cambio de la cancelación de los Bonos del BGF y la extinción de la garantía del ELA relativa a determinados Bonos del BGF, por lo que el ELA ya no tiene responsabilidad con respecto a dichas reclamaciones. En consecuencia, cada una de las Reclamaciones Parciales de los Bonistas del BGF ha sido liberada conforme a la aprobación y la consumación de la Modificación Calificada. Como se señaló anteriormente, la Modificación Calificada dispone, entre otras cosas, que los tenedores de los Bonos del BGF liberarán al BGF y sus afiliados de las reclamaciones relacionadas con los Bonos del BGF, y de cualquier acción u omisión del BGF y sus afiliados con respecto a todo endeudamiento del BGF o préstamo al BGF. El BGF es una corporación e instrumentalidad pública del ELA. En consecuencia, el ELA es un afiliado del BGF dentro del ámbito de la liberación conforme a la Modificación Calificada. Por lo tanto, las Reclamaciones de los Bonistas del BGF fueron liberadas tras la consumación de la Modificación Calificada el 29 de noviembre de 2018.

43. Puesto que las Reclamaciones de los Bonistas del BGF son inejecutables contra el ELA y sus bienes conforme al § 502(b)(1) del Código de Quiebras, dichas reclamaciones deben rechazarse puesto que solicitan la recuperación de montos por los que el ELA no tiene responsabilidad.

**B. Ausencia de responsabilidad por reclamaciones duplicadas por bonos**

44. Según se expone en el **<u>Anexo A</u>** del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar responsabilidad, en parte, sobre la base de bonos emitidos por la AFI (conjuntamente, las "<u>Reclamaciones Parcialmente Duplicadas por Bonos</u>").

45. Cada una de las Reclamaciones Parcialmente Duplicadas por Bonos pretende alegar, total o parcialmente, responsabilidad contra los Deudores vinculada con uno o más bonos que están duplicados en relación con una o más Reclamaciones Principales que, según se explicó anteriormente, fueron radicadas en el marco de los Casos de Título III en nombre de los tenedores de determinados bonos emitidos por la AFI. Si las Reclamaciones Parcialmente Duplicadas por Bonos no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores en detrimento de otras partes interesadas en los Casos de Título III de los Deudores. Los titulares de las Reclamaciones Parcialmente Duplicadas por Bonos no se verán perjudicados por el hecho de que se rechacen sus reclamaciones, puesto que las responsabilidades relacionadas con las Reclamaciones Parcialmente Duplicadas por Bonos figuran en una o más Reclamaciones Principales.

### C. Ausencia de responsabilidad por las Reclamaciones por Bonos asegurados en el mercado secundario que constituyen duplicados con respecto a las Reclamaciones Principales

46.     Según se establece en el Anexo A del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar responsabilidad, en parte, vinculada con los Bonos asegurados en el mercado secundario, que corresponden a los Bonos de la AEP que están duplicados en relación con las responsabilidades alegadas en una o más Reclamaciones Principales (conjuntamente, las "Reclamaciones parciales por bonos asegurados en el mercado secundario").

47.     Cada una de las Reclamaciones parciales por bonos asegurados en el mercado secundario alega responsabilidades vinculadas con los Bonos asegurados en el mercado secundario. Los números CUSIP vinculados con dichos Bonos asegurados en el mercado secundario corresponden a bonos emitidos por la AEP y/o que llevan los números CUSIP originales. Dichos números CUSIP originales, que reflejan las emisiones de los bonos en los que los reclamantes tienen participación patrimonial, se mencionan en una o más Reclamaciones Principales. En consecuencia, en las Reclamaciones parciales por bonos asegurados en el mercado secundario se alegan responsabilidades vinculadas con bonos emitidos por la AEP que constituyen duplicados en relación las responsabilidades alegadas en una o más Reclamaciones Principales.

48.     Si las Reclamaciones parciales por bonos asegurados en el mercado secundario no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores, en detrimento de otras partes interesadas en los Casos de Título III. Los tenedores de las Reclamaciones parciales por bonos asegurados en el mercado secundario no se verán perjudicados por el hecho de que se rechacen sus reclamaciones, puesto que las responsabilidades relacionadas figuran en una o más Reclamaciones Principales. Esta Tricentésima octogésima cuarta objeción global no constituye en

24

ningún caso una objeción a las reclamaciones mantenidas por la aseguradora de los Bonos

asegurados en el mercado secundario, sino que constituye una objeción al titular de los Bonos

asegurados en el mercado secundario, que quedan sujetos a las Reclamaciones Principales.

**D. Ausencia de responsabilidad relativa a reclamaciones basadas en inversiones en fondos mutuos**

49.     Conforme a lo expuesto en el Anexo A del presente documento, determinadas

Reclamaciones que han de ser rechazadas pretenden alegar, en parte, responsabilidad sobre

inversión(es) en uno o más fondos mutuos que, a su vez, pudieron haber invertido en los bonos

emitidos por los Deudores (conjuntamente, "Reclamaciones Parciales de Fondos Mutuos").

50.     Los reclamantes tienen la carga de la prueba para demostrar legitimación a efectos

de radicar una evidencia de reclamación. *In re Minbatiwalla*, 424 B.R. 104, 111 (Bankr. S.D.N.Y.

2010). Es ampliamente aceptado que solo los acreedores o sus representantes autorizados están

legitimados para radicar reclamaciones. Reg. Fed. del Proc. de Quiebr. 3001(b); Título 11 U.S.C.,

§§ 501(a) ("Los acreedores o fiduciarios autorizados podrán radicar evidencias de

reclamaciones"); *In re Melillo*, 392 B.R. 1, 5 (B.A.P. 1st Cir. 2008) ("Solo los acreedores o

fiduciarios autorizados podrán radicar evidencias de reclamaciones".). Las partes que solo tengan

intereses derivados carecen de legitimación para radicar reclamaciones contra los bienes de un

deudor. *Caso Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988) (donde se concluyó que una

parte con "una relación con el Deudor [que] no es directa, sino más bien derivada "era" persona

ajena en relación con el procedimiento de quiebra del Deudor", sin "ninguna posibilidad de

reclamar contra los activos" y "como regla general, no tiene legitimación en relación con el

procedimiento de quiebra del Deudor".); *véase también In re Tower Park Properties, LLC*, 803

F.3d 450, 462-63 (9th Cir. 2015) (donde se concluyó que un beneficiario de un fideicomiso no era

parte interesada); *In re Refco Inc.*, 505 F.3d 109, 117 (2d Cir. 2007) ("En la medida en que se

hagan valer los derechos de una parte interesada, esos derechos han de hacerse valer por dicha

parte interesada, no por un tercero".); *In re López*, 446 B.R. 12, 17 (Bankr. D. Mass. 2011) (para constituirse como parte interesada "la parte solicitante deberá hacer valer sus propios derechos y no aquellos que asistan a un tercero o que se deriven en relación con tal tercero".); *In re Hayes*, 393 B.R. 259, 267 (Bankr. D. Mass. 2008) (donde se reconoce el "principio general de que 'no se da legitimación de una parte interesada si la parte pretende hacer valer un derecho que es puramente derivado de los derechos de otra parte en el procedimiento de quiebras'" (que cita *In re Refco*, 505 F.3d en 115 n. 10)).

51.     "Un acreedor, conforme al Código [de Quiebras], es el que tiene reclamación contra el deudor o los bienes", en lugar de "un acreedor de uno de los acreedores del deudor". *S. Blvd., Inc. c. Martin Paint Stores*, 207 B.R. 57, 61 (S.D.N.Y. 1997). Puesto que, a lo sumo, las Reclamaciones Parciales de Fondos Mutuos fueron radicados en virtud de la condición del reclamante como presunto acreedor de un presunto acreedor del ELA, las Reclamaciones Parciales de Fondos Mutuos no fueron radicadas por un acreedor real del ELA. *Véase In re Thalmann*, 469 B.R. 677, 683 (Bankr. S.D. Tex. 2012) (donde se concluye que el destinatario carecía de legitimación para radicar evidencias de reclamaciones porque no era acreedor ni agente autorizado de un acreedor). En cambio, las Reclamaciones Parciales de Fondos Mutuos se derivan de las reclamaciones que deben hacerse valer por los fondos mutuos directamente para que el Tribunal examine cualquier recuperación alegada. *Véase el caso Goldman*, 82 B.R. en 896 (donde se concluye que una parte con una relación "derivada" no puede "reclamar los activos" y "como regla general, carece de legitimación en el procedimiento de quiebras del Deudor"). Es más, no se sabe si el fondo mutuo sigue reteniendo la propiedad de los bonos controvertidos.

52.     En efecto, en unas circunstancias casi idénticas, el Tribunal ya rechazó reclamaciones radicadas contra COFINA por unos inversores en los fondos mutuos que, a su vez, invirtieron presuntamente en los bonos de COFINA, por "carecer de interés individual en los títulos

de valores de COFINA". *Tr. del 13 de marzo de 2019 de la aud. ante su señoría, Laura Taylor Swain* [ECF núm. 5969], en 64:01-10 ("EL TRIBUNAL: De modo que, para que lo entienda, su documentación muestra que es inversor en un fondo mutuo. En la medida en que cualquiera de esos fondos mutuos posea realmente los bonos de COFINA, el fondo mutuo sería el reclamante pertinente, ¿así que no proporcionó ninguna evidencia de una reclamación directa válida contra COFINA? SRA. STAFFORD: Así es, señoría. EL TRIBUNAL: Se concede la objeción a la reclamación, y se rechaza la reclamación por falta de interés individual en títulos valores de COFINA."); *véase también la Orden por la que se concede la Sexagésima cuarta objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico a Reclamaciones basadas en las inversiones en fondos mutuos* [ECF núm. 9099]; *Orden de memorando por la que se rechaza la moción para alterar o enmendar la orden que concede la objeción (extr. 8297) a las Reclamaciones núms. 152470 y 152283*, ECF núm. 9121]. El Tribunal del Primer Circuito confirmó dicha determinación. *Véase* Caso núm. 19-2231, Doc. Núm. 00117746322, de fecha 27 de mayo de 2021. En consecuencia, los reclamantes no son acreedores del ELA y carecen de legitimación para hacer valer reclamaciones derivadas. Puesto que al ELA no se le puede atribuir la responsabilidad por las Reclamaciones Parciales de Fondos Mutuos, dichas partes de las Reclamaciones que han de ser rechazadas deben rechazarse en su totalidad.

**E.  Ausencia de responsabilidad relativa a reclamaciones basadas en los Bonos dela CFP**

53.     Conforme a lo identificado en el Anexo A del presente documento, determinadas partes de las Reclamaciones que han de ser rechazadas pretenden alegar reclamaciones basadas en una presunta participación patrimonial en Bonos de la CFP emitidos por la CFP, que no es deudor de Título III y cuyas responsabilidades no están garantizadas por el ELA  ni por ningún otro Deudor (conjuntamente, las "Reclamaciones Parciales de los Bonistas de la CFP").

54.     Cada una de las Reclamaciones Parciales de los Bonistas de la CFP pretende alegar, en parte, responsabilidades contra los Deudores vinculadas con los Bonos de la CFP que no están garantizados por ninguno de los Deudores. La CFP no es deudor de Título III y es una entidad aparte y jurídicamente independiente de los Deudores. *Véase, por ejemplo*, 3 L.P.R.A. § 9081(c) (que se refiere a la CFP como una "entidad jurídica independiente" y aparte del ELA). Es más, cada una de las Declaraciones Oficiales de la CFP emitidas en relación con los Bonos de la CFP dispone que 1) los Bonos de la CFP no constituyen una deuda del ELA ni de ninguna de sus subdivisiones políticas, salvo la CFP, y que el ELA no garantiza las deudas de la CFP, *véase, por ejemplo*, la Declaración Oficial de la CFP de 2012 en 1, y 2) la "Asamblea Legislativa de Puerto Rico no tiene obligación jurídica de asignar montos suficientes para pagar en los plazos establecidos el principal, la prima de reembolso (si la hubiere) y los intereses vencidos sobre los Bonos. No hay garantía de que la Asamblea Legislativa de Puerto Rico asigne, o ponga a disposición de otro modo, fondos suficientes para realizar dichos pagos sobre los Bonos." *id*. en 18.

55.     Además, aunque los Bonos de la CFP fueran pagaderos, en parte, desde asignaciones legislativas, no crean ninguna responsabilidad vinculante contra el ELA porque, como se expone en las Declaraciones Oficiales de la CFP, la Asamblea Legislativa no tenía la obligación ni garantizaba que se realizaran asignaciones suficientes para pagar el principal y los intereses sobre los bonos. La jurisprudencia deja claro que cuando la Asamblea Legislativa tiene la libertad de decidir si realizar o no asignaciones para pagar un bono, no existe ninguna "deuda constitucionalmente reconocida *porque [los bonos] no le imponen ningún deber ni responsabilidad exigibles al Gobierno*" de realizar tales asignaciones. *Véase ACA Financial Guaranty Corporation c. la ciudad de Buena Vista, Virginia,* 298 F. Supp.3d 834, 848 (W.D. Va. 2018) (que cita *Dykes c. N. Virginia Transp. Dist. Comm'n*, 242 Va. 357, 375, 411 S.E.2d 1 (Va.

1991)); *véase también, Solicitud de Oklahoma Capitol Imp. Authority, 958 P.2d 759, 768 (Okla. 1998) (los bonos que solo eran pagaderos en la medida en que la Asamblea Legislativa optase por realizar asignaciones para pagarlos no constituían deuda del estado); In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S-1005, 814 P.2d 875, 889 (Colo. 1991) (el mismo)*. En la medida en que la Asamblea Legislativa decida no asignar fondos para los pagos relativos a los bonos, los bonistas no pueden radicar una reclamación contra los Deudores. *Véase ACA Financial Guaranty Corp. c. la ciudad de Buena Vista, Virginia,* núm. 18-1268, 2019 WL 758292, en *2 (4th Cir. 21 de febrero de 2019) (que concluye que la ciudad de Buena Vista, VA, no tenía la obligación jurídica de efectuar los pagos de la renta "cuando la obligación queda sujeta expresamente a la decisión anual de la ciudad de asignar fondos".). En consecuencia, tales obligaciones no son jurídicamente exigibles. *Véase ACA Financial Guaranty Corporation c. la ciudad de Buena Vista, Virginia,* 298 F. Supp. 3d en 839, 848 ("cuando una localidad promete pagar con sujeción a su futura decisión de asignar dichos pagos, no realiza una promesa jurídicamente exigible de pagar".); *Véase también Lonegan c.* el Estado, 174 N.J. 435, 451, 453-54 (2002) ("una asignación legislativa futura proyectada o anticipada no constituye una deuda o responsabilidad actual . . . [porque] la Asamblea Legislativa futura no tiene la obligación de realizar la asignación"). Este es exactamente el caso que nos ocupa: el ELA no tiene ninguna obligación de asignar montos para pagar los bonos y, efectivamente, las propias declaraciones oficiales disponen que el ELA no es responsable en relación con los bonos. En consecuencia, las reclamaciones que alegan responsabilidad contra el ELA con respecto a los Bonos de la CFP deben rechazarse, ya que el ELA no es responsable en este sentido.

56.     En consecuencia, los Deudores no son responsables por ninguna de las Reclamaciones Parciales de los Bonistas de la CFP.

**F. Ausencia de responsabilidad por reclamaciones de los Bonistas de COFINA**

57.     Conforme a lo expuesto en el Anexo A del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar, en parte, responsabilidad basada en supuesta participación patrimonial en los bonos emitidos por COFINA (conjuntamente, las "Reclamaciones Parciales de los Bonistas de COFINA").

58.     Como se explicó anteriormente, la Orden de Conciliación resolvió la Controversia entre el ELA y COFINA y, conforme al párrafo 55 de la Orden de Conciliación, la totalidad de las reclamaciones contra el ELA, surgidas o vinculadas con la relación del ELA y COFINA, han sido liberadas. Además, conforme al párrafo 3(c) del *Acuerdo de Conciliación* [ECF núm. 5045-1], de fecha 19 de octubre de 2018, que se adjunta a la Orden de Conciliación (el "Acuerdo de Conciliación"), y el párrafo 7 de la Orden de Confirmación Enmendada, el procedimiento contencioso entre el ELA y COFINA sobre la Controversia entre el ELA y COFINA ha sido rechazado de forma definitiva luego de la aprobación del pacto y la conciliación de la Controversia entre el ELA y COFINA. Además, conforme al párrafo 29(f) de la Orden de Confirmación Enmendada, reclamaciones (tales como las Reclamaciones Parciales de los Bonistas de COFINA) que surgieron de o están vinculadas con la relación entre el ELA y COFINA, fueron liberadas. Orden de Confirmación Enmendada, ¶ 29(f). [6] Por todos esos motivos, las Reclamaciones Parciales de los Bonistas de COFINA deben rechazarse porque dichas reclamaciones basadas en una supuesta y aparente participación patrimonial en los Bonos de COFINA han sido satisfechas,

---

[6] Conforme al Plan, una "Reclamación" se define como "[c]ualquier derecho a un pago o cumplimiento, independientemente de si tal derecho consta en una sentencia, es liquidado, no liquidado, fijo, accidental, vencido, no vencido, controvertido, no controvertido, legal, en equidad, garantizado o no garantizado, conocido o desconocido, reclamado o no reclamado; o cualquier derecho a un remedio en equidad por incumplimiento o ejecución de un cumplimiento, independientemente de si tal derecho a un remedio en equidad consta en una sentencia, es fijo, accidental, vencido, no vencido, controvertido, no controvertido, garantizado o no garantizado, y la totalidad de las deudas, procesos, indemnizaciones por daños y perjuicios, derechos, remedios, pérdidas, responsabilidades, obligaciones, sentencias, acciones, causas de acción, procedimientos o reclamaciones de cualquier tipo o naturaleza, en derecho, equidad o de cualquier otra forma". Plan § 1.53.

liberadas y/o liquidadas conforme a la Orden de Conciliación, el Acuerdo de Conciliación, la Orden de Confirmación Enmendada y el Plan.

### G. Ausencia de responsabilidad por los Bonos de Gravamen Prioritarios de la AAA

59.     Conforme a lo expuesto en el Anexo A del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar, en parte, responsabilidad basada en supuesta participación patrimonial en los bonos emitidos por la AAA (las "Reclamaciones Parciales de Gravamen Prioritario de los Bonistas de la AAA").

60.     Las Reclamaciones Parciales de Gravamen Prioritario de los Bonistas de la AAA alegan responsabilidades vinculadas con los Bonos de Gravamen Prioritarios de la AAA emitidos por la AAA que no es Deudor de Título III, y es una entidad aparte y jurídicamente independiente de los Deudores. Además, los Deudores no han garantizado el reembolso de los Bonos de Gravamen Prioritarios. Las Reclamaciones Parciales de Gravamen Prioritario de los Bonistas de la AAA no proporcionan fundamento alguno para alegar una reclamación contra los Deudores por los bonos emitidos por la AAA que no están garantizados por los Deudores. Como consecuencia de dicho incumplimiento de la normativa aplicable, ni los Deudores ni el Tribunal pueden determinar la validez de las Reclamaciones Parciales de Gravamen Prioritario de los Bonistas de la AAA.

### H. Reclamaciones que alegan pérdidas por inversiones y efectivo

61.     Conforme a lo expuesto en el Anexo A del presente documento, determinadas Reclamaciones que han de ser rechazadas pretenden alegar, en parte, responsabilidades que surgen de supuestas pérdidas por inversiones y/o reclamaciones por determinadas posiciones de "efectivo" mantenidas en la cuenta de corretaje de los reclamantes (conjuntamente, las "Reclamaciones Parcialmente Deficientes").

31

62.     Sin embargo, ninguna de las Reclamaciones Parcialmente Deficientes alega posible causa de acción alguna contra los Deudores que pueda generar responsabilidad de los Deudores por los supuestos daños y perjuicios sufridos como consecuencia de la decisión de los reclamantes de vender sus bonos con pérdidas. En consecuencia, los Deudores no tienen responsabilidad por las pérdidas alegadas en las Reclamaciones Parcialmente Deficientes. *Véase English c. Energy Future Holdings (In re Energy Future Holdings)*, 2018 U.S. Dist. LEXIS 49952, en *7 (D. Del., 27 de marzo de 2018) (que dispone que la orden del tribunal de quiebras por la que se rechaza la evidencia de reclamación era la adecuada, cuando el reclamante había vendido los bonos emitidos por el deudor y, por lo tanto, no tenía ningún derecho a un pago en relación con los bonos ni ha demostrado el reclamante que tuviera posible causa de acción contra el deudor por los supuestos daños y perjuicios sufridos por el reclamante al vender con pérdidas los bonos del deudor); *In re Allegheny Int'l, Inc*., 954 F.2d 167, 173 (3d Cir. 1992) (que cita *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991) (que cita 3 L. King, *Collier on Bankruptcy* § 502.02, en 502-22 (15th ed. 1991)) ("Al principio, el reclamante debe alegar hechos que sean suficientes para sostener la reclamación").

63.     Además, determinadas Reclamaciones Parcialmente Deficientes alegan una reclamación por unas posiciones de "efectivo" mantenidas en la cuenta de corretaje de los reclamantes. Sin embargo, los reclamantes no proporcionaron ninguna evidencia que demuestre una pérdida que afectase a dichas posiciones de efectivo. Los reclamantes tampoco proporcionaron ningún fundamento para alegar una reclamación contra los Deudores por dichas posiciones de efectivo supuestamente mantenidas por el reclamante. Como consecuencia de dicho incumplimiento de la normativa aplicable, ni los Deudores ni el Tribunal pueden determinar la validez de las Reclamaciones Parcialmente Deficientes.

## I.  Reclamaciones Deficientes por Bonos

64.    Por último, determinadas Reclamaciones que han de ser rechazadas pretenden alegar, en parte, responsabilidad basada en "un Bono de la Autoridad de Edificios Públicos de P.R", una "inversión", "quiero mi dinero" u otros términos similares que alegan responsabilidades vinculadas con las inversiones en bonos emitidos por el Gobierno (las "Reclamaciones Deficientes por Bonos").

65.    En algunos casos, las Reclamaciones Deficientes por Bonos no contenían ninguna documentación justificativa que indicase cuáles eran los bonos que los reclamantes alegaban que generaban responsabilidades de los Deudores. En otros casos, las Reclamaciones Deficientes por Bonos proporcionaban como documentación justificativa una copia de un extracto de corretaje u otra documentación justificativa que contenía información sobre bonos supuestamente en posesión del reclamante, pero los montos de los bonos incluidos en dicha documentación justificativa no correspondían con el monto que figuraba en la evidencia de reclamación del reclamante.

66.    El 13 de agosto de 2019, el Tribunal dictó la *Orden que concedió parcialmente y levantó parcialmente la Moción de los Deudores para dictar una orden que A) autorice procedimientos alternativos de resolución de controversias, B) apruebe formas de notificación adicionales, C) apruebe envíos propuestos y D) conceda el remedio relacionado* [núm. ECF 8453] (la "Orden de Envío Autorizado") que autorizó que los Deudores realizaran envíos "a cualquier reclamante que no haya proporcionado suficiente información que permitiera a los Deudores enjuiciar sus reclamaciones". Orden de Envío Autorizado, ¶ 3.

67.    Conforme a la Orden de Envío Autorizado, "[s]i los Deudores realizan el Envío Propuesto al reclamante, y este último no responde o responde pero no aporta suficiente información que permita a los Deudores reconciliar su reclamación, los Deudores tendrán derecho a oponerse a la reclamación como deficiente". *Id.*

68.     De conformidad con la Orden de Envío Autorizado, los Deudores han enviado al
menos una carta a cada reclamante vinculado con las Reclamaciones Deficientes por Bonos,
esencialmente en la forma del Anexo 1 de la Orden de Envío Autorizado. Cada Envío, en la parte
pertinente, rezaba lo siguiente:

> Se requiere información adicional para que los Deudores sigan
> examinando su reclamación. Los Deudores no pueden determinar a
> partir de la información que usted proporcionó cuál es la base de la
> reclamación que trata de alegar contra uno o más Deudores. Al
> responder a esta carta, rogamos se asegure de proporcionar toda la
> información solicitada, así como tantos detalles como sea posible
> aportar sobre su reclamación. Las descripciones que incorporó en su
> evidencia de reclamación eran demasiado vagas para que los
> Deudores comprendieran la reclamación que usted trata de alegar,
> de manera que rogamos proporcione más detalles y no se limite
> simplemente a copiar la misma información.
> *Véase* ECF núm. 8453-1 en 2, 7.

Los Envíos recibidos por los reclamantes vinculados con las Reclamaciones Deficientes por Bonos
exigían a los reclamantes responder en un plazo de 30 días desde la fecha de la carta. *Véase id.*
Además, en los Envíos se advertía a los reclamantes de que "[s]i no responde a esta solicitud y no
proporciona la información y la documentación requeridas para justificar su reclamación, es
posible que los Deudores se vean en la obligación de oponerse a su reclamación." *Id.*

69.     Cada una de las Reclamaciones Deficientes por Bonos o bien no respondió a los
Envíos, o bien envió una respuesta que tampoco contenía información necesaria que permita a los
Deudores reconciliar la reclamación. En consecuencia, los Deudores analizaron la documentación
sometida con la evidencia de reclamación o con los Envíos en relación con la alegación de
inversiones relacionadas con bonos emitidos por el Gobierno, emitidos por el ELA o sus agencias
e instrumentalidades. En la medida en que cada una de las Reclamaciones Deficientes por Bonos
pretenda alegar responsabilidades adicionales no vinculadas con bonos emitidos por el Gobierno
identificados en la evidencia de reclamación, en la documentación justificativa o en el Envío de
réplica, dichas partes de cada una de las evidencias de reclamaciones que aparecen en el Anexo A

del presente documento son deficientes porque no proporcionan información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones.

70.    En apoyo de lo anterior, los Deudores invocan la *Declaración de Jay Herriman en apoyo de la Tricentésima octogésima cuarta objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico, de la Autoridad de Carreteras y Transportación de Puerto Rico, del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, de la Corporación del Fondo de Interés Apremiante de Puerto Rico y de la Autoridad de Edificios Públicos de Puerto Rico a Reclamaciones por bonos deficientes, duplicadas y en las que no existe responsabilidad*, de fecha 20 de agosto de 2021, adjunta al presente como **Anexo B**.

## NOTIFICACIÓN

71.    De conformidad con los Procedimientos Enmendados relativos a Objeciones Globales y la Orden de Notificación del Tribunal, los Deudores notifican la presente Tricentésima octogésima cuarta objeción global a) a los acreedores individuales objeto de esta Tricentésima octogésima cuarta objeción global, b) al Síndico U.S. Trustee, y c) a la Lista maestra de notificaciones (según se define en los *Procedimientos de administración de casos enmendados núm. 15* [ECF núm. 17127-1]), disponibles en el sitio web de casos de los Deudores, en https://cases.primeclerk.com/puertorico.  La notificación de esta Tricentésima octogésima cuarta objeción global se adjunta al presente como **Anexo C**. Las traducciones al español de la Tricentésima octogésima cuarta objeción global y de la totalidad de los anexos adjuntos al presente se están radicando con esta objeción y se trasladarán a las partes. Los Deudores sostienen que, dada la naturaleza del remedio solicitado, no es necesario enviar ninguna otra notificación.

## RESERVA DE DERECHOS

72.    Esta Tricentésima octogésima cuarta objeción global se limita a los motivos expuestos en este documento. En consecuencia, esta se radica sin perjuicio de los derechos de los

Deudores, o de los derechos de cualesquiera otras partes interesadas en dichos Casos de Título III,

a objetar a las Reclamaciones que han de ser rechazadas o a cualesquiera otras reclamaciones sobre

la base de los motivos que fueren. Los Deudores se reservan expresamente el derecho a radicar

toda otra objeción sustantiva o procesal. Ninguna disposición contenida en el presente documento,

ni ninguna acción adoptada conforme a tal remedio, tienen por objetivo, ni se interpretarán en el

sentido de que: a) constituyan una admisión en cuanto a la validez de cualesquiera reclamaciones

contra los Deudores; b) constituyan una renuncia a los derechos de los Deudores, o de cualesquiera

otras partes interesadas en los Casos de Título III, a impugnar cualquier reclamación sobre la base

de los motivos que fueren; c) constituyan una promesa o requisito para pagar cualquier

reclamación; d) constituyan una solicitud o autorización a asumir cualquier acuerdo, contrato o

arrendamiento anteriores a la petición conforme al artículo 365 del Código de Quiebras; o e)

constituyan una renuncia a los derechos de los Deudores, o de cualesquiera otras partes interesadas

en los Casos de Título III, conforme a PROMESA, el Código de Quiebras o cualquier otra

normativa legal aplicable.

### **AUSENCIA DE SOLICITUDES PREVIAS**

73.      No se ha radicado ninguna solicitud de remedio previa a la presente Tricentésima

octogésima cuarta objeción global ni ante este Tribunal ni ante ningún otro órgano judicial.


*[El resto de la página se deja en blanco intencionadamente]*

POR LO QUE los Deudores solicitan respetuosamente que se dicte una orden, esencialmente en la forma de la orden propuesta que se adjunta al presente como **Anexo D**, 1) que conceda el remedio solicitado en el presente documento, y 2) que conceda a los Deudores cualesquiera otros remedios que se consideren justos.

Fecha: 20 de agosto de 2021
          San Juan (Puerto Rico)

Respetuosamente sometida,

[*Firma en la versión en inglés*]
Hermann D. Bauer
USDC núm. 215205
Carla García-Benítez
USDC núm. 203708
Gabriel A. Miranda
USDC núm. 306704
**O'NEILL & BORGES LLC**
250 Avenida Muñoz Rivera, local 800
San Juan, PR 00918-1813
Tel.: (787) 764-8181
Fax: (787) 753-8944

[*Firma en la versión en inglés*]
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel.: (212) 969-3000
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión y Administración Financiera para Puerto Rico, como representante del Estado Libre Asociado de Puerto Rico, de la Autoridad de Carreteras y Transportación de Puerto Rico, del Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, de la Corporación del Fondo de Interés Apremiante de Puerto Rico y de la Autoridad de Edificios Públicos de Puerto Rico.*