Response Deadline: September 20, 2021, at 4:00PM (Atlantic Standard Time)
Hearing Date:  October 6, 2021, at 9:30AM (Atlantic Standard Time)

---

**PLEASE CAREFULLY REVIEW THIS OBJECTION AND THE ATTACHMENTS HERETO
TO DETERMINE WHETHER THE OBJECTION AFFECTS YOUR CLAIM(S).**

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered)<br><br>**This filing relates to the<br>Commonwealth and HTA.** |

---

### THREE HUNDRED EIGHTY-FIFTH OMNIBUS OBJECTION (SUBSTANTIVE) OF
### THE COMMONWEALTH OF PUERTO RICO AND THE PUERTO RICO HIGHWAYS
### AND TRANSPORTATION AUTHORITY TO PARTIAL DUPLICATE, DEFICIENT, NO
### LIABILITY, AND INCORRECT DEBTOR BOND CLAIMS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, COFINA, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Highways and Transportation Authority ("HTA," and together with the Commonwealth and HTA, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Commonwealth pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] file this three hundred eighty-fifth omnibus objection (the "Three Hundred Eighty-Fifth Omnibus Objection") to the proofs of claim listed on **Exhibit A** hereto, each of which purports to be based, in part, on (*a*) bond claims that are duplicative of one or more master proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*b*) bond claims that assert liabilities associated with secondarily insured bonds that are duplicative of proofs of claim filed against the Debtors on behalf of the holders of certain bonds, and/or (*c*) an ownership interest in bonds issued by the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), the Puerto Rico Public Finance Corporation ("PRPFC") and/or the Puerto Rico Municipal Finance Agency ("PRMFA"), which are not Title III Debtors, for amounts for which the Debtors have not guaranteed repayment.  In addition, certain of the proofs of claim listed on **Exhibit A** hereto are deficient because they (*i*) fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim and/or (*ii*) assert liabilities for purported investment losses, but fail to state a claim on which the Debtors can be held liable for their purported investment losses.  Additionally, certain of the claims listed on **Exhibit A** hereto should be partially reclassified because a portion of the claim identifies either the Commonwealth or HTA as obligor, when that portion of the claim is properly asserted, if at all, against another Title III Debtor.  A portion of each claim will remain asserted against the

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101-2241.

Commonwealth and/or the Puerto Rico Electric Power Authority ("PREPA").  The Debtors reserve the right to object to any of the remaining amounts asserted in the claims, as identified in the column titled "Corrected" in **Exhibit A** hereto, on any basis whatsoever.  In support of the Three Hundred Eighty-Fifth Omnibus Objection, the Debtors respectfully represent as follows:

## JURISDICTION

1.     The United States District Court for the District of Puerto Rico has subject matter jurisdiction to consider this matter and the relief requested herein pursuant to PROMESA section 306(a).

2.     Venue is proper in this district pursuant to PROMESA section 307(a).

## BACKGROUND

A.     **The Bar Date Orders**

3.     On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "Commonwealth Title III Case").  On May 21, 2017 (the "Petition Date"), the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for HTA, pursuant to PROMESA section 304(a), commencing a case under Title III thereof (the "HTA Title III Case," and together with the Commonwealth Title III Case, the "Title III Cases").  On June 29, 2017, the Court entered an order granting the joint administration of the Title III Cases for procedural purposes only.  ECF No. 537.[3]

---

[3] Unless otherwise stated herein, ECF citations refer to documents filed in Bankruptcy Case No. 17 BK 3283-LTS.

4.       On January 16, 2018, the Debtors filed their *Motion for Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2255] (the "Bar Date Motion").  Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [ECF No. 2521] (the "Initial Bar Date Order"), the Court granted the relief requested in the Bar Date Motion and established deadlines and procedures for filing proofs of claim in the Title III Cases.  Upon the informative motion of certain creditors, and the support of the Debtors, the Court subsequently entered the *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [ECF No. 3160] (together with the Initial Bar Date Order, the "Bar Date Orders"), extending these deadlines to June 29, 2018 at 4:00 p.m. (Atlantic Time).

**B.       Bond Debt Master Proofs of Claim – Commonwealth Title III Case**

5.       Pursuant to the Initial Bar Date Order, indenture trustees, fiscal agents, or any similar agent or nominee for each respective series of bonds issued by one of the Debtors or a non-debtor may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond documents.  Initial Bar Date Order, ¶ 5(a). As explained below, master proofs of claim (collectively, the "Master Claims") have been filed in the Commonwealth Title III Case on behalf of the holders of certain bonds or notes issued by HTA, PRIFA, PRMFA, the University of Puerto Rico ("UPR"), and the Puerto Rico Public Buildings Authority ("PBA").

6.       ***PRIFA***—PRIFA is an affiliate of the GDB and is a government instrumentality of the Commonwealth.  PRIFA was created in 1988 by Act No. 44-1988 (the "PRIFA Enabling Act").

PRIFA provides financial, administrative and other types of assistance to the Commonwealth, its public corporations and other instrumentalities responsible for developing and operating infrastructure facilities.  On behalf of the holders of various bonds and notes issued by PRIFA (collectively, the "PRIFA Bonds"), master proofs of claim were asserted against the Commonwealth (collectively, the "PRIFA Master Claims") by BNYM, US Bank, and UMB Bank, N.A.  First, BNYM asserted three master proofs of claim: Proof of Claim No. 16759, asserting, on behalf of holders of Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 15 (the "PRIFA Notes"), a "contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Trustee or the Owners may have against the Commonwealth arising at law or in equity based upon or relating to the Trust Agreement, the Noteholder Agreement, the Notes, or the Pledged Revenues . . . "; Proof of Claim No. 19814 asserting, on behalf of holders of PRIFA Notes, claims for principal and unpaid interest, in addition to fees and expenses of the trustee; and Proof of Claim No. 103718, asserting, on behalf of holders of revenue bonds issued by PRIFA, including Revenue Bonds (Port Authority Project), Series 2011A, "a secured, contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Trustee or the holders of the Bonds has or may have against the Commonwealth arising at law or in equity . . . ."

7.      Additionally, US Bank filed a master proof of claim with respect to certain PRIFA Bonds, which was logged by Prime Clerk, LLC, as Proof of Claim No. 13386, on behalf of holders of PRIFA Rum Tax Bonds (Special Tax Revenue Bonds, Series 2005A, 2005B, 2005C, and Series 2006B), asserting "claims for contingent, unliquidated amounts for interest payable in the future, interest accrued and accruing in the future as to past due principal and interest, fees and costs and indemnity claims of the Trustee to be incurred in the future under the Bond Documents, and all

other amounts owed on account of any and all claims the Trustee has or may have relating to the outstanding Bond obligations, amount not less than $249,099,446.17, which course of conduct continues . . . ."  Rider to Proof of Claim No. 13386, ¶ 26.

8.      *UPR*—UPR allegedly is "a public corporation of the Commonwealth constituting an organic system of higher education," pursuant to Act No. 1 of the Legislature of Puerto Rico, approved January 20, 1966 (18 L.P.R.A. §§ 601-614).  Rider to Proof of Claim No. 13382, ¶ 5. US Bank serves as trustee for certain University System Revenue Refunding Bonds Series P and Q issued by UPR, and filed a master proof of claim, logged by Prime Clerk, LLC, as Proof of Claim No. 13382 (the "UPR Master Claim").  The UPR Master Claim asserts "contingent, unliquidated claims against the Commonwealth for all rights and entitlement that U.S. Bank as Trustee has or may have of whatever nature or kind set forth in the Trust Agreement, or pursuant to other applicable documents or law, including for breach of covenants and for the potential diversion of revenues pledged for the payment of the Bonds, whether in the past or in the future." *Id.*, ¶ 12.

9.      *PBA*—PBA purportedly issued Revenue Bonds to finance office buildings and other facilities leased to various departments, public agencies and instrumentalities of the Commonwealth.  US Bank and US Bank Trust serve as fiscal agents for certain revenue bonds issued by PBA, as identified in Footnote 3 of Proof of Claim No. 62833 (the "PBA Bonds"), and on behalf of the holders of the PBA Bonds, filed a master proof of claim in the Commonwealth Title III Case for all outstanding amounts owed (the "PBA Master Claim"), which was logged by Prime Clerk, LLC, as Proof of Claim No. 62833.[4]  The PBA Master Claim asserts liquidated claims

---

[4]  Proof of Claim No. 62833 amended and superseded Proof of Claim No. 13351, which was initially filed by the Fiscal Agent.

for approximately $4 billion in allegedly unpaid principal, $160 million in allegedly unpaid interest, and reimbursement for fees and expenses of the fiscal agents, in addition to unliquidated and contingents claims for any and all amounts owed "on account of any and all claims the Fiscal Agent has or may have relating to the outstanding Bond obligations, whether known or unknown against the Commonwealth and all those purporting to act on the Commonwealth's behalf . . . ." Rider to PBA Master Claim, ¶¶ 19-21.

10.      **_HTA_**—HTA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 74-1965 of the Legislative Assembly of the Commonwealth ("HTA Enabling Act").  HTA is responsible for the construction, operation, and maintenance of highways and other transportation systems in the Commonwealth.  *See* 9 L.P.R.A § 2002.  The HTA Enabling Act authorizes HTA to issue bonds.  *See* 9 L.P.R.A. §§ 2004(g), (h), (l).  Pursuant thereto, HTA issued several series of bonds under two different resolutions (the "HTA Bonds"): (*i*) Resolution No. 68-18, adopted June 13, 1968 (the "1968 Resolution"), and (*ii*) Resolution No. 98-06, adopted February 26, 1998 (the "1998 Resolution").  As of May 21, 2017, HTA's petition date, approximately $830 million in principal amount of bonds issued under the 1968 Resolution remain outstanding, and approximately $3.4 billion in principal amount of bonds issued under the 1998 Resolution remain outstanding.  BNYM serves as fiscal agent with respect to the HTA Bonds.

11.      On behalf of the holders of HTA Bonds, BNYM filed three master proofs of claim in the Commonwealth Title III Case (the "HTA-CW Master Claims"), each asserting a "secured, contingent and unliquidated claim against the Commonwealth on account of any and all claims, causes of action, rights, and/or remedies that the Fiscal Agent or the Owners may have against the Commonwealth arising at law or in equity . . . ."  *See* Addendum to Proof of Claim No. 121053, ¶

7

15; Addendum to Proof of Claim No. 120982, ¶ 15; Addendum to Proof of Claim No. 115380, ¶ 15.[5]

12.     ***PRMFA***—BNYM and U.S. Bank Trust each serve as trustee for certain bonds issued by PRMFA (the "PRMFA Bonds"). On behalf of the holders of certain Puerto Rico Municipal Finance Agency 2005 Series A Bonds, BNYM filed a master proof of claim against the Commonwealth, which was logged by Prime Clerk, LLC, as Proof of Claim No. 30168. On behalf of holders of certain Puerto Rico Municipal Finance Agency Series 2005 C Bonds, U.S. Bank Trust filed a master proof of claim, which was logged by Prime Clerk, LLC, as Proof of Claim No. 13364 (the "PRMFA Master Claim").

**C.     Bond Debt Master Proofs of Claim – HTA Title III Case**

13.     HTA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 74-1965 of the Legislative Assembly of the Commonwealth ("HTA Enabling Act"). HTA is responsible for the construction, operation, and maintenance of highways and other transportation systems in the Commonwealth. *See* 9 L.P.R.A § 2002.

14.     On behalf of the holders of the HTA Bonds, BNYM filed three master proofs of claim in the HTA Title III Case (collectively, the "HTA Title III Master Claims," and together with the Commonwealth Master Claims, the "Master Claims"): Proof of Claim No. 37245, asserting on behalf of holders of bonds issued under the 1968 Resolution approximately $847 million in liabilities plus unliquidated amounts; Proof of Claim No. 38574, asserting on behalf of holders of bonds issued under the 1998 Resolution approximately $3.2 billion in liabilities plus

---

[5] While BNYM initially filed three proofs of claim logged by Prime Clerk as Proofs of Claim Nos. 21286, 26541, and 35277, these were superseded and amended by Proofs of Claim Nos. 121053, 120982, and 115380.

unliquidated amounts; and Proof of Claim No. 32622, asserting on behalf of holders of subordinated bonds issued under the 1998 Resolution approximately $279 million in liabilities plus unliquidated amounts.

15.     Certain bonds or notes issued by HTA have been insured by one of several municipal bond insurers, either on the primary market or on the secondary market.  Municipal bond insurance is obtained on the primary market when the municipality issuing the bonds engages an insurance company to underwrite an insurance policy for that series of bonds.  In the event that a bond is not insured on the primary market, holders of such uninsured bonds may elect to obtain insurance via the secondary market.  Holders of uninsured bonds who seek to obtain insurance in the secondary market contract directly with a municipal bond insurer and the original issuer is not part of this contract process.  When a holder of an uninsured bond obtains an insurance policy on the secondary market, a new CUSIP number is issued which corresponds to the original CUSIP numbers assigned to the bonds at the time of issuance.  Certain bonds issued by HTA have been insured on the secondary market and, accordingly, have been issued new CUSIP numbers which correspond to bonds issued by HTA bearing original CUSIP numbers (the "Secondarily Insured Bonds").

**D.      Bond Debt Issued by the Puerto Rico Aqueduct and Sewer Authority**

16.     PRASA was established pursuant to Act Number 40 of May 1, 1945.  PRASA is a "public corporation and an autonomous government instrumentality" created for the purpose of providing water and sewer services on the island.  22 L.P.R.A. § 142, 144.

17.     The PRASA Enabling Act authorizes PRASA to issue bonds.  22 L.P.R.A. § 144(g). Pursuant thereto, the PRASA governing board has adopted resolutions authorizing PRASA to issue bonds, including Resolution No. 1583, as amended and restated as of March 7, 2008 ("Resolution

No. 1583"). In 2008, PRASA issued $1,316,204,456 principal amount of Series A revenue bonds (the "2008 Senior Series A Bonds," or the "PRASA Senior Lien Bonds").

18.    Holders of PRASA Senior Lien Bonds have received and continue to receive all payments owed to holders of the PRASA Bonds in full as they become due and owing. Accordingly, EMMA reflects that PRASA has not posted any notices of default with respect to the PRASA Senior Lien Bonds.[6] In addition, the Commonwealth has not guaranteed repayment of the Senior Lien Bonds. Accordingly, the offering statements for the PRASA Senior Lien Bonds state that they are "not a debt of the Commonwealth of Puerto Rico or any of its municipalities or other political subdivisions, other than [PRASA], and neither the Commonwealth of Puerto Rico or any such municipalities or other political subdivisions, other than [PRASA], shall be liable for the payment of the principal of or interest on said Bonds."[7]

**E.    Bond Debt Issued by the Puerto Rico Municipal Finance Agency**

19.    PRMFA is a public corporation and government instrumentality of the Commonwealth created by Act No. 29 of the Legislative Assembly of Puerto Rico, approved June 30, 1972, as amended and supplemented and codified as P.R. Laws Ann. Tit. 21 § 681 *et seq. See* P.R. Laws Ann. Tit. 21, § 684. Pursuant thereto, on November 1, 2002, PRMFA issued 2002 Series A Bonds (the "PRMFA 2002 Series A Bonds") in the aggregate amount of $510,615,000.00. The PRMFA 2002 Series A Bonds were issued to provide funds for PRMFA to purchase certain municipal bonds and notes of various Commonwealth municipalities from the Government Development Bank of Puerto Rico ("GDB"). The PRMFA 2002 Series A Bonds are payable "solely from principal and interest payments received by the respective trustees from the municipal

---

[6] *See, e.g.*, https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

[7] *See, e.g.*, Offering Statement for PRASA Revenue Bonds, Series B (Senior Lien), February 15, 2012, available at https://emma.msrb.org/ER584465-ER454076-ER856857.pdf.

bonds pledged under their respective indentures and from money's held in the reserve accounts and other funds and accounts under their respective indentures." *See, e.g.*, Puerto Rico Municipal Finance Agency, Official Statement, Refunding Bonds, Series 2002 A, *available at* https://emma.msrb.org/MS199497-MS174805-MD338851.pdf (the "PRMFA 2002 Series A Official Statement"). The offering statement issued in connection with the PRMFA 2002 Series A Bonds states on its cover page that "neither the credit of the Commonwealth nor that of any of its government instrumentalities will be pledged for the payment of the [PRMFA 2002 Series A] Bonds." *Id.* at 1. With respect to the legislative appropriations of principal and interest on the PRMFA 2002 Series A Bonds, the PRMFA 2002 Series A Official Statement states "[t]he payment of such sum by the Commonwealth is subject to appropriation by the Legislature of Puerto Rico, which appropriation is authorized but not legally required to be made" *Id.* at 1, 15.

20.      In addition, on December 9, 2005 PRMFA issued, among other bonds, 2005 Series A Bonds (the "PRMFA 2005 Series B Bonds," and together with the PRMFA 2002 Series A Bonds, the "PRMFA Bonds") in the aggregate amount of $59,075,000.00. The PRMFA 2005 Series B Bonds were issued to provide funds to refund, along with other available funds, certain outstanding PRMFA 1997 Series A Bonds. The PRMFA 2005 Series B Bonds are payable "solely from principal and interest payments received by the respective trustees from the municipal bonds pledged under their respective indentures and from money's held in the reserve accounts and other funds and accounts under their respective indentures." *See, e.g.*, Puerto Rico Municipal Finance Agency, Official Statement, Refunding Bonds, Series 2005 B, *available at* https://emma.msrb.org/MS49325-MS218002-MS614754.pdf (the "PRMFA 2005 Series B Official Statement," and together with the PRMFA 2002 Series A Official Statement, the "PRMFA Official Statements"). The offering statement issued in connection with the PRMFA 2005 Series

B Bonds states on its cover page that "neither the credit of the Commonwealth nor that of any of its government instrumentalities will be pledged for the payment of the [PRMFA 2005 Series B] Bonds." *Id.* at 1. With respect to the legislative appropriations of principal and interest on the PRMFA 2005 Series B Bonds, the PRMFA 2005 Series B Official Statement states "[t]he payment of such sum by the Commonwealth is subject to appropriation by the Legislature of Puerto Rico, which appropriation is authorized but not legally required to be made" *Id.* at 1, 15.

### F.      Bond Debt Issued by the Puerto Rico Public Finance Corporation

21.     PRPFC is a subsidiary corporation of GDB created pursuant to Resolution No. 5044 of the Board of Directors of GDB, as amended ("Resolution No. 5044"), adopted pursuant to the authority granted under Act No. 17 of the Legislature of Puerto Rico, approved September 23, 1948, as amended. PRPFC provides government agencies, instrumentalities, municipalities and other subdivisions of the Commonwealth with alternative mechanisms to meet their financing needs. PRPFC has the capacity to borrow money and issue debt through the issuance of bonds and other obligations.

22.     In 1998, PRPFC issued Commonwealth Appropriation Bonds, 1999 Series A (the "1998 Commonwealth Appropriation Bonds"), in the aggregate amount of $345,370,000.00, in order to fund the purchase of a GDB promissory note of the Office for the Improvement of Public Schools of Puerto Rico. The 1998 Commonwealth Appropriation Bonds were issued under a trust agreement between PRPFC and Banco Popular de Puerto Rico, as trustee. The 1998 Commonwealth Appropriation Bonds are limited obligations of PRPFC payable solely from pledged revenues consisting of payments of principal and of interest on the promissory note and other amounts deposited to the credit of a sinking fund established pursuant to the trust agreement, with principal and interest payable solely from legislative appropriations made pursuant to Act No.

85-1998.   The offering statement issued in connection with the 1998 Commonwealth Appropriation Bonds states on its cover page that the "[1998 Commonwealth Appropriation Bonds] will not constitute an obligation of the Commonwealth or any of its political subdivisions or public instrumentalities (other than [PR]PFC), and neither the Commonwealth nor any of its political subdivisions or public instrumentalities (other than [PR]PRC) shall be liable thereon." *See, e.g.*, Puerto Rico Public Financing Corporation, Official Statement, Commonwealth Appropriation Bonds, Series 1998A, *available at* https://emma.msrb.org/MS145212-MS120520-MD233589.pdf (the "1998 PRPFC Official Statement").  The 1998 PRPFC Official Statement also states "[t]he Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the principal of, redemption premium, if any, and interest due on the Bonds. There is no assurance that sufficient funds will be appropriated by the Legislature of Puerto Rico or otherwise made available to make such payments on the Bonds."  *Id.* at 11.

**G.   Proofs of Claim Filed, Omnibus Objection Procedures, and Claim Objections**

23.   To date, approximately 180,483 proofs of claim have been filed against the Debtors and logged by Prime Clerk, LLC.  Such proofs of claim total approximately $43.6 trillion in asserted claims against the Debtors, in addition to unliquidated amounts asserted.

24.   Of the proofs of claim filed, approximately 117,009 have been filed in relation to, or reclassified to be asserted against, the Commonwealth.  Approximately 2,268 proofs of claim have been filed in relation to, or reclassified to be asserted against, HTA.  In accordance with the terms of the Bar Date Orders, many of these claims need not have been filed at all, or suffer from some other flaw, such as being subsequently amended, not putting forth a claim for which the Debtors are liable, being duplicative of other proofs of claim, or failing to provide information necessary for the Debtors to determine whether the claim is valid.

25.     To efficiently resolve as many of the unnecessary proofs of claim as possible, on
October 16, 2018, the Debtors filed with this Court their *Motion for Entry of an Order (A)
Approving Limited Omnibus Objection Procedures, (B) Waiving the Requirement of Bankruptcy
Rule 3007(e)(6), and (C) Granting Related Relief* [ECF No. 4052] (the "Omnibus Procedures
Motion").  The Court granted the relief requested in the Omnibus Procedures Motion by order
dated November 14, 2018. *See Order (A) Approving Limited Omnibus Objection Procedures, (B)
Waiving the Requirement of Bankruptcy Rule 3007(e)(6), and (C) Granting Related Relief* [ECF
No. 4230]; *Omnibus Objection Procedures* [ECF No. 4230-1] (collectively, the "Initial Omnibus
Objection Procedures").   On November 29, 2018, the Court approved English and Spanish
versions of the forms of notice for omnibus objections to be filed in accordance with the Initial
Omnibus Objection Procedures.  *See Order Approving the English and Spanish Versions of the
Form of Notice for Omnibus Objections* [ECF No. 4381] (the "Notice Order").

26.     In the continued interest of resolving any unnecessary proofs of claim in an efficient
manner, on May 23, 2019, the Debtors filed an amended procedures motion seeking, among other
things, to allow the Debtors to file omnibus objections on substantive bases, to further expand the
number of claims that may be included on an objection, and to approve additional forms of notice.
*Notice of Hearing with Respect to an Order (A) Approving Amended Omnibus Objection
Procedures, (B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional
Forms of Notice, and (D) Granting Related Relief* [ECF No. 7091].  On June 14, 2019, the Court
granted the requested relief, by the *Order (A) Approving Amended Omnibus Objection Procedures,
(B) Waiving Requirements of Bankruptcy Rule 3007(e), (C) Approving Additional Forms of Notice,
and (D) Granting Related Relief* [ECF No. 7440] (the "Amended Omnibus Objection
Procedures").

14

27.     Pursuant to the Initial Omnibus Objection Procedures and Amended Omnibus Objection Procedures, to date the Court has held over 15 hearings and entered orders on over 310 omnibus objections filed by the Puerto Rico Sales Tax Financing Corporation ("COFINA"), HTA, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), the Puerto Rico Public Buildings Authority ("PBA"), and/or PREPA.  Based upon rulings and orders of the Court to date, approximately 100,649 claims asserting $43.0 trillion in liability against the Commonwealth, COFINA, HTA, PREPA, PBA, and ERS have been disallowed and expunged from the claims registry in the Title III proceedings.

28.     This Three Hundred Eighty-Fifth Omnibus Objection is filed in accordance with the Court's Amended Omnibus Objection Procedures.

## OBJECTIONS TO PROOFS OF CLAIM

29.     Claims that are "unenforceable against the debtor and property of the debtor, under any agreement or applicable law" should be disallowed.  11 U.S.C. § 502(b)(1).  While a properly executed and filed proof of claim constitutes *prima facie* evidence of the validity of the claim, *see* Fed. R. Bankr. P. 3001(f), made applicable to this case by PROMESA section 310, the objecting party may overcome this *prima facie* evidence with evidence which, if believed, would refute at least one of the allegations essential to the claim.  *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.), *aff'd*, 242 F.3d 367 (2d Cir. 2000); *see also Factors Funding Co. v. Fili (In re Fili)*, 257 B.R. 370, 372 (1st Cir. B.A.P. 2001) ("[A] claim is presumed valid until an objecting party has introduced evidence sufficient to rebut the claimant's prima facie case." (citation omitted)).

30.     The Amended Omnibus Objection Procedures allow the Debtors to file an omnibus objection to multiple proofs of claim on any basis provided for in Federal Rule of Bankruptcy Procedure 3007(d)(1)-(7), in addition to other substantive bases set forth in the Amended Omnibus Objection Procedures.

31.     The Three Hundred Eighty-Fifth Omnibus Objection seeks to partially disallow and partially reclassify, in accordance with the Amended Omnibus Objection Procedures, portions of the proofs of claim listed on **Exhibit A** hereto (collectively, the "Claims to Be Partially Disallowed and Partially Reclassified"), each of which is based, in part, on (*a*) bond claims that are duplicative of one or more master proofs of claim filed against the Debtors on behalf of the holders of certain bonds, (*b*) bond claims that assert liabilities associated with secondarily insured bonds that are duplicative of proofs of claim filed against the Debtors on behalf of the holders of certain bonds, and/or (*c*) an ownership interest in bonds issued by PRASA, PRPFC, and/or PRMFA, which are not Title III Debtors, for amounts for which the Debtors have not guaranteed repayment.   In addition, certain of the proofs of claim listed on **Exhibit A** hereto are deficient because they (*i*) fail to provide sufficient information to enable the Debtors to reconcile the proofs of claim and/or (*ii*) assert liabilities for purported investment losses, but fail to state a claim on which the Debtors can be held liable for their purported investment losses.   Additionally, certain of the claims listed on **Exhibit A** hereto should be partially reclassified because a portion of the claim identifies either the Commonwealth or HTA as obligor, when that portion of the claim is properly asserted, if at all, against another Title III Debtor.   A portion of each claim will remain asserted against the Commonwealth and/or PREPA.   The Debtors reserve the right to object to any of the remaining amounts asserted in the claims, as identified in the column titled "Corrected" in **Exhibit A** hereto, on any basis whatsoever.   **Exhibit A** hereto further specifies why each of the Claims to Be Partially Disallowed and Partially Reclassified should be partially disallowed and partially reclassified.

### A. No Liability for Duplicate Bond Claims

32.     As set forth in **Exhibit A** hereto, certain Claims to Be Partially Disallowed and Partially Reclassified purport to assert liability, in part, on the basis of bonds issued by PRIFA, UPR, PBA, HTA, and PRMFA (collectively, the "Partial Duplicate Bond Claims").

33.     Each of the Partial Duplicate Bond Claims purports to assert, in whole or in part, liability against the Debtors associated with one or more bonds that is duplicative of one or more Master Claims, which as described above were filed in the Title III Cases on behalf of the holders of certain bonds issued by PRIFA, UPR, PBA, HTA, and PRMFA.  Any failure to disallow the Partial Duplicate Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Debtors, to the detriment of other stakeholders in the Debtors' Title III Cases.  The holders of the Partial Duplicate Bond Claims will not be prejudiced by the disallowance of their claims because the liabilities associated with the Partial Duplicate Bond Claims are subsumed within one or more Master Claims.

### B. No Liability for Secondarily Insured Bond Claims that Are Duplicative of Master Claims

34.     As set forth in Exhibit A hereto, certain of the Claims to Be Partially Disallowed and Partially Reclassified purport to assert liability, in part, of Secondarily Insured Bonds, which correspond to HTA Bonds that are duplicative of liabilities asserted by one or more Master Claims (collectively, the "Partial Secondarily Insured Bond Claims").

35.     Each of the Partial Secondarily Insured Bond Claims asserts liabilities associated with Secondarily Insured Bonds.  The CUSIP numbers associated with such Secondarily Insured Bonds correspond to bonds issued by HTA and/or bearing original CUSIP numbers. Those original CUSIP numbers, which reflect bond issuances in which the claimants hold ownership interests, are listed in one or more Master Claims.  Therefore, the Partial Secondarily Insured Bond Claims

assert liabilities associated with bonds issued by HTA that are duplicative of liabilities asserted by one or more Master Claims.

36.     Any failure to disallow the Partial Secondarily Insured Bond Claims will result in the applicable claimants potentially receiving an unwarranted double recovery against the Debtors, to the detriment of other stakeholders in the Title III Cases.  The holders of the Partial Secondarily Insured Bond Claims will not be prejudiced by the disallowance of their claims because the liabilities associated are subsumed within one or more Master Claims.  This Three Hundred Eighty-Fifth Omnibus Objection in no way constitutes an objection to any claims held by the insurer of the Secondarily Insured Bonds, but rather to the holder of the Secondarily Insured Bonds, which are subject to the Master Claims.

### C.  No Liability for PRASA Senior Lien Bonds

37.     As identified in **Exhibit A** hereto, certain Claims to Be Partially Disallowed and Partially Reclassified purport to assert claims based, in part, on the alleged ownership of bonds issued by PRASA (collectively, the "Partial PRASA Senior Lien Bondholder Claims").

38.     Each of the Partial PRASA Bondholder Claims asserts liabilities associated with PRASA Senior Lien Bonds issued by PRASA, which is not a Title III Debtor, and is a separate, legally distinct entity from the Commonwealth.  In addition, the Commonwealth has not guaranteed repayment for the Senior Lien Bonds.  Further, the Partial PRASA Senior Lien Bondholder Claims do not assert a basis for asserting a claim against the Commonwealth for bonds issued by PRASA that are not guaranteed by the Commonwealth.  Accordingly, neither the Commonwealth nor the Court are able to determine the validity of the Partial PRASA Senior Lien Bondholder Claims.

**D.  No Liability for Claims Based on PRPFC and PRMFA Bonds**

39.     As identified in Exhibit A hereto, certain portions of the Claims to Be Partially

Disallowed and Partially Reclassified purport to assert claims based on an alleged ownership

interest in (1) PRPFC Bonds issued by PRPFC (collectively the "Partial PRPFC Bondholder

Claims") and/or (2) PRMFA Bonds issued by PRMFA (collectively the "Partial PRMFA

Bondholder Claims," and together with Partial PRPFC Bondholder Claims, the "Partial No

Liability Bondholder Claims").  Neither PRPFC nor PRMFA are Title III debtors, and their

liabilities are not guaranteed by the Commonwealth or any other of the Debtors.

40.     Each of the Partial PRPFC Bondholder Claims purports to assert, in part, liabilities

against the Debtors associated with PRPFC Bonds not guaranteed by the Commonwealth or any

of the other Debtors.  PRPFC is not a Title III debtor, and is a separate, legally distinct entity from

the Debtors.  *See, e.g.,* 3 L.P.R.A. § 9081(c) (referring to PRPFC as an "independent juridical

entity" separate from the Commonwealth).  Moreover, each of the PRPFC Official Statements

issued in connection with the PRPFC Bonds states that (1) the PRPFC Bonds are not a debt of the

Commonwealth or any of its political subdivisions, other than PRPFC, and that the Commonwealth

does not guarantee PRPFC's debts *see. e.g.*, 2012 PRPFC Official Statement at 1, and (2) the "[t]he

Legislature of Puerto Rico is not legally bound to appropriate sufficient amounts to timely pay the

principal of, redemption premium, if any, and interest due on the Bonds.  There is no assurance

that sufficient funds will be appropriated by the Legislature of Puerto Rico or otherwise made

available to make such payments on the Bonds."  *Id.* at 18.  Therefore, neither the Commonwealth

nor any of the other Debtors hold any liability on the PRPFC Bonds.

41.     In addition, each of the Partial PRMFA Bondholder Claims purports to assert, in

part, liabilities against the Debtors associated with PRMFA Bonds not guaranteed by the

19

Commonwealth or any of the other Debtors.  *See, e.g.,* 21 L.P.R.A. § 684(a) (creating PRMFA as "body corporate" separate to the Commonwealth); 3 L.P.R.A. § 9081(c) (referring to PRMFA as an "independent juridical entity" to the Commonwealth).  PRMFA is not a Title III debtor, and is a separate, legally distinct entity from the Debtors.  Moreover, each of the PRMFA Official Statements issued in connection with the PRMFA Bonds states that (1) "neither the credit of the Commonwealth nor that of any of its government instrumentalities will be pledged for the payment of the [PRMFA 2002 Series A] Bonds," *see. e.g.*, PRMFA 2002 Series A Official Statement at 1, and (2) the "[t]he payment of such sum by the Commonwealth is subject to appropriation by the Legislature of Puerto Rico, which appropriation is authorized but not legally required to be made" *id.* at 1, 15.  Therefore, neither the Commonwealth nor any of the other Debtors are liable for the PRMFA Bonds.

42.    Moreover, even though the PRPFC Bonds and the PRMFA Bonds were payable, in part, from legislative appropriations, they do not create a binding liability against the Commonwealth, because as set forth in the PRPFC Official Statements and the PRMFA Official Statements, the Legislature was not obligated to, and did not guarantee that appropriations sufficient to pay principal and interest on the bonds would be made.  The jurisprudence is clear that where the legislature is free to decide whether or not to make appropriations to pay a bond, there is no "constitutionally cognizable debt *because [the bonds] do[] not impose any enforceable duty or liability" on the government* to make such appropriations.  *See ACA Financial Guaranty Corporation v. City of Buena Vista, Virginia*, 298 F. Supp.3d 834, 848 (W.D. Va. 2018) (citing *Dykes v. N. Virginia Transp. Dist. Comm'n*, 242 Va. 357, 375, 411 S.E.2d 1 (Va. 1991); *see also Application of Oklahoma Capitol Imp. Authority*, 958 P.2d 759, 768 (Okla. 1998) (bonds which were only payable to the extent the legislature chose to make appropriations to pay them did not

constitute debt of the state); *In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S-1005,* 814 P.2d 875, 889 (Colo. 1991) (same). To the extent the Legislature decides not to appropriate funds for payments on the bonds, the bondholders do not have a claim against the Debtors. *See ACA Financial Guaranty Corp. v. City of Buena Vista, Virginia*, No. 18-1268, 2019 WL 758292, at *2 (4th Cir. Feb. 21, 2019) (finding that the city of Buena Vista, VA was not legally obligated to make rent payments "when the obligation is expressly subject to the City's annual decision to appropriate funds."). Such obligations are, therefore, not legally enforceable. *See ACA Financial Guaranty Corporation v. City of Buena Vista, Virginia*, 298 F. Supp. 3d at 839, 848 ("when a locality promises to pay subject to its future decision to allocate those payments, it has not made a legally enforceable promise to pay at all"); *see also Lonegan v. Stat*e, 174 N.J. 435, 451, 453-54 (2002) ("a projected or anticipated future legislative appropriation is not a present day debt or liability . . . [because a] future legislature is not bound to make the appropriation"). That is exactly the situation here: the Commonwealth is under no obligation to appropriate money to pay the bonds, and, indeed, the official statements themselves state the Commonwealth is not liable with respect to the bonds. As a result, claims asserting liability relating to the PRPFC or PRMFA against the Commonwealth bonds must be disallowed, as the Commonwealth has no such liability.

43.     Accordingly, each of the Partial No Liability Bondholder Claims fails to assert a basis for asserting a claim against the Debtors for bonds issued by PRPFC and/or PRMFA that are neither guaranteed by nor a debt of the Commonwealth or any other Debtor. Because of this failure to assert a valid claim and comply with the applicable rules, neither the Debtors nor the Court are able to determine the validity of the Partial No Liability Bondholder Claims.

**E.  Claims Asserting Investment Losses**

21

44.     As set forth in Exhibit A hereto, certain of the Claims to Be Partially Disallowed and Partially Reclassified purport to assert liability, in part, based on liabilities arising out of alleged investment losses (collectively, the "Partial Deficient Claims Asserting Investment Losses").

45.     None of the Partial Deficient Claims Asserting Investment Losses, however, assert any potential causes of action against the Debtors that might render the Debtors liable for alleged damages incurred as a result of the claimants' decision to sell their bonds at a loss.  Accordingly, the Debtors are not liable for the losses asserted in the Partial Deficient Claims Asserting Investment Losses.  *See English v. Energy Future Holdings (In re Energy Future Holdings)*, 2018 U.S. Dist. LEXIS 49952, at *7 (D. Del., March 27, 2018) (holding bankruptcy court's order disallowing proof of claim was proper where claimant had sold bonds issued by the debtor and, thus, neither had any right to payment with respect to the bonds, nor did claimant show it had any potential cause of action against the debtor for the alleged damages incurred by the claimant in selling the debtor's bonds at a loss); *In re Allegheny Int'l, Inc*., 954 F.2d 167, 173 (3d Cir. 1992) (citing *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 L. King, *Collier on Bankruptcy* § 502.02, at 502-22 (15th ed. 1991)) ("Initially, the claimant must allege facts sufficient to support the claim").

### F.  Deficient Bondholder Claims

46.     In addition, certain of the Claims to Be Partially Disallowed and Partially Reclassified purport to assert liability associated with investments in government-issued bonds but failed to provide any information identifying the nature or source of the obligations or explaining why the Debtors, or any other Title III Debtor is liable to the claimant (the "Deficient Bondholder Claims").

47.     In some instances, the Deficient Bondholder Claims did not contain any supporting documentation indicating which bonds claimants asserted gave rise to liabilities owed by the Debtors.    In other instances, the Deficient Bondholder Claims provided as supporting documentation a copy of a brokerage statement, or other supporting documentation containing information regarding bonds purportedly held by the claimant, but the amounts of the bonds included in that supporting documentation did not match the amount on the claimant's proof of claim.

48.     On August 13, 2019, the Court entered the *Order Granting in Part and Adjourning in Part Debtors' Motion for Entry of An Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief* [ECF No. 8453] (the "Authorized Mailings Order"), which authorized the Debtors to send mailings "to any claimant who has not provided sufficient information to enable Debtors to process their claim."  Authorized Mailings Order, ¶ 3.

49.     Pursuant to the Authorized Mailings Order, "[i]f the Debtors mail the Proposed Mailing to a claimant, and the claimant either does not respond or responds but fails to provide sufficient information to permit Debtors to reconcile their claim, the Debtors are authorized to object to the claim as deficient." *Id.*

50.     In accordance with the Authorized Mailings Order, the Debtors have sent at least one letter, substantially in the form of Exhibit 1 to the Authorized Mailings Order, to each claimant associated with the Deficient Bondholder Claims.  Each Mailing provided, in relevant part:

> Additional information is required in order for the Debtors to continue with assessing your claim. The Debtors are unable to determine from the information you provided the basis for the claim you are attempting to assert against one or more of the Debtors.  In responding to this letter, please ensure that you provide all of the information requested and as much detail as possible about your

23

claim.  The descriptions you put on your proof of claim were too
vague for the Debtors to understand the claim you are trying to
assert, so please provide more detail and do not simply copy over
the same information.
*See* ECF No. 8453-1 at 2, 7.

The Mailings received by the claimants associated with the Deficient Bondholder Claims directed

the claimants to respond within thirty dates of the date of the letter.  *See id*.  Furthermore, the

Mailings cautioned the claimants that "[i]f you do not respond to this request and do not provide

the requested information and documentation in support of your claim, the Debtors may be forced

to object to your claim."  *Id.*

51.     Each of the Deficient Bondholder Claims either failed to respond to the Mailings,

or submitted a response that still did not contain information necessary to enable the Debtors to

reconcile the claim.  Accordingly, the Debtors reviewed the documentation submitted with the

proofs of claim or with the Mailings for assertions of investments related to government-issued

bonds.

## G.  Partially Reclassified Bond Claims

52.     Lastly, the remaining portion of each of the Claims to Be Partially Disallowed and

Partially Reclassified identifies the Commonwealth or HTA as the obligor, when such portion is

properly asserted, if at all, against another Title III Debtor (collectively, the "Partially Reclassified

Bond Claims").

53.     One of the Partially Reclassified Bond Claims is currently asserted against the

Commonwealth, and purports to assert, in part, liabilities associated with municipal bond(s), but

the proof of claim, supporting documentation provided by the claimant, and/or CUSIP information

show that the portions of the liabilities associated with the Partially Reclassified Bond Claims

would appropriately be asserted, if at all, against PREPA.  The other Partially Reclassified Bond

Claims is currently asserted against HTA, and purports to assert, in part, liabilities associated with municipal bond(s), but the proof of claim, supporting documentation provided by the claimant, and/or CUSIP information show that the portions of the liabilities associated with the Partially Reclassified Bond Claims would appropriately be asserted, if at all, against the Commonwealth. Accordingly, the Partially Reclassified Bond Claims should be reclassified, in part, to be asserted against the Commonwealth and/or PREPA, the Title III Debtor identified in the column titled "Corrected" in **Exhibit A** hereto.  The Debtors reserve their right to object to any part of the Partially Reclassified Bond Claims on any other grounds whatsoever.

54.     In support of the foregoing, the Debtors rely on the *Declaration of Jay Herriman in Support of the Three Hundred Eighty-Fifth Omnibus Objection (Substantive) of the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority to Partially Duplicate, Deficient, No Liability, and Incorrect Debtor Bond Claims*, dated August 20, 2021, attached hereto as **Exhibit B**.

## NOTICE

55.     In accordance with the Omnibus Objection Procedures and the Court's Notice Order, the Debtors are providing notice of this Three Hundred Eighty-Fifth Omnibus Objection to (a) the individual creditors subject to this Three Hundred Eighty-Fifth Omnibus Objection, (b) the U.S. Trustee, and (c) the Master Service List (as defined by the *Fifteenth Amended Case Management Procedures* [ECF No. 17127-1]), which is available on the Debtors' case website at https://cases.primeclerk.com/puertorico.  A copy of the notice for this Three Hundred Eighty-Fifth Omnibus Objection is attached hereto as **Exhibit C**.  Spanish translations of the Three Hundred Eighty-Fifth Omnibus Objection and all of the exhibits attached hereto are being filed with this objection and will be served on the parties.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **RESERVATION OF RIGHTS**

56.    This Three Hundred Eighty-Fifth Omnibus Objection is limited to the grounds stated herein.   Accordingly, it is without prejudice to the rights of the Debtors to object to the Claims to Be Partially Disallowed and Partially Reclassified or any other claims on any ground whatsoever.   The Debtors expressly reserve all further substantive or procedural objections. Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (a) an admission as to the validity of any claim against the Debtors; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (e) a waiver of the Debtors' rights under PROMESA, the Bankruptcy Code or any other applicable law.

## **NO PRIOR REQUEST**

57.    No prior request for the relief sought in this Three Hundred Eighty-Fifth Omnibus Objection has been made to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order, substantially in the form of the proposed order attached hereto as **Exhibit D**, (1) granting the relief requested herein, and (2) granting such other and further relief as is just.

*[Remainder of Page Intentionally Left Blank]*

Dated: August 20, 2021
   San Juan, Puerto Rico

Respectfully submitted,

/s/ *Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
Carla García-Benítez
USDC No. 203708
Gabriel A. Miranda
USDC No. 306704
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944


/s/ *Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900


*Attorneys for the Financial
Oversight and Management Board for
Puerto Rico, as representative of the
Commonwealth of Puerto Rico and the
Puerto Rico Highways and
Transportation Authority*

**Fecha límite para responder: 20 de septiembre de 2021 a las 4:00 p.m. (AST)**
**Fecha de la vista: 6 de octubre de 2021, a las 9:30 a.m. (AST)**

---

**REVISE DETENIDAMENTE ESTA OBJECIÓN Y LOS DOCUMENTOS ADJUNTOS PARA DETERMINAR SI LA OBJECIÓN AFECTA A SU(S) RECLAMACIÓN(ES).**

---

**TRIBUNAL DE DISTRITO DE LOS ESTADOS UNIDOS PARA EL DISTRITO DE PUERTO RICO**

| | |
|---|---|
| *In re*:<br><br>JUNTA DE SUPERVISIÓN Y ADMINISTRACIÓN FINANCIERA PARA PUERTO RICO,<br><br>     como representante del<br><br>ESTADO LIBRE ASOCIADO DE PUERTO RICO *et al*.,<br><br>               Deudores. [1] | PROMESA<br>Título III<br><br>Núm. 17 BK 3283-LTS<br><br>(Administrado Conjuntamente)<br><br>**La presente radicación guarda relación con el ELA y la ACT.** |

**TRICENTÉSIMA OCTOGÉSIMA QUINTA OBJECIÓN GLOBAL (SUSTANTIVA) DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO Y DE LA AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO A RECLAMACIONES POR BONOS PARCIALMENTE DUPLICADAS, DEFICIENTES, EN LAS QUE NO EXISTE RESPONSABILIDAD Y RADICADAS CONTRA EL DEUDOR INCORRECTO**

---

[1] Los Deudores en los presentes Casos de Título III, junto con el respectivo número de caso de Título III y los últimos cuatro (4) dígitos del número de identificación contributiva federal de cada Deudor, en su caso, son i) el Estado Libre Asociado de Puerto Rico (el "ELA") (Caso de Quiebra Núm. 17 BK 3283-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3481); ii) la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA") (Caso de Quiebra Núm. 17 BK 3284-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 8474); iii) la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT") (Caso de Quiebra Núm. 17 BK 3567-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3808); iv) el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE") (Caso de Quiebra Núm. 17 BK 3566-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 9686); v) la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE") (Caso de Quiebra Núm. 17 BK 4780-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3747); y vi) la Autoridad de Edificios Públicos de Puerto Rico (la "AEP", y junto con el ELA, COFINA, la ACT, el SRE y la AEE, los "Deudores") (Caso de Quiebra Núm. 19-BK-5523-LTS) (Últimos cuatro dígitos de la identificación contributiva federal: 3801) (Los números de los casos de Título III están enumerados como números de Casos de Quiebra debido a ciertas limitaciones en el programa informático).

A la atención de su señoría, Juez del Tribunal de Distrito de los Estados Unidos, Laura Taylor Swain:

El Estado Libre Asociado de Puerto Rico (el "ELA") y la Autoridad de Carreteras y Transportación de Puerto Rico (la "ACT", y junto con el ELA, los "Deudores"), a través de la Junta de Supervisión y Administración Financiera para Puerto Rico (la "Junta de Supervisión"), como el único representante de Título III del ELA conforme a la sección 315(b) de la *Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico* ("PROMESA"),[2] radican esta tricentésima octogésima quinta objeción global (la "Tricentésima octogésima quinta objeción global") a las evidencias de reclamaciones mencionadas en el **Anexo A** del presente documento, cada una de las cuales pretende basarse parcialmente en *a*) reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales radicadas contra los Deudores en nombre de determinados bonistas, *b*) reclamaciones por bonos que alegan responsabilidades vinculadas con bonos asegurados en el mercado secundario que constituyen duplicados con respecto a evidencias de reclamaciones radicadas contra los Deudores en nombre de determinados bonistas y/o *c*) una participación patrimonial en los bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico (la "AAA"), la Corporación para el Financiamiento Público de Puerto Rico (la "CFP"), y/o la Agencia para el Financiamiento Municipal de Puerto Rico (la "AFM"), que no son Deudores de Título III, por montos por los que los Deudores no han garantizado el reembolso. Además, algunas de las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento son deficientes porque *i*) no proporcionan información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones y *ii*) alegan responsabilidades por supuestas pérdidas por inversiones, pero no

---

[2] PROMESA ha sido codificada en el Título 48 U.S.C., §§ 2101-2241.

2

explican por qué los Deudores podrían ser responsables por sus supuestas pérdidas por inversiones. Además, algunas de las reclamaciones que figura en el **Anexo A** del presente documento deben reclasificarse parcialmente, ya que parte de la reclamación identifica al ELA o a la ACT como deudor, cuando en todo caso lo correcto sería que dichas partes de la reclamación se alegaran contra otro Deudor de Título III. Una parte de cada reclamación seguirá estando radicada contra el ELA y/o la Autoridad de Energía Eléctrica de Puerto Rico (la "AEE"). Los Deudores se reservan el derecho a oponerse a cualquiera de los montos restantes alegados en las reclamaciones, según se identifican en la columna titulada "Corregidas" en el **Anexo A** del presente documento, sobre la base de los motivos que fueren. En apoyo de la Tricentésima octogésima quinta objeción global, los Deudores manifiestan respetuosamente lo siguiente:

### JURISDICCIÓN

1.      El Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico tiene jurisdicción sobre la materia para atender la presente causa y el remedio en ella solicitado conforme a la sección 306(a) de PROMESA.

2.      La sede judicial de este distrito es la competente conforme a la sección 307(a) de PROMESA.

### ANTECEDENTES

**A.      Órdenes de Fecha Límite**

3.      El 3 de mayo de 2017, la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio para el ELA conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "Caso de Título III del ELA"). El 21 de mayo de 2017 (la "Fecha de Petición"), la Junta de Supervisión emitió una certificación de reestructuración conforme a las secciones 104(j) y 206 de PROMESA, y radicó una petición voluntaria de remedio

3

para la ACT conforme a la sección 304(a) de PROMESA, iniciando un caso conforme al Título III de dicho cuerpo legal (el "Caso de Título III de la ACT", y junto con el Caso de Título III del ELA, los "Casos de Título III"). El 29 de junio de 2017, el Tribunal dictó una orden por la que concedió la administración conjunta de los Casos de Título III únicamente con fines procesales. ECF núm. 537.[3]

4.       El 16 de enero de 2018, los Deudores radicaron su *Moción de una orden que A) fije fechas límite y procedimientos para radicar evidencias de reclamaciones y B) apruebe la forma y la manera de su notificación* [ECF núm. 2255] (la "Moción de Fecha Límite"). Conforme a la *Orden que A) fija fechas límite y procedimientos para radicar evidencias de reclamaciones y B) aprueba la forma y la manera de su notificación* [ECF. núm. 2521] (la "Orden Inicial de Fecha Límite"), el Tribunal concedió el remedio solicitado en la Moción de Fecha Límite y fijó fechas límite y procedimientos para radicar evidencias de reclamaciones en el marco de los Casos de Título III. Luego de la moción informativa de determinados acreedores, y del apoyo de los Deudores, el Tribunal dictó a continuación la *Orden que A) extendió fechas límite para radicar evidencias de reclamaciones y B) aprobó la forma y la manera de su notificación* [ECF núm. 3160] (conjuntamente con la Orden Inicial de Fecha Límite, las "Órdenes de Fecha Límite"), extendiendo dichas fechas límite hasta el 29 de junio de 2018, a las 04:00 p.m. (AST).

**B.      Evidencias de reclamaciones principal relativas a la deuda de los bonos: Caso de Título III del ELA**

5.       Conforme a la Orden Inicial de Fecha Límite, fiduciarios autorizados, agentes fiscales o cualquier otro agente o apoderado similar en relación con cada serie respectiva de bonos

---

[3] Salvo disposición en contrario contenida en el presente documento, las citas ECF harán referencia a documentos radicados en el marco del Caso de Quiebra Núm. 17 BK 3283-LTS.

emitidos por uno de los Deudores o por un no deudor, podrán radicar una evidencia de reclamación principal contra el deudor pertinente, en su propio nombre y en el de todos los titulares de las reclamaciones por bonos relacionadas con la respectiva serie de bonos en relación con las obligaciones surgidas de los respectivos acuerdos de fideicomiso, resoluciones o documentos similares vinculados con los bonos. Orden Inicial de Fecha Límite, ¶ 5(a). Como se explica más adelante, las evidencias de reclamaciones principales (conjuntamente, las "Reclamaciones Principales") han sido radicadas en el marco del Caso de Título III del ELA en nombre de los tenedores de determinados bonos o pagarés emitidos por la ACT, la AFI, la AFM, la Universidad de Puerto Rico (la "UPR") y la Autoridad de Edificios Públicos de Puerto Rico (la "AEP").

6.      **_AFI_**: la AFI es una filial del BGF y constituye una instrumentalidad del Gobierno del ELA. La AFI fue creada en 1988 mediante la Ley núm. 44-1988 (la "Ley para crear la AFI"). La AFI brinda asistencia financiera, administrativa y de otro tipo al ELA, a sus corporaciones públicas y a otras dependencias encargadas del desarrollo y del funcionamiento de las infraestructuras. En nombre de los tenedores de varios bonos y pagarés emitidos por la AFI (conjuntamente, los "Bonos de la AFI"), se radicaron evidencias de reclamaciones principales contra el ELA (conjuntamente, las "Reclamaciones Principales de la AFI") por parte de BNYM, US Bank y UMB Bank, N.A. En primer lugar, BNYM alegó tres evidencias de reclamaciones principales: la Evidencia de reclamación núm. 16759 alegando, en nombre de los tenedores de los Pagarés de anticipación de bonos relativos a rentas de fondo de impuestos dedicado, serie 15 (los "Pagarés de la AFI"), una "reclamación contingente y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas, derechos y/o remedios que el Fiduciario o los Propietarios puedan tener contra el ELA, en virtud de la ley o equidad, sobre la base del Acuerdo de fideicomiso (o en relación con este), el Acuerdo de tenedores de pagarés, los Pagarés o las

5

Rentas pignoradas". . . "; la Evidencia de reclamación núm. 19814 alegando, en nombre de los

tenedores de los Pagarés de la AFI, reclamaciones por el principal y los intereses impagados,

además de las tarifas y los gastos del fiduciario; y la Evidencia de reclamación núm. 103718

alegando, en nombre de los tenedores de los bonos de renta emitidos por la AFI, incluidos Bonos

de Renta (Proyecto de la Autoridad Portuaria), serie 2011A, "una reclamación garantizada,

contingente y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas

radicadas, derechos y/o remedios que el Fiduciario o los tenedores de los Bonos tengan o puedan

tener contra el ELA, en virtud de la ley o equidad". . . ."

7.        Además, US Bank radicó una evidencia de reclamaciones principal en relación con

determinados Bonos de la AFI, que fue registrada por Prime Clerk, LLC, como Evidencia de

reclamaciones núm. 13386, en nombre de los tenedores de los Bonos de la AFI relativos a

impuestos sobre el ron (Bonos relativos a rentas de impuestos especiales, series 2005A, 2005B,

2005C y serie 2006B), alegando "reclamaciones por montos contingentes y no liquidados en

relación con los intereses pagaderos a futuro, intereses acumulados y que se acumulen en el futuro

en lo referente al principal adeudado en el pasado y las reclamaciones por intereses, tarifas, costos

e indemnización del Fiduciario en los que se incurra en el futuro en virtud de los Documentos de

Bonos, así como por la totalidad de los montos adeudados en razón de todas las reclamaciones que

tenga o pueda tener el Fiduciario en relación con las Obligaciones de Bonos pendientes, monto

mínimo de $249,099,446.17, cuyo curso de conducta continúa". . . ."  Cláusula Adicional de la

Evidencia de reclamación núm. 13386, ¶ 26.

8.        **_UPR_**: la UPR es supuestamente "una corporación pública del ELA que integra un

sistema orgánico de educación superior", conforme a la Ley núm. 1 de la Asamblea Legislativa de

Puerto Rico, aprobada el 20 de enero de 1966 (18 L.P.R.A. §§ 601-614). Cláusula Adicional de la

Evidencia de reclamación núm. 13382, ¶ 5. US Bank actúa como fiduciario en relación con determinados Bonos de renta de refinanciamiento del sistema universitario, series P y Q emitidos por la UPR, y radicó una evidencia de reclamación principal, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 13382 (la "Reclamación Principal de la UPR"). La Reclamación Principal de la UPR alega "reclamaciones contingentes y no liquidadas contra el ELA por todos los derechos y titularidades que U.S. Bank como Fiduciario tenga o pueda tener, de la naturaleza o tipo que fueran, en relación con el Acuerdo de Fideicomiso, o de conformidad con otros documentos o leyes aplicables, lo que incluye incumplimiento de pactos o desviación potencial de rentas pignoradas para el pago de los Bonos, en la actualidad o en el futuro". *Id.*, ¶ 12.

9.    *AEP*: la AEP supuestamente emitió Bonos de Renta para financiar edificios de oficinas y otras instalaciones arrendadas a varios departamentos, agencias públicas y organismos del ELA. US Bank y US Bank Trust actúan como agentes fiscales en relación con determinados bonos de renta emitidos por la AEP, conforme a lo explicado en la nota al pie 3 de la Evidencia de reclamación núm. 62833 (los "Bonos de la AEP"), y, en nombre de los tenedores de los Bonos de la AEP, radicó una evidencia de reclamación principal en el marco del Caso de Título III del ELA por todos los montos pendientes de pago adeudados (la "Reclamación Principal de la AEP"), que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 62833. [4]   La Reclamación Principal de la AEP reivindica reclamaciones liquidadas por aproximadamente $4000 millones en concepto de capital principal supuestamente impagado, $160 millones en concepto de intereses supuestamente impagados y por reembolso de comisiones y gastos de los agentes fiscales, además de reclamaciones no liquidadas y contingentes por la totalidad de los

---

[4] la Evidencia de reclamación núm. 62833 enmendó y sustituyó la Evidencia de reclamación núm. 13351, que fue radicada inicialmente por el Agente Fiscal.

montos adeudados " en razón de la totalidad de las reclamaciones que el Agente Fiscal tenga o

pueda tener en relación con las Obligaciones de bonos pendientes, conocidos o por conocer, contra

el ELA y aquellos que pretendan actuar en nombre del ELA". . . ."  Cláusula Adicional de la

Reclamación Principal de la AEP, ¶¶ 19-21.

10.    _**ACT**_: la ACT es una corporación pública e instrumentalidad del ELA, que

constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de

la Ley núm. 74-1965 de la Asamblea Legislativa del ELA (la "Ley para crear la ACT"). La ACT

se encarga de la construcción, operación y mantenimiento de carreteras y otros sistemas de

transportación en el ELA. *Véase* 9 L.P.R.A § 2002. La Ley para crear la ACT autoriza a la ACT a

emitir bonos. *Véase* 9 L.P.R.A. §§ 2004(g), (h), (l). Conforme a dicha normativa legal, la ACT

emitió varias series de bonos al amparo de dos resoluciones diferentes (los "Bonos de la ACT"):

*i*) la Resolución núm. 68-18, adoptada el 13 de junio de 1968 (la "Resolución de 1968"), y *ii*) la

Resolución núm. 98-06, adoptada el 26 de febrero de 1998 (la "Resolución de 1998"). Desde el 21

de mayo de 2017, la fecha de petición de la ACT, aproximadamente $830 millones del monto

principal de los bonos emitidos conforme a la Resolución de 1968 quedan pendientes de pago, y

aproximadamente $3400 millones del monto principal de los bonos emitidos conforme a la

Resolución de 1998 quedan igualmente pendientes de pago. BNYM actúa como agente fiscal con

respecto a los Bonos de la ACT.

11.    En nombre de los tenedores de los Bonos de la ACT, BNYM radicó tres evidencias

de reclamaciones principales en el marco del Caso de Título III del ELA (las "Reclamaciones

Principales ACT-ELA"), cada una de las cuales alegaba "una reclamación garantizada, contingente

y no liquidada contra el ELA en razón de la totalidad de las reclamaciones, causas radicadas,

derechos y/o remedios que el Agente Fiscal o los Propietarios puedan tener contra el ELA, en

8

virtud de la ley o equidad. . . ." *Véase* Adenda de la Evidencia de reclamación núm. 121053, ¶ 15; Adenda de la Evidencia de reclamación núm. 120982, ¶ 15; Adenda de la Evidencia de reclamación núm. 115380, ¶ 15.[5]

12.     ___AFM___: BNYM y U.S. Bank Trust actúan como fideicomisarios en relación con determinados bonos emitidos por la AFM (los "Bonos de la AFM"). En nombre de los tenedores de determinados bonos de la Agencia para el Financiamiento Municipal de Puerto Rico, 2005, serie A, BNYM radicó una evidencia de reclamación principal contra el ELA, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 30168. En nombre de los tenedores de determinados bonos de la Agencia para el Financiamiento Municipal de Puerto Rico, serie 2005 C, U.S. Bank Trust radicaron una evidencia de reclamación principal, que fue registrada por Prime Clerk, LLC, como Evidencia de reclamación núm. 13364 (la "Reclamación Principal de la AFM").

## C.     Evidencias de reclamaciones principales relativas a la deuda de los bonos: Caso de Título III de la ACT

13.     La ACT es una corporación pública e instrumentalidad del ELA, que constituye una entidad corporativa y política independiente y aparte del ELA, creada en virtud de la Ley núm. 74-1965 de la Asamblea Legislativa del ELA (la "Ley para crear la ACT"). La ACT se encarga de la construcción, operación y mantenimiento de carreteras y otros sistemas de transportación en el ELA. *Véase* 9 L.P.R.A § 2002.

14.     Actuando en nombre de los tenedores de los Bonos de la ACT, BNYM radicó tres evidencias de reclamaciones principales en el marco del Caso de Título III de la ACT (conjuntamente, las "Reclamaciones Principales de Título III de la ACT", y junto con las

---

[5]  Aunque BNYM radicó inicialmente tres evidencias de reclamaciones registradas por Prime Clerk como Evidencias de reclamaciones núms. 21286, 26541 y 35277, estas fueron sustituidas y enmendadas por las Evidencias de reclamaciones núms. 121053, 120982 y 115380.

9

Reclamaciones Principales del ELA, las "Reclamaciones Principales"): la Evidencia de reclamación núm. 37245, por la que se reclama, en nombre de los tenedores de los bonos emitidos conforme a la Resolución de 1968, aproximadamente $847 millones en concepto de responsabilidad más montos no liquidados; la Evidencia de reclamación núm. 38574, por la que se reclama, en nombre de los tenedores de los bonos emitidos conforme a la Resolución de 1998, aproximadamente $3200 millones en concepto de responsabilidad más montos no liquidados; y la Evidencia de reclamación núm. 32622, por la que se reclama, en nombre de los tenedores de los bonos subordinados emitidos conforme a la Resolución de 1998, aproximadamente $279 millones en concepto de responsabilidad más montos no liquidados.

15.   Determinados bonos o pagarés emitidos por la ACT han sido asegurados por una o más aseguradoras de bonos municipales en el mercado primario o en el secundario. El seguro de bonos municipales se obtiene en el mercado primario cuando el municipio emisor de los bonos contrata una compañía de seguros para suscribir una póliza de seguro en relación con dicha serie de bonos. En el caso de que un bono no se asegure en el mercado primario, los tenedores de tales bonos no asegurados podrían optar por obtener un seguro a través del mercado secundario. Los tenedores de los bonos no asegurados que busquen obtener un seguro en el mercado secundario entran en una relación contractual directamente con una aseguradora de bonos municipales, por lo que el emisor original no es parte en dicho proceso de contratación. Cuando un tenedor de un bono no asegurado obtiene una póliza de seguro en el mercado secundario, se emite un nuevo número CUSIP que corresponde a los números CUSIP originales asignados a los bonos en el momento de su emisión. Determinados bonos emitidos por la ACT han sido asegurados en el mercado secundario y, en consecuencia, se les han emitido nuevos números CUSIP que corresponden a los

bonos emitidos por la ACT que llevan números CUSIP originales (los "<u>Bonos asegurados en el mercado secundario</u>").

**D.** **Deuda de los bonos emitidos por la Autoridad de Acueductos y Alcantarillados de Puerto Rico**

16.   La AAA fue creada de conformidad con la Ley núm. 40, de 1 de mayo de 1945. La AAA es una "corporación pública e instrumentalidad gubernamental autónoma", creada para la prestación de los servicios de suministro de agua y alcantarillado en la isla. 22 L.P.R.A. § 142, 144.

17.   La Ley para crear la AAA autoriza a la AAA a emitir bonos. 22 L.P.R.A. § 144(g). Conforme a dicha Ley, la junta directiva de la AAA adoptó resoluciones que autorizan a la AAA emitir bonos, lo que incluye la Resolución núm. 1583, en su versión enmendada y modificada el 7 de marzo de 2008 (la "<u>Resolución núm. 1583</u>"). En 2008, la AAA emitió unos bonos de renta, Serie A, por un monto del principal de $1,316,204,456 (los "<u>Bonos Prioritarios Serie A de 2008</u>" o los "<u>Bonos de Gravamen Prioritarios de la AAA</u>").

18.   Los tenedores de los Bonos de Gravamen Prioritarios de la AAA han recibido, y siguen recibiendo, la totalidad de los pagos íntegros adeudados a tales tenedores de los Bonos de la AAA, a medida que estos vencen y se vuelven pagaderos. En consecuencia, el EMMA refleja que la AAA no ha publicado ninguna notificación de incumplimiento en relación con los Bonos de Gravamen Prioritarios de la AAA.[6]  Además, el ELA no ha garantizado el reembolso de los Bonos de Gravamen Prioritarios. En consecuencia, las declaraciones de oferta relativas a los Bonos de Gravamen Prioritarios de la AAA indican que "no constituyen deuda del Estado Libre Asociado

---

[6] *Véase, por ejemplo*,
https://emma.msrb.org/Security/Details/A6634BCA31A0801CF45190F8C461039A9.

de Puerto Rico ni de ninguno de sus municipios u otras subdivisiones políticas, con la excepción

de [la AAA], por lo que ni el Estado Libre Asociado de Puerto Rico ni ningunos de dichos

municipios u otras subdivisiones políticas, con la excepción de [la AAA], será responsable por el

pago del principal o de los intereses sobre los referidos Bonos".[7]

E.     **Deuda de los bonos emitidos por la Agencia para el Financiamiento Municipal de Puerto Rico**

19.     La AFM es una corporación pública e instrumentalidad gubernamental del ELA

creada por la Ley núm. 29 de la Asamblea Legislativa de Puerto Rico, aprobada el 30 de junio de

1972 (en su versión enmendada, complementada y codificada en las Leyes de Puerto Rico, Tít. 21

§ 681 *et seq. Véase* Leyes de Puerto Rico, Tít. 21, § 684. Conforme a dicha Ley, el 1 de noviembre

de 2002 la AFM emitió Bonos de Serie A de 2002 (los "Bonos de la AFM de Serie A de 2002")

por el monto principal de $510,615,000.00. Los Bonos de la AFM de Serie A de 2002 fueron

emitidos para proporcionarle fondos a la AFM para comprarle al Banco Gubernamental de

Fomento para Puerto Rico (el "BGF") determinados bonos y pagarés municipales de varios

municipios del ELA. Los Bonos de la AFM de Serie A de 2002 son pagaderos "únicamente con

los pagos del principal y los intereses recibidos por el respectivo fiduciario de los bonos

municipales pignorados en virtud de sus respectivos contratos de emisión y con montos

mantenidos en las cuentas de reserva y otros fondos y cuentas en virtud de sus respectivos contratos

de emisión". *Véase, por ejemplo,*  Agencia para el Financiamiento Municipal de Puerto Rico,

Declaración  Oficial,  Bonos  de  Refinanciamiento,  Serie  2002  A,  *disponible  en*

https://emma.msrb.org/MS199497-MS174805-MD338851.pdf  (la  "Declaración  Oficial  de  la

---

[7] *Véase, por ejemplo,* Declaración de Oferta relativa a los Bonos de Renta de la AAA, Serie B (Gravamen Prioritario), 15 de febrero de 2012, disponible en https://emma.msrb.org/ER584465-ER454076-ER856857.pdf.

AFM de Serie A de 2002"). La declaración de oferta emitida en relación con los  Bonos de la AFM
de Serie A de 2002 dispone en su portada que "ni el crédito del ELA ni el de ninguna de sus
instrumentalidades gubernamentales será pignorado para el pago de los Bonos [de la AFM de Serie
A de 2002]". *Id.*  en 1. En lo que respecta a las asignaciones legislativas del principal y de los
intereses sobre los Bonos de la AFM de Serie A de 2002, la "Declaración Oficial de la AFM de
Serie A de 2002 dispone que "[e]l pago de dicha suma por el ELA queda sujeto a una asignación
por la Asamblea Legislativa de Puerto Rico, asignación que está autorizada pero que no es
jurídicamente obligatoria" *Id*. en 1, 15.

20.     Además, el 9 de diciembre de 2005 la AFM emitió, entre otros bonos, unos Bonos
de Serie A de 2005 (los "Bonos de la AFM de Serie B de 2005", y junto con los Bonos de la AFM
de Serie A de 2002, los "Bonos de la AFM") por el monto total de $59,075,000.00. Los Bonos de
la AFM de Serie B de 2005 fueron emitidos para proporcionar fondos para reembolsar, junto con
otros fondos disponibles, determinados Bonos de la AFM de Serie A de 1997. Los Bonos de la
AFM de Serie B de 2005 son pagaderos "únicamente con los pagos del principal y los intereses
recibidos por el respectivo fiduciario de los bonos municipales pignorados en virtud de sus
respectivos contratos de emisión y con montos mantenidos en las cuentas de reserva y otros fondos
y cuentas en virtud de sus respectivos contratos de emisión". *Véase, por ejemplo*, Agencia para el
Financiamiento Municipal de Puerto Rico, Declaración Oficial, Bonos de Refinanciamiento, Serie
2005   B,   *disponible   en*   https://emma.msrb.org/MS49325-MS218002-MS614754.pdf   (the
"Declaración Oficial de la AFM de Serie B de 2005", y junto con la Declaración de la AFM de
Serie A de 2002, las "Declaraciones Oficiales de la AFM"). La declaración de oferta emitida en
relación con los Bonos de la AFM de Serie B de 2005 dispone en su portada que "ni el crédito del
ELA ni el de ninguna de sus instrumentalidades gubernamentales será pignorado para el pago de

los Bonos [de la AFM de Serie B de 2005]". *Id.* en 1. En lo que respecta a las asignaciones legislativas del principal y de los intereses sobre los Bonos de la AFM de Serie B de 2005, la "Declaración Oficial de la AFM de Serie B de 2005 dispone que "[e]l pago de dicha suma por el ELA queda sujeto a una asignación por la Asamblea Legislativa de Puerto Rico, asignación que está autorizada pero que no es jurídicamente obligatoria" *Id.* en 1, 15.

**F.      Deuda de los bonos emitidos por la Corporación para el Financiamiento Público de Puerto Rico**

21.      La CFP es una corporación subsidiaria del BGF creada conforme a la Resolución núm. 5044 de la Junta Directiva del BGF, en su versión enmendada (la "Resolución núm. 5044"), adoptada de conformidad con la autoridad concedida en virtud de la Ley núm. 17 de la Asamblea Legislativa de Puerto Rico, aprobada el 23 de septiembre de 1948, en su versión enmendada. La CFP proporciona a las agencias públicas, instrumentalidades, municipios y a otras subdivisiones del ELA mecanismos alternativos para que puedan satisfacer sus necesidades de financiamiento. La CFP tiene la facultad de tomar en préstamo fondos y emitir deuda a través de bonos y otras obligaciones.

22.      En 1998, la CFP emitió Bonos de Asignación del ELA, de 1999, Serie A (los "Bonos de Asignación del ELA de 1998"), por un monto total de $345,370,000.00, para financiar la compra de un pagaré del BGF de la Oficina para el Mejoramiento de las Escuelas Públicas de Puerto Rico. Los Bonos de Asignación del ELA de 1998 fueron emitidos en virtud de un acuerdo de fideicomiso entre la CFP y Banco Popular de Puerto Rico, como fiduciario. Los Bonos de Asignación del ELA de 1998 son obligaciones limitadas de la CFP, pagaderos únicamente desde ingresos pignorados que se integran por pagos del principal y los intereses sobre los pagarés y otros montos depositados en el saldo de un fondo de amortización creado conforme al acuerdo de

14

fideicomiso, siendo el principal y los intereses pagaderos únicamente de asignaciones legislativas realizadas conforme a la Ley núm. 85-1998. La declaración de oferta emitida en relación con los Bonos de Asignación del ELA de 1998 dispone en su portada que los "[Bonos de Asignación del ELA de 1998] no constituirán una obligación del ELA ni de ninguna de sus subdivisiones políticas o instrumentalidades públicas (salvo la CFP[de PR]), y ni el ELA ni ninguna de sus subdivisiones políticas o instrumentalidades públicas (salvo la CFP[de PR]) será responsable de su pago". Véase, por ejemplo, Corporación para el Financiamiento Público de Puerto Rico, Declaración Oficial, Bonos de Asignación del ELA, Serie 1998A, disponible en https://emma.msrb.org/MS145212-MS120520-MD233589.pdf (la "Declaración Oficial de la CFP de 1998"). La Declaración Oficial de la CFP de 1998 también dispone lo siguiente: "[l]a Asamblea Legislativa de Puerto Rico no tiene obligación jurídica para asignar montos suficientes para un pago en los plazos establecidos del principal, de la prima de reembolso (si la hubiere) ni de los intereses vencidos sobre los Bonos. No hay garantía de que la Asamblea Legislativa de Puerto Rico asigne, o ponga a disposición de otro modo, fondos suficientes para realizar dichos pagos sobre los Bonos". *Id.* en 11.

**G.   Evidencias de reclamaciones radicadas, procedimientos relativos a objeciones globales y objeciones a reclamaciones**

23.   Hasta la fecha, se han radicado aproximadamente 180,483 evidencias de reclamaciones contra los Deudores, que han sido registradas por Prime Clerk, LLC. Dichas evidencias de reclamaciones ascienden a un total aproximado de $43.6 billones en reclamaciones radicadas contra los Deudores, además de los montos no liquidados reclamados.

24.   De las evidencias de reclamaciones radicadas, aproximadamente 117,009 han sido radicadas en relación con el ELA, o reclasificadas como radicadas contra el ELA. Aproximadamente 2,268 evidencias de reclamaciones han sido radicadas en relación con la ACT,

o reclasificadas como radicadas contra la ACT. De conformidad con las condiciones de las Órdenes de Fecha Límite, muchas de estas reclamaciones no deberían haber sido radicadas en absoluto o adolecen de otro tipo de vicios; por ejemplo, haber sido enmendadas posteriormente, no alegar una reclamación por la que los Deudores sean responsables, estar duplicadas en relación con otras evidencias de reclamaciones o no aportar información necesaria para que los Deudores determinen si la reclamación es válida.

25.     Para resolver eficazmente el mayor número posible de las evidencias de reclamaciones innecesarias, el 16 de octubre de 2018 los Deudores radicaron ante este Tribunal su *Moción para que se dicte una orden que A) apruebe procedimientos limitados relativos a objeciones globales, B) exima el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) conceda el remedio relacionado* [ECF núm. 4052] (la "<u>Moción de Procedimientos Globales</u>"). El Tribunal concedió el remedio solicitado en la Moción de Procedimientos Globales mediante la orden de fecha 14 de noviembre de 2018. *Véase la Orden que A) aprueba procedimientos limitados relativos a objeciones globales, B) exime el requisito contenido en la regla 3007(e)(6) de las Reglas de Quiebras, y C) concede el remedio relacionado* [ECF núm. 4230]; *Procedimientos relativos a Objeciones Globales* [ECF núm. 4230-1] (conjuntamente, los "Procedimientos Iniciales relativos a Objeciones Globales"). El 29 de noviembre de 2018, el Tribunal aprobó las versiones en inglés y en español de los formularios de notificación relativos a las objeciones globales a efectos de radicarlas de conformidad con los Procedimientos Iniciales relativos a Objeciones Globales. *Véase Orden por la que se aprobaron las versiones en inglés y en español de los formularios de notificación relativos a objeciones globales* [ECF núm. 4381] (la "<u>Orden de Notificación</u>").

26.     En aras del interés constante por resolver eficazmente cualesquiera evidencias de reclamaciones innecesarias, el 23 de mayo de 2019 los Deudores radicaron una moción relativa a procedimientos enmendados en la que solicitaron, entre otras cosas, que se les permitiera radicar objeciones globales sobre unas bases sustantivas, aumentar el número de reclamaciones que pudieran incluirse en una objeción y aprobar formas de notificación adicionales. *Notificación de vista en relación con una Orden que A) apruebe Procedimientos Enmendados relativos a Objeciones Globales, B) exima los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) apruebe formas de notificación adicionales y D) conceda el remedio relacionado* [ECF núm. 7091]. El 14 de junio de 2019, el Tribunal concedió el remedio solicitado por medio de la *Orden que A) aprueba Procedimientos Enmendados relativos a Objeciones Globales, B) exime los requisitos contenidos en la regla 3007(e) de las Reglas de Quiebras, C) aprueba formas de notificación adicionales y D) concede el remedio relacionado* [ECF núm. 7440] (los "Procedimientos Enmendados relativos a Objeciones Globales").

27.     Conforme a los Procedimientos Iniciales relativos a Objeciones Globales y los Procedimientos Enmendados relativos a Objeciones Globales, el Tribunal ha celebrado hasta la fecha más de 15 vistas y ha dictado órdenes sobre más de 310 objeciones globales radicadas por la Corporación del Fondo de Interés Apremiante de Puerto Rico ("COFINA"), la ACT, el Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico (el "SRE"), la Autoridad de Edificios Públicos de Puerto Rico (la "AEP") y/o la AEE. Sobre la base de las resoluciones y órdenes del Tribunal dictadas hasta la fecha, aproximadamente 100,649 reclamaciones que reivindicaban $43.0 billones en responsabilidad contra el ELA, COFINA, la ACT, la AEE, la AEP y el SRE fueron rechazadas y retiradas del registro de reclamaciones en el marco de los procedimientos radicados conforme al Título III.

28.     Esta Tricentésima octogésima quinta objeción global se radica de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales del Tribunal.

## OBJECIONES A EVIDENCIAS DE RECLAMACIONES

29.     Las reclamaciones que sean "inejecutables contra el deudor y los bienes de este, en virtud de cualquier contrato o normativa legal aplicable" deben rechazarse. Título 11 U.S.C., § 502(b)(1). Aunque una evidencia de reclamación debidamente formalizada y radicada constituye una prueba *prima facie* de la validez de la reclamación, *véase* Fed. del Proc. de Quiebr. 3001(f), aplicable a este caso en virtud de la sección 310 de PROMESA, la parte objetante podrá superar dicha evidencia *prima facie* con pruebas que, de creerse, refutarían al menos una de las alegaciones esenciales para la reclamación. *In re Reilly*, 245 B.R. 768, 773 (B.A.P. 2d Cir.), *aff'd*, 242 F.3d 367 (2d Cir. 2000); *véase también Factors Funding Co. c. Fili (In re Fili)*, 257 B.R. 370, 372 (1st Cir. B.A.P. 2001) ("[S]e presume que una reclamación es válida hasta que una parte objetante haya introducido evidencias suficientes para refutar el caso *prima facie* del reclamante". (se omite cita)).

30.     Los Procedimientos Enmendados relativos a Objeciones Globales permiten a los Deudores radicar una objeción global a varias evidencias de reclamaciones sobre cualquiera de las bases recogidas en las reglas 3007(d)(1) a (7) de las Reglas Federales del Procedimiento de Quiebra (*Federal Rule of Bankruptcy Procedure*), así como sobre otras bases sustantivas establecidas en los Procedimientos Enmendados relativos a Objeciones Globales.

31.     La Tricentésima octogésima quinta objeción global pretende, en parte, rechazar y reclasificar, de conformidad con los Procedimientos Enmendados relativos a Objeciones Globales, las partes de las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento (conjuntamente, las "Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente"), cada una de las cuales se basa parcialmente en *a*) reclamaciones por bonos que constituyen duplicados con respecto a una o más evidencias de reclamaciones principales

18

radicadas contra los Deudores en nombre de determinados bonistas, *b*) reclamaciones por bonos que alegan responsabilidades vinculadas con bonos asegurados en el mercado secundario que constituyen duplicados con respecto a evidencias de reclamaciones radicadas contra los Deudores en nombre de determinados bonistas y/o *c*) una participación patrimonial en bonos emitidos por la AAA, la CFP y/o la AFM, que no son Deudores de Título III, por montos por los que los Deudores no han garantizado el reembolso. Además, algunas de las evidencias de reclamaciones que aparecen en el **Anexo A** del presente documento son deficientes porque *i*) no proporcionan información suficiente para que los Deudores puedan reconciliar las evidencias de reclamaciones y *ii*) alegan responsabilidades por supuestas pérdidas por inversiones, pero no explican por qué los Deudores podrían ser responsables por sus supuestas pérdidas por inversiones. Además, algunas de las reclamaciones que aparecen en el **Anexo A** del presente documento deben reclasificarse parcialmente, ya que parte de la reclamación identifica al ELA o a la ACT como deudor, cuando en todo caso lo correcto sería que dichas partes de la reclamación se alegaran contra otro Deudor de Título III. Una parte de cada reclamación seguirá estando radicada contra el ELA y/o la AEE. Los Deudores se reservan el derecho a oponerse a cualquiera de los montos restantes alegados en las reclamaciones, según se identifican en la columna titulada "Corregidas" en el **Anexo A** del presente documento, sobre la base de los motivos que fueren. El **Anexo A** del presente documento especifica además por qué cada una de las Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente debe ser rechazada parcialmente y reclasificada parcialmente.

**A. Ausencia de responsabilidad por reclamaciones duplicadas por bonos**

32.   Según se expone en el **Anexo A** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden

alegar responsabilidad, en parte, sobre la base de los bonos emitidos por la AFI, la UPR, la AEP, la ACT y la AFM (conjuntamente, las "Reclamaciones Parcialmente Duplicadas por Bonos").

33.     Cada una de las Reclamaciones Parcialmente Duplicadas por Bonos pretende alegar, total o parcialmente, responsabilidad contra los Deudores vinculada con uno o más bonos que están duplicados en relación con una o más Reclamaciones Principales que, según se explicó anteriormente, fueron radicadas en el marco de los Casos de Título III en nombre de los tenedores de determinados bonos emitidos por la AFI, la UPR, la AEP, la ACT y la AFM. Si las Reclamaciones Parcialmente Duplicadas por Bonos no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores en detrimento de otras partes interesadas en los Casos de Título III de los Deudores. Los titulares de las Reclamaciones Parcialmente Duplicadas por Bonos no se verán perjudicados por el hecho de que se rechacen sus reclamaciones, puesto que las responsabilidades relacionadas con las Reclamaciones Parcialmente Duplicadas por Bonos figuran en una o más Reclamaciones Principales.

**B.  Ausencia de responsabilidad por las Reclamaciones por Bonos asegurados en el mercado secundario que constituyen duplicados con respecto a las Reclamaciones Principales**

34.     Según se establece en el Anexo A del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar responsabilidad, en parte, vinculada con Bonos asegurados en el mercado secundario, que corresponden a los Bonos de la ACT que están duplicados en relación con las responsabilidades alegadas en una o más Reclamaciones Principales (conjuntamente, las "Reclamaciones parciales por bonos asegurados en el mercado secundario").

35.     Cada una de las Reclamaciones parciales por bonos asegurados en el mercado secundario alega responsabilidades vinculadas con los Bonos asegurados en el mercado

secundario. Los números CUSIP vinculados con dichos Bonos asegurados en el mercado secundario corresponden a bonos emitidos por la ACT y/o que llevan los números CUSIP originales. Dichos números CUSIP originales, que reflejan las emisiones de los bonos en los que los reclamantes tienen participación patrimonial, se mencionan en una o más Reclamaciones Principales. En consecuencia, las Reclamaciones parciales por bonos asegurados en el mercado secundario alegan responsabilidades vinculadas con bonos emitidos por la ACT que constituyen duplicados en relación con las responsabilidades alegadas en una o más Reclamaciones Principales.

36.     Si las Reclamaciones parciales por bonos asegurados en el mercado secundario no son rechazadas, ello resultaría en que los reclamantes en cuestión obtuvieran potencialmente una recuperación duplicada no justificada contra los Deudores, en detrimento de otras partes interesadas en los Casos de Título III. Los tenedores de las Reclamaciones parciales por bonos asegurados en el mercado secundario no se verán perjudicados por el hecho de que se rechacen sus reclamaciones, puesto que las responsabilidades relacionadas figuran en una o más Reclamaciones Principales. Esta Tricentésima octogésima quinta objeción global no constituye en ningún caso una objeción a las reclamaciones mantenidas por la aseguradora de los Bonos asegurados en el mercado secundario, sino que constituye una objeción al titular de los Bonos asegurados en el mercado secundario, que quedan sujetos a las Reclamaciones Principales.

**C. Ausencia de responsabilidad por los Bonos de Gravamen Prioritarios de la AAA**

37.     Conforme a lo identificado en el **<u>Anexo A</u>** del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar reclamaciones basadas parcialmente en supuesta participación patrimonial en los bonos

emitidos por la AAA (conjuntamente, las "<u>Reclamaciones Parciales de Gravamen Prioritario de los Bonistas de la AAA</u>").

38.     Cada una de las Reclamaciones Parciales relativas a los Bonistas de la AAA alega responsabilidades vinculadas con los Bonos AAA de gravamen prioritarios emitidos por la AAA, que no es un Deudor de Título III, sino que es una entidad aparte y jurídicamente independiente del ELA. Además, el ELA no ha garantizado el reembolso de los Bonos de Gravamen Prioritarios. Asimismo, las Reclamaciones Parciales de Gravamen Prioritario de los Bonistas de la AAA no proporcionan fundamento alguno para alegar una reclamación contra el ELA por los bonos emitidos por la AAA que no están garantizados por el ELA. En consecuencia, ni el ELA ni el Tribunal pueden determinar la validez de las Reclamaciones Parciales de Gravamen Prioritario de los Bonistas de la AAA.

**D. Ausencia de responsabilidad relativa a reclamaciones basadas en los Bonos de la CFP y de la AFM**

39.     Conforme a lo identificado en el Anexo A del presente documento, determinadas partes de las Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar reclamaciones basadas en una presunta participación patrimonial en 1) Bonos de la CFP emitidos por la CFP (conjuntamente, las "<u>Reclamaciones Parciales de los Bonistas de la CFP</u>") y/o 2) Bonos de la AFM emitidos por la AFM (conjuntamente, las "<u>Reclamaciones Parciales de los Bonistas de la AFM</u>", y junto con las Reclamaciones Parciales de los Bonistas de la CFP, las "<u>Reclamaciones parciales de los bonistas en las que no existe responsabilidad</u>"). Ni la CFP ni la AFM son deudores de Título III, y sus responsabilidades no están garantizadas por el ELA o cualquier otro de los Deudores.

40.      Cada una de las Reclamaciones Parciales de los Bonistas de la CFP pretende alegar, en parte, responsabilidades contra los Deudores vinculadas con los Bonos de la CFP que no están garantizados por el ELA ni por ninguno de los demás Deudores. La CFP no es deudor de Título III y es una entidad aparte y jurídicamente independiente de los Deudores. *Véase, por ejemplo*, 3 L.P.R.A. § 9081(c) (que se refiere a la CFP como una "entidad jurídica independiente" y aparte del ELA). Es más, cada una de las Declaraciones Oficiales de la CFP emitidas en relación con los Bonos de la CFP dispone que 1) los Bonos de la CFP no constituyen una deuda del ELA ni de ninguna de sus subdivisiones políticas, salvo la CFP, y que el ELA no garantiza las deudas de la CFP, *véase, por ejemplo*, la Declaración Oficial de la CFP de 2012 en 1, y 2) la "Asamblea Legislativa de Puerto Rico no tiene obligación jurídica de asignar montos suficientes para pagar en los plazos establecidos el principal, la prima de reembolso (si la hubiere) y los intereses vencidos sobre los Bonos. No hay garantía de que la Asamblea Legislativa de Puerto Rico asigne, o ponga a disposición de otro modo, fondos suficientes para realizar dichos pagos sobre los Bonos". *Id.* en 18. En consecuencia, ni el ELA ni ninguno de los demás Deudores son responsables en absoluto por los Bonos de la CFP.

41.      Además, cada una de las Reclamaciones Parciales de los Bonistas de la AFM pretende alegar, en parte, responsabilidades contra los Deudores vinculadas con los Bonos de la AFM que no están garantizados por el ELA ni por ninguno de los demás Deudores. *Véase, por ejemplo,* 21 L.P.R.A. § 684(a) (que crea a la AFM como un "organismo corporativo" y aparte del ELA); 3 L.P.R.A. § 9081(c) (que se refiere a la AFM como una "entidad jurídica independiente" del ELA)*. La AFM no es deudor de Título III y es una entidad aparte y jurídicamente independiente de los Deudores. Además, cada una de las Declaraciones Oficiales de la AFM emitidas en relación con los Bonos de la AFM dispone que 1) "ni el crédito del ELA ni el de ninguna de sus

instrumentalidades gubernamentales será pignorado para el pago de los Bonos [de la AFM de Serie A de 2002]", *véase, por ejemplo*, la Declaración Oficial de la AFM de Serie A de 2002 en 1, y 2) el "[e]l pago de dicha suma por el ELA queda sujeto a una asignación por la Asamblea Legislativa de Puerto Rico, asignación que está autorizada pero que no es jurídicamente obligatoria" *id*. en 1, 15. En consecuencia, ni el ELA ni ninguno de los demás Deudores son responsables por los Bonos de la AFM.

42.     Además, aunque los Bonos de la CFP y los Bonos de la AFM fueran pagaderos, en parte, desde asignaciones legislativas, no crean ninguna responsabilidad vinculante contra el ELA porque, como se expone en las Declaraciones Oficiales de la CFP y las Declaraciones Oficiales de la AFM, la Asamblea Legislativa no tenía la obligación ni garantizaba que se realizaran asignaciones suficientes para pagar el principal y los intereses sobre los bonos. La jurisprudencia deja claro que cuando la Asamblea Legislativa tiene la libertar de decidir si realiza o no asignaciones para pagar un bono, no existe ninguna "deuda constitucionalmente reconocida *porque [los bonos]  no le imponen ningún deber ni responsabilidad exigibles al Gobierno*" de realizar tales asignaciones. *Véase ACA Financial Guaranty Corporation c. la ciudad de Buena Vista, Virginia,* 298 F. Supp.3d 834, 848 (W.D. Va. 2018) (que cita *Dykes c. N. Virginia Transp. Dist. Comm'n*, 242 Va. 357, 375, 411 S.E.2d 1 (Va. 1991)); *véase también*, *Solicitud de Oklahoma Capitol Imp. Authority*, 958 P.2d 759, 768 (Okla. 1998) (los bonos que solo eran pagaderos en la medida en que la Asamblea Legislativa opte por realizar asignaciones para pagarlos no constituían deuda del estado); *In re Interrogatory Propounded by Governor Roy Romer on House Bill 91S-1005*, 814 P.2d 875, 889 (Colo. 1991) (el mismo). En la medida en que la Asamblea Legislativa decida no asignar fondos para los pagos relativos a los bonos, los bonistas no pueden radicar una reclamación contra los Deudores. *Véase ACA Financial Guaranty Corp. c. la ciudad de Buena*

24

*Vista, Virginia,* núm. 18-1268, 2019 WL 758292, en *2 (4th Cir. 21 de febrero de 2019) (que concluye que la ciudad de Buena Vista, VA, no tenía la obligación jurídica de efectuar los pagos de la renta "cuando la obligación queda sujeta expresamente a la decisión anual de la ciudad de asignar fondos".). En consecuencia, tales obligaciones no son jurídicamente exigibles. *Véase ACA Financial Guaranty Corporation c. la ciudad de Buena Vista, Virginia,* 298 F. Supp. 3d en 839, 848 ("cuando una localidad promete pagar con sujeción a su futura decisión de asignar dichos pagos, no realiza una promesa jurídicamente exigible de pagar".); *Véase también Lonegan c.* el Estado, 174 N.J. 435, 451, 453-54 (2002) ("una asignación legislativa futura proyectada o anticipada no constituye una deuda o responsabilidad actual . . . [porque] la asamblea legislativa futura no tiene la obligación de realizar la asignación"). Este es exactamente el caso que nos ocupa: el ELA no tiene ninguna obligación de asignar montos para pagar los bonos y, efectivamente, las propias declaraciones oficiales disponen que el ELA no es responsable en relación con los bonos. En consecuencia, las reclamaciones que aleguen responsabilidad con respecto a la CFP o la AFM contra los bonos del ELA deben rechazarse, ya que el ELA no es responsable en este sentido.

43.     En consecuencia, ninguna de las Reclamaciones parciales de los bonistas en las que no existe responsabilidad proporciona fundamento alguno para alegar una reclamación contra los Deudores por bonos emitidos por la CFP y/o la AFM, que no están garantizados por el ELA o cualquiera de los otros Deudores ni constituyen su deuda. Como consecuencia de no alegar una reclamación válida y de incumplir la normativa aplicable, ni los Deudores ni el Tribunal pueden determinar la validez de las Reclamaciones parciales de los bonistas en las que no existe responsabilidad.

### E.  Reclamaciones que alegan pérdidas por inversiones

44.      Conforme a lo expuesto en el Anexo A del presente documento, determinadas Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar, en parte, responsabilidades que surgen de supuestas pérdidas por inversiones (conjuntamente, las "<u>Reclamaciones parcialmente deficientes que alegan pérdidas por inversiones</u>").

45.      Sin embargo, ninguna de las Reclamaciones parcialmente deficientes que alegan pérdidas por inversiones alega posible causa de acción alguna contra los Deudores que pueda generar responsabilidad de los Deudores por los supuestos daños y perjuicios sufridos como consecuencia de la decisión de los reclamantes de vender sus bonos con pérdidas. En consecuencia, los Deudores no son responsables por las pérdidas alegadas en las Reclamaciones parcialmente deficientes que alegan pérdidas por inversiones. *Véase English c. Energy Future Holdings (In re Energy Future Holdings)*, 2018 U.S. Dist. LEXIS 49952, en *7 (D. Del., 27 de marzo de 2018) (que dispone que la orden del tribunal de quiebras por la que se rechaza la evidencia de reclamación era la adecuada, cuando el reclamante había vendido los bonos emitidos por el deudor y, por lo tanto, no tenía ningún derecho a un pago en relación con los bonos ni ha demostrado el reclamante que tuviera posible causa de acción contra el deudor por los supuestos daños y perjuicios sufridos por el reclamante al vender con pérdidas los bonos del deudor); *In re Allegheny Int'l, Inc*., 954 F.2d 167, 173 (3d Cir. 1992) (que cita *In re Holm,* 931 F.2d 620, 623 (9th Cir.1991) (que cita 3 L. King, *Collier on Bankruptcy* § 502.02, en 502-22 (15th ed. 1991)) ("Al principio, el reclamante debe alegar hechos que sean suficientes para sostener la reclamación").

**F.  Reclamaciones Deficientes de los Bonistas**

46.    Además algunas de las Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente pretenden alegar responsabilidad vinculada con inversiones en bonos emitidos por el Gobierno, pero no han proporcionado ninguna información que identifique la naturaleza o fuente de las obligaciones, ni han explicado por qué los Deudores, o cualquier otro Deudor de Título III, son responsables ante el reclamante (los "Bonos Deficientes de los Bonistas").

47.    En algunos casos, las Reclamaciones Deficientes de los Bonistas no contenían ninguna documentación justificativa que indicase cuáles eran los bonos que los reclamantes alegaban que generaban responsabilidades de los Deudores. En otros casos, las Reclamaciones Deficientes de los Bonistas proporcionaban como documentación justificativa una copia de un extracto de corretaje u otra documentación justificativa que contenía información sobre bonos supuestamente en posesión del reclamante, pero los montos de los bonos incluidos en dicha documentación justificativa no correspondían con el monto que figuraba en la evidencia de reclamación del reclamante.

48.    El 13 de agosto de 2019, el Tribunal dictó la *Orden que concedió parcialmente y levantó parcialmente la Moción de los Deudores para dictar una orden que A) autorice procedimientos alternativos de resolución de controversias, B) apruebe formas de notificación adicionales, C) apruebe envíos propuestos y D) conceda el remedio relacionado* [núm. ECF 8453] (la "Orden de Envío Autorizado") que autorizó que los Deudores realizaran envíos "a cualquier reclamante que no haya proporcionado suficiente información que permitiera a los Deudores enjuiciar sus reclamaciones". Orden de Envío Autorizado, ¶ 3.

49. Conforme a la Orden de Envío Autorizado, "[s]i los Deudores realizan el Envío Propuesto al reclamante, y este último no responde o responde pero no aporta suficiente información que permita a los Deudores reconciliar su reclamación, los Deudores tendrán derecho a oponerse a la reclamación como deficiente". *Id.*

50. De conformidad con la Orden de Envío Autorizado, los Deudores han enviado al menos una carta a cada reclamante vinculado con las Reclamaciones Deficientes de los Bonistas, esencialmente en la forma del Anexo 1 de la Orden de Envío Autorizado. Cada Envío, en la parte pertinente, rezaba lo siguiente:

> Se requiere información adicional para que los Deudores sigan examinando su reclamación. Los Deudores no pueden determinar a partir de la información que usted proporcionó cuál es la base de la reclamación que trata de alegar contra uno o más Deudores. Al responder a esta carta, rogamos se asegure de proporcionar toda la información solicitada, así como tantos detalles como sea posible aportar sobre su reclamación. Las descripciones que incorporó en su evidencia de reclamación eran demasiado vagas para que los Deudores comprendieran la reclamación que usted trata de alegar, de manera que rogamos proporcione más detalles y no se limite simplemente a copiar la misma información.
> *Véase* ECF núm. 8453-1 en 2, 7.

Los Envíos recibidos por los reclamantes vinculados con las Reclamaciones Deficientes de los Bonistas exigían a los reclamantes responder en un plazo de 30 días desde la fecha de la carta. *Véase id.* Además, en los Envíos se advertía a los reclamantes de que "[s]i no responde a esta solicitud y no proporciona la información y la documentación requeridas para justificar su reclamación, es posible que los Deudores se vean en la obligación de oponerse a su reclamación." *Id.*

51. Cada una de las Reclamaciones Deficientes de los Bonistas o bien no respondió a los Envíos, o bien envió una respuesta que tampoco contenía información necesaria que permita a los Deudores reconciliar la reclamación. En consecuencia, los Deudores analizaron la

28

documentación sometida con la evidencia de reclamación o con los Envíos en relación con la alegación de inversiones relacionadas con bonos emitidos por el Gobierno.

### G. Reclamaciones por bonos parcialmente reclasificadas

52.     Por último, la parte restante de cada una de las Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente identifica al ELA o a la ACT como el deudor, cuando en todo caso lo correcto sería que dicha parte se alegara contra otro Deudor de Título III (conjuntamente, las "Reclamaciones por Bonos Parcialmente Reclasificadas").

53.     Una de las Reclamaciones por Bonos Parcialmente Reclasificadas está alegada actualmente contra el ELA y pretende alegar, en parte, responsabilidades vinculadas con bono(s) municipal(es), sin embargo la evidencia de reclamación, la documentación justificativa proporcionada por el reclamante y/o la información CUSIP muestran que en todo caso lo correcto sería alegar las responsabilidades vinculadas con las Reclamaciones por bonos parcialmente reclasificadas contra la AEE. Las otras Reclamaciones por Bonos Parcialmente Reclasificadas están alegadas actualmente contra la ACT y pretenden alegar, en parte, responsabilidades vinculadas con bono(s) municipal(es), sin embargo la evidencia de reclamación, la documentación justificativa proporcionada por el reclamante y/o la información CUSIP muestran que en todo caso lo correcto sería alegar las responsabilidades vinculadas con las Reclamaciones por bonos parcialmente reclasificadas contra el ELA. En consecuencia, las Reclamaciones por Bonos Parcialmente Reclasificadas deben reclasificarse, en parte, para alegarse contra el ELA y/o la AEE, el Deudor de Título III identificado en la columna titulada "Corregidas" en el **Anexo A** del presente documento. Los Deudores se reservan el derecho a objetar a cualquiera de las partes de las Reclamaciones por Bonos Parcialmente Reclasificadas sobre cualquier otro motivo que fuere.

54.      En apoyo de lo anterior, los Deudores invocan la *Declaración de Jay Herriman en apoyo de la Tricentésima octogésima quinta objeción global (sustantiva) del Estado Libre Asociado de Puerto Rico y de la Autoridad de Carreteras y Transportación de Puerto Rico a Reclamaciones por bonos parcialmente duplicadas, deficientes, en las que no existe responsabilidad y radicadas contra el deudor incorrecto*, de fecha 20 de agosto de 2021, adjunta al presente como **Anexo B**.

## **NOTIFICACIÓN**

55.      De conformidad con los Procedimientos relativos a Objeciones Globales y la Orden de Notificación del Tribunal, los Deudores notifican la presente Tricentésima octogésima quinta objeción global a) a los acreedores individuales objeto de esta Tricentésima octogésima quinta objeción global, b) al U.S. Trustee, y c) a la Lista maestra de notificaciones (según se define en los *Procedimientos de administración de casos enmendados núm. 15* [ECF núm. 17127-1]), disponibles en el sitio web de casos de los Deudores, en https://cases.primeclerk.com/puertorico. Una copia de la notificación relativa a esta Tricentésima octogésima quinta objeción global se adjunta al presente como **Anexo C**. Las traducciones al español de la Tricentésima octogésima quinta objeción global y de la totalidad de los anexos adjuntos al presente se están radicando con la presente objeción y se trasladarán a las partes.  Los Deudores sostienen que, dada la naturaleza del remedio solicitado, no es necesario enviar ninguna otra notificación.

## **RESERVA DE DERECHOS**

56.      Esta Tricentésima octogésima quinta objeción global se limita a los motivos expuestos en este documento. En consecuencia, esta se radica sin perjuicio de los derechos de los Deudores a objetar a las Reclamaciones que han de ser rechazadas parcialmente y reclasificadas parcialmente o a cualesquiera otras reclamaciones por los motivos que fueren. Los Deudores se reservan expresamente el derecho a radicar toda otra objeción sustantiva o procesal. Ninguna

disposición contenida en el presente documento, ni ninguna acción adoptada conforme a tal remedio, tienen por objetivo, ni se interpretarán en el sentido de que: a) constituyan una admisión en cuanto a la validez de cualesquiera reclamaciones contra los Deudores; b) constituyan una renuncia a los derechos que asisten a los Deudores a impugnar cualesquier reclamación sobre la base de los motivos que fueren; c) constituyan una promesa o requisito para pagar cualquier reclamación; d) constituyan una solicitud o autorización a asumir cualquier acuerdo, contrato o arrendamiento anteriores a la petición conforme al artículo 365 del Código de Quiebras; o e) constituyan una renuncia a los derechos que asisten a los Deudores conforme a PROMESA, el Código de Quiebras o cualquier otra normativa legal aplicable.

### AUSENCIA DE SOLICITUDES PREVIAS

57.    No se ha radicado ninguna solicitud de remedio previa a la presente Tricentésima octogésima quinta objeción global ni ante este Tribunal ni ante ningún otro órgano judicial.

POR LO QUE los Deudores solicitan respetuosamente que se dicte una orden, esencialmente en la forma de la orden propuesta que se adjunta al presente como **Anexo D**, 1) que conceda el remedio solicitado en el presente documento, y 2) que conceda a los Deudores cualesquiera otros remedios que se consideren justos.


[*El resto de la página se deja en blanco intencionadamente*]

Fecha: 20 de agosto de 2021
San Juan (Puerto Rico)

Respetuosamente sometida,

*[Firma en la versión en inglés]*
Hermann D. Bauer
USDC núm. 215205
Carla García-Benítez
USDC núm. 203708
Gabriel A. Miranda
USDC núm. 306704
**O'NEILL & BORGES LLC**
250 Avenida Muñoz Rivera, local 800
San Juan, PR 00918-1813
Tel.: (787) 764-8181
Fax: (787) 753-8944

*[Firma en la versión en inglés]*
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
Nueva York, NY 10036
Tel.: (212) 969-3000
Fax: (212) 969-2900

*Abogados de la Junta de Supervisión y
Administración Financiera para Puerto
Rico, como representante del Estado
Libre Asociado de Puerto Rico y la
Autoridad de Carreteras y
Transportación de Puerto Rico.*

32