# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>PUERTO RICO HIGHWAYS AND<br>TRANSPORTATION AUTHORITY,<br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3567-LTS |
| AMERINATIONAL COMMUNITY SERVICES,<br>LLC, as Servicer for the GDB Debt Recovery<br>Authority and CANTOR-KATZ COLLATERAL<br>MONITOR LLC,<br>Plaintiffs,<br>-v-<br>AMBAC ASSURANCE CORPORATION,<br>ASSURED GUARANTY CORP., ASSURED<br>GUARANTY MUNICIPAL CORP., NATIONAL<br>PUBLIC FINANCE GUARANTEE<br>CORPORATION, FINANCIAL GUARANTY<br>INSURANCE COMPANY, PEAJE INVESTMENTS<br>LLC, and THE BANK OF NEW YORK MELLON,<br>as Fiscal Agent,<br>Defendants. | Adv. Proc. No. 21-00068-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,
as representative of PUERTO RICO HIGHWAYS
AND TRANSPORTATION AUTHORITY; THE
FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO as representative of
THE COMMONWEALTH OF PUERTO RICO,

Movants,

v.

AMERINATIONAL COMMUNITY SERVICES,
LLC, as Servicer for the GDB Debt Recovery
Authority and CANTOR-KATZ COLLATERAL
MONITOR LLC,

Respondents.

**INTERVENING DEFENDANT FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS, OR IN
THE ALTERNATIVE, TO STAY COUNTS I, II, AND IV OF THE COMPLAINT**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL ALLEGATIONS OF THE COMPLAINT ................................ 7

ARGUMENT ............................................................................................. 12

I.    **COUNT I SHOULD BE DISMISSED AGAINST THE
COMMONWEALTH BECAUSE HTA COULD NOT AND DID NOT
GRANT A SECURITY INTEREST IN COMMONWEALTH PROPERTY** ....... 12

    A.    The Appropriation Provisions of the Act 30-31 Excise Tax Statutes Do Not Grant
HTA a Property Interest in Retained Act 30-31 Revenues ................................... 13

    B.    The Plain Language of the HTA Enabling Act Limits the Grant of any Security
Interest in Act 30-31 Revenues to Proceeds of Such Revenues Actually
Transferred to HTA by the Commonwealth............................................................ 21

    C.    The Security Agreement Does Not Purport to Grant A Security Interest in Act 30-
31 Revenues Retained by the Commonwealth........................................................ 23

    D.    Even Assuming a Security Interest in Act 30-31 Revenues Retained by the
Commonwealth Existed, it Would Be Unperfected ............................................... 24

    E.    Even if the DRA Parties Have A Valid Security Interest On Moneys "Covered
Into" a "Special Account" Held in Favor of HTA, the Act 30-31 Revenues Are Not
Credited to That Special Account .......................................................................... 25

    F.    Bankruptcy Code § 552(a) Precludes Any Claim by the DRA Parties to
Postpetition Revenues Retained By The Commonwealth...................................... 26

        1.    Section 552(b)(1) Does Not Apply Because Postpetition Act 30-31
Revenues Are Not "Proceeds" of Prepetition Property .............................. 27

        2.    Because Postpetition Act 30-31 Revenues Are Not "Special Revenues" of
HTA Within the Meaning of Section 928(a), a Prepetition Security Interest,
If Any, Would Not Continue Postpetition ................................................. 29

II.    **COUNT I SHOULD BE DISMISSED BECAUSE PROMESA PREEMPTS
THE APPROPRIATION PROVISIONS OF THE ACT 30-31 EXCISE
TAX STATUTES** ........................................................................................ 31

    A.    The Act 30-31 Excise Tax Statutes Are Expressly Preempted Because They Are
Inconsistent with PROMESA Title II .................................................................... 33

    B.    The Act 30-31 Excise Tax Statutes Are Expressly Preempted Because They Are
Inconsistent With PROMESA Title III .................................................................. 35

C.     The Act 30-31 Excise Tax Statutes Are Impliedly Preempted By PROMESA Title
II ....................................................................................................................... 35

III.    **COUNTS I, II AND IV SHOULD BE DISMISSED PURSUANT TO RULE
12(B)(6) BECAUSE THE DRA PARTIES LACK STANDING TO BRING
OBJECTIONS TO HTA BONDHOLDERS' CLAIMS** ........................................... 38

IV.    **TO THE EXTENT COUNTS I OR IV SEEK A DECLARATION
REGARDING FUNDS HELD BY HTA (BUT NOT DEPOSITED IN THE
FISCAL AGENT CONTROLLED ACCOUNT), THEY DO NOT
PRESENT A JUSTICIABLE CASE OR CONTROVERSY** .................................. 41

V.     **IN THE ALTERNATIVE, COUNTS I, II AND IV SHOULD BE STAYED
OR TERMINATED PENDING THE COURT'S CONSIDERATION OF
CONFIRMATION OF THE PLAN THAT SEEKS TO SETTLE THE
BONDHOLDER CLAIMS TO WHICH THE DRA PARTIES OBJECT** ............. 45

CONCLUSION .................................................................................................................. 49

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*ACP Master, Ltd. v. Puerto Rico (In re Fin. Oversight and Mgmt. Bd. for P.R.)*,
300 F. Supp. 3d 328 (D.P.R. 2018),
*aff'd*, 919 F.3d 638 (1st Cir. 2019) ................................................................................42, 38

*ACP Master, Ltd. v. Puerto Rico (In re Fin. Oversight and Mgmt. Bd. for P.R.)*,
919 F.3d 638 (1st Cir. 2019) ...........................................................................7, 42, 43, 44

*Advanced Testing Techs., Inc. v. Desmond (In re Comp. Eng'g Assocs., Inc.)*,
337 F.3d 38 (1st Cir. 2003)..............................................................................................19

*Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*,
300 U.S. 227 241 (1937)..................................................................................................42

*Alabama v. Tuscaloosa Cnty.*,
172 So. 892 (Ala. 1937)...................................................................................................16

*Antilles Cement Corp. v. Fortuño*,
670 F.3d 310 (1st Cir. 2012)............................................................................................32

*Apa v. Butler*,
638 N.W. 2d. 57 (S.D. 2001) ...........................................................................................17

*Arizona v. Bowsher*,
935 F.2d 332 (D.C. Cir. 1991)..........................................................................................18

*Arizona v. United States*,
567 U.S. 387 (2012)...............................................................................................5, 32, 36

*Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*,
316 B.R. 330 (B.A.P. 9th Cir. 2004).................................................................................28

*Armstrong Bank v. Shraiberg, Landau & Page, P.A. (In re Tuscany Energy, LLC)*,
581 B.R. 681 (Bankr. S.D. Fla. Jan. 25, 2018) ................................................................25

*AT&T Mobility v. Concepcion*,
563 U.S. 333 (2011).................................................................................................32, 36

*Barnett Bank, N.A. v. Nelson*,
517 U.S. 25 (1996)..........................................................................................................36

*Cantor v. Anderson,*
  639 F. Supp. 364 (S.D.N.Y.),
  *aff'd*, 833 F.2d 1002 (2d Cir. 1986) ....................................................................14

*Chamber of Commerce of the U.S. v. Whiting,*
  563 U.S. 582 (2011) ..............................................................................................32

*Citizens Fid. Bank & Trust Co. v. All–Brite Sign Serv. Co. (In re All–Brite Sign
  Serv. Co.),*
  11 B.R. 409 (Bankr. W.D. Ky. 1981) .....................................................................29

*Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.,*
  839 F.2d 1104 (5th Cir.1988) .................................................................................13

*Crosby v. National Foreign Trade Council,*
  530 U.S. 363 (2000)................................................................................................37

*Edwards v. Childers,*
  228 P. 472 (Okla. 1924) ..................................................................................... 17-18

*Ernst & Young v. Depositors Econ. Prot. Corp.,*
  45 F.3d 530 (1st Cir. 1995).....................................................................................42

*Ex parte Bakelite Corp.,*
  279 U.S. 438 (1929) .......................................................................................... 44-45

*Fin. Sec. Assurance Inc. v. Days Cal. Riverside Ltd. (In re Days Cal. Riverside
  Ltd.),*
  27 F.3d 374 (9th Cir. 1994) ....................................................................................27

*Financial Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Glob.
  Designated Activity Company (In re Fin.Oversight & Mgmt. Bd. for P.R.),*
  948 F.3d 457 (1st Cir. 2020),
  *cert. denied*, 141 S. Ct. 844 (2020) ..............................................................2, 5, 18, 28

*First Nat'l Bank of Alexander City v. Avondale Mills Bevelle Emps. Fed. Credit
  Union,*
  967 F.2d 556 (11th Cir. 1992) ................................................................................13

*First Niagara Leasing, Inc. v. Chesapeake Contractors, Inc. (In re Chesapeake
  Contractors),*
  413 B.R. 254 (Bankr. D. Md. 2008) .......................................................................15

*Flute v. United States,*
  808 F.3d 1234 (10th Cir. 2015) ..............................................................................18

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
85 F. Supp. 3d 577 (D.P.R. 2015),
*aff'd*, 805. F.3d 322, *aff'd*, 136 S. Ct. 1938 (2016)................................................37

*Puerto Rico v. Franklin Cal. Tax Free Tr.*,
136 S. Ct. 1938 (2016).................................................................................32

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995).....................................................................................36

*FTC v. J.K. Publ'ns, Inc.*,
No. 99-00044, 2001 WL 36086354 (C.D. Cal. Jan. 17, 2001)................................14

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992).......................................................................................36

*Goodeagle v. United States*,
128 Fed. Cl. 642 (Fed. Cl. 2016) ....................................................................15

*Gras v. Smith (In re Global Envtl. Solutions)*,
342 B.R. 116 (D.N.H. 2006)...........................................................................39

*Gustavsen v. Alcon Labs., Inc.*,
272 F. Supp. 3d 241 (D. Mass. 2017) ...............................................................36

*Hewitt v. Helms*,
482 U.S. 755 (1987).....................................................................................43

*Howard v. Burlington N. & Santa Fe Ry. (In re Bangor & Aroostook R.R.)*,
320 B.R. 226 (Bankr. D. Me. 2005),
*aff'd*, 2007 U.S. Dist. Lexis 13125 (D. Me. Feb. 23, 2007) .................................16

*In re AA 10,000 Corp.*,
No. 07-06601, 2008 WL 11275079 (Bankr. D.P.R. May 9, 2008)...........................13

*In re Bering Trader, Inc.*,
944 F.2d 500 (9th Cir. 1991) .....................................................................27, 28

*In re Chi. Invs., LLC*,
470 B.R. 32 (Bankr. D. Mass. 2012) ...........................................................39, 40

*In re Choquette*,
290 B.R. 183 (Bankr. D. Mass. 2003) ...............................................................39

*In re Corpus Christi Hotel Partners, Ltd.*,
133 B.R. 850 (Bankr. S.D. Tex. 1991) ..............................................................29

*In re DVR, LLC*,
 582 B.R. 507 (Bankr. D. Colo. 2018),
 *aff'd*, 606 B.R. 80 (D. Colo. 2019) ...............................................................46, 47

*In re Fin. Oversight & Mgmt. Bd.*,
 478 F. Supp. 3d 190 (D.P.R. 2020)...........................................................3, 14, 15

*In re Fin. Oversight & Mgmt. Bd.*,
 618 B.R. 619 (D.P.R. 2020) ..................................................................... *passim*

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
 No. 17 BK 3283-LTS, 2019 WL 4735362 (D.P.R. June 28, 2019)........................40

*In re Heritage Org., LLC*,
 375 B.R. 230 (Bankr. N.D. Tex. 2007)....................................................................47

*In re Las Vegas Monorail*,
 429 B.R. 317 (Bankr. D. Nev. 2010) ......................................................................23

*In re Ludwig Honold Mfg. Co.*,
 30 B.R. 790 (Bankr. E.D. Pa. 1983) .......................................................................39

*In re Morales Travel Agency*,
 667 F.2d 1069 (1st Cir. 1981).................................................................................16

*In re Simon*,
 179 B.R. 1 (Bankr. D. Mass 1995) ..........................................................................39

*In re Texas Tri-Collar, Inc.*,
 29 B.R. 724 (Bankr. W.D. La 1983) ........................................................................28

*In re WR Grace & Co.*,
 729 F.3d 332 (3d Cir. 2013)....................................................................................40

*Indus. Comm'n v. Brewer*,
 231 Ariz. 46 (Ariz. Ct. App. 2012) .........................................................................18

*Int'l Shoe Co. v. Pinkus*,
 278 U.S. 261 (1929).................................................................................................37

*Kowal v. Malkemus (In re Thompson)*,
 965 F.2d 1136 (1st Cir. 1992)..................................................................................39

*Law Debenture Tr. Comp. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum
 Corp.)*,
 339 B.R. 91 (D. Del. 2006)......................................................................................47

*Local Loan Co. v. Hunt*,
    292 U.S. 234 (1934) ..................................................................................................27

*Lugo v. United States (In re Fin. Oversight and Mgmt. Bd. for P.R.)*,
    404 F. Supp. 3d 536 (D.P.R. 2019) ..........................................................................42

*Manigault v. Springs*,
    199 U.S. 473 (1905) ....................................................................................................5

*Mass Ass'n of Health Maint. Orgs v. Ruthhardt*,
    194 F.3d 176 (1st Cir. 1999) .....................................................................................32

*Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
    Mgmt. Bd. for P.R.)*,
    916 F.3d 98 (1st Cir. 2019) ..................................................................................4, 34

*Miller v. Wells Fargo Bank Int'l. Corp.*,
    540 F.2d 548 (2d Cir. 1976) .....................................................................................19

*N.H. Bus. Dev. Corp. v. Cross Baking Co. (In re Cross Baking Co.)*,
    818 F.2d 1027 (1st Cir. 1987) .............................................................................27, 28

*Ohio v. Kovacs*
    469 U.S. 274 (1985) ..............................................................................................3, 26

*Pelopidas, LLC v. Keller*,
    No. ED109395, 2021 Mo. App. LEXIS 757 (Mo. App. August 10, 2021) ......19, 20

*Perez v. Campbell*,
    402 U.S. 637 (1971) ..................................................................................................37

*Pliva v. Mensing*,
    564 U.S. 604 (2011) ..................................................................................................36

*Prin Corp. v. Altman (In re Altman)*,
    265 B.R. 652 (Bankr. D. Conn. 2001) .....................................................................48

*Pub. Servs. Comm'n. of Utah v. Wycoff Co., Inc.*,
    344 U.S. 237 (1952) ............................................................................................42, 43

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
    136 S. Ct. 1938 (2016) .............................................................................................32

*Reichelderfer v. Quinn*,
    287 U.S. 315 (1932) ..............................................................................................5, 18

*Rios v. Symington*,
    172 Ariz. 3 (Ariz. 1992) ...........................................................................................17

*Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  327 F. Supp. 3d 365 (D.P.R. 2018),
  *aff'd*, 916 F.3d 98 (1st Cir. 2019) .......................................................................34

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  330 F. Supp. 3d 685 (D.P.R. 2018),
  *aff'd*, 945 F.3d 3 (1st Cir. 2019) .........................................................................34

*RWNIH-DL 122nd Street 1 LLC v. Futterman (In re Futterman)*,
  No. 17-01223, 2019 WL 2553614 (S.D.N.Y June 20, 2019) ...............................46, 47, 48, 49

*Sanderson v. Texarkana*,
  146 S.W. 105 (Ark. 1912)....................................................................................16

*Smith v. C&S Wholesale Grocers, Inc. (In re Delano Retail Partners, LLC)*,
  No. 11-37711-B-7, 2017 Bankr. LEXIS 2397 (Bankr. E.D. Cal. Aug. 14, 2017) ........................................................................................................25

*State ex rel. Fath v. Henderson*,
  160 Mo. 190 (Mo. 1901).....................................................................................18

*State ex rel. Longstaff v. Anderson*,
  146 N.W. 703 (S.D. 1914) ..................................................................................17

*Steslow v. Citicorp Mortg., Inc. (In re Steslow)*,
  225 B.R. 883 (Bankr E.D. Pa. 1998) ...................................................................19

*United States v. Winstar Corp.*,
  518 U.S. 839 (1996) (Souter, J., plurality opinion) .........................................5, 18

*Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.)*,
  907 F.2d 1430 (4th Cir. 1990) ............................................................................27

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
  945 F.3d 3 (1st Cir. 2019),
  *cert. denied*, 141 S. Ct. 241 (2020) .......................................................... 4, 33-34

*Wolfchild v. United States*,
  559 F.3d 1228 (Fed. Cir. 2009)...........................................................................18

**CONSTITUTIONS AND STATUTES**

U.S. Const. art. VI, cl. 2............................................................................................32

11 U.S.C. § 507.......................................................................................................35

11 U.S.C. § 552 ............................................................................................................ *passim*

11 U.S.C. § 902 .......................................................................................................29, 30

11 U.S.C. § 926 ...............................................................................................................14

11 U.S.C. § 928 .......................................................................................................27, 29

11 U.S.C. § 944 ...............................................................................................................35

28 U.S.C. § 2201 .............................................................................................................42

9 L.P.R.A. §§ 2001-2035 ...................................................................................................8

9 L.P.R.A § 2002 ...............................................................................................................8

9 L.P.R.A. § 2003(b) .......................................................................................................22

9 L.P.R.A. § 2004(l) ...............................................................................8, 15, 21, 22

9 L.P.R.A. § 2015 .......................................................................................8, 20, 22

9 L.P.R.A. § 5681 ..................................................................................................... *passim*

13 L.P.R.A. § 12 .......................................................................................................20, 21

13 L.P.R.A. § 31751 ................................................................................................. *passim*

19 L.P.R.A. § 2219 .........................................................................................................23

19 L.P.R.A. § 2233 .................................................................................................13, 23

19 L.P.R.A. § 2262 .........................................................................................................25

19 L.P.R.A. § 2367 .........................................................................................................12

7 P.R. Laws Ann. § 3171 ...................................................................................................7

UCC Article 9 ...........................................................................................................2, 13

P.R. Const. art. VI, § 2 ............................................................................................2, 16

PROMESA § 4............................................................................................4, 31, 33, 35

PROMESA § 101 .............................................................................................................37

PROMESA § 201 .......................................................................................4, 33, 34, 35

PROMESA § 202.............................................................................4, 5, 31, 33, 34, 35, 37

PROMESA § 301 ..............................................................................................6, 35, 38

PROMESA § 405 ..................................................................................................37

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 3007 (Norton Bankruptcy Code Pamphlet 1994–95 ed., Editors'
    Comment) ......................................................................................................39

Restatement (Third) of Trusts § 5 cmt. i ..................................................................19

Restatement (Third) of Suretyship & Guaranty § 1 ...................................................23

Alexander D. Flachsbart, *Municipal Bonds in Bankruptcy: Sec. 902(2) and the
    Proper Scope of "Special Revenues" in Chapter 9*,
    72 Wash. & Lee L. Rev. 955 (2015) ................................................................30

Antonin Scalia,. Scalia and Garner's *Reading Law: The Interpretation of Legal
    Texts* (Kindle Locations 4031-4042). Thomson West. Kindle Edition ..................18

Oxford English Dictionary (2020) ...........................................................................22

Intervening Defendant the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of Debtors, the Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Highways and Transportation Authority ("HTA"), pursuant to PROMESA section 315(b),[1] submits this Memorandum of Law in support of the Oversight Board's Motion to Dismiss, or in the Alternative, to Stay Counts I, II and IV of plaintiffs' *Adversary Complaint* (the "Complaint") [ECF No. 1], filed concurrently herewith.

## PRELIMINARY STATEMENT

1.      Counts I, II and IV assert a variety of causes of action for declaratory relief regarding the alleged claims and rights of the DRA Parties and HTA Bondholders to Commonwealth or HTA property.  Among other things, the DRA Parties seek declarations that: (i) the DRA Parties have a perfected security interest in Act 30-31 Revenues collected by the Commonwealth "wherever located," even if never transferred to HTA (Count I); (ii) the security interest held by HTA Bondholders is limited to revenues deposited by HTA in specified accounts, and does not include Act 30-31 Revenues (Counts II and IV); and, (iii) the DRA Parties have a recourse claim against HTA (Count IV).  As described below, each of these Counts fails and must be dismissed as a matter of law.

2.      ***First***, Count I of the Complaint should be dismissed as to the Commonwealth because it seeks a judicial declaration that the DRA Parties possess rights in property they do not possess pursuant to unambiguous statutes, loan documents and controlling law.  The Complaint is predicated on a fundamental misunderstanding of the DRA Parties that, based on a security agreement from HTA, they obtained security interests in Commonwealth property the

---

[1] Capitalized terms not expressly defined herein (many of which are defined *infra*) have the meaning ascribed to them in the Motion to Dismiss filed concurrently herewith.

Commonwealth has not transferred to HTA.  The DRA Parties contend they have a security interest in certain revenues collected and retained by the Commonwealth even though the DRA Parties acknowledge the Commonwealth was not a party to any agreements with them.  Relying solely on the security interest granted by HTA—not the Commonwealth—the DRA Parties claim HTA could (and did) grant an interest in tax and fee revenues collected, owned and retained by the Commonwealth and never transferred to HTA.  The DRA Parties rely on an appropriation statute providing the Commonwealth will cover over (deposit) certain future revenues to HTA.  But, the DRA Parties nowhere explain how those revenues become pledged to them before the Commonwealth covers them over to HTA and HTA receives them.  Principles of Puerto Rico property law firmly engrained in its Uniform Commercial Code (the "UCC") (as well as the law of every state and territory of the United States)[2] refute that contention.  HTA must have a property interest in collateral before any security interest it grants can attach to the collateral.  As a matter of law, (i) HTA has no property interest in the relevant revenues conditionally[3] allocated to it by the Commonwealth unless and until the Commonwealth actually transfers such revenues to HTA, and (ii) future excise taxes and fees are not property at all (and could not be subject to a security interest) until assessed and collected by the Commonwealth.[4]  The Commonwealth imposes, collects and owns Act 30-31 Revenues pursuant to its inalienable taxing power, P.R. Const. Art. VI, § 2.  Thus, HTA has no property interest in retained Act 30-31 Revenues unless and until they

---

[2] Uniform Law Commission – UCC Article 9, Secured Transactions, available at https://www.uniformlaws. org/committees/community-home?CommunityKey=6317f73b-badb-47b2-8a5a-58ee62032ba1.

[3] In accordance with Article VI, Section 8 of the Puerto Rico Constitution, all the relevant credit documents and statutes provide the amounts appropriated by the Commonwealth are subject to retention or reclamation by the Commonwealth if the Commonwealth has insufficient other available revenues to pay debt issued with its full faith and credit.

[4] *Financial Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Glob. Designated Activity Company (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 948 F.3d 457, 468-69 (1st Cir. 2020) ("*Andalusian*"), *cert. denied*, 141 S. Ct. 844 (2020).

2

are actually transferred to it. This inescapable conclusion is not new. This Court has twice before interpreted the plain and unambiguous language of the same statutes, and concluded they do not give HTA any property interest in excise taxes and fees assessed, collected and retained by the Commonwealth unless and until actually transferred to HTA.[5] For all of the same reasons provided by the Court for its earlier rulings (discussed below), this Court should reach the same conclusion and dismiss Count I.[6]

3.      At best, HTA could have an unsecured claim against the Commonwealth for not transferring the moneys to it or to a designated deposit account held for HTA at the Commonwealth, but this is no more than a breach of a statutory obligation that may entitle HTA to a dischargeable unsecured claim against the Commonwealth—a far cry from the property interest alleged by the DRA Parties. *See Ohio v. Kovacs* 469 U.S. 274, 278–79 (1985).[7]

4.      Moreover, even assuming, *arguendo*, HTA could and did grant a security interest in Act 30-31 Revenues retained by the Commonwealth (neither of which is true), such a security interest would not be perfected given the absence of any control agreement executed by the Commonwealth (and the depositary bank) in favor of the DRA Parties. In any event, most, if not all, of such revenues necessarily consist of excise taxes and fees assessed and collected by the

---

[5] *In re Fin. Oversight & Mgmt. Bd.*, 478 F. Supp. 3d 190, 195–96 (D.P.R. 2020) (the "926 Opinion"); *In re Fin. Oversight & Mgmt. Bd.*, 618 B.R. 619, 634–35 (D.P.R. 2020) (the "Lift Stay Opinion"). Acts 30-31 merely increased the amount of the conditional appropriations to HTA and were included in the excise tax statutes the Court already analyzed in connection with the 926 Opinion and HTA Bondholders' lift stay proceedings.

[6] While Count IV lacks clarity with respect to what funds the DRA Parties seek to recover from, to the extent the DRA Parties seek a recovery from funds retained by the Commonwealth, their request for a declaration fails as matter of law for the same reason Count I fails: HTA has no property interest in retained Commonwealth revenues. The Act 30-31 Excise Tax Statutes do not give HTA any property rights unless and until the revenues are transferred to HTA. Revenues retained by the Commonwealth are not "available" to HTA and are not HTA's property, and thus HTA creditors such as the DRA Parties have no right to recover from such funds. *See* Lift Stay Opinion, 618 B.R. at 534-35 (concluding Excise Taxes within the Commonwealth's possession "are not 'able to be used or obtained' by HTA nor are they at HTA's disposal."); *see also* 926 Opinion, 478 F. Supp. 3d at 195-96.

[7] In any event, statutes providing for annual appropriations do not create rights to payment by the recipient. When such statutory appropriations are revoked, amended or repealed by a future legislature, the initial intended recipient (here HTA) has no right to sue to collect.

Commonwealth postpetition, for which attachment of a security interest would be precluded by Bankruptcy Code Section 552(a). Under any analysis, the DRA Parties' claims in Count I fail because the DRA Parties do not have the perfected security interest they claim.

5. ***Second***, Count I fails for the additional reason that any statutory obligation of the Commonwealth to transfer monies to HTA (as alleged by the DRA Parties) is inconsistent with, and expressly and impliedly preempted by, PROMESA.

6. The declaration requested in Count I is grounded in the appropriation provisions of the Act 30-31 Excise Tax Statutes, which are inconsistent with PROMESA, and therefore subject to PROMESA's express preemption provision, PROMESA § 4. As the First Circuit and this Court have recognized, because PROMESA gives the Oversight Board the exclusive authority to certify budgets, there can be no spending of Commonwealth funds outside the Oversight Board certified budgetary process of PROMESA § 202. PROMESA § 4 therefore expressly preempts any preexisting law appropriating funds without regard to a budget certified by the Oversight Board. *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3, 8 (1st Cir. 2019) ("[I]f a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed in that budget, regardless of what any territorial laws say."), *cert. denied*, 141 S. Ct. 241 (2020); *see also Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019). Simply put, if pre-PROMESA Commonwealth statutes appropriating funds were not preempted, PROMESA §§ 201 and 202 would be inoperable.

7. The appropriation provisions of the Act 30-31 Excise Tax Statutes are likewise expressly preempted because they conflict with Title III of PROMESA by creating non-dischargeable claims arising from prepetition appropriations that must be paid in full. The DRA

Parties' assertion of their supposed rights conflicts with the discharge and priority claim provisions of Title III of PROMESA.

8.      The appropriation provisions of the Act 30-31 Excise Tax Statutes also are impliedly preempted by PROMESA because (i) simultaneous compliance with both PROMESA and territory laws (including the Act 30-31 Excise Tax Statutes and multiple other statutes that appropriate billions of dollars annually for different uses pursuant to Commonwealth law) is impossible, and (ii) the appropriation provisions pose an obstacle to the accomplishment and execution of the full purposes and objectives of PROMESA.  *See Arizona v. United States,* 567 U.S. 387, 399 (2012).

9.      Additionally, no legislature can bind future legislatures.  *Andalusian*, 948 F.3d at 469 ("[O]ne legislature is competent to repeal any act which a former legislature was competent to pass; and one . . . legislature cannot abridge the powers of a succeeding legislature.") (quoting *United States v. Winstar Corp.*, 518 U.S. 839, 873 (1996)); *see also Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932) (Stone, J.) ("[T]he will of a particular Congress . . . does not impose itself upon those to follow in succeeding years."); *Manigault v. Springs*, 199 U.S. 473, 487 (1905) (Brown, J.) ("This law was doubtless intended as a guide to persons desiring to petition the legislature for special privileges . . . but it is not binding upon any subsequent legislature . . . .").  Thus, the appropriation statutes relied on by the DRA Parties are unenforceable against the annual budget laws imposed pursuant to PROMESA § 202(e).

10.     **Third**, Counts I and IV should be dismissed because they constitute objections of the DRA Parties to HTA Bondholders' claims against HTA.  They seek declarations limiting HTA Bondholders' security interests against HTA property (*see* Compl. ¶¶ 113, 115, 142), and the DRA Parties lack standing to prosecute claim objections without leave of Court.  Absent (a) prior

5

demand to, and unjustifiable refusal to bring such a claim by, the trustee, and (b) leave of Court—
none of which occurred or is alleged—only the trustee (here, the Oversight Board under
PROMESA § 301(c)(7)) has standing to object to claims.  Indeed, the Oversight Board *has* filed
objections to HTA Bondholders' claims, and in connection with the Oversight Board's objections
to HTA Bondholders' claims against the Commonwealth, the Oversight Board has agreed to settle
those claims and HTA Bondholders' claims against HTA under the proposed Commonwealth
*Seventh Amended Joint Title III Plan of Adjustment* (as it may be amended, supplemented, or
modified from time to time, the "Plan") [Case No. 17-BK-3283, ECF No. 17627] and the PSA.

11.     Similarly, Count II is a DRA Parties' objection to HTA Bondholders' claims[8] by
someone other than the trustee and without satisfying the threshold legal requirements.  Count II
expressly seeks a declaration limiting the scope of HTA Bondholders' lien and recourse to
revenues deposited in the HTA Bonds' Fiscal Agent account, Compl. ¶ 129, and the Oversight
Board has agreed to settle HTA Bondholders' claims.  Accordingly, Count II also should be
dismissed for lack of standing and because the DRA Parties are attempting to litigate issues subject
to a settlement embedded in the Plan.  The DRA Parties can object to confirmation, but not object
to claims of HTA Bondholders without Court approval.

12.     ***Fourth***, to the extent Counts I and IV are not treated as proofs of claim against
HTA, the DRA Parties' requests for declarations seek impermissible advisory opinions and should
be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1).  Count I alleges the
DRA Parties hold a security interest against funds actually received and held by HTA.  Count IV
asserts the DRA Parties have a recourse claim against HTA.  But, HTA has not yet filed a plan of

---

[8] Count II is entitled "Declaration the HTA Bondholders Have Limited Collateral to Secure the Bonds, that the HTA Bonds Are Limited Recourse Obligations, and Neither the Collateral Pledged to Secure the Bonds, nor the Bond Revenues to which the Bondholders Have Recourse, Includes the Act 30-31 Revenues."

adjustment.  The DRA Parties are simply attempting to jump the line and procure early allowance determinations on their claims against HTA to which HTA has not yet objected.  Such causes of action against HTA do not relate to any concrete dispute, but instead seek abstract determinations as to parties' rights in certain revenue sources, outside the context of a concrete dispute such as Commonwealth plan confirmation or a claim objection proceeding.  As the First Circuit held in *Aurelius Cap. Master, Ltd. v. Commonwealth of P.R. (In re Fin. Oversight and Mgmt. Bd. for P.R.)* ("*ACP Master*"), 919 F.3d 638, 645 (1st Cir. 2019), such actions do not present justiciable cases or controversies and must be dismissed.

13.     ***Fifth***, if the Court does not dismiss Counts I, II, and IV, the portions of those counts objecting to other creditors' claims against HTA or the Commonwealth should alternatively be stayed or terminated without prejudice because the relief the DRA Parties request is inconsistent with and threatens to undermine the Oversight Board's settlement of HTA Bondholders' claims.  While the DRA Parties may object to the settlement, they do not have the right to file ancillary litigation in an effort to derail it.  As a result, the portions of Counts I, II, and IV that attempt to object to HTA Bondholders' claims being settled should either be terminated without prejudice or stayed until the Court has ruled on confirmation of the Commonwealth's proposed Plan.

## FACTUAL ALLEGATIONS OF THE COMPLAINT

14.     DRA is a statutory public trust and public governmental instrumentality of the Commonwealth and is independent from any other governmental entity.  Compl. ¶ 4.  It was created under the Government Development Bank for Puerto Rico Debt Restructuring Act, to help give effect to the terms of the Government Development Bank's ("GDB") PROMESA Title VI restructuring.  *Id.* ¶¶ 4, 20-21; 7 P.R. Laws Ann. § 3171.

7

15.     HTA is a public corporation established pursuant to Act No. 74-1965, which is codified as 9 L.P.R.A. §§ 2001-2035 (the "HTA Enabling Act").  *See* Compl. ¶ 24.  HTA is separate from the Commonwealth.  9 L.P.R.A. § 2015.  HTA is responsible for the construction, operation, and maintenance of the Commonwealth's transportation system.  *See* Compl. ¶ 24; 9 L.P.R.A § 2002.  The HTA Enabling Act authorizes HTA to issue bonds and to secure their repayment by granting a security interest in certain property "made available" to HTA.  *See* Compl. ¶ 25; 9 L.P.R.A. § 2004(l).

16.     HTA issued several series of bonds governed by: (i) Resolution No. 68-18, adopted June 13, 1968 (the "1968 Resolution," and the bonds issued thereunder, the "1968 Bonds"), and (ii) Resolution No. 98-06, adopted February 26, 1998 (the "1998 Resolution," and the bonds issued thereunder, the "1998 Bonds," and the 1968 Bonds together with the 1998 Bonds, the "HTA Bonds," the holders of Bonds, the "HTA Bondholders" and the 1968 Resolution together with the 1998 Resolution, the "HTA Bond Resolutions").  *See* Compl. ¶ 26; *see also* 1968 Resolution, ECF No. 1-1; 1998 Resolution, ECF No. 1-2.

17.     The HTA Bonds were payable from certain revenues received by HTA, including toll revenues and the excise tax and fee revenues appropriated to HTA by the Commonwealth. HTA was authorized to and did pledge as collateral for the bonds (the "Bond Revenues") the revenues it would thereafter deposit in a certain account.[9]  *See* Compl. ¶¶ 27-31 (citing the HTA Bond Resolutions, attached to the Complaint as Ex. A and B).

18.     The Complaint alleges the HTA Bond Resolutions granted HTA Bondholders a security interest only in Bond Revenues both received by HTA and deposited into accounts held

---

[9] The Complaint (¶¶ 30-31) defines "Bond Revenues" as the "Revenues" defined in the 1968 and 1998 HTA Bond Resolutions, which definitions include (i) moneys appropriated to HTA by the Commonwealth and (ii) HTA's own source revenues, such as toll revenues, and which are pledged by HTA as security for the HTA Bonds.

at the Fiscal Agent for the bonds (the "Bond Revenue Accounts").  *See* Compl. ¶¶ 32-33; 1968

Resolution at 41; 1998 Resolution at 47.

19.     Between March 2008 and January 2014, GDB extended loans to HTA pursuant to

15 loan agreements (the "Loan Agreements," and each, a "Loan Agreement"), which loans were

memorialized by 23 promissory notes (the "Loan Claims").  Compl. ¶ 48.  The Loan Claims are

payable from "any available moneys and resources of HTA," including what the Complaint defines

as "Act 30-31 Revenues," which include the "incremental revenues implemented through Acts 30

and 31 and allocated to HTA . . . ." Compl. ¶ 46.  Act 30 is "Act No. 30-2013" and Act 31 is "Act

31-2013."  Compl. ¶¶ 40, 49.

20.     Act 30 amended Section 23.01 of Act No. 22-2000 to remove a $15 "cap" on

vehicle license fees the Commonwealth would "cover[] into" a special deposit for the benefit of

HTA.  Compl. ¶¶ 42, 43.  Act 31 amended Section 3060.11 of Act No 1-2011 by removing a

previously existing cap on excise taxes collected on crude oil, and partially finished and finished

oil by-products and any other hydrocarbon mixture, which excise taxes the Commonwealth

conditionally appropriated to HTA and "covered into" a special deposit in favor of HTA.  Compl.

¶¶ 44, 45.  Act 31 also conditionally appropriated $20 million per year in cigarette excise taxes to

HTA, which funds were to be covered into a special deposit in favor of HTA.  Compl. ¶ 45.

21.     Act 30, codified by a modification to 9 L.P.R.A. § 5681, increased the amount of

vehicle license fees conditionally appropriated to HTA for HTA's corporate purposes.  *See* Compl.

¶¶ 40, 43.  Act 31 was codified through (i) modifications to 13 L.P.R.A. § 31751(a)(1)(C) to

remove the cap on petroleum excise taxes conditionally appropriated to HTA for its corporate

purposes, and (ii) the addition of § 31751(a)(3)(C) to appropriate $20 million per year in cigarette

taxes to HTA for its corporate purposes (*see* Compl. ¶¶ 40, 45) (9 L.P.R.A. § 5681 and 13 L.P.R.A.

9

§§ 31751(a)(1)(C), 31751(a)(3)(C) are collectively referred to as the "Act 30-31 Excise Tax Statutes").

22.     Act 30-31 Revenues are expressly subject to retention by the Commonwealth under Section 8 of Article VI of the Puerto Rico Constitution and are "available resources" of the Commonwealth. *See* 9 L.P.R.A. § 5681 and 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C).

23.     On August 28, 2013, GDB and HTA executed a security agreement by which HTA assigned as security to GDB, HTA's "rights, title, obligations and interest in" Act 30-31 Revenues (the "Security Agreement"). *See* Compl. ¶ 50; Ex. F (Security Agreement at 1.1 at pp. 1-2). Section 1.2 of the Security Agreement assigns, pledges and grants "a continuing security interest, which shall be junior, inferior and subordinate in all respects to the outstanding bonds of [HTA] issued pursuant to the Bond Resolutions, in all of the right, title and interest of [HTA] in the revenues *allocated to it* by Acts No. 30-2013 & 31-2013 approved by the Legislature of the Commonwealth of Puerto Rico on June 25, 2013, whether presently held or hereafter acquired and wherever located (collectively, the "Collateral")." *Id.*; Ex. F (Security Agreement at 1.2 at p. 2) (emphasis added).

24.     Consistent with the Security Agreement's grant of a security interest in revenues "whether presently held or hereafter acquired," the Loan Agreement attached to the Complaint and executed contemporaneously with the Security Agreement recites HTA "has agreed to pledge and grant a security interest in favor of the Bank over the revenues ***received*** pursuant to Acts 30-2013 & 31-2013 to secure all obligations under this Agreement." Compl. ¶ 49; Ex. E (emphasis added).

25.     On November 29, 2018, GDB and DRA executed a Master Transfer Agreement assigning to DRA GDB's legal rights, title, and interest in (i) the Loan Claims, (ii) $200,000,000

10

in aggregate original principal amount of HTA Revenue Bonds (Series A) issued under the 1998

Resolution, and (iii) GDB's security interest in Act 30-31 Revenues.  Compl. ¶¶ 5, 22.

26.    The Complaint seeks judicial declarations that would both (i) limit HTA

Bondholders' security interest and claims and (ii) establish the DRA Parties' alleged rights to Act

30-31 Revenues and to collect from Bond Revenues not deposited in the Bond Revenue Accounts,

whether retained by the Commonwealth or collected and then transferred to HTA.

27.    The Complaint alleges HTA Bondholders' claims, if any, are limited to amounts

received by HTA and deposited in the Bond Revenue Accounts.  Compl. ¶ 35.  The DRA Parties

dispute any claim by HTA Bondholders to a security interest in Act 30-31 Revenues.  *Id.* ¶¶ 34-

35, 59-60.  According to the DRA Parties, their Loan Claims[10] and Security Agreement give them

the sole security interest in Act 30-31 Revenues "wherever located."  *Id.* ¶¶ 50-51,115.  The DRA

Parties also allege they hold "general recourse obligation[s]" of HTA, which they contend provides

them the right to collect on their Loan Claims from Bond Revenues not deposited in the Bond

Revenue Accounts.  *Id.* ¶ 61.

28.    Count I seeks a declaration the "DRA is the only party with (i) a valid, perfected,

first-priority lien on the Act 30-31 Revenues and (ii) a right to collect from the Act 30-31

Revenues."  Compl. ¶ 115.  In Count II, the DRA Parties seek a declaration the security interest

held by HTA Bondholders is limited to revenues deposited by HTA in the Bond Revenue

Accounts, and does not include Act 30-31 Revenues claimed by the DRA Parties as security.

Compl. ¶¶116-129.  Through Count IV, the DRA Parties seek a declaration they have a general

---

[10] The DRA Parties state their "Complaint is focusing at this time on the DRA's recover[y]" as it relates to the 23
promissory notes, which they refer to as the "Loan Claims." Compl. ¶ 23 n.6.

recourse claim against HTA payable from Bond Revenues not deposited in the Bond Revenue

Accounts.  Compl. ¶¶ 141-145.

## ARGUMENT

**I.     COUNT I SHOULD BE DISMISSED AGAINST THE COMMONWEALTH BECAUSE HTA COULD NOT AND DID NOT GRANT A SECURITY INTEREST IN COMMONWEALTH PROPERTY**

29.     Count I seeks a declaration that the DRA Parties are the only party with a "valid,

perfected, first-priority lien on the Act 30-31 Revenues," irrespective of where such revenues are

"located,"[11] as well as a "right to collect from the Act 30-31 Revenues."[12]  Compl. ¶ 115.  To the

extent Count I asserts a security interest in Act 30-31 Revenues retained by the Commonwealth, it

must be dismissed because the DRA Parties do not have a valid security interest in or right to

collect from Act 30-31 Revenues unless and until the collections of those revenues are delivered

to HTA.  Importantly, to the extent the DRA Parties assert they possess an effective, perfected

security interest in HTA's right (if any) to receive the Act 30-31 Revenues, that would not give

them a secured claim against the Commonwealth, only an interest in HTA's unsecured claim (if

any) against the Commonwealth arising from retention of collections of Act 30-31 Revenues.

30.     The DRA Parties do not reference in their Complaint anything remotely supporting

a security interest in Act 30-31 Revenues retained by the Commonwealth.  Most fundamentally,

the Commonwealth has not executed any security agreement with the DRA Parties or taken any

other action that could have given the DRA Parties a security interest in Commonwealth

---

[11] In Uniform Commercial Code parlance, revenues cannot be "located" anywhere.  They are intangibles and thus cannot be said to have a "location."

[12] Under the UCC as adopted in Puerto Rico, a purported "right to collect" is merely a remedy and not a property right.  *See generally* 19 L.P.R.A. § 2367(e) (upon agreement, or after default, a secured party can undertake to collect payment from the obligor if the secured party has a security interest in that right to payment).  Thus, the DRA Parties' request that they obtain a declaration holding they "have a right to collect from the Act 30-31 Revenues" stands or falls on whether they have an effective, perfected security interest in those revenues—and they do not.

revenues—and the DRA Parties' Complaint does not allege otherwise.  The DRA Parties' asserted security interest is based solely on the Security Agreement between HTA and GDB, to which the Commonwealth was not a party and which does not grant a security interest in Commonwealth revenues.  Compl. ¶¶ 37, 50, 105.  The Security Agreement cannot support a claim the DRA Parties have a security interest in Commonwealth revenues for the simple reason that HTA has the power to grant a security interest only in collateral in which it has a property interest.  As a matter of law, HTA does not have any such interest in Act 30-31 Revenues collected and retained by the Commonwealth.  Moreover, even if the DRA Parties could have a security interest in collections of Act 30-31 Revenues retained by the Commonwealth, it would be unperfected because the DRA Parties do not allege they have control (as defined in Article 9 of the UCC) over the Commonwealth's deposit accounts.  As a result, the DRA Parties do not have a perfected security interest against Commonwealth revenues or proceeds thereof, and their request for a declaration that they do should be dismissed.

A.    **The Appropriation Provisions of the Act 30-31 Excise Tax Statutes Do Not Grant HTA a Property Interest in Retained Act 30-31 Revenues**

31.    It is a fundamental statutory tenet of secured transactions that HTA can grant a security interest only in assets in which it has rights—which means a property interest in the putative collateral.  *See* 19 L.P.R.A. § 2233(b)(2) (a security interest is enforceable against the debtor and third parties with respect to the collateral only if "the debtor has rights in the collateral . . . .").[13]  But, the Act 30-31 Excise Tax Statutes are clear HTA has no property interest in Act 30-

---

[13] *See also, e.g.*, *In re AA 10,000 Corp.*, No. 07-06601, 2008 WL 11275079, at *6 (Bankr. D.P.R. May 9, 2008) (applying UCC Article 9 in effect at the time (which is the same under current Article 9), and finding a creditor had no security interest because the debtor who attempted to grant the security interest had no rights in the putative collateral). *See also Crocker Nat'l Bank v. Ideco Div. of Dresser Indus., Inc.*, 839 F.2d 1104, 1109 (5th Cir.1988) (holding a non-paying buyer does not have a sufficient right in the collateral to enable the buyer to transfer a security interest in the product to a third party where the seller had the right to withhold and stop delivery of the goods); *First Nat'l Bank of Alexander City v. Avondale Mills Bevelle Emps. Fed. Credit Union*, 967 F.2d 556, 559 (11th Cir. 1992) ("Though Caldwell was a prolific thief, the fact remains that as a thief her title was void and she had insufficient rights

31 Revenues retained by the Commonwealth. Count I must therefore be dismissed as against the Commonwealth because, as a matter of law, HTA could not have granted a security interest in such revenues.

32.     Importantly, this Court already considered the very statutes at issue in this adversary proceeding (the Act 30-31 Excise Tax Statutes) and determined—twice—that HTA does not have a property interest in Act 30-31 Revenues retained by the Commonwealth. Specifically, this Court considered whether HTA has any property interests in Act 30-31 Revenues retained by the Commonwealth in both the monolines' lift stay motion [Case No. 17-BK-3567-LTS, ECF No. 673] (the "Monoline Lift Stay Motion") and their motion for appointment of a trustee pursuant to 11 U.S.C. § 926 [Case No. 17-BK-3283-LTS, ECF No. 13708] (the "926 Motion"). In connection with both motions, the Court determined the Act 30-31 Excise Tax Statutes—that is, 9 L.P.R.A. § 5681 and 13 L.P.R.A. § 31751(a) (among other statutes)[14]—do not give HTA a property interest in Act 30-31 Revenues until the Commonwealth's collections of those revenues are actually transferred to HTA.

33.     In connection with the 926 Motion, the Court determined there was no "colorable basis" to contend HTA had a property interest in Act 30-31 Revenues retained by the Commonwealth. 926 Opinion, 478 F. Supp. 3d at 195–96. Similarly, in connection with the Monoline Lift Stay Motion, after a detailed review of, among other things, the Act 30-31 Excise

---

to grant an enforceable security interest in the share CD."); *F.T.C. v. J.K. Publ'ns, Inc.*, No. 99-00044, 2001 WL 36086354, at *13 (C.D. Cal. Jan. 17, 2001) ("Under Article Nine of the Uniform Commercial Code (either in California or Missouri), a debtor must have proper 'rights in the collateral' before granting such an interest."); *Cantor v. Anderson*, 639 F. Supp. 364, 368 (S.D.N.Y. 1986) ("Second, while possession may perfect a security interest in goods pursuant to U.C.C. 9–302(1)(a), a security cannot attach until the debtor has 'rights in the collateral' pursuant to U.C.C. § 9–203(1)(c) and U.C.C. § 9–204(1)."), *aff'd* 833 F.2d 1002 (2d Cir. 1986).

[14] Specifically, the Act 30-31 Excise Tax Statutes formed part of the "Excise Tax Statutes" referred to by the Court in the Lift Stay Opinion and 926 Opinion. *See* Lift Stay Opinion, 618 B.R. at 625, 628–29 (defining "Excise Tax Statutes" as including 13 L.P.R.A. § 31751 and 9 L.P.R.A. § 5681 and defining "Excise Tax Revenues" as including the cigarette excise taxes, motor vehicle license fees, and excise taxes on crude oil and related products at issue here); *see also* 926 Opinion, 478 F. Supp. 3d at 195 (holding the same "Excise Tax Revenues" are not HTA's property).

Tax Statutes, the Court made a preliminary determination Act 30-31 Revenues (among other

revenues) were not "available" for HTA to pledge pursuant to 9 L.P.R.A. § 2004(l).  *See* Lift Stay

Opinion, 618 B.R. at 634–35 ("Excise Taxes are not 'able to be used or obtained' by HTA nor are

they at HTA's disposal; they are within the possession and control of the Commonwealth.").

34.     The Court has thus already determined HTA lacks the property interest in Act 30-

31 Revenues required to grant a security interest in them to the DRA Parties.  The Court's Lift

Stay Opinion and 926 Opinion were based on the Court's interpretation of *exactly* the same

unambiguous statutes at issue here: 9 L.P.R.A. § 5681 and 13 L.P.R.A. §§ 31751(a)(1)(C),

31751(a)(3)(C).  These statutes mean the same thing now as they meant then.  There is no reason

to divert from the Court's prior interpretation.[15]

35.     Indeed, the Court's conclusions in the 926 Opinion and Lift Stay Opinion are

demonstrably correct: on their face, the Act 30-31 Excise Tax Statutes do not transfer any property

interest in Act 30-31 Revenues to HTA.[16]  At most, they create an obligation to transfer.  Act 30-

---

[15] The DRA Parties intervened and participated in the Monoline Lift Stay Motion and filed a joinder to the 926 Motion. While the Lift Stay Opinion may have made only preliminary determinations as to the property interests purportedly created by the Act 30-31 Excise Tax Statutes, the 926 Opinion separately rejected the contention that HTA has a property interest in the Act 30-31 Revenues.  *See* 926 Opinion*, 478 F. Supp. 3d at 195–96. Notably, the monolines' appeal of the 926 Opinion—in which the DRA Parties intervened—was recently dismissed voluntarily, and the First Circuit has issued a formal mandate in the case.  *See* Case No. 20-1847, Doc. No. 00117769652 (1st Cir. Jul. 30, 2021).  This Court's 926 Opinion is thus final and unchallengeable.  In any event, in these circumstances it is well-settled a district court is entitled to treat its prior legal decisions as law of the case, absent a compelling reason not to do so (and none is presented here).  *See, e.g., First Niagara Leasing, Inc. v. Chesapeake Contractors, Inc. (In re Chesapeake Contractors)*, 413 B.R. 254, 260 (Bankr. D. Md. 2008) ("the findings of the court [in order denying motion for relief from stay] as to the fact that Movant holds no security interest in the collateral cannot be changed and is binding. Under the doctrine of 'law of the case,' after a finding that the Movant lacked a security interest, the court is precluded from reconsidering the exact same issue again"); *Goodeagle v. United States*, 128 Fed. Cl. 642, 648 (2016) ("[T]he law of the case doctrine may be applied to previous trial court decisions at the discretion of the court in the interest of avoiding relitigation. Not only may a court treat its previous decisions as binding, but it is highly encouraged to do so barring extraordinary circumstances.").

[16] The Complaint neither references the Court's prior determinations that HTA does not have a property interest in the Act 30-31 Revenues nor explains the DRA Parties' theory as to how HTA may have such an interest.  The DRA Parties have previously argued the Act 30-31 Excise Tax Statutes "transferred and assigned" Act 30-31 Revenues to HTA, simply because the statutes required the revenues to be "covered into" a special deposit. *See DRA Parties Response to FOMB's Memo. of Law in Support of Mot. for Partial Summary Judgment,* ¶ 8 [Case No. 20-005, ECF 99].  To the extent this is the basis for the DRA Parties' claim to Act 30-31 Revenues retained by the Commonwealth, the argument is wrong for the reasons explained in the main text.

31 Revenues are collected, controlled, and held by the Commonwealth pursuant to its inalienable

taxing power. *See* P.R. Const. Art. VI, § 2. Tax revenues belong to the taxing authority—here,

the Commonwealth—until the taxing authority actually transfers them (once collected). *See, e.g.*,

*Alabama v. Tuscaloosa Cnty.*, 172 So. 892, 893 (Ala. 1937) (taxes levied by a county for county

purposes "belong to, are the property of, the county"); *Sanderson v. Texarkana*, 146 S.W. 105, 106

(Ark. 1912). Consistent with this premise, the Act 30-31 Excise Tax Statutes specify Act 30-31

Revenues are the Commonwealth's "available resources" and can be used by the Commonwealth

to pay its debt service when needed. *See* 9 L.P.R.A. § 5681; 13 L.P.R.A. §§ 31751(a)(1)(C),

(a)(3)(C). In respect of fees and revenues not transferred to HTA, the Commonwealth's retention

of its clawback right under the Puerto Rico Constitution further shows HTA lacks any interest in

the relevant fees and revenues. *See, e.g.*, *In re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st

Cir. 1981) (a party's right to use funds in its possession for its own purposes is inconsistent with

notion that a third party has a property interest in such funds); *Howard v. Burlington N. & Santa

Fe Ry. (In re Bangor & Aroostook R.R.)*, 320 B.R. 226, 232 (Bankr. D. Me. 2005) (same), *aff'd*,

2007 WL 607867 (D. Me. Feb. 23, 2007).

36.     The Act 30-31 Excise Tax Statutes provide for the appropriation by the

Commonwealth of collections of Act 30-31 Revenues to HTA for its corporate purposes, subject

to the Commonwealth's retention powers under Section 8 of Article VI of the Puerto Rico

Constitution. *See* 13 L.P.R.A. § 31751(a)(1)(C) (providing the gasoline excise taxes are simply

"appropriated" to HTA); *see also Secretary of Justice Opinion 2005-14*, at 18-19, 25 (Case No.

17-BK-3283-LTS, ECF No. 13162-6) (referring to laws similar to the Act 30-31 Excise Tax

Statutes as "appropriations laws" of "indefinite extent."). Specifically, the Act 30-31 Excise Tax

Statutes appropriate the proceeds of Act 30-31 Revenues to HTA by providing that, once the

Commonwealth collects the relevant license fees or taxes, the Commonwealth is to "transfer" or "cover" the fees or taxes into a "special deposit" in favor of HTA on a monthly basis. *See* 9 L.P.R.A. § 5681 ("[T]he amount of the fees . . . shall be covered in its entirety into a Special Deposit in the name and for the benefit of [HTA]."); 13 L.P.R.A. § 31751(a)(1) (the tax proceeds "shall be covered into a special deposit in favor of [HTA]"); 13 L.P.R.A. § 31751(a)(1)(A) (requiring transfer on a monthly basis to special deposit); 13 L.P.R.A. § 31751(a)(3) (same).

37.     This requirement to transfer the funds to a special deposit does not give HTA a property interest in the Act 30-31 Revenues at the time they are collected or otherwise before they are delivered to HTA.  On the contrary, jurisprudence from across the United States is clear that statutory provisions just like those contained in 9 L.P.R.A. § 5681 and 13 L.P.R.A. § 31751, requiring the transfer of proceeds of excise tax revenues and license fees to a special deposit in favor an entity, constitute mere appropriations, and do not themselves transfer ownership or any other property interest.[17]  *See, e.g.*, *Apa v. Butler*, 638 N.W. 2d. 57, 60–63 (S.D. 2001) (law requiring proceeds of certain taxes be placed in special fund and spent on specific purposes constituted "continuing appropriation" of those proceeds, which was subject to amendment in the state's general budget); *State ex rel. Longstaff v. Anderson*, 146 N.W. 703, 703–05 (S.D. 1914) (law requiring proceeds of various excise taxes and license fees be "set apart" into "special funds" constituted "appropriation" of those proceeds); *Rios v. Symington*, 172 Ariz. 3, 6-8 (Ariz. 1992) ("Thus, the creation of each special fund at issue here was an appropriation . . . . Indeed, it would be difficult to conclude otherwise . . . . That the Legislature has created a special fund to meet a specified object means, quite literally, that it has made an appropriation."); *Edwards v. Childers*,

---

[17] The reference in the Act 30-31 Excise Tax Statutes to a "special deposit" is therefore not to any specific deposit account or other fund—instead, the jurisprudence cited makes clear that the statutory language providing for the transfer of the Act 30-31 Revenues to a "special deposit" for HTA is nothing more than a statutory formula used to make an appropriation to HTA.

17

228 P. 472, 473–74 (Okla. 1924) (statute requiring gasoline taxes to be "placed in a special fund" for highway authority constituted "appropriation" of those funds to highway authority). Such an appropriation can be amended or repealed by the same and future legislatures. *See Indus. Comm'n v. Brewer*, 231 Ariz. 46, 50 (Ariz. Ct. App. 2012) ("[T]he Special Fund is an appropriation [and] can . . . also be amended by the legislature or even dissolved."); *see also State ex rel. Fath v. Henderson*, 160 Mo. 190, 214 (Mo. 1901) ("Let it be freely admitted that one General Assembly can not tie the hands of its successor, and that although this tax is set apart into a special fund, it still belongs to the State and may be appropriated to another and different use . . . .").[18]

38.     An appropriation of funds does not itself confer a property interest in such funds before they are actually transferred. *See, e.g.*, *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991) ("When the United States sets aside money for the payment of specific debts, it does not thereby lose its property interest in that money . . . The money here is federal money. That various persons have claims against the United States in amounts exactly matching the funds, and intended by Congress to be paid from these funds, does not give those individuals a property interest in the money."); *see also Flute v. United States*, 808 F.3d 1234, 1245–46 (10th Cir. 2015) (statute did not create trust where it did not "contain[] any express trust language" but simply contained "language appropriating a sum of money for the Secretary's use in paying reparations to specific individuals"); *Wolfchild v. United States*, 559 F.3d 1228, 1238 (Fed. Cir. 2009) ("The simple

---

[18] It is black-letter law that one legislature cannot bind the present or a future legislature. *Winstar Corp.*, 518 U.S. at 872 (Souter, J., plurality opinion); *Reichelderfer*, 287 U.S. at 318 ("the will of a particular Congress . . . does not impose itself upon those to follow in succeeding years"); *Andalusian*, 948 F.3d at 469 ("[O]ne legislature is competent to repeal any act which a former legislature was competent to pass; and one . . . legislature cannot abridge the powers of a succeeding legislature.") (quoting *Winstar Corp.*, 518 U.S. at 873)); *see also* Scalia, Antonin. Scalia and Garner's *Reading Law: The Interpretation of Legal Texts* (Kindle Locations 4031-4042). Thomson West. Kindle Edition (footnotes omitted) ("Just as a corporate board of directors cannot adopt an immutable policy, legislators cannot make their laws irrepealable or disable themselves or their successors from taking action: '[O]ne legislature cannot bind a subsequent one . . . .' This canon is traditionally known as the nonentrenchment doctrine.").

statutory directives as to the expenditures authorized by the Appropriations Acts do not evidence

an intention on Congress's part to create" a trust).

39.     This conclusion is consistent with the general principle that an obligation to transfer

property or secure an obligation does not transfer an interest in property until a delivery in fact

occurs.  *See Advanced Testing Techs., Inc. v. Desmond (In re Comp. Eng'g Assocs., Inc.)*, 337 F.3d

38, 46 (1st Cir. 2003) ("[A] mere promise to pay a debt out of a designated fund does not operate

as an effective assignment where the assignor continues to control the fund; retention of control

precludes the perfection of an assignment."); *Miller v. Wells Fargo Bank Int'l. Corp.*, 540 F.2d

548, 558 (2d Cir. 1976) ("[A] mere agreement to pay a debt out of a designated fund does not

operate as a legal or equitable assignment since the assignor retains control over the subject

matter." (quotation marks omitted)); *Steslow v. Citicorp Mortg., Inc. (In re Steslow)*, 225 B.R. 883,

886 n.4 (Bankr. E.D. Pa. 1998) ("[A] covenant without a pledge granting additional security

interest is simply a promise, not a security interest."); Restatement (Third) of Trusts § 5 cmt. i ("If

a contract to convey property is not specifically enforceable, the purchaser acquires no interest in

the property before the conveyance is made but has merely a personal claim against the vendor.").

40.     This legal principle—an appropriation does not transfer a property interest—is also

consistent with the text of the Act 30-31 Excise Tax Statutes:  the requirement in 9 L.P.R.A. §

5681 and 13 L.P.R.A. § 31751(a) that the Commonwealth "shall" transfer the collections of Act

30-31 Revenues to HTA is the language of future obligation, not of a present, statutory transfer of

property to HTA.  *See Pelopidas, LLC v. Keller*, No. ED109395, 2021 Mo. App. LEXIS 757, at

*30 (Mo. Ct. App. Aug. 10, 2021) (noting that the parties' use of the words "shall be" "clearly

expressed a *future* duty or requirement")  (emphasis in original).  To the extent the Commonwealth

19

does not make such transfers to HTA, nothing in the Act 30-31 Excise Tax Statutes suggests a property interest is nonetheless transferred to HTA.

41.    Finding that the Act 30-31 Excise Tax Statutes do not transfer a property interest in Act 30-31 Revenues to HTA upon collection also is affirmed by comparison of the Act 30-31 Excise Tax Statutes to § 2.07 of Act 1-2015.  Section 2.07 added subsection (G) to 13 L.P.R.A. § 31751(a)(1), specifying that "on or after the Effective Date" a deposit account into which the Commonwealth is required to deposit certain Act 30-31 Revenues (among other revenues) "shall belong to [HTA] for the benefit of the holders of the bonds . . . ."  *See* Act 1-2015, § 2.07 (inserting 13 L.P.R.A. § 31751(a)(1)(G)).  The "Effective Date" specified in Act 1-2015 never occurred, and thus the revenues do not "belong to the Highways and Transportation Authority," are not held "in trust" for HTA, and are not held "for the benefit of the holders of the bonds."[19]  However, the explicit (potential) transfer of ownership in one of the relevant statutes shows the Commonwealth (a) knew how to enact a statute transferring a property interest in revenues to HTA (i.e., after the Effective Date the revenues "shall belong to…"), and (b) did not do so outside of 13 L.P.R.A. § 31751(a)(1)(G).

42.    The Act 30-31 Excise Tax Statutes can also be contrasted with statutes purporting to transfer ownership of certain tax revenues to COFINA, which state those revenues would **not** be Commonwealth "available revenues" and were "*hereby* transferred to, and shall be the property of" COFINA, without further action required by the Commonwealth—language that has no parallel in the Act 30-31 Excise Tax Statutes.  *See* 13 L.P.R.A. § 12 (emphasis added); *see also Pelopidas, LLC*, 2021 Mo. App. LEXIS 757, at *25–26 (noting that use of the word "hereby"

---

[19] There can be no disagreement that the Effective Date specified in Act 1-2015 never happened.  *See* Lift Stay Opinion, 618 F.3d at 629 (recognizing the Oversight Board had observed and the movants in the Lift Stay Motion did not dispute the Effective Date did not occur).

indicates a present action accomplished by the relevant document itself, not just a "future obligation").[20]

43.      For these additional reasons, the Court should (i) again hold the Act 30-31 Excise Tax Statutes do not give HTA a property interest in Act 30-31 Revenues prior to the delivery of the proceeds of those collections to HTA, and thus retained Act 30-31 Revenues cannot be subject to a security interest granted by HTA, and (ii) dismiss Count I without leave to amend.[21]

**B.      The Plain Language of the HTA Enabling Act Limits the Grant of any Security Interest in Act 30-31 Revenues to Proceeds of Such Revenues Actually Transferred to HTA by the Commonwealth**

44.      The plain language of the HTA Enabling Act also makes clear HTA could not grant a security interest in Act 30-31 Revenues retained by the Commonwealth.  9 L.P.R.A. § 2004(l) authorizes HTA to secure its indebtedness only by pledging "any tax or other funds which may be

---

[20] Specifically, 13 L.P.R.A. § 12 provides a portion of the sales and use tax collected "shall be directly deposited in [the Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico . . . ."  13 L.P.R.A. § 12.  Section 12 further emphasizes the Dedicated Sales Tax Fund, all the funds deposited therein on the effective date of the Enabling Act, and all future funds that must be deposited therein "are hereby transferred to, and shall be the property of COFINA." *Id.*  Even with this language, there were still disputes regarding whether the Commonwealth transferred property rights to COFINA pursuant to 13 L.P.R.A. § 12.

[21] Count IV seeks a declaration (i) the DRA Parties have a right to collect from all "Bond Revenues," other than those deposited with the Fiscal Agent and (ii) the Loan Claims are general recourse obligations of HTA.  *See* Compl. ¶¶ 141-45.  "Bond Revenues," as it is defined in the Complaint (¶¶ 30-31), include excise tax and fee revenues collected and appropriated to HTA by the Commonwealth pursuant to the Act 30-31 Excise Tax Statutes (i.e., 9 L.P.R.A .§ 5681 and 13 L.P.R.A §§ 31751(a)(1), (a)(c)), as well as HTA's own source revenues, such as toll revenues, that are pledged by HTA as security on the HTA Bonds.  Although the Complaint acknowledges the alleged recourse obligations are payable from "available moneys and resources of **HTA**," Compl. ¶ 143 (emphasis added), the Complaint seems to be purposefully unclear whether the DRA Parties contend HTA resources include Bond Revenues collected by the Commonwealth and not actually transferred to HTA.  To the extent the DRA Parties assert their Loan Claims are payable from revenues collected and retained by the Commonwealth, their claim should be dismissed for the reasons stated herein—the Act 30-31 Excise Tax Statutes do not grant HTA any property interests unless and until the revenues (whether Act 30-31 Revenues or Bond Revenues) are transferred to HTA.  Bond Revenues retained by the Commonwealth are not "available" to HTA.  *See* Lift Stay Opinion, 618 B.R. at 634-35 (concluding Excise Taxes within the Commonwealth's possession "are not 'able to be used or obtained' by HTA nor are they at HTA's disposal.").

*made available* to [HTA] by the Commonwealth." 9 L.P.R.A. § 2004(l).[22]  In this regard, the DRA Parties admit their "Loan Claims are payable from . . . *available* moneys and resources of HTA." Compl. ¶¶ 49, 143 (emphasis added).  As this Court correctly determined in the Lift Stay Opinion, however, Act 30-31 Revenues (among other revenues) retained by the Commonwealth are *not* "available" to HTA.  *See* Lift Stay Opinion, 618 B.R. at 634–35.  In so ruling, the Court referred to the dictionary definition of "made available" as "able to be used or obtained; at someone's disposal," *id.* at 634 (quoting *Available*, Oxford English Dictionary (2020)), and determined that, because the Act 30-31 Revenues are "within the possession and control of the Commonwealth," they are "not 'able to be used or obtained' by HTA nor are they at HTA's disposal," prior to transfer to HTA, and thus could not be pledged by HTA pursuant to 9 L.P.R.A. § 2004(l).  *Id.* at 634.  This conclusion is bolstered by 13 L.P.R.A. § 31751(a)(1)(C), which provides HTA "is hereby authorized to commit or pledge the proceeds of the collection *thus received* . . . ."  *Id.* at 632 (emphasis added).  Because HTA has not received the Act 30-31 Revenues, nor are they "available" to HTA, even if HTA had purported to pledge those funds to the DRA Parties (while they were held by the Commonwealth), such pledge would be ineffective.  Accordingly, the Court was right: Act 30-31 Revenues retained by the Commonwealth are not "available" to HTA, and thus cannot be pledged by it.

45.      Moreover, 9 L.P.R.A. § 2015 provides HTA's debts[23] "shall not be a debt of the Commonwealth of Puerto Rico or any of its political subdivisions, and neither the Commonwealth

---

[22] The authorization set forth in 9 L.P.R.A. § 2004(l) applies to the pledge of revenues to secure "bonds."  The term "bonds" is defined in 9 L.P.R.A. § 2003(b) to mean "bonds, temporary bonds, refunding bonds, debentures, **notes**, interim receipts or provisional bonds, certificates **or other evidences of indebtedness** of the Authority issued under the provisions of this chapter."  9 L.P.R.A. § 2003(b) (emphasis added).  As such, the DRA Parties' Loan Claims may fall within this broad definition of bonds.

[23] 9 L.P.R.A. § 2015 provides that "bonds" issued by HTA shall not be debt of the Commonwealth.  "Bonds," as used therein, is defined to include "notes" and "other evidences of indebtedness," 9 L.P.R.A. § 2003(b), and includes the DRA Parties' Loan Claims.  *See supra* n. 22.

22

of Puerto Rico nor any such political subdivision shall be liable thereon."  If the Commonwealth's

own revenues (retained Act 30-31 Revenues) were subject to a security interest, the

Commonwealth would have effectively guaranteed the DRA Parties' claims—in direct

contradiction of the Commonwealth's express, statutory disclaimer of liability for HTA's debt.

*See, e.g.*, Restatement (Third) of Suretyship & Guaranty § 1 (granting lien on assets to secure

another entity's debt constitutes the equivalent of a guarantee obligation).  The DRA Parties do

not and cannot allege anything that would support such an absurd conclusion, and, accordingly,

Count I should be dismissed without leave to amend.

### C.    The Security Agreement Does Not Purport to Grant A Security Interest in Act 30-31 Revenues Retained by the Commonwealth

46.    Count I also should be dismissed because, even if HTA could grant a security

interest in Act 30-31 Revenues retained by the Commonwealth (it could not), HTA did not do so.

The only agreement alleged to create a security interest in favor of the DRA Parties is the Security

Agreement, executed by HTA, not the Commonwealth.  *See* 19 L.P.R.A. § 2233(b)(3)(A) ("a

security interest is enforceable against the debtor . . . only if . . . [t]he debtor has authenticated a

security agreement that provides a description of the collateral . . . .").  The Security Agreement

grants a security interest only in revenues actually transferred to and received by HTA—that is, in

Act 30-31 Revenues "allocated" to HTA and "presently held or hereafter acquired" by HTA)—

not revenues *retained* by the Commonwealth.  *See* Security Agreement, § 1.2.[24]  Only revenues

---

[24] Section 1.1 of the Security Agreement states HTA "unconditionally assigns, conveys and transfers" the Act 30-31 Revenues allocated to HTA.  As the Complaint implicitly acknowledges, however, the substance of the agreement creates a security interest, and so any property interest the DRA Parties might have is at most a security interest (and not outright ownership) in collections of Act 30-31 Revenues transferred to HTA.  *See* 19 L.P.R.A. § 2219(a)(1) ("… this chapter applies to: (1) a transaction, *regardless of its form*, that creates a security interest in personal property …"); *see also e.g.*, *In re Las Vegas Monorail*, 429 B.R. 317, 339, n.38 (Bankr. D. Nev. 2010) (purported absolute assignment of revenues is treated just as grant of security interest).  Section 1.1 thus does not expand or alter the scope of the security interest granted by § 1.2, which only covers collections of Act 30-31 Revenues received by HTA.

23

actually transferred to and received by HTA can be described as revenues HTA either "presently holds" or that HTA has "hereafter acquired,"[25] and thus only revenues actually received by HTA were pledged by the Security Agreement.

47.     The Loan Agreement (Compl. Ex. E), executed contemporaneously with the Security Agreement, corroborates this conclusion.  It provides HTA "has agreed to pledge and grant a security interest in favor of the Bank over the revenues ***received*** pursuant to Acts 30-2013 & 31-2013 to secure all obligations under this Agreement."  Loan Agreement, 3rd Whereas Clause (emphasis added).

48.     The governing agreements are in accord: any security interest the DRA Parties possess extends only to collections of Act 30-31 Revenues actually *received* and held by HTA— not revenues retained by the Commonwealth which HTA has neither received nor acquired.

### D.     Even Assuming a Security Interest in Act 30-31 Revenues Retained by the Commonwealth Existed, it Would Be Unperfected

49.     Count I also should be dismissed because even assuming, arguendo, HTA could and did grant a security interest in collections of Act 30-31 Revenues not transferred to HTA, such a security interest would be unperfected.

50.     Act 30-31 Revenues are collected into and held in Commonwealth deposit accounts.  *See, e.g.*, Compl. ¶ 95 (noting the Commonwealth has retained the Act 30-31 Revenues since 2015).  Under Article 9 of the UCC as adopted by Puerto Rico, and subject to an exception

---

[25] The fact the Security Agreement purports to grant a security interest in Act 30-31 Revenues "wherever located," *see* Security Agreement § 1.2, does not alter the calculus and adds nothing to the description.  As observed above, *see* n.11, under the UCC, revenues are not "located" anywhere, and the use of this language does not permit HTA to grant a security interest in revenues in which it does not have a property interest.  As explained, HTA does not have a property interest in Act 30-31 Revenues retained by the Commonwealth.  Further, the plain reading of § 1.2 of the Security Agreement regarding "wherever located" only applies to moneys that HTA either "presently holds" or that HTA has "hereafter acquired."  The only potential import of the "wherever located" language in the Security Agreement is that, once HTA receives Act 30-31 Revenues, the DRA Parties' security interest would attach regardless of where HTA deposits those revenues.  *Cf.* Lift Stay Opinion, 618 B.R. at 638–39 (bondholders' security interest only attaches to moneys HTA deposits into specified deposit accounts).

24

not relevant here, the only way to perfect a security interest in deposit accounts is by "control" of those deposit accounts. *See* 19 L.P.R.A. § 2262(b)(1) ("A security interest in a deposit account may be perfected only by control under § 2264 of this title"). The financing statements filed by the DRA Parties—even if they named the Commonwealth as a debtor (they do not)—could not perfect a security interest in Commonwealth deposit accounts. *Id.*; *see also Smith v. C&S Wholesale Grocers, Inc. (In re Delano Retail Partners, LLC)*, No. 11-37711-B-7, 2017 Bankr. LEXIS 2397, at *18 (Bankr. E.D. Cal. Aug. 14, 2017) ("A financing statement is not effective to perfect a security interest in a deposit account."); *Armstrong Bank v. Shraiberg, Landau & Page, P.A. (In re Tuscany Energy, LLC)*, 581 B.R. 681, 688 (Bankr. S.D. Fla. Jan. 25, 2018) ("A security interest in a deposit account cannot be perfected by the filing of a financing statement. A security interest in a deposit account may only be perfected by control over that deposit account."). The DRA Parties do not allege they have control over any of the deposit accounts containing Act 30-31 Revenues (nor could they), meaning any security interest they claim in Act 30-31 Revenues retained by the Commonwealth is unperfected.[26] Accordingly, the DRA Parties are not entitled to a declaration they hold a "perfected, first priority" lien on Act 30-31 Revenues.

> **E.** **Even if the DRA Parties Have A Valid Security Interest On Moneys "Covered Into" a "Special Account" Held in Favor of HTA, the Act 30-31 Revenues Are Not Credited to That Special Account**

51.     Even if (1) the "special deposit" referenced in 9 L.P.R.A. § 5681 and 13 L.P.R.A. § 31751(a) were a deposit account owned by HTA (it is not, as discussed above, but rather just a statutory formula for an appropriation), and (2) the DRA Parties have an effective, perfected security interest in moneys actually "covered into" that "special deposit" pursuant to 9 L.P.R.A. §

---

[26] Even assuming the DRA Parties could perfect their purported security interest in the Commonwealth's Act 30-31 Revenues by filing a financing statement, the DRA Parties do not allege they filed any financing statements naming the Commonwealth as a debtor and indicating their collateral extends to retained Act 30-31 Revenues.

5681 and 13 L.P.R.A. § 31751(a) (they do not), Count I must still be dismissed.  Act 30-31
Revenues are being retained by the Commonwealth and thus are never being "covered into" any
such "special deposit" account owned by HTA.

52.     As the DRA Parties concede in the Complaint, the Commonwealth has been
"depriving" HTA of Act 30-31 Revenues since 2015.  Compl. ¶ 95.  Put differently, the
Commonwealth has not been transferring collections of Act 30-31 Revenues to any "special
deposit" account in favor of HTA pursuant to the Act 30-31 Excise Tax Statutes, and thus the DRA
Parties' security interest could never have attached to the Act 30-31 Revenues.  While it is possible
the Commonwealth's retention could give rise to an unsecured claim against the Commonwealth
for breach of statute, that claim would be (a) held by HTA and (b) dischargeable. *See Kovacs*, 469
U.S. at 278–279 (claim arising from breach of statute was dischargeable, unsecured claim).  It
would not be a basis for the DRA Parties to have a security interest in Commonwealth revenues.
As a result, Count I must be dismissed.

### F.   Bankruptcy Code § 552(a) Precludes Any Claim by the DRA Parties to Postpetition Revenues Retained By The Commonwealth

53.     Even if the DRA Parties had a valid, perfected security interest in Act 30-31
Revenues retained by the Commonwealth (they do not), Bankruptcy Code § 552(a) would prevent
attachment of any security interest to Act 30-31 Revenues generated after the Commonwealth's
Title III petition date.  As a result, Count I must be dismissed against the Commonwealth to the
extent it claims a security interest in Act 30-31 Revenues generated after the Commonwealth's
petition date.

54.     Section 552(a) provides, "Except as provided in subsection (b) of this section,
property acquired by the estate or by the debtor after the commencement of the case is not subject
to  any  lien  resulting  from  any  security  agreement  entered  into  by  the  debtor  before  the

26

commencement of the case." 11 U.S.C. § 552(a). The policy rationale behind section 552(a) is well settled. If the mere prepetition pledge of future revenues, without an underlying pledge of the asset that generates the revenues, sufficed to encumber postpetition revenues, then the debtor could not obtain financing because it could not grant the lender a first-priority security interest in future revenues. Section 552(a) prevents such a result and thus facilitates a debtor's "fresh start," which is a primary purpose of bankruptcy law. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934); *N.H. Bus. Dev. Corp. v. Cross Baking Co. (In re Cross Baking Co.)*, 818 F.2d 1027, 1029 (1st Cir. 1987) (explaining the purpose of section 552(a) "is to prevent a creditor's pre-petition security interest in 'after-acquired property' (a 'floating lien') . . . from attaching to property acquired by the estate or debtor-in-possession *after* the filing of a bankruptcy petition."); *see also Fin. Sec. Assurance Inc. v. Days Cal. Riverside Ltd. (In re Days Cal. Riverside Ltd.)*, 27 F.3d 374, 375 (9th Cir. 1994) (section 552 serves the Bankruptcy Code's interest in freeing the debtor of its pre-petition obligations); *Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.)*, 907 F.2d 1430, 1436 (4th Cir. 1990) (same).

55. Pursuant to section 552(a), Act 30-31 Revenues generated by the Commonwealth postpetition are not subject to HTA's prepetition grant of a security interest, and for the reasons explained below, the specific exceptions to the rule provided by section 552(b)(1) and Bankruptcy Code section 928(a) do not serve as a basis to deviate from section 552(a)'s general rule.

### 1. Section 552(b)(1) Does Not Apply Because Postpetition Act 30-31 Revenues Are Not "Proceeds" of Prepetition Property

56. Section 552(b)(1) is a narrow exception to section 552(a)'s general rule that prepetition security interests do not attach to property acquired after the petition date. *In re Bering Trader*, *Inc.,* 944. F.2d 500, 502 (9th Cir. 1991). It allows for the continuation of a prepetition security interest, but only with respect to "proceeds, products, offspring, or profits" of prepetition

27

property itself subject to the original lien. 11 U.S.C. § 552(b)(1)[27]; *see also In re Cross Baking*, 818 F.2d at 1032 (concluding amounts paid on receivables that arose after the filing of the bankruptcy petition were not proceeds of prepetition collateral).

57.     Postpetition Act 30-31 Revenues are not proceeds of property that existed prepetition. Until collected, Act 30-31 Revenues are predicated on variable and contingent fuel purchases and licensing of vehicles, which are simply expectancies that may never occur. *See Andalusian*, 948 F.3d at 468 (holding future employers' contributions to the retirement system based on future employee labor, not determinable until the labor was performed, were "merely an expectancy"). An expectancy is not a property right to which a security interest can attach, or that could produce postposition proceeds. *Id.* Act 30-31 Revenues collected postpetition were neither due and owing nor calculable prepetition, and "not payable until they are determined postpetition," and they are not "proceeds" of prepetition property. *Id.* at 470. Indeed, legions of cases hold postpetition payments not generated until after the petition date are not proceeds of prepetition property. *See Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004) ("[W]here it is only post-petition acts which generate an account receivable, those post-petition receivables will not be considered proceeds because there is no interest in, or connection to, the right in the account receivable created prepetition."); *In re Texas Tri-Collar, Inc.*, 29 B.R. 724, 726–27 (Bankr. W.D. La 1983) ("Since accounts receivable generated after commencement of the case are in no way proceeds, product, offspring, rents or profits of prepetition accounts receivable, [bank's] security interest . . . does not extend to postpetition receivables under section 552(b)."); *see also In re Bering Trader*, 944 F.2d at 502 (same); *In re*

---

[27] If a security interest granted prepetition "extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law." 11 U.S.C. § 552(b)(1).

28

*Corpus Christi Hotel Partners, Ltd.*, 133 B.R. 850, 854, 856 (Bankr. S.D. Tex. 1991) (same);

*Citizens Fid. Bank & Trust Co. v. All–Brite Sign Serv. Co. (In re All–Brite Sign Serv. Co.)*, 11 B.R.

409, 414 (Bankr. W.D. Ky. 1981) (same).

58.    At most, there was "merely an expectancy" that postpetition Act 30-31 Revenues

would be generated, collected by the Commonwealth, transferred to HTA and then used by HTA

to make payments on the loans from GDB.  Postpetition Act 30-31 Revenues therefore cannot

constitute "proceeds" of prepetition collateral, rendering the section 552(b)(2) exception

inapplicable.  Put more simply, if a lender holds a security interest in a debtor's prepetition

inventory, the sale of that inventory postpetition will yield proceeds (typically "accounts") subject

to the lender's security interest.  Here, however, the DRA Parties had no security interest in the

Commonwealth's or HTA's property on the petition date that was later transformed into proceeds.

### 2. Because Postpetition Act 30-31 Revenues Are Not "Special Revenues" of HTA Within the Meaning of Section 928(a), a Prepetition Security Interest, If Any, Would Not Continue Postpetition

59.    The exception set forth in section 928(a) that allows a security interest in "special

revenues" to continue postpetition likewise does not apply because postpetition Act 30-31

Revenues do not qualify as special revenues of HTA, nor does the Complaint allege otherwise.

60.    Section 928(a) provides: "Notwithstanding section 552(a) of this title and subject

to subsection (b) of this section, *special revenues acquired by the debtor* after the commencement

of the case shall remain subject to any lien resulting from any security agreement entered into by

the debtor before the commencement of the case."  11 U.S.C. § 928(a) (emphasis added).

61.    Fundamentally, Act 30-31 Revenues and their proceeds do not qualify as "special

revenues" because the license fees and excise taxes generating Act 30-31 Revenues are imposed

and collected by the Commonwealth, not HTA.  Section 902(2)(B) defines special revenues to

29

include only "***special*** excise taxes imposed on particular activities or transactions."  11 U.S.C. §

902(2)(B) (emphasis added).[28]  For excise taxes to be deemed "special" excise taxes, they must

have been imposed by the debtor that issued the bonds—here, HTA.  *See* Alexander D. Flachsbart*,*

*Municipal Bonds in Bankruptcy: Sec. 902(2) and the Proper Scope of "Special Revenues" in*

*Chapter 9*, 72 Wash. & Lee L. Rev. 955, 998 (2015) ("[S]tate aid used to secure a bond issuance

would not qualify as 'special revenues' because such transfer payments would be non-tax

receivables not related to 'municipal ownership, operation, or disposition' of a project.").  Act 30-

31 Revenues are imposed *by the Commonwealth* and may be allocated and transferred to HTA.

The revenues collected by and held at the Commonwealth are not the debtor's (HTA's) revenues,

and therefore cannot qualify as "special revenues" under section 902(2)(B).

62.    Moreover, even assuming postpetition Act 30-31 Revenues would otherwise

qualify as "special revenues" (they do not), they were not special revenues "acquired by the

debtor."  GDB loaned money to HTA, and HTA granted a security interest solely in HTA's rights

to Act 30-31 Revenues—not in accounts or monies of the Commonwealth.  Compl. ¶¶ 48-51.  As

discussed above, the debtor at issue (HTA) never acquired a property interest in Act 30-31

Revenues held at the Commonwealth.  *See supra* Point I(A); Lift Stay Opinion, 618 B.R. at 634–

35 (revenues allocable to HTA are not "able to be used or obtained" by HTA nor are they at HTA's

disposal before they are transferred to HTA; they are within the possession and control of the

---

[28] Beyond "special excise taxes," special revenues are defined to mean: "(A) receipts derived from the ownership,
operation, or disposition of projects or systems ***of the debtor*** that are primarily used or intended to be used primarily
to provide transportation, utility, or other services, including the proceeds of borrowings to finance the projects or
systems; . . . (C) incremental tax receipts from the benefited area in the case of tax-increment financing; (D) other
revenues or receipts derived from particular functions ***of the debtor***, whether or not the debtor has other functions; or
(E) taxes specifically levied to finance one or more projects or systems, excluding receipts from general property,
sales, or income taxes (other than tax-increment financing) levied to finance the general purposes ***of the debtor***; . . ."
11 U.S.C. § 902(2) (emphasis added).  For obvious reasons, postpetition Act 30-31 Revenues do not fall within any
such other categories of special revenues.  They are not derived from the debtor – HTA.  Instead, they are generated
by the Commonwealth.  Nor could they be described as incremental tax receipts "from the benefitted area" within the
meaning of the statute.

Commonwealth). Thus, any exception to section 552(a) for special revenues *of HTA*—the debtor
that entered into the security agreement—does not create an exception for revenues retained by
the Commonwealth.

63.    Section 552(a) cuts off any security interest in Act 30-31 Revenues generated and
collected by the Commonwealth postpetition, and neither exception to section 552(a) is applicable.
Accordingly, Count I should be dismissed against the Commonwealth to the extent it claims a
security interest in Act 30-31 Revenues generated and collected after the Commonwealth's petition
date.

## II.    COUNT I SHOULD BE DISMISSED BECAUSE PROMESA PREEMPTS THE APPROPRIATION PROVISIONS OF THE ACT 30-31 EXCISE TAX STATUTES

64.    Count I should also be dismissed because the appropriation provisions of the Act
30-31 Excise Tax Statutes are inconsistent with and preempted by PROMESA. With no
appropriation and transfer, collections of Act 30-31 Revenues never reach HTA and never become
subject to the DRA Parties' purported security interest or right to collect. Under PROMESA, all
power over appropriation of Commonwealth revenues (including Act 30-31 Revenues) is
conferred to the Oversight Board by, for example, requiring that any expenditures be pursuant to
an Oversight Board-certified budget. PROMESA § 202. All inconsistent Commonwealth laws
are preempted. *See* PROMESA § 4. As the Act 30-31 Excise Tax Statutes purport to appropriate
Commonwealth revenues without regard to the Oversight Board's certified budget, and because
the pre-PROMESA appropriation provisions make impossible or obstruct the central goal of
PROMESA—to allow the Oversight Board to formulate budgets designed to return the
Commonwealth to fiscal responsibility—they are preempted, necessitating the dismissal of Count
I for failure to state a claim.

31

65.     Likewise, PROMESA Title III preempts the Act 30-31 Excise Tax Statutes.  Title III is designed to restructure the Commonwealth's allowable claims, whereas the Act 30-31 Excise Tax Statutes (to the extent they create allowable claims) require the financial obligations they create to transfer money to HTA be paid in full.  If such statutes were not preempted, no Commonwealth law requiring payment of valid obligations would be preempted and no restructuring would be possible.

66.     The United States Constitution's Supremacy Clause dictates federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  A state law that runs afoul of the Supremacy Clause is "a nullity."  *Mass Ass'n of Health Maint. Orgs v. Ruthhardt*, 194 F.3d 176, 178 (1st Cir. 1999).

67.     Whether a federal statute preempts state law[29] is primarily a question of Congressional intent.  *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (courts "focus on the plain wording of the [statutory preemption] clause, which necessarily contains the best evidence of Congress' pre-emptive intent" (quoting *Chamber of Commerce of the U.S. v. Whiting*, 563 U.S. 582, 594 (2011))).  Such intent can be evinced through an express preemption provision, or implied where state law makes impossible or poses an obstacle to compliance with federal law.  *Arizona*, 567 U.S. at 399 ("There is no doubt that Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision."); *id.* at 399-400 (discussing implied preemption).

68.     Here, the Act 30-31 Excise Tax Statutes' appropriation provisions are inconsistent with and both expressly and impliedly preempted by PROMESA.[30]

---

[29] The laws of Puerto Rico are the "functional equivalent" of state laws for preemption purposes.  *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 323 (1st Cir. 2012).

[30] To the extent the DRA Parties seek to assert the general recourse obligations of HTA they allege in Count IV against Bond Revenues collected and held by the Commonwealth, the appropriation provisions of the Act 30-31 Excise Tax

A.    **The Act 30-31 Excise Tax Statutes Are Expressly Preempted Because They Are Inconsistent with PROMESA Title II**

69.    PROMESA's express preemption provision, §4, is broad and unequivocal: "The provisions of this Act *shall prevail* over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act."  PROMESA § 4 (emphasis added).

70.    The appropriation provisions of the Act 30-31 Excise Tax Statutes are preempted because, for instance, they are inconsistent with the Oversight Board's powers under PROMESA §§ 201 and 202 to certify budgets and fiscal plans providing for appropriations of the Commonwealth's money.  Section 201 authorizes the Oversight Board to promulgate a fiscal plan that, among other things, provides a "method" for the Commonwealth to "achieve fiscal responsibility and access to the capital markets" and to accomplish various other objectives. PROMESA § 201(b)(1).  Certification of fiscal plans and budgets falls to the Oversight Board's "sole discretion."  PROMESA §§ 201(c)(3), (d)(2), 202(c)(1).  Budgets certified by the Oversight Board are deemed to be "in full force and effect."  PROMESA § 202(e)(3)(C).  Thus, the Act 30-31 statutes contradict PROMESA §§ 201 and 202 granting the Oversight Board full power over the fiscal plan and budget.

71.    PROMESA's preemption of inconsistent Commonwealth statutes is settled.  As the First Circuit and this Court recognized, because PROMESA gives the Oversight Board the exclusive authority to certify budgets, PROMESA § 4 expressly preempts any preexisting law appropriating funds without regard to a budget certified by the Oversight Board.  *See Vázquez-*

---

Statutes which underpin the asserted rights of HTA to such funds are expressly and impliedly preempted by PROMESA for the reasons stated in this Point II.  The appropriation provisions in the Act 30-31 Excise Tax Statutes appropriated to HTA both Act 30-31 Revenues and Bond Revenues (other than HTA's own source revenues, such as toll revenues).  *Supra* n. 21.  Because those appropriation provisions are preempted, Bond Revenues held by the Commonwealth are not "available moneys and resources of HTA" and Count IV, if asserted as to the Commonwealth, should be dismissed.

*Garced*, 945 F.3d at 8 ("Simply put, if a certified budget is to have 'full force and effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed in that budget, regardless of what any territorial laws say."); *Méndez-Núñez*, 916 F.3d at 116 ("Under PROMESA's preemption provision, the grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail over ***any*** general or specific provisions of territory law' . . . .") (emphasis added) (citation omitted); *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("[A] budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws are preempted."), *aff'd*, 945 F.3d 3 (1st Cir. 2019); *Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 327 F. Supp. 3d 365, 372 (D.P.R. 2018) ("Congress' determination, in PROMESA, to empower the Oversight Board to accept, reject, develop and certify budgets, and to render certified budgets effective by operation of law, prevails over the general allocation of budgetary power to Puerto Rico's legislature."), *aff'd*, 916 F.3d 98 (1st Cir. 2019).

72.      As this Court explained in *Rosselló Nevares*:

> It beggars reason, and would run contrary to the reliability and transparency mandates of PROMESA, to suppose that a budget for a fiscal year could be designed to do anything less than comprehend all projected revenues and financial resources, and all expenditures, for the fiscal year.  Since a certified budget is in full effect as of the first day of the covered period, means and sources of government spending are necessarily rendered unavailable if they are not provided for within the budget. ***A prior year authorization for spending that is not covered by the budget is inconsistent with PROMESA's declaration that the Oversight Board-certified budget for the fiscal year is in full force and effect, and is therefore preempted by that statutory provision by force of Section 4 of PROMESA.***

*Rosselló Nevares*, 330 F. Supp. 3d at 704 (emphasis added).

73.      The Act 30-31 Excise Tax Statutes appropriate Act 30-31 Revenues to HTA.  This expenditure, like any other expenditure required by Puerto Rico law regardless of whether a budget

certified by the Oversight Board authorizes the expenditure, is inconsistent with PROMESA §§
201 and 202 and preempted by § 4.  *See supra* ¶¶ 6, 71 (collecting authorities).

B.     **The Act 30-31 Excise Tax Statutes Are Expressly Preempted Because They
Are Inconsistent With PROMESA Title III**

74.     Count I should also be dismissed because the appropriation provisions of the Act
30-31 Excise Tax Statutes are inconsistent with PROMESA Title III, and therefore expressly
preempted by PROMESA § 4.  Absent preemption, the appropriation provisions within the Act
30-31 Excise Tax Statutes would require the Commonwealth to pay 100% of the Act 30-31
Revenues to HTA, effectively creating a specifically enforceable, non-dischargeable obligation
against the Commonwealth in favor of HTA.  This would directly contradict PROMESA Title III,
which grants the debtor the protection of the automatic stay and does not provide a priority for
claims arising from appropriation statutes, let alone a specifically enforceable priority.  Further,
Title III provides the debtor with a broad discharge, which incorporates the expansive definition
of claim contained in the Bankruptcy Code.[31]  Therefore, Acts 30-31 are patently inconsistent with
the discharge and priority provisions of Title III.

75.     Accordingly, the Act 30-31 Excise Tax Statutes are preempted by PROMESA Title
III.

C.     **The Act 30-31 Excise Tax Statutes Are Impliedly Preempted By PROMESA
Title II**

76.     The Act 30-31 Excise Tax Statutes are also impliedly preempted by PROMESA.
There are two types of implied preemption: when (i) "compliance with both federal and state [law]
is a physical impossibility," (impossibility preemption), or (ii) the appropriation provisions pose

---

[31] The only priority provision of the Bankruptcy Code, made applicable to Title III cases by PROMESA § 301(a), is
§ 507(a)(2), which provides a priority for allowed administrative expenses.  Bankruptcy Code § 944, also made
applicable to Title III cases by PROMESA § 301(a), affords a broad discharge to debtors.

an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," (obstacle preemption). *Arizona*, 567 U.S. at 399 (impossibility preemption); *AT&T Mobility v. Concepcion*, 563 U.S. 333, 343, 352 (2011) (holding California's *Discovery Bank* rule was preempted by the Federal Arbitration Act because the rule stood "as an obstacle to the accomplishment of the FAA's objectives"); *Freightliner Corp. v. Myric*k, 514 U.S. 280, 287 (1995) (obstacle preemption). Both types apply to the Act 30-31 Excise Tax Statutes.

77.     ***First***, compliance with both PROMESA and the Act 30-31 Excise Tax Statutes is a "physical impossibility." *Arizona*, 657 U.S. at 399.  The Commonwealth cannot both (i) appropriate collections of Act 30-31 Revenues to HTA without regard to Oversight Board-certified Commonwealth budgets, and (ii) comply with PROMESA's requirement that there be no spending by the Commonwealth except as authorized in certified budgets.  The appropriation provisions of the Act 30-31 Excise Tax Statutes are therefore preempted.  *See Gustavsen v. Alcon Labs., Inc.*, 272 F. Supp. 3d 241, 246 (D. Mass. 2017) (when "'it is impossible . . . to comply with both state and federal requirements[,]' . . . the state law is preempted." (quoting *Pliva v. Mensing*, 564 U.S. 604, 618 (2011)).

78.     ***Second***, the Act 30-31 Excise Tax Statutes pose an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399; *see also, e.g.*, *Barnett Bank, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).  In assessing conflict preemption, the Court's "ultimate task . . . is to determine whether state regulation is consistent with the structure and purpose of the [federal] statute as a whole," "[l]ooking to the provisions of the whole law, and to its object and policy." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 103 (1992) (citation omitted).

79.     The Supreme Court's decision in *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000) is instructive.  There, a Massachusetts law restricting authority of its agencies to purchase goods or services from companies doing business with Burma was preempted because it undermined the intended purpose and "natural effect" of a federal law conferring discretion to the President to control economic sanctions against Burma and directing the President to develop a comprehensive, multilateral strategy towards Burma.  *Id.* at 373; *see also Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 602 (D.P.R. 2015) (holding Puerto Rico's Recovery Act preempted by the federal Bankruptcy Code), *aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016).

80.     Through PROMESA, Congress set out for Puerto Rico to regain "fiscal responsibility and access to capital markets," and provided the means to effectuate that goal: giving the Oversight Board complete control over Commonwealth expenditures.  PROMESA §§ 101, 202, 405(m)(4).[32]  Implied preemption of the Act 30-31 Excise Tax Statutes by PROMESA is a logical imperative.  If the Act 30-31 Excise Tax Statutes' appropriation provisions remained enforceable, the Oversight Board's exclusive power to appropriate Commonwealth monies would be meaningless and Congress's expressed intent in passing PROMESA frustrated.  Absent preemption, in the DRA Parties' view, the Commonwealth must continue to appropriate Act 30-31 Revenues to HTA, making them unavailable to pay Commonwealth expenses or to satisfy Commonwealth debt, including GO debt.  The Oversight Board's ability to balance the budget to enable Puerto Rico to achieve fiscal responsibility and access to the capital markets would be

---

[32] Likewise, statutes purporting to create obligations that frustrate or interfere with federal bankruptcy law are preempted.  *See, e.g.*, *Perez v. Campbell*, 402 U.S. 637, 654 (1971) (state law conditioning driver's license renewal on bankrupt paying discharged automobile tort judgment was preempted because it had the "effect of frustrating federal [bankruptcy] law"); *Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929) ("States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations.").

nullified.  Indeed, any possible Commonwealth restructuring of Commonwealth obligations to HTA or its bondholders would be blocked.  As a result, the Act 30-31 Excise Tax Statutes are preempted, to avoid completely thwarting Congress's intent.

81.    Because PROMESA Title II preempts the Act 30-31 Excise Tax Statutes' appropriation provisions, Count I must be dismissed for failure to state a claim.

## III.   COUNTS I, II AND IV SHOULD BE DISMISSED PURSUANT TO RULE 12(B)(6) BECAUSE THE DRA PARTIES LACK STANDING TO BRING OBJECTIONS TO HTA BONDHOLDERS' CLAIMS

82.    Counts I, II and IV should be dismissed because they seek to usurp the exclusive authority of the Oversight Board to object to HTA Bondholders' claims.  In Count I, the DRA Parties seek a declaration that "the DRA is the *only* party" with a lien on or right to collect from Act 30-31 Revenues. Compl. ¶ 115 (emphasis added).  Relatedly, Count II requests a declaration to preclude any claim HTA Bondholders have to Act 30-31 Revenues, and limit HTA Bondholders' lien and recourse to Bond Revenues "actually received by HTA and actually deposited in the applicable [Bond Revenue Account]." Compl. ¶ 129.  Count IV likewise alleges HTA Bondholders' lien (if any) attaches only to Bond Revenues deposited in the Bond Revenue Accounts. Compl. ¶ 142.  Although styled as claims for declaratory relief, these Counts are improper and unauthorized objections to HTA Bondholders' claims to a security interest in Act 30-31 Revenues, or in Bond Revenues not deposited in the Bond Revenue Accounts, and seeks a determination that HTA Bonds are not payable from such revenues.

83.    Only the trustee—here, the Oversight Board[33]—may bring an objection to HTA Bondholders' claims unless (i) demand is made on the Oversight Board, (ii) the demand is unjustifiably refused, (iii) the DRA Parties show the objection would provide some benefit to the

---

[33] *See* PROMESA § 301(c)(7).

debtor, and (iv) the DRA Parties obtain court approval to bring the objection.  First Circuit law is clear that, without leave of court, the "trustee alone may interpose objections to proofs of claim." *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1147 (1st Cir. 1992) ("Leave to object is not generally accorded an individual creditor unless the chapter 7 trustee refuses to object, notwithstanding a request to do so, and the bankruptcy court permits the creditor to object in the trustee's stead."); *see also In re Choquette*, 290 B.R. 183, 188 n.9 (Bankr. D. Mass. 2003) ("[A] creditor may seek leave from the court to object to a proof of claim *only* if the trustee refuses to take any action." (quoting *In re Simon*, 179 B.R. 1, 6-7 (Bankr. D. Mass 1995))) (emphasis in original); *Gras v. Smith (In re Global Envtl. Solutions)*, 342 B.R. 116, 119 (D.N.H. 2006) (same). An objecting creditor "must also establish that if the objection to the proof of claim were sustained, there would be some benefit to the estate."  *In re Simon*, 179 B.R. at 7.  This requirement "upholds the policy of maintaining the orderly administration of the estate."  Otherwise, "[i]f every creditor were entitled to challenge the claim of another creditor filed in a particular case, an orderly administration could degrade to chaos."  *Id.* (quoting Fed. R. Bankr. P. 3007 (Norton Bankruptcy Code Pamphlet 1994–95 ed., Editors' Comment)).  The same rule applies in chapter 11.  *See In re Chi. Invs., LLC*, 470 B.R. 32, 91-92 (Bankr. D. Mass. 2012) (applying *In re Thompson* in chapter 11 case).  Although there is no "trustee" in a chapter 11 case, the *In re Chicago Investments* court concluded that, where a chapter 11 debtor-in-possession has already filed an objection to the creditor's claim, the same considerations limiting creditor claim objections in a chapter 7 case apply.  *Id.*[34]

---

[34] The First Circuit follows the majority rule.  *See, e.g., In re Simon,* 179 B.R. at 6-7 ("Several courts, including the First Circuit, have ruled that a creditor may seek leave from the court to object to a proof of claim *only* if the trustee refuses to take any action") (collecting cases); *In re Ludwig Honold Mfg. Co.*, 30 B.R. 790, 792 (Bankr. E.D. Pa. 1983) ("[T]he overwhelming weight of authority . . . is to the effect that a general creditor of a bankrupt has no right to contest another creditor's claim or to appeal from the refusal of the court to disallow it unless upon application the trustee has refused to do so and the district court has authorized the creditor to proceed in the trustee's name.").

84.     The Complaint does not (and cannot) allege the DRA Parties made a demand on the Oversight Board or sought leave of Court before filing the Complaint.  Nor could the DRA Parties have obtained leave because the Oversight Board did in fact object to HTA Bondholders' alleged claims through the filing of what are described as the "Clawback Actions" and, as the Complaint alleges (¶¶ 92-93), the Oversight Board seeks to resolve those claims in a settlement embedded in the proposed Plan.[35]  *See* Plan §§ 1.114, 2.1; Case No. 20-AP-005, ECF No. 1; *see also* Case No. 20-AP-007, ECF No. 1.[36]

85.     Allowing the DRA Parties to pursue objections to the same claims the Oversight Board objected to and settled "would waste judicial resources and delay administration of the bankruptcy estate to its and its creditors' detriment with no corresponding benefit to the estate. This would undermine the articulated policy concern of an orderly and efficacious administration of the bankruptcy estate."  *In re Chi. Invs., LLC*, 470 B.R. at 92 (dismissing creditors' claim "[b]ecause the Debtors now seek to settle their dispute with Haymarket through the Fourth Amended Plan, the Franchisor's Objection to Haymarket's Claims is procedurally improper as it seeks to undermine the value of that settlement.").[37]  Indeed, this Court's recent decision to deny the Official Committee of Unsecured Creditors' motion for leave to assert claim objections reached

---

[35] The Complaint refers to provisions in the *Third Amended Plan* [ECF No. 16740], which was further amended and is now the Plan, as defined above (i.e., the *Seventh Amended Plan*).

[36] The Oversight Board's objections to HTA Bondholders' claims include counts seeking to disallow any asserted security interest, lien or other property interest in revenues allocable to HTA held at the Commonwealth, including any claims to Act 30-31 Revenues and Bond Revenues not received by HTA and deposited in the Fiscal Agent accounts (20-AP-005), and any asserted property right in revenues held at HTA, other than those deposited with the Fiscal Agent (20-AP-007).

[37] These cases are consistent with the general principle that restructuring should proceed expeditiously, and proceed to confirmation as quickly as is reasonably achievable.  *See, e.g.*, *In re WR Grace & Co.*, 729 F.3d 332, 346 (3d Cir. 2013) (finding that among the objectives and purposes of the Bankruptcy Code are "the expeditious liquidation and distribution of the bankruptcy estate to its creditors"); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17 BK 3283-LTS, 2019 WL 4735362, at *5 (D.P.R. June 28, 2019) (recognizing "broad public interest in efficient and expeditious progress of the Title III cases").

the same conclusion.  *See* Order dated May 5, 2021 [ECF No. 192 in Case No. 20-005-LTS].  Just

as the Court observed there, the Court's resources are not unlimited, and such issues "can be

litigated in connection with the Oversight Board's forthcoming request for confirmation of [its

plan].  Additionally, there are controversies which the Court need not address at this juncture

concerning whether the [Committee] has a right to file such claim objections in the first place."

*Id.* at 5.

86.    Notably, the DRA Parties' right to object to any settlement subject to Court

approval is reserved, but this is not the time, manner or the place to object.  Permitting Counts I,

II and IV to proceed would impose unnecessary expense on the Debtors and could place the

Oversight Board's settlement with the HTA Bondholders at risk before the Court has an

opportunity to consider the proposed Plan that, if approved, will resolve HTA Bondholders' claims

against the Commonwealth, including claims of a property interest in its excise tax and fee

revenues.  Counts I, II and IV therefore should be dismissed for lack of standing.

## IV.    TO THE EXTENT COUNTS I OR IV SEEK A DECLARATION REGARDING FUNDS HELD BY HTA (BUT NOT DEPOSITED IN THE FISCAL AGENT CONTROLLED ACCOUNT), THEY DO NOT PRESENT A JUSTICIABLE CASE OR CONTROVERSY

87.    If the Complaint is not treated as a proof of claim on the part of the DRA Parties

against *HTA*, Counts I and IV should be dismissed under Rule 12(b)(1) because those Counts

would constitute requests for advisory opinions.  Through Count I, the DRA Parties seek a

declaration that they are the only party with a perfected security interest in and a right to collect

from Act 30-31 Revenues.  Compl. ¶¶ 103-115.  Count IV seeks a declaration that the Loan Claims

are payable from Bond Revenues not deposited in the Bond Revenue Accounts.  *Id.* ¶ 145.  To the

extent such Counts seek declarations regarding a security interest in or right to payment from funds

already transferred *to HTA*, they seek advisory opinions about claims against HTA and should be dismissed pursuant to Rule 12(b)(1).

88.     This Court has recognized "Article III, section 2 of the Constitution of the United States limits the exercise of federal judicial power to actual cases and controversies." *ACP Master, Ltd. v. Puerto Rico (In re Fin. Oversight and Mgmt. Bd. for P.R.)*, 300 F. Supp. 3d 328, 336 (D.P.R. 2018), *aff'd*, 919 F.3d 638 (1st Cir. 2019).   "The authority conferred on federal courts by the Declaratory Judgment Act [("DJA")], 28 U.S.C. § 2201, is likewise limited to controversies that are within the constitutionally-constrained scope of federal jurisdiction." *Id.*  "The Supreme Court has explained that the DJA's 'case of actual controversy' requirement refers to the cases and controversies that are justiciable under Article III."[38]  *ACP Master*, 919 F.3d at 645.

89.     For a controversy to be justiciable, it must present "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Lugo v. United States (In re Fin. Oversight and Mgmt. Bd. for P.R.)*, 404 F. Supp. 3d 536, 545 (D.P.R. 2019) (quoting *Aetna Life Ins. Co. of Hartford Conn. v. Haworth*, 300 U.S. 227, at 241 (1937)). "Federal courts are not empowered to issue advisory opinions where there is no such actual controversy." *Id.*

90.     "The constitutional requirement that controversies be justiciable and admit of specific relief through a decree of a conclusive character demands more, however, than strong or even significant disagreement, however high the stakes, to obtain declaratory relief.  The issue must be raised, and the relief sought, in a fashion that would address a specific live controversy of

---

[38] "This means that the DJA 'does not itself confer subject matter jurisdiction, but, rather, makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis.'" *ACP Master*, 919 F.3d at 645 (quoting *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 534 (1st Cir. 1995)).

sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *In re Fin.*

*Oversight and Mgmt. Bd. for P.R.*, 300 F. Supp. 3d at 337; *see also Pub. Servs. Comm'n of Utah*

*v. Wycoff Co.*, 344 U.S. 237, 244, 246  (1952) ("The disagreement must not be nebulous or

contingent but must have taken on fixed and final shape so that a court can see what legal issues it

is deciding, what effect its decision will have on the adversaries, and some useful purpose to be

achieved in deciding them . . . . [W]hen the request is not for ultimate determination of rights but

for preliminary findings and conclusions intended to fortify the litigant against future regulation,

it would be a rare case in which the relief should be granted.").

91.     The First Circuit's decision in *ACP Master*, 919 F.3d 638, is directly on point.

There, a group of Puerto Rico general obligation ("GO") bondholders initiated an adversary

proceeding seeking, among other things, a declaration that they possessed certain liens and

property interests in specified Commonwealth revenues and that the Commonwealth lacked any

interest in those funds.  This Court dismissed those claims, finding they presented no justiciable

case or controversy.

92.     The First Circuit affirmed, holding the bondholders' requests for declaratory relief

sought impermissible advisory opinions because, although the GO bondholders' "allegations . . .

demonstrate that a substantial controversy exists between them and the [Oversight] Board, such a

controversy is not sufficiently immediate or real to warrant declaratory relief." *Id.* at 646.  The

GO bondholders failed "to show that the relief requested would, if granted, settle 'some dispute

which affects the behavior of the defendant towards the plaintiff[s].'" *Id.* (quoting *Hewitt v. Helms*,

482 U.S. 755, 761 (1987)).  "To the contrary, the declarations would 'reach far beyond the

particular case' as they unleash ramifications to be resolved in future litigation and implicate the

potential claims of other creditors without them having a say in the current suit." *Id.* (quoting

*Wycoff*, 344 U.S. at 243).  The GO bondholders were asking for an "abstract declaration that [was] unrelated to any current concrete dispute, such as a claim objection proceeding, request for adequate protection or relief from stay, or confirmation-related proceeding."  *Id.*  The First Circuit held the issues should wait for "the eventual presentation of the Commonwealth's plan of adjustment" where this Court "will probably address the claims averred in each of the counts at issue, and at that time the Bondholders and other creditors will be able to present their claims prior to plan confirmation."  *Id.*

93.     The same considerations apply here.  Through Counts I and IV, the DRA Parties seek declarations regarding their purported security interest in Act 30-31 Revenues and alleged rights to payment from Act 30-31 Revenues and Bond Revenues not deposited in the Bond Revenue Accounts.  But the DRA Parties have not pled anything approaching an immediate, real controversy requiring specific relief pertaining to their claim against HTA.  HTA has not proposed a plan of adjustment and the terms of the PSA regarding an HTA plan will not become effective until confirmation of an HTA plan of adjustment.  Just as in *ACP Master*, granting the requested declaration, as far as it relates to HTA's moneys, "would reach far beyond the particular case [and] unleash ramifications to be resolved in future litigation and implicate the potential claims of other creditors without them having a say in the current suit." 919 F.3d at 646 (internal quotation marks and citation omitted).

94.     These issues should instead be resolved through a concrete dispute, such as either an objection to the DRA Parties' claims against HTA or confirmation proceedings relating to a future HTA plan of adjustment—when all creditors will be able to present their competing claims. The DRA Parties should not be permitted to circumvent the HTA Title III case and obtain abstract declarations regarding their entitlement, or lack thereof, to funds held by HTA.  *See, e.g.*, *Ex parte*

44

*Bakelite Corp.*, 279 U.S. 438, 450 (1929). Counts I and IV should be dismissed pursuant to Rule 12(b)(1).[39]

## V.   IN THE ALTERNATIVE, COUNTS I, II AND IV SHOULD BE STAYED OR TERMINATED PENDING THE COURT'S CONSIDERATION OF CONFIRMATION OF THE PLAN THAT SEEKS TO SETTLE THE BONDHOLDER CLAIMS TO WHICH THE DRA PARTIES OBJECT

95.     The Oversight Board submits Counts I, II and IV should be dismissed as a matter of law. Alternatively, if the Court denies the Oversight Board's motion to dismiss, the counts should be stayed or terminated pending the confirmation hearing on the ground they constitute an improper attempt to interfere with the Oversight Board's efforts to settle the HTA Bondholders' claims against the Commonwealth.

96.     The DRA Parties' opposition to the Oversight Board's motion to intervene complained that, while both HTA Bondholders and the DRA Parties "have asserted clawback claims against the Commonwealth" for retained "excise tax revenues (including the Act 30-31 revenues)," "the Government Parties chose to settle with the HTA Bondholders only . . . ." ECF 30 at 4. The DRA Parties also noted that, with the settlement, "the Seventh Amended Plan provides HTA Bondholders with a certain contingent value instruments ("CVI") as recovery for their" claims, and the CVI "provides the Bondholders with senior priority allowing them to receive a greater recovery than the DRA." *Id.* at 5. In support of their thinly-veiled attack on the settlement with HTA Bondholders, the DRA Parties argue they are "the only party with a right to collect

---

[39] The Oversight Board has not moved to intervene with respect to Count III (through which the DRA Parties seek a declaration their Loan Claims are not subordinate to the HTA Bonds). It is anticipated the monoline defendants will move to dismiss Count III, which, if granted, could also dispose of this issue. In other words, it would not matter if the DRA Parties have a security interest in HTA's property if they are not entitled to any recovery before HTA Bondholders will be paid in full (and they will not be). For this reason as well, the DRA Parties' request for relief is premature and they lack standing to pursue it.

from, and security interests in, the Act 30-31 Revenues." *Id.*  In so doing, the DRA Parties seek to undercut the claims of HTA Bondholders and otherwise impede their settlement.

97.      While the DRA Parties may object to confirmation at the appropriate time, the Complaint goes further and seeks declarations as to HTA Bondholders' claims against the Commonwealth—issues the Oversight Board had been litigating against HTA Bondholders and are being settled under the Plan.  The Complaint seeks a declaration that only the DRA Parties— and not HTA Bondholders—have rights to Act 30-31 Revenues retained by the Commonwealth (Count I) and that HTA Bondholders' lien (if any) is limited to Bond Revenues deposited with the Fiscal Agent (Count II).  Count IV also seeks to establish HTA Bondholders' security interest (if any) does not attach to Bond Revenues not deposited in the Bond Revenue Accounts.  Counts I, II and IV attempt to have this Court adjudicate and limit HTA Bondholders' claims and the distribution from the Commonwealth as contemplated by the Plan.

98.      These Counts are not only improper claim objections (*see* Point III above), but if granted, the requested declarations would undermine the distribution, nature, and value of HTA Bondholders' claim that would be settled under the Plan and vitiate the Oversight Board's (as the sole representative of the Debtors in the Title III cases) exclusive authority to file a plan and seek to settle claims against the Debtors, subject to Court approval.  The DRA Parties may not embroil the Commonwealth in continued litigation over settled claims.  Otherwise, "[t]rustees would never be able to settle claims without unanimous support for the settlement" because settlement would just beget litigation, the opposite of what settlements should do.  *RWNIH-DL 122nd Street 1 LLC v. Futterman (In re Futterman)*, No. 17-01223, 2019 WL 2553614, *4 (S.D.N.Y June 20, 2019); *see also In re DVR, LLC*, 582 B.R. 507, 522 (Bankr. D. Colo. 2018) (a trustee must be empowered to settle claims, otherwise "the delay that litigation entails may hold up the trustee's distribution to

46

creditors interminably" and "permit a creditor to hold the estate hostage to protracted litigation"),
*aff'd*, 606 B.R. 80 (D. Colo. 2019).

99.    Permitting the DRA Parties to proceed with litigation would be profoundly
disruptive, inefficient and a waste of resources, and "would undermine the important policy of
promoting settlements in bankruptcy proceedings by requiring the parties to litigate the very issues
that the settlement seeks to resolve." *Law Debenture Tr. Comp. v. Kaiser Aluminum Corp. (In re
Kaiser Aluminum Corp.)*, 339 B.R. 91, 94 (D. Del. 2006) (affirming bankruptcy court's decision
to stay creditor's claim objection pending evaluation of trustee's proposed settlement, which
settlement mooted the objection to a competing creditor's claim).

100.    As this Court noted in a similar context related to PREPA Bonds, the question is
also one of timing.  Case No. 17-bk-4780-LTS, ECF 1855 at 3 (addressing "proper sequencing of
the Objection and the hearing on the 9019 Motion").  Which rightfully comes first —the DRA
Parties' claim-objection-dressed-as-a-complaint (if the DRA Parties become authorized to
prosecute a claim objection), or the Court's consideration of the Oversight Board's settlement with
the HTA Bondholders?  As this Court recognized in *PREPA*, consideration of a settlement must
come first.  Otherwise, "bankruptcy cases routinely would be stalemated … because any
dissatisfied party in interest could derail a compromise just by filing its own objection [or
Adversary Complaint] to a claim and demanding control over the disposition of its own objection."
*Id.* (quoting *In re Futterman*, 2019 WL 2553614, at *4).  To avoid that absurd result, "the Trustee
has the authority to settle claims, [which] is true even if other parties in interest have filed
objections to those claims."  *In re Futterman*, 2019 WL 2553614, at *4.[40]

---

[40] *See also In re DVR, LLC*, 582 B.R. at 524 (concluding court may conduct hearing and rule on proposed settlement
of claim objections even though court had not yet ruled on merits of competing creditor's claim objections); *Law
Debenture Tr. Comp. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 96 (D. Del. 2006)
(rejecting argument an objection must be heard before the trustee's settlement); *In re Heritage Org., LLC*, 375 B.R.

101.    Moreover, if the Oversight Board's settlement with HTA Bondholders embedded in the Plan becomes effective through confirmation, there will be no need to determine HTA Bondholders' alleged lien rights vis-a-vis the Commonwealth, rendering the DRA Parties' claims against HTA Bondholders in Counts I, II, and IV moot.[41]  If the Oversight Board's settlement does not become effective, objecting to the HTA Bondholders' claims will first be up to the Oversight Board, not the DRA Parties.

102.    *In re Futterman* (where a settlement required court approval) further demonstrates the appropriate procedural course for the DRA Parties is to oppose confirmation at the appropriate time.  There, the debtor filed a claim objection to certain creditors' claims.  The trustee examined the objection and decided to settle it.  However, the debtor believed the settlement recovery was excessive and objected, arguing it could not be approved without a hearing on his objection.  The court rejected the argument, holding the debtor's rights were limited to objecting to the settlement:

> Parties in interest have the right to object to the wisdom of a settlement if they do not think that the settlement makes sense. But as Mr. Futterman's attorneys have conceded in a prior hearing, the fact that Mr. Futterman was allowed to raise an objection to the RWN deficiency claim does not mean that Mr. Futterman himself has the right to veto a settlement, or to insist on continuing a litigation that would have the effect of vetoing the Trustee's settlement, or that, by virtue of his objection, Mr. Futterman now personally owns the right to control the disposition of the deficiency claim. Instead, his rights are limited to the rights that a party in interest has to object to the wisdom of the Trustee's settlement decision under Rule 9019. If the rule were otherwise … [t]he effect would be to turn over control of certain parts of the estate (namely the resolution of claims) to parties other than the trustee, which is exactly the opposite of what the Bankruptcy Code envisions.

---

230, 285 (Bankr. N.D. Tex. 2007) (rejecting a creditor group's arguments that the Chapter 11 trustee lacked authority to settle their objections to certain proofs of claim); *Prin Corp. v. Altman (In re Altman)*, 265 B.R. 652, 659 (Bankr. D. Conn. 2001) (approving a proposed settlement between the chapter 11 trustee and a creditor resolving the creditor's proof of claim, where the chapter 11 debtor had objected to the claim).

[41] To the extent the DRA Parties contend their claims relate to the priority determination and should be adjudicated to give effect to the CVI Reserve, as explained in the Oversight Board's reply brief in support of its motion for leave to intervene [ECF No. 30], only Count III (to which the Oversight Board has not yet sought to intervene) seeks to determine the respective priority rights of the DRA Parties and HTA Bondholders.

*In re Futterman*, 2019 WL 2553614, at *4.

103.    Absent outright dismissal of Counts I, II, and IV, the same result is appropriate here.  While dismissal of Counts I, II, and IV is warranted for the reasons above, at a minimum, the DRA Parties should not be permitted to interfere with the Oversight Board's attempt to settle HTA Bondholders' claims.  For that reason, the Court should stay or terminate Counts I, II and IV pending a confirmation hearing on the Plan, as the Court did previously in the PREPA context. *See* Case No. 17-bk-4780-LTS, ECF No. 1855 (terminating claim objection filed by unsecured creditors committee "without prejudice to renewal after resolution of the 9019 Motion").

## **CONCLUSION**

104.    For all these reasons, the Oversight Board requests that the Court dismiss or, in the alternative, stay Counts I, II and IV.

[*Remainder of Page Intentionally Left Blank*]

Dated: August 26, 2021
San Juan, Puerto Rico

Respectfully submitted,


*/s/   Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944


*/s/ Michael A. Firestein*

Martin J. Bienenstock
Brian S. Rosen
Jeffrey Levitan
Ehud Barak
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900


Michael A. Firestein
Lary Alan Rappaport
(Admitted Pro Hac Vice)
2029 Century Park East
Suite 2400
Los Angeles, CA 90067-3010
Tel:  (310) 557-2900
Fax:  (310) 557-2193
Email: mfirestein@proskauer.com
        lrappaport@proskauer.com

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

50

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on August 26, 2021, I caused the foregoing document to be

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
