# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>　　as representative of,<br><br>THE COMMONWEALTH OF PUERTO RICO *et al.*,<br><br>　　Debtors.[1] | PROMESA Title III<br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>　　as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>　　Debtors. | PROMESA<br><br>Title III<br><br>No. 17 BK 3567-LTS |
| AMERINATIONAL COMMUNITY SERVICES, LLC, as Servicer for the GDB Debt Recovery Authority and CANTOR-KATZ COLLATERAL MONITOR LLC,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>AMBAC ASSURANCE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., NATIONAL PUBLIC FINANCE | Adv. Proc. No. 21-00068-LTS<br><br>PROMESA<br><br>Title III |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19 BK 5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

GUARANTEE CORPORATION, FINANCIAL
GUARANTY INSURANCE COMPANY, PEAJE
INVESTMENTS LLC, and THE BANK OF NEW
YORK MELLON, as Fiscal Agent,

                    Defendants.

AMBAC ASSURANCE CORPORATION, ASSURED
GUARANTY CORP., ASSURED GUARANTY MUNICIPAL
CORP., NATIONAL PUBLIC FINANCE
GUARANTEE CORPORATION, FINANCIAL
GUARANTY INSURANCE COMPANY, and PEAJE
INVESTMENTS LLC,

                    Counterclaim Plaintiffs / Third-Party
                    Plaintiffs,

                    v.

AMERINATIONAL COMMUNITY SERVICES, LLC,
as Servicer for the GDB Debt Recovery Authority and
CANTOR-KATZ COLLATERAL MONITOR LLC,

                    Counterclaim Defendants,

                    and

GDB Debt Recovery Authority,

                    Third-Party Defendant.

Adv. Proc. No. 21-00068-LTS

PROMESA

Title III

## DEFENDANTS' ANSWER, DEFENSES, AND COUNTERCLAIMS

Defendants[2] respectfully submit this Answer, Defenses, and Counterclaims to Plaintiffs'

Adversary Complaint (ECF No. 1) ("**Complaint**").[3]  Defendants deny all of the allegations in the

---

[2] "Defendants" refers to Ambac Assurance Corporation ("**Ambac**"), Assured Guaranty Corp. ("**AGC**"),
Assured Guaranty Municipal Corp. ("**AGMC**"), National Public Finance Guarantee Corporation
("**National**"), Financial Guaranty Insurance Company ("**FGIC**"), and Peaje Investments LLC ("**Peaje**").

[3] Defendants reserve the right to amend the answer, defenses, and counterclaims herein and assert additional
defenses and counterclaims within 14 days of any ruling denying, in whole or in part, Defendants' motions
to dismiss, *see* Fed. R. Bankr. P. 7012(a), and to otherwise amend their pleadings as permitted under the

Complaint (including in the Introduction) unless expressly admitted herein.  Defendants deny all

headings that purport to make factual or legal arguments.  Defendants answer the allegations of

the like-numbered paragraphs of the Complaint as follows:[4]

## <u>NATURE OF THE ACTION</u>

1.    Defendants admit that the Complaint requests that the Court issue a declaratory

judgment that the DRA is the only party with a right to collect from and a security interest in the

Act 30-31 Revenues,[5] including the right to receive such revenues. Defendants deny that DRA is

entitled to any such declaration.

2.    Defendants admit that the Complaint requests the stated declaratory relief, but deny

that DRA is entitled to the requested relief. Defendants deny the remaining allegations in paragraph

2 of the Complaint.

3.    Defendants admit that the Complaint requests the stated declaratory relief, but deny

that DRA is entitled to the requested relief. Defendants deny the remaining allegations in paragraph

3 of the Complaint.

---

Court's orders, the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and
PROMESA.

[4] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in
the Complaint. The terms "**DRA**" and "**DRA Parties**" shall refer collectively to AmeriNational Community
Services LLC and Cantor-Katz Collateral Monitor in their capacities as servicer and collateral monitor,
respectively, for the GDB Debt Recovery Authority.

[5] Unless the context suggests otherwise, the term "**Act 30-31 Revenues**" has the same meaning given to
that term by the DRA Parties in the DRA Adversary Complaint.  *See* Compl. at ¶ 46 ("the incremental
revenues implemented though Acts 30 and 31 and allocated to HTA are (i) the revenues in excess of $15
for each vehicle or trailer license issued; (ii) the revenues in excess of $120 million per fiscal year from the
Petroleum Products Excise Taxes; and (iii) $20 million per fiscal year from the excise tax on cigarettes
(collectively, the 'Act 30-31 Revenues')").

## THE PARTIES

4.      Defendants state that the allegations in paragraph 4 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4 of the Complaint.

5.      Defendants state that the allegations in paragraph 5 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5 of the Complaint.

6.      Defendants deny that Ambac has its principal place of business at One State Street Plaza, New York, New York 10004.  Defendants affirmatively aver that Ambac has its principal place of business at One World Trade Center, 41st Floor, New York, New York 10007. Defendants otherwise admit the allegations set forth in paragraph 6.

7.      Defendants admit the allegations in paragraph 7 of the Complaint.

8.      Defendants admit the allegations in paragraph 8 of the Complaint.

9.      Defendants admit the allegations in paragraph 9 of the Complaint.

10.      Defendants admit the allegations in paragraph 10 of the Complaint.

11.      Defendants admit the allegations in paragraph 11 of the Complaint.

12.      Defendants state that the allegation in paragraph 12 that "BNYM stands in the shoes of the bondholders of HTA in this proceeding" constitutes a legal conclusion to which no answer is required.  To the extent an answer is required, Defendants deny the allegation.  Defendants admit that BNYM serves as Fiscal Agent for the HTA Bonds and has filed proofs of claim, and

Defendants refer to these documents for the complete and accurate contents thereof.[6]  Defendants state that they lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 12 of the Complaint.

13.    Paragraph 13 contains no allegations and no response is therefore necessary.

## JURISDICTION AND VENUE

14.    Defendants state that the allegations in paragraph 14 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny that Defendants have any justiciable claim against Defendants with respect to Act 30-31 Revenues.

15.    Defendants state that the allegations in paragraph 15 of the Complaint constitute legal conclusions to which no answer is required.

16.    Defendants state that the allegations in paragraph 16 of the Complaint constitute legal conclusions to which no answer is required.

17.    Defendants admit that the DRA Parties purport to bring this adversary proceeding pursuant to Rules 3007, 7001(1), (2), (8), and (9) of the Federal Rules of Bankruptcy Procedure and Bankruptcy Code sections 11 U.S.C. §§ 502 and 506, made applicable to this proceeding pursuant to PROMESA section 301(a); and 28 U.S.C. §§ 2201 and 2202.  Defendants deny that the DRA Parties are entitled to any relief.

## FACTUAL BACKGROUND

18.    Defendants admit the allegations in paragraph 18 of the Complaint.

19.    Defendants admit the allegations in paragraph 19 of the Complaint.

---

[6] Defendants admit that BNYM filed the proofs of claim set forth in footnote 5 of paragraph 12 of the Complaint but deny that it did so for the HTA Bondholders.

20.      Defendants admit the allegations in paragraph 20 of the Complaint.

21.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21 of the Complaint, except admit that there was a Qualifying Modification providing for the issuance and exchange of certain bonds, and to the extent the allegations differ from its terms, they are denied.

22.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Complaint regarding management and supervision of any assets of DRA, admit that a Master Transfer Agreement exists and refer the Court to the actual agreement as the best evidence of its terms, and to the extent the allegations differ from its terms, they are denied, and state that the remaining allegations in paragraph 22 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

23.      Defendants deny that they have disregarded the rights of the DRA bondholders.[7] Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23 of the Complaint.

24.      Defendants admit the allegations in paragraph 24 of the Complaint and refer the Court to the cited laws as the best evidence of its content and meaning.

25.      Defendants state that the allegations in paragraph 25 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations, deny that section 2004(l) of the HTA Enabling Act authorized HTA to secure

---

[7] The allegations in footnote 6 of paragraph 23 of the Complaint constitute legal conclusions and/or statements of DRA's intentions to which no answer is required.

any "debt obligations" that are not "bonds" (as defined in the HTA Enabling Act), and refer the Court to the cited law as the best evidence of its content and meaning.

26.      Defendants refer to the documents referenced in paragraph 26 of the Complaint for the complete and accurate contents thereof. Defendants otherwise admit the allegations in paragraph 26 of the Complaint.

27.      Defendants refer to the documents referenced in paragraph 27 of the Complaint for the complete and accurate contents thereof, state that the allegations concerning those documents constitute legal conclusions to which no answer is required, and otherwise deny the allegations in paragraph 27 of the Complaint.

28.      Defendants refer to the document referenced in paragraph 28 of the Complaint for the complete and accurate contents thereof and otherwise deny the allegations in paragraph 28 of the Complaint to the extent they vary from the contents of the 1968 Resolution.

29.      Defendants refer to the document referenced in paragraph 29 of the Complaint for the complete and accurate contents thereof and otherwise deny the allegations in paragraph 29 of the Complaint to the extent they vary from the contents of the 1998 Resolution.

30.      Defendants refer to the documents referenced in paragraph 30 of the Complaint and footnote 7 for the complete and accurate contents thereof and otherwise deny the allegations in paragraph 30 of the Complaint to the extent they vary from the contents of the 1968 Resolution and documents referenced in footnote 7.

31.      Defendants refer to the documents referenced in paragraph 31 of the Complaint and footnote 8 for the complete and accurate contents thereof and otherwise deny the allegations in paragraph 31 of the Complaint to the extent they vary from the contents of the 1998 Resolution and the documents referenced in footnote 8.

32.     Defendants refer to the documents referenced in paragraph 32 of the Complaint for the complete and accurate contents thereof, deny the allegations of paragraph 32 to the extent they vary from the contents of the 1968 and 1998 Resolutions, state that the allegations therein constitute legal conclusions to which no answer is required, and otherwise deny the allegations in paragraph 32 of the Complaint.

33.     Defendants refer to the documents referenced in paragraph 33 of the Complaint for the complete and accurate contents thereof and otherwise deny the allegations in paragraph 33 of the Complaint to the extent they vary from the contents of the documents.

34.     Defendants admit that the Title III Court entered two orders denying stay relief to certain defendants, which orders are identifiable as ECF Nos. 13541 and 14186 (the "**Lift Stay Orders**") and speak for themselves.  Defendants admit that the Lift Stay Orders were upheld by the First Circuit Court of Appeals in a reported decision at *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 989 F.3d 170 (1st Cir. 2021), which speaks for itself.  Defendants state that the remaining allegations in paragraph 34 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations and specifically deny that the Title III Court or the First Circuit has made any final legal determinations regarding Defendants' rights under the HTA Bonds, the Bond Resolutions, the HTA Enabling Act, and other statutes of the Commonwealth relative to the HTA Bonds.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 989 F.3d 170, 182 (1st Cir. 2021) ("[T]he Title III court will not and cannot treat its earlier, summary determination about whether the Monolines had a colorable claim as conclusive.").

35.     Defendants state that the allegations in paragraph 35 of the Complaint regarding certain rulings and legal rights constitute legal conclusions to which no answer is required and

otherwise deny the allegations in paragraph 35.  To the extent an answer is required, Defendants deny the allegations.

36.     Defendants refer to the 2002 Resolution referenced in paragraph 36 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 36 to the extent they vary from its contents.

37.     Defendants admit that HTA entered into the 2002 Security Agreement, refer to the 2002 Security Agreement referenced in paragraph 37 of the Complaint for the complete and accurate contents thereof, *see* ECF No. 674-5, No. 17-3567, and deny the allegations in paragraph 37 to the extent they vary from its contents.

38.     Defendants refer to the rulings referenced in paragraph 38 of the Complaint for the complete and accurate contents thereof, deny the allegations to the extent they vary from the content of the rulings, and state that the allegations in paragraph 38 of the Complaint constitute legal conclusions to which no answer is required and otherwise deny them.

39.     Defendants admit that on or around February 7, 2002, the Fiscal Agent, on behalf of the 1998 Bondholders, filed a UCC-1 Financing Statement with the Puerto Rico State Department and refer to that document for the complete and accurate contents thereof.  Defendants state that the remaining allegations in paragraph 39 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the remaining allegations in paragraph 39 of the Complaint.

40.     Defendants admit that on or around June 25, 2013, the Governor for Puerto Rico signed into law Act No. 30-2013 and Act No. 31-2013.  Defendants refer to these laws for the complete and accurate content thereof and deny the allegations to the extent they vary from the contents of Act No. 30-2013 and Act No. 31-2013.  Defendants state that the remaining allegations

in paragraph 40 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the remaining allegations in paragraph 40 of the Complaint.

41.    Defendants refer to the Statement of Motives of Act 30 and Act 31 referenced in paragraph 41 of the Complaint for the complete and accurate contents thereof and deny the allegations to the extent they vary from the contents of Act No. 30-2013 and Act No. 31-2013.

42.    Defendants refer to Act 30 referenced in paragraph 42 of the Complaint for the complete and accurate contents thereof and otherwise deny the allegations in paragraph 42 of the Complaint to the extent they vary from the contents of Act No. 30-2013. Defendants further state that the allegations in paragraph 42 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations.

43.    Defendants refer to Act 30 and certain other statutes implicitly referenced in paragraph 43 of the Complaint for the complete and accurate contents thereof and otherwise deny the allegations in paragraph 43 of the Complaint to the extent they vary from the contents of Act No. 30-2013 and the other statutes implicitly referenced therein. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43 of the Complaint regarding actual amounts received for each motor vehicle or trailer license issued.

44.    Defendants refer to Act 31 and certain other statutes implicitly referenced in paragraph 44 of the Complaint for the complete and accurate contents thereof and otherwise deny the allegations in paragraph 44 of the Complaint to the extent they vary from the contents of Act 31 and the other statutes implicitly referenced therein. The remaining allegations in paragraph 44 of the Complaint constitute legal conclusions to which no answer is required. To the extent a

response is required, Defendants lack sufficient information to confirm or deny the allegations in paragraph 44 of the Complaint.

45.     Defendants state that the allegations in paragraph 45 of the Complaint regarding the effects of Act 31 and certain other statutes implicitly referenced therein constitute legal conclusions to which no answer is required.  To the extent a response is required, Defendants refer to Act 31 and the statutes implicitly referenced in paragraph 45 of the Complaint for the complete and accurate contents thereof, and deny the allegations in paragraph 45 of the Complaint to the extent they vary from the contents of those statutes.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 45 of the Complaint (including allegations regarding the actual amounts received by HTA).

46.     Defendants admit that the Complaint contains the term "Act 30-31 Revenues" with the meaning ascribed to it by DRA in paragraph 46 of the Complaint.  The remaining allegations in paragraph 46 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

47.     Defendants state that the allegations pertaining to the pledge of Act 30-31 Revenues, the intent of Act 30 and Act 31 and whether such revenues are Bond Revenues are legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in paragraph 47 of the Complaint.

48.     Defendants refer to the Loan Agreements and promissory notes referenced in paragraph 48 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 48 to the extent they vary from the contents of the Loan Agreements and promissory notes.  Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 of the Complaint.

49.      Defendants refer to the Loan Agreements referenced in paragraph 49 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 49 to the extent they vary from the contents of the Loan Agreements.  Defendants otherwise deny the allegations in paragraph 49 of the Complaint.

50.      Defendants refer to the Security Agreement referenced in paragraph 50 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 50 of the Complaint to the extent they vary from the contents of the Security Agreement.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that GDB and HTA executed the Security Agreement on August 28, 2013.  The remaining allegations in paragraph 50 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

51.      Defendants refer to the Security Agreement referenced in paragraph 51 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 51 of the Complaint to the extent they vary from the contents of the Security Agreement.

52.      Defendants refer to the Security Agreement referenced in paragraph 52 of the Complaint for the complete and accurate definition of "Obligations" and deny the allegations in paragraph 52 of the Complaint to the extent they vary from the contents of the Security Agreement.

53.      Defendants refer to the Security Agreement referenced in paragraph 53 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 53 of the Complaint to the extent they vary from the contents of the Security Agreement.  Defendants otherwise state that the allegations in paragraph 53 and its accompanying footnote 9 contain legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

54.     Defendants refer to the UCC-1 Financing Statement and the amendment referenced in paragraph 54 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 54 of the Complaint to the extent they vary from the contents of the UCC-1 Financing Statement and any amendment.  Defendants otherwise state that the allegations in paragraph 54 contain legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

55.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55 of the Complaint.

56.     Defendants admit the allegations in paragraph 56 of the Complaint.

57.     Defendants admit the allegations in paragraph 57 of the Complaint.

58.     Defendants refer to the HTA Bondholder Financing Statements referenced in paragraph 58 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 58 of the Complaint to the extent they vary from the contents of the HTA Bondholder Financing Statements.  Defendants deny the remaining allegations in paragraph 58 of the Complaint.

59.     Defendants state that the allegations in paragraph 59 contain legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

60.     Defendants state that the allegations in paragraph 60 contain legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

61.     Defendants state that the allegations in paragraph 61 contain legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations.

62.     Defendants refer to the Security Agreement referenced in paragraph 62 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 62 of the Complaint to the extent they vary from the contents of the Security Agreement.

63.     Defendants refer to the Security Agreement referenced in paragraph 63 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 63 of the Complaint to the extent they vary from the contents of the Security Agreement.

64.     Defendants refer to the Security Agreement referenced in paragraph 64 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 64 of the Complaint to the extent they vary from the contents of the Security Agreement.

65.     Defendants lack knowledge or information sufficient to form a belief as to the truth of whether outstanding bonds have been issued under the 2013 Resolution.   Defendants refer to the documents referenced in paragraph 65 of the Complaint for the complete and accurate contents thereof and deny the allegation regarding the 1968 Bonds to the extent they vary from the contents of the Security Agreement.

66.     Defendants state that the allegations in paragraph 66 contain legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations.

67.     Defendants refer to the Loan Agreements referenced in paragraph 67 of the Complaint for the complete and accurate contents thereof and deny the remaining allegations in paragraph 67 of the Complaint to the extent they vary from the contents of the Loan Agreements.

68.     Defendants refer to the Security Agreement and Loan Agreements referenced in paragraph 68 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 68 to the extent they vary from the contents of these agreements. Defendants admit that they are not signatories to the Security Agreement and the Loan Agreements but instead affirmatively allege they are third-party beneficiaries of the Security Agreements and the Loan Agreements.   Defendants deny the remaining allegations in paragraph 68 of the Complaint.

69.     Defendants refer to the Security Agreement and Loan Agreements referenced in paragraph 69 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 69 to the extent they vary from the contents of these agreements. Defendants otherwise state that the allegations in paragraph 69 contain legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations and specifically deny that they "are not express or intended third party beneficiaries of either the Security Agreement or the Loan Agreements."

70.     Defendants refer to the Security Agreement and Loan Agreements referenced in paragraph 70 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 70 to the extent they vary from the contents of these agreements. Defendants otherwise state that the allegations in paragraph 70 contain legal conclusions to which no response is required.   To the extent a response is required, Defendants deny the allegations.

71.     Defendants refer to the Security Agreement and Loan Agreements referenced in paragraph 71 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 71 to the extent they vary from the contents of these agreements. Defendants otherwise state that the allegations in paragraph 71 contain legal conclusions to which

no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the Bondholders cannot enforce the subordination provisions against the DRA.

72.     Defendants refer to the Security Agreement in paragraph 72 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 72 to the extent they vary from the contents of the agreement.  Defendants otherwise state that the allegations in paragraph 72 contain legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations and specifically deny that the 1998 Bondholders are not third party beneficiaries of the Security Agreement.

73.     Defendants refer to the Security Agreement referenced in paragraph 73 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 73 to the extent they vary from the contents of the agreement.  Defendants otherwise state that the allegations in paragraph 73 contain legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

74.     Defendants refer to the Security Agreement referenced in paragraph 74 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 74 to the extent they vary from the contents of the agreement.  Defendants otherwise state that the allegations in paragraph 74 contain legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations.

75.     Defendants refer to the Bond Resolutions referenced in paragraph 75 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 75 of the Complaint to the extent they vary from the contents of the Bond Resolutions.  The remaining

allegations in paragraph 75 of the Complaint constitute legal conclusions to which no answer is required. To the extent a response is required, Defendants deny the allegations.

76. The allegations in paragraph 76 of the Complaint constitute legal conclusions to which no answer is required. To the extent a response is required, Defendants deny the allegations.

77. Defendants refer to the Bond Resolutions and Security Agreement referenced in paragraph 77 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 77 of the Complaint to the extent they vary from the contents of the Bond Resolutions and Security Agreement. Further, the allegations in paragraph 77 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations.

78. Defendants refer to the Security Agreement referenced in paragraph 78 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 78 of the Complaint to the extent they vary from the contents of the Security Agreement. Further, the allegations in paragraph 78 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations.

79. Defendants refer to the Security Agreement referenced in paragraph 79 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 79 of the Complaint to the extent they vary from the contents of the Security Agreement. Further, the allegations in paragraph 79 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations.

80. Defendants refer to the Security Agreement referenced in paragraph 80 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 80 of the Complaint to the extent they vary from the contents of the Security Agreement. Further, the

allegations in paragraph 80 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

81.     Defendants refer to the Loan Agreements referenced in paragraph 81 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 81 of the Complaint to the extent they vary from the contents of the Loan Agreements.

82.     The allegations in paragraph 82 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

83.     The allegations in paragraph 83 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

84.     Defendants refer to the Loan Agreements referenced in paragraph 84 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 84 of the Complaint to the extent they vary from the contents of the Loan Agreements.  Defendants otherwise deny the allegations in paragraph 84 to the extent these allegations state or imply that any of the Loan Agreements are not subordinated.

85.     Defendants refer to the Loan Contract referenced in paragraph 85 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 85 of the Complaint to the extent they vary from the contents of the Loan Contract.  Defendants lack knowledge or information sufficient to form a belief as to the current outstanding principal balance. Defendants otherwise deny the allegations in paragraph 85 to the extent these allegations state or imply that the Loan Contract is not subordinated.

86.     Defendants refer to the Loan Contract referenced in paragraph 86 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 86 of the Complaint to the extent they vary from the contents of the Loan Contract.  Defendants lack

knowledge or information sufficient to form a belief as to the current outstanding principal balance. Defendants otherwise deny the allegations in paragraph 86 to the extent these allegations state or imply that the Loan Contract is not subordinated.

87.     Defendants refer to the Loan Contract referenced in paragraph 87 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 87 of the Complaint to the extent they vary from the contents of the Loan Contract.  Defendants lack knowledge or information sufficient to form a belief as to the current outstanding principal balance. Defendants otherwise deny the allegations in paragraph 87 to the extent these allegations state or imply that the Loan Contract is not subordinated.

88.     Defendants refer to the Loan Contract referenced in paragraph 88 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 88 of the Complaint to the extent they vary from the contents of the Loan Contract.  Defendants lack knowledge or information sufficient to form a belief as to the current outstanding principal balance. Defendants otherwise deny the allegations in paragraph 88 to the extent these allegations state or imply that the Loan Contract is not subordinated.

89.     Defendants refer to the Loan Contract referenced in paragraph 89 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 89 of the Complaint to the extent they vary from the contents of the Loan Contract.  Defendants lack knowledge or information sufficient to form a belief as to the current outstanding principal balance. Defendants otherwise deny the allegations in paragraph 89 to the extent these allegations state or imply that the Loan Contract is not subordinated.

90.     Defendants lack knowledge or information sufficient to form a belief as to the current outstanding principal balance.  The remaining allegations in paragraph 90 of the Complaint

otherwise constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the remaining allegations and specifically deny that the cited loan obligations "are not in any way subordinated to the HTA Bonds on the Bond Revenues."

91.    Defendants admit the allegations in paragraph 91 of the Complaint.

92.    Defendants refer to the Third Amended Plan and HTA PSA referenced in paragraph 92 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 92 of the Complaint to the extent they vary from the contents of the Third Amended Plan and HTA PSA.

93.    Defendants refer to the Third Amended Plan referenced in paragraph 93 of the Complaint for the complete and accurate contents thereof and deny the allegations in paragraph 93 of the Complaint to the extent they vary from the contents of the HTA PSA.

94.    Defendants deny the allegations in paragraph 94 of the Complaint.

95.    Defendants refer to the Proofs of Claims implicitly referred to in paragraph 95 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 95 to the extent they vary from their contents.  Defendants also deny the allegations in paragraph 95 of the Complaint insofar as neither GDB nor DRA filed a clawback claim against the Commonwealth.

96.    Defendants refer to the Third Amended Plan referenced in paragraph 96 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 96 to the extent they vary from its contents.  The remaining allegations in paragraph 96 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

97.     Defendants refer to the HTA PSA referenced in paragraph 97 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 97 to the extent they vary from its contents.

98.     Defendants refer to the HTA PSA referenced in paragraph 98 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 98 to the extent they vary from its contents.  The remaining allegations in paragraph 98 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

99.     Defendants refer to the HTA PSA referenced in paragraph 99 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 99 to the extent they vary from its contents.

100.    Defendants refer to the HTA PSA referenced in paragraph 100 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 100 to the extent they vary from its contents.

101.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 101 of the Complaint.

102.    Defendants deny the allegations in paragraph 102 of the Complaint.

## CAUSES OF ACTION

103.    Defendants repeat and reallege their answers to paragraphs 1 through 102 of the Complaint as if fully set forth herein.

104.    Defendants refer to the Statement of Motives of Act 30 and Act 31 referenced in paragraph 104 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 104 to the extent they vary from the contents of the Statement of Motives

of Act 30 and Act 31.  The other allegations in paragraph 104 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

105.   Defendants refer to the Security Agreement referenced in paragraph 105 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 105 to the extent they vary from that agreement's terms.  The other allegations in paragraph 105 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in paragraph 105 of the Complaint.

106.   Defendants refer to the GDB Financing Statement referenced in paragraph 106 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 106 to the extent they vary from the terms of the GDB Financing Statement.  The other allegations in paragraph 106 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations.

107.   Defendants deny the allegations in paragraph 107 of the Complaint.

108.   Defendants refer to the Transfer Agreement referenced in paragraph 108 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 108 to the extent they vary from the terms of the Transfer Agreement.  The other allegations in paragraph 108 of the Complaint constitute a legal conclusion to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

109.   The allegations in paragraph 109 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in paragraph 109 of the Complaint.

110.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110 of the Complaint.

111.    The allegations in paragraph 111 of the Complaint constitute a legal conclusion to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

112.    Defendants refer to Act 30, Act 31, and the Loan Agreements referenced in paragraph 112 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 112 to the extent they vary from the contents of Act 30, Act 31, and the Loan Agreements.  The other allegations in paragraph 112 of the Complaint constitute a legal conclusion to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

113.    Defendants refer to the Bond Resolutions referenced by implication in paragraph 113 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 113 to the extent they vary from the terms of the Bond Resolutions.  The other allegations in paragraph 113 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

114.    Defendants refer to the Third Amended Plan referenced in paragraph 114 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 114 to the extent they vary from its terms.  The remaining allegations in paragraph 114 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

115.    Defendants deny the allegations in paragraph 115 of the Complaint.

116.    Defendants repeat and reallege their answers to paragraphs 1 through 115 of the Complaint as if fully set forth herein.

117.     The allegations in paragraph 117 of the Complaint constitute a legal conclusion to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

118.     Defendants deny that the Title III Court or the First Circuit has made any final legal determinations regarding Defendants' rights under the HTA Bonds, the Bond Resolutions, the HTA Enabling Act, and other statutes of the Commonwealth relative to the HTA Bonds.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 989 F.3d 170, 182 (1st Cir. 2021) ("[T]he Title III court will not and cannot treat its earlier, summary determination about whether the Monolines had a colorable claim as conclusive.").  Defendants refer to the Title III Court's ruling referenced in paragraph 118 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 118 to the extent they vary from its terms. The remaining allegations in paragraph 118 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

119.     Defendants refer to Act 30, Act 31, and the Bond Resolutions referenced in paragraph 119 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 119 to the extent they vary from the terms of Act 30, Act 31, and the Bond Resolutions.  The remaining allegations in paragraph 119 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

120.     Defendants refer to the HTA Bondholder Financing Statements referenced in paragraph 120 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 120 to the extent they vary from the terms of the HTA Bondholder Financing Statements.  The other allegations in paragraph 120 of the Complaint constitute a legal

conclusion to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

121.    Defendants refer to the HTA Bondholder Financing Statements referenced in paragraph 121 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 121 to the extent they vary from the terms of the HTA Bondholder Financing Statements.  The other allegations in paragraph 121 of the Complaint constitute a legal conclusion to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

122.    The allegations in paragraph 122 constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in paragraph 122 of the Complaint.

123.    Defendants refer to the HTA Bondholder Financing Statements referenced in paragraph 123 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 123 to the extent they vary from the terms of the HTA Bondholder Financing Statements.  The other allegations in paragraph 123 constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in paragraph 123 of the Complaint.

124.    Defendants refer to the 2002 Resolution referenced in paragraph 124 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 124 to the extent they vary from its terms.  The other allegations in paragraph 124 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

125.    Defendants refer to the Bond Resolution referenced in paragraph 125 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 125 to the extent they vary from the terms of the Bond Resolution.  The other allegations in paragraph 125 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

126.    Defendants deny the allegations in paragraph 126 of the Complaint.

127.    Defendants refer to the Bond Resolution referenced in paragraph 127 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 127 to the extent they vary from the terms of the Bond Resolution. The other allegations in paragraph 127 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

128.    Defendants deny the allegations in paragraph 128 of the Complaint.

129.    Defendants deny the allegations in paragraph 129 of the Complaint.

130.    Defendants repeat and reallege their answers to paragraphs 1 through 129 of the Complaint as if fully set forth herein.

131.    The allegations contained in paragraph 131 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

132.    The allegations contained in paragraph 132 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

133.   The allegations contained in paragraph 133 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

134.   The allegations contained in paragraph 134 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

135.   The allegations contained in paragraph 135 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

136.   The allegations contained in paragraph 136 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

137.   The allegations in paragraph 137 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

138.   The allegations in paragraph 138 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

139.   Defendants refer to the Third Amended Plan referenced in paragraph 139 of the Complaint for the complete and accurate contents thereof and deny the allegations of paragraph 139 to the extent they vary from its terms.  The other remaining allegations in paragraph 139 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

140.   The allegations in paragraph 140 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

141.    Defendants repeat and reallege their answers to paragraphs 1 through 140 of the Complaint as if fully set forth herein.

142.    The allegations contained in paragraph 142 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

143.    The allegations contained in paragraph 143 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

144.    The allegations contained in paragraph 144 of the Complaint constitute legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations.

145.    The allegations in paragraph 145 of the Complaint constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations.

## **PRAYER FOR RELIEF**

The allegations in the "Prayer for Relief" constitute legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny all allegations in paragraphs A through E in the "Prayer for Relief."

## DEFENSES

Defendants assert the following defenses to the Complaint, reserving the right to timely raise such additional defenses as may be appropriate in light of the developments in this action.

### FIRST DEFENSE

### (Failure to State a Claim)

The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE

### (No Claims Against The Commonwealth, And Any Such Claims are Barred Under the Court's Bar Date Order)

Under paragraph 15 of the Court's *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof*, ECF No. 2521 (the "**Bar Date Order**"), any creditor who failed to file a proof of claim before the Bar Date (as defined therein) "(a) shall not be treated as a creditor of the Debtors for purposes of . . . receiving distributions under any plan of adjustment in these Title III Cases, and (b) shall be forever barred, estopped, and enjoined from asserting such claim against the Debtors."  Further, the Bar Date Order required each creditor to file a separate proof of claim against each Title III debtor against which it asserted a claim.  *Id.* ¶ 11.  Neither GDB nor DRA filed a proof of claim in the Commonwealth Title III Case on account of any claim under the Loan Agreements.  DRA does not qualify as a "covered territorial instrumentality" under paragraph 6 of the Bar Date Order and was therefore not excepted from its requirements.

Paragraph 15 of the Bar Date Order further provides that "the Debtors **and their property** shall be forever discharged from any and all indebtedness or liability with respect to such claim," meaning that the Bar Date Order forever discharged any liens or other claims against the Commonwealth's property that DRA may attempt to assert.

28

Moreover, on March 13, 2019, DRA and GDB jointly filed a "Motion to Clarify Transfer of Claim" (ECF No. 5628, the "**Motion to Clarify**") that identified all of the potential claims against the Commonwealth that had been transferred from GDB to DRA on "Exhibit A" to the Motion to Clarify.  Exhibit A to the Motion to Clarify identifies *no* HTA-related claims against the Commonwealth that were transferred by GDB to DRA, and instead establishes that the *only* claims against the Commonwealth that were transferred by GDB to DRA were claims on account of certain Commonwealth general obligation bonds and certain "APLA Bonds" not related to HTA.  The Motion to Clarify therefore establishes that DRA acquired no HTA-related claims against the Commonwealth from GDB, holds no such HTA-related claims against the Commonwealth, and as such is not a creditor of the Commonwealth with respect to any HTA-related claims.

Accordingly, DRA is forever barred under the Bar Date Order from asserting claims against the Commonwealth or its property on account of the Loan Agreements, and in any event holds no relevant claims against the Commonwealth on account of the Loan Agreements, because no such claims against the Commonwealth were ever transferred by GDB to DRA.

### THIRD DEFENSE
**(Claim Subject To Reduction)**

Alternatively, to the extent that the Commonwealth has not retained the Act 30-31 Revenues that the DRA Parties claim are subject to a security interest, and to the extent DRA has a claim against the Commonwealth, the amount of such claim must be reduced by the amount of Act 30-31 Revenues that the Commonwealth transferred from its accounts.  Any Act 30-31 Revenues not retained by the Commonwealth would remain subject to Section 3.2 of the Assignment and Security Agreement (as defined in the Counterclaims below), as amended, which

governs GDB's right to Act 30-31 Revenues and subordinates GDB's interest to HTA Bondholders and HTA's operating expenses.

## FOURTH DEFENSE
### (Contractual Subordination)

Pursuant to the Assignment and Security Agreement, Loan Agreements, and Bond Resolutions, DRA's claims are subordinated to the HTA Bondholders' claims. The HTA Bondholders, as third-party beneficiaries to the Assignment and Security Agreement and Loan Agreements, may enforce their rights under those agreements, including their respective subordination provisions. The Court can and should enforce the subordination provisions under section 510 of the Bankruptcy Code, made applicable to this proceeding by section 301(a) of PROMESA.

## FIFTH DEFENSE
### (Equitable Subordination)

To the extent any of the Loan Agreements or agreements granting security interests or liens did not effectuate subordination of GDB's loans and security interests, DRA's claims on account of such Loan Agreements or agreements granting security interests or liens should nonetheless be equitably subordinated. GDB, an insider of HTA, engaged in inequitable conduct to the extent that GDB used its position as both fiscal agent of and lender to HTA to, among other things, intentionally induce HTA to violate and breach subordination covenants in the Bond Resolutions. This conduct resulted in injury to Defendants and conferred an unfair advantage on GDB, and DRA as the transferee of GDB's assets. For example, according to the DRA Parties, GDB's actions denied Defendants the protection of express language stating that the loans are junior, inferior and subordinate in all respects to the HTA Bonds. The claims, liens, and other interests of DRA, as the purported assignee of GDB, must accordingly be equitably subordinated to the

claims, liens and other interests of Defendants.  Such equitable subordination is consistent with

the provisions of PROMESA and Title 11.

### SIXTH DEFENSE

### (Mistake)

In the alternative, the omission of the express subordination provisions required by the

Bond Resolutions in any Spanish Language Agreements (as defined in the Counterclaims below)

or other Loan Agreements or agreements constitutes a mutual mistake by the parties.  As evidenced

by the Bond Resolutions, GDB and HTA intended for conforming subordination language found

in other loan agreements to be included in all of the operative loan and security agreements.

Defendants were third party beneficiaries of the required subordination provisions.  Thus, any

omission of such language was a mutual mistake and any agreements lacking such required

provisions are voidable based on the mutual mistake and/or should be reformed to conform to the

other GDB-HTA agreements containing the required subordination provisions.

### SEVENTH DEFENSE

### (Equitable Estoppel/Waiver)

On numerous occasions, GDB has acknowledged that its asserted security interest in the

Act 30-31 Revenues is subordinate to the security interest therein held by the HTA Bondholders

and that any indebtedness of HTA to GDB would not have priority over or parity with the liens or

payment rights granted to HTA Bondholders under the Bond Resolutions, the 2002 Security

Agreement, and/or any other resolutions.  For example, Section 1.2 of the Assignment and Security

Agreement provides that any purported pledge of Act 30-31 Revenues to GDB "shall be junior,

inferior and subordinate in all respects to the outstanding bonds of the Assignor issued pursuant to

the Bond Resolutions."  By way of further example, in a reoffering circular issued in 2010, GDB

and HTA disclosed that the repayment of GDB's lines of credit to HTA "is subordinate to the

31

Highway Revenue Bonds and the Transportation Revenue Bonds." As a result, claims were not asserted and remedies were not exercised against HTA and/or GDB. As the purported assignee of GDB, the doctrine of equitable estoppel and waiver bars the DRA from now asserting that the Loan Claims and any security interests thereon are not subordinate to the claims held by HTA Bondholders and any corresponding security interests.

## EIGHTH DEFENSE

### (Lack of Standing)

To the extent that incremental Act 30-31 Revenues as to which DRA claims to have a priority under the Assignment and Security Agreement have been disbursed from Commonwealth accounts to HTA, no such revenues are subject to distribution under a plan of adjustment in the Commonwealth Title III Case. Accordingly, any claim by DRA to priority on such incremental revenues is non-justiciable within the Commonwealth's Title III Case to the extent that such incremental Act 30-31 Revenues have been disbursed from Commonwealth accounts. In addition, DRA, as successor to GDB, agreed to subordinate its interests in Act 30-31 Revenues, including revenues received by HTA, and therefore DRA has no cognizable injury or standing in respect of Act 30-31 Revenues.

## NINTH DEFENSE

### (Loan or Security Agreements Are *Ultra Vires* Acts Making Agreements Not Enforceable)

HTA and its officials lacked authority under the HTA Enabling Act, 9 L.P.R.A. § 2001 *et seq.*, to enter into loan agreements with GDB without the subordination language required under Section 602 of the Bond Resolutions or to take any other action to impair or violate Section 602 of the Bond Resolutions. Loan or security agreements without conforming, express subordination provisions are *ultra vires*, void, and unenforceable.

GDB and its officials also lacked authority to enter the loan agreements with HTA.  Under Act No. 164 of 2001, as amended, GDB was "prohibited from granting a loan to any government entity, other than a subsidiary of the bank, whose repayment source, as determined by the Board of Directors of [GDB], consists of future budget appropriations from the General Fund" without approval from the Commonwealth legislature.  Act No. 164-2001 § 8.  HTA is a "government entity" under Act No. 164.  *See* Statement of Motives, Act No. 164-2001 ("[GDB] has granted advances or financing to several departments, agencies and ***public corporations***, hereinafter government entities." (emphasis added)).  Because GDB maintained a portfolio of over $100 million in loans to HTA, this prohibition applied to any loan GDB extended to HTA unless the loan was necessary for the borrower to "honor the payment of the principal or the interests on its obligations towards bond holders or financial entities other than [GDB]."  Act No. 164-2001 § 8. The stated purpose for the Loan Agreements, however, was otherwise, *e.g.*, to enable HTA to finance operating costs, capital improvement expenditures, and to settle litigation over certain infrastructure projects.  The Loan Agreements when entered lacked any identifiable source of income.  For example, while certain Loan Agreements identify sources of payment as "proceeds of bonds to be issued by [HTA]," HTA at all relevant times lacked access to capital markets and had no likelihood of obtaining proceeds through new bond issuances.  Thus, the GDB Board of Directors could not have reasonably determined that the Loan Agreements had any potential source of payment other than appropriations from the Commonwealth General Fund.  The Loan Agreements nowhere purport to have received approval from the legislature.  Because GDB was prohibited from entering the Loan Agreements, they are *ultra vires*, void, and unenforceable.

## TENTH DEFENSE

### (Illegality)

The Loan Agreements and the Assignment and Security Agreement are illegal and in violation of Sections 602 of the Bond Resolutions, the HTA Enabling Act, the Puerto Rico Vehicle and Traffic Law, and the Internal Revenue Code for a New Puerto Rico to the extent they purported to grant an interest in the Bond Revenues or Act 30-31 Revenues for Plaintiffs equal to or senior to the interests of the Defendants.  Such illegal agreements are void and unenforceable.

## ELEVENTH DEFENSE

### (Prohibited Acts)

Plaintiffs lack authority to bring the Complaint because it is a prohibited act under the GDB Restructuring Act and the Asset Restrictions contained in certain agreements among GDB, DRA, and Plaintiffs, including the Transfer Agreement, the Servicing Agreement, and the Collateral Monitor Agreement.

## TWELFTH DEFENSE

### (Undue Influence)

GDB, acting as the Commonwealth's and HTA's fiscal agent, paying agent, reporting agent, and financial advisor, exerted undue influence by causing HTA to grant it interests and security under the Loan Agreements and the Assignment and Security Agreement that it could not have otherwise obtained absent its influence over HTA.  The Loan Agreements and Assignment and Security Agreement are unenforceable due to undue influence.

## COUNTERCLAIMS

### Parties

1.      Counterclaim Plaintiff Ambac Assurance Corporation ("**Ambac**") is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One World Trade Center, 41st Floor, New York, New York 10007.  Ambac is a monoline insurer.

2.      Counterclaim Plaintiff Assured Guaranty Corp. ("**AGC**") is a Maryland insurance corporation with its principal place of business at 1633 Broadway, New York, New York 10019.  AGC is a monoline insurer.

3.      Counterclaim Plaintiff Assured Guaranty Municipal Corp. ("**AGM**," and together with AGC, "**Assured**") is a New York insurance corporation with its principal place of business at 1633 Broadway, New York, New York 10019.  AGM is a monoline insurer.

4.      Counterclaim Plaintiff National Public Finance Guarantee Corporation ("**National**") (formerly known as MBIA Insurance Corp. of Illinois) is a New York financial guaranty insurance corporation with its principal place of business at 1 Manhattanville Road, Purchase, NY 10577.  National is a monoline insurer.

5.      Counterclaim Plaintiff Financial Guaranty Insurance Company ("**FGIC**") is a New York stock insurance corporation with its principal place of business at 463 Seventh Avenue, New York, New York 10018.  FGIC is a monoline insurer.

6.      Counterclaim Plaintiff Peaje Investments LLC ("**Peaje**") is a Delaware limited liability company with its principal place of business in New York, New York.  Peaje is the beneficial owner of uninsured 1968 Bonds.

7.      Ambac, Assured, National, FGIC, and Peaje are collectively referred to as "Counterclaim Plaintiffs."

8.     Counterclaim Defendant the GDB Debt Recovery Authority (the "**DRA**") is a statutory public trust and public governmental instrumentality of the Commonwealth of Puerto Rico (the "**Commonwealth**").  *See* 7 L.P.R.A. § 3171.  DRA has the capacity to sue and be sued. *See* 7 L.P.R.A. § 3175(a).

9.     Counterclaim Defendant AmeriNational Community Services, LLC, in its capacity as servicer for the GDB Debt Recovery Authority, is a Minnesota limited liability company with its principal place of business at 217 South Newton Avenue, Albert Lea, MN 56007.

10.     Counterclaim Defendant Cantor-Katz Collateral Monitor, in its capacity as collateral monitor for the GDB Debt Recovery Authority, is a Delaware limited liability company.

## Jurisdiction and Venue

11.     This Court has subject-matter jurisdiction over this adversary proceeding pursuant to PROMESA sections 306(a) and 306(b) because it arises under PROMESA Title III, in a Title III case, relates to the Commonwealth's underlying Title III case, and involves disputes over property of the Commonwealth and/or the Puerto Rico Highways and Transportation Authority ("**HTA**").

12.     This Court has personal jurisdiction over the DRA and the DRA Parties pursuant to PROMESA section 306(c).

13.     Venue is proper under PROMESA section 307 because this adversary proceeding is brought in a PROMESA Title III case pending in the District of Puerto Rico.

## Factual Background

14.     Counterclaim Plaintiffs are holders of interests in HTA Bonds issued under HTA Resolution No. 68-18 (as amended and supplemented, the "**1968 Resolution**") and Resolution No. 98-06 (as amended and supplemented, the "**1998 Resolution**," and together with the 1968 Resolution, the "**Bond Resolutions**").

15.     The Government Development Bank for Puerto Rico ("**GDB**") is an instrumentality of the Commonwealth that was established under Commonwealth law to serve as a depository of funds for the Commonwealth, its instrumentalities, public corporations, and municipalities.  DRA is a purported assignee of GDB.

   **A.     GDB Exercises Significant Control Over HTA and Advises HTA in Issuing the HTA Bonds.**

16.     Since 1948, and at all relevant times prior to the enactment of Act No. 21-2016, GDB acted as the "fiscal agent of the Commonwealth Government, its agencies and municipalities," including HTA.  *See* 7 L.P.R.A. § 581(A).  Under its charter, GDB was established to act as "fiscal agent and as paying agent and as a financial advisory and reporting agency of the Commonwealth Government and of the agencies, instrumentalities, commissions, authorities, municipalities and political subdivisions of Puerto Rico."  Act No. 17, approved September 23, 1948; *see also* Act No. 272 of 1945, as amended to be made applicable to GDB.

17.     As fiscal agent, GDB was responsible for approving all bonds issued by the Commonwealth and substantially all of the Commonwealth's instrumentalities, including HTA. *See*, *e.g.*, Commonwealth of Puerto Rico, Comprehensive Annual Financial Report, Year Ended June 30, 2011, at 73 ("GDB acts as fiscal agent, depository of funds, disbursing agent, investor and financial advisor for the Commonwealth, its public corporations, and municipalities in connection with the issuance of bonds and notes[.]").

18.     GDB additionally served as a lender to many of the Commonwealth's instrumentalities, including HTA.

19.     Upon information and belief, GDB also was responsible for advising and approving HTA's loans, and signed a number of the loan agreements as "Fiscal Agent."  *See, e.g.*, Compl. Ex. F at 10 (Jorge A. Cliviles Diaz signing for GDB as "Fiscal Agent").

20.     GDB thus served HTA simultaneously as both its fiscal agent and financial advisor and also as a lender.

21.     Thus, GDB was an insider of HTA, including, without limitation, for purposes of HTA's financing transactions such as issuing HTA Bonds and entering Loan Agreements with GDB.

22.     As fiscal agent, GDB had the statutory power, since at least 2001, to "compel any instrumentality or public incorporation of the Commonwealth of Puerto Rico to deliver or grant access to its books, records and other documents, including, without limitation, budgets, financial statements, certificates, audit reports, notifications, policies, procedures, manuals, plans and any other information related to the finances of such instrumentality or public corporations as the Bank may deem appropriate." *See* 7 L.P.R.A. § 581(B).

23.     Through GDB's position as fiscal agent and financial advisor to HTA, GDB had access to HTA's books and records, and other materials documenting HTA's financial condition.

24.     GDB exerted further control over municipalities and public corporations by requiring them to maintain deposits with GDB, and then lending money back to them. *See* 2013 Audited Financial Statements for GDB at 11-12 (noting that loans and public corporation deposits consisted of the vast majority of GDB's assets). This illusion of solvency did not last long, as audited financial statements expressed doubt that GDB could operate as a going concern, and not long thereafter, GDB commenced a Title VI proceeding. The Commonwealth passed laws that granted GDB even broader powers and control over public corporations like HTA. For example, Act 24 of 2014 required public corporations to deposit their monies with GDB, thus forcing public corporations to contribute capital to GDB at a time when GDB was in significant financial distress.

25.     Finally, GDB was also given the power to appoint an emergency officer to oversee HTA's daily financial affairs, including the power to amend HTA's budgets, the power to amend HTA's collective bargaining agreements, and the power to reject or otherwise amend HTA's contracts.  *See* Act 1-2015, Chapter III.

26.     As HTA's fiscal agent and advisor, GDB had the responsibility for approving bonds issued by HTA.  Indeed, the Official Statements prepared in connection with the bonds issued under the Bond Resolutions state that GDB, "as required" by Act No. 272 of 1945, as amended, "has acted as financial advisor to [HTA] in connection with the [bonds] offered hereby." *See, e.g.*, 1996 Highway Revenue Bonds, Official Statement at 43 (March 28, 2003); 2003 Highway Revenue Refunding Bonds, Official Statement at 73 (April 1, 2003); 2007 Transportation Revenue Bonds, Official Statement at 57 (February 15, 2007); 2010 Reoffering Circular at 32, 42; EC Resolution 2010-18 ¶¶ 1-2 (approving terms of Bonds and the 2010 Reoffering Circular associated with the bonds).

27.     GDB also possessed knowledge, and was bound by, the provisions of the Bond Resolutions because it owned and had otherwise acquired HTA's Bonds.  Certain of these Bond claims held by GDB remain outstanding and were transferred to DRA, including approximately $200 million of Series A Transportation Revenue Bonds.

28.     As such, GDB had actual knowledge that HTA was bound by certain covenants in favor of the holders of bonds issued under the Bond Resolutions, including covenants under which HTA agreed to subordinate any subsequent incurrence of debt to the bonds issued thereunder. Specifically, under Section 602 of the 1968 Resolution, HTA covenanted that it "will not incur any indebtedness nor create or cause or suffer to be created any debt, lien, pledge, assignment, encumbrance or any other charge having a priority to or being on a parity with the lien on Revenues

on the Bonds." 1968 Resolution § 602.  HTA further covenanted that "[a]ny other indebtedness incurred by [HTA] after the effective date hereof under documents not in effect on the effective date hereof shall contain a statement that such indebtedness is junior, inferior and subordinate in all respects to the Bonds and agreements with issuers of Credit Facilities or Liquidity Facilities secured on a parity with the Bonds as to lien on and source and security for payment from Revenues hereunder." *Id.*

29.     Similarly, under Section 602 of the 1998 Resolution, HTA covenanted that it "will not incur any indebtedness nor create or suffer to be created any lien, pledge, assignment, encumbrance or charge upon the Revenues ranking equally with or prior to the senior bonds." 1998 Resolution § 602.  HTA further covenanted that "[a]ny other indebtedness incurred by the Authority after the effective date hereof under documents not in effect on the effective date hereof shall contain a statement that such indebtedness is junior, inferior and subordinate in all respects to the bonds as to lien on and source and security for payment from Revenues hereunder."  *Id.*

30.     Section 802 of the Bond Resolutions further provides that HTA cannot grant a preference or priority to one set of Bondholders over another, stating that "nothing herein contained shall permit, or be construed as permitting without the consent of the holders of all bonds affected thereby … a preference or priority of any bond or bonds over any other bond or bonds."

**B.     HTA, in Financial Distress, Accepts Loans from GDB that Purportedly Violate Its Covenants to Bondholders.**

31.     During the 2008-2013 period, HTA suffered financial distress and urgently needed new capital to cover its operational deficits.  GDB became HTA's source of such new capital.  *See, e.g.*, Statement of Motives, Act No. 31 of 2013 (explaining that HTA "operates with a deficiency of approximately $355 million annually, which has been corrected in the past by means of loans granted by [GDB] to continue operating and meeting its obligations to its creditors," and that

GDB's "practice began in 2008, when [HTA] resorted to financing to cover its operations"). By this time, HTA had lost access to the capital markets and its last bond issuance under the Bond Resolutions was in 2010.  HTA thus had no other source of capital other than lines of credit extended by GDB.

32.     From March 2008 through January 2014, GDB and HTA entered into fifteen loan agreements (the "**Loan Agreements**").  The loan agreements had no specific source of repayment and, until at least 2013, were unsecured obligations.

33.     Upon information and belief, GDB drafted the Loan Agreements.  At the same, GDB acted both as the lender under the Loan Agreements and as HTA's fiscal agent and financial advisor.

34.     In that regard, the loan transactions were not the product of arms' length negotiations.

35.     The Loan Agreements drafted in English contain provisions stating that the loans thereunder "shall be junior and subordinate to outstanding bonds of [HTA]" (or similar statements).

36.     This accords with disclosures in official statements for HTA's bonds, which GDB approved.  For example, in 2010, GDB approved a reoffering circular issued in 2010 (the **"2010 Reoffering Circular"**).  *See, e.g.*, EC Resolution 2010-18 ¶¶ 1-2 (approving terms of Bonds and the 2010 Reoffering Circular associated with the bonds).  In the 2010 Reoffering Circular, GDB and HTA disclosed that the "repayment" of GDB's lines of credit to HTA "is subordinate to the Highway Revenue Bonds and the Transportation Revenue Bonds." *See* 2010 Reoffering Circular, at 32.  GDB thus induced investors to purchase Bonds through its disclosure that its lines of credit were payment subordinated to the Bonds.

37.     However, as alleged by the DRA Parties, five of the Loan Agreements, drafted in Spanish (the "**Spanish Language Agreements**") dated October 27, 2011, November 29, 2011, September 12, 2012, February 28, 2013, and January 16, 2014, do not include provisions expressly subordinating the loans thereunder to HTA.

38.     According to the DRA Parties, even though GDB knew that HTA, in Section 602 of the Bond Resolutions, covenanted to include subordination language in any other indebtedness HTA incurred, GDB failed to include a provision in the Spanish Language Agreements, and the amendments thereto, expressly subordinating the agreements to the bonds of HTA.  By entering the Spanish Language Agreements, HTA therefore was induced to violate its covenant to its bondholders.

39.     GDB and HTA additionally executed an assignment and security agreement in 2013 that purported to grant GDB a security interest in the Act 30-31 Revenues (the "**Assignment and Security Agreement**").  Like the Loan Agreements, the Assignment and Security Agreement contains subordination language indicating that the parties understood that the Loan Claims, as defined in the Complaint, were subordinate to the HTA Bonds.

40.     Underscoring that GDB acted in conflicting roles, the amendments to the Assignment and Security Agreement disclosed that HTA had adopted resolutions that authorized the Executive Director of HTA to execute amendments to that agreement "in accordance with any resolution duly adopted by the Board of Directors of [GDB] and ***subject to the Bank's financial advice***."  *See, e.g.*, Fifth Amendment to Assignment and Security Agreement at 3 (emphasis added).  Thus, HTA was to execute and perform under these agreements pursuant to GDB's financial advice, even though GDB was also a creditor of HTA.

**C.     GDB's Intentional Conduct Undermined the Rights and Interests of HTA's Bondholders.**

41.     As GDB was acting both as a fiscal agent and lender to HTA, GDB engaged in intentional conduct that undermined the rights and interests of HTA's bondholders.

42.     First, GDB induced HTA to enter certain Loan Agreements, the terms of which, as alleged by the DRA Parties, purportedly violated HTA's covenants to bondholders under Sections 602 and 802 of the Bond Resolutions.

43.     Second, according to the DRA Parties' Complaint, the clear subordination language in the Assignment and Security Agreement and the majority of the Loan Agreements is purported to be limited and not enforceable by HTA Bondholders.  If these allegations were correct (which they are not), then the subordination provisions cannot have complied with the covenants, which require subordination to the bondholders' interests.  Upon information and belief, GDB intentionally induced or compelled HTA to violate the Bond Resolutions when it entered the Assignment and Security Agreement and the Loan Agreements because they did not conform to the requirements of the Bond Resolutions.

44.     Third, GDB violated its obligations to HTA's bondholders under the Assignment and Security Agreement.  Section 3.2(a) of the Assignment and Security Agreement required GDB to apply Act 30-31 Revenues to pay HTA Bondholders in full before it could use such revenues to pay down the principal and interest on its loans to HTA.  Notwithstanding this provision, in FY2015 and FY2016, GDB received and retained approximately $129 million of revenues that, on information and belief, consisted of Act 30-31 Revenues.  In violation of Section 3.2 of the Assignment and Security Agreement, GDB did not apply any of these revenues to pay HTA Bonds even though, at the time, HTA's bonds remained outstanding and HTA had ceased making bond payments.

45.     Fourth, GDB provided these loans at a time when it knew HTA was undercapitalized and when HTA had no access to the capital markets.  At the time that GDB had extended loans to HTA, HTA incurred substantial net operating losses.  And, as numerous Puerto Rico statutes recognized, the loans were intended to finance HTA's deficits and had no identified source of repayment when issued.  By extending credit to HTA while HTA was in significant financial distress, GDB obtained unjustifiably favorable terms for the Spanish Language Agreements by omitting express subordination language that the DRA Parties claim to be lacking from the Spanish Language Agreements.  Similarly, when HTA entered the Assignment and Security Agreement, GDB had already extended approximately $1.657 billion in unsecured loan principal to HTA.  *See* Claim No. 151149 (claiming $1.733 billion in principal issued under the Loan Agreements and listing principal sums of only $61 million and $15 million extended to HTA on or after August 28, 2013, the date of the Assignment and Security Agreement).  GDB thus misused its position as agent to HTA and as HTA's only source of capital to induce HTA to enter the Assignment and Security Agreement that the DRA Parties claim entirely secures $1.6 billion in antecedent unsecured debt.  GDB harmed both HTA and its creditors by misusing its position as HTA insider and agent and HTA's only potential source of new capital to attempt to obtain advantage over the HTA Bondholders.

### D.      DRA Acquires GDB's Rights and Obligations Under the Loan Agreements.

46.     Pursuant to GDB's Qualifying Modification under Title VI of PROMESA, on November 29, 2018, DRA and GDB entered into the Master Transfer Agreement, whereby GDB transferred substantially all its assets to DRA, including its rights under the Loan Agreements.  As an assignee of GDB, DRA received no more than GDB possessed.

47.     Importantly, the solicitation materials for GDB's Qualifying Modification disclosed a number of risks associated with the GDB's loans to HTA, including the risk that the loans could be equitably subordinated to HTA's bonds.

48.     As a holder of GDB's interests under the Loan Agreements, DRA has disregarded HTA's covenant to the HTA Bondholders under Sections 602 and 802 of the Bond Resolutions by seeking a declaration that the Loan Agreements are *not* subordinated to the HTA Bonds.

### FIRST CLAIM FOR RELIEF

**Contractual Subordination**
**11 U.S.C. § 510(a)**

49.     Counterclaim Plaintiffs hereby reallege and incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

50.     By their plain and unambiguous terms, the Assignment and Security Agreement and most Loan Agreements expressly subordinate the rights of DRA in the Act 30-31 Revenues to those of the HTA Bondholders.

51.     The Assignment and Security Agreement provides that the pledge of the Act 30-31 Revenues "shall be junior, inferior and subordinate in all respects to the outstanding bonds of [HTA] issued pursuant to the Bond Resolutions."  Assignment and Security Agreement § 1.2. Contrary to the DRA Parties' assertions, section 1.2 does not limit this subordination in any way whatsoever, but makes clear that DRA's security interest in the Act 30-31 Revenues is subordinate *in all respects* to HTA's bonds.  The broad language further rebuts the DRA Parties' argument that the subordination provision only applies when HTA has specifically pledged incremental revenues to the HTA Bondholders.  *See also* Assignment and Security Agreement § 2.5 (the liens granted to GDB shall be "junior, inferior, and subordinate ***in all respects*** only to the outstanding bonds of [HTA] issued pursuant to the Bond Resolutions").  Indeed, if the DRA Parties were correct that

these provisions only effectuate subordination to the bondholders' liens, then section 2.2 of the Assignment and Security Agreement would be a nullity because HTA was required to keep the collateral free and clear from any other lien.  *Id.* § 2.2.

52.   Further, provisions in the Loan Agreements subordinate DRA's claims under the Loan Agreements to the HTA Bonds.  *See, e.g.*, 2009 Loan Agreement § 2 ("The Loan shall be junior and subordinate to the outstanding bonds of the Borrower . . . ."); 2013 Loan Agreement § 2.6 ("payment of principal and interest on the Loan from the revenues approved by Act 30-2013 & 31-2013 is junior and subordinated in all respects to the payment of the outstanding bonds of the Borrower").

53.   The DRA Parties claim that a handful of the Loan Agreements purportedly do not contain express subordination language.  But HTA was not authorized in the first instance to enter into loan agreements that lacked subordination language, due to the constraints imposed by the Bond Resolutions.   Regardless, multiple agreements that the DRA Parties claim to lack subordination language have been amended to identify the Act 30-31 Revenues as a source of the payment for the applicable loans.  And under the Assignment and Security Agreement, the Act 30-31 Revenues must first be applied to the repayment of the HTA Bonds.  The GDB loans are only payable from "any surplus then remaining" after payment of the outstanding HTA bonds. Assignment and Security Agreement § 3.2(a).   Thus, despite any alleged lack of explicit subordination provisions in certain agreements, those agreements incorporate the subordination provisions contained in the Assignment and Security Agreement.

54.   Further, GDB contractually subordinated payment on its loans to HTA's operating expenses.  Under the First Amendment to the Assignment and Security Agreement, dated March 31, 2015, GDB and HTA agreed that, "[n]otwithstanding the order of priority established in

Subsection 3.2(iii) [of the Assignment and Security Agreement], as of the date of this First Amendment, [GDB] shall transfer to [HTA] fifty percent (50%) of the Revenues, up to a maximum monthly amount of Ten Million Dollars ($10,000,000), to cover operational costs and expenses of [HTA] for a period of up to three (3) months as of the date of the first transfer or until June 30, 2015, whichever occurs first." While this transfer of Revenues was initially designated to occur for three months, under the Fourth Amendment to the Assignment and Security Agreement, dated July 30, 2015, GDB agreed to continue transferring 50% of Revenues, up to $10 million per month, to cover HTA's operational costs and expenses "until all outstanding Obligations owed by [HTA] to [GDB] are transferred to PRIFA pursuant to Act 1-2015," which transfer to PRIFA never occurred.

55.    Through the Sixth Amendment to the Assignment and Security Agreement, dated January 19, 2016, GDB eliminated the monthly cap of $10 million on the transfer of Revenues for HTA's operating expenses, thus providing HTA the full 50% of Revenues per month. The Sixth Amendment to the Assignment and Security Agreement further provided that GDB's management "shall evaluate monthly the funding needs of [HTA] to cover its operational costs and expenses, and will determine the amount to be transferred for such purposes."

56.    At all relevant times, HTA ran significant operational losses that entitled it to distributions under section 3.2 of the Assignment and Security Agreement, as amended. For example, HTA's operating losses totaled $444 million in FY2015, $423 million in FY2016, $467 million in FY2017, $502 million in FY2018, and $621 million in FY2019.[8] Thus, the DRA

---

[8] *See* HTA, Audited Financial Statements, Year Ended June 30, 2015, at 11; HTA, Independent Auditor's Report and Required Supplementary Information and Supplementary Information, June 30, 2016, at 9; HTA, Financial Statements with Independent Auditor's Report, Fiscal Year Ended June 30, 2017, at 11; HTA, Independent Auditor's Report and Required Supplementary

Parties' asserted right to any payment of Revenues is further subordinated to the operating costs and expenses of HTA.

57.     The HTA Bondholders may enforce their rights under the Assignment and Security Agreement and Loan Agreements as third party beneficiaries.   The Assignment and Security Agreement provides that GDB's security interest is subordinate to the "outstanding bonds of [HTA] issued pursuant to the Bond Resolutions."   Assignment and Security Agreement § 1.2. And the loan agreements themselves subordinate the loans to the outstanding bonds of HTA.  This language demonstrates the parties' intent to benefit the bondholders.

58.     The Assignment and Security Agreement and Loan Agreements alter the priority of the DRA's claims and therefore qualify as subordination agreements enforceable under Bankruptcy Code section 510(a), made applicable to this proceeding by section 301(a) of PROMESA.  The Court has the power and the obligation to enforce the subordination provisions of the Assignment and Security Agreement and Loan Agreements in favor of the HTA Bondholders.

## SECOND CLAIM FOR RELIEF

**Equitable Subordination of Loan Agreements and Security Interests
11 U.S.C. § 510(c)**

59.     Counterclaim Plaintiffs hereby reallege and incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

60.     At all times when GDB entered the Loan Agreements, GDB was an insider of HTA because GDB served as HTA's fiscal agent and financial advisor, had access to all of HTA's books

---

Information and Supplementary Information and Audit of Federal Awards, Fiscal Year Ended June 30, 2018, at 11; HTA, Financial Statements with Independent Auditor's Report, Fiscal Year Ended June 30, 2019, at 10.

and records, and, upon information and belief, advised, approved, managed and controlled HTA's decision to enter into the Loan Agreements and the Assignment and Security Agreement, and otherwise maintained a position of authority over HTA by providing a necessary source of capital to cover HTA's operating deficits.

61.     GDB also possessed and exercised significant powers and control over public corporations, including HTA.  Indeed, GDB was even granted the power to appoint an emergency officer to negotiate or modify HTA's contracts, and to otherwise maintain significant control over HTA's day-to-day affairs.

62.     GDB approved offering circulars for HTA's bonds that disclosed that the repayment of its loans to HTA were subordinate to all of HTA's bonds.  These disclosures induced bondholders to purchase HTA's bonds.

63.     GDB engaged in inequitable conduct by, among other things, using its position as both fiscal agent of and lender to HTA to induce HTA to enter into the Spanish Language Agreements or any other agreement which did not expressly subordinate GDB's claims and liens to HTA Bonds and liens in violation of the subordination covenants that GDB knew HTA entered with bondholders, and purportedly to grant liens and other rights on account of antecedent debt and other obligations.  GDB did this, even though it had disclosed to the capital markets that the loans were subordinate in repayment to the bonds.

64.     Further, GDB, as a bondholder, induced or compelled HTA to grant a lien to secure its bond claims, even though that lien was barred under section 802 of the Bond Resolutions.  This also harmed the Counterclaim Plaintiffs and HTA by providing certain collateral to GDB and to the exclusion of the Counterclaim Plaintiffs.  GDB obtained this alleged lien through a willful breach of the Bond Resolutions, and thus its conduct was inequitable.

65.     GDB also engaged in inequitable conduct when it received approximately $129 million in payments at a time that the bonds were unpaid.  GDB's receipt of these payments violated section 3.2 of the Assignment and Security Agreement, which required the application of those payments first to pay HTA's bonds.

66.     GDB's inequitable conduct resulted in injury to Counterclaim Plaintiffs and conferred an unfair advantage on GDB, and DRA as the transferee of GDB's assets, because it denied Counterclaim Plaintiffs the protection of express subordination language to which they were entitled under Section 602 of the Bond Resolutions.

67.     Equitable subordination of DRA's claims and interests under the Loan Agreements and the Assignment and Security Agreement is consistent with the provisions of PROMESA and the Bankruptcy Code because it remedies GDB's inequitable conduct that specifically injured Counterclaim Plaintiffs.

68.     Because GDB transferred its interests under the Loan Agreements and the Assignment and Security Agreement to DRA, GDB's inequitable conduct requires DRA's claims and interests on account of the Loan Agreements and the Assignment and Security Agreement to be equitably subordinated to the claims and liens of the HTA Bondholders.  Indeed, the solicitation materials for GDB's Qualifying Modification disclosed that as a consequence of GDB's inequitable conduct with respect to HTA, there was a risk that GDB's loans would be equitably subordinated to the bonds.  DRA thus assumed the equitable subordination risks associated with the loans.

69.     Accordingly, pursuant to 11 U.S.C. § 510(c), any claim or interest of DRA with respect to the Spanish Language Agreements or any other agreement deemed not to subordinate

GDB's Claims and liens to HTA Bondholders' claims and liens should be equitably subordinated to the claims and interests of HTA Bondholders.

## THIRD CLAIM FOR RELIEF

### Equitable Subordination of DRA's Claims and Security Interests on Account of HTA Bonds
### 11 U.S.C. § 510(c)

70.     Counterclaim Plaintiffs hereby reallege and incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

71.     In addition to Loan Claims, DRA claims $200,000,000 in Bond Claims in connection with bonds issued under the 1998 Resolution, including certain variable rate demand obligations ("**VRDOs**") that GDB "purchased."

72.     At all relevant times when GDB acquired HTA Bonds, and for the reasons alleged above, GDB was an insider of HTA.

73.     GDB engaged in inequitable conduct by "purchasing" the VRDOs, which were required to be redeemed by HTA.  The VRDOs were subject to a standby bond purchase agreement with Bank of Nova Scotia.  Upon the termination of a liquidity facility that was provided by Bank of Nova Scotia, the bonds were required to be purchased from the bondholders with the proceeds of the liquidity facility.  Bank of Nova Scotia, however, sold the bonds to GDB, as well as all of its rights under a reimbursement agreement.

74.     This transaction was a sham and effectively qualified as a redemption by an agent of HTA.  Under section 413 of the Bond Resolutions, when HTA purchases bonds, it is required to deliver such bonds to the Fiscal Agent for cancellation.  *See* 1998 Resolution § 413.  In order to avoid the cancellation of these bonds (which would have reduced the size of HTA's capital structure), GDB allegedly purchased the VRDOs.  However, in purchasing the VRDOs, GDB

acted as an agent for HTA, which is evidenced by the fact that GDB purchased the bonds at par, even though HTA had lost market access and was effectively insolvent at that time.

75.     Other than the issuer, no entity exercising ordinary business judgment would have purchased these bonds at par.  On information and belief, GDB was aware that its actions would harm bondholders.

76.     GDB's inequitable conduct in purchasing the VRDOs harmed the HTA Bondholders by leaving the VRDOs as a liability on HTA's balance sheet and thus diluted the recoveries of all other HTA Bondholders.

77.     Further, according to DRA, while GDB owned certain of HTA's bonds (*e.g.*, the VRDOs), it attempted to secure the bonds with an exclusive lien on Act 30-31 Revenues.  This was so even though the VRDOs and the reimbursement obligations were to rank, at most, on a *pari passu* basis with the 1998 Resolution Bonds.

78.     According to the DRA Parties, GDB purportedly obtained a lien exclusively for its bond claims even though the Bond Resolutions explicitly provide that the provisions therein are for the equal benefit of all of the bondholders, and even though section 802 of the Bond Resolutions prohibits HTA from granting a preference or priority to one bondholder over the others.  If the DRA Parties' allegations are correct, then GDB willfully breached the Bond Resolutions by obtaining this exclusive security interest and induced HTA to violate its obligations as well.

79.     GDB's inequitable conduct in obtaining this purported security interest harmed the HTA Bondholders (and HTA) because (i) the Bond Claims consisted of the outstanding VRDOs that were effectively redeemed by HTA and (ii) the Act 30-31 Revenues could have been used to either repay HTA's existing debts or to fund its operating expenses.  Further, the grant of any lien to secure one bondholder—GDB—over other bondholders harmed the HTA Bondholders because

it deprived all other HTA Bondholders the guarantee of equal treatment provided under Section 802 of the Bond Resolutions.

80.     Equitable subordination of DRA's Bond Claims and interests is consistent with the provisions of PROMESA and the Bankruptcy Code because it remedies GDB's inequitable conduct that specifically injured Counterclaim Plaintiffs.

81.     Because GDB transferred its interests under the Bond Claims to DRA, GDB's inequitable conduct requires DRA's claims and interests on account of the Loan Agreements and Assignment and Security Agreement to be equitably subordinated to the claims and liens of the HTA Bondholders.

82.     Accordingly, pursuant to 11 U.S.C. § 510(c), any claim or interest of DRA with respect to the Bond Claims should be equitably subordinated to the claims and interests of HTA Bondholders.

**FOURTH CLAIM FOR RELIEF**

**Reformation of Contract Based on Mutual Mistake**

83.     Counterclaim Plaintiffs hereby reallege and incorporate by reference each and every allegation in the preceding paragraphs as though fully set forth herein.

84.     In the alternative to equitable subordination, the omission of any express subordination provisions required by the Bond Resolutions in the Spanish Language Agreements or other agreements constitutes, upon information and belief, a mutual mistake by GDB and HTA.

85.     HTA's covenant under Section 602 of the Bond Resolutions to include subordination language in any subsequent indebtedness incurred by HTA establishes that HTA and GDB intended to include such language in all Loan Agreements, including in the Spanish Language Agreements.

86.     As fiscal agent and financial advisor to HTA in connection with bond issuances, GDB had, upon information and belief, actual knowledge that HTA was bound by covenants under the Bond Resolutions, including the subordination covenants under Section 602 of the Bond Resolutions.  GDB was established to further Puerto Rico's economic development, Act No. 17, approved September 23, 1948, § 1, and its credibility and efficacy as a financial institution, fiscal agent, and financial advisor required it to adhere to HTA's commitments to the Bondholders.

87.     Consistent with the Bond Resolutions' subordination covenants, GDB and HTA included such express subordination provisions in the vast majority of the Loan Agreements.

88.     The parties' pattern of conduct, and HTA's covenant under the Bond Resolutions, also establish that the parties intended and agreed to include subordination language in all Loan Agreements, including the Spanish Language Agreements.

89.     Any omission of the required subordination provision from the Spanish Language Agreements or any other agreements was therefore a mutual mistake of GDB and HTA.

90.     The subordination provision that the parties intended to include in the Spanish Language Agreements and any other agreements lacking such provision expressly subordinated GDB's claim under the loans to the outstanding bonds of HTA. Because this provision plainly served to benefit Counterclaim Plaintiffs, who are holders of such bonds, Counterclaim Plaintiffs are intended third party beneficiaries under the Spanish Language Agreements and any other such agreements.

91.     As third party beneficiaries under the Spanish Language Agreements and other agreements between GDB and HTA, Counterclaim Plaintiffs have standing and are entitled to request reformation of the Spanish Language Agreements and other such agreements to conform the terms of the agreements to include the subordination provisions.

92.    The Spanish Language Agreements and any other agreements lacking the required subordination provisions should be reformed to conform to all other Loan Agreements that contain the required subordination provisions.

**PRAYER FOR RELIEF**

WHEREFORE, the Defendants-Counterclaim Plaintiffs respectfully request that the Court enter Judgment in their favor on the Counterclaims and correspondingly issue the following relief:

a) A declaratory judgment that DRA's Loan Claims and liens are contractually subordinated to the HTA Bondholders' claims and liens;

b) A declaratory judgment that DRA's Loan Claims and liens are equitably subordinated to the HTA Bondholders' claims and liens;

c) A declaratory judgment that DRA's Bond Claims and liens are equitably subordinated to the HTA Bondholders' claims and liens;

d) A judgment reforming the Spanish Language Agreements and any agreements between GDB and HTA missing the required subordination provisions to include the required subordination provisions;

e) Such other relief as the Court deems just and proper.

Dated: August 26, 2021
San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile:  (787) 766-7001
    Email:  rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
    Dennis F. Dunne (admitted *pro hac vice*)
    Atara Miller (admitted *pro hac vice*)
    Grant R. Mainland (admitted *pro hac vice*)
    John J. Hughes, III (admitted *pro hac vice*)
    Jonathan Ohring (admitted *pro hac vice*)
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile:  (212) 530-5219
    Email: ddunne@milbank.com
        amiller@milbank.com
        gmainland@milbank.com
        jhughes2@milbank.com
        johring@milbank.com

*Attorneys for Ambac Assurance Corporation*

**REXACH & PICÓ, CSP**

By: */s/ María E. Picó*
María E. Picó
(USDC-PR No. 123214)
802 Ave. Fernández Juncos
San Juan, PR 00907-4315
Telephone: (787) 723-8520
Facsimile: (787) 724-7844
Email: mpico@rexachpico.com

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
Heriberto Burgos Pérez
(USDC-PR No. 204809)
Ricardo F. Casellas-Sánchez
(USDC-PR No. 203114)
Diana Pérez-Seda
(USDC-PR No. 232014)
P.O. Box 364924
San Juan, PR 00936-4924
Telephone: (787) 756-1400
Facsimile: (787) 756-1401
Email: hburgos@cabprlaw.com
        rcasellas@cabprlaw.com
        dperez@cabprlaw.com

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*
Martin A. Sosland (admitted *pro hac vice*)
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
Email: martin.sosland@butlersnow.com

James E. Bailey III (admitted *pro hac vice*)
Adam M. Langley (admitted *pro hac vice*)
6075 Poplar Ave., Suite 500
Memphis, TN 38119
Telephone: (901) 680-7200
Facsimile: (901) 680-7201
Email: jeb.bailey@butlersnow.com
        adam.langley@butlersnow.com

***Attorneys for Financial Guaranty Insurance Company***

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr. (admitted *pro hac vice*)
Mark C. Ellenberg (admitted *pro hac vice*)
William J. Natbony (admitted *pro hac vice*)
Thomas J. Curtin (admitted *pro hac vice*)
Casey J. Servais (admitted *pro hac vice*)
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Email: howard.hawkins@cwt.com
        mark.ellenberg@cwt.com
        bill.natbony@cwt.com
        thomas.curtin@cwt.com
        casey.servais@cwt.com

***Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.***

**ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC**

By: */s/ Eric Perez-Ochoa*
Eric Perez-Ochoa
(USDC-PR No. 206314)
Luis A. Oliver-Fraticelli
(USDC-PR No. 209204)
208 Ponce de León Ave., Suite 1600
San Juan, PR 00936
Telephone: (787) 756-9000
Facsimile: (787) 756-9010
Email: epo@amgprlaw.com
      loliver@amgprlaw.com

**WEIL, GOTSHAL & MANGES LLP**

By: */s/ Robert Berezin*
Jonathan Polkes (admitted *pro hac vice*)
Gregory Silbert (admitted *pro hac vice*)
Robert Berezin (admitted *pro hac vice*)
767 Fifth Avenue
New York, NY 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email:  jonathan.polkes@weil.com
      gregory.silbert@weil.com
      robert.berezin@weil.com

***Attorneys for National Public Finance Guarantee Corporation***

MONSERRATE SIMONET &
GIERBOLINI, LLC

DECHERT LLP

*/s/ Dora L. Monserrate Peñagarícano*
Dora L. Monserrate-Peñagarícano
USDC-PR No. 212612
Fernando J. Gierbolini-González
USDC-PR No. 211901
Richard J. Schell
USDC-PR No. 305811
101 San Patricio Avenue
Maramar Plaza, Suite 1120
Guaynabo, Puerto Rico 00968
Phone:      (787) 620-5300
Fax:         (787) 620-5305

*/s/ Allan S. Brilliant*
Allan S. Brilliant (*pro hac vice)*
Yehuda Goor (*pro hac vice)*
1095 Avenue of the Americas
New York, New York 10036
Tel: (212) 698-3500
Fax: (212) 698-3599

-and-

G. Eric Brunstad, Jr. (*pro hac vice)*
90 State House Square
Hartford, Connecticut 06103
Tel: (860) 524-3960
Fax: (860) 524-3930

-and-

Stuart T. Steinberg (*pro hac vice)*
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104
Tel: (215) 994-2521
Fax: (215) 994-2222

***Attorneys for Peaje Investments LLC***