# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br><br>Title III<br><br>Case No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY,<br><br>Debtors. | PROMESA<br><br>Title III<br><br>Case No. 17 BK 3567-LTS |
| AMERINATIONAL COMMUNITY SERVICES, LLC, as Servicer for the GDB Debt Recovery Authority, and CANTOR-KATZ COLLATERAL MONITOR LLC,<br><br>Plaintiffs,<br><br>v.<br><br>AMBAC ASSURANCE CORPORATION, ASSURED GUARANTY CORP., ASSURED GUARANTY MUNICIPAL CORP., FINANCIAL GUARANTY INSURANCE COMPANY, NATIONAL PUBLIC FINANCE GUARANTEE | Adv. Pro. No. 21-00068-LTS |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's Federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 04780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

CORPORATION, PEAJE INVESTMENTS LLC, and THE
BANK OF NEW YORK MELLON, as Fiscal Agent,

Defendants.

## DEFENDANTS' MOTION
## TO DISMISS THE COMPLAINT

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................1

FACTS ...............................................................................................................3

       A.    The Bond Resolutions Provide That the Rights of HTA
Bondholders Are Senior to Any Later-Incurred HTA Debt. .......................3

       B.    The GDB/HTA Loan Agreements Acknowledge HTA
Bondholders' Senior Rights and Expressly Subordinate the
GDB/HTA Loans. ...........................................................................6

            1.    The Subordination Provisions Acknowledge That the
Bondholders' Payment Rights and Security Interests Are
Senior. ...........................................................................7

            2.    The Payment Priority Provision Requires That Bondholders
Get Paid First. ...................................................................9

       C.    Public Disclosures Acknowledge That the GDB/HTA Loans Are
Subordinate and Unlikely To Be Repaid. .................................................10

       D.    The DRA Parties Acquired the GDB/HTA Loans Through GDB's
Title VI Qualifying Modification. ..........................................................11

       E.    The Claims Allowance Process and the HTA PSA ....................................12

       F.    The Complaint Seeks to Upend the Settlement .........................................14

STANDARD OF REVIEW ..................................................................................16

ARGUMENT ....................................................................................................16

I.      COUNTS I, II, AND IV SHOULD BE TERMINATED PENDING THIS
COURT'S CONSIDERATION OF THE COMMONWEALTH PLAN AND
HTA PSA. ................................................................................................16

II.     COUNTS I, II, AND IV SHOULD BE DISMISSED TO THE EXTENT THEY
SEEK IMPERMISSIBLE ADVISORY OPINIONS. ..........................................18

III.    ALL COUNTS ARE BARRED UNDER THE BAR DATE ORDER ............................21

IV.   COUNT I FAILS ON THE MERITS BECAUSE THE BONDS ARE PAYABLE
FROM ACTS 30-31 REVENUES. ..................................................................22

V.      COUNT III SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM
        BECAUSE THE DRA PARTIES' LOANS AND SECURITY INTERESTS ARE
        SUBORDINATED TO BONDHOLDERS' CLAIMS AND SECURITY
        INTERESTS. .................................................................................................................25

        A.      The Subordination Provisions Are Enforceable and Do Not
                Require Privity of Contract. ..............................................................................25

        B.      The DRA Parties' Attempts to Rewrite the Subordination
                Provisions Are Meritless. ...................................................................................31

                1.      The Subordination Provisions Effectuate Both Payment and
                        Lien Subordination. ................................................................................31

                2.      The Payment Priority Provision Requires Application of
                        the Acts 30-31 Revenues to the Bonds ..............................................35

                3.      The DRA Parties' Contention That the Subordination
                        Provisions Apply Only to the Transportation Bonds Is Both
                        Irrelevant and Wrong. ...........................................................................37

                4.      The DRA Parties' Remaining Arguments Concerning the
                        Spanish Language Loan Agreements Are Unsupported ...............40

CONCLUSION ......................................................................................................................42

CERTIFICATE OF SERVICE ...........................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aetna Life Ins. Co. v. Haworth*,
   300 U.S. 227 (1937)........................................................................................19

*Aurelius Capital Master Ltd. v. P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   919 F.3d 638 (1ST CIR. 2019) .....................................................................19, 21

*Bco. Central Corp. v. Yauco Homes, Inc.*,
   135 D.P.R. 858 (D.P.R. 1994) ................................................................29, 30, 31

*Bank of Alton v. Mission Bank*,
   1986 U.S. Dist. Lexis 26794 (D. Kan. Apr. 14, 1986) ..........................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................16

*Beniquez Diaz v. Autoridad de Acueductos y Alcantarillados*,
   Case No. K DP2009-1039, 2013 WL 2299366 (P.R. CT. App. 2013)....................30

*Borras-Borrero v. Corporacion del Fondo del Seguro*,
   958 F.3D 26 (1st Cir. 2020)............................................................................17

*CPA Group Int'l Inc. v. Am. Int'l Ins. Co. of P.R.*,
   No. Civ. 01-1483(JP), 2002 WL 31944044 (D. P.R. May 23, 2002)....................30

*Fin. Oversight & Mgmt. Bd. for P.R. v. Ambac Assurance Corp. (In re Fin. Oversight & Mgmt.*
   *Bd.  P.R.)*, Adv. Pro. No. 20-00005-LTS  (D.PR. Jan. 16, 2020)....................13, 18

*Highland Park CDO I Grantor Trust v. Wells Fargo Bank, NA*,
   No. 08 Civ. 5723 (NRB), 2009 WL 1834596 (S.D.N.Y. June 16, 2009)................33

*In re Advanced Cellular Sys., Inc.*,
   483 F.3D 7 (1st Cir. 2007)..............................................................................35

*In re Bank of New England Corp.*,
   364 F.3D 355 (1st Cir. 2004)...........................................................................26

*In re Best Prods.*,
   168 B.R. 35 (Bankr. S.D.N.Y. 1994)................................................................26

*In re Env't Aspecs. Inc.*,

**Table of Authorities, Cont'd**

**Page(s)**

235 B.R. 378 (Bankr. E.D.N.C. 1999) ...................................................................31

*In re Fencepost Prods., Inc.,*
629 B.R. 289 (Bankr. D. Kan. Mar. 31, 2021) ......................................................43

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
300 F. Supp. 3d 328 (D.P.R. 2018) ................................................................16, 19

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
995 F.3d 18 (1st Cir. 2021) .....................................................................................42

*In re First Baldwin Bancshares, Inc.,*
Case No. 13-00027, 2013 WL 5429844 (Bankr. S.D. Ala. Sept. 20, 2013) ....................32, 33

*In re Heritage Org., L.L.C.,*
375 B.R. 230 (Bankr. N.D. Tex. 2007) ..................................................................17

*In re Kaiser Aluminum Corp.,*
339 B.R. 91 (D. Del. 2006) .....................................................................................17

*In re La Paloma Generating Co.,*
595 B.R. 466 (Bankr. D. DeL. 2018) ...............................................................29, 33

*In re Lantana Motel*,
124 B.R. 252 (Bankr. S.D. Ohio 1990) ................................................26, 31, 32, 33

*Med Center Bank v. Fleetwood,*
854 S.W.2D 278 (Tex. App. 1993) .........................................................................40

*Pilot v. Alesco Preferred Funding XV, Ltd.,*
CA No. 13-0628-WS-M., 2014 WL 1900668 (S.D. Ala. May 13, 2014) ..............32

*Pub. Serv. Comm'n of Utah v. Wycoff Co.,*
344 U.S. 237 (1952) ..........................................................................................19, 21

*Wilmington Trust v. JPMorgan Chase Bank*,
No. 14-08248-RDD (Bankr. S.D.N.Y. 2014) ........................................................34

**Table of Authorities, Cont'd**

**Page(s)**

**Statutes and Other Authorities**

11 U.S.C. § 510(A) .........................................................................................................26, 29

ACT 30-2013 § 1 .....................................................................................................4, 24, 36, 41

ACT 31-2013 § 3 .........................................................................................................4, 24, 36

7 L.P.R.A. § 581-595 ........................................................................................................10

9 L.P.R.A.

    § 2012(B) .........................................................................................................6, 42
    § 2012(E) .........................................................................................................6, 42
    § 2013 .................................................................................................................29

31 L.P.R.A. § 3374 ..........................................................................................................29

Fed. R. Civ. P. 12(b)(1)....................................................................................................16

Fed. R. Civ. P. 12(b)(6)....................................................................................................16

CALIFORNIA DEBT AND INVESTMENT ADVISORY COMMISSION, *California Debt Issuance Primer* (2005)................................................................................................16

COM. CONT. STRATEGIES DRAFTING AND NEGOTIATING § 16.05[A] (2D ED. 2021).....................40

The Committee On Commercial Finance, ABA Section Of Business Law, *Report Of The Model First Lien/Second Lien Intercreditor Agreement Task Force*, 65 BUS. LAW. 809, 817 (2010)................................................................................................34

The Defendants[2] respectfully submit this motion to dismiss (the "**Motion to Dismiss**") the complaint (the "**Complaint**") filed by the DRA Parties in the above-captioned adversary proceeding (the "**Adversary Proceeding**") pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to the Adversary Proceeding under Rule 7012(b) of the Federal Rules of Bankruptcy Procedure.  In support of the Motion to Dismiss, the Defendants assert as follows:

## PRELIMINARY STATEMENT

1.      After years of hard-fought litigation regarding the existence and scope of Defendants' rights to payment from and security interests in certain revenues, Defendants reached a settlement with the Financial Oversight and Management Board for Puerto Rico (the "**Board**") that has made possible a largely consensual confirmation of a plan of adjustment for the Commonwealth (the "**Commonwealth Plan**").  The DRA Parties' Complaint seeks to upend that settlement and the Commonwealth Plan by attempting to litigate the very issues that have been settled.  These kinds of collateral attacks have been repeatedly rejected by the Court as an impermissible attempt to litigate issues that are subject to consideration under the Bankruptcy Rule 9019 standard at plan confirmation, and there is no reason for a different outcome here.  On the merits, the Complaint seeks to distort clear contractual subordination provisions and ignores Commonwealth law rendering the DRA Parties' loans and security interests junior to previously-

---

[2] "**Defendants**" means Assured Guaranty Corp. ("**AGC**"), Assured Guaranty Municipal Corp. (f/k/a Financial Security Assurance Inc.) (together with AGC, "**Assured**"), Ambac Assurance Corporation ("**Ambac**"), The Bank of New York Mellon, as Fiscal Agent (the "**HTA Fiscal Agent**"), National Public Finance Guarantee Corp., Financial Guaranty Insurance Company ("**FGIC**"), and Peaje Investments LLC.  "**DRA Parties**" means AmeriNational Community Services, LLC and Cantor-Katz Collateral Monitor LLC.  "**GDB**" means the Government Development Bank for Puerto Rico.  "**DRA**" means the GDB Debt Recovery Authority.  "**HTA**" means the Puerto Rico Highways and Transportation Authority.  The "**Commonwealth**" means the Commonwealth of Puerto Rico.  "**Natbony Decl.**" shall refer to the Declaration of William J. Natbony that is submitted contemporaneously with this Motion to Dismiss.  Capitalized terms used herein but not otherwise defined shall have the meanings given to them in the Complaint.

issued HTA revenue bonds and corresponding security interests.  The Complaint should be dismissed.

2.      *First*, Count I (seeking a declaration that the DRA Parties are the only parties with a right to collect from, and a valid security interest in, certain crude oil taxes, motor vehicle license fees, and other excise taxes levied pursuant to Acts 30 and 31 of 2013 (the "**Acts 30-31 Revenues**"), Count II (seeking a declaration that the HTA Bondholders have limited collateral to secure the HTA Bonds) and Count IV (seeking a declaration that the DRA's Loans are entitled to collect from the Bond Revenues not deposited in the Bond Revenue Accounts) should be terminated pending this Court's consideration of the Commonwealth Plan, which encompasses a settlement of the claims in those three Counts.  This Court has ruled on three different occasions that creditors are not entitled to litigate claims that the Board has chosen to settle and that will be evaluated under the Bankruptcy Rule 9019 standard.  To the extent that the DRA Parties seek to challenge the Defendants' settlement with the Board, the Court's prior rulings allow them to do so through the plan confirmation and settlement objection process, but not here.

3.      *Second*, Counts I, II and IV should also be dismissed for lack of subject matter jurisdiction to the extent they seek impermissible advisory opinions, given that those Counts seek rulings with respect to distributions under a "future plan" for HTA, which HTA has not yet proposed.  Compl. ¶ 101.  As the First Circuit has held, claims with respect to distributions under a future, as-yet unfiled plan are non-justiciable.

4.      *Third*, all Counts should be dismissed because any claims and property interests that the DRA Parties may have had against the Commonwealth are barred under the Court's Bar Date Order, and GDB did not transfer to the DRA Parties any clawback claims.

5.      *Fourth*, Count I—which is premised on the allegation that the HTA bonds are not secured by the Acts 30-31 Revenues—should be dismissed because the DRA Parties themselves

concede, and the documents incorporated into the Complaint confirm, that the Acts 30-31 Revenues also secure HTA's bonds.

6.     *Fifth*, Count III fails as a matter of law because it seeks broad declaratory relief that the DRA Parties' loans are not subordinated to Defendants' rights, notwithstanding that Commonwealth law and the very agreements governing the loans expressly subordinate the DRA Parties' liens and claims to the pre-existing HTA bond obligations.

7.     Accordingly, the Complaint should be dismissed in its entirety.

## **FACTS**

### A.   **The Bond Resolutions Provide That the Rights of HTA Bondholders Are Senior to Any Later-Incurred HTA Debt.**

8.     Pursuant to its powers under Act 74 of 1965 (the "**Enabling Act**"), HTA issued bonds pursuant to certain resolutions it adopted in 1968 (the "**1968 Resolution**") and in 1998 (the "**1998 Resolution**" and, together with the 1968 Resolution, the "**Bond Resolutions**").  The bonds issued by HTA under the Bond Resolutions generally fall into three tranches:  Bonds issued under the 1968 Resolution (the "**Highway Bonds**"); senior Bonds issued under the 1998 Resolution (the "**Senior Transportation Bonds**"); and junior Bonds issued under the 1998 Resolution (the "**Junior Transportation Bonds**", together with the Senior Transportation Bonds, the "**Transportation Bonds**" and collectively, the "**Bonds**").

9.     Under the Bond Resolutions, HTA pledged its "Revenues" and certain other monies to secure the repayment of the Bonds issued thereunder.  *See* Compl. Ex.  A, 1968 Resolution §§ 401, 601; Compl. Ex. B, 1998 Resolution §§ 401, 601; *see also* Natbony Decl. Ex. 1, Resolution 83-01 (pledging motor vehicle license fees to the payment of the Highway Bonds); Natbony Decl. Ex. 2 (Resolution 98-08 pledging toll revenues to the payment of the Highway Bonds); Natbony Decl. Ex. 3, 2002 Security Agreement dated February 7, 2002 (granting security interest in monies

required to be deposited with the fiscal agent for the Bonds and in proceeds thereof). As defined in the Bond Resolutions, the term "Revenues" includes toll revenues, as well as certain excise taxes derived from the sale of gasoline, crude oil, motor vehicle license registration, and petroleum products. *See, e.g.*, Compl. Ex. A, 1968 Resolution § 101; Compl. Ex. B, 1998 Resolution § 101.

10.     The Bonds are payable from (i) "Revenues" (*see* Compl. Ex. A, 1968 Resolution § 601; Compl. Ex. B, 1998 Resolution § 601), (ii) from other monies and funds, and (iii) in the case of any deficiency in the funding of any of the accounts established for the payment of the Bonds (the "**Bond Revenue Accounts**"), from any other funds received by HTA from the Commonwealth or from any other source for the payment of debt service (*see, e.g.*, Compl. Ex. A, 1968 Resolution § 401; Compl. Ex. B, 1998 Resolution § 401).

11.     Puerto Rico law requires the Commonwealth to reimburse (the "**Reimbursement Obligation**") HTA and the holders of the Bonds (the "**Bondholders**") if there is a deficiency in the Bond Revenue Accounts. *See* Compl. Ex. D, Act 31-2013 § 3 (amending Section 3060.11(a)(1)(E) of Act No. 1-2011). The Reimbursement Obligation under Act 31 may be satisfied by "(1) any other taxes in effect on any other fuel or propellant used, among other purposes, to propel road vehicles; and (2) any remaining portion of the tax on gasoline, gas oil or diesel oil established in Section 3020.06 that are in effect." *Id*. In addition, in the event that motor vehicle license fees are used to cover the requirements of the public debt, the Reimbursement Obligation under Act 30 may be satisfied from the first proceeds received from the registration of motor vehicles. *See* Compl. Ex. C, Act 30-2013 § 1 (amending Section 23.01 of Act No. 22-2000) ("the amounts used to cover said deficiency shall be reimbursed to the Authority from the first proceeds received in the next or subsequent fiscal years by the Government of Puerto Rico proceeding from the registration of motor vehicles").

12.     The Bond Resolutions also contain four important bondholder protections that are relevant here:

a.      *First*, the Bond Resolutions prohibit HTA from incurring any debt that is *pari passu* with or senior to the Bonds.  *See* Compl. Ex. A, 1968 Resolution § 602 (prohibiting HTA to incur senior debt); Compl. Ex. B, 1998 Resolution § 602 (same).

b.      *Second*, the Bond Resolutions prohibit HTA from granting any liens that would be senior to the liens securing the Bonds or otherwise bestow any preference or priority on one Bondholder over another without the consent of all Bondholders.  *Id.* § 802 (prohibiting the grant of any senior liens or amendments that would give one bondholder a preference over another); *see also* Compl. Ex. A, 1968 Resolution § 802.

c.      *Third*, the Bond Resolutions prohibit third parties from enforcing any of their provisions.  *See* Compl. Ex. A, 1968 Resolution § 1005; Compl. Ex. B, 1998 Resolution § 1104.

d.      *Finally*, the Bond Resolutions require HTA to include in any future HTA debt documents executed after the adoption of the Bond Resolutions a statement that the indebtedness memorialized thereunder is "junior, inferior and subordinate in all respects to the Bonds . . . . as to lien on and source and security for payment from Revenues hereunder."  Compl. Ex. A., 1968 Resolution § 602; *see also* Compl. Ex. B, 1998 Resolution § 602 (similar).

13.     Together, these provisions ensured that the rights of the Bondholders would remain senior to the rights of the holders of any later-issued HTA debt.  And, under the Enabling Act, HTA's obligations under the Bond Resolutions, including its obligation to refrain from incurring

indebtedness senior to the Bonds, are "valid and binding obligations" authorized under Puerto Rico law.  9 L.P.R.A. §§ 2012(b), (e).

**B.** **The GDB/HTA Loan Agreements Acknowledge HTA Bondholders' Senior Rights and Expressly Subordinate the GDB/HTA Loans.**

14.     As alleged in the Complaint, the DRA Parties' loan claims purportedly arose from a series of loan agreements between GDB and HTA (the "**GDB/HTA Loan Agreements**" and the loans arising thereunder, the "**GDB/HTA Loans**").   Compl. ¶ 48.   The GDB/HTA Loan Agreements were executed beginning in 2008, long after the Bond Resolutions were adopted (but, for more than a billion dollars in GDB/HTA Loans, *before* the enactment in 2013 of Acts 30 and 31 and *before* the purported security interest was retroactively granted in respect of this antecedent debt by a financially distressed HTA).   *See* Natbony Decl. Ex. 18, Claim No. 151149 (providing that the total principal amount of the GDB/HTA Loans prior to 2013 was at least $1,574,597,748.04, after increases through amendments).   According to the Complaint, these loan obligations are payable from the Acts 30-31 Revenues, as well as proceeds of public-private partnerships, bond proceeds, and certain revenues of HTA.   Compl. ¶ 49.

15.     On June 25, 2013, Acts 30 and 31 were signed into law.   Compl. ¶ 40.   On August 28, 2013, GDB and HTA entered into the assignment and security agreement (the "**Assignment and Security Agreement**"), which the DRA Parties allege granted GDB a security interest in Acts 30-31 Revenues (see Compl. ¶¶ 52-53).[3]   Notably, the Assignment and Security Agreement acknowledges that the Acts 30-31 Revenues also secure the Bonds.   *See* Compl. Ex. F, Assignment and Security Agreement § 5.1 (defining "revenues" securing the GDB/HTA Loans to include the revenues securing the payment of "outstanding bonds of [HTA] issued pursuant to the Bond

---

[3] Section 1.2 of the Assignment and Security Agreement purported to grant a lien on "Revenues," which is defined to include Acts 30-31 Revenues.  *See* Compl. Ex. F, Assignment and Security Agreement § 5.1.

Resolutions. . . ."); *see also* Compl. Ex. F, First Amendment to Assignment and Security Agreement (noting that the Acts 30-31 Revenues also secure "the outstanding bonds of [HTA] issued under the Bond Resolutions").

16.     Moreover, the GDB/HTA Loan Agreements and the various associated documents, including the DRA Parties' own UCC financing statements, all of which are referenced in or integral to the Complaint, acknowledge that the GDB/HTA Loans and any corresponding security interests are subordinated to the Bonds and their corresponding security interests.   And the Assignment and Security Agreement on which the DRA Parties rely contains a turnover provision making clear that GDB is entitled to payment from the Acts 30-31 Revenues, if at all, only *after* the Bondholders have been paid in full.

### 1.     The Subordination Provisions Acknowledge That the Bondholders' Payment Rights and Security Interests Are Senior.

17.     The DRA Parties allege that at least twelve of fifteen loan agreements contain subordination language that provides the following (or similar): "the obligations of the Borrower hereunder with respect to the payment of principal and interest on the Loan … is [sic] junior and subordinated in all respects to the payment of the outstanding bonds of the Borrower…"  Compl. ¶ 67; *see also, e.g.*, Natbony Decl. Ex. 4, the Mar. 19, 2008 Loan Agreement § 3 ("The Line of Credit shall be junior and subordinate to outstanding bonds of the [Borrower] . . .); Natbony Decl. Ex. 5, the Aug. 6, 2008 Loan Agreement § 3 (same); Natbony Decl. Ex. 6, the Oct. 30, 2009 Loan Agreement I § 2 ("The Loan shall be junior and subordinate to outstanding bonds of the [Borrower]. . . ."); Natbony Decl. Ex. 7, the Oct. 30, 2009 Loan Agreement II § 3 ("The loan shall be junior and subordinate to outstanding bonds of the [Borrower]."); Natbony Decl. Ex. 8, the Nov. 9, 2009 Loan Agreement § 5 ("The Loan shall be junior and subordinate to outstanding bonds of the [Borrower] . . . ); Natbony Decl. Ex. 9, the June 30, 2010 Loan Agreement § 3 ("The Loan

shall be junior and subordinate to outstanding bonds of the Borrower."); Natbony Decl. Ex. 10,

the July 13, 2010 Loan Agreement § 4 (same); Natbony  Decl. Ex. 11, the Aug. 27, 2010 Loan

Agreement I § 4 ("The Loan shall be junior and subordinate to outstanding bonds of the [Borrower]

. . .") ; Natbony  Decl. Ex. 12, the Aug. 27, 2010 Loan Agreement II § 5 (same); Compl. Ex. E,

the Aug. 28, 2013 Loan Agreement § 2.6 ("the obligations of [HTA] hereunder with respect to the

payment of principal and interest on the Loan from the revenues approved by Acts 30-2013 & 31-

2013 is junior and subordinated in all respects to the payment of the outstanding bonds of [HTA]

. . . ."); *id.* § 3.2 (following acceleration of loan obligations, "all repayments shall be on a basis

junior, inferior and subordinate in all respects to the bonds issued under the provisions of the Bond

Resolutions").[4]

18.     This subordination language can also be found in certain promissory notes that,

according to the DRA Parties, "memorialized" the GDB/HTA Loans.  Compl. ¶ 48; *see, e.g.,*

Natbony Decl. Ex. 14, ECF 16276-16 at 31, *Promissory Note dated Aug. 28, 2013, $61,830,000*

*Loan* (" . . . all payments under the Loan Agreement and this Note shall be junior, inferior and

subordinate to outstanding bonds of the Borrower issued pursuant to the Bond Resolutions.");

Natbony Decl. Ex. 14, ECF 16276-16 at 71, *Promissory Note dated Aug. 27, 2010, $70,937,649.25*

*Loan* ("The Loan shall be junior and subordinate to outstanding bonds of the Authority and shall

be subject to certain other terms and conditions, as set forth in the Loan Agreement."); Natbony

Decl. Ex. 14, ECF 16276-16 at 64, *Promissory Note dated Aug. 27, 2010, $47,362,350.75 Loan*

(same); Natbony  Decl.  Ex.  14,  ECF  16276-16  at  78,  *Promissory  Note  dated  Aug.  27,  2013,*

---

[4] The DRA Parties allege that five of the GDB/HTA Loan Agreements, each of which was memorialized in Spanish,
"contain no subordination language at all."  Compl. ¶ 84.  Notably, four of those agreements were entered into before
the enactment of Acts 30 and 31 and the execution of the Assignment and Security Agreement, which subordinates
the alleged security interest in those revenues to the Bonds.  *See id.* ¶¶ 85-89.  The fifth Spanish language agreement
does not refer to Acts 30 and 31 or the Assignment and Security Agreement, and does not purport to pledge revenues
from Acts 30 or 31. *See* Natbony Decl. Ex.  13, the Jan. 16, 2014 Loan Agreement §1.5.

*$7,350,000 Loan* (same); Natbony Decl. Ex. 14, ECF 16276-16 at 41, *Promissory Note dated August 27, 2010, $45,000,000 Loan* ("The Loan shall be junior and subordinate to outstanding bonds of the Authority . . . . ").

19.     Likewise, the Assignment and Security Agreement provides that the security interest purportedly granted to GDB to secure payment of the GDB/HTA Loans "shall be junior, inferior and subordinate **in all respects** to the outstanding bonds of [HTA] issued pursuant to the Bond Resolutions."  Compl. ¶ 62; *id.,* Ex. F, Assignment and Security Agreement § 1.2 (emphasis added).  Section 2.5 of the Assignment and Security Agreement likewise states that the liens granted to GDB shall be "junior, inferior, and subordinate **in all respects**" to the Bonds.  *Id.* § 2.5 (emphasis added).

20.     Lastly, even the UCC financing statements that the DRA Parties filed to perfect their purported security interest in the Acts 30-31 Revenues disclose that the liens described therein are "junior, inferior, and subordinate to the outstanding bonds of" HTA.  *See* Compl. Ex. G, GDB Financing Statement dated Aug. 28, 2013.

### 2.     The Payment Priority Provision Requires That Bondholders Get Paid First.

21.     As the DRA Parties concede (*see* Compl. ¶¶ 78, 137), the Assignment and Security Agreement also contains a payment-priority provision (*i.e.*, a waterfall provision) with a turnover obligation.  That provision makes clear that GDB's right to be repaid from the Acts 30-31 Revenues is subordinate to the repayment of the Bonds.  It states:

> 3.2 Application of Revenues and Proceeds:   The Revenues assigned and the proceeds acquired under the Collateral shall be applied by the Bank as follows:
>
> (i)  to the payment of outstanding bonds of the Assignor issued pursuant to the Bond Resolutions . . .
>
> (iii)  next, any surplus then remaining to the payment of Obligations in the [order of priority established in section 3.2(iii)].

Compl. Ex. F, Assignment and Security Agreement § 3.2.

22.     In other words, if the Bonds are unpaid (as they are now), then the Acts 30-31
Revenues (or any proceeds thereof) cannot be applied to GDB's "Obligations" (as defined in the
Assignment and Security Agreement § 5.1) and instead must be applied to the Bonds.

23.     Moreover, section 3.2, as amended, also provides that surplus Acts 30-31 Revenues
(remaining after the payment of the Bonds) must first be applied to the payment of HTA's
operating expenses. Specifically, in the First Amendment to the Assignment and Security
Agreement, GDB agreed that up to $120 million annually (up to $10 million per month) of Acts
30-31 Revenues would first be applied to "cover operational costs and expenses" of HTA. *See*
Compl. Ex. F, First Amendment to Assignment and Security Agreement § 1 (amending section
3.2 of Assignment and Security Agreement). And in subsequent amendments, GDB agreed to
remove the cap on the amount of Acts 30-31 Revenues that could be used for the payment of
HTA's operating expenses. *See* Compl. Ex. F, Sixth Amendment to Assignment and Security
Agreement § 1. Thus, section 3.2 provides that both the Bonds *and* HTA's operating expenses
must be paid before any surplus Acts 30-31 Revenues may be applied to the GDB/HTA Loans.

C.     **Public Disclosures Acknowledge That the GDB/HTA Loans Are Subordinate
and Unlikely To Be Repaid.**

24.     In addition to its role as a lender, GDB served in a unique position as HTA's fiscal
agent, paying agent, reporting agent, and financial advisor. 7 L.P.R.A. §§ 581-595. In its capacity
as financial advisor to HTA, GDB approved a reoffering circular issued in 2010 relating to the
reoffering of the Bonds (the **"2010 Reoffering Circular"**). *See* Natbony Decl. Ex. 15, Resolution
EC 2010-18 § 2 (GDB resolution providing that the "Reoffering Circular . . . [is] hereby
approved"). The 2010 Reoffering Circular disclosed that the "repayment" of GDB's lines of credit
to HTA "is subordinate to the Highway Revenue Bonds [*i.e.*, the Highway Bonds] and the

Transportation Revenue Bonds [*i.e.*, the Senior Transportation Bonds and Junior Transportation Bonds].”  Natbony Decl. Ex. 16, 2010 Reoffering Circular at 32, 42.  This disclosure confirmed what the loan documents already provided:  the GDB/HTA Loans are subordinate in all respects to the Bonds.

25.     Other public disclosures likewise acknowledged that the GDB/HTA Loans had no source of repayment.  Indeed, legislation enacted by the Commonwealth—including Acts 30 and 31—repeatedly disclosed that the GDB/HTA Loans had no source of repayment.  *See* Compl. Ex. C, Act 30-2013 at pp. 1-2 (noting that GDB extended lines of credit to HTA with “no repayment sources . . . identified to meet said obligations”); Compl. Ex. D, Act 31-2013 at 2 (same).

26.     Finally, the publicly filed solicitation document issued by GDB in connection with its Title VI qualifying modification disclosed that a number of potential infirmities existed with respect to GDB’s loans to HTA.  In light of these infirmities, the Title VI documents attributed minimal value to the GDB/HTA Loans.  *See* Natbony Decl. Ex. 17, GDB Solicitation Statement of Qualifying Modification, Case No. 18-cv-1561-LTS, ECF No. 5-15 at E-126.

**D.     The DRA Parties Acquired the GDB/HTA Loans Through GDB’s Title VI Qualifying Modification.**

27.     On November 5, 2018, the Board certified a qualifying modification for GDB under Title VI of PROMESA (the “**Qualifying Modification**”), which was approved by this Court on November 7, 2018.  Compl. ¶ 20.

28.     The DRA was created as a vehicle to give effect to the terms of the Qualifying Modification.  *Id.* ¶ 21.  Under the framework of the Qualifying Modification, the DRA issued new bonds to the GDB bondholders in exchange for their existing GDB bonds.  *Id.*

29.     On November 29, 2018, the DRA and the GDB entered into a transfer agreement pursuant to which GDB transferred substantially all its assets to the DRA, including GDB’s

interests in the GDB/HTA Loans.  *Id.*  ¶ 22.  Certain other assets, however, were retained by GDB, including certain retained causes of actions.  *See* Natbony Decl. Ex. 17, GDB Solicitation Statement of Qualifying Modification, Case No. 18-cv-1561-LTS, ECF No. 5-15 at E-101-02 (noting that property transferred to DRA included the GDB/HTA Loans, but did not include certain causes of action that would be retained by GDB).  These assets would remain at and would be controlled by GDB, and DRA merely received a beneficial interest therein.  *See id.*

**E.      The Claims Allowance Process and the HTA PSA**

30.      On May 3, 2017 and May 21, 2017, the Board commenced Title III cases for the Commonwealth and HTA, respectively.  On February 15, 2018, this Court established procedures for the filing of proofs of claim in each case.  *See* ECF No. 2521 (the "**Bar Date Order**").  The Defendants filed proofs of claim in HTA's Title III case on account of the Bonds, and also filed proofs of claim in the Commonwealth's Title III case asserting that the Commonwealth was wrongfully taking property of HTA pledged for the repayment of the Bonds (the "**Clawback Claims**").  *See* Compl. ¶¶ 6-12 (citing proofs of claim).  GDB, as DRA's predecessor in interest, filed proofs of claim in HTA's Title III case on account of its Bonds and the GDB/HTA Loans. Tellingly, and consistent with the subordination provisions and turnover obligations in its loan and security agreements with HTA, GDB did not assert any clawback claims in the Commonwealth's Title III case.  *See* Natbony Decl. Ex. 18, Claim No. 151149; Natbony Decl. Ex. 19, Claim No. 29485.

31.      Relying on the Defendants' filed Clawback Claims, the Board commenced litigation against the Defendants seeking to disallow such Clawback Claims and otherwise determine the Defendants' respective rights with respect to the pledged revenues.  *See, e.g.*, *Fin. Oversight & Mgmt. Bd. for P.R. v. Ambac Assurance Corp. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Adv. Pro. No. 20-00005-LTS [ECF No. 1] (D.P.R. Jan. 16, 2020) (the "**HTA Clawback**

**Complaint**"). As this Court knows, the HTA Clawback Complaint and related proceedings have been vigorously litigated by all parties, including complex fact discovery and appeals. Neither GDB nor the DRA Parties were named defendants in the HTA Clawback Complaint because they never asserted clawback claims. Instead, the DRA Parties intervened on a limited basis, and the Court expressly held that "[t]he DRA Parties do not have the right to settle, oppose settlement or appeal any decision of this Court with respect to the [HTA Clawback Complaint] or related adversary proceedings." *See* Adv. Proc. No. 20-00005, ECF No. 41 (the "**DRA Intervention Order**").

32.    In May 2021, the Board and certain Bondholders, including Assured and National, entered into a plan support agreement (the "**HTA PSA**") pursuant to which the parties settled the Clawback Claims, including those subject to the HTA Clawback Complaint. *See* HTA PSA, ECF No. 16741-3. Certain Bondholders—including Ambac and FGIC—subsequently executed joinders to the HTA PSA.[5] The HTA PSA represents a significant milestone in these Title III cases because it resolves claims of some of the Commonwealth's largest creditors and provides the Board with a clearer path towards a largely consensual confirmation of the Commonwealth Plan.

33.    The currently proposed Commonwealth Plan provides for the issuance of a contingent value instrument (the "**HTA CVI**") as consideration for the settled Clawback Claims. The Commonwealth Plan provides for the allocation of the HTA CVI (subject to certain caps set forth therein) consistent with the priority established in HTA's prepetition debt documents: (i) first, on account of the Highway Bonds; (ii) second, on account of the Senior Transportation

---

[5] Assured and National do not adopt the statement that Ambac and FGIC executed joinders, because they have not had an opportunity to review the joinders executed by Ambac and FGIC.

Bonds; (iii) third, on account of the Junior Transportation Bonds; and (iv) fourth, on account of

GDB/HTA Loans.  *See* Commonwealth Plan, ECF No. 17627 at J-12; *see also id.* at Art. 60.2.

34.     This allocation reflects what the prepetition bond and loan documents require:  the

DRA Parties' loan claims and security interests are subordinated to the Bonds. The disclosure

statement for the Commonwealth Plan confirms this:

> The Oversight Board believes that based on the language of the indenture for the HTA 68
> Bonds, the HTA 98 Bonds, the DRA Parties' loans with GDB, and the HTA Enabling Act,
> among other documents, the DRA's HTA Loan claims are subordinate to the CW/HTA
> Claims, and proposed to treat them accordingly.

Disclosure Statement, ECF No. 17517 at 480 n.449.

35.     The Commonwealth Plan provides for the establishment of a reserve for certain

payments under the HTA CVI pending the "GDB Loan Priority Determination" (the "**HTA CVI**

**Reserve**").  *See* Commonwealth Plan, ECF No. 17627, Art. 1.171, 63.2.  As defined in the

Commonwealth Plan, a GDB Loan Priority Determination means:

> The determination, in either the Commonwealth Title III Case or the HTA Title III Case,
> (a) with respect to the relative rights of recovery and priority of payment of the HTA 68
> Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans,
> and/or (b) that the Government Development Bank Debt Recovery Authority does not
> possess an allowable claim or entitlement to recover with respect to the HTA Clawback
> CVI based upon such GDB HTA Loans.

*Id.*, Art. 1.258 (the "GDB Loan Priority Determination").

**F.      The Complaint Seeks to Upend the Settlement**

36.     After the Board executed the HTA PSA and filed the Commonwealth Plan, the

DRA Parties commenced a collateral attack on those significant milestones with the filing of their

Complaint.  The Complaint asserts four Counts:

37.     Count I of the Complaint seeks a declaration that the DRA Parties are the only

parties with the right to collect from, and that have a security interest in, the Acts 30-31 Revenues.

Compl. ¶¶ 103-15.

38.     Count II of the Complaint seeks a declaration that the Bondholders' security interests and rights to payment are limited to the monies held in the Sinking Funds established under the Bond Resolutions. *Id.* ¶¶ 116-29.

39.     Count III of the Complaint seeks a declaration that the DRA Parties' loan claims and liens are not subordinate to the Bonds. *Id.* ¶¶ 130-40; *id.* Prayer for Relief (c).

40.     Count IV of the Complaint seeks a declaration that the DRA Parties—but not the Bondholders—have a right to collect from the Bond Revenues (as defined in the Complaint) that have not been deposited into the Sinking Funds established under the Bond Resolutions. *Id.* ¶¶ 141-45.

41.     The Complaint rests on two mistaken assumptions regarding the DRA Parties' rights. *First*, the DRA Parties allege that they are the only parties with a lien on, and a right to payment from, the Acts 30-31 Revenues. *See* Compl. ¶¶ 1, 40-61, 72-78, 82-83, 96, 98, 103-115, 125-28, 136, 139. *Second*, the DRA Parties illogically claim entitlement to collect from what they define as the "Bond Revenues" either on a *pari passu* basis with the Bonds or to the total exclusion of the Bonds and in complete disregard of the Bond Resolutions. *Id.* ¶ 141-45. [6] As detailed below, both assumptions are demonstrably wrong.[7]

---

[6] Given that the DRA Parties contend that Bondholders may only be paid from Bond Revenues on deposit in the Bond Revenue Accounts, the DRA Parties appear to allege that they are the only parties in this adversary proceeding that are entitled to collect from Bond Revenues prior to their deposit in the Bond Revenue Accounts. *See* Compl. ¶ 126.

[7] The HTA Fiscal Agent states the following: The DRA Parties mischaracterize the HTA Fiscal Agent's role as fiscal agent under the Bond Resolutions by asserting, without any support, that the HTA Fiscal Agent "stands in the shoes of the bondholders of HTA in this proceeding." Compl. ¶ 12. To the contrary, the HTA Fiscal Agent's limited administrative rights and duties as fiscal agent are expressly set forth in the Bond Resolutions, and no other duties or obligations may be implied by, or read into, the Bond Resolutions. *See, e.g.,* Compl. Ex. B, 1998 Resolution § 701; *see Bank of Alton v. Mission Bank*, 1986 U.S. Dist. LEXIS 26794, at *10 (D. Kan. Apr. 14, 1986) ("The Bank was merely a fiscal and paying agent hired to perform specific duties. Additionally, the duties of the Bank were specifically limited to those as specified."); *see also* CALIFORNIA DEBT AND INVESTMENT ADVISORY COMMISSION, *California Debt Issuance Primer* (2005) ("A fiscal agent or paying agent is not a trustee, but merely acts as an agent of the issuer to perform functions necessary to comply with the requirements of the documents."). The HTA Fiscal Agent's limited and clearly defined administrative obligations do not include representing the Bondholders' interests in legal proceedings. *See generally* Compl. Ex. A, 1968 Resolution Art. VII; Compl. Ex. B, 1998 Resolution Art. VII. The DRA Parties cannot unilaterally create obligations that do not exist by suing the HTA Fiscal Agent in lieu of

## STANDARD OF REVIEW

42.     A motion to dismiss should be granted where, as here, there is no subject matter jurisdiction because the plaintiff seeks an impermissible advisory opinion.  Fed. R. Civ. P. 12(b)(1); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 300 F. Supp. 3d 328, 338-39 (D.P.R. 2018) (finding that certain counts of complaint sought "advisory opinions and must be dismissed for lack of subject matter jurisdiction").

43.     A motion to dismiss should also be granted where, as here, a complaint fails to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss, the DRA Parties must plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . ."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  Consequently, "if the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal."  *Borras-Borrero v. Corporacion del Fondo del Seguro*, 958 F.3d 26, 33 (1st Cir. 2020).

## ARGUMENT

I.     **COUNTS I, II, AND IV SHOULD BE TERMINATED PENDING THIS COURT'S CONSIDERATION OF THE COMMONWEALTH PLAN AND HTA PSA.**

44.     Counts I, II, and IV seek declaratory relief concerning the extent of the Defendants' liens and collateral.  Compl. ¶¶ 103-29, 141-45.  The Court's prior rulings compel termination of these Counts because the Board has already settled these issues pursuant to the HTA PSA and the Commonwealth Plan.

45.     On three prior occasions, this Court rejected similar attempts by litigants who sought to interpose objections to claims previously settled by the Board.  *See* ECF No. 9695 (the

_____

Bondholders.  If the DRA Parties intend to seek relief against Bondholders or their interests, such holders must receive notice and an opportunity to be heard.

"**PREPA Order**"); ECF No. 14331 (the "**GO Order**"); ECF No. 16385 (the "**ERS Order**").  For
example, in the PREPA Order, this Court terminated a claim objection filed by the Official
Committee of Unsecured Creditors to certain claims that were the subject of a settlement with the
Board.  This Court noted that, "[w]hile any party in interest has a statutory right to object to a
claim, **the Trustee, as the representative of the estate, has the ability to compromise that
objection**, as long as the objectant is given notice and an opportunity to be heard with respect to
the fairness and wisdom of the compromise." PREPA Order, at 5 (*quoting In re Heritage Org.,
L.L.C.,* 375 B.R. 230, 285 (Bankr. N.D. Tex. 2007)) (emphasis added).  The Court explained that
resolving a claim objection prior to considering a proposed settlement of the same claim would
"undermine the important policy of promoting settlements in bankruptcy proceedings by requiring
the parties to litigate the very issues that the settlement seeks to resolve."  PREPA Order, at 6
(*quoting In re Kaiser Aluminum Corp.*, 339 B.R. 91, 94 (D. Del. 2006)).

46.     For similar reasons, this Court likewise has rejected other attempts by litigants to
interpose objections to claims that the Board had settled.  *See* GO Order (denying motion to lift
stay to litigate claim objections); *see also* Natbony Decl. Ex. 23, Tr. of Sept. 16, 2020 Omnibus
Hr'g at 83:14-18, ECF No. 14339 (allowing the Debtors "to continue their efforts to negotiate a
settlement that could form a basis for an amended and confirmable plan of adjustment, [while also
preventing], or at least keep[ing] in abeyance, a scenario in which [claims objection] litigation
flourishes and stymies forward movement"); ERS Order (denying effort to litigate an objection to
ERS bond claims "for substantially the reasons set forth" in the PREPA Order).

47.     The Court's prior rulings compel a similar result here. Counts I, II, and IV raise
issues and seek declaratory relief that is duplicative of the relief sought in the HTA Clawback
Complaint.  *Compare* Compl. ¶¶ 27-33, 103-128 (seeking declaratory relief concerning scope of
bondholders' liens and claims) *with* HTA Clawback Complaint*, Fin. Oversight & Mgmt. Bd. for*

*P.R. v. Ambac Assurance Corp.*, Adv. Pro. No. 20-00005-LTS [ECF No. 1] (D.P.R. Jan. 16, 2020)

¶¶ 4, 35- 81, 119 (alleging that the Bonds are non-recourse obligations and that the bondholders' security interests extend only to Bond Revenues in the Bond Revenue Accounts).

48.     The Board, however, has chosen to settle these claims.  *See* Disclosure Statement, ECF No. 17517 at 36 (noting that the claims subject to the HTA Clawback Complaint "**will be compromised and settled pursuant to the confirmation of the Plan** . . .") (emphasis added).  As a result of the settlement memorialized in the HTA PSA, the Commonwealth Plan provides for a recovery on the Clawback Claims.  The DRA Parties are free to challenge the reasonableness of the proposed settlement in the context of confirmation of the Commonwealth Plan.  But the Court's prior rulings plainly prohibit them from doing so through this adversary proceeding.

## II.     COUNTS I, II, AND IV SHOULD BE DISMISSED TO THE EXTENT THEY SEEK IMPERMISSIBLE ADVISORY OPINIONS.

49.     Counts I, II, and IV should be dismissed for lack of subject matter jurisdiction to the extent they seek impermissible advisory opinions concerning distributions under a future, as-yet unfiled plan of adjustment for HTA.  For this Court to have subject matter jurisdiction, the Complaint must present a "real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937); *see also Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 243-44 (1952) ("The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them.").

50.     The First Circuit has held that claims seeking guidance concerning treatment under an as-yet unfiled plan of adjustment are not ripe.  *See Aurelius Capital Master Ltd. v. Puerto Rico*

*(In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 919 F.3d 638, 645-46 (1st Cir. 2019) (hereinafter,

"***Aurelius***").   In *Aurelius*, certain general obligation bondholders commenced an adversary

proceeding seeking declaratory relief affirming that they held statutory liens and other priority

rights with respect to certain excise taxes.  *Id.* at 645.  This Court dismissed those claims as non-

justiciable.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 300 F. Supp. 3d 328, 338-39 (D.P.R.

2018).  On appeal, the bondholders argued that their "requested declarations would facilitate the

process  for  formulating  a  plan  of  adjustment  for  the  Commonwealth"  and  that  "prompt

clarification of their rights would offer critical guidance in the buildup to the plan confirmation

stage."  *Id*.  The First Circuit affirmed this Court's conclusion that it lacked subject matter

jurisdiction to adjudicate those claims and held that such claims would be justiciable only when a

plan of adjustment was filed by the Commonwealth, and at that time, the creditors would be

entitled to raise such issues at plan confirmation.  *See id*.

51.     While the Complaint purports to seek a resolution of the DRA Parties' alleged

priority rights with respect to the HTA CVI Reserve established under the Commonwealth Plan,

Counts  I,  II,  and  IV  of  the  Complaint  seek  relief  that  extends  well  beyond  those  rights.[8]

Specifically,  the  DRA  Parties  seek  broad  declaratory  relief  concerning  their  rights  to  Bond

Revenues and Acts 30-31 Revenues.  The HTA CVI created under the Commonwealth Plan

constitutes general, unsecured obligations of the Commonwealth.  The DRA Parties have not

established that the HTA CVI is in any way tied to, much less secured by, Acts 30-31 Revenues.

Moreover, this Court has already recognized, in the context of the Government Parties' motion to

intervene in this Adversary Proceeding, that the Complaint does not seek to address solely the

---

[8] As explained above, the Commonwealth Plan is providing a recovery to the HTA Bondholders only on their
Clawback Claims *against the Commonwealth*, providing for the establishment of a reserve pending the GDB Loan
Priority Determination.  The DRA Parties will have an opportunity to establish their rights, if any, to the reserve in
the context of confirmation of the Commonwealth Plan.

DRA Parties' priority claims with respect to the HTA CVI Reserve.  *See* Adv. Proc. No. 21-00068, ECF No. 34 at 8  ("The Court is also not persuaded by the DRA Parties' argument that they seek relief only with respect to the funds earmarked in the Plan for the CVI Reserve.  Indeed, as described above, the Complaint plainly seeks a declaration concerning the scope of the DRA Parties' rights to the Acts 30-31 Revenues, and the DRA Parties' right to collect Commonwealth revenues not deposited in the Bond Revenue Accounts.").

52.     The DRA Parties' own allegations confirm that relief sought in the Complaint extends far beyond the allocation of payments from the HTA CVI Reserve.  As defined in the Complaint, the term "Bond Revenues" includes items of property that are *not* being distributed to HTA creditors under the Commonwealth Plan, including toll revenues.  *See* Compl. ¶ 31. Nevertheless, the DRA Parties seek declaratory relief as to their rights in such property. *See id.* ¶¶ 103-45.  The DRA Parties openly admit that the "Complaint is intended to provide a means to resolve the priority question with respect to the payments made by the Commonwealth on account of the clawback claims, ***and any payments that may be made on account of the Loan Claims and the HTA Bonds under a future plan for HTA."*** *Id.* ¶ 101 (emphasis added).  In other words, the DRA Parties are asking this Court to issue an impermissible advisory opinion with respect to a "future plan" that the Board has not yet submitted. *Id.*  As in *Aurelius*, any alleged harms stemming from an HTA plan of adjustment will become real only if and when such plan is proposed. *See Aurelius*, 919 F.3d at 645.

53.     Until an HTA plan is filed, the ultimate treatment of the DRA Parties' claims against HTA will continue to be "nebulous and contingent" rather than in a "fixed and final shape." *Wycoff*, 344 U.S. at 243-44.  Counts I, II and IV are thus non-justiciable and should be dismissed for lack of subject matter jurisdiction to the extent they seek relief with respect to such an as-yet unfiled HTA plan.

III.    **ALL COUNTS ARE BARRED UNDER THE BAR DATE ORDER**

54.    Whatever claims or asserted property interests that the DRA Parties may have held against the Commonwealth are barred under the Bar Date Order.   To recover under the Commonwealth Plan on account of the claims asserted in the Complaint, the DRA Parties were required to file a proof of claim against the Commonwealth alleging such claims.  *See* Bar Date Order, ECF No. 2521 ¶¶ 4, 11-12.

55.    However, the only proof of claim filed by GDB or the DRA Parties against the Commonwealth was for unrelated indebtedness; the proof of claim does not refer to any alleged lien or interest in Acts 30-31 Revenues or any clawback claim; indeed, it does not even mention the GDB/HTA Loans or the Bonds.  *See generally* Natbony Decl. Ex. 19, Claim No. 29485, at Ex. A.  Notably, on March 13, 2019, after the completion of GDB's Title VI qualifying modification process, the DRA Parties and GDB jointly filed a Motion to Clarify Transfer of Claim (ECF No. 5628, the "**Motion to Clarify**") that identified all of the potential claims against the Commonwealth that had been transferred from GDB to DRA on "Exhibit A" to the Motion to Clarify.  Exhibit A to the Motion to Clarify identifies *no* HTA-related claims against the Commonwealth that were transferred by GDB to DRA, and instead establishes that the *only* claims against the Commonwealth that were transferred by GDB to DRA were claims on account of certain Commonwealth general obligation bonds and certain "APLA Bonds" not related to HTA. The Motion to Clarify therefore confirms that DRA never acquired and does not hold any HTA-related claims against the Commonwealth from GDB, and therefore is not a creditor of the Commonwealth with respect to any HTA-related claims.

56.    While the Bar Date Order did provide a limited exception for covered territorial instrumentalities, its language did not extend that exception to any other entities.  Neither the DRA Parties nor the DRA have been certified by the Board as covered territorial instrumentalities under

PROMESA.  *See* PROMESA § 5(57) (providing that "covered territorial instrumentality" means "a territorial instrumentality designated by the Oversight Board pursuant to Section 101 to be subject to the requirements of this Act"); *id.* § 101(d)(1) (providing that the Board has the sole authority to designate a covered territorial instrumentality).[9]  Though GDB may have been a covered territorial instrumentality, nothing in the Bar Date Order exempted transferees of the covered territorial instrumentalities' claims from the requirements to file proofs of claim.  Thus, they are not excepted from the requirements of the Bar Date Order.

57.     As a result of the DRA Parties' failure to comply with the Bar Date Order, the Commonwealth "and [its] property" is "**forever discharged from any and all indebtedness or liability**" with respect to any claims the DRA Parties may have had against the Commonwealth on account of the GDB/HTA Loans.  *See* Bar Date Order, ECF No. 2521 ¶ 15 (emphasis added). In any event, the DRA Parties hold no HTA-related claims against the Commonwealth, because no such HTA-related claims against the Commonwealth were transferred by GDB to the DRA.

## IV.  COUNT I FAILS ON THE MERITS BECAUSE THE BONDS ARE PAYABLE FROM ACTS 30-31 REVENUES.

58.     Count I of the Complaint seeks a declaration that the DRA Parties are the only parties with a valid lien on Acts 30-31 Revenues, that such lien secures only their loan claims, and that the Bonds may not be paid from Acts 30-31 Revenues.  Compl. ¶¶ 103-15.  Count I fails as a matter of law and should be dismissed with prejudice.  To the extent that the DRA Parties hold a valid lien on the Acts 30-31 Revenues, Count I must be dismissed because any such lien is certainly

---

[9] Underscoring that the DRA and the DRA Parties are not covered territorial instrumentalities under PROMESA, the GDB Title VI qualifying modification solicitation materials stated that it would be an event of default under the DRA's bond documents if DRA was designated a covered territorial instrumentality.  *See* Natbony Decl. Ex. 17, GDB Solicitation Statement of Qualifying Modification, Case No. 18-cv-1561-LTS, ECF No. 5-15 at E-28 (noting that the designation of the DRA as a "covered territorial instrumentality" would qualify as an event of default under its debt documents).

not exclusive and—despite the DRA Parties' mistaken assertion to the contrary, *see id.* ¶¶ 82-83, 111-13—the Acts 30-31 Revenues are available for the repayment of the Bonds.

59.     Contrary to the DRA Parties' arguments, the Bond Resolutions provide that the Bonds are not payable solely from "Revenues."  Rather, section 401 of each Bond Resolution provides that any deficiencies in any of the Bond Revenue Accounts shall be covered from "any other funds that [HTA] receives from the Commonwealth" or from "any other source."  Compl. Ex. A, 1968 Resolution § 401; Compl. Ex. B, 1998 Resolution § 401.  And, as the DRA Parties concede, section 601 of each Bond Resolution provides that the Bonds are payable from "any funds received by [HTA] for [the purpose of paying debt service] from the Commonwealth." Compl. Ex. B, 1998 Resolution § 601; Compl. Ex. A, 1968 Resolution § 601.  Section 601, in turn, pledges these other monies to the payment of the Bonds.  *See id.*  In other words, the Bond Resolutions provide that, if necessary, "any funds received from the Commonwealth" for servicing debt or received from "any other source" may be used to pay the Bonds in addition to the Bond Revenues.

60.     Puerto Rico law made certain additional tax revenues available under Acts 30-31 for the payment of the Bonds through the Reimbursement Obligation.  *See* Compl. Ex. D, Act 31-2013 §3 (amending Section 3060.11(a)(1)(E) of Act No. 1-2011, and providing for funding of Reimbursement Obligation from "any other taxes in effect on any other fuel or propellant used, among other purposes, to propel road vehicles"); Compl. Ex. C, Act 30-2013 § 1 (amending Section 23.01 of Act No. 22-2000) ("the amounts used to cover said deficiency shall be reimbursed to the Authority from the first proceeds received in the next or subsequent fiscal years by the Government of Puerto Rico proceeding from the registration of motor vehicles").  Thus, even assuming *arguendo* that the Acts 30-31 Revenues are not Bond Revenues (which the Defendants do not concede), Acts 30-31 Revenues subject to the Reimbursement Obligations are still funds

received by HTA to fund the Reimbursement Obligation from the Commonwealth.  The DRA Parties concede that deficiencies exist in the Bond Revenue Accounts (Compl. ¶ 110), and thus relevant Acts 30-31 Revenues are available under Puerto Rico law to fund the Reimbursement Obligation.

61.     While the Complaint asserts that the Acts 30-31 Revenues are subject solely to the lien securing the GDB/HTA Loans, the Assignment and Security Agreement clearly acknowledged that the Acts 30-31 Revenues secured and were assigned to the payment of the Bonds as well.  *See* Compl. Ex. F, Assignment and Security Agreement § 5.1 (defining "Revenues" to include the revenues assigned for the payment of "outstanding bonds of [HTA] issued pursuant to the Bond Resolutions"); Compl. Ex. F, First Amendment to Assignment and Security Agreement at 1 (noting that security interest was granted in Acts 30-31 Revenues "to secure the repayment of the outstanding bonds of [HTA] issued under the Bond Resolutions . . ."); Compl. Ex. F, Fourth Amendment to Assignment and Security Agreement at 1 (same).  Count I thus fails to state a claim because the Assignment and Security Agreement plainly acknowledges that the liens secure both the GDB/HTA Loans *and* the Bonds.

62.     The DRA Parties contend that the liens granted under the Assignment and Security Agreement do secure the Bonds, but only those Bonds that the DRA Parties hold.  *See* Compl. ¶¶ 53, 23 n.6.  But that would violate the Bond Resolutions, which state that the protections therein are for the benefit of all HTA Bondholders and that HTA cannot grant any preference or priority to any one set of Bondholders over any other.  *See* Compl. Ex. A, 1968 Resolution §§ 201, 802 ("nothing herein contained shall permit, or be construed as permitting . . . a preference or priority of any bond or bonds over any other bond or bonds"); Compl. Ex. B, 1998 Resolution §§ 201, 802 (same).  These rights granted to the Bondholders can only be altered or amended with the "consent

of all holders of the bonds." *See id.*  GDB, as an owner of the Bonds, assented to these provisions.
*See* Compl. Ex. B, 1998 Resolution § 204.

63.     These provisions ensure that all HTA Bondholders receive the same benefits and
protections under the Bond Resolutions and that HTA lacks authority to grant any preference or
priority to one holder of any Bond over another holder of the Bond.  Accordingly, either all
"Obligations" (as defined in the Assignment and Security Agreement), including all Bonds, are
secured by the Acts 30-31 Revenues or none of them are, not even the Bonds held by the DRA
Parties.  Without consent of all Bondholders, HTA had no authority to grant the liens under the
Assignment and Security Agreement to GDB to secure its Bonds.

## V.     COUNT III SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM BECAUSE THE DRA PARTIES' LOANS AND SECURITY INTERESTS ARE SUBORDINATED TO BONDHOLDERS' CLAIMS AND SECURITY INTERESTS.

64.     Count III of the Complaint seeks a broad declaration from this Court that "DRA's
Loan Claims and liens are not subordinated to the HTA Bondholders' claims and liens."  Compl.
¶ 140.  However, the GDB/HTA Loan Agreements and the Assignment and Security Agreement
plainly provide that the DRA Parties' claims and liens are subordinate to the Bondholders' claims
and liens, and the same result is compelled by Commonwealth law.  That subordination is
enforceable in these Title III cases, and thus Count III must be dismissed.

### A.     The Subordination Provisions Are Enforceable and Do Not Require Privity of Contract.

65.     Section 510(a) of the Bankruptcy Code, made applicable to these Title III
proceedings by PROMESA Section 301(a), provides that "a subordination agreement is
enforceable in a case under this title to the same extent that such agreement is enforceable under
applicable nonbankruptcy law."  11 U.S.C. § 510(a).  Section 510(a) of the Bankruptcy Code thus
overrides priorities that otherwise would apply in bankruptcy:  "subordination alters the normal

priority of the junior creditor's claim so that it becomes eligible to receive a distribution only after the claims of the senior creditor have been satisfied." *In re Bank of New England Corp.*, 364 F.3d 355, 362 (1st Cir. 2004).

66.     A subordination agreement is simply "a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another." *In re Best Prods.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994); *In re Lantana Motel*, 124 B.R. 252, 255 (Bankr. S.D. Ohio 1990) ("A subordination agreement is an agreement by which a party having a superior right of some sort agrees with someone having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior.").

67.     Here, the subordination provisions in the GDB/HTA Loan Agreements and the Assignment and Security Agreement: (i) provide that the GDB/HTA Loans are "junior and subordinate to the outstanding bonds of the Borrower" (Natbony Decl. Ex. 9, the June 30, 2010 Loan Agreement § 4; *supra* ¶¶ 17 & 19); (ii) subordinate the liens securing the GDB/HTA Loans to the Bonds (Compl. Ex. F, Assignment and Security Agreement §§ 1.2, 2.5); and (iii) subordinate the DRA Parties' rights to payment to the payment of the Bonds (Compl. Ex. F, Assignment and Security Agreement § 3.2; Compl. Ex. E, the Aug. 28, 2013 Loan Agreement § 2.6; *supra* ¶ 17). The subordination language of the GDB/HTA Loan Agreements and the Assignment and Security Agreement does not arise in a vacuum; rather, such agreements expressly incorporated language required by the Bond Resolutions and GDB assented to those provisions because it was a Bondholder.  *See* Compl. Ex. B, 1998 Resolution § 204.  Because GDB agreed to subordinate the priority of its claims and liens to the Bonds, as it was required to under the Bond Resolutions, a valid subordination agreement exists, enforceable under section 510(a) of the Bankruptcy Code.

68.     The DRA Parties contend that the subordination provisions do not apply to the Acts 30-31 Revenues because, they claim, the DRA Parties are the only parties entitled to collect from

such revenues.  Compl. ¶¶ 83, 138.  However, as discussed above (*see supra*, Part IV), (i) the Bond Resolutions expressly provide that, in the case of a deficiency in the Bond Revenue Accounts, HTA is required to pay the Bonds from "any other funds that it receives from the Commonwealth" or from "any other source" and (ii) Acts 30 and 31 expressly provide that specified Acts 30-31 Revenues are to be used to fund the Reimbursement Obligation.

69.    The DRA Parties' arguments are also contrary to the language in the GDB/HTA Loan Agreements, which expansively provide that the GDB/HTA Loans "shall be junior and subordinate to the outstanding bonds of the Borrower." *See* Natbony Decl. Ex. 10, the July 13, 2010 Loan Agreement § 4; Natbony Decl. Ex. 8, the Nov. 9, 2009 Loan Agreement § 5 ("The Loan shall be junior and subordinate to the outstanding bonds of the [Borrower]…"); Natbony Decl. Ex. 4, the Mar. 19, 2008 Loan Agreement § 3 (same); *supra* ¶ 17.  Virtually identical language appears within the promissory notes.  *See* Natbony Decl. Ex. 14.  The language in the GDB/HTA Loan Agreements and in the promissory notes does not provide any exception for Acts 30-31 Revenues. And, in subsequent amendments to the GDB/HTA Loan Agreements that provided that such loans were payable from Acts 30-31 Revenues, GDB did not change the subordination language to include any carveout for Acts 30-31 Revenues. *See, e.g.*, Natbony Decl. Ex. 9, the June 30, 2010 Loan Agreement, Fourth Amendment § 1; Natbony Decl. Ex. 8, Nov. 9, 2009 Loan Agreement, Fifth Amendment § 3.  Consequently, the Acts 30-31 Revenues are subject to the subordination provisions in those agreements.

70.    The August 28, 2013 Loan Agreement confirms that Acts 30-31 Revenues are subject to the payment subordination provisions.  Specifically, section 2.6 of the August 28, 2013 Loan Agreement provides that "payment of principal and interest on the Loan ***from the revenues approved by Acts 30-2013 & 31-2013*** is junior and subordinated in all respects" to the payment of HTA's Bonds.  Compl. Ex. E, the Aug. 28, 2013 Loan Agreement § 2.6 (emphasis added). Thus,

contrary to the DRA Parties' arguments, the GDB/HTA Loan Agreements specifically provide that the DRA Parties' claims and rights to collect Acts 30-31 Revenues are subordinate to the Bonds.

71.     Unable to rebut the plain language of the subordination provisions, the DRA Parties assert that the provisions cannot be enforced by the Defendants because the Defendants are not parties to, and allegedly are not third party beneficiaries of, the GDB/HTA Loan Agreements or the Assignment and Security Agreement.   Compl. ¶¶ 132-34; *see also id.* ¶ 68.   However, contractual privity is not required for the Defendants to enforce the subordination provisions.   To the contrary, Defendants can enforce these provisions for two independent reasons.

72.     *First*, the Enabling Act empowers the Defendants to enforce the subordination of the DRA Parties' rights in order to protect the Defendants' senior payment rights and security interests conferred under the Bond Resolutions.   The Enabling Act specifically provides that Bondholders "shall have the right and power . . . by action or suit in equity to enjoin any acts or things which may be unlawful or in violation of the rights of the bondholders."  9 L.P.R.A. § 2013. Accordingly, even if the GDB/HTA Loan Agreements could somehow be interpreted to alter the priority of payment and liens set forth in the Bond Resolutions (and they cannot), the Defendants clearly have standing to enforce the subordination required under Commonwealth law.

73.     *Second*, the DRA Parties' arguments fail for the independent reason that the Defendants are third-party beneficiaries to the GDB/HTA Loan Agreements and the Assignment and Security Agreement.   Courts look to state law to determine the enforceability of a subordination agreement. *See, e.g.*, 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."); *In re La Paloma Generating Co.*, 595 B.R. 466, 470 (Bankr. D. Del. 2018) (examining New York law to determine enforceability of subordination provisions).  Puerto Rico

law provides that a third party has the right to enforce a contract that contains a stipulation in favor of that third person.  *See* 31 L.P.R.A. § 3374; *Bco. Central Corp. v. Yauco Homes, Inc.*, 135 D.P.R. 858, 866 (P.R. 1994)[10] (holding that senior creditor had the right to enforce a lien subordination provision in a deed of sale, even though it was not a party to that deed).

74.     A contractual stipulation favors a third party where, as here, it "recognizes the right of a third party to demand a certain economic benefit" from one of the contracting parties. *Beniquez Diaz v. Autoridad de Acueductos y Alcantarillados*, Case No. K DP2009-1039, 2013 WL 2299366, at *8 (P.R. Ct. App. 2013), Natbony Decl. Ex. 25.  Notably, "[t]he Supreme Court of Puerto Rico . . . has held that a party who benefits from the contract may be afforded rights under it as a third-party beneficiary, even though it was not expressly named" in that contract.  *CPA Group Int'l Inc. v. Am. Int'l Ins. Co. of P.R.*, No. Civ. 01-1483(JP), 2002 WL 31944044, at *11 (D. P.R. May 23, 2002).  All that is required is that "the benefits afforded to that [third] party can be identified in the provisions of the contract."  *Id.*

75.     *Banco Central Corp. v. Yauco Homes* is instructive.  There, the Supreme Court of Puerto Rico held that a junior creditor's agreement to "postpone and subordinate their mortgage in favor of [another mortgage] to be constituted . . . in favor of" a third-party bank was clearly intended to "grant the bank the right to" enforce the terms of the stipulation and "demand the subordination of the lesser mortgage."  *Bco. Central Corp.*, 135 P.R. at 866, Natbony Decl. Ex. 24.  The Court observed that, where the parties agreed to turn over money to a third party, the third party had the right to demand the performance of that obligation even without contractual privity.  *Id.* at 867.  In such a case, the junior creditor "had to know" that it had undertaken to subordinate its rights to the rights of another creditor and that "said subordination could be demanded by the

---

[10] *See* Natbony Decl. Ex. 24.

Bank, the party directly benefited by the contractual provision." *Id.* Thus, the Court held that the subordination provision—which simply provided that the mortgage would be subordinate to the liens of the senior creditor— "clearly grants a right to the third party to demand the performance thereof." *Id*.

76.     The same reasoning applies here.  Like the junior creditor in *Banco Central*, GDB agreed to subordinate its liens and claims to the Bonds.  The subordination provisions identify the beneficiaries (the HTA Bondholders) and imposed an undertaking on GDB to subordinate its rights to the payment and liens in favor of the Bondholders.  Notably, these provisions incorporated subordination language that was required by the Bond Resolutions to protect the Bondholders, thus making the Bonds more marketable.  *Compare* Compl. Ex. B, 1998 Resolution § 602 (requiring language that such indebtedness is "junior, inferior, and subordinate in all respects" to the Transportation Bonds) *with* Compl. Ex. F, Assignment and Security Agreement § 1.2 (providing that security interest granted to GDB is "junior, inferior, and subordinate in all respects" to the Bonds).[11]  Further, the DRA Parties concede that the Assignment and Security Agreement's payment priority provision imposes a turnover obligation.  *See* Compl. ¶¶ 78, 137 (calling section 3.2 a "turnover provision").[12]  The Defendants can enforce that obligation under Puerto Rico law. *See Banco Central*, 135 D.P.R. at 867.[13]

---

[11] Notably, while the Assignment and Security Agreement and the GDB/HTA Loan Agreements do not contain provisions prohibiting third party beneficiaries from enforcing their rights, the Bond Resolutions – issued years before those agreements – do contain such language.  *See* Compl. Ex. A, 1968 Resolution § 1005; Compl. Ex. B, 1998 Resolution § 1104.  Thus, HTA knew how to include such language in its debt documents (and did so in earlier executed agreements governing the Bonds), but chose not to include such language in any of the GDB/HTA Loan Agreements or the Assignment and Security Agreement.

[12] Moreover, the DRA Parties' allegations also are inconsistent with their assignor's conduct.  For example, GDB approved official statements that proclaimed to the capital markets that the GDB/HTA Loans were subordinate to the Highway Bonds and the Transportation Bonds.  *See* Natbony Decl. Ex. 16, July 1,  2010 Reoffering Circular at 32. Adv. Proc. No. 17-00159, ECF No. 102-2.  GDB thus induced investors to purchase the Bonds with a promise that its lines of credit would be subordinate to the Bonds.

[13] The law is similar in other jurisdictions.  *See, e.g.*, *In re Env't Aspecs. Inc.*, 235 B.R. 378, 397-98 (Bankr. E.D.N.C. 1999) (failure of subordinated creditor to sign subordination agreement did not render the subordination provisions

77.     Because an enforceable subordination agreement exists, Count III must be dismissed in its entirety.  The DRA Parties are not entitled to a declaration that their loan and liens are not subordinate to the Bonds because they are subordinate, as a matter of law.

**B.     The DRA Parties' Attempts to Rewrite the Subordination Provisions Are Meritless.**

78.     Unable to legitimately refute that an enforceable subordination agreement exists, the DRA Parties try to rewrite the terms of the agreements.  Their arguments cannot save Count III from dismissal.

**1.     The Subordination Provisions Effectuate Both Payment and Lien Subordination**

79.     Plaintiffs assert that the subordination provisions in the Assignment and Security Agreement "focus on the subordination of the lien," and therefore could effectuate only lien subordination.  *Id.* ¶¶ 72-73.  But that assertion ignores the turnover provision in the Assignment and Security Agreement and the payment subordination provisions in the GDB/HTA Loan Agreements, each of which clearly subordinate the DRA Parties' right to repayment, not just their liens.  Payment subordination "provides that the subordinated creditor's right to payment and collection will be subordinate to the rights of another claimant."  *In re Lantana Motel*, 124 B.R. at 255-56; *In re First Baldwin Bancshares, Inc.*, Case No. 13-00027, 2013 WL 5429844, at * 7 (Bankr. S.D. Ala. Sept. 20, 2013) ("Debt subordination . . . entitles the senior creditor to full satisfaction of its superior debt before the subordinated creditor receives payment on its debt.").  Courts have found that payment subordination exists where a creditor states that its loans are subordinate to another debt.  *See Pilot v. Alesco Preferred Funding XV, Ltd.*, CA No. 13-0628-WS-M., 2014 WL 1900668, at *5 (S.D. Ala. May 13, 2014) (where agreement provided that

---

unenforceable); *In re Lantana Motel*, 124 B.R. 252, 255 (Bankr. S.D. Ohio 1990) (holding that subordination agreement was enforceable even though senior creditor failed to sign subordination agreement).

indebtedness arising under a note was subordinate to other debt securities, that provision "unambiguously precludes the appellant from receiving any payment before the appellees' indebtedness is fully satisfied"). By contrast, lien subordination would not preclude the ability of a junior creditor to receive payments as long as such payments are made from sources other than shared collateral. *See In re Lantana Motel*, 124 B.R. at 256 ("Property interest subordination does not concern any rights the parties may have to receive payments."); *In re First Baldwin Bancshares, Inc.*, 2013 WL 5429844, at *7 (lien subordination "does not affect the subordinating creditor's right to payment under its debt instrument prior to default").

80.     Here, the relevant subordination provisions *do* prohibit payments to the DRA Parties on account of their GDB/HTA Loans, and thus cannot be construed as solely lien subordination provisions. The GDB/HTA Loan Agreements make clear that the DRA Parties' right to repayment is subordinate to the Bonds. *See* Natbony Decl. Ex. 6, the Oct. 30, 2009 Loan Agreement I § 2 ("The **Loan** shall be junior and subordinate to the outstanding **bonds** of the [Borrower] . . . .") (emphasis added); Compl. Ex. E, the Aug. 28, 2013 Loan Agreement § 3.2 ("all **repayments** shall be on a basis junior, inferior, and subordinate **in all respects** to the **bonds** issued under the provisions of the Bond Resolutions.") (emphasis added); *supra* ¶ 17.

81.     Indeed, the DRA Parties concede that Section 3.2 of the Assignment and Security Agreement is a payment priority provision with "turnover language." *See* Compl. ¶¶ 78, 137. Waterfall provisions with turnover language amount to payment subordination. *See, e.g.*, *In re La Paloma Generating Co.*, 595 B.R. at 476 (waterfall provision indicated intent for senior claims to be paid in full before junior creditors could receive a recovery); *Highland Park CDO I Grantor Trust v. Wells Fargo Bank, NA*, No. 08 Civ. 5723 (NRB), 2009 WL 1834596, at *3 (S.D.N.Y. June 16, 2009) (where agreement required junior mezzanine lender to turn over monies to the payment of the senior lender's claims, that agreement was "obviously designed to ensure that the senior

-32-

loan is paid in full before Highland is permitted to keep any money received in repayment of the mezzanine loan"). The operative provisions of the Assignment and Security Agreement subordinated *both* GDB's liens *and* its right to payment to the Bonds "in all respects." Specifically, Section 1.2 of the Assignment and Security Agreement provides that the alleged "continuing security interest" granted to GDB "shall be junior, inferior, and subordinate ***in all respects <u>to the outstanding bonds</u>*** of [HTA] issued pursuant to the Bond Resolutions . . . ." Compl. Ex. F, Assignment and Security Agreement § 1.2 (emphasis added).

82. If GDB wished only to subordinate its liens to the liens securing the Bonds, then the Assignment and Security Agreement would have said so, as is typical where junior creditors subordinate solely their liens to the senior liens on common collateral. *See, e.g.*, *Wilmington Trust v. JPMorgan Chase Bank*, No. 14-08248-rdd (Bankr. S.D.N.Y. 2014), ECF No. 44-1 § 2.1 ("[A]ny Lien on the Common Collateral securing any Second-Priority Claims . . . shall be junior and subordinate in all respects ***to all Liens on the Common Collateral securing*** any Senior Lender Claims . . .") (emphasis added); The Committee on Commercial Finance, ABA Section of Business Law, *Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force*, 65 Bus. Law. 809, 817 (2010) (providing that any "Lien on Collateral securing any Second Lien Obligation will at all times be junior and subordinate in all respects ***to a Lien on such Collateral*** securing any First Lien Obligation") (emphasis added). The Assignment and Security Agreement, however, subordinated GDB's liens to the HTA Bonds "***in all respects***."

83. The DRA Parties next contend that the subordination provisions "have no practical effect" because they would "only come into effect if HTA pledged" Acts 30-31 Revenues to the Bondholders. *Id.* ¶¶ 74-77. Not so. Setting aside whether Acts 30-31 Revenues qualify as pledged revenues under the Bond Resolutions, sections 1.2 and 2.5 of the Assignment and Security Agreement subordinated GDB's liens to the Bonds "in all respects." Compl., Ex. F, Assignment

and Security Agreement §§ 1.2, 2.5.  This language clearly subordinates GDB's liens to the

payment of the Bonds, not just the Bondholders' liens. The DRA Parties' "practical effect"

arguments are also incompatible with section 2.2 of the Assignment and Security Agreement,

which provided that HTA would protect the collateral from any liens that were not provided for in

the Assignment and Security Agreement.  *See id.* § 2.2.  If, as the DRA Parties suggest, the DRA

Parties have an exclusive lien on Acts 30-31 Revenues but the subordination only would apply if

HTA subsequently pledged Acts 30-31 Revenues to payment of the Bonds, then section 2.2 would

be meaningless.  *See In re Advanced Cellular Sys., Inc.*, 483 F.3d 7, 12 (1st Cir. 2007) (noting that

courts should avoid interpretations of a contract that would render provisions therein as

"surplusage" or otherwise "meaningless").

84.     The practical effect of this subordination is straightforward:  The DRA Parties have

no right to any of the Acts 30-31 Revenues until the Bonds are paid in full.  Indeed, the Bond

Resolutions require HTA to cover deficiencies in the Bond Revenue Accounts from funds received

from the Commonwealth or from any other source.  *See* Compl. Ex. B*, 1998 Resolution § 401.

And, as discussed above, Acts 30 and 31 made certain Acts 30-31 Revenues available to fund the

Reimbursement Obligation.  *See supra* at Part IV.  The subordination of GDB's security interest

in Acts 30-31 Revenues to the Bonds themselves thus facilitates the Reimbursement Obligation.

Thus, GDB would have no recourse to the Acts 30-31 Revenues to repay the GDB/HTA Loans,

or to exercise remedies with respect to its collateral as a result of the subordination to the payment

of the Bonds.

85.     This "practical effect" is not academic:  the DRA Parties concede that there is a

deficiency in the Bond Revenue Accounts.  Compl. ¶ 110 (claiming that the balance of those

accounts is zero).   The DRA Parties have thus admitted that the circumstances triggering

subordination and turnover and giving rise to the Reimbursement Obligation exist, and thus Acts

30-31 Revenues must be applied to the repayment of the Bonds. *See, e.g.*, Compl. Ex. D, Act 31-2013 §3 (amending Section 3060.11(a)(1)(E) of Act No. 1-2011); Compl. Ex. C, Act 30-2013 § 1 (amending Section 23.01 of Act No. 22-2000).

> ## 2. The Payment Priority Provision Requires Application of the Acts 30-31 Revenues to the Bonds

86.     Section 3.2 of the Assignment and Security Agreement requires Acts 30-31 Revenues first to be applied to the payment of the Bonds. Significantly, the DRA Parties concede that this is a turnover provision, where the payment of the Bonds is prioritized over the GDB/HTA Loans. *See* Compl. ¶¶ 78, 137. Nevertheless, the DRA Parties state: "This provision sets forth the rules and priority for the distribution of the 'Collateral,' as defined in the Security Agreement, among creditors that share a right to such collateral." *Id.* ¶ 78. The DRA Parties claim that section 3.2 applies only to any "shared collateral proceeds" and that "Revenues that are not shared collateral between the GDB and the 1998 Bondholders are not covered by Section 3.2 of the [Assignment and] Security Agreement." *Id.* ¶¶ 79-80. These arguments do not reflect the contractual language.

87.     The prefatory language in section 3.2 states: "The Revenues assigned **and** the Proceeds acquired under the Collateral shall be applied by the Bank as follows . . . ." Compl. Ex. F, Assignment and Security Agreement § 3.2 (emphasis added). Thus, two items of property are covered by this provision: (i) "Revenues assigned" and (ii) "Proceeds acquired under the Collateral." *Id.* The "Revenues assigned" are the Acts 30-31 Revenues. *Id.* § 5.1.[14] Section 3.2

---

[14] At this juncture, the DRA Parties have not set forth factual allegations concerning whether plan distributions would qualify as proceeds of their Collateral other than their assertion that section 3.2 would not subordinate their rights to receive the proceeds of their purported collateral. Compl. ¶ 80. However, section 3.2 applies to the distribution of "proceeds acquired under the Collateral." Compl. Ex. F, Assignment and Security Agreement § 3.2. The DRA Parties, as purported secured creditors, would bear the burden of tracing their liens to such proceeds. To the extent that the DRA Parties are able to carry that burden, the Defendants reserve the right to contend that any such proceeds would also be required to be applied under section 3.2.

then provides for a priority of applying the "Revenues assigned": *first*, they go "to the payment

of outstanding bonds of [HTA] issued pursuant to the Bond Resolutions;" and only after that, are

the "Revenues assigned" applied to GDB's "Obligations" to the extent "any surplus" is "then

remaining." *See id.* § 3.2.

88.　　The DRA Parties invent a number of conditions that are nowhere in section 3.2.

The below comparison contrasts the actual contract language against what the DRA Parties claim

section 3.2 says:

| Actual Language of Section 3.2 | DRA Parties' Characterization of Section 3.2 |
|---|---|
| 3.2 Application of Revenues and Proceeds: The Revenues assigned and the proceeds acquired under the Collateral shall be applied by the Bank as follows:<br><br>(i) to the payment of outstanding bonds of the Assignor issued pursuant to the Bond Resolutions;<br><br>(ii) any and all expenses (including reasonable attorneys' fees) incurred by the Bank in obtaining the Collateral;<br><br>(iii) next, any surplus then remaining to the payment of Obligations in the [order of priority established in section 3.2(iii)] | 3.2 Application of Revenues and Proceeds: The ~~Revenues assigned~~ Shared Collateral and the proceeds acquired under the Shared Collateral shall be applied by the Bank as follows:<br><br>(i) to the payment of outstanding bonds of the Assignor issued pursuant to the Bond Resolutions solely to the extent that such outstanding bonds hold a lien on the Shared Collateral;<br><br>(ii) any and all expenses (including reasonable attorneys' fees) incurred by the Bank in obtaining the Collateral;<br><br>(iii) next, ~~any surplus then remaining~~ to the payment of Obligations in the [order of priority established in section 3.2(iii)] |

89.　　Contrary to the DRA Parties' assertions, section 3.2 does not reference "shared

collateral." Rather, section 3.2 governs the disposition of the "Revenues assigned"—*i.e.*, the Acts

30-31 Revenues.  *See* Compl. Ex. F, Assignment and Security Agreement § 1.1, 5.1.  Moreover,

section 3.2 does not in any way condition any turnover obligation on the existence of a lien on

such Acts 30-31 Revenues securing the Bonds.  The section means exactly what it says: Acts 30-

31 Revenues must first be applied to the payment of the Bonds.  Only after the Bonds are paid,

"any surplus then remaining" (if any) would be available to pay the DRA Parties' claims.

3. **The DRA Parties' Contention That the Subordination Provisions Apply Only to the Transportation Bonds Is Both Irrelevant and Wrong.**

90.     Relying solely on the Assignment and Security Agreement, the DRA Parties assert

that the GDB/HTA Loans are not subordinate to the Highway Bonds with respect to the Acts 30-

31 Revenues because the Assignment and Security Agreement purportedly does not include the

1968 Resolution in its definition of "Bond Resolutions."  Compl. ¶¶ 64-66, 131, 133.  The DRA

Parties make this argument notwithstanding that the Defendants are holders of Transportation

Bonds (in addition to Highway Bonds) and thus, even under the DRA Parties' misguided theories,

the DRA Parties are subordinate to the payment of the Defendants' Transportation Bond claims

and to the payment of an uncapped amount of HTA's operating expenses.[15]  There are billions of

dollars of outstanding Transportation Bonds, and thus no plausible scenario in which the DRA

Parties would receive any recovery on account of their GDB/HTA Loans under the

Commonwealth Plan.  The DRA Parties' arguments are thus irrelevant.

91.     Aside from being irrelevant, the DRA Parties' arguments are also wrong.  The

GDB/HTA Loan Agreements plainly provide that the GDB/HTA Loans are subordinate to *all* of

the Bonds, not just the Transportation Bonds.  The DRA Parties concede that "twelve of the fifteen

---

[15] *See* Compl. Ex. F, First Amendment to Assignment and Security Agreement at 13 § 1 (providing that an annual amount of $120 million of Acts 30-31 Revenues could be used to fund HTA's operating expenses); Sixth Amendment to Assignment and Security Agreement at 33 § 1 (removing $120 million cap established under First Amendment to Security Agreement).

loan agreements" provide that the loans are "junior and subordinated in all respects to the payment of the outstanding bonds of the Borrower." Compl. ¶ 67. These loan agreements broadly subordinated GDB's loans to "the outstanding bonds of the Borrower." *See, e.g.*, Natbony Decl. Ex. 10, the July 13, 2010 Loan Agreement § 4; *supra* ¶ 17. Moreover, just as this subordination language was not amended to include any carveout for Acts 30-31 Revenues (*supra* Part V.A.), these subordination provisions were also not amended to limit the subordination only to the Transportation Bonds.

92.     The inclusion of broad language in the GDB/HTA Loan Agreements subordinating the GDB/HTA Loans to the Bonds is sufficient to establish that the DRA Parties' loan claims are subordinate to all of the Bonds and thus cannot be paid until all of the Bonds are paid. *See supra* Part V.B.1. Indeed, as GDB disclosed in the 2010 Reoffering Circular: "[HTA] has refinanced some of its recent capital expenditures and working capital requirements with Government Development Bank lines of credit, ***the repayment of which is subordinate to the Highway Revenue Bonds and the Transportation Revenue Bonds***." Natbony Decl. Ex. 16, 2010 Reoffering Circular at 32 (emphasis added).

93.     Even if one were to accept the DRA Parties' twisted interpretation of the Assignment and Security Agreement, the DRA Parties still subordinated their claims and liens to debt that they knew was expressly junior to the Highway Bonds as provided in the 1998 Resolution (*i.e.*, the Transportation Bonds). Section 401 of the 1998 Resolution provides that when there is a deficiency in payments with respect to the Highway Bonds and the Transportation Bonds (which the DRA Parties concede exists here, *e.g.*, Compl. ¶ 110), funds received from the Commonwealth or from any other source to make up those deficiencies "will be applied for such purpose first to make up any deficiencies in the amounts needed to pay the principal of and interest on any 1968 Resolution Bonds and then to make up any such deficiencies needed to pay such principal of and

interest on the [Senior Transportation Bonds] and then the [Junior Transportation Bonds]." Compl. Ex. B, 1998 Resolution § 401. Thus, even assuming that section 3.2 applied only to the Transportation Bonds, that would provide no help to the DRA Parties as to revenues and funds subject to subordination under the 1998 Resolution, including those subject to the Reimbursement Obligation, as they would first be required (once turned over) to cover any deficiencies for the Highway Bonds. Indeed, there are several other subordination provisions in the 1998 Resolution. *See, e.g.*, *id.* §§ 101, 401, 402, 601 and 611. As a holder of the Bonds, the DRA assented to this order of priority. *See* Compl. Ex. B, 1998 Resolution § 204.

94. By agreeing to a turnover obligation to already junior debt, GDB (and therefore, the DRA Parties) subordinated its claims to the Highway Bonds as provided in the 1998 Resolution. *See Med Center Bank v. Fleetwood*, 854 S.W.2d 278, 282-83 (Tex. App. 1993) (holding that an interest subordinated to an already subordinated interest was also subordinate to the senior interest); *see also* Com. Cont. Strategies Drafting and Negotiating § 16.05[A] (2d ed. 2021) (noting that in a tiered subordination structure where junior subordinated creditor agreed to turn over payments to a senior subordinated creditor, "payments on the senior subordinated debt (including the dividend received from the junior subordinated holders) would be required to be paid over to the senior debt, until the senior debt is fully discharged").

95. The DRA Parties do not, and cannot, plead any facts that they would be entitled to any recovery on account of their alleged interests in Acts 30-31 Revenues. Thus, the disclosure that GDB provided in the 2010 Reoffering Circular remains true: "the repayment of [the GDB loans] is subordinate to the Highway Revenue Bonds and the Transportation Revenue Bonds." Natbony Decl. Ex. 16, 2010 Reoffering Circular at 32.

4.  **The DRA Parties' Remaining Arguments Concerning the Spanish Language Loan Agreements Are Unsupported**

96.     Finally, the DRA Parties claim that five of the GDB/HTA Loan Agreements (which they neglected to attach to their Complaint), each of which were memorialized in Spanish, do not contain any subordination language and that those GDB/HTA Loans are therefore not subordinated to the Bonds.

97.     As established above, however, the Acts 30-31 Revenues assigned under the Assignment and Security Agreement are subject first to the application of such revenues to the payment of the Bonds. *See supra* Parts V.B.1 and V.B.2; *see also* Compl. Ex. F, Assignment and Security Agreement § 3.2.  Thus, whether or not these loan agreements contain subordination language is beside the point: Commonwealth law subordinates the GDB/HTA Loans to the Bonds, and the Assignment and Security Agreement contains subordination language limiting the DRA Parties' ability to collect the assigned Acts 30-31 Revenues to only the surplus, if any, remaining after the payment of the Bonds in full. *See id.* § 3.2.

98.     The cited GDB/HTA Loan Agreements confirm that the DRA Parties' arguments are meritless.  When four of these GDB/HTA Loans were issued, prior to the enactment of Acts 30 and 31 and the execution of the Assignment and Security Agreement, the loan obligations were merely unsecured obligations that had no identified source of repayment. *See* Compl. Ex. C, Act 30-2013 at pp. 1-2.[16] The GDB/HTA Loan Agreements that the DRA Parties claim lack subordination language were subsequently amended to provide that the GDB/HTA Loans thereunder were payable from the Acts 30-31 Revenues "assigned and committed in favor of" GDB under the Assignment and Security Agreement. *See, e.g.*, Natbony Decl. Ex. 20, Sixth

---

[16] The fifth GDB/HTA Loan Agreement (executed in January 2014 and governing a $15 million line of credit) provides that the GDB/HTA Loan thereunder is payable from traffic fines up to only $15 million in amount, but, like the other four GDB/HTA Loan Agreements, does not identify Acts 30-31 Revenues as a source of payment for that loan. *See* Natbony Decl. Ex. 13, the Jan. 6, 2014 Loan Agreement § 1.5.

Amendment to Nov. 29, 2011 Loan Agreement, ECF No. 16276-2 (providing that the loans were payable from Acts 30-31 Revenues "*assigned* and committed in favor of the Bank pursuant to that certain Assignment and Security Agreement between the Authority and the Bank dated as of August 28, 2013") (emphasis added); Natbony Decl. Ex. 21, Fourth Amendment to Sept. 12, 2012 Loan Agreement, ECF No. 16276-4 (same); Natbony Decl. Ex. 22, Second Amendment to Feb. 28, 2013 Loan Agreement, ECF No. 16276-6 (same). The "assigned" Acts 30-31 Revenues are required to be applied to the Bonds first under the Assignment and Security Agreement.

99.     Moreover, under the documents forming the basis for the Complaint, HTA was not authorized to execute debt agreements that lacked subordination language. Under the Bond Resolutions, HTA agreed that any agreements governing future indebtedness must include language subordinating such indebtedness to the Bonds. *See, e.g.*, Compl. Ex. A, 1968 Resolution § 602, 802; Compl. Ex. B, 1998 Resolution §§ 602, 802. And GDB, as a Bondholder, accepted these provisions. *See, e.g., id.* § 204. These provisions were expressly authorized under the Enabling Act (9 L.P.R.A. § 2012(e)) and are deemed "valid and binding" obligations under Puerto Rico law. *Id.* § 2012(b). The GDB/HTA Loan Agreements were all executed *after* HTA had covenanted not to incur senior or *pari passu* debt. Thus, to the extent HTA executed any agreements lacking the requisite subordination language, it lacked authority to do so.[17]

---

[17] Notably, given that the DRA Parties are subordinate to both the payment of HTA's Bonds and its operating expenses, the DRA Parties cannot establish that any favorable resolution of the Counts of the Complaint "would likely redress the professed injury." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 995 F.3d 18, 22 (1st Cir. 2021) (internal marks and citation omitted). The Bonds are not being paid in full, and thus the DRA Parties have no entitlement to distributions in these cases. The DRA Parties would be required to establish that both the Bonds *and* HTA's operating expenses are paid in full to receive any distribution. The DRA Parties cannot establish that either of those conditions are satisfied. The Commonwealth Plan provides the DRA Parties with a distribution notwithstanding that, as established above, the DRA Parties would otherwise not be entitled to receive anything. Moreover, because section 3.2 of the Assignment and Security Agreement requires turnover of Acts 30-31 Revenues to the payment of the Bonds, the DRA Parties have no rights of their own to litigate. *See In re Fencepost Prods., Inc.*, 629 B.R. 289, 296-99 (Bankr. D. Kan. Mar. 31, 2021) (holding that deeply subordinated and out of the money junior creditor did not possess any rights of its own to litigate because its distributions were required to be turned over to senior creditor). The DRA Parties' adversary proceeding is thus an exercise in futility and a waste of party and Court resources.

## CONCLUSION

For the reasons set forth herein, the Complaint should be dismissed with prejudice.[18]

Dated:  New York, New York
August 26, 2021

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: */s/ Heriberto Burgos Pérez*
   Heriberto Burgos Pérez
   USDC-PR 204809
   Ricardo F. Casellas-Sánchez
   USDC-PR 203114
   Diana Pérez-Seda
   USDC-PR 232014
   P.O. Box 364924
   San Juan, PR 00936-4924
   Telephone: (787) 756-1400
   Facsimile:  (787) 756-1401
   Email:   hburgos@cabprlaw.com
       rcasellas@cabprlaw.com
       dperez@cabprlaw.com

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**

By: */s/ Howard R. Hawkins, Jr.*
   Howard R. Hawkins, Jr.*
   Mark C. Ellenberg*
   William J. Natbony*
   Thomas J. Curtin*
   Casey J. Servais*
   200 Liberty Street
   New York, NY 10281
   Telephone:  (212) 504-6000
   Facsimile:   (212) 504-6666
   Email:   howard.hawkins@cwt.com
       mark.ellenberg@cwt.com
       bill.natbony@cwt.com
       thomas.curtin@cwt.com
       casey.servais@cwt.com

* Admitted *pro hac vice*

*Attorneys for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

---

[18] The Defendants reserve the right to assert counterclaims against the DRA Parties to subordinate or recharacterize their claims, or to otherwise challenge the validity of their claims and liens.

**SEPULVADO, MALDONADO & COURET**

By: */s/ Albéniz Couret Fuentes*
    Albéniz Couret Fuentes
    (USDC-PR No. 222207)
    304 Ponce de León Ave. Suite 990
    San Juan, PR 00918
    Telephone: (787) 765-5656
    Facsimile: (787) 294-0073
    Email: acouret@smclawpr.com


*Attorneys for The Bank of New York Mellon, as Fiscal Agent*

**REED SMITH LLP**

By: */s/ Luke A. Sizemore*
    Luke A. Sizemore (admitted *pro hac vice*)
    Jared S. Roach (admitted *pro hac vice*)
    225 Fifth Avenue, Suite 1200
    Pittsburgh, PA 15222
    Telephone: (412) 288-3131
    Facsimile: (412) 288-3063
    Email: lsizemore@reedsmith.com
        jroach@reedsmith.com

    and

    Kurt F. Gwynne (*admitted pro hac vice*)
    1201 Market Street, Suite 1500
    Wilmington, DE  19801
    Email:  kgwynne@reedsmith.com
    Telephone:  302-778-7500
    Facsimile:  302-778-7575
    Email: kgwynne@reedsmith.com

*Attorneys for The Bank of New York Mellon, as Fiscal Agent*

**FERRAIUOLI LLC**

By: /s/ Roberto Cámara-Fuertes
Roberto Cámara-Fuertes (USDC-PR No.
219002)
Sonia Colón (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com
scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ Atara Miller
Dennis F. Dunne (admitted pro hac vice)
Atara Miller (admitted pro hac vice)
Grant R. Mainland (admitted pro hac vice)
John J. Hughes, III (admitted pro hac vice)
Jonathan Ohring (admitted pro hac vice)
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: ddunne@milbank.com
amiller@milbank.com
gmainland@milbank.com
jhughes2@milbank.com
johring@milbank.com

***Attorneys for Ambac Assurance
Corporation***

**ADSUAR MUNIZ GOYCO SEDA &
PEREZ-OCHOA PSC**

By: */s/ Eric Pérez-Ochoa*
    Eric Pérez-Ochoa
    Luis A. Oliver-Fraticelli
    208 Ponce de Leon Ave., Suite 1600
    San Juan, PR 00936
    Telephone:   (787) 756-9000
    Fax:         (787) 756-9010
    Email:      epo@amgprlaw.com
              loliver@amgprlaw.com

*Counsel for National Public Finance
Guarantee Corp.*

**WEIL, GOTSHAL & MANGES LLP**

By: */s/  Jonathan Polkes*
    Jonathan Polkes
    Gregory Silbert
    Robert Berezin
    Kelly DiBlasi
    Gabriel A. Morgan
    767 Fifth Avenue
    New York, NY 10153
    Telephone:   (212) 310-8000
    Fax:         (212) 310-8007
    Email:      jonathan.polkes@weil.com
              gregory.silbert@weil.com
              robert.berezin@weil.com
              kelly.diblasi@weil.com
              gabriel.morgan@weil.com

*Counsel for National Public Finance Guarantee
Corp.*

**REXACH & PICÓ, CSP**

By: */s/ Maria E. Picó*

María E. Picó

USDC-PR 123214
802 Ave. Fernández Juncos
San Juan PR 00907-4315
Telephone:     (787) 723-8520
Facsimile:      (787) 724-7844
E-mail:mpico@rexachpico.com

***Attorney for Financial Guaranty Insurance Company***

**BUTLER SNOW LLP**

By: */s/ Martin A. Sosland*

Martin A. Sosland
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
Email: martin.sosland@butlersnow.com
James E. Bailey III
Adam M. Langley
6075 Poplar Ave., Suite 500
Memphis, TN 38119
Telephone: (901) 680-7200
Facsimile: (901) 680-7201
Email: jeb.bailey@butlersnow.com
adam.langley@butlersnow.com

***Counsel for Financial Guaranty Insurance Company***

**MONSERRATE SIMONET &
GIERBOLINI, LLC**

 _/s/ Dora L. Monserrate Peñagarícano_
Dora L. Monserrate-Peñagarícano
USDC-PR No. 212612
Fernando J. Gierbolini-González
USDC-PR No. 211901
Richard J. Schell
USDC-PR No. 305811
101 San Patricio Avenue
Maramar Plaza, Suite 1120
Guaynabo, Puerto Rico 00968
Phone: (787) 620-5300
Fax:    (787) 620-5305

*Attorneys for Peaje Investments LLC*

**DECHERT LLP**

 _/s/ Allan S. Brilliant_
Allan S. Brilliant (*pro hac vice*)
Yehuda Goor (*pro hac vice*)
1095 Avenue of the Americas
New York, New York 10036
Tel: (212) 698-3500
Fax: (212) 698-3599

-and-

G. Eric Brunstad, Jr. (*pro hac vice*)
90 State House Square
Hartford, Connecticut 06103
Tel: (860) 524-3960
Fax: (860) 524-3930

-and-

Stuart T. Steinberg (*pro hac vice*)
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104
Tel: (215) 994-2521
Fax: (215) 994-2222

*Attorneys for Peaje Investments LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I filed this document electronically with the Clerk of the Court using

the CM/ECF System, which will send notification of such filing to all parties of record in the

captioned case.

At New York, New York, on the 26th day of August, 2021.

By: /s/ *Howard R. Hawkins, Jr.*
Howard R. Hawkins, Jr.*
* Admitted pro hac vice