**NATBONY DECLARATION**
**<u>EXHIBIT 16</u>**

REOFFERING-NOT A NEW ISSUE
BOOK-ENTRY ONLY

$297,945,000

# PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

### $253,670,000 Highway Revenue Refunding Bonds (Series AA)
Consisting of
$188,395,000 Series AA-1 Bonds
$65,275,000 Series AA-2 Bonds

### $44,275,000 Transportation Revenue Refunding Bonds (Series H)

Original Issue Date: April 29, 2003                                                                 Conversion Date: July 1, 2010

The Series AA Bonds and the Series H Bonds (collectively, the "Reoffered Bonds") are subject to tender on July 1, 2010 (the "Conversion Date"), on which date the interest rate mode on the Reoffered Bonds shall be converted from the Term Rate Mode to the Fixed Rate Mode.

The Series AA Bonds, consisting of $188,395,000 aggregate principal amount of Series AA-1 Bonds and $65,275,000 aggregate principal amount of Series AA-2 Bonds, the outstanding bonds of the Puerto Rico Highways and Transportation Authority (the "Authority") previously issued under Resolution No. 68-18 adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution"), and any additional refunding bonds that the Authority may from time to time issue under the 1968 Resolution (collectively, the "Highway Revenue Bonds") are payable from, and are secured by a pledge of, certain revenues of the Authority, which include: (i) all current gasoline taxes, a portion of the current gas oil and diesel oil taxes, and a portion of the current motor vehicle license fees allocated to the Authority by the Commonwealth; (ii) all toll revenues of the Authority's traffic facilities financed with Highway Revenue Bonds and any extensions and improvements thereto; and (iii) certain investment earnings (collectively, the "1968 Resolution Revenues").

The Series H Bonds, the outstanding bonds of the Authority previously issued under Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution" and, together with the 1968 Resolution, the "Resolutions"), and any additional bonds that the Authority may from time to time issue under the 1998 Resolution (collectively, the "Transportation Revenue Bonds") are payable from, and are secured by a pledge of, certain revenues of the Authority, which include: (i) the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth of Puerto Rico (the "Commonwealth") on certain petroleum products; (ii) toll revenues of the Authority's traffic facilities that were not financed with Highway Revenue Bonds; (iii) certain investment earnings; and (iv) the 1968 Resolution Revenues available after payment of debt service on the Authority's outstanding Highway Revenue Bonds (collectively, the "1998 Resolution Revenues").

All of the aforesaid revenues of the Authority that constitute taxes and license fees are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are not sufficient therefor.

The Reoffered Bonds have the following characteristics:

- The Reoffered Bonds are registered under The Depository Trust Company's book-entry only system. Purchasers of the Reoffered Bonds will not receive definitive bonds.

- The inside cover page of this Reoffering Circular contains information concerning the maturity schedules, interest rates and prices of the Reoffered Bonds.

- Interest on the Reoffered Bonds will be payable on each January 1 and July 1, commencing on January 1, 2011.

- The Reoffered Bonds are subject to redemption prior to maturity as set forth under "THE REOFFERED BONDS- Redemption of the Reoffered Bonds."

- The Reoffered Bonds will be issued in denominations of $5,000 principal amount and integral multiples thereof.

- The scheduled payment of principal and interest on the Series AA-1 Bonds (the "Insured Bonds"), when due, will be guaranteed under an insurance policy issued concurrently with the original delivery of the Insured Bonds by ASSURED GUARANTY MUNICIPAL CORP. (FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.). The Series AA-2 Bonds and the Series H Bonds are not insured.

- In connection with the original issuance of the Reoffered Bonds, Sidley Austin Brown & Wood LLP (now, Sidley Austin LLP), as bond counsel to the Authority, stated that under federal laws and regulations then in force, interest on the Reoffered Bonds is exempt from federal income taxation and the Reoffered Bonds and interest thereon are exempt from state, Commonwealth and local income taxation. In the opinion of Nixon Peabody LLP, Bond Counsel to the Authority, under existing laws, the conversion of the Reoffered Bonds to the fixed rate mode and the reoffering of the Reoffered Bonds under the terms contained in the Resolutions and the resolution of the Authority relating to the conversion and reoffering of the Reoffered Bonds, will not cause the interest on the Reoffered Bonds to be includable in the gross income of owners for Federal income tax purposes.

- However, see "TAX EXEMPTION" herein, for alternative minimum tax consequences with respect to interest on the Reoffered Bonds, a description of certain rules that the Authority must comply with to preserve the federal tax exemption of interest, and other tax considerations.

- The Reoffered Bonds will be delivered on or about July 1, 2010.

The Reoffered Bonds are not a debt of the Commonwealth or any of its political subdivisions, other than the Authority, and neither the Commonwealth nor any such subdivisions, other than the Authority, is liable thereon.

| Jefferies & Company | | RBC Capital Markets |
|---|---|---|
| Barclays Capital | BofA Merrill Lynch | Citi |
| Goldman, Sachs & Co. | J.P. Morgan | Ramirez & Co. Inc. |
| Raymond James | UBS Financial Services Incorporated of Puerto Rico | Wells Fargo Securities |
| BBVAPR MSD | FirstBank Puerto Rico Securities | Oriental Financial Services | Santander Securities |

June 17, 2010

$297,945,000
## Puerto Rico Highways and Transportation Authority

### $188,395,000 Highway Revenue Refunding Bonds (Series AA-1) [*]

4.95% Term Bonds due July 1, 2026; Price: 100%        CUSIP[‡] 745181K89

### $65,275,000 Highway Revenue Refunding Bonds (Series AA-2)

5.30% Term Bonds due July 1, 2035; Price: 100%        CUSIP[‡] 745181K97

### $44,275,000 Transportation Revenue Refunding Bonds (Series H)

5.45% Term Bonds due July 1, 2035; Price: 100%        CUSIP[‡] 745190Z76

.

---

[*] Insured by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.).

[‡] Copyright 2010, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Authority nor the Underwriters take any responsibility for the accuracy of such numbers.

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Reoffering Circular does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Reoffered Bonds by any person, in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Authority and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Reoffering Circular nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs or condition of the Authority since the date hereof.

The Underwriters have provided the following sentence for inclusion in this Reoffering Circular. The Underwriters have reviewed the information in this Reoffering Circular in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THE REOFFERING OF THE REOFFERED BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE REOFFERED BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL ON THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM") makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Reoffering Circular or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE" and "APPENDIX VI - Municipal Bond Insurance Policy".

[THIS PAGE INTENTIONALLY LEFT BLANK]

TABLE OF CONTENTS

INTRODUCTION ................................................ 1
RECENT DEVELOPMENTS ............................... 2
Recent Developments Relating to the Authority .. 2
Recent Developments Relating to the
Commonwealth ............................................... 3
REOFFERING PLAN ......................................... 6
THE REOFFERED BONDS ................................ 6
General ............................................................. 6
Principal and Interest ........................................ 7
Redemption of the Reoffered Bonds ................. 7
Book Entry Only System ................................... 9
Payments and Transfers ................................... 11
Discontinuance of Book Entry Only System ....... 11
BOND INSURANCE ......................................... 12
Bond Insurance Policy ..................................... 12
Assured Guaranty Municipal Corp. (Formerly
known as Financial Security Assurance Inc.) ....... 12
SECURITY AND SOURCES OF PAYMENT
FOR THE REOFFERED BONDS ...................... 14
Pledged Revenues ........................................... 14
Flow of Funds Under 1968 Resolution and
1998 Resolution ............................................. 15
1998 Senior Bond Reserve Account ................... 17
1968 Reserve Account ..................................... 18
Replenishment of 1968 and 1998 Reserve
Accounts ....................................................... 18
Commitment Not to Reduce Taxes and Fees ....... 18
Special Fund for Deposit of Taxes and Fees
Allocated to the Authority ................................ 19
Prior Payment of Full Faith and Credit
Obligations of the Commonwealth ..................... 19
Additional Bonds under the 1998 Resolution
and the 1968 Resolution ................................... 20
THE AUTHORITY ........................................... 21
General Description .......................................... 21
Organization ................................................... 22
Management ................................................... 22
Consultants .................................................... 23
Employment Relations ..................................... 23
New and Pending Legislation Affecting the
Authority ....................................................... 23

TRANSPORTATION SYSTEM REVENUES
AND EXPENDITURES ...................................... 24
Revenues ....................................................... 24
Recent Operating Results ................................. 31
Operating Expenses and Capital Expenditures ... 32
DEBT ............................................................. 36
Debt of the Authority ...................................... 36
Principal and Interest Requirements of the
Reoffered Bonds ............................................. 37
TAX EXEMPTION ........................................... 38
Ancillary Tax Matters ...................................... 38
Changes in Law and Post Issuance Events .......... 39
REOFFERING AGREEMENT ........................... 39
LITIGATION .................................................. 40
ENVIRONMENTAL MATTERS ........................ 41
LEGAL MATTERS .......................................... 41
LEGAL INVESTMENT ..................................... 42
GOVERNMENT DEVELOPMENT BANK .......... 42
RATINGS ....................................................... 42
CONTINUING DISCLOSURE ........................... 42
MISCELLANEOUS .......................................... 44
APPENDIX I          FINANCIAL STATEMENTS
                    INCLUDING THE REPORTS
                    OF KEVANE GRANT
                    THORNTON LLP
APPENDIX II-A       FORM OF OPINION OF
                    BOND COUNSEL
APPENDIX II-B       OPINION OF BOND
                    COUNSEL DELIVERED
                    UPON ORIGINAL ISSUANCE
                    OF THE BONDS
APPENDIX III        SUMMARY OF CERTAIN
                    PROVISIONS OF THE 1968
                    RESOLUTION
APPENDIX IV         SUMMARY OF CERTAIN
                    PROVISIONS OF THE 1998
                    RESOLUTION
APPENDIX V          LETTER FROM THE
                    TRAFFIC ENGINEERS
APPENDIX VI         MUNICIPAL BOND
                    INSURANCE POLICY

Case:17-30159-LTS Doc#:102-16 Filed:09/21/21 Entered:09/21/21 15:96:48 Desc:
Exhibit 16 Page 7 of 157

[THIS PAGE INTENTIONALLY LEFT BLANK]

**$297,945,000**
**Puerto Rico Highways and Transportation Authority**

**$253,670,000**
**Highway Revenue Refunding Bonds (Series AA)**
**Consisting of**
**$188,395,000 Series AA-1 Bonds**
**$65,275,000 Series AA-2 Bonds**

**$44,275,000**
**Transportation Revenue Refunding Bonds (Series H)**

## INTRODUCTION

This Reoffering Circular sets forth information in connection with the reoffering and conversion by Puerto Rico Highways and Transportation Authority (the "Authority") of $253,670,000 aggregate principal amount of its Highway Revenue Refunding Bonds (Series AA) consisting of $188,395,000 aggregate principal amount of the Series AA-1 Bonds (the "Series AA-1 Bonds") and $65,275,000 aggregate principal amount of the Series AA-2 Bonds (the "Series AA-2 Bonds" and, together with the Series AA-1 Bonds, the "Series AA Bonds") and $44,275,000 aggregate principal amount of its Transportation Revenue Refunding Bonds (Series H) (the "Series H Bonds"). The Series AA Bonds and the Series H Bonds are referred to collectively as the "Reoffered Bonds."

The Reoffered Bonds were originally issued on April 29, 2003 and are subject to tender on July 1, 2010 (the "Conversion Date"). On the Conversion Date, the interest rate mode on the Reoffered Bonds will be converted from the Term Rate Mode to the Fixed Rate Mode. The Series AA Bonds were originally issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Authority Act"), Resolution No. 68-18 adopted by the Authority on June 13, 1968, as previously amended (the "1968 Resolution"), and as further amended, including by a resolution adopted by the Authority on April 10, 2003. The Series H Bonds were originally issued pursuant to the Authority Act, Resolution No. 98-06 adopted by the Authority on February 26, 1998, as previously amended (the "1998 Resolution" and, together with the 1968 Resolution, the "Resolutions"), and as further amended, including by a resolution adopted by the Authority on April 10, 2003. The Bank of New York Mellon acts as fiscal agent under the 1968 Resolution (in such capacity, the "1968 Fiscal Agent") and under the 1998 Resolution (in such capacity, the "1998 Fiscal Agent").

The Authority has covenanted in the 1998 Resolution not to issue additional Highway Revenue Bonds under the 1968 Resolution, other than bonds whose maturity does not extend beyond July 1, 2036 and which are issued to refund outstanding Highway Revenue Bonds to achieve debt service savings. As of April 30, 2010, the Authority had outstanding $1.6 billion of Highway Revenue Bonds issued under the 1968 Resolution and $4.6 billion of Transportation Revenue Bonds issued under the 1998 Resolution. The Series AA Bonds are Highway Revenue Bonds and the Series H Bonds are Transportation Revenue Bonds.

In the event that other revenues of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") are not sufficient to pay general obligation bonds of the Commonwealth and bonds guaranteed by the Commonwealth, a significant portion of the Authority's revenues may be used to pay these general obligation bonds and Commonwealth guaranteed bonds. Accordingly, this Reoffering Circular incorporates by reference the Comprehensive Annual Financial Report of the Commonwealth for the Fiscal Year ended June 30, 2008, prepared by the Department of the Treasury of Puerto Rico (the "Commonwealth's Annual Financial Report"), which report includes the basic financial statements of the Commonwealth as of and for the Fiscal Year ended June 30, 2008,(the "Commonwealth Financial Statements") which have been audited by KPMG LLP, certified public accountants, as stated in their report dated August 12, 2008, accompanying the financial statements. The Commonwealth's Annual Financial Report was filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). Furthermore, this Reoffering Circular incorporates by reference the Commonwealth's Financial Information and Operating Data Report dated May 1, 2010 (the "Commonwealth Report"). The Commonwealth Report was filed by the

Commonwealth through EMMA. The Commonwealth Report was not prepared by the Authority, and the Authority does not assume any responsibility for its accuracy or completeness.

The Commonwealth Report includes important information about the Commonwealth, including information about its economy, historical revenues and expenditures of the Commonwealth's General Fund, and the preliminary year-end results for fiscal year 2009.

Any Official Statement of the Commonwealth or of any instrumentality of the Commonwealth or any revised Commonwealth Report filed through EMMA, or any other document filed with the MSRB, after the date hereof and prior to the termination of the reoffering of the Reoffered Bonds, which supplements or amends the information appearing in the Commonwealth Report shall be deemed to be incorporated by reference into this Reoffering Circular and to be part of this Reoffering Circular from the date of filing of such document. Any statement contained in any of the above described documents incorporated by reference shall be deemed to be modified or superseded for purposes of this Reoffering Circular to the extent that a statement contained herein modifies or supersedes such statement. Any statement contained herein or in any of the above described documents shall also be deemed to be modified or superseded to the extent that a statement contained in any subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Reoffering Circular.

This Reoffering Circular describes the terms of and security for the Reoffered Bonds and the use of proceeds of the Reoffered Bonds. Also included are summaries and descriptions of certain provisions of the 1968 Resolution and the 1998 Resolution. These descriptions and summaries do not purport to be comprehensive or definitive. All references herein to the 1968 Resolution and the 1998 Resolution are qualified in their entirety by reference to the definitive form thereof, all references to Federal and Commonwealth laws are qualified in their entirety by reference to the complete statutes, regulations and published interpretations by Federal or Commonwealth officials, and all references to the Reoffered Bonds are qualified by the forms thereof contained in the corresponding resolution and are further qualified in their entirety by reference to laws and principles of equity relating to or affecting the enforceability of creditors' rights.

This Reoffering Circular, including information incorporated in this Reoffering Circular by reference, contains certain "forward-looking statements" concerning the operations, financial condition, plans and objectives of the Authority and the Commonwealth. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, including general economic conditions, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the summaries of the 1968 Resolution and the 1998 Resolution in Appendices III and IV, respectively.

## RECENT DEVELOPMENTS

### Recent Developments Relating to the Authority

*Management Initiatives to Increase Revenues and Reduce Expenses*

*Initiatives to Increase Revenues.* The management of the Authority expects to increase its revenues through a variety of new programs and initiatives. At the request of the Authority, the Puerto Rico Transit Law was amended to lower the permitted blood alcohol level for 18-20 year-old drivers, which should permit the Authority to receive up to $11.5 million annually in additional federal funds. The Authority has also taken steps to reduce toll "leakage" and has implemented electronic tolls through the AutoExpreso system.

*Initiatives to Reduce Expenses.* The management of the Authority has recently implemented certain initiatives designed to reduce expenses and improve the Authority's finances. The Authority estimates that these initiatives will result in savings of approximately $57 million in fiscal year 2010 and approximately $78 million

annually thereafter. These initiatives include (i) the elimination of the subsidy paid to the Metropolitan Bus Authority, which will save approximately $24 million annually; (ii) the modification of the Tren Urbano management agreement, which is expected to result in annual reductions of approximately $13.5 million in Tren Urbano operating expenses; (iii) the elimination of the $10 million annual transfer to the Department of Transportation and Public Works; and (iv) reductions in workforce expenses, which are expected to result in savings of approximately $9.5 million in fiscal year 2010 and $30.6 million annually thereafter.

*Public – Private Partnerships*

The Commonwealth has established as its public policy the promotion of infrastructure public – private partnerships ("PPPs"). PPPs are collaborations between governmental and non-governmental entities to develop infrastructure projects, manage government-owned assets or provide services. One example of a PPP is the Teodoro Moscoso Bridge, owned by the Authority but operated by a private entity. Act 29 of June 8, 2009 establishes a legal framework for PPPs which includes the creation of a Public – Private Partnership Authority. On May 28, 2010, the Puerto Rico Public-Private Partnership Authority board approved a bidding process for the construction, modernization and maintenance of certain Authority projects. Included among the projects currently being considered are PPPs for some of the existing toll roads owned by the Authority, such as PR-5, PR-20, PR-22, PR-52, PR-53, and PR-66. The Authority expects that any tax-exempt bonds previously issued to fund the construction or improvement of these toll roads may be required to be redeemed, defeased or tendered for in accordance with federal tax law.

*The Authority experienced a reduction in net assets in fiscal year 2009*

In fiscal year 2009, the Authority had gross revenues, consisting primarily of toll receipts, taxes, license fees and capital grants, of $732 million, and expenses of $1.002 billion, resulting in a reduction in net assets of $270 million, from $4.727 billion as of June 30, 2008, to $4.456 billion as of June 30, 2009. These expenses included $402 million of depreciation and amortization, which are non-cash expenses. See "TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES – Recent Operating Results."

**Recent Developments Relating to the Commonwealth**

A significant portion of the revenues of the Authority are subject to prior claim to pay general obligation bonds of the Commonwealth and bonds guaranteed by the Commonwealth in the event that other Commonwealth revenues were not sufficient to pay these general obligation bonds and Commonwealth guaranteed bonds. Therefore, this Reoffering Circular includes the following information with respect to recent developments affecting the Commonwealth. This information has been reproduced from the Commonwealth Report.

*Economic Condition*

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006. Although Puerto Rico's economy is closely linked to the United States economy, for fiscal years 2007, 2008 and 2009, Puerto Rico's real gross national product decreased by 1.2%, 2.8%, and 3.7%, respectively, while the United States economy grew at a rate of 1.8% and 2.8%, respectively, and contracted during fiscal year 2009 at a rate of 2.5%. According to the Puerto Rico Planning Board's (the "Planning Board") latest projections, which take into account the preliminary results for fiscal year 2009, the economic impact of a delay in the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), and other economic factors, the gross national product for fiscal year 2010 is forecasted to contract by 3.6%. The gross national product for fiscal year 2011, however, is forecasted to grow by 0.4%.

*Fiscal Condition*

*Structural Budget Imbalance.* Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and expenditures. The structural imbalance was exacerbated during fiscal years 2008 and 2009, with recurring government expenditures significantly exceeding recurring revenues.

Prior to fiscal year 2009, the government bridged the deficit resulting from the structural imbalance through the use of non-recurring measures, such as borrowing from Government Development Bank for Puerto Rico ("GDB") or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one time measures such as the use of derivatives and borrowings collateralized with government owned real estate. Since March 2009, the government has taken multiple steps to address and resolve this structural imbalance.

For fiscal year 2009, the estimated deficit was approximately $3.490 billion, consisting of the difference between preliminary revenues (without taking into account a one time accounting adjustment related to the sales and use tax) and estimated expenses for such fiscal year. The estimated deficit is projected to be less than $2.5 billion for fiscal year 2010 and approximately $1.0 billion for fiscal year 2011, as discussed below. The administration projects it will eliminate the deficit by fiscal year 2013.

*Results for Fiscal Year 2009.* Total preliminary General Fund revenues for fiscal year 2009 were $7.673 billion, representing a decrease of $686 million, or 8.2%, from fiscal year 2008 revenues and an increase of $73 million, or 1.0%, over the $7.6 billion revised estimate presented by the administration in February 2009. Total expenses for fiscal year 2009 were approximately $11.250 billion, consisting of budgeted General Fund expenditures of $9.484 billion and approximately $1.766 billion of additional non-budgeted expenses. The difference between preliminary General Fund revenues and total expenses for fiscal year 2009 was principally paid from proceeds of Puerto Rico Sales Tax Financing Corporation ("COFINA") by its Spanish-language acronym) bond issues pursuant to the fiscal stabilization plan described below.

*Preliminary Results for Fiscal Year 2010 (First Eight Months).* Preliminary General Fund revenues for the first eight months of fiscal year 2010 (from July 2009 through February 2010) were $4.47 billion, a decline of $318 million, or 6.6%, from the $4.79 billion of revenues for the same period in the prior fiscal year and on target with the budgeted revenues for the first eight months of fiscal year 2010. As budgeted, the decline in General Fund revenues reflects the reduction in General Fund revenues from the sales and use tax as a result of the allocation of a larger portion of such tax to COFINA (amounting to $365 million for the first eight months of fiscal year 2010), and the continuing impact of the ongoing economic recession, partly offset by the effect of the temporary and permanent revenue raising measures implemented as part of the fiscal stabilization plan described below (including $128 million in additional property taxes for the first eight months of fiscal year 2010). If the additional allocation to COFINA and additional property taxes are not taken into account, the reduction in General Fund revenues would have been $81 million, or 1.9%. The estimated General Fund revenues for fiscal year 2010 remain, as budgeted, at $7.670 billion.

Budgeted expenditures for fiscal year 2010 amount to $10.170 billion, consisting of $7.670 billion of budgeted General Fund expenditures and approximately $2.5 billion of additional expenditures to be covered from COFINA bond issues, as part of a multi-year fiscal stabilization plan to achieve fiscal balance

*Economic Plans*

*Fiscal Stabilization Plan.* In January 2009, the administration, which controls the Executive and Legislative branches of government, began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act No. 7"), seeks to achieve budgetary balance on or before fiscal year 2013, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual $2 billion operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) a bond issuance program through COFINA. The proceeds from the COFINA bond issuance program were and will be used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2009 through 2011 (and for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal year 2010, the administration began to design and intends to adopt during fiscal year 2011 a comprehensive reform of the tax system and commence to implement a long-term economic development

4

plan, both of which are designed to complement the short-term economic reconstruction and supplemental stimulus initiatives described below.

· As of April 30, 2010, the administration had implemented measures that are expected to result in annual savings of approximately $900 million.

*Government Reorganization Plan.* The administration has also taken the first steps to reorganize and modernize the Executive Branch. On December 11, 2009, the Governor signed Act No. 182 that seeks to reduce the number of government agencies and operational expenditures. On April 13, 2010, the administration submitted to the Legislative Assembly a bill proposing a referendum to amend the Constitution in order to restructure the Legislative Assembly by reducing the number of legislators. If the bill is approved, the referendum would be held on or prior to May 1, 2011 and any amendments to the Constitution approved in such referendum would take effect with respect to the Legislative Assembly to be installed on January 2, 2013.

*Unfunded Pension Benefit Obligations and Cash Flow Deficits of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and cash flow deficits of the three government retirement systems that are funded principally with government appropriations. As of June 30, 2009, the total unfunded accrued actuarial liability for the three retirement systems was $23.9 billion and the expected aggregate cash flow deficit for fiscal year 2010 was $640 million.

In February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The Commission is expected to submit a report to the Governor by the end of the first quarter of fiscal year 2011.

*Economic Reconstruction Plan.* In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. Puerto Rico has been awarded approximately $6.5 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of April 23, 2010, Puerto Rico has disbursed $2.8 billion in ARRA funds, or 43% of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan.* The administration has also developed the Strategic Model for a New Economy, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also proposes to (i) strengthen the labor market and encourage greater labor-force participation by bringing out-of-date labor laws and regulations in line with U.S. and international standards, (ii) adopt a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies, and (iii) adopt a comprehensive tax reform that takes into account the Commonwealth's current financial situation. In February 2010, the Governor named a committee to review the Commonwealth's tax system and propose a tax reform. The committee's report is due by September 2010 and the administration plans to file tax reform legislation during the immediately following legislative session.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. The

administration is currently evaluating and expects to commence procurement for eight public-private partnership priority projects during fiscal year 2011.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout Puerto Rico. These projects, some of which are ongoing, include the development of a trans-shipment port and tourism and urban redevelopment projects.

*Recalibration of Ratings of Commonwealth General Obligation Bonds*

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" with a stable outlook by Moody's, which is three categories above the previous "Baa3" rating. The administration expects that this recalibration will increase the number of potential investors for the Commonwealth's general obligation bonds and have a positive impact on the Commonwealth's financing costs.

*Proposed Fiscal Year 2011 Budget*

On April 26, 2010, the Governor submitted to the Legislative Assembly a proposed budget for fiscal year 2011. The proposed budget provides for total General Fund revenues of $8.195 billion, compared to estimated General Fund revenues of $7.670 billion for fiscal year 2010. The proposed General Fund revenues of $8.195 billion include base revenues of $7.645 billion, $241 million from tax enforcement and compliance measures, and $89 million of property taxes from the self-appraisal of real property. The proposed General Fund revenues originally included $220 million from the license fees of video lottery machines, but this measure has been withdrawn. Preparation of the budget is an ongoing process and various proposals are under review to replace these $220 million. The proposed fiscal year 2011 budget provides for total expenditures of $9.195 billion, consisting of General Fund expenditures of $8.195 billion and additional expenditures of $1.0 billion that are expected to be covered from proceeds of COFINA bond issues, including a $500 million proposed bond issue during fiscal year 2011. The proposed total expenditures for fiscal year 2011 are $975 million, or 9.6%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $2.055 billion, or 18.3%, lower than estimated total expenditures of $11.250 billion for fiscal year 2009.

## REOFFERING PLAN

The Series AA Bonds and the Series H Bonds were originally issued to refund certain bonds issued under their respective Resolutions and pay the costs of issuance of the Series AA Bonds and Series H Bonds. It is anticipated that the proceeds of the reoffering of the Reoffered Bonds will be applied to pay the purchase price of the Reoffered Bonds on the Conversion Date.

## THE REOFFERED BONDS

### General

The Reoffered Bonds were originally issued on April 29, 2003 and are subject to tender on the Conversion Date. On the Conversion Date, the interest rate on the Reoffered Bonds will be converted from the Term Rate Mode to the Fixed Rate Mode. The Reoffered Bonds are dated as of their date of original issuance, will bear interest from the Conversion Date at the rates to maturity, and will mature on the dates and in the principal amounts set forth on the inside cover page of this Reoffering Circular. The Reoffered Bonds will be subject to redemption at the times and at the prices set forth below under the "Redemption Provisions." The Reoffered Bonds will be issued in denominations of $5,000 or any multiple thereof as described below under "Book-Entry Only System."

6

**Principal and Interest**

*General*

The principal and premium, if any, on the Series AA Bonds shall be payable in lawful money of the United States of America at the designated office of the 1968 Fiscal Agent. The principal and premium, if any, on the Series H Bonds shall be payable in lawful money of the United States of America at the designated office of the 1998 Fiscal Agent. Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months.

Interest on the Reoffered Bonds will be payable on each January 1 and July 1, commencing on January 1, 2011, to the person whose name appears on the registration books of the 1968 Fiscal Agent (in the case of the Series AA Bonds) or the 1998 Fiscal Agent (in the case of the Series H Bonds) as the registered owner thereof on the 15th day of the month immediately preceding the month in which payment is due.

**Redemption of the Reoffered Bonds**

*Optional Redemption*

*Series AA Bonds* The Series AA Bonds may be redeemed on any date on or after July 1, 2020, at the option of the Authority, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), from any available moneys (other than moneys deposited in the 1968 Sinking Fund in respect of an Amortization Requirement) at a redemption price equal to the principal amount of the Reoffered Bonds to be redeemed plus accrued interest to the redemption date, without premium.

*Series H Bonds.* The Series H Bonds may be redeemed on any date on or after July 1, 2020, at the option of the Authority, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), from any available moneys (other than moneys deposited in the 1998 Senior Bond Sinking Fund in respect of an Amortization Requirement) at a redemption price equal to the principal amount of the bonds to be redeemed plus accrued interest to the redemption date, without premium.

*Extraordinary Optional Redemption*

The Reoffered Bonds are subject to extraordinary redemption at the option of the Authority from the proceeds of any concession agreement or similar arrangement whereby the Authority contracts with a private party for the design, construction, operation and/or maintenance of highway projects, in whole or in part, on any date on or after July 1, 2012 at a redemption price equal to the principal amount of the bonds to be redeemed plus accrued interest to the redemption date, without premium.

*Mandatory Redemption*

*Series AA-1 Bonds.* The Series AA-1 Bonds are subject to redemption in part on July 1, 2020 and on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1968 Sinking Fund) from moneys in the 1968 Sinking Fund at par plus accrued interest in the years and amounts set forth below.

| Amortization Requirements for Series AA-1 Bonds | |
|---|---|
| Year | Amount |
| 2020 | $35,000,000 |
| 2021 | 53,705,000 |
| 2022 | - |
| 2023 | 31,795,000 |
| 2024 | 32,860,000 |
| 2025 | 33,960,000 |
| 2026[†] | 1,075,000 |

† Final Maturity

The particular bonds or portions thereof to be redeemed shall be selected by the 1968 Fiscal Agent, in such manner as it in its discretion may determine to be appropriate and fair.

*Series AA-2 Bonds.* The Series AA-2 Bonds are subject to redemption in part on July 1, 2026 and on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1968 Sinking Fund) from moneys in the 1968 Sinking Fund at par plus accrued interest in the years and amounts set forth below.

| Amortization Requirements for Series AA-2 Bonds | |
|---|---|
| Year | Amount |
| 2026 | $34,035,000 |
| 2027 | 3,030,000 |
| 2028 | 3,135,000 |
| 2029 | 3,240,000 |
| 2030 | 3,345,000 |
| 2031 | 3,460,000 |
| 2032 | 3,575,000 |
| 2033 | 3,695,000 |
| 2034 | 3,815,000 |
| 2035[†] | 3,945,000 |

† Final Maturity

The particular bonds or portions thereof to be redeemed shall be selected by the 1968 Fiscal Agent, in such manner as it in its discretion may determine to be appropriate and fair.

*Series H Bonds.* The Series H Bonds are subject to redemption in part on July 1, 2014 and on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1998 Senior Bond Sinking Fund) from moneys in the 1998 Senior Bond Sinking Fund at par plus accrued interest in the years and amounts set forth below.

**Amortization Requirements for**
**Series H Bonds**

| Year | Amount |
|------|--------|
| 2014 | $ 305,000 |
| 2015 | 315,000 |
| 2016 | 325,000 |
| 2017 | 335,000 |
| 2018 | 345,000 |
| 2019 | 360,000 |
| 2020 | 370,000 |
| 2021 | 385,000 |
| 2022 | 395,000 |
| 2023 | 410,000 |
| 2024 | 425,000 |
| 2025 | 435,000 |
| 2026 | 450,000 |
| 2027 | 465,000 |
| 2028 | 485,000 |
| 2029 | 500,000 |
| 2030 | 515,000 |
| 2031 | 535,000 |
| 2032 | 9,550,000 |
| 2033 | 9,340,000 |
| 2034 | 9,125,000 |
| 2035[†] | 8,905,000 |

† Final Maturity

The particular bonds or portions thereof to be redeemed shall be selected by the 1998 Fiscal Agent, in such manner as it in its discretion may determine to be appropriate and fair.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from DTC. Neither the Authority nor the Underwriters take any responsibility for the accuracy thereof. Beneficial Owners of the Reoffered Bonds should confirm this information with DTC or the DTC Participants.

DTC will act as securities depository for the Reoffered Bonds. The Reoffered Bonds will be issued as fully registered bonds in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully registered Reoffered Bond will be issued for each maturity of each series of the Reoffered Bonds in the aggregate principal amount of such maturity and will be deposited with DTC in the aggregate principal amount of the Reoffered Bonds. So long as the nominee of DTC is the registered owner of the Reoffered Bonds, such nominee, subject to the limitations set forth under "Bond Insurance", will be considered the sole owner or holder of the Reoffered Bonds for all purposes under the 1998 Bond Resolution, the 1968 Bond Resolution and any applicable laws. Except as otherwise provided below, a Beneficial Owner (as hereinafter defined) of Reoffered Bonds will not be entitled to have the Reoffered Bonds registered in such owner's name, will not be entitled to receive definitive Reoffered Bonds and will not be considered an owner or holder of the Reoffered Bonds under the 1998 Bond Resolution or the 1968 Bond Resolution.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants

of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, is the holding company of DTC, National Securities Clearing Corporation, and Fixed Income Clearing Corporation all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others, such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com or www.dtc.org.

Purchases of the Reoffered Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Reoffered Bonds on DTC's records. The ownership interest of each actual purchaser of each Reoffered Bond (a "Beneficial Owner") is in turn to be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases. Beneficial Owners, however, are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds will be accomplished by entries made on the books of Direct or Indirect Participants acting on behalf of the Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Reoffered Bonds except in the event that use of the book-entry system for the Reoffered Bonds is discontinued.

To facilitate subsequent transfers, all Reoffered Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of Reoffered Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Reoffered Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Reoffered Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Reoffered Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Reoffered Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Reoffered Bonds documents. For example, Beneficial Owners of Reoffered Bonds may wish to ascertain that the nominee holding the Reoffered Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices will be sent to DTC. If less than all of the Reoffered Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the Reoffered Bonds of such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Reoffered Bonds unless authorized by a Direct Participant in accordance with DTC's MMI procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Reoffered Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Payment of redemption proceeds and principal and interest payments on the Reoffered Bonds will be made to Cede & Co. or to such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information

from the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the 1968 Fiscal Agent or the 1998 Fiscal Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

**Payments and Transfers**

No assurance can be given by the Authority that DTC will make prompt transfer of payments to the Direct Participants or that Direct Participants will make prompt transfer of payments to Indirect Participants or to Beneficial Owners. The Authority is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or its Participants.

The Authority, the 1968 Fiscal Agent, and the 1998 Fiscal Agent will have no responsibility or obligation to such Direct Participants, Indirect Participants, or the persons for whom they act as nominees with respect to the payments to or the providing of notice for the Direct Participants, the Indirect Participants, or the Beneficial Owners. Payments made to DTC or its nominee shall satisfy the obligations of the Authority to the extent of such payments.

For every transfer of the Reoffered Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

**Discontinuance of Book-Entry Only System**

DTC may discontinue providing its services as securities depository with respect to the Reoffered Bonds at any time by giving reasonable notice to the Authority, the 1968 Fiscal Agent, and the 1998 Fiscal Agent. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Reoffered Bonds are required to be printed and delivered. The Authority may decide to discontinue the use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, definitive Reoffered Bonds will be printed and delivered.

In the event that such book-entry only system is discontinued for the Bonds, the following provisions will apply to the Reoffered Bonds: principal of the Reoffered Bonds and redemption premium, if any, will be payable in lawful money of the United States of America at the principal corporate trust office of the 1968 Fiscal Agent or the 1998 Fiscal Agent, as the case maybe, in New York, New York. Interest on the Reoffered Bonds will be payable on each July 1 and January 1, by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1968 Fiscal Agent and the 1998 Fiscal Agent, as applicable, as of the close of business on the record date therefor as set forth in the 1968 Resolution and the 1998 Resolution.

The Reoffered Bonds will be issued only as registered bonds without coupons in authorized denominations. The transfer of the Reoffered Bonds will be registrable and the Reoffered Bonds may be exchanged at the principal corporate trust office of the 1968 Fiscal Agent or the 1998 Fiscal Agent, as applicable, in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

The Authority will have no responsibility or obligation to DTC, to Direct Participants or to Indirect Participants with respect to (1) the accuracy of any records maintained by DTC, any Direct Participant, or any Indirect Participant; (2) any notice that is permitted or required to be given to the owners of the Reoffered Bonds under the 1968 Resolution or the 1998 Resolution; (3) the selection by DTC or any Direct Participant or Indirect Participant of any person to receive payment in the event or a partial redemption of the Reoffered Bonds; (4) the

payment by DTC or any Direct Participant or Indirect Participant of any amount with respect to the principal or redemption premium, if any, or interest due with respect to the Reoffered Bonds; or (5) any consent given or other action taken by DTC as the owner of the Reoffered Bonds.

## BOND INSURANCE

### Bond Insurance Policy

The Insured Bonds are covered by a Municipal Bond Insurance Policy (the "Policy") issued by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM"). The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as Appendix VI to this Reoffering Circular.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

### Assured Guaranty Municipal Corp. (Formerly known as Financial Security Assurance Inc.)

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Assured Guaranty Municipal Holdings Inc. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure and structured finance markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

On July 1, 2009, AGL acquired the financial guaranty operations of Holdings from Dexia SA ("Dexia"). In connection with such acquisition, Holdings' financial products operations were separated from its financial guaranty operations and retained by Dexia. For more information regarding the acquisition by AGL of the financial guaranty operations of Holdings, see Item 1.01 of the Current Report on Form 8-K filed by AGL with the Securities and Exchange Commission (the "SEC") on July 8, 2009.

Effective November 9, 2009, Financial Security Assurance Inc. changed its name to Assured Guaranty Municipal Corp.

AGM's financial strength is rated "AAA" (negative outlook) by Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business ("S&P") and "Aa3" (negative outlook) by Moody's Investors Service, Inc. ("Moody's"). On February 24, 2010, Fitch, Inc. ("Fitch"), at the request of AGL, withdrew its "AA" (Negative Outlook) insurer financial strength rating of AGM at the then current rating level. Each rating of AGM should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of AGM in its sole discretion. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guarantee the market price of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

### Recent Developments

*Ratings.* On May 17, 2010, S&P published a Research Update in which it affirmed its "AAA" counterparty credit and financial strength ratings on AGM. At the same time, S&P continued its negative outlook on AGM. Reference is made to the Research Update, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

In a press release dated February 24, 2010, Fitch announced that, at the request of AGL, it had withdrawn the "AA" (Negative Outlook) insurer financial strength rating of AGM at the then current rating level. Reference is

made to the press release, a copy of which is available at www.fitchratings.com, for the complete text of Fitch's comments.

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

There can be no assurance as to any further ratings action that Moody's or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2009, which was filed by AGL with the SEC on March 1, 2010, and AGL's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2010, which was filed by AGL with the SEC on May 10, 2010. Effective July 31, 2009, Holdings is no longer subject to the reporting requirements of the Securities and Exchange Act of 1934, as amended (the "Exchange Act").

*Capitalization of AGM*

At March 31, 2010, AGM's consolidated policyholders' surplus and contingency reserves were approximately $2,220,015,145 and its total net unearned premium reserve was approximately $2,228,912,193 in accordance with statutory accounting principles.

Incorporation of Certain Documents by Reference

Portions of the following documents filed by AGL with the SEC that relate to AGM are incorporated by reference into this Reoffering Circular and shall be deemed to be a part hereof:

(i) The Annual Report on Form 10-K for the fiscal year ended December 31, 2009 (which was filed by AGL with the SEC on March 1, 2010); and

(ii) The Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2010 (which was filed by AGL with the SEC on May 10, 2010).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Reoffering Circular and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.): 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption BOND INSURANCE – Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Reoffering Circular, except as so modified or superseded.

AGM makes no representation regarding the Reoffered Bonds or the advisability of investing in the Reoffered Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Reoffering Circular or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE".

## SECURITY AND SOURCES OF PAYMENT FOR THE REOFFERED BONDS

#### Pledged Revenues

The Series AA Bonds and any other Highway Revenue Bonds issued under the 1968 Resolution are payable solely from, and secured by a pledge of, the 1968 Resolution Revenues and all other moneys held for the credit of the 1968 Sinking Fund, which includes the 1968 Bond Service Account, the 1968 Redemption Account and the 1968 Reserve Account.

*1968 Resolution Revenues.* The 1968 Resolution Revenues consist of: (i) the gross receipts of the current $0.16 per gallon excise tax on gasoline and $0.04 of the current $0.08 per gallon excise tax on gas oil and diesel oil imposed by the Commonwealth and allocated to the Authority (after any deductions for taxes on fuels used in sea and air transportation that are required to be reimbursed under certain circumstances) by the Puerto Rico Internal Revenue Code (the remaining $0.04 per gallon excise tax has been allocated to the Metropolitan Bus Authority by Act No. 39 of July 19, 1997); (ii) the gross receipts derived from the $15 per vehicle increase of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 ("Act No. 9"); (iii) Existing Toll Facilities Revenues; and (iv) investment earnings on deposits to the credit of funds and accounts established under the 1968 Resolution, except for the 1968 Construction Fund. 1968 Resolution Revenues do not include gasoline taxes, gas oil and diesel oil taxes, and motor vehicle license fees which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Highway Revenue Bonds.

The Series H Bonds, and any other Senior Transportation Revenue Bonds issued under the 1998 Resolution are payable solely from, and secured by a pledge of, the 1998 Resolution Revenues and all other moneys held for the credit of the 1998 Senior Bond Sinking Fund, which includes the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, and the 1998 Senior Bond Reserve Account. Under certain circumstances described below, unencumbered moneys in the 1998 Construction Fund or the 1998 Subordinated Bond Sinking Fund may be used to pay debt service on the Senior Transportation Revenue Bonds, if moneys in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account are insufficient therefor, prior to applying moneys in the 1998 Senior Bond Reserve Account.

*1998 Resolution Revenues.* The 1998 Resolution Revenues consist of: (i) all excise taxes on crude oil, unfinished oil and derivative products ("petroleum products"), up to $120 million per fiscal year, imposed by the Commonwealth and allocated to the Authority by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended ("Act No. 34"), which amended Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended (the "Puerto Rico Internal Revenue Code"); (ii) the tolls and other charges imposed by the Authority for the use of Toll Facilities (other than Existing Toll Facilities Revenues, as defined below, prior to the repeal and cancellation of the 1968 Resolution); (iii) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico allocates to the Authority in the future and which the Authority pledges to the payment of Transportation Revenue Bonds; (iv) investment earnings on deposit to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund; and (v) prior to the repeal and cancellation of the 1968 Resolution, any unencumbered 1968 Resolution Revenues remaining on deposit in the 1968 Construction Fund after payment or provision for payment of debt service and required reserves on the outstanding Highway Revenue Bonds (the "Excess 1968 Resolution Revenues"), and after said repeal and cancellation, all 1968 Resolution Revenues. The 1998 Resolution Revenues do not include excise taxes on petroleum products which may be levied or collected from time to time other than the amount of such taxes described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Transportation Revenue Bonds. The excise tax on petroleum products imposed by the Puerto Rico Internal Revenue Code and allocated to the Authority by Act No. 34 is a different tax from the excise tax on gasoline and gas oil and diesel oil imposed by the Puerto Rico Internal Revenue Code and allocated to the Authority, as discussed below.

Under the 1998 Resolution, the Authority has covenanted not to encumber, withdraw or pledge any Excess 1968 Resolution Revenues deposited in the 1968 Construction Fund except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund.

14

**Flow of Funds Under 1968 Resolution and 1998 Resolution**

The following chart illustrates the flow of 1968 Resolution Revenues and 1998 Resolution Revenues into the various funds and accounts established under the 1968 Resolution and the 1998 Resolution. The chart is provided only as a summary of the flow of funds under the 1968 Resolution and the 1998 Resolution, and does not purport to be complete. Reference is made to the summaries of the 1968 Resolution and the 1998 Resolution in Appendix III and Appendix IV, respectively, which should be read in conjunction herewith.

[Remainder of page intentionally left blank]

**Flow of Funds Under the 1968 and 1998 Resolutions**



---

(1)   Under the 1998 Resolution, separate accounts in the Subordinated Bond Reserve Fund may be established for Series of Subordinated Bonds with different Subordinated Reserve Requirements.

(2)   Certain Authority operation and maintenance expenses are paid from the 1998 Construction Fund.

Upon receipt of any moneys constituting 1968 Resolution Revenues, including moneys in the Special Fund constituting 1968 Resolution Revenues received from the Department of the Treasury (see "Special Fund" below), the Authority is required under the 1968 Resolution to deposit such moneys in equal monthly amounts into the 1968 Bond Service Account and the 1968 Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Highway Revenue Bonds and in the amounts necessary for the required deposits to the 1968 Reserve Account. Any remaining 1968 Resolution Revenues (other than investment earnings) are deposited into the 1968 Construction Fund. Under the 1998 Resolution, the Authority has agreed not to encumber or withdraw or pledge any 1968 Resolution Revenues deposited in the 1968 Construction Fund except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund, which Excess 1968 Resolution Revenues must be withdrawn monthly and transferred to the 1998 Revenue Fund for application as described below.

Upon receipt of any moneys constituting 1998 Resolution Revenues (other than investment earnings), including moneys in the Special Fund constituting 1998 Resolution Revenues received from the Department of the Treasury, the Authority is required under the 1998 Resolution to deposit such moneys into the 1998 Revenue Fund. In addition, the Authority is required to deposit monthly into the 1998 Revenue Fund all Excess 1968 Resolution Revenues. The Authority is required to withdraw monthly from the 1998 Revenue Fund and deposit into the 1998 Senior Bond Service Account and the 1998 Senior Bond Redemption Account the respective equal monthly amounts necessary to provide for the payment of principal of and interest and premium, if any, on the Senior Transportation Revenue Bonds and deposit to the 1998 Senior Bond Reserve Account the amount necessary, if any, to replenish the 1998 Senior Bond Reserve Account. Any remaining 1998 Resolution Revenues (other than investment earnings) are then required to be deposited monthly (in the respective equal monthly amounts) first into the accounts within the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Subordinated Transportation Revenue Bonds and then, into the 1998 Subordinated Bond Reserve Fund, as required. Any remaining 1998 Resolution Revenues are then deposited into the 1998 Construction Fund and are available to the Authority for any of its authorized purposes, but subject to the payment of certain operation and maintenance expenses and repair, renewal and replacement costs, as required by the 1998 Resolution. Once all outstanding Highway Revenue Bonds are paid or defeased and the 1968 Resolution is repealed and canceled, all revenues of the Authority formerly constituting 1968 Resolution Revenues will be deposited monthly into the 1998 Revenue Fund for application as described above.

**Neither the 1968 Resolution nor the 1998 Resolution contains events of default or provides for the acceleration of the maturities of the Highway Revenue Bonds or the Transportation Revenue Bonds.**

**1998 Senior Bond Reserve Account**

The 1998 Resolution establishes a 1998 Senior Bond Reserve Account, the moneys in which are to be applied to the payment of interest on the Senior Transportation Revenue Bonds, and maturing principal of serial Senior Transportation Revenue Bonds whenever moneys in the 1998 Senior Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1998 Senior Bond Redemption Account to satisfy any Amortization Requirements for the term Senior Transportation Revenue Bonds whenever 1998 Resolution Revenues are insufficient for such purpose. The 1998 Resolution provides, however, that before the moneys in the 1998 Senior Bond Reserve Account are used to cover any insufficiency in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account, the 1998 Fiscal Agent shall cover such insufficiency by first withdrawing from the 1998 Construction Fund any unencumbered 1998 Resolution Revenues deposited therein and, to the extent such moneys are insufficient to cover said deficiency, by withdrawing moneys on deposit in the 1998 Subordinated Bond Service Account and 1998 Subordinated Bond Redemption Account.

The Authority covenants to accumulate and maintain in the 1998 Senior Bond Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Senior Transportation Revenue Bonds and 10% of the original principal amount of each Series of Senior Transportation Revenue Bonds outstanding (the "1998 Senior Bond Reserve Requirement"). The 1998 Resolution permits any increase in the 1998 Senior Bond Reserve Requirement to be funded over not more than five years and allows the Authority to use a letter of credit or insurance policy to fund the 1998 Senior Bond Reserve Requirement.

On June 1, 2010, approximately $280.5 million was on deposit in the 1998 Senior Bond Reserve Account. The 1998 Senior Bond Reserve Requirement is currently fully funded with cash and cash equivalents.

Excess moneys in the 1998 Senior Bond Reserve Account may be retained in such Reserve Account, may be applied to the payment of outstanding notes issued by the Authority to finance temporarily any Transportation Facilities or outstanding Senior Transportation Revenue Bonds to be refunded or may be transferred to the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, or the 1998 Construction Fund, as directed by the Authority.

**1968 Reserve Account**

The 1968 Resolution establishes the 1968 Reserve Account, the moneys in which are to be applied to the payment of interest on the Highway Revenue Bonds and maturing principal of serial Highway Revenue Bonds whenever moneys in the 1968 Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1968 Redemption Account to satisfy any Amortization Requirements for the term Highway Revenue Bonds whenever 1968 Resolution Revenues are insufficient for such purpose. The Authority covenants to accumulate and maintain in the 1968 Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Highway Revenue Bonds and 10% of the original principal amount of each Series of Bonds outstanding (the "1968 Reserve Requirement"). The 1968 Resolution permits any increase in the 1968 Reserve Requirement to be funded over not more than five years and allows the Authority to use a letter of credit or insurance policy to fund the 1968 Reserve Requirement.

On June 1, 2010, approximately $140.2 million was on deposit in the 1968 Reserve Account. The 1968 Reserve Requirement is currently fully funded with cash and cash equivalents.

Excess moneys in the 1968 Reserve Account are transferred to the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as directed by the Authority.

**Replenishment of 1968 and 1998 Reserve Accounts**

Under the Puerto Rico Internal Revenue Code, if moneys in the 1968 Reserve Account, 1998 Senior Bond Reserve Account or any accounts established in the 1998 Subordinated Bond Reserve Fund (collectively, the "Reserve Accounts") are applied to cover a deficiency in the amounts necessary for payment of the principal of and interest on the Highway Revenue Bonds, Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds, respectively, the amounts used from any of the applicable Reserve Accounts to cover said deficiency shall be reimbursed to the Authority from the first amounts received in the next fiscal year or subsequent years by the Commonwealth derived from (i) any other taxes which may then be in effect on any other fuel or propellant which is used, among other purposes, to propel highway vehicles, and (ii) any remaining portion of the gasoline tax and petroleum products tax then in effect. The proceeds of said other taxes and the remainder of the gasoline tax and petroleum products tax to be used to reimburse the applicable Reserve Accounts are not deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority, and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, used to reimburse said Reserve Accounts. In the 1998 Resolution, the Authority covenants to apply any such reimbursement received first to replenish the 1968 Reserve Account, then to replenish the 1998 Senior Bond Reserve Account, and finally to replenish any accounts in the 1998 Subordinated Bond Reserve Fund.

**Commitment Not to Reduce Taxes and Fees**

The Commonwealth has agreed and committed in the Puerto Rico Internal Revenue Code that it will not reduce the gasoline tax below $0.16 per gallon, the tax on gas oil and diesel oil below $0.04 per gallon or the tax on petroleum products below the tax rates in effect on July 16, 1997 (as described below), and that it will not reduce the amount of any such taxes allocated to the Authority until all obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, secured by the pledge thereof are fully paid. The Commonwealth has also agreed and pledged in Act No. 9 that it will not reduce the motor vehicle license fees

allocated and pledged to the payment of obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, so long as the proceeds of such fees remain pledged to the payment of such obligations.

**Special Fund for Deposit of Taxes and Fees Allocated to the Authority**

Under the Puerto Rico Internal Revenue Code and Act No. 9, the proceeds of the taxes and license fees allocated to the Authority are deposited by the Department of the Treasury in a special fund (the "Special Fund") in favor of the Authority. In accordance with the Constitution of Puerto Rico, the proceeds of such taxes and license fees are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are insufficient therefor. The Commonwealth has never applied the proceeds of such taxes or license fees allocated to the Authority to the payment of such debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of such debt. For information with respect to the Commonwealth's debt and the economic and financial condition of the Commonwealth, see "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" below and *Debt* in the Commonwealth Report.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used first to pay public debt before being used for other purposes. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions heretofore rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Reoffered Bonds do not constitute public debt.

The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle license fees allocated to the Authority by the Puerto Rico Internal Revenue Code and Act No. 9 are available Commonwealth resources under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. However, under the Puerto Rico Internal Revenue Code and Act No. 9, such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose. Tolls and other fees and charges collected by the Authority and investment earnings are not considered available Commonwealth resources.

The Commonwealth has never applied taxes or license fees allocated to the Authority to the payment of its public debt; nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of its public debt. See *Debt* in the Commonwealth Report.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended ("Act No. 39"), the Secretary of the Treasury of Puerto Rico is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Special Fund for the Amortization of General Obligations Evidenced by Bonds and Promissory Notes (the "Commonwealth Redemption Fund"). As of the date of this Reoffering Circular, the amount on deposit in the Commonwealth Redemption Fund complied with such requirement. Moneys in the Commonwealth Redemption Fund may also be applied to the payment of other Commonwealth guaranteed obligations outstanding prior to adoption of Act No. 39. Such moneys are not available to pay the Reoffered Bonds.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico (hereinafter "internal revenues") in the two fiscal years preceding the then current fiscal year. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded.

Internal revenues consist principally of income taxes, property taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury of Puerto Rico, and motor vehicle fuel taxes and license fees, which are allocated to the Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth have been invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest rating category by Moody's Investors Service and Standard & Poor's Ratings Services), none of which is eligible to be used for legal defeasance under Puerto Rico law ("non-eligible investments").

Future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $984,688,996 in the fiscal year ending June 30, 2016 (based on the assumption that the Public Improvement Refunding Bonds, Series 2004 A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, and that the Public Improvement Refunding Bonds, Series 2004 B, the Public Improvement Refunding Bonds, Series 2008 B, a portion of the Public Improvement Refunding Bonds, Series 2003 C, a portion of the Public Improvement Bonds of 2006, Series A, and a portion of the Public Improvement Refunding Bonds, Series 2007 A, each of which are also variable rate bonds, bear interest at 12% per annum). This amount is equal to 12.82% of $7,679,421,000, which is the average of the adjusted internal revenues of the Commonwealth for the two fiscal years ended June 30, 2008 and June 30, 2009. Information about the Commonwealth public sector debt and debt service requirements for the Commonwealth's general obligation bonds and the Commonwealth's guaranteed debt appear under "Debt" in the Commonwealth Report.

**The Reoffered Bonds are not a debt of the Commonwealth or any of its political subdivisions (other than the Authority), and neither the Commonwealth nor any such subdivision (other than the Authority) shall be liable thereon.**

### Additional Bonds under the 1998 Resolution and the 1968 Resolution

*Senior Transportation Revenue Bonds.* The Authority may issue additional Senior Transportation Revenue Bonds under the 1998 Resolution to provide funds for any lawful purpose of the Authority, including the payment of all or any part of the cost of Transportation Facilities (including the payment of any outstanding notes of the Authority issued for the purpose of paying all or a part of such cost); provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Senior Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate revisions made effective on or prior to the date of delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Senior Transportation Revenue Bonds and the additional Senior Transportation Revenue Bonds then to be issued and not less than 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds (including Subordinated Transportation Revenue Bonds) and the additional Senior Transportation Revenue Bonds then to be issued.

The Authority may also issue additional Senior Transportation Revenue Bonds to refund all or any part of the outstanding Senior Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum annual Principal and Interest Requirements for any fiscal year on the Senior Transportation Revenue Bonds to be outstanding after the issuance of such additional Senior Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements for any fiscal year on the Senior Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Senior Transportation Revenue Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV - SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

Any additional Senior Transportation Revenue Bonds issued under the 1998 Resolution will be on a parity with the outstanding Senior Transportation Revenue Bonds and will be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the 1998 Resolution.

*Subordinated Transportation Revenue Bonds.* The Authority may issue Subordinated Transportation Revenue Bonds under the 1998 Resolution to pay all or any part of the cost of any highway project or transit project eligible for financial assistance under federal legislation, provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Subordinated Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate changes made effective on or prior to delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 125% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds then to be issued.

The Authority may also issue Subordinated Transportation Revenue Bonds to refund all or any part of the outstanding Subordinated Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum Principal and Interest Requirements for any fiscal year on the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such additional Subordinated Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements for any fiscal year on the Subordinated Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Subordinated Transportation Revenue Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV - SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

*Highway Revenue Bonds.* The Authority may not issue additional Highway Revenue Bonds under the 1968 Resolution except bonds maturing no later than July 1, 2036, which are issued to refund outstanding Highway Revenue Bonds in order to achieve debt service savings. The issuance of such Highway Revenue Bonds must meet the tests for the issuance of such bonds under the 1968 Resolution, which tests are more fully described in "Issuance of Additional Bonds" in "APPENDIX III - SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION."

## THE AUTHORITY

### General Description

The Authority was created in 1965 to assume responsibility for the construction of roads and highways and related transportation facilities in Puerto Rico. The Authority is a separate entity from the Department of Transportation and Public Works for purposes of financing and constructing Puerto Rico's transportation system, but since 1971, the Secretary of Transportation and Public Works (the "Secretary"), appointed by the Governor, has overseen the management of the Authority and exercises the powers of the Governing Board of the Authority.

The Authority has adopted a long-term master plan for development of the transportation infrastructure necessary to foster and sustain Puerto Rico's economic growth and a five-year Construction Improvement Program to implement that plan. (The current Construction Improvement Program covers the period from fiscal year 2010, which began on July 1, 2009, through fiscal year 2014). As required by the 1968 Resolution and the 1998 Resolution, the Authority supplements the master plan as necessary and annually updates the five-year Construction Improvement Program.

The Authority Act gives the Authority broad powers to carry out its responsibilities in accordance with the Department's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway and other transportation facilities owned, operated or constructed by it; the ability to set tolls and other charges for the use of the highway and other transportation facilities; and the power to issue bonds, notes and other obligations. The Authority plans and manages the construction of all major projects relating to Puerto Rico's transportation system, undertakes major repairs and maintains the toll highways. The Department maintains Puerto Rico's highway system, other than the toll highways, and undertakes construction of smaller projects.

The Authority classifies its highways and roads within the following categories: primary, primary urban, secondary, and tertiary. As of December 31, 2009, the Commonwealth had approximately 4,635 miles of highways and 12,045 miles of local streets and roads. The highway system comprises approximately 389 miles of primary

system highways, which are the more important interregional traffic routes, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,058 miles of tertiary highways and roads and public housing development roads serving local, intra-regional traffic. The primary system highways include 170.7 miles of toll roads, such as the Luis A. Ferré (PR-52), De Diego (PR-22), PR-53, Eastern Corridor (PR-66), PR-5 and Martínez Nadal (PR-20) toll highways, plus 33 miles of connecting roads and free expressways.

In August 1990, the Authority Act was amended to empower the Authority to enter into concession agreements, subject to approval by a government board of adjudications, with private parties for the design, construction, operation and maintenance of highway projects. Such projects, to be owned by the Authority and the Commonwealth, could be financed by such private parties by the imposition of tolls or otherwise. To date, the only highway facility subject to a private concession agreement is the Teodoro Moscoso Bridge, which is operated by Autopistas de Puerto Rico y Compañía, S.E.

In March 1991, the Authority Act was further amended to authorize the Authority to work with and implement policies established by the Secretary for the purpose of developing a multi-modal transportation system for the Commonwealth to alleviate traffic congestion. Pursuant to this power, the Authority undertook the planning, design, construction and operation of Tren Urbano, a mass transit rail project for the San Juan Metropolitan area. The initial phase of Tren Urbano became fully operational in fiscal year 2005. It consists of approximately 27 miles of trackway, running from Bayamón to Santurce, via Río Piedras and Hato Rey, sixteen stations and a maintenance and storage facility. Also, the Authority initially purchased 74 passenger rail cars. The total cost of this initial phase was approximately $2.419 billion, of which $685.7 million was paid with funds provided by the federal government.

**Organization**

To carry out its responsibilities to develop the Commonwealth's transportation system, the Authority is organized into the Executive Director's Office, which provides overall management of the Authority, the office of the Deputy Executive Director, who assists the Executive Director in the overall management of the Authority, and the offices of three Assistant Executive Directors, each of whom reports to the Executive Director and the Deputy Executive Director. The Assistant Executive Director for Infrastructure oversees the Planning Area, which is responsible for the development of the Construction Improvement Program as well as long-term planning, the Design Area, which is responsible for designing and supervising the design by consultants of Authority projects, the Property Acquisition Area, which acquires necessary easements and rights-of-way for Authority projects, and the Construction Area, which supervises and inspects the construction work performed by the Authority's contractors. The Assistant Executive Director for Administration and Finance oversees the Finance Area, which is responsible for the financial affairs of the Authority, including budgetary services, the Administration Area, which provides administrative support to the Authority, and the Information Technologies Area, which oversees computer operations. The Assistant Executive Director for Traffic and Toll Operations oversees all aspects of the operation, maintenance, and repair of the toll highways. Most construction, renovation and improvement of highway facilities is performed by private contractors selected through a public bidding process mandated by the Authority Act. The Authority plans, inspects and supervises such work.

**Management**

The Authority's organic law, as amended in 1971, provides that the powers and duties of the Authority shall be exercised by the Secretary of Transportation and Public Works, who replaced the Board of Directors of the Authority pursuant to the 1971 amendment to the Authority's organic law. The Authority also has an Executive Director, who oversees the Authority's day-to-day operations. As of June 1, 2010, Rubén Hernández Gregorat, MEM, PE was both the Secretary of Transportation and Public Works and the Executive Director of the Authority, having been appointed on January 5, 2009.

Other principal officers of the Authority include the following:

| Name | Position | Date of Appointment |
| --- | --- | --- |
| Evelyn S. Colón | Deputy Executive Director | August 21, 2009 |
| Harold Cortés | Assistant Executive Director for Infrastructure | March 2, 2009 |
| Carlos Contreras | Assistant Executive Director for Traffic and Toll Operations | February 2, 2009 |
| Brenda Gomila | Assistant Executive Director for Human Resources and Industrial Safety | June 1, 2009 |

The administrative offices of the Authority are in the Roberto Sanchez Vilella Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico. Its mailing address is P.O. Box 42007, San Juan, Puerto Rico 00940-2007. Its telephone number is (787) 721-8787.

**Consultants**

The Authority retains the firm of Roy Jorgensen Associates, Inc. as independent traffic engineers to carry out certain responsibilities under the 1968 Resolution and the 1998 Resolution. These include an annual evaluation of the Authority's master plan and Construction Improvement Program for capital improvements and the maintenance activities of the Department and the Authority with respect to Puerto Rico's highway system.

**Employee Relations**

As of May 2010, the Authority employed 2,270 persons, substantially all of whom were permanent employees. The Authority believes that relations with its employees are good.

In 1987, the Puerto Rico Supreme Court classified the Authority as a "private employer" for purposes of Puerto Rico labor law, permitting the Authority's employees to engage in collective bargaining. An independent union, representing approximately 1,146 permanent employees, has been certified for collective bargaining purposes. The existing collective bargaining agreement of the Authority was executed in 2006 and expires on June 30, 2010. Management of the Authority and the union are currently negotiating a new agreement.

**New and Pending Legislation Affecting the Authority**

*New Legislation*

Law 125 of October 17, 2009 amended the Vehicle and Traffic Law of 2000 to provide that in cases of emergency, certain duly identified rescue, firefighting and emergency response vehicles (and military convoys during emergency mobilizations declared by the Governor of the Commonwealth or the President of the United States), shall have the right to use the AutoExpreso toll lanes. The Secretary of the Department of Transportation and Public Works must coordinate with the agencies that operate vehicles covered by the law to establish a special toll rate which may not be more than the operational costs that the Authority incurs for such use of the AutoExpreso lane.

Law 192 of December 22, 2009 amended the Vehicle and Traffic Law of 2000 and provided new guidelines for the offense of driving under the influence of intoxicating beverages. Previously, this offense had been defined for drivers over 18 years of age as operating a motor vehicle with a blood alcohol content of .08% or more. Law 192 provides the same limits for drivers 21 and older, but for drivers between the ages of 18 and 20 the

maximum blood alcohol content while operating a motor vehicle is .02%. By increasing compliance with federal standards, the Authority can maximize federal funds. The changes implemented by Law 192 increase compliance with federal laws on drinking age and are expected to result in an additional $11.5 million in federal funds received annually by the Authority.

*Pending Legislation*

A bill has been introduced in the Puerto Rico House of Representatives which would require that fines imposed for avoidance of tolls be delivered to the Authority and dedicated to construction and maintenance of permanent highway infrastructure works and improvements. Another bill, also pending in the Puerto Rico House of Representatives, would dedicate fifty percent of administrative faults under the jurisdiction of the Commonwealth committed while operating a motor vehicle on a highway or toll bridge to the Authority to also be used for construction and maintenance of permanent highway infrastructure works and improvements.

From time to time bills have been introduced in the Legislative Assembly of Puerto Rico to exempt certain categories of individuals from the obligation to pay tolls, or to reduce the tolls payable by these individuals, including policemen, firemen, and others. Some of these bills are currently pending. The Authority has in the past opposed these types of bills and currently intends to continue to do so. No assurance can be given as to whether any of these bills will ultimately be enacted into law. However, the Authority does not believe that these bills would have a material adverse effect on the Authority.

The Authority cannot predict whether any of these bills, or any other bill affecting the Authority, will ultimately become law.

## TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES

### Revenues

Various factors affect the level of 1968 Resolution Revenues and 1998 Resolution Revenues available to the Authority, including, in particular, general economic conditions, the supply and cost of crude oil and gasoline and other oil-derived fuels. These factors have an impact on motor vehicle usage and fuel consumption and are discussed further below. In addition, decisions by the Authority as to the types and level of charges it may impose for the use of its Transportation Facilities will affect the amount of moneys available to the Authority.

*Sources of 1968 Resolution Revenues*

*General.* The major sources of the Authority's 1968 Resolution Revenues are the gasoline tax and the gas oil and diesel oil tax allocated to the Authority pursuant to the Puerto Rico Internal Revenue Code, the motor vehicle license fee allocated to the Authority pursuant to Act No. 9, and the toll charges on the Authority's existing toll highways (which do not include the Eastern Corridor), including tolls collected on any extension thereof, however financed. In fiscal year 2009, 1968 Resolution Revenues were derived 41.7% from gasoline taxes, 44.6% from toll charges, 8.7% from motor vehicle license fees, 3.3% from gas oil and diesel oil taxes, and 1.8% from investment earnings. (The sum of these percentages may not equal 100% due to rounding).

*Gasoline and Gas Oil Taxes.* The Puerto Rico Internal Revenue Code, which currently imposes a $0.16 per gallon tax on gasoline and an $0.08 per gallon tax on gas oil and diesel oil, provides for the deposit of the entire $0.16 tax on gasoline and $0.04 of the tax on gas oil and diesel oil in the Special Fund, and authorizes the Authority to pledge such amounts to the payment of the principal of and interest on its bonds and other obligations or for any other lawful purpose of the Authority. The Authority has pledged such tax receipts to the holders of the Highway Revenue Bonds, but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such taxes to payment of certain Commonwealth moneys to the extent other Commonwealth moneys are insufficient therefor. The Authority has also pledged such tax receipts to the holders of the Transportation Revenue Bonds, subject to the prior application of such tax receipts to the payment of debt service on Highway Revenue Bonds and the maintenance of a reserve therefor. The Commonwealth has agreed and committed in the Puerto Rico Internal Revenue Code that the tax on gasoline will not be reduced below $0.16 per gallon and the tax on gas oil and

24

diesel oil will not be reduced below $0.04 per gallon and that the amount of such taxes allocated to the Authority will not be reduced until all obligations of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid. Gasoline taxes and gas oil and diesel oil taxes which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph are not required to be allocated to the Authority or pledged by the Authority to the holders of the Highway Revenue Bonds or the Transportation Revenue Bonds.

Gasoline taxes, gas oil and diesel oil taxes are collected by the Department of the Treasury. The portions of such taxes allocated to the Authority are transferred to the Authority at least monthly as such taxes are collected.

The Department of the Treasury periodically conducts an audit of gasoline, gas oil, diesel oil and petroleum products importers, producers and wholesalers to verify amounts reported and paid. In addition to such audit procedures, the Authority reviews monthly the records of the Department of the Treasury for consistency with monthly reports provided to the Authority by distributors of oil, gasoline and petroleum products.

*Motor Vehicle License Fees.* Under the Vehicle and Traffic Law (Act No. 22 of January 7, 2000, as amended), the Commonwealth imposes annual license fees on various classes of motor vehicles. The current license fees range from $25.00 to $40.00 for passenger cars and vary for other vehicles. Act No. 9 increased the per vehicle annual motor vehicle license fees by $15.00 and provided for the deposit of the proceeds of the $15.00 increase in the Special Fund, which proceeds may be pledged to the payment of debt service on obligations of the Authority or any other legal purpose of the Authority. As with the gasoline and gas oil and diesel oil taxes described above, the Authority has pledged such license fees to the holders of the Highway Revenue Bonds and, subject to the prior application of such fees to the payment of debt service on Highway Revenue Bonds and the maintenance of a reserve therefor, the Authority has also pledged such fees to the holders of the Transportation Revenue Bonds. Such fees are also collected by the Department of the Treasury and the portion of such fees allocated to the Authority is transferred to the Authority at least monthly, as such fees are collected. Under Act No. 9, the Commonwealth has agreed and pledged that the license fees allocated to the Authority, as described herein, will not be reduced so long as such proceeds remain pledged to the payment of such obligations.

*Tolls on Existing Toll Highways.* Until the 1968 Resolution is repealed and canceled, all tolls collected on the Authority's existing toll highways financed with Highway Revenue Bonds, including tolls collected on any extension thereof financed with Transportation Revenue Bonds (the "Existing Toll Facilities Revenues"), will constitute 1968 Resolution Revenues. As such, they are pledged to the payment of the Highway Revenue Bonds and, subject to the prior application of such toll revenues to the payment of debt service on the Highway Revenue Bonds and the maintenance of a reserve therefor, are additionally pledged to the payment of Transportation Revenue Bonds.

Under the 1968 Resolution, the Authority has covenanted not to reduce or eliminate any tolls and other charges for the use of Traffic Facilities if such tolls and other charges have been taken into account in the calculation of 1968 Resolution Revenues for purposes of satisfying the tests for the issuance of additional bonds under the 1968 Resolution and if the 1968 Resolution Revenues for any 12 consecutive months out of the immediately preceding 15 months prior to the proposed adjustment, after adjusting such revenues for the proposed decrease in tolls, would have been less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter for all Highway Revenue Bonds then outstanding. Such tolls and other charges have been taken into account for satisfying such additional bonds test under the 1968 Resolution.

The Authority has also covenanted, under the 1998 Bond Resolution, that it will not reduce or eliminate any tolls or other charges imposed for the use of its Toll Facilities unless the 1998 Resolution Revenues received by the Authority for any 12 consecutive months out of the 15 months immediately prior to such reduction (adjusted to give effect for such entire 12 months to moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate changes made effective on or prior to the effective date of any such toll reduction, and tolls from Toll Facilities which have begun operations or been removed from operation during such 12 months) is at least equal to 150% and 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter for all Senior Transportation Revenue Bonds then outstanding and for all Transportation Revenue Bonds then outstanding, respectively.

Tolls are currently imposed on the Luis A. Ferré toll highway (PR-52), which extends 67 miles from San Juan to Ponce and has four ramps and five toll stations; the De Diego toll highway (PR-22), which extends 52 miles from San Juan to Arecibo and has one ramp and six toll stations; PR-53, which will connect Fajardo and Salinas upon its completion, a distance of 57 miles, of which 37 miles have been completed, and which has five toll stations; the Martínez Nadal Expressway (PR-20), which extends six miles, connecting PR-2 with PR-1 near Caguas, and has one toll station; PR-5, which extends 2.5 miles, connecting PR-2 to PR-199 (Las Cumbres Avenue), and has one toll station; and PR-66, which extends 6.2 miles connecting PR-3 and PR-26, and has one toll station and two ramps.

The last toll increase was in September 2005, when the Authority raised toll rates by approximately 43% in the aggregate.

In 2004, the Authority began implementing a high-speed electronic toll collection system known as AutoExpreso. This technology employs radio transmissions from transponder-equipped vehicles to plaza-mounted antennas, and video systems for violation enforcement. AutoExpreso has exceeded the Authority's usage and performance expectations. It has significantly increased vehicle circulation throughout toll plazas without costly infrastructure expansion, and has resulted in reduced travel time and increased convenience for customers. Direct benefits to the Authority include reduced cost of toll collection, enhanced auditing capabilities, additional payment option offering and receipt of toll payments in advance. AutoExpreso has been implemented on 21 of the 26 existing ramps and toll stations. Currently, approximately 40% of toll revenues are collected through AutoExpreso.

The Authority's toll highway revenues have always exceeded its toll highway operation and maintenance expenses. Toll highway revenues and operation and maintenance expenses for fiscal year 2009 were $206.5 million and $71.5 million, respectively, compared to $212.7 million and $61.2 million, respectively, for fiscal year 2008.

*Investment Earnings.* Moneys held for the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations. Moneys held for the credit of the 1968 Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations. Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the 1968 Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Highway Revenue Bonds outstanding. Income from the investment of moneys held for the credit of the 1968 Construction Fund is not considered 1968 Resolution Revenues under the 1968 Resolution.

*Sources of 1998 Resolution Revenues*

*Petroleum Products Tax.* In 1997, the Puerto Rico Internal Revenue Code was amended by Act No. 34 to allocate to the Authority the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth on petroleum products (which include crude oil, unfinished oil and derivative products). The tax is imposed on any petroleum product introduced, consumed, sold or transferred in the Commonwealth. The petroleum products tax rate varies on a monthly basis according to an index price of crude oil determined by the Department of the Treasury (based on the market price of crude oil quoted in certain markets specified in the Puerto Rico Internal Revenue Code), as follows:

| Index Price of Crude Oil (per barrel) | Rate of Tax (per barrel) |
| --- | --- |
| $16.00 and lower | $6.00 |
| $16.01 to $24.00 | $5.00 |
| $24.01 to $28.00 | $4.00 |
| $28.01 and higher | $3.00 |

Petroleum products taxes are collected by the Department of the Treasury, deposited in a Special Fund, and transferred to the Authority on a monthly basis, subject to an $11 million monthly limit and to the $120 million annual limit. If the total amount of the taxes collected in any month is less than $11 million, such deficiency is made up with any taxes in excess of $11 million collected in any other month of the same fiscal year.

The following table presents the number of barrels of crude oil on which the petroleum products tax was imposed, the average annual tax rate (per barrel) and the total taxes collected by the Department of the Treasury in each fiscal year since fiscal year 1987 (the first full fiscal year in which the tax was collected).

### COLLECTIONS OF PETROLEUM PRODUCTS TAX

| Fiscal Year Ended June 30, | Number of Barrels Taxed (millions) | Average Annual Tax Rate[1] ($ per barrel) | Total Tax Collected ($ million) |
|---|---|---|---|
| 1987 | 23.67 | $4.91 | $119.90 |
| 1988 | 22.13 | 4.41 | 98.54 |
| 1989 | 25.11 | 5.00 | 128.23 |
| 1990 | 22.74 | 4.91 | 112.79 |
| 1991 | 26.80 | 4.16 | 112.17 |
| 1992 | 24.07 | 5.00 | 120.37 |
| 1993 | 26.09 | 5.00 | 130.47 |
| 1994 | 28.27 | 5.42 | 152.91 |
| 1995 | 27.90 | 5.00 | 139.59 |
| 1996 | 31.55 | 5.00 | 157.74 |
| 1997 | 32.29 | 4.92 | 158.74 |
| 1998 | 32.20 | 5.33 | 171.64 |
| 1999 | 31.70 | 6.00 | 190.10 |
| 2000 | 32.20 | 4.50 | 144.80 |
| 2001 | 34.82 | 3.50 | 121.90 |
| 2002 | 35.88 | 4.42 | 158.60 |
| 2003 | 34.80 | 3.50 | 121.90[2] |
| 2004 | 36.50 | 3.16 | 115.30 |
| 2005 | 37.20 | 3.00 | 110.26 |
| 2006 | 34.40 | 3.00 | 102.20 |
| 2007 | 34.60 | 3.00 | 102.76 |
| 2008 | 33.40 | 3.00 | 99.04 |
| 2009 | 34.10 | 3.00 | 101.32 |
| 2010[e] | 33.70 | 3.00 | 98.23 |

(1)    The average annual tax rate is the arithmetic average of the monthly tax rate determined by the Department of the Treasury during such fiscal year. The total tax collected is the actual amount of tax collected during the fiscal year. Due to the monthly fluctuations in the tax rate, the total tax collected is different from the result produced from multiplying the number of barrels taxed by the average annual tax rate.

(2)    Does not include $11.0 million collected from taxes in arrears paid by a delinquent insolvent taxpayer that filed for protection under the Bankruptcy Code.

(e)    Estimated

*Source*: Department of the Treasury and the Authority.

The Puerto Rico Internal Revenue Code authorizes the Authority to pledge the entire amount of petroleum products tax allocated to the Authority (not to exceed $120 million in any fiscal year) to the payment of the principal of and interest on bonds and other obligations of the Authority or for any other lawful purpose of the Authority. The Authority has pledged the petroleum products tax receipts to the holders of the Transportation Revenue Bonds, but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such tax receipts to the payment of certain Commonwealth debts to the extent other Commonwealth funds are insufficient therefor. The Commonwealth has agreed and committed in the 1997 amendment to the Puerto Rico Internal Revenue Code not to eliminate or reduce the rates of excise tax on petroleum products in effect on the date of the amendment (which are the rates set forth above) or the amount of such taxes allocated to the Authority until all

obligations of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid. Any petroleum product tax collected in excess of $120 million per fiscal year is not required to be allocated to the Authority and is not pledged by the Authority to the holders of Transportation Revenue Bonds.

*Tolls and Other Charges.* The Authority Act grants to the Authority plenary power to fix, impose, alter and collect tolls and other reasonable charges for the use of the Transportation Facilities operated by the Authority or for services rendered thereby. The Authority is obligated to take into account in setting or changing such tolls and other charges such factors as will promote the use of the Transportation Facilities in the broadest and most varied manner economically possible. Prior to fixing or altering such tolls or other charges, the Authority must hold a public hearing to receive comments with respect thereto.

Until the 1968 Resolution is repealed and canceled, all Existing Toll Facilities Revenues will constitute 1968 Resolution Revenues and are pledged to the payment of the Transportation Revenue Bonds only to the extent they become Excess 1968 Resolution Revenues. Upon the repeal and cancellation of the 1968 Resolution, the Existing Toll Facilities Revenues will constitute 1998 Resolution Revenues and will be pledged to the payment of the Transportation Revenue Bonds. To date, the only toll facility that provides toll revenues that are not Existing Toll Facilities Revenues, but that instead constitute 1998 Resolution Revenues, is PR-66, also known as Eastern Corridor Phase I, which was inaugurated in April 2006, with a minimum roundtrip toll of $3.00. PR-66 extends 6.2 miles connecting PR-3 and PR-26, and has one toll station and two ramps.

The Authority has not pledged the fare box revenues of Tren Urbano to the payment of the bonds issued under the 1998 Resolution or the 1968 Resolution, including the Reoffered Bonds.

*Excess 1968 Resolution Revenues.* Before the repeal and cancellation of the 1968 Resolution, the Excess 1968 Resolution Revenues (which consist of all unencumbered 1968 Resolution Revenues remaining after payment of debt service and required reserves on the outstanding Highway Revenue Bonds issued under the 1968 Resolution) are included as 1998 Resolution Revenues. After the payment or defeasance of all Highway Revenue Bonds and the repeal and cancellation of the 1968 Resolution, all 1968 Resolution Revenues will become 1998 Resolution Revenues.

*Investment Earnings.* Moneys held for the credit of the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations. Moneys held for the credit of the 1998 Senior Bond Reserve Account and each account in the 1998 Subordinated Bond Reserve Fund shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations. Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the 1998 Senior Bond Reserve Account and each account in the 1998 Subordinated Bond Reserve Fund shall be invested in Investment Obligations which mature not later than the final maturity date of any Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds outstanding. Income from investments of moneys held for the credit of the 1998 Construction Fund is not considered 1998 Resolution Revenues under the 1998 Resolution.

*Historical Revenues*

The following table presents the Authority's revenues, debt service and debt service coverage ratio for the five fiscal years ended June 30, 2005 to June 30, 2009, as well as for the ten months ended April 30, 2010 and April 30, 2009. Under the 1998 Resolution, the Excess 1968 Resolution Revenues representing unencumbered funds in the 1968 Construction Fund must be deposited monthly in the 1998 Revenue Fund and are available for the payment of debt service on Transportation Revenue Bonds, for required deposits to the reserve accounts established thereunder and for other authorized purposes under the 1998 Resolution. See APPENDIX IV – SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

## HISTORICAL REVENUES AND DEBT SERVICE COVERAGE
### (dollars in thousands)

| | Fiscal Year Ended June 30, | | | | | Ten months ended April 30, | |
|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2010 |
| **1968 Resolution Revenues:** | | | | | | | |
| Gasoline taxes | $185,883 | $178,932 | $181,642 | $174,727 | $174,539 | $146,488 | $144,388 |
| Gas oil and diesel oil taxes | 16,679 | 15,676 | 18,467 | 18,076 | 13,737 | 12,309 | 8,974 |
| Subtotal | $202,562 | $194,608 | $200,109 | $192,803 | $188,276 | $158,797 | $153,362 |
| Motor Vehicle license fees | 32,385 | 31,655 | 31,101 | 34,042 | 36,309 | 23,610 | 27,098 |
| Subtotal | $234,947 | $226,263 | $231,210 | $226,845 | $224,585 | $182,407 | $180,460 |
| Toll receipts | 146,286 | 189,618 | 203,154 | 193,932 | 186,754 | 155,882 | 157,773 |
| Investment Income | 9,858 | 9,923 | 9,803 | 8,512 | 7,679 | 6,591 | 4,878 |
| **Total 1968 Resolution Revenue** | $391,091 | $425,804 | $444,167 | $429,289 | $419,018 | $344,880 | $343,111 |
| Debt Service on Highway Revenue Bonds | $153,925 | $145,080 | $124,942 | $129,018 | $129,928 | $108,273 | $114,059 |
| 1968 Resolution Coverage Ratio | 2.54 | 2.93 | 3.55 | 3.33 | 3.23 | - | - |
| Excess 1968 Resolution Revenues | $237,166 | $280,724 | $319,225 | $300,271 | $289,090 | $236,607 | $229,052 |
| **1998 Resolution Revenues** | | | | | | | |
| Petroleum Products Tax | $110,262 | $102,206 | $102,763 | $ 99,038 | $101,317 | $ 85,241 | $ 82,142 |
| Excess 1968 Resolution Revenues | 237,166 | 280,724 | 319,225 | 300,271 | 289,090 | 236,607 | 229,052 |
| Toll Receipts | - | 3,430 | 16,799 | 18,784 | 19,722 | 16,240 | 16,135 |
| Investment Income | 16,692 | 16,801 | 14,466 | 18,850 | 16,070 | 12,061 | 9,937 |
| **Total 1998 Resolution Revenues** | $364,120 | $403,161 | $453,253 | $436,943 | $426,199 | $350,149 | $337,266 |
| Debt Service on Senior Transportation Revenue Bonds | $196,726 | $225,891 | $206,408 | $226,974 | $242,697 | $202,248 | $213,189 |
| 1998 Resolution Senior Coverage Ratio[(1)] | 1.85 | 1.78 | 2.20 | 1.93 | 1.76 | - | - |
| Debt Service on Subordinated Transportation Revenue Bonds | $ 20,398 | $ 24,018 | $ 28,267 | $ 30,363 | $ 30,319 | $ 25,266 | $ 25,287 |
| Total Debt Service on Transportation Revenue Bonds | $217,124 | $249,909 | $234,675 | $257,337 | $273,016 | $227,513 | $238,476 |
| 1998 Resolution Senior and Subordinated Coverage Ratio[(2)] | 1.68 | 1.61 | 1.93 | 1.70 | 1.56 | - | - |
| Aggregate Revenues[(3)] | $518,045 | $548,241 | $578,195 | $565,961 | $556,127 | $458,422 | $451,325 |
| Aggregate Debt Service[(4)] | $371,049 | $394,989 | $359,617 | $386,355 | $402,944 | $335,787 | $352,535 |
| Aggregate Coverage Ratio[(5)] | 1.40 | 1.39 | 1.61 | 1.46 | 1.38 | - | - |

(1) Equals ratio of Total 1998 Resolution Revenues to Debt Service on the Senior Transportation Revenue Bonds.

(2) Equals ratio of Total 1998 Resolution Revenues to Debt Service on the Senior Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds.

(3) Represents the sum of Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues).

(4) Represents the sum of Debt Service on all Highway Revenue Bonds and all Transportation Revenue Bonds.

(5) Aggregate Revenues divided by Aggregate Debt Service.

The Authority's aggregate 1968 Resolution Revenues and 1998 Resolution Revenues ("Aggregate Revenues") increased at a compound annual rate of 1.79% during the period from fiscal year 2005 through fiscal year 2009 due primarily to the growth in toll receipts, which accounted for approximately 37.1% of Aggregate Revenues for fiscal year 2009. Toll revenues grew by 50.4% from fiscal year 2005 to fiscal year 2007, increasing most dramatically in 2006 as a result of a 43% aggregate increase in toll rates implemented on September 10, 2005. Thereafter, toll revenues decreased for both fiscal year 2008 and fiscal year 2009. This decrease can be attributed to the negative impact of the economic downturn combined with the higher toll rates, a five cent reduction in the fares for express lanes, and the significant increase in the price of oil (West Texas Intermediate) from an average price of $48.40 in fiscal year 2005 to an average price of $96.84 per barrel in fiscal year 2008. Furthermore, in fiscal year 2009 the Authority's external auditor introduced a downward adjustment of $1.46 million in toll receipts for deferred income on account of amounts collected but not yet earned. Overall, toll revenues contracted by 6.13% in the aggregate during the period from fiscal year 2007 to fiscal year 2009.

Gasoline tax revenues accounted for approximately 41.7% of 1968 Resolution Revenues and 31.4% of Aggregate Revenues for fiscal year 2009. During the fiscal years 2005-2009, gasoline tax revenues decreased slightly. Gasoline tax revenues are closely related to gasoline consumption. Gasoline consumption in turn is affected by gasoline prices and by the number of vehicles in circulation. Although gasoline prices rose significantly during this five year period, the adverse impact on gasoline consumption was initially offset by an increase in the number of vehicles in circulation. However, the more dramatic increase in gasoline prices in the latter part of this period resulted in a small decrease in gasoline consumption in 2005 and 2006. Nevertheless, gasoline consumption and gasoline tax revenue showed significant resilience to the impact of negative factors, revealing low income and price elasticities.

Gas oil and diesel oil tax receipts accounted for approximately 3.3% of 1968 Resolution Revenues and 2.5% of Aggregate Revenues for fiscal year 2009. Gas oil and diesel oil tax receipts decreased from fiscal year 2005 to fiscal year 2006, then increased in fiscal year 2007. Gas oil and diesel oil tax receipts decreased in fiscal year 2009 after remaining essentially unchanged in fiscal year 2008. This decrease from fiscal year 2005 to fiscal year 2006 resulted primarily from the decision by the Puerto Rico Electric Power Authority to increase the amount of electricity purchased from private co-generation plants using natural gas and coal as fuels. The relatively high level of receipts in fiscal year 2007 and fiscal year 2008 was primarily due to increased consumption of fuel oils by the Puerto Rico Electric Power Authority following a fire at its Palo Seco generating plant.

Motor vehicle license fees accounted for approximately 8.7% of 1968 Resolution Revenues and 6.5% of Aggregate Revenues for fiscal year 2009. From fiscal year 2005 to fiscal year 2007, license fee collections declined, despite a significant increase in the number of sales of new automobiles. For fiscal years 2008 and 2009, the Authority received extraordinary payments relating to motor vehicle license fees for prior years. The Authority believes that the magnitude of these payments and of the increases in motor vehicle license fee revenues for fiscal years 2008 and 2009 could be due to institutional problems in the transfer of funds from the Puerto Rico Treasury Department which arose after certain private service stations were allowed to collect motor vehicle license fees.

The revenues allocated to the Authority from the petroleum products tax are capped at $120 million in each fiscal year. For fiscal years 2005 and 2006, the petroleum products tax collected amounted to $110.3 million and $102.2 million, respectively. This was due primarily to the rise in the price of petroleum products, which resulted in a lower tax rate and lower collections. After a slight increase in fiscal year 2007, petroleum product tax revenues decreased in both fiscal year 2008 and fiscal year 2009, primarily due to a drop in consumption of taxable products relating to the economic downturn and related energy crisis.

The foregoing discussion of past revenue growth is not intended to be predictive of future revenue growth. Economic conditions in Puerto Rico, as well as the price of oil and petroleum products and the levels of automobile registration and usage, will affect the Authority's revenues in the future.

*Projected 1968 Resolution Revenues and 1998 Resolution Revenues*

The following table presents the Authority's estimates of 1968 Resolution Revenues, 1998 Resolution Revenues, debt service on Highway Revenue Bonds and Transportation Revenue Bonds (including the Reoffered Bonds and other bonds expected to be issued during this period), and debt service coverage for each of the five fiscal years ending June 30, 2010 to June 30, 2014. The projected 1968 Resolution Revenues and 1998 Resolution Revenues shown below are based on toll rates, tax rates and allocations to the Authority now in effect, and debt service is based on Highway Revenue Bonds and Transportation Revenue Bonds currently outstanding and projected to be issued during the forecast period. Such projections are subject to periodic review and may be adjusted to reflect such factors as changes in general economic conditions, in the demand for gasoline and other petroleum products and in the levels of automobile registration and usage. The projections are based on assumptions that the Authority believes to be reasonable; however, there is no assurance that the projections will prove to be accurate. The projections have been prepared by, and are the responsibility of the management of the Authority. The Authority's auditors have neither examined nor compiled the projections, and accordingly they have not expressed an opinion or any other form of assurance with respect thereto.

**PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY**
**PROJECTED REVENUES AND DEBT SERVICE COVERAGE**
(dollars in thousands)

| | Fiscal Year Ending June 30, | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| *1968 Resolution Revenues* | | | | | |
| Gasoline Taxes | $172,340 | $173,290 | $174,100 | $175,600 | $176,890 |
| Gas oil and diesel oil taxes | 11,000 | 11,000 | 10,500 | 10,000 | 10,000 |
| Subtotal | $183,340 | $184,290 | $184,600 | $185,600 | $186,890 |
| Motor vehicle license fees | 33,000 | 33,250 | 33,500 | 33,750 | 34,000 |
| Subtotal | $216,340 | $217,540 | $218,100 | $219,350 | $220,890 |
| Toll receipts | 190,410 | 194,900 | 200,420 | 206,040 | 211,170 |
| Investment Income | 6,076 | 6,054 | 6,067 | 6,060 | 6,067 |
| **Total 1968 Resolution Revenues** | $412,826 | $418,494 | $424,587 | $431,450 | $438,127 |
| Debt Service on Highway Revenue Bonds | $136,871 | $136,717 | $139,368 | $137,817 | $139,341 |
| 1968 Resolution Coverage Ratio | 3.02 | 3.06 | 3.05 | 3.13 | 3.14 |
| Excess 1968 Resolution Revenues | $275,956 | $281,778 | $285,219 | $293,633 | $298,786 |
| *1998 Resolution Revenues* | | | | | |
| Petroleum Products Tax | $ 98,230 | $ 98,780 | $ 99,240 | $100,090 | $100,830 |
| Investment Income | 14,270 | 14,555 | 14,606 | 14,847 | 15,168 |
| Eastern Corridor Toll Receipts | 19,590 | 19,790 | 19,980 | 20,180 | 20,380 |
| Subtotal 1998 Resolution Revenues | 132,090 | 133,125 | 133,826 | 135,117 | 136,378 |
| Excess 1968 Resolution Revenues | 275,956 | 281,778 | 285,219 | 293,633 | 298,786 |
| **Total 1998 Revenues** | $408,046 | $414,903 | $419,045 | $428,750 | $435,164 |
| Debt Service on 1998 Senior Transportation Revenue Bonds | $255,827 | $260,187 | $278,450 | $280,005 | $279,682 |
| 1998 Senior Coverage Ratio[1] | 1.60 | 1.59 | 1.50 | 1.53 | 1.56 |
| Available to Pay 1998 Subordinated Transportation Revenue Bonds[2] | $152,219 | $154,716 | $140,595 | $148,745 | $155,482 |
| Debt service on 1998 Subordinated Transportation Revenue Bonds | 30,344 | 30,343 | 30,364 | 30,324 | 30,344 |
| Senior and Subordinate Debt Service | 286,171 | 290,530 | 308,814 | 310,329 | 310,026 |
| Senior and Subordinate Debt Service Coverage Ratio[3] | 1.43 | 1.43 | 1.36 | 1.38 | 1.40 |
| Aggregate Revenues [4] | $544,916 | $551,620 | $558,414 | $566,567 | $574,505 |
| Aggregate Debt Service[5] | $423,042 | $427,247 | $448,182 | $448,146 | $449,366 |
| Aggregate Debt Service Coverage Ratio [6] | 1.29 | 1.29 | 1.25 | 1.26 | 1.28 |

(1) Equals ratio of Total 1998 Resolution Revenues to debt service on the Senior Transportation Revenue Bonds in the fiscal year in question.
(2) Represents total 1998 Resolution Revenues less debt service on the Senior Transportation Revenue Bonds.
(3) Equals ratio of Total 1998 Resolution Revenues to debt Service on the Senior Transportation Revenues Bonds and Subordinated Transportation Revenue Bonds.
(4) Represents the sum of the Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues) for the fiscal year in question.
(5) Represents the sum of Highway Revenue Bonds, Transportation Revenue Bonds and Subordinated Transportation Revenue Bonds debt service for the fiscal year in question.
(6) Aggregate Revenues divided by Aggregate Debt Service.

Total 1968 Resolution Revenues and 1998 Resolution Revenues for the period from fiscal year 2010 through fiscal year 2014 are projected to grow at a compound annual rate of 1.50% and 1.62%, respectively. The projections are based on econometric models prepared for the Authority by an independent firm.

**Recent Operating Results**

In fiscal year 2009, the Authority had gross revenues, consisting primarily of toll receipts, taxes, license fees and capital grants, of $732 million, and expenses of $1.002 billion, resulting in a reduction in net assets of $270 million, from $4.727 billion as of June 30, 2008, to $4.456 billion as of June 30, 2009. The Authority also suffered losses in each of the fiscal years 2006 through 2008. However, the Authority's expenses include a substantial

losses in each of the fiscal years 2006 through 2008. However, the Authority's expenses include a substantial amount of non-cash expenses (depreciation and amortization). In fiscal year 2009, for example, expenses included \$402 million of depreciation and amortization, which exceeds the reduction in net assets by \$132 million. Revenues and debt service coverage ratios presented herein are calculated in accordance with the Resolutions, which provide that the Authority's bonds are payable from the gross revenues pledged thereunder, without deduction for operating and maintenance expenses.

The Authority has financed some of its recent capital expenditures and working capital requirements with Government Development Bank lines of credit, the repayment of which is subordinate to the Highway Revenue Bonds and the Transportation Revenue Bonds. In connection with such lines of credit, the Authority and Government Development Bank, which acts as the fiscal agent of the Commonwealth, have entered into a fiscal oversight agreement pursuant to which it has requested the Authority to implement a comprehensive expense reduction program, including fiscal oversight controls to improve the financial stability of the Authority. The Authority is required to provide certain financial and operational information to the Government Development Bank on a regular basis. The Authority intends to repay or refinance some or all of these lines of credit with the proceeds of future bond issuances (when and if it is able to do so in accordance with the Resolutions' additional bonds tests), the proceeds of public – private partnership transactions, and internally generated funds.

### Operating Expenses and Capital Expenditures

*Operation and Maintenance - Highway Facilities*

The Department of Transportation has the responsibility for maintaining Puerto Rico's highway system, except for the toll highways and related connecting roads, which are maintained by and at the expense of the Authority. The maintenance expenses of the Department are paid with moneys appropriated annually by the Legislature of Puerto Rico. On occasion, the Authority advances funds to pay the costs of emergency repairs that are the responsibility of the Department, and is subsequently reimbursed for these advances. To the extent funds are not provided by the Legislature, the Authority has agreed under the 1998 Resolution that it will pay from available moneys in the 1998 Construction Fund the costs of maintenance of the Traffic Facilities financed with proceeds of Highway Revenue Bonds and Transportation Revenue Bonds. The 1998 Resolution requires the Authority to pay from available moneys in the 1998 Construction Fund (and not from moneys in the 1968 Construction Fund) the costs of any necessary repairs to, or renewals or replacements of, Traffic Facilities financed with proceeds of Highway Revenue Bonds and Transportation Revenue Bonds, as recommended by the transportation engineers retained by the Authority.

The Authority's operation and maintenance expenses payable from available moneys in the 1998 Construction Fund consist of the expenses of operating and maintaining the toll highways and related roads and, beginning in fiscal year 2005, the expenses of operating and maintaining Tren Urbano. Under the 1998 Resolution, these expenses are payable from available moneys in the 1998 Construction Fund after payment of debt service on the Highway Revenue Bonds and Transportation Revenue Bonds and any required deposits to the 1998 Senior Bond Reserve Account and the accounts in the 1998 Subordinated Bond Reserve Fund. Certain other expenses of the Authority, including certain of its administration costs, are included in the Construction Improvement Program and are capitalized.

The following table sets forth the annual toll highway operation and maintenance expenses and beginning in 2006, the electronic toll collection expenses paid by the Authority from unencumbered moneys in the 1998 Construction Fund for each of the five fiscal years in the five-year period ended June 30, 2009, as well as the annual amount contributed by the Authority to the Department to help pay the cost of maintaining the non-toll highways (which amount is not reimbursed by the Department to the Authority). The table also sets forth the Authority's projected annual toll highway operation and maintenance expenses and electronic toll collection expenses to be paid by the Authority from unencumbered moneys in the 1998 Construction Fund for the five fiscal years ending June 30, 2014, as well as the projected contributions by the Authority to the Department for maintenance of non-toll highways.

## HIGHWAY FACILITIES
## OPERATION AND MAINTENANCE EXPENSES
### (in thousands)

| Fiscal Year Ended June 30 | Contributions of the Authority to the Department | Toll Highway Operation & Maintenance | Electronic Toll Collection | Total[1] |
|---|---|---|---|---|
| 2005 | 8,271 | 45,563 | - | 45,563 |
| 2006 | 9,250 | 53,315 | $11,933 | 65,248 |
| 2007 | 10,000 | 50,632 | 14,294 | 64,926 |
| 2008 | 10,000 | 46,119 | 15,075 | 61,194 |
| 2009 | 10,000 | 50,704 | 20,776 | 71,480 |
| 2010[p] | - | 48,464 | 18,932 | 67,396 |
| 2011[p] | - | 30,000 | 18,000 | 48,000 |
| 2012[p] | - | 31,500 | 18,000 | 49,500 |
| 2013[p] | - | 33,000 | 18,000 | 51,000 |
| 2014[p] | - | 34,500 | 18,000 | 52,500 |

| | |
|---|---|
| (1) | Total does not include the contributions of the Authority to the Department. |
| (p) | Projected. |

In certain years, emergency repairs to the highway system have been necessary, particularly as a result of storm or flood damage. The cost of these repairs is borne by the Department, except for the cost of repairs to the toll highways, which is borne by the Authority. The Department and the Authority generally have been reimbursed from the Federal Emergency Management Agency for some of the costs of such repairs attributable to federally designated disaster areas. The Legislature of Puerto Rico also appropriates funds from time to time for emergency repairs by the Department in addition to amounts appropriated for maintenance.

The traffic engineers retained by the Authority under the 1968 Resolution and 1998 Resolution conduct an annual evaluation of the level of maintenance of the highway system. The traffic engineers believe that the Authority's maintenance program represents an adequate level of maintenance to preserve the investment and provide an acceptable level of service. The results of the traffic engineers' most recent maintenance evaluation are summarized in the letter of such traffic engineers included as Appendix V.

*Operation and Maintenance - Tren Urbano*

Tren Urbano is a mass transit rail project for the San Juan Metropolitan area. The initial phase of Tren Urbano became fully operational in fiscal 2005. It consists of approximately 27 miles of trackway, running from Bayamón to Santurce, via Río Piedras and Hato Rey.

Tren Urbano is currently operated by Alternate Concepts, Inc. ("ACI") pursuant to an operation and maintenance agreement originally executed in 2005 between the Authority, Siemens Transportation Partnership Puerto Rico S.E., ACI and Juan R. Requena y Asociados, and amended and extended on May 28, 2010. Pursuant to the amendment, the contract was extended for a five year term expiring on June 5, 2015, and ACI remained as the sole operator. Under the agreement, ACI is responsible for operating and maintaining Tren Urbano and is entitled to receive for such services an annual base compensation. As part of the 2010 amendment, the original contract's inflation adjustment to the base compensation was eliminated. The base compensation does not include the cost of insurance and electricity which is paid separately by the Authority. In addition, the contractor is entitled to receive incentive compensation, and is subject to penalties, based on meeting or not meeting certain operating and maintenance performance measures.

In addition to the direct costs of operating Tren Urbano, the Authority funds the costs associated with the technical, administrative and contractual oversight of Tren Urbano and its intermodal operations, which is done through the Integrated Transportation Alternative (ATI, by its Spanish acronym), a division within the Authority. Additional costs related to Tren Urbano include a contract for security services with the Puerto Rico Police

33

Department, a subsidy of fixed-route feeder services for operators of private jitney services (carros públicos), and paratransit feeder bus services provided by the Metropolitan Bus Authority.

The Authority has made certain recent changes that are expected to reduce the cost to the Authority of operating Tren Urbano. These changes include (i) better coordination between the routes of Tren Urbano and the Metropolitan Bus Authority (MBA) with the goal of developing a trunk and feeder system to Tren Urbano and certain principal bus routes; (ii) the establishment of uniform fares in Tren Urbano and MBA's buses, which required a reduction of the one-way Tren Urbano fare from $1.50 to $0.75; (iii) an increase in the use of two-car trains in the off-peak hours, holidays and weekends, and a reduction in the operating hours and the number of attendants in some station entrances; and (iv) the improvement of the level of service. The Authority expects that these changes will increase ridership, which has been approximately 35,000 trips per day instead of the originally projected 57,000 trips per day, that the increase in ridership will partially offset the reduction in revenues caused by the reduction in fares, and that the expense reduction measures will result in lower overall Tren Urbano expenses.

The table below shows the Tren Urbano operating and maintenance expenses paid by the Authority in fiscal year 2009. The table also shows the Authority's estimate of the annual operating and maintenance expenses of Tren Urbano for the period from fiscal 2010 through fiscal 2014. These estimates are based upon the terms of the Authority's contract with ACI and include the Authority's estimate of the cost of insurance and electricity. They also include the costs of the ATI oversight organization, financial incentives for carros públicos, security services, and feeder bus services.

## Operating and Maintenance Expenses for
## Tren Urbano and Intermodal Service
## (in millions)

| Fiscal Year | Estimated Annual Operating and Maintenance Expenses |
|---|---|
| 2009 | $75,510,088 |
| 2010[(p)] | 74,773,772 |
| 2011[(p)] | 61,500,000 |
| 2012[(p)] | 63,000,000 |
| 2013[(p)] | 64,500,000 |
| 2014[(p)] | 66,000,000 |
| (p) Projected. | |

The costs of operation and maintenance of Tren Urbano will be covered by available moneys in the 1998 Construction Fund and passenger fares, which currently cover approximately 10% of the operation and maintenance costs.

*Operation and Maintenance – Ferry Service*

Since July 2007, the Authority is no longer responsible for the operation and maintenance of the San Juan-Cataño ferry.

*Construction Improvement Program*

As required by the 1968 Resolution and the 1998 Resolution, the Authority has developed a master plan to serve as the basis for the long-term planning of Puerto Rico's transportation facilities, which it supplements as necessary. To implement the plan, the Authority prepares a five-year Construction Improvement Program that is updated annually. Since completing the construction of Tren Urbano in fiscal year 2005, the Authority has focused its current Construction Improvement Program on improving the primary and primary urban highway facilities, while also addressing the most essential needs of secondary and tertiary roads. The Authority has also included in

its Construction Improvement Program the cost of repairs, renewals and replacements to the highway system bridges in the Puerto Rico strategic network, plans for dealing with urban congestion and for local improvements, and certain capitalized expenditures.

The current five-year Construction Improvement Program projects expenditures of approximately $1.46 billion from fiscal year 2010 through fiscal year 2014. Approximately $750 million (51%) of the funding for the Construction Improvement Program is expected to be provided by federal funds.

Federal aid for highway construction is received under a number of federal programs, including those directed to construction of new roads and repair and reconstruction of existing roads. The programs provide for matching federal assistance, ranging generally from 80% to 90% of the cost of a project. The level of federal highway aid is dependent upon Congressional authorizations that are apportioned or allocated to the states and the Commonwealth. The U.S. Department of Transportation has broad discretion to release funds for spending within the limits set by Congress. No assurance can be given that the level of federal highway aid will be maintained at the levels projected. In the event of material reductions in such aid, the Construction Improvement Program will be appropriately adjusted in the absence of internally generated funds, external financing or other sources of funds available to offset any such reductions.

The traffic engineers retained by the Authority under the 1968 Resolution and the transportation engineers under the 1998 Resolution, if different, annually review the Construction Improvement Program and the Authority's estimates of revenue sources available for its implementation. In their most recent evaluation, dated March 2009, the traffic engineers concluded that the Authority's 2007-2011 Construction Improvement Program is a reasonable response to the immediate and short-term transportation needs and is generally consistent with the Authority's long-term transportation master plan. The traffic engineers also concluded that revenue projections have been reasonably accurate and provide a sound basis for determining the size of future programs. The results of that review are summarized in the traffic engineers' letter included as Appendix V.

*Teodoro Moscoso Bridge*

The Teodoro Moscoso Bridge represents one of the links to San Juan's strategic highway network. In furtherance of its expanded powers to enter into concession agreements with private companies, the Authority entered into a concession agreement with Autopistas de Puerto Rico y Compañía, S.E. ("APR") for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge, a bridge spanning the San Jose Lagoon from San Juan to Carolina. Pursuant to the concession agreement, as recently amended, APR constructed the bridge and is obligated to operate and maintain the bridge for a term of 50 years, subject to earlier termination by either party under certain circumstances. The bridge, which is owned by the Authority, opened in February 1994. The bridge does not constitute a Traffic Facility under the 1968 Resolution or a Transportation Facility under the 1998 Resolution.

Construction of the bridge was financed through the issuance by the Authority of Special Facility Revenue Bonds which were refunded by the Authority in October 2003 with its Special Facility Revenue Refunding Bonds, 2003 Series A (the "Special Facility Revenue Refunding Bonds") in the principal amount of approximately $153.2 million. The proceeds derived from the sale of the Special Facility Revenue Refunding Bonds were loaned by the Authority to APR, which agreed to repay the loan in amounts sufficient to pay the principal of and interest on the bonds. The Special Facility Revenue Refunding Bonds will be payable primarily from net toll revenues from the bridge collected by APR, after payment of bridge operating expenses.

Under the Special Facility Revenue Refunding Bonds, the Authority has covenanted that if net toll revenues, together with available reserves, are insufficient to pay the Special Facility Revenue Refunding Bonds, or if the concession agreement is terminated, the Authority will assume APR's obligation to pay the Special Facility Revenue Refunding Bonds. If the Authority assumes the obligation to pay the Special Facility Revenue Refunding Bonds, the Authority will be required to exchange the Special Facility Revenue Refunding Bonds for new Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds issued under the 1998 Resolution, provided it meets the requirements for the issuance of such new bonds. These new bonds would have the same interest rates, maturity dates and redemption provisions as the Special Facility Revenue Refunding Bonds. If the Authority cannot issue such new bonds in exchange for the Special Facility Revenue Refunding Bonds, the Special

Facility Revenue Refunding Bonds would continue to be payable from revenues available to the Authority after payment of debt service on the Transportation Revenue Bonds.

Pursuant to certain amendments adopted in 2009, the Authority is now entitled to collect 5% of the gross revenues generated by the bridge, payable annually. In connection with the amendments, the Authority and APR settled certain litigation that had been pending relating to PR-66.

## DEBT

### Debt of the Authority

The following table sets forth the outstanding debt of the Authority as of May 31, 2010.

| | |
|---|---:|
| Highway Revenue Bond[1] | $1,559,763,400 |
| Senior Transportation Revenue Bonds [1] | 4,246,731,506 |
| Subordinated Transportation Revenue Bonds | 362,425,000 |
| Grant Anticipation Bonds Res. 04-18 | 107,815,000 |
| Lines of Credit – Government Development Bank | 929,313,000 |
| Total | $7,206,047,906 |

(1)   Includes accretion on capital appreciation bonds.

*Government Development Bank Lines of Credit*

The Authority has outstanding $929 million in non-revolving lines of credit from the Government Development Bank as of May 31, 2010. Of this total, $851 million was used to fund capital expenditures and $78 million was used to fund working capital requirements. In addition, the Authority has a $20 million revolving line of credit related to projects funded with moneys provided under ARRA (which had a zero balance as of May 31, 2010) and an approved $63 million line of credit (which has not yet closed) to fund a payment relating to the settlement of pending litigation. The Authority is required to provide certain financial and operational information to the Government Development Bank on a regular basis. The Authority intends to repay or refinance some or all of these lines of credit with the proceeds of future bond issuances (when and if it is able to do so in accordance with the Resolutions' additional bonds tests), the proceeds of public – private partnership transactions, and internally generated funds.

**Principal and Interest Requirements of the Reoffered Bonds**

The Principal and Interest Requirements for the outstanding Highway Revenue Bonds and Transportation Revenue Bonds (excluding the Reoffered Bonds) and for the Reoffered Bonds for each of the fiscal years 2010 through 2046 are set forth in the following table:

| Years Ending June 30, | Outstanding Transportation Revenue Bonds and Highway Revenue Bonds[1] | The Reoffered Bonds | | | Total Debt Service |
|---|---|---|---|---|---|
| | | Principal | Interest | Total | |
| 2010 | $ 423,042,194 | - | - | - | $ 423,042,194 |
| 2011 | 412,048,859 | - | $ 15,198,115 | $ 15,198,115 | 427,246,974 |
| 2012 | 432,983,947 | - | 15,198,115 | 15,198,115 | 448,182,062 |
| 2013 | 432,947,987 | - | 15,198,115 | 15,198,115 | 448,146,102 |
| 2014 | 433,863,283 | $ 305,000 | 15,198,115 | 15,503,115 | 449,366,398 |
| 2015 | 433,854,139 | 315,000 | 15,181,493 | 15,496,493 | 449,350,632 |
| 2016 | 432,699,749 | 325,000 | 15,164,325 | 15,489,325 | 448,189,074 |
| 2017 | 432,644,882 | 335,000 | 15,146,613 | 15,481,613 | 448,126,494 |
| 2018 | 429,065,759 | 345,000 | 15,128,355 | 15,473,355 | 444,539,114 |
| 2019 | 423,555,033 | 360,000 | 15,109,553 | 15,469,553 | 439,024,586 |
| 2020 | 385,721,945 | 35,370,000 | 15,089,933 | 50,459,933 | 436,181,878 |
| 2021 | 348,657,231 | 54,090,000 | 13,337,268 | 67,427,268 | 416,084,498 |
| 2022 | 380,968,723 | 395,000 | 10,657,888 | 11,052,888 | 392,021,611 |
| 2023 | 305,127,075 | 32,205,000 | 10,636,360 | 42,841,360 | 347,968,435 |
| 2024 | 305,133,723 | 33,285,000 | 9,040,163 | 42,325,163 | 347,458,886 |
| 2025 | 305,100,984 | 34,395,000 | 7,390,430 | 41,785,430 | 346,886,414 |
| 2026 | 305,113,029 | 35,560,000 | 5,685,703 | 41,245,703 | 346,358,731 |
| 2027 | 338,419,094 | 3,495,000 | 3,804,110 | 7,299,110 | 345,718,204 |
| 2028 | 338,428,461 | 3,620,000 | 3,618,178 | 7,238,178 | 345,666,638 |
| 2029 | 329,638,710 | 3,740,000 | 3,425,590 | 7,165,590 | 336,804,300 |
| 2030 | 332,515,635 | 3,860,000 | 3,226,620 | 7,086,620 | 339,602,255 |
| 2031 | 332,506,647 | 3,995,000 | 3,021,268 | 7,016,268 | 339,522,915 |
| 2032 | 323,515,360 | 13,125,000 | 2,808,730 | 15,933,730 | 339,449,090 |
| 2033 | 324,033,460 | 13,035,000 | 2,098,780 | 15,133,780 | 339,167,240 |
| 2034 | 324,571,922 | 12,940,000 | 1,393,915 | 14,333,915 | 338,905,837 |
| 2035 | 325,102,497 | 12,850,000 | 694,408 | 13,544,408 | 338,646,905 |
| 2036 | 316,899,647 | - | - | - | 316,899,647 |
| 2037 | 261,619,297 | - | - | - | 261,619,297 |
| 2038 | 261,625,160 | - | - | - | 261,625,160 |
| 2039 | 196,795,235 | - | - | - | 196,795,235 |
| 2040 | 160,022,510 | - | - | - | 160,022,510 |
| 2041 | 160,018,903 | - | - | - | 160,018,903 |
| 2042 | 118,272,296 | - | - | - | 118,272,296 |
| 2043 | 84,921,848 | - | - | - | 84,921,848 |
| 2044 | 60,588,099 | - | - | - | 60,588,099 |
| 2045 | 60,595,352 | - | - | - | 60,595,352 |
| 2046 | 14,579,250 | - | - | - | 14,579,250 |
| Total | $11,287,197,926 | $297,945,000 | $232,452,138 | $530,397,138 | $11,817,595,064 |

(1) Excluding the Reoffered Bonds

Upon the reoffering of the Reoffered Bonds, the remaining average life of the Highway Revenue Bonds and the Transportation Revenue Bonds will be approximately 17.53 years.

## TAX EXEMPTION

*Opinion of Sidley Austin Brown & Wood LLP.*

In connection with the original issuance of the Reoffered Bonds, Sidley Austin Brown & Wood LLP (now, Sidley Austin LLP), as bond counsel to the Authority, stated the following with respect to the Reofferred Bonds, the Series G Transportation Revenue Bonds and the Series 2003 Subordinated Transportation Revenue Bonds (collectively, the "2003 Bonds"):

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which requirements the Authority must continue to meet after the issuance of the 2003 Bonds in order that interest on the 2003 Bonds is not included in gross income for federal income tax purposes. The Authority's failure to meet these requirements may cause interest on the 2003 Bonds to be included in gross income for federal income tax purposes, retroactive to their date of issuance. The Authority has covenanted to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the 2003 Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth, which would prevent the Authority from complying with the requirements of the Code.

In the opinion of Sidley Austin Brown and Wood and subject to continuing compliance by the Authority with the tax covenant referred to above, under the provisions of the Acts of Congress and under regulations, rulings and court decisions then in force, interest on the 2003 Bonds will not be includable in gross income for federal income tax purposes. Interest on the 2003 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. Interest on the 2003 Bonds, however, is includable in the computation of the alternative minimum tax on corporations imposed by the Code. Sidley Austin Brown & Wood LLP rendered no opinion on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as is provided for in the documents pertaining to the 2003 Bonds) or in reliance upon the advice of counsel other than such firm on the exclusion from gross income of the interest on the 2003 Bonds for federal income tax purposes. Sidley Austin Brown & Wood LLP, as bond counsel, further opined that, under the provisions of the Acts of Congress then in force, the 2003 Bonds and the interest thereon were exempt from state, Commonwealth and local income taxation.

*Opinion of Nixon Peabody LLP.*

In the opinion of Nixon Peabody LLP, Bond Counsel to the Authority, under existing laws, the conversion of the Reoffered Bonds to the fixed rate mode and the reoffering of the Reoffered Bonds under the terms contained in the Resolutions and the resolution of the Authority relating to the conversion and reoffering of the Reoffered Bonds, will not cause the interest on the Reoffered Bonds to be includable in the gross income of owners for Federal income tax purposes. Bond Counsel has expressed no tax opinion as to any other event or matter occurring subsequent to the original issuance of the Reoffered Bonds and Bond Counsel expresses no opinion with respect to the treatment of the Reoffered Bonds and the interest thereon for purposes of state, Commonwealth of Puerto Rico and local taxation.

### Ancillary Tax Matters.

Ownership of the Reoffered Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit. Ownership of the Reoffered Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Reoffered Bonds; for certain bonds issued during 2009 and 2010, the American Recovery and Reinvestment Act of 2009 modifies the application of those rules as they apply to financial institutions. Prospective investors are advised to consult their own tax advisors regarding these rules.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Reoffered Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations. In addition, interest on the Reoffered Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any federal tax matters other than those described in the opinion attached as Appendix II-A. Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Reoffered Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

### Changes in Law and Post Issuance Events

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Reoffered Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Reoffered Bonds. This could result from changes to federal or state income tax rates, changes in the structure of federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Reoffered Bonds from gross income for federal or state income tax purposes, or otherwise. It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the federal or state income tax treatment of holders of the Reoffered Bonds may occur. Prospective purchasers of the Reoffered Bonds should consult their own tax advisers regarding such matters.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Reoffered Bonds may affect the tax status of interest on the Reoffered Bonds. Bond Counsel expresses no opinion as to any federal, state or local tax law consequences with respect to the Reoffered Bonds, or the interest thereon, if any action is taken with respect to the Reoffered Bonds or the proceeds thereof upon the advice or approval of other counsel.

### REOFFERING AGREEMENT

The Underwriters have agreed, jointly and severally, subject to certain conditions, to purchase the Reoffered Bonds for reoffering at a price equal to their principal amount. In accordance with the Bond Resolution and the Reoffering Agreement, the Underwriters will be paid an aggregate reoffering fee of $1,736,644.12. The obligation of the Underwriters to purchase the Reoffered Bonds is subject to certain conditions precedent. The Underwriters will be obligated to purchase all the Reoffered Bonds, if any such bonds are purchased. The Underwriters may offer to sell the Reoffered Bonds to certain dealers (including dealers depositing the Reoffered Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed, from time to time, by the Underwriters. The Authority has agreed to indemnify the Underwriters, to the extent permitted by law, against certain liabilities, including liabilities under federal securities laws, or to contribute to payments that the Underwriters may be required to make in respect thereof.

J.P. Morgan Securities Inc. ("JPMSI"), one of the Underwriters of the Reoffered Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Reoffered Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS& Co. will purchase Reoffered Bonds from JPMSI at the original issue price less a negotiated portion of the selling concession applicable to any Reoffered Bonds that CS&Co. sells. JPMSI has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Reoffered Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Reoffered Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets Corporation ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Reoffered Bonds as part of the consideration for their professional services.

Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## LITIGATION

Siemens Transportation Project Puerto Rico S.E., ("STT") one of the main contractors involved in the design, construction and implementation of the Tren Urbano project, and other related parties filed suit against the Authority in 2003 for a variety of claims arising out of this project. Such claims included breach of contract and damages relating to withheld amounts and acceleration of work. The first claims totaled $50 million. In 2004 the Authority filed counterclaims for $100 million, the liquidated damages specified in the Tren Urbano contracts. The litigation process is currently stayed pending the outcome of settlement negotiations. As a result of amendments to the original claims and counterclaims, the plaintiffs and the Authority now seek approximately $114 million and $233 million, respectively. In addition, the Authority has claims pending against third party defendants of approximately $34 million, while third party defendants have filed their own counterclaims of approximately $211 million. As of June 10, 2010, a settlement had been reached with Siemens and Acciona/NESCO Entrecanales, the major parties to the litigation. Negotiations are underway with the two other remaining parties and are expected to conclude by the end of the year. The Authority does not expect the outcome of this case to have a material negative effect on its operations.

In 2001, Redondo Construction Corp. ("RCC") filed a complaint in the US District Court for the District of Puerto Rico. In the complaint, RCC alleged that the Authority, the Puerto Rico Public Buildings Authority and several officers of the Government of Puerto Rico had violated its civil rights by prohibiting RCC from bidding on and entering into contracts with the government of the Commonwealth and thus caused RCC damages in the amount of $50 million. Shortly after such filing, RCC filed for bankruptcy. In 2002 and 2003 RCC filed four different adversary proceedings against the Authority claiming in excess of $30 million plus interest. In 2008, the complaint filed in the US District Court was dismissed with prejudice in regard to its federal law claims and without prejudice in regards to its state law claims. In 2010, RCC filed an appeal to the US Court of Appeals seeking the reversal of the dismissal. This appeal is currently pending. In 2009, RCC also asserted its dismissed state law claims from the US District Court case in a complaint filed in local court seeking damages in excess of $50.0 million. This proceeding is still in the early stages. In 2010, the US Bankruptcy Court entered judgments relating to the adversary

proceedings in amounts approximating $30 million plus interest. The Authority is currently appealing all four judgments.

In 2005 a class action lawsuit was filed against the Authority on behalf of approximately 300 irregular employees who were suspended or whose contracts were not renewed by the Authority, claiming that Law 172 of June 30, 2004 had the effect of naming them to regular positions. The plaintiffs are seeking damages, including retroactive payment of salaries and benefits. The total amount of the claims has not been determined but each identified plaintiff has filed a claim of at least $400,000.00. The next step in the case is a hearing to determine whether recurring funds existed in amounts sufficient to have allowed the Authority to hire any of the plaintiffs. Depending on the outcome of the hearing, the case may continue to the discovery phase. The Authority is defending this case actively and aggressively.

There is no pending litigation of any nature restraining or enjoining or seeking to restrain or enjoin the issuance, sale or delivery of the Reoffered Bonds or in any way contesting or affecting the validity of the Reoffered Bonds, the resolutions or the proceedings of the Authority taken with respect to the authorization, issuance or sale thereof, or the pledge or application of any moneys under the 1968 Resolution, the 1998 Resolution, or the existence or powers of the Authority.

The Authority is involved as defendant in various legal proceedings arising in the normal course of its business. Many of these proceedings involve claims against the Authority based on breach of contract, claims for additional compensation under construction contracts, claims for damages from automobile accidents allegedly caused by alleged defects in highway construction or maintenance, claims relating to condemnation of property, challenges to public bidding procedures conducted by the Authority, and employment related claims, among others. The Authority and its General Counsel do not believe that liability from any such legal proceedings, in excess of available insurance coverage and the provision for losses not covered by insurance, as shown on the financial statements, will have a material adverse effect on the financial condition of the Authority.

## ENVIRONMENTAL MATTERS

The Authority seeks compliance with Commonwealth and federal laws and guidance that require environmental evaluations for all National Environmental Policy Act ("NEPA") actions and approvals. When a NEPA document needs to be prepared, the Environmental Studies Office of the Authority conducts an evaluation and prepares the documentation, such as Categorical Exclusion Reviews, Finding of Not Significant Impacts, or Environmental Impacts Statements. In all cases, the documents are submitted to the FHWA for review, comments or approval. Consultations between the Puerto Rico Department of Transportation, FHWA, and State and federal agencies are performed in all projects and may be repeated or continued if major changes have occurred in the projects, or if a substantial time period elapses after the last major project action.

The Authority uses a computer management system in a systematic approach to identifying and managing its environmental obligations and issues that can complicate many aspects of the NEPA process. With this computerized system the Authority can increase its operating efficiency during the environmental phase, design phase and construction activities.

The Authority faces environmental issues typical for a government agency responsible for construction and maintenance of highways and related public works. As of the date of this Reoffering Circular, the Authority is in material compliance with federal and Commonwealth environmental laws and is not aware of any environmental issues which could have a material adverse effect on the Authority and its operations.

## LEGAL MATTERS

The forms of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, and the original opinions issued by Sidley Austin at the time of issuance of the Reoffered Bonds are set forth in Appendix II to this Reoffering Circular. Certain legal matters will be passed upon for the Underwriters by O'Neill & Borges, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Reoffered Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## GOVERNMENT DEVELOPMENT BANK

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the reoffering of the Reoffered Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Reoffered Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as Underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Series AA-1 Bonds (the Insured Bonds) have been rated "Aa3 (negative outlook)" by Moody's and "AAA (negative outlook)" by Standard & Poor's based on the Policy issued by AGM. The Series AA-2 Bonds have been rated "A2" by Moody's and "BBB+" by Standard & Poor's. The Series H Bonds have been rated "A3" by Moody's and "BBB" by Standard & Poor's.

The ratings reflect only the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by any or all of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Reoffered Bonds.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Authority, as specifically stated hereinbelow, will agree to the following:

1.     Each of the Authority and the Commonwealth will agree to file within 305 days after the end of each fiscal year, beginning with its fiscal year ending on June 30, 2010, with the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), core financial information and operating data for the prior fiscal year, including (i) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority and the Commonwealth, as the case may be, and information as to revenues, expenditures, financial operations and indebtedness of the Authority and the Commonwealth, as the case may be, in each case, generally found or incorporated by reference in this Reoffering Circular; and

2.     The Authority will agree to file, in a timely manner not in excess of ten business days of the occurrence of the event, with EMMA, notice of any failure to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the Reoffered Bonds:

(a)     principal and interest payment delinquencies;
(b)     non-payment related defaults, if material;
(c)     unscheduled draws on debt service reserves reflecting financial difficulties;
(d)     unscheduled draws on credit enhancements reflecting financial difficulties;
(e)     substitution of credit or liquidity providers, or their failure to perform;

(f) adverse tax opinions or the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the security, or other material events affecting the tax-exempt status of the Bonds;

(g) modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

(h) bond calls, if material;

(i) defeasances;

(j) release, substitution, or sale of property securing repayment of the Bonds, if material;

(k) rating changes;

(l) bankruptcy, insolvency, receivership or similar events;

(m) the consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions other than pursuant to its terms, if material; and

(n) appointment of a successor or additional trustee or the change of name of a trustee, if material.

With respect to the following events:

Events (c) and (d). For a description of the Reoffered Bonds, see "THE REOFFERED BONDS." The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (e). For information on the tax status of the Reoffered Bonds, see "TAX EXEMPTION."

Event (g). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Reoffering Circular under "The Reoffered Bonds-Redemption of the Reoffered Bonds," (ii) the only open issue is which Reoffered Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondholders as required under the terms of the Reoffered Bonds, the 1968 Resolution or 1998 Resolution, and (iv) public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 3423856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Reoffered Bonds.

The Commonwealth expects to provide the information described in (1) above by delivering the first bond official statement of the Commonwealth or of any instrumentality of the Commonwealth that includes its financial statements for the preceding fiscal year and operating data generally containing the information set forth in the Commonwealth Report or, if no official statement is issued by the 305 day deadline, by delivering such Commonwealth Report and the Commonwealth Annual Financial Report by such deadline.

The Authority has complied with its continuing disclosure obligations during the five years preceding the date of this reoffering circular.

The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007, and 2008 were filed after the Commonwealth's filing deadline because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying the submission of the Commonwealth's audited financial statements. On May 1, 2010, the Commonwealth filed a notice with EMMA stating that the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 would not be provided on the date specified in the Commonwealth's continuing disclosure agreements, but would be filed on or before July 31, 2010. The Commonwealth Report for the 2009 fiscal year was filed on May 1, 2010.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above whether or not, such other events are material with respect to the Reoffered Bonds, but

the Authority does not undertake to provide any such notice of the occurrence of any event, except those events, if material, listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Reoffered Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all Beneficial Owners of the outstanding Reoffered Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Sections 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth, and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Reoffered Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Commonwealth; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1968 Resolution and 1998 Resolution, the various acts and the Reoffered Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions.

There are appended to this Reoffering Circular the audited financial statements of the Authority for the fiscal years ended June 30, 2008 and 2009 together with the report of Kevane Grant Thornton LLP (Appendix I), the proposed forms of opinions of Bond Counsel and the original opinion of Sidley Austin (Appendix II), the Summary of the 1968 Resolution (Appendix III), the Summary of the 1998 Resolution (Appendix IV), the letter of the Traffic Engineers (Appendix V), and specimen of the bond insurance policy insuring the Insured Bonds (Appendix VI).

The financial statements of the Authority included in Appendix I and the Commonwealth Financial Statements have been audited by Kevane Grant Thornton LLP, San Juan, Puerto Rico, and KPMG LLP, San Juan, Puerto Rico, respectively, as set forth in their respective reports therein. The prospective financial information of the Authority included in this Reoffering Circular has been prepared by, and is the responsibility of the management of the Authority. Kevane Grant Thornton LLP has neither examined nor compiled the prospective financial information, and accordingly, Kevane Grant Thornton LLP does not express an opinion or any other form of assurance with respect thereto. The Kevane Grant Thornton LLP report included in Appendix I to this Reoffering Circular relates to the historical financial information of the Authority. Such report does not extend to any prospective financial information (whether or not contained in this Reoffering Circular) and should not be read to do so. The information in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is incorporated by reference in this Reoffering Circular on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC was supplied by DTC. The remaining information set forth in this Reoffering Circular, except the information appearing in "REOFFERING AGREEMENT," was supplied by the Executive Director of the Authority in his official capacity and is included in this Reoffering Circular on his authority.

This Reoffering Circular will be filed with the MSRB through EMMA.

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**

By: _____/s/ Rubén A. Hernández Gregorat_____

Secretary of Transportation and Public Works and
Executive Director PRHTA

Case:17-03283-LTS Doc#:702-16 Filed:09/27/21 Entered:09/27/21 15:96:48 Desc:
Exhibit 16 Page 53 of 157

[THIS PAGE INTENTIONALLY LEFT BLANK]

Case:17-30159-LTS Doc#:102-16 Filed:08/27/21 Entered:08/27/21 15:96:48 Desc:
Exhibit 16 Page 54 of 157

APPENDIX I



Financial Statements and Report of Independent
Certified Public Accountants

## Puerto Rico Highways and Transportation Authority

(A Component Unit of the Commonwealth of Puerto Rico)

June 30, 2009 and 2008

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Table of Contents

Report of Independent Certified Public Accountants ................................................................................................. 1-2

Management's Discussion and Analysis ................................................................................................................... 3-11

Financial Statements:

    Statements of Net Assets ..................................................................................................................................... 12-13

    Statements of Revenues, Expenses and Changes in Net Assets .................................................................. 14

    Statements of Cash Flows ................................................................................................................................... 15-16

Notes to Financial Statements ................................................................................................................................. 17-47

Required Supplementary Information:

    Schedule of Funding Progress for Retiree Health Plan ................................................................................ 48

Report of Independent Auditors on Compliance and Internal Control over
Financial Reporting in Accordance with Government Auditing Standards ........................................... 49-50


Kevane
**Grant Thornton**

REPORT OF INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS

**Kevane Grant Thornton LLP**
33 Calle Bolivia
Ste 400
San Juan, Puerto Rico 00917-2013

T +1 787 754 1915
F +1 787 751 1284
www.kevane.com

Hon. Ruben Hernandez Gregorat, Secretary
Department of Transportation and Public Works,
Commonwealth of Puerto Rico

We have audited the accompanying statement of net assets of Puerto Rico Highways and Transportation Authority (the Authority), a component unit of the Commonwealth of Puerto Rico, as of June 30, 2009 and the related statements of revenues, expenses and changes in net assets, and cash flows for the year then ended. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audit. The financial statements of Puerto Rico Highways and Transportation Authority as of June 30, 2008, were audited by other auditors whose report dated September 19, 2008, expressed an unqualified opinion on those statements.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statements presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Puerto Rico Highways and Transportation Authority at June 30, 2009, and the changes in its net assets and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

In accordance with *Government Auditing Standards*, we have also issued our report, dated December 22, 2009, on our consideration of the Authority's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts and grants agreements and other matters. The purpose of that report is to describe the scope of our testing of internal control over financial reporting and compliance and the results of that testing, and not to provide an opinion on the internal control over financial reporting or on compliance. That report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be considered in assessing the results of our audit.

The management's discussion and analysis information on pages 3 through 11 and the schedule of funding progress for retiree health plan on page 47 are not a required part of the basic financial statements but is supplementary information required by accounting principles generally accepted in the United States of America. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the required supplementary information. However, we did not audit the information and express no opinion on it.

This report is intended solely for the information and use of the Board of Directors and management of the Authority and the Department of Treasury of the Commonwealth of Puerto Rico and is not intended to be and should not be used by anyone other than these specified parties.

Kevane Grant Thornton LLP

San Juan, Puerto Rico,
December 22, 2009.

2462533



2

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Management Discussion and Analysis
### Years ended June 30, 2009 and 2008

The following discussion and analysis of the financial performance and activity of the Puerto Rico Highways and Transportation Authority (the Authority) provides an introduction and understanding of the basic financial statements of the Authority for the fiscal years ended June 30, 2009 and 2008. This discussion was prepared by management and should be read in conjunction with the financial statements and the notes thereto, which follows this section.

### Financial Highlights for 2009

- Net assets totaled $4,456.4 million at June 30, 2009.
- Net assets decreased by $270.2 million in 2009, as compared to a decrease of approximately $238 million in 2008.
- Net capital assets totaled $11,303.6 million at June 30, 2009.
- Net capital assets decreased by .16% at June 30, 2009, when compared with the balance at June 30, 2008 of $11,321.5 million.

### Financial Highlights for 2008

- Net assets totaled $4,726.7 million at June 30, 2008.
- Net assets decreased $268.1 million in 2008, as compared to a decrease of $190.1 million in 2007.
- Net capital assets totaled $11,321.5 million at June 30, 2008.
- Net capital assets increased by 1% at June 30, 2008, when compared with the balance at June 30, 2007 of $11,239.2 million.

### The Financial Statements

The basic financial statements provide information about the Authority's business-type activities. The financial statements are prepared in accordance with U.S. generally accepted accounting principles as promulgated by the Governmental Accounting Standards Board (GASB).

### Overview of the Financial Statements for Business-Type Activities

The financial statements consist of the: (1) statement of net assets, (2) statement of revenues, expenses, and changes in net assets, (3) statement of cash flows, and (4) notes to the financial statements. The financial statements are prepared on the accrual basis of accounting, meaning that all expenses are recorded when incurred and all revenues are recognized when earned, in accordance with U.S. generally accepted accounting principles.

### Statement of Net Assets

The statement of net assets reports all financial and capital resources of the Authority. The statement is presented in the format where assets equal liabilities plus net assets. Assets are presented in order of liquidity and are classified as current (convertible into cash within one year) and noncurrent. The focus of the statement of net asset is to show a picture of the liquidity and health of the Authority as of the end of the year.

3

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Management Discussion and Analysis
### Years ended June 30, 2009 and 2008

The Authority's net assets are reported in the following categories:

- *Net Assets Invested in Capital Assets, Net of Related Debt* — this component of net assets consists of all capital assets, reduced by the outstanding balances of any bonds, notes, or other borrowings that are attributable to the acquisition, construction, or improvement of those assets. Although the Authority's investment in its capital assets is reported net of related debt, it is noted that the resources required to repay this debt must be provided annually from operations and from gasoline and petroleum taxes allocated annually by the Commonwealth of Puerto Rico, since the capital assets themselves cannot be used to liquidate liabilities.

- *Restricted for Debt Service* — this component of net assets consists of restricted assets for the principal and interest payments of the bonds payable. This restriction is imposed by the bondholders through debt covenants.

- *Restricted for Construction* — this component of net assets consists of restricted assets for the specific purpose of pay the construction projects. This restriction is imposed by the grantors and contributors, as well as the bondholders through debt covenants.

- *Unrestricted Net Assets* — this component consists of net assets that do not meet the definition of net assets invested in capital assets, net of related debt, or restricted for debt service or for construction.

### Statement of Revenues, Expenses, and Changes in Net Assets

The statement of revenues, expenses, and changes in net assets includes operating revenues, which consist of toll, train fares, impact fee and other, and operating expenses, such as costs of operating the mass transportation system, administrative expenses, and depreciation on capital assets; and non-operating revenue and expenses, such as gasoline, diesel, oil and petroleum taxes, vehicle license fee, interest and investment income, and interest expense. The focus of the statement of revenues, expenses, and changes in net assets is the change in net assets. This is similar to net income or loss and portrays the results of operations of the Authority for the entire operating period.

### Statement of Cash Flows

The statement of cash flows discloses net cash provided by or used for operating activities, investing activities, noncapital financing activities, and from capital and related financing activities. This statement also portrays the health of the Authority in that current cash flows are sufficient to pay current liabilities.

### Notes to Financial Statements

The notes to financial statements are an integral part of the basic financial statements and describe the significant accounting policies, related-party transactions, deposits and investments, capital assets, capital lease obligations, bonds payable, long-term liabilities, defined-benefit pension plans, derivative financial instruments, and the commitments and contingencies. The reader is encouraged to review the notes in conjunction with the management discussion and analysis and the financial statements.

4

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

**Management Discussion and Analysis**
Years ended June 30, 2009 and 2008

Financial Analysis of the Authority's Business-Type Activities

*Statements of Net Assets*

The following table reflects a condensed summary of assets, liabilities, and net assets of the Authority as of June 30, 2009, 2008, and 2007:

| | June 30, | | |
| --- | --- | --- | --- |
| | **2009** | **2008** | **2007** |
| **Assets:** | | | |
| Current assets | $ 55,545,027 | $ 88,421,458 | $ 79,864,357 |
| Restricted assets | 828,078,353 | 800,883,622 | 863,277,527 |
| Capital assets, net | 11,303,575,031 | 11,321,489,657 | 11,239,182,666 |
| Other assets | 124,046,633 | 131,820,569 | 160,370,993 |
| Total assets | $12,311,245,044 | $ 12,342,615,306 | $ 12,342,695,543 |
| | | | |
| **Liabilities:** | | | |
| Current liabilities | $ 495,524,891 | $ 524,953,981 | $ 366,094,476 |
| Long-term liabilities, net | 7,359,318,355 | 7,090,993,767 | 6,981,861,473 |
| Total liabilities | $ 7,854,843,246 | $ 7,615,947,748 | $ 7,347,955,949 |
| | | | |
| **Net Assets:** | | | |
| Investment in capital assets, net of related debt | $ 3,842,733,290 | $ 3,991,522,521 | $ 4,142,081,412 |
| Restricted for debt service | 595,340,428 | 576,138,901 | 634,835,969 |
| Restricted for construction | 41,763,134 | 47,590,565 | 71,674,452 |
| Unrestricted | (23,435,054) | 111,415,571 | 146,147,761 |
| Total net assets | 4,456,401,798 | 4,726,667,558 | 4,994,739,594 |
| Total liabilities and net assets | $12,311,245,044 | $ 12,342,615,306 | $ 12,342,695,543 |

*June 30, 2009*

Current assets decreased by 37 % to $55.5 million. The change in current assets is primarily due to a decrease in overnight deposits under repurchase agreements.

Restricted assets increased by 3% to $828.06 million. The increased consist basically due to an increased in the investment with trustee at June 30, 2009.

5

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Management Discussion and Analysis
### Years ended June 30, 2009 and 2008

Capital assets decreased by .16% to $17,914.6 million due to a decrease in construction in progress and increase in the accumulated depreciation of approx $50 million in the Transportation System (Urban Train). Capital assets are funded mainly with the proceeds of bonds and notes and with capital grants from the Federal Highways Administration (FHWA) and Federal Transit Administration (FTA). Total capital grants from FHWA and FTA during fiscal year 2009 and used to fund capital assets amounted to approximately $128.7 million.

Other assets decreased by 6% to $124.05 million due to a decrease on revenues bonds issuance cost resulting from the current year amortization.

Current liabilities decreased by 5% to $495 million. The factors that caused this decrease was mainly the net effect of an increase in balances due to suppliers offset by a decrease in balances due to contractors and non-revolving lines of credit.

Long-term liabilities increased by 4% to $7,359 million due principally to a net effect of a decrease in bonds payable and an increase in lines of credit and legal reserve.

Net assets decreased by 5% to $4,456.4 million principally due to a reduction on the Investment in capital assets, net of related debt and unrestricted net assets.

#### *June 30, 2008*

Current assets increased by 11% to $88.4 million. The change in current assets is primarily due to an increase in overnight deposits acquired under repurchase agreements.

Restricted assets decreased by 7% to $800.9. This decrease consist principally of a decrease in amounts deposited in construction fund of $75 million for amounts disbursed for construction cost during the year and a decrease in receivables from capital grants due to the completion level of certain projects net of an increase in sinking fund reserves for the payment of bond principal and interest.

Capital assets increased by 1% to $11,321.5 million due to the Authority's capital improvement program. Capital assets are funded with the proceeds of bonds and notes and with capital grants from the Federal Highways Administration (FHWA) and Federal Transit Administration (FTA). Total capital grants received from FHWA and FTA during fiscal year 2009 and used to fund capital assets amounted to approximately $158.8 million.

Other assets decreased by 18% to $131.8 million due to the current year amortization of the bond issue cost and a decrease in amount due from the Department of Transportation and Public Work (DTPW). The balance due by DTPW as of June 30, 2007 was reduced this fiscal year 2008 through charges to repairs of roads and bridges.

Current liabilities increased by 43% to $525.0 million. This increase consist principally of an increase in accounts payable and accrued liabilities and construction contracts payable of $50 million, an increase in line of credit of $83.6 million, an increase in accrued interest payable of $14.5 million, and an increase in current portion of bonds payable of $18 million net of a decrease in checks issued over bank balance of $8.5 million.

# Puerto Rico Highways and Transportation Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

**Management Discussion and Analysis**
**Years ended June 30, 2009 and 2008**

Long-term liabilities increased by 1% to $7,091.0 million due principally to the issue of $200 million of Subordinated Transportation Revenue Bonds (Series 2007B and 2008A) net of bonds paid during the fiscal year 2008.

Net assets decreased by 5% to $4,726.7 million. This decrease was the result of an excess of expenses over revenues (both operating and non-operating) and capital grants of $268.1 million. The largest portion of the Authority's net assets represents its investment in capital assets net of related debt outstanding used to acquire those capital assets.

### *Statements of Revenues, Expenses and Changes in Net Assets*

The following table reflects a condensed summary of the revenues, expenses, and changes in net assets for the three years ended on June 30, 2009, 2008 and 2007.

|  | 2009 | 2008 | 2007 |
|---|---|---|---|
| Operating revenues | $ 229,161,530 | $ 239,549,405 | $ 249,334,483 |
| Operating expenses | 319,279,141 | 299,822,186 | 266,849,286 |
| Depreciation and amortization | 401,846,189 | 388,378,256 | 368,500,526 |
| Operating loss | (491,963,800) | (448,651,037) | (386,015,329) |
| Non-operating revenues | 325,902,272 | 325,882,395 | 333,972,123 |
| Non-operating expenses | (280,640,613) | (304,087,854) | (264,779,600) |
| Loss before capital grants | (446,702,141) | (426,856,496) | (316,822,806) |
| Capital grants | 176,436,381 | 158,784,460 | 126,717,771 |
| Change in net assets | (270,265,760) | (268,072,036) | (190,105,035) |
| Net Assets at beginning of year | 4,726,667,558 | 4,994,739,594 | 5,184,844,629 |
| Net Assets at end of year | $ 4,456,401,798 | $ 4,726,667,558 | $ 4,994,739,594 |

### *Year Ended June 30, 2009*

Operating revenues, which consisted of toll fares, train fares and other revenues decreased by 4.53% to $229.1 million mainly due to a decrease in toll fares of $6.2 million and a decrease in impact fee of $5.7 million. This decrease is due to a reduction in patronage during fiscal year 2009 as a result of general economic conditions.

Operating expenses increased by 6% to $319.2 million mainly due to the net effect of an increase in the legal reserve of $30 million and decrease in salaries and related benefits as a result of a change in the capitalization policy for the year ended June 30, 2008.

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

### Management Discussion and Analysis
### Years ended June 30, 2009 and 2008

Non-operating revenues, which consist principally of gasoline, oil, diesel and petroleum taxes and vehicle license fees allocated by the Commonwealth of Puerto Rico to the Authority, maintained in line with prior year, it reflected an increase of .08%.

Non-operating expenses, which consist principally of interest expense on bonds and line of credit, transfers and construction work performed for other government agencies, net of investment income, decreased by 8% to $280.6 million. This decrease is due to a decrease in transfers and construction work performed for other government agencies.

### *Year Ended June 30,* 2008

Operating revenues, which consisted of toll and train fares, decreased by 4% to $239.5 mainly due to a decrease in toll fares of $7.2 million and a decrease in train fares of $3.7 million. This decrease is due to a decrease in patronage during fiscal year 2008 as a result of general economic conditions.

Operating expenses increased by 12% to $299.8 mainly due to a decrease in expenses capitalized during fiscal year 2008 to construction in process of approximately $30 million.

Non-operating revenues, which consist principally of gasoline, oil, diesel and petroleum taxes and vehicle license fees allocated by the Commonwealth of Puerto Rico to the Authority, decreased by 2% to $325.9 million. This decrease is mainly due to a decrease of $8.1 million in gasoline, oil, diesel and petroleum taxes due to general economic conditions such as the increase in cost of petroleum during the year, net of an increase of vehicle license fee of $2.9 million.

Non-operating expenses, which consist principally of interest expense on bonds and line of credit, transfers and construction work performed for other government agencies, net of investment income, increased by 15% to $304.1. This increase is due to an increase interest on bonds and line of credit during fiscal year 2008 of $22 million, an increase in transfers and construction work performed for other government agencies of $26.5 million net of an increase in investment income of $9.1 million.

### CAPITAL ASSETS AND DEBT ADMINISTRATION

### Capital Assets

At June 30, 2009, the Authority had invested approximately $11,303.6 million in capital assets (net of related depreciation) including roads, bridges, transportation equipment, buildings, land and equipment and construction in progress. At June 30, 2008, the Authority had invested approximately $11,321.5 million in capital assets.

At the end of fiscal year 2005, the Authority started operating the mass rail transportation system for the San Juan Metropolitan area known as "Tren Urbano". The Authority incurred approximately $2.42 billion in costs, $685.7 million paid with federal funds, for this project which consists of approximately 17 km. of track running from Bayamón to Santurce. Maintenance services are partially funded with capital grants from Federal Transit Administration (FTA). Total capital grants received from FTA during fiscal year 2009 and used for maintenance services amounted to $21.4 million.

The Authority entered into a five-year contract for the operation and maintenance of the system with a private company, which expires on June 5, 2010, with an option to extend the term for an

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

## Management Discussion and Analysis
### Years ended June 30, 2009 and 2008

additional five (5) years. Under this agreement, the private company is responsible for operating and maintaining Tren Urbano and is entitled to receive for such services an annual base compensation, subject to inflation adjustment for changes in cost of labor and materials. The base compensation does not include the cost of insurance and electricity which is paid by the Authority.

### Debt Administration

By the end of fiscal year 2009, the principal amount of the Highways and Senior Transportation, and Grant Anticipation Revenues Bonds outstanding, net of unamortized discounts and net losses on advance refunding, which approximated $7,033.4 million, are insured and rated Baa3 by Moody's Investors Service (Moody's) and BBB by Standard & Poor's (S&P) for the Senior Bonds and BBB+ for the other Bonds. The remaining uninsured bonds are rated Baa1 by Moody's and A by S&P, except for the Subordinated Transportation Revenue Bonds, which are rated Aaa and A-, respectively.

On May 1, 2008, the Authority issued $400 million of Subordinated Transportation Revenue Bonds (Series 2008A). The Proceeds from the Series 2008A were used to repay the Subordinated Transportation Revenue Bonds from Series 2006A, 2007A and 2007B.

The Authority's bond sales must be approved by the Secretary of Transportation and Public Works, who exercises the powers of the Governing Board of the Authority in coordination with the Government Development Bank for Puerto Rico and the Fiscal Agent of the Commonwealth of Puerto Rico. The Authority must comply with certain rules and regulations of the United States Treasury Department and the United States Securities and Exchange Commission relating to such sales.

In connection with the issuance of the CPI and LIBOR Bonds, the Authority has entered into interest rate swap agreements. In general, the swap agreements provides that, subject to the terms thereof, the Authority will pay to the swap provider a fixed rate and the swap provider will pay to the Authority a floating rate based on the CPI or LIBOR Rate, based on a notional amount equal to the principal amount of the CPI and LIBOR Bonds outstanding. The purpose of the swap agreement is generally to convert the Authority's floating rate obligations with respect to the CPI and LIBOR Bonds to fixed rate obligations.

### ECONOMIC FACTORS AND NEXT YEAR'S BUDGET

The economy of Puerto Rico must be analyzed as a region of the U.S. economy, since it is part of the U.S. monetary and banking system, and it is located within its custom and territorial boundaries. The main driver of the Puerto Rico economy is a huge external sector closely tied to the flow of merchandise, tourists, and capital between Puerto Rico and the Mainland. Thus, historically, the real growth rate of the Puerto Rico economy has followed that of the U.S. economy, except in periods of energy crisis, when the rise in oil prices exerted a more profound negative effect on the level of economic activity in Puerto Rico. According to the NBER, the U.S. economy entered into a recessionary period in December 2007, which turned into a deep recession in the third quarter of 2008, concurrent with a U.S. and globally financial and housing market crises. The current recession has been the longest and deepest since the Great Depression of the thirties. In this period of what has been called the Great Recession, the U.S. economy experienced declines in real GDP at annual rates of -5.4% in the fourth quarter of 2008 and -6.4% in the first quarter of 2009. In terms of fiscal

9

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Management Discussion and Analysis
### Years ended June 30, 2009 and 2008

years, U.S. real GDP dropped by -2.25% in fiscal year 2009, posting its first decline in the present decade. In fiscal year 2009, the U.S. economy also lost 3.2 million payroll jobs and the average annual unemployment rate rose from 4.95% in fiscal year 2008 to 7.57% in fiscal year 2009.

Real GNP of the Puerto Rico economy declined by more than -5.0% in fiscal year 2009, a negative record since the Great Depression, as anticipated by the Interamerican Econometric Model and later confirmed by the Planning Board. This steep decline in Puerto Rico real GNP was caused by the interaction of several factors, mainly the substantial magnitude of the U.S. and global economic crises, combined with the negative effects of the fiscal crisis of the Puerto Rico Central Government and a substantial overbuilding in the housing sector. However, in spite of the volatility of oil and gasoline prices during fiscal year 2009, the average price of gasoline dropped from $3.24 per gallon in fiscal year 2008 to $2.51 per gallon in fiscal year 2009, posting a decline of 73 cents per gallon or 20%. This decline in gasoline prices contributed to offset the negative impact of the recession on gasoline and other petroleum products consumption, as well as Authority's revenues.

We must emphasize that in spite of the adverse macroeconomic environment prevailing in fiscal year 2009, the Authority was able to achieve a level of recurrent revenues, excluding train fares and financial revenues, close to the level attained in fiscal year 2008. The total of the main five categories of recurrent revenues amounted to $532.5 million, a drop of only $6.1 million over the amount collected in fiscal year 2008 ($538.6 million), which can be mainly attributed to negative structural and extraordinary factors affecting diesel tax revenues and toll revenues.

Gasoline tax revenues amounted to $174.6 million in fiscal year 2009, a figure similar to that of fiscal year 2008 ($174.7 million). Gasoline tax revenues remained stable in spite of the adverse recessionary conditions, due to the favorable impact of the 20% decline in gasoline prices. The lower level of gasoline and petroleum products prices also contributed to a moderate 2.3% increase in revenues of the special petroleum products tax, which rose from $99.04 million in fiscal year 2008 to $101.3 million in fiscal year 2009. Revenues from the tax on diesel oil dropped from $18.08 in fiscal year 2008 to $13.86 million in fiscal year 2009, a decline of $4.22 million. This decline was mainly due to a lower consumption of taxable Fuel # 2 (Middle Distillates) from the Electric Power Authority (AEE), which contributes with more than fifty percent to total diesel tax revenues. The lower consumption of the Fuel #2 by the AEE was caused by the reopening of the Palo Seco generating plant, which fully operated in fiscal year 2009, and the decline of -5.36% in electricity generation caused by recessionary economic conditions, which tend to affect more negatively the demand for high cost Fuel #2. Toll revenues were negatively affected by the recession and a special structural factor associated with a temporary, but significant, decline in toll revenues from PR-53 plazas, when toll collection was changed from two to only one direction. Total revenues from toll plazas amounted to $208.01[1] million in fiscal year 2009, a drop of $4.62 million, of which $2.1 million or 45% can be attributed to the decline in revenues of PR-53, and about $1.0 million to the decline in revenues in September of 2008 due to floods associated with hurricane Kyle. Revenues from the motor vehicles license fees increased for a second year in a row, rising from $34.0 million in fiscal year 2008 to $36.3 million in fiscal year 2009, in spite of a significant drop in new vehicle registration. This increase was probably due to the payment of Treasury's for license fees collected prior to fiscal year 2009.

---

[1] Total toll revenues during fiscal year 2009 does not include $1.5 million of deferred revenues.

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

**Management Discussion and Analysis**
**Years ended June 30, 2009 and 2008**

A weak macroeconomic environment is expected to persist in fiscal year 2010, due to a modest recovery in the U.S. economy, without any significant growth in Puerto Rico real GNP, as projected by the Inter American University Econometric Model. We must emphasize that in spite of the turnaround to a positive growth in the U.S. economy in the third quarter of 2009, at an annual rate of 2.8%, in fiscal year 2010 the U.S. economy is expected to achieve only a meager growth of 0.26% in terms of real GDP, posting another loss of 4.0 million payroll jobs and a 10% average unemployment rate. The Puerto Rico economy is expected to enter into a recovery phase in the second semester of fiscal year 2010, with the help of the U.S. recovery and the positive impact of the Federal and local stimulus plans. However, in spite of a weak macroeconomic environment in fiscal year 2010, operating revenues of the Authority, excluding train fares and investment income, are expected to expand moderately to a level of $541.5 million in fiscal year 2010, posting an increase of $9.0 million or 1.7% over fiscal year 2009. The behavior of main recurrent revenues in the first four months of fiscal year 2010 shows encouraging signs. In the first four months of the current fiscal year 2010, revenues from the gasoline tax amounted to $58 million, showing an increase of 2.78% over the same period of last year. A decline of 29% in gasoline prices in the period of July-October 2009 over a year ago was the main factor contributing to the increase in gasoline demand. The behavior of toll revenues is even more encouraging. In the period July-October 2009, toll revenues amounted to $69.35 million, surpassing by $1.87 million or 2.8% the level attained in the same period of 2008.

## CONTACTING THE AUTHORITY'S FINANCIAL MANAGEMENT

This financial report is designed to provide our bondholders, patrons, and other interest parties with a general overview of the Authority's finances and to demonstrate the Authority's accountability for the money it receives. If you have question or need additional financial information, contact the Puerto Rico Highways and Transportation Authority, Finance Area, P.O. Box 42007, San Juan, Puerto Rico 00940-2007.

11

# Puerto Rico Highways and Transportation Authority

(A Component Unit of the Commonwealth of Puerto Rico)

**Statements of Net Assets**
June 30, 2009 and 2008

Assets

| | 2009 | 2008 |
|---|---|---|
| **Current assets:** | | |
| Cash and cash equivalents | $ 30,718,499 | $ 80,245,810 |
| Accounts receivable, net of allowance for doubtful accounts of $41,722,944 and $41,603,899 in 2009 and 2008, respectively | 22,833,588 | 5,568,799 |
| Prepaid expenses and other assets | 1,992,940 | 2,606,849 |
| Total current assets | 55,545,027 | 88,421,458 |
| **Restricted assets:** | | |
| Cash and cash equivalents | 41,964,963 | 38,618,433 |
| Cash and investments with trustee | 774,515,123 | 746,764,187 |
| Receivables- | | |
| Puerto Rico Treasury Department | 227,311 | 227,310 |
| US Federal Government | 10,199,758 | 13,954,161 |
| Accrued interest and other | 1,171,198 | 1,319,531 |
| Total restricted assets | 828,078,353 | 800,883,622 |
| **Capital assets:** | | |
| Land | 1,821,795,129 | 1,812,808,155 |
| Construction work in progress | 925,870,443 | 1,014,081,507 |
| Transportation system, net | 2,227,825,827 | 2,276,213,343 |
| Roads and bridges, net | 6,297,724,618 | 6,192,020,421 |
| Equipment, vehicles and other, net | 30,359,014 | 26,366,231 |
| Total capital assets | 11,303,575,031 | 11,321,489,657 |
| **Revenue bonds issuance cost,** net of accumulated amortization of $40,860,894 and $33,086,958 in 2009 and 2008, respectively | 124,046,633 | 131,820,569 |
| **Advances to governmental entity,** net of of allowance for doubtful accounts of $18,790,466 and $15,059,802 in 2009 and 2008, respectively | - | - |
| Total Assets | $ 12,311,245,044 | $ 12,342,615,306 |

The accompanying notes are an integral part of these financial statements.

# Puerto Rico Highways and Transportation Authority

## (A Component Unit of the Commonwealth of Puerto Rico)

**Statements of Net Assets**
**June 30, 2009 and 2008**

### Liabilities and Net Assets

|  | 2009 | 2008 |
|---|---:|---:|
| **Current liabilities:** | | |
| Checks issued over bank balance | $ 7,554,582 | $ 13,105,773 |
| Accounts payable | 82,916,894 | 22,486,343 |
| Accrued and other liabilities | 33,890,789 | 26,939,756 |
| Non-revolving lines of credit | - | 83,570,729 |
| Liabilities payables from restricted assets- | | |
| Accounts and subcontracts payable | 110,090,406 | 140,896,349 |
| Accrued interest payable | 156,982,220 | 154,015,031 |
| Current portion of bonds payable | 104,090,000 | 83,940,000 |
| Total current liabilities | 495,524,891 | 524,953,981 |
| **Long- term debt:** | | |
| Accrued legal claims | 62,404,000 | 31,940,000 |
| Accrued vacations and sick leave | 16,260,794 | 14,354,584 |
| Non-revolving lines of credit | 351,313,000 | - |
| Bonds payable, net | 6,929,340,561 | 7,044,699,183 |
| Total long-term debt | 7,359,318,355 | 7,090,993,767 |
| Total liabilities | 7,854,843,246 | 7,615,947,748 |
| **Net assets:** | | |
| Investment in capital assets, net of related debt | 3,842,733,290 | 3,991,522,521 |
| Restricted for debt service | 595,340,428 | 576,138,901 |
| Restricted for construction | 41,763,134 | 47,590,565 |
| Unrestricted | (23,435,054) | 111,415,571 |
| Total net assets | 4,456,401,798 | 4,726,667,558 |
| Total liabilities and net assets | $ 12,311,245,044 | $ 12,342,615,306 |

The accompanying notes are an integral part of these financial statements.

# Puerto Rico Highways and Transportation Authority

**(A Component Unit of the Commonwealth of Puerto Rico)**

**Statements of Revenues, Expenses and Changes in Net Assets**
**Years ended June 30, 2009 and 2008**

|  | 2009 | 2008 |
|---|---|---|
| **Operating revenues:** | | |
| Toll and train fares | $ 217,683,308 | $ 223,258,672 |
| Impact fee and other | 11,478,222 | 16,290,733 |
| Total operating revenues | 229,161,530 | 239,549,405 |
| **Operating expenses:** | | |
| Salaries and related benefits | 25,429,180 | 54,733,004 |
| Toll highways administration and maintenance | 31,563,122 | 23,992,384 |
| Train operating and maintenance costs | 75,510,088 | 73,068,072 |
| Integrated transportation system | 27,228,909 | 29,707,530 |
| Repairs and maintenance of roads and bridges | 67,825,049 | 66,463,401 |
| Utilities | 12,084,121 | 14,555,321 |
| Other | 79,638,672 | 37,302,474 |
| Total operating expenses | 319,279,141 | 299,822,186 |
| **Operating loss before depreciation** | | |
| **and amortization** | (90,117,611) | (60,272,781) |
| **Depreciation and amortization** | 401,846,189 | 388,378,256 |
| **Operating loss** | (491,963,800) | (448,651,037) |
| **Non-operating income (expenses):** | | |
| Gasoline, diesel, oil and petroleum tax revenues | 289,593,522 | 291,840,831 |
| Vehicle license fee | 36,308,750 | 34,041,564 |
| Interest on bonds and line of credit | (316,175,096) | (286,603,283) |
| Interest and investment income | 38,585,898 | 38,298,408 |
| Transfers and construction work performed | | |
| for other government agencies | (3,051,415) | (55,782,979) |
| Total non-operating income | 45,261,659 | 21,794,541 |
| **Loss before capital grants** | (446,702,141) | (426,856,496) |
| **Capital grants** | 176,436,381 | 158,784,460 |
| **Change in net assets** | (270,265,760) | (268,072,036) |
| **Net assets at beginning of the year** | 4,726,667,558 | 4,994,739,594 |
| **Net assets at end of year** | $ 4,456,401,798 | $ 4,726,667,558 |

The accompanying notes are an integral part of these financial statements.                                        14

## Puerto Rico Highways and Trasnportation Authority

(A Component Unit of the Commonwealth of Puerto Rico)

**Statements of Cash Flows**
Years ended June 30, 2009 and 2008

|  | 2009 | 2008 |
|---|---:|---:|
| **Operating activities:** |  |  |
| Receipts from toll and train fares | $ 208,160,045 | $ 223,258,672 |
| Receipts from other sources | 11,478,222 | 20,136,669 |
| Payments to employees and related benefits | (23,655,471) | (52,064,753) |
| Payments to suppliers for goods and services | (198,781,931) | (212,533,234) |
| Net cash flows used in operating activities | (2,799,135) | (21,202,646) |
| **Non-capital financing activities:** |  |  |
| Transfers and construction work performed |  |  |
| for other government agencies | (3,051,415) | (55,782,979) |
| Payment for bonds issuance cost | - | (123,500) |
| Net change in checks issued over bank balance | (5,551,191) | (8,467,850) |
| Net cash flows used in non-capital financing activities | (8,602,606) | (64,374,329) |
| **Capital and related financing activities:** |  |  |
| Receipts from US Federal Government grants | 180,190,784 | 168,885,655 |
| Acquisition and construction of capital assets, net of |  |  |
| capitalized interest | (373,660,653) | (386,639,014) |
| Receipts from gasoline, petroleum and |  |  |
| vehicle license fees | 321,899,709 | 334,385,542 |
| Net advances from line of credit | 267,742,271 | 83,570,729 |
| Proceeds from bond issuance | - | 200,000,000 |
| Payments to retire bonds | (83,940,000) | (66,020,000) |
| Interest paid | (357,994,446) | (326,520,052) |
| Net cash flows (used in) provided by capital and |  |  |
| related financing activities | (45,762,335) | 7,662,860 |
| **Investing activities:** |  |  |
| Payments for cash and investments with Trustee | (440,866,210) | (303,607,361) |
| Deposits to cash and investments with Trustee | 413,969,061 | 357,733,810 |
| Investment and interest income received | 37,880,444 | 34,806,242 |
| Net cash flows provided by investing activities | 10,983,295 | 88,932,691 |
| **Net (decrease) increase in cash and cash equivalents** | (46,180,781) | 11,018,576 |
| **Cash and cash equivalents at beginning of year** | 118,864,243 | 107,845,667 |
| **Cash and cash equivalents at end of year** | $ 72,683,462 | $ 118,864,243 |

The accompanying notes are an integral part of this statement. 15

# Puerto Rico Highways and Trasnportation Authority

(A Component Unit of the Commonwealth of Puerto Rico)

## Statements of Cash Flows
Years ended June 30, 2009 and 2008

| | | | |
|---|---:|---:|---:|
| **Reconciliation to cash and cash equivalents** | | | |
| **presented in the statements of net asstes:** | | | |
| Cash and cash equivalents | $ | 30,718,499 | $ 80,245,810 |
| Cash and cash equivalents - restricted | | 41,964,963 | 38,618,433 |
| Total | $ | 72,683,462 | $ 118,864,243 |
| | | | |
| **Reconciliation of operating loss to net cash flows** | | | |
| **provided by operating activities:** | | | |
| Operating loss | $ | (491,963,800) | $ (448,651,037) |
| Adjustments to reconcile operating loss to net | | | |
| cash flows used in operating activities: | | | |
| Depreciation and amortization | | 401,846,189 | 388,378,256 |
| Loss on disposition of assets | | 216,464 | - |
| Decrease in amount due from government | | | |
| entities through charges to repairs of | | | |
| roads and bridges | | - | 20,246,663 |
| Net change in operating asstes and liabilities: | | | |
| Accounts receivable | | (17,264,789) | 3,845,936 |
| Prepaid expenses and other assets | | 613,909 | 274,046 |
| Accounts payable | | 60,430,551 | 12,035,239 |
| Accrued liabilities | | 10,952,131 | (994,843) |
| Accrued legal claims | | 30,464,000 | |
| Accrued vacations and sick leave | | 1,906,210 | 3,663,094 |
| Net cash flows used in operating activities | $ | (2,799,135) | $ (21,202,646) |
| | | | |
| **Supplemental cash flows information** | | | |
| **(Non-cash transaction):** | | | |
| Bonds defeased in issuance of bonds | $ | - | $ 400,000,000 |
| | | | |
| Capital appreciation bonds | $ | 5,207,054 | $ 5,508,099 |

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

## (1) Organization and summary of significant accounting policies:

### (a) Organization -

Puerto Rico Highways and Transportation Authority ("the Authority") is a public corporation and instrumentality of the Commonwealth of Puerto Rico, created by Act No. 74 of June 23, 1965, as amended, to provide roads and other facilities for the movement of persons, vehicles and vessels, and for the planning, promotion and feasibility of mass transportation systems. The Authority is a component unit of the Commonwealth of Puerto Rico and accordingly is included in the general-purpose financial statements of the Commonwealth. The powers normally exercised by a Board of Directors are vested with the Secretary of the Department of Transportation and Public Works (DTPW). The Authority is exempt from the payment of any taxes on its revenues and properties.

### (b) Summary of significant accounting policies:

#### (i) Measurement focus and basis of accounting -

The accounting policies of the Authority conform to generally accepted accounting principles in the United States of America, as promulgated in pronouncements of the Governmental Accounting Standards Board (GASB) and the pronouncements of the Financial Accounting Standards Board (FASB) issued before December 1, 1989, which are not in conflict with GASB pronouncements. As permitted by GASB Statement No. *20 Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities that Use Proprietary Fund Accounting,* the Authority has elected to not apply FASB pronouncements issued after November 30, 1989.

The Authority's operations are accounted for as a proprietary fund (enterprise fund) using the flow of economic resources measurement focus and the accrual basis of accounting. With this measurement focus, all assets and all liabilities associated with the Authority's operations are included on the statement of net assets. Revenue is recognized in the period in which it is earned and expenses are recognized in the period in which incurred.

The Authority accounts for its operations and financings in a manner similar to private business enterprises; the intent is that costs of providing goods or services to the general public on a continuing basis be financed or recovered primarily through user charges.

#### (ii) Cash and cash equivalents -

The Authority considers as cash and cash equivalents all highly liquid investments with original maturities at the date of purchase of three months or less.

#### (iii) Investments -

The Authority follows the provisions of GASB No. 31, "Accounting and Financial Reporting for Certain Investments and for External Investment Pools". This statement requires investments to be reported on the statements of net assets at fair value and investment income, including changes in the fair value of investments, to be reported as non-operating income in the statement of revenues, expenses and changes in net assets. Fair values have been determined using quoted market values at June 30, 2009 and 2008.

17

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements
## June 30, 2009 and 2008

**(iv) Allowance for doubtful accounts -**

The allowance for doubtful accounts is an amount that management believes will be adequate to absorb possible losses on existing accounts receivable that may become uncollectible based on evaluations of collectibility of accounts receivable and prior credit loss experience. Because of uncertainties inherent in the estimation process, management's estimate of credit losses inherent in the existing accounts receivable and related allowance may change in the future.

**(v) Capital assets:**

Cost basis-

Capital assets are recorded at historical cost or estimated historical cost. The cost of property and equipment includes costs for infrastructure assets (rights-of-way and bridge substructures and highways and bridges), toll facilities, equipment and other related costs (including software), buildings and furniture and equipment. Highways and bridge substructures include road sub-base, grading, land clearing, embankments, and other related costs. Costs for infrastructure assets include construction costs, design and engineering fees and administrative and general expenses paid from construction monies.

Capitalization policy-

Infrastructure capital assets (road, bridges, highways, transportation equipment, etc.) are defined by the Authority as assets with an initial, individual cost of more than $500,000 and an estimated useful life of more than one year. Other capital assets, such as equipment, vehicles, etc. are defined by the Authority as assets with an initial individual cost of more than $100 and an estimated life of more than three years.

Costs to acquire additional capital assets, which replace existing assets or otherwise prolong their useful lives, are generally capitalized.

The costs of normal maintenance and repairs that do not add to the value of the assets or materially extend assets lives are not capitalized.

Interest cost is capitalized as part of the historical cost of acquiring certain assets. To qualify for interest capitalization, assets must require a period of time before they are ready for their intended purpose. Interest earned on proceeds of tax-exempt borrowings arrangements restricted for the acquisition of qualifying assets is offset against interest cost to determine the net amount to be capitalized. Interest cost is not capitalized on costs paid with the proceeds of grants or donations restricted solely for construction.

Depreciation of capital assets-

Depreciation is provided using the straight-line method over an estimated useful live of 40 years for roads and highways, 50 years for bridges and transportation system and 10 years for equipment, vehicles and other.

Impairment of capital assets-

The Authority has implemented GASB No. 42, *Accounting and Financial Reporting for Impairment of Capital Assets and for Insurance Recoveries*. The objective of GASB 42 is to establish accounting and financial reporting standards for impairment of capital assets. A capital asset is considered

18

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements
June 30, 2009 and 2008

impaired when its service utility has declined significantly and unexpectedly. This statement also clarifies and establishes accounting requirements for insurance recoveries.

Governments are required to evaluate prominent events or changes in circumstances affecting capital assets to determine whether impairment of a capital asset has occurred. Such events or changes in circumstances that may be indicative of impairment include evidence of physical damage, enactment or approval of laws or regulations or other changes in environmental factors, technological changes or evidence of obsolescence, changes in the manner or duration of use of a capital asset, and construction stoppage among others.

The Authority evaluated its capital assets as required by GASB 42 and no impairment was identified during the years ended June 30, 2009 and 2008.

### (vi) Claims and judgments -
The estimated amount of the liability for claims and judgments is recorded on the accompanying statements of net assets based on the Authority's evaluation of the probability of an unfavorable outcome in the litigation of such claims and judgments. The Authority consults with legal counsel upon determining whether an unfavorable outcome is expected. Because of uncertainties inherent in the estimation process, management's estimate of the liability for claims and judgments may change in the future.

### (vii) Vacation and sick leave -
Employees earn annual vacation leave at the rate of 30 days per year up to a maximum permissible accumulation of 60 days for regular employees. Employees accumulate sick leave at the rate of 18 days per year. Sick leave is only payable if the regular employee resigns and has more than 10 years of employment, or retires and takes a pension. Maximum permissible accumulation for sick leave is 90 days for all employees, and the excess is paid within the next year. The Authority records as a liability and as an expense the vested accumulated vacation and sick leave as benefits accrue to employees.

### (viii) Unamortized gains/losses on advance refunding -
Gains/losses resulting from current or advance refunding of debt are deferred and amortized over the shorter of the life of the new debt and the remaining life of old debt. The amount deferred is reported as a reduction of the debt and the amount amortized is reported as a component of interest expense.

### (ix) Bond premiums/discounts and bond issuance costs -
Bond premiums/(discounts) are presented in the accompanying statements of net assets as an increase/reduction of the face amount of bonds payable. Bond issuance costs are presented as a deferred asset in the accompanying statements of net assets. The premiums/(discounts) and issuance costs are amortized over the life of the bonds on a method that approximates the effective interest method. Amortization related to bond premium/(discounts) was approximately $22,091,600 and $23,044,300 for the years ended June 30, 2009 and 2008, respectively, and is included as a component of interest expense in the accompanying statements of revenues, expenses and changes in net assets.

19

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements
### June 30, 2009 and 2008

Depreciation and amortization expense in the accompanying statements of revenues, expenses and changes in net assets includes amortization of bond issuance costs for the years ended June 30, 2009 and 2008 of approximately $7,773,900 and $8,427,300, respectively.

**(x) Net assets –**
Net assets are classified in the following four components in the accompanying statements of net assets:

Invested in Capital Assets, Net of Related Debt-
This component of net assets consist of capital assets net of accumulated depreciation and reduced by the outstanding balance of any bonds, mortgages, notes, or other borrowings that are attributable to the acquisition, construction or improvement of those assets. If there are significant unspent related debt proceeds at year end, the portion of the debt attributable to the unspent proceeds is not included in the calculation of this component of net assets. Rather, that portion of the debt is included in the same net asset component as the unspent proceeds.

Restricted for Debt Service-
Net assets restricted for debt service consists of restricted assets for payment of principal and interest related to bonds payable. This restriction is imposed by the bondholders through debt covenants.

Restricted for Construction-
Net assets restricted for construction consists of restricted assets for the specific purpose of financing the construction projects. This restriction is imposed by the grantors and contributors, as well as the bondholders through debt covenants.

Unrestricted-
Unrestricted net assets consist of net assets that do not meet the definition of "restricted for debt service", "restricted for construction" or "invested in capital assets, net of related debt".

**(xi) Revenues recognition –**
The Authority distinguishes operating revenues and expenses from non-operating items. Revenues associated with toll and train fares are recorded as operating revenues when cash is received. Expenses related to the administration and maintenance of toll highways and transportation system, repair and maintenance of roads and bridges, and administrative expenses are recorded as operating expenses. All other revenues and expenses are considered non-operating.

Non-operating revenues consist principally of gasoline, diesel, oil and petroleum taxes and vehicle license fees which are allocated to the Authority by the Commonwealth of Puerto Rico as approved by law to finance the acquisition and construction of capital assets and for the payment of the related debt. These taxes and fees are recorded as non-operating revenues at the moment of the Puerto Rico Treasury Department collect such taxes and inform the Authority of such collection.

**(xii) Contributions –**
Contributions are funds assigned by the federal and local governments, agencies and/or private companies such as Federal Highway Administration (FHWA), Federal Transit Administration (FTA), and Federal Emergency Management Agency (FEMA) to the Authority for the exclusive

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Notes to Financial Statements
June 30, 2009 and 2008

purpose of the construction of specific projects or infrastructure repairs and maintenance. Capital grants of the Authority are reported as non-operating revenues rather than contributed capital as required by GASB Statement No 33, *Accounting and Financial Reporting for Nonexchange Transactions*.

**(xiii) Financial instruments -**

The Authority uses derivative financial instruments to manage the economic impact of fluctuations in interest rates. The Authority follows the provision of Government Accounting Standards Board (GASB) Technical Bulletin No. 2003-1, Disclosure Requirements for Derivatives Not Reported at Fair Value on the Statement of Net Assets, in accounting for its derivative financial instruments.

**(xiv) Use of estimates -**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the period. Actual results could differ from those estimates.

The implementation of Statement 34, *Basic Financial Statements and Management's Discussion and Analysis for State and Local Governments* (GASB No. 34) involved the use of assumptions and estimates in the determination of the cost of general infrastructure assets, such as roads, highways, bridges and land. The cost of such assets was estimated based on current costs for similar assets deflated using the general price index through the estimated average age of the assets.

**(xv) Reclassifications -**

Certain reclassifications have been made to the 2008 figures to conform to current year's presentation.

**(xvi) Newly issued accounting pronouncements -**

In June 2007, GASB issued Statement No. 51, "Accounting and Financial Reporting for Intangible Assets." This statement requires that all intangible assets not specifically excluded by its scope provisions be classified as capital assets. Accordingly, existing authoritative guidance related to the accounting and financial reporting for capital assets should be applied to these intangible assets, as applicable. This statement also provides authoritative guidance that specifically addresses the nature of these intangible assets. Such guidance should be applied in addition to the existing authoritative guidance for capital assets. The provisions of this statement are effective for periods beginning after June 15, 2009. Management has not completed its determination of the impact on the financial statements once the provisions of this statement are implemented.

In June 2008, GASB issued Statement No. 53, "Accounting and Financial Reporting for Derivative Instruments". This statement requires the requires to measure most derivative instruments at fair value in their financial statements that are prepared using the economic resources measurements focus and the accrual basis of accounting. The statement also addresses hedge accounting requirements. The provisions of this statement are effective for periods beginning after June 15, 2009. Management has not completed its determination of the impact on the financial statements once the provisions of this statement are implemented.

21

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

(xvii)  **Risk financing** -
The Authority carries commercial insurance to cover casualty, theft, claims and other losses. The current insurance policies have not been cancelled or terminated. The Authority has not settled any claims in excess of its insurance coverage during the three years. The Authority also pays premiums for workers compensation insurance to another component unit of the Commonwealth of Puerto Rico.

(2)  **Cash and cash equivalents:**

Cash and cash equivalents at June 30, 2009 and 2008 consist of:

|  | 2009 | 2008 |
|---|---|---|
| Cash on hand and in banks | $  5,856,485 | $  12,324,212 |
| Repurchase agreements | 24,310,038 | 67,377,322 |
| Certificates of deposit | 551,976 | 544,276 |
| Total | $  30,718,499 | $  80,245,810 |

Cash and cash equivalents includes overnight deposits acquired under repurchase agreements with Economic Development Bank (EDB) and Government Development Bank (GDB) in the amounts of $15 million and $49 million at June 30, 2009 and 2008, respectively. These deposits are exempt from collateral and therefore are subject to custodian credit risk. The remaining balance of $9 million and $18 million at June 30, 2009 and 2008, respectively, of the repurchase agreements is collateralized by US Government Securities.

22

## Puerto Rico Highways and Transportation Authority
### (A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

**(3)  Accounts receivable:**

Accounts receivable at June 30, 2009 and 2008 consist of:

|  | 2009 | 2008 |
|---|---|---|
| Government agencies and other | $ 56,009,919 | $ 40,727,830 |
| Rent receivables | 3,879,264 | 3,758,814 |
| Repairs to highways | 1,329,768 | 1,291,234 |
| Other | 3,337,581 | 1,394,820 |
| Total | 64,556,532 | 47,172,698 |
| Less allowance for doubtful accounts | 41,722,944 | 41,603,899 |
| Accounts receivable, net | $ 22,833,588 | $ 5,568,799 |

**(4)  Restricted cash and investments with trustee:**

Restricted cash and investments with Trustee at June 30, 2009 and 2008 consist of:

|  | 2009 | 2008 |
|---|---|---|
| **Cash and cash equivalents:** | | |
| Cash on hand and in banks | $ 4,667,133 | $ 4,817,171 |
| Cash held by: | | |
| Puerto Rico Treasury Department | 19,723,037 | 21,465,640 |
| Government Development Bank | 8,151,426 | 3,774,574 |
| Puerto Rico State Infrastructure | | |
| Bank Deposit | 9,423,367 | 8,561,048 |
| Total | $ 41,964,963 | $ 38,618,433 |
| **Cash and investments with trustee:** | | |
| Cash and cash equivalents | $ 148,562,360 | $ 335,837,098 |
| Guaranteed investment contracts | 348,369,351 | 337,881,130 |
| US Government securities | 253,676,115 | 63,335,882 |
| Mortgage backed securities | 23,907,297 | 9,710,077 |
| Total | $ 774,515,123 | $ 746,764,187 |

23

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

At June 30, 2009 and 2008 the above amounts were restricted to comply with long-term principal and interest debt service requirements or for construction of transportation facilities. These restricted assets are held by the Fiscal Agent under the Bonds Resolutions in the following funds and accounts:

*1968 Reserve Account* - Reserve for payment of principal of and interest on Highway Revenue Bonds in the event moneys in Bond Service Account or Redemption Account under Resolution 68-18 are insufficient for such purpose.

*1968 Bond Service Account and Redemption Account* (Sinking Fund under Resolution 68-18) - Current year requirements for principal and interest on Highway Revenue Bonds.

*1998 Senior Reserve Account* - Reserve for payment of principal and interest on Senior Transportation Revenue Bonds in the event moneys in Senior Bond Service Account Senior Bond Redemption Account under Resolution 98-06 are insufficient for such purpose.

*1998 Senior Bond Service Account and Senior Bond Redemption Account* (Senior Bond Sinking Fund under Resolution 98-06) - Current year requirements for principal and interest on Senior Transportation Revenue Bonds.

*1998 Subordinated Reserve Fund* - Reserve for payment of principal of and interest on Subordinated Transportation Revenue Bonds in the event moneys in Subordinated Bond Service Account or Subordinated Bond Redemption Account under Resolution 98-06 are insufficient for such purpose.

*1998 Subordinated Bond Service Account and Subordinated Bond Redemption Account* (Subordinated Bond Sinking Fund under Resolution 98-06) - Current year requirements for principal of and interest on Subordinated Transportation Revenue Bonds.

*1998 Construction Fund* - Special fund created by the Resolution 98-06. The proceeds of any Transportation Revenue Bonds issued for the purpose of paying the cost of acquiring or constructing transportation facilities, together with the money received from any other source for such purpose, except proceeds which are (i) applied to the repayment of advances, (ii) deposited in the 1998 Senior Bond Reserve Account or 1998 Subordinated Bond Reserve Fund, (iii) deposited in the 1998 Senior or Subordinated Bond Service Account as capitalized interest or (iv) used for the payment of financing expenses, shall be deposited in the 1998 Construction Fund and held by the Fiscal Agent in trust.

*2004 Grant Anticipation Bond Reserve Account* - Reserve for payment of principal and interest on 2004 Grant Anticipation Bonds in the event insufficient funds for such purpose are available in the Bond Payment Fund.

24

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements
### June 30, 2009 and 2008

At June 30, 2009 and 2008 amounts held by Fiscal Agent in the above accounts amounts to (in thousands):

|  | 2009 | | 2008 |
|---|---|---|---|
| 1968 Reserve Account | $ 143,185 | $ | 148,285 |
| 1968 Sinking Fund | 89,275 | | 87,781 |
| 1998 Senior Reserve Account | 290,645 | | 279,516 |
| 1998 Senior Sinking Fund | 148,647 | | 124,004 |
| 1998 Subordinated Reserved Fund | 42,153 | | 42,154 |
| 1998 Subordinated Sinking Fund | 21,235 | | 21,111 |
| 1998 Contruction Fund | 26,455 | | 31,617 |
| 2004 Grant Anticipation Reserve Account | 12,920 | | 12,297 |
| Total | $ 774,515 | $ | 746,765 |

Deposits in Puerto Rico Infrastructure Bank (SIB) represent funds held by Government Development Bank (GDB) related to the establishment of a state infrastructure bank account, which is dedicated solely to provide loans or other form of financial assistance consistent with the National Highway System Designation Act of 1995. The SIB is funded by a matching share agreement whereby on or before the date the Authority receives a Federal payment, the Authority must deposit an amount equal to at least 25% of such payment. These time deposits are held in the Authority's name.

## (5) Deposits and investments:

The following disclose essential risk information about deposits and investments as required by Governmental Accounting Standard Board Statement No. 40, *Deposits and Investments Risk Disclosures*.

The Authority is restricted by law to deposit funds only in institutions approved by the Puerto Rico Treasury Department, and such deposits are required to be kept in separate accounts in the name of the Authority. Resolutions 68-18, 98-06 and 04-18 (the Bond Resolutions) require that moneys in the debt service funds be held by Bank of New York (the Fiscal Agent) in trust and applied as provided in the Bond Resolutions.

Pursuant to the Investment Guidelines for the Commonwealth adopted by Government Development Bank for Puerto Rico ("GDB"), the Authority may invest in obligations of the Commonwealth, obligations of the United States, certificates of deposit, commercial paper, repurchase agreements, banker's acceptances, or in pools of obligations of the municipalities of Puerto Rico, among others. Monies in the sinking funds can only be invested in direct obligations of the United States government, or obligations unconditionally guaranteed by the United States government, and/or interest-bearing time deposits, or other similar arrangements, as provided by the Bond Resolutions.

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

### Custodian credit risk - deposits
For deposits, custodial credit risk is the risk that in the event of bank failure, the Authority's deposits may not be returned to it. Under Puerto Rico statutes public funds deposited in commercial bank must be fully collateralized for the amount deposited in excess of federal depository insurance. All securities pledged as collateral are held by the Secretary of the Treasury of the Commonwealth of Puerto Rico. The bank balance of the Authority's deposit at June 30, 2009 and 2008 amounts to $22.1 million and $117.6 million, respectively.

As of June 30, 2009 and 2008, the Authority's custodial credit risk was approximately $55.5 million and $100.3 million, respectively, which is the bank balance of cash deposited, including repurchase agreements, at the Government Development Bank and Economic Development Bank for Puerto Rico and the Department of Treasury of the Commonwealth of Puerto Rico. These deposits are exempt from the collateral requirement established by the Commonwealth.

### Custodian credit risk – investments
For an investment, custodial credit risk is the risk that in event of the failure of the counterparty, the Authority will not be able to recover the value of its investment or collateral securities that are in the possession of an outside party. The Authority invests in prime investments with a minimum quality rating of A1 Moody's or Standard and Poor's. In addition, investment in bond sinking funds are limited to investments in direct obligations of the United States government, or obligations unconditionally guaranteed by the United States government, and/or interest-bearing time deposits, or other similar arrangements, as provided by the Bond Resolutions.

The Authority holds guaranteed investment contracts with a fair value of $348 million and $338 million at June 30, 2009 and 2008, respectively. These investments are guaranteed by US Government Securities.

Providers of guaranteed investment contracts as of June 30, 2009 and 2008 are as follows:

|  | 2009 | 2008 |
|---|---|---|
| Societe Generale | $ 79,845,253 | $ 79,729,203 |
| Bank of New York | 63,795,587 | 63,308,300 |
| Banks of America | 46,883,778 | 46,883,778 |
| FSA Capital Management Service | 44,674,424 | 44,674,425 |
| Citigroup Financial Product, Inc. | 40,092,954 | 39,414,850 |
| First Union National Bank | – | 37,358,373 |
| Wachovia Bank NA | 26,512,201 | 26,512,201 |
| Westdeutsche Landesbank | 46,565,154 | – |
| Total | $ 348,369,351 | $ 337,881,130 |

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Notes to Financial Statements
June 30, 2009 and 2008

#### Interest rate risk

Interest rate risk is the risk that changes in interest rates will adversely affect the fair value of an investment. Generally, the longer the maturity of an investment, the greater the sensitivity of its fair value is to changes to market interest rate. Maturities of restricted cash and investments with Trustee at June 30, 2009, are as follows:

|  | Maturiting From/To | Fair Market Value |
|---|---|---|
| Cash and cash equivalents | N/A | $ 148,562,360 |
| Guaranteed investments contracts | 7/2009-7/2045 | 348,369,351 |
| US Government and agencies securities | 12/2011-2/2023 | 253,676,115 |
| Mortgage backed securities | 11/2014-1/2023 | 23,907,297 |
| Total |  | $ 774,515,123 |

All investments have been classified as Aaa by Standard & Poors.

#### (6)  Advances to governmental entity:

Advances to governmental entity at June 30, 2009 and 2008, consist principally of advances made by the Authority to the Department of Transportation and Public Works of the Commonwealth of Puerto Rico ("DTPW") to carry-out its participation in the construction improvement program of the Authority. These advances are reduced by the Authority through charges made by DTPW for repairs and maintenance of roads and bridges.

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Notes to Financial Statements
June 30, 2009 and 2008

**(7) Capital assets:**

The following schedule summarizes the capital assets held by the Authority as of June 30, 2009 and 2008:

| | Balance at June 30, 2008 | Increases | Decreases | Balance at June 30, 2009 |
|---|---|---|---|---|
| **Assets not being depreciated:** | | | | |
| Land | $ 1,812,808,155 | $ 8,986,974 | $ - | $ 1,821,795,129 |
| Construction in progress | 1,014,081,507 | 263,908,154 | (352,119,218) | 925,870,443 |
| Total | 2,826,889,662 | 272,895,128 | (352,119,218) | 2,747,665,572 |
| **Assets being depreciated:** | | | | |
| Transportation system | 2,419,375,826 | - | - | 2,419,375,826 |
| Roads | 10,782,705,241 | 371,787,316 | - | 11,154,492,557 |
| Bridges | 3,198,354,587 | 73,321,100 | - | 3,271,675,687 |
| Equipment, vehicles and other | 88,295,101 | 10,578,104 | (1,796,677) | 97,076,528 |
| Total | 16,488,730,755 | 455,686,520 | (1,796,677) | 16,942,620,598 |
| Less accumulated depreciation | (7,994,130,760) | (394,072,253) | 1,491,874 | (8,386,711,139) |
| Total asstes being depreciated | 8,494,599,995 | 61,614,267 | (304,803) | 8,555,909,459 |
| Total capital assets | $ 11,321,489,657 | $ 334,509,395 | $ (352,424,021) | $ 11,303,575,031 |

| | Balance at June 30, 2007 | Increases | Decreases | Balance at June 30, 2008 |
|---|---|---|---|---|
| **Assets not being depreciated:** | | | | |
| Land | $ 1,768,566,254 | $ 44,241,901 | $ - | $ 1,812,808,155 |
| Construction in progress | 1,228,571,191 | 398,728,768 | (613,218,452) | 1,014,081,507 |
| Total | 2,997,137,445 | 442,970,669 | (613,218,452) | 2,826,889,662 |
| **Assets being depreciated:** | | | | |
| Transportation system | 2,418,980,649 | 395,177 | - | 2,419,375,826 |
| Roads | 10,215,869,622 | 566,835,619 | - | 10,782,705,241 |
| Bridges | 3,134,852,859 | 64,339,955 | (838,227) | 3,198,354,587 |
| Equipment, vehicles and other | 89,510,531 | 1,408,792 | (2,624,222) | 88,295,101 |
| Total | 15,859,213,661 | 632,979,543 | (3,462,449) | 16,488,730,755 |
| Less accumulated depreciation | (7,617,168,440) | (379,950,955) | 2,988,675 | (7,994,130,760) |
| Total asstes being depreciated | 8,242,045,221 | 253,028,548 | (473,774) | 8,494,599,995 |
| Total capital assets | $ 11,239,182,666 | $ 695,999,217 | $ (613,692,226) | $ 11,321,489,657 |

The Authority capitalized interest for approximately $33.5 million and $44.2 million during the years ended June 30, 2009 and 2008, respectively.

28

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

### (8) Bonds payable:

The bond resolutions authorize the issuance of revenue bonds to obtain funds to pay the construction and related costs of transportation facilities. Bonds outstanding under the bond resolutions at June 30, 2009 and 2008, consist of:

| | 2009 | 2008 |
|---|---|---|
| **RESOLUTION 68-18:** | | |
| Serial bonds, maturing through 2034 with interest ranging from 3.30% to 6.50% | $ 846,655,000 | $ 888,005,000 |
| Term bonds, maturing through 2039 with interest ranging from 4.00% to 6.00% | 733,670,000 | 733,670,000 |
| Capital appreciation bonds, maturing through 2026 with interest ranging from 4.36% to 4.58% | 22,839,669 | 21,836,622 |
| **RESOLUTION 98-06:** | | |
| Serial bonds, maturing through 2037 with interest ranging from 2.25% to 5.75% | 1,915,630,000 | 1,951,630,000 |
| Term bonds, maturing through 2046 with interest ranging from 2.25% to 5.75% | 2,208,795,000 | 2,208,795,000 |
| Capital appreciation bonds, maturing through 2026 with interest ranging from 4.47% to 5.08% | 88,951,198 | 84,747,191 |
| LIBOR based interest rate bonds maturing through 2045 | 389,060,000 | 389,060,000 |
| Consumer Price Index based interest rate bonds maturing through 2028 | 57,965,000 | 57,965,000 |
| LIBOR based interest rate bonds maturing on August 2009 (See note 16) | 400,000,000 | 400,000,000 |
| Subtotal | $6,663,565,867 | $6,735,708,813 |

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

|  | 2009 | 2008 |
|---|---|---|
| Subtotal from previous page | $ 6,663,565,867 | $6,735,708,813 |
| **RESOLUTION 04-18:** | | |
| Serial bonds, maturing through 2021 with interest ranging from 2.25% to 5.00% | 114,585,000 | 121,175,000 |
| Total bonds outstanding | 6,778,150,867 | 6,856,883,813 |
| Add net unamortized premium | 370,249,091 | 392,340,731 |
| Less unamortized loss on advance refundings | (114,969,397) | (120,585,361) |
| Net bonds payable | 7,033,430,561 | 7,128,639,183 |
| Less current portion | (104,090,000) | (83,940,000) |
| Long-term portion | $ 6,929,340,561 | $7,044,699,183 |

The bonds are secured by a pledge of the gross receipts of the gasoline excise taxes and one half of the diesel oil excise taxes, a maximum of $11 million monthly (but not more than $120 million annually) derived from excise taxes over crude oil and its derivatives, $15 per vehicle per year from motor vehicle license fees, the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority in the future and which the Authority may pledge, proceeds of any tolls or other charges which the Authority may impose for the use of any of its traffic facilities and certain investment earnings.

The proceeds of the gasoline tax, the gas oil and diesel oil tax, the crude oil tax and the motor vehicle license fees allocated to the Authority are available taxes and revenues under the Constitution of the Commonwealth of Puerto Rico. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth, but such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has never applied these revenues for such payments.

The Bond Resolutions further provide that receipts of pledged revenues be deposited in certain accounts with the Fiscal Agent for the payment of interest and principal of the bonds outstanding.

Nothing in the Bond Resolutions is to be construed as preventing the Authority from financing any facilities authorized by the Act that created the Authority, as amended, through the issuance of bonds or other obligations, which are not secured under the provisions of the Bond Resolutions.

On May 1, 2008, the Authority issued $400 million of Subordinated Transportation Revenue Bonds (Series 2008A). The Proceeds from the Series 2008A were used to repay the Subordinated Transportation Revenue Bonds from Series 2006A, 2007A and 2007B.

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements
June 30, 2009 and 2008

A summary roll forward of bonds payable at June 30, 2009 and 2008, are as follows:

|  | Balance 2008 | Issuance accretions | Payments amortization | Balance 2009 | Current portion |
|---|---|---|---|---|---|
| **Serial bonds:** |  |  |  |  |  |
| Resolution 68-18 | $ 888,005,000 | $ - | $ (41,350,000) | $ 846,655,000 | $ 43,920,000 |
| Resolution 98-06 | 1,951,630,000 | - | (36,000,000) | 1,915,630,000 | 53,400,000 |
| Resolution 04-18 | 121,175,000 | - | (6,590,000) | 114,585,000 | 6,770,000 |
| Total | 2,960,810,000 | - | (83,940,000) | 2,876,870,000 | 104,090,000 |
| **Term bonds:** |  |  |  |  |  |
| Resolution 68-18 | 733,670,000 | - | - | 733,670,000 | - |
| Resolution 98-06 | 2,208,795,000 | - | - | 2,208,795,000 | - |
| Total | 2,942,465,000 | - | - | 2,942,465,000 | - |
| **Bond anticipation note** | 400,000,000 | - | - | 400,000,000 | - |
| **CPI based interest rate bonds:** |  |  |  |  |  |
| Resolution 98-06 | 57,965,000 | - | - | 57,965,000 | - |
| **LIBOR based interest rate bonds:** |  |  |  |  |  |
| Resolution 98-06 | 389,060,000 | - | - | 389,060,000 | - |
| **Capital appreciation bonds:** |  |  |  |  |  |
| Resolution 68-18 | 21,836,622 | 1,003,047 | - | 22,839,669 | - |
| Resolution 98-06 | 84,747,191 | 4,204,007 | - | 88,951,198 | - |
| Total | 106,583,813 | 5,207,054 | - | 111,790,867 | - |
| **Total bonds outstanding** | $ 6,856,883,813 | $ 5,207,054 | $ (83,940,000) | $ 6,778,150,867 | $ 104,090,000 |

31

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements
### June 30, 2009 and 2008

| | June 30, 2008 | | | | |
| | Balance 2007 | Issuance accretions | Payments amortization | Balance 2008 | Current portion |
|---|---|---|---|---|---|
| **Serial bonds:** | | | | | |
| Resolution 68-18 | $ 926,025,000 | $ - | $ (38,020,000) | $ 888,005,000 | $ 41,350,000 |
| Resolution 98-06 | 1,973,255,000 | - | (21,625,000) | 1,951,630,000 | 36,000,000 |
| Resolution 04-18 | 127,550,000 | - | (6,375,000) | 121,175,000 | 6,590,000 |
| Total | 3,026,830,000 | - | (66,020,000) | 2,960,810,000 | 83,940,000 |
| | | | | | |
| **Term bonds:** | | | | | |
| Resolution 68-18 | 733,670,000 | - | - | 733,670,000 | - |
| Resolution 98-06 | 2,208,795,000 | - | - | 2,208,795,000 | - |
| Total | 2,942,465,000 | - | - | 2,942,465,000 | - |
| | | | | | |
| **Bond anticipation note** | - | 400,000,000 | - | 400,000,000 | - |
| | | | | | |
| **CPI based interest rate bonds:** | | | | | |
| Resolution 98-06 | 57,965,000 | - | - | 57,965,000 | - |
| | | | | | |
| **LIBOR based interest rate bonds:** | | | | | |
| Resolution 98-06 | 589,060,000 | 200,000,000 | (400,000,000) | 389,060,000 | - |
| | | | | | |
| **Capital appreciation bonds:** | | | | | |
| Resolution 68-18 | 20,580,609 | 1,256,013 | - | 21,836,622 | - |
| Resolution 98-06 | 80,495,105 | 4,252,086 | - | 84,747,191 | - |
| Total | 101,075,714 | 5,508,099 | - | 106,583,813 | - |
| Total bonds outstanding | $ 6,717,395,714 | $ 605,508,099 | $ (466,020,000) | $ 6,856,883,813 | $ 83,940,000 |

32

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

The LIBOR based interest rate bonds consist of $389 million of the 2007 Series N. The Series N LIBOR Bonds bear interest from their date of delivery at a per annum rate for each period equal to (a) 67% of the Three-Month LIBOR Rate for such period plus (b) a per annum spread equal to 0.53%. In each case the LIBOR-based interest rate cannot exceed the maximum rate permitted under Puerto Rico law (currently 12%).

The Series 2008A LIBOR bonds (Bond Anticipation Note) matured in August 2009 and bear interest at the index of one month LIBOR plus a spread of 225 base points not to exceed 12%. The maturity date was subsequently extended. (See note 16).

Interest on the Consumer Price Index ("CPI") Bonds will be payable on the first Business Day of each month commencing on July 2, 2007. The CPI Rate, which will be reset monthly, is an interest rate based on changes in the CPI and cannot exceed the maximum rate permitted under the Puerto Rico law (currently 12%).

In connection with the issuance of the CPI, LIBOR bonds and USD SIFMA index based interest rate bonds, the Authority has entered into interest rate swap agreements. In general, the swap agreements provide that, subject to the terms thereof, the Authority will pay to the swap provider a fixed rate and the swap provider will pay to the Authority a floating rate based on the CPI or LIBOR rate, based on a notional amount equal to the principal amount of the CPI and LIBOR bonds outstanding. The purpose of the swap agreement is generally to convert the Authority's floating rate obligations with respect to the CPI and LIBOR bonds to fixed rate obligations.

### (i) Interest rates swap agreements

In order to protect against the potential of rising interest rates, the Authority entered into pay-fixed, receive-variable interest rate swap agreements in the following bonds; $389 million LIBOR based interest rate bonds; $200 million USD SIFMA Swap Index based interest rate bonds and $57 million CPI based interest rate bonds. The counterparties are Citibank, N.A, ("Citibank), Morgan Stanley Capital Services, Inc ("Morgan") and UBS Financial Services ("UBS").

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

**(ii) Terms, and fair values**

The credit ratings of the counterparties, terms and fair value of the outstanding swaps as of June 30, 2009, are as follows:

| Counter Party | Rating (1) | Notional Amount | Effective Date | Fixed Rate | Variable Rate | Termination Date | Fair Value |
|---|---|---|---|---|---|---|---|
| Citibank | A1/A+/A+ | $ 233,440,000 | March 6 2007 | 4.106% | 67% of Libor Interest Rate plus a spread of .53% | July 1, 2045 | $ (37,461,220) |
| Citibank | A1/A+/A+ | $ 155,620,000 | March 6 2007 | 4.107% | 67% of Libor Interest Rate plus a spread of .53% | July 1, 2041 | $ (24,280,585) |
| Morgan | A2/A/A A- | $ 57,965,000 | March 6, 2007 | 4.050%/ 4.060% | Consumer price index rate plus a spread of 1.12% | July 1, 2027/ July 1, 2028 | $ (2,831,972) |
| Morgan | A2/A/A A- | $ 150,000,000 | May 27, 2008 | 4.06% | USD SIFMA Swap Index less a spread of .5% | July 1, 2028 | $ (18,404,468) |
| UBS | Aa2/A+/A+ | $ 50,000,000 | May 27, 2008 | 4.37% | USD SIFMA Swap Index less a spread of .5% | July 1, 2028 | $ 5,818,107 |

(1) Moody's Investors Service, Standard & Poor's and Fitch, respectively.

The notional amounts of the swaps match the principal amount of the associated debt. The swap agreements contain scheduled reductions to outstanding notional amounts that follow scheduled reductions in the associated debt.

**(iii) Fair values**

Relevant market interest rates as of June 30, 2009, valuation date of the swaps, were lower than market interest rate on the effective date of the swaps. Consequently, as of the valuation date the swaps had a negative fair value. The fair values listed in the above table represent the theoretical cost of terminating the swaps. The fair values were provided by the counterparties and were estimated using Counter party's internal present value models.

**Puerto Rico Highways and Transportation Authority**
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

*Credit risk* - Because all of the Authority's swaps rely upon the performance of the third parties who serve as swap counterparties, the Authority is exposed to credit risk, or the risk that swap counterparty fails to perform according to its contractual obligations. The appropriate measurement of this risk at the reporting date is the fair value of the swaps, as shown in the columns labeled Fair Value in the tables above. When the fair value is positive the Counterparty owes the Authority, which creates a credit risk for the Authority. When the fair value is negative the Authority owes the Counterparty and therefore the Authority does not possess credit risk. The Authority minimizes the credit risk in derivative instruments by entering into transactions with high-quality counterparties whose credit rating is acceptable under the investment policies of the Authority.

*Termination risk* - The Authority's swap agreements do not contain any out-of-the-ordinary termination events that would expose it to significant termination risk. In keeping with market standards the authority or the counterparty may terminate each swap if the other party fails to perform under the terms of the contract. In addition, the swap documents allow either party to terminate in the event of a significant loss of creditworthiness. The Authority views such events to be remote at this time. If the swap is terminated, the variable-rate bond would no longer carry a fixed interest rate. Also, if at the time of termination the swap has a negative fair value, the Authority would be liable to the counterparty for a payment equal to the swap's fair value.

*Rollover risk* - the Authority is not exposed to rollover risk since the due date of the swaps is the same due date of the related bonds.

**(iv) Debt maturities**

The outstanding bonds as of June 30, 2009 require future payments of principal and interest as follows:

| Fiscal year ended June 30, | Principal | Interest | Total |
|---|---|---|---|
| 2010 | $ 104,090,000 | $ 307,620,077 | $ 411,710,077 |
| 2011 | 220,095,000 | 341,173,668 | 561,268,668 |
| 2012 | 429,980,000 | 331,201,715 | 761,181,715 |
| 2013 | 157,645,000 | 324,469,931 | 482,114,931 |
| 2014 | 166,090,000 | 315,948,452 | 482,038,452 |
| 2015 to 2019 | 932,074,118 | 1,493,039,025 | 2,425,113,143 |
| 2020 to 2024 | 961,386,296 | 1,214,811,973 | 2,176,198,269 |
| 2025 to 2029 | 840,495,453 | 990,407,529 | 1,830,902,982 |
| 2030 to 2034 | 1,051,385,000 | 718,971,239 | 1,770,356,239 |
| 2035 to 2039 | 1,170,400,000 | 426,612,295 | 1,597,012,295 |
| 2040 to 2044 | 618,155,000 | 163,305,198 | 781,460,198 |
| 2045 to 2047 | 126,355,000 | 16,577,873 | 142,932,873 |
| Total | $ 6,778,150,867 | $ 6,644,138,975 | $ 13,422,289,842 |

35

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

For variable interest rate bonds included above, the debt service requirements and net swap payments were computed assuming current interest rates remain the same for their term. As rates vary, variable-rate bond interest payments and net swap payments will vary.

**(v)  Debt refunding**

The outstanding balances as of June 30, 2009 and 2008 of the bond issues defeased by the Authority are as follows:

|                                         | 2009 | 2008 |
|-----------------------------------------|------------------:|------------------:|
| Series Y                                | $    444,180,000  | $   451,180,000   |
| Series D                                | 548,575,000       | 548,575,000       |
| Series K                                | 485,105,000       | 492,780,000       |
| Series B                                | 452,600,000       | 443,810,000       |
| Series A                                | 53,485,000        | 416,400,000       |
| Series G                                | 290,770,000       | 290,770,000       |
| Series J                                | 269,100,000       | 273,340,000       |
| Series C                                | --                | 14,880,000        |
| Series H                                | 9,905,000         | 9,905,000         |
| Total outstanding defeased bond issues  | $  2,553,720,000  | $ 2,941,640,000   |

36

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

### (9) Borrowings under lines of credit:

At June 30, 2009 and 2008, lines of credit consist of the following:

| Description | 2009 | 2008 |
|---|---|---|
| (a) Non-revolving line of credit of up to $122,113,000 bearing interest at the Government Development Bank cost of funding for tax exempt or variable rate loan transactions plus a margin of 150 basis points (4.24% at June 30, 2009), which expires on September 30, 2010. (See note 16) | $ 122,113,000 | $ - |
| (b) Non-revolving line of credit of up to $25,000,000 bearing interest at the Government Development Bank cost of funding for tax exempt or variable rate loan transactions plus a margin of 150 basis points (2.68% at June 30, 2009), which expires on September 30, 2010. (See note 16) | 25,000,000 | - |
| (c) Non-revolving line of credit of up to $140,000,000 bearing interest at the Government Development Bank cost of funding for tax exempt or variable rate loan transactions plus a margin of 150 basis points (4.24% at June 30, 2009), which expires on September 30, 2010. (See note 16) | 140,000,000 | 83,570,729 |
| Subtotal | $ 287,113,000 | $ 83,570,729 |

37

# Puerto Rico Highways and Transportation Authority
## (A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

| Description | 2009 | 2008 |
|---|---|---|
| Subtotal from previous page | $ 287,113,000 | $ 83,570,729 |
| (d) Non-revolving line of credit of up to $15,000,000 bearing interest at the Government Development Bank cost of funding for tax exempt or variable rate loan transactions plus a margin of 125 basis points (2.43% at June 30, 2009), which due on September 30, 2010. (See note 16) | 15,000,000 | - |
| (e) Non-revolving line of credit of up to $78,300,000 bearing interest at prime rate plus a margin of 150 basis points (4.75% at June 30, 2009), maturing on June 30, 2011. | 49,200,000 | - |
| Total | $ 351,313,000 | $ 83,570,729 |

## (10) Retirement plan:

Substantially all the Authority's employees participate in the Retirement System of the Commonwealth of Puerto Rico ("the System"), a cost sharing multi-employer defined benefit pension plan. The payroll for employees covered by the System for the years ended June 30, 2009 and 2008 was approximately $78 million and $73 million, respectively.

All Authority's employees, who at the time of employment are 55 years old or less, are eligible to participate in the System. Employees who retire at or after age 55 with 25 years of credited service or age 58 with 10 years of credited service are entitled to a retirement benefit, payable each month for life, computed based on a benefit rate set forth by Commonwealth statute.

The System also provides death and disability benefits established by Commonwealth statute. Commonwealth legislation requires employees to contribute 5.775% for the first $550 of their monthly gross salary and 8.275% for the excess over $550 of monthly gross salary. The Authority is required by the same statute to contribute 9.275% of the participant's gross salary.

On September 24, 1999, an amendment to Act No. 447 of May 1, 1951, which created the Retirement System, was enacted with the purpose of establishing a new pension program (System 2000). Employees participating in the current system as of December 31, 1999, may elect to stay in the defined benefit plan or transfer to the new program. Employees joining the Authority on or after January 1, 2001, will only be allowed to become members of System 2000. System 2000 will reduce the retirement age from 65 years to 60 for those employees who joined the current plan on or after April 1, 1990.

38

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

## Notes to Financial Statements
June 30, 2009 and 2008

System 2000 is a hybrid defined contribution plan, also known as a cash balance plan. Under this new plan, there will be a pool of pension assets, which will be invested by the System, together with those of the current defined benefit plan. The Commonwealth of Puerto Rico will not guarantee benefits at retirement age. The annuity will be based on a formula which assumes that takes into account each year the employee's contribution (with a minimum of 8.275% of the employee's salary up to a maximum of 10%) and investment income as defined in the Plan. Participants will receive periodic account statements similar to those of defined contribution plans showing their accrued balances. Disability pensions will not be granted under System 2000.

Total employer contributions (rounded) for the years ended June 30, 2009, 2008 and 2007 were approximately as follows:

|  | 2009 | 2008 | 2007 |
| --- | --- | --- | --- |
| Traditional Plan | 4,553,000 | 4,523,000 | 4,723,000 |
| System 2000 | 2,619,000 | 2,297,000 | 2,146,000 |

Additional information on the Retirement System is provided in its financial statements for the year ended June 30, 2009 and 2008, a copy of which can be obtained from the Retirement System Administration, Minillas Station, P.O. Box 42003, San Juan, PR 00940.

The Authority has a labor union contract that provides all union employees who work for the Authority upon retirement with the following lump-sum bonus payable at the retirement date computed as follows:

| Years worked | Amount |
| --- | --- |
| 10-15 years | $170 per year of service |
| 16-20 | $200 per year of service |
| 21-25 | $225 per year of service |
| 26-30 | $250 per year of service |

In addition, management employees have similar benefits under the same conditions granted to labor union personnel, as detailed above.

**Puerto Rico Highways and Transportation Authority**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

---

### (11) Other post-employment benefits:

The Authority has implemented GASB Statement No. 45, *"Accounting and Financial Reporting for Employers for Postemployment Benefits Other Than Pensions"* ("GASB 45"). This Statement establishes the standards for the measurement, recognition, and display of Other Postemployment Benefits ("OPEB") expense/expenditures and related liabilities (assets), note disclosures, and, if applicable, required supplementary information ("RSI") in the financial reports of state and local governmental employers.

Postemployment benefits are part of an exchange of salaries and benefits for employee services rendered. Most OPEB have been funded on a pay-as-you-go basis and have been reported in financial statements when the promised benefits are paid. GASB 45 requires state and local government's financial reports to reflect systematic, accrual-basis measurement and recognition of OPEB cost (expense) over a period that approximates employees' years of service and provides information about actuarial accrued liabilities associated with the OPEB and whether and to what extent progress is being made in funding the plan.

#### (i) Plan description

The Authority agreed to provide medical, pharmacy, dental and vision medical insurance coverage to eligible retirees, its spouses and dependents, for a period of two years after retirement as a single employer defined benefit Other Post Employment Benefit Plan ("The Plan"). The Plan can be amended by action of the Authority subject to applicable collective bargaining and employment agreements. The Plan does not issue a stand alone financial report since there are no assets legally segregated for the sole purpose of paying benefits under the Plan.

#### (ii) Funding policy

The obligations of the plan members employer are established by action of the Authority pursuant to applicable collective bargaining and employment agreements. The required contribution rates of the employer and the members vary depending on the applicable agreement. The Authority currently contributes enough money to the plan to satisfy current obligations on a pay-as-you-go basis. The costs of administering the plan are paid by the Authority

#### (iii) Annual OPEB cost and net OPEB obligation

The Authority's annual OPEB cost (expense) is calculated based on the annual required contribution of the employer ("ARC"). The Authority has engaged an actuary to calculate the ARC and related information per the provisions of GASB Statement 45 for employers in the Plan with more than one hundred total plan members. The ARC represents a level of funding that, if paid on an ongoing basis, is projected to cover normal cost each year and to amortize any unfunded actuarial liabilities (or funding excess) over a period not to exceed thirty years.

40

**Puerto Rico Highways and Transportation Authority**
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

The following table shows the components of the Authority's annual OPEB cost for the year ended June 30, 2009, the amount actually contributed to the plan, and the Authority's net OPEB obligation to the Plan at June 30, 2009:

| | | |
|---|---|---:|
| Annual required contribution (ARC) | $ | 889,461 |
| Interest on net OPEB obligation | | (12,044) |
| Adjustment to annual required contribution | | 14,923 |
| Annual OPEB cost (expense) (AOC) | | 892,340 |
| Contribution made | | 507,600 |
| Increase (decrease) in net OPEB obligation | | 384,740 |
| Net OPEB asset, beginning of year | | (240,879) |
| Net OPEB obligation, end of year | $ | 143,861 |

The Authority's annual OPEB cost, percentage of annual OPEB cost contribution to the plan, and net OPEB obligation for the year ended June 30, 2009 and 2008 were as follows:

| Fiscal Year Ended | Annual OPEB Cost | Percentage of Annual OPEB Cost Contributed | Net OPEB Asset / (Obligation) |
|---|---|---|---|
| 2008 | 889,461 | 127% | 240,879 |
| 2009 | 889,461 | 56% | (384,740) |

As of June 30, 2009, the actuarial accrued liability for benefits was $7,068,000 all of which was unfunded. The covered payroll (annual payroll of active employees covered by the plan) was approximately $76,659,000 and $68,714,000 during the years ended June 30, 2009 and 2008 respectively, and the ratio of the unfunded actuarial accrued liability to the covered payroll was approximately nine percent (9%) and ten percent (10%), as of June 30, 2009 and 2008, respectively.

The projection of future benefit payments for an ongoing plan involves estimates of the value of reported amounts and assumptions about the probability of occurrence of events far into the future. Examples include assumptions about future employment, mortality, and the healthcare cost trend. Amounts determined regarding the funded status of the plan and the annual required contributions of the employer are subject to continual revision as actual results are compared with past expectations and new estimates are made about the future.

**(iv) Methods and assumptions**

Projections of benefits for financial reporting purposes are based on the substantive plan (the plan as understood by the employer and plan members) and include the types of benefits provided at the time of each valuation and the historical pattern of sharing of benefit costs between the employer and plan members to the point. The methods and assumptions used

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

include techniques that are designed to reduce the effects of short-term volatility in actuarial accrued liabilities and the actuarial value of assets, consistent with the long-term perspective of the calculations.

The valuation date was June 30, 2008 and the Projected Unit Credit Cost Method was used. The actuarial assumptions were based on a set of assumptions modified to the Authority.

Turnover rates were taken from a standard actuary table, T-5. This table was chosen so as to match the Authority historical turnover experience. Retirement rates were also based on recent Authority experience, but are less reliable due to the size of the current retiree group and the relative newness of the program. Both the retirement rates and turnover assumption will be reviewed in the next valuation to make sure they are tracking well with the actual experience.

A discount rate of 5% was used. This rate is the best actuarial estimate of expected long-term experience and is in accordance with guidelines for selection of these rates under GASB 45. The healthcare trend rates are based on the actuarial knowledge of the general healthcare environment and the specific coverage offered by the Authority.

## (12) Commitments and contingent liabilities:

### (i) Construction
As of June 30, 2009 and 2008, the Authority had commitments for approximately $662 million and $733 million, respectively, related to construction contracts.

### (ii) Leases
The Authority has various non-cancelable operating leases for office space with the Puerto Rico Public Buildings Authority and other lessors, the latest of which expires in June 2022. The rental expense for the years ended June 30, 2009 and 2008, were approximately $1,082,000 and $966,000, respectively. Future rental payments as of June 30, 2009 under these leases are as follows:

| Year ending June 30, | |
|---|---:|
| 2010 | $ 791,000 |
| 2011 | 791,000 |
| 2012 | 791,000 |
| 2013 | 791,000 |
| 2014 | 791,000 |
| 2015 to 2019 | 3,955,000 |
| 2020 to 2022 | 1,582,000 |
| Total future rental payments required | $ 9,492,000 |

42

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

### Notes to Financial Statements
June 30, 2009 and 2008

#### (iii) Litigation

Urban Train

On December 24, 2003, Siemens Transportation Partnership Puerto Rico S.E. ("STT") and others filed legal claims against the Authority in the amount of approximately $50 million for damages, amounts withheld, acceleration of work and other causes of action in connection with the construction of the Urban Train Project.

On November 24, 2004, the Authority filed a counter claim against STT for liquidating damages as stipulated in the contract in the amount of $100 million. The Authority amended its counter claim on November 17, 2008 to include other credits against STT. Therefore, the total claimed damages were increased to $233 million.

Under the contractual obligations between STT and the Authority, STT was responsible to defend, indemnify and hold harmless the Authority from claims asserted by third parties against the agency for the acts and omissions by STT, or any of its subcontractors, in the Project. Presently, some Alignment Section Contractor (ASC's) have asserted claims against the Authority for damages suffered in part by STT actions or omissions amounting to $150 million, approximately.

On September 22, 2005, the Authority filed a third party complaint for breach of contract, liquidated damages and others against various ASC's in the amount of $25 million.

On April 20, 2007, the Administrative Judge designated this case as a complex litigation and remitted it to the Chief Justice of the Supreme Court who has to assign a presiding judge for the case. The parties are still awaiting such designation.

On August 28, 2008, STT amended its complaint to adjust the amount claimed to $114 million.

On April 21, 2009, in accordance to the calendar approved by the Court through its Order dated May 6, 2009, the PRHTA field an Amended Third Party Complaint in which, aside from amending its allegation to the already appearing parties, the guarantors and sureties and assurance companies were brought to the case.

In the opinion of legal counsel, although discovery up to date has shown that it is unlikely that STT will prevail in its allegation against the Authority, due to the complexities of the case it is not possible to estimate the amount of any potential loss.

Redondo Construction

Redondo Construction filed legal claims against the Authority in the amount of approximately $38.1 million for damages, additional compensation, unpaid claims, prejudgment interests and others causes of actions related to various construction contracts. The Bankruptcy Court entered judgment on August 31, 2009. See Note 16.

## Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

Others

The Authority is defendant or co-defendant in various lawsuits for alleged damages in cases principally related to construction projects. These are generally either fully or partially covered by insurance. The contractors are required, under the terms of the construction agreements, to carry adequate public liability insurance and to hold harmless the Authority from lawsuits brought on account of damages relating to the construction of the projects.

The Authority, based on legal advice, has recorded an adequate provision to cover probable losses on those claims not fully covered by insurance. In the opinion of legal counsel, any liability in excess of the insurance coverage and/or the recorded provision that may arise from such claims would not be significant to affect to the Authority's financial position or results of operations

**(iv) Special Facility Revenue Bonds**

On December 20, 1992, the Authority and Autopistas de Puerto Rico y Compañía S.E. ("Autopistas") entered into a concession agreement ("the Concession Agreement"), amended in 1992, and again in 2004, for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge ("the Bridge"), a toll bridge, which traverses the San Jose Lagoon between the municipalities of San Juan and Carolina. Autopistas designed and constructed the Bridge and commenced operating the Bridge on February 23, 1994. The initial term of this agreement is 35 years, expiring on April 3, 2027.

In March 1992, the Authority issued Special Facility Revenue Bonds, 1992 Series A, B and C amounting to approximately $117 million for the purpose of facilitating the construction of the Bridge. The proceeds from the sale of the bonds were transferred by the Authority to Autopistas, the borrower, pursuant to a loan agreement (the Loan Agreement) by and between Autopistas and the Authority.

On October 30, 2003, the Authority issued Special Facility Revenue Refunding Bonds, 2004 Series A amounting to approximately $153 million for the purpose of refunding the Authority's Special Facility Revenue Bonds, 1992 Series A, B, and C, which were issued to fund the construction of the Bridge, and to pay the cost of issuance of the bonds. The proceeds from the sale of the bonds were transferred by the Authority to Autopistas, pursuant to a new loan agreement by and between Autopistas and the Authority.

Under certain circumstances, the Concession Agreement may be terminated and the Authority is then obligated to assume all of the Autopistas's obligations to pay principal of, and interest on, the bonds outstanding, which pursuant to the Loan Agreement will be paid from the net revenues of the use and operation of the Bridge. The Authority does not currently expect the Concession Agreement to terminate. The outstanding bonds (including accrued interest) at June 30, 2009 and 2008, amounted to approximately $158 million and $153 million, respectively.

**(v) Federal assistance programs**

The Authority participates in a number of federal financial assistance programs. These programs are subject to audits in accordance with the provisions of OMB Circular A-133, *Audits of States, Local Governments, and Non-Profit Organizations*, or to compliance audits by grantor agencies.

# Puerto Rico Highways and Transportation Authority
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

## (13) Operation and maintenance of urban train system:

The Authority entered into a System and Test Track Turnkey Contract ("STTT Contract") with Siemens Transportation Partnership Puerto Rico, S.E., Juan R. Requena y Asociados, and Alternate Concepts, Inc. (all together known as "Siemens") for the purpose of operating and maintaining the Tren Urbano. During 2005, the STTT Contract became effective upon the execution of the contract for an initial term of five years with an option by the Authority to extend the term for an additional five years. The compensation is based on a schedule included in the master agreement which approximate $4 million on a monthly basis. The total annual operation and maintenance cost, including cost of insurance and electricity, for fiscal years 2009 and 2008 was approximately $80.1 million and $80.4 million, respectively.

### Integrated transportation system

Costs incurred in connection with the integrated transportation system financed in part by the Authority during the years ended June 30, 2009 and 2008 are as follows:

|              | 2009          | 2008          |
|--------------|---------------|---------------|
| Metrobus II  | $ 13,654,546  | $ 23,200,000  |
| Metrobus I   | 13,574,363    | 5,568,799     |
| Other        | -             | 938,731       |
| Total        | $ 27,228,909  | $ 29,707,530  |

As authorized by Resolution 2007-40, the Authority contracted the Metropolitan Bus Authority (AMA), a public corporation of the Commonwealth of Puerto Rico, to operate the service known as Metrobus II which consists of a feeder bus service of 21 AMA routes that were changed to service the Urban Train stations. This feeder bus service is considered a key strategy for increasing rail ridership.

On April 8, 2009, by Resolution 2009-06, the Authority cancelled the contract with AMA related to Metrobus II service.

Metrobus I service consist of two express routes, Metrobus Route I and Metrobus Expreso, which provides service between the University of Puerto Rico and Old San Juan. The Authority contracted First Transit to operate this service. The service is provided seven days a week using 24 buses owned by First Transit.

**Puerto Rico Highways and Transportation Authority**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Financial Statements
June 30, 2009 and 2008

(14)   Impact fee and other:

Impact fee and other for the years ended June 30, 2009 and 2008 consist of:

|  | 2009 | 2008 |
|---|---|---|
| Impact fee | $ 6,220,122 | $ 11,935,457 |
| Electronic toll label sales and fines fees | 2,462,060 | 2,242,252 |
| Metrobus fare fees | 569,766 | 885,486 |
| Other | 2,226,274 | 1,227,538 |
| Total | $ 11,478,222 | $ 16,290,733 |

The Authority charges a fee to real estate developers for the impact the new development will have on the Authority's transportation facilities.

(15)   Transfers and construction work performed for other government agencies:

During the years ended June 30, 2009 and 2008, the Authority transferred cash and performed construction work on behalf of other government agencies, which are related mainly to repairs, maintenance and improvements of government buildings and other areas in the amount of $3,051,415 and $55,782,979, respectively.

(16)   Subsequent events:

a)   On July 8, 2009, the Authority extended the maturity date to September 30, 2010 of the non-revolving line of credits that matured on June 30, 2009.

b)   On August 27, 2009, the Authority extended the maturity date of the $400,000,000 LIBOR based interest rate bonds (See note 8) as follows; $300,000,000 maturing December 21, 2009 and $100,000,000 maturing August 30, 2011. On December 21, 2009 the maturing date of the $300,000,000 was extended to August 30, 2011 with an option to extend the maturity until August 30, 2013.

c)   On August 31, 2009 the Bankruptcy Court entered judgment in favor of Redondo Construction for approximately $22.2 million plus prejudgment interest at 6% to 6.5%. The Authority filed several post judgment motions to amend judgment and to oppose prejudgment interests.

On December 11, 2009, the Bankruptcy Court concluded that one of the cases where judgment was entered against the Authority for approximately $10 million, was not related to the bankruptcy proceedings. Therefore, the case was referred to the Federal District Court. The Federal District Court will review the case and determine if the judgment entered by the Bankruptcy Court will prevail otherwise, additional hearings may be scheduled. See related Note 12 (iii).

46

**Puerto Rico Highways and Transportation Authority**
(A Component Unit of the Commonwealth of Puerto Rico)

**Notes to Financial Statements**
**June 30, 2009 and 2008**

During December, 2009 the Authority was served with another claim from Redondo Construction for economic damages of approximately $40.0 million, however this claim is in a very preliminary stage.

The Authority, based on legal advice, has recorded an adequate provision to cover probable losses on these claims.

d)  Since October, 2009 the Authority has received approximately $4.5 million from the American Recovery and Reinvestment Act of 2009 (ARRA). ARRA has authorized $105 million for the Puerto Rico Highway Program and $14 million for Transit Projects. Such funds are available for disbursements for fiscal years 2009 through 2011.

47

# Puerto Rico Highways and Trasnportation Authority

## (A Component Unit of the Commonwealth of Puerto Rico)

### Schedule of Funding Progress for Retiree Health Plan
### Year ended June 30, 2009

Actuarial valuation date - June 30, 2008

| | | |
|---|---|---:|
| Actuarial accrued liability | | |
| Active participants | $ | 6,615,104 |
| Retires participants | | 453,303 |
| Total | | 7,068,407 |
| | | |
| Actuarial value of plan assets | | - |
| Unfunded actuarial accrued liability | $ | 7,068,407 |
| | | |
| Funded ratio | | 0% |
| | | |
| Covered payroll | $ | 76,659,320 |
| | | |
| Ratio of unfunded actuarial accrued liability | | |
| to covered payroll | | 9% |



**Report On Internal Control Over Financial Reporting
And On Compliance And Other Matters Based On An
Audit Of Financial Statements Performed In Accordance
With Government Auditing Standards**

Hon. Ruben Hernandez Gregorat, Secretary
Department of Transportation and Public Works,
Commonwealth of Puerto Rico

**Kevane Grant Thornton LLP**
33 Calle Bolivia
Ste 400
San Juan, Puerto Rico 00917-2013

T +1 787 754 1915
F +1 787 751 1284
www.kevane.com

We have audited the financial statements of the Puerto Rico Highways and Transportation Authority (the Authority) as of and for the year ended June 30, 2009 and have issued our report thereon dated December 22, 2009. We conducted our audit in accordance with auditing standards generally accepted in the United States of America and the standards applicable to financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States.

<u>Internal Control over Financial Reporting</u>

In planning and performing our audit, we considered Authority's internal control over financial reporting as a basis for designing our auditing procedures for the purpose of expressing our opinions on the financial statements, but not for the purpose of expressing an opinion on the effectiveness of the Authority's internal control over financial reporting. Accordingly, we do not express an opinion on the effectiveness of the Authority internal control over financial reporting.

Our consideration of internal control over financial reporting was for the limited purpose described in the preceding paragraph and would not necessarily identify all deficiencies in internal control over financial reporting that might be significant deficiencies or material weaknesses. However, as discussed below, we identified certain deficiencies in internal control over financial reporting that we consider to be significant deficiencies.

A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis. A significant deficiency is a control deficiency, or combination of control deficiencies, that adversely affects the Authority's ability to initiate, authorize, record, process, or report financial data reliably in accordance with generally accepted accounting principles such that there is more than a remote likelihood that a misstatement of the Authority's financial statements that is more than inconsequential will not be prevented or detected by the Authority's internal control. We consider the deficiencies described in items 09-01 through 09-05 in the accompanying schedule of findings and responses to be significant deficiencies in internal control over financial reporting.

49

A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the financial statements will not be prevented or detected by the Authority's internal control.

Our consideration of the internal control over financial reporting was for the limited purpose described in the first paragraph of this section and would not necessarily identify all deficiencies in the internal control that might be significant deficiencies and, accordingly, would not necessarily disclose all significant deficiencies that are also considered to be material weaknesses. We believe that the significant deficiency described in item 09-01 is also material weaknesses.

## Compliance and Other Matters

As part of obtaining reasonable assurance about whether Authority's financial statements are free of material misstatement, we performed tests of its compliance with certain provisions of laws, regulations, contracts, and grant agreements, noncompliance with which could have a direct and material effect on the determination of financial statement amounts. However, providing an opinion on compliance with those provisions was not an objective of our audit, and accordingly, we do not express such an opinion. The results of our tests disclosed no instances of noncompliance or other matters that are required to be reported under Government Auditing Standards.

We noted certain matters that we reported to management of Authority, in a separate letter dated December 22, 2009.

This report is intended solely for the information and use of the Authority's management, the audit committee, the U.S. Department of Transportation and pass-through entities and is not intended to be and should not be used by anyone other than these specified parties.

San Juan, Puerto Rico,           *Kevane Grant Thornton LLP*
December 22, 2009.

2462534



50

APPENDIX II-A

437 Madison Avenue

New York, New York 10022-7001

(212) 940-3000

Fax: (212) 940-3111

July 1, 2010

Puerto Rico Highways and Transportation Authority
San Juan, Puerto Rico

The Bank of New York Mellon
New York, New York

Ladies and Gentlemen:

We have examined a record of proceedings relating to the conversion and reoffering by Puerto Rico Highways and Transportation Authority (the "Authority") of the interest rate mode on its (i) $253,670,000 aggregate principal amount of Highway Revenue Refunding Bonds (Series AA) (the "Series AA Bonds") and (ii) $44,275,000 aggregate principal amount of Transportation Revenue Refunding Bonds (Series H) (the "Series H Bonds," and together with the Series AA Bonds, the "Reoffered Bonds").

The Series AA Bonds were issued and secured pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Authority Act"), Resolution No. 68-18 adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution") and as further amended, including by a resolution adopted by the Authority on April 10, 2003 ("Resolution No. 2003-23"). The Series H Bonds were issued pursuant to the Authority Act, Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution" and together with the 1968 Resolution, the "Bond Resolutions") and as further amended, including by a resolution adopted by the Authority on April 10, 2003 ("Resolution No. 2003-24"). The interest rate on the Reoffered Bonds is being converted from the Term Rate Mode to the Fixed Rate Mode pursuant to Resolution No. 2010-13 adopted by the Authority on June 17_, 2010 ("Resolution No. 2010-13"; collectively with the Bond Resolutions, Resolution No. 2003-23 and Resolution No. 2003-24, the "Resolutions") fixing the terms of the Reoffered Bonds. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the applicable Resolution.

The Reoffered Bonds are dated, mature, are payable and bear interest at the rates and on the dates set forth in the Resolutions. The Reoffered Bonds are issuable in the form of fully registered bonds in denominations of $5,000 each or any integral multiple thereof and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Reoffered Bonds.

II-A-1

As Bond Counsel we have examined (i) the Authority Act, (ii) certified copies of the proceedings of the Authority authorizing the issuance, conversion and reoffering of the Reoffered Bonds, (iii) the Resolutions, (iv) one Series AA Bond and (v) one Series H Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

1.      The proceedings of the Authority in connection with the authorizing, issuance, conversion and reoffering of the Reoffered Bonds has been validly and legally taken.

2.      The Authority Act and such proceedings show lawful authority of the issuance, conversion and reoffering of the Reoffered Bonds by the Authority.

3.      As authorized by the Authority Act and by said proceedings, the Resolutions have been duly adopted by the Authority.

4.      The Reoffered Bonds have been duly authorized, executed and delivered by the Authority and constitute legal, valid, binding and enforceable obligations of the Authority payable from and secured under the applicable Resolutions, and are entitled to the benefit and security of the applicable Resolutions.

5.      The change in the interest rate mode applicable to the Reoffered Bonds from Term Rate Mode to a Fixed Rate Mode and the reoffering of the Reoffered Bonds under the terms contained in the Resolutions will not cause interest on the Reoffered Bonds to be includable in the gross income of owners of such Reoffered Bonds for federal income tax purposes.

Except as stated in the preceding paragraph, we express no opinion as to any other Federal, Commonwealth or state tax consequences of the ownership or disposition of the Reoffered Bonds. Furthermore, we express no opinion as to any Federal, Commonwealth, state or local tax law consequences with respect to the Reoffered Bonds, or the interest thereon, if any action is taken with respect to the Reoffered Bonds or the proceeds thereof upon the advice or approval of other bond counsel.

It is to be understood that the rights of the holders of the Reoffered Bonds and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

APPENDIX II-B

## SIDLEY AUSTIN BROWN & WOOD LLP

CHICAGO

DALLAS

LOS ANGELES

SAN FRANCISCO

WASHINGTON, D.C.

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
TELEPHONE 212 839 5300
FACSIMILE 212 839 5599
www.sidley.com

FOUNDED 1866

BEIJING

GENEVA

HONG KONG

LONDON

SHANGHAI

SINGAPORE

TOKYO

April 29, 2003

Hon. Fernando E. Fagundo
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined (a) Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended ("Act No. 74"), creating Puerto Rico Highways and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico, (b) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended among other things by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") to the Authority for use for its corporate purposes, (c) the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (d) Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including Resolution No. 68-18, adopted on June 13, 1968, as amended (the "1968 Resolution"), with respect to the Highway Revenue Bonds (hereinafter mentioned), together with a resolution adopted on April 10, 2003, with respect to the Series AA Bonds described below (the "authorizing resolution") and other proofs submitted relative to the authorization, sale and issuance of

$717,365,000

## PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
## HIGHWAY REVENUE REFUNDING BONDS
## (SERIES AA)

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption and to tender prior to maturity, all as set forth in the authorizing resolution.

We have also examined one of said Series AA Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.  Act No. 74, the Puerto Rico Internal Revenue Code of 1994, the Vehicle and Traffic Law of Puerto Rico and Reorganization Plan No. 6 of 1971 are valid.

2.  Said proceedings have been validly and legally taken.

3.  Said Series AA Bonds have been duly authorized and issued to refund a portion of the outstanding bonds of the Authority issued under the 1968 Resolution.

4.  The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds"). The 1968 Resolution provides for the issuance of additional bonds under the conditions and limitations therein set forth, and the Authority has covenanted in Resolution No. 98-06, adopted on February 26, 1998, as amended (the "1998 Resolution"), to limit the issuance of such additional bonds.

5.  Said Series AA Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1968 Resolution and designated "Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund". The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a sufficient amount of the Revenues (as defined in the 1968 Resolution), together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority for the payment of its bonds and pledged by the Authority to the payment of principal and interest on the Highway Revenue Bonds (including said Series AA Bonds) as the same may become due and payable and to create and maintain a reserve therefor. Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of and the interest on all such Highway Revenue Bonds (including said Series AA Bonds) issued by the Authority under the provisions of the 1968 Resolution.

The Allocated Gasoline Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the

Authority, are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose.

6. Said Series AA Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and said Series AA Bonds are payable only out of the Revenues and other moneys of or allocated to the Authority, to the extent provided in the 1968 Resolution.

7. Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to continuing compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the 1968 Resolution and the 1998 Resolution regarding the use, expenditure and investment of Series AA Bond proceeds (and the proceeds of certain other bonds of the Authority being issued on the date hereof under the 1998 Resolution) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on said Series AA Bonds is not includable in gross income for federal income tax purposes, and (ii) said Series AA Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on said Series AA Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of said Series AA Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income. No opinion is expressed as to the effect of any action taken or not taken after the date of this opinion without our approval (except for such action or omission to act as is otherwise provided in the 1968 Resolution or in the authorizing resolution) or in reliance upon advice of counsel other than ourselves on the exclusion from gross income of the interest on said Series AA Bonds for federal income tax purposes.

The Authority has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on said Series AA Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the said Series AA Bonds. We are not aware of any provisions of the Constitution and laws of the Commonwealth of Puerto Rico which would prevent such compliance.

Respectfully submitted,

Sidley Austin Brown & Wood LLP

II-B-3

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| CHICAGO | 787 SEVENTH AVENUE | BEIJING |
| DALLAS | NEW YORK, NEW YORK 10019 | GENEVA |
| LOS ANGELES | TELEPHONE 212 839 5300 | HONG KONG |
| SAN FRANCISCO | FACSIMILE 212 839 5599 | LONDON |
| WASHINGTON, D.C. | www.sidley.com | SHANGHAI |
| | FOUNDED 1866 | SINGAPORE |
| | | TOKYO |

April 29, 2003

Hon. Fernando E. Fagundo
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined (a) Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended ("Act No. 74"), creating Puerto Rico Highways and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico, (b) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended among other things by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated (1) the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") and (2) the proceeds (up to $120 million per fiscal year) of the tax imposed on crude oil, unfinished oil and derivative products (the "Allocated Crude Oil Tax Proceeds") to the Authority for use for its corporate purposes, (c) the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), which allocated the proceeds of the fifteen dollar license increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (d) Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including (I) Resolution No. 68-18, adopted on June 13, 1968, as amended (the "1968 Resolution"), with respect to the Highway Revenue Bonds (hereinafter mentioned), and (II) Resolution No. 98-06, adopted on February 26, 1998, as amended (the "1998 Resolution"), together with a resolution

adopted on April 10, 2003, with respect to the Series H Bonds described below (the "authorizing resolution") and other proofs submitted relative to the authorization, sale and issuance of

**$72,035,000**

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
TRANSPORTATION REVENUE REFUNDING BONDS
(SERIES H)**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption and to tender prior to maturity, all as set forth in the authorizing resolution.

We have also examined one of said Series H Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.   Act No. 74, the Puerto Rico Internal Revenue Code of 1994, the Vehicle and Traffic Law of Puerto Rico and Reorganization Plan No. 6 of 1971 are valid.

2.   Said proceedings have been validly and legally taken.

3.   Said Series H Bonds have been duly authorized and issued to refund a portion of the Authority's outstanding Senior Transportation Revenue Bonds (hereinafter mentioned).

4.   The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds"). The 1968 Resolution provides for the issuance of additional Highway Revenue Bonds under the conditions and limitations therein set forth, and the Authority has covenanted in the 1998 Resolution to limit the issuance of such additional Highway Revenue Bonds.

5.   The 1998 Resolution provides for the issuance of additional bonds on a parity with said Series H Bonds under the conditions, limitations and restrictions therein set forth (said Series H Bonds and such additional parity bonds being herein called the "Senior Transportation Revenue Bonds") for any lawful purpose of the Authority and for the purpose of refunding any bonds issued by the Authority under the 1998 Resolution and any other obligations of the Authority, including outstanding Highway Revenue Bonds. In addition, the 1998 Resolution provides for the issuance of bonds subordinate to the Senior Transportation Revenue Bonds as to their lien on the revenues and other moneys of the Authority, as described below, under the conditions, limitations and restrictions and for the purposes set forth therein (the Senior Transportation Revenue Bonds and such bonds subordinate thereto being herein collectively called the "Transportation Revenue Bonds").

6.     The 1998 Resolution provides for the creation of a special fund designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"), and, subject to the limitations of the next two paragraphs, for the deposit to the credit of said special fund of all moneys received by the Authority (a) from the Allocated Crude Oil Tax Proceeds, (b) from the Allocated Gasoline Tax Proceeds, (c) from the Allocated Additional License Fees, (d) from any tolls or other charges imposed by the Authority for the use of any Toll Facilities and (e) from the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority and expressly authorizes the Authority to pledge to the payment of the principal of and interest on bonds or other obligations issued by the Authority and which are pledged by the Authority to the payment of the principal of and interest on Transportation Revenue Bonds issued under the provisions of the 1998 Resolution.

The Allocated Gasoline Tax Proceeds, the Allocated Crude Oil Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority, are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose.

The 1968 Resolution provides for the prior deposit to the credit of a special fund designated "Puerto Rico Highways and Transportation Authority Construction Fund" (herein called the "1968 Construction Fund") of the Allocated Gasoline Tax Revenues, the Allocated Additional License Fees and all Existing Toll Facilities Revenues (as such term is defined in the 1998 Resolution), after the required deposits of such moneys have been made to the credit of the Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund. In the 1998 Resolution, the Authority has covenanted (i) to withdraw monthly from the 1968 Construction Fund and deposit to the credit of the Revenue Fund until the outstanding Highway Revenue Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, all unencumbered moneys held to the credit of the 1968 Construction Fund and (ii) except for the foregoing withdrawal and any encumbrances on the moneys in the 1968 Construction Fund existing on the date of adoption of and as provided in the 1998 Resolution, not further to encumber or otherwise withdraw or pledge any such available moneys in the 1968 Construction Fund.

7.     Said Series H Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1998 Resolution and designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund". The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a sufficient amount of the moneys held to the credit of the Revenue Fund, together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority and available under the 1998 Resolution for the payment of principal of and interest on the Senior Transportation Revenue Bonds, to pay the principal of and interest on all Senior Transportation Revenue Bonds (including said Series H Bonds) issued under the provisions of the 1998 Resolution as the same may become due and payable and to create and maintain a reserve therefor. Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of and the interest on

II-B-6

all Senior Transportation Revenue Bonds (including said Series H Bonds) issued by the Authority under the provisions of the 1998 Resolution.

8.    Said Series H Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and said Series H Bonds are payable only out of the revenues and other moneys of or allocated to the Authority, to the extent provided in the 1998 Resolution.

9.    Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to continuing compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), the 1968 Resolution and the 1998 Resolution regarding the use, expenditure and investment of Series H Bond proceeds (and the proceeds of certain other Transportation Revenue Bonds and Highway Revenue Bonds being issued on the date hereof) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on said Series H Bonds is not includable in gross income for federal income tax purposes, and (ii) said Series H Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.  No opinion is expressed as to the effect of any action taken or not taken after the date of this opinion without our approval (except for such action or omission to act as is otherwise provided in the 1998 Resolution or in the authorizing resolution) or in reliance upon advice of counsel other than ourselves on the exclusion from gross income of the interest on said Series H Bonds for federal income tax purposes.

Interest on said Series H Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of said Series H Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

The Authority has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on said Series H Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the said Series H Bonds. We are not aware of any provisions of the Constitution and laws of the Commonwealth of Puerto Rico which would prevent such compliance.

Respectfully submitted,

Sidley Austin Brown & Wood LLP

II-B-7

Case 17-30159-LTS Doc#392-16 Filed 09/27/21 Entered 09/27/21 15:06:48 Desc:
Exhibit 16 Page 115 of 157

[THIS PAGE INTENTIONALLY LEFT BLANK]

**SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION**

The following are brief summaries of certain provisions of the 1968 Resolution. Such statements do not purport to be complete and reference is made to the 1968 Resolution, copies of which are available from the Authority or the 1968 Fiscal Agent. The 1968 Resolution, the Highway Revenue Bonds issued thereunder and the 1968 Resolution Revenues are referred to in this summary as the "Resolution," the "Bonds," and "Revenues," respectively.

**Definition of Certain Terms**

"Accreted Value" means, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, an amount equal to the principal amount of such Bond on the date of original issuance plus the interest accrued on such Bond from the date of original issuance to the date of calculation or the Interest Commencement Date, as the case may be, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond or Capital Appreciation and Income Bond.

"Balloon Bonds" mean any Bonds, the interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one fiscal year and for which maturing principal amount Amortization Requirements have not been fixed.

"Capital Appreciation Bonds" means any Bonds as to which interest is compounded periodically on each of the applicable dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity (or extended maturity date for Extendible Maturity Bonds), earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either serial bonds or term bonds.

"Capital Appreciation and Income Bonds" means any Bonds as to which accruing interest is not paid prior to the interest payment date immediately succeeding the Interest Commencement Date specified in the resolution authorizing such Bonds and the interest on which is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either serial bonds or term bonds.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Extendible Maturity Bonds" means Bonds the maturities of which, by their terms, may be extended by and at the option of the holders of the Bonds or the Authority.

"1968 Fiscal Agent" means the bank or trust company appointed by the Authority and acting as fiscal agent whether original or successor pursuant to the provisions of the Resolution.

"Fiscal year" means the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Authority.

"Government Obligations" means (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii)

municipal obligations, the payment of the principal of and interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) above and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations; (iii) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i) and (ii) above held by a bank (including the 1968 Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the issuer of the underlying obligations described in said clauses (i) and (ii) and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated; and (iv) secured Time Deposits.

"Interest Commencement Date" means, with respect to any particular Capital Appreciation and Income Bonds, the date specified in the resolution authorizing the issuance of such Bonds after which interest accruing on such Bonds shall be payable on a periodic basis prior to maturity, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Interim Bonds" means any Bonds issued under the Resolution on an interim basis which are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" means any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

        (i)      Government Obligations;

        (ii)     obligations issued or guaranteed by any instrumentality or agency of the United States of America, whether now existing or hereafter organized, including but not limited to those of the Federal Financing Bank, Federal Home Loan Banks, the Export-Import Bank, Government National Mortgage Association and the Tennessee Valley Authority;

        (iii)    bankers' acceptances, certificates of deposit or time deposits of any bank, national banking association (including the 1968 Fiscal Agent), trust company or savings and loan association (including any investment in pools of such bankers acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a bank, trust company, or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clause (i) or (ii) above or (iv) or (v) below, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1968 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

        (iv)    obligations issued by any state or territory of the United States, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto;

        (v)    municipal obligations, the payment of the principal of and the interest on which is insured, which are rated, on the date of investment therein, in one of the three highest rating

categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto;

(vi)     any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the 1968 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clause (i) or (ii) above, provided that the 1968 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vii)     commercial paper rated, or backed by a letter of credit or line of credit the issuer of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto; and

(viii)     any other investment obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto.

"Principal and Interest Requirements" for any period, as applied to the Bonds of any Series, means the sum of:

(i)     the amount required to pay interest on all Bonds of such Series then outstanding which is payable on each interest payment date in such period;

(ii)     the amount required to pay principal of all serial Bonds of such Series then outstanding which is payable upon the stated maturity of such serial Bonds in such period; and

(iii)     the Amortization Requirements for the term Bonds of such Series for such period.

To the extent that the period for calculating Principal and Interest Requirements shall be a fiscal year and the first day of the next fiscal year shall be an interest or principal payment date, such first day of the next fiscal year shall be included in the preceding fiscal year and not in the current fiscal year for purposes of calculating Principal and Interest Requirements.

The following rules apply in determining the amount of the Principal and Interest Requirements for any period:

(a)     in the case of Variable Rate Bonds the interest rate thereon shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been outstanding, (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation and (C) the lesser of the maximum rate then permitted by law and the maximum rate permitted on such Variable Rate Bonds by the resolution authorizing the issuance thereof; provided, however, that if the Authority has notified the 1968 Fiscal Agent that a Swap agreement is in effect in respect of such Variable Rate Bonds, then for all purposes of this paragraph the interest rate on such Variable Rate Bonds shall be the Swap rate under such Swap agreement;

III-3

(b) in the case of Put Bonds, the tender date or dates shall be ignored if the source for payment of said tender is a liquidity facility and the stated periods for Amortization Requirements and the stated dates for principal payments shall be used, and in the case of Bonds secured by a credit facility or a liquidity facility, the terms of the reimbursement obligation to the issuers thereof shall be ignored and the stated periods for Amortization Requirements and the stated dates for principal payments shall be used; provided, however, that during any period after the issuer of a credit facility or a liquidity facility, as the case may be, has advanced funds thereunder, the reimbursement obligation of which is payable from and secured on a parity with the Bonds and before such amount is repaid, Principal and Interest Requirements shall include the principal amount so advanced and interest thereon, in accordance with the principal repayment schedule and interest rate or rates specified in the credit facility or liquidity facility, as the case may be, in lieu of the stated principal of and Amortization Requirements and interest on such Bonds;

(c) in the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date shall have been extended;

(d) in the case of Capital Appreciation Bonds, the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included during such period in which said principal and interest portions are due;

(e) in the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value of Capital Appreciation and Income Bonds shall be included during the period in which said principal and interest portions are due;

(f) in the case of Balloon Bonds or Interim Bonds, the debt service requirements of the Balloon Bonds or Interim Bonds may be excluded and in lieu thereof the Balloon Bonds or interim Bonds shall be viewed as debt securities having a comparable federal tax status as such Balloon Bonds or Interim Bonds maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds and issued by issuers having a credit rating, issued by Moody's or any successors thereto or S&P or any successors thereto comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g) if all or a portion of the principal of or interest on a Series of Bonds is payable from moneys irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations irrevocably set aside or deposited for such purpose on the date of computation, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the above computation shall be supported by a verification report from a nationally recognized independent certified public accountant as to the sufficiency of such moneys set aside and projected earnings.

"Put Bonds" means Bonds which by their terms may be tendered by and at the option of the Holder thereof for payment prior to the stated maturity thereof.

"Reserve Account Insurance Policy" means the insurance policy, surety bond or other acceptable evidence of insurance, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer shall be a municipal bond insurer whose senior debt obligations, ranking *pari passu* with its obligations under such policy, bond or other evidence of insurance, are rated at the time of deposit to the credit of the 1968 Reserve Account in any of the three highest rating categories (without regard to any gradation within any such category) of either Moody's or any successors thereto or S&P or any successors thereto.

"Reserve Account Letter of Credit" means the irrevocable, transferable letter of credit, if any, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer shall be a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking *pari passu* with its obligations under such letter of credit, are rated at the time of deposit to the credit of the 1968 Reserve Account in any of the three highest rating categories (without regard to any gradation within any such category) of either Moody's or any successors thereto or S&P or any successors thereto.

"1968 Reserve Requirement" means the lesser of (a) the maximum Principal and Interest Requirements for any fiscal year on account of the outstanding Bonds and (b) ten percent (10%) of the original principal amount of each Series of Bonds outstanding (determined on the basis of their initial offering prices to the public).

"1968 Revenues" means (a) all moneys received by the Authority on account of the gasoline tax allocated to the Authority by Act No. 75, approved June 23, 1965; (b) Toll Revenues; (c) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico has allocated or may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal of and interest on Bonds issued under the provisions of the Resolution; provided that written notice of such pledge has been delivered to S&P, Moody's, and any other rating agency then rating the Bonds and (d) investment earnings on deposits to the credit of funds and accounts established under the Resolution, except for the Construction Fund.

"Swap agreement" means an agreement between the Authority and a Swap party whereby the Swap party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on Variable Rate Bonds at or prior to the times such interest is due and payable in consideration of the Authority's payment to the Swap party of amounts set forth in the Swap agreement

"Swap party' means a person who is party to a Swap agreement and whose senior obligations are rated at the time of the execution and delivery of such Swap agreement in one of the three highest rating categories (without regard to gradations within a category) by (i) S&P or its successor and (ii) Moody's or its successor.

"Swap rate" means the fixed rate per annum on the principal amount of Variable Rate Bonds covered by a Swap agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the Swap party less the amount paid to the Authority by the Swap party by (ii) such principal amount of Variable Rate Bonds; provided, however, that if such Swap agreement has been in effect for less than twelve months, such percentage shall be multiplied by 360 divided by the number of days between the effective date of such Swap agreement and the date of calculation determined on the basis of 30-day month; provided further, that if no amount has been paid under the Swap agreement, the Swap rate shall be deemed to be the fixed rate per annum contracted to be paid by the Authority to the Swap party.

"Toll Revenues" means the tolls or other charges, if any, imposed by the Authority for the use of any of its Traffic Facilities.

"Traffic Facilities" means any of the following facilities for which Bonds shall be issued under the Resolution the cost of which facilities paid from the proceeds of such Bonds shall not have been reimbursed to the Authority from funds not encumbered by the Resolution: (1) roads, avenues, streets, thoroughfares, speedways, bridges, tunnels, channels, stations, terminals, and any other land or water facilities necessary or desirable in connection with the movement of persons, freight, vehicles or vessels; (2) parking lots and structures and other facilities necessary or desirable in connection with the parking,

loading or unloading of all kinds of vehicles and vessels; and (3) all property, rights, easements, and interests therein necessary or desirable for the construction, maintenance, control, operation or development of such traffic facilities.

"Variable Rate Bonds" means Bonds issued with a variable, adjustable, convertible or similar interest rate which is not fixed in percentage at the date of issue for the term thereof, but which may or may not be convertible to a fixed interest rate for the remainder of their term. (Section 101).

**Sinking Fund**

The Resolution creates the "Puerto Rico Highways Authority Highway Revenue Bonds Interest and Sinking Fund" (the "1968 Sinking Fund"). The "1968 Bond Service Account," "1968 Redemption Account," and "1968 Reserve Account" are created within the 1968 Sinking Fund. (Section 401).

The moneys in each Account are held by the 1968 Fiscal Agent in trust and, pending application, are subject to a lien in favor of the holders of the outstanding Bonds and for the further security of such holders until paid out or transferred as provided in the Resolution. (Section 401).

All Revenues (other than investment earnings), and any other funds of the Commonwealth allocated to the Authority for the payment of principal of and interest on any Bonds, are deposited monthly with the 1968 Fiscal Agent as follows:

(1)     To the 1968 Bond Service Account, an amount equal to 1/6th of the amount of interest payable on all Bonds of each Series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of principal of any serial bonds; provided, however, that the amount so deposited on account of the interest in each month after the delivery of the Bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the Bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such Bonds on such first interest payment date less the amount of any accrued interest paid on such Bonds and deposited to the credit of the 1968 Bond Service Account;

(2) To the 1968 Redemption Account, an amount equal to 1/12th of the Amortization Requirement for such fiscal year for the term bonds of each Series then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of Bonds if such principal amount of Bonds should be redeemed prior to their maturity from moneys in the 1968 Sinking Fund;

(3)     To the 1968 Reserve Account, such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the 1968 Reserve Requirement; provided, however, that such deposits shall only be made to the extent necessary to make the amount then in the 1968 Reserve Account equal to the 1968 Reserve Requirement; provided, further, that in the event of an increase in the 1968 Reserve Requirement due to the issuance of additional Series of Bonds, such increase may be funded by deposits in each of the five (5) years, commencing in the fiscal year in which such additional Series of Bonds is issued, of 20% of such increase in the Reserve Requirement; and

(4)     Any 1968 Revenues remaining after making the deposits referred to above shall be deposited to the credit of the 1968 Construction Fund for use by the Authority for any of its authorized purposes. (Section 401).

The requirements specified in paragraphs (1), (2), and (3) above are cumulative. (Section 401).

In lieu of any required deposit of Revenues into the 1968 Reserve Account, or in substitution for all or a portion of the moneys then on deposit in the 1968 Reserve Account, the Authority may deposit into the 1968 Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit for the benefit of the holders in an amount equal to the required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any interest payment date on which a deficiency exists which cannot be cured by moneys in any other fund or account held by the 1968 Fiscal Agent pursuant to the Resolution and available for such purpose. If a disbursement is made under the Reserve Account Insurance Policy or the Reserve Account Letter of Credit, the Authority shall be obligated either to reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement, or to deposit into the 1968 Reserve Account from Revenues, funds in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit. (Section 401).

Moneys in the 1968 Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     Subject to the provisions of paragraph (c) below, the 1968 Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the 1968 Sinking Fund. The 1968 Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the 1968 Bond Service Account and the purchase price from the 1968 Redemption Account, but no such purchase shall be made within 45 days next preceding any interest payment date on which such Bonds are subject to redemption except from moneys in excess of the amounts set aside or deposited for the redemption of Bonds.

(b)     Subject to the provisions of paragraph (c) below, the 1968 Fiscal Agent shall call for redemption on each interest payment date on which Bonds are subject to redemption from moneys in the 1968 Sinking Fund such amount of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the 1968 Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time.

(c)     Moneys in the 1968 Redemption Account shall be applied to the purchase or redemption of Bonds in the following order:

First, the term Bonds of each Series, if any, in the order of their issuance, to the extent of the Amortization Requirement, if any, of the then current fiscal year for such term Bonds and any deficiency in preceding fiscal years in the purchase or redemption of such term Bonds under the provisions of this subdivision; provided, however, that if none of the term Bonds of a Series shall be subject to redemption from moneys in the 1968 Sinking Fund and if the 1968 Fiscal Agent shall at any time be unable to exhaust the moneys applicable to the Bonds of any such Series in the purchase of such bonds under the provisions of paragraph (a) above, such moneys or the balance of such moneys, as the case may be, shall be retained in the 1968 Redemption Account and, as soon as it is feasible, applied to the retirement of the Bonds of such Series;

Second, to the purchase of any outstanding Bonds, whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

III-7

Third, term Bonds of each Series in proportion (as nearly as practicable) to the aggregate principal amount of the Bonds of each such Series originally issued; and

Fourth, after the retirement of all term Bonds, serial Bonds in the inverse order of their maturities, and to the extent that serial Bonds of different Series mature on the same date, in proportion (as nearly as practicable) to the principal amount of each Series maturing on such date. (Section 403).

All expenses in connection with such purchase or redemption shall be paid from the 1968 Construction Fund. (Section 403).

Moneys in the 1968 Reserve Account shall be used for the purpose of paying interest on the Bonds and maturing principal of serial Bonds whenever and to the extent that the moneys held for the credit of the 1968 Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1968 Redemption Account pursuant to the requirements mentioned in paragraph (2) above whenever and to the extent that the Revenues are insufficient for such purpose. Excess moneys in the 1968 Reserve Account shall be transferred to the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as directed by the Authority. (Section 404).

**1968 Construction Fund**

Moneys in the 1968 Construction Fund may be used for any authorized purpose of the Authority, including, prior to the adoption of the 1998 Resolution, the payment of the cost of maintaining, repairing, and operating the Traffic Facilities and the cost of necessary renewals and replacements of Traffic Facilities. (Sections 401, 604, and 605). Before any payment or withdrawal shall be made from moneys in the 1968 Construction Fund there shall be filed with the 1968 Fiscal Agent a certificate signed by a designated officer of the Authority setting forth the amount of money to be so disbursed and stating that such money will be used to pay the costs of constructing Traffic Facilities or for other purposes permitted by the Resolution. Upon receipt of such certificate the 1968 Fiscal Agent shall withdraw from the 1968 Construction Fund and deposit to the credit of a special checking account in its commercial department in the name of the Authority the amount so specified in such certificate. The 1968 Fiscal Agent shall also at any time at the written direction of the Authority transfer any part of the moneys in the 1968 Construction Fund to the credit of the 1968 Redemption Account. (Section 405).

**Issuance of Additional Bonds**

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority may not withdraw, expend, pledge or otherwise encumber moneys held to the credit of the 1968 Construction Fund whether for the purpose of satisfying the Authority's priorities construction program or otherwise, except for the payment over to the 1998 Resolution as described in the third sentence of the fourth paragraph under "Summary of Certain Provisions of the 1998 Resolution-Sinking Funds." See "Summary of Certain Provisions of the 1998 Resolution--Miscellaneous Covenants--Relating to the 1968 Resolution."

**Defeasance**

If all the outstanding Bonds shall have been paid or deemed to have been paid as provided below, then and in that case the right, title, and interest of the bondholders under the Resolution shall cease, terminate, and become void, and such Bonds shall, except as described in the next sentence, cease to be entitled to any lien, benefit or security under the Resolution. In such event, the Authority shall repeal and cancel the Resolution and may apply any surplus in the 1968 Sinking Fund and all balances remaining in

any other funds and accounts other than moneys held for the redemption or payment of Bonds to any lawful purposes of the Authority as the Secretary shall determine. Under the terms of the 1998 Resolution, all such surplus and balances are required upon the repeal and cancellation of the Resolution to be transferred to the 1998 Revenue Fund.

Any outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Resolution when the whole amount of the principal of, redemption premium, if any, and interest on such Bond shall have been paid or duly provided for and the conditions set forth in clause (c) below have been satisfied or when (a) in case such Bond has been called for redemption or the Authority has given irrevocable instructions to call such Bond for redemption, (b) there shall have been deposited either moneys in an amount which shall be sufficient, or Government Obligations the principal of and interest on which are sufficient, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given irrevocable instructions to give, as soon as practicable, a notice to the holder of such Bond by first-class mail, postage prepaid, stating that the deposit in trust of moneys or such time deposits or Government Obligations required by clause (b) of this paragraph has been made and that such Bond is deemed to have been paid in accordance with the Resolution and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

Neither the moneys nor Government Obligations deposited with the 1968 Fiscal Agent or other appropriate fiduciary institution acting as escrow agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and redemption premium, if any, and interest on the Bonds which have been defeased.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the terms of the provisions of the resolution which authorized the issuance of such Variable Rate Bonds.

Notwithstanding any of the provisions of the Resolution to the contrary, Put Bonds and Extendible Maturity Bonds may only be fully discharged and satisfied either by paying the principal of and interest on said Bonds as they become due and payable or by depositing moneys which shall be sufficient at the time of such deposit to pay when due the maximum amount of principal of and redemption premium, if any, and interest on such Put Bonds and Extendible Maturity Bonds which could become payable to the holders of such Bonds upon the exercise of any options provided to the holders of such Bonds and the Authority; provided, however, that if, at the time a deposit is made pursuant to this paragraph, the options originally exercisable on the Put Bonds and Extendible Maturity Bonds are no longer exercisable, such Bonds shall not be considered Put Bonds or Extendible Maturity Bonds for these purposes.

If any portion of the moneys deposited for the payment of the principal of and redemption premium, if any, and interest on any portion of Bonds is not required for such purpose, the Authority may use the amount of such excess, subject to certain tax covenants contained in the Resolution, free and clear of any trust, lien, security interest, pledge or assignment securing said Bonds or otherwise existing under the Resolution. (Section 901).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the purposes for which additional Bonds may be

issued are limited to refunding other Bonds for debt service savings and to exchange Bonds for Special Facility Bonds.

Bonds may be issued under and secured by the Resolution, subject to the conditions hereinafter described, at any time or times for the purpose of providing funds to pay the cost of Traffic Facilities, to refund all or any part of the outstanding Bonds of any one or more Series by payment at maturity or redemption at a selected redemption date or dates, including the payment of any redemption premium thereon, to fund a deposit to the 1968 Reserve Account and to pay any costs of issuance of such Bonds. (Sections 208 and 209).

Before such Bonds shall be authenticated and delivered, there shall be filed with the 1968 Fiscal Agent, among other things, a certificate dated the date of original issuance of the Bonds, signed by the Executive Director, setting forth:

(i)     the amount of the Revenues for any twelve (12) consecutive calendar months out of the fifteen (15) calendar months immediately preceding the month in which such certificate is signed;

(ii)    the amount of the Toll Revenues for the twelve (12) calendar months for which the Revenues are shown in item (i) above;

(iii)   the difference between the amounts set forth in items (i) and (ii) above;

(iv)    the amount of the maximum Principal and Interest Requirement for any fiscal year thereafter on account of the Bonds then outstanding and the Bonds then requested to be delivered;

(v)     the percentage derived by dividing the amount in item (i) above by the amount in item (iv) above; and

(vi)    the percentage derived by dividing the amount in item (iii) above by the amount in item (iv) above.  (Section 208).

The 1968 Fiscal Agent may only deliver such additional Bonds if the percentage shown in either item (v) or item (vi) is not less than 150%. (Section 208). The Authority need not deliver said certificate in connection with the issuance of refunding bonds if the Executive Director delivers a certificate to the effect that the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Bonds to be outstanding after the issuance of the refunding Bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Bonds outstanding prior to the issuance of such refunding Bonds. (Section 209).

If the percentage shown in item (vi) of the certificate mentioned above and filed with the 1968 Fiscal Agent in connection with the issuance of any additional Bonds is less than 150%, the Authority may not reduce the tolls or other charges imposed by it for the use of its Traffic Facilities such that, as of the effective date of such reduction, the amount of Revenues for any twelve (12) consecutive calendar months out of the fifteen (15) calendar months immediately preceding such effective date, adjusted to reflect the Toll Revenues it would have received, based on the volume of traffic for such twelve (12) months, if such reduction had been in effect for such twelve (12) months, is less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all Bonds then outstanding.  (Section 609).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the ability of the Authority to reduce tolls or other charges imposed by it for the use of its Toll Facilities is further restricted as described in "Miscellaneous Covenants--Level of Tolls and Other Charges" under *Summary of Certain Provisions of the 1998 Resolution*.

Any increase in the 1968 Reserve Requirement resulting from the issuance of such additional Bonds may be satisfied by equal deposits of 20% of such increase into the 1968 Reserve Account in each of the next five years beginning with the fiscal year in which such additional Bonds were issued. (Section 401).

**Other Indebtedness**

The Authority will not incur any indebtedness nor create or cause or suffer to be created any debt, lien, pledge, assignment, encumbrance or any other charge having a priority to or being on a parity with the lien on Revenues of the Bonds issued under the Resolution, except upon the conditions and in the manner provided in the Resolution. Any other indebtedness incurred by the Authority shall contain an express statement that such indebtedness is junior, inferior and subordinate in all respects to the Bonds. For purposes of the above limitation in incurrence of indebtedness, indebtedness shall not be deemed to include contracts entered into in the ordinary course of business or agreements to repay advances received from the federal government. Nothing in the Resolution shall be deemed to prohibit the Authority from entering into currency swaps, interest rate swaps or other arrangements for hedging of interest rates on any indebtedness. (Section 602).

Nothing in the Resolution is to be construed as preventing the Authority from financing any facilities authorized by the act creating the Authority by the issuance of bonds or other obligations which are not secured under the provisions of the Resolution. (Section 1001).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority may not incur any indebtedness nor create or suffer to be created any lien, pledge, assignment, encumbrance or charge upon the Existing Toll Facilities or the Existing Tax and Fee Revenues ranking equally with or prior to the Bonds.

**Investment of Funds**

Moneys held for the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations, and moneys held for the credit of the 1968 Construction Fund and the 1968 Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations, which Government Obligations and Investment Obligations shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of such Fund or Accounts will be required for the purposes intended. Amounts on deposit in the 1968 Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Bonds outstanding. (Section 502).

Investment earnings on moneys on deposit to the credit of the following Fund and Accounts shall be applied as follows:

(a)     investment earnings on moneys on deposit to the credit of the 1968 Construction Fund shall be retained to the credit of said Fund;

(b)    investment earnings on moneys on deposit to the credit of the 1968 Reserve Account shall be retained in said Account at any time that the amounts on deposit to the credit of said Account are less than the 1968 Reserve Requirement and, if moneys on deposit therein are sufficient for such purposes, then such earnings shall be withdrawn and deposited to the credit of the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as the Authority shall direct; and

(c)    investment earnings on moneys on deposit to the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall be transferred to the 1968 Construction Fund or at the option of the Authority retained in such Account. (Section 502).

In computing the amount in any Fund or Account created pursuant to the provisions of the Resolution, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such Fund or Account. The computation of the amount on deposit in or credited to the Fund and Accounts created under the Resolution and the valuation of the investments of such amount shall be performed by the 1968 Fiscal Agent as of the close of business on the last day of each fiscal year and at such other times as the Authority shall request, and such computation and valuation shall not be required to be performed at other times. (Section 503).

**Modifications**

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the ability of the Authority to amend the Resolution will be limited. See "Miscellaneous Covenants--Relating to the 1968 Resolution" in *Summary of Certain Provisions of the 1998 Resolution*.

The Authority may adopt resolutions supplemental to the Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission, or to correct any inconsistent provisions or errors in the Resolution or any supplemental resolution, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security, or to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Resolution, or to add to the covenants and agreements of the Authority in the Resolution or to surrender any right or power reserved to or conferred upon the Authority, or to make necessary changes to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds, and such other bonds as may be marketable from time to time, or to make changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any Series of Bonds. (Section 801).

Subject to the terms and provisions contained below, and not otherwise, the holders of not less than a majority in aggregate principal amount of the Bonds at the time outstanding (or in case less than all of several Series of Bonds then outstanding are affected by the supplement thereto, the holders of a majority or more in principal amount of the Bonds of the Series so affected and outstanding at the time the consent and approval are given) shall have the right, from time to time, anything contained in the

Resolution to the contrary notwithstanding, to consent to and approve the adoption by the Authority of such resolution or resolutions supplemental thereto as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Resolution or in any supplemental resolution; provided, however, that nothing contained in the Resolution shall permit, or be construed as permitting, without the consent of the holders of one hundred percent (100%) of the Bonds outstanding (a) an extension of the maturity of the principal of or interest on any Bond issued thereunder (other than as provided for by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues ranking prior to or on a parity with the lien or pledge created by the Resolution, except for a parity lien on or pledge of Revenues given to any provider of a credit facility or liquidity facility under any reimbursement or similar agreement, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to and approval of such supplemental resolution. Nothing contained in the Resolution, however, shall be construed as making necessary the approval by bondholders of the adoption of a supplemental resolutions that would otherwise not require their consent.

The consent of the holders of any Series of additional Bonds shall be deemed given if the underwriters or initial purchasers for resale consent in writing to such supplemental resolution and the nature of the amendment effected by such supplemental resolution is disclosed in the official statement or other offering document pursuant to which such series of additional Bonds is offered and sold to the public.

Upon the adoption of any supplemental resolution pursuant to the provisions of the Resolution, the Resolution shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under the Resolution of the Authority, the 1968 Fiscal Agent and all holders of Bonds then outstanding shall thereafter be determined, exercised, and enforced in all respects under the provisions of the Resolution as so modified and amended. (Section 802).

**Miscellaneous Covenants**

*Master Plan.* The Authority covenants that the master plan for the construction of required Traffic Facilities in the Commonwealth will be supplemented periodically as necessary and that the five-year Construction Improvement Program will be updated each year to cover the Traffic Facilities to be constructed by the Authority in the ensuing five-year period. (Section 603).

*Costs of Maintenance, Repair and Operation of Traffic Facilities.* The Authority covenants that, if and to the extent funds for the purpose of maintaining, repairing, and operating all Traffic Facilities financed by the Authority in whole or in part by the issuance of Bonds of the Authority under the provisions of the Resolution are not provided by the Commonwealth, the Authority will pay such costs from unencumbered funds then on deposit in the 1968 Construction Fund or from the Revenues thereafter deposited to the credit of the 1968 Construction Fund pursuant to the Resolution. (Section 604). As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority's obligations under this paragraph will be payable from moneys in the 1998 Construction Fund instead of the 1968 Construction Fund.

The Authority covenants that it will cause an annual general evaluation to be made by the Traffic Engineers of the level of maintenance of Traffic Facilities financed in whole or in part by the issuance of Bonds, which Traffic Facilities shall be, in the judgment of the Authority with the approval of the Traffic Engineers, material to the overall system of traffic facilities operated by the Authority. This evaluation is to be directed towards surface and shoulder conditions and condition of structures and signs on the Traffic

Facilities. The annual report delivered by the Traffic Engineers under Section 605 of the Resolution and the Authority's obligations to cause repairs, renewal or replacements to be made to Traffic Facilities, shall pertain to the Traffic Facilities financed in whole or in part with Bond proceeds and adjudged to be material to the overall system of traffic facilities operated by the Authority. (Section 604).

*Annual Report of Traffic Engineers.* The Authority covenants that it will cause the Traffic Engineers to prepare a report each year promptly after the completion of their general evaluation of the level of maintenance of the Traffic Facilities referred to in the preceding paragraph setting forth (i) their comments with respect to any supplements or revisions made by the Authority in the master plan or in the five-year Construction Improvement Program referred to above under "Master Plan" and their recommendations as to any supplements or revisions which should be made in such plan or in the Construction Improvement Program, and (ii) their findings as to whether the Traffic Facilities have been maintained in good repair, working order and sound condition and their recommendations as to necessary repairs, renewals or replacements. (Section 605).

If it appears from such report that repairs, renewals or replacements of any such Traffic Facilities are necessary, the Authority shall promptly cause the same to made and if and to the extent that funds for such purpose have not been made available by the Commonwealth, moneys on deposit to the credit of the 1968 Construction Fund which have not theretofore been encumbered for other purposes, and moneys which are thereafter deposited to the credit of the 1968 Construction Fund pursuant to the Resolution shall first be applied for such purpose. (Section 605). As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority's obligations under this paragraph will be payable from moneys in the 1998 Construction Fund instead of the 1968 Construction Fund.

<b>APPENDIX IV</b>

<b>SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION</b>

The following are brief summaries of certain provisions of the 1998 Resolution. Such statements do not purport to be complete and reference is made to the 1998 Resolution, copies of which are available from the Authority or the 1998 Fiscal Agent. For the purposes of this summary, the term "senior bonds" shall refer to "Senior Transportation Revenue Bonds"; the term "Subordinated Transportation Revenue Bonds" shall refer to "Subordinated Transportation Revenue Bonds"; and the term "bonds" shall refer to "Transportation Revenue Bonds"; as those terms are used in this Official Statement.

**Definition of Certain Terms**

"Accreted Value" means, with respect to any 0Capital Appreciation Bond or Capital Appreciation and Income Bond, an amount equal to the principal amount of such Bond on the date of original issuance plus the interest accrued on such Bond from the date of original issuance to the date of computation or the Interest Commencement Date, as the case may be, such interest to accrue at the rate set forth in the resolution providing for the issuance of said Bond, but not exceeding the maximum rate permitted by law, compounded periodically at the times provided for in such resolution.

"Capital Appreciation Bonds" means any bonds as to which interest is compounded periodically on each of the applicable dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by said resolution, and which may be either serial bonds or term bonds.

"Capital Appreciation and Income Bonds" means any bonds as to which accruing interest is not paid prior to the interest payment date immediately following the Interest Commencement Date specified in the resolution authorizing such Bonds and the interest on which is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either serial bonds or term bonds.

"Cost of Transportation Facilities" or "cost of Transportation Facilities" means the cost of acquisition and construction of Transportation Facilities and the cost of all labor, materials, machinery and equipment, the cost of all lands, property, rights, easements and franchises acquired, interest prior to and during construction and for any additional period authorized by law if so provided by, and subject to any limitations in, the resolution authorizing the issuance of a Series of bonds, the cost of engineering and legal services, preliminary surveys, or plans and specifications, expenses of administration properly chargeable to such construction or acquisition, legal, architectural and engineering expenses and fees, the cost of audits and of preparing and issuing the bonds, fees and expenses of the 1998 Fiscal Agent and consultants, financing charges, taxes or other governmental charges lawfully assessed during construction, claims arising in connection with construction, premiums on insurance in connection with construction, premiums for bond insurance, interest rate insurance or insurance assuring availability of the amounts required to be on deposit in the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, any amounts required to be deposited in the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, initial set-up fees and annual fees for any Credit Facility or Liquidity Facility and tender agent fees and fees payable for remarketing bonds

IV-1

supported by any Credit Facility or Liquidity Facility during such period, as may be specified in the resolution authorizing the issuance of such Series of bonds and all other items of expense not elsewhere in this definition specified, incident to the financing or construction of any Transportation Facilities and the placing of the same in operation.

"Existing Tax and Fee Revenues" means (1) the proceeds of the sixteen cents a gallon tax imposed on gasoline and one-half of the eight cents per gallon tax imposed on gas oil and diesel oil imposed by Subtitle B of Act No. 120, approved October 31, 1994, as amended, and allocated to the Authority by Act No. 223 of November 30, 1995, as amended, and by said Act's predecessor statutes and (2) the proceeds of the $15 increase per vehicle of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act. No. 9, approved August 12, 1982.

"Existing Toll Facilities Revenues" means the tolls or other charges imposed by the Authority for the use of any Traffic Facilities financed in whole or in part by the issuance of 1968 Resolution Bonds, including any extensions, betterments or improvements to such Facilities however financed or otherwise paid for.

"Fiscal Year" means the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Authority.

"Government Obligations" means (i) direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States Government, (ii) bonds, debentures or notes issued by any of the following Federal Agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association or Federal Land Banks, (iii) obligations issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, (iv) municipal obligations, the payment of the principal of and interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) of this definition and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations, and (v) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii), (iii) and (iv) of this definition held by a bank (including the 1998 Fiscal Agent) or trust company as custodian and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

"Interest Commencement Date" means, with respect to any particular Capital Appreciation and Income Bonds, the date specified in the resolution providing for the issuance of such bonds after which interest accruing on such bonds shall be payable on a periodic basis prior to maturity, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Investment Obligations" means:

        (i)      Government Obligations,

(ii)     direct and general obligations of any state or territory of the United States of America to the payment of the principal of and interest on which the full faith and credit of such state or territory is pledged, provided that such obligations are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto,

(iii)     bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the 1998 Fiscal Agent), trust company or savings and loan association (including any investment in pools of such bankers' acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clauses (i) or (ii) above, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1998 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties,

(iv)     any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the 1998 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clauses (i) or (ii) above, provided that the 1998 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties,

(v)     obligations, whether or not insured, issued by any state or territory of the United States, or any political subdivision, agency or instrumentality thereof which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto,

(vi)     participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto, and S&P or any successors thereto,

(vii)     (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and S&P or any successors thereto (without regard to gradations within such category) that (A) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and, meets the requirements of Section 852(a) of said Code for the calendar year; (B) invests all of its assets in obligations described in clauses (i) and (ii) above; and (C) has at least 98% of (I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the 1998 Fiscal Agent

IV-3

or any state or federally chartered bank, banking association, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and S&P or any successors thereto (without regard to any gradations within such category), and

(viii)    any other obligations permitted under the laws of the Commonwealth which are rated, or which are issued by issuers which are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto, or which are collateralized by such Investment Obligations.

"Mass Transit Facilities" means the equipment, omnibus facilities, rail facilities, and real property, constituting or to constitute part of, or used or reasonably anticipated to be used in connection with the operation of, any mass transportation facility or system, and related services operated by the Authority directly or by contract, lease or other arrangements entered into by the Authority, as the foregoing may from time to time be augmented or diminished.

"1968 Resolution Bonds" means all bonds issued under the 1968 Resolution.

"Principal and Interest Requirements" means for any fiscal year, as applied to the bonds of any Series issued under the provisions of the 1998 Resolution, the sum of:

(i)    the amount required to pay the interest on all outstanding bonds of such Series which is payable after July 31 in such fiscal year and on or before July 31 in the following fiscal year,

(ii)    the amount required to pay the principal of the serial bonds of such Series then outstanding which is payable after July 31 in such fiscal year and on or before July 31 in the following fiscal year, and

(iii)    the Amortization Requirement for the term bonds of such Series for such fiscal year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements for any period:

(a)    in the case of Capital Appreciation Bonds, the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included when due and payable as part of the principal or Amortization Requirements in accordance with the above provisions;

(b)    in the case of Capital Appreciation and Income Bonds, the Appreciated Value of Capital Appreciation and Income Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included when due and payable as part of the principal or Amortization Requirements in accordance with the above provisions;

(c)    the interest rate on bonds issued with a variable, adjustable, convertible or similar rate of interest shall be in the case of (A) in the case of such bonds outstanding on and before the date of calculation the greater of the average interest rate on such bonds during the sixty months or twelve months ending in either case with the month preceding the date of calculation (or such

shorter period (ending with the same month as aforesaid) that such bonds shall have been Outstanding), and (B) in the case of such bonds first being delivered on such date of calculation and are being issued (1) on the basis that interest on such bonds would be excludible from gross income of the owners thereof for federal income tax purposes, the greater of the average of the Bond Market Association Swap Index (the "BMA Index") (i) for the twelve month period and (ii) the sixty month period in either case ending seven days before the date of calculation plus 100 basis points, or (2) as bonds not described in clause (B)(1), the greater of the average of the London Interbank Offered Rate ("LIBOR") for the time period most closely resembling the reset period for such bonds (i) for the twelve month period and (ii) for the sixty month period in either case ending seven days before the date of calculation plus 100 basis points (if the BMA Index or LIBOR shall cease to be published, the index to be used shall be that index which the Authority, in consultation with Government Development Bank for Puerto Rico, determines most closely replicates such index, as set forth in a certificate of the Executive Director filed with the Fiscal Agent); provided, however, that if the Authority has notified the Fiscal Agent that a Swap agreement is in effect in respect of such bonds, then for all purposes of this paragraph, except for the purpose of determining the required deposits to the Senior Bond Sinking Fund or the Subordinated Bond Sinking Fund described in "Sinking Funds" below, the interest rate on such bonds shall be the Swap rate under such Swap agreement; and if such Swap rate is a variable rate, the interest rate on such bonds (except for the purpose specified above in this paragraph) shall be the average Swap rate for the preceding sixty months (or such shorter period that the Swap agreement has been in effect), or if such Swap agreement has not been in effect prior to the date of calculation, the Swap rate on the date of calculation;

(d) in the case of the bonds which by their terms may be tendered at the option of the holder thereof for payment prior to maturity, the tender date or dates shall be ignored if the tender price for such bonds is payable from a letter of credit or insurance policy or similar credit or liquidity facility and the stated dates for Amortization Requirements and principal payments shall be used; provided, however, that if the issuer of the letter of credit or insurance policy or similar credit or liquidity facility has advanced funds thereunder and such amount has not been repaid, Principal and Interest Requirements shall include the repayment obligations thereof in accordance with the principal repayment schedule and interest rate or rates specified in the letter of credit or insurance policy or similar credit or liquidity facility or in the agreement with the Authority providing for the issuance of such instrument;

(e) in the case of bonds the maturity of which may be extended by and at the option of the holder of the bonds or the Authority, the bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

(f) in the case of bonds (A) which are expected to be repaid from the proceeds of bonds or other indebtedness or (B) on which interest is payable periodically and for which twenty-five percent (25%) or more of the principal amount matures during any one year and for which no Amortization Requirements have been established, the debt service requirements of the bonds may be excluded and in lieu thereof the bonds shall be treated, for purposes of the computation of Principal and Interest Requirements, as debt securities having a comparable federal tax status as such bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than thirty (30) years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities issued on the date of issuance of the bonds and issued by issuers having a credit rating, issued by Moody's or any successors thereto or S&P or any successors thereto, comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g) if all or a portion of the principal of or interest on a Series of bonds is payable from moneys irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations irrevocably set aside or deposited for such purpose on the date of computation, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the above computation shall be supported by a verification report from a nationally recognized independent certified public accountant as to the sufficiency of such moneys set aside and projected earnings.

"Reserve Account Insurance Policy" means an insurance policy, surety bond or other acceptable evidence of insurance, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of a municipal bond insurer whose policy or bond results in the rating of municipal obligations secured by such policy or bond, at the time of deposit to the credit of the Reserve Account, in either of the two highest rating categories (without regard to any gradations within either such category) of either Moody's or any successors thereto or S&P or any successors thereto.

"Reserve Account Letter of Credit" means an irrevocable, transferable letter of credit, which letter of credit constitutes an unconditional senior obligation of a banking association, bank or trust company or branch thereof whose letter of credit results in the rating of municipal obligations secured by such letter of credit, at the time of deposit to the credit of the Reserve Account, in either of the two highest categories (without regard to any gradations within either such category) of either Moody's or any successors thereto or S&P or any successors thereto and any agreement of the type referred to in the definition of "Subordinated Reserve Requirement."

"Revenues" means all moneys received by the Authority on account of the crude oil tax allocated to the Authority by Act No. 34, approved July 16, 1997, as amended, all Existing Tax and Fee Revenues upon the repeal and cancellation of the 1968 Resolution, any tolls or other charges imposed by the Authority for the use of any of the Toll Facilities other than Existing Toll Facilities Revenues received by the Authority prior to the repeal and cancellation of the 1968 Resolution, the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal of and interest on bonds or other obligations issued under the provisions of the 1998 Resolution, and investment earnings on deposits to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund.

"Senior Reserve Requirement" with respect to the senior bonds means the lesser of (i) the maximum Principal and Interest Requirements for any fiscal year on account of the outstanding senior bonds and (ii) ten (10%) percent of the original principal amount of each Series of senior bonds outstanding determined on the basis of their initial offering prices to the public.

"Subordinated Reserve Requirement" with respect to any Series of Subordinated Transportation Revenue Bonds means that amount fixed from time to time by resolution of the Authority as the amount required to be held to the credit of a separate account in the Subordinated Bond Reserve Fund corresponding to such Series. For purposes of determining the amount on deposit to the credit of any such separate account, any agreement between the 1998 Fiscal Agent and a financial institution serving as the depository institution of the Commonwealth state infrastructure bank (or other similar fund) created by virtue of Section 350 of the National Highway System Designation Act of 1995, as amended (23 U.S.C. Section 101), or any similar federal legislation, pursuant to which agreement such depository institution irrevocably agrees to

provide funds to the 1998 Fiscal Agent for deposit to the credit of any separate account in the Subordinated Bond Reserve Fund shall be treated as satisfying the applicable Subordinated Reserve Requirement to the extent of the maximum amount of funds so available to be provided to the 1998 Fiscal Agent for deposit to the credit of such separate account.

"Swap agreement" means an agreement between the Authority and a Swap party whereby the Swap party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on bonds issued under the 1998 Resolution with a variable, adjustable, convertible or similar rate of interest at or prior to the times such interest is due and payable in consideration of the Authority's payment to the Swap party of amounts set forth in the Swap agreement.

"Swap party" means a person who is party to a Swap agreement and whose senior obligations are rated at the time of the execution and delivery of such Swap agreement in one of the three highest rating categories (without regard to any gradations within any such category) by (i) S&P or its successors and (ii) Moody's or its successors.

"Swap rate" means the fixed rate per annum on the principal amount of bonds issued under the 1998 Resolution with a variable, adjustable, convertible or similar rate of interest covered by a Swap agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the Swap party less the amount paid to the Authority by the Swap party by (ii) such principal amount of bonds; provided, however, that if such Swap agreement has been in effect for less than twelve months, such percentage shall be multiplied by 360 divided by the number of days between the effective date of such Swap agreement and the date of calculation determined on the basis of 30-day months;

"Toll Facilities" means any Traffic Facilities for the use of which the Authority imposes tolls.

"Traffic Facilities" means any of the following facilities for which 1968 Resolution Bonds or bonds or other obligations shall be issued by the Authority under the provisions of the 1998 Resolution the cost of which facilities paid from the proceeds of such bonds or other obligations shall not have been reimbursed to the Authority from funds not encumbered by the 1998 Resolution or the 1968 Resolution:

      (i)     roads, avenues, streets, thoroughfares, speedways, bridges, tunnels, channels, stations, terminals and any other land or water facilities necessary or desirable in connection with the movement of persons, freight, vehicles or vessels;

      (ii)    parking lots and structures and other facilities necessary or desirable in connection with parking, loading or unloading of all kinds of vehicles or vessels; and

      (iii)   all property rights, easements, and interests therein necessary or desirable for the construction, maintenance, control, operation or development of such traffic facilities.

"Transportation Engineers" means the engineer or engineers or engineering firms or corporations at the time employed by the Authority under the provisions of the 1998 Resolution.

"Transportation Facilities" means all Traffic Facilities, all Mass Transit Facilities, and any other highway, road, transportation or other facilities or undertakings permitted from time to

time by the enabling act for which bonds or other obligations shall be issued by the Authority under the provisions of the 1998 Resolution the cost of which facilities paid from the proceeds of such bonds or other obligations shall not have been reimbursed to the Authority from funds not encumbered by the 1998 Resolution.

**Sinking Funds**

The 1998 Resolution creates the "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund" (the "Senior Bond Sinking Fund"). The "Senior Bond Service Account," "Senior Bond Redemption Account," and "Senior Bond Reserve Account" are created within the Senior Bond Sinking Fund. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds Interest and Sinking Fund" (the "Subordinated Bond Sinking Fund"). The "Subordinated Bond Service Account," and "Subordinated Bond Redemption Account" are created within the Subordinated Bond Sinking Fund. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds Reserve Fund" (the "Subordinated Bond Reserve Fund"). The Authority may establish one or more accounts in the Subordinated Bond Reserve Fund to correspond to Series of Subordinated Transportation Revenue Bonds with different Subordinated Reserve Requirements. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"). The Authority has covenanted that all Revenues (except investment earnings on deposits to the credit of the funds and accounts established under the 1998 Resolution) will be deposited when received to the credit of the Revenue Fund. Until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the Authority shall on or before the last day of the month during which the 2003 Bonds shall be issued and on or before the 25th day of each month thereafter withdraw from the 1968 Construction Fund and transfer to the credit of the Revenue Fund all unencumbered moneys held for the credit of the 1968 Construction Fund (herein "unencumbered 1968 Construction Fund moneys"), such transfer to be made on the books of the Authority as of the close of the preceding month. (Section 401).

The moneys in each Fund or Account are held by the 1998 Fiscal Agent in trust and, pending application, are subject to a lien in favor of the holders of the outstanding bonds and for the further security of such holders until paid out or transferred as provided in the 1998 Resolution. (Section 401).

All Revenues (other than investment earnings), Excess 1968 Resolution Revenues and any other funds of the Commonwealth allocated to the Authority for the payment of principal of and interest on any bonds, are withdrawn monthly from the Revenue Fund and deposited with the 1998 Fiscal Agent as follows:

(1)     to the Senior Bond Service Account, an amount equal to 1/6th of the amount of interest payable on all senior bonds of each Series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of principal of any serial bonds of such Series until the amount in the Senior Bond Service Account equals the amount of interest

payable on such interest payment date and the amount of such principal installment; but the amount so deposited on account of the interest in each month after the delivery of the senior bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited to the credit of the Senior Bond Service Account;

(2)     to the Senior Bond Redemption Account, an amount equal to 1/12th of the Amortization Requirement for such fiscal year for the term bonds of each Series of senior bonds then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Senior Bond Sinking Fund;

(3)     to the Senior Bond Reserve Account, such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the Senior Reserve Requirement; but such deposits shall only be made to the extent necessary to make the amount then in the Senior Bond Reserve Account equal to the Senior Reserve Requirement; and provided, further, that in the event of an increase in the Senior Reserve Requirement due to the issuance of additional Series of senior bonds, such increase will be funded by deposits in each of the five (5) years, commencing in the fiscal year in which such additional Series of senior bonds is issued, of 20% of such increase in the Senior Reserve Requirement;

(4)     to the Subordinated Bond Service Account, an amount equal to one-sixth (1/6) of the amount of interest payable on all Subordinated Transportation Revenue Bonds of each Series on the interest payment date next succeeding and an amount equal to one-twelfth (1/12) of the next maturing installment of principal of such serial bonds of such Series until the amount in the Subordinated Bond Service Account equals the amount of interest payable on such interest payment date and the amount of such principal installment; but the amount so deposited on account of interest in each month after the delivery of the Subordinated Transportation Revenue Bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited with the 1998 Fiscal Agent to the credit of the Subordinated Bond Service Account;

(5)     to the Subordinated Bond Redemption Account, an amount equal to one-twelfth (1/12) of the Amortization Requirement for such fiscal year for the term bonds of each Series of Subordinated Transportation Revenue Bonds then outstanding plus one-twelfth (1/12) of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Subordinated Bond Sinking Fund;

(6)     to each separate account within the Subordinated Bond Reserve Fund, such amount, if any, of any balance remaining after making the deposits described under paragraph (1) through (5) above (allocated pro rata to each account on the basis of the corresponding Subordinated Reserve Requirements) at least equal to the respective deposit requirements corresponding to each such account established by the Authority; but no such deposits to any such account described under this paragraph will be made in any month if the amount then to the

credit of such account shall be equal to the applicable Subordinated Reserve Requirement; and provided, further, that notwithstanding the above, in the event that any Subordinated Reserve Requirement increases on account of the issuance of additional Series of Subordinated Transportation Revenue Bonds, the Authority may provide for equal annual deposits as will ensure that the applicable Subordinated Reserve Requirement will be met not earlier than the end of a five year period following the issuance of such Series of Subordinated Transportation Revenue Bonds; and

(7)    the balance remaining after making the deposits referred to above shall be deposited to the credit of the 1998 Construction Fund for use by the Authority for any of its authorized purposes, subject to the provisions of Sections 604 and 605 of the 1998 Resolution. (Section 401).

The requirements specified in paragraphs (1) through (6) above are cumulative. (Section 401).

The Authority further covenants that any other funds which it receives from the Commonwealth or any other source to make up any deficiencies in the amounts needed to pay the principal of and interest on any bonds issued under the provisions of the 1968 Resolution and the 1998 Resolution will be applied for such purpose first to make up any deficiencies in the amounts needed to pay the principal and interest on any 1968 Resolution Bonds and then to make up any such deficiencies needed to pay such principal of and interest on the senior bonds and then the Subordinated Transportation Revenue Bonds. (Section 401).

When the 1968 Resolution is repealed and cancelled, all moneys (other than those held for the redemption or payment of 1968 Resolution Bonds), including obligations purchased as an investment of such moneys will be withdrawn from the 1968 Construction Fund and 1968 Sinking Fund and deposited into the Revenue Fund. (Section 402).

Moneys in the Senior Bond Redemption Account shall be applied to the retirement of senior bonds as follows:

(a)    Subject to the provisions of paragraph (c) below, the 1998 Fiscal Agent shall endeavor to purchase outstanding senior bonds, whether or not such bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such bonds if such bonds should be called for redemption on such date from moneys in the Senior Bond Sinking Fund. The 1998 Fiscal Agent shall pay the interest accrued on such bonds to the date of delivery thereof from the Senior Bond Service Account and the purchase price from the Senior Bond Redemption Account, but no such purchase shall be made within 45 days next preceding any interest payment date on which such bonds are subject to redemption except from moneys in excess of the amounts set aside or deposited for the redemption of senior bonds.

(b)    Subject to the provisions of paragraph (c) below, the 1998 Fiscal Agent shall call for redemption on each date on which senior bonds are subject to redemption from moneys in the Senior Bond Sinking Fund on the forty-fifth day prior to such redemption date such amount of senior bonds then subject to redemption as, with the redemption premium, if any, will exhaust the Senior Bond Redemption Account as nearly as may be; but not less than $50,000 principal amount of senior bonds shall be called for redemption at any one time.

(c)     Moneys in the Senior Bond Redemption Account shall be applied to the purchase or redemption of senior bonds in the following order:

First, the term bonds of each Series of senior bonds, if any, in the order of their issuance, to the extent of the Amortization Requirement, if any, of the then current fiscal year for such term bonds and any deficiency in preceding fiscal years in the purchase or redemption of such term bonds under the provisions of this subdivision; but if none of the term bonds of a Series of senior bonds shall be subject to redemption from moneys in the Senior Bond Sinking Fund and if the 1998 Fiscal Agent shall at any time be unable to exhaust the moneys applicable to the bonds of any such Series in the purchase of such bonds under the provisions of paragraph (a) above, such moneys or the balance of such moneys, as the case may be, shall be retained in the Senior Bond Redemption Account and, as soon as it is feasible, applied to the retirement of the bonds of such Series;

Second, to the purchase of any outstanding senior bonds, whether or not such bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

Third, term bonds of each Series of senior bonds in proportion (as nearly as practicable) to the aggregate principal amount of the bonds of each such Series originally issued; and

Fourth, after the retirement of all term senior bonds, any balance shall be applied to the retirement of serial senior bonds of each Series in proportion to the aggregate principal amount of each such Series originally issued.

All expenses in connection with such purchase or redemption shall be paid from the 1998 Construction Fund.  (Section 404).

Moneys in the Senior Bond Reserve Account shall be used for the purpose of paying interest on the senior bonds and maturing principal of serial senior bonds whenever and to the extent that the moneys held for the credit of the Senior Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Senior Bond Redemption Account whenever and to the extent that the Revenues or other moneys deposited to the credit of the Revenue Fund are insufficient for such purpose; but prior to making any withdrawal from the Senior Bond Reserve Account, the 1998 Fiscal Agent shall withdraw first available unencumbered moneys in the 1998 Construction Fund and then any moneys held to the credit of the Subordinated Bond Redemption Account and then any moneys held to the credit of the Subordinated Bond Service Account in respect of the principal of any Subordinated Transportation Revenue Bonds and finally any other moneys held to the credit of the Subordinated Bond Service Account and transfer all such money so withdrawn to the Senior Bond Service Account or the Senior Bond Redemption Account in the respective amounts necessary to cure any insufficiencies in said Accounts.  (Sections 405, 409, and 411).

Moneys held in the Subordinated Bond Service Account and Subordinated Bond Redemption Account will be applied to the payment of Subordinated Transportation Revenue Bonds' debt service in the same manner as moneys in the Senior Bond Service Account and the Senior Bond Redemption Account are applied to the payment of senior bonds' debt service, subject to the provisions employing moneys in the Subordinated Bond Sinking Fund to address insufficiencies in the Senior Bond Sinking Fund described in the previous paragraph.  (Sections 406, 407, and 411).

Money held for the credit of each account in the Subordinated Bond Reserve Fund shall be used for the purpose of paying interest on each Series of Subordinated Transportation Revenue Bonds and maturing principal of serial Subordinated Transportation Revenue Bonds of each such Series to which such account relates whenever and to the extent that the moneys held for the credit of the Subordinated Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Subordinated Bond Redemption Account whenever and to the extent that the Revenues or other moneys deposited to the credit of the Revenue Fund are insufficient for such purpose. (Section 408).

The Authority may deposit into the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to all or a portion of the applicable reserve requirement, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any interest payment date on which a deficiency exists in the applicable reserve account which cannot be otherwise cured. If a disbursement is made under the Reserve Account Insurance Policy or the Reserve Account Letter of Credit, the Authority shall be obligated either to reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement, or to deposit into the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund from Revenues, funds in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit, and any moneys held in any such reserve account may be applied for such purpose. (Sections 401, 405, and 408).

**1998 Construction Fund**

Before any payment or withdrawal shall be made from moneys in the 1998 Construction Fund there shall be filed with the 1998 Fiscal Agent a certificate signed by a designated officer of the Authority setting forth the amount of money to be so disbursed and stating that such money will be used to pay the costs of constructing Transportation Facilities or for other authorized purposes. Upon receipt of such certificate the 1998 Fiscal Agent shall withdraw from the 1998 Construction Fund and deposit to the credit of a special checking account in its commercial department in the name of the Authority the amount so specified in such certificate. The 1998 Fiscal Agent shall also at any time at the written direction of the Authority transfer any part of the unencumbered moneys in the 1998 Construction Fund to the credit of any account in the Senior Bond Sinking Fund and shall make the transfers to the Senior Bond Service Account and Senior Bond Redemption Account to cure deposit deficiencies therein as described above. (Section 409).

**Defeasance**

If all the outstanding bonds shall have been paid or deemed to have been paid as provided below, then and in that case the rights, title, and interest of the 1998 Fiscal Agent under the 1998 Resolution shall cease, terminate, and become void, and such bonds shall cease to be entitled to any lien, benefit or security under the 1998 Resolution. In such event, the Authority shall repeal and cancel the 1998 Resolution and may apply any surplus in the Senior Bond Sinking Fund, Subordinated Bond Sinking Fund, and all balances remaining in any other fund and accounts other than moneys held for the redemption or payment of bonds to any lawful purposes of the Authority.

Any outstanding bond shall be deemed to have been paid within the meaning and with the effect expressed in the 1998 Resolution when the whole amount of the principal of, redemption premium, if any, and interest on such bond shall have been paid or duly provided for and the conditions set forth in clause (c) below have been satisfied, when (a) in case such bond has been called for redemption or the Authority shall have given to the 1998 Fiscal Agent irrevocable instructions to call such bond for redemption, (b) there shall have been deposited with the 1998 Fiscal Agent Government Obligations the principal of and interest on which are sufficient, without any reinvestment thereof, to pay when due the principal of and premium, if any, and interest due and to become due on such bond on or prior to the redemption date or maturity date thereof, as the case may be, and (c) if such bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the 1998 Fiscal Agent irrevocable instructions to give, as soon as practicable, a notice to the holder of such bond by first-class mail, postage prepaid, stating that the deposit of moneys or Government Obligations required by clause (b) of this paragraph has been made with the 1998 Fiscal Agent or other appropriate fiduciary institution acting as escrow agent for the holder of such bond, and that such bond is deemed to have been paid in accordance with the 1998 Resolution and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such bond.

Neither the moneys nor Government Obligations deposited with the 1998 Fiscal Agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and redemption premium, if any, and interest on the bonds which have been defeased.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the terms of the provisions of the resolution which authorized the issuance of such Variable Rate Bonds. (Section 1001).

**Issuance of Additional Bonds**

Senior bonds may be issued under and secured by the 1998 Resolution, subject to the conditions hereinafter described, at any time or times for any lawful purpose of the Authority. (Sections 208 and 209).

Before such bonds shall be delivered, there shall be filed with the 1998 Fiscal Agent, among other things, a certificate signed by the Executive Director not earlier than thirty (30) days prior to the delivery date of such bonds setting forth:

(i) the amount of Revenues received by the Authority and until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the amount of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund in each of the fifteen (15) months immediately preceding the month in which such certificate is signed, adjusted (I) to give effect to legislation enacted on or prior to the date of delivery of such bonds that would have increased the Revenues or the amounts of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund as aforesaid if such legislation (x) had been in effect throughout such fifteen (15) months, (y) allocates additional moneys to the Authority and (z) expressly permits the Authority to pledge to the payment of the bonds issued under the provisions of the 1998 Resolution or the 1968 Resolution until the 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution and the Authority has expressly

IV-13

pledged such additional moneys to such payment on or prior to such date of delivery and (II) to reflect the moneys which would have been received if (A) the schedule of tolls in effect on the date of delivery of such bonds had been in effect and (B) the Toll Facilities to be financed in whole or part with the proceeds of such bonds had been in operation throughout such fifteen (15) months,

(ii)     the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the senior bonds then requested to be delivered, and

(iii)     the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the senior bonds then requested to be delivered; and

(iv)     the percentage derived by dividing the amount in item (i) above for any twelve consecutive months by the amount in item (ii) above; and

(v)     the percentage derived by dividing the amount in item (i) above for any twelve consecutive months by the amount in item (iii) above. (Section 208).

The 1998 Fiscal Agent may only deliver such additional senior bonds if the percentages shown in item (iv) and item (v) are not less than 150% and 100%, respectively. (Section 208).

The Authority need not deliver said certificate in connection with the issuance of senior bonds issued for the purpose of refunding senior bonds of any Series if the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the senior bonds to be outstanding after the issuance of such refunding senior bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the senior bonds outstanding prior to the issuance of such refunding senior bonds. (Section 209).

Subordinated Transportation Revenue Bonds may be issued under and secured by the 1998 Resolution, subject to the conditions described below, at any time or times for the purpose of paying the cost of any Transportation Facilities falling within the definition of "Federal-aid highway" or "capital projects" under Section 101 of Title 23 and Section 5302 of Title 49, respectively, of the United States Code, as such definitions may be amended from time to time, or qualifying for any other federal transportation assistance for the defraying (directly or indirectly) of such cost. (Section 210).

Before Subordinated Transportation Revenue Bonds shall be delivered, there shall be filed with the 1998 Fiscal Agent, among other things, a certificate signed by the Executive Director not earlier than thirty (30) days prior to the delivery date of such Subordinated Transportation Revenue Bonds indicating that the percentage derived by dividing (a) the amount of Revenues and Excess 1968 Resolution Revenues determined in the same manner as specified in clause (i) above by (b) the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the Subordinated Transportation Revenue Bonds then requested to be delivered is not less than 125%. (Section 210).

IV-14

Refunding Subordinated Transportation Revenue Bonds may be issued only to refund other Subordinated Transportation Revenue Bonds of any Series. The Authority need not deliver said certificate in connection with the issuance of refunding Subordinated Transportation Revenue Bonds if the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such refunding Subordinated Transportation Revenue Bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Subordinated Transportation Revenue Bonds outstanding prior to the issuance of such refunding Subordinated Transportation Revenue Bonds. (Section 211).

**Other Indebtedness**

The Authority will not incur any indebtedness nor create or suffer to be created any lien, pledge, assignment, encumbrance or charge upon the Revenues ranking equally with or prior to the senior bonds issued under the 1998 Resolution, except the lien and charge of the senior bonds secured by the 1998 Resolution, or ranking equally with the Subordinated Transportation Revenue Bonds except the lien and charge of the Subordinated Transportation Revenue Bonds secured by the 1998 Resolution. Any other indebtedness incurred by the Authority after the effective date of the 1998 Resolution under documents not in effect on the effective date of the 1998 Resolution shall contain a statement that such indebtedness is junior, inferior and subordinate in all respects to the bonds. For purposes of the above limitation on incurrence of indebtedness, indebtedness shall not be deemed to include contracts entered into in the ordinary course of business, agreements to repay advances received from the Federal government or agreements to repay (to the extent drawn) all or a portion of the stated amount drawn under any Credit Facility, Liquidity Facility, Reserve Account Letter of Credit or Reserve Account Insurance Policy. Nothing in the 1998 Resolution shall be deemed to prohibit the Authority from entering into currency swaps, interest rate swaps or other arrangements for hedging of interest rates on any indebtedness. (Section 602).

Nothing in the 1998 Resolution is to be construed as preventing the Authority from financing any facilities authorized by the act creating the Authority, as amended, by the issuance of bonds or other obligations which are not secured under the provisions of the 1998 Resolution. (Section 1101).

**Investment of Funds**

Moneys held for the credit of the Revenue Fund, Senior Bond Service Account, Senior Bond Redemption Account, Subordinated Bond Service Account, and Subordinated Bond Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations, and moneys held for the credit of the 1998 Construction Fund, Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations, which Government Obligations and Investment Obligations shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said Fund or Accounts will be required for the purposes intended. Amounts on deposit in the Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall be invested in Investment Obligations which mature not later than the final maturity date of any senior bonds or Subordinated Transportation Revenue Bonds outstanding, as the case may be. (Section 502).

Investment earnings on moneys on deposit to the credit of the following Funds and Accounts shall be applied as follows:

(a)    Investment earnings on moneys on deposit to the credit of the Senior Bond Service Account, the Senior Bond Redemption Account, the Subordinated Bond Service Account, the Subordinated Bond Redemption Account and the 1998 Construction Fund shall be transferred to the credit of or retained in the 1998 Construction Fund; but the Authority may elect to have such investment earnings remain to the credit of the Senior Bond Service Account, the Senior Bond Redemption Account, the Subordinated Bond Service Account or the Subordinated Bond Redemption Account to fund the next payment of principal of, Amortization Requirements for and interest on the senior bonds or the Subordinated Transportation Revenue Bonds, in which event the Authority shall receive a credit against the amounts required to be deposited in said Accounts as applicable;

(b)    Investment earnings on moneys on deposit to the credit of the Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall be retained in said accounts at any time that the respective amounts on deposit to the credit of said accounts is less than the Senior Reserve Requirement or the corresponding Subordinated Reserve Requirement, as applicable; and

(c)    Investment earnings on moneys on deposit to the credit of the Revenue Fund shall be retained therein. (Section 502).

In computing the amount in any Fund or Account created pursuant to the provisions of the 1998 Resolution, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such Fund or Account. The computation of the amount on deposit in or credited to the Fund and Accounts created under the 1998 Resolution and the valuation of the investments of such amount shall be performed by the 1998 Fiscal Agent as of the close of business on the last day of each fiscal year and at such other times as the Authority shall request, and such computation and valuation shall not be required to be performed at other times. (Section 503).

## Modifications

The Authority may adopt resolutions supplemental to the 1998 Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission, or to correct any inconsistent provisions or errors in the 1998 Resolution or any supplemental resolution, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security, or to add to the conditions, limitations and restrictions on the issuance of bonds under the provisions of the 1998 Resolution or to add to the covenants and agreements of the Authority in the 1998 Resolution or to surrender any right or power reserved to or conferred upon the Authority, or to amend the conditions, limitations and restrictions on the issuance of Subordinated

IV-16

Transportation Revenue Bonds or the covenants and agreements relating to the Subordinated Transportation Revenue Bonds (as shall not adversely affect the interests of the holders of any senior bonds) as may be required to enable the Authority to comply with the provisions of any federal legislation, rules or regulations or court decisions or orders relating to the receipt by the Authority of grants or other assistance from the United States Government. (Section 801).

The holders of not less than a majority in aggregate principal amount of the senior bonds and of the Subordinated Transportation Revenue Bonds then outstanding and affected thereby shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the 1998 Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the 1998 Resolution or in any supplemental resolution; but nothing contained in the 1998 Resolution shall permit, or be construed as permitting, without consent of the holders of all bonds affected thereby, (a) an extension of the maturity of the principal of or the interest on any bond, or (b) a reduction in the principal amount of any bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues other than the lien and pledge created by the 1998 Resolution, or (d) a preference or priority of any bond or bonds over any other bond or bonds, or (e) a reduction in the aggregate principal amount of the bonds required for consent to such supplemental resolution, or (f) a change in the subordination provisions. (Section 802).

If at any time the Authority determines that it is necessary or desirable to adopt any supplemental resolution for any of the purposes of the above paragraph, the 1998 Fiscal Agent at the expense and request of the Authority shall cause notice of the proposed adoption of such supplemental resolution to be mailed, first class, postage prepaid, to all bondholders and to Government Development Bank for Puerto Rico. Such notice shall briefly set forth the nature of the proposed supplemental resolution and shall state that copies thereof are on file at the office of the 1998 Fiscal Agent for inspection by all bondholders. The 1998 Fiscal Agent shall not, however, be subject to any liability to any bondholder by reason of its failure to cause such notice to be mailed, and any such failure shall not affect the validity of such supplemental resolution when consented to and approved. (Section 802).

Whenever, at any time within one year after the date of the mailing of such notice, the Authority shall obtain an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the senior bonds and of the Subordinated Transportation Revenue Bonds then Outstanding, which instrument or instruments shall refer to the proposed supplemental resolution described in such notice and shall specifically consent to and approve the adoption thereof in substantially the form of the copy thereof referred to in such notice, and the Authority shall deliver to the 1998 Fiscal Agent a certificate signed by the Executive Director that the holders of such required percentages of bonds have filed such consents, thereupon, but not otherwise, the Authority may adopt such supplemental resolution in substantially such form, without liability or responsibility to any holder of any bond, whether or not such holder shall have consented thereto. (Section 802).

If the holders of not less than a majority in aggregate principal amount of the affected senior bonds and of the affected Subordinated Transportation Revenue Bonds outstanding at the time of the adoption of such supplemental resolution shall have consented to and approved the adoption thereof, no holder of any bond shall have any right to object to the adoption of such supplemental resolution, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the adoption thereof, or to enjoin or restrain the Authority from adopting the same or from taking any action pursuant to the

provisions thereof and such consent shall be binding on the holder giving such consent and upon any subsequent holder whether or not he has notice thereof. (Section 802).

Upon the adoption of any supplemental resolution pursuant to the provisions of the 1998 Resolution, the 1998 Resolution shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under the 1998 Resolution of the Authority, the 1998 Fiscal Agent, and all holders of bonds then outstanding shall thereafter be determined, exercised and enforced in all respects under the provisions of the 1998 Resolution as so modified and amended. (Section 803).

**Miscellaneous Covenants**

*Master Plan.* The Authority covenants that the master plan for the construction of required Transportation Facilities in the Commonwealth will be supplemented periodically as necessary and that the five-year Construction Improvement Program will be updated each year to cover the Transportation Facilities to be constructed by the Authority in the ensuing five-year period. (Section 603).

*Costs of Maintenance, Repair and Operation of Traffic Facilities.* The Authority covenants that, if and to the extent funds for the purpose of maintaining, repairing and operating all Traffic Facilities financed by the Authority in whole or in part by 1968 Resolution Bonds and all Transportation Facilities financed by the Authority in whole or in part by bonds under the provisions of the 1998 Resolution are not provided by the Commonwealth, the Authority will pay such costs from unencumbered funds then on deposit in the 1998 Construction Fund or from the Revenues or unencumbered 1968 Construction Fund moneys thereafter deposited to the credit of the 1998 Construction Fund pursuant to the 1998 Resolution and not from funds then on deposit or thereafter deposited to the credit of the 1968 Construction Fund. (Section 604).

The Authority further covenants that it will cause an annual general evaluation to be made by the Transportation Engineers of the level of maintenance of all Traffic Facilities and Transportation Facilities financed in whole or in part by the issuance of bonds under the provisions of, respectively, the 1968 Resolution and the 1998 Resolution, which Facilities shall be, in the judgment of the Authority and of the Traffic Engineers, material to the overall system of Transportation Facilities of the Authority. (Section 604).

The Authority further covenants that it will operate or cause to be operated the Toll Facilities, any Mass Transit Facilities and all other Transportation Facilities that it may from time to time operate or cause to be operated in an efficient and economical manner, that it will at all times maintain or cause to be maintained such Transportation Facilities in good repair and in sound operating condition and that it will make or cause to be made all necessary repairs, renewals and replacements thereto. (Section 604).

*Annual Report of Traffic Engineers.* The Authority covenants that it will cause the Transportation Engineers to prepare a report each year promptly after the completion of their general evaluation of the level of maintenance, repair and operating condition of the Transportation Facilities setting forth (i) their comments with respect to any supplements or revisions made by the Authority in the master plan or in the five-year Construction Improvement Program referred to above under "Master Plan" and their recommendations as to any supplements or revisions which should be made in such plan or in the Construction Improvement Program, and (ii) their findings as to whether those Traffic Facilities have been maintained in good repair,

working order and sound operating condition and their recommendations as to necessary repairs, renewals or replacements. (Section 605).

If it appears from such report that repairs, renewals or replacements of any such Facilities are necessary, the Authority shall promptly cause the same to be restored to a condition of good repair and to sound operating condition, and if and to the extent that funds for such purpose have not been made available by the Commonwealth, moneys on deposit to the credit of the 1998 Construction Fund which have not theretofore been encumbered for other purposes, and moneys which are thereafter deposited to the credit of the 1998 Construction Fund pursuant to the 1998 Resolution shall first be applied for such purpose. No funds then on deposit or thereafter deposited to the credit of the 1968 Construction Fund shall be applied for such purpose. (Section 605).

*Relating to the 1968 Resolution.* The Authority covenants that immediately upon the repeal and cancellation of the 1968 Resolution, all Existing Tax and Fee Revenues and Existing Toll Revenues shall be pledged to the payment of the principal of and premium, if any, and interest on the bonds issued under the provisions of the 1998 Resolution to the same extent and with the same effect as the pledge of Revenues and other moneys deposited to the credit of the Revenue Fund. (Section 601).

The Authority further covenants that it will cause the 1968 Resolution to be repealed and cancelled at the earliest practicable date. The Authority further covenants that, except for the proposed supplemental resolution described in *Summary of Certain Provisions of the Proposed Supplemental Resolution,* it will not adopt any resolution supplemental to the 1968 Resolution for the purpose of granting to or conferring upon the 1968 Fiscal Agent for the benefit of the holders of the bonds issued under the 1968 Resolution any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon such holders or the 1968 Fiscal Agent, or for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the 1968 Resolution, or for the purpose of extending the maturity of any 1968 Resolution Bond or creating a lien upon or a pledge of revenues ranking prior to or on a parity with the lien or pledge created by the 1968 Resolution. Nothing shall prevent the Authority from adopting a resolution supplemental to the 1968 Resolution to cure any ambiguity or formal defect or omission in the 1968 Resolution. (Section 609).

The Authority covenants that so long as any 1968 Resolution Bonds are outstanding under the provisions of the 1968 Resolution it will cause to be made the deposits to the credit of the 1968 Construction Fund required by the 1968 Resolution. The Authority further covenants that except for any withdrawals required to be made as set forth in the third sentence of the fourth paragraph of "Sinking Funds" above, it will not withdraw, expend, pledge or otherwise encumber moneys held to the credit of the 1968 Construction Fund whether for the purpose of satisfying the Authority's Construction Improvement Program or otherwise, except for the satisfying the Authority's obligations under Section 513 of that certain trust agreement, dated as of April 1, 1992, by and between the Authority and Banco Santander Puerto Rico, successor trustee. See, "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* above in this Official Statement (Section 610).

*Use of Revenues.* The Authority covenants and agrees that, so long as any of the bonds secured by the 1968 Resolution shall be outstanding, none of the Revenues will be used for any purpose other than as provided in the 1968 Resolution and the 1998 Resolution, and that no

contract or contracts will be entered into or any action taken by which the rights of the 1998 Fiscal Agent or of the bondholders might be impaired or diminished. (Section 611).

*Additional 1968 Resolution Bonds.* The Authority covenants that so long as any bonds shall be outstanding under the provisions of the 1998 Resolution it will not issue additional 1968 Resolution Bonds which mature after July 1, 2036 and except for (a) Series I Bonds and (b) bonds issued for the purpose of meeting the obligations of the Authority under Section 11.4(b) of that certain Concession Agreement for the Final Design, Construction, Operation and Maintenance of a Privatized Transportation Facility, dated December 20, 1991, as amended, by and between the Authority and Autopistas de Puerto Rico y Compañía, S.E. relating to its obligations in respect of the Teodoro Moscoso Bridge. See, "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* above in this Official Statement.

*Swap Agreements.* The Authority covenants that it will not enter into a Swap agreement unless it first delivers copies of the proposed Swap agreement to S&P and Moody's and any other rating agency then rating the bonds. (Section 613).

*Level of Tolls and Other Charges.* Notwithstanding any provisions in the 1968 Resolution enabling the Authority to reduce tolls or other charges, the Authority covenants that it will not reduce the tolls or other charges imposed by it for the use of its Toll Facilities unless, as of the effective date of such reduction, the Authority delivers to the 1998 Fiscal Agent a certificate, signed by the Executive Director of the Authority not earlier than thirty (30) days prior to the effective date of such reduction, setting forth:

      (i)     the amount of Revenues received by the Authority and, until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the amount of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund in each of the fifteen (15) months immediately preceding the month in which such certificate is signed, adjusted (I) to give effect to legislation enacted on or prior to the effective date of such reduction that would have increased the Revenues or the amounts deposited to the credit of the Revenue Fund from the 1968 Construction Fund as aforesaid if such legislation (x) had been in effect throughout such fifteen (15) months, (y) allocates additional moneys to the Authority, and (z) expressly permits the Authority to pledge to the payment of the bonds issued under the provisions of the 1998 Resolution or the 1968 Resolution until the 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution and the Authority has expressly pledged such additional moneys to such payment on or prior to such date of delivery and (II) to reflect the moneys which would have been received if (A) the schedule of tolls in effect on such effective date had been in effect and (B) any Toll Facilities which have commenced operation or been removed from operation during such fifteen (15) months either had been in operation or not operating, throughout such fifteen (15) months,

      (ii)    the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding, and

      (iii)   the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and all Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then

outstanding and it shall appear from such certificate that the percentages derived by dividing the sum of the amounts shown in item (i) of such certificate for any twelve (12) consecutive months by the amount shown in item (ii) of said certificate and by the amount shown in item (iii) of said certificate, shall not be less than one hundred fifty per centum (150%) and one hundred per centum (100%), respectively.  (Section 614).

.

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX V



**JORGENSEN**
Roy Jorgensen Associates, Inc.

*Corporate Offices*

3735 Buckeystown Pike
Post Office Box 70
Buckeystown, MD 21717-0070

Telephone: 1-301-831-1000
Facsimile: 1-301-874-2876

June 7, 2010

Eng. Rubén A. Hernández Gregorat
Secretary and Executive Director
Puerto Rico Highway and Transportation Authority
P.O. Box 42007
San Juan, Puerto Rico 00940-2007

Dear Eng. Hernández:

This letter summarizes the results of our evaluation of the level of maintenance of the Puerto
Rico Highway and Transportation Authority's Traffic Facilities and our review of the
Construction Improvement Program. Our study was conducted in accordance with Resolution
No. 68-18, adopted June 13, 1968, as amended, and Resolution No. 98-06, adopted February 26,
1998. Results of the study are documented in our Final Report, entitled "Maintenance
Evaluation and Program Review – 2007-2008", dated March 2009.

Based on our field inspections for the 2008 period, we find that the overall level of maintenance
is generally adequate to preserve the investment and provide an acceptable level of service to
users of the road and other traffic facilities. Maintenance work methods and levels of service
have been in general conformance to accepted maintenance policies and procedures in
transportation and public works agencies throughout North America.

As part of our study we reviewed the Authority's 5-year Construction Improvement Program for
Fiscal Years 2008-2012. In our opinion, the program is a reasonable response to the immediate
and short-term transportation needs of the Commonwealth and is generally consistent with the
Authority's long-range transportation master plan. Funding for rehabilitation and maintenance
portion of the program appears to be adequate, based on revenue projections that have been
reasonably accurate in the past and provide a sound basis for determining the size of future
programs.

Please let us know if you need any additional information.

Sincerely,

Steven K. Griffith
Senior Associate/Project Manager

.

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX VI



**FINANCIAL SECURITY ASSURANCE®**

**MUNICIPAL BOND INSURANCE POLICY**

ISSUER: Puerto Rico Highways and Transportation Authority

BONDS: $188,395,000 in aggregate principal amount of Highway Revenue Refunding Bonds (Series AA) Maturing on July 1, 2026

Policy No.: 200688-N

Effective Date: April 30, 2003

Premium: $5,982,995.00

FINANCIAL SECURITY ASSURANCE INC. ("Financial Security"), for consideration received, hereby UNCONDITIONALLY and IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of Financial Security, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Financial Security shall have received Notice of Nonpayment, Financial Security will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by Financial Security in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Financial Security. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by Financial Security is incomplete, it shall be deemed not to have been received by Financial Security for purposes of the preceding sentence and Financial Security shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, Financial Security shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by Financial Security hereunder. Payment by Financial Security to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of Financial Security under this Policy.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless Financial Security shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which has been recovered from such Owner pursuant to the

VI-1

Page 2 of 2
Policy No. 200668-N

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to Financial Security which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

Financial Security may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to Financial Security pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to Financial Security and shall not be deemed received until received by both and (b) all payments required to be made by Financial Security under this Policy may be made directly by Financial Security or by the Insurer's Fiscal Agent on behalf of Financial Security. The Insurer's Fiscal Agent is the agent of Financial Security only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of Financial Security to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, Financial Security agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to Financial Security to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of Financial Security, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, FINANCIAL SECURITY ASSURANCE INC. has caused this Policy to be executed on its behalf by its Authorized Officer.

Countersignature

By

FINANCIAL SECURITY ASSURANCE INC.

By
Authorized Officer

A subsidiary of Financial Security Assurance Holdings Ltd.
350 Park Avenue, New York, N.Y. 10022-6022

(212) 826-0100

Form 500NY (5/90)



Printed by: ImageMaster, Inc.