Certified Translation MC-2021-143
Page 1 of 29

**COMMONWEALTH OF PUERTO RICO**
**COURT OF FIRST INSTANCE**
**JUDICIAL CENTER OF PONCE**
**SUPERIOR PART**

| | |
|---|---|
| SALVADOR EDUARDO MANDRY NONES, ET ALS | **CIVIL NUM**: J AC2008-0853 |
| **Plaintiff** | **ROOM** 605 |
| **Vs.** | **RE:** |
| COMMONWEALTH OF PUERTO RICO, ET ALS. **Defendants** | EMINENT DOMAIN |

JUDGMENT

On October 24, 2008, plaintiffs filed a complaint in which they alleged the expropriation of two farms of their property described in the complaint, in the modality of reverse condemnation, and claimed just compensation for their value. It was alleged in the lawsuit that the properties are included within the area that the Legislature of Puerto Rico designated as the "Punta Cucharas Natural Reserve Area" through the approval of Act No. 227 of August 9, 2008 — hereinafter "Act 227". Plaintiffs argued that the action of the Commonwealth of Puerto Rico — hereinafter, "the Commonwealth" — in including said farms in the Punta Cucharas Natural Reserve Area — hereinafter, "PCNR" — deprived them of any possible productive use of their property and constituted a taking of their real property right by imposing restrictions on the property by law, without the State having previously filed an eminent domain action or deposited just compensation.

In the complaint, it was alleged that in 2007 and as a prior step to the inclusion of the farms described above within the PCNR area, the Department of Natural and Environmental Resources — hereinafter "the DNER" — arbitrarily and illegally made a demarcation of the Maritime-Terrestrial Zone — hereinafter "MTZ" — in the farms. As a result of said demarcation, in portion "A" of farm 1,908, an area of 133.6698 cuerdas$^{TN}$ was included within the MTZ, leaving outside the MTZ only an area of 49.8228 cuerdas. In farm 4,751, an area of 7.8730 cuerdas was included within the MTZ, leaving only an area of 4.0760 cuerdas outside the MTZ.  Plaintiffs

Identifier No.-SEN2019_____

Translator's Note:  A cuerda is a measurement of land area equivalent to 0.9712219102 acres.

2

alleged that by means of this subterfuge, the DNER, which already contemplated the future acquisition of the properties, attempted to convert 73% of portion "A" of property 1,908 and 66% of property 4,751 to public domain with the evident purpose of reducing the compensation that plaintiffs would be entitled to receive in the future.

Javier Enrique Mandry Mercado — hereinafter referred to as "Javier Mandry" — who, as of that date, had a 3.100% interest in the properties, was included as a defendant in the lawsuit for the sole purpose of joining him to the lawsuit because he was an indispensable party to the claim and has not joined the lawsuit as a plaintiff. Javier Mandry initially appeared through Manuel Purcell Requena and answered the complaint. Subsequently, Javier Mandry sought to withdraw the answer to the complaint signed by Mr. Purcell Requena and replace it with an amended answer signed by him pro se. The Court did not authorize the filing of the amended answer pro se and issued an order on December 23, 2009, granting him a term of 30 days to retain legal representation.[1]

The Commonwealth filed a Motion to Dismiss on March 25, 2009. Plaintiff opposed said motion and, in turn, requested partial summary judgment in his favor. On November 20, 2009, both the Commonwealth's motion to dismiss and plaintiffs' motion for summary judgment were denied. The Commonwealth proceeded to answer the complaint, denied most of its pleadings and raised a number of affirmative defenses, primarily aimed at alleging that the complaint was premature and that plaintiff had failed to exhaust the relevant administrative procedures.

---

[1] On May 28, 2010, the Court issued a new order indicating to Javier Mandry that he could not appear pro se and granting him a new term to retain professional representation. In light of Javier Mandry's repeated failure to comply with the Court's orders, on November 17, 2010, an order was issued striking his plea and found in default. Despite this, Javier Mandry continued to file pleadings pro se, which required this Court to issue an order on December 5, 2016 ordering him to refrain from filing pleadings pro se. Javier Mandry also disregarded that order which led this Court to issue an order on December 5, 2017 advising him that a further violation could be held in contempt of Court and could entail severe sanctions.

3

The parties conducted discovery after which they filed the pretrial conference report wherein they stipulated that there was no dispute that the Commonwealth "does not intend to claim any part of plaintiff's farms described in item 2 of the complaint because they are within the boundaries of a MTZ demarcation."

Plaintiff Salvador Mandry Nones passed away on February 17, 2011 and was substituted by his five children Salvador Rafael, Eduardo José, Margarita Rosa and Adrián Roberto, and Javier of surname Mandry Mercado, who were already parties to the lawsuit, as well as by his widow Rosa Estela Mercado Guzmán, who voluntarily submitted to the jurisdiction of the Court.

Subsequently, the court bifurcated the case with respect to the issues to be adjudicated, providing that it would first decide whether Act 227 constituted a taking of plaintiffs' property, and then decide, if applicable, the just compensation to be paid for the seized property. As such, both parties filed their respective motions for summary judgment in support of their pleadings. On February 27, 2014, this Court issued a Partial Judgment wherein it determined that Act 227 constituted a taking of plaintiff's property and ordered the holding of a hearing for the finding of just compensation. Denied its reconsideration, the Commonwealth appealed to the Court of Appeals requesting its reversal.

In a resolution dated June 30, 2014, in appeal KLCE2014-00713, the CA denied issuing the requested writ of Certiorari, on the grounds that the CFI "issued a ruling consistent with the law when it determined that the State's action supported by Act 227, supra, constituted a taking of property belonging to respondent." After filing a motion for reconsideration that was denied August 13, 2014, the Commonwealth filed a Petition for Certiorari with the Supreme Court in case CC-2014-0801, which was denied on December 5, 2014. A motion for reconsideration filed by the Commonwealth before the Supreme Court was declared moot by Resolution dated April 17, 2015.

4

Upon remand from the Supreme Court and the Court of Appeals, the case returned to the jurisdiction of this Court of First Instance for the determination of the just compensation to be paid by the Commonwealth. On June 20, 2016, the parties filed a supplemental preliminary conference report between counsel to adapt it to what was resolved in the partial judgment. Therein, the parties agreed that the issues to be adjudicated in the hearing of the case would be: the just compensation to which the plaintiff is entitled as a consequence of the taking of said property and as part of that controversy, the best and most productive use of the farms and the effect thereon of the demarcation of the MTZ that the DNER carried out in 2007.

Near the hearing on the merits of the case, the Commonwealth notified this Court of the automatic stay generated by the filing of case No. 17 BK-3283-LTS under PROMESA Chapter III, filed by the Puerto Rico Financial Oversight and Management Board on behalf of the Commonwealth. Plaintiffs resorted to the federal forum to request relief from the automatic stay, and Judge Laura Taylor Swain, who is presiding over proceedings under PROMESA Chapter III, issued an order on July 7, 2017 where she released the above captioned complaint from the automatic stay to continue with the finding of just compensation, but kept it in effect for purposes of recording the judgment, enforcement proceedings and obtaining provisional remedies.

On October 16, 2018, a motion was filed informing the death of plaintiff Estrella María Aparicio Vázquez, on August 28, 2018 and requesting her substitution by her heirs, her son Oscar Adolfo Mandry Aparicio, her grandchildren María del Carmen and Selma Verónica, surnamed Mandry Llombart, and Oscar Adolfo and Gustavo Alejandro, surnamed Mandry Bonilla.

The hearing on its merits of the case was held on August 6, 7, 8, 9, 9, 16, and 17; September   4  and  6;  and  October   4  and  30,  2018.  Both   parties

5

submitted expert and documentary evidence. Architect Javier Bonnin Orozco, Dr. Máximo Cerame Vivas and the appraiser, Eng. Ismael Isern Suárez — hereinafter, "Eng. Isern" — testified as expert witnesses for the plaintiff. The Commonwealth presented as witnesses Mr. Vicente Quevedo Bonilla, DNER Technician, Surveyor Gerardo Ramos and as appraiser Mr. Esteban Núñez Camacho — hereinafter, "Mr. Núñez".

After the end of Mr. Isern's testimony, the legal representative of the Commonwealth indicated to the Court that the report presented in evidence did not correspond with the copy she had. The matter was discussed in the courtroom and the plaintiff admitted that by inadvertent mistake it had presented into evidence a preliminary copy of Mr. Isern's report. In view of this situation, it was ordered that Mr. Isern return to the courtroom to clarify which of the documents was the final one that should be in evidence. It was established that the copy that the legal representative of the Commonwealth of Puerto Rico had was the final version. Once the matter was clarified, the Court ordered Mr. Isern to take the witness stand again so that the defendant could ask him the questions he wished to ask. It so happened.

After considering and weighing the stipulations of the parties, and the totality of the expert and documentary evidence admitted into evidence and giving it the probative weight and credibility it deemed it deserved, the Court proceeded to formulate the following

FINDINGS OF FACT:

The parties stipulated the truth of the following facts:

1.    The appraisals of the farms subject of this case as of August 9, 2008 were: Farm 1,908, 184.0899 cuerdas; farm 4,751 was 12.9333 cuerdas. The combined land area of both was 197.0232 cuerdas.

2.    In June 2004, the DNER issued a report titled *Report on Natural Value of the Punta Cucharas Natural Area*, recommending the designation of the area as a natural reserve.

3.    As part of the efforts made by the DNER to achieve the designation of the Punta Cucharas Natural Area, the DNER conducted a demarcation of the Maritime Terrestrial Zone (MTZ).

4.    On February 2, 2007, Surveyor José A. Vilanova Portalatín, Director of the Surveying Division of the DNER recommended and the Secretary of the DNER approved a plan entitled *Land Acquisition Plans for "La Matilde" Property*.

6

5.    In the plat dated February 2, 2007 entitled Land Acquisition Plans for "La Matilde" Property, the MTZ is delimited in the two properties that are the subject of this case. The area that was included as part of the MTZ in the 1,908 farm was designated on the plat as Parcel 003-01 with a land area of 134.0042 cuerdas. The area that was included as part of the MTZ in farm 4,751 was designated on the plat as Parcel 004-01 with a land area of 7.1214 cuerdas.

6.    On February 21, 2007, the Secretary of the DNER sent a letter to Mr. Salvador Mandry Nones notifying him "that on July 19 and August 31, 2005, technical personnel from the Surveying Division and the Assistant Secretary of Planning visited the area of Finca Matilde for the purpose of initiating the work to delimit the boundary of the Maritime Terrestrial Zone on the land.

7.    The Commonwealth of Puerto Rico has no intention of claiming any part of plaintiffs' lands because they were not within the limits of a Maritime Terrestrial Zone boundary.

8.    Farms 1,908 and 4,751 are located in an area that was included in a Special Area Plan in the Land Management Plan called "PL.E.2 LA MATILDE". Article 44.3 of the R.O.T. states that "The Special Plan for the area of La Matilde intends to facilitate residential, tourist, and commercial development conditioned to the protection of natural resources such as the Salinas lagoon and a wetlands area to the south of the identified area and to the conversion of PR.2 into expressway with the construction of marginal streets".

9.    Said Article 44.3 also provides that the development objectives of the plan are:
. " Maximize the potential of the area for residential and tourist projects, preferably oriented to the Caribbean Sea and commercial, preferably along the future PR-2 expressway.
. Order development along PR-2 marginal streets to avoid direct connections to PR-2.
. Establish a protection zone for the wetlands and the Salinas Lagoon."

10.    Farm 1,908 and Farm 4,751 were within two Land Management Districts: EV.4, whose purposes and permitted uses appear in Chapter 16 of the R.O.T. and SREP.N, whose purposes and permitted uses appear in Chapter 35 of the R.O.T.

11.    The parties stipulate that the appraisal experts of both parties, Eng. Ismael Isern, for plaintiffs and Mr. Esteban Núñez Camacho, for defendant, were duly qualified to testify regarding the valuation of the properties subject of this litigation.

By virtue of the evidence admitted and believed by the Court during the hearing, the following facts were additionally proven:

12.    The recordation descriptions of the properties of which the plaintiffs, together with defendant Javier Mandry, were full owners and which were included in the Punta Cuchara Natural Reserve, are:

7

PARCEL MT-3- RUSTIC: Located in Canas Ward of the Municipality of Ponce, with a land area of eight hundred one cuerdas forty-six centimes, equivalent to three hundred fifteen hectares, zero areas, fifty-eight centimeters and three hundred eighty-four milliares, which is after deducting five point four (5.04) cuerdas for the shooting range of the Puerto Rico Police, and which is made up of the following portions:

RUSTIC PORTION A: Located in the Canas Ward of the Municipality of Ponce, composed of ONE HUNDRED NINETY TWO cuerdas fifty one centimrd, equivalent to seventy five hectares, sixty six areas, forty one centimeters and three hundred four milliards, of flat land, identified in the segregation plat as Portion MT3-Llana, adjoining on the North, with lands of the Puerto Rico Aqueduct and Sewer Authority, Regional Office, in an alignment of two hundred eight point six (208.06) meters, with lands of the Municipal Government of Ponce in two alignments totaling four hundred fifty-three point three (454.03) [sic] meters and with State Highway Number Two in six alignments totaling six hundred twenty-six point ninety-eight (626.98) meters; on the East, with the MT-2 Flat Portion in an alignment of eight hundred thirty-six point zero nine (836.09) meters; on the South, with the Caribbean Sea in six alignments totaling eight hundred sixty point forty-seven (860.47) meters and on the West, with the MT-4 Flat Portion in an alignment of seven hundred twenty point forty-one (720.41) meters.

It is recorded at folio 293, of volume 635 of Ponce II, property 1,908, first recordation.

RUSTICA: Parcel MT-2 located in Canas Ward of the Municipality of Ponce, Puerto Rico, composed of THIRTEEN POINT EIGHTY-NINE CUERDAS equivalent to FIFTY-FOUR THOUSAND FIVE HUNDRED NINETY-THREE POINT TWO HUNDRED SEVENTY-SEVEN SQUARE METERS; bounded on the North by 65. 292 meters with State Highway No. 2; on the South, 64.554 meters and .430 meters with the Caribbean Sea; on the East, 836.087 meters with lands owned by Mandry Mercado Estate and on the West, 845.481 meters with lands of the property from which it is segregated.

It is recorded at folio 8, of volume 696 of Ponce II, property 4,751, first recordation.

13.     The properties described above adjoin each other and form a continuous body with the same physical and topographical characteristics. Both appraisers agreed that the properties can be considered as a unit for valuation purposes, although the ELA appraiser valued the two properties separately. Hereinafter both properties will be referred to as "the subject properties".

14.     The subject properties are located south of the PR-2 highway (hereinafter, "the PR-2") at Km. 222.8. PR-2 is a road with a high vehicular flow because it is the connection route between Ponce and the West of the Island. The portion of

Case:17-03283-LTS   Doc#:18049-1   Filed:09/07/21   Entered:09/07/21 11:34:54   Desc:
Exhibit Certified Translation of Judgment   Page 8 of 29

Certified Translation MC-2021-143
Page 8 of 29

8

PR-2 where the farms are located had already been converted into an expressway by the date of approval of Act 227. The farms have access to PR-2 from one of the marginal roads of this highway.

15.     The topography is practically flat in its totality, although with some slope from north to south.

16.     Most of the farms are located within the zone susceptible to flooding with an "AE" classification and the part closest to the Caribbean Sea, an area of wetlands and mangroves, has a "VE" classification. Zone "AE" indicates areas where base flood elevation has been determined.

17.     As stated by Architect Javier Bonnin Orozco, Regulation 13 of the Planning Board, on special flood risk areas, establishes that "AE" classification is not an impediment for land development, but rather provides that constructions in areas with "AE" classification must have an elevation above the flood level. This can be achieved through the use of fill, which is usual for the land in Ponce. Only in the area near the Caribbean Sea, which has a "VE" classification, would development be limited.

18.     The 2003 Land Management Plan of the Autonomous Municipality of Ponce establishes two classifications for the land of the subject farms. Most of the subject properties have a classification as urban land located in an underlying EV.4 district with an overlay district, the (PL.E). The wetland area near the Caribbean Sea has a SREP.N. classification.

19.     The PL.E (Special Plans) District is established to facilitate, through planning guidelines, the harmonious development or redevelopment of areas that merit special attention. The conditions for uses, activities, intensities and other parameters are established in the underlying Districts identified in the Land Management Plans and not in the special plans of the superimposed districts. Preferred uses and activities and infrastructure design indicated in the special plans are for illustrative purposes only and should be considered as guidelines for harmonizing developments.

9

20.     The special plan applicable to the subject farms is PL.E.2 (La Matilde)[2] [2]. The purpose of this special plan is to facilitate residential, tourist and commercial development, conditioned by the protection of natural resources such as the Salinas Lagoon and a wetlands area to the south of the identified area and the conversion of PR-2 into an expressway with the construction of marginal streets. The plan's development objectives include maximizing the area's potential for residential and tourism projects, preferably oriented toward the Caribbean Sea, and commercial projects, preferably along the future PR-2 expressway. The plat illustrating the development guidelines of the special plan locates the subject area in an area for new development in accordance with the EV.4 Management District.

21.     The EV.4 District is established to encourage residential, commercial, service and light industrial development in sectors that allow for a wide variety of uses with high intensity[3].

22.     The portion of the subject farms closest to the Caribbean Sea is in a SREP.N Land Management District. The SREP.N District is established to protect or restore sensitive natural resources, establish new forests and buffer areas, and allow ecotourism development in sectors that merit it. This district will also apply to protect ecosystems bordering water bodies. Segregation of land identified by the SREP.N District is not allowed, unless it is to separate it from the original farm with the purpose of reserving or dedicating it for conservation purposes[4]. The SREP.N District allows the construction of single-family dwellings, museums, historic sites, recreational and vacation camps, public parks and gardens, under certain conditions and restrictions of the Land Management Regulations of the Ponce Territorial Plan. All development must comply with an intensity of use of 1 dwelling unit per legally segregated lot, a maximum height of 2 stories, buildings may only occur on land with a slope of less than 25%, with minimum side and rear               yards               of               20               meters,

---

[2] Land Management Regulation, Sec. 44.3
[3] The appraisers for both parties' agreed that the EV.4 Land Management District allows for a wide variety of high intensity uses and that both commercial and residential uses are ministerially permitted uses.
[4] Land Management Regulation, Sec. 35.1

among other restrictions[5].

23.     The farms had available all infrastructure services necessary for their development.

24.     The neighborhood where the Subject is located is one of extensive urban development. In 2008, the area had residential housing developments, industrial developments, hotels, restaurants, state and municipal government offices, the recreational area of the "El Tuque" Public Beach, fast food restaurants and, minutes away from the subject farms, the Ponce Towne Center, Ponce Mall, Sam's Club, Walgreens, and K-Mart shopping centers. As can be seen from the aerial photographs presented in evidence, to the south of PR-2, there are no residential developments.

25.     Taking into consideration the factors that emerge from the totality of the evidence presented by the parties regarding the location, access, exposure to PR-2, topography, predominant uses in the neighborhood, available infrastructure and the development guidelines of the special plan that place the subject properties in an area for new development in accordance with the EV.4 Management District, and that the total land area of both properties is 197.023 acres, the Court determines that the best and most productive use of the subject property should be established by sector.

26.     This Court accepts the opinion of the plaintiffs' appraisal expert, Mr. Isern, considering the value of both subject properties as a whole and subdivided into three areas or sectors.

27.     The closest to the PR-2, with a land area of 50 cuerdas, its best and most productive use or destination is for commercial purposes. This size is based on several elements: the provisions of the Land Management Regulations, which include designating the road frontage for commercial use; the topography and total size of the subject properties; its location in the western area of Ponce, where there has been extensive commercial development; its visual exposure to the PR-2 Highway; that the size of the commercial uses in the area suggests a ratio of 3 wide to 2 deep to accommodate parking

---

[5] Land Management Regulations, sec. 35.2 to 35.9.

Case:17-03283-LTS   Doc#:18049-1   Filed:09/07/21   Entered:09/07/21 11:34:54   Desc:
Exhibit Certified Translation of Judgment   Page 11 of 29

Certified Translation MC-2021-143
Page 11 of 29

11

space; that the economic conditions demonstrated by the report of the Banco Popular de Puerto Rico for the period from 2006 to 2008, revealed the economic viability of the commercial use in an area of that size.

28.     The area closest to the Caribbean Sea, where the mangroves are located, with a land area of 35.075 cuerdas, its best use is for conservation purposes. Mr. Isern determined the size of the area to which he assigned a best conservation use based on a plan submitted by Architect Federico Montilla to the Permits Office of the Autonomous Municipality of Ponce — hereinafter "the Permits Office" — in 2005 for a multi-use project called Mandry Seaside Estates. This plan, in turn, relies on a jurisdictional determination — hereinafter "JD" for "Jurisditional Determination" — on wetlands that was issued for the subject properties by the U.S. Army Corps of Engineers — hereinafter "the Corps of Engineers" — on November 1, 1995. That JD was managed by Dr. Máximo Cerame Vivas and established that the wetlands to be protected (Wetlands) covered an area of 35,075 cuerdas and the lands susceptible to development (Upland), 171.280 cuerdas. The term of the JD was 5 years.

29.     Upon submission of the Mandry Seaside Estates project in 2005, the Permits Office required the preparation of an updated JD. On September 5, 2005, officials of the Permits Office of the Autonomous Municipality of Ponce who were evaluating the Mandry Seaside Estates project sent a letter to Mr. Salvador Mandry requesting a revision of the delimitation of the maritime-terrestrial zone that appeared in the submitted plans. On October 24, 2005, the Corps of Engineers indicated to Architect Montilla that the new JD would be done according to the "1987 Wetland Delineation Manual", the same one that was used for the 1995. Dr. Cerame Vivas was once again entrusted with the task of updating the JD.

30.     Dr. Cerame Vivas stated that in the discharge of this assignment, he made several visits to the farms, walking through them, flying over them and photographing them. Although the updated JD process endeavor was not completed, his observations     led     him     to     conclude     that     there     was     no     significant

Case:17-03283-LTS  Doc#:18049-1  Filed:09/07/21  Entered:09/07/21 11:34:54  Desc:
Exhibit Certified Translation of Judgment  Page 12 of 29

Certified Translation MC-2021-143
Page 12 of 29

12

variation in the wetland area during the years since the 1995 JD. Dr. Cerame Vivas explained

that in order to issue the JD, the Corps of Engineers negotiates their jurisdiction and choos

the area they are interested in protecting, which means that it is possible that in the

"Upland" area, there may be wetlands that need not be protected.

31.     Dr. Cerame Vivas' testimony was fully credited by the Court, and allows

the inference that by August 2008 the undevelopable wetlands area of the subject farms

had a land area of 35,075 cuerdas[6].

32.     To the portion of the subject farms that lies between the area to which

it attributed a best commercial use and the area to which it assigned a best use for

conservation purposes, 111.948 cuerdas in size, its best and most productive use is for

residential tourism purposes.

33.     Mr. Isern valued the area of 50 cuerdas, (196,519.8300 sq. m.) next to

the PR-2 highway, to which he attributed a better commercial use, at $20,600,000.00,

with a unit price of $105.00 per square meter. He made the valuation using the

comparable sales method, for which he used four sales of properties located in Ponce,

with the same EV.4 classification and a better commercial use. The adjusted unit prices of

the comparable sales were $115.00/sq.m. for number 1, $131.00/sq.m. for number 2,

$161.00/sq.m. for number 3 and $105.00/sq.m. for number 4.

34.     The State appraiser, Mr. Núñez, assigned a better mixed use, commercial-

residential to the land next to PR-2. He valued Parcel 003-02, to which he attributed a land

area of 49.8228 cuerdas, (195,823.1866 sq.m.) at $13,708,000, with a unit price of $70.00

per square meter[7]. He used the comparable sales method, using four sales, three of which

were in EV-4 land management districts and one in an EV-3 district. The adjusted

comparable sales units to value Parcel 003-02 were $73.00/sq.m. for number 1,

$69.00/sq.m. for number 2, $72.00/sq.m. for number 3 and $67.00/sq.m. for number 4.

---

[6] Rule 110 (C) of the Rules of Evidence sets forth that to establish a fact, it does not require such
degree of proof which, excluding the possibility of error, produces absolute certainty.
[7] In the valuation report effective November 15, 2007, he concluded that the value of this parcel
was $14,882,600.00 with a unit price of $76.00/sq.m.

13

35.     The adjoining land, Parcel 004-02, measuring 4.0760 cuerdas (16,020.3265 sq.m.) was valued at $2,243,000.00, with a unit price of $140.00 per square meter. He used the comparable sales method with four sales, three of which were in EV-4 land management districts and one in an EV-3 district.

36.     The size of Parcel 003-02 indicated on the stipulated acquisition plat is not 49.8228 cuerdas, but rather 64.05061 cuerdas, equivalent to 253,534.6697 sq.m.[8]. The size of this parcel used by Mr. Núñez arises from a plan provided to him, which differs from the stipulated plan. If Parcel 003-02 is valued at the 53,534.6697 sq. m. that appears in the stipulated plan, using the unit price of $70/sq.m. established by Mr. Núñez, its value would amount to $17,747,426.88.

37.     The area of 50 cuerdas to which Eng. Isern attributes a better commercial use is within the combined area of 53.8998 cuerdas of Parcels 003-02 and 004-02 to which Mr. Núñez attributes a better mixed commercial-residential use.

38.     Eng. Isern's opinion that the 50 cuerdas closest to PR-2 have a better and more productive commercial use is supported by reasonableness criteria appearing from his report and testimony and were not rebutted by the Commonwealth. When comparing the value opinions of both experts on the land next to PR-2, we conclude that the value estimated by Eng. Isern for the 50 cuerdas to which he assigns a better commercial use is justified and reasonable.

39.     Mr. Núñez did not make a valuation of land whose best use was for residential purposes. Neither from his report nor from his testimony on Parcels 003-02 and 004-02, next to PR-2 to which he attributed a mixed commercial-residential best use, can a valuation for residential best use be inferred. In his reports on both parcels, three of the four comparable parcels be considered for valuation have best use commercial and one, a mixed use, residential-commercial.

---

[8] Exhibit I by stipulation, sheet 4.

Case:17-03283-LTS   Doc#:18049-1   Filed:09/07/21   Entered:09/07/21 11:34:54   Desc:
Exhibit Certified Translation of Judgment   Page 14 of 29

Certified Translation MC-2021-143
Page 14 of 29

14

40.     Eng. Isern valued the 111.948 cuerdas, (440,000.0386 sq.m.) property, to which he attributed a better residential use at $9,700,000, based on a unit price of $22.00/sq.m. To reach that value he used three comparable sales with adjusted values of $42.00, number 6; $38.00 number 7; and $17.00, number 5.

41.     The use of comparables 6 and 7 was questioned by Mr. Núñez who testified that they had a better business use. On cross-examination he acknowledged, however, that the EV. 2 classification of sale number 6 only allowed for residential uses. The classification of comparable sale number 7 is EV.4 which also allows residential uses, but even if this comparable is disregarded, the unit price of $22.00/ c.m. for residential use, is still reasonable.

42.     Eng. Isern valued the 35.070 cuerdas to which he attributed a best conservation use at $196,000.00 based on a unit price of $5,600.00/cuerda. He used the comparable sales method with three comparable sales. It gave number 8 an adjusted unit price of $1,900.00/cuerda; number 9 an adjusted unit price of $5,600.00/cuerda and number 10 an adjusted unit price of $3,200.00/cuerda.

43.     The State appraiser, Mr. Núñez, assigned a best conservation use to Parcels 003-01 and 004-01, with sizes of 134.2271 cuerdas and 8.8573 cuerdas, respectively.  He valued Parcel 003-01, at $537,000.00, with a unit price of $4,000.00 per cuerda. He used the comparable sales method with five comparable sales. The adjusted unit prices of the comparable sales to value Parcel 003-01 were $3,132.95/cuerda for number 1, $3,250.00/cuerda for number 2, $5,111.10/cuerda for number 3; $5,268.92/cuerda for number 4 and $3,632.85/cuerda for number 5. The adjustment analysis on page 83 of the report for Parcel 003-01[9], makes it evident that it rated the higher unit farms as "superior" because of its erroneous interpretation regarding the effect          of          the          inclusion          in          the          maritime

---

[9] Mr. Núñez did not provide a detailed report for Parcel 004-01, merely indicating that he would use the value assigned to Parcel 003-01.

Case:17-03283-LTS   Doc#:18049-1   Filed:09/07/21   Entered:09/07/21 11:34:54   Desc:
Exhibit Certified Translation of Judgment   Page 15 of 29

Certified Translation MC-2021-143
Page 15 of 29

15

terrestrial nd zone on the permitted uses on the subject farms. This error of analysis leads us to conclude that the unitary assigned by Mr. Núñez for the best use lands for conservation is too low and should be discarded.

### CONCLUSIONS OF LAW

"The administrative demarcation of the maritime-terrestrial zone is undoubtedly a function of vital importance for the State because it establishes the limits of the maritime public domain with respect to the adjoining properties. Even when the demarcation implies a declaration of the physical nature of the land as a maritime-terrestrial zone, the fact is that "in no case does it have a declaratory nature of rights". *Buono Correa v. Srio. Rec. Naturales*, 177 DPR 415, 426(2009).

In the present case, the demarcation of the maritime-terrestrial zone did not have the effect of altering the permitted uses of the lands of the subject farms because it is a stipulated fact that after the demarcation, the lands continued to be privately owned. In *San Geronimo Caribe Project v. E.L.A.*, 174 D.P.R. 518 (2008) citing *Rubert Amstrong v. E.L.A.*, 97 D.P.R. 588 (1969), it was recognized that mangroves and marshes could constitute private enclaves within the maritime land zone under the Ports Act of 1886.

In *Buono Correa v. Srio. Rec. Naturales*, supra, p. 445, it was noted that Regulation 4860 "...clarifies, in section 1.5, that lands of private domain that are embedded in the maritime terrestrial zone are excluded from its application, although the provisions of Regulation 4860 regarding their demarcation apply to them."

Rule 110 of the Rules of Evidence establishes the principles by which the trier of fact must evaluate the evidence presented for the purpose of determining what facts have been established. Among them, that "[t]o establish a fact, such degree of proof which, excluding the possibility of error, produces absolute certainty is not required"; that "[t]he direct evidence of a credible witness is sufficient proof of any fact, unless otherwise provided by law" and that "[i]n civil

16

cases, the decision of the trier of fact shall be made by a preponderance of the evidence on the basis of probability, unless otherwise provided".

Rule 704 of Evidence provides that "The opinions or inferences of a person as an expert witness may be based on facts or data perceived by him or within his personal knowledge or reported to him before or during the trial or hearing. If the subject matter is of such a nature that persons skilled in that field reasonably rely upon it in forming opinions or drawing inferences about the matter in question, the facts or data need not be admissible into evidence."

It has been ruled that "the probative value of expert testimony depends on several factors, including the following: (1) the qualifications of the expert; (2) the strength of the basis of his testimony; (3) the reliability of the underlying science or technique; and (4) the bias of the expert." *Dye-Tex Puerto Rico, Inc. v. Royal Insurance Company of Puerto Rico, Inc*. 150 DPR 658, 664 (2000). These criteria are also included in the current Rule 702 of Evidence.

The claim before us is one of eminent domain. In the case of *Velázquez Velázquez v. ELA*, 135 DPR 84, 88-89, our Highest Court stated:

> The State's obligation to pay just compensation can manifest in three ways: (1) through the direct exercise of the power of eminent domain by urging an expropriation remedy; (2) through its regulation; and (3) when a de facto taking occurs by substantially affecting the use of the property physically. *Culebra Enterprises Corp. et. al. v. E.L.A*., supra; *Sucn. Garcia v. Authoridad*, 114 D.P.R 676 (1983); Olivero v. Authority, 107 D.P.R. 301 (1978). Precisely for the exceptional cases of physical occupation, taking of a real right, or restrictions to property by way of regulation without having filed an expropriation action, the reverse expropriation action has been instituted. In E.*L.A. v. Northwestern Const., Inc.*, 103 D.P.R. 377, 383 (1975), we explained that it is called inverse "because it is brought by the owner of the property against the State to obtain the compensation to which he is entitled, but the courts generally apply to it the same rules and principles that govern the expropriation action brought by the State". See also *Olivero v. Authority*, supra, p. 307.

When —as has happened in this case— the Court decide that the *de jure* and *de facto* taking of the property happened since the

17

property was frozen, the compensation is fixed based on the value at that time. *ELA v. Northwestern Const. Inc.*, supra, 382; *Hicaco Lime Plant v. Tribunal Superior*, 103 DPR 385 (1975). As previously stated, and ratified by the Court of Appeals in the instant case, the taking occurred upon the passage of Act 227, that is, on August 9, 2008.

The State's right of expropriation is an inherent and necessary attribute of sovereignty and is superior to all property rights. *López et al. v. PREPA*, 151 DPR 701, 706 (2000); *Adm. de Terrenos v. Nerashford Dev. Corp.*, 136 DPR 801, 808 (1994); *ELA v. Registrador*, 111 DPR 117 (1981). However, this power of the State is limited by the requirement that just compensation be paid, that the expropriated object be for a public purpose, and that the procedure established by law be followed. *Culebra Enterprises Corp. v. ELA*, 143 DPR 946 (1997); *Hampton Development Corp. v. ELA*, 139 DPR 877 (1996); *ELA v. Registrador*, supra, p. 119; *ELA v. Rosso*, 95 DPR 501, 536 (1967). The just compensation to which the owner of an expropriated property is entitled is that amount that represents the full value of the property at the time of the taking. *Olivero v. Autoridad de Carreteras*, 107 DPR 301, 314 (1978); *ELA v. Fonalledas Córdova*, 84 DPR 573, 579 (1962). Just compensation is intended to place the former owner of the property in the same economic situation in which he was in before the expropriation. *ELA v. Rexco Industries*, 137 DPR 683 (1994). Thus, as a measure for the payment of just compensation, the concept of market value of the property, as established in the federal jurisdiction, was adopted. *Adm. de Terrenos v. Nerashford Dev. Corp*, supra, page 807. supra. "The just compensation to which the owner of an expropriated property is entitled is that amount which represents the full value of the property at the time of the taking, and in the absence of a statutory definition of this concept of value we have favored the rule of fixing it by determining the market value of the expropriated property — "valor en plaza" is called in Spanish America, see, Canasi, *El Justiprecio en la Expropiación Pública*, (1952), p. 124 — That is, the price that a buyer would be willing to pay in a voluntary sale and that

a seller would be willing to accept, considering the conditions of the property at the date of expropriation and the most productive or beneficial use to which it could be put in the reasonably near future. *Pueblo v. Colón*, 73 DPR 579 (1952); *Pueblo v. Sucn. Rabell*, 72 DPR 574 (1951); *Pueblo v. Huyke*, 70 DPR 754 ,756 (1950). The fixing of this value requires a skillful synchronization of several factors, and in the last analysis, a healthy balance between the right of the owners and the demands of the community." *ELA v. Fonalledas* Córdova, supra.

In determining the market value of an expropriated property, any competent evidence may be considered if it legitimately establishes a market value. In expropriation cases— and therefore in this reverse expropriation case, to which, as we have seen, the rules and principles governing ordinary expropriations apply— the burden of proof regarding the fair value of the expropriated property rests on the party making the claim. *Martínez Rivera v. Tribunal Superior*, 85 DPR 1, 11 (1962); Pue*blo v. García*, 66 DPR 504, 508 (1946). See, also, *ELA v. Fonalledas Córdova*, supra, p. 574; *ELA v. Bravo*, 79 DPR 779, 785 (1956). It is then up to the plaintiff to prove his right to recover just compensation and establish the value of the property by presenting the corresponding evidence on the market value of the expropriated property. *ACTPR v. 780.61416m2, BPPR*, 165 DPR 121, 133 (2005); Mart*ínez Rivera v. Tribunal Superior,* supra, p. 11; *Pueblo v. García*, supra, p. 508.

The market value of the property has been defined as the price that a determined buyer in a non-forced sale would be willing to pay and the price at which a seller, under the same circumstances, would be willing to sell, considering the condition of the land on the date of the expropriation and the most productive use to which the owner could devote it in the reasonably near future. *Adm. de Terrenos v. Nerashford Dev. Nerashford Dev. Corp*, supra, p. 809; *Pueblo v. Huyke*, 70 DPR 754, 756-757 (1950).

19

In determining this, the court must take into consideration any element or indicator that a prudent buyer would consider. *Adm. de Terrenos v. Nerashford Dev. Corp.*, supra, at 809. Regarding this matter, it has stated:  "In determining fair market value of property in condemnation proceedings, the triers of fact are generally allowed to consider such elements that 'fairly might be brought forward and reasonably be given substantial weight (in) fair negotiations by an owner willing to sell and a purchaser desiring to buy'. Therefore, the relevant factors in condemnation case, where the major issue is the fair market value of the condemned property, are those that a hypothetical buyer and seller would consider in setting a purchase price for the property." See, 5 Nichols on Eminent Domain, Mathew Bender, §18.05[1], p. 18-25, third edition.

As the case law points out, one of the critical elements in determining the just compensation of a property is the most productive use to which the owner could put the property within the reasonably foreseeable future. Nichols explains the effect of the concept of best and most productive use on the valuation of a property as follows:

> Just compensation within the meaning of the Fifth Amendment is not limited to the market value of the property as presently used.  Instead, a property owner's compensation should be determined by considering any higher market value obtainable by developing the property to the highest and best use for which it is suitable. The phrase "highest and best use" is a term of art in the lexicon of real estate appraisal.

> Even in other contexts such as a sale, a property's highest and best use is one of the primary considerations determining its fair market value. This concept has been defined as the legally and physically possible use of the land that is likely to produce the highest value. Therefore, in determining the highest and best use, the owner must prove that the property is physically adaptable for such use and that there is a need or demand for this use in the determining its fair reasonably near future.

> A determination of a property's highest and best use requires a study of the community, the neighborhood, zoning, market factors, the site, and its improvements. Important factors to consider include market demand, economic development in the area, specific plans of businesses and individuals (including action already taken to develop the property for that purpose), and the use to which the property is devoted at the time of the taking. Frequently, a property's highest and best use will be limited to its current use due to zoning.

> When determining a property's highest and best use, the court may not engage in mere speculation and conjecture. The highest and best use must   be   shown   with   a   degree   of   certainty   that   the

Case:17-03283-LTS   Doc#:18049-1   Filed:09/07/21   Entered:09/07/21 11:34:54   Desc:
Exhibit Certified Translation of Judgment   Page 20 of 29

Certified Translation MC-2021-143
Page 20 of 29

20

property's use will change in the not-too-distant future. 4 *Nichols on Eminent Domain*, § 13.01(8). (Emphasis added.)

As noted above, the issue in the appraisal reports and the testimony of the parties' experts is primarily as to the best and most productive use of the subject farms. Plaintiff's appraiser, Eng. Isern, concluded that the best use should be analyzed by dividing the subject farms into zones. To a portion of fifty (50) cuerdas adjacent to PR-2, he assigned a commercial best use. To the one hundred and eleven acres and nine hundred and forty-eight thousandths of another (111.948 cuerdas) adjacent to it, he determined a better use for residential tourism, and to the remaining thirty-five acres and seventy-five thousandths of another (35.075 cuerdas) closer to the Caribbean Sea, a better use for conservation.

The Commonwealth's appraiser concluded that the best use for parcels 003-02 and 004-02, the closest to PR-2, with 49.8228 cuerdas and 4.0760 cuerdas, respectively, is a mixed commercial-residential use. The remainder of the subject properties, parcel 003-01, to which he attributes a land area of 134.2771 cuerdas and parcel 004-01, to which he attributes a land area of 8.8573 cuerdas, establishes a better use of conservation. In the foregoing findings of fact, we have concluded that this is not the best and most productive use for the totality of these two parcels.

Several aspects of the testimony of appraiser Núñez undermine the reliability of his opinion of value, because they indicate little objectivity and an eagerness to reduce the valuation of the properties. Of note are the discrepancies in the space for Parcels 003-01 and 003-02, with the stipulated Plat, which Mr. Núñez attributes to having used a different plat provided to him and a typographical error. When making his valuation report in 2015 Mr. Núñez was aware that the land within the area marked as MTZ on the plans was still privately owned. DNER officials stated they had not indicated to Mr. Núñez that the uses on those lands had to be limited to conservation. Mr. Núñez admitted during his testimony that the only factor he used to give a better conservation use to the lands when preparing his valuation report in 2015 was that they appeared

Case:17-03283-LTS   Doc#:18049-1   Filed:09/07/21   Entered:09/07/21 11:34:54   Desc:
Exhibit Certified Translation of Judgment   Page 21 of 29

Certified Translation MC-2021-143
Page 21 of 29

21

within the MTZ marked on the plan provided to him. Despite this, in the analysis of comparable sales appearing at pages 79 through 81 of his valuation report for parcel 003-01 Mr. Núñez acknowledges that the subject "zoning" is EV.4, which as noted in the findings of proven facts allows for an extensive variety of both commercial and residential uses. This, coupled with the error of analysis that incurs in undervaluing the subject properties against comparable ones for their location within the MTZ, led him to a conclusion of excessively low value for most of the expropriated land.

In November 2007, Mr. Núñez made valuation reports for parcels 003-02 and 004-02 at the request of the DNER with an effective date of November 15 and 10, 2007, respectively, for the purpose of acquisition for a nature reserve. It valued parcel 003-02 with a land area of 49.8228 cuerdas at $14,882,600.00 with a unitary value of $76.00 per square meter. Parcel 004-02 with a land area of 4.0760 cuerdas was valued at $2,243,000.00, with a unit price of $140.00 per square meter. On that occasion, Mr. Núñez was not asked to value parcels 003-01 and 004-01 because the DNER understood that they were of public domain by virtue of the MTZ demarcation made that year.

In the valuation report that Mr. Núñez rendered on June 15, 2015, with an effective date of August 9, 2008 —8 months after those of 2007— he valued the same properties, with the same space, using the same comparable sales and concluded that Parcel 004-02 had the same value but that the value of Parcel 003-02 was $13,708,000.00, or $1,174,600.00 less than what he had concluded in his 2007 report. The explanation he gave for reducing the unit price from $76.00 per square meter to $70.00 per square meter for Parcel 003-02 was that in the report that he had prepared in 2015 he did not make a time adjustment to the comparables as since 2006 the value of the properties had stagnated. If that was the reason, it is illogical that he had made the adjustment for time in the 2007 report and that in the 2015 report, which  effective date was only 8 months later, he eliminated it, even for the years prior to 2006. For further inconsistency,

22

he stated on page 20 of its 2015 report on the 003 parcels that "because of the type of neighborhood condition it is considered that the trend of values increases at an average rate" and that there is no evidence to the contrary.

The Court's attention was drawn to the fact that when adjusting the sizes of the properties that appear in his valuation report to conform them to the stipulated sizes, Mr. Núñez added the additional size to parcels 003-01 and 004-01 to which he attributed a better conservation use and valued at a rate of $4,000.00 per cuerda. When asked what criteria he used to place the additional space on these two parcels, Mr. Núñez could not provide a logical or rational explanation to justify it.

Also noteworthy is the difference between the valuation of parcels 003-02 and 004-02, which are contiguous lots with exactly the same conditions and characteristics. Even taking into consideration the difference in the size of both parcels, it is difficult to understand that the unit price assigned to parcel 004-02 is $140.00/sq.m. and to those of Parcel 003-02, $70.00/sq.m.

Cynthia Torres Torres, in her book, *La Expropiación Forzosa en Puerto Rico*, p. 144, San Juan (2002), explains that the best and most productive use of a property is determined by taking into consideration four factors: 1) that it is a legally permitted use, 2) that it is a physically possible use, 3) that it is an economically viable use, and 4) that it yields the greatest benefit to the owner.

These criteria are also applied by the U.S. Government in the "Uniform Appraisal Standards for Federal Land Acquisitions." 43 CFR § 2201.3. In N*ational Parks and Conservation Ass'n. v. Bureau of Land Management*, 606 F. 3d 1058 1066-1067 (2009) it states:

> "'Under the Uniform Appraisal Standards definition, highest and best use is [t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.' The Appraisal Institute, Uniform Appraisal Standards for Federal Land Acquisitions 34 (quoting Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). While Department of Interior regulations define highest and best use as the "most probable" use of land,             the             Uniform             Standards

only require "reasonable probability" of a given use. Uniform Standards at 34; Desert Citizens, 231 F.3d at 1181 n. 10. Under the Uniform Standards, the highest and best use must also be: (1) physically possible; (2) legally permissible; (3) financially feasible; and (4) must result in the highest value.

The legally allowable uses on the subject properties at the date of the approval of Act 227, on August 9, 2008, were those established in the EV.4 Land Management District of the Ponce Land Management Regulations, which allows for a wide variety of high intensity uses so that both commercial and residential tourism uses were legally possible. The wetland lands had a SREP.N classification which, while not limiting uses to conservation, does not allow development uses either.

The appraisers' reports agree that both commercial and residential uses are physically possible on the lands within the EV.4 district. Both appraisers agreed that commercial use is the use that would give the greatest productivity to the lands closest to PR-2.[10]

With respect to economically viable uses, both appraisers conclude that commercial and residential uses are viable. Mr. Núñez testified that the extension of the commercial use concluded by Eng. Isern could not be sustained without a feasibility study. However, he admitted that he did not do a feasibility study to conclude that the combined 53.8998 acres of parcels 0030-02 and 004-02 had a better mixed commercial-residential use.

The economically viable use criterion is one that relies on market characteristics and that it is important to consider the characteristics of the community, the neighborhood and the zoning in the area where the property is located. The aerial photographs of the area in which the Subject is located, which were presented in evidence, demonstrate the high commercial, industrial, institutional and residential development of the neighborhood. Plaintiff's expert witness at trial testified that by 2008 it was easier to obtain financing for commercial uses than for residential uses.

The existence of commercial and institutional uses of this nature in the neighborhood where the subject properties are located indicates the economic viability of a

---

[10] Report of Eng. Isern, p. 25; Report of Mr. Núñez, Parcel 003, p. 27.

24

commercial use in the part closest to PR-2 as indicated by the plaintiff's expert witness in his testimony and as established by the development objectives of the "La Matilde" Special Plan, which include "maximizing the potential of the area for residential and tourist projects, preferably oriented to the Caribbean Sea and commercial, preferably along the future expressway of PR-2."

As we have seen, case law establishes that the market value of the property has been defined as the price that a determined buyer in a non-forced sale would be willing to pay and the price at which a seller, under the same circumstances, would be willing to sell, considering the condition of the land on the date of the expropriation and the most productive use to which the owner could devote it within a reasonably near future. *Adm. de Terrenos v, Nerashford Dev. Corp.*, supra; *Pueblo v. Huyke*, supra.

Rule 702 of the 2009 Rules of Evidence establishes the criteria to determine the probative value of the expert testimony presented by the parties: (a) whether the testimony is based on sufficient facts or information; (b) whether the testimony is the product of reliable principles and methods; (c) whether the witness reliably applied the principles and methods to the facts of the case; (d) whether the principle underlying the testimony has been generally accepted in the scientific community; (e) the qualifications or credentials of the witness; and (f) the bias of the witness. In applying it, it is compelling to conclude that the opinion of the Commonwealth's appraiser, Mr. Núñez, as to the best and most productive use, does not meet the criteria listed under subparagraphs (a) through (d) of Rule 702 to receive much evidentiary weight because, as we have seen, it is not supported by the facts in evidence and suffers from serious omissions and methodological contradictions that make it unreliable for purposes of establishing the fair market value of the Subject.

Sales of similar properties constitute the primary evidence of market value that assists in the determination of fair value. *ELA v. Fonalledas Córdova*, supra, page 580, citing *Pueblo v. Amadeo*, 82 DPR 102, 1222 (1961). The fair market value of an expropriated parcel of

25

land cannot be determined on uncertain and purely speculative grounds. *ELA v. Fonalledas Córdova*, supra, page 579, citing *ELA v. Sucn. Gautier*, 81 DPR 580, 594 (1959). There is no fixed rule as to when a property is similar to another and in each case the court must exercise its sound discretion. *Autoridad sobre Hogares de PR v. Valldejuli*, 71 DPR 640 (1950). Hence, it is pertinent to consider the similarity in topography, facilities, services, access, location, size and best use of the expropriated and comparable properties. *Pueblo v. Amadeo*, supra, p. 122; *Estado Libre v. Bravo*, supra, p. 785. If the sales and purchases do not meet these requirements, they will not be admissible. Once the just compensation for the admissible expert testimony is established, one may move on to the appraisal report that is rendered. It is in this report that the investigation and analysis of the data obtained can be appreciated. All this information and evaluation is what supports their estimated value. It has also been decided that land sales that, in topography and location, are not similar to the expropriated property, are inadmissible in the corresponding expropriation proceeding. E*LA v. 317,813 Cuerdas de Terreno*, 84 DPR 1, 10 (1961) citing *Pueblo v. Colón*, 73 DPR 579, 583 (1952).

Mr. Núñez's decision to limit the best use of most of the subject farms to one of conservation, led him to not use comparable sales of residential uses; therefore the only evidence the Court received regarding the value of the portion of the subject farms which best and most productive use is tourist residential, is that which arises from the report and testimony of plaintiff's expert witness. The Commonwealth did not present any evidence contradicting the opinion of plaintiff's appraiser as to the value of the residential best use property.

The valuation report of plaintiff's expert is reliable and must be awarded greater credibility in accordance with the criteria set forth in Rule 702 of the Rules of Evidence, because it is based on the correct facts and conforms to the methodology established by the authorities to establish the best and most productive use of the Subject. Engineer Isern's opinion is the one that best fits

Case:17-03283-LTS  Doc#:18049-1  Filed:09/07/21  Entered:09/07/21 11:34:54  Desc:
Exhibit Certified Translation of Judgment  Page 26 of 29
Certified Translation MC-2021-143
Page 26 of 29

26

the characteristics of the neighborhood and the prevailing uses in the area, the infrastructure available in the area, the objectives established in the La Matilde Special Plan for the development of the land, and the uses to which the market has dedicated the land in the area. The valuation approach used is appropriate for the subject properties. The comparable sales he used to establish the size of the portion to which he assigned a commercial use support his testimony that it is reasonable to determine that the fifty (50) cuerdas closest to PR-2 have that best use. The four comparable sales he used to establish the value of the commercial use property are of properties located in Ponce, with uses, infrastructure, accesses comparable to the Subject.

The Court, when determining the market value of a property, must take into consideration any element or indicator that a prudent buyer would consider. *Land Management v. Nerashford Dev. Corp.*, supra, p. 809. The determination of that value requires a skillful synchronization of several factors, and in the final analysis, a healthy balance between the right of the owners and the demands of the community. *ELA v. Fonalledas*, supra, 579.

As previously stated, in cases of reverse expropriation the courts generally apply to it the same rules and principles that govern the expropriation action initiated by the State. *Veláz quez Velázquez v. ELA*, supra, 88-89. The Supreme Court has ruled that the just compensation to which the owner of an expropriated property is entitled is that amount that represents the full value of the property at the time of the taking. *ELA v. Northwestern Const. Inc.*, supra. Compensation for an expropriated property is that "which puts the owner in as good a financial position as he would have been in if the property had not been expropriated". The payment of interest is an integral part of just compensation under the constitutional mandate of just compensation. The Expropriation Act, supra, establishes that the interest rate set by the OCIF Finance Board is the rate to be used to calculate interest in cases of eminent domain. *ELA v. Rexco Industries, Inc.*, 137 DPR 683, 689 (1994).

The Supreme Court explained how interest should be computed under the Expropriation Act in the case of *Autoridad de Carreteras y Transportación de Puerto Rico v. 8554,741 Metros Cuadrados*, 172 DPR 1050, 1064-1065 (2008). Act 167-2015, however, amended Section 5B of the Expropriations Act to provide that "[i]n cases where the period between the taking and the total payment by the State exceeds one semester, the Court shall consider the variations in the interest rates applicable to the semesters between the date of the expropriation until the date of the total payment of just compensation, as determined by the Office of the Commissioner of Financial Institutions (OCIF); providing that interest shall be computed on a simple and not compounded basis."

**JUDGMENT**

For the foregoing reasons, the complaint is hereby granted. Consequently, a judgment is hereby rendered decreeing that the just compensation to be paid by the Commonwealth of Puerto Rico to the plaintiffs and Mr. Javier Mandry Mercado for the properties seized is the sum of $30,496,000.00.

The Commonwealth of Puerto Rico shall pay interest on said amount from the date of the taking (August 9, 2008) until its full payment. The computation of interest shall be made in accordance with the prevailing interest rates in the market, as per Regulation 78-1 of the Office of the Commissioner of Financial Institutions and as they have varied semiannually from the date of the taking until the date of full payment of the just compensation computed as simple interest.

This judgment is rendered with costs as provided in Rule 44.1(a) of the Rules of Civil Procedure.

Notice is hereby given to the parties that as authorized by Judge Laura Taylor Swain in the order entered on July 7, 2017, this Court may only determine the amount of just compensation and this judgment may not be enforced or provisional remedies obtained                    for                    its                    enforcement,                    without

28

the corresponding authorization of the United States District Court for the District of

Puerto Rico in Case No. 17 BK-3283-LTS.

**BE NOTIFIED**

Given in Ponce, Puerto Rico on the 6th day of August, 2019.


[Signature]
FRANCISCO J. ROSADO COLOMER
Superior Judge

**No. 2021-143  TRANSLATOR'S CERTIFICATE OF ACCURACY**

I, Mayra Cardona Durán, of legal age, single, resident of Guaynabo, Puerto Rico, Certified Interpreter of the United States Courts (Certification No. 98-020) and certified by the National Association of Judiciary Interpreters and Translators (10671), holding a Master's Degree in Translation and admitted to the Puerto Rico Bar Association (Bar No. 12390, RUA No. 11038) hereby CERTIFY: that according to the best of my knowledge and abilities, the foregoing is a true and rendition into English of the original Spanish text, which I have translated and it is stamped and sealed as described therein. This document is comprised of Twenty Nine (29) Pages, including this certification page, and does not contain changes or erasures.

In Guaynabo, Puerto Rico today, Tuesday, August 31, 2021.

Lcda. Mayra Cardona
BA Lit/Fr, MA Trans, JD
United States Courts Certified Interpreter
NAJIT Certified Interpreter and Translator
3071 Alejandrino Ave. PMB 306 Guaynabo, Puerto Rico 00969-7035
Tel. (787) 530-1414
e-mail: mayra@cardona.com