# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Case No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | |
| Debtors.[1] | |

| | |
|---|---|
| AMERINATIONAL COMMUNITY SERVICES, LLC, as Servicer for the GDB Debt Recovery Authority, and CANTOR-KATZ COLLATERAL MONITOR LLC, | **Re: ECF No. 17009** |
| Movants, | |
| v. | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | |
| THE COMMONWEALTH OF PUERTO RICO, | |
| Respondent. | |

## OBJECTION OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO TO DRA PARTIES' MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .......................................................................................................... 7

       A.     The GDB/HTA Loans Security Agreement ............................................... 7

       B.     The Commencement of the Title III Cases and the Qualifying
              Modification ................................................................................ 8

       C.     Restrictions on the DRA Parties' Rights to Enforce Public
              Corporation Loans ....................................................................... 9

       D.     The DRA Parties' Lift Stay Motion and Subsequent Proceedings .......... 10

OBJECTION ............................................................................................................... 12

     I.     The Motion Should be Denied Because the DRA Parties are Contractually
         Barred from Seeking the Relief Requested and Lack Standing .......................... 12

     II.    The DRA Parties do not have Standing to Step into the Shoes of HTA to
         Bring The Motion ................................................................................... 15

     III.   The Motion Should be Denied Because it is Based on Appropriation
         Provisions of Statutes Preempted by PROMESA .................................................. 16

     IV.   The Motion Should be Denied Because it is Predicated On HTA Possessing
         a Property Interest it Does Not Have. ................................................................ 20

     V.    The Motion Should be Denied Because it Fails to Meet the Requirements
         for an Administrative Expense Claim ................................................................ 24

       A.     Claimants Do Not Have Administrative Expense Claims Against the
              Commonwealth under the "Fundamental Fairness" Exception to
              Section 503(b) of the Bankruptcy Code .................................................. 24

           1.     "Fundamental Fairness" does not apply to claims based on
                  prepetition obligations. ................................................................ 24

       B.     Claimants Do Not Have Administrative Expense Claims Against
              The Commonwealth Under the Plain Language of Section 503(b) .......... 31

CONCLUSION ........................................................................................................... 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>**CASES**</small>

*Abercrombie v. Hayden Corp. (In re Abercrombie)*,
   139 F.3d 755 (9th Cir. 1998) ....................................................................26

*Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*,
   954 F.3d 1 (1st Cir. 2020) ........................................................................25

*Apa v. Butler*,
   638 N.W. 2d. 57 (S.D. 2001) ...................................................................17

*Arizona v. Bowsher*,
   935 F.2d 332 (D.C. Cir. 1991) .................................................................17

*Arizona v. United States*,
   567 U.S. 387 (2012)..................................................................................20

*Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*,
   316 B.R. 330 (B.A.P. 9th Cir. 2004).......................................................22

*BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*,
   301 F. Supp. 3d 306 (D.P.R. 2017)..........................................................15

*City of Chicago v. Marshall*,
   281 F. Supp. 3d 702 (N.D. Ill. 2017), *rev'd on other grounds sub nom. In re
   Steenes*, 918 F.3d 554 (7th Cir. 2019), *reh'g granted,* 2019 U.S. App. LEXIS
   13642 (7th Cir. May 7, 2019) ..................................................................25

*Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*,
   536 F.2d 950 (1st Cir. 1976).............................................................25, 29

*Cumberland Farms, Inc. v. Fla. Dep't of Env't Prot.*,
   116 F.3d 16 (1st Cir. 1997).......................................................................29

*Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co.*,
   948 F.3d 457 (1st Cir. 2020), *cert. denied,* 141 S. Ct. 844 (2020) ...................21, 22

*First Nat'l Bank of Lafayette v. Tex. Tri-Collar, Inc. (In re Tex. Tri-Collar, Inc.)*,
   29 B.R. 724 (Bankr. W.D. La 1983)........................................................22

*Governo v. Allied World Ins. Co.*,
   No. 17-11672, 2019 WL 4034810 (D. Mass. Aug. 27, 2019) .................13

*Gustavsen v. Alcon Labs., Inc.*,
   272 F. Supp. 3d 241 (D. Mass. 2017) ......................................................20

*Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*,
　　272 B.R. 510 (B.A.P. 1st Cir. 2002), *aff'd and remanded*, 310 F.3d 9 (1st Cir.
　　2002) ....................................................................................................................6, 29

*In re AA 10,000 Corp.*,
　　No. 07-06601, 2008 WL 11275079 (Bankr. D.P.R. May 9, 2008)............................21

*In re Bradlees Stores, Inc.*,
　　No. 02 CIV. 0896 (WHP), 2003 WL 76990 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78
　　F. App'x 166 (2d Cir. 2003) ....................................................................................33

*In re Brown*,
　　No. 05-41071, 2007 WL 494990 (Bankr. D. Mass. Feb. 13, 2007) .........................14

*In re Charlesbank Laundry, Inc.*,
　　755 F.2d 200 (1st Cir. 1985)........................................................................24, 25, 28

*In re Corpus Christi Hotel Partners, Ltd.*,
　　133 B.R. 850 (Bankr. S.D. Tex. 1991) ....................................................................22

*In re Fin. Oversight and Mgmt. Bd. for P.R.*,
　　No. 17 BK 3283-LTS, 2021 WL 1732139 (D.P.R. May 3, 2021)............................28

*In re Fin. Oversight and Mgmt. Bd. for P.R.*,
　　478 F. Supp. 3d 190 (D.P.R. 2020)..........................................................................23

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
　　481 F. Supp. 3d 60 (D.P.R. 2020), (Motion ) ....................................................27, 31

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
　　485 F. Supp. 3d 351 (D.P.R. 2020)............................................................................6

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
　　618 B.R. 619 (D.P.R. 2020)..........................................................................5, 11, 32

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
　　621 B.R. 289 (D.P.R. 2020)....................................................................................28

*In re Furr's Supermarkets, Inc.*,
　　2007 WL 559766 (B.A.P. 10th Cir. Feb. 22, 2007)................................................26

*In re GT Advanced Techs., Inc.*,
　　547 B.R. 3 (Bankr. D.N.H. 2016), *aff'd sub nom. Tera Xtal Tech. Corp. v. GT
　　Advanced Techs., Inc.*, No. 16-CV-91-PB, 2017 WL 590340 (D.N.H. Feb. 13,
　　2017) ......................................................................................................................33

*In re HNRC Dissolution Co.*,
　　396 B.R. 461 (B.A.P. 6th Cir. 2008).......................................................................26

*In re Jeans.com*,
    491 B.R. 16 (Bankr. D.P.R. 2013) ........................................................................................33

*In re Old Carco LLC*,
    424 B.R. 650 (Bankr. S.D.N.Y. 2010), *aff'd*, No. 09-50002 AJG, 2010 WL
    4455648 (S.D.N.Y. Nov. 2, 2010) ........................................................................................33

*In re Weinschneider*,
    395 F.3d 401 (7th Cir. 2005) ................................................................................................26

*John K. & Catherine S. Mullen Benevolent Corp. v. United States*,
    290 U.S. 89 (1933)................................................................................................................18

*Krys v. Off. Comm. of Unsecured Creditors of Refco Inc. (In re Refco Inc.)*,
    505 F.3d 109 (2d Cir. 2007)................................................................................................15

*Louisville Joint Stock Land Bank v. Radford*,
    295 U.S. 555 (1935)............................................................................................................31

*Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
    *Mgmt. Bd. for P.R.)*,
    916 F.3d 98 (1st Cir. 2019) ................................................................................................19

*Newberry v. City of San Bernardino (In re City of San Bernardino)*,
    558 B.R. 321 (C.D. Cal. 2016), (*see* Motion,) ....................................................................30

*Norfolk S. Ry. Co. v. Perez*,
    778 F.3d 507 (6th Cir. 2015) ..............................................................................................13

*Ohio v. Kovacs*,
    469 U.S. 274 (1985).................................................................................................5, 20, 31

*Philip Morris Cap. Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.)*,
    944 F.2d 500 (9th Cir. 1991) ..............................................................................................22

*Puerto Rico ex rel. Isabela Irrigation Serv. v. United States*,
    134 F.2d 267 (1st Cir. 1943)................................................................................................18

*Reading Co. v. Brown*,
    391 U.S. 471 (1968)..................................................................................................24, 25, 28

*Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
    *Mgmt. Bd. for P.R.)*,
    327 F. Supp. 3d 365 (D.P.R. 2018)......................................................................................19

*Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)*,
    698 F.2d 571 (2d Cir. 1983)................................................................................................15

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
 330 F. Supp. 3d 685 (D.P.R. 2018) ........................................................................ 19

*State ex rel. Longstaff v. Anderson,*
 146 N.W. 703 (S.D. 1914) ..................................................................................... 17

*Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.),*
 258 F.3d 385 (5th Cir. 2001) ................................................................................. 26

*Union De Trabajadores De La Industria Eléctrica Y Riego v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.,*
 No. 20-2041, 2021 WL 3560747 (1st Cir. Aug. 12, 2021) .................................... 32

*United States v. Sec. Indus. Bank,*
 459 U.S. 70 (1982) ................................................................................................. 31

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
 945 F.3d 3 (1st Cir. 2019) ...................................................................................... 19

*Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.),*
 954 F.2d 1 (1st Cir. 1992) ................................................................................ 26, 28

**STATUTES**

9 L.P.R.A. § 2002 ........................................................................................................ 7

9 L.P.R.A. § 2004(l) ........................................................................................ 7, 11, 23

9 L.P.R.A. § 2015 ........................................................................................................ 7

9 L.P.R.A. § 5681 ............................................................................................... passim

13 L.P.R.A. § 31751 .................................................................................................. 17

13 L.P.R.A. § 31751(a) .............................................................................................. 23

13 L.P.R.A. § 31751(a)(1)(A) ................................................................................... 16

13 L.P.R.A. § 31751(a)(1)(C) ....................................................................... 8, 15, 24

13 L.P.R.A. § 31751(a)(3) .......................................................................................... 17

13 L.P.R.A. § 31751(a)(3)(C) ....................................................................... 8, 15, 24

19 L.P.R.A. § 2233(b)(2) ........................................................................................... 21

v

11 U.S.C. § 926 ..........................................................................................................23

11 U.S.C. § 503 ..........................................................................................................31

11 U.S.C. § 503(b) ...........................................................................................5, 24, 31

11 U.S.C. § 503(b)(1)(A) ................................................................................... passim

11 U.S.C. § 552(a) ................................................................................................5, 21

11 U.S.C. § 1109(b) ....................................................................................................15

PROMESA § 4 ........................................................................................4, 16, 18, 19, 20

PROMESA § 201(b)(1) ...............................................................................................18

PROMESA § 201(c)(3) ...............................................................................................18

PROMESA § 201(d)(2) ...............................................................................................18

PROMESA § 202 ....................................................................................................4, 16

PROMESA § 202(c)(1) ...............................................................................................18

PROMESA § 202(e)(1)(C) ..........................................................................................18

PROMESA § 202(e)(3)(C) ..........................................................................................16

PROMESA § 304(a) .....................................................................................................8

PROMESA § 405(m)(1) ..............................................................................................19

PROMESA § 405(m)(2) ..............................................................................................19

PROMESA § 405(m)(4) ..............................................................................................19

## CONSTITUTIONAL PROVISIONS

P.R. Const. art. VI, § 8 ..........................................................................................8, 18

## OTHER AUTHORITIES

Restatement (Second) Torts, § 895B(3)(a) (Am. Law Inst. 1977) ...............................30

Restatement (Second) Torts, § 265 (Am. Law Inst. 1977) .........................................30

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Commonwealth of Puerto Rico (the "Commonwealth" or the "Debtor"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtor's sole Title III representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA")[2], respectfully submits this objection (the "Objection") to *The DRA Parties' Motion for Allowance of an Administrative Expense Claim* [ECF No. 17009] (the "Motion")[3] filed by AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA Parties"), in support thereof avers:

## PRELIMINARY STATEMENT[4]

1. Previously, the DRA Parties commenced an adversary proceeding [Adv. Pro. No. 21-00068-LTS] seeking judgments ruling, among other things, that their claims are secured by Act 30-31 revenues and other revenues. The Oversight Board's motion to dismiss is being briefed. The DRA Parties also filed a motion for adequate protection or stay relief, premised on the same security interest arguments. [ECF No. 16276]. Discontent with all that existing litigation, the DRA Parties bring yet another Motion identically grounded in the same alleged security interests, where they request an administrative claim. The DRA Parties' instant Motion claims the Commonwealth's retention of its property, which allegedly it should have transferred to HTA due to the DRA Parties' purported security interests, somehow resulted in an $800 million administrative expense claim in their favor.

---

[2] PROMESA has been codified at 48 U.S.C. §§ 2101–2241.

[3] All docket citations unless otherwise noted refer to Case No. 17-03283-BK-LTS.

[4] All capitalized terms not defined herein shall have the meaning ascribed to them below.

2.      Since the Bankruptcy Code became effective for cases filed on or after October 1, 1979, creditors asserting property interests have filed motions for adequate protection and/or stay relief when they believed their collateral value was diminishing due to the automatic stay or to the debtor's use, sale, or lease of the collateral.  Indeed, the DRA Parties have done so. [ECF No. 16276].  But here, based on the same allegations in their stay relief motion, they ask the Court to override the last forty-two years of bankruptcy jurisprudence and to convert the Commonwealth's alleged use of its property into a tort to be treated like an administrative expense.  For obvious reasons, the Motion lacks any authority for its proposition and argues the Court should exercise its discretion due to "fundamental fairness" while ignoring this Court's decisions precluding prepetition creditors such as the DRA Parties from such relief.  Additionally, the Motion should be denied because the DRA Parties are contractually precluded from filing the Motion and lack standing to assert HTA's rights to receive revenues from the Commonwealth.

3.      Pursuant to certain moratorium laws and the "clawback" executive orders enacted by the Commonwealth prior to the commencement of these Title III Cases (the "Moratorium Laws and Clawback Executive Orders"),[5] certain taxes and fees conditionally appropriated to specific instrumentalities, such as HTA, pursuant to various statutes were retained to pay for "essential services . . . ." *See* Art. 202 of Act No. 5-2017.  After the passage of PROMESA and commencement of these Title III Cases, the Commonwealth fiscal plans and budgets certified by the Oversight Board also provided for the retention of those revenues.  As a result, the Act 30-31 Revenues, among other funds, were retained at the Commonwealth and these instrumentalities did not continue debt service payments.

---

[5] The Moratorium Laws and Clawback Executive Orders, are, collectively:  Executive Order 2015-046; Executive Order 2015-049; Act No. 21-2016; and Act No. 5-2017.  *See also* Motion ¶¶ 23–24, 26, 28.

4.     Subsequent to the retention by the Commonwealth of such taxes and fees, including the Act 30-31 Revenues, the DRA Parties acquired indebtedness from the Government Development Bank of Puerto Rico (the "GDB") that already was in default and had been ascribed no value in the solicitation of GDB's Title VI qualifying modification.[6] The DRA Parties filed a series of actions seeking to generate a recovery on such indebtedness, including this Motion, a motion seeking relief from the automatic stay and adequate protection,[7] and an adversary proceeding seeking to establish among other things, a first priority security interest against revenues (the "Act 30-31 Revenues") generated from Act No. 30-2013 ("Act 30") and Act 31-2013 ("Act 31" and,  together, the "Act 30-31 Excise Tax Statutes,") wherever located.[8]

5.     The Motion should be denied for at least four independent reasons.  First, the DRA Parties lack standing to pursue this Motion under the Asset Restrictions set forth in the Transfer Agreement and agreed to by the DRA, which limit the DRA Parties' ability to participate in these Title III Cases.  Specifically, the Asset Restrictions allow only actions to assure funds are available for debt service if provided in a fiscal plan or certified budget, to preserve or defend security interests held by the DRA Parties, or to ensure the DRA Parties' claims receive treatment in a Title III case that is the same as provided to other creditors with the same legal priority, security, or pledge rights.  It is undisputed that the funds the DRA Parties want are not provided for in a certified fiscal plan or budget.  It is undisputed that the DRA Parties have another pending motion for stay relief and adequate protection to preserve their purported security interests.  And it is

---

[6] See Application of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority, Pursuant to Section 601(M)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act, for Approval of the Qualifying Modification for GDB, Dkt. No. 1 of Civil Case No. 18-01561 (LTS) (Solicitation Statement dated Aug. 9, 2018), the ("Solicitation Statement") at E-124.

[7] See The DRA Parties' Amended Motion and Memorandum of Law in Support of their Request for Adequate Protection or Relief from the Automatic Stay [ECF No. 16276] (the "Amended Lift Stay Motion").

[8] See [Adv. Pro. No. 21-00068-LTS, ECF No. 1] (the "DRA Adversary Complaint").

undisputed that the Motion is not a confirmation objection seeking similar treatment to other claims.  Therefore, the Motion does not fall within any of these categories, and accordingly should be denied.

6.      Further, the DRA Parties lack standing to bring the Motion as any appropriations made under the Act 30-31 Excise Tax Statutes are made to HTA for its corporate purposes, not to any particular creditor, and certainly not to the DRA Parties.  Any rights the DRA Parties may have are against HTA not the Commonwealth.  Thus, the Motion is nothing more than an unsubtle and improper attempt to usurp *HTA's* right (if any) to receive the Act 30-31 Revenues.

7.      <u>Second</u>, as demonstrated in the Oversight Board's motion to dismiss the DRA Adversary Complaint [Adv. Pro. No. 21-00068-LTS, ECF No. 40] (the "<u>Motion to Dismiss</u>"), the Motion should be denied because it is based on Puerto Rico statutes, inconsistent with, and preempted by, PROMESA.  PROMESA gives the Oversight Board the sole authority to certify budgets authorizing the spending of Commonwealth resources.  PROMESA § 202.  To the extent the Act 30-31 Excise Tax Statutes purport to appropriate Commonwealth revenues without regard to the Oversight Board's certified budget, and because the appropriation provisions make impossible or obstruct the central goal of PROMESA—to return the Commonwealth to fiscal responsibility—they are preempted and cannot provide a basis for an administrative expense claim. *See* Motion to Dismiss ¶¶ 64–65.  As the First Circuit and this Court recognized, because PROMESA gives the Oversight Board the exclusive authority to certify budgets, PROMESA § 4 expressly preempts any preexisting law appropriating funds without regard to a budget certified by the Oversight Board.  *See infra* ¶ 41.[9]

---

[9] In any event, statutes providing for annual appropriations do not create rights to payment by the recipient that endures after such statutory appropriations are revoked, amended or repealed by a future legislature.  Here, the Oversight

8.     Even if Act 30 and Act 31 are not preempted, at best, HTA may have a discoverable unsecured claim against the Commonwealth for breach of a prepetition statutory obligation to transfer funds—a far cry from the administrative expense claim or property interest alleged by the DRA Parties. *See Ohio v. Kovacs*, 469 U.S. 274, 278–279 (1985).

9.     Third, the Motion should be denied because it is predicated on HTA possessing a property interest in Act 30-31 Revenues retained by the Commonwealth, coupled with the DRA Parties possessing a security interest therein.  As this Court already has found, however, the essential predicate to the DRA Parties' claim is without foundation.  *See* Lift Stay Opinion [as defined *infra* ¶23], 618 B.R. at 634–35; *see also* Motion to Dismiss ¶¶ 32–33.  HTA has no property interest in Act 30-31 Revenues retained by the Commonwealth and could not have granted a security interest in what it did not have.  And even if such interest existed prepetition (it did not), Bankruptcy Code section 552(a) prevents attachment of any security interest to Act 30-31 Revenues generated after the commencement of the Commonwealth's Title III case.  The retention of Act 30-31 Revenues cannot therefore form the basis of *any* claim against the Commonwealth, much less one with administrative priority.

10.     Fourth, even if the DRA Parties were somehow able to overcome these hurdles,  the DRA Parties still would not be entitled to a claim with administrative priority under the plain language of, and jurisprudence interpreting, Bankruptcy Code section 503(b).  The DRA Parties' primary argument that they are entitled to administrative priority due to "fundamental fairness" fails.[10]  "Fundamental fairness" is in the eye of the beholder.  The Commonwealth and its residents

---

Board's certified budgets overrode the appropriations contained in the Act 30-31 Excise Tax Statutes, and with them, any right to enforce such statutes.

[10] As discussed *infra* ¶¶ 52–60, the DRA Parties argue limited case law considering "fundamental fairness" suggest courts may grant administrative expense priority to "two categories of claims that do not otherwise come within the plain language of Section 503(b) [of the Bankruptcy Code]."  However, those "two categories" are the rare exception not present here:  postpetition operations of the debtor in possession that cause tortious injuries to third parties, or

would think fairness means it can use its revenues for its people.  The DRA Parties clearly believe fundamental fairness means they get paid at the expense of other creditors and the Commonwealth's residents.  The DRA Parties' purported administrative expense claim is entirely duplicative of their claim against HTA arising from prepetition loan agreements.  Case law, including from the First Circuit, is clear that claims arising from prepetition agreements—even when based on postpetition breaches—do not have administrative expense status under "fundamental fairness".[11]  Nor does "fundamental fairness" apply to the instant situation where the actions at issue—defaults—are authorized by Title III and a political sovereign such as the Commonwealth and are not a tort or violation of law.  Indeed, in the present case, the contrary is true—the actions in question are mandated by applicable federal law—here, PROMESA.

11.     Finally, the Motion should be denied because the DRA Parties' alternative argument—that the plain language of section 503(b)(1)(A) of the Bankruptcy Code[12] applies, and the Commonwealth's retention of Act 30-31 Revenues constitutes a postpetition transaction with the DRA Parties that benefited the Commonwealth—fails.  The DRA Parties did not provide any postpetition goods, services, or other consideration to the Commonwealth, and their allegations pertain to prepetition statutes and executive orders.  Accordingly, for the reasons set forth herein, the Motion should be denied.

---

claims arising from postpetition actions of the debtor that "deliberately violate applicable law and damage others." Motion ¶ 63.  Here, the DRA Parties ignore that what they complain about—the Commonwealth not paying HTA—is the purpose of Title III, not a violation of anything.

[11]  This Court has already held that in the context of the Monolines' Lift Stay Motion that the 'Constitutional claims' stem from the same bond claims and are not independent.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 485 F. Supp. 3d 351, 361 (D.P.R. 2020) ("Movants' Proposed Claims plainly stem from their bond claims and, although styled as requests for declaratory relief, ultimately are vehicles for asserting rights to payment of amounts outstanding under various bond issues.").

[12] The DRA Parties impliedly concede section 503(b)(1)(A) does not apply, by leading with a "fundamental fairness" argument, which is  an exception to the general requirements for allowance of administrative expense claims.  *See, e.g.*, *Hicks, Muse & Co. v. Brandt (In re Healthco Int'l, Inc.)*, 272 B.R. 510, 513 (B.A.P. 1st Cir. 2002), *aff'd and remanded*, 310 F.3d 9 (1st Cir. 2002).

## BACKGROUND

### A.    The GDB/HTA Loans Security Agreement

12.    HTA is a public corporation established pursuant to Act No. 74-1965, which is codified as 9 L.P.R.A. §§ 2001–2035 (the "HTA Enabling Act").  *See* 9 L.P.R.A. § 2002.  HTA is separate from the Commonwealth.  *Id.* § 2015.  HTA is responsible for the construction, operation, and maintenance of the Commonwealth's transportation system.  *See id.* § 2002.  The HTA Enabling Act authorizes HTA to issue bonds and to secure their repayment by granting a security interest in certain property "made available" to HTA.  *See id.* § 2004(l).

13.    The GDB operated as a banking institution and depository of funds for the Commonwealth, its instrumentalities, public corporations, and municipalities.  Solicitation Statement ¶ 8.  Prior to the commencement of the Commonwealth's Title III case and HTA's Title III case (collectively, the "Title III Cases"), between March 2008 and January 2014, GDB extended loans to HTA pursuant to 15 loan agreements, which loans were memorialized by 23 promissory notes (the "GDB/HTA Loans").

14.    On August 28, 2013, GDB and HTA executed an *Assignment and Security Agreement* (the "Security Agreement")[13] by which HTA assigned as security to GDB HTA's "rights, title, obligations and interest in" Act 30-31 Revenues.  *See* Security Agreement § 1.1. Section 1.2 of the Security Agreement assigns, pledges, and grants "a continuing security interest, which shall be junior, inferior and subordinate in all respects to the outstanding bonds of [HTA] issued pursuant to the [HTA] Bond Resolutions, in all of the right, title and interest of [HTA] in the revenues *allocated to it* by [Act 30] & [Act 31] . . . whether presently held or hereafter acquired and wherever located[.]" *Id.*  § 1.2 (emphasis added).

---

[13] A copy of the Security Agreement was previously filed on the Court's docket as Exhibit E to the Amended Lift Stay Motion.

15.     Consistent with the Security Agreement's grant of a security interest in revenues "whether presently held or hereafter acquired," the loan agreement[14] executed contemporaneously therewith recites HTA "has agreed to pledge and grant a security interest in favor of the Bank over the revenues *received* pursuant to [Act 30 and Act 31] to secure all obligations under this [Security] Agreement."  DRA Adversary Complaint ¶ 49; *id.* Ex. E (emphasis added).  Act 30-31 Revenues are also expressly subject to retention by the Commonwealth under Section 8 of Article VI of the Puerto Rico Constitution and are "available resources" of the Commonwealth.  *See* 9 L.P.R.A. § 5681 and 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C).

**B.     The Commencement of the Title III Cases and the Qualifying Modification**

16.     On May 3, 2017, the Oversight Board commenced the Commonwealth's Title III case by filing a voluntary petition for relief pursuant to section 304(a) of PROMESA.  On May 21, 2017, the Oversight Board filed a voluntary petition for relief for HTA pursuant to section 304(a) of PROMESA, commencing a case under title III thereof.  On July 12, 2017, the Oversight Board issued a resolution authorizing GDB to use Title VI of PROMESA.  *See* Dkt. No. 1 of Civil Case No. 18-01561 (LTS) ¶ 18 (Aug. 10, 2018).  On August 10, 2018, GDB and AAFAF initiated a proceeding to restructure GDB's debt obligations pursuant to Title VI of PROMESA.

17.     On November 6, 2018, this Court approved the *Title VI Qualifying Modification for GDB* (the "Qualifying Modification").  *See* Dkt. No. 270 of Civil Case No. 18-01561 (LTS).  To provide the legal framework for the Qualifying Modification, the Puerto Rico Legislature passed Act No. 109-2017 (the "GDB Restructuring Act").  The GDB Restructuring Act created the DRA as a statutory public trust and independent public governmental instrumentality of the Commonwealth.  *See* GDB Restructuring Act, Art. 103.  The Qualifying Modification mandated

---

[14] A copy of the loan agreement can be found as Exhibit E to the DRA Adversary Complaint.

that the GDB loans supporting the new bonds to be issued by the DRA, including the GDB/HTA

Loans, would continue to be held by a government entity with carefully circumscribed

enforcement rights, thus ensuring that the DRA or any subsequent transferee would not force a

public corporation into Title III or frustrate a pending Title III case.  *See* GDB Restructuring Act

§ 208(a).

18.     Under the Qualifying Modification, the claims of GDB's bondholders and

municipal and private depositors were exchanged for new bonds issued by the DRA.  In return,

GDB transferred to the DRA its municipal loan portfolio and a portion of its portfolio of loans to

Commonwealth governmental entities, including the GDB/HTA Loans and GDB's security

interest in the proceeds of Act 30-31 Revenues (collectively, the "Restructuring Property").  Each

of the GDB/HTA Loans was classified in the Qualifying Modification as non-performing and were

attributed no value.  Solicitation Statement at E-126; Transfer Agreement ¶¶ 1–3.

19.     In accordance with the Qualifying Modification, several third-party service

providers were engaged to perform specific functions, including the Servicer, Wilmington Trust,

N.A. as the Indenture Trustee, and the Collateral Monitor.

### C.     Restrictions on the DRA Parties' Rights to Enforce Public Corporation Loans

20.     The Restructuring Property was transferred to the DRA pursuant to the terms of the

Transfer Agreement entered into a few weeks after the Court approved the Qualification

Modification.  *See* Transfer Agreement, dated November 29, 2018 (the "Transfer Agreement").[15]

Under the Transfer Agreement, the DRA's rights with respect to loans made to non-municipal

---

[15] A copy of the Transfer Agreement is attached as Exhibit G to the Amended Lift Stay Motion.

public corporations, such as HTA (each, a "Non- Municipal Loan"), are limited solely to the extent

necessary:

> (i) to assure that the applicable Obligor's funds that are available for debt service (consistent with the applicable Fiscal Plan, if any, and applicable PROMESA Budget, if any) are applied to such Non-Municipal Loan in accordance with the applicable Asset Documents, legal priority, security or other pledge rights benefiting such Loan Asset, [("Clause 1")]

> (ii) to preserve, protect or defend any security or other pledge rights benefiting such Non-Municipal Loan, and [("Clause 2")]

> (iii) in the case of a Non-Municipal Loan where the applicable Obligor is in a proceeding under Title III or Title VI of PROMESA and such Obligor has other creditors with the same legal priority, security or pledge rights as the Issuer, to ensure that the Issuer receives treatment in such proceedings that is the same as that provided to other creditors with the same legal priority, security or pledge rights. [("Clause 3")]

Transfer Agreement, Schedule 1 (Definition of "Asset Restrictions").

### D.   The DRA Parties' Lift Stay Motion and Subsequent Proceedings

21.   On June 25, 2019, the DRA Parties filed *The DRA Parties' Motion and Memorandum of Law in Support of Their Motion for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection* [ECF No. 7643] (the "DRA Parties' Original Lift Stay Motion").   The Oversight Board and AAFAF (together the "Government Parties") and the DRA Parties entered into several agreements adjourning this Court's consideration thereof.[16]

---

[16] *See Stipulated Order Subjecting the DRA Parties' Lift Stay Mot. to Mediation and 120-Day Stay re Joint Stipulation, ECF No. 632 in Case No. 17-03567 and ECF No. 8481 in Case No. 17-03283; Interim Order Approving Am. Joint Stipulation Regarding the DRA Parties' Mot. and Mem. of Law in Supp. of their Mot. for Relief from the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection, ECF No. 662 in Case No. 17-3567 and ECF No. 6922 in Case No. 17-3283; Order Granting in Part and Denying in Part DRA Parties' Mot., ECF No. 721 in Case 17-03567 and ECF No. 12005 in Case 17-03283; Order Approving Joint Stipulation of the Gov't Parties and the DRA Parties Regarding the DRA Parties' Mot. and the Mem. of Law in Supp. of their Mot. for Relief From the Automatic Stay, or in the Alternative, Ordering Payment of Adequate Protection, ECF No. 753 in Case No. 17-03567 and ECF No. 12533 in Case No. 17-3283.*

22.     The briefing for the DRA Parties' Original Lift Stay Motion did not commence until after the court ruled on preliminary issues raised in a similar motion filed by certain monoline insurers of HTA debt and debt of other Commonwealth instrumentalities (the "Monolines"). *See* [Case No. 17-BK-3567-LTS, ECF No. 673] (the "Monolines' Lift Stay Motion"); *see also* [ECF No. 12533].

23.     On July 2, 2020, the Court decided *In re Financial Oversight & Management Board for Puerto Rico*, 618 B.R. 619 (D.P.R. 2020) (the "Lift Stay Opinion"). After a detailed review of, among other things, Act 30 and Act 31, the Court ruled Act 30-31 Revenues (among other revenues) were not "available" for HTA to pledge pursuant to 9 L.P.R.A. § 2004(l). *See id* at 634–35 ("Excise Taxes are not 'able to be used or obtained' by HTA nor are they at HTA's disposal; they are within the possession and control of the Commonwealth.").

24.     On March 31, 2021, the DRA Parties filed the Amended Lift Stay Motion. On April 21, 2021, the Government Parties filed *The Government Parties Objection to the DRA Parties' Standing to Seek Relief from the Automatic Stay or in the Alternative, Ordering Payment of Adequate Protection* [ECF No. 16518] (the "Standing Objection").

25.     On June 15, 2021, the DRA Parties filed the Motion.

26.     On August 9, 2021, the Court entered an order overruling the Standing Objection "insofar as it relates to the aspect of the [Amended Lift Stay] Motion that seeks adequate protection[s.]" [ECF No. 17725 at 8] (the "Standing Order"), memorializing an oral ruling made on August 4, 2021. The Court determined that the Amended Lift Stay Motion was not barred by the Asset Restrictions because it was an action to protect and defend collateral, unlike the Motion which seeks affirmative allowance of a claim. *See also* Aug. 4, 2021 Omnibus Hr'g Tr. at 51:22–

11

24 ("adequate protection allows a secured creditor to protect the security or other pledge rights benefiting its claims . . . .").

## OBJECTION

27.     As discussed below, the Motion should be denied because: (i) the DRA Parties are contractually precluded from filing the Motion by the Transfer Agreement; (ii) they have no standing to step into the shoes of HTA to bring the Motion; (iii) the Motion relies on Puerto Rico statutes preempted by PROMESA; (iv) at best, the failure to transfer the Act 30-31 Revenues to HTA is a breach of prepetition statutes, simply a default; (v) the Motion is predicated on HTA possessing a property interest in Act 30-31 Revenues not delivered to HTA, which it does not have; and (vi) the DRA Parties are not entitled to an administrative expense claim under either "fundamental fairness" or Bankruptcy Code section 503(b)(1)(A).

**I.      The Motion Should be Denied Because the DRA Parties are Contractually Barred from Seeking the Relief Requested and Lack Standing**

28.     The Motion should be denied because it violates the Asset Restrictions in the Transfer Agreement, which governs the relationship between the DRA Parties and the Commonwealth.  *See* Standing Order at 3 ("the DRA Parties are required to comply with the Asset Restrictions, which are defined in Schedule 1 to the Transfer Agreement").  The Asset Restrictions, which apply explicitly to the GDB/HTA Loans, preclude the DRA Parties from affirmatively seeking to strike down or invalidate Commonwealth laws, interfering with certified Commonwealth and HTA fiscal plans and budgets, or filing a motion for allowance of an administrative expense claim.  The Motion does not explain how it could be permissible under any section of the Asset Restrictions.

29.     Clause 1 of the Asset Restrictions permits actions to ensure funds made available to the applicable Obligor "consistent with the applicable Fiscal Plan . . . [or] Budget" are duly

12

applied to debt service and the security and pledge rights pertaining thereto. *See* Transfer Agreement, Schedule 1(b) at cl. 1. As the current Commonwealth fiscal plan and budget both do not allocate Act 30 and 31 Revenues to HTA for payment to the DRA Parties, the Motion is not permitted by Clause 1. *See* 2021 Fiscal Plan for Puerto Rico: Restoring Growth and Prosperity (April 23, 2021).[17]

30.   Clause 2 permits actions taken only to "preserve, protect or defend any security or other pledge rights . . . ." Transfer Agreement, Schedule 1(b) at cl. 2. Although this Court found "the DRA Parties' request for adequate protection [sought] a remedy for the alleged diversion of collateral" and the DRA Parties had standing to pursue the Amended Lift Stay Motion, that finding was directly linked to the defense and enforcement of an alleged security interest—by definition, a request for "adequate protection" protects security interests. *See* Aug. 4, 2021 Omnibus Hr'g Tr. at 51:17–21, 52:14–15. Here, the Motion does not seek to protect a security interest; rather it seeks to establish an administrative priority claim against the Commonwealth based on an alleged tort and violation of the law. The Motion is not permitted by Clause 2.

31.   Generally, to "protect" means "to defend or guard from attack [or] loss . . . , to cover or shield from injury or danger, or to screen [or] shelter." *Norfolk S. Ry. Co. v. Perez*, 778 F.3d 507, 512–13 (6th Cir. 2015) (quoting *Webster's Unabridged Dictionary of the English Language* 1553 (2d ed. 2001)) (internal quotation marks omitted). Similarly, to "defend" "means to deny or oppose the right of a plaintiff in . . . a suit or wrong charged." *Governo v. Allied World Ins. Co.*, No. 17-11672, 2019 WL 4034810, at *5 (D. Mass. Aug. 27, 2019) (internal quotation mark omitted) (citing *Mount Vernon Fire Ins. Co. v. Visionaid, Inc.*, 76 N.E.3d 204, 208 (Mass. 2017). But here, the DRA Parties do not seek to preserve or protect their security interest or to

---

[17] A copy of the 2021 Commonwealth Fiscal Plan is attached to the Motion as Exhibit D.

ascertain the status of certain funds.  Indeed they already did that with their stay relief motion.
Rather, they seek affirmative relief in the form of an administrative expense claim to compensate
them for purported violations of law.  Nor do the DRA Parties attempt to "preserve" their rights,
which is generally understood to mean "keep, guard . . . , protect . . . , [or] maintain" (*see In re
Brown*, No. 05-41071, 2007 WL 494990, at *1 (Bankr. D. Mass. Feb. 13, 2007), as they do not
wish to maintain or ascertain their rights by this Motion—instead, they seek to create entirely new
rights against the Commonwealth.  Accordingly, the remedies sought by the DRA Parties are
outside the scope of the rights the DRA Parties may exercise under Clause 2.  Indeed, if the present
Motion were to fall within the right of the DRA Parties to "preserve, protect and defend," it is
difficult to imagine any actions that would be prohibited by the Asset Restrictions, thereby
uprooting one of the critical elements of the Qualifying Modification—the restriction on the DRA
Parties' ability to interfere with pending Title III cases to try to increase its recovery on claims.

32.     Finally, as the Court held with respect to the Amended Lift Stay Motion, "Clause 3
has not been triggered and it is therefore inapplicable to the present circumstances" because there
are no other alleged creditors receiving different treatment than the DRA Parties with respect to
their asserted rights in connection with the GDB/HTA Loans.  Standing Order at 6.  The same
logic applies to the Motion, as the DRA Parties have conceded there are no creditors with the same
legal priority with respect to their GDB/HTA Loans, and they have not alleged a different treatment
with respect to their HTA bonds as other holders of such bonds.  Additionally, even if Clause 3
were triggered it would not give the DRA Parties standing as other creditors with similar claims
arising from conditionally appropriated taxes and fees are not receiving administrative expense
priority for such claims.  Accordingly, the Asset Restrictions prohibit the filing of the Motion, and
it should be denied.

## II.     The DRA Parties do not have Standing to Step into the Shoes of HTA to Bring The Motion

33.     The Motion must also be denied because the DRA Parties lack standing to bring it. This is because any appropriations made under the Act 30-31 Excise Tax Statutes are made to HTA for HTA's "corporate purposes," *see* 9 L.P.R.A. § 5681, 13 L.P.R.A. § 31751(a)(1)(C), (a)(3)(C), not to any particular creditor, and certainly not to the DRA Parties.  Though the DRA Parties argue they have a security interest in HTA's assets, any claim arising from not receiving those assets belongs to HTA and only HTA has standing to prosecute such a claim.  Any acts committed by the Commonwealth would have harmed only HTA directly and the DRA Parties merely derivatively.  The DRA Parties are, at most, a creditor of a creditor (HTA), and, as this Court previously held, a creditor of a creditor lacks standing to assert the rights of the latter. *See BNYM v. COFINA (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306, 312 (D.P.R. 2017) ("[p]rudential standing under Article III of the U.S. Constitution requires that a party demonstrate that its claim is 'premised on [its] own legal rights (as opposed to those of a third party'" (quoting *Katz v. Pershing, LLC,* 672 F.3d 64, 72 (1st Cir. 2012))).

34.     Circuit courts have consistently held party-in-interest standing under Bankruptcy Code § 1109(b) is confined to parties whose interests are directly—and not indirectly or derivatively—affected. *See Krys v. Off. Comm. of Unsecured Creditors of Refco Inc. (In re Refco Inc.)*, 505 F.3d 109, 118 (2d Cir. 2007) ("Bankruptcy court is a forum where creditors and debtors can settle their disputes *with each other.*  Any internal dispute between a creditor and that creditor's investors belongs elsewhere.") (emphasis in original); *Roslyn Sav. Bank v. Comcoach Corp. (In re Comcoach Corp.)*, 698 F.2d 571, 573 (2d Cir. 1983) ("the 'real party in interest' is the one who, under the applicable substantive law, has the legal right which is sought to be enforced or is the party entitled to bring suit") (citation omitted).  This reasoning is obvious—the creditor whose

15

rights the creditor of the creditor attempts to prosecute may not agree with what the other creditor

is trying to do with its rights.

35.     Put simply, the Act 30-31 Excise Tax Statutes give the DRA Parties no rights to

anything—at most, they require the transfer of revenues *to HTA* for *HTA's benefit*.  Therefore, the

only party that can enforce them is HTA, and the Motion must be denied for lack of standing.

## III.    The Motion Should be Denied Because it is Based on Appropriation Provisions of Statutes Preempted by PROMESA

36.     The Motion should also be denied because it is based on appropriation provisions

of the Act 30-31 Excise Tax Statutes which are preempted by PROMESA.  Under PROMESA, all

power over appropriation of Commonwealth revenues (including Act 30-31 Revenues) is

conferred on the Oversight Board by § 202, which provides the Oversight Board is the only entity

with power to certify budgets, which shall be "deemed to be in full force and effect,"

(§ 202(e)(3)(C)), and which circumscribe all of the Commonwealth's spending.  PROMESA

§ 202.  All inconsistent Commonwealth laws are expressly preempted.  *See id.* § 4.  Because the

appropriation provisions in the Act 30-31 Excise Tax Statutes make impossible or obstruct the

central goal of PROMESA—to return the Commonwealth to fiscal responsibility—they are also

impliedly preempted, and cannot supply the basis for the relief requested in the Motion.[18]  Thus,

the Act 30-31 Revenues are not transferred to HTA by operation of law and not by any action

taken by the Commonwealth.

37.     The Act 30-31 Excise Tax Statutes appropriate the Commonwealth's revenues to

HTA.  Specifically, the Act 30-31 Excise Tax Statutes appropriate the Act 30-31 Revenues to HTA

by requiring the Commonwealth to "transfer" or "cover" the Act 30-31 Revenues into a special

---

[18] While briefly summarized here, to avoid burdening the Court by repeating arguments extensively briefed in a
concurrently pending motion, the Oversight Board incorporates by reference its preemption arguments in the Motion
to Dismiss ¶¶ 64–81.

deposit in favor of HTA on a monthly basis. *See* 9 L.P.R.A. § 5681; 13 L.P.R.A. § 31751(a)(1)(A) (requiring transfer on a monthly basis to special deposit); 13 L.P.R.A. § 31751(a)(3) (same). This requirement to transfer the funds to a special deposit is no more than an appropriation of funds. Jurisprudence from across the United States is clear that statutory provisions just like those contained in 9 L.P.R.A. § 5681 and 13 L.P.R.A. § 31751, requiring the transfer of proceeds of excise tax revenues and license fees to a special deposit in favor of an entity, constitute mere appropriations, and do not themselves transfer ownership or any other property interest. *See, e.g.*, *Apa v. Butler*, 638 N.W. 2d. 57, 60–63 (S.D. 2001) (law requiring proceeds of certain taxes be placed in special fund and spent on specific purposes constituted "continuing appropriation" of those proceeds, which was subject to amendment in the state's general budget); *State ex rel. Longstaff v. Anderson*, 146 N.W. 703, 703–05 (S.D. 1914) (law requiring proceeds of various excise taxes and license fees be "set apart" into "special funds" constituted "appropriation" of those proceeds).[19]

38.    And, it is hornbook law that an appropriation of funds does not itself confer a property interest in such funds until they are actually transferred. *See, e.g.*, *Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991) ("When the United States sets aside money for the payment of specific debts, it does not thereby lose its property interest in that money. . . The money here is federal money. That various persons have claims against the United States in amounts exactly matching the funds, and intended by Congress to be paid from these funds, does not give those individuals a property interest in the money.").

---

[19] Again, to avoid burdening the Court by repeating arguments extensively briefed in a concurrently pending motion involving the same issue and same parties, the Oversight Board incorporates by reference its arguments on this point in the Motion to Dismiss, including those in ¶¶ 36–38.

39.     Additionally, the alleged diversion of funds and preventing a security interest from attaching are insufficient to create any claim let alone an administrative claim.  For example, the Supreme Court expressly held actions taken by the U.S. government that made it significantly harder for a municipality to fund a sinking fund does not give rise to a takings clause claim in favor of the bondholders.  *John K. & Catherine S. Mullen Benevolent Corp. v. United States*, 290 U.S. 89, 94–95 (1933) (the United States government's acquisition of lands "frustrated action by the city to replenish the assessment fund to which alone the bondholder must look for payment of his bonds. But this was not a taking of the bondholder's property.") (citation omitted).  The First Circuit followed *Mullen* on essentially similar facts.  *Puerto Rico ex rel. Isabela Irrigation Serv. v. United States*, 134 F.2d 267 (1st Cir. 1943).  Here, the fact the Commonwealth may have— prepetition—taken actions making it harder for HTA to repay its debts does not give rise to any claim in favor of the DRA Parties, let alone an administrative expense claim.

40.     Finally, PROMESA's express preemption provision, section 4, is broad and unequivocal: "The provisions of this Act *shall prevail* over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act."  PROMESA § 4 (emphasis added).  The appropriation provisions of the Act 30-31 Excise Tax Statutes are preempted because they are inconsistent with the Oversight Board's powers under PROMESA sections 201 and 202 to certify budgets and fiscal plans providing for appropriations of the Commonwealth's money. Section 201 authorizes the Oversight Board to promulgate a fiscal plan that, among other things, provides a "method" for the Commonwealth to "achieve fiscal responsibility and access to the capital markets" and to accomplish various other objectives.  *Id.* § 201(b)(1).  Certification of fiscal plans and budgets falls to the Oversight Board's "sole discretion."   *Id.* §§ 201(c)(3), (d)(2),

202(c)(1).  Budgets certified by the Oversight Board are deemed to be "in full force and effect."
*Id.* § 202(e)(1)(C).[20]

41.   As the First Circuit and this Court recognize, because PROMESA gives the
Oversight Board the exclusive authority to certify budgets, PROMESA § 4 expressly preempts
any preexisting law appropriating funds without regard to a budget certified by the Oversight
Board.  *See Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.
Bd. for P.R.)*, 945 F.3d 3, 8 (1st Cir. 2019) ("Simply put, if a certified budget is to have 'full force
and effect,' subsection 202(e)(3)(C), there can be no spending from sources not listed in that
budget, regardless of what any territorial laws say." ); *Méndez-Núñez v. Fin. Oversight & Mgmt.
Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98, 116 (1st Cir. 2019) ("Under
PROMESA's preemption provision, the grants of authority to the Board at §§ 201 and 202 to
approve Fiscal Plans and Budgets 'prevail over *any* general or specific provisions of territory law'
. . . .") (citation omitted) (emphasis added); *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for
P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("[A]
budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan
becomes law . . . and inconsistent Commonwealth laws are preempted."); *Rivera-Schatz v. Fin.
Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 327 F. Supp. 3d 365,
372 (D.P.R. 2018) ("Congress' determination, in PROMESA, to empower the Oversight Board to

---

[20] In accordance with Article VI, Section 8 of the Puerto Rico constitution, all the relevant loan documents and statutes
provide the amounts appropriated by the Commonwealth are subject to retention or reclamation by the Commonwealth
if the Commonwealth has insufficient other available revenues to pay debt issued with its full faith and credit.  Whether
these retention rights were triggered does not need to be decided in connection with the Motion for the reasons
discussed in the main text.  In any event, PROMESA makes manifest the Commonwealth retention power has been
triggered. Congress inserted findings into PROMESA section 405(m) stating there is a "fiscal emergency" in Puerto
Rico rendering the Commonwealth "unable to provide its citizens with effective services," and necessitating a fair and
orderly "restructur[ing]" of the Commonwealth's debts.  PROMESA § 405(m)(1), (m)(2), (m)(4).  "Clawback"
regarding the Act 30-31 Excise Tax Statutes requires nothing more.  In addition to these Congressional findings, under
the proposed Commonwealth Plan, GO debtholders still receive less than a 100% recovery. *See Seventh Amended
Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico*, et al. [ECF No. 17627].

accept, reject, develop and certify budgets, and to render certified budgets effective by operation

of law, prevails over the general allocation of budgetary power to Puerto Rico's legislature.").

42.     As discussed above, the Act 30-31 Excise Tax Statutes appropriate the Act 30-31

Revenues to HTA.  These expenditures, like any other expenditures required by Puerto Rico law

regardless of whether a budget certified by the Oversight Board authorizes the expenditure, are

inconsistent with PROMESA sections 201 and 202 and preempted by section 4.

43.     The Act 30-31 Excise Tax Statutes are also impliedly preempted by PROMESA as

compliance with both PROMESA and Act 30 and Act 31 is a "physical impossibility."  *See*

*Arizona v. United States,* 567 U.S. 387, 399 (2012) (citation omitted).  The Commonwealth cannot

both (i) appropriate collections of Act 30-31 Revenues to HTA without regard to Oversight Board–

certified Commonwealth budgets, and (ii) comply with PROMESA's requirement that there be no

spending by the Commonwealth except as authorized in certified budgets.  The appropriation

provisions of the Act 30-31 Excise Tax Statutes are therefore preempted.  *See Gustavsen v. Alcon*

*Labs., Inc.*, 272 F. Supp. 3d 241, 246 (D. Mass. 2017) (when "it is impossible . . . to comply with

both state and federal requirements, . . . the state law is preempted.") (quoting *Pliva v. Mensing*,

564 U.S. 604, 618 (2011)).

44.     Because the Motion is based upon the Act 30-31 Excise Tax Statutes, which are

both expressly and impliedly preempted by PROMESA, the Motion should be denied.

**IV.     The Motion Should be Denied Because it is Predicated On HTA Possessing a
         Property Interest it Does Not Have.**

45.     Even assuming the Commonwealth's obligation to transfer the Act 30-31 Revenues

to HTA is not preempted (it is), at most the Commonwealth's retention could give rise to an

unsecured claim against the Commonwealth for breach of statute, which would be (a) held by HTA

and (b) dischargeable. *See Kovacs*, 469 U.S. at 278–279 (claim arising from breach of statute was

20

dischargeable, unsecured claim). The Commonwealth's retention would not be a basis for the DRA Parties to have an administrative expense claim against the Commonwealth.

46.     The DRA Parties assert that HTA possesses a "property interest in the Act 30-31 Revenues" even as to Act 30-31 Revenues retained by the Commonwealth and not delivered to HTA. Motion ¶ 49. But they offer no support for this assertion, nor could they, because the Lift Stay Opinion is clear: HTA has no property interest in Act 30-31 Revenues retained by the Commonwealth.[21] Therefore, HTA could not have granted to the DRA Parties a security interest in the Act 30-31 Revenues held by the Commonwealth.[22]

47.     Additionally, pursuant to section 552(a) of the Bankruptcy Code, Act 30-31 Revenues generated by the Commonwealth postpetition are not subject to HTA's prepetition grant of a security interest. Act 30-31 Revenues generated postpetition are not proceeds of property that existed prepetition. Act 30-31 Revenues are predicated on variable and contingent purchases and licensing of vehicles, that, until generated and or otherwise incurred, are simply expectancies that may never occur. *See Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Glob. Designated Activity Co.*, 948 F.3d 457, 470 (1st Cir. 2020), *cert. denied,* 141 S. Ct. 844 (2020) (holding future employers' contributions to the retirement system based on future employee labor, not determinable until the labor was performed, were "merely an expectancy"). An expectancy is not

---

[21] The Oversight Board has also shown, in the Motion to Dismiss, how the plain language of the HTA Enabling Act limits the grant of any security interest in Act 30-31 Revenues to proceeds of such revenues actually transferred to HTA, and the Security Agreement did not purport to grant a security interest in retained revenues even if such a grant were legal. The Oversight Board incorporates by reference its argument therein. *See* Motion to Dismiss ¶¶ 44–45.

[22] It is a fundamental statutory tenet of secured transactions that HTA can grant a security interest only in assets in which it has rights—which means a property interest in the putative collateral. *See* 19 L.P.R.A. § 2233(b)(2) (a security interest is enforceable against the debtor and third parties with respect to the collateral only if "the debtor has rights in the collateral . . . ."); *see also, e.g., In re AA 10,000 Corp.*, No. 07-06601, 2008 WL 11275079, at *6 (Bankr. D.P.R. May 9, 2008) (applying UCC Article 9 in effect at the time (which is the same under current Article 9), and finding a creditor had no security interest because the debtor who attempted to grant the security interest had no rights in the putative collateral).

a property right to which a security interest can attach, or that could produce postposition proceeds. *Id*. Act 30-31 Revenues generated postpetition were neither due and owing nor calculable prepetition, and "not payable until they are determined postpetition," and they are not "proceeds" of prepetition property. *Id*. Indeed, legions of cases hold postpetition payments not generated until after the petition date are not proceeds of prepetition property. *See Arkison v. Frontier Asset Mgmt., LLC (In re Skagit Pac. Corp.)*, 316 B.R. 330, 336 (B.A.P. 9th Cir. 2004) ("[W]here it is only post-petition acts which generate an account receivable, those post-petition receivables will not be considered proceeds because there is no interest in, or connection to, the right in the account receivable created pre-petition.").[23]

48. At most, there was "merely an expectancy" that postpetition Act 30-31 Revenues would be generated, collected by the Commonwealth, transferred to HTA, and then used by HTA to make payments on the loans from GDB. Postpetition Act 30-31 Revenues therefore cannot constitute "proceeds" of prepetition collateral because there was no prepetition collateral, rendering the section 552(b)(2) exception inapplicable. Put more simply, if a lender holds a security interest in a debtor's prepetition inventory, the sale of that inventory postpetition will yield proceeds subject to the lender's security interest. Here, however, the DRA Parties had no security interest in the Commonwealth's or HTA's property on the petition date that was later transformed into proceeds. Additionally, Act 30-31 Revenues and their proceeds do not qualify as "special

---

[23] *See also First Nat'l Bank of Lafayette v. Tex. Tri-Collar, Inc. (In re Tex. Tri-Collar, Inc.)*, 29 B.R. 724, 726–27 (Bankr. W.D. La 1983) ("Since accounts receivable generated after commencement of the case are in no way proceeds, product, offspring, rents or profits of prepetition accounts receivable, [bank's] security interest . . . does not extend to postpetition receivables under section 552(b)."); *see also Philip Morris Cap. Corp. v. Bering Trader, Inc. (In re Bering Trader, Inc.)*, 944 F.2d 500, 502 (9th Cir. 1991) (same); *In re Corpus Christi Hotel Partners, Ltd.*, 133 B.R. 850, 854, 856 (Bankr. S.D. Tex. 1991) (same).

revenues" because the license fees and excise taxes generating Act 30-31 Revenues are imposed and collected by the Commonwealth, not HTA.[24]

49.    Importantly, this Court considered the very statutes at issue here (the Act 30-31 Excise Tax Statutes) and determined—twice—that HTA does not have a property interest in Act 30-31 Revenues retained by the Commonwealth. Specifically, this Court considered whether HTA has any property interests in Act 30-31 Revenues retained by the Commonwealth in both the Monolines' Lift Stay Motion and their motion for appointment of a trustee pursuant to 11 U.S.C. § 926 [ECF No. 13708] (the "926 Motion"). In connection with both motions, the Court determined Act 30 and Act 31—that is, 9 L.P.R.A. § 5681 and 13 L.P.R.A. § 31751(a) (among other statutes)—do not give HTA a property interest in Act 30-31 Revenues until the collections of those revenues are actually transferred to HTA.[25] In connection with the 926 Motion, the Court determined there was no "colorable basis" to contend HTA had a property interest in Act 30-31 Revenues retained by the Commonwealth. *In re Fin. Oversight and Mgmt. Bd. for P.R.*, 478 F. Supp. 3d 190, 195–96 (D.P.R. 2020) (the "926 Opinion"). Similarly, in connection with the Monolines' Lift Stay Motion, after a detailed review of, among other things, the Act 30-31 Excise Tax Statutes, the Court ruled Act 30-31 Revenues (among other revenues) were not "available" for HTA to pledge pursuant to 9 L.P.R.A. § 2004(l). *See* Lift Stay Opinion, 618 B.R. at 634–35 ("Excise Taxes are not 'able to be used or obtained' by HTA nor are they at HTA's disposal; they are within the possession and control of the Commonwealth.").[26]

---

[24] Because the issue here involves the same legal point being litigated between the same parties in a concurrently filed motion, the Oversight Board incorporates by reference its arguments on this point in the Motion to Dismiss ¶¶ 61–63.

[25] Act 30-31 Revenues only add to the amount of money being conditionally allocated to HTA.

[26] Importantly, to the extent the DRA Parties assert they possess a valid, perfected security interest in HTA's right (if any) to receive the Act 30-31 Revenues, that would not give them a secured claim against the Commonwealth, only

50.     The Court has already determined HTA lacks the property interest in Act 30-31 Revenues retained by the Commonwealth required to grant a security interest in them to the DRA Parties.  The Court's Lift Stay Opinion and 926 Opinion were based on the Court's interpretation of *exactly* the same unambiguous statutes at issue here:  9 L.P.R.A. § 5681 and 13 L.P.R.A. §§ 31751(a)(1)(C), 31751(a)(3)(C).  These statutes mean the same thing now as they meant then.  There is no reason to divert from the Court's prior interpretation and so the Motion fails. [27]

## V.     The Motion Should be Denied Because it Fails to Meet the Requirements for an Administrative Expense Claim

### A.     Claimants Do Not Have Administrative Expense Claims Against the Commonwealth under the "Fundamental Fairness" Exception to Section 503(b) of the Bankruptcy Code

51.     The DRA Parties claim that an exception to 11 U.S.C. § 503(b), "fundamental fairness," entitles them to an administrative expense claim.  However, the two opinions they cite— *Reading Co. v. Brown*, 391 U.S. 471 (1968) and *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir. 1985)—do not support their claims being granted administrative expense priority under section 503(b) of the Bankruptcy Code.

#### 1.     "Fundamental Fairness" does not apply to claims based on prepetition obligations.

52.     In *Reading*, a bankruptcy trustee's alleged negligence led to a fire that damaged a non-debtor third party, who then asserted an administrative expense claim.  *Reading*, 391 U.S. at 473.  The Supreme Court held under the Bankruptcy Act (in effect then) that damages caused by

---

[27] The DRA Parties have previously argued that the Act 30-31 Excise Tax Statutes "transferred and assigned" the Act 30-31 Revenues to HTA, simply because the statutes required the revenues be "covered into" a special deposit.  *See DRA Parties Response to FOMB's Mem. of Law in Support of Mot. for Partial Summary Judgment*, ¶ 8 [Adv. Pro. No. 20-005-LTS, ECF No. 99].  To the extent this is the basis for the DRA Parties' claim to Act 30-31 Revenues retained by the Commonwealth, the argument is wrong for the reasons explained in the Motion to Dismiss.  *See* Motion to Dismiss ¶¶ 51–52.

an interest in HTA's unsecured claim (if any) against the Commonwealth arising from retention of collections of Act 30-31 Revenues.

the actions of a trustee operating a business in a chapter XI arrangement give rise to "actual and necessary costs" of preserving the bankruptcy estate. *Id*. at 479–83. The Supreme Court based its decision on the fact that, in a chapter XI case, the "business [is] operating under a Chapter XI arrangement for the benefit of creditors" to increase their recovery, *id*. at 479, and that, as the only purpose of continuing to operate the debtor was to increase prepetition creditors' recoveries, it was only fair to give innocent third parties that "had an insolvent business thrust upon [them] by operation of law" administrative priority. *Id*. at 478.[28] In *Charlesbank*, the First Circuit applied *Reading* to a chapter 11 case and held a civil compensatory fine—where a debtor deliberately violated a zoning ordinance (presumably because such violation was more lucrative than adherence)—qualifies as an administrative expense. 755 F.2d at 202.

53.    *Reading* and *Charlesbank* illustrate where a chapter 11 debtor operating a business postpetition, through negligence or violation of the law, harms a person or entity with whom the debtor had an independent post-petition relationship, an administrative expense claim may be owed. Notably, the acts giving rise to liability in *Reading* and *Charlesbank* had nothing to do with

---

[28] Certain courts dispute the application of this rationale to municipal bankruptcy, noting *Reading* has never been applied in chapter 9 cases, and should not be, because unlike chapter 11 debtors, chapter 9 debtors are not run solely for the benefit of prepetition creditors. *See In re Jefferson County*, Case No. 11-05736, Hr'g Tr. at 34, 41 [ECF No. 2931], attached hereto as **Exhibit A**, (Bankr. N.D. Ala. June 24, 2015) (holding *Reading* is inapplicable in a Chapter 9 case and that *Reading* "has never been, based on [the court's] review of the case law, which was hundreds of cases, recognized in a Chapter 9 case."). In chapter 11 cases the debtors continue to operate during the bankruptcy case for the benefit of the creditors, according to these cases it is fair to make the prepetition creditors pay for harm done during the bankruptcy. However, a PROMESA Title III case is not run merely for the benefit of creditors. *See Andalusian Glob. Designated Activity Co. v. Fin. Oversight & Mgmt. Bd. for P.R.*, 954 F.3d 1, 7–8 (1st Cir. 2020) ("Bondholders' argument is refuted by the obvious differences between governmental bankruptcies and commercial private party bankruptcies. . . The bankruptcy of a public entity, however, is very different from that of a private person or concern.") (citation omitted). Unlike a commercial bankruptcy, which attempts to "balanc[e] the rights of creditors and debtors," the "principle purpose of chapter 9," and by analogy PROMESA, "is to allow municipal debtors the opportunity to continue operations while adjusting or refinancing their creditor obligations." *Id*. (quoting *In re New York City Off-Track Betting Corp.,* No. 09-17121, 2011 WL 309594, at *5 (Bankr. S.D.N.Y. Jan. 25, 2011)). Accordingly, the fairness analysis the Supreme Court adopted in *Reading* may not be applicable here. *See City of Chicago v. Marshall*, 281 F. Supp. 3d 702 (N.D. Ill. 2017), *rev'd on other grounds sub nom. In re Steenes*, 918 F.3d 554 (7th Cir. 2019), *reh'g granted,* 2019 U.S. App. LEXIS 13642 (7th Cir. May 7, 2019) (holding that *Reading Co. v. Brown* does not apply with same force in chapter 13 context because individual debtor does not exist for sole purpose of making money for company).

alleged prepetition obligations, as here.  Courts repeatedly decline to apply *Reading* to postpetition conduct by debtors breaching prepetition contracts or other asserted relationships with the debtor. *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 955 (1st Cir. 1976) ("It is only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration."); *see Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 6–7 (1st Cir. 1992) (finding claim for attorney fees based on postpetition lawsuit that centered on prepetition contract did not fall under *Reading* because "its *prepetition* genesis ultimately distinguishes it from the *postpetition* losses accorded priority in *Reading* and *Charlesbank*") (emphasis in original); *see also Abercrombie v. Hayden Corp. (In re Abercrombie)*, 139 F.3d 755, 759 (9th Cir. 1998) (*Reading* exception is inapplicable where "the source of the estate's obligation remains the prepetition fee provision" even where debtor's actions continued postpetition).[29]  Here, the DRA Parties' purported administrative expense claim is entirely premised on prepetition loan agreements and loan claims which they knew were not being paid on when the DRA Parties received economic rights under them.  Without prepetition contracts with HTA, the DRA Parties would have no basis to assert a claim of any kind.  And, indeed, even more problematic, Movants claim the source of the diversion of the Act 30-31 Revenues is the Moratorium Laws and Clawback Executive Orders, (Motion ¶¶ 26–31), and, later on, PROMESA.

---

[29] For example, in *In re Furr's Supermarkets, Inc.*, the creditor entered into a prepetition contract with the debtor, a grocery store, under which the creditor agreed to consign stamps to the debtor and the debtor agreed to pay the creditor the proceeds of any stamp sales. Nos. NM-06-099, 7-01-10779-SA, 2007 WL 559766 (B.A.P. 10th Cir. Feb. 22, 2007). After filing for bankruptcy, the debtor "fail[ed] to account for either the stamps or the proceeds thereof" and the creditor sought an administrative expense claim for the debtor's disposition of its collateral under *Reading*.  The court denied the motion, holding even if the creditor's property had been converted, "[t]his amounts to nothing more than a breach of debtor's payment obligation under the [pre-petition contract]" and therefore not an administrative expense claim.  *Id*. at *3.  *See also In re HNRC Dissolution Co.*, 396 B.R. 461, 484 n.18 (B.A.P. 6th Cir. 2008) (citing *In re Sunarhauserman, Inc.*, 126 F.3d 811 (6th Cir. 1997); *In re Weinschneider*, 395 F.3d 401 (7th Cir. 2005); *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385 (5th Cir. 2001); *In re Abercrombie*, 139 F.3d at 759.

Motion ¶ 68.  All of the Commonwealth's affirmative actions were taken *prepetition* and its postpetition conduct was simply to default on obligations created prepetition.  As the DRA Parties' entire claim springs from prepetition contracts and prepetition actions, *Reading* does not apply to the DRA Parties' claims and they cannot be awarded an administrative expense claim.

54.  *In re Financial Oversight & Management Board for Puerto Rico*, 481 F. Supp. 3d 60, 65 (D.P.R. 2020), cited in the Motion at ¶ 63, compels denial of the Motion.  There, this Court found no administrative expense claim was justified because the nexus of the alleged harm arose from prepetition conduct.  In that case, the Commonwealth confiscated a car of the movant prepetition as a result of criminal intervention by law enforcement agents claiming a violation of Commonwealth law, and the owner of the car sought allowance of an administrative expense for the value of the car.  481 F. Supp. 3d at 62, 64.  This Court denied the motion, holding that "Movant has not claimed that his Motion is based on any efforts to preserve the debtor's assets, nor has he claimed that he supplied consideration beneficial to the debtor making section 503(b)(1)(A) inapplicable here."  *Id.* at 65.  This Court further held the claimant "ha[d] not demonstrated that his claim originated postpetition.  The forfeiture of the automobile was the operative 'transaction' between Movant and the Commonwealth."  *Id.*  Therefore, the claim failed under both the text of section 503(b)(1)(A) and "fundamental fairness", which this Court held "is not applicable to prepetition claims," and is restricted to "claims alleging postpetition harms that arise from postpetition events."  *Id*. at 65–66.

55.  Likewise here, every one of the DRA Parties' alleged claims relates to obligations arising under and governed by the HTA bonds, the GDB/HTA Loans, and the Security Agreement—all of which are prepetition transactions.  *See supra* ¶¶ 12–15.  Any default on those prepetition obligations, triggered by passage of the Moratorium Laws, the Clawback Executive

Orders and PROMESA (all of which were enacted prepetition), would be a violation of prepetition obligations.    The entirety of the DRA Parties' claims arise from actions taken by the Commonwealth and HTA that harmed their chance of getting paid back on HTA bonds and loan obligations issued prepetition.  As a result, the DRA Parties' claims have a "prepetition genesis" that takes them outside of *Reading*.  *See In re Hemingway Transp.*, 954 F.2d at 7.

56.     Moreover, the DRA Parties are sophisticated entities created by statute, who assumed all the risks of ownership over those loan obligations, not innocent third parties harmed by a trustee's negligence, or governmental entities enforcing willful zoning violations. *Reading*, 391 U.S. at 473, *Charlesbank,* 755 F.2d at 202.  The DRA Parties accepted the transfer of the GDB/HTA Loan claims on the basis that those claims were worthless and would not receive payment, years after the purported diversion of these revenues had begun.  Fundamental fairness concepts cannot be applied here because unlike *Reading* and *Charlesbank,* where the wrongful or negligent act giving rise to administrative liability was indisputable, here the Commonwealth's default on its prepetition obligations is allowed by Title III, benefits the Commonwealth's residents and other creditors, and is only harmful to the DRA Parties because the default stops them from being preferred.

57.     The other cases cited by DRA Parties also do not support their asserted entitlement to an administrative expense claim.  *In re Financial Oversight & Management Board for Puerto Rico*, 621 B.R. 289, 300 (D.P.R. 2020) is cited for the unremarkable proposition that creditors may have administrative expenses in Title III cases.  Motion ¶ 62.  But, in that case, this Court allowed an administrative expense in connection with a postpetition transition services agreement entered into by the debtor that provided important postpetition benefits to the debtor.  *See also In re Fin. Oversight and Mgmt. Bd. for P.R.*, No. 17 BK 3283-LTS, 2021 WL 1732139, at *5 (D.P.R. May

3, 2021) (finding fees due under an interim services agreement entered into by the debtor postpetition could be administrative expenses). It did not involve anything like the situation here.

58.      *In re Mammoth Mart*, 536 F.2d at 955 (*see* Motion ¶ 65), was a Chapter XI case, which found that administrative expense claims were due to entities that did business with the debtor-in-possession. The policy reasoning is straightforward—granting such an administrative claim incentivizes parties to conduct business with debtors-in-possession. No such policy considerations exist with respect to the Motion—notably, the DRA Parties have done *no* business with the debtors and provided no services to them, much less postpetition, beneficial services. Similarly, in *Cumberland Farms, Inc. v. Florida Department of Environmental Protection*, 116 F.3d 16 (1st Cir. 1997), the court followed *Reading* and *Charlesbank* and granted an administrative expense claim to the Florida Department of Environmental Protection to be paid by a debtor-in-possession that had willfully "flout[ed] Florida's environmental protection laws." *Id.* at 21. For the reasons expressed above, *Reading* does not apply here. *Supra* ¶¶ 52–53. Finally, in *Healthco*, the court explicitly found "fundamental fairness exceptions [did] not apply." 272 B.R. at 513. Nevertheless, the court awarded administrative expense priority because the liability at issue totally arose postpetition. There, the bankruptcy trustee unsuccessfully prosecuted a fraudulent transfer action during the bankruptcy case. It resulted in the court awarding costs to the bankruptcy trustee's adversary. The *Healthco* court granted administrative expense priority to the adversary for the costs because they arose totally from postpetition litigation and did not arise out of any prepetition obligation or contract. "Fundamental Fairness" requires a willful or tortious postpetition violation of applicable law that harms an innocent third party—conduct not present in this record.

29

59.    Here, the parties' rights are governed by simple prepetition contracts—the GDB/HTA Loans and the Security Agreement with HTA.  Even if the Commonwealth is found to have breached those agreements (itself an impossibility, because the Commonwealth is not a party to them), they remain prepetition contract claims.   The Motion's claim that "[t]he Commonwealth's post-petition diversion of [allegedly] secured revenue streams . . . was tortious and a deliberate violation of Puerto Rico law", (*see* Motion ¶ 69), also ignores the fact that the Commonwealth's conduct was taken in accordance with applicable law, and thus cannot be considered tortious.  Even more basic, the relevant conduct is simply the Commonwealth's determination to default, which is also not a tort.  If defaults were torts that gave rise to administrative claims, discharges would be worthless because they would be offset by administrative claims. The DRA Parties cannot ground an administrative expense claim based on defaults on prepetition debts by invoking fundamental fairness on actions taken pursuant to PROMESA, or legislation or promulgated executive orders passed by the Commonwealth or Governor, respectively.  Their attempt to equate a tort or wrongful conduct (a fire under *Reading*, a zoning violation under *Charlesbank*, or a postpetition violation of First Amendment rights as described in *Newberry v. City of San Bernardino (In re City of San Bernardino)*, 558 B.R. 321, 329 (C.D. Cal. 2016), (*see* Motion ¶ 76) to a plain default, let alone a default required by legislation or proper executive action should be rejected out of hand.  The enactment of legislation cannot constitute a tort or a violation of law, nor can be the acts taken pursuant to that legislation.  *See* Restatement (Second) Torts, § 895B(3)(a) (Am. Law Inst. 1977) ("Even when a State is subject to tort liability, it and its governmental agencies are immune to the liability for acts and omissions constituting . . . the exercise of a . . . legislative function"); *id.* § 265 ("One is privileged to commit an act which would otherwise be . . . a conversion if he is acting in discharge of a duty or authority

created by law to preserve the public safety, health, peace, or other public interest, and his act is reasonably necessary to the performance of his duty or the exercise of his authority."). If the various actions taken by the Governor and Commonwealth do not create liability they cannot be a basis for any claim that would trigger an administrative expense claim.[30] *See United States v. Sec. Indus. Bank*, 459 U.S. 70, 74–75 (1982) (contractual rights can be legislatively impaired without raising constitutional issues); s*ee also Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935) (stating in the context of takings claims that "[u]nder the bankruptcy power Congress may discharge the debtor's personal obligation, because, unlike the states, it is not prohibited from impairing the obligations of contracts").

60.     Furthermore, in seeking damages for the Commonwealth's alleged violations of prepetition obligations under the Management and Budget Office Organic Act, Act No. 147 (June 18, 1980) and the mandates of Act 30 and Act 31 themselves, the Motion at most articulates a breach of prepetition statutes, which would give rise to a prepetition, dischargeable claim. *See Kovacs,* 469 U.S. 274 (a prepetition breach of statute creates a prepetition claim against the debtor). If a default on prepetition debt were to create a postpetition administrative claim, then all prepetition claims would become postpetition administrative claims whenever the debtor determines postpetition not to pay them. Such a result would completely undo bankruptcy.

## B.     Claimants Do Not Have Administrative Expense Claims Against The Commonwealth Under the Plain Language of Section 503(b)

61.     The DRA Parties claims also do not satisfy section 503 of the Bankruptcy Code. 11 U.S.C. § 503(b)(1)(A) requires a claimant demonstrate they provided something to the debtor and paying them would constitute an "actual, necessary cost[] and expense[] of preserving the

---

[30] Further, even if such actions rose to the level of a Constitutional violation, any claims arising therefrom are dischargeable under PROMESA, as the Oversight Board will demonstrate at confirmation of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. [ECF No. 17627].

estate." *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 481 F. Supp. 3d at 64 (a motion for an administrative claim must establish that "(1) the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor." (quoting *Hemingway Transp.,* 954 F.2d at 5)); *Union De Trabajadores De La Industria Eléctrica Y Riego v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.*, No. 20-2041, 2021 WL 3560747 (1st Cir. Aug. 12, 2021) (same).  The DRA Parties simply assert because the "Commonwealth continues to . . . retain the Act 30-31 Revenues for its benefit after the commencement of its Title III proceeding," some form of a postpetition transaction has taken place.  The DRA Parties then argue because the Commonwealth is using its own funds "to pay expenses" and "will also use such funds to make payments to creditors," somehow consideration given by the DRA Parties has benefited the Commonwealth.  Motion ¶ 78.  This is baseless and does not satisfy the two prongs of section 503(b)(1)(A).

62.     It bears noting that the DRA Parties provided nothing of value to the Commonwealth or HTA (and do not claim they did so).  The only thing the DRA Parties reference to supposedly ground their administrative expense claim is the Commonwealth's retention of its own revenues.  But it is impossible to contend the Commonwealth's retention of its own revenues constitutes the provision of value to the Debtor by the DRA Parties.  There is no transaction between the Commonwealth and the DRA Parties at issue in the Commonwealth's usage of its own funds to carry out its mission or in its restructuring under PROMESA.  This Court indicated as much in the Lift Stay Opinion, where it found the Act 30-31 Revenues belonged to the Commonwealth.  *See* Lift Stay Opinion, 618 B.R. at 634–35 (D.P.R. 2020) (finding the Act 30-31 Revenues "are not 'able to be used or obtained' by HTA nor are they at HTA's disposal" and are

instead "within the possession and control of the Commonwealth."). Of course, the DRA Parties provided no postpetition services or anything else of value to the Commonwealth, and have no contractual relationship with the Commonwealth in connection with the HTA Bonds or GDB/HTA Loans. The DRA Parties are likewise not currently providing any postpetition benefit to the Debtor, nor do they identify an "actual, necessary cost[] and expense[] of preserving" the Debtor's estate for which they may be permitted an administrative expense claim. 11 U.S.C. § 503(b)(1)(A). To grant an administrative expense priority to a creditor that claims the debtor's money should have been used differently risks inverting the entire priority scheme of bankruptcy law and allowing creditors to transform their prepetition claims into administrative expense claims.

63.    In the First Circuit, for a claim to be entitled to administrative expense priority, it "must have arisen from a transaction with the trustee or debtor in possession, rather than from a pre-petition transaction with the debtor[.]" *In re Jeans.com*, 491 B.R. 16, 24 (Bankr. D.P.R. 2013) (quoting *Mason v. Off. Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330 F.3d 36, 42 (1st Cir. 2003)). It is well-established that even an alleged postpetition breach of a prepetition contract does not convert the claim arising therefrom into an administrative expense claim. *See In re Old Carco LLC*, 424 B.R. 650, 657 (Bankr. S.D.N.Y. 2010), *aff'd*, No. 09-50002 AJG, 2010 WL 4455648 (S.D.N.Y. Nov. 2, 2010) ("where there is a pre-petition contract or lease, and the consideration supporting the claim is supplied pre-petition, courts have determined that those claims are not entitled to administrative priority, even if the right to payment arises post-petition"); *In re GT Advanced Techs., Inc.*, 547 B.R. 3, 12 (Bankr. D.N.H. 2016), *aff'd sub nom. Tera Xtal Tech. Corp. v. GT Advanced Techs., Inc.*, No. 16-CV-91-PB, 2017 WL 590340 (D.N.H. Feb. 13, 2017) (quoting *Old Carco*); *see also In re Bradlees Stores, Inc.,* No. 02 CIV. 0896 (WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003), *aff'd*, 78 F. App'x 166 (2d Cir. 2003) ("contract-based

bankruptcy claims are deemed to arise at the time the contract is executed, and therefore a post-petition breach of a pre-petition contract gives rise solely to a pre-petition claim.").

64.     The reasoning is obvious—prepetition obligations are the very obligations a bankruptcy case endeavors to restructure.  If a postpetition breach of a prepetition contract (or here a prepetition statute), such as a failure to pay interest on bonds or promissory notes issued prepetition, led to an administrative expense claim, debtors would be unable to free themselves from onerous prepetition obligations, frustrating the very purpose of a bankruptcy case.  As there is no postpetition transaction cited by the DRA Parties where they provided the Commonwealth with anything—every one of the DRA Parties' alleged claims relates to agreements that were entered into "[p]rior to the commencement of the Title III cases" as the DRA Parties concede, (*see* Motion ¶ 5)—much less with consideration necessary to the preservation of the Debtor, the Motion must fail.

## **CONCLUSION**

WHEREFORE, the Commonwealth respectfully requests that the Court deny the Motion, and grant the Debtor such other and further relief as is just.

Dated: September 9, 2021
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
Joshua A. Esses (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as Representative for the Commonwealth*

34

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
205 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-1813
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and*
*Management Board as Representative for the*
*Commonwealth*

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

*/s/ Hermann D. Bauer*
Hermann D. Bauer
