UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DEBTORS' OPENING EXPERT REPORTS AND DISCLOSURES

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA," and together with the Commonwealth and ERS, the "Debtors"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submits its opening expert reports and disclosures in support of confirmation of the *Seventh Amendment Title III Joint Plan*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

*of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (as it may be amended, modified, or supplemented, the "Plan"),[3] and in accordance with paragraphs 3 and 19 of the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640) entered on August 2, 2021 (the "Order") and Federal Rules of Civil Procedure 26(a)(2)(A) and 26(a)(2)(C).

1. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), and consistent with the witnesses identified in paragraph 1 of *Debtors' Identification of Expert Witnesses* [ECF No. 18044] (the "Expert Identification"), attached hereto as Exhibit A is the opening expert report of Marti P. Murray, and attached hereto as Exhibit B is the opening expert report of Dr. Andrew Wolfe. Supporting documents and information related to these expert reports will be posted in a separate folder in the Plan Depository.

2. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(C), and further consistent with the witnesses identified in paragraph 2 of the Expert Identification, the Debtors herein provide the following information for its witnesses who do not need to provide a written report:[4]

   a. **David M. Brownstein, Managing Director at Citigroup, Inc.** The subject matters on which Mr. Brownstein may testify include: (i) the Oversight Board's efforts in seeking federal tax-exempt status for the New GO Bonds and the CVIs, including, without limitation, the Rum Tax CVIs, to be issued upon consummation of the Plan; and (ii) the benefits that will result

---

[3] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

[4] In connection with its disclosure of this potential testimony, the Oversight Board contends and reserves its right to show the Plan's consistency with the Fiscal Plan is dispositively established by its certification of the Plan pursuant to PROMESA section 104(j)(3), because pursuant to PROMESA section 106(e), the Court lacks subject matter jurisdiction over challenges to the Oversight Board's certifications. The disclosures herein in respect of the consistency issue are made to address the contingency that the Court determines it does have subject matter jurisdiction. Furthermore, the Oversight Board contends and reserves its right to show that, pursuant to PROMESA section 305 and because Bankruptcy Code section 363 does not apply in Title III cases, its settlements are not subject to Court approval.

to certain classes of claimholders from the inclusion of a taxable election for Puerto Rico Investors holding certain types of GO bonds, pursuant to the Plan, allowing them to select to receive taxable New GO Bonds.

As to topic (i), Mr. Brownstein is expected to testify concerning the Oversight Board's efforts to seek tax exempt status for the New GO Bonds and the CVIs. Specifically, Mr. Brownstein will testify as to the scope and extent of those efforts, including: (a) his understanding of advice regarding the necessary content of an opinion the Commonwealth and the Oversight Board would need to provide to the IRS in an effort to seek tax-exempt status for the New GO Bonds and the CVIs; and (b) the efforts of the Commonwealth and the Oversight Board, to date, in obtaining such an opinion. Mr. Brownstein will base this testimony on his personal participation in, or supervision of, communications between and among the Commonwealth's and the Oversight Board's advisors and the IRS, and his significant expertise in complex restructurings involving the issuance of new securities, including seeking tax-exempt status for such securities.

Regarding topic (ii), Mr. Brownstein is expected to testify that it is uncertain whether all New GO Bonds issued under the Plan will be tax-exempt. Mr. Brownstein will further testify that, to account for this possibility and in an effort to ensure that mainland investors receive the most favorable treatment that is possible, the Plan includes a mechanism which allows Puerto Rico Investors (as defined in the Plan)—who are generally exempt from federal taxation obligations—to elect to be treated in Classes 22, 29, 33, 35, 39, 43, 45, 48 or 50 and receive taxable New GO Bonds. Mr. Brownstein will testify that to the extent any holders in Puerto Rico elect to take taxable bonds, it could provide a benefit to mainland bondholders, who are generally not exempt from paying federal income taxes. Mr. Brownstein will testify that this should improve recoveries for mainland bondholders and ensure on-island and mainland investors will receive

reasonably equivalent treatment in respect of their claims. Mr. Brownstein will base this testimony on his personal knowledge of the Plan, his understanding of the uncertainty relating to whether the New GO Bonds will be tax-exempt, his general knowledge of U.S. federal income taxation in connection with the issuance of general obligation bonds and Puerto Rico, and his significant expertise in complex restructurings involving the issuance of new securities.

    b.  **Adam Chepenik, Principal at Ernst & Young, LLP.** The subject matters on which Mr. Chepenik may testify include: (i) the minimum unrestricted cash balance recommended by the Oversight Board following confirmation of the Plan; and (ii) the emergency reserve, including its defined purpose and structure.

    On topic (i), Mr. Chepenik is expected to testify that the minimum cash balance recommended by the Oversight Board includes: (a) a minimum unrestricted General Fund cash balance of at least $1.0 billion; and (b) a disaster aid revolver in the amount of $750 million to provide for interim disaster aid funding. He will describe them both, including the underlying rationale and/or methodology for each. Mr. Chepenik will base his testimony on topic (i) on, among other things, (a) his participation in the analysis of the minimum cash balance recommended by the Oversight Board based on five methodologies; (b) his participation in structuring the disaster aid revolver; and (c) his experience advising public sector entities on the development of cash flow, liquidity and budget forecasting, and multi-year fiscal planning.

    On topic (ii), Mr. Chepenik is expected to testify about the defined purpose of the emergency reserve, the methodology used to determine the reserve amount, replenishment mechanisms, and limitations on access and use of the reserve. Mr. Chepenik will base this testimony on his understanding of the development and structure of the emergency reserve.

  c. **Jay Herriman, Managing Director at Alvarez & Marsal North America, LLC.** The subject matters on which Mr. Herriman may testify include the claims reconciliation process undertaken by the Oversight Board, including, without limitation, the development and implementation of the ADR and ACR procedures and the status of outstanding claims as of the commencement of the hearing to consider confirmation of the plan of adjustment. In connection therewith, Mr. Herriman will discuss the reasonableness of the assumptions made with respect to the anticipated total amount of allowed unsecured claims, which will be: (*i*) approximately $2,750,000,000 asserted against the Commonwealth, (*ii*) approximately $410,252,419 asserted against PBA, and (*iii*) approximately $337,721.14 asserted against ERS. Mr. Herriman will base such testimony on, among other things, (a) the review and analysis of the proofs of claim filed against such Debtors by the Oversight Board and its advisors, and (b) Mr. Herriman's extensive experience in complex restructuring, including claims reconciliation and analysis.

  d. **Sheva R. Levy, Principal at Ernst & Young, LLP.** The subject matters on which Ms. Levy may testify include: (i) the history and funded status of the various pension systems maintained for the employees of the Commonwealth as described in the PROMESA Section 211 report, including (a) the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("ERS"), (b) the Puerto Rico Teachers Retirement System ("TRS"), and (c) the Retirement System for the Judiciary of the Commonwealth of Puerto Rico ("JRS," and together with ERS and TRS, the "Pension Systems"); (ii) a description of the proposed treatment of the claims of the Pension Systems' beneficiaries pursuant to the Plan, including (a) the proposed pension monthly benefit modification formula, (b) the proposed pension freezes for participants of TRS and JRS, and (c) the proposed impact on System 2000 participants; and (iii)

the savings the Commonwealth is expected to achieve through the proposed pension reform measures.

On topic (i), Ms. Levy is expected to testify about the funded status for each Pension Systems and the amount of annual benefit payments to their beneficiaries as of the Commonwealth and ERS petition dates. With regard to topic (ii), Ms. Levy is expected to testify regarding (a) the proposed monthly benefit modification formula in the Plan and how the participants of each class, on average, are expected to be affected; (b) how the proposed freeze of benefits under TRS and JRS is structured, and the proposed future participation of affected participants in the Act 106-2017 defined contribution plan and U. S. Social Security; and (c) the estimated amount of the aggregate balances of the System 2000 plan accounts that are expected to be returned to participants in that plan. On topic (iii), Ms. Levy is expected to testify that the reform of the Pension Systems is estimated to save the Commonwealth in excess of four billion dollars through the 30-year period of the applicable Commonwealth Fiscal Plan certified by the Oversight Board and the provisions in the Plan are consistent with the provisions modeled for the Fiscal Plan. Ms. Levy will base her testimony on, among other things, (a) her actuarial analysis of the projected pension costs of the Commonwealth before and after accounting for the Plan's pension reform measures, (b) her understanding of the terms of the treatment of pension classes under the Plan, and (c) her experience in providing actuarial support services.

e. **Gaurav Malhotra, Principal and Head of U.S. Restructuring at Ernst & Young, LLP.** The subject matters on which Mr. Malhotra may testify include: (i) that confirmation of the Plan is not likely to be followed by the need for further financial reorganization, (ii) the financial obligations provided for in the Plan are consistent with the debt sustainability analysis in the 2021 certified fiscal plan for the Commonwealth, and (iii) the

6

financial impact of preempted Commonwealth statutes, or portions thereof, is inconsistent with the financial requirements of PROMESA.

On topic (i), Mr. Malhotra will base his testimony on, among other things, (a) forecasts of revenues, expenditures, budgets, and the amounts necessary for the Commonwealth to make payments that will be due pursuant to the Plan; (b) components of the Plan that are expected to mitigate the impacts of potential financial underperformance by the Commonwealth; (c) additional reforms and other measures that are not included in the Fiscal Plan that could be implemented to address projected revenue shortfalls in certain years, and (d) Mr. Malhotra's experience in providing financial restructuring advisory services in public sector restructuring.

On topic (ii), Mr. Malhotra will base his testimony on (a) the restructured debt service and other financial obligations provided for in the Plan; and (b) the debt sustainability analysis in the Commonwealth's 2021 certified Fiscal Plan.

On topic (iii), Mr. Malhotra will base his testimony on, among other things, (a) the appropriations or the appropriations based on mathematical formulas described in each of the Commonwealth statutes at issue; (b) application of formulas appropriations described in the statutes to the revenue sources identified in the statutes to estimate how much those specific appropriations would have been in Fiscal Years 2021 and 2022; and (c) the amounts calculated in (b) above are inconsistent with the Fiscal Plan.

   f. **Juan Santambrogio, Managing Director at Ernst & Young, LLP.** The subject matters on which Mr. Santambrogio may testify include: (i) the estimated financial impact of the terms of the plan support agreement with AFSCME (the "AFSCME PSA") and the plan support agreement in principle with AMPR that remains subject to ratification by its members (the "AMPR PSA," and together with the AFSCME PSA, the "Union PSAs"), including the amended

7

collective bargaining agreements ("CBAs") that would be effectuated pursuant to those settlements, (ii) the Benefit Restoration, as defined and described in the Plan, and (iii) the Pension Reserve Trust, as defined and described in the Plan.

With respect to topic (i), Mr. Santambrogio is expected to testify that the estimated labor benefits and fiscal savings pursuant to the Union PSAs and the amended CBAs are consistent with the applicable Fiscal Plan for the Commonwealth certified by the Oversight Board.

On topics (ii) and (iii) Mr. Santambrogio is expected to testify on describing the operation of the Benefit Restoration; and the funding of the Pension Reserve Trust.

Mr. Santambrogio will base his testimony on, among other things, (a) his involvement in the financial analysis of these settlements, (b) his analysis of the final agreed upon terms of the Union PSAs and the amended CBAs, and (c) his experience providing financial restructuring advisory services, including advising on the financial impact of labor agreements with public sector unions.

g. **Ojas Shah, Partner at McKinsey & Company.** The subject matters on which Mr. Shah may testify include the best interest test analyses in the Disclosure Statement and showing the Plan is in the best interest of the creditors of each of the Debtors.

Mr. Shah is expected to testify that creditors of each Debtor will receive recoveries pursuant to the Plan, in the aggregate, in a percentage of their claims as of the date of the filing of the Title III case not materially less than they would receive outside of Title III utilizing the "base case" of assumptions, and that the recoveries under the Plan are within the range of recoveries in other scenarios presented in the best interests tests analyses, which are attached as Exhibit P to the Disclosure Statement, or that lower percentage recoveries are due to specific provisions of Title III that would not apply outside Title III.

8

Mr. Shah is expected to base this testimony on, among other things, (a) his review and understanding of the classification and treatment of claims under the Plan, (b) his review and understanding of the assumptions made in connection with the Debtors' best interests test analyses, which were prepared by McKinsey, including: (i) the resource envelope available for all creditors of the Debtors, (ii) the amount of unsecured claims, and the anticipated disposition of certain legal disputes which would require resolution outside of Title III, including, among others, the assumed treatment of holders of the DRA's claims and the PRIFA BANs claims, and (iii) the assumed treatment of GO Bonds and Commonwealth guarantees in light of the Commonwealth constitutional debt limit, among others, and (c) Mr. Shah's extensive experience serving the FOMB over the past several years and other experience in providing financial advisory services.

h. **Steve Zelin, Partner and Head of the Restructuring and Special Solutions Group in the Americas at PJT Partners LP.** The subject matters on which Mr. Zelin may testify include: (i) certain Plan settlement negotiations, including negotiations of the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement and PRIFA Plan Support Agreement (each as defined in the Plan); and (ii) certain terms of the Plan, including (a) cash and debt service payments to be made pursuant to the Plan; (b) CVIs to be issued upon effectiveness of the Plan; (c) Consummation Costs and Restriction Fees (as described and defined in the Plan); and (d) the release, injunction, and exculpation provisions included in the Plan.

On topic (i), Mr. Zelin is expected to testify that the negotiations concerning the Plan settlement agreements identified above, conducted under the supervision of the Court-appointed mediation team, and in particular, the Mediation Team Leader, Judge Barbara J. Houser, were vigorous, included the robust and active involvement of all mediation participants, among

others, and were conducted at arm's-length and in good faith. Mr. Zelin is also expected to testify that, given the totality of the facts and circumstances of these cases, the settlements reached were reasonable. Mr. Zelin will base his testimony on, among other things, (a) his personal participation in dozens of settlement negotiating sessions with members of and advisors to the Oversight Board along with the other ultimate parties to the relevant agreements and their respective principals and advisors (both financial and legal), as well as the mediation team and (b) his significant experience in negotiating settlements of numerous disputes as part of many other complex restructurings.

Regarding topic (ii), Mr. Zelin is expected to testify about the dollar amount of cash and debt service payments proposed to be made under the Plan, and the structure, development and reasonableness of the CVIs to be issued upon effectiveness of the Plan. Mr. Zelin is also expected to testify that the debt service payments and CVIs are consistent with the applicable Fiscal Plan certified by the Oversight Board. Regarding the CVIs, Mr. Zelin will explain how each component of the CVIs operate, who receives them, the triggering mechanisms for payment to each recipient, the rationale for the CVI, hypothetical scenarios that explain how the cash flow waterfalls work under the CVIs, as well as how the CVIs were developed in the course of the settlement negotiations, and why, in his opinion, the CVIs are fair and reasonable in the context of resolving the Commonwealth's Title III proceeding. Mr. Zelin will base his testimony on, among other things, (a) his review and understanding of the cash and debt service payments provided for in the Plan, including pursuant to a valuation of liens, if any, (b) his personal participation in the development of the CVIs, (c) his review and understanding of the applicable Fiscal Plan as certified by the Oversight Board, as well as (d) his decades of experience in restructuring transactions as well as performing and understanding financial projections. Mr. Zelin's testimony regarding the CVIs will also be based on certain considerations taken into account in the development of the

10

CVIs, including but not limited to, (a) the use of objective outperformance metrics, (b) limitations imposed on CVI payments, (c) the generally-accepted use of contingent instruments in the restructuring market (including the municipal finance and other markets), and (d) Mr. Zelin's restructuring experience, including his past work resolving complex multi-party negotiations. Regarding topic (ii), Mr. Zelin is also expected to testify that, in his opinion, payment of the Consummation Costs and Restriction Fees as described and defined in the Plan is fair and reasonable. Mr. Zelin will base his testimony on, among other things, (a) the considerations taken into account in the development of the Consummation Costs and Restriction Fees provisions, including but not limited to the obligations, responsibilities, and efforts undertaken by the proposed fee recipients, (b) the relative magnitude of fee payments compared to the Commonwealth's overall debt, (c) the fact that the fees are the result of negotiations with plan supporters and are, based on his understanding, essential to their support, (d) the use of such fees in comparable cases, and (e) Mr. Zelin's personal restructuring experience. Mr. Zelin also is expected to testify that the release, injunction, and exculpation provisions in the Plan are necessary elements of the Plan and that, based on his understanding, certain parties would not have agreed to the settlements if such provisions were not included in therein. Mr. Zelin will base his testimony on, among other things, (a) the terms of the release, injunction and exculpation provisions in the Plan, (b) the critical importance of such provisions to the development of and support for the Plan, (c) the need for such provisions to enable the debtors to successfully emerge from Title III, and (d) the use of similar provisions in Mr. Zelin's experience in advising restructuring transactions.

3. The Oversight Board reserves the right to amend these expert reports and disclosures in accordance with the terms set forth in the Order.

*[Remainder of Page Intentionally Left Blank]*

Dated: September 13, 2021
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock
Brian. S. Rosen
(Admission *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

/s/ *Hermann D. Bauer*
Hermann D. Bauer