# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>   Debtors.[1] | PROMESA<br>Title III<br><br><br>No. 17 BK 3283-LTS<br>(Jointly Administered)<br><br>**Re: ECF Nos. 17009 and 18065** |

## DRA PARTIES' REPLY TO THE OBJECTION OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO TO DRA PARTIES' MOTION FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM

---

[1]   The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation  (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA")  (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801).

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ................................................................................................................3

REPLY..........................................................................................................................5

I.   THE DRA PARTIES ARE ENTITLED TO ADMINISTRATIVE EXPENSE
     PRIORITY UNDER THE BANKRUPTCY CODE.......................................................5

     A.   The DRA has an allowed administrative expense claim under the
          "fundamental fairness" doctrine ...................................................................5

     B.   The FOMB's objections lack merit................................................................5

          1.   The DRA Parties claim is based on post-petition actions of the
               Commonwealth...................................................................................6

          2.   The FOMB cannot legally justify the Commonwealth's post-petition
               conduct..............................................................................................7

          3.   The DRA's administrative expense claim is not based on a prepetition
               breach by the Commonwealth .............................................................9

          4.   Policy and precedent favor awarding administrative expense claims
               for post-petition torts.......................................................................10

     C.   In the alternative, the DRA has an allowed administrative expense claim
          under the plain language of Bankruptcy Code section 503(b)(1)(A) ...................12

II.  THE DRA PARTIES ARE NOT CONTRACTUALLY BARRED FROM
     ASSERTING AN ADMINISTRATIVE EXPENSE CLAIM AGAINST THE
     COMMONWEALTH ...............................................................................................14

III. THE DRA PARTIES HAVE STANDING TO ASSERT AN ADMINISTRATIVE
     EXPENSE CLAIM AGAINST THE COMMONWEALTH BECAUSE THEY ARE
     A PARTY IN INTEREST .........................................................................................17

IV.  THE DRA PARTIES' RIGHTS UNDER THE PUERTO RICO CONSTITUTION
     AND OTHER LOCAL LAW ARE NOT PREEMPTED BY PROMESA .....................22

     A.   The Act 30-31 Incremental Revenues are not appropriations ...............................22

     B.   PROMESA does not expressly preempt Acts 30 and 31 .....................................24

     C.   PROMESA does not implicitly preempt Acts 30 and 31 .....................................26

i

V.   HTA HAS AN OWNERSHIP INTEREST IN THE REVENUES GENERATED BY ACTS 30 AND 31 RETAINED BY THE COMMONWEALTH ...................................27

A.   HTA has a valid interest in the revenues generated by acts 30-31 which are subject to the DRA's security interest ...................................................28

B.   The DRA's lien continues to attach to post-petition Act 30-31 Incremental Revenues ...........................................................................................31

C.   The Court has not addressed HTA's property interest in the Act 30-31 Incremental Revenues in prior decisions ............................................32

CONCLUSION....................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Abercrombie,*
139 F.3d 755 (9th Cir. 1998) ...................................................................10

*In re Acemla De P.R. Inc.,*
No. 17-02021 ESL, 2019 WL 311008 (Bankr. D.P.R. Jan. 22, 2019) ...........................17, 19

*In re Amatex Corp.,*
755 F.2d 1034 (3d Cir. 1985)..................................................................17, 18

*Antilles Cement Corp. v. Fortuño,*
670 F.3d 310 (1st Cir. 2012)......................................................................26

*Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin.
Oversight & Mgmt. Bd. for P.R.),*
989 F.3d 170 (1st Cir. 2021) ....................................................................32

*Bank of N.Y. Mellon v. Puerto Rico Sales Tax Fin. Corp. (COFINA) (In re Fin.
Oversight & Mgmt. Bd. for P.R.),*
301 F. Supp. 3d 306 (D.P.R. 2017)...........................................................19

*Benjamin v. Aroostook Med. Ctr., Inc.,*
57 F.3d 101 (1st Cir. 1995)........................................................................20

*Brigade Leveraged Cap. Structures Fund Ltd. v. Garcia-Padilla,*
217 F. Supp. 3d 508 (D.P.R. 2016)...........................................................8

*In re Comcoach Corp.,*
698 F.2d 571 (2d Cir.1983).................................................................20, 21

*Cumberland Farms, Inc. v. Florida Dep't of Env't Prot.,*
116 F.3d 16 (1st Cir. 1997)..................................................................10, 11

*In re FBI Distrib. Corp.,*
330 F.3d 36 (1st Cir. 2003)........................................................................12

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
478 F. Supp. 3d. 190 (D.P.R. 2020)...........................................................33

*Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity
Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.),*
948 F.3d 457 (1st Cir. 2020)......................................................................31

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
481 F. Supp. 3d 60 (D.P.R. 2020) ...................................................................12

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
583 B.R. 626 (D.P.R. 2017) ...........................................................................27

*In re. Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
618 B.R. 619 (D.P.R. 2020), *aff'd,* 989 F.3d 170 (1st Cir. 2021) ...........19

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico,*
872 F.3d 57 (1st Cir. 2017), *aff'd,* 948 F.3d 457 (1st Cir. 2020) ...........18

*Freightliner Corp. v. Myrick,*
514 U.S. 280 (1995) ......................................................................................26

*In re Furr's Supermarkets, Inc.,*
359 B.R. 356 (B.A.P. 10th Cir. 2007) .........................................................10

*In re Goody's Family Clothing, Inc.,*
401 B.R. 656 (D. Del. 2009), *aff'd,* 610 F.3d 812 (3d Cir. 2010) ....................11, 13

*In re Hackney,*
351 B.R. 179 (Bankr. N.D. Ala. 2006) .......................................................13

*In re Heffernan Mem'l Hosp. Dist.,*
202 B.R. 147 (Bankr. S.D. Cal. 1996) ........................................................31

*In re Hemingway Transp., Inc.,*
954 F.2d 1 (1st Cir. 1992) .............................................................................10

*In re High Voltage Eng'g Corp.,*
403 B.R. 163 (D. Mass. 2009) ......................................................................18

*In re HNRC Dissolution Co.,*
396 B.R. 461 (B.A.P. 6th Cir. 2008) ...........................................................11

*Puerto Rico ex rel. Isabela Irrigation Serv. v. United States,*
134 F.2d 267 (1st Cir. 1943) .........................................................................11

*In re Jack/Wade Drilling, Inc.,*
258 F.3d 385 (5th Cir. 2001) ........................................................................11

*In re James Wilson Assocs.,*
965 F.2d 160 (7th Cir. 1992) ........................................................................17

*John K. & Catherine S. Mullen Benevolent Corp. v. United States,*
290 U.S. 89 (1933) .........................................................................................11

*In re Mammoth Mart, Inc.*,
536 F.2d 950 (1st Cir. 1976)........................................................................................10

*Méndez-Núñez, v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*,
916 F.3d 98 (1st Cir. 2019).........................................................................................26

*Newberry v. City of San Bernardino (In re City of San Bernardino)*,
558 B.R. 321 (C.D. Cal. 2016) ...................................................................................11

*In re Newcare Health Corp.*,
244 B.R. 167 (B.A.P. 1st Cir. 2000) ..........................................................................20

*Ohio v. Kovacs*,
469 U.S. 274 (1985).......................................................................................................8

*In re Peachtree Lane Assocs., Ltd.*,
188 B.R. 815 (N.D. Ill. 1995), *aff'd*, 150 F.3d 788 (7th Cir. 1998) .........................19

Raymond Weil, S.A. v. Theron,
585 F. Supp. 2d 473 (S.D.N.Y. 2008).........................................................................9

*Reading Co. v. Brown*,
391 U.S. 471 (1968).....................................................................................................11

*Redondo Constr. Corp. v. Izquierdo*,
746 F.3d 21 (1st Cir. 2014).........................................................................................16

*In re Refco Inc.*,
505 F.3d 109 (2d Cir. 2007).........................................................................................21

*Rivera-Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*,
327 F. Supp. 3d 364 (D.P.R. 2018)............................................................................26

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*,
330 F. Supp. 3d 685 (D.P.R. 2018), *aff'd and remanded*, 945 F.3d 3 (1st Cir.
2019) ............................................................................................................................29

*Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*,
755 F.2d 200 (1st Cir. 1985).......................................................................................11

*In re Tri-Star Techs. Co.*,
260 B.R. 319 (Bankr. D. Mass. 2001) .........................................................................9

*United States v. Matthews*,
643 F.3d 9 (1st Cir. 2011)............................................................................................16

*United States v. Sec. Indus. Bank,*
    459 U.S. 70 (1982) ..................................................................................................8

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
    *Mgmt. Bd. for P.R.),*
    945 F.3d 3 (1st Cir. 2019) ......................................................................................26

*In re Weinschneider,*
    395 F.3d 401 (7th Cir. 2005) ..................................................................................11

**Puerto Rico Constitution**

P.R. Const. art. II, § 9 ...................................................................................................8

P.R. Const. art. VI, § 6 ................................................................................................22

P.R. Const. art. VI, § 7 ................................................................................................22

P.R. Const. art. VI, § 8 ......................................................................................7, 23, 28

P.R. Const. art. VI, § 9 ..........................................................................................7, 27

**United States Statutes**

11 U.S.C. § 503(b)(1) ...................................................................................................1

11 U.S.C. § 503(b)(1)(A) ................................................................................3, 12, 13

11 U.S.C. § 507 ..........................................................................................................25

11 U.S.C. § 507(a)(2) .................................................................................................25

11 U.S.C. § 552(a) ......................................................................................................30

11 U.S.C. § 902(2) ......................................................................................................30

11 U.S.C. § 902(2)(B) ...........................................................................................30, 31

11 U.S.C. § 902(2)(E) .................................................................................................31

11 U.S.C. § 926 ..........................................................................................................33

11 U.S.C. § 928(a) ......................................................................................................30

11 U.S.C. § 1109(b) ..............................................................................................17, 20

48 U.S.C. § 2103 ........................................................................................................23

48 U.S.C. § 2123 ........................................................................................................24

48 U.S.C. § 2141 ...................................................................................................24

48 U.S.C. § 2141(b)(1)(N) ......................................................................................25

48 U.S.C. § 2142 ...................................................................................................24

48 U.S.C. § 2142(c)(1) ...........................................................................................27

48 U.S.C. § 2144(c)(3) ...........................................................................................24

48 U.S.C. § 2144(c)(3)(B) .......................................................................................27

48 U.S.C. § 2161 .........................................................................................17, 25, 27

48 U.S.C. § 2174(b)(3) ...........................................................................................25

48 U.S.C. § 2174(b)(6) .......................................................................................25, 27

**Puerto Rico Statutes**

13 L.P.R.A. §§ 31626(a)(1) .....................................................................................30

31 L.P.R.A. § 5 .....................................................................................................29

9 P.R. Laws Ann. § 5681 ........................................................................................28

13 P.R. Laws Ann. §§ 31751(a)(1)(A), (a)(1)(C), (a)(3)(A), (a)(3)(C) ............................28

*Government Development Bank for Puerto Rico Debt Restructuring Act,*
   Act No. 109-2017, as amended by Act No. 147-2018 ...........................................1

*Internal Revenue Code for a New Puerto Rico Act*
   No. 1-2011, as amended by Act No. 31 2013 ............................................... *passim*

*Puerto Rico Vehicles and Traffic Act,*
   Act No. 22-2000, as amended by Act No. 30-2013 ........................................ *passim*

**Other Authorities**

Collier on Bankruptcy ¶ 1109.2 (15th ed. 1984) .......................................................17

Juan Gómez & Juan Galarza, P.R. Dep't of the Treasury, *Commonwealth of
Puerto Rico Basic Financial statements and Required Supplementary
Information.* Departmento De Hacienda Gobierno De Puerto Rico (Sept. 23,
2021),
http://www.hacienda.gobierno.pr/sites/default/files/Inversionistas/commonwealth
_of_puerto_rico_fy_2014_audited_financial_statements.pdf .......................................23

**COME NOW** AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA Parties"), which serves as the collateral monitor for Wilmington Trust, N.A. in connection with the new bonds that the DRA issued pursuant to the *Government Development Bank for Puerto Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018, and the approved Qualifying Modification for the Government Development Bank for Puerto Rico (the "GDB")[2] under Title VI of the *Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA"), by and through the undersigned legal counsel, and respectfully submit this reply (the "Reply") to the *Objection of Financial Oversight and Management Board for Puerto Rico to DRA Parties' Motion for Allowance of Administrative Expense Claim* (the "Objection") [ECF No. 18065].

## PRELIMINARY STATEMENT

Since the commencement of the Commonwealth's Title III case, the Commonwealth has diverted millions of dollars of the DRA's collateral.  As detailed in the DRA Parties' *Motion for Allowance of an Administrative Expense Claim* [ECF 17009] (the "Motion")[3], this should give rise to a significant administrative expense claim in favor of the DRA—whether under the "fundamental fairness" doctrine or the plain language of Bankruptcy Code section 503(b)(1).

The FOMB filed an objection to the Motion, which delineates a number of arguments, but none counter the fundamental point that the Commonwealth unlawfully deprived the DRA of its

---

[2]   *See* ECF No. 270 of Civil Case No. 18- 01561 (LTS) (Nov. 7, 2018).

[3]   Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

collateral— the Act 30-31 Incremental Revenues and the Restated Revenues[4]—during the pendency of these Title III proceedings and thus owes the DRA an administrative expense claim. In fact, the FOMB does not dispute that the Commonwealth retained the Act 30-31 Incremental Revenues and the Restated Revenues during the post-petition period. Rather, the FOMB asserts that such actions do not lead to an administrative expense claim.

The FOMB argues that the DRA's claim is based on *HTA's* breach of prepetition contracts between the parties and thus cannot give rise to an administrative expense claim. Not so. The DRA's entitlement to an administrative expense claim has nothing to do with HTA's conduct. HTA's actions will be (and are) the subject of actions in HTA's Title III proceedings. Moreover, the DRA's administrative expense claim is not based on the Commonwealth's prepetition conduct. It derives wholly from the Commonwealth's post-petition actions.

The FOMB also asserts that the DRA lacks standing to file and prosecute the Motion on two grounds. *First*, the FOMB argues that the Asset Restrictions in the Master Transfer Agreement prohibit the relief sought by the DRA Parties. The FOMB and AAFAF previously tried this argument—and lost. As this Court knows, they raised nearly identical arguments with respect to the DRA Parties' request for adequate protection. The Court denied those arguments then—and should do so again for the same reasons. Like the DRA Parties' request for adequate protection, an administrative expense claim is a remedy afforded to the DRA to protect its property rights. Here, the Motion fits squarely within the type of relief and actions authorized under the Asset Restrictions.

---

[4]    As defined at ¶¶ 4- 7 in *Plaintiff's Memorandum of Law in Opposition to the Motions to Dismiss*, Adv. Pro. No. 21-00068-LTS (D.P.R. Sept. 23, 2021) [ECF No. 60] (the "MTD Opposition").

*Second*, the FOMB argues that the DRA Parties lack party-in-interest standing here because the DRA is a creditor of HTA, and HTA is the entity with a direct claim against the Commonwealth.    However, the Commonwealth's post-petition diversion of the revenues generated by Acts 30-31 harmed the DRA.    This creates the administrative claim against the Commonwealth.    Nothing more is needed to establish a claim.    The FOMB was unsuccessful when it tried this argument before against the Monolines.    The Court should reject their latest attempt as well.

Finally, the FOMB argues that the Motion should be denied because it is "based on appropriation provisions of [Acts 30 and 31] which are preempted by PROMESA" and because the Motion is predicated on HTA possessing a property interest in the revenues generated by Acts 30 and 31, which allegedly it does not have.    *See* Objection ¶¶ 36-50.[5]

However, as detailed extensively in the MTD Opposition, these arguments miss the mark. PROMESA does not preempt Acts 30 and 31, and HTA has an ownership interest in the revenues from Acts 30-31.    Furthermore, preemption by itself has no effect on HTA's ownership of, or the DRA's interests in, these revenues.    Accordingly, the Commonwealth would still owe the DRA an administrative expense claim under the plain language of Bankruptcy Code section 503(b)(1)(A) for the post-petition use of the DRA's collateral.    For these reasons, and as detailed below, the Court should grant the Motion.

## **BACKGROUND**

1.    On June 15, 2021, the DRA Parties filed the Motion.  The Motion seeks allowance of an administrative expense claim on the grounds that, *inter alia*, the Commonwealth unlawfully

---

[5]    These legal arguments are also being briefed in connection with motion to dismiss briefing that is pending in a separate adversary proceeding commenced by the DRA Parties (the "DRA Adversary Proceeding").  *See* Adv. Pro. No. 21-00068-LTS.

retained the revenues generated by Acts 30 and 31 after the Commonwealth's petition date.  *See*
Motion ¶¶ 23-47.  In the Motion, the DRA Parties allege that, upon information and belief, the
Commonwealth unlawfully retained no less than $800 million of the these revenues during the
post-petition period.  *See id.* ¶ 67.

2.    Beginning in May 2021, the Servicer, on behalf of the DRA, retained the services
of TMF Financial Forensics and Lighthouse Consulting Group, LLC to analyze certain financial
and accounting issues related to the Commonwealth's retention of the Act 30-31 Incremental
Revenues[6] from July 2014 through June 30, 2021.

3.    The conclusions of this analysis are set forth in the Expert Report of Lizette
Martinez, CPA, CFF, CFE, dated as of September 13, 2021 (the "Martinez Expert Report"), a copy
of which is attached hereto as Exhibit A.[7]  The Martinez Expert Report concludes that HTA was
allocated ▇▇▇▇▇▇ in Act 30-31 Incremental Revenues during the post-petition period[8] and
received only ▇▇▇▇▇▇ of the allocated amount.  *See* Martinez Expert Report at 35.  The
Commonwealth therefore retained ▇▇▇▇▇▇ of the Act 30-31 Incremental Revenues
allocated to HTA during this period.  *See id.*[9]

---

[6]   The "Act 30-31 Incremental Revenues" consist of certain incremental revenues that were allocated to HTA
through Acts 30 and 31.  The Act 30-31 Revenues are composed of: (i) the revenues received from each vehicle
or trailer license fee in excess of $15; (ii) the revenues received from the petroleum excise taxes in excess of $120
million per fiscal year; and (iii) $20 million per fiscal year from the excise tax on cigarettes.  The DRA is the
*exclusive party* with collateral and payment rights with respect to the Act 30-31 Incremental Revenues.

[7]   In accordance with the Protective Orders at ECF No. 12912, ECF No. 12920, ECF No. 16681-2, and ECF No. 76
of Adv. No. 20-0005 (LTS), an unredacted version of the Martinez Expert Report and this Reply will be filed
under seal.

[8]   The relevant post-petition period in the Martinez Expert Report is based on HTA's petition date, which is May
21, 2017.  The Commonwealth's petition date is May 3, 2017.

[9]   Further discovery is needed to determine if the revenues were properly transferred to HTA.

4.      On September 9, 2021, the FOMB filed the Objection.  In the Objection, the FOMB

argues that the DRA is not entitled to allowance of an administrative expense claim because (i) the

DRA is contractually barred under the Asset Restrictions in the Master Transfer Agreement, *see*

Objection ¶¶ 28-32, (ii) the DRA, as a creditor of HTA, does not have standing to assert a claim

the FOMB alleges belongs to HTA, *see id.* ¶¶ 33-35, (iii) PROMESA expressly and impliedly

preempts Acts 30 and 31 and all other applicable local law such that the DRA has no claim to the

post-petition use of their collateral, *see id.* ¶¶ 36-44, (iv) HTA lacks an ownership interest in the

revenues generated by Acts 30 and 31, and the DRA's security interest did not attach to the

revenues diverted post-petition, *see id.* ¶¶ 45-50, and (v) the DRA's administrative expense claim

fails on the merits, *see id.* ¶¶ 51-64.  The DRA Parties respond to each of those below.

## REPLY

## I.      THE DRA PARTIES ARE ENTITLED TO ADMINISTRATIVE EXPENSE PRIORITY UNDER THE BANKRUPTCY CODE

### A.      The DRA has an allowed administrative expense claim under the "fundamental fairness" doctrine

5.      The Commonwealth's post-petition diversion of the revenues generated by Acts 30

and 31 justifies the allowance of an administrative expense claim based on principles of

"fundamental fairness."  *See* Motion ¶¶ 62-75.  As detailed in the Motion, "fundamental fairness"

requires the granting of an administrative expense claim when either "the debtor's postpetition

operations occasion tortious injuries to third parties (*Reading*), or when the claim arises from

postpetition actions that deliberately violate applicable law and damage others (*Charlesbank*)."

*Id.* ¶ 63.  Here, the Commonwealth has deprived the DRA of its collateral by illegally diverting █

████████████ of the Act 30-31 Incremental Revenues that constitutes DRA collateral during

the post-petition period.  *See* Martinez Expert Report at 35.

6.       As set forth in detail in the Motion, the Commonwealth has violated the DRA's (and, in turn, the DRA's bondholders') constitutional rights under Article VI, Section 8 of the Puerto Rico Constitution by depriving the DRA of its collateral.  *See supra* ¶ 5; Motion ¶¶ 23-32.

### B.       The FOMB's objections lack merit

7.       The FOMB argues that the "fundamental fairness" doctrine is not applicable here because it does not apply to a debtor's breach of prepetition contracts.  *See* Objection ¶ 53.  More specifically, the FOMB contends that the DRA's administrative expense claim is "entirely premised" on the HTA Loan Agreements, Security Agreement and the prepetition enactment of the Moratorium Laws and Clawback Executive Orders to institute the diversion of the Act 30-31 Incremental Revenues and the Retained Revenues from HTA.  *See id.*  However, for reasons explained in detail below, the FOMB's argument mischaracterizes the factual and legal bases for an administrative expense claim under the "fundamental fairness" doctrine.[10]

### 1.       The DRA Parties claim is based on post-petition actions of the Commonwealth

8.       The FOMB argues that the DRA cannot receive an administrative expense claim based on prepetition actions with respect to a prepetition contract.  *See* Objection ¶¶ 53-54 ("All of the Commonwealth's affirmative actions were taken prepetition . . . .").  However, the argument misconstrues the factual and legal bases for the DRA's administrative expense claim set forth in the Motion and inaccurately describes the Commonwealth's actions in several ways.

---

[10]    The FOMB argues that the equities underlying the "fundamental fairness" doctrine should not apply in municipal restructurings such as this Title III proceeding because corporate bankruptcies are intended to preserve enterprise value for creditors whereas the primary purpose of municipal bankruptcies is to ensure public services.  S*ee* Objection ¶ 52, n.28.  This position is meritless because, *inter alia*, it is contrary to case law from this Court, which already acknowledges the application of the "fundamental fairness" doctrine in PROMESA proceedings.  *See In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 481 F. Supp. 3d 60, 65 (D.P.R. 2020).  Counsel's argument would give the FOMB the right to take limitless actions irrespective of their "fundamental fairness."

9.       It is true that the Commonwealth took unlawful executive and legislative action prior to the Commonwealth's petition date.   However, the FOMB ignores that the Commonwealth's illegal diversion of the DRA's collateral continued for years *after* the Commonwealth's Title III petition date (of its own accord and/or at the direction of the FOMB). *See* Motion ¶¶ 67-75.

10.      The Motion makes clear that the DRA's administrative expense claim is based on this *post-petition conduct* because the Commonwealth systematically stripped the DRA of collateral during fiscal years 2018 through 2021 by diverting the revenues generated by Acts 30-31 away from HTA to pay for expenses of the Commonwealth.  *See id*.  The Commonwealth's post-petition diversion of the DRA's collateral was unjustified.

>    2.       *The FOMB cannot legally justify the Commonwealth's post-petition conduct*

11.      The FOMB argues that the Commonwealth diverted the DRA's collateral through proper legislative and executive action.  *See* Objection ¶ 59 ("[T]he Commonwealth's conduct was taken in accordance with applicable law, and thus cannot be considered tortious.").   However, there is no record before this Court that the Commonwealth's activities, including its post-petition retention and diversion of the revenues from Acts 30-31, were consistent with applicable law. Until the FOMB creates such a record, the argument lacks merit.

12.      The Motion explains why (i) the Moratorium Laws and Clawback Executive Orders are unlawful legislation and (ii) the Commonwealth's continued retention of the revenues generated by Acts 30 and 31 violate the Puerto Rico Constitution.[11] To date, the FOMB has not demonstrated any facts to the contrary.  *See* Motion ¶¶ 67-75.

---

[11]    In sum, these actions did not – and still do not – activate the "clawback" provisions of Article VI, Section 8 of the Puerto Rico Constitution.  Absent the limited exception of the "clawback", the Act 30-31 Revenues must

13.     The FOMB also relies on language in the Restatement (Second) of Torts that "[e]ven when a State is subject to tort liability, it and its governmental agencies are immune to the liability for acts and omissions constituting . . . the exercise of a . . . legislative function" for the blanket proposition that enacted legislation cannot give rise to a tort.  *See* Objection ¶ 59.  The notion that the Commonwealth has *carte blanche* to eviscerate a secured creditor's constitutional rights whenever convenient is belied by the actions of Congress and Puerto Rico.  Why would the FOMB burden the Commonwealth with these Title III proceedings if the Commonwealth can simply erase of all of its debts with the stroke of pen?

14.     Congress's power under the bankruptcy clause may be "regularly construed to authorize the retrospective impairment of contractual obligations", but the Supreme Court has recognized that such power "is subject to the Fifth Amendment's prohibition against taking private property without compensation."  *United States v. Sec. Indus. Bank*, 459 U.S. 70, 74- 75 (1982); *see also* P.R. Const. art. II, § 9 (providing that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law.").  Extinguishing the DRA's property rights in the revenues from Acts 30-31 through legislation does not automatically shield the Commonwealth from tort liability.

15.     The opposite is true—the Commonwealth's enactment of legislation that violates the Fifth Amendment and the Puerto Rico Constitution, and its post-petition conduct in furtherance thereof, entitles the DRA to just compensation.  *See Brigade Leveraged Cap. Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 519 (D.P.R. 2016) ("Secured creditors are, in short,

---

continue to be transferred to HTA as mandated by P.R. Const. Art. VI, § 9 ("[p]ublic property and funds shall only be disposed of . . . pursuant to law.").

entitled to constitutional protection for their bargained for property interest.") (internal quotation marks and citation omitted).[12]

> 3.   *The DRA's administrative expense claim is not based on a prepetition breach by the Commonwealth*

16.   The FOMB argues the Commonwealth's diversion of revenues generated by Acts 30 and 31 was a prepetition economic breach of the HTA Loan Agreements and the Security Agreement.   *See* Objection ¶¶ 52-59.   This argument makes little sense because the Commonwealth is not a party to, and therefore cannot breach, these agreements.   *See* Motion ¶¶ 5, 7 (discussing the DRA's contractual relationship with HTA under the HTA Loan Agreements and the Security Agreement); *see also In re Tri-Star Techs. Co.*, 260 B.R. 319, 327 (Bankr. D. Mass. 2001) (collecting cases holding that a non-party to an agreement is not bound by it and cannot breach its terms); *Raymond Weil, S.A. v. Theron*, 585 F. Supp. 2d 473, 484 (S.D.N.Y. 2008) (finding that third-parties who are not bound by an agreement cannot breach it).

17.   While the DRA's interests in the revenues from Acts 30-31 arise from the HTA Loan Agreements and the Security Agreement, its claims against HTA for potential breaches of the prepetition agreements are not at issue here.   As explained in detail in the Motion and above, the legal and factual bases for the DRA's administrative expense claim against the *Commonwealth* arises from the Commonwealth's willful, post-petition violation of the Puerto Rico Constitution

---

[12]   The FOMB's repeatedly cites to *Ohio v. Kovacs*, 469 U.S. 274 (1985) for the unremarkable proposition that a prepetition breach of statute creates a prepetition claim.   *See* Objection ¶¶ 8, 45, 60.   However, this decision is not relevant here because it is the Commonwealth's *post-petition* violations of law that entitles the DRA to an administrative expense claim.

and applicable laws—precisely the type of tortious conduct by a debtor that the "fundamental fairness" doctrine is intended to prevent. *See* Motion ¶¶ 67-75; *supra* ¶ 10.[13]

       4.    *Policy and precedent favor awarding administrative expense claims for post-petition torts*

18.      The FOMB's policy-based arguments regarding the treatment of post-petition torts similarly miss the mark. The FOMB argument that "[i]f defaults were torts that gave rise to administrative claims, discharges would be worthless because they would be offset by administrative claims." Objection ¶ 59. This argument lacks merits here—as the Commonwealth did not default on a contract as detailed above. *See supra* ¶¶ 16-17. The Commonwealth harmed the DRA by taking post-petition actions in violation of applicable law, which fits squarely within the scope of the "fundamental fairness" doctrine. *See Cumberland Farms, Inc. v. Florida Dep't of Env't. Prot.*, 116 F.3d 16, 21 (1st Cir. 1997) (administrative priority granted to claim arising from post-petition violation of environmental laws).

19.      In addition, many cases cited by the FOMB pertain to actual contract breaches. *See* Objection ¶ 53. By contrast, as explained in detail above and in the Motion, the DRA's administrative expense claim could not arise from the Commonwealth's breach of the HTA Loan Agreements and the Security Agreement. The Commonwealth is not a party to, and thus cannot breach, such agreements. *See supra* ¶ 16; *cf. In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1976) (claim for severance pay was based on prepetition services rendered to debtor); *In re Hemingway Transp., Inc.*, 954 F.2d 1, 6-7 (1st Cir. 1992) (claim for legal fees was based on an indemnification clause in a prepetition lease agreement); *In re Abercrombie*, 139 F.3d 755, 758-

---

[13]    The Commonwealth's assertion that it could breach the HTA Loan Agreements and the Security Agreement raise questions as to whether the Commonwealth and HTA are in fact distinct entities that can seek confirmation of two separate plans of adjustment, or are in fact seeking now to confirm a plan on behalf of both entities.

59 (9th Cir. 1998) (award of attorney's fees was based on provisions of a prepetition real estate agreement); *In re Furr's Supermarkets, Inc.*, 359 B.R. 356 (B.A.P. 10th Cir. 2007) (claim arose from failure to remit to creditor the proceeds of a prepetition sale of stamps as required under a prepetition consignment agreement).

20.     It is the Commonwealth's tortious, post-petition diversion of the DRA's collateral that gives rise to the DRA's administrative expense claim under the "fundamental fairness" doctrine.

21.     The other cases cited by the FOMB are also irrelevant because none of them involved tortious acts committed by the debtor.  *See* Objection ¶ 53 n.29; *In re HNRC Dissolution Co.*, 396 B.R. 461, 484 n.18 (B.A.P. 6th Cir. 2008) ("[W]ithdrawal liability claim does not stem from tortious or deliberate misconduct by the Debtors" because "withdrawal from multiemployer pension plans is permitted, and even anticipated, under ERISA."); *In re Weinschneider*, 395 F.3d 401, 403 (7th Cir. 2005) (denying award of attorney fees incurred to defend a case brought by a chapter 7 trustee against the debtor because the trustee "was acting properly"); *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 390 (5th Cir. 2001) (same).

22.     By contrast, the facts of this case are consistent with the facts of decisions cited by the DRA Parties in the Motion, where the debtor engaged in tortious conduct after the petition date.  *See* Motion ¶¶ 63, 65-66, 69, 75; *Newberry v. City of San Bernardino (In re City of San Bernardino)*, 558 B.R. 321, 329–30 (C.D. Cal. 2016) (stating that a party can file a claim for administrative expenses on account of alleged constitutional violations) (citing *Reading Co. v. Brown*, 391 U.S. 471, 477 (1968)); *Cumberland Farms*, 116 F.3d at 21 (fundamental fairness requires that a post-petition fine for environmental-law violations be given administrative treatment); *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.)*, 755 F.2d 200,

203 (1st Cir. 1985) (civil fine for violating a state court injunction imposed upon debtor while debtor was engaged in Chapter 11 reorganization qualified for administrative expense treatment as an actual, necessary expense of preserving the estate).[14]

23.     At bottom, the FOMB's Objection is a smokescreen to obscure the DRA's actual bases for an administrative expense claim.  The Commonwealth's acts to systematically strip the DRA of its collateral during the post-petition period reveals that the DRA's claim falls squarely within the "fundamental fairness" doctrine—it is post-petition harm arising from post-petition events. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 481 F. Supp. 3d 60, 65-66 (D.P.R. 2020) (stating that the fundamental fairness doctrine applies to "claims alleging postpetition harms that arise from postpetition events").

**C.     In the alternative, the DRA has an allowed administrative expense claim under the plain language of Bankruptcy Code section 503(b)(1)(A)**

24.     Even if the Court were to find the "fundamental fairness" doctrine inapplicable, the DRA would still be entitled to an administrative expense claim under the plain terms of Bankruptcy Code section 503(b)(1)(A).  "[F]or a claim to qualify as an administrative expense under subsection 503(b)(1), (1) it must have arisen from a transaction with the trustee or debtor in possession, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the claim must have benefitted the estate in some demonstrable way." *See In re FBI*

---

[14]   The FOMB also cites to *John K. & Catherine S. Mullen Benevolent Corp. v. United States*, 290 U.S. 89, 94–95 (1933) and *Puerto Rico ex rel. Isabela Irrigation Serv. v. United States*, 134 F.2d 267 (1st Cir. 1943) to support its argument that diverting the Act 30-31 Revenues does not give rise to a claim. *See* Objection ¶ 39.  The cases are inapposite here because (i) they involve potential claims under the Takings Clause of the U.S. Constitution, which is not the basis for the DRA's administrative expense claim, and (ii) the creditors in those cases did not have a lien on the property that was taken by the U.S. government, whereas here, the DRA has a valid, properly perfected security interest in the revenues generated by Acts 30-31 retained by the Commonwealth. *John K. & Catherine S. Mullen Benev. Corp. v. United States*, 290 U.S. at 94 ("The bonds have no general lien upon the lands [taken by the U.S. government]"); *Puerto Rico ex rel. Isabela Irrigation Serv. v. United States*, 134 F.2d at 273 ("The People of Puerto Rico could have provided that the amounts required to pay the principal and interest on the bonds . . . should constitute a lien in its favor upon the property but this was not done").

*Distrib. Corp.*, 330 F.3d 36, 42 (1st Cir. 2003) (citation omitted); Motion ¶¶ 76-78. Here, the Commonwealth's diversion of the DRA's collateral to pay for "essential services" and other general expenses of the Commonwealth fall squarely within Bankruptcy Code section 503(b)(1)(A). *See* Motion ¶¶ 76-78.[15]

25.     The FOMB argues that the DRA cannot satisfy the requirements for an administrative expense claim under section 503(b)(1)(A) because the Commonwealth merely retained "its own revenues", and therefore, the DRA did not engage in a post-petition transaction with the Commonwealth that provided value. *See* Objection ¶¶ 61-62.

26.     The FOMB is wrong. As an initial matter, its argument presupposes that the Commonwealth retained its own property when it diverted the revenues generated by Acts 30-31. The DRA disputes this position. *See infra* Section V.

27.     Moreover, the Commonwealth's post-petition retention of the DRA's collateral constitutes a "post-petition transaction" between the DRA and the Commonwealth. During the post-petition period, the Commonwealth became obligated to the DRA when it retained the DRA's property. Nothing more is needed to satisfy the requirement that there be a post-petition transaction with a debtor. *See In re Hackney*, 351 B.R. 179, 184 (Bankr. N.D. Ala. 2006) (holding that, to qualify for administrative expense status, "an expenditure must have occurred, or an obligation must have been incurred, post-petition"); *In re Goody's Family Clothing, Inc.*, 401 B.R. 656, 671 (D. Del. 2009), *aff'd*, 610 F.3d 812 (3d Cir. 2010) (holding that post-petition transaction need "not involve the exchange of money or formation of a contract", and that a debtor in

---

[15]   Even if the FOMB can prove the PROMESA preempts Acts 30 and 31 (it does not), the DRA would still be entitled to an administrative expense claim under Bankruptcy Code section 503(b)(1)(A). Preemption by itself has no effect on HTA's ownership of, or the DRA's interests in, the Act 30-31 Revenues. Accordingly, the Commonwealth's post-petition use of such revenues for its own benefit gives rise to an administrative expense claim under Bankruptcy Code section 503(b)(1)(A) for the reasons discussed herein.

possession's post-petition retention of property leased pre-petition qualified as an administrative
expense claim).

28.     The Commonwealth then used the DRA's property for its own benefit, including to
pay creditors and expenses.  *See* Motion ¶ 78.  For these reasons, the Commonwealth's actions fit
squarely within Bankruptcy Code section 503(b)(1)(A).

## II.     THE DRA PARTIES ARE NOT CONTRACTUALLY BARRED FROM ASSERTING AN ADMINISTRATIVE EXPENSE CLAIM AGAINST THE COMMONWEALTH

29.     The FOMB argues that "[t]he Motion should be denied because it violates the Asset
Restrictions in the Master Transfer Agreement."  Objection ¶ 28.  But this argument is meritless.
It is the same argument as the Standing Objection,[16] which this Court denied with respect to similar
actions.  The Court should again reject the argument.

30.     Under the Master Transfer Agreement, "Asset Restrictions" is defined, in relevant
part:

> (b) *with respect to any Non-Municipal Loan, rights, remedies and powers in respect
> of such Non-Municipal Loan may be exercised solely to the extent necessary* (i) to
> assure that the applicable Obligor's funds that are available for debt service
> (consistent with the applicable Fiscal Plan, if any, and applicable PROMESA
> Budget, if any) are applied to such Non-Municipal Loan in accordance with the
> applicable Asset Documents, legal priority, security or other pledge rights
> benefitting such Loan Asset [("Clause 1")], (ii) *to preserve, protect, or defend any
> security or other pledge rights benefitting such Non-Municipal Loan* [("Clause 2")]
> and (iii) in the case of a Non-Municipal Loan where the applicable Obligor is in a
> proceeding under Title III or Title VI or PROMESA and such Obligor has other
> creditors with the same legal priority, security or pledge rights as the Issuer, to
> ensure that the Issuer receives treatment in such proceedings that is the same as that
> provided to other creditors with the same legal priority, security or pledge rights
> [("Clause 3")].

*See* ECF No. 16276, Ex. G, Sch. 1 (emphasis added).

---

[16]    As defined at ¶ 24 of the Objection.

31.     The DRA's request for an allowed administrative expense claim falls squarely within the scope of Clause 2.  This Court previously addressed the question of whether the DRA Parties' motion seeking adequate protection based on the Commonwealth's diversion of the revenues generated by Acts 30-31 complied with the Asset Restrictions.  In its Standing Order,[17] the Court held that the DRA Parties' request for adequate protection was a valid exercise of its "rights, remedies and powers" under Clause 2.  *See* Standing Order at 7.  The Court observed that the "DRA Parties are not limited strictly to preserving, protecting or defending the DRA's rights; rather, the stem of the provision makes it clear that they are authorized to exercise 'rights, remedies and powers' to 'preserve, protect, or defend' the security of pledge rights 'benefiting' the Non-Municipal Loans." *Id.* at 6-7.

32.      In this case, the result should be no different.  The DRA Parties' request for an allowed administrative expense claim is based on the same facts underlying their request for adequate protection—they both seek redress for the Commonwealth's improper retention of the DRA's collateral.  *See id.* ("The premise of the [DRA Parties' request for adequate protection] is that the Commonwealth has continuously depleted the value of the DRA's collateral and has indicated that it will continue to do so for the duration of the Commonwealth's Title III cases.") (internal quotation marks and citation omitted).

33.     Like adequate protection, an administrative expense claim is a remedy afforded to creditors to protect their property rights.  11 U.S.C. 361(3) (expressly authorizing administrative expense claims as a remedy for creditors to realize their interests in property).  The drafters of Clause 2 could have expressly constrained the DRA Parties' actions to a particular set of remedies,

---

[17]     As defined at ¶ 264 of the Objection.

but they did not do so.  Under a plain reading of Clause 2, the DRA can pursue any remedy—including an administrative expense claim—that is "necessary to preserve, protect or defend" its security and pledge rights.  Therefore, the FOMB's argument that the Motion should not be allowed under Clause 2, *see* Objection ¶ 30, is meritless.[18]

34.       Because the issues raised in the Objection concerning Clauses 2 and 3 of the Asset Restrictions are essentially the same as those already decided by the Court in the Standing Order (which was not appealed), the Court's decision in the Standing Order is binding under the law of the case doctrine. *See Redondo Constr. Corp. v. Izquierdo*, 746 F.3d 21, 26-27 (1st Cir. 2014) ("The law of the case doctrine establishes that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (citing *United States v. Matthews*, 643 F.3d 9, 12 (1st Cir. 2011)).

35.       The FOMB also asserts that the Motion should be denied because it falls within the scope of Clause 1 of the Asset Restrictions.  *See* Objection at ¶ 29.  However, this argument fails.  The FOMB's argument assumes (incorrectly) that the DRA's administrative expense claim is an attempt to collect debt service from *HTA*.  But, as explained before, the DRA's entitlement to an administrative expense claim is premised on the *Commonwealth's* post-petition retention and diversion of the DRA's collateral.  Because the relief requested in the Motion has nothing to do with HTA or the payment of debt service from HTA, Clause 1 of the Asset Restrictions is not triggered.  The DRA Parties are, instead, operating under Clause 2 of the Asset Restrictions to preserve, protect and defend their collateral.

---

[18]     There is no need to address whether the DRA Parties are constrained by Clause 3. In its Objection the  FOMB concedes that Clause 3 has not been triggered and is therefore inapplicable to the present circumstances.  *See* Standing Order at 6.

36.     For these reasons, the DRA Parties are not barred by the Asset Restrictions from filing and prosecuting the Motion.

## III.   THE DRA PARTIES HAVE STANDING TO ASSERT AN ADMINISTRATIVE EXPENSE CLAIM AGAINST THE COMMONWEALTH BECAUSE THEY ARE A PARTY IN INTEREST

37.     The DRA Parties have standing to assert an administrative expense claim because the Commonwealth's post-petition diversion of the revenues generated by Acts 30-31 harmed the DRA.  However, the FOMB argues that the DRA Parties lack standing because the DRA is a creditor of HTA, and only HTA holds direct claims against the Commonwealth based on its retention of the revenues.  *See* Objection ¶ 33.  For the reasons explained below, the Court should reject the FOMB's arguments because they are inconsistent with the Bankruptcy Code and the FOMB's prior statements made before the Court.

38.     The DRA has standing to request allowance of an administrative expense claim against the Commonwealth under Bankruptcy Code section 1109(b) (as incorporated into this Title III proceeding through PROMESA section 301(a), 48 U.S.C. § 2161).  Bankruptcy Code section 1109(b) provides a nonexclusive list of entities that qualify as parties in interest, including "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee."  11 U.S.C. § 1109(b).  The party in interest language in section 1109(b) "must be construed broadly to permit parties affected by a [bankruptcy] proceeding to appear and be heard."  *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985) (citing 5 *Collier on Bankruptcy* ¶ 1109.2 (15th ed. 1984)).

39.     "The general theory behind [Bankruptcy Code section 1109(b)] is that anyone holding a direct financial stake in the outcome of the case should have an opportunity . . . to participate in the adjudication of any issue that may ultimately shape the disposition of his or her

interest." *In re Acemla De P.R. Inc.*, No. 17-02021 ESL, 2019 WL 311008 at *18 (Bankr. D.P.R. Jan. 22, 2019) (quoting Collier on Bankruptcy ¶ 1109.01 (16th ed. 2011)); *see also In re James Wilson Associates*, 965 F.2d 160, 169 (7th Cir. 1992) (defining a party in interest as "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding"); *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 872 F.3d 57, 63 (1st Cir. 2017) (noting that "[t]he statutory language [of § 1109(b)] is, indeed, quite broad . . ."). Courts "must determine on a case by case basis whether the prospective party in interest has a sufficient stake in the proceeding so as to require representation." *In re High Voltage Eng'g Corp.*, 403 B.R. 163, 166 (D. Mass. 2009) (quoting *Amatex*, 755 F.2d at 1042).

40.     Here, the DRA has standing as a party in interest to seek allowance of an administrative expense claim against the Commonwealth because it has a direct stake in the Commonwealth's Title III proceeding. Obligations under the HTA Loan Agreements are secured by the revenues generated by Acts 30-31, which have been improperly diverted by the Commonwealth. *See* Motion ¶¶ 7-9, 23-29, 48-51, 59-61. The Commonwealth's actions therefore directly jeopardize the DRA's property interest. It is difficult to imagine a more concrete "stake" than this. *See High Voltage Eng'g Corp.*, 403 B.R. at 166-67 (D. Mass. 2009) (holding that there is standing if an order "diminish[es]" property interests or "detrimentally affect[s the appellant's] rights").

41.     The FOMB ignores these facts and instead urges the Court to adopt a general rule that a creditor of a creditor (here, the DRA, as a creditor of HTA) lacks standing. *See* Objection ¶ 33. However, this argument rests on the erroneous presumption that any direct claim arising from the Commonwealth's retention of the revenues from Acts 30 and 31 resides at HTA, and the DRA's harm is merely derivative of HTA's direct claim. *See id.*

42.     The FOMB made this very same argument in February 2020 in response to the
Monolines' amended motion for relief from the automatic stay.  *See* ECF No. 680 ¶¶ 66-69.
However, there, the FOMB conceded that if the Monolines had a security interest in the excise tax
revenues, they also had standing to seek stay relief by virtue of that interest.  *See In re. Fin.
Oversight & Mgmt. Bd. for Puerto Rico*, 618 B.R. 619, 631 n.13 (D.P.R. 2020), *aff'd*, 989 F.3d
170 (1st Cir. 2021) ("Although … the preliminary hearing also included 'whether the movants
have standing to sue,' the [FOMB] has conceded that its arguments concerning standing are
coextensive with its arguments that the HTA Movants lack liens or other property interests with
respect to the Revenues.") (the "Lift Stay Opinion").  The same reasoning applies here, and it is
illogical for the FOMB to now flip to the opposite position.

43.     The Court should also reject the FOMB's argument that a creditor of a creditor
lacks standing because it is contrary to well-established precedent holding that party-in-interest
status is a case-specific inquiry not governed by rigid categorical rules.  *Acemla De P.R. Inc.*, 2019
WL 311008 at *18 (stating that standing in a bankruptcy case extends to "anyone holding a direct
financial stake in the outcome of the case") (internal citation omitted); *In re Peachtree Lane
Assocs., Ltd.*, 188 B.R. 815, 824 (N.D. Ill. 1995), *aff'd*, 150 F.3d 788 (7th Cir. 1998) ("Determining
whether a given party is a 'party in interest' . . . calls for a case by case analysis.").  The proper
focus is on a prospective party's "stake in the proceeding" and whether it is "sufficient . . . to
require representation."  *High Voltage Eng'g Corp.*, 403 B.R. at 166-67.  The cases cited by the
FOMB do not warrant a different outcome.

44.     The FOMB cites to three cases to support its position, but none apply here.  First,
they look to *Bank of N.Y. Mellon v. Puerto Rico Sales Tax Financing Corp (COFINA) (In re Fin.
Oversight & Mgmt. Bd. for P.R.)*, 301 F. Supp. 3d 306, 312 (D.P.R. 2017) to erroneously assert

that the DRA lacks standing.  *See* FOMB Obj. ¶ 33.  However, this case simply holds that a party

must have "prudential" standing under Article III of the U.S. Constitution.  *See In re Fin. Oversight*

*& Mgmt. Bd. for P.R.*, 301 F. Supp. 3d at 312.  Relevant "considerations . . . principally concern

whether the litigant (1) asserts rights and interests of a third party and not his or her own, (2)

presents a claim arguably falling outside the zone of interests protected by the specific law invoked,

or (3) advances abstract questions of wide public significance essentially amounting to generalized

grievances more appropriately addressed to the representative branches."  *In re Newcare Health*

*Corp.*, 244 B.R. 167, 170 (B.A.P. 1st Cir. 2000) (quoting *Benjamin v. Aroostook Med. Ctr., Inc.*,

57 F.3d 101, 104 (1st Cir. 1995)).  None of these limitations apply here because (i) the DRA is

seeking to protect its own interests by seeking an administrative expense claim, not those of a third

party, (ii) the DRA has a property interest in the revenues streams from Acts 30 and 31 retained

by the Commonwealth and therefore have a direct claim against the Commonwealth relating to

that property interest, and (iii) the third factor is not applicable.  Prudential factors therefore

support the DRA's standing.

45.      The FOMB also relies on *In re Comcoach Corp.*, 698 F.2d 571 (2d Cir.1983), an

inapposite case involving a bankrupt tenant, a homeowner, and a bank holding a mortgage on the

home.  *See* Objection ¶ 34.  *Comcoach* is off base for two reasons.  *First*, it proceeded from the

incorrect assumption that one "must be either a creditor or a debtor" to have party in interest

standing.  *Id*. at 573.  Bankruptcy Code section 1109(b), however, provides that "party in interest"

is not limited to creditors and debtors, but broadly encompasses "the debtor, the trustee, a creditors'

committee, an equity security holders' committee, a creditor, an equity security holder, or any

indenture trustee."  11 U.S.C. § 1109(b).

46.     *Second*, the facts of *Comcoach* are readily distinguishable.  There, the court held that the bank lacked standing to seek stay relief in the tenant's bankruptcy proceeding because the connection between the bank—a creditor of the homeowner, who was in turn a creditor of the bankrupt tenant—and the tenant was too attenuated to constitute the direct stake Bankruptcy Code section 1109(b) requires.  This was so because "the Bank lacks any right to equitable relief against the bankrupt arising out of a breach of performance giving rise to a right to payment." *Comcoach*, 698 F.2d at 574.  By contrast, the DRA holds a direct financial stake in the diverted revenues generated by Acts 30-31, and in preserving and protecting its property rights to such revenues. The connection between the DRA and the Commonwealth is therefore direct and distinct from the connection at issue in *Comcoach*.

47.     *In re Refco Inc.*, 505 F.3d 109 (2d Cir. 2007) bears no similarity to the issue at hand. In *Refco*, the court stated that a bankruptcy court is not an appropriate forum to resolve a dispute between a creditor and its investors alleging fraud and breach of fiduciary duty.  *See id.* at 118-19. Here, the DRA seeks to resolve its claim against the Commonwealth based on the Commonwealth's unlawful retention of its collateral.

48.     Finally, the FOMB suggests that the Court should bar participation because "the creditor whose rights the creditor of the creditor attempts to prosecute may not agree with what the other creditor is trying to do with its rights."  Objection ¶ 34.  But that concern has no application here because the DRA is seeking recompense based on its own property interests in the diverted revenues, and not those of an intermediary.  Simply put, no such conflict exists here.

## IV.   THE DRA PARTIES' RIGHTS UNDER THE PUERTO RICO CONSTITUTION AND OTHER LOCAL LAW ARE NOT PREEMPTED BY PROMESA

49.     The FOMB argues that the Motion should be denied because PROMESA preempts Acts 30 and 31, which the FOMB argues constitute appropriation statutes – meaning that the

Commonwealth is no longer required to transfer any of these proceeds to HTA. *See* Objection ¶¶ 36-44. This argument lacks merit because the Act 30-31 Incremental Revenues and the Restated Revenues are not appropriations and PROMESA does not expressly or implicitly preempt Acts 30 and 31.[19]

### A.  The Act 30-31 Incremental Revenues are not appropriations

50.     The FOMB also argues that the appropriations provisions of Acts 30 and 31 do not grant HTA a property interest in the revenues generated therein. *See* Objection ¶ 37-38. However, this argument fails because Acts 30 and 31 are not appropriations statues and do not contain appropriation provisions.  Although the Puerto Rico Constitution does not define the term "appropriations," it provides guidance on how they work for budgetary purposes.  Specifically, Article VI, Section 7 requires that "appropriations made for any fiscal year shall not exceed the total calculated resources . . . estimated for said fiscal year."  P.R. Const. art. VI, § 7.  Article VI, Section 6 provides that, "[i]f at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the government and for the payment of interest on and amortization of the public debt for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation acts . . . shall continue in effect item by item . . . until corresponding appropriations are made."  P.R. Const. art. VI, § 6.

51.     These clauses provide the basic framework for how appropriations work within the Commonwealth budget.  *First*, appropriations are made on a fiscal year by fiscal year basis to establish a balanced budget.  *Second*, if a new budget is not made by the beginning of a fiscal year,

---

[19]   These legal arguments are also being briefed in connection with the DRA Adversary Proceeding.  The DRA Parties hereby incorporate by reference all of their arguments made in the MTD Opposition on this issue.  *See* MTD Opposition ¶¶ 67-114.  The MTD Opposition makes additional and lengthier arguments on this issue but we have included a condensed version of the argument for the Court's convenience here.

the appropriations of the prior fiscal year for the government's operating expenses and GO debt service shall be binding until the new budget is adopted.

52. Acts 30 and 31 do not fall within the framework of appropriations because, by their own terms, (i) Acts 30 and 31 do not require that their revenues be subject to the fiscal year-by-fiscal year allocation process in the Commonwealth's budget; (ii) the Commonwealth is required to cover the Act 30-31 Incremental Revenues into a special deposit for HTA's benefit; and (iii) the Commonwealth does not have budgetary rights over these revenues because they were transferred pursuant to Acts 30 and 31 and the Commonwealth does not have the legal authority to divert them to the General Fund, unless a valid "clawback" is triggered.[20]

53. The Legislature's intent with respect to Acts 30 and 31 is clear: the revenues generated by these statutes are not discretionary Commonwealth appropriations. Rather, the Puerto Rico Legislature assigned these funds exclusively to HTA, and, ***absent a valid "clawback"*** (which none has been demonstrated to date), the Commonwealth is required to transfer these funds to HTA in compliance with Acts 30 and 31. The "clawback" demonstrates that the revenues from Acts 30-31 are not appropriations. If they had been discretionary budgetary appropriations from their inception (as the FOMB insists), there would have been no need to include an exception for the constitutional "clawback" provisions of Article VI, Section 8 of the Constitution.

---

[20] *See*, *e.g.*, Juan Gómez & Juan Galarza, P.R. Dep't of the Treasury, *Commonwealth of Puerto Rico Basic Financial statements and Required Supplementary Information.* Departmento De Hacienda Gobierno De Puerto Rico (Sept. 23, 2021) at 215, n. 13(b), http://www.hacienda.gobierno.pr/sites/default/files/Inversionistas/commonwealth_of_puerto_rico_fy_2014_audited_financial_statements.pdf, where the HTA Loans are listed as Debt Supported by the Commonwealth Appropriations.

23

### B.   PROMESA does not expressly preempt Acts 30 and 31

54.      The FOMB argues that PROMESA expressly preempts Acts 30 and 31. *See*
Objection ¶¶ 40-42.  This argument cannot be squared with the text of PROMESA, which clearly
does not preempt Acts 30 and 31.   Congress stated explicitly its intent for PROMESA to
supplement—not supplant—territorial law and to displace territorial law **only** when it directly
conflicts with PROMESA.  PROMESA expressly provides that "[t]he provisions of this Act shall
prevail over any general or specific provisions of territory law, State law, or regulation that is
*inconsistent* with this Act."  PROMESA § 4, 48 U.S.C. § 2103 (emphasis added).  PROMESA
makes clear that Congress did not see a conflict between the statute and Acts 30 and 31 in several
ways.

55.      *First*, where Congress intended to exclude territorial law, it said so expressly.  For
example, PROMESA section 103(c) provides that "*[a]ny provision of the laws of the covered
territory governing procurement shall not apply to the Oversight Board*."  48 U.S.C. § 2123
(emphasis added).

56.      *Second*, Congress provided the FOMB with only limited authority to retroactively
rescind portions of law that alter creditor priorities under PROMESA section 204(c)(3)(B).  48
U.S.C. § 2144(c)(3) (providing a limited authorization for the FOMB to "review, and in its sole
discretion, rescind, any law that—(i) was enacted during the period between . . . May 4, 2016 . . .
and the date of appointment of all members and the Chair of the Oversight Board; and (ii) alters
pre-existing priorities of creditors in a manner outside the ordinary course of business or
inconsistent with the territory's constitution or the laws of the territory as of . . . May 4, 2016 . . .
*but such rescission shall only be to the extent that the law alters such priorities*.") (emphasis
added).  Otherwise, PROMESA was meant to preserve the legal *status quo* so that the FOMB

could preserve the creditor rights and priorities under pre-existing laws that preceded the imminent passage of PROMESA. This specific focus and brief period of time—which does not extend all the way back to Acts 30 and 31—further evidences Congress' care in circumscribing the FOMB's authority.

57.     *Third*, PROMESA sections 201 and 202—the relevant provisions that establish the process for approval of fiscal plans and certified budgets—are silent about displacing Commonwealth law. 48 U.S.C. §§ 2141, 2142. However, PROMESA sections 201 and 202 make clear that fiscal plans and budgets must comply with Puerto Rico law, which is consistent with Congress' intent to supplement—not eliminate—Commonwealth law. 48 U.S.C. § 2141(b)(1)(N) (providing that any fiscal plan shall "*respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016.*") (emphasis added).

58.     *Fourth*, PROMESA section 301 does not incorporate the bulk of the Bankruptcy Code section 507 waterfall priority provisions. *See* 48 U.S.C. § 2161. PROMESA Section 301 only incorporates Bankruptcy Code section 507(a)(2), which gives priority to administrative expense claims. Congress' decision not to incorporate the entirety of Bankruptcy Code section 507 into PROMESA further indicates that it did not intend for PROMESA to displace existing territorial law on creditor priorities; rather, Congress intended to maintain priorities existing under Commonwealth law.

59.     *Finally*, PROMESA section 314(b)(6) provides that, for purposes of confirmation of a Title III plan of adjustment, the plan must be "feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is

provided by such plan." 48 U.S.C. § 2174(b)(6). Additionally, PROMESA section 314(b)(3)

requires that the debtor not be "prohibited by law from taking any action necessary to carry out

the plan." 48 U.S.C. § 2174(b)(3). Once again, these statutes denote Congress' intent to preserve

creditors' rights, interests, and remedies under Puerto Rico law, and not to displace them through

PROMESA.

### C. PROMESA does not implicitly preempt Acts 30 and 31

60.     The FOMB also argues that, in the absence of express preemption, PROMESA

implicitly preempts Acts 30-31 because "compliance with both PROMESA and Act 30 and Act

31 is a 'physical impossibility'." Objection ¶ 43.

61.     The FOMB's argument fails because it is wholly possible—and required—for the

Commonwealth and FOMB to approve a budget that conforms with Acts 30-31. *See, e.g.,*

*Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995) (state law can impose more stringent

requirements than federal highway safety regulations); *Antilles Cement Corp. v. Fortuño*, 670 F.3d

310, 324-25 (1st Cir. 2012) (Puerto Rico's more demanding criteria for procurement of foreign

goods allow compliance with both local and federal law). They could do so by identifying and

allocating revenues and expenses according to the appropriations in the fiscal plan and budget

while ensuring that statutory revenues were authorized to continue to flow to their originally

authorized purposes.

62.     The FOMB's reliance on the decisions in *Vázquez-Garced v. Fin. Oversight &*

*Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3 (1st Cir. 2019)

("*Vazquez-Garced I*"), *Méndez-Núñez, v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin.*

*Oversight & Mgmt. Bd. for P.R.)*, 916 F.3d 98 (1st Cir. 2019) ("*Méndez-Núñez*"), and *Rivera-*

*Schatz v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 327 F.

Supp. 3d 364, 372 (D.P.R. 2018) ("*Rivera Schatz*"), to argue that expenditures not contained in a budget certified by the FOMB are inconsistent with, and preempted by, PROMESA, is misguided.[21]

63.    These cases simply stand for the proposition that a certified budget provides the exclusive means for the Commonwealth to spend its budgetary allocations. They do not hold, as the FOMB suggests, that PROMESA preempts all Commonwealth laws that determine how public funds must be used in compliance with Article VI, Section 9 of the Puerto Rico Constitution. Nor do they change Acts 30 and 31 into budgetary appropriations, which they are not.

64.    The FOMB is bound by the carefully calibrated framework Congress enacted with PROMESA. That framework requires, among other things, that the FOMB respect Puerto Rico law and limits the FOMB's control over Commonwealth spending to *annual budgetary appropriations only*. The FOMB cannot use PROMESA to strike down any law it deems problematic, such as Acts 30 and 31, just to make its "job easier." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 583 B.R. 626, 636 (D.P.R. 2017). That is particularly so because, as explained above, PROMESA specifically preserves Commonwealth law relating to creditor priority, security, and property rights. *See* 48 U.S.C. §§ 2141(b)(1)(N), 2142(c)(1), 2144(c)(3)(B), 2161, 2174(b)(6).

---

[21]    All these cases relate to controversies surrounding specific items that must be included in the annual Commonwealth budget and which require budgetary allocations, *which is not the case for the revenues generated by Acts 30 and 31*. *See Vázquez-Garced I*, 945 F.3d at 8 (addressing the reprogramming of funds in the Commonwealth budget from prior fiscal years); *Méndez-Núñez*, 916 F.3d at 115 and *Rivera Schatz* 327 F. Supp. 3d at 368-369 (addressing the FOMB's reduction of the Puerto Rico Legislature's annual budget after the Legislature refused to adopt a recommendation included in the FOMB's certified fiscal plan).

65.     For all these reasons and the other arguments made in MTD Opposition that are incorporated by reference, the FOMB cannot rely on its theory of preemption to disregard the DRA's property interests in the revenues generated by Acts 30-31.

## V.   HTA HAS AN OWNERSHIP INTEREST IN THE REVENUES GENERATED BY ACTS 30-31 RETAINED BY THE COMMONWEALTH

66.     The FOMB argues that HTA does not have an ownership interest in revenues generated by Acts 30 and 31 that are retained by the Commonwealth.  *See* Objection ¶¶ 45-50. However, for the reasons explained below, this argument lacks merit because (i) HTA has a valid interest in the revenues generated by Acts 30-31, (ii) the DRA's lien continues to attach post-petition, (iii) the Court has not addressed HTA's property interest in the revenues from Acts 30 and 31 in prior decisions, and (iv) the se revenues are not appropriations.

### A.   HTA has a valid interest in the revenues generated by Act 30-31, which are subject to the DRA's security interest

67.     The DRA has a valid, properly perfected security interest in the Act 30-31 Incremental Revenues retained by the Commonwealth.[22]  The FOMB claims that the Act 30-31 Incremental Revenues are the Commonwealth's property until such time as the Commonwealth transfers such revenues to HTA, and therefore, the DRA has no lien on the Act 30-31 Incremental Revenues retained by the Commonwealth.  *See* Objection ¶¶ 45-50.  The FOMB is mistaken, however, because HTA holds a constitutionally protected property right and interest in the Act 30-

---

[22]   These legal arguments are also being briefed in connection with the DRA Adversary Proceeding.  The DRA Parties hereby incorporate by reference all of their arguments in the MTD Opposition on this issue.  *See* MTD Opposition ¶¶ 18-66. The MTD Opposition makes additional and lengthier arguments on this issue but we have included a condensed version of the argument for the Court's convenience here.

31 Incremental Revenues upon their collection by the Commonwealth, which HTA has pledged to the DRA.

68.     By virtue of the "covered into" language in Acts 30 and 31, as well as the requirement that the Commonwealth convey these revenues to HTA *without discretion*, the legislature clearly transferred and assigned the revenues generated by Acts 30-31 to HTA.  9 P.R. Laws Ann. § 5681; 13 P.R. Laws Ann. §§ 31751(a)(1)(A), (a)(1)(C), (a)(3)(A), (a)(3)(C).  This provides HTA with a property interest in these revenues as soon as they are collected by the Commonwealth.

69.     In the absence of a proper clawback under Article VI, Section 8 of the Puerto Rico Constitution,[23] the only way that HTA's protected property interest in Acts 30 and 31 can be

---

[23]   The Commonwealth may **only** exercise a valid and legal clawback (i) when the fiscal year begins with a balanced budget, *see* P.R. Const. Art. VI, § 7; (ii)  *if available revenues for the fiscal year are insufficient to meet the appropriations made for that year*, *see* P.R. Const. art. VI, §§ 8-9; 23 L.P.R.A. § 104(c)(1); 9 L.P.R.A. §§ 2021, 5681; 13 L.P.R.A. §§ 31751(a)(1)(C), (a)(3)(C)); and, (iii) it may use the funds *only* to pay interest on and amortization of the public debt, *i.e.* general obligation ("GO") debt.  It is public knowledge that the Commonwealth has not paid GO debt since January 2016.

The only pronouncement by the Puerto Rico Supreme Court on this topic is through the voice of the former Puerto Rico Supreme Court Associate Justice Negrón García in his dissenting opinion at *Hernández Torres v. Hernández Colón*, 129 DPR 824, 861-63 (1992), a case where the majority opinion does not resolve a dispute concerning clawback.  In any event, Justice Negrón García explains that Article VI, Sections 7 and 8 of the Puerto Rico Constitution operate, jointly, as follows:

What happens if, the budget appropriations —over time— exceeds the resources?  The question leads us to Art. VI, § 8 of the Constitution of the Commonwealth. . .

On its own terms, *this section cannot be activated to remedy a situation in which the Legislature begins with a deficit budget, due to incurring in ab initio appropriations in excess of the total resources' calculations.  The constitutional precept was conceived to remedy exceptional situations created by random and different circumstances, outside the legislative evolutionary scope, and of course, of the First Executive. . .*

[T]he constitutional requirement of a balanced budget prevents the Legislative Assembly and the First Executive from approving the general budget if they know, based on the projections of all available resources, that they are limited and exceed the appropriations. *In that moment, neither of the branches can "balance" nor "complete" the budget with the use of the exceptional mechanism established by Art. VI, § 8 of the Constitution of the Commonwealth, supra, and the provisions of the Government Accounting Act [...].* To reach another conclusion would mean artificially creating the impression that the budget is

---

altered is through the repeal of the governing statutes, *which the Commonwealth has not done*, *see* 31 L.P.R.A. § 5 ("Laws shall only be repealed by means of subsequent laws; and disuse, custom or practice to the contrary shall not impede their enforcement."), and which the FOMB cannot do, *see Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701-02 (D.P.R. 2018), *aff'd and remanded*, 945 F.3d 3 (1st Cir. 2019) ("[T]he Oversight Board has not been given power to affirmatively legislate.").

70.     It follows that HTA was entitled to pledge these rights to creditors such as the GDB (now DRA).  The Security Agreement clearly specifies that HTA absolutely, irrevocably, and unconditionally assigned to the GDB all of its rights, title, obligations, and interest in the revenues allocated to HTA by virtue of Acts 30 and 31 "*whether presently held or hereafter acquired and wherever located.*" *See* Security Agreement § 1.1 and 1.2 (emphasis added).  As successor to GDB, the DRA now holds a perfected security interest in HTA's rights in these revenues "*wherever located.*"

71.     The DRA's security interest follows wherever HTA's rights to the Act 30-31 Incremental Revenues go.  This includes the Commonwealth's coffers, where the Act 30-31 Incremental Revenues have been deposited due to the Commonwealth's illegal retention and/or

---

balanced, that is, that the expenditures do not exceed the estimated resources. In that initial stage, when the approved appropriations exceed the total calculated resources, the mechanism of imposing taxes must be used. In its absence, because the Governor is constitutionally prevented from endorsing a budget that contains a deficit, he must veto the items —Const. E.L.A., *supra*, Art. III, § 20— and downgrade or eliminate any appropriation that grants funds in excess. This is the only way to save the constitutional problem of a deficit budget.

It is impossible to argue that, during the process of approving the budget, the Governor can invoke the mechanism of priorities contained in Art. VI, § 8 of the Constitution of the Commonwealth, *supra*, and the provisions of the Government Accounting Law of Puerto Rico, Act No. 230, *supra*. This conception is totally foreign to the minimum constitutional plan of "maintaining the economic stability of the government". Journal of Sessions, *supra*, Vol. 4, page 2587. (Translation ours and emphasis added).

diversion of these funds. Therefore, the DRA has alleged a valid lien on each dollar of Act 30-31 Incremental Revenues collected by the Commonwealth.

### B.      The DRA's lien continues to attach to post-petition Act 30-31 Incremental Revenues

72.      The FOMB argues that, even if the DRA does have a lien on the retained revenues from Acts 30-31, the DRA's lien cut off on the Commonwealth's petition date under Bankruptcy Code section 552(a). *See* Objection ¶¶ 47-48. However, the DRA's liens do not terminate on the Commonwealth's petition date because the Act 30-31 Incremental Revenues are "special revenues" under Section 902(2) of the Bankruptcy Code.

73.      Bankruptcy Code section 928(a) states that Bankruptcy Code section 552(a) does not apply with respect to "special revenues acquired by the debtor" post-petition. 11 U.S.C. § 928(a). "Special revenues" is defined in the Bankruptcy Code as "special excise taxes imposed on particular activities or transactions." 11 U.S.C. § 902(2)(B). By its plain meaning, Bankruptcy Code section 902(2)(B) includes all of the Act 30-31 Incremental Revenues (as well as the Restated Revenues). *See*, *e.g.*, 13 L.P.R.A. §§ 31626(a)(1) (gasoline tax), 312626(a)(3) (gas oil and diesel oil tax), 31627(a) (petroleum products tax), 31627a(a) (non-diesel petroleum products tax), 31625 (cigarette tax), 31628 (motor vehicle license fee).

74.      The FOMB argues that Act 30-31 Incremental Revenues do not qualify as "special revenues" "because the license fees and excise taxes generating Act 30-31 Incremental Revenues are imposed and collected by the Commonwealth, not HTA." Objection ¶ 48. However, Bankruptcy Code section 902(2)(B), on its face, does not require special excise taxes to be imposed by the same entity that granted the lien on such revenues to qualify as "special revenues." *See*, *e.g.*, *In re Heffernan Mem'l Hosp. Dist.*, 202 B.R. 147 (Bankr. S.D. Cal. 1996). In *Heffernan*, the court found that sales tax revenues imposed and collected by the City of Calexico for the exclusive

use of the Heffernan Memorial Hospital District qualified as "special revenues" of the debtor.  *See id.* at 149.  Although *Heffernan* concerned special revenues under Bankruptcy Code section 902(2)(E), the same analysis applies here, as like Bankruptcy Code section 902(2)(E), Bankruptcy Code section 902(2)(B) does not require imposition by the debtor.

75.     Finally, the FOMB argues that the revenues generated by Acts 30 and 31 post-petition are not subject to HTA's prepetition grant of a security interest because the revenues are predicated on variable and contingent purchases and fees that are "simply expectancies" that may never occur.  *See* Objection ¶ 47.  The FOMB cites to the First Circuit's decision in *Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 948 F.3d 457 (1st Cir. 2020) ("*Andalusian*") to support this argument.  *Id.*  However, the holding in *Andalusian* is not applicable to the Act 30-31 Incremental Revenues because HTA's right to receive the revenues under Acts 30 and 31 is not a subjective expectancy; it is a right premised on the plain and unequivocal text of the Puerto Rico Internal Revenue Code and the Motor Vehicle Traffic Act.  Acts 30 and 31 leave no room for discretion.

### C.     The Court has not addressed HTA's property interest in the Act 30-31 Incremental Revenues in prior decisions

76.     The FOMB claims that "this Court considered the very statutes at issue here the Act 30-31 Excise tax Statutes) and determined—twice—that HTA does not have a property interest in revenues generated by Acts 30-31 retained by the Commonwealth."  Objection ¶ 49.  This Court will, of course, recognize that it has not yet determined HTA's property interests in the Act 30-31 Incremental Revenues, a fact FOMB has previously acknowledged.  *See infra* ¶ 79.

77.     The Court's prior lift stay decision focused on whether the *Monolines* satisfied their burden to demonstrate their own property or security interest in the *res* at issue.  *See* Lift Stay Opinion at 637.  In the Lift Stay Opinion, the Court concluded that the HTA bondholders' lien

extended only to money actually deposited in specific accounts established by the 1968 Resolution

and 1998 Resolution, respectively. *See id.* at 637 ("The [Monolines] have therefore failed to

demonstrate a colorable claim to equitable or beneficial ownership interests in the Excise Taxes

that have not been transferred to HTA and deposited in the Resolution Funds."). The Court did

not rule on HTA's interests in the Act 30-31 Incremental Revenues.

78.        [24]   The Court also did not address the Commonwealth's justification for diverting

the revenues away from HTA or whether such justification is permissible under the Puerto Rico

Constitution and other applicable law.[25]

79.        HTA's ownership interests in the excise tax revenues (which include the Act 30-31

Incremental Revenues) was likewise not resolved in its decision denying the Monoline's motion

for appointment of a trustee pursuant to Bankruptcy Code section 926. *In re Fin. Oversight &*

*Mgmt. Bd. for P.R.*, 478 F. Supp. 3d. 190 (D.P.R. 2020) (the "926 Opinion"). In its 926 Opinion

this Court stated that the Monolines "have not demonstrated a legal basis for their assertion that

[the excise tax revenues] are actually owned by HTA." *Id.* at 196. The Court based this finding

exclusively on the narrow ruling in the Lift Stay Opinion, which did not render a final decision on

HTA's ownership interest in the excise tax revenues. *See* Lift Stay Opinion at 637. The FOMB

---

[24]   The Court only concluded that the "specific resolutions govern[ing] the relationship between HTA *and the
Bondholders*" and the excise tax statutes' "commitments to transfer certain of the Revenues to HTA *for the benefit
of the Bondholders,*" do not purport to grant *bondholders* property rights in the Excise Tax Revenues, and
therefore "[n]either the Bond Resolutions nor the Excise Tax Statutes promise *the Bondholders* that the
Commonwealth will pay them." *Id*. at 634 (emphasis added); *see also id*. at 635 (noting that section 2015 of title
9 expressly provides that the Commonwealth is not liable for HTA's bond obligations).

[25]   The First Circuit affirmance of the Lift Stay Opinion: (i) did not address the extent of HTA's property interest in
the retained excise tax revenues and (ii) did not address the extent of the DRA's security interest in the Act 30-
31 Revenues. *See Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re Fin. Oversight &
Mgmt. Bd. for P.R.)*, 989 F.3d 170 (1st Cir. 2021). Instead, the First Circuit clarified that "*the Title III court will
not and cannot treat its earlier, summary determination [in the Lift Stay Opinion] about whether the Monolines
had a colorable claim as conclusive.*" *Id.* at 182 (emphasis added).

even recognized the narrowness of this Court's rulings before the First Circuit Court of Appeals as part of the Monolines' appeal of the 926 Opinion. *See Opposition to Appellants' Motion to Hold Appeal in Abeyance and Cross-Motion to Dismiss Appeal as Moot*, First Circuit Case No. 20-1847, Document: 00117655369 at 15-16 (stating that the Lift Stay Opinion did not "conclusively determine whether HTA has an interest in the [excise tax revenues]"). Now, back before this Court, the FOMB has again changed course and is trying to argue (incorrectly) that the Court has already ruled on this issue.

80.     For the foregoing reasons, the FOMB is mistaken in claiming that this Court has addressed the scope and extent of HTA's ownership or property interest in the revenues from Acts 30-31 in prior rulings.

## CONCLUSION

81.     In light of the foregoing, the DRA Parties hereby respectfully request this Court enter an order (i) granting the DRA an allowed administrative expense claim in the Commonwealth Title III case equal to the amount of revenues generated by Acts 30 and 31 that have been retained by the Commonwealth during the pendency of its Title III case for its benefit, and (ii) overruling the Objection.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 24th date of September, 2021.

*[Remainder of Page Intentionally Left Blank]*

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, PR 00936-4225
Tel:    787-250-5632
Fax:    787-759-9225

By:    */s/ Arturo J. García-Solá*
Arturo J. García-Solá
(USDC No. 201903)
E-mail: ajg@mcvpr.com

*/s/ Nayuan Zouairabani*
Nayuan Zouairabani
(USDC No. 226411)
E-mail: nzt@mcvpr.com

***Attorneys for AmeriNational Community
Services, LLC, as Servicer for the GDB Debt
Recovery Authority***

**C. CONDE & ASSOC. LAW OFFICES**

By:    */s/ Carmen D. Conde Torres*
Carmen D. Conde Torres
(USDC No. 207312)

*/s/ Luisa S. Valle Castro*
Luisa S. Valle Castro
(USDC No. 215611)

254 San José Street
Suite 5
San Juan, PR 00901-1523
Tel:    787-729-2900
Fax:    787-729-2203
E-mail: condecarmen@condelaw.com

-and-

**SCHULTE ROTH & ZABEL LLP**

By:    */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted *pro hac vice*)
Noah N. Gillespie (admitted *pro hac vice*)
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel:    202-729-7470
Fax:    202-730-4520
E-mail: douglas.mintz@srz.com
           noah.gillespie@srz.com

-and-

Douglas Koff (admitted *pro hac vice*)
Abbey Walsh (admitted *pro hac vice*)
Peter J. Amend (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
Tel:    212-756-2000
Fax:    212-593-5955

E-mail:        douglas.koff@srz.com
                abbey.walsh@srz.com
                peter.amend@srz.com

***Attorneys for Cantor-Katz Collateral Monitor
LLC, as Collateral Monitor for the GDB Debt
Recovery Authority***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 24, 2021, I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

*/s/ Nayuan Zouairabani*
Nayuan Zouairabani

## **EXHIBIT A**

### **Martinez Expert Report**

DOC ID - 37048809.17