**<u>EXHIBIT B</u>**

CVI Trust Agreement

Draft: 10/11/2021

**TRUST AGREEMENT**

**(relating to CVIs)**

**by and between**

**COMMONWEALTH OF PUERTO RICO**

**and**

**_____, as Trustee**

_____

**Dated as of _____ xx, 2021**

_____

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND INTERPRETATION ................................................................. 3

    Section 1.01    Definitions .................................................................................. 3
    Section 1.02    Rules of Construction ................................................................ 22

ARTICLE II. AUTHORIZATION AND ISSUANCE OF NOTES ............................................ 22

    Section 2.01    Authorization of Notes .............................................................. 22
    Section 2.02    Provisions for Issuance of Notes ............................................... 24

ARTICLE III. GENERAL TERMS AND PROVISIONS OF NOTES ..................................... 25

    Section 3.01    Place and Medium of Payment.................................................. 25
    Section 3.02    Legends ...................................................................................... 25
    Section 3.03    CUSIP Numbers ......................................................................... 25
    Section 3.04    Execution and Authentication ................................................... 26
    Section 3.05    Interchangeability of Notes ....................................................... 26
    Section 3.06    Transfer and Registry ................................................................ 26
    Section 3.07    Transfer of Notes ...................................................................... 26
    Section 3.08    Regulations with Respect to Exchanges and Transfers............. 27
    Section 3.09    Notes Mutilated, Destroyed, Lost or Stolen ............................. 27
    Section 3.10    Book Entry Notes ...................................................................... 28
    Section 3.11    Preparation of Definitive Notes; Temporary Notes ................. 29

ARTICLE IV. REDEMPTION OF NOTES ............................................................................. 30

    Section 4.01    Authorization of Redemption.................................................... 30
    Section 4.02    Extraordinary Redemption of GO CVIs at Election of Commonwealth ....................................................................... 30
    Section 4.03    Extraordinary Redemption of Clawback CVIs at Election of Commonwealth ....................................................................... 30
    Section 4.04    Extraordinary Redemption at the Election of the Commonwealth ........ 30
    Section 4.05    Selection of Notes to be Redeemed........................................... 30
    Section 4.06    Notice of Redemption ............................................................... 31
    Section 4.07    Payment of Redeemed Notes .................................................... 31

ARTICLE V. LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;  PLEDGED DEPOSITS AND APPLICATION THEREOF ............................................................... 33

    Section 5.01    Lien on Trust Estate .................................................................. 33
    Section 5.02    Establishment of Funds and Accounts ...................................... 33
    Section 5.03    Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition.............. 34
    Section 5.04    Subject to Waterfall Outperformance Amount and Annual Waterfall Payment.................................................................. 37
    Section 5.05    Not Subject to Waterfall Outperformance Amount ................. 40
    Section 5.06    Rum Tax CVI Annual Payment Amount .................................. 41
    Section 5.07    HTA Clawback CVI Priority Distribution Waterfall ............... 42
    Section 5.08    CVIs Payment Fund ................................................................. 43
    Section 5.09    Trustee and Independent Consultant Expenses Fund............... 44

i

ARTICLE VI. INVESTMENT OF FUNDS ........................................................................... 45

    Section 6.01    Investment of Funds ...................................................................... 45
    Section 6.02    Liability for Investments .............................................................. 46

ARTICLE VII. PARTICULAR COVENANTS ...................................................................... 46

    Section 7.01    Payment of Notes ......................................................................... 46
    Section 7.02    Pledge of Good Faith, Credit and Taxing Power of
                 Commonwealth ............................................................................ 46
    Section 7.03    Powers as to Notes ....................................................................... 46
    Section 7.04    Further Assurance ........................................................................ 47
    Section 7.05    Offices for Payment and Registration of Notes ........................... 47
    Section 7.06    General ......................................................................................... 47
    Section 7.07    Non-Impairment Covenant ........................................................... 47
    Section 7.08    Baseline SUT Reduction and SUT True-Up ................................ 48
    Section 7.09    Substitute Measured Tax .............................................................. 49
    Section 7.10    Tax Covenant ............................................................................... 49
    Section 7.11    Rum Tax Reporting ...................................................................... 49
    Section 7.13    Fiscal Plan.  The .......................................................................... 50

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT ................... 51

    Section 8.01    Appointment and Acceptance of Trustee ...................................... 51
    Section 8.02    Appointment and Acceptance of Paying Agents........................... 51
    Section 8.03    Responsibilities of Trustee and Paying Agents ............................ 51
    Section 8.04    Property Held in Trust .................................................................. 51
    Section 8.05    Rights of the Trustee and the Paying Agent ................................. 51
    Section 8.06    Compensation and Indemnification ............................................. 53
    Section 8.07    Permitted Acts ............................................................................. 54
    Section 8.08    Resignation of Trustee ................................................................. 54
    Section 8.09    Removal of Trustee ...................................................................... 54
    Section 8.10    Successor Trustee and/or Paying Agent ....................................... 55
    Section 8.11    Transfer of Rights and Property to Successor Trustee .................. 55
    Section 8.12    Merger or Consolidation of the Trustee ....................................... 56
    Section 8.13    Ancillary Agreements .................................................................. 56

ARTICLE IX. AMENDMENTS TO TRUST AGREEMENT.................................................. 56

    Section 9.01    Modification and Amendment without Consent ........................... 56
    Section 9.02    Supplemental Trust Agreements Effective with Consent of
                 Holders ........................................................................................ 57
    Section 9.03    General Provisions Relating to Supplemental Trust Agreements .......... 57

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF
HOLDERS ............................................................................................................................. 58

    Section 10.01    Powers of Amendment .............................................................. 58
    Section 10.02    Consent of Holders ................................................................... 58
    Section 10.03    Modifications by Unanimous Consent ....................................... 59
    Section 10.04    Mailing ..................................................................................... 59
    Section 10.05    Exclusion of Notes .................................................................... 59
    Section 10.06    Notation on Notes ..................................................................... 60

4820-1003-9275.14

ARTICLE XI. DEFAULTS AND REMEDIES ............................................................... 60

Section 11.01    Events of Default................................................................. 60
Section 11.02    No Acceleration with Respect to the Notes ........................... 61
Section 11.03    Enforcement of Remedies .................................................... 61
Section 11.04    Priority of Payments after Default ........................................ 61
Section 11.05    Termination of Proceedings ................................................. 62
Section 11.06    Holders' Direction of Proceedings ........................................ 62
Section 11.07    Control by Holders of Notes; Limitations............................... 63
Section 11.08    Actions by Trustee; Possession of Notes by Trustee Not Required....... 63
Section 11.09    Waiver and Non–Waiver of Default ....................................... 64
Section 11.10    Notice of Event of Default ................................................... 64
Section 11.11    Remedies Not Exclusive ..................................................... 64

ARTICLE XII. DEFEASANCE ............................................................................... 64

Section 12.01    Discharge and Defeasance .................................................. 64

ARTICLE XIII. EXECUTION OF INSTRUMENTS BY NOTE HOLDERS  AND PROOF
OF OWNERSHIP OF NOTES ................................................................................ 65

Section 13.01    Evidence of Signatures of Holders and Ownership of Notes................ 65

ARTICLE XIV. MISCELLANEOUS ......................................................................... 66

Section 14.01    Preservation and Inspection of Documents............................ 66
Section 14.02    Money and Funds Held for Particular Notes........................... 66
Section 14.03    Cancellation of Notes ........................................................ 66
Section 14.04    No Recourse under Trust Agreement or on the Notes ............. 66
Section 14.05    Severability of Invalid Provision........................................... 67
Section 14.06    Parties of Interest.............................................................. 67
Section 14.07    Notices............................................................................ 67
Section 14.08    Headings.......................................................................... 67
Section 14.09    Governing Laws ................................................................ 67
Section 14.10    Retention of Jurisdiction of Title III Court ............................. 68
Section 14.11    Signatures and Counterparts............................................... 68
Section 14.12    Successors and Assigns...................................................... 68
Section 14.13    Conflicts .......................................................................... 68

Attachment 1        5.5% SUT Baseline
Attachment 2        PRIFA Rum Tax CVI Outperformance Metric
Attachment 3        GO CVI Allocation Summary
Attachment 4        Clawback CVI Allocation Summary
Attachment 5        Form of GO CVI (includes variations for different GO CVI Subseries)
Attachment 6        Form of Clawback CVI (includes variations for different Clawback CVI
                    Subseries and Sub-Subseries)
Attachment 7        Calculations relating to GO CVIs and Clawback CVIs Payments
Attachment 8        Illustrative scenarios of the calculation of the Subject to Waterfall
                    Outperformance Amount
Attachment 9        Illustrative scenarios of the calculation of the Not Subject to Waterfall
                    Outperformance Amount

4820-1003-9275.14

Attachment 10          Illustrative scenarios of the calculation of the Rum Tax CVI Annual
                       Payment Amount
Attachment 11          Continuing Disclosure Agreement

EXHIBIT A - CONFIRMATION ORDER

4820-1003-9275.14

## TRUST AGREEMENT

**THIS TRUST AGREEMENT,** dated as of _____ xx, 2021, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and _____, as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Holders that it has authorized this Trust Agreement.

## R E C I T A L S

[to be updated as proceedings progress]

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. (**"PROMESA"**); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Case, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below) attached hereto as Exhibit A, the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were [the resolution of certain claims relating to the Commonwealth's general obligation bonds and certain other liabilities of the Commonwealth] and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Notes (as defined below) pursuant to this Trust Agreement.

On October __, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the CVI Legislation (as defined below) which, among other things, authorized the issuance of the Notes and the irrevocable pledge of the good faith[1], credit and taxing power of the Commonwealth for the prompt payment of the Notes when due.

---

[1] "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution. "Good faith" is the literal translation of the term "buena fe". See Article VI, Section 2 of the Commonwealth's Constitution.

1

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the CVI Legislation, the Title III Court made a binding determination that the Notes are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Puerto Rico law and federal law: [to be updated consistent with final Plan]

a.  The Confirmation Order is a judicial determination pursuant to Section 4 of PROMESA, and is full, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

b.  The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and the Plan.

c.  All provisions herein made to pay or secure payment of the Notes are legal, valid, binding, and enforceable, including, without limitation, the covenants provided for herein.

d.  At the time of issuance and delivery of the Notes, the Commonwealth is hereby authorized and directed to have stamped or written on each of the Notes a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2021

All things have been done which are necessary to make the Notes, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust indenture for the security of the Notes, in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Notes are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Notes as follows:

This Trust Agreement provides for the issuance by the Commonwealth of the Notes to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the CVI Legislation, and the rights and remedies of the holders from time to time of the Notes.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, amounts available for the payment of the Notes shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Notes issued and to be issued hereunder, without preference, priority or distinction as to participation in the Trust Estate, and the benefit and protection thereof of one Note over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Notes shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if the Commonwealth or its successors or assigns shall well and truly pay or cause to be paid the Notes, according to the provisions set forth in the Notes, respectively and each of them or shall provide for the payment of Notes by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement and shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth, then, provided no Notes remain Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Notes are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Notes are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions.**  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

4820-1003-9275.14

**"5.5% SUT"** means the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

**"5.5% SUT Baseline"** reflects the baseline projections of the 5.5% SUT set forth in Attachment 1 hereto.  Upon the occurrence of a Baseline SUT Reduction, an SUT True-Up or the substitution of a Substitute Measured Tax for the 5.5% SUT, the Commonwealth shall prepare and substitute a revised Attachment 1 for the then applicable Attachment 1 as provided in Sections 7.08 and 7.09 hereof.

**"AAFAF"** means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

**"Allowed"** has the meaning set forth in the Plan.

**"Allowed Claim"** means a Claim, to the extent it is or has become Allowed.

**"Ancillary Agreements"** means the Trust Agreement, the Confirmation Order, the Plan and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.

**"Annual Clawback CVI Carryforward Amount"** has the meaning set forth in Section 5.04(c)(ii)(B) or (C) hereof, as applicable.

**"Annual GO CVI Carryforward Amount"** has the meaning set forth in Section 5.04(c)(i)(B) hereof.

**"Annual Waterfall Payment"** has the meaning set forth in Section 5.04(e) and (f) hereof, as applicable.

**"Authorized Officer"** means (a) in the case of the Commonwealth, the Secretary of Treasury and his or her designees, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by–laws of the Trustee.

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

**"Base Cover Over"** means $10.50 per proof gallon of the Rum Tax, or such lesser amount per proof gallon of the Rum Tax required to be covered over to the Commonwealth by the U.S. Department of Treasury pursuant to the U.S. Code.

"**Base Cover Over Revenues**" means the product of (a) Commonwealth Rum Tax Revenues, and (b) the ratio of the Base Cover Over divided by the sum of (1) the Supplemental Cover Over and (2) the Base Cover Over.

"**Baseline SUT Reduction**" has the meaning set forth in Section 7.08(b) hereof.

"**Book Entry Note**" means a Note issued to and registered in the name of a Depository for the participants in such Depository.

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

["**Calculation Agent**" means the Person serving in such capacity under the Calculation Agent Agreement from time to time.  The Calculation Agent shall be an Independent Consultant for all purposes of this Trust Agreement.

"**Calculation Agent Agreement**" means the Calculation Agent Agreement, dated as of _____, 2021, by and among the Commonwealth, the Calculation Agent and the Trustee, as amended or supplemented from time to time.]

"**Causes of Action**" has the meaning set forth in the Plan.

"**CCDA**" means the Puerto Rico Convention Center District Authority.

"**Claim**" means any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

"**Clawback CVI Annual Not Subject to Waterfall Payment Amount**" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.05 hereof.

"**Clawback CVI Annual Payment Amount**" means, for each Fiscal Year, the sum of the Clawback CVI Annual Not Subject to Waterfall Payment Amount plus the Clawback CVI Annual Subject to Waterfall Payment Amount.

"**Clawback CVI Annual Subject to Waterfall Payment Amount**" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

"**Clawback CVI Carryforward Balance**" has the meaning attributed under Section 5.04(c)(ii).

"**Clawback CVI Lifetime Cap**" means a total of $5,239,002,764 paid from both Clawback CVI Annual Not Subject to Waterfall Payment Amounts and Clawback CVI Subject to Waterfall Payment Amounts, and, with respect to the PRIFA Rum Tax Clawback CVIs only, from the Rum Tax CVI Annual Payment Amount, of which (a) $3,697,668,995 is allocable for Allowed CW/HTA Claims; (b) $217,228,391 is allocable for Allowed CW/Convention Center Claims; (c) $22,580,090 is allocable for Allowed CW/MBA Claims, and (d) $1,301,525,288 is allocable for Allowed CW/PRIFA Rum Tax Claims.

"**Clawback CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the Clawback CVIs, calculated as provided in Section 5.04(b)(v) or (vi) hereof, as applicable.

"**Clawback CVIs**" means, collectively, the general obligation securities, other than the GO CVIs, issued as Notes pursuant to this Trust Agreement, the payment for which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement. For the avoidance of doubt, unless otherwise provided in this Trust Agreement, the term "Clawback CVI" as used in this Trust Agreement refers to the security representing the interests of the Holders thereof to payments from (a) the Subject to Waterfall Outperformance Amounts, (b) the Not Subject to Waterfall Payment Amounts, and (c) solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amounts.

"**Clawback CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid cumulatively an amount equal to the Clawback CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2051, in the event an SUT Outperformance Condition has not occurred in the prior Fiscal Year, and (2) the CVIs Annual Payment Amount Payment Date in 2051, in the event an SUT Outperformance Condition has occurred in the prior Fiscal Year.

"**Commonwealth**" has the meaning given to such term in the Recitals.

"**Commonwealth Rum Tax Revenues**" means the total Rum Tax collections received by the Commonwealth as documented within the U.S. Department of the Treasury monthly detailed activity report of net excise tax due to the Commonwealth and certified by the Puerto Rico Department of Treasury or any equivalent documentation of such collections that the U.S. Department of the Treasury and/or Puerto Rico Department of Treasury may choose to adopt.

"**Comprehensive Cap**" has the meaning ascribed to such term in the Debt Responsibility Act.

"**Confirmation Order**" means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

"**CVI Legislation**" means the legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the GO CVIs and the Clawback CVIs and the irrevocable pledge of the good faith, credit and taxing power of the Commonwealth for the prompt payment of the Notes when due, which legislation may be part of, or included in, the New GO Bonds Legislation.

"**CVIs Annual Payment Amount**" means, for each Fiscal Year, an amount equal to the sum of the Clawback CVI Annual Payment Amount plus the GO CVI Annual Payment Amount plus, solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amount.

"**CVIs Annual Payment Amount Calculation Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [October 1][2] of the next Fiscal Year.

"**CVIs Annual Payment Amount Payment Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [November 1] of the next Fiscal Year.

"**CVIs Annual Payment Amount Verification Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [October 15] of the next Fiscal Year.

"**CVIs Maximum Payment Amounts**" means the Clawback CVI Lifetime Cap, the Clawback CVI Maximum Annual Payment, the GO CVI Lifetime Cap, the GO CVI Maximum Annual Payment, and the PRIFA Rum Tax Clawback CVIs Lifetime Cap, as applicable.

"**CVIs Outperformance Condition Determination Date**" means, for each Fiscal Year, [September 1] of the next Fiscal Year.

"**CVIs Payment Fund**" means the fund established in accordance with Section 5.08.

"**CW/Convention Center Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-

---

[2] Bracketed dates in this Trust Agreement are under discussion pending confirmation of, among other things, when the information that is necessary for making the determination of the SUT Outperformance Condition and the Rum Tax Outperformance Condition is available and, following such determinations that either or both of such conditions have occurred, the timing of calculations and verification and related challenges, if any.

2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.

"**CW/Convention Center Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/HTA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751(a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.

"**CW/HTA Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths' percent (68.6%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/MBA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order.

"**CW/MBA Clawback Recovery**" means the aggregate recovery by holders of Allowed CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/PRIFA Rum Tax Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the PRIFA Bonds.

"**CW/PRIFA Rum Tax Clawback Recovery**" means the aggregate recovery by holders of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**Debt Management Policy**" means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act.

"**Debt Policy Revenues**" means, collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue assigned to, or owned by, the Puerto Rico Sales Tax Financing Corporation or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan (as defined in the Plan), (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further, that, for purposes of illustration, with respect to Fiscal Year 2020, and as reflected in the CW Fiscal Plan (as defined in the Plan), "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six hundred Thousand Dollars ($15,146,600,000.00).

"**Debt Responsibility Act**" shall mean Act No. 101-2020, as the same may be amended, modified or supplemented.

"**Defeasance Security**" means:

(a)     a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)     any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; *provided* that at the time an investment therein is made such U.S. Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

"**Depository**" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement to serve as securities depository for the Notes, or any successor of any of the foregoing, as applicable.

4820-1003-9275.14

"**Effective Date**" means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

"**Electronic Means**" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

"**Eligible Investments**" means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)        Defeasance Securities;

(b)        interest-bearing general obligations of the United States of America;

(c)        United States treasury bills and other non-interest bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)        short-term discount U.S. Government Obligations;

(e)        certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)        banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)        commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)        domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(i)        Investment Agreements that are fully collateralized by Eligible Investments; and

(j)        domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

"**EMMA**" means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the

purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

**"Event of Default"** has the meaning given to such term in Section 11.01 hereof.

**"Extraordinary Redemption Payment Account"** means the account established by Section 5.02(f) hereof.

"**Final Order**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

**"Fiscal Plan"** means the Fiscal Plan of the Commonwealth adopted in a Fiscal Year.

**"Fiscal Year"** means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

**"Fitch"** means Fitch Ratings and its successors.

**"GDB"** means Government Development Bank for Puerto Rico.

**"GDB HTA Loans"** means, collectively, the loans, if any, made to HTA by GDB and now held by the GDB Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

"**General Fund**" means the Commonwealth's primary operating fund.

**"GO CVI Annual Payment Amount"** means the amount due and payable to the Holders of the GO CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

**"GO CVI Carryforward Balance"** has the meaning attributed under Section 5.04(c)(i).

**"GO CVI Lifetime Cap"** means $3,500,000,000.

"**GO CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the GO CVIs, calculated as provided in Section 5.04(b)(iv) hereof.

"**GO CVI Notional Amount**" means Three Billion Five Hundred Million Dollars ($3,500,000,000.00) in aggregate initial notional amount as of the Effective Date.

"**GO CVIs**" means, collectively, the general obligation securities, other than the Clawback CVIs, issued as Notes pursuant to this Trust Agreement, the payment for which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement.

"**GO CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the GO CVIs have been paid cumulatively an amount equal to the GO CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2043, in the event an SUT Outperformance Condition has not occurred in the Fiscal Year ending on June 30, 2043, and (2) the CVIs Annual Payment Amount Payment Date in 2043, in the event an SUT Outperformance Condition has occurred in the Fiscal Year ending on June 30, 2043.

"**Holder**" or any similar term, when used with reference to a Note or Notes, means the registered owner thereof.

"**HTA**" means the Puerto Rico Highways and Transportation Authority.

"**HTA Bonds**" has the meaning set forth in the Plan.

"**HTA Clawback CVI**" means the Clawback CVI to be issued on account of Allowed CW/HTA Claims.

"**Independent**" when used with respect to any specified person or entity means such a person or entity who (1) is not the Commonwealth, any instrumentality thereof, or any employee of the Commonwealth or any of its instrumentalities, (2) does not have any direct financial interest or material indirect financial interest in this Trust Agreement, the Notes or the Commonwealth or any of its instrumentalities (other than in connection with the services to be provided as Independent Consultant, and (3) is not connected with the Commonwealth, any of its instrumentalities, any party to this Trust Agreement, or any officer, employee, promoter, underwriter, trustee, partner, director, member or person of the foregoing performing similar functions (other than under this Agreement and any agreement pursuant to which it provides the Independent Consultant services.

"**Independent Consultant**" means an Independent third party performing certain designated functions hereunder chosen by the Commonwealth.  An Independent Consultant may be chosen for any or all of the functions requiring an Independent Consultant hereunder.  Such Independent Consultant shall be nationally recognized and professionally qualified to provide the services of the type required to be performed by such Independent Consultant hereunder.

"**Instructions**" has the meaning given to such term in Section 8.05.

12

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.

"**Measured SUT**" means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code [(or used for any other purpose established by law)] up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

"**MBA**" means the Metropolitan Bus Authority.

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**New GO Bonds Legislation**" Act No. _____-2021.

"**Note**" means any security of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof to evidence the interests of (a) the Holders of the Clawback CVIs to receive their proportionate shares of the Clawback CVI Annual Payment Amounts and, in the case of the Holders of the PRIFA Rum Tax Clawback CVIs only, to receive the Rum Tax CVI Annual Payment Amounts, and (b) the Holders of the GO CVIs to receive their proportionate shares of the GO CVI Annual Payment Amounts.

"**Not Subject to Waterfall Clawback CVI**" represents the portion of payments to the Holders of the Clawback CVIs made from the Not Subject to Waterfall Outperformance Amounts.

"**Not Subject to Waterfall Clawback CVIs Payment Account**" means the account established by Section 5.02(d) hereof.

"**Not Subject to Waterfall Clawback CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Amount Payment Date, the amount to be deposited into the Not Subject to Waterfall Clawback CVIs Payment Account equal to the payments due to the Holders of the Clawback CVIs from the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Amount Payment Date.

**"Not Subject to Waterfall Outperformance Amount"** means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.05(a) hereof.

**"Outperformance Amount"** means, for each Fiscal Year in which an SUT Outperformance Condition has occurred, the amount by which the Measured SUT exceeds the 5.5% SUT Baseline reflected in Attachment 1 hereto, as such Attachment 1 may be revised from time to time in accordance with the terms hereof.

**"Outstanding"**, when used in reference to Notes, means, as of a particular date, all such Notes authenticated and delivered hereunder except:

(a)     any Notes canceled by the Trustee at or before such date;

(b)     any Notes deemed to have been paid in accordance with Section 12.01 hereof;

(c)     any Note canceled or paid pursuant to Section 3.09 and Section 4.07 hereof or any Note in lieu of or in substitution for which another Note, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof;

(d)     for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Notes hereunder, any Note deemed to not be Outstanding in accordance with Section 10.05 hereof;

(e)     GO CVIs on and after the GO CVIs Final Maturity Date, solely to the extent all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid; and

(f)     Clawback CVIs on and after the Clawback CVIs Final Maturity Date, solely to the extent all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid; provided, however, the Sub-Subseries of Clawback CVIs relating to the CW/HTA Claims, namely the HTA 68 Bond Claims, the HTA 98 Senior Bond Claims, the HTA 98 Sub Bond Claims and the GDB HTA Loans, which are payable in that order of priority, shall be deemed no longer Outstanding when such Holders have been paid their respective notional amounts set forth in Attachment 4 hereto in full prior to the Clawback CVIs Final Maturity Date.

**"Oversight Board"** has the meaning given to such term in the Recitals.

**"Paying Agent"** means, with respect to the Notes, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

**"Permitted Rum Tax Waterfall Deductions"** means the sum of the following:

(a)     <u>Science and Technology Trust</u> – $5,000,000 transferred to the Puerto Rico Science, Research and Technology Trust Fund Account;

(b)     <u>Rum Producer Incentive Payments</u> – as described in the definition of **"Rum Producer Incentive Payments"**;

14

(c)  Conservation Trust – the amount transferred to the Puerto Rico Conservation Trust Account – calculated as the product of (1) Supplemental Cover Over Revenues and (2) $1/6^{th}$; and

(d)  PRIDCO – the amount transferred to the Puerto Rico Industrial Development Company Account – calculated as the lesser of (1) $5,000,000 and (2) 2.5% multiplied by the Commonwealth Rum Tax Revenues.

**"Person"** means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

**"Plan"** means the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms thereof.

**"PRIFA"** means the Puerto Rico Infrastructure Financing Authority.

**"PRIFA Bonds"** means, collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and (d) Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

**"PRIFA Related Plan Support Agreement"** means the PRIFA Related Plan Support Agreement, dated as of [July 27, 2021], by and among the Oversight Board, the Commonwealth, certain holders of PRIFA Bond Claims, and certain other signatories, as amended or supplemented from time to time.

**"PRIFA Rum Tax CVI Annual Payment Amount"** means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.06 hereof.

**"PRIFA Rum Tax Clawback CVIs"** means the Subseries of Clawback CVIs that are the only Subseries of Clawback CVIs that are the beneficiaries of the Rum Tax CVI Annual Payment Amounts.

**"PRIFA Rum Tax Clawback CVIs Lifetime Cap"** means $1,301,525,288 of the Clawback CVI Lifetime Cap, allocable to the PRIFA Rum Tax Clawback CVIs.

**"PRIFA Rum Tax Clawback CVIs Payment Account"** means the account established by Section 5.02(e) hereof.

"**PRIFA Rum Tax Clawback CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Amount Payment Date, the amount to be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account equal to the payments due to the Holders of the PRIFA Rum Tax Clawback CVIs from (a) the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, (b) the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, and (c) the Rum Tax CVI Annual Payment Amounts as calculated in accordance with Section 5.06 hereof, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Amount Payment Date.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

"**Puerto Rico Science, Research and Technology Trust Fund Account**" means [  ].

"**Puerto Rico Conservation Trust Account**" means [  ].

"**Puerto Rico Industrial Development Company Account**" means [  ].

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a) a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b) a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

16

(c) a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d) the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e) a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meet the applicable rating requirements set forth above.

**"Quarter in Interest"** means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.  Subject to the foregoing, in the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Notes (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

**"Rating Service"** means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

**"Record Date"** means, when used in relation to Notes of a Series, the date which is fifteen (15) days before the date of payment or action to be taken, whether or not such fifteenth day is a Business Day.

**"Redemption Price"** when used with respect to a Note, means the price established for such redemption in accordance with Article IV hereof and as set forth in the notice of redemption relating thereto.

**"Remaining Clawback CVI Lifetime Cap"** means, as the context requires, (a) the initial Clawback CVI Lifetime Cap as it relates to the Clawback CVIs collectively, or as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, (b) less the notional amounts of the Clawback CVIs redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment

Amount Payment Date or each extraordinary redemption date in accordance with Section 4.03 hereof.

"**Remaining GO CVI Lifetime Cap**" means (a) the initial GO CVI Lifetime Cap, (b) less the notional amounts of the GO CVIs redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Amount Payment Date or each extraordinary redemption date in accordance with Section 4.02 hereof.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan.

"**Rum Tax**" means the federal excise taxes on rum and distilled spirits produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the U.S. Code.

"**Rum Producer Incentive Payments**" means the total amount of incentive payments actually shared with and paid to the rum tax producers as stipulated in their respective contracts with the Commonwealth, which percentage is, as of the date of this Trust Agreement, 46%.  Solely for purposes of calculating the Rum Tax Outperformance Condition, such percentage is not permitted to exceed the following amounts in the following Fiscal Years: (a) for Fiscal Years ending June 30, 2022 through June 30, 2031, 46%; (b) for Fiscal Years ending June 30, 2032 through June 30, 2036, 48%; and (c) for Fiscal Years ending June 30, 2037 through June 30, 2051, 50%.  Any increase in the total amount of incentive payments actually shared with and paid to the rum tax producers in accordance with their respective contracts in excess of the maximum percentages set forth in the preceding sentence will not affect the Rum Tax Outperformance Metric.  For the avoidance of doubt, the Rum Producer Incentive Payments may be increased beyond the limits set forth in this definition at the Commonwealth's discretion, however any payments made in excess of such limits will not affect the Rum Tax Outperformance Condition calculation and payment of the Rum Tax CVI Annual Payment Amount.

"**Rum Tax CVI Annual Payment Amount**" means, for each Fiscal Year in which a Rum Tax Outperformance Condition has occurred, the amount calculated as provided in Section 5.06 hereof.

"**Rum Tax Outperformance Condition**" means that Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric in any given Fiscal Year.  A Rum Tax Outperformance Condition may occur in Fiscal Years in which an SUT Outperformance Condition has not occurred.

"**Rum Tax Outperformance Metric**" reflects the baseline projections of 100% of the Waterfall General Fund Rum Tax Collections within the Commonwealth's 2021 Fiscal Plan projections set forth in Attachment 1 hereto.

"**S&P**" means S&P Global Ratings and its successors.

"**Sales Tax**" means the sales and use tax, including any replacement or similar sales and use tax, imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter

D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

"**Secretary of Treasury**" means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

"**Series**" means either Clawback CVIs or GO CVIs.

"**Series 2021A-1 Capital Appreciation Bonds**" means the Commonwealth's General Obligation Bonds, Series 2021A-1 Bonds.

"**Subject to Waterfall Clawback CVI**" represents the portion of payments to the Holders of the Clawback CVIs made from the Subject to Waterfall Outperformance Amounts.

"**Subject to Waterfall CVIs Payment Account**" means the account established by Section 5.02(b) hereof.

"**Subject to Waterfall Clawback CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Amount Payment Date, the amount to be deposited into the Subject to Waterfall Clawback CVIs Payment Account equal to the payments due to the Holders of the GO CVIs and due to the Holders of the Clawback CVIs from the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Amount Payment Date.

"**Subject to Waterfall Outperformance Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.04(a) hereof.

"**Subseries**" means the four categories of Claims of the Clawback CVIs – the CW/Convention Center Subseries, the CW/HTA Claims Subseries, the CW/MBA Claims Subseries and the CW/PRIFA Rum Tax Claims Subseries.

"**Substitute Measured Tax**" means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

"**Sub-Subseries**" means, as the context requires, the following four Sub-Subseries of Clawback CVIs within the Subseries relating to CW/HTA Claims: (i) HTA 68 Bond Claims; (ii) HTA 98 Senior Bond Claims; (iii) HTA 98 Sub Bond Claims; and (iv) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

"**Supplemental Cover Over**" means the amount per proof-gallon of the Rum Tax that the U.S. Department of Treasury covers over to the Commonwealth, less the Base Cover Over, for the applicable Fiscal Year.

"**Supplemental Cover Over Revenues**" means the product of (a) the Commonwealth Rum Tax Revenues, and (b) the ratio of the Supplemental Cover Over divided by the sum of (1)

19

the Supplemental Cover Over and (2) the Base Cover Over.  For purposes of calculating the Rum Tax CVI Annual Payment Amount in Section 5.06 hereof, the maximum amount of Supplemental Cover Over Revenues in each applicable Fiscal Year is the Supplemental Cover Over Revenues Cap.

**"Supplemental Cover Over Revenues Cap"** means $88,000,000.

**"Supplemental Trust Agreement"** means any trust agreement of the Commonwealth amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

**"SUT Outperformance Condition"** means that the 5.5% SUT (or the Substitute Measured Tax if substituted as permitted herein) collected exceeds the 5.5% SUT Baseline (as adjusted or revised in Attachment 1 as herein provided) in any given Fiscal Year.  An SUT Outperformance Condition may occur in any Fiscal Year even if a Rum Tax Outperformance Condition has not occurred in such Fiscal Year.

**"SUT True-Up"** has the meaning set forth in Section 7.08(c) and (d) hereof.

**"Title III Case"** has the meaning given to such term in the Recitals.

**"Title III Court"** has the meaning given to such term in the Recitals.

**"Transaction Counsel"** means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

**"Treasury Rate"** means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI or the Clawback CVI, as the case may be, being redeemed.

**"Trust Agreement"** means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

**"Trust Estate"** means, other than the Trustee and Independent Consultant Expenses Fund, (a) for the benefit of the Holders of the GO CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account and the GO CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the GO CVIs; (b) for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs; (c) with respect to the PRIFA Rum Tax Clawback CVIs, all of the

Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the PRIFA Rum Tax Clawback CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the PRIFA Rum Tax Clawback CVIs; and (d) in each case, the Trustee's right to receive any such money, securities and other assets relating to each of the foregoing, as applicable, wheresoever located.

"**Trustee**" means the bank or trust company appointed as Trustee for the Notes pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

"**Trustee and Independent Consultant Expenses**" means the reasonable and verified permitted costs, fees and expenses of the Trustee and the Independent Consultants arising out of or incurred in connection with carrying out and administering their respective duties hereunder, but excludes certain expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, including, without limitation, the enforcement of remedies under Article XI hereof, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim, as more fully described in Section 8.06 hereof.

"**Trustee and Independent Consultant Expenses Advances**" means (a) the amount initially deposited into the Trustee and Independent Consultant Expenses Fund in accordance with Section 2.02(b) hereof, and (b) the amount of Trustee and Independent Consultant Expenses advanced by the Commonwealth in each Fiscal Year following Fiscal Years in which neither an SUT Outperformance Condition nor a Rum Tax Outperformance Condition has occurred as provided in Section 5.03(a) hereof in order to fund the Trustee and Independent Consultant Expenses Fund in an amount equal to the Trustee and Independent Consultant Expenses Cap.

"**Trustee and Independent Consultant Expenses Cap**" means an annual amount not to exceed $_____.

"**Trustee and Independent Consultant Expenses Fund**" means the Trustee and Independent Consultant Expenses Fund so designated, created and established pursuant to Section 5.02(a) hereof.

"**Trustee and Independent Consultant Expenses Funding Amount**" means, as of each CVIs Annual Payment Amount Calculation Date, the sum of (a) the amount by which the Trustee and Independent Consultant Expenses Cap for such Fiscal Year exceeds the amount on deposit in the Trustee and Independent Consultant Expenses Fund, plus (b) all Trustee and Independent Consultant Expenses Advances not previously reimbursed to the Commonwealth.

"**U.S. Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage

Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

"**U.S. Presidential Declaration of Disaster**" means the declaration of a disaster by the President of the United States under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, P.L. 100-707, as amended or supplemented from time to time, and any comparable successor legislation.

"**Waterfall General Fund Rum Tax Collections**" means (a) Waterfall Cover Over Revenues less (b) Permitted Rum Tax Waterfall Deductions.

"**Waterfall Cover Over Revenues**" means the sum of (a) Waterfall Supplemental Cover Over Revenues plus (b) Base Cover Over Revenues.

"**Waterfall Supplemental Cover Over Revenues**" means the lesser of (a) Supplemental Cover Over Revenues and (b) the Supplemental Cover Over Revenues Cap.

**Section 1.02   Rules of Construction.**   Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement.  All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## AUTHORIZATION AND ISSUANCE OF NOTES

**Section 2.01   Authorization of Notes.**

(a)   There are hereby authorized to be issued Notes of the Commonwealth in two series – the "GO CVIs" and the "Clawback CVIs."  The Notes shall be issued in authorized denominations of one dollar ($1.00) and integral multiples thereof.

(b)   On the Effective Date, the Commonwealth shall deliver the GO CVIs in the original GO CVI Notional Amount to those beneficiaries entitled to receive the same as provided

in the Plan.  The GO CVIs shall be deemed issued on July 1, 2021.  The GO CVIs shall mature on the earlier of (a) the date when the Holders of the GO CVIs have been paid an amount equal to the GO CVI Lifetime Cap and (b) [July 1], 2043, subject to the final GO CVI Annual Payment Amount being paid no later than the GO CVIs Final Maturity Date (with the GO CVIs remaining Outstanding until such time as all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid).  Payments to the Holders of the GO CVIs shall not exceed in the aggregate the GO CVI Lifetime Cap.

(c)     The Clawback CVIs shall be issued in the original aggregate notional amount of $5,239,002,764 in four Subseries designated as "Allowed CW/HTA Claims," "Allowed CW/Convention Claims," "Allowed CW/PRIFA Rum Tax Claims" and "Allowed CW/MBA Claims."

(i)     Within the Subseries relating to "Allowed CW/HTA Claims," there shall be issued four Sub-Subseries: (A) HTA 68 Bond Claims; (B) HTA 98 Senior Bond Claims; (C) HTA 98 Sub Bond Claims; and (D) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

(ii)     On the Effective Date,  the Commonwealth shall deliver (A) $3,697,668,995 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/HTA Claims, of which (w) $179,462,539 shall be allocated to the Sub-Subseries relating to HTA 68 Bond Claims; (x) $1,833,405,578 shall be allocated to the Sub-Subseries relating to HTA 98 Senior Bond Claims; (y) $207,294,178 shall be allocated to the Sub-Subseries relating to HTA 98 Sub Bond Claims; and (z) the remaining $1,477,506,700 shall be allocated to the Sub-Subseries relating to GDB HTA Loans; (B) $217,228,391 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/Convention Claims; (C) $1,301,525,288 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/PRIFA Rum Tax Claims; and (D) $22,580,090 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/MBA Claims, all as provided in the Plan.

(iii)     The Clawback CVIs shall be deemed issued on July 1, 2021.  The Clawback CVIs shall mature on the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid an amount equal to the initial Clawback CVI Lifetime Cap, and (b) on [July 1,] 2051, subject to the final Clawback CVI Annual Payment Amount being paid no later than the Clawback CVIs Final Maturity Date (with the Clawback CVIs remaining Outstanding until such time as all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid).  Payments to the Holders of the Clawback CVIs shall not exceed in the aggregate the Clawback CVI Lifetime Cap.  From the Clawback CVI Lifetime Cap, payments to the Holders of the Clawback CVIs for the Allowed CW/HTA Claims shall not exceed in the aggregate $3,697,668,995, which are further limited within each Sub-Subseries to the amounts allocated thereto; payments to the Holders of the Clawback CVIs for the Allowed CW/Convention Center Claims shall not exceed in the aggregate $217,228,391;

payments to the Holders of the Clawback CVIs for the Allowed CW/PRIFA Rum Tax Claims shall not exceed in the aggregate $1,301,525,288; and payments to the Holders of the Clawback CVIs for the Allowed CW/MBA Claims shall not exceed in the aggregate the $22,580,090, all as provided in the Plan.

(d)     The Notes are general obligations of the Commonwealth payable in the manner more particularly provided herein, subject to the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition. The Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution and applicable Puerto Rico law to the payment of the Notes in accordance with the terms of Section 7.02 hereof.[3]

(e)     The form of the GO CVI Note is attached hereto as Attachment 5. The form of the Clawback CVI is attached hereto as Attachment 6.

**Section 2.02   Provisions for Issuance of Notes.**  The Commonwealth shall issue Notes under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Secretary of Treasury of the Commonwealth, or his or her designee; ***provided***, ***however***, that such direction may not conflict with the terms of this Trust Agreement, the CVI Legislation, the Plan or the Confirmation Order. The Notes authorized to be issued in accordance with the terms of this Section 2.02 shall be executed by the Commonwealth and delivered to the Trustee.  Such Notes shall, as directed by the Commonwealth, be authenticated by the Trustee upon delivery to the Trustee of:

(a)     a copy of this Trust Agreement authorizing such Notes, certified by an Authorized Officer of the Commonwealth;

(b)     delivery by the Commonwealth to the Trustee of an amount equal to the Trustee and Independent Consultant Expenses Cap for deposit into the Trustee and Independent Consultant Expenses Fund;

(c)     a written order as to the delivery of such Notes, signed by an Authorized Officer of the Commonwealth, describing the Notes to be delivered and designating the Person(s) to whom such Notes are to be delivered; and

(d)     [an opinion of Transaction Counsel with respect to validity, legality and enforceability of the Notes and the good faith, credit and taxing power pledge of the Commonwealth and with respect to such other matters as are customary in connection with the issuance of the Notes; provided, however, that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; provided, further, that such opinion of Transaction Counsel may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy].

---

[3] **Commonwealth pledge of its good faith, credit and taxing power is contingent on passage of the legislation.**

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF NOTES

**Section 3.01   Place and Medium of Payment.**   Amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be payable in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Notes, upon presentation and surrender of Notes, such Notes shall be payable at the designated corporate trust office of the Trustee, and amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be paid by check mailed to the registered owner thereof as of the Record Date at the address thereof as it appears on the registry books of the Commonwealth or by wire transfer to such registered owner of the Notes if such registered Owner owns at least one million dollars ($1,000,000) initial notional amount of Notes of the GO CVIs or any of the Subseries of the Clawback CVIs.

Notes shall be initially dated as of July 1, 2021.  Notes of each Series and Subseries issued on or subsequent to the first CVIs Annual Payment Amount Payment Date shall be dated as of the CVIs Annual Payment Amount Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be a CVIs Annual Payment Amount Payment Date, in which case they shall be dated as of such date of authentication; ***provided, however,*** that if, as shown by the records of the Trustee, no CVIs Annual Payment Amount has been paid as of the CVIs Annual Payment Amount Payment Date immediately preceding the date of authentication thereof by the Trustee, the Notes of such Series issued in lieu of Notes surrendered for transfer or exchange shall be dated as of the date through which the last CVIs Annual Payment Amount has been paid in full on the Notes surrendered or, if no CVIs Annual Payment Amount has been paid on the Notes surrendered since their authentication, as of the date of authentication of the surrendered Notes.

**Section 3.02   Legends.**   The Notes shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGEMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2021."

**Section 3.03   CUSIP Numbers.**  The Commonwealth shall provide for the assignment of CUSIP numbers for all Notes of all Series and Subseries (including a separate CUSIP number for each Subseries, or, in the case of a Subseries that has Sub-Subseries, a separate CUSIP number for each Sub-Subseries) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Holders as a convenience to Holders; ***provided, however,*** that any such notice may state that no representation is made as to the correctness of such number either as printed on such Notes or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Note or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption.  The Commonwealth shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Note of which the Commonwealth has knowledge.  The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication.**  The Notes shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer thereof, or in such other manner as may be permitted by law.  In case any one or more of the officers or employees who shall have signed any of the Notes shall cease to be such officer or employee before the Notes so signed shall have been actually authenticated and delivered by the Trustee, such Notes may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Notes had not ceased to hold such offices or be so employed.  Any Note may be signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Note shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Notes such Persons may not have been so authorized or have held such office or employment.

The Notes of each Series and Subseries shall bear thereon a certificate of authentication, in the form set forth in the forms of Notes annexed hereto, executed manually by the Trustee.  Only such Notes as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Note shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee.  Such certificate of the Trustee upon any Note executed on behalf of the Commonwealth shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Notes.**   Notes, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate notional amount of Notes of the same Series, Subseries and Sub-Subseries and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry.**  So long as any of the Notes remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Notes; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Note entitled to registration or transfer.  So long as any of the Notes remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Notes at the designated corporate trust office of the Trustee.

**Section 3.07   Transfer of Notes.**  Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Note shall be registered upon the books of the Commonwealth as the absolute owner of such Note, whether such Note shall be overdue or not, for the purpose of receiving payment of, or on account of, the Notes, subject to the provisions of Section 3.01 hereof with respect to Record Dates, and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Note to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary.  The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

**Section 3.08   Regulations with Respect to Exchanges and Transfers.**  In all cases in which the privilege of exchanging Notes or transferring Notes is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Notes in accordance with the provisions hereof.  All Notes surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Notes, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Note upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer.  The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Notes of any Series or Subseries during the period beginning on the Record Date for such Notes immediately preceding a CVIs Annual Payment Amount Payment Date relating to such Notes and ending on such CVIs Annual Payment Amount Payment Date, or, in the case of any proposed other redemption of Notes of such Series or Subseries, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Notes Mutilated, Destroyed, Lost or Stolen.**  In case any Note shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Note of like Series, Subseries and Sub-Subseries, tenor and notional amount as the Note so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Note, upon surrender and cancellation of such mutilated Note or in lieu of and substitution for such Note so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and

paying such expenses as the Commonwealth and the Trustee may incur in connection therewith. All Notes so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth.  In case any Note which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth may, instead of issuing a Note in exchange or substitution therefor, pay or authorize the payment of such mutilated Note upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Note, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.

**Section 3.10   Book Entry Notes.**  Anything herein to the contrary notwithstanding, Notes shall be authorized and issued as Book Entry Notes.

For all purposes of the Trust Agreement, the Holder of a Book Entry Note shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Note or to any direct or indirect participant in such Depository.  Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Note with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Note, (b) the delivery to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any notice with respect to such Note, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any amount with respect to the CVIs Annual Payment Amount and Redemption Prices relating to such Note.   The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Note for the purpose of (x) payment of the CVIs Annual Payment Amount and Redemption Prices relating to such Note, (y) giving notices of redemption and of other matters with respect to such Note, (z) registering transfers with respect to such Note, and for all other purposes whatsoever.   The Trustee shall pay the CVIs Annual Payment Amount and Redemption Prices relating to such Note only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such CVIs Annual Payment Amount and Redemption Prices to the extent of the sum or sums so paid.   No Person other than the Depository shall receive a Note or other instrument evidencing the Commonwealth's obligation to make payments of the CVIs Annual Payment Amount.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Note which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Note to the Trustee; ***provided, however,*** that the Trustee shall maintain records as to each such payment and of the notional amount of such Note Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Note.

4820-1003-9275.14

The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Note or any other Person, may terminate the services of the Depository with respect to a Book Entry Note if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Notes or (b) a continuation of the requirement that all of the Outstanding Notes of like Series, Subseries and/or Sub-Subseries issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Notes, and the Commonwealth shall terminate the services of the Depository upon receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Notes for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Note, or upon the resignation of a Depository with respect to a Book Entry Note, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Notes shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by the Holders transferring or exchanging such Notes, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11   Preparation of Definitive Notes; Temporary Notes.**  The definitive Notes of each Series and Subseries shall be lithographed or printed on steel engraved borders, except that Book Entry Notes may be typewritten.  Until the definitive Notes of any Series or Subseries are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Notes, but subject to the same provisions, limitations and conditions as the definitive Notes, except as to the denominations thereof and as to exchangeability for registered Notes, one or more temporary Notes, substantially of the tenor of the definitive Notes in lieu of which such temporary Note or Notes are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Notes.  The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Notes for exchange and the cancellation of such surrendered temporary Notes the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Notes of the same aggregate notional amount and Series, Subseries and Sub-Subseries as the temporary Notes surrendered.  Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and security as definitive Notes issued pursuant hereto.

4820-1003-9275.14

All temporary Notes surrendered in exchange for a definitive Note or Notes shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF NOTES

**Section 4.01   Authorization of Redemption.**  Notes are subject to mandatory redemption in accordance with their respective rights to payment from CVIs Annual Payment Amounts. Notes shall be additionally redeemable from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein.

**Section 4.02   Extraordinary Redemption of GO CVIs at Election of Commonwealth.** The GO CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.02 shall be verified by an Independent Consultant.

**Section 4.03   Extraordinary Redemption of Clawback CVIs at Election of Commonwealth.**  The Clawback CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.03 shall be verified by an Independent Consultant.

**Section 4.04   Extraordinary Redemption at the Election of the Commonwealth.**  In the case of any extraordinary redemption of Notes in accordance with the provisions of Section 4.02 or 4.03 hereof from moneys other than CVIs Annual Payment Amounts, the Commonwealth shall give written notice to the Trustee of its election to redeem, whether such Notes are GO CVIs or Clawback CVIs, the notional amount to be redeemed, and the Redemption Prices of the Notes to be redeemed.  Such notice shall be given to the Trustee not less than forty-five (45) days prior to the redemption date.  The Series, Subseries and Sub-Subseries of Notes and notional amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein, including any priority of payment with respect to such Series, Subseries and/or Sub-Subseries as provided herein.  The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee hereunder, is sufficient to redeem on the redemption date at the Redemption Price thereof, all of the Notes or portions thereof to be so redeemed.

**Section 4.05   Selection of Notes to be Redeemed.**  In the event of redemption of less than all of the Outstanding Notes of like Series, Subseries or Sub-Subseries, the Trustee shall select the Notes to be redeemed (i) on a pro rata basis to the extent practicable, or, (ii) in the case of Book Entry Notes, where pro rata redemption is not possible, in accordance with the applicable

procedures of the Depository.  Notes selected shall be in amounts of $1.00 or whole multiples of $1.00 in excess thereof, except that if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1.00, shall be redeemed.

Section 4.06   Notice of Redemption.  Whenever Notes are to be redeemed in accordance with Sections 4.02 and 4.03, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth which notice shall specify:  (a) the Notes to be redeemed which shall be identified by the designation of the Notes given in accordance with Article II hereof; (b) the numbers and other distinguishing marks of the Notes to be redeemed, including CUSIP numbers; (c) the redemption date; (d) the Redemption Price (including the Redemption Price thereof); (e) with respect to each such Note, the notional amount thereof to be redeemed; (f) that, except in the case of Book Entry Notes, such Notes will be redeemed at the designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (g) that no representation is made as to the correctness of the CUSIP number either as printed on the Notes or as contained in such notice and that an error in a CUSIP number as printed on a Note or as contained in such notice shall not affect the validity of the proceedings for redemption; and (h) if the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Note to be redeemed the Redemption Price thereof.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books.  Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders of the Notes to be redeemed in the manner provided herein.  Such certification shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.  [The Trustee shall make available to the Holders of Notes subject to redemption a copy of the notice of redemption under procedures established by the Trustee.]

Section 4.07   Payment of Redeemed Notes.  Notice having been given in the manner provided in Section 4.06 hereof, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, except as

4820-1003-9275.14

otherwise provided in Section 3.10 hereof upon presentation and surrender of such Notes, at the office or offices specified in such notice, and, in the case of Notes presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Notes, or portions thereof, shall be paid at the Redemption Price; ***provided, however,*** that payment of the Redemption Price may be paid by wire transfer as provided in the first paragraph of Section 3.01 hereof.  If there shall be called for redemption less than all of the notional amount of a registered Note, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Note, without charge to the owner thereof, for the unredeemed balance of the notional amount of the registered Note so surrendered, Notes of like Series, Subseries and Sub-Subseries and tenor in any of the authorized denominations.  If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes or portions thereof to be redeemed shall no longer be considered to be Outstanding hereunder.  If such money shall not be so available on the redemption date, such Notes or portions thereof shall continue to be payable as herein provided as if such redemption had not been noticed.

4820-1003-9275.14

# ARTICLE V.

## LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS; PLEDGED DEPOSITS AND APPLICATION THEREOF

**Section 5.01   Lien on Trust Estate.**   The Commonwealth hereby grants, upon the issuance of the Notes, a lien on the Trust Estate in favor of the Trustee for the benefit of the Holders of the Notes, all as reflected in the definition of "Trust Estate".  The lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the lien.  [Such lien shall be perfected automatically, without further need for notice, recording or control, if and to the extent so provided in the Confirmation Order.][4]

**Section 5.02   Establishment of Funds and Accounts.**

(a)      The Trustee shall establish a Trustee and Independent Consultant Expenses Fund, which fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee. Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.03(d) hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses.

(b)      The Trustee shall establish a CVIs Payments Fund and, within such CVIs Payments Fund, (i) a Subject to Waterfall CVIs Payment Account, and, within such Subject to Waterfall CVIs Payment Account, a (A) GO CVIs Subaccount and (B) a Clawback CVIs Subaccount, (ii) a Not Subject to Waterfall Clawback CVIs Payment Account, (iii) a PRIFA Rum Tax Clawback CVIs Payment Account, and (iv) an Extraordinary Redemption Payment Account, and, within such Extraordinary Redemption Payment Account, a (A) GO CVIs Subaccount, (B) Clawback CVIs Subaccount and (C) PRIFA Rum Tax Clawback CVIs Subaccount, which fund, accounts and subaccounts shall constitute a portion of the Trust Estate and shall be held in trust for the benefit of the Holders as provided herein and maintained by the Trustee.

(c)      The GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account and the GO CVIS Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs as provided herein, including Section 5.04 hereof.

(d)      The Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall Clawback CVIs Payment Account and the Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the Holders of the PRIFA Rum Tax Clawback CVIs, as provided herein, including Section 5.05 hereof.

---

[4] Subject to review of Puerto Rico law and confirmation this is legally enforceable.

(e)     The PRIFA Rum Tax Clawback CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs as provided herein, including Sections 5.05 and 5.06 hereof.

(f)     The Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Notes subject to redemption in accordance with Sections 4.02 and 4.03 hereof.  The GO CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs.  The Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs.  The PRIFA Rum Tax Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs.

(g)     The moneys in each such fund, account and subaccount shall be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.03   Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition.**

(a)     By no later than each CVIs Outperformance Condition Determination Date, commencing after the end of the Fiscal Year ending on June 30, 2022, the Commonwealth shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year.  The Commonwealth shall provide written notice to the Trustee as to whether an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has or has not occurred within five Business Days of such CVIs Outperformance Condition Determination Date.  The Trustee shall provide written notice to the Holders of the Notes as to whether an SUT Outperformance Condition has or has not occurred within three Business Days of its receipt from the Commonwealth of the notice set forth above.  The Trustee shall provide written notice to the Holders of the PRIFA Rum Tax Clawback CVIs as to whether a Rum Tax Outperformance Condition has or has not occurred within three Business Days of its receipt from the Commonwealth of the notice set forth above.  The Commonwealth shall thereafter undertake to calculate the amounts required to be calculated in accordance with Section 5.03(b) hereof by on or prior to the CVIs Annual Payment Amount Calculation Date.  The Commonwealth shall within [two] Business Days of the CVIs Outperformance Condition Determination Date also provide to the [Independent Consultant] [Calculation Agent] retained to verify the calculations in accordance with this Section 503 such other information as shall be reasonably requested by the [Independent Consultant] [Calculation Agent] and then available to allow the [Independent Consultant] [Calculation Agent] to begin its work to verify such calculations on or prior to the CVIs Annual Payment Amount Verification Date.  [Calculation Agent Agreement to provide mechanism for determining and verifying calculations relating to the occurrence or non-occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, the sharing of information relating to the foregoing and the challenge process, together with remedies.]

(b)     By no later than each CVIs Annual Payment Amount Calculation Date, whether or not an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Commonwealth shall calculate the Trustee

34

and Independent Consultant Expenses Funding Amount. By no later than each CVIs Annual Payment Amount Calculation Date, (i) if an SUT Outperformance Condition has occurred with respect to the prior Fiscal Year, the Commonwealth shall calculate the Subject to Waterfall Outperformance Amount as provided in Section 5.04 hereof, and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 hereof, and (ii) if a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Commonwealth shall calculate the Rum Tax CVI Annual Payment Amount, if any, as provided in Section 5.06 hereof. In each case, the Commonwealth shall calculate the amount by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Amount Payment Date on a schedule in substantially the form of Attachment 7 hereto. The Commonwealth shall also provide on such schedule calculations as to the revised amounts of the applicable Remaining Clawback CVI Lifetime Cap and the Remaining GO CVI Lifetime Cap, by Series, Subseries and Sub-Subseries, taking into consideration the amounts to be applied on the CVIs Annual Payment Amount Payment Date. The Commonwealth shall provide notice of the amounts so calculated to the [Independent Consultant] [Calculation Agent] retained to verify such calculations within [two] Business Days of the CVIs Annual Payment Amount Calculation Date. The Commonwealth shall also provide to such [Independent Consultant] [Calculation Agent] such other information as shall be reasonably requested by the [Independent Consultant] [Calculation Agent] to allow the [Independent Consultant] [Calculation Agent] to verify such calculations on or prior to the CVIs Annual Payment Amount Verification Date.

(c)    By no later than each CVIs Annual Payment Amount Verification Date following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, [Independent Consultant] [Calculation Agent] shall review the calculations made by the Commonwealth. The [Independent Consultant] [Calculation Agent] shall either verify the calculations made by the Commonwealth or work with the Commonwealth to agree upon the calculations to be verified. In each case, the Commonwealth shall calculate, and shall have verified by [Independent Consultant] [Calculation Agent], the amount by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Amount Payment Date, and such other information described in Section 5.03(b), as set forth on a schedule in substantially the form of Attachment 7 hereto. [Calculation Agent Agreement to provide mechanism for determining calculations relating to the foregoing and the challenge process, together with remedies, prior to final verification.] Upon such verification, the Commonwealth shall provide notice to the Trustee of the amounts described in the preceding sentence, within five Business Days of such verification. The Trustee shall provide written notice to the Holders of the Notes of the amounts calculated by the Commonwealth and verified by the Independent Consultant within three Business Days of its receipt from the Commonwealth of the notice set forth in the preceding sentence. [Scope of information and availability to Holders to be addressed in Calculation Agent Agreement.]

(d)    To the extent that an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred, the Commonwealth shall transfer to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date, subject to the CVIs Maximum Payment Amounts, an amount equal to the sum of the Subject to Waterfall Outperformance Amount, the Not Subject to Waterfall Outperformance Amount, if any,

and the Rum Tax CVI Annual Payment Amount, if any, together with written directions on the amounts, if any, that are to be deposited into each Subaccount of the Subject to Waterfall CVIs Payment Account (in an amount equal to the Subject to Waterfall CVIs Payment Account Deposit), the Not Subject to Waterfall CVIs Payment Account (in an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit) and the PRIFA Rum Tax Clawback CVIs Payment Account (in an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit). Upon receipt by the Trustee from the Commonwealth of the amounts described in the preceding sentence, (i) an amount equal to the Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Subject to Waterfall CVIs Payment Account and portions thereof shall be deposited into the Subaccounts therein as hereinafter provided, (ii) an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Not Subject to Waterfall CVIs Payment Account, and (iii) an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account. The moneys deposited into the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Payment Account shall be held by the Trustee uninvested until the payment to the respective Holders. Contemporaneously with such deposits, the Commonwealth shall transfer to the Trustee an additional amount equal to the Trustee and Independent Consultant Expenses Funding Amount for deposit into the Trustee and Independent Consultant Expenses Fund. The moneys deposited into the Trustee and Independent Consultant Expenses Fund may be invested as provided in Article VI hereof.

(e)     No payments (other than from the PRIFA Rum Tax Clawback CVIs Payment Account if a Rum Tax Outperformance Condition has occurred) shall be made to the Holders of the Notes in Fiscal Years following Fiscal Years in which an SUT Outperformance Condition has not occurred.

(f)     No payments shall be made to the Holders of the GO CVIs in excess of the GO CVI Annual Payment Amount or the GO CVI Lifetime Cap, as applicable.

(g)     No payments shall be made to the Holders of the Clawback CVIs in excess of the Clawback CVI Annual Payment Amount or the Clawback CVI Lifetime Cap, as applicable.

(h)     No payments shall be made to the Holders of the PRIFA Rum Tax Clawback CVIs from the Rum Tax CVI Annual Payment Amount in excess of the amount calculated in accordance with Section 5.06(a) hereof or the PRIFA Rum Tax Clawback CVIs Lifetime Cap.

(i)     [The Trustee shall provide for the timely posting of the following final notices and verified information on EMMA[5]:

(A)     notices of the occurrence of an SUT Outperformance Condition and a Rum Tax Outperformance Condition as provided in Section 5.03(a) hereof; and

_____

[5] Subject to review to ensure that all information is made publicly available and not to limited group of investors.

(B)    the verified information as provided in Section 5.03(c) hereof, including a copy of the final Attachment 7 relating thereto.]

**Section 5.04   Subject to Waterfall Outperformance Amount and Annual Waterfall Payment.**

(a)    The Subject to Waterfall Outperformance Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022 (with such calculation identifying any Subject to Waterfall Outperformance Amount associated with the Fiscal Year ending June 30, 2022), following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; provided, however, for the avoidance of doubt, the Subject to Waterfall Outperformance Amount is subject to the aggregate GO CVI Maximum Annual Payment and the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)    fifty percent (50%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to (A) the Holders of the GO CVIs and (B) the Holders of Clawback CVIs from Subject to Waterfall Outperformance Amounts; and

(ii)    seventy-five percent (75%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred.

(b)    For purposes of calculating the Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)    the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount, less the Trustee and Independent Consultant Expenses Funding Amount, is the "annual Outperformance" referred to in Section 5.04(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.04(a)(i) above as described in Section 5.04(b)(ii) below, as well as the 75% of "annual Outperformance" amount for purposes of Section 5.04(a)(ii) above;

(ii)    the "annual Outperformance" amount calculated in accordance with Section 5.04(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance" referred to in Section 5.04(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

4820-1003-9275.14

(iii)     the Commonwealth will then calculate the lesser of 50% of the "cumulative Outperformance" amount and 75% of the "annual Outperformance" amount;

(iv)     the GO CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the GO CVI Carryforward Balance and $200,000,000 and (B) $400,000,000;

(v)     until the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the Clawback CVI Carryforward Balance and $175,000,000 and (B) $350,000,000; and

(vi)     beginning in the Fiscal Year after the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance and $375,000,000 and (ii) $750,000,000.

(c)     For purposes of subsection (b) above,

(i)     the "GO CVI Carryforward Balance" shall be calculated as follows:

(A)     for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)     for each Fiscal Year thereafter, the Annual GO CVI Carryforward Amount shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $200,000,000 and (B) CVI payments (if any) made to the Holders of the GO CVIs in the prior Fiscal Year.  The Annual GO CVI Carryforward Amount from the current Fiscal Year shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance from the prior Fiscal Year; and

(C)     to the extent there is a positive GO CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2043, the Commonwealth will not owe any further amount to the Holders of the GO CVIs.

(ii)     the "Clawback CVI Carryforward Balance" shall be calculated as follows:

(A)     for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)     for each year thereafter during the period described in Section 5.04(b)(vi), the Annual Clawback CVI Carryforward Balance shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $175,000,000 and (B) aggregate CVI payments made to the Holders of Clawback CVIs (if any) in the prior Fiscal Year.  The Annual Clawback CVI Carryforward Amount from the

current Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year;

(C)      for each year during the period described in Section 5.04(b)(v), the Annual Clawback CVI Carryforward Amount shall be calculated as the difference between (which for the avoidance of doubt, may be a positive or negative number) (y) $375,000,000 and (z) aggregate CVI payments made (if any) to the Holders of Clawback CVIs in the prior Fiscal Year. The Annual Clawback CVI Carryforward Amount from the current Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year; and

(D)      to the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2051, the Commonwealth will not owe any further amount to the Holders of the Clawback CVIs.

Illustrative scenarios of the calculation of the Subject to Waterfall Outperformance Amount are set forth in Attachment 8.

(d)      For purposes of Section 5.04(a)(i), for the avoidance of doubt, amounts paid to the Holders of the Clawback CVIs will first be allocated to Subject to Waterfall Clawback CVIs (from Subject to Waterfall Payments) for purposes of calculation of payments previously made.

(e)      Until the GO CVIs Final Maturity Date, the Subject to Waterfall Outperformance Amount shall be distributed as follows as the Annual Waterfall Payment:

(i)      the first $100,000,000 shall be paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto;

(ii)      the next $11,111,111 shall be paid to the holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto; and

(iii)      thereafter, any remaining available moneys in the Annual Waterfall Payment shall be shared with ninety percent (90%) being paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto, and the remaining ten percent (10%) being paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

(f)      Beginning in the Fiscal Year following the GO CVIs Final Maturity Date, subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, the Subject to Waterfall Outperformance Amount shall be distributed one hundred percent (100%) to the Holders of the Clawback CVIs until the Clawback CVIs Final Maturity Date.

**Section 5.05    Not Subject to Waterfall Outperformance Amount.**

(a)    The Not Subject to Waterfall Outperformance Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; ***provided***, ***however***, for the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount is subject to the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)    forty percent (40%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of Clawback CVIs from the Not Subject to Waterfall Outperformance Amounts; and

(ii)    ninety-five percent (95%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred, less payments previously made to (A) the Holders of GO CVIs and (B) the Holders of Clawback CVIs from the Subject to Waterfall Outperformance Amounts for the corresponding Fiscal Year.

(b)    For purposes of calculating the Not Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)    the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount, less the Trustee and Independent Consultant Expenses Funding Amount, is the "annual Outperformance" referred to in Section 5.05(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.05(a)(i) above as described in Section 5.05(b)(ii) below, as well as the 95% of "annual Outperformance" amount for purposes of Section 5.05(a)(ii) above;

(ii)    the "annual Outperformance" amount calculated in accordance with Section 5.05(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance" referred to in Section 5.05(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)    the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount and 95% of the "annual Outperformance" amount; and

(iv)     the Clawback CVI Maximum Annual Payment shall be calculated in the same manner as in Section 5.04(b)(v) and (vi) hereof.

(c)     For purposes of subsection (b) above, the Clawback CVI Carryforward Balance shall be calculated in the same manner as Section 5.04(c)(ii).

(d)     For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted.

(e)     Subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, one hundred percent (100%) of the Not Subject to Waterfall Outperformance Amount shall be paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

Illustrative scenarios of the calculation of the Not Subject to Waterfall Outperformance Amount are set forth in Attachment 9.

**Section 5.06     Rum Tax CVI Annual Payment Amount.**

(a)     The Rum Tax CVI Annual Payment Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of a Rum Tax Outperformance Condition and shall be equal to the lesser of the following:

(i)     forty percent (40%) of cumulative Outperformance of the Waterfall General Fund Rum Tax Collections relative to the Rum Tax Outperformance Metric (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of the PRIFA Rum Tax Clawback CVIs on account of previous Rum Tax CVI Annual Payment Amounts;

(ii)     fifty percent (50%) of annual Outperformance of the Waterfall General Fund Rum Tax Collections above the Rum Tax Outperformance Metric, measured at the conclusion of each Fiscal Year; and

(iii)     $30 million.

(b)     For purposes of calculating the Rum Tax CVI Annual Payment Amount in accordance with subsection (a) above,

(i)     the Commonwealth shall first calculate the amount by which the actual Waterfall General Fund Rum Collections in the prior Fiscal Year exceeded the Rum Tax Outperformance Metric for such Fiscal Year as set forth in the then applicable Attachment 2, which amount is the "annual Outperformance" referred to in Section 5.06(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.06(a)(i) above as described in Section

41

5.06(b)(ii) below, as well as the 50% of "annual Outperformance" amount for purposes of Section 5.06(a)(ii) above;

(ii)     the "annual Outperformance" amount calculated in accordance with Section 5.06(b)(i) above is added to (if a positive number during a Fiscal Year in which a Rum Tax Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which a Rum Tax Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance"  referred to in Section 5.06(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations; and

(iii)     the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount, 50% of the "annual Outperformance" amount, and $30,000,000.

Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount are set forth in Attachment 10.

**Section 5.07     HTA Clawback CVI Priority Distribution Waterfall.**

Subject only to a Final Order, including with respect to the GDB Loan Priority Determination, to the contrary and notwithstanding any other provision of this Trust Agreement:

(a)     All moneys to be applied by the Trustee under this Trust Agreement on account of the HTA Clawback CVI shall be applied as follows:

(i)     First, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 68 Bond Claims, up to $179,462,539, until such amount has been paid in full;

(ii)     Second, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Senior Bond Claims, up to $1,833,405,578, until such amount has been paid in full;

(iii)     Third, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Sub Bond Claims, up to $207,294,178, until such amount has been paid in full;

(iv)     Fourth, following payment of the amounts above in full, to the Sub-Subseries related to the GDB HTA Loans up to $1,477,506,700.

(b)     No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries in the above waterfall have been paid in full.

(c)     Pending entry of a Final Order with respect to the GDB Loan Priority Determination: (i) all monies to be applied by the Trustee under this Trust Agreement in payment

or satisfaction of all amounts due and unpaid to the Sub-Subseries of HTA Clawback CVI related to the HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims, shall be subject to the HTA Clawback CVI Payment Reserve; and (ii) the HTA Clawback CVI otherwise allocable to Holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to the Holders of the GDB HTA Loans.

Upon an order with respect to the GDB Loan Priority Determination becoming a Final Order, funds in the HTA Clawback CVI Payment Reserve and any undistributed HTA Clawback CVI shall be released to Holders of the Sub-Subseries of HTA Clawback CVI related to the HTA 98 Bonds or GDB HTA Loans, as the case may be, based upon (i) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of the GDB Loan Priority Determination, and (ii) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, according to the priorities set forth in this Section 5.07.

**Section 5.08   CVIs Payment Fund.**

(a)     In connection with the preparation of Attachment 7 on any CVIs Annual Payment Amount Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall calculate the amount to be deposited into each Subaccount in the Subject to Waterfall CVIs Payment Account that are payable to (i) the Holders of the GO CVIs, (ii) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, and (iii) the Holders of the PRIFA Rum Tax Clawback CVIs. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, and (ii) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account. Moneys deposited into the Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Notes entitled to payment therefrom on the CVIs Annual Payment Amount Payment Date as provided in Section 5.04(e) and (f) hereof and Attachments 2 and 3 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (iii) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(b)     In connection with the preparation of Attachment 7 on any CVIs Annual Payment Amount Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall calculate the Not Subject to Waterfall Outperformance Amount to be distributed pursuant to the provisions of Section 5.05 hereof. The Commonwealth shall then calculate the amounts from the Not Subject to Waterfall Outperformance Amount that are payable to (i) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, and (ii) the Holders of the PRIFA Rum Tax Clawback CVIs. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the Not Subject to Waterfall CVIs Payment Account. Moneys deposited into

43

the Not Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Clawback CVIs (other than the Holders of the PRIFA Rum Tax Clawback CVIs) on the CVIs Annual Payment Amount Payment Date as provided in Section 5.05 and Attachment 4 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes.  Subject to the CVIs Maximum Payment Amounts, the amount calculated in (ii) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(c)     Amounts calculated in accordance with Section 5.08(a)(iii) and Section 5.08(b)(ii) shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account when received by the Trustee.  To the extent a Rum Tax Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall transfer, subject to the PRIFA Rum Tax Clawback CVIs Lifetime Cap, an amount equal to the Rum Tax CVI Annual Payment Amount, if any, to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.  Moneys deposited into the PRIFA Rum Tax Clawback CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of PRIFA Rum Tax Clawback CVIs on the CVIs Annual Payment Amount Payment Date.

(d)     No later than one Business Day before any extraordinary redemption date noticed by the Commonwealth in accordance with Sections 4.02 or 4.03 hereof, the Commonwealth shall transfer to the Trustee an amount necessary to provide for the payment of the Redemption Price of the Notes being redeemed for deposit into the Extraordinary Redemption Payment Account.  Moneys deposited in connection with the extraordinary redemption of GO CVIs shall be deposited into the GO CVIs Subaccount.  Moneys deposited in connection with the extraordinary redemption of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs shall be deposited into the Clawback CVIs Subaccount.  Moneys deposited in connection with the extraordinary redemption of PRIFA Rum Tax Clawback CVIs shall be deposited into the of PRIFA Rum Tax Clawback CVIs Subaccount.  Moneys deposited into the Extraordinary Redemption Payment Account shall be held uninvested by the Trustee and distributed from the appropriate Subaccount to the Holders of the Notes being redeemed as directed in writing by an Authorized Officer of the Commonwealth.

**Section 5.09   Trustee and Independent Consultant Expenses Fund.**

(a)     The Trustee and Independent Consultant Expenses Fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee.  Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.03(d) hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses, in each case upon written requisition signed by an Authorized Officer of the Commonwealth.

(b)     In the event at any time the amounts on deposit in the Trustee and Independent Consultant Expenses Fund are insufficient to pay the amounts due to the Trustee and the Independent Consultants in accordance with their agreements with the Commonwealth, the

4820-1003-9275.14

Commonwealth will make provisions for such payment with the Trustee and such Independent Consultants.  Nothing in this Trust Agreement shall be construed as requiring that amounts payable to the Trustee and such Independent Consultants be paid solely from the amounts on deposit in the Trustee and Independent Consultant Expenses Fund, such Fund provides an alternative mechanism for such payments.

## ARTICLE VI.

## INVESTMENT OF FUNDS

**Section 6.01   Investment of Funds**.

(a)     Moneys in the CVIs Payment Fund and the accounts therein shall be held uninvested by the Trustee.  The Trustee shall have no obligation for the payment of interest on moneys held by it in the CVIs Payment Fund and the accounts therein.

(b)     Subject to the limitations set forth in this paragraph, moneys held in the Trustee and Independent Consultant Expenses Fund shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the written direction of an Authorized Officer of the Commonwealth.   The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments.  Ratings of permitted investments shall be determined at the time of purchase of such permitted investments.   The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)     Obligations purchased or other investments made as an investment of money in the Trustee and Independent Consultant Expenses Fund held under the provisions hereof shall be deemed at all times to be a part of such fund and the income or interest earned, profits realized or losses suffered by the Trustee and Independent Consultant Expenses Fund due to the investment thereof shall be credited or charged, as the case may be, to the Trustee and Independent Consultant Expenses Fund.

(d)     In computing the amount in the Trustee and Independent Consultant Expenses Fund under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)     Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.   Except as otherwise provided herein, such investments shall be sold by the Commonwealth or by the Trustee at the written direction of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the Trustee and Independent Consultant Expenses Fund.  The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the details of all

45

investments held for the credit of the Trustee and Independent Consultant Expenses Fund as of the end of the preceding month.  The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month. The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in the Trustee and Independent Consultant Expenses Fund in the previous month.

(f)     Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.02   Liability for Investments.**   Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Notes as follows:

**Section 7.01   Payment of Notes.**   Subject to the limitations herein, including the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition and the CVIs Maximum Payment Amounts, the Commonwealth shall pay or cause to be paid every Note, on the dates and at the places and in the manner provided herein and in the Notes according to the true intent and meaning thereof.

**Section 7.02   Pledge of Good Faith, Credit and Taxing Power of Commonwealth**. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notes as and when due in accordance with this Trust Agreement.  The Notes constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution.  The Secretary of Treasury is authorized and directed to pay the Notes as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required.  Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Notes in the amounts and at the times required by Section 5.03(b) hereof.  For the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03   Powers as to Notes.**   Pursuant to the CVI Legislation, the Plan and the Confirmation Order, the Commonwealth is duly authorized to execute and deliver the Notes and to execute the Trust Agreement.  The Commonwealth further represents that all corporate action

46

on the part of the Commonwealth to that end has been duly and validly taken.  Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Notes and the provisions hereof are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof.  The Commonwealth further represents that its good faith, credit and taxing power pledge in support of the Notes is a valid, binding and legally enforceable pledge of the Commonwealth.   The Commonwealth further covenants that it shall not fail at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the lien created by Section 5.01 and all of the rights of the Trustee for the benefit of the Holders of Notes under the Trust Agreement against all claims and demands of all Persons whomsoever.

Section 7.04   **Further Assurance.**  The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the pledge and lien provided for herein, or which the Commonwealth may hereafter become bound to pledge or assign.

Section 7.05   **Offices for Payment and Registration of Notes.**  Unless all of the Notes are Book Entry Notes, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Notes may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee. The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Notes authorized thereby or referred to herein may be presented for payment.  The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Notes may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Notes.  The provisions of this Section shall be subject to the provisions of Section 3.10 hereof.

Section 7.06   **General**.  The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the Effective Date, all conditions, acts and things required by the Plan and the statutes of the Commonwealth, including the Act, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Notes, shall exist, have happened and have been performed.

Section 7.07   **Non-Impairment Covenant**.  The Commonwealth, for the benefit of all initial and subsequent Holders of the Notes, covenants and agrees that, until all obligations with respect to this Trust Agreement and the Notes have been paid or otherwise satisfied in accordance with their respective terms, the Commonwealth will not:

(a)      take any action that would impair the rights and remedies of the Holders of the Notes;

(b)     limit or restrict the rights or powers of the appropriate officers of the Commonwealth to fulfill the terms of any agreements made with respect to the Notes; or

(c)     impair the ability of the Holders of the Notes to track performance of the Measured SUT and the Waterfall General Fund Rum Tax Collections;

*provided*, *however*, the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with this Trust Agreement, which shall protect Holders of the Notes from such elimination or replacement reducing the likelihood that an SUT Outperformance Condition will occur; and, *provided*, *further*, that the Commonwealth shall provide for the timely posting with EMMA by the Commonwealth of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction.

### Section 7.08     [Baseline SUT Reduction and SUT True-Up.]

(a)     [The 5.5% SUT Baseline set forth in Attachment 1 hereto reflects the statutory and administrative provisions of the law governing the imposition and collection of the 5.5% SUT as of the Effective Date.  No adjustments to the 5.5% SUT Baseline shall be made for exemptions or holidays that are included in the Puerto Rico Internal Revenue Code (Sections 4030.01 through 4030.27 thereof) as of the Effective Date.

(b)     In the event that subsequent to the Effective Date, exemptions or holidays are created during a U.S. Presidential Declaration of Disaster for a period not to exceed thirty (30) days and only for emergency-related categories of spend, the 5.5% SUT Baseline shall be reduced by an amount equal to the estimated impact on collections of the 5.5% SUT resulting from any such exemptions or holidays (the "Baseline SUT Reduction").  The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the Baseline SUT Reduction.

(c)     In the event that subsequent to the Effective Date, any other exemptions or holidays of any kind are implemented with respect to the 5.5% SUT (including any exemptions or holidays created during a U.S. Presidential Declaration of Disaster for a period exceeding thirty (30) days or for categories of spend other than emergency-related categories of spend, the Measured SUT shall be increased by an amounts equal to the estimated impact on collections of the 5.5% SUT resulting from such exemptions or holidays ("SUT True-Up").  The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the SUT True-Up.

(d)     To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, the Commonwealth shall adjust the Measured SUT for each Fiscal Year to maintain the same amount of outperformance had the Measured SUT remained at 5.5% by multiplying (i) the projected Measured SUT generated at the lower rate by (ii) the fraction equal to 5.5% divided by the lower

rate. Such an adjustment shall be considered an SUT True-Up for purposes of this Section 7.08. The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the SUT True-Up due to such an adjustment.

(e) For the calculation of either the Baseline SUT Reduction or SUT True-Up, the calculation shall be determined by the Secretary of Treasury and verified by an Independent Consultant. Verification by an Independent Consultant shall be binding on both the Commonwealth and the Holders of the Notes. [discuss methodology for verification]

(f) Within ten Business Days of the verification by an Independent Consultant of the final calculation of any Baseline SUT Reduction or SUT True-Up, the Commonwealth shall post such calculations and supporting narrative with EMMA under all of the CUSIP numbers applicable to the Notes. ]

Section 7.09 [Substitute Measured Tax. ]

(a) [The Commonwealth may substitute a 5.5% SUT with a Substitute Measured Tax, subject to the satisfaction of the requirements set forth in this Section 7.09.

(b) The Substitute Measured Tax shall be all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

(c) _____ ]

Section 7.10 Tax Covenant.

(a) The Commonwealth will take all reasonable best efforts to provide that payments or redemptions made with respect to the Notes shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the Notes may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding, that may otherwise be applicable to such payments or redemptions.

(b) The Commonwealth will take all reasonable best efforts to cause the Notes to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities, to effectuate such tax-exemption.

Section 7.11 Comprehensive Cap on Net Tax Supported Indebtedness. For so long as any portion of the Notes shall remain outstanding, the Commonwealth shall maintain a Comprehensive Cap on all net tax supported debt for purposes of the limitation on the issuance of additional net tax supported debt set forth in Article VI of the Debt Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues (as defined in the Plan) as and when measured in accordance with the Debt Responsibility Act, including a

49

secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues (as defined in the Plan) required to pay the maximum annual debt service on the COFINA Bonds (as defined in the Plan) outstanding as of the Effective Date.  Subject in all respects to the terms of the Plan, debt service payments on Series 2021A-1 Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or PRIFA (as defined in the Plan), in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap.  In connection with the issuance of Net Tax Supported Indebtedness, the Secretary of Treasury shall certify that such Net Tax Supported Indebtedness is being issued in compliance with the Comprehensive Cap.  Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Notes issued under this Trust Agreement, and the validity of such Net Tax Support Indebtedness shall not be subject to legal challenge.  In calculating Debt Policy Revenues for purposes of this Section 7.11 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

Section 7.12   **Rum Tax Reporting**.   [reporting obligations and audit rights to be developed]

Section 7.13   **Creation of Liens**.  The Commonwealth shall not create or cause to be created any lien or charge on the Trust Estate, other than as provided in Section 5.01 hereof.

Section 7.14   **Fiscal Plan.**  Any Fiscal Plan certified after the Effective Date will include provisions for the payment in each Fiscal Year of, to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition is satisfied in the prior Fiscal Year, any amounts due and owing on the CVIs in accordance with the terms hereof; provided, however, that nothing in the Fiscal Plan shall be deemed to be a determination that an SUT Outperformance Condition or a Rum Tax Outperformance Condition has occurred with respect to any such Fiscal Year or shall create an obligation of the Commonwealth to make any payments with respect thereto, it being the intention of this Trust Agreement that such determinations and related obligations shall be governed by the provisions of Article V hereof.

Section 7.15   **Continuing Disclosure**.  The Commonwealth covenants that, in connection with the sale, delivery or marketing of the Notes, it will enter into a continuing disclosure agreement in substantially the form attached hereto as Attachment 11 hereto. [NTD:  scope of continuing disclosure to be discussed, and to include notification by the Commonwealth to the Trustee of any continuing default under this Trust Agreement].  An event of default under such continuing disclosure agreement, including the failure to timely provide the notices or information described therein shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the continuing disclosure agreement.

# ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee.**  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents.**  In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Notes of any Series, Subseries or Sub-Subseries so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent.  Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents.**  The recitals of fact contained herein and in the Notes shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof or of any Notes, or in respect of the security afforded hereby, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to the application of any money paid to or by the Commonwealth or others in accordance herewith except as to the application of any money paid to it in its capacity as Trustee or Paying Agent.  Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee.  If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   Property Held in Trust.**  All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof.

**Section 8.05   Rights of the Trustee and the Paying Agent.**  The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties.  The Trustee and any

51

Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Commonwealth, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof upon the faith thereof, but in its reasonable discretion the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence.  Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Notes relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Notes, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Notes.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Notes or Majority in Interest of Outstanding Notes, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("Instructions"); *provided*, *however*, that the Commonwealth shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a person is to be added or deleted from the listing.  If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling.  The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer.  The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth.  Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to negligence or willful misconduct of the Trustee.  The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06   Compensation and Indemnification.**  Unless otherwise provided, there shall be paid from the Trustee and Independent Consultant Expenses Fund to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder, and also all reasonable, necessary and documented expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder.  The Commonwealth agrees to pay the foregoing, other than expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, including, without limitation, the enforcement of remedies under Article XI hereof, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim.  None of the provisions contained herein shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is

53

reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts.**   The Trustee may become the owner of or may deal in Notes as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Notes or to effect or aid in any reorganization growing out of the enforcement hereof or of the Notes whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Notes in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08   Resignation of Trustee.**   The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Notes by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books. Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; ***provided, however,*** that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09   Removal of Trustee.**   The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon 30 day's written notice by the Holders of a Quarter in Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth.   The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Notes.   No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.   A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof,

54

shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10   Successor Trustee and/or Paying Agent.**  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; *provided*, *nevertheless*, that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Notes, at their last addresses appearing on the registry books. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor.  Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee.**  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally appointed as Trustee.  However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of

55

conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein. Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth.

**Section 8.12   Merger or Consolidation of the Trustee.**   Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, **provided** such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance.  In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

**Section 8.13   Ancillary Agreements**.  The Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements.

## ARTICLE IX.

## AMENDMENTS TO TRUST AGREEMENT

**Section 9.01   Modification and Amendment without Consent.**   Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)      To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Notes, **provided** such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements, in the CVI Legislation or in the Act; **provided** that such additional covenants and agreements shall be for the equal benefit and security of all Notes, without discrimination or preference;

(b)      [To provide for revisions based upon a Baseline SUT Reduction, SUT True-Up or Substitute Measured Tax as permitted by Sections 7.08 and 7.09 hereof];

(c)      To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements, the Plan, the Confirmation Order, the CVI

Legislation or in the Act; provided that same shall be for the equal benefit and security of all Notes, without discrimination or preference;

(d)    To confirm, as further assurance, the lien, and the subjection to the lien, of the Commonwealth's right title and interest in the Trust Estate, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Notes, without discrimination or preference; and

(e)    With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the last paragraph of this Section 9.01, adversely affect the interests of the Holders in any respect.

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement is authorized pursuant to this Section 9.01 and will not materially adversely affect the rights of the Holders of the Notes in any materially adverse respect.

For the avoidance of doubt, no Supplemental Indenture shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 hereof with the consent of each affected Holder.

**Section 9.02   Supplemental Trust Agreements Effective with Consent of Holders.** The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Holders and the rights of the Secretary of Treasury in accordance with and subject to the provisions of Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

**Section 9.03   General Provisions Relating to Supplemental Trust Agreements.** The Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX or Article X hereof.  A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms.  The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Commonwealth, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective,

shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and EMMA under the CUSIPs for the Outstanding Notes.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF HOLDERS

### Section 10.01  Powers of Amendment.

(a)     Except as provided in Section 9.01 hereof, any modification or amendment hereof or of the rights and obligations of the Commonwealth and of the Holders of the Notes hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Notes Outstanding at the time such consent is given, or (ii) in case less than all of the several Series, Subseries or Sub-Subseries of Notes then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Notes of each Series, Subseries or Sub-Subseries so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Notes of any specified like Series or Subseries and tenor remain Outstanding, the consent of the Holders of such Notes shall not be required and such Notes shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Notes under this Section.

(b)     No such modification or amendment shall, without the prior written consent of the Holder of such Note, permit a change in the provisions related to the timing or amount of any payment on the Notes, including, without limitation, any change in the currency to be used to pay the Notes, any change in the amount or date of any payment, the terms of redemption of any Outstanding Note or a reduction in the notional amount thereof.  Further, no such modification or amendment shall, without the prior written consent of the Holder of such Note, reduce the percentages or otherwise affect the classes of Notes the consent of the Holders of which is required to effect any such modification or amendment.  Further, no waiver of any default or compliance with any provision of this Section 10.01 shall be granted without the prior written consent of the Holder of such Note.

(c)     For the purposes of this Section 10.01, a Series, Subseries or Sub-Subseries shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Notes of such Series, Subseries or Sub-Subseries in any respect or diminishes (or is likely to diminish) the recovery of or the amount likely to be paid on account of such Series, Subseries or Sub-Subseries in any respect.  [The Trustee shall obtain an opinion of Transaction Counsel as to whether the Notes of any particular Series, Subseries or Sub-Subseries would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth, the Trustee and all Holders of Notes.]

### Section 10.02  Consent of Holders.  The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section.  Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized

Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Notes.  A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Notes of any Series, Subseries or Sub-Subseries affected by such modification or amendment for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Notes.  Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Notes specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided.  For purposes of calculating the required percentage of Notes consenting to a modification or amendment, any such consent shall be binding upon the Holder of the Notes of such Series, Subseries or Sub-Subseries affected giving such consent and on any subsequent Holder of such Notes (whether or not such subsequent Holder has notice thereof).  At any time after the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries affected shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries and will be effective as provided in this Section, shall be given to the Holders by mailing such notice to Holders or by Electronic Means.  The Commonwealth shall file with the Trustee proof of giving such notice.  Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Notes of such Series, Subseries or Sub-Subseries affected at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; ***provided, however***, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient.

**Section 10.03  Modifications by Unanimous Consent.**  The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Notes may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Notes then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04  Mailing**.  Any provision in this Article X for the mailing of a notice or other document to Holders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Notes then Outstanding at such Person's address, if any, appearing upon the registry books of the Commonwealth, and (b) to the Trustee.

**Section 10.05  Exclusion of Notes.**  Notes owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall

59

not be entitled with respect to such Notes to give any consent or take any other action provided for herein.  At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of the Commonwealth, upon which the Trustee may rely, describing all Notes so to be excluded.

**Section 10.06 Notation on Notes.**  Notes delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Note Outstanding at such effective date and upon presentation of his Note for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Note by the Trustee as to any such action.  If the Commonwealth or the Trustee shall so determine, new Notes so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Note then Outstanding shall be exchanged, without cost to such Holder, for Notes of the same Series or Subseries then Outstanding, upon surrender of such Notes.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default.**  An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)     Following the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, the Commonwealth shall fail to pay to the Holders of the Notes the amounts due and payable hereunder by the CVIs Annual Amount Payment Date or any applicable extraordinary redemption date; or

(b)     The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Notes on the part of the Commonwealth to be performed, other than the provisions of Section 7.15 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which the Event of Default relates, unless, if such default is capable of being cured but is not capable of being cured within forty-five (45) days, the Commonwealth has commenced to cure such default within forty-five (45)  days and does cure such default within ninety (90) days of the date the default initially occurred; or

(c)     the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Notes or the security provided for in this Trust Agreement to be impaired, and such impairment affects the enforceability of or payments on the Notes, or any Person to be released from any covenants or obligations with respect to the Notes.

**Section 11.02 No Acceleration with Respect to the Notes.**  There shall be no right of acceleration with respect to the Notes.

**Section 11.03 Enforcement of Remedies.**

(a)      If an Event of Default occurs under Section 11.01(a) and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (recursos disponibles) of the Commonwealth resources to the payment of the Notes, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(b)      If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates shall, seek any other remedies that are available under applicable law or in equity to any other holder of a Commonwealth bond to which its good faith, credit and taxing power are pledged.  If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes  to which such Event of Default relates shall, seek specific performance of any relevant provisions of this Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(c)      Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

**Section 11.04 Priority of Payments after Default.**  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder shall not be sufficient to pay the amounts on the Notes as the same become due and payable, the money held by the Trustee hereunder together with any money then available or thereafter becoming available to pay the Notes, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows:

First:  To the payment of amounts due to the Trustee and Paying Agents under Section 8.06;

Second:

(i)      from amounts collected from the exercise of remedies relating to an Event of Default relating to Subject to Waterfall Outperformance Amounts, to the payment to the Holders of the GO CVIs and the Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been

61

distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Subject to Waterfall Outperformance Amount occurred;

(ii)     from amounts collected from the exercise of remedies relating to an Event of Default relating to Not Subject to Waterfall Outperformance Amounts, to the payment to the Holders of Not Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Not Subject to Waterfall Outperformance Amount occurred; and

(iii)    from amounts collected from the exercise of remedies relating to an Event of Default relating to the Rum Tax CVI Annual Payment Amount, to the payment to the Holders of the PRIFA Rum Tax Clawback CVIs to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Rum Tax CVI Annual Payment Amount occurred.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Notes or to any other Person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date upon which such application is to be made.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Notes are Outstanding and unpaid shall be paid to the Commonwealth.

**Section 11.05 Termination of Proceedings.**  In case any Proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such Proceeding had been commenced in the case of discontinuance of abandonment or the provisions of this Trust Agreement shall be modified in accordance with any determination by the entity making such determination if the Proceedings were determined adversely to the Trustee.

**Section 11.06 Holders' Direction of Proceedings.**   Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall have the right by an instrument in writing executed and delivered to the

Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder with respect to such Event of Default, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy related to such Event of Default available pursuant to Section 11.03, **_provided_**, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Holders not parties to such direction.  Notwithstanding the foregoing, (a) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Not Subject to Waterfall Outperformance Amount, including the calculation or application thereof, only the Holders of the Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding, and (b) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Rum Tax CVI Annual Payment Amount, including the calculation or application thereof, only the Holders of the PRIFA Rum Tax Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding.

**Section 11.07  Control by Holders of Notes; Limitations**.  No Holder of any of the Notes shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued.  Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Notes secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all Proceedings shall be instituted and maintained for the benefit of all Holders of the Outstanding Notes.  Notwithstanding any other provision hereof, the Holder of any Note shall have the right which is absolute and unconditional to receive payment of the amounts due on such Note expressed in such Note (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder, and the Holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution and in the Plan, the Confirmation Order and the CVI Legislation.

**Section 11.08  Actions by Trustee; Possession of Notes by Trustee Not Required.**  All rights of action hereunder or under any of the Notes secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Notes or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Notes to which such action relates, subject to the provisions hereof.

**Section 11.09  Waiver and Non–Waiver of Default**.  No delay or omission of the Trustee or any Holder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein.  Every power and remedy given by this Article XI to the Trustee and the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall waive such default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; *provided, however,* the Trustee may not waive any default if it has received a direction from not less than a Quarter in Interest of the Outstanding Notes to which such default relates that such default may not be waived by the Trustee; *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10  Notice of Event of Default**.  The Trustee shall promptly give notice of each Event of Default hereunder known to the Trustee to AAFAF and the Commonwealth and to the Holders of Notes, unless such Event of Default shall have been remedied or cured before the giving of such notice; *provided, however*, that failure to provide notice to AAFAF and the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Holders.  In the case of the Holders of the Notes, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Notes, as the names and addresses of such Holders appear on the books for registration and transfer of Notes as kept by the Trustee.

**Section 11.11  Remedies Not Exclusive**.  No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## ARTICLE XII.

## DEFEASANCE

### Section 12.01  Discharge and Defeasance.

(a)  If the Commonwealth shall pay or cause to be paid to the Holder of a Note the Remaining Clawback CVI Lifetime Cap or the Remaining GO CVI Lifetime Cap, as applicable, then all rights granted hereby to such Note (including without limitation, the lien) shall be discharged and satisfied.  In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth.

(b)  Notes for the redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such redemption) at the redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed

4820-1003-9275.14

in paragraph (a) of this Section.  All Outstanding Notes of any Series or Subseries shall prior to the redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)      the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Notes; and

(ii)      there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay the Remaining Clawback CVI Lifetime Cap or Remaining GO CVI Lifetime Cap, as applicable, on the redemption date; and

(iii)      the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Note having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, and (B) such defeasance is in accordance with the terms hereof.

Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of said Notes; ***provided, however,*** that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due said Notes on such redemption date.

## ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY NOTE HOLDERS AND PROOF OF OWNERSHIP OF NOTES

**Section 13.01 Evidence of Signatures of Holders and Ownership of Notes.** Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Notes may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Notes in person or by his or their attorneys duly appointed in writing.  Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Notes, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Holder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank

or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the Person or Persons executing any such instrument on behalf of a corporate Holder may be established without further proof if such instrument is signed by a Person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Notes and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books.  Any request, consent or vote of the owner of any Note shall bind all future owners of such Note in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith.  The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

## ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01 Preservation and Inspection of Documents.**  All documents received by the Trustee from the Commonwealth or from Holders under the provisions hereof shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Commonwealth, any Holder and their agents and their representatives, any of whom may make copies thereof; ***provided, however,*** that with respect to inspection by a Holder a written request of such Holder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

**Section 14.02 Money and Funds Held for Particular Notes.**  The amounts held by the Trustee or any Paying Agent for the payment of particular Notes due on any particular date shall, pending such payment, be irrevocably set aside and held in trust by it for the Holders of such Notes entitled thereto, and for the payments on such Notes, with the amounts so set aside and validly and irrevocably held in trust for the Holders of such Notes, shall no longer be considered to be unpaid upon such payment.

**Section 14.03 Cancellation of Notes.**  The Trustee or any Paying Agent shall forthwith cancel all Notes which have been redeemed or paid, or upon the Clawback CVIs Final Maturity Date in the case of the Clawback CVIs and the GO CVIs Final Maturity Date in the case of the GO CVIs, and shall dispose of such Notes in accordance with its customary procedures.  No such Notes shall be deemed Outstanding Notes hereunder and no Notes shall be issued in lieu thereof.

**Section 14.04 No Recourse under Trust Agreement or on the Notes.**  All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no recourse shall be had for the payment of the Notes or for any claims based thereon, hereon against

66

any member, officer or employee of the Commonwealth or any Person executing the Notes, all such liability, if any, being expressly waived and released by every Holder of Notes by the acceptance of the Notes.

**Section 14.05  Severability of Invalid Provision.**  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of the Notes.

**Section 14.06  Parties of Interest.**  Nothing herein, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Paying Agents and the Holders any rights, remedies or claims hereunder or by reason hereof or any covenant, condition or stipulation thereof.  All covenants, stipulations, promises and agreements herein by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents and the Holders.

**Section 14.07  Notices.**  Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed:  in the case of the Commonwealth, _____, _____, San Juan, PR _____; and in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at _____, _____, _____ _____, attention: Corporate Trust; in the case of the Commonwealth or the Secretary of Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901, or, in each case, to such other individual and at such other address as the Person to be notified shall have specified by notice to the other Persons.  Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any Series or Subseries of Notes, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Notes of the Series or Subseries to the Commonwealth's dissemination agent for distribution through the EMMA system.  The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing.  The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph.  The sole remedy for failure of the Trustee to perform is specific performance.

**Section 14.08  Headings.**  Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.09  Governing Laws.**  This Trust Agreement and the Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly

4820-1003-9275.14

within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Notes; *provided*, *however*, that the authorization of this Trust Agreement and the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

**Section 14.10 Retention of Jurisdiction of Title III Court.**  The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan and the Confirmation Order, including, without limitation, with respect to the payment of the Notes and the enforcement of the remedies set forth herein to the fullest extent permitted by law. Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Notes (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.11 Signatures and Counterparts.**  This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

**Section 14.12 Successors and Assigns.**   Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 14.13 Conflicts**.  All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

**[Remainder of page intentionally left blank; signature page follows]**

**Attachment 1**

**5.5% SUT BASELINE**

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $1,282,901,069.30 |
| 2023 | 1,279,617,661.88 |
| 2024 | 1,301,220,703.34 |
| 2025 | 1,315,295,083.41 |
| 2026 | 1,345,037,783.09 |
| 2027 | 1,377,398,882.61 |
| 2028 | 1,403,141,426.98 |
| 2029 | 1,414,785,980.78 |
| 2030 | 1,427,393,695.32 |
| 2031 | 1,437,998,166.98 |
| 2032 | 1,447,406,781.79 |
| 2033 | 1,428,210,572.57 |
| 2034 | 1,426,102,595.91 |
| 2035 | 1,429,798,842.15 |
| 2036 | 1,438,540,327.00 |
| 2037 | 1,452,657.050.02 |
| 2038 | 1,477,755,111.63 |
| 2039 | 1,495,355,971.13 |
| 2040 | 1,518,089,898.19 |
| 2041 | 1,541,405,892.18 |
| 2042 | 1,565,457,864.38 |
| 2043 | 1,590,148,747.39 |
| 2044 | 1,616,252,365.93 |
| 2045 | 1,642,150,220.79 |
| 2046 | 1,668,748,988.64 |
| 2047 | 1,696,060,240.60 |
| 2048 | 1,724,082,302.73 |
| 2049 | 1,752,859,808.94 |
| 2050[§] | 1,781,536,796.27 |
| 2051[§] | 1,810,682,942.40 |

[§] May 2020 Fiscal Plan contains projections through FY2049.  FY2050 and FY2051 baseline calculated using FY 2049 projections and the average growth rate from FY2045-FY2049.

Attachment 1-1

**Attachment 2**

**PRIFA RUM TAX CVI OUTPERFORMANCE METRIC**

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $208,569,215.76 |
| 2023 | 200,354,469.05 |
| 2024 | 201,031,406.80 |
| 2025 | 201,692,902.40 |
| 2026 | 202,348,675.07 |
| 2027 | 202,998,555.87 |
| 2028 | 203,632,157.16 |
| 2029 | 204,259,404.03 |
| 2030 | 204,869,786.20 |
| 2031 | 205,473,363.12 |
| 2032 | 206,059,507.07 |
| 2033 | 206,627,882.49 |
| 2034 | 207,188,744.83 |
| 2035 | 207,731,302.94 |
| 2036 | 208,265,935.46 |
| 2037 | 208,781,748.91 |
| 2038 | 209,289,240.57 |
| 2039 | 209,788,269.00 |
| 2040 | 210,278,694.61 |
| 2041 | 210,749,432.35 |
| 2042 | 211,211,199.81 |
| 2043 | 211,674,906.69 |
| 2044 | 212,129,474.13 |
| 2045 | 212,574,772.82 |
| 2046 | 213,021,852.71 |
| 2047 | 213,459,499.22 |
| 2048 | 213,898,852.55 |
| 2049 | 214,339,919.35 |
| 2050 | 214,782,706.32 |
| 2051 | 215,227,220.15 |

Attachment 2-1

**Attachment 3**

**GO CVI Allocation Summary**

| Claim | GO CVI Allocation % |
|---|---|
| Vintage CW Bond Claim | 32.244 |
| 2011 CW Series D/E/PIB Bond Claim | 3.514 |
| 2011 CW Bond Claim | 2.479 |
| 2012 CW Bond Claim[6] | 15.157 |
| 2014 CW Bond Claim[7] | 20.266 |
| Vintage CW Guarantee Claim | 15.194 |
| 2011 CW Guarantee Bond Claim | 7.552 |
| 2012 CW Guarantee Bond Claim | 3.594 |

---

[6] 2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA Helicopter loan.

[7] 2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports Bonds.

Attachment 3-1

**Attachment 4**

**Clawback CVI Allocation Summary**

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[8] | 68.6 |
| payable in the following order of priority: | |
| First, HTA 68 Bond Claims up to $179,462,539; | |
| Second, HTA 98 Senior Bond Claims up to $1,833,405,578[9]; | |
| Third, HTA 98 Sub Bond Claims up to $207,294,178[7]; and | |
| Fourth, GDB HTA Loans up to $1,477,506,700. | |
| Allowed CW/Convention Center Claims | 4.0 |
| Allowed CW/PRIFA Rum Tax Claims | 27.0 |
| Allowed CW/MBA Claims | 0.4 |

---

[8] Capitalized terms have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement; the waterfall is implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination.

[9] To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI to be held in reserve in an amount equal to the difference of (a) the amount of cash that would be due to holders and insurers of the HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds minus (b) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.

Attachment 4-1

**Attachment 5**

**FORM OF GO CVI**
**(includes variations for different GO CVI Subseries)**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2021.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-___                                                                                          $3,500,000,000

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS, SUBJECT TO THE
OCCURRENCE OF CERTAIN CONDITIONS

Attachment 5-1

| Subseries[10] | GO CVI Allocation Percentage | CUSIP No. |
|---|---|---|
| Vintage CW Note Claims | 32.244% | |
| 2011 CW Series D/E/PIB Note Claim | 3.514 | |
| 2011 CW Note Claim | 2.479 | |
| 2012 CW Note Claim | 15.157 | |
| 2014 CW Note Claim | 20.266 | |
| Vintage CW Guarantee Claim | 15.194 | |
| 2011 CW Guarantee Note Claim | 7.552 | |
| 2012 CW Guarantee Note Claim | 3.594 | |

Registered Owner: Cede & Co.

Initial Notional Amount and GO CVI Lifetime Cap:  Three Billion Five Hundred Million Dollars

1.      All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of _____, 2021 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and _____, as Trustee and Paying Agent.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

2.      The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Amount Payment Dates (the [November 1] following a Fiscal Year in which an SUT Outperformance Condition has occurred), or earlier upon redemption as hereinafter referred to, up to the GO CVI Lifetime Cap specified above.

3.      The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the GO CVIs Final Maturity Date of an SUT Outperformance Condition, (b) the annual limitations hereinafter referred to, and (c) the GO CVI Lifetime Cap, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the corporate trust office of the Trustee and Paying Agent, in _____, _____ (the "Corporate Trust Office").  This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition on [November 1] of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition occurred (the "CVIs Annual Payment Amount Payment Date").  The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

---

[10] Note: the Holders of each Subseries shall receive a Note identifying only their respective Subseries and related GO CVI Allocation percentage.

4.      The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof.  The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.      This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $3,500,000,000, known as "Commonwealth of Puerto Rico GO CVIs", issued under the authority of and in full compliance with the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order").

6.      In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs".  This Note is a GO CVI.  The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement.  The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement.

7.      The Commonwealth will determine if an SUT Outperformance Condition has occurred on each CVIs Outperformance Condition Determination Date, which is [September 1] of each Fiscal Year, beginning [September 1], 2022.  An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement.  Once the amount of the excess is determined and verified by an Independent Consultant, such excess amount is used first to fund an account used to pay certain Trustee costs and expenses or reimburse the Commonwealth for advancing such Trustee and Independent Consultant costs and expenses, and then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.      These Notes are subject to mandatory redemption on each CVIs Annual Payment Amount Payment Date, subject to the limitations described in the Trust Agreement, in amounts equal to the GO CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all GO CVIs on such CVIs Annual Payment Amount Payment Date, but in no event in an amount that in the aggregate exceeds the GO CVI Lifetime Cap prior to the GO CVIs Final Maturity Date.

9.      The GO CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the GO CVIs have been paid in an amount equal to the GO CVI Lifetime Cap, and (b) (1) [September 1], 2043, if an SUT Outperformance Condition did not occur during the prior Fiscal Year, and (2) [November 1], 2043, if an SUT Outperformance Condition did occur during the prior Fiscal Year, whether or not the Holders of all GO CVIs have been paid in the aggregate an amount

Attachment 5-3

equal to the GO CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

10.     The GO CVIs are also subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVIs.

11.     Whenever Notes or portions thereof are to be redeemed in accordance with paragraph 10 hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed.  If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books.  The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

12.     The Trustee shall, if any of the Notes or portions thereof to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

13.     Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price.  If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series and Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

14.     If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

15.     The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof.  At the corporate trust office of the Trustee, in _____, _____, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

Attachment 5-4

16.     Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series and Subseries and tenor as the surrendered Note.

17.     The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

18.     This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

19.     It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank]*

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this Note to be executed with the facsimile signature of the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the ____ day of _____, 2021.

 [Facsimile signature] _____
Secretary of the Treasury of Puerto Rico

(SEAL)

Attest:

[Facsimile signature] _____
Secretary of State of Puerto Rico

Attachment 5-6

CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

_____, as Trustee

By:_____
        Authorized Officer

Date of authentication: _____

Attachment 5-7

FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ attorney to register the transfer of the within Note
on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____  Guaranteed by: _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

4820-1003-9275.14

**Attachment 6**

**FORM OF CLAWBACK CVI**
**(includes variations for different Clawback CVI Subseries and Sub-Subseries)**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2021.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-___                                                          $[_____][11]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS, SUBJECT TO THE
OCCURRENCE OF CERTAIN CONDITIONS

---

[11] To reflect Notional Amount for each Subseries and Sub-Subseries of the Clawback CVIs.

4820-1003-9275.14

| Subseries[12] | Clawback CVI Allocation Percentage | CUSIP No. |
|---|---|---|
| Allowed CW/HTA Claims[13] | 68.6% | |
| payable in the following order of priority: | | |
| First, HTA 68 Bond Claims up to $179,462,539; | | |
| Second, HTA 98 Senior Bond Claims up to $1,833,405,578[14]; | | |
| Third, HTA 98 Sub Bond Claims up to $207,294,178[10]; and | | |
| Fourth, GDB HTA Loans up to $1,477,506,700 | | |
| Allowed CW/Convention Center Claims | 4.0 | |
| Allowed CW/PRIFA Rum Tax Claims | 27.0 | |
| Allowed CW/MBA Claims | 0.4 | |

Registered Owner: Cede & Co.

Initial Notional Amount and Series/Subseries/Sub-Subseries Clawback CVI Lifetime Cap: _____ Dollars

     1.     All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of _____, 2021 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and _____, as Trustee and Paying Agent.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

     2.     The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Amount Payment Dates (the [November 1] following a Fiscal Year in which an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][15] has occurred), or earlier upon redemption as hereinafter referred to, up to the Clawback CVI Lifetime Cap specified above.

---

[12] Note: the Holders of each Subseries and Sub-Subseries shall receive a Note identifying only their respective Subseries/Sub-Subseries and related Clawback CVI Allocation percentage and priority.

[13] Clawback CVIs issued to the holders of the Allowed CW/HTA Claims will be issued in Sub-Subseries to the Holders of the HTA 68 Bond Claims, HTA 98 Senior Bond Claims, HTA 98 Sub Bond Claims and GDB HTA Loans to recognize their respective priorities of payment for the notional amounts listed above.

[14] To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI will be held in reserve as described in paragraph [9] hereof.

[15] To be included in PRIFA Rum Tax Clawback CVIs

4820-1003-9275.14

3.      The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the Clawback CVIs Final Maturity Date of an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11], (b) the annual limitations hereinafter referred to, and (c) the Clawback CVI Lifetime Cap applicable to this Note, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the corporate trust office of the Trustee and Paying Agent, in _____, _____ (the "Corporate Trust Office"). This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition on [November 1] of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11] occurred (the "CVIs Annual Payment Amount Payment Date"). The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

4.      The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof. The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.      This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $[_____], known as "Commonwealth of Puerto Rico Clawback CVIs", issued under the authority of and in full compliance with the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order").

6.      In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs". This Note is a Clawback CVI. The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement. The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement. [If this Note is a PRIFA Rum Tax Clawback CVI, this Note is additionally payable from the Rum Tax CVI Annual Payment Amount.][11]

7.      The Commonwealth will determine if an SUT Outperformance Condition [and/or a Rum Tax Outperformance Condition][11] has occurred on each CVIs Outperformance Condition Determination Date, which is [September 1] of each Fiscal Year, beginning [September 1], 2022. An SUT Outperformance Condition in any Fiscal Year will occur if actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement. [A Rum Tax Outperformance Condition in any Fiscal Year will occur if the Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric for

Attachment 6-3

that Fiscal Year set forth in the Trust Agreement][11].  Once the amount of the excess is determined and verified by an Independent Consultant, such excess amount is used first to fund an account used to pay certain Trustee costs and expenses or reimburse the Commonwealth for advancing such Trustee costs and expenses, and then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.      These Notes are subject to mandatory redemption on each CVIs Annual Payment Amount Payment Date in an amount equal to the Clawback CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all Clawback CVIs on such CVIs Annual Payment Amount Payment Date, but in no event in an amount that in the aggregate exceeds the Clawback CVI Lifetime Cap prior to the Clawback CVIs Final Maturity Date.

9.      [This Note is an Allowed CW/HTA Claims Subseries, so amounts distributed on the CVIs Annual Payment Amount Payment Date from the Clawback CVI Allocation Percentage allocated to the Allowed CW/HTA Claims Subseries shall be distributed in the following order of priority: first to the Holders of the Sub-Subseries relating to HTA 68 Bond Claims until such Holders receive $179,462,539; second to the Holders of the Sub-Subseries relating to HTA 98 Senior Bond Claims until such Holders receive $1,833,405,578; third to the Holders of the Sub-Subseries relating to HTA 98 Sub Bond Claims until such Holders receive $207,294,178; and fourth to the Holders of the Sub-Subseries relating to GDB HTA Loans until such Holders receive $1,477,506,700.  No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries have been paid in full.][16]

10.     [This Note is part of the Sub-Subseries that relates to HTA 98 Senior Bond Claims or HTA 98 Sub Bond Claims, so, to the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI are to be held in reserve in an amount equal to the difference of (a) the amount of cash that would be due to holders and insurers of the HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds minus (b) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is pari passu with respect to payment on account of the HTA 98 Bonds.][17]

11.     [This Note is a PRIFA Rum Tax Clawback CVI and is additionally payable from PRIFA Rum Tax CVI Annual Payment Amounts.][11]

12.     The Clawback CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the Clawback CVIs have been paid in an amount equal to the Clawback CVI Lifetime Cap, and (b) (1) [September 1], 2051, if an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11] did not occur during the prior Fiscal Year, and (2) [November 1], 2051, if an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11] did occur during the prior Fiscal Year, whether or not the Holders of all Clawback CVIs have been

---

[16] To be included in Clawback CVIs relating to Allowed CW/HTA Claims.

[17] To be included in Clawback CVIs relating to HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims.

paid in the aggregate an amount equal to the Clawback CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

13.     The Clawback CVIs are subject to redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVIs.

14.     Whenever Notes are to be redeemed in accordance with paragraph [13] hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed.  If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice.  Such notice shall be given by mailing a copy of such notice not less than twenty (20) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books.  The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

15.     The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than twenty (20) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

16.     Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price.  If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

17.     If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

18.     The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof.  At the corporate trust office of the Trustee, in _____, _____, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

Attachment 6-5

19.     Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

20.     The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

21.     This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

22.     It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank]*

4820-1003-9275.14

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this Note to be executed with the facsimile signature of the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the _____ day of _____, 2021.

  [Facsimile signature] _____
Secretary of the Treasury of Puerto Rico

(SEAL)

Attest:

[Facsimile signature] _____
Secretary of State of Puerto Rico

4820-1003-9275.14

CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

_____, as Trustee


By:_____
      Authorized Officer


Date of authentication: _____

4820-1003-9275.14

FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to register the transfer of the within Note on the books kept for registration thereof, with full power of substitution in the premises.

|  |  |
|---|---|
|  | Signature: _____ |
| Dated: _____ | Guaranteed by: _____ |

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

4820-1003-9275.14

**Attachment 7**

Commonwealth of Puerto Rico

Calculations relating to GO CVIs and Clawback CVIs Payments

(calculations attached)

For Fiscal Year Ending:  June 30, 20__

CVIs Outperformance Condition Determination Date:  September 1, 20__

SUT Outperformance Condition has/has not occurred.

Rum Tax Outperformance Condition has/has not occurred.

CVIs Annual Payment Amount Calculation Date:  October 1, 20__

CVIs Annual Payment Amount Verification Date:  October 15, 20__

CVIs Annual Payment Amount Payment Date:  November 1, 20__

Attachment 7-1

<u>Calculations Relating to GO CVIs Upon Occurrence of SUT Outperformance Condition</u>

(calculations attached)

Subject to Waterfall Outperformance Amount:  $_____

      Less:  Amount applied to Trustee and Independent Consultant Expenses:

            Deposit to Trustee and Independent Consultant Expenses Fund:  $_____

            Reimbursement to Commonwealth for advances:  $_____

      Payment to Holders of GO CVIs:  $_____ (deposit to GO CVIs Subaccount of the
          Subject to Waterfall CVIs Payment Account)

      Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs:
          $_____ (deposit to Clawback CVIs Subaccount of the Subject to Waterfall
          CVIs Payment Account)

      Payment to Holders of PRIFA Rum Tax Clawback CVIs:  $_____ (deposit to
          PRIFA Rum Tax Clawback CVIs Payment Account)

Remaining GO CVI Lifetime Cap as of June 30, 20__:  $_____

Remaining GO CVI Lifetime Cap after CVIs Annual Payment Amount Payment Date:  $_____

Application of Subject to Waterfall Outperformance Amount to GO CVIs (from GO CVIs
Subaccount): $_____

      Amount per $1 Authorized Denomination of GO CVI:  $0._____

| Claim | GO CVI % | Current Unit Distribution | Prior Unit Distribution | Total Distribution |
|---|---|---|---|---|
| Vintage CW Bond | 32.244 | | | |
| 2011 CW Series D/E/PIB Bond | 3.514 | | | |
| 2011 CW Bond | 2.479 | | | |
| 2012 CW Bond | 15.157 | | | |
| 2014 CW Bond | 20.266 | | | |
| Vintage CW Guarantee | 15.194 | | | |
| 2011 CW Guarantee Bond | 7.552 | | | |
| 2012 CW Guarantee Bond | 3.594 | | | |

Attachment 7-2

Calculations Relating to Clawback CVIs Upon Occurrence of
<u>SUT Outperformance Condition and/or Rum Tax Outperformance Condition</u>

(calculations attached)

Not Subject to Waterfall Outperformance Amount:  $_____

> Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs:
> $_____ (deposit to Not Subject to Waterfall CVIs Payment Account)

> Payment to Holders of PRIFA Rum Tax Clawback CVIs:  $_____ (deposit to
> PRIFA Rum Tax Clawback CVIs Payment Account)

Amount Payable to Holders of Clawback CVIs other than Holders of PRIFA Rum Tax Clawback
CVIs:

> From Clawback CVIs Subaccount of the Subject to Waterfall Payment Amount:
> $_____

> From Not Subject to Waterfall Payment Amount:  $_____

> Total:  $_____

> Amount per $1 Authorized Denomination:  $0._____

Amount Payable to Holders of PRIFA Rum Tax Clawback CVIs:

> From Clawback CVIs Subaccount of the Subject to Waterfall Payment Amount:
> $_____

> From Not Subject to Waterfall Payment Amount:  $_____

> From Rum Tax CVI Annual Payment Amount:  $_____

> Total:  $_____

> Amount per $1 Authorized Denomination:  $0._____

Remaining Clawback CVI Lifetime Cap as of June 30, 20__:  $_____

Remaining Clawback CVI Lifetime Cap after CVIs Annual Payment Amount Payment Date:
$_____

Attachment 7-3

| Claim | Remaining Lifetime Cap Before Distribution | Current Distribution | Remaining Lifetime Cap After Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
|     HTA 68 Bond (first priority) | | | |
|     HTA 98 Senior Bond (second priority) | | | |
|     HTA 98 Sub Bond (third priority) | | | |
|     GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |
| CW/MBA | | | |

| Claim | Current Unit Distribution | Prior Unit Distribution | Total Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
|     HTA 68 Bond (first priority) | | | |
|     HTA 98 Senior Bond (second priority) | | | |
|     HTA 98 Sub Bond (third priority) | | | |
|     GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |
| CW/MBA | | | |

Attachment 7-4

**Attachment 8**

**Illustrative scenarios of the calculation of the
Subject to Waterfall Outperformance Amount**

4820-1003-9275.14

**Attachment 9**

**Illustrative scenarios of the calculation of the
Not Subject to Waterfall Outperformance Amount**

4820-1003-9275.14

**Attachment 10**

**Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount**

4820-1003-9275.14