# **EXHIBIT J**

Draft Legislation as approved by the House of Representatives of Puerto Rico[1]

---

[1] The annexed draft legislation, passed by the House of Representatives of Puerto Rico provides for the issuances of the general obligation bonds and the contingent value instruments, and is required to be included in the Plan Supplement. However, as set forth in a published statement of the Oversight Board, see Oversight Board Statement, dated October 8, 2021, the Oversight Board does not support the current version of the draft legislation, asserts that it is inconsistent with the proposed Plan, and reserves all rights in connection therewith.

**(TEXTO DE APROBACION FINAL POR LA CAMARA)**
**(30 DE SEPTIEMBRE DE 2021)**

## ESTADO LIBRE ASOCIADO DE PUERTO RICO

19na Asamblea                                                                    2da Sesión
   Legislativa                                                                        Ordinaria

# CÁMARA DE REPRESENTANTES

# P. de la C. 1003

27 DE SEPTIEMBRE DE 2021

Presentado por los representantes *Hernández Montañez, Varela Fernández, Matos García, Santa Rodríguez y Torres Cruz*

Referido a la Comisión de Hacienda y Presupuesto

**LEY**

Para crear la "Ley para Ponerle Fin a la Quiebra de Puerto Rico", establecer las disposiciones y condiciones para aprobar la oferta, venta y emisión de los diferentes tipos de Bonos de Obligación General, así como para disponer la creación de los Instrumentos de Valor Contingente; establecer la política pública de protección y el mecanismo de restitución de fondos de los municipios afectados por cualesquiera recortes impuestos por el Plan de Ajuste propuesto como parte del procedimiento de Título III de PROMESA; derogar la Ley Núm. 39 del 13 de mayo de 1976, según enmendada, conocida como "Ley para Proveer para la Transferencia Mensual al Fondo Especial para la Amortización y Redención de Obligaciones Generales Evidenciadas por Bonos y Pagarés"; enmendar el inciso (a) del Artículo 3 de la Ley Núm. 147 de 18 de junio de 1980, según enmendada, conocida como "Ley Orgánica de la Oficina de Gerencia y Presupuesto"; enmendar el Artículo 3 y el inciso (m) del Artículo 7, así como eliminar los Artículos 25 y 34 y reenumerar los Artículos 25-A y 35 como los Artículos 25 y 34, respectivamente, de la Ley Núm. 44 de 21 de junio de 1988, según enmendada, conocida como "Ley de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico"; enmendar los Artículos 23.01 y 23.02 de la Ley 22-2000, según enmendada, conocida como "Ley de Vehículos y Tránsito de Puerto Rico"; enmendar el Artículo 1.03 (b) y el inciso (h) del Artículo 2.02 de la Ley 351-2000, según enmendada, conocida como "Ley del Distrito del

Centro de Convenciones de Puerto Rico"; enmendar el Artículo 8 de la Ley 179-2002, según enmendada; enmendar el Artículo 31 de la Ley 272-2003, según enmendada, conocida como "Ley del Impuesto sobre el Canon por Ocupación de Habitación del Estado Libre Asociado de Puerto Rico"; añadir un nuevo Artículo 7A a la Ley 103-2006, según enmendada; enmendar la Sección 3060.11 y eliminar la Sección 3060.11A de la Ley 1-2011, según enmendada, conocida como "Código de Rentas Internas de Puerto Rico de 2011"; y enmendar el inciso (a) del Artículo 7.018 y el inciso (a) del Artículo 7.027 de la Ley 107-2020, según enmendada, conocida como "Código Municipal de Puerto Rico"; a los fines de tomar los pasos afirmativos necesarios para encaminar la salida de Puerto Rico del procedimiento de quiebras creado al amparo del Título III de la Ley PROMESA; cumplir con las disposiciones de la referida ley federal respecto a las condiciones mínimas necesarias para la culminación de la Junta de Supervisión y Administración Financiera; y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

A comienzos del año 2006, el liderato político puertorriqueño se planteaba crear mecanismos legales y políticos para remediar la condición económica que arrastraba Puerto Rico desde hacía varias décadas. Esto debido a, entre otros factores, la terminación del incentivo al sector manufacturero. Como resultado de los acontecimientos, en el 2013, en un esfuerzo conjunto, distintos sectores gubernamentales y privados intentaron incluir a Puerto Rico en el Capítulo 9 del Código de Quiebras Federal, el cual no obtuvo el respaldo del Congreso. En el 2015, en una colaboración entre el Ejecutivo y el Legislativo, buscaron atender la situación de la deuda nacional estableciendo un mecanismo local similar al creado mediante el citado Código. Dicha iniciativa fue posteriormente invalidada por ser contraria a la Constitución de los Estados Unidos de América, al ser la quiebra materia de campo ocupado por ley federal.

Posteriormente, en el 2016, con el objetivo de proveerle un respiro al Gobierno de Puerto Rico en torno a la potencial avalancha de reclamaciones por parte de sus acreedores, el Congreso de EE.UU. promulgó la ley federal conocida como la Ley PROMESA. Esta ley estableció, en su Título III, un procedimiento de quiebras que incorporaba una amplia porción de las disposiciones del Código de Quiebras, al cual Puerto Rico tendría acceso en aras de restructurar su monumental deuda. De igual forma, creó una entidad que tomaría el control de todos los aspectos presupuestarios, financieros y de administración fiscal de Puerto Rico denominada *Federal Oversight and Management Board*, o Junta de Supervisión y Administración Financiera (JSAF). En efecto, la JSAF pasaría a supervisar y controlar esencialmente todos los aspectos fiscales y presupuestarios del gobierno del Estado Libre Asociado de Puerto Rico.

Aun cuando la referida legislación había sido aprobada, el gobierno de Puerto Rico realizó múltiples intentos para alcanzar acuerdos de consenso con diversos grupos de

acreedores. A pesar de sus esfuerzos, la intención del Gobierno no prosperó. Así, el 3 de mayo de 2017, la JSAF, presentó una petición de restructuración de deuda al amparo del Título III de PROMESA. La presentación de esta petición ante el Tribunal de Título III dio comienzo al procedimiento de quiebras más grande en la historia de los mercados municipales de EE.UU., al cual pertenecen los bonos y las obligaciones del Estado Libre Asociado de Puerto Rico. Para tener presente la magnitud de este evento debe considerarse que se estimaba que el Estado Libre Asociado tendría que restructurar $35 mil millones como parte del susodicho proceso de restructuración.

Este proceso no solo conllevaría un litigio altamente técnico y contencioso, sino que obligaría al liderato gubernamental puertorriqueño a cumplir con los planes fiscales diseñados y certificados por la JSAF. Por virtud de la Ley PROMESA, los planes fiscales certificados tienen fuerza de ley y su inobservancia legitima a la Junta a acudir al Tribunal de Título III para que dicho foro haga valer la intención de la citada ley federal.

Sumado a lo anterior, el gobierno de Puerto Rico lleva enfrentándose a eventos imprevistos desde el 2017. Estos eventos han afectado el potencial de recuperación económica de Puerto Rico y alargado el costoso proceso de Título III. Las consecuencias del paso de los huracanes Irma y María, los terremotos de la zona suroeste de Puerto Rico y la actual pandemia del COVID-19 continúan afectando a nuestra Isla hoy día. Estos eventos incidieron negativa y profundamente en el quehacer diario de nuestra sociedad y, colateralmente, alargaron la presencia de la Junta en Puerto Rico.

Tras más de cuatro años de presentada la petición de quiebras al amparo del Título III de PROMESA, la Junta ha presentado una séptima versión enmendada del Plan de Ajuste o Reestructuración de la Deuda (PDA) para Puerto Rico ante el Tribunal de Título III. Este Plan es el resultado de varios años de negociación entre la JSAF, en su calidad de representante exclusivo de Puerto Rico ante el Tribunal de Título III, y un sinnúmero de clases de acreedores de obligaciones del Gobierno central.

Se estima que, como parte del referido proceso de Título III, el Pueblo de Puerto Rico ha incurrido en costos de litigio que, incluyendo las negociaciones con las distintas clases de acreedores y los honorarios de abogado del proceso de reestructuración, rondan entre $300 y $500 millones. En este contexto, la negativa de actuar sobre el Plan de Reestructuración propuesto por la JSAF, o la omisión de considerarlo de manera objetiva y responsable, podría representar un riesgo de volver al comienzo del proceso de negociación.

Lo anterior necesariamente conllevaría un peligro real de (i) incurrir en costos que alcancen o superen las cifras ya incurridas; (ii) un levantamiento de la prohibición de cobro establecida mediante el mecanismo de paralización o *stay* conferido por el procedimiento de quiebras, potenciando una avalancha de reclamaciones de cobro por parte de los acreedores; y (iii), extender de forma indefinida la presencia y el mandato de

la JSAF en nuestro sistema de gobierno. Algunas partes involucradas en la quiebra del País sugieren que el Tribunal de Título III también ostenta el poder de imponerle el Plan de Ajuste al Gobierno sin el aval de la Asamblea Legislativa.

La alternativa a estos escenarios es la aprobación del Plan, que, de ser ratificado por el Gobierno y los acreedores, y posteriormente confirmado por el Tribunal de Título III, representaría el último peldaño en el proceso de restructuración de la deuda de Puerto Rico. Este Plan incorpora los acuerdos alcanzados con las diversas clases de acreedores de obligaciones del Gobierno Central. Estas clases incluyen a los bonistas de obligaciones generales, sindicatos de empleados públicos, el Comité de Acreedores No Asegurados y el Comité Oficial de Retirados, entre otros.

En total, los acuerdos incluidos en el PDA reducen la deuda pública del Gobierno central en aproximadamente un 50%. Es decir, la deuda pública se reduciría de aproximadamente $70 mil millones, a $34 mil millones y la deuda de bonos de Obligaciones Generales (GO) y de la Autoridad de Edificios Públicos se reduciría de $18.8 mil millones a $7.4 mil millones. A su vez, el pago anual de la deuda pública de Puerto Rico se reduciría a aproximadamente de $3,300 millones a $1.1 mil millones. Así mismo, el margen prestatario del Estado Libre Asociado se reduciría de un 25% a un 7.5%, cifra que representa la mitad del máximo constitucional permitido. En términos prácticos, estas reducciones representan más dinero en las arcas del gobierno, lo cual implica que Puerto Rico tendrá una nueva oportunidad de invertir en su gente a través de mejoras a la infraestructura, de sufragar los costos de los servicios esenciales que está llamado a ofrecer; y de prepararse para y atender futuras emergencias.

Para alcanzar esta reducción de la deuda gubernamental, la Ley PROMESA requiere que la Asamblea Legislativa de Puerto Rico apruebe legislación que viabilice la emisión de una serie de bonos de obligaciones generales (GO) y la creación de instrumentos de valor contingente (IVC) que garanticen el pago de ciertas reclamaciones. Debe destacarse que los IVC también disponen para la creación de un fideicomiso que eventualmente garantice el pago de pensiones, el disfrute del gobierno de hasta $200 millones de fondos generados en exceso a las proyecciones contenidas en los Planes Fiscales de 2020 y 2021, y otros mecanismos de repago.

En esencia, el Gobierno central debe emitir alrededor de $7.4 mil millones en nuevos bonos de obligaciones generales, y autorizar la creación de los IVC. Los IVC solo serían pagaderos al cumplirse determinadas métricas de recaudos del impuesto sobre ventas y uso (IVU) y, en el caso de una porción limitada de los IVCs, la porción del arbitrio federal al ron que el Departamento del Tesoro Federal transfiere al Gobierno de Puerto Rico. Es decir, solo se pagaría hasta un máximo específico de deuda si ciertas condiciones están presentes.

A tenor con la Sección 314 de PROMESA, y con la recién firmada Ley 42-2021, el Gobierno de Puerto Rico tiene la obligación de aprobar la presente legislación para viabilizar la aprobación del Plan y la posterior salida de la Junta de Supervisión Fiscal. Debemos tener presente que la  Ley 42, *supra*, expresamente revocó el poder que hasta ese momento ostentaba el Gobernador de emitir deuda sin intervención legislativa bajo múltiples estatutos. De esta manera, resulta necesario que esta Asamblea Legislativa y el Ejecutivo continúen su ya histórica colaboración, con el objetivo de aprobar la legislación que permita la emisión de bonos requerida y que, a su vez, autorice la creación de los IVC arriba descritos.

Si bien el PDA propone múltiples aspectos positivos para Puerto Rico, y a pesar de que su aprobación encaminaría el fin del proceso de Título III para la Isla, también le impone una carga financiera a los pensionados públicos al proponer un recorte general de 8.5% en las pensiones de nuestros retirados.

Que quede meridianamente claro que la política pública de la presente Asamblea Legislativa es de cero recortes a los pensionados.

Esta Asamblea Legislativa no ha perdido de perspectiva que nuestros pensionados, a diferencia de otros grupos de acreedores, ya sufrieron recortes en sus pensiones como resultado de la aprobación de estatutos que, con el propósito de prevenir la insolvencia de los sistemas de retiro del gobierno, redujeron los beneficios de pensión, aumentaron la cantidad de aportaciones de los empleados y elevaron la edad de retiro para los planes de pensión de cada uno de los tres sistemas principales de retiro del Gobierno. Por tanto, las Ramas Legislativa y Ejecutiva han sido enfáticas en que la política pública de Puerto Rico es de cero recortes a las pensiones.

Los municipios son el ente gubernamental más cercano a nuestra población. La crisis y los planes fiscales han impactado los ingresos de nuestros ayuntamientos. En la medida en que el PDA logre recortes a la deuda estatal, estas economías deberán solventar específicamente medidas de recolección y disposición de residuos, desperdicios y para implementar programas de reciclaje en los municipios, a fin de que los ayuntamientos puedan garantizar estos servicios tan fundamentales e indispensables para garantizar y mejorar la calidad de vida de nuestra ciudadanía.

La Asamblea Legislativa continuará impulsando propuestas que defiendan el mejor interés del Pueblo. En esta hazaña, confiamos en que la Rama Legislativa contará con el apoyo del Ejecutivo para guiar a Puerto Rico en el camino por recorrer. La aprobación del Presupuesto General de Puerto Rico para el año fiscal 2021-2022, Res. Conj. 8-2021, fue un paso correcto en esa dirección. También lo es la aprobación de esta medida, que permitirá que el actual Presupuesto General se convierta en el primer presupuesto balanceado de cuatro. Al finalizar este proceso, Puerto Rico habrá cumplido con la mitad de los requisitos dispuestos por PROMESA. La presente Ley cimienta el

esfuerzo histórico, multisectorial y de consenso de ponerle fin a la Junta de Supervisión Fiscal.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

1  **CAPÍTULO 1.- DISPOSICIONES GENERALES.**

2  **ARTÍCULO 101.- TÍTULO.**

3  Esta Ley se conocerá y podrá ser citada como la "Ley para Ponerle Fin a la Quiebra

4  de Puerto Rico".

5  **ARTÍCULO 102.- DECLARACIÓN DE INTENCIÓN Y POLÍTICA PÚBLICA**

6  La presente legislación es cónsona con los objetivos de la Ley para la Supervisión,

7  Administración y Estabilidad Económica de Puerto Rico (*Puerto Rico Oversight,*

8  *Management and Economic Stability Act*, o PROMESA, por sus siglas en inglés) y se adopta

9  al amparo del estado de derecho vigente, con el propósito específico de viabilizar los

10  siguientes objetivos, los cuales, a su vez, son los requisitos estatutarios para la

11  terminación del mandato de la Junta de Supervisión y Administración Financiera (JSAF)

12  creada por virtud del referido estatuto federal:

13     1. Tomar las acciones afirmativas requeridas para cumplir con el mandato

14        inequívoco del Pueblo de Puerto Rico de culminar el menoscabo de nuestro

15        sistema republicano y democrático de gobierno puertorriqueño;

16     2. Concretar la salida exitosa del Estado Libre Asociado de Puerto Rico del

17        proceso de quiebras dispuesto en el Título III de la Ley PROMESA;

1   3. Viabilizar el acceso del Estado Libre Asociado de Puerto Rico a los mercados

2    crediticios a corto y largo plazo, a tasas de interés razonables, para cumplir con

3    las necesidades prestatarias de nuestro gobierno local;

4   4. Perfeccionar la aprobación del primero de cuatro presupuestos balanceados,

5    legislado y firmado por las Ramas Legislativa y Ejecutiva, respectivamente, el

6    pasado 30 de junio de 2021 como la Resolución Conjunta 8-2021;

7   5. Ejercer todas las acciones necesarias para que la salida de la JSAF ocurra lo

8    antes posible.

9   6. Las Transacciones de Restructuración de deuda autorizadas mediante la

10   presente Ley, están totalmente sujetas y condicionadas a que la Junta de

11   Supervisión y Administración Financiera (JSAF) no apruebe recorte alguno a

12   las pensiones de los empleados gubernamentales retirados en el Plan de Ajuste

13   o Reestructuración.

14  La presente legislación no busca legitimar el mandato ni la gestión de la JSAF. Al

15 contrario, se promueve con el único propósito de adelantar aquellas acciones

16 estrictamente necesarias y requeridas por la citada ley federal para facilitar la salida de la

17 referida entidad de manera responsable tan pronto como sea viable. En este contexto, se

18 enfatiza que la intención inequívoca de la Asamblea Legislativa y de la JSAF al impulsar

19 la promulgación del presente estatuto es precisamente asegurar dicha salida. Por la

20 presente declaración se reconoce que la JSAF no tiene la autoridad de perpetuar su

21 existencia más allá de las condiciones establecidas en la Ley PROMESA, sea mediante el

1    Plan de Ajuste o Reestructuración cuya implementación se viabiliza en esta Ley, o

2    mediante su interpretación del citado estatuto federal.

3    En consideración a lo anterior, se establece que la política pública del Estado Libre

4    Asociado de Puerto Rico en torno a la Ley PROMESA y la existencia de la JSAF es dar

5    aquellos pasos requeridos para terminar con el mandato de esta entidad, siempre que las

6    medidas promulgadas e implementadas no vulneren la voluntad del Pueblo, perpetúen

7    el menoscabo de nuestro sistema de gobierno ni atenten contra los sectores más

8    vulnerables de la sociedad puertorriqueña.

9    En la medida en que las propuestas que sometan o acciones que sean requeridas

10    por la JSAF atenten contra la presente política pública, el gobierno del Estado Libre

11    Asociado de Puerto Rico tomará todas las acciones que estime necesarias y pertinentes

12    para defender los mejores intereses de nuestra ciudadanía.

13    **ARTÍCULO 103.- DEFINICIONES.**

14    (a)    5.5% del IVU:    significa los ingresos y recaudos presentes y futuros

15    generados por la porción del impuesto sobre ventas y uso establecido bajo las Secciones

16    4020.01 y 4020.02 del Subcapítulo D del Código de Rentas Internas de Puerto Rico que

17    corresponde a la tasa contributiva del cinco y medio por ciento (5.5%).

18    (b)    Acuerdos Complementarios: significa el Plan, la Orden de Confirmación, el

19    Contrato de Bonos de Obligación General, la forma de los Bonos de Obligación General,

20    el Contrato de IVC, la forma de los IVCs, y cualquier otro acuerdo o instrumento

21    relacionado o suscrito con relación a, o en apoyo de, una Transacción de Restructuración

22    y de conformidad con, o en apoyo de, el Plan o una Modificación Elegible.

1     (c)    ACT: significa la Autoridad de Carreteras y Transportación de Puerto Rico.

2     (d)    ADCC: significa la Autoridad del Distrito del Centro de Convenciones de

3    Puerto Rico.

4     (e)    AEP: significa la Autoridad de Edificios Públicos de Puerto Rico.

5     (f)    AFI: significa la Autoridad para el Financiamiento de la Infraestructura de

6    Puerto Rico.

7     (g)    AMA: significa la Autoridad Metropolitana de Autobuses de Puerto Rico.

8     (h)    Año Fiscal:  significa el año fiscal del Estado Libre Asociado, que empieza

9    el 1ro de julio y termina el 30 de junio.

10     (i)    Bonos de Obligación General: significa los bonos de obligación general

11   emitidos por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General

12   de conformidad con esta Ley, el Plan y la Orden de Confirmación, y cualesquiera bonos

13   de obligación general emitidos subsiguientemente por el Estado Libre Asociado bajo el

14   Contrato de Bonos de Obligación General de acuerdo a y consistente con los términos del

15   Plan para retirar, refinanciar o cancelar bonos de obligación general originalmente

16   emitidos conforme al Plan y la Orden de Confirmación.

17     (j)    Código de Puerto Rico: significa la Ley 1-2011, según enmendada, conocida

18   como el "Código de Rentas Internas para un Nuevo Puerto Rico."

19     (k)    Condición de Rendimiento Superior del Arbitrio al Ron: significa que los

20   Ingresos del Arbitrio al Ron del Estado Libre Asociado en un Año Fiscal, calculados

21   conforme a, y neto de, aquellas deducciones permitidas conforme al Plan y establecidas

1   en el Contrato de IVC, exceden los umbrales contemplados en el Plan y establecidos en

2   el Contrato de IVC para dicho Año Fiscal.

3   (l)   Condición de Rendimiento Superior del IVU: significa que los recaudos del

4   IVU Medido o del Impuesto Sustituto Medido, según sea el caso, en cualquier Año Fiscal

5   exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para

6   dicho Año Fiscal.

7   (m)   Contrato de Bonos de Obligación General: significa uno o más contratos de

8   fideicomiso, escrituras, resoluciones y cualesquiera suplementos o enmiendas

9   relacionadas, o contratos o acuerdos similares, relacionados a los Bonos de Obligación

10   General a ser otorgados y suscritos por el Representante del Gobernador autorizando: (1)

11   la emisión de los Bonos de Obligación General y describiendo sus términos; y (2) el pago

12   de los Costos de Financiamiento, cada uno de conformidad con los términos del Plan.

13   (n)   Contrato de IVC: significa uno o más contratos de fideicomiso, escrituras,

14   resoluciones y cualesquiera otros suplementos o enmiendas relacionadas, o contratos o

15   acuerdos similares, relacionados a los IVCs a ser otorgados y suscritos por el Estado Libre

16   Asociado autorizando: (1) la emisión de los IVCs por el Estado Libre Asociado y la

17   descripción de sus términos; y (2) el pago de los Costos de Financiamiento de los IVCs,

18   cada uno conforme a los términos del Plan.

19   (o)   Costos de Financiamiento: significa los costos asociados a las Transacciones

20   de Restructuración, incluyendo, pero sin limitarse a, los costos, honorarios y gastos para

21   (i) emitir, pagar o repagar los Bonos de Obligación General y los IVCs, según aplicable,

22   ya sea que los costos sean incurridos tras la emisión de dichos Bonos de Obligación

1    General o IVCs o durante el término de dichos instrumentos, (ii) efectuar pagos según

2    requeridos por los Acuerdos Complementarios, (iii) pagar cualquier sello, emisión o

3    impuesto similar y otros cargos relacionados a la Transacción de Restructuración (si

4    alguno), (iv) prepararse para y efectuar las Transacciones de Restructuración, y (v) llevar

5    a cabo todas las actividades en curso relacionadas a las Transacciones de Restructuración.

6    Para evitar dudas, los Costos de Financiamiento también incluyen los honorarios y gastos

7    administrativos previos y posteriores al cierre incurridos con relación a los Acuerdos

8    Complementarios.

9          (p)    Entidad Gubernamental: significa cualquier agencia, departamento,

10   oficina, corporación pública, fideicomiso, fondo, sistema, instrumentalidad, subdivisión

11   política, autoridad fiscal o municipio del Estado Libre Asociado.

12         (q)    Estado Libre Asociado: significa el Estado Libre Asociado de Puerto Rico.

13         (r)    Fecha de Efectividad: significa la fecha en la que el Plan entre en vigor

14   conforme a sus términos.

15         (s)    Fiduciario de los Bonos de Obligación General: significa el o los

16   fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados de

17   conformidad con los términos y condiciones del Contrato de Bonos de Obligación

18   General.

19         (t)    Fiduciario de los IVC: significa el o los fiduciario(s) o el o los fiduciario(s)

20   sustituto(s), según sea el caso, nombrados conforme a los términos y condiciones del

21   Contrato de IVC.

1  (u)   Fondo del Servicio de la Deuda: significa un fondo del servicio de la deuda

2  establecido de conformidad con el Contrato de Bonos de Obligación General.

3  (v)   Impuesto Sustituto Medido: significa toda o una porción de un impuesto

4  de aplicabilidad general en el Estado Libre Asociado que, mediante un cambio en la ley,

5  sea legislado para sustituir completamente el IVU Medido o que de lo contrario

6  constituya una medida similar o comparable de actividad económica en el Estado Libre

7  Asociado, en cada caso de conformidad con los términos del Contrato de IVC.

8  (w)   Ingresos del Arbitrio al Ron del Estado Libre Asociado: significa el total de

9  los recaudos del arbitrio a los licores destilados impuesto bajo el Código de Rentas

10  Internas de los Estados Unidos de 1986 (según enmendado de tiempo en tiempo)

11  recibidos por el Estado Libre Asociado, según documentado en el reporte del

12  Departamento del Tesoro Federal de la actividad mensual del arbitrio neto pagado al

13  Estado Libre Asociado y certificado por el Departamento de Hacienda de Puerto Rico o

14  en cualquier otro reporte análogo según establecido en el Contrato de IVC.

15  (x)   IVCs o Instrumentos de Valor Contingente: significa, en el colectivo, los

16  pagarés de obligación general emitidas bajo el Contrato de IVC de conformidad con esta

17  Ley, el Plan y la Orden de Confirmación, que consisten en los IVCs de Obligación General

18  y los IVCs "Clawback".

19  (y)   IVCs "Clawback":  significa una serie de IVCs emitidos bajo el Contrato de

20  IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan

21  que surgen de la deuda emitida por ACT, ADCC, AFI y AMA. Para evitar dudas, los IVCs

1 "Clawback" podrán emitirse en una o más subseries, incluyendo, pero sin limitarse a, la

2 Subserie de las Reclamaciones del Arbitrio al Ron.

3     (z)    IVC de Obligación General: significa una serie de IVCs emitidos bajo el

4 Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado

5 permitidas bajo el Plan que surgen de o están relacionadas a deuda de obligación general

6 del Estado Libre Asociado, incluyendo deuda directa o garantizada.

7     (aa)    IVU Medido: significa el 5.5% del IVU recaudado por el Estado Libre

8 Asociado durante un Año Fiscal, menos aquellos ingresos transferidos al Fondo para el

9 Desarrollo de la Industria de las Artes, Ciencias y Cinematografía conforme a la Sección

10 Núm. 4050.06 del Código de Puerto Rico (o utilizado para cualquier otro propósito

11 establecido por ley), hasta Tres Millones Doscientos Cuarenta Mil Dólares ($3,240,000.00)

12 por Año Fiscal.

13     (bb)    Ley: significa esta "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

14     (cc)    Máximo Agregado de los IVCs "Clawback": significa, inicialmente a partir

15 de la Fecha de Efectividad, $5,239,002,764. El Máximo Agregado de los IVCs "Clawback"

16 se reducirá cada Año Fiscal en una cantidad igual a los pagos efectuados bajo los IVCs

17 "Clawback" conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una

18 Condición de Rendimiento Superior del IVU. En adición, la porción del Máximo

19 Agregado de los IVCs "Clawback" asignados a la Subserie de las Reclamaciones del

20 Arbitrio al Ron se reducirá aún más cada Año Fiscal en una cantidad igual a los pagos

21 efectuados bajo la Subserie de Reclamaciones del Arbitrio al Ron conforme al Contrato

1  de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior

2  del Arbitrio al Ron.

3      (dd)   Máximo Agregado de los IVC de Obligación General: significa, inicialmente

4  desde la Fecha de Efectividad, $3,500,000,000. El Máximo Agregado de los IVC de

5  Obligación General se reducirá anualmente por una cantidad igual a los pagos efectuados

6  en los IVC de Obligación General conforme al Contrato de IVC.

7      (ee)   Modificación Elegible: significa una "Modificación Elegible" para ADCC

8  y/o AFI aprobada conforme al Título VI de PROMESA.

9      (ff)   Orden de Confirmación: significa la orden del Tribunal de Título III

10  confirmando el Plan.

11      (gg)   Persona: significa cualquier persona natural o jurídica, incluyendo, pero sin

12  limitarse a, el Estado Libre Asociado, cualquier Entidad Gubernamental, o cualquier

13  firma, sociedad, empresa conjunta, fideicomiso, sucesión, compañía de responsabilidad

14  limitada, corporación de individuos, asociación o corporación pública o privada,

15  organizada o existente bajo las leyes de Puerto Rico, de los Estados Unidos de América,

16  de cualquier estado u otra jurisdicción, o cualquier estado, municipio, subdivisión

17  política, autoridad fiscal, agencia o instrumentalidad de los Estados Unidos de América,

18  cualquier estado o cualquier otra jurisdicción, o cualquier combinación de las anteriores.

19      (hh)   Plan: significa el Plan de Ajuste conjunto para el Estado Libre Asociado,

20  SRE y AEP (y cualquier otra Entidad Gubernamental incluida en dicho plan) confirmado

21  bajo el Título III de PROMESA, incluyendo los anejos relacionados, según estos puedan

22  ser enmendados, suplementados o modificados de tiempo en tiempo.

1        (ii)      PROMESA: significa la Ley de Supervisión, Administración, y Estabilidad

2 Económica de Puerto Rico, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et

3 seq., según enmendada o modificada.

4        (jj)      Reclamaciones Existentes: significa las reclamaciones en contra del Estado

5 Libre Asociado, AEP, SRE, ACT, AFI, ADCC y AMA.

6        (kk)      Representante del Gobernador: significa el Gobernador, el Secretario de

7 Hacienda o cualquier otro oficial de una Entidad Gubernamental designado por el

8 Gobernador mediante Orden Ejecutiva para cumplir con los propósitos y mandatos de la

9 presente Ley en representación del Estado Libre Asociado de Puerto Rico.

10        (ll)      Secretario de Hacienda: significa el Secretario del Departamento de

11 Hacienda del Estado Libre Asociado.

12        (mm)  Sistemas de Retiro del Estado Libre Asociado: significa el Sistema de Retiro

13 de Empleados del Gobierno, según definido en el inciso (nn) del presente Artículo, el

14 Sistema de Retiro de Maestros de Puerto Rico y el Sistema de Retiro de la Judicatura del

15 Estado Libre Asociado de Puerto Rico.

16        (nn)  SRE: significa el Sistema de Retiro de Empleados del Gobierno del Estado

17 Libre Asociado de Puerto Rico.

18        (oo)      Subserie de Reclamaciones del Arbitrio al Ron: significa una subserie de los

19 IVCs "Clawback" emitidos bajo el Contrato de IVC con relación a las reclamaciones

20 contra el Estado Libre Asociado permitidas bajo el Plan que surgen de, o están

21 relacionadas a, los Ingresos del Arbitrio al Ron del Estado Libre Asociado retenidos por

22 el Estado Libre Asociado y no transferidos a AFI.

(pp)   Transacciones de Restructuración: significa cada una de las transacciones contempladas por, o en apoyo a, el Plan o una Modificación Elegible, incluyendo, pero sin limitarse a, la emisión de los Bonos de Obligación General y los IVCs y la cancelación o la extinción de las Reclamaciones Existentes conforme al Plan o una Modificación Elegible, según sea el caso.

**ARTÍCULO 104. – AUTORIZACIÓN DE ACCIONES POR LAS ENTIDADES GUBERNAMENTALES.**

Cada Entidad Gubernamental requerida a tomar o llevar a cabo cualquier acción necesaria o conveniente para implementar el Plan y/o las Transacciones de Restructuración queda por la presente autorizada a llevar a cabo y deberá llevar a cabo todas aquellas acciones necesarias o convenientes para implementar el Plan o las Transacciones de Restructuración, incluyendo, pero sin limitarse a, (a) negociar, entrar en y suscribir cualquier acuerdo, escritura, certificado o documento, y (b) desembolsar o transferir fondos según provisto y/o requerido en el Plan. La autorización provista en este Artículo será suficiente para que el Representante del Gobernador, a nombre del Estado Libre Asociado, y cualquier director ejecutivo, presidente u oficial de rango y autoridad similar, a nombre de la Entidad Gubernamental que representa, pueda llevar a cabo cualquier acción contemplada en el Plan y/o en las Transacciones de Restructuración. Para evitar dudas, la autorización aquí establecida será tan amplia y suficiente como lo permita el estado de derecho vigente para permitir que el Estado Libre Asociado pueda establecer, financiar, y de otra manera implantar cualquiera y todas las disposiciones y/o mecanismos incluidos en el Plan para proteger las pensiones de los

1  empleados gubernamentales retirados. Además, la Autoridad de Asesoría Financiera y

2  Agencia Fiscal de Puerto Rico queda por la presente autorizada a requerirle a cualquier

3  Entidad Gubernamental que cumpla con los requisitos establecidos en este Artículo.

4      En o antes de la Fecha de Efectividad, el Representante del Gobernador queda por

5  la presente autorizado a: (a) aprobar la oferta, venta y emisión de los Bonos de Obligación

6  General y los IVCs según contemplado en el Plan y dispuesto en los Capítulos 2 y 3 de

7  esta Ley, respectivamente; (b) proveer para la cancelación y extinción de las

8  Reclamaciones Existentes conforme a y de acuerdo con los términos del Plan o de una

9  Modificación Elegible, según aplicable; (c) autorizar el pago de los Costos de

10  Financiamiento de conformidad con los términos del Plan; (d) aprobar la forma del

11  Contrato de los Bonos de Obligación General, del Contrato de IVC, y de los otros

12  Acuerdos Complementarios y otorgar el Contrato de los Bonos de Obligación General, el

13  Contrato de IVC y los otros Acuerdos Complementarios a nombre del Estado Libre

14  Asociado; (e) incluir en los Acuerdos Complementarios cualquier pacto, término u otra

15  condición según pueda ser requerida por el Plan, incluyendo (1) consentir a nombre del

16  Estado Libre Asociado a la aplicación de las leyes del Estado de Nueva York para

17  gobernar e interpretar dichos Acuerdos Complementarios, y la jurisdicción de cualquier

18  tribunal estatal o federal, con relación a cualquier demanda o procedimiento relacionado

19  con los Bonos de Obligación General, los IVCs, los Acuerdos Complementarios y/o

20  cualesquiera otros asuntos relacionados a las Transacciones de Restructuración, y (2) la

21  creación de gravámenes sobre los dineros, valores y otros activos depositados con el

22  Fiduciario de los Bonos de Obligación General o el Fiduciario de los IVCs a beneficio de

1    los tenedores de los Bonos de Obligación General y los IVCs, respectivamente; y (f) llevar

2    a cabo cualesquiera y todas otras acciones necesarias o convenientes para efectuar las

3    Transacciones de Restructuración. Para evitar dudas, no obstante la aplicación de las

4    leyes del Estado de Nueva York para gobernar e interpretar cualquier Acuerdo

5    Complementario, la autorización por el Estado Libre Asociado del Contrato de Bonos de

6    Obligación General y el Contrato de IVC y la emisión por el Estado Libre Asociado de los

7    Bonos de Obligación General y los IVCs se gobernarán por las leyes del Estado Libre

8    Asociado, disponiéndose que, sujeto a los términos del Contrato de Bonos de Obligación

9    General y el Contrato de IVC, los tenedores de los Bonos de Obligación General y de los

10    IVCs, respectivamente, tendrán aquellos derechos y remedios de tenedores de deuda

11    pública del Estado Libre Asociado establecidos en las Secciones 2 y 8 del Artículo VI de

12    la Constitución del Estado Libre Asociado.

13        La autorización para emitir bonos conferida mediante la presente Ley estará

14    limitada únicamente a aquellos bonos contemplados por y requeridos para implementar

15    el Plan, y se hará conforme lo establezcan el propio Plan, los Contratos de Obligación

16    General, la Orden de Confirmación y los demás Acuerdos Complementarios. El

17    Gobernador de Puerto Rico o su Representante deberán solicitar la autorización de la

18    Asamblea Legislativa para cualquier emisión posterior que sea distinta a la aquí

19    permitida.

1   **CAPÍTULO 2 – LOS BONOS DE OBLIGACIÓN GENERAL**

2   **ARTÍCULO 201.- EMISIÓN DE LOS BONOS DE OBLIGACIÓN GENERAL.**

3   (a)   A partir y luego de la Fecha de Efectividad, el Representante del

4   Gobernador, estará autorizado para aprobar la oferta, venta y emisión de los Bonos de

5   Obligación General, de tiempo en tiempo, de conformidad con las disposiciones del

6   Contrato de Bonos de Obligación General, la Orden de Confirmación, el Plan y de los

7   demás Acuerdos Complementarios, hasta una cantidad agregada inicial de principal de

8   $7,414,063,543.25, y para aprobar la oferta, venta y emisión, de tiempo en tiempo, de

9   Bonos de Obligación General adicionales, sujeto a las limitaciones contempladas en el

10   Plan y establecidas en el Contrato de Bonos de Obligación General para retirar,

11   refinanciar o cancelar los Bonos de Obligación General originalmente emitidos conforme

12   al Plan y a la Orden de Confirmación.

13   (b)   Los Bonos de Obligación General incluirán bonos de interés corriente y

14   bonos de revalorización de capital, estarán fechados, devengarán intereses, y vencerán

15   en la fecha o fechas, que no excederán treinta (30) años de su fecha o fechas de emisión, y

16   serán redimibles o podrán ser prepagados, en cada caso, en la medida en que sea aplicable

17   y según sea determinado por el Representante del Gobernador, como representante del

18   Estado Libre Asociado, y autorizado en el Contrato de Bonos de Obligación General de

19   conformidad y consistente con el Plan. El Representante del Gobernador, como

20   representante del Estado Libre Asociado, determinará la forma y manera de emitir de los

21   Bonos de Obligación General y establecerá su denominación o denominaciones, el lugar

22   o los lugares de pago y sus demás términos, conforme a y consistente con el Plan. A

1    discreción del Representante del Gobernador, los Bonos de Obligación General podrán

2    ser emitidos en una o más series separadas.

3          (c)    Los Bonos de Obligación General serán obligaciones legales, válidas y

4    vinculantes del Estado Libre Asociado, emitidos conforme al Artículo VI, Sección 2 de la

5    Constitución del Estado Libre Asociado, y serán pagaderos conforme a los términos del

6    Contrato de Bonos de Obligación General y de los otros Acuerdos Complementarios.

7          (d)    Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en

8    cualquier Bono de Obligación General autorizado bajo esta Ley deje de ocupar su cargo

9    previo a la entrega de dichos Bonos de Obligación General, dicha firma o facsímil de la

10    firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos

11    como si dicho oficial hubiese permanecido en su cargo hasta dicha entrega.  Además,

12    cualquier Bono de Obligación General podrá contener la firma o facsímil de la firma de

13    aquellas personas que, al momento de la emisión de dicho bono, sean los oficiales

14    autorizados a firmarlo, pero que, en la fecha del Bono de Obligación General, no

15    ocupaban su puesto.

16          (e)    Los Bonos de Obligación General emitidos de conformidad con las

17    disposiciones de esta Ley se considerarán instrumentos negociables bajo las leyes de

18    Puerto Rico.

19          (f)    Los Bonos de Obligación General autorizados por esta Ley se podrán emitir

20    como bonos de cupón o en forma registrada, o ambos, según se establezca en el Contrato

21    de Bonos de Obligación General.

1   **ARTÍCULO 202.- EMPEÑO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE**

2   **IMPONER CONTRIBUCIONES.**

3          La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre

4   Asociado quedan por la presente empeñados para el pago puntual del principal e interés

5   de los Bonos de Obligación General emitidos bajo las disposiciones de esta Ley según y

6   cuándo venzan de conformidad con los términos del Contrato de Bonos de Obligación

7   General. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar

8   el principal e interés de los Bonos de Obligación General según venzan o tras su redención

9   o prepago de conformidad con el Contrato de Bonos de Obligación General, de los

10   recursos disponibles del Estado Libre Asociado en el Año Fiscal en que dicho pago sea

11   requerido. Las disposiciones de esta Ley con relación al pago de principal e interés en los

12   Bonos de Obligación General se considerarán una obligación continua para que el

13   Secretario de Hacienda haga dichos pagos, aunque no se hayan hecho asignaciones

14   específicas para dichos propósitos. Se autoriza e instruye al Representante del

15   Gobernador a incluir en el Contrato de Bonos de Obligación General el compromiso que

16   aquí establece el Estado Libre Asociado con relación a los Bonos de Obligación General.

17   Los Bonos de Obligación General establecerán que la buena fe, el crédito y el poder de

18   imponer contribuciones del Estado Libre Asociado están empeñados para el pago de las

19   obligaciones allí establecidas.

1  **ARTÍCULO 203.- FONDO DEL SERVICIO DE LA DEUDA; GRAVAMEN**

2  **ESTATUTARIO.**

3  (a)  Se autoriza al Representante del Gobernador a establecer el Fondo de

4  Servicio de la Deuda con el Fiduciario de los Bonos de Obligación General para el pago

5  de los Bonos de Obligación General. Hasta que los Bonos de Obligación General hayan

6  sido completamente pagados o satisfechos de conformidad con sus términos,

7  mensualmente, el Estado Libre Asociado depositará con el Fiduciario de los Bonos de

8  Obligación General una suma en efectivo en la cantidad agregada igual a (i) una sexta

9  parte (1/6) de la obligación semi anual del Estado Libre Asociado con relación al pago de

10  interés devengado sobre los Bonos de Obligación General y (ii) una doceava parte (1/12)

11  de la obligación anual del Estado Libre Asociado con relación al pago del principal de los

12  Bonos de Obligación General. Dichos fondos deberán mantenerse e invertirse por el

13  Fiduciario de los Bonos de Obligación General de conformidad con las disposiciones del

14  Contrato de Bonos de Obligación General.

15  (b)  A partir de la emisión, los Bonos de Obligación General estarán

16  garantizados automáticamente por un gravamen estatutario de primer rango sobre los

17  fondos depositados en el Fondo de Servicio de la Deuda, incluyendo cualquier ingreso o

18  recaudos generados de dichos fondos. Dicho gravamen estatutario de primer rango se

19  creará, surtirá efecto y se perfeccionará automáticamente, y será válido y vinculante a

20  partir y luego de la Fecha de Efectividad, sin que sea necesario acto o acuerdo alguno por

21  ninguna otra Persona. No será necesario otorgar, suscribir ni inscribir instrumento

22  alguno en ningún récord oficial ni en registro u oficina del gobierno alguna para

1   perfeccionar o continuar teniendo dicho gravamen estatutario de primer rango o para

2   establecer o mantener la prioridad aquí establecida. El gravamen establecido en este

3   Artículo será válido, vinculante y ejecutable, y estará perfeccionado contra todas las

4   Personas que tengan reclamaciones de cualquier tipo de daños, contractuales, o de

5   cualquier otro tipo contra el Estado Libre Asociado o sus activos independientemente de

6   si dichas Personas fueron notificadas sobre dicho gravamen.

7   **ARTÍCULO 204.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.**

8      Los Bonos de Obligación General, incluyendo, pero sin limitarse a, cualesquiera

9   pagos o ingresos con relación a los Bonos de Obligación General y la transferencia de los

10  Bonos de Obligación General, estarán, en todos momentos, totalmente exentos de todo

11  tipo de contribuciones (incluyendo, pero sin limitarse, a contribuciones sobre ingresos),

12  tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por

13  cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas.

14  Los tenedores y beneficiarios de los Bonos de Obligación General no tendrán que rendir

15  planillas o cualquier otro reporte de contribuciones o requisito similar con relación al

16  Estado Libre Asociado o cualquier Entidad Gubernamental por razón de tener, ser dueño

17  de o transferir Bonos de Obligación General.

18  **ARTÍCULO 205.- CONVENIOS DEL ESTADO LIBRE ASOCIADO.**

19     El Estado Libre Asociado, con la intención de quedar contractualmente obligado,

20  por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y

21  subsiguientes de los Bonos de Obligación General que, hasta que todas las obligaciones

1    relacionadas a dichos bonos hayan sido completamente satisfechas, de conformidad con

2    sus términos, el Estado Libre Asociado se obliga a lo siguiente:

3         (a)    no llevar a cabo ninguna acción que (1) impida el depósito mensual de los

4    fondos en el Fondo del Servicio de la Deuda conforme al Artículo 203 de esta Ley, (2)

5    limite o altere los derechos del Estado Libre Asociado de conformidad con el Plan y la

6    Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los

7    tenedores de los Bonos de Obligación General o (3) perjudique los derechos y remedios

8    de los tenedores de los Bonos de Obligación General;

9         (b)    hacer y llevar a cabo todos los actos permitidos por ley y que sean

10   razonablemente necesarios o deseables para asegurar que el pago de interés a los

11   tenedores de cualesquiera Bonos de Obligación General esté exento de pago de

12   contribuciones federales, y que sea y continúe estando excluido del ingreso bruto para

13   propósitos de contribuciones sobre ingresos federales, en la medida en que aplique; y

14        (c)    causar que cualquier Plan Fiscal del Estado Libre Asociado incluya

15   disposiciones para el pago en cada Año Fiscal del principal de e intereses sobre los Bonos

16   de Obligación General de conformidad con los términos del Contrato de Bonos de

17   Obligación General; y

18        (d)    en la medida necesaria para cumplir con sus obligaciones de pagar los Bonos

19   de Obligación General, aplicará (i) el producto del impuesto a la propiedad del 1.03%

20   recaudado conforme a la Ley 107-2020, según enmendada, conocida como "Código

21   Municipal de Puerto Rico, por el Centro de Recaudación de Ingresos Municipales del

22   Estado Libre Asociado de Puerto Rico, (ii) cualquier dinero que surja de la operación del

1   Artículo VI, Sección 8 de la Constitución del Estado Libre Asociado y (iii) cualquier otro

2   recurso disponible del Estado Libre Asociado para el pago del principal y los intereses (y

3   el valor acumulado) sobre dichos Bonos de Obligación General; disponiéndose que (A)

4   este convenio no le concede a los tenedores de dichos Bonos de Obligación General un

5   gravamen sobre dichos ingresos, dineros y recursos, y (B) para propósitos del

6   cumplimiento con este convenio, en la medida en que dichos ingresos, dineros y recursos

7   se transfieran al Fondo General del Estado Libre Asociado, se considerará que los pagos

8   de principal e intereses (y del valor acumulado) realizados a los tenedores de los Bonos

9   de Obligación General provenientes del Fondo General del Estado Libre Asociado se han

10  hecho de dichos ingresos, dineros y recursos en el orden establecido anteriormente.

11  **CAPÍTULO 3 – LOS INSTRUMENTOS DE VALOR CONTINGENTE**

12  **ARTÍCULO 301.- EMISIÓN DE LOS IVCS.**

13  (a)   A partir y luego de la Fecha de Efectividad, el Representante del

14  Gobernador estará autorizado para aprobar la oferta, venta y emisión, conforme a los

15  términos del Contrato de IVC, la Orden de Confirmación, el Plan y los Acuerdos

16  Complementarios, de IVCs en dos subseries – los IVCs de Obligación General y los IVCs

17  "Clawback" – hasta una cantidad agregada de $3,500,000,000 y $5,239,002,764,

18  respectivamente. Cada serie de los IVCs podrá incluir una o más subseries.

19  (b)   Los IVCs tendrán fecha y vencerán en el tiempo o tiempos que determine

20  el Representante del Gobernador, como representante del Estado Libre Asociado, y

21  autorizados en el Contrato de IVC, disponiéndose que los IVCs de Obligación General

22  vencerán no más tarde del Año Fiscal 2044 y que los IVCs "Clawback" vencerán no más

1   tarde del Año Fiscal 2052. Los IVCs no devengarán intereses y estarán sujetos a redención

2   según sea determinado por el Representante del Gobernador y autorizado en el Contrato

3   de IVC de conformidad y consistente con el Plan. El Representante del Gobernador

4   determinará la forma de los IVCs y la manera de emitir los IVCs, y establecerá la

5   denominación o denominaciones de los IVCs y el lugar o los lugares de pago de los

6   mismos y sus otros términos, todo de conformidad y consistente con el Plan.

7   (c)   Los IVCs serán obligaciones legales, válidas y vinculantes del Estado Libre

8   Asociado, emitidos de conformidad con el Artículo VI, Sección 2 de la Constitución del

9   Estado Libre Asociado, y pagaderos de conformidad con los términos del Contrato de

10   IVC y de los Acuerdos Complementarios, disponiéndose que, de conformidad con el

11   Contrato de IVC:

12   (1)  no se hará pago alguno a los tenedores de los IVCs (a menos que sean

13   tenedores de la Subserie de Reclamaciones del Arbitrio al Ron bajo las

14   circunstancias establecidas en el inciso (2) a continuación) en un Año Fiscal a

15   menos que durante el Año Fiscal anterior ocurra una Condición de Rendimiento

16   Superior del IVU;

17   (2)  no se hará pago alguno en un Año Fiscal a los tenedores de la Subserie

18   de Reclamaciones del Arbitrio al Ron a menos que durante el Año Fiscal anterior

19   ocurra una Condición de Rendimiento Superior del IVU o una Condición de

20   Rendimiento Superior del Arbitrio al Ron;

21   (3)  no se hará pago alguno a los tenedores de IVCs de Obligación General

22   o a los IVCs "Clawback" en exceso del Máximo Agregado de los IVCs de

1    Obligación General o del Máximo Agregado de los IVCs "Clawback",

2    respectivamente;

3            (4)  a partir de la fecha de vencimiento de cada serie de los IVCs, si el Estado

4    Libre Asociado ha hecho todos los pagos requeridos bajo dichas series conforme

5    al Contrato de IVC, se considerará que todas las obligaciones del Estado Libre

6    Asociado bajo dichas series han sido satisfechas y que las series no están en

7    circulación, aun si no se llegó al Máximo Agregado de los IVCs de Obligación

8    General o el Máximo Agregado de los IVC "Clawback", según sea el caso, para

9    dicha fecha.

10   (d)    Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en

11   cualesquiera IVCs autorizados bajo esta Ley deje de ocupar su cargo antes de la entrega

12   de dichos IVCs, dicha firma o facsímil de firma será, no obstante, válida y suficiente, y se

13   considerará para todos los propósitos como si dicho oficial hubiese permanecido en su

14   puesto hasta dicha entrega. Además, cualesquiera IVCs podrán tener la firma o facsímil

15   de firma de aquellas personas que, al momento en que se emitan dichos bonos, sean los

16   oficiales adecuados para firmarlos, pero que, en la fecha de los IVCs, no hayan estado

17   ocupando sus puestos.

18   (e)    Los IVCs emitidos conforme al Contrato de IVC son pagarés del Estado

19   Libre Asociado para todos los propósitos y se considerarán instrumentos negociables bajo

20   las leyes de Puerto Rico.

21   (f)    Los IVCs autorizados por esta Ley se emitirán de forma registrada.

1       (g)     Solamente para propósitos de calcular el servicio anual máximo de la deuda

2    pública del Estado Libre Asociado conforme al Artículo VI, Sección 2 de la Constitución

3    del Estado Libre Asociado, se asumirá que el servicio de la deuda pagadero bajo los IVCs

4    en cualquier Año Fiscal será igual a las cantidades máximas que podrían ser pagaderas

5    durante dicho Año Fiscal bajo los IVCs de conformidad con el Contrato de IVC.

6       (h)     Se establece que los servicios de la deuda pagadero bajo los IVCs en

7    cualquier Año Fiscal no menoscabarán bajo concepto alguno las obligaciones y reservas

8    creadas por la Corporación del Fondo de Interés Apremiante (COFINA).

9    **ARTÍCULO 302.- EMPEÑO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE**

10   **IMPONER CONTRIBUCIONES.**

11       La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre

12   Asociado quedan por la presente irrevocablemente empeñados para el pago puntual de

13   los IVCs emitidos bajo las disposiciones de esta Ley según y cuándo venzan de

14   conformidad con los términos del Contrato de IVC. El Secretario de Hacienda queda por

15   la presente autorizado y dirigido a pagar los IVCs según venzan o al momento de ser

16   redimidos de conformidad con el Contrato de IVC, de los recursos del Estado Libre

17   Asociado en el Año Fiscal en que dicho pago sea requerido, y las disposiciones de esta

18   Ley relacionadas al pago de los IVCs se considerarán una obligación continua del

19   Secretario de Hacienda para hacer los pagos en el Año Fiscal en que dicho pago sea

20   requerido, aun si no se han hecho asignaciones específicas para dicho propósito. El

21   Representante del Gobernador queda por la presente autorizado y dirigido a incluir en

22   el Contrato de IVC el compromiso que aquí establece el Estado Libre Asociado con

1   relación a los IVCs, y se establecerá en dichos IVCs que la buena fe, el crédito y el poder

2   de imponer contribuciones del Estado Libre Asociado están empeñados para el pago de

3   los mismos.

4   **ARTÍCULO 303.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.**

5        Los IVCs, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con

6   relación a los IVCs y la transferencia de los IVCs, estarán, en todos momentos, totalmente

7   exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones

8   sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre

9   Asociado o por cualquier Entidad Gubernamental, y de cualesquiera y todas las

10  retenciones relacionadas). Si los IVCs se emiten originalmente a un fideicomiso, las

11  distribuciones que haga dicho fideicomiso a sus beneficiarios atribuibles a pagos o

12  ingresos recibidos por el fideicomiso con relación a los IVCs y la transferencia de los IVCs

13  por el fideicomiso, si se permitiera, así como la transferencia del interés en dicho

14  fideicomiso, estarán, en todo momento, totalmente exentos de todo tipo de

15  contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas,

16  licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier

17  Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas). Los

18  tenedores y beneficiarios de los IVCs y/o de un interés en el fideicomiso que sea dueño

19  de los IVCs no tendrán que rendir planillas o cualquier otro reporte de contribuciones o

20  requisito similar con relación al Estado Libre Asociado o cualquier Entidad

21  Gubernamental por razón de tener, ser dueño de o transferir IVCs.

1    **ARTÍCULO 304.- CONVENIOS DEL ESTADO LIBRE ASOCIADO DE PUERTO**

2    **RICO.**

3         El Estado Libre Asociado, con la intención de quedar contractualmente obligado,

4    por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y

5    subsiguientes de los IVCs que, hasta que todas las obligaciones con relación a dichos

6    bonos hayan sido completamente pagadas o satisfechas de conformidad con sus

7    términos, el Estado Libre Asociado:

8         (a)    no llevará a cabo acción alguna que:

9              (i)    limite o altere los derechos del Estado Libre Asociado de

10             conformidad con el Plan y la Orden de Confirmación para cumplir con los

11             términos de cualesquiera acuerdos con los tenedores de los IVCs;

12             (ii)    perjudique los derechos y remedios de los tenedores de los IVCs; o

13             (iii)    limite la habilidad de los tenedores de los IVCs de monitorear el

14             rendimiento del IVU Medido y de los Ingresos del Arbitrio al Ron del

15             Estado Libre Asociado disponibles para el pago de los IVCs (de

16             conformidad con el Plan y según establecido en el Contrato de IVC);

17             disponiéndose, sin embargo, que lo anterior no impedirá que el Estado

18             Libre Asociado pueda ejercer su poder, mediante un cambio en la ley, de

19             eliminar el IVU Medido, o reemplazar el IVU Medido con un Impuesto

20             Sustituto Medido, cada uno de conformidad con el Contrato de IVC, que

21             protegerá a los tenedores de los IVC de que dicha eliminación o reemplazo

22             reduzca la probabilidad de que la Condición de Rendimiento Superior del

1   IVU se cumpla; y disponiéndose además que el Estado Libre Asociado

2   divulgará a tiempo la información que pueda ser requerida bajo el Contrato

3   de IVC con relación al IVU Medido, los recaudos del impuesto sobre ventas

4   y uso, y cualesquiera ajustes a los umbrales base del 5.5% del IVU

5   realizados de conformidad con el Contrato de IVC;

6   (b)   causará que cualquier Plan Fiscal del Estado Libre Asociado presentado a

7   la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA

8   luego de la Fecha de Efectividad, mientras dicha entidad esté presente y en funciones en

9   Puerto Rico incluya disposiciones para el pago en cada Año Fiscal del principal de e

10   intereses sobre los IVCs de conformidad con los términos del Contrato de IVC en la

11   medida en que la Condición de Rendimiento Superior del IVU o la Condición de

12   Rendimiento Superior del Arbitrio al Ron, según sean aplicables, ocurran durante el Año

13   Fiscal anterior.

14   **CAPÍTULO 4 – MUNICIPIOS**

15   **ARTÍCULO 401.- FONDO EXTRAORDINARIO**

16   Se crea el "Fondo Extraordinario para Atender el Recogido y Disposición de

17   Residuos, Desperdicios y para Implementar Programas de Reciclaje en los Municipios",

18   en adelante el "Fondo Extraordinario", el cual estará dentro del "Fondo de Equiparación

19   de los Municipios" dispuesto en el Artículo 7.015 de la Ley 107-2020, según enmendada,

20   pero en una cuenta separada de otros ingresos de dicho fondo, y que se utilizará para los

21   propósitos específicos dispuestos en esta Ley.

22   **ARTÍCULO 402.-** Declaración de Política Pública

1    El Gobierno de Puerto Rico por la presente declara que es la política pública del

2  Estado Libre Asociado el garantizar a su población el recogido y disposición eficiente de

3  la basura, desperdicios sólidos, escombros, así como la implementación de programas de

4  reciclaje para atender estos residuos, por lo que en la medida que el Plan de Ajuste de la

5  Deuda incluya reducciones en el monto de la deuda garantizada estas economías que se

6  generarán deberán hacerse accesibles a los municipios para que puedan brindar estos

7  servicios.

8  **ARTÍCULO 403.- REMISIÓN DE AHORROS EN EL PAGO DE DEUDA AL FONDO**

9  **EXTRAORDINARIO**

10    El Fondo Extraordinario establecido en el Artículo 401 de esta Ley se nutrirá de

11  una asignación anual del Fondo General, la cual será equivalente a la reducción de deuda

12  estatal del Plan de Ajuste de Deuda basada en la contribución del 1.03 de la propiedad

13  mueble e inmueble, la cual no será menor de sesenta y dos millones de dólares

14  ($62,000,000).

15  **Artículo 404.- PROPÓSITOS DEL FONDO EXTRAORDINARIO**

16    Los municipios solo podrán acceder a los recursos económicos del Fondo

17  Extraordinario aquí dispuesto, exclusiva y específicamente, para los propósitos descritos

18  a continuación:

19    (a)    recogido y disposición de basura;

20    (b)    recogido y disposición desperdicios sólidos;

21    (c)    recogido y disposición de escombros;

22    (d)    implementación, recogido y disposición de reciclaje.

1    **Artículo 405.- FÓRMULA DE DISTRIBUCIÓN ENTRE MUNICIPIOS**

2    A fin de lograr una justa distribución de los recursos del Fondo Extraordinario, se

3    utilizará los siguientes criterios para determinar las cantidades a las que pueden tener

4    acceso los municipios:

5    (a)    El total de personas beneficiarias del Programa de Asistencia Nutricional,

6    per cápita, según certificación al efecto emitida por el Departamento de la Familia, que

7    sea determinado en el año fiscal inmediatamente anterior o en el año fiscal más próximo

8    que se tenga la información.

9    (b)    El presupuesto funcional per cápita de cada municipio, del año fiscal

10    inmediatamente anterior o del año fiscal más próximo que se tenga la información.

11    (c)    El valor tasado de la propiedad tributable per cápita ubicada dentro de los

12    límites territoriales de cada municipio, correspondiente al año fiscal inmediatamente

13    anterior o al año fiscal más próximo que se tenga la información.

14    (d)    La población del municipio por milla cuadrada, según el último censo

15    decenal.

16    La metodología para la distribución será determinada por los parámetros

17    dispuestos en este artículo, pero podrán incorporarse aquellos parámetros existentes para

18    la distribución de los recursos del Fondo de Equiparación de los Municipios, siempre y

19    cuando no sean contrarios a los propósitos y objetivos aquí descritos, por la Junta de

20    Gobierno del CRIM. La aplicación de dicha metodología deberá beneficiar aquellos

21    municipios que reciben el menor ingreso por contribución sobre la propiedad u otras

1   fuentes, así como a los municipios con el mayor número de dependientes del Programa

2   de Asistencia Nutricional y de mayor densidad poblacional.

3   **CAPÍTULO 5– ENMIENDA Y DEROGACIÓN DE CIERTAS LEYES PARA ALLEGAR**

4   **FONDOS AL FONDO GENERAL Y GARANTIZAR QUE TODA LEGISLACIÓN**

5   **CUMPLA CON LA DISPONIBILIDAD DE FONDOS ESTABLECIDOS EN EL PLAN**

6   **FISCAL.**

7   **ARTÍCULO 501.- SE ENMIENDA EL INCISO (A) DEL ARTÍCULO 3 DE LA LEY**

8   **NÚM. 147 DE 18 DE JUNIO DE 1980, SEGÚN ENMENDADA, PARA QUE LEA**

9   **COMO SIGUE:**

10   "Artículo 3.- Facultades y Deberes de la Oficina de Gerencia y Presupuesto.

11   (a)   La Oficina de Gerencia y Presupuesto bajo las reglas, reglamentos,

12   instrucciones y órdenes que el Gobernador prescribiere, asesorará al Primer Ejecutivo, a

13   la Asamblea Legislativa y a los organismos gubernamentales en los asuntos de índole

14   presupuestarios, programáticos y de gerencia administrativa, así como en asuntos de

15   naturaleza fiscal relativos a sus funciones; llevará a cabo las funciones necesarias que

16   permitan al Gobernador someter a la Asamblea Legislativa la propuesta del Presupuesto

17   General del Gobierno, de conformidad con el Artículo 4 de esta Ley, incluyendo las

18   Corporaciones Públicas. A su vez, velará por que la ejecución y administración del

19   presupuesto por parte de los organismos públicos se conduzcan de acuerdo con las leyes

20   y resoluciones de asignaciones, con las más sanas y adecuadas normas de administración

21   fiscal y gerencial, y en armonía con lo dispuesto por el Plan de Crecimiento Económico y

22   Fiscal aprobado de conformidad con la Ley de Responsabilidad Fiscal y de Revitalización

1    Económica de Puerto Rico (el "Plan Fiscal y de Crecimiento Económico") y con los

2    propósitos programáticos para los cuales se asignan o proveen los fondos públicos.

3    Evaluará los programas y actividades de los organismos públicos en términos de

4    economía, eficiencia y efectividad y le someterá al Gobernador informes con

5    recomendaciones para la implantación de las mismas. Además, preparará y mantendrá

6    el control de todos aquellos documentos fiscales y presupuestarios que sean necesarios

7    para la administración del presupuesto y efectuará los cambios, enmiendas o ajustes que

8    se ameriten, sujeto a las disposiciones legales y normas establecidas por la Asamblea

9    Legislativa, y el Gobernador. A estos fines, y con el propósito de que la Asamblea

10   Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal

11   Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer

12   y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las

13   medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de

14   cinco (5) días laborables contados a partir desde que se le son requeridas. Presentará junto

15   al Secretario de Hacienda un informe detallado con respecto a las proyecciones de

16   ingresos y gastos del año fiscal siguiente y correspondiente al Presupuesto General

17   propuesto ante la Asamblea Legislativa en un término que no excederá cinco (5) días

18   calendario luego de la presentación de la propuesta de Presupuesto General del Gobierno

19   del Estado Libre Asociado de Puerto Rico por parte el Gobernador. Se mantendrá atento

20   a las nuevas corrientes y tendencias en el ámbito presupuestario y gerencial de la

21   administración pública para evaluar y adaptar aquellas técnicas, métodos y enfoques que

22   apliquen al campo administrativo local, tanto en la formulación y ejecución del

1     presupuesto como en la evaluación de programas, el análisis gerencial y la auditoría

2     operacional y administrativa. Además, deberá proponer aquella legislación que se

3     considere necesaria y conveniente para incorporar dichos enfoques y tendencias a

4     nuestro proceso presupuestario y administrativo.

5         (b)    …"

6     **ARTÍCULO 502.- SE ENMIENDA EL ARTÍCULO 3 DE LA LEY 44 DE 21 DE JUNIO**

7     **DE 1988, SEGÚN ENMENDADA, CONOCIDA COMO LA LEY DE LA AUTORIDAD**

8     **PARA EL FINANCIAMIENTO DE LA INFRAESTRUCTURA DE PUERTO RICO,**

9     **PARA QUE LEA COMO SIGUE:**

10     **Artículo 3.- Definiciones**

11     "Las siguientes palabras y términos, cuando sean usados o se haga referencia a los

12     mismos en esta Ley, tendrán los significados que se indican a continuación, a no ser que

13     del contexto se entienda claramente otra cosa:

14     (a) …

15         …

16     (j) Fondo de Desarrollo — Significará el Fondo de Desarrollo de Infraestructura

17     creado bajo el Artículo 25 de esta Ley, conforme a lo dispuesto en la Ley Núm. 54 de 4 de

18     Agosto de 1997 (27 L.P.R.A. § 431 et seq.)

19     (k) …

20         …

1    (r) Cuenta del Corpus — Significará la cuenta del corpus del Fondo de Desarrollo

2    según se establece en el inciso (a) del Artículo 25 de esta Ley. Los rendimientos de capital

3    que genere esta cuenta deberán utilizarse según se establece en el Artículo 25 de esta Ley.

4    (s) Cuentas adicionales — Significará cuentas creadas dentro del Fondo de

5    Desarrollo, además de la Cuenta del Corpus, que sean necesarias para llevar a cabo los

6    propósitos de esta Ley, según se establece en el inciso (a) del Artículo 25 de esta Ley."

7    **ARTÍCULO 503.- SE ENMIENDA EL INCISO (M) DEL ARTÍCULO 7 DE LA LEY 44**

8    **DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

9    Artículo 7. – Poderes Generales.

10    La Autoridad tendrá todos los poderes necesarios y convenientes para llevar a

11    cabo y efectuar los propósitos y disposiciones de esta Ley, incluyendo, pero sin que se

12    entienda como limitación, lo siguiente:

13    "(a) …

14    (m) Hipotecar o pignorar cualquier propiedad para el pago del principal de y los

15    intereses sobre cualesquiera bonos emitidos por la Autoridad o bonos emitidos por una

16    entidad beneficiada, y pignorar la totalidad o parte de los ingresos que la Autoridad

17    recibiese."

18    **ARTÍCULO 504.- SE DEROGAN LOS ARTÍCULOS 25 Y 34 DE LA LEY 44 DE 21 DE**

19    **JUNIO DE 1988, SEGÚN ENMENDADA, Y SE REENUMERAN LOS ARTÍCULOS 25-**

20    **A y 35 COMO LOS ARTÍCULOS 25 y 34, RESPECTIVAMENTE.**

21    **ARTÍCULO 505.- SE ENMIENDA EL ARTÍCULO 23.01 DE LA LEY 22-2000, SEGÚN**

22    **ENMENDADA, PARA QUE LEA COMO SIGUE:**

1      "Artículo 23.01. — Procedimiento para el pago de derechos.

2      Todo dueño de un vehículo de motor, sujeto al pago de derechos anuales de

3      permiso pagará en cualquier colecturía de rentas internas de cualquier municipio, en el

4      lugar que designe el Secretario del Departamento de Hacienda, en las estaciones oficiales

5      de inspección, bancos, o en el lugar que designe el Secretario, los derechos que

6      correspondan al vehículo para cada año, según se indican éstos en la notificación que al

7      efecto deberá enviarle el Secretario. Los derechos por este concepto se pagarán

8      anticipadamente por todo el año excepto que cuando al momento de pagar los derechos

9      resten menos de seis (6) meses para la próxima renovación, solo se requerirá el pago

10     equivalente a los meses que resten por transcurrir en la fecha en que se devengan,

11     contándose las fracciones de meses como un mes completo. Esta disposición aplicará a

12     todos los vehículos de motor, independientemente de la cantidad que paguen por

13     derecho de licencia por año. Al recibo de los derechos correspondientes, el colector

14     expedirá el permiso para vehículo de motor que consistirá del formulario de notificación

15     emitido por el Secretario, con las debidas anotaciones y firma del colector, indicativas de

16     que se ha efectuado el pago de los derechos. Junto con el permiso, el colector entregará el

17     correspondiente marbete o placas de número, según sea el caso. Sólo se exhibirá un (1)

18     marbete del vehículo de motor durante el año de vigencia del pago de derechos. Se

19     autoriza al Secretario a que, previa consulta con el Secretario de Hacienda, adopte un

20     Reglamento a los fines de conceder un descuento de hasta diez por ciento (10%) a aquellos

21     conductores que opten por adquirir y pagar anticipadamente marbetes multianuales para

22     sus vehículos. El dueño de la estación de inspección depositará en una cuenta especial

1    para que el Departamento de Hacienda haga transferencias diarias de los marbetes

2    expedidos. El Departamento de Hacienda aprobará un reglamento para estos fines, en el

3    cual requerirá una fianza y seguros para garantizar que se reciban los recaudos de los

4    marbetes vendidos. El cargo por servicio que cobre la estación de inspección, el banco o

5    cualquier otro lugar que designe el Secretario de Hacienda no será mayor de cinco dólares

6    ($5). En los casos referentes a derechos de exámenes, incluyendo licencias de aprendizaje,

7    expedición de duplicado de licencias, renovación de licencias de conducir, traspaso de

8    vehículos y todo otro cobro de derechos, se utilizarán comprobantes de pago, sellos de

9    rentas internas o cualquier otro mecanismo de pago que establezca el Secretario de

10    Hacienda."

11    **ARTÍCULO 506.- SE ENMIENDA EL ARTÍCULO 23.02 DE LA LEY 22-2000, SEGÚN**

12    **ENMENDADA, PARA QUE LEA COMO SIGUE:**

13    "Artículo 23.02. — Derechos a pagar. Con relación a los derechos a pagar bajo esta

14    Ley, se seguirán las normas siguientes:

15    (a) …

16    …

17    (e)…

18    (f)…"

19    **ARTÍCULO 507. - SE ENMIENDA EL ARTÍCULO 1.03(B) DE LA LEY 351-2000,**

20    **SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

21    Artículo 1.03 (b). — Definiciones.

1    Las siguientes palabras y términos, cuando sean usados o se haga referencia a los

2    mismos en esta Ley, tendrán el significado indicado a continuación, a menos que del

3    contexto surja otro significado:

4         (a) …

5         …

6         (l) …

7         (m) …

8         (n) …

9         (ñ) …

10        (o) …"

11   **ARTÍCULO 508. - SE ENMIENDA EL INCISO (H) DEL ARTÍCULO 2.02 DE LA LEY**

12   **351-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

13        **Artículo 2.02 – Poderes Específicos de la Autoridad.**

14        "La Autoridad tendrá las siguientes facultades y derechos"

15        (a) …

16        (h) Tomar préstamos con el propósito de financiar los costos del Centro, los

17   proyectos de mejoramiento y proyectos en las parcelas privadas o el Distrito y cumplir

18   con cualquiera de sus propósitos y poderes corporativos, a discreción de la Junta; hacer

19   y emitir bonos negociables de la Autoridad; garantizar el pago de dichos bonos, o

20   cualquier parte de los mismos, mediante la prenda, hipoteca, cesión o escritura de

21   fideicomiso de propiedades de la Autoridad localizadas en o fuera del Distrito, cargos

22   por beneficio, otros ingresos, rentas, cuotas, recibos y cualquier interés en contratos,

1    arrendamientos o subarrendamientos; entrar en cualesquiera acuerdos con los

2    compradores o tenedores de dichos bonos o con otras personas con las cuales la

3    Autoridad está obligada con relación a cualquier bono, emitido o por ser emitido, según

4    la Autoridad considere aconsejable, los cuales constituirán contratos con dichos

5    compradores o tenedores; obtener cualquier facilidad que aumente su capacidad para

6    tomar dinero a préstamo o emitir deuda o que aumente su liquidez con relación a

7    cualesquiera bonos en la forma en que la Autoridad determine ventajosa; y, en general,

8    proveer garantías para el pago de los bonos y los derechos de los tenedores de éstos."

9    **ARTÍCULO 509.- SE ENMIENDA EL ARTÍCULO 8 DE LA LEY 179-2002, SEGÚN**

10   **ENMENDADA, PARA QUE LEA COMO SIGUE:**

11   "Artículo 8.- Las agencias gubernamentales, los municipios, así como las entidades

12   recipientes de asignaciones de fondos públicos los utilizarán para los fines establecidos

13   en la resolución conjunta correspondiente y de ninguna manera, dispondrán de los

14   mismos para otros propósitos o fines que no estén señalados de manera categórica y

15   específica en la resolución conjunta aprobada.

16   Cualquier cambio o modificación de los propósitos o fines establecidos en la

17   resolución conjunta original, conllevará el inicio o repetición por la Asamblea Legislativa

18   de todos los procedimientos.

19   El cumplimiento con estas resoluciones conjuntas, asignando fondos públicos, se

20   hará siguiendo las normas y procedimientos aplicables a los municipios y a las

21   instrumentalidades gubernamentales. Con excepción de las personas naturales, todos los

1   contratos suscritos y cualquiera otro documento legal estarán sujetos a las leyes del

2   Estado Libre Asociado de Puerto Rico y serán interpretados de acuerdo a las mismas.

3   Con el propósito de que la Asamblea Legislativa pueda analizar que las

4   asignaciones o reasignaciones de fondos públicos dispuestos en esta Ley cumplen con el

5   Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial

6   de proveer y enviar una certificación oficial que valide la disponibilidad de fondos

7   respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas

8   en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas."

9   **ARTÍCULO 510.- SE ENMIENDA EL ARTÍCULO 31 DE LA LEY NÚM. 272 DE 9 DE**

10  **SEPTIEMBRE DE 2003, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

11  "Artículo 31. — Disposición de Fondos.

12  La Oficina de Turismo distribuirá las cantidades recaudadas por concepto del Impuesto

13  fijado en el Artículo 24 de esta Ley, de la siguiente manera:

14  (i) dos (2) por ciento del Impuesto total recaudado ingresará mensualmente a los

15  fondos generales de la Oficina de Turismo para cubrir los gastos de operación, manejo y

16  distribución de los recaudos del Impuesto, o para cualquier otro uso que disponga la

17  Oficina de Turismo. (ii) cinco (5) por ciento del Impuesto total recaudado ingresará

18  mensualmente al Fondo General del Departamento de Hacienda para los Años Fiscales

19  2005-2006 y 2006-2007, a las arcas de la Compañía de Parques Nacionales para los Años

20  Fiscales 2007-2008 y 2008-2009, y a partir del Año Fiscal 2009-2010 a las arcas de la Oficina

21  de Turismo. A partir del año en que la Autoridad certifique al Departamento de Hacienda

22  y a la Oficina de Turismo, el inicio de las operaciones del Centro de Convenciones, y

1   durante los diez (10) años subsiguientes, este cinco por ciento (5%) estará disponible para

2   cubrir cualquier déficit, si alguno, que surja de las operaciones de las facilidades que

3   opera la Autoridad del Distrito del Centro de Convenciones, en reserva que mantendrá

4   la Oficina de Turismo. Disponiéndose, sin embargo, que para cada año fiscal y/o cada

5   vez que la Autoridad del Distrito del Centro de Convenciones proponga presentar un

6   presupuesto que exceda el déficit de dos millones quinientos mil (2,500,000) dólares, el

7   presupuesto de la Autoridad del Distrito del Centro de Convenciones deberá ser

8   presentado a la Junta de Directores de la Autoridad a la Oficina de Turismo y al Secretario

9   de Hacienda para los Años Fiscales 2005-2006 y 2006-2007 y a la Junta de Directores de la

10  Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 en una

11  reunión específica a estos fines, y a la Junta de Directores de la Autoridad y a la Oficina

12  de Turismo, comenzando el Año Fiscal 2010-2011 en adelante. Este cinco por ciento (5%)

13  se mantendrá disponible durante cada año fiscal en una cuenta de reserva especial que

14  mantendrá la Oficina de Turismo para cubrir cualquier déficit en exceso de dos millones

15  quinientos mil (2,500,000) dólares, que surja de la operación de las facilidades de la

16  Autoridad del Distrito del Centro de Convenciones. Para cada año fiscal, cualquier

17  sobrante, luego de cubrir dicho déficit operacional, si alguno, se liberará de la reserva

18  especial y estará disponible para el uso del Departamento de Hacienda para los Años

19  Fiscales 2005-2006 y 2006-2007, de la Compañía de Parques Nacionales para los Años

20  Fiscales 2007-2008 y 2008-2009 y a partir del Año Fiscal 2010-2011 para el uso de la Oficina

21  de Turismo. A partir del Año Fiscal 2015-2016, y durante los cinco (5) años subsiguientes,

22  este cinco por ciento (5%) será transferido mediante aportaciones trimestrales por el

1    Departamento a la Autoridad para cubrir los costos asociados exclusivamente a la

2    operación del Centro de Convenciones de Puerto Rico. Disponiéndose, sin embargo, que

3    para cada año fiscal la Autoridad del Distrito del Centro de Convenciones deberá

4    presentar sus estados financieros auditados, conjuntamente con un informe evidenciando

5    el uso de los fondos transferidos según establecido en los incisos (ii) y (iv) de este

6    apartado a la Junta de Directores de la Autoridad y al Director de la Oficina de Turismo,

7    en una reunión específica a esos efectos. Si al finalizar algún año fiscal tales estados

8    financieros auditados reflejan una ganancia neta, la Autoridad del Distrito del Centro de

9    Convenciones devolverá a la Oficina de Turismo la cantidad generada como ganancia

10   neta sin exceder el monto total transferido por la Oficina de Turismo a la Autoridad del

11   Distrito del Centro de Convenciones en ese mismo año fiscal, por virtud de los incisos (ii)

12   y (iv) de este apartado. (iii) dos millones quinientos mil (2,500,000) dólares serán

13   transferidos por la Oficina de Turismo a la Autoridad del Distrito del Centro de

14   Convenciones en aportaciones trimestrales de seiscientos veinticinco mil (625,000.00)

15   dólares para cubrir los costos asociados exclusivamente a la operación del Distrito del

16   Centro de Convenciones. Disponiéndose, sin embargo, que para cada año fiscal y/o cada

17   vez que se proponga presentar un presupuesto modificado, el presupuesto de la

18   Autoridad del Centro de Convenciones deberá ser presentado a la Junta de Directores de

19   la Autoridad y Director Ejecutivo de la Oficina de Turismo, en una reunión específica a

20   esos efectos. Esta cantidad será transferida según establecido en este apartado a partir del

21   Año Fiscal 2015-2016, y por un período de cinco (5) años. (iv) Hasta cuatro millones

22   (4,000,000) de dólares se mantendrán disponibles durante cada año fiscal, en una cuenta

1     de reserva especial que mantendrá la Oficina de Turismo para gastos operacionales

2     dedicados a los asuntos especializado del sector, sus gastos y/o la fiscalización e

3     implementación por este del Contrato de Servicios de Mercadeo de Destino contemplado

4     en el Artículo 8 de la "Ley para la Promoción de Puerto Rico como Destino". (v) El

5     remanente que resulte después de las asignaciones y reservas dispuestas en los incisos

6     (i), (ii), (iii) y (iv), hasta un tope de veinticinco millones (25,000,000) de dólares, se le

7     asignarán a la Corporación. Los fondos asignados a la Corporación serán utilizados por

8     esta para la promoción, mercadeo, desarrollo y fortalecimiento de la industria turística

9     en Puerto Rico. Si el remanente excediera los veinticinco millones (25,000,000) de dólares,

10    dicho exceso será utilizado por la Oficina de Turismo para el desempeño de sus funciones

11    dedicados a los asuntos especializado del sector y sus gastos. La Oficina de Turismo del

12    Departamento de Desarrollo Económico y Comercio le someterá mensualmente a la

13    Autoridad y a la Corporación un desglose de los recaudos por concepto del impuesto."

14    **ARTÍCULO 511.- SE AÑADE UN NUEVO ARTÍCULO 7A A LA LEY 103-2006, SEGÚN**

15    **ENMENDADA, PARA QUE LEA COMO SIGUE:**

16        "Artículo 7A.- Deber Ministerial de la Oficina de Gerencia y Presupuesto

17        Con el propósito de que la Asamblea Legislativa pueda analizar que las medidas

18    legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto

19    tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la

20    disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por

21    las comisiones legislativas en un plazo de treinta (30) días laborables contados a partir

1    desde que se le son requeridas. Dicha certificación deberá incluir la cantidad exacta

2    disponible, sea mayor o menor a la dispuesta en la medida en consideración.

3        Al emitir la certificación oficial, la Oficina de Gerencia y Presupuesto garantiza la

4    disponibilidad de dichos fondos.  Una certificación oficial en donde se informe que los

5    fondos están comprometidos para una obra o uso específico distinto a la dispuesto en la

6    medida legislativa que se solicita deberá venir acompañada con la evidencia de la

7    obligación, copia de las facturas y cualquier otra información pertinente que demuestre

8    la no disponibilidad de dichos fondos.

9        El proceso para requerir las certificaciones oficiales de disponibilidad de fondos

10   por parte de las comisiones legislativas no requerirá de ningún formulario o trámite

11   especial, solo requerirá una misiva de la comisión legislativa solicitando la certificación

12   que se trate.

13       Cuando cualquier comisión permanente, especial o conjunta de la Asamblea

14   Legislativa de Puerto Rico presente cualquier informe recomendando la aprobación de

15   alguna medida legislativa en la cual se haya solicitado una certificación oficial tendrá que

16   incluir en el referido informe una sección titulada "Deber Ministerial de la Oficina de

17   Gerencia y Presupuesto referente a disponibilidad de fondos".  En esta Sección, se

18   aseverará el impacto fiscal, si alguno, que se estime la aprobación de la medida tendría

19   sobre los presupuestos de las agencias, departamentos, organismos, instrumentalidades

20   o corporaciones públicas.  Si la Oficina de Gerencia y Presupuesto no emite la

21   correspondiente certificación en el tiempo dispuesto en este Artículo, se incluirá en dicha

22   sección del informe el siguiente texto: "La Oficina de Gerencia y Presupuesto no

1    suministró la certificación oficial de disponibilidad de fondos en el tiempo dispuesto por

2    ley incumpliendo con el deber ministerial dispuesto en la Ley 103-2006, según

3    enmendada, mejor conocida como "Ley para la Reforma Fiscal del Gobierno del Estado

4    Libre Asociado de Puerto Rico de 2006".

5    **ARTÍCULO 512.- SE ENMIENDA LA SECCIÓN 3060.11 DE LA LEY NÚM. 1 DE 31 DE**

6    **ENERO DE 2011, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

7        Sección 3060.11 – Disposición de Fondos.

8        "El producto de los impuestos y derechos de licencia recaudados por virtud de

9    este Subtítulo ingresará en el Fondo General del Tesoro de Puerto Rico."

10   **ARTÍCULO  513.- SE ELIMINA LA SECCIÓN 3060.11A DE LA LEY NÚM. 1 DE 31 DE**

11   **ENERO DE 2011, SEGÚN ENMENDADA.**

12   **ARTÍCULO 514.- SE DEROGA LA LEY NÚM. 39 DEL 13 DE MAYO DE 1976, SEGÚN**

13   **ENMENDADA.**

14   **ARTÍCULO 515.- SE ENMIENDA EL ARTÍCULO 7.018 DE LA LEY 107-2020, SEGÚN**

15   **ENMENDADA, PARA QUE LEA COMO SIGUE:**

16   "Artículo 7.018 – Fondos – Fideicomisos; Distribución

17   Los fondos en el fideicomiso general que el CRIM establece con el Fiduciario Designado

18   según el inciso (c) del Artículo 7.003 de este Capítulo, serán distribuidos por el CRIM en

19   el orden de prioridad que a continuación se indica:

20       (a) La cantidad que corresponda a la contribución especial del 1.03% será depositado

21            en el Fondo General.

22       (b) …

1    (c) …

2        …"

3    **ARTÍCULO 516.- SE ENMIENDA EL ARTÍCULO 7.027 DE LA LEY 107-2020, SEGÚN**

4    **ENMENDADA, PARA QUE LEA COMO SIGUE:**

5    Artículo 7.027 – Recaudación e Ingreso de Contribuciones en Fondos y Aplicación del

6    Producto de las Contribuciones (Fondo de Redención de Bonos)

7    El producto de las contribuciones que se imponen por los Artículos 7.025 y 7.026 ingresará

8    al fideicomiso general establecido por el CRIM con la Autoridad de Asesoría Financiera

9    y Agencia Fiscal de Puerto Rico (AAFAF), de conformidad con el Capítulo I de este libro.

10       (a) El producto de las contribuciones especiales sobre la propiedad impuesta por el

11           Artículo 7.026 ingresará al Fondo General.

12       (b) …

13       (c) …

14       (d) …"

15   **CAPÍTULO 6 – DISPOSICIONES MISCELÁNEAS**

16   **Artículo 601.-Prohibición del menoscabo de las Obligaciones de la Corporación del**

17   **Fondo de Interés Apremiante (COFINA)**

18       Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier Año

19   Fiscal no menoscabarán bajo concepto alguno las obligaciones de la Corporación del

20   Fondo de Interés Apremiante (COFINA), incluyendo las obligaciones y reservas creadas.

1   **Artículo 602.-Autorización al Representante del Gobernador**

2   Las responsabilidades, facultades, deberes y autorizaciones concedidas por la

3   presente Ley al Representante del Gobernador, estará limitada exclusivamente a lo

4   dispuesto en esta Ley y no a futuras emisiones de deudas"

5   **Artículo 603.- Separabilidad.**

6   Si cualquier clausula, párrafo, subpárrafo, acápite o parte de esta Ley fuera

7   anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará,

8   perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará

9   limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición,

10   sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así

11   hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una

12   circunstancia de cualquier clausula, párrafo, subpárrafo, oración, palabra, letra, artículo,

13   disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley

14   fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal

15   efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas

16   Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e

17   inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las

18   disposiciones y la aplicación de esta Ley, aunque se deje sin efecto, anule, invalide,

19   perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto,

20   invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

21   **Artículo 604.- Supremacía.**

1   Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición

2 general o especifica de cualquier otra ley o reglamento del Gobierno que sea inconsistente

3 con esta Ley.

4 **Artículo 605.- Vigencia.**

5   Esta Ley comenzará a regir inmediatamente luego de su aprobación, excepto por

6 el Capítulo 5 de esta Ley, el cual comenzará a regir en la Fecha de Efectividad. Las

7 Transacciones de Restructuración de deuda autorizadas mediante la presente Ley, están

8 totalmente sujetas y condicionadas a que la Junta de Supervisión y Administración

9 Financiera (JSAF) no apruebe recorte alguno a las pensiones de los empleados

10 gubernamentales retirados en el Plan de Ajuste o Reestructuración."