# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

      Debtors.[1]

---------------------------------------------------------------x

PROMESA
Title III

Case No. 17 BK 3283-LTS

(Jointly Administered)

## OBJECTION OF SERVICE EMPLOYEES INTERNATIONAL UNION TO
## PLAN OF ADJUSTMENT AND PROPOSED CONFIRMATION ORDER

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# <u>TABLE OF CONTENTS</u>

Page(s)

The Order Cannot Require the Commonwealth to Enact Legislation ................................. 1

The Order Should Clarify that, Consistent with the POA, It Does Not Seek to
    Reject Collective Bargaining Agreements................................................................. 7

The Order Should Make Clear that Union Grievance Claims Are to be Paid in the
    Ordinary Course .................................................................................................... 8

The POA Would Leave Puerto Rico with an Unaffordable Debt Burden .......................... 9

Reservation of Rights ....................................................................................................... 11

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Pierluisi*,
2021 WL 4768715 (D.P.R. Oct. 13, 2021) ...................................................... 3, 4, 5

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010) ....................................................................................... 5

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984) ....................................................................................... 7

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004) ......................................................................................... 6

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R.*,
330 F.Supp.3d 685 (D.P.R. 2018) ............................................................... 4, 5

*Seila Law LLC v. Consumer Fin. Protection Bureau*,
140 S. Ct. 2183 (2020) ................................................................................... 6

**Statutes**

48 U.S.C. §2163 ...................................................................................................... 4

48 U.S.C. §2174(b)(6) Section 314(b)(6) .......................................................... 9, 10

48 U.S.C. §2175 ...................................................................................................... 5

Service Employees International Union ("SEIU") submits this objection ("Objection") to the July 7, 2021 *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Docket Entry #17,627] ("POA") and to the October 8, 2021 *Order and Judgment Confirming Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Docket Entry #18,447] ("Order") proposed by the Financial Oversight and Management Board for Puerto Rico ("Oversight Board").

1.    SEIU is an international labor union that serves as collective bargaining representative for approximately two million service workers throughout North America.  SEIU and its local union chapters are collective bargaining representatives of approximately 20,000 Puerto Rico residents employed by the Commonwealth or its instrumentalities.  SEIU members employed by the Commonwealth belong to one of two SEIU local chapters:  SEIU Local 1996/Sindicato Puertoriqueno de Trabajadores y Trabajadoras and SEIU Local 1199/Union General de Trabajadores.[2]

**The Order Cannot Require the Commonwealth to Enact Legislation**

2.    SEIU objects to the Order first to the extent that it purports to require the Commonwealth to enact legislation called for by the POA.  Such a requirement would constitute a clear infringement on the powers of the Government of Puerto Rico and the rights of its people.

3.    The POA rests on assumption that the Commonwealth will enact legislation -- referred to in the POA as the "New GO Bonds Legislation" and the "CVI Legislation," *see* POA §§1.363, 1.170 -- that would authorize the issuance of the new securities

---

[2] SEIU is a member of the Official Committee of Unsecured Creditors ("Committee").  SEIU submits this Objection in its individual capacity and not in its capacity as a Committee member, nor in any way on behalf of the Committee.

called for by the POA.  The Order would require the Commonwealth to enact this legislation.  In

particular, paragraph 21 of the Order provides that

> Pursuant to PROMESA Section 305, with the consent of the
> Oversight Board and consistent with the Plan, using all their
> political and governmental powers, the Governor and Legislature
> *are directed* to take all acts necessary to carry out and satisfy all
> obligations and distributions set forth in the Plan, including,
> without limitations, *enacting enabling legislation* required by, and
> *solely to the extent set forth in*, the Plan.

(Emphasis added).

4.     The Order would thus force the elected members of Puerto Rico's

Legislative Assembly to craft a bill that conforms to the dictates of the POA, and that contains no

conditions or terms other than those allowed by the POA.  Then, whatever the views held by the

legislators or their constituents, the Order would force Senators and Representatives to cast their

votes in favor of the mandated bill.  When the mandated bill reached the Governor's desk, the

Order would force the Governor to sign it, whatever his beliefs about whether it was best for the

Puerto Rican people.

5.     To date, Puerto Rico's elected leaders have chosen not to enact the

legislation that the Oversight Board seeks.  The October 11, 2021 supplement to the POA

contains draft legislation from the Puerto Rico House of Representatives and Senate that would

authorize the new securities, *see Plan Supplement and Plan Related Documents of the*

*Commonwealth of Puerto Rico, et al.* [Docket Entry #18,470], at Exhibit J and K, but the

Oversight Board declares that that draft legislation "is inconsistent with the proposed Plan."  *Id.*

at 7 nn. 9, 10.  The draft legislation conditions authorization for the new securities on, among

other things, a prohibition on cuts to public employee pension benefits and to employer

contributions to public employee health coverage.[3]  The conditions also include certain funding

obligations for Puerto Rico municipalities and for the University of Puerto Rico.[4]  In the

Oversight Board's view, the draft legislation "adds costly mandates and massive spending

increases" that would make the POA "unaffordable."[5]

      6.      On October 14, 2021, the Oversight Board made a significant change in its

position.  In a letter to the Governor and legislative leaders, the Oversight Board stated that it

would "not oppose" enabling legislation that, among other things, banned pension cuts and

provided funding to municipalities and to the University of Puerto Rico.[6]  That announcement

appears to increase the likelihood that the Board and the Commonwealth will reach an accord.

      7.      Nonetheless, as of today, the Board has not obtained from the

Commonwealth the enabling legislation that it seeks, and the Order, filed prior to October 14,

still seeks to coerce the Commonwealth to enact such legislation.  Because that request

constitutes a brazen overreach, one that willfully ignores what this Court has explained are the

limits on the Oversight Board's power, SEIU is compelled to object to it.

      8.      As this Court has recognized, the Oversight Board is not a control board

that rules Puerto Rico.  *See Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 583 B.R. 626, 633

(D.P.R. 2017); *see also id.* at 635 ("Congress did not make the [Oversight Board] an operating

---

[3] *See Senate Approves Amended Go Bond-CVI Legislation with Range of Conditions; Bill Now Heads Back to House*, REORG RESEARCH (Oct. 8, 2021)

[4] *See id.*

[5] Statement, Financial Oversight and Management Board for Puerto Rico (Oct. 8, 2021).

[6] October 14, 2021 letter from David A. Skeel to Gov. Pierluisi, et al.

trustee").[7]  Judge Swain has noted that the Oversight Board does *not* have the power "to take any and all actions it believes are necessary to further its role under PROMESA." *Id.* at 634.  In particular, the Court has explained, Congress did not give the Oversight Board "power to affirmatively legislate." *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.) ("Rosselló Nevares")*, 330 F.Supp.3d 685, 701 (D.P.R. 2018). Legislating remains a prerogative of the Commonwealth.

9. Indeed, PROMESA Section 303 expressly reserves political, legislative and governmental power to the Commonwealth, stating that, with certain exceptions not relevant here, Title III "does not limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or governmental powers of the territory or territorial instrumentality."  48 U.S.C. §2163.  By seeking to force the Governor and the Legislature to use "all their political and governmental powers" to enact the New GO Bonds Legislation and the CVI Legislation, Order ¶21, the Order runs directly contrary to the express reservation of governmental powers set forth in PROMESA Section 303.

10. In limiting the Oversight Board's authority, and broadly reserving the Commonwealth's right to govern, PROMESA created what this Court has described as an "awkward power-sharing arrangement." *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Pierluisi ("Pierluisi")*, 2021 WL 4768715, at *2 (D.P.R. Oct. 13, 2021) (*quoting Rosselló Nevares,* 330 F.Supp.3d at 701); *see also Fin. Oversight & Mgmt. Bd. for Puerto Rico,* 583 B.R. at 637 (noting

---

[7] During debate on the PROMESA bill in the U.S. House of Representatives, Pedro Pierluisi, then Resident Commissioner of Puerto Rico, explained that PROMESA provided the Oversight Board "the authority to oversee, but not to command and control, the Government of Puerto Rico." 162 Cong. Rec. H3583 (daily ed. June 9, 2016).

"power sharing structure created by PROMESA"). Judge Swain has explained that because the Oversight Board shares power with the Commonwealth, the Oversight Board must obtain "buy-in from the elected officials and legislators" for those measures that require the adoption or modification of legislation. *Rosselló Nevares*, 330 F.Supp.3d at 701.

11.     The need for "buy-in" certainly applies in the case of a proposed plan of adjustment. PROMESA Section 315 authorizes the Oversight Board to submit a plan of adjustment, *see* 48 U.S.C. §2175, but Section 314(b)(5) makes confirmation of such a plan contingent on the Oversight Board obtaining "any legislative, regulatory, or electoral approval necessary under applicable law to carry out any provision of the plan." *Id.* §2174(b)(5). As this Court explained, Section 314(b)(5) thus "gives the Commonwealth government the ability to 'obstruct implementation' or 'complicate' the Oversight Board's efforts to produce a confirmable plan of adjustment." *Pierluisi*, 2021 WL 4768715, at *2 (*quoting Rosselló Nevares*, 330 F.Supp.3d at 701). To overcome such obstruction or complication, the Oversight Board needs to obtain the "buy-in" of the Commonwealth's elected leadership. It cannot coerce the legislation it needs.

12.     The Oversight Board might argue that even if it lacks the power to force the enactment of legislation, the Court possesses such power. That would be incorrect. Nothing in PROMESA gives a Title III court the authority to order a territorial government to enact legislation. Nor does such authority rest in the Court's inherent power to manage the case. Indeed, mandating the passage of legislation falls well outside the power of the judiciary. Fundamental to our system of government is a separation of powers and functions, under which courts decide cases but legislatures craft laws. *See Free Enterprise Fund v. Public Co.*

5

*Accounting Oversight Bd.*, 561 U.S. 477, 510 (2010) ("editorial freedom" to shape legislation "belongs to the Legislature, not the Judiciary").

13.     Courts have what the Supreme Court has called the "blunt" and "negative" power to void legislation that has already been enacted, if it runs afoul of superior law. *Seila Law LLC v. Consumer Fin. Protection Bureau*, 140 S. Ct. 2183, 2211 (2020).  No doubt, courts can also require a government to comply with an agreement that the government voluntarily entered.  In addition, courts have the authority to order public agencies or officials to take ministerial actions required by law, if they fail or refuse to do so.  *See Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 63 (2004).

14.     Requiring a government to enact a law, however, is something else entirely.  Legislation is not ministerial action.  It is the product of freely exercised votes of elected representatives, cast after debate and deliberation, and based on their sense of how best to advance the interests of their constituents.  This legislative process, based on freely cast votes, stands at the core of our republican form of government and, indeed, of the American democratic process.  Legislation by judicial edict, as sought by the Oversight Board, would be antithetical to that process.  It would strip legislators of their proper role and, by forcing their hands, would deprive their constituents -- here, the Puerto Rican people -- of their right to democratic representation.

15.     For these reasons, we object to any language in the Order requiring the Commonwealth to enact legislation to carry out the terms of the POA.

6

## **The Order Should Clarify that, Consistent with the POA, It Does Not Seek to Reject Collective Bargaining Agreements**

16.     SEIU next objects to the Order to the extent that it fails to confirm and clarify that, pursuant to the POA, collective bargaining agreements with the Commonwealth are not subject to rejection.

17.     The POA explains that collective bargaining agreements are to remain in effect.  In particular, Section 76.10 of the POA states, in relevant part, that "none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain in effect."

18.     The Order, however, nowhere makes this clear.  It states that executory contracts that are not assumed "shall be deemed rejected," Order ¶24, without anywhere noting the POA's provision regarding collective bargaining agreements.  Because collective bargaining agreements are generally considered to be executory contracts, *see NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 521-22 (1984), and because the Order takes precedence over the POA in case of an inconsistency between the two, *see* Order ¶73, the Order might be mistakenly read as rejecting collective bargaining agreements.  Such a reading would be contrary to the clear intent of POA §76.10.  Nonetheless, for the avoidance of doubt, the Court should clarify the Order to state that it does not reject, or authorize rejection of, collective bargaining agreements, but instead leaves them in effect.

7

**The Order Should Make Clear that Union Grievance Claims Are to be Paid in the
Ordinary Course**

19.     In these Title III cases, SEIU has claims based on pre-petition grievances

filed under its collective bargaining agreements with the Commonwealth.  These grievances,

which are typical in a unionized workplace, allege that the Commonwealth, in its role as

employer, on various occasions violated the collective bargaining agreements or local labor or

employment laws.

20.     In its March 12, 2020 *Order (A) Authorizing Administrative*

*Reconciliation of Claims, (B) Approving Additional Form of Notice, and (C) Granting Related*

*Relief* ("ACR Order") [Docket Entry #12274], the Court held that these grievances would be

paid in the ordinary course.  Paragraph 6 of the ACR Order defines "Prepetition Actions" to

include grievances asserted by certain named labor unions or their Puerto Rico-based local

affiliates, including SEIU.  Paragraph 6 states that "[t]o the extent that any disposition of a

Prepetition Action results in a settlement, arbitration award, or other resolution that requires

payment, such payment shall be made by the Commonwealth *in the ordinary course*."  *Id.*

(emphasis added).[8]

21.     Although the ACR Order clearly states that SEIU's grievance claims are

to be paid in the ordinary course, the Order nowhere so provides.  Rather, without mention of

grievance claims, the Order blanketly discharges all claims against the Commonwealth, *see*

---

[8] The POA makes clear that because union grievance claims are eligible for the ACR process, they are not to be
treated as general unsecured claims.  The POA expressly excludes from the definition of "CW General Unsecured
Claim" "any Claim that is eligible to be transferred into or administered through the ACR process," POA §1.177(u),
and the ACR Order provides that union grievance claims are eligible for that process.  *See* ACR Order ¶2
("Grievance Claims" included in those categories of claims that "shall be resolved through the Debtors' existing
administrative reconciliation processes ('Administrative Claims Reconciliation')."); Oct. 8, 2019 *Motion for Entry
of an Order (A) Authorizing Administrative Reconciliation of Certain Claims, (B) Approving Additional Form of
Notice, and (C) Granting Related Relief* [Docket Entry #8827], at 10 (defining "Grievance Claims" as "union
grievances").

Order ¶¶49(a), 49(b), and enjoins creditors from pursuing discharged claims in any proceeding, *see id*. ¶52.  Moreover, the Order states that, in the case of an inconsistency, it takes precedence over any other order of the Court.  *See id*. ¶73.

22.     It would be incorrect to read the Order as overriding the provision in the ACR Order giving SEIU's grievances a right to payment in the ordinary course.  There is no evidence that the Oversight Board intends such a reading.  Nonetheless, for the avoidance of doubt, the Court should amend the Order to confirm and make clear that SEIU retains the right, consistent with the ACR Order, to have its grievances paid in the ordinary course.[9]

**The POA Would Leave Puerto Rico with an Unaffordable Debt Burden**

23.     Finally, SEIU objects to the POA because it would leave Puerto Rico with an unaffordable debt burden.  *See* PROMESA Section 314(b)(6), 48 U.S.C. §2174(b)(6) (requiring that a plan of adjustment be feasible).  Using analysis by Nobel Laureate economist Joseph Stiglitz, SEIU objected to the COFINA plan of adjustment, and in that objection explained that

> [g]iven its deep and widespread poverty, its unreliable and fragile infrastructure, and its feeble rate of growth, Puerto Rico has far more pressing social and economic needs than most U.S. states, and so should emerge from these reorganization proceedings with -- at most -- no heavier a debt load than the average U.S. state.

---

[9] The Order should also be clarified to indicate that grievance claims are not subject to the administrative claims bar date set forth in paragraph 38 of the Order.  Even if pre-petition grievance claims were deemed to be administrative claims because they are to be paid in the ordinary course, they are exempt from the requirement to file an administrative proof of claim because their administrative status was incurred "in accordance with an order of the Court," Order ¶38, namely, the ACR Order.  Nonetheless, the Order should be modified to confirm and expressly state that administrative proofs of claim need not be filed for union grievance claims.  Indeed, given the glacial rate at which Commonwealth agencies resolve and liquidate union grievances, many union grievances will remain unresolved by the administrative bar date, which is 90 days after the POA takes effect.

Nov. 15, 2018 *Objection of Service Employees International Union* [Docket Entry #4,233], at ¶1.

That statement remains just as true today.  Yet there is no dispute that the POA would leave

Puerto Rico far more indebted than the average U.S. state.

24.     Puerto Rico is poor, with a median household income of between $20,000

and $25,000.  *See* Sept. 13, 2021 *Testimony of Simon Johnson* [Docket Entry #18,093-1] at 10

(¶3.2).  That is well below that of even the poorest U.S. state, Mississippi, which has a median

household income of between $40,000 and $45,000.  *See id.*  Moreover, although markedly

poorer on average than residents on the U.S. mainland, Puerto Ricans bear a heavy tax burden.

They pay income taxes to the Commonwealth at rates comparable to federal taxes paid by those

on the mainland.  On top of that, they pay a high and regressive 11.5% sales-and-use tax.

25.     Rather than providing Puerto Ricans the relief they need, the POA would

leave the Island mired in debt.  According to Oversight Board expert witness Marti Murray,

under the POA, Puerto Rico would rank *ninth from the top* in rankings of the most indebted U.S.

states, with a net tax-supported debt per capita of $2,532.  *See* Sept. 13, 2021 *Expert Report of

Marti P. Murray* [Docket Entry #18097-1], at 42 (Table 9).  By contrast, the average per-capita

debt for all U.S. states, each of which is far richer than Puerto Rico, is only $1,505.  *See id.*

26.     Because the POA would leave Puerto Rico with an unsustainable level of

debt, the Court should not confirm it.

**Reservation of Rights**

27.    SEIU reserves the right to supplement or modify this Objection in light of any subsequent modifications to the POA or the Order.  Such reservation of rights is particularly important given the uncertainty currently hanging over the Oversight Board's reorganization plans.  As noted above, despite recent significant movement by the Oversight Board, it has yet to reach agreement with the Commonwealth on the terms of enabling legislation.  Given this uncertainty, SEIU reserves all rights to object further to any modified POA or Order.

October 15, 2021

Respectfully submitted,

**COHEN, WEISS AND SIMON LLP**

By: */s/ Peter D. DeChiara*
Peter D. DeChiara (pro hac vice)
Richard M. Seltzer *(pro hac vice)*
Marie B. Hahn *(pro hac vice)*
pdechiara@cwsny.com
rseltzer@cwsny.com
mhahn@cwsny.com
900 Third Avenue, Suite 2100
New York, NY  10022-4869
(212) 563-4100

**MONSERRATE SIMONET & GIERBOLINI**
*/s/ Miguel Simonet Sierra*
Miguel Simonet Sierra
USDC # 210101
101 San Patricio Ave., Suite 1120
Guaynabo, PR 00968
Tel.: (787) 620-5300

*Counsel to Service Employees International Union*

11

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 15th day of October 2021, I caused the

foregoing to be electronically filed with the Clerk of the Court using the CM/ECF System, which

will notify all counsel of record.

/s/ *Peter D. DeChiara*

Peter D. DeChiara