# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br>    as representative of<br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br>    as representative of<br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Movant,<br><br>v.<br><br>AMERINATIONAL COMMUNITY SERVICES,<br>LLC, as servicer for the GDB Debt Recovery<br>Authority, and CANTOR-KATZ COLLATERAL<br>MONITOR LLC<br><br>        Respondents. | |

## DRA PARTIES' MEMORANDUM OF LAW IN OPPOSITION TO DEBTORS' MOTION IN LIMINE FOR ORDER EXCLUDING EXPERT TESTIMONY OF LIZETTE MARTINEZ

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation  (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747; and (vi) Puerto Rico Public Buildings Authority (Bankruptcy Case No. 19-BK-5233 (LTS)) (Last Four Digits of Federal Tax ID: 3801).

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND .............................................................................................................4

STANDARD OF LAW.....................................................................................................8

ARGUMENT ................................................................................................................10

      A.    Notwithstanding the Separate Adversary Proceeding, the Report Is
Relevant to Whether the Plan Meets Certain  Confirmation
Requirements Set Forth in PROMESA § 314(b). .....................................10

            1.    The Report Details the Commonwealth's Illegal Clawback of
Act 30-31 Revenues and Is Therefore Relevant to PROMESA
§ 314(b)(3). ....................................................................................10

            2.    The Report Quantifies the DRA Parties'  Administrative
Claim, and Is Therefore Relevant to the  Reserves Necessary
to Comply with PROMESA § 314(b)(4). ......................................12

      B.    The DRA Parties Have a Valid Security Interest in the Act 30-31
Revenues. ..................................................................................................13

      C.    PROMESA Has Not Preempted the Act 30-31 Excise Tax Statutes.........14

      D.    The Report's Analysis of How HTA Has Used the  Act 30-31
Revenues Is Relevant Background Evidence. ...........................................15

CONCLUSION.............................................................................................................15

CERTIFICATE OF SERVICE ......................................................................................17

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acevedo-Garcia v. Monroig*, 351 F.3d 547 (1st Cir. 2003)................................................... 9

*Armstrong v. United States*, 364 U.S. 40 (1960) .............................................................. 12

*Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72 (1st Cir. 2010)........................................ 8

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)....................................... 8, 10

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004) ............................ 9

*Financial Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Glob. Designated Activity
    Company*, 948 F.3d 457 (1st Cir. 2020).................................................................... 16

*FTC v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014) ............................................... 10

*Gibbs v. Gibbs*, 210 F.3d 491 (5th Cir. 2000)................................................................. 9

*In re ADnational Corp.*, No. 03-81614, 2006 WL 5003849 (Bankr. D. Md. Mar. 7, 2006)........ 14

*In re Cir. City Stores, Inc.*, 515 B.R. 302 (Bankr. E.D. Va. 2014) ............................... 14

*In re Fin. Oversight & Mgmt. Bd.*, 478 F. Supp. 3d 190 (D.P.R. 2020)...................... 15

*In re Fin. Oversight & Mgmt. Bd.*, 618 B.R. 619 (D.P.R. 2020)................................... 15

*In re Momenta, Inc.*, 455 B.R. 353 (Bankr. D.N.H. 2011) ........................................... 14

*In re Salem*, 465 F.3d 767 (7th Cir. 2006) ................................................................... 10

*Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc.*, 2017 U.S. Dist. LEXIS 222650 (D. Mass.
    April 18, 2017).......................................................................................................... 10

*Pages-Ramirez v. Ramirez-Gonzales*, 605 F.3d 109 (1st Cir. 2010)........................... 10

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77 (1st Cir. 1998) .............. 10

*See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) .... 13

*United States v. Cruz-Ramos*, 987 F.3d 27 (1st Cir. 2021)........................................... 8

*United States v. Guzmán-Montañez*, 756 F.3d 1 (1st Cir. 2014) ................................... 8

*United States v. Wood*, 741 F.3d 417 (4th Cir. 2013) ................................................................. 10

**Puerto Rico Constitution**
Article VI, Section 8 of the Puerto Rico Constitution ................................................... 5

**U.S. Statutes**
48 U.S.C. §§ 2101-2241 ................................................................................ 1, 12

**Puerto Rico Statutes**
13 L.P.R.A. §§ 31751(a) ............................................................................... 5, 14

9 L.P.R.A. § 5681 ........................................................................................ 5, 14

PROMESA § 314(b) ...................................................................................... passim

**Rules of Procedure**
Fed. R. Evid. 401 ................................................................................ 4, 8, 9, 17

Fed. R. Evid. 402 ......................................................................................... 8, 10

Fed. R. Evid. 702 ...................................................................................... 9, 10, 11

iii

AmeriNational Community Services, LLC (the "Servicer"), as servicer for the GDB Debt

Recovery Authority (the "DRA"), and Cantor-Katz Collateral Monitor LLC, a Delaware limited

liability company (the "Collateral Monitor," and together with the Servicer, collectively, the "DRA

Parties"), which serves as the collateral monitor for Wilmington Trust, N.A. in connection with

the new bonds that the DRA issued pursuant to the *Government Development Bank for Puerto

Rico Debt Restructuring Act*, Act No. 109-2017, as amended by Act No. 147-2018, and the

approved qualifying modification for the Government Development Bank for Puerto Rico (the

"Qualifying Modification")[2] under Title VI of the *Puerto Rico Oversight, Management and

Economic Stability Act* ("PROMESA")[3], by and through the undersigned legal counsel,

respectfully submit this Memorandum of Law in Opposition to the Motion *in Limine* for an Order

Excluding Expert Testimony of Lizette Martinez (the "Motion") filed by the Financial Oversight

and Management Board for Puerto Rico (the "FOMB").

## PRELIMINARY STATEMENT

1.      The Court should deny the Motion and admit the Expert Report of Lizette Martinez,

CPA, CFF, CFE, (the "Report").  The Report details the Commonwealth's illegal retention of Act

30-31 Incremental Revenues[4] from July 2014 through June 2021.  The FOMB has moved to

exclude the entire Report, despite not taking any issue with Ms. Martinez's qualifications,

methods, or conclusions.

2.      Instead, the FOMB asserts that Ms. Martinez's findings are irrelevant to

confirmation of the Plan, and that the Court should refuse to consider them on that basis alone.

But the FOMB's relevancy objections do not rise to the high bar courts have established for

---

[2]      *See* Dkt. No. 270 of Civil Case No. 18- 01561 (LTS) (Nov. 7, 2018).

[3]      PROMESA is codified at 48 U.S.C. §§ 2101-2241.

[4]      All capitalized terms not defined herein have the meaning ascribed to them below.

excluding expert reports.  To reach this bar, the FOMB must establish that the expert's report has _no_ tendency to make a fact more or less probable than it would be without the evidence or does _nothing_ to help the trier of fact understand the evidence or to determine a fact in issue.  Instead, the FOMB offers mostly rehashed legal arguments already before the Court which have yet to be decided.

3.     Worse, the objections are premised on the presupposition of the FOMB's view of the case.  That is not how motions _in limine_ or the Federal Rules of Evidence work, which is why none of the cases cited by the FOMB support its position.  Instead, the case shows that the admission of expert reports is strongly favored, especially in bench trials.  As demonstrated below, the Report easily meet the standard for admissibility.

4.     The FOMB makes four separate relevancy arguments, none of which hold water. _First_, the FOMB asserts that the Report does not affect whether the Plan satisfies the confirmation requirements set forth in PROMESA § 314(b) in part because the DRA Parties' claims are the subject of a separate adversary proceeding.  _See_ Motion at ¶¶1, 3, 27-28.  However, irrespective of the separate adversary proceeding, the Commonwealth's illegal clawback of the Act 30-31 Incremental Revenues precludes the Plan from satisfying PROMESA § 314(b)(3), which requires the Commonwealth to "not [be] prohibited by law from taking any action necessary to carry out the [P]lan."  The Report details the flow of the Act 30-31 Incremental Revenues and will thereby help the Court understand the mechanics of how the Commonwealth's illegal clawback of such revenues occurred.  The Report therefore is relevant to the DRA Parties' showing that the Plan cannot satisfy PROMESA § 314(b)(3).  Likewise, to the extent the DRA Parties' administrative claim is not resolved prior to the effective date, PROMESA § 314(b)(4) requires the Plan to reserve an amount sufficient to cover the DRA Parties' claim in the event that such claim is ultimately

allowed.  The Report quantifies the DRA Parties' administrative claim, which seeks the total amount of Act 30-31 Incremental Revenues allocated to HTA that the Commonwealth has unlawfully retained during the relevant period, and is therefore directly relevant to demonstrating the amount the Plan must reserve for the DRA Parties in order to comply with PROMESA § 314(b)(4).

5.    _Second_, the FOMB argues that the Report is irrelevant "because the DRA Parties have no security interest against Act 30-31 Incremental Revenues collected and retained by the Commonwealth" because, according to the FOMB, the Act 30-31 Incremental Revenues were not the HTA's to pledge.  Motion ¶¶ 4-5, 29-33.  In support, the FOMB relies exclusively on arguments from its motion to dismiss the DRA Parties' adversary complaint [Case No. 21-68-LTS, ECF No. 40] (the "Motion to Dismiss").  The DRA Parties disagree with each of these arguments for all the reasons stated in their opposition to the Motion to Dismiss [Case No. 21-68-LTS, ECF No. 60] (the "Opposition").  As the Opposition conclusively establishes, the DRA Parties have a valid security interest over the Act 30-31 Incremental Revenues.  This motion _in limine_ is not the proper avenue for the Court to decide this point, as the Motion to Dismiss will be decided independently of any determination regarding the admissibility of the Report.

6.    _Third_, the FOMB argues that the Report is irrelevant because "[t]he Act 30-31 Excise Tax Statutes are [] inconsistent with PROMESA and preempted by it."  Motion ¶¶ 6, 34-36.  As with the prior topic, the FOMB relies heavily on arguments incorporated from the Motion to Dismiss.  Likewise, the DRA Parties dispute the FOMB's points for all the reasons described in the Opposition.

7.    _And finally_, the FOMB asserts the Report's analysis of how HTA used the Act 30-31 Incremental Revenues has no bearing on whether to confirm the Plan, because the Plan does

3

not adjust the debts of HTA.  Motion ¶¶ 4, 37.  But evidence may be as background evidence, or offered as an aid to understanding, even if such background evidence does not itself relate to a consequential fact.  *See* Fed. R. Evid. 401 advisory committee's notes.  By detailing how the Act 30-31 Incremental Revenues were ultimately used by HTA, the Report provides the Court with a clearer picture of what actually happened.  The Court, as the ultimate trier of fact presiding over a bench trial, is more than capable of determining how much weight to afford such evidence.

8.     Currently the issues surrounding the Commonwealth's illegal clawback of Act 30-31 Incremental Revenues remain unresolved by the Court.  Despite these open issues, the Motion asks the Court to exclude the Report based on the FOMB's view of how the Court should decide the underlying legal issues.  This improper use of a motion *in limine* should be rejected and the Report should not be excluded, as it clearly meets the low threshold of relevance for the all the reasons stated herein.

## **BACKGROUND**

9.     Between March 2008 and January 2014, GDB extended several loans to HTA (the "Loan Claims").  See Case No. 21-00068-LTS, ECF No. 1 ("DRA Complaint"), ¶ 48.  The Loan Claims are payable from "any available moneys and resources of HTA," including the "incremental revenues implemented through Acts 30 and 31 and allocated to HTA . . . ."  *Id.* ¶ 46.  The DRA is a creditor of HTA, whose claims include the Loan Claims, which, along with the GDB's perfected security interest in the Act 30-31 Incremental Revenues (as defined below), were transferred to the DRA by the GDB pursuant to the Master Transfer Agreement dated November 29, 2018 by and between the GDB and the DRA [Dkt. No. 16276-7 of Case No. 17-03283 (LTS)] (the "Transfer Agreement").

10.     Acts 30 and 31, which allocated the Act 30-31 Revenues to HTA, were enacted so HTA could meet and repay the Loan Claims to the GDB.  HTA, in turn, pledged and assigned its interest in the Act 30-31 Revenues to the GDB to secure the Loan Claim.

11.     Acts 30 and 31 each require that the Act 30-31 Revenues be transferred and conveyed from the Commonwealth to HTA unless Article VI, Section 8 of the Puerto Rico Constitution is invoked.  *See* 9 L.P.R.A. § 5681; 13 L.P.R.A. §§ 31751(a)(1)(A), 31751(a)(1)(C), 31751(a)(3)(A), and 31751(a)(3)(C).[5]

12.     Act 30 amended Section 23.01 of Act 22-2000 to allocate to the HTA additional excise taxes on motor vehicle and trailer licenses.  Prior to Act 30, the HTA was allocated $15 from each of these license fees (the "Act 30 Restated Revenues").  Act 30 allocated the entire amount of the license fees beyond the $15 to HTA.

13.     Similarly, Act 31 amended certain subsections the Puerto Rico Internal Revenue Code to modify existing excise tax allocations from certain petroleum products.  Prior to Act 31, HTA was allocated up to a maximum of $120 million per year from the petroleum excise taxes (the "Act 31 Restated Revenues" and together with the Act 30 Restated Revenues, the "Restated Revenues").  Act 31 removed the cap and allocated the entire amount of petroleum excise taxes to HTA.  Additionally, Act 31 allocated $20 million per year in cigarette excise tax revenues to HTA.

14.     Thus, Acts 30 and 31 created new revenue streams for HTA consisting of: (1) the excess of $15 from each vehicle license fee; (2) the petroleum excise taxes in excess of $120 million per year; and (3) $20 million per year in cigarette excise tax revenues.  These

---

[5]     Thus, the FOMB's assertion that the "Act 30-31 Revenues are expressly subject to retention by the Commonwealth under Section 8 of Article VI of the Puerto Rico Constitution and are 'available resources' of the Commonwealth" (Motion ¶ 14), provides only a selective picture of the requirements under the law.

new/additional revenue streams added by Acts 30 and 31 are what is referred to as the "Act 30-31 Incremental Revenues."

15.     Following the passage of Acts 30 and 31, GDB and HTA executed the Security Agreement pursuant to which the latter "absolutely, irrevocably, and unconditionally assign[ed], convey[ed] and transfer[ed] without recourse, to [GDB all of its] rights, title, obligations and interest in" all of the Act 30-31 Incremental Revenues, including HTA's right to receive such revenues, as well as a security interest "in all of the right, title and interest of [HTA] in the [Act 30-31 Incremental Revenues], whether presently held or hereafter acquired and wherever located." *Id.* ¶¶ 50-52.

16.     The lien granted to the GDB by the Security Agreement was perfected by the filing of the GDB Financing Statement. *Id.* ¶¶ 53-54.

17.     No other creditor has a lien on the Act 30-31 Incremental Revenues.

18.     Accordingly, following the execution of the Transfer Agreement, the DRA became the only creditor with a valid, perfected, first priority lien on and right to collect from the Act 30-31 Incremental Revenues.

19.     The Commonwealth has illegally clawed back the Act 30-31 Incremental Revenues, which belong to the DRA, to fund the Plan.  The DRA Parties are objecting to the Plan on several grounds, including failure of the best interest test as it does not currently recognize the DRA's property interests over the Act 30-31 Incremental Revenues nor the illegal clawback of such revenues.

20.     On June 15, 2021, the DRA Parties filed a motion seeking the allowance of an administrative expense claim under Bankruptcy Code section 503(b)(1)(A) (the "DRA Administrative Expense Claim Motion") based on the Commonwealth's illegal post-petition

6

retention of the Act 30-31 Revenues.  *See* Dkt. No. 17009 ¶¶ 62-75.  On September 9, 2021, the

FOMB objected to the DRA Administrative Expense Claim Motion.  *See* Dkt. No. 18065.  The

DRA Parties subsequently responded to the FOMB's objection on September 24, 2021.  *See* Dkt.

No. 19244.  This matter remains currently pending before the Court.

21.     On June 26, 2021, the DRA Parties commenced an adversary proceeding by an

adversary complaint (the "DRA Adversary Complaint") against the Monolines, Peaje Investments

LLC, and the Bank of New York Mellon, as fiscal agent, seeking a declaratory judgment regarding

the validity, extent, seniority and priority of the liens, security interests, rights and claims of each

of the DRA and the defendants' named in the DRA Adversary Complaint with respect to HTA.

*See* Adv. Pro. No. 21-00068-LTS [Dkt. No. 1].  In the DRA Adversary Complaint, the DRA

Parties assert that the Plan assumes that the HTA Bonds have priority over the DRA's HTA

Loans with respect to their clawback claims, resulting in HTA bondholders receiving a greater

recovery on those claims than the DRA.  *See* DRA Adversary Complaint ¶ 114.

22.     On August 26, 2021, the defendants named in the DRA Adversary Complaint, and

the FOMB and AAFAF as interveners, moved to dismiss the complaint.  *See* Adv. Pro. No. 21-

00068-LTS [Dkt. Nos. 17983, 17979].  On September 23, 2021, the DRA Parties filed their

opposition to the motions to dismiss.  *See* Adv. Pro. No. 21-00068-LTS [Dkt. No. 60].  As of the

date hereof, this litigation remains pending.

23.     Pursuant to the Confirmation Discovery Procedures Order [ECF No. 17640], the

DRA Parties submitted Ms. Martinez's Report, which details the Commonwealth's retention of

the Act 30-31 Revenues from July 2014 through June 30, 2021.

24.     The FOMB has moved to exclude the entirety of the Report, despite not taking any

issue with Ms. Martinez's qualifications, methods, or conclusions.

## STANDARD OF LAW

25.     "All relevant evidence is admissible," except as otherwise provided by the Constitution, federal law, the federal rules of evidence, or the rules prescribed by the Supreme Court.  *See* Fed. R. Evid. 402.  Evidence is relevant under Rule 401 if "it has <u>any</u> tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action."  Fed. R. Evid. 401 (emphasis added).  Such a threshold for relevance is "very low," as the evidence need not definitively resolve an issue in the case, but merely "move the inquiry forward to some degree."  *United States v. Cruz-Ramos*, 987 F.3d 27, 42 (1st Cir. 2021) (citing *Bielunas v. F/V Misty Dawn, Inc.*, 621 F.3d 72, 76 (1st Cir. 2010)); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993) (the "standard of relevance is thus a liberal one").

26.     Evidence may be relevant under Rule 401 even if it "fails to prove or disprove the fact at issue-whether taken along or in combination with all other helpful evidence on that issue." *United States v. Guzmán-Montañez*, 756 F.3d 1, 11 (1st Cir. 2014) (holding evidence not dispositive of the defendant's guilt was still relevant).  This is also true of evidence that is background in nature, offered as an aid to understanding, even if such background evidence does not itself relate to a consequential fact.  *See* Fed. R. Evid. 401 advisory committee's notes; *see e.g. Acevedo-Garcia v. Monroig*, 351 F.3d 547, 561-62 (1st Cir. 2003) (no abuse of discretion in admitting evidence regarding claims not at issue in the case because such background evidence demonstrated the "atmosphere" of the work place).[6]

---

[6]     The FOMB also cites Federal Rule of Evidence 104 in passing, but misstates its import, ultimately abandoning whatever argument it initially was attempting to make.  *See* Motion ¶¶ 24, 38.

27.     Rule 702(a) allows a qualified expert to testify so long as "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).[7]  The law favors admission of expert reports, particularly in bench trials. *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in Daubert are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."); *United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013) (Where the court is also "the trier of facts, [its] evidential gatekeeping function [is] relaxed, and [it is] in the best position to decide the proper weight to give the expert opinions."); *FTC v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014) ("When we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be unduly impressed by the expert's testimony or opinion in a bench trial."); *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("Where the gatekeeper and the factfinder are one and the same-that is, the judge-the need to make [expert admissibility] decisions prior to hearing the testimony is lessened.").  Excluding expert testimony before the expert testifies at trial is disfavored, and "[d]eferring the *Daubert* analysis until after the expert testifies at trial is even more appropriate when the court will be holding a bench trial." *Mass. Mut. Life Ins. Co. v. DLJ Mortg. Capital, Inc.*, 2017 U.S. Dist.

---

[7]     Expert testimony must also satisfy the requirements of being "based on sufficient facts or data," "the product of reliable principles and methods," and that "the expert has reliably applied the principles to the facts of the case." Fed. R. Evid. 702(b)-(d).  The FOMB does not allege that the Report fails to meet any of the standards set forth in Rule 702(b)-(d), and therefore concedes that Ms. Martinez's testimony is based on sufficient facts and data, is the product of reliable principles and methods, and that Ms. Martinez has reliably applied the principles and methods to the facts of this case.

LEXIS 222650 (D. Mass. April 18, 2017) (collecting Circuit Court cases in support of giving expert testimony even more leeway in bench trials).[8]

28.　Precluding the admission of evidence based on "[a] relevancy-based argument is usually a tough sell." *Cruz-Ramos*, 987 F.3d at 42.  It is an even tougher sell when the trial judge is acting as a fact-finder and not a gatekeeper.  The FOMB has failed to make the tough sell here. To exclude, the FOMB must demonstrate that the evidence does not move the inquiry forward to even _some_ degree. *Id.* They have failed to do so.  Instead, as described in greater detail below, the Report "move[s] the inquiry forward to some degree" with respect to confirmation of the Plan, and thus should not be excluded from the proceedings.

## ARGUMENT

**A.　Notwithstanding the Separate Adversary Proceeding,
the Report Is Relevant to Whether the Plan Meets Certain
Confirmation Requirements Set Forth in PROMESA § 314(b).**

**1.　The Report Details the Commonwealth's Illegal Clawback of Act 30-
31 Revenues and Is Therefore Relevant to PROMESA § 314(b)(3).**

29.　The FOMB asserts that the Report does not affect whether the Plan satisfies the confirmation requirements set forth in PROMESA § 314(b) in part because the DRA Parties' claims are the subject of a separate adversary proceeding. *See* Motion at ¶¶1, 3, 27-28.  However, notwithstanding the separate adversary proceeding, PROMESA § 314(b)(3) requires the

---

[8]　　The DRA Parties recognize, as the FOMB does, that expert evidence is subject to both Rule 402 and Rule 702. *See Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77 (1ˢᵗ Cir. 1998); *Pages-Ramirez v. Ramirez-Gonzales*, 605 F.3d 109 (1ˢᵗ Cir. 2010).  But the FOMB erroneously insinuates that being subject to Rules 402 and 702 means courts are less likely to admit expert testimony.  The FOMB's cases do not support such a contention.  In *Ruiz-Troche* and *Pages-Ramirez*, the court focused on the *reliability* of the expert testimony, not the relevance, and such expert testimony was admitted.  The FOMB's reliance on *Plaza-Torres v. Rey* is similarly misplaced.  2006 WL 6884391 (D.P.R. Apr. 21, 2006).  There, the court found that an employee's qualifications for the job were wholly irrelevant to that employee being sexually harassed. *Id.*  Ms. Martinez's testimony here is not so attenuated.  While the FOMB is correct that expert testimony must go to a fact of consequence, *Kenney v. Head* is not analogous to the this case.  670 F.3d 354 (1ˢᵗ Cir. 2012) (finding that the specific precedent related to probable cause made statements related to the motive of an arresting officer irrelevant).  Here, as detailed herein, the Report directly concerns Plan confirmation issues, and thus should not be excluded.

Commonwealth to "not [be] prohibited by law from taking any action necessary to carry out the [P]lan." As the Report helps show, the Plan cannot satisfy this requirement because it allows for the illegal clawback of Act 30-31 Incremental Revenues from the DRA.

30.     The Plan cannot be confirmed under PROMESA section 314(b)(3) because it violates the DRA's rights under Commonwealth law and the Takings Clauses of the Constitutions of the United States and Puerto Rico (the "Takings Clauses") in several respects. *First*, the Plan attempts to convert illegally clawed-back HTA funds to property of the Commonwealth and then distribute these funds to Commonwealth creditors. *See* Plan §§ 2.1, 89.3, Ex. K-3; *see also* Disclosure Statement at 87-88. The clawed-back funds – as property of HTA subject to the DRA's perfected liens – constitute a property interest subject to constitutional protection under the Takings Clauses. *See Armstrong v. United States*, 364 U.S. 40, 48 (1960) (liens "constitute compensable property" and cannot be destroyed without just compensation).

31.     *Second*, the Plan destroys the DRA's liens and priority designations. The Plan does this by (i) ratifying an illegal clawback, *see* Plan § 89.3 (alleging that PROMESA preempts Puerto Rico law governing Commonwealth appropriations and the clawback thereof), (ii) unilaterally dictating the relative priorities of creditors at HTA, *see* Plan §§ 1.171, 63.2, Ex. J-12 (assuming that DRA's HTA Loan Claims are subordinate to HTA bondholders' claims), (iii) mandating HTA to make distributions to certain of its creditors outside of a confirmed HTA plan, *see id.* § 86.1(b)(xv) (requiring HTA to make $264 million in interim distributions to certain HTA bondholders), (iv) releasing and enjoining the DRA's, HTA's and CCDA's claims against certain non-Debtors, and (v) granting impermissibly broad exculpations to HTA, CCDA and the Monolines.

32.    Accordingly, the Plan effectively "takes possession" of the liens and confiscates the DRA's essential secured property rights without providing the DRA just compensation as required under the Takings Clauses. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (noting that "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner").

33.    While these problems with the Plan are at issue in the DRA Parties' separate adversary proceeding, that fact does not alter the requirement under PROMESA § 314(b)(3) that the Commonwealth not be prohibited by law from carrying out aspects of the Plan. The Report provides details concerning those aspects of the Plan that pertain to the Commonwealth's illegal actions with respect to the Act 30-31 Incremental Revenues. As such, the Report is relevant to demonstrating that the Plan is not confirmable with respect to PROMESA § 314(b)(3).

### 2.    The Report Quantifies the DRA Parties' Administrative Claim, and Is Therefore Relevant to the Reserves Necessary to Comply with PROMESA § 314(b)(4).

34.    The Report is also relevant to confirmation issues because it quantifies the DRA Parties' administrative claim, which is directly relevant to how much the Plan must reserve in order to comply with PROMESA § 314(b)(4).

35.    Under PROMESA § 314(b)(4), the Plan cannot be confirmed unless it pays all administrative expense claims in full on its effective date. *See* 48 U.S.C. 2174(b)(4) (requiring a plan to provide "that on the effective date of the plan each holder of a claim of a kind specified in 507(a)(2) of title 11 will receive on account of such claim cash equal to the allowed amount of such claim"); *see also In re ADnational Corp.*, No. 03-81614, 2006 WL 5003849, at *2 (Bankr. D. Md. Mar. 7, 2006) (ordering debtor to "establish a Disputed Claims Reserve from the cash on hand in the full amount of [creditor's] Administrative Expense Claims"); *In re Cir. City Stores,*

*Inc.*, 515 B.R. 302, 313 n.8 (Bankr. E.D. Va. 2014) (holding that the plan could not have been confirmed if the liquidating trust did not maintain "a reserve account in which it holds sufficient funds that have been set aside to pay all unresolved administrative claims"); *In re Momenta, Inc*., 455 B.R. 353, 356 (Bankr. D.N.H. 2011) (finding that "allowance of a significant administrative expense claim may require a chapter 11 debtor to have a large cash reserve available on the date of confirmation" because "the holder of an administrative expense claim must receive cash equal to the amount of their claim on the effective date of the plan").

36.     The Plan cannot be confirmed because it fails to provide for the payment in full of, or reserve in a sufficient amount to pay, the DRA's administrative expense claim.  Even though the FOMB has challenged the DRA's entitlement to an administrative expense claim, this does not relieve the FOMB of the obligation to provide for the payment of, or an adequate reserve for, all administrative expense claims, including the DRA's administrative expense claim, in order to confirm the Plan.  Accordingly, at a minimum, section 82.3(a) of the Plan (which establishes a holdback for Disputed Claims) must be revised to provide for a reserve in the amount sufficient to satisfy the DRA's administrative expense claim in full to the extent such claim is allowed.

37.     The amount of the DRA's administrative expense claim is $148.7 million, which is the total amount of Act 30-31 Incremental Revenues allocated to HTA that the Commonwealth has unlawfully retained during the relevant time period.  This $148.7 million figure is the direct result of the work performed by Ms. Martinez as set forth in the Report.  As such, the Report itself is relevant to the inquiry of whether the Plan complies with PROMESA § 314(b)(4).

**B.      The DRA Parties Have a Valid Security Interest in the Act 30-31 Revenues.**

38.     The FOMB argues that the Report is irrelevant "because the DRA Parties have no security interest against Act 30-31 Revenues collected and retained by the Commonwealth" because, according to the FOMB, the Act 30-31 Revenues were not the HTA's to pledge.  Motion

13

¶¶ 4-5, 29-33 (citing Motion to Dismiss).  The DRA Parties disagree with each of these arguments

for all the reasons stated in the Opposition.  *See* Opposition ¶¶ 18-128.  It should be noted briefly,

however, that pursuant to the laws at issue, the Commonwealth has no discretion as to the transfer

of the Act 30-31 Incremental Revenues to HTA.  It *must* transfer and convey them to HTA once

collected.  *See* 9 L.P.R.A. § 5681; 13 L.P.R.A. §§ 31751(a)(1)(A), (a)(3)(A), (a)(3)(B).  As such,

HTA has a valid property interest in the Act 30-31 Incremental Revenues and therefore had the

requisite authority to effect the assignment of such revenues to the DRA.[9]

39.     Rather than respond further, the DRA Parties refer to and incorporate fully their

Opposition.  As stated above, this motion *in limine* is not the proper avenue for the FOMB to argue

about the ultimate legal issue of the DRA Parties' valid security interests, as the Motion to Dismiss

will be decided independently of any determination regarding the admissibility of the Report.

**C.     PROMESA Has Not Preempted the Act 30-31 Excise Tax Statutes.**

40.     The FOMB asserts that the Court should not consider the Report because Acts 30-

31 have been preempted by PROMESA such that the Commonwealth is no longer required to

transfer any of Act 30-31 proceeds to HTA.  Motion ¶¶ 34-36.  As above, this argument is taken

whole cloth from the Motion to Dismiss which is still before the Court.  In response, the DRA

---

[9]     As it did in the Motion to Dismiss, the FOMB incorrectly asserts that this Court has already ruled that the Act 30-31 Excise Tax Statutes do not give HTA any property interest in the collections of Act 30-31 Revenues until those amounts are actually transferred to HTA.  Motion ¶ 29  (citing *In re Fin. Oversight & Mgmt. Bd.*, 478 F. Supp. 3d 190, 195–96 (D.P.R. 2020); *In re Fin. Oversight & Mgmt. Bd.*, 618 B.R. 619, 634–35 (D.P.R. 2020)).  However, as the FOMB has recognized, this Court has not yet determined HTA's property interests in the Act 30-31 Incremental Revenues.  The Court's prior decisions focused on whether the Monolines satisfied their burden to demonstrate their own property or security interest in the res at issue in that particular case.  *See* Opposition ¶¶ 35-41.

Likewise, the FOMB repeats its arguments premised on the variability of the Act 30-31 Revenues.  *See* Motion ¶ 30, n.5 (citing *Financial Oversight & Mgmt. Bd. for Puerto Rico v. Andalusian Glob. Designated Activity Company*, 948 F.3d 457, 468-69 (1st Cir. 2020), *cert. denied*, 141 S. Ct. 844 (2020)).  However, as set forth in the Opposition, the holding in *Andalusian* is not applicable to the Act 30-31 Incremental Revenues because Acts 30 and 31 leave no room for discretion. Thus, contrary to the FOMB's assertion otherwise, HTA's right to receive Act 30-31 Incremental Revenues is not a subjective expectancy; it is a right premised upon the plain and unequivocal text of the Puerto Rico Internal Revenue Code and the Motor Vehicle Traffic Act, as amended.  *See* Opposition ¶¶ 76-77.

Parties refer the Court to their Opposition at ¶¶ 79-114, which clearly establishes that Acts 30-31 are not in conflict with PROMESA or its purpose.  Moreover, the determination of whether or not Acts 30-31 have been preempted by PROMESA is not properly made on this motion *in limine.*

### D.     The Report's Analysis of How HTA Has Used the Act 30-31 Revenues Is Relevant Background Evidence.

41.     The FOMB asserts the Report's analysis of how HTA used the Act 30-31 Revenues has no bearing on whether to confirm the Plan, which does not adjust HTA's debts.  Motion ¶¶ 4, 37.  However, in providing detail and confirmation of the HTA's use of such funds, the Report provides the Court with a fuller, more complete picture.  Such details also serve to confirm the accuracy comprehensiveness of the Report itself.  While perhaps not directly dispositive of ultimate factual issues to be heard during the Plan confirmation proceedings, such evidence is nevertheless relevant as background evidence that can aid the Court in understanding all the facts, even if such background evidence does not itself relate to a consequential fact.  *See* Fed. R. Evid. 401 advisory committee's notes.  The Court, as the ultimate trier of fact presiding over a bench trial, is obviously free to determine the weight to afford such evidence.

## CONCLUSION

42.     For the foregoing reasons, the DRA Parties respectfully request that the Court deny the relief sought by the FOMB.

**MCCONNELL VALDÉS LLC**

270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225
San Juan, PR 00936-4225
Tel:    787-250-5632
Fax:    787-759-9225


By:    */s/ Arturo J. García-Solá*
Arturo J. García-Solá
(USDC No. 201903)
E-mail: ajg@mcvpr.com

*/s/ Alejandro J. Cepeda-Díaz*
Alejandro J. Cepeda-Díaz
(USDC No. 222110)
E-mail: ajc@mcvpr.com

*/s/ Nayuan Zouairabani*
Nayuan Zouairabani
(USDC No. 226411)
E-mail: nzt@mcvpr.com

***Attorneys for AmeriNational Community
Services, LLC, as Servicer for the GDB Debt
Recovery Authority***

**C. CONDE & ASSOC. LAW OFFICES**

By:    */s/ Carmen D. Conde Torres*
Carmen D. Conde Torres
(USDC No. 207312)

*/s/  Luisa S. Valle Castro*
Luisa S. Valle Castro
(USDC No. 215611)

254 San José Street
Suite 5
San Juan, PR 00901-1523
Tel:    787-729-2900
Fax:    787-729-2203
E-mail: condecarmen@condelaw.com

-and-

**SCHULTE ROTH & ZABEL LLP**

By:    */s/ Douglas S. Mintz*
Douglas S. Mintz (admitted *pro hac vice*)
Noah N. Gillespie (admitted *pro hac vice*)
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005
Tel:    202-729-7470
E-mail: douglas.mintz@srz.com
           noah.gillespie@srz.com

-and-

Douglas Koff (admitted *pro hac vice*)
Taleah Jennings (admitted *pro hac vice*)
Abbey Walsh (admitted *pro hac vice*)
Peter J. Amend (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
Tel:    212-756-2000
E-mail:      douglas.koff@srz.com
                abbey.walsh@srz.com
                peter.amend@srz.com

***Attorneys for Cantor-Katz Collateral Monitor
LLC, as Collateral Monitor for the GDB Debt
Recovery Authority***

16

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 15, 2021, I caused the foregoing document to be

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all CM/ECF participants in this case.

*/s/ Arturo J. García-Solá*

Arturo J. García-Solá

17