# Exhibit 5

(To the October 15, 2021 Declaration of Michael T. Mervis)

Page 1

1              UNITED STATES DISTRICT COURT
                  DISTRICT OF PUERTO RICO
2
                Case Number 17 BK 3283-LTS
3                   PROMESA Title III
4
    In re:                                    )
5                                              )
    THE FINANCIAL OVERSIGHT AND                )
6   MANAGEMENT BOARD FOR PUERTO RICO.          )
                                               )
7       as representative of                   )
                                               )
8   THE COMMONWEALTH OF PUERTO RICO,           )
    et al.,                                    )
9                                              )
                             Debtors,          )
10
11
12
13
14    REMOTE VIDEO-RECORDED DEPOSITION OF OJAS N. SHAH
15
16
17
18        The remote video-recorded deposition upon
    oral examination of OJAS N. SHAH, a witness
19  remotely sworn by me, Tara Gandel Hudson, RPR, CRR,
    a Notary Public in and for the County of Hancock,
20  State of Indiana, taken on behalf of Cantor-Katz
    Collateral Monitor LLC, with the witness located in
21  Florham Park, Morris County, New Jersey, on the 6th
    day of October, 2021, scheduled to commence at
22  9:30 a.m., pursuant to the Federal Rules of Civil
    Procedure with written notice as to the time and
23  place thereof.
24
25

## Page 2

```
 1            APPEARANCES
           (All appearing remotely.)
 2
 3  For the Cantor-Katz Collateral Monitor, LLC, as
    Collateral Monitor for GDB Debt Recovery Authority
 4
         Noah Gillespie
 5       Jacqueline Maero Blaskowski
         SCHULTE ROTH & ZABEL LLP
 6       901 Fifteenth Street NW
         Suite 800
 7       Washington, D.C.  20005
         202.729.7470
 8       noah.gillespie@srz.com
         jacqueline.maeroblaskowski@srz.com
 9
         Douglas I. Koff
10       SCHULTE ROTH & ZABEL LLP
         919 Third Avenue
11       New York, NY  10022
         212.756.2000
12       douglas.koff@srz.com
13
14  For the Financial Oversight and Management Board as
    Representative for the Debtors:
15
         Michael Mervis
16       Margaret A. Dale
         Joshua A. Esses
17       PROSKAUER
         Eleven Times Square
18       New York, NY  10036
         212.969.3000
19       mmervis@proskauer.com
         mdale@proskauer.com
20       jesses@proskauer.com
21       Scott Cooper
         PROSKAUER
22       2029 Century Park
         Suite 2400
23       310.557.2900
         scooper@proskauer.com
24
25
```

## Page 3

```
 1            APPEARANCES
           (All appearing remotely.)
 2
 3  For the Financial Oversight and Management Board as
    Representative for the Debtors:
 4
         William D. Dalsen
 5       PROSKAUER
         One International Place
 6       Boston, MA  02110-2600
         617.526.9429
 7       wdalsen@proskauer.com
 8
         Gabriel A. Miranda
 9       O'NEILL & BORGES LLC
         250 Munoz Rivera Avenue
10       Suite 800
         San Juan, Puerto Rico  00918-1813
11       787.764.8181
         gabriel.miranda@oneillborges
12
13
    For Ambac Assurance Corporation:
14
         Alexandra Paslawsky
15       MILBANK LLP
         55 Hudson Yards
16       New York, NY  10001-2163
         212.530.5511
17       apaslawsky@milbank.com
18
19  For Financial Guaranty Insurance Company (FGIC):
20       Candice M. Carson
         BUTLER SNOW
21       2911 Turtle Creek Blvd
         Suite 1400
22       Dallas, TX  75219
         419.680.5500
23       candice.carson@butlersnow.com
24
25
```

## Page 4

```
 1            APPEARANCES
           (All appearing remotely.)
 2
 3  For the Official Committee of Unsecured Creditors:
 4       Leah Lopez
         PAUL HASTINGS
 5       200 Park Avenue
         New York, NY  10166
 6       212.318.6043
         leahlopez@paulhastings.com
 7
 8  For the Official Committee of Retired Employees:
 9       Laura E. Pelanek
         JENNER & BLOCK
10       353 N. Clark Street
         Chicago, IL
11       312.222.9350
         lpelanek@jenner.com
12
13  For the National Public Finance Guarantee Corporation:
14       Robert Berezin
         Colin McGrath
15       Stephanie Morrison
         WEIL, GOTSHAL & MANGES
16       767 Fifth Avenue
         New York, NY  10153-0119
17       212.310.8000
         robert.berezin@weil.com
18       colin.mcgrath@weil.com
         stephanie.morrison@weil.com
19
20  For the Assured Guaranty Corp. and Assured Guaranty
    Municipal Corp.:
21
         Casey John Servais
22       CADWALADER WICKERSHAM & TAFT LLP
         200 Liberty Street
23       New York, NY  10281
         212.504.6193
24       casey.servais@cwt.com
25
```

## Page 5

```
 1            APPEARANCES
           (All appearing remotely.)
 2
 3  For the QTCB Noteholder Group:
 4       David K. Shim
         MORGAN LEWIS & BOCKIUS
 5       One State Street
         Hartford, CT  06103-3178
 6       860.240.2580
         david.shim@morganlewis.com
 7
 8
    For the National Public Finance Guarantee Corporation:
 9
         Alexandra C. Casellas-Cabrera
10       ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA, PSC
         208 Ponce de Leon Avenue
11       Popular Center building
         16th Floor
12       San Juan, PR  00918
         787.281.1816
13       acasellas@amgprlaw.com
14
15  For the Witness, Ojas N. Shah:
16       Andrew B. Joseph
         FAEGRE DRINKER
17       600 Campus Drive
         Florham Park, NY  07932
18       Indianapolis, IN  46204
         973.549.7000
19       andrew.joseph@faegredrinker.con
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

```
 1        APPEARANCES
         (All appearing remotely.)
 2
 3  For the Puerto Rico Fiscal Agency and Financial
      Advisory Authority:
 4
 5      Peter Friedman
        O'MELVENY & MYERS
 6      1625 Eye Street, NW
        Washington, D.C. 20006
 7      202.383.5302
        pfriedman@omm.com
 8
        Ashley Pavel
 9      Joseph L. Roth
        O'MELVENY & MYERS
10      610 Newport Center Drive
        17th Floor
11      Newport Beach, CA 9266-
        949.823.7138
12      apavel@omm.com
        joeroth@omm.com
13
14  ALSO PRESENT:
15      Roy Berman, Law Clerk, Morrison & Foerster
        Edmond Esses, Kroll
16      Matthew Pinos, Law Clerk, SRZ
        David W. Prager, Kroll
17      Clint Thomas, Technician
        Steven Troncone, Videographer
18      Manny Valenciano, Veritext
19
20
21
22
23
24
25
```

Page 7

```
 1
 2
         INDEX OF EXAMINATION
 3                              PAGE
 4  DIRECT EXAMINATION ............................11
       Questions by Noah Gillespie
 5
 6
 7
 8       INDEX OF EXHIBITS
                                 PAGE
 9  Deposition Exhibit:
10  Exhibit 1 - Analysis of Creditor Recoveries ...49
           should the Title III Case be
11         Dismissed for Creditors of the
           Commonwealth of Puerto Rico
12
    Exhibit 2 - Debtors' Opening Expert Reports ...61
13       and Disclosures
14  Exhibit 3 - 104 Governor-Duties and powers ....84
15  Exhibit 4 - FOMB_CONF_88825, Spreadsheet .....105
16  Exhibit 5 - Disclosure Statement for the .....121
           Seventh Amended Title III Joint
17         Plan of Adjustment of the
           Commonwealth of Puerto Rico, et al.
18
    Exhibit 6  - Puerto Rico's Proposed Plan ....133
19       of Adjustment Benefits
20  Exhibit 7 - CR Legislation Approved by .......147
         Congress Has Medicaid Funding
21       Measure for Puerto Rico and USVI,
         CDL Cancellation Language
22
23
24
25
```

Page 8

1  (9:41 a.m.)
2      THE VIDEOGRAPHER: Okay. We are now on the
3  video record. Today is October 6, 2021. Time
4  is approximately 9:41 a.m.
5      We are here in the matter of the insolvency
6  proceedings for The Commonwealth of Puerto Rico
7  to take the deposition of Ojas Shah.
8      The court reporter may proceed.
9      OJAS SHAH,
10  having been first duly sworn to tell the truth, the
11  whole truth and nothing but the truth relating to
12  said matter, was examined and testified as follows:
13      MR. GILLESPIE: Good morning everybody. My
14  name is Noah Gillespie, and I'm an attorney with
15  Schulte Roth & Zabel. And together with the law
16  firm McConnell Valdes, we represent certain
17  creditors known in this proceeding as the DRA
18  parties.
19      I'm joined today by Doug Koff and
20  Jacqueline Maero Blaskowski of my firm and also
21  certain colleagues from McConnell Valdes.
22      Before we went on the record, we had a
23  discussion just to note that the witness has a
24  keyboard and computer screen, computer monitor
25  in front of him.

Page 9

1      Mr. Joseph acknowledged that this is simply
2  to access the Exhibit Share platform that we'll
3  be using, and so that's how we will proceed.
4      At this point, I think it may be
5  appropriate, since we have a number of counsel
6  on the line, if we could briefly go around and
7  state attorney appearances for the record, if
8  the attorneys --
9      MS. DALE: Hi, everyone. It's Margaret.
10  My understanding was that we would take care of
11  that afterward just because of the number of
12  parties on. She has --
13      She obviously has the most important folks,
14  which is you, Noah, and Mr. Mervis so -- and of
15  course the witness, Ojas, I'm sorry, and Andy.
16      I think we should just proceed with the
17  deposition, and we'll work with you all to sort
18  it out if there's any questions about who is
19  here. We have the participant list and the
20  like.
21      MR. GILLESPIE: That's fine.
22      MS. DALE: Okay. Thank you.
23      MR. GILLESPIE: And I think we should also
24  just put the stipulations on the record; that
25  objections today will be reserved aside from

Page 50

1  if you're asking are there other conclusions,
2  yeah, the conclusions are the scheduled outputs
3  that we have in the analysis.
4  BY MR. GILLESPIE:
5  Q  So I understand that the results of the analysis
6  in this report are the schedules of outputs that
7  are in the tables of the reports?
8  A  That's right.
9  Q  Mr. Shah, please describe in detail your role
10    with respect to this report.
11 A  Sure.
12    So I led the team to prepare this report; I
13    was involved in reviewing the information and
14    data that was collected as well as the
15    development of the methodology used; and then
16    ultimately reviewing the analysis and signing
17    off on the output of our work; and I also was
18    involved in drafting the report that you see
19    here.
20 Q  To the extent you just described, you were
21    personally involved in the preparation of this
22    report?
23 A  That's right.
24 Q  Were you personally involved in any other aspect
25    of the preparation of this report?

Page 51

1     MR. JOSEPH:  Objection to the form.
2     MR. MERVIS:  Same objection.
3     Go ahead.
4  A  I'm not sure I understand.  Can you clarify the
5    question.
6  BY MR. GILLESPIE:
7  Q  I just want to make sure we have a complete
8    understanding of the ways that you were
9    personally involved in preparing this report.
10    You mentioned a number of them.  I just
11    want to make sure we're not overlooking anything
12    else you were personally involved with for this
13    report.
14 A  I don't believe I overlooked anything.
15 Q  In connection with preparing this report, you
16    accepted assumptions from legal advisers?
17 A  That's right.
18 Q  And you also accepted information and data from
19    financial advisers?
20 A  That's correct.
21 Q  Did you review all of the language in this
22    report?
23 A  Again, help me understand your question.  Is the
24    question did I -- maybe you can clarify the
25    question.  I just want to make sure I answer it

Page 52

1  appropriately.
2     MR. JOSEPH:  If you don't understand, he'll
3  rephrase it for you.
4  BY MR. GILLESPIE:
5  Q  We're looking here at what's been marked Shah
6    Exhibit 1.
7     Did you review this report in its entirety
8    before it was finalized?
9  A  I did review the report, yes.
10 Q  And did you review the language of the report?
11 A  Yes.
12 Q  Did you approve all the language of the report?
13 A  I did sign off on the report, as I mentioned; so
14    yes.
15 Q  Is there any other person at McKinsey who is
16    more knowledgeable than you about this report?
17 A  No.
18 Q  Who wrote the report?
19 A  This -- when -- well, help me clarify.  Are you
20    asking who literally wrote each of the words?
21 Q  Yes.  Who are all of the individuals who were
22    involved in drafting this report?
23 A  It would be myself and the team that I
24    identified earlier.
25 Q  Just remind us who makes up that team.

Page 53

1  A  Rafael Rivera, Justin Collins, Gaby Piere.
2  Q  How much of this report did you yourself write?
3  A  I don't have an exact answer for you but a good
4    chunk of it.
5  Q  Can you estimate how many words in the report
6    are yours?
7     MR. JOSEPH:  Objection.  Objection to form.
8  A  I have no idea.  I can't answer that question.
9  BY MR. GILLESPIE:
10 Q  In the drafting of this report, were any
11    portions drafted by attorneys?
12 A  Of this report?  No.
13    Well, let me clarify.  When you reference
14    the report, are you talking about the analysis
15    portion, or are you talking about the legal
16    assumption appendix at the end of the report?
17 Q  I'm talking about, really, the entirety of Shah
18    Exhibit 1.  Are there any portions --
19 A  Then, yes, there are portions drafted by
20    attorneys.
21 Q  I think you're referring to the Assumptions
22    section in Appendix 5.
23    Is that one of the places that attorneys
24    were involved in the drafting?
25 A  That would be one of the places, yes.

14 (Pages 50 - 53)

Page 62

1  in Exhibit 2.
2 A  When you say "any interaction," is there a time
3     frame or other context that I can try and answer
4     the question?
5 Q  Let's keep it to 2021 and whether you've had any
6     conversations or communications, including
7     emails, with any of the individuals listed in
8     bold here in Shah Exhibit 2.
9 A  Over the course of 2021, I would believe I would
10    have had some interaction with some of the folks
11    listed here.
12 Q  Which individuals are you referring to?  Just
13    their names.
14 A  I would expect there is probably some
15    interaction --
16       I don't know Jay, so I don't believe Jay
17    would be on the list.  But I would expect
18    there's probably some interaction over the
19    course of 2021 with the others related to some
20    topic or the other, possibly.
21 Q  And so I understand that's everybody else --
22 A  Yes.
23 Q  -- except Jay?
24       MR. GILLESPIE:  Mr. Shah and Mr. Thomas,
25    could we please go back to Shah Exhibit 1.

Page 63

1 BY MR. GILLESPIE:
2 Q  In Shah Exhibit 1, let's go to page 2.
3 A  Okay.
4 Q  I'll direct your attention to the third
5    paragraph, the one that starts:
6       "This analysis was prepared by McKinsey."
7 A  Yes.
8 Q  And so the report states:
9       "Proskauer Rose" --
10      (Reporter request for clarification.)
11 Q  And perhaps I can summarize.
12      So the second sentence starts with
13   Proskauer Rose, and it says that:
14      "Legal advisers to the FOMB provided
15   McKinsey & Company with a set of legal
16   assumptions used in the preparation of this
17   analysis."
18      Did I read that correctly?
19 A  That's right.
20 Q  It goes on to say:
21      "The legal assumptions are included in
22   Appendix 5 of this document."
23      Did I read that right?
24 A  Yes.
25 Q  And then the next sentence goes on to talk about

Page 64

1    how the financial advisers of the FOMB provided
2    McKinsey:
3       "With financial information used in the
4    preparation of this analysis.  Such financial
5    information included schedules, detailing
6    estimates of outstanding bond debt, perspectives
7    on cash balances, and other financial data."
8       Did I read that correctly?
9 A  That's right.
10 Q  The next paragraph begins by saying:
11      "McKinsey & Company has accepted as true,
12   accurate, and appropriate all legal and
13   financial information and assumptions provided."
14      Did I read that correctly?
15 A  Yes.
16 Q  So I'd like to understand the information this
17   is talking about.  Let's start with the
18   financial information.
19      What financial information did you receive
20   from the FOMB's financial advisers?
21 A  It was schedules related to outstanding debt;
22   the profile of the debt, meaning the principal
23   and interest schedules and interest rate that
24   may have been associated with that debt.
25 Q  I think page 2 also references prospectives on

Page 65

1    cash balances.
2       What financial information did you receive
3    about cash balances?
4 A  With regards to the cash balances, it's the
5    FOMB's cash report that we discussed earlier.
6 Q  Page 2 also mentions other financial data.
7       What does that include?
8 A  The other financial data would have been in
9    reference to the nonbond -- or nonfinancial debt
10   claims that exist.
11 Q  When did you receive this financial information?
12      MR. JOSEPH:  Objection to form.
13      Go ahead.
14 A  So is your question with regards to this best
15   interest test report?
16 BY MR. GILLESPIE:
17 Q  Yes.  We were just talking about, for this best
18   interest test report, Shah Exhibit 1 --
19 A  Yes.
20 Q  -- that financial advisers, the FOMB, had
21   provided these three categories of financial
22   information that we were just talking about?
23 A  That's right.
24 Q  And so when did McKinsey receive this financial
25   information?

17 (Pages 62 - 65)

Page 66

1  MR. JOSEPH: Objection to form.
2  Go ahead.
3  A  So it would be over time. And some of this
4  information would have been received back when
5  the original best interest test was being
6  prepared, as the factual data on the bond
7  issuances, maturity schedules, and interest
8  schedules really haven't changed over time.
9  Some of this information would have been
10  prepared -- or would have been received, you
11  know, released information used in this
12  report, you know, at the time this report was
13  being prepared. For example, you know, the most
14  recent estimates of unsecured claims or, you
15  know, the cash information that was available at
16  that time.
17  BY MR. GILLESPIE:
18  Q  Am I understanding you correctly that in this
19  best interest test report, you also relied on
20  some of the financial information provided for
21  earlier best interest reports?
22  A  That's correct.
23  Q  Did you receive any financial information from
24  counsel?
25  A  There are certain pieces of information that

Page 67

1  counsel helped provide to us where they were
2  the -- they were the liaison, for example, with
3  the Alvarez team that was doing the claims work.
4  So that information, for example, on the
5  unsecured claims came to us through counsel.
6  Q  Were there any other types of financial
7  information that counsel facilitated for you?
8  A  Not that I'm aware of, no.
9  Q  Did you receive any financial information from
10  AAFAF?
11  A  Specifically for this analysis, no.
12  Q  For this analysis, did you receive any financial
13  information from the government of Puerto Rico?
14  A  To directly ask your question: Did the
15  government directly send us information? No.
16  Q  We talked about the financial information you
17  received from the FOMB's financial advisers.
18  Did you receive any financial information
19  from the FOMB itself?
20  A  Did we receive -- we did not receive any
21  information from the FOMB.
22  Q  Looking back here at page 2, third paragraph --
23  or, excuse me, the fourth paragraph, in the last
24  sentence or the last line there, the report
25  states that:

Page 68

1  "McKinsey & Company has not taken any
2  independent position with respect to this
3  information and these assumptions."
4  Do you see that?
5  A  That's correct.
6  Q  And so you have not independently verified any
7  of the financial information or assumptions you
8  were provided?
9  A  That's correct.
10  Q  I want to focus now on the facts and data
11  provided to you that you considered in forming
12  your opinions, including what was provided to
13  you by attorneys.
14  Did you rely on any documents that counsel
15  provided in performing the analysis
16  in Shah Exhibit 1?
17  A  So I believe we covered this, but the legal
18  assumption appendix was provided by counsel and
19  relied upon in the preparation of the analysis.
20  Q  Yes.
21  And aside from assumptions, did you receive
22  any documents from counsel that you relied upon
23  in performing your analysis?
24  A  Outside of the assumptions, you're asking?
25  Q  Correct.

Page 69

1  A  Again, we referenced that counsel had served as
2  kind of a liaison with regards to the unsecured
3  claims information with the Alvarez team; so
4  that also is information that was shared with us
5  that was used in the preparation of the
6  analysis.
7  Q  Can you identify all of the assumptions that you
8  relied on in forming your opinions that were
9  provided to you, including by attorneys?
10  A  Sorry. Can you -- can you ask the question
11  again, Noah. I want to make sure I understand
12  what's being asked.
13  Q  I'm trying to identify all of the assumptions
14  that you were provided in forming your opinions,
15  whether those came to you from attorneys or
16  someone else.
17  MR. JOSEPH: I'm going to object to the
18  form of the question.
19  If you can answer, go ahead.
20  A  So I -- I will try and answer to the best of my
21  recollection to be comprehensive.
22  So in terms of -- and again, I'll ask for
23  another point: When you say "all of the
24  assumptions," are you considering data
25  assumptions, or maybe you can just clarify, you

18 (Pages 66 - 69)

Page 70

1 know, what falls within this category of your
2 question for all of the assumptions.
3 BY MR. GILLESPIE:
4 Q Yes. I think it's all of the assumptions that
5 you relied upon in forming the opinions
6 in Shah Exhibit 1. Those would be fact
7 opinions, legal opinions, any type -- or, excuse
8 me, same thing -- any type of factual
9 assumptions or legal assumptions, any
10 assumptions at all. And I'd love for you to
11 identify for me as best as you can --
12 A Yes.
13 Q -- the assumptions that you relied upon.
14 A Again --
15    MR. JOSEPH: Object to form.
16    Go ahead.
17 A Does data qualify as an assumption here? I just
18 am trying to figure out whether I need to recap
19 the data that's provided as well.
20 BY MR. GILLESPIE:
21 Q Do I understand correctly, you know, McKinsey
22 received the financial information that we
23 talked about from financial advisers and others,
24 and McKinsey accepted all of that -- all of that
25 data as accurate?

Page 71

1 A Mm-hmm. That's correct.
2 Q So aside from that --
3 A Okay. So aside --
4    Okay. Go ahead.
5 Q Aside from that, were there other assumptions
6 that anyone provided to you that you relied on
7 in formulating this report?
8    MR. JOSEPH: Objection to form.
9    Go ahead if you can.
10 A Okay. So aside from the data provided and the
11 FOMB's cash report, which we have also talked
12 about and is publicly available, there are a
13 series of legal assumptions, which we've talked
14 about and is in the appendix.
15    Outside of that -- let's see. Would there
16 have been anything --
17    The only thing that jumps out that I can
18 recall that wouldn't -- that wasn't covered in
19 those other categories is there is weekly
20 reporting the TSA -- that the government does on
21 TSA cash activity. I believe we may have looked
22 at one of those reports that the government
23 provides to a broad host of stakeholders.
24    Beyond that and the things that we've
25 already talked about, I don't believe anything

Page 72

1 else is missing.
2 BY MR. GILLESPIE:
3 Q Did you refuse to adopt any assumption that
4 anyone provided to you?
5    MR. JOSEPH: Objection to form.
6 A Again, I'm -- maybe you can clarify: When you
7 say "anyone," are you talking about the lawyers?
8 Are you talking about others? It's a very broad
9 question.
10 BY MR. GILLESPIE:
11 Q I'm happy to break it down.
12    Did you refuse to adopt any assumption that
13 any attorney asked you to make?
14 A We did not refuse any assumption that was
15 provided by counsel.
16 Q Did anyone else ask you to make any assumptions?
17    MR. JOSEPH: Objection to form.
18    Go ahead.
19 A No. No.
20 BY MR. GILLESPIE:
21 Q Let's walk through some of the assumptions that
22 you flag in your report.
23    MR. GILLESPIE: And, Mr. Thomas, if we
24 could please go to page 5.
25    Actually, I think we should go to page 4.

Page 73

1 I'm sorry.
2    I'm sorry. I had it right the first time.
3 Let's go to page 5. It's the first paragraph.
4 I apologize.
5 BY MR. GILLESPIE:
6 Q So are you able to see page 5, Mr. Shah?
7 A Yes.
8 Q In looking at the first paragraph there, it
9 states:
10    "Based on discussions with the FOMB's
11 financial advisers, this analysis assumes an
12 annual discount rate of 5 percent." ^
13    (Reporter request for clarification.)
14 Q -- "as reasonable for the calculation of the
15 present value of future principal and interest
16 payments."
17    Do you see that?
18 A I do.
19 Q How did you determine that 5 percent was a
20 reasonable discount rate?
21 A I believe we covered this near the beginning of
22 the session, but as I referenced, this was based
23 on a conversation with the folks at Citi who are
24 well versed in the municipal credit markets.
25 Q What did you share in terms of why 5 percent was