## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re The Financial Oversight and Management Board for Puerto Rico, as representatives of the Commonwealth of Puerto Rico, et al., and particularly, Administración de Servicios de Salud Mental y Contra la Adicción (ASSMCA),<br><br>Debtor | CASE NO. 17-BK 3283-LTS<br>PROMESA Title III<br>48 U.S.C. 2101 *et seq.* |
| Josefina Guinot Meléndez ,<br><br>Creditor | Matter:  Motion to Set Aside Order, And Informing Resolution |


### CREDITOR JOSEFINA GUINOT'S MOTION TO SET ASIDE ORDER,
### INFORMING RECEIPT OF RESOLUTION,
### AND REQUESTING EQUITABLE COMPENSATION


Attorney for Movant:

William Santiago Sastre
WILLIAM SANTIAGO SASTRE
USDC PR NO. 201106
P.O. BOX 1801
SABANA SECA, P.R. 00952-1801
(786)-622-3939
wssbankruptcy@gmail.com

Case No. 17-BK 3283-LTS

**TABLE OF CONTENTS**

| CONTENT HEADING | Page |
|---|---|
| I.    RELEVANT BACKGROUND | 2 |
| II.   MOTION TO SET ASIDE ORDER | 11 |
| III.  DAMAGES AND COMPENSATION | 12 |
| IV.   THE ENTIRE AMOUNT REQUESTED BY MS. GUINOT SHOULD BE AWARDED, AS THE C.A.S.P. CONCLUDED THAT ASSMCA REPEATEDLY VIOLATED MS. GUINOT'S SUBSTANTIVE AND DUE PROCESS RIGHTS AND UNLAWFULLY FIRED HER, AND BOTH ASSMCA AND THE C.A.S.P. PROPITIATED AND PERMITTED AN UNCONSCIONABLE  20-YEAR DELAY IN THE ADMINISTRATIVE PROCEEDINGS THAT PREJUDICED AND DAMAGED MS. GUINOT | 13 |
| A. Debtor ASSMCA's Gross Negligence And Malicious Actions | 14 |
| B. C.A.S.P.'s (And Its Predecessors') Institutional Malfeasance | 16 |
| C. Ms. Guinot's Injuries And Damages | 19 |
| V.    PRAYER | 21 |

Case No. 17-BK 3283-LTS

## TABLE OF AUTHORITIES

### Federal Cases

| Case | Page |
|---|---|
| <u>Bostock v. Clayton County, Georgia</u>, 590 U.S. ___ ; 140 S. Ct. 1731 (2020) | 7, fn. 4; 8, fn. 4 |
| <u>In re: RELATIVITY FASHION, LLC, et al.</u>, Case No. 15-11989, 565 B.R. 50 (NYSD 2017) | 14 |
| <u>Marrano v. Citizen's Bank of Massachusetts</u>, 549 US 365 (2007) (appeal from the First Circuit) | 13 |
| <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989) | 7, fn. 4 |

### Federal Statutes

| Statute | Page |
|---|---|
| The Bankruptcy Code | 13, 16 |
| Bankruptcy Rule 9024 | 11 |
| Title VII of the Civil Rights Act of 1964 | 7, fn. 4; 8, cont. fn. 4 |

### State Statutes

| Statute | Page |
|---|---|
| Puerto Rico Constitution, Section 1 of the Rights Charter | 7, fn. 4 |
| Law No. 17 of April 22 of 1988 (29 L.P.R.A. sec. 155, *et seq*.) | 7, fn. 4 |
| Law No. 20 of April 11, 2001 (1 L.P.R.A. § 317), Article 3 | 7, fn. 4 |
| Law No. 64 of February 17, 2006 | 5 |
| Law No. 184 of August 3, 2004 (3 L.P.R.A. sec. 1461, *et. seq*.) | 5 |
| Uniform Administrative Procedures Act, Section 2163(g) (3 L.P.R.A. § 2163(g)) | 16, 20 |
| Reorganization Plan No. 2 (3 L.P.R.A. App. XII) approved on July 26, 2010 | 6 |

### State Rules and Regulations

| Authority | Page |
|---|---|
| ASSMCA Personnel Manual | 8 (fn. 5), 9, 15 |
| Canon 5 of the Puerto Rico Code of Judicial Ethics | 7, fn. 4 |

Case No. 17-BK 3283-LTS

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re The Financial Oversight and Management Board for Puerto Rico, as representatives of the Commonwealth of Puerto Rico, et al., Debtor | CASE NO. 17-BK 3283-LTS PROMESA Title III 48 U.S.C. 2101 *et seq.* |
| Josefina Guinot Meléndez , Creditor | Matter:  Motion to Set Aside Order, And Informing Resolution |

### CREDITOR JOSEFINA GUINOT'S MOTION TO SET ASIDE ORDER, INFORMING RECEIPT OF RESOLUTION, AND REQUESTING EQUITABLE COMPENSATION

Mrs. JOSEFINA GUINOT MELÉNDEZ, creditor of the Administración de Servicios de Salud Mental y Contra la Adicción (ASSMCA), alleges and prays through undersigned counsel:

Ms. Guinot respectfully requests that the Honorable Court set aside its March 19, 2021 Order (ECF 16132) disallowing Ms. Guinot's claim, and that the Court accept the superseding Notice of Claim which is concurrently filed.  The original claim (#169331) was improvidently disallowed on the here contested ground that Ms. Guinot did not provide supporting documentation.  This, even though, in keeping with the Court's instruction (ECF 7582), the parties had stipulated to a Partial Lift of Stay (ECF 16686), precisely to allow the Comisión Apelativa de Servicio Público (C.A.S.P.) to issue its stayed Resolution in administrative appeal no. 2001-07-0054.  We respectfully report that the C.A.S.P. issued Resolutions on July 8 and August 10, 2021 (respectively, Attachment A and B, translated), which wholly adopted the findings and conclusions of an Examiner's Report ("IOE", for "Informe del Oficial Examinador") dated July 13, 2018.

### RELEVANT BACKGROUND

1.  Creditor Ms. Guinot began working in the Women's Unit of AMSSCA on November 1, 1991.

Case No. 17-BK 3283-LTS

2.   In 1994, she was transferred to a different position at the Central Admissions Unit (UCA), where she was supervised by Mrs. Providencia Quijano.

3.   At the end of 1996, Ms. Guinot requested a transfer to a new different post at the Drug and Alcohol Unit, Pavilion G.

4.   As was adjudicated in the administrative IOE, all the while she worked for ASSMCA, Ms. Guinot's co-workers and supervisory personnel subjected her to recurrent workplace harassment and to a hostile work environment.   Such harassment included the following incidents, about which Ms. Guinot testified at the administrative hearing:

    a. One day co-workers Héctor Figueroa and Carlos Díaz derided the homosexuals in the center, particularly Ms. Guinot, saying: "queers and lesbians stink, phew", and "what a queer, phew."

    b. Mr. Héctor Figueroa once said, referring to Mrs. Guinot, "what she needs is for me to take her to the beach and undress her down there ("pelar pa' abajo")."

    c. On one occasion, Mrs. Providencia Quijano, a supervisor, showed Mrs. Guinot an artificial penis in front of many people, and told her in a mocking tone that she had a gift for her, how delicious ("rico") it was, and that it was what she (Mrs. Guinot) needed.

    d. Ms. Quijano also criticized Ms. Guinot usual attire (pants and blazer) and told Ms. Guinot to dress wear a dress, and act feminine and flirtatious.

    e. Mrs. Lydia Rodríguez Ríos, a nurse practitioner, made disparaging comments about Ms. Guinot's attire (pants and blazer) and her person, and asked aloud "Where is that queer [pata]?" in front of a client.

    f. Benigno López González, a drug and alcohol maintenance employee, called her queer, garbage, you are nobody, worthless ("burundanga"), insect ("chincha"), in front of residents, which made her feel uncomfortable and bad.

    g. In 1999-2000, Ms. Moreira from UCA grabbed a card drawer, and made a feint to hit Ms. Guinot with the drawer.   Ms. Guinot testified that she told Supervisor Eugenio Pérez, who took no action.

2

Case No. 17-BK 3283-LTS

    h. In 1999-2000, Ms. Guinot entered the records office, and Ms. Moreira said: "How good it would be to cut her skin with a razor and pour salt and vinegar."

    i. One day in 1999-2000, as Mrs. Guinot walked out to the parking lot, Mrs. Carmen Moreira told Benigno López (who was in a car), "run over her ("písala"), run over her." Ms. Guinot informed the supervisor and the union of that incident.

    j. One day when Mrs. Guinot was passing by, Rafael Díaz commented to Benigno López, "Did you see that queer?" and López answered "yes, I saw her."

    k. Rafael Díaz said that "I am going to take her and nail her to the cross so she won't be so bad ("mala")."

    l. Someone put bleach on her chair seat, which discolored and ruined her pants.

    m. Rafael Díaz made obscene gestures towards her with a cactus.

    n. In 1999-2000, Ms. Angélica called Ms. Guinot "crazy thing", and insulted Ms. Guinot with phrases such as "even if a monkey dresses in silk, she remains a monkey."

    o. In January 2001, someone slipped a piece of paper under the door of Mrs. Guinot's office that said "crazy, witch" (Ms. Guinot's Exhibit II).

    p. Co-worker Lilliam Rivera said, "Nobody wants you, you are like a hot potato."

    q. A chauffeur nicknamed Rocky stood in front of Ms. Guinot's office and made a genital penetration gesture with his hands.

    r. Mrs. Blanca Navarro, a Drug Pavilion G social worker, once said, "Look, there goes that trash ("burundanga")."

    s. Carmen Lydia Pérez said that Ms. Guinot must have AIDS, since she was a lesbian.

    t. In 2001, Arcadio Pedraza interrupted a conversation with Antonia Dones and in Ms. Guinot's presence began to mimic and mock effeminate gays.  Mr. Pedraza pejoratively stated that he had "f…ked several homosexuals in the ass."

The above incidents are but a sample, and were not rebutted during the hearing on the merits.

    5.   Ms. Guinot testified that the repeated years-long harassment made her feel isolated, unwanted, worthless and angry, and affected her health.

    6.   Ms. Guinot reported the harassment to supervisors (IOE factual finding, FF, # 13) and union members (IOE p. 21, parr. 2), who did nothing, and no corrective action was ever taken against any of the harassers.

Case No. 17-BK 3283-LTS

7.   Ms. Guinot was dismissed from her post as a career public employee by letter dated July 6, 2001, which was hand-delivered to her on July 17, 2001. ASSMCA's Exhibit XX.

8.   Although Ms. Guinot was working in the Drug Ward G Pavilion at the time of the 2001 dismissal, the dismissal and IOE analysis relied on allegations and documents dating from 1993-1997, while Ms. Guinot was working in other prior positions in the Women's Unit or in UCA. ASSMCA Exhibits I, II, III, IV, VII, VIII, IX, X, XI.

9.   Those documents, many written by her harassers, were not presented to Ms. Guinot when they were generated, to enable her to contemporaneously confront the harassers and timely refute their false claims. They were produced after the appeal was filed in 2001. During the administrative hearing, Mr. Alberto Santana, ASSMCA's Human Resources supervisor, testified that those documents were not included in Ms. Guinot's personnel file, but were sequestered in his office until it was decided (i.e., in 2001) whether to proceed with a disciplinary action:

> ...Yes, obviously, because as the person in charge of labor relations, I kept what was called some work documents, which I never like to be called a work file, because research documents are work documents. The only true employee file, is the personnel file, right? Any referrals that were brought to my attention for my consideration, was a working document. What was then made official and went to the file, was if any type of action against that employee was taken, then [the documents] were placed in the employee's personnel file, and that was what went to the file. Meanwhile, the working papers remained in my office.[1]  (translated text)

10.  On July 19, 2001, Ángel Pérez Muñiz, a (now deceased) lawyer from the General Union of Workers timely submitted an appeal to the J.A.S.A.P. on behalf of Ms. Guinot, refuting and denying the allegations on which the dismissal was based, requesting "her day in court to prove her innocence", and urging that "[Ms. Guinot's] dismissal be revoked and, as a consequence, order her reinstatement."  C.A.S.P. appeal No. 2001-07-0054.

---

[1] "…Si, obviamente, porque como a cargo de relaciones laborales, yo llevaba como lo que se llamaba unos documentos de trabajo, que nunca me gusta que le digan expediente de trabajo, porque los documentos de investigación son documentos de trabajo.  El único expediente que hay es el expediente de personal, ¿verdad?  Y entonces yo tenía como documentos de trabajo me llegaba unos, si fuera, unos referidos ante mi consideración, esos formaban un documento de trabajo.  Lo que se oficializaba luego e iba al expediente era si progresaba algún tipo de acción contra ese empleado entonces sí formaba parte del expediente del empleado, y eso era lo que iba al expediente.  Mientras tanto, los documentos de trabajo permanecían en mi oficina en un file como documentos de trabajo."

11. On October 22, 2001, Debtor ASSMCA answered the appeal.

12. In 2001 the J.A.S.A.P. was not statutorily authorized to consider or award damages for discrimination. Thus, on June 28, 2002, civil lawsuit KPE 2002-1438 was timely filed before the Honorable Judge Aldebol Mora of the San Juan state court, alleging violation of Title VII and requesting mental and emotional damages. That discrimination case was stayed pending the administrative proceedings, to avoid duplication and inconsistent finding and rulings.

13. In the in pre-administrative hearing Conference Report presented on July 8, 2002, Ms. Guinot's lawyer *inter alia* denounced that (translated text):

> [ASSMCA] consented and endorsed that a persecution campaign be carried out against the Appellant, discriminating against her for her sexual preferences and allowing colleagues in her work area to make fun of her, calling her "crazy", "queer" and "homosexual" without any corrective measures being taken against said personnel.

14. By virtue of Law No. 184 of August 3, 2004 (3 L.P.R.A. sec. 1461, *et. seq.*), the Law for the Administration of Human Resources in the Public Service, the J.A.S.A.P. was supplanted by the Appeals Commission of the Human Resources Administration System (C.A.S.A.R.H.).

15. In 2006 the C.A.S.A.R.H. was given jurisdiction to decide ***any*** form of discrimination ("todo tipo de discrimen"). Law No. 64 of February 17, 2006.

16. In May, 2006, the state judge in civil lawsuit KPE 2002-1438 requested that, in view of this change in controlling law, the discrimination claim be accepted by the C.A.S.A.R.H. with the laudable purpose of avoiding duplicative proceedings and inconsistent adjudications. The parties and two C.A.S.A.R.H. Examiners separately acceded to the Courts' petition (IOE FF ## 10 and 11) with ASSMCA's express acquiescence. That is, with the express consent of the Appellee ASSMCA and the express endorsement of the C.A.S.A.R.H., in 2006 the discrimination claim was transferred from the judicial forum that always had jurisdiction over that claim, to an administrative forum (C.A.S.A.R.H.) that at that time had full jurisdiction to decide any discrimination claim, including one based on sex. The delay in presenting the claim

5

in the administrative forum was exclusively due to changes in the controlling law, which are routinely a sufficient basis to amend allegations to conform to such changes.  The C.A.S.A.R.H. Examiner ordered that the pleadings be amended to include the discrimination claim.

17.  In January 2007, Ms. Guinot's attorney complied with said Order, and included the following "allegations that complement those contained in the conference report presented in this case" (translated text):

> (1) From the beginning of her employment, Appellant was the object [sic, of] ridicule by employees and supervisors, including medical directors, because of her sexual preference, with insults such as "Here comes the dirty queer", "You don't take the HIV test because you have AIDS", "crazy", "queer", "homosexual" and similar phrases.
> (2) They even showed her phallic objects in a sexually suggestive way, and her attire was criticized, to such an extent that the Appellant was affected in the performance of her duties, without the Appellee's management taking disciplinary actions against employees and supervisors who harassed her almost daily.
> (3) Said pattern of harassment and discrimination continued throughout the term of her employment, despite complaints filed by the Appellant for said practices to cease.

18.  In July, 2010 the C.A.S.A.R.H. and the Comisión de Relaciones del Trabajo del Servicio Público were merged, giving rise to the present C.A.S.P.  Reorganization Plan No. 2 (3 L.P R A App. XII), approved on July 26, 2010.

19.  Between 2008 and 2015, Ms. Guinot's attorneys filed multiple motions, requesting status hearings, and petitioning that a date for the administrative hearing be set, to no avail. After two fruitless meetings with the Secretary of the C.A.S.P. requesting the same, in a letter dated December 23, 2015, Ms. Guinot's attorney informed the Secretary of Justice of an intention to sue ASSMCA and the C.A.S.P. for the delay in celebrating the administrative hearing on the merits.

20.  With uncharacteristic celerity, on January 12, 2016, the Honorable Examiner ordered a status hearing for January 28, 2016, and set dates in February 2016 for the hearing on its merits.

21.  The hearing on its merits was held on February 25 and 26, 2016, and on April 7, 2016.

Case No. 17-BK 3283-LTS

22.  Two years later, on July 13, 2018, the Honorable Examiner issued the IOE (which the C.A.S.P. panel subsequently adopted in its entirety).  The IOE adjudicated that:

• During the time Ms. Guinot worked at ASSMCA, Ms. Guinot was subjected to a hostile work environment and a pattern of continuous harassment in the work place[2];

• Ms. Guinot reported the hostile work environment and harassment to several supervisors and to Union representatives, who did nothing to stop them, nor did they reprimand the harassers;

• the C.A.S.P. assertedly lacked jurisdiction to decide whether the adjudicated hostile environment and harassment supported a sexual discrimination claim, because (1) a discrimination claim was not expressly spelled out in the original appeal document[3] which was filed by a union lawyer, and because (2) allegedly, prior to the July, 2001 appeal, no statute expressly prohibited discrimination based on sexual orientation;[4]

---

[2] The IOE expressly included the following finding of facts (FF), as translated herein:

"12. Several ASSMCA employees, including Ms. Lydia Rodríguez Ríos (nurse), Mr. Benigno López González (witness, maintenance employee), Ms. Lydia Rivera, Ms. Carmen Moreira, Mr. Héctor Figueroa López (witness, ATSCA), Mr. Carlos Simmons (ATSCA), Mr. Carlos Díaz (ATSCA), Mr. Rafael Díaz, Ms. Carmen Lydia Pérez, Mr. Arcadio Pedraza, subjected the APPELLANT to a pattern of workplace harassment, mocking her and making hurtful comments to her […];

13. At least two people in supervisory positions over the APPELLANT, Mrs. Providencia Quijano, and Mr. Eugenio Pérez, were aware of the workplace harassment to which she was subjected, without taking adequate, sufficient and timely measures to stop the same.

14. Mrs. Providencia Quijano, acting supervisor of the UCA, showed APPELLANT a phallic object, as part of the harassment pattern."

[3] It was not expressly included because in 2001 the J.A.S.A.P. lacked jurisdiction to adjudicate discrimination. Discrimination claims were instead initially pursued in a separate state court lawsuit, KPE 2002-1438.

[4] We respectfully submit that this is incorrect.  Prior to 2001, Section 1 of the Rights Charter of the Puerto Rico Constitution, Law No. 17 of Abril 22 of 1988 (29 L.P.R.A. sec. 155, which prohibited workplace sexual harassment), and federal Title VII of the Civil Rights Act of 1964, all expressly prohibited discrimination because of sex.  In Bostock v. Clayton County, Georgia, 590 U.S. ___ ; 140 S. Ct. 1731 (2020), the U.S. Supreme Court held that the prohibition of discrimination "because of sex" in Title VII necessarily encompasses discrimination because of sexual orientation.  In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), the US Supreme Court ruled that there is a cause of action for discrimination based on sex when an employee is a victim of discrimination because she does not conform to the stereotypes that the harassers expect of her sex (in that case, an employee was denied a promotion because she did not fit the stereotype of what a woman was supposed to look and act like). Since 1999, the public policy of the Judicial Branch embodied in Canon 5 of Judicial Ethics prohibits discrimination based on gender or sexual orientation. Since April of 2001, the public policy of the legislative branch disapproves of discrimination based on sexual orientation. See article 3 of Law No. 20 of April 11, 2001 (1 L.P.R.A. § 317):

It is the public policy of the Commonwealth of Puerto Rico to guarantee the full development and respect of the human rights of women and the exercise and enjoyment of their fundamental freedoms. Recognizing that women continue to be subjected to significant discrimination, oppression and marginalization that violate the principles of equal rights and respect for human dignity and that hinder

• ASSMCA violated internal and other governmental regulations which required that any work incident be promptly addressed within 10 days to two weeks following the incident,[5] yet no disciplinary action was taken prior to June, 2001;

---

*cont.* …their participation in political, social, economic, cultural and civil life, it is necessary to strengthen and consolidate the instruments and mechanisms that the State has for the effective implementation of this policy of social equality, gender equity, respect for plurality, differences and diversity. It is an essential part of this public policy to guarantee these rights and that all women, regardless of their geographical location, age, race, ethnicity, marital status, <u>sexual orientation</u>, social and economic condition, physical capacity, political and religious affiliation, have access to the participatory processes generated by the Women's Ombudsperson's Office in the performance of its functions.

Furthermore, we emphasize that in October 2003 ASSMCA moved to dismiss the discrimination claim then pending before the state court, *precisely alleging, as did the IOE, that the then existing laws focused on discrimination based on sex or gender, not sexual orientation.* On January 13, 2004, the state court denied Appellee ASSMCA's motion, on the grounds that Ms. Guinot's examples and allegations of discrimination "**may in itself constitute an actionable event under the provisions that prohibit discrimination on the basis of gender.**" Bold emphasis added. In <u>Bostock</u>, *supra*, the U.S. Supreme Court confirmed that this analysis was entirely correct.

[5] The following translated analysis from pages 18-19 of the IOE fully explains the basis for its conclusion:

"The delicate function of imposing a disciplinary measure requires responsibility and diligence. This permeates the Principle of Merit in public service, across the entire width of the Executive Branch, as can be seen in the Regulation of Essential Components of the Principle of Merit, Number 2186, as amended, which provides the following, in cases of investigations on violation of the rules of discipline in public service:

"The appointing authority will carry out an investigation within the next <u>10 working days</u> from when it officially learned of the facts and a determination of whether any disciplinary action should be taken."

'We therefore see that this regulatory language imposes a duty on the agency to carry out the corresponding investigation in just <u>two weeks from the occurrence of the investigated events</u>. Based on this, once the investigation ends, it must immediately file charges against the employee, or shelve them.

'This seeks to ensure that there is contemporaneity between the offense committed and the imposition of the punishment motivated by the violation of the rules of conduct, in turn facilitating both parties to obtain the necessary evidence so that, on the one hand, the agency can sustain the measure, and on the other hand, the employee can defend himself against it. All of this protects employment and the principle of retention in the public service.

'Specifically, APPELLEE's Personnel Manual, Section 8.3, subsection d.1, uses the same language on the matter, with the exception that it refers to a "reasonable" time limit [within which to take a disciplinary action]. Likewise, it also provides a complicated and extensive procedure that must be followed during the investigation, in which the employee's immediate supervisor, the Assistant Administrator, the Director of the Human Resources Office, and the agency's Legal Advice Office participate. None of this contributes to the speed of the procedure, in clear detriment of the Principle of Merit.

'It is worth mentioning here that, in addition to the damage to the Merit Principle posed by the delay in imposing the disciplinary measure, as we shall see later, there is no controversy that the extensive regulatory investigative process was not followed by the APPELLEE. Agencies cannot choose to comply with their regulations when they want to. They must always do so, once approved, as it is a reiterated rule in administrative law that "once an agency has promulgated regulations to facilitate its decision-making process and limit the scope of its discretion, it is obliged to strictly observe them and is not allowed to substitute its personal opinion as to whether or not to recognize the rights that it herself has extended to its employees." (citations omitted) <u>García Gabán v. UPR</u>, 120 DPR 167, 175 (1987).

'From the moment the events occur, the investigation must be quick, so that exactly what happened can be known and, if justified, prompt disciplinary action may be taken.

'Despite what its Personnel Manual clearly provides, APPELLEE took too long to investigate and finally impose the disciplinary measure, since almost 6 years elapsed between the first events that occurred in 1995, to 2001.

'Not even under the most favorable interpretation for the agency, even being extremely lax in the application of the law and its interpretation, can we consider reasonable a delay of almost 6 years in imposing a disciplinary measure. The period of time during which the events occurred is too long to be considered a pattern, since they are extremely separated from each other in the period of time in which they happened. To pretend to box them within the tight mold of a pattern, exceeds the limits of reasonableness."

Case No. 17-BK 3283-LTS

• the ASSMCA further failed to comply with its own Personnel Manual, as it did not practice progressive discipline before resorting to dismissal;

• Ms. Guinot's dismissal was unlawful;

• therefore, the unlawful dismissal was revoked, and the ASSMCA was condemned to pay Ms. Guinot's salary and all other fringe benefits, after subtracting the wages that Ms. Guinot earned in private jobs;

• despite the analysis in the preceding three bullet points and footnote 5, the IOE also inconsistently cited hearsay documents from 1993-1997, which related to prior positions, as a basis for concluding that Ms. Guinot engaged in some of the conduct alleged in those hearsay documents, for which reason the IOE dismissed the administrative appeal and recommended that Ms. Guinot be retroactively suspended for two months.[6]

This internal IOE was not at that time published nor provided to the parties.

23.   After receiving the IOE, in August of 2018 the C.A.S.P. appellate panel then decided that it was submitting Ms. Guinot's administrative appeal for inclusion in these federal bankruptcy proceedings. The state administrative proceedings were thus then automatically stayed, and therefore the C.A.S.P. panel refrained from issuing a resolution.

24.   On April 16, 2019, Ms. Guinot requested that this Honorable Court lift the automatic stay to permit the C.A.S.P. to issue a resolution.  Docket no. 7580.

25.   In an Order dated 6/24/19 (Docket No. 7582), the Honorable Court terminated without prejudice the 4/16/2019 Request for Lift of Stay, and directed that the parties fulfill the meet and confer requirements of Paragraph III.Q of the Case Management Order.

---

[6] We emphasize that, aside from declining to go to voluntary counselling sessions because she mistrusted why she and not her harassers were asked to assist, there was no demonstration that in the year preceding her July, 2001 dismissal Ms. Guinot engaged in any of the alleged actions for which she was dismissed.  Those allegations were all unfairly and unlawfully based on the 1993-1998 hearsay documents and on documents that were not identified prior to the hearing, most of which were not shown to or discussed with Ms. Guinot prior to the 2001 administrative appeal.  **In fact, the IOE held that prior to 2001, she was not ever subject to a disciplinary action.**

Case No. 17-BK 3283-LTS

26,  Undersigned counsel then repeatedly requested that the opposing parties' counsel agree to meet and confer, by letter, e-mail and phone calls.  See e.g., September 17, 2019 letter attached to Docket No. 15379.  Opposing counsel did not respond to our requests.

27.  On December 8, 2020, Ms. Guinot therefore filed a Renewed Request for Lift of Stay. Docket No. 15379.

28.  On December 8, 2020, in an Order Setting Briefing Schedule the Honorable Court gave the Debtor ASSMCA until December 22, 2021 to respond. Docket No. 15385.

29.  On January 21, 2021, Ms. Guinot reported that the parties had jointly stipulated to a lift of stay in order to ask the C.A.S.P. to issue its Resolution, and she withdrew her Motion for Lift of Stay.  Voluntary Withdrawal of Motion to Lift the Automatic Stay, Docket No. 15686.

30.  Undersigned counsel reminded opposing counsel that pursuant to the Stipulation ASSMCA should likewise withdraw its objection to Ms. Guinot's claim.  (We apologize, as we have not been able to locate a copy of this communication.)  Opposing counsel failed to do so.

31.  On March 3, 2021 this Honorable Court acknowledged our withdrawal of motion for lift of stay.  Docket No. 15907.

32.  On March 19, 2021, this Honorable Court entered an Order disallowing a large number of claims, including Ms. Guinot's claim, on the ground that she failed to provide supporting documentation for her claim.  Docket No. 16132.

33.  Meanwhile, on July 8, 2021 the C.A.S.P. issued a terse 4-page resolution, in which it adopted the IOE without any analysis.  See Attachment A hereto.

34.  On August 2, 2021, Ms. Guinot requested partial reconsideration of some aspects of the IOE.

35.  In an equally terse final Resolution issued on August 8, 2021 and filed on August 10, 2021, which in large part was a cut-and-paste of its earlier July 8 resolution, the C.A.S.P. flatly denied, without analysis, our request for Reconsideration.  See Attachment B hereto.

## MOTION TO SET ASIDE ORDER

36.  Ms. Guinot twice requested that the automatic stay be lifted to permit the C.A.S.P. to issue a resolution, on April 16, 2019 (Docket no. 7580) and on December 8, 2020 (Docket No. 15379).  On January 21, 2021, Ms. Guinot's counsel filed a copy of the joint Stipulation in which the parties agreed that the automatic stay would be modified to the extent necessary to allow the administrative case to proceed to final judgment before CASP.  Docket No. 15686.  Ms. Guinot's counsel thus withdrew its motion to lift the stay.  ECF 15686.  He asked opposing counsel to likewise withdraw its objection to Ms. Guinot's claim, in view of the joint Stipulation.  Opposing counsel declined to do so.

37.  Thus, the Honorable Court's March 19, 2021 Order disallowing Ms. Guinot's claim on the ground that she failed to provide supporting documentation (Doc. No. 16132) unfairly fails to consider that: (i) Ms. Guinot could not provide such documentation until the C.A.S.P. issued its ruling; (ii) since 2019 we twice sought a lift of stay (ECF 7582 and 15379) to obtain such a ruling; (iii) the parties stipulated to a partial lift of stay to obtain such a ruling, and the Honorable Court was timely provided with a copy of their joint Stipulation (ECF 15686); (iv) the C.A.S.P just issued a ruling on July 8, 2021 (Attachment A) and August 10, 2021 (Attachment B), pursuant to the stipulated partial lift of stay.

38.  The Honorable Court should not allow Debtor's unjustifiable failure to formally withdraw its objection, in keeping with the joint Stipulation, to prejudice Ms. Guinot, particularly since the Honorable Court was timely provided with a copy of the Stipulation.

39.  In view of the above, Ms. Guinot respectfully requests under Bankruptcy Rule 9024 that the Honorable Court set aside its March 19, 2021 Order, Docket No. 16132, disallowing Ms.

Case No. 17-BK 3283-LTS

Guinot's claim on the ground that she failed to provide supporting documentation. Having

received a copy of the C.A.S.P. resolutions (translated Attachments A and B), Ms. Guinot is now

in a position to provide, and here provides, the following specific elements of her claim.

## DAMAGES AND COMPENSATION

40.   In its attached resolution, the C.A.S.P. did not specify an amount, but merely held that

the firing was unlawful and that Ms. Guinot was due pay and fringe benefits, from which two

months' pay and any money she made working in the private sector should be subtracted.  The

C.A.S.P. also did not set a money amount for damages for the adjudicated hostile work

environment and workplace harassment.

41.   We therefore respectfully submit the following:

*Salaries owed minus money earned*

42.   We respectfully submit that between July 2001 and December 2015 the back salary

(after discounting amounts earned during the two-month suspension and also the salaries earned

in the private sector) amounts to $355,000.

*Medical expenses*

43.   Ms. Guinot was covered by health insurance, which allowed her to go to the Fondo de

Seguro del Estado for her asthma, severe joint pains and other work-related ailments.  She was

not covered by medical insurance during the time she worked after being fired.  We estimate the

loss of these fringe benefits as $31,800.

*Social Security*

44.   Ms. Guinot monthly receives $530 Social Security.  She would receive more had she

not been unjustifiably fired.  Assuming she lives to be 85 on 2030, we submit that she is owed

$55,500.

Case No. 17-BK 3283-LTS

*Lost Pension*

45. Upon retirement in 2015, Ms. Guinot would have the right to receive a government pension had she not been fired in 2001. If she were to die at 85 years old on 2030, she would be owed $249,600.

*Damages for hostile work environment and workplace harassment.*

46. Workplace harassment is malicious, unwanted, repetitive and/or abusive conduct by agents, supervisors or employees, which violates protected constitutional rights, such as the inviolability of the dignity of an employee, her right to be free from abusive attacks on her honor, reputation, health or personal integrity in her work or employment. Workplace hostility prevents reasonable employees from performing their duties or tasks in a normal manner.

47. Ms. Guinot suffered near daily humiliation and harassment for the 10-year period she worked at ASSMCA between November 1991 and July, 2001. We conservatively estimate the damages for the prolonged unchecked harassment and hostile work environment at $500,000.

*Total Compensation Owed to Ms. Guinot*

48. We thus respectfully submit that Ms. Guinot is owed $1,135,855.50 in damages for her extraordinary ordeal. For the following reasons, we ask that the entire amount be awarded.

**THE ENTIRE AMOUNT REQUESTED BY MS. GUINOT SHOULD BE AWARDED, AS THE C.A.S.P. CONCLUDED THAT ASSMCA REPEATEDLY VIOLATED MS. GUINOT'S SUBSTANTIVE AND DUE PROCESS RIGHTS AND UNLAWFULLY FIRED HER, AND BOTH ASSMCA AND THE C.A.S.P. PROPITIATED AND PERMITTED AN UNCONSCIONABLE 20 YEAR DELAY IN THE ADMINISTRATIVE PROCEEDINGS THAT PREJUDICED AND DAMAGED MS. GUINOT**

49. The Bankruptcy Code is a child of Equity, and is intended to provide a fresh start to "honest but unfortunate debtors." For public policy reasons, undeserving debtors that exhibited moral turpitude, intentional wrongdoing, or gross or willful negligence, are not allowed to invoke the full protections of our bankruptcy laws. See, e.g., <u>Marrano v. Citizen's Bank of</u>

Case No. 17-BK 3283-LTS

Massachusetts 549 US 365 (2007) (on appeal from the First Circuit); In re: RELATIVITY

FASHION, LLC, et al., Case No. 15-11989, 565 B.R. 50 (NYSD 2017).

**DEBTOR ASSMCA'S GROSS NEGLIGENCE AND MALICIOUS ACTIONS**

50. Here, the sheer volume and unmitigated relentlessness of ASSMCA's and its

employees' inexcusable actions and omissions at the very least constitute grossly negligent and

at most willful, malicious disregard of Ms. Guinot's substantive and due process rights, and a

stunning renunciation of any semblance of proper and healthy workplace procedures:

- ASSMCA allowed Ms. Guinot to be the target of constant and prolonged workplace

  harassment which affected her deeply and caused her lasting damage and hindered her

  work performance, for example, co-workers crudely mocked Ms. Guinot, calling her

  "queer" ("pata"), "crazy", "lesbian" and "infected with AIDS", and one supervisor

  blandished a dildo saying that was what Ms. Guinot needed;

- ASSMCA failed to take corrective measures against the harassers, which included

  supervisors;

- ASSMCA's witnesses falsely testified that Ms. Guinot did not report the harassment:

  for example, her supervisor Mr. Eugenio Pérez testified that Ms. Guinot never

  complained about the harassment, but then ASSMCA's own Exhibit V, a memo

  written and signed by Mr. Perez himself, stated that "the employee comes to my office

  and verbalizes that she cannot work with her colleagues in the record area, because

  they make fun of her and talk about her" (Mr. Pérez then admitted that if Ms. Guinot's

  allegations were true they constituted harassment);

- ASSMCA based the 2001 dismissal on documents that were too remote and irrelevant,

  since they dated back to 1993-1999, and they related to positions prior to the position

  from which Ms. Guinot was dismissed in 2001;

Case No. 17-BK 3283-LTS

- ASSMCA failed to promptly investigate the allegations contained in those documents within the 10-day to two-week period described in governmental guidelines, and Ms. Guinot was never allowed to contemporaneously refute and confront her critics;

- ASSMCA based the 2001 dismissal on documents which constitute hearsay evidence (for example, messages by harassing co-workers which were never presented to Ms. Guinot, which harassing co-workers were not present during the hearing and could not be interrogated);

- ASSMCA based the 2001 dismissal on documents which it admitted were not part of Ms. Guinot's employee file and which had not been presented to Ms. Guinot when they were generated so that she could timely react and defend herself against the allegations at the time they were generated;

- ASSMCA violated Ms. Guinot's due process rights by failing to comply with section 8.3 of its own Personnel Manual and Regulations that required applying progressive discipline, for example, suspension, before resorting to the extreme sanction of a dismissal, which in itself it is an independent basis to revoke the dismissal;

- ASSMCA violated Ms. Guinot's due process rights by failing to comply with section 8.3 of its own Personnel Manual and Regulations, which required informing her of her right to an informal hearing before the dismissal, and adequately warning her of what would happen in an informal hearing, which in itself is an independent basis to revoke the dismissal;

- ASSMCA withheld important documents (ASSMCA produced only about 60 pages, despite later claiming that it had "two boxes" and "several files" of documents), despite repeated requests for their production and despite petitions requesting sanctions for

such non-production, claiming that "all relevant documentation has been delivered"
and that "additional documentation does not exist",

- ASSMCA then based its case on documents it had never announced, some which it had
  never produced, despite the fact that the Examiner had ordered that only expressly
  announced documents would be admitted into evidence;

- ASSMCA caused the fifteen-year delay between 2001 and 2016 by its inaction in
  answering motions and following orders.

ASSMCA is therefore not the deserving, honest, unfortunate debtor that the equity-based
bankruptcy regime is intended to help. Its actions were at least grossly negligent, and at most
willfully malicious.

51. Although ASSMCA is nominally connected to the Commonwealth of Puerto Rico, it is
an independent agency with the capacity to be separately sued.

52. Therefore, Ms. Guinot respectfully requests that this Honorable Court hold that Ms.
Guinot's request for $1,135,855.50 in damages be awarded in its entirety.

## C.A.S.P.'S (AND ITS PREDECESSORS') INSTITUTIONAL MALFEASANCE

53. Ms. Guinot's underlying administrative appeal No. 2001-07-0054 was filed on July 19,
2001.

54. Section 2163(g) of the Uniform Administrative Procedures Act (3 L.P.R.A. § 2163 (g))
mandates that:

> (g) Any case submitted to an adjudicative proceeding before an agency shall be
> resolved within a term of six (6) months, from its filing, except in exceptional
> circumstances.

55. Instead, the interminable and mismanaged proceedings inflicted by the C.A.S.P. and its
predecessors have unconscionably lasted 20 (!) years. They have wasted thousands of man-
hours that Ms. Guinot and her lawyers invested in twenty years of information gathering, legal

research, interviewing witnesses, drafting motions, hoping against hope that the system would

function as it should.  This encompasses (i) motion practice over the course of fifteen (15!) years

(2001-2016); (ii) numerous requests for discovery and repeated requests for sanctions because of

ASSMCA's non-compliance, (iii) a Summary Judgment Motion filed by creditor Ms. Guinot in

July 2007 which Debtor ASSMCA did not timely answer (without ever requesting a timely

extension) despite being repeatedly ordered to answer, resulting a default ruling which was

subsequently improvidently vacated;[7] (iv) prior to the hearing the Examiner twice decreed that

only expressly identified and listed Exhibits would be admitted into evidence during the hearing,

yet despite our vehement objection during the hearing he allowed ASSMCA to present (and the

IOE later relied on) documents that were never listed as decreed, some of which were even never

produced; (v) a delay of two years between the hearing dates in February and April, 2016 and the

issuance of the Examiner's IOE in July of 2018; (vi) after accepting jurisdiction over the

discrimination claim in 2006 and ordering that the pleadings be amended to include that claim,

C.A.S.P. now says that it lacks jurisdiction over this claim because it was not included in the

---

[7] The following amply illustrates how ASSMCA's delays were coupled with the C.A.S.P.'s (and its predecessors') sloppy mismanagement of its docket and its failure to move the proceedings.  On August 7, 2007, Ms. Guinot submitted a Summary Judgment Motion (which asserted that the 2001 dismissal was unjustified because her due process rights had been violated).  On August 9, 2007 Respondent ASSMCA was ordered to answer the Summary Judgment Motion within 20 days.  In response to Ms. Guinot's protest concerning ASSMCA's unexcused failure to obey or seek an extension, on April 7, 2008 (9 months after the deadline to answer had passed) the C.A.S.A.R.H. ordered that in 10 days ASSMCA had to show cause for having disobeyed the August 7, 2007 Order, or else the Motion would be granted.  In view of ASSMCA's continued disobedience and noncompliance, on May 21, 2001, the C.A.S.A.R.H. declared that ASSMCA was in default.  On October 21, 2008 ASSMCA then very tardily filed a Motion to Show Cause, alleging that it had not obeyed the Order to answer the 2007 Summary Judgment Motion, nor the Order to Show Cause, due to work overload, without explaining why in all that time it had not ever timely requested any extension to answer, or to show cause.  In 2008, the C.A.S.A.R.H. then tersely withdrew its default ruling, without analysis, findings of fact, nor explanation.  But, mere overwork, which afflicts all lawyers, is never a valid reason to disobey orders without timely motions for time extensions.  Moreover, it was not until January 2016, eight (!) years later, that the C.A.S.P. belatedly and tersely denied the Summary Judgment Motion, again without any determinations of fact and law.  Not coincidentally, that bare dismissal was hastily issued immediately after Ms. Guinot's attorney forced the C.A.S.P.'s hand and angered the C.A.S.P. by filing a letter with the Justice Department in December 2015 notifying the intention to sue C.A.S.P. for inaction and particularly for failure to rule on multiple motions, many requesting that it schedule a hearing on the merits for what then was a 15-years old appeal.

original appeal.  C.A.S.P.'s actions and omissions heaped insult and injury on top of that caused by ASSMCA.

56.  C.A.S.P.'s inexcusable twenty-year delay and absolute mismanagement of the administrative appeal constitutes dereliction of duty.  Lamentably, at the C.A.S.P., many years-long delays of proceedings that should only take six months are notoriously par for the course.  C.A.S.P.'s misadministration is undeniable evidence that the appeals system for public employees who are statutorily obligated to file their appeal in that forum, is irredeemably broken.

57.  The analysis in important sections of the IOE, which analysis was uncritically adopted by the C.A.S.P., is wrong as a matter of law.  For example, the IOE expressly based its inference that Ms. Guinot engaged in a practice of using disrespectful language (see either Resolution, Attachment A or B, last sentence of parr. 1, fn. 3) on a *single* incident *which dated from 1993*, in which Ms. Guinot admitted she said "que jodienda" ("what a f…king problem") when faced with an impossible choice.[8]  The IOE further expressly based its inference that Ms. Guinot engaged in a pattern of threatening co-workers, on an *uncorroborated contested 1995 hearsay report* by *adjudicated harasser* Ms. Providencia Quijano.[9]  The C.A.S.P. panel cited this IOE passage

---

[8] This is what happened. In April of 1993, while Ms. Guinot was working in the Women's Unit, Supervisor Margarita Boria called the ATCAs for a meeting, to be held (1) *outside of work hours* (2) on *Ms. Guinot's day off*, (3) at a time when Ms. Guinot was taking a course at the University to become certified as a teacher, *which she could not miss*. Ms. Guinot reasonably called Ms. Boria, explained the conflict, and requested that the meeting be rescheduled for another time, so that she would not have to choose between missing class and missing the meeting. Ms. Boria declined to accommodate Ms. Guinot. The expression "que jodienda" ("what a f…king problem") escaped Ms. Guinot spontaneously and unintentionally, and was not addressed to the supervisor, nor was it said with the intention of disrespecting her.

[9] The false accusation that Ms. Guinot exhibited threatening behavior (Resolution, Attachment A or B, last line of fn. 3, parr. 1) arises directly from ASSMCA's hotly contested Exhibit I. That unsworn hearsay document was drafted on October 23, 1995 by the UCA supervisor Providencia Quijano, who the IOE identified as one of Ms. Guinot's biggest harassers. IOE FF # 14. In Exhibit I, Ms. Quijano alleged that she overheard Ms. Guinot talking to herself, allegedly muttering that a director had been killed and that the next one should be from UCA.  Ms. Guinot strongly denied this. We emphasize that at no time is it alleged that Ms. Guinot directly threatened to harm anyone; nor was the police ever called, nor was Ms. Guinot confronted.  In fact, Ms. Quijano testified under oath that she could not even remember that incident.  She further testified that she could not even remember nor recognize Ms. Guinot, who was sitting right in front of her.  It is one thing to allege something in an unsworn 1995 memo that was never given to Ms. Guinot (thus preventing her from contemporaneously refuting its content).  It is quite another thing to make the same allegation under oath and to Ms. Guinot's face.

(Attachment B, fn. 3) even though Ms. Guinot denied the incident and even though Ms. Quijano, questioned under oath, could not corroborate that it ever occurred.  Ms. Guinot refuted or gave a lucid explanation for *each* hearsay allegation that between 1993 and 1997 she failed to adequately perform her duties as an employee.  Moreover, in 1997 Ms. Quijano readily recommended that Ms. Guinot be granted her request to be transferred to a new post in G Pavilion because Ms. Guinot was "an employee who was responsive to work requirements" ("la Sra. Guinot es una empleada que responde al trabajo").  Guinot's Exhibit IV.  Indeed, there was no allegation that in the year and a half before Ms. Guinot was fired in June of 2001, she used inappropriate or threatening language or engaged in behavior that justified destitution.

58.  The C.A.S.P. is an adjudicative arm of the executive branch of the government of Puerto Rico.  Thus, C.A.S.P. mismanagement and malfeasance is ultimately governmental misconduct.  So, the issue becomes whether this court of equity is willing to allow such institutional malfeasance to continue to injure employees' rights.  It must not allow it.

**MS. GUINOT'S INJURIES AND DAMAGES**

59.  Ms. Guinot has been victimized many times over.

60.  First, between 1991 and 2001 ASSMCA subjected her to a brutal gauntlet of relentless harassment which crushed her spirit, isolated her, deeply affected her work, and harmed her health.  Then, in June, 2001 ASSMCA illegally fired Ms. Guinot, violating established guidelines and due process, basing the dismissal on her harassment-induced isolation, and on hearsay evidence dating from 1993-1998.

61.  Subsequently, the J.A.S.A.P., the C.A.S.A.R.H. and now the C.A.S.P. denied her right to the statutorily mandated prompt hearing (within six months) for her eminently legitimate claims.  The fifteen-year delay from the 2001 filing of her appeal to the 2016 hearing disproportionately vitiated Ms. Guinot's case.  That case depended especially on witness

Case No. 17-BK 3283-LTS

testimony. During that fifteen-year delay, at least one critical witness (and one of her lawyers) died, and other critical witnesses retired, moved, and were not found. In contrast, ASSMCA based its case on decade-old hearsay documents whose authors were not available to be cross-examined. The (thus far) 20-year total duration of the administrative proceedings mooted a principal demand of the 2001 appeal, reinstatement. Ms. Guinot is now too old and too frail and too wounded and too sick to return to work. Ms. Guinot has been denied what she wanted most of all, vindication for the pervasive evil harassment she suffered, which still affects her deeply. Any compensation she is due, which would always have been inadequate, might now be subject to the bankruptcy chopping block. This would not have been an issue had the appeals process been completed within the six-month period mandated in Section 2163(g) of the Uniform Administrative Procedures Act (*supra*, p. 16), nor even if the process had lasted five years. At this point in time, Ms. Guinot is unemployed, in ill-health, needs a cane to walk, has no pension, her Social Security is insufficient to meet her needs, since even before Hurricane María she lives in a leaky house she cannot afford to repair but the hurricane made things worse, she cannot repair her rundown car, and she is suffering from severe economic limitation.

62. We know the great difficulty that this Honorable Court faces in adjudicating the demands of thousands of creditors. We also acknowledge that some of the detail offered above may not perfectly be within the scope of this Court's adjudicative function over bankruptcy matters. Yet, equity, justice, and judicial duty nonetheless require that this Honorable Court give considered scrutiny when the present extraordinary circumstances mandate different remedies. For ten years ASSMCA subjected Ms. Guinot to the *via crucis* of a brutally hostile work environment and harassment. ASSMCA then unjustly fired Ms. Guinot, based on expired refuted hearsay allegations, in violation of the law and ASSMCA's own internal regulations. And then, the C.A.S.P. and its predecessors subjected her to an excruciating, fumbling, 20-year

Case No. 17-BK 3283-LTS

adjudicative ordeal, during which time her right to a speedy and fair adjudication was denied. This totals thirty (!) years of grievous harm, of justice delayed, and justice denied.

63.  Severely reducing her compensation now, her one chance at some form of outrageously delayed justice and vindication, would only add inequitable insult to unconscionable injury.

**PRAYER**

WHEREFORE, Ms. Guinot respectfully prays that this Honorable Court exercise its equity powers and enter judgment against Debtor-ASSMCA as follows:

1.  That the Honorable Court set aside its Order (ECF 16132) disallowing Ms. Guinot's claim on the mooted ground that she failed to provide supporting documentation, and that the Court accept the superseding Notice of Claim which is concurrently filed.

2.  That the Honorable Court award Ms. Guinot $355,000 for back pay between 2001 and 2015 (after having already deducted salaries which would have been due but for a retroactive two-month suspension and also after deducting wages earned in the private sector), $31,800 for denied medical benefits, $55,500 for Social Security benefits to which she would have been entitled, $249,600 in pension benefits to which she would have been entitled, and $500,000 damages for ten years of hostile work environment and workplace harassment.

3.  For an award of attorney's fees and costs as allowable by law in an amount the Court determines to be reasonable; and

4.  For such other and further relief as this Court deems just and proper.

DATED: October 15, 2021                      /s/ William Santiago Sastre
                                             WILLIAM SANTIAGO SASTRE
                                             USDC PR NO. 201106
                                             P.O. BOX 1801
                                             SABANA SECA, P.R. 00952-1801
                                             (787) 622-3939
                                             wssbankruptcy@gmail.com
                                             Attorney for Movant