UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-----------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

         Debtors.

-----------------------------------------------------------------x

PROMESA
Title III


No. 17 BK 3283-LTS
(Jointly Administered)


**[Response to Docket # 17627, # 17680]**

**OBJECTION TO CONFIRMATION OF PLAN BY INDIVIDUAL GO
AND PBA BONDHOLDER (PETER C. HEIN)**


Dated:  October 19, 2021

## <u>TABLE OF CONTENTS</u>

Page

I.    FOMB BEARS THE BURDEN OF PROVING EACH REQUIREMENT FOR CONFIRMATION IS MET ...............................................................................1

II.   PLAN RELEASES ARE TOO BROAD AND IMPROPERLY EXTEND TO NON-DEBTORS ...............................................................................................1

     A.    Relief sought ...........................................................................................1

     B.    The releases are too broad (even as applied to Debtors), and improperly extend to non-Debtors .............................................................1

     C.    No non-consensual release of non-debtors is permissible .......................3

III.  OBJECTION TO PROVISIONS PURPORTING TO MAKE RELEASES AND RELATED PROVISIONS INTEGRAL AND ESSENTIAL................................3

IV.  IMPROPER PRO RATA PAYMENT OF ADDITIONAL CONSIDERATION TO SOME BUT NOT ALL HOLDERS OF BONDS WITH THE SAME PRIORITY AND SECURITY ...........................................................................3

     A.    Relief sought ...........................................................................................3

     B.    Bondholders who own the same series of bonds must receive the same pro rata consideration ................................................................4

V.   OBJECTION TO PURPORTED NON-SEVERABILITY OF PAYMENT OF DIFFERENT CONSIDERATION TO BONDHOLDERS WITH BONDS THAT HAVE SAME PRIORITY AND SECURITY ....................................................6

VI.  48 U.S.C. §2126(E) (PROMESA TITLE I) DOES NOT DEPRIVE THE COURT OF JURISDICTION TO EVALUATE COMPLIANCE WITH THE CONFIRMATION REQUIREMENTS OF §2174 (PROMESA TITLE III). ...................6

     A.    Federal subject matter jurisdiction over Title III cases, including confirmation proceedings, exists under 48 U.S.C. §2166(a). ................6

     B.    Section 2166(a) provides this Court with jurisdiction to assess whether a failure to meet requirements of 48 U.S.C. §2141(b)(7) precludes confirmation.............................................................................6

     C.    The unreliability and result-oriented nature of FOMB's fiscal plans underscore why, at the plan confirmation stage, the Court can (and must) exercise the jurisdiction granted to it under §2166(a) and determine whether FOMB's proffered proof – including its fiscal plans – meets

FOMB's burden to prove an entitlement to confirmation of a Plan that releases GO and PBA bondholder claims against a debtor FOMB represents. ...................................................................................6

    1.    Unsupported data on key metrics, such as population, inconsistent with actual U.S. census data and estimates ...................................6

    2.    FOMB's underestimation of revenues .........................................6

    3.    FOMB's assumption that Medicaid expenses will increase dramatically but federal funding will fall off a cliff ...................7

VII.    FAILURE TO RESPECT THE PRIORITY AND SECURED STATUS OF GO AND PBA BONDHOLDERS WHO DO NOT CONSENT TO THE PLAN, AS WELL AS FAILURES TO COMPLY WITH THE U.S. CONSTITUTION AND OTHER PROVISIONS OF PROMESA, REQUIRES DENIAL OF PLAN CONFIRMATION AND PRECLUDES RELEASE OF COMMONWEALTH ...............7

    A.    Relief sought ............................................................................7

    B.    The GO bonds are valid, have payment priority under the Puerto Rico Constitution and statutes, and are secured. ..........................................7

        1.    Validity .........................................................................8

        2.    "First claim" priority ...................................................9

        3.    Secured status...............................................................10

    C.    The PBA bonds are valid, have payment priority under the Puerto Rico Constitution and statutes, and are secured. ..........................................10

    D.    Failure to prove the requirements of 48 U.S.C. §2174(b)(3) are met precludes confirmation...........................................................11

    E.    Failure to prove the requirements of 48 U.S.C. §2174(b)(6) are met precludes confirmation...........................................................12

        1.    Validity, priority and secured status were never successfully challenged ...................................................................12

        2.    Commonwealth has failed to timely issue audited financial statements...................................................................12

        3.    Commonwealth has the resources to pay all principal and interest due on its GO and PBA debt...........................................13

    F.    Failure to meet the requirements of 48 U.S.C. §2141(b)(1)(N) and §2174(b)(7) precludes confirmation. ..........................................14

G.   The Takings Clause bars release of Commonwealth from claims of nonconsenting GO and PBA bondholders who do not receive full compensation for their property. ........................................................... 15

H.   Due Process and Ex Post Facto Clauses bar release of Commonwealth from claims of GO and PBA bondholders. ........................................... 17

I.    Due Process precludes deference to FOMB's certifications of financial plans or the plan of adjustment. ................................................................ 18

VIII.  OBJECTION TO ANY USE OF, OR RELIANCE UPON, THE CONFIDENTIAL MEDIATION-NEGOTIATION PROCESS ....................................... 18

IX.   NEITHER SETTLEMENTS BY MAJOR BONDHOLDERS IN A CONFIDENTIAL MEDIATION-NEGOTIATION PROCESS NOR VOTING CAN ABROGATE THE RIGHTS OF NONCONSENTING BONDHOLDERS TO FULL PAYMENT OF PRINCIPAL AND INTEREST .............................................. 19

A.   Relief sought ........................................................................................ 19

B.   Successful prosecution to judgment of an adversary proceeding was required if Debtors sought to alter the validity, priority or secured status of GO and PBA bonds. ............................................................................... 19

C.   Use of a confidential mediation-negotiation process – rather than adjudication of the priority, secured status and validity of the GO and PBA bonds – cannot be used to abrogate rights of non-consenting bondholders. ......... 20

D.   Voting likewise cannot abrogate the rights of non-consenting bondholders. ........ 22

X.    FOMB'S IMPROPER AND COERCIVE SOLICITATION REQUIRES DENIAL OF CONFIRMATION ................................................................................ 22

A.   Relief sought ........................................................................................ 22

B.   Improper solicitation – exchange offer ................................................... 23

C.   Improperly coercive solicitation – Disclosure Statement ....................... 24

D.   Improper solicitation – Disclosure Statement that did not provide adequate information, including information on Federal taxable or tax-exempt status ........ 25

XI.   PLAN DISCRIMINATES AGAINST 50-STATES RESIDENTS IN VIOLATION OF LAW AND DUE PROCESS, EQUAL PROTECTION AND PRIVILEGES AND IMMUNITIES CLAUSES ................................................ 26

A.   Relief requested ................................................................................... 26

B.   Discrimination based on place of residence ............................................ 26

XII.   FAILURE TO DISCLOSE ENTIRETY OF PLAN, INCLUDING ACTUAL
       LEGISLATION CALLED FOR BY THE PLAN, BEFORE DEADLINES FOR
       VOTING AND FOR OBJECTION ...........................................................................27

XIII.  COMMONWEALTH'S IMPAIRMENT OF THE RIGHTS OF ITS "FIRST
       CLAIM" PRIORITY, SECURED GO AND PBA BONDHOLDERS VIOLATES
       THE CONTRACT CLAUSE ...................................................................................28

       A.   Impermissible impairment of Commonwealth's obligations under the GO
            and PBA bonds. .......................................................................................28

       B.   The impairment is neither reasonable nor necessary. .............................................29

            1.   Cash on hand in excess of debt service due. ...............................................29

            2.   Failure to issue timely awaited financials ...................................................29

            3.   Failure to implement structural reforms ......................................................29

            4.   Increased outflows ..................................................................................30

            5.   Non-essential expenditures. ......................................................................30

            6.   Low relative tax burden. ...........................................................................30

            7.   Tax reductions and preferential tax rates, credits and grants, even
                 while in Title III. ...................................................................................31

            8.   Per capita aggregate public debt levels lower than the 50 states. ..............31

            9.   The business climate in Puerto Rico has only gotten worse .....................32

            10.  The spending culture persists. ....................................................................32

XIV.   LEGISLATION CANCELING AND EXTINGUISHING GO AND PBA DEBT
       PRESCRIBES A METHOD OF COMPOSITION OF INDEBTEDNESS THAT,
       UNDER 48 U.S.C. §2163, CANNOT BIND NONCONSENTING
       BONDHOLDERS ...................................................................................................33

XV.    PROMESA VIOLATES THE BANKRUPTCY UNIFORMITY CLAUSE,
       WHICH IS ONE GROUND FOR DISMISSAL OF THIS TITLE III ..............................33

XVI.   COMMONWEALTH'S TITLE III PROCEEDING SHOULD BE DISMISSED...........34

XVII.  OBJECTION TO WAIVER OF RULE 3020(E) AUTOMATIC STAY, AND
       REQUEST FOR STAY OF CONSUMMATION UNTIL ANY TIMELY
       APPEAL IS ADJUDICATED ..................................................................................35

iv

XVIII. RESERVATION OF RIGHT TO SUPPLEMENT THIS OBJECTION IF ONE
OR MORE OF THE RETAIL CLASSES REJECT THE PLAN......................................35

XIX.   RESERVATION OF RIGHTS TO RESPOND TO ANY REVISIONS TO THE
PLAN, AND CONTINUED ASSERTION OF PRIOR OBJECTIONS ..........................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*American United Mut. Life Ins. Co.* v. *City of Avon Park*,
311 U.S. 138 (1940)......................................................................................22

*Aurelius (see Financial Oversight and Management Board for Puerto Rico* v.
*Aurelius Investment LLC)*

*Blake* v. *McClung*,
176 U.S. 59 (1900)......................................................................................26

*Calder* v. *Bull*,
3 U.S. 386 (1798)......................................................................................22

*Cedar Point Nursery* v. *Hassid*,
141 S.Ct. 2063 (2021)......................................................................................16

*Chrysafis* v. *Marks*,
____ U.S. ____ (Aug. 12, 2021)......................................................................................18

*City of Avon Park* (*see American United Mut. Life*)

*Commercial Western Finance*,
*(see In re Commercial Western Finance)*

*Comptroller* v. *Wynne*,
135 S.Ct. 1787 (2015)......................................................................................27

*County of Moultrie* v. *Rockingham*,
92 U.S. 631 (1875)......................................................................................9

*Eastern Enterprises* v. *Appel*,
524 U.S. 498 (1998)......................................................................................17

*Financial Oversight and Management Board for Puerto Rico* v. *Aurelius
Investment LLC*,
140 S.Ct. 1649 (2020)......................................................................16, 18, 28, 33, 34

*FOMB* v. *Aurelius (see Financial Oversight and Management Board for Puerto Rico*
v. *Aurelius Investment LLC)*

*Harris* v. *Rosario*,
446 U.S. 651 (1980)......................................................................................33

*Horne* v. *Department of Agriculture*,
  576 U.S. 350 (2015)...........................................................16

*In re Commercial Western Finance Corp.,* 761 F.2d 1329 (9th Cir. 1985)...................19

*In re Dow Corning*,
  280 F.3d 648 (6th Cir. 2002) .................................................3

*In re Lowenschuss*,
  67 F.3d 1394 (9th Cir. 1995) .................................................3

*In re Mansaray-Ruffin*,
  530 F.3d 230 (3d Cir. 2008)...................................................19

*Knick* v. *Township of Scott*,
  139 S.Ct. 2162 (2019)...........................................................17

*Koontz* v. *St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013).......................................................... 16-17

*Louisiana* v. *New Orleans*,
  215 U.S. 170 (1909)...........................................................16

*Lynch* v. *United States*,
  292 U.S. 571 (1934)...................................................15, 16, 29

*Mansaray-Ruffin (see In re Mansaray-Ruffin)*

*Monongahela Navigation* v. *United States*,
  148 U.S. 312 (1893)...........................................................17

*Mullaney* v. *Anderson*,
  342 U.S. 415 (1952)...........................................................26

*Penn Central Transportation Co.* v. *New York City*,
  438 U.S. 104 (1978)...........................................................16

*Security Industrial Bank (see United States* v. *Security Industrial Bank)*

*Saenz* v. *Roe*,
  526 U.S. 489 (1999).......................................................27, 28

*Shapiro* v. *Thompson*,
  394 U.S. 618, 638 (1969)...................................................26

*Slattery Co.* v. *United States*,
  231 F.2d 37 (5th Cir. 1956) .................................................19

*Town of Coloma* v. *Eaves*,
    92 U.S. 484 (1875)............................................................................................9

*United Automobile* v. *Fortuño*,
    633 F.3d 37 (1st Cir. 2011).............................................................................28

*United States* v. *Contra Costa County Water District*,
    678 F.2d 90 (9th Cir. 1982).............................................................................19

*United States* v. *Security Industrial Bank*,
    459 U.S. 70 (1982)..........................................................................................16

*United States* v. *Vaello-Madero*,
    956 F.3d 12 (1st Cir. 2020), *cert. granted*, 141 S.Ct. 1462 (2021).................33

*United States Trust Co.* v. *New Jersey*,
    431 U.S. 1 (1977)............................................................................15, 16, 17, 29, 32

*United Steel Union* v. *Virgin Islands*,
    842 F.3d 201 (3d Cir. 2016).............................................................................32

*Von Hoffman* v. *City of Quincy*,
    4 Wall. 535 (1867)...........................................................................................16

*Wolff* v. *New Orleans*,
    103 U.S. 358 (1881).........................................................................................16

**Constitution – U.S.**

U.S. Const. Art. I, §8, cl. 4 (Bankruptcy clause) ..........................................................33

U.S. Const. Art. I, §9, cl. 3 (prohibition of Bills of Attainder and Ex Post Facto
    laws) .........................................................................................................................17

U.S. Const. Art. I, §10, cl. 1 (Contracts clause and prohibition of Bills of
    Attainder and Ex Post Facto laws) ...........................................................................28

U.S. Const. Art. IV, §2, cl. 1 (Privileges and Immunities clause)................................26

U.S. Const. Amendment V (Due Process and Takings clauses)....................... 15-17, 26

U.S. Const. Amendment XIV, §1 (Privileges and Immunities, Due Process and
    Equal Protection clauses) .........................................................................................26

**Puerto Rico Constitution**

Article II, Section 7 (Due Process, Equal Protection and Contract Clauses) ...............11

Article II, Section 9 (Takings Clause) ........................................................................11

Article II, Section 12, Clause 2 (prohibition on
    Ex Post Facto laws and Bills of Attainder)........................................................................11

Article VI, Section 2 ....................................................................................................................10

Article VI, Section 8 ............................................................................................................9, 10, 11

## Statutes and Rules – Federal

11 U.S.C. §105 ...............................................................................................................................3

11 U.S.C. §109(c)(3).......................................................................................................................33

11 U.S.C. §524(a)(3).......................................................................................................................3

11 U.S.C. §524(e) ...........................................................................................................................3

11 U.S.C. §524(g)(4)(A)(ii)............................................................................................................3

11 U.S.C. §1123(a)(4).................................................................................................................3, 4

11 U.S.C. §1125 .......................................................................................................................23, 24

11 U.S.C. §1125(a) .......................................................................................................................25

11 U.S.C. §1125(b) .......................................................................................................................23

11 U.S.C. §1129(a)(8)...............................................................................................................23, 35

11 U.S.C. §1129(b) .......................................................................................................................23

11 U.S.C.  § 1129(b)(1) .................................................................................................................35

48 U.S.C. §737 .............................................................................................................................26

48 U.S.C. §2124(j)........................................................................................................................28

48 U.S.C. §2126(E)........................................................................................................................6

48 U.S.C. §2141 ...........................................................................................................................14

48 U.S.C. §2141(b)(1)(N)............................................................................................................14

48 U.S.C. §2141(b)(7) .............................................................................................................6, 14

48 U.S.C. §2141(c)-(f)..................................................................................................................28

48 U.S.C. §2142...........................................................................................................................28

48 U.S.C. §2142(c)(2) ...............................................................................................28

48 U.S.C. §2142(d)(2) ...............................................................................................28

48 U.S.C. §2142(e)(3)-(4) ..........................................................................................28

48 U.S.C. §2143 .........................................................................................................28

48 U.S.C. §2144 .........................................................................................................28

48 U.S.C. §2146(a)(2) ................................................................................................29

48 U.S.C. §2146(a)(2)(A) ...........................................................................................12

48 U.S.C. §2163 .....................................................................................................27, 33

48 U.S.C. §2166(a) ......................................................................................................6

48 U.S.C. §2174 ......................................................................................................6, 14

48 U.S.C. §2174(b)(3) ................................................................................................11

48 U.S.C.§2174(b)(6) ...........................................................................................12, 20

48 U.S.C. §2174(b)(7) ................................................................................................14

**Rules**

Bankruptcy Rule 7001(2) .............................................................................................19

F.R. Evid. 408 ............................................................................................................19

**Legislative Reports**

H.R. Report 114-602, to accompany
   H.R. 5278, "Puerto Rico Oversight, Management and Economic
   Stability Act" (June 3, 2016) ...............................................................................14

**Statutes – Puerto Rico**

13 LPRA §41 ..............................................................................................................10

21 LPRA §5001 ..........................................................................................................10

21 LPRA §5005 ..........................................................................................................10

23 LPRA §104(c)(1) .....................................................................................................9

**Other Authorities**

Alexander Hamilton, Sec. Treasury, Report Relative to a Provision for the Support
of Public Credit, January 9, 1790, available on Founders Online
(https://founders.archives.gov/documents/Hamilton/01-06-02-0076-0002-0001) .................34

## **TABLE OF ABBREVIATIONS AND CITATIONS**

| | |
|---|---|
| # | Docket entries are referred to in the form of "#___" |
| COFINA | Puerto Rico Sales Tax Financing Corporation |
| Commonwealth | Commonwealth of Puerto Rico |
| GO bonds | General obligation bonds issued by the Commonwealth of Puerto Rico for which the full faith credit and taxing power of the Commonwealth is pledged |
| Hein ¶ ___ or Ex. ___ | Accompanying Declaration of Peter C. Hein |
| PBA bonds | Bonds issued by Puerto Rico Public Building Authority "secured by a pledge" of certain rentals and "further secured by the guaranty of the Commonwealth" |

Peter C. Hein, a GO and PBA bondholder who purchased in the 2009 through March 2012 time period, years before PROMESA was even in prospect, objects to Confirmation.

## I.   FOMB BEARS THE BURDEN OF PROVING EACH REQUIREMENT FOR CONFIRMATION IS MET

FOMB admits that it "has the burden of demonstrating each of the provisions of PROMESA section 314 are satisfied."  #18471-page-3-of-4.

## II.   PLAN RELEASES ARE TOO BROAD AND IMPROPERLY EXTEND TO NON-DEBTORS

**A.  Relief sought:  [1]** Plan releases should be modified to expressly state that "No claim, obligation or liability arising from, or related to, any bonds issued by COFINA is released."  This exclusion should be incorporated in the definitions of Claims and Causes of Action used in Plan §92.2(a) and in related bar order and injunction provisions (including §§92.2(b), 92.3, 92.9, 92.11).  **[2]** Any (appropriately narrowed) releases should be limited to releases only of Debtors.  **[3]** All Retail Investors should be paid all consideration that was offered conditioned on acceptance of the PSA or the Plan.  No Retail Investor should be disadvantaged because they were unwilling to agree to releases that potentially impaired rights arising from COFINA bonds and/or that improperly released numerous non-Debtors.

Debtors' opening brief states in conclusory terms that FOMB will prove the releases "are reasonable and integral to the plan" (#17680-page-27-of-58), but offers no justification for the breadth of the releases or for extending releases to non-debtors.  If FOMB belatedly offers a justification, I hereby request an opportunity to respond in writing.

**B.  The releases are too broad (even as applied to Debtors), and improperly extend to non-Debtors.**  The basic release provision in Plan §92.2(a) broadly releases all Claims or Causes of Action (broadly defined in §1.125 and §1.135) "against the **Released Parties**" "relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective

Assets, property, or interests of any nature whatsoever …" (and it goes on).  "**Released Parties**"

(§1.425) includes numerous non-Debtors:

> "(a) the Government Parties, (b) the PSA Creditors, (c) the Retiree Committee,
> (d) the Creditors' Committee, (e) AFSCME, and (f) with respect to the foregoing
> clauses (a) through (e), each of their respective Related Persons."

**Government Parties** is defined (§1.275) to include not only Debtors, but also "any of its

agencies."  Expressly excluded from Government Parties are CCDA, HTA, MBA, PFC, PRASA,

PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by

such Entities.  But claims against or bonds issued by COFINA are **not** specifically excluded.

Perhaps one might distinguish between "agency" and "instrumentality," but various of the other

entities specifically excluded from §1.275 are elsewhere characterized as instrumentalities, *see*

#17628-page-196n.195-of-654.

**Related Persons** is defined in §1.423 to include yet additional non-debtors:

> "[w]ith respect to any Entity (including … the Commonwealth and the Government
> Parties), its predecessors, successors and assigns … and their respective current and
> former employees, managers, elected or appointed officials, directors, officers,
> board members, principals, members, equity holders …, partners, financial
> advisors, attorneys, accountants, consultants, agents and professionals (including
> … any and all Professionals retained by the Debtors and AAFAF), or other
> representatives, nominees or investment managers, each acting in such capacity,
> and any Entity claiming by or through any of them (including their respective
> officers, directors, managers, shareholders, partners, employees, members and
> professionals), each in its respective capacity as such."

The scope of the §92.2(a) release is so overly broad that the negotiating parties were constrained

to expressly exclude – in §92.2(a) itself – claims against PREPA arising from or related to

PREPA-issued bonds.  But there is *no* comparable exclusion for claims arising from or related to

COFINA-issued bonds.  There is a definition of Released Claims (§1.424), but that does *not*

limit §92.2(a) and its exclusions name nine separate Commonwealth agencies or

instrumentalities (*compare* #17628-page-196n.195-of-654), but *not* COFINA.  There is also a

definition of Government Released Claims (§1.276) with a limited exclusion of some COFINA-

related claims, but that definition, too, does **not** limit §92.2(a).

**C. No non-consensual release of non-debtors is permissible.**  11 U.S.C. §524(e) expressly provides that (except per §§524(a)(3) and (g)(4)(A)(ii), both inapplicable here) "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."  This is a specific direction in the statute; general language elsewhere (such as in 11 U.S.C. §105) cannot override the express limitation on releases imposed by §524(e).  *E.g.*, *In re Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995). Furthermore, even those courts that do permit releases or injunctions of claims of non-consenting creditors against non-debtors in "unusual circumstances" impose requirements (such as contribution of substantial assets by the non-debtor) not met here.  *E.g.*, *In re Dow Corning*, 280 F.3d 648, 658 (6th Cir. 2002).

**III. OBJECTION TO PROVISIONS PURPORTING TO MAKE RELEASES AND RELATED PROVISIONS INTEGRAL AND ESSENTIAL**

Plan §92.4 asserts the releases and related provisions are integral and essential to the Plan.  But FOMB's Plan cannot dictate court approval of overly broad releases or releases of non-debtors.

**IV. IMPROPER PRO RATA PAYMENT OF ADDITIONAL CONSIDERATION TO SOME BUT NOT ALL HOLDERS OF BONDS WITH THE SAME PRIORITY AND SECURITY**

**A. Relief sought:**  To comply with 11 U.S.C. §1123(a)(4), all bondholders must receive the same added pro rata consideration (*i.e.*, the added 1.5% + 1.321% of par) that currently only goes to some.  The net cost of paying the added 1.321% of par to all bondholders will likely be less than the $50 million already allocated to Retail Support Fees.  Hein ¶4.  For a total cost of about $64.953 million, all bondholders could be paid the same 1.5% + 1.321% of par pro rata added consideration.  Hein ¶3.  Commonwealth has over $25.4 billion cash on hand, of which $11.8 billion is unrestricted and over $745 million can only be used to pay GO bonds.  Hein ¶¶11-12.  FOMB has made repeated adjustments sweeting Plan terms for public employees and public employee retirees.  Hein ¶59 & Ex. V.  An added $64.953 million to pay all bondholders the same pro rata consideration pales compared to (i) the staggering amounts of professional and

3

other fees and costs paid in these proceedings (*e.g.*, Hein ¶52), and (ii) the billions of dollars of payments to favored constituencies, including billions of dollars of likely future "upside" payments to public employees and retirees. *E.g.*, #16908-page-15-to-20-of-178; Hein Ex. V; Point VII.F.

**B.  Bondholders who own the same series of bonds must receive the same pro rata consideration.**  This is required by 11 U.S.C. §1123(a)(4), which requires that a plan "shall provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment."  However, selected parties – who were permitted to participate in Plan negotiations, and who joined the PSA by 2/22/2021 – receive a pro rata 1.5% Consummation Fee, plus a 1.321% Restriction Fee, a total of 2.821% of par extra consideration paid pro rata.  Plan §§1.266, 1.272, 1.273, 1.307, 3.3, 3.5.  Retail Investors, like me, do not receive this 2.821%.

Despite the self-serving rhetoric about being paid "to compensate certain parties for the cost of negotiation, confirmation and consummation," under the terms of the Plan these "fees" are simply pro rata additional payments.  Plan §3.3 is express that each Consummation Cost recipient gets "a pro rata share" equaling 1.5% of the aggregate amount of its bond claims as of 2/22/2021.  A bondholder who sells on 2/23/2021 still gets the 1.5%, even if they are not around for confirmation or consummation (and many have sold, *see* #17524-page-9,37-to-41-of-41).  No proof of expenses incurred is required to receive the 1.5% fee.  And, in any event, if expenses were incurred, they were incurred by the party for negotiating for itself – the recipients of Consummation Costs do ***not*** claim to have incurred any expenses while acting for the benefit of the entire body of bondholders in any or all of the bond series, *see* #17524-page-8-of-41, #17382-page-5-of-7, #17296-page-3-of-11, #17397-page-4-to-5-of-11.

The 1.321% "restriction" fee is likewise simply pro rata additional consideration – agree to support and vote for the Plan, and you get 1.321%.  It is as simple as that.  Plan §3.5; PSA §5.1; *see* Point X.B.  Parties to the PSA were not actually restricted:  New CUSIPS were issued,

approximately 2 business days after the exchange offer closed, that carried the 1.321% extra consideration and were freely tradable. #17649-page-12-to-14-of-29. Even before that, the PSA allowed sales to someone not already a signatory if that person would join. #17628-2-page-29,31-of-135; PSA §§4.5(a), 4.6(a).

It is no answer to say that (without advance notice) FOMB made a tactical decision to suddenly "offer" the 1.321% to all who would join the PSA – including Retail Investors. That coercive, take-it-or-leave-it "offer" required a bondholder to support, and vote for, the Plan – and agree to overly-broad releases that would potentially jeopardize claims arising from, or related to, bonds issued by COFINA, and that released numerous non-debtors. And since the offer was posted on EMMA, but never actually mailed to all bondholders, most Related Investors were likely never aware of it before the short time to tender had passed. #17649-page-2-of-29.

This is not a case where a creditor invests new cash in a debtor, and thus can be said to have provided value that warrants payment separate from that creditor's pro rata share of the consideration paid to its class. Here, the payments were (i) 1.5% of par to certain major holders in exchange for entering into a PSA by 2/22/2021 (committing them to support and vote for the plan), and (ii) an added 1.321% for those major holders plus others who joined the PSA (and thereby committed to support and vote for the plan) by the 8/13/2021 CUSIP exchange offer deadline. Added payments for plan support and votes – it is as simple as that.

It is no answer to say payment-for-plan-support-and-vote for some but not all bondholders was the only alternative to litigation. I repeatedly sought to have a committee appointed to represent individual bondholders who have been excluded from the negotiation of the Plan (*cf.* #17420-page-19-¶34-of-27), but this Court repeatedly rejected that. #6128, #6487, #6534, #17221, #17524, #17724. Had such a committee been appointed, there would have been a mechanism to negotiate treatment of all bond claims, so all holders of a particular series of bonds would receive the same consideration. But there was not.

V.   **OBJECTION TO PURPORTED NON-SEVERABILITY OF PAYMENT OF DIFFERENT CONSIDERATION TO BONDHOLDERS WITH BONDS THAT HAVE SAME PRIORITY AND SECURITY**

Plan §3.10 improperly seeks to require unequal treatment of bondholders.  The solution is to require the same 1.5% and 1.321% of par be paid to all GO and PBA bondholders.

VI.   **48 U.S.C. §2126(E) (PROMESA TITLE I) DOES NOT DEPRIVE THE COURT OF JURISDICTION TO EVALUATE COMPLIANCE WITH THE CONFIRMATION REQUIREMENTS OF §2174 (PROMESA TITLE III).**

A.   **Federal subject matter jurisdiction over Title III cases, including confirmation proceedings, exists under 48 U.S.C. §2166(a).**

The Court is referred to #18181-page 8-to-10-of-157.

B.   **Section 2166(a) provides this Court with jurisdiction to assess whether a failure to meet requirements of 48 U.S.C. §2141(b)(7) precludes confirmation.**

The Court is referred to #18181-page-10-to-12-of-157.

C.   **The unreliability and result-oriented nature of FOMB's fiscal plans underscore why, at the plan confirmation stage, the Court can (and must) exercise the jurisdiction granted to it under §2166(a) and determine whether FOMB's proffered proof – including its fiscal plans – meets FOMB's burden to prove an entitlement to confirmation of a Plan that releases GO and PBA bondholder claims against a debtor FOMB represents.**

The Court is referred to #18181-page-13-to-17-of-157 and Hein ¶¶17-23.

The following are but examples of the unreliability and result-oriented nature of FOMB's fiscal plans:

1.   **Unsupported data on key metrics, such as population, inconsistent with actual U.S. census data and estimates.**  FOMB's forecasts that underlie its financial and economic projections use population data that is materially lower than the U.S. Census actual counts and estimates.  Hein ¶¶17-18.

2.   **FOMB's underestimation of revenues.**  FOMB has underestimated revenues and Commonwealth's capacity to pay its constitutional priority debt.  In actuality, for example, in fiscal 2021, Commonwealth had $3.530 billion more capacity to meet its obligations than FOMB forecast on 5/27/2020.  Hein ¶¶19-20.

6

3.     **FOMB's assumption that Medicaid expenses will increase dramatically but federal funding will fall off a cliff.**  The 4/23/2021 fiscal plan shows Commonwealth Medicaid expenditures increasing from $1.968 billion in FY2021 to $2.974 billion (#17628-8-page-53-of-309), yet federal Medicaid funding is projected to drop from $2.46 billion in FY2021 to $0.468 billion in FY2023 and $0.519 billion in FY2026 (#17628-8-page-48-of-309).  A more realistic assumption – that federal funding would at least keep pace with the Medicaid expenses requiring such federal funding – would result in a net increase of $2.5 to $3.0 billion per year in Puerto Rico's ability to meet its obligations.  Hein ¶¶21-23.

VII.   **FAILURE TO RESPECT THE PRIORITY AND SECURED STATUS OF GO AND PBA BONDHOLDERS WHO DO NOT CONSENT TO THE PLAN, AS WELL AS FAILURES TO COMPLY WITH THE U.S. CONSTITUTION AND OTHER PROVISIONS OF PROMESA, REQUIRES DENIAL OF PLAN CONFIRMATION AND PRECLUDES RELEASE OF COMMONWEALTH**

A.  **Relief sought:**  **[1]** All GO and PBA bondholders who do not agree to accept less favorable treatment should be paid all principal and interest that is due, and their claims should not be discharged or released unless fully paid.  **[2]** No payouts should be made to classes that do not enjoy Constitutional and statutory priority until such GO and PBA bondholders are fully paid.  **[3]** In particular, billions of dollars of potential payments out of "Excess Cash Surplus" should not be made to or for the benefit of public employees and public employee retirees, and their unions, until such GO and PBA bondholders are fully paid.  All payments out of "Excess Cash Surplus" should first be made to GO and PBA bondholders, as required by the Puerto Rico Constitution (interest and amortization of public debt "shall first be paid") and the U.S. Constitution (no taking without "just compensation").  Alternatively, confirmation should be denied, and this Title III should be dismissed.

B.  **The GO bonds are valid, have payment priority under the Puerto Rico Constitution and statutes, and are secured.**

Years before PROMESA was even in prospect, Commonwealth sold GO bonds to individual investors nationwide, including the 50 states (#16908-page-7n.1,48,63-to-64,70,88-to-90,98-to-112-of-178), based on covenants and representations that

7

The good faith, credit and taxing power of the Commonwealth are irrevocably
pledged for the prompt payment of the principal of and interest on the Bonds.  The
Constitution of Puerto Rico provides that public debt of the Commonwealth, which
includes the Bonds, constitutes a first claim on available Commonwealth resources.
(Cover, Official Statement, Series 2012A, italics added; see also p.1 par.2,4;
#9508-2-page-1,5-of-20; Hein ¶6)

The GO bonds were "issued under the provisions of" Act 33-1942 and in a section on the

"Security" for the bonds, the official statements stated:

> *In accordance with the Act*, the Commonwealth … *pledged* the good faith, credit
> and taxing power of the Commonwealth for the prompt payment of the principal of
> and interest on the Bonds.  *Pursuant to the Act*, the Bonds constitute general
> obligations of the Commonwealth, payable with any funds available to the
> Commonwealth, *which funds are appropriated as continuous appropriations,
> without the need to make specific appropriations for such purposes* (2012A OS,
> pp.1,12, emphasis added, #9508-2-page-5,6-of-20; Hein ¶6 ).

In addition, Act 83-1991, as amended, "provides for the levy of an annual special tax of

1.03% of the assessed value of all real and personal property not exempt from taxation.  The

proceeds are…credited to the Commonwealth Debt Redemption Fund…for application to the

payment of general obligation bonds…."  And Act 39-1976, as amended:

> requires the Secretary of the Treasury to transfer each month from available funds
> of the Commonwealth to the Redemption Fund such amounts which,…will be
> equal to the sum of one-sixth of the interest to be paid in the next six months and
> one-twelfth of the principal to be paid or required to be amortized within the next
> twelve months on all [GO bonds]….Moneys in the Redemption Fund are held in
> trust by Government Development Bank.  Act [39-1976] provides that the
> obligation of the Secretary of Treasury to make the above transfers is cumulative,
> and the amount of any deficiency in any month shall be added to the amount of
> transfers required in future months until such deficiency has been fully paid.
> (2012A OS, pp. 13-14, #9508-2-page-7-to-8-of-20)

    **1.  Validity:**  None of the GO bonds I own have been adjudged invalid; these bonds

are valid.  *See, e.g.*, #11148, #10702 and authorities discussed therein.  The essence of the

challenge to bond validity – and justification for lower recoveries for bonds issued in 2011, 2012

and 2014 – was the supposition that these debt issuances violated Puerto Rico's Constitutional

debt service limit (*e.g.*, #4784-page-11-to-12-of-62).  But Puerto Rico – and its bond counsel –

attested to the lawfulness of each of the bond issues in question (*e.g.*, #11148-page-7-to-17-of-

22; #10029-page-4, #10029-1 thru #10029-5).  Commonwealth continued to attest to its

compliance with the debt limitation even after the bond issuances.  *E.g.* #10029-3-page-4,17-of-

17, #10029-4-page-4,19-of-19, #10029-5-page-2-of-3.  Puerto Rico's independent auditors

certified financial statements in which Commonwealth attested to its compliance with the debt

limitation.  #10029-3-page-14-of-17, #10029-4-page-11,16-of-19.  Even the 608+ page "Final

Investigative Report" produced in August 2018 by Kobre & Kim, the Independent Investigator

**hired by FOMB** to "conduct an investigation…into…Puerto Rico's issuance of debt" (Ex. B,

Report p.2), concluded that

> Puerto Rico employed a reasonably robust process for these Debt Limit Calcula-
> tions.  In addition, **we did not find any evidence** that Puerto Rico's government per-
> sonnel believed that Puerto Rico's interpretation of the Constitutional Debt Limit
> was wrong or **that Puerto Rico performed the Debt Limit Calculation incorrectly**.
> Hein Decl. Ex. B, Report p. 267 (emphasis added).

Any notion that the remedy for Commonwealth's asserted (but never adjudicated) violation of its

own Constitution should be invalidation of bonds Commonwealth sold with its assurances that

the bonds were validity issued, makes no sense and is not the law.  Indeed, the Supreme Court

has repeatedly criticized tactics akin to those employed by Puerto Rico authorities here – stating

that "it would be tolerating a fraud" (*County of Moultrie* v. *Rockingham*, 92 U.S. 631, 637

(1875)) to sanction the "dishonesty" (*Town of Coloma* v. *Eaves*, 92 U.S. 484, 485 (1875)) of

government issuing bonds, taking money and then claiming bonds do not have to be repaid

because what government told bondholders at the time of issuance was (supposedly) untrue.

There is simply no basis for discounting recoveries of 2011, 2012 and 2014 bondholders.

    **2.  "First claim" priority:**  My GO bonds have a "first claim" priority under Puerto

Rico's Constitution and statutes.  *E.g.*, P.R. Const. Art. VI, Sec. 8 ("In case the available

revenues including surplus for any fiscal year are insufficient to meet the appropriations made

for that year, interest on the public debt and amortization thereof **shall first be paid**," emphasis

added); 23 L.P.R.A. §104(c)(1) and the statutes referenced below.  Even while disputing the

secured status of GO bonds, FOMB admitted that Art. VI, §8 "creates a Puerto Rico law payment priority", as do these statutes.  Adv.Proc.19-292-Doc#1-page-6,29,36,46-of-53.

      **3.   Secured status:**  GO bondholders have constitutional and statutory liens on the Commonwealth's available resources and special property tax revenues.  P.R. Const. Art. VI, §8 and §2, last ¶ ("The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof"); 13 LPRA §41 ("irrevocably pledged for the payment of the principal of, and the interest on, the bonds…which…shall be paid with...any available funds in the Commonwealth Treasury, which funds are appropriated as continuous appropriations without its being necessary to make new appropriations for said purpose").

      In addition, Act 83 of 1991 (21 L.P.R.A. §5001 *et seq.*) establishes a "special tax of [1.03%] per annum on the appraised value of all personal and real property in Puerto Rico not exempted from taxes" "for the amortization and redemption of the general obligations of the Commonwealth."  The 1.03% of property tax is to be deposited in Commonwealth's Debt Service Redemption Fund, which is ***not*** part of the general fund.  #17628-page-155-of-654.  By statute (21 L.P.R.A. §5005) commitment of the 1.03% of the Property Tax to the payment of principal and interest on GO bonds "will be considered to be a prior lien bond."

      The secured status was spelled out in previously filed papers; *e.g.*, Adv.Proc.19-292-#5 & #52; Adv.Proc.19-291-#10 and additional authorities discussed therein.  No court invalidated the constitutional and statutory liens, which remain in full effect.

     **C.  The PBA bonds are valid, have payment priority under the Puerto Rico Constitution and statutes, and are secured.**

      PBA bonds were also sold to individual investors nationwide based on covenants and representations that the bonds "are *secured by a pledge* of…rentals of government facilities financed or refinanced by such bonds and leased by [PBA] to departments, agencies, instrumentalities and municipalities of the Commonwealth" and that "[t]he Bonds are *further*

*secured by the guaranty of the Commonwealth* under which the *Commonwealth pledges* to draw

from any funds available in the Department of Treasury…such sums as may be necessary to

cover any deficiency in the amount required for the payment of principal of and interest on the

Bonds.  The good faith and credit of the Commonwealth, *as in the case of the Commonwealth's*

*general obligation bonds, are pledged for such payments*."  (Cover, Official Statement, Series Q,

emphasis added; Hein Ex. A)  The OS for the PBA bonds further advised investors that

Commonwealth's guaranty was provided for under Act 17-1968 and Act 321-2003, the Guaranty

Act (Hein Ex. A p.13-14).  None of the PBA bonds I own have been adjudged invalid; these

bonds are valid and have "first claim" priority under Puerto Rico's Constitution and statutes.  *See*

Point VII.B, above.

### D.  Failure to prove the requirements of 48 U.S.C. §2174(b)(3) are met precludes confirmation.

Section 2174(b)(3) provides, as a condition to plan confirmation, that Debtor prove that

"the debtor is not prohibited by law from taking any action necessary to carry out the plan".

**[1]** Puerto Rico's Constitution, Article VI, §8, provides that "[i]n case the available revenues

including surplus for any fiscal year are insufficient to meet the appropriations made for that

year, interest on the public debt and amortization thereof shall first be paid."  The Plan – that

fails to pay all principal and interest due on Commonwealth's GO and GO guaranteed debt, even

while Commonwealth makes payments to numerous other creditors who lack "first claim"

priority, and even while Commonwealth makes numerous other expenditures (*see* Points VII.F &

XIII.B) – violates GO bondholders' right to "first" payment under the Puerto Rico Constitution

and thus may not be confirmed.  **[2]** In addition, as discussed in Points VII.G, VII.H, VII.I, XI

and XIII below, the U.S. Constitution prohibits actions necessary to carry out the Plan, including

the failure to pay GO and PBA bondholders in full, and the purported "cancellation and

extinguishment" of their claims, and this likewise precludes confirmation of the Plan.  Similar

provisions of the Puerto Rico Constitution (Art. II, §7, Art. II, §9, Art. II, §12) likewise prohibit

actions to carry out the Plan for substantially the same reasons.

11

### E.  Failure to prove the requirements of 48 U.S.C. §2174(b)(6) are met precludes confirmation.

Section 2174(b)(6) requires FOMB to prove that a plan "is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan".  Because GO and PBA bonds are entitled to payment priority and/or are secured, Puerto Rico law would afford holders a greater recovery.

### 1.  Validity, priority and secured status were never successfully challenged.

The "first claim" priority and secured status, under Puerto Rico's Constitution and statutes, of GO and Commonwealth guaranteed bonds has never been successfully challenged.  *See* Point VII.B. Rather than adjudicate challenges – at FOMB's urging, or with its concurrence (*e.g.*, #7640, #8083, #8992), but over my objection (*e.g.*, #9508-page-14-to-23-of-24; #9683-page-2-of-3; #11284-page-3,6-to-10-of-12) – the Court stayed litigation in favor of a confidential negotiation-mediation process.  FOMB cannot point to any decision that undermines the "first claim" secured position of the GO and PBA bonds in order to meet its burden under §2174(b)(6).

### 2.  Commonwealth has failed to timely issue audited financial statements.

A statutory prerequisite to FOMB issuing a restructuring certification is a determination that Puerto Rico "has . . . adopted procedures necessary to deliver timely audited financial statements."  48 U.S.C. §2146(a)(2)(A).  At the time Puerto Rico was selling bonds, Puerto Rico's audited financials were generally timely.  Its fiscal 2011 audited financials were issued 4/27/2012, about 302 days after fiscal year end.  #16908-page-136-of-178.  The fiscal 2013 audited financials were issued within a year (on 6/30/2014).  #16908-page-148-of-178.  It was only after Puerto Rico in 2015 sought to avoid payment of its Constitutional "first claim" debt that Puerto Rico became seriously delinquent in issuing its financials.

Commonwealth's delays in providing audited financial statements became markedly worse after PROMESA was enacted and FOMB was installed.  The "latest" audited financial statement, for the year ended June 30, 2018, was not issued until June 30, 2021, 1,096 days

(three years) after the fiscal year end.  # 17628-14-page-12-of-471.  Thus, FOMB cannot point to timely audited financials to prove the Plan is in the best interests of GO and PBA bondholders.

  **3.   Commonwealth has the resources to pay all principal and interest due on its GO and PBA debt.**  The belated FY 2018 audited financials show that Commonwealth has the cash on hand right now to pay all principal and interest due to date on its priority GO and PBA debt, and have billions of dollars left over.  Per the audited financials, as of 5/31/2021 the total past-due Commonwealth and PBA principal and interest was $6.79 billion.  #17628-14-page-107-of-471 note 3(d).  Yet Commonwealth currently has $25.413 billion of cash, including over $745 million set aside specifically to pay GO debt, and an additional $11.8 billion unrestricted cash that can, and under Puerto Rico's Constitution should, be used to pay the priority GO and PBA debt.  Hein ¶¶10-12 & Ex. C,D.  This cash has accumulated despite Puerto Rico's total outlays increasing over 29%, from $16.752 billion in FY 2018 to $21.689 billion in FY 2021 (Hein ¶¶44 & Exs. CC,DD).

  In the future, FOMB states "debt service based on prepetition contractual debt obligations" for GO, PBA, CCDA, PRIFA, PFC and ERS will amount to only $1.749 billion in FY 2022 (just 8.84% of projected FY 2022 expenditures), and $1.668 billion in FY 2026 (just 8.5% of projected FY 2026 expenditures of $19.581 billion).  Hein ¶¶14-16; #17628-8-page-302-of-309.  By contrast, pension expense – which lacks the GO and PBA constitutional priority – was projected in the 4/23/2021 fiscal plan as $2.307 billion (FY 2022) and $2.263 billion (FY 2026) – 32% and 36% per year more than prepetition contractual debt service (and now, if not reduced, will be higher yet).

  FOMB also projects that, in FY22, "[d]ebt service based on prepetition contractual debt obligations" for GO, PBA, CCDA, PRIFA, PFC and ERS of $1.749 billion will be just 8.1% of projected revenues of $21.487 billion.  #17628-8-page-302-&-n.2-of-309.  For FY2026, FOMB projects revenues of $20.914 billion, and prepetition contractual debt service of $1.668 billion, or just 8.0% of revenues.  *Id.*  Furthermore, as in past years, added federal funds are going to be received to fund the large Medicaid expenditures.  It is manifest that Puerto Rico – on FOMB's

own numbers – has plenty of capacity to pay full pre-petition contractual debt service.  *See* Hein

¶¶14-23.

### F.  Failure to meet the requirements of 48 U.S.C. §2141(b)(1)(N) and §2174(b)(7) precludes confirmation.

Protections against unilateral decisions by FOMB to unfairly treat bondholders who have

a first claim priority under Puerto Rico's Constitution include Section 2141(b)(1)(N), which

requires that fiscal plans "***shall … respect*** the relative lawful priorities or lawful liens, as may be

applicable, in the constitution, other laws, or agreements of a covered territory…in effect prior to

June 30, 2016" (emphasis added).  Section 2174(b)(7) requires, at confirmation, the plan be

"consistent with the applicable fiscal plan."

The House Report discussion of §2141 and §2174 explains:

> ***Fiscal Plans ensure the protection of the lawful priorities and liens*** as guaranteed by the territorial constitution and applicable laws, and prevent unlawful inter-debtor transfers of funds. …

> By incorporating consistency with the fiscal plan into the requirements of confirmation of a plan of adjustment, ***the committee has ensured lawful priorities and liens***, as provided for by the territory's constitution, laws, and agreements, ***will be respected*** in any debt restructuring that occurs.  H.R.Rep.page-114-602-regarding-§201,314-pp.58,63/115(emphasis added).  (Hein Ex. X)

The House Report's explanation ("ensured lawful priorities and liens…will be

respected") underscores that, at plan confirmation, courts can (and should) remedy FOMB's

disregard of §2141(b)(1)(N).

The Plan does not respect the "first claim" priority and liens of GO bondholders:

a.      Energy incentive and tax incentive claims aggregating over $2 billion are

***un***impaired.  #17628-page-489-to-491-of-654.  Other classes that do not have Constitutional

priority are also ***un***impaired (*e.g.*, Classes 51A,51C,51J,51K,55,57,67,68) or receive larger

percentage recoveries, ranging from 91.5% up to 100% (Classes 51B,51D-to-51I,51L,69).

#17628-page-79,464,466-to-481,489-to-491,504-of-654.  FOMB, as representative of debtor

Commonwealth, has no right to decide it is better for the debtor that FOMB represents to reverse

the priorities under the Puerto Rico Constitution and pay these classes more than nonconsenting GO and PBA bondholders.

b.        Yet additional classes that do not have Constitutional priority nevertheless receive non-contingent *cash* recoveries, including *cash* payments to public employees and their unions. *E.g.*, Class 52,53,56,58.  #17628-page-486-to-488,490-to-494-of-654.

c.        Under FOMB's own projections, over $2.1 billion of "Excess Cash Surplus" may be paid out for Upside Performance Bonuses ($1.551 billion) and Benefit Restoration ($620.6 million) in FY22-FY26.  (#17627-page-41(§1.118), 57(§1.234), 127(§56.l(a)), 234-to-235,258-to-259-of-291; #17628-8-page-44-of-309; #16908-page-15-to-16,20-of-178).  Furthermore, if the Medicaid funding "cliff" is averted, added payments for Upside Performance Bonuses, Benefit Restoration and Pension Reserve contributions will be staggering (Hein ¶65), and if the 5/27/2020 fiscal plan projections are used as the benchmark, the added payments to or for the benefit of public employees and retirees and their unions will be doubly staggering (Hein ¶66).

Because – whatever the base for the calculation – an Excess Cash Surplus number that results in huge multi-billion dollar payments to or for the benefit of public employees is computed before debt service (*see* 4/23/2021 fiscal plan p.43 & Ex. 18 (#17628-8-page-44-of-309); #17628-6-page-30-of-35 & n.2; #17628-7-page-42-of-65 & n.2), it is very possible that these multi-billion dollar payouts to public employees and retirees will jeopardize Puerto Rico's ability to pay debt service even on the New GO Bonds.

### G.  The Takings Clause bars release of Commonwealth from claims of nonconsenting GO and PBA bondholders who do not receive full compensation for their property.

GO and PBA bondholders have constitutionally protected property interests.  The priority and security interests under Puerto Rico's Constitution and statutes constitute property rights. Even simply bondholders' "contract rights" "are a form of property" for purposes of Taking Clause.  *United States Trust*, 431 U.S. at 19n.16.  The Court applied this principle to sustain a Fifth Amendment claim in *Lynch* v. *United States*, 292 U.S. 571 (1934):

> The Fifth Amendment commands that property be not taken without making just compensation.  Valid contracts are property, whether the obligor be a private individual, a municipality, a state or the United States … (id. at 579)

*Lynch* is cited with approval in *UST*, 431 U.S. at 26n.25.

*United States Trust* emphasized that "States are bound by their debt contracts" "notwithstanding" that "the taxing power may have to be exercised if debts are to be repaid," and cited earlier decisions ruling that "a state may not authorize a municipality to borrow money and then restrict its taxing power so the debt cannot be repaid."  431 U.S. at 24&n.22, *citing Louisiana* v. *New Orleans*, 215 U.S. 170, 175-178 (1909); *Wolff* v. *New Orleans*, 103 U.S. 358, 365-68 (1881); *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 554-55 (1867).

The Supreme Court has also been clear that "[t]he bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation" and thus bankruptcy cannot be used to trump the Fifth Amendment.  *United States* v. *Security Industrial Bank*, 459 U.S. 70, 75 (1982).

The taking sought to be achieved by FOMB (which "is part of the local Puerto Rican government," *see FOMB* v. *Aurelius*, 140 S.Ct. 1649, at 1661) and Commonwealth is a per se taking.  The Supreme Court's decisions – most recently this year in *Cedar Point* v. *Hassid*, 141 S.Ct. 2063 (2021) – make clear that the *Penn Central* regulatory takings framework that this Court adopted in COFINA (361 F.Supp.3d 203, at 244) has no application here.  As *Cedar Point* explained, "Government action that physically appropriates property is no less a physical taking because it arises from a regulation."  "Whenever a regulation results in a physical appropriation of property, a per se taking has occurred, and *Penn Central* has no place" (*Id*. at 2072).

*Cedar Point* reinforces the Court's recent decisions in *Horne* (2015) and *Koontz* (2013), which also underscore that a per se taking occurred.  **Horne** ruled that the Takings Clause "protects 'private property' without any distinction between different types" (576 U.S. at 358); "a physical appropriation of property" – including personal property – "[gives] rise to a per se taking, without regard to other factors."  (*Id.* at 360); and partial takings of personal property (e.g., 47% in *Horne*) are still per se takings.  (*Id.* at 362, 366).  **Koontz** ruled that when

"government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account...a 'per se (takings) approach' is the proper mode of analysis." 570 U.S. at 614.

The Fifth Amendment provides a "right to full compensation" that "arises at the time of the taking." *Knick* v. *Township of Scott*, 139 S.Ct. 2162, 2170 (2019). "[C]ompensation must be a full and perfect equivalent for the property taken." *Monongahela Navigation* v. *United States*, 148 U.S. 312, 326 (1893). A secretly-negotiated–by others–discounted amount cannot be considered, much less be deemed "full" compensation, as to bondholders who were not participants in the negotiation-mediation process.

### H. Due Process and Ex Post Facto Clauses bar release of Commonwealth from claims of GO and PBA bondholders.

The plurality in *Eastern Enterprises* v. *Appel*, 524 U.S. 498 (1998) recognized that retroactive application of legislation could violate substantive Due Process if plaintiff established that its liability was "arbitrary and irrational." *Id.* at 537. Having concluded that retroactive application violated the Takings Clause, the plurality did not address the Due Process claim. *Id.* at 538. However, Justice Kennedy, concurring, invoked Due Process, reasoning:

> If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership. As a consequence, due process protection for property must be understood to incorporate our settled tradition against retroactive laws of great severity. (*Id.* at 548-49).

Justice Thomas concurred that the Takings Clause was violated, but wrote to emphasize that the Ex Post Facto Clause "even more clearly reflects the principle that '[r]etrospective laws are, indeed, generally unjust.'" (524 U.S. at 538-39).

Justices Kennedy and Thomas' opinions point to application of substantive Due Process and extension of Ex Post Facto jurisprudence as additional grounds to preclude retroactive application of PROMESA to abrogate property rights under bonds long-ago issued.

## I.   Due Process precludes deference to FOMB's certifications of financial plans or the plan of adjustment.

This Court must make independent determinations of all matters underlying FOMB's application to confirm a Plan of Adjustment that abrogates rights of GO and PBA bondholders. FOMB is acting as a "part of the local Puerto Rican government" (*Aurelius*, 140 S.Ct. at 1661), and FOMB is expressly a representative of Debtors.  FOMB's determinations – whether to certify a fiscal plan or plan of adjustment, or whether to prefer local public employee unions and retirees or other local constituencies – are entitled to no deference.  To let FOMB's preferences dictate the confirmation outcome, including whether bondholder claims against Debtors may be released, – would make FOMB "a judge in [its] own case", which – even apart from the terms of PROMESA discussed above and below – Due Process (among other legal principles) precludes. *E.g.*, *Chrysafis* v. *Marks*, _ U.S. __ (Aug. 12, 2021) (enjoining, pending review, a statute that permitted tenant self-certification of financial hardship and precluded a landlord from contesting that certification).

## VIII.   OBJECTION TO ANY USE OF, OR RELIANCE UPON, THE CONFIDENTIAL MEDIATION-NEGOTIATION PROCESS

The mediation team has admonished that mediation and court proceedings "should not be conflated" (#1836), and this Court's orders have required strict confidentiality and "separation of mediation and litigation activities" (#1841, #8686).  Furthermore, FOMB objected to providing any discovery into what transpired in the confidential mediation-settlement process, invoking, inter alia, mediation privilege.  *See* Ex. KK, pp.15-17; Ex. MM p.9.

No public, contemporaneous record of what transpired in the mediation and negotiation process exists.  Because of the confidentiality orders, individual bondholders could not follow through media sources what was transpiring in the mediation.  And a mediation-negotiation process is quite unlike a court proceeding, particularly in a multi-party case such as this:  In court, ***all*** parties are notified of, and permitted to attend and participate in, ***all*** sessions.  ***All*** parties can stay abreast of everything that occurs.  By contrast, if confidential mediation occurs in a case like this with a multiplicity of parties, a party may have no information about what is

going on between the active participants in the negotiations and may have no participation whatsoever in the actual negotiation of a deal. Here, FOMB admits that Retail Investors, including me, did not negotiate the Plan (#17420-page-19-of-27).

I did not agree to have any issues concerning validity, priority or secured status of the GO and PBA bonds resolved through the mediation-negotiation process in lieu of adjudication; rather I objected. *E.g.*, #9096 (citing prior filings), #9508, #11284. And under settled legal principles, what settling bondholders agreed to cannot, and should not, be considered for any purpose. *See, e.g.*, F.R. Evid. 408; *U.S.* v. *Contra Costa*, 678 F.2d 90, 92 (9th Cir. 1982) (citing 408); *Slattery* v. *U.S.*, 231 F.2d 37, 41 (5th Cir. 1956) ("prices paid in settlement … inadmissible").

**Relief sought:** No one should be permitted to assert that settlements reached have some validity or basis because they resulted from the confidential mediation-negotiation process.

## IX. NEITHER SETTLEMENTS BY MAJOR BONDHOLDERS IN A CONFIDENTIAL MEDIATION-NEGOTIATION PROCESS NOR VOTING CAN ABROGATE THE RIGHTS OF NONCONSENTING BONDHOLDERS TO FULL PAYMENT OF PRINCIPAL AND INTEREST

**A. Relief sought:** Debtors cannot be released from claims by nonconsenting bondholders.

### B. Successful prosecution to judgment of an adversary proceeding was required if Debtors sought to alter the validity, priority or secured status of GO and PBA bonds.

Confirmation is not the proper procedure by which to abrogate bondholder property rights. Under Due Process and Bankruptcy Rule 7001(2), an adversary proceeding was required against each bondholder "to determine the validity, priority, or extent of a lien or other interest in property". *Mansaray-Ruffin*, 530 F.3d 230, 234-43 (3d Cir. 2008); *Commercial Western Finance*, 761 F.2d 1329, 1336-38 (9th Cir. 1985). Debtors implicitly acknowledged that by filing (but not prosecuting) adversary proceedings to challenge bondholders' liens. *E.g.*, Adv.Proc. 19-292. However, that adversary was not prosecuted – it was stayed at Debtors' behest (and over my objection). *E.g.*, Adv.Proc. 19-292-Doc#54 & #54-page-2n.5-of-7; #11284.

No adversary proceeding was brought to contest validity or priority (albeit a claims objection to contest validity was brought, but also was never the subject of a judicial ruling).

**C.   Use of a confidential mediation-negotiation process – rather than adjudication of the priority, secured status and validity of the GO and PBA bonds – cannot be used to abrogate rights of non-consenting bondholders.**

FOMB brought a court proceeding by filing this Title III, yet FOMB sought (and obtained) stays, and extensions of stays, in favor of confidential mediation (*e.g.*, #7640, #8083, #8992).  There have not been judicial rulings on bondholders' legal rights, as "first claim" priority creditors, and as holders of secured and other property interests under the Puerto Rico Constitution and statutes.  Instead, the Plan incorporates the results of an opaque, closed-door process in which deals were cut outside the view of Retail Investors (including me) who FOMB admits did ***not*** negotiate the Plan (#17420-page-19-of-27).  But Plan terms that are products of a confidential mediation-negotiation  process cannot be imposed on non-consenting bondholders. The fundamental validity, priority and secured status issues must be decided now, since not all bondholders – despite the coercive efforts to procure consents – have consented.

The fact that other bondholders, including hedge funds who bought at distressed prices post-PROMESA, have been willing to settle their claims in no way undermines the Constitutional and statutory "first claim" secured position of GO and GO guaranteed bondholders:  Those settling parties are also receiving special consideration, including Consummation Costs and other benefits, and, as to post-PROMESA purchases, are undoubtedly enjoying significant profits even if they also receive far less than the full principal plus full accrued interest to date that all bondholders are entitled to.

At the confirmation stage, §2174(b)(6) expressly speaks of "requir[ing] the court to consider":  It is the court that has the obligation to make the necessary finding of whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by the plan.

Moreover, unclean hands precludes FOMB from exploiting its deals with major hedge funds to impose the resulting settlements on non-consenting bondholders.  Thus, steps by Commonwealth and FOMB – starting with refusals to pay interest on the Constitutional "first claim" debt, and then launching meritless challenges (never adjudicated) to the validity, priority and secured status of the GO and PBA debt, had the effect of putting downward pressure on GO and PBA bond prices, thereby causing many of the original holders pre-PROMESA to sell to hedge funds and others with a short-term orientation who bought large stakes at deeply depressed prices and then struck deals with FOMB to the detriment of unrepresented Retail Investors.

FOMB's initial agreement on a GO/PBA PSA was with hedge funds who admit they had no duty to Retail Investors (#17254-page-8-to-10, 23-of-41, #17382-page-5-of-7; #17296-page-3-of-11, #17397-page-4-to-5-of-11).  These hedge funds – post-PROMESA and after the filing of the Title III – had accumulated large positions at prices distressed, *inter alia*, by Puerto Rico's efforts to evade payment of its Constitutional debt, and then sought to leverage their positions into a settlement that met their own short term profit realization objectives.  LCDC – one of the major head fund groups that reached the initial agreement with FOMB on the plan of adjustment announced 9/22/2019 (#17524-page-23-of-44) – had actually contested the validity of GO bonds held by thousands of Retail Investors, including me.  *See* #9730, #10417-1.  A settlement resulting from a confidential negotiation-mediation process catalyzed by hedge funds is not a substitute for a judicial determination of bondholder rights and remedies under the law.

To make matters worse, the Court denied motions to appoint a committee to represent individual investors (or at least a bondholder committee with fiduciary duties to all bondholders) (*see* #6128, #6487, #17221, #17524, #6534, #17724; *see also* #7540-page-10-of-19).  Thus, there was no committee owing duties to Retail Investors who could ensure the interests of Retail Investors were actively represented at the mediation-negotiation table.  The views of an individual with modest holdings can simply be ignored; a committee was needed.

21

**D.  Voting likewise cannot abrogate the rights of non-consenting bondholders.**

Constitutional rights, as well as other legal barriers to confirmation, cannot be abrogated by "vote" of others.  Here, PROMESA's retroactively-imposed vote mechanism was abused to permit self-interested bondholders to vote to "take[] *property* from A. and give[] it to B."–as *Calder* v. *Bull*, 3 U.S. 386, 388 (1798) put it.

Furthermore, as discussed in Point X below, the "votes" here were a product of coercion – extra consideration was conditioned on class votes to "accept" or on agreeing to the PSA in an exchange offer suddenly launched to Retail Investors even before the Disclosure Statement was approved by the Court.  #17649.  And the chaotic nature of the voting process also underscores that one cannot credit the vote as the result of a free, uncoerced, informed choice.  *See* #18237; #18247; #18306; #18439; Hein Exs. EE-GG; Point X.

Abuses like those present here prompted the Supreme Court to reverse confirmation of a municipal debtor's plan in *American United* v. *City of Avon Park*, 311 U.S. 138 (1940).  The Court emphasized the court's responsibility to ensure a plan is "openly arrived at and devoid of overreaching, however subtle" (*id.* at 146); expressed concerns about "special benefits for the reorganizers" (*id.*); addressed "the need for protection of investors against an inside few or of one class of investors from the encroachments of another" and "[t]he requirement of full, unequivocal disclosure" (*id.*).

Of particular note, the Court admonished against "unfair discrimination," stating that "a composition would not be confirmed where one creditor was obtaining some special favor or inducement not accorded the others" and that "if a vote is influenced by the expectation of advantage … it cannot be considered an honest and unbiased vote."  *Id.* at 147.  The Court thus reversed confirmation despite approval by "the vast majority of security holders" (*id.* at 148).

## X.  FOMB'S IMPROPER AND COERCIVE SOLICITATION REQUIRES DENIAL OF CONFIRMATION

**A.  Relief sought:**  In light of the double-barrelled coercion of Retail Investors discussed below, one cannot credit the vote results as a free and fair choice.  The Court should **[1]** deny

confirmation; or, alternatively, **[2]** disallow or "designate" votes by persons who joined the PSA by accepting the 7/27/2021 exchange offer or who were the subject of the coercive solicitation of votes of Retail Investors, and order a new, non-coercive solicitation of votes of bondholders compliant with 11 U.S.C. §1125, pursuant to which bondholders should be permitted to vote "accept" or "reject" (or not vote) without the potential for payment of 1.321% of par (or some portion thereof) as a reward for an "accept" vote, or the potential for a loss of 1.321% of par (or some portion thereof) as a penalty for a "reject" vote; or, alternatively, **[3]** deem all Retail classes to have rejected the Plan solely for purposes of assessing and applying the legal standards governing confirmation (including 11 U.S.C. §1129(a)(8) and (b)) (but such classes should nevertheless receive equal pro rata consideration, as urged above in Point IV).

    **B.  Improper solicitation – exchange offer.**  Section 1125(b) is express:  "An acceptance or rejection of a plan *may not be solicited* … *unless*, *at the time of or before* such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement *approved*, after notice and a hearing, by the court as containing adequate information," (emphasis added).

    Rather than wait until the Court approved, and creditors received and studied the 2695 page disclosure statement (with exhibits), Debtors preemptively, without advance Court approval, launched the 7/27/2021 exchange offer in an effort to lock in support – and votes – for the Plan.  #17649-page-2,9,to-29-of-29.  The exchange offer had a stated deadline of August 13, 2021, but as a practical matter Retail Investors were required to notify their brokers by earlier dates (*e.g.*, by August 10).  #17649-page-2,4,6,10-of-29.

    The Court did not approve the Disclosure Statement, and authorize solicitation of acceptances and rejections of the Plan, until August 2, 2021 (*after* the exchange offer had been launched, *see* #17649), and the solicitation packages were only belatedly mailed weeks thereafter (#17639-page-6-to-of-27-¶¶ 2,9,11,13; #18237; #18247; #18306; #18439).  The 7/27/2021

exchange offer was not compliant with the Court's order approving the disclosure statement and solicitation packages and distribution procedures (#17639).

The exchange offer professed that it was "not … a solicitation … within the meaning of section 1125" (#17649-page-10-of-29).  But FOMB "doth protest too much" (Hamlet).  The Plan is structured to pay added consideration pro rata to certain favored bondholders who negotiated the Plan.  For individual bondholders excluded from the Plan negotiations, and who had no committee to represent them (#6534, #17724), to be sure to get even part of the added consideration given to negotiating bondholders (*i.e.*, the 1.321% of par "restriction fee") a bondholder had to consent to become a party to the PSA (#17649-page-10-to-14-of-29).  And the PSA asserts that a PSA joiner must "support" plan confirmation, "***timely vote***…to accept the Plan" and not vote for or support any modification or plan FOMB did not propose (#17628-2-page-30,32-to-33,42-to-43-of-135 §§4.5(c),4.6(c),5.1(ii), emphasis added).  Adding self-serving language in PSA §5.2 that "this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan" does not alter the reality that FOMB was offering added consideration for votes.  Indeed, major bondholder groups themselves acknowledge that the PSA "committed" them to "vote to accept."  #18453-page-2-¶2-of-7.

**C.  Improperly coercive solicitation – Disclosure Statement:**  The solicitation pursuant to the Disclosure Statement was also improperly coercive.  First, Retail Investors were expressly told that unless a majority of their class vote "accept," there will be no Retail Support Fee for them.  *E.g.*, #17628-page-27,57,420-to-421-of-654; Plan §§1.440, 3.6, 11.1, 13.1, 15.1, 20.1, 35.1, 42.1, 45.1, 51.1.  Only if a Retail class votes "accept" can members of that class even potentially receive even a fraction of the 2.821% of par that the Initial GO/PBA PSA Creditors with 67% of bond claims receive.  Payment of a fee conditioned on a vote does not become OK because the coercive benefit (part of a 1.321% of par fee) is tied to the overall vote of the class, rather than the vote of each individual class member.

*Second*, to vote for the Plan, a bondholder would have to accept the overly broad

releases, including overly broad releases of non-debtors.  *See* Point II.  A bondholder who also

owns COFINA bonds, for example, concerned that claims arising from or related to COFINA-

issued bonds were not expressly excluded from the Plan releases, may conclude they are

constrained not to vote, or vote "reject," even if they would otherwise have voted "accept" in

order to increase the chance their Retail Class accepted (and thus increase the chance they would

receive the extra consideration paid for "accept" votes).  There was no option to vote "accept" on

the plan, but "reject" the releases of non-debtors.

*Third*, compounding the coercion, all Retail Investors lacked the basic information on the

size of Retail Investor holdings as compared to the overall size of all bond holdings that is

necessary to make an informed decision on whether to vote "accept" – *i.e.*, does my retail class

potentially get the full 1.321% fee in exchange for "accept" votes, or is the payment for "accept"

votes some perhaps much smaller amount.  I highlighted the need for that information (*e.g.*,

#16908-page-23-to-25-of-178; #17221-page-18-of-34), but it was not provided.

**D.  Improper solicitation – Disclosure Statement that did not provide adequate
information, including information on Federal taxable or tax-exempt status.**  The Court did

order FOMB to make a limited number of added disclosures (#17387).  However, important

information identified in my Objections (#16908, #16977, #17536) was never included in the

final disclosure statement.  Notably, there never was an adequate disclosure – not even in the

plan supplement filed 10/11/2021 – of "potential material Federal tax consequences," which are

expressly required to be disclosed under 11 U.S.C. 1125(a).  #16908-page-28-to-29-of-178.  The

Disclosure Statement simply asserts "[t]he tax status of the New GO Bonds has not been

determined."  #17628-page-604,612,613-of-654.  And even in discovery, FOMB and AAFAF

simply refused to produce whatever information they had concerning their communications with

the IRS, including any application for a determination letter or ruling.  Ex. HH p.15;  Ex. II p.13-

14; Ex. JJ pp.11-12; Ex. KK pp.11-13; Ex. LL pp.8-9; Ex. MM pp. 10-11.

XI.   **PLAN DISCRIMINATES AGAINST 50-STATES RESIDENTS IN VIOLATION
OF LAW AND DUE PROCESS, EQUAL PROTECTION AND PRIVILEGES AND
IMMUNITIES CLAUSES**

**A.  Relief requested:**  All holders of a particular series should be given the option to

exercise the election to receive a single maturity of potentially taxable higher coupon bonds, not

just Puerto Rico Investors

**B.  Discrimination based on place of residence.**  Only Puerto Rico investors have the

option to elect one single 2041 maturity paying 5%, whereas 50-states investors receive bits and

pieces of 12 bonds (two of which pay no current interest, and 5 of which have 4% coupons).

#17627-page-108,264-to-266-of-291.  The consideration given Puerto Rico Investors is more

valuable:  **(i)** for an individual investor, splintered bits and pieces are effectively unmarketable at

any reasonable price, whereas the Puerto Rico Investor replaces each of their existing securities

with one new security retaining essentially the same level of marketability; **(ii)** if – as occurred

with the COFINA case – it turns out that securities initially issued as taxable can be tax exempt

after all, Puerto Rico Investors get their cake and get to eat it too.  *See* #16908-page-29&n.14-of-

178 (and #8487, #6283, #7211, #8427 cited therein).

The discrimination against individual 50-states bondholders based on residence violates

Article IV, §2, cl.1, Amendment V, Amendment XIV, §1 and 48 U.S.C. §737.  *E.g.*, *Mullaney* v.

*Anderson*, 342 U.S. 415, 419-420n.2 (1952) (Alaska license fee that was lower for residents than

non-residents violated Article IV §2; notes Congress had enacted §737 "'so as to leave no doubt

that there may be no discrimination against citizens of the United States who are not residents of

Puerto Rico;'" cited Congressional materials are at Hein Ex. Y and Z);  *Blake* v. *McClung*, 176

U.S. 59, 67-68 (1900) (Tennessee's preference of Tennessee residents in distributions from an

insolvent corporation violated Art. IV, §2, cl.1); *Shapiro* v. *Thompson*, 394 U.S. 618, 638, 641-

42 (1969) ("Congress may not authorize the States to violate the Equal Protection Clause;"

federal legislation discriminating based on residence violated Due Process);

*Comptroller* v. *Wynne*, 135 S.Ct. 1787, 1794 (2015) ("the dormant Commerce Clause precludes States from 'discriminat[ing] between transactions on the basis of some interstate element'").

PROMESA does not, and cannot, authorize discrimination based on residence.  The *Saenz* v. *Roe*, 526 U.S. 489 (1999) ruling that Congress' legislative powers "may not be exercised in a way that violates other specific provisions of the Constitution …" (*id.* at 508) is applicable to the Privileges and Immunities Clause and the Equal Protection Clause (*id.* at 507-508 & n.21).

**XII.   FAILURE TO DISCLOSE ENTIRETY OF PLAN, INCLUDING ACTUAL LEGISLATION CALLED FOR BY THE PLAN, BEFORE DEADLINES FOR VOTING AND FOR OBJECTION**

FOMB contemplated having to file its plan supplement by September 27, one week before the original October 4 deadline for voting.  Plan §1.395.  But when the deadline for voting was moved back two weeks because solicitation packages had not been timely distributed, FOMB took advantage of the problem its delay had caused to push back the filing of its plan supplement to October 11, and then finally filed it at 11:54 PM.  #18470.  That gave Retail Investors literally only hours before they were required to submit their instructions to firms like Merrill Lynch who – given the complexity of the process FOMB has employed – required instructions by customers by 3 PM on October 12.  Hein ¶67 & Ex. EE (sequence 000170), GG; #18306, #18439.  Even worse, no English translation of the House bill was provided and portions of the Senate bill are also Spanish-only.  #18470-10; #18470-11-page-54-of-54.

The plan supplement becomes part of the Plan (§1.395).  Yet individual investors have not had a reasonable opportunity to review the new materials (many are likely not even aware of them).  Worse yet, FOMB apparently intends to further amend both the plan of adjustment and fiscal plan, perhaps even after the time to submit objections has closed.

Furthermore, the draft legislation first partially disclosed at 11:54 PM on 10/11/2021 will, if adopted, violate the Contract Clause, as well as 48 U.S.C. §2163, as discussed below.

27

### XIII.   COMMONWEALTH'S IMPAIRMENT OF THE RIGHTS OF ITS "FIRST CLAIM" PRIORITY, SECURED GO AND PBA BONDHOLDERS VIOLATES THE CONTRACT CLAUSE

The Contracts Clause provides "[n]o state shall… pass any… law impairing the obligation of contracts."  Art. I, §10, cl.1.  This prohibits states (or Commonwealth) from enacting laws or exercising powers that would permit borrowers (including states or Commonwealth) to abrogate their debts.  The Contract Clause applies to Commonwealth (*cf. United Automobile* v. *Fortuño*, 633 F.3d 37 (1st Cir. 2011)).

#### A.   Impermissible impairment of Commonwealth's obligations under the GO and PBA bonds.

The impairment occurs in two ways, each of which independently violates the Contracts clause:  ***First***, the Senate bill purports to authorize "cancellation and extinguishment of the existing claims" – *i.e.*, existing GO and PBA bonds.  #18470-11-page-46-of-54-Art.104.

***Second***, FOMB "is part of the local Puerto Rican government"  with power to "create a budget 'deemed' to be that of Puerto Rico" (*Aurelius*, 140 S.Ct. 1649, 1661-62).  FOMB's approval of fiscal plans dictates what budgets and legislation Commonwealth's legislature may pass.  48 U.S.C. §§2141(c)-(f),2142,2143,2144.  Absent a compliant fiscal plan, FOMB's fiscal plan is "deemed approved".  §2141(d)(2),(e)(2).  Absent Governor and Legislature developing a compliant budget, FOMB's prescribed budget is "deemed…approved" by Governor and Legislature.  §2142(c)(2),(d)(2),(e)(3)-(4).  FOMB's certification of the submission of the Plan, including as being consistent with FOMB's approved fiscal plan, is a condition precedent to confirmation of the Plan.  48 U.S.C. §2124(j); Plan §85.1(a).  Since FOMB "is part of the local Puerto Rican government" (140 S.Ct. at 1661), FOMB's approval of the fiscal plan and certification of the Plan as consistent with that fiscal plan, constitute "law" for purposes of the Contract Clause.

There is no "Congress-authorized-violation" exception to the Contracts Clause.  Congress' legislative powers "may not be exercised in a way that violates other specific provisions of the Constitution."  *Saenz* v. *Roe*, 526 U.S. 489, 508 (1999).

**B. The impairment is neither reasonable nor necessary.**

*United States Trust*, the controlling case regarding whether a municipal issuer can impair its own bond obligations, cites *Lynch* with approval for the proposition "need for money is no excuse for repudiating contractual obligations" (431 U.S. at 26n.25). *UST* makes clear that impairment must be ***both*** reasonable and necessary. 431 U.S. at 25-26,29-32. Furthermore, Chief Justice Burger, concurring, would have required that "the State must demonstrate" "that the impairment was essential to the achievement of an important State purpose," and "that it did not know and could not have known the impact of the contract on that state interest at the time that the contract was made." 431 U.S. at 32. This standard should be applied here. Here, Commonwealth fails any Contracts Clause standard:

**1. Cash on hand in excess of debt service due.** If "need" of a government debtor with $25+ billion cash and the ability to pay in full – today – all past-due principal and interest on its constitutional "first claim" priority debt (Hein ¶¶10-12), and projected as needing to pay only about 8% to 8.7% of forecast expenditures and revenues in order to pay its prepetition contractual debt service (Hein ¶¶14-16), justifies legislative abrogation of its "first claim" Constitutional priority GO bonds, *United States Trust* will lose all meaning. Through 2012, Commonwealth's bonds were sold as investment grade bonds –not "payment optional" bonds.

**2. Failure to issue timely awaited financials.** Commonwealth has yet to issue audited financials for any post-6/30/2018, post-PROMESA, fiscal year. The untimeliness of issuance of audited financial statements has only become worse during the pendency of these proceedings. Point VII.E.2. This despite PROMESA's emphasis on timely delivery of audited financials. 48 U.S.C. §2146(a)(2).

**3. Failure to implement structural reforms.** FOMB's own expert admits that Commonwealth "has largely failed to implement the structural reforms recommended by" FOMB. #18151-1-page-5-of-30.

**4.  Increased outflows.**  Total outflows increased over 29% from FY2018 to FY2021.  Hein ¶44 & Exs. CC,DD.

**5.  Non-essential expenditures.**  Despite paying nothing on its GO debt since January 2016 (Hein Ex. HH p.37)), Puerto Rico has paid out billions of dollars for purposes other than maintenance of truly essential services.  For example:

**a.**  Puerto Rico's contract registry shows 9789 contracts totalling $301,418,709 for "advertising, representation or artistic services" from 5/3/2017 (when the Title III was filed) to 10/13/2021.  A search for "consulting services" for the same time frame shows 9918 contracts totalling $2,375,668,318.  Hein ¶¶45-46 & Ex. O,P,Q,R.

**b.**  Over $475 million has been paid in Christmas bonuses to public employees in FY2016-2021.  Hein ¶47 & Ex. S.

**c.**  Hundreds of millions of dollars of payments to Government employees who do not report to work cannot be "essential."  Hein ¶¶48-51 & Ex. N.

**d.**  Puerto Rico has continued paying, including on a "PayGo" basis, all public employee pensions to retired employees who by definition are retired and thus not currently providing health or safety pubic services.  An average of over $2 billion per year has been paid to retired public employees since this Title III was filed, *see* Hein ¶¶24-25 & Exs. E-H,J.

**e.**  Puerto Rico's costs to avoid its debt are on track to exceed $2.5 *billion* in professional fees, FOMB expenses, Commonwealth Title III costs and pre-PROMESA expenditures on lawyers on consultants.  Hein ¶52.

**6.  Low relative tax burden.**

**a.**  Per KPMG (Puerto Rico's auditor, #17628-14-page-7-of-471), Puerto Rico's revenues from taxes as a percent of GDP are much lower than the OECD country average (10.66% GDP in Puerto Rico, versus OECD average 33.19% GDP).  Hein ¶30 & Ex.L.

**b.**  Puerto Rico has a significant informal economy not subject to effective tax compliance.  #17628-8-page-17-to-18-of-309.  As Commonwealth fiscal plans have noted,

"[a]bout one quarter of Puerto Rican workers participate in the informal economy …., a portion substantially higher than any mainland state."  #3126-1-page-43-of-145.  Effectively taxing these activities would increase revenue.

      **c.**   Only about 68% of the 1.03% Property Tax dedicated to payment of GO debt is collected.  Hein ¶¶27-28.

      **d.**   Most Puerto Rico taxpayers do not pay federal income taxes, and as a result (as discussed below) Puerto Rico has greater debt capacity relative to its economy than the states. The highest basic marginal rate in Puerto Rico is 33%.  In each of the 50 states, with the burden of high federal rates on top of state rates, the overall state, local and federal tax burden exceeds that of Commonwealth taxpayers.  In some cases, far exceeds:  For example, in New York City the top combined state, city and federal rate (including net investment income tax) is 55.6%.  In California, 54.1%.  Hein ¶¶31-32.

      **7.   Tax reductions and preferential tax rates, credits and grants, even while in Title III.**

      **a.**   Per FOMB itself, "Puerto Rico offers a far more generous tax incentive program far more generous than virtually every other jurisdiction in the U.S. as a share of the economy or total tax collections."  [sic]  #17628-251-to-253-of-309, pp.250-52.  For example, the size of Puerto Rico's tax expenditures as a share of GNP or GDP, and as a share of total taxes, is literally 10 times and 5 times, respectively, greater than that in New York.  Hein ¶¶33-34.

      **b.**   Although filing under Title III and not paying any interest or principal on its GO debt since January 2016, Puerto Rico has nevertheless enacted multiple reductions in tax rates and new tax incentives in the past three years, adding to the proliferation of tax credits and preferential rates in Puerto Rico.  Hein ¶¶35-43 & Ex. M.

      **8.   Per capita aggregate public debt levels lower than the 50 states.**

Puerto Rico *told investors* that:  **[1]** "any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt"; **[2]** "If one factors in the federal

debt load, PR would rank *last* in outstanding debt per capita among all US jurisdictions"; and

**[3]** per capita state and local debt in Puerto Rico of $15,956 was dramatically *lower* than

combined state, local and federal debt per capita of any state.  Hein ¶29 & Ex. K.

### 9.   The business climate in Puerto Rico has only gotten worse.

In 2017 Puerto Rico was #55 in the world (by contrast continental U.S. is #8).  After

years of FOMB oversight, Puerto Rico actually dropped to #65, now behind Saudi Arabia and

Ukraine.  Hein ¶¶53-54 & Exs. T,U.

### 10.  The spending culture persists.

Recent legislation shows that Commonwealth officials view this proceeding as an

opportunity to extinguish debt so they can spend even more.  *See* Hein Ex. V,W; #18470-11-

page-39-to-41-of-54; Act 7.

Even if Appellees proved "necessity," they must also prove that impairment was

"reasonable."  Impairment based on concerns of a type known at the time bonds were sold is not

"reasonable".  431 US at 31-32.  It was known at the time the GO and PBA bonds were issued

that Puerto Rico was experiencing financial challenges.  Thus, it is not "reasonable" to seize on

"subsequent changes…of degree and not of kind" (431 U.S. at 32).  The Contract Clause

"prohibit[s]…self-serving, post hoc changes in contract obligations."  *United Steel Union* v.

*Virgin Islands*, 842 F.3d 201, 213-15 (3d Cir. 2016) (even if contract impairment was

"necessary," it was not "reasonable").

Natural disasters and COVID are no excuse for failure to pay debt that, under Puerto

Rico's Constitution, has a "first claim" priority on available resources.  First, one must note that

Puerto Rico defaulted ***before*** the recent hurricanes and earthquakes and before COVID.

Furthermore, many States – e.g., Louisiana, Florida, Texas, New York – have been hit with

hurricanes and other major storms.  California has experienced earthquakes, droughts and

extensive fires – resulting in repeated blackouts.  All states have been hit with COVID – there is

no showing that Puerto Rico has been hit worse than the states.  Significant federal funds address

the cost of disaster recovery and of COVID for states and for Puerto Rico.  None of the states

used natural  disasters or COVID as an excuse for not paying their publicly issued-bonds.

## XIV.   LEGISLATION CANCELING AND EXTINGUISHING GO AND PBA DEBT PRESCRIBES A METHOD OF COMPOSITION OF INDEBTEDNESS THAT, UNDER 48 U.S.C. §2163, CANNOT BIND NONCONSENTING BONDHOLDERS

Section 2163 provides that territory law–here, the proposed legislation (#18470-11-page-

46-of-54) – prescribing a method of composition of indebtedness cannot bind nonconsenting

creditors.

## XV.   PROMESA VIOLATES THE BANKRUPTCY UNIFORMITY CLAUSE, WHICH IS ONE GROUND FOR DISMISSAL OF THIS TITLE III

PROMESA is *not* a "uniform" law "on the subject of bankruptcies throughout the United

States" (as Article I, §8, cl.4 requires).  PROMESA was targeted to an existent situation

involving Puerto Rico and does not apply "throughout the United States."

To begin, the Territory Clause does not trump other specific provisions of the

Constitution.  *Aurelius*, 140 S.Ct. at 1656-58.  Thus the Territory Clause does not trump the plain

language of the Bankruptcy Clause so as to allow Congress to treat Puerto Rico differently.

The Bankruptcy Clause is specific:  "uniform" "throughout the United States."  Puerto

Rico bonds were sold to individuals "throughout the United States".  Those individuals

(including me) cannot be subject to non-uniform bankruptcy laws.  PROMESA Title III

("Adjustment of Debts") is a bankruptcy law and not "uniform".  (In cases such as *Harris* v.

*Rosario*, 446 U.S. 651 (1980) (AFDC reimbursements) and *United States* v. *Vaello-Madero*, 956

F.3d 12 (1st Cir. 2020)(SSI benefits), *cert. granted*, 141 S.Ct. 1462 (2021), there was no specific

U.S. Constitutional provision providing for "uniform" AFDC reimbursements or SSI benefits.)

As an example of the non-uniformity:  Chapter 9 requires a debtor be "insolvent"

(11 U.S.C. §109(c)(3)).  Yet there has never been an evidentiary showing and proof of

insolvency of Commonwealth in this case.  As noted above, Puerto Rico's own – belated – 2018

audited financials now show that Puerto Rico could pay its entire past due principal and interest

in cash today, and the fiscal plans show it could pay full prepetition debt service.

Whether PROMESA violates the Bankruptcy Clause's uniformity requirement was not before the Court in *Aurelius*.  However, the Court recognized PROMESA Title III proceedings are "federal bankruptcy" proceedings (*Aurelius*, 140 S.Ct. at 1655), noting FOMB's powers include "representation of local interests" in such bankruptcy proceedings (*id*. at 1662).  Thus, the Bankruptcy Clause's uniformity requirement applies, which PROMESA violates. *See also* #13231 and  Adv.Proc. 20-068-Doc#1).]

## XVI.   COMMONWEALTH'S TITLE III PROCEEDING SHOULD BE DISMISSED

This case presents the spectacle of **(1)** Commonwealth having the capacity to pay all past due debt service (principal and interest) on the debt that per its Constitution has a "first claim" on Commonwealth resources (Hein ¶¶10-16), **(2)** Commonwealth to date having "largely failed to implement the structural reforms recommended by" FOMB (per FOMB's own expert, #18151-1-page-5-of-30), and **(3)** Commonwealth officials pressing to spend more, and FOMB making repeated efforts to "sweeten the pot" for Commonwealth's government and its public employees and public employee retirees to purchase the support of those constituencies for a Plan (*e.g.*, #16908-page-15-to-20-of-178; Hein Ex. V).  There are no current audited financials, internal control deficiencies stand unresolved (Hein Ex. AA), and there has been no proof of insolvency or inability to pay over time.  The Title III process is being misused.

The United States faced a choice in the late 1700s:  Pay its debt or stiff the creditors. Alexander Hamilton wisely urged that the new country honor its debt, writing:

> States, like individuals, who observe their engagements, are respected and trusted: while the reverse is the fate of those, who pursue an opposite conduct.  (Hamilton, Report Relative to a Provision for the Support of Public Credit, Jan. 9, 1790).

Regrettably, FOMB and Puerto Rico officials have chosen the path Hamilton so eloquently advised against.

**Relief requested**.  Either GO and PBA bondholders should be paid in full, including all accrued interest, or the Commonwealth Title III proceeding should be dismissed, and there should be no discharge of the GO and PBA debt.

**XVII.  OBJECTION TO WAIVER OF RULE 3020(E) AUTOMATIC STAY, AND REQUEST FOR STAY OF CONSUMMATION UNTIL ANY TIMELY APPEAL IS ADJUDICATED**

I object to including any waiver of the Rule 3020(e) automatic stay in the Plan (*see* Plan §92.20) or in any order related to the Plan.  No particularized justification for this provision of the Plan has been provided in #17680.  I also request a stay of the effective date of confirmation pending the determination of any timely-filed appeal or, in the alternative, at least until the First Circuit rules on any application for stay presented to it.

**XVIII.  RESERVATION OF RIGHT TO SUPPLEMENT THIS OBJECTION IF ONE OR MORE OF THE RETAIL CLASSES REJECT THE PLAN**

The results of the vote have not yet been announced.  I reserve the right to supplement this objection if one or more of the Retail classes reject the plan and, accordingly, 11 U.S.C. §§1129(b)(1) and 1129(a)(8) come into play.

**XIX.  RESERVATION OF RIGHTS TO RESPOND TO ANY REVISIONS TO THE PLAN, AND CONTINUED ASSERTION OF PRIOR OBJECTIONS**

If FOMB submits revisions to the Plan of Adjustment or the Fiscal Plan, I hereby request the opportunity to respond in writing.  I also reserve and preserve all objections to the Plan, including objections to the proposed classification of claims; all objections to the Disclosure Statement; and all objections to procedures followed, including those referenced at #16387-page-20-to-21-of-22 and in my subsequent filings.

October 19, 2021

Respectfully Submitted,

/s/ Peter C. Hein
Peter C. Hein, pro se
101 Central Park West, Apt. 14E
New York, NY  10023
917-539-8487
petercheinsr@gmail.com
Claim 10696 and 174229
GO Bonds:  500,000 par amount, plus
unpaid interest to date
[5 separate CUSIPS:  74514LVX2
                                    74514LWA1
                                    74514LWM5
                                    74514LWZ6
                                    74514LB63]
PBA Bonds:  200,000 par amount, plus
unpaid interest to date
[CUSIP:  745235M24]

**Declaration pursuant to 28 U.S.C. §1746**

I declare under penalty of perjury that the factual statements in the foregoing objection are true
and correct to the best of my knowledge and belief.

Executed on this 19th day of October 2021.

/s/ Peter C. Hein
Peter C. Hein

## **Certificate of Service**

I, Peter C. Hein, certify that I have caused the foregoing "Objection to Confirmation of Plan by Individual GO and PBA Bondholder (Peter C. Hein)" to be served via the Court's CM/ECF system.

October 19, 2021

_____ /s/ Peter C. Hein _____
Peter C. Hein

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

-------------------------------------------------------------------x

In re:                                                    PROMESA
                                                          Title III
THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of                               No. 17 BK 3283-LTS
                                                          (Jointly Administered)
THE COMMONWEALTH OF PUERTO RICO,
*et al.*,

          Debtors.

-------------------------------------------------------------------x


**[Accompanying Objection to Docket #17627, #17680 (seeking confirmation of the Plan)]**

**DECLARATION OF PETER C. HEIN ACCOMPANYING OBJECTION TO
CONFIRMATION OF PLAN BY INDIVIDUAL GO AND PBA BONDHOLDER**


Dated:  October 19, 2021

# DECLARATION OF PETER C. HEIN

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief:

1.      This declaration attaches certain documents, or excerpts therefrom, not already in the record that are referred to in my "Objection to Confirmation of Plan By Individual GO and PBA Bondholder."  Excerpts are submitted to facilitate focus on the specific pages pertinent to the point the exhibit supports.  When I submit pertinent excerpts, I refer to a public website where the full document can be found or I will provide full copies if requested by the Court. This declaration also presents certain calculations, and identifies and summarizes pertinent information in certain documents already in the Title III case record or that were produced into the data room by AAFAF or FOMB.  Because these materials are voluminous and already in the record or accessible to the Court and parties, I am not attaching them to this Declaration but am providing specific identifying information, such as docket entry and page numbers or AAFAF or FOMB production numbers.  The factual statements in my "Objection to Confirmation of Plan By Individual GO and PBA Bondholder" are true and correct to the best of my knowledge and belief.

## The cost of paying the additional 2.821% (1.5% + 1.321%) of par to all bondholders

2.      The total amount of all GO and PBA bond claims appears to be approximately $17.59 billion.  #17680-page-14n.10-of-58.  The total amount of Initial GO/PBA PSA Creditor bond claims appear to have been $11.779 billion as of 2/22/2021.  (This number appears in a depository document, DocID 230822, at p.2 DS-065361, right column, 3d bullet, on a chart of information provided by FOMB to UCC and then posted by FOMB to the data room.  The document is classified as confidential by FOMB, however, FOMB has consented to my use of this number from the document in a public filing, per 10-14-2021 Dale letter to Hein, p.3.) These numbers indicate that Initial GO/PBA Creditors hold about 67% of all GO/PBA bond claims.  A document posted in the data room suggests 88.49% of the tabulated CUSIPs

($12,407,440,000 of $14,021,531,000) participated.  (This document can be accessed by using the link available in the left margin, under Quick Links, on the Prime Clerk Commonwealth of Puerto Rico website; search for DocID234213, FOMB_CONF_88826, in "Information relating to tender offer," a non-confidential folder; the document is an excel spread sheet tabulation of tender offer participation for certain CUSIPs.  No information is provided to reconcile the totals on this document with the overall amount of bond claims specified in the FOMB brief cited above.)

3.      Assume that – in addition to the Initial GO/PBA Creditors (67% of GO/PBA bond claims), who receive the extra 1.5% of par Consummation Costs and 1.321% PSA restriction fee (totalling an extra 2.821% of par paid to them pro rata) – an additional 21% of GO/PBA holders were induced by the promise of an extra 1.321% of par to commit to support and vote for the plan, and signed on to the PSA by 8/13/2021.  The cost of providing to all GO/PBA bond claims the same pro rata recovery that the Initial GO/PBA Creditors receive  (i.e., the added pro rata payments of 1.5% + 1.321% = 2.821% of par)  would be:  (i) [for the 12% of bondholders (100% - 67% - 21% = 12%) who currently do not receive either the 1.5% fee or 1.321% fee]:  12% x $17.59 billion x 2.821% = $59.54 million LESS $50 million (allocated already for Retail Support Fees) = $9.545 million, PLUS (ii) [for the 21% of bondholders whose plan support and vote was purchased by 8/13/2021 and thus who already get the 1.321% fee but who are not among the Initial GO/PBA Creditors (67% of bond claims) who get both the added 1.5% and the added 1.321%]:  21% x $17.59 billion x 1.5% = $55.408 million, for a total of approx. $64.953 million.

4.      The net cost of paying the 1.321% of par to the 12% (presumably for the most part Retail Investors), irrespective of whether their classes vote "accept" or "reject", and irrespective of whether they worked through the confusion in the ATOP delivery process, would appear to be less than the $50 million already allocated for Retail Support Fees.  (12% x $17.59 billion x 1.321% = $27.883 million, which is less than $50 million.)  FOMB has been willing to make repeated adjustments significantly sweeting Plan terms for Commonwealth's government and its public employees and public employee retirees, most recently agreeing to eliminate any

cuts to accrued public employee and retiree pensions and to provide substantial additional funds for various purposes.  *See* Exhibit V hereto (10-14-2021 FOMB letter, further described below). The added cost (likely in the area of $64.953 million) to pay all bondholders the same pro rata consideration is minor as compared to (i) the staggering amounts of professional and other fees and costs paid in these proceedings (which, as I discuss below, are on track to exceed $2.5 billion), and (ii) the billions of dollars of payments to favored constituencies, including billions of dollars of likely future "upside" payments to public employees and retirees.  *E.g.*, #16908-page-15-to-20-of-178.

5.      Even if my numbers are somewhat off, the foregoing calculations suggest the magnitude of the additional payment amounts required to treat all bondholders equally – and not preferentially provide added pro rata consideration to hedge funds and other institutions that individual Retail Investors do not receive – are modest by comparison to the large sums being disbursed under the Plan to favored constituencies and in professional and other fees and costs. FOMB and AAFAF surely have exact numbers, so if FOMB and AAFAF dispute my calculations, they should proffer the actual numbers and the backup for the actual numbers.

**Official Statements**

6.      **General obligation bonds**:  Excerpts from the Series 2012A official statement are already in the record at #9508-2.  Similar material appears in other official statements for Commonwealth GO bonds.  The official statements are publicly available on the Municipal Securities Rulemaking Board's EMMA website (emma.msrb.org).  One can simply type in a CUSIP (*e.g.*, 74514LB63 for the Series 2012A 2037 maturity) and click on "Disclosure Documents."

7.      **Public Building Authority bonds**:  Attached as Exhibit A are excerpts from the Series Q official statement.  Similar material appears in other official statements for other PBA bonds.  The PBA official statements are also publicly available on the Municipal Securities Rulemaking Board's EMMA website (emma.msrb.org).  One can simply type in a CUSIP (*e.g.*,

-3-

745235M24 for the Series Q 2037 maturity or 745235P62 for the Series S 2039 maturity) and
click on "Disclosure Documents."

**Puerto Rico's Investor Resources webpage representations that the debt limitation in the Puerto Rico Constitution has never been reached**

8.      Puerto Rico's "Investor Resources" webpage for Commonwealth of Puerto Rico
is already in the record at #7961-1-page-6-to-8-of-71 (screen shot taken 6/24/2019) and
#10029-5 (screen shot taken from Internet 1/9/2020).  To locate on the Internet, type in
"Government Development Bank for Puerto Rico – Tax-Exempt Securities by Issuer"; scroll
down to "Commonwealth of Puerto Rico" (the first entry); click and scroll down to "Security."
This Investor Resources webpage includes the following statements:

> Public Improvement Bonds are general obligations of the Commonwealth for the
> payment of which the good faith, credit and taxing power of the Commonwealth
> have been pledged.  Their payment constitutes a first charge on all available
> revenues of the Commonwealth …
>
> … The Constitution of the Commonwealth provides that no additional direct debt
> may be issued or additional guarantees extended if the principal and interest
> payments for general obligation bonds and notes due in any fiscal year, together
> with any amount paid by the Commonwealth in respect to its guarantees in the
> preceding fiscal year, exceed 15 percent of the average annual general revenues of
> the Commonwealth for the two preceding years.  ***This debt limitation has never
> been reached.***  (#7961-1-page-6-to-7-of-71, #10029-5-page-1-to-2-of-3, emphasis
> added)

**Kobre & Kim report**

9.      Attached hereto as Exhibit B are excerpts from the August 2018 Kobre & Kim
"Final Investigative Report", including Part IX, "Calculation of the Constitutional Debt Limit".
For a link to the full copy of the report, *see*
https://www.documentcloud.org/documents/4777926-FOMB-Final-Investigative-Report-Kobre-
amp-Kim.html.  FOMB, acting by and through the Special Investigation Committee, retained
Kobre & Kim as the Independent Investigator to (among other things) "conduct an investigation
under PROMESA into … Puerto Rico's issuance of debt."  *See* Report, Ex. B, p.2; #3774.
Kobre & Kim concluded (Report, Ex. B, p.267) that

Puerto Rico employed a reasonably robust process for these Debt Limit Calculations.  In addition, we did not find any evidence that Puerto Rico's government personnel believed that Puerto Rico's interpretation of the Constitutional Debt Limit was wrong or that Puerto Rico performed the Debt Limit Calculation incorrectly.

**Commonwealth has sufficient cash to pay all principal and interest due on its GO and PBA debt**

10.    Commonwealth's fiscal year 2018 audited financial statements state that, as of 5/31/2021, the total past-due Commonwealth and PBA principal and interest was $6.79 billion ($5.536 billion + $1.256 billion).  *See* #17628-14-page-107-of-471 note 3(d).

11.    Attached as Exhibit C hereto are excerpts from the monthly AAFAF "Summary of Bank Account Balances for the Government of Puerto Rico and its instrumentalities," dated 9/30/2021.  As of August 31, 2021, (a) Commonwealth held a total of $25.413 billion of cash. (Ex. C, p.4, sequence 00054) and (b) Commonwealth held approximately $11.770 billion cash in its unrestricted TSA account and its TSA sweep account (Ex. C, p.7, sequence 00057, $11.580 billion + $.190 billion).  In addition, Commonwealth held over $745 million cash in accounts restricted to payment of general obligation debt (Ex. C, p.11, sequence 00061, $599.7 million + $146.6 million).  AAFAF summaries of bank account balances for the government of Puerto Rico and its instrumentalities are available on the AAFAF website at "aafaf.pr.gov/financial-documents"; click on "Summary of Bank Account Balances".

12.    Attached as Exhibit D are excerpts from a more recent report, Commonwealth's Treasury Single Account ("TSA") cash flow report as of October 1, 2021, which shows a TSA cash account balance as of 10/1/2021 of $11.799 billion (Ex. D, p.5).  TSA cash flow reports are also available on the AAFAF website at "aafaf.pr.gov/financial-documents"; click on "Treasury Single Account (TSA) Liquidity."

**Commonwealth has the capacity to pay all principal and interest due on its GO and GO guaranteed debt**

### FOMB's certified fiscal plan for Commonwealth

13.    The full text of the certified 2021 and 2020 fiscal plans is available on the FOMB website:  https://oversightboard.pr.gov/fiscal-plans-2/, or as Disclosure Statement exhibits: #17628-8, for the 4/23/2021 fiscal plan, and #15988-5, for the 5/27/2020 fiscal plan.  Specific topics covered in the fiscal plans include those outlined in the sections that follow.

### The fiscal plan shows current prepetition contractual debt service is projected to be about 8.5% to 8.8% of projected expenditures.

14.    FOMB projects expenditures of $19.771 billion in FY22, and "[d]ebt service based on prepetition contractual debt obligations" for GO, PBA, CCDA, PRIFA, PFC and ERS of $1.749 billion, or just 8.8% of projected expenditures.  #17628-8-page-302-&-n.2-of-309.  For FY2026, FOMB projects expenditures of $19.581 billion (assuming inflation of 1.1% to 1.5%), and prepetition contractual debt service of $1.66 billion, or just 8.5% of expenditures.  *Id.*

15.    The prepetition contractual debt service of $1.749 billion for FY2022 and $1.668 billion for FY2026 is much less than the projected annual pension expenses, which are now presumably even greater since accrued benefits are now apparently not being reduced for anyone under the Plan, no matter how highly compensated.  Projected pension expense in the 4/23/2021 fiscal plan is $2.307 billion (for FY2022) and $2.263 billion (for FY2026) (#17628-8-page-304-of-309), and, as noted — since pensions will now not be reduced — will presumably be higher.

### The fiscal plan shows current prepetition contractual debt service is projected to be about 8.0% to 8.1% of projected revenues.

16.    FOMB also projects that, in FY22, "[d]ebt service based on prepetition contractual debt obligations" for GO, PBA, CCDA, PRIFA, PFC and ERS of $1.749 billion will be just 8.1% of projected revenues of $21.487 billion.  #17628-8-page-302-&-n.2-of-309.  For FY2026, FOMB projects revenues of $20.914 billion (assuming inflation of 1.1% to 1.5%), and prepetition contractual debt service of $1.668 billion, or just 8.0% of revenues.  *Id.*  (To the extent inflation exceeds the projected 1.1% to 1.5%, the fixed prepetition contractual debt service

amount will likely be even less as a percent of revenues in future years.  Also, while FOMB may argue that the Ex. 154 chart in the section titled "24.1 Detailed financial projections" does not distinguish local Puerto Rico source revenues versus federal source revenues, and that prepetition contractual debt service would be higher as a percentage of local Puerto Rico source revenues, that does not alter the fact that Puerto Rico – based on FOMB's own numbers and projections – can pay its full current, prepetition debt service obligations – and certainly its GO and PBA debt service obligations that have Constitutional priority.  The conclusion is further re-enforced when one considers that, as has been the practice for a number of years, federal funds will be available to pay a substantial share of the large annual Medicaid expenditures (as discussed below).  In sum, it is manifest that Puerto Rico – on FOMB's own numbers – has ample capacity to pay full prepetition contractual debt service.

> ### Projections premised on population data that is inconsistent with U.S. Census population counts and estimates.

17.     There are significant inconsistencies between official U.S. Census population data for Puerto Rico and the 4/23/2021 fiscal plan population data that underlies the financial and economic projections used in the fiscal plan.  The 4/23/2021 fiscal plan asserts FY2020 population was 3,030,000, and in a steady decline, to 2,928,000 in the current fiscal year (FY2022), going down to 2,764,000 in four years (FY2026), and continuously declining thereafter with a 33% drop by FY2051.  *See* #17628-8-page-42-to-43-of-309, pp.41-42, Ex. 17 & note on Ex. 17.  The 4/23/2021 fiscal plan population forecasts are across the board even somewhat lower than those in the 5/27/2020 plan.  *Compare* 5/27/2020 plan, #15988-5-page-39-of-272, p.38 Ex. 13.

18.     By contrast, the latest U.S. census data shows population numbers that are markedly higher.  Thus, per the U.S. census, Puerto Rico's population on 4/1/2020 (in fiscal 2020) was an actual 3,285,874, over 8.4% higher than the 2020 FY population assumed in the fiscal plan.  #18181-page-103-of-157.  Whereas the fiscal plan shows a steady decline year after year, the U.S. Census actual count as of 4/1/2020 was up 2.89% from the Census Bureau's

7/1/2019 estimate of 3,193,694.  #18181-page-103-of-157.  The United States Census "Quick Facts" Puerto Rico is in the record at #18181-page-103-to-105-of-157 and available on the Internet at https://www.census.gov/quickfacts/PR.  A larger population than FOMB assumed will enhance Puerto Rico's ability to pay its prepetition contractual debt service.

### Past underestimation of revenues.

19.     FOMB's 5/27/2020 fiscal plan projected – for FY2021, set to begin a month later – $20.900 billion in revenues (including general fund revenues of $9.223 billion), $20.566 billion in expenses, $0.1 billion in "measures", and a post-"measures" surplus of $0.440 billion.  (#15988-5-page-41-to-42-of-272, pp.40-41 Ex. 14-15).  Following the completion of FY2021 (ending June 30, 2021), we know that actual FY2021 revenues were $25.659 billion (24.7% greater than FOMB's estimates), including general fund revenues of $12.474 billion (35.2% greater), $21.689 billion in expenses, and $3.970 billion net operating cash flow.  The 6-30-2021 TSA cash flow report (excerpts in the record at #18181-page-106-to-121-of-157) shows on page 9 the actual fiscal year 2021 revenues, general fund revenues, expenses and net operating cash flow.  *See* #18181-page-113-of-157.

20.     Based on the foregoing, in fiscal 2021, Commonwealth had $3.530 billion more capacity to meet its obligations than FOMB forecast on 5/27/2020 ($3.970 billion - $0.440 billion).

### FOMB's assumption that Medicaid expenses will increase dramatically but federal funding will fall off a cliff.

21.     The 4/23/2021 fiscal plan shows Commonwealth Medicaid expenditures increasing from $1.968 billion in FY2021 to $2.974 billion (#17628-8-page-53-of-309), yet federal Medicaid funding is projected to drop from $2.46 billion in FY2021 to $0.468 billion in FY2023 and $0.519 billion in FY2026  (#17628-8-page-48-of-309).  The fiscal plan assumes that federal funding will drop off a cliff, even though (i) Puerto Rico has received "increased levels of federal reimbursement" since at least 2011 (#17628-8-page-47-to-48-of-309), and (ii) based on public statements, leaders of both parties in Congress as well as Puerto Rican Government

-8-

officials believe there will be significant increases in federal Medicaid funding for 2022 and future years.  *E.g.*, #18181-page-122-to-134-of-17.

22.      In effect, FOMB assumes (as a given) significant continued, and increased, Medicaid expense, but does not factor in corresponding increased federal Medicaid funding to pay for this large spending, and thus assumes the Commonwealth General Fund will bear virtually all of these large Medicaid expenditures.

23.      A more realistic assumption – that federal funding would at least keep pace with the Medicaid expenses requiring such federal funding – would result in a net increase of $2.5 to $3.0 billion per year in Puerto Rico's ability to meet its obligations.

### Pensions have continued to be paid in full on a PayGo basis throughout this Title III

24.      Through this Title III process, pensions for public employee retirees have continued to be paid in full and in cash.  Attached as Exhibits E, F, G and H are excerpts from AAFAF PayGo reports, on AAFAF's website, reflecting PayGo costs for FY2018, FY2019, FY2020 and FY2021.  Also, attached as Exhibit J is a summary of the PayGo costs for those years produced in the data room (AAFAF_CONF_0008453).  (Exhibit G was pulled from the AAFAF public website; it is not clear why this public document is marked "CONFIDENTIAL".)

25.      The PayGo reports and summary data produced show that an average of over $2 billion per year has been spent on PayGo pension expense for Commonwealth (including the Judicial and Teachers' Retirement Systems).  Had the priorities under the Puerto Rico Constitution been followed, approximately $10 billion spent since this Title III was filed in May 2017 would have been available to pay GO and PBA debt service.  If the priorities under the Puerto Rico Constitution are followed going forward, at least an additional over $2 billion per year will be available to pay GO and PBA debt service.

### 1.03% property tax revenues

26.      Act 83 of 1991 (codified 21 L.P.R.A. §5001 et seq.) establishes a "special tax of [1.03%] per annum on the appraised value of all personal and real property in Puerto Rico not

-9-

exempted from taxes" "for the amortization and redemption of the general obligations of the
Commonwealth."  The 1.03% of property tax is specifically committed by statute to the payment
of principal and interest on existing GO bonds: by statute (21 L.P.R.A. §5005) commitment of
the 1.03% of property tax to the payment of principal and interest on GO bonds "will be
considered to be a prior lien bond."  The "Summary of Bank Account Balances" report on
AAFAF website (Exhibit C p.11, sequence 00061, headed "Restricted Amounts Subject to Title
III Proceedings") shows a balance as of 8/31/2021 of $599.7 million of "GO Redemption Funds"
"from the 1.03% property tax collected since fiscal year 2017 and deposited in the Public Debt
Redemption Fund," up from $556.1 million as of the month before.

   27. The 4/23/2021 fiscal plan states that property tax collections have averaged only
about 68%, "which is well below comparable U.S. jurisdictions.  Low compliance rates and
thousands of properties in Puerto Rico that do not appear on the property tax rolls affect the
revenue productivity and fairness of the property tax system."  #17628-8-page-262-of-309,
p.261.  Exhibit I, a document produced into the data room by AAFAF
(AAFAF_CONF_0008624) is a summary CRIM document showing substantial uncollected
1.03% property tax amounts for each of FY2016-FY2020.  Another Commonwealth document in
the data room (ASSETS_2004_0002154 to 2169, at 2169), shows $464,591,994 uncollected
from 2002 through some point in 2019.  (This document is designated as confidential, but
AAFAF has agreed that I can include this number in my public filing, *see* 10-11-2021 McKeen
letter to Hein, p.1.)

   28. In sum, the 1.03% property tax already yields substantial funds annually that can
only be applied to GO debt service, and collections of the 1.03% property tax can and should be
increased.

**Commonwealth's capacity to raise revenues sufficient to cover essential expenditures yet still pay its Constitutional "first claim" bonds in full.**

> **Puerto Rico's representation that its per capita debt level should be compared to the state, local and federal debt levels of states.**

29.    Attached as Exhibit K are excerpts from a presentation made in a Commonwealth of Puerto Rico investor webcast on October 15, 2013.  (The full text of the presentation appears at Docket #4606-8-page-1-to-73 and is also available on the Commonwealth of Puerto Rico, Government Development Bank, Investor Presentations website at http://www.gdb-pur.com/documents/UpdateonFiscalandEconomicProgressWebcast-Final.pdf; or type into google "government development bank Puerto Rico investor presentations")  On page 57, Puerto Rico was explicit that "any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt" and that "If one factors in the federal debt load, PR would rank **last** in outstanding debt per capita among all US jurisdictions" (emphasis added), citing to US Bureau of the Census and the Government Development Bank for Puerto Rico as the source of the data.

> **Puerto Rico's comparative tax burden.**

30.    Attached as Exhibit L are excerpts from Commonwealth of Puerto Rico Tax Reform Assessment Project, Executive Summary Oct. 31, 2014 (a fuller version of this document is available on the Internet; type in "KPMG Commonwealth of Puerto Rico Tax Reform Assessment Project" or go to http://www.hacienda.gobierno.pr/sites/default/files/unified_tax_code_of_pr-_executive_summary_0.pdf ).  Page 6 shows Puerto Rico's taxes as a percentage of GDP were lower than all OECD countries listed.  Page 7 shows tax collections in Puerto Rico were 10.66% of GDP, compared to an OECD average of 33.19%.  (A fuller version of this document also appears in Docket #4606-8-page-76-to-93-of-180.)

31.    Most Puerto Rico taxpayers do not pay federal income taxes, and, as a result, Puerto Rico has greater debt capacity relative to its economy that the states.  For those who do not receive the benefit of the many Puerto Rico incentives (discussed below), the highest basic

-11-

marginal rate in Puerto Rico is 33%.  https://taxsummaries.pwc.com/puerto-rico/individual/taxes-on-personal-income  (There is also a "gradual adjustment tax" for individuals with net taxable income greater than $500,000; these taxpayers pay an additional tax that is 5% of the excess of their total net taxable income over $500,000, limited to 33% of their personal and dependents' exemption plus $8,895.)

32.     In many states, whose residents bear the burden of high federal rates on top of state rates, the overall state, local and federal tax burden far exceeds that of Commonwealth taxpayers.  For example, in New York City the top combined state, city and federal rate (including net investment income tax) is 55.6%.  In California, 54.1%.  In fact, since the top federal marginal rate is 40.8% (37% marginal rate plus 3.8% net investment income tax), it can be said that higher income taxpayers everywhere in the 50 states pay a higher combined state, city and federal rate than their counterparts in Puerto Rico.

**Puerto Rico's numerous tax incentives and recent legislative enhancements of tax incentives and reductions in tax rates**

33.     The 4/23/2021 fiscal plan acknowledges that a report on Puerto Rico's "tax expenditures" – i.e., revenue losses resulting from tax preferences and incentives – showed that "Puerto Rico issues more than 300 tax incentives with total foregone revenue in excess of $21 billion" and " that Puerto Rico offers a far more generous tax incentive program far more generous than virtually every other jurisdiction in the U.S. as a share of the economy or total tax collections."  [sic]  #17628-251-to-253-of-309, pp.250-52.  Data in the 4/23/2021 fiscal plan is from a tax expenditure report Puerto Rico issued in September 2019 for tax year 2017, in response to the FOMB's requiring such a report.

34.     As evident from the fiscal plan's Ex. 124 & 125 bar charts (#17628-8-page-252-to-253-of-309), the size of Puerto Rico's tax expenditures as a share of GNP or GDP, and as a share of total taxes, is literally "off the charts" compared to the United States as a whole or any individual state.  #17628-8-page-252-253-of-309, pp.251-52.  For example, Puerto Rico's tax expenditures are 30% of GNP and 20% of GDP, whereas in New York tax expenditures are 2.5%

-12-

of gross state product.  #17628-8-page-252-of-309, p.251-Ex. 124.  Puerto Rico's tax

expenditures are 218% of total taxes, as compared 54% in New York.  #17628-8-page-253-of-

309, p.252-Ex. 125.  In May 2021 Puerto Rico issued a tax expenditure report for tax year 2018

but – to quote from page 9 of the report – "There are no totals shown for tax expenditures in this

[tax year 2018] Report."  Excerpts from this report for tax year 2018 are attached as Exhibit BB;

the report is available on the internet at

http://www.hacienda.gobierno.pr/sites/default/files/tax_expenditure_report_for_tax_year_2018_r

ev_9-june-2021_0.pdf

35.     Puerto Rico – despite filing in Title III and not paying any interest or principal on

its general obligation debt since January 2016 (Ex. HH, AAFAF 8-27-2021 Response, p. 37,

described further below) – has in the past several years enacted multiple reductions in tax rates

and new tax incentives.  On December 10, 2018 Puerto Rico enacted Act 257-2018, which is in

the data room at AAFAF_CONF_0008098.  This bill is 228 pages long.  As explained in the

Statement of Motives, "[t]his reform introduces various changes to the income tax regime for

both individuals and corporations.  In the case of individuals, they shall be provided with a

dollar-for-dollar reduction of 5 percent (5%) in the amount they currently pay ….."  (Act 257-

2018, p.6, AAFAF_CONF_0008103).  Act 257-2018 also reduced tax rates applicable to

corporations (id. at p.10, AAFAF_CONF_0008107).

36.     Legislation approved the next year, on July 1, 2019, Act 60-2019, noted that Act

257-2018 – also called the "New Tax Model" - reduced rates (Act 60-2019, p.3; in data room at

AAFAF_CONF_0007654.  Another subsequent Act, Act 40-2020 approved April 16, 2020 (in

the data room at AAFAF_CONF_0007494) described Act 257-2018 as having "lightened the tax

burden of individuals and corporations," "eliminated the tax on services rendered between

businesses and designated professional services (known as B2B) for 77% of taxpayers" and

"reduced the SUT for prepared foods from 11.5% to 7%" (Act 40-2020, page 2,

AAFAF_CONF_0007495).[1]  A contemporaneous report by Reuters (#4606-8-page-167-of-180), characterized Act 257-2018 with the headline "Puerto Rico Governor signs bill for $2 billion in tax relief," 12/10/18 (on Internet) (reporting that Puerto Rico lowered taxes by about $2 billion).

37.     Act 60-2019 – called the "Puerto Rico Incentives Code" – is a 420 page long enactment of new and revised tax incentive provisions.  Among the tax incentives are special rates and privileges for "Exempt Business" (page 30), which is any "Eligible Business" "that has been granted a Decree".  "Eligible Business" includes "individuals or business activities that qualify for a Decree" including (i) Individual Resident Investors who relocate to Puerto Rico, and (vi) "Private Equity Funds" (page 29).  These "Exempt Business" taxpayers have a "preferential flat income tax rate of 4 percent (4%), in lieu of any other income tax" (page 86, §2011.02(a)(1)).  The stockholders or partners of a corporation or partnership that is an "Exempt Business holding a Decree" "'shall not be subject to the payment of income tax on distributions of dividends or profits from the Exempt Income of said Exempt Business…..'" (page 86, §2011.02(b)(1)).  An Exempt Business also has a 75% exemption on the real and personal property tax (page 89, §2011.03(a)).

38.     For income derived from interest and dividends by a Resident Individual Investor, there is an "[]exempt[ion] from income taxes in Puerto Rico" (page 96, §2022.01(a)).

39.     The 420 page Act 60-2019 even provides special benefits for "film projects" which are defined to include "video games" (pages 253-254, §§2091.01(a)(1) and 2091.01(a)(1) (iv)(F)).

40.     The Act 60-2019 incentives are summarized in Exhibit M, a screen shot from the Invest Puerto Rico website, https://www.investpr.org/puerto-rico-tax-incentives

Some of Act 60's highlights:

- 4% flat income tax rate

- 0% Distribution of Dividends Rate

---

[1] The data room is accessible through the Prime Clerk website (see menu on left side of screen) which lists under "quick links," as the 15th item down, "Disclosure Statement Data Room".

- 75% Property Tax Exemption

- 75% Exemption on Construction Taxes

- 50% Exemption on other Municipal Taxes

- 50% Municipal Patent Exemption

41.     Act 40-2020 (AAFAF_CONF_0007494, at 0007496) states that although Act

257-2018 "achieved a 5 percent (5%) dollar-for-dollars reduction for individuals" Act 40-2020

would "lighten the tax burden of our workforce even further" by "providing an additional

reduction of 3 percent (3%) to taxpayers whose gross income does not exceed $100,000; for a

total reduction of 8% for individuals who earn $100,000 or less".  Act 40-2020 is 160 pages.

42.     Yet further tax reductions were enacted in Act 57-2020, the  "Supplemental Act to

Address the Effects of the Puerto Rican Economy Caused by the COVID-19 Emergency"

(AAFAF_CONF_0008326, at 8328, available in the data room).

**Recipients of $2 billion of tax credits are granted unimpaired claims with full recoveries**

43.     The Plan provides that almost $2 billion ($1,972,113,081) of "tax credit claims,"

as well as $466,772 of energy incentive claims, will be ***unimpaired***.  See class 57 and class 55

treatment, #17628-page-489-to-491-of-654.  These claims are unsecured and do not have the

constitutional priority of GO and PBA claims.  For example, all three of the largest class 57

claims identified by FOMB (10-14-2021 Dale letter to Hein, p.6) are expressly stated to be

unsecured: (i) $466,538,298 class 57 claim of Cordis, claim 62668, p.3, item 10 (search claims

data base for claim 62668), (ii) $216,530,073 class 57 claim of MSD International GMBH, claim

90909, p.3, item 10, and (iii) $153,897,343 class 57 claim of McNeil Healthcare, claim 67125,

p.3, item 10.

**Total outflows increased over 29% FY2018-FY2021, without any determination as to which
expenditures are "essential"**

44.     Attached as Exhibit CC are excerpts from the Puerto Rico Department of

Treasury TSA cash flow report as of 6/29/2018, and attached as Exhibit DD are excerpts from

the TSA cash flow report as of 6/30/2021.  No TSA cash flow reports appear on the AAFAF,

"Financial Documents" web page covering full fiscal years before FY2018 (the earliest dated

TSA cash flow report is dated 10/20/2017).  "Total outflows" increased over 29%:  (i) from

$16.752 billion in FY2018 (as of 6/29/2018) (Ex. CC, p. 8), the earliest full fiscal year for which

data is available, (ii) to $21.689 billion (as of 6/30/21) for FY2021 (Ex. DD, p.8); the "total

outflows" for FY2021 of $21.689 billion were $1.375 billion higher than plan (Ex. DD, p.8).

(While Exhibit DD is labeled "CONFIDENTIAL," I pulled it from AAFAF's public website and

it does not appear to have information any more "confidential" than the many similar TSA cash

flow reports that appear in the same location on the AAFAF website.)

### Expenditures for Advertising Representation, Artistic Services and Consulting Services

45.     Attached as Exhibits O, P, Q and R are printouts of excerpts from searches for

contracts in the Contract Registry database maintained by the office of the Puerto Rico

Comptroller.  Per the Comptroller's website, it appears this Contract Registry dates back many

years, perhaps to 1975.  *See* https://www.ocpr.gov.pr/registros/consulta-de-registro-de-contratos/.

46.     To conduct a search, type in https://consultacontratos.ocpr.gov.pr/.  Then select

Service Category, such as "advertising, representation or artistic services" or "consulting

services"; then put in the date range (for example) 5/3/2017 (when this Title III was filed)

through 10/13/2021.  The database shows there were 9789 "advertising, representation or artistic

services" contracts in this period, totalling $301,418,709.  *See* Exs. O and P.  A search for

"consulting services" for the same time frame shows 9918 contracts totalling $2,375,668,318.

*See* Exs. Q and R.

### Continued payment of Christmas bonuses

47.     Over $475 million has been paid out in Christmas bonuses to public employees in

FY2016-2021.  *See* AAFAF_CONF_0008454, produced by AAFAF (Exhibit S hereto).

### Public employee attendance

48.     Attached hereto as Exhibit N are excerpts from an "Office of the Administration

and Transformation of Human Resources" ("OATRH") Attendance Report as of October 2020

"Prepared for the FOMB" with the logo "FAFAA, Puerto Rico Fiscal Agency and Financial
Advisory Authority." Available on the Internet at https://www.aafaf.pr.gov/wp-
content/uploads/2g-oatrh-attendance-report-october-2020.pdf. This shows attendance for public
employees from the week beginning 12/31/17 to the week ending 10/31/20, after which the
reports ceased. (This report is stamped "confidential," but has been publicly available for
months on AAFAF's public website; it is not clear why the report is stamped "confidential.")

49.     These OATRH attendance reports are a stated requirement imposed by FOMB.
*See* #17628-8-page-289-of-309. OATRH had been regularly issuing these attendance reports
"Prepared for the FOMB" for years, as is evident from checking the AAFAF website. Available
on https://www.aafaf.pr.gov/financial-documents/attendance-report/. For reasons never
explained, these reports ceased to be made publicly available after October 2020, as is also
evident from the AAFAF website. I propounded discovery to find out why OATRH ceased to
issue these monthly attendance reports, but FOMB and AAFAF refused to say. *See* Ex. HH
p.30-31, Ex.II p.25, Ex.JJ p.14, Ex. KK p.15, Ex. LL p.11-12, Ex. MM pp.14.

50.     Per Exhibit N, of 114 government agencies, 85%+ reported attendance when the
reports began in 2017. By the last week of October 2020, only 8.77% reported attendance – just
one-tenth the number in late 2017. *See* second column.

51.     Even before the pandemic hit, in January 2020, the percent of "employees
working" (the fourth column) was as low as 16.73% to 38.55%. Ex. N, p.4.

**Puerto Rico's costs incurred in its efforts to avoid paying its debt appear to be on track to
exceed $2.5 billion.**

52.     The costs incurred by Puerto Rico for the FOMB/Title III process, combined with
other costs incurred by Puerto Rico in its efforts to avoid paying its debt, appear now to be on
track to exceed $2.5 billion. One must compile the cost data from various different sources. The
costs include (a) professional fees projected at approximately $1.6 billion for the FY2018-
FY2026 period (per FOMB 4/23/2021 fiscal plan, #17628-8-page-58-of-309), (b) FOMB
operating costs which appear to be in the area of $625 million (the 10/23/2018 fiscal plan, p.29,

estimated FOMB operating costs at $430 over 6 years (apparently FY2018-FY2023); the

4/23/2021 fiscal plan forecasts $75 million pre-measures, $65 million post-measures, per year

through FY2026, which will add another at least $195 million for FY2024-FY2026), (c) $213

million spent by Puerto Rico pre-PROMESA on lawyers and consultants who worked on the

effort to avoid Puerto Rico paying its debts (as previously tallied and reported by me in #4673-

page-12&n.2-of-17), and (d) what are presumably significant additional costs incurred by

Commonwealth itself to deal with FOMB and the Title III process above and beyond the

professional fees incurred by Commonwealth's attorneys and other professionals whose fees are

reported to the fee examiner and approved by the Court.  The fee examiner on occasion does

compile professional fee costs to date, but those numbers are a lagging indicator.  For example,

on July 13, 2021 the fee examiner reported that "with the eleventh interim fee period (October 1,

2020-January 31, 2021) process well under way, the Fee Examiner has received applications that

total approximately $943 million."  #17322-page-2-of-7.  Some information on the general

breakdown of what entities are responsible for which incurred professional fees and cost

projections also appears in FOMB's annual reports available on its website (click on "About Us"

tab, and scroll down to "FOMB Reports", then scroll down to the Annual Reports).

**Puerto Rico drops further in World Bank "Doing Business" rankings**

53.     Attached as Exhibit T are excerpts from the 2017 World Bank "Doing Business"

report (full text available on the Internet) that, on page 7 (Ex. T p.7), ranks Puerto Rico (U.S.)

(treated for this purpose by the World Bank as an "economy" separate from the rest of the U.S.)

as #55 in the world.  (By comparison, the United States is ranked #8.)

54.     Attached as Exhibit U are excerpts from the 2020 World Bank "Doing Business"

report (full text available on the Internet) that show, on page 4 (Ex. U p.4), that after several

years of FOMB "oversight," Puerto Rico dropped to #65, falling behind Saudi Arabia (#62) and

Ukraine (#64).

**Commonwealth and FOMB take steps to put downward pressure on GO and PBA bond prices, creating an opportunity for funds with a short-term orientation to purchase large stakes at deeply depressed prices**

55.     Commonwealth initially used its unlawful unilateral refusal to pay its Constitutional "first claim" priority debt to put downward pressure on GO and PBA bond prices (which fell to as low as the low 60s and high 50s as a percent of par in the late June 2015-early July 2015 time frame, see #7540-1-page-38-of-70, using a series 2012A term bond with a 2037 maturity as an example).  FOMB then "doubled-down" on measures, such as filing this Title III in May 2017 and failing to pay even interest on the Constitutional "first claim" priority debt, that also served to depress bond prices and opened the door to hedge funds with a short-term orientation buying large stakes at deeply depressed prices (prices in the mid-50s as a percent of par in the May 2017 time frame, *see* #7540-1-page-54-of-70).  Even before hurricanes Irma and Maria hit in September 2017, the 2012A 2037 term bond prices dropped to the lower 50s. #7540-1-page-58-of-70.  Later in 2017, after the hurricanes hit, prices fell to the high teens - low 20s.  For example, on 12/4/2017 $48,363,000 par of the 2012A 2037 maturity term bond – almost 20% of the entire issue size – traded in the high teens – low 20s.  #7540-1-page-56-to-57-of-70.

56.     The downward pressure on the bond prices opened the way to FOMB being able to negotiate, in the confidential process that had been established in the summer of 2017, the initial PSA agreements that served the short term interests of the hedge funds who negotiated them, but were highly detrimental to the interests of unrepresented individual Retail Investors – many, like me, who had bought around the time of the initial bond offerings, years before PROMESA was ever in prospect.

57.     FOMB's meritless challenges to bond validity further adversely impacted the prices of certain series of bonds, further enhancing FOMB's ability to take advantage of the short-term orientation of active hedge fund traders to strike deals with selected parties in the confidential mediation-negotiation process to the detriment of unrepresented Retail Investors. The price-manipulative impact of FOMB's challenges is evident from what has happened to the

-19-

price of GO bonds after market participants learned of the planned or actual filing of these meritless challenges.  The bonds issued in 2009, 2011 and 2012 traded at roughly equivalent relative levels on July 1, 2015, after Puerto Rico's Governor announced a purported inability to pay, and continued to trade at roughly equivalent levels for years thereafter.  #7540-1-page-1-of-70, summarizing trading on the pages that follow.  However, around January 2019 – when the invalidation objections began to be filed – the prices of the 2009, 2011 and 2012 bonds began to diverge.  By June 12, 2019 the 2009 bonds traded at prices about 32% above 2012, and about 9% above 2011.  #7540-page-15-to-18-of-19; #7540-1-page-1-to-67-of-70.

58.    The Plan reflects not adjudications on a public record of the relative rights of GO and PBA bondholders and other creditors, but instead the Plan incorporates the results of a completely opaque closed-door process where deals were cut outside the view of Retail Investors who FOMB admits did not participate in negotiating the Plan (#17420-page-19-of-27).  The fact that other bondholders, including hedge funds who bought at distressed prices post-PROMESA, have been willing to settle their claims in no way undermines the Constitutional and statutory "first claim" secured position of GO and GO guaranteed bondholders:  those settling parties are receiving special consideration, including Consummation Costs and other benefits, and, as to post-PROMESA purchases at deep discounts (enabled in part as a result of steps taken by Commonwealth and FOMB), are undoubtedly enjoying significant profits even if they receive less than full principal plus full accrued interest to date.

**FOMB's repeated agreements to provide additional benefits for Puerto Rico unions, public employees and public employee retirees.**

59.    Attached as Exhibit V is FOMB's 10/14/2021 letter to Puerto Rico officials offering to amend the Plan to, *inter alia*, eliminate any cuts to accrued pensions of current and retired public employees; provide additional funding to municipalities; provide additional funding to UPR "to improve the student experience and environment;" provide $1 million to study the feasibility of extending Medicaid coverage; and create "a mechanism to advance the terms of payment and debt cancellation following the termination" of FOMB.

60.     Attached as Exhibit W is FOMB's 10/8/2021 statement concerning P.R. House Bill 1003.  FOMB states, in part:  "Puerto Rico House Bill 1003, as amended and approved by the Senate, conditions the issuance of the bonds on provisions that would cost tens of billions of dollars.  In addition to preventing any cuts to government retirees' pension benefits, the Senate's bill would prevent the freezing and reforming of the insolvent pension plans that previous Puerto Rico governments underfunded for decades.  It adds costly mandates and massive spending increases as a condition to implementing the 7th Amended Plan of Adjustment."

**Puerto Rico's failure to remedy issues with its internal controls**

61.     Attached as Exhibit AA is FOMB's 10-12-2021 letter to the Puerto Rico Secretary of the Treasury regarding Commonwealth's failure to remedy internal control deficiencies.

**House Report 114-602**

62.     Attached as Exhibit X are excerpts from House Report 114-602, 114th Cong., 2d Sess. (June 3, 2016), which accompanied the PROMESA legislation.  This material is previously in the record at Docket#17524-page-34-to-36-of-41.

**The Plan does not respect the "first claim" priority and liens of GO bondholders.**

63.     Other classes that do not have Constitutional priority are unimpaired (*e.g.*, Classes 51A,51C,51J,51K,55,57,67,68) or receive percentage recoveries, ranging from 91.5% up to 100%, that are larger than GO and PBA bondholders receive (Classes 51B,51D-to-51I,51L,69). #17628-page-79,464,466-to-481,489-to-491,504-of-654.  The unimpaired claims include energy incentive and tax incentive claims aggregating over $2 billion.  #17628-page-489-to-491-of-654.

64.     Yet additional classes that do not have Constitutional priority nevertheless receive non-contingent cash recoveries, including cash payments to public employees and their unions. E.g. Class 52,53,56,58.  #17628-page-486-to-488,490-to-494-of-654.

65.     Under FOMB's own projections, over $2.1 billion of "Excess Cash Surplus" may be paid out for Upside Performance Bonuses ($1.551 billion) and Benefit Restoration ($620.6

million) in FY22-FY26.  (#17627-page-41(§1.118), 57(§1.234), 127(§56.l(a)), 234-to-235,258-to-259-of-291; #17628-8-page-44-of-309; #16908-page-15-to-16,20-of-178).  If the Medicaid funding "cliff" is averted (*see* above discussion), added payments for Upside Performance Bonuses, Benefit Restoration and Pension Reserve contributions will be staggering.

66.     If the 5/27/2020 fiscal plan projections are used as the benchmark, the added payments to or for the benefit of public employees and retirees and their unions will be doubly staggering.  In this regard, FOMB has stated in 20.2.5 of the 4/23/2021 fiscal plan that "In order to ensure that retirees may benefit from the Commonwealth's outperformance of 2020 Fiscal Plan financial projections, the Plan of Adjustment also contemplates a mechanism whereby retirees subject to the aforementioned reduction in monthly pension benefits may see that reduction partially, or even fully, restored in cases where the Commonwealth materially exceeds the financial projections in the Fiscal Plan that is certified by the Oversight Board and is in effect as of the Effective Date of the Plan of Adjustment," *see* #17628-8-page-279-to-280-of-309.  The 5/27/2020 fiscal plan projects lower surpluses or greater deficits than the 4/23/2021 fiscal plan, and thus the potential added payments and benefits to public employees and retirees from supposed outperformance of the 5/27/2020 fiscal plan numbers are staggering.  *Compare* 2020 fiscal plan (#15988-5-page-41-of-272 Ex. 14) *with* 2021 fiscal plan (#17628-8-page-44-of-309 Ex. 18); *see also* #16908-page-15-to-20-of-178.  (Perhaps FOMB will now say it really didn't mean what it said in section 20.2.5, which is phrased in a confusing and contradictory fashion, but 20.2.5 says what it says.)

**Notifications of the voting and ATOP delivery deadlines, and additional problems experienced in that process.**

67.     Supplementing the materials previously submitted with my motions to extend the voting deadline and for other relief (#18237, #18247, #18306, #18439), attached as Exhibit EE is a Merrill notice (in relation to CUSIP 74514LB63) that the revised deadline for providing instructions was October 12 at 3pm, 6 days in advance of the October 18 extended voting deadline.  I found this by looking online; it was not until October 16, 2021 (after the deadline for

instructions had passed) that I received this in the mail.  (Mail delivery of "corporate action"
notices is often 10-14 days after the date of the notice; typically these notices advise customers
of bond calls or redemptions six weeks or so into the future and thus typically these "corporate
action" notices do not require immediate action by either the customer or the broker).

68.     Attached as Exhibit FF is a notice of the extended voting deadline of October 18,
2021, received by mail from Merrill on October 12, 2021, 12 days after the 10/1/2021 date of the
notice, and on the very day of the deadline for instructions.  The notice reads:  "Dear Client:  We
have been requested to forward you the enclosed material in regard to an extension deadline of
October 18, 2021.  If you have any questions, please contact your Financial Institution directly."
[sic]  A copy of #18258 is enclosed with the notice.  I received this same form of notice, with the
same enclosure and in the same plastic black envelope, from Morgan Stanley, also on October
12, 2021.  It would appear from the fact the language is identical, the packaging was identical,
and the brief two sentence notice speaks of "contact your Financial Institution directly" that these
notices were not drafted by the brokerage firms, but rather were prepared by FOMB's
solicitation agent, which may also have arranged the mailing (explaining the identical plastic
envelopes).

69.     Attached as Exhibit GG is a declaration by Mark Elliott, dated October 15, 2021,
concerning issues he and his clients have had in attempting to vote and deliver their bonds
through ATOP.

**Legislative history for 48 U.S.C. Section 737**

70.     Attached as Exhibit Y is 93 Cong. Rec. Part 8 at 10402, col. 3 (July 26, 1947)
(also in the record at #4606-8-page-174-to-175-of-180).

71.     Attached as Exhibit Z is Senate Report 422, 80th Cong., 1st Sess. at 3-4 (July 2,
1947) (stating that "Legislation in Puerto Rico has discriminated against nonresident American
citizens," and that "The purpose of this addition is to assure that the citizens of the United States

not residing in Puerto Rico will have the same treatment in Puerto Rico as local residents.")(also in the record at #4606-8-page-176-to-180-of-180)

**Discovery responses from AAFAF and FOMB**

72.     Attached are excerpts of cited pages from discovery responses by AAFAF and FOMB that are referenced in my Objection to Confirmation of the Plan:  (a) Exhibit HH is AAFAF's response and objections to Hein Request for Production - Set 1 (8-27-2021 ); (b) Exhibit II is FOMB's response and objections to Hein Request for Production - Set 1 (8-27-2021); (c) Exhibit JJ is AAFAF's 9-24-2021 response and objections to Hein Request for Production - Set 2; (d) Exhibit KK is FOMB's 9-24-2021 response and objections to Hein Request for Production - Set 2; (e) Exhibit LL is AAFAF's 9-27-2021 response and objection to Hein Interrogatories - Set 1; (f) Exhibit MM is FOMB's 9-27-2021 response and objection to Hein Interrogatories - Set 1.


Dated:  October 19, 2021

_____
                    /s/Peter C. Hein
                    Peter C. Hein

## **Certificate of Service**

I, Peter C. Hein, certify that I have caused the foregoing "Declaration of Peter C. Hein accompanying Objection to Confirmation of Plan by Individual GO and PBA Bondholder" to be served via the Court's CM/ECF system.

October 19, 2021

_____/s/ Peter C. Hein_____
Peter C. Hein

NEW ISSUE-BOOK ENTRY ONLY

**$152,540,000**

# Puerto Rico Public Buildings Authority
### Government Facilities Revenue Refunding Bonds, Series Q
### Guaranteed by the Commonwealth of Puerto Rico

The Puerto Rico Public Buildings Authority Government Facilities Revenue Refunding Bonds, Series Q (the "Bonds") are being issued by Puerto Rico Public Buildings Authority (the "Authority") pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended ("Act No. 56"), and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995, as amended or supplemented (the "1995 Bond Resolution").

The Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution are payable from, and are secured by a pledge of, the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth of Puerto Rico (the "Commonwealth").

**The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Department of Treasury of the Commonwealth (the "Treasury") such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith and credit of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.**

The Bonds will have the following characteristics:

- The Bonds will be dated their date of delivery.

- The Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the Bonds will not receive definitive Bonds.

- Interest on the Bonds will be payable on January 1, 2010 and on each July 1 and January 1 thereafter.

- The Bonds are subject to redemption as described herein.

- The inside cover page contains information concerning the maturity schedule, interest rates, and yields of the Bonds.

- The issuance of the Bonds and the purchase of the Bonds by the Underwriters are subject to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel, and certain other conditions.

- In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Authority and the Commonwealth, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Bond Counsel is further of the opinion that, interest on the Bonds is exempt from state, Commonwealth and local income taxation. See *Tax Matters*, beginning on page 32 of this Official Statement, regarding certain other tax considerations.

- McConnell Valdés LLC, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters.

- It is expected that settlement for the Bonds will occur on or about October 28, 2009.

**Merrill Lynch & Co.**                                                    **Ramirez & Co., Inc.**

| | | | |
|---|---|---|---|
| **Barclays Capital** | **Goldman, Sachs & Co.** | **J.P. Morgan** | **Morgan Stanley** |
| **Popular Securities** | **Santander Securities** | **UBS Financial Services Incorporated of Puerto Rico** | |

October 16, 2009

**$152,540,000**
## Puerto Rico Public Buildings Authority
**Government Facilities Revenue Refunding Bonds, Series Q**
**Guaranteed by the Commonwealth of Puerto Rico**

**$8,200,000 Serial Bonds**

| Maturity July 1, | Principal Amount | Interest Rate | Yield | CUSIP* |
|---|---|---|---|---|
| 2022 | $8,200,000 | 5.125% | 5.200% | 745235L90 |

**$38,620,000 – 5.500% Term Bonds due July 1, 2037; Yield 5.650% (CUSIP No. 745235M24)** [*]
**$1,150,000 – 6.000% Term Bonds due July 1, 2038; Yield 5.500%† (CUSIP No. 745235M32)** [*]
**$104,570,000 – 5.625% Term Bonds due July 1, 2039; Yield 5.730% (CUSIP No. 745235M40)** [*]

---

[*]   Copyright 2009, American Bankers Association.  CUSIP data herein are provided by Standard & Poor's CUSIP Service Bureau, a division of The McGraw-Hill Companies, Inc.  The CUSIP number listed above is being provided solely for the convenience of bondholders, and the Authority does not make any representation with respect to such number or undertake any responsibility for its accuracy.  The CUSIP number is subject to being changed after the issuance of the Bonds as a result of various subsequent actions including, but not limited to, a refunding in whole or in part of the Bonds.

[†]   Priced at the stated yield to the July 1, 2014 optional redemption date at a redemption price of 100%.  See "Redemption Provisions" under *The Bonds* herein.

—

# TABLE OF CONTENTS

INTRODUCTION .................................................... 1
RECENT DEVELOPMENTS ................................ 3
    Revised Economic Data for Fiscal Year 2009
    and 2010 ..................................................... 3
    Results for Fiscal Year 2009 ............................ 3
    Approved Budget for Fiscal Year 2010 and Preliminary
    General Fund Revenues for First Two Months of Fiscal
    Year 2010 ..................................................... 4
    Actuarial Valuation and Cash Shortfall of the
    Employees Retirement System .......................... 4
    Amendments to Act No. 7 of March 9, 2009 ......... 4
    Approval of Public-Private Partnerships Act .............. 5
    Recent Bond Issues by the Commonwealth and Certain
    Instrumentalities .......................................... 5
    Cost Reduction Measures Adopted by the Authority .... 5
    Orders Requiring Reduction in Service Contracts and
    Leases ........................................................ 5
    Implementation of Second Round of Layoffs under Act
    No. 7 .......................................................... 6
    Progress in the Implementation of the Fiscal
    Stabilization Plan .......................................... 6
PLAN OF FINANCING ...................................... 6
    The Bonds .................................................... 6
    Use of Proceeds ............................................ 10
THE BONDS ...................................................... 10
    Description of the Bonds ................................. 10
    Redemption Provisions ................................... 10
    Book-Entry Only System ................................ 11
    Discontinuance of the Book-Entry Only System ........ 13
SECURITY ........................................................ 13
    Commonwealth Guaranty ............................... 14
    Opinion of the Secretary of Justice of the
    Commonwealth ............................................ 14
    Lease Agreements ......................................... 15
    Pledge of the Commonwealth to Pay or Advance
    Rentals ....................................................... 17
    Additional Bonds .......................................... 17
PROVISIONS RELATING TO PUBLIC DEBT OF
THE COMMONWEALTH ................................. 17
    Payment of Public Debt .................................. 17
    Payment Record ........................................... 18
    Debt Limitation ............................................ 18
    Commonwealth Guaranteed Debt ..................... 19

THE AUTHORITY .............................................. 20
    General ....................................................... 20
    Powers ....................................................... 20
    Management ................................................. 21
PROGRAMS AND FACILITIES OF THE
AUTHORITY ..................................................... 22
    Office Buildings Program ............................... 22
    School Buildings Program .............................. 22
    Health Facilities Program ............................... 23
    Correctional Facilities Program ....................... 23
    Other Facilities ............................................ 23
DEBT OF THE AUTHORITY AND DEBT
SERVICE REQUIREMENTS .............................. 23
    Debt .......................................................... 23
    Debt Service Requirements ............................. 24
SUMMARY OF CERTAIN PROVISIONS OF THE
1995 BOND RESOLUTION ................................ 25
    Revenues .................................................... 25
    1995 Sinking Fund ....................................... 26
    1995 Redemption Account ............................. 26
    1995 Construction Fund ................................. 28
    Additional Bonds .......................................... 28
    Investment of Funds ...................................... 29
    General Covenants ........................................ 30
    Modifications ............................................... 31
    Notice of Default .......................................... 31
TAX MATTERS .................................................. 32
    Federal Income Taxes .................................... 32
    State Taxes .................................................. 32
    Original Issue Discount .................................. 32
    Original Issue Premium .................................. 32
    Ancillary Tax Matters .................................... 33
    Changes in Law and Post Issuance Events ............... 33
UNDERWRITING ............................................... 33
LEGAL INVESTMENT ....................................... 34
LEGAL MATTERS ............................................. 34
GOVERNMENT DEVELOPMENT BANK FOR
PUERTO RICO ................................................... 34
RATINGS ........................................................... 34
CONTINUING DISCLOSURE .............................. 35
MISCELLANEOUS ............................................. 37
APPENDIX I - Proposed Form of Opinion of
    Bond Counsel ............................................. I-1

**$152,540,000**
## Puerto Rico Public Buildings Authority
**Government Facilities Revenue Refunding Bonds, Series Q**
**Guaranteed by the Commonwealth of Puerto Rico**

### INTRODUCTION

This Official Statement sets forth information in connection with the sale by Puerto Rico Public Buildings Authority (the "Authority") of $152,540,000 aggregate principal amount of its Puerto Rico Public Buildings Authority Government Facilities Revenue Refunding Bonds, Series Q (the "Bonds").

The Bonds will be issued pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended (the "Enabling Act"), and under the provisions of Resolution No. 468, adopted by the Authority on June 22, 1995 (the "1995 Bond Resolution"), as supplemented by Resolution No. 1408, adopted by the Authority on October 16, 2009 (the "Bond Resolution"). Immediately prior to the issuance of the Bonds, the Authority will have outstanding $3,001,849,085 of its Government Facilities Bonds (calculated by excluding all accretion on any existing capital appreciation bonds and convertible capital appreciation bonds) issued under the 1995 Bond Resolution. The fiscal agent under the 1995 Bond Resolution is U.S. Bank National Association (the "1995 Fiscal Agent").

The Bonds, the outstanding bonds of the Authority previously issued under the 1995 Bond Resolution, and any additional bonds that the Authority may from time to time issue under the 1995 Bond Resolution (collectively, the "Government Facilities Bonds") are payable from and are secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to departments, agencies, instrumentalities and municipalities of the Commonwealth. The Bonds are further guaranteed by the Commonwealth.

This Official Statement includes the cover page, the inside cover page, the appendices hereto and the following documents, which have been filed by the Commonwealth through the Electronic Municipal Market Access System ("EMMA") at http://emma.msrb.org established by the Municipal Securities Rulemaking Board ("MSRB"), and are incorporated herein by reference:

(1)  the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2008, prepared by the Treasury (the "Commonwealth's Annual Financial Report"). The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2008, which have been audited by KPMG LLP, independent auditors, as stated in their report dated August 12, 2009, accompanying such financial statements. KPMG LLP did not audit the financial statements of the Authority's capital project fund or the Children's Trust special revenue funds (major funds), and certain activities, funds and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, and their opinions, insofar as they relate to the amounts pertaining to such activities, funds and component units separately identified in their reports, are based solely on the reports of the other auditors. The report by KPMG LLP contains an emphasis paragraph for the adoption of Governmental Accounting Standard Board (GASB) Statement No. 45 *Accounting and Financial Reporting by Employers for Postemployment Benefits other than Pensions*, during the year ended June 30, 2008;

(2)  the Commonwealth of Puerto Rico Financial Information and Operating Data Report, dated May 15, 2009 (the "Commonwealth Report"), which is included as Appendix I of the Official Statement dated September 11, 2009 for the $3,425,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2009 A (General Obligation Bonds). The Commonwealth Report includes important information about the Commonwealth, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund (the "General Fund"), the estimated year-end

results of the fiscal 2008 budget, the budgets for fiscal years 2008 and 2009, the proposed budget for fiscal year 2010, and the debt of the Commonwealth's public sector; and

(3)   the basic financial statements of the Authority as of and for the fiscal year ended June 30, 2008, which have been audited by Parissi, P.S.C., San Juan, Puerto Rico, certified public accountants, as stated in their report dated September 29, 2008, accompanying such financial statements (the "Authority's 2008 Financial Statements").

The Commonwealth Report and the Authority's 2008 Financial Statements are also on file with each nationally recognized municipal securities information repository.  The Authority's 2008 Financial Statements were filed before the May 1, 2009 deadline.  See *Continuing Disclosure*, beginning on page 35 of this Official Statement.

Any Official Statement or appendix thereto of the Commonwealth or of any instrumentality of the Commonwealth that is filed with the MSRB through EMMA containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report, or any new or revised Commonwealth Report or Commonwealth's Annual Financial Report, or other document, that is filed with the MSRB through EMMA containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report, in each case after the date hereof and prior to the termination of the offering of the Bonds, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document.  Any statement contained in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement.  Any statement contained herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement.  Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, upon a written or oral request by such person, a copy of any or all of the foregoing documents incorporated herein by reference.  Requests for such documents should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22d Floor, New York, NY 10020, telephone number (212) 333-0364, or to Vice President – General Obligations Division, Government Development Bank for Puerto Rico, PO Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth Report, the Commonwealth's Annual Financial Report and the Authority's 2008 Financial Statements may be obtained by accessing http://emma.msrb.org or by visiting the Government Development Bank's website at www.gdbpr.com.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the operations, financial condition, plans and objectives of the Authority and the Commonwealth.  These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, including general economic conditions, many of which are beyond the control of the Authority and the Commonwealth.  The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements.  Actual results may differ materially from those expressed or implied by these forward-looking statements.

Exhibit A

Principal of and premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority or the 1995 Fiscal Agent on payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name" and will be the responsibility of such Participant and not of DTC, the 1995 Fiscal Agent, or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, premium, if any, and interest with respect to the Bonds to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority or the 1995 Fiscal Agent, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Authority or the 1995 Fiscal Agent. Under such circumstances, in the event that a successor depository is not obtained, definitive Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, definitive Bonds will be printed and delivered to DTC.

*The Authority, the 1995 Fiscal Agent and the Underwriters will have no responsibility or obligation to DTC, Direct Participants, Indirect Participants or the Beneficial Owners of the Bonds with respect to (i) the accuracy of any records maintained by DTC, any Direct Participant or any Indirect Participant; (ii) the payment by DTC to any Direct Participant or any Indirect Participant of any amount due to any Beneficial Owner in respect of the principal of or premium, if any, or interest on any Bonds; (iii) the delivery of any notice by DTC, any Direct Participant or any Indirect Participant; (iv) the selection of Beneficial Owners to receive payment in the event of any partial redemption of the Bonds; or (v) any other action taken or omitted to be taken by DTC or any Direct Participant or Indirect Participant. The current "rules" applicable to DTC are on file with the SEC and current "procedures" of DTC to be followed in dealing with its Participants are on file with DTC.*

**Discontinuance of the Book-Entry Only System**

In the event that such book-entry only system is discontinued, the following provisions will apply: (i) principal of and the redemption premium, if any, on the Bonds will be payable in lawful money of the United States of America at the corporate trust office of the 1995 Fiscal Agent in New York, New York; (ii) interest on the Bonds will be payable on each January 1 and July 1 by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1995 Fiscal Agent as of the close of business on the record date therefor as set forth in the 1995 Bond Resolution (June 15 and December 15); (iii) the Bonds will be issued only as registered bonds without coupons in denominations of $5,000 or any multiple thereof, and (iv) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate trust office of the 1995 Fiscal Agent in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such registration, transfer or exchange.

For every registration or transfer of the Bonds, the Beneficial Owners may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

## SECURITY

All Government Facilities Bonds will be secured equally and ratably by a pledge of rentals of the facilities leased by the Authority (the "Leased Facilities"). The Leased Facilities will not be mortgaged or otherwise encumbered to secure any Government Facilities Bonds. The Enabling Act provides that the good faith and credit of the Commonwealth are pledged for the payment of rentals under any lease agreement with any department, agency or instrumentality of the Commonwealth and to the making of advances by the Secretary of Treasury of the Commonwealth to the Authority of any unpaid portion of rentals payable to the Authority by any department, agency or instrumentality of the Commonwealth. The Enabling Act also provides that the good faith and credit of any

municipality entering into a lease agreement with the Authority are pledged for the payment of any rentals thereunder.

The Bonds are further secured by the guaranty of the Commonwealth under which the Commonwealth pledges to draw from any funds available in the Treasury such sums as may be necessary to cover any deficiency in the amount required for the payment of principal of and interest on the Bonds. The good faith and credit of the Commonwealth, as in the case of the Commonwealth's general obligation bonds, are pledged for such payments.

The rentals received in respect of the leased facilities financed by any Government Facilities Bonds and leased by the Authority to various departments, agencies, instrumentalities and municipalities of the Commonwealth are not available to be applied to the payment of any of the Public Buildings Authority Public Education and Health Facilities Bonds or Public Buildings Authority Revenue Bonds issued under the 1978 Bond Resolution and the 1970 Bond Resolution.

## Commonwealth Guaranty

As provided in Act No. 17 of the Legislature of Puerto Rico, approved on April 11, 1968, as amended (the "Guaranty Act"), the Commonwealth guarantees, among other things, the payment of the principal of and interest on the Government Facilities Bonds. The Guaranty Act, which was amended by Act No. 321 of December 28, 2003, to increase the amount of the guaranty from $2,500,000,000 to $3,325,000,000, reads as follows:

The Commonwealth of Puerto Rico hereby guarantees payment of the principal and the interest on bonds outstanding at any given time, in an aggregate principal amount not exceeding $3,325,000,000 issued from time to time by the Public Buildings Authority for any of its purposes authorized by this Enabling Act. The bonds covered by this warranty shall be those specified by the Authority, and a statement of such warranty shall be set forth on the face of such bonds. If at any time the revenues or income and any other moneys of the Authority, pledged for the payment of the principal and interest on such bonds, are not sufficient for the payment of such principal and interest when they come due, nor to maintain the reserve fund for the bonds that the Authority has pledged to maintain, the Secretary of Treasury shall withdraw from any available funds in the Treasury of Puerto Rico, such sums as may be necessary to cover the deficiency in the amount required for the payment of such principal and interest, and to bring said reserve fund to the required maximum agreed by the Authority, and shall direct that the sums thus withdrawn be applied to such payment and purpose. For purposes of this Enabling Act, those bonds under the defeasance provisions of the resolution or resolutions by which they were issued shall not be deemed as outstanding. The good faith and credit of the Commonwealth are hereby pledged to make the payments described in the above paragraph.

The Bonds have been specified by the Authority in the Bond Resolution to be guaranteed by the Commonwealth under the Guaranty Act. Following the issuance of the Bonds, the Authority will have $3,154,389,085 aggregate principal amount of bonds outstanding covered by the Guaranty Act, consisting of $43,380,000 of bonds issued under Resolution No. 77, adopted by the Authority on November 16, 1970, as amended (the "1970 Bond Resolution"), $32,585,000 of bonds issued under Resolution No. 158, adopted by the Authority on February 14, 1978, as amended (the "1978 Bond Resolution"), and $3,078,424,085 of bonds issued under the 1995 Bond Resolution, calculated in each case by excluding the accretion on capital appreciation bonds and convertible capital appreciation bonds. See *Debt of the Authority and Debt Service Requirements*.

To date, no payments have ever been required under the Guaranty Act.

## Opinion of the Secretary of Justice of the Commonwealth

Prior to the delivery of the Bonds, the Secretary of Justice of the Commonwealth will have rendered his opinion to the Authority to the effect that:

1.      The Authority is lawfully authorized to specify up to $3,325,000,000 aggregate principal amount of bonds of the Authority outstanding at any one time, issued for any of its authorized purposes, to be covered by the guaranty of the Commonwealth under the Guaranty Act, and the Commonwealth will be obligated to pay the principal of and the interest on the bonds so specified to be covered by said guaranty, if and to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient to make such payments as the same become due;

2.      Any amounts required to be paid by the Commonwealth under said guaranty will constitute "public debt" in the meaning of Section 8 of Article VI of the Puerto Rico Constitution, and will accordingly be entitled to the same priority of payment under such Section as the direct bonded indebtedness of the Commonwealth;

3.      The Secretary of Treasury can be required in a court of justice under the provisions of Section 2 of Article VI of the Puerto Rico Constitution to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI, including any payments required to be made under said guaranty, at the suit of any holder of bonds issued by the Authority and guaranteed pursuant to the Guaranty Act; and

4.      The Commonwealth guaranty of the Bonds constitutes a general obligation of the Commonwealth to which its good faith, credit and taxing power are pledged.

**Lease Agreements**

In accordance with the provisions of the 1995 Bond Resolution, the Authority enters into lease agreements (the "Lease Agreements") with various departments, agencies, instrumentalities and municipalities of the Commonwealth with respect to the Leased Facilities.  The Lease Agreements require the corresponding lessees to pay to the Authority annual rentals in substantially equal monthly installments.  The rentals are calculated by taking into account the following factors:

(1) the interest on and principal of (including any amortization requirements of) and redemption premium, if any, on Government Facilities Bonds issued to finance or refinance such Leased Facilities,

(2) any amounts necessary to pay the general administrative expenses of the Authority related to the Leased Facilities, and

(3) any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities.

The Lease Agreements may also require the lessees to pay certain amounts on account of the principal of and interest on outstanding notes issued to provide interim financing for the initial development and construction of the Leased Facilities.

Each Lease Agreement with respect to a facility or facilities terminates when the Government Facilities Bonds (as well as any notes issued to provide interim financing) which were issued to finance or refinance the acquisition or construction of such facility or facilities have been paid in full.  All Lease Agreements provide for the adjustment of rentals so that the total amounts payable will be sufficient to meet the required debt service charges.  Each Lease Agreement provides that the obligation of the lessee to pay rentals is absolute and unconditional.

Under the 1995 Bond Resolution, the Authority is required to forward, upon receipt, the portion of the rental payment from the lessees corresponding to the debt service payments on the Bonds (as well as any notes issued to provide interim financing) to the 1995 Fiscal Agent.  From time to time, the Authority experiences delays in the payment of monthly rentals by certain lessees.  In an effort to reduce the frequency and length of those delays, on December 7, 2001, the Authority entered into an Inter-Agency Agreement (the "Inter-Agency Agreement") with Government Development Bank, the Puerto Rico Office of Management and Budget ("OMB") and Treasury pursuant to which OMB instructs Treasury to forward funds necessary to pay rentals under Lease Agreements to Government Development Bank by the 10th day of each month, which funds are, in turn, deposited in a special

15

account of the Authority at Government Development Bank.  The portion of such rentals that will be used to pay debt service on the Authority's bonds is kept in such account for delivery to the respective fiscal agents.  The remainder is forwarded to the Authority to cover its general and administrative expenses related to the Lease Facilities, as well as any amounts necessary to provide and maintain a reserve fund for the replacement of major items of equipment comprising a portion of such Leased Facilities.

During recent fiscal years, the Authority has experienced increased delays in rental payments, as the Commonwealth has experienced growing budget deficits.  Given the budgetary constraints of the Commonwealth, in recent fiscal years OMB has not proposed, and, as a result, the Legislature did not appropriate, sufficient funds to provide the Authority with the aggregate amount of rental payments provided for in the Lease Agreements. Consequently, OMB has been unable to instruct Treasury to forward to Government Development Bank the full amount of rental payments payable under the Lease Agreements.  Nevertheless, OMB has always instructed Treasury to forward to Government Development Bank sufficient funds to pay all interest on and principal of (including any amortization requirements) and redemption premium, if any, on Government Facilities Bonds, as well as a portion of general and administrative expenses of the Authority related to the Leased Facilities.  No funds have been provided to replenish or maintain the reserve for the replacement of major items of equipment comprising a portion of such Leased Facilities, which as of June 30, 2009, had no funds deposited therein.

In recent years there has also been a shortfall between the amounts budgeted by the Authority to cover all of its operational expenses and the actual amounts which the Authority is required to receive in rental payments under Lease Agreements to cover its operating (non-debt service) expenses and contribution to reserves.  For fiscal year 2009, OMB budgeted for the payment of rent to the Authority approximately $145 million less than the amount requested by the Authority.  As of June 30, 2009, the Authority's accumulated rent receivables were $248,449,000, which represents an increase of $74,004,000 over the balance as of June 30, 2008.

As described above, the shortfalls in rental payments have not affected the Authority's ability to pay its debt service, and there have been no defaults or delays in the payment of the principal of or interest on any indebtedness of the Authority.  Although the rental payment delays and the Authority's budgetary shortfalls have caused compliance failures with the Inter-Agency Agreement, OMB, Treasury and Government Development Bank intend to enforce its terms more effectively in the future.

To address the delays and shortfalls in the payment of rental payments, the Authority has undertaken and continues to undertake certain fiscal measures to cover such shortfalls, including:

- Divesting certain real estate that the Authority does not contemplate developing or constructing. During fiscal year 2009, the Authority generated $15 million from the sale of such real estate.

- Ensuring that OMB has proposed sufficient funds in the Commonwealth's proposed budgets for fiscal year 2010 to provide the Authority with the adequate amount of rental payments.

- Implementing various Executive Orders issued by the Governor during the second half of fiscal year 2009 calling for the implementation of measures of austerity, fiscal control and expense reduction, including salary reduction of non-career employees and agency heads, salary freezes, ban on new positions, and the elimination of vacant positions.

- Developing and implementing various operating expense reduction measures, including the implementation of energy reduction, transportation, communication and security services cost savings initiatives, consolidation of office space to obtain additional rental income, and renegotiation of services contracts.

- Implementing effective and consistent collection methods for past due rentals and entering into payment plans with lessees.

The Authority also anticipates that for fiscal year 2010 and beyond, in spite of the Commonwealth's fiscal imbalance, the Legislature will appropriate sufficient funds to cover substantially all the rental payments provided

for in the Lease Agreements.  Accordingly, the budgetary shortfalls currently being experienced by the Authority are expected to be reduced.  Although the Authority proposed a balanced operating budget for fiscal year 2010, the Legislature appropriated a budget of $328,297,000 with a projected shortfall of $1,796,414.

OMB and Government Development Bank have established a six-year plan for the repayment of accumulated debt owed by departments, agencies and instrumentalities of the Commonwealth to certain public corporations, including the Authority.  Pursuant to this plan, OMB scheduled and the Legislature appropriated for fiscal year 2010 approximately $51 million for the amortization of overdue rent to the Authority.  This first installment was paid to the Authority on September 17, 2009.  OMB has agreed to continue requesting annual General Fund appropriations for the payment of such debt.

For further information regarding certain provisions required by the 1995 Bond Resolution to be included in each Lease Agreement in respect of facilities financed or refinanced by the Bonds, see *Summary of Certain Provisions of the 1995 Bond Resolution*.

**Pledge of the Commonwealth to Pay or Advance Rentals**

Under the 1995 Bond Resolution, the Authority has covenanted that if any department, agency, instrumentality or municipality fails to pay any rent when due, the Authority will promptly notify the Secretary of Treasury.

As provided in the Enabling Act, the good faith and credit of the Commonwealth are pledged for the payment of the rent payable under any Lease Agreement with the Authority executed by any of the Commonwealth's executive departments, including, among others, the Department of Education, the Department of Health and the Department of Rehabilitation and Correction (the "Department of Correction"), and any other governmental body created by the Legislature of Puerto Rico and depending mainly on legislative appropriations to meet its operating expenses.

The Enabling Act also provides that if any rent payable to the Authority by any agency or instrumentality (other than a department) under a lease contract is not paid when due, the Commonwealth shall advance the unpaid balance to the Authority.  The Commonwealth pledges its good faith and credit to the making of such advances.  Any advances so made are required to be reimbursed by the particular agency or instrumentality involved.

Payments or advances of rentals by the Commonwealth, as described above, are subject to annual appropriations by the Legislature, which appropriations are legally required to be made.  However, the obligation to make such appropriations is not legally enforceable in view of the sovereign immunity of the Commonwealth and, unlike the obligation to make payments under the guaranty of the Bonds, the obligation to pay or advance rentals does not constitute "public debt" within the meaning of Section 8 of Article VI of the Puerto Rico Constitution.

**Additional Bonds**

Under and in accordance with the provisions and restrictions of the 1995 Bond Resolution, the Authority may issue additional Government Facilities Bonds from time to time to finance additional government facilities or complete the construction of existing government facilities or to refund any bonds issued under the 1995 Bond Resolution, the 1970 Bond Resolution or the 1978 Bond Resolution.  Although the Authority reserves the right to issue additional Public Buildings Authority Revenue Bonds under the 1970 Bond Resolution and Public Buildings Authority Public Education and Health Facilities Bonds under the 1978 Bond Resolution, since the adoption of the 1995 Bond Resolution, the Authority has only issued additional bonds under the 1995 Bond Resolution.

**PROVISIONS RELATING TO PUBLIC DEBT OF THE COMMONWEALTH**

**Payment of Public Debt**

The Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first lien on available Commonwealth taxes and revenues.  Public debt includes general obligation bonds and notes of the

17

Commonwealth and, according to opinions rendered by the Secretary of Justice of Puerto Rico, any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.  Any such guaranty payments, including guaranty payments under the Guaranty Act, are equal in their claim on such available Commonwealth revenues to claims for the payment of debt service on general obligation bonds and notes of the Commonwealth.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highway Authority").  The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose.  The Commonwealth has never applied such amounts to payment of its public debt.

Since fiscal 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth.  The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose.  The Commonwealth has never applied such amounts to the payment of its public debt.

Since November 2006, the Commonwealth imposes a general sales and use tax of 5.5%.  Half of the 5.5% sales and use tax is transferred to a legislatively mandated Dedicated Sales Tax Fund and is not included as Commonwealth internal revenues consistent with the legislation creating the Sales Tax Financing Corporation, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that it is not available revenues pursuant to the aforementioned Constitutional provisions.  See "Major Sources of General Fund Revenues—Sales and Use Taxes" under *Puerto Rico Taxes, Other Revenues, and Expenditures* in the Commonwealth Report.

The Constitution of Puerto Rico expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary of Treasury to require application of available revenues, including surplus, to the payment of principal of and interest on public debt when due.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance.  Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt.  Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes.  Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury and motor vehicle fuel taxes and license fees, which are allocated to the Highway Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.  In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available resources" under the constitutional provisions relating to the public debt.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth were invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest category by Moody's and Standard & Poor's), none of which is eligible to be used for a legal defeasance under Puerto Rico law ("non-eligible investments").  Since bonds refunded with proceeds of non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $949,276,446 in the fiscal year ending June 30, 2016 (based on the assumption that (i) the bonds refunded with non-eligible investments are treated as being outstanding, (ii) the Public Improvement Refunding Bonds, Series 2004 A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (iii) a portion of the Public Improvement Refunding Bonds, Series 2003C, the Public Improvement Refunding Bonds, Series 2004B, a portion of the Public Improvement Bonds of 2006, Series A, a portion of the Public Improvement Refunding Bonds, Series 2007A and the Public Improvement Refunding Bonds, Series 2008B, each of which are also variable rate bonds, bear interest at 12% per annum, and (iv) the public improvement bonds to which the basis swap and the constant maturity swap relate bear interest at their stated interest rates rather than the rates set forth in said swaps).  This amount ($949,276,446) is equal to 12.36% of $7,679,421,000, which is the average of the adjusted internal revenues for the fiscal year ended June 30, 2008 and the preliminary adjusted internal revenues for the fiscal year ended June 30, 2009.  If bonds refunded with non-eligible investments described in the preceding paragraph were treated as not being outstanding, and the interest on the outstanding bonds described in items (ii) through (iv) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements entered into in respect thereof, the percentage referred to in the preceding sentence would be 10.21%.  Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation.  In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.

The Commonwealth's policy has been and continues to be to maintain the amount of such debt prudently below the constitutional limitation.  The proposed Commonwealth budget for fiscal year 2010 does not contemplate the issuance of new Commonwealth general obligation debt.  The Commonwealth is undertaking the refunding and restructuring of several outstanding general obligation bond issues.

Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes.  Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products.  See *Public Corporations* in the Commonwealth Report.  However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case.  Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures.  Debt of public corporations is issued in accordance with their enabling statutes.  Government Development Bank, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

**Commonwealth Guaranteed Debt**

As of July 1, 2009, $3.0 billion of Commonwealth guaranteed bonds of the Authority are outstanding.  Excluding the refunding of the Refunded Interest, maximum annual debt service on these bonds is $250.3 million in fiscal year 2011, with their final maturity being July 1, 2037.  No payments under the Commonwealth guaranty have been required to date for these bonds.

As of June 30, 2009, $267 million of Commonwealth guaranteed bonds of Government Development Bank are outstanding.  No payments under the Commonwealth guaranty have been required for these bonds.

As of June 30, 2009, Government Development Bank holds approximately $181 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The Port of the Americas Authority is authorized to issue and Government Development Bank is authorized to purchase its bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port of the Americas. No payments under the Commonwealth guaranty have been required for these bonds. See "Other Public Corporations—Port of the Americas Authority" under *Public Corporations* in the Commonwealth Report.

As of June 30, 2009, the aggregate outstanding principal amount of obligations of the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed by the Commonwealth are $912 million. This amount consists of $284.7 million in revenue bonds sold to the public, $309.8 million in bonds issued to the United States Department of Agriculture, Rural Development, and $317.5 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under *Public Corporations* in the Commonwealth Report.

## THE AUTHORITY

**General**

The Authority, a body corporate and politic constituting an instrumentality of the Commonwealth exercising public and essential governmental functions, was created on June 19, 1958 by the Enabling Act. Under the Enabling Act, the primary functions of the Authority are to design and construct office buildings, quarters, courts, warehouses, shops, schools, health facilities, social welfare facilities and related facilities for lease to the Commonwealth or any of its departments, agencies, instrumentalities or municipalities. The executive offices of the Authority are located at Roberto Sánchez Vilella Government Center, North Building, 6th Floor, De Diego Avenue, San Juan, Puerto Rico 00940, telephone number (787) 722-0101.

**Powers**

The Authority has broad powers under the Enabling Act, including among others:

- to make contracts and to execute all instruments necessary or convenient for the exercise of any of its powers;

- to acquire any kind of properties and rights therein in any lawful manner, including, without limitation, acquisition by purchase, either by agreement or through the exercise of the power of eminent domain, lease or bequest, and to possess, lease, use and operate any properties or facilities;

- to prepare plans, projects and cost estimates for the construction, improvement or repair of any property or facility;

- to contract with any Commonwealth department, agency or official, or with any private person or entity with regard to the administration of any properties or facilities of the Authority;

- to borrow money and issue bonds of the Authority for any of its corporate purposes, and to secure payment of its bonds by pledge of all or any of its properties, revenues or income; and

- to do all acts necessary or convenient to carry out the powers granted to it.

20

## Puerto Rico Public Buildings Authority
### Debt Service Requirements

| Fiscal Year Ending June 30, | Total Debt Service on Bonds Outstanding under 1970, 1978 and 1995 Bond Resolutions[1] | The Bonds | | | Total Debt Service[3] |
|---|---|---|---|---|---|
| | | Principal | Interest | Total | |
| 2010 | $  174,646,681 | $       - | $    5,734,403 | $    5,734,403 | $   180,381,085 |
| 2011 | 250,313,737 | - | 8,495,413 | 8,495,413 | 258,809,150 |
| 2012 | 242,738,425 | - | 8,495,413 | 8,495,413 | 251,233,838 |
| 2013 | 222,872,219 | - | 8,495,413 | 8,495,413 | 231,367,632 |
| 2014 | 222,714,007 | - | 8,495,413 | 8,495,413 | 231,209,419 |
| 2015 | 222,558,919 | - | 8,495,413 | 8,495,413 | 231,054,332 |
| 2016 | 222,306,857 | - | 8,495,413 | 8,495,413 | 230,802,269 |
| 2017 | 222,347,907 | - | 8,495,413 | 8,495,413 | 230,843,319 |
| 2018 | 190,402,569 | - | 8,495,413 | 8,495,413 | 198,897,982 |
| 2019 | 187,592,619 | - | 8,495,413 | 8,495,413 | 196,088,032 |
| 2020 | 190,969,432 | - | 8,495,413 | 8,495,413 | 199,464,844 |
| 2021 | 213,451,919 | - | 8,495,413 | 8,495,413 | 221,947,332 |
| 2022 | 166,777,413 | 8,200,000 | 8,495,413 | 16,695,413 | 183,472,825 |
| 2023 | 190,291,100 | - | 8,075,163 | 8,075,163 | 198,366,263 |
| 2024 | 175,397,544 | - | 8,075,163 | 8,075,163 | 183,472,707 |
| 2025 | 203,495,925 | - | 8,075,163 | 8,075,163 | 211,571,088 |
| 2026 | 197,014,549 | - | 8,075,163 | 8,075,163 | 205,089,711 |
| 2027 | 203,164,004 | - | 8,075,163 | 8,075,163 | 211,239,166 |
| 2028 | 203,492,332 | - | 8,075,163 | 8,075,163 | 211,567,494 |
| 2029 | 203,494,162 | - | 8,075,163 | 8,075,163 | 211,569,325 |
| 2030 | 203,490,763 | - | 8,075,163 | 8,075,163 | 211,565,925 |
| 2031 | 203,490,488 | - | 8,075,163 | 8,075,163 | 211,565,651 |
| 2032 | 203,489,138 | - | 8,075,163 | 8,075,163 | 211,564,301 |
| 2033 | 203,490,731 | - | 8,075,163 | 8,075,163 | 211,565,894 |
| 2034 | 203,491,624 | - | 8,075,163 | 8,075,163 | 211,566,786 |
| 2035 | 219,146,576 | - | 8,075,163 | 8,075,163 | 227,221,739 |
| 2036 | 203,491,133 | - | 8,075,163 | 8,075,163 | 211,566,295 |
| 2037 | 23,919,000 | 38,620,000 | 8,075,163 | 46,695,163 | 70,614,163 |
| 2038 | - | 51,410,000 | 5,951,063 | 57,361,063 | 57,361,063 |
| 2039 | - | 54,310,000 | 3,054,938 | 57,364,938 | 57,364,938 |
| **Total** [2] | $ 5,570,051,771 | $ 152,540,000 | $ 237,812,791 | $ 390,352,791 | $ 5,960,404,562 |

_____
(1) Does not include Refunded Interest.
(2) Totals may not add due to rounding.
(3) Total debt service does not reflect capitalized interest.

### SUMMARY OF CERTAIN PROVISIONS OF THE 1995 BOND RESOLUTION

The following statements are brief summaries of certain provisions of the 1995 Bond Resolution.  Such statements do not purport to be complete and reference is made to the 1995 Bond Resolution, copies of which are available for examination at the office of the 1995 Fiscal Agent.  For the purposes of this summary, the terms "Bond" or "Bonds" shall refer to the Government Facilities Revenue Bond or Bonds.

**Revenues**

The Authority covenants that each Lease Agreement which it enters into for any government facilities financed or refinanced under the 1995 Bond Resolution ("Authority Facilities") will require the Lessee thereunder to pay rentals which in the aggregate will be sufficient to provide the sums needed from time to time to pay the interest on all Bonds issued by the Authority for the financing or refinancing of the Authority Facilities covered by such Lease Agreement, the principal of all such Bonds which are serial Bonds and the amortization requirements and redemption premium for any such Bonds which are term Bonds ("1995 Debt Service Rentals").  (Section 701).  All 1995 Debt Service Rentals received from the leasing of Authority Facilities are pledged as hereinafter provided.

25

**1995 Sinking Fund**

A special fund is created by the 1995 Bond Resolution and designated "Puerto Rico Public Buildings Authority Government Facilities Revenue Bonds Sinking Fund" (the "1995 Sinking Fund"). Two separate accounts are created in the 1995 Sinking Fund, namely, the "1995 Bond Service Account" and the "1995 Redemption Account" (Section 502).

The Authority covenants that all 1995 Debt Service Rentals will be collected by the Authority and immediately deposited with the 1995 Fiscal Agent to the credit of the following accounts in the following order:

(1)     To the 1995 Bond Service Account, such amount thereof as may be required to make the amount then to the credit of the 1995 Bond Service Account equal to the amount of interest then due and payable and the interest which will accrue up to the next interest payment date on all Bonds of each series then outstanding and the principal of all serial Bonds, if any, which will become due and payable within the next ensuing twelve months;

(2)     To the 1995 Redemption Account, such amount of the balance remaining after making the deposit under paragraph (1) above as may be required to make the amounts so deposited in the then current fiscal year equal to the amortization requirements, if any, for such fiscal year for the term Bonds of each series then outstanding, plus the premium, if any, which would be payable on a like principal amount of Bonds if such principal amount of Bonds should be redeemed on the next redemption date from moneys in the 1995 Sinking Fund; and

(3)     The balance, if any, shall be deposited to the credit of the 1995 Bond Service Account. (Section 502).

The requirements specified in paragraphs (1) and (2) above shall be cumulative. (Section 502).

**1995 Redemption Account**

Moneys in the 1995 Redemption Account shall be applied to the retirement of Bonds as follows:

(a)     Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the 1995 Sinking Fund. The 1995 Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the 1995 Bond Service Account and the purchase price from the 1995 Redemption Account, but no such purchase shall be contracted for within the period of 45 days next preceding any interest payment date on which such Bonds are subject to call for redemption under the provisions of the 1995 Bond Resolution.

(b)     Subject to the provisions of paragraph (c) below, the 1995 Fiscal Agent shall call for redemption on each date on which Bonds are subject to redemption from moneys which are in the 1995 Sinking Fund on the 45th day prior to such redemption date such amount of Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the 1995 Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time. Such redemption shall be made in accordance with the provisions of the 1995 Bond Resolution. Not less than 30 days before the redemption date the 1995 Fiscal Agent shall withdraw from the 1995 Bond Service Account and from the 1995 Redemption Account and set aside in separate accounts the respective amounts required for paying the principal of and redemption premium, if any, and the interest on the Bonds so called for redemption.

(c)     Moneys in the 1995 Redemption Account shall be applied by the 1995 Fiscal Agent in each fiscal year to the purchase or redemption of Bonds of each series then outstanding in the following order:

*first*, the term Bonds of each such series to the extent of the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable

26

premium, if any; and if the amount available in such fiscal year shall not be equal thereto, then, in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding, plus the applicable premium, if any;

*second*, any balance then remaining shall be applied to the purchase of any Bonds whether or not such Bonds shall be subject to redemption in accordance with paragraph (a) above;

*third*, any balance then remaining shall be applied to the redemption of term Bonds of each such series in proportion to the amortization requirement, if any, for such fiscal year for the term Bonds of each such series then outstanding plus the applicable premium, if any; and

*fourth*, after the retirement of all term Bonds, any balance still remaining shall be applied to the retirement of the serial Bonds of each series in proportion to the aggregate principal amount of the serial Bonds of such series originally issued under the provisions of the 1995 Bond Resolution.  (Section 504).

The term "Principal and Interest Requirement" for any fiscal year, as applied to the Bonds of any series under the 1995 Bond Resolution, shall mean the sum of:

(a)      the amount required to pay the interest on all outstanding Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year;

(b)      the amount required to pay the principal of all outstanding serial Bonds of such series which is payable after July 31 of such fiscal year and on or before July 31 in the following fiscal year; and

(c)      the amortization requirement for the term Bonds of such Series for such fiscal year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements for any period:

(i)      in the case of Capital Appreciation Bonds, the Accreted Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of the principal or amortization requirements in accordance with the above provisions;

(ii)      in the case of Capital Appreciation and Income Bonds, the Appreciated Value becoming due at maturity or by virtue of an amortization requirement shall be included when due and payable as part of principal or amortization requirements in accordance with the above provisions;

(iii)      the interest rate on Bonds issued with a variable, adjustable, convertible or similar rate of interest shall be the average rate of interest per annum on such Bonds for the preceding twelve months or such shorter period that such Bonds shall have been outstanding, or if such Bonds had not been outstanding prior to the date of calculation, the rate of interest on such Bonds on the date of calculation;

(iv)      in the case of Bonds which by their terms may be tendered at the option of the holder thereof for payment prior to maturity, the tender date or dates shall be ignored if the tender price for such Bonds is payable from a letter of credit or insurance policy or similar credit or liquidity facility and the stated dates for amortization requirements and principal payments shall be used; provided, however, that if on the date of calculation the issuer of the letter of credit or insurance policy or similar credit or liquidity facility has advanced funds thereunder and such amount has not been repaid, Principal and Interest Requirements shall include the repayment obligations thereof in accordance with the principal repayment schedule and interest rate or rates specified in (or specified in the agreement authorizing the issuance of) the letter of credit or insurance policy or similar credit or liquidity facility;

(v)      in the case of Bonds the maturity of which may be extended by and at the option of the holder thereof or the Authority, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended; and

27

(vi)       in the case of Bonds (A) which are expected to be repaid from the proceeds of Bonds or other indebtedness or (B) on which interest is payable periodically and for which 25% or more of the principal amount matures during any one year and for which no amortization requirements have been established, the debt service requirements on the Bonds may be excluded and in lieu thereof the Bonds shall be treated, for purposes of the computation of Principal and Interest Requirements, as debt securities having a comparable federal tax status to that of such Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than thirty years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Bonds and issued by issuers having a credit rating, by Moody's or any successors thereto or Standard & Poor's or any successors thereto, comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities.  (Section 101).

Notwithstanding the foregoing, if the Authority has notified the 1995 Fiscal Agent that an interest rate swap agreement is in effect in respect of any Bonds, then for all purposes of the above paragraphs, except for the purpose of determining the required deposits to the 1995 Sinking Fund pursuant to Section 502 of the 1995 Bond Resolution, the interest rate on such Bonds shall be the interest rate calculated with reference to such interest rate swap agreement; and if such rate calculated with reference to such interest rate swap agreement is a variable rate, the interest rate on such Bonds (except for the purpose specified above in this sentence) shall be the average interest rate calculated with reference to such interest rate swap agreement for the preceding twelve months or such shorter period that the interest rate swap agreement has been in effect, or if such interest rate swap agreement had not been in effect prior to the dates of calculation, the interest rate calculated with reference to such interest rate swap agreement on the date of calculation.  (Section 101).

**1995 Construction Fund**

The balance of proceeds of Bonds issued under Section 208 of the 1995 Bond Resolution available for payment of construction costs is required to be deposited to the credit of the Construction Fund under the 1995 Bond Resolution (the "1995 Construction Fund") and applied to the payment of the cost of the Initial Facilities, Additional Facilities, Improvements and uncompleted Facilities for which such Bonds were issued.  (Section 208).

Payments from the 1995 Construction Fund shall be disbursed by check signed by the Treasurer of the Authority or by any officer or employee of the Authority designated by resolution of the Authority.  (Section 402). Any balance remaining in the 1995 Construction Fund from time to time after the completion of the Authority Facilities and Improvements theretofore financed by the Authority may, at the option of the Authority, be deposited to the credit of the 1995 Redemption Account or the 1995 Bond Service Account.  (Section 404).

**Additional Bonds**

Additional Bonds may be issued from time to time to provide funds to pay all or any part of any remaining costs of the Initial Facilities or to pay all or any part of the cost of any Additional Facilities or Improvements to Authority Facilities financed under the 1995 Bond Resolution or any uncompleted part of the Initial Facilities or Additional Facilities or Improvements, and to pay any notes or other obligations of the Authority therefore issued, or to repay any advances made from any source, to finance such costs; provided that no such Bonds shall be issued unless under the then existing law such Bonds may be specified by the Authority to be covered by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such Bonds by resolution.  Before any such Additional Bonds may be issued, there must be filed with the 1995 Fiscal Agent, among other things, a certificate signed by the Executive Director of the Authority stating that on the basis of all Lease Agreements or amendments or supplements thereto, as executed and delivered or as expected to be executed and delivered, the 1995 Debt Service Rentals, as calculated by the Authority will be sufficient and timely to pay the principal of; and the redemption premium, if any, and interest on, such Bonds and all Bonds then outstanding.  (Section 208).

Refunding bonds, including crossover refunding bonds, may be issued by the Authority at any time or times for the purpose of providing funds for refunding at or prior to their maturity or maturities all or any part of (i) the outstanding Bonds of any series, or (ii) the outstanding debt of the Authority incurred to finance Authority Facilities as defined in the 1970 Bond Resolution or in the 1978 Bond Resolution, in either case including the payment of any

redemption premium prior thereto; provided that no such refunding bonds shall be issued unless under the then existing law such bonds may be specified by the Authority to be covered (as of the crossover date with respect to crossover refunding bonds) by the guaranty of the Commonwealth under the Guaranty Act and the Authority so specifies such refunding bonds by resolution.  (Section 209).

## Investment of Funds

The 1995 Bond Resolution provides for the following types of investments:

(a)  Government Obligations which are (i) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States Government, (ii) obligations (including participation certificates) issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, including but not limited to those of the Federal Home Loan Mortgage Corporation, Federal Home Loan Banks, the Farm Credit System, Federal National Mortgage Association and the Student Loan Marketing Association, (iii) municipal obligations, the payment of the principal of, interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) or (ii) above or (iv) below and which obligations are not subject to redemption prior to the date on which the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations and which municipal obligations are rated in the highest category (without regard to any gradation within such category) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, and (iv) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii) and (iii) above held by a national banking association or bank (including the 1995 Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the obligor on the underlying obligation described above, and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

(b)  Investment Obligations which are (i) Government Obligations, (ii) obligations of any state or territory of the United States of America which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto, (iii) bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the 1995 Fiscal Agent), any trust company or any savings and loan association (including any investment in pools of such bankers' acceptances, certificates, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, national banking association, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clause (i) or (ii) above, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1995 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties, (iv) any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth of Puerto Rico or any national banking association (including the 1995 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any or more of the securities described in clause (i) or (ii) above, in which securities the 1995 Fiscal Agent has a perfected first security interest and such securities are held free and clear of claims by third parties, or if not so secured, meets the rating requirements set forth in clause (vii) below, (v) participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any gradations within such categories) by both Moody's or any successors thereto, and Standard & Poor's or any successors thereto, (vi) (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to gradations within such category) and (a) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and meets the requirements of Section 852(a) of said Code for the calendar year; (b) invests all of its assets in Government Obligations or in Investment Obligations described in clause (ii) above; and (c) has at least 98% of

29

(I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the 1995 Fiscal Agent or any state or federally chartered bank, banking association, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and Standard & Poor's or any successors thereto (without regard to any gradations within such category), and (vii) any other investment obligations which are rated, which are issued by issuers which are rated, or which are backed by letters of credit or lines of credit the provider of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such categories) by both Moody's or any successors thereto and Standard & Poor's or any successors thereto or which are collateralized by such Investment Obligations. (Section 101).

Moneys held in the 1995 Construction Fund, the 1995 Bond Service Account and the 1995 Redemption Account shall, as nearly as practicable, be invested and reinvested in Investment Obligations, which mature, or are subject to redemption by the holder thereof at the option of such holder not later than the dates when the moneys held for the credit thereof will be required for the purposes intended. (Section 602).

**General Covenants**

The Authority covenants that it will not agree to any amendment, modification or termination of any Lease Agreements of any Authority Facilities (or exercise any right it may have to rescind the lease of any lessee of space in any Authority Facilities) which would reduce the amounts of rental payments below the amounts required by Section 701 of the 1995 Bond Resolution or postpone the times of making such rental payments or which would otherwise materially and adversely affect the security of the bondholders (Section 702), that it will not create or suffer to be created any lien or charge upon the Authority Facilities or any part thereof or upon the 1995 Debt Service Rentals therefrom, other than the liens and charges created or permitted under the 1995 Bond Resolution (Section 705), and that each Lease Agreement will provide that the obligation of the lessee to pay timely the required rentals thereunder shall be absolute and unconditional. (Section 709).

The Authority covenants that it will not dispose of or encumber any Authority Facilities, unless (a) the Authority determines that notwithstanding such disposition or encumbrance, total rents under each Lease Agreement will be sufficient to provide the sums required under Section 701 of the 1995 Bond Resolution, and (b) the Authority will receive as the price for any such disposition (but not an encumbrance), together with any other available moneys, the total amount of the 1995 Debt Service Rentals which would otherwise have been payable by the lessees of such Authority Facilities during the remaining term of the related Lease Agreements plus such additional amounts as will be necessary to pay the fees and expenses of the 1995 Fiscal Agent and all other expenses in connection with the application of the proceeds of such sale to the payment of the principal of and interest on outstanding Bonds issued by the Authority under the 1995 Bond Resolution including any redemption premiums. The proceeds of any such disposition (other than an encumbrance) shall be promptly deposited in the 1995 Redemption Account.

The Authority may also from time to time dispose of or encumber any fixtures or movable property in connection with the Authority Facilities or any materials used in connection therewith, if the Authority determines that such articles are no longer needed or useful in connection with the construction or operation or maintenance of the Authority Facilities and the proceeds thereof (other than an encumbrance) shall be applied to the replacement of the property so disposed of or at the option of the Authority shall be deposited to the credit of the 1995 Redemption Account. (Section 708).

Each Lease Agreement is required to provide that it may not be assigned or otherwise transferred in whole or in part by either party (unless the conditions set forth under the 1995 Bond Resolution for a termination of such Lease Agreement have been met), and will provide that all or any part of the Authority Facilities covered by such Agreement may be subleased as a whole or in part by the lessee if, among other things the following conditions have been met: (a) the sublessee under the sublease shall be a department, agency or instrumentality of the Commonwealth unless the Authority shall have obtained an opinion of nationally recognized bond counsel that such sublease will not cause interest on any Bonds to be includable in gross income of the owners thereof for federal income tax purposes (other than Bonds for which such interest is intended not to be excludable in gross income for such purposes); (b) such lessee shall acknowledge in writing that it shall continue to remain liable for the payment

30

of all rentals under such Lease Agreement; and (c) there shall have been delivered to the Authority and such lessee (i) if the sublessee is a department of the Commonwealth, a certificate signed by the Secretary or an Assistant Secretary of such department stating that on the basis of budgeted appropriations for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to timely pay all rentals which will be due and payable during such fiscal year, or (ii) if the sublessee is an agency or instrumentality of the Commonwealth, a certificate signed by the chief executive officer of the sublessee stating that on the basis of budgeted appropriations and/or estimate revenues for the sublessee for the fiscal year in which the sublease is to become effective the sublessee will have available funds sufficient to pay timely all rentals which will be due and payable during such fiscal year.  (Section 710).

The Authority covenants that it will cause audits to be made of its books and accounts by an independent firm of certified public accountants chosen by the Authority.  Reports of such audits shall, among other things, set forth the findings of such certified public accountants as to whether the moneys received by the Authority under the 1995 Bond Resolution have been applied in accordance with the provisions thereof.  Copies of such reports shall be filed with the 1995 Fiscal Agent and shall be mailed by the Authority to each bondholder who shall have filed his name and address with the Secretary of the Authority for such purpose.  (Section 712).

**Modifications**

The Authority may adopt resolutions supplemental to the 1995 Bond Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission or to correct any inconsistent provisions or errors in the 1995 Bond Resolution; provided such action shall not adversely affect the interests of the bondholders, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security that may lawfully be granted to or conferred upon the bondholders, or to add to the conditions, limitations and restrictions on the issuance of Bonds, or to add to the covenants and agreements of the Authority in the 1995 Bond Resolution or to surrender any right or power reserved to or conferred upon the Authority.  (Section 901).

The holders of not less than a majority in aggregate principal amount of the Bonds then outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the 1995 Bond Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the 1995 Bond Resolution; provided, however, that nothing contained in the 1995 Bond Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, (c) the creation of a lien upon or a pledge of 1995 Debt Service Rentals other than the liens and pledges created by or pursuant to the 1995 Bond Resolution, (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution.  (Section 902).  No supplemental resolution may, however, change, amend or modify the rights or obligations of the 1995 Fiscal Agent under the 1995 Bond Resolution without the written consent of the 1995 Fiscal Agent.  (Section 904).

**Notice of Default**

In the event that (i) on the second business day prior to the date on which a payment of interest, principal, or premium, if any, is due on any Bond there is not an amount sufficient in such account or fund as the 1995 Fiscal Agent may draw upon for the payment on such due date of such interest, principal, or premium, or (ii) the Authority shall default in the due and punctual making of any 1995 Sinking Fund deposit required by Section 502 of the 1995 Bond Resolution, the 1995 Fiscal Agent shall promptly give written notice of such insufficiency or default, as the case may be, to the Authority, the Secretary of Treasury and Government Development Bank.  In the event that the Authority shall default in the due and punctual performance of any other covenants or agreements in the Bonds or the 1995 Bond Resolution and the 1995 Fiscal Agent shall have knowledge of, or is notified of, such default, and the Authority shall fail to correct such default within 30 days after notice thereof to the Authority by the 1995 Fiscal Agent, the 1995 Fiscal Agent shall promptly give notice of such default to the Secretary of Treasury and Government Development Bank.  (Section 804).

The 1995 Bond Resolution and the Bonds do not provide for acceleration of the maturities of the Bonds in the event of a default thereunder or in any other circumstances and do not provide that the bondholders may require the 1995 Fiscal Agent to take any action on their behalf.

**TAX MATTERS**

**Federal Income Taxes**

The Internal Revenue Code of 1986, as amended (the "Code"), imposes certain requirements that must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 (the "Tax Certificate"), the Authority and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Authority and the Commonwealth have made certain representations and certifications in the Bond Resolution and the Tax Certificate. Bond Counsel will not independently verify the accuracy of those representations and certifications.

In the opinion of Nixon Peabody LLP, Bond Counsel, under existing law and assuming compliance with the aforementioned covenant, and the accuracy of certain representations and certifications made by the Authority and the Commonwealth described above, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. Bond Counsel is also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. No opinion is expressed as to whether interest on any portion of the Bonds is excluded from the adjusted current earnings of corporations for purposes of computing the alternative minimum tax imposed on corporations.

**State Taxes**

Bond Counsel is also of the opinion that, under existing statutes, interest on the Bonds is exempt from state, Commonwealth and local income taxation. Bond counsel expresses no opinion as to other state, Commonwealth or local tax consequences arising with respect to the Bonds.

**Original Issue Discount**

Bond Counsel is further of the opinion that the difference between the principal amount of all of the Bonds other than the Bonds maturing on July 1, 2022, July 1, 2037 and July 1, 2039 (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for federal income tax purposes to the same extent as interest on the Bonds. Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount. The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment. Owners of the Discount Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Discount Bonds.

**Original Issue Premium**

The Bonds maturing on July 1, 2038 (collectively, the "Premium Bonds") are being offered at prices in excess of their principal amounts. An initial purchaser with an initial adjusted basis in a Premium Bond in excess of its principal amount will have amortizable bond premium which is not deductible from gross income for federal income tax purposes. The amount of amortizable bond premium for a taxable year is determined actuarially on a

32

constant interest rate basis over the term of each Premium Bond based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, over the period to the call date, based on the purchaser's yield to the call date and giving effect to any call premium).  For purposes of determining gain or loss on the sale or other disposition of a Premium Bond, an initial purchaser who acquires such obligation with an amortizable bond premium is required to decrease such purchaser's adjusted basis in such Premium Bond annually by the amount of amortizable bond premium for the taxable year.  The amortization of bond premium may be taken into account as a reduction in the amount of tax-exempt income for purposes of determining various other tax consequences of owning such Bonds.  Owners of the Premium Bonds are advised that they should consult with their own advisors with respect to the state and local tax consequences of owning such Premium Bonds.

## Ancillary Tax Matters

Ownership of the Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit.  Ownership of the Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Bonds; for certain bonds issued during 2009 and 2010, the American Recovery and Reinvestment Act of 2009 modifies the application of those rules as they apply to financial institutions.  Prospective investors are advised to consult their own tax advisors regarding these rules.

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations.  In addition, interest on the Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any Federal tax matters other than those described in the opinions attached as *Appendix I*.  Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

## Changes in Law and Post Issuance Events

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Bonds.  This could result from changes to Federal or state income tax rates, changes in the structure of Federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Bonds from gross income for Federal or state income tax purposes, or otherwise.  It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the Federal or state income tax treatment of holders of the Bonds may occur.  Prospective purchasers of the Bonds should consult their own tax advisers regarding such matters.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Bonds may affect the tax status of interest on the Bonds.  Bond Counsel expresses no opinion as to any Federal, state or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

## UNDERWRITING

The Underwriters, represented by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Authority at an aggregate purchase price of $149,086,963.43 reflecting an original issue discount of $2,410,905.00 and an

underwriters' discount of $1,042,131.57 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover page hereof.  The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased.  The Bonds may be offered and sold to certain dealers (including dealers depositing Bonds into investment trusts) and institutional purchasers at prices lower or yields higher than such public offering prices or yields, and such offering prices or yields may be changed, from time to time, by the Underwriters.

Merrill Lynch and Santander Securities Corporation ("SSC") have agreed to provide services and advice to each other related to the structuring and execution of the underwriting of the Bonds in accordance with the terms and provisions of a joint venture agreement which was entered into between SSC and Banc of America Securities LLC ("BAS") (Merrill Lynch and BAS are now affiliated broker-dealers).  SSC and Merrill Lynch will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth.  Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers.  Compensation with respect to the underwriting of the securities will be allocated between them.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## LEGAL MATTERS

The proposed form of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, is set forth in *Appendix I* to this Official Statement.  Certain legal matters will be passed upon for the Underwriters by their counsel, McConnell Valdés LLC, San Juan, Puerto Rico.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the Bonds offered hereby.  As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds.  Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations.  Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Bonds have been assigned ratings of "Baa3" by Moody's and of "BBB-" by Standard & Poor's.

The ratings reflect only the respective opinions of such rating agencies and an explanation of the significance of such ratings may be obtained only from the respective rating agency.  Such rating agencies were

provided with materials relating to the Authority, the Commonwealth, the 1995 Bond Resolution, the Bonds and other relevant information.  No application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that any ratings obtained will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies if, in the judgment of either or both, circumstances so warrant.  Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Commonwealth and the Authority have covenanted to the following for the benefit of the Beneficial Owners (generally the tax owners of the Bonds):

1.      The Commonwealth will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2009, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited annual financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case of the type included or incorporated by reference in this Official Statement;

2.      The Authority will file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2009, with the MSRB through EMMA, (i) the Authority's audited financial statements for the prior fiscal year prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) other financial information or operating data regarding the Authority included herein; and

3.      The Authority will file in a timely manner through EMMA notice of failure of the Commonwealth to comply with clause 1 above and of the Authority to comply with clause 2 above, and notice of any of the following events with respect to the Bonds, if material:

    (a)      principal and interest payment delinquencies;

    (b)      non-payment related defaults;

    (c)      unscheduled draws on debt service reserves reflecting financial difficulties;

    (d)      unscheduled draws on credit enhancements reflecting financial difficulties;

    (e)      substitution of credit or liquidity providers, or their failure to perform;

    (f)      adverse opinions or events affecting the exclusion from gross income for federal income tax purposes of interest on the Bonds;

    (g)      modifications to rights of security holders;

    (h)      bond calls;

    (i)      defeasances;

    (j)      release, substitution, or sale of property, securing repayment of the Bonds; and

    (k)      rating changes.

Event (c) and (e) are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995.  However, events (c) and (e) may not be applicable, since the terms of the Bonds do not provide for "debt service reserves" or "liquidity providers."  In addition, with respect to the following events:

Events (d) and (e). The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the Bonds, see *Tax Matters*.

Event (h). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement in "Redemption Provisions" under *The Bonds*, (ii) the only other issue is which Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the holders of the Bonds as required under the terms of the Bonds, and (iv) public notice of the redemption is given pursuant to Exchange Act Release No. 34-23856 of the SEC; even if the originally scheduled amounts are reduced by prior optional redemptions or Bond purchases.

The Commonwealth expects to provide the information described in clause 1 above by filing its first official statement or similar disclosure document that includes such information for the preceding fiscal year or, if no such official statement or similar disclosure document is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth has made similar continuing disclosure covenants in connection with prior bond issuances, and has complied with all such covenants, except hereinafter noted. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009 because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying the submission of the Commonwealth's audited financial statements. The Commonwealth Report for the fiscal years ended June 30, 2004, 2006 and 2008, were filed after the deadline due to a delay in its preparation.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Authority, such other events are material with respect to the Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific performance of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. §3077 and §3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if.

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or

type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Authority or the Commonwealth; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Covenants have been made in order to assist the Underwriters in complying with the Rule.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1995 Bond Resolution, the Lease Agreements with respect to the facilities that are to be financed or refinanced in whole or in part by the Bonds, the various Acts, and the Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions. Appended to, and constituting a part of, this Official Statement is the proposed form of opinions of Nixon Peabody LLP, Bond Counsel (*Appendix I*).

The information set forth in *Provisions Relating to Public Debt of the Commonwealth* and in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information set forth in this Official Statement, except the information appearing in *Provisions Relating to Public Debt of the Commonwealth*, *Underwriting* and "Book-Entry Only System" under *The Bonds*, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority. The information pertaining to "Book-Entry Only System" was supplied by DTC.

Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact.

This Official Statement will be filed with the MSRB.

**PUERTO RICO PUBIC BUILDINGS AUTHORITY**

/s/   Jesús F. Méndez
Executive Director

37

APPENDIX I



437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

_____ __, 2009

Puerto Rico Public Buildings Authority
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Public Buildings Authority (the "Authority"), a body corporate and politic constituting an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") created pursuant to Act No. 56 of the Legislature of Puerto Rico, approved June 19, 1958, as amended, (the "Enabling Act"), of its $152,540,000 aggregate principal amount of Government Facilities Revenue Refunding Bonds, Series Q Guaranteed by the Commonwealth of Puerto Rico (the "Bonds").  We have also examined Act No. 17 of the Legislature of Puerto Rico, approved April 11, 1968, as amended (the "Guaranty Act"), providing for the guaranty by the Commonwealth of the payment of the principal of and interest on a principal amount of bonds outstanding at any one time of the Authority, not exceeding $3,325,000,000, specified by the Authority to be covered by such guaranty, to the extent that the revenues and other moneys of the Authority pledged to the payment of such principal and interest are not sufficient for that purpose.

The Bonds are being issued under and secured by Resolution No. 468, adopted by the Authority on June 22, 1995, as amended and supplemented (the "1995 Resolution") and a supplemental resolution thereto fixing the terms of the Bonds, adopted by the Authority on October 16, 2009 (the "Bond Resolution" and together with the 1995 Resolution, the "Resolution").  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are being issued to provide funds to refund interest (but not principal) of certain bonds issued by the Authority under the 1995 Resolution.

The Authority is authorized to issue additional bonds for the purpose of paying all or a part of the cost of government facilities and improvements of such facilities and refunding bonds for refunding any bonds issued by the Authority under the provisions of the 1995 Resolution, under Resolution No. 77, adopted by the Authority on November 16, 1970, as supplemented, or under Resolution No. 158, adopted by the Authority on February 14, 1978, as

I-1

Exhibit A

00027

supplemented, only upon the terms and conditions set forth in the Resolution, and such bonds, when issued, shall, with all the Bonds, be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the Resolution.

The Bonds are dated, mature, are payable and bear interest in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in denominations of $5,000 each or any integral multiple thereof and will be initially registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York, which will act as securities depository for the Bonds.

As Bond Counsel we have examined (i) the Enabling Act, (ii) the Guaranty Act, (iii) certified copies of the proceedings of the Authority authorizing the issuance of the Bonds (iv) the 1995 Resolution, (v) the Bond Resolution and (vi) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

Based upon the foregoing, we are of the opinion, under existing law, as follows:

1.      The Enabling Act is valid.

2.      The Guaranty Act is valid.

3.      The proceedings of the Authority in connection with the authorizing, issuance and sale of the Bonds has been validly and legally taken.

4.      The Authority has properly specified the Bonds to be covered by the guaranty of the Commonwealth under the Guaranty Act.

5.      The Enabling Act and such proceedings show lawful authority of the issuance and sale of the Bonds by the Authority.

6.      The good faith and credit of the Commonwealth are pledged for the payment of any amounts required to be paid by the Commonwealth pursuant to said guaranty.

7.      As authorized by the Enabling Act and by said proceedings, the 1995 Resolution and the Bond Resolution have each been duly adopted by the Authority.

8.      The Bonds have been duly authorized, executed and delivered by the Authority and constitute legal, valid, binding and enforceable obligations of the Authority

payable from and secured by a pledge of the rentals of government facilities financed or refinanced by such bonds and leased by the Authority to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

9.      The Internal Revenue Code of 1986 (the "Code") sets forth certain requirements which must be met subsequent to the issuance and delivery of the Bonds for interest thereon to be and remain excluded from gross income for Federal income tax purposes. Noncompliance with such requirements could cause the interest on the Bonds to be included in gross income for Federal income tax purposes retroactive to the date of issue of the Bonds. Pursuant to the Bond Resolution and the Tax Certificate as to Arbitrage and the Provisions of Sections 103 and 141-150 of the Internal Revenue Code of 1986 of even date herewith (the "Tax Certificate"), the Authority and the Commonwealth have covenanted to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Bonds from gross income for Federal income tax purposes pursuant to Section 103 of the Code. In addition, the Authority and the Commonwealth have made certain representations and certifications in its Bond Resolution and Tax Certificate.  We have not undertaken to independently verify the accuracy of those certifications and representations.

Under existing law, assuming compliance with the aforementioned tax covenants and the accuracy of the aforementioned representations and certifications, interest on the Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Code. We are also of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. No opinion is expressed as to whether interest on any portion of the Bonds is excluded from the adjusted current earnings of corporations for purposes of computing the alternative minimum tax imposed on corporations.

10.      The interest on the Bonds is exempt from state, Commonwealth and local income taxation.

11.      Bond Counsel is further of the opinion that the difference between the principal amount of the Bonds maturing on July 1, 2022, July 1, 2037 and July 1, 2039 (collectively the "Discount Bonds") and the initial offering price to the public (excluding bond houses, brokers or similar persons or organizations acting in the capacity of underwriters or wholesalers) at which price a substantial amount of such Discount Bonds of the same maturity was sold constitutes original issue discount which is excluded from gross income for Federal income tax purposes to the same extent as interest on the Bonds.  Further, such original issue discount accrues actuarially on a constant interest rate basis over the term of each Discount Bond and the basis of each Discount Bond acquired at such initial offering price by an initial purchaser thereof will be increased by the amount of such accrued original issue discount.  The accrual of original issue discount may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Discount Bonds, even though there will not be a corresponding cash payment.

Except as stated in paragraphs 9 through 11 above, we express no opinion as to any other Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds.  Furthermore, we express no opinion as to any Federal, state,

I-3

Commonwealth or local tax law consequences with respect to the Bonds, or the interest thereon, if any action is taken with respect to the Bonds or the proceeds thereof upon the advice or approval of other counsel.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

I-4



KOBRE & KIM | DISPUTES AND INVESTIGATIONS

**The Financial Oversight & Management Board for Puerto Rico Independent Investigator**

**FINAL INVESTIGATIVE REPORT**

Kobre & Kim LLP | AUGUST 20, 2018

Exhibit B

00031

# THE INDEPENDENT INVESTIGATOR'S

# FINAL INVESTIGATIVE REPORT

# THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO

# SPECIAL INVESTIGATION COMMITTEE

# INDEPENDENT INVESTIGATOR'S

# FINAL INVESTIGATIVE REPORT

\*

**SUBMITTED BY:**

**THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO**

**SPECIAL INVESTIGATIVE COMMITTEE**

**INDEPENDENT INVESTIGATOR**

**KOBRE & KIM LLP**

Pursuant to The Puerto Rico Oversight, Management and Economic Stability Act of 2016, Sections 101(b), 104(o) and PROMESA Investigative Procedures Sections 1.3(10), 2.1(b)(1), 3.1(a).

Exhibit B

# EXECUTIVE SUMMARY

## Findings and Recommendations[1]

As of May 3, 2017, Puerto Rico had approximately $74 billion of bond debt and $49 billion of unfunded pension liabilities. For an economy of Puerto Rico's size, the burden of this debt has been catastrophic—it has been a financial, and ultimately a humanitarian, catastrophe. The toll it has taken on the people of Puerto Rico begs a pressing question: How did it happen?

This Report, like the Independent Investigation upon which it is based, aims to answer that question based on the facts. On the same basis, it offers recommendations for the people of Puerto Rico, and the policymakers who represent them, to consider in making sure they never have to go through all this again.

On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee, retained Kobre & Kim LLP as the Independent Investigator. The mandate was to conduct an investigation under PROMESA into the factors contributing to Puerto Rico's fiscal crisis, as well as Puerto Rico's issuance of debt. Following interviews with over 100 witnesses and review of thousands of documents, as discussed in detail in Part I, we find the following:

---

[1] All capitalized terms in this Executive Summary are used consistently with the definitions set forth in the Defined Terms, attached as Appendix A.

Exhibit B

00034

When the Possession Tax Credit's ten-year phase-out period terminated in 2006, Puerto Rico faced a declining population, increasing unemployment, mounting budgetary issues (amplified by a lack of transparency into the spending of the Puerto Rico-Related Entities, as well as delayed disclosure of audited financial reports), and escalating pension liabilities. Instead of implementing long-term plans to stimulate the Puerto Rico economy, to balance the budget and to fund ERS during the Relevant Period, Puerto Rico's political branches and GDB turned to the debt markets for shorter-term fixes. The short-term fixes included, among others: (i) the creation of the SUT, a portion of which purportedly secured issuances by COFINA; (ii) the entry into swap arrangements to generate cash to close budget gaps; (iii) an increase in deficit financing; and (iv) the issuance of Puerto Rico-Related Bonds that were purportedly secured by contributions to ERS.

With some of these structures, the Puerto Rico-Related Entities incurred billions of dollars of liability, but did not include those amounts when calculating how close Puerto Rico was to reaching its Constitutional Debt Limit. At times, in the absence of certain regulations we will discuss, underwriters sold the Puerto Rico-Related Bonds through Local CEFs in which only Puerto Rico investors purchased shares. Many of those Local CEFs were also managed by affiliates of the same investment banks that underwrote the Puerto Rico-Related Bonds in which the Local CEFs were invested.

GDB, in its dual role as fiscal agent and lender, enabled the Puerto Rico-Related Entities (particularly the Public Utilities and HTA) to subsist on appropriations from the General Fund, short-term cash influxes from GDB, and bond proceeds. This was done instead of holding the Puerto Rico-Related Entities accountable for their debts, ensuring that Issuers of revenue bonds actually collected sufficient revenues to repay those bonds, or demanding fiscal responsibility and independence. As the Puerto Rico-Related Entities amassed unsustainable levels of debt, the CRAs became increasingly concerned about the Puerto Rico-Related Entities' perpetual reliance on support from Puerto Rico and GDB, among other factors. The CRAs ultimately implemented a series of credit rating downgrades for Puerto Rico-Related Bonds at various points between 2012 and 2014, with most of those bonds reaching "junk" status between February and June of 2014.

As each of the Puerto Rico-Related Entities lost access to the capital markets, the short-term fixes strained the liquidity of Puerto Rico and GDB until it simply became untenable. Eventually, many of the Puerto Rico-Related Entities sought bankruptcy relief in the Title III Proceedings.

Below, we present a summary of our primary findings relating to each aspect of our Independent Investigation. We also provide an overview of certain recommendations stemming from those findings. We developed these recommendations on the basis of the evidence we reviewed, with the goals of restoring Puerto Rico's access to the capital markets and reducing the likelihood of another debt crisis.

3

00035

# PART IX
# CALCULATION OF THE
# CONSTITUTIONAL DEBT LIMIT

The Constitutional Debt Limit found in Section 2 of Article VI of the Puerto Rico Constitution limits the amount of debt that Puerto Rico may issue directly in the form of bonds or notes for which it has pledged its "full faith credit and taxing power," as well as how much debt it may guarantee. The provision limits the amount of debt that Puerto Rico may issue or guarantee based on a multi-part calculation of the mathematical relationship between future debt service payments, prior-year guarantee payments and average revenues (the "Debt Limit Calculation"), as discussed in Part IX.A below.

As part of our investigation, we explored Puerto Rico's interpretation of the Constitutional Debt Limit and its historical practices to ensure compliance with it. We sought to determine the extent to which Puerto Rico's interpretation or application of the Debt Limit Calculation may have contributed to the debt crisis.

Based on our investigation, and as discussed further below, we find as follows:

- Puerto Rico has historically interpreted the Constitutional Debt Limit to require that only the following be included in the Debt Limit Calculation: (i) direct obligations for which it is has pledged its full faith, credit and taxing power; and (ii) certain debt servicing payments on bonds or notes it has guaranteed. In other words, debt issued by the public corporations (unless that debt is guaranteed by Puerto Rico) is not included in the Debt Limit Calculation and is not limited by the Constitutional Debt Limit;

Exhibit B

00036

- Based on the plain text of the provision, Puerto Rico's interpretation that non-guaranteed debt of public corporations is not included in the Debt Limit Calculation appears uncontroversial and, based on our research, is not the subject of litigation;

- However, the fact that Puerto Rico's Constitutional Debt Limit does not limit debt issued by its public corporations (unless guaranteed)—although not unusual in US states and territories—means that a significant portion of debt that is ultimately attributable to Puerto Rico's public sector, and that substantially contributed to the financial crisis, was not subject to the limit. A substantial portion of the $74 billion in public sector debt constitutes non-guaranteed debt of the public corporations;

- Puerto Rico has interpreted the Constitutional Debt Limit as a debt service limit. That is, the limit is tied to future annual debt service payments and prior-year guarantee payments, not based on the absolute amount of debt issued. That interpretation appears uncontroversial and, based on our research, is not the subject of litigation;

- Multiple witnesses informed us that, as a consequence of the future debt service feature of the limit, GDB worked with the underwriters to structure the future debt service payments to avoid a Constitutional Debt Limit violation;

- Puerto Rico has also interpreted the Constitutional Debt Limit to require that the Debt Limit Calculation include debt that it has guaranteed, but only to the extent that: (i) the issuer (a public corporation, for example) is unable to make debt service payments; and (ii) Puerto Rico is required to do so under its guaranty;

- Puerto Rico's interpretation concerning guaranteed debt is the subject of ongoing litigation about debt service payments on the bonds that PBA issued ("PBA Bonds"), and we express no view as to that interpretation. We did, however, investigate Puerto Rico's understanding of its compliance with the Constitutional Debt Limit. Based on our investigation, we did not find evidence that any Puerto Rico official believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violated the Constitutional Debt Limit; and

- We also investigated the practices Puerto Rico employed to confirm compliance with the Constitutional Debt Limit. Based on our investigation, we conclude that Puerto Rico employed a reasonably robust process involving a number of players, as well as consultation with counsel. The players included the Secretary of the Treasury, career officials at GDB, bond counsel, the underwriters and, to a limited extent, the PRDOJ.

## A. The Constitutional Debt Limit Provision and Debt Limit Calculation

The Constitutional Debt Limit is set forth in Section 2 of Article VI of the Puerto Rico Constitution. The relevant portion of that section reads as follows:

> [N]o direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be

> pledged shall be issued by the Commonwealth if the total of (i) the amount
> of principal of and interest on such bonds and notes, together with the
> amount of principal of and interest on all such bonds and notes theretofore
> issued by the Commonwealth and then outstanding, payable in any fiscal
> year and (ii) any amounts paid by the Commonwealth in the fiscal year next
> preceding the then current fiscal year for principal or interest on account of
> any obligations evidenced by bonds or notes guaranteed by the
> Commonwealth, shall exceed 15% of the average of the total amount of the
> annual revenues raised under the provisions of Commonwealth legislation
> and covered into the Treasury of Puerto Rico in the two fiscal years next
> preceding the then current fiscal year; . . . and the Commonwealth shall not
> guarantee any obligations evidenced by bonds or notes if the total of the
> amount payable in any fiscal year on account of principal of and interest on
> all the direct obligations referred to above theretofore issued by the
> Commonwealth and then outstanding and the amounts referred to in item
> (ii) above shall exceed 15 percent of the average of the total amount of such
> annual revenues.[1]

Put more simply, under this provision, Puerto Rico may not issue general obligation debt (*i.e.*, bonds or notes to which it has pledged its full faith and credit and taxing power) or guarantee debt if it will cause a certain calculation to exceed 15%. That calculation is as follows:

As to any issuance or guaranty of debt,

- (A) the sum of

    - (i) the maximum future annual debt service (principal and interest "payable in any fiscal year") on all of its outstanding general obligation debt (including the issuance in question),

    plus

    - (ii) any amounts Puerto Rico has paid in the previous fiscal year on account of any bonds or notes it guaranteed,

cannot exceed 15% of

- (B) Puerto Rico's average annual "internal revenues" based on averaging the prior two fiscal years.

---

[1] P.R. Const. art. VI, § 2.

00038

"Internal revenues" consists principally of income taxes, property taxes, sales and use taxes (excluding the portion allocated by law to COFINA) and excise taxes.[2] And so, in short, item (A)(i), plus item (A)(ii), cannot be greater than 15% of item (B).

The following example, taken from the Official Statement for the 2014 GO Bond Issuance, illustrates the calculation. In this example, according to the Official Statement:

- The maximum future annual debt service for Puerto Rico's outstanding general obligation debt (including the bonds in question) (*i.e.*, item (A)(i) in the previous paragraph) was $1,161,777,697;

- The amounts paid by Puerto Rico in the previous fiscal year on account of bonds or notes it guaranteed (*i.e.*, item (A)(ii) in the previous paragraph) was $17,315,000;

- The sum of $1,161,777,697 and $17,315,000 equals $1,179,092,697;

- The average of Puerto Rico's annual internal revenues in the previous two fiscal years (*i.e.*, item (B) in the previous paragraph) was $8,307,097,000; and

- Dividing $1,197,092,697 by $8,307,000 yields 14.2%, which is less than 15%.[3]

To determine the maximum future annual debt service, Puerto Rico determines the debt service requirements on its outstanding GO Bonds for future years. For variable rate bonds (where the interest rates fluctuate), Puerto Rico uses the maximum legal rate (12%). It then determines the maximum annual requirement. In this example, it is shown to be $1,161,777.697 for fiscal year ended 2016.[4]

In Section C below, we discuss where the numbers that fed into the above calculation came from. But first, we discuss how the scope of the Constitutional Debt Limit was historically interpreted by Puerto Rico.

## B. Puerto Rico's Interpretation of the Constitutional Debt Limit and Debt Limit Calculation

As part of our investigation, we examined how Puerto Rico interpreted and applied the Constitutional Debt Limit and Debt Limit Calculation during the Relevant Period.

### 1. Public Corporation Debt Is Generally Not Included

First, Puerto Rico interpreted the Constitutional Debt Limit to require the Debt Limit Calculation to include: (i) direct general obligations of Puerto Rico; and (ii) as discussed further below in subsection (3), certain payments on debt obligations that Puerto Rico may guarantee. In

---

[2] *See, e.g.*, Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 31 (2014).

[3] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).

[4] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 34 (2014).

Exhibit B

other words, as interpreted by Puerto Rico, the Debt Limit Calculation does not include debt issued by the public corporations if that debt is not guaranteed by Puerto Rico (such as non-guaranteed revenue bonds issued by PREPA, for instance). This interpretation appears consistent with the plain text of the provision and, based on our research, does not appear to be the subject of litigation.

Our investigation included interviews of a number of former Secretaries of Justice, whose role in GO Bond issuances included issuing an opinion that the bonds constitute valid and binding general obligations of Puerto Rico. One former Secretary of Justice we interviewed commented that the provisions of the Constitutional Debt Limit clearly refer to "direct obligations" of Puerto Rico and that the public corporations, even though instrumentalities of Puerto Rico (like the Issuers) are separate and distinct entities from Puerto Rico. The senior official commented that this explains why there are many instrumentalities in Title III Proceedings.

This interpretation helps explain how public sector debt (which includes debt of the public corporations) could reach $74 billion notwithstanding the Constitutional Debt Limitation. In short, a substantial portion of that $74 billion was in the form of non-guaranteed public corporation debt, to which the Constitutional Debt Limit was understood not to apply.

We note that it is not unusual for US states and territories to apply debt limitations solely to general obligation debt. Nor is it unusual that this specifically defined nature of the debt limitation coincides with a growth in nonguaranteed debt. Indeed, a 1961 report by the Advisory Commission on Intergovernmental Relations ("ACIR"), titled "State Constitutional and Statutory Restrictions on Local Government Debt," notes the prevalence of debt limitations that only cover general obligation debt:

> One feature of these State-imposed restrictions [concerning debt limits] deserves emphasis—the fact that they do not encompass all types of local bond issues, but commonly apply only to local governments' issuance of full faith and credit debt. Various legal doctrines and devices by which local governments can issue nonguaranteed or "revenue" debt, usually exempt from such state restrictions, have developed widely. In recent years, there has been an extremely rapid growth of "unrestricted" local debt.[5]

The ACIR also observed the resulting rapid growth of nonguaranteed debt to finance projects traditionally financed through general obligation debt:

> Nonguaranteed debt originally developed to finance utility-type operations of local governments, such as water supply. It was later broadened (with Federal backing) to provide for local public housing projects. As recently as 1957, the bulk of all local nonguaranteed debt outstanding had been incurred for these two kinds of purposes. But the past few years have witnessed a rapid

---

[5] U.S. Advisory Comm'n on Intergovernmental Relations, *State Constitutional and Statutory Restrictions on Local Government Debt,* 2 (1961).

00040

> extension of the so-called "revenue bond" device to finance types of projects traditionally financed by full faith and credit borrowing . . . .[6]

It is for Puerto Rico's political branches to consider and decide whether the Constitutional Debt Limit should be broadened or legislation enacted to restrict debt issued by any of the public corporations. Alternatively, other constitutional or legislative positions directed specifically to the debt of the public corporations could be considered as a way to address debt that is outside Article VI, Section 2, but should nonetheless by limited or maintained.

## 2. The Constitutional Debt Limit Is Based On Debt Service, Not the Absolute Amount of Debt

Second, Puerto Rico has interpreted the Constitutional Debt Limit to be based on future debt service and prior-year guarantee payments (and their relationship to prior-year revenues), not based on total amount of debt issued or guaranteed. This interpretation appears consistent with the plain text of the provision and, based on our research, does not appear to be the subject of litigation.

Because the Debt Limit Calculation includes future annual debt service payments, Puerto Rico could attempt to avoid a violation by structuring the servicing payments in a certain way. For example, a longer maturity on a bond being issued could result in lower annual payments so as to fit the issuance within the 15% limit. According to multiple witnesses, GDB historically worked with the underwriters to manage the debt and structure the service payments to avoid a violation. Based on our investigation, it appears this interpretation was shared among the participants responsible for ensuring compliance with the Constitutional Debt Limit and that the practice of managing debt to avoid a violation was understood to be permissible.

We also note that Puerto Rico is not alone in tying its debt limitations to debt service payments. A number of US states have debt limits that, like Puerto Rico, are calculated based on annual debt service. In Tennessee and Hawaii, for example, debt service on public debt cannot exceed 10% and 18.5% of annual revenues, respectively.[7]

## 3. Guaranteed Debt and PBA Bonds

Third, Puerto Rico has interpreted the Constitutional Debt Limit to require that the Debt Limit Calculation include debt that it has guaranteed, but only to an extent. Specifically, under Puerto Rico's interpretation, debt service payments on guaranteed debt are not included in the Debt Limit Calculation unless the issuer of the debt is unable to make payment and Puerto Rico is required to make payment under its guarantee. In other words, while debt service payments that Puerto Rico is required to make under its guaranty *are* included in the Debt Limit Calculation (as item (A)(ii) of the calculation discussed above), debt service payments either that the issuer makes or that Puerto Rico is not required under its guaranty to make *are not* included.

---

[6] U.S. Advisory Comm'n on Intergovernmental Relations, *State Constitutional and Statutory Restrictions on Local Government Debt,* 25–26 (1961).

[7] *See* Tenn. Code Ann. § 9-9-105(c)(1) (West 2018); Haw. Const. Art. 7, § 13.

258

00041

Puerto Rico's interpretation may be relevant to a dispute concerning Puerto Rico's guaranty of PBA Bonds, which we discuss below. In light of this ongoing litigation, we express no view about whether this interpretation is consistent with the plain text of the provision.

### (a) Puerto Rico's Treatment of Guaranteed Debt, In General

We learned that Puerto Rico has had a longstanding practice of only including in the Debt Limit Calculation debt servicing payments that Puerto Rico was required to pay. In addition, we found that Puerto Rico's practice and interpretation concerning guaranteed debt has been disclosed repeatedly, at least as far back as 2007. For example, Puerto Rico's *Financial Information and Operating Data Report* dated July 1, 2007 (appended to the official statement for Public Improvement Bonds of 2007, Series A) described this interpretation in relation to certain guaranteed PRASA bonds, as follows:

> Annual debt service payments on the PRASA guaranteed bonds have been paid by PRASA since fiscal year 2006 and, thus, such payments are not now included now [sic] in the calculation of the 15% debt limitation. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.[8]

Later reports made this point even more clearly:

> Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.[9]

Similarly, official statements for the PBA Bonds state as follows:

> As provided above, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the issuers of such guaranteed bonds are unable to make such payments and the Commonwealth is therefore required to make such payments under

---

[8] Commonwealth of P.R., *Official Statement for Public Improvement Bonds of 2007, Series A*, I-27 (2007).
[9] Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series 2009 A*, I-38 (2009).

259

00042

> its guarantee, in which case such debt service would be included in
> the calculation of the 15% constitutional debt limitation.[10]

Although witnesses confirmed that Puerto Rico's interpretation was part of a longstanding practice, no witness we asked was able to identify specific legal authority or a Secretary of Justice opinion upon which Puerto Rico relied for this particular point. And we did not find any, either.

We are aware of various opinions by former Secretaries of Justice that address a similar, but not identical, issue. Those opinions were provided in connection with the issuance of various guaranteed bonds and concluded that amounts "required to be paid" by Puerto Rico under a guaranty constitute "public debt" within the meaning of Section 8 of Article VI of the Puerto Rico Constitution.[11] But this speaks to the rights of holders in the event that Puerto Rico has insufficient resources to satisfy its obligations. It does not specifically address the extent to which debt service payments should be included in the Debt Limit Calculation.

### (b) PBA Bonds

PBA is a public corporation. The PBA Bonds add an additional layer of complexity to the question of how the Debt Limit Calculation should be applied because, as discussed further below, Puerto Rico has not only guaranteed the PBA Bonds with a pledge of its full faith, credit and taxing power, but the PBA Bonds themselves are payable from rental payments on facilities rented to governmental entities and Puerto Rico has guaranteed those rental payments with a pledge of its full faith, credit and taxing power. As discussed below, certain creditors maintain that debt service payments on PBA Bonds should be included in the Debt Limit Calculation.

PBA owns a number of buildings—including office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops and related facilities—that it leases to various governmental entities, such as departments, agencies, instrumentalities and municipalities of the Government. It has issued PBA Bonds, approximately $ 4.1 billion of which are were outstanding as of February 2017.[12]

---

[10] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Bonds, Series R, 24* (2011); *see also* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 10 (2014) ("The Constitution of Puerto Rico provides that the Commonwealth shall not guarantee any obligation evidenced by bonds or notes if (a) the sum of (i) the total amount payable in any fiscal year on account of principal of and interest on all the Direct Obligations already issued and (ii) the amount paid by the Commonwealth in the next preceding fiscal year on account of Guaranteed Obligations exceeds (b) 15% of the average of the total annual internal resources of the Commonwealth for the two preceding fiscal years. Accordingly, debt service payable on Guaranteed Obligations is *not* taken into consideration for purposes of the debt limit *unless* the Commonwealth is required to pay such debt service pursuant to its guarantee and the Commonwealth may continue to guarantee bonds and notes issued by its instrumentalities as long as the 15% limitation is not exceeded.") (emphasis added).

[11] *See, e.g.*, P.R. Aqueduct & Sewer Auth., *Official Statement for Revenue Refunding Bonds, 2008 Series A, 2008 Series B*, 7–8 (2008).

[12] P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

Exhibit B

00043

PBA Bonds are payable from and secured by a pledge of the rental payments owed by the governmental entity that leased the building.[13] In other words, Puerto Rico has guaranteed the rental payments owed by the governmental entity, and the PBA Bonds are secured by that guaranty.[14] In addition, Puerto Rico has guaranteed payment of the principal of and interest on the PBA Bonds themselves.[15] For both the guaranty of rental payments and the guaranty of payment on PBA Bonds, Puerto Rico has pledged its full faith, credit and taxing power.[16]

According to the official statements for the PBA Bonds, under a 2001 agreement designed to reduce the frequency and length of delays in rent payments, each month the Treasury Department forwarded to GDB funds for PBA rental payments, which were deposited into a PBA account at GDB. Portions of the rental payments were used to cover debt service on PBA Bonds.

As noted, Puerto Rico has not included either the rental payments or debt service payments on the PBA Bonds in the Debt Limit Calculation because it understood that no payments under its guaranty were required.[17]

In one of the Title III adversary proceedings, holders of senior bonds issued by COFINA ("COFINA Senior Bondholders") have argued that, due to the nature of Puerto Rico's guarantees, the "rental obligations and payments" by Puerto Rico should have been included as future debt service payments in the Debt Limit Calculation.[18] They argue that, due to the nature of the arrangements, it is an "illusion" that Puerto Rico does not have a "direct full faith and credit obligation to PBA bond investors" and that "the Court must look to the substance of the transaction in determining that the PBA debt should be counted against the constitutional debt limit."[19]

The COFINA Senior Bondholders contend that the effect of not including the future debt service on PBA Bonds in the Debt Limit Calculation was to increase the total permissible debt. They claim that properly including the future payments on PBA Bonds in the calculation would

---

[13] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 1 (2012).

[14] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 17 (2012).

[15] *See* Act of July 2, 2012, No. 131, 2012 P.R. Laws 380, 380 ("Act No. 17 of April 11, 1968, as amended . . . provided that the Government of Puerto Rico would guarantee the payment of the principal of and interest on bonds issued by the PBA and specified by the latter for any of the purposes authorized by law.").
[16] *See, e.g.*, Act of July 2, 2012, No. 131, § 1, 2012 P.R. Laws 380, 381–82; P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 1, 17 (2012).

[17] *See, e.g.*, P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 22 (2012) ("No payments under the Commonwealth guaranty have been required to date for any of the Authority's bonds.").

[18] Mot. and Incorporated Mem. of Law at 32, *Lex Claims, LLC v. Alejandro García-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.

[19] Mot. and Incorporated Mem. of Law at 32, *Lex Claims, LLC v. Alejandro García-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.

Exhibit B

00044

result in the Constitutional Debt Limit having been exceeded by March 2011 and that by March 2014 the debt level would have been approximately 17.5%, in excess of the 15% limit.[20]

We are aware of no ruling by Puerto Rico courts on the constitutionality of the practice and take no position as to the merits of the COFINA Senior Bondholders' argument.

As part of our investigation, we sought to determine whether there was any evidence that Puerto Rico understood its practice of not including debt service payments on PBA Bonds to violate the Constitutional Debt Limit. Based on our investigation, we found no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violates the Constitutional Debt Limit. As noted, according to witnesses, Puerto Rico had a longstanding practice of treating direct debt and guaranteed debt differently for purposes of the Debt Limit Calculation. And several witnesses stated that they were not aware of anyone expressing the view that PBA Bonds should be included in the Debt Limit Calculation. In addition, we note that the Puerto Rico Commission for the Comprehensive Audit of the Public Credit reported that "[t]he computational methods used by GDB appeared to be arithmetically correct, performed in a manner consistent with protocol employed in years past, and supported by the opinion of outside bond counsel."[21] Moreover, through at least the 2013 fiscal year, independent auditors opined that the debt limit had not been exceeded.[22]

### 4. Swap Termination Fee Payments

Puerto Rico has also interpreted the Constitutional Debt Limit not to require that the Debt Limit Calculation include certain Swap termination fee payments. As discussed in Part XIII, a Swap is a type of complex financial transaction into which certain Issuers entered, that transfers the risk of interest rate fluctuations between the Issuer and its counterparty. Swap agreements often provide for the payment of certain "termination fees" triggered by certain credit events.

Through Act No. 39 of August 1, 2005 ("Act 39-2005"), Puerto Rico pledged the "good faith, the credit and the power to impose taxes of the Commonwealth" for amounts payable—interest, specifically—under Swap agreements entered into by Puerto Rico as well as by the PBA.[23] Act 39 expressly excludes, however, any amount payable or to be paid by Puerto Rico in termination fees for Puerto Rico Basis Swaps and PBA Swaps from the Debt Limit Calculation. Specifically, with regard to Puerto Rico Basis Swaps, Act 39 provides:

> In the case of a qualified basis swaps agreement, the amount paid to the other party by the Commonwealth as payment for terminating the agreement shall constitute neither interest nor principal nor shall it be deemed as a component of the service of the debt of the

---

[20] Mot. and Incorporated Mem. of Law at 32-33, *Lex Claims, LLC v. Alejandro García-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.

[21] P.R. Comm'n for the Comprehensive Audit of the Pub. Credit, *Pre-audit Survey Report,* 20 (2016).

[22] P.R. Comm'n for the Comprehensive Audit of the Pub. Credit, *Pre-audit Survey Report*, 20 (2016).

[23] Art. 3 § 5 & Art. 4 § 2(b), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

Exhibit B

00045

> Commonwealth for purpose of Section 2 of Article VI of the
> Constitution of Puerto Rico.[24]

Additionally, with regard to PBA, Act 39 provides:

> For the purpose of the calculation of the constitutional limit of the
> public debt under Section 2 of Article VI of the Constitution of
> Puerto Rico, any amount payable or to be paid by the
> Commonwealth under the Guarantee with respect to any payment
> for the termination of a Qualified Interest Rate Exchange Agreement
> of [PBA] shall neither constitute the principal, nor the interest, nor
> shall it be deemed to be a component of the service of the debt of
> the Authority or of the Commonwealth.[25]

There is no provision in Act 39 that states specifically whether or not termination fees in connection with non-basis Puerto Rico swaps should be counted toward to the Constitutional Debt Limit.

As discussed further in Parts XIII and XVI, Puerto Rico has taken the position that Swap termination payments payable by Puerto Rico, even though a "good faith" and credit obligation, are not to be included in the Debt Limit Calculation. According to the official statement for the 2014 GO Bond Issuance, the payment does not need to be included because "it is not a payment of principal of or interest on general obligation debt of the Commonwealth."[26] The official statement acknowledges, however, that "the exclusion of such amounts from the debt limit has to this point never been ruled upon by any court."[27]

Based on our investigation, we found no evidence that Puerto Rico personnel believed the interpretation was incorrect, although we note that witnesses we asked had little recollection of any discussions concerning this issue.

From 2008 to 2014, annual net and gross amounts paid net swap termination fees paid were as follows. As discussed further in Part XVI, an argument could be made that these payments should have been included in the Debt Limit Calculation, which may have had the effect of decreasing the amount Puerto Rico could borrow within the Constitutional Debt Limit.

---

[24] Art. 3 § 3(g), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

[25] Art. 4 § 4(g), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

[26] Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).

[27] Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).

Exhibit B
00046

**Figure IX.A: Puerto Rico and PBA Swap Termination Fees by Fiscal Year**

| Fiscal year ended | Net termination payments | Gross termination payments |
|---|---|---|
| 2008 | (9,536,750.00) | (9,536,750.00) |
| 2009 | (24,640,000.00) | (36,770,000.00) |
| 2010 | 246,000.00 | (12,454,000.00) |
| 2011 | (58,552,030.00) | (58,552,030.00) |
| 2012 | (125,386,600.00) | (125,386,600.00) |
| 2013 | - | - |
| 2014 | (101,234,600.00) | (101,234,600.00) |

## C. Puerto Rico's Process For Ensuring Compliance With The Constitutional Debt Limit

We also investigated the practices Puerto Rico employed to confinn compliance with the Constitutional Debt Limit. Based on om investigation, we conclude that Pue1io Rico employed a reasonably robust process involving a number of players and advice of counsel. The players included the Secretaiy of the Treasmy, GDB, bond counsel, the underwriters, and, to a limited extent, the PRDOJ.

### 1. The Secretary of the Treasury's Certificate

In connection with any GO Bond offe1ing, the Secreta1y of the Treasmy issued a certificate, titled the "Certificate as to the Borrowing Power of the Commonwealth of Puerto Rico under Section 2 of Aliicle VI of the Commonwealth Constitution" ("Certificate of Bonowing Power"), which sets out the figmes for the debt limit calculation described in Pali IX.A.[28] The Celiificate ofBouowing Power is included in the closing binder. It forms pali of the basis for bond counsel's opinion that the bonds constitute valid and binding general obligations of Pue1io Rico, and the figmães aiie consistent with those provided in the official statement.

For example, consistent with the figmes set fo1lh above in Pali IX.A, the Ce1tificate of Bmrnwing Power for the 2014 GO Bond Issuance states that:

---

[28] *See, e.g.,* TreasUiy of Commonwealth of P.R., *Certificate as to the Bon-owing Power of the Commonwealth of Puerto Rico under Section 2 of Article Ⅲ of the Commonwealth Constitution* (Mar. 17, 2014) (on file with P.R. Dep't of Treasmy).

Exhibit B

00047

- The annual revenues transferred into the Treasury for each of the previous two fiscal years with certain exceptions ($8,357,838,000 for fiscal year ended 2012 and $8,256,356,000 for fiscal year ended 2013) as well as the average of those two numbers: $8,307,097,000 (*i.e.*, item (B) above);

- The total principal amount of the bonds or notes issued by Puerto Rico for which the full faith, credit and taxing power are pledged;

- The maximum future annual debt service on the bonds and notes identified in the previous bullet payable in any fiscal year (in this case being fiscal year ended 2016): $1,161,777.697 (*i.e.*, item (A)(i) above); and

- The total amounts paid by Puerto Rico in fiscal year ended 2013 on account of bonds or notes guaranteed by Puerto Rico: $17,315,000 (*i.e.*, item (A)(ii) above).

Finally, the Certificate of Borrowing Power also provided a calculation of the estimated "borrowing margin," or the difference between the figure of item (A) above and the 15% of item (B) above. In the case of the 2014 GO Bond Issuance, that figure was 0.806% (15.000% minus 14.194%), reflecting a near maximum debt level.

### 2. GDB

Based on the statements of multiple witnesses, we learned that the numbers set forth in the Certificate of Borrowing Power were provided by the finance department at GDB. Individuals primarily responsible for these numbers were career employees, and the person largely responsible for general obligation debt calculations for much of the Relevant Period had many years of experience. A former high-level GDB official explained that the GDB finance department maintained an Excel spreadsheet of internal revenues and bond issuances that was used to perform the calculation. The GDB official explained that the finance department would confirm the internal revenues based on information the Department of Treasury maintained online.

In performing any necessary calculations (such as the maximum future annual debt service, which assumes an interest rate of 12%), GDB finance would confer with and rely upon bond counsel and in-house counsel at GDB.

As noted, the calculation was also included in the official statements, which, like the Certificate of Borrowing Power, were signed by the Secretary of the Treasury. We learned that, before the official statements were signed, there were meetings among the Secretary of the Treasury and members of GDB management, including the GDB President and in-house counsel, at which the calculation was discussed.

### 3. Bond Counsel

Multiple former high-ranking GDB and PRDOJ officials stated that the Debt Limit Calculation, including what was to be included and not included, was reviewed and approved by bond counsel. One former high-ranking GDB witness reported that on local issuances, Puerto Rico counsel advised regarding the Constitutional Debt Limit. As noted, a former high-ranking GDB witness told us GDB relied on counsel's advice.

00048

A former bond counsel witness conveyed that counsel reviewed the calculations and made sure the calculation process was consistent with counsel's understanding of how the calculation was supposed to be performed. Another former bond counsel also stated that counsel would ask questions to confirm whether certain debt issuances were accounted for, although they would ultimately rely upon the accuracy of the numbers.

As part of the issuance, bond counsel would issue an opinion stating that the bonds constitute valid and binding general obligations of Puerto Rico.[29]

### 4. Underwriters' Counsel

We learned that underwriters and their counsel provided an additional check on Puerto Rico's compliance with the Constitutional Debt Limit. This is because underwriters had strong interest during the Relevant Period to avoid underwriting and marketing debt securities that might later be found to have been unlawfully issued.

One underwriters' counsel witness stated that the underwriters relied on the calculations provided by GDB and bond counsel's opinion that the Constitutional Debt Limit had been respected for a given issuance. A bond counsel witness reported that underwriters' counsel would also check to make sure the calculation was consistent with underwriters' understanding of how the calculation should be performed and would ask questions about what items were included and excluded from the calculation. The witness stated that underwriters' counsel would review the calculations but not look behind the numbers.

A former high-ranking GDB official, as well as underwriter witnesses, stated that underwriters' counsel independently performed the constitutionally required calculations. The underwriter witness conveyed that the underwriter received advice from counsel about how to perform the calculations. Significantly, our investigation revealed no evidence that, at any point during the Relevant Period, underwriters' counsel reached a conclusion that any constitutional calculation by GDB resulted in an unlawful offering.

Multiple witnesses explained that the underwriters worked with GDB to structure the debt service to ensure compliance with the Constitutional Debt Limit provision. This was possible because the Puerto Rico Constitution, as discussed above, did not limit the total debt. Rather, it limited future annual direct debt service payments (and payments in the more recent fiscal year on guaranteed debt) to no more than 15% of the average revenue for the prior two fiscal years.

### 5. PRDOJ

Finally, The Secretary of Justice issued an opinion concluding that "the Bonds constitute valid obligations of the Commonwealth . . . ."[30] Multiple PRDOJ witnesses stated, however, that

---

[29] *See, e.g.*, Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, II-1–II-2 (2014).

[30] Inquiry No. 14-142-A, Op. Sec. Just. César R. Miranda Rodríguez, 2 (Mar. 17, 2014) (on file with P.R. Dep't of Justice).

266

00049

PRDOJ did not perform or check the Debt Limit Calculation figures that appeared in official statements, instead deferring to GDB's calculations.

## D. The Balanced Budget Provision and the Maximum Debt Maturity Provision

We also note two other provisions in the Puerto Rico Constitution that may be implicated by the Government's issuance of debt: the balanced budget provision and the maximum debt maturity provision.

The balanced budget provision is located at Section 7 of Article VI of the Puerto Rico Constitution. Based on the English version of the Constitution, the text reads: "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law." This may lead a reader to conclude that debt may not be issued in order to finance budgetary shortfalls, because appropriations (*i.e.*, expenditures) may not exceed total revenues. However, as discussed in Part IV of this Report, a 1974 opinion issued by a Puerto Rico Secretary of Justice has been interpreted to mean that Puerto Rico is permitted to use proceeds of debt issuances as an available resource to prepare a balanced budget. We are not aware of any contrary Secretary of Justice legal opinion, and no court appears to have interpreted this provision of the Puerto Rico Constitution.

The maximum debt maturity provision is located in Section 2 of Article VI. It provides that no general obligation bonds or notes "for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date." As noted in Part IV of this Report, Puerto Rico regularly refinanced debt by "scooping and tossing"—that is, issuing new Puerto Rico-Related Bonds and using at least a portion of the proceeds to pay off old Puerto Rico-Related Bonds. We briefly discuss potential arguments that could be made as to the "scoop and toss" practice and compliance with the maximum debt maturity provision in Part IV.

## E. Conclusion

In summary, the evidence we reviewed supports the conclusion that Puerto Rico employed a reasonably robust process for these Debt Limit Calculations. In addition, we did not find any evidence that Puerto Rico's government personnel believed that Puerto Rico's interpretation of the Constitutional Debt Limit was wrong or that Puerto Rico performed the Debt Limit Calculation incorrectly.

Nevertheless, in light of Puerto Rico's debt crisis, Puerto Rico should consider whether it may be worthwhile for its judiciary to review the meaning of Section 2 of Article VI of the Puerto Rico Constitution, as well as the methods pursuant to which Puerto Rico determines the types of debt servicing payments to be included within the Debt Limit Calculation. Significantly, the Constitutional Debt Limit did not prevent the issuance of legal, but ultimately unsustainable, amounts of public debt.

267

Exhibit B

00050

# Requirement 1(E)



## Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities

*Information as of August 31, 2021*

**September 30, 2021**

EXHIBIT C                                                                00051

1

# Disclaimer

- This presentation was prepared and is being published by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") as part of the ongoing evaluation of financial matters of the Government of Puerto Rico, including certain of its public corporations and its instrumentalities (the "Government"). The information contained herein provides the cash balances of Government accounts as of the dates indicated but is not intended to provide an analysis of the source of these funds or their adequacy to satisfy the Government's liquidity needs. Government creditors and other third parties should not rely on this information to make any investment decision regarding securities issued by the Government or any instrumentality thereof.

- The account balances included herein are based on information AAFAF obtained from governmental instrumentalities and financial institutions as of the dates indicated as part of an ongoing review of the bank accounts and balances of the Government and its instrumentalities. AAFAF has not validated all the information received and, as a result, cannot and does not assume any responsibility for the accuracy of such information. As additional information becomes available and the validation process is completed, there could be material changes to the information contained herein.

- The account balances included herein are provided to show the cash position as of specific dates, and this presentation does not purport to provide, nor take into consideration, any changes since such dates. Such balances are expected to change, potentially materially, on a day-to-day basis based on, among other things, the financial needs of the Government and its instrumentalities, as well as judicial determinations regarding such funds.

- The information contained herein regarding the restricted or unrestricted nature of any cash balance is preliminary and subject to further analysis.

- The account balances included herein have not been confirmed through an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization.

- This document does not constitute an audit of compliance with any Federal law, rule, or regulation.

EXHIBIT C                                                    00052

2

# Disclaimer (cont'd.)

- Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

- AAFAF, the Government, and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government, the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein, and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including, without limitation, consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of or reliance upon this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms described in the "Disclaimer" slides.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined.

- The Parties do not undertake any duty to update the information contained herein.

EXHIBIT C                                                                    00053                    3

# Executive Summary

*$ in millions*

**DELTA**

+58M



$25,355    $25,413

TSA[1]
G5

11,991.1    11,771.0

(220M)

Public Corporations
and Legally Separate Entities
G4

5,000.2    5,329.3

+329M

Pension Related
G3

472.9    478.6

+6M

Non-TSA Central Gov't
G2

5,162.9    5,046.3

(117M)

Restricted Accounts/
Subject to Title III Proceedings
G1

2,728.0    2,787.6

+60M

7/30/2021    8/31/2021

**Key takeaways**:

1. Overall **balance** of reported accounts **increased by approximately $58M** from July 31st to Aug 31st.

2. Mainly driven by:

   a) $329M increase in Public Corporations and Legally Separate Entities

   b) $60M increase in Restricted Accounts and/or subject to Title III Proceedings

   c) $6M increase in Pension Related

   d) ($117M) decrease in Central Gov't Non-TSA Accounts

   e) ($220M) decrease in central Government's Treasury Single Account balance ("TSA[1]")

---

[1] Includes TSA Sweep Accounts.
* Refer to the groupings, 'G', as they summarize the current classifications presented in detail on Slide 7.

EXHIBIT C                                                                    00054                    4

# Executive Summary (cont'd.)

- AAFAF started its efforts to identify government bank accounts and their balances to obtain a comprehensive view of the cash position of the Government. Requests were sent to governmental instrumentalities, the Office of the Commissioner of Financial Institutions ("OCIF") and various commercial banks.

- Based on the information obtained, AAFAF prepared an inventory of bank accounts across governmental instrumentalities, including those outside the scope of the fiscal plans submitted to the Financial Oversight and Management Board for Puerto Rico ("FOMB").

- The exercise and the inventory described in this presentation, which had not been conducted by prior administrations, obtained information on +800 bank accounts.  AAFAF now has centralized access to bank account information for most of the Government.

- AAFAF has conducted this process in consultation with the FOMB and its advisors, and has been providing periodic reports to the FOMB since July 2017.

- On October 31, 2017, AAFAF commenced publishing weekly cash flow reports for the TSA on its website and EMMA.  On December 18, 2017, AAFAF commenced reporting on month-end cash balance position of the bank accounts included in this presentation to provide additional transparency.

- On December 18, 2017, the FOMB announced that it would conduct an independent forensic investigation of the information on Government bank accounts published by AAFAF. On February 6, 2018, the FOMB announced the retention of Duff & Phelps, LLC ("D&P") to conduct this forensic analysis.

- D&P published an *"Independent Forensic Analysis Team" Report on Title III Bank Accounts as of June 30, 2018*, on March 12, 2019.  AAFAF takes no position in this summary on the D&P Report.

- The information presented excludes certain funds as set forth in the "Excluded Funds" slide.

# Excluded Funds

| Agency | Description |
|---|---|
| **Legislative Branch** | ▪ The Puerto Rico Legislative Assembly receives monthly transfers from the General Fund to fund its operations based on budgetary appropriations. |
| **Judicial Branch** | ▪ The Puerto Rico Judicial Branch receives monthly transfers from the General Fund to fund its operations based on budgetary appropriations. The Judicial Branch also holds funds in custody related to legal proceedings. |
| **Municipal Funds** | ▪ Municipal funds include funds of Puerto Rico municipalities, the Municipal Revenue Collections Center and the Puerto Rico Municipal Finance Agency. |
| **Government Development Bank** | ▪ GDB was the subject of a Qualifying Modification which went effective on November 29, 2018.  No funds either held by GDB or transferred to any entity as a result of the Qualifying Modification are accounted for herein. |
| **Investment Accounts** | ▪ Various investment accounts are included for certain instrumentalities (e.g. ERS, TRS, JRS, State Insurance Fund Corporation and Automobile Accident Compensation Administration, UPR). |

EXHIBIT C                                                                 00056                    6

# Bank Account Balances for the Government and its Instrumentalities

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| **Revised Grouping** | **7/30/2021** | **8/31/2021** | *Notes* |
| **G5** TSA | 11,769.6 | 11,580.2 | ▪ Reported on a weekly basis on AAFAF's website. |
| **G5** TSA Sweep | 221.5 | 190.7 | ▪ TSA sweep includes the Gen Tax sweep account which holds unreconciled general fund revenues and the SUT sweep account which holds unreconciled SUT amounts. Both accounts are regularly swept into the TSA or other accounts as described on the following slide. |
| **G3** Pension Related | 472.9 | 478.6 | ▪ Accounts classified as 'Other PR Treasury Custody Accounts' grouped as Pension Related, mainly comprised of two (2) bank accounts held for the deposits of repayment of employee loans issued by the Retirement Systems. <br>▪ $345M on the account for employee loans repayment issued by the ERS, and $120M account balance for employee loans repayment issued by the TRS. |
| **G2** Central Gov't Non-TSA **G1** | 5,162.9 | 5,046.3 | ▪ $2,177M American Rescue Plan Act Federal Funds. <br>▪ $449M Cares Act COVID-19 related Federal Funds. <br>▪ $539M Federal funds administered by the Public Housing Authority. <br>▪ $412M in Emergency Rental Assistance Program <br>▪ PR Unemployment Trust Fund at US Treasury of $293M. <br>▪ $248M lottery related funds. <br>▪ $92M under Child Support Administration |
| **G1** COFINA | 21.7 | 21.7 | ▪ The balance shown on the COFINA accounts as of **8/31/21** reflects operational funds post-effectiveness of the COFINA Plan. |
| **G1** **G4** Other Restricted Title III Accounts | 999.6 | 1,046.4 | ▪ ERS related accounts of $300M, $600M GO Redemption Fund account, and $147M in claw back funds. |
| **G1** PREPA | 1,416.5 | 1,450.7 | ▪ Refer to the PREPA slide for breakdown of classified accounts. |
| **G4** PRASA | 802.2 | 824.6 | ▪ Refer to the PRASA slide for breakdown of classified accounts. |
| HTA | 290.2 | 268.8 | ▪ Refer to the HTA slide for breakdown of classified accounts. |
| **G4** UPR | 306.0 | 365.6 | ▪ Refer to the UPR slide for breakdown of classified accounts. |
| **G4** ASES | 204.1 | 362.6 | ▪ State and Federal funds used mainly for payments of health insurance premiums and claims. |
| Other Public Corps & Legally Separate Entities | 3,687.8 | 3,776.4 | ▪ Government entities with autonomous fiscal authority established by law. <br>▪ Slides 17 and 20 include an overview of the entities and balances. |
| **TOTAL** | **$25,355M** | **$25,413M** | |

\* Refer to the groupings, 'G', as they are summarized on Slide 4.

EXHIBIT C                    00057                    7

# TSA, TSA Sweep and Pension Related Accounts

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| **Grouping Subcategory** | **7/30/2021** | **8/31/2021** | *Notes* |
| TSA | 11,769.6 | 11,580.23 | • The TSA is the Government's main operational bank account in which a majority of receipts from governmental funds are deposited and from which most expenses are disbursed. <br> • It includes tax collections, charges for services, intergovernmental collections and amongst other receipts and deposits. |
| **TOTAL** | **$11,770M** | **$11,580M** | |

**TSA Sweep Accounts[1]:**

| | | | |
|---|---|---|---|
| General & Agency Collections | - | - | • Accounts used for Government receipts from all the collection posts Island wide and the web based platform, 'Colecturía Virtual' receipts in collections posts account, and for receipts of amounts collected by collection officers at the agencies mainly for charges for services and fees; swept daily to the TSA. |
| SUT | 45.6 | 37.7 | • Account used for consolidated receipts of Sales and Use Tax. Balances are swept on a daily basis into accounts held by the trustee of the COFINA bonds, the General Fund and/or the Municipal Administration Fund. |
| Gen Tax | 175.9 | 153.1 | • SURI GenTax Account. Balances are swept periodically to the TSA, numerous times each month upon completion of reconciliations for distribution. |
| **TOTAL** | **$221M** | **$191M** | |

**Pension Related:**

| | | | |
|---|---|---|---|
| Employee Withholding | 472.8 | 478.6 | • Accounts classified as 'Other PR Treasury Custody Accounts' grouped as Pension Related, mainly comprised of two (2) bank accounts held for the deposits of repayment of employee loans issued by the Retirement Systems. <br> • $345M on the account for employee loans repayment issued by the ERS, and $120M account balance for employee loans repayment issued by the TRS. |
| Pay-go charges | - | - | • Pay-go charges include balances from payments made by municipalities and public corporations in connection with benefits paid to retirees. These Pay-Go related charges are being deposited in a separate account and are programmed to sweep back to the TSA account for reimbursement of pension payments pertaining to Municipalities and Public Corporations. |
| **TOTAL** | **$473M** | **$479M** | |

[1] Includes Zero Balance Accounts which are accounts used for disbursements of vendors payments, payroll and pensions. These accounts make disbursements and are automatically replenished from the TSA account.

EXHIBIT C

00058

# Central Government – Non-TSA

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| **Central Government Entity** | *7/30/2021* | *8/31/2021* | |
| Public Housing Administration | 540.9 | 539.1 | • PHA accounts include grants of Federal funds received to finance public housing programs and their operations. |
| Other Treasury Custody Accounts | 3,356.2 | 3,198.5 | • Other Treasury Custody Accounts include balances from the Lotteries and the newly opened COVID-19 related accounts. |
| Department of Labor and Human Resources | 632.9 | 647.7 | • DLHR accounts include operational accounts and other funds as follows:<br>– $301M PR Unemployment Trust Fund at US Treasury as of **Aug M/E.**<br>– Work Opportunity Incentive Fund to finance an incentive program to promote job creation.<br>– Contribution Trust Fund from employers' receipts used to pay claims to employees.<br>– Act No. 15 special revenues for operations. |
| Child Support Administration | 92.2 | 91.9 | • Custody bank account containing child support payments from non-custodial parents. |
| Puerto Rico Police | 29.3 | 40.2 | • Bank account used to process Police Department payroll funded through budget appropriations. |
| Department of Housing | 34.6 | 31.0 | • DOH accounts include grants of Federal funds received to finance public housing programs and their operations. |
| DDEC | 97.7 | 97.2 | • DDEC accounts include operational accounts from General Fund appropriations and internally generated revenues, Act No. 22-2012, film program and Federal funds. |
| 9-1-1 Services | 42.5 | 44.2 | • 9-1-1 Services account represents their operational account from special revenues (Act 144-1994). |
| Other Non-TSA Entities | 336.5 | 356.5 | • Description included in Appendix B. |
| **TOTAL** | **$5,163M** | **$5,046M** | |

# COFINA

$ in millions

| | Balance as of | |
| --- | --- | --- |
| | *7/30/2021* | *8/31/2021* |
| COFINA - Post-effectiveness of the Plan of Adjustment. | **$21.7M** | **$21.7M** |

▪ The Puerto Rico Sales Tax Financing Corporation ("COFINA") was created pursuant to Act No. 91-2006, as amended, and, prior to the commencements of its Title III proceeding, had issued bonds payable solely from a portion of the sales and use tax imposed by the Government on qualified transactions.

▪ Sales and use tax collections are consolidated at an account at Banco Popular de Puerto Rico ("BPPR").

▪ The United States District Court for the District of Puerto Rico confirmed the Third Amendment Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation (the "COFINA Plan") by amended order dated February 5, 2019. The COFINA Plan became effective on February 12, 2019.

▪ Given the resolution of ownership of future SUT by the COFINA Plan, COFINA bank account balances held by the trustee (other than operational or other unrestricted funds) are not included in this summary.

▪ The balance shown on the COFINA accounts reflects operational funds post-effectiveness of the COFINA Plan.

EXHIBIT C

10

00060

# Restricted Accounts Subject to Title III Proceedings

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| Grouping Subcategory | 7/30/2021 | 8/31/2021 | |
| ERS Related Accounts | 296.8 | 300.1 | • $82M distributed across 14 operational accounts for the ERS.<br>• $111M relating to proceeds from sale of investments.<br>• $95M corresponding to a Post-petition Segregated Account created as part of a stipulation entered into as part of the Title III proceedings. |
| GO Redemption Funds | 556.1 | 599.7 | • Revenues from the 1.03% property tax collected since fiscal year 2017 and deposited in the Public Debt Redemption Fund. |
| Claw back | 146.6 | 146.6 | • $147M corresponding to revenues retained (or "clawed-back") by the Government in fiscal year 2016 pursuant to Executive Order 2015-46 for the payment of General Obligation debt. |
| **TOTAL** | **$999M** | **$1,046M** | |

*The aforementioned funds are held in segregated accounts and most of them are subject to various claims under the Title III proceedings. The ultimate use of the funds may be subject to court determination.*

EXHIBIT C                    00061                    11



# *Puerto Rico Department of Treasury*

## *Treasury Single Account ("TSA") FY 2022 Cash Flow*

*As of October 1, 2021*

**Disclaimer**

- The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Nor does this document constitute an audit of compliance with any other federal law, rule, or regulation.  Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

- Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.

## Glossary

| Term | | Definition |
|---|---|---|
| ACAA | - | Automobile Accident Compensation Administration, or Administración de Compensaciones por Accidentes de Automoviles, is a component unit of the Commonwealth of Puerto Rico. |
| Act 154 | - | Act 154 means Act No. 154-2010, which, inter alia, imposes a temporary excise tax on the acquisition by multinationals of certain property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. The Act 154 temporary excise tax expires on December 31, 2027. |
| AFI / PRIFA | - | Infrastructure Financing Authority. |
| ASC | - | Compulsory Liability Insurance, private insurance company. |
| ASES | | Puerto Rico Health Insurance Administration, a public corporation and component unit of the Commonwealth of Puerto Rico. |
| CINE | - | Puerto Rico Cinema Fund, a recipient of certain assigned sales and use tax revenues. |
| COFINA | - | Puerto Rico Sales Tax Financing Corporation. |
| Deferred General Fund Receipts | - | Revenues pertaining to Fiscal Year 2020, such as individual and corporate income taxes, that are collected in subsequent fiscal years due to various executive orders and tax extensions in response to the COVID-19 pandemic. |
| DTPR | - | Department of the Treasury of Puerto Rico. |
| DTPR Collection System | - | This is the software system that DTPR uses for collections. |
| FAM | - | Municipal Fund Administration, a recipient of certain assigned sales and use tax revenues. |
| General Fund Collections | - | All gross tax collections received and deposited into the TSA from all Hacienda Collection Posts, through the Hacienda Colecturia Virtual (online), and/or SURI, as well as certain pass-through collections and others. |
| General Fund | - | General Fund (Operating Fund) means the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process. |
| Gross Payroll | - | Gross Payroll is equal to the sum of: (i) Net Payroll from the DTPR RHUM system; (ii) Other Payroll and (iii) Cash outlays for wage garnishments by Agency. |
| HTA | - | Puerto Rico Highways and Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| Liquidity Plan (LP) | - | The Liquidity Plan is the translation of the Certified Fiscal Plan ("CFP") and Certified Budget ("Budget") into a cash flow projection. The TSA Liquidity Plan encompasses all cash flow activity within the TSA. Certain cash flow activity is contemplated in the CFP and Budget, but occurs outside the TSA. Cash flow bridges from the TSA to the CFP and Budget have been included to facilitate comparison. |
| NAP | - | NAP, or the Nutrition Assistance Program, also known as PAN, or Programa de Asistencia Nutricional is a federal assistance nutritional program provided by the United States Department of Agriculture (USDA) solely to Puerto Rico. |
| Other Payroll | - | Other Payroll expenses relate to employee withholdings, social security, insurance, and other deductions. |
| Other State Collections | - | Inflows related to various Health Department programs, the State Insurance Fund, the Commissioner of Financial Institutions, interest earned on TSA bank accounts and others. |
| PayGo | - | PayGo - Puerto Rico pension system that is funded through a pay-as-you-go system.  Retirement benefits expenses of government employers are paid by the central government and reimbursed by the employers, with such funds received by the TSA. |
| PREPA | - | Puerto Rico Electric Power Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| PRITA | - | Puerto Rico Integrated Transport Authority, a public corporation and component unit of the Commonwealth of Puerto Rico. |
| PSTBA | - | The PSTBA is an amount established under Act 91-2006, as amended, and the Sales Tax Revenue Bond Resolution, as amended and restated on June 10, 2009 (the "Bond Resolution"), that currently must be received by COFINA from 5.5% of the SUT before the Commonwealth can receive any of the other 5.5% SUT. |
| Public Corporation | - | Public corporations are governmental authorities with autonomous structure separate from the central  government administration and with independent treasury functions. |
| RHUM System | - | This is the software system that DTPR uses for payroll. |
| SIFC | - | State Insurance Fund Corporation, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| Special Revenue Receipts | - | Collections made by central government agencies at collection posts for services rendered by the agencies as well as fees, licenses, permits, fines and others. |
| SURI | - | Sistema Unificada de Rentas Internas is the new digital tool of the Department of the Treasury that will allow integration and streamlining of the administration of taxes and revenues and eliminate the complexity of the current systems for the benefit of the Treasury and the taxpayers. |
| Sweep Account Transfers | - | Transfers of Fiscal Year 2020 collections in the SURI sweep account to the TSA during Fiscal Year 2021. The closing balance of the sweep account on June 30, 2020, was $1,024 million. |
| TSA | - | Treasury Single Account, the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval.  Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA. |

3

**Introduction**

- Enclosed is the weekly Treasury Single Account ("TSA") cash flow report and supporting schedules with weekly YTD FY2022 actual results compared to the FY2022 Liquidity Plan and FY2021 actual results.

- TSA is the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed.

- Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances held in custody by the Secretary of Treasury for the benefit of the Government fiduciary funds, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA.

- Disbursements from the TSA include payroll and related costs, vendor and operational disbursements (including those reimbursed by Federal assistance grants and funded from Special Revenue Funds), welfare expenditures, capital outlays, debt service payments, required budgetary formulas and appropriation payments, pass-through payments of pledged revenues to certain public corporations, tax refunds, payments of current pension benefits and other disbursements.

- Federal funds related to disaster relief for hurricanes Irma and Maria are deposited in a separate bank account overseen by the Government Authorized Representative ("GAR"). Funds may be transferred to the TSA either: (i) after admissible disbursements (per approved Project Worksheets) have been made or (ii) once supporting documentation for an accrual or related expense are provided to and approved by FEMA.  Therefore, FEMA funding may also be received in advance of actual cash disbursement, as payments to vendors may occur subsequent to when the corresponding services are rendered / expenses are recorded.

- Data limitations and commentary:
    The government has focused on cash transaction information for which access to reliable, timely, and detailed data is readily available. The government continues to work with DTPR and other parties to access additional reliable data that would help to provide additional detail in the future.

**As of October 1, 2021**

**Puerto Rico Department of Treasury | AAFAF**

*Executive Summary - TSA Cash Flow Actual Results*

*(figures in Millions)*

| Bank Cash Position | Weekly Cash Flow | YTD Net Cash Flow | YTD Net Cash Flow Variance |
|---|---|---|---|
| $11,799 | $115 | $128 | $137 |

**Bridge from FY21 Liquidity Plan projected TSA Cash Balance to actual FY21 TSA Cash Balance as of October 1, 2021**

| Cash Flow line item | Variance Bridge ($M) | Comments |
|---|---|---|
| Liquidity Plan Projected Cash Balance 10/1/21: | $    11,662 | 1. State collections are ahead of plan. General fund collections drive $193M of the positive variance. The remaining $62M of outperformance pertains to SRF receipts, which are largely pledged to specific uses and expected to be cash flow neutral over the long term. |
| 1 State Collections | 255 | |
| 2 General Fund Appropriations Timing | (69) | |
| All Other | (49) | 2. Certain October General Fund appropriations, including those for ASES, ASEM, and PRITA were partially transferred out of the TSA on Friday, October 1. This is one business day earlier than projected by the Liquidity Plan and this variance will unwind during the week ended October 8, 2021. |
| **Actual TSA Cash Account Balance** | **$    11,799** | |

Source: DTPR

Exhibit D

00066

5

**As of October 1, 2021**

**Puerto Rico Department of Treasury | AAFAF**

*YTD TSA Cash Flow Summary - Actual vs LP*



**TSA Cumulative YTD Net Cash Flow ($M)**

| | |
|---|---|
| LP Bank Cash Balance: | $11,662 |
| Actual TSA Bank Cash Balance: | $11,799 |

Legend: — Net YTD Actual Cumulative Cash Flow   - - - LP YTD Cumulative Cash Flow

<u>**YTD Actuals vs. Liquidity Plan**</u>
YTD net cash flow is $128M and cash flow variance to the Liquidity Plan is $137M, most of which is assumed to be temporary at this time.

**As of October 1, 2021**

**Puerto Rico Department of Treasury | AAFAF**
*YTD Cash Flow Summary - TSA Cash Flow Actual Results*

<u>Net Cash Flow - YTD Actuals</u>

1.) The primary cash driver of FY22 is state collections. Federal Fund inflows of $2,495M represent 43% of YTD inflows, but are largely offset by Federal Fund disbursements, with YTD net deficit of $69M (Refer to page 13 for additional detail).



<u>Net Cash Flow YTD Variance - LP vs. Actual</u>

1.) Year to date cash flow outperformance is mainly driven by variances in state collections.



Source: DTPR

**As of October 1, 2021**

**Puerto Rico Department of Treasury | AAFAF**
*TSA Cash Flow Actual Results for the Week Ended October 1, 2021*

| | | FY22 Actual | FY22 LP | Variance | FY22 Actual | FY22 LP | FY21 Actual | Variance |
| | *(figures in Millions)* | 10/1 | 10/1 | 10/1 | YTD | YTD | YTD (a) | YTD FY22 vs YTD FY22 LP |
|---|---|---|---|---|---|---|---|---|
| | **State Collections** | | | | | | | |
| 1 | General fund collections (b) | $370 | $57 | $313 | $2,875 | $2,682 | $3,036 | $193 |
| 2 | Other fund revenues & Pass-throughs (c) | – | 0 | (0) | 44 | 33 | 48 | 11 |
| 3 | Special Revenue receipts | 9 | 6 | 3 | 107 | 88 | 110 | 19 |
| 4 | All Other state collections (d) | 6 | 12 | (5) | 161 | 130 | 87 | 32 |
| 5 | Sweep Account Transfers | – | – | – | – | – | 1,024 | – |
| 6 | Subtotal - State collections (e) | $385 | $75 | $310 | $3,187 | $2,932 | $4,305 | $255 |
| | **Federal Fund Receipts** | | | | | | | |
| 7 | Medicaid | 1 | – | 1 | 714 | 582 | 1,057 | 132 |
| 8 | Nutrition Assistance Program | 67 | 52 | 15 | 1,065 | 967 | 720 | 98 |
| 9 | All Other Federal Programs | 88 | 75 | 13 | 496 | 697 | 368 | (201) |
| 10 | Other | 14 | – | 14 | 219 | 157 | 236 | 62 |
| 11 | Subtotal - Federal Fund receipts | $170 | $126 | $43 | $2,495 | $2,403 | $2,381 | $92 |
| | **Balance Sheet Related** | | | | | | | |
| 12 | Paygo charge | 19 | 22 | (3) | 132 | 105 | 168 | 26 |
| 13 | Other | – | – | – | – | – | – | – |
| 14 | Subtotal - Other Inflows | $19 | $22 | ($3) | $132 | $105 | $168 | $26 |
| 15 | **Total Inflows** | **$574** | **$224** | **$350** | **$5,813** | **$5,441** | **$6,854** | **$373** |
| | **Payroll and Related Costs (f)** | | | | | | | |
| 16 | General fund (i) | (48) | (53) | 5 | (661) | (622) | (635) | (39) |
| 17 | Federal fund | (27) | (30) | 3 | (183) | (255) | (112) | 72 |
| 18 | Other State fund | (15) | (4) | (11) | (39) | (33) | (41) | (6) |
| 19 | Subtotal - Payroll and Related Costs | ($90) | ($87) | ($3) | ($883) | ($910) | ($788) | $28 |
| | **Operating Disbursements (g)** | | | | | | | |
| 20 | General fund (i) | (34) | (32) | (2) | (423) | (444) | (480) | 21 |
| 21 | Federal fund | (32) | (44) | 13 | (436) | (442) | (500) | 6 |
| 22 | Other State fund | (5) | (13) | 7 | (193) | (190) | (115) | (3) |
| 23 | Subtotal - Vendor Disbursements | ($71) | ($89) | $18 | ($1,052) | ($1,076) | ($1,096) | $24 |
| | **State-funded Budgetary Transfers** | | | | | | | |
| 24 | General Fund (i) | (82) | – | (82) | (849) | (831) | (420) | (18) |
| 25 | Other State Fund | (3) | – | (3) | (32) | (34) | (74) | 2 |
| 26 | Subtotal - Appropriations - All Funds | ($85) | – | ($85) | ($881) | ($865) | ($494) | ($16) |
| | **Federal Fund Transfers** | | | | | | | |
| 27 | Medicaid | – | – | – | (710) | (582) | (1,054) | (128) |
| 28 | Nutrition Assistance Program | (75) | (52) | (23) | (1,069) | (967) | (725) | (102) |
| 29 | All other federal fund transfers | (9) | – | (9) | (166) | (90) | (66) | (76) |
| 30 | Subtotal - Federal Fund Transfers | ($84) | ($52) | ($32) | ($1,945) | ($1,639) | ($1,845) | ($306) |
| | **Other Disbursements - All Funds** | | | | | | | |
| 31 | Retirement Contributions | (93) | (103) | 10 | (642) | (645) | (640) | 4 |
| 32 | Tax Refunds & other tax credits (h) (i) | (12) | (4) | (8) | (203) | (203) | (291) | (0) |
| 33 | Title III Costs | (23) | (4) | (19) | (61) | (50) | (59) | (11) |
| 34 | State Cost Share | – | – | – | – | – | – | – |
| 35 | Milestone Transfers | – | (0) | 0 | – | (3) | (2) | 3 |
| 36 | Custody Account Transfers | (2) | – | (2) | (18) | (9) | – | (10) |
| 37 | Cash Reserve | – | – | – | – | – | – | – |
| 38 | All Other | – | – | – | – | (50) | (58) | 50 |
| 39 | Subtotal - Other Disbursements - All Funds | ($129) | ($111) | ($18) | ($924) | ($959) | ($1,049) | $35 |
| 40 | **Total Outflows** | **($460)** | **($339)** | **($121)** | **($5,685)** | **($5,449)** | **($5,272)** | **($236)** |
| 41 | **Net Operating Cash Flow** | **$115** | **($115)** | **$230** | **$128** | **($9)** | **$1,583** | **$137** |
| 42 | Bank Cash Position, Beginning (j) | 11,684 | 11,777 | (93) | 11,671 | 11,671 | 7,701 | – |
| 43 | **Bank Cash Position, Ending (j)** | **$11,799** | **$11,662** | **$137** | **$11,799** | **$11,662** | **$9,284** | **$137** |

*Note:* *Refer to the next page for footnote reference descriptions.*

**Puerto Rico Department of Treasury | AAFAF**

*FY21 TSA Cash Flow Actual Results - Footnotes*

Footnotes:

(a) Represents FY2021 actual results through October 2, 2020.

(b) Represents gross tax collections received and deposited from all Hacienda Collection Posts, through the Hacienda Colecturia Virtual (online) and/or SURI. Additionally, as of the date of this report, the "General Fund Collections" line item includes unreconciled collections due to DTPR transition to collecting various gross tax receipts through the new SURI system. The transition from the Hacienda Colecturia collections system to SURI is ongoing and as such, revenue concept detail for the general tax SURI collections is not available at this time for the portion of collections received by the new general tax SURI account.  This resulted in timing-related unreconciled gross collections which will be retroactively allocated to "General Collections" as appropriate once this information becomes available.

(c) These revenues are collected by DTPR and immediately appropriated.

(d) Inflows related to the State Insurance Fund, the Department of Labor and Human Resources, the Commissioner of Financial Institutions, interest earned on TSA bank accounts and others. As of the date this report the TSA has received $2.5M in interest income in FY21 from earnings on the TSA cash balance.

(e) As of October 1, 2021, there are $149M in collections in the SURI sweep account pending reconciliation and transfer to the TSA.

(f) Represents total gross payroll. Gross payroll includes net payroll disbursed to government employees, cash transfers to the Police Department for payroll costs, and other payroll related costs (employee withholdings, social security, insurance, and other

(g) Includes payments to third-party vendors as well as intergovernmental payments to agencies with separate Treasuries.

(h) Includes Federally Funded Employee Retention Credits.

(i) These line items include transfers out of the TSA related to the COVID-19 Emergency Measures Support Package. Total TSA outflows related to the COVID-19 Emergency Measures Support Package are approximately $534M as of October 1, 2021. Of this amount, $459M was disbursed in FY2020, $75M in FY2021, and $562k in FY2022.

(j) Excludes BPPR Clawback Accounts (for clawback revenues prior to June 2016) of $147M.

Source: DTPR

As of October 1, 2021

**Puerto Rico Department of Treasury | AAFAF**
*General Fund Collections Summary*

Key Takeaways / Notes

1.) Accumulated collections into TSA sweep accounts are now consistently transferred to the TSA with a 7-10 day lag. As of the date of this report, there were $149M in collections in the SURI sweep account pending transfer to the TSA. Other General Fund revenue also includes receipts that have not been allocated to other concepts and this amount is approximately $981M. Due to the on-going transition of various gross tax collections from Hacienda Colecturia to SURI, revenue concept detail for general tax SURI collections from September 1, 2021, through the date of this report is not available at this time. This collections schedule will be updated as information becomes available.

**General Fund Collections Year to Date: Actual vs. Forecast ($M)**

| General Fund Collections | Actual (a) YTD 10/1 | LP YTD 10/1 | Var $ YTD 10/1 | Var % YTD 10/1 |
|---|---|---|---|---|
| Corporations | $201 | $440 | ($239) | *-54%* |
| Current Year Collections | 200 | 381 | (181) | *-48%* |
| Current Year CIT for FEDE (Act 73-2008) (b | 1 | 11 | (10) | *-94%* |
| FY20 Deferrals/Extensions | - | 48 | (48) | *-100%* |
| Individuals | 448 | 678 | (231) | *-34%* |
| Current Year Collections | 448 | 590 | (142) | *-24%* |
| FY20 Deferrals/Extensions | - | 89 | (89) | *-100%* |
| Partnerships | 14 | 28 | (14) | *-51%* |
| Act 154 | 287 | 468 | (181) | *-39%* |
| Non Residents Withholdings | 74 | 69 | 5 | *7%* |
| Current Year Collections | 73 | 67 | 6 | *9%* |
| Current Year NRW for FEDE (Act 73-2008) | 1 | 2 | (1) | *-47%* |
| Motor Vehicles | 118 | 108 | 10 | *9%* |
| Rum Tax (c) | 142 | 107 | 35 | *33%* |
| Alcoholic Beverages | 47 | 58 | (11) | *-19%* |
| Cigarettes (d) | 22 | 35 | (13) | *-38%* |
| HTA | 102 | 136 | (34) | *-25%* |
| Gasoline Taxes | 24 | 35 | (10) | *-29%* |
| Gas Oil and Diesel Taxes | 2 | 4 | (2) | *-53%* |
| Vehicle License Fees ($15 portion) | 6 | 8 | (1) | *-18%* |
| Vehicle License Fees ($25 portion) | 15 | 26 | (11) | *-42%* |
| Petroleum Tax | 42 | 54 | (12) | *-23%* |
| Other | 12 | 9 | 3 | *34%* |
| CRUDITA | 16 | 48 | (33) | *-68%* |
| Other General Fund | 1,070 | 117 | 953 | *813%* |
| **Total** | **$2,539** | **$2,293** | **$245** | **11%** |
| | | | | |
| SUT Collections (f) | 336 | 388 | (52) | *-13%* |
| Current Year  Collections | 336 | 324 | 12 | *4%* |
| FY20 Deferrals/Extensions | - | 64 | (64) | *-100%* |
| | | | | |
| **Total General Fund Collections** | $   2,875 | $   2,682 | $    193 | *7%* |

**YTD General Fund Receipts Cumulative Variance Liquidity Plan vs. Actual Cumulative Variance by Category ($M)**



Footnotes:
(a) General Fund gross cash receipts by concept are approximated using net General Fund revenues adjusted for recurring monthly gross-ups and other adjustments.
(b) Relates to income tax reserves that are subsequently passed through to PRIDCO.
(c) Positive variance of +$31M relates to timing of cash transfers to the TSA
(d) Includes some cigarette tax collections that are subsequently passed through to HTA, PRMBA and other.
(e) This amount includes FY20 Income Tax from Partnerships.
(f) SUT collections excludes PSTBA, FAM & CINE, and only includes the amounts deposited into the TSA for General Fund use.

**Puerto Rico Department of Treasury | AAFAF**

*Other State Fund Collections Summary*

**Key Takeaways / Notes**

1.) Other state fund collections are ahead of the Liquidity Plan. "All Other" state collections positive variance is in part driven by $25M reimbursed to the TSA by the Department of Labor and Human Resources for payroll and operating costs from prior fiscal years. This represents a permanent positive variance relative to the Liquidity Plan. Remaining variance is mostly assumed to be temporary due to timing, as special revenues and other collections may be received with irregular cadence.

**Other State Fund Collections Year to Date: Actual vs. Forecast ($M)**

| | Actual (a) YTD 10/1 | LP YTD 10/1 | Var $ YTD 10/1 | Var % YTD 10/1 |
|---|---|---|---|---|
| **Other State Fund Collections** | | | | |
| Other Fund Revenues & Pass-Throughs | $44 | $33 | $11 | *33%* |
| Electronic Lottery | - | - | - | *NA* |
| Cigarettes (PRITA) | 6 | 9 | (3) | *-34%* |
| ASC Pass Through | 4 | 6 | (2) | *-36%* |
| ACCA Pass Through | 19 | 18 | 0 | *2%* |
| Other | 16 | - | 16 | *NA* |
| Special Revenue Fund (Agency Collections) | 107 | 88 | 19 | *21%* |
| Department of Education | 7 | 5 | 1 | *24%* |
| Department of Health | 13 | 13 | 1 | *7%* |
| Department of State | 4 | 8 | (5) | *-56%* |
| All Other | 83 | 61 | 21 | *34%* |
| Other state collections | 161 | 130 | 32 | *25%* |
| Bayamón University Hospital | 1 | 1 | (0) | *-37%* |
| Adults University Hospital (UDH) | 12 | 8 | 4 | *48%* |
| Pediatric University Hospital | 5 | 4 | 1 | *14%* |
| Commisioner of the Financial Institution | 4 | 4 | 0 | *8%* |
| Department of Housing | 4 | 5 | (1) | *-23%* |
| Gaming Commission | 56 | 64 | (8) | *-12%* |
| All Other | 80 | 43 | 37 | *84%* |
| **Total** | **$312** | **$251** | **$62** | ***25%*** |

**YTD Other State Fund Receipts Cumulative Variance Liquidity Plan vs. Actual Cumulative Variance by Category ($M) (a)**



Source: DTPR

Exhibit D

11

00072

**Puerto Rico Department of Treasury | AAFAF**

*Sales and Use Tax Collections Summary*

**Key Takeaways / Notes**

1.) The proceeds from the Puerto Rico 10.5% SUT rate are allocated as follows: Of the 10.5%, 5.5% is deposited into a COFINA BNY Mellon account until the PSTBA cap is reached, and 4.5% is deposited into the General Fund. The remaining 0.5% is remitted to FAM. The PSTBA cap for FY22 is $473 million.



YTD Gross SUT Collections - General Fund and PSTB ($M) (a) (b)

**Footnotes**

(a) This schedule reflects gross cash activity and is subject to revision based on periodic reconciliations and accounting adjustments.

(b) As of October 1, 2021 there is $50M in SUT collected pending verification and allocation. The verification process includes matching receipts with the appropriate returns and reconciling government account information. Once this process is complete, SUT funds are distributed in accordance with the COFINA Plan of Adjustment based on the ownership of funds and otherwise based on the limits on distributions established therein.

Source: DTPR

**As of October 1, 2021**

**Puerto Rico Department of Treasury | AAFAF**
*Federal Funds Net Cash Flow Summary (a)(b)*

**Key Takeaways / Notes**

1.) Receipts for the Nutritional Assistance Program (NAP) and Medicaid (ASES Pass-through) are received in advance of the subsequent pass through disbursements. Federal Funds received for Payroll and Vendor Payments are typically reimbursed following disbursement. Currently, there may be temporary surplus / (deficit) due timing differences relating to prior year carryover. Puerto Rico received $2.24 billion from the Coronavirus Relief Fund (CRF) established under the CARES Act and $2.5 billion of federal Coronavirus State & Local Fiscal Recovery funds (CSFRF). These funds are held in a separate account outside of TSA. Some of the measures funded by the accounts are initially paid out through TSA, and later reimbursed from the respective external account.

| Weekly FF Net Surplus (Deficit) | FF Inflows | FF Outflows | Net Cash Flow | LP Net Cash Flow | Variance |
|---|---|---|---|---|---|
| Medicaid (ASES) | $ 1 | $ - | $ 1 | $ - | $ 1 |
| Nutritional Assistance Program (NAP) | 67 | (75) | (8) | - | (8) |
| Payroll / Vendor Disbursements / Other Federal Programs | 88 | (57) | 31 | - | 31 |
| COVID-19 Federal Funds (CRF & CSFRF) | 14 | (11) | 3 | - | 3 |
| Federally Reimbursable Tax Credits | - | - | - | - | - |
| **Total** | **$ 170** | **$ (143)** | **$ 27** | **$ -** | **$ 27** |

| YTD Cumulative FF Net Surplus (Deficit) | FF Inflows | FF Outflows | Net Cash | LP Net Cash | Variance |
|---|---|---|---|---|---|
| Medicaid (ASES) | $ 714 | $ (710) | $ 4 | $ - | $ 4 |
| Nutritional Assistance Program (NAP) | 1,065 | (1,069) | (4) | - | (4) |
| Payroll / Vendor Disbursements / Other Federal Programs | 496 | (511) | (14) | - | (14) |
| COVID-19 Federal Funds (CRF & CSFRF) | 219 | (274) | (55) | 42 | (97) |
| Federally Reimbursable Tax Credits | - | - | - | 25 | (25) |
| **Total** | **$ 2,495** | **$ (2,564)** | **$ (69)** | **$ 67** | **$ (136)** |



**YTD Federal Funds Net Cash Flows ($M)**

Footnotes

(a) Please note that federal fund classification as represented here is based on the fund classification at the point of transaction. Agencies regularly review cash transactions and make accounting adjustments that result in fund reclassifications.

Source: DTPR

Exhibit D

13

00074

**As of October 1, 2021**

**Puerto Rico Department of Treasury | AAFAF**

*Payroll / Vendor Disbursements Summary*

**Key Takeaways / Notes : Gross Payroll**

1.) Gross payroll is mainly tracking FY22 forecasts to date. Most variance is driven by lower federally funded DOE payroll than projected. Negative variance for the Department of Correction and Rehabilitation is driven by $19.4M of COVID-related incentives. This represents a permanent variance relative to the FY22 LP; however, the TSA will be reimbursed for these distributions from CSLFRF funds held outside the TSA.

| Gross Payroll ($M) (a)<br>Agency | YTD<br>Variance |
|---|---|
| Department of Education | $ 86 |
| Department of Correction & Rehabilitation | (22) |
| Police | (10) |
| Department of Health | (15) |
| All Other Agencies | (11) |
| **Total YTD Variance** | **$ 28** |

**Key Takeaways / Notes : Vendor Disbursements**

1.) Total YTD vendor payments are largely in line with forecast, though there are various offsetting variances within. Disbursements on behalf of the Department of Health are $32M higher than forecast. This is primarily due to $34M of expenses that will be reimbursed from CRF and CSLFRF funds held outside the TSA.

| Vendor Disbursements ($M)<br>Agency | YTD<br>Variance |
|---|---|
| Department of Education | $ 104 |
| Department of Public Security | 22 |
| Department of Correction & Rehabilitation | (3) |
| Department of Health | (26) |
| All Other Agencies | (73) |
| **Total YTD Variance** | **$ 24** |



Cumulative YTD Variance - Payroll by Agency ($M) (a)



Cumulative YTD Variance - Vendor Disbursements by Agency ($M)

Footnotes

(a) Gross Payroll is equal to the sum of: (i) Net Payroll by Agency from the DTPR RHUM system; (ii) Other Payroll and (iii) Cash outlays for wage garnishments by Agency.

Source: DTPR

Exhibit D

14

**As of October 1, 2021**

**Puerto Rico Department of Treasury | AAFAF**
*State Funded Budgetary Transfers Summary*

**Key Takeaways / Notes**

1.) General Fund appropriations are generally executed throughout the year on a consistent basis in the first week of a given month. The amount transferred each month is usually the sum of the receiving entity's budgeted amount for FY22 divided into twelve, subject to a 2.5% holdback through the first nine months of the fiscal year, to be disbursed during the fourth quarter following reconciliation of General Fund revenues to Fiscal Plan projections and subsequent approval and authorization for release by the Oversight Board and the Director of OMB. Other General Fund transfers and Other Fund transfers require the recognition of certain revenues within DTPR accounting records prior to sending funds to a receiving entity. The Liquidity Plan projected $59M of HTA Capex funds carried over from FY21 would be transferred during September 2021. These funds have not been transferred yet, driving the positive Other GF variance.



**YTD FY2022 Budgeted Appropriations Executed ($M)**

**Remaining Appropriation Budget ($M)**

| Entity Name | Actual YTD | Full Year Expectation | Remaining |
|---|---|---|---|
| GF - UPR | $    153 | $    637 | $    484 |
| GF - CRIM | 22 | 88 | 66 |
| GF - FOMB | 15 | 60 | 45 |
| GF - ASEM | 7 | 22 | 14 |
| GF - Other | 652 | 2,380 | 1,728 |
| OF - Other | 32 | 137 | 104 |
| **Total** | **$    881** | **$    3,323** | **$    2,442** |

**YTD Appropriation Variance ($M)**

| Entity Name | Actual YTD | Liquidity Plan YTD | Variance |
|---|---|---|---|
| GF - UPR | $    153 | $    153 | $    (0) |
| GF - CRIM | 22 | 21 | (0) |
| GF - FOMB | 15 | 15 | - |
| GF - ASEM | 7 | 5 | (2) |
| GF - Other | 652 | 636 | (16) |
| OF - Other | 32 | 34 | 2 |
| **Total** | **$    881** | **$    865** | **$    (16)** |

Source: DTPR

Exhibit D

15

00076

**As of October 1, 2021**

**Puerto Rico Department of Treasury | AAFAF**
*Tax Refunds / PayGo and Pensions Summary*

**Key Takeaways / Notes : Tax Refunds**

1.) Tax refunds includes EITC distributions, refunds to individuals and seniors as well other tax credits.

**YTD Tax Refunds Disbursed ($M)**



| | |
|---|---|
| Act - Tax Refunds | 203 |
| LP - Tax Refunds | 203 |

**Key Takeaways / Notes : PayGo Receipts and Retirement Contributions**

1.) YTD PayGo Receipts are slightly higher than forecast. Further details on the status of PayGo can be found in the monthly PayGo Report on AAFAF's website.

**YTD PayGo Receipts and Retirement Contributions ($M)**

| | |
|---|---|
| Act - PayGo Receipts | 132 |
| LP - PayGo Receipts | 105 |
| Act - Retirement Contributions | 642 |
| LP - Retirement Contributions | 645 |

Source: DTPR

Exhibit D

16

00077

***Requirement 6***



***PayGo***

*PayGo and Individual Contribution Debt by Entity*

*June 30, 2018*

Confidential

*Disclaimer*

- *The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.*

- *The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.*

- *This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.*

- *Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.*

- *This document does not constitute an audit of compliance with any federal law, rule or regulation.*

- *By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.*

- *This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.*

- *Post Hurricane Maria has affected systems, communications or management availability due to prioritization of recovery and reconstruction activities in some component*

- *This is affecting timing, reliability and, therefore, integrity of information and data.*

- *Continuous efforts are being made to enhance data integrity progressively.*

EXHIBIT E

Confidential

**Summary of PayGo Invoices, Individual Contributions, Collections and Debt Balances***

FY17-18

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PayGo Invoices** | | | | | | | | | | | | | |
| Central Government | 94,899,321 | 87,319,201 | 87,319,201 | 87,319,201 | 87,319,201 | 102,237,543 | 87,319,201 | 87,319,201 | 87,319,201 | 87,319,201 | 87,319,201 | 87,319,201 | 1,070,328,878 |
| Public Corporations | 34,666,402 | 32,973,997 | 31,876,981 | 32,229,754 | 32,229,754 | 35,111,350 | 32,314,418 | 32,121,100 | 32,147,988 | 32,159,113 | 32,159,113 | 32,152,891 | 392,142,860 |
| Municipalities | 14,035,639 | 13,159,136 | 13,159,119 | 13,159,127 | 13,159,129 | 14,877,596 | 13,159,129 | 13,159,128 | 13,159,129 | 13,159,123 | 13,159,113 | 13,159,136 | 160,504,504 |
| Judiciary Retirees | 2,225,147 | 2,147,308 | 2,153,499 | 2,158,845 | 2,430,464 | 2,150,065 | 2,161,203 | 2,184,340 | 2,184,349 | 2,164,879 | 2,167,843 | 2,190,466 | 26,318,410 |
| Teacher Retirees | 68,846,309 | 64,941,486 | 65,600,215 | 65,568,265 | 74,481,220 | 66,690,330 | 67,036,578 | 66,617,549 | 67,295,749 | 66,751,001 | 66,591,141 | 66,486,206 | 806,906,050 |
| Total | 214,672,818 | 200,541,128 | 200,109,016 | 200,435,193 | 209,619,769 | 221,066,883 | 201,990,530 | 201,401,318 | 202,106,416 | 201,553,317 | 201,396,411 | 201,307,901 | 2,456,200,701 |
| **PayGo Collections** | | | | | | | | | | | | | |
| Central Government | 94,899,321 | 87,319,201 | 87,319,201 | 87,319,201 | 87,319,201 | 102,237,543 | 87,319,201 | 87,319,201 | 87,319,201 | 87,319,201 | 87,319,201 | 87,319,201 | 1,070,328,878 |
| Public Corporations | 29,343,538 | 27,482,166 | 26,637,448 | 25,665,842 | 18,718,601 | 19,250,232 | 18,230,167 | 17,199,919 | 16,784,523 | 16,796,355 | 16,164,228 | 15,635,437 | 247,908,456 |
| Municipalities | 7,104,905 | 6,385,712 | 5,466,524 | 5,364,705 | 5,144,193 | 6,051,823 | 4,282,573 | 4,021,452 | 3,920,423 | 3,569,898 | 3,368,391 | 1,663,490 | 56,344,090 |
| Judiciary Retirees | 2,225,147 | 2,147,308 | 2,153,499 | 2,158,845 | 2,430,464 | 2,150,065 | 2,161,203 | 2,184,340 | 2,184,349 | 2,164,879 | 2,167,843 | 2,190,466 | 26,318,410 |
| Teacher Retirees | 68,846,309 | 64,941,486 | 65,600,215 | 65,568,265 | 74,481,220 | 66,690,330 | 67,036,578 | 66,617,549 | 67,295,749 | 66,751,001 | 66,591,141 | 66,486,206 | 806,906,050 |
| Total | 202,419,220 | 188,275,873 | 187,176,888 | 186,076,859 | 188,093,680 | 196,379,993 | 179,029,723 | 177,342,461 | 177,504,246 | 176,601,335 | 175,610,804 | 173,294,800 | 2,207,805,883 |
| **PayGo Debt** | | | | | | | | | | | | | |
| Central Government | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Public Corporations | 5,322,863 | 5,491,830 | 5,239,534 | 6,563,912 | 13,511,153 | 15,861,118 | 14,084,251 | 14,921,181 | 15,363,465 | 15,362,757 | 15,994,885 | 16,517,455 | 144,234,404 |
| Municipalities | 6,930,734 | 6,773,424 | 7,692,595 | 7,794,422 | 8,014,936 | 8,825,772 | 8,876,556 | 9,137,676 | 9,238,705 | 9,589,225 | 9,790,722 | 11,495,646 | 104,160,414 |
| Judiciary Retirees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Teacher Retirees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | 12,253,597 | 12,265,254 | 12,932,129 | 14,358,335 | 21,526,089 | 24,686,890 | 22,960,807 | 24,058,857 | 24,602,170 | 24,951,982 | 25,785,607 | 28,013,100 | 248,394,818 |
| **Individual Contribution Collections** | | | | | | | | | | | | | |
| Central Government | 11,165,522 | 11,135,292 | 11,162,291 | 10,274,723 | 9,378,145 | 9,308,442 | 9,265,176 | 9,238,779 | 9,179,037 | 9,119,732 | 9,086,279 | 9,434,547 | 117,747,968 |
| Public Corporations | 10,070,071 | 10,490,868 | 9,825,734 | 9,102,524 | 8,456,636 | 8,383,882 | 8,671,845 | 8,099,454 | 8,051,505 | 7,759,654 | 7,759,855 | 7,651,582 | 104,323,609 |
| Municipalities | 3,847,251 | 3,740,616 | 3,557,456 | 3,399,172 | 3,244,322 | 3,301,879 | 3,140,070 | 3,192,495 | 3,091,265 | 3,039,557 | 2,965,370 | 2,884,525 | 39,403,976 |
| Judiciary Retirees | 241,832 | 240,449 | 239,780 | 234,963 | 242,205 | 234,379 | 238,143 | 237,036 | 236,007 | 234,772 | 233,480 | 230,967 | 2,844,012 |
| Teacher Retirees | 446,072 | 525,497 | 620,155 | 490,493 | 329,027 | 468,765 | 396,973 | 407,852 | 405,778 | 421,469 | 419,621 | 416,114 | 5,347,814 |
| Total | 25,770,748 | 26,132,721 | 25,405,416 | 23,501,875 | 21,650,335 | 21,697,348 | 21,712,206 | 21,175,616 | 20,963,592 | 20,575,184 | 20,464,605 | 20,617,735 | 269,667,379 |
| **Individual Contribution Debt** | | | | | | | | | | | | | |
| Central Government | - | - | - | - | - | - | 134,487 | 134,487 | 134,487 | 138,575 | 261,151 | 840,675 | 1,643,861 |
| Public Corporations | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Municipalities | 465,231 | 576,702 | 521,322 | 439,278 | 512,620 | 468,225 | 488,971 | 432,573 | 473,010 | 541,803 | 580,246 | 734,035 | 6,234,017 |
| Judiciary Retirees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Teacher Retirees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total | 465,231 | 576,702 | 521,322 | 439,278 | 512,620 | 468,225 | 623,458 | 567,060 | 607,497 | 680,378 | 841,397 | 1,574,709 | 7,877,878 |

*Invoices of previous months may fluctuate because of credits issued due to Employers claims.

EXHIBIT E

## Adjustment Schedule

| PayGo Invoices | Central Government | Public Corporations | Municipalities | Judiciary Retirees | Teacher Retirees | Total July-May |
|---|---|---|---|---|---|---|
| Invoiced FY17-18 | $ 983,009,677 | $ 359,989,969 | $ 147,345,368 | $ 24,127,943 | $ 740,419,844 | $ **2,254,892,800** |
| Invoices as of 5/31/18 report | 983,009,677 | 365,811,626 | 147,345,368 | 23,398,887 | 740,419,843 | **2,259,985,400** |
| Adjustment for 5/31/18 report | - | - | - | 729,057 | - | **(5,092,600)** |
| Adjusted 5/31/18 report | $ 983,009,677 | $ 365,811,626 | $ 147,345,368 | $ 24,127,943 | $ 740,419,843 | $ **2,260,714,457** |

*Rational*

- *The adjustments to the 5/31/18 PayGo Report are mostly due an increase in PayGo invoices for the Judiciary Retirement System which now includes pension payments for Medical, Summer and Christmas Bonuses.*

EXHIBIT E

***Requirement 6***



***PayGo***

*PayGo and Individual Contribution Debt by Entity*

*August 15, 2019*

Confidential

EXHIBIT F

**Disclaimer**

- The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

- This document does not constitute an audit of compliance with any federal law, rule or regulation.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.

- Post Hurricane Maria has affected systems, communications or management availability due to prioritization of recovery and reconstruction activities in some component

- This is affecting timing, reliability and, therefore, integrity of information and data.

- Continuous efforts are being made to enhance data integrity progressively.

**Confidential**

EXHIBIT F

**Summary of PayGo Invoices and Debt Balances***
FY18-19

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PayGo Invoices** | | | | | | | | | | | | | |
| Central Government | $ 73,768,271 | $ 68,861,827 | $ 69,172,319 | $ 69,244,488 | $ 69,558,899 | $ 77,674,897 | $ 70,268,839 | $ 70,317,343 | $ 33,842,112 | $ 71,417,210 | $ 70,658,943 | $ 792,689,595 | 1,537,474,743 |
| Government Entities | 29,977,060 | 28,572,888 | 28,635,680 | 28,773,736 | 28,913,423 | 32,183,105 | 29,168,061 | 29,293,048 | 29,424,501 | 29,431,931.68 | 29,404,992 | 30,559,735 | 354,338,160 |
| Municipalities | 14,615,774 | 13,256,453 | 13,191,362 | 13,264,093 | 13,265,602 | 16,132,673 | 13,235,487 | 13,412,102 | 13,457,002 | 13,549,792.62 | 8,923,700 | 13,522,624 | 159,826,664 |
| Judiciary Retirees | 2,296,478 | 2,202,362 | 2,161,898 | 2,148,621 | 2,156,977 | 2,405,234 | 2,167,640 | 2,162,826 | 2,166,788 | 2,192,080.45 | 2,196,785 | 2,201,180 | 26,458,868 |
| Teacher Retirees | 70,604,997 | 66,247,744 | 67,000,821 | 67,125,097 | 67,448,272 | 75,526,327 | 69,117,688 | 68,220,586 | 68,464,617 | 69,258,185.96 | 68,536,625 | 68,343,901 | 825,894,861 |
| **Total** | $ 191,262,581 | $ 179,141,273 | $ 180,162,081 | $180,556,034 | $181,343,173 | $203,922,236 | $183,957,713 | $183,405,905 | $147,355,020 | $ 185,849,200 | $179,721,045 | $ 907,317,035 | $ 2,903,993,297 |
| **PayGo Collections** | | | | | | | | | | | | | |
| Central Government | $ 73,768,271 | $ 68,861,827 | $ 69,172,319 | $ 69,244,488 | $ 69,558,899 | $ 77,674,897 | $ 70,268,839 | $ 70,317,343 | $ 33,842,112 | $ 71,417,210 | $ 70,658,943 | $ 792,689,595 | 1,537,474,743 |
| Government Entities | 27,690,275 | 26,042,763 | 25,483,076 | 25,189,371 | 26,206,078 | 28,646,775 | 26,026,193 | 25,691,706 | 25,319,988 | 25,071,296 | 3,108,699 | 13,090,057 | 277,575,257 |
| Municipalities | 8,440,618 | 7,342,177 | 7,360,971 | 7,426,668 | 7,039,267 | 7,717,408 | 5,737,921 | 5,663,396 | 5,591,635 | 4,836,199 | 1,452,337 | 2,199,184 | 70,807,781 |
| Judiciary Retirees | 2,296,478 | 2,202,362 | 2,161,898 | 2,148,621 | 2,156,977 | 2,405,234 | 2,167,640 | 2,162,826 | 2,166,788 | 2,192,080 | 2,196,785 | 2,201,180 | 26,458,868 |
| Teacher Retirees | 70,604,997 | 66,247,744 | 67,000,821 | 67,125,097 | 67,448,272 | 75,526,327 | 69,117,688 | 68,220,586 | 68,464,617 | 69,258,186 | 68,536,625 | 68,343,901 | 825,894,861 |
| **Total** | $ 182,800,640 | $ 170,696,872 | $ 171,179,086 | $171,134,244 | $172,409,494 | $191,970,641 | $173,318,261 | $172,055,858 | $135,385,139 | $ 172,774,971 | $145,953,388 | $ 878,532,917 | $ 2,738,211,511 |
| **PayGo Debt** | | | | | | | | | | | | | |
| Central Government | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Government Entities | 2,286,785 | 2,530,124 | 3,152,604 | 3,584,365 | 2,707,345 | 3,536,330 | 3,141,887 | 3,601,342 | 4,104,513 | 4,360,636 | 26,296,294 | 17,460,677.82 | 76,762,903 |
| Municipalities | 6,175,156 | 5,914,276 | 5,830,391 | 5,837,426 | 6,226,334 | 8,415,265 | 7,497,565 | 7,748,705 | 7,865,368 | 8,713,594 | 7,471,363 | 11,323,440.12 | 89,018,883 |
| Judiciary Retirees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Teacher Retirees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total** | $ 8,461,941 | $ 8,444,401 | $ 8,982,995 | $ 9,421,790 | $ 8,933,679 | $ 11,951,595 | $ 10,639,453 | $ 11,350,047 | $ 11,969,881 | $ 13,074,230 | $ 33,767,657 | $ 28,784,118 | 165,781,786 |

**Summary of Individual Contribution Collections and Debt Balances***
FY18-19

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ***Individual Contribution Collections*** | | | | | | | | | | | | | |
| Central Government | $ 8,786,713 | $ 8,726,052 | $ 8,670,200 | $ 8,678,975 | $ 8,555,930 | $ 8,553,004 | $ 8,454,308 | $ 8,537,309 | $ 8,523,210 | $ 8,612,475 | $ 9,025,395 | $ 104,146,860 | 199,270,431 |
| Government Entities | 8,003,106 | 8,741,301 | 7,931,617 | 7,816,842 | 7,945,877 | 8,366,273 | 13,102,866 | 9,755,852 | 8,468,826 | 7,694,947 | 4,476,927 | 4,258,983 | 96,563,419 |
| Municipalities | 3,456,879 | 3,471,446 | 3,432,003 | 3,447,219 | 3,485,764 | 3,433,883 | 3,391,017 | 3,396,147 | 3,403,972 | 3,376,585 | 3,430,836 | 3,142,238 | 40,867,990 |
| Judiciary Retirees | 230,132 | 229,789 | 229,692 | 228,401 | 226,229 | 231,844 | 226,688 | 228,401 | 229,914 | 229,117 | 230,910 | 227,818 | 2,748,934 |
| Teacher Retirees | 98,743 | 399,757 | 494,756 | 520,641 | 548,706 | 534,772 | 559,445 | 595,250 | 593,349 | 618,290 | 639,673 | 610,721.03 | 6,214,104 |
| **Total** | $ 20,575,573 | $ 21,568,345 | $ 20,758,269 | $ 20,692,079 | $ 20,762,506 | $ 21,119,777 | $ 25,734,324 | $ 22,512,960 | $ 21,219,271 | $ 20,531,414 | $ 17,803,742 | $ 112,386,620 | $ 345,664,878 |
| ***Individual Contribution Debt*** | | | | | | | | | | | | | |
| Central Government | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - |
| Government Entities | - | - | - | - | - | - | - | - | - | 28 | 3,958 | 32,037 | 36,023 |
| Municipalities | - | - | - | - | - | - | - | - | - | 1,339 | - | 115,582 | 116,921 |
| Judiciary Retirees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Teacher Retirees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,367 | $ 3,958 | $ 147,618 | 152,944 |

*Invoices of previous months may fluctuate because of credits issued due to Employers claims.

EXHIBIT F

*Requirement 6*



*PayGo*

*PayGo and Individual Contribution Debt by Entity*

*For the month of June FY20*

Confidential

**Disclaimer**

- The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

- Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States.

- This document does not constitute an audit of compliance with any federal law, rule or regulation.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.

- Continuous efforts are being made to enhance data integrity progressively.

EXHIBIT G

Confidential

| Summary of PayGo Invoices and Debt Balances (a) |
|---|
| FY2020 |

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PayGo Invoices** | | | | | | | | | | | | | |
| Central Government (b) | $ 108,861,493 | $ 100,521,733 | $ 100,137,167 | $ 100,261,965 | $ 100,183,547 | $ 118,724,128 | $ 99,966,813 | $ 100,607,611 | $ 100,865,585 | $ 101,252,157 | $ 99,388,881 | $ 97,511,883 | $ 1,228,282,963 |
| Government Entities (c) | 30,120,244 | 28,774,525 | 28,870,556 | 28,799,777 | 28,882,947 | 30,646,826 | 28,704,970 | 27,990,866 | 28,066,869 | 27,980,418 | 28,840,397 | 29,967,937 | 347,646,333 |
| Municipalities (b) | - | - | - | - | - | - | - | - | - | 139,013,933 | 13,411,085 | 12,706,996 | 165,132,013.24 |
| Judicial Retirement System | 2,376,323 | 2,247,902 | 2,253,902 | 2,245,847 | 2,243,790 | 2,504,335 | 2,354,386 | 2,363,114 | 2,345,298 | 2,337,236 | 2,344,212 | 2,319,861 | 27,936,206 |
| Teachers' Retirement System | 71,983,796 | 69,618,575 | 71,847,488 | 72,543,069 | 78,423,865 | 71,885,948 | 71,548,831 | 72,204,761 | 74,850,271 | 73,599,094 | 72,798,077 | 72,831,145 | 874,134,920 |
| **Total** | $ 213,341,855 | $ 201,162,735 | $ 203,109,114 | $ 203,850,657 | $ 209,734,150 | $ 223,761,238 | $ 202,575,000 | $ 203,166,352 | $ 206,128,023 | $ 344,182,838 | $ 216,782,652 | $ 215,337,821 | $ 2,643,132,436 |
| **PayGo Collections** | | | | | | | | | | | | | |
| Central Government (b) | $ 108,861,493 | $ 100,521,733 | $ 100,137,167 | $ 100,261,965 | $ 100,183,547 | $ 118,724,128 | $ 99,966,813 | $ 100,607,611 | $ 100,865,585 | $ 101,252,157 | $ 99,388,881 | $ 97,511,883 | $ 1,228,282,963 |
| Government Entities (c) | 28,928,330 | 27,696,137 | 27,773,600 | 27,736,230 | 27,825,982 | 29,386,616 | 26,943,070 | 26,176,468 | 26,281,099 | 24,963,060 | 6,957,656 | 7,876,471 | 288,544,718 |
| Municipalities (b) | - | - | - | - | - | - | - | - | - | 97,397,317 | 790,360 | 350,199 | 98,537,876.61 |
| Judicial Retirement System | 2,376,323 | 2,247,902 | 2,253,902 | 2,245,847 | 2,243,790 | 2,504,335 | 2,354,386 | 2,363,114 | 2,345,298 | 2,337,236 | 2,344,212 | 2,319,861 | 27,936,206 |
| Teachers' Retirement System | 71,983,796 | 69,618,575 | 71,847,488 | 72,543,069 | 78,423,865 | 71,885,948 | 71,548,831 | 72,204,761 | 74,850,271 | 73,599,094 | 72,798,077 | 72,831,145 | 874,134,920 |
| **Total** | $ 212,149,941 | $ 200,084,347 | $ 202,012,158 | $ 202,787,110 | $ 208,677,185 | $ 222,501,027 | $ 200,813,100 | $ 201,351,955 | $ 204,342,253 | $ 299,548,864 | $ 182,279,186 | $ 180,889,559 | $ 2,517,436,684 |
| **PayGo Debt** | | | | | | | | | | | | | |
| Central Government | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Government Entities (c) | 1,191,915 | 1,078,389 | 1,096,956 | 1,063,547 | 1,056,965 | 1,260,210 | 1,761,900 | 1,814,398 | 1,785,770 | 3,017,358 | 21,882,742 | 22,091,467 | 59,101,616 |
| Municipalities | - | - | - | - | - | - | - | - | - | 41,616,616 | 12,620,724 | 12,356,796 | 66,594,136.63 |
| Judicial Retirement System | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Teachers' Retirement System | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total** | $ 1,191,915 | $ 1,078,389 | $ 1,096,956 | $ 1,063,547 | $ 1,056,965 | $ 1,260,210 | $ 1,761,900 | $ 1,814,398 | $ 1,785,770 | $ 44,633,974 | $ 34,503,466 | $ 34,448,263 | $ 125,695,752 |

(a) Invoices of previous months may fluctuate because of credits issued due to Employers claims.
(b) Due to the invalidation of Law 29 , the invoicing of Municipalities in FY2020 only began in April, 2020.
(c) Governmental authorities with autonomous structure separate from the central government administration and with independent treasury functions. There has been slowdown in collections due to processing delays related to Executive Orders 2020-23 & 2020-29 and the imposed curfew.

EXHIBIT G

Confidential

## Summary of Individual Contribution Collections and Debt Balances (a)
### FY2020

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Individual Contribution Collections** | | | | | | | | | | | | | |
| Central Government | $ 8,446,234 | $ 8,230,231 | $ 8,259,683 | $ 8,247,775 | $ 8,206,727 | $ 8,233,857 | $ 8,369,494 | $ 8,328,952 | $ 8,351,884 | $ 8,345,957 | $ 8,334,889 | $ 8,310,554 | $ 99,666,235 |
| Government Entities | 8,077,370 | 8,058,715 | 7,833,579 | 7,882,656 | 7,814,460 | 7,741,296 | 5,940,281 | 5,352,381 | 5,121,129 | 5,120,723 | 5,060,076 | 3,928,177 | 77,930,844 |
| Municipalities | 3,415,860 | 3,433,467 | 3,414,615 | 3,404,513 | 3,475,114 | 3,409,656 | 3,408,214 | 3,392,233 | 3,373,675 | 3,312,050 | 3,367,795 | 3,066,758 | 40,473,949 |
| Judicial Retirement System | 234,541 | 235,741 | 234,349 | 233,530 | 232,699 | 231,542 | 229,271 | 227,361 | 226,609 | 226,372 | 224,420 | 223,295 | 2,759,731 |
| Teachers' Retirement System - DC (b) | 540,873 | 371,454 | 625,084 | 641,953 | 660,156 | 657,708 | 649,242 | 892,986 | 710,919 | 718,350 | 703,476 | 675,002 | 7,847,202 |
| Teachers' Retirement System - DB (c) | 5,859,913 | 5,754,493 | 5,979,407 | 5,818,810 | 6,022,467 | 5,826,513 | 5,696,300 | 5,421,731 | 5,631,530 | 5,629,480 | 5,624,311 | 5,494,229 | 68,759,184 |
| **Total** | $ 26,574,791 | $ 26,084,102 | $ 26,346,716 | $ 26,229,237 | $ 26,411,623 | $ 26,100,572 | $ 24,292,802 | $ 23,615,643 | $ 23,415,746 | $ 23,415,746 | $ 20,442,148 | $ 20,442,148 | $ 297,437,146 |
| **Individual Contribution Debt** | | | | | | | | | | | | | |
| Central Government | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Government Entities | 127,241 | 167,307 | 126,751 | 124,515 | 125,007 | 126,439 | 11,732 | 11,732 | 162,186 | 124,345 | 202,589 | 1,339,839 | 2,649,682 |
| Municipalities | - | - | 1,354 | - | - | - | - | - | 28,157 | 64,561 | 104,857 | 250,883 | 449,812 |
| Judicial Retirement System | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Teachers' Retirement System - DC (b) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Teachers' Retirement System - DB (c) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | - |
| **Total** | $ 127,241 | $ 167,307 | $ 128,105 | $ 124,515 | $ 125,007 | $ 126,439 | $ 11,732 | $ 11,732 | $ 190,343 | $ 188,907 | $ 307,445 | $ 1,590,721 | $ 3,099,494 |

(a) Invoices of previous months may fluctuate because of credits issued due to Employers claims.
(b) Pertains to employees under Act 106 Defined Contribution Plan
(c) Pertains to active employees under Law 91 – 2004, as amended, under the original Defined Benefit Plan. Such funds are deposited directly to the TSA Operational Account to fund PayGo Expenses.

EXHIBIT G

Confidential

*Requirement 6 (A)*



*PayGo*

*PayGo and Individual Contribution Debt by Entity*

*For the month of June FY21*

EXHIBIT H                                                    Confidential

00089

**Disclaimer**

- The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

- Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States.

- This document does not constitute an audit of compliance with any federal law, rule or regulation.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.

- Continuous efforts are being made to enhance data integrity progressively.

EXHIBIT H

Confidential

| Summary of PayGo Invoices and Debt Balances (a) |
|:---:|
| FY2021 |

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **PayGo Invoices** | | | | | | | | | | | | | |
| Central Government | $ 94,321,340 | $ 87,416,858 | $ 86,995,924 | $ 86,904,193 | $ 85,074,536 | $ 99,723,935 | $ 85,912,992 | $ 86,297,661 | $ 86,845,605 | $ 85,570,560 | $ 84,293,304 | $ 83,772,705 | 1,053,129,613 |
| Government Entities (b) | 28,794,207 | 27,620,908 | 27,446,304 | 27,461,663 | 27,445,781 | 29,884,311 | 27,248,658 | 27,452,804 | 27,508,070 | 28,278,657 | 29,269,136 | 31,022,351 | 339,432,849 |
| Municipalities | 14,735,651 | 13,333,802 | 13,287,440 | 13,279,242 | 13,287,776 | 15,913,390 | 13,152,652 | 13,324,094 | 13,316,172 | 13,366,377 | 13,269,866 | 13,017,361 | 163,283,821 |
| Judicial Retirement System | 2,426,852 | 2,355,920 | 2,337,535 | 2,337,595 | 2,322,393 | 2,576,548 | 2,333,743 | 2,298,847 | 2,336,499 | 2,362,576 | 2,345,532 | 2,358,777 | 28,392,816 |
| Teachers' Retirement System | 76,354,341 | 74,698,697 | 77,178,857 | 76,420,984 | 81,395,436 | 74,650,101 | 73,624,711 | 75,115,431 | 76,085,151 | 75,617,742 | 72,798,077 | 75,063,365 | 909,002,893 |
| **Total** | $ 216,632,390 | $ 205,426,185 | $ 207,246,059 | $ 206,403,676 | $ 209,525,923 | $ 222,748,285 | $ 202,272,755 | $ 204,488,838 | $ 206,091,497 | $ 205,195,911 | $ 201,975,914 | $ 205,234,559 | $ 2,493,241,992 |
| **PayGo Collections** | | | | | | | | | | | | | |
| Central Government | $ 94,321,340 | $ 87,416,858 | $ 86,995,924 | $ 86,904,193 | $ 85,074,536 | $ 99,723,935 | $ 85,912,992 | $ 86,297,661 | $ 86,845,605 | $ 85,570,560 | $ 84,293,304 | $ 83,772,705 | 1,053,129,613 |
| Government Entities (b) | 26,006,212 | 24,709,423 | 24,557,226 | 24,582,650 | 24,574,807 | 26,705,303 | 24,400,134 | 24,578,991 | 24,594,118 | 24,530,379 | 25,053,442 | 6,597,091 | 280,889,776 |
| Municipalities | 9,731,674 | 8,013,556 | 7,924,007 | 7,933,610 | 7,255,454 | 8,419,738 | 6,872,213 | 7,579,031 | 7,614,919 | 7,998,179 | 7,916,150 | 5,592,644 | 92,851,175 |
| Judicial Retirement System | 2,426,852 | 2,355,920 | 2,337,535 | 2,337,595 | 2,322,393 | 2,576,548 | 2,333,743 | 2,298,847 | 2,336,499 | 2,362,576 | 2,345,532 | 2,358,777 | 28,392,816 |
| Teachers' Retirement System | 76,354,341 | 74,698,697 | 77,178,857 | 76,420,984 | 81,395,436 | 74,650,101 | 73,624,711 | 75,115,431 | 76,085,151 | 75,617,742 | 72,798,077 | 75,063,365 | 909,002,893 |
| **Total** | $ 208,840,419 | $ 197,194,455 | $ 198,993,549 | $ 198,179,031 | $ 200,622,627 | $ 212,075,625 | $ 193,143,792 | $ 195,869,961 | $ 197,476,293 | $ 196,079,435 | $ 192,406,504 | $ 173,384,582 | $ 2,364,266,273 |
| **PayGo Debt** | | | | | | | | | | | | | |
| Central Government | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - | $    - |
| Government Entities (b) | 2,787,995 | 2,911,485 | 2,889,078 | 2,879,013 | 2,870,974 | 3,179,008 | 2,848,524 | 2,873,813 | 2,913,951 | 3,748,278 | 4,215,694 | 24,425,260 | 58,543,072 |
| Municipalities | 5,003,977 | 5,320,246 | 5,363,432 | 5,345,632 | 6,032,322 | 7,493,652 | 6,280,439 | 5,745,063 | 5,701,252 | 5,368,198 | 5,353,716 | 7,424,717 | 70,432,647 |
| Judicial Retirement System | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Teachers' Retirement System | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total** | $ 7,791,972 | $ 8,231,730 | $ 8,252,510 | $ 8,224,645 | $ 8,903,296 | $ 10,672,660 | $ 9,128,963 | $ 8,618,876 | $ 8,615,204 | $ 9,116,475 | $ 9,569,410 | $ 31,849,977 | $ 128,975,719 |

(a) Invoices of previous months may fluctuate because of credits issued due to Employers claims.
(b) Governmental authorities with autonomous structure separate from the central government administration and with independent treasury functions.

EXHIBIT H

Confidential

## Summary of Individual Contribution Collections and Debt Balances (a)
### FY2021

| | July | August | September | October | November | December | January | February | March | April | May | June | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Individual Contribution Collections** | | | | | | | | | | | | | |
| Central Government | $ 8,398,372 | $ 8,352,027 | $ 8,422,730 | $ 8,603,642 | $ 9,163,467 | $ 8,882,027 | $ 8,812,800 | $ 8,784,241 | $ 8,799,476 | $ 8,815,152 | $ 8,796,007 | $ 8,788,662 | **104,618,602** |
| Government Entities | 6,002,716 | 5,420,882 | 5,446,234 | 5,510,429 | 5,442,583 | 5,931,722 | 5,541,040 | 5,431,844 | 5,423,927 | 5,498,169 | 5,287,877 | 5,629,204 | **66,566,628** |
| Municipalities | 3,452,385 | 3,414,550 | 3,444,648 | 3,500,384 | 3,420,571 | 3,398,180 | 3,355,517 | 3,397,096 | 3,403,506 | 3,466,848 | 3,402,246 | 2,924,951 | **40,580,882** |
| Judicial Retirement System | 232,097 | 233,805 | 235,354 | 234,629 | 232,738 | 232,209 | 281,649 | 263,173 | 264,566 | 262,920 | 262,310 | 260,579 | **2,996,028** |
| Teachers' Retirement System - DC (b) | 5,236,043 | 5,149,972 | 5,281,582 | 5,237,125 | 5,207,458 | 5,220,501 | 5,213,278 | 5,155,835 | 6,042,458 | 5,149,560 | 5,143,876 | 5,010,252 | **63,047,939** |
| Teachers' Retirement System - DB (c) | 607,183 | 357,551 | 784,788 | 767,653 | 795,898 | 783,403 | 790,825 | 798,032 | 1,944,612 | 872,316 | 872,809 | 830,502 | **10,205,572** |
| **Total** | $ 23,928,795 | $ 22,928,787 | $ 23,615,336 | $ 23,853,863 | $ 24,262,715 | $ 24,448,042 | $ 23,995,110 | $ 23,830,221 | $ 25,878,544 | $ 24,064,965 | $ 23,765,125 | $ 23,444,150 | **288,015,652** |
| **Individual Contribution Debt** | | | | | | | | | | | | | |
| Central Government | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | **-** |
| Government Entities | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| Municipalities | - | - | - | - | - | - | - | - | - | - | - | 142,051 | **142,051** |
| Judicial Retirement System | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| Teachers' Retirement System - DC (b) | - | - | - | - | - | - | - | - | - | - | - | - | **-** |
| Teachers' Retirement System - DB (c) | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | **-** |
| **Total** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 142,051 | **142,051** |

(a) Invoices of previous months may fluctuate because of credits issued due to Employers claims.
(b) Pertains to employees under Act 106 Defined Contribution Plan
(c) Pertains to active employees under Law 91 – 2004, as amended, under the original Defined Benefit Plan. Such funds are deposited directly to the TSA Operational Account to fund PayGo Expenses.

EXHIBIT H

Confidential

4



# *Summary of Current Year Tax Billings vs. Current Year Tax Collections*

## *Property Tax Billed (A)*

| Fiscal Year | Concept - All Tax | | | Fiscal Year | Concept - 1.03% | | |
| | Real | Personal | Total | | Real | Personal | Total |
|---|---|---|---|---|---|---|---|
| 2015-2016 | 770,090,154.62 | 425,206,184.33 | 1,195,296,338.95 | 2015-2016 | 78,977,070.57 | 55,079,050.83 | 134,056,121.39 |
| 2016-2017 | 781,171,253.34 | 413,416,670.32 | 1,194,587,923.66 | 2016-2017 | 80,190,752.55 | 52,791,705.57 | 132,982,458.12 |
| 2017-2018 | 819,568,781.15 | 375,922,531.26 | 1,195,491,312.41 | 2017-2018 | 82,374,007.37 | 47,555,002.36 | 129,929,009.73 |
| 2018-2019 | 824,877,159.82 | 398,066,792.98 | 1,222,943,952.80 | 2018-2019 | 82,705,151.87 | 50,256,283.79 | 132,961,435.66 |
| 2019-2020 | 836,599,646.38 | 430,678,930.22 | 1,267,278,576.60 | 2019-2020 | 83,924,757.11 | 54,285,931.06 | 138,210,688.18 |

## *Property Tax Collected (B)*

| Fiscal Year | Current Year - All Tax Collections | | | Fiscal Year | Current Year - 1.03% Collections | | |
| | Real | Personal | Total | | Real | Personal | Total |
|---|---|---|---|---|---|---|---|
| 2015-2016 | 522,538,103.32 | 301,185,369.22 | 823,723,472.54 | 2015-2016 | 53,589,217.33 | 39,014,023.95 | 92,603,241.28 |
| 2016-2017 | 533,512,492.90 | 324,981,556.02 | 858,494,048.92 | 2016-2017 | 54,767,463.75 | 41,498,884.43 | 96,266,348.18 |
| 2017-2018 | 552,811,585.36 | 341,453,878.60 | 894,265,463.96 | 2017-2018 | 55,562,518.55 | 43,194,644.25 | 98,757,162.80 |
| 2018-2019 | 558,270,502.49 | 390,447,623.57 | 948,718,126.06 | 2018-2019 | 55,974,209.18 | 49,294,356.93 | 105,268,566.11 |
| 2019-2020 | 546,210,777.67 | 372,909,046.49 | 919,119,824.16 | 2019-2020 | 54,793,959.15 | 47,004,191.22 | 101,798,150.37 |

## *Property Tax Due but not Collected (C)*

| Fiscal Year | Current Year - All Tax Unpaid | | | Fiscal Year | Current Year - Unpaid 1.03% | | |
| | Real | Personal | Total | | Real | Personal | Total |
|---|---|---|---|---|---|---|---|
| 2015-2016 | 247,552,051.30 | 124,020,815.11 | 371,572,866.41 | 2015-2016 | 25,387,853.24 | 16,065,026.88 | 41,452,880.11 |
| 2016-2017 | 247,658,760.44 | 88,435,114.30 | 336,093,874.74 | 2016-2017 | 25,423,288.80 | 11,292,821.15 | 36,716,109.94 |
| 2017-2018 | 266,757,195.79 | 34,468,652.66 | 301,225,848.45 | 2017-2018 | 26,811,488.82 | 4,360,358.11 | 31,171,846.93 |
| 2018-2019 | 266,606,657.33 | 7,619,169.41 | 274,225,826.74 | 2018-2019 | 26,730,942.69 | 961,926.86 | 27,692,869.55 |
| 2019-2020 | 290,388,868.71 | 57,769,883.73 | 348,158,752.44 | 2019-2020 | 29,130,797.96 | 7,281,739.84 | 36,412,537.81 |

*Amounts shown as Tax Collections (B) only take into consideration current year tax collections. They do not take into account prior year collections made during the fiscal year.

EXHIBIT I

|  | 6/30/2018 | 6/30/2019 | 6/30/2020 | 6/30/2021 |
|---|---|---|---|---|
| Central Government | $ 1,070,328,878 | $ 1,537,474,743 | $ 1,228,282,963 | $ 1,053,129,613 |
| Government Entities | 369,758,045 | 354,338,160 | 347,646,333 | 339,432,849 |
| Municipalities | 160,504,504 | 159,826,664 | 165,132,013 | 163,283,821 |
| Judicial Retirement System | 26,318,410 | 26,458,868 | 27,936,206 | 28,392,816 |
| Teachers' Retirement System | 806,906,050 | 825,894,861 | 874,134,920 | 909,002,893 |
| **Total** | **$ 2,433,815,889** | **$ 2,903,993,297** | **$ 2,643,132,436** | **$ 2,493,241,992** |
| Total (minus Govt Entities and Municipalities) | 1,903,553,340 | 2,389,828,472 | 2,130,354,090 | 1,990,525,322 |

EXHIBIT J



# The Commonwealth of Puerto Rico
## Update on Fiscal and Economic Progress

*FY 2014 Q1 Investor Webcast - October 15, 2013*

# GDB believes that any comparison of the public debt levels of Puerto Rico with the states should include state, local and federal debt

> **If one factors in the federal debt load, PR would rank last in outstanding debt per capita amongst all US jurisdictions***

## Puerto Rico Debt Per Capita vs the USA Comparison Analysis as of June 30, 2011
### (in millions)

### State Level Debt(1)

US Avg: $2,390 per capita
PR: $2,805 per capita
**Rank: #12 of 51**

### State & Local Level Debt(2)

US Avg: $7,355 per capita
PR: $15,956 per capita
**Rank: #1 of 51**

### State, Local, Federal Level Debt(3)

US Avg: $57,024 per capita
PR: $15,956 per capita
**Rank: #51 of 51**



| State | | Rank (of 51) |
|---|---|---|
| HI | $5,376 | 3 |
| CT | $5,087 | 4 |
| NY | $4,976 | 5 |
| AK | $3,825 | 6 |
| RI | $3,787 | 7 |
| DE | $3,668 | 8 |
| CA | $3,122 | 9 |
| IL | $2,874 | 10 |
| NH | $2,847 | 11 |
| PR | $2,805 | 12 |

| State | | Rank (of 51) |
|---|---|---|
| PR | $15,956 | 1 |
| NY | $13,552 | 2 |
| CA | $9,971 | 3 |
| NJ | $9,739 | 4 |
| NV | $9,500 | 5 |
| WA | $9,379 | 6 |
| HI | $9,340 | 7 |
| MA | $9,258 | 8 |
| IL | $8,991 | 9 |
| AK | $8,927 | 10 |



| State | | Rank (of 51) |
|---|---|---|
| MS | $53,766 | 42 |
| OH | $53,690 | 43 |
| NC | $53,676 | 44 |
| SD | $53,042 | 45 |
| WV | $52,887 | 46 |
| AR | $52,819 | 47 |
| MT | $51,895 | 48 |
| ID | $51,698 | 49 |
| WY | $51,334 | 50 |
| PR | $15,956 | 51 |

*Source: US Bureau of the Census and the Government Development Bank for Puerto Rico
(1) For Puerto Rico State Debt includes GO debt.
(2) For Puerto Rico local debt includes debt of Municipalities and Public Corporations.
(3) US Federal Debt per capita is $49,669

EXHIBIT K

00096

57

# Commonwealth of Puerto Rico

# Tax Reform Assessment Project

*Unified Tax Code of Puerto Rico:*

*Tax Policy Implementation Options*

*Executive Summary*

*October 31, 2014*

Exhibit L                                                                                    00097

# Table of Contents

1.1  Scope of Report ........................................................................................................ 1

1.2  Methodology ............................................................................................................ 2

1.3  Summary of Principal Findings ................................................................................ 6

1.4  Options .................................................................................................................. 11

1.5  Summary of Projections ......................................................................................... 14

1.6  Transition .............................................................................................................. 16

KPMG's role is limited to the services and deliverables articulated in the Contract for Professional Services dated March 18, 2014 as subsequently amended (the "Engagement Contract").  It is understood that any actions taken by the Government of the Commonwealth of Puerto Rico related to these services and deliverables may involve numerous factors that are outside of the Contract's scope.  KPMG's services and deliverables cannot take such factors into account and, therefore, recommendations for such actions are not implied and should not be inferred from these services and deliverables. Further, while such deliverables may include analyses of certain legislative initiatives, no service described in the Engagement Contract and/or subsequent amendments will involve advising the Department regarding lobbying or other public policy advocacy activities related to legislation or regulation, including evaluating the likelihood of enactment of any proposed initiative or providing advice to the Department as to methodologies to ensure enactment. KPMG cannot undertake any role in connection with the Contract services that could be deemed lobbying, public policy advocacy, or impair the independence of KPMG as an auditor for the Department of the Treasury such as drafting legislation and engaging in implementation assistance.

Exhibit L

00098

# 1. Executive Summary

## 1. 1 Scope of Project

On August 17, 2013, the Governor of the Commonwealth of Puerto Rico issued an Executive Order creating a Tax Reform Advisory Group to analyze the current tax system, its rules and administration and report its conclusions and recommendations to build an effective and fair tax system.  The Executive Order explicitly recognized the need to take measures to address the fiscal crisis facing the Commonwealth. It also implied that those measures should not have an adverse impact on the working class or consumers.

The Executive Order enumerated a number of specific factors to be considered:

- The interaction of the components of the state and local tax system and its impact on individuals and businesses;
- The need to restructure, eliminate or extend these components to achieve the desired revenue objectives and simultaneously facilitate economic development
- Analysis of existing tax preferences to determine their effectiveness, elimination or restructuring to align them with the Commonwealth's economic development plan
- Analysis of the current system's promotion of equity in the distribution of the tax burden between the working class and the business and industrial base of the economy
- Evaluation of the current structure of tax administration to improve compliance and efficiency
- Comparison of  the tax structure of Puerto Rico with successful tax structures of countries with similar economic and social priorities, and
- The views of diverse interest groups.

On March 18, 2014, KPMG contracted with the Treasury to make a full assessment of the Puerto Rican tax structure and to develop a full report and set of alternative scenarios for Treasury to evaluate for a simplified tax system that will provide the desired revenues through a more streamlined and effective system that should also result in more effective oversight.  Analysis of the individual income tax was specifically excluded from the scope this contract.  Analysis of the property tax was not included.

On May 6, 2014, KPMG contracted with the Treasury to expand the scope of the engagement to include the individual income tax.

Subsequent meetings with the Secretary of the Treasury and her colleagues refined the goals of the project to include the following:

- Produce adequate revenue
- Distribute the burden of taxation fairly
- Promote economic growth
- Increase international competitiveness of products, workers and businesses
- Minimize interference with private decision making
- Streamline compliance and administration

Exhibit L    / 1 /    00099

## 1.3    Summary of Principal Findings

### 1.3.1    High Level Observations

The current income and consumption tax structures are inordinately complex, due principally to a plethora of special provisions that for the most part were adopted in a haphazard manner over time generally to provide incentives for particular forms of economic activity.  These special provisions have never been subjected to a cost benefit analysis. As shown in Tables 1 and 2, revenue from consumption and income taxes are below peer jurisdictions.

**Table 1: Taxes as a Percentage of GDP in Puerto Rico Compared to Selected Jurisdictions[4]**



---

[4] (*) While Table 1 uses GDP as the measure of comparison across countries, the results are similar when using GNP as the measure of comparison.   Puerto Rico taxes as a percentage of GNP is closer to 15% but still substantially lower than the tax liability of the peer countries shown.

Exhibit L                                              000100

**Table 2: Tax Collections as Percent of GDP -- Comparison of Puerto Rico to OECD Countries**

|  | Puerto Rico | Average | Range |
|---|---|---|---|
| Personal Income | 2.2% | 8.3% | 2.2 - 24.2% |
| Corporate Income | 2.7% | 3.0% | 1.2 - 10.70% |
| SS Contributions | 2.75% | 9.00% | 0.00 - 16.70% |
| Payroll/Workforce | 0.21% | 0.41% | 0.00 - 4.44% |
| Property | 0.75% | 1.76% | 0.29 - 4.16% |
| Goods/Services | 2.216% | 10.77% | 2.06 - 15.91% |
| Total | 10.66% | 33.19% |  |

Table 3 presents data on the distribution of income and tax liability and shows that less than 10 percent of filers are responsible for almost 78 percent of income tax receipts.

**Table 3:  2013 Income Tax Liability by Income Class (In Millions of USD)[5]**

| Income Level | Filers | Tax Liability (Excluding SS & Medicare) | Share of Tax (Excluding SS & Medicare) | Tax Liability (Including Social Security and Medicare) | Share of Tax (Including Social Security and Medicare) |
|---|---|---|---|---|---|
| Less than $20,000 | 538,026 | $4 | .2% | $368 | 9.6% |
| Between $19,999 and $40,000 | 319,108 | $191 | 9.2% | $791 | 20.6% |
| Between $39,999 and $60,000 | 107,107 | $270 | 13.0% | $604 | 15.7% |
| Greater than $59,999 | 89,459 | $1,614 | **77.6%** | $2,079 | 54.1% |
| **Total** | **1,053,700** | **$2,079** | **100.0%** | $3,842 | **100.0%** |

---

[5] Distributional analysis based on 2012 individual tax returns provided by Department of Treasury.

About Us          Business in PR          Sectors          Incentives          Contact Us

# Opportunity knocks. Act 60 opens the door.

Hundreds of the world's leading companies and visionary entrepreneurs already call Puerto Rico 'home'. Here are a few reasons why you should as well.

As Puerto Rico writes a new chapter in its history, Invest Puerto Rico is fostering efforts to drive transformation. Chief among these is the newly created **Puerto Rico Incentives Code** (aka Act 60), an all-encompassing tool designed to accelerate economic growth through investment, innovation, export, and job creation.

Read on to learn what this means for you, or click here to download a high-level summary of Act 60. You can read the full English translation of Act 60 here, or click here to view the original Spanish version, also referred to as "Código de Incentivos de Puerto Rico," Ley Núm. 60 de 1 de julio de 2019.



## IN A NUTSHELL

Act 60 captures most of Puerto Rico's tax incentive laws under one code, establishing an efficient process for granting and leveraging the benefits in your favor.

## WHAT'S NEW

- The Office of Incentives for Businesses in Puerto Rico (OIBPR) is responsible for the administration of all incentive applications under Act 60.

- A Single Business Portal or "SBP," was created for interested parties to apply for permits and incentives. Click here to visit the portal.

- The Island's Qualified Opportunity Zones program is governed by the provisions of Act 60.

- New eligible activities under Act 60 include: blockchain, recorded live events, and combined heat and power activities. (A full list of the new eligible activities will be made available in the near future on this page.)

- Act 60's benefits are divided into "chapters," each one addressing specific sectors: Individuals, Export (Services and Goods), Financial and Insurance Services, Visitor Economy, Manufacturing (including R&D), Infrastructure, Farming, Creative Industries, Entrepreneurship, Air and Sea Transport, and others.

- Tax exemption decrees now have a standardized 15-year term; and are subject to renegotiation for an additional fifteen years.

- Additional benefits for small- and medium-sized businesses were established for the Puerto Rican islands of Vieques and Culebra.

# WHAT'S IN IT FOR YOU?

Some of Act 60's highlights:

- 4% flat income tax rate

- 0% Distribution of Dividends Rate

- 75% Property Tax Exemption

- 75% Exemption on Construction Taxes

- 50% Exemption on other Municipal Taxes

- 50% Municipal Patent Exemption*

*percentage can be lower if negotiated with the municipality

GET IN TOUCH

Other industry-specific incentives are now part of Act 60. The incentives are referred to as "Chapters." See below for the former "Tax Incentive Laws" descriptors and the new "Chapter Tax Incentives Code" names under Act 60.

| Tax Incentive Laws | Chapter Tax Incent |
|---|---|
| "Tax Incentives Act for the Retention and Return of Medical Professionals" (Act 14 of 2014) | INDIVIDUAL (Qualified Medical F |
| "Act to Promote Individual Investors to Puerto Rico" (Act 22 of 2012) | INDIVIDUAL (Resident Individual |
| "Act to Promote the Export of Services" (Act 20 of 2012) | EXPORT OF TRAD SERVICES |
| "Regulatory Act for the International Financial Center" (Act 273 of 2012)<br><br>"Private Equity Funds Act" (Act 185 of 2014) | FINANCE, INVESTI INSURANC |
| "Puerto Rico Tourism Development Act of 2010" (Act 74 of 2010) | VISITOR'S ECON |
| "Tax Incentives Act for the Development of Puerto Rico" (Act 73 of 2008) | MANUFACTUR |
| "Green Energy Incentives Act" (Act 83-2010) | INFRASTRUCTURE & GR |
| "Agricultural Tax Incentives Act of Puerto Rico" (Act 225 of 1995) | AGROINDUST |
| "Film Industry Economic Incentives Act" (Act 27 of 2011) | CREATIVE INDUS |
| "Young Entrepreneurs Act" (Act 135 of 20 ) | ENTREPRENEUR |
| "Tax Exemption to Public Carriers of Air Transportation Services" (Act 135 of 1945)<br><br>"Act of Maritime Cargo Transportation" (Act 126 of 1966) | OTHER INDUST |

Home                Resources            Single
                                         Business
About Us             Incentives          Portal

Caribbean            Join the            Site
HQ                   Team                Selection
                                         Map
Business in          RFPs
PR                   & RFQs              Contact Us

                                         **(787) 966-**
                                         **7642**

Invest Puerto
Rico, Inc.

The Hub, Suite
301

200 Convention
Boulevard

San Juan,
Puerto Rico
 00907

Partners: DISCOVER PUERTO RICO
| DEDC                                    Invest Puerto    Privacy
Follow Us                                Rico | All      and         | CDBG-
                          ©2021          rights          Cookie        DR
                                         reserved |      Policies

**Requirement 2(G)**





**Prepared for the FOMB**

*Office of the Administration and Transformation of Human Resources*
*Attendance Report*
*As of October 2020*

CONFIDENTIAL

1

000107

*Disclaimer*

- *The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.*

- *The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.*

- *This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Nor does this document constitute an audit of compliance with any other federal law, rule, or regulation.  Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.*

- *Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.*

- *By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.*

- *This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.*

- *Following Hurricane Maria, the systems and communications of some component units and government agencies were adversely affected, which in turn affected the timing, reliability and integrity of information and data.  Continuous efforts are being made to enhance data integrity progressively.*

**CONFIDENTIAL**

2

| | | | A | B | C | D | E | F | G | H | A+B+C+D+E+F+G+H |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week | Reporting Government Agencies (Out of 114 Government Agencies) (%) | Total Active Employees | Employees Working (%) | Employees on Sick Leave (%) | Employees on Vacation Leave (%) | Employees on Holidays (%)* | Employees on Maternity Leave (%) | Employees on Other Leaves (%)[1] | Employees for which attendance has not been confirmed (%) | Employees Absent without Authorization (%) | Total |
| 12/31/17 - 1/6/2018 | 85.09% | 94,634 | 50.46% | 1.76% | 12.03% | 13.33% | 0.07% | 14.69% | 7.63% | 0.03% | 100.00% |
| 1/7/2018 - 1/13/2018 | 86.48% | 96,413 | 60.08% | 2.72% | 2.48% | 0.43% | 0.09% | 30.77% | 3.39% | 0.04% | 100.00% |
| 1/14/2018 - 1/20/2018 | 85.96% | 96,225 | 54.69% | 2.08% | 1.33% | 13.08% | 0.09% | 25.31% | 3.39% | 0.03% | 100.00% |
| 1/21/2018 - 1/27/2018 | 85.96% | 96,225 | 54.69% | 2.08% | 1.33% | 13.08% | 0.09% | 25.31% | 3.39% | 0.03% | 100.00% |
| 1/28/2018 - 2/3/2018 | 86.84% | 102,112 | 65.35% | 3.40% | 1.16% | 0.00% | 0.11% | 3.03% | 26.79% | 0.16% | 100.00% |
| 2/4/2018 - 2/10/2018 | 87.72% | 101,777 | 67.31% | 3.32% | 1.08% | 0.00% | 0.11% | 3.04% | 24.97% | 0.17% | 100.00% |
| 2/11/2018 - 2/17/2018 | 87.72% | 101,533 | 70.21% | 3.75% | 1.20% | 0.29% | 0.10% | 2.74% | 21.53% | 0.18% | 100.00% |
| 2/18/2018 - 2/24/2018 | 86.84% | 99,660 | 60.98% | 2.64% | 1.09% | 13.80% | 0.09% | 2.62% | 18.63% | 0.15% | 100.00% |
| 2/25/2018 - 3/3/2018 | 85.96% | 97,358 | 60.22% | 2.68% | 0.98% | 14.25% | 0.09% | 2.97% | 18.67% | 0.14% | 100.00% |
| 3/4/2018 - 3/10/2018 | 87.72% | 114,959 | 72.20% | 3.43% | 1.78% | 0.00% | 0.10% | 4.00% | 18.34% | 0.15% | 100.00% |
| 3/11/2018 - 3/17/2018 | 71.89% | 114,616 | 71.89% | 3.44% | 1.98% | 0.56% | 0.11% | 4.19% | 17.67% | 0.16% | 100.00% |
| 3/18/2018 - 3/24/2018 | 86.84% | 114,144 | 62.67% | 3.15% | 2.11% | 12.92% | 0.11% | 4.24% | 14.54% | 0.26% | 100.00% |
| 3/25/2018 - 3/31/2018 | 87.72% | 115,394 | 52.73% | 2.34% | 1.77% | 25.67% | 0.08% | 3.71% | 13.57% | 0.13% | 100.00% |
| 4/1/2018 - 4/7/2018 | 85.09% | 112,833 | 73.64% | 3.36% | 2.26% | 0.00% | 0.11% | 4.19% | 16.28% | 0.16% | 100.00% |
| 4/8/2018 - 4/14/2018 | 70.18% | 94,056 | 71.92% | 2.98% | 2.08% | 0.00% | 0.14% | 3.33% | 19.47% | 0.08% | 100.00% |
| 4/15/2018 - 4/21/2018 | 80.70% | 110,095 | 70.45% | 3.46% | 2.11% | 0.00% | 0.12% | 3.34% | 20.33% | 0.19% | 100.00% |
| 4/22/2018 - 4/28/2018 | 82.46% | 108,693 | 75.29% | 4.07% | 2.09% | 0.00% | 0.13% | 4.28% | 13.96% | 0.18% | 100.00% |
| 4/29/2018 - 5/5/2018 | 83.33% | 110,401 | 72.81% | 3.81% | 2.34% | 0.00% | 0.13% | 3.96% | 12.88% | 4.07% | 100.00% |
| 5/6/2018 - 5/12/2018 | 82.46% | 109,739 | 75.22% | 3.38% | 2.10% | 0.00% | 0.12% | 3.97% | 15.07% | 0.14% | 100.00% |
| 5/13/2018 - 5/19/2018 | 78.95% | 100,304 | 73.43% | 3.83% | 2.03% | 0.00% | 0.12% | 3.61% | 16.79% | 0.19% | 100.00% |
| 5/20/2018 - 5/26/2018 | 77.19% | 99,809 | 66.76% | 3.17% | 2.67% | 0.04% | 0.10% | 12.37% | 14.73% | 0.16% | 100.00% |
| 5/27/2018 - 6/2/2018 | 75.44% | 99,155 | 63.59% | 3.14% | 2.66% | 13.63% | 0.10% | 3.73% | 12.98% | 0.17% | 100.00% |
| 6/3/2018 - 6/9/2018 | 73.68% | 93,352 | 66.06% | 3.76% | 16.16% | 0.01% | 0.10% | 3.83% | 10.04% | 0.04% | 100.00% |
| 6/10/2018 - 6/16/2018 | 71.05% | 97,313 | 50.88% | 3.32% | 34.81% | 0.00% | 0.10% | 3.62% | 7.13% | 0.14% | 100.00% |
| 6/17/2018 - 6/23/2018 | 71.93% | 98,585 | 51.22% | 3.43% | 34.57% | 0.01% | 0.09% | 3.49% | 7.03% | 0.15% | 100.00% |
| 6/24/2018 - 6/30/2018 | 70.18% | 90,361 | 48.00% | 3.12% | 37.99% | 0.00% | 0.04% | 3.20% | 7.62% | 0.03% | 100.00% |
| 7/1/2018 - 7/7/2018 | 67.54% | 89,804 | 40.02% | 2.70% | 39.01% | 7.08% | 0.04% | 3.26% | 7.87% | 0.02% | 100.00% |
| 7/8/2018 - 7/14/2018 | 63.16% | 87,840 | 40.82% | 2.48% | 39.74% | 3.18% | 0.04% | 5.34% | 8.37% | 0.03% | 100.00% |
| 7/15/2018 - 7/21/2018 | 59.65% | 85,914 | 42.40% | 2.71% | 40.86% | 0.00% | 0.04% | 3.05% | 10.91% | 0.03% | 100.00% |
| 7/22/2018 - 7/28/2018 | 46.49% | 35,223 | 77.28% | 4.71% | 9.74% | 0.00% | 0.09% | 6.60% | 1.49% | 0.09% | 100.00% |
| 7/29/2018 - 8/04/2018 | 69.30% | 84,153 | 53.02% | 4.22% | 17.96% | 13.35% | 0.06% | 3.60% | 7.75% | 0.04% | 100.00% |
| 8/5/2018 - 8/11/2018 | 59.65% | 74,186 | 70.04% | 2.65% | 3.79% | 0.01% | 0.10% | 3.27% | 20.10% | 0.04% | 100.00% |
| 12/2/2018-12/08/2018 | 61.40% | 88,687 | 73.24% | 5.65% | 2.81% | 0.00% | 0.14% | 4.25% | 13.32% | 0.59% | 100.00% |
| 12/9/2018-12/15/2018 | 60.53% | 88,423 | 74.42% | 5.51% | 3.08% | 0.00% | 0.14% | 4.26% | 12.38% | 0.21% | 100.00% |
| 12/16/2018-12/22/2018 | 57.89% | 87,934 | 69.40% | 5.34% | 4.01% | 0.05% | 0.12% | 4.58% | 16.28% | 0.22% | 100.00% |
| 12/23/2018-12/29/2018 | 52.63% | 83,969 | 28.90% | 3.63% | 5.17% | 17.11% | 0.07% | 35.41% | 9.51% | 0.20% | 100.00% |
| 12/30/2018-1/05/2019 | 58.77% | 87,233 | 31.52% | 3.62% | 5.48% | 16.94% | 0.07% | 34.25% | 7.96% | 0.16% | 100.00% |
| 1/06/2019-1/12/2019 | 57.89% | 86,104 | 63.75% | 3.76% | 3.37% | 13.42% | 0.10% | 4.23% | 11.10% | 0.27% | 100.00% |
| 1/13/2019-1/19/2019 | 53.51% | 84,681 | 78.99% | 4.48% | 2.44% | 0.00% | 0.11% | 3.66% | 9.90% | 0.42% | 100.00% |
| 1/20/2019-1/26/2019 | 55.26% | 87,903 | 67.03% | 3.19% | 1.90% | 13.38% | 0.34% | 3.90% | 10.05% | 0.21% | 100.00% |
| 1/27/2019-2/2/2019 | 50.88% | 79,441 | 78.75% | 4.47% | 2.17% | 0.00% | 0.14% | 3.97% | 10.36% | 0.14% | 100.00% |
| 2/3/2019-2/9/2019 | 52.63% | 85,383 | 79.18% | 4.48% | 2.04% | 0.00% | 0.13% | 3.77% | 10.20% | 0.20% | 100.00% |
| 2/10/2019-2/16/2019 | 50.00% | 85,348 | 76.38% | 4.12% | 1.98% | 0.00% | 0.14% | 3.98% | 13.18% | 0.22% | 100.00% |
| 2/17/2019-2/23/2019 | 52.63% | 85,467 | 68.06% | 3.47% | 1.61% | 13.81% | 0.11% | 3.83% | 8.89% | 0.22% | 100.00% |
| 2/24/2019-3/2/2019 | 50.88% | 77,235 | 77.85% | 4.51% | 1.83% | 0.00% | 0.15% | 4.04% | 11.49% | 0.13% | 100.00% |
| 3/3/2019-3/9/2019 | 53.51% | 85,816 | 78.57% | 4.37% | 1.81% | 0.00% | 0.14% | 4.13% | 10.77% | 0.21% | 100.00% |
| 3/10/2019-3/16/2019 | 51.75% | 85,571 | 79.05% | 4.00% | 1.80% | 0.00% | 0.15% | 4.07% | 10.72% | 0.21% | 100.00% |
| 3/17/2019-3/23/2019 | 49.12% | 81,771 | 66.18% | 3.67% | 1.85% | 13.82% | 0.15% | 3.90% | 10.25% | 0.18% | 100.00% |
| 3/24/2019-3/30/2019 | 48.25% | 81,377 | 74.64% | 4.48% | 1.90% | 0.00% | 0.18% | 3.96% | 14.62% | 0.22% | 100.00% |
| 3/31/2019-4/6/2019 | 47.37% | 81,849 | 77.32% | 4.17% | 1.87% | 0.00% | 0.18% | 4.00% | 12.28% | 0.18% | 100.00% |
| 4/7/2019-4/13/2019 | 50.88% | 83,755 | 79.30% | 4.03% | 2.05% | 0.08% | 0.17% | 4.07% | 10.12% | 0.18% | 100.00% |
| 4/14/2019-4/20/2019 | 47.37% | 82,882 | 32.70% | 2.64% | 2.29% | 27.28% | 0.09% | 33.09% | 1.77% | 0.14% | 100.00% |
| 4/21/2019-4/27/2019 | 46.49% | 81,402 | 72.52% | 3.95% | 2.20% | 0.00% | 0.17% | 4.09% | 16.98% | 0.09% | 100.00% |
| 4/28/2019-5/04/2019 | 44.74% | 81,167 | 73.38% | 3.71% | 1.97% | 0.00% | 0.16% | 3.84% | 16.86% | 0.08% | 100.00% |
| 5/05/2019-5/11/2019 | 46.49% | 81,443 | 74.69% | 3.34% | 1.94% | 0.00% | 0.15% | 4.08% | 15.73% | 0.07% | 100.00% |

PRELIMINARY/ UNAUDITED DATA

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5/12/2019-5/18/2019 | 45.61% | 81,411 | 71.28% | 3.98% | 2.28% | 0.00% | 0.16% | 4.07% | 18.14% | 0.09% | 100.00% |
| 5/19/2019-5/25/2019 | 43.86% | 76,544 | 63.95% | 2.12% | 2.08% | 0.00% | 0.14% | 13.64% | 18.00% | 0.07% | 100.00% |
| 5/26/2019-6/01 2019 | 45.61% | 81,349 | 61.61% | 3.53% | 2.74% | 12.86% | 0.14% | 3.89% | 15.14% | 0.09% | 100.00% |
| 6/02/2019 - 6/08/2019 | 46.49% | 80,859 | 75.28% | 5.08% | 3.71% | 0.00% | 0.14% | 3.68% | 11.91% | 0.20% | 100.00% |
| 6/09/2019 - 6/15/2019 | 45.61% | 80,190 | 45.93% | 3.24% | 40.64% | 0.00% | 0.06% | 3.83% | 6.13% | 0.17% | 100.00% |
| 6/16/2019 - 6/22/2019 | 42.98% | 67,381 | 32.79% | 2.92% | 46.23% | 0.00% | 0.06% | 1.60% | 16.38% | 0.03% | 100.00% |
| 6/23/2019 - 6/29/2019 | 36.84% | 64,641 | 30.02% | 2.68% | 47.87% | 0.00% | 0.11% | 1.61% | 17.68% | 0.03% | 100.00% |
| 6/30/2019 - 7/06/2019 | 41.23% | 66,260 | 26.29% | 2.41% | 51.57% | 7.80% | 0.10% | 1.63% | 10.04% | 0.16% | 100.00% |
| 07/07/2019 - 7/13/2019 | 42.11% | 65,933 | 35.16% | 3.08% | 50.26% | 0.00% | 0.05% | 1.71% | 9.57% | 0.17% | 100.00% |
| 07/14/2019 - 7/20/2019 | 41.23% | 65,806 | 34.66% | 2.84% | 41.41% | 0.00% | 0.17% | 11.09% | 9.67% | 0.16% | 100.00% |
| 07/21/2019 - 7/27/2019 | 40.35% | 61,555 | 35.41% | 3.40% | 54.79% | 0.00% | 0.05% | 1.88% | 4.26% | 0.21% | 100.00% |
| 07/28/2019 - 08/03/2019 | 40.35% | 61,399 | 29.76% | 3.31% | 46.82% | 0.00% | 0.05% | 1.86% | 18.17% | 0.03% | 100.00% |
| 8/4/2019 - 08/10/2019 | 37.72% | 62,146 | 68.79% | 2.95% | 2.18% | 0.00% | 0.15% | 1.37% | 24.51% | 0.05% | 100.00% |
| 08/11/2019 - 08/17/2019 | 37.72% | 63,235 | 74.00% | 2.98% | 1.31% | 0.00% | 0.10% | 1.44% | 20.10% | 0.07% | 100.00% |
| 8/18/2019 - 8/24/2019 | 35.96% | 62,573 | 74.92% | 3.60% | 1.00% | 0.10% | 0.13% | 1.35% | 18.78% | 0.12% | 100.00% |
| 8/25/2019 - 8/31/2019 | 38.60% | 58,629 | 68.18% | 3.35% | 1.26% | 0.18% | 0.14% | 16.77% | 10.01% | 0.11% | 100.00% |
| 9/1/2019 - 9/7/2019 | 42.98% | 64,984 | 68.16% | 2.87% | 1.95% | 15.66% | 0.37% | 1.62% | 9.17% | 0.20% | 100.00% |
| 9/8/2019 - 9/14/2019 | 43.86% | 65,059 | 81.60% | 4.12% | 1.29% | 0.00% | 0.18% | 1.82% | 10.79% | 0.20% | 100.00% |
| 9/15/2019 - 9/21/2019 | 42.98% | 65,082 | 81.56% | 3.79% | 1.10% | 0.00% | 0.13% | 1.60% | 11.59% | 0.23% | 100.00% |
| 9/22/2019 - 9/28/2019 | 43.86% | 65,187 | 61.26% | 2.74% | 0.91% | 0.12% | 0.13% | 15.57% | 19.20% | 0.07% | 100.00% |
| 9/29/2019 - 10/05/2019 | 41.23% | 23,372 | 64.15% | 5.16% | 2.42% | 0.00% | 0.07% | 3.53% | 24.65% | 0.02% | 100.00% |
| 10/06/2019 - 10/12/2019 | 38.60% | 64,964 | 81.20% | 4.43% | 1.53% | 0.00% | 0.15% | 1.90% | 10.46% | 0.33% | 100.00% |
| 10/13/2019 - 10/19/2019 | 39.47% | 65,036 | 64.74% | 3.09% | 1.28% | 15.23% | 0.12% | 2.32% | 13.01% | 0.21% | 100.00% |
| 10/20/2019 - 10/26/2019 | 39.47% | 59,511 | 73.96% | 3.68% | 1.32% | 0.00% | 0.17% | 1.68% | 19.08% | 0.11% | 100.00% |
| 10/27/2019 - 11/2/2019 | 38.60% | 59,387 | 80.96% | 5.06% | 1.36% | 0.00% | 0.14% | 1.69% | 10.68% | 0.11% | 100.00% |
| 11/3/2019 - 11/9/2019 | 39.47% | 64,871 | 80.52% | 4.60% | 1.42% | 0.01% | 0.14% | 1.84% | 10.54% | 0.93% | 100.00% |
| 11/10/2019 - 11/16/2019 | 34.21% | 58,243 | 66.48% | 2.61% | 1.39% | 16.24% | 0.10% | 1.50% | 11.59% | 0.09% | 100.00% |
| 11/17/2019 - 11/23/2019 | 37.72% | 64,425 | 50.38% | 2.13% | 6.47% | 15.38% | 0.61% | 10.08% | 14.86% | 0.09% | 100.00% |
| 11/24/2019 - 11/30/2019 | 36.84% | 64,432 | 21.20% | 2.39% | 3.71% | 16.30% | 0.05% | 40.50% | 15.82% | 0.03% | 100.00% |
| 12/1/2019 - 12/07/2019 | 47.37% | 66,016 | 80.15% | 4.62% | 2.00% | 0.00% | 0.15% | 1.68% | 11.16% | 0.24% | 100.00% |
| 12/08/19 - 12/14/2019 | 47.37% | 65,999 | 80.22% | 4.72% | 1.93% | 0.00% | 0.62% | 1.92% | 10.21% | 0.38% | 100.00% |
| 12/15/2019 - 12/21/2019 | 46.49% | 60,420 | 76.43% | 5.51% | 2.71% | 0.00% | 0.12% | 1.73% | 13.35% | 0.15% | 100.00% |
| 12/22/2019 - 12/28/2019 | 45.61% | 60,176 | 17.63% | 1.24% | 5.10% | 5.71% | 0.02% | 67.32% | 2.98% | 0.00% | 100.00% |
| 12/29/2019 - 1/4/2020 | 42.98% | 56,436 | 16.73% | 0.79% | 3.90% | 42.90% | 0.02% | 32.40% | 3.26% | 0.00% | 100.00% |
| 1/5/2020 - 1/11/2020 | 44.74% | 65,612 | 21.61% | 1.34% | 2.23% | 17.26% | 0.04% | 54.18% | 3.19% | 0.15% | 100.00% |
| 1/12/2020 - 1/18/2020 | 42.11% | 56,858 | 24.70% | 2.19% | 1.31% | 0.00% | 0.09% | 67.26% | 4.43% | 0.02% | 100.00% |
| 1/19/2020 - 1/25/2020 | 42.98% | 56,500 | 26.52% | 1.72% | 0.88% | 16.49% | 0.07% | 45.04% | 9.27% | 0.01% | 100.00% |
| 1/26/2020-2/1/2020 | 42.11% | 56,209 | 38.55% | 2.61% | 0.68% | 0.09% | 0.10% | 49.32% | 8.61% | 0.04% | 100.00% |
| 2/2/20 - 2/8/2020 | 35.09% | 13,326 | 85.67% | 7.39% | 2.96% | 0.00% | 0.13% | 3.39% | 0.45% | 0.01% | 100.00% |
| 2/9/2020 - 2/15/2020 | 35.09% | 18,726 | 59.88% | 5.40% | 2.16% | 0.00% | 0.07% | 2.62% | 29.86% | 0.01% | 100.00% |
| 2/16/2020 - 2/22/2020 | 32.46% | 10,509 | 35.39% | 1.51% | 0.74% | 7.29% | 0.05% | 1.73% | 53.29% | 0.00% | 100.00% |
| 2/23/2020 - 2/29/2020 | 28.07% | 9,717 | 38.56% | 1.95% | 0.73% | 0.00% | 0.04% | 1.66% | 57.05% | 0.01% | 100.00% |
| 3/1/2020 - 3/7/2020 | 30.70% | 4,974 | 74.87% | 3.40% | 1.47% | 13.83% | 0.14% | 3.64% | 2.63% | 0.02% | 100.00% |
| 3/8/2020 - 3/14/2020 | 14.04% | 1,307 | 83.78% | 4.21% | 1.84% | 0.00% | 0.38% | 6.58% | 3.21% | 0.00% | 100.00% |
| 3/15/2020 - 3/21/2020 | 9.65% | 328 | 53.86% | 0.00% | 0.16% | 0.00% | 0.49% | 45.49% | 0.00% | 0.00% | 100.00% |
| 3/22/2020 - 3/28/2020 | 8.77% | 526 | 51.90% | 0.00% | 0.00% | 12.36% | 0.57% | 34.98% | 0.19% | 0.00% | 100.00% |
| 3/29/2020 - 4/4/2020 | 8.77% | 526 | 57.03% | 0.00% | 0.00% | 0.00% | 0.38% | 42.59% | 0.00% | 0.00% | 100.00% |
| 4/5/2020 - 4/11/2020 | 11.40% | 42,243 | 0.78% | 0.04% | 0.00% | 0.30% | 0.02% | 96.38% | 2.47% | 0.01% | 100.00% |
| 4/12/2020 - 4/18/2020 | 11.40% | 42,244 | 1.11% | 0.04% | 0.00% | 0.00% | 0.01% | 95.52% | 3.32% | 0.00% | 100.00% |
| 4/19/2020 - 4/25/2020 | 10.53% | 42,189 | 1.04% | 0.04% | 0.01% | 0.00% | 0.02% | 96.46% | 2.43% | 0.00% | 100.00% |
| 4/26/2020 - 5/2/2020 | 11.40% | 42,230 | 1.14% | 0.04% | 0.01% | 0.00% | 0.02% | 96.36% | 2.43% | 0.00% | 100.00% |
| 05/03/2020 - 05/09/2020 | 15.79% | 47,656 | 1.31% | 0.04% | 0.00% | 0.00% | 0.06% | 83.54% | 15.05% | 0.00% | 100.00% |
| 05/10/2020 - 05/16/2020 | 14.91% | 43,981 | 3.56% | 0.09% | 0.02% | 0.00% | 0.05% | 92.32% | 3.96% | 0.00% | 100.00% |
| 05/17/2020 - 05/23/2020 | 14.91% | 43,982 | 3.49% | 0.09% | 0.02% | 0.00% | 0.05% | 92.25% | 4.09% | 0.01% | 100.00% |
| 05/24/2020 - 05/30/2020 | 14.91% | 43,981 | 2.78% | 0.08% | 0.03% | 18.79% | 0.03% | 75.07% | 3.22% | 0.00% | 100.00% |
| 5/31/2020 - 6/6/2020 | 14.04% | 49,304 | 2.81% | 0.08% | 0.02% | 0.00% | 0.03% | 82.73% | 14.32% | 0.01% | 100.00% |
| 6/7/2020 - 6/13/2020 | 12.28% | 48,318 | 1.34% | 0.04% | 56.93% | 0.00% | 0.00% | 25.70% | 15.99% | 0.00% | 100.00% |
| 6/14/2020 - 6/20/2020 | 11.40% | 48,202 | 3.70% | 0.05% | 56.94% | 0.00% | 0.00% | 6.91% | 32.40% | 0.00% | 100.00% |
| 6/21/2020 - 6/27/2020 | 9.65% | 6,803 | 5.76% | 0.09% | 0.09% | 0.00% | 0.00% | 13.24% | 80.82% | 0.00% | 100.00% |
| 6/28/2020 - 7/4/2020 | 7.89% | 5,852 | 4.15% | 0.03% | 0.05% | 0.27% | 0.00% | 1.33% | 94.17% | 0.00% | 100.00% |
| 7/5/2020 - 7/11/2020 | 11.40% | 1,423 | 38.44% | 1.05% | 0.84% | 0.00% | 0.01% | 59.52% | 0.14% | 0.00% | 100.00% |
| 7/12/2020 - 7/18/2020 | 12.28% | 6,923 | 14.46% | 0.38% | 0.25% | 0.00% | 0.01% | 5.41% | 79.49% | 0.00% | 100.00% |

PRELIMINARY/ UNAUDITED DATA

| 7/19/2020 - 7/25/2020 | 9.65% | 6,160 | 7.76% | 0.18% | 0.23% | 0.00% | 0.00% | 2.60% | 89.23% | 0.00% | 100.00% |
| 7/26/2020 - 8/1/2020 | 10.53% | 6,236 | 7.63% | 0.13% | 0.19% | 0.22% | 0.00% | 3.54% | 88.29% | 0.00% | 100.00% |
| 8/2/2020 - 8/8/2020 | 13.16% | 7,155 | 18.31% | 0.49% | 0.29% | 0.00% | 0.00% | 4.10% | 76.81% | 0.00% | 100.00% |
| 8/9/2020 - 8/15/2020 | 13.16% | 7,149 | 18.56% | 0.43% | 0.29% | 0.00% | 0.00% | 3.91% | 76.81% | 0.00% | 100.00% |
| 8/16/2020 - 8/22/2020 | 13.16% | 7,153 | 19.42% | 0.52% | 0.29% | 0.00% | 0.00% | 3.05% | 76.72% | 0.00% | 100.00% |
| 8/23/2020 - 8/29/2020 | 11.40% | 6,951 | 16.89% | 0.49% | 0.26% | 0.00% | 0.00% | 3.34% | 79.02% | 0.00% | 100.00% |
| 8/30/2020 - 9/5/2020 | 10.53% | 6,671 | 15.14% | 0.42% | 0.27% | 0.00% | 0.01% | 1.79% | 82.37% | 0.00% | 100.00% |
| 9/6/2020 - 9/12/2020 | 10.53% | 6,763 | 14.25% | 0.38% | 0.25% | 3.30% | 0.01% | 0.62% | 81.19% | 0.00% | 100.00% |
| 9/13/2020 - 9/19/2020 | 11.40% | 6,840 | 17.89% | 0.75% | 0.34% | 0.00% | 0.01% | 0.76% | 80.25% | 0.00% | 100.00% |
| 9/20/2020 - 9/26/2020 | 11.40% | 3,825 | 17.64% | 0.92% | 0.47% | 0.00% | 0.01% | 0.68% | 80.28% | 0.00% | 100.00% |
| 9/27/2020 - 10/03/2020 | 10.53% | 6,775 | 16.94% | 0.97% | 0.35% | 0.00% | 0.03% | 0.88% | 80.83% | 0.00% | 100.00% |
| 10/4/2020 - 10/10/2020 | 11.40% | 6,991 | 18.29% | 1.02% | 0.51% | 0.00% | 0.04% | 1.91% | 78.23% | 0.00% | 100.00% |
| 10/11/2020 - 10/17/2020 | 12.28% | 7,000 | 14.87% | 0.77% | 0.50% | 4.19% | 0.04% | 1.57% | 78.06% | 0.00% | 100.00% |
| 10/18/2020 - 10/24/2020 | 10.53% | 6,782 | 17.31% | 0.99% | 0.60% | 0.00% | 0.03% | 0.65% | 80.42% | 0.00% | 100.00% |
| 10/25/2020 - 10/31/2020 | 8.77% | 6,642 | 15.46% | 1.16% | 0.57% | 0.00% | 0.03% | 0.65% | 82.13% | 0.00% | 100.00% |

The information contained herein is based on the information OATRH has received to date from the Reporting Government Agencies.  These figures are subject to change as additional information is received.

1 - This column includes the following leaves: without pay, military, comp time, workman's comp, suspended active employees, administrative assignments and other licenses.

Employee strike on May 1, 2018; most employees are from the Department of Education

Department of Education

Department of Education teachers on vacation during summer

PRELIMINARY/ UNAUDITED DATA

# Consultation of the Contract Registry



## Search criteria

**Government entity**
Seleccionar Entidad

**Contract No.**

**Contractor**

**Service Category**
ADVERTISING, REPRESENTATION OR ARTIS...

**Type of service**
Select Type of Service

**Amount**
$          $

**Grant Date**
03/05/2017  -  13/10/2021

**Effective date**
From  -  Until

🔍 Look for      ✐ Delete

## Frequent Searches - All Entities

## Results

Show 10 records



| Contract No. | Contractor | Awarded in | Valid since | Valid Until | Amount | Type of service | |
|---|---|---|---|---|---|---|---|
| 2022-S0003 + | ARM CONSULTING GROUP LLC | 15 / Jul / 2021 | 15 / Jul / 2021 | Jul / 31/2021 | $ 10,000.00 | PUBLIC RELATIONS SERVICES | Public Buildings Au |
| 2022-RT0011 + | AURELIZ CABRERA DESSUS | Jul / 21/2021 | Jul / 21/2021 | Dec / 31/2021 | $ 7,500.00 | PRESS OFFICIAL SERVICES | University of Puerto |
| 2022-PRH058 | GFR MEDIA, LLC | 21 / Sep / 2021 | 21 / Sep / 2021 | Jun / 30/2022 | $ 25,000.00 | ADVERTISING SERVICES | Puerto Rico Housin |
| 2022-PRH045 | MARGARITA ÁLVAREZ SUÁREZ | Aug / 17/2021 | Aug / 17/2021 | Jun / 30/2022 | $ 24,000.00 | PUBLIC RELATIONS SERVICES | Puerto Rico Housin |
| 2022-PPP00 + | SANDRA GUTIÉRREZ DÁVILA | Jun / 30/2021 | Jul / 01/2021 | Jun / 30/2022 | $ 96,000.00 | PUBLIC RELATIONS SERVICES | Puerto Rico Public |
| 2022-MS0083 | ANGEL GARCÍA MALAVÉ | Aug / 09/2021 | Aug / 09/2021 | 03 / Jun / 2022 | $ 7,600.00 | TRAMOYA SERVICES | Music Program 100 |
| 2022-MS0080 | EFRAIN LEBRÓN ROMERO | 02 / Aug / 2021 | 02 / Aug / 2021 | 03 / Jun / 2022 | $ 11,700.00 | TRAMOYA SERVICES | Music Program 100 |
| 2022-MS0030 | ALEXSANDRA MARRERO GONZÁLEZ | 02 / Aug / 2021 | 02 / Aug / 2021 | 03 / Jun / 2022 | $ 11,700.00 | TRAMOYA SERVICES | Music Program 100 |
| 2022-MS0025 | EVELYN SURO BLACK | 02 / Aug / 2021 | 02 / Aug / 2021 | Jun / 30/2022 | $ 9,989.52 | TRAMOYA SERVICES | Music Program 100 |
| 2022-MS0019 | MAYIRETTE LAPORTE GONZÁLEZ | 02 / Aug / 2021 | 02 / Aug / 2021 | 03 / Mar / 2022 | $ 5,160.00 | TRAMOYA SERVICES | Music Program 100 |

Showing records from 1 to 10 out of a total of 9,789 records

Previous  1  2  3  4  5  ...  979  Next

| Núm. Contrato | Enmienda | Contratista | Otorgado en | Vigencia Desde | Vigencia Hasta | Cuantía | Categoría de Servicio | Tipo de Servicio | publicsearching.contract.list.resultsentitynamecolumn Entidad | Cancelación Efectiva en |
|---|---|---|---|---|---|---|---|---|---|---|
| 2009-B00085 | B | TARGET POINT, INC. | 29/03/2019 | 29/03/2019 | 30/04/2019 | $5,450.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 4065 Municipio de San Juan |  |
| 2016-000043 | B | RINNOVA INC | 30/06/2017 | 30/06/2017 | 30/09/2017 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE REPRESENTACIÓN | Autoridad del Distrito del Centro de 3159 Convenciones de Puerto Rico |  |
| 2016-000043 | C | RINNOVA INC | 30/09/2017 | 30/09/2017 | 31/03/2018 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE REPRESENTACIÓN | Autoridad del Distrito del Centro de 3159 Convenciones de Puerto Rico |  |
| 2016-000043 | D | RINNOVA INC | 28/03/2018 | 28/03/2018 | 30/06/2018 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE REPRESENTACIÓN | Autoridad del Distrito del Centro de 3159 Convenciones de Puerto Rico |  |
| 2016-000201 | A | INSIGHT COMMUNICATIONS, CORP. | 14/01/2019 | 14/01/2019 | 16/04/2019 | $191,295.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Autoridad de Acueductos y Alcantarillados de 3020 Puerto Rico |  |
| 2016-000201 | B | INSIGHT COMMUNICATIONS, CORP. | 15/04/2019 | 15/04/2019 | 30/09/2019 | $771,375.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Autoridad de Acueductos y Alcantarillados de 3020 Puerto Rico |  |
| 2016-000201 | C | INSIGHT COMMUNICATIONS, CORP. | 30/09/2019 | 30/09/2019 | 31/05/2020 | $1,122,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Autoridad de Acueductos y Alcantarillados de 3020 Puerto Rico |  |
| 2016-000201 | F | INSIGHT COMMUNICATIONS, CORP. | 21/05/2021 | 21/05/2021 | 30/06/2021 | $272,622.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Autoridad de Acueductos y Alcantarillados de 3020 Puerto Rico |  |
| 2016-000201 | D | INSIGHT COMMUNICATIONS, CORP. | 31/05/2020 | 31/05/2020 | 30/06/2021 | $1,989,570.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Autoridad de Acueductos y Alcantarillados de 3020 Puerto Rico |  |
| 2016-000201 | E | INSIGHT COMMUNICATIONS, CORP. | 21/12/2020 | 21/12/2020 | 30/06/2021 | $500,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Autoridad de Acueductos y Alcantarillados de 3020 Puerto Rico |  |
| 2016-000201 | G | TELECONTACTO-TELECONTACT, INC. | 28/06/2021 | 28/06/2021 | 31/12/2021 | $1,386,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Autoridad de Acueductos y Alcantarillados de 3020 Puerto Rico |  |
| 2016-000333 | H | Cortes Seguinot, Edwin | 31/08/2017 | 31/08/2017 | 30/11/2017 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | 4050 Municipio de Mayagüez |  |
| 2016-000333 | I | Cortes Seguinot, Edwin | 30/11/2017 | 30/11/2017 | 30/06/2018 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | 4050 Municipio de Mayagüez |  |
| 2016-000333 | J | Cortes Seguinot, Edwin | 26/06/2018 | 29/06/2018 | 31/12/2018 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | 4050 Municipio de Mayagüez |  |
| 2016-000333 | K | Cortes Seguinot, Edwin | 04/12/2018 | 30/12/2018 | 28/02/2019 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | 4050 Municipio de Mayagüez |  |
| 2016-000333 | L | Cortes Seguinot, Edwin | 26/02/2019 | 28/02/2019 | 30/06/2019 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | 4050 Municipio de Mayagüez |  |
| 2016-000333 | M | Cortes Seguinot, Edwin | 19/06/2019 | 30/06/2019 | 31/12/2019 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | 4050 Municipio de Mayagüez |  |
| 2016-000438 | C | CARLOS R. ALBERTY FRAGOSO | 23/06/2017 | 23/06/2017 | 30/06/2018 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | 3190 Instituto de Cultura Puertorriqueña |  |
| 2016-000438 | D | CARLOS R. ALBERTY FRAGOSO | 22/06/2018 | 22/06/2018 | 30/06/2019 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | 3190 Instituto de Cultura Puertorriqueña |  |
| 2016-003013 | B | CORPORACION DE BELLAS ARTES DE CAGUAS, CORP. | 15/06/2017 | 15/06/2017 | 30/06/2018 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 4013 Municipio de Caguas |  |
| 2016-160051 | G | WINTOL MEDIA, INC. | 29/06/2021 | 29/06/2021 | 30/09/2021 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | Área Local de Desarrollo Laboral de 4913 Caguas/Guayama (ALDL Caguas/Guayama) |  |
| 2016-160051 | B | WINTOL MEDIA, INC. | 30/06/2017 | 30/06/2017 | 30/06/2018 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | Área Local de Desarrollo Laboral de 4913 Caguas/Guayama (ALDL Caguas/Guayama) |  |
| 2016-160051 | F | WINTOL MEDIA, INC. | 29/04/2021 | 29/04/2021 | 30/06/2021 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | Área Local de Desarrollo Laboral de 4913 Caguas/Guayama (ALDL Caguas/Guayama) |  |
| 2016-160051 | E | WINTOL MEDIA, INC. | 29/06/2020 | 29/06/2020 | 30/06/2021 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | Área Local de Desarrollo Laboral de 4913 Caguas/Guayama (ALDL Caguas/Guayama) |  |
| 2016-160051 | D | WINTOL MEDIA, INC. | 28/06/2019 | 28/06/2019 | 30/06/2020 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | Área Local de Desarrollo Laboral de 4913 Caguas/Guayama (ALDL Caguas/Guayama) |  |
| 2016-160051 | C | WINTOL MEDIA, INC. | 29/06/2018 | 29/06/2018 | 30/06/2019 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | Área Local de Desarrollo Laboral de 4913 Caguas/Guayama (ALDL Caguas/Guayama) |  |
| 2017-000002 | A | MAXIMIANO VALDES SOUBLETTE | 07/08/2017 | 07/08/2017 | 30/06/2018 | $125,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | Corporación de la Orquesta Sinfónica de Puerto 3195 Rico |  |
| 2017-000002 | B | MAXIMIANO VALDES SOUBLETTE | 01/08/2018 | 01/08/2018 | 30/06/2019 | $125,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS ARTÍSTICOS | Corporación de la Orquesta Sinfónica de Puerto 3195 Rico |  |
| 2017-000009 | B | ROBERTA ALMEIDA FERRAZ BRAGA | 12/05/2017 | 12/05/2017 | 30/06/2017 | -$1,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 3155 Compañía de Turismo de Puerto Rico |  |
| 2017-000016 | B | CHRISTIAN ISMAEL CEJAS | 12/05/2017 | 12/05/2017 | 30/06/2017 | -$10,451.95 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 3155 Compañía de Turismo de Puerto Rico |  |
| 2017-000017 | A | EDR SOLUTIONS, L.L.C. | 11/05/2017 | 11/05/2017 | 30/06/2017 | $5,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 1537 Oficina del Contralor Electoral |  |
| 2017-000017 | B | MARÍA CLAUDIA DELGADO OROZCO | 17/05/2017 | 17/05/2017 | 30/06/2017 | -$3,702.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE REPRESENTACIÓN | 3155 Compañía de Turismo de Puerto Rico |  |
| 2017-000017 |  | Sr. Juan Manuel Pagán Teitelbaum | 25/05/2017 | 25/05/2017 | 31/12/2017 | $4,500.72 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PRODUCTOR | 3056 Servicio de Extensión Agrícola |  |
| 2017-000018 | B | HILS BALFOUR SYNERGY LIMITED | 15/06/2017 | 15/06/2017 | 30/06/2017 | -$25,592.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE REPRESENTACIÓN | 3155 Compañía de Turismo de Puerto Rico |  |
| 2017-000018 |  | Digital Audiovisual Services, Inc. | 19/05/2017 | 19/05/2017 | 30/06/2017 | $12,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Junta de Gobierno de la Universidad de Puerto 3069 Rico |  |
| 2017-000023 |  | CHAD ENTERTAIMENT | 11/05/2017 | 14/05/2017 | 14/05/2017 | $800.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PROMOTOR DE ESPECTÁCULOS PÚBLICOS | 4025 Municipio de Culebra |  |
| 2017-000025 | B | ALICIA TERAN RIVERA | 18/05/2017 | 18/05/2017 | 30/06/2017 | -$10,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE REPRESENTACIÓN | 3155 Compañía de Turismo de Puerto Rico |  |
| 2017-000029 | B | RM Y ASOCIADOS, CORP. | 10/05/2017 | 10/05/2017 | 30/06/2017 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 4061 Municipio de Río Grande |  |
| 2017-000031 | B | Strategic Communication Management | 19/06/2017 | 19/06/2017 | 30/06/2017 | -$3,250.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | Negociado de Telecomunicaciones de Puerto 3032 Rico (NET) |  |
| 2017-000032 | B | Alterna Communications Corp. | 21/06/2017 | 21/06/2017 | 30/06/2017 | $25,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE OFICIAL DE PRENSA | 3060 Universidad de Puerto Rico en Aguadilla |  |
| 2017-000033 | B | Vissepo Producciones Inc | 20/07/2017 | 20/07/2017 | 30/09/2017 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PRODUCTOR | Oficina del Procurador de las Personas de Edad Avanzada del Estado Libre Asociado de Puerto 1459 Rico |  |

000113

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2022-DS0411 | | PUBLICIDAD TERE SUAREZ, LLC | 01/07/2021 | 01/07/2021 | 30/09/2021 | $50,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 2235 Departamento de Salud |
| 2022-DS0433 | A | PUBLICIDAD TERE SUAREZ. LLC | 28/09/2021 | 28/09/2021 | 30/09/2021 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 2235 Departamento de Salud |
| 2022-DS0433 | | PUBLICIDAD TERE SUAREZ LLC | 18/08/2021 | 18/08/2021 | 30/09/2021 | $50,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 2235 Departamento de Salud |
| 2022-DS0451 | | PUBLICIDAD TERE SUAREZ, LLC | 27/08/2021 | 27/08/2021 | 31/08/2021 | $121,704.36 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 2235 Departamento de Salud |
| 2022-DS0451 | A | PUBLICIDAD TERE SUAREZ, LLC | 31/08/2021 | 01/09/2021 | 31/12/2021 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 2235 Departamento de Salud |
| 2022-DS0549 | | AUDIO VISUAL PRODUCTIONS AND SHOW SERVICES | 23/08/2021 | 23/08/2021 | 31/12/2021 | $5,100.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE CAMARÓGRAFO | 2235 Departamento de Salud |
| 2022-F00007 | | MICHELLE LEYDA TORRES RODRIGUEZ | 01/07/2021 | 01/07/2021 | 30/06/2022 | $60,480.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 1423 Fideicomiso Institucional de la Guardia Nacional de Puerto Rico |
| 2022-L00043 | | SIMA EVENTS, INC. | 01/09/2021 | 01/09/2021 | 06/09/2021 | $9,500.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE REPRESENTACIÓN | 3080 Administración de Compensaciones por Accidentes de Automóviles |
| 2022-MS0019 | | MAYIRETTE LAPORTE GONZÁLEZ | 02/08/2021 | 02/08/2021 | 03/03/2022 | $5,160.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE TRAMOYA | 3198 Programa de Música 100x35: Sistema de Orquestas y Coros Juveniles e Infantiles de Puerto Rico |
| 2022-MS0025 | | EVELYN SURO NEGRÓN | 02/08/2021 | 02/08/2021 | 30/06/2022 | $9,989.52 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE TRAMOYA | 3198 Programa de Música 100x35: Sistema de Orquestas y Coros Juveniles e Infantiles de Puerto Rico |
| 2022-MS0030 | | ALEXSANDRA MARRERO GONZÁLEZ | 02/08/2021 | 02/08/2021 | 03/06/2022 | $11,700.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE TRAMOYA | 3198 Programa de Música 100x35: Sistema de Orquestas y Coros Juveniles e Infantiles de Puerto Rico |
| 2022-MS0080 | | EFRAIN LEBRÓN ROMERO | 02/08/2021 | 02/08/2021 | 03/06/2022 | $11,700.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE TRAMOYA | 3198 Programa de Música 100x35: Sistema de Orquestas y Coros Juveniles e Infantiles de Puerto Rico |
| 2022-MS0083 | | ÁNGEL GARCÍA MALAVÉ | 09/08/2021 | 09/08/2021 | 03/06/2022 | $7,600.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE TRAMOYA | 3198 Programa de Música 100x35: Sistema de Orquestas y Coros Juveniles e Infantiles de Puerto Rico |
| 2022-PPP003 | | SANDRA GUTIÉRREZ DÁVILA | 30/06/2021 | 01/07/2021 | 30/06/2022 | $96,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | 3512 Autoridad para Alianzas Público Privadas de Puerto Rico |
| 2022-PPP003 | A | SANDRA GUTIÉRREZ DÁVILA | 15/07/2021 | 15/07/2021 | 30/06/2022 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | 3512 Autoridad para Alianzas Público Privadas de Puerto Rico |
| 2022-PRH045 | | MARGARITA ÁLVAREZ SUÁREZ | 17/08/2021 | 17/08/2021 | 30/06/2022 | $24,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | 3175 Autoridad para el Financiamiento de la Vivienda de Puerto Rico |
| 2022-PRH058 | | GFR MEDIA, LLC | 21/09/2021 | 21/09/2021 | 30/06/2022 | $25,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE PUBLICIDAD | 3175 Autoridad para el Financiamiento de la Vivienda de Puerto Rico |
| 2022-RT0017 | A | AURELIZ CABRERA DESSUS | 29/09/2021 | 29/09/2021 | 31/12/2022 | $0.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE OFICIAL DE PRENSA | 3063 Universidad de Puerto Rico en Ponce |
| 2022-RT0017 | | AURELIZ CABRERA DESSUS | 21/07/2021 | 21/07/2021 | 31/12/2021 | $7,500.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE OFICIAL DE PRENSA | 3063 Universidad de Puerto Rico en Ponce |
| 2022-S00031 | A | ARM CONSULTING GROUP LLC | 30/07/2021 | 30/07/2021 | 30/06/2022 | $86,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | 3145 Autoridad de Edificios Públicos |
| 2022-S00031 | | ARM CONSULTING GROUP LLC | 15/07/2021 | 15/07/2021 | 31/07/2021 | $10,000.00 | SERVICIOS DE PUBLICIDAD, DE REPRESENTACIÓN O ARTÍSTICOS | SERVICIOS DE RELACIONES PÚBLICAS | 3145 Autoridad de Edificios Públicos |

$301,418,709.66

000114

# Consultation of the Contract Registry



## Search criteria

| Government entity | Contract No. | Contractor |
|---|---|---|
| Select Entity | | |

| Service Category | Type of service | Amount |
|---|---|---|
| CONSULTING SERVICES ✕ | Select Type of Service | $    $ |

| Grant Date | | Effective date |
|---|---|---|
| 03/05/2017   -   13/10/2021 | | From   -   Until |

🔍 Look for    ✎ Delete

## Frequent Searches - All Entities

## Results

Show 10 records



| Contract No. | Contractor | Awarded in | Valid since | Valid Until | Amount | |
|---|---|---|---|---|---|---|
| 2022-S00061 | STAR CONSULTING GROUP LLC | 16 / Sep / 2021 | 16 / Sep / 2021 | Jun / 30/2022 | $ 10,000.00 | FINANCIAL CONSULTANCY |
| 2022-S00052 | EVA LYNN RODRIGUEZ COLON | 06 / Aug / 2021 | 06 / Aug / 2021 | Jun / 30/2022 | $ 50,000.00 | ADMINISTRATIVE CONSULT |
| 2022-S00035 | ECOVAL LLC | Jul / 21/2021 | Jul / 21/2021 | Jun / 30/2022 | $ 149,925.00 | ADMINISTRATIVE CONSULT |
| 2022-S00034 | CHURCHES & CHURCHES PSC | Jul / 16/2021 | Jul / 16/2021 | Jun / 30/2022 | $ 231,400.00 | ADMINISTRATIVE CONSULT |
| 2022-S00011 | STAR CONSULTING GROUP LLC | Jul / 01/2021 | Jul / 01/2021 | Jun / 30/2022 | $ 96,875.00 | ADMINISTRATIVE CONSULT |
| 2022-S00006 | NORTOL ENVIRONMENTAL AND OCCUPATIONAL SAFETY, INC. | Jul / 01/2021 | Jul / 01/2021 | Jun / 30/2022 | $ 10,000.00 | ENVIRONMENTAL CONSUL |
| 2022-PRH053 | MIGUEL A. COLÓN PAGÁN | Sep / 13/2021 | Sep / 13/2021 | Jun / 30/2022 | $ 80,000.00 | ADMINISTRATIVE CONSULT |
| 2022-PRH044 | PENELOPE GRIFFIN PINK | Aug / 17/2021 | Aug / 17/2021 | Jun / 30/2022 | $ 42,240.00 | ADMINISTRATIVE CONSULT |
| 2022-PRH043 | EDWIN RIVERA PINK | Aug / 13/2021 | Aug / 13/2021 | Jun / 30/2022 | $ 42,240.00 | ADMINISTRATIVE CONSULT |
| 2022-PRH041 | TAULER BLANC, LLC DBA CAMPORREALE & CO. | 12 / Aug / 2021 | 12 / Aug / 2021 | Jun / 30/2022 | $ 144,000.00 | FINANCIAL CONSULTANCY |

Showing records from 1 to 10 of a total of 9,918 records

Previous   1   2   3   4   5   ...   992   Next

Office of the Comptroller of Puerto Rico
Consultation of the Contract Registry
https://consultacontratos.ocpr.gov.pr
Exhibit Q
000115
1/1

| Núm. Contrato | Enmienda | Contratista | Otorgado en | Vigencia Desde | Vigencia Hasta | Cuantía | Categoría de Servicio | Tipo de Servicio | Entidad | publicsearching.contract.list.resultsentitynamecolumn | Cancelación Efectiva en |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005-000026 | L | DANIEL MUNS GARCIA D/B/A MUNS & ASSOCIATES | 13/07/2017 | 13/07/2017 | 30/06/2018 | $10,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2005-000026 | M | DANIEL MUNS GARCIA D/B/A MUNS & ASSOCIATES | 20/06/2018 | 01/07/2018 | 30/06/2019 | $10,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2005-000026 | N | DANIEL MUNS GARCIA D/B/A MUNS & ASSOCIATES | 28/06/2019 | 01/07/2019 | 30/06/2020 | $11,875.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2005-000026 | O | DANIEL MUNS GARCIA D/B/A MUNS & ASSOCIATES | 30/06/2020 | 01/07/2020 | 30/06/2021 | $11,875.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2006-000001 | O | JIMENEZ & SALDAÑA DENTISTAS, C.S.P | 29/06/2017 | 01/07/2017 | 30/06/2018 | $54,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2006-000001 | P | JIMENEZ & SALDAÑA DENTISTAS, C.S.P | 29/06/2018 | 01/07/2018 | 30/06/2019 | $54,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2006-000001 | Q | JIMENEZ & SALDAÑA DENTISTAS, C.S.P | 28/06/2019 | 01/07/2019 | 30/06/2020 | $54,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2010-000013 | I | Lcdo. Amaury Lluveras Gómez | 30/06/2017 | 01/07/2017 | 30/06/2018 | $60,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2010-000013 | J | Lcdo. Amaury Lluveras Gómez | 27/06/2018 | 01/07/2018 | 30/06/2019 | $60,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2010-000013 | K | Lcdo. Amaury Lluveras Gómez | 26/06/2019 | 01/07/2019 | 30/06/2020 | $60,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2010-000013 | L | Lcdo. Amaury Lluveras Gómez | 30/06/2020 | 01/07/2020 | 30/06/2021 | $60,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4311 | Corporación para el Desarrollo de la Salud en el Municipio de Bayamón, C.D. | |
| 2011-001913 | L | COMMERCIAL EQUIPMENT FINANCE, INC. (CEFI) | 30/06/2017 | 30/06/2017 | 30/06/2018 | $126,145.84 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4065 | Municipio de San Juan | |
| 2011-001913 | M | COMMERCIAL EQUIPMENT FINANCE, INC. (CEFI) | 29/06/2018 | 29/06/2018 | 30/06/2019 | $215,464.28 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4065 | Municipio de San Juan | |
| 2011-001913 | N | COMMERCIAL EQUIPMENT FINANCE, INC. (CEFI) | 28/06/2019 | 28/06/2019 | 30/06/2020 | $311,146.00 | SERVICIOS DE CONSULTORÍA | CONSULTORIA FINANCIERA | 4065 | Municipio de San Juan | |
| 2011-001913 | O | COMMERCIAL EQUIPMENT FINANCE, INC. (CEFI) | 21/01/2020 | 21/01/2020 | 30/06/2020 | $311,146.00 | SERVICIOS DE CONSULTORÍA | CONSULTORIA FINANCIERA | 4065 | Municipio de San Juan | |
| 2011-001913 | P | COMMERCIAL EQUIPMENT FINANCE, INC. (CEFI) | 24/06/2020 | 24/06/2020 | 30/06/2021 | $311,146.00 | SERVICIOS DE CONSULTORÍA | CONSULTORIA FINANCIERA | 4065 | Municipio de San Juan | |
| 2011-001913 | Q | COMMERCIAL EQUIPMENT FINANCE, INC. (CEFI) | 30/06/2021 | 30/06/2021 | 30/06/2022 | $311,146.00 | SERVICIOS DE CONSULTORÍA | CONSULTORIA FINANCIERA | 4065 | Municipio de San Juan | |
| 2011-001913 | Q | COMMERCIAL EQUIPMENT FINANCE, INC. (CEFI) | 30/06/2021 | 30/06/2021 | 30/06/2022 | $311,146.00 | SERVICIOS DE CONSULTORÍA | CONSULTORIA FINANCIERA | 4065 | Municipio de San Juan | |
| 2011-BGF100 | H | INTERBORO SYSTEMS CORPORATION | 30/06/2017 | 30/06/2017 | 30/09/2017 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA RELACIONADA CON LOS SISTEMAS DE INFORMACIÓN | 3085 | Banco Gubernamental de Fomento para Puerto Rico | |
| 2011-BGF100 | I | INTERBORO SYSTEMS CORPORATION | 30/09/2017 | 30/09/2017 | 31/12/2017 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA RELACIONADA CON LOS SISTEMAS DE INFORMACIÓN | 3085 | Banco Gubernamental de Fomento para Puerto Rico | |
| 2011-BGF100 | J | INTERBORO SYSTEMS CORPORATION | 29/12/2017 | 29/12/2017 | 31/03/2018 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA RELACIONADA CON LOS SISTEMAS DE INFORMACIÓN | 3085 | Banco Gubernamental de Fomento para Puerto Rico | |
| 2011-BGF100 | K | INTERBORO SYSTEMS CORPORATION | 28/03/2018 | 28/03/2018 | 30/06/2018 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA RELACIONADA CON LOS SISTEMAS DE INFORMACIÓN | 3085 | Banco Gubernamental de Fomento para Puerto Rico | |
| 2011-BGF100 | L | INTERBORO SYSTEMS CORPORATION | 29/06/2018 | 29/06/2018 | 30/06/2019 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA RELACIONADA CON LOS SISTEMAS DE INFORMACIÓN | 3085 | Banco Gubernamental de Fomento para Puerto Rico | |
| 2012-000515 | M | TORRES-ROSA CONSULTING ENGINEERS | 31/07/2017 | 31/07/2017 | 31/10/2017 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4058 | Municipio de Ponce | |
| 2012-DS0167 | I | CARMEN LUISA RIVERA HADDOCK | 30/09/2017 | 01/10/2017 | 30/09/2018 | $36,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | |
| 2012-DS0167 | J | CARMEN LUISA RIVERA HADDOCK | 28/09/2018 | 01/10/2018 | 30/09/2019 | $36,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | |
| 2012-DS0521 | H | CORALAIDEE JIMENEZ BURGOS | 30/09/2017 | 01/10/2017 | 30/09/2018 | $36,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | |
| 2012-DS0521 | I | CORALAIDEE JIMENEZ BURGOS | 28/09/2018 | 01/10/2018 | 30/09/2019 | $36,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | |
| 2012-DS0673 | G | LUIS ANGEL BENIQUEZ CORTES | 11/09/2017 | 01/10/2017 | 30/09/2018 | $21,816.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | |
| 2013-000134 | G | CARRASQUILLO MARTINEZ, IRIS M. | 16/06/2017 | 30/06/2017 | 31/12/2017 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4019 | Municipio de Ceiba | |
| 2013-DS0481 | F | MARCOS EZEQUIEL FELICI GIOVANINI | 29/09/2017 | 01/10/2017 | 30/09/2018 | $20,304.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | 29/03/2018 |
| 2014-BGF114 | D | Departamento de Hacienda | 10/01/2019 | 10/01/2019 | 28/08/2019 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA RELACIONADA CON LOS SISTEMAS DE INFORMACIÓN | 3085 | Banco Gubernamental de Fomento para Puerto Rico | |
| 2014-BGF114 | D | EVERTEC GROUP LLC | 10/01/2019 | 10/01/2019 | 28/08/2019 | $0.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA RELACIONADA CON LOS SISTEMAS DE INFORMACIÓN | 3085 | Banco Gubernamental de Fomento para Puerto Rico | |
| 2014-DS0322 | E | JONATHAN JORGE MORALES GONZALEZ | 29/09/2017 | 01/10/2017 | 30/09/2018 | $41,652.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | |
| 2014-DS0322 | F | JONATHAN JORGE MORALES GONZALEZ | 28/09/2018 | 01/10/2018 | 30/09/2019 | $41,652.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | |
| 2014-DS0341 | F | LYZBETH ARLENE CORDERO RIVERA | 13/09/2017 | 01/10/2017 | 30/09/2018 | $45,000.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | |
| 2014-DS0342 | G | ALEXANDRA REYES RAMOS | 28/03/2018 | 29/03/2018 | 28/03/2019 | $30,780.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2235 | Departamento de Salud | 20/04/2018 |
| 2014-DS0536 | D | SHEINA LIZ MONTAÑEZ MARTINEZ | 30/06/2017 | 01/07/2017 | 30/06/2018 | $30,600.00 | SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 2242 | Oficina Central para Asuntos del Sida y Enfermedades Transmisibles | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2022-P00010 | | SCOTTMADDEN, INC. | 23/07/2021 | 23/07/2021 | 30/10/2021 | $665,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 3075 Autoridad de Energía Eléctrica de Puerto Rico |
| 2022-P00012 | | NORTON ROSE FULBRIGHT US LLP | 26/07/2021 | 26/07/2021 | 30/06/2022 | $500,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | 3075 Autoridad de Energía Eléctrica de Puerto Rico |
| 2022-P00014 | | CAVANAUGH MACDONALD CONSULTING, LLC | 24/08/2021 | 24/08/2021 | 30/06/2022 | $172,800.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | 3075 Autoridad de Energía Eléctrica de Puerto Rico |
| 2022-PF0002 | | OMAR SANTOS CRESPO | 01/07/2021 | 01/07/2021 | 31/12/2021 | $14,725.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4046 Municipio de Luquillo |
| 2022-PF0009 | | ARACELIS MORALES SOLANO | 01/09/2021 | 01/09/2021 | 01/09/2022 | $26,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 4046 Municipio de Luquillo |
| 2022-PPP004 | | CPM PR, LLC | 15/07/2021 | 15/07/2021 | 31/12/2021 | $500,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP005 | | KPMG, LLP | 28/07/2021 | 28/07/2021 | 30/06/2022 | $600,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP005 | A | KPMG, LLP | 19/08/2021 | 19/08/2021 | 30/06/2022 | $350,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP009 | | BUENA VIBRA GROUP, INC. | 23/07/2021 | 23/07/2021 | 30/06/2022 | $198,900.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA EN COMUNICACIONES | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP014 | | AG ENVIRONMENTAL PSC | 01/07/2021 | 01/07/2021 | 30/06/2022 | $75,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP016 | | ECLIPSE MANAGEMENT, LLC | 29/06/2021 | 01/07/2021 | 30/06/2022 | $246,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP018 | | STRIDE STRATEGIES, LLC | 28/06/2021 | 01/07/2021 | 30/06/2022 | $150,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA LEGAL | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP019 | | IMG REBEL ADVISORY, INC. | 30/06/2021 | 01/07/2021 | 30/06/2022 | $350,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP020 | | SQUIRE PATTON BOGGS (US) LLP | 30/06/2021 | 01/07/2021 | 30/06/2022 | $225,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA LEGAL | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP025 | | FTI CONSULTING, INC. | 30/06/2021 | 01/07/2021 | 30/06/2022 | $2,500,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP030 | | RS&H, INC. | 07/07/2021 | 07/07/2021 | 30/06/2022 | $149,800.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PPP039 | | STATEMENT, LLC | 01/10/2021 | 01/10/2021 | 30/06/2022 | $115,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA EN COMUNICACIONES | Autoridad para Alianzas Público Privadas de 3512 Puerto Rico |
| 2022-PRH005 | | AIXA BASTAR MALDONADO | 06/07/2021 | 06/07/2021 | 30/06/2022 | $10,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH005 | A | AIXA BASTAR MALDONADO | 16/09/2021 | 16/09/2021 | 30/06/2022 | $26,480.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH006 | A | MARIBEL REY HERNAIZ | 16/09/2021 | 16/09/2021 | 30/06/2022 | $26,480.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH006 | | MARIBEL REY HERNAIZ | 14/07/2021 | 14/07/2021 | 30/06/2022 | $10,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH011 | | AIDA L. PÉREZ MARTÍNEZ | 12/07/2021 | 12/07/2021 | 30/06/2022 | $10,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH012 | | ALBERTO LÓPEZ ROSARIO | 14/07/2021 | 14/07/2021 | 30/06/2022 | $40,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH013 | | ABBY N REYES LOPEZ | 14/07/2021 | 14/07/2021 | 30/06/2022 | $52,500.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA EN RECURSOS HUMANOS | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH014 | | DAVID LABOY MALAVÉ | 14/07/2021 | 14/07/2021 | 30/06/2022 | $85,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH016 | | CARLOS O CASTILLO MATOS | 20/07/2021 | 20/07/2021 | 30/06/2022 | $57,600.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH023 | | MARGARA, CORP. | 22/07/2021 | 22/07/2021 | 30/06/2022 | $10,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH023 | A | MARGARA, CORP. | 01/09/2021 | 01/09/2021 | 30/06/2022 | $60,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH030 | | INNOVATIVE EMERGENCY MANAGEMENT, INC. | 04/08/2021 | 04/08/2021 | 30/06/2025 | $6,899,245.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH032 | | JORGE L. SILEN BELTRAN | 09/08/2021 | 09/08/2021 | 30/06/2022 | $50,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH033 | | GTA CONSULTING, LLC | 09/08/2021 | 09/08/2021 | 30/06/2022 | $60,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH035 | | BARRERAS MÉNDEZ, LLC | 09/08/2021 | 09/08/2021 | 30/06/2022 | $160,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH041 | | TAULER BLANC, LLC DBA CAMPORREALE & CO. | 12/08/2021 | 12/08/2021 | 30/06/2022 | $144,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH043 | | EDWIN RIVERA ROSADO | 13/08/2021 | 13/08/2021 | 30/06/2022 | $42,240.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH044 | | PENELOPE GRIFFIN ROSADO | 17/08/2021 | 17/08/2021 | 30/06/2022 | $42,240.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-PRH053 | | MIGUEL A. COLÓN PAGÁN | 13/09/2021 | 13/09/2021 | 30/06/2022 | $80,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | Autoridad para el Financiamiento de la Vivienda 3175 de Puerto Rico |
| 2022-S00006 | | NORTOL ENVIRONMENTAL AND OCCUPATIONAL SAFETY, INC. | 01/07/2021 | 01/07/2021 | 30/06/2022 | $10,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA AMBIENTAL | 3145 Autoridad de Edificios Públicos |
| 2022-S00013 | A | STAR CONSULTING GROUP LLC | 22/07/2021 | 22/07/2021 | 30/06/2022 | $0.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 3145 Autoridad de Edificios Públicos |
| 2022-S00013 | | STAR CONSULTING GROUP PSC | 01/07/2021 | 01/07/2021 | 30/06/2022 | $96,875.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 3145 Autoridad de Edificios Públicos |
| 2022-S00034 | | IGLESIAS & IGLESIAS PSC | 16/07/2021 | 16/07/2021 | 30/06/2022 | $231,400.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 3145 Autoridad de Edificios Públicos |
| 2022-S00035 | | ECOVAL LLC | 21/07/2021 | 21/07/2021 | 30/06/2022 | $149,925.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 3145 Autoridad de Edificios Públicos |
| 2022-S00052 | | EVA LYNN RODRIGUEZ COLON | 06/08/2021 | 06/08/2021 | 30/06/2022 | $50,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA ADMINISTRATIVA | 3145 Autoridad de Edificios Públicos |
| 2022-S00061 | | STAR CONSULTING GROUP LLC | 16/09/2021 | 16/09/2021 | 30/06/2022 | $10,000.00 SERVICIOS DE CONSULTORÍA | CONSULTORÍA FINANCIERA | 3145 Autoridad de Edificios Públicos |

2,375,668,318.52

**Government of Puerto Rico TSA**
Christmas Bonuses paid via RHUM
*FY2016 - FY2021, amounts in $000s*

| ID | Entity | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | Total |
|---|---|---|---|---|---|---|---|---|
| 010 | The General Court of Justice | $3,096 | $3,031 | $2,978 | $4,534 | $4,168 | $4,065 | $21,872 |
| 015 | Office of the Governor | 147 | 131 | 96 | 96 | 105 | 104 | 679 |
| 016 | Office of Management and Budget | 96 | 95 | 81 | 81 | 75 | 56 | 484 |
| 018 | Planning Board | 170 | 187 | 87 | 80 | 84 | 117 | 726 |
| 021 | Bureau of Emergency Management and Disaster Management | 168 | 162 | 112 | 99 | 3 | 2 | 546 |
| 022 | Office of The Commissioner of Insurance | 106 | 110 | 50 | 48 | 44 | 41 | 400 |
| 023 | Puerto Rico Department of State | 115 | 108 | 65 | 55 | 62 | 64 | 470 |
| 024 | Puerto Rico Department of the Treasury | 1,814 | 1,372 | 1,294 | 1,149 | 1,069 | 926 | 7,623 |
| 026 | Retirement System for Government Employees & the Judiciary | 335 | 323 | 165 | 145 | 121 | 111 | 1,200 |
| 028 | State Elections Commission | 425 | 703 | 436 | 368 | 357 | 348 | 2,636 |
| 030 | Puerto Rico Office of Human Resources Management and Transformation | – | – | – | 42 | 40 | 39 | 120 |
| 031 | General Services Administration | 91 | 92 | 60 | 54 | 48 | 39 | 384 |
| 034 | Commission of Investigation Processing and Appeals | 4 | 4 | 3 | 3 | 2 | 2 | 19 |
| 037 | Civil Rights Commission | 11 | 11 | 10 | 10 | 6 | 5 | 54 |
| 038 | Puerto Rico Department of Justice | 976 | 964 | 903 | 862 | 760 | 745 | 5,209 |
| 042 | Bureau of the Fire Department of Puerto Rico | 1,695 | 1,839 | 913 | 913 | 871 | 846 | 7,078 |
| 043 | Puerto Rico National Guard | 180 | 187 | 174 | 158 | 147 | 144 | 989 |
| 045 | Department of Public Safety | – | – | – | – | 133 | 707 | 840 |
| 049 | Puerto Rico Department of Transportation and Public Works | 1,327 | 1,301 | 796 | 716 | 642 | 583 | 5,365 |
| 055 | Puerto Rico Department of Agriculture | 312 | 273 | 121 | 117 | 110 | 110 | 1,044 |
| 060 | Office of the Citizens Ombudsman | 49 | 47 | 42 | 40 | 34 | 32 | 245 |
| 063 | Cooperative Development Commission of Puerto Rico | 33 | 32 | 17 | 16 | 14 | 13 | 125 |
| 065 | Public Service Commission | 97 | 92 | 54 | 51 | 44 | – | 339 |
| 067 | Puerto Rico Department of Labor and Human Resources | 1,106 | 1,196 | 745 | 640 | 633 | 609 | 4,930 |
| 068 | Puerto Rico Labor Relations Board | 11 | 11 | 9 | 8 | 8 | 8 | 56 |
| 069 | Puerto Rico Department of Consumer Affairs | 128 | 128 | 64 | 70 | 68 | 68 | 528 |
| 071 | Department of Health | 2,698 | 3,322 | 2,578 | 2,373 | 2,179 | 1,996 | 15,145 |
| 075 | Commissioner of Financial Institutions | 56 | 52 | 1 | 48 | 42 | 39 | 237 |
| 078 | Department of Housing | 383 | 388 | 173 | 165 | 198 | 186 | 1,492 |
| 081 | Department of Education | 30,946 | 29,460 | 27,523 | 26,353 | 23,853 | 21,624 | 159,760 |
| 082 | Institute of Puerto Rican Culture | 124 | 128 | 87 | 80 | 76 | 73 | 568 |
| 087 | Department of Recreation and Sports | 878 | 867 | 319 | 290 | 140 | 134 | 2,628 |
| 089 | Administration of the Horse Racing Industry and Sport | 39 | 37 | 14 | 25 | 30 | – | 146 |
| 091 | Teacher Retirement System | 206 | 203 | 136 | 120 | 65 | 60 | 791 |
| 095 | Mental Health and Drug Addiction Services Administration | 679 | 646 | 635 | 574 | 538 | 446 | 3,517 |
| 096 | Office of the Women's Advocate | 25 | 23 | 13 | 24 | 21 | 23 | 129 |
| 105 | Industrial Commission | 355 | 351 | 109 | 105 | 100 | 96 | 1,116 |
| 106 | Public Housing Administration | 376 | 367 | 199 | 193 | 177 | 223 | 1,536 |
| 120 | Veteran's Advocate Office | 14 | 14 | 9 | 9 | 8 | 8 | 62 |
| 122 | Secretariat of the Department of the Family | 501 | 435 | 296 | 262 | 244 | 235 | 1,973 |
| 123 | Family and Children Administration | 2,205 | 1,759 | 1,224 | 1,122 | 1,117 | 1,077 | 8,503 |
| 124 | Child Support Administration (ASUME) | 465 | 374 | 254 | 240 | 231 | 219 | 1,783 |
| 126 | Vocational Rehabilitation Administration | 458 | 449 | 434 | 416 | 384 | 374 | 2,515 |
| 133 | Administration for Socioeconomic Development of the Family | 1,877 | 1,525 | 999 | 923 | 883 | 830 | 7,038 |
| 139 | Natural Resources Administration | 508 | 540 | 475 | 474 | 566 | 500 | 3,062 |
| 137 | Department of Correction and Rehabilitation | 4,033 | 5,652 | 3,838 | 3,826 | 3,414 | 3,313 | 24,076 |
| 139 | Parole Board | 44 | 46 | 24 | 20 | 22 | 21 | 176 |
| 141 | Telecommunications Regulatory Board | 72 | 69 | 40 | 38 | 29 | – | 248 |
| 152 | Elderly and Retired People Advocate Office | 80 | 80 | 77 | 70 | 59 | 70 | 436 |
| 153 | Office for People with Disabilities | – | 62 | 39 | 32 | 33 | 31 | 198 |
| 155 | State Historic Preservation Office of Puerto Rico | 14 | 14 | 13 | 13 | 12 | 17 | 83 |
| 221 | Bureau of the Medical Emergency Corps of Puerto Rico | 591 | 569 | 406 | 380 | 345 | – | 2,290 |
| 224 | Com. Joint Inf. Comptroller | 7 | 9 | – | 6 | – | 3 | 25 |
| 226 | Com. Legislative Donation | 15 | 14 | 13 | 9 | 7 | 7 | 64 |
| 231 | Office for the Patient's Advocate | 20 | 25 | 18 | 15 | 12 | 11 | 101 |
| 241 | Administration for Integral Development of Childhood | 400 | 324 | 198 | 182 | 168 | 160 | 1,433 |
| 266 | Office of Public Affairs | 6 | 6 | 7 | 7 | 6 | 6 | 38 |
| 271 | Puerto Rico Innovation and Technology Service | – | – | – | – | – | 12 | 12 |
| 272 | Office of the Inspector General | – | – | – | – | 7 | – | 7 |
| 279 | Public Service Appeals Commission | 27 | 26 | 24 | 23 | 21 | 19 | 140 |
| 281 | Office of the Election Comptroller | 46 | 46 | 29 | 28 | 23 | 22 | 195 |
| 298 | Public Service Regulatory Board | – | – | – | – | – | 72 | 72 |
| 311 | Puerto Rico Gaming Commission | – | – | – | – | – | 110 | 110 |
| 329 | Office of Socio-Economic and Community Development | – | – | 27 | 47 | 32 | 32 | 137 |
| | **Subtotal Agencies** | **60,640** | **60,282** | **49,511** | **48,848** | **44,688** | **41,833** | **305,802** |
| 530 | Employee & Judiciary Retirement Systems | 22,639 | 21,995 | 21,451 | 21,050 | 20,623 | 19,836 | 127,594 |
| 592 | Teachers Retirement System | 7,497 | 7,354 | 7,206 | 7,043 | 6,907 | 6,772 | 42,780 |
| | **Subtotal Pensioners & Retirees** | **30,136** | **29,349** | **28,657** | **28,093** | **27,530** | **26,609** | **170,374** |
| | **Grand Total** | **$90,775** | **$89,632** | **$78,169** | **$76,942** | **$72,218** | **$68,441** | **$476,176** |



RHUM Bonuses FY2016 - FY2021 ($k)

■ FY2016   ■ FY2017   ■ FY2018   ■ FY2019   ■ FY2020   ■ FY2021

14TH EDITION

*A World Bank Group Flagship Report*

# Doing Business 2017

## Equal Opportunity for All



*Comparing Business Regulation
for Domestic Firms in **190** Economies*

**WORLD BANK GROUP**

Exhibit T

000120

## TABLE 1.1   Ease of doing business ranking

| Rank | Economy | DTF score | Rank | Economy | DTF score | Rank | Economy | DTF score |
|---|---|---|---|---|---|---|---|---|
| 1 | New Zealand | 87.01 ↑ | 65 | Azerbaijan | 67.99 ↑ | 128 | Tajikistan | 55.34 ↑ |
| 2 | Singapore | 85.05 ↑ | 66 | Oman | 67.73 ↑ | 129 | Cabo Verde | 55.28 |
| 3 | Denmark | 84.87 ↑ | 67 | Jamaica | 67.54 ↑ | 130 | India | 55.27 ↑ |
| 4 | Hong Kong SAR, China | 84.21 ↑ | 68 | Morocco | 67.50 ↑ | 131 | Cambodia | 54.79 ↑ |
| 5 | Korea, Rep. | 84.07 ↑ | 69 | Turkey | 67.19 | 132 | Tanzania | 54.48 ↑ |
| 6 | Norway | 82.82 ↑ | 70 | Panama | 66.19 | 133 | Malawi | 54.39 ↑ |
| 7 | United Kingdom | 82.74 ↑ | 71 | Botswana | 65.55 ↑ | 134 | St. Kitts and Nevis | 53.96 |
| 8 | United States | 82.45 | 72 | Brunei Darussalam | 65.51 ↑ | 135 | Maldives | 53.94 |
| 9 | Sweden | 82.13 ↑ | 73 | Bhutan | 65.37 ↑ | 136 | Palau | 53.81 ↑ |
| 10 | Macedonia, FYR | 81.74 ↑ | 74 | South Africa | 65.20 | 137 | Mozambique | 53.78 |
| 11 | Taiwan, China | 81.09 ↑ | 75 | Kyrgyz Republic | 65.17 ↑ | 138 | Grenada | 53.75 |
| 12 | Estonia | 81.05 ↑ | 76 | Malta | 65.01 ↑ | 139 | Lao PDR | 53.29 ↑ |
| 13 | Finland | 80.84 ↑ | 77 | Tunisia | 64.89 ↑ | 140 | West Bank and Gaza | 53.21 ↑ |
| 14 | Latvia | 80.61 ↑ | 78 | China | 64.28 ↑ | 141 | Mali | 52.96 ↑ |
| 15 | Australia | 80.26 ↑ | 79 | San Marino | 64.11 ↑ | 142 | Côte d'Ivoire | 52.31 ↑ |
| 16 | Georgia | 80.20 ↑ | 80 | Ukraine | 63.90 ↑ | 143 | Marshall Islands | 51.92 ↑ |
| 17 | Germany | 79.87 | 81 | Bosnia and Herzegovina | 63.87 ↑ | 144 | Pakistan | 51.77 ↑ |
| 18 | Ireland | 79.53 ↑ | 82 | Vietnam | 63.83 ↑ | 145 | Gambia, The | 51.70 ↑ |
| 19 | Austria | 78.92 ↑ | 83 | Qatar | 63.66 | 146 | Burkina Faso | 51.33 ↑ |
| 20 | Iceland | 78.91 ↑ | 83 | Vanuatu | 63.66 ↑ | 147 | Senegal | 50.68 ↑ |
| 21 | Lithuania | 78.84 ↑ | 85 | Tonga | 63.58 ↑ | 148 | Sierra Leone | 50.23 ↑ |
| 22 | Canada | 78.57 | 86 | St. Lucia | 63.13 ↑ | 149 | Bolivia | 49.85 ↑ |
| 23 | Malaysia | 78.11 ↑ | 87 | Uzbekistan | 63.03 ↑ | 150 | Niger | 49.57 ↑ |
| 24 | Poland | 77.81 ↑ | 88 | Guatemala | 62.93 ↑ | 151 | Micronesia, Fed. Sts. | 49.48 |
| 25 | Portugal | 77.40 ↑ | 89 | Samoa | 62.17 ↑ | 152 | Kiribati | 49.19 ↑ |
| 26 | United Arab Emirates | 76.89 ↑ | 90 | Uruguay | 61.85 ↑ | 153 | Comoros | 48.69 ↑ |
| 27 | Czech Republic | 76.71 ↑ | 91 | Indonesia | 61.52 ↑ | 154 | Togo | 48.57 ↑ |
| 28 | Netherlands | 76.38 ↑ | 92 | Kenya | 61.22 ↑ | 155 | Benin | 48.52 ↑ |
| 29 | France | 76.27 ↑ | 93 | Seychelles | 61.21 ↑ | 156 | Algeria | 47.76 ↑ |
| 30 | Slovenia | 76.14 ↑ | 94 | Saudi Arabia | 61.11 ↑ | 157 | Burundi | 47.37 ↑ |
| 31 | Switzerland | 76.06 | 95 | El Salvador | 61.02 | 158 | Suriname | 47.28 ↑ |
| 32 | Spain | 75.73 ↑ | 96 | Trinidad and Tobago | 60.99 ↑ | 159 | Ethiopia | 47.25 ↑ |
| 33 | Slovak Republic | 75.61 ↑ | 97 | Fiji | 60.71 ↑ | 160 | Mauritania | 47.21 ↑ |
| 34 | Japan | 75.53 ↑ | 98 | Zambia | 60.54 ↑ | 161 | Zimbabwe | 47.10 ↑ |
| 35 | Kazakhstan | 75.09 ↑ | 99 | Philippines | 60.40 ↑ | 162 | São Tomé and Príncipe | 46.75 ↑ |
| 36 | Romania | 74.26 ↑ | 100 | Lesotho | 60.37 ↑ | 163 | Guinea | 46.23 ↑ |
| 37 | Belarus | 74.13 ↑ | 101 | Dominica | 60.27 | 164 | Gabon | 45.88 |
| 38 | Armenia | 73.63 ↑ | 102 | Kuwait | 59.55 | 165 | Iraq | 45.61 ↑ |
| 39 | Bulgaria | 73.51 ↑ | 103 | Dominican Republic | 59.35 ↑ | 166 | Cameroon | 45.27 ↑ |
| 40 | Russian Federation | 73.19 | 104 | Solomon Islands | 59.17 ↑ | 167 | Madagascar | 45.10 ↑ |
| 41 | Hungary | 73.07 ↑ | 105 | Honduras | 59.09 ↑ | 168 | Sudan | 44.76 |
| 42 | Belgium | 73.00 ↑ | 106 | Paraguay | 59.03 ↑ | 169 | Nigeria | 44.63 ↑ |
| 43 | Croatia | 72.99 ↑ | 107 | Nepal | 58.88 ↑ | 170 | Myanmar | 44.56 ↑ |
| 44 | Moldova | 72.75 ↑ | 108 | Ghana | 58.82 ↑ | 171 | Djibouti | 44.50 ↑ |
| 45 | Cyprus | 72.65 ↑ | 108 | Namibia | 58.82 | 172 | Guinea-Bissau | 41.63 ↑ |
| 46 | Thailand | 72.53 ↑ | 110 | Sri Lanka | 58.79 ↑ | 173 | Syrian Arab Republic | 41.43 |
| 47 | Mexico | 72.29 ↑ | 111 | Swaziland | 58.34 ↑ | 174 | Liberia | 41.41 |
| 47 | Serbia | 72.29 ↑ | 112 | Belize | 58.06 | 175 | Timor-Leste | 40.88 |
| 49 | Mauritius | 72.27 ↑ | 113 | Antigua and Barbuda | 58.04 ↑ | 176 | Bangladesh | 40.84 ↑ |
| 50 | Italy | 72.25 ↑ | 114 | Ecuador | 57.97 ↑ | 177 | Congo, Rep. | 40.58 |
| 51 | Montenegro | 72.08 ↑ | 115 | Uganda | 57.77 ↑ | 178 | Equatorial Guinea | 39.83 |
| 52 | Israel | 71.65 ↑ | 116 | Argentina | 57.45 ↑ | 179 | Yemen, Rep. | 39.57 |
| 53 | Colombia | 70.92 ↑ | 117 | Barbados | 57.42 ↑ | 180 | Chad | 39.07 ↑ |
| 54 | Peru | 70.25 ↑ | 118 | Jordan | 57.30 ↑ | 181 | Haiti | 38.66 ↑ |
| 55 | Puerto Rico (U.S.) | 69.82 ↑ | 119 | Papua New Guinea | 57.29 ↑ | 182 | Angola | 38.41 |
| 56 | Rwanda | 69.81 ↑ | 120 | Iran, Islamic Rep. | 57.26 ↑ | 183 | Afghanistan | 38.10 |
| 57 | Chile | 69.56 ↑ | 121 | Bahamas, The | 56.65 | 184 | Congo, Dem. Rep. | 37.57 ↑ |
| 58 | Albania | 68.90 ↑ | 122 | Egypt, Arab Rep. | 56.64 ↑ | 185 | Central African Republic | 36.25 |
| 59 | Luxembourg | 68.81 ↑ | 123 | Brazil | 56.53 ↑ | 186 | South Sudan | 33.48 |
| 60 | Kosovo | 68.79 ↑ | 124 | Guyana | 56.26 ↑ | 187 | Venezuela, RB | 33.37 |
| 61 | Greece | 68.67 | 125 | St. Vincent and the Grenadines | 55.91 | 188 | Libya | 33.19 |
| 62 | Costa Rica | 68.50 ↑ | 126 | Lebanon | 55.90 ↑ | 189 | Eritrea | 28.05 ↑ |
| 63 | Bahrain | 68.44 ↑ | 127 | Nicaragua | 55.75 ↑ | 190 | Somalia | 20.29 ↑ |
| 64 | Mongolia | 68.15 ↑ | | | | | | |

*Source: Doing Business* database.

*Note:* The rankings are benchmarked to June 2016 and based on the average of each economy's distance to frontier (DTF) scores for the 10 topics included in this year's aggregate ranking. For the economies for which the data cover two cities, scores are a population-weighted average for the two cities. An arrow indicates an improvement in the score between 2015 and 2016 (and therefore an improvement in the overall business environment as measured by *Doing Business*), while the absence of one indicates either no improvement or a deterioration in the score. The score for both years is based on the new methodology.

Exhibit T

# Doing
# Business
## 2020

Comparing Business

Regulation in

190 Economies

**WORLD BANK GROUP**

EXHIBIT U

000122

## TABLE O.1    Ease of doing business ranking

| Rank | Economy | DB score | Rank | Economy | DB score | Rank | Economy | DB score |
|------|---------|----------|------|---------|----------|------|---------|----------|
| 1 | New Zealand | 86.8 | 65 | Puerto Rico (U.S.) | 70.1 | 128 | Barbados | 57.9 |
| 2 | Singapore | 86.2 | 66 | Brunei Darussalam | 70.1 | 129 | Ecuador | 57.7 |
| 3 | Hong Kong SAR, China | 85.3 | 67 | Colombia | 70.1 | 130 | St. Vincent and the Grenadines | 57.1 |
| 4 | Denmark | 85.3 | 68 | Oman | 70.0 | 131 | Nigeria | 56.9 |
| 5 | Korea, Rep. | 84.0 | 69 | Uzbekistan | 69.9 | 132 | Niger | 56.8 |
| 6 | United States | 84.0 | 70 | Vietnam | 69.8 | 133 | Honduras | 56.3 |
| 7 | Georgia | 83.7 | 71 | Jamaica | 69.7 | 134 | Guyana | 55.5 |
| 8 | United Kingdom | 83.5 | 72 | Luxembourg | 69.6 | 135 | Belize | 55.5 |
| 9 | Norway | 82.6 | 73 | Indonesia | 69.6 | 136 | Solomon Islands | 55.3 |
| 10 | Sweden | 82.0 | 74 | Costa Rica | 69.2 | 137 | Cabo Verde | 55.0 |
| 11 | Lithuania | 81.6 | 75 | Jordan | 69.0 | 138 | Mozambique | 55.0 |
| 12 | Malaysia | 81.5 | 76 | Peru | 68.7 | 139 | St. Kitts and Nevis | 54.6 |
| 13 | Mauritius | 81.5 | 77 | Qatar | 68.7 | 140 | Zimbabwe | 54.5 |
| 14 | Australia | 81.2 | 78 | Tunisia | 68.7 | 141 | Tanzania | 54.5 |
| 15 | Taiwan, China | 80.9 | 79 | Greece | 68.4 | 142 | Nicaragua | 54.4 |
| 16 | United Arab Emirates | 80.9 | 80 | Kyrgyz Republic | 67.8 | 143 | Lebanon | 54.3 |
| 17 | North Macedonia | 80.7 | 81 | Mongolia | 67.8 | 144 | Cambodia | 53.8 |
| 18 | Estonia | 80.6 | 82 | Albania | 67.7 | 145 | Palau | 53.7 |
| 19 | Latvia | 80.3 | 83 | Kuwait | 67.4 | 146 | Grenada | 53.4 |
| 20 | Finland | 80.2 | 84 | South Africa | 67.0 | 147 | Maldives | 53.3 |
| 21 | Thailand | 80.1 | 85 | Zambia | 66.9 | 148 | Mali | 52.9 |
| 22 | Germany | 79.7 | 86 | Panama | 66.6 | 149 | Benin | 52.4 |
| 23 | Canada | 79.6 | 87 | Botswana | 66.2 | 150 | Bolivia | 51.7 |
| 24 | Ireland | 79.6 | 88 | Malta | 66.1 | 151 | Burkina Faso | 51.4 |
| 25 | Kazakhstan | 79.6 | 89 | Bhutan | 66.0 | 152 | Mauritania | 51.1 |
| 26 | Iceland | 79.0 | 90 | Bosnia and Herzegovina | 65.4 | 153 | Marshall Islands | 50.9 |
| 27 | Austria | 78.7 | 91 | El Salvador | 65.3 | 154 | Lao PDR | 50.8 |
| 28 | Russian Federation | 78.2 | 92 | San Marino | 64.2 | 155 | Gambia, The | 50.3 |
| 29 | Japan | 78.0 | 93 | St. Lucia | 63.7 | 156 | Guinea | 49.4 |
| 30 | Spain | 77.9 | 94 | Nepal | 63.2 | 157 | Algeria | 48.6 |
| 31 | China | 77.9 | 95 | Philippines | 62.8 | 158 | Micronesia, Fed. Sts. | 48.1 |
| 32 | France | 76.8 | 96 | Guatemala | 62.6 | 159 | Ethiopia | 48.0 |
| 33 | Turkey | 76.8 | 97 | Togo | 62.3 | 160 | Comoros | 47.9 |
| 34 | Azerbaijan | 76.7 | 98 | Samoa | 62.1 | 161 | Madagascar | 47.7 |
| 35 | Israel | 76.7 | 99 | Sri Lanka | 61.8 | 162 | Suriname | 47.5 |
| 36 | Switzerland | 76.6 | 100 | Seychelles | 61.7 | 163 | Sierra Leone | 47.5 |
| 37 | Slovenia | 76.5 | 101 | Uruguay | 61.5 | 164 | Kiribati | 46.9 |
| 38 | Rwanda | 76.5 | 102 | Fiji | 61.5 | 165 | Myanmar | 46.8 |
| 39 | Portugal | 76.5 | 103 | Tonga | 61.4 | 166 | Burundi | 46.8 |
| 40 | Poland | 76.4 | 104 | Namibia | 61.4 | 167 | Cameroon | 46.1 |
| 41 | Czech Republic | 76.3 | 105 | Trinidad and Tobago | 61.3 | 168 | Bangladesh | 45.0 |
| 42 | Netherlands | 76.1 | 106 | Tajikistan | 61.3 | 169 | Gabon | 45.0 |
| 43 | Bahrain | 76.0 | 107 | Vanuatu | 61.1 | 170 | São Tomé and Príncipe | 45.0 |
| 44 | Serbia | 75.7 | 108 | Pakistan | 61.0 | 171 | Sudan | 44.8 |
| 45 | Slovak Republic | 75.6 | 109 | Malawi | 60.9 | 172 | Iraq | 44.7 |
| 46 | Belgium | 75.0 | 110 | Côte d'Ivoire | 60.7 | 173 | Afghanistan | 44.1 |
| 47 | Armenia | 74.5 | 111 | Dominica | 60.5 | 174 | Guinea-Bissau | 43.2 |
| 48 | Moldova | 74.4 | 112 | Djibouti | 60.5 | 175 | Liberia | 43.2 |
| 49 | Belarus | 74.3 | 113 | Antigua and Barbuda | 60.3 | 176 | Syrian Arab Republic | 42.0 |
| 50 | Montenegro | 73.8 | 114 | Egypt, Arab Rep. | 60.1 | 177 | Angola | 41.3 |
| 51 | Croatia | 73.6 | 115 | Dominican Republic | 60.0 | 178 | Equatorial Guinea | 41.1 |
| 52 | Hungary | 73.4 | 116 | Uganda | 60.0 | 179 | Haiti | 40.7 |
| 53 | Morocco | 73.4 | 117 | West Bank and Gaza | 60.0 | 180 | Congo, Rep. | 39.5 |
| 54 | Cyprus | 73.4 | 118 | Ghana | 60.0 | 181 | Timor-Leste | 39.4 |
| 55 | Romania | 73.3 | 119 | Bahamas, The | 59.9 | 182 | Chad | 36.9 |
| 56 | Kenya | 73.2 | 120 | Papua New Guinea | 59.8 | 183 | Congo, Dem. Rep. | 36.2 |
| 57 | Kosovo | 73.2 | 121 | Eswatini | 59.5 | 184 | Central African Republic | 35.6 |
| 58 | Italy | 72.9 | 122 | Lesotho | 59.4 | 185 | South Sudan | 34.6 |
| 59 | Chile | 72.6 | 123 | Senegal | 59.3 | 186 | Libya | 32.7 |
| 60 | Mexico | 72.4 | 124 | Brazil | 59.1 | 187 | Yemen, Rep. | 31.8 |
| 61 | Bulgaria | 72.0 | 125 | Paraguay | 59.1 | 188 | Venezuela, RB | 30.2 |
| 62 | Saudi Arabia | 71.6 | 126 | Argentina | 59.0 | 189 | Eritrea | 21.6 |
| 63 | India | 71.0 | 127 | Iran, Islamic Rep. | 58.5 | 190 | Somalia | 20.0 |
| 64 | Ukraine | 70.2 | | | | | | |

*Source: Doing Business database.*

*Note:* The rankings are benchmarked to May 1, 2019, and based on the average of each economy's ease of doing business scores for the 10 topics included in the aggregate ranking. For the economies for which the data cover two cities, scores are a population-weighted average for the two cities. Rankings are calculated on the basis of the unrounded scores, while scores with only one digit are displayed in the table.

EXHIBIT U

000123



# FINANCIAL OVERSIGHT & MANAGEMENT BOARD
## FOR PUERTO RICO

Members
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

David A. Skeel, Jr.
Chair

Natalie A. Jaresko
Executive Director

**BY ELECTRONIC MAIL**

October 14, 2021

Honorable Pedro Pierluisi
Governor of Puerto Rico

Honorable José Luis Dalmau
President of the Senate of Puerto Rico

Honorable Rafael Hernández
Speaker of the House of Representatives of Puerto Rico


Dear Governor Pierluisi, President Dalmau, and Speaker Hernández:


We write to you concerning House Bill 1003, as amended and approved by the Senate ("HB 1003"
or the "Bill") and its impact on the Seventh Amended Plan of Adjustment (the "Plan").

The Plan is a historic opportunity for Puerto Rico to adjust its debts and position the
Commonwealth to flourish in the years ahead. The Plan cuts the Commonwealth's outstanding
debt by 80%, eliminating more than $25 billion in debt. The Plan meaningfully advances the
accomplishment of the Oversight Board's statutory mission by enabling the Commonwealth to
achieve fiscal responsibility and access to the capital markets, creating a path for the Oversight
Board's termination after confirmation, and realizing balanced budgets as required by PROMESA.

The Oversight Board has no philosophical disagreement with the Bill's laudable policy aspirations.
The Bill, however, would make the Plan unaffordable for Puerto Rico by conditioning the
government's approval of the issuance of the new general obligation bonds required by the Plan
on provisions costing tens of billions of dollars. For every dollar the Plan saves in reduced debt,
the Bill could spend the savings on new obligations over the next 30 years—leaving the
Commonwealth in the same predicament that led to the enactment of PROMESA and the creation
of the Oversight Board in the first place. The Bill must be revised significantly because it puts the

Governor Pierluisi
President Dalmau
Speaker Hernández
October 14, 2021
Page 2 of 3

Commonwealth back under an unsustainable financial burden and thereby renders the Plan not feasible and not confirmable.

The Oversight Board has a deep-rooted interest in the well-being of retirees, has no desire to cut pensions, and has in fact already agreed to revisions to the Plan that would eliminate any pension cuts to over 85% of retirees.  But, the Bill's language on pensions goes much further than simply eliminating the remaining modest pension cuts and in so doing increases the risk the Plan is neither confirmable nor ultimately affordable.

The Legislature and the Governor have made clear they want to take that risk on behalf of the residents of Puerto Rico.  While the Oversight Board continues to have reservations about the impact on the Plan, it is prepared to accept the wishes of the elected representatives of the residents of Puerto Rico to the extent it can do so prudently and without failing to carry out its duties under PROMESA.  When the Legislature and Governor enact acceptable legislation, the Oversight Board will amend the Plan to eliminate cuts to the accrued pensions of retired public employees and current employees of the Commonwealth.

Given the importance of the Plan, and the singular opportunity that it represents for the Commonwealth, the Oversight Board understands that the economic benefits resulting from confirmation of the Plan would allow for certain additional spending.  But, time is running out. With that context, and consistent with the Oversight Board's statutory mission, the Oversight Board would not oppose legislation that:

1. Requires that the Plan submitted for confirmation be amended to provide for no cuts to the accrued pensions of retired public employees and current employees of the Commonwealth unless otherwise required by the U.S. District Court for the District of Puerto Rico (but to be clear, this requirement does not extend to the Plan's freeze of the TRS and JRS pensions or the elimination of any remaining cost of living adjustments);
2. Provides additional funding, within limits, to the municipalities for providing necessary government services;
3. Provides additional funding for UPR to be utilized to improve the student experience and environment, such that appropriations total $500 million per year, for five years from FY2023 through FY2027, while UPR also implements structural and operational efficiencies;
4. Provides funding of $1,000,000 to conduct a study of the feasibility of extending medical coverage to currently uninsured residents;
5. Creates a mechanism to advance the terms of payment and debt cancellation following the termination of the Oversight Board; and
6. Establishes a joint working group with the Oversight Board, Legislature, and the Executive Branch.

Governor Pierluisi
President Dalmau
Speaker Hernández
October 14, 2021
Page 3 of 3

While the Oversight Board is willing to meet to answer your questions and to talk about next steps, we are not willing to revisit the positions established in this letter.  It is our sincerest hope that the Government will join with the Oversight Board in furthering the Plan and the other initiatives listed above for the greater good of all of Puerto Rico.

Sincerely,

*David Skeel*

David A. Skeel

CC: Mr. Omar Marrero Díaz



**Financial Oversight and Management Board for Puerto Rico**

**STATEMENT**

*San Juan, PR – October 8, 2021 –* The Financial Oversight and Management Board for Puerto Rico today issued the following statement:

The Oversight Board believes the bill the Puerto Rico Senate passed on Wednesday to approve the issuance of the new general obligation bonds that are part of the debt restructuring would make the 7th Amended Plan of Adjustment unaffordable for Puerto Rico.

Puerto Rico House Bill 1003, as amended and approved by the Senate, conditions the issuance of the bonds on provisions that would cost tens of billions of dollars. In addition to preventing any cuts to government retirees' pension benefits, the Senate's bill would prevent the freezing and reforming of the insolvent pension plans that previous Puerto Rico governments underfunded for decades. It adds costly mandates and massive spending increases as a condition to implementing the 7th Amended Plan of Adjustment.

The Oversight Board has been working for five years in good faith with retirees, unions, bondholders and other creditors to negotiate a Plan of Adjustment that is fair and sustainable, and with the Legislature and the Governor to pass the legislation to issue new bonds. The Oversight Board is convinced that the legislation passed endangers Puerto Rico's ability to come out of bankruptcy and repeats the unsustainable spending practices and policies that drove Puerto Rico into bankruptcy in the first place.

The outrageous costs of the amendments to House Bill 1003 taken together would make the confirmation of the 7th Amended Plan of Adjustment impossible. Therefore, the Oversight Board would be forced to withdraw the proposed Plan of Adjustment from the U.S. District Court.

The consequences of the plan's failure would be grave for the people of Puerto Rico. We do not know today if creditors would wait for new legislation to issue the bonds. We do not know if creditors would agree to renegotiate or request that the moratorium on debt payment in place right now be lifted, forcing the government to pay the full debt now. We also do not know if creditors would take advantage of their right to terminate their agreement to support the plan, in which case the Puerto Rico government would have to pay creditors $100 million immediately as a termination fee.

What we do know is that the current Plan of Adjustment is the best opportunity for Puerto Rico to restructure its debts, and any future restructuring to exit bankruptcy would cost the people of Puerto Rico more money.

The 7th Amended Plan of Adjustment would cut the Commonwealth's outstanding debt by 80%, from $33 billion to $7 billion. Before PROMESA, the Commonwealth had to pay up to 25 cents of every dollar it collected in taxes and fees from the people of Puerto Rico to creditors; the plan would reduce that amount to just over 7 cents of every dollar.

This plan provides the best path for Puerto Rico to move on, recover, and grow. Failure to achieve confirmation of the plan now would mean Puerto Rico remains in bankruptcy and the Oversight Board remains in place longer than if Puerto Rico were able to emerge from its bankruptcy process under PROMESA with the current Plan of Adjustment.

Bankruptcy is holding Puerto Rico back. Every resident of Puerto Rico suffers, and every business in Puerto Rico is affected by this largest public sector bankruptcy in the history of the United States. It is paramount for Puerto Rico's future and prosperity to end bankruptcy.

The Oversight Board will respond in detail to House Bill 1003 as amended by the Senate and continue to work with the Legislative Assembly and the Governor to reach our goal of completing the Title III debt restructuring process under PROMESA, which is an essential step for the Oversight Board to complete its mandate under the law.

### 

About the Financial Oversight and Management Board for Puerto Rico:

The Financial Oversight and Management Board for Puerto Rico was created under the bipartisan Puerto Rico Oversight, Management and Economic Stability Act (PROMESA) of 2016. The purpose of the Oversight Board is to provide a method for Puerto Rico to achieve fiscal responsibility and access to the capital markets.

Website: www.oversightboard.pr.gov

Contact:
Edward Zayas
Edward.zayas@promesa.gov
787-641-0001

Matthias Rieker
Matthias.rieker@promesa.gov
787-641-0001

Exhibit W                                                                000128

| 114TH CONGRESS | HOUSE OF REPRESENTATIVES | REPT. 114–602 |
|---|---|---|
| 2d Session | | Part 1 |

# PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT

---

JUNE 3, 2016.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. BISHOP of Utah, from the Committee on Natural Resources, submitted the following

# R E P O R T

together with

## ADDITIONAL VIEWS

[To accompany H.R. 5278]

[Including cost estimate of the Congressional Budget Office]

The Committee on Natural Resources, to whom was referred the bill (H.R. 5278) to establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike all after the enacting clause and insert the following:

**SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

(a) SHORT TITLE.—This Act may be cited as the "Puerto Rico Oversight, Management, and Economic Stability Act" or "PROMESA".

(b) TABLE OF CONTENTS.—The table of contents of this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Effective date.
Sec. 3. Severability.
Sec. 4. Supremacy.
Sec. 5. Definitions.
Sec. 6. Placement.
Sec. 7. Compliance with Federal laws.

TITLE I—ESTABLISHMENT AND ORGANIZATION OF OVERSIGHT BOARD

Sec. 101. Financial Oversight and Management Board.
Sec. 102. Location of Oversight Board.
Sec. 103. Executive Director and staff of Oversight Board.
Sec. 104. Powers of Oversight Board.
Sec. 105. Exemption from liability for claims.
Sec. 106. Treatment of actions arising from Act.
Sec. 107. Budget and funding for operation of Oversight Board.

59–006

EXHIBIT X

000129

45

TITLE II—RESPONSIBILITIES OF OVERSIGHT BOARD

*Section 201. Approval of Fiscal Plans*

This section establishes the method for developing Fiscal Plans for territorial governments and instrumentalities that provide the appropriate elected officials with the autonomy to develop such Fiscal Plans with guidance from the Oversight Board. To initiate the process, the Oversight Board determines a schedule by which the Governor must provide an approvable and certifiable Fiscal Plan. If the Governor fails to draft an acceptable Fiscal Plan as determined by the Oversight Board by the deadlines set forth in the schedule, then the Oversight Board will develop and adopt the Fiscal Plan, which shall be deemed approved by the Governor.

Each Fiscal Plan serves as the cornerstone for the structural reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards "fiscal responsibility and access to capital markets." These documents incorporate requirements including any recommendation made by the Oversight Board pursuant to Section 205, the elimination of structural deficits, as well as the improvement of fiscal governance, accountability, and internal controls. Importantly, Fiscal Plans ensure the protection of the lawful priorities and liens as guaranteed by the territorial constitution and applicable laws, and prevent unlawful inter-debtor transfers of funds.

The Committee acknowledges the concern as to the ambiguity of the language regarding the funding of public pension systems. To clarify, Section 201(b)(1)(C) tasks the Oversight Board with ensuring fiscal plans "provide adequate funding for public pension systems." This language should not be interpreted to reprioritize pension liabilities ahead of the lawful priorities or liens of bondholders as established under the territory's constitution, laws, or other agreements. While this language seeks to provide an adequate level of funding for pension systems, it does not allow for pensions to be unduly favored over other indebtedness in a restructuring.

*Section 202. Approval of budgets*

This section outlines the process for developing annual budgets. Similar to the development of Fiscal Plans, the Oversight Board will establish a schedule the Governor and Legislature must meet for the development of territory and territorial instrumentality budgets. All budgets developed under this section must be developed in accordance with the appropriate Fiscal Plan. If the Governor and Legislature fail to develop certifiable budgets within the established deadline, then the Oversight Board is required to develop the budget for the territory or territorial instrumentality for that fiscal year.

*Section 203. Effect of finding of noncompliance with budget*

This section requires the Governor to submit a report at the end of each fiscal quarter to the Oversight Board describing the actual revenues, expenditures, and cash flow of the government for the previous quarter, as well as any other information the Oversight Board may request. If the revenues, expenditures, or cash flow is not in accordance with the certified budget, then the Oversight Board will alert the Governor of the inconsistency and provide an

EXHIBIT X

000130

50

*Section 312. Filing of plan of adjustment*

This section permits only the Oversight Board to file a plan of adjustment, once the Oversight Board has issued a certification pursuant to Section 104(j).

*Section 313. Modification of plan*

This section allows the Oversight Board to repeatedly change or modify a plan of adjustment, as submitted per Section 312, before such plan is confirmed, so long as such modification meets the requirements of Title III.

*Section 314. Confirmation*

This section outlines the conditions necessary to having a plan confirmed by a court. Under this section, the court shall confirm a plan if: (1) the plan complies with the referenced statutes in Section 301; (2) the plan complies with Title III; (3) the debtor is not prohibited by law from undertaking any of the actions of the plan; (4) unless otherwise agreed to, the holders of claims specified in 11 U.S.C. 507(a)(2) will receive cash equal to the allowed amount of such claim; (5) the debtor has secured the necessary legislative, regulatory, or electoral approval of such plan, or such provision is expressly conditioned on the securing of such actions; (6) the plan is in the best interest of the creditors and is feasible, which must include a consideration as to whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided; and (7) the plan is consistent with the Fiscal Plan as established under Title II of PROMESA.

By incorporating consistency with the Fiscal Plan into the requirements of confirmation of a plan of adjustment, the Committee has ensured lawful priorities and liens, as provided for by the territory's constitution, laws, and agreements, will be respected in any debt restructuring that occurs.

*Section 315. Role and capacity of Oversight Board*

This section designates the Oversight Board as the representative of the debtor and authorizes the Oversight Board to take any action necessary on behalf of the debtor including the filing of a petition under Section 304, the submission or modification of a plan of adjustment, or the submission of other filings as required by the court.

*Section 316. Compensation of professionals*

This section permits the court to authorize the debtor's reasonable payment of professionals, such as attorneys, paralegals or others connected with a Title III proceeding. This ensures these professionals will receive compensation for services rendered during the Title III case.

*Section 317. Interim compensation*

This section authorizes the court to permit payment to professionals while the Title III case is ongoing.

EXHIBIT X

House Subcommittee on Immigration and Naturalization, which appears in the Appendix.]

TREATMENT OF DISPLACED PERSONS—STATEMENT BY LT. COL. J. M. SAGE

[Mr. COOPER asked and obtained leave to have printed in the RECORD a statement relative to the treatment of displaced persons in Europe, made by Lt. Col. Jerry M. Sage, United States Army, before the House Committee on Immigration and Naturalization, which appears in the Appendix.]

AMENDMENT OF ORGANIC ACT OF PUERTO RICO

The Senate resumed the consideration of the bill (H. R. 3309) to amend the Organic Act of Puerto Rico.

Mr. TAFT. Mr. President, I send to the desk an amendment to the pending bill and ask that the attention of the Senator from Nebraska [Mr. BUTLER].

The PRESIDENT pro tempore. The Clerk will state the amendment.

The LEGISLATIVE CLERK. On page 4, line 12, it is proposed to strike out section 5, and to renumber the succeeding sections accordingly.

The PRESIDENT pro tempore. The question is on agreeing to the amendment offered by the Senator from Ohio [Mr. TAFT].

Mr. BUTLER. Mr. President, we are willing to accept the amendment.

The amendment was agreed to.

The amendment was ordered to be engrossed and the bill to be read a third time.

The bill was read the third time and passed.

ORGANIC ACT OF PUERTO RICO

Mr. BUTLER. Mr. President, I had prepared some remarks which I had desired to present to the Senate when House bill 3309 to amend the Organic Act of Puerto Rico was under consideration. I ask unanimous consent that the statement be printed in the RECORD.

There being no objection, the statement was ordered to be printed in the RECORD, as follows:

The Committee on Public Lands has recommended that H. R. 3309, which would amend the Organic Act of Puerto Rico, be passed in substantially the same form as it was passed by the House, with the addition of two new sections.

The Organic Act of Puerto Rico, which H. R. 3309 would amend, is an act of Congress which serves the same purpose in Puerto Rico as a State constitution does in a State. Under the present Organic Act which was passed in 1917 and amended in various ways since then, the government of Puerto Rico has three branches—executive, legislative, and judicial. The legislative is popularly elected, but the Organic Act provides that the President of the United States shall appoint, and the Senate of the United States shall confirm, the Governor; two of the heads of the executive departments, the commissioner of education, and the attorney general; and all the justices of the Supreme Court of Puerto Rico, which is the highest court in the judicial system of the island. H. R. 3309 would amend those sections of the Organic Act which deal with the Governor, the heads of departments, and the justices of the supreme court.

Section 1 of the bill would authorize the voters of Puerto Rico to elect the Governor for a 4-year term, beginning with the general election in 1948. To be eligible for election the candidate would have to be a citizen of the United States, at least 30 years old, able to read and write the English language, and must have been a resident of Puerto Rico during the 2 years immediately preceding the election.

Section 2 would prescribe impeachment procedure if the Governor were charged with treason, bribery, or other high crimes and misdemeanors. The insular house of representatives would have power to impeach, and the senate of Puerto Rico would sit as a court to try the Governor. Upon conviction he would be removed from office.

Skipping to section 4 of the bill, it would provide a line of succession, in case the Governor was for some reason unable to act.

In case of a vacancy in the office of Governor, or during the Governor's temporary absence or disability, the attorney general would act as Governor. If he could not act for any reason, the treasurer would act as Governor. The Legislature of Puerto Rico would be authorized to provide for additional successors, as it saw fit. If a newly elected Governor could not take office, the Legislature of Puerto Rico, at its next succeeding regular session, would elect, by majority vote, a temporary successor to hold office until a successor was elected at a special session to be held within 120 days after the adjournment of the legislature.

Section 3 of the bill deals with the heads of executive departments. The Governor now has authority to appoint the heads of five of the seven executive departments created by the Organic Act; the treasurer, who heads the department of finance; the commissioner of the interior, head of the department of the interior; the commissioner of agriculture and commerce, head of the department of agriculture and commerce; the commissioner of labor, head of the department of labor; and the commissioner of health, head of the department of health. These appointments are confirmed by the Senate of Puerto Rico. The Governor does not appoint the head of the department of justice, the attorney general, or the head of the department of education, the commissioner of education. These two officials are appointed now by the President with the approval of the United States Senate. The bill would authorize their appointment by the Governor with the approval of the Senate of Puerto Rico. All the heads of the executive departments at the present time, whether appointed by the Governor or by the President, are Puerto Ricans, in conformity with the long-standing policy of the United States to encourage people of the Territories to participate increasingly in their local governments. There would therefore be no practical difference from the present situation if the elected Governor were empowered to appoint the attorney general and the commissioner of education as well as the other heads of departments.

In order to avoid confusion, I should point out that the auditor of Puerto Rico is not designated by the Organic Act as a head of an executive department. He is now appointed by the President and would continue to be appointed by the President even with the enactment of the bill before the Senate. The bill makes no reference whatsoever to the auditor or to his duties.

The fifth section of the bill would authorize the Governor to fill, with the advice and consent of the Senate of Puerto Rico, all vacancies hereafter occurring in the offices of chief justice and associate justices of the Supreme Court of Puerto Rico. At present all the justices of that court are appointed by the President.

Section 6 merely deletes from the Organic Act language which would be inapplicable upon the enactment of H. R. 3309.

Sections 7 and 8 of the bill were added by the committee. Section 7 provides for an administrative officer with the title of "Coordinator of Federal agencies in Puerto Rico," appointed by the President and confirmed by the Senate. This section was added because of the committee's belief that there was a certain amount of duplication and conflict among the activities of the 58 or more Federal agencies operating in the island, and that the observations of a Federal representative, not associated with any particular agency, when considering recommendations made to the President and the Congress, could be of considerable aid to the latter in putting Federal agencies on a more efficient basis as regards their Puerto Rican operations. The Coordinator would have the power to recommend only, not to institute reforms on his own initiative.

Section 8 would make Puerto Rico subject to the same extent as one of the States to the comity clause of article IV of the Constitution of the United States, extending to citizens of each State the privileges and immunities of the citizens of the several States. Congress has not expressly extended the Constitution to Puerto Rico, as it did in the case of Alaska and Hawaii, and the committee considered it advisable to bring Puerto Rico expressly within the operation of the comity clause so as to leave no doubt that there may be no discrimination against citizens of the United States who are not residents of Puerto Rico.

When Puerto Rico first came under the sovereignty of the United States in 1898, it was not thought advisable to make available extensive opportunities for self-government. Therefore the upper house of the legislature was not at first popularly elected; the governorship was to be filled by appointment of the President; the top judiciary was to be Presidentially appointed, too. The people of Puerto Rico were not at first made citizens of the United States. But they have been citizens since 1917. They have been electing their legislature since that date, and, under the authority granted by Congress in the Organic Act, they have been administering their affairs on their own initiative. Although the laws they have enacted have embraced a wide range of subject matter, Congress has never found it necessary to exercise its prerogative of annulling a law enacted by the Puerto Rican Legislature. The appointed Governors now choose the heads of the executive departments, their "cabinets" from among qualified Puerto Ricans. The people of Puerto Rico want a further opportunity to participate in their local government: they want the right to elect their Governor, and they want the Governor to have the right to select the members of their Supreme Court. They feel that since they have been authorized for so many years to enact their laws that it is only just that they have some voice, directly or indirectly, in the selection of those who will execute and interpret those laws. Puerto Ricans of all political faiths are united in their support of this bill.

Its enactment would be entirely in keeping with American principles of self-government and democracy. It would enhance the prestige of the United States in the eyes of the world at a time when the rights of non-self-governing territories are a matter of world-wide interest. The United States has nothing to lose by the enactment of this bill. It would not alter the political or fiscal relationship between Puerto Rico and the United States in the slightest degree. It grants no new substantive powers to the Governor, the supreme court, or the legislature. Congress does not surrender any of its constitutional authority to legislate for Puerto Rico, or to review laws enacted by the Legislature of Puerto Rico. Although the justices of the supreme court will be appointed by the Governor, if H. R. 3309 is enacted, the decisions of that court will continue to be reviewed by the United States Circuit Court of Appeals for the First Circuit, and by the United States Supreme Court upon certiorari. The bill makes no change

EXHIBIT Y

Case:17-03283-LTS Doc#:18575 Filed:10/19/21 Entered:10/19/21 14:46:01 Desc:Main Document Page 209 of 303

in the jurisdiction of the Federal District Court for Puerto Rico, which has the same jurisdiction as all other Federal district courts. The judge of the Federal district court is appointed, and will continue to be appointed, by the President.

In short, the enactment of H. R. 3309 would, by amending the Organic Act, make the structure of the Government of Puerto Rico reflect the advances in ability to govern themselves made by the people of Puerto Rico in the years since 1900, when control through appointment of Governor and supreme court was considered wise and necessary.

## INVESTIGATION OF DEPARTMENT OF JUSTICE IN CONNECTION WITH ALLEGED ELECTION FRAUDS IN MISSOURI

The Senate resumed the consideration of the motion of Mr. WHERRY to proceed to consideration of Senate Resolution 150, to discharge the Committee on the Judiciary from further consideration of Senate Resolution 116.

Mr. FERGUSON. I want to speak to the Senate for a few moments.

Mr. President, many days ago a matter was called to the attention of the Senate, and I have been reading about a charge against the minority of the Senate and shall call it to their attention, because I hope at the end we shall be able to make progress on a matter which has been pending.

Senate Democrats are inevitably adding to the suspicion that in blocking the inquiry into the Missouri vote scandal they have something to hide. This seems to us to be poor politics. The mere attempt to suppress a probe by the Senate Judiciary Committee has made the matter a sure issue in the 1948 campaign, regardless of the facts in the case. Moreover, if, as the administration contends, the Department of Justice did nothing to whitewash the original investigation, then the Senate bloc has done a disservice to Attorney General Clark.

I attempted, Mr. President, to call that to the attention of the Senate a few days ago.

If his skirts are clean, Mr. Clark should welcome an opportunity to tell his story fully. The issue now has gone far beyond the attempt by President Truman to urge ex-Representative Roger Slaughter at last summer's primaries. The mechanics of the steal engineered by the Pendergast machine in Kansas City are now being brought out by the Federal grand jury and the FBI.

This was all called to the attention of the Senate by the Junior Senator from Michigan.

These facts will come to light irrespective of congressional action. It will be impossible to camouflage them. But there are other relevant questions which ought to be answered by the administration. The country has a right to know why the preliminary FBI investigation was so restricted in scope and why the matter was dropped by the Department of Justice until outside pressure forced the administration to take it up again. That outside pressure, Mr. President, was the action of the Senate Judiciary Committee.

Possibly there is a logical explanation for this seeming effort to call off the dogs. But certainly the obstructionism of the Senate Democrats only weakens the administration's pose of innocence.

Mr. President, I think it is only fair that we should offer to the minority of the Senate the last agreement that they will be able to accept for an investigation of the Department of Justice as set forth in the resolution. We should ask them—and I shall ask them—for unanimous consent to consider and adopt the resolution, so that an investigation may be made. We do not want this session to close with a filibuster like that which was conducted for the purpose of endeavoring to keep Mr. BILBO in the Senate, when it has been closed in the last few days by a filibuster to keep the Pendergast machine from being investigated.

Mr. President, I hope that the majority party of the Senate tonight will see fit on this occasion, at a quarter to 12 o'clock, to adopt the resolution and take away from the thoughts of the people these things which are being charged against them. They have this last opportunity, and I hope they will accept it.

Therefore, Mr. President, I move that the Senate return to the regular order and accept the opportunity to adopt the resolution to permit an investigation of the Department of Justice which is under the jurisdiction of the Democratic Party and the present administration.

## INCREASED ALLOWANCE TO VETERANS

Mr. TAFT. Mr. President, there are two or three small matters which are entirely agreed to, and I should like to get them out of the way. So far as I know, there will be no objection. If there is any objection, I shall be willing to set them aside. Yesterday we passed a bill which provided an increased allowance to disabled veterans on vacation. The House refused to accept it, but passed its own bill, providing a somewhat smaller allowance.

I ask unanimous consent to suspend the rule and to consider and pass the House bill in order that at least a small amount may be given to disabled veterans.

Mr. TYDINGS. Is it the intention of the Senator from Ohio to take an adjournment at 12 o'clock?

Mr. TAFT. No. I think we will run on a while. I suggested that, but I withdraw the suggestion.

Mr. TYDINGS. What I am interested in, Mr. President, is that at midnight those who have been waiting patiently for 2 or 3 days on the promise of an executive session shall not be crowded out.

Mr. TAFT. I will give the Senator that assurance.

The PRESIDENT pro tempore. The Senator from Ohio asks unanimous consent that the Senate proceed to the consideration of House bill 3308. Is there objection?

There being no objection, the bill (H. R. 3308) to increase the minimum allowance payable for rehabilitation in certain service-connected cases was read the first time by its title, the second time at length, ordered to a third reading, read the third time, and passed.

## STUDY AND ACTIVITIES OF THE STATE DEPARTMENT AND OTHER GOVERNMENT AGENCIES

Mr. TAFT. Mr. President, yesterday the Senate passed a resolution to create a special committee in relation to the so-called Mundt resolution.

The House has refused to accept the resolution. The Senator from New Jersey [Mr. SMITH] has a Senate resolution to create a special committee to do the same thing. I ask unanimous consent that the Senator from New Jersey have permission to submit his resolution. It is the same resolution which was passed yesterday, except that it is a Senate resolution instead of a joint resolution.

The PRESIDENT pro tempore. Is there objection to the unanimous-consent request?

There being no objection, the resolution (S. Res. 161) was considered and agreed to as follows:

*Resolved,* That the Committee on Foreign Relations, or any duly authorized subcommittee thereof, shall make a full and complete study and investigation with respect to the nature, manner of performance, and effect of all activities carried out by the State Department or any other agency of the Government (including private companies engaged in international broadcasts or other information activities) for the purpose of acquainting the peoples of foreign countries with the United States, its people and their activities, and the policies and objectives of its Government, including, without limitation—

(1) the policies and methods employed, and their objectives;

(2) the qualifications of all personnel engaged in any such activities;

(3) whether the costs of such activities are justified; and

(4) whether such activities are a proper function of Government or should be carried out by privately owned organizations, with or without subsidies.

SEC. 2. For the purposes of this resolution, the committee, or any duly authorized subcommittee thereof, is authorized during the sessions, recesses, and adjourned periods of the Eightieth Congress until its final report is submitted to the Senate, to employ upon a temporary basis such technical, clerical, and other assistants as it deems advisable. The expenses of the committee under this resolution, which shall not exceed $25,000, shall be paid from the contingent fund of the Senate upon vouchers approved by the chairman of the committee.

SEC. 3. The committee shall make its final report to the Senate not later than February 1, 1948, containing the results of its study and investigation, together with such recommendations as to the United States Information and Educational Exchange Act of 1947, any amendments thereto or other necessary legislation as it may deem desirable. The committee or its duly authorized subcommittee, is authorized (for the purposes of this resolution) to cooperate with any subcommittee of the Committee on Foreign Affairs of the House of Representatives which is appointed from the membership of such committee for such purposes.

## CONVEYANCE OF LAND TO MONTGOMERY COUNTY, PA.

Mr. TAFT. Mr. President, recurring to Calendar No. 749, House bill 3862, very recently the Senator from Oregon [Mr. MORSE] withdrew an objection made to the consideration of the bill. I ask unanimous consent that the pending

EXHIBIT Y

000133

# Calendar No. 434

80TH CONGRESS }     SENATE     {   REPORT
1st Session  }              {   No. 422

## AMENDING THE ORGANIC ACT OF PUERTO RICO

JULY 2 (legislative day, APRIL 21), 1947.—Ordered to be printed

Mr. BUTLER, from the Committee on Public Lands, submitted the
following

# REPORT

[To accompany H. R. 3309]

The Committee on Public Lands, to whom was referred the bill
(H. R. 3309) to amend the Organic Act of Puerto Rico, having con-
sidered the same, report favorably thereon with amendments and
with the recommendation that the bill, as amended, do pass.

Beginning on page 5, line 3, insert two new sections, 7 and 8, as
follows:

SEC. 7. Section 49b is hereby added to the Organic Act to read as follows:

"SEC. 49b. (1) There shall be an administrative officer whose official title shall
be the 'Coordinator of Federal Agencies in Puerto Rico', who shall be appointed
by the President, by and with the advice and consent of the Senate of the United
States, and who shall hold office at the pleasure of the President for the purpose
of coordinating the administration of all Federal civilian functions and activities
in Puerto Rico. He shall receive as compensation for his services an annual
salary of $7,500.

"(2) The Coordinator of Federal Agencies shall coordinate the administration
of all Federal civilian functions and activities in Puerto Rico. The administrative
heads of all Federal civilian agencies in Puerto Rico shall make such reports to
the Coordinator of Federal Agencies as he shall require and he shall through the
Secretary of the Interior make recommendations to the heads of such agencies
with respect to their personnel, functions, and activities in Puerto Rico; the
President may, however, by Executive order exempt any Federal agency from
making such reports to the Coordinator of Federal Agencies. The Coordinator
of Federal Agencies shall make recommendations for the better coordination of
the Federal civilian functions and activities and may make recommendations for
the elimination or reduction of those which duplicate or conflict with each other
or with activities carried on by the Government of Puerto Rico. He shall report
through the Secretary of the Interior to the President and to Congress concerning
the administration of all Federal civilian functions and activities in Puerto Rico,
specifying the recommendations made by him to the Federal agencies and the
results of such recommendations. He shall advise the Secretary of the Interior,
who shall advise the Bureau of the Budget and the Congress with respect to all
appropriation estimates submitted by any civilian department or agency of the
Federal Government to be expended in or for the benefit of Puerto Rico. He shall
confer with the Governor of Puerto Rico with respect to the correlation of activities
of Federal and insular agencies and all plans and programs and other matters of
mutual interest.

EXHIBIT Z

"(3) The President of the United States may, from time to time, after hearing, promulgate Executive orders expressly excepting Puerto Rico from the application of any Federal law, not expressly declared by Congress to be applicable to Puerto Rico, which as contemplated by section 9 of this Act is inapplicable by reason of local conditions. The Coordinator of Federal Agencies may, from time to time, make recommendations to the President for such purpose. Any such recommendation shall show the concurrence or dissent of the Governor of Puerto Rico.

"(4) The Coordinator of Federal Agencies, in the name of the President of the United States, shall have authority to request from the Governor of Puerto Rico, and the Governor shall furnish to him all such reports pertaining to the affairs, conditions and government of Puerto Rico as the Coordinator of Federal Agencies shall from time to time request, for transmission to the President through the Secretary of the Interior.

"(5) The President of the United States shall prescribe such rules and regulations as may be necessary to carry out the provisions of this section."

SEC. 8. Section 2 of said Organic Act (48 U. S. C., sec. 737) is amended by adding at the end thereof the following new paragraph:

"The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of Article IV of the Constitution of the United States."

### EXPLANATION OF THE BILL

The bill proposes to accomplish the following purposes: (1) To authorize the people of Puerto Rico to elect their Governor, beginning with the general election in 1948; (2) to authorize the Governor to appoint the heads of all executive departments, except the auditor, with the advice and consent of the Puerto Rican Senate; (3) to provide a line of succession in the event the Governor is temporarily absent or unable to perform his duties; (4) to authorize the Governor to appoint the members of the Supreme Court of Puerto Rico.

At the present time, the Organic Act of Puerto Rico provides that the President of the United States, by and with the advice and consent of the Senate of the United States, shall appoint the Governor (48 U. S. C., sec. 771), the attorney general and commissioner of education (48 U. S. C., sec. 775), the auditor (48 U. S. C., sec. 786), the justices of the Supreme Court of Puerto Rico (48 U. S. C., sec. 861), and that he shall also designate an Acting Governor in case of the temporary absence or disability of the Governor (48 U. S. C., sec. 772).

At hearings held upon this bill there was unanimity of support of the legislation on the part of both Federal and insular government officials, including the Secretary of the Interior and the Governor of Puerto Rico. On the basis of endorsements received from the island, the committee considers this bill to be very satisfactory to an overwhelming majority of the people.

Since 1917, when the present organic act was passed, the people of Puerto Rico have elected their own legislature, whose authority extends "to all matters of a legislative character not locally inapplicable." They have administered their own affairs entirely upon their own initiative and Congress has never found it necessary to exercise its prerogative of annulling any law enacted by the Puerto Rican Legislature. Likewise the people of Puerto Rico have demonstrated a high degree of political consciousness by their extensive use of the franchise. In the general election of 1944, 82.2 percent of the registered voters went to the polls. This proposal to authorize the election of the Governor appears to be a common denominator for all shades of political opinion in Puerto Rico.

EXHIBIT Z

It has long been the policy of the United States to encourage the people in the Territories to increasingly participate in their local governments, as they indicate themselves capable of discharging greater responsibilities. In Puerto Rico, this policy recently has been advanced by the appointment of residents of Puerto Rico to high government positions. The Governor, the commissioner of education, and the attorney general, for example, are now Puerto Ricans. These appointments have met with widespread approval in Puerto Rico. It is the committee's view that the time has come to make the basic law, the organic act, reflect the advances in self-governing ability made by the people of Puerto Rico since 1900, when the requirement of a Presidentially appointed Governor and supreme court was inaugurated.

The changes which would be made by the enactment of H. R. 3309 would not alter Puerto Rico's political or fiscal relationship to the United States. Congress does not surrender any of its constitutional authority to legislate for Puerto Rico or to review insular laws. Neither would this legislation prove an obstacle to a subsequent determination by the Congress of the permanent political status question. The passage of this bill, however, would stand as an evidence of our good will toward the people of Puerto Rico and as a demonstration to the nations of the world, at a time when territorial administration is a matter of international interest and concern, that the United States practices as well as preaches the doctrines of democracy and self-determination.

The clarifying amendments suggested by the Department of the Interior were for the most part adopted by the House Committee on Public Lands and incorporated in the bill with the committee's own amendments.

Two new sections were added by the Senate committee, 7 and 8.

Section 7 provides for the position of Coordinator of Federal Agencies in Puerto Rico. At the present time, there are at least 58 Federal agencies with field offices or branches operating in the island. Many of them are engaged in giving aid to Puerto Rico on bases that seem to be at times conflicting and contradictory. Based on a recent inspection trip by several members of the committee, there seemed to be a need to bring the activities of all these agencies into focus and eliminate unnecessary duplication and waste.

In some cases, the committee feels that Federal laws and systems of regulation, drafted with an eye to conditions in the 48 States, may have been extended too fast and in too far-reaching a manner into an island with cultural traditions and economic methods dissimilar from those on the mainland. The establishment of the position of coordinator will permit a continuing study of the application of such Federal statutes and of the operation of these Federal agencies to the life of the island. The coordinator will have power to recommend measures of coordination among them or even the elimination of those which duplicate or conflict with each other or with activities of the island government. He will have no power except to make recommendations. It is felt that such recommendations can be of tremendous benefit to the Congress and the President in placing the functioning of our Federal agencies on a sounder and more efficient basis in Puerto Rico.

Section 8 will make Puerto Rico subject to paragraph 1 of section 2 of article 4 of the Federal Constitution, commonly known as the

**4**       AMENDING THE ORGANIC ACT OF PUERTO RICO

comity clause.   The purpose of this addition is to assure that citizens of the United States not residing in Puerto Rico will have the same treatment in Puerto Rico as local residents.   This right is guaranteed by the Constitution to citizens of the various States but has been held not to apply to Puerto Rico.   Legislation in Puerto Rico has discriminated against nonresident American citizens.

The report of the Interior Department to the chairman of the House Committee on Public Lands is hereinbelow set forth in full and made a part of this report.

---

THE SECRETARY OF THE INTERIOR,
*Washington, May 19, 1947.*

Hon. RICHARD J. WELCH,
*Chairman, Committee on Public Lands,*
*House of Representatives.*

MY DEAR MR. WELCH: It is my understanding that your committee plans to begin hearings on May 19 on H. R. 3309, a bill to amend the Organic Act of Puerto Rico.   I strongly favor enactment of this measure and recommend that it receive the favorable consideration of your committee.

H. R. 3309 would amend the Organic Act of Puerto Rico so as to permit the people of that island to elect their Governor.   The bill further gives the Governor the authority to appoint the heads of executive departments and the chief justice and associate justices of the Supreme Court of Puerto Rico.

This Department has consistently supported legislation granting to Puerto Rico greater powers of local autonomy.   While many Puerto Ricans want more than the right to elect their Governor, I believe it is fair to say that all would like at least that.   H. R. 3309 places Puerto Rico a little further along the road to full self-government and, in my opinion, its provisions are entirely desirable and would be acceptable to the people of Puerto Rico, the political leaders of the island, and to Governor Piñero.

A few minor amendments are suggested to the bill.   These amendments are indicated in the attached redraft of the bill by underscoring the new language which should be added and striking through the language which should be omitted. The reasons for these amendments will be self-evident.

In view of the intention of your committee to consider the bill within the next few days, this report has not been submitted to the Bureau of the Budget.   I am unable, therefore, to state its relationship to the program of the President.

Sincerely yours,

WARNER W. GARDNER,
*Acting Secretary of the Interior.*

#### A BILL To amend the Organic Act of Puerto Rico

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 12 of the Organic Act of Puerto Rico, approved March 2, 1917 (48 U. S. C., sec. 771) is hereby amended by repealing the second sentence thereof and substituting the following: "At the general election in 1948 and each such election quadrennially thereafter the Governor of Puerto Rico shall be elected by the qualified voters of Puerto Rico and shall hold office for a term of four years commencing on the 2nd *second* day of January following the date of the election and until his successor is elected and qualified.   No person shall be eligible to election as Governor unless at the time of the election he is a citizen of the United States, is at least thirty years of age, *age,* is able to read and write the English language, and has been a bona fide resident of Puerto Rico during the immediately preceding two years.   Such election shall be held in the manner now *or hereafter* provided by law for the election of the Resident Commissioner.

SEC. 2.   Section 12a is hereby added to the *said* Organic Act to read as follows: "SEC. 12a.   The Governor shall be removed from office on impeachment for, and conviction of, treason, bribery, or other high crimes and misdemeanors.   The *House of Representatives* of Puerto Rico shall have the sole power of impeachment.   Impeachment shall require the concurrence of two-thirds of all of the members of the *House of Representatives.*   The Senate *of Puerto Rico* shall have the sole power to try all impeachments.   When sitting ofr that purpose they shall

AMENDING THE ORGANIC ACT OF PUERTO RICO          5

be on oath or affirmation: *and* ~~When the Governor of Puerto Rico is tried,~~ the Chief Justice of the Supreme Court of Puerto Rico shall preside.   No person shall be convicted without the concurrence of three-fourths of all the members of the Senate.   Judgment in cases of impeachment shall not extend further than to removal from office, and disqualification to hold and enjoy any office of honor, trust, or profit under the government of Puerto Rico.   The person convicted shall, nevertheless, be liable and subject to indictment, trial, judgment, and punishment according to law."

SEC. 3.   Section 13 of ~~the~~ *said* Organic Act (48 U. S. C., secs. *773*, 775) is hereby amended by repealing the second, third, and fourth sentences and substituting the following therefor: "The heads of all executive departments and agencies shall be appointed by the Governor by and with the advice and consent of the Senate of Puerto Rico.   Each shall hold office during the ~~terms~~ *continuance in office* of the Governor by whom he is appointed and until his successor is qualified, unless sooner removed by the Governor,"~~, and the following is hereby added at the end of the section:~~

SEC. 4.   *Section 24 of said Organic Act (48 U. S. C., sec. 772) is amended to read as follows:*

"SEC. *24.*   In the event of a vacancy in the office of Governor, or if for any reason the Governor is temporarily absent from Puerto Rico or unable to perform his duties, the *Attorney General* shall act as Governor with all the powers and duties of the office for the remainder of the term in case of a vacancy, or during such temporary absence or disability.   If the *Attorney General* is unable to act, the Treasurer, the *Auditor,* and such other persons as may be provided by the laws of Puerto Rico, in that order, shall act as Governor.

SEC. 4 *5.*   Section 40 of the Organic Act (48 U. S. C., sec. 861) is hereby amended by changing the colon in the second sentence to a period, by deleting the words following through "States", and by substituting therefor the following: "All vacancies occurring in the offices of the Chief Justice and Associate Justices *of the Supreme Court of Puerto Rico* shall be filled by appointment ~~of~~ *by* the Governor by and with the advice and consent of the Senate of Puerto Rico.   All justices of the Supreme Court shall hold office during good behavior,".

~~SEC. 5.   All laws or parts of laws inconsistent herewith are repealed to the extent of their inconsistency.~~

SEC. *6.   Section 50 of said Organic Act (48 U. S. C., sec. 797) is hereby amended by deleting the following words from the third sentence thereof: "appointed by the President and also those appointed by the Governor of Puerto Rico".*

O

EXHIBIT Z

000138



# FINANCIAL OVERSIGHT & MANAGEMENT BOARD
## FOR PUERTO RICO

David A. Skeel, Jr.
Chair

Members
Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

Natalie A. Jaresko
Executive Director

**BY ELECTRONIC MAIL**

October 12, 2021

Secretary Francisco Parés-Alicea
Department of Treasury
Government of Puerto Rico

Dear Secretary Parés-Alicea:

We write to follow up on your September 10, 2021 letter in response to the Oversight Board's letter dated September 1, 2021, pursuant to PROMESA Section 205, and in relation to the actions taken by the Government to address the internal control deficiencies identified by KPMG as part of the fiscal year 2016 audit process and the request of the management letters for fiscal years 2017 and 2018.

The Oversight Board appreciates the submission of the KPMG management letters for 2017 and 2018 dated November 18, 2020 and August 27, 2021, respectively.

After reviewing your response, the Oversight Board continues to be concerned by the internal control weaknesses identified by KPMG. KPMG noted that no evaluations are performed periodically over internal controls and remedial actions have not been taken for most of the control deficiencies identified in previous audits. Also, many of the deficiencies identified in the 2016 management letters continue to be mentioned in the 2017 and 2018 management letters.

As stated in the management letters, management is required to design and implement effective internal controls over financial reporting. These internal controls should also be adequately documented across the organization and for all reporting units.

The Oversight Board understands that many of the internal control deficiencies identified by KPMG, among other deficiencies, could be addressed by a new ERP system, which the Government has developed plans to implement. However, the Government should not wait for the ERP implementation to perform a comprehensive review and documentation of the internal control environment and address any potential weaknesses. In fact, the process of documenting policies

EXHIBIT AA

000139

Honorable Francisco Parés
October 12, 2021
Page 2 of 2

and procedures in preparation for the ERP implementation is an appropriate time to document the control environment and improvements that can be made.

Moreover, the Government should not rely on the deficiencies identified by KPMG as its only means of identifying and correcting internal control weakness. As the management letters indicate, the procedures undertaken by KPMG were not designed to identify all deficiencies in internal control that might be material weaknesses. The Government's own review should be comprehensive of all internal controls relevant to each of the reporting entities, including agencies and component units.

The Oversight Board looks forward to continuing to work with you and ensure that the financial control environment of the Commonwealth is strong and subject to consistent review and improvement by management.

Sincerely,

*David Skeel*

David A. Skeel, Jr.

Andrew G. Biggs
Arthur J. González
Antonio L. Medina
John E. Nixon
Justin M. Peterson
Betty A. Rosa

CC:   Ms. Natalie A. Jaresko
      Mr. Omar Marrero Diaz

EXHIBIT AA

000140

Rev. June 9th, 2021



OFFICE OF ECONOMIC
AND FINANCIAL AFFAIRS

DEPARTMENT OF THE
**TREASURY**

PUERTO RICO

# TAX EXPENDITURE REPORT
# FOR TAX YEAR 2018

MAYO 2021

2   PUERTO RICO TAX EXPENDITURE REPORT FOR TAX YEAR 2018   Rev. June 9th, 2021

## Table of Contents

INTRODUCTION ..................................................................................................................... 3

PUERTO RICO TAX EXPENDITURE REPORT ................................................................ 5

    I. DEFINITION OF TAX EXPENDITURES .................................................................... 5

    II. TAX EXPENDITURES AS PART OF THE BUDGET ............................................... 5

    III. MEASUREMENT OF THE COST OF TAX EXPENDITURES ................................. 6

        III-A Measurement and Behavior ................................................................................ 6

        III-B The Special Case of Foreign Incentive Corporations .......................................... 8

        III-C The Non-Additive Nature Of Tax Expenditures ................................................... 9

        III-D Data Sources and Measurement Techniques ...................................................... 9

            III-D.(a) Individual Income Taxes ........................................................................... 9

            III-D.(b) Business Income Taxes ............................................................................ 10

            III-D.(c) Sale and Use Taxes ................................................................................. 10

            III-D.(d) Excise Taxes ........................................................................................... 11

    IV. IDENTIFICATION OF TAX EXPENDITURES AND BENCHMARKING ................ 11

        IV-A Income Taxes In General ................................................................................. 11

        IV-B Individual Income Taxes .................................................................................. 12

        IV-C Business Income Taxes ................................................................................... 12

        IV-C Sale and Use Taxes ........................................................................................ 14

        IV-D Excise Taxes .................................................................................................. 14

    V. FUTURE EDITIONS OF THE PR-TER ................................................................. 15

    VI. THE TAX EXPENDITURE BUDGET .................................................................... 15

        Table 1- Tax Expenditure by Tax Regime and by Type of Expenditure ...................... 16

        Table 2- Tax Expenditure by Tax Regime and by Budget Category ........................... 18

        Table 3- Tax Expenditure by Tax Regime and by Type of Expenditure With Incentive Act Detail 19

        Table 4- Revenue Foregone by Tax Expenditure, by Tax Regime, by Type of Tax Expenditure and by Budget Category ................................................................. 20

        Table 4A Tax Expenditures by Budget Category ...................................................... 51

        Table 5 Legal Citation for the Law Creating Each Tax Expenditure and Data Source For The Tax Expenditure Estimate By Tax Regime ............................................. 84

Bibliography ..................................................................................................................... 327





OFFICE OF ECONOMIC AND FINANCIAL AFFAIRS

EXHIBIT BB

corporations were to move their operations from Puerto Rico, there would be significant dynamic effects felt throughout the economy.

Treasury has decided to include estimates of the cost of tax expenditures for the Incentive Acts in the TEB measured without behavior in the same way as any other tax expenditure. However, the elimination of the Incentive Acts would likely not increase tax revenues, but instead significantly decrease revenues because of the foreign-**owned corporations' ability to relocate** operations outside of Puerto Rico and the resulting signicant dynamic reductions in the economy.

### III-C The Non-Additive Nature Of Tax Expenditures

There are no totals shown for tax expenditures in this Report. The cost of a tax expenditure shown in this Report is measured assuming that every other tax expenditure remains unchanged. For example, the cost of the deduction for medical expenses is measured assuming that the charitable donations deduction remains intact. Consider a taxpayer that would remain in the same tax bracket if either the medical deduction or the charitable donations deduction was eliminated but would move into a higher income tax bracket if both were eliminated. In that case, the addition of the two independent estimates would be different (smaller) than an estimate if the tax expenditures were eliminated as a group. In general, the cost of a group of tax expenditures may not correspond to the sum of the cost of each tax expenditure in that group. This is true because tax measures interact with one another. For this reason, totals of tax expenditures are generally inaccurate and are not shown in this report.

### III-D Data Sources and Measurement Techniques

Listed below are the data sources used and the techniques used to estimate the cost of tax expenditures for each of the tax regimes included in this Report. There are two major sources of data, tax returns and national accounts data. Tax returns are the best source of information about tax expenditures. However, tax returns are not available for tax years 2017 and 2018 for each of the tax regimes in this Report. For example, the latest regular corporate tax returns that are available are for tax year 2016. When tax returns are not available national accounts data is generally used to extrapolate the latest year of tax returns. When national accounts data is used as an extrapolator the cost estimates will be revised as tax returns become available. National accounts data itself is on a revision cycle so that it is possible that the national accounts will be revised between the publication of two PRTERs while tax returns are still not available; these national accounts revisions may also give rise to revisions of the cost of tax expenditures appearing in this Report. Cost estimates of tax expenditures that appear in PRTER17 that have **been revised for inclusion in this Report appear with a superscript "r." alongsi**de the estimate.

### *III-D.(a) Individual Income Taxes*

Data – Individual income tax returns.

Technique – A microsimulation model run against the population of individual tax returns.




EXHIBIT BB



## *Puerto Rico Department of Treasury*

## *Treasury Single Account ("TSA") FY 2018 Cash Flow*

## *As of June 29, 2018*

EXHIBIT CC

1

000144

*Glossary*

| Term | Definition |
|---|---|
| AACA | Automobile Accident Compensation Administration, or Administración de Compensaciones por Accidentes de Automoviles, is a component unit of the Commonwealth of Puerto Rico. |
| Act 154 | Act 154 means Act No. 154-2010, which, inter alia, imposes a temporary excise tax on the acquisition by multinationals of certain property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. The Act 154 temporary excise tax expires on December 31, 2027. |
| AFI/RBC | Infrastructure Financing Authority. |
| Agency Collections | Collections made by central government agencies at collection posts for services rendered by the agencies as well as fees, licenses, permits, fines and others. |
| Approved FY 2018 Budget | Consolidated Budget for Fiscal Year 2018 approved by the Puerto Rico Legislative Assembly on July 13, 2017. |
| ASC | Compulsory Liability Insurance, private insurance company. |
| ASSMCA | Administración de Servicios de Salud Mental y Contra la Adicción, or Mental Health and Addiction Services Administration, is an agency of the Commonwealth of Puerto Rico. |
| Bank Checks Paid | A report provided by the bank that is utilized to determine vendor payments. |
| BPPR | Banco Popular of Puerto Rico. |
| Budget Reserves | Non-cash reserves for budgeting purposes.  Consist of a Liquidity Reserve ($190M), OMB Reserve ($446M), Budgetary Reserve ($85M), Other Income Reserve ($84M), and Emergency Fund ($30M). |
| Checks in Vault | Refers to checks issued but physically kept in vault. |
| Collections | Collections made by the Department of the Treasury (Treasury) at collection posts and/or the Treasury revenue collection systems, such as income taxes, excise taxes, fines and others. |
| COFINA | Puerto Rico Sales Tax Financing Corporation. |
| COFINA SUT Collections | In accordance with a sales tax finance agreement between the government of Puerto Rico and COFINA, throughout FY2018 the first 5.5% (of total 10.5%) of gross SUT collections are reserved for and deposited into the COFINA bank account held at BNY Mellon until a $753M cap has been reached on total SUT collections remitted to COFINA. |
| DTOP | Department of the Transportation and Public Works |
| DTPR | Department of the Treasury of Puerto Rico. |
| ERS | Employees Retirement System means the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, a statutory trust created by Act No. 447 of May 15, 1951, as amended, to provide pension and other benefits to retired employees of the Commonwealth, its public corporations and municipalities. ERS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements. |
| General Fund | General Fund (Operating Fund) means the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process. |
| DTPR Collection System | This is the software system that DTPR uses for collections. |
| HTA | Puerto Rico Highways and Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| JRS | Judiciary Retirement System means the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, a statutory trust created to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth. JRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements. |
| Liquidity Plan | The FY 2018 Treasury Single Account Liquidity Plan was prepared at the beginning of the fiscal year based on the approved FY 2018 Budget, was projected monthly through June 2018, and is used as the benchmark against which results are measured.  As a result of material economic and operational changes stemming from Hurricanes Irma and Maria, DTPR is in the process of developing a reforecast of TSA cash flows to year-end.  Until then, the original TSA forecast will continue to serve as the measure for cash flow |
| Net Payroll | Net payroll is equal to gross payroll less tax withholdings and other deductions. |
| Nutrition Assistance Program | NAP, or the Nutrition Assistance Program, also known as PAN, or Programa de Asistencia Nutricional is a federal assistance nutritional program provided by the United States Department of Agriculture (USDA) solely to Puerto Rico. |
| Pension PayGo | Pension PayGo- Puerto Rico pension system that is funded through a pay-as-you-go system.  Retirement benefits expenses of government employers are paid by the central government and reimbursed by the employers, with such funds received by the TSA. |
| PRASA | Puerto Rico Aqueducts and Sewers Authority. |
| PREMA | Puerto Rico Emergency Management Agency. |
| PREPA | Puerto Rico Electric Power Authority. |
| PRHA | Puerto Rico Housing Authority. |
| PRIFAS | Puerto Rico Integrated Financial Accounting System. |
| Reconciliation Adjustment | Reserve account in DTPR cash flow, related to E&Y's Expense Reconciliation Adjustment (RA) as per the Fiscal Plan certified on March 13, 2017. |
| Retained Revenues | Revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" accounts.  The largest of these pass-through accounts consist of (i) AACA auto insurance, (ii) AFI/RBC petroleum tax, (iii) ASC personal injury insurance, (iv) HTA toll revenues. |
| RHUM System | This is the software system that DTPR uses for payroll. |
| SIFC | State Insurance Fund Corporation. |
| Special Revenue Funds | Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. Special Revenue Funds are funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds. |
| SSA | Social Security Administration. |
| TRS | Teachers Retirement System means the Puerto Rico System of Annuities and Pensions for Teachers, a statutory trust created to provide pension and other benefits to retired teachers of the Puerto Rico Department of Education and to the employees of the Teachers Retirement System. TRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements. |
| TSA | Treasury Single Account, the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval.  Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA. |

EXHIBIT CC

3

### Introduction

- *Enclosed is the weekly Treasury Single Account ("TSA") cash flow report, supporting schedules and Liquidity Plan to actual variance analysis.*

- *TSA is the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed.*

- *Beginning April 2016, TSA receipts are deposited in a commercial bank account rather than the Government Development Bank for Puerto Rico ("GDB").*

- *Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances held in custody by the Secretary of Treasury for the benefit of the Government fiduciary funds, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA.*

- *Disbursements from the TSA include payroll and related costs, vendor and operational disbursements (including those reimbursed by Federal assistance grants and funded from Special Revenue Funds), welfare expenditures, capital outlays, debt service payments, required budgetary formulas and appropriation payments, pass-through payments of pledged revenues to certain public corporations, tax refunds, payments of current pension benefits and other disbursements.*

- *Federal funds related to disaster relief for hurricanes Irma and Maria are deposited in a separate bank account overseen by the Government Authorized Representative ("GAR"), and transferred to the TSA only after admissable disbursements (per approved Project Worksheets) have been made.  These inflows to the TSA will be captured on the Federal Funds Receipts (Schedule C); outflows will be captured on the Vendor Payments (Schedule E).*

- *Data for TSA inflows/outflows is reported from various systems within the Department of Treasury of Puerto Rico ("DTPR"):*
  *Cash Flow Actual Results - Source for the actual results is the TSA Cash Flow.*
  *Schedule A - Collections - Source for collections information is the DTPR collections system.*
  *Schedule B - Agency Collections - Source for the agency collections is DTPR.*
  *Schedule C - Federal Fund Receipts - Source for the federal funds receipts is DTPR.*
  *Schedule D - Net Payroll - Source for net payroll information is the DTPR Rhum Payroll system.*
  *Schedule E - Vendor Payments - The source for vendor payments is the Bank checks paid report and a report from the DTPR PRIFAS system.*
  *Schedule F - Other Legislative Appropriations - Source for the other legislative appropriations is DTPR.*
  *Schedule G - Central Government - Partial Inventory of Known Short Term Obligations - Sources are DTPR.*
  *Schedule H – Budget Allocation of the Reconciliation Adjustment for the Central Government Loan to PREPA - Source is the Office of Management and Budget*

- *Data limitations and commentary:*
  *The government has focused on the seven schedules above for which access to reliable, timely, and detailed data is available to support these items. The government continues to work with DTPR and other parties to access additional reliable data that would help us provide detail in the future for other line items in the Cash Flow.*

EXHIBIT CC

*FY 2018 TSA Forecast Key Assumptions*

- *The FY 2018 Treasury Single Account cash flow forecast Liquidity Plan was prepared at the beginning of the fiscal year based on the approved FY 2018 Budget, was projected monthly through June 2018, and is used as the benchmark against which weekly results and variances are measured.  As a result of material economic and operational changes stemming from Hurricanes Irma and Maria, DTPR is in the process of developing a reforecast of TSA cash flows to year-end.  Until then, the original TSA forecast will continue to serve as the measure for weekly cash flow variances.*

- *Forecast collections and disbursements through the General Fund and Federal Fund are consistent with the approved FY 2018 Budget, with the exception of payroll outlays which were forecast based on run-rate cash disbursement trends, and budget reserves which are non-cash and do not impact the TSA direct cash flows.*

- *TSA General Fund inflows are "gross" (i.e. include accrued Tax Refunds in 2018) and therefore higher than presented in the approved FY 2018 Budget, which considers General Fund revenues net of current year tax refunds.  Repayment of deferred tax refunds (from CY 2016 and prior) total $292mm; reserve for current year tax refunds (excluding garnishments) total $456mm.*

- *Payroll outlays are based on FY 2017 run-rate disbursements, less savings measures, representing a $298mm favorable adjustment to the approved FY 2018 Budget for the full fiscal year.  Payroll is presented inclusive of segregated employee contributions ($349M for the year).  Payroll is disbursed through the TSA on a bi-weekly basis, approximately on the 15th and 30th of each month.*

- *Pensions reflect the implementation of the pay-as-you-go model in FY 2018. Retirement system inflows represent deposits from municipalities and corporations net of administrative expenses. Figures also include ERS / TRS / JRS asset sales ($390M), which occured in July 2017.*

- *The Liquidity Plan assumes collections and outlays of Federal Funds are equal in FY 2018 (zero net cash impact), excluding potential timing impact.*

- *Clawback funds set aside prior to June 2016 (approx. $146mm held at BPPR accounts and $144mm held at GDB) are considered restricted cash and therefore excluded from the projected cash balance.*

- *The Liquidity Plan assumes $592mm of Reconciliation Adjustment as per the approved FY 2018 Budget and March 13 certified Fiscal Plan, which is projected separately from supplier payments and distributed evenly over 12 months.  No further provision has been made for potential contingent liabilities against the government.*

- *The Liquidity Plan assumes that beginning November 2017, COFINA SUT collections flow to the General Fund and are available to the TSA for operational purposes, totaling approx. $316mm in incremental collections in the forecast.  However, these funds flowed to the COFINA bank account (BNY Mellon), which created a permanent variance of -$316mm against the Liquidity Plan.*

EXHIBIT CC

**Puerto Rico Department of Treasury | AAFAF**                                                          **As of June, 29 2018**

*Executive Summary - TSA Cash Flow Actual Results for the Week Ended June 29, 2018*



| Key Figures as of 06/29/2018 | | | | |
|---|---|---|---|---|
| **$3.10bn** | **($266M)** | **($152M)** | **$1299M** | **$702M** |
| Bank Cash Position | Weekly Cash Flow | Weekly Variance [a] | YTD Net Cash Flow | YTD Net Cash Flow Variance [a] |



**Weekly Cash Position: Actuals vs. Liquidity Plan (figures in $M)**

**Weekly Cash Flow Variance ($152M):**   Weekly variance mainly due to: (1) -$149M PREPA draw upon Revolving Credit Agreement (permanent); (2) -$95M in vendor disbursements (permanent); and (3) +$35M of federal fund receipts (permanent); and (4) ASES Appropriations (temporary). All other line items have a total weekly variance of +$5M.

**YTD Net Cash Flow Variance $702M:**   The primary drivers of the +$702M YTD variance are: (1) Net cash benefit from additional Medicaid Funding due to the Bipartisan Budget Act of 2018 (+$679M, permanent); (2) Net cash benefit of RA less cash reapportionment +$306M (permanent, see Sch.H); (3) Net cash benefit of lower disbursements of tax refunds than forecast (+$117M, permanent); (4) Rum Tax Collections (+$99M, permanent); (5) Net cash impact of lower vendor disbursements and subsequent lower federal fund receipts for federally reimbursable payments (-$134M, mostly permanent)  (6) Sales & Use Tax Collections (-$316M, permanent); and (7) All others (-$50M).

*Footnotes:*
*(a) Variances represent actual results vs. FY2018 Liquidity Plan.  Additional detail and commentary on weekly and YTD variances is provided on pages 7 and 8 of this report.*

EXHIBIT CC                                                                                                      6

**Puerto Rico Department of Treasury | AAFAF**
*Key Takeaways - TSA Cash Flow Actual Results*

As of June 29, 2018

| Key Figures as of 06/29/2018 | | | | |
|---|---|---|---|---|
| $3.10bn | ($266M) | ($152M) | $1299M | $702M |
| Bank Cash Position | Weekly Cash Flow | Weekly Variance [a] | YTD Net Cash Flow | YTD Net Cash Flow Variance [a] |

**Notable variances [a] for the week ended June 29, 2018:**

| | | |
|---|---|---|
| -$149M | Outflow - PREPA Loan | (Permanent) Due to liquidity needs at PREPA, the entity drew down the remaining allowable amount on the Superpriority Post-petition Revolving Credit Loan Agreement on 6/29 to end the year with the original $300M loan amount outstanding. |
| -$95M | Outflow - Vendor Disbursements | (Permanent) Variance is permanent and primarily driven by $56M in Central Government disbursements to PRASA for accounts payable in arrears.  Remaining variance was mostly due to $57M disbursed on behalf of the Department of Education, the second highest in a single week throughout FY2018. |
| +$35M | Inflow - Federal Fund Receipts | (Temporary) Variance is due to the incremental receipt of federal funds for the Nutritional Assistance Program and the subsequent pass-through due to additional funding provided for in the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017. |
| +$51M | Outflow - ASES Appropriations | (Temporary) Variance is due to the timing of federal funds received for the Medicaid Program and the subsequent pass-through appropriation to ASES, and will be offset next fiscal year. |
| +$5M | All Other Inflows & Outflows | Includes Electronic Lottery (-$41M), Nutritional Assistance Program Outflows (-$15M), PayGo Inflows (+$33M), Tax Refunds (+$22M), and others (+$6M). |

**Notable YTD variances [a] as of June 29, 2018:**

| | | |
|---|---|---|
| -$338M | Inflow - Sales & Use Tax | (Mostly Permanent) YTD permanent variance is driven by: (1) Liquidity Plan assumed $316M of COFINA funds would flow to the General Fund but instead, the funds were deposited in the COFINA account; (2) lower than anticipated collections due to lost revenues from Hurricane Maria's impact on economic activity; (3) temporary sales tax exemption on prepared foods and items sold by small and medium merchants (exemptions expired on 1/7 and 12/31, respectively). Additionally, various other offsetting and competing drivers have influenced gross SUT month to month, including a shift in buying mix from smaller, less SUT compliant stores to larger, more SUT compliant retailers. |
| -$300M | Outflow - Net PREPA Loan | (Permanent) $300M in funds relating to a loan from the Central Government were transferred to PREPA from the TSA on February 23, 2018. |
| -$32M | Inflow - General Collections | (Mostly Permanent) Principally due to the negative impacts caused by Hurricane Maria.  Significant YTD collections variances are  -$129M in Act 154 collections, -$56M in Nonresident Withholdings, -$82M in Individual Income tax collections, partially offset by +$245M in Corporate Income Taxes, +$170M in HTA Pass Through collections (Petroleum & Gas Tax collections constitutes the majority of the favorable YTD variance) and others. |
| +$354M | Inflow - Federal Fund Receipts | (Temporary)  YTD variances in federal fund receipts are the result of<br><br>**(1) Additional federal funds received for federal programs (net +$714):**  Disbursements for the Nutritional Assistance Program (+$282M offsetting variance) and ASES pass-through Medicaid funds (+$432M offsetting variance) represent permanent differences, as additional funds incremental to the Liquidity Plan were unlocked for Nutritional Assistance and Medicaid.  The Bipartisan Budget Act of 2018 provided for additional Medicaid funding that was not considered in the original Liquidity Plan.  Furthermore, the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017 provided for additional Nutritional Assistance funding that was not considered in the original Liquidity Plan.<br><br>**(2) Lower vendor disbursements (net -$488M):** -$595M lower-than-projected federal reimbursements for vendor payments, partially offset by disaster-related federal reimbursements for vendor payments not considered in the Liquidity Plan (+$107M offsetting variance);<br><br>**(3) Other (net +$128M):** Lower federally-funded payroll disbursements as a percent of total payroll versus the Liquidity Plan (-$56M variance); and an additional +$184M of timing variance. |
| +$592M | Outflow - Reconciliation Adj. | (Offset by Reapportionments) Of the $592M total FY2018 budgeted Reconciliation Adjustment (RA), $562M has been offset by reapportionments of the RA for other budgetary needs: (1) $300M loan to PREPA; (2) $80M for the Department of Transportation; (3) $11M for the OMB; (4) $78M for the creation of the Emergency Municipal Assistance Fund; (5) $39M for the Police Department; (6) $38M for ASEM; (7) $15M for PREMA; and (8) $30M for the payment of Central Government accounts payable in arrears owed to PRASA.  Actual cash offsets to the $592M YTD RA variance total -$465M.  Refer to Schedule H for additional detail. |
| +$330M | Outflow - Vendor Disbursements | (Partially Temporary)  +$488M of YTD variance is related to federally-reimbursable disbursements, approximately 65% of which the Liquidity Plan projected would relate to budget period 2017.  Remaining variance mostly due to offsetting permanent variances, including: (1) the creation of the Emergency Municipal Assistance Fund and subsequent $1M disbursements to each of the 78 Puerto Rico Municipalities to cover operational and administrative costs in light of any declines in collections resulting from Hurricanes Irma and Maria; (2) $107M in disaster-related vendor payments not considered in the Liquidity Plan that will be or have been reimbursed by federal funds; and (3) $56M in Central Government disbursements to PRASA for accounts payable in arrears. |
| +$97M | All Other Inflows & Outflows | Largest variances Included are Agency Collections (-$81M), outflows for the Nutritional Assistance Program (-$282M), Pension Related Costs (+$151M), appropriations to ASES (+$248M, Rum Tax collections (+$84M) and others (-$48M). |

EXHIBIT CC

7

**Puerto Rico Department of Treasury | AAFAF**
*TSA Cash Flow Actual Results for the Week Ended June 29, 2018*

As of June 29, 2018

| | | | Prior Variance | Actual | Forecast | Variance | Actual YTD | Forecast YTD | Variance YTD | |
|---|---|---|---|---|---|---|---|---|---|---|
| | *(figures in $000s)* | Schedule | YTD 6/22 | 6/29 | 6/29 | 6/29 | 6/29 | 6/29 | 6/29 | Comments (k) |
| | **General & Special Revenue Fund Inflows** | | | | | | | | | |
| 1 | Collections (a) | A | ($12,353) | $76,937 | $96,629 | ($19,692) | $8,073,476 | $8,105,522 | ($32,046) | 1 |
| 2 | Agency Collections | B | (74,894) | 10,210 | 15,839 | (5,628) | 464,511 | 545,033 | (80,523) | 2 |
| 3 | Sales and Use Tax | | (315,504) | 48,277 | 71,132 | (22,855) | 1,640,047 | 1,978,406 | (338,359) | 3 |
| 4 | Excise Tax through Banco Popular | | (5,830) | — | 686 | (686) | 609,823 | 616,339 | (6,516) | 4 |
| 5 | Rum Tax | | 99,338 | — | 15,700 | (15,700) | 239,138 | 155,500 | 83,638 | 5 |
| 6 | Electronic Lottery | | (16,626) | — | 40,669 | (40,669) | 105,380 | 162,675 | (57,294) | 6 |
| 7 | Subtotal - General & Special Revenue Fund Inflows | | ($325,870) | $135,424 | $240,655 | ($105,230) | $11,132,375 | $11,563,475 | ($431,100) | |
| | **Retirement System Inflows** | | | | | | | | | |
| 8 | Contributions From Pension Systems (b) | | (69,615) | 48,938 | 16,101 | 32,837 | 349,653 | 386,431 | (36,778) | |
| 9 | Pension System Asset Sales | | — | — | — | — | 390,480 | 390,480 | — | |
| 10 | Subtotal - Retirement System Inflows | | (69,615) | $48,938 | $16,101 | $32,837 | $740,133 | $776,911 | ($36,778) | |
| | **Other Inflows** | | | | | | | | | |
| 11 | Federal Fund Receipts (c) | C | 318,641 | 115,622 | 80,201 | 35,421 | 5,604,721 | 5,250,659 | 354,062 | 11 |
| 12 | Other Inflows (d) | | 97,191 | 9,289 | 3,539 | 5,750 | 420,812 | 317,871 | 102,941 | |
| 13 | Interest earned on Money Market Account | | 4,193 | — | — | — | 4,193 | — | 4,193 | |
| 14 | GDB Transactions | | (28,766) | — | — | — | — | 28,766 | (28,766) | |
| 15 | Loans and Tax Revenue Anticipation Notes (l) | | 149,064 | — | — | — | 149,064 | — | 149,064 | |
| 16 | Subtotal - Other Inflows | | $540,324 | $124,911 | $83,741 | $41,170 | $6,178,790 | $5,597,296 | $581,494 | |
| 17 | **Total Inflows** | | $144,839 | $309,273 | $340,497 | ($31,223) | $18,051,298 | $17,937,682 | $113,616 | |
| | **Payroll Outflows** | | | | | | | | | |
| 18 | Net Payroll (e) | D | 7,504 | (68,568) | (66,750) | (1,818) | (1,693,435) | (1,699,121) | 5,686 | 11 |
| 19 | Other Payroll Related Costs - (SSA, SIFC, Health Insurance) (f) | | 9,295 | (20,218) | (1,905) | (18,313) | (1,317,152) | (1,308,133) | (9,018) | |
| 20 | Gross Payroll - PR Police Department (g) | | (50,617) | — | — | — | (681,100) | (630,483) | (50,617) | 20 |
| 21 | Subtotal - Payroll and Related Costs | | ($33,818) | ($88,786) | ($68,655) | ($20,131) | ($3,691,687) | ($3,637,737) | ($53,950) | |
| | **Pension Outflows** | | | | | | | | | |
| 22 | Pension Benefits | | 59,182 | (82,490) | (87,958) | 5,468 | (2,089,640) | (2,154,290) | 64,650 | |
| 23 | Pension Paygo Outlays on Behalf of Public Corporations | | 79,325 | — | (7,211) | 7,211 | — | (86,536) | 86,536 | |
| 24 | Subtotal - Pension Related Costs | | $138,507 | ($82,490) | ($95,169) | $12,679 | ($2,089,640) | ($2,240,826) | $151,186 | |
| | **Appropriations - All Funds** | | | | | | | | | |
| 25 | Health Insurance Administration - ASES | | 197,359 | (34) | (50,776) | 50,742 | (2,272,595) | (2,520,695) | 248,100 | 11 |
| 26 | University of Puerto Rico - UPR | | 0 | (10,000) | — | (10,000) | (678,321) | (668,321) | (10,000) | |
| 27 | Muni. Revenue Collection Center - CRIM | | (2,659) | — | (16,013) | 16,013 | (256,376) | (269,730) | 13,354 | |
| 28 | Highway Transportation Authority - HTA | | (147,730) | — | (11,817) | 11,817 | (296,719) | (160,806) | (135,913) | |
| 29 | Public Buildings Authority - PBA | | 9 | (9) | — | (9) | (69,811) | (69,811) | 0 | |
| 30 | Other Government Entities | | 15,231 | (17,589) | (22,612) | 5,023 | (569,459) | (589,713) | 20,254 | 19 |
| 31 | Subtotal - Appropriations - All Funds | | $62,210 | ($27,632) | ($101,217) | $73,585 | ($4,143,281) | ($4,279,075) | $135,795 | |
| | **Other Disbursements - All Funds** | | | | | | | | | |
| 32 | Vendor Disbursements (h) | E | 424,839 | (159,864) | (65,066) | (94,798) | (2,949,286) | (3,279,328) | 330,042 | 32 |
| 33 | Other Legislative Appropriations (i) | F | — | 945 | (1,251) | 305 | (370,412) | (373,021) | 2,609 | 33 |
| 34 | Tax Refunds | | 117,311 | (11,014) | (33,298) | 22,284 | (704,099) | (843,695) | 139,595 | 34 |
| 35 | Nutrition Assistance Program | | (266,903) | (55,575) | (40,166) | (15,409) | (2,288,971) | (2,006,659) | (282,312) | 35 |
| 36 | Other Disbursements | | 22,922 | — | — | — | (65,844) | (88,766) | 22,922 | 36 |
| 37 | Reconciliation Adjustment | H | 542,667 | — | (49,333) | 49,333 | — | (592,000) | 592,000 | 37 |
| 38 | Loans and Tax Revenue Anticipation Notes | | (300,000) | (149,064) | — | (149,064) | (449,064) | — | (449,064) | 15, 38 |
| 39 | Subtotal - Other Disbursements - All Funds | | $543,141 | ($376,464) | ($189,114) | ($187,350) | ($6,827,677) | ($7,183,468) | $355,791 | |
| 40 | **Net Outflows** | | $710,039 | ($575,372) | ($454,155) | ($121,217) | ($16,752,285) | ($17,341,107) | $588,822 | |
| 41 | **Net Cash Flows** | | $854,878 | ($266,099) | ($113,659) | ($152,440) | $1,299,013 | $596,575 | $702,438 | |
| 42 | Bank Cash Position, Beginning (j) | | — | 3,364,109 | 2,509,231 | 854,878 | 1,798,997 | 1,798,997 | — | |
| 43 | **Bank Cash Position, Ending (j)** | | $854,878 | $3,098,010 | $2,395,573 | $702,438 | $3,098,010 | $2,395,573 | $702,438 | |
| | Net Loan Outstanding to PREPA (sum of lines 15 & 38): | | ($150,936) | ($149,064) | — | ($149,064) | ($300,000) | — | ($300,000) | |

*Footnotes (k):*
(a) Includes reserve for tax returns ($456 million) and Special Revenue Fund portion of posted collections.
(b) Paygo charges to municipalities and public corporations collected at the TSA.
(c) As of the date of this report, includes $107M in federal funded account balances transferred to the TSA that relate to disaster relief.
(d) Inflows related to the Department of Health, Department of Labor and Human Resources, the Commissioner of Financial Institutions, and others.
(e) Payroll is paid bi-weekly on the 15th and 30th (or last day of the month, whichever comes sooner).
(f) Related to employee withholdings, social security, insurance, and other deductions.
(g) Police payroll is reflected individually because it is paid through a separate bank account. Also, the police payroll line item shown in the TSA cash flow is gross (i.e. inclusive of Other Payroll Related items).
(h) Includes payments to third-party vendors as well as intergovernmental payments to agencies with separate Treasuries.
(i) This refers to General Fund appropriations to non-TSA entities such as Legislative Assembly, Correctional Health, Comprehensive Cancer Center, and others.
(j) Excludes Banco Popular of Puerto Rico Account with balance of approximately $146mm; Amounts deposited in GDB subject to GDB restrictions.
(k) Unless otherwise stated, variances are either net material in nature or are expected to reverse in the short term.
(l) Section 2.6(b)(ii) of the Superpriority Post-petition Revolving Credit Loan Agreement ("the Agreement") specifies that upon PREPA's receipt of any revenues in excess of amounts necessary to (i) pay budgeted expenses for Ineligible Uses provided for in the Budget (inclusive of the Ineligible Uses Variance) and other allowable expenses for Ineligible Uses, or any FEMA reimbursable expense for contracts that have been obligated by FEMA and approved by the Oversight Board and (ii) maintain a maximum cash balance of up to $300M PREPA shall apply such Revenues to the repayment of the outstanding Revolving Credit Loans. The criteria that result in an aforementioned repayment may be triggered due to the seasonality of PREPA disbursements. Depending on the timing of PREPA receipts and disbursements, additional repayments may occur over the next several weeks, though additional draw downs may also occur before fiscal year-end.

**Comments (k):**

1. Collections were lower than Liquidity Plan by 20% for the week ended 6/29, mainly due to lower than projected Alcoholic Beverage tax collections (-$6M), Motor Vehicles (-$6M), Petroleum & Gas taxes (-$8M), and others. Significant YTD collections variances are -$129M in Act 154 collections, -$56M in Nonresident Withholdings, -$82M in Individual Income taxes, partially offset by +$245M in Corporate Income Taxes, +$170M in Petroleum & Gas taxes.

2. YTD variance mainly due to -$35M lower in Department of Health collections and -$30M lower in Treasury collections, with the remaining variance spread across 40+ other agencies. The majority of YTD variance (-$62M of total) is due to collections shortfall in September and October following Hurricane Maria.

3. YTD variance is mostly permanent, due to -$316M in COFINA SUT Collections flowing to the COFINA bank account that were not considered in the Liquidity Plan, lost revenues from Hurricane Maria's impact on economic activity, temporary sales tax exemptions on prepared foods and items sold by small and medium merchants (exemptions expired on 1/7 and 12/31, respectively), and various other competing drivers such as a shift in buying mix from smaller, less SUT compliant stores to larger, more SUT compliant retailers.

4. YTD variance is assumed to be permanent as stronger Rum Tax collections are a result of (1) higher than projected volume of exports; and (2) increase of Rum Tax per unit to $13.25 per proof gallon from $10.50 per proof gallon, effective as of January 2018.

5. YTD variance is a function of lower Electronic Lottery Collections due to the impact of Hurricanes Irma and Maria, and this variance is assumed to be permanent.

8. Variance partially offsets previous YTD variance, as Paygo payments are transferred to the TSA at the end each month as opposed to the bi-weekly transfers projected in the Liquidity Plan. The majority of YTD variance is due to not yet receiving PayGo payments from PRASA and other public corporations & municipalities.

11. YTD variances in federal fund receipts are the result of: (1) Lower-than-projected federal reimbursements for vendor payments (-$595M variance); (2) disaster-related federal reimbursements for vendor payments not considered in the Liquidity Plan (+$107M variance); (3) greater disbursements for the Nutritional Assistance Program (+$282M variance); (4) ASES pass-through Medicaid appropriations (+$432M variance); (5) lower federally-funded portion of payroll disbursements versus the Liquidity Plan (-$56M variance); and an additional +$184M of timing variance. Note the Bipartisan Budget Act of 2018 provided for additional Medicaid funding that was not considered in the Liquidity Plan. As such, federal funds received after 3/31 for the Medicaid Program, and for the remainder of the year, are incremental to the amount projected in the Liquidity Plan and will result in permanent positive variances. Furthermore, the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017 provided for additional Nutritional Assistance funding than was considered in the Liquidity Plan. The Commonwealth began to use these funds as of March 1, and additional resources will remain available to Puerto Rico until September 30th, 2019.

12. YTD variance mainly due to +$54M higher in Petroleum import tax collections and +$15M in a one-time transfer from the Puerto Rico Tourism Company, with remaining variance due to higher non-recurring inflows across various programs and agencies, all of which are assumed to be permanent variances against the Liquidity Plan.

14. YTD variance is offset by GDB Transactions (relates to legacy debt service deposit agreement) variance in line 36.

19. Variance due to the timing of various payments to financial service providers and employer contributions to PayGo for insurance providers.

20. Weekly variance due to timing and will be offset later this month. -$55M of the YTD variance is offset by +$55M of the YTD variance in line 23, as distributions to the Police Department for payment of employer contributions to their retirement system is included in the line 23 YTD forecast.

23. Variances in this line item are permanent as this line item was not utilized this fiscal year. +$55M of the YTD variance offsets -$55M of the YTD variance in line 20, as distributions to the Police Department for payment of employer contributions to their retirement system was included in the line 23 forecast but are disbursed through line 20. Remaining YTD variance is offset by a reduction in Contributions From Pension Systems in line 8.

25. Variance is due to the timing of federal funds received for the Medicaid Program and the subsequent pass-through appropriation to ASES, and will be offset next fiscal year.

28. YTD variance largely due to additional transfers in funds to support capital expenditures and congestion management initiatives for HTA, consistent with the Revised Fiscal Plan.

32. Vendor disbursements exceeded Liquidity Plan by $95M for the week ended 6/29 mainly due to $56M in Central Government disbursements to PRASA for accounts payable in arrears. Remaining variance was mostly due to $57M disbursed on behalf of the Department of Education, the second highest in a single week throughout FY2018. The largest portion ($467M) of YTD variance is related to federally-reimbursable disbursements, approximately 65% of which the Liquidity Plan projected would relate to budget period 2017. This variance is offset by various disbursements that were not forecast in the Liquidity Plan, including $78M to Municipalities for emergency recovery and $107M in other disaster-related disbursements.

35. Weekly and YTD variances are most likely permanent and are offset by increases in federal funds received for the Nutritional Assistance Program due to additional funding provided for by The Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017.

36. YTD variance offsets GDB Transactions (relates to legacy debt service deposit agreement) variance in line 14), with remaining variance due to timing.

37. $300M of the YTD variance is offset by the Net Loan outstanding to PREPA. The $300M original loan repurposed portions of the Reconciliation Adjustment (RA) that is budgeted at the agency level. The remaining YTD variance is offset by various other reapportionments from the RA including $80M in funds for DTOP, $78M for Municipal Recovery, and others (see Schedule H of this report for additional detail).

15, 38. YTD variance due to excess revenues collected by PREPA that were applied to the repayment of outstanding Revolving Credit Loans, in accordance with Section 2.6(b)(ii) of the Superpriority Post-petition Revolving Credit Loan Agreement[l]. Due to the timing of PREPA receipts and disbursements, various repayments occurred since the Loan was originally drawn upon, though PREPA drew down the remaining allowable amount on 6/29 to end the year with the original $300M loan amount outstanding.

EXHIBIT CC
8
000150

**Puerto Rico Department of Treasury | AAFAF**                                                                                    **As of June 29, 2018**

*Schedule A: Collections Detail - Actual Results vs. Forecast (a)*

| | | Actual | Forecast | Variance | Actual | Forecast | Variance |
|---|---|---|---|---|---|---|---|
| | *(figures in $000s)* | **6/29** | **6/29** | **6/29** | **YTD** | **YTD** | **YTD** |
| | **General Fund** | | | | | | |
| 1 | Individuals | $29,902 | $27,697 | $2,205 | $2,242,922 | $2,325,000 | ($82,078) |
| 2 | Corporations | $9,804 | 5,625 | 4,179 | 1,793,817 | 1,549,000 | 244,817 |
| 3 | Non Residents Withholdings | $24,489 | (1,791) | 26,280 | 634,059 | 690,356 | (56,297) |
| 4 | Act 154 (b) | – | (6,101) | 6,101 | 1,306,908 | 1,435,661 | (128,752) |
| 5 | Alcoholic Beverages | $10,224 | 16,005 | (5,781) | 263,766 | 286,028 | (22,262) |
| 6 | Cigarettes | $5,837 | 11,850 | (6,013) | 224,453 | 229,009 | (4,556) |
| 7 | Motor Vehicles | $9,238 | 6,690 | 2,548 | 414,268 | 318,000 | 96,268 |
| 8 | Other General Fund | $1,974 | 20,575 | (18,602) | 176,857 | 463,000 | (286,143) |
| 9 | **Total General Fund Portion of General Collections** | **$91,468** | **$80,550** | **$10,918** | **$7,057,049** | **$7,296,053** | **($239,004)** |
| | **Retained Revenues (c)** | | | | | | |
| 10 | AACA Pass Through | $2,175 | 2,547 | (372) | 78,532 | 79,952 | (1,420) |
| 11 | AFI/RBC Pass Through | – | (46) | 46 | 7,496 | 26,135 | (18,639) |
| 12 | ASC Pass Through | $1,848 | (416) | 2,264 | 79,763 | 97,874 | (18,111) |
| 13 | HTA Pass Through | $4,263 | 12,286 | (8,023) | 640,940 | 470,874 | 170,066 |
| 14 | Total Other Retained Revenues | $1,430 | 1,708 | (278) | 74,488 | 134,634 | (60,146) |
| 15 | **Total Retained Revenues Portion of General Collections** | **$9,716** | **$16,079** | **($6,363)** | **$881,218** | **$809,469** | **$71,749** |
| 16 | **Total Collections from DTPR Collections System** | **$101,184** | **$96,629** | **$4,555** | **$7,938,267** | **$8,105,522** | **($167,255)** |
| 17 | Timing-related unreconciled TSA Collections (d) | ($24,247) | – | ($24,247) | $135,209 | – | $135,209 |
| 18 | **Total General Collections** | **$76,937** | **$96,629** | **($19,692)** | **$8,073,476** | **$8,105,522** | **($32,046)** |

*Source: DTPR, collection system*

Footnotes:
*(a) Figures in forecast period correspond to original TSA liquidity plan projections, which was developed in July 2017 based on the Approved Budget, General Fund Revenue projections, and other input from the DTPR and AAFAF teams.*
*(b) Collections presented only include Act 154 Collections received into the Collections Post Account (CPA). Additional Act 154 Collections are received into a separate account and cash flow line item, shown on page 8 in line 4: Excise Tax through Banco Popular. Total Act 154 Collections are therefore the sum of these two amounts: $1.3bn received into the CPA and $609M through Banco Popular, for a total of $1.9bn in Act 154 Collections throughout FY2018.*
*(c) Retained Revenues are revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred as "pass through" accounts, the majority of which include (i) ACAA auto insurance, (ii) AFI/RBC petroleum tax, (iii) ASC personal injury insurance, and (iv) HTA toll revenues.*
*(d) Due to timing. Receipts in collections post account occur approximately two business days prior to being deposited into the TSA.*

EXHIBIT CC

**Requirement 1 (A)**



*Puerto Rico Department of Treasury*

*Treasury Single Account ("TSA") FY 2021 Cash Flow*

*For the month of June FY21 and Q4 FY21*

# Glossary

| Term | Definition |
|------|-----------|
| ACAA | - Automobile Accident Compensation Administration, or Administración de Compensaciones por Accidentes de Automoviles, is a component unit of the Commonwealth of Puerto Rico. |
| Act 154 | - Act 154 means Act No. 154-2010, which, inter alia, imposes a temporary excise tax on the acquisition by multinationals of certain property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. The Act 154 temporary excise tax expires on December 31, 2027. |
| AFI / PRIFA | - Infrastructure Financing Authority. |
| ASC | - Compulsory Liability Insurance, private insurance company. |
| ASES | - Puerto Rico Health Insurance Administration, a public corporation and component unit of the Commonwealth of Puerto Rico. |
| CINE | - Puerto Rico Cinema Fund, a recipient of certain assigned sales and use tax revenues. |
| COFINA | - Puerto Rico Sales Tax Financing Corporation. |
| Deferred General Fund Receipt | - Revenues pertaining to Fiscal Year 2020, such as individual and corporate income taxes, that are collected in Fiscal Year 2021 due to various executive orders and tax extensions in response to the COVID-19 pandemic. |
| DTPR | - Department of the Treasury of Puerto Rico. |
| DTPR Collection System | - This is the software system that DTPR uses for collections. |
| FAM | - Municipal Fund Administration, a recipient of certain assigned sales and use tax revenues. |
| General Fund Collections | - All gross tax collections received and deposited into the TSA from all Hacienda Collection Posts, through the Hacienda Colecturia Virtual (online), and/or SURI, as well as certain pass-through collections and others. |
| General Fund | - General Fund (Operating Fund) means the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process. |
| Gross Payroll | - Gross Payroll is equal to the sum of: (i) Net Payroll from the DTPR RHUM system; (ii) Other Payroll and (iii) Cash outlays for wage garnishments by Agency. |
| HTA | - Puerto Rico Highways and Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| Liquidity Plan (LP) | - The Liquidity Plan is the translation of the Certified Fiscal Plan ("CFP") and Certified Budget ("Budget") into a cash flow projection. The TSA Liquidity Plan encompasses all cash flow activity within the TSA. Certain cash flow activity is contemplated in the CFP and Budget, but occurs outside the TSA. Cash flow bridges from the TSA to the CFP and Budget have been included to facilitate comparison. |
| NAP | - NAP, or the Nutrition Assistance Program, also known as PAN, or Programa de Asistencia Nutricional is a federal assistance nutritional program provided by the United States Department of Agriculture (USDA) solely to Puerto Rico. |
| Other Payroll | - Other Payroll expenses relate to employee withholdings, social security, insurance, and other deductions. |
| Other State Collections | - Inflows related to various Health Department programs, the State Insurance Fund, the Commissioner of Financial Institutions, interest earned on TSA bank accounts and others. |
| PayGo | - PayGo - Puerto Rico pension system that is funded through a pay-as-you-go system.  Retirement benefits expenses of government employers are paid by the central government and reimbursed by the employers, with such funds received by the TSA. |
| PRASA | - Puerto Rico Aqueduct and Sewer Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| PREPA | - Puerto Rico Electric Power Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| PRITA | - Puerto Rico Integrated Transport Authority, a public corporation and component unit of the Commonwealth of Puerto Rico. |
| PSTBA | - The PSTBA is an amount established under Act 91-2006, as amended, and the Sales Tax Revenue Bond Resolution, as amended and restated on June 10, 2009 (the "Bond Resolution"), that currently must be received by COFINA from 5.5% of the SUT before the Commonwealth can receive any of the other 5.5% SUT. |
| Public Corporation | - Public corporations are governmental authorities with autonomous structure separate from the central  government administration and with independent treasury functions. |
| RHUM System | - This is the software system that DTPR uses for payroll. |
| SIFC | - State Insurance Fund Corporation, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| Special Revenue Receipts | - Collections made by central government agencies at collection posts for services rendered by the agencies as well as fees, licenses, permits, fines and others. |
| SURI | - Sistema Unificada de Rentas Internas is the new digital tool of the Department of the Treasury that will allow integration and streamlining of the administration of taxes and revenues and eliminate the complexity of the current systems for the benefit of the Treasury and the taxpayers. |
| Sweep Account Transfers | - Transfers of Fiscal Year 2020 collections in the SURI sweep account to the TSA during Fiscal Year 2021. The closing balance of the sweep account on June 30, 2020, was $1,024 million. |
| TSA | - Treasury Single Account, the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval.  Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA. |

EXHIBIT DD   <span style="color:red">CONFIDENTIAL</span>   3

## Introduction

- Enclosed is the weekly Treasury Single Account ("TSA") cash flow report and supporting schedules with monthly YTD FY2021 actual results compared to the FY2021 Liquidity Plan and FY2020 actual results.

- TSA is the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed.

- Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances held in custody by the Secretary of Treasury for the benefit of the Government fiduciary funds, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA.

- Disbursements from the TSA include payroll and related costs, vendor and operational disbursements (including those reimbursed by Federal assistance grants and funded from Special Revenue Funds), welfare expenditures, capital outlays, debt service payments, required budgetary formulas and appropriation payments, pass-through payments of pledged revenues to certain public corporations, tax refunds, payments of current pension benefits and other disbursements.

- Federal funds related to disaster relief for hurricanes Irma and Maria are deposited in a separate bank account overseen by the Government Authorized Representative ("GAR"). Funds may be transferred to the TSA either: (i) after admissible disbursements (per approved Project Worksheets) have been made or (ii) once supporting documentation for an accrual or related expense are provided to and approved by FEMA. Therefore, FEMA funding may also be received in advance of actual cash disbursement, as payments to vendors may occur subsequent to when the corresponding services are rendered / expenses are recorded.

- Federal funds related to the Coronavirus Aid, Relief, and Economic Security ("CARES") Act have been deposited into bank accounts overseen by Hacienda, but separate from the TSA.

- Sistema Unificada de Rentas Internas ("SURI") is the new digital platform designed to integrate and streamline the administration of taxes and revenues. Collections are initially deposited into a SURI sweep account outside of the TSA. Collections must be verified and reconciled before they can be swept into the TSA. The reconciliation process is still being refined, and as a result, there have been significant delays in transferring collections from the sweep account to the TSA. The SURI sweep account balance is reported on page 5 of this report.

- Data limitations and commentary:
  The government has focused on cash transaction information for which access to reliable, timely, and detailed data is readily available. The government continues to work with DTPR and other parties to access additional reliable data that would help to provide additional detail in the future.

EXHIBIT DD                                    **CONFIDENTIAL**

000154

June FY2021

**Puerto Rico Department of Treasury | AAFAF**
*Executive Summary - TSA Cash Flow Actual Results*
*(figures in Millions)*

| $11,671 | $34 | $248 | $1,671 | $1,108 | $3,970 | $2,162 |
|---------|-----|-------|--------|--------|--------|--------|
| Bank Cash Position | June Cash Flow | Monthly Variance | Q4 Cash Flow | Q4 Variance | YTD Net Cash Flow | YTD Net Cash Flow Variance |

**Bridge from Liquidity Plan projected cash balance and actual ending cash balance as of June 30, 2021**

| | Cash Flow line item | Variance Bridge ($M) | Comments |
|---|---|---|---|
| | Liquidity Plan Projected Cash Balance 6/30/21: | $ 9,509 | 1. State collections ended the year $2,099 million ahead of plan and the TSA sweep account includes and additional $158 million of primarily general fund collections which will be transferred in short order. Outperformance is primarily due to the impact of increased Federal stimulus and better than expected economic activity during the Covid-19 pandemic. |
| 1 | State Collections | 2,099 | |
| 2 | Custody Account Transfers | 244 | 2. Various custody account transfer items account for +$244M of variance. The plan included $54M as part of the overall $400M Broadband Expansion plan which has been delayed into FY22. The $50M for the 21st Century Technical & Business Education Fund has also not yet been transferred from the TSA. $56M is temporary variance related to municipalities, including $50M in transfers for the Municipal Development Funds in addition to $6M in transfers for the Municipal Improvement Funds which may be transferred in the first 60 days of the next fiscal year. The custody account transfers budget included $23M for litigation related to DOE transitory employee backpay, which was paid out and reported within gross payroll. |
| 3 | Tax Refunds & Other Tax Credits | 178 | |
| 4 | General Fund Operating Disbursements | 174 | 3. Tax refunds were $178M lower than forecast. Positive variance is due to various EITC benefits realized in the form of credit against tax liabilities owed by EITC benficiaries instead of cash distributions as contemplated with the Liquidity Plan and timing differences arising from the extension of tax filing deadlines due to the COVID-19 pandemic. |
| 5 | State Cost Share | 173 | 4. Approximately $174M of positive variance is attributable to General Fund Opex. These funds may be spent during the first 60 days of FY2022. |
| 6 | PREPA LUMA Payment | (750) | 5. Approximately $173M of positive variance is attributable to budgeted State Cost Share. Cost share payments will occur in conjunction with increased recovery spending in FY22. |
| | All Other | 44 | 6. On June 1, 2021, $750 million was transferred to PREPA for funding of the working capital accounts required under the LUMA O&M agreement. This was not contemplated in the 2021 Fiscal Plan, and therefore excluded from the Liquidity Plan, resulting in a permanent negative variance to the forecast. Subsequent to the certification of the Fiscal Plan and Budget, Joint Resolution 139 was passed which provided for the $750 million disbursement. |
| | Actual TSA Cash Balance | $ 11,671 | |

000155

**Puerto Rico Department of Treasury | AAFAF**
*YTD TSA Cash Flow Summary - Actual vs LP*

TSA Cumulative YTD Net Cash Flow ($M)

| | |
|---|---|
| LP Bank Cash Balance: | $9,509 |
| Actual TSA Bank Cash Balance: | $11,671 |



**YTD Actuals vs. Liquidity Plan**
YTD net cash flow was $3,970M and cash flow variance to the Liquidity Plan ended the year +$2,162M. The primary driver of FY21 variance was outperformance of state collections (+$2,099M vs forecast).

**Puerto Rico Department of Treasury | AAFAF**
*YTD Cash Flow Summary - TSA Cash Flow Actual Results*

### Net Cash Flow - YTD Actuals

1.) State Collections represents the largest gross cash inflow source to the TSA. The primary driver of cash increase to $11,671 million by the end of FY21 was surplus generated by General Fund cash receipts in excess of General Fund cash disbursements into and out of the TSA. Total General Fund cash surplus generated for the year is preliminarily $3,731M and can be attributed to the $1,024M sweep transfer of FY20 revenues, strong FY21 General Fund collections, as well as spending within budget. However, some of this surplus may unwind as various expenditures related to FY21 are made in the first 60 days of FY22 and other unspent funds are reapportioned for alternative or future use. The second largest source of gross cash inflows were Federal Funds, representing 38% of FY21 inflows. However, these gross inflows are largely offset by Federal Fund disbursements, with a FY21 net deficit of $5M (Refer to page 14 for additional detail).



TSA YTD Cash Flow Actuals: Key Cash Flow Concepts ($M)

### Net Cash Flow YTD Variance - LP vs. Actual

1.) State collections performing ahead of forecast are the primary driver of FY21 variance. Positive variance can be attributed to revenue outperformance across various revenue concepts. Refer to page 11 of this report for additional detail.



TSA YTD Top Cash Flow Variances ($M)

**Puerto Rico Department of Treasury | AAFAF**
*TSA Cash Flow Actual Results as of June 30, 2021*

| | FY21 Actual June | FY21 LP June | Variance June | FY21 Actual YTD | FY21 LP YTD | FY20 Actual YTD (a) | Variance YTD FY21 vs LP |
|---|---|---|---|---|---|---|---|
| *(figures in Millions)* | | | | | | | |
| **State Collections** | | | | | | | |
| 1  General fund collections (b) | $1,477 | $987 | $490 | $12,474 | $10,493 | $8,895 | $1,981 |
| 2  Deferred GF Receipts (COVID-19 Exec Action) | – | – | – | 479 | 667 | – | (188) |
| 3  Other fund revenues & Pass-throughs (c) | 39 | 22 | 17 | 272 | 208 | 1,020 | 65 |
| 4  Special Revenue receipts | 39 | 37 | 2 | 430 | 434 | 383 | (4) |
| 5  All Other state collections (d) | 58 | 35 | 23 | 634 | 388 | 333 | 245 |
| 6  Sweep Account Transfers | – | – | – | 1,024 | 1,024 | – | – |
| 7  Subtotal - State collections (e) | $1,614 | $1,081 | $533 | $15,313 | $13,214 | $10,630 | $2,099 |
| **Federal Fund Receipts** | | | | | | | |
| 8  Medicaid | 255 | 237 | 18 | 2,881 | 3,255 | 2,279 | (374) |
| 9  Nutrition Assistance Program | 402 | 203 | 199 | 3,167 | 1,998 | 2,663 | 1,169 |
| 10  All Other Federal Programs | 199 | 288 | (89) | 2,077 | 2,951 | 1,855 | (874) |
| 11  Other | 407 | – | 407 | 1,684 | 166 | 340 | 1,517 |
| 12  Subtotal - Federal Fund receipts | $1,264 | $728 | $536 | $9,808 | $8,370 | $7,136 | $1,438 |
| **Balance Sheet Related** | | | | | | | |
| 13  Paygo charge | 42 | 45 | (3) | 538 | 539 | 508 | (1) |
| 14  Other | – | – | – | – | – | – | – |
| 15  Subtotal - Other Inflows | $42 | $45 | ($3) | $538 | $539 | $508 | ($1) |
| 16  **Total Inflows** | **$2,920** | **$1,854** | **$1,066** | **$25,659** | **$22,122** | **$18,274** | **$3,536** |
| **Payroll and Related Costs (f)** | | | | | | | |
| 17  General fund (i) | (227) | (230) | 3 | (2,651) | (2,757) | (2,739) | 105 |
| 18  Federal fund | (38) | (52) | 13 | (466) | (608) | (523) | 142 |
| 19  Other State fund | (14) | (11) | (3) | (157) | (132) | (138) | (25) |
| 20  Subtotal - Payroll and Related Costs | ($280) | ($293) | $13 | ($3,274) | ($3,496) | ($3,400) | $222 |
| **Operating Disbursements (g)** | | | | | | | |
| 21  General fund (i) | (159) | (167) | 8 | (1,736) | (1,909) | (1,294) | 174 |
| 22  Federal fund | (137) | (237) | 100 | (1,935) | (2,344) | (1,491) | 408 |
| 23  Other State fund | (69) | (60) | (9) | (702) | (660) | (653) | (41) |
| 24  Subtotal - Vendor Disbursements | ($365) | ($464) | $99 | ($4,372) | ($4,913) | ($3,438) | $541 |
| **State-funded Budgetary Transfers** | | | | | | | |
| 25  General Fund (i) | (154) | (163) | 9 | (1,973) | (1,979) | (1,886) | 6 |
| 26  Other State Fund | (36) | (23) | (13) | (266) | (246) | (318) | (20) |
| 27  Subtotal - Appropriations - All Funds | ($190) | ($186) | ($4) | ($2,240) | ($2,226) | ($2,204) | ($14) |
| **Federal Fund Transfers** | | | | | | | |
| 28  Medicaid | (257) | (237) | (20) | (2,881) | (3,305) | (2,467) | 424 |
| 29  Nutrition Assistance Program | (390) | (203) | (187) | (3,105) | (1,998) | (2,613) | (1,106) |
| 30  All other federal fund transfers (h) | (352) | – | (352) | (1,427) | (124) | – | (1,303) |
| 31  Subtotal - Federal Fund Transfers | ($998) | ($440) | ($558) | ($7,412) | ($5,428) | ($5,080) | ($1,985) |
| **Other Disbursements - All Funds** | | | | | | | |
| 32  Retirement Contributions | (209) | (217) | 8 | (2,542) | (2,610) | (2,485) | 68 |
| 33  Tax Refunds & other tax credits (i) (j) | (75) | (113) | 37 | (773) | (951) | (873) | 178 |
| 34  Title III Costs | (24) | (6) | (18) | (158) | (88) | (133) | (70) |
| 35  State Cost Share | – | (213) | 213 | (40) | (213) | (41) | 173 |
| 36  Milestone Transfers | – | (29) | 29 | (2) | (90) | – | 88 |
| 37  Custody Account Transfers | – | (108) | 108 | (56) | (300) | – | 244 |
| 38  Cash Reserve | – | – | – | – | – | – | – |
| 39  All Other | (744) | – | (744) | (820) | – | (145) | (820) |
| 40  Subtotal - Other Disbursements - All Funds | ($1,052) | ($686) | ($367) | ($4,391) | ($4,251) | ($3,677) | ($140) |
| 41  **Total Outflows** | **($2,885)** | **($2,068)** | **($818)** | **($21,689)** | **($20,315)** | **($17,799)** | **($1,375)** |
| 42  **Net Operating Cash Flow** | **$34** | **($214)** | **$248** | **$3,970** | **$1,808** | **$476** | **$2,162** |
| 43  Bank Cash Position, Beginning (k) | 11,636 | 9,723 | 1,914 | 7,701 | 7,701 | 7,225 | – |
| 44  **Bank Cash Position, Ending (k)** | **$11,671** | **$9,509** | **$2,162** | **$11,671** | **$9,509** | **$7,701** | **$2,162** |

*Note:* Refer to page 10 for footnote reference descriptions.

**June FY2021**

**Puerto Rico Department of Treasury | AAFAF**
*TSA Cash Flow Actual Results as of June 30, 2021*

| | (figures in Millions) | FY21 Actual Q1 | FY21 Actual Q2 | FY21 Actual Q3 | FY21 Actual Q4 | FY21 Actual YTD | FY21 LP Q1 | FY21 LP Q2 | FY21 LP Q3 | FY21 LP Q4 | FY21 LP YTD | Variance Q1 | Variance Q2 | Variance Q3 | Variance Q4 | Variance YTD FY21 vs LP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **State Collections** | | | | | | | | | | | | | | | |
| 1 | General fund collections (b) | $2,547 | $2,719 | $2,773 | $4,435 | $12,474 | $1,952 | $2,363 | $2,711 | $3,466 | $10,493 | $595 | $356 | $62 | $969 | $1,981 |
| 2 | Deferred GF Receipts (COVID-19 Exec Action) | 448 | 31 | – | – | 479 | 600 | 67 | – | – | 667 | (152) | (36) | – | – | (188) |
| 3 | Other fund revenues & Pass-throughs (c) | 47 | 61 | 67 | 93 | 272 | 45 | 52 | 52 | 59 | 208 | 2 | 13 | 15 | 33 | 65 |
| 4 | Special Revenue receipts | 109 | 110 | 96 | 115 | 430 | 102 | 119 | 99 | 115 | 434 | 7 | (8) | (3) | 0 | (4) |
| 5 | All Other state collections (d) | 84 | 196 | 194 | 160 | 634 | 83 | 91 | 116 | 98 | 388 | 1 | 105 | 78 | 62 | 245 |
| 6 | Sweep Account Transfers | 1,024 | – | – | – | 1,024 | 512 | 384 | 128 | – | 1,024 | 512 | (384) | (128) | – | – |
| 7 | Subtotal - State collections (e) | $4,259 | $3,122 | $3,130 | $4,801 | $15,313 | $3,295 | $3,075 | $3,106 | $3,737 | $13,214 | $965 | $46 | $24 | $1,064 | $2,099 |
| | **Federal Fund Receipts** | | | | | | | | | | | | | | | |
| 8 | Medicaid | 1,054 | 443 | 771 | 612 | 2,881 | 1,120 | 711 | 711 | 711 | 3,255 | (66) | (268) | 60 | (99) | (374) |
| 9 | Nutrition Assistance Program | 703 | 568 | 728 | 1,168 | 3,167 | 501 | 463 | 486 | 548 | 1,998 | 202 | 105 | 242 | 619 | 1,169 |
| 10 | All Other Federal Programs | 357 | 435 | 492 | 793 | 2,077 | 625 | 840 | 732 | 754 | 2,951 | (268) | (405) | (240) | 39 | (874) |
| 11 | Other | 227 | 435 | 493 | 529 | 1,684 | 104 | 62 | – | – | 166 | 123 | 373 | 493 | 529 | 1,517 |
| 12 | Subtotal - Federal Fund receipts | $2,341 | $1,881 | $2,484 | $3,102 | $9,808 | $2,350 | $2,077 | $1,929 | $2,014 | $8,370 | ($10) | ($195) | $555 | $1,088 | $1,438 |
| | **Balance Sheet Related** | | | | | | | | | | | | | | | |
| 13 | Paygo charge | 162 | 144 | 118 | 114 | 538 | 135 | 135 | 135 | 135 | 539 | 27 | 9 | (16) | (21) | (1) |
| 14 | Other | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 15 | Subtotal - Other Inflows | $162 | $144 | $118 | $114 | $538 | $135 | $135 | $135 | $135 | $539 | $27 | $9 | ($16) | ($21) | ($1) |
| 16 | **Total Inflows** | **$6,762** | **$5,147** | **$5,733** | **$8,017** | **$25,659** | **$5,780** | **$5,287** | **$5,170** | **$5,885** | **$22,122** | **$982** | **($140)** | **$562** | **$2,132** | **$3,536** |
| | **Payroll and Related Costs (f)** | | | | | | | | | | | | | | | |
| 17 | General fund (i) | (630) | (701) | (656) | (664) | (2,651) | (634) | (755) | (665) | (702) | (2,757) | 5 | 54 | 9 | 38 | 105 |
| 18 | Federal fund | (111) | (123) | (116) | (117) | (466) | (138) | (164) | (147) | (158) | (608) | 27 | 42 | 31 | 42 | 142 |
| 19 | Other State fund | (37) | (52) | (32) | (37) | (157) | (30) | (36) | (32) | (34) | (132) | (7) | (16) | 0 | (3) | (25) |
| 20 | Subtotal - Payroll and Related Costs | ($777) | ($876) | ($804) | ($817) | ($3,274) | ($802) | ($956) | ($844) | ($895) | ($3,496) | $25 | $80 | $40 | $77 | $222 |
| | **Operating Disbursements (g)** | | | | | | | | | | | | | | | |
| 21 | General fund (i) | (476) | (509) | (351) | (400) | (1,736) | (426) | (490) | (483) | (511) | (1,909) | (50) | (19) | 132 | 111 | 174 |
| 22 | Federal fund | (481) | (618) | (387) | (449) | (1,935) | (488) | (676) | (585) | (595) | (2,344) | 6 | 58 | 198 | 146 | 408 |
| 23 | Other State fund | (115) | (155) | (203) | (230) | (702) | (179) | (159) | (155) | (168) | (660) | 64 | 5 | (47) | (62) | (41) |
| 24 | Subtotal - Vendor Disbursements | ($1,072) | ($1,281) | ($940) | ($1,079) | ($4,372) | ($1,092) | ($1,325) | ($1,223) | ($1,274) | ($4,913) | $20 | $44 | $283 | $195 | $541 |
| | **State-funded Budgetary Transfers** | | | | | | | | | | | | | | | |
| 25 | General fund (i) | (332) | (653) | (511) | (477) | (1,973) | (505) | (476) | (476) | (523) | (1,979) | 173 | (177) | (35) | 45 | 6 |
| 26 | Other State Fund | (54) | (67) | (79) | (66) | (266) | (86) | (53) | (53) | (53) | (246) | 32 | (13) | (26) | (13) | (20) |
| 27 | Subtotal - Appropriations - All Funds | ($386) | ($720) | ($590) | ($544) | ($2,240) | ($591) | ($529) | ($529) | ($576) | ($2,226) | $205 | ($190) | ($60) | $32 | ($14) |
| | **Federal Fund Transfers** | | | | | | | | | | | | | | | |
| 28 | Medicaid | (1,054) | (226) | (989) | (612) | (2,881) | (1,171) | (711) | (711) | (711) | (3,305) | 117 | 486 | (277) | 99 | 424 |
| 29 | Nutrition Assistance Program | (705) | (565) | (702) | (1,133) | (3,105) | (501) | (463) | (486) | (548) | (1,998) | (204) | (102) | (216) | (585) | (1,106) |
| 30 | All other federal fund transfers | (49) | (280) | (352) | (745) | (1,427) | (62) | (62) | – | – | (124) | 13 | (218) | (352) | (745) | (1,303) |
| 31 | Subtotal - Federal Fund Transfers | ($1,808) | ($1,071) | ($2,042) | ($2,491) | ($7,412) | ($1,734) | ($1,236) | ($1,198) | ($1,260) | ($5,428) | ($75) | $166 | ($845) | ($1,231) | ($1,985) |
| | **Other Disbursements - All Funds** | | | | | | | | | | | | | | | |
| 32 | Retirement Contributions | (640) | (651) | (625) | (627) | (2,542) | (652) | (652) | (652) | (652) | (2,610) | 13 | 1 | 28 | 26 | 68 |
| 33 | Tax Refunds & other tax credits (h) (i) | (289) | (20) | (287) | (177) | (773) | (292) | (72) | (140) | (446) | (951) | 3 | 53 | (147) | 269 | 178 |
| 34 | Title III Costs | (58) | (13) | (44) | (42) | (158) | (34) | (18) | (18) | (18) | (88) | (25) | 5 | (26) | (25) | (70) |
| 35 | State Cost Share | – | – | (40) | – | (40) | – | – | – | (213) | (213) | – | – | (40) | 213 | 173 |
| 36 | Milestone Transfers | (2) | – | – | – | (2) | (14) | (19) | (29) | (29) | (90) | 12 | 19 | 29 | 29 | 88 |
| 37 | Custody Account Transfers | – | (16) | (21) | (19) | (56) | (5) | (17) | (66) | (213) | (300) | 5 | 1 | 45 | 194 | 244 |
| 38 | Cash Reserve | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 39 | All Other | (58) | 18 | (15) | (764) | (820) | – | – | – | – | – | (58) | 18 | (15) | (764) | (820) |
| 40 | Subtotal - Other Disbursements - All Funds | ($1,047) | ($682) | ($1,033) | ($1,629) | ($4,391) | ($997) | ($778) | ($905) | ($1,571) | ($4,251) | ($50) | $97 | ($128) | ($558) | ($140) |
| 41 | **Total Outflows** | **($5,091)** | **($4,628)** | **($5,409)** | **($6,560)** | **($21,689)** | **($5,217)** | **($4,824)** | **($4,699)** | **($5,575)** | **($20,315)** | **$125** | **$196** | **($711)** | **($985)** | **($1,375)** |
| 42 | **Net Operating Cash Flow** | **$1,671** | **$518** | **$323** | **$1,457** | **$3,970** | **$563** | **$462** | **$472** | **$310** | **$1,808** | **$1,108** | **$56** | **($148)** | **$1,146** | **$2,162** |
| 43 | Bank Cash Position, Beginning (j) | 7,701 | 9,372 | 9,890 | 10,214 | 7,701 | 7,701 | 8,264 | 8,727 | 9,198 | 7,701 | – | 1,108 | 1,164 | 1,015 | – |
| 44 | Bank Cash Position, Ending (j) | $9,372 | $9,890 | $10,214 | $11,671 | $11,671 | $8,264 | $8,727 | $9,198 | $9,509 | $9,509 | $1,108 | $1,164 | $1,015 | $2,162 | $2,162 |

*Note: Refer to the next page for footnote reference descriptions.*

Source: DTPR          EXHIBIT DD          **CONFIDENTIAL**          9

000159

**Puerto Rico Department of Treasury | AAFAF**

*FY21 TSA Cash Flow Actual Results - Footnotes*

Footnotes:

(a)  Represents FY2020 actual results through June 30, 2020.

(b)  Represents gross tax collections received and deposited from all Hacienda Collection Posts, through the Hacienda Colecturia Virtual (online) and/or SURI. Additionally, as of the date of this report, this line item includes unreconciled collections due to DTPR transition to collecting various gross tax receipts through the new SURI system. The transition from the Hacienda Colecturia collections system to SURI is ongoing and as such, revenue concept detail for the general tax SURI collections is not available at this time for the portion of collections received by the new general tax SURI account.  This resulted in timing-related unreconciled gross collections which will be retroactively allocated to each revenue concept as appropriate once this information becomes available.

(c)  These revenues are collected by DTPR and immediately appropriated.

(d)  Inflows related to the State Insurance Fund, the Department of Labor and Human Resources, the Commissioner of Financial Institutions, interest earned on TSA bank accounts and others. As of the date this report the TSA has received $12M in interest income in FY21 from earnings on the TSA cash balance.

(e)  As of June 30, 2021, there are $158M in collections in the SURI sweep account pending reconciliation and transfer to the TSA.

(f)  Represents total gross payroll. Gross payroll includes net payroll disbursed to government employees, cash transfers to the Police Department for payroll costs, and other payroll related costs (employee withholdings, social security, insurance, and other deductions).

(g)  Includes payments to third-party vendors as well as intergovernmental payments to agencies with separate Treasuries.

(h)  This line includes $343M of federally-reimbursable tax credits year to date. Of that amount, $317M are COVID-19 related Economic Impact Payments and $25M are American Opportunity Credits. These payments were previously reported in the "Tax Refunds & Other Tax Credits" line. An estimated $17M of these payments were made during May 2021. This figure may be revised as updated information becomes available.

(i)  Includes Federally Funded Employee Retention Credits.

(j)  These line items include transfers out of the TSA related to the COVID-19 Emergency Measures Support Package. Total TSA outflows related to the COVID-19 Emergency Measures Support Package are approximately $533M as of June 30, 2021. Of this amount, $459M was disbursed in FY2020 and $75M in FY2021.

(k)  Excludes BPPR Clawback Accounts (for clawback revenues prior to June 2016) of $147M.

**Puerto Rico Department of Treasury | AAFAF**
*General Fund Collections Summary*

**Key Takeaways / Notes**

1.) Accumulated collections into TSA sweep accounts are now consistently transferred to the TSA with a 2-4 day lag. This will result in lower, more stable balances in the sweep accounts and more predictable transfers to the TSA when compared to 1Q of this fiscal year. Overall outperformance is due to the impact of increased Federal stimulus and better than expected economic activity during the Covid-19 pandemic. Motor Vehicle outperformance is the result of higher than expected vehicle sales, especially in the truck category. Other General Fund revenue includes $440 million of income taxes from partnerships, which represents a positive variance against the forecast for this category, and $314M of Other Excise Taxes, $298M greater than forecast for FY21. These include revenues that may be retroactively allocated to specific excise tax concepts in the future. Reduced travel throughout FY21 due to the COVID-19 pandemic and associated travel restrictions drove lower non-resident withholdings for the fiscal year. As of the date of this report, there were $158M in collections in the SURI sweep account pending transfer to the TSA, $104M of which are pending reconciliation and allocation to specific revenue concepts. This collections schedule will be updated as information becomes available.

**General Fund Collections Year to Date: Actual vs. Forecast ($M)**

| | Actual (a)<br>YTD 6/30 | LP<br>YTD 6/30 | Var $<br>YTD 6/30 | Var %<br>YTD 6/30 |
|---|---|---|---|---|
| **General Fund Collections** | | | | |
| Corporations | $2,207 | $1,993 | $214 | *11%* |
| FY21 Collections | 1,957 | 1,776 | 181 | *10%* |
| FY21 CIT for FEDE (Act 73-2008) (b) | 39 | 57 | (18) | *-32%* |
| FY20 Deferrals/Extensions | 211 | 159 | 52 | *33%* |
| Individuals | 3,052 | 2,527 | 525 | *21%* |
| FY21 Collections | 2,854 | 2,233 | 621 | *28%* |
| FY20 Deferrals/Extensions | 198 | 294 | (96) | *-33%* |
| Act 154 | 1,754 | 1,691 | 63 | *4%* |
| Non Residents Withholdings | 379 | 586 | (206) | *-35%* |
| FY21 Collections | 368 | 567 | (199) | *-35%* |
| FY21 NRW for FEDE (Act 73-2008) (b) | 12 | 19 | (7) | *-38%* |
| Motor Vehicles | 615 | 341 | 274 | *80%* |
| Rum Tax (c) | 253 | 214 | 39 | *18%* |
| Alcoholic Beverages | 272 | 266 | 6 | *2%* |
| Cigarettes (d) | 142 | 128 | 14 | *11%* |
| HTA | 436 | 548 | (112) | *-20%* |
| Gasoline Taxes | 102 | 166 | (64) | *-39%* |
| Gas Oil and Diesel Taxes | 10 | 21 | (11) | *-51%* |
| Vehicle License Fees ($15 portion) | 33 | 21 | 12 | *56%* |
| Vehicle License Fees ($25 portion) | 79 | 107 | (28) | *-26%* |
| Petroleum Tax | 173 | 215 | (42) | *-19%* |
| Other | 39 | 18 | 21 | *116%* |
| CRUDITA | 117 | 259 | (142) | *-55%* |
| Other FY20 Deferrals/Extensions (e) | 35 | - | 35 | *NA* |
| Other General Fund | 1,327 | 457 | 870 | *190%* |
| **Total (e)** | **$10,589** | **$9,010** | **$1,579** | ***18%*** |
| | | | | |
| SUT Collections (f) | 2,364 | 2,150 | 214 | *10%* |
| FY21 Collections | 2,328 | 1,936 | 392 | *20%* |
| FY20 Deferrals/Extensions | 36 | 214 | (178) | *-83%* |
| | | | | |
| **Total General Fund Collections** | **$ 12,953** | **$ 11,160** | **$ 1,793** | ***16%*** |
| | | | | |
| Transfer of FY20 Closing Sweep Balance | 1,024 | 1,024 | - | *0%* |
| | | | | |
| **Total TSA Cash General Fund Collections** | **$ 13,977** | **$ 12,184** | **$ 1,793** | ***15%*** |

**YTD General Fund Receipts Cumulative Variance Liquidity Plan vs. Actual Cumulative Variance by Category ($M)**



Footnotes:
(a) General Fund gross cash receipts by concept are approximated using net General Fund revenues adjusted for recurring monthly gross-ups and other adjustments.
(b) Relates to income tax reserves that are subsequently passed through to PRIDCO.
(c) This amount includes rum tax moratorium revenues.
(d) Includes some cigarette tax collections that are subsequently passed through to HTA, PRMBA and other.
(e) This amount includes FY20 Income Tax from Partnerships. Note the Liquidity Plan projection for this line item was rolled up in Corporate Income Tax deferrals/extensions.
(f) SUT collections excludes PSTBA, FAM & CINE, and only includes the amounts deposited into the TSA for General Fund use.

**Puerto Rico Department of Treasury | AAFAF**
*Other State Fund Collections Summary*

**Key Takeaways / Notes**

1.) Other state fund collections are ahead of the Liquidity Plan. Positive "All Other" variance in Other State Collections is mainly due to +$232M collections by the new Gaming Commission. The Liquidity Plan did not consider a projection for Gaming Commission collections nor the subsequent disbursements to hoteliers & others of these funds (as this flow of funds was previously managed outside the TSA by the PR Tourism Company). Therefore, despite the positive variance presented in the table to the right, this is offset by approximately $165M in outflows of these receipts for a net variance of +$67M. This variance is permanent with respect to the FY21 Liquidity plan; however, it should be net cash flow neutral over the long term and funds may be disbursed early in the next fiscal year.

**Other State Fund Collections Year to Date: Actual vs. Forecast ($M)**

| | Actual (a) YTD 6/30 | LP YTD 6/30 | Var $ YTD 6/30 | Var % YTD 6/30 |
|---|---|---|---|---|
| **Other State Fund Collections** | | | | |
| Other Fund Revenues & Pass-Throughs | $272 | $208 | $65 | *31%* |
| Electronic Lottery | 81 | 29 | 52 | *183%* |
| Cigarettes (PRITA) | 36 | 36 | - | *0%* |
| ASC Pass Through | 17 | 20 | (3) | *-16%* |
| ACCA Pass Through | 90 | 69 | 21 | *31%* |
| Other | 48 | 54 | (6) | *-11%* |
| Special Revenue Fund (Agency Collections) | 430 | 434 | (4) | *-1%* |
| Department of Education | 10 | 16 | (6) | *-39%* |
| Department of Health | 63 | 76 | (13) | *-17%* |
| Department of State | 30 | 14 | 16 | *111%* |
| All Other | 328 | 329 | (1) | *0%* |
| Other State Collections | 634 | 388 | 245 | *63%* |
| Bayamón University Hospital | 5 | 9 | (4) | *-44%* |
| Adults University Hospital (UDH) | 45 | 27 | 18 | *68%* |
| Pediatric University Hospital | 17 | 20 | (2) | *-11%* |
| Commisioner of the Financial Institution | 82 | 30 | 52 | *174%* |
| Department of Housing | 22 | 14 | 7 | *51%* |
| Gaming Commission | 232 | - | 232 | *NA* |
| All Other | 231 | 289 | (58) | *-20%* |
| **Total** | **$1,336** | **$1,030** | **$306** | ***30%*** |

**YTD Other State Fund Receipts Cumulative Variance Liquidity Plan vs. Actual Cumulative Variance by Category ($M)**



**Puerto Rico Department of Treasury | AAFAF**

*Sales and Use Tax Collections Summary*

**Key Takeaways / Notes**

1.) The proceeds from the Puerto Rico 10.5% SUT rate are allocated as follows: Of the 10.5%, 5.5% is deposited into a COFINA BNY Mellon account until the PSTBA cap is reached, and 4.5% is deposited into the General Fund. The remaining 0.5% is remitted to FAM. The PSTBA cap for FY21 is $454 million.



**YTD Gross SUT Collections - General Fund and PSTB ($M) (a)**

| | |
|---|---|
| Total | 2,961 |
| General Fund Collections | 2,364 |
| COFINA (BNY) | 454 |
| FAM | 143 |
| CINE | 0 |

Footnotes

(a) This schedule reflects gross cash activity and is subject to revision based on periodic reconciliations and accounting adjustments.

(b) As of June 30, 2021 there is $54M in SUT collected pending verification and allocation. The verification process includes matching receipts with the appropriate returns and reconciling government account information. Once this process is complete, SUT funds are distributed in accordance with the COFINA Plan of Adjustment based on the ownership of funds and otherwise based on the limits on distributions established therein.

**Puerto Rico Department of Treasury | AAFAF**
*Federal Funds Net Cash Flow Summary*

**Key Takeaways / Notes**

1.) Receipts for the Nutritional Assistance Program (NAP) and Medicaid (ASES Pass-through) are received in advance of the subsequent pass through disbursements. Federal Funds received for Payroll and Vendor Payments are typically reimbursed following disbursement. Currently, there may be temporary surplus / (deficit) due timing differences relating to prior year carryover. Puerto Rico received $2.24 billion from the Coronavirus Relief Fund (CRF) established under the CARES Act. These funds are held in a separate account outside of TSA and being disbursed according to the Strategic Disbursement Plan. Some of the measures are initially paid out through TSA, and later reimbursed from the CRF account. Additionally, on May 19, 2021, $2.5 billion of federal Coronavirus State & Local Fiscal Recovery funds (CSFRF) were deposited in the TSA. These were immediately transferred to a separate account under custody of Hacienda on May 20, 2021 and this pass-through is not reflected in TSA inflows and outflows within this report. The TSA disbursed $343M of federally-reimbursable tax credits between January 1, 2021, and May 28, 2021. These include $317M of COVID-19 related Economic Impact Payments and $25M of American Opportunity Credits. These payments were previously reported in the "Tax Refunds & Other Tax Credits" line of the TSA cash flow.

| Monthly FF Net Surplus (Deficit) | FF Inflows | FF Outflows | Net Cash Flow | LP Net Cash Flow | Variance |
|---|---|---|---|---|---|
| Medicaid (ASES) | $ 255 | $ (257) | $ (2) | $ - | $ (2) |
| Nutritional Assistance Program (NAP) | 402 | (390) | 12 | - | 12 |
| Payroll / Vendor Disbursements / Other Federal Programs | 195 | (168) | 27 | - | 27 |
| Coronavirus Relief Fund (CRF) | 407 | (359) | 49 | - | 49 |
| Federally Reimbursable Tax Credits | 4 | - | 4 | | 4 |
| **Total (a)** | **$ 1,264** | **$ (1,174)** | **$ 90** | **$ -** | **$ 90** |

| YTD Cumulative FF Net Surplus (Deficit) | FF Inflows | FF Outflows | Net Cash Flow | LP Net Cash Flow | Variance |
|---|---|---|---|---|---|
| Medicaid (ASES) | $ 2,881 | $ (2,881) | $ 0 | $ (51) | $ 51 |
| Nutritional Assistance Program (NAP) | 3,167 | (3,105) | 62 | - | 62 |
| Payroll / Vendor Disbursements / Other Federal Programs | 1,759 | (1,802) | (42) | - | (42) |
| Coronavirus Relief Fund (CRF) | 1,684 | (1,683) | 0 | 42 | (42) |
| Federally Reimbursable Tax Credits | 318 | (343) | (25) | | (25) |
| **Total (a)** | **$ 9,808** | **$ (9,813)** | **$ (5)** | **$ (9)** | **$ 4** |

**YTD Federal Funds Net Cash Flows ($M)**



Footnotes

(a) Please note that federal fund classification as represented here is based on the fund classification at the point of transaction. Agencies regularly review cash transactions and make accounting adjustments that result in future reclassifications.

(b) Note that the Liquidity Plan will generally project a YTD deficit and surplus each week for Medicaid and CRF funding, respectively. This is due to deficit and surpluses carried forward from FY20 (FY20 federal receipts in excess of FY20 federal fund outlays and spending prior to CRF reimbursement) that were assumed to unwind throughout the first quarter of FY21 as funds received in FY20 were utilized, thus resulting in projected net cash flow deficits and surpluses for the full year FY21 in Medicaid funding (-$51M) and CRF ($42M), yielding a projected -$9m net deficit projected for FY21. Aside from the aforementioned projected cash flow surplus and deficit, all other federally funded cash flows are assumed to result in zero net cash flow for the full FY20, and week-to-week variations are assumed to be timing related.

Source: DTPR    EXHIBIT DD    <span style="color:red">CONFIDENTIAL</span>    14

000164

**Puerto Rico Department of Treasury | AAFAF**

*Payroll / Vendor Disbursements Summary*

### Key Takeaways / Notes : Gross Payroll

1.) Gross payroll mainly tracked FY21 forecasts. Most variance was driven by DOE payroll, likely due to COVID-19 and the subsequently adjusted and abnormal school year. DOE payroll variance dropped during the week ended 3/26 due to a one-time settlement related to DOE transitory employee salaries. The FY21 Certified Budget included a $23M reserve for this item that appears in the Custody Account Transfers line of the FY21 Liquidity Plan.

| Gross Payroll ($M) (a) | YTD |
|---|---|
| **Agency** | **Variance** |
| Department of Education | 210 |
| Department of Health | (35) |
| Department of Correction & Rehabilitation | 16 |
| Police | (18) |
| All Other Agencies | 50 |
| **Total YTD Variance** | **$ 222** |

### Key Takeaways / Notes : Vendor Disbursements

1.) Total vendor payments were less than projected, though there are various offsetting variances within. Disbursements on behalf of the Department of Education are $460M lower than expected. This is offset by negative variance due to several items, including a portion of CARES Act assistance amounting to $292M that was paid through the TSA on behalf of Treasury to vendors and subsequently reimbursed from the CRF account, which includes $22M distributed for the Private Hospitals initiative during the week ended 12/18.

| Vendor Disbursements ($M) | YTD |
|---|---|
| **Agency** | **Variance** |
| General Court of Justice | (34) |
| Department of Health | (27) |
| Department of Correction and Rehabilitation | (25) |
| Department of Justice | (2) |
| All Other Agencies | 630 |
| **Total YTD Variance** | **$ 541** |



**Cumulative YTD Variance - Payroll by Agency ($M) (a)**



**Cumulative YTD Variance -Vendor Disbursements by Agency ($M)**

Footnotes
   (a) Gross Payroll is equal to the sum of: (i) Net Payroll  by Agency from the DTPR RHUM system; (ii) Other Payroll and  (iii) Cash outlays for wage garnishments by Agency.

**Puerto Rico Department of Treasury | AAFAF**
*State Funded Budgetary Transfers Summary*

**Key Takeaways / Notes**

1.) General Fund appropriations are generally executed throughout the year on a consistent basis in the first week of a given month. The amount transferred each month is usually the sum of the receiving entity's budgeted amount for FY21 divided into twelve, subject to a 2.5% holdback through the first nine months of the fiscal year, to be disbursed during the fourth quarter following reconciliation of General Fund revenues to Fiscal Plan projections and subsequent approval and authorization for release by the Oversight Board and the Director of OMB. Other General Fund transfers and Other Fund transfers require the recognition of certain revenues within DTPR accounting records prior to sending funds to a receiving entity. Negative Other GF variance is driven by $43.7M in funds reprogrammed from the FY20 Healthcare reserve account for UPR Cancer. The $72.5M reprogrammed from the FY20 Healthcare reserve account and transferred to ASES throughout FY21 to cover costs associated with contracts between ASES and several Managed Care Organizations were returned to the TSA during the week ended May 5, 2021.

**YTD FY2020 Budgeted Appropriations Executed ($M)**



**Remaining Appropriation Budget ($M)**

| Entity Name | Actual YTD | Full Year Expectation | Remaining |
|---|---|---|---|
| GF - UPR | $ 561 | $ 603 | $ 42 |
| GF - HTA | 228 | 281 | 53 |
| GF - CRIM | 133 | 132 | (1) |
| GF - FOMB | 58 | 58 | - |
| GF - ASEM | 35 | 17 | (18) |
| GF - Other | 959 | 889 | (70) |
| OF - PRITA | 30 | 35 | 5 |
| OF - Other | 237 | 211 | (25) |
| **Total** | **$ 2,240** | **$ 2,226** | **$ (14)** |

**YTD Appropriation Variance ($M)**

| Entity Name | Actual YTD | Liquidity Plan YTD | Variance |
|---|---|---|---|
| GF - UPR | $ 561 | $ 603 | $ 42 |
| GF - HTA | 228 | 281 | 53 |
| GF - CRIM | 133 | 132 | (1) |
| GF - FOMB | 58 | 58 | - |
| GF - ASEM | 35 | 17 | (18) |
| GF - Other | 959 | 889 | (70) |
| OF - PRITA | 30 | 35 | 5 |
| OF - Other | 237 | 211 | (25) |
| **Total** | **$ 2,240** | **$ 2,226** | **$ (14)** |

**Puerto Rico Department of Treasury | AAFAF**

*Tax Refunds / PayGo and Pensions Summary*

**Key Takeaways / Notes : Tax Refunds**

1.) Tax refunds includes EITC distributions, refunds to individuals and seniors as well as other tax credits. Variance to the Liquidity Plan mostly a combination of (i) various EITC benefits realized in the form of credit against tax liabilities owed by EITC beneficiaries instead of cash distributions as contemplated with the Liquidity Plan; and (ii) timing differences arising from the extension of tax filing deadlines due to the COVID-19 pandemic.

**Key Takeaways / Notes : Pension PayGo**

1.) PayGo Receipts finished the year in line with forecast, though there are various offsetting positive and negative variances within due to payments received in FY21 from certain Component Units for FY20 and FY19 invoices. Such receipts from the State Insurance Fund, PRIDCO, and ACAA, totaling $31.7M, $12.2M, and $5.3M, and through December 2020, respectively, are primary drivers of this variance. FY20 PayGo payments totaling $6.0M from the Ports Authority received through the week ended 11/6 this fiscal year also contribute to this variance. Further details on the status of PayGo can be found in the monthly PayGo Reports published on AAFAF's website.



YTD Tax Refunds Disbursed ($M)



YTD Pension PayGo and Outflows ($M)

P.O. Box 2016
Lakewood, NJ 08701



**MERRILL**
A BANK OF AMERICA COMPANY

PETER C HEIN
101 CENTRAL PARK W # 14E
NEW YORK NY 10023-4250



*Go Paperless!  To receive your mail online,
please visit www.MyMerrill.com to enroll in
Online Delivery.*

October 7, 2021

## Review - Voluntary Corporate Action

The enclosed notice provides information related to a
**voluntary** corporate action event.  If you would like to
participate in this event, please review the event details in
the attachment.

*Advice, planning and
support*
*Always remember, your
Merrill Lynch Financial
Advisor is available to help
you reach your financial
goals.*

| SECURITY/ CORPORATION | CUSIP | QUANTITY | CORPORATE ACTION | DEADLINE |
|---|---|---|---|---|
| PUERTO RICO COMWLTH PUB IMPT REF BDS SER A OID APR12 05.125%JUL01 2037 | 74514LB63 | 100,000 | REORGANIZATION - VOLUNTARY | 10/12/2021 |

We obtained the information in this notice from sources we believe to be reliable, but we
do not guarantee its accuracy nor have an opinion on the information provided.

*When you have questions, you have options*
*Please contact your Merrill Lynch Financial Advisor or call (800) MERRILL (637-7455).*

Code: Corp Action 09/2020
P

October 7, 2021

Merrill Lynch, Pierce, Fenner & Smith Incorporated (also referred to as "MLPF&S" or "Merrill") makes
available certain investment products sponsored, managed, distributed or provided by companies that are
affiliates of Bank of America Corporation ("BofA Corp."). MLPF&S is a registered broker-dealer, registered
investment adviser, Member SIPC and a wholly owned subsidiary of BofA Corp.

Banking Products are provided by Bank of America, N.A. and affiliated banks, members FDIC and wholly
owned subsidiaries of Bank of America Corporation.

Investment products:

| Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |
| --- | --- | --- |

Code: Corp Action 09/2020
P

Oct 06, 2021 1:28:40 PM EST

## Confirm Global Corporate Action Notice

1000595808

Plan of Reorg-Voluntary: **Action Required**

Security Name: PUERTO RICO COMWLTH PUBIMPT REF BDS SER A OIDAPR12 5.125%JUL01 2037

Issue Country:  PUERTO RICO
ML Security ID: RWW77
Cusip:          74514LB63
ISIN:           US74514LB634

### INSTRUCTION DEADLINE DATES
**Final Date for Instructions:**                    **Oct 12, 2021 15:00 EST**
**Final Date for Withdrawal Instructions:**         **Oct 12, 2021 15:00 EST**
**TERMS**
Expiration Date:                          Oct 18, 2021
Withdrawal Date:                          Oct 18, 2021

### OPTIONS
**Option 1:**
Puerto Rico Investors who hold more than USD 1 million of bonds may vote to accept the Plan and receive the distribution under the Plan.

**Option 2:**
Puerto Rico Investors who hold less than USD 1 million of bonds may vote to accept the Plan and receive the distribution under the Plan.

**Option 3:**
Non Retail Investors may vote to accept the Plan and make no distribution election and will receive the distribution under the Plan if the Court confirms the Plan.

**Option 4:**
Non Retail Investors may vote to reject the Plan and make no distribution election and will receive the distribution under the Plan if the Court confirms the Plan.

**Option 5:**
Retail Investors may vote to accept the Plan and not make the Taxable Election and will receive the distribution under the Plan if the Court confirms the Plan.

**Option 6:**
Retail Investors may reject to accept the Plan and not make the Taxable Election and will receive the distribution under the Plan if the Court confirms the Plan.

1

**Option Default:**

Default Option:                                    Y
TAKE NO ACTION

## EVENT DETAILS

UPDATE: This offer has been extended.

NO ENTITLEMENTS WILL BE FINALIZED UNTIL AFTER THE COURT HEARING.

IMPORTANT INFORMATION
( FOR VOTING CLASSES ONLY)
Numerosity Information Submission
( Applicable Only for Beneficial Holders Submitting More than One Vote Through ATOP)
Any beneficial holder of Vintage PBA Bonds that holds multiple CUSIPs of Vintage PBA Bonds and
submits more than one vote through one or more Nominees, MUST submit ( or coordinate with your
Nominee( s) to submit) a list of all such ATOP instruction confirmation numbers ( also referred to as
ATOP voluntary offer instructions or IVOIsm) . The Balloting Agent has made available a template
electronic spreadsheet ( the INumerosity Spreadsheetm) on its website at: https:
//cases.primeclerk.com/puertorico ( click on the link titled INumerosity Spreadsheetm) .

Please return ( or coordinate with your Nominee to return) the Numerosity Spreadsheet to the
Balloting Agent in excel format via email to puertoricoinfo@ primeclerk.com. If you anticipate any
difficulty in submitting your Numerosity Spreadsheet in excel format, please contact Prime Clerk at (
844) 822- 9231 ( toll free for U.S. and Puerto Rico) or ( 646) 486- 7944 ( for international callers) or by
e- mail at puertoricoballots@ primeclerk.com .

Holders can visit https: //cases.primeclerk.com/puertorico/ for more information on this offer.

RETAIL INVESTOR. An individual who purchased GO Bonds, PBA Bonds and/or CW Guarantee
Bond Claims for his or her own brokerage account, trust account, custodial account or in a separately
managed account, with aggregate holdings in an amount less than One Million Dollars ( USD
1,000,000.00) ; provided, however, that Retail Investor shall not include any individual in his or her
capacity as a holder of a GO Bond or aPBA Bond ( a) the payment of principal and interest of which is
insured by Ambac, Assured, FGIC, National or Syncora, or ( b) who tendered for exchange such GO
Bond or PBA Bond, as the case may be, in accordance with the terms and provisions of Article II of
the GO/PBA Plan Support Agreement, in which case, such individual shall be deemed a holder of GO
Bonds or PBA Bonds in the applicable Class of GO Bonds or PBA Bonds, as the case may be, not
held by Retail Investors.

PUERTO RICO INVESTOR. IF YOU ARE A HOLDER OF A CW BOND CLAIM, A PBA BOND CLAIM,
OR A CW GUARANTEE BOND CLAIM THAT IS, OR AN ENITITY THAT IS WHOLLY- OWNED BY
OR THE SOLE BENEFICIAL OWNER OF WHICH IS, A NATURAL PERSON( S) AND RESIDENT( S)
OF THE COMMONWEALTH OF PUERTO RICO FOR PURPOSES OF PAYMENT OF PUERTO
RICO PERSONAL INCOME TAXES YOU MEET THE DEFINTION OF A PUERTO RICO INVESTOR
A PUERTO RICO INVESTOR SHALL NOT INCLUDE ANYHOLD ER OF A GO BOND OR A PBA
BOND, THE PAYMENT OF PRINCIPAL AND INTEREST OF WHICH IS INSURED BY AMBAC,
ASSURED, FGIC, NATIONAL, OR SYNCORA.

2

Puerto Rico Investor
Distribution Election with a Deemed Vote to Accept / Non Retail Investors: By electing into this Option, you are a Beneficial Holder of CW Series D/E/PIB Bond Claims that is NOT a Retail Investor, but is a Puerto Rico Investor, and you affirmatively make the Taxable Election relating to your CW Series D/E/PIB Bond Claim. By electing into this option you are certifying that you do not meet the definition of Retail Investor, but meet the definition of a Puerto Rico Investor. By electing into this option you are being deemed to vote to accept the Plan in both Classes, and ( if the Court confirms the Plan) you will receive the distribution under the Plan for the Classes. Holders electing into this Option will have their bonds RESTRICT ED FROM TRANSFERRING THROUGH THE EFFECTIVE DATE OF THE PLAN.

Distribution Election with a Deemed Vote to Accept / Retail Investors: By electing into this Option, you are a beneficial holder of securities that is a Retail Investor and a Puerto Rico Investor, and you affirmatively make the Taxable Election relating to your CW Series D/E/PIB Bond Claim. By electing into this option you are certifying that you meet the definition of Retail Investor and meet the definition of Puerto Rico Investor. By electing into this option you are being deemed to vote to accept the Plan in both Classes, and ( if the Court confirms the Plan) you will receive the distribution under the Plan for the Classes. For the avoidance of doubt, if Class votes to accept the Plan and the Court confirms the Plan, you will receive your pro rata portion of the Retail Support Fee. Holders electing into this Option will ha ve their bonds RESTRICTED FROM TRANSFERRING THROUGH THE EFFECTIVE DATE OF THE PLAN.

Non- Puerto Rico, Non- Retail Investor
Vote Only Accept / Non Retail Investors: By electing into this Option, youare a Beneficial Holder that is not a Retail Investor and you make no distribution election relating to your CW Series D/E/PIB Bond Claim. By electing into this option you are voting to ACCEPT the Plan in the Class and ( if the Court confirms the Plan) will receive the distribution under the Plan for the Class. Holders electing into this Option will have their bonds RETURNED TO THE TARGET AFTER VOTING DEADLINE OF OCTOBER 4, 2021 ( unless such Voting Deadline is extended) .

Vote Only Reject / Non Retail Investors: By electing into this Option, you are a Beneficial Holder that is not a Retail Investor and you make no distribution election relating to your CW Series D/E/PIB Bond Claim. By electi ng into this option you are voting to REJECT the Plan in both Classes, and ( if the Court confirms the Plan) you will receive the distribution under the Plan for the Class. Holders electing into this Option will have their bonds RETURNED TO THE TARGET AFTER VOTING DEADLINE OF OCTOBER 4, 2021 ( unless such Voting Deadline is extended) .

Non- Puerto Rico, Retail Investor
Vote Only Accept / Retail Investors: By electing into this Option, you are a Beneficial Holder certifying that you meet the definition of a Retail Investor and you do not make the Taxable Election relating to your CW Series D/E/PIB Bond Claim. By electing into this option you are voting to ACCEPT the Plan in the Class, and ( if the Court confirms the Plan) you will receive the distribution under the Plan for the Class. For the avoidance of doubt, if Class votes to accept the Plan and the Court confirms the Plan, you will al so be entitled to your pro rata share of a Retail Support Fee. Holders electing into this Option will have their bonds RESTRICTED FROM TRANSFERRING THROUGH THE EFFECTIVE DATE OF THE PLAN.

Vote Only Reject / Retail Investors: By electing into this Option, you are a Beneficial Holder certifying that you meet the definition of a Retail Investor and you do not make the Taxable Election relating to your CW Series D/E/PIB Bond Claim. By electing into this option you are voting to REJECT the Plan in

EXHIBIT EE                                                    000172

the Class. If the Court confirms the Plan, you will receive the distribution under the Plan for the Class. For the avoidance of doubt, if Class 38 votes accept the Plan and the Court confirms the Plan, you will also be entitled to your pro rata share of a Retail Support Fee. Holders electing into this Option will have their bonds RESTRICTED FROM TRANSFERRING THROUGH THE EFFECTIVE DATE OF THEPLAN. DEFAULT

Holders who do not elect will be treated as not a Retail Investor and not a Puerto Rico Investor. If the Court confirms the Plan, Beneficial Holders who do not elect into one of the Options will receive the distribution otherwise going to Class 36. For the avoidance of doubt, if you do meet the definition of Retail Investor and do not vote to accept the Plan you risk not receiving your pro rata portion of the Retail Support Fee.

For the further avoidance of doubt, if you make a CW Series D/E/PIB Taxable Bond Distribution Election with respect to your CW Series D/E/PIB Bond Claims in accordance with the instructions and procedures set forth, your CW Series D/E/PIB Bond Claims will be moved into the relevant Class and treated as a CW Series D/E/PIB Bond Claim ( Taxable Election) for voting and distribution purposes.

Pursuant to the Plan, holders of CW Series D/E/PIBBond C laims are entitled to their Pro Rata Share of the CW Series D/E/PIB Recovery. Such holders may elect to have their CW Series D/E/PIB Bond Claim treated as a CW Series D/E/PIB Bond Claim ( Taxable Election) and will be deemed to vote to accept the Plan in the relevant Classes ( as applicable) . If you do not make the CW Series D/E/PIB Taxable Bond Distribution Election, you may vote to accept or reject the Plan in the relevant contra CUSIPs.

Holders should consult their tax advisor for complete details in reference to withholding taxes.

Bonds may be tender in minimum denomination of USD 5,000 and any integral multiple of USD 5,000 in excess thereof.

The Objection deadline is 5: 00 p.m. ( AST) on October 19, 2021.

CONFIRMATION HEARING: November 8th through 10th, 12th, 15th through 18th and 22nd through 23rd of 2021 at 9: 30 a.m. ( AST) .

Current market prices should be checked.

This offer is subject to various conditions being satisfied and may be amended or terminated under certain conditions.

If you are short you can be held liable for any resultant proceeds.  If you intend to cover your short position please notify your respective client representative prior to your deadline.

To assess the tax consequences of this corporate action, clients should seek professional tax advice.

Any instructions received from you will be deemed to constitute a representation and warranty from you that you are eligible to participate in this issue. If requested, you agree to promptly provide proof of eligibility.

**Instruction Details**

EXHIBIT EE

Entries covering the above transaction will be posted to your account.

A USD 30.00 per instruction service charge (SVCH) will be assessed by Merrill to each U.S. dollar denominated account, for which valid orders have been executed, in addition to any fees referenced in the above notification.

If you elect to accept this offer, or need investment advice on this offer, please contact your Financial Advisor directly. However, if you have a self directed/Non-Advisory account, and you elect to accept this offer, please call 1-877-653-4732.

If you have any further questions concerning this or any other event, please call 1-800-637-7455.

5



10/01/21

*P.O. BOX 2011*
*LAKEWOOD, NJ 08701*

SUPPLEMENTAL NOTICE
SECURITY DESCRIPTION: PUERTO RICO COMWLTH

CUSIP#:        74514LB63

QUANTITY:              100,000

***********AUTO**5-DIGIT 10023
PETER C HEIN
101 CENTRAL PARK W # 14E
NEW YORK NY 10023-4250

Dear Client:

We have been requested to forward you the enclosed material in regard to an extension deadline of October 18, 2021
If you have any questions, please contact your Financial Institution directly

FOR INFORMATION CALL: YOUR FINANCIAL ADVISOR          (800) 999-1185

JOB NUMBER: E26783 3PU      CONTROL#: 6100916590933499



000014847



# DO NOT MAIL

ıllıllıılıllıllllllıılıllllllllıılıılıllıllılıllıllıll·llll
***********AUTO**5-DIGIT 10023
PETER C HEIN
101 CENTRAL PARK W # 14E
NEW YORK NY 10023-4250

EXHIBIT FF                                              000175

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## ORDER GRANTING MODIFICATION OF CERTAIN DEADLINES IN SOLICITATION PROCEDURES ORDER AND CONFIRMATION PROCEDURES ORDER

Upon consideration of the *Motion of the Official Committee of Retired Employees to Extend the Voting Deadline for Holders of Claims in Classes 51B, 51D, 51E, 51F, and 51L* (Docket Entry No. 18214 in Case No. 17-3283, the "Retiree Committee Motion"),[2] the *Joinder of Official Committee of Unsecured Creditors with Respect to (I) Motion of the Official Committee of Retired*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] All docket entries referenced herein are to entries in Case No. 17-3283, unless otherwise indicated.

EXHIBIT FF

*Employees to Extend the Voting Deadline for Holders of Claims in Classes 51B, 51D, 51E, 51F, and 51L and (II) Urgent Motion of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico for Expedited Consideration of Its Motion to Extend the Voting Deadline for Holders of Claims in Classes 51B, 51D, 51E, 51F, and 51L* (Docket Entry No. 18228, the "UCC Joinder"), the *Notice of Hearing and Motion of Individual Bondholder for an Order Extending the Voting Deadline for Retail Investors* (Docket Entry No. 18237, the "Hein Motion"), and the *Financial Oversight and Management Board for Puerto Rico's (A) Response to Retiree Committee Motion to Extend Voting Deadline, UCC Joinder to Retiree Committee Motion, and Motion of Individual Bondholder for an Order Extending the Voting Deadline for Retail Investors, and (B) Cross-Motion to Modify Certain Deadlines in Solicitation Procedures Order and Confirmation Procedures Order* (Docket Entry No. 18243, the "Cross-Motion" and, together with the Retiree Committee Motion, the UCC Joinder, and the Hein Motion, the "Motions");[3] and it appearing that (*i*) the Court has subject-matter jurisdiction over the Motions pursuant to PROMESA section 306(a)(1); (*ii*) venue of this proceeding is proper under PROMESA sections 106(a) and 307, and 28 U.S.C. 1391(b); and (*iii*) the Court has good cause to grant the relief requested in the Motions, it is hereby ORDERED:

1.    The Motions are GRANTED as set forth herein.

---

[3]    The Court has also received and reviewed the *Reply and Response of Individual Bondholder to FOMB Response and Cross-Motion (#18243) Regarding Deadlines for Voting and Other Deadlines, and Request by Individual Bondholder for Additional and Modified Relief in Light Of FOMB's Stated Intentions and New Information about FOMB's Solicitation* (Docket Entry No. 18247, the "Hein Reply") and *The Official Committee of Retired Employees' (A) Response to the Financial Oversight and Management Board for Puerto Rico's Cross-Motion to Modify Certain Deadlines in the Solicitation Procedures Order and Confirmation Procedures Order, and (B) Reply in Support of Voting Deadline Motion* (Docket Entry No. 18246).

EXHIBIT FF

000177

2.      The following deadline in the Solicitation Procedures Order[4] shall be modified as follows:

- The Voting Deadline shall be extended by fourteen (14) days, to and including October 18, 2021, at 5:00 p.m. (Atlantic Time).

3.      The following deadline in the Solicitation Procedures Order and the Confirmation Procedures Order shall be modified as follows:

4.      The deadline for filing the Voting Tabulation Declaration shall be extended by nine (9) days, to and including November 3, 2021.

5.      All other deadlines in the Solicitation Procedures Order and the Confirmation Procedures Order shall remain in full force and effect, and shall not be affected by this order. For the avoidance of doubt, the deadline for filing all other declarations in support of confirmation of the Plan *except* the Voting Tabulation Declaration shall remain October 25, 2021, as set forth in the Solicitation Procedures Order.

6.      To the extent that the Hein Reply contains additional requests for relief that are outside the scope of the Hein Motion's request for an extension of the Voting Deadline to October 18, 2021, such requests are denied without prejudice to inclusion in a future motion. See Rivera Concepcion v. Puerto Rico, 682 F. Supp. 2d 164, 170 (D.P.R. 2010) ("Arguments raised for the first time in a reply memorandum will not be considered by this Court."). Any such motion must comply with sections I.H and I.I of the *Fifteenth Amended Notice, Case Management and Administrative Procedures* (Docket Entry No. 17127-1).

---

[4]      Capitalized terms used but not defined herein have the meaning given to them in the Cross-Motion.

EXHIBIT FF

7.     This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this order.

8.     This Order resolves Docket Entry Nos. 18214, 18228, 18237, 18243, and 18247 in Case No. 17-3283.

Dated: September 27, 2021                          /s/ Laura Taylor Swain
                                                   LAURA TAYLOR SWAIN
                                                   United States District Judge

EXHIBIT FF                                                    000179



**THIS ENVELOPE CONTAINS
45% POST INDUSTRIAL
RECYCLED LDPE**

PRESORTED
FIRST CLASS MAIL
U.S. POSTAGE PAID
FARMINGDALE, NY
PERMIT NO. 225

# TIME CRITICAL MATERIAL
## ENCLOSED

EXHIBIT FF

000180

## DECLARATION OF MARK ELLIOTT

I, MARK ELLIOTT, hereby declare under penalty of perjury, pursuant to
28 U.S.C. § 1746, that the following statements are true and correct to the best of
my knowledge and belief:

<u>Background Information</u>

I am the founder of the Registered Investment Advisory Firm Elliott Asset
Management, a Boston-based independent investment advisory firm.  I have a BS
in Molecular Biology, Magna Cum Laude, from the College at Charleston.  I
attended Medical School at Dartmouth College and completed graduate
coursework in Business Harvard University's Executive Education Program.  I
have passed the following industry exams and obtained the following licenses:
Series 63, Series 65, and Series 66.  I have been investing professionally for family
and friends informally since 1999, and I founded Elliott Asset Management in
2006, which acts in a fiduciary capacity providing hedge fund style investments to
individuals at a low cost.

This is written under severe time pressure due to the nature of the recent
proceedings and events.  I apologize for any errors, omissions, and lack of my
regular careful professionalism.

<u>Puerto Rico General Obligation, Public Building Authority, and other Puerto Rico bond issues:</u>

In the course of my business as a professional investment manager I work
with three different asset custodians: Charles Schwab, Merrill Lynch, and
Interactive Brokers.  I have spoken with management and customer service of all
three—and all three have expressed frustration and utter confusion with the voting
and tendering process.  In fact, the situation has been so confusing to the
custodians/brokers that some have implemented special handling procedures I have
never before witnessed in my more than 20 years of being a professional money

000181

manager and my more than 40 years being an active investor in the U.S. and
international markets.

For instance:  In my discussions with Charles Schwab "Corporate
Reorganizations Department" they expressed frustration and told me they were
"not given enough information to know what is going on" and therefore they
issued a special bulletin to their staff (that I personally saw and have a copy of)
that states Schwab personnel are to "give no advice or feedback on these issues…
and to direct all calls to PrimeClerk."  As I have previously stated, the PrimeClerk
number provided by the notices is nothing but an answering machine message
offering to "try" to call back within three business days.  After almost 2 weeks I
*did not receive a call back*.  And because of the complexity, Charles Schwab
*required all clients to call them and verbally confirm and attest* they had read and
understood all 4000 pages (plus associated referenced documents).  Furthermore,
they must verbally confirm they understand their bonds will be submitted via a
complex series of procedures using terms that even, I, as an experienced
investment professional, have little idea what they are referring to.  After being
presented with this, essentially impossible-to-understand statement, small investors
must swear they understand that Schwab staff—even if they did understand what it
all means (and almost none do)—are not allowed to provide any feedback to
investors other than to refer the small investors to PrimeClerk (which, as noted, in
my experience results in leaving a message on an answering machine with no call
back).  If clients do NOT attest they have fully read and understand these
complicated documents (that I and others have difficulty understanding after
several *days* of review) then they are not allowed to make an election and lose the
potential to receive their share of the added fee amounts that otherwise would, and
should, be paid to them.  Furthermore there are other elections needed to be made
for insured bonds that are equally as confusing (and other issues with insured and
uninsured issues confusing matters even more).

EXHIBIT GG

Furthermore, the fact that almost 700 CUSIPS are being reorganized in multiple sub entities and each with multiple classes of investors and different offers from insured and uninsured issuers, all referencing opaque materials with nonspecific references to websites and thumb drives (which are of little value since most individual investors know they are *not* to introduce unsolicited foreign media into their computers). (Indeed, a securities professional may be precluded from putting unsolicited foreign media into a computer, at least absent taking various compliance steps.)

Furthermore, most of the little written information sent to clients provides NO statement that the investors need to take ANY action to protect their rights, other than a nonspecific reference suggesting investors to "call their brokers"—and the brokers then tell investors to "call PrimeClerk" (who do not answer) and very few individual investors are even able to make an election, being utterly unable to understand it.

Furthermore, in my case, I have taken extraordinary efforts to understand what I can in the very limited time to advise my clientele. I know to be ready because of my experience with being "jammed" in the COFINA matter, where I believe thousands of small investors unfairly lost hundreds of millions of dollars that benefitted hedge funds and government officials.

With my investors I must get them to agree to complex instructions *orally*, *with the broker agent on the phone*, and most of my investors are busy professionals and the brokers have been overwhelmed because of the complexity of this deal and due to staff shortages from covid—so it takes them hours to answer the phones! In fact I was on the phone the entire day on Wednesday, October 13, after spending much of the previous day and much of my time in the previous two weeks trying to prepare custodians for my calls.

Some of my clients are surgeons or other medical professionals and could not and cannot wait on hold the hours it took to reach staff at Schwab to give their

authorizations.  And while I waited for one client I couldn't wait for others—
therefore I was only able to help about half my clients make elections in time.  The
countless small investors without someone like me who is fighting so hard for
them surely achieved less satisfactory results.  I am confident almost all small
investors still have no idea what is even taking place—and this is BEFORE this
last bombshell released in the last 24 hours:

**Finally, in the last 24 hours it was announced that Puerto Rico was
allowed to make whole on 100% OF ALL PENSIONS with NO CUTS.  This is
a VERY material change that completely changes the security offered in this
transaction.  Therefore I believe it is an IMPERATIVE investors be given
proper time to be given an opportunity to CHANGE elections that have
already been made, especially in light of this new material information.**

This case is following a familiar pattern involving secret negotiations
favoring the negotiating parties and then time sensitive, mind-numbingly complex
and opaque "disclosure" is provided apparently with the intent to obfuscate to push
the plan through quickly and implement it to make it unappealable due to
"equitable mootness."

And, as with previous Puerto Rico reorganizations the deadlines are around
public holidays and other difficult times.  In this instance the IRS tax deadlines,
with the IRS overwhelmed due to COVID back-ups.

Mark Elliott, President

Elliott Asset Management

October 15, 2021

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

     Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS
(Jointly Administered)

## AAFAF'S RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION OF INDIVIDUAL BONDHOLDER (PETER C. HEIN) – SET 1

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

000185

Mr. Hein.  AAFAF further objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.

Subject to and without waiving the foregoing general and specific objections, AAFAF responds as follows:

AAFAF directs Mr. Hein to the official statements that accompanied the bond issuances, which are available in the "Bond Offering Statements" folder in the Plan Depository.

**REQUEST FOR PRODUCTION NO. 9:**

Produce all Communications sent to, or received from, the IRS by or on behalf of FOMB, FAFAA, Commonwealth, or any other representative, agency or instrumentality of Commonwealth, relating to the tax treatment, or potential tax treatment, of (i) New GO Bonds and/or (ii) CVIs, including any applications (formal or informal) for rulings or determinations, including rulings or determinations of tax exempt status.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this Request because it seeks "all" communications rather than communications sufficient to show particular information.

**REQUEST FOR PRODUCTION NO. 10:**

Produce reports, studies, calculations and analyses, and drafts thereof, including spread sheets or other compilations of the underlying data, comparing Puerto Rico's revenues from consumption taxes and/or income taxes to revenues in other jurisdictions, including but not limited to any reports or analyses similar in form or content to Tables 1 and/or 2 on pages 6 and 7 in the Commonwealth of Puerto Rico Tax Reform Assessment Project, Executive Summary Oct. 31, 2014 (available on the Internet; type in "KPMG Commonwealth of Puerto Rico Tax Reform Assessment                                    Project"                                    -
http://www.hacienda.gobierno.pr/sites/default/files/unified_tax_code_of_pr-_executive_summary_0.pdf).  (Since this document is available from a Puerto Rico government website, it is not being attached, but will be provided upon request if FOMB, Commonwealth and FAFAA are not able to access it on Hacienda's website).

15

000186

on Treasury's website.[23]

## REQUEST FOR PRODUCTION NO. 24:

Produce documents sufficient to show the amount of bonuses, other than Christmas bonuses, paid to public employees for each fiscal year July 1, 2016 through June 30, 2021.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 24:

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this Request on the ground that the term "public employees" is vague, ambiguous, and overbroad to the extent it includes employees who are employed by government entities that are not debtors under the Plan of Adjustment.

Subject to and without waiving the foregoing general and specific objections, AAFAF responds as follows:

AAFAF directs Mr. Hein to the following materials:

- The Commonwealth's certified budget, available on the Oversight Board's website.[24]

- The Commonwealth's financial statements for FY16, FY17, and FY18, available on Treasury's website.[25]

## REQUEST FOR PRODUCTION NO. 25:

Produce attendance reports for the following months (which do not appear to be available on the AAFAF website, https://www.aafaf.pr.gov/financial-documents/attendance-report/): November 2020 through July 2021.

---

[23] http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-rico.

[24] https://oversightboard.pr.gov/budgets-2/.

[25] http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-rico.

EXHIBIT HH

000187

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.

Subject to and without waiving the foregoing general and specific objections, AAFAF responds as follows:

After conducting a reasonable search, AAFAF has not located any responsive documents.

**REQUEST FOR PRODUCTION NO. 26:**

Produce any reports, studies, calculations or analyses of attendance data, and drafts thereof, including data concerning the percent of employees (i) who are active, (ii) working, (iii) on sick leave, (iv) on vacation leave, (v) on holiday, (vi) on maternity leave, (vii) on other leave, (viii) for which attendance has not been confirmed, or (ix) absent without authorization, for periods during fiscal 2017 through 2021, including analyses or compilations of information from weekly or monthly attendance reports or discussions of such matters in Communications.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Request to the extent it seeks documents protected by the Attorney-Client Privilege, Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges, the Common Interest Privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  AAFAF further objects to this Request to the extent it seeks all responsive documents, rather than documents sufficient to show the requested information, as overbroad and unduly burdensome.  AAFAF further objects to this Request to the extent it seeks production of "reports, studies, calculations or analyses of attendance data, and drafts thereof" as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this Request because discovery of "Communications" is overbroad, unduly burdensome, and not relevant to the parties' claims or

31

000188

burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this Request as better directed to the Oversight Board.

**REQUEST FOR PRODUCTION NO. 34:**

Produce Commonwealth financial or operating statements or reports that contain one or more line items specifically identifying the amount paid (i) for interest and (ii) for repayment of principal, on Commonwealth GO debt for each fiscal year July 1, 2016 through June 30, 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 34:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Request to the extent it seeks documents protected by the Attorney-Client Privilege, Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges, the Common Interest Privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  AAFAF further objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this Request to the extent it seeks all responsive documents, rather than documents sufficient to show the requested information, as overbroad and unduly burdensome.  AAFAF also objects to this Request because the Commonwealth's financial statements are publicly available.[29]

Subject to and without waiving the foregoing general and specific objections, AAFAF responds as follows:

AAFAF directs Mr. Hein to the January 2016 bank account statement for GDB Account Number -0006 (Treasury Single Account), which shows a transaction of $328,745,861.80 for the payment of General Obligation debt, CW_STAY0006752.  It is public knowledge that no payments have been made to General Obligation Debt since January 2016.

---

[29] http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-rico.

EXHIBIT HH

000189

**REQUEST FOR PRODUCTION NO. 35:**

Produce Commonwealth financial or operating statements or reports that contain one or more line items specifically identifying the amount paid (i) for interest and (ii) for repayment of principal, on Commonwealth guaranteed debt issued by the Public Building Authority, for each fiscal year July 1, 2016 through June 30, 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 35:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects

to this Request to the extent it seeks documents protected by the Attorney-Client Privilege,

Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges, the Common

Interest Privilege, or any other applicable privileges, doctrines, or immunities protecting

information from disclosure.  AAFAF further objects to this Request as overbroad, unduly

burdensome, and not relevant to the parties' claims or objections in connection with the Plan of

Adjustment.  AAFAF further objects to this Request to the extent it seeks all responsive

documents, rather than documents sufficient to show the requested information, as overbroad and

unduly burdensome.  AAFAF also objects to this Request because the Commonwealth's financial

statements are publicly available.[30]

Subject to and without waiving the foregoing general and specific objections, AAFAF

responds as follows:

AAFAF directs Mr. Hein to the Commonwealth's FY18 financial statement, available on

AAFAF's website.[31]

**REQUEST FOR PRODUCTION NO. 36:**

Produce Commonwealth financial or operating statements or reports that contain one or more line items specifically identifying the aggregate amount of expenditures for pensions,

---

[30] http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-rico.
[31] https://www.aafaf.pr.gov/wp-content/uploads/Commonwealth-PR-2018-Audited-Fin-Stmt.pdf.

EXHIBIT HH

000190

Dated: August 27, 2021
San Juan, Puerto Rico

Respectfully submitted,

**O'MELVENY & MYERS LLP**

*/s/ Peter Friedman*

John J. Rapisardi
(Admitted *Pro Hac Vice*)
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
Email: jrapisardi@omm.com

Peter Friedman
(Admitted *Pro Hac Vice*)
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
Email: pfriedman@omm.com

Elizabeth L. McKeen
(Admitted *Pro Hac Vice*)
Ashley M. Pavel
(Admitted *Pro Hac Vice*)
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: +1-949-823-6900
Fax: +1-949-823-6994
Email: emckeen@omm.com
            apavel@omm.com

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

49

EXHIBIT HH

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## RESPONSES AND OBJECTIONS OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS SOLE TITLE III REPRESENTATIVE OF THE DEBTORS, TO REQUESTS FOR PRODUCTION OF INDIVIDUAL BONDHOLDER (PETER C. HEIN) - SET 1

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523 (LTS)) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

EXHIBIT II

000192

## RESPONSE TO REQUEST NO. 8:

The Commonwealth objects to this Request on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan.  The Commonwealth also objects to this Request to the extent it seeks documents outside of the Commonwealth's possession, custody or control.  In addition, the Commonwealth objects to this Request to the extent that it seeks information that may be protected by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.

Subject to the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 10, 13, and 15, and the specific objections above, the Commonwealth directs Mr. Hein to the official statements that accompanied the bond issuances, which are available in the "Bond Offering Statements" folder in the Plan Depository.  Further subject to the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 10, 13, and 15, and the specific objections above, the Commonwealth will conduct a reasonable search to locate readily accessible responsive, non-privileged documents, if any, in those files in which it reasonably expects to find such documents.

## REQUEST NO. 9:

Produce all Communications sent to, or received from, the IRS by or on behalf of FOMB, FAFAA, Commonwealth, or any other representative, agency or instrumentality of Commonwealth, relating to the tax treatment, or potential tax treatment, of (i) New GO Bonds and/or (ii) CVIs, including any applications (formal or informal) for rulings or determinations, including rulings or determinations of tax exempt status.

## RESPONSE TO REQUEST NO. 9:

The Commonwealth objects to this Request on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan.  The Commonwealth further objects to this Request because discovery of "all Communications" is overly broad, unduly burdensome, and beyond the scope of legitimate or necessary discovery in connection with the

13

EXHIBIT II                                                                                              000193

analysis of the confirmability of the Plan.  The Commonwealth also objects to this Request to the extent it seeks documents outside of the Commonwealth's possession, custody or control.  In addition, the Commonwealth objects to this Request on the grounds that it seeks information that is protected by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 10, 14, and 15, and the specific objections above, the Commonwealth will not produce documents responsive to this Request.

## REQUEST NO. 10:

Produce reports, studies, calculations and analyses, and drafts thereof, including spread sheets or other compilations of the underlying data, comparing Puerto Rico's revenues from consumption taxes and/or income taxes to revenues in other jurisdictions, including but not limited to any reports or analyses similar in form or content to Tables 1 and/or 2 on pages 6 and 7 in the Commonwealth of Puerto Rico Tax Reform Assessment Project, Executive Summary Oct. 31, 2014 (available on the Internet; type in "KPMG Commonwealth of Puerto Rico Tax Reform Assessment Project" http://www.hacienda.gobierno.pr/sites/default/files/unified_tax_code_of_pr-_executive_summary_0.pdf). (Since this document is available from a Puerto Rico government website, it is not being attached, but will be provided upon request if FOMB, Commonwealth and FAFAA are not able to access it on Hacienda's website).

## RESPONSE TO REQUEST NO. 10:

The Commonwealth objects to this Request on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan.  The Commonwealth further objects to this Request because discovery of "reports, studies, calculations and analyses, and drafts thereof" is overly broad, unduly burdensome, and beyond the scope of legitimate or necessary discovery in connection with the analysis of the confirmability of the Plan.  The Commonwealth also objects to this Request to the extent it seeks documents outside of the Commonwealth's possession, custody or control.  The Commonwealth also objects to this Request

14

EXHIBIT II                                    000194

## RESPONSE TO REQUEST NO. 24:

The Commonwealth objects to this Request on the grounds that it does not seek information

proportional or relevant to the analysis of the confirmability of the Plan.

Subject to the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 10, 13, and 15,

and the specific objections above, the Commonwealth directs Mr. Hein to AAFAF's responses and

objections to this Request.

## REQUEST NO. 25:

Produce attendance reports for the following months (which do not appear to be available
on the AAFAF website, https://www.aafaf.pr.gov/financial-documents/attendance-report/):
November 2020 through July 2021.

## RESPONSE TO REQUEST NO. 25:

The Commonwealth objects to this Request on the grounds that it does not seek information

proportional or relevant to the analysis of the confirmability of the Plan.

Subject to the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 10, 13, and 15,

and the specific objections above, the Commonwealth directs Mr. Hein to AAFAF's responses and

objections to this Request.

## REQUEST NO. 26:

Produce any reports, studies, calculations or analyses of attendance data, and drafts thereof,
including data concerning the percent of employees (i) who are active, (ii) working, (iii) on sick
leave, (iv) on vacation leave, (v) on holiday, (vi) on maternity leave, (vii) on other leave, (viii) for
which attendance has not been confirmed, or (ix) absent without authorization, for periods during
fiscal 2017 through 2021, including analyses or compilations of information from weekly or
monthly attendance reports or discussions of such matters in Communications.

## RESPONSE TO REQUEST NO. 26:

The Commonwealth objects to this Request on the grounds that it does not seek information

proportional or relevant to the analysis of the confirmability of the Plan.  The Commonwealth

objects to this Request because discovery of "any reports, studies, calculations or analyses, and

EXHIBIT II

Dated:  August 27, 2021
San Juan, Puerto Rico

Respectfully submitted,
*/s/ Brian S. Rosen*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Julia D. Alonzo (*pro hac vice*)
Laura Stafford (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board, as representative for the
Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board, as
representative for the Debtors*

38

EXHIBIT II

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT<br>BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br>*et al.*,<br><br>         Debtors. | PROMESA<br>Title III<br><br><br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

**AAFAF'S RESPONSES AND OBJECTIONS TO REQUESTS FOR PRODUCTION OF**
**INDIVIDUAL BONDHOLDER (PETER C. HEIN) – SET 2**

EXHIBIT JJ

materials provided by persons or entities other than AAFAF.  AAFAF further objects to this

Request because it is better directed to the Oversight Board.

**REQUEST FOR PRODUCTION NO. 49:**

Produce documents sufficient to show the aggregate value of all personal and real property in Puerto Rico not exempted from tax for each fiscal year July 1, 2016 through June 30, 2021.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 49:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims

or objections in connection with the Plan of Adjustment.

**REQUEST FOR PRODUCTION NO. 50:**

Request No. 9 of Peter Hein's Requests for Production Set – 1 (dated August 20, 2021) is intended as a continuing request. See "Additional Instructions" Nos. 4 and 5. Without prejudice to my position that Request No. 9 of my Set – 1 was and should be treated as a continuing request, Request No. 9 is hereby re-propounded, as of the date thereof.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 50:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

incorporates its responses and objections to Request No. 9 of Mr. Hein's *Requests for Production*

*of Individual Bondholder (Peter C. Hein) – Set 1*.

**REQUEST FOR PRODUCTION NO. 51:**

Produce all Communications sent to, or received from, the IRS by or on behalf of FOMB, FAFAA, Commonwealth, or any other representative, agency, or instrumentality of Commonwealth, relating to the tax treatment, or potential tax treatment, of bonds or other securities issued or proposed to be issued by Commonwealth or any agency or instrumentality thereof, including COFINA or GO bonds, during the pendency of these Title III proceedings, including any application (formal or informal) for rulings or determinations, including rulings or determinations of tax-exempt status.

11

EXHIBIT JJ

**RESPONSE TO REQUEST FOR PRODUCTION NO. 51:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims

or objections in connection with the Plan of Adjustment.

Subject to and without waiving the foregoing general and specific objections, AAFAF

responds as follows:  AAFAF will meet and confer with Mr. Hein in response to this Request.

**REQUEST FOR PRODUCTION NO. 52:**

Produce an English-language version Act 107-2020 (referenced on page 3 of the CRIM
certified fiscal years 2022 through 2026 fiscal plan dated 4/23/2021 titled "Fiscal plan for the
municipal revenue collecting center - Improving property tax collections").

**RESPONSE TO REQUEST FOR PRODUCTION NO. 52:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

objects to this Request on the grounds that it does not seek information proportional or relevant

to the analysis of the confirmability of the Plan.  In addition, the Commonwealth objects to this

Request on the grounds it seeks documents that are either publicly available or are more readily

obtained from another source.  AAFAF also objects to this Request to the extent it seeks

production of unofficial translations.

Subject to and without waiving the foregoing general and specific objections, AAFAF

responds as follows:

AAFAF will produce an official English version of, or a preexisting certified translation

of, Act 107-2020, to the extent such document exists and may be located pursuant to a

reasonable search.

**REQUEST FOR PRODUCTION NO. 53:**

Produce the fiscal plan models for, supporting or underlying the 4/23/2021, 5/27/2020,
5/9/2019, 10/23/2018 and/or 4/19/2018 Commonwealth fiscal plans certified by FOMB,

12

**REQUEST FOR PRODUCTION NO. 55:**

Produce all documents that discuss or relate to the reason attendance reports are not in existence for months beginning November 2020 to the present (this request follows up on AAFAF's response to date to my Request No. 25 in Set – 1 (August 20, 2021)).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 55:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Request to the extent it seeks documents protected by the Attorney-Client Privilege, Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges, the Common Interest Privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  AAFAF further objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.

**REQUEST FOR PRODUCTION NO. 56:**

Produce copies of any record, whether a transcription, a recording or other memorialization, of what transpired in the course of the mediation and/or negotiation process that resulted in PSAs and/or the proposed plan.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 56:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Request to the extent it seeks documents protected by the Attorney-Client Privilege, Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges, the Common Interest Privilege, the Mediation Privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  AAFAF further objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this Request to the extent

14

000200

that it seeks information outside of AAFAF's possession, custody, or control.  AAFAF further

objects to this Request because it is better directed to the Oversight Board.

**REQUEST FOR PRODUCTION NO. 57:**

Produce any documents that reflect participation of individual bondholders in the
mediation and/or negotiation process that resulted in PSAs and/or the proposed plan.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 57:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

objects to this Request to the extent it seeks documents protected by the Attorney-Client

Privilege, Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges,

the Common Interest Privilege, the Mediation Privilege, or any other applicable privileges,

doctrines, or immunities protecting information from disclosure.  AAFAF further objects to this

Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections

in connection with the Plan of Adjustment.  AAFAF further objects to this Request to the extent

that it seeks information outside of AAFAF's possession, custody, or control.  AAFAF further

objects to this Request because it is better directed to the Oversight Board.

**REQUEST FOR PRODUCTION NO. 58:**

Produce all reports, studies, calculations and analyses, and drafts thereof, and any
summaries thereof, developed by the person or persons who assisted FOMB, Commonwealth
and/or AAFAF in developing counts, estimates or projection of the population of Puerto Rico,
and all Communications related thereto with such person.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 58:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

objects to this Request to the extent it seeks documents protected by the Attorney-Client

Privilege, Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges,

the Common Interest Privilege, or any other applicable privileges, doctrines, or immunities

15

Dated: September 24, 2021
      San Juan, Puerto Rico

Respectfully submitted,

O'MELVENY & MYERS LLP

/s/ *Peter Friedman*

John J. Rapisardi
(Admitted *Pro Hac Vice*)
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
Email: jrapisardi@omm.com

Peter Friedman
(Admitted *Pro Hac Vice*)
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
Email: pfriedman@omm.com

Elizabeth L. McKeen
(Admitted *Pro Hac Vice*)
Ashley M. Pavel
(Admitted *Pro Hac Vice*)
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: +1-949-823-6900
Fax: +1-949-823-6994
Email: emckeen@omm.com
      apavel@omm.com

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

20

000202

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

<table>
<tr><td>

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of


THE COMMONWEALTH OF PUERTO RICO, *et
al.*,

               Debtors.[1]

</td><td>

PROMESA
Title III


No. 17 BK 3283-LTS
(Jointly Administered)

</td></tr>
</table>

## RESPONSES AND OBJECTIONS OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS SOLE TITLE III REPRESENTATIVE OF THE DEBTORS, TO REQUESTS FOR PRODUCTION OF INDIVIDUAL BONDHOLDER (PETER C. HEIN) - SET 2

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523 (LTS)) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

000203

attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 13, 15, 16, and 18, and the specific objections above, the Commonwealth will not produce documents responsive to this Request.

## REQUEST NO. 49:

Produce documents sufficient to show the aggregate value of all personal and real property in Puerto Rico not exempted from tax for each fiscal year July 1, 2016 through June 30, 2021.

## RESPONSE TO REQUEST NO. 49:

The Commonwealth objects to this Request on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. The Commonwealth also objects to this Request to the extent it seeks documents outside of the Commonwealth's possession, custody or control. The Commonwealth further objects to this Request because it is overly broad and unduly burdensome insofar as it seeks documents regarding "all personal and real property in Puerto Rico not exempted from tax" for the period from July 1, 2016 and June 30, 2021.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 13, 15, 16, and 18, and the specific objections above, the Commonwealth will not produce documents responsive to these Requests.

## REQUEST NO. 50:

Request No. 9 of Peter Hein's Requests for Production Set - 1 (dated August 20, 2021) is intended as a continuing request. See "Additional Instructions" Nos. 4 and 5. Without prejudice to my position that Request No. 9 of my Set - 1 was and should be treated as a continuing request, Request No. 9 is hereby re-propounded, as of the date thereof.

## RESPONSE TO REQUEST NO. 50:

The Commonwealth objects to this Request because it is duplicative of Request No. 9 of the *Requests for Production of Individual Bondholder (Peter C. Hein) – Set 1* (the "First RFPs").

11

The Commonwealth incorporates, as if fully set forth herein, its Responses and Objections, as set forth in *Responses and Objections of the Financial Oversight and Management Board for Puerto Rico, as Sole Title III Representative of the Debtors, to Requests for Production of Individual Bondholder (Peter C. Hein) - Set 1*, dated August 27, 2021.

## REQUEST NO. 51:

Produce all Communications sent to, or received from, the IRS by or on behalf of FOMB, FAFAA, Commonwealth, or any other representative, agency, or instrumentality of Commonwealth, relating to the tax treatment, or potential tax treatment, of bonds or other securities issued or proposed to be issued by Commonwealth or any agency or instrumentality thereof, including COFINA or GO bonds, during the pendency of these Title III proceedings, including any application (formal or informal) for rulings or determinations, including rulings or determinations of tax-exempt status.

## RESPONSE TO REQUEST NO. 51:

The Commonwealth objects to this Request on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan.  The Commonwealth further objects to this Request because discovery of "all Communications" is overly broad, unduly burdensome, and beyond the scope of legitimate or necessary discovery in connection with the analysis of the confirmability of the Plan.  The Commonwealth also objects to this Request to the extent it seeks documents outside of the Commonwealth's possession, custody or control.  Further, the Commonwealth objects to this Request as overly broad and unduly burdensome insofar as it seeks communications sent to or received by "any other representative, agency, or instrumentality of the Commonwealth" regarding the "tax treatment, or potential tax treatment, of bonds or other securities issued or proposed to be issued by Commonwealth [*sic*] or any agency or instrumentality thereof . . . during the pendency of these Title III proceedings."  In addition, the Commonwealth objects to this Request on the grounds that it seeks information that is protected by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  Further,

EXHIBIT KK

the Commonwealth objects to this response because it is duplicative of Request No. 9 of the First

RFPs.

Subject to the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 13, 14,

16, and 18, and the specific objections above, the Commonwealth will meet and confer regarding

this Request.

### REQUEST NO. 52:

Produce an English-language version Act 107-2020 (referenced on page 3 of the CRIM
certified fiscal years 2022 through 2026 fiscal plan dated 4/23/2021 titled "Fiscal plan for the
municipal revenue collecting center - Improving property tax collections").

### RESPONSE TO REQUEST NO. 52:

The Commonwealth objects to this Request on the grounds that it does not seek information

proportional or relevant to the analysis of the confirmability of the Plan.   Further, the

Commonwealth objects to this Request on the grounds it seeks documents that are either publicly

available or are more readily obtained from another source.

Subject to the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 15, 16,

and 18, and the specific objections above, the Commonwealth will produce non-privileged

documents responsive to this Request, if any.

### REQUEST NO. 53:

Produce the fiscal plan models for, supporting or underlying the 4/23/2021, 5/27/2020,
5/9/2019, 10/23/2018 and/or 4/19/2018 Commonwealth fiscal plans certified by FOMB, including
in a form that shows the calculations and assumptions in such models (an example of such a fiscal
plan model is that referenced in the Retiree Committee PSA annexed as an exhibit to the Disclosure
Statement, see, e.g., #17628-6-page-30-of-35 note 2).

### RESPONSE TO REQUEST NO. 53:

The Commonwealth objects to this Request on the grounds that it does not seek information

proportional or relevant to the analysis of the confirmability of the Plan.  Prior versions of fiscal

plan models are not relevant to the confirmability of the Plan.  The Commonwealth also objects to

Request on the grounds that it seeks information that may be protected by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  The Commonwealth further objects to this Request because it is duplicative of Request No. 53.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 15, 16, and 18, and the specific objections above, the Commonwealth will not produce documents responsive to this Request.

### REQUEST NO. 55:

Produce all documents that discuss or relate to the reason attendance reports are not in existence for months beginning November 2020 to the present (this request follows up on AAFAF's response to date to my Request No. 25 in Set - 1 (August 20, 2021)).

### RESPONSE TO REQUEST NO. 55:

The Commonwealth objects to this Request on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan.  Whether attendance reports for the months from November 2020 to the present exist has no bearing on the confirmability of the Plan.  Further, the Commonwealth objects to this Request on the grounds it seeks documents that are outside of its possession, custody and control.  The Commonwealth further objects to this Request because it is better directed to AAFAF.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 13, 15, 16, and 18, and the specific objections above, the Commonwealth will not produce documents responsive to this Request.

### REQUEST NO. 56:

Produce copies of any record, whether a transcription, a recording or other memorialization, of what transpired in the course of the mediation and/or negotiation process that resulted in PSAs and/or the proposed plan.

**RESPONSE TO REQUEST NO. 56:**

The Commonwealth objects to this Request on the grounds that it seeks information that is protected by the mediation privilege, the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure. The Commonwealth further objects to this Request to the extent that it seeks information outside of the Commonwealth's possession, custody or control. The Commonwealth also objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 15, 16, and 18, and the specific objections above, the Commonwealth will not produce documents responsive to this Request.

**REQUEST NO. 57:**

Produce any documents that reflect participation of individual bondholders in the mediation and/or negotiation process that resulted in PSAs and/or the proposed plan.

**RESPONSE TO REQUEST NO. 57:**

The Commonwealth objects to this Request on the grounds that it seeks information that is protected by the mediation privilege, the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure. The Commonwealth further objects to this Request to the extent that it seeks information outside of the Commonwealth's possession, custody or control. The Commonwealth also objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.

EXHIBIT KK

000208

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 15, 16, and 18, and the specific objections above, the Commonwealth will not produce documents responsive to this Request.

### REQUEST NO. 58:

Produce all reports, studies, calculations and analyses, and drafts thereof, and any summaries thereof, developed by the person or persons who assisted FOMB, Commonwealth and/or AAFAF in developing counts, estimates or projection of the population of Puerto Rico, and all Communications related thereto with such person.

### RESPONSE TO REQUEST NO. 58:

The Commonwealth objects to this Request on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan.  The Commonwealth also objects to this Request to the extent it seeks discovery regarding the certified fiscal plan. PROMESA section 106(e) deprives the court of subject matter jurisdiction to consider challenges to the Oversight Board's certification decisions, and accordingly, discovery regarding those decisions is improper. Further, the Commonwealth objects to this Request on the grounds that it seeks information that may be protected by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  The Commonwealth also objects to this Request because discovery of "all reports, studies, calculations and analyses" and "drafts thereof" is overly broad, unduly burdensome, and beyond the scope of legitimate or necessary discovery in connection with the analysis of the confirmability of the Plan.

Subject to the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 10, 14, 15, and 16, and the specific objections above, the Commonwealth will produce non-privileged documents responsive to this Request, if any.

EXHIBIT KK

000209

Dated:  September 24, 2021
San Juan, Puerto Rico

Respectfully submitted,

/s/ Brian S. Rosen

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Julia D. Alonzo (*pro hac vice*)
Laura Stafford (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board, as representative for the
Debtors*

/s/ Hermann D. Bauer

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board, as
representative for the Debtors*

22

000210

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br>*et al*.,<br><br>             Debtors.[1] | PROMESA<br>Title III<br><br><br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## AAFAF'S RESPONSES AND OBJECTIONS TO INTERROGATORIES OF INDIVIDUAL BONDHOLDER (PETER C. HEIN) – SET 1

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

EXHIBIT LL

person or a business, proprietorship, firm, partnership, corporation, association, organization, or other entity and their officers and employees reasonably likely to possess information relevant to the Plan of Adjustment.

15.     AAFAF objects to the definition of the terms "You," "Your," "you," and "your" as overbroad because they encompass individuals and entities without regard to their connection or relevance to the Plan of Adjustment.  In responding to the Requests, AAFAF will construe "You," "Your," "you," and "your" to mean AAFAF and its officers and employees reasonably likely to possess information relevant to the Plan of Adjustment.

16.     AAFAF objects to Additional Instruction No. 1, Additional Instruction No. 2, Additional Instruction No. 3, Additional Instruction No. 4, and Additional Instruction No. 6 to the extent that they require procedures that are inconsistent with, not authorized by, or exceed those required by the Governing Rules.  AAFAF further objects to providing a privilege log unless necessary to substantiate a claim of privilege, consistent with the Governing Rules. AAFAF expressly reserves the right to provide a categorical privilege log.

17.     AAFAF objects to Additional Instruction No. 5 because the stated time period of "July 1, 2016 through the date of your response" is overbroad and unduly burdensome.

18.     The above General Objections are incorporated into each of the following specific Objections and Responses.

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY 1:

State whether any individual bondholders whose size of holdings fall or fell within the threshold to qualify as Retail Investors under the Plan were offered the opportunity to receive the 1.5% consummation fee and, if so, identify when and how that offer was made to such individual bondholders and produce all Documents that reflect or relate to such offer.

**RESPONSE TO INTERROGATORY 1:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

objects to this Interrogatory as overbroad, unduly burdensome, and not relevant to the parties'

claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this

Interrogatory to the extent it seeks information not in AAFAF's possession, custody, or control.

AAFAF further objects to this Interrogatory because it is better directed to the Oversight Board.

**INTERROGATORY 2:**

State (i) whether individual bondholders whose size of holdings fall or fell within the
threshold to qualify as Retail Investors under the Plan and who wish to receive the 1.5%
consummation fee could in the past receive such 1.5% fee, or can do so at this time, without
agreeing to the releases, including the releases of non-debtors, that appear in the PSA and in the
plan, and (ii) whether individual bondholders whose size of holdings fall or fell within the
threshold to qualify as Retail Investors under the Plan and who wish to receive the 1.321%
restriction fee could in the past receive such fee, or can do so at this time, without agreeing to the
releases, including the releases of non-debtors, that appear in the PSA and in the plan, and, if so,
explain how a bondholder who does not wish to agree to the releases, including the releases of
non-debtors, that appear in the PSA and in the plan could or can receive the 1.5% consummation
fee and/or the 1.321% restriction fee.

**RESPONSE TO INTERROGATORY 2:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

objects to this Interrogatory as overbroad, unduly burdensome, and not relevant to the parties'

claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this

Interrogatory to the extent it seeks information not in AAFAF's possession, custody, or control.

AAFAF further objects to this Interrogatory because it is better directed to the Oversight Board.

**INTERROGATORY 3:**

Identify each individual bondholder whose size of holdings fall or fell within the
threshold to qualify as a Retail Investor and who participated in the negotiation of the plan or of
the treatment of GO and/or PBA bondholders under the plan, whether in the course of mediation
or otherwise, including by name, affiliations with firms or entities, address, email, phone
number, and whether the individual qualifies or qualified as a Retail Investor as defined in the
Plan, and identify the claim number or other information that would show the nature and

EXHIBIT LL                                    000213

magnitude of all claims such individual bondholder and any firm or entity the individual is affiliated with may have in these Title III cases.

**RESPONSE TO INTERROGATORY 3:**

In addition to its General Objections, AAFAF objects to this Interrogatory as overbroad,

unduly burdensome, and not relevant to the parties' claims or objections in connection with the

Plan of Adjustment.  AAFAF further objects to this Interrogatory to the extent it seeks

information not in AAFAF's possession, custody, or control.  AAFAF further objects to this

Interrogatory because it is better directed to the Oversight Board.

**INTERROGATORY 4:**

Is there any agreement with any person, or other prohibition or restraint imposed by any person, that prohibits You from producing in discovery in these proceedings a copy of (i) any of the Documents requested in Peter Hein's Requests for Production – Set 1, Request No. 9, or Peter Hein's Requests for Production – Set 2, Request Nos. 50 and 51; or (ii) any Communication with, to or from the IRS from July 1, 2016 to present. If so, identify and describe such agreement or prohibition or restraint, and produce copies of any such agreement or prohibition or restraint.

**RESPONSE TO INTERROGATORY 4:**

In addition to its General Objections, AAFAF objects to this Interrogatory as overbroad,

unduly burdensome, and not relevant to the parties' claims or objections in connection with the

Plan of Adjustment.  AAFAF is willing to meet and confer with Mr. Hein regarding this

Interrogatory.

**INTERROGATORY 5:**

State whether any person who is not an employee, officer, attorney for, or agent of, FOMB, AAFAF, Commonwealth or the IRS has been sent or provided one or more copies, in any form, of any Document requested in Peter Hein's Requests for Production – Set 1, Request No. 9, or Peter Hein's Requests for Production – Set 2, Request Nos. 50 and 51. If so, identify who, what Documents they have been sent or provided and when they were provided those Documents.

EXHIBIT LL                                                                 000214

**RESPONSE TO INTERROGATORY 5:**

In addition to its General Objections, AAFAF objects to this Interrogatory to the extent it

seeks information protected by the Attorney-Client Privilege, Attorney Work-Product Doctrine,

the Executive and Deliberative Process Privileges, the Common Interest Privilege, or any other

applicable privileges, doctrines, or immunities protecting information from disclosure.  AAFAF

further objects to this Interrogatory as overbroad, unduly burdensome, and not relevant to the

parties' claims or objections in connection with the Plan of Adjustment.

**INTERROGATORY 6:**

State (i) the amount of the 1.03% of Property Tax billed, and (ii) the amount of the 1.03%
of Property Tax collected, for each fiscal year from July 1, 2016 through June 30, 2021 by or for
Commonwealth.

**RESPONSE TO INTERROGATORY 6:**

In addition to its General Objections, incorporated herein by this reference, AAFAF

objects to this Interrogatory as duplicative of Request #1 and #2 of *Requests for Production of*

*Individual Bondholder (Peter C. Hein) – Set 1.*  AAFAF further objects to this Interrogatory to

the extent it seeks information that is public or otherwise already available to Mr. Hein.  AAFAF

further objects to this Request as overbroad, unduly burdensome, and not relevant to the parties'

claims or objections in connection with the Plan of Adjustment.

Subject to and without waiving the foregoing general and specific objections, AAFAF

responds as follows:

AAFAF, under Federal Rule of Civil Procedure 33(d), directs Mr. Hein to the documents

bates stamped AAFAF_CONF_0008624.[2]

---

[2] The cited document depicts among other things the amount of the 1.03% of Property Tax billed and the amount of
the 1.03% property tax collected for FY16-FY20.  As noted in AAFAF's correspondence dated September 24, 2021,
this figure shows, per fiscal year, the amounts collected that were billed in that same fiscal year.  The monthly
balance of the bank account holding the 1.03% property tax is reflected in the Summary of Bank Account Balances

EXHIBIT LL                                                    000215

**RESPONSE TO INTERROGATORY 8:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Interrogatory as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this Interrogatory to the extent it seeks information not in AAFAF's possession, custody, or control. AAFAF further objects to this Interrogatory because it is better directed to the Oversight Board.

**INTERROGATORY 9:**

State the amount or estimated amount of Bond Claims held by Initial GO/PBA PSA Restriction Fee Creditors, as of the date of your response.

**RESPONSE TO INTERROGATORY 9:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Interrogatory as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.  AAFAF further objects to this Interrogatory to the extent it seeks information not in AAFAF's possession, custody, or control. AAFAF further objects to this Interrogatory because it is better directed to the Oversight Board. AAFAF further objects to this Interrogatory because the amounts or estimated amounts of Bond Claims are provided in the publicly available proofs of claims, as well as in an EMMA filing dated June 25, 2021.[4]

**INTERROGATORY 10:**

Explain in detail why attendance reports for the months of November 2020 through July 2021 are not available, including whether a decision was made to stop producing such reports and, if so, by who and why.

---

[4] https://emma.msrb.org/P31428726-P31110213-P31520907.pdf.

EXHIBIT LL                                              000216

**RESPONSE TO INTERROGATORY 10:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Interrogatory to the extent it seeks information protected by the Attorney-Client Privilege, Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges, the Common Interest Privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  AAFAF further objects to this Interrogatory as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.

**INTERROGATORY 11:**

State the amount of (i) Christmas and (ii) other bonuses paid by Commonwealth to public employees for each fiscal year July 1, 2016 through June 30, 2021.

**RESPONSE TO INTERROGATORY 11:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Interrogatory as duplicative of Request #23 and #24 of *Requests for Production of Individual Bondholder (Peter C. Hein) – Set 1*.  AAFAF further objects to this Interrogatory to the extent it seeks information that is public or otherwise already available to Mr. Hein.  AAFAF further objects to the term "other bonuses" as vague, ambiguous, and overbroad.  AAFAF further objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.

Subject to and without waiving the foregoing general and specific objections, AAFAF responds as follows:

AAFAF, under Federal Rule of Civil Procedure 33(d), directs Mr. Hein to the documents bates stamped AAFAF_CONF_0008454 (depicting Christmas Bonuses paid by the Commonwealth as reflected by the RHUM payroll system, FY16-21) and

12

EXHIBIT LL

AAFAF_CONF_0009236 (depicting PRIFAS extract of data for Summer Bonus and Medication Bonus paid by the Commonwealth to pensioners, FY16-21).

**INTERROGATORY 12:**

State the amount of, and describe the costs incurred or anticipated to be incurred by Commonwealth for, payments to or for the benefit of PREPA employees, and/or former PREPA employees, absorbed by or who transferred their employment to Commonwealth, its agencies and its instrumentalities.

**RESPONSE TO INTERROGATORY 12:**

In addition to its General Objections, incorporated herein by this reference, AAFAF objects to this Interrogatory to the extent it seeks information protected by the Attorney-Client Privilege, Attorney Work-Product Doctrine, the Executive and Deliberative Process Privileges, the Common Interest Privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.  AAFAF further objects to this Interrogatory to the extent it requires AAFAF to "describe the costs," rather than stating their amounts.  This Interrogatory has already described the costs for which information is sought.  AAFAF further objects to this Request as overbroad, unduly burdensome, and not relevant to the parties' claims or objections in connection with the Plan of Adjustment.

Subject to and without waiving the foregoing general and specific objections, AAFAF responds as follows:

AAFAF, under Federal Rule of Civil Procedure 33(d), will produce final, non-privileged, responsive document(s)—which AAFAF is currently creating in the ordinary course of business, and which are not yet completed—when they are completed in the ordinary course of business.

13

EXHIBIT LL                                                                                      000218

Dated: September 27, 2021
       San Juan, Puerto Rico

Respectfully submitted,

O'MELVENY & MYERS LLP

/s/ *Peter Friedman*

John J. Rapisardi
(Admitted *Pro Hac Vice*)
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061
Email: jrapisardi@omm.com

Peter Friedman
(Admitted *Pro Hac Vice*)
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
Email: pfriedman@omm.com

Elizabeth L. McKeen
(Admitted *Pro Hac Vice*)
Ashley M. Pavel
(Admitted *Pro Hac Vice*)
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Tel: +1-949-823-6900
Fax: +1-949-823-6994
Email: emckeen@omm.com
        apavel@omm.com

*Attorneys for the Puerto Rico Fiscal Agency*
*and Financial Advisory Authority*

14

EXHIBIT LL                                              000219

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*<br><br>Commonwealth. [1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## RESPONSES AND OBJECTIONS OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS SOLE TITLE III REPRESENTATIVE OF THE COMMONWEALTH, TO INTERROGATORIES OF INDIVIDUAL BONDHOLDER (PETER C. HEIN) - SET 1

Pursuant to Rule 26 and Rule 33 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rules 7026 and 7033 of the Federal Rules of Bankruptcy Procedure and section 310 of the *Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA"), the Local Rules of the United States Bankruptcy Court for the District of Puerto Rico, the Local Rules of the United States District Court for the District of Puerto Rico, and/or this Court's chambers practices and case management orders (collectively, the "Governing Rules"); and the Court's *Order Establishing Deadlines Concerning Objections to Confirmation and*

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

privilege log unless necessary to substantiate a claim of privilege, consistent with the Governing Rules. The Commonwealth expressly reserves the right to provide a categorical privilege log.

17.     The Commonwealth objects to the Interrogatories because the Interrogatories, including subparts, exceed the fifteen (15) interrogatories permitted pursuant to the Confirmation Procedures Order.

18.     The above General Objections are incorporated into each of the following specific Responses.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 1:

State whether any individual bondholders whose size of holdings fall or fell within the threshold to qualify as Retail Investors under the Plan were offered the opportunity to receive the 1.5% consummation fee and, if so, identify when and how that offer was made to such individual bondholders and produce all Documents that reflect or relate to such offer.

### RESPONSE TO INTERROGATORY NO. 1:

The Commonwealth objects to this Interrogatory on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. The Commonwealth further objects to this Interrogatory because discovery regarding "any individual bondholders" and "all Documents" is overly broad, unduly burdensome, beyond the scope of legitimate or necessary discovery in connection with the Confirmation Hearing, and not proportional to the needs of the case. In addition, the Commonwealth objects to this Request on the grounds that it seeks information that may be protected by the mediation privilege, the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.

7

000221

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 12, 14, 15, and 16, and the specific objections above, the Commonwealth will not respond to this Interrogatory.

## INTERROGATORY NO. 2:

State (i) whether individual bondholders whose size of holdings fall or fell within the threshold to qualify as Retail Investors under the Plan and who wish to receive the 1.5% consummation fee could in the past receive such 1.5% fee, or can do so at this time, without agreeing to the releases, including the releases of non-debtors, that appear in the PSA and in the plan, and (ii) whether individual bondholders whose size of holdings fall or fell within the threshold to qualify as Retail Investors under the Plan and who wish to receive the 1.321% restriction fee could in the past receive such fee, or can do so at this time, without agreeing to the releases, including the releases of non-debtors, that appear in the PSA and in the plan, and, if so, explain how a bondholder who does not wish to agree to the releases, including the releases of non-Commonwealth, that appear in the PSA and in the plan could or can receive the 1.5% consummation fee and/or the 1.321% restriction fee.

## RESPONSE TO INTERROGATORY NO. 2:

The Commonwealth objects to this Interrogatory on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. The Commonwealth further objects to this Interrogatory because discovery regarding "any individual bondholders" is overly broad, unduly burdensome, beyond the scope of legitimate or necessary discovery in connection with the Confirmation Hearing, and not proportional to the needs of the case. The Commonwealth further objects to this Interrogatory because the Plan identifies the creditors who may receive fees and under what circumstances. Questions regarding what might have happened in the past and/or what a hypothetical Retail Investor would want in order to receive fees are not relevant, unduly burdensome, beyond the scope of legitimate or necessary discovery in connection with the Confirmation Hearing, and not proportional to the needs of the case In addition, the Commonwealth objects to this Request on the grounds that it seeks information that may be protected by the mediation privilege, the attorney-client privilege, the attorney work

8

000222

product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 12, 14, 15, and 16, and the specific objections above, the Commonwealth will not respond to this Interrogatory.

## INTERROGATORY NO. 3:

Identify each individual bondholder whose size of holdings fall or fell within the threshold to qualify as a Retail Investor and who participated in the negotiation of the plan or of the treatment of GO and/or PBA bondholders under the plan, whether in the course of mediation or otherwise, including by name, affiliations with firms or entities, address, email, phone number, and whether the individual qualifies or qualified as a Retail Investor as defined in the Plan, and identify the claim number or other information that would show the nature and magnitude of all claims such individual bondholder and any firm or entity the individual is affiliated with may have in these Title III cases.

## RESPONSE TO INTERROGATORY NO. 3:

The Commonwealth objects to this Interrogatory on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. The Commonwealth further objects to this Interrogatory because discovery regarding "each individual bondholder" is overly broad, unduly burdensome, beyond the scope of legitimate or necessary discovery in connection with the Confirmation Hearing, and not proportional to the needs of the case. In addition, the Commonwealth objects to this Request on the grounds that it seeks information that may be protected by the mediation privilege, the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 5, 6, 8, 9, 14, 15, and 16, and the specific objections above, the Commonwealth will not respond to this Interrogatory.

EXHIBIT MM

## INTERROGATORY NO. 4:

Is there any agreement with any person, or other prohibition or restraint imposed by any person, that prohibits You from producing in discovery in these proceedings a copy of (i) any of the Documents requested in Peter Hein's Requests for Production - Set 1, Request No. 9, or Peter Hein's Requests for Production - Set 2, Request Nos. 50 and 51; or (ii) any Communication with, to or from the IRS from July 1, 2016 to present. If so, identify and describe such agreement or prohibition or restraint, and produce copies of any such agreement or prohibition or restraint.

## RESPONSE TO INTERROGATORY NO. 4:

The Commonwealth objects to this Interrogatory on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. The Commonwealth further objects to this Interrogatory because discovery regarding (i) "any agreement with any person" and (ii) "any Communication with, to or from the IRS from July 1, 2016 to present," is overly broad, unduly burdensome, beyond the scope of legitimate or necessary discovery in connection with the Confirmation Hearing, and not proportional to the needs of the case. The Commonwealth also objects to this Interrogatory because it is vague and ambiguous insofar as it requests information regarding "any . . . prohibition or restraint," without defining such terms.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 6, 8, 9, 11, 12, 13, 14, 15, and 16, and the specific objections above, the Commonwealth will not respond to this Interrogatory.

## INTERROGATORY NO. 5:

State whether any person who is **not** an employee, officer, attorney for, or agent of, FOMB, AAFAF, Commonwealth or the IRS has been sent or provided one or more copies, in any form, of any Document requested in Peter Hein's Requests for Production - Set 1, Request No. 9, or Peter Hein's Requests for Production - Set 2, Request Nos. 50 and 51. If so, identify who, what Documents they have been sent or provided and when they were provided those Documents.

10

## RESPONSE TO INTERROGATORY NO. 5:

The Commonwealth objects to this Interrogatory on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. The Commonwealth further objects to this Interrogatory because discovery regarding "whether any person who is **not** an employee, officer, attorney for, or agent of, FOMB, AAFAF, Commonwealth or the IRS has been sent or provided one or more copies, in any form, of any Document requested in Peter Hein's Requests for Production - Set 1, Request No. 9, or Peter Hein's Requests for Production - Set 2, Request Nos. 50 and 51" is overly broad, unduly burdensome, beyond the scope of legitimate or necessary discovery in connection with the Confirmation Hearing, and not proportional to the needs of the case. In addition, the Commonwealth objects to this Request on the grounds that it seeks information that is protected by the mediation privilege, the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 6, 8, 9, 12, 14, 15, and 16, and the specific objections above, the Commonwealth will not respond to this Interrogatory.

## INTERROGATORY NO. 6:

State (i) the amount of the 1.03% of Property Tax billed, and (ii) the amount of the 1.03% of Property Tax collected, for each fiscal year from July 1, 2016 through June 30, 2021 by or for Commonwealth.

## RESPONSE TO INTERROGATORY NO. 6:

The Commonwealth objects to this Interrogatory on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. The Commonwealth also objects to this Interrogatory as duplicative of Request Nos. 1 and 2 of the *Requests for Production of Individual Bondholder (Peter C. Hein) – Set 1* (the "First RFPs"). The

EXHIBIT MM

Subject to the General Objections identified in paragraphs 1, 2, 3, 4, 6, 8, 9, 14, 15, and 16, and the specific objections above, the Commonwealth directs Mr. Hein to the document Bates stamped DS-065360 located in the Plan Depository in the folder labeled "Information Disclosed to Official Committee of Unsecured Creditors in Connection with Disclosure Statement Discovery Requests."

## INTERROGATORY NO. 10:

Explain in detail why attendance reports for the months of November 2020 through July 2021 are not available, including whether a decision was made to stop producing such reports and, if so, by who and why.

## RESPONSE TO INTERROGATORY NO. 10:

The Commonwealth objects to this Interrogatory on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. In addition, the Commonwealth objects to this Request on the grounds that it seeks information that is protected by the mediation privilege, the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privileges, doctrines, or immunities protecting information from disclosure.

In light of the General Objections identified in paragraphs 1, 2, 3, 4, 6, 8, 9, 14, 15, and 16, and the specific objections above, the Commonwealth will not respond to this Interrogatory.

## INTERROGATORY NO. 11:

State the amount of (i) Christmas and (ii) other bonuses paid by Commonwealth to public employees for each fiscal year July 1, 2016 through June 30, 2021.

## RESPONSE TO INTERROGATORY NO. 11:

The Commonwealth objects to this Interrogatory on the grounds that it does not seek information proportional or relevant to the analysis of the confirmability of the Plan. The Commonwealth further objects to this Interrogatory as duplicative of Request Nos. 23 and 24 of

14

Dated: September 27, 2021
San Juan, Puerto Rico

Respectfully submitted,

*/s Margaret A. Dale*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Margaret A. Dale (*pro hac vice*)
Julia D. Alonzo (*pro hac vice*)
Laura Stafford (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board, as representative for
the Commonwealth*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board, as
representative for the Commonwealth*

EXHIBIT MM

000227