## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **VAQUERÍA TRES MONJITAS, INC.** and **SUIZA DAIRY, INC.** | **CIVIL CASE NO.: 04-1840 (DRD)** |
| Plaintiffs, | |
| v. | |
| **JOSE O. FABRE LABOY**, in his official capacity, as the Secretary of the Department of Agriculture for the Commonwealth of Puerto Rico, and **JUAN R. PEDRÓ-GORDIÁN**, in his official capacity, as Administrator of the Office of the Milk Industry Regulatory Administration for the Commonwealth of Puerto Rico. | **RE:   INJUNCTIVE AND DECLARATORY RELIEF** |
| Defendants | |

## AMENDED OPINION AND ORDER GRANTING
## PRELIMINARY INJUNCTION

This matter came on to be heard on a complaint filed by plaintiffs on August 13, 2004.

[Dkt. No. 1][1]  Plaintiffs, fresh milk processors, attacked as unconstitutional certain critical

aspects of the regulation of the milk market by the Government of the Commonwealth of Puerto

Rico.  The complaint and its amendments seek declaratory and injunctive relief. The petition for

a preliminary injunction under Fed. R. Civ. P. 65 was filed on August 20, 2004 [Dkt. No. 2] and

seeks an order precluding the Administrator of the Milk Industry Regulatory Office (by its

Spanish acronym "ORIL") from continuing to implement certain decisions that plaintiffs claim

are unconstitutional. Plaintiffs, Vaqueria Tres Monjitas, Inc. (Tres Monjitas) and Suiza Dairy,

Inc. (Suiza) challenge the constitutionality, as implemented, of the laws and regulations that

---

[1]  The complaint was amended on two occasions.  The Amended Complaint was filed on June 13, 2005 (Dkt. No. 143).
Second Amended Complaint was filed upon request of this court based on representations by defendants on September
14, 2005 (Docket. No. 206-1).

govern the milk industry in Puerto Rico, particularly the Milk Industry Regulation Act No. 34 of June 11, 1957, 5 P.R. Laws Ann. § 1092-1125 (Act 34) and Regulation No. 1 of June 11, 1957 (Milk Regulation No. 1) as subsequently amended, all under Due Process, Equal Protection, the Takings Clause and, finally, the Dormant Commerce Clause.

Because of the sensitive nature of a constitutional attack on a heavily regulated market, the court held numerous days of hearings and received copious evidence. Fifty-one preliminary injunction hearings were held between February 15, 2005 and August 5, 2006.[2] The hearings were held not only with the participation of plaintiffs and the Government officers in charge of implementing the milk regulations, but also with the participation of interveners Indulac and the Association of Dairy Farmers all of whom are affected/favored by the challenged laws and regulations as later explained in this Opinion and Order.

In addition to presenting evidence, the parties have submitted detailed memorandums of law after the last hearing held on August 5, 2006. The court further granted the parties the reasonable time requested to file memorandums and corresponding oppositions, replies and sur-replies which were all filed by January 3, 2007. Oral arguments were heard on February 7, 2007. Motions containing exhibits to update the record have been filed by the parties.

Subsequently the parties have supplemented the record as the challenged actions continue to occur. Now, having heard and considered the motions, evidence, memorandums and arguments this court is ready to rule. A preliminary injunction is issued for the reasons stated herein.

---

[2] The undersigned presided over forty-nine (49) of the fifty-one (51) evidentiary hearings held by the court. The first two (2) hearings were presided over by then Magistrate Judge Aida Delgado after Magistrate Judge Justo Arenas disqualified himself "sua sponte". (Docket No. 27) Magistrate Judge Aida Delgado presided over the hearings upon order of District Judge Carmen C. Cerezo. (Docket No. 45) Magistrate Judge Aida Delgado recused herself "sua sponte". (Docket No. 70) The case was reassigned to then Magistrate Judge Gustavo Gelpí. (Docket No. 74) Shortly thereafter, District Judge Carmen C. Cerezo recused herself "sua sponte" as well. (Docket No. 76) The case was then referred to District Judge Pérez Giménez, who also recused himself "sua sponte". Finally the case was assigned to the docket of the undersigned. (Docket Nos. 77, 78 and 79)

## STANDARDS FOR PRELIMINARY INJUNCTION
## IN THE FIRST CIRCUIT

Because injunctive relief has been requested, before setting the factual scenario in the instant case, the court reviews the basic injunctive standard applicable in the First Circuit Court.

For injunctive relief to be issued under Fed.R.Civ.P. 65, the party seeking the preliminary injunction remedy must establish that: (1) it is substantially likely to prevail on the merits of the claim; (2) absent the injunction there is a significant risk of irreparable harm; (3) the balance of hardships weights in its favor; and (4) the injunction will not harm public interest. See New Comm. Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 8-9 (1st Cir. 2002). The First Circuit has instructed the trial courts to use the aforementioned quadripartite test when considering requests for preliminary injunctions. See Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991).

### A. Likelihood of Success on the merits

As to the first factor, likelihood of success, the First Circuit has stated, "**Our analysis begins with probability of success, as we have often found this furcula to be critical.**" Id., at 6 (*emphasis added*). See also, Public Service Co. v. West Newbury, 835 F.2d 380, 383 (1st Cir. 1987); Lancor v. Lebannon Housing Auth., 760 F.2d 361, 362 (1st Cir. 1985) ("Of these four factors, the probability-of-success component in the past has been regarded by us **as critical** in determining the propriety of injunctive relief"); Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009-22 (1st Cir. 1981). (Emphasis ours.)

In the same vein, the overseeing appellate court has called the likelihood of success factor the "**sine qua non**" of the preliminary injunction test.[3] "The sine qua non of that

---

[3] *Sine qua non*: Without which not. That without which the thing cannot be. An indispensable requisite or condition. *Black's Law Dictionary*, 1990.

formulation is whether the plaintiffs are likely to succeed on the merits. In the ordinary course, plaintiffs who are unable to convince the trial court that they will probably succeed on the merits will not obtain interim injunctive relief."*See* Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993); *see also*, SEC v. Fife, 311 F.3d 1, 8 (1st Cir. 2002); New Comm. Wireless Serv. Inc. v. Sprintcom, Inc. 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.") Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir. 1981) ("[T]he probability-of-success component has loomed large in cases before this court."), cert. denied, 455 U.S. 921, 102 S. Ct. 1277, 71 L.Ed.2d 461 (1982); LeBeau v. Spirito, 703 F.2d 639, 645 (1st Cir. 1983) (affirming denial of preliminary injunction and ending inquiry after concluding that plaintiffs were unlikely to prevail on the merits).

The First Circuit has further stated, "[t]he heart of this test is... the question whether the harm caused plaintiff without the injunction, in light of the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants." Vargas-Figueroa v. Saldana, 826 F.2d 160, 162 (1st Cir. 1987); *see also*, Massachusetts v. Watt, 716 F.2d 946, 953 (1st Cir. 1983); SEC v. World Radio Mission, 544 F.2d 535, 541-42 (1st Cir. 1976) ("To the extent that a defendant can show harm, this must be discounted by the degree that a plaintiff can show likelihood of success. The more foreseeable is the plaintiff's ultimate success, the less weight is to be given to the defendant's prospective loss.").

## B. Irreparable Harm

This criteria "must not be assumed, it must be demonstrated ... speculative injury does not constitute a showing of irreparable harm". Narragansett Indian Tribe v. Guilbert, 934 F.2d at

6, 7 (citations omitted).  However, "[a] deprivation of a [federal] constitutional right 'for even minimal periods of time, unquestionably constitutes irreparable injury." DeNovellis v. Shalala, 135 F.3d 58, 71-72 (1ˢᵗ Cir. 1998); *see also* Justino Acevedo-Luis v. Mercedes Pagan, 478 F. 3d 35, 38 (1ˢᵗ Cir. 2007)("[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")(*emphasis on original*)[4](*citing* Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. at 2673, 2689-90 (1976); New York Times Co., v. United States, 403 U.S. 713, 91 S. Ct. 2140, 29 L.Ed. 2d 822 (1971).

Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined.  Parks v. Dunlop, 517 F.2d 785 (5ᵗʰ Cir. 1975)  A preliminary injunction will not be issued simply to prevent a mere possibility of injury. A presently existing, actual threat must be shown. 11 C. Wright and A. Miller, Federal Practice and Procedure, §2948; *see also* State of New York v. Nuclear Regulatory Commission, 550 F.2d 745 (2ⁿᵈ Cir. 1977); Crowther v. Seaborg, 415 F.2d 437 (10ᵗʰ Cir. 1969).  However, even under traditional Rule 65 standards, a temporary loss of income which may be recovered later does not usually constitute irreparable injury.  Gately v. Massachusetts, 2 F.3d 1221, 1232 (1ˢᵗ Cir. 1993).  Finally,

> [a] preliminary injunction should not [be] issue[d] except to prevent a real threat of harm. Ross-Simons, 102 F.3d at 19; 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice & Procedure § 2948.1, at 153-54 (2d ed.1995). A threat that is either unlikely to materialize or purely theoretical will not do. Ross-Simons, 102 F.3d at 19; Pub. Serv. Co. v. Town of W. Newbury, 835 F.2d 380, 382 (1st Cir.1987). An imminent threat

---

[4]The Court deems necessary to clarify that although in  Justino Acevedo-Luis v. Mercedes Pagan, 478 F. 3d at 38, the First Circuit Court of Appeals stated that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'", this does not help a jury in determining the compensatory damages for redressing a First Amendment violation. The First Circuit went on to clarify that "while the language accurately described one of the requirements for a **preliminary injunction** in a First Amendment case, [ ]it would not be helpful to a jury in determining the compensatory **damages** for a First Amendment violation. Id. (Emphasis on original.) The quoted language, however, is originally from the case of Elrod v. Burns, 427 U.S. 347, 373 (1976) which the First Circuit recognizes at Justino Acevedo. Notwithstanding the constitutional violations in the instant case as to Due Process, Equal Protection and Takings are from at least 2003 and are more than "for minimal periods of time."

> that evidence will be lost is one thing-but a claimed threat, unaccompanied by any showing of reasonable grounds for believing that the evidence in question is imperilled, is insufficient to warrant the entry of a prophylactic injunction. Humble Oil & Ref. Co. v. Harang, 262 F.Supp. 39, 42-43 (E.D.La.1966). **Preliminary injunctions are strong medicine, and they should not [be] issue[d] merely to calm the imaginings of the movant.**

 Matos ex rel. Matos v. Clinton School District, 367 F.3d 68, 73 (1st Cir. 2004)(*emphasis ours*).

In the instant case violations of Due Process rationality requirements, Equal Protection, acts constituting a taking of property under the Taking Clause and a violation of the Dormant Clause are alleged. The court is of the opinion that should the case pass  muster, injunctive relief is in order due to the  irreparable harm criteria. See Tenoco Oil Co., Inc. v. Department of Consumer Affairs, 876 F.2d 1013 (1st Cir. 1989) (granting injunctive relief under Due Process, Equal Protection and Taking Clause);  Walgreen Co. v. Rullan, 405 F.3d 50 (1st Cir. 2005) (warranting injunctive relief under the Dormant Commerce Clause).


## C. Balancing of the Relevant Equities

This criteria requires the court to examine, performing a balancing, on which side do equity lies.  "[T]he heart of the matter is whether 'the harm caused plaintiff without the injunction, in the light of the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause the defendants'." *See*  DeNovellis, 135 F.3d at 77.  In other words, the court should focus upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does, and the effect of the court's action on the public interest. *See*  Matos ex rel. Matos, 367 F.3d at 73 (*citations omitted*).  Finally, this criteria is the result of a comparison between the injury suffered by plaintiff outweighing any harm which granting injunctive relief would inflict on the defendant.  Planned Parenthood League, 641 F.2d at 1009.

## D. The Effect on the Public Interest of a Grant or a Denial of the Restrainer

This criteria requires the Court to weigh where do the public interest lies by the granting or the denial of the injunctive relief.  It constitutes a balancing of interest between the granting or the denial based on public interest.  The effect on the public interest is measured by whether the public interest would be better served by issuing rather than by denying the injunction. Massachusetts Coalition of Citizens with Disabilities, et al., v. Civil Defense Agency and Office Emergency Preparedness, 649 F.2d 71, 74 (1st Cir. 1981).

## FINDINGS OF FACTS

This court specifically finds the following facts proven:[5]

1.      ORIL is an administrative office attached to the Department of Agriculture of Puerto Rico. The Secretary of Agriculture is the head of said Department. [6] ORIL is statutorily  empowered to regulate all aspects of the Puerto Rican milk market. [7]

2.      The Administrator of ORIL is also the Chairman of the Board of the *Fondo de Fomento de la Industria Lechera* ("FFIL")[8], an entity created by law which is

---

[5] The court has included public policy facts that the court does not challenge.  The court does not question any "political" motives, nor does the court wishes to "sit as a super legislature to weight the wisdom of the Legislature." Tenoco Oil Co. Inc. v. Department of Consumer Affairs, 876 F.2d 1013, 1021 (1st Cir. 1989) (internal citations omitted). These facts are included only to provide the reader the benefit of a fuller record enabling a deeper comprehension of the constitutional challenge as to the laws and regulations as applied under Due Process, Equal Protection, the Takings Clause and the Dormant Commerce Clause of the Constitution.  The court only challenges the law as applied as it may transgress the Due Process, Equal Protection, Takings Clause and/or the Dormant Commerce Clause.

[6] See Act 34 of June 11, 1957, P.R. Laws Ann. Title 5 §§ 1092 to 1118, as amended ("Act 34").  All future references to Act 34 are made indicating the P.R. Laws Ann. Title 5 § number, unless otherwise noted.  P.R. Laws Ann. §1093 and 1099(e).

[7] See Legislative History and Declaration of Purpose, as well as the text of Act 34, P.R. Laws Ann. Title 5 § 1092, et seq. approved June 11, 1957.

[8] See Transcript of the Hearing held on November 1, 2005 p. 36 lines 20-24; P.R. Laws Ann. Title 5 § 1099 (e).

the sole owner of intervener Indulac.[9]  Up until after this case was initiated, the Administrator of ORIL was also the Chairman of the Board of Directors of Indulac.[10]  As of today, he continues as a member of said board.[11]  The FFIL is designed and required to promote the consumption of fresh milk. [12]

3.      Both the FFIL and Indulac are entities under the full control of the dairy farmers.[13]  The FFIL pays for ORIL's Administrator's automobile and other expenses.[14]

4.      Indulac, ORIL and the FFIL share among themselves the same building facility.[15]  Mr. José Benítez, a former dairy farmer is the Chief Executive Officer of the FFIL and also the Chief Executive Officer of Indulac.[16]  Mr. Benitez' compensation derives from the FFIL.[17]

5.      Mr. Luis Fullana, another dairy farmer and fact and expert lay witness for ORIL is one of the former Administrators of ORIL.[18]

6.       Indulac is the only entity authorized in Puerto Rico to manufacture UHT milk, a kind of fluid milk that needs no refrigeration prior to opening.[19]  Indulac sells

---

[9] See Plaintiff's Exhibit 22 § 4(a) and Plaintiff's Exhibit 57 Art. 2; Transcript of the Hearing held on October 24, 2005, p. 116 lines 6-7; Transcript of the Hearing held on October 25, 2005, p. 10 lines 9-10; Transcript of the Hearing held on November 1, 2005, p. 20 lines 9-11; Transcript of the Hearing held on February 15, 2005, p. 23 line 13-18.

[10] See Transcript of the Hearing held on February 28, 2006, p. 21 lines 7-9; p. 63, line 11 - p. 67 line 1.

[11] See Plaintiff's Exhibit 69, Art. 3, § 1 (a); Transcript of the Hearing held on February 28, 2006, p. 67 line 5 - p. 69 line 8.

[12] See Transcript of the Hearing held on October 24, 2005, p. 44 lines 2-8.

[13] See P.R. Laws Ann. Title 5 §1099(e); Transcript of the Hearing held on February 28, 2006, p. 72 lines 15-17; Transcript of the Hearing held on March 2, 2006, p. 19 lines 15-20.

[14] See Transcript of the Hearing held on February 28, 2006, p. 16 line 16 - p. 18 line 6.

[15] See Transcript of the Hearing held on February 28, 2005, p. 48 line 18 – p. 49 line 1.

[16] See Transcript of the Hearing held on June 5, 2006 p. 69 line 2 – p. 70 line 10.

[17] See Transcript of the Hearing held on June 16, 2006 p. 35 lines 7-8; see also Transcript of the Hearing held on February 15, 2005, p. 29 lines 11-17.

[18] See Transcript of the Hearing held on October 18, 2005, p. 18 line 7 - p. 19 line 5.

[19] See Transcript of the Hearing held on August 22, 2005, p. 23 lines 4-7; p. 58 lines 2-3.

locally manufactured UHT under sixteen different private brands.  Indulac devotes, by far, most its  raw milk to the manufacture of UHT.[20]  At all times of the hearings Indulac was in control of approximately 70% of the UHT market in Puerto Rico.[21]  The rest of the UHT market belongs to out-of-state producers.[22]

7.      Fresh milk and UHT (two forms of fluid milk) are at least imperfect substitutes.[23]  When the price of one of those products goes up the quantity demanded for the same goes down and demand for the other product rises accordingly.[24]  Fresh milk and UHT are competitors in the fluid milk market. Their respective level of success is strongly influenced by their relative prices. [25]  The price of fresh milk at all market levels is regulated.  Pursuant to law, the maximum price set by the Administrator eliminated any adjustments to the income of the fresh milk processors resulting from price discounts previously considered, except as to the last price review issued by ORIL on April 19, 2007. On this date after being confronted with allowance of said adjustments to Indulac's price discounts were then re-established. The net effect is that the maximum price operates also as a minimum price for any margin calculations.

---

[20] See Transcript of the Hearing held on March 1, 2006, p. 27 lines 12-21; See also Transcript of the Hearing held on March 2, 2006, p. 17 line 23 – p. 18 line 5.

[21] See Plaintiff's Exhibits 24 and 25 and Defendant's Exhibit KK; See also Transcript of the Hearing held on August 22, 2005, p. 27 lines 14-15.

[22] Id.

[23] See Transcript of the Hearing held on August 22, 2005, p. 45 lines 7-8; Transcript of the Hearing held on September 16, 2005, p. 39 lines 23-25; Transcript of the Hearing held on February 16, 2005, p. 429 lines 13-15; Transcript of the Hearing held on July 6, 2005, p. 121 lines 24-25; Transcript of the Hearing held on July 7, 2005, p. 33 lines 23-24; Transcript of the Hearing held on July 26, 2006, p. 110 lines 21-22.

[24] See Transcript of the Hearing held on August 22, 2005, p. 44 lines 22-25; Transcript of the Hearing held on September 23, 2005, p. 34 lines 6-14; Transcript of the Hearing held on July 24, 2006, p. 132 lines 6-20.

[25] See Transcript of the Hearing held on February 24, 2006, p. 61 lines 5-8; Transcript of the Hearing held on August 4, 2006, p. 46 line 20 – p. 47 line 3.

The price of UHT is not regulated at any level. The price of UHT in Puerto Rico is customarily below that of fresh milk. [6]2

8.    The Association of Dairy Farmers groups the Puerto Rico dairy farmers and represents its interests. The dairy farmers have always opposed allowing the fresh milk processors to manufacture fluid milk in the form of UHT milk.[27] The dairy farmer sector has attempted several times to purchase the fresh milk processors.[28] The dairy farmers control the FFIL and control Indulac and want to consolidate in their hands the control of the whole industry.[29] The efforts to control the totality of the industry by eliminating the fresh milk processors, continued throughout the hearings.[30] Those efforts entail the participation of officials of the Government of Puerto Rico involved directly and indirectly in the milk industry and its price setting scheme.[31] The more desperate the financial condition of the fresh milk processors, the easier for the dairy farmers to acquire them or eliminate them.[32]

---

[26] See Transcript of the Hearing held on September 16, 2005, p. 89 line 6; Transcript of the Hearing held on September 23, 2005, p. 14 lines 8-9; Transcript of the Hearing held on November 1, 2005, p. 47 lines 11 -17; Transcript of the Hearing held on July 31, 2006, p. 11 line 19.

[27] See Transcript of the Hearing held on November 1, 2005, p. 69 line 24 – p. 70 line 19; Transcript of the Hearing held on June 20, 2006, p. 37 lines 2-14.

[28] See Defendant's Exhibit C; Transcript of the Hearing held on October 24, 2005, p. 82 line 16 – p. 83 line 2; Transcript of the Hearing held on July 10, 2006, p. 8 line 13 – p.11 line 11; p. 17 line 8; Transcript of the Hearing held on August 1, 2006, p. 48 lines 5 – 7; Transcript of the Hearing held on May 9, 2006, p. 129 line 20 - p. 130 line 5.

[29] See Plaintiff's Exhibits 54 p. 2, 62 and 114; See also Transcript of the Hearing held on August 1, 2006, p. 26 line 2 – p. 27 line 20 and p. 29 line 8 – p. 30 line 22 and p. 36 line 11 – p. 37 line 7; Transcript of the Hearing held on May 9, 2006, p. 129 line 20 - p. 133 line 1.

[30] See Plaintiff's Exhibits 62 and 114; See also Transcript of the Hearing held on August 1, 2006, p. 26 line 2 – p. 27 line 20 and p. 29 line 8 – p. 30 line 22 and p. 36 line 11 – p. 37 line 7.

[31] See Transcript of the Hearing held on March 2, 2006, p. 2 line 22 - p. 3 line 16; Transcript of the Hearing held on June 30, 2006, p. 27 line 8 - p. 34 line 14.

[32] See Transcript of the Hearing held on September 26, 2005, p. 33 line 24 – p. 34 line 22.

9.   Plaintiffs are the only fresh milk processors currently operating in Puerto Rico. Suiza Dairy controls approximately 65.3% of the fresh milk market and Vaquería Tres Monjitas ("VTM") controls 34.7%.[33]  Suiza Dairy formally requested a license to manufacture and market UHT milk and the same was denied by the Administrator.[34]  Suiza presently sells an insignificant amount of UHT manufactured by Indulac under the brand Puerto Rico Dairy.  That insignificant supply of UHT milk by Indulac to Suiza is deemed  neither reliable nor consistent. [35]

10.   Before the filing of this complaint, plaintiffs and the Administrator were still meeting  to try to reach a solution to the milk industry controversy subject of this complaint.[36]  To represent him in those conversations, the Administrator of ORIL appointed Mr. Samuel Torres, Esq.  Mr. Torres is also an attorney for Indulac.[37]  Mr. Torres is also the same person that on behalf of ORIL's Administrator stated in an ORIL hearing that the fresh milk processors had not been and never would be allowed to manufacture UHT milk.[38]  Further, Fernando Toledo, a Secretary of Agriculture, who is a life long dairy farmer, is the person who appointed the two public sector representatives of the Board of the  FFIL.[39]  Mr. Toledo is the same person that has been involved in the

---

[33]  See Defendant's Exhibit CC, Table 22. These numbers may have been slightly modified in favor of Tres Monjitas because of the routes resigned by Suiza assigned to Tres Monjitas. See Docket No. 446, Motion by Suiza advising of resignation of routes.

[34]  See Plaintiff's Exhibits 9 and 10; Transcript of the Hearing held on November 1, 2005, p. 48 lines 11-15; p. 57 line 19 - p. 59 line 2; Transcript of the Hearing held on February 15, 2005, p. 140 line 16 – p.141 line 9.

[35]  See Transcript of the Hearing held on February 15, 2005, p. 141 line 10- p. 142 line 6.

[36] See Plaintiff's Exhibits 2, 3, 4 and 5; see also Transcript of the Hearing held on February 28, 2006, p. 65 lines 2-11.

[37] See Transcript of the Hearing held on February 28, 2006, p. 80 line 20 - p. 82 line 22 and p. 87 lines 14-17.  See also Plaintiff's Exhibit 2, 3, 4 and 5.

[38]  See Plaintiff's Exhibits 78.

[39] See Transcript of the Hearing held on February 28, 2005, p. 6 line 8 - p. 7 line 7.

negotiations to buy the fresh milk processing plants, Suiza and VTM, co-plaintiffs in the instant case.[40]

11.     The regulatory background of the underlying regulations is the following: Act 34 of June 11, 1957, P.R. Laws Ann. Tit. 5 §§ 1092-1118, as amended ("Act 34") provides ORIL broad authority to regulate the price of milk within the Commonwealth of Puerto Rico. Act 34 authorized the setting of minimum sales prices for raw milk and maximum sales prices for processed milk.  In order to meet the legislative intent and mandates of Act 34, the Administrator of ORIL promulgated Regulation No. 1, with the approval of the Secretary of Agriculture.[41]

Article 16 of Act 34 (P.R. Ann. Tit. 5 §1107 (a)(e)) authorizes the Administrator to set the prices of milk at all levels.  The law further establishes that "at least once a year" the Administrator is required to review the price of milk and make the necessary adjustment according to the increase and decrease of production costs as well as the operational expenses at all levels.

From August 13th, 2004 and until recently (even after oral arguments), the Administrator of ORIL has been constantly and frequently shifting the targeted regulations by issuing a series of new regulations and administrative orders (not merely the yearly price regulations required by statute), changing the milk industry rules while the instant case was developing. During this period of time, ORIL amended the existing regulations and enacted new orders and resolutions changing the rules of the game of at least the following milk industry issues: (1)

---

[40]See Transcript of the Hearing held on February 15, 2005, p. 66 lines 6-17 and Transcript of the Hearing held on February 16, 2005, p. 243 line 21-p. 244 line 8.
[41] See Plaintiff's Exhibit 49.

the price paid for the retained milk, (2) the price paid for the dairy farmers production within and over quotas, (3) the transportation reimbursement, (4) the reassignment of a determined number of dairy farmers from one processing plant to the other, and adjusting without holding a hearing a profitable and rentable fresh milk market shared by both processing plants, the school luncheon program and (5)the price paid by Indulac for surplus milk.

On August 12, 2005, defendants confirmed and admitted that the Regulation #1 had been vacated by the enactment of a new regulation, Regulation #10.[42] This representation led the Court to order plaintiff to amend the complaint to include the new regulation.[43] Subsequently, after expressing the court serious concerns about the validity of Regulation #10[44], defendants indicated that they were to begin the rule making process anew since they agreed that Regulation #10 was invalid.[45] The Administrator of ORIL then began the process of enacting another regulation, Regulation #11, admitting that Regulation #10 was defective because the same had not been properly published.[46] As of this date, Regulation #11 has not been enacted.

---

[42] See Plaintiff's Exhibit 59 and Transcript of the Hearing held on August 12, 2005, p. 21, lines 22-25 and p. 22 lines 1-3.

[43] See Docket No. 206.

[44] See Transcript of the Hearing held on September 16th, 2005.

[45] See Transcript of the Hearing held on September 23, 2005, p. 58 line 18; See also 'Defendant's Informative Motion Regarding Regulation 10 and the Mootness Argument' filed on September 23, 2005 [Docket No. 210].

[46] See Transcript of the Hearing held on November 1, 2005, p. 14, lines 13-16.

Moreover, a year after the evidentiary hearings began on February 24, 2006 ORIL issued a Provisional Administrative Order[47] modifying the dairy farmer's compensation system and setting the price to be paid by Indulac at .32 cents.[48]

On November 30, 2006 ORIL issued a Provisional Administrative Order allowing Vaquería Tres Monjitas to use surplus milk to substitute powdered milk used in the processing of ice cream, milk shakes and sour cream at the price of .25 cents per quart. [49]

On January 3, 2007 two new administrative orders were issued, one eliminating the .10 cents payment over quota of the dairy farmers' production[50] and the other one banning the leasing and sale of the dairy farmer's assigned quotas.

On January 31, 2007 ORIL enacted a Provisional Administrative Order authorizing Suiza to use surplus milk to substitute powder milk to manufacture the product Nesquik. Suiza was allowed to pay .25 cents per quart for the surplus milk used for this purpose. [51]

On February 7, 2007, without holding hearings of any kind, ORIL issued an Administrative Order transferring the production of certain dairy farmers from co-plaintiff Suiza to co-plaintiff Vaquerías Tres Monjitas. This change made an adjustment in the participation of the processing plants without a hearing in profitable fresh milk market, including the school luncheon program.[52]

---

[47] See Defendant's Exhibit AA.

[48] See detailed discussion on finding of fact # 36, 37, 38 of this Opinion and Order.

[49] See Exhibit 6 of Docket No. 448. Please refer to Exhibit 6 of Docket No. 464 for the certified translation of the same.

[50] See Exhibit 10 of Docket No. 446. Please refer to Exhibit 10 of Docket No. 469 for the certified translation of the same.

[51] See Exhibit 8 of Docket No. 448. Please refer to Exhibit 8 of Docket No. 464 for the certified translation of the same.

[52] See Exhibit 8 of Docket No. 450.

On March 27, 2007 ORIL issued another Administrative Order that unilaterally and again without holding hearings, readjusted the participation of the processing plants in the school luncheon programs, decreasing 5.06% of Suiza's share and increasing Vaquerías Tres Monjitas' participation in the same equivalent amount. This order was subsequently amended on April 5, 2007 to establish that the same will be effective for the next school period, starting on August of 2007.[53] The court will not address any challenge as to the school luncheon program amongst the fresh milk processors since the court has held no hearings as to these matters. [4][5]

ORIL also issued another Administrative Order on April 5, 2007. As per Indulac's request, ORIL allowed Indulac to pay less than the .32 cents established by the Administrative Order of February 24, 2006 for the milk used to manufacture products others than UHT as cheese, powdered milk and evaporated milk.[55]

On April 19, 2007 ORIL issued a new Price Resolution[56] that left untouched the fresh processors price structure and failed to address properly any adjustments, nor a reasonable rate of return of the processing plants. [57] Finally, on June 13, 2007 ORIL issued an order reducing the farmers' compensation for raw milk.[58] None of these newly issued orders have diminished the merits of plaintiffs' claims.

---

[53] See Exhibit 1 of Docket Nos. 456 and 465. Please refer to Exhibit 1 of Docket No. 470 for the certified translation of the same.

[54] Further there is no claim amongst the two fresh milk processors.
[55] See Exhibit 11 of Docket No.446. Please refer to Exhibit 11 of Docket No. 469 for the certified translation of the same.

[56] See Exhibit 12 of Docket No. 446. Please refer to Exhibit 12 of Docket No. 469 for the certified translation of the same.

[57] See detailed discussion on finding of fact #54 of this Opinion and Order.

[58] See Docket No. 474, Addendum 3.

12.     The production of milk in Puerto Rico is cyclical,[59] meaning that less raw milk is produced during the hottest months of the year and more raw milk is produced during the coldest months.[60]

13.     In 1952, Indulac was created with the purpose of handling the volume of raw milk produced in excess of the demands for raw milk in certain periods of the year.[61]  Originally, and for many years, both the dairy farmers and the fresh milk processors had the same representation on Indulac's Board of Directors.[62]

14.     For decades, fresh milk was the only kind of fluid milk that could be produced. At that time, milk produced in excess of the demands for fresh milk had to be turned into alternative products or destroyed.[63]  For many years after its incorporation, Indulac was devoted to the production of  cream, butter and cheese, products which have a lower rentability than fresh milk, but which do not compete with fresh milk.[64]

15.     Production of raw milk is much more expensive in Puerto Rico than anywhere else in the continental United States and more than in most other countries in the world.[65]

16.     Initially, the agreement between the fresh milk processors and milk producers related to Indulac was that the same would operate to manage the volume of

---

[59] See Transcript of the Hearing held on October 18, 2006, p. 34 line 21 - p. 36 line 4.

[60] See Transcript of the Hearing held on March 1, 2006, p. 8 line 12 - p. 9 line 25; Transcript of the Hearing held on June 6, 2006, p. 19 line 16 – p. 21 line 6 and p. 30 lines 13 – 19.

[61] See Indulac's Certificate of Incorporation, Plaintiff's Exhibit 21.

[62] See Plaintiff's Exhibit 21.

[63] See Plaintiff's Exhibit 78, p. 32, lines 20-24; See also Transcript of the Hearing held on February 16, 2005, p. 416 line 13 – p. 417 line 10.

[64] See Plaintiff's Exhibit 21; See also Transcript of the Hearing held on February 16, 2005, p. 417 line 20 – p. 418 line 1.

[65] See Transcript of the Hearing held on June 6, 2006, p. 77 lines 6-9.

milk that in certain periods of the year exceeded the demand for fresh milk and turn said "surplus" into by-products that would not compete with fresh milk.[66]

17. For many years and as of this writing, pursuant to the decisions of the Administrator of ORIL and the regulations in place, the fresh milk processors have been required to collect all milk produced by the dairy farmers. The fresh milk processors would retain whatever milk they needed to satisfy the requirements of the fresh milk market and would then transport the rest of the raw milk ("surplus milk" according to the law) to Indulac for the manufacturing of milk by-products.[67]. The cost of transporting Indulac's raw milk to Indulac's plants is reimbursed to the fresh milk processors through a formula approved by ORIL.[68] The <u>legal</u> definition of surplus milk is milk produced in excess of the market demands for fresh milk.[69] But as of this writing, since fluid milk is processed as UHT by Indulac and warehoused without refrigeration, there is no surplus of fluid milk in Puerto Rico. If surplus is defined as milk processed in excess of fluid milk market demands, Puerto Rico does not produce enough fluid milk to satisfy itself on a yearly basis and thus no surplus exists. [70] Surplus milk constitutes a legal, not an economic, characterization.

18. The milk retained for production by the fresh milk processors had to be paid to the dairy farmers at the price set by the Administrator.[71] That price has always been one that is <u>well over </u> what is required by the dairy farmers to cover costs

---

[66] See Transcript of the Hearing held on February 16, 2005, p. 416 line 16 – p. 418 line 8 and p. 445 lines 10-16. See also Plaintiff's Exhibit 21.

[67] See Plaintiff's Exhibit 49 § 6.

[68] See Plaintiff's Exhibits 64 and 65.

[69] Act 34 § 1096  (b)(4).

[70] See Defendant's Exhibit KK and Transcript of the Hearing held on March 2, 2006, p. 109 line 6 – p. 111 line 17. See also Transcript of the Hearing held on June 20, 2006, p 76 line 8 – p. 77 line 11.

[71] See Plaintiff's Exhibit 49.

and make a reasonable profit.[72]  This permitted the surplus milk purchased by Indulac to manufacture UHT to be paid by said entity at a price much lower than that required by the farmers to cover production costs.[73]

19.     The farmers for years, and until the February 2006 order, received as compensation for their raw milk a weighted average resulting from the number of quarts of milk produced by fresh milk processors multiplied by the price set by the Administrator and the number of quarts declared surplus multiplied by the price of $0.10, which until the year 2006 remained the price set for surplus milk.[74]  But de facto,  Indulac has for years never paid less than $0.10 and in most cases did pay much more than $0.10 per quart for surplus milk.[75]  Although Indulac before 2006, was not obligated to pay more than $0.10 per quart per surplus milk, it did so because that payment increased the amount of money received per quart by the dairy farmers. [76]

20.     Although legally only the Administrator had the authority and duty to set the margin of the dairy farmers, the Administrator before 2006 never prohibited Indulac from increasing the same by increasing the amount paid for surplus milk. Thus Indulac, on its own, increased the farmers' margin.[77]  Indulac has traditionally taken the position that its existence is justified precisely to increase

---

[72] See Transcript of the Hearing held on May 8, 2006 p.39 lines 24-25 and p. 40 lines 1-2
[73] See Transcript of  the Hearing held on  March 1, 2006 p. 28 lines 4-6.
[74] See Plaintiff's Exhibits 124-126 and Defendant's Exhibit AA, Art. 8.
[75] See Defendant's Exhibit W.
[76] See Defendant's Exhibit W; See also Transcript of the Hearing held on October 24, 2005, p. 60-62; Transcript of the Hearing held on February 16, 2005, p. 438 line 13 - p. 439 line 9.
[77] See Transcript of the Hearing held on February 27, 2006, p. 43; Transcript of the Hearing held on March 2, 2006, p. 131-132; Transcript of the Hearing held on May 8, 2006, p. 21; p. 26 line 3 - p. 29 line 12; Transcript of the Hearing held on  May 11, 2006, p. 32-33.

the benefits to the farmers as high as possible, independently of ORIL's pricing regulations. [8] [7]

21.    In other words, Indulac payments were generally as follows. Indulac paid $0.10 cents per quart of raw milk. If that was enough to reach or exceed the farmers' weighted average compensation as set by Indulac, Indulac did not pay more. If with that contribution the farmer's weighted average did not reach Indulac's predetermined desired level, Indulac would put in the additional monies until that level was reached.  In both cases,  Indulac would contribute further amounts to finance certain FFIL's programs and to service through the FFIL loans taken for Indulac's benefit. [9] [7]

22.    Even by paying the dairy farmer an amount greater than the regulated amount of $0.10 per quart for surplus,[80] the total cost of milk to Indulac was well below the production cost of the dairy farmers. [81] This fact is economically correct even if Indulac's contribution to the FFIL programs and the debt service of Indulac's loans are considered as cost of milk, as Indulac did.[82]

23.    Indulac pays  well below production costs for its raw material as the  processors of fresh milk are required to pay much more than production cost and reasonable profit for each quart of milk they retain for fresh milk.  Through said imposed method, the farmer's average is not affected by Indulac's below cost price. The

---

[78]
 See Transcript of the Hearing held on October 25, 2005, p. 32 line 23 - p. 33 line 8; Transcript of the Hearing held on October 24, 2006, p. 64; Transcript of the Hearing held on February 16, 2005, p. 423; Transcript of the Hearing held on November 3, 2005, p. 171-172; Transcript of the Hearing held on June 5, 2006, p. 74 line 22 – p. 75 line 2.
[79]
 See Transcript of the Hearing held on March 2, 2006, p. 132 line 14 - p. 133 line 20; Transcript of the Hearing held on May 9, 2006, p. 141 line 11 - p. 148 line 25; p. 143 lines 15-24; Transcript of the Hearing held on May 10, 2006, p. 10-11; Transcript of the Hearing held on June 30, 2006, p. 34 line 17 - p. 39 line 2.
[80] See Defendant's Exhibit W.
[81]See Transcript of the Hearing held on February 24, 2006, p. 56 lines 1 – 6.
[82]
 See Plaintiff's Exhibit 52 p. 3

final result is unquestionably that fresh milk processors in effect subsidize with their very high cost per quart Indulac's very low cost.

24.     During the mid-eighties, a change was introduced to the farmer's compensation system.  Up to that moment, the weighted average received by the farmer for the totality of his production within quota varied depending on the processor to which the farmer sold his milk.  This was the case as different processors had different levels of retained vs. surplus milk.  Dairy farmers selling their milk to processors with a high percentage of retained milk received a higher weighted average than those dairy farmers selling milk to fresh milk processors with a higher percentage of surplus.  In the year 1985, when Mr. Luis Fullana was head of ORIL, a regulatory change was introduced pursuant to which the weighted average for all dairy farmers on the Island was to be calculated on the basis of island-wide proportion of retained milk vs. surplus regardless of the situation of each individual processor.  From that time on, every dairy farmer in Puerto Rico has received the same compensation per quart of raw milk for every single quart produced within quota, regardless of the processor to which that farmer is attached. [3][8]

25.     By the year 1998, Indulac was aggressively marketing UHT and devoting as much surplus milk as possible to its production.[84]  Indulac's main product today is unquestionably the manufacture of UHT.[85]  Indulac's pricing strategy for its UHT is to meet or beat the low price at which that product is introduced into

---

[83]

[84] See Transcript of the Hearing held on October 18, 2005, p. 19 line 6 - p. 23 line 7.

[85] See Transcript of the Hearing held on March 1, 2006, p. 29.

See Transcript of the Hearing held on August 22, 2005, p. 32 lines 22-23; Transcript of the Hearing held on March 1, 2006, p. 21-27.

Puerto Rico by foreign producers.[86] For years that price has been consistently and substantially lower than the price of fresh milk. [7][8]

26.   The price at which UHT milk is sold in Puerto Rico is basically set by imported UHT milk since the Continental United States enjoys a lower price for raw milk than the cost in Puerto Rico.[88] That milk comes into Puerto Rico from mainland United States and is sold to the consumer. However, contrary to what occurs in mainland United States, where UHT is normally sold at a price much higher than fresh milk, the opposite is true in Puerto Rico.[89] UHT consumer prices in Puerto Rico have been consistently lower than the regulated price of fresh milk.[90] In order to compete with UHT imports, Indulac has to match or beat that low price.    In doing so, Indulac competes against both UHT imports and plaintiffs' fresh milk.[91] Due to the high cost of producing milk in Puerto Rico, Indulac can only so act by paying for raw milk a price well below actual production cost of the dairy farmers.[92] Without its regulatory subsidized price by the fresh milk processors for raw milk, Indulac would not be able to compete with the UHT importers. Indulac consequeantly takes over a substantial portion

[86]

 Transcript of the Hearing held on August 22, 2005, p. 86 lines 11-14; Transcript of the Hearing held on July 24, 2006, p. 129 lines 21-25; Transcript of the Hearing held on July 24, 2006, p. 131 lines 3-5; p. 158 lines 13-16; Transcript of the Hearing held on June 19, 2006, p. 68 lines 6-8; p. 71 lines 11-25; p. 76 lines 14-17; p. 78 lines 10-25.

[87] See Transcript of the Hearing held on September 16, 2005 p. 38 lines 18-22 see also Transcript of the Hearing held on February 15, 2005, p. 42 lines 8-16.
[88]

 Transcript of the Hearing held on August 4, 2006, p. 36 lines 1-9; Transcript of the Hearing held on June 19, 2006, p. 70 lines 4-8.
[89]

See Transcript of the Hearing held on August 22, 2005 p. 80 lines 7-9.
[90]

See Plaintiff's Exhibits 34, 46 and 71 at p.3.
[91]

 See Transcript of the Hearing held on October 24, 2005, p. 151-152; Transcript of the Hearing held on February 16, 2005, p. 422 line 19-21; Transcript of the Hearing held on July 7, 2005, p. 63 line 6-14; Transcript of the Hearing held on June 19, 2006, p. 69 line 20 - p. 71 line 18; Transcript of the Hearing held on August 1, 2006, p. 45-46.
[92]

 See Transcript of the Hearing held on June 19, 2006, p. 70 lines 1-23, p. 76 lines 1-25; Transcript of the Hearing held on August 4, 2005, p. 30; Transcript of the Hearing held May 9, 2006, p. 128 lines 13-16.

of the Puerto Rico fluid milk market and enjoys a competitive edge over the importers. [93] Undisputably, the purpose and effect of Indulac's subsidized price for raw milk is to deprive importers of UHT of their natural low price advantage in order to preserve the local milk market for the local milk producers. The admissions of defendants themselves so demonstrate. The Administrator of ORIL said on the stand:

> "If right now, instead of .32 cents we were to raise the price of surplus milk to .53, .55 cents, and we lower the price of fresh milk to .53 or .55 cents in order for Indulac to be able to have a profit and continue in operation, we are going to have to raise the price of UHT milk to 1.30 or 1.50 per liter or quart. And if we are going to do that today without these two [protectionist] bills of law, the imported UHT milk is going to take over the entire [UHT] market and it will make Indulac go bankrupt..."[94]

At another point Mr. Pedró answered as follows a question in cross examination:

> **Q.** (Mr. Escalera) Mr. Pedró, the fact is that you know that without the subsidy we have just discussed, Indulac would not be capable to compete with imported UHT. Right?
> **A.** Yes.[95]

The Chief Executive Officer of Indulac Mr. Benítez responded as follows in cross examination:

> **Q.** (Mr. Escalera) So, Indulac has to buy its raw milk well below production cost in order to be able to compete with imported UHT, right?
> **A.** That's correct.[96]

Both the expert for the Farmers Association, Mr. Feliciano, and the expert for

---

[93] See Transcript of the Hearing held on May 9, 2006, p. 128 lines 13 - 16. See also Transcript of the Hearing held on June 19, 2006, p. 70 lines 1-23 and p. 76 lines 1-25.
[94] See Transcript of the Hearing held on February 27, 2006, p. 34 line 19 - p. 35 line 3.
[95] See Transcript of the Hearing held on May 9, 2006, p. 128.
[96] See Transcript of the Hearing held on June 19, 2006, p. 76 lines 14-17.

Indulac, Mr. Schaffer,  testified in the same sense.[97]

27.     This regulatory created scheme has provoked a consistent growth in UHT and a consistent decline in the sales of fresh milk.[98] From 1998 through 2004 fresh milk sales declined from 318.50 million quarts to 275.27 million quarts. In the same periods, sales of UHT milk increased from 38.40 million quarts to 69.93 million quarts. Fresh milk sales have decreased at 2.4% per year while UHT milk has increased 10.5% per year since 1998. Evidently, since plaintiffs are not allowed to process UHT, they retain only the raw milk necessary to satisfy the declining demand for fresh milk.  When the demand for fresh milk falls, less fresh milk is retained and less milk at the higher price went originally into the weighted average calculation (and now into the money pool) from which the farmer is paid for its raw milk.  Stated differently, a decrease in the demand of fresh milk (made from retained milk) and an increase in the demand for UHT (made from surplus) affected negatively the farmer's average and now the possibility of paying the farmer at the established level.[99]  Before the February 2006 order, this problem was dealt with by voluntary increases in the amounts contributed by Indulac for farmers' compensation and mandatory increases required by ORIL in the price paid by fresh milk processors for retained milk.[100]  Indulac's increased contributions to the average came out of its high profits (multimillion dollars) in the UHT business achieved by subsidized price of raw milk.[101]

---

[97] See Transcript of the Hearng held on July 24, 2006 p. 129 and Transcript of August 4, 2006 p. 6.

[98] See Plaintiff's Exhibits 28-30; Transcript of the Hearing held on August 22, 2005, p. 39 line 21 - p. 40 line 2; Transcript of the Hearing held on September 20, 2005, p. 67 lines 4-11; Transcript of the Hearing held on August 24, 2005, p. 43-44.

[99] See Transcript of the Hearing held on May 8, 2006, p. 10 lines 10-17, 22.

[100] See Defendant's Exhibit W and Plaintiff's Exhibit 12; Transcript of the Hearing held on October 24, 2005, p. 74-77.

[101] See Plaintiff's Exhibit 36, 102, 102A, 108 and 109; see Transcript of the Hearing held on February 27, 2006, p. 34-p. 35.

28.     By the year 2002, the Board of Indulac began to guarantee a minimum payment to the farmer.[102] That guarantee was set by Indulac and not by ORIL. This meant that in every biweekly liquidation in which the weighted average would go below the guaranteed minimum payment, Indulac would put whatever amount was necessary over the $0.10 it was required to pay for surplus milk, in order to take the average for the totality of production within quota to the now guaranteed level.[103]  This level was the amount necessary to cover the farmer's cost and a profit as determined by Indulac. Through this method the farmer had the certainty that what Indulac would pay for the raw milk over and above the required $0.10 would in turn translate into a certain fixed minimum guaranteed compensation per quart for each and every farmer. Indulac increased the farmer's guarantee several times since 2002. [104]  The Administrator did not intervene with this guarantee nor did he at any time impede the farmer's margin as set by Indulac.[105] There has never been statutory or regulatory authority for these acts by Indulac.

29.     After contributing the money for the farmer's guarantee, Indulac proceeded to contribute to the FFIL programs and to pay the debt service of its loans.[106]

30.     The UHT business has been extremely productive to Indulac to the point that Indulac  decided to devote all its milk to UHT while buying milk in the United States to manufacture Puerto Rican cheese.[107]  The key to Indulac's profitability is precisely Indulac's purchase of raw milk at below cost of production prices. That low price as stated before is possible only because of the fresh milk

---

[102] See Transcript of the Hearing held on May 8, 2006, p. 22 line 23 - p. 24 line 3.

[103] See Transcript of the Hearing held on October 24, 2005, p. 60, 64; Transcript of the Hearing held May 8, 2006, p. 21; Transcript of the Hearing held June 6, 2006, p. 45 lines 8-16.

[104] See Transcript of the Hearing held on May 8, 2006, p. 22 lines 23 – p. 23 line 18.
[105] See Transcript of the Hearing held on May 8, 2006, p. 21 lines 5-19 and p. 25 line 19-p. 27 line 4.
[106] See Transcript of the Hearing held on June 16, 2006, p. 16 lines 8-18.
[107] See Transcript of the Hearing held on March 2, 2006, p. 21 lines 9 – 19.

processors excessively high price for the same milk.[108]

31.     In December of that same year, 2002, the law regulating the milk industry was amended to give the farmers full and "*de jure*" control of the FFIL.[109]   At the same time, the by-laws and certificate of incorporation of Indulac (which for years had provided for equal representation of farmers and fresh milk processors on Indulac's board) were amended to exclude the fresh milk processors from the Board of Indulac against their will.[110]   These amendments also included the elimination of the prohibition to Indulac to enter into the fresh milk business and an express authorization for Indulac to fully compete in all areas with the fresh milk processors and other participants of the milk and related industries.[111] All legal limitations Indulac previously had to operate as a full and modern corporate competitor as to fresh milk were then eliminated; however, the fresh milk processor (Suiza) continued with a denial of a permit to manufacture UHT.[112]

32.     The UHT phenomena turned Indulac into a major player in the fluid milk market in Puerto Rico.  Despite this obvious fact, Indulac continued to operate within a regulated market but in an unregulated fashion.[113] Indulac continued to decide without the Administrator's participation how much to pay the dairy farmers for the surplus milk.[114]   Indulac did so despite the fixed price set for this milk by the

---

[108] See Transcript of the Hearing held on February 16, 2005, p. 431 lines 8-13.

[109] P.R. Laws Ann.Tit. 5 § 1099 as amended by Act No. 278 of December 19, 2002

[110] See Exhibits 7, 8, 22, Article 6(a), (b), 57, Article 6, 66 p. 7, 67, 68, and 69; Transcript of the Hearing held on November 1, 2005, p. 45 line 23 - p. 46 line 24; Transcript to Hearing held on February 28, 2006, p. 26, 29; p. 31 line 25 - p. 45 line 2; p. 55-60; Transcript to Hearing held on October 24, 2005, p. 68 line 1 - p. 69 line 7; Transcript to Hearing held on February 15, 2005,  p. 21 line 7 - p. 22 line 14.

[111] See Plaintiff's Exhibit 22; Transcript of the Hearing held on July 7, 2005, p. 119 lines 22-24; Transcript of the Hearing held on May 9, 2006, p. 128 line 19 – p. 129 line 19

[112] Of course, a license to produce UHT for the fresh milk processors is meaningless unless they are given the same low price for said milk that Indulac receives.

[113] See Transcript of the Hearing held on October 24, 2005, p. 65 lines 13-17; see also Transcript of the Hearing held on June 16, 2006, p. 47.

[114] See Transcript of the Hearing held on May 8, 2006, p.l 21 lines 5-19.

regulation in place. Furthermore, although the operation of the fresh milk processors was subject to analysis and review every year in order to set prices for all levels of fresh milk, Indulac was never subject to a similar examination or audit.[115] By deciding how much extra money to pay for its raw milk, Indulac was deciding de facto the level of compensation of the dairy farmer that was by statute to be set by the Administrator.[116]

33. Since the Board of Indulac is composed of dairy farmers, the decision of those farmers to set the margin of the producers was in fact a decision to set their own personal margins.[117]

34. Indulac was not only entitled to decide how much to pay for it's raw milk, but it was free to decide how much to charge for it's processed UHT.[118] In other words, this fluid milk competitor within the regulated milk market of Puerto Rico could decide freely its own margin and profit, and further was able to determine the profit of the dairy farmers. Of the three major players of the Puerto Rican milk industry (dairy farmers, Indulac and the fresh milk processors) only the latter was not controlled by the farmers and only the latter had its margin actually regulated by the Administrator.[119]

35. On account of a dispute regarding which price regulation issued by ORIL was actually in place, well into in the middle of these injunction hearings, the Administrator issued on February 2006 a provisional order that modified the

---

[115] See Transcript of the Hearing held on October 24, 2005, p. 51-55; Transcript of the Hearing held on June 16, 2006, p. 47 lines 16-18; Transcript of the Hearing held on June 30, 2006, p. 41 lines 8-10.

[116] See Transcript of the Hearing held on July 26, 2006, p. 124 line 11 – p. 125 line 3; Transcript of the Hearing held on March 2, 2006, p. 131 line 11 - p. 132 line 12; Transcript of the Hearing held on June 6, 2006, p. 46 lines 15-18; p 49 line 16 – p. 50 line 14; p. 52 lines 5-7.

[117] See Transcript of the Hearing held on July 26, 2006, p. 124 line 11 – p. 125 line 3, p. 127 lines 10-21.

[118] See Transcript of the Hearing held on July 26, 2006, p. 124 line 11 – p. 125 line 3 and p. 127 lines 10-21; see also Transcript of the Hearing held on May 8, 2006 p. 10 lines 4-17.

[119] See Transcript of the Hearing held on October 24, 2005, p. 51-55.

dairy farmers' compensation system. Without holding hearings of any kind, and without ever having conducted an examination of the operations of Indulac[120], the Administrator set the price to be paid by Indulac for raw milk at $0.32.[121] This payment was not only coincidentally the price at which Indulac had unilaterally decided shortly before to pay for the milk,[122] but also the price which Indulac had represented in writing to the Administrator that it could pay for the milk and still make a reasonable profit.[123] The Administrator took Indulac's word at face value. The fresh fluid producers were never consulted. Indulac's profit projections presented to the Administrator contemplated substantial income from the juice business, an unregulated activity which is the main source of income to the fresh milk processors. Indulac was to continue to pay below cost for raw milk and use that advantage to further compete with the fresh milk processors in their other profitable lines of unregulated business. At that time, Indulac began to compete with the fresh milk processors in the juice business.[124]

36.      The February 2006 order capped Indulac's risk by setting the price Indulac was to pay for its raw milk at the level Indulac requested, that is $0.32.[125] Indulac no longer was at risk of having to invest additional monies to raise the weighted average to the level of the guarantee. Indulac was thus insulated from the risk of

---

[120] See Transcript of the Hearing held on October 24, 2005, p. 51-55; Transcript of the Hearing held on June 16, 2006, p. 47 lines 16-18.

[121] See Defendant's Exhibit AA.

[122] See Plaintiff's Exhibits 102, 110, and Defendant's Exhibit CCC; See also Transcript of the Hearing held on March 2, 2006, p. 35 line 13 – p. 36 line 24;Transcript of the Hearing held on May 12, 2006, p. 41 line 19 - p. 42 line 18; p. 45 lines 14-24.

[123] See Transcript of the Hearing held on February 27, 2006, p. 23 lines 2-6; Transcript of the Hearing held on May 12, 2006, p. 42 line 4-6.

[124] See Transcript of the Hearing held on June 19, 2006, p. 32 line 18 - p. 33 line 24; Transcript of the Hearing held on May 12, 2006, p. 41 lines 1-6; Transcript of the Hearing held on May 11, 2006, p. 27 line 24 - p. 28 line 9.

[125] See Defendant's Exhibit AA, Art. 8; Transcript of the Hearing held on June 12, 2006, p. 20 line 16 - p. 21 line 16; Transcript of the Hearing held on May 8, 2006, p. 50 lines 13 – 15.

financial exposure on account of a rise in the amount of raw milk devoted to UHT ("surplus") vs. the amount devoted to fresh milk ("retained milk").  ORIL relieved Indulac of the economic burden of having to increase payment for milk (to stabilize the farmers' income) as the demand for fresh milk continued to decrease at least in part because of Indulac's own efforts to market UHT. Additionally, Indulac was relieved of the burden of paying for the Fund's loans taken for Indulac's benefit and programs which would now come out of the money paid by Indulac <u>and the processors</u> of fresh milk as opposed to coming exclusively from Indulac's profits.[126]   Despite these benefits to Indulac the Administrator's order did nothing to alleviate the problems created by Indulac's subsidized UHT or plaintiffs excessive cost of raw milk.

37.     Under this provisional order, the payment fund has been in deficit practically from day one.[127]  From the monies contributed by the fresh milk processors and Indulac the farmers are paid first, the loans and programs are second in line, and any remaining amount returns to the fresh milk processors.  But, the system is running a multi-million dollar deficit simply to satisfy loans and programs and, as we will see, even to pay the farmers.[128] Evidently, if no money is left to pay for loans, programs and the farmers much less is there  to be money available to alleviate the critical situation of the processing plants. A loan of over $2 million by Indulac to the Fund reduced the deficit to $1 million in February of 2007.  In only three months the deficit of the Fund went from $1 million to almost $4 million.[129] The deficit in the last biweekly period of the month of May 2007 grew

---

[126]  See Transcript of the Hearing held on March 2, 2006, p. 132 line 14 - p. 133 line 20; Transcript of the Hearing held on May 10, 2006, p. 10 line 6 – p.11 line 9; Transcript of the Hearing held on June 30, 2006, p. 34 line 17 - p. 39 line 2.

[127]  See Plaintiff's Exhibits 84-93, and 95.

[128]  See Plaintiff's Exhibits 124-126.

[129]  See Exhibit 1 of Docket No. 463.

by almost $1 million in just two weeks[130].  The deficit as of June 13, 2007 was already $6,110,940.34.  The situation has reached to the point that the money available is not even enough to pay the farmers, the first priority of the payment fund[131].  This fault occurred even though now the over-quota milk is not paid for at all. Over quota milk is milk produced by a farmer in excess of that farmer's production quota.  That is, of course, different from "surplus" which is the island-wide production of milk that in a particular period exceeds the market demand for fresh milk.  This milk was for decades paid at 10 cents per quart.   These situations provoked a new order dated April 19, 2007.[132] In this order the compensation of the farmer is further reduced.   Although the Administrator concluded that for the year 2005 in which the last price increase became effective, the dairy farmers suffered a reduction in margin from 8.84 cents per quart to 5.28 cents per quart, their milk is now going to be paid as follows:  5% of the milk produced within quota will not be paid at all, 95% of the quota will be paid according to the following scale:  70% at $0.55 per quart, 20% at $0.50 per quart and 10% at $0.30 cents per quart.  It was the Dairy Farmers Association itself that suggested these reductions on June 6, 2007.  Despite the fact that this is an order of price setting, it took the Administrator less than a week to find that suggestion acceptable and to adopt it in its order.  The Fund now is incapable of providing monies neither for the payment of the programs nor for the servicing of Indulac's loans, or even to keep the farmers' compensation at the 2005 level.

38.     This system is about to cause the industry to collapse. In no market of the United

---

[130] See Exhibit 1 of Docket No. 463 and addendum of Docket No. 474.
[131] See Exhibits 1 to 8 of Docket No. 446, Exhibit 1 of Docket No. 463 and Addendums 1 and 2 of Docket No. 474.
[132] See Exhibit 12 of Docket No. 446.

States does UHT play the large role it plays in Puerto Rico.[133]  The evidence
shows that fresh milk is in continuous rapid pace decline. The system is also
placing the farmer's compensation at risk, as the milk transportation
infrastructure is exclusively provided by fresh milk processors and
consequently[134] a threat to them is a threat to the industry. Lately the amount of
surplus milk has increased beyond Indulac's handling and marketing capabilities.
As a result, substantial amounts of raw milk are being destroyed.[135]

39.     The February 2006 order establishes the farmer's compensation (recovery of
costs and profit) at $0.55 per quart of raw milk produced within quota.  This
amount is coincidentally exactly the same guarantee that Indulac had in effect for
the farmers before the provisional order.[136]  The February 2006  order set the
fresh milk processors' price at  66.125 cents for the same milk for which Indulac
merely paid $0.32 per quart.[137] But now, not only the farmers' compensation has
been reduced as indicated but the Administrator has also reduced Indulac's cost
of milk.  On April 5, 2007 the Administrator issued another order [138] establishing
new prices for Indulac's raw milk according to the use to which said milk was to
be destined.  The new order reduced the price substantially for important portions
of Indulac's raw milk.  Indulac's new raw milk price structure is as follows:
UHT milk $0.32, evaporated milk and powdered milk $0.12, cheese $0.20.
Again, ORIL established those prices exactly as requested by Indulac.  The
Administrator made it clear that this new advantageous price structure would be

---

[133]
 See Transcript of the Hearing held on July 11, 2006, p. 87 lines 9-24; p. 105 lines 5-10; p. 134 lines 13-20; Transcript
of the Hearing held on August 4, 2006, p. 21 lines 13-25.
[134] See Plaintiff's Exhibits 49 and Defendant's Exhibit AA.
[135]
See Plaintiff's Exhibit 111, p.2; See also Transcript of the Hearing held on June 20, 2006, p. 51 lines 5-18.
[136]
[137] See Transcript of the Hearing held on June 16, 2006, p. 53 line 25 – p. 54 lines 1- 3.
 See Defendant's Exhibit AA.
[138] See Addendum 11 of Docket No. 446.

available <u>exclusively</u> to Indulac.  The liquidations for the period ended May 6, 2007[139] demonstrates via a proffer by Suiza that the Administrator has basically reduced Indulac's raw milk price from $0.32 to approximately $0.265.  This is a reduction in Indulac's cost of milk and contribution to the farmers' payment fund of 17.3%.

40.    ORIL is required by law to review every year the situation of the milk industry and adjust the prices of fresh milk accordingly.[140]    At least one year ORIL conducted no price review simply because Suiza had changed owners.[141] On another occasion ORIL did not issue a resolution regarding the price of milk because lack of auditing staff to perform the task .[142]  ORIL has no mechanism in place for automatic price adjustments on the basis of changes in costs between yearly price revisions.  Since all price reviews are prospective and normally the order is effective months after the end of the cost period used for evaluation, the fresh milk processors never recover the losses on account of increased expenses and decreased volumes in the interval between reviews. Additionally ORIL has no regulatory standards whatsoever to judge fairly the profit margin of the fresh milk processors. [143]The rules of cost analysis (if they exist) are not notified in advance and they in fact vary from year to year.  The net result is an artificial reduction in the amount of expenses allowed to the plants[144] and an artificial upwards increase in their income.[145] The 2007 price order achieves this increase by considering as fresh milk income money derived from unregulated business

---

[139] See Exhibit 8 of Docket 446.
[140] See Act 34 § 1107(e).
[141] See Transcript of the Hearing held on November 3, 2005, p. 83 lines 11-21.  See also Transcript of the Hearing held on February 15, 2005, p. 190 line 4 - p. 191 line 13.
[142] See Transcript of the Hearing held on February 24, 2006, p. 76 lines 10-19.
[143] See Transcript of the Hearing held on September 23, 2005 p. 9 lines 10 – 22.
[144] See Transcript of the Hearing held on September 20, 2005, p. 21 line 19 - p. 22 line 15.
[145] See Transcript of the Hearing held on September 20, 2005, p. 26 lines 3- 20 and p. 57 lines 4 – 13.

activities.[146] This manipulation of plaintiffs' real financial picture is the consistent result, year after year, albeit on account of ever changing regulatory criteria.

41.    The last price change for fresh milk processors was effective in May 2005. For the same, ORIL used cost numbers of the natural year 2003[147] despite the fact that ORIL had available the cost numbers for the first half of the year 2004.[148] ORIL concluded despite being well aware that certain very important cost items such as fuel, electricity and resin had sky-rocketed for the year 2004.[149]

42.    This decision by ORIL seriously underestimated the costs of the plants for the period in which the new prices would be in effect.  Even as of the date of this order, the plants continue to operate under a price structure based on the year 2003 cost numbers and volumes[150], despite a proffered increase by Suiza to the plants of 61.60% in the cost of gasoline, 41.22% in the cost of electricity and 49.59% increase and in the cost of resin to Suiza together with a continuously sharp decrease of sales volumes.[151]

43.    During the review process for the price increase effective May 2005, ORIL for the first time, adjusted upwards the income from fresh milk sales by plaintiff.[152] Instead of determining the real amount of money collected by plaintiff on account of those sales, the Administrator simply established the plants' income

---

[146]See Exhibit 12 of Docket No. 446.

[147] See Transcript of the Hearing held on May 8, 2006, p. 71 line 18 – p. 72 line 25; Transcript of the Hearing held on September 20, 2005, p. 16 line 24 – p. 17 line 7.

[148]See Transcript of the Hearing held on May 8, 2006, p. 48 line 23 - p. 49 line 25.

[149] See Transcript of the Hearing held on September 23, 2005, p. 15 lines 19-23; Transcript of the Hearing held on September 20, 2005, p. 62 lines 1-10; Transcript of the Hearing held on May 9, 2006, p. 65 lines 1-20.

[150] See Defendant's Exhibit K; Transcript of the Hearing held on August 4, 2006, p. 103 line 25 - p. 107 line 11.

[151] See Exhibits 13 and 14 of Docket No. 446. See Exhibit 13 of Docket No. 469 for the certified translation of the same.

[152] See Plaintiff's Exhibit 81.  See also Transcript of the Hearing held on May 8, 2006, p. 75 line 17 - p. 76 line 15.

by multiplying the amount of milk sold by the regulated price.[153]   By doing this, ORIL for the first time in unannounced fashion eliminated the adjustments made to sales figures by the plants on account of milk returns as similar loss factors that had been previously accepted.   ORIL had no regulatory parameters on this issue, nor did it provide any evidence rationale to support this decision.   Nevertheless, although the 2007 price order left untouched the price structure of plaintiffs, those adjustments and disallowances were not made.[154]

44.   Similary, for the order effective May 2005, the Administrator was disallowing the adjustments to income resulting from discounts to agents and other promotions.   The position of the Administrator was that these discounts were illegal.[155]   Nonetheless, ORIL had previous to 2005 admitted at least certain amounts of adjustments on account of these promotions and discounts without regulatory parameters for the same.[156]   Competitor Indulac also in the milk business regularly provided discounts not opposed by the regulator as an essential part of its marketing strategy.[157]   The Administrator has never intervened with Indulac in this regard.   The same law that the Administrator interpreted to apply to the fresh milk processors and was used by the Administrator for these disallowances, applied equally to Indulac.[158] (The Administrator also sits on the Board of Indulac.)   Lastly, Indulac incurs in the same agents' cost as the fresh milk processors without ORIL's intervention.[159]   As a matter of fact, in a letter to

---

[153]   See Transcript of the Hearing held on May 8, 2006, p. 74, lines 10-25.

[154]   See Exhibit 12 of Docket No. 446.  See Exhibit 12 of Docket No. 469 for the certified translation of the same.

[155]   See Transcript of the Hearing held on May 8, 2006, p. 129 lines 14-23.

[156]   See Transcript of the Hearing held on November 3, 2005, p. 54 line 1 – p. 57 line 15.

[157]   See Transcript of the Hearing held on May 8, 2006, p. 140 lines 10 – 15 and p. 95 lines 7 – 21.

[158]   See Transcript of the Hearing held on May 8, 2006, p. 139 line 21 – p. 140 line 6.

[159]   See Defendant's Exhibits P and Q; Transcript of the Hearing held on May 9, 2006, p. 4 line 7- p. 5 line 15.

the Administrator following up on Indulac's September 8, 2006 letter requesting a price reduction to the Administrator, Indulac openly states to ORIL that offers and discounts of UHT would last three months and estimates that it would have a total of $1,840,000.00 of offers and discounts.   In the following paragraphs Indulac admits that during the year 2006 it has granted substantial offers and discounts due to inventory obsolescence.[160]

45.     Shrinkage is the loss of milk production inherent to any milk manufacturing process.   The price order effective in the year 2005 made a substantial reduction on the shrinkage factor claimed by the plants.   ORIL simply explained this adjustment by stating that the shrinkage factor it was applying has been historically used by ORIL.   The evidence demonstrates this to be totally  untrue. The 2005 shrinkage factor of $0.0075 had never been applied before.[161]   The Administrator has never performed a study to determine the reasonable shrinkage factor that should be applicable in Puerto Rico, nor has he approved any regulatory standard on the same.[162]   The shrinkage factor claimed by plaintiffs compares very favorably with the average shrinkage factors accepted in geographic parallel regions less affected by heat in Continental United States, although temperature constitutes undisputably a key critical factor   increasing shrinkage.[163]   In the 2007 price order the shrinkage factor "historically applied" changed to $0.0088.[164]

46.     For the price order effective May 2005, the Administrator examined the cost of

---

[160]See Exhibit 2 to Indulac's motion Docket No. 448.  Please refer to Exhibit 2 of Docket No. 464 for a certified translation of the same.

[161]See Plaintiff's Exhibit 81; Transcription of Hearing held on May 8, 2006, p. 91 line 13 – p. 93 line 3.

[162] See Transcript of the Hearing held on May 8, 2006, p. 106 line 13 – p. 107 line 6; Transcript of the Hearing held on September 20, 2005, p. 36 lines 2-10.

[163] See Transcript of the Hearing held on September 23, 2005, p. 20 lines 18-22; Transcript of the Hearing held on May 8, 2006, p. 109 line 23 – p. 110 line 24.

[164]See Exhibit 12 of Docket No. 446.

plastic and professional fees of both plants.[165]  In each case, he used for both the lowest of the figures presented by either of the two plants.  ORIL had no evidence that Suiza was paying its plastic caps and bottles above market price.[166]  ORIL had no evidence of overpayment by Vaquería Tres Monjitas for professional fees.[167]

47.   ORIL disallowed the experts' fees paid by the fresh milk processors for work related to the rate proceedings and regulation by ORIL.[168]  It did so without any evidence that these expenses were excessive.[169]

48.   To determine the price at which milk should be sold to allow the fresh milk processors to obtain a reasonable profit by way of a reasonable return on capital, ORIL determines the capital base, divides it by the number of quarts sold and obtains the capital per quart of milk sold.[170]  But in using said method  ORIL uses the amount of milk sold during the base year of examination, which for the order effective on May 2005 was calendar year 2003.[171]  ORIL did this although by the time it issued its April 2005 order, the year 2004 had transpired demonstrating that the amount of fresh milk sold during that year had substantially decreased compared to the year 2003.  This decreasing trend has been consistent for the last

---

[165] See Transcript of the Hearing held on September 20, 2005, p. 39 line 20 – p. 44 line 2; p. 45 line 24 – p. 47 line 10; Transcript of the Hearing held on September 23, 2005, p. 15; Transcript of the Hearing held on November 3, 2005, p. 25 line 19 - p. 27 line 9; p. 49 line 2 – p. 51 line 24; Transcript of the Hearing held on May 9, 2006, p. 33 line 13 – p. 38 line 18; p. 38 line 19 – p. 42 line 17.

[166] See Transcript of the Hearing held on September 23, 2005, p. 15; Transcript of the Hearing held on May 9, 2006, p. 39 lines 15-24.

[167] See Transcript of the Hearing held on September 23, 2005, p. 24 line 4 – p. 27 line 3; Transcript of the Hearing held on May 9, 2006, p. 33 line 14 – p. 34 line 7.

[168] See Transcript of the Hearing held on September 20, 2005, p. 53 lines 1-9; Transcript of the Hearing held on May 9, 2006, p. 110 lines 17-25.

[169] Id.

[170] See Transcript of the Hearing held on May 9, 2006, p. 44 line 12 - p. 49 line 17.

[171] See Transcript of the Hearing held on May 8, 2006, p. 71 line 18 - p. 72 line 25; Transcript of the Hearing held on May 9, 2006, p. 50 lines 3-18; p. 45 line 16 – p. 46 line 8.

few years.[172]  Despite the decreasing trend, ORIL issued its year 2005 order with year 2003 volumes that it knew were fictitious since the Administrator had then available figures prepared by his own office.

49.    Furthermore, ORIL has repeatedly stated that on every occasion the price of fresh milk has been increased the demand decreases.[173]  ORIL failed to take into consideration that the year 2005 price increase would further decrease volumes for that year making even more unreliable the 2003 volume numbers used for year 2005 price determination and rate of return calculations.[174]

50.    By over-estimating the amount of milk to be sold during the period of the price increase, ORIL was artificially reducing the amount of capital per quart of the fresh milk processors.  The application of a certain rate of return to an artificially lowered capital base provides an artificially diminished level of reasonable profit required.[175]  By 2005, when the new prices went into effect prospectively, the 2004 decrease in volume of sales had further eroded the capital of fresh milk processors.

51.    ORIL uses a 10% rate of return over capital.  ORIL has no regulatory parameters for this rate of return and has never conducted a study to determine what that rate of return should be.[176]  ORIL's only basis for the 10% rate of return is the 1997 US publication entitled Milk Fact which cited this figure as the national average.[177]  The parameter is obviously outdated, stale, and fails to take into

---

[172]  See Plaintiff's Exhibits 28 and 29; Defendant's Exhibit KK; Transcript of the Hearing held on February 16, 2005, p. 423-425; Transcript of the Hearing held on August 22, 2005, p. 29-30; Transcript of the Hearing held on September 23, 2005, p. 9-10; Transcript of the Hearing held on May 8, 2006, p. 71 line 18 – p. 72 line 25.

[173] See Defendant's Exhibits S and T; see also Transcipt of the Hearing held on May 8, 2006, p. 7 line 23 - p. 9 line 17.

[174] See Defendant's Exhibit K.

[175] See Transcript of the Hearing held on September 23, 2005, p. 33 lines 17 -23.

[176] See Transcript of the Hearing held on May 9, 2006, p. 120 line 19 - p. 122 line 22.

[177] See Transcript of the Hearing held on May 9, 2006, p. 109 line 18 - p. 110 line 11.

consideration the economic conditions of doing business in the market in Puerto
Rico after May 2006, when the Bonds of Puerto Rico were considerably
devaluated by Moody's.[178]

52. The evidence presented by plaintiffs demonstrates that the average rate of return
reasonable for the milk industry in Puerto Rico is the figure around 15%. That
evidence was not disputed by ORIL.[179] The Department of Consumer Affairs of
Puerto Rico uses a reasonable rate of 15.81% return for gasoline wholesalers in
Puerto Rico, also a commodity obviously highly affected by increasing fuel costs
and electricity.[180] The court does not question the established fee per se; the error
is in not performing a reasonable, timely economic study setting the reasonable
rate and the continuing usage of stale data as to rate of return (1997), and further
not considering currently doing business in the Puerto Rican market under
current economic realities. The court does not hint at any figure as to reasonable
rate of return. This rate belongs to the setting by the Administrator, not the court.

53. Prior price orders issued by ORIL have demonstrated year after year that even
with the downwards adjustments made by said office to the fresh milk
processors' capital base, when actual real numbers were reviewed the following
year plaintiffs were never able to obtain even the 10% return over the adjusted
base ORIL had estimated they would make.[181]

54. The regulatory system of ORIL has created for the fresh milk processors yearly
losses that have consistently diminished their capital base. The normal

---

[178]The court takes judicial notice of an economic event which took place in Puerto Rico, is undisputable and has
obvious economic repercussions . Further the court is authorized to take judicial notice of events published in the
internet. Chhetry v. U.S. Department of Justice, ___F.3d___,2007 WL 1759472.

[179] See Transcript of the Hearing held on September 20, 2005, p. 76 line 23 - p. 77 line 4.

[180] See Transcript of the Hearing held on May 9, 2006, p. 110 lines 17-25.

[181] See Defendant's Exhibits K, S, T and Plaintiff's Exhibit 81 and Transcript of the Hearing held on May 9, 2006, p. 51
line 10 – p. 67 line 21; p. 70 line 2 – p. 74 line 17.

regulatory way of dealing with this issue is by creating a capital account of "regulatory accrual" that would add to the capital base the erosion experienced because of this regulatory system.[182]  By providing in future rates a rate of return over the real capital plus the capital losses, the companies could be made whole and be provided the necessary recovery of cost and reasonable profit.  ORIL has refused to recognize a regulatory accrual account as part of the capital base.[183]

The last order of ORIL resulting from a yearly price revision was issued on April 19, 2007.[184]  Again, this order was issued without first establishing the applicable regulatory parameters.  The fresh milk processors' price structure, last determined on the basis of year 2003 sales volumes and costs, remained untouched. This time the Administrator authorized the adjustments allowing discounts to agents and other promotions despite having previously sustained in the court proceedings that the discounts were illegal.[185]  The shrinkage factor that the Administrator applied this time is different to the one applied in the order effective May 2005.   Despite this, the Administrator again justifies this shrinkage factor by saying that it is the shrinkage factor "historically applied". For the first time, the Administrator adjusted the revenue of the plants by including as income of the regulated fresh milk processing business the income of separate corporations related to plaintiffs, operating in the unregulated plastic business.  ORIL did so despite a firm and final judgment from the local court providing that ORIL could only use in its price reviews revenue from fresh milk

---

[182] See Transcript of the Hearing held on September 20, 2005, p. 74 lines 6-12.

[183] See Defendant's Exhibit V and Transcript of the Hearing held on November 3, 2005, p. 127 line 25 – p. 129 line 2; Transcript of the Hearing held on May 9, 2006, p. 47 line 11 – p. 48 line 17; Transcript of the Hearing held on September 20, 2005 p. 74 – lines 5-14.

[184] See Exhibit 12 of Docket No. 446.  Please refer to Exhibit 12 of Docket No. 469 for a certified translation of the same.

[185] See Transcript of the Hearing held on May 8, 2006 p. 129 lines 14- 24.

sales.[186] The critical matter for constitutional repercussions is not a violation of a local court opinion, but that again there is yet another unannounced change in conditions used for the first time against the milk processors. This is yet another change in conditions.  The Administration makes no conclusion that the plastic pricing of plaintiff included in their books is excessive in terms of market availability but adjusts the same nonetheless. [187] Under the new order, the Administrator indicated that he had no available information on increased costs for electricity and fuel although those costs are available from Government agencies in Puerto Rico and is a matter of simply applying the figures to the 2003 figures he is continuously using.[188]

55.     By incurring in the regulatory actions described above ORIL, has not allowed plaintiffs to recover costs and make a reasonable profit.[189]

56.     The financial situation of the fresh milk business of the fresh milk processors has greatly deteriorated on account of these administrative acts.[190]   The fresh milk processor's market share of the fluid milk market of Puerto Rico continues to go down while UHT's market share of that same market continues to grow.  Milk is being destroyed at farm level because Indulac can no longer absorb the huge amount of surplus created by the pricing scheme.[191]

57.     The milk payment fund under the February 2006 order is not now capable of

---

[186] See Transcript of the Hearing held on May 11, 2006 p.49 lines 17-25; See also Defendant's Exhibit E.
[187] See Transcript of the Hearing held on September 23, 2005, p. 14 line 22 – p. 15 line 4; and May 9, 2006 p. 39 lines 15-24.
[188] See undisputed facts regarding the information available from the Government agencies in Puerto Rico on Docket No. 446.
[189] See Transcript of the Hearing held on September 20, 2005, p. 90 lines 14-16 and p. 90 line 24 – p. 91 line 7.
[190] See Plaintiff's Exhibits 38, 40, 41 and Transcript of the Hearing held on September 16, 2005, p. 65 lines 19-23; p. 66 lines 3-9.
[191] See Exhibit Plaintiff's Exhibit 111, p. 2; Transcript of the Hearing held on June 20, 2006, p. 51 lines 5-18.

even paying neither for Indulac's loans nor for the FFIL's programs.[192]   Worst still, the last liquidations show that the Fund is running short for over $400,000 every two weeks on the money needed to pay the farmers compensation.[193]   In other words, the system is deteriorating so rapidly that now even the farmers' payment is jeopardized as Indulac no longer provides money for said purposes because its responsibility is now limited to less than $0.32 per quart of surplus.[194]   Despite the fact that in every biweekly period the deficit increases substantially, and that there is not even enough money to pay the farmers, the Administrator has further reduced the cost of milk to Indulac through an order dated April 5, 2007.[195]   Pursuant to that order, the price of raw milk used by Indulac to manufacture evaporated milk and powder milk has gone down.  In the liquidation period which ended May 2, 2007 the price reduction for Indulac only resulted in reducing Indulac's payment for milk 17.3%. [196]  Although Indulac is the only entity in Puerto Rico presently manufacturing those products, the fact that the order makes it clear that said pricing will be available only to Indulac eliminates any incentive to the fresh milk processors to proceed with the manufacture of the same.

58.   The Administrator has also allowed the fresh milk processors to buy milk for certain by-products uses at below the level of 66.125 cents.  This has had a very limited impact in reducing the fresh milk processors contribution to the payment

---

[192]  See Plaintiff's Exhibits 124-126. See also Exhibits 1-8 of Docket No. 446. Please refer to Exhibits 1- 8 of Docket No. 469 for the certified translation of the same.

[193] See Exhibit 1 of Docket No. 463.

[194]  See Transcript of the Hearing held on March 2, 2006, p. 132 line 14 - p. 133 line 20; Transcript of the Hearing held on May 9, 2006, p. 141 line 11 - p. 149 line 25; Transcript of the Hearing held on May 10, 2006, p. 10 line 6 – p. 11 line 9.

[195] See Exhibit 11 of Docket No. 446. Please refer to Exhibit 11 of Docket No. 469 for the certified translation of the same.

[196] See Exhibit 8 of Docket No. 446. Please refer to Exhibit 8 of Docket No. 469 for the certified translation of the same.

Fund.  This is the case as the amount of milk for by-products in the case of plaintiffs is not substantial.  Furthermore, in the case of Suiza the amount of milk that Suiza is now buying at below 66.125 cents is an amount of milk that Suiza previously imported as powder milk.[197]   Suiza is therefore now contributing higher amounts to the payment Fund than before because it is buying in Puerto Rico milk that it used to import as powder milk. The price reduction to Suiza, as proffered by Suiza, pursuant to the liquidation of May 2, 2007, amounts to less than one cent from the 66.125. On the other hand, the reduction granted to Indulac for evaporated milk, powdered milk and cheese is 5.5  cents from 32 cents per quart. Indulac's percentage price reduction is around 17.5% as compared to 1.3% for Suiza.  (See Docket 446, Ex. 8, and Translation at Docket 469.)

59.   ORIL has attempted to maintain the fresh milk price to the consumer as low as possible in order to make that staple readily available. This is a valid public policy and also prevents the decrease in demand that accompanies high prices. However, at the same time, ORIL has been squeezing the fresh milk processors preventing them from recovering reasonably incurred costs and making a reasonable profit by forcing them to operate with the insufficient margin between an artificially high cost for raw milk. This creates an artificial capital credit in that fictitious stale sales of milk are calculated in the formula and results in a mistaken price to plaintiffs' clients.[198]

60.   The procedure in its totality is designed to allow Indulac to purchase raw milk well below cost without affecting the farmers' income.  With this below cost

---

[197] See Exhibit 8 of Docket No. 448.  Please refer to Exhibit 8 of Docket No. 464 for the certified translation of the same.

[198] See Transcript of the Hearing held on September 20, 2005 p. 8 lines 11-17 and p. 9 lines 6-7.

milk, Indulac competes against both the fresh milk processors and the importers of UHT milk.

61.     As admitted by the Administrator of ORIL, Mr. Pedró, and the Chief Executive Officer of Indulac, Mr. Benítez, without a much below cost price for its raw milk Indulac would not be able to compete with imported UHT.[199]  When Indulac requested in December of 2006 a further decrease in pricing for raw milk; the UHT sole local producer openly admitted that it needed additional price accommodations in order to be able "to compete with importers of UHT milk."[200]  Indulac controls most of the UHT market of Puerto Rico because of its well below cost price for raw milk.  Without the economic benefit, not available to importers, the importers would take over the UHT market in Puerto Rico.[201]

62.     The FFIL has as one of its most important roles, the promotion of the consumption of fresh milk.[202]  The FFIL has indicated that fresh milk is preferable to UHT for health reasons.[203]

63.     Puerto Rico in the last years has not produced enough fluid milk to satisfy yearly local fluid milk demand.[204]

---

[199] See Transcript of the Hearing held on February 27, 2006, p. 34 line 19 – p. 35 line 3.; Transcript of the Hearing held on June 19, 2006, p. 76 lines 2-17.

[200] See Exhibit 1 of Docket No. 448.  Please refer to Exhibit 1 of Docket No. 464 for a certified Translation of the same.

[201] See footnote 5 at p. 2 of Exhibit 1 of Docket No. 448.  Please refer to Exhibit 1 of Docket No. 464 for a certified translation of the same.

Facts Nos. 26, 40, 59, 60, 61 and 65 are critical to the remedy under the Dormant Commerce Clause. The facts are the establishment by application of a regulation of a price scheme only applicable to the only manufacturer of local UHT.  Indulac is authorized to purchase raw milk at well below cost price of the dairy farmers financed by the fresh milk processors who ultimately pay more than required. The procedure allows the local producer to favorably compete with the UHT importers. The procedure of purchasing raw milk to manufacture UHT, powdered milk, evaporated milk, at well below cost is authorized exclusively to that local producer, Indulac, as the Administrator stated: "Without these two Bills of Law (sic) the imported UHT milk (sic) is going to take over the entire market. . . Further, as  admitted by the Chief Executive Officer of Indulac, without the below cost price of raw milk Indulac can not compete with the importers. (See § 26 infra.)

[202] Transcript of the Hearing held on June 6, 2006, p. 5 lines 1-4.

[203] See Exhibits Defendant's Exhibit PP and Plaintiff's Exhibit 118; Transcript of the Hearing held on June 6, 2006, p. 11 line 15 - p. 12 line 23.

[204] See Defendant's Exhibit KK.

64.     Classified milk pricing is the system prevalent in milk markets throughout the United States.[205]  This system classifies raw milk for the manufacturing of fluid milk at the highest price.[206]  No distinction is made between UHT and fresh milk.[207]  The years before UHT, Puerto Rico was operating under a classified pricing system allowing the purchase of raw milk for milk by-products to be paid at a lower price than milk for fluid milk manufacturing.

65.     In no jurisdiction of the United States is a fresh milk processor required to pay a price well above cost and profit for raw milk so that a local UHT producer can pay much less than cost and profit for the same raw material. The purchasing scheme allowing the exclusive UHT local manufacturer to purchase raw milk well below cost of fresh milk prices and below cost of the dairy farmers allows the local UHT manufacture to compete favorably with the importers.[208]

66.     At the end of 2006, Indulac was requesting from ORIL a reduction in the price of raw milk paid by Indulac.[209]  Indulac was further requesting to be relieved of the obligation to pay for the amount of milk that is now destroying at the farm level.[210]  In the year 2006, this amounted to more than 7.7 millions quarts.[211]  Furthermore, Indulac requested the Administrator that it be allowed to pay for any milk received over 83 million quarts according to the final rentability of that milk.[212]  The last liquidations of the year 2007 reflect that Indulac is not paying

---

[205] See Kenneth W. Barley, Marketing and Pricing of Milk and Dairy Products in the United States, Iowa State University Press, 1997, page 118; Transcript of the Hearing held on September 16, 2005, p. 41 line 24 – p. 42 line 5.

[206] See Transcript of the Hearing held on August 22, 2005, p. 74 line 24 – p. 75 line 5; p. 77 line 7; Transcript of the Hearing held on September 26, 2005, p. 36 line 20; p. 37 line 4.

[207] See Transcript of the Hearing held on September 16, 2005, p. 41 lines 19-24.

[208] See Transcript of the Hearing held on August 22, 2005, p. 75, lines 22-25.

[209] See Exhibit 2 of Docket No. 448.  Please refer to Exhibit 2 of Docket No. 464 for a certified translation of the same.

[210] Id.

[211] See p. 2 of Exhibit 1 of Docket No. 448.  Please refer to Exhibit 1 of Docket No. 464 for a certified translation of the same.

[212] See Exhibit 11 of Docket No. 446. Please refer to Exhibit 11 of Docket No. 469 for the certified translation of the same.

for destroyed milk.[213] Indulac, as well as the other participants in the market, has
been operating to maximize its profits.

67.     During this year the biweekly money available to pay the farmers is running short
        by several hundred thousand dollars per biweekly period, reaching the highest
        deficit ($726,212.84) in the biweekly period of May 30, 2007.   In the last
        biweekly period that shortage to pay the farmers was of over $600,000.[214]

## ESSENTIAL FACTS AS TO DUE PROCESS, EQUAL
## PROTECTION AND TAKINGS COMMERCE CLAUSE VIOLATIONS

1.     The Administrator of ORIL has created a price scheme wherein the local
       manufacturer of UHT purchases raw milk at below cost of production of
       the dairy farmers while the milk processors, in order to make up the
       economic deficit, must pay substantially over cost and reasonable profit
       rates for the same raw milk.

2.     The milk industry in general is regulated at the level of dairy farmers' price
       as to the price paid by the two milk processors for raw milk and at the price
       paid by the fresh milk consumers. UHT is regulated in Indulac's favor as to
       the price paid for the fresh raw milk to the dairy farmer. The UHT milk is
       not regulated at the price to the consumer.

3.     For many years, the fresh milk producers have been financing the low cost
       of raw milk paid by the UHT local manufacturer.

4.     The UHT manufacturer is not audited by ORIL as the two fresh milk
       processors are audited.

---

[213] See Exhibit 1 of Docket No. 463.
[214] Ex. 1 of Docket No. 474.

5.    Notwithstanding the legal requirement of auditing the entire milk market in Puerto Rico, for years the only parties actually being regulated are the fresh milk industrial processor as well as the dairy farmers. The dairy farmers are technically regulated with a price of milk sold to the milk processor and a price for UHT and other milk products sold to Indulac. However, said price for years has been unilaterally increased by Indulac, a government-controlled entity who in turn is controlled by the dairy farmers. Indulac is not regulated as to the price of fresh milk to consumers and receives raw milk at extremely low,  below cost prices.

6.    The Administrator set new prices for Indulac in February 2006 for purchase of raw milk at $0.32 per quart for fresh milk without a hearing and granting in only one week exactly the price requested by Indulac. Further, Indulac is permitted by administrative inaction to unilaterally increase the price it pays to the farmer.

7.    Indulac was partially relieved by the order of February 2006 of paying loan payments and programs paid to Fund (FFIL) previously by Indulac for the well being of the milk industry; the program then was being paid by Indulac and the milk processors. Said order again decreased the price of fresh milk to be actually paid by Indulac.

8.    Indulac was relieved of payment through the order of February 2006 of the economic burden of having to increase payment of milk (to stabilize farmers' income) as the demand of fresh milk continued.

9.    The order of February 2006 continued the price of raw milk paid by fresh milk processors to dairy farmers at 0.66125 and set the recovery cost and profit of dairy farmers at 0.55 per quarts, while Indulac's price was set at

0.32 per quart (plus Indulac relieved of prior obligations as set at § 7 and 8 supra).

10.  By order of April 5, 2007, the Administrator granted a further reduction to Indulac in its net payment of raw milk to dairy farmers of $0.32. Milk used by Indulac for the production of evaporated milk was reduced to $0.12 as well as powdered milk to $0.12.  Raw milk used by Indulac to produce cheese is to be purchased at $0.20. The net result is that the price of raw milk to Indulac is now reduced to $0.265 (as calculated by Suiza).  Said reduction in prices is not authorized for the two fresh milk processors.

11.  Similarly, fresh milk processors were granted a moderate decrease in purchase price of raw milk destined for certain milk by-products, mainly powdered milk. However, the amount constitutes in total a decrease of less than one cent from the price paid of 66.125. The reduction, as calculated by Suiza, to Indulac is substantial  since the diminishment of the price constitutes 5.5 cents less than the 32 cents paid for a quart. The final result is that the price reduction for Indulac constitutes around 17.5% as compared to 1.3% reduction to Suiza.

12.  The price scheme has caused substantially, or at least partially, a considerable loss in the market of fresh milk and a considerable increase in the UHT market to the point that Indulac has ceased to be a "balancing plant," a tamed "toothless" tiger, to purchase excess milk produced by the dairy farmers and is now an aggressive competitor armed with an economic regulatory formula that allows purchase of its principal raw material at much less than one half the payment made by the two fresh milk producers. The sales of fresh milk from 1998 to 2004 have decreased  2.4% per year

for a total reduction of 14%. On the other hand, the sales of UHT have
increased during the period at the rate of 10.5% per year for a total of 82%.
(See Exhibit 29.)[215]

13.    Suiza has been denied by ORIL a permit to operate an UHT processing
plant, a determination which has been repeatedly reiterated by dairy
farmers.

14.    The Administrator of ORIL is ordered to "at least once a year" perform the
necessary adjustments according to the increase and/or reduction of the
production costs, as well as operational expenses at all levels, and to
review the price of milk purchased from the dairy farmers as well as the
price of finished fresh milk produced by the industrial process. P.R. Laws
Ann. Tit. 5 § 1107 (a)-(e). The Administrator failed to comply with his
obligation in one year, alleging a change in ownership and/or control of
Suiza. Said exception is not authorized by any statute, creating de facto a
presumption of illegality as to Suiza due to a change in stock ownership
and prejudiced the other milk processor, Tres Monjitas.

15.    ORIL has no mechanisms in place for automatic price adjustments (higher
or lower) based upon recurring production costs necessary for both the
dairy farmers and/or the fresh milk processor. (Indulac does not have their
price to the consumer regulated.) There are certain costs that are critical
and recurrent wherein the matter can be easily handled, ie. fuel costs,
electricity cost, labor costs, resin, food, grain costs, and supplements for
the cows.

16.    There is no mechanism in place for the milk processors and dairy farmers

---

[215] Total sales of UHT in 1998 were 38.40 million quarts and in 2004, 69.93 million quarts. (Ex. 29); fresh milk had
a market of 318.50 million quarts reduced to 275.27 million quarts for 2004 (See Ex. 28-30).

to recuperate the losses on the basis of higher costs basis that occur from
year to year. There is simply no regulatory accrual to recuperate interim
losses that occur from one year to another. There is, therefore, no remedy
to recuperate for past losses. The Administrator has made no adjustment to
mitigate for the losses of the milk processors from year to year that occur
either by an increase in cost or as result of a loss in market.

17.   The Administrator uses stale 2003 figures of the milk processors to
determine 2005-2007 costs and also to determine a reasonable process to
the consumer of the finished fresh milk and to determine a reasonable
profit for the industrial milk processors. Equally, in using sales to the
public figures that are stale even though recent figures are available (2004
for price set in 2005), the Administrator uses said figures even though the
market of sales has actually declined  in the case of fresh milk market. In
using stale figures, the Administrator uses said figures and fictitiously
increases the capital of the milk processors and further fictitiously
considers sales that are below actual sales.[216]

18.   Using stale sales figures of 2003, as was the case of the price order of April
2007, is particularly prejudicial since the volume of sales of the fresh milk
processors has decreased (as is known to the Administrator) during said
period by around 10%. Further, that the costs of certain critical production
costs such as electricity and fuel have undoubtedly increased are matters of
public knowledge[217], and are consequently readily available. (The
Administrator alleges that these figures have not been provided–

---

[216] The court does not understand the use of stale sales figures since the Administrator has actual sales at least every
quarter of a year.
[217] Fuel costs are regulated by the Consumer Affairs Department and electric costs are public since the electricity is
provided by a public government corporation.

notwithstanding the figures are public and can be simply adopted and

applied to the 2003 figures being reiterately used by ORIL as to the two

processing plants.

The rules of cost analysis are constantly being changed from year to year,

sometimes directly in contradiction, some are added, some are eliminated, all to the

detriment of the fresh milk processors and without any notice whatsoever. The court

provides highlights.

A)      Other non-related Business– In the April 2007 price review the milk

processors profit in other non dairy markets (juices) was taken into account

as a profit for the first time notwithstanding said criteria never before

having been applied. Further, there exits a prior court final decision to the

contrary holding that profits of non regulated businesses would not be

taken into account. The legal issue for federal due process purposes is not

that there is a violation to a local judicial decision, but that this parameter

was unannounced and retroactively applied creating  due process concerns.

B)      Price Discounts– Price discounts in considerable dollar amounts have been

unchallenged by the Administrator of ORIL as to Indulac. The position of

the Administrator relating to discounts as to the fresh milk producers has

been in constant flux and outright contradiction. During the review of

2005, the Administrator bluntly denied any type of discount to agents

and/or for other promotions. Prior thereto they had been at least partially

allowed. In 2005 without making any conclusion as to any antitrust and/or

price discrimination violation the discounts were deemed "illegal." Yet in

the past the Administrator allowed some discounts yet rejected others.

Notwithstanding, similar discounts in the amount of 1.8 million dollars

were allowed to Indulac in 2006 and Indulac also claimed additional

discounts due to inventory obsolescence in 2006. In April 2007, the

Administrator surprisingly allowed discounts without stating any reasons

whatsoever. Notwithstanding, the milk processors have lost any and all

credit from the year 2005 until 2007 and have yet to have a defined

parameter.

C)      Returns of Product– During 2005 the Administrator changed the rules as to

income from sales of fresh milk. In the past, any amount of monies

genuinely proven returned to clients for the product were not counted as

income. In 2005, returns for the first time were not included as a credit and

hence total sales were fictitiously increased as milk returns were rejected

without any reasoning whatsoever. Again there was no defined parameter.

D)      Shrinkage constitutes the loss of milk inherent to any milk manufacturing

process. The principal factor causing shrinkage is temperature. For the first

time in the price order of 2005 the Administrator made a reduction in the

allowance of shrinkage factors. The Administrator alleged "historical"

factor figures as to the change. At the hearings in court the reasoning was

not proven. The low factor authorized was not proven to be "historical."

See Finding of Fact #45. The shrinkage factor claimed by the fresh milk

processors in court compares favorably with average shrinkage factors in

geographic parallel regions in the Continental United States less affected

by heat. In the year 2007 the historical factor was changed again without

providing any reasoning. Again the court notes the lack of standards and/or

of applying standards at random or not being rationally set.

E)      Plastic Container cost and professional fees.  The Administrator uses

constantly for cost analysis the lower figure presented by either of the two plants for plastic containers and professional fees independent of the legitimacy of either plants actual legitimate numbers.

ORIL'S disallowance as to cost of professional fees as to price regulations without making any findings or providing reasoning seems, at best, arbitrary.[218]

F)      Cost analysis using stale sale figures.

The use of 2003 figures and/or of long past years overstates the amount of milk sold as the evidence provides a clear market loss by the fresh milk producers. ORIL is hence artificially reducing the capital per quart of the fresh milk processor (stated otherwise the capital of the milk processors is also artificially increased since it deems sales for interim years as made and profit realized when said calculated profit was never materialized as wrongful sales figures are applied.) The error is simply in that actual sales are not those reflected in past years since sales of fresh milk are decreasing in alarming numbers. The court does not understand said use of stale figures since ORIL has updated sales at least up to the last  quarter of the current year.[219] The application to a certain wrongful sales figure to a rate of return per quart lowers the capital base and results in a diminished level of profit.

G)      Cost analysis using stale cost figures. Using stale cost figures further breeds mischief as to the final result. As stated herein it is unquestionable that certain critical costs have increased in Puerto Rico since 2003 as to at

---

[218]At worst it is vindictive since the determination to deny professional fees  was made after the hearings in the instant injunctive hearing began. Anyway, there is no reasoning provided by ORIL.
[219]In fact the Administrator has updated figures as to raw fresh milk sales up to the last fifteen day monthly liquidation of the current year. The liquidation of the last fifteen days of June 2007 is currently available.

least electricity and fuel costs. Placing outdated 2003 figures into this

category will obviously yield an artificial, unfair result to the real costs of

the fresh milk industrial processors, Suiza and Tres Monjitas.

H)      Rate of Return (Profit)

The rate of return is 10%, which is the average rate of return for the milk

industry in the Continental United States for the year 1997. The parameter

even when instituted and now questioned, is not based on any study as to

where Puerto Rico fit into the 1997 national U.S. average. Further, it is

now stale and fails to take into consideration the economic conditions of

doing business in Puerto Rico, particularly after May 2006 when the Bonds

of Puerto Rico where considerably devaluated by Moody's.[220]

## FACTS PARTICULARLY CRITICAL AS TO THE CLAIM UNDER THE
## DORMANT COMMERCE CLAUSE

As a preliminary matter the court reiterates an emphasis on economic reality as to

this case. Indulac, the exclusive UHT manufacturer in Puerto Rico, is a public corporation

now controlled by the dairy farmers  as opposed to a corporation with participation by the

fresh milk processors as was in the past. The FFIL is also exclusively controlled by the

dairy farmers (five Board members out of nine) and is an entity dedicated to "promoting

the production, sale, processing, and consumption of fresh milk and its by products and

---

[220]The court takes judicial notice of an unquestioned economic event which occurred in Puerto Rico, the devaluating of Puerto Rican Bonds by Moody's occurring in May 2006 as reprinted in internet articles describing and confirming the event. Chhetry v. U.D. Department of Justice, ___F.3d___, 2007 WL 1759472 (CA 2). ("...The BIA did not err in taking administrative notice of changed country conditions [current events] based on articles found on Yahoo.com or the web sites of CNN and BBC News") (citing Hoxhal\lori v. Gonzalez, 468 F.3d 179, 186 N.5 (2nd Cir. 2006).) The court has found at least three articles in the web published at USA Today.com published May 8, 2006 entitled "Puerto Rico Bond cut to near junk"; an article published at NY Times.com entitled "Puerto Rico's woes lead to Protest and fears of worsening financial Fallout" published May 8, 2008; and an article published at www.free republic.com entitled "Puerto Rico Government shut down: Bonds became junk," published on May 8, 2006, all reiterating the reality that Moody's had down graded Puerto Rico credit by degrading 4 (four) billion dollars in bonds and describing the degrading matter as a "fiscal crisis."
       Further, the matter being taken as judicial notice by the court is authorized at preliminary injunction level hearing notwithstanding its hearsay contents. Asseo v. Pan American Grain Company, Inc. Et al., 805 F.2d 23, 26 (1st Cir. 1986) ("Affidavits and other hearsay materials are often received in preliminary injunction proceedings).

any other activity for the advancement of the milk industry." P.R. Laws Ann. Tit 5 § 1099.

The dairy farmers, therefore, control both the FFIL and Indulac and can therefore create

plans to promote UHT, exclude Indulac from payments to certain programs, obligate fresh

milk to contribute by themselves for certain other programs and above all can manipulate

the price of raw milk to be paid to themselves thru Indulac, as they have actually done,

notwithstanding regulation from the Administrator.

The dairy farmers oppose allowing fresh milk processors to manufacture fluid milk

in UHT form. The dairy farmers have in the past and throughout the injunctive

proceedings attempted to purchase the fresh milk processors. The dairy farmers have

attempted to control the entire market including the milk processors, the FFIL and

Indulac. Those efforts entail the participation of officials of the Government of Puerto

Rico involved directly and indirectly in the milk industry and price setting scheme. The

more desperate the financial condition of the two fresh milk processors, the easier for the

two dairy farmers to acquire them or eliminate them. The dairy farmers thus de jure hold

the reigns of power in the industry.[221]  Under this factual scenario as to the actual power of

the dairy farmers the court sets forth the facts relative to the violation of the Dormant

Commerce Clause. (See generally Finding of Fact No. 8.)

ORIL has developed a sophisticated price scheme authorizing for years the only

UHT local manufacturer, Indulac, to purchase raw milk at well below cost production

price and reasonable profit to the dairy farmers compared to the price paid by fresh milk

producers. The below cost price established by regulation is financed by the fresh milk

processors who are obligated to pay by regulation a much higher price in order to offset

the below cost sale to the UHT milk producer. The purpose is to enable the UHT producer

to favorably compete with the UHT importers and to compete with the fresh milk

---

[221]The Administrator of ORIL was formally the Chairman of the Board of Indulac, now a Director and receives
indirect compensation by the payment of the car used and other expenses for the FFIL.

processors. The deal of purchasing fresh raw milk in below cost fashion to manufacture
UHT is only available to local UHT manufacturer. The Administrator of ORIL stated at
the injunctive hearing: "Without these two Bills of Law (sic) the imported UHT milk (sic)
is going to take over the entire [UHT] market." Further, the Chief Executive Officer of
Indulac openly admitted that without the below cost price of raw milk, Indulac can not
compete with the importers. See Findings of Fact No. 26. See also Findings 40, 59, 60, 61,
and 65.  Other economic incentives have also been provided to Indulac, such as canceling
debts and discontinuing economic contributions to the FFIL, and paying even lower
amounts for other by-products of milk in order to even further lower their costs of milk in
order to be able to favorably compete with the importers.

Finally, in the House Bill 126 to the Legislative History and Declaration of
Purposes of Law No. 34, known as the Milk Industry Regulation Act, codified at P.R.
Laws Ann. Tit. 5 § 1092 et sec., the Declaration of Legislative History and Purposes states
the following as to the solution to the then chaotic critical situation of the local milk
industry relating to the importation of dairy products:

> "(1) Instrument regulation that will allow to dispose of the milk surplus in such a
> manner that, without affecting the interests of the persons engaged in the operation
> of the business in the different phases of the industry, the consumer would be
> provided dairy products that will generally substitute."

Hence, through the milk surplus program back in 1957, "the consumer would be
provided dairy products that will gradually substitute imported products." They have
evidently complied and set forth the program by over-providing to Indulac, the purchaser
of the excess milk, with a program of incentives and economic relief. The regulation now
adds purchase of cheap raw milk designed to fight the importers and now fifty years later
to be an aggressive competitor of the two plants taking considerable part of the market to
the point of enabling the purchase of the two plants at less than their economic value.

The Administrator has not instituted a neutral program as to a classified pricing

system to compete with the importers, but rather an aggressive program in direct violation

to the Milk Industry Regulation Act to provide undue advantage to the local

manufacturers over importers and to be to curtail the fresh milk market and increase its

UHT market.

JUSTICIABILITY

Before entering on the merits the court deems appropriate to dispose of potential

justiciability doctrines resulting from the interpretation of Article II, §2, of the United

States Constitution as to "cases" and "controversies." The United States Supreme Court in

the past has reiterately stated that the justiciability requirement as to "case" and

"controversy" imposes substantial constitutional limits on the federal judicial system.

Further, other justiciability requirements are derived not from the Constitution but from

prudent judicial administration. These last doctrines are turned "prudential." The

prudential requirements are self-imposed by the Supreme Court and may be overriden by

Congress.  Warth v. Seldin, 422 U.S. 490, 501 (1975) (Congress may grant an express

right of action to persons who otherwise would be barred by prudential standing rules).

These principles are related to justiciability. First, the justiciability doctrine is related to

separation of powers. Flast v. Cohen, 392 U.S. 83, 95; 88 S. Ct. 1942 (1968). Second, the

doctrine of justiciability serves to "conserve judicial resources."  Federal Jurisdiction,

Erwin Chemerisnky, 4th Edition Aspen Press. 2003, p. 45. Third, the doctrines of

justiciability are geared to impose judicial resolution making by providing "the federal

courts with concrete controversies best suited for judicial resolution." Id., p. 46. See also

Flast v. Cohen, 392 U.S. at 75. This principle ensures that concrete controversies and

proper litigants are before the court. Baker v. Carr, 369 U.S. 186, 204 (1962). Finally, the

justiciability doctrine presents "fairness especially to litigants that are not properly before

the court." Chemerinsky, p. 46.

The court has paused to examine the prudential doctrines' requirements since there exists a challenge of defendant specially as to "standing," particularly as to the Dormant Commerce Clause cause of action claimed by plaintiffs.

The case is obviously ripe since the regulations challenged, in an applied fashion by plaintiff, are in effect. Some had been in place since years prior to the challenge, others were enacted prior to the filing, and others enacted and applied after the case began, and finally others have been established after the close of the hearings. The application of the regulation, hence, is a final decision of the regulatory agency and is ripe for a challenge under the Due Process, Equal Protection and Takings Fifth Amendment Clauses and/or the Just Compensation Clause. <u>Williamson County Regional Planning Com'n v. Hamilton Bank</u>, 473 U.S. 172, 186, 105 S.Ct. 3116 (1985) ("a claim that the application of government regulations effects a taking of property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulation.") The quoted threshold has been met in the instant case.

Plaintiffs have obvious standing to challenge the regulations issued by ORIL since a price is set to them as milk processors as to the purchase of raw milk from the farmer. Further, a price of sale to the consumer is established resulting from the challenged regulations. Hence, the court must conclude as to the Due Process, Equal Protection and Taking Clause challenge that plaintiffs have standing under <u>Baker v. Carr</u>, 369 U.S. at 204-208.

There is, further, a challenge under the <u>Burford</u>[222] abstention doctrine. However, Burford does not apply "when the effect of an entire state regulatory scheme is challenged as unconstitutional." <u>Tenoco Oil Company v. Department of Consumer Affairs</u>, 876 F.2d

---

[222]<u>Burford v. Sun Oil Co.</u>, 319 U.S. 315, 63 S. Ct. 1098 (1943).

1013, 1029 N. 23 (1st Cir. 1989). The court understands that this boundary has been met as

plaintiffs are challenging the price paid to the consumer; the parameters used by the

Commissioner, the change in parameters, the use of stale figures, the lack of regulatory

accrual to recuperate interim losses; the low price of raw milk paid by UHT manufacturer,

Indulac, all financed by the milk processors; the use of a fair return rate figure to the milk

processors set forth in 1997 from an average United States Continental figure applicable

to the Puerto Rican market in 2005-2007.

      Plaintiffs are hence challenging the entire regulatory scheme as applied and hence

there is no <u>Burford</u> abstention as counseled by the First Circuit Court in <u>Tenoco Oil</u>, Id.


**APPLICABLE LAW AN DISCUSSION**

      A.    **<u>Due Process, Equal Protection and Taking Clauses</u>**.

      *<u>Due Process and Equal Protection Clauses</u>*

      The Due Process, Equal Protection and Taking Clauses unquestionably apply to

Puerto Rico. <u>Tenoco Oil Company, Inc. v. Department of Consumer Affairs, et al.</u>,

876 F.2d at 1017 n.9. In <u>Tenoco</u>, the plaintiffs alleged that the orders issued by the

Secretary of the Department of Consumer Affairs regulating the gasoline prices violated

constitutional and statutory provisions of Puerto Rico law, as well as the due process and

taking clauses of the United States Constitution. The Court of Appeals stated as follows:

          The Supreme Court has held that one or another or both of
          the Constitution's two due process clauses (that in the Fifth
          Amendment and that in the Fourteenth) apply to Puerto Rico
          even though the latter is not a state. <u>Calero-Toledo v.</u>
          <u>Pearson Yacht Leasing Co.</u>, 416 U.S. 663, 668-69 n.5,
          94 S.Ct. 2080, 2084-85 n. 5, 40 L.Ed.2d 452 (1974).

          The Supreme Court has not ruled definitely on the
          application to Puerto Rico of the takings clause of the Fifth
          Amendment, which provides that "private property [shall
          not] be taken for public use without just compensation,"
          U.S. Const., Amend. 5. <u>But</u> <u>see</u> <u>Webb's</u> <u>Fabulous</u>

> Pharmacies v. Beckwith, 449 U.S. 155, 159, 101 S.Ct. 446,
> 449-50, 66 L.Ed.2d 358 (1980) ("takings" clause
> incorporated into the Fourteenth Amendment, applicable to
> the states).  We have no doubt, however, that the takings
> clause, like the due process and equal protection clauses,
> applies to the Commonwealth of Puerto Rico.  See, e.g.,
> Culebras Enterprises Corp. v. Rivera Ríos, 813 F.2d 506
> (1st Cir. 1987) (assuming applicability).  See generally
> J.R. Torruella, The Supreme Court and Puerto Rico: The
> Doctrine of Separate and Unequal (1985).

Tenoco Oil Co., 876 F.2d at 1017, n. 9.

As to the question of whether the gasoline prices regulation [milk price regulation]

being challenged violates the takings and due process clauses, the appellate court held that

"[a] regulation takes property without due process of law only if  "arbitrary,

discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt ..."

Tenoco Oil Co., 876 F.2d at 1021 (citing Pennell v. City of San José, 485 U.S. 1,

108 S.Ct. 849, 857, 67 L.Ed.2d 1 (1988) (quoting Permian Basin Area Rate Cases,

390 U.S. 747, 769-70, 88 S.Ct. 1344, 1361, 20 L.Ed.2d 312 (1968) (quoting Nebbia v.

New York, 291 U.S. 502, 539, 54 S.Ct. 505, 516-17, 78 L.Ed. 940 (1934).  The regulation

will stand if a rational relationship exists between it and a legitimate governmental

objective. Tenoco Oil Co., 876 F.2d at 1021;  Nebbia, 291 U.S. at 537, 54 S.Ct. at 516.

See also PFZ Props. Inc. v. Rodríguez, 928 F. 2d 28, 31-32 (1st Cir. 1991).


A similar analysis governs regulatory classifications under the Equal Protection

Clause.  Medeiros v. Vincent, 431 F. 3d. 25, 32-33 (1st Cir. 2005) (citing Eastern

Enterprises v. Chater, 110 F. 3d 150, 159 (1st Cir. 1997)) ("[A] court must apply

substantially the same [rational basis] analysis to both substantive due process and equal

protection challenges").  To meet the constitutional requirements, a regulation must

rationally pursue a legitimate governmental interest.   The government, however, cannot

pursue its interest(s) in an arbitrary manner.

In the instant case, the milk regulatory scheme appears to be defective, as it only purports to pursue a legitimate state interest without first establishing a rational nexus between the basis for the regulation and the governmental legitimate interest. As stated above, the enacted regulations are primarily relevant to a policy that ORIL was indeed impaired to pursue. The ultimate result, however, is two-fold as the regulatory scheme has an adverse impact on plaintiffs, the milk industry and the consumer.

The milk regulatory scheme has forced plaintiffs to "subsidize" now a strong competitor, Indulac, by providing this governmental entity a distinct edge over its mainland competitors in the market of the UHT milk to benefit those in control of Indulac, that is, the dairy farmers. The regulatory scheme provides UHT a significant advantage by granting Indulac the right to purchase the raw milk below the cost of the dairy farmers to compete against the **fresh milk producers**, and the evidence reveals a high market increase by UHT and a declining market obtained at least partially by the low cost of pricing the raw milk. Further, the farmers also obtain the purchase of all within quota of their dairy production, and most critically have expressed their continued interest in purchasing the fresh milk processors. The economic value of milk processors is in continued decline resulting at least partially from the increased UHT market created by the purchase of financed low priced raw milk by the milk processors who are forced to pay higher prices to the dairy farmers to offset the low price paid by Indulac.

The Court notes, however, that the current subsidy program also serves a local or state interest, as it eliminates the cost advantages of the out-of-state producers in a potential violation of the Dormant Commerce Clause.

Puerto Rico, as many other jurisdictions in the United States, has a legitimate state interest in promoting the local milk industry and the consumption of derivative milk products produced locally. Puerto Rico also has a legitimate interest in protecting the

employment opportunities created by both the dairy farmers and the processing sectors of the milk industry.  However, the state must pursue this legitimate interest within the boundaries set forth by the Equal Protection, Due Process and Takings Clauses, as well as the Dormant Commerce Clause, which are all fully applicable to Puerto Rico.  A discussion on the applicability of the dormant Commerce Clause to Puerto Rico is discussed under a separate sub-title.

As stated above, the Government of Puerto Rico has a legitimate interest in promoting the consumption of fresh milk, particularly the milk that is locally produced. The FFIL, a governmental entity existing to promote the fresh milk consumption, has confirmed that fresh milk is healthier that the UHT milk.  However, it appears that there is no rational nexus between the  current milk regulatory pricing scheme of raw milk and the alleged governmental legitimate interest being pursued, as the pricing regulation clearly favors Indulac, the sole processor of UHT milk, and the purchase of subsidized low priced raw milk dwindles at least partially a considerable part of the milk market from the fresh milk processors.

The core of the Puerto Rico milk regulatory pricing scheme is the fixed price of raw milk, which is currently below the production cost, and it is fully controlled and regulated by the defendants, in order to subsidize Indulac, who is an exclusive local UHT milk market participant, and who also is an entity created by the government.  As it stands, Indulac is allowed to pay a fixed price below the production cost for the raw milk it uses to produce the UHT milk, in order to compete in the fluid milk market in Puerto Rico, and compete with the UHT importers, their principal competitors.  To prevent the dairy farmer from being affected by the low price, the plaintiffs, that is, the fresh milk processors, are required to pay an unreasonable high amount of money, more than double, to allow the dairy farmer to recuperate insufficient costs and make a profit not paid by

Indulac.  Hence, the price is inflated to the manufacturers of processed milk, and

contrariwise sold below cost to Indulac.  This scenario causes UHT to increase its market

share at the expense of the fresh milk processors.  Further, the dairy farmers who control

the FFIL and Indulac have openly admitted their desire to purchase plaintiffs' business.

Indulac's principal product is the UHT milk, which is not currently regulated.

Indulac, however, is a participant in the regulated fluid milk market of Puerto Rico that

obtains the raw material at a subsidized below production cost, and has virtually no

restrictions in the free market competition of fluid milk, and it is not affected by the

government's milk pricing scheme.   Except that through the challenged regulation,

Indulac is able to purchase its principal raw material at an inexpensive price.

The court harbors serious constitutional doubts as to the methodology used by

ORIL in seeking to arrive at just compensation. The court briefly explains.

The use of cost and operation expenses used by ORIL.  ORIL used 2003 figures as

to cost and operational figures where figures were available as to at least half the year of

2004. The stale figures were used in establishing the 2005 pricing regulation as well as the

2006 and the February 2007 pricing regulation wherein the Administrator continued to use

the economic figures of 2003. The Court of Appeals in <u>Tenoco Oil Co.</u>,  876 F.2d 1013,

clearly contraindicated the use of stale figures being used by the Consumer Affairs

Department in the establishment of both the "reasonable operational costs" and a "fair

return" of the fuel industry. The court stated the following:

> By1986, the 8.6¢ figure, last used by federal authorities in 1981, was five years
> old.  The federal regulator has regularly used then current nationwide economic
> data to update their margins, the 8.6¢ figure in 1981 being the most recent product
> of such efforts.  That a figure devised in 1981 for regulating gasoline wholesaler
> prices throughout the United States and Puerto Rico (taken as a whole) would still
> be the right one for regulating prices in 1986 in *Puerto Rico alone* is by no means
> obvious.  **One would have expected the agency to be able to support such an**
> **essential figure by specific economic data projecting the wholesalers'**
> **reasonable operating costs and a fair return or investment for the year in**
> **question, 1986**. (Emphasis ours.)

In the instant case the use of stale figures for establishing the reasonable

operational cost and expenses of the milk processors for 2005, 2006[223] and 2007 figures

for 2003 were used when 2004 figures were available. The court opines that said

regulatory procedure is clearly "arbitrary" within the due process mandate cited at Tenoco

Oil, 876 F.2d at 1024. Using stale sales figures of the year 2003 as was the case of the

2005, 2006, and 2007 order is particularly prejudicial since the volume of sales of the milk

processors is constantly diminishing and said figure is well known by ORIL. During said

period the volume of sale of fresh milk was reduced by more than 10%. The use of stale

figures further creates a loss in the capital of the manufacturing milk processing plants[224].

As stated above, the use of said stale figures are particularly prejudicial since the use of by

ORIL of said figures provides a fictional figure of income and of capital to the two plants

given that  the volume is clearly fictional as the true sales are diminishing, causing a

fictitious credit for the plants in the establishment of the reasonable final profit number of

the two manufacturing plants. The reiterated use of fictional, stale, economic figures as to

sales volume for the annual price regulation reviews of 2005, 2006, and 2007 constitutes

an arbitrary determination in violation of due process. Tenoco Oil, 876 F.2d at 1013.

Further, in the year 2005, for the first time, the Administrator adjusted the income

in sales by refusing to accept, as in the past was unquestioned, a credit for bonafide

returns of milk to the milk process manufacturers. This action created again an artificially

higher volume of sales producing an artificial income, another erratic credit within the

formula. The problem constitutes not only in an error against the milk processors but also

a due process violation in that the change was unannounced and provided no reason or

justification for the alteration in the method of calculating sales. Again the determination

---

[223]The price to purchase raw milk from the dairy farmers for the two fresh milk producers in 2006 remained the same at .66125. The price to purchase raw milk by Indulac was reduced to .32 per quart of raw milk.
[224]The fictional profit, of course, alters in turn the reasonable return of capital since ORIL determines the capital base, divides by the number of quarts sold and obtains the capital per quart of milk sold.

creates a fiction in the income of the plants as the bonafide credit provided to the

consumer or the retailer means that there exists a real unrecognized loss in total sales

volumes and income derived therefrom. (No finding was made by the Administrator that

the returns were not genuine.) This change in methodology, producing a fictitious higher

volume of sales and income, is deemed capricious and arbitrary[225] and banned under

Tenoco Oil. Id.

Similarly the rules of the regulation are in constant flux and outright contradiction

as to allowances for discounts. Prior to the 2005, certain discounts were allowed, partially

allowed at random, but no set known parameter was apparent. However, in 2005 **all**

discounts were disallowed as to agents and/or for other promotions. In 2005 without

making any conclusion of facts and/or any antitrust determination or price discrimination

the Administrator banned **all** discounts claimed by the fresh milk processors terming the

discounts as "illegal." Notwithstanding, similar discounts were being authorized to

Indulac, a competitor in 2006, in the amount of 1.8 million dollars and separately and

quietly accepting them as to Indulac due to inventory obsolescence. In the 2007 regulatory

review, ORIL authorized discounts from the two plants. No reason was provided.

Notwithstanding, the 2005 and 2006 reviews incurred in the error of not allowing

discounts, yet the competitor Indulac was allowed discounts corroborated at least as to the

review of 2006. Again the regulatory procedure is "arbitrary" in violation of due process

requirements under Tenoco Oil, Id. As to this particular parameter the methodology of

ORIL is also "discriminatory" as to a violation of Equal Protection (competitors not being

treated equally by the regulator). Medeiros v. Vincent, 431 F.3d at 29.

As stated prior thereto in this order, the Administrator has changed the parameters

as to the allowance of loss related to the shrinkage factor in the production of fresh milk.

---

[225]The court notes a proclivity of ORIL to changes the rules of the regulation against the plaintiffs almost as if the regulator needed to arrive at a final predetermined price determined through unannounced changes without providing any reasons for the change in parameters.

This factor is mostly determined by the temperature of geographic regional area wherein the fresh milk is processed. For the first time, at the regulation process of 2005, the Administrator lowered the shrinkage factor alleging a "historical" factor; plaintiffs proved otherwise in unrebutted fashion. The shrinkage factor was lowered in the regulatory review of 2005 to 0.0075 which used a lower factor that had never been applied. No reason was provided; only a fictional "historic" reason was provided. The Administrator failed to prove that a study on shrinkage had been performed. The shrinkage factor claimed by plaintiff is favorable compared to shrinkage in parallel regions in the Continental United Stated less affected by temperature. In the 2007 regulatory revision the "historically" applied factor changed to 0.0088. Again no explanation was provided. Notwithstanding, the price reviews of 2005 and 2006 were made with yet another parameter changed and lowered causing prejudice to plaintiffs without any explanation from ORIL. Again the court must conclude an arbitrary determination in violation of due process.[226]

The cost of plastic containers and professional fees should have been accepted in the normal cause of examination as production costs of the final product delivered to the consumer (plastic containers/caps) as well the operational costs of professional fees. Notwithstanding, the administrator used the lowest figure as to each cost item of each individual plant. ORIL had no evidence that Suiza was overpaying plastics nor that there was overpayment by Tres Monjitas as to professional fees. In this particular case the conduct seems to the court irrational and not justified without making particular findings as to inflated costs by either plant. The same occurred with expert fees as to rate regulation proceedings required by law carried on by ORIL. P.R. Laws Ann. Tit 5 § 1107(e) (rate reviews "once a year" and market analysis "at least every four years)."  The

---

[226] Curiously at the hearing of June 30, 2006 it was admitted that the shrinkage factor of Indulac was 8% and that of the plants was around 1%– Tr. June 30, 2006, p. 55-57. The Administrator of ORIL made a similar admission at the hearing of May 8, 2006, p. 116-119 stating the shrinkage factor of Indulac at 8%.

Administrator denied this operational expense notwithstanding the necessity of both plants to be prepared with economic, marketing and legal experts to present their interest before ORIL. See generally Driscoll v Edison Light & Power Co., 307 U.S. at 120-121 (allowing professional expenses as operational costs as well as expert fees.).  Said action by ORIL is arbitrary[227] under the doctrines of Tenoco Oil, 876 F.2d 1021.

The rate of return of capital has been incorrectly determined by ORIL by using stale figures. ORIL uses the 1997 Continental national average to determine "fair return rates or investment" of 2005, 2006, 2007. However, there is no study of the local market to determine how Puerto Rico "fits" into the national average. Second and most critical, a study of 1997 is being used to determine reasonable rate of returns in 2005, 2006, 2007. The Court of Appeals clearly counseled as to the use of stale statistics in rigorously regulated markets:

> "One would have expected the agency to be able to support such an essential figure [devised in 1981] by specific economic data projecting the wholesalers' reasonable operating costs and a fair return of investment **for the year in question**, 1986." Tenoco Oil, 876 F.2d at 1024.

The message is quite clear– the regulating administrative agencies may not use stale figures and/or economic studies that are clearly not current. Again the court must find that the fair return or investment rate established at 10% is clearly arbitrary on two grounds, stale and lack of nexus between the Continental average and Puerto Rico in the sense that it is unknown where Puerto Rico "fits" within the national average. Finally, in this particular era wherein price of electricity and fuel has undoubtedly raised pursuant to public figures maintained by the Consumer Affairs Department and the government controlled Electric Power Agency and after the significant devaluation of Puerto Rican Government Bonds, the market of Puerto Rico must be thoroughly analyzed to determine

---

[227]Again the court does not understand the refusal to accept professional fees and/or the retaining of experts as part of operational cost which is traditionally accepted in the price regulation scheme. The specter of a predetermined result raises as these types of traditional operational cost previously unquestioned are unexpectedly denied without any finding whatsoever.

the real costs of doing business in Puerto Rico and the economic realities of doing business in the island in 2007 rather than merely applying average rates of return of 1997 in the Continental United States. The use of fuel and electricity costs dating back to 2003 suffers equal infirmity as the use of 1997 figures of rate of return applied to 2005-2007 price regulations.. Again the court must conclude that the "reasonable rate of return or investment" set forth by ORIL is "arbitrary" for the reasons set forth herein.[228]

The law requires ORIL to at least "once a year" review the price regulations. However, there is no regulatory accrual for losses from one year to another. That is losses that occur from one year to another are not accrued allowing for the loss incurred in a past year in a regulated market to be recuperated. A loss to the processing plants is imbued in the pricing system by the decrease in sales of fresh milk from year to year; notwithstanding yet the regulator uses past years sales which are higher than actual sales. The same occurs with electricity, fuel costs that have undoubtedly increased in the last four years but ORIL uses 2003 figures. The Administrator makes no provisions and takes no measures to offset the loss.[229] The Administrator further refused to comply with holding yearly reviews as to prices for a year in which that was a change in control of Suiza. No statutory allowance is provided for said exception. In fact a change of ownership amounted to an unwarranted de facto determination of an illegal act by mere change of control in ownership which is, of course, plainly in error under any corporate law standards. The change of ownership of Suiza prejudiced and punished Tres Monjitas, a separately owned milk processor company. Further in the order of 2007, the rules were substantively changed  for the first time to consider as income of the two plants income

---

[228]The companies suggested a rate of return or investment similar to the rate of return granted by the Consumer Affairs Department of Puerto Rico recently to the fuel wholesalers of 15.81%. However, the court does not hint as to the appropriate standard; the court does not sit as a super-administrator to set the standards.

[229]The court has strongly suggested that as to increases in fuel, electricity, certain raw materials, dairy supplements and foods for the agricultural herds, ORIL set forth a system of rapid/automatic increases/decreases be established though accelerated procedures similar to that established by the Consumer Affairs Department in the regulation of the cement industry in the early 1970's. This matter is, however, purely discretional but which may avoid further constitutional challenges on these grounds.

derived from other non regulated business as is the case of the sale of juices. Up to said

date by virtue of a final court order, unregulated business income was not to be counted,

be it loss or profit. Again the court notes a change in the regulating parameters. The

federal constitutional deficiency is not the open violation to a final court Commonwealth

order but to the establishment of a new parameter without any prior notice to the plants

and showing no  nexus with the regulated dairy industry.[230] The court concludes that all

parameters/criteria discussed in this paragraph taken as a whole are deemed "arbitrary" in

violation of due process.[231]

Finally and most critical the court tackles the thorny issue of Indulac being

regulated exclusively to receive a price which is currently less than one half of the price of

the cost of the dairy farmers. The price is financed by the fresh milk processors who pay

more than the price deemed reasonable by the Administrator. The cost plus fair return rate

of the dairy farmers was last established at 55cents per quart of milk. The actual price of a

quart of milk paid by Indulac is 26-1/2 cents as calculated by Suiza.[232] Further, the cost of

26-1/2 per quart for purchase by Indulac as compared to around 65 cents per quart being

paid by Suiza (counting the credit granted to Suiza to purchase raw milk for powdered

milk production), the difference in price is substantial and prima facie discriminatory if

considered that Indulac is now a strong competitor in the market and is no longer a mere

"balancing plant" to purchase the surplus milk not used by the fresh milk processors. The

---

[230]This is yet another parameter-altered change providing the impression that a net result is originally sought and later the parameters are added/subtracted to justify the net result.

[231]The court is aware that the Legislature has placed the Administrator of ORIL in a difficult, potentially conflicting situation of wearing two hats. On the one hand he regulates the industry including the price scheme favoring the purchase of un-expensive raw milk by Indulac. On the other hand the Administrator sits in the Board of Directors of Indulac, a regulated party. A chamber of horrors factual scenario can very well occur. On the one hand the Administrator establishes one day a price for raw milk for Indulac to be purchased from the dairy farmers and within the next few days he sits as a Board of Director to approve Indulac's action, as they have done, to unilaterally increase the price paid by Indulac to the dairy farmers although said unilateral conduct may be against the law. P.R. Laws Ann. Tit. 5 § 1111(Unfair business practices; disrruption of the market– prohibiting in the regulated market undermining the prices set of raw milk by the Administrator; prohibiting in the regulated marked reduction in prices in any distribution medium.

[232]Even if the price is only 32 cents without taking into account the recent reduction of April 5, 2007 for raw milk used for cheese, powdered milk, evaporated milk production was allowed to be  purchased at 20 cents and 12 cents for the last two productions, the final below cost payment is substantial.

current regulation requires the milk produced within quota to be purchased by Indulac.

Fresh milk processors pay at .66125 (except powdered milk); Indulac pays 0.32 except for

raw milk purchased for the production of cheese, evaporated milk and powdered milk

(totaling 0.26 -1/2 for all purchases of raw milk). The milk processors purchase most of

the milk; Indulac purchase the excess.[233]

      Armed with a low cost of raw milk Indulac has increased their share of the general

milk market from 38.40 million quarts in 1998 to 69.93 million quarts (increase of 82%)

(Ex. 29) and on the other hand the fresh milk market has declined from 318.50 million

quarts in 1998 to 275.27 million quarts in 2004 (Ex. 28-30)(14% decrease). Further and

most critical the dairy farmers in control of both the FFIL and Indulac have expressed,

even throughout the period of the injunctive hearing, a desire to purchase the two fresh

milk industrial plants. The court notes the obvious, the lower the market sales of the fresh

milk plants and the higher the market of Indulac, controlled by the dairy farmers, the

lower the economic value of the two plants enabling a cheaper price for the purchase.

Further the gains in the market of Indulac are undoubtedly caused at least partially by the

purchase of raw milk at extremely low prices.

      However, the court finds that the elimination of the fresh milk processors is

contraindicated by various sections of the law of the enabling law. The court explains.

      Article §16 of Act 34 known as The Milk Industry Act of June 11 of 1957 codified

at P.R. Laws Ann. Tit. 5 § 1092 particularly at § 1107(b) states the following:

   (B) In determining the limit of the regulation of the industry, the Administrator
shall take into account the needs and interests of the different sectors within the
industry so that any measure adopted will tend to stabilize and stimulate the
progress in the production and marketing of milk and its byproducts and therefore

---

[233]As a result in the continued loss of the FFIL Capital fund discussed supra at the Findings of Fact section of this
Opinion and Order the over quota milk produced by the dairy farmers is no longer liquidated at 100% of the quota.
Recently the first 5% of the quota assigned is also not liquidated. Order of Jan. 3, 2006 (Docket No. 446, Order at
Addendum #10). Further, FFIL now liquidates pursuant to recent order of June 13, 2007 as follows– 5% within
quota not liquidated; thereafter 10% within quota liquidated at 30 cents; 20% within quota liquidated at 50 cents;
70% within quota liquidated at 70 cents. See Order at Docket No. 474, Addendum #3).

further the prosperity of the industry.

This particular section emphasizes that the regulation of the industry is geared to "stabilize and stimulate the progress and marketing of milk and its by products" and "therefore further the **prosperity of the industry**"as opposed to one section of the industry or one particular party of the industry.

Further, at Subsection (e) the law mandates the following:

. . .He shall, likewise, make thorough economic studies, at least every four (4) years, for the purpose of revising and keeping the price of fresh milk within a reasonable and equitable margin for the different sectors within the industry, that is, producers, processors, distributors of the product and consumers in general.

This section in particular requires that every four years a thorough economic study be made by the Administrator of the "fresh milk" to provide a "reasonable and equitable margin for **the different sectors within the industry** that is the producers (dairy farmers); processors (fresh milk as well as UHT processors); distributors . . . and consumers . . ." The court notes that the protected market is fresh milk considering equitable margins to all within the industry including the dairy farmers and the processors.

The court finds nowhere within the law a purpose of eliminating the milk processors through purchase of the dairy farmer or of creating an absolute control of the entire industry by the dairy farmers. To the contrary the protection offered by the mandate of the law is to all the industry as opposed to a particular section.

Further, Legislative History and Declaration of Purposes of the law narrates  the purposes of the law.

"To regulate the dairy industry and provide for the creation of a Fund for its development; to create the Office of the Administrator of the Regulation of the Dairy Industry, determine its power and to empower it to regulate said industry; to create a Consultive Board; to establish penalties for violations to this law; to derogate Law No. 106 of June 28, 1956 and to validate the official actions pursuant to said statute and for other purposes.

LEGISLATIVE HISTORY AND DECLARATION OF PURPOSES

In the middle of last year, the Special Committee created by Resolution Number 77 of the Senate conducted a study on the production, manufacture and distribution of milk in Puerto Rico. The study revealed that the dairy industry was in crisis: a chaotic situation affected the consumers, producers and manufacturers of milk due to the deficient commercial relations that existed among the manufacturers themselves and between them and the producers.

The detailed investigation performed and the testimonies rendered by the persons who attended the public hearings held by the Special Senate Committee served as a reasonable basis to reach conclusions to the effect that: there existed a chaotic situation in the dairy industry due to the interests in conflict among the manufacturers themselves and between them and the producers, the efforts of the producers and the manufacturers to resolve the chaos had been unsuccessful because they had not been able to reach an agreement, if said situation continued a collapse would occur in this important industry in detriment to the health and economy of the country, the factory for the manufacture of surplus established by the manufacturers and products had not been able to function well due to the conflict between the producers and the manufacturers, there had been an enormous amount of milk destroyed at said factory for which there is a potential market in Puerto Rico since the average consumption of milk in the country is less than 50 percent of what is advisable, and despite the increase registered in the production of milk and of the surplus that was wasted, the consumer price remains static or tends to increase.

All of the interested parties that concurred to the hearings held by the Special Senatorial Committee -producers, manufacturers and consumers- requested that the Government create an organism that would regulate the relations between the parties in order to establish the definite basis for the development and the stability of the dairy industry, and to seek a way to better distribute and market the main product and it by-products.

In view of this evidence presented at the public hearings referred to above, the report of the Special Senatorial Committee recommended the creation of a regulatory body for the dairy industry and that it be given powers, among others, to: (1) instrument regulations that will allow to dispose of the milk surplus in such a manner that, without affecting the interests of the persons engaged in operating businesses in the different phases of the industry, the consumer would be provided dairy products that will gradually substitute imported products, (2) organize educational campaigns geared to increasing the consumption of fresh milk, (3) organize the elaboration, distribution and marketing of fresh milk, instrumenting a better distribution that will consider the best methods to reduce costs.

In attention to the recommendations of the Special Senatorial Committee, and due to the grave crisis that exists in the dairy industry, the Office of the Administrator of the Regulation of the Dairy Industry was created. This organism was granted ample power to create regulations to adequately resolve the chaotic situation which the dairy industry was experiencing.

The Legislative Assembly through this law clarifies and ratifies its original intention with regard to the regulation of the dairy industry. In this manner the

Legislative Assembly wishes to emphasize its intention that the State, in the exercise of its police power and for the purpose of promoting the general welfare, intervene directly with the dairy industry, so that through adequate regulations it will be able to straighten its course so that the public interest will be adequately served through the greatest production of milk and pure dairy products by a vigorous, sound and progressive industry that operates efficiently and that can offer milk and dairy products to the consumer at fair and reasonable prices.

It is evident that the disagreements of today existed fifty years ago in 1957 between dairy farmers and fresh milk processors[234]; a collapse of the milk industry was very near; the problem of excess milk and the disposal thereof was one of the disagreements between dairy farmers and fresh milk processors (as it is today). All agreed that principal commodity to be protected was the fresh milk and all further agreed that the solution to the problem was to develop a method to handle excess milk "without affecting the interest of the persons engaged in guiding business."  The solution contemplated was not to hurt any of the entities within the milk industry. Obviously, the solution is not hurting a party by a regulation wherein the price of milk is lowered for one of the competitor, to the point of being purchased by a competitor, or by one of the members of the industry, as is occurring in the instant case. Further, the elimination of one of the key players of the industry purchased by another or a de facto monopoly of the industry to one of the parties within the industry was not contemplated and in fact was contraindicated by the express language of "without affecting the interest" to the entities at "engaged in operating the business." The different price scheme favoring one of the parties is discriminatory, against public policy and hence irrational.

The court must, therefore, conclude that the elimination of one of the components of the industry is "demonstrably irrelevant to the policy the Legislature is free to adopt." Tenoco Oil Co., 876 F.2d at 1024. Hence, the court must strike the policy of establishing

---

[234]The Supreme Court of the United States has recognized the control of local dairy industry by dairy farmers and the potential clashes with the milk processors, together with the "political effectiveness of the local dairy farmers."  See West Lynn Creamery v. Healy, 512 U.S. 186 (1994) N. 22, citing G. Miller "The Industrial organization of Political Production," 149 Journal of Institutional and Theoretic Economics 769 (1993)."

the discriminatory practice of purchasing raw milk by Indulac at below cost numbers of the dairy farmers as compared to over cost payment by the milk processors. Said practice is prohibited by this court in any subsequent order of the Administrator of ORIL.

The current milk pricing scheme, however, has contributed to a continuous decrease in the demand for fresh milk and in the economic resources available to satisfy the demands of the milk industry. The alarming increase in the liquidation deficits and the FFIL's inability of payment in the last liquidations clearly show that there is not enough money available to pay the dairy farmers, hence, a clear proof of a decadent market. In sum, as the demand for fresh milk decreases, the larger the amount of surplus milk, which translates in less money available for compensation to the daily farmer. Thus, the Court is forced to conclude that the milk pricing scheme is not sustainable, as the nexus between the government's legitimate interest and the rationality of the regulation to pursue this interest is lacking.

### *The Takings Clause*

The First Circuit, as well as other circuits, have clearly established that an economic regulation may be irrational enough in its enforcement, as to violate the Due Process and Equal Protection Clauses, also resulting in violation of the Takings Clause. Tenoco Oil Co., 876 F.2d at 1026-1027. "A price regulation which forces wholesalers to sell gasoline for a price which does not cover operating costs and a reasonable profit may, in short order, become so onerous that the wholesalers will be unable ever to recover their earlier cumulative losses through subsequent price increases and may be forced out of business." Id.

In Duquesne Light Company v. Barasch, 488 U.S. 299, 307 (1989), the Court held:

> The guiding principle has been that the Constitution protects
> [regulated businesses] from being limited to a charge for

their property serving the public which is so "unjust" as to be confiscatory.  Covington & Lexington Turnpike Road Co. v. Sandford, 164 U.S. 578, 597 (1896) (A rate is too low if it is "so unjust as to destroy the value of [the] property for all the purposes for which it was acquired," and in so doing "practically deprive[s] the owner of property without due process of law"); Federal Power Commission v. Natural Gas Pipeline Co. Of America, 315 U.S. 575, 585 (1942) ("By long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense"); Federal Power Commission v. Texaco Inc., 417 U.S. 380, 391-392 (1974) ("All that is protected against, in a constitutional sense, is that the rates fixed by the Commission be higher than a confiscatory level").  **If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments.  As has been observed, however, "[h]ow such compensation may be ascertained, and what are the necessary elements in such an inquiry, will always be an embarrassing question**."  Smyth v. Ames, 169 U.S. 466, 546 (1898).  See also Permian Basin Area Rate Cases, 390 U.S. at 790 ("[N]either law nor economics has yet devised generally accepted standards for the evaluation of rate-making orders").  (Emphasis ours).

The analysis of whether confiscation or a taking of property in a regulated market has actually occurred cannot be done in a vacuum.  After all, "… the impact of certain rates can only be evaluated in the context of the system under which they are imposed."  Id.  In this context, the court "must examine the manner in which the [agency] has employed the methods of regulation which it has itself selected…"  Permian Basin, 390 U.S. 747, 792 (1968).

ORIL has lacked stability in the use of regulatory standards for the determination of allowable costs and reasonable prices, which provides the Administrator unlimited discretion to arbitrarily allow and disallow costs and change the rules applicable to operating and costs' expenses at will, in order to keep milk prices low, while forcing the fresh milk processors to pay the excessively high price for raw milk to subsidize Indulac.  ORIL's "decision to arbitrarily switch back and forth between methodologies" to achieve

that result raises "serious constitutional questions." <u>Duquesne,</u> 488 U.S. at 315.  The lack

of regulatory rules has been the instrument through which plaintiffs have been denied the

recovery of their costs, as well as a "fair profit" in their fresh milk business.[235]

In a pricing scheme, the expenses may be disallowed provided that an abuse of

discretion on the part of the regulated corporation is established.  <u>State of Missouri ex rel.

Southwestern Bell Telephone Co. v. Public Service Commission of Missouri</u>, 262 U.S.

276, 289 (1923).  A presumption of correctness favors the books of a  public service

corporation.  <u>West Ohio Gas Company v. Public Utility Commission of Ohio (#1)</u>, 294

U.S. 63, 68 (1935).  Thus, the expenses are presumed to be incurred in good faith.  <u>West

Ohio Gas Company</u>, 294 U.S. at 72;  <u>State of Missouri</u>, 262 U.S. at 288-289.  These legal

principals are particularly applicable to the instant case, as to the cost of plastic

containers; professional and expert fees necessary for annual review; discounts to agents

and promotions; shrinkage factors; returned milk, and other criteria not well handled by

ORIL as previously discussed herein.

The Court finds that ORIL has failed to follow these principles and has

intentionally squeezed plaintiffs between the cap of a fixed regulated price and an

irrational high price for raw milk.   ORIL has intentionally issued this administrative

measure in order to protect Indulac in the competition with the local fresh milk industry

---

[235]
There is really no comparison between the situation of plaintiffs here and that of plaintiffs in <u>Duquesne Light Co. v.
Barasch</u>, 488 U.S. 299 (1989).  In the first place, the regulatory activity in Duquesne was supported by clear regulatory
parameters.  Secondly, plaintiff in <u>Duquesne</u> was protesting the regulatory body's refusal in allowing it to recover the
investment costs (capital expenses) associated with the construction of plants that later on turned to be unnecessary.  But
plaintiffs in <u>Duquesne</u> were not trying to recover legitimate operating expenses that were never
intended for public use.  The Supreme Court, however, refused to intervene because plaintiffs admitted that they were
recovering a reasonable return on the capital investment even without recovering this particular investment cost.  In this case we
have concluded, that plaintiffs are not recovering even their operational costs because of the arbitrary way in which ORIL
has manipulated the numbers for regulatory purposes.  Needless to say, much less are plaintiffs recovering a reasonable
rate of return on the capital investment, as has been discussed in this opinion and order.  Lastly, in <u>Duquesne</u> no
argument has been made that the regulated "rates jeopardize the financial integrity of the companies, even by leaving
them insufficient operating capital or by impeding their ability to raise future capital.  Nor has it been demonstrated that
these rates are inadequate to compensate current equity holders for the risk associated with their investments under a
modified prudent investment scheme."  <u>Duquesne</u> at 312.  The opposite, however, constitutes the facts in the instant case.

and the continental importers.  The evidence shows, from admissions of the farmers, that ORIL's price fixing scheme is designed to fulfill these goals. Based upon the expense statistics for the year 2003, and even before adjusting the same downwards, ORIL was acting in a regulatory defective way.   ORIL should have used the actual 2004 expense statistics that it had.  W. Ohio Gas v. Public Utility Commission of Ohio (#2), 294 U.S. 79, 82 (1935).  Moreover, ORIL had enough evidence available to support an advanced forecast on the impact that the expenses' increase will have on the fresh milk processors for the year in which the rates were to be in place, that is, in April 2005 and forward.

The taking of property may also be triggered by ORIL's lack of announced known regulatory standards, which allows ORIL to switch back and forth freely on the methodology used to make different adjustments at will so as to bring the cost of the milk processors down.  ORIL's practice raises serious constitutional questions.  Duquesne, 514 U.S. at 315.  In Duquesne, *supra*, a case similar to the case at bar, when the volume of milk produced was excessively high, a "decision to arbitrarily switch back and forth between methodologies" for an income adjustment was discretionary allowed in order to make the necessary adjustments on the return of capital and investments calculations, professional fees, and transfer of prices, provided that these adjustments were made within the scope of the abuse of discretion rule cited therein.  Id.  Hence, in the instant case, ORIL has acted improperly by eliminating the processors' costs for experts' fees and professional fees that were related to the pricing rate scheme or as part of operational costs.  Driscol v. Edison Light and Power Company, 307 U.S. 104, 120-121 (1939).

Plaintiffs further argue that they are convinced that ORIL is not willing to objectively address plaintiffs' financial costs and/or fair rate of return or investment within the milk pricing scheme simply because these needs are contrary and incompatible with the economic interests of Indulac, the dairy farmers, causing a fictitious need to

maintain the cost of the milk to the consumer low.  The Court does not quarrel with the Government's laudable interest to maintain the price of milk low to the consumer.  The problem is in the methodology used to set the price, the cost of production and cost of operations, and lack of adequate standards in that they are constantly in a flux, sometimes recognized other times banned. Above all the fair rate of return is based on a stale national average figure dating back to 1997, which is outdated when it is used for the years 2003 to 2007, particularly after  May 2006, the date when the Puerto Rican Bonds were devaluated by Moodys.  The Court is mindful that Indulac was created by the government to develop a side market within the milk industry by producing milk related products derived from milk that otherwise would have been discarded, and to protect the dairy farmers from suffering a production loss.

It is plaintiffs' contention that ORIL's announcing its intention of adopting an automatic price revision rule to take into account certain major increases in expenses, means very little.  Any automatic adjustment formula must begin with a rational price level to be fairly established according to preexisting and pre-announced regulatory parameters.  Since Puerto Rico has never determined prices in a scientific non-arbitrary way, an automatic price adjustment formula makes little sense until an initial scientific price determination is adopted.

The most glaring example of a taking is the establishment of a fair return rate or investment.  The same is based on a stale average of rate of return in the continental United States published in 1997.  But there is no scientific method used as to how Puerto Rico "fits" within the average.   The average in the United States was published in 1997 but applied in Puerto Rico in 2003 through 2007, in stale fashion against the guidance provided in Tenoco Oil, 836 F.2d at 1024 (stating that a price regulation is stale if the figures are not current - five years deemed stale).  Further, the rate of return does not take

into consideration critical economic facts that occurred in Puerto Rico in May 2006, such as the devaluation of Puerto Rico bonds by the evaluation of Moodys.

Further, the regulatory scheme fails in that there is no procedure allowing for regulatory accrual of losses which occur from one yearly review to the next.  The losses that occur from one year to the subsequent year are not accrued allowing for the losses incurred in a regulated market to be recuperated.

In sum, the current milk price scheme clearly represents a taking of property for the milk processors by not allowing them to recover their true costs and the allowance of a fair profit.  The current situation of the milk price scheme is responsible for the dire financial situation of plaintiffs today.

B.    **The Dormant Commerce Clause**.

Article I,  Section 8, Cl. 3 of the United States Constitution confers upon Congress the affirmative power "to regulate commerce … among the several States."   This affirmative power to regulate includes "a negative aspect, known as the dormant Commerce Clause" Grant's Dairy--Maine, LLC v. Commissioner of Maine Department of Agriculture, Food & Rural Resources, 232 F.3d 8, 18 (1st Cir. 2000). As summarized  by First Circuit in Pharmaceutical Research and Manufacturers of America v. Concannon, 249 F.3d 66, 79 (1st  Cir. 2001):

> The constitutional provision affirmatively granting Congress the authority to legislate in the area of interstate commerce "has long been understood, as well, to provide 'protection from state legislation inimical to the national commerce [even] where Congress has not acted…' " National Foreign Trade Counsel v. Natsios, 181 F.3d 38, 61 (1st Cir. 1999) (alterations in original) (quoting Barclays Bank PLC v. Franchise Task Board of California, 512 U.S. 298, 310 (1994)), aff'd sub nom. Crosby v. National Foreign Trade Council, 530 U.S. 363 (2000).  This negative command known as the dormant Commerce Clause, prohibits states from acting in a manner that burdens the flow of interstate commerce.  Oklahoma Task Commission v. Jefferson Lines, Inc., 514 U.S. 175, 179-180 (1995); Healy v. Beer Institute,

491 U.S. 324, 326 n.1 (1989).

The purpose of the Dormant Commerce Clause doctrine is to prohibit "protectionist state regulation designed to benefit in-state economic interests." Grant's Dairy, 232 F. 3d at 18 (citing Fulton Corporation v. Faulkner, 516 U.S. 325, 330 (1996) and New Energy Company v. Limbach, 486 U.S. 269, 273-274 (1988)).

Following the mandate of the Supreme Court in West Lynn Creamery v. Healy, 512 U.S. 186 (1994), the First Circuit has indicated that the application of the Dormant Commerce Clause doctrine requires a "sensitive, case-by-case analysis of purposes and effects" Id. at 201; Grant's Dairy, 232 F. 3d at 18-19; Walgreen Co.v. Rullán, 405 F. 3d 50, 55 (1st Cir. 2005).

Official state action can be discriminatory against interstate commerce in three different ways, to wit, (a) facially, (b) purposefully, or (c) in practical effect. Wyoming v. Oklahoma, 502 U.S. 437, 454-55 (1992). A facial discrimination against interstate commerce almost always results in a constitutional infirmity, that is *per se* invalid. Foulton Corp. v. Faulkner, 516 U.S. 325 (1996) ("State laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.'") quoting Oregon Waste Systems, Inc. v. Department of Environmental Quality of State of Oregon, 511 U.S. 93 (1994)). Discriminatory effect results in a balancing approach with strict scrutiny for the state's justification. Since this is a constitutional attack on the application of regulatory power, the Court concentrates on the last two forms of discrimination under the analytical formulation of the First Circuit in Walgreen Co., 405 F. 3d at 55:

> Under the dormant Commerce Clause, if a state law has either the purpose or effect of significantly favoring in–state commercial interests, over out-of-state interests, the law will "routinely" be invalidated "unless discrimination is demonstrably justified by a valid factor unrelated to economic protectionism" (citing Houlton Citizens' Coalition v. Town of Houlton, 175 F. 3d 178, 184 (1st Cir. 1999) which in turn quoted West Lynn Creamery, 512 U.S. at 192-

193.)

As the Supreme Court itself has indicated, the legitimate purpose justifying the

local discriminatory action has to be one that "cannot be served by reasonable

nondiscriminatory alternatives." Oregon Waste Systems, Inc. v. Department of

Environmental Quality, 511 U.S. 93, 101 (1994) (citing New Energy Co. of Indiana v.

Limbach, 486 U.S. 269, 278 (1988)). See Walgreen Co., 405 F.3d at 59 (citing Hunt v.

Washington State Apple Advertising Com'n, 432 U.S. 333, 353 (1977)). Justifications for

"discriminatory restrictions on commerce must pass the 'strictest scrutiny'". Oregon

Waste Systems, Inc., 511 U.S. at 101 (citing Hughes v. Oklahoma, 441 U.S. 322, 377

(1979)). This balancing approach is called the Pike Test. Pike v. Bruce Church, Inc. 397

U.S. 137 (1970). Rotunda and Nowack have stated:

> In these decisions one factor becomes imperative to the
> judicial tribunal, a legitimate state regulation must not
> burden interstate commerce in either purpose or effect
> unless the extent of that burden is outweighed by a
> legitimate state objective that cannot be achieved in a less
> burdensome manner. Rotunda and Nowak Treatise on
> Constitutional Law, Thompson-West (2007) s. 11.6 p. 199.
> (Emphasis added).

The Dormant Commerce Clause doctrine applies to Puerto Rico on the same

terms that it applies to the states. Trailer Marine Transport Corp. v. Rivera Vázquez, et

al., 977 F.2d 1, 8-9 (1st Cir. 1992). As to the applicability of the Commerce Clause to

Puerto Rico, the Court of Appeals held:

> Both the Supreme Court and this court [First Circuit] have
> long held or assumed that Congress has power under the
> Commerce Clause to regulate commerce with Puerto Rico.
> See Secretary of Agriculture v. Central Refining Co.,
> 338 U.S. 604, 616, 70 S.Ct. 403, 409, 94 L.Ed. 381 (1950)
> (Sugar Act of 1948 applied to Puerto Rico through the
> Commerce Clause); Puerto Rico Tel. Co. v. F.C.C.,
> 553 F.2d 694, 701 (1st Cir. 1977) (Federal Communications
> Commission regulations applied via the Commerce Clause
> to government-owned telephone company in Puerto Rico).
> Thus, in one aspect, the question "whether the Commerce

Clause applies to Puerto Rico" has been settled in the affirmative for many years; the more precise issue posed in this case, is whether the dormant Commerce Clause doctrine also applies to Puerto Rico.

The Supreme Court has resolved this silence by holding that the power granted Congress under the Commerce Clause is not invariably exclusive of the states but only sometimes so. Cooley v. Board of Wardens, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852). Pertinently, the Court's decisions hold, in an application that is opaquely called the dormant Commerce Clause, that state laws or local regulations are invalid under the Commerce Clause *ex propio vigore* where they unduly burden or discriminate against interstate or foreign commerce. City of Philadelphia v. New Jersey, 437 U.S. 617, 623-24, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978).

**The central rationale of the dormant Commerce Clause doctrine, as the Supreme Court has explained, is the dominant purpose of the Commerce Clause to foster economic integration and prevent local interference with the flow of the nation's commerce**. H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 537-38, 69 S.Ct. 657, 664-65, 93 L.Ed. 865 (1949). **This rationale applies with equal force to official actions of Puerto Rico. Full economic integration is as important to Puerto Rico as to any state in the Union. In a different context, the Supreme Court has flatly rejected the notion that Puerto Rico may erect an "intermediate boundary"separating it from the rest of the country**. Torres v. Com. of Puerto Rico, 442 U.S. 465, 472, 99 S.Ct. 2425, 2430, 61 L.Ed.2d 1 (1979). **There is no reason to believe that Congress intended to authorize Puerto Rico to restrict or discriminate against cross-border trade and ample reason to believe otherwise**. *E.g.*, 48 U.S.C. § 738 (no duties may be imposed on trade between Puerto Rico and the United States); 48 U.S.C. § 741a (Puerto Rico can tax imported goods but cannot discriminate in favor of goods made in Puerto Rico).

If the government of Puerto Rico were nothing other than the alter ego or immediate servant of the federal government, then the dormant Commerce Clause doctrine would have no pertinence, for a doctrine designed to safeguard federal authority against usurpation has no role when the federal government itself is effectively the actor. (Citations omitted). Whatever the ultimate source of its authority or its exact constitutional status, Puerto Rico today certainly has sufficient actual autonomy to justify treating it

as a public entity distinct from Congress and subject to the
dormant Commerce Clause doctrine.  In the Supreme
Court's words, "the purpose of Congress in the 1950 and
1952 legislation was to accord to Puerto Rico the degree of
autonomy and independence normally associated with States
of the Union ...."  Examining Board v. Flores de Otero,
426 U.S. 572, 594, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).
See also Córdova & Simonpietri Ins. Co. v. Chase
Manhattan Bank, N.A., 649 F.2d 36, 40-41 (1st Cir. 1981).
(Emphasis added).

As to the First Circuit's prior holding in Buscaglia v. Ballester, 162 F.2d 805

(1st Cir. 1945), *cert. denied*, 332 U.S. 816 (1947), the appellate court overturned and

succinctly stated "that Buscaglia will no longer be followed."  Trailer Marine, 977 F.2d at

9.  See also Antilles Cement Corporation v. Acevedo Vilá, 408 F.3d 41, 46 (1st Cir. 2005)

("The dormant Commerce Clause and its doctrinal accouterments apply to Puerto Rico as

though Puerto Rico were a state"); Walgreen Co. v. Rullán, 405 F.3d 50, 55 (1st Cir.

2005),  *cert. denied*, ____ U.S. ____, 126 S.Ct. 1059, 163 L. Ed.2d 928 (2006) ("The

dormant Commerce Clause doctrine, . . . applies to Puerto Rico on the same terms as it

applies to the states"); United Egg Producers v. Department of Agriculture of the Com. of

Puerto Rico, et al., 77 F.3d 567, 570-571 (1st Cir. 1996).

In a recent Puerto Rico Supreme Court opinion, Asociación Puertorriqueña de

Importadores de Cerveza, Inc. v. Estado Libre Asociado de Puerto Rico, et al.,

_____ D.P.R. _____, 2007 TSPR 92, 2007 WL 1630877 (May 16, 2007), Justice Rebollo,

in his concurring decision, cited Trailer Marine, *supra*, in support of his finding on the

applicability of the Dormant Commerce Clause to Puerto Rico.  Justice Rebollo explained

that in Trailer Marine, the First Circuit made a thorough analysis on the applicability of

the Dormant Commerce Clause to the then territory of Alaska and the United States

Virgin Islands, citing Anderson v. Mullaney, 191 F.2d 123, 127 (9th Cir. 1951), and

JDS Realty Corp. v. Government of Virgin Islands, 824 F.2d 256, 259-260 (3rd Cir.1987):

But we cannot conceive that in granting legislative power to

the Territorial Legislature it **was intended that the power should exceed that possessed by the legislature of a State in dealing with commerce.** The words "all rightful subjects of legislation" describing the extent to which the legislative power of the Territory should extend, 48 U.S.C.A. § 77, do not include the imposition upon commerce such as that here involved of burdens which a State might not create under like circumstances. "All rightful subjects of legislation" must be held to refer to matters local to Alaska. Anderson v. Mullaney, 191 F.2d at 128. (Emphasis added).

Asociación Puertorriqueña de Importadores de Cerveza, Inc., 2007 WL1630877. See also

United Egg Producers v. Department of Agriculture, 77 F.3d 567 (1st Cir. 1996); Starlight

Sugar, Inc. v. Soto, 253 F.3d 137 (1st Cir. 2001); Walgreen Co. v. Rullán, 405 F.3d 50

(1st Cir. 2005), *cert. denied*, ____ U.S. ____, 126 S.Ct. 1059, 163 L.Ed.2d 928 (2006).

Justice Rebollo further stressed that:

> There can surely be no doubt in anyone's mind that the United States  – at least in trade commerce matters – enjoys broad powers to **prevent** what the United States Supreme Court has characterized as "**the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation**." Granholm v. Heald, 544 U.S. 460,  472 (2005) (citing Hughes v. Oklahoma, 441 U.S. 322, 325-326 (1979)).

Most critical to Justice Rebollo was the express language provided in the Puerto Rican Federal Relations Act:

> Finally, in the absence of an express provision excluding Puerto Rico from the application of the dormant Commerce Clause, [n.13] there is no reason to believe that Congress authorized Puerto Rico to discriminate against interstate and foreign commerce.  Likewise, it would be risky to argue otherwise, **given the existence of a prohibitive in the Federal Relations Act that orders the Legislature of the Commonwealth "*that no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico*."**  Federal Relations Act sec. 3, L.P.R.A., vol. 1.

Moreover, Justice Rebollo found persuasive the analysis made by Constitutional law commentator Laurence H. Tribe:

> According to the distinguished commentator Laurence H.
> Tribe, the United States Supreme Court's approach to this
> matter lays great emphasis on the question whether the
> statute at issue discriminates against interstate or foreign
> [out-of-state] commerce.  Tribe, *supra*, at 1059.
> Consequently, a state law that discriminates against
> interstate commerce, ***either on its face or in its practical
> effect***, will be invalidated unless the state shows that the
> statute serves a legitimate local purpose and that this
> purpose cannot be served as well by nondiscriminatory
> means.  Id.  (Emphasis added).

Asociación Puertorriqueña de Importadores de Cerveza, Inc., 2007 WL1630877.    See

also Ramos v. Puerto Rico Medical Examining Bd., _____ F.Supp.2d _____, 2007 WL

1745654, *3, n.4 (D.Puerto Rico) (June 18, 2007):

> In order to resolve the present controversy it is unnecessary
> to determine whether the Privileges and Immunities Clause
> of the United States Constitution applies to Puerto Rico *ex
> propio vigore*.  The court notes, however, that like the
> Commerce Clause, the Privileges and Immunities Clause
> derives from Art. IV of the Articles of the Confederation,
> and was intended to create a national economic union.

In the instant case, defendants challenge the standing of plaintiffs.  The Court,

however, finds that plaintiffs have *prima facie* standing to proceed with this Dormant

Commerce Clause challenge.  As stated above, plaintiffs are required to pay for the raw

milk an amount much higher than the amount constituting the farmers' cost and

reasonable profit in order for Indulac to be able to buy the same milk at a price way below

that level, without affecting the dairy farmers' income.  When Indulac turns this milk into

fluid milk it directly competes with the fresh milk processors and affects their market

share and their general competitiveness in the fluid milk market of Puerto Rico.  The milk

pricing scheme currently under attack exists only because most of the financial burden is

carried by plaintiffs.   Indeed, plaintiffs carry on with the recovery of expenses, reasonable

profit of the dairy farmers, and the competitive weight of having their market share in the

Puerto Rico fluid milk market eroded by Indulac's activities, their subsidized competitor.

The market share has caused an adverse erosion in plaintiffs' financial condition.

Contrary to defendants' position, it is clear that a plaintiff in dormant Commerce Clause

cases does not have to be a member of the class of entities against which the state measure

discriminates.  In Houlton Citizens' Coalition v. Town of Houlton, 175 F. 3d. 178, 183

(1st Cir. 1999), the Court said:

> In Commerce Clause jurisprudence, cognizable injury is not
> restricted to those members of the affected class against
> whom states or their political subdivisions ultimately
> discriminate.  See General Motors Corporation v. Tracy,
> 519 U.S. 278, 286 (1997).  Thus, and in-state-business
> which meets constitutional and prudential requirements due
> to the direct or indirect effect of a law purported to violate
> the dormant Commerce Clause has standing to challenge
> that law. (Emphasis added).

In Houlton, 175 F.3d at 183, the Court set forth the normal prudential

considerations of standing:

> Here, Faulkner, a co-plaintiff satisfies both the
> constitutional requirements and the prudential conditions for
> standing.  He has lost the business of his residential
> customers in Houlton; that injury can be traced directly to
> the Town's neoteric waste management scheme; and the
> injury would be adequately redressed by equitable relief
> and/or damages against the Town.  As a classic plaintiff
> asserting his own economic interests under the Commerce
> Clause (a constitutional provision specifically targeted to
> protect those interests) Faulkner **avoids any concerns
> relative either to *jus tertii*,** Warth v. Selding, 422 U.S. 490,
> 499 (1975), **or to the "zone of interest" requirement,** see
> Valley Forge Christian College v. Americans United for
> Separation of Church and State, Inc., 454 U.S. 464, 475
> (1982).  (Emphasis added).

Further, in Alliance of Auto. Mfrs v. Gwadosky, 430 F. 3d 30 (1st Cir. 2005), the

First Circuit again followed Houlton, and held that the state measure under attack

discriminated against interstate commerce by favoring in-state automobile dealers at the

expense of out-of-state automobile dealers.  But the financial burden of the system that the

state had in place was carried mainly by the Ford Motor Company and other automobile

manufacturers.  These entities were not competitors of the automobile dealers of either

state, thus, not similarly situated amongst them.   However, Ford paid the financial burden

of the barrier that was erected against interstate commerce; therefore, the association to

which Ford belonged was granted standing.  See also Bacchus Imports, Ltd. v. Dias,

468 U.S. 263 (1984);  General Motors Corp. v. Tracey, 519 U.S. 278, 286 (1997).   In the

instant case, plaintiffs have the financial burden of subsidizing Indulac, the dairy farmers,

and ultimately, the responsibility of keeping the milk industry afloat, regardless of the

cost.  Hence, plaintiffs have standing to challenge the government's violation of the

Dormant Commerce Clause.

The price discrimination regulation under scrutiny fails both the "purpose" and

"effect" tests.[236]  There is no dispute on the record on any of the two counts.  The

Administrator of ORIL, Juan Pedró González, testified about the pricing of $0.32 per

quart of surplus milk for Indulac contained in the provisional administrative order of

February 24, 2006. Very eloquently, he explained the need for that discriminatory pricing

in the following way:

"If right now, instead of .32 cents we were to raise the price of surplus milk to .53,
.55 cents, and we lower the price of fresh milk to .53 or .55 cents in order for
Indulac to be able to have a profit and continue in operation, we are going to have
to raise the price of UHT milk to 1.30 or 1.50 per liter or quart.  And if we are
going to do that today without these [protective] two bills of law, the imported
UHT milk is going to take over the entire market and it will make Indulac go
bankrupt." See Transcript of February 27, 2006, at pages 34-35.

This statement of the Regulator is confirmed by the testimony of Mr. Benítez, a dairy

farmer and President of Indulac, who indicated that Indulac could not pay more than 32 cents

---

[236]
When considering a possible Dormant Commerce Clause violation, the Court shall carefully examine the circumstances
on a case-by-case basis.  All "[f]ormulas for applying the dormant Commerce Clause are, if flexible enough to be valid,
usually too general to resolve concrete cases.  Still, the formulas offer a starting point and, under the precedents, state
action that 'discriminates against interstate commerce'" stands condemned." Trailer Marine Transport v. Rivera, 977
F. 2d 1, 28 (1st Cir. 1992). (citations omitted)   See also Walgreen v. Rullán, 405 F. 3d at 55.  Here, our purpose and
effect analysis is firmly grounded in the specific facts proven on the record.  West Lynn Creamery, 512 U.S. at 201.  The
Court's justification to apply the Dormant Commerce Clause to Puerto Rico is simply because Puerto Rico "…may not
place itself in a position of economic isolation".  Baldwin v. G.A.F. Seelig, 294 U.S. 511, 527 (1935).

because "We would not be able to compete with imported UHT or it [Indulac] would sustain economic losses." Both experts for defendants admitted that the justification for this price discrimination was the competition faced by Indulac from the UHT milk importers. The record shows that as recent as the year 2006, Indulac was requesting to the Administrator further price reductions in order to compete with imported UHT milk, and they were successful as the price was further reduced by allowing milk used for products, such as cheese, evaporated milk, etc., and by reducing required payments to be made to the FFIL by Indulac.

In the instant case, the record amply supports a finding of a constitutional violation of the Dormant Commerce Clause, as the milk pricing scheme is invalid *per se*. The mere purpose to discriminate against interstate commerce is sufficient to trigger a constitutional challenge of the Dormant Commerce Clause:

> If a state law discriminates against interstate commerce because of its interstate nature, the state law should be held to be a *per se* violation of the dormant Commerce Clause. Because the purpose of the law is illegitimate, there is no need for the Court to engage in any balancing test: Rotunda and Nowak, Treatise on Constitutional Law Thompson-West 2007 S.11.8 p. 220.[237]

Indulac's price subsidy is also questionable under the balancing "effect" test. As admitted by Mr. Pedró himself, if no protectionist laws are enacted, and Indulac is forced to pay an amount equal to the farmer's cost and a reasonable profit, then the imported UHT milk taking would take over the market forcing Indulac into bankruptcy. Hence, Indulac's price benefit not only has the purpose of stopping or at least limiting the market share of imports but it is having the desired effect.[238]

---

[237] The Court is mindful of the fact that the Supreme Court has "also recognized that there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause and the category subject to the Pike v. Bruce Church balancing approach. In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 US 573, 579 (1986). See also Gen. Motors Corp. v. Tracy, 519 U.S. 278, 298 n. 12 (1997) ("There is, however, no clear distinction between these two strands of analysis").

[238] The milk production cost in Puerto Rico is much higher than that in the Continental United States. Indulac presently holds about 70% of the UHT milk market in Puerto Rico, a fact that makes the challenged regulation discriminatory. In sum, Indulac has control of almost 3/4 of the UHT milk market in Puerto Rico, simply because it has no competition, as Indulac subsidized price for raw milk cannot be defeated by UHT milk importers.

Puerto Rico's situation is similar to other milk cases already entertained by the United States Supreme Court finding a violation to the Commerce Clause.  Puerto Rico is trying to compensate, through a subsidy paid by plaintiffs, the natural cost advantage of out-of-state milk producers in order to protect the local milk market as well as the local dairy farmers.  The Supreme Court has consistently struck down such type of measures despite any local ingenuity.

"Nice distinctions between direct and indirect burdens [are] irrelevant" when purpose and effect is to suppress or mitigate interstate competition.  (Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 374 (1964) (citing Baldwin v. G.A.F. Seelig, Inc., 294 U.S. 511 (1935)) because they have the same effect as an interstate tax or custom duty).  Oregon Waste Systems, Inc., 511 U.S. at 106 (1994) ("… regulating interstate commerce in such a way so as to give those who handle domestic articles of commerce a cost advantage over their competitors handling similar items produced elsewhere, constitutes … protectionism").  Measures that neutralize the natural advantages possessed by lower cost out-of-state producers are routinely held unconstitutional.  See Baldwin, 294 U.S. at 527 (elimination of milk regulation "designed to neutralize advantages belonging to the [out-of-state] place of origin"); West Lynn Creamery, 512 U.S. at 194 (milk market); Bacchus Imports, Ltd. v. Dias, 468 U.S. 263 (1984) (liquor); Hunt, 432 U.S. at 351 (statute invalidated because it had "the effect of stripping away from the Washington apple industry the competitive and economic advantages it has earned for itself"); and other cases of this kind cited in West Lynn Creamery, 512 U.S. at 194 (calling them "legion").

In West Lynn Creamery, 512 U.S. 186, the "avowed purpose" and "undisputed effect" of the measures therein under attack were to "enable higher cost Massachusetts dairy farmers to compete with lower cost dairy farmers of other states" and to allow "Massachusetts dairy farmers who produce at higher costs to sell at or below the price charged by lower cost out-of-state

_____

producers."

The situation in West Lynn Creamery, *supra*, is similar to the case at bar. In West Lynn Creamery, the State of Massachusetts imposed a tax on all the raw milk sold by dealers (both in and out-of-state) to Massachusetts retailers, and distributed the tax proceeds to Massachusetts' dairy farmers only.  In the instant case, the Puerto Rico government imposes a surcharge on fresh milk processors that allows Indulac to receive low priced raw milk to compete with imported UHT milk while at the same time maintaining an elevated price for all the raw milk produced by the Puerto Rico dairy farmers. Both the West Lynn Creamery tax and the Puerto Rico surcharge are designed to and have the effect of interfering with commerce while channeling money to the local dairy farmer. Cf. Bacchus Imports, Ltd., Id. (same effect achieved by exempting certain local liquor from state tax).

The record is devoid of any suggestion that this discriminatory pricing scheme is supported by any legitimate state interest unrelated to protectionism, and that said interest cannot be achieved by lawful means.  These measures do not pass judicial scrutiny. To argue that this is a measure needed by Puerto Rico's "struggling" milk industry, is not enough.  Bacchus, 468 U.S. at 272  ("…we perceive no principle of Commerce Clause jurisprudence supporting the distinction between thriving and struggling enterprises under these circumstances, and the state cites no authority for its proposed distinction"). ("[T]he propriety of economic protectionism may not be allowed to hinge upon the state's (or this Court's) characterization of the industry as either 'thriving' or 'struggling'"). Id. at 273.  See also West Lynn Creamery, 512 U.S. at 205 (rejecting this same argument with respect to the alleged possible collapse of the milk industry in Massachusetts, and citing for the same proposition another milk case, Baldwin, 294 U.S. at  522-523.)

Defendants' discriminatory practice is not saveable with the argument that it simply promotes the local products and that it does not intent to discriminate against the foreign

products.  Bacchus, 468 U.S. at 273 ("… it is irrelevant to the Commerce Clause inquiry that the

motivation of the Legislature was the desire to aid the makers of the locally produced beverage

rather than to harm out-of-state producers").  A desire to either increase the market share of local

producers or simply mitigate the declined demand for their products does not pass muster either.

West Lynn Creamery, 512 U.S. at 196, n.12 ("For Commerce Clause purposes, it does not matter

whether the challenged regulation actually increases the market share of local producers or

whether it merely mitigates a projected decline").  The fact that for years Indulac has produced

by-products that did not make a profit is irrelevant to our analysis of the Dormant Commerce

Clause challenge.  Firstly, Indulac is today a significantly profitable entity that has generated

much of its profits from the UHT milk business for several years.  Secondly, "the dormant

Commerce Clause is applicable to activities undertaken without the intention of earning a profit."

Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 584-85 (1997) (citing

Edwards v. People of State of California, 314 U.S. 160 (1941).

        Finally, the fact that the discriminatory measure allows Indulac to favorably compete with

out-of-state interests, such as the UHT milk importers, as well as intrastate interests, such as the

fresh milk processors, makes no difference.  Walgreen Co., 405 F. 3d at 58.  Courts have

invalidated laws under the Commerce Clause because "they discriminate against out-of-state

entities and some in-state entities in order to favor a subset of in-state interests." Id. (citing C & A

Cardone, Inc. v. Clarkstown, 511 U.S. 383, 394 (1994)).

        It is immaterial whether the competition from Indulac's UHT milk is a main cause for the

declining volume of fresh milk or simply one of the factors.  Every witness testifying on the

subject agreed that it was at least a factor.  The degree at which fresh milk is affected by UHT

milk competition has no bidding for this constitutional analysis.  Bacchus Imports, Ltd. v. Dias,

468 U.S. 263, 269 (1984).  In Baldwin v. G. A. S. Selig, Inc., 294 U.S. 511 (1935), a unanimous

Supreme Court rejected the notion that a direct-indirect burden distinction could be relayed upon

by the state to defend otherwise non-competitive scheme.  <u>Associated Industries of Missouri v.</u>

<u>Lohman</u>, 511 U.S. 641, 650 (1994) ("Actual discrimination, whatever it is found is impermissible,

and the magnitude and scope of the discrimination have no bearing on the determinative question

whether discrimination has occurred"); <u>Maryland v. Louisiana</u>, 451 U.S. 725 (1981).

       The Court must cease its analysis at this point having determined the applicability of the

Dormant Commerce Clause, having further set forth sufficient facts showing a strong federal

factual scenario as to a *prima facie* violation, and having determined standing.  The Court stops as

it finds that any potential remedy as to the Dormant Commerce Clause has already been provided

under <u>Permian Basin Area Rate Cases</u>, 390 U.S. at 769-70.  The Court stated that a regulation

begins to take property without due process of law only if "arbitrary, discriminatory or

<u>demonstrably irrelevant to the policy the legislature is free to adopt</u>." (Emphasis ours).  Based on

the highlighted above quote, the Court has already found unconstitutional the regulation granting

Indulac the privilege of purchasing raw milk at below cost process of the dairy farmers based on

the fact that Indulac is using said benefit to give a competitive edge over the fresh milk

processors, and the farmers are also using said regulatory scheme to attempt to purchase the two

processing plants at a bargain price.  The net result under either alternative is that the fresh milk

processors are eliminated from the market which is clearly contraindicated by the Statement of

Motives set forth in Law No. 34.  The Milk Industry Regulatory Act clearly indicates that when

establishing a procedure "to dispose of the milk surplus" the matter would be handled "in such a

manner that [would not] affect [ ] the interest of the persons engaged in [the] operating [of the]

businesses in the different phases of the industry."  Hence, no milk industry party would be

affected by the procedure of "dispos[ing] of the milk surplus through a regulation."  The Court

found, therefore, that the milk processors are steadily losing their market through the regulatory

procedure of granting Indulac the right to produce milk at below cost of the dairy farmers.  The

Court struck said remedy as unconstitutional, which is the only remedy that can be achieved

through the Dormant Commerce Clause.  Hence, the Court finds that said remedy is, at this point,

academic and under justiciability standards the court refuses to  continue any further analysis.

INJUNCTIVE RELIEF REVISITED

Injunctive relief under Fed. R. Civ. P. 65 requires that a party seeking injunctive relief

comply with a quadripartite test. New Comm Wireless Services, Inc. V. SprintCom, Inc., 287

F.3d at 8-9.

The first criteria to be complied is likelihood of success, the sine qua non requirement.

Weaver v. Henderson, 984 F.2d at 12. Should said requirement not be present, "the remaining

factors become matters of iddle curiosity." Auburn News Co., Inc. v. Providence Journal Co., 659

F.2d at 277. The court finds, as more fully described infra, violations of Due Process, Equal

Protection and the Takings Clause, a pattern of lack of standards, change in standards with

unfettered discretion, use of stale figures, and lack of an appropriate standard as to fair rate of

return in the regulations set by the regulator all pointing to a taking "pursuant" to Duquesne Light

Co., 488 U.S. at 307; Tenoco Oil, 826 F.2d at 1026-1027.

The second criteria constitutes the presence of non-speculative irreparable harm.

Narrangansett Indian Tribe v. Guilbert, 934 F.2d at 6-7. The court finds that said criteria has been

reached since the two processing plants are losing market and have suffered for the periods from

2003 to 2007 a Due Process and Equal Protection violation reaching levels of a "taking."  The

record is abundant as to the continuous violations for said period, including a  methodology

deficiency in parameters and unlimited discretion of the Administrator in changing, adding,

subtracting, from year to year, parameters. Further, there is no system for a regulatory accrual to

recuperate interim losses that occur from year to year, yet a stale system to determine "fair rate of

return" is in place. These deficiencies point to permanent loss in market and long-standing

violations of constitutional rights for extensive protracted periods of time. The court opines this

criteria to have surpassed the required threshold.

The third criteria requires the court to perform a balancing of equities under <u>Matos ex rel.</u> <u>Matos v. Clinton School Dist.</u>, 367 F.3d at 73. The court balances whether "the harm caused plaintiff without the injunction, in light of plaintiffs likelihood of success in the merits, outweighs  the harm the injunction will cause defendants." <u>DeNovellis v. Shalala</u>, 135 F.3d at 77.

Plaintiff is merely requesting that the regulations promulgated provide a "fair rate of return" and that the parameters set not be arbitrary. Defendants potentially will suffer the loss of continuing with an unquestionable discriminatory price preference as to the purchase of raw milk, financed by plaintiff, which is being used at least partially to dwindle plaintiffs share of the fluid milk market. Further, the dairy farmers are using said loss of market in an attempt to purchase the good will and market of plaintiff at a low price, all caused or partially caused by the preferential price scheme whereby Indulac buys raw milk at more than half the cost of plaintiffs and under the cost of the dairy farmers. The matter is not close. The constitutional rights of plaintiff override, with its consequential permanent loss of market and potential fire sale of its plants, the rights of defendant to continue with a preferential purchase price of raw milk which is prima facie discriminatory and  must be ceased.

<u>The effect on the public interest</u>. Without the injunctive relief, the plants are close to being sold at very low prices, an important independent element of the industry is about to be lost and the industry is then close to being monopolized by one party of the milk industry. The public interest has been clearly set by the law: The court concedes that the excess milk be properly attended by government regulation; however, by disposition of the law (Legislative History and Purposes of the "Milk Industry Regulation Act") said regulative procedure is to be performed "without affecting the interest of the persons engaged in operating [the] business . . . of the industry."

Hence, the public interest lies in the granting of the injunctive relief.[239]

---

[239] The defendants allege that the court should not issue an injunctive relief based on the doctrine of "clean hands" as Plaintiffs acted as Director of Indulac and hence participated in the decision of Indulac. The court is of the opinion that the doctrine should not apply. <u>Dr. José S. Belaval, Inv. v. Pérez-Perdomo</u>, 488 F.3d 11 (1st Cir. 2007) (clean

## THE REMEDY

In view of the foregoing, plaintiffs' petition for preliminary injunctive relies if

---

hands doctrine "only applies when claimant's misconduct is directly related to the merits of the controversy between the parties . . . ")  First, the court clarifies that plaintiffs' industrial fresh milk processors, ceased to be members of the Board of Indulac on September 2, 2003 (Ex. 7, Transcript February 15, 2005, pp. 134-135). Further, the court has issued injunctive relief based on arbitrary parameter determinations relating exclusively to ORIL's conduct in accepting or rejecting production and/or operational costs and/or using stale figures in determining manufacturing and operational costs and/or in changing from year to year the parameters and/or in the application of a 1997 United States stale average "fair rate of return" to the 2003 to 2007 fair rates of return as to the milk industry in Puerto Rico. The conduct which the court attributes to ORIL as violating Due Process, Equal Protection and the Takings Clause of the Federal Constitution  in regulating the milk industry lacks any participation by the two plants.

The court sets forth various illustrative examples. The two plants did not participate at all in the following:

– ORIL's decision in 2005 to terminate the credit for bona fide returned milk credited to retailers or wholesalers which fictitiously increased the real capital income of the two plants (in the past returns were accepted by ORIL).

– The plaintiffs did not participate in the decision of the Administrator in using sales figures of the plants of 2003 as basis for regulating industry prices in 2005, 2006, 2007. The use of stale cost figures does not allow for obvious increases in cost and operations such as electricity, fuel, resin and labor that have occurred since 2003 to 2007. Sales had decreased as, known by ORIL, and again the capital base of the two plants on past sales is fictitious since the sales of fresh milk have actually decreased from 2003 to 2007. Tenoco Oil Co., 876 F.2d 1024 (criticizing use of stale figures of years past the actual year of the review.)

– ORIL used as "fair return rates of investments" as to the plants a 1997 United States average figure of 10% applied to the regulatory prices set in 2003, 2005, 2006, 2007, without a study as to how Puerto Rico "fit" into the national average. The United States average of 10% is further stale being used in 2003 to 2007. Tenoco Oil Co., Id. (The use of stale rates of return from the Continental United States to Puerto Rico fuel industry not found reasonble.) Finally, as to the yearly review of the price regulation for 2007, ORIL failed to take into consideration the economic reality of the devaluation of Four Billion Dollars of governmental Bonds of Puerto Rico by Moody's in May of 2006.

– The two claimants had no participation in the change of parameters by ORIL of discounts to agents although in years immediately before discounts were granted by ORIL; further discounts being actually taken by Indulac in amounts of around $1.8 million dollars and the regulator did nothing to stop these discounts. No parameters as to discounts are present since one year they are accepted by ORIL without reasoning and the next year they are surprisingly rejected.

– The credit granted as to shrinkage (loss of raw milk due to temperature) was diminished by ORIL without any explanation. The "historical factor" alleged by ORIL was proved to be nonexistent.

– ORIL refused to grant credit for operational costs of professional fees and use of experts relating to the annual review hearing; a criteria accepted to be credited by the Supreme Court. Driscoll v. Edison Light & Power Co., 307 U.S. 104.

– There is no mechanism to recuperate losses occurring between yearly periods of price review. That is, there is no regulatory accrual for the losses that occur from year to year. Hence, the plants must carry the losses and never are able to recuperate losses.

– In the 2007 review ORIL for the first time counted the revenue of the plants in non-regulated business (sale of non-regulated juice business) notwithstanding state court's final order to the contrary respected until 2007. The constitutional deficiency being again the changing of parameters.

– ORIL refused to hold a yearly increase regulatory hearing merely because of a change of ownership of Suiza; Tres Monjitas, a separately owned and managed company, suffered prejudice. The regulating statute contains no exception to the yearly reviews merely due to a change in ownership. A mere change in ownership fails to warrant a presumption of illegality under any corporate law analysis. Again the federal deficiency is a change in parameters.

– The current difference in prices of raw milk from the dairy farmers purchased by Indulac (around 26.5 cents) and that of the plaintiffs (around .65 cents) is a matter of legislation wherein the two plants have no determinative nor regulative capacity.

The court, therefore, considers that since the injunctive relief has been granted based on Due Process, Equal Protection and the Takings conduct attributed to ORIL where Suiza and Tres Monjitas are not involved in any "misconduct . . . directly related to the merits of the controversy between the parties" the doctrine of clean hands does not apply. Texaco Puerto Rico, Inc. v. Department of Consumer Affairs, 60 F.3d 867, 888 (1st Cir. 1995).

**GRANTED** as follows:

Effective immediately, both the fresh milk processors and Indulac will begin paying the amount of $0.55 per quart of raw milk to the dairy farmers. When the Administrator eventually determines to change the price to be paid to said dairy farmers, all market participants using raw milk to process fluid milk will pay the same amount for the milk. Under no circumstances will the fresh milk processors be required to pay more for their raw milk or carry additional costs for the purpose of allowing Indulac's access to raw milk for UHT or fluid milk manufacturing at a lower cost than the cost at which plaintiffs can acquire raw milk from fresh or fluid milk processing. The Administrator may set at his discretion the prices for raw milk for non fluid milk use.

In a period of no more than thirty (30) days, the Administrator will put into effect non-discriminatory, rational and scientific regulatory standards that will allow him to determine costs and fair profits return for all the participants in the Puerto Rico regulated milk market. Those standards will set the reasonable rate of return that each participant should receive. The Administrator shall perform a study as to the economic realities of doing business in Puerto Rico and the particular "fit" of Puerto Rico into any economic model which may be used from other jurisdictions. Any figures used from other jurisdictions are not to be stale but are to be "for the year in question." <u>Tenoco Oil Co.</u>. The Administrator is to establish a system or incorporate a system or provide for mitigation for regulator accrual for losses properly supported that occur between periods of yearly reviews. The price structure of the fresh milk processors will be reviewed immediately under those parameters. The methodology of the parameters is to be consistent with this Opinion and Order.

The Administrator is ordered to adopt a temporary mechanism that will allow the processors to recover the new rate of return they are entitled to (whatever that may be) for the year 2003 (base cost year of the present structure) and up to the day when they begin to recover said rate based on the new regulatory standards and corresponding order. The Administrator may

so act through regulatory accruals, special temporary rates of return or any other available mechanism of his choosing. The period for this special recovery shall be reasonably determined by the Administrator. The Administrator will hold hearings for this purpose with the participation of plaintiffs, and all parties within the milk industry, within a period of thirty (30) days of this Opinion and Order. A decision by the Administrator shall follow promptly.

The court will retain jurisdiction until full compliance has been duly met with this preliminary injunction.

Upon compliance with the dispositions of this Opinion and Order, the parties shall forthwith move the court to schedule a hearing on the permanent injunction.

**IT IS SO ORDERED.**

At San Juan, Puerto Rico, this 13th day of July 2007.


s/ Daniel R. Domínguez
**DANIEL R. DOMINGUEZ**
**U.S. DISTRICT JUDGE**