**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO as representative of<br><br> THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUBLIC BUILDINGS AUTHORITY<br><br>*Debtors*[1] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283 – LTS<br>(Jointly Administered) |

**CREDIT UNION'S JOINT OBJECTION TO SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO *ET AL*.**

---

[1] The Debtors in these Title III Cases, along with each debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of federal Tax ID: 3481); (ii) Puerto Rico Sales tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ........................................................................ 2

II.    RELEVANT BACKGROUND ........................................................................ 3

    A.   Objectors Identification ................................................................ 3

    B.   Factual Background ..................................................................... 4

III.   ARGUMENT-OBJECTIONS TO CONFIRMATION OF THE PLAN ................................ 9

    A.   The Cooperatives Claims are Not Subject to Impairment or Reduction in the Plan as these are Constitutional Claims for the Taking of Property Without Just Compensation  9

    B.   The Seventh Plan of Adjustment cannot be confirmed because it disregards pending litigations and derails the proprietary fundamental rights of the Objecting Credit Unions to prosecute the causes of action and remedies to which they may be entitled. ............. 16

    C.   The Releases and Exculpations Provided for in the Plan of Adjustment are Excessive, Undermine the Cooperatives Rights Against Other Parties Who are Not Title III Debtors and Renders the Plan Unconfirmable ........................................................ 18

        1.  Instead of being released and exculpated, the Credit Unions' Claims Should be Excepted from Discharge in the Confirmation Order Pursuant to 11 USC 944  (c) (1)................................................................................. 19

        2.  Discharge is only available to honest debtors ......................................... 20

        3.  Discharge is equitable in nature................................................... 21

    D.   The Seventh Plan of Adjustment Cannot be Confirmed as it is not in compliance with PROMESA since it fails to be consistent with a Fiscal Plan that is compliant with section 201 of PROMESA ......................................................... 23

IV. REMEDIES SOUGHT IN OBJECTION TO CONFIRMATION OF THE PLAN .............. 27

V. RESERVATION OF RIGHTS ........................................................... 28

i

## **TABLE OF AUTHORITIES**

**Cases**

A&D Auto Sales, Inc. v. U.S., 748 F.3d 1142 (Fed. Cir. 2014). .................................................... 17

Aid Ass'n for Lutherans v. U.S. Postal Serv., 321 F. 3d 1166, 1173 (D.C. Cir. 2003). .............. 28

American Clinical Laboratory Association v. Azar, 931 F. 3d 1195, 1204 (D.C. Cir. 2019) ...... 26

Amgen, Inc. v. Smith, 357 F. 3d 103, 112 (D.C. Cir. 2004).......................................................... 28

Armstrong v. United States, 362 U.S. 40, 49 (1960). ................................................................... 11

Broad v. Sealaska Corp., 85 F.3d 42, 432 (9th Cir. 1996)........................................................... 16

Brown v. Felsen, 442 U.S. 127, 128 (1979) .................................................................................. 22

Buckingham v. McLean, 54 U.S. 151 (1852). ............................................................................... 21

Cobb v. City of Stockton, 909 F.3d 1256 (9th Cir 2018) ............................................................... 15

Commonwealth of Puerto Rico vs. Sánchez Valle, 136 S. Ct. 1863 (2016) ................................ 10

COMSAT Corp. v. F.C.C., 114 F. 3d, 223, 227 (D.C. Cir. 1997)................................................. 27

Cooperativa Cafeteros de P.R. v. Colón Torres, 84 D.P.R. 278,281-282 (1961) ......................... 5

Dimare Fresh Inc. v. U.S., 808 F.3d 1301, 1307 (Fed. Cir. 2015) .............................................. 15

Dimare, supra, at 1307 .................................................................................................................. 16

Dolan v. City of Tigard, 512 U.S. 374, 383, 114 S.Ct. 2309 (1994) ........................................... 10

Dyrud v. Luckman (In re Luckman), 2012 Bankr. LEXIS 5902, *15, 2012 WL 6708586.......... 22

Federal Express Corp. v. U.S. Department of Commerce, 485 F. Supp. 3d 69, 79 (D.C. 2020), 28

First Omni Bank N.A. v. Thrall (In re Thrall), 196 B.R. 959, 970 (Bankr. Colo. 1996)............. 23

Florida Health Sciences Center, Inc. v. Secretary of Health and Human Services, 830 F. 3d 515,
    522 (D.C. Cir. 2016)(" ........................................................................................................... 28

Florida Health Sciences Center, Inc., supra, at 52 ...................................................................... 29

Florida Health Sciences Center, Inc., supra, at 522 .................................................................... 29

FOMB v. Aurelius Investment, LLC, 140 S. Ct. 1649, 1665 (2020). ........................................... 29

Fresno Community Hospital and Medical Center v. Azar, 370 F. Supp. 3d 139, 151 (D.C. 2019)
    (Emphasis added),.................................................................................................................... 28

Grogan v. Garner, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) .................... 22

In re City of Detroit, 524 B.R. 147, 268 (Bankr. E.D. Mich. 2014), ............................................ 12

In re City of Detroit, 524 B.R. 147, 268-269, 270 (Bankr. E.D. Mich. 2014)............................. 13

In Re City of Detroit, 524 BR 147, 270, (Bankr. ED. Mich., 2014)............................................. 12

In re City of San Bernardino, 566 B.R. 46 (Bankr. C.D. Calif. 2017).......................................... 24

In re Financial Oversight and Management Board for Puerto Rico, 2020 WL 7693134, at 22 ... 29

In re Financial Oversight and Management Board for Puerto Rico, 916 F. 3d 98, 110 and 114
    (1st Cir. 2019)........................................................................................................................ 29

In re Financial Oversight and Management Board for Puerto Rico, supra, at 105 (1st Cir. 2019).
    .............................................................................................................................................. 30

In re Financial Oversight and Management Board of Puerto Rico, 327 F. Supp. 3d 364, 371
    (D.P.R. 2018). ....................................................................................................................... 30

In Re Hooper, 112 BR 1009, 1012-13 (BAP 9th Cir., 1990)). ...................................................... 23

In re Koritz, 2 B.R. 408, 414 (1979)............................................................................................. 22

In Torres vs. Puerto Rico, 442 US 465 (1979), ........................................................................... 10

Indep. Cosmetic Mfrs. & Distribs., Inc. v. U.S. Dep't of Health, Educ. & Welfare, 574 F. 2d 553,
    555 (D.C. Cir. 1978). ........................................................................................................... 29

Koontz v. St. Johns River Water Management District, 570 U.S. 595 (2013)............................. 16

Lines v. Frederick, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970),................................. 22

Local Loan Co., 292 U.S. 234, 244 (1934)................................................................................... 22

Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 (1935)............................................. 9

Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992).................................................. 15, 16

Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 153 (1st Cir. 2012)........................ 15

Maine Educ. Ass'n Benefits Trust, supra, at 153 ....................................................................... 16

Matter of Vickers, 577 F.2d 683, 686-87 (10th Cir. 1978),......................................................... 21

Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 122 (1978) ............................................. 10

Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978). ................................... 16

Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922)................................................................ 10

Pennsylvania Coal Co. v. Mahon, supra ................................................................. 15

Posadas de Puerto Rico Assoc. vs. Tourism Co. of Puerto Rico, 478 US 328, 331 n.1 (1986) ... 10

Southwest Airlines Co. v. Transportation Sec. Admin, 554 F. 3d 1065, 1071 (D.C. Cir. 2009). 27

Torres, 442 US at 475-76 ................................................................................. 10

U.S. Const. Amend. V ....................................................................................... 10

U.S. v. Security Industrial Bank, 459 U.S. at 80 ....................................................... 11

Webb's Fabulous Pharmacies, Inc. v. Beckwith, 499 U.S. 155, 164 (1980). ............................ 11

**Statutes**

11 U.S.C. § 105 ................................................................................. 7, 23, 24

11 U.S.C. 944 (b) ............................................................................................ 20

11 U.S.C. 944 (c) (1) ................................................................................... passim

48 U.S.C. §2126(e)) ......................................................................................... 26

48 U.S.C. §2174(b)). ........................................................................................ 25

Federal Credit Union Act (12 U.S.C. §1751 et seq.) ..................................................... 4

PROMESA's section 201(b), 48 U.S.C. §2141(b) ...................................................... 25, 30

PROMESA's section 301, 48 U.S.C. §2161 ................................................................. 21

Puerto Rico Act 255 of October 28, 2002, as amended ................................................... 2

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ................................................................... 26

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUBLIC BUILDINGS AUTHORITY<br><br>*Debtors*[1] | PROMESA<br>Title III<br><br>Case No. 17 BK 3283 – LTS<br>(Jointly Administered) |

## CREDIT UNION'S JOINT OBJECTION TO SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSMENT OF THE COMMONWEALTH OF PUERTO RICO *ET AL.*

**TO THE HONORABLE COURT**:

COME NOW creditors, Cooperativa de Ahorro y Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperativa de Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Vega Alta, Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandía, and Cooperativa de Ahorro y Crédito de Juana Díaz, through the undersigned attorneys, (hereinafter, "the Objectors", "the Credit Unions" or "the Cooperatives") and hereby file this joint objection (the "Objection") to the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of

---

[1] The Debtors in these Title III Cases, along with each debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of federal Tax ID: 3481); (ii) Puerto Rico Sales tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

1

Puerto Rico, dated July 30th, 2021. (Dkt. 17627) (hereinafter, "the Plan of Adjustment") as submitted by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") as representative of the Commonwealth of Puerto Rico.

## I. PRELIMINARY STATEMENT

The Objectors herein are several state-chartered Credit Unions[2] who are part of a financial cooperative system in the island comprised of 116 Cooperatives and encompassing around 1.2 million members and depositors, the majority of whom are middle and low- income savers and elderly persons (vulnerable populations that need to be protected). As State Chartered cooperatives, the Objectors have a special nature, tinged with a high public interest. On one hand, they are regulated, supervised and insured by Corporación Pública para la Supervisión y Seguro de Cooperativas de Puerto Rico (hereinafter, "COSSEC") a Public Corporation created by Commonwealth's Law. On the other hand, they are primary lenders and providers of cost-effective financial services to a multitude of people.

The Credit Unions have all filed Proofs of Claim relating to the unconstitutional and fraudulent taking of their assets without just compensation, wherefore these claims are based on the U.S. Constitution.  Therefore, these claims may not be reduced as part of a bankruptcy case and cannot be affected by the Congress' Bankruptcy powers, pursuant to which PRMOESA was enacted. As set forth in more detail below, the parties are constitutionally entitled to just compensation for their claims in full, without impairment, reduction, or adjustment because of the Commonwealth of Puerto Rico Title III Bankruptcy. Moreover, as discussed below, the appearing Credit Unions' claims should also be excepted from the discharge provided for in 11 USC 944 (b)

---

[2] State Chartered credit unions in Puerto Rico are known as "Cooperativas de Ahorro y Crédito," or "Cooperatives." The Objectors are credit unions chartered under Puerto Rico Act 255 of October 28, 2002, as amended.

due to debtors' lack of honesty, reckless disregard, misconduct, and fraudulent behavior. To these effects, the Credit Unions herein respectfully request form this Honorable Court to deny the confirmation of the Plan of Adjustment, or in the alternative to except from discharge their claims when entering the Order Confirming Debtor's Plan.

## II.      RELEVANT BACKGROUND

### A.      Objectors Identification

1.      In compliance with the Fifteenth Amended Case Management Procedures Order (Dkt. 17127), each independent objecting party to the plan states its name, amount, and nature of each claim as follows:

      a.      Cooperativa de Ahorro y Crédito de Abraham Rosa is a credit union organized under the laws of the Commonwealth of Puerto Rico who has appeared as a creditor in this case upon the filing of proof of claim number 53780, thereafter amended to proof of claim number 169510 seeking recovery of $17,827,609.00 which are owed by the Commonwealth of Puerto Rico.

      b.      Cooperativa de Ahorro y Crédito de Ciales is a credit union organized under the laws of the Commonwealth of Puerto Rico who has appeared as a creditor in this case upon the filing of proof of claim number 29527, thereafter amended to proof of claim number 169491 seeking recovery of $22,944,604.00 which are owed by the Commonwealth of Puerto Rico.

      c.      Cooperativa de Ahorro y Crédito de Juana Diaz is a credit union organized under the laws of the Commonwealth of Puerto Rico who has appeared as a creditor in this case upon the filing of proof of claim number 31421, thereafter amended to proof of claim number 169507 seeking recovery of $3,269,189.00 which are owed by the Commonwealth of Puerto Rico.

      d.      Cooperativa de Ahorro y Crédito de Rincón is a credit union organized under the laws of the Commonwealth of Puerto Rico who has appeared as a creditor in this case upon the filing of proof of claim number 36224, thereafter amended to proof of claim

number 169512 seeking recovery of $32,956,914.00, which are owed by the Commonwealth of Puerto Rico.

             e.       Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandía is a credit union organized under the laws of the Commonwealth of Puerto Rico who has appeared as a creditor in this case upon the filing of proof of claim number 29458, thereafter amended to proof of claim number 169493 seeking recovery of $16,549,461.00 which are owed by the Commonwealth of Puerto Rico.

             f.  Cooperativa de Ahorro y Credito de Vega Alta is a credit union organized under the laws of the Commonwealth of Puerto Rico who has appeared as a creditor in this case upon the filing of proof of claim number 25601, thereafter amended to proof of claim number 169494 seeking recovery of $19,753,068.00 which are owed by the Commonwealth of Puerto Rico.

These proofs of claims are all based in the causes and claims alleged in Adversary Complaints, Cases Number 18-00028 and 19-00389, filed and pending under the instant Title III Case.

## B.  Factual Background

1.  The Cooperatives are depository institutions subject to governmental supervision and regulation as established and implemented by the Commonwealth of Puerto Rico (hereinafter, the "Commonwealth" or "Debtor") through COSSEC. These governmental duties and obligations are similar to those of the National Credit Union Administration ("NCUA"), the federal entity that supervises and insures credit union shares and deposits pursuant to Federal Credit Union Act (12 U.S.C. §1751 et seq.).

2.  In addition to their role as depository institutions, the cooperative nature of the credit unions entails an additional high public interest.  That interest is the result of cooperatives being able to "… contribute to greater production of wealth as well as to a more equitable distribution thereof. In order to ensure, for example, increased purchasing power for the limited resources of our people, so that there may be a larger quantity of consumer goods available, as well as the enjoyment of more and better social and economic services, the purchase of articles for daily

consumption and the rendering of the various services to the community should be organized, to the extent that circumstances will permit, in cooperative form." Cooperativa Cafeteros de P.R. v. Colón Torres, 84 D.P.R. 278,281-282 (1961).

3.  The Commonwealth's duties as regulator and supervisor of the Cooperative Financial System are heightened by the fiduciary duties inherent to the governance structure of COSSEC under a Board of Directors with ex officio directors of Commonwealth officials with full access to, knowledge of and control over public finances.

4.  For decades Cooperatives in Puerto Rico maintained safe and sound financial conditions, even through the years of Financial Crisis from 2008 to 2016. This financial soundness allowed Cooperatives to deal with economic cycles through their own capitalization and funding of COSSEC, without expenditure of governmental funds.

5.  This financial soundness of the Cooperatives was known by the Commonwealth, its instrumentalities and the Government Development Bank ("GDB"), who designed, oversaw, controlled and was in charge of all bond and debt issued by the Commonwealth.

6.  Given this financial soundness of the Cooperatives, between 2009 and 2012 the Commonwealth together with the GDB and COSSEC concerted efforts in a fraudulent scheme to offer[3] and actually place upon Cooperatives (including the Objectors herein) excessive amounts of unsound Puerto Rico Debt Securities issued by the Commonwealth, COFINA, and other related issuers and to fund the GDB through the targeted offer and sale of GDB Bonds and Notes, intending to allow the GDB to finance the operations of the agencies and instrumentalities of the

---

[3] In particular, and just as an example on 2009 the Commonwealth through COSSEC issued circular letter 09-03 to offer the Cooperatives the purchase of Puerto Rico GO's. Such circular letter extolled the alleged virtues of the debt instruments with statements such as"…backed by the Government which guarantees 100% of interest and principal payments, as provided in the bonds", and "[t]hese bonds are excellent guarantees, which  allows investors to apply for loan against their investment".

Commonwealth through loans that did not have adequate sources of repayment. In doing so, the Commonwealth, the GDB and COSSEC actively and with malice sought funds from the Cooperatives while the GDB was insolvent or while driving it into insolvency.

7.   With full knowledge of the state of governmental insolvency and of the unsustainability of the governmental debt obligations, the Commonwealth, the GDB, the Puerto Rico Treasury and the OCFI misused and abused the regulatory power of COSSEC to impose measures over the Cooperatives to implement the **taking** of their cash and liquid funds through the placement of excessive amounts of unsustainable, materially diminished and value impaired government instruments in Cooperative's investment portfolios.

8.   Moreover, in its allegations in the Adversary Proceeding 19-00280, the Oversight Board alludes to the knowledge by the Defendants, **at the time of the issuance of the bonds**, of the state of insolvency of the Commonwealth and that its was unable to satisfy its obligations as they became due. *See*, ¶¶ 299-300; 307; 313-314 of the First Amended Complaint in  Adversary Proceeding <u>SCC of the Financial Oversight Board v. Barclays Capital, et als</u>., 19-00280. Docket #28.

9.   The Commonwealth, through COSSEC, with reckless disregard for their obligations to safeguard the safety and soundness of the cooperative financial system orchestrated an abusive governmental regulatory scheme with the knowledge of wrongfulness of their actions and omissions, with knowledge of the financial risks and adverse effects thereof to Cooperatives and in violation of their statutory and fiduciary duties to safeguard and insure Cooperatives and their members and depositors.

10. The Commonwealth, the GDB and COSSEC knowingly misused the statutory framework and authority to regulate the Cooperatives to take material and ever-increasing amount of their moneys to use in governmental spending without a source or ability of repayment.

11. As a result of this scheme, the Commonwealth and the GDB fraudulently took material portions of the Objectors' cash and liquid assets without providing adequate compensation for them. This course of action constitutes a direct, unilateral **taking** of funds from the Objectors, its members and depositors.

12. On March 22, 2018, the six Cooperatives objecting herein filed an Adversary Proceeding identified as Case No. 18-00028 against the Commonwealth of Puerto Rico, COSSEC; GDB; GDB Debt Recovery Authority, GDB Public Entity Trust; Puerto Rico Fiscal Agency and Financial Advisory Authority ("FAFFA"); and the Oversight Board.

13. Adversary proceeding No. 18-00028 seeks, *inter alia*, a determination of exception from discharge of the Cooperatives' claims based on their constitutional claims for Debtor's taking of their private property without just and right compensation, and also to obtain a determination of non-dischargeability pursuant to 11 U.S.C. § 105, and pursuant to provisions of PROMESA. The adversary proceeding is still pending adjudication from this Honorable Court. The specific claims of Adversary proceeding No. 18-00028 are hereby incorporated by reference into this objection. *See* docket 126 in Adversary Proceeding Number 18-00028, *Second Amended Complaint*.

14. Also, on July 1, 2019, the six Cooperatives objecting herein filed an Adversary Proceeding identified as Case No. 19-00389 against the Commonwealth of Puerto Rico, COSSEC, the Commonwealth, and the Oversight Board seeking, among others, that the Commonwealth comply with statutory requirements to adequately fund the governmental insurance that covers the shares and deposits of cooperatives. Failure to comply with these statutory funding mechanisms renders the government's insurance contract ineffective, thus violating the constitutional rights of the Objectors. Adversary proceeding No. 19-000389 is still pending adjudication from this Honorable Court. The specific claims of Adversary proceeding No. 19-00389 are hereby incorporated by

reference into this objection. *See* docket 55 in Adversary Proceeding Number 19-00389, *Amended Complaint*.

15. On July 30th, 2021 the Commonwealth of Puerto Rico, represented by the Financial Oversight and Management Board for Puerto Rico, proposed its Seventh Amended Title III Joint Plan of Adjustment to modify its obligations to creditors whose claims are subject to reduction or compromise.

16. This proposed plan of adjustment disregards the Objectors' claims for exception of discharge as they are not mere actions for the collection of money.  In this respect, the constitutional nature of the claims presented in cases 18-00028 and 19-00389 makes such claims not subject to reduction or compromise under a Plan of Adjustment.  Moreover, the legal and factual issues presented in cases 18-00028 and 19-00389 have not been adjudicated by the Court. Also, the releases and exculpations in this proposed plan of adjustment are drafted in extremely broad terms which exceed the proper scope of a Plan of Adjustment for Debtors.

17.  Essentially, the Plan of Adjustment is being used by the Commonwealth and the other defendants in the adversary cases as the means to "whitewash" their misconduct, unconstitutional taking, fraudulent actions and reckless disregard to their statutory and fiduciary duties to safeguard and insure the Cooperative Financial System, its members and depositors.

18. The Cooperatives´ claims are based on their Constitutional rights for the government's taking of property without just compensation and, therefore, are not subject to reduction, compromise, or discharge as it will expounded below.

8

### III.    ARGUMENT-OBJECTIONS TO CONFIRMATION OF THE PLAN

#### A.    The Cooperatives Claims are Not Subject to Impairment or Reduction in the Plan as these are Constitutional Claims for the Taking of Property Without Just Compensation

The Plan of Adjustment seeks to adjust and modify the Commonwealth's obligations to creditors whose claim are subject to reduction and impairment. Inasmuch as the Plan of Adjustment does not list the Credit Unions' Claims in a separate Class providing for full payment of their claims, but under impaired classes (Classes 40, 15, 10, and 8), and in the case of two of the Credit Unions even under a class wherein they will not receive any distribution at all (Class 63), the Plan is constitutionally flawed and cannot be confirmed.

The Credit Unions herein respectfully submit that their claims are not subject to impairment or reduction inasmuch as these are constitutionally protected by the Fifth and Fourteenth Amendments of the Constitution of the United States, that prohibit the taking of property without just compensation, and thus cannot be affected by the Congress' bankruptcy powers, pursuant to which PROMESA was enacted. The Commonwealth must pay the Credit Unions' claims in full regardless of what reduction and compromises it seeks in the Plan of Adjustment.

Since the case of <u>Louisville Joint Stock Land Bank v. Radford</u>, 295 U.S. 555 (1935) the United States Supreme Court decided that Congress may not pass laws under its Bankruptcy power that would affect a taking of private property without just compensation. In <u>U.S. v. Security Industrial Bank</u>, 459 U.S. 70 (1982) the Supreme Court stated:

> The Bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation. Louisville Joint Stock Land Bank v. Radford, supra. Thus however "rational" the exercise of the bankruptcy power may be, that inquiry is quite separate from the questions whether the enactment takes property within the prohibition of the Fifth Amendment.

9

The Takings Clause of the Fifth Amendment mandates that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V. This amendment is made applicable to the states, and thus to municipalities, through the Fourteenth Amendment. U.S. Const. Amend. XIV ; Dolan v. City of Tigard, 512 U.S. 374, 383, 114 S.Ct. 2309 (1994); Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 122 (1978).  The Takings Clause is applicable to the States through the 14th Amendment. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922). [4]

The "Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens, which, in all fairness be and justice should be borne by the public as a whole." Armstrong v. United States, 362 U.S. 40, 49 (1960).

A state may not transform private moneys into public property without just compensation. "This is the very kind of thing that the Taking Clause of the Fifth Amendment was meant to prevent". Webb's Fabulous Pharmacies, Inc. v. Beckwith, 499 U.S. 155, 164 (1980). In *Louisville Joint Stock Land Bank*, Justice Brandeis stressed the importance of preserving the Fifth Amendment despite times of hardship:

---

[4] There has been substantial argument as to whether the Bill of Rights of the Constitution of the United States applies to the Commonwealth directly or through the Fourteenth Amendment. The Supreme Court has stated that "Puerto Rico is subject to the Due Process Clause of either the Fifth or the Fourteenth Amendment". Posadas de Puerto Rico Assoc. vs. Tourism Co. of Puerto Rico, 478 US 328, 331 n.1 (1986). In Torres vs. Puerto Rico, 442 US 465 (1979), Justice Brennan's concurrent opinion states that "whatever the validity of [the Insular Cases when] ...they were decided, these cases are clearly not authority for questioning the application of the Fourteenth Amendment, or any other provision of the Bill of Rights to the Commonwealth of Puerto Rico", Torres, 442 US at 475-76. In its most recent decision applying a provision of the Bill of Rights to a citizen in Puerto Rico, Commonwealth of Puerto Rico vs. Sánchez Valle, 136 S. Ct. 1863 (2016), the Court did not discuss this issue because both parties had accepted that the Double Jeopardy Clause applied to the Commonwealth. The federal Government, however, in its brief, as amicus curiae, at page 10, n. 1, asserted that "...the Double Jeopardy Clause could not apply to Puerto Rico through the Due Process Clause of the Fourteenth Amendment, because the Fourteenth Amendment applies only to 'state[s]'. The Double Jeopardy Clause thus must apply to Puerto Rico based on its status as a territory belonging to the United States". There seems to be no question, in any case, that the fundamental guaranties of the Bill of Rights apply to all American citizens in Puerto Rico.

10

> The Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation.

Therefore, although Congress may authorize the Commonwealth under PROMESA to impair contractual and other claims pursuant to its bankruptcy powers, it may not authorize the taking of private property without just compensation in violation of the Fifth Amendment. U.S. v. Security Industrial Bank, 459 U.S. at 80.

Furthermore, the confirmation of a Plan of Reorganization in the U.S. Bankruptcy Code's context that does not pay in full creditors' claims for taking their private property, would constitute a public taking of private property and denial of just compensation for that taking.  *See* In Re City of Detroit, 524 BR 147, 270, (Bankr. ED. Mich., 2014).

Specifically, in the bankruptcy proceeding of the *City of Detroit*, In re City of Detroit, 524 B.R. 147, 268 (Bankr. E.D. Mich. 2014), the Court had the opportunity to examine constitutional claims against the City and determine if such claims were to be protected and recognized as part of the Plan of Adjustment considered in that case. In the referenced case two groups of unsecured creditors objected the plan since they had constitutional claims against the city or its officer. One of the groups was seeking to recover damages for the deprivation of the constitutional rights and the other group had pending lawsuits to recover on their just compensation under the Fifth Amendment, the Takings Clause.  Both groups asserted that the plan could not be confirmed unless it provided full payment of such claims.

The City objected these arguments and sustained that the claims were unsecured, subject to impairment, and therefore dischargeable. However, as requested by the Court, the Attorney General intervened and argued that impairing the claims under the Takings Clause would raise substantial constitutional concerns and, therefore, the order confirming the plan should explicitly

except the Takings Clause claims from discharge, as 11 U.S.C. 944 (c) (1) permits in the Court's discretion.

The group who had pending lawsuits to recover their just compensation under the Fifth Amendment's Takings Clause argued that the City must pay their just compensation awards in full, instead of the fractional dividend that the plan proposed. If the City treats their claims as general unsecured claims the plan would be unconstitutional. In order to sustain such arguments, the creditors relied in the previously cited decisions of the United States Supreme Court in *Radford* and *Security Industrial Bank*.

The City argued that it is not relevant that the Constitution itself provides the right to just compensation. The City also distinguished *Rafford* and *Security Industrial* arguing that the Supreme Court faced a Takings Clause issue only because the applicable bankruptcy law itself destroyed an existing property right.

After consideration of these arguments, the Court discussed the applicable law and determined as follows:

> "all that matters under the Fifth Amendment is that the owner of private property must be justly compensated if that property was taken for public use, whenever and however that taking occurred.
>
> If confirmed, this plan would deny that just compensation. The plan would allow the City to impair the property owners' constitutional claim for just compensation after the City took their private property. That violates the Fifth Amendment."
>
> *See*, In re City of Detroit, 524 B.R. 147, 268-269, 270 (Bankr. E.D. Mich. 2014)

Although the Court in *In re City of Detroit* stated that the statute, if interpreted to allow impairment of the Takings Clause creditors' claims, would be contrary to the Fifth Amendment, it decided to use its discretion under Section 944(c)(1) of the Bankruptcy Code, 11 U.S.C. 944 (c)

(1), ordering the exception from discharge of the Takings Clause creditors' claims in the confirmation order.

The case at bench involves similar constitutional claims to the one considered and decided by the Bankruptcy Court in *City of Detroit*. As occurred to the Takings Clause creditors in Detroit, the Credit Unions' property (cash and liquid assets) was taken by the Commonwealth and its instrumentalities for public use without just compensation.

As stated in Adversary Proceeding 18-00028, the Commonwealth, the GDB and COSSEC abused and misused the governmental regulatory power over credit unions, adopting a regulatory policy of steering Credit Unions' liquid resources towards Puerto Rico Debt Instruments, which the Commonwealth and the GDB knew were unsafe, risky, unsustainable and that lacked adequate sources of repayment.

This regulatory policy was implemented through the issuance of circular letters together with coercive and selective examinations and the threat of retaliatory legislative initiatives. As a result of this scheme, the Commonwealth and the GDB took material portions of the Credit Unions' cash and liquid assets without providing adequate compensation for them.

This course of action was equivalent to a direct and unilateral taking of funds from the Credit Unions' accounts. When a state appropriates money from private entities for itself through the use of its regulatory powers, as it occurred in the case of the Credit Unions herein, it has made a direct physical taking of property subject to the just compensation requirements of the Constitution.

The Commonwealth and its instrumentalities illegally appropriated the moneys of the Credit Unions to finance the government's operation. In exchange, the Cooperatives were provided with materially diminished and value impaired government papers that did not constitute just

compensation. The Cooperatives' moneys were directly extracted by the government through its regulatory powers over the Cooperatives, compelling them into purchasing worthless bonds.

Moreover, by compelling he Credit Unions to purchase knowingly materially diminished and value impaired government bonds, the Commonwealth deprived the Cooperatives' property of any significant economic value, thus constituting a **categorical regulatory taking**. *See* Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992).

Unlike the case of Cobb v. City of Stockton, 909 F.3d 1256 (9th Cir 2018) where the objecting claimant relinquished his property interests many years before the bankruptcy filing through a quick-take condemnation procedure pursuant to California Law and procedures, in the instant case the Credit Unions are seeking that their claims be excepted form discharge in Adv. Adversary Proceeding 18-00028 filed 3 years ago and still pending adjudication under this Title III Case for debtor's direct and regulatory taking of their property without just compensation.

Current Takings Clause doctrine distinguishes between two forms of takings: (1) direct, physical takings of property and (2) regulatory takings. Pennsylvania Coal Co. v. Mahon, supra. The former occurs when there is a "direct appropriation of property." Dimare Fresh Inc. v. U.S., 808 F.3d 1301, 1307 (Fed. Cir. 2015). The latter occurs when "a restriction on the use of property...went too far." Id. Whether a particular action constitutes a direct taking or a regulatory taking will impact the applicable level of scrutiny. Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 153 (1st Cir. 2012).

As to regulatory takings, there are two types. On the one hand, there are categorical takings, which take place "when regulations compel the property owner to suffer a physical invasion of his property or prohibit all economically beneficial **or** productive use." (Emphasis added) Dimare, supra, at 1307, citing Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992). This type of regulatory taking is treated as if it were a direct appropriation case.  Notice that there are two

14

distinct scenarios for categorical takings. The existence of either one will trigger the categorical approach. Maine Educ. Ass'n Benefits Trust, supra, at 153.

Non-categorical takings are analyzed on an ad hoc, case by case manner. There are no rigid rules to be applied in these circumstances. However, three main factors govern this approach: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the government action. Dimare, supra, at 1307, *c.f.* Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978).

Takings occur when the government acts pursuant to its regulatory powers. This includes instances of coercion by the government thorough those regulatory powers. Koontz v. St. Johns River Water Management District, 570 U.S. 595 (2013). As the Ninth Circuit has stated, "[r]egulatory Takings generally require some governmental regulation or other government action **that compels** the owner to sacrifice all economically viable use of his or her property." Broad v. Sealaska Corp., 85 F.3d 42, 432 (9th Cir. 1996) (Emphasis added). As such, coercion by the government through its regulatory powers can trigger a Takings Claim. See A&D Auto Sales, Inc. v. U.S., 748 F.3d 1142 (Fed. Cir. 2014).

As previously expounded, in the case of the objecting Credit Unions herein, both forms of taking occurred in the instant case. *See also* ¶¶ 3,6, 21, 48, 68, 70, 75, 77, 78, 79 83, 84, 87, 90, 91, 93, 94 and 150 of the Second Amended Complaint in adversary case number 18-00028 (supporting the takins clause claims of Objectors herein). Docket #126 of Adversary case Number 18-00028.

In sum, the Commonwealth illegally appropriated the moneys of the Credit Unions to finance the government's operations, knowing that the government was financially insolvent,

15

which constitutes the taking. In exchange, the Credit Unions were provided with valueless government papers that did not constitute just and right compensation.

Considering the above, the Credit Unions respectfully submit that their claims are not subject to impairment or reduction in the proposed Plan of Adjustment because these are constitutionally protected claims by the Fifth Amendment of the Constitution of the United States of America.   Simply put, the Plan of Adjustment as it is currently drafted violates the Takings Clause of the Fifth Amendment as to the Credit Unions' claims. Accordingly, the Plan of Adjustment that provides for an impairment, reduction and in some occasions for zero distribution to the Credit Unions' claims should not be confirmed. In the alternative, the Credit Unions' claims must be excepted from discharge in the Order of Confirmation pursuant to 11 U.S.C. 944 (c) (1).

> **B.** **The Seventh Plan of Adjustment cannot be confirmed because it disregards pending litigations and derails the proprietary fundamental rights of the Objecting Credit Unions to prosecute the causes of action and remedies to which they may be entitled.**

Due Process of Law for the Credit Unions herein warrants and requires adjudication on the merits of the factual and legal issues presented in the pending adversary proceedings within said judicial procedures and not collaterally through the present confirmation process.

In Adversary Proceeding No. 19-00389, the Credit Unions have asserted their constitutional claims for the government's failure to adequately fund its insurance contract covering the shares and deposits of the Cooperatives and ultimately its depositors.  Such failures unconstitutionally impair COSSEC's statutory, fiduciary, and contractual duties with the Credit Unions.

However, the Seventh Plan of Adjustment's silence regarding the pending litigation and claims raises the question of whether or not the confirmation of the plan would sweep the cases that are being litigated or not.  If the Plan of Adjustment as drafted has the purpose of annulling

16

these pending cases, then its confirmation would constitute a collateral summary judgement of judicial claims that are not mere suits for the collection of money, carried in violation of due process of the Credit Unions and their depositors. Moreover, such a result would in itself constitute an additional "taking" of the Credit Unions' causes of action, especially those based on constitutional rights and on the unenforceability of the discharge on grounds of dishonesty, malice, willful misconduct and fraudulent behavior.

These circumstances are further aggravated by the broad releases and exculpations integrated in the Plan of Adjustment, which are excessive in their extension to non-Debtor governmental instrumentalities and rewards them for the reckless and intentional conduct that caused Puerto Rico's fiscal crisis. These possibilities are contrary to applicable law, making it necessary that the Plan of Adjustment be modified to avoid these intended or non-intended effects, or that the Court makes a clear and binding ruling preserving the claims pending adjudication in adversary cases 18-00028 and 19-00389.

The preservation of these claims is also required to the public interest, as it pertains to the protection of the capital and resources of depository institutions. The Credit Unions' claims have a right to judicial adjudication of un-renounced and non-released claims and rights asserted in active ongoing litigations, just as acknowledged in the Plan of Adjustment with regards to claims against CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA.  This same acknowledgement is warranted with respect to the pending claims of the Credit Unions in Adversary Proceedings 18-00028 and 19-00389.

**C.    The Releases and Exculpations Provided for in the Plan of Adjustment are Excessive,  Undermine the Cooperatives Rights Against Other Parties Who are Not Title III Debtors and Renders the Plan Unconfirmable**

The Plan of Adjustment provisions for releases and exculpations are drafted in a convoluted, byzantine, and confusing language that lends itself to multiple interpretations, but that in the end operate against transparency.

It cannot be stress enough that the Objectors´ claims should be also preserved pursuant to the **public interest**, as these claims pertain to the protection of the capital and resources of depository institutions. In fact, Adversary Proceeding 18-00028 was filed by the Credit Unions in compliance with their fiduciary duties of protecting the interests of their members and depositors. In this sense, the protection of the credit unions and of their members and depositors is aligned with the policy objectives of a Plan of Adjustment of a municipality, which is the higher aim of ensuring the governmental function of protecting and serving the municipality's citizens. Failure to protect the credit unions and their members and depositors defeats that purpose by affecting that same constituency.

Also, the exculpations granted to the Government Parties in this Plan of Adjustment are impermissibly broad since they extend the release to additional parties, such as each of the respective Related Persons of the Debtors, AAFAF and the Oversight Board, as well as any Entity considered Government Parties. Although the exculpation carves out negligence and willful misconduct, these causes of actions will only be permissible if the actions or omissions for such causes of action are previously recognized in a Final Order, but such actions are not limited to the bankruptcy case.  The proposed exculpation provides release to the Related Persons of the Debtors "solely acting in its capacity as such at any time up to and including the Effective Date".  This

18

clearly disregards that some of such Related Persons may be related to non-Debtor governmental instrumentalities that caused Puerto Rico's fiscal crisis prior the commencement of this Title III and for whom there are active ongoing litigations that may be compromised with this proposed exculpation.

**1.      Instead of being released and exculpated, the Credit Unions' Claims Should be Excepted from Discharge in the Confirmation Order Pursuant to 11 U.S.C. 944 (c) (1)**

Instead of receiving a releases and exculpations when the Plan of Adjustment is confirmed, Debtor and its instrumentalities, including COSSEC should not receive a discharge from the Credit Unions' claims. The objecting Credit Unions' claims are not limited to debtor's breach under the bonds' obligations and their defaults.

Specifically, Adversary Proceeding 18-00028 seeks relief under a fraud and false pretense claim incurred by Debtor and the other defendants in such case. Adversary Proceeding 18-00028 requests from this Honorable Court a determination of dishonesty in Defendants' behavior that should not allow the Debtor in the case at bench to obtain a discharge of Credit Unions' claims under section 944 (b) of the Code, 11 U.S.C. 944 (b), incorporated by PROMESA's section 301, 48 U.S.C. §2161.[5]

---

[5] The Oversight Board in Adversary Proceeding 18-00028 has argued that the Credit Unions' claims cannot be excepted from discharge because such determination would be contravening the subordination of claims provided by Section 510(b) of the Bankruptcy Code. 11 U.S.C. 510 (b). The argument is completely unwarranted. First of all, none of the Credit Unions' claims were included in Class 64 of the Plan of Adjustment, which is the one treating subordination of claims pursuant to section 510 (b) of the Code. Second and most important, the argument is flawed because the subordination provided for in such section of the Code deals with the distributions in a plan, not with the discharge or right to eliminate an obligation, or with the right or not to continue pursuing an obligation after a case is closed, like it occurs when a debt is not discharged in a bankruptcy proceeding. The subordination provided for in section 510 (b) of the Code is not applicable to the constitutional claims for the governmental taking of the Credit Unions' property without due compensation. Moreover, the concept of subordination for purposes of distribution in a plan is completely unrelated to the right of a claimant to seek a determination of non-dischargeability of a debt due to debtor's dishonesty, fraudulent acts, and violations to the claimants' constitutional rights, as requested in adversary

## 2.  Discharge is only available to honest debtors

It is well settled as a legal maxim in bankruptcy law that discharge of debts are only granted to honest debtors. "[T]he two great objects of the [bankruptcy] law are "to grant a discharge to honest debtors who should conform to its provisions, and to distribute their property ratably among all their creditors." <u>Buckingham v. McLean</u>, 54 U.S. 151 (1852).

"One of the primary purposes of the Bankruptcy Act is the rehabilitation of an honest debtor by discharging his debts to afford him a fresh start in his economic life. <u>Matter of Vickers</u>, 577 F.2d 683, 686-87 (10th Cir. 1978), *cited by* <u>In re Koritz</u>, 2 B.R. 408, 414 (1979)

The general policy of Bankruptcy Law favors allowing only an honest debtor to discharge debts and to make a fresh start free from the burden of past indebtedness. <u>Lines v. Frederick</u>, 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), *cited by* <u>Dyrud v. Luckman (In re Luckman)</u>, <u>2012 Bankr. LEXIS 5902, *15, 2012 WL 6708586.</u>

The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. <u>Grogan v. Garner</u>, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). "By seeking discharge, however, [the debtor] places the rectitude of his prior dealings squarely in issue, for as the Court has noted, the Act limits the opportunity to the 'honest

---

proceeding 18-00028, supporting the Credit Unions' claims. In other words, if applicable, which the Credit Unions do not admit, a subordination for purposes of distribution under the plan is fully compatible with the non-dischargeability of claims. In such hypothetical scenario wherein the Credit Unions claims or part of their claims are classified as a section 510 (b) subordination claim, and if the plan is finally confirmed with such a treatment, the Credit Unions would simply receive their subordinated treatment in the plan, but would be entitled to pursue their claims once the case is closed. That is, even if the plan is confirmed with a subordination treatment to the referenced claims, the Credit Unions would still be entitled to the non-dischargeability of their claims because of their constitutional basis and because of debtors' fraudulent scheme to take their money, defendants' dishonesty, and because of the physical and regulatory taking caused to the Credit Unions prior to the orders for relief under PROMESA. Such type of claims, in violation of constitutional rights, would not be subordinated to other claims in a plan, as section 510(b) would not be applicable as Plaintiffs' claims are not based on securities.

but unfortunate debtor.'" <u>Brown v. Felsen</u>, 442 U.S. 127, 128 (1979) *quoting* <u>Local Loan Co</u>., 292 U.S. 234, 244 (1934)<u>.</u>

Debtor and its instrumentalities in the instant case have not been honest and should not be granted a discharge under section 944 of the Code. The complaint filed in Adv. Proceeding 18-00028 alleges with specificity the instances wherein the Commonwealth and its related agencies have been dishonest to the Cooperatives in their dealings, by intentionally availing for itself their funds and monies, inducing the purchase of its bonds with complete knowledge of its precarious financial condition. *See* Docket #126 of Adversary case Number 18-00028.  The Credit Unions seek relief under a fraud claim against the Commonwealth and thus the Debtor and the other defendants in the case should not be exculpated or released from their claims.

### 3.      Discharge is equitable in nature.

Discharge and its legal principles, and factual surroundings are equitable in nature. Bankruptcy Courts have solved that "[is]sues surrounding a debtor's discharge and the dischargeability of certain debts are inextricably bound to and arise only in connection with bankruptcy relief because such issues concern whether the debtor will be granted the protection and benefits of bankruptcy. [citation omitted]. This close and inextricable tie to the historically equitable bankruptcy process provides a further indication of the equitable roots of dischargeability issues. An examination of the remedy sought also indicates that the dischargeability issue is equitable in nature." <u>First Omni Bank N.A. v. Thrall (In re Thrall)</u>, 196 B.R. 959, 970 (Bankr. Colo. 1996) (validating In Re Hooper, 112 BR 1009, 1012-13 (BAP 9th Cir., 1990)).

Following this line and the general principle previously expounded that only honest debtors are entitled to discharge, the Credit Unions' causes of action in Adv. Proc. 18-00028 for the non-dischargeability of their claims in Debtor's Title III case are predicated under section 944 of the

21

Bankruptcy Code, and under the equitable powers given to the Court through section 105 of the Code, 11 U.S.C. § 105, both of which were incorporated to PROMESA proceedings.

As this Honorable Court is aware of, section 105 of the Bankruptcy Code allows Courts to issue orders that it deems necessary or appropriate to carry out the provisions of the Bankruptcy Code. Section 105 endows the Courts with equitable powers and allows remedies that are in accordance with the Bankruptcy Code and limited to its confinements. However, the fact that a section of the Code is inapplicable to a particular proceeding or situation does not limit the Court's powers under section 105, 11 U.S.C. § 105. In the case of In re City of San Bernardino, 566 B.R. 46 (Bankr. C.D. Calif. 2017) the Bankruptcy Court for the Central District of California solved that the fact that in other cases a particular section limited the Court's equitable powers, does not limit section 105 where such section is inapplicable in municipal bankruptcies. Thus, when section 105 is not expressly limited by any other section of the Code, or by a controlling act as it is in this case under PROMESA, then the powers of section 105 should not be limited.

In this case wherein the Debtor has defrauded the objecting Credit Unions herein, the powers of section 105 should carry out the general and equitable principles of the Code to disallow a discharge order. The Bankruptcy Code does not foster dishonesty or fraud, neither does PROMESA nor this Honorable Court. Its provisions and this Honorable Court's findings and conclusions should not be interpreted to be able to reward dishonest debtors with a discharge of the Credit Unions' claims and the release and exculpation of the debtor from these claims.

Moreover, in this particular case and under the provisions of PROMESA itself, this Honorable Court is also empowered as an Article III Court to make determinations of non-dischargeability of the claims presented in the proceedings under Title III of PROMESA in order to avoid interpreting a statute in a manner that would render it unconstitutional. Therefore, the Plans as it is currently drafted should not be confirmed. In the alternative, the objecting Credit

22

Unions reproduce and submit the causes of action in Adversary Case 18-00028 for the non-dischargeability of their claims in the context of the Confirmation of the Plan of Adjustment requesting that their claims be excepted from discharge in the Confirmation Order due to debtor's fraudulent and dishonest behavior in its dealings with the Credit Unions herein.

### D.    The Seventh Plan of Adjustment Cannot be Confirmed as it is not in compliance with PROMESA since it fails to be consistent with a Fiscal Plan that is compliant with section 201 of PROMESA

Section 314(b) of PROMESA provides that the Court shall confirm a plan of adjustment if,

> (1) the plan complies with the provisions of title 11, made applicable to a case under this subchapter by section 2161 of this title;
> (2) the plan complies with the provisions of this subchapter;
> (3) the debtor is not prohibited by law from taking any action necessary to carry out the plan;
> (4) except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that on the effective date of the plan each holder of a claim of a kind specified in 507(a)(2) [1] of title 11 will receive on account of such claim cash equal to the allowed amount of such claim;
> (5) any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval;
> (6) the plan is feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan; and
> (7) the plan is consistent with the applicable Fiscal Plan certified by the Oversight Board under subchapter II. (48 U.S.C. §2174(b)).

The Fiscal Plan pursuant to which the Oversight Board has filed the Plan of Adjustment for confirmation by this Honorable Court fails to comply with the requirements provided in Section 201(b) of PROMESA, PROMESA's section 201(b), 48 U.S.C. §2141(b). More specifically, the Fiscal Plan certified by the Oversight Board nor the Plan of Adjustment filed for confirmation includes any evidence that they ensure the funding of essential public services, nor provide adequate funding for public pension systems, as required by Section 201(b)(1)(B) and (C). Instead,

they do provide for the privileged treatment of certain creditors to maximize their profits over the funding of essential public services, which is not required by any of the provisions of PROMESA.

If the certified Fiscal Plan is noncompliant with PROMESA, it is legally impossible to certify and confirm a Plan of Adjustment based on and in reliance with such Fiscal Plan. The certification by the Oversight Board of a Fiscal Plan and even of a Plan of Adjustment does not equate to a bar to their judicial review if they are both in violation of the provisions of PROMESA. Although section 106(e) (48 U.S.C. §2126(e)) states that there shall be no jurisdiction in any United States district court to review challenges to the Oversight Board's certification determinations under PROMESA, Courts have interpreted those statutory provisions that preclude judicial review are inapplicable to *ultra vires* violations of a statute. In accordance with D.C. Circuit law, "[w]hen deciding whether a statute bars judicial review, we begin with 'the strong presumption that Congress intends judicial review of administrative action'." American Clinical Laboratory Association v. Azar, 931 F. 3d 1195, 1204 (D.C. Cir. 2019), *quoting* Smith v. Berryhill, 139 S.Ct. 1765, 1776 (2019). Accordingly, "[e]ven where, as here, a statutory provision expressly prohibits judicial review, the presumption applies to dictate that such a provision be read narrowly." (Emphasis added) Id..

This narrow interpretation of Section 106(e) is of particular importance considering that the Oversight Board's unelected officials exert full control and power over Puerto Rico's taxpayer funds, displacing Puerto Rico's elected officials and depriving Puerto Rico's residents and taxpayers of the due process that comes from the separation of powers provided by the Constitution and more specifically from Act 600 with respect to the Commonwealth. In this context, this Honorable Court is the only remaining check and balance to the Board's governing power over the use of the Commonwealth's public funds. Under this very particular departure from the separation of powers required by the Constitution for the exercise of governmental authority, Section 106(e)

24

is not to be read as a grant of *carte blanche* absolute power to disregard applicable, non-preempted valid laws. It is the duty of the Court to make sure that a governmental entity does not exceed its delegated powers. Here, judicial review would not address the wisdom of the decision, but its legal propriety. In these instances, judicial review allows the Court to make sure that Congress' commands are respected and that statutory limits are obeyed.

Specifically, statutory provisions that preclude judicial review are inapplicable when the challenge is made, not as to the content of a decision *per se*, but to whether the entity exceeded its statutory authority in the first place: "Our conclusion rests not on a review of a 'determination…under' the subparagraph covered by the provision, but rather resolves the question whether the [agency] has made the kind of determination required by the statute." Southwest Airlines Co. v. Transportation Sec. Admin, 554 F. 3d 1065, 1071 (D.C. Cir. 2009). In that case, the Court further explained: "We read the [preclusion] clause to mean simply that 'the courts may not review the [agency's] actions where the [agency] has acted within the scope of its authority' under the controlling statute." (Emphasis added) Id., *quoting* COMSAT Corp. v. F.C.C., 114 F. 3d, 223, 227 (D.C. Cir. 1997).

As a result, when a government entity exceeds its grant of authority, courts can address and remedy these situations, notwithstanding the existence of a jurisdictional bar: "Under the *ultra vires* doctrine, courts have jurisdiction to review an agency's action, despite the presence of a preclusion statute, if that agency's action 'is ultra vires, i.e., beyond the scope of its lawful authority'." Fresno Community Hospital and Medical Center v. Azar, 370 F. Supp. 3d 139, 151 (D.C. 2019) (Emphasis added), *quoting* Florida Health Sciences Center, Inc. v. Secretary of Health and Human Services, 830 F. 3d 515, 522 (D.C. Cir. 2016)("Because we presume Congress 'rarely intends to foreclose review of action exceeding agency authority', we typically construe bars on

25

judicial review to extend 'no further than the Secretary's statutory authority' to make the challenged determination", *quoting* Amgen, Inc. v. Smith, 357 F. 3d 103, 112 (D.C. Cir. 2004).

In other words, "[j]udicial review is available when an agency acts *ultra vires*," even when a preclusion bar is present. Federal Express Corp. v. U.S. Department of Commerce, 485 F. Supp. 3d 69, 79 (D.C. 2020), *quoting* Aid Ass'n for Lutherans v. U.S. Postal Serv., 321 F. 3d 1166, 1173 (D.C. Cir. 2003). In order "[t]o challenge agency action on the ground that it is ultra vires, [plaintiff] must show a 'patent violation of agency authority'." Florida Health Sciences Center, Inc., supra, at 522, *quoting* Indep. Cosmetic Mfrs. & Distribs., Inc. v. U.S. Dep't of Health, Educ. & Welfare, 574 F. 2d 553, 555 (D.C. Cir. 1978). Furthermore, "[a] violation is 'patent' if it is 'obvious' or 'apparent'." Florida Health Sciences Center, Inc., supra, at 52, *quoting* Black's Law Dictionary (10th ed. 2014).

Even though the Oversight Board is not a federal administrative agency, this Honorable Court has reaffirmed its "prior reasonings about the level of deference properly afforded to the Oversight Board determinations on account of the Oversight Board's 'operational similarity to a federal agency'." In re Financial Oversight and Management Board for Puerto Rico, 2020 WL 7693134, at 22, *c.f.* FOMB v. Aurelius Investment, LLC, 140 S. Ct. 1649, 1665 (2020). Moreover, these same principles also govern the decisions of the Commonwealth government, an entity within which the Board was created. This means that the Oversight Board is subject to the *ultra vires* doctrine.

On the other hand, challenges that question whether the Board has acted within its statutory authority have been found to not be barred by section 106(e). *See* In re Financial Oversight and Management Board for Puerto Rico, 916 F. 3d 98, 110 and 114 (1st Cir. 2019) (referencing claims challenging "the Board's actions as exceeding its authority under PROMESA"; claim that the

"Board exceeded its authority under PROMESA [secs] 204 and 205, which grant the Board powers related to legislation").

The Puerto Rico District Court has taken on a similar approach. While holding that claims that "go to the extent of the powers granted to the Oversight Board by Congress under PROMESA…are not direct attacks on certification and therefore are outside the scope of PROMESA section 106(e)." In re Financial Oversight and Management Board of Puerto Rico, 327 F. Supp. 3d 364, 371 (D.P.R. 2018).

As we have seen, section 201 of PROMESA "grants the Board exclusive authority to review, approve and certify" fiscal plans and the island's budget. In re Financial Oversight and Management Board for Puerto Rico, supra, at 105 (1st Cir. 2019).  But PROMESA's section 201(b), 48 U.S.C. §2141(b), also imposes statutory "requirements" and mandates for the development of a Fiscal Plan that must be complied with prior to its certification by the Oversight Board.  The Oversight Board does not have the power, authority nor discretion to decide to overlook or ignore compliance with any of such statutory requirements. By doing so, it constitutes an ultra vires action or omission subject to judicial review. Moreover, a Fiscal Plan certified in that manner precludes the certification and confirmation of a Plan of Adjustment under PROMESA. Therefore, the appearing Credit Unions respectfully submit that the Plan of Adjustment should not be confirmed as it currently stands.

## IV. REMEDIES SOUGHT IN OBJECTION TO CONFIRMATION OF THE PLAN

In light of the foregoing arguments, the appearing Credit Unions respectfully request from this Honorable Court to deny confirmation of the Seventh Plan of Adjustment filed by the Oversight Board at docket #17627.

27

In the alternative this Honorable Court intends to enter an Order for the Confirmation of the Plan of Adjustment, the Credit Unions herein respectfully request that Order Confirming Plan expressly except their claims from discharge pursuant to section 11 U.S.C. 944 (c) (1) applicable under PROMESA.

In the alternative, the Credit Unions objecting herein request that an order be entered directing debtor for an amendment to the Plan of Adjustment to preserve their claims and causes of actions, including those asserted in Adversary Proceedings 18-00028 and 19-00389, as well as any claims and causes of action they have against non/Debtor entities, particularly COSSEC, AAFAF, GDB and GDB-DRA.

## V. RESERVATION OF RIGHTS

The Credit Unions objecting herein expressly reserve their right to supplement and amend this objection and introduce evidence at any hearing relating to this objection without in any way limiting any other rights that it may have. The Credit Unions also reserve their right to object to confirmation of the Plan of Adjustment or any other subsequent amended plan or supplement thereto on these same grounds or any additional grounds, as may be appropriate.

**WHEREFORE,** the appearing Credit Unions respectfully request that the Confirmation of the Title III Seventh Amended Plan of Adjustment submitted by the Financial Oversight Board as representative of the Commonwealth of Puerto Rico be denied. In the alternative, it is respectfully requested that in its discretion under section 944 (c) (1) of the Code that this Honorable Court except from discharge the Credit Unions' claims in the order confirming the Plan.

Respectfully submitted, in San Juan, Puerto Rico this 19th day of October, 2021.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY, in accordance with Fed. R. Bankr. P. 9014(b), Fed. R. Bankr. P. 7004(b), and the Court's Fifteenth Amended Notice, Case Management and Administrative Procedures

Order [ECF#17127 ] (the "CMP Order"), that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the parties appearing in said system including the US Trustee and to all those parties registered to receive notice within the electronic notification service.



*Attorneys for Credit Unions*
*PO Box 191757*
*San Juan, PR 00919-1757*

*/s/ Enrique M. Almeida, Esq.*
**Enrique M. Almeida, Esq.**
*USDC-PR 217701*
*enrique.almeida@almeidadavila.com*

29