# EXHIBIT T

(H. B. 2212)
(Conference)

## (No. 1-2015)

(Approved January 15, 2015)

# AN ACT

To    establish the public policy that shall govern the implementation of this Act within the context of the Basic Principles of the New Tax System of Puerto Rico and provide for the evaluation and approval thereof; add a new Section 12-A to Act No. 74 of June 23, 1965, as amended, known as the "Puerto Rico Highway and Transportation Authority Act"; add a new Section 34 and renumber current Section 34 as Section 35 of Act No. 44 of June 21, 1988, as amended, known as the "Puerto Rico Infrastructure Financing Authority Act"; amend Sections 3020.01 and 3020.07, add a new Section 3020.07A; amend Section 3060.11 and add a new Section 3060.11A to Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico"; and amend Sections 16 and 18 of Act No. 123-2014, known as the "Puerto Rico Integrated Transportation Authority Act," in order to establish the public policy; create the Infrastructure Financing Authority Special Economic Assistance Fund, provide that the full faith and credit and the taxing power of the Commonwealth of Puerto Rico shall be pledged to guarantee the repayment of bonds or notes to be issued by the Authority payable from such Special Fund; and authorize the Secretary of the Treasury, with the written consent of the Secretary of Justice, in relation to the bonds or notes of the Authority guaranteed by the Commonwealth of Puerto Rico, to waive the sovereign immunity of the Commonwealth of Puerto Rico; agree that such guarantee may be governed by the laws of the State of New York and that the Commonwealth of Puerto Rico be subject to the courts of said jurisdiction; modify the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend and impose an additional excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend; establish that the new excise tax shall take effect on March 15, 2015; transfer to the Infrastructure Financing Authority Special Economic Assistance Fund the proceeds from the new excise on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend imposed under the new Section 3020.07A; transfer to the Puerto Rico Integrated Transportation Authority up to thirty

six million dollars ($36,000,000) from the revenues collected from the tax on cigarettes established in Section 3020.05; provide for the creation of a statutory lien on the revenues, taxes, and fees pledged for the repayment of the bonds issued by the Highway and Transportation Authority; provide for the use of the funds allocated to the Puerto Rico Integrated Transportation Authority; establish reports to the Legislative Assembly; establish a procedure to address the Fiscal and Operational Emergency of the Highway and Transportation Authority and/or the Integrated Transportation Authority, and provide for the transparency and accountability of said public corporations; provide for the creation of a Public and Capital Improvements Plan of the Highway and Transportation Authority to be financed by the Government Development Bank for Puerto Rico up to a maximum of fifty million dollars ($50,000,000); among other things.

## STATEMENT OF MOTIVES

As of December 31, 2012, the debt of the Puerto Rico Highway and Transportation Authority (HTA) with the Government Development Bank for Puerto Rico amounted to more than $2.2 billion and lacked a source of repayment. Said debt resulted from the practice of former government administrations, particularly that of 2009-2012, of defraying operating deficits and satisfying the needs for capital investments of the HTA through lines of credit with the GDB, without a source of repayment to meet such obligations.

Said practice did not deal with the budget and operational deficits of the HTA, but rather sunk such corporation deeper into crisis. Consequently, HTA's debt increased exponentially and GDB's liquidity decreased significantly, because HTA's outstanding loans constituted 24% of the entire loan portfolio of the GDB.

Given the compelling need to identify other sources of additional income that would allow the HTA to continue operating and repaying such financing to the GDB, the Legislative Assembly timely took the necessary legislative measures to allocate more funds to the HTA with the approval of Acts No. 30 and 31-2013. Act No. 30-2013 amended Act No. 22-2000, as amended, known as the "Puerto

Rico Vehicles and Traffic Act," to provide that the total revenues received for each motor vehicle or trailer license or private or public service vehicle registration renewal, and not just $15.00 as provided in Act No. 22-2000 before the amendment, shall be covered into a Special Deposit to provide a source of repayment for the loans of the HTA with the GDB.

Moreover, Act No. 31-2013 amended Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," to modify the amount of the excise tax imposed on crude oil, and partially finished and finished oil by-products and any other hydrocarbon blend, and transfer the total amount of such revenues to the Highway and Transportation Authority to provide a source of repayment for its loans with the GDB. In addition, said Act allocated to the HTA $20 million of the revenues from the excise tax on cigarettes collected every year. These fees, excise taxes, and other surtaxes were pledged by the HTA in favor of the GDB and the holders of the certain obligations issued by the HTA in 2013. The proceeds from the sale of said obligations in 2013 allowed the HTA to repay certain loans with the GDB, which resulted in benefits for the GDB and the Commonwealth of Puerto Rico by providing additional liquidity to the GDB which, in turn, allowed it to provide additional financing to the Commonwealth of Puerto Rico and its instrumentalities in times of fiscal and financial constraints.

Said measures were part of other initiatives undertaken by the Legislative Assembly directed to provide the HTA and the Secretary of the Department of Transportation and Public Works with the legal framework to make mandatory adjustments and transformations, which included the implementation of a reorganization plan consistent with the provisions of Act No. 66-2014. Said Act provided all the elements for entities to adopt fiscal emergency measures and guarantee the operations and essential services offered by said corporations.

However, although the additional revenues generated after the enactment of Act No. 30 and 31-2013 resulted in great benefits as stated above, they did not provide the HTA with sufficient capacity to issue additional debt to refinance its interim debt with the GDB and third parties, and to continue operating. Despite the efforts made by this Administration to turn around the operations the HTA, namely, the enactment of Act No. 41-2014, which introduced a new Board of Directors composed of seven (7) members that would oversee the operations of the HTA; the identification of new funds to match federal grants for highway projects, which would reduce the cash need of the HTA by nearly $30 million annually; the savings resulting from the implementation of Act No. 66-2014, the "Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act," which are estimated in $25 million; and the approval of Act No. 123-2014, which creates the Puerto Rico Integrated Transportation Authority (ITA) and would allow to transfer the Urban Train and the operating costs thereof from the HTA to the ITA. The need for additional recurring revenue also intensified due to the significant increase in interest rates on the obligations of the Central Government and its instrumentalities during the last Fiscal Year, thus increasing the revenues required to refinance the existing obligations of the HTA, and the accumulation during said period of accounts payable to suppliers and contractors whose payment is essential to prevent delays in the government's work.

Hence, to improve the HTA's fiscal and financial situation, this Administration deems it necessary and convenient that the Puerto Rico Infrastructure Financing Authority (IFA) assume or repay certain debts of the HTA that were intended to be repaid with a portion of the additional funds transferred to the HTA under Acts No. 30-2013 and 31-2013, to provide IFA with a dedicated source of repayment for such debts, once the New Tax System of Puerto Rico is approved and a tax on crude oil, partially finished and finished oil by-products or

any other hydrocarbon blend is imposed, and all of the revenues derived from such tax are transferred to IFA.  This Legislative Assembly also deems it is necessary to provide that the Commonwealth of Puerto Rico may pledge its full faith, credit, and taxing power to guarantee the repayment of the bonds or notes issued by IFA payable from these taxes thus ensuring that the bonds or notes are sold in the most efficient and cost-effective way possible.  In addition, the Secretary of the Treasury is hereby authorized to consent that the guarantee of the Commonwealth of Puerto Rico shall be governed by the laws of the State of New York and that the courts of the State of New York shall have jurisdiction to address any issue connected with such guarantee.  No similar language is included for IFA since it enjoys such authority as a result of its freedom of contract.

This Legislative Assembly authorized up to $2.950 billion to guarantee with the full faith, credit, and taxing power of the Commonwealth of Puerto Rico the repayment of the bonds or notes issued by IFA to repay the HTA's debts.  That limit is established by the debt to be transferred from the HTA to IFA, defined in this Act as the "Transferred Debt," which includes debt of the HTA with the GDB incurred on or before June 30th, 2015, and the Bond Anticipation Notes 2013A issued by the HTA on August 29th, 2013.  The HTA's debt with the GDB consists of: (1) twenty-four (24) lines of credit whereby, as of September 30th, 2014, the HTA owed approximately $2.027 billion, including accrued interest; and (2) a $200 million variable rate demand obligation (VRDO) issued by the HTA repurchased by the GDB from a private bank in May 2014 to prevent default by the HTA.  The estimated balance of the Bond Anticipation Notes 2013A issued by the HTA on August 29, 2013, is approximately $275 million as of September 30th, 2014. The remaining balance shall be used to offset— given the market conditions and the current rating of the Commonwealth's general obligation bonds— the

reduction in the net proceeds from the authorized issue resulting from an original issue discount.

Furthermore, in order to allocate funds to the recently created ITA, this Administration has decided to transfer to the ITA $36 million of the revenues derived from the tax on cigarettes imposed by Section 3020.05 of the "Internal Revenue Code for a New Puerto Rico." In this manner, sufficient funds are provided to carry out the public policy of this Administration that mass transportation becomes a real mobility option for Puerto Rican families so as to improve their quality of life and contributing to the economic and social development of the Island.

This Legislative Assembly determines that (i) the assumption or payment by IFA of certain debt of the HTA to be assumed or paid by IFA are valid and sufficient grounds for transferring to IFA the revenues pledged thereto that shall be used to pay the debt assumed or incurred to repay such debt, once it is effectively transferred; (ii) such assumption and repayment, and transfer, are in benefit of the HTA, since they reduce the amount of debt for which such public corporation is responsible as well as in benefit of IFA, the debt holders of both public corporations, and the residents of the Commonwealth of Puerto Rico, and are necessary to improve the health, welfare, and prosperity of those residents; and (iii) such assumption and repayment, and transfer are necessary so that both public corporations may perform their public government functions to the fullest.

It is worth noting that the excise taxes and taxes on crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend set forth herein do not apply by law to the purchase of power by the Electric Power Authority, thus, this legislation shall have no effect on the price of electricity. In addition, this Act exempts goods that are already subject to the $0.04 tax on the gallon or fraction of diesel from a portion of the new excise tax and tax on crude

oil, partially finished and finished oil by-products, or any other hydrocarbon blend to ensure that this legislation has no effect on the price of diesel.

Moreover, in order to strengthen the credit of the HTA in the future, this Act provides for the creation of a lien on certain revenues, taxes, and fees that the Commonwealth of Puerto Rico has allocated to the HTA and which the HTA is authorized to pledge under this Act and the provisions of the documents that govern the bond issues thereof. Such lien would be effective only after the date defined as the Effective Date in Section 12A of Act No. 74 of June 23, 1965, as amended.

In addition to ensuring the feasibility and economic solvency of the highways and mass transportation system of the Island, the measures adopted in Chapter I of this Act show a fiscal, administrative, and operational crisis in both the Highway and Transportation Authority (HTA) and the Puerto Rico Integrated Transportation Authority (ITA) that has remained unresolved for decades and that must be faced in an innovative, effective, and aggressive manner before the close of Fiscal Year 2014-2015. In this manner, we will be able to ensure the rendering of essential, public transportation services to the people. The increase in the tax on crude oil and the transfer of the Highway and Transportation Authority's debt to the Infrastructure Financing Authority alone do not help solving the operational and administrative problems of these public entities. Only a thorough restructuring and reorganization of the finances and operations of the HTA and the ITA would bring about the structural changes warranted by such public corporations to guarantee an efficient and effective operation and service to the people.

Therefore, a Chapter is hereby incorporated in which a well-organized and responsible process is established to restructure the finances and operations of the HTA and the ITA, thus transforming said instrumentalities into modern and efficient public corporations. In summary, this measure creates an Oversight

Committee which shall be constituted by the President of the Bank, the Secretary of the Treasury, the Director of the Office of Management and Budget, one (1) member appointed by the Senate of Puerto Rico, and one (1) member appointed by the House of Representatives.  This Committee shall conduct a feasibility study, within a term that shall not exceed thirty (30) days, to reach one of the following conclusions:

(1)     There is a significant financial or operational problem, but it may be solved satisfactorily upon the execution of an Improvement Agreement by and between the Oversight Committee and the Directors of the HTA and/or the ITA; or

(2)     There is a Fiscal and/or Operational Emergency in the HTA and/or the ITA, which cannot be effectively solved through a plan or Improvement Agreement.

If the Oversight Committee concludes that financial or operational problem may be solved satisfactorily upon the execution of an Improvement Agreement, the Oversight Committee shall execute said Agreement with the Directors of the HTA and/or the ITA to implement corrective measures as are necessary to address the identified financial and operational problems within a period that shall not exceed ten (10) days after the Study is published. The Agreement may establish all the terms and conditions that the Oversight Committee deems necessary to address the financial and operational problems thus identified.

If the Oversight Committee concludes that the financial or operational problem may not be solved satisfactorily upon the execution of an Improvement Agreement it shall appoint an Emergency Officer to the HTA and/or the ITA. The Emergency Officer shall be empowered to issue any type of rules and orders deemed necessary to redesign the operational and financial structure of said public corporations. Such rules and orders may include any type of provision and shall be binding to all the officials and employees of the HTA and/or the ITA. The

Emergency Officer shall cease his/her functions upon expiration of his/her term of appointment or once the fiscal emergency has ended, because the HTA and the ITA can operate with ninety-five percent (95%) of their own funds or if the Oversight Committee so determines by unanimity. Lastly, in order to ensure that the HTA and the ITA carry out their duties effectively, transparency and accountability requirements are hereby established to assess the performance of both public corporations.

Finally, this Administration recognizes that the Department of the Treasury is currently in the process of developing a comprehensive reform of our tax system that shall be passed by this Legislative Assembly on or before March 15, 2015. It further recognizes that the provisions of the Internal Revenue Code modified under this Act must be consistent with the economic objectives pursued by the changes that the tax laws shall undergo as part of the aforementioned reform, which include, the creation of a fairer, more equitable internal revenue system by reducing the number of taxpayers that file income tax returns, and substitute it for a tax system that does not tax income but rather consumption.  The basic principles that will govern the New Tax System of Puerto Rico shall be:

• To be designed to reward job rather than to punish work.  It must be a system that does not unfairly burden the workforce.

• To be equitable and aimed at expanding the tax base so that more Puerto Ricans contribute less, which effectively deters tax evasion and reduces to a maximum the underground and informal economy.

• To establish a tax structure that provides the necessary resources to offer services to the people, while being consistent with the public policy on incentives for economic development. The tax incentives must be aimed to achieve one purpose: economic development and the creation of permanent jobs.

- To encourage savings and incentivize local investment mainly that which stimulates economic development.

- To be competitive from a global standpoint and be at the forefront of the challenges brought by the opening of international markets, including new technology.

- To promote and encourage competitiveness among products, jobs, and local business in the international market as a main objective.

- To be designed to interfere the least with personal and business decisions.

This Legislative Assembly provides that the new excise taxes approved in this Act shall take effect on March 15, 2015. It is critical to implement the new excise tax provided for herein upon the adoption of the New Tax System that includes among its essential elements an aggressive development of the production sectors of the Island, while we identify new sources of income so that the government apparatus may continue operating and offering services within a renovated and reorganized framework, and also compensate such sectors that have been contributing to the Island for years. Insofar as an IFA bond or note issue is completed prior to the approval of the tax reform, any modification to the tax measures established herein shall meet the requirements included in this Act to substitute or alter the taxes pledged for the payment of said bonds or notes and the contractual requirements set forth in the documents of such issue, all of which are directed to guarantee the quality of the source of repayment of said bonds or notes, and protect the interests of the holders thereof.

*BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:*

## CHAPTER I

Section 1.01.- Public Policy.-

The mission of the State is, in modern society, to guarantee its constituents the highest quality of life possible. Issues such as housing, health, security, education, and employment, among others, are essential elements to achieve such goal, since they have an impact on all of aspects of the citizen's individual, family, and professional lives. Our people deserves and demands a strong government entity with financial resources to provide the people with tools, and with the vision and strength to face the challenges of the 21st century.

The economic crisis that we are undergoing and the lack of judgment in making tax-related decisions in the past have affected each element of the Puerto Rican society. The State has experienced in several forms and with different intensity the consequences of said circumstances. The fiscal situation faced by the Highway and Transportation Authority and, consequently, the Government Development Bank for Puerto Rico, jeopardizes the stability of the government apparatus. Dealing with the fiscal crisis of the Commonwealth of Puerto Rico and its lack of liquidity to meet its obligations, which is the result of the unwise decisions of former governors, is no longer an option but rather an unavoidable duty and responsibility.

However, addressing the fiscal situation of the Commonwealth of Puerto Rico requires an all-encompassing and integrated reevaluation of our tax system, not only to satisfy the needs of the State, but also to guarantee the people that this is a fair, simple, well-balanced mechanism that seeks the economic development of individuals, of the middle working class, the Island's production sectors, and the society in general.

The new Tax System of Puerto Rico shall seek to abide by the Basic Principles set forth in this Act herein below:

(a)     Alleviate the present burden of individual taxpayers, taking as a comparative basis the tax systems and income and expenditure structure of the states and other countries.

(b)     Achieve that individuals and corporations contribute to the treasury according to their financial capacity.

(c)     Effectively control tax evasion, improving compliance oversight and increasing collections by broadening the tax base.

(d)     Simplify the tax system and the tax payment process.

(e)     Adjust tax liability taking into account the financial situation of families below the poverty threshold established by the federal census bureau.

(f)     Establish a simple tax system, which is easy to understand and to administer, thus facilitating taxpayer's compliance and State's oversight.

(g)     Provide resources for the administration of programs and services offered by the State.

(h)     Promote a self-sustainable economic growth that stimulates the economic development of the Island, keeping a stable and reliable business environment.

(i)     Replace the Sales and Use Tax (IVU, Spanish acronym) with a new type of consumption tax, that is, the Value-added Tax (VAT), which has been successfully implemented in over 150 countries around the world and is the most efficient and effective consumption tax.

(j)     Significantly reduce income tax rates applicable to individuals, especially to the middle class. Thus, there shall be included the elimination of the payment of income taxes by individual taxpayers filing separately whose annual income is, at least, thirty-five thousand dollars ($35,000), or family filing jointly whose annual income is seventy thousand dollars ($70,000).

(k)    The new model shall broaden the tax base incorporating persons or entities that do not share the responsibility of financing public programs and services and that operate within the framework of an informal or underground economy.

(l)    Implement a refund system for low-income people, which may include the elderly, persons with disabilities, pensioners, and individuals who depend on state or federal financial assistance as a mechanism to address the regressiveness of the consumption tax. To achieve this, there shall be considered the impact on taxpayers of both the value-added tax to be implemented, and any incremental tax burden in the form of excise taxes, which still applies to crude oil by-products and other articles.

(m)    Evaluate the impact thereof on the municipal revenues regime to ensure the fiscal health of the municipalities of the Island to guarantee the continuity in the offering of municipal services, thus promoting economic and commercial development.

(n)    Establish the first Estimation Macroeconomic Model in Puerto Rico, which shall allow us to accurately evaluate the macroeconomic impact of economic and tax policy decisions.

(o)    Eliminate the Surtax on Gross Income.

(p)    Income-tax related provisions shall be retroactive to January 1st, 2015.

For such reason, it is hereby declared as public policy of the Commonwealth of Puerto Rico that the measures taken under this Act shall be considered vis-a-vis the evaluation of the New Tax System of Puerto Rico. The Secretary of the Department of the Treasury shall take the necessary measures to finish the study on the New Tax System of Puerto Rico on or before December 31st, 2015, the date on which a report shall be submitted to the Legislative Assembly.  The bill of the New Tax System of Puerto Rico shall be submitted for the Legislative Assembly's

14

evaluation not later than February 15th, 2015. The provisions of this Act shall take effect along with the approval of the New Tax System of Puerto Rico, which shall be approved before March 15th, 2015, retroactive to January 15th, 2015 for the benefit of taxpayers.

Section 1.02.- Special Committee.-

There is hereby created a Committee to be composed of the following officials: The President of the Government Development Bank for Puerto Rico, the Director of Office of Management and Budget, the Secretary of the Treasury, five (5) members of the Senate of Puerto Rico, and five (5) members of the House of Representatives to be designated by the Governor in consultation with the Presiding Officers of the two Legislative Bodies. Such Committee shall render a report to the Governor and the Presiding Officers of the two Legislative Bodies on or before February 2, 2015, which evaluates, analyzes, makes recommendations and includes potential alternatives in addition to and/or in substitution for the tax contemplated in this measure, if any. The Committee shall make said report public and readily accessible on the website of the Commonwealth of Puerto Rico. Likewise, the Committee shall ensure that the impact of any measure introduced is equal to or lower than the crude oil adjustment estimate, which is, on average, of one dollar and seventeen cents ($1.17) per week per motor vehicle. The report submitted by the Committee shall not replace the study that must be rendered by the Secretary of the Treasury, under Section 18(d) of Act No. 123-2014. The Committee shall meet once again within one (1) year after rendering the first report, in order to evaluate the impact of the measures taken under this Act on consumers and the treasury.

## CHAPTER II

Section 2.01.- A new Section 12A is hereby added to Act No. 74 of June 23, 1965, as amended, to read as follows:

"Section 12A.-

(a)    The following terms as used in this Section shall have the meaning stated below:

(1)    'Excise Tax on Crude Oil Allocated to the Authority' shall have the meaning provided in subsection (b)(2)(A) of this Section.

(2)    'BANs of the Authority' means the Bond Anticipation Notes 2013A of the Authority issued on August 29, 2013, as amended and supplemented.

(3)    'Code' means the Internal Revenue Code for a New Puerto Rico approved under Act No. 1-2011, as amended.

(4)    'Effective Date' means the date on which the following two (2) requirements are met: (i) all liens on income, taxes, and fees earmarked for the Authority, including those designated under Acts No. 30-2013 and 31-2013, to collateralize the BANs of the Authority (as a result of the payment of said BANs or with the consent of the holders of said BANs) as well as any outstanding debt of the Authority with the Government Development Bank for Puerto Rico are satisfied; (ii) all outstanding loans and obligations that the Authority currently has with the Government Development Bank for Puerto Rico and the Authority's BANs have been repaid or transferred from the Authority to the Infrastructure Financing Authority; provided that it shall not be necessary to transfer all of said loans and obligations if so agreed by the Authority and the holders of a majority in aggregate principal amount of outstanding senior bonds under the Resolution of 1998, and in accordance with the provisions of said resolution.  The President of the Government Development Bank for Puerto Rico shall certify the date on which the requirements in subparagraphs (i) and (ii) are met and said certification shall be filed with the Office of the Secretary of the Senate and the Office of the Clerk of the House of Representatives and shall be published on the website of the Government Development Bank for Puerto Rico.

(5)   'Pledged Revenues' means the income, taxes, and fees pledged under Section (b)(1), (b)(2), and (b)(3) of this Section 12A.

(6)   'Revenues derived from the Excise Tax on Crude Oil allocated to the Authority' means the Excise Tax on Crude Oil allocated to the Authority and any other gross revenues derived from an excise tax on crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend subject to the lien established in Section (b)(3) of this Section 12A.

(7)   'Resolution of 1968' means Resolution 68-18 approved by the Authority on June 13, 1968, as supplemented and amended.

(8)   'Resolution of 1998' means Resolution 98-06 approved by the Authority on February 26, 1998, as supplemented and amended.

(b)   Effective on and after the Effective Date, liens and pledges are hereby created and executed on the Pledged Revenues in favor and for the benefit of the holders of the bonds issued under the Resolution of 1968 and the Resolution of 1998, as follows:

(1)   In the case of the holders of bonds issued under the Resolution of 1968:

(A)   the gross revenues derived from the excise tax of $0.16 per gallon of gasoline and the excise tax of $0.04 per gallon of gas oil and diesel oil imposed by the Commonwealth of Puerto Rico and allocated to the Authority (after any deduction for amounts reimbursed under Section 3030.19 and 3030.20) under Section 3020.06 of the Code; and

(B)   the gross revenues derived from annual motor vehicle license fee of $15 imposed by the Commonwealth of Puerto Rico and allocated to the Authority in accordance with Act No. 9 of August 12, 1982 of the Legislative Assembly of Puerto Rico;

(2)   In the case of the holders of bonds issued under the Resolution of 1998:

(A)   the gross revenues derived from the excise tax on crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend, in the amount of six dollars ($6.00) per barrel or fraction imposed under Section 3020.07 of the Code and allocated to the Authority under Section 3060.11 of the Code (Excise tax on Crude Oil Allocated to the Authority);

(B)   taxes and fees identified in Section b(1) that are available and serve as collateral for the bonds issued under the Resolution of 1998, in accordance with the terms thereof, after the application of said revenues as provided in the Resolution of 1968.

(C)   Motor vehicle license fees in effect on the date of approval of this Act imposed by the Commonwealth of Puerto Rico under Sections 23.01 and 23.02 of Act No. 22-2000, as amended by Act No. 30-2013 of the Legislative Assembly of Puerto Rico, also known as the 'Vehicles and Traffic Act,' and allocated to the Highway and Transportation Authority under Act No. 30-2013; and

(D)   All excise taxes on cigarettes, up to twenty (20) million dollars per Fiscal Year, imposed by the Commonwealth of Puerto Rico and allocated to the Authority under Act No. 31-2013 of the Legislative Assembly of Puerto Rico.

(3)   in the case of the holders of the bonds issued under the Resolution of 1968 and the Resolution of 1998, all other income, taxes, and fees allocated in the future to the Authority, if the Authority pledges such amounts as collateral for any debt or obligation, in which case a first priority security interest

shall be created on said income, taxes, and fees to serve as collateral for the payment of the principal of and interest on bonds issued under (A) the Resolution of 1968, if such other income, taxes, and fees are those of the type listed in Section b(1) of this Section, be it understood that said income, taxes, and fees shall be available and serve as collateral for the bonds issued under the Resolution of 1998, in accordance with the terms thereof, after the application of said income, taxes, and fees as provided in the Resolution of 1968, and (B) under the Resolution of 1998, in the case of any other type of income, taxes, and fees. If the Authority does not create a lien on said income, taxes, and fees that are to be allocated to the Authority in the future in favor of any party, then such revenues may be used for any allowed purpose.

(c)     Subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, the liens created in subsection (b) of this Section shall constitute a first priority security interest against said Pledged Revenues and may be enforceable by the holders and insurers of bonds issued under the Resolution of 1968 and the Resolution of 1998, respectively. It shall be understood that the Authority has assigned and pledged its right to, title, and interest on Pledged Revenues to collateralize such bonds and, in benefit of the holders and insurers thereof, and take any necessary action to document and enforce said assignment or pledge. The assignment of a first priority security interest provided in subsection (b) of this Section shall be a statutory lien (and not a property lien) effective by the operation of law and shall not require a property lien to become effective.

(d)     First priority security interest created under subsection (b) of this Section and other liens created by the Authority to secure any obligations thereof shall be valid and binding without the need to be filed or recorded. Pledged Revenues and other pledged income shall be subjects to the liens and pledges

provided in subsection (b) of this Section without physical delivery of said income, taxes, and fees or further act, registration or perfection of any kind, and subject only to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, such liens shall be valid and binding as against all parties having claims of any kind in tort, in contract, or otherwise against the Authority or the Commonwealth of Puerto Rico, irrespective of whether such parties have notice thereof.

(e)     Notwithstanding the provisions of any Act to the contrary, effective on and after the Effective Date, the rate or amount of income, taxes, and fees established to be collected on account of Pledged Revenues shall not be reduced or eliminated, nor such income shall be transferred to an entity other than the Authority; the Commonwealth of Puerto Rico hereby agrees, for the benefit of the holders of bonds issued under the Resolution of 1968 and the Resolution of 1998, not to reduce, eliminate, or transfer such income, taxes, or fees. For purposes of clarification, the agreement made under this Section shall not apply to the excise tax imposed under Section 3020.07A of Act No. 1-2011, as amended.

(f)     The Commonwealth of Puerto Rico agrees not to take any legal action that would defeat, diminish, impair or adversely affect the liens created under this Act.

(g)     Subject to the provisions of the Resolution of 1968 and the Resolution of 1998, as the case may be, the agreements of the Commonwealth of Puerto Rico provided in subsections (e) and (f) of this Section 12A are for the benefit of (1) the holders and insurers of bonds issued by the Authority under the Resolution of 1968 and may be enforceable by the holders of a majority in aggregate principal amount of such outstanding bonds under the Resolution of 1968, and in accordance with the terms thereof, and (2) the holders and insurers of bonds issued by the Authority under the Resolution of 1998 and may be enforceable by the holders of a majority

in aggregate principal amount of such outstanding bonds under the Resolution of 1998, and in accordance with the terms thereof.

(h)     The Secretary shall establish a payment mechanism whereby any Pledged Revenues (except for the revenues derived from the Excise Tax on Crude Oil allocated to the Authority, for which a payment mechanism shall be established as provided in Section 3060.11(G) of the Code) shall be paid, as soon as reasonably practicable after being collected by the Commonwealth of Puerto Rico and/or the Secretary or its authorized agents, directly to the trustee or the representative of the holders of the bonds issued under the Resolution of 1968 and the Resolution of 1998, and said mechanisms shall be effective on the Effective Date, except that to the extent that such obligation is altered under the agreement entered into between the Authority and the holders of a majority in aggregate principal amount of outstanding bonds under the Resolution of 1998, and in accordance with the terms thereof.

(i)     Although subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, Pledged Revenues that collateralize the bonds issued under the Resolution of 1968 and the Resolution of 1998 are taxes imposed by the Commonwealth of Puerto Rico and allocated to the Authority to finance transportation and traffic facilities and systems."

Section 2.02.- A new Section 34 is hereby added to Act No. 44 of June 21, 1988, as amended, to read as follows:

"Section 34.- Infrastructure Financing Authority Special Economic Assistance Fund.-

(a)     The following terms as used in this Section shall have the meaning stated below:

'Refinancing Bonds' means the bonds issued by the Authority for the purpose of repaying, in whole or in part, the Transferred Debt.

'Transferred Debt' shall mean the debt of the Highway and Transportation Authority incurred on or before June 30th, 2015, and designated by the Authority as the 'Transferred Debt.'

'Pledged Revenues' means the excise taxes, fees, and taxes allocated to the Authority under the provisions of Section 3060.11A of Act No. 1-2011, as amended.

'Collateralized Debt Obligation' means any bond, note, or other obligation of the Authority payable from or backed by the Pledged Revenues, including Refinancing Bonds.

(b)     A special fund is hereby created, which shall be a fund to be held in trust, denominated as the "Infrastructure Financing Authority Special Economic Assistance Fund." The special fund may consist of one or more bank accounts held in trust. The monies deposited in said Special Fund, including Pledged Revenues, shall be used by the Authority to (i) repay (a) the Transferred Debt, (b) Refinancing Bonds, (c) any Collateralized Debt Obligation, and (d) any other debt incurred by the Authority to refinance the Transferred Debt; and (ii) any other purpose authorized by this Act or Section 3060.11A of Act No. 1-2011, as amended.

(c)     Notwithstanding any other legal provision, including Act No. 24-2014, but subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, the Special Fund created under subsection (b) above and the Pledged Revenues shall belong to the Authority. The Pledged Revenues shall be deposited by the Department of the Treasury of Puerto Rico, its authorized agent, or any other government instrumentality of the Commonwealth of Puerto Rico, (i) prior to the issue of Refinancing Bonds and any Collateralized Debt Obligations, in the Special Fund with a financial institution which shall hold said funds in trust to be used by the Authority in accordance with the provisions of

this Act; (ii) once the Refinancing Bonds are issued, with a financial institution acting as the trustee or representative of holders of said bonds, in an account in favor of the holders of said bonds (and other bonds issued under the same agreement with said trustee or representative), (iii) after repaying the Refinancing Bonds or in the event that such bonds are not issued but other Collateralized Debt Obligations are issued, with the financial institution acting as the trustee or representative of any Collateralized Debt Obligation; or (iv) after repaying all Collateralized Debt Obligations, in the Special Fund with a financial institution which shall hold said funds in trust to be used in accordance with the provisions of this Act. Insofar as the Government Development Bank for Puerto Rico or any other government instrumentality of the Commonwealth of Puerto Rico becomes the holder any of (i) the revenues derived from the excise tax imposed by Section 3020.07A of Act No. 1-2011, as amended, before the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act) or (ii) any Pledged Revenues after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act) but before such Refinancing Bonds or Collateralized Debt Obligations are paid in full, the Government Development Bank for Puerto Rico or such other government instrumentality shall hold such amounts in trust and shall transfer such revenues or Pledged Revenues, (i) to the Special Fund in the financial institution designated by the Authority if such holding occurs before the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act) or (ii) to the trustee or representative of the holders of Refinancing Bonds or any other Collateralized Debt Obligation, if such holding occurs after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act) and if said amounts have been pledged to secure the issue of said debt of the Authority, in any case, free from any lien or compensation fee of

the Government Development Bank for Puerto Rico or of said government instrumentality, and said amounts shall be used solely as provided in this Act and Section 3060.11A of Act No. 1-2011, as amended.

(d)    Pledged Revenues are hereby pledged to secure the payment of (i) the Transferred Debt, (ii) Refinancing Bonds, and (iii) any other Collateralized Debt Obligations; provided that said pledge shall be effective on and after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act.) Such pledge shall constitute a lien valid and enforceable by bondholders and bond insurers, if any, without the need to execute any additional document whatsoever, or to file a financing statement or other document, under the 'Commercial Transactions Act' or any other law, with the Department of State or other government office. Pledged Revenues, including those received after the issue of Refinancing Bonds, or any other Collateralized Debt Obligation, shall be subject to said lien automatically without the need for those Pledge Revenues to be held by a trustee or representative of the holders of Bonds or any other Collateralized Debt Obligation. Said lien shall be subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico and, subject to said provisions, said lien shall be valid as against any other party or entity having claims in tort, contract, or otherwise, against the Infrastructure Financing Authority, the Highway and Transportation Authority, or any other person or entity, irrespective of whether such party or entity have notice thereof. Notwithstanding the foregoing, Pledged Revenues received by the Authority before the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act) shall be used by the Authority only to cover debts, obligations, and/or operating expenses of the Highway and Transportation Authority or to pay the interests on or the principal of the Authority's BANs (as such term is defined in Section 12A of Act No. 74 of June

23, 1965, as amended by this Act); provided, that neither the Commonwealth of Puerto Rico nor the Authority shall be required to use Pledged Revenues to cover any debts, obligations, and/or operating expenses of the Highway and Transportation Authority or to pay interest on and principal of the Authority's BANs (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act) after September 30, 2015.

(e)      Pledged Revenues and other monies deposited or to be deposited in said Special Fund shall only be used for the payment of interest and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, insofar as all other available resources mentioned in said Section are insufficient for such purposes.

(f)      Notwithstanding any other provision of law, including Articles 1242 through 1251 of the Civil Code of Puerto Rico, the allocation of Pledged Revenues to the Authority may not be revoked or rescinded until the Refinancing Bonds or any Collateralized Debt Obligation, or any other bonds, notes or other obligations of said Authority secured by said Pledged Revenues have been paid in full, and no person may bring an action claiming said revocation or rescindment.

(g)      The Commonwealth of Puerto Rico hereby agrees and reasserts its commitment to any person or any agency of the United States of America or of any state or of the Government of Puerto Rico, that executes, acquires, or insures the Refinancing Bonds or any other Collateralized Debt Obligation of the Authority for the payment of which Pledged Revenues have been encumbered, not to reduce or eliminate the rate of the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend imposed in Section 3020.07A of Act No. 1-2011; provided that this commitment shall not preclude the Commonwealth of Puerto Rico, through an amendment to this Act, from substituting the Pledged Revenues for other revenues in an equal or higher amount

and of equal or better quality as source of repayment for the Refinancing Bonds or other Collateralized Debt Obligations, provided, further, that such substitution meets the requirements set forth in the documents of such the Refinancing Bonds or other Collateralized Debt Obligations.

(h)     The Commonwealth of Puerto Rico hereby guarantees the payment of the principal of and interest on Refinancing Bonds and any Collateralized Debt Obligation to be issued from time to time only when the aggregate par value does not exceed two billion nine hundred fifty million dollars ($2.950); the maximum average nominal interest rate of such Bonds does not exceed 8.5%; the average original-issue discount of such Bonds is not less than 93%; and the maturity date thereof is not later than thirty (30) years after the date or dates of issue. Refinancing Bonds and Collateralized Debt Obligations to which this guarantee of the Commonwealth of Puerto Rico applies under the described conditions, shall be those specified by the Secretary of the Treasury and the Government Development Bank for Puerto Rico, and such Refinancing Bonds and Collateralized Debt Obligations, shall bear on their face a statement of the Commonwealth's guarantee. The Secretary of the Treasury, with the advice of the Government Development Bank for Puerto Rico, is hereby authorized to establish, in particular cases, special terms and conditions under which the holder of Refinancing Bonds and Collateralized Debt Obligations guaranteed herein shall be entitled to make a claim under the guarantee of the Commonwealth of Puerto Rico. If the Secretary of the Treasury prescribes such special terms and conditions, the same shall be included in a guarantee executed by the Secretary of the Treasury. Subject to the special terms and conditions, if any, negotiated by the Secretary of the Treasury in relation to the guarantee of the Commonwealth of Puerto Rico that are included in the guarantee executed by the Secretary of the Treasury, if at any time Revenues thus Pledged are insufficient to pay such principal and interest as the same shall become

due, the Secretary of the Treasury shall withdraw from any funds available in the Treasury of Puerto Rico such sums as may be necessary for making up the deficiency in the amount required for the payment of such principal and interest, and shall direct that the sums so withdrawn be applied to such payment. The full faith and credit of the Commonwealth of Puerto Rico are hereby pledged to such payment.

(i)      The Secretary of the Treasury is hereby authorized to include in any contract, purchase agreement, or other financing agreement related to the Refinancing Bonds and other Collateralized Debt Obligations, including any guarantee of the Commonwealth of Puerto Rico, if any, those other terms and conditions he/she may deem necessary and convenient for the sale by the Authority of such Refinancing Bonds and other Collateralized Debt Obligations, including to consent on behalf of the Commonwealth of Puerto Rico with the written consent of the Secretary of Justice, to (i) that any contract, purchase agreement, or other financing agreement related to the Refinancing Bonds and other Collateralized Debt Obligations, including any guarantee of the Commonwealth of Puerto Rico, if any, be subject to the laws of New York, (ii) be under the jurisdiction of any state or federal court located in the New York County (Manhattan), New York City, in the event that a lawsuit may arise in connection with Refinancing Bonds and Collateralized Debt Obligations or any other agreement in connection therewith, including said guarantee, if any, and (iii) waive the sovereign immunity of the Commonwealth of Puerto in any lawsuit or other legal proceeding related thereto. Notwithstanding the foregoing, the Commonwealth of Puerto Rico may not waive its sovereign immunity from execution or attachment of public property located in the Commonwealth of Puerto Rico. Any waiver to its sovereign immunity with respect to the Refinancing Bonds and Collateralized Debt Obligations shall be expressly limited to legal proceedings related to such Refinancing Bonds and

Collateralized Debt Obligations or any other agreement in connection therewith and, under no circumstances, such waiver shall constitute (i) a general waiver of the Commonwealth of Puerto Rico to its sovereign immunity, or (ii) a waiver of its sovereign immunity with respect to legal proceedings not related to the Refinancing Bonds and Collateralized Debt Obligations issued under the provisions of this Act or any other agreement in connection therewith.

(j)     Reports to the Legislative Assembly.- On or before the fifth day following any issue related to Refinancing Bonds and Collateralized Debt Obligations, the Secretary of the Treasury and the President of the Government Development Bank for Puerto Rico shall file a joint report with the Secretary of the Senate and the Clerk of the House of Representatives stating in detail the transactions conducted and the specific use to be given to the proceeds from the sale of such bonds. Likewise, said report shall include the balance of the funds and amounts collected as a result of the taxes imposed herein. Any modification contemplated with regard to a matter stated in said Report shall be notified before carrying out the same by filing an Amended Report by the Secretary of the Treasury and the President of the Government Development Bank for Puerto Rico."

Section 2.03.-   Current Section 34 of Act No. 44 of June 21, 1988, as amended, is hereby renumbered as Section 35.

Section 2.04.- Section 3020.01 of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," is hereby amended to read as follows:

"Section 3020.01.–  General Excise Tax Provision.–

An excise tax shall be imposed, collected, and paid, at the rates prescribed in Sections 3020.02 to 3020.07A, inclusive, of this Subtitle, on cement manufactured locally or introduced into Puerto Rico, sugar, plastic products, the introduction or

manufacture of cigarettes, gasoline, aviation fuel, gas oil or diesel oil, crude oil, partially finished and finished oil by-products, as well as on any other hydrocarbon blend, and motor vehicles. The fixed excise tax shall apply if the goods have been introduced, sold, consumed, used, transferred or acquired in Puerto Rico, and it shall be paid only once, at the time and in the manner specified in Chapter 6 of this Subtitle. The application of the tax shall be subject to the exemptions granted in Chapter 3 of this Subtitle."

Section 2.05.- Current subsections (a) and (i) are hereby amended; subsections (f) and (g) are hereby deleted, and subsections (h), (i), (j), (k) (l), (m) and (n) are hereby renumbered as subsections (f), (g), (h) (i), (j), (k) and (l) of Section 3020.07 of Act No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," to read as follows:

"Section 3020.07.–   Crude Oil, Partially Finished and Finished Oil By-products and Other Hydrocarbon Blends–

(a)     (i)     In addition to any other excise tax levied in this Subtitle, an excise tax shall be imposed, collected, and paid for the use in Puerto Rico of crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend, of nine dollars and twenty-five cents ($9.25) per Barrel or fraction thereof.

(ii)     The excise tax provided in subsection (a)(i) of this Section shall be reduced by three dollars and twenty five cents ($3.25), that is, from nine dollars and twenty-five cents ($9.25), to six dollars ($6.00) per Barrel or fraction thereof, on the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), but not before March 15, 2015.

(b)     …

…

(f)     …

(g)     Exemptions.–  The tax imposed by this Section shall not apply to:

(1)     Crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend (including natural gas) used to generate electricity by:

(A)     the Electric Power Authority;

(B)     any cogeneration plant only with relation to that portion of the natural gas used to generate electricity sold to the Electric Power Authority or any successor entity; or

(C)     the Maritime Transport Authority , any successor thereof or any entity operating the maritime transport system serving the island-municipalities of Vieques and Culebra.

(2)     …

(h)     …

(i)     …

(j)     …

(k)     …

(l)     …"

Section 2.06.- A new Section 3020.07A is hereby added to Act No. 1-2011, as amended, to read as follows:

"Section 3020.07A.- Excise Tax on Crude Oil, Partially Finished and Finished Oil By-products, and any other Hydrocarbon Blend Devoted to the Infrastructure Financing Authority.-

(a)     (i)     In addition to the excise tax prescribed in Section 3020.07 of this Subtitle for the use in Puerto Rico of crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend, an additional excise tax shall be imposed, collected, and paid for the use in Puerto Rico of crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend, of six dollars and twenty-five cents ($6.25) per Barrel or fraction thereof.

(ii)     The excise tax provided in subsection (a)(i) of this Section shall be increased by three dollars and twenty five cents ($3.25), that is, from six dollars and twenty-five cents ($6.25) to nine dollars and fifty cents ($9.50) per Barrel or fraction thereof, on the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), but not before March 15, 2015.

(b)     In the case of refineries and petrochemical companies, if a gain in volume of end product is obtained as part of their oil refining process, such gain shall be subject to the tax imposed by this Section.

(c)     For purposes of this Section, the term 'use' shall include the introduction, use, consumption, sale, acquisition, and transfer in Puerto Rico of the crude oil or oil products taxed in this Section.

(d)     The tax on all transactions and transfers of fuel taxed by this Section shall be computed on the basis of a corrected temperature of 60 degrees Fahrenheit (60°F).

(e)     The volume of fuel subject to the payment of excise taxes shall be the total of barrels dispatched from the tanks of the supplier to the tanks of the local importer, distributor, or manufacturer, as the case may be, and as evidenced by the measurements taken and certified by the inspector authorized by the U.S. Customs and the Department of Consumer Affairs before and after the transfer.

(f)     The provisions of Chapter 3 of this Subtitle shall not apply to this Section, except for the provisions of Sections 3030.01 and 3030.02.

(g)     Exemptions.- The tax imposed under this Section shall not apply to:

(1)     Crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend (including natural gas) used to generate electricity by:

(A)    the Electric Power Authority, any successor entity or entity operating the facilities of the Electric Power Authority or the successor thereof; or

(B)    any cogeneration plant only with relation to that portion of the natural gas used to generate electricity sold to the Electric Power Authority or any successor entity;

(C)    the Maritime Transport Authority , any successor thereof or any entity operating the maritime transport system serving the island-municipalities of Vieques and Culebra.

(2)    Crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend exported from Puerto Rico.

(3)    Crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend imported or sold locally to the agencies and instrumentalities of the Federal government.

(4)    Crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend used by local refineries or petrochemical companies in the oil refining process, whether for a shrinkage in the raw material used in production (plant loss) or in refinery fuel expenses. In the case of refineries that use crude oil, this exemption shall never exceed, individually or jointly, six percent (6%) of the verified total of the oil products used in the refining process. In the case of petrochemical companies, the exemption may exceed six percent (6%), but for that, the petitioner must submit evidence to the Secretary that justifies a greater exemption, and the Secretary shall determine the amount of the exemption by evaluating the evidence submitted and any other pertinent information.

(5)    Crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend used in the manufacture of goods which, after being finished, cannot be identified as oil products taxable under this part. All persons

covered by this exemption must have a prior acknowledgement and authorization of the Secretary.

(6)     Crude oil, partially finished and finished oil by-products, or any hydrocarbon blend used as lubricant or fuel in the propulsion of aircraft and watercraft in their air and sea travels between Puerto Rico and other places

(7)     Crude oil, partially finished and finished oil by-products, or any hydrocarbon blend used as lubricant or fuel for stem generation to cook, can, and sterilize raw material proceeding from industrial fishing.

(8)     Crude oil, partially finished and finished oil by-products, or any hydrocarbon blend used by vessels that provide towing service and/or fueling service to freight ships, cruise ships and/or other vessel that requires these services, be it within or without territorial waters.

(9)     Crude oil, partially finished and finished oil by-products, or any other hydrocarbon blend subject to the excise tax on diesel oil imposed under subsection (a)(3) of Section 3020.06; provided, that on and after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), this exemption shall not apply to the three-dollar and twenty-five cent ($3.25)-increase established in subsection (a)(ii) of this Section 3020.07A, thus, said articles also subject to the excise tax on diesel oil shall be subject to a single excise tax of three dollars and twenty-five cents ($3.25) under this Section 3020.07A.

(h)     The goods, including crude oil, partially finished and finished oil by-products, or any hydrocarbon blend subject to the provisions of this Section shall be exempt from the sale and use tax established in Subtitle D.

(i)     Time to Pay.- The tax shall be paid pursuant to Section 3060.01 of Chapter 6 of this Subtitle, except in the case of local manufacturers, which shall be paid pursuant to the provisions of Section 3060.02.

(j)      Refund for Exemptions.- In the cases of refineries and petrochemical companies, the Secretary shall grant a credit or shall refund the excise taxes paid to the treasury if the exempt person proves, to the satisfaction of the Secretary, that he/she is entitled to enjoy one (1) or more of the exemptions established in this Section. In such cases, the credit or refund shall be limited to:

(1)      The exempt person when he/she has paid the tax directly.

(2)      The exempt person, upon prior consent by the person who paid the tax.

(3)      The person who, after paying the tax, has not transferred it, in whole or in part, in the sales price billed to the exempt person.

(k)      Amount of the Bond. - The bond or endorsement to an existing bond, if any, shall be equal to the average of the taxes paid within thirty (30) days in favor of the Secretary to ensure the faithful compliance with the provisions of this Section.

(l)      The Secretary shall require that a monthly inventory be carried out under the FIFO (First-In First-Out) method in accordance with generally accepted accounting principles for transactions related to the payment of taxes, acceptance of credits, and allowable refunds, in accordance with the provisions of this Section."

Section 2.07.- Section 3060.11 of Act No. 1-2011, as amended, is hereby amended to read as follows:

"Section 3060.11.– Disposition of Funds.–

(a)      The proceeds from taxes and license fees collected by virtue of this Subtitle shall be deposited in the General Fund of the Treasury of Puerto Rico except as provided below and in Section 3060.11A:

(1)      …

(A)      …

(B)    The Secretary shall pay on a monthly basis the total revenues derived from the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbons blends fixed in Section 3020.07 of this Subtitle.

(C)    …

(D)    …

(E)    In event the amount of the proceeds from the tax on gasoline, gas oil, or diesel oil established in Section 3020.06 of this Act or that amount of the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend established in Section 3020.07 of this Act, allocated or to be allocated in the future to the Highway and Transportation Authority may at any time be insufficient to pay the principal of and the interest on the bonds or other obligations over money taken on a loan or issued by the Highway and Transportation Authority to defray the cost of traffic facilities and for the payment of which the proceeds from the tax imposed on gasoline, gas oil, or diesel oil established in Section 3020.06 of this Act or the amount of the excise tax assessed on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend established in Section 3020.07 of this Act, has been pledged and the reserve funds of the Highway and Transportation Authority for the payment of debt service are applied to make up the deficiency in the amount needed to make such payments, the amounts of said reserve fund used to make up said deficiency shall be reimbursed to the Highway and Transportation Authority from the first proceeds received on the next Fiscal Year or subsequent fiscal years by the Government of Puerto Rico from:  (1) any other taxes in effect on any other fuel or propellant used, among other purposes, to propel road vehicles; provided that, to prevent misunderstandings, the excise tax imposed by Section 3020.07A of this Act shall not be considered a tax on fuels or propellant used to propel road

vehicles; and (2) any surplus of the tax on gasoline, gas oil, or diesel oil established in Section 3020.06 of this Act that are in effect. The proceeds from such other taxes and the remaining portion of the tax on gasoline and gas oil or diesel oil established in Section 3020.06 of this Act that are to be used as provided in this Section to reimburse the reserve funds for debt service requirements, shall not be covered into the General Fund of the Government of Puerto Rico when collected, but rather into the aforementioned special deposit for the benefit of the Highway and Transportation Authority of Puerto Rico and subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, to be used to reimburse said reserve fund for the payment of the debt service requirements.

(F)    In the event the Commonwealth of Puerto Rico uses any portion of the revenues derived from the tax on gasoline, of the four (4) cents of the tax on gas oil or diesel oil imposed in Section 3020.06, or the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend fixed in Section 3020.07 for the payment of interest on and the amortization of the public debt as provided in Section 8 of Article VI of the Constitution, the amount used by the Commonwealth of Puerto Rico for the payment of interest on and the amortization of the public debt shall be reimbursed to the Highway and Transportation Authority from the revenues collected by the Commonwealth of Puerto Rico in the following fiscal year or, if such reimbursement is not possible in the following Fiscal Year, in subsequent Fiscal Years, except those revenues that have been pledged to meet any obligation. The proceeds from such taxes that are to be used as provided in this Section to reimburse to the Highway and Transportation Authority any amount used by the Commonwealth of Puerto Rico for the payment of interest on and the amortization of the public debt, shall not be covered into the General Fund of the Government of the Government of Puerto Rico when collected, but rather transferred to the

Highway and Transportation Authority of Puerto Rico and subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse said amounts to the Highway and Transportation Authority.

(G)   Notwithstanding any other legal provision, including Act No. 24-2014, but subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, on or after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), the special deposit established in subsection (a)(1) of this Section 3060.11 and the Revenues derived from the Excise Tax on Crude Oil allocated to the Authority  (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), shall belong to the Highway and Transportation Authority for the benefit of the holders of the bonds issued under the Resolution of 1968 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), and the Resolution of 1998 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), as applicable, and the revenues derived from the Excise Tax on Crude Oil allocated to the Authority  (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), shall be deposited by the Department of the Treasury of Puerto Rico, its authorized agent, or any other government instrumentality of the Commonwealth of Puerto Rico collecting the same, (i) with the fiscal agent under the Resolution of 1968 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), and the Resolution of 1998 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), as applicable; or (ii) after the bonds and obligations of the Highway and Transportation Authority issued under the Resolution of 1968 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), and the Resolution of 1998 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this

Act), as applicable, are fully repaid, with the Government Development Bank for Puerto Rico for the benefit of the Highway and Transportation Authority. Insofar as, on or after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), the Government Development Bank for Puerto Rico or any other government instrumentality of the Commonwealth of Puerto Rico becomes the holder any of the Revenues derived from the Excise Tax on Crude Oil allocated to the Authority (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), or other amounts pledged to secure the bonds or other obligations of the Highway and Transportation Authority under the Resolution of 1968 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), or the Resolution of 1998 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), as applicable, before such bonds or obligations are paid in full, the Government Development Bank for Puerto Rico or such other government instrumentality shall hold such Revenues derived from the Excise Tax on Crude Oil allocated to the Authority (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), in trust for the benefit of the Highway and Transportation Authority free from any lien in favor of the Government Development Bank for Puerto Rico or compensation fee and shall transfer such amounts to the fiscal agent or representative of the holders of the bonds and obligations of the Highway and Transportation Authority issued under the Resolution of 1968 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), insofar as such amounts secure obligations under such Resolution and the Resolution of 1998 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), insofar as such amounts secure obligations under said Resolution, to be used exclusively for the repayment of obligations under the Resolution of 1968 (as such term is defined

in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), and the Resolution of 1998 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), as applicable.

The Secretary is hereby authorized to establish a collections mechanism whereby the Revenues derived from the Excise Tax on Crude Oil allocated to the Authority (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), to be deposited in the aforementioned special deposit shall be paid directly by the taxpayer to the financial institution acting as fiscal agent for the holders of the bonds issued under the Resolution of 1998.

(2)   …

(3)   …

(4)   …

(5)   As of the approval of the new tax system of Puerto Rico, the proceeds from the tax on cigarettes established in Section 3020.05 of this Subtitle up to thirty six million dollars ($36,000,000) per fiscal year shall be covered into a special deposit in favor of the Puerto Rico Integrated Transportation Authority for its corporate powers and purposes. The thirty six million dollars ($36,000,000) per fiscal year to be covered into the special deposit in favor of the Puerto Rico Integrated Transportation Authority shall be the third priority and contingent on the deposit of twenty million dollars ($20,000,000) from the revenues collected from the tax on cigarettes established in Section 3020.05 of this Subtitle into the special deposit in favor of the Highway and Transportation Authority as provided in paragraph (3) of this subsection, and on the deposit of the ten million dollars ($10,000,000) of the revenues collected from the tax on cigarettes imposed under Section 3020.05 of this Subtitle covered into the special deposit in favor of the Metropolitan Bus Authority, as provided in paragraph (4) of this subsection.

(A)    The Secretary shall transfer every month or as agreed with the Puerto Rico Integrated Transportation Authority, the amounts covered into such special deposit account, deducting therefrom any amounts reimbursed in accordance with the provisions of Section 3030.18 of this Subtitle.

(B)    The Secretary shall pay such thirty six million dollars ($36,000,000) every Fiscal Year from the excise tax on cigarettes established in Section 3020.05 of this Subtitle in monthly contributions of up three million dollars ($3,000,000). If during any month of the fiscal year the revenues from the said excise tax are insufficient to make the three million dollar ($3,000,000)- monthly payment provided herein, the Secretary shall make up such deficiency using any excess of the three million dollars ($3,000,000) revenues collected on account of such excise tax on previous or subsequent months of the same Fiscal Year.

(C)    The transfer to the Puerto Rico Integrated Transportation Authority of the revenues derived from said excise tax shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The revenues derived from such taxes shall be used solely for the payment of the interest on and amortization of the public debt, as provided in Section 8 of Article VI of the Constitution of Puerto Rico, insofar as the other available resources referred to in said Section are insufficient to attain such purposes. If the Commonwealth of Puerto Rico uses any amount of the revenues collected from the tax on cigarettes fixed in Section 3020.05 for the payment of interest on and the amortization of the public debt as provided in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest on and the amortization of the public debt shall be reimbursed to the Puerto Rico Integrated Transportation Authority from the revenues collected by the Commonwealth of Puerto Rico in the following fiscal year or, if such

reimbursement is not possible in the following Fiscal Year, in subsequent fiscal years, except those revenues that have been pledged to meet any obligation. The revenues derived from such taxes that are to be used as provided in this Section to reimburse the Puerto Rico Integrated Transportation Authority any amount used by the Commonwealth of Puerto Rico for the payment of interest on and the amortization of the public debt, shall not be covered into the General Fund of the Government of the Government of Puerto Rico when collected, but rather transferred to the Puerto Rico Integrated Transportation Authority and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse said amounts to the Puerto Rico Integrated Transportation Authority.

(D) Notwithstanding any other provision to the contrary, the Puerto Rico Integrated Transportation Authority shall transfer any amount corresponding to the tax collected by virtue of Section 3020.05 to pay any debt or obligation of the Infrastructure Financing Authority backed by the taxes collected by virtue of Section 3020.07A, insofar as the revenues from said taxes are insufficient to repay such debts or obligations and the documents related to said debt or obligation of the Infrastructure Financing Authority so requires.

The Secretary shall transfer from time to time, as agreed on with the Authority, the amounts covered into the special deposit, deducting therefrom the reimbursable amounts in accordance with the provisions of Sections 3030.19 and 3030.20 of this Subtitle."

Section 2.08.- A new Section 3060.11A is hereby added to Act No. 1-2011, as amended, to read as follows:

"Section 3060.11A.-Disposition of Funds in favor of the Infrastructure Financing Authority.–

(a)      The revenues derived from the taxes collected by virtue of Section 3020.07A shall be deposited into the Infrastructure Financing Authority Special Economic Assistance Fund established in Section 34 of Act No. 44 of June 21, 1988, and shall be used: (i) to repay obligations incurred by the Puerto Rico Infrastructure Financing Authority for the purpose of refinancing or repaying any debts or obligations of the Highway and Transportation Authority from time to time assumed or paid by the Infrastructure Financing Authority, and (ii) for other purposes authorized under Section 34 of Act No. 44 of June 21, 1988, as amended. The Secretary shall transfer the amount of such revenues on a monthly basis or as agreed with the Puerto Rico Infrastructure Financing Authority. The Secretary is hereby authorized to establish a collections mechanism whereby the revenues that are to be deposited in the Infrastructure Financing Authority Special Economic Assistance Fund are paid directly by the taxpayer to the Puerto Rico Infrastructure Financing Authority, to a financial institution designated by the Secretary of the Treasury or the Infrastructure Financing Authority, or a financial institution acting as trustee in the trust agreement pursuant to which the bonds of the Puerto Rico Infrastructure Financing Authority are issued, and whose source of repayment  are such revenues.

(b)      In accordance with Section 34 of Act No. 44 of June 21, 1988, as amended, and subject to the conditions established therein, the revenues derived from the excise tax imposed under Section 3020.07A are pledged to secure the repayment of the 'Refinancing Bonds,' 'Collateralized Debt Obligations,' and the 'Transferred Debt,' as such terms are defined in said Section; provided that, said pledge shall be effective on and after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act.)  The Puerto Rico Infrastructure Financing Authority is hereby authorized, after covering in any Fiscal Year, the repayment of the principal of and interest on and any other

obligation related to such Refinancing Bonds, Collateralized Debt Obligations, and the Transferred Debt payable during said Fiscal Year, to pledge or encumber the revenues derived from the excise tax to be deposited in the Infrastructure Financing Authority Special Economic Assistance Fund for the payment of the principal of and interest on other bonds or obligations or to secure the obligations and operations of the Highway and Transportation Authority. Such pledge or encumbrance shall be subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico. The revenues derived from such collection shall only be used for the payment of interest on and the amortization of the public debt as provided in Section 8 of Article VI of the Constitution, insofar as all other available resources mentioned in said Section are insufficient for such purposes. On the contrary, the revenues derived from such collections, in the necessary amount, shall only be used to: (1) on or before the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), cover the debts, obligations, and/or operating expenses of the Highway and Transportation Authority or to pay interest on and principal of the Authority's BANs (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act); and (2) on or after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965,            as amended by this Act), (A) to pay the principal of and interest on such Refinancing Bonds, Collateralized Debt Obligations, and the Transferred Debt and to fulfill any agreements entered into by and between the Infrastructure Financing Authority and the holders of said Refinancing Bonds, Collateralized Debt Obligations and Transfer Debt; (B) once such Refinancing Bonds, Collateralized Debt Obligations, and the Transferred Debt are repaid, to pay any other bonds and obligations of the Infrastructure Financing Authority, and to fulfill any agreements entered into by and between the Infrastructure Financing Authority and the holders of other bonds

or obligations of said Authority; (C) to make any other payment related to any other obligation incurred by said Authority, including payments under interest-rate swap agreements and other obligations in relation to money taken on loan or bonds issued by said instrumentality payable from Pledged Revenues; and (D) at the discretion of the Infrastructure Financing Authority for any other purpose allowed under Section 34 of Act No. 44 of June 21, 1988, as amended.

(c)     The individual paying excise taxes on crude oil and other oil byproducts shall furnish a copy of the tax returns and receipt of payment of excise taxes to the Puerto Rico Infrastructure Financing Authority.

(d)     The Commonwealth of Puerto Rico hereby agrees and reasserts its commitment to any person, firm or corporation, or to any agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that executes or acquires bonds of the Infrastructure Financing Authority for the payment of which revenues derived from the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend imposed in Section 3020.07A  have been pledged, as authorized under this Section, not to reduce or eliminate the rate of the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend imposed in Section 3020.07A; provided that, this commitment shall not preclude the Commonwealth of Puerto Rico, through an amendment to this Act, from substituting the Pledged Revenues for other revenues in an equal or higher amount and of equal or better quality as source of repayment for said bonds, provided that such substitution meets the requirements set forth in the documents of such bonds. It further agrees and reasserts its commitment to deposit in the Infrastructure Financing Authority Special Economic Assistance Fund the amounts pledged to secure the repayment of the obligations of the Puerto Rico Infrastructure Financing Authority, as

provided in this Section, until such bonds issued at any time, including interest thereon are fully paid.

(e)     If the Commonwealth of Puerto Rico uses any amount of the revenues collected from the excise tax on crude oil, partially finished and finished oil by-products, and any other hydrocarbon blend fixed in Section 3020.07A for the payment of interest on and amortization of the public debt as provided in Section 8 of Article VI of the Constitution, the amounts used by the Commonwealth of Puerto Rico for the payment of interest on and the amortization of the public debt shall be reimbursed to the Puerto Rico Infrastructure Financing Authority from the revenues collected by the Commonwealth of Puerto Rico in the following Fiscal Year or, if such reimbursement is not possible in the following Fiscal Year, in subsequent fiscal years, except those revenues that have been pledged to meet any obligation. The revenues derived from such taxes that are to be used as provided in this Section to reimburse the Puerto Rico Infrastructure Financing Authority any amount used by the Commonwealth of Puerto Rico for the payment of interest on and the amortization of the public debt, shall not be covered into the General Fund of the Government of the Government of Puerto Rico when collected, but rather shall be deposited in the Infrastructure Financing Authority Special Economic Assistance Fund and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, shall be used to reimburse said amounts to the Puerto Rico Infrastructure Financing Authority.

(f)     On or after the Effective Date (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), the amounts deposited each Fiscal Year in the Infrastructure Financing Authority Special Economic Assistance Fund in excess of the necessary amounts to, during said Fiscal Year, (1) pay the   principal of and interest on Refinancing Bonds, Collateralized Debt Obligations, and the Transferred Debt or any other bonds or obligations issued by

the Authority after the repayment of such Refinancing Bonds, Collateralized Debt Obligations, and the Transferred Debt; (2) meet obligations incurred under the bond issue documents, (3) make any other payment related to any other obligation incurred by the Authority, including payments under interest-rate swap agreements and other obligations in relation to money taken on loan or bonds issued by said instrumentality payable from Pledged Revenues or (4) cover those debts and/or obligations of the Highway and Transportation Authority as required by the Resolution of 1998 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act), and that the Infrastructure Financing Authority has agreed to cover. Any surplus amount shall be transferred to the General Fund of the Commonwealth of Puerto Rico. In order to make such transfer, the Board of Directors of the Authority shall certify that the transferred amounts are not necessary to comply with the provisions of the Resolution of 1998 (as such term is defined in Section 12A of Act No. 74 of June 23, 1965, as amended by this Act). Any amount to be transferred shall be used as provided by Joint Resolution of the Legislative Assembly.

(g)     Reports to the Legislative Assembly.- Every month, the President of the Government Development Bank for Puerto Rico, the Executive Director of the Puerto Rico Infrastructure Financing Authority, and the Executive Director of the Highway and Transportation Authority shall file a joint report with the Legislative Assembly on the use of the Infrastructure Financing Authority Special Economic Assistance Fund. Likewise, said report shall include the balance of the funds and amounts collected as a result of the taxes imposed herein. Said monthly report shall be filed with the Office of the Secretary of the Senate and the Office of the Clerk of the House of Representatives on or before the fifteenth (15th) day of each month and shall state in detail the balance, transactions, distribution, and uses given to such Special Fund."

Section 2.09.- Subsection (b) is hereby amended; a new subsection (c) is hereby added; and current subsections (c), (d), and (e) are hereby renumbered as (d), (e), and (f), respectively, in Section 18 of Act 123-2014, to read as follows:

"Section 18.- Funds.-

(a)   …

(b)   The 'Special Integrated Mass Transportation Development Fund' is hereby created in the name and for the benefit of the Authority to be used by the Authority for its corporate purposes. This Special Fund shall be replenished with the total of funds collected on account of administrative fines imposed in accordance with the provisions of Act No. 22-2000, as amended, known as the 'Puerto Rico Vehicle and Traffic Act,' issued by the Puerto Rico Police officers. Exempt from the foregoing are the funds collected on account of administrative fines imposed in accordance with the provisions of Section 23.06 of Act No. 22-2000, as amended, known as the 'Puerto Rico Vehicle and Traffic Act'; funds collected on account of fines imposed for violations of municipal ordinances covering infractions described in Sections 6.19 to 6.23 of Act No. 22-2000, as amended; funds collected on account of fines imposed under Sections 2.25, 2.34, and 23.05 of Act No. 22-2000, as amended, and which shall be covered into the Special Fund of the Office of the Director of Driver's Services created by virtue of said Act; the twenty percent (20%) of the amount of maximization achieved, for Fiscal Years 2014-2015 and thereafter, of the collections on account of traffic tickets paid, including the maximization achieved through the mechanization of the systems used to process fines imposed by the Department of Transportation and Public Works and/or the Puerto Rico Police; and/or through legislation to fund initiatives or replenish special funds aimed at attaining the technological, professional, and labor development of the Puerto Rico Police, as well as any other funds collected on account of fines imposed under Act No. 22-2000, as amended,

which shall be allocated to the Office of the Director of Driver's Services, in accordance with the provisions of Act No. 22-2000, as amended. Provided, that only during Fiscal Year 2014-2015, the Secretary of the Treasury may deposit, in the event of any gap in the General Fund's revenues, whether in whole or in part, the funds that were covered into the 'Special Integrated Mass Transportation Development Fund' in the General Fund. The Secretary of the Treasury shall have full discretion to make such a determination. Said determination shall remain in effect for the remainder of the corresponding Fiscal Year or until the revenue gap is closed, whichever comes first.

(c)     Insofar as the transfer of the Urban Train to the Authority has not been completed, the funds covered into the 'Special Integrated Mass Transportation Development Fund' under subsection (b) of this Section, or transferred by the Infrastructure Financing Authority to the Authority as provided in subsection (b) of Section 34 of Act No. 44 of June 21, 1988, as amended, shall be transferred to an account in the Government Development Bank for Puerto Rico for the benefit of the Highway and Transportation Authority, and the funds deposited in said account shall be used to defray operating costs related to mass transportation systems operated by the Authority and any debt or obligation related to said mass transportation systems, as approved by the Government Development Bank for Puerto Rico in carrying out its duty as fiscal agent; provided that, on or before September 30th, 2015, the Government Development Bank for Puerto Rico shall have full discretion to repeal the requirement established in this subsection (c) to make a deposit in an account for the benefit of the Highway and Transportation Authority. Once the transfer of the Urban Train to the Authority is completed, the Government Development Bank for Puerto Rico and the Highway and Transportation Authority shall transfer the account created in this subsection (c) to the Authority to be used by the latter for any of its lawful purposes.

(d)     …

(e)     …

(f)     …"

Section 2.10.- Scope.-

(a)     None of the provisions of Sections 2.01 to 2.09 of this Act shall be construed or applied in such manner so as to impair the power of the Legislative Assembly to assess and collect taxes as provided in Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.

(b)     None of the provisions of Sections 2.01 to 2.09 of this Act shall be construed or applied in such manner so as to impair the rights of holders of bonds or notes that constitute a public debt of the Commonwealth of Puerto Rico under the provisions of Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico.

## CHAPTER III

## FISCAL AND OPERATIONAL EMERGENCY PROCEDURE

Section 3.01.- Declaration of Purposes of this Chapter.-

Given the Fiscal Emergency declared in Act No. 66-2014, and the key role that public transportation plays in the economic and social development of the Island, this Legislative Assembly has determined that the HTA and the ITA are undergoing a fiscal and operational emergency that directly affects the general welfare of our people. For such reason, it is of utmost importance to restructure the administration and operation of the HTA and the ITA to ensure that the people of Puerto Rico receives public transportation services and to meet all obligations to debt holders. This Chapter shall apply exclusively to the HTA and the ITA given the particular economic situation these corporations are undergoing. By December 31, 2012, the HTA's debt with the GDB exceeded $2.2 billion and lacked a source of repayment. Such debt is the result of the former practice of financing the

operating deficits of the HTA and the need for capital investments through lines of credit with the GDB without a clear source of repayment to meet such obligations. This Legislative Assembly hereby determines and declares that the authority granted in this Chapter serves the best interests of the people of Puerto Rico.

Section 3.02.- Financial and Operational Feasibility Study.-

(a)     In light of the Fiscal Emergency, an Oversight Committee shall be constituted within a term that shall not exceed thirty (30) days after the effective date of this Act. Such committee shall be entrusted with conducting a Financial and Operational Feasibility Study of the HTA and/or the ITA.

(b)     Composition of the Oversight Committee.- The Oversight Committee shall be composed of the President of the Bank, the Secretary of the Treasury, the Director of the Office of Management and Budget (OMB), the President of the Senate of Puerto Rico or his/her representative, and the Speaker of the House of Representatives or his/her representative. The Oversight Committee shall conduct said Study and notify the beginning thereof in writing to the HTA and the ITA five (5) days before the Study begins. If the President of the Senate of Puerto Rico or the Speaker of the House of Representatives appoints a representative, said representative shall have at least (5) years of proven professional experience in business management, accounting, administration, and/or finance. The Committee shall hold its first meeting within five (5) days after the constitution thereof.

(c)     Powers of the Oversight Committee.- As part of the Oversight Process, the Oversight Committee shall have all the powers needed to perform the following duties:

(1)     To examine all the books and records of the HTA and the ITA; and

(2)     To use the information and services of the employees of the HTA, the ITA, the Bank, the Department of the Treasury, the OMB, and any other government entity it deems necessary to conduct the Study.

(d)     General Provisions of the Financial and Operational Feasibility Study.-  The Financial and Operational Feasibility Study of the HTA and/or the ITA shall be concluded within a term that shall not exceed thirty (30) days after the Committee has been constituted. Within five (5) days after the report [sic] has been concluded, the Oversight Committee shall submit the results thereof to the Governor of the Commonwealth of Puerto Rico, the President of the Senate of Puerto Rico, and the Speaker of the House of Representatives. Under no circumstances an extension to submit the results of the study shall be requested.

(e)     Content of the Financial and Operational Feasibility Study.- The Study to be conducted by the Oversight Committee shall include all the information regarding the finances, administration, and operations of the HTA and/or the ITA, as appropriate, including, but not limited to, the probability or occurrence of the following conditions:

(1)     Noncompliance with the payment of the principal of or interest on any obligation, including bonds, notes, or debentures of the HTA and/or the ITA.

(2)     HTA and/or ITA's noncompliance with any of the following transfers:

(i)     Taxes withheld from employees;

(ii)     Retirement Contributions made by employees;

(iii)   Any other responsibility provided by law.

(3)     Any HTA and/or ITA's debt or liability that has been delinquent for more than thirty (30) days.

(4)     Any operating deficit of the HTA and/or the ITA that exceeds the two (2)-year period.

(5)     Any projected increase in the operating deficit of the HTA and/or the ITA.

(6)     Any potential interruption of the services offered by the HTA and/or the ITA.

(7)     Any projected deficit in the general fund of the HTA and/or the ITA for the current Fiscal Year in excess of ten percent (10%) of the total projected revenues.

(f)     Conclusion of the Financial and Operational Feasibility Study.- The Study conducted by the Oversight Committee shall contain one of the following conclusions supported by a majority:

(1)     There is a significant financial or operational problem, but it may be solved satisfactorily upon the execution of an Improvement Agreement between the Oversight Committee and the HTA and/or the ITA. Provided that said conclusion shall be supported by unanimity of the members of the Oversight Committee; or

(2)     There is a Fiscal and/or Operational Emergency in the HTA and/or the ITA, which cannot be effectively solved through a plan or Improvement Agreement.

Section 3.03.- HTA and/or ITA Improvement Agreement.-

(a)     If it is concluded that a financial or operational problem may be solved satisfactorily upon the execution of an Improvement Agreement, the Oversight Committee shall execute said Agreement with the Directors of the HTA and/or the ITA to implement corrective measures as are necessary to address the identified financial and operational problems within a period that shall not exceed ten (10) days after the Study is published. The Agreement may establish all the

terms and conditions that the Oversight Committee deems necessary to address the identified financial and operational problems. The Improvement Agreement shall be ratified by the Board of Directors of the HTA created under Act No. 41-2014, and the Board of Directors of the ITA created under Act No. 123-2014.

(b)   If the Oversight Committee and the HTA and/or the ITA fail to execute the Improvement Agreement within (10) days after the Study is published, or if the Oversight Committee determines that the HTA and/or the ITA has failed to meet the terms established in the Improvement Agreement, the Oversight Committee shall appoint an Emergency Officer to the HTA and/or the ITA in accordance with Section 3.04 of this Chapter.

Section 3.04.- Fiscal and Operational Emergency in the HTA and/or the ITA.-

(a)   If the Oversight Committee concludes that the financial or operational problem may not be effectively solved upon the execution of an Improvement Agreement as provided in subsection (f) of Section 3.02 of this Chapter, or if the conditions provided in subsection (b) of Section 3.03 of this Chapter are met, the Committee shall appoint an Emergency Officer to the HTA and/or the ITA, as appropriate, and must notify such determination to the HTA and/or the ITA within a term that shall not exceed ten (10) days after the Study is submitted.

Section 3.05.- Emergency Officer.-

(a)   In General.- The Emergency Officer of the HTA and/or the ITA shall be appointed by a majority of members of the Oversight Committee; provided, that the representatives of the Senate and the House of Representatives cast a vote in his/her favor. The Emergency Officer shall discharge the duties of his/her office to the satisfaction of the Oversight Committee for a term of at least five (5) years or until the Fiscal and Operational Emergency of the HTA and/or the ITA ends. However, the Emergency Officer may be removed by unanimity of the Committee

due to gross negligence. If gross negligence is found and the Emergency Officer is removed from the HTA and/or the ITA, the Oversight Committee shall appoint a new Emergency Officer within fifteen (15) days from said removal. The Emergency Officer shall have at least (5) years of proven professional experience in business management, public administration, accounting, administration, and/or finance.

(b)    Compensation.- The Emergency Officer shall receive a fair compensation for his/her work in the HTA and/or the ITA as provided in the contract. The contract of the Emergency Officer shall be published on the website of the Bank within seven (7) days from the execution thereof.

(c)    Recruitment of Personnel.- In addition to the resources provided by law, the Emergency Officer may hire personnel as needed to perform his/her functions, provided that the Oversight Committee approves it.

(d)    Powers.- The Emergency Officer shall be empowered to issue any type of rules and orders deemed necessary to comply with the provisions of this Act, including rules and orders regarding the personnel of the HTA and/or the ITA, including but not limited to the administrative and managerial personnel. The rules and orders may include any type of provision, including, but not limited to: the implementation of a financial, operational, and/or restructuring plan. The rules and orders issued by the Emergency Officer shall be binding to all the officials and employees of the HTA and/or the ITA. Any official or employee that fails to obey any order issued by the Emergency Officer that is not inconsistent with the law, moral, or public safety shall be removed from his/her office following due process of law. As part of the powers of the Emergency Officer, he/she shall take any of the following actions:

(1)    To analyze the factors and circumstances that contribute to the financial and/or operational condition of the HTA and/or the ITA, and establish and implement the corresponding corrective actions.

(2)    To amend, revise, approve, or deny the budget of the HTA and/or the ITA and limit the total expenditures for the duration of the Fiscal and/or Operational Emergency of the HTA and/or the ITA.

(3)    To require any information he/she deems necessary from the personnel of the HTA and/or the ITA.

(4)    To publish on his/her website any information he/she deems necessary in benefit of the debt holders of the HTA and/or the ITA, the Governor, the Legislative Assembly, and the general public, including but not limited to:

(i)    Monthly reports on the fiscal and operational condition of the HTA and/or the ITA;

(ii)    Monthly reports on the corrective actions proposed to address the Fiscal and/or Operational Emergency of the HTA and/or the ITA and the implementation process thereof;

(iii)    All contracts awarded or approved by the Emergency Officer whose total sum exceeds ten thousand dollars ($10,000);

(iv)    The Financial and Operational Plan of the HTA and/or the ITA, in accordance with the provisions of Section 3.05 of this Chapter; and

(v)    Any other information that the Oversight Committee, the Governor, or the Legislative Assembly requires to be published with regard to his/her endeavor and the performance of his/her duties.

(5)    To examine all the documents of the HTA and/or the ITA, the Bank, the Department of the Treasury, and the Office of Management and Budget as appropriate to carry out his/her functions.

(6)    To amend, revise, approve, or deny any commitment, contract, expense, loan, creation of a new position, the replacement for a vacancy, or any other action that entails a change in the fiscal or operational circumstances of the HTA and/or the ITA.

(7)    To review and approve any payment made the HTA and/or the ITA prior to its disbursement.

(8)    To exercise all the authority of the HTA and/or the ITA to renegotiate existing collective bargaining agreements and act as the agent of the HTA and/or the ITA in every collective bargaining process. Every contract or agreement entered into during the Fiscal and/or Operational Emergency of the HTA and/or the ITA must be approved by the Emergency Officer.

(9)    To consolidate departments and offices of the HTA and/or the ITA, transfer functions from one department or office to another, remove any personnel as he/she deems convenient, and restructure the operations of the HTA and/or the ITA in all aspects thereof for the purposes of cutting back on spending, notwithstanding the provisions of any arrangement, contract, agreement, or provision of law.

(10)   To require compliance with all his/her rules and orders, including through legal remedies, if necessary.

(11)   To sell, lease, or negotiate any asset of the HTA and/or the ITA to guarantee operational efficiency and ensure the HTA and/or the ITA meet all its obligations; provided that such actions do not jeopardize the general wellbeing and health of the residents of the Commonwealth of Puerto Rico.

(12)   To seek GDB's financing to take the recommended corrective actions, provided that all legal requirements are met.

(13) To reduce, suspend, or eliminate the compensation of any secretary, director, and/or member of the Board of Directors of the HTA and/or the ITA.

(14) If the Emergency Officer determines that the Fiscal and/or Operational Emergency of the HTA and/or the ITA is due to, in whole or in part, a potential criminal action, he/she must refer the case to the Secretary of Justice within sixty (60) days after learning about it.

(15) To take any other action or perform any function deemed necessary by the Oversight Committee to address the Fiscal and/or Operational Emergency of the HTA and/or the ITA as provided by contract.

Section 3.06.- Financial and Operational Plan for the HTA and/or the ITA.-

(a)     In General.- Within forty-five (45) days after his/her appointment, the Emergency Officer shall develop and publish on his/her website a Financial and Operational Plan for the HTA and/or the ITA, in consultation with the HTA and/or the ITA. The Emergency Officer may amend such Financial and Operational Plan from time to time as deemed necessary. Any amendment to the Financial and Operational Plan shall be published on the website as an attachment to the original Plan. Within fifteen (15) days after the Plan is published, the Emergency Officer, in conjunction with the Secretaries and/or Directors of the HTA and/or the ITA, shall hold a public information meeting to be broadcasted online to discuss the provisions of the Plan and the implementation thereof.

(b)     Content.- The Financial and Operational Plan for the HTA and/or the ITA shall contain, at least, the following:

(1)     A strategy to carry out the functions of the HTA and/or the ITA with the available resources in accordance with the projected revenues estimate drafted by the Emergency Office;

(2)     A strategy to meet debt service requirements in accordance with the applicable terms including, but not limited to, the payment of any bonds, notes, or any other legal obligation incurred by the HTA and/or the ITA;

(3)     A detailed account of the actions to be implemented on a monthly and yearly basis to restructure the finances and operations of the HTA and/or the ITA and address the Fiscal and/or Operational Emergency of said agencies;

(4)     A request for proposal to be made on or before March 31st, 2015 to reorganize the operations of the ITA and certain operations of the HTA by means of a Public Private Partnership or franchise.

Section 3.07.- Emergency Officer Monthly Reports.-

(a)     In General.- The Emergency Officer shall publish on his/her website, and deliver a copy to the Governor, the President of the Senate, and the Speaker of the House of Representatives, monthly reports on the fiscal and operational condition of the HTA and/or the ITA, and monthly reports on the proposed corrective actions to address the Fiscal and/or Operational Emergency of the HTA and/or the ITA, as well as on the implementation process thereof; such reports shall contain, at least, the following:

(1)     A description of every expense incurred, approved, or rejected during the year, in the amount of ten thousand dollars ($10,000) or more;

(2)     A description of every financing made, approved, or rejected, exceeding ten thousand dollars ($10,000);

(3)     A description of any new position created in the HTA and/or the ITA;

(4)    A description of any vacancy in the HTA and/or the ITA that is filled during the period that the Emergency Officer is carrying out his/her functions;

(5)    A description of any position eliminated or any position from which an HTA and/or ITA's official has been removed.

Section 3.08.- Restructuring and  Recovery of the HTA and/or the ITA.-

(a)    In General.- The Emergency Officer of the HTA and/or the ITA shall cease his/her functions only when the Oversight Committee determines that the Fiscal and/or Operational Emergency of the HTA and/or the ITA has been addressed.

(b)    Conditions.- The Fiscal and/or Operational Emergency of the HTA and/or the ITA shall end when the Emergency Officer complies with the following:


(1)    The HTA and/or the ITA are able to operate with ninety-five percent (95%) of its own funds, for these purposes "own funds" shall include any fee-generated revenues and formula appropriations corresponding to the respective agencies. However, appropriations under the General Budget Resolution of the Commonwealth of Puerto Rico or any other resolution shall not be considered "own funds"; or

(2)    The Oversight Committee so determines by unanimity.

(c)    Notwithstanding the provisions of subsection (b) of this Section, the minimum term during which the Emergency Officer shall carry out his/her functions shall be five (5) years.

Section 3.09.- Applicability of Act No. 71-2014 to the HTA and/or the ITA.-

The Emergency Officer may resort to the provisions of Act No. 71-2014 known as the "Puerto Rico Public Corporation Debt Enforcement and Recovery Act," provided, that he/she notifies the President of the Bank in advance. In such

59

case, the Emergency Officer shall prove that there is no viable Fiscal and Operational Plan to satisfactorily address the Fiscal and/or Operational Emergency of the HTA and/or the ITA within a reasonable period of time or that the Fiscal and Operational Plan adopted may not be effectively implemented to satisfactorily address the Emergency.

Section 3.10.- Liability.-

Any person acting pursuant to the provisions of this Act shall not be held liable in their personal capacity in any claim against the HTA and/or the ITA for actions taken as a result of the provisions of this Chapter, unless such actions are considered criminal acts or reckless disregard.

Section 3.11.- Responsibilities of the Secretary or Director.-

(a)    The Secretary or Director of the HTA and/or the ITA shall meet all the requirements of the Oversight Committee and the Emergency Officer. Failure to meet any of such requirements shall be considered reckless disregard in the performance of ministerial duties. In said case, the Oversight Committee or the Emergency Officer, as appropriate, may remove the Secretary or Director, provided that the Governor is notified within thirty (30) days in advance.

Section 3.12.- HTA Public and Capital Improvements Plan.-

(a)    The HTA shall submit within forty-five (45) days after the approval of this Act to each body of the Legislative Assembly and the Governor a Public and Capital Improvements Plan for Highways, Bridges, and Thoroughfares (the "Plan",) which shall include the following:

(1)    An itemization of the projects to be developed by location, including costs.

(2)    Average time frame of projects to be developed.

(b)    The Legislative Assembly shall evaluate the projects contemplated in the Plan and may recommend through Joint Resolution to such effect, any necessary modifications in accordance with the public policy set forth in this Act within sixty (60) days after submitting the Plan for the Legislative Assembly's' consideration.

(c)    The Government Development Bank for Puerto Rico is hereby authorized to make an advance funding to the Highway and Transportation Authority of up to a maximum of fifty million dollars ($50,000,000) on or before April 15, 2015, to fund the public works and capital improvements contemplated in the Plan, in accordance with the terms agreed on between the Government Development Bank for Puerto Rico and the Highway and Transportation Authority. Said advance may have as its source of repayment, if sufficient, future

revenues of the Highway and Transportation Authority; notwithstanding the foregoing, said advance may be assumed, by agreement between the Highway and Transportation Authority and the Infrastructure Financing Authority, by the Infrastructure Financing Authority and be considered as Transferred Debt, as such term is defined in Section 34 of Act No. 44 of June 21, 1988, as amended.

Section 3.13.- Transparency of the HTA.-

(a)     The Puerto Rico Highway and Transportation Authority shall publish on its webpage the following information:

(1)     A financial statement and report of the operations of the Authority during said fiscal year;

(2)     A full report of the status and progress of the use of state funds, federal funds, special appropriations, and its own revenues;

(3)     An account of any finding by the Federal Government in relation to the use of federal funds.

(4)     A relation between the number of employees and payroll costs, including fringe benefits;

(5)     Collective bargaining agreements negotiated during the corresponding period and a report of the costs of such collective bargaining agreements;

(6)     Number of miles of roads repaved per month;

(7)     Per-mile cost of repaved roads;

(8)     Average time to repave one mile of road;

(9)     Repaving frequency of busiest roads;

(10)    Ratio between toll revenues and investment in repairing toll roads administered by the HTA.

(11)    Ratio between toll revenues and investment in repairing toll roads administered by private entities.

(12)    Road improvement projects per year and per-mile cost of such projects;

(13)    Source of financing of improvements made to roads;

(14)    Evaluation of bridges in need of improvements, and repairs made to or replacement of bridges within the reported period;

(15)    Source of financing of improvements made to bridges;

(16)    Account of payroll expenses by operating division of the public corporation;

(17)    Income and expenditures resulting from the operations of the HTA;

(18)    Ratio between own income and external subsidies;

(19)    Return on assets;

(20)    Ratio between debt-to-capital and general expenses to payroll expenses; and

(21)    Any other information deemed appropriate by the Emergency Officer to establish HTA's accountability parameters.

(b)    Such information shall be published at least once every year not later than March 15 of the following year.

Section 3.14.- Section 16 of Act No. 123-2014, known as the "Puerto Rico Integrated Transportation Authority," is hereby amended to read as follows:

"Section 16.- Reports.-

The Integrated Transportation Authority shall submit to the Legislative Assembly at the beginning of each regular session, an annual report of the program to be implemented during the next Fiscal Year. Said report shall be filed annually on or before January 15th with the Office of the Secretary of the Senate and the Office of the Clerk of the House of Representatives, and shall state in detail the standards of efficiency and productivity for all mass transportation systems under

the supervision of the Authority for the immediately preceding calendar year, including:

- Month-over-month and year-over-year user growth or reduction rate comparison;

- Vehicles, vessels, wagons, or units (as applicable, according to the type of mass transportation) in use per route;

- Number of daily trips per route;

- Number of passengers per route with an average fluctuation between working days and non-working days;

- Established schedule per route;

- Minimum compliance with the established schedule;

- Maximum number of incomplete trips;

- Weekly average of vehicles, vessels, wagons, or units (as applicable, according to the type of mass transportation) that are out of service and the reasons therefor;

- An account of the number of employees per fleet vehicle, vessel, wagon, or unit (as applicable, according to the type of mass transportation);

- Cost of transportation per trip unit, or passenger; and

- Covenants negotiated during the preceding year or an account of the cost of those covenants compared to the immediately preceding covenants.

It is hereby provided that the Integrated Transportation Authority shall meet the following operational efficiency standards not later than January 30th, 2016:

| | |
|---|---|
| User growth rate | 5.0% |
| Number of vehicles, vessels, wagons, or units of the total fleet in use (as applicable, according to the type of mass transportation) | 85% |

| | |
|---|---|
| Maximum number of employees per total of vehicles or units of mass transportation or rail transport | 6 |
| Maximum number of employees per total of ferryboats or maritime transport vessels | 12 |
| Minimum compliance with the established schedule | 90% |
| Maximum number of incomplete trips | 10% |

In addition to the account of the aforementioned parameters and criteria of the preceding year, the Integrated Transportation Authority shall submit every quarter, on or before April 15th, July 15th, and October 15th of each year, a report to the Office of the Clerk of the House and the Office of the Secretary of the Senate, including the following information:

(1)   The number of passengers per route and day;

(2)   The income and expenditures resulting from the operations, and the cost of transportation per trip unit or passenger;

(3)   The ratio between its own revenues and external subsidies;

(4)   The ratio between passengers served and the number of employees and  revenue and expenditures;

(5)   The number of units in service per day and route;

(6)   The percentage of the bus, vehicle, wagon, vessel or ferryboat fleet that is out of service per day;

(7)   The average time units remain out of service for repairs;

(8)   The frequency of service per route;

(9)   The travel time for each route according to the published schedule and the actual daily average travel time for each route;

(10)   The percentage of schedule adherence per route;

(11)   The specific actions taken to cut back on operating expenditures and the savings generated with the implementation thereof;

(12)   The strategies to improve the services provided to users;

(13)   The user growth rate; and

(14)   Any other pertinent information that provides the Legislative Assembly with an outlook of the services offered to users.

The Legislative Assembly, through the committees of each of the Houses with jurisdiction over mass transportation matters, shall render a report every six (6) months about the performance and execution of the mass transportation systems administered or supervised by the Integrated Transportation Authority making any appropriate recommendations and providing alternatives as are necessary to ensure that the people receive adequate and efficient mass transportation services.

The Authority shall also submit to the Legislative Assembly and the Governor of Puerto Rico, as soon as possible after the close of each fiscal year of the Commonwealth of Puerto Rico, but before the close of the calendar year:

(1)   A financial statement and a full report of the transactions carried out by the Authority during the preceding fiscal year; and

(2)   A full report of the status and progress of all of its transportation facilities and the activities carried out from the creation of the Authority or from the date of the last of these reports.

The Integrated Transportation Authority shall also submit to the Legislative Assembly and the Governor of Puerto Rico, upon request, official reports of its transactions and activities in accordance with this Act."

Section 4.01.- Severability.

If any article, section, subsection, paragraph, subparagraph, clause, or part of this Act were held to be null or unconstitutional by a competent court, such holding shall not affect, impair, or invalidate the remaining provisions and parts of this Act.

Section 5.01.- Effectiveness .

This Act shall take effect immediately after its approval; provided, however, that the six dollar and twenty-five cent ($6.25)-excise tax imposed under Section 3020.07A(a)(i) of Act No. 1-2011, as provided in Section 2.06 of this Act, shall take effect on March 15, 2015.

# CERTIFICATION

I hereby certify to the Secretary of State that the following **Act No. 1-2015 (H. B. 2212)** **(Conference)** of the **3rd Special Session** of the **17th Legislative Assembly of Puerto Rico:**

**AN ACT**    to establish the public policy that shall govern the implementation of this Act within the context of the Basic Principles of the New Tax System of Puerto Rico and provide for the evaluation and approval thereof; add a new Section 12-A to Act No. 74 of June 23, 1965, as amended, known as the "Puerto Rico Highway and Transportation Authority Act"; add a new Section 34 and renumber current Section 34 as Section 35 of Act No. 44 of June 21, 1988, as amended, known as the "Puerto Rico Infrastructure Financing Authority Act"; amend Sections 3020.01 and 3020.07, add a new Section 3020.07A; etc.

has been translated from Spanish to English and that the English version is correct.

In San Juan, Puerto Rico, on this 27th day of April, 2015.

Juan Luis Martínez Martínez
Acting Director