# EXHIBIT 4

```
                                               1
                        DRAFT -- NOT PROOFREAD


     1          ** ROUGH DRAFT - ADAM CHEPENIK **

     2                  * * * * *

     3          Tara Gandel Hudson, RPR CRR

     4                  * * * * *

     5          This draft is unedited and uncertified and

     6      may contain an occasional reporter's note, a

     7      misspelled proper name and/or nonsensical word

     8      combinations.  All such entries will be

     9      corrected on the final certified transcript.

    10                  * * * * *

    11


    12          IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF PUERTO RICO
    13
                        PROMESA TITLE III
    14                CASE NO. 17 BK 3283-LTS

    15
         In re:                              )
    16                                       )
         THE FINANCIAL OVERSIGHT             )
    17   AND MANAGEMENT BOARD FOR            )
         PUERTO RICO,                        )
    18                                       )
             as representative of            )
    19                                       )
         THE COMMONWEALTH OF PUERTO RICO,    )
    20   THE EMPLOYEES RETIREMENT SYSTEM OF  )
         THE GOVERNMENT OF THE COMMONWEALTH  )
    21   OF PUERTO RICO, AND THE PUERTO      )
         RICO PUBLIC BUILDINGS AUTHORITY,    )
    22                                       )
                 Debtors.                    )
    23
```

24

25

                                                              2
                        DRAFT -- NOT PROOFREAD


1                     APPEARANCES
                (All appearing remotely.)
2
        For the Cantor-Katz Collateral Monitor, LLC, as
3       Collateral Monitor for GDB Debt Recovery Authority:

4               Douglas S. Mintz
                SCHULTE ROTH & ZABEL LLP
5               901 Fifteenth Street, NW
                Suite 800
6               Washington, DC  20005
                202.729.7470
7               douglas.mintz@srz.com

8               Douglas I. Koff
                Thomas L. Mott
9               Taleah E. Jennings
                SCHULTE ROTH & ZABEL LLP
10              919 Third Avenue
                New York, NY  10022
11              212.756.2000
                douglas.koff@srz.com
12              thomas.mott@srz.com
                taleah.jennings@srz.com
13
        For the Financial Oversight and Management Board as
14      Representative for Debtors:

15              Jeffrey Levitan
                Michael T. Mervis
16              Julia D. Alonzo
                Margaret A. Dale
17              Chantel L. Febus
                PROSKAUER ROSE LLP
18              Eleven Times Square
                New York, NY  10036
19              212.969.3000
                jlevitan@proskauer.com
20              mmervis@proskauer.com

```
                   jalonzo@proskauer.com
21                 mdale@proskauer.com
                   cfebus@proskauer.com
22
                   Michael A. Firestein
23                 PROSKAUER ROSE LLP
                   2029 Century Park East
24                 Suite 2400
                   Los Angeles, CA  90067-3010
25                 310.557.2900
                   mfirestein@proskauer.com
```

⬆                                                          3
                   DRAFT -- NOT PROOFREAD

```
 1
                   Laura Stafford
 2                 PROSKAUER ROSE LLP
                   One International Place
 3                 Boston, MA  02110-2600
                   617.526.9600
 4                 lstafford@proskauer.com

 5
                   Gabriel A. Miranda-Rivera
 6                 O'NEILL & BORGES LLC
                   250 Munoz Rivera Avenue
 7                 Suite 800
                   San Juan, PR  00918-1813
 8                 878.764.8181
                   gabriel.miranda@oneillborges.com
 9

10     For Ambac Assurance Corporation:

11                 Jonathan Ohring
                   Atara Miller
12                 MILBANK LLP
                   55 Hudson Yards
13                 New York, NY  10001-2163
                   212.530.5000
14                 johring@milbank.com
                   amiller@milbank.com

15

16     For the Financial Guaranty Insurance Company (FGIC):
```

17          Adam M. Langley
            BUTLER SNOW LLP
18          6075 Poplar Avenue
            Suite 500
19          Memphis, TN  38119
            901.680.7200
20          adam.langley@butlersnow.com

21

    For National Public Finance Guarantee Corporation:
22
            Robert S. Berezin
23          Lauren Fairman
            WEIL GOTSHAL & MANGES LLP
24          767 Fifth Avenue
            New York, NY  10153-0119
25          robert.berezin@weil.com
            lauren.fairman@weil.com

♠                                                            4
                    DRAFT -- NOT PROOFREAD

1
            Kirsten Erichsen
2           WEIL GOTSHAL & MANGES LLP
            110 Fetter Lane
3           London, EC4A1AY, UK
            44.20.7903.1000
4           kirsten.erichsen@weil.com

5

            Eric Perez-Ochoa
6           ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC
            268 Munoz Rivera Avenue
7           Suite 1400
            San Juan, PR  00918
8           787.657.9000
            epo@amgprlaw.com
9
    For Assured Guaranty Corp. and Assured Guaranty
10  Municipal Corp.:

11          William J. Natbony
            Casey John Servais
12          Thomas Curtin
            CADWALADER WICKERSHAM & TAFT LLP
13          200 Liberty Street

```
                    New York, NY  10281
14                  212.504.6000
                    bill.natbony@cwt.com
15                  casey.servais@cwt.com
                    thomas.curtin@cwt.com
16
      For the QTCB Noteholder Group:
17
                    David L. Lawton
18                  MORGAN LEWIS & BOCKIUS LLP
                    One State Street
19                  Hartford, CT  06103-3178
                    860.240.2700
20                  david.lawton@morganlewis.com

21    For the Puerto Rico Fiscal Agency and Financial
      Advisory Authority:
22
                    Peter Friedman
23                  O'MELVENY & MYERS LLP
                    1625 Eye Street NW
24                  Washington, DC  20006
                    202.383.5300
25                  pfriedman@omm.com
```

                                                     5
                    DRAFT -- NOT PROOFREAD

```
 1                  Elizabeth L. McKeen
                    O'MELVENY & MYERS LLP
 2                  610 Newport Center Drive
                    17th Floor
 3                  Newport Beach, CA  92660
                    949.823.6900
 4                  emckeen@omm.com

 5                  Mohammad Saleh Yassin
                    O'MELVENY & MYERS LLP
 6                  7 Times Square
                    New York, NY  10036
 7                  212.728.5971
                    msyassin@omm.com
 8

 9    For AmeriNational Community Services, LLC
      as servicer for the GDB Debt Recovery Authority
```

```
10
              Arturo J. Garcia-Sola
11            Alejandro J. Cepeda-Diaz
              Nayuan Zouairabani-Trinidad
12            McCONNELL VALDES LLC
              270 Munoz Rivera Avenue
13            Suite 7
              Hato Rey, PR  00918
14            787.759.9292
              ajg@mcvpr.com
15            ajc@mcvpr.com
              nzt@mcvpr.com
16

17    For the Ad Hoc Group of Constitutional Shareholders:

18            Andrew Kissner
              Katherine E. Richardson
19            MORRISON & FOERSTER LLP
              250 West 55th Street
20            New York, NY  10019-9601
              212.468.8000
21            akissner@mofo.com
              krichardson@mofo.com
22

23

24

25
```

                                              6
                    DRAFT -- NOT PROOFREAD

```
1
    For the witness, Adam W. Chepenik:
2
              Antoinette DeCamp
3             ERNST & YOUNG
              Associate General Counsel
4             Washington, D.C.

5

6
```

```
            ALSO PRESENT:
   7
                    Matthew G. Pinos, Law Clerk, SRZ
   8                Paul Baker, Technician
                    Justin Bond, Videographer
   9                Karen Patterson, Veritext
                    Manny Valenciano, Veritext
  10

  11

  12

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24

  25


                    DRAFT -- NOT PROOFREAD
                                                    7
                    DRAFT -- NOT PROOFREAD


   1            THE VIDEOGRAPHER:  Good morning.  Today is

   2        October 20, 2021.  We're on the record at

   3        9:30 a.m.  Today we'll take a videotape
```

4        deposition in Case Number 17 BK 3283-LTS.  This

5        deposition is being held remotely.

6              Would you please swear the witness.

7                    ADAM W. CHEPENIK,

8   having been first remotely sworn to tell the truth,

9   the whole truth and nothing but the truth relating

10  to said matter, was examined and testified as

11  follows:

12  DIRECT EXAMINATION,

13        QUESTIONS BY ARTURO J. GARCIA:

14  Q   So here we go.  First of all, good morning to

15        all.  And welcome to the deposition of

16        Adam Chepenik.

17              Am I pronouncing your name correctly?

18  A   You are.

19  Q   Okay.  Thank you.  From Ernst & Young.  EY,

20        as -- pursuant to an AmeriNational Community

21        Services LLC subpoena to testify at a deposition

22        in a civil action.

23              For the record, my name is Arturo

24        Garcia-Sola, McConnell Valdes LLC, appearing on

25        behalf of AmeriNational Community Services, LLC,

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1    as a servicer for the GDB Debt Recovery

2    Authority, the DRA, together with my colleagues

3    from MCV, Alejandro Cepeda, Antonio Ramirez,

4    Nayuan Zouairaban.

5         Also participating will be one or more

6    attorneys from Cantor-Katz representing

7    Cantor-Katz Collateral Monitor LLC.  For

8    Wilmington Trust of the firm of Schulte, Roth &

9    Zabel.

10         I confirm the standard stipulations for

11    deposition with counsel for EY and also for the

12    FOMB.  Regarding the usual objections,

13    everything will be reserved until the hearing

14    except as to form and privilege.

15         And also, I note for the record that

16    objections by one party will be deemed as

17    objections by all the parties.

18         I remind everybody, if I have to remind

19    anyone, that the proceeding today is being

20    remote -- is a remote proceeding; so just allow

21    me to recognize that for the record.

22         Because we are proceeding remotely and

23    everybody is in a different place and room -- I

24    hope that everyone is keeping safe, by the way,

25    on the COVID-19 situation -- I also hope that we

DRAFT -- NOT PROOFREAD

9

DRAFT -- NOT PROOFREAD

1    can all be cognizant there's technical

2    difficulties, and so I am hoping that we try to

3    avoid speaking over each other and also that we

4    treat each other with professional courtesy so

5    that we can move as expeditiously as reasonably

6    possible.

7         As to the exhibits, we will be using

8    Veritex Egnyte platform, and my colleague

9    Alejandro Cepeda will be marking and publishing

10   any document that is used as an exhibit

11   throughout the deposition.  That is because I'm

12   absolutely and totally incapable of managing the

13   technical aspects of the Egnyte program so that

14   everyone participating can have access to the

15   exhibits and review the same.

16        Also, the witness and the witness's

17   attorney will be able to manage the document by

18   scrolling up or down and magnify the object so

19   that you can take a look at the document.

20        So we are proceeding to take the deposition

21   of Ernst & Young through the testimony of

22   Mr. Adam Chepenik pursuant to the agreements

23    between the DRA parties and the FOMB, which have

24    been approved and adopted by the court and are

25    memorialized in a Court Order dated October 18,

DRAFT -- NOT PROOFREAD

                                                          10

DRAFT -- NOT PROOFREAD


1    2021 -- that's Docket Number 18532 -- and EY's

2    acknowledgment that it will be presenting a

3    witness today, i.e., Mr. Chepenik.

4         So good morning to the witness, and thank

5    you for your appearance here today.

6         Can you please state your full name for the

7    record?

8  A  Adam Chepenik.

9  Q  Have you ever been deposed before?

10 A  I have not.

11 Q  Have you ever given testimony before at any

12    trial or any hearing?

13 A  Do you mean oral testimony or written?

14 Q  Let's start with oral testimony.

15 A  No, sir.

16 Q  Have you ever presented written testimony to a

17    Court?

18 A  I filed a written declaration in connection with

19    one of the many Puerto Rico cases.

20   Q   Which was that Puerto Rico case?

21   A   I do not recall which specific case it pertained

22       to.

23   Q   Was that one of the PROMESA cases?

24   A   Yes.  Yes, sir.

25   Q   And do you recall whether that would be the main

                    DRAFT -- NOT PROOFREAD
                                                      11
                    DRAFT -- NOT PROOFREAD

1        Commonwealth proceeding?

2    A   I believe so, yes.

3    Q   So when did you submit a declaration for that

4        proceeding?

5    A   I do not recall specifically, but to the best of

6        my recollection, it was about a year or two ago.

7    Q   All right.  So it was not recent?

8    A   No, sir.

9    Q   So that declaration, if I may ask, would not

10       have been related to the plan confirmation

11       proceedings that are due to start November 8?

12   A   That's --

13       MR. MERVIS:  Sorry.  I just need to break

14       in here for a minute.

15       So Arturo, this is a request to the

16       witness, but I just want to make sure we're all

17    on the same page.

18        That the agreement that you referenced

19    earlier, which has been docketed, as I

20    understand, it prohibits me as representative of

21    the board from objecting to the form of a

22    question unless Ms. DeCamp doesn't.

23        So the logistical problem with that is if

24    the witness is answering your question fairly

25    quickly, I won't be able to know whether

DRAFT -- NOT PROOFREAD
                                                    12
DRAFT -- NOT PROOFREAD

1    Ms. DeCamp is going to object or not.  I

2    actually would have objected to the last

3    question on the form basis.

4        So I would ask the witness to just please

5    pause for, say, five seconds or so before

6    answering the question so that I have the

7    opportunity to do so if Ms. DeCamp doesn't.

8        Is that okay, Arturo?

9        MR. GARCIA:  It's okay with me.

10        MR. MERVIS:  Thank you.

11        MR. GARCIA:  I'll allow you that courtesy.

12        MR. MERVIS:  Well, I don't know any other

13    way to do it, Arturo.

14          MR. GARCIA:  It's okay.  Don't worry.

15          MR. MERVIS:  I'll object with a normal

16     proceeding so --

17          MR. GARCIA:  That's okay, Michael.  All

18     right.

19  BY MR. GARCIA:

20  Q   So can I have the testimony read back, please.

21          (The requested text was read by the

22     reporter.)

23          MR. MERVIS:  So I object to the form.

24  BY MR. GARCIA:

25  Q   You can answer.

                    DRAFT -- NOT PROOFREAD
                                                    13
                    DRAFT -- NOT PROOFREAD

1   A   I believe that to be correct.

2   Q   Do you recall in general terms what the subject

3       of that declaration was?

4   A   I recall it was related to various Commonwealth

5       laws as it pertains to PROMESA and either their

6       applicability or their revenues associated with

7       those laws.

8   Q   Okay.  You say, first, various -- "it had to do

9       with various Commonwealth laws."

10          What laws are you referring to,

11        Mr. Chepenik?

12   A    The declaration was filed, like I mentioned

13        earlier, one to two years ago, and so I do not

14        recall -- it was not one of the documents I

15        reviewed in preparation for this deposition

16        because it was not one of the topics that was

17        requested and subpoenaed to EY to respond to.

18   Q    Do you recall any laws that were part of that

19        declaration or any law in particular?

20   A    I do not recall the contents of the declaration

21        in detail because it was not part of the -- one

22        of the -- it was not pertinent to the questions

23        that were subpoenaed for EY to respond to so --

24   Q    I understand.

25        Do you recall if Act Number 30 of 2013 was

                    DRAFT -- NOT PROOFREAD
                                                  14
                    DRAFT -- NOT PROOFREAD

1         included in that in any way?

2              MS. DeCAMP:  Objection.  Asked and

3         answered.

4              MR. GARCIA:  I'm just asking specific laws,

5         Antoinette.

6              MS. DeCAMP:  I understand.  I understand.

7    A    Should I answer?

8          MS. DeCAMP:  You can answer.

9     BY MR. GARCIA:

10    Q   Yes, answer.

11    A   I do not recall.

12    Q   What about Act Number 31 of 2013?

13          MS. DeCAMP:  Objection.  Asked and

14       answered.

15          You can answer.

16    A   I do not recall.

17    BY MR. GARCIA:

18    Q   What about any Commonwealth law dealing with

19       excise taxes?

20          MS. DeCAMP:  Objection.  Asked and

21       answered.

22          You can answer.

23    A   I do not recall.

24    BY MR. GARCIA:

25    Q   In addition to the hearing at which you

                    DRAFT -- NOT PROOFREAD
                                              15
                    DRAFT -- NOT PROOFREAD

1        submitted a declaration for, have you ever had

2        any participation in any hearing outside of

3        PROMESA -- entirely outside of PROMESA in any

4        capacity?

5    A    I'm sorry.  You need to be more specific.  I

6         don't --

7    Q    Okay, I will.

8              Outside of PROMESA, have you ever testified

9         in any other hearing?

10   A    No, sir.

11   Q    So it's safe to say that the only time that you

12        participated in a hearing was through the

13        declaration you recall you submitted about a

14        year and a half ago?

15   A    If by "participation" you mean as a witness?

16   Q    Well, in any capacity.

17   A    Again, sir, I apologize for asking you to be

18        specific but I've been working in the

19        restructuring space for many years; so if you

20        mean --

21             I understand what you're implying is as a

22        witness to either written or oral form, and if

23        that is the case, to the best of my

24        recollection, this is the only time.  Correct.

25   Q    Okay.  Good.

DRAFT -- NOT PROOFREAD

16

DRAFT -- NOT PROOFREAD

1              Now you understand that you're testifying

2    under oath here today; correct?

3    A    I do.

4    Q    Is there anything that would prevent you from

5         doing so like, for instance, you're taking any

6         medication that may inhibit your recollection

7         or, you know, affect your testimony?

8    A    Not that I can -- not that I can think of that

9         would --

10   Q    Okay.  So just a little bit about the logistics

11        for the deposition before we start with the

12        questioning.

13             I'll be asking you some questions about the

14        topics that have been previously identified in

15        the subpoena.  Please try to answer all

16        questions verbally so the court reporter can

17        record your answer in the transcript of the

18        deposition, notwithstanding that we are

19        proceeding through video.

20             Also, please allow me to finish my question

21        before you give your answer, just as I will try

22        to wait until you finish your answer to my

23        questions before proceeding to another question.

24             This is necessary to allow the reporter to

25        transcribe accurately the record of the

DRAFT -- NOT PROOFREAD

17

DRAFT -- NOT PROOFREAD

1     proceedings today.

2          If at any time you do not understand any

3     one of my questions, please let me know, and I

4     will try to rephrase the question so that you

5     can understand it.

6          I'm not here to trick you.  I want an

7     accurate record of both my questions and your

8     responses to the question.  So again, if you

9     don't understand, please let me know, and I will

10    try to rephrase.

11         Now, you may hear objections, as you

12    already have, before you give your answer.

13    Please note that despite the objections, you are

14    required to answer the questions, unless you are

15    to be instructed by counsel not to answer a

16    particular question.

17         Do you understand?

18  A   I understand.

19  Q   So also, should you need a break at any point in

20    time, please let me know, and I will make sure

21    that we get the break.  Just try not to make --

22    to ask for a break in the middle of a question

23    or in the middle of a particular topic.  But if

24     you need a break, just let me know, and we'll

25     break.

                    DRAFT -- NOT PROOFREAD
                                                    18
                    DRAFT -- NOT PROOFREAD

1          Sometimes it will be me who needs the

2      break, by the way, not just you so we understand

3      each other.

4   A  Understood.

5          Before we proceed, though, I do want to ask

6      if we should take a very brief break now only

7      because I tried to launch the Exhibit Share --

8   Q  Okay.

9   A  -- web browser, and it's saying I do not have an

10     account.  So I don't know if we should take a

11     break now just to --

12  Q  Yes, let's do that.  It's happened before.  I

13     think that there should be a concierge available

14     to help you.

15         MR. GARCIA:  Is there a concierge online or

16     Karen?

17         THE VIDEOGRAPHER:  We are off the record at

18     9:44.

19         (A recess was taken.)

20         THE VIDEOGRAPHER:  Back on the record at

21      9:50.

22  BY MR. GARCIA:

23  Q   So I will start again.

24          Mr. Chepenik, by the way do you have --

25          (A discussion was held off the record to

                DRAFT -- NOT PROOFREAD
                                                    19
                DRAFT -- NOT PROOFREAD

1   correct technical issues.)

2          MR. GARCIA:  Hello, Karen, we're listening

3   to you.

4          This is what I was referring to at the

5   beginning when I was talking about technical

6   problems with remote depositions.  Sometimes

7   they can be entertaining.

8   BY MR. GARCIA:

9   Q   Mr. Chepenik, do you have any documents in front

10      of you today?

11  A   I do not, no.

12  Q   So I'm going to ask for the first exhibit to be

13      put on the screen.  My colleague Alejandro is

14      trying to do that.

15          Can you see the document on the screen,

16      Mr. Chepenik?

17  A   I can.

18          (Deposition Exhibit 1 was presented for

19          identification.)

20   Q   Have you seen this document before?

21   A   If this is the subpoena to Ernst & Young LLP,

22          yes, I have seen it.

23          MR. GARCIA:  Can you please scroll down,

24          Mr. Cepeda-Diaz, to Attachment A?

25

DRAFT -- NOT PROOFREAD
                                                    20
DRAFT -- NOT PROOFREAD

1   BY MR. GARCIA:

2   Q   Have you seen this part of the document before?

3   A   I have, yes.

4   Q   Outside of Topic Number 1, which your counsel

5          has objected and I'm not going to get into, are

6          you prepared to testify with respect to Topics 2

7          through 6 appearing on that listing?

8          MR. MERVIS:  Object to the form.

9   BY MR. GARCIA:

10   Q   You can answer.

11   A   To the best of my ability and to the extent

12          Ernst & Young was involved in the process of

13          preparing the budgets, certainly.

14   Q   Okay.

15          So you understand that you are a witness

16      designated by EY; correct?

17   A   Correct.

18   Q   And you understand that you have been designated

19      to testify based on your knowledge as to

20      Topics Number 2 to 6; correct?

21          MS. DeCAMP:  Objection.

22   BY MR. GARCIA:

23   Q   You may answer.

24   A   To the best of my knowledge and to the extent

25      that Ernst & Young was involved in the budgetary

DRAFT -- NOT PROOFREAD

                                                    21

DRAFT -- NOT PROOFREAD

1       process, yes, I'm prepared, and I understand.

2    Q   Did you prepare for the deposition today?

3    A   I did.

4    Q   Okay.  Can you tell me how you prepared for the

5       deposition?

6    A   I reviewed a number of documents, and I spoke

7       with a number of colleagues about the topics in

8       the subpoena.

9    Q   All right.  Let's break this down.

10          With respect to documents, do you recall

11      what documents you reviewed to prepare for your

12    deposition?

13  A   I do.

14  Q   Can you tell me what those were.

15  A   I reviewed the historical budgets that were

16      certified by the oversight board; I reviewed the

17      historical revenue letters that were issued by

18      the oversight board to the government; I

19      reviewed the -- I guess it was an objection to

20      the proposed questions that was filed with the

21      Court by Proskauer; I briefly reviewed the

22      expert report submitted by Mr. Brickley and

23      Ms. Hernandez.

24  Q   And Ms. who?

25  A   Not Hernandez.


                    DRAFT -- NOT PROOFREAD
                                                    22
                    DRAFT -- NOT PROOFREAD

1   Q   Martinez?

2   A   Martinez.  I apologize.  Yeah, Ms. Martinez.

3           And I reviewed -- those are the primary

4       things I would say I reviewed.

5   Q   We'll come back to that in a minute, but you

6       also said that you discussed with a number of

7       colleagues; correct?

8   A   Correct.

9   Q   Okay.  Can you tell me who were those

10       colleagues?

11   A   I spoke with colleagues of mine at Ernst &

12       Young; and I spoke with counsel at Ernst &

13       Young; and I spoke with representatives from

14       Proskauer.

15   Q   Starting with your EY colleagues, can you tell

16       me who those were?

17   A   Certainly.

18           So the primary people I spoke with at

19       Ernst & Young were Juan Santambrogio, Sophia

20       Panagiotakis.

21   Q   I'm sorry, can you -- Sophia?

22   A   Panagiotakis.  She's Greek.  And it's spelled

23       more or less phonetically, but I can't recall

24       off the top of my head.

25   Q   Don't worry.  We'll look it up.

                    DRAFT -- NOT PROOFREAD
                                                    23
                    DRAFT -- NOT PROOFREAD

1            Who else?

2   A   So Juan Santambrogio, Sophia Panagiotakis and

3       Shavi Sarna were the three colleagues I spoke

4       with.  Oh, and --

5            Yeah, those are the three colleagues that

6      I --

7            And then Antoinette DeCamp as well.

8   Q   Sure.  I'm not going to get into discussions

9       with your counsel Ms. DeCamp.  Okay?

10           You also mentioned that you met with

11      certain representatives from Proskauer; correct?

12  A   Correct.

13  Q   Who were those?

14  A   The representatives from Proskauer I can recall,

15      to the best of my recollection, were Margaret

16      Dale, Michael Mervis, Julie Alonzo, and Michael

17      Firestein, and Ehud Barak.

18  Q   Sorry.  And who?

19  A   Ehud Barak.

20  Q   Okay.

21           In addition to the persons that you've

22      identified at EY, your counsel, and the

23      Proskauer attorneys, did you meet with anybody

24      from the FOMB, from the fiscal board, in

25      preparation for the deposition today?

DRAFT -- NOT PROOFREAD

                                            24

DRAFT -- NOT PROOFREAD

1   A   To the best of my recollection, no.

2   Q   I'm going to ask you about some specific people.

3          Does that include Mr. David Skeel?  Did you

4     meet with him?

5   A  Can I just clarify?

6          Are you speaking about in the context of

7     this --

8   Q  Preparing for your deposition?

9   A  Correct.  Okay.

10         My understanding, if that's the context,

11    then the answer is, No, I did not speak with or

12    meet with David Skeel.

13  Q  Okay.  And ask a different question then.

14         In connection with the topics that you will

15    be testifying to today, not necessarily in the

16    preparation, but did you discuss anything with

17    Mr. Skeel on those Topics?

18  A  In any capacity of preparation for the

19    deposition today?

20  Q  You already told me --

21         You already told me that you did not meet

22    with Mr. Skeel in preparation for the

23    deposition; correct?

24  A  Correct.

25  Q  All right.  I'm asking you a different question

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1      now.

2          Had you discussed the topics that would be

3      discussed in a deposition with Mr. Skeel at any

4      point in time?

5  A   I appreciate you clarifying.

6          MS. DeCAMP:  Wait.  Wait.  Objection.  I

7      think it's still vague.

8  BY MR. GARCIA:

9  Q   Do you understand the question?

10 A   I think I understand the question.  You're

11     asking if I spoke with David in any capacity

12     about it the deposition today.

13         Is that what you're asking?

14 Q   About the topics that would be discussed in the

15     deposition today.  Again, not in the context of

16     preparing for the deposition.  Just in general.

17 A   To the best of my recollection, I have not

18     spoken with him about the topics that are

19     subject to the declaration today -- or to the

20     deposition today.

21 Q   Okay.

22         Did you meet with any other board members

23     in preparation for this deposition today?

24         MR. MERVIS:  Just note my objection to the

25        form.

                    DRAFT -- NOT PROOFREAD
                                                        26
                    DRAFT -- NOT PROOFREAD

 1    BY MR. GARCIA:

 2    Q    You may answer.

 3              You know who the board members are;

 4         correct?

 5    A    I do know who the board members are, and, to the

 6         best of my recollection, the answer is no.

 7    Q    All right.  Did you discuss any of the topics,

 8         not in preparation for this deposition, but in

 9         any context with any of the board members aside

10         from Mr. Skeel?

11              MS. DeCAMP:  Objection.

12              You can answer.

13    A    You mean -- in what time frame do you mean have

14         I spoken with them?

15    BY MR. GARCIA:

16    Q    In the last six months.

17    A    To the best of my recollection, no, in the last

18         six months, I have not spoken with the board

19         member -- any board member about the topics that

20         are subject to the deposition today.

21    Q    Do you recall if you discussed the topics at any

22      point in time with the board members?

23   A  To the best of my recollection, I do not recall

24      having spoken with them about these topics.

25   Q  Okay.

                    DRAFT -- NOT PROOFREAD
                                                    27
                    DRAFT -- NOT PROOFREAD

1           In preparation for your deposition today,

2        did you meet with Natalie Jaresko, the executive

3        director of the board, with respect to

4        preparation for the deposition?

5     A  To the best of my recollection, I have not, no.

6     Q  Did you discuss any of the topics?  Do you

7        recall having discussed any of the topics with

8        Ms. Jaresko before your preparation for the

9        deposition at any point in time?

10    A  To the best of my recollection, no, I do not

11       recall having spoken with her about these

12       topics.

13    Q  Do you know of any --

14          Did you meet with any other, let's say,

15       employee?  Did you meet with any employee of the

16       oversight board with respect to preparation for

17       your deposition today?

18          Not the board members, not the executive

19    director, any other employees?

20  A  To the best of my recollection, no, I have not.

21  Q  Okay.  So you testified that you reviewed

22    historical budgets, budgets certified by the

23    board, revenue letters, the objections submitted

24    by Proskauer on the topics, and also the expert

25    reports of both Mr. Brickley and Ms. Martinez.

DRAFT -- NOT PROOFREAD
                                                    28
DRAFT -- NOT PROOFREAD

1       Aside from those documents, do you recall

2     anything else that you may have reviewed in

3     preparation for the deposition?

4   A  Well, I reviewed the subpoena, which we've

5     already talked about.  And the only other

6     document I can recall having reviewed -- well, I

7     did not mention fiscal plans, but I reviewed the

8     historical fiscal plans.  And I believe there

9     was a September 10 letter from Proskauer that

10    was sent, I believe, to the DRA parties that I

11    briefly reviewed as well.

12  Q  With respect to historical fiscal plans, do you

13    recall which year you reviewed?

14  A  The primary one I reviewed was the current

15    fiscal plan.  The current certified fiscal plan,

16      that was the primary one.

17   Q   Is that the current fiscal plan for the

18      Commonwealth?

19   A   Correct.

20   Q   Do you recall reviewing any fiscal plan for

21      other instrumentalities of the government?

22          MR. MERVIS:   Just note my objection to the

23      form.

24   BY MR. GARCIA:

25   Q   Do you understand the question?

DRAFT -- NOT PROOFREAD

29

DRAFT -- NOT PROOFREAD

1   A   In the context of preparing for this deposition?

2   Q   Yes.  Yes, sir.

3   A   In the context of preparing for this deposition,

4      to the best of my recollection, I did not review

5      other fiscal plans.

6   Q   In particular, did you review a fiscal plan for

7      HTA?  Do you know what "HTA" means?  The Highway

8      Transportation Authority?

9   A   Yeah.  There are two questions there.  So I do

10      know what HTA represents.

11   Q   Okay.

12   A   And if you're asking in connection with

13      preparing for this deposition, I did not review

14      the HTA fiscal plan.

15   Q   Other than in preparation for this deposition,

16      have you reviewed any fiscal plan for HTA?

17   A   Do you have a time frame?

18   Q   In the last year.

19   A   It is possible I may have looked at the HTA

20      fiscal plan in the past year.  I do not recall

21      in any level of specificity the components of

22      it.

23   Q   But you have seen fiscal plans for HTA?

24          MS. DeCAMP:  Objection.

25

                    DRAFT -- NOT PROOFREAD
                                                   30
                    DRAFT -- NOT PROOFREAD

1   BY MR. GARCIA:

2   Q   You may answer.

3   A   I have seen fiscal plans of HTA.

4   Q   Do you recall which one in particular you saw?

5   A   I do, yes.

6   Q   Which one was that?

7   A   The most current fiscal plan for HTA.

8   Q   What is that fiscal plan --

9          For what year is that fiscal plan, sir?

10   A   For the current fiscal year.

11   Q   So fiscal year 2022?

12   A   Correct.

13   Q   Did you discuss any of those documents that you

14       have informed yourself in preparation for the

15       deposition with anyone that helped you prepare

16       for your deposition, other than counsel?

17   A   I have to ask you to be a little more specific.

18   Q   Okay.

19   A   Which documents do you mean?

20   Q   All right.  Let's go one by one.

21   A   Okay.

22   Q   No problem.

23       You said that you reviewed historical

24       budgets certified by the FOMB; correct?

25   A   Correct.

DRAFT -- NOT PROOFREAD
                                                    31
DRAFT -- NOT PROOFREAD

1   Q   Okay.  Did you discuss those historical budgets

2       certified by the FOMB with anyone in preparation

3       for this deposition?

4   A   Thank you for clarifying the question.

5       Yes, I did.

6   Q   Who?

```
 7   A   It was with the EY team; so with the people I

 8       mentioned earlier.

 9   Q   Was there any counsel present at those

10       discussions with your colleagues?

11   A   There were conversations that occurred with

12       counsel present and conversations that occurred

13       with just the EY team.

14   Q   Okay.  Well, then, referring to the

15       conversations that occurred just with the EY

16       team, your EY team, do you recall what, if

17       anything, you discussed regarding those

18       historical budgets certified by the FOMB?

19   A   If you have a specific question about what we

20       discussed, then I'm happy to answer that.  You

21       know, I think they were relatively broad

22       discussions to try to refresh my recollection on

23       the budget process, the amounts of the budgets,

24       and matters on the construction of the budgets.

25   Q   Okay.
```

DRAFT -- NOT PROOFREAD

32

DRAFT -- NOT PROOFREAD

```
 1       So with respect to the construction of the

 2       budget, do you recall what was discussed with

 3       your colleagues outside of the presence of
```

4      counsel?

5   A   In general, yes, I do.

6   Q   Okay.  What was that?

7   A   We discussed matters such as the budgets are

8       drawn from the fiscal plans; so how the budgets

9       tie to the fiscal plan, the amount of the

10      budget.

11  Q   You also mentioned that you reviewed revenue

12      letters; correct?

13  A   Correct.

14  Q   All right.

15          So with respect to those revenue letters,

16      do you recall if you discussed those revenue

17      letters with anybody -- anyone of your

18      colleagues outside the presence of counsel?

19  A   Yes.

20  Q   Okay.  So same question then.

21          What did you discuss with respect to those

22      revenue letters, in general, with those

23      colleagues outside of the presence of counsel?

24  A   To the best of my recollection, we discussed the

25      components of the revenue letter and the

1       structure of the revenue letters.

2   Q   Okay.  Can you tell me what the components of a

3       revenue letter are?

4           MS. DeCAMP:  Objection.  I don't know that

5       that ties to any of the topics, but I'll give

6       you a little bit of leeway if this is

7       foundational as to what -- his knowledge for

8       testifying.

9           MR. GARCIA:  I'm sorry, Ms. DeCamp.  It's

10      actually foundation.

11          MS. DeCAMP:  Okay.

12          You can answer.

13          MR. GARCIA:  Thank you.

14  A   Can you repeat the question?

15  BY MR. GARCIA:

16  Q   Yes.

17          What are the components of the revenue

18      letters?

19  A   So if you're referring to the revenue letter

20      that's part of the budgeting process under

21      PROMESA, which is my understanding of what

22      you're asking about, the revenue letter is the

23      first step in the annual budgeting process.

24          It defines the envelope from which the

25      government can produce a budget that can be

DRAFT -- NOT PROOFREAD

34

DRAFT -- NOT PROOFREAD

1       certified by the fiscal plan under Section 202

2       of PROMESA.

3    Q  So I'll ask the question again.

4          What components --

5          What are the components of those letters?

6    A  Well, I am not quite clear what you mean by

7       "components," but the revenue letter is the

8       first step in the process under PROMESA.  It's a

9       letter that has to be issued by the oversight

10      board to the government defining the spending

11      envelope -- well, it defines the revenues from

12      which the government can produce a budget that

13      can be certified by the oversight board as

14      complying with PROMESA.

15         PROMESA does not define, in Section 202,

16      the revenue letter -- the components of the

17      revenue letter.  I don't quite understand what

18      you mean, but there's no components that are

19      defined in the revenue letter other than to say

20      it is the revenue envelope from which the

21      government can establish a budget.

22   Q  Thank you for the answer, Mr. Chepenik.  I asked

23    about the components because earlier, when I

24    asked you about what with respect to revenue

25    letters you discussed with your colleagues, you

DRAFT -- NOT PROOFREAD

35

DRAFT -- NOT PROOFREAD

1    mentioned two things: first, the components of

2    the letter; and second, the structure of the

3    letter.

4         Do you remember that?

5    A   Oh --

6    Q   Do you remember that testimony you provided?

7    A   Okay.

8    Q   Okay.  So that's why I'm asking about the

9    components.  I think you answered my question --

10    okay? -- to my satisfaction.

11         I'll ask the same question with respect to

12    the structure of the revenue letters.  What

13    about the structure did you discuss?

14         MR. GARCIA:  Again, Ms. DeCamp, this is for

15    foundational background purposes.

16         MS. DeCAMP:  Thank you.

17    A   In terms of the structure --

18         Thank you for clarifying.

19         In terms of the structure, I really just

20     meant the component -- or the contents of what

21     were included in the revenue letters.

22   BY MR. GARCIA:

23   Q   Then you indicated you also reviewed the

24       objections by the oversight board.  I'm not

25       going to get into that.

                    DRAFT -- NOT PROOFREAD
                                                    36
                    DRAFT -- NOT PROOFREAD

1         Lastly, you mentioned that you reviewed the

2     expert reports of Mr. Brickley and Ms. Martinez.

3         So with respect to those two reports -- and

4     we can do it one at a time.  Let's start with

5     Mr. Brickley -- what do you recall?

6         Why did you review that report, the

7     Brickley report?

8   A   Well, I was trying to better understand the

9     context of the questions that were asked because

10    they were a little vague in terms of clarity and

11    what specifically was trying to be sought from

12    this deposition.

13        So I was trying to better inform myself

14    about the context and the reasons for the

15    questions that were being -- that were being

16    subpoenaed to EY to respond to.

17  Q   Okay.  With respect to the Brickley report --

18          By the way, did you review the transcript

19      of his deposition?

20  A   I did not, no.

21  Q   Did you review any transcript of any deposition

22      of any expert -- I realize that's a lot; so we

23      can break it down after you give me the first

24      answer -- in preparation for your deposition

25      today?

DRAFT -- NOT PROOFREAD
                                                37
DRAFT -- NOT PROOFREAD

1   A   I might be able to shorten that time frame

2       because to the best of my recollection, I have

3       not reviewed any transcripts in preparation for

4       my deposition.

5   Q   Great.  We're understanding each other.  Thank

6       you.

7           All right.  So now with respect to Martinez

8       report, same question as to Mr. Brickley.  Why

9       did you review that report?

10  A   For the same -- for the same reason.  To try to

11      better understand the context for the questions

12      that were subpoenaed to EY to respond to.

13  Q   I'm just going to ask the question.  You can say

14      "Yes" or "No."

15          Did you meet with anyone from the

16      Commonwealth government in preparation for your

17      deposition today?

18  A   To the best of my recollection, I did not.

19  Q   Have you discussed the topics that are the

20      subject of the deposition today, to the best of

21      your recollection, with anyone from the

22      Commonwealth government prior to preparing for

23      deposition today?

24  A   Again, do you have a time frame in mind?

25  Q   Let's say last year.

                    DRAFT -- NOT PROOFREAD
                                                    38
                    DRAFT -- NOT PROOFREAD


 1  A   I do not recall having had any conversations

 2      with a representative of the government on this

 3      topic -- or on these topics.

 4  Q   And that's in the last year; correct?

 5  A   In the last year in preparation for this

 6      deposition.

 7  Q   Okay.

 8          Prior to the last year, not in preparation

 9      for the deposition, do you recall having

10      discussed any of the topics with anyone from the

11      Commonwealth government for any purpose?

12           MR. MERVIS:  Object to the form.

13  BY MR. GARCIA:

14  Q   You may answer.

15  A   Do you mean in --

16           Do you mean a government official?

17  Q   Government official, yes.

18  A   I do not recall.  To the best of my

19      recollection, I do not recall having had a

20      conversation.

21  Q   All right.  I ask now in particular with respect

22      to HTA.

23           Do you recall having met with HTA?  And I'm

24      going to broaden the time period for that one.

25      With respect to the topics in the deposition

DRAFT -- NOT PROOFREAD

39

DRAFT -- NOT PROOFREAD

1   today, having discussed any of them with any HTA

2   official?

3        MR. MERVIS:  I object to the form.

4  A   And you mean me personally?

5  BY MR. GARCIA:

6  Q   Yes, you personally.

7  A   To the best of my recollection, I have not had a

8      conversation with an HTA official.

9   Q   Within the last five years, have you met with

10      any HTA official on anything?

11  A   The last five years?

12  Q   Yes.

13  A   So since EY was engaged to support the oversight

14      board?

15  Q   All right.  That's fair.  Although I think you

16      were an adviser to the fiscal board before you

17      worked with EY; so let's break it up into the

18      two time periods.

19          Let's start with since you've been with EY,

20      which I believe was 2017, April 2017.

21  A   Well, I'm certainly prepared to speak to the

22      role EY has played in the budgeting process as

23      it's relevant to this deposition, but I'm not

24      authorized by the U.S. Treasury or others to

25      speak to anything that may have occurred before

DRAFT -- NOT PROOFREAD
                                          40
DRAFT -- NOT PROOFREAD

1      EY was engaged by the oversight board or,

2      frankly, before the oversight board existed.

3   Q   Fine.  That's not my question.  My question

4      is --

5        Let's take it back to 2017.  That's four

6    years and some months.

7        In the last four years and a few months, do

8    you recall having spoken with any HTA official

9    on the topics of the deposition today, in

10   general?

11       MR. MERVIS:  Objection to the form.

12       You may answer.

13   A   To the best of my recollection, no, I have not.

14   BY MR. GARCIA:

15   Q   Approximately how much time did you spend in

16       preparing for your deposition today?

17   A   I probably spent 30 hours, 40 hours, maybe.

18   Q   Okay.  Over how many days?

19   A   Over the past several weeks.

20   Q   Now, in addition to the documents you reviewed;

21       the conversations you had with your colleagues;

22       the conversations you had with counsel from EY

23       and Proskauer; do you recall having done

24       anything else to prepare for the deposition

25       today?

DRAFT -- NOT PROOFREAD
                                        41
DRAFT -- NOT PROOFREAD

1    A   I do.

 2   Q   Please, what else did you do?

 3   A   I think there was one additional conversation

 4       that I had with another adviser.

 5   Q   Okay.  Who was that adviser?

 6   A   Tim Alburgh from ^Conn & McKinsey.

 7   Q   What was your conversation with Mr. Alburgh

 8       about?

 9   A   It was confirming something that I believed to

10       be correct and accurate, but I wanted to

11       reconfirm.

12   Q   What was that, that you wanted to reconfirm?

13   A   Where a -- the flow of funds for a certain

14       revenue streams.

15   Q   So flow of funds for certain revenue streams.

16       Which revenue streams?

17   A   For the conditionally allocable revenues in the

18       fiscal plan.

19   Q   Which fiscal plan, if any?

20   A   The Commonwealth fiscal plan.

21   Q   Any other fiscal plan that you reviewed with

22       respect to those revenue streams?

23           MR. MERVIS:  Sorry.  I object to the form.

24           MR. GARCIA:  Withdrawn.  Withdrawn.  Okay.

25       Sorry, Michael.  Mr. Mervis.

DRAFT -- NOT PROOFREAD

42

DRAFT -- NOT PROOFREAD

⌃

```
 1   BY MR. GARCIA:

 2   Q   You mentioned that you met with Mr. Alburgh to

 3       confirm an issue --

 4           (A discussion was held off the record to

 5       correct technical issues.)

 6           MR. GARCIA:  Withdrawn.  Withdrawn.  Okay.

 7       Sorry, Michael -- Mr. Mervis.

 8   BY MR. GARCIA:

 9   Q   You mentioned that you met with Mr. Alburgh to

10       confirm an issue about the flow of funds and

11       specifically you said the revenue streams, and

12       particularly the conditionally allocable

13       revenues.  What do you mean by conditionally

14       allocable revenues?

15   A   Those are our revenue streams that are defined

16       in the fiscal plan.

17   Q   I'm sorry.  That are what?

18   A   There are certain revenue streams that are

19       defined in the fiscal plan.

20   Q   So how are the conditionally allocable revenues

21       defined in the fiscal plan?

22   A   How are they defined?

23           It's just -- I mean, there's a category of
```

24    revenues that fall under the conditionally

25    allocable revenues.

DRAFT -- NOT PROOFREAD

43

DRAFT -- NOT PROOFREAD

1    Q    What are those revenues that follow in that

2         category?

3    A    The rum cover-over -- certain rum cover-over

4         remittances.  Tourism, certain tourism hotel tax

5         revenues.  Certain petroleum tax collections and

6         certain cigarette tax collections.

7    Q    All right.

8    A    There may be others, but those are the ones that

9         I recall.

10   Q    All right.  And what was it that you had to

11        confirm with Mr. Alburgh with respect to

12        specifically the petroleum tax?

13            MS. DeCAMP:  Objection to form.

14   BY MR. GARCIA:

15   Q    You may answer.

16   A    I don't recall us speaking specifically about

17        the petroleum tax revenue stream in and of

18        itself.  There was nothing unique about that

19        particular revenue stream.  It was more about

20        the flow of the revenues for all conditionally

21     allocable revenues.

22  Q   What about the flow of the revenues you

23     discussed with Mr. Alburgh to confirm your

24     belief that the flow was accurate?

25         I'm trying to put words in your mouth,

                    DRAFT -- NOT PROOFREAD
                                                    44
                    DRAFT -- NOT PROOFREAD

1     okay?  I'm just trying to, you know, cut this

2     short by trying to remember what you testified

3     and asking you the next question.

4         Again, I'm not trying to confuse you.  All

5     right?  If I were to do that, please, excuse me,

6     and ask me to repeat the question.  I have no

7     problem with repeating the question.  This is

8     really just background, and I want to understand

9     what you know and what you discussed with

10    others.  Okay.

11  A  Certainly.

12  Q  I don't want to be unfair.

13        Again, can you just tell me, explain to me

14    what was it that you had to confirm with

15    Mr. Alburgh about the flow of funds?

16  A  I was trying to confirm the revenue --

17        I was trying to confirm that the revenue

18      sat within the TSA, in the Treasury Single

19      Account, and were considered as all of the

20      revenues that flowed through the TSA the same,

21      the same way.

22   Q   When you say TSA, what are you referring to?

23   A   The Treasury Single Account.

24   Q   Is that the main account for the government of

25      Puerto Rico?

DRAFT -- NOT PROOFREAD
                                                45
DRAFT -- NOT PROOFREAD

1        MS. DeCAMP:  Object to form.

2        You can answer.

3   A   To the best of my knowledge, the TSA is a series

4       of bank accounts.  It's not one.  I don't know

5       if I would say it's the main bank account, but

6       it's sort of the consolidation account, if you

7       will, where most revenues are deposited for the

8       government.

9   BY MR. GARCIA:

10  Q   Just a follow-up question on that.

11       You say that it's consolidation of

12      accountants where most revenues are deposited.

13      What kinds of revenues, to the best of your

14      recollection, are deposited in that TSA account?

15          MS. DeCAMP:  Objection.

16          You can answer.

17  A   To the best of my recollection, it's most

18      revenues that are backed by a number of revenue

19      sources, so corporate tax collections,

20      individual income tax collections, various

21      collections from different fees and -- fees

22      and -- I don't know.  Other charges that are

23      assessed across the government.

24  BY MR. GARCIA:

25  Q   Does that include excise taxes, the revenues

                DRAFT -- NOT PROOFREAD
                                              46
                DRAFT -- NOT PROOFREAD

1       coming from excise taxes?

2           MS. DeCAMP:  Objection.

3           You can answer.

4   A   To the best of my knowledge, the answer is yes.

5       That's what I was trying to confirm.

6   BY MR. GARCIA:

7   Q   You told me about the petroleum tax, and I want

8       to go into the cigarette tax.  What specifically

9       did you discuss about the cigarette tax with

10      Mr. Alburgh in preparation for this deposition?

11          MS. DeCAMP:  Objection.  Asked and

12      answered.

13    BY MR. GARCIA:

14    Q   Can you answer, please?

15    A   Yes.  To the best of my recollection, the

16        conversation was about all conditionally

17        allocable revenues.  It was not about the

18        cigarette tax specifically.

19    Q   What specifically about the cigarette tax did

20        you discuss with him, if anything?

21           MS. DeCAMP:  Objection.  Literally just

22        asked and answered.

23           MR. GARCIA:  But he didn't tell me what he

24        discussed with him with respect to the cigarette

25        tax in particular.

                 DRAFT -- NOT PROOFREAD
                                                47
                 DRAFT -- NOT PROOFREAD

1            MS. DeCAMP:  Objection.  He did.

2            MR. GARCIA:  Can the court reporter please

3        read back the answer.

4            (The requested text was read by the

5        reporter.)

6            MR. GARCIA:  And the answer?

7            (The requested text was read by the

8        reporter.)

9    BY MR. GARCIA:

10   Q    I understand that it was not about the cigarette

11        tax specifically.  I understand that.  So do you

12        recall anything -- strike that.

13             Or withdrawn.

14             Do you recall whether you discussed

15        anything in particular about the cigarette tax?

16   A    In the conversation with --

17   Q    Mr. Alburgh?

18   A    -- Mr. Alburgh?  I do not recall.

19             MR. GARCIA:  I think this may be a good

20        moment to break for five minutes.  Is that okay,

21        Mr. Chepenik?

22             THE WITNESS:  It is.

23             MR. GARCIA:  Ms. DeCamp, Mr. Mervis, is

24        that okay with you?

25             MS. DeCAMP:  Sure.

                 DRAFT -- NOT PROOFREAD
                                                   48
                 DRAFT -- NOT PROOFREAD

1              MR. MERVIS:  Yeah, might be closer to ten,

2         Arturo, as a practical matter but that's fine.

3              THE VIDEOGRAPHER:  I'll take us off the

4         record at 10:29.

5              (A recess was taken.)

6          THE VIDEOGRAPHER:  We are back on the

7     record at 10:40.

8  BY MR. GARCIA:

9  Q   All right.  So let's keep going.

10         For purposes of helping refresh your

11    recollection about the next few questions I'm

12    going to ask which have to do with your

13    background, I'm going to put a document on the

14    screen which is really your LinkedIn profile.

15         Okay?

16  A   Okay.

17         MR. GARCIA:  Alejandro.

18         (Deposition Exhibit 2 was presented for

19    identification.)

20  Q   Do you recognize this document that's on the

21    screen now?

22  A   I do.

23  Q   I don't have any other profile for you; so

24    that's why I'm using this.  Again, it's just to

25    help you recollect -- refresh your recollection,

                 DRAFT -- NOT PROOFREAD
                                               49
                 DRAFT -- NOT PROOFREAD

1     if need be.  Okay?

2          I ask you, Mr. Chepenik, where are you

3      currently employed?

4   A   I'm currently employed at Ernst & Young.

5   Q   Since when?

6   A   Since April of 2017.

7   Q   What is your current position with EY?

8   A   I am a principal in our restructuring practice.

9   Q   Has that been the same position that you have

10      occupied since April 2017, or have you had any

11      other positions?

12  A   It's the same position.

13  Q   Prior to joining EY, where were you working or

14      employed?

15  A   In the most --

16          Right before EY, I was working at the U.S.

17      Department of the Treasury.

18  Q   And in what position?

19  A   I held multiple positions at the Department of

20      the Treasury.

21  Q   Let's start with the first position you had.

22          When did you start working with the U.S.

23      Department of the Treasury?

24  A   I started working there in September of 2011.

25  Q   And in what capacity did you start working

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1      there?

2   A  I started working as a senior policy adviser in

3      the office of capital markets.

4   Q  And what were your responsibilities in that

5      position?

6   A  I'm really not authorized to speak to the

7      specifics of my work there.

8   Q  I'm not asking you anything about the specifics.

9      I'm just asking you about your responsibilities

10     in that position.

11  A  In that position, I worked on a number of

12     capital market-related matters.

13  Q  Okay.  And how long did you hold that position?

14  A  About two and a half -- two and a half years.

15     Between two and a half and three years.

16  Q  Did you go onto another position within the

17     Department of the Treasury?

18  A  I did.

19  Q  Which position was that?

20  A  I became the deputy director for a newly

21     established group at the U.S. Treasury

22     Department called "The Office of State and Local

23     Finance."

24  Q  Sorry.  Called what?

25   A   It was called "The Office of State and Local

DRAFT -- NOT PROOFREAD
                                                          51
DRAFT -- NOT PROOFREAD

 1       Finance."

 2   Q   All right.  And for how long did you hold that

 3       position?

 4   A   Approximately three years.

 5   Q   Until when, more or less?

 6   A   Until I left the department.

 7   Q   Okay.  When did you leave the department?

 8   A   I left, as I recall -- the best of my

 9       recollection, I left in March of 2011 -- March

10       or April of 2011.

11   Q   Can you tell me in general --

12   A   Wait, I apologize.  2017, not 2011.

13   Q   Okay.  In general, can you tell me what your

14       responsibilities were in that position?

15   A   In general terms, I was responsible for several

16       of the policy matters that the office managed

17       for the department and several -- you know, the

18       personnel matters, overseeing the office,

19       et cetera.

20   Q   In that position, did you do any work related to

21       the government of Puerto Rico?

22    A    I -- again, I'm not authorized to speak about

23         what I worked on in connection with my time at

24         the U.S. Treasury Department.

25              In general terms, if that's what you're

DRAFT -- NOT PROOFREAD

52

DRAFT -- NOT PROOFREAD

1    referring to, in general terms, yes, I had

2    fairly extensive interactions with government

3    officials in Puerto Rico in that capacity at the

4    U.S. Treasury Department.

5    Q    Again, just in general terms, nothing specific,

6         but what was your involvement about with the

7         Commonwealth?

8    A    Again, I'm not authorized by the U.S. Treasury

9         Department to disclose any interactions or

10        matters that I had with federal officials or

11        with Puerto Rico government officials, but in

12        general terms, I would interact on a regular

13        basis with Puerto Rico officials -- officials

14        from the Puerto Rico government at the time.

15   Q    Okay.  I ask you to look at your LinkedIn

16        profile, under U.S. Department of the Treasury,

17        as deputy director, specifically there's a

18        description there about what you were doing in

19    that position -- correct? -- which is a public

20    discussion?

21  A   Correct.

22  Q   Okay.  What was that?

23  A   What does it say under the --

24  Q   You can read it if you want to.

25  A   Under the Deputy Director role?

                    DRAFT -- NOT PROOFREAD
                                                53
                    DRAFT -- NOT PROOFREAD

 1  Q   Yes.

 2  A   That I served as a liaison between the

 3      federal -- between federal officials and

 4      government officials in Puerto Rico and provided

 5      assistance -- technical assistance to Congress

 6      in the drafting of PROMESA.

 7  Q   Am I to understand that you actually were

 8      involved in the drafting of PROMESA?

 9          MR. MERVIS:  Note my objection to the form.

10  A   I would need you to better clarify that Congress

11      is the one who drafts laws; so I was not a

12      member of Congress and did not draft PROMESA.

13  BY MR. GARCIA:

14  Q   I know you're not a member of Congress, but I am

15      reading from your profile in LinkedIn, which is

16      a public document.

17            You stated in that public document, posting

18      that you:

19            "Provided extensive --

20            -- and I quote --

21            -- "Extensive technical assistance to

22      Congress in the drafting of the Puerto Rico

23      Oversight, Management and economic Stability

24      Act, PROMESA."

25            That's what it says; correct?

                    DRAFT -- NOT PROOFREAD
                                                        54
                    DRAFT -- NOT PROOFREAD

1     A   Correct.

2     Q   So again I ask did you provide --

3            Were you involved in the actual drafting,

4         in any way, shape, or form, of PROMESA?

5            MS. DeCAMP:   Objection.

6            You can answer.

7     A   Again, members of Congress draft legislation and

8         bills.  I was part of the team that provided

9         technical assistance to Congress as they drafted

10        PROMESA.

11    BY MR. GARCIA:

12    Q   It also states in your profile --

13          Well, prior to working with the Department

14      of the Treasury -- U.S. Department of the

15      Treasury, where were you employed?

16   A  I was employed by The Blackstone Group.

17   Q  In what capacity?

18   A  I was a member of the restructure team.

19   Q  And since when?

20   A  Since I graduated from graduate school.

21   Q  Until when?

22   A  You mean the dates?

23   Q  Yes.

24   A  From the summer of 2010 to the fall of 2011 when

25      I started for the U.S. Treasury Department.

DRAFT -- NOT PROOFREAD

                                                    55

DRAFT -- NOT PROOFREAD

1   Q  Did you also work at JPMorgan Chase?

2   A  I did.

3   Q  In what capacity?

4   A  I held several roles within JPMorgan.

5   Q  Can you tell me what those were.

6   A  I was a member of the strategy team, as I

7      recall -- equity market strategy, and I was a

8      private banking analyst.

9   Q  And what time period did you work at JPMorgan

10      Chase?

11   A   That was from the summer of -- well, I interned

12      for JPMorgan when I was in college, and then I

13      worked full time for JPMorgan from the summer of

14      2003 until I left for Harvard Business School in

15      the summer of 2007.

16   Q   Okay.

17      And did you also work as an adviser to the

18      FOMB at any point in time?

19   A   I worked --

20      Under PROMESA, there's a provision to

21      detail federal officials to help establish the

22      oversight board.

23      And so your question was did I work as an

24      adviser?  My understanding what you mean is did

25      I work in any capacity with the oversight board,

DRAFT -- NOT PROOFREAD
                                    56
DRAFT -- NOT PROOFREAD

1      then it was in the capacity as a detailee from

2      the U.S. Treasury to the oversight board, but I

3      was still an employee of the U.S. Treasury

4      Department.

5    Q   So, in other words, you were still an employee

6      of the treasury department, but in detail with

```
 7        the FOMB during the formative stages of the

 8        FOMB; is that correct?

 9   A    Generally, that's correct.

10   Q    So what were your responsibilities in that time

11        period working with the FOMB as a detailee from

12        the Treasury Department?

13   A    Again, I'm not authorized to disclose or share

14        any information during my time at the U.S.

15        Treasury Department.

16   Q    But this is all working now for the FOMB as a

17        detailee.

18             Is it your testimony that you cannot tell

19        me what you were doing during that time period?

20             MS. DeCAMP:  Objection to form.

21             You canner answer.

22   BY MR. GARCIA:

23   Q    You were working as an adviser in detail with

24        the FOMB?

25   A    I am here today as a representative of EY
```

DRAFT -- NOT PROOFREAD

57

DRAFT -- NOT PROOFREAD

```
 1        subpoena, you know, the subpoena that was issued

 2        to EY in connection with my work as an employee

 3        of EY in its role in connection with supporting
```

4      the oversight board's --

5   Q   We'll get to those questions.  I'm just trying

6      it get the background right.

7         So is it your testimony that you cannot

8      tell me, sitting here today, what you were doing

9      while you were in detail from the Treasury

10     Department with the FOMB?

11        MS. DeCAMP:  Objection to form.

12        You can answer.

13  A   I'm prepared to speak to EY's role from the time

14     it was engaged by the oversight board to support

15     the oversight board's efforts in connection with

16     the matters that were issued in the subpoena.

17  BY MR. GARCIA:

18  Q   I understand that.  It's the second time you

19     tell me.  I didn't ask the question --

20        I didn't ask that question.  I asked a

21     different question, which I will have the

22     reporter read back to you, and then you can

23     provide an answer "Yes" or "No."

24        (The requested text was read by the

25     reporter.)

1            MR. MERVIS:  Arturo, you're asking him to

2       answer that question again?

3            MR. GARCIA:  I'm asking him to tell me

4       "Yes" or "No."  It's a "Yes" or "No" question,

5       and that's the question.

6            MR. MERVIS:  Okay.  I object to the form.

7   A   I am not authorized by the U.S. Treasury to

8       disclose any matters that I worked on while I

9       was an employee at the U.S. Treasury Department

10      or a detailee to the oversight board.

11  BY MR. GARCIA:

12  Q   I take that as a no.  That's fine.

13           Can you briefly tell us your educational

14      background?

15  A   Certainly.

16           I attended graduate school at Harvard

17      Business School in the Harvard Kennedy School of

18      Government where I have a master's in business

19      administration and a master's in public

20      administration.  I'm a CFA, a certified -- or

21      chartered financial analyst.

22           In my undergraduate studies, I attended the

23      University of Maryland where I have degrees in

24      finance, economics, and management science and

25      statistics.

DRAFT -- NOT PROOFREAD

59

DRAFT -- NOT PROOFREAD

1  Q  Okay.  Let's go back to your position with EY.

2        You mentioned before that you were a

3     principal; correct?

4  A  Correct.

5  Q  Can you tell us what your responsibilities and

6     duties are in that position?

7  A  Could you clarify?  In what capacity do you

8     mean?

9  Q  The principal.  What are your responsibilities?

10 A  Generally, a principal in EY is a partner.  I'm

11    an equity partner in the firm and responsible

12    for client relationship, client development, and

13    client service.

14 Q  Okay.  In the client service area, what are your

15    responsibilities?

16       MS. DeCAMP:  Objection.  Vague.

17       You can answer.

18 A  If what you mean is what do I do in terms of

19    client service, I'm not sure if that's what you

20    mean, but is that -- is that what you mean?

21 BY MR. GARCIA:

22 Q  Tell me that.

23   A   Okay.

24   Q   I'll take that.

25   A   If what you mean by --

                    DRAFT -- NOT PROOFREAD
                                                60
                    DRAFT -- NOT PROOFREAD

1        My understanding of what you mean is, you

2        know, the role that I play in client service,

3        and that is to oversee the teams of EY

4        professionals that work on different engagements

5        for our clients.

6        So it's overseeing the team, managing the

7        team, the work product that the team produces,

8        and helping where I can and have expertise with

9        the development and production of that work

10       product in support of our clients.

11   Q   Okay.  So coming, then, to the relationship with

12       the fiscal board or the oversight board, can you

13       tell me what the relationship between EY and the

14       fiscal board is?

15       MS. DeCAMP:  Objection.  I don't know --

16       Which topic is this?  I think we're getting

17       far afield of foundational questions.

18       MR. GARCIA:  It's still background.  I want

19       to know what the relationship between EY and the

20      FOMB is.

21              MS. DeCAMP:  Still objection.  Vague.

22              MR. GARCIA:  Okay.

23   BY MR. GARCIA:

24   Q   You can answer.

25   A   EY is a consultant -- is a consultant to the

                    DRAFT -- NOT PROOFREAD
                                                    61
                    DRAFT -- NOT PROOFREAD

1      oversight board.

2    Q   It is a consultant on what?

3              MS. DeCAMP:  Objection.  Vague.

4              You can answer.

5    A   On a number of matters.

6    BY MR. GARCIA:

7    Q   What are those matters?

8    A   There are a number of them.

9              Do you mean --

10   Q   What are those matters?  That's the question.

11   A   Are you asking what our scopes of work are?  I

12       don't know what --

13   Q   I'm asking you what types of matters you work on

14       for the FOMB.

15   A   In --

16   Q   EY.  EY.  I'm not talking about you yet.  I will

17      get to you.

18          EY.

19   A   Okay.

20   Q   You said before you were a partner -- an equity

21      partner; that you were a principal.

22          So you work in client service.  I'm asking

23      you based on that background, what types of

24      matters EY works on for the FOMB?

25          MS. DeCAMP:  Object to form.


                    DRAFT -- NOT PROOFREAD
                                              62
                    DRAFT -- NOT PROOFREAD


1       But you can answer.

2    A  Well, we have two -- two primary contracts with

3       the oversight board: one for EY's in-court

4       Title III-related work; and one for our

5       out-of-court, non-Title III-related matters.

6    BY MR. GARCIA:

7    Q  With respect to the Title III in-court matters,

8       what are those matters, in general?

9    A  I do not review our contracts in preparation for

10      this deposition; so I'm going off of memory.

11          And to the best of my recollection, those

12      matters are around long-term projections,

13      pension matters, the plan of adjustment, and

14        creditor mediation support.

15    Q    Credit mediation support?

16    A    Creditor mediation.  Mediation.

17    Q    Okay.  Creditor mediation.  Okay.

18            Anything else that you recall?

19    A    Cash -- cash balance analysis.

20    Q    Anything else?

21    A    Not --

22            Not that I can recall.

23    Q    Okay.  Since when has EY had a contract with the

24        FOMB?

25    A    A Title III contract?

                    DRAFT -- NOT PROOFREAD
                                                    63
                    DRAFT -- NOT PROOFREAD

1    Q    Yeah.  Let's take that first.

2    A    Since 2017.

3    Q    Do you recall when in 2017?

4            MS. DeCAMP:  Objection.

5    A    The documents should be publicly available, I

6        believe.  I do not recall off the top of my

7        head, but you can -- you can look it up.

8    BY MR. GARCIA:

9    Q    Do you know who the FOMB --

10           Who does EY report to at the FOMB?

11          MS. DeCAMP:  Objection.

12          You can answer.

13   A   In connection with which matter?

14   BY MR. GARCIA:

15   Q   The Title III matters.

16   A   Which of the Title III matters?

17   Q   Well, you want to do this the hard way; let's do

18       it the hard way.

19          The long-term projections.

20          MR. MERVIS:  Whoa, whoa.

21          MS. DeCAMP:  Wait.  I'll object to the form

22       of that question.

23          Ask a question in a nonargumentative way,

24       please, Mr. Garcia.

25

                    DRAFT -- NOT PROOFREAD
                                                    64
                    DRAFT -- NOT PROOFREAD

1    BY MR. GARCIA:

2    Q   Mr. Chepenik, with respect to the long-term

3        projections, who does the FOMB report to -- I'm

4        sorry -- who does EY report to at the FOMB?

5    A   I'd like to clarify, too, I'm also not trying to

6        be difficult, as you've stated.

7           Quite literally, we have different -- we

8       work with different people on different matters

9       all the time; so I want to make sure I'm giving

10      you the accurate answer to the question you're

11      asking.

12          It's not me trying to be difficult.  I just

13      want to be clear about that.  I want to be

14      truthful and representative of your intent.

15   Q  I appreciate that, and same here.  I'm trying to

16      understand what the background is, what the

17      relationships are, and that's what I'm doing.

18   A  Okay.  So in general -- let me start there

19      because I think that --

20          My understanding is, in general, that's

21      your question, sort of who do we report into.

22      The answer to that is we report into --

23      ultimately, for all of our work product,

24      Natalie Jaresko, as the executive director, and

25      the oversight board members.  They are our

DRAFT -- NOT PROOFREAD

65

DRAFT -- NOT PROOFREAD

1       client.

2   Q   So that would be the same answer with respect to

3       pension matters and the plan of adjustment?

4   A   Generally, that is the case.

```
 5   Q   Okay.  And also with respect to cash balance

 6       analysis?

 7   A   Generally, that is the case, yes.

 8   Q   So I'm --

 9           (Reporter request for clarification.)

10           MR. GARCIA:  I just said that I'm not going

11       to get into creditor mediation support, which is

12       the other area that he said they provide support

13       to the FOMB.

14           I'm not going to get into that.  I'm sure

15       there would be some issues with that, so I don't

16       want to get into that.

17   BY MR. GARCIA:

18   Q   Now I'm going to ask you a little bit of the

19       same questions with respect to your personal

20       involvement, not EY, but your personal

21       involvement.  Can you tell me in general what

22       your personal involvement has been, that

23       engagement with the FOMB?

24   A   In general terms, my role, as one of the senior

25       executives responsible for most of the
```

DRAFT -- NOT PROOFREAD

66

DRAFT -- NOT PROOFREAD

```
 1       workstreams that we're involved in; so if you're
```

2      asking about the Title III-related matters, I am

3      generally involved to some extent in most of

4      them.

5   Q  Can you be specific as to any of those tasks

6      that you were personally involved in on the

7      Title III?

8   A  I am generally involved in most of the matters

9      that I mentioned to you.

10  Q  Okay.

11         So I'm going to now get into some of the

12     substance of the deposition and the topics that

13     were in the subpoena.  Okay?

14         And I have shown you that list before.  If

15     you want to refer your recollection, we can put

16     it back on the board.  I'm not going to ask yet

17     anything specific.  It's still just general.

18     Okay?

19         Starting with --

20         Actually starting with Topic Number 6 which

21     has to do with Acts 30 and 31 Incremental

22     Revenues.

23         The question for now, Mr. Chepenik, are you

24     familiar with Acts Number 30 of 2013 and

25     Act Number 31 of 2013?

DRAFT -- NOT PROOFREAD

67

DRAFT -- NOT PROOFREAD

1   A   I apologize.  I just pulled up the

2       Exhibit Share.  I see the subpoena.

3   Q   Yeah.  It's Exhibit A to the subpoena.

4   A   I'm sorry.  I had to scroll down to the

5       question.

6           You asked if I'm generally familiar with

7       Acts 30 and 31?

8   Q   Yes.

9           Are you familiar with the statutes?

10  A   I am generally familiar with the statutes.

11  Q   Okay.  What is your understanding of those

12      statutes?

13          MS. DeCAMP:  Objection.

14  BY MR. GARCIA:

15  Q   Do you have an understanding of what those

16      statutes provide?

17          MS. DeCAMP:  Objection.  Calls for a legal

18      conclusion.  That's not one of the topics.

19          MR. GARCIA:  I'm not asking him to give me

20      a legal conclusion.  I'm asking him -- he's said

21      he's generally familiar with Acts 30 and 31; so

22      I'm asking him --

23  BY MR. GARCIA:

24   Q    -- what is your understanding that the statutes

25        provide in the lay way, as a layperson, not as

DRAFT -- NOT PROOFREAD

68

DRAFT -- NOT PROOFREAD

1     an expert, not as an attorney, which I know

2     you're not.

3          So just as a layperson, what is your

4     understanding?

5          MS. DeCAMP:  I'll object.  The scope of his

6     testimony today on Topic 6 and Acts 30 and 31

7     are what is specifically mentioned in Exhibit A

8     as the questions that are presented.

9          Asking for a broad understanding, his

10    personal understanding of Acts 30 and 31 is not

11    an appropriate question for this deposition.

12         MR. GARCIA:  Are you instructing the

13    witness not to answer the question based on --

14         MS. DeCAMP:  Yes.  I'm instructing him not

15    to answer that broad question.

16         You may ask specific questions about the

17    topic in the depo notice.

18         MR. GARCIA:  Again, just so I understand

19    and the record is clear, Ms. DeCamp, you're

20    instructing the witness not to tell me if he

21      knows what his understanding is about Act 30,

22      31, which is purely a foundational question.

23          Is that what you're telling me, Ms. DeCamp?

24          MS. DeCAMP:  Could you explain to me how a

25      lay interpretation of Acts 30 and 31 is a

                    DRAFT -- NOT PROOFREAD
                                                    69
                    DRAFT -- NOT PROOFREAD

1       foundational question to the specific questions

2       that you're asking?

3           MR. GARCIA:  It was frankly because I want

4       to know what his knowledge is about the statute,

5       if any.  Then I can ask more specific questions

6       that are in the topic.

7           I first need to know what his understanding

8       is of the statutes.

9           MS. DeCAMP:  So this question is not a

10      question that Ernst & Young LLP is --

11          His response to this question will not be

12      the response by Ernst & Young LLP; it will

13      simply be his own personal understanding, if he

14      has one.

15          MR. GARCIA:  That's fine.  I will take that

16      answer, Ms. DeCamp.

17          MS. DeCAMP:  With that carve-out, you may

18     answer to the extent that you have a personal

19     understanding of Acts 30 and 31.

20  A   My personal understanding, not in my capacity as

21     a firm for Ernst & Young's understanding of

22     Acts 30 and 31, is that Act 30 relates to -- and

23     this is to the best of my understanding too --

24     Act 30 relates to additional license fees that

25     were allocated to the highway authority -- or at

DRAFT -- NOT PROOFREAD

70

DRAFT -- NOT PROOFREAD

1     least to be allocated to the highway authority.

2         Act 31 pertains to petroleum tax

3     collections and to additional cigarette tax

4     collections in their allocation to HTA.

5  BY MR. GARCIA:

6  Q   In that context, the context that you just gave

7     me about your understanding, what do you mean by

8     "allocation" or "allocated to HTA"?

9  A   Just addition -- again, this is my personal

10     understanding.  I'm not a lawyer, nor am I an

11     expert in either of these laws.

12  Q   That's fine.  That's fine.

13  A   My understanding is it released additional funds

14     beyond the statutory limits that previously

15        existed.

16    Q   Okay.  Fine.

17            But when you say "allocated," what do you

18        mean by that?

19    A   That historically had been used by the

20        authority.

21    Q   In the work that you have done --

22            In the work that you have done for the

23        FOMB, did you -- withdrawn.

24            In the work that you have done for the

25        FOMB, did you have occasion to review into what

                    DRAFT -- NOT PROOFREAD
                                                    71
                    DRAFT -- NOT PROOFREAD

1         accounts those funds coming from Acts 30 and 31

2         were deposited?

3     A   In my personal -- in my personal?

4     Q   In your involvement for the FOMB, the work

5         you've done for the FOMB, do you have an

6         understanding as to into what account those

7         funds were deposited, Acts 30 and 31?

8             MR. MERVIS:  Object to the form.

9     A   To the best of my recollection, I do not -- I

10        personally do not know which accounts those --

11        like account number, if that's what you're

12      asking for, that those funds are deposited into.

13   BY MR. GARCIA:

14   Q   Do you know whether those funds -- those

15       revenues were deposited into the TSA account

16       that you mentioned before?

17   A   Ultimately, my understanding is that's where

18       those revenues sit; that they make their way

19       into the TSA, just as many other revenues are

20       deposited into the TSA.

21   Q   Okay.  And from the TSA, do you have a general

22       understanding as to where those funds were

23       transferred?

24          MR. MERVIS:  I object to the form of the

25       question.

DRAFT -- NOT PROOFREAD

72

DRAFT -- NOT PROOFREAD

1    BY MR. GARCIA:

2    Q   You may answer.

3    A   Over what time period?

4    Q   During the time that you have been working for

5        the FOMB, in 2017, engaged as a consultant.

6    A   So EY was not engaged to perform a, you know,

7        forensic-tracing analysis of those funds, and to

8        the best of my knowledge, most of that money is

```
 9        still sitting in the TSA.

10   Q    Do you remember earlier that we discussed your

11        conversation with Mr. Alburgh on the flow of

12        funds; correct?

13   A    Correct.

14   Q    As part of that conversation that you had with

15        Mr. Alburgh, did you discuss the HTA funds that

16        were in the TSA -- that were in the TSA account?

17            Did you discuss that?

18            MS. DeCAMP:  Objection.

19            You can answer.

20   A    To the best of my recollection, we discussed all

21        the conditionally allocable revenues, not the

22        HTA -- not the HTA component of those

23        conditionally allocable revenues.

24   BY MR. GARCIA:

25   Q    As you just said, HTA was a component of those
```

DRAFT -- NOT PROOFREAD

73

DRAFT -- NOT PROOFREAD

```
 1        conditionally allocated revenues; correct?

 2            MR. MERVIS:  I object to the form.

 3   A    By "HTA," my understanding is you mean

 4        certain -- like the petroleum tax revenues, or

 5        which revenues do you mean?
```

6    BY MR. GARCIA:

7    Q   Well, you tell me.

8        What part of the allocable -- what was your

9        term -- conditionally allocable revenues were

10       HTA revenues?

11       MS. DeCAMP:  Objection.

12   BY MR. GARCIA:

13   Q   You can answer.

14   A   To the best of my understanding, I believe it's

15       petroleum tax revenues and certain cigarette tax

16       revenues and certain license fee revenues.

17   Q   With respect to the conversation you had with

18       Mr. Alburgh, did you have occasion to discuss

19       with him where those funds would be transferred

20       from the TSA account?

21       MR. MERVIS:  Object to the form.

22   BY MR. GARCIA:

23   Q   You may answer.

24   A   To the best of my recollection, we did not

25       discuss that.

                    DRAFT -- NOT PROOFREAD
                                            74
                    DRAFT -- NOT PROOFREAD

1    Q   Okay.  By the way, since I'm on Number 6 now.

2        I'll ask you a couple of questions with respect

```
3      to Number 6.

4           Did you ever speak with anybody at the FOMB

5      with respect to Topic Number 6 -- specifically

6      Topic Number 6?

7           I know I asked questions in general before.

8      I want to know if, with respect to Topic

9      Number 6, which is one of the topics that you've

10     been designated to speak to, do you recall

11     whether you met with anybody from the FOMB to

12     discuss that topic?

13  A  My understanding, you mean in connection with

14     preparing for the declaration --

15  Q  Yes.

16  A  -- I'm sorry -- for the deposition.

17          And if that's the case, to the best of my

18     recollection, no, I have not spoken with any

19     representative of the FOMB.

20  Q  So you have not spoken with any representative

21     of the FOMB with respect to Topic Number 6;

22     correct?

23          MR. MERVIS:  I object to the form of the

24     question.

25
```

DRAFT -- NOT PROOFREAD

1    BY MR. GARCIA:

2    Q   You can answer.

3    A   To the best of my recollection, that is correct.

4        I have not spoken with a representative of the

5        FOMB in connection with Question Number 6.

6    Q   Okay.  Do you know whether anyone at the FOMB

7        would have knowledge relative to the topic on

8        Number 6?

9            MS. DeCAMP:  Objection.

10   BY MR. GARCIA:

11   Q   You can answer.

12   A   I'm here as a representative of EY pursuant to

13       the subpoena that was issued to EY in connection

14       with EY's work on these topics.

15           I can't speculate.  I wouldn't know what

16       people at the FOMB know or don't know.

17   Q   So my question was whether --

18           So you don't know whether anyone at the

19       FOMB would have knowledge of this topic?

20           MR. MERVIS:  Object to the form.

21   A   To the best of my knowledge, I'm unaware of what

22       they may or may not know.

23   BY MR. GARCIA:

24   Q   You're not aware of what?

25   A   I'm not -- to the best of my knowledge, I'm not

DRAFT -- NOT PROOFREAD
DRAFT -- NOT PROOFREAD

1        aware of what, you know, a representative of the

2        oversight board may or may not know.

3    Q   Okay.

4    A   I couldn't tell you whether they --

5    Q   All right.

6            Did you do anything to try to determine

7        whether anyone at the FOMB would have knowledge

8        about that specific topic in Number 6?

9    A   I'm here as a representative of EY pursuant to a

10       subpoena that was issued to EY in connection

11       with its work that it's done on the budgetary

12       development and certification process.  So the

13       answer is no, I'm not aware.

14   Q   Okay.

15           MR. GARCIA:  Alejandro, can you please post

16       Tab Number 30 on the board.

17           (A discussion was held off the record to

18       correct technical issues.)

19           MR. GARCIA:  Having a couple of technical

20       issues.  Sorry.

21           Sorry about this.

22          MR. KOFF:  Arturo, it's Doug Koff.  And I

23     need a break in like five minutes because I'm

24     attending too.

25          So if we can take one.  I apologize to

                    DRAFT -- NOT PROOFREAD
                                                    77
                    DRAFT -- NOT PROOFREAD

1      everyone, but I just need like a three-minute

2      break.

3           MR. GARCIA:  Can we go off the record for

4      five minutes while we also fix the technical

5      issue here?

6           Do you mind?

7           THE VIDEOGRAPHER:  I'll take us off the

8      record at 11:20.

9           (A recess was taken.)

10          THE VIDEOGRAPHER:  We're back on the record

11     at 11:31.

12  BY MR. GARCIA:

13  Q   Sorry about those technical issues.  Took a

14      little longer than I expected, but we'll move

15      forward.

16          Okay?

17          (Deposition Exhibit 3 was presented for

18      identification.)

19   Q   There's a document on the screen, but before I

20       go to the document, I'll ask you one other

21       question with respect to -- in general with

22       respect to Topic Number 6.

23           I don't want you to enter into the subject

24       matter of any discussions, if there were any

25       discussions.  Okay?  I don't --

                    DRAFT -- NOT PROOFREAD
                                                    78
                    DRAFT -- NOT PROOFREAD

1            I'm just asking you whether anyone from

2        Proskauer, the law firm representing the FOMB,

3        provided you any information to help you prepare

4        to testify on this particular topic today?

5            MR. MERVIS:  Arturo, sorry, which topic are

6        you referring to?

7            MR. GARCIA:  Number 6.

8            MR. MERVIS:  Okay.

9    A   To the best of my recollection, no.

10   BY MR. GARCIA:

11   Q   So did you, in preparing for the deposition,

12       again, not getting into the substance, if there

13       was any, but did you meet with anybody from

14       Proskauer to prepare for the deposition on this

15       particular Topic Number 6?

16   A   I recall having a handful of meetings with

17        representatives from Proskauer on all of the

18        topics in preparation for the deposition.

19             I cannot recall a specific meeting just to

20        talk about Topic Number 6.

21   Q   Okay.  And I believe you indicated before that

22        those meetings would have been with --

23             Well, I don't want to have an objection of

24        asked and answered.  I'm not recalling who you

25        mentioned.

                    DRAFT -- NOT PROOFREAD
                                                    79
                    DRAFT -- NOT PROOFREAD

1             MR. GARCIA:  Do you mind, Antoinette, if I

2         ask that question again?

3             MS. DeCAMP:  Sure.  Go ahead.

4    BY MR. GARCIA:

5    Q   Can you please tell me who you met with from the

6         FOMB with respect to Topic Number 6, to the best

7         of your recollection.

8             MS. DeCAMP:  Yes.  It's a different

9         objection.  It's not the --

10            Yeah.

11            MR. GARCIA:  I'm sorry, you guys were

12        speaking over each other; so I didn't hear

13      either one.

14          MR. MERVIS:  Yeah.  Arturo, you asked who

15      he met with from the FOMB.  I don't know if

16      that's what you meant to ask.

17          MR. GARCIA:  I'm sorry.  From Proskauer.

18   BY MR. GARCIA:

19   Q   From Proskauer, Mr. Chepenik.

20   A   So I think I just answered the prior question in

21      terms of the context of the discussions that I

22      had with representatives from Proskauer, and

23      they were on all topics, not just the meeting on

24      Topic Number 6.

25          If that's what you mean, which I interpret

                    DRAFT -- NOT PROOFREAD
                                                80
                    DRAFT -- NOT PROOFREAD

1      that is what you mean, the attorneys at

2      Proskauer that I met with in preparation for my

3      deposition generally were Margaret Dale, Michael

4      Mervis, Michael Firestein, Ehud Barak, and Julia

5      Alonzo.

6   Q   Yes.  Thank you for that.  Those were the ones I

7      remembered, but I just wanted to make sure.

8   A   Okay.

9   Q   So can you see a document on the screen?

10   A   I can.

11   Q   Okay.  Have you seen this document before?

12   A   I have.

13   Q   You have.

14       Do you recall when you saw it the first

15       time?

16   A   I do not recall the first time I saw it.  I do

17       recall having seen it in preparation for the

18       deposition today.

19   Q   Okay.  That was going to be my next question; so

20       thank you.

21       So in your --

22       Can you give me an explanation of what the

23       document is.  I don't want to put words in your

24       mouth.

25       MR. MERVIS:  I object to the form.

                    DRAFT -- NOT PROOFREAD
                                              81
                    DRAFT -- NOT PROOFREAD

1   A   This is what is commonly referred to as

2       "Act 30."

3   BY MR. GARCIA:

4   Q   Okay.

5       MR. GARCIA:  Can you please scroll down to

6       the part where it, you know, talks about the

7      revenues allocated.

8             I think it's highlighted.  Maybe we didn't

9      use the --

10            Can you please highlight the language,

11     Mr. Cepeda.  Okay.

12  BY MR. GARCIA:

13  Q   Do you see the highlighted language in the

14      document now?  It's highlighted in light blue?

15  A   Yes.

16  Q   It states, and I quote:

17            "Except as otherwise provided in the Act,

18      the amount of the fees collected in accordance

19      with Sections 23.01 and 23.02 of this Act shall

20      be covered in its entirety into a special

21      deposit in the name and for the benefit of the

22      Highways and Transportation Authority."

23            Do you see that language?

24  A   I see the language, yes.

25  Q   Do you have your own understanding of that

                    DRAFT -- NOT PROOFREAD
                                                    82
                    DRAFT -- NOT PROOFREAD

1      language in the statute?

2             MS. DeCAMP:  Objection.  Again, you're

3      asking about his personal understanding?

4          MR. GARCIA:  Yes, his personal.  I said

5      "your own understanding."

6   BY MR. GARCIA:

7   Q   Do you have your own understanding about the

8       language that is highlighted, Mr. Chepenik?

9          THE WITNESS:  Antoinette, should I answer?

10         MS. DeCAMP:  You can answer if you have

11      your own personal understanding about what this

12      Act -- what this language says.

13  A   I don't have -- I don't have my own personal

14      understanding about what this language has or

15      means.  I think we're operating, you know, in

16      the PROMESA world.  And I can certainly speak to

17      the budgeting process generally, but I do not

18      have a specific personal point of view on this

19      language.

20  BY MR. GARCIA:

21  Q   Do you recall, when was the first time that you

22      saw this language in the statute?

23  A   As I recall, the first time I focused on this

24      provision is right now.

25  Q   Is when?

1   A   Right now, when you just showed it to me.

2   Q   All right.  So you had not seen this provision

3       of the statute before?

4           MR. MERVIS:  Object to the form.

5   A   I have seen the statute in preparation for the

6       deposition, but I don't personally recall this

7       particular provision, reviewing that as part of

8       my deposition preparation.

9   BY MR. GARCIA:

10  Q   Okay.  And prior to deposition preparation, had

11      you seen the statute?

12  A   I have seen the statute prior to my -- yes.

13  Q   In what connection did you see the statute?

14  A   It's just commonly referred --

15          It's a commonly referred statute, and I

16      just recall having seen it in the past.

17  Q   So again, in what connection do you recall

18      having seen it in the past?

19  A   I do not recall.

20  Q   So you don't remember what you saw the statute

21      in connection with in the past?  That's your

22      testimony?

23  A   I do not recall.

24  Q   To the best of your recollection, did you review

25      the statute for anything related to your work

DRAFT -- NOT PROOFREAD

84

DRAFT -- NOT PROOFREAD

1      for the oversight board?

2   A   To the best of my recollection, I do not.

3   Q   You did not.

4          That's your answer?

5   A   To the best of my recollection, I do not recall.

6   Q   Okay.  Is the statute in any way, shape, or form

7      related to your work for the FOMB? your personal

8      work for the FOMB?

9          MR. MERVIS:  I object to the form.

10          MS. DeCAMP:  Objection.

11  BY MR. GARCIA:

12  Q   You can answer.

13  A   To the best of my recollection, no.

14          MR. GARCIA:  Can you put Act Number 31 on

15      the screen.

16          Slow process.  I apologize.

17          Okay.  It's coming up.

18          (Deposition Exhibit 4 was presented into

19      evidence.)

20  BY MR. GARCIA:

21  Q   Do you see a document on your screen,

22      Mr. Chepenik?

23   A   I do, yes.

24   Q   Have you seen this document before?

25   A   I have, yes.

                    DRAFT -- NOT PROOFREAD
                                                    85
                    DRAFT -- NOT PROOFREAD

 1   Q   Okay.  What is this document, to the best your

 2       understanding?

 3   A   To the best of my understanding, this appears to

 4       be Act 31.

 5   Q   And can you tell me what is your understanding

 6       about, in general, about Act 31?

 7           MS. DeCAMP:  Objection.  Asking for his

 8       personal understanding again?

 9           MR. GARCIA:  Yes.

10           MS. DeCAMP:  Okay.

11   BY MR. GARCIA:

12   Q   Yes.  Yes, please answer.

13   A   So my personal understanding of this is it

14       relates to additional petroleum tax revenue

15       collection remittances and cigarette tax

16       collection remittances.

17           MR. GARCIA:  Can you please scroll down to

18       the same section that you were on before in

19       Act 31.

20          I think it's there.  Yes, that's the one.

21          Can you please highlight 1, and then (a).

22   BY MR. GARCIA:

23   Q   Okay.  Do you see the language highlighted in

24       light blue on the document, Mr. Chepenik?

25   A   I do, yes.


                    DRAFT -- NOT PROOFREAD
                                                  86
                    DRAFT -- NOT PROOFREAD


 1   Q   Okay.  And I quote, it says:

 2          "The sum of the tax collected on gasoline

 3       and four cents of the gas, oil, or diesel oil

 4       tax established by Section 3020.06 of the

 5       subtitle, and the total amount per fiscal year

 6       of the excise tax collected for crude oil,

 7       partially finished, and finished oil by-products

 8       and any other hydrocarbon mixtures established

 9       in Section 3020.07 of this subtitle, shall be

10       covered into a special deposit in favor of the

11       Highways and Transportation Authority for its

12       corporate purposes."

13          Do you see that language?

14   A   I do, yes.

15   Q   Have you seen that language before?

16   A   I do not recall having seen that language.

17  Q   So did you see it in preparation -- do you

18      recall having seen it in preparation for your

19      deposition today?

20  A   I do not recall having focused on that clause in

21      preparation for my deposition today.

22  Q   Again, I'm going to ask you your own personal

23      understanding of what this particular provision

24      of Act 31 provides.

25          MS. DeCAMP:  I'll object.  It's outside the

DRAFT -- NOT PROOFREAD

                                                    87

DRAFT -- NOT PROOFREAD

1   scope of the depo.

2          But you can answer.

3          MR. MERVIS:  I object to form.

4   BY MR. GARCIA:

5   Q   You can answer.

6   A   I do not have a personal point of view on what

7       this provision means.

8   Q   Okay.

9          Have you seen the language, and I quote:

10          "Shall be covered into a special deposit in

11      favor of the Highways and Transportation

12      Authority for its corporate purposes"?

13          Have you seen it before?

14    A    It has not been something that I have focused

15         on.

16    Q    In connection with the discussion you had with

17         Mr. Alburgh regarding the testimony you gave

18         before -- I don't want to repeat it -- Did you

19         have occasion to discuss these particular

20         sections of Act 30 and 31?

21              MR. MERVIS:  Note my objection to the form.

22    BY MR. GARCIA:

23    Q    You may answer.

24    A    No.  To the best of my recollection, we did not

25         discuss.

                    DRAFT -- NOT PROOFREAD
                                                    88
                    DRAFT -- NOT PROOFREAD

1     Q    In general, have you seen the language, and I

2          quote:

3               "Shall be covered into a special

4          deposit" --

5               -- before in this type of statute?

6               MS. DeCAMP:  Objection.

7               But you can answer.

8     A    You mean as a provision of the Act 31 or --

9               I'm not quite sure what --

10    BY MR. GARCIA:

11  Q   In general terms, I'm asking whether you've seen

12      this type of language:

13          "Shall be covered into a special

14      deposit" --

15          -- before in these types of statutes?

16          MS. DeCAMP:  Objection.

17  BY MR. GARCIA:

18  Q   You may answer.

19  A   No, not that I can recall.

20  Q   All right.  So I'll try -- in fact, you can't

21      recall.

22          Do you recall what this particular language

23      signifies, and I quote:

24          "Shall be covered into a special deposit."

25          Do you know?

                DRAFT -- NOT PROOFREAD
                                                89
                DRAFT -- NOT PROOFREAD

1           MS. DeCAMP:  Objection.

2   BY MR. GARCIA:

3   Q   You may answer.

4   A   I don't have a personal perspective on what that

5       particular language would mean for this law.  In

6       a PROMESA -- under a PROMESA framework, not

7       under this particular law.

```
 8   Q   That's fine, but I'm not asking you about

 9       PROMESA framework.  I'm asking you about this

10       particular language in the statute outside of

11       any other context.

12           Am I to understand that you have no

13       particular understanding about those words in

14       the statute?

15           Is that your testimony?

16           MR. MERVIS:  Object to the form.

17   BY MR. GARCIA:

18   Q   You may answer.

19   A   I do not have a particular point of view on what

20       that provision implies.

21   Q   Okay.  Let's go to (a).  You see the highlighted

22       portion of the statute that starts with the

23       letter (a)?  It's the second highlighted

24       paragraph.

25   A   Yes, I see that.
```

                    DRAFT -- NOT PROOFREAD
                                                   90
                    DRAFT -- NOT PROOFREAD

```
 1   Q   And I quote it, it says:

 2           "The secretary shall transfer every month,

 3       or as agreed on with the Highways and

 4       Transportation Authority, the amounts covered
```

5     into said special deposit, deducting from these

6     the amounts reimbursed according to the

7     provisions of Section 3030.19 and 3030.20 of

8     this subtitle."

9         Do you see that language?

10  A  I do, yes.

11  Q  Have you seen this language before?

12  A  Not that I recall.

13  Q  You didn't see it in preparation for this

14     deposition?

15  A  I did not focus on that language for this

16     deposition, no.

17  Q  Yeah.  But my question was whether you saw it in

18     preparation for the deposition?

19        MS. DeCAMP:  Objection.

20        You can answer.

21  A  To the best of my recollection, no.

22  BY MR. GARCIA:

23  Q  Did you discuss these two provisions that are

24     highlighted with anybody in preparation for your

25     deposition?

DRAFT -- NOT PROOFREAD

91

DRAFT -- NOT PROOFREAD

1  A  To the best of my recollection, no.

2   Q   Does that include anybody from the FOMB?

3   A   It does.

4   Q   Does that include anybody from Proskauer?

5   A   It does.

6   Q   Okay.

7           Do you know where the taxes covered by

8       Acts 30 and 31 are being deposited,

9       Mr. Chepenik?

10          MR. MERVIS:  I object to the form.

11  BY MR. GARCIA:

12  Q   You may answer.

13  A   To the best of my understanding, they are

14      deposited ultimately into The Treasury Single

15      Account.

16  Q   Do you know if after they are deposited in the

17      TSA account that we were discussing before, they

18      are transferred somewhere else?

19          MR. MERVIS:  Objection.

20  BY MR. GARCIA:

21  Q   You may answer.

22  A   In which time period do you mean?  Currently?

23  Q   In the last four years, since you've been

24      working with EY?

25  A   There's only one instance in which I'm aware of

DRAFT -- NOT PROOFREAD

92

DRAFT -- NOT PROOFREAD

1  a specific allocation of these revenues.

2 Q What was that one instance that you're aware of?

3 A In 2019, there was a special resolution passed

4  pertaining to petroleum tax revenues.

5 Q Okay.  What was that special resolution?

6 A It was part of the certified budgeting process,

7  and, yeah, I mean that -- it allocated petroleum

8  tax revenues.

9 Q Do you recall what the resolution provided?

10 A I recall it provided for $299 million of

11  petroleum tax revenues to be allocated for, I

12  recall, to the best of my recollection, for

13  police and teacher salaries.

14 Q Allocated to whom?

15   Sorry.  I didn't hear.

16 A I don't know -- if you have the resolution, it

17  would help refresh my recollection.  But I

18  recall -- to the best of my recollection, I

19  believe it was for police and teacher salaries.

20 Q Other than that special resolution related to

21  those $299 million of petroleum taxes, do you

22  know where the revenues in Acts 30 and 31 would

23  be transferred outside of the TSA account to?

24          MS. DeCAMP:  Object.

25          But you can answer.

                    DRAFT -- NOT PROOFREAD
                                                    93
                    DRAFT -- NOT PROOFREAD

1    A   To the best of my recollection, I'm not aware of

2        other transfers of those revenues.

3    BY MR. GARCIA:

4    Q   But are you aware that they are transferred?

5          MS. DeCAMP:  Object to form.

6    A   No.

7          My understanding, to the best of my

8        recollection, is that those monies are generally

9        deposited into TSA.  Cash is cash.  It's

10       commingled within the Treasury Single Account.

11   BY MR. GARCIA:

12   Q   So is it your understanding that, except for the

13       $299 million that were the subject of the

14       special resolution in 2019, the funds are

15       deposited in the TSA account and remain there?

16   A   Since EY was retained, I believe that is the

17       case.

18   Q   All right.

19         MR. GARCIA:  I believe this might be an

20       appropriate moment to break for lunch.

21          Mr. Chepenik, how long do you need for

22      lunch?

23          THE WITNESS:  What time -- how long is

24      customary?

25          MR. GARCIA:  It's as little as half an hour

                    DRAFT -- NOT PROOFREAD
                                                    94
                    DRAFT -- NOT PROOFREAD

 1      to as long as one hour.  What is --

 2          THE VIDEOGRAPHER:  We'll go off the record.

 3          MR. GARCIA:  We can go off the record.

 4          THE VIDEOGRAPHER:  Let's go off the record

 5      at 11:53.

 6          (A recess was taken.)

 7          THE VIDEOGRAPHER:  We are back on the

 8      record at 1:01 p.m.

 9   BY MR. GARCIA:

10   Q  Good afternoon, everyone.  Especially to

11      Mr. Chepenik.  Hope you all had a healthy and

12      nice lunch.  I hope that the weather, wherever

13      it is you are, is better than the one we're

14      having in San Juan.

15          Anyway, I'm going to ask Mr. Cepeda to

16      bring another exhibit to the screen.  This one

17      could take a little longer because it's a pretty

18      big document.  But I'm not going to go into much

19      of it at all, just actually maybe two

20      paragraphs, if not just one.

21          (Deposition Exhibit 5 was presented for

22      identification.)

23   Q  Mr. Chepenik, do you see a document on your

24      screen?

25   A  I do.

                    DRAFT -- NOT PROOFREAD
                                                    95
                    DRAFT -- NOT PROOFREAD

1    Q  It's been identified as Exhibit 5 for the depo.

2            Have you seen this document before?

3    A  I have, yes.

4    Q  Can you tell me what it is?

5    A  This is --

6            I believe this is the most current

7       certified fiscal plan for the central

8       government.

9    Q  In other words, for the Commonwealth?

10   A  Yes, the Commonwealth government.

11   Q  Are you familiar with the government?

12   A  I am, yes.

13   Q  Have you had occasion prior to today to review

14      this document?

15  A   I did, yes.

16  Q   In what setting did you review it before?

17  A   In conjunction with a number of our work -- the

18      EY workstreams.

19  Q   Any other context besides the workstreams?

20  A   Not particularly, no.

21  Q   Did you review the document in preparation for

22      the deposition today?

23  A   Oh, I did not realize that was the question.

24          Yes, I did.

25  Q   It actually was not the question, but I was

                    DRAFT -- NOT PROOFREAD
                                                    96
                    DRAFT -- NOT PROOFREAD

1       first exploring other context before coming to

2       this one, but you've answered.  Thank you.

3           Did EY have any involvement in the

4       preparation of the fiscal plan that's on the

5       screen?

6   A   EY had input on a few specific topics for the

7       fiscal plan but was in the primary consultant

8       hired by the oversight board to prepare and

9       review the fiscal plan.

10  Q   Okay.  By the way, did you have any involvement

11      with EY in connection with the fiscal plan?

12   A   I did, yes.

13   Q   What specific topics was EY working on with

14       respect to the fiscal plan?

15   A   To the best of my recollection, the main

16       contributions were around the Department of

17       Education section, and in those measures, around

18       the section on the office of the CFO, the CFO

19       proposal, and the Pension section in the fiscal

20       plan.

21   Q   So that was your answer with respect to EY.

22           Would that be the same answer with respect

23       to your own involvement in the preparation of

24       this fiscal plan?

25   A   To the best of my recollection, I was personally

DRAFT -- NOT PROOFREAD

97

DRAFT -- NOT PROOFREAD

1    most involved in the OCFO section and the

2    Pension section.

3  Q   Was there any involvement by EY or by you in

4      connection with the HTA part of the fiscal plan?

5  A   To the best of my recollection, no.

6  Q   In preparation for the deposition today, did you

7      review any HTA sections in the fiscal plan prior

8      to today?

9   A   I did not, no.

10   Q   Okay.  I'm going to ask Mr. Cepeda to scroll

11       down to page 45 of the document.

12           Before we look at the language, do you know

13       how the fiscal plan treats the revenues

14       generated by Acts 30, 31?

15           MS. DeCAMP:  Objection.

16           You can answer.

17   BY MR. GARCIA:

18   Q   Please answer.

19   A   To the best of my knowledge, they are treated

20       the same way that all other revenues --

21       virtually all other revenues of the government

22       are treated.

23   Q   Okay.  Can you tell me what that way is.

24           MS. DeCAMP:  Objection.

25

DRAFT -- NOT PROOFREAD
                                              98
DRAFT -- NOT PROOFREAD

1   BY MR. GARCIA:

2   Q   Please answer.

3   A   My understanding is revenues are all

4       consolidated into one aggregate revenue stream

5       that's forecasted out, and then expenses are

6        forecasted out against those revenues.

7    Q   When you say that "all the revenues are

8        consolidated into one aggregate revenue stream,"

9        what do you mean by that?

10   A   That there's no particularly unique treatment

11       for different revenue streams.  They are all

12       treated the same -- in the same fashion where

13       the revenues are forecasted out creating a

14       revenue baseline, if you will.

15           Measures are incorporated.  Those can be

16       fiscal or structural reform measures that have

17       an impact on various revenue streams.  And then

18       those revenue streams are all totaled to create

19       an aggregate revenue stream.

20   Q   After the aggregate revenue stream is created --

21       strike that.  Withdrawn.

22           For what purpose in the fiscal plan is the

23       aggregate revenue stream created?

24           MS. DeCAMP:  Objection.

25

                    DRAFT -- NOT PROOFREAD
                                                  99
                    DRAFT -- NOT PROOFREAD


1    BY MR. GARCIA:

2    Q   You can answer.

3   A   My understanding is the revenue stream is

4       created to forecast the total amount of revenues

5       available for expenses to be allocated against

6       or surpluses to be generated.

7   Q   Okay.  All right.

8           So now I'm going to ask you to turn to

9       Section 5.1, Baseline Revenue Forecast.

10          What's a baseline revenue forecast?  Do you

11      know?

12          MS. DeCAMP:  Objection.  Objection.

13          You can answer.

14  A   So EY does not set the baseline revenue

15      forecast.  So I cannot tell you with absolute

16      certainty, but my understanding is the baseline

17      revenue forecast is the revenue forecast before

18      measures are applied.  So before either fiscal

19      measures or structural reformers.

20          MR. GARCIA:  Can you please highlight,

21      starting with the sentence that begins:

22          "The inclusion of these revenues" --

23          -- until the end.

24          Okay.

25

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1    BY MR. GARCIA:

2    Q    Do you see the highlighted portion of that

3         section on your screen, Mr. Chepenik?

4    A    Yes, I do.

5    Q    Okay.  I'm just going to read a part of that for

6         the record, and I quote:

7              "The inclusion of these revenues in the

8         2021 fiscal plan is based on the oversight

9         board's legal conclusions that: (i), such monies

10        are property of the Commonwealth; (ii), each

11        pre-PROMESA statute appropriating or

12        transferring such monies to instrumentalities of

13        the Commonwealth is preempted by PROMESA; (iii),

14        such statutes were enacted by prior legislatures

15        that cannot bind the current legislature; and

16        (iv), in any event, absent PROMESA, under the

17        Puerto Rico constitution, such monies would not

18        be transferred to the instrumentalities while

19        general obligation debt is not being paid

20        according to its terms."

21             Do you see that highlighting?

22   A    I do, yes.

23   Q    Have you seen this language before?

24   A    To the best of my recollection, I do not recall

25      having focused on that language.

↖

 1   Q   Okay.  I'm not going to ask you any question to

 2       provide me any kind of a legal conclusion.  I

 3       know you're not a lawyer.  Okay?

 4           I'm not going to ask you either to

 5       interpret, in any legal way, the provision that

 6       I highlighted.  Okay?  I'm not doing that.

 7           I'm just asking you what is your

 8       understanding of this language in the

 9       Commonwealth fiscal plan for 2021?

10           MS. DeCAMP:  To clarify, you're asking for

11       his personal view as opposed to any EY position;

12       correct?

13           MR. GARCIA:  Yes.

14   BY MR. GARCIA:

15   Q   I'm asking for your personal view.

16           MS. DeCAMP:  You can answer to the extent

17       you have a view.

18           MR. MERVIS:  I object to the form.

19   BY MR. GARCIA:

20   Q   Okay.  You can answer.

21   A   I do not have a particular view about what this

22      means.

23   Q   You have --

24          You don't have a particular view.  Do you

25      have any view?

                   DRAFT -- NOT PROOFREAD
                                                        102
                   DRAFT -- NOT PROOFREAD

 1          MR. MERVIS:  Same objection.

 2   A   I do not.

 3   BY MR. GARCIA:

 4   Q   Okay.  Now, you've indicated that you've worked

 5      with the FOMB with respect to the preparation of

 6      fiscal plans, and you indicated what areas of

 7      the fiscal plan you were involved with.  I know

 8      that.  Okay?

 9          But do you have experience outside of this

10      engagement in the preparation of fiscal plans in

11      general?  And, again, either you personally or

12      you as a member -- as a principal of EY.

13          MR. MERVIS:  I'm sorry.  Can I ask the

14      reporter to read that back.

15          Thank you.

16          (The requested text was read by the

17      reporter.)

18          MR. MERVIS:  I object to the form.

19   BY MR. GARCIA:

20   Q   Please answer.

21   A   In terms of fiscal plans, can you better

22       elaborate what you mean by that?

23   Q   Well, do you know what a fiscal plan is?

24   A   I know what this fiscal plan is but not

25       necessarily what you mean more generally.

DRAFT -- NOT PROOFREAD

                                               103

DRAFT -- NOT PROOFREAD

1    Q   Have you worked in the preparation of fiscal

2        plans outside of this engagement at any time?

3            MR. MERVIS:   Objection to the form.

4    BY MR. GARCIA:

5    Q   You may answer.

6    A   My understanding is what you imply by fiscal

7        plan is a multiyear -- a multiyear sort of plan

8        for a public sector entity that may or may not

9        be in connection with the bankruptcy process.

10           If that is what you mean, the answer is

11       yes.

12   Q   Okay.

13           Well, based on that answer that you have

14       just given, I ask you whether you've seen this

15       type of language in other fiscal plans, either

16      in the Commonwealth setting or other settings

17      before?

18           MS. DeCAMP:  Objection.

19  BY MR. GARCIA:

20  Q    You can answer.

21  A    I would say, you know, based on my experience,

22       that each sort of multiyear plan that's

23       developed by a public sector entity, be it a

24       state or local government, is unique to that

25       state or local government's situation.  So it's

                    DRAFT -- NOT PROOFREAD
                                                    104
                    DRAFT -- NOT PROOFREAD

1      not always in connection with the same types of

2      processes.

3  Q    Based on your experience, you cannot tell me

4       whether you have any understanding of what this

5       language means for purposes of this particular

6       fiscal plan of the Commonwealth?

7           MS. DeCAMP:  Objection.

8           You can answer.

9  A    I do not have a point of view on this language.

10  BY MR. GARCIA:

11  Q    Okay.  I'm not asking your point of view.  I'm

12       asking you about understanding -- any

13      understanding that you may have with respect to

14      this language on the fiscal plan?

15           MS. DeCAMP:  Objection.

16           You can answer.

17   A   I don't have a particular understanding of this

18      language, no.

19   BY MR. GARCIA:

20   Q   So you have --

21           You don't have a particular understanding,

22      but do you have any understanding?

23   A   I don't have a particular understanding of this

24      language.

25   Q   So I understand that you have no understanding

                    DRAFT -- NOT PROOFREAD
                                                    105
                    DRAFT -- NOT PROOFREAD

1      whatsoever about this language in the fiscal

2      plan?

3           MS. DeCAMP:  Objection.

4           You can answer.

5   A   I do not have a particular understanding of the

6      language.

7          MR. GARCIA:  Let's go to a different

8      exhibit.  This one is a little less heavy, but

9      it's still somewhat heavy; so it's going to

10      probably take some time coming up on the screen.

11           (Deposition Exhibit 6 was presented for

12      identification.)

13  BY MR. GARCIA:

14  Q   Mr. Chepenik, do you see a document on the

15      screen now?

16  A   I do, yes.

17  Q   It's been marked as Exhibit 6 for the

18      deposition.

19           Have you seen the document before?

20  A   I have, yes.

21  Q   In what setting did you see the document before?

22  A   I just generally reviewed various fiscal plans

23      once they were prepared.

24  Q   Okay.  For what purpose do you "generally review

25      various fiscal plans"?

                    DRAFT -- NOT PROOFREAD
                                                    106
                    DRAFT -- NOT PROOFREAD

1   A   Just to try to be informed about -- about

2       different fiscal plans.

3   Q   And for what purpose do you want to be informed

4       about the fiscal plans, sir?

5   A   I just want to be the best-prepared adviser that

6       I can be for our client.

7    Q   Okay.

8        Did the FOMB have any involvement in the

9        preparation of the HTA fiscal plan?

10       MR. MERVIS:  Did you say "FOMB," Arturo?

11       MR. GARCIA:  Yeah.

12       MR. MERVIS:  Okay.

13   BY MR. GARCIA:

14   Q   Do you know if the FOMB had any involvement?

15   A   I personally was not involved, nor was EY

16       involved in the preparation of the HTA fiscal

17       plan; so I cannot tell you with certainty.

18       However, the document was certified by the

19       oversight board ultimately; so I would -- based

20       on my experience, I would imagine that there was

21       some review of the fiscal plan.

22   Q   Yeah.  Actually, the cover of the document

23       actually states, and I quote:

24       "As certified by the for the Financial

25       Oversight and Management Board for Puerto Rico."

                    DRAFT -- NOT PROOFREAD
                                                    107
                    DRAFT -- NOT PROOFREAD

1        Correct?

2    A   That's correct.  Yes.

3    Q   Would that give you any references to what was

4       the involvement of the FOMB in the preparation

5       of the fiscal plan?

6              MS. DeCAMP:  Objection.  Calls for

7       speculation.

8   BY MR. GARCIA:

9   Q   You can answer.

10  A   I genuinely -- I'm unaware of the extent of the

11      involvement that the oversight board had in the

12      development of the fiscal plan.

13  Q   Okay.  What does it mean to "certify" a fiscal

14      plan?

15             MR. MERVIS:  Object to the form.

16  A   To the best of my knowledge, I do know.  And to

17      the best of my knowledge, the certification is a

18      requirement under PROMESA, Section 2 -- under

19      Section 2 of PROMESA, I believe it's Section

20      201, that lays out a series of 14 criteria that

21      need to be met for a fiscal plan to be able to

22      be certified by the oversight board.

23             So it implies that the oversight -- in the

24      oversight board's view, that the -- the

25      certified fiscal plan met those criteria.

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1    BY MR. GARCIA:

2    Q   Do you know what those criteria are?

3            MS. DeCAMP:  Objection.

4            You can answer.

5    A   Generally, yes.

6    BY MR. GARCIA:

7    Q   Can you tell me what those are, to the best of

8        your recollection?

9    A   I would need your help pulling up PROMESA to

10       look at the 14 criteria.

11   Q   Right.

12   A   I don't recall --

13   Q   Perfect.  I withdraw that one.

14           Do you have any recollection of what some

15       of the criteria may be.

16           I'm not going to ask you about PROMESA.  I

17       can look it up.  I just want to understand what

18       your recollection may be about the fiscal plan.

19   A   I don't recall, off the top of my head.

20   Q   Okay.

21   A   I would have to refresh my recollection.

22   Q   That's fine.  That's fair.  We're not going

23       there.

24           Did EY have any involvement in the

25       preparation of the HTA fiscal plan?

DRAFT -- NOT PROOFREAD

109

DRAFT -- NOT PROOFREAD

1    A   To the best of my knowledge, no.

2    Q   Did you personally have any involvement as an

3        adviser to the FOMB?

4            MS. DeCAMP:  Objection.  Asked and answered

5        but --

6            MR. GARCIA:  The prior question was with

7        respect to EY.  I'm asking now whether he

8        personally had --

9            MS. DeCAMP:  Outside of EY?  That's not

10       within the scope of the deposition.

11   BY MR. GARCIA:

12   Q   Any involvement?

13   A   No, not that I recall.

14   Q   Okay.

15           To your knowledge or your best

16       recollection, was anybody else, aside from the

17       FOMB, involved in the drafting of a fiscal plan

18       like this one?

19           MR. MERVIS:  Object to the form of the

20       question.

21   BY MR. GARCIA:

22   Q   You can answer.

23   A   So I apologize asking you to clarify.

24        So you mean with respect to the HTA fiscal

25        plan or to just any fiscal plan?

                    DRAFT -- NOT PROOFREAD
                                                110
                    DRAFT -- NOT PROOFREAD

1   Q   I'm actually referring to the HTA fiscal plan,

2        which is the one that's right on the board now.

3   A   I understand.

4        I'm not aware of who was involved in the

5        development of the fiscal plans.

6   Q   Okay.

7   A   You did mention whether the FOMB's development

8        of the fiscal plan -- my understanding of the

9        process is the government submits a fiscal plan

10       to the FOMB that reviews that fiscal plan, and

11       ultimately it's certified -- whatever version is

12       certified is certified because it meets those 14

13       criteria in Section 201.

14   Q   Okay.  Good.  That's actually what I was trying

15       to get.  Thank you.  I just didn't want to put

16       words in your mouth.

17       Let's go pages 49 to 51.

18       I'm specifically looking for Section 2.1.

19       We can't seem to find it.

20          MR. GARCIA:  Sorry.  I was directing my

21     colleague to the wrong page in the document.  My

22     mistake.  I apologize.

23          MR. MERVIS:  Arturo, what page is it?

24          MR. GARCIA:  Yes, Michael.

25          MR. MERVIS:  What page number are you on?

                    DRAFT -- NOT PROOFREAD
                                                    111
                    DRAFT -- NOT PROOFREAD

1          MR. GARCIA:  We're on page 25, Section 2.1.

2     I was directing Alejandro to the wrong page.

3     Again, my mistake.

4          MR. MERVIS:  Yes, I've got it.  I couldn't

5     see it on the screen.

6          MR. GARCIA:  Yes, I know.  This is why we

7     were not finding it.  It was my mistake.

8          MR. MERVIS:  Okay.

9  BY MR. GARCIA:

10  Q   There's language there, but I'm going to ask you

11     a couple of background questions before I get to

12     the language.

13          Do you know whether Act -- whether --

14     strike that.

15          Before when we were talking about fiscal

16     plans, you testified about revenue streams going

17       to the fiscal plans.

18            Do you remember that testimony?

19    A   Generally, yes, I do.

20    Q   Okay.  And earlier, also, you testified about

21        Act 30, 31, Revenues, and you described them in

22        your own words as -- I don't recall whether you

23        used the words "excise taxes," but you used

24        "revenues generated by different statutes";

25        correct?

                    DRAFT -- NOT PROOFREAD
                                                        112
                    DRAFT -- NOT PROOFREAD


1     A   I do not recall if those are the exact words

2         that I used.

3     Q   Right.  Do you recall what the words were?  I

4         just want to put it in context.

5              MR. MERVIS:  Object to form.

6     BY MR. GARCIA:

7     Q   Please answer to the best of your recollection.

8     A   To the best of my recollection, I recall saying

9         that Act 30 relates to certain license fees and

10        Act 31 relates to certain petroleuam taxes and

11        cigarette taxes.

12    Q   And I ask the question, then, now, based on your

13        answer, whether those types of revenues that

14     come out of those taxes that you just mentioned

15     are sources of operating revenues for government

16     instrumentalities.

17          Do you know?

18          MR. MERVIS:  I object to the form.

19   BY MR. GARCIA:

20   Q   You can answer.

21   A   I -- I'm not aware of the use of those funds.

22   Q   I'm not asking you for the use of those funds,

23     at least not yet.

24          I'm asking you whether those are sources of

25     operating revenues.

                    DRAFT -- NOT PROOFREAD
                                                    113
                    DRAFT -- NOT PROOFREAD

1          MR. MERVIS:  Same objection.

2   A   I'm unaware if those particular revenue sources

3     are operating revenues.

4   BY MR. GARCIA:

5   Q   Before -- strike the word "operating."

6          Are you aware whether they are sources of

7     revenue?

8   A   For whom?

9   Q   For government instrumentalities?

10   A   I'm aware that, you know, the taxes under those

11      provisions, just like taxes under other

12      provisions, are revenues.  Whose revenues they

13      are I can't necessarily speak to.

14  Q   Okay.  Before we saw Acts 30 and 31, we saw them

15      on the screen; correct?

16  A   Correct, yes.

17  Q   And we marked them as exhibits?

18  A   Yes.

19  Q   And I read some language of the two statutes

20      into the record of the deposition, and I asked

21      questions about those; correct?

22  A   You did, yes.

23  Q   And we were talking about Act 30, 31, Revenues;

24      correct?

25  A   We were, yes.

DRAFT -- NOT PROOFREAD
114
DRAFT -- NOT PROOFREAD

1   Q   In light of our discussion earlier today and

2       your knowledge of Acts 30, 31, do you understand

3       that Acts 30, 31, revenues that come from the

4       excise taxes are revenues to HTA in your -- in

5       your understanding?

6           MS. DeCAMP:  Objection.

7           MR. MERVIS:  Object to the form.

8    BY MR. GARCIA:

9    Q    Do you have an understanding of that?

10   A    No.  I do not believe that is the case.

11   Q    You don't believe that they are revenues -- that

12        the Acts 30, 31 aren't revenues?

13   A    That was not your question, if I --

14   Q    So explain to me your answer then.

15            MS. DeCAMP:  Why don't you ask the question

16        again, and then he can answer your question.

17            MR. GARCIA:  Can I have the question read

18        back.  Not the last one, but the one prior to

19        the last one.

20            (The requested text was read by the

21        reporter.)

22   BY MR. GARCIA:

23   Q    So Acts 30, 31, are they revenue?

24   A    Okay.  So yes, I believe that the money

25        collected under those Acts is revenue.

                    DRAFT -- NOT PROOFREAD
                                                    115
                    DRAFT -- NOT PROOFREAD

1    Q    Okay.  And do you have an understanding as to

2        revenue for whom?

3            MS. DeCAMP:  Objection.

4            You can answer if you have a personal

5      understanding.

6   A   I do not have a personal point of view of that,

7      no.

8   BY MR. GARCIA:

9   Q   Okay.  Please review while I read for the record

10     the language that's highlighted in Exhibit 5.

11     The relevant language is, and I quote:

12         "Before 2015, HTA received appropriations

13     of revenues from the cigarette tax, gasoline

14     tax, diesel tax, petroleum tax, vehicle license

15     fees collected by the Commonwealth.  In 2015,

16     the sitting governor issued Executive Order

17     2015-046, pursuant to which the Commonwealth

18     began retaining these revenues."

19         Do you see that language?

20  A   I do.

21  Q   Have you seen this language before?

22  A   This particular language, to the best of my

23     recollection, I have not.

24  Q   Okay.  The Executive Order 2015-046 that's

25     referenced in the language that I quoted for the

DRAFT -- NOT PROOFREAD

116

DRAFT -- NOT PROOFREAD

1      record, have you seen that executive order

2      before?

3   A   To the best of my recollection, I have not.

4   Q   So to the best of your recollection, did you not

5       see the Executive Order 2015-046 in preparation

6       for your deposition today?

7   A   That is correct.  And I'll just add that that

8       executive order was issued in 2015, which was

9       before the oversight board was constituted,

10      PROMESA was passed, or EY was retained.

11  Q   You are absolutely correct, yes.

12          Do you know whether Executive

13      Order 2015-046 that is referenced in the HTA

14      fiscal plan is still in place?

15  A   My understanding is we're operating in a

16      post-PROMESA world, and PROMESA is the statute

17      that governs the development of these fiscal

18      plans and the allocation of revenues.

19  Q   Okay.  So based on your answer that you just

20      gave me, is it your understanding that Executive

21      Order 2015-046 is not presently in effect?

22          MS. DeCAMP:  Objection.

23          You can answer.

24  A   I do not have a point of view.  I am unaware.

25

DRAFT -- NOT PROOFREAD

117

DRAFT -- NOT PROOFREAD

1    BY MR. GARCIA:

2    Q   So the taxes that are referenced in the

3        particular language that I read into the record,

4        meaning cigarette tax, gasoline tax, diesel tax,

5        petroleum tax, and vehicle license fees -- do

6        you see that language?

7    A   I do, yes.

8    Q   Do you know what those words in the language

9        that I read for the record refer to?

10           MS. DeCAMP:  Objection.

11           You can answer.

12   A   I am not positive.

13   BY MR. GARCIA:

14   Q   Okay.  Earlier, when we were talking about

15       Acts 30, 31 and we were talking specifically

16       about different taxes, you referred to cigarette

17       taxes; correct?

18   A   Correct.

19   Q   You also referred to gasoline tax?

20   A   Correct -- no.  I think I referred to petroleum

21       taxes but --

22   Q   Okay.  Petroleum tax.  You referred to petroleum

23       tax; correct?

24   A   Correct.

25   Q   I think you also referred to license fees?

                        DRAFT -- NOT PROOFREAD
                                                          118
                        DRAFT -- NOT PROOFREAD

 1   A   Correct.

 2   Q   Do you know whether those taxes that are listed

 3       there and the license fees are the taxes that

 4       are referred to in Acts 30, 31?

 5           MS. DeCAMP:  Objection.

 6   BY MR. GARCIA:

 7   Q   You can answer.

 8   A   I'm not positive.

 9   Q   So before when we were talking about those

10       different taxes that we identified, what were

11       you referring to?

12   A   A portion of those taxes fall under Acts 30 and

13       31, but a portion of the cigarette tax, for

14       instance, goes for other purposes, as I

15       understand it; so I don't necessarily --

16           I don't necessarily make the connection

17       between these taxes being Act 30, 31 taxes or

18       just the taxes in general.

19   Q   Okay.  But with respect to the ones that are

20       listed on this paragraph that I highlighted for

21     you and also quoted for the record -- and,

22     again, I'm referring to the cigarette tax, the

23     gasoline tax, diesel tax, petroleum tax, and

24     vehicle licenses fees collected by the

25     Commonwealth, are these taxes that may be

                    DRAFT -- NOT PROOFREAD
                                                    119
                    DRAFT -- NOT PROOFREAD

1     included in your best recollection in Acts 30

2     and 31, to some extent?

3          MR. MERVIS:  I object to the form.

4     BY MR. GARCIA:

5     Q   You can answer.

6     A   It is -- I'm not sure whether it's the same

7          taxes.

8     Q   But are some of those taxes part of Act 30 and

9          31 that we were discussing before?

10         MS. DeCAMP:  Objection --

11         You can answer.

12    A   I'm not --

13         I can't say with certainty.  I can't say

14    with certainty that those are the same taxes

15    that are being referenced.

16    BY MR. GARCIA:

17    Q   All right.  Do Acts 30 and 31 include cigarette

18      tax?  Include cigarette tax?

19  A   Act 31 does, I believe, yes.

20  Q   Do Acts 30 or 31 include gasoline tax?

21  A   I believe it does, yes.

22  Q   Do Acts 30 or 31 include diesel tax?

23  A   I -- to the best of my recollection, I believe

24      it does.

25  Q   Do Acts 30 or 31 include petroleum tax?

DRAFT -- NOT PROOFREAD

&#9650;                                              120

DRAFT -- NOT PROOFREAD

1   A   To the best of my recollection, Act 31 does,

2       yes.

3   Q   So does Act 30 or 31 include vehicle license

4       fees?

5   A   To the best of my recollection, it includes a

6       portion of the license fee under Act 30.

7   Q   So, in other words, all those taxes or fees

8       referenced in this particular section of the

9       fiscal plan that I read into the record are

10      included to some extent in Acts 30 and 31;

11      correct?

12          MS. DeCAMP:  Objection.

13          You can answer.

14  A   Again, I apologize.  I'm not positive that those

15      are the same -- the same specific taxes

16      designated under those laws are the ones that

17      are referenced here but --

18   BY MR. GARCIA:

19   Q   I'm not trying to be difficult.  I am not.

20          You just said with respect to each of those

21      that they were part of, not probably, all of

22      them, but to some extent, each of those --

23      cigarette tax, gasoline tax, diesel tax,

24      petroleum tax, and vehicle license fees -- were

25      included within Act 30 or 31; is that correct?

                    DRAFT -- NOT PROOFREAD
                                                    121
                    DRAFT -- NOT PROOFREAD

1   A   Yes.

2   Q   So then I ask you the question again with

3       respect to the language in the highlighted

4       portion:  Do you understand, based on what we

5       justified discussed, that the highlighted

6       language is referring, at least in part or to

7       some extent, to Act 30, 31 revenues?

8          MR. MERVIS:  Object to the form.

9   BY MR. GARCIA:

10   Q   You can answer.

11   A   It is possible, but I cannot say with certainty.

12  Q   Do you have any knowledge as to how those

13      particular revenues were assigned to any

14      government instrumentality?

15          And I mean the same revenues we're talking

16      about: cigarette tax, diesel tax, petroleum tax,

17      and vehicle license fees?

18          MR. MERVIS:  Objection to form.

19  A   Over which time period do you mean?

20  BY MR. GARCIA:

21  Q   Well, let's say from -- before 2015.  Before

22      the --

23          MR. MERVIS:  Objection.

24  BY MR. GARCIA:

25  Q   Do you know?

                    DRAFT -- NOT PROOFREAD
                                                    122
                    DRAFT -- NOT PROOFREAD

1           MS. DeCAMP:  Objection.

2   BY MR. GARCIA:

3   Q   Okay.  Do you know?

4   A   I am personally not familiar with the

5       allocation.

6           The way we produce budgets is we take the

7       revenues from the fiscal plan and use that as an

8       envelope, and so there's no distinction or

9        differentiation between the revenues.

10   Q   Okay.  So when you create a budget, you have

11       revenues on one side; correct?

12           MS. DeCAMP:  Objection.

13           You can answer.

14   A   When you create a budget --

15           So the first step -- I think we covered

16       this at the very beginning -- the first step in

17       the budget process is to issue a revenue letter

18       which sets the envelope for spending under that

19       budget, and that revenue envelope is drawn from

20       the fiscal plan.

21   BY MR. GARCIA:

22   Q   Great.

23           And do those revenues include taxes such as

24       cigarette tax, gasoline tax, diesel tax,

25       petroleum tax, and vehicle license fees

                    DRAFT -- NOT PROOFREAD
                                                        123
                    DRAFT -- NOT PROOFREAD

1        include -- there may be other sources, but do

2        they include those types of taxes or fees?

3            MR. MERVIS:  Objection.

4    BY MR. GARCIA:

5    Q   You may answer.

6   A   I can't say for certain.  We quite literally

7       take a, you know, the output of the total

8       revenues from the fiscal plan and that sets the

9       revenue envelope for spending.

10   Q   Okay.

11   A   It doesn't differentiate between what -- those

12       revenues -- what revenues are included, which I

13       believe is your question.

14   Q   So when you create a budget, you take a

15       number -- a total number for revenues and

16       include that in the budget.

17           Is that what you're telling me?

18   A   Sorry.  Can you repeat the question.

19           MR. GARCIA:  Can you read it back, please.

20           (The requested text was read by the

21       reporter.)

22           MR. MERVIS:  Note my objection, please.

23   BY MR. GARCIA:

24   Q   You can answer.

25   A   The process is set by the -- the expenditures

                    DRAFT -- NOT PROOFREAD
                                                      124
                    DRAFT -- NOT PROOFREAD

1       are set to match the -- to equal the revenues.

2   Q   Yes.  And am I understanding that to be a

3       balanced budget?

4   A   No, not at all.

5   Q   When revenues are equal to expenses -- that's

6       what you just said; right? -- are you referring

7       to a balanced budget?

8   A   No, I'm not.

9           MR. MERVIS:  Hold, hold.  Objection to the

10      form.

11  BY MR. GARCIA:

12  Q   What are you referring to?

13  A   I'm referring to your question which is do

14      expenses equal the revenue in the revenue

15      letter.

16  Q   All right.  So again, my question really was

17      whether -- when you are creating a budget, you

18      take a total number of revenues that the entity,

19      let's say the Commonwealth, is expecting to

20      receive and drop that into the budget.

21          Is that how do you it?

22          MR. MERVIS:  Object to the form.

23          MS. DeCAMP:  Objection.

24  BY MR. GARCIA:

25  Q   You can answer.

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1    A    No.

2          We take the revenues from the fiscal plan

3          to set a revenue parameter for spending, and

4          then the government develops a budget based off

5          of that revenue parameter, envelope, if you

6          will.

7    Q    And is that revenue parameter provided in a

8          total number of revenues?

9    A    Generally, in the revenue letter that I

10         reference, yes.

11   Q    Okay.  Is the revenue parameter at any point in

12         time provided in specific numbers coming from

13         specific -- from particular sources?

14   A    For which -- dish mean, over what time --Over

15         what time frame.

16   Q    Just in general, I'm talking about the

17         preparation of a budget.

18   A    So for -- as an example for the current year's

19         budget, the revenue letter is just one number

20         for total general fund spending.

21   Q    Right.

22         And is that revenue parameter or number in

23         the revenue letter?  Is it otherwise informed or

24         split into different revenue sources anywhere in

25      the process of creating a budget?

DRAFT -- NOT PROOFREAD

126

DRAFT -- NOT PROOFREAD

1           MR. MERVIS:  Objection to the form.

2    A   For the current year budget, the revenue letter

3        has one line, has one number for general fund

4        spending that can be spent.

5    BY MR. GARCIA:

6    Q   Mr. Chepenik, can you please refer me back to

7        your experience in preparing a budget for

8        government instrumentality.

9           MS. DeCAMP:  Objection.

10   BY MR. GARCIA:

11   Q   You can answer.

12   A   I apologize.  I don't understand the question.

13   Q   What of the question you don't understand?  I'm

14       asking you about your experience in preparing

15       budgets for government instrumentalities.

16          Do you have experience preparing budgets

17       for government instrumentalities?

18   A   Generally, yes.  I've helped in my role at EY

19       as -- in the preparation of the review of the

20       budgets.  I'm not -- I apologize.  It's not

21       clear to me what you're asking.

22   Q   I'm just in general asking you about your

23       experience in preparing budgets.  You know,

24       you've given me your experience before and now

25       in the answers to my question, you are, you

                    DRAFT -- NOT PROOFREAD
                                                     127
                    DRAFT -- NOT PROOFREAD

1    know, kind of straying way from that experience.

2    I'm trying to ask you now to put it in black and

3    white in context what is your experience

4    preparing a budget for a government

5    instrumentality or reviewing a budget?

6        MS. DeCAMP:  I will object -- I object to

7    the argumentative preface before you got to what

8    your actual question was.

9        MR. GARCIA:  Okay.

10       MR. MERVIS:  I object to the part that came

11   after --

12       MR. GARCIA:  Keep the argument aspect of

13   the question, and just go to the question.

14   BY MR. GARCIA:

15   Q   What is your experience in either preparing or

16       reviewing budgets for government

17       instrumentality?

18   A   I helped work with and oversee the team at EY

19     that helps review the budgets for the oversight

20     board.

21  Q  And in that role, as you just defined, what do

22     you do to review the budgets?  What do you look

23     at?

24  A  We look at the submissions from the government

25     on the spending parameters to validate that

DRAFT -- NOT PROOFREAD

                                                    128

DRAFT -- NOT PROOFREAD

1     those proposed spending parameters are both

2     within the revenue envelope that's sent out

3     through the revenue letter in consistency with

4     the fiscal plan.

5  Q  And specifically, what do you look at to

6     determine the consistency with the fiscal plan?

7  A  We would look at the budget documents that are

8     submitted and oftentimes something called a

9     Savannah file which is a very detailed level

10    spending allocation that the government

11    proposes.

12  Q  You mean the what the Savannah file?

13  A  It's an Excel document.

14  Q  It's like a schedule?

15  A  Yeah, a schedule of spending.

16   Q   I know what you mean by Savannah by the way.

17       It's very local here.

18           In those documents that you review, would

19       you take --

20           Would you see the different types of

21       revenue streams that are included within a

22       budget before it's finalized?

23   A   No.  I would not.

24   Q   So you only see the total amount of revenues?

25       That's all you see?

DRAFT -- NOT PROOFREAD

↑                                                                    129

DRAFT -- NOT PROOFREAD

1    A   No.  I would not see revenues at all.  It's a

2        spending pending plan.

3    Q   You only see the spending part of the budget?

4    A   That's correct.  The budget is -- it's an

5        expense -- it is an expense plan.  There is no

6        revenue component.

7    Q   All right.  So you don't -- so the government's

8        budget does not have a revenue component?

9    A   The budget is a expensing plan.  So we're just

10       looking at whether the totals of that spending

11       plan are consistent with the revenue envelope

12       that was sent out in the revenue letter from the

13   oversight board.  In that revenue letter for

14   this year's budget as an example has one line --

15   not even one line.  One number for total

16   spending for the general fund.  So --

17  Q   Have you ever seen the complete budget for the

18   government instrumentalities government of

19   Puerto Rico?

20       MR. MERVIS:  Object to the form of the

21   question.

22  BY MR. GARCIA:

23  Q   Have you seen it?

24  A   I've seen the certified budgets, yes.

25  Q   What do those certified budgets include?

DRAFT -- NOT PROOFREAD

130

DRAFT -- NOT PROOFREAD

1       MS. DeCAMP:  Object.

2  A   They include the certified budgets include the

3   pending allocations by agency.

4  BY MR. GARCIA:

5  Q   Only the spending allocations?

6  A   To the best of my recollection, yes.  Only the

7   spending allocations.

8  Q   Do you assist the FOMB in its review of the

9   budgeting process at the Puerto Rico

```
10      legislature?

11   A   EY.  EY does, yes.

12   Q   Who at EY?

13   A   It varies.  But typically it's myself, Juan

14       Santambrogio, and Sophia I can't pan.

15   Q   Okay.  I'm now referring to yourself as a

16       principal of EY.  Okay?  Do you assist the FOMB

17       in its review of the budget process within the

18       Puerto Rico legislature?

19   A   Over which time period?  You mean the most

20       current year?  Past years?  What?

21   Q   Let's say the last four years, since you've been

22       employed at EY?

23   A   I have.  Yes.

24   Q   Okay.  And what is your role in helping the FOMB

25       with the review of those budgets?
```

DRAFT -- NOT PROOFREAD
                                                    131
DRAFT -- NOT PROOFREAD

```
 1   A   So my personal --

 2   Q   By the way. -- strike that.

 3           I'm not talking about the certified budgets

 4       of the fiscal board.  I'm talking about the

 5       government budget as it's going through the

 6       legislative process before the Puerto Rico
```

```
 7        [legislation.  Do you understand the explanation

 8        to my question?

 9   A    I do.

10   Q    All right now I'm going to ask you what is your

11        role in that process?

12   A    My role is to oversee the team that is it

13        evaluating in clap breaks, frankly, with the

14        oversight board staff, both the documents and

15        the spending parameters that are submitted by

16        the government.

17   Q    Okay.  And in that role, you see the pending

18        parameters; correct?

19   A    The proposed spending parameters, correct.

20   Q    Do you also see revenue participate parameters?

21   A    No.  Not generally the revenue parameter is set

22        by the revenue letter that's issued by the

23        oversight board.

24   Q    So when the Puerto Rico legislature puts

25        together a budget, it plugs in a number from the
```

DRAFT -- NOT PROOFREAD

132

DRAFT -- NOT PROOFREAD

```
 1        certified board, from the FOMB, and then it

 2        works on the spending side.  Is that what you're

 3        telling me?
```

4           MR. MERVIS:  Objection to the form.

5           MS. DeCAMP:  Objection.  You can answer.

6   A   To the best of my knowledge, generally that's

7       the case.  I could not tell you for certain.  I

8       could not tell you for certain.  That is how it

9       should work.

10  BY MR. GARCIA:

11  Q   What is the last budget of the Puerto Rico

12      government, the Commonwealth government, that

13      you saw?

14  A   I don't recall off the top of my head.  I

15      believe there were submissions at different

16      points in time during this year's budget

17      process.

18  Q   Okay.  So let's refer them to this year's budget

19      process.

20          When was the budget for this year, this

21      fiscal year, approved by the Puerto Rico

22      legislature?  Do you know?

23  A   The date it was approved.

24  Q   Yeah.  More or less.

25  A   I believe they certified a budget --

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

 1               Actually I don't recall the specific date.

 2    Q    Do you --

 3    A    It was in late June, I recall, but I don't

 4         recall the specific date.

 5    Q    Do you know?  Do you know what the fiscal year

 6         of the Puerto Rico government is?

 7    A    This fiscal year.

 8    Q    Do you know what the fiscal year, do you know

 9         when does it run from, to, in the case of the

10         Puerto Rico fiscal year?

11    A    The Puerto Rico fiscal year runs from July 1 to

12         June 30.

13    Q    So isn't it correct that a budget for the

14         Puerto Rico government's fiscal year needs to be

15         approved before the start of the fiscal year;

16         isn't that correct?

17              MS. DeCAMP:  Objection.

18              You can answer.

19    A    A budget needs to be certified by the oversight

20         board before the beginning of the fiscal year.

21    BY MR. GARCIA:

22    Q    I'm not talking about the role of the fiscal

23         board in certifying T I'm asking about your

24         knowledge.  You indicated that the Puerto Rico

25         fiscal year runs from July 1 to June 30.  I'm

DRAFT -- NOT PROOFREAD

134

DRAFT -- NOT PROOFREAD

1       asking you a straightforward question.

2              Do you know whether the Puerto Rico

3       government budget needs to be approved before

4       the start of the Puerto Rico fiscal --

5       Puerto Rico government fiscal year?

6              MS. DeCAMP:  Objection.  You can answer.

7   A   To the best of my knowledge, yes.  The budget

8       needs to be approved prior to the commencement

9       of the next fiscal year.

10  BY MR. GARCIA:

11  Q   Okay.  In other words, the work on the budget

12      needs to happen before the commence meant of the

13      following fiscal year; correct?

14  A   That's correct.  Yes.

15  Q   And were you involved in the process of review

16      of the budget process of the Puerto Rico

17      legislature -- Puerto Rico government, prior to

18      its approval on our about June 30?

19  A   Me personally you mean?

20  Q   You personally.  Yes.

21  A   I personally was somewhat involved.

22  Q   Okay.  So what was your involvement?

23   A   Primarily overseeing the team, the development

24       of some of the materials that we shared with our

25       client in the production of those documents.

DRAFT -- NOT PROOFREAD

↑                                                            135

DRAFT -- NOT PROOFREAD

1    Q   What were those documents that you oversaw the

2        development or the production of?

3    A   There's a -- there's an actual budget

4        presentation, like a PowerPoint type

5        presentation, explaining the components of the

6        budget.

7            There's a certified resolutions themself.

8            And associated components within the

9        certified resolutions.  So there are -- there's

10       a lot of control language that goes into the

11       budget.

12   Q   Okay.  So when you say a budget presentation

13       that has the different components, what are

14       those components?

15   A   Well, it just described --

16           If it's the document I'm thinking of, it's

17       a document used in one of the public board

18       meetings where executive director Jaresko

19       explained, you know, what was within that

20      budget.

21   Q   Again, I ask the question, what are the

22      components that are included in that budget

23      presentation?

24   A   It includes different cuts, if you will, of the

25      spending breakdown of the government.

                    DRAFT -- NOT PROOFREAD
                                                    136
                    DRAFT -- NOT PROOFREAD

1   Q   Does that presentation include anything on

2      revenue?

3   A   To the best of my recollection, it does not.

4   Q   And again, I'm referring to the Puerto Rico

5      legislative process to enact the budget, not the

6      certification by the board but just the

7      Puerto Rico legislative process.

8          That's what I'm referring to.

9   A   Okay.  Sorry.  Maybe I misunderstood the

10      question.

11   Q   So when I asked the question about what

12      documents in that legislative process to put

13      together the budget, you saw or you worked with,

14      you indicated a budget presentation.  Was that a

15      budget presentation for the Puerto Rico

16      legislature?

17   A   No.  It was not.  I apologize.  I was referring

18       to ultimately the budget that was certified by

19       the oversight board at the end of the process.

20   Q   Okay.  Well, that's fine but that's not what I'm

21       referring to.

22           I know what a certified budget by the board

23       is.

24           I'm looking at the Puerto Rico legislative

25       process for the preparation of a budget.  Okay?

                    DRAFT -- NOT PROOFREAD
                                                    137
                    DRAFT -- NOT PROOFREAD

1           I'm going to ask you the question again

2       because you may have been referring to the

3       certification process.  So I'll ask you, what

4       involvement, if any, you had with respect to

5       that process?

6           MR. MERVIS:  Objection to the form.

7   A   The best of my recollection, I was not involved

8       in the direct legislative negotiations that the

9       Puerto Rico legislature had internally.  EY and

10      my involvement was more around the proposed

11      budget that the legislature wanted to evaluate

12      whether or not that was consistent with the

13      fiscal plan.

14   BY MR. GARCIA:

15   Q   Okay.  And in evaluating whether the proposed

16       budget was consistent with the fiscal plan, what

17       documents did you see related to the budget?

18   A   The proposed spending allocations.

19   Q   You only looked at the proposed spending

20       allocations?

21   A   Correct.  Yes.

22   Q   You never looked at the expense side, you,

23       yourself?

24   A   I apologize.  You have to help me understand the

25       difference between spending and expenses.

DRAFT -- NOT PROOFREAD

138

DRAFT -- NOT PROOFREAD

1   Q   I'm sorry.  I'm sorry.  I misspoke.

2           The revenue side of the budget.

3   A   Correct.  The budget itself is a spending --

4       it's a spend -- it's not a revenue document.

5   Q   The Puerto Rico budget only includes the

6       spending side?

7   A   To the best of my recollection yes.  That's

8       correct.

9   Q   So, in other words, under oath you're testifying

10      here today that the budget prepared by the

11      Puerto Rico legislature only includes a spending

12      side?

13          MS. DeCAMP:  Objection.

14          You can answer.

15   A  The revenue is set through the revenue letter

16      that's issued by the oversight board at the

17      beginning of the budgeting process.

18          That's the revenue that I'm aware of that's

19      used as the envelope of total spending.  The

20      process the legislature undertakes is to set a

21      spending plan of expenditures consistent with --

22      that should be consistent with that revenue

23      envelope that's set by the oversight board.

24   BY MR. GARCIA:

25   Q  So your testimony is that the Puerto Rico

                    DRAFT -- NOT PROOFREAD
                                                    139
                    DRAFT -- NOT PROOFREAD

1       legislature has absolutely no role in

2       determining what revenues are going to go into

3       the budget?

4           MS. DeCAMP:  Objection.

5    BY MR. GARCIA:

6    Q  Is that your testimony?

7           You can answer.

8   A   My testimony is that the revenues that are used

9       for the budgeting process each year are defined

10      under PROMESA under Section 202.  That process

11      defines that the oversight board is the one to

12      send a revenue letter defining the revenue

13      envelope from which the government can allocate

14      spending.

15   Q   So if I were to go and look at a Puerto Rico

16      government budget I would see a revenue letter

17      and a spending budget?  That's what you're

18      telling me?

19          MS. DeCAMP:  Objection.

20   A   I can only speak to the certified budget that

21      you would see.  If you looked at the certified

22      budget you would see a spending parameters

23      defined by agency.

24   BY MR. GARCIA:

25   Q   I'm going to ask you the question again.

DRAFT -- NOT PROOFREAD

                                                    140

DRAFT -- NOT PROOFREAD

1       Have you ever looked at a Puerto Rico

2       government budget approved by the legislature of

3       Puerto Rico?

4   A   Yes, I have.

5   Q   Can you tell me what that looks like?

6   A   This year's budget was approved by the

7       Puerto Rico legislature.  And that is a very

8       lengthy document that lists out different levels

9       of spending for different agencies, in a fair

10      amount of detail, actually.

11  Q   It only has the different levels of spending?

12      It doesn't have a revenue site other than the

13      revenue letter that comes from the fiscal board.

14      That's your testimony?

15  A   To the best of my recollection, that is correct.

16      The certified budget and the budget passed by

17      the legislature this year, lists out all of the

18      spending by agency in a fair amount of detail.

19  Q   Are you aware of any requirement that the budget

20      of the government of Puerto Rico be a balanced

21      budget?

22          MS. DeCAMP:  Objection.  But you can

23      answer.

24  A   I'm aware of the need for the budget to be

25      consistent with the fiscal plan.  And that's the

DRAFT -- NOT PROOFREAD

141

DRAFT -- NOT PROOFREAD

1   approach that the review has taken.

2   BY MR. GARCIA:

3   Q   Sir, do you know what a balanced budget is?

4   A   It depends on what you mean by balanced budget.

5   Q   Do you know what it is?  What a bad budget is.

6       I'm not asking --

7           I'm not asking you about the certified

8       budget bit fiscal board.  Do you know what a

9       balanced budget is for the a government?

10          MS. DeCAMP:  Objection.

11          You can answer.

12  A   It depends on what you mean.  So it's not clear

13      to me whether you mean on an accrual --

14  BY MR. GARCIA:

15  Q   What do you understand?

16          MR. MERVIS:  Arturo he hadn't finished his

17      answer.

18  A   You know, it's not clear to me when you say

19      balanced budget, there's a lot of different

20      meanings to that.  I don't know whether you mean

21      on an accrual basis, on a cash basis, what

22      specifically you mean by balanced budget.

23  BY MR. GARCIA:

24  Q   I'm asking you whether you know if the

25      Puerto Rico government budget needs to be a

DRAFT -- NOT PROOFREAD

142

DRAFT -- NOT PROOFREAD

1    balanced budget?

2          MR. MERVIS:  Object to the form.

3          MS. DeCAMP:  Objection.

4    A   All I know is that the budget that can be

5        certified by the oversight board needs to be

6        consistent with the fiscal plan.

7    BY MR. GARCIA:

8    Q   I'm going to have to take a break here, sir.

9        The videographer.  Justin can we take a

10       ten-minute break.

11         THE VIDEOGRAPHER:  We'll go off the record

12       at 2:07.

13         (A recess was taken.)

14         THE VIDEOGRAPHER:  Back on the record at

15       2:19.

16         MR. GARCIA:  So, Mr. Cepeda, I'm going to

17       ask you to put back on the screen the subpoena

18       for the deposition today.  I believe it was

19       Exhibit 1.

20   BY MR. GARCIA:

21   Q   Do you see the document on the screen now?

22   A   I do.

23   Q   You saw that document earlier today when we were

24    starting the deposition; correct?

25  A   Correct, yes.

                    DRAFT -- NOT PROOFREAD
                                                        143
                    DRAFT -- NOT PROOFREAD

 1  Q   I'm going to ask you to take a look at Topic

 2      Number 2.  And that topic reads:

 3          "Whether or not the Commonwealth had a

 4      balanced budget for each fiscal year from 2016

 5      to the represent, including any efforts

 6      undertaken by FOMB to determine whether or not

 7      the Commonwealth had a balanced budget for each

 8      of those fiscal years."

 9          Do you see that?

10  A   I do.

11  Q   I'll first ask you how did you prepare to answer

12      questions with respect to this particular topic

13      of the subpoena?

14  A   I had a number of conversations with counsel and

15      with my team trying to better understand what it

16      could mean.

17  Q   What was?

18  A   What could be meant by this -- by this topic

19      because to me, it's actually not very clear.

20  Q   So what's your understanding of the topic? your

21      general understanding of the topic?

22   A  Well, I'm not entirely sure.  That's why I was

23      asking whether you meant a balanced budget on an

24      accrual basis, on a cash basis, and what

25      specifically you mean by a balanced budget.

                    DRAFT -- NOT PROOFREAD
                                                    144
↑                   DRAFT -- NOT PROOFREAD

1           You know, where I settled in my preparation

2       for this deposition is that you meant -- you

3       meant -- actually, I wasn't sure whether you

4       meant on an accrual or a cash basis.  It was one

5       of the clarifying questions I was hoping you

6       could answer for me.

7    Q  Go ahead.

8    A  Under both cases, though, I don't believe that

9       the Commonwealth had a balanced -- has had a

10      balanced budget for each fiscal year from Fiscal

11      '16 to the present.

12   Q  So that is either a balanced budget in either

13      scenario that you mentioned?

14   A  Accrual?

15   Q  Correct.

16   A  On an accrual basis or on a cash basis?

17   Q  Or on a cash basis.

18          So your testimony is that the Commonwealth

19      had -- you understand the Commonwealth does not

20      have a balanced budget on -- for any year from

21      2016 to the present under either an accrual

22      basis or under a cash basis?

23          MS. DeCAMP:  Objection.

24  BY MR. GARCIA:

25  Q   You can answer.

                    DRAFT -- NOT PROOFREAD
                                                      145
                    DRAFT -- NOT PROOFREAD

1           MS. DeCAMP:  You can answer from --

2   A   Yeah.

3           MS. DeCAMP:  -- whatever year after EY

4       became engaged to do work for the board forward.

5   A   That's actually what I was going to say.  I

6       can't say with any certainty for Fiscal '16 or

7       Fiscal '17, but as it relates to Fiscal '18,

8       '19, '20, and '21 and '22, the five years in

9       which the oversight board has been constituted

10      to review and certify budgets and in which EY

11      was engaged, during those years, under PROMESA,

12      the budgets most certainly have not been

13      balanced on an accrual or even on a cash basis.

14  BY MR. GARCIA:

15   Q   Okay.  And can you tell me why they have not

16       been balanced under either an accrual or a cash

17       basis?

18   A   Certainly.

19   Q   Please do.

20   A   Well, for one matter, debt service is not being

21       paid on the central government's debt.  We're

22       operating in a Title III framework.

23           So not all expenses, particularly debt

24       service, are being paid, and that would be a

25       requirement for you to have either an accrual or

DRAABT -- NOT PROOFREAD

146

DRAFT -- NOT PROOFREAD

1    a cash-based balanced budget.

2    Q   Any other reason why any of those budgets for

3        the last four years has not been balanced either

4        on the actuarial basis or the cash basis?

5    A   That's the primary reason that I can think

6        about.

7    Q   All right.  But could there be any other reason,

8        aside from the primary one on the debt service?

9    A   There are other expenses that potentially could

10       not be paid in which case those would -- those

11       would be also sort of accrued balances that are

12      due to be budgeted and paid but are not being

13      budgeted and paid.

14  Q   Do you recall any of those types of expenses?

15  A   There isn't one that particularly comes to mind,

16      but I can think, you know, historically

17      vendor -- vendor payments is fairly typical

18      where those may not -- those accrued payments to

19      providers of services to the government were not

20      budgeted, would be an example.

21  Q   Okay.  And for any one of those four years, '18,

22      '19, '20, '21, where you've been engaged to EY

23      to work with the Commonwealth -- I'm sorry --

24      with the FOMB, and the FOMB has been in place in

25      Puerto Rico, do you know whether the budgets

DRAFT -- NOT PROOFREAD
                                              147
DRAFT -- NOT PROOFREAD

1       were balanced at the beginning of the year --

2   A   So --

3   Q   -- fiscal year -- of each fiscal year?

4   A   Again, even though the budgeting process is

5       under PROMESA, in which EY was engaged, is

6       actually straightforward.  It's a fairly

7       straightforward process.  And that process takes

8       the revenue envelope from the fiscal plan and

9      allocates, based on the government's spending

10     parameters, spending along that revenue

11     envelope.

12           Ultimately, the budget that's certified by

13     the oversight board is a budget that has

14     expenditures that are consistent and in line

15     with that revenue envelope.

16           So I -- you know, to the best of my

17     knowledge, under no circumstances would any of

18     those budgets have been balanced at the

19     beginning of the year, again, because debt

20     service is not being paid.  And you have to

21     budget for debt service for you to have a

22     balanced budget on either accrual or cash basis.

23  Q  But for each one of those four budgets, again,

24     '18, '19, '20, '21, there was not an allocation

25     for payment of the debt service; correct?

                    DRAFT -- NOT PROOFREAD
                                                  148
                    DRAFT -- NOT PROOFREAD

1   A  That is correct.  For the central government,

2      there was not an allocation for debt service.

3   Q  So in that respect, Mr. Chepenik, was the

4      balance -- in light of the fact that the budget

5      did not call for payment of the debt service,

6       was the -- was the budget balanced at the

7       beginning of the year?

8              MS. DeCAMP:  Objection.  Asked and

9       answered.

10    BY MR. GARCIA:

11    Q   Was it balanced?

12              MS. DeCAMP:  You can answer.

13    A   I think, if I can sort of take a little bit of

14       latitude here, and tell me if I'm wrong, but I

15       think the word "balanced" is incorrect.

16              What I would say is that the expenses that

17       were budgeted for equal the revenue envelope

18       that's designated by the oversight board.

19              The revenues and the budgeted expenses are

20       equal, but under no circumstances, on an accrual

21       base or on a cash basis, were those budgets

22       balanced at the beginning of the year, middle of

23       the year, or end of the year.

24    BY MR. GARCIA:

25    Q   And the reason for that is that there is no

DRAFT -- NOT PROOFREAD

149

DRAFT -- NOT PROOFREAD

1       allocation for the payment of debt service?

2    A   That's the primary reason, correct.

3   Q   Correct.  All right.

4          So my question was based on there being no

5       allocation for payment of debt service.

6          It was not included as an expense on the

7       budget; right?

8   A   (Nods head.)

9   Q   You have to answer verbally.

10  A   Correct.  For the central government, that is

11      correct.

12  Q   So at least at the beginning of the year,

13      because there was no particular expense for the

14      payment of debt service, deal debt service, the

15      budget that was approved would have been

16      balanced with respect to revenues and expenses?

17         MS. DeCAMP:  Objection.

18  BY MR. GARCIA:

19  Q   You can answer.

20  A   I apologize, but I would not say it was

21      "balanced," which is the word I think you're

22      emphasizing.

23         What I would say is that the expenses that

24      were budgeted equaled the revenue envelope.  But

25      equal, having those two -- having revenues and

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

```
 1      expenses equal to each other in this context

 2      under PROMESA does not mean that it's a balanced

 3      budget.

 4          It's not because there was no allocation

 5      for GO debt service.  There is an obligation

 6      that is still accruing to be paid, but it is not

 7      being budgeted to be paid.  That's why it's not

 8      balanced on an accrual basis.

 9  Q   So you're now giving me your legal opinion?

10  A   No.

11          MS. DeCAMP:  Objection.

12          MR. MERVIS:  Objection.

13  BY MR. GARCIA:

14  Q   Because I didn't ask for your legal opinion.

15          MS. DeCAMP:  Objection.  It wasn't a legal

16      opinion.

17          MR. GARCIA:  All right.  Well, his

18      understanding then.  That's okay.

19  BY MR. GARCIA:

20  Q   So did you meet with anybody at the FOMB to

21      prepare for this particular topic in the list of

22      topics for examination?

23          MR. MERVIS:  Objection to the form.

24  A   When you say "meet with anyone at the FOMB" --
```

25

1   BY MR. GARCIA:

2   Q   Did you meet with anyone to prepare for this

3       particular topic?

4           MR. MERVIS:  Same objection.

5   A   I met with the people that I mentioned at the

6       beginning to talk through all of the topics

7       except for Topic Number 1.

8   BY MR. GARCIA:

9   Q   So only lawyers from Proskauer?

10  A   I also have met with my team.

11  Q   Yes.

12  A   EY.

13  Q   But at the FOMB, did you meet with anybody in

14      particular at the FOMB, not lawyers from

15      Proskauer, to prepare for this topic?

16  A   If you mean oversight board staff --

17  Q   Yes.

18  A   -- or oversight board members?

19          Is that what mean?

20  Q   Oversight board members.  Let's start with

21      those.

22      Did you meet with any oversight board

23      members to prepare for this topic?

24   A   Not that I remember, no.

25   Q   Did you meet with Natalie Jaresko to prepare for

                    DRAFT -- NOT PROOFREAD
                                                  152
                    DRAFT -- NOT PROOFREAD

1       this topic?

2    A   No.

3    Q   Did you meet with any other oversight board

4        staff to prepare for this topic?

5    A   No, not that I remember.

6    Q   Your testimony is that you did not meet with

7        anybody from the oversight board to prepare for

8        this topic; correct?

9           MR. MERVIS:  Objection.

10   A   You know, that's correct.  I met with the

11       Proskauer team, and I met with my team.

12   BY MR. GARCIA:

13   Q   So only your team and the Proskauer team?

14   A   Correct.

15   Q   Okay.

16          Do you know whether anybody at the FOMB

17       would have knowledge about this particular

18       topic?

19          MS. DeCAMP:  Objection.

20     BY MR. GARCIA:

21     Q   I'm not talking about Proskauer.

22          Anybody -- any board member, executive

23          director, or staff of the FOMB would have

24          knowledge about this topic?

25          MS. DeCAMP:  Objection.

DRAFT -- NOT PROOFREAD

153

DRAFT -- NOT PROOFREAD

1          You can answer.

2     A   I am not aware of what the oversight board,

3          staff, or board members may or may not know on

4          this topic.

5     BY MR. GARCIA:

6     Q   So the answer is you don't know?

7     A   The answer is I am not aware of what they may or

8          may not know.

9     Q   Did you try to determine whether anybody at the

10          FOMB would have knowledge on this topic to meet

11          with them to prepare for today?

12     A   I'm sorry.  Can you repeat the question?

13          MR. GARCIA:  Can I have it read back,

14          please.

15          (The requested text was read by the

16      reporter.)

17  A   No, I did not.

18  BY MR. GARCIA:

19  Q   There's a second part to this second topic after

20      the word "to the present," and I quote:

21          "Including any efforts undertaken by FOMB

22      to determine whether or not the Commonwealth had

23      a balanced budget for each of those fiscal

24      years."

25          Do you see that language?

DRAFT -- NOT PROOFREAD
                                                    154
DRAFT -- NOT PROOFREAD

1   A   Yes.

2   Q   So did you meet with anybody at the FOMB, either

3       members, the director, or staff, to prepare for

4       this topic?

5   A   To the best of my recollection, I did not, no.

6   Q   Did you try to determine whether anybody at the

7       FOMB, either at the level of the board members

8       or the director or staff, had any particular

9       knowledge that they could convey to you in

10      preparing for the deposition today?

11  A   Sorry.  Can you repeat that question one more

12      time?

13          MR. GARCIA:  Yes.

14          Can I have it read back, please.

15          (The requested text was read by the

16     reporter.)

17   A   To the best of my recollection, I -- no.

18   BY MR. GARCIA:

19   Q   Okay.  Let's go to Topic Number 3.

20          Do you see that?

21   A   Yes.

22   Q   Okay.  And that reads:

23          "Whether or not the available revenues of

24     the Commonwealth were insufficient to meet the

25     appropriations for each fiscal year from 2016 to

DRAFT -- NOT PROOFREAD
                                                   155
DRAFT -- NOT PROOFREAD

1     the present, including any efforts undertaken by

2     the FOMB to determine whether available revenues

3     of the Commonwealth were insufficient."

4          I'm going to modify this question to --

5     this topic to make it 2018 onward.  So 2018,

6     2019, '20, and '21, the four years you've been

7     employed with EY that the FOMB has been around.

8          (Reporter request for clarification.)

9   Q   So that's my modification to the topic, just to

10     account for the fact that you, nor the FOMB,

11     were here since 2016.  Okay?

12         So do you know --

13         Did you meet with anybody from the FOMB at

14     the level of members, the executive director, or

15     staff to prepare for Topic Number 3?

16  A  To the best of my recollection, no.

17  Q  Did you do anything to try to determine whether

18     anyone at the FOMB, again at the level of the

19     board members, director, or the staff, would

20     have any knowledge to help you prepare for the

21     deposition today?

22  A  The best of my recollection, no.

23  Q  With respect to that question, Mr. Chepenik,

24     what, if anything, is your understanding

25     regarding the language:


DRAFT -- NOT PROOFREAD
                   156
DRAFT -- NOT PROOFREAD


1         "Available revenues of the Commonwealth

2     were insufficient to meet the appropriations for

3     each fiscal year, 2018 to 2021"?

4         Do you have an understanding of that?

5  A  I was actually going to ask you a question about

6     the term "available revenues" because I did not

7      see them defined as one of the definition terms

8      in the subpoena.

9          Can you just clarify what you mean by

10     "available revenues" for me?

11   Q   Sure.

12         Revenues are available for the payment of

13     expenses in a budget.  It's a pretty broad

14     definition.

15   A   I apologize to ask for some more specificity;

16     however, I think it would be helpful if you have

17     specific revenues in mind that are considered as

18     available revenues.

19   Q   It's all available revenues in Puerto Rico.

20   A   Okay.  My understanding is you would be

21     referring to all revenues that are projected in

22     the fiscal plan, and if that's -- if that's

23     correct, then I would say that available

24     revenues are insufficient to meet all of the

25     needs of the government.

DRAFT -- NOT PROOFREAD

                                                157

DRAFT -- NOT PROOFREAD

1          So that's why the government is in

2      bankruptcy in Title III.

3    Q   What is the basis for your understanding?

4    A    I think expenses are -- total expenses exceed

5         the available revenues.

6    Q    Are you familiar with the clauses of the

7         Puerto Rico Constitution in Article VI,

8         Sections 7 and 8, that have to do with balanced

9         budgets?

10            MS. DeCAMP:  Objection.  Outside the scope.

11   BY MR. GARCIA:

12   Q    Are you familiar?

13   A    Not particularly.  I'm not, no.

14   Q    Have you ever reviewed the Puerto Rico

15        Constitution as part of your work at EY for the

16        FOMB?

17   A    To the best of my recollection, no.

18   Q    All right.  I'm going to ask you to look at

19        Topic Number 4.  I'm just going to read it for

20        the record while you review it.

21            The topic reads, and I quote:

22            "Whether or not any revenues of the

23        Commonwealth were diverted, retained,

24        reallocated, or redirected in order for there to

25        be sufficient available revenue to meet the

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

```
 1      appropriations made for each fiscal year from --

 2      modification, 2018 to the present, including any

 3      efforts undertaken by FOMB to evaluate the

 4      amounts of revenues to divert, retain,

 5      reallocate or redirect."

 6           Do you see that?

 7   A  Yes, I do.

 8   Q  Did you meet with anybody at the FOMB, either at

 9      the level of the board members, director, or

10      staff, to prepare for this topic?

11   A  To the best -- or staff --

12           To the best of my recollection, no, I did

13      not.

14   Q  Did you undertaken take any effort to determine

15      whether anybody at the FOMB would have

16      information to help you prepare for this topic

17      in the notice?

18   A  When you say "at the FOMB," do you mean the

19      board members, executive director, or the staff?

20   Q  That's correct.  Yes.

21   A  In that case, no, to the best of my knowledge

22      and recollection, I did not.

23   Q  So again, I guess -- I'm not going to guess.

24      Strike that.

25           Your testimony would be that you met with
```

DRAFT -- NOT PROOFREAD

159

DRAFT -- NOT PROOFREAD

1        your team members and attorneys from Proskauer?

2     A   Correct.

3     Q   Okay.

4     A   In preparation for this.

5     Q   Yes.

6     A   Correct.

7     Q   Okay.

8            Do you mean --

9            Do you know what it means when revenues are

10       diverted?  Do you have any understanding of

11       that?

12           MS. DeCAMP:  Objection.

13           MR. MERVIS:  Objection to the form.

14           MS. DeCAMP:  You can answer.

15    BY MR. GARCIA:

16    Q   You can answer.

17    A   I do not have -- a personal view?  I do not have

18        a personal view on what that means --

19    Q   Okay.

20    A   -- in the context of this question.

21    Q   Do you have any personal understanding of what

22        "retained" means in that topic?

23   A   I do not have a personal view on the word

24       "retained" in this context.

25   Q   What about "reallocated"?

                    DRAFT -- NOT PROOFREAD

↑                                                        160

                    DRAFT -- NOT PROOFREAD

1    A   No.  I do not have a personal view on what that

2        term means in this context.

3    Q   What about "redirected"?

4    A   In this context, I do not have a personal view.

5    Q   Are you familiar with the word "clawback"

6    A   I am, yes.

7    Q   What is your understanding of "clawback"?

8    A   It means -- it's a defined term in the subpoena.

9    Q   So what is your understanding of clawback, if

10       any?

11           MS. DeCAMP:  Objection.

12   BY MR. GARCIA:

13   Q   You can answer.

14   A   If it relates to -- I mean, it's a defined term

15       in the subpoena.  It relates to --

16           It relates to certain types of public

17       funds.

18   Q   That's what states -- that's what's stated in

19       the subpoena.  I'm asking whether you have an

20    understanding about what "clawback" means?

21          MS. DeCAMP:  Objection.  Outside the scope.

22  BY MR. GARCIA:

23  Q   Do you have an understanding?

24          MR. MERVIS:  Objection.

25          MS. DeCAMP:  Objection.

                    DRAFT -- NOT PROOFREAD
                                                        161
                    DRAFT -- NOT PROOFREAD

 1  BY MR. GARCIA:

 2  Q   You can answer if you have an understanding.

 3  A   I don't have a particular understanding, no.

 4  Q   And if I were to ask you the same question with

 5      respect to retention of funds, would I get the

 6      same answer from you, if you don't have an

 7      understanding, or do you?

 8          MS. DeCAMP:  Object to the form.

 9  A   So the question here is in the context of the

10      disbursement of payments; right?

11  BY MR. GARCIA:

12  Q   Yes.

13  A   And it sort of mischaracterizes the budgeting

14      process, which is what I'm familiar with.  And

15      the budgeting process takes the revenues from

16      the fiscal plan, sets a revenue envelope, and

17     that revenue envelope is used to establish the

18     spending parameters that the government uses to

19     set its budget that the board ultimately

20     certifies.

21          There's no -- in the context of this

22     question, there's no --

23          There's no way to differentiate between the

24     different revenues that are used for those

25     expenditures and, therefore, to know what funds

DRAFT -- NOT PROOFREAD

                                             162

DRAFT -- NOT PROOFREAD

1     are diverted, retained or reallocated or

2     redirected.

3          The revenue envelope is just -- pulled from

4     the fiscal plan revenue parameters.  That's why

5     it's hard for me to answer with more specificity

6     for you.

7  Q   Thank you for your answer.  That was not my

8     question, but I appreciate your answer anyway.

9          I was referring, really, to your

10    understanding of clawback or retention of funds

11    by the -- in the context of this topic in the

12    deposition notice.  That's what I was referring

13    to.

14          Do you have any understanding of that? what

15      that means?

16   A   I don't know a personal point of view of what

17      that term implies, no.

18   Q   So sitting here today, your testimony is that

19      you do not have an understanding of what a

20      clawback of funds means?

21          MS. DeCAMP:  Objection.

22          MR. MERVIS:  Objection.

23   A   My testimony is that I don't have a particular

24      distinct point of view on the topic.

25

                    DRAFT -- NOT PROOFREAD
                                                    163
                    DRAFT -- NOT PROOFREAD

1   BY MR. GARCIA:

2   Q   Have you heard the word "clawback" before in any

3      context?

4   A   I have.

5          THE WITNESS:  Can we actually take a

6      five-minute break?  Is that possible?

7          MR. GARCIA:  Sure.  We're in the middle of

8      a question.  I would appreciate if you answer

9      this question, and then we can go to the break.

10          MR. MERVIS:  What is it?

11        MR. GARCIA:  Can I have it read back.

12        (The requested text was read by the

13        reporter.)

14   BY MR. GARCIA:

15   Q   Before we take the five-minute break, you said,

16        yes, you have.  And can you tell me what you

17        have -- what your understanding of "clawback"

18        is? of a clawback?

19        MR. MERVIS:  Objection.

20   BY MR. GARCIA:

21   Q   You can answer.

22   A   The clawback, I think it just relates to the

23        conditionally allocable revenues that are in the

24        fiscal plan.  It's relating to those revenue

25        streams.

                 DRAFT -- NOT PROOFREAD
                                              164
                 DRAFT -- NOT PROOFREAD

1    Q   Again, can you explain for the record what you

2         mean with respect to the conditional allocable

3         funds with respect to the clawback?  Can you

4         explain it to me?

5    A   So there are a series of revenues that are

6         forecasted as part of the fiscal plan.  And

7         there they are of it revenue stream.  There's a

8      revenue streams around the --

9            (Reporter request for clarification.)

10   A   So you're asking what are the conditionally

11       allocable revenues?

12   Q   How do those relate to the clawback concept that

13       you described before.  That's my question.

14   A   So the conditionally allocable revenues are the

15       revenue streams that are forecasted in the

16       fiscal plan that I believe are commonly referred

17       to as the "clawback funds."  And you asked what

18       those specific revenues were, or did you have a

19       different question?

20   Q   I asked what your understanding was as the

21       clawback referred to the conditionally allocated

22       funds?

23   A   So my understanding is it refers to those

24       revenues in the fiscal plan.  Those particular

25       revenue streams.

                DRAFT -- NOT PROOFREAD
                                                165
                DRAFT -- NOT PROOFREAD

1    Q   And are some of those revenues based on the

2        discussion we had before -- and then we'll

3        break -- related to some of the taxes that were

4        in Acts 30 and 31, like cigarette tax, petroleum

```
 5        tax, gasoline tax, and the rest?

 6   A    The revenues under Act 30 and 31, I do believe,

 7        are included as conditionally allocable revenues

 8        in the fiscal plan, yes.

 9   Q    So to that extent, they would have been clawback

10        funds; correct?

11   A    Yes.  I believe that those fall into the

12        category of --

13   Q    Okay.

14   A    -- clawback funds.

15           MR. GARCIA:  We can take the five-minute

16        break now.  Sorry.  I went on for a little

17        longer, but we were in the middle of a topic.

18           Thank you.

19           THE VIDEOGRAPHER:  We'll go off at 2:49.

20           (A recess was taken.

21           THE VIDEOGRAPHER:  We are back on the

22        record at 2:56.

23           MR. GARCIA:  Okay.  Can you put the

24        Exhibit A to the subpoena back on the record,

25        back on the ShareFile -- screen.  Sorry.
```

                    DRAFT -- NOT PROOFREAD
                    DRAFT -- NOT PROOFREAD

```
 1           Yes, exhibit A.
```

2    BY MR. GARCIA:

3    Q    Do you see a document mean on the screen?

4    A    Yes, I do.

5    Q    I want you to take a look at Topic Number 5,

6         which is the last one that we haven't yet

7         discussed.  And that reads, while you read it to

8         yourself, I quote it:

9              "The amounts of clawback funds disbursed

10        for uses other than the payment of general

11        obligation debt for each fiscal year from 2016,

12        which I'm now modifying to 2018 to the present,

13        including any efforts undertaken by the FOMB to

14        evaluate the amounts of clawback funds to

15        disburse for uses other than the payment of

16        general obligation debt."

17             Do you see that?

18   A    Yes.

19   Q    In connection with that specific topic,

20        Mr. Chepenik, did you meet with anybody at the

21        FOMB, whether at the level of member, director,

22        or staff, to prepare for this particular topic?

23   A    In preparation for my deposition, not to the

24        best of my knowledge, no.

25   Q    Did you do anything to try to determine whether

DRAFT -- NOT PROOFREAD

167

DRAFT -- NOT PROOFREAD

1        anybody at the FOMB would have been able to

2        assist you in preparing for this topic?  By

3        that, I mean, members, the director, or staff?

4    A   To the best of my recollection, no.

5    Q   All right.  I'll ask you, do you have any

6        knowledge of whether the clawback funds as we

7        identified them just prior to going into the

8        break, have been used to pay GO debt service?

9    A   From Fiscal '18 onward?

10   Q   That's correct.

11   A   I'm not aware of the clawback funds or any funds

12       for that matter being used to pay GO debt

13       service.

14   Q   During that time period has any GO debt service

15       been paid to your knowledge?

16   A   The only GO debt service that I believe might

17       have been paid would have been insured debt

18       service.

19   Q   When you say "insured debt service," what do you

20       mean by that?

21   A   So GO debt, that would have been wrapped by the

22       monoline bond insurers, it is possible that that

23       debt was paid.

24   Q   Do you have any recollection of what that amount

25       would have been?

DRAFT -- NOT PROOFREAD

168

DRAFT -- NOT PROOFREAD

1    A   I do not.

2    Q   The payment?

3    A   I do not have knowledge.

4    Q   And do you have any knowledge as to when that

5        payment may have been made?

6    A   I do not have any direct knowledge.  I imagine

7        it would have been around the semiannual payment

8        dates.  Around -- summertime and in the

9        wintertime.  Either December, January, and June

10       or July each year.

11   Q   So every semester of every year?

12   A   If it was paid, I imagine that would have been

13       the case.  But again, I'm not positive.

14   Q   You're not positive whether they were paid?

15   A   I just have no personal knowledge about those

16       payments.

17   Q   Okay.  Do you know whether any claw-back funds

18       were transferred back to HTA?

19           MR. MERVIS:  Objection to the form.

20   BY MR. GARCIA:

21   Q   You can answer.

22   A   I think I mentioned earlier I'm not aware of any

23       instance of any claw-back funds being used for

24       any purpose other than that one instance in 2019

25       that I mentioned to you at the outset.

DRAFT -- NOT PROOFREAD

                                                    169

DRAFT -- NOT PROOFREAD

1    Q   So that would include no -- you don't know

2        whether any, any of those claw-back funds would

3        have been transferred back to HTA?

4            MR. MERVIS:  Objection.

5    A   I am not aware of any instance of claw-back

6        funds being used for any purpose other than that

7        one special resolution in 2019.

8            Again, I think I explained this earlier, it

9        sort of mischaracterizes the process, the

10       budgeting process.  The revenue envelope is set

11       from revenues drawn from the fiscal plan.  It

12       doesn't distinguish in this budget year, for

13       instance, that revenue letter does not diversity

14       what funds are being used.  It's a pool of cash,

15       a pool of revenue that can be used to fund

16       expenditures.

17           MR. GARCIA:  I'm going to ask my colleague,

18      Mr. Cepeda, to bring one last document to the

19      screen.

20  BY MR. GARCIA:

21  Q   Do you recall that this morning you mentioned

22      that you had signed a delegation in the PROMESA

23      case at some point before you started to reap

24      for this deposition; correct?

25  A   Correct.

                    DRAFT -- NOT PROOFREAD
                                                    170
                    DRAFT -- NOT PROOFREAD

1   Q   All right.

2           MR. GARCIA:  Can you put the document on

3       the screen.

4           (Deposition Exhibit 7 was presented for

5       identification.)

6   BY MR. GARCIA:

7   Q   Do you see a document now on the screen?

8   A   I do, yes.

9   Q   It's been marked as Exhibit 7 for the

10      deposition.

11          Have you seen this document before?

12  A   I have, yes.

13  Q   Is this the declaration that you were referring

14      to in earlier testimony during the morning

15     session that you had given?

16  A  It is, yes.

17  Q  Okay.  I want you to go to paragraph Number 4.

18        Do you see that paragraph?

19  A  I do.

20  Q  You can read it to yourself.  I will quote the

21     language for the record:

22        "I am familiar with the analysis made to

23     arrive at the 1.67 billions figure in Exhibit K.

24     Specifically, I reviewed the referenced statutes

25     to understand the mathematical formulas

                    DRAFT -- NOT PROOFREAD
                                              171
                    DRAFT -- NOT PROOFREAD

1     described therein, and then applied those

2     formulas to the revenue sources identified, to

3     estimate how much those specific appropriations

4     would have been in fiscal year '19.  The

5     $1.67 billion figure for fiscal year '19

6     referenced in Exhibit K does not include all

7     revenues historically appropriate by the

8     Commonwealth on an annual basis including to the

9     Commonwealth's instrumentalities and does not

10    include any of the revenues set forth in the HTA

11    allocable revenue statutes or other claw-back

12      statutes with respect to CCDA and PRIFA."

13          Do you see that language?

14  A   I do.

15  Q   That is your declaration; correct?

16  A   It is, yes.

17  Q   Can you please explain to me what you mean by

18      the third sentence.

19          MR. GARCIA:  Mr. Cepeda, can you highlight

20      it, the one that starts with:

21          "The $1.67 billion figure."

22  BY MR. GARCIA:

23  Q   Can you explain to me what you meant by that

24      sentence in your declaration.

25  A   As I recall, this was in relation to

                DRAFT -- NOT PROOFREAD
                                            172
                DRAFT -- NOT PROOFREAD

1       Commonwealth statutes that were -- the

2       allocations within those statutes.

3           The appropriations were different than what

4       historically had been appropriated, and I was

5       asked to help calculate what that value would

6       have been if PROMESA was not in effect, and the

7       revenues appropriated had not been subject to

8       the budgeting process under PROMESA.

9   Q   Okay.  When you say "subject would not have been

10      subject to the budgeting process of PROMESA,"

11      what do you mean?

12  A   I mean, where the process under Section 202 of

13      PROMESA, where the expenses are set in

14      conformance with the revenue envelope for the

15      government.

16          So where the oversight board sets out that

17      revenue parameters drawn from the fiscal plan

18      and then the government produces a budget within

19      those parameters.

20  Q   Okay.  And specifically towards the end of that

21      sentence, it says, and I quote:

22          "Does not include any of the revenues set

23      forth in the HTA allocable revenue statutes or

24      other claw-back statutes with respect to CCDA

25      and PRIFA."

                    DRAFT -- NOT PROOFREAD
                                                    173
                    DRAFT -- NOT PROOFREAD

1           What do you mean by that sentence or phrase

2       in that sentence?

3   A   I filed this declaration quite some time ago; so

4       to the best of my recollection, this was

5       referring to what was embedded within the

6      1.67 billion figure.

7   Q   Again, when you say "does not include any of the

8      revenues set forth in the HTA allocable revenue

9      statutes," what do you mean by that?

10  A   I mean that those amounts are not included in

11     the 1.67 billion figure.

12  Q   And why were not included in the $1.67 billion

13     figure?

14  A   I do not recall.

15  Q   This is your declaration, and it's dated

16     April 28, '20; right?

17  A   Yes.  It was some time ago.

18  Q   It's not that long ago.

19         You have no recollection of why you said

20     that in your declaration, Mr. Chepenik?

21         MS. DeCAMP:  Objection.  Argumentative.

22  BY MR. GARCIA:

23  Q   You can answer.

24         MS. DeCAMP:  You can answer.

25  A   I do not recall.

                    DRAFT -- NOT PROOFREAD
                                                   174
                    DRAFT -- NOT PROOFREAD

1   BY MR. GARCIA:

2   Q   I'm going to ask you to look at Exhibit K.

```
 3        Exhibit K is titled "Schedule of Preempted

 4        statutes," Exhibit K to your declaration.

 5            Can you tell me what that means, "schedule

 6        of preempted statutes"?

 7    A   To the best of my recollection, this refers to a

 8        series of statutes, Puerto Rico law-based

 9        statutes that are preempted by PROMESA.

10    Q   Who gave you this list?

11    A   I do not recall.

12    Q   Is this the list that you compiled?

13    A   I do not -- I do not recall.

14    Q   So you do not recall whether you put this list

15        together?

16    A   I do not.  I do not recall.

17    Q   I asked you to go to page K3, under Roman

18        Numeral II.

19            Do you see it?

20    A   I do.

21    Q   It states:

22            "Statutes appropriating Commonwealth

23        revenues."

24            Do you see that?

25    A   I do.
```

DRAFT -- NOT PROOFREAD

1    Q    All right.  So what do you mean by

2         "appropriating Commonwealth revenues"?

3              MR. MERVIS:  Objection to the form.

4    BY MR. GARCIA:

5    Q    You can answer.

6    A    So to the best of my recollection, this refers

7         to statutes that appropriated revenues

8         historically.

9    Q    Okay.  What do you mean?  If you can explain it

10        to me, it's an exhibit used for your

11        declaration.

12             What you meant by "appropriating"?

13             MR. MERVIS:  Same objection.

14   BY MR. GARCIA:

15   Q    You can answer.

16   A    I don't recall.  Appropriating would have meant

17        the -- what's the best way to describe it?

18             Appropriating would have meant, you know,

19        the issuance of revenues.

20   Q    Issuance of revenues?  Is that what you said?

21   A    Yeah, the issuance of revenues or the raising of

22        revenues.

23   Q    Okay.  All right.

24             So when you say "issuance of revenues or

25      raising the revenues," what do you mean by that?

DRAFT -- NOT PROOFREAD

176

DRAFT -- NOT PROOFREAD

1   A   So just under Puerto Rico statute, you can pass

2       a law that raises revenues --

3   Q   Okay.

4   A   -- use revenues.

5   Q   So is that what we call the "revenue bill"?

6           MR. MERVIS:  Objection to the form.

7   A   I believe you could call it a "revenue bill."

8       Yes.

9   BY MR. GARCIA:

10  Q   To your knowledge, is a revenue bill the same as

11      an appropriation bill?

12          MS. DeCAMP:  Objection.

13          What topic do all these questions relate

14      to?

15          MR. GARCIA:  Relate to questions, including

16      Question Number 6 and some others.

17  A   A revenue bill is not always the same as an

18      appropriation bill.  No.

19  BY MR. GARCIA:

20  Q   So how are they different, in your

21      understanding?

22   A   Well, a revenue bill is a bill that raises

23       revenue and an appropriations bill is a bill

24       that appropriates revenue.

25   Q   What do you mean by "appropriates revenue"?

DRAFT -- NOT PROOFREAD
177
DRAFT -- NOT PROOFREAD

1   A   That appropriates spending of some form.

2   Q   Okay.  So a revenue bill, in your understanding,

3       is a bill that raises revenue; correct?

4   A   Typically that's correct, yes.

5   Q   And an appropriations bill is a bill that

6       appropriates revenue to a given spending; is

7       that correct?

8   A   Not necessarily, no.

9   Q   So for specific spending purposes; is that

10      correct?

11  A   Not necessarily.

12  Q   Okay.  Give me your understanding again, please.

13  A   For an appropriation bill?

14  Q   Yeah.

15  A   Yeah, an appropriation bill is generally an

16      allocation of appropriations.  It could be for a

17      specific purpose or not.  It's not -- doesn't

18      necessarily need to be defined.

19   Q   But an appropriation would be for something

20       that's going to be spent; is that correct?

21   A   Typically an appropriation would be, yeah, for

22       an appropriation.

23   Q   An appropriation would be an appropriation, but

24       I still don't understand what you're trying to

25       tell me.


                    DRAFT -- NOT PROOFREAD
                                                    178
                    DRAFT -- NOT PROOFREAD

1        You just said, and I can have it read back,

2        "an appropriation would be an appropriation,"

3        but what does that mean?

4    A   It depends on --

5            MR. MERVIS:  Hold on.  Objection to the

6        form.

7    BY MR. GARCIA:

8    Q   You can answer.

9    A   It depends on the --

10           It depends on the statute.  You can have

11       very common if -- very commonly, you know,

12       legislatures would pass an appropriation bill

13       that, say, you know, for the general, you know,

14       use and purpose of that government.  It doesn't

15       necessarily need to be for a specific purpose.

16   Q   Okay.  You see the first category under Roman

17       Numeral II?  You see it there?

18   A   I do, yes.

19   Q   That's HTA; correct?

20   A   It does, yes.

21   Q   Do you recall whether those three statutes --

22       any of those three statutes mentioned there are

23       Acts 30 or 31?

24   A   I do not recall.

25   Q   All right.  Take a look at Number 2.

DRAFT -- NOT PROOFREAD
                                         179
DRAFT -- NOT PROOFREAD

1           You see the bracketed language at the end

2        of the citation to the statute?  Do you see

3        that?

4    A   I do.

5    Q   It says:

6            "Gas oil, diesel oil, and petroleum

7        products."

8            Right?

9    A   It does.

10   Q   Does that refresh your recollection as to that

11       may be one of the statutes we discussed earlier

12       today?

13          MR. MERVIS:  Objection to the form.

14    A   It's possible that that's referring to Act 31.

15        I just -- I'll not sure.  I didn't look back at

16        that prior to the deposition.

17    BY MR. GARCIA:

18    Q   You see Number 3?

19    A   I do.

20    Q   And you see the bracket language, "cigarette

21        tax"?

22    A   I do.

23    Q   Does that refresh your recollection as to

24        whether it's part of 30 or 31?

25    A   It does not.

                    DRAFT -- NOT PROOFREAD
                                              180
                    DRAFT -- NOT PROOFREAD

1           As I said previously, it could mean that

2        local Puerto Rico act, the reference, the

3        statutory reference could mean Act 30, but I

4        don't know for certain.  I did not review this

5        in preparation for my declaration or my

6        deposition.

7    Q   Then okay.

8           Number 1, take a look at the bracketed

9        language at the end: Motor Vehicle License Fees.

10          Do you see that?

11   A   I do.

12   Q   Does that refresh your recollection as to

13        whether that would be Act 30 or 31?

14          MR. MERVIS:  Objection to the form.

15   BY MR. GARCIA:

16   Q   You can answer.

17   A   It does not.

18   Q   It does not.

19          So when we were talking earlier about motor

20        vehicle license fees in the context of Act 30,

21        you remember that conversation we had?

22   A   I do.  I just don't know whether these statutory

23        references refer to Act 30 or 31 specifically or

24        in this case under Number 1, Act 9.

25          I don't recall because I did not review

DRAFT -- NOT PROOFREAD
                                            181
DRAFT -- NOT PROOFREAD

1        this declaration in preparation for my

2        deposition.

3   Q   Mr. Chepenik, during any of the breaks either

4        this morning or this afternoon, did you speak

5        with your counsel about the testimony that we

6        were discussing?

7        MS. DeCAMP:  That's a "Yes" or "No"

8     question.

9  A   Yes.

10  BY MR. GARCIA:

11  Q   And did you speak with counsel for the FOMB?

12        MR. MERVIS:  Objection to the form.

13  BY MR. GARCIA:

14  Q   Did you speak with counsel of the FOMB?

15     Antoinette?

16        MS. DeCAMP:  You can answer "Yes" or "No."

17     "Yes" or "No."

18  A   Yes.

19  BY MR. GARCIA:

20  Q   Is counsel to the FOMB your counsel?

21        MR. MERVIS:  Objection to the form.

22        MS. DeCAMP:  Objection to the form.

23  BY MR. GARCIA:

24  Q   Is counsel for the FOMB your counsel?

25        MS. DeCAMP:  You can answer if you know.

                DRAFT -- NOT PROOFREAD
                                                    182
                DRAFT -- NOT PROOFREAD

1  A   I do not recall.

2  BY MR. GARCIA:

3  Q   You do not recall.

4          Who is your counsel for purposes of this

5     deposition today?

6          MS. DeCAMP:  Objection.  We answered these

7     questions at the start.

8          MR. GARCIA:  I'm trying to refresh his

9     recollection because I don't think he remembers.

10  BY MR. GARCIA:

11  Q   Can you answer the question.

12  A   So my counsel, as an affiliate of EY, is

13     Ms. DeCamp.

14  Q   All right.

15  A   My understanding -- let me finish.

16          My understanding is there's a stipulation

17     agreement as it relates to Mr. Mervis and

18     Proskauer as well.  I've not seen that

19     stipulation; so I'm not entirely clear about

20     that component.

21  Q   But may question to you is very simple.  For

22     purposes of this deposition today, is Mr. Mervis

23     your counsel?

24          MR. MERVIS:  Object to the form.

25

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

```
 1  BY MR. GARCIA:

 2  Q   You can answer.

 3  A   I --

 4  Q   It's a "Yes" or "No" question.

 5          MR. MERVIS:  No, it's not.  Object to the

 6      form.

 7  A   I cannot answer that question with certainty.

 8  BY MR. GARCIA:

 9  Q   Why can't you answer with certainty?

10          MS. DeCAMP:  Objection.

11          You can answer.

12  BY MR. GARCIA:

13  Q   I'm trying to --

14          Yeah, you can answer.

15  A   I have not seen the stipulation agreement that

16      the parties agreed to in connection with this

17      deposition.

18  Q   It doesn't have -- my question doesn't have

19      anything to do with the stipulation agreement,

20      Mr. Chepenik.

21          My question is simply a question of fact

22      whether for purposes of this deposition today

23      Mr. Mervis was acting as your counsel?

24          MR. MERVIS:  I object to the form of the

25      question.
```

DRAFT -- NOT PROOFREAD

184

DRAFT -- NOT PROOFREAD

1  BY MR. GARCIA:

2  Q   You can answer.

3  A   I unfortunately cannot give you a yes or no

4      answer without consulting with my counsel.

5  Q   Can you please --

6          We're going to go off the record, and

7      you're going to consult with your counsel,

8      Antoinette DeCamp, so that you can answer my

9      question.

10         Okay?

11         Let's take a two-minute break?

12         MS. DeCAMP:  Can I ask you a question.

13         So you want him to consult with me and then

14     to relay the results of a privileged

15     consultation on the record in this deposition?

16         MR. GARCIA:  No.  What I'm asking him is

17     whether he understand --

18         He just said in order to answer my

19     question, he needs to consult with you.  And the

20     question is whether Mr. Mervis was his counsel

21     for purposes of this deposition.  That's the

22     question.

23          I don't understand that to be a privileged

24     question.  I'm only asking.

25          MR. MERVIS:  Why does it matter?

                    DRAFT -- NOT PROOFREAD
                                                    185
                    DRAFT -- NOT PROOFREAD

1          MR. GARCIA:  An issue of fact whether

2     Mr. Mervis is his counsel for the deposition.

3          MR. MERVIS:  But that's the problem.  It is

4     not an issue of fact; it's an issue of law.  Why

5     does it matter who he thinks the lawyer is?

6  BY MR. GARCIA:

7  Q   Do you need to consult?

8          MR. GARCIA:  I'm not going to engage in

9     debate, Michael.

10          MR. MERVIS:  You're entitled not to.  It

11     doesn't make any sense.

12          MR. GARCIA:  It doesn't to you.  I'm not

13     going to engage in debate with you.

14  BY MR. GARCIA:

15  Q   Do you need to consult with your counsel,

16     Ms. DeCamp?

17          MS. DeCAMP:  Let's consult, Adam.

18          MR. GARCIA:  All right.  Two minutes to

19     consult.

20          MR. MERVIS:  It may take more than two

21     minutes.

22          MR. GARCIA:  I don't think it's --

23          MR. MERVIS:  -- the witness and Ms. DeCamp;

24     right?

25          MS. DeCAMP:  He said he may need to consult

                    DRAFT -- NOT PROOFREAD
                                              186
                    DRAFT -- NOT PROOFREAD

1     with his counsel.  You can't put a time limit on

2     that.  Thank you.

3          MR. GARCIA:  Justin --

4          THE VIDEOGRAPHER:  If we all agree, I will

5     go off the record at 3:19.

6          (A recess was taken.)

7          THE VIDEOGRAPHER:  Back on the record at

8     3:23.

9  BY MR. GARCIA:

10  Q  All right.  So, Mr. Chepenik, I'm going to ask

11     you whether during the morning and the afternoon

12     session, right before the one break we had now,

13     whether you met or discussed anything with

14     Antoinette DeCamp during any one of the breaks

15     outside from the last one?

16          MS. DeCAMP:  It's a "Yes" or "No."

17          MR. MERVIS:  Can you say that -- I don't

18     understand.

19          Objection to form.

20          MS. DeCAMP:  It's a "Yes" or "No" question.

21     A   Yes.

22     BY MR. GARCIA:

23     Q   You did.  All right.

24          And I'm going to ask you now, what was the

25     subject of those discussions?

                    DRAFT -- NOT PROOFREAD
                                                  187
                    DRAFT -- NOT PROOFREAD

1          MS. DeCAMP:  I mean, I am going to object.

2     What is the --

3          I do not want him to get into any

4     privileged conversations that he had with me

5     during the break.

6          MR. GARCIA:  Ms. DeCamp, as you know, the

7     witness was under oath.

8          MS. DeCAMP:  Correct.

9          MR. GARCIA:  He was in the middle of a

10     deposition.

11          MS. DeCAMP:  Correct.

12          MR. GARCIA:  Whatever he discussed with

13     anybody during the break is not a privileged

14      conversation, especially since he's under oath.

15          So I'm entitled.  I am entitled for him to

16      tell me what he discussed with you during any

17      break in the middle of the deposition while he

18      was under oath.

19          That's my question.

20      MS. DeCAMP:  I don't agree with that,

21      particularly in the context of a 30(b)(6)

22      deposition where you are not -- you're asking

23      for the collective testimony of Ernst~& Young,

24      which can come from his personal knowledge or

25      the collective knowledge of anybody else that

DRAFT -- NOT PROOFREAD

188

DRAFT -- NOT PROOFREAD

1       has knowledge about Ernst & Young.

2           I do not agree that if I --

3           If I permit him to answer the question, I

4       want your stipulation that this is not a waiver

5       of any privilege.

6       MR. GARCIA:  Well, I disagree with you as

7       to whether the conversation he may have had with

8       you during the break is a privileged

9       conversation.

10          I do not agree with you and your

11    understanding of what the rules are for purposes

12    of a witness who is under oath in a deposition

13    in the middle of the deposition.  So I don't

14    agree with you on that.  Okay?

15        Because I don't agree with you on that, I

16    cannot stipulate to the issue because I don't

17    think there is any privilege to be waived during

18    a discussion with the witness during a break in

19    the deposition.

20        Are you going to instruct him not to

21    answer?

22        MS. DeCAMP:  I'm going to instruct him not

23    to answer as to any details of what we may or

24    may not have discussed during the break.

25        You can discuss if there is a way to answer

                    DRAFT -- NOT PROOFREAD
                                                    189
                    DRAFT -- NOT PROOFREAD

1    the question at a high level, similar to what

2    would be in a privilege log, which is basically

3    who you talked to and the 30,000-foot-level

4    subject, you can disclose that.

5        MR. GARCIA:  Again, I don't agree with your

6    understanding of the privilege, but I will take

7    the answer, reserving all my rights.

8    BY MR. GARCIA:

9    Q    Mr. Chepenik, can you answer the question.

10   A    What is the specific question.

11   Q    The question is whether during any of the breaks

12        during the deposition while you were under oath

13        you had any discussion with Ms. DeCamp.

14             MR. MERVIS:  Didn't he already answer that?

15   A    Yes.

16   BY MR. GARCIA:

17   Q    Yes.

18             And the question is what were those

19        discussions about?

20             MR. MERVIS:  So let me just make an

21        objection.

22             To the extent that Proskauer attorneys were

23        involved in communications during breaks with

24        the witness and Ms. DeCamp, our view is that

25        those conversations are immune from discovery

                    DRAFT -- NOT PROOFREAD
                                                190
                    DRAFT -- NOT PROOFREAD

1    because they constitute the board's work

2    product.

3             I can't exactly instruct the witness not to

4    answer, but I would ask Ms. DeCamp to instruct

5    him not to answer.

6        MS. DeCAMP:  Excuse me.  Given that

7    Proskauer has an interest in preserving its own

8    privilege, and in order to not waive any

9    privilege or protection that might be asserted

10    by Proskauer, I will instruct you, Adam, not to

11    answer questions about the subjects of what we

12    discussed during any breaks.

13        MR. GARCIA:  Let me state for the record

14    that I disagree with Ms. DeCamp's interpretation

15    of the privilege of discussions during breaks.

16        But with respect to the objection that was

17    raised by Mr. Mervis, the objection is even

18    stronger.  Okay?

19        Mr. Mervis was not the attorney defending

20    during the deposition, and I don't believe that

21    the privilege or even work product attaches in

22    the way that Mr. Mervis is mentioning for the

23    record.

24        So I will reserve all rights with respect

25    to recalling the witness to ask any particular

DRAFT -- NOT PROOFREAD

191

DRAFT -- NOT PROOFREAD

1    questions while he was under oath in the middle

2      of testimony, sometimes in topics that were

3      continuing on after the break, conversations

4      that we had with either Ms. DeCamp or

5      Mr. Mervis.

6          So again, I'm asking you, Ms. DeCamp,

7      you're instructing him not to answer my

8      question?

9          MS. DeCAMP:  Correct.

10   BY MR. GARCIA:

11   Q   Are you going to refuse to answer my question

12      based on the instruction given by your counsel?

13   A   Are you directing that question to me?

14   Q   Yes.

15   A   I cannot answer that question.

16   Q   You cannot what?

17          MS. DeCAMP:  I think he was answering your

18      prior question.

19          So could you repeat --

20          Adam, I think Mr. Garcia's question to you

21      was are you going to follow my instruction to

22      you not to answer the question?

23   A   Yes, I'm going to follow the advice of counsel.

24          MR. GARCIA:  Again, I will reserve all

25      rights.  That will include possibly recalling

DRAFT -- NOT PROOFREAD

192

DRAFT -- NOT PROOFREAD

1    the witness for further testimony on the issue

2    of whatever discussions he may have had with

3    either of you during the breaks while he was

4    under oath and being questioned about specific

5    topics in the deposition.

6         I personally do not have any further

7    questions, and with that --

8         MR. MERVIS:  Arturo, just so we're clear, I

9    note your reservation of rights.  The board

10   reserves its right.  If you have authority to

11   support your position, you should provide us

12   with it during a meet-and-confer, if we're not

13   able to resolve it you can make a motion.

14        MR. GARCIA:  Whether we have to, we'll meet

15   and confer on that.  At this moment, I'm not

16   going to engage in --

17        MR. MERVIS:  I wasn't asking you to, but

18   you made a speech; so I made a speech back.

19        MR. GARCIA:  All right.  So anyway, at this

20   moment, I don't have any further questions.  I

21   am going to pass the baton onto my colleague

22   from Schulte, who represents the collateral

23   monitor here, who may have other questions of

24        the witness.

25              Taleah?

                    DRAFT -- NOT PROOFREAD
                                                    193
                    DRAFT -- NOT PROOFREAD

1          MS. JENNINGS:  This is Taleah Jennings.

2          Thank you, Arturo.  I do have some

3      questions.

4  CROSS-EXAMINATION,

5      QUESTIONS BY TALEAH _ JENNINGS:

6  BY MS. JENNINGS:

7  Q   Good afternoon, Mr. Chepenik.

8          (A discussion was held off the record to

9      correct technical issues.)

10 Q   Mr. Chepenik, since you've been working at EY

11     with the FOMB, have you had direct contact with

12     any members of the oversight board?

13 A   In connection with my deposition?

14 Q   No.  Just period.

15 A   Yes, I have.

16 Q   Who?

17 A   I can name them, but all of the board members.

18 Q   And can you estimate about how frequently you've

19     spoken to anyone on the oversight board? any

20     members of the oversight board?  Is it on a

21    daily basis?  Is it on a weekly basis?

22         MR. MERVIS:  Sorry.  Just note my objection

23    to the form.

24  A   I would say not in connection with this

25    deposition preparation.  Just in general in my

                    DRAFT -- NOT PROOFREAD
                                                    194
                    DRAFT -- NOT PROOFREAD

 1    role with EY, I have, I would say, interactions

 2    with the board members on a weekly basis.

 3  BY MS. JENNINGS:

 4  Q   Anyone in particular, any particular members

 5    that you meet with more regularly than others or

 6    interact with more regularly than others?

 7  A   From the board members themselves, I wouldn't

 8    say that I meet with one board member more

 9    frequently than others.

10         If -- if you mean the board staff, then I

11    would say I certainly meet with the executive

12    director Natalie -- or speak with the executive

13    director Natalie Jaresko on a more frequent

14    basis.

15  Q   When's the last time you spoke with Ms. Jaresko?

16  A   You mean just in general?

17  Q   Period.  Last time you spoke with her.

18   A   Yesterday.

19   Q   Before that?

20   A   I speak with executive director on multiple

21       times a day, typically.

22   Q   I see.  Have you ever spoken with Ms. Jaresko at

23       any point in time regarding whether or not the

24       Commonwealth had a balanced budget for fiscal

25       years 2018 through the present?

                    DRAFT -- NOT PROOFREAD
                                                    195
                    DRAFT -- NOT PROOFREAD

 1           MR. MERVIS:  Note my objection to the form.

 2   A   To the best of my recollection, we have never

 3       had that specific conversation.

 4   BY MS. JENNINGS:

 5   Q   Do you know what the FOMB's knowledge is

 6       regarding whether or not the Commonwealth had a

 7       balanced budget for the fiscal years 2018

 8       through 2020?

 9           MR. MERVIS:  Object to the form.

10   A   I don't have any particular knowledge about what

11       their views may or may not be as it pertains to

12       being a balanced budget or not.

13   BY MS. JENNINGS:

14   Q   I'm not necessarily saying their views.  My word

15     was about their "knowledge."

16  A  Provide the same answer.  I'm not familiar with

17     what their knowledge may or may not be.

18  Q  And you said that with regard to the testimony

19     you provided, EY has no knowledge about whether

20     the Commonwealth had a balanced budget for

21     fiscal years 2016 and 2017; correct?

22  A  Correct.  EY was not engaged, and the oversight

23     board did not exist.

24  Q  And so EY is not best situated to answer

25     questions regarding whether or not the

DRAFT -- NOT PROOFREAD

196

DRAFT -- NOT PROOFREAD

1     Commonwealth had a balanced budget during those

2     years; correct?

3          MR. MERVIS:  Object to the form.

4          MS. DeCAMP:  Objection.

5          THE WITNESS:  Can I answer that,

6     Antoinette?

7          MS. DeCAMP:  You can answer.

8  BY MS. JENNINGS:

9  Q  Yes.

10  A  Can you repeat the question one more time?

11  Q  Yes.

12          Ernst & Young is not best situated to

13     answer questions regarding whether or not the

14     Commonwealth had a balanced budget during

15     2016 -- fiscal years 2016 and 2017; correct?

16          MR. MERVIS:  Object to the form.

17  A  I would say EY does not have a point of view or

18     a perspective on whether the budgets were

19     balanced in those years.

20  BY MS. JENNINGS:

21  Q  So is your answer to my question --

22          What is your answer to my question?

23          MR. MERVIS:  Object to the form.

24  A  I do not believe we have knowledge of whether

25     those budgets were balanced or not.


                   DRAFT -- NOT PROOFREAD
                                                197
                   DRAFT -- NOT PROOFREAD

1   BY MS. JENNINGS:

2   Q  And do you know whether the FOMB has knowledge

3      about whether the budgets were balanced for

4      those fiscal years or not?

5           MS. DeCAMP:  Objection.

6           You can answer.

7   A   The FOMB was not in existence at that time; so

8       I'm not --

 9  BY MS. JENNINGS:

10  Q   That's not my question.

11      My question is --

12          MR. MERVIS:  Hold on, Taleah.  You cut him

13      off.  You've got to let him finish.

14  BY MS. JENNINGS:

15  Q   I thought you answered my question.  Go ahead.

16  A   The FOMB was not in existence at that time; so

17      I'm unaware of what knowledge they have as it

18      relates to those budgets being balanced in 2016

19      or 2017.

20  Q   That wasn't the answer to my question; so let me

21      ask you the question again.

22          Do you know whether the FOMB has knowledge,

23      not whether they existed at the time, but

24      whether they have knowledge about whether the

25      budgets were balanced for the Commonwealth for

                    DRAFT -- NOT PROOFREAD
                                                    198
                    DRAFT -- NOT PROOFREAD

 1      fiscal years 2016 and 2017?  Do you know if the

 2      FOMB has knowledge of that?

 3          MS. DeCAMP:  Objection.

 4          You can answer.

 5  A   I -- to the best of my knowledge, I do not have

6      knowledge about whether they have knowledge

7      about --

8  BY MS. JENNINGS:

9  Q    Thank you.  We're understanding each other now.

10        MR. MERVIS:  There's a lot of knowledge

11      going on.

12  BY MS. JENNINGS:

13  Q    You testified that you met with Proskauer in

14      preparation for your testimony today.

15        Did Proskauer attorneys provide you with

16      any information to help you testify as to

17      whether or not the Commonwealth had a balanced

18      budget for fiscal years 2018 through the

19      present.  The answer is --

20        First question is "Yes" or "No" question.

21      Did they provide you with any information?

22  A    To the best of my recollection, no.

23  Q    And did anyone --

24        Are you aware --

25        Did anyone from Proskauer inform you that

                DRAFT -- NOT PROOFREAD
                                          199
                DRAFT -- NOT PROOFREAD

1      Ms. Jaresko is the most knowledgeable person on

2      the oversight board to answer questions about

3     whether or not the Commonwealth had a balanced

4     budget for fiscal years 2016 through the

5     present?

6          MR. MERVIS:  Sorry.  Can I ask the reporter

7     to read that question back.

8          (The requested text was read by the

9     reporter.)

10         MR. MERVIS:  Okay.  So I think that that

11    could invade attorney work product.  But if

12    you'll agree, Taleah, that it's not -- that

13    there's no waiver beyond that question, I'm

14    happy to have him answer just to speed this up

15    and move it along.

16         MS. JENNINGS:  I think for now, with regard

17    to that specific question, I can agree to that.

18         MR. MERVIS:  Okay.

19  A  To the best of my recollection, no, nobody

20    stated that to me.

21 BY MS. JENNINGS:

22  Q  What is the FOMB's knowledge regarding any

23    efforts undertaken by the FOMB to determine

24    whether or not the Commonwealth had a balanced

25    budget for fiscal years 2016 through 2020?

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1              MS. DeCAMP:  Objection.

2              You can answer.

3    A   I can only speak to what EY's knowledge is in

4        preparation of the budget each year.  I am

5        unaware of what knowledge the FOMB has.

6    BY MS. JENNINGS:

7    Q   That's because you haven't spoken to anyone at

8        the FOMB at any time, not even in connection

9        with preparation for this deposition, but at any

10       time regarding what efforts were undertaken by

11       the FOMB to determine whether or not the

12       Commonwealth had a balanced budget for fiscal

13       years 2016 through 2020; is that correct?

14             MS. DeCAMP:  Objection.

15             You can answer.

16   A   Well, certainly I think there's a

17       differentiation between fiscal years '16 and '17

18       versus the other fiscal years since the board

19       has been in existence and been responsible for

20       certifying budgets each year.

21             But I did not speak -- I did not speak with

22       the oversight board about it being a balanced

23       budget.  That's not really how the budgeting

24       process works under PROMESA.

25

DRAFT -- NOT PROOFREAD
                                                        201
DRAFT -- NOT PROOFREAD

1    BY MS. JENNINGS:

2    Q    When you say there's a differentiation between

3         the fiscal years '16, '17, and the others,

4         that's not true with regard to my question;

5         right?

6              My question was have you spoken to anyone

7         at the FOMB regarding what efforts were

8         undertaken by the FOMB to determine whether or

9         not the Commonwealth had a balanced budget for

10        fiscal years 2016 through 2020?

11             MR. MERVIS:  So --

12   BY MS. JENNINGS:

13   Q    Let me finish my question.

14             MR. MERVIS:  I jumped the gun.  I

15        apologize.

16   BY MS. JENNINGS:

17   Q    If I'm understanding your answer to the previous

18        question correctly, the answer to that is no,

19        you have not spoken to anyone at the FOMB about

20        that?

21             MR. MERVIS:  Object to the form.

22   BY MS. JENNINGS:

23   Q   You can answer.

24   A   To the best of my recollection, no.  I have not

25       spoken to them about that.

DRAFT -- NOT PROOFREAD

202

DRAFT -- NOT PROOFREAD

1   Q   And during your meetings with Proskauer in

2       connection with preparing to testify today, did

3       they provide you any information relating to any

4       efforts undertaken by the oversight board to

5       determine whether or not the Commonwealth had a

6       balanced budget for each fiscal year from 2016

7       through the present?  Did they provide you any

8       information regarding that topic?

9           MR. MERVIS:  Note my objection to the form.

10   A   To the best of my recollection, no.

11   BY MR. MERVIS:

12   Q   And did anyone from Proskauer inform you that

13       Ms. Jaresko was the most knowledgeable person at

14       the oversight board to answer questions

15       regarding that topic?

16           MS. DeCAMP:  Objection.  You can answer.

17           MR. MERVIS:  So I guess I'm not sure that's

18       different than the one you asked before, but in

19    any event, I'm okay with him answering that

20    question, notwithstanding that it could

21    potentially invade work product if you'll agree

22    that it's not a waiver as to any other question

23    or answer.

24         MS. JENNINGS:  With regard to this specific

25    question, yes.


                    DRAFT -- NOT PROOFREAD
                                              203
                    DRAFT -- NOT PROOFREAD

1         MR. MERVIS:  Okay.

2         MS. JENNINGS:  I'm not trying to invade the

3    privilege or be sneaky about it.

4         MR. MERVIS:  No, no.  Until he answers I

5    don't know.  I don't want to have to go offline

6    and confer with him.  Maybe the reporter could

7    just read it back.

8         (The requested text was read by the

9    reporter.)

10         THE WITNESS:  Can I answer?

11   BY MR. MERVIS:

12   Q   Yes.

13   A   To the best of my recollection, no.

14   Q   What is the FOMB's knowledge about whether or

15       not available revenues of the Commonwealth were

16      insufficient to meet the appropriations for each

17      fiscal year 2018 through the present?

18   A  I'm unaware of what the FOMB's knowledge is on

19      that topic.

20   Q  That's because you have not spoken to anyone at

21      the FOMB about that topic at any time; correct?

22   A  Can you actually reread not the last question

23      but the second-to-last question?

24   Q  Sure.

25          MS. JENNINGS:  Ms. Court Reporter, can you

                 DRAFT -- NOT PROOFREAD
                                                    204
                 DRAFT -- NOT PROOFREAD

1      please read that.

2          (The requested text was read by the

3      reporter.)

4   BY MS. JENNINGS:

5   Q  And the answer?

6          (The requested text was read by the

7      reporter.)

8   Q  And then my next question was:  And that's

9      because you have not spoken to anyone at the

10     FOMB about that topic at any time; is that

11     correct?

12         MS. DeCAMP:  Objection.

13          You can answer.

14   A   I do not recall having a recent discussion with

15       anyone around available revenues.  But the

16       question reminded me of what I had answered

17       earlier around 2019.  And the special resolution

18       that was certified by the oversight board.  It's

19       possible that some discussions happened in 2019,

20       but I do not recall the details of those

21       conversations.

22   BY MS. JENNINGS:

23   Q   And you've provided several hours of testimony

24       today already.  None of your testimony was

25       reliant upon what you just identified may have

DRAFT -- NOT PROOFREAD

205

DRAFT -- NOT PROOFREAD

1    been discussed in 2019; is that right?

2    A   That's correct.

3    Q   And with regard to that, this same issue whether

4        or not revenues were insufficient to meet the

5        appropriations for these fiscal years, you have

6        no knowledge --

7            (Reporter request for clarification.)

8    Q   With regard -- I should have the topics in front

9        of me or in front of you --

10          But with regard to the topic that we're on

11     now, whether or not available revenues of the

12     Commonwealth were insufficient to meet the

13     appropriations for each fiscal year from 2016

14     through the present, you have no knowledge on

15     that issue with regard to fiscal year 2016 or

16     2017; correct.

17          When I say "you," I mean, as the EY

18     30(b)(6) witness?

19  A   That is correct.

20  Q   You didn't do anything to try to find that

21     information out; correct?

22  A   In preparation for the deposition, I did not.

23  Q   And with regard to this same topic, whether or

24     not available revenues of the Commonwealth were

25     insufficient to meet the appropriations for each

DRAFT -- NOT PROOFREAD
206
DRAFT -- NOT PROOFREAD

1      fiscal year, limit it to 2018 through the

2      present, did anyone from Proskauer provide you

3      with any information to help you prepare to

4      testify on that topic today?

5          MR. MERVIS:  Note my objection to the form.

6  A   To the best of my recollection, no.

7    BY MS. JENNINGS:

8    Q    And are you aware that Proskauer has

9         represented -- withdrawn.

10        Did Proskauer or any Proskauer attorneys

11        represent -- inform you that Ms. Jaresko is the

12        individual the most knowledgeable person at the

13        oversight board to answer questions regarding

14        whether or not available revenues of the

15        Commonwealth were insufficient to meet the

16        appropriations for each fiscal year from 2016

17        through the present?

18        MR. MERVIS:  I have a concern that the

19        answer to that question might invade the

20        oversight board's work product.  But, Taleah, if

21        you will agree that in allowing him to answer

22        that question there is not a waiver beyond the

23        question and the answer, then I'll let him

24        answer.

25        MS. JENNINGS:  Can I just understand what

              DRAFT -- NOT PROOFREAD
                                           207
              DRAFT -- NOT PROOFREAD

1         the work product issue is?  Because I may be

2         able to dispel that, but I just don't

3         understand.

4          MR. MERVIS:  The short answer is, look,

5     first of all, I have no idea whether anybody at

6     Proskauer told him that.  I know I didn't but

7     others might be.

8          MS. JENNINGS:  All right.

9          MR. MERVIS:  Secondly, if someone did, I

10    don't know the context; right?

11         So without knowing the context of the

12    conversation, I can't say whether it's a work

13    product issue or just like a scheduling issue or

14    any kind of issue.  I don't know.

15         So what I'm trying to avoid is taking the

16    time to go off the record to consult with the

17    witness about something that may not even be an

18    issue.

19         So that's the best I can give you.

20         MS. JENNINGS:  So without -- yes, I'm not

21    trying to get into work product by answering

22    this question.  I will not --

23         We will not take the position that you're

24    waiving any privilege.

25

```
 1  BY MS. JENNINGS:

 2  Q   But my question is did any Proskauer attorneys

 3      during your preparation sessions inform you that

 4      Ms. Jaresko is the most knowledgeable person at

 5      the oversight board to answer questions

 6      regarding whether or not available revenues of

 7      the Commonwealth were insufficient to meet the

 8      appropriations for each fiscal year from 2016

 9      through the present?

10          THE WITNESS:  I can answer?

11          MR. MERVIS:  Yeah.

12  BY MS. JENNINGS:

13  Q   Yes.

14          MS. DeCAMP:  You can answer.

15  A   To the best of my recollection, no, nobody

16      mentioned that to me.  Nobody at Proskauer.

17  BY MS. JENNINGS:

18  Q   And other than anyone at Proskauer, did anyone

19      of mention that to you?

20  A   To the best of my recollection, no, no one has

21      ever mentioned that to me.

22  Q   What is the FOMB's knowledge regarding any

23      efforts undertaken by the FOMB to determine

24      whether available revenues of --

25          That's withdrawn, actually.
```

DRAFT -- NOT PROOFREAD

209

DRAFT -- NOT PROOFREAD

```
 1        MR. MERVIS:  I was going to say I've not
 2     heard that acronym said that way.  I don't know
 3     that I look it.
 4        MS. JENNINGS:  I may have another slip, but
 5     let's keep going.
 6  BY MS. JENNINGS:
 7  Q  What is the FOMB's knowledge about whether or
 8     not any revenues of the Commonwealth were
 9     diverted, retained, reallocated, or redirected
10     in order for there to be sufficient available
11     revenue to meet the appropriations made for each
12     fiscal year from 2016 through the present?
13        MS. DeCAMP:  Objection.
14        You can answer.
15  A  I'm not aware of what the knowledge of the FOMB
16     might be on that matter.
17  BY MS. JENNINGS:
18  Q  And you did not try to speak to anyone at the
19     FOMB to gain that understanding; correct? to
20     gain their understanding?
21  A  That's correct.
22  Q  Did any Proskauer attorney during your
```

23      preparations provide you with any information to

24      help you prepare to help you testify about this

25      topic?

DRAFT -- NOT PROOFREAD

210

DRAFT -- NOT PROOFREAD

1        MR. MERVIS:  Note my objection to the form.

2  A  Not that I recall.

3  BY MS. JENNINGS:

4  Q  How many prep sessions did you have where

5      Proskauer participated for this deposition?

6  A  I recall three.

7  Q  And how many prep sessions did you have in full,

8      in total, for this deposition?

9  A  Between I would say ten and twelve.

10  Q  And during those --

11      During the sessions where Proskauer was in

12      attendance, did they provide you with any

13      information?  I know I asked about specific

14      areas, but did they provide you with any

15      information during those prep sessions?

16      MR. MERVIS:  Sorry.  Objection to form.

17  A  Generally, those sessions were general

18      deposition preparation since I had not -- I had

19      not been deposed prior to this experience.  And

20      trying to help me better understand the

21      questions that were being -- that were being

22      asked of EY to respond to because I felt they

23      needed some additional clarity to be able to

24      provide specific answers to those questions.

25

                    DRAFT -- NOT PROOFREAD
                                                    211
                    DRAFT -- NOT PROOFREAD


1   BY MS. JENNINGS:

2   Q    Did they provide you some clarity with regard to

3        what the questions meant?

4   A    They tried, but I wouldn't say it was

5        information that was provided to me.  I had the

6        same question that I asked Mr. Garcia earlier

7        about whether, you know, it being a balanced

8        budget if we thought that they came out on an

9        accrual or cash basis.  Technical sort of

10       clarifications like that.

11            MS. JENNINGS:  Michael, that's not a good

12       look for you.

13            MR. MERVIS:  Trying to make sense of

14       what's --

15   BY MS. JENNINGS:

16   Q    I'll just ask was there anything else?  Were

17          there any other clarifications that they tried

18          to help you with?

19     A    Not in particular that I recall.  This was --

20          the subpoena came to EY in connection with the

21          work that EY conducted so I'm familiar already

22          generally speaking with EY's work product on

23          that.

24               For me it was refreshing my recollection

25          around our team's work in support of the

                         DRAFT -- NOT PROOFREAD
                                                        212
                         DRAFT -- NOT PROOFREAD

1          oversight board as opposed to Proskauer

2          informing me or providing information to me in

3          connection with responses.

4     Q    So they did not provide you with any information

5          other than what you just discussed regarding

6          clarification in connection with preparing to

7          testify today?

8     A    Not -- nothing of consequence, that I can

9          recall.

10    Q    I was going to say maybe I should be more

11         specific:  With regard to the topics in which

12         you are testifying today?

13    A    Nothing in particular comes to mind.

14    Q    And did anyone from Proskauer provide you

15         information regarding the stipulation agreement

16         that you were referring to earlier?

17              MR. MERVIS:  I ask on that one that the

18         answer be, at least to that one, be "Yes" or

19         "No."

20    A    No.

21    BY MS. JENNINGS:

22    Q    What is the FOMB's knowledge about any efforts

23         undertaken by the FOMB to evaluate the amounts

24         of revenues to divert, retain, reallocate, or

25         redirect?

                DRAFT -- NOT PROOFREAD
                                              213
                DRAFT -- NOT PROOFREAD

1              MS. DeCAMP:  Objection.

2              You can answer.

3    A    I am not aware of the FOMB's knowledge on that

4         topic.  I also don't know whether, you know,

5         they would describe -- use the terms that you

6         use to begin with.

7    BY MS. JENNINGS:

8    Q    You don't know one way or the other?

9    A    I'm not aware of their knowledge.

10    Q    And that's because you haven't spoken to anyone

11      at the FOMB about that topic; correct?

12          I don't mean just in connection with your

13      preparation, but period.

14  A   Not that I can recall.

15          MR. MERVIS:  Sorry, can I take a 30-second

16      break?

17          MS. JENNINGS:  Sure.

18          THE REPORTER:  Are we going off the record?

19          MS. JENNINGS:  It looks like maybe not.

20          MR. MERVIS:  I apologize.  I was dealing

21      with a filing deadline on something else.

22          MS. JENNINGS:  Let me refresh my

23      recollection of where we were.

24  BY MS. JENNINGS:

25  Q   Mr. Chepenik, you did not do anything to try to

DRAFT -- NOT PROOFREAD
214
DRAFT -- NOT PROOFREAD

1       find out what the FOMB's knowledge is with

2       regard to any efforts undertaken by them to

3       evaluate the amounts of revenues to divert,

4       retain, reallocate, or redirect; is that

5       correct?

6   A   To the best of my recollection, that is correct.

7       I did not undertake any efforts on that topic.

8  Q   And do you know whether the FOMB has undertaken

9      any efforts to evaluate the amounts of revenues

10      to divert, retain, reallocate, or redirect?

11          MS. DeCAMP:  Objection.

12          You can answer.

13  A   To the best of my recollection, I'm not aware.

14  BY MS. JENNINGS:

15  Q   Well, you're not aware of whether they have or

16      they haven't, or you don't remember whether they

17      have or they haven't?

18  A   To the best of my recollection, I'm not aware of

19      whether they have or have not.

20  Q   Did you ever know?  I'm confused by the "to the

21      best of my recollection."

22  A   To the best of my recollection, I am not -- I'm

23      not aware.  Nothing comes to mind, if that's

24      what you're asking.

25  Q   That's what I was asking.

                    DRAFT -- NOT PROOFREAD
                                                    215
                    DRAFT -- NOT PROOFREAD

1  A   My recollection, as far as I recall, yeah.

2  Q   To your knowledge, were from any efforts

3      undertaken by the FOMB.  I'm going back a topic,

4      to determine whether or not the available

5      revenues of the Commonwealth were insufficient

6      to meet the appropriations in fiscal years 2018

7      through the present?

8   A   I'm sorry.  Can you just have -- can the

9      reporter read back the question one more time.

10  Q   I think I can repeat it.

11  A   Okay.

12  Q   Are you aware of any efforts undertaken -- by

13      "you," I mean in your capacity as the 30(b)(6)

14      witness today.

15          Are you aware of any efforts undertaken by

16      FOMB to determine whether or not the available

17      revenues of the Commonwealth were insufficient

18      to meet the appropriations in fiscal years 2018

19      through the present?

20          MS. DeCAMP:  Objection.

21          But you can answer.

22  A   I believe I'm aware of one instance in which

23      that efforts might have been undertaken.

24  BY MS. JENNINGS:

25  Q   That's the one we talked about?

DRAFT -- NOT PROOFREAD

216

DRAFT -- NOT PROOFREAD

1   A   Correct.  In 2019.

2   Q   And other than that, are you aware of any other

3        efforts undertaken by the FOMB?

4   A   Not that I can recall.

5   Q   And do you know if any other efforts were

6        undertaken by the FOMB, or are you just don't

7        know one way or the other?

8   A   Not that I'm aware of.

9   Q   You're not aware one way or the other whether

10       there were additional efforts?

11  A   I'm not aware whether there were or not, if

12       that's what you're asking.

13  Q   Yes.

14           And are you aware of any efforts undertaken

15       by the FOMB to determine whether or not the

16       Commonwealth had a balanced budget for fiscal

17       years 2016 through the present?

18           I'm including all of those years.

19           MS. DeCAMP:   Objection.

20           You can answer.

21  A   I am not aware.

22  BY MS. JENNINGS:

23  Q   You are not aware of any efforts?

24  A   I'm not aware of any efforts.

25  Q   You don't know whether there were any or were

DRAFT -- NOT PROOFREAD

217

DRAFT -- NOT PROOFREAD

1      not; is that correct?

2   A  Correct.  I'm unaware of whether there were or

3      were not any efforts undertaken.

4   Q  Moving onto another topic which was in your

5      30(b)(6) notice.  What is the FOMB's knowledge

6      about the amounts of clawback funds disbursed

7      for uses other than the payment of general

8      obligation debt for fiscal years 2018 through

9      the present?

10         MS. DeCAMP:  Objection.

11         You can answer.

12  A  What is the knowledge of --

13         Can you repeat the question one more final

14     for me.

15  BY MS. JENNINGS:

16  Q  What is FOMB's knowledge about the amounts of

17     claw-back funds disbursed for other use -- for

18     uses other than the payment of general

19     obligation debt for each fiscal year from 2018

20     through the present?

21  A  I'm unaware of what the FOMB's knowledge is on

22     that topic.

23  Q  And that's because you haven't spoken to anyone

24      at the FOMB regarding that topic; correct?

25   A  Correct.

                    DRAFT -- NOT PROOFREAD
                                                      218
                    DRAFT -- NOT PROOFREAD

 1   Q  At any point in time?

 2   A  To the best of my recollection -- correct? -- at

 3      any point in time?

 4   Q  And you did not attempt to speak to anyone at

 5      the FOMB regarding that topic; correct?

 6   A  To the best of my recollection, that's correct.

 7   Q  Did anyone from Proskauer during your prep

 8      sessions provide you any information to help you

 9      prepare to testify about the amounts of

10      claw-back funds disbursed for uses other than

11      the payment of general obligation debt?

12         MR. MERVIS:  Note my objection to the form.

13   A  To the best of my recollection, no.

14   BY MS. JENNINGS:

15   Q  And did anyone from Proskauer tell you that

16      Ms. Jaresko is the most knowledgeable person at

17      the oversight board to answer questions

18      regarding that issue?

19         MR. MERVIS:  Again, I do have a potential

20      work product concern, but if you'll agree --

21        MS. JENNINGS:  Same agreement.

22        MR. MERVIS:  Let me get it out so it's

23    clear.

24        -- if you'll agree that if the witness

25    answers that question, it's not a waiver of work

DRAFT -- NOT PROOFREAD
                                              219
DRAFT -- NOT PROOFREAD

1    product with respect to any other question or

2    answer, then I'm fine.

3        MS. JENNINGS:  That's agreed.

4        MR. MERVIS:  Thank you.

5        Do you want to read it back?  Could the

6    court reporter just read it back.

7        (The requested text was read by the

8    reporter.)

9  A  To the best of my recollection, no, nobody at

10    Proskauer told me that.

11 BY MS. JENNINGS:

12 Q  Do you know what the FOMB's knowledge is

13    regarding any efforts the FOMB took to evaluate

14    the amounts of claw-back funds used for

15    disbursements other than for the payment of

16    general obligation debt?

17 A  I'm not particularly aware of what the FOMB may

18     know on that topic -- may be aware of on the

19     topic.

20  Q   That's because you have not spoken to anyone at

21     the FOMB regarding that topic; correct?

22          MS. DeCAMP:  Objection.

23          You can answer.

24  A   To the best of my recollection, that's correct.

25

                    DRAFT -- NOT PROOFREAD
                                                    220
                    DRAFT -- NOT PROOFREAD

1  BY MS. JENNINGS:

2  Q   And you did not attempt to speak to anyone at

3     the FOMB regarding that topic; correct?

4  A   To the best of my recollection, that is correct.

5  Q   No one at Proskauer, during your prep sessions,

6     provided you any information regarding that

7     topic; correct?

8          MR. MERVIS:  Note my objection to the form.

9          THE WITNESS:  Can I answer, Antoinette?

10          MS. DeCAMP:  Yes.  Yes, you can answer.

11  A   To the best of my recollection, no.  No one from

12     Proskauer provided information on that topic to

13     me.

14  BY MS. JENNINGS:

15   Q   No one at Proskauer during your prep sessions

16       informed you that Ms. Jaresko was the most

17       knowledgeable person on the board to answer

18       questions regarding those efforts; correct?

19           MR. MERVIS:  So I do have a concern that

20       the answer to that question might invade

21       attorney work product.

22           I'm happy to have the witness answer the

23       question that's --

24           Taleah, you'll agree that in having him

25       answer we're not waiving any work product claim

DRAFT -- NOT PROOFREAD

221

DRAFT -- NOT PROOFREAD

1    other than with respect to that question and

2    answer.

3        MS. JENNINGS:  Agreed.

4        MR. MERVIS:  Okay.  If the court reporter

5    could just read back the question.

6        (The requested text was read by the

7    reporter.)

8   A   To the best of my recollection, no, no one as

9       Proskauer informed me of that topic.

10  BY MS. JENNINGS:

11  Q   Do you know what the amounts of --

12        Do you know anything about the amounts of

13    claw-back funds that were disbursed for uses

14    other than the payment of general obligation

15    debt during fiscal years 2016 through the

16    present?

17        MR. MERVIS:  Object to the form.

18  A   I'm aware of one instance.  I believe

19    conditionally allocable.  Those conditionally

20    allocable revenues were used.

21  BY MS. JENNINGS:

22  Q   Is that something you provided testimony about

23    earlier today?

24  A   It is.

25  Q   Are you aware of any other amounts of claw-back

DRAFT -- NOT PROOFREAD
                                                  222
DRAFT -- NOT PROOFREAD

1     funds that were disbursed for uses other than

2     the payment of general obligation debt during

3     those fiscal years 2016 through the present?

4         MR. MERVIS:  I object to the form.

5   A   I can only speak to the time when EY was

6     engaged, beginning in the fiscal '18 process

7     forward; so not fiscal '16 or '17.

8         In that time period, I'm only aware of that

9      one instance I testified it earlier in 2019 with

10      the special resolution in which those funds were

11      used.

12   BY MS. JENNINGS:

13   Q   Do you know if there were ever any other

14      instances where claw-back funds were used other

15      than for the payment of general obligation debt?

16          MR. MERVIS:  I object to the form.

17   A   Again, in the time period that I can speak to

18      from which EY was engaged to support the

19      oversight board in its role as an adviser, that

20      is the only time period I'm aware of.

21   BY MS. JENNINGS:

22   Q   Do you know if there were any others, or you

23      just don't know one way or the other?

24   A   I'm not prepared to -- I can't speak to a time

25      period before EY was engaged when the oversight

                    DRAFT -- NOT PROOFREAD
                                                    223
                    DRAFT -- NOT PROOFREAD

1      board existed.

2   Q   Sorry.  Go ahead.

3   A   No, I'm --

4   Q   So from 2018 through the present, are you aware

5      of any other instances other than the one that

 6      you've talked about, or do you know one way or

 7      the other whether there are any others?

 8   A  I am not aware of another instance in which that

 9      was the case.

10   Q  And do you know one way or the other whether

11      there have been other instances during that time

12      period?

13   A  I'm not aware of another instance other than

14      that one time in 2019.

15   Q  Do you think that is the only instance where

16      that occurred?

17   A  To the best of my recollection, I believe that

18      is the only time it has occurred.

19   Q  Just to finish that, you have not confirmed that

20      understanding with anyone from the FOMB;

21      correct?

22   A  To the best of my recollection, that is correct.

23         MR. MERVIS:  How much more do you have?  I

24      thought maybe -- it's been over an hour; so I

25      think it might make sense to take a break.  But

                DRAFT -- NOT PROOFREAD
                                                224
                DRAFT -- NOT PROOFREAD


 1      if you're --

 2         MS. JENNINGS:  Let me just finish up with

```
 3    this one area.  Then we can take a short break.

 4  BY MS. JENNINGS:

 5  Q   Were any efforts undertaken by the FOMB to

 6      evaluate the amounts of claw-back funds to

 7      disburse for uses other than payment of general

 8      obligation debt during the years 2018 through

 9      the present?

10          MS. DeCAMP:  Objection.

11          You can answer.

12  A   I apologize for asking you to read that one more

13      time.

14          The first part of the question.  What was

15      it you asked?

16  BY MS. JENNINGS:

17  Q   Were any efforts undertaken by the FOMB to

18      evaluate the amounts of claw-back funds to

19      disburse for uses other than payment of general

20      obligation debt during fiscal years 2018 through

21      the present?

22  A   I believe efforts were undertaken, yes.

23  Q   What efforts?

24  A   Efforts to determine the amount that would be

25      needed in connection with that 2019 special
```

DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1     resolution that I mentioned.

2  Q  Other than that one specific example that you

3     gave, are you aware of any other efforts?

4  A  To the best of my recollection, I'm not aware of

5     any other efforts that were undertaken.

6  Q  Is it your understanding that that is the only

7     effort undertaken by the FOMB during that time

8     period to evaluate the amounts of claw-back

9     funds to disburse for uses other than the

10     payment of general obligation debt, or is it

11     that you just don't have information?

12          MR. MERVIS:  Object to the form.

13  A  I do not have information on the topic.

14          MS. JENNINGS:  Okay.  Do you want to take a

15     five- or ten-minute break?

16          MR. MERVIS:  That would be good.  Let's

17     make it ten minutes.

18          THE VIDEOGRAPHER:  We will go off the

19     record at 4:15.

20          (A recess was taken.)

21          THE VIDEOGRAPHER:  We're back on the record

22     at 4:23.

23  BY MS. JENNINGS:

24  Q  Mr. Chepenik, what is the FOMB's knowledge about

25      whether or not the Acts 30 and 31 incremental

DRAFT -- NOT PROOFREAD

226

DRAFT -- NOT PROOFREAD

1    revenues, as that term is defined in your

2    30(b)(6) notice, were diverted, retained,

3    reallocated, or redirected during fiscal years

4    2018 through the present?

5         MS. DeCAMP:  Objection.

6         You can answer.

7    A   I'm not positive what the FOMB's knowledge is on

8        those topics.

9    BY MS. JENNINGS:

10   Q   When you say "you're not positive," does that

11       mean you have no knowledge of what the FOMB's

12       knowledge is on those topic?

13   A   I'm just not --

14         I'm not sure what their knowledge is.

15   Q   Do you have any understanding as to what their

16       knowledge is on that topic?

17   A   I imagine that there's some knowledge on that

18       2019 resolution that I mentioned, which involved

19       petroleum tax revenues; so it's an Act 31

20       revenue.

21   Q   Anything else?

22  A   Nothing else I can recall.

23  Q   Do you know what the FOMB's knowledge is

24      regarding any other revenues of or due to the

25      HTA other than the Act 30, 31 incremental

DRAFT -- NOT PROOFREAD
                                              227
DRAFT -- NOT PROOFREAD

1       revenues, were diverted, retained, reallocated,

2       or redirected during fiscal years 2018 through

3       the present?

4           MR. MERVIS:  Object to the form.

5           Excuse me.  Object to the form.

6   A   I'm unaware of what the FOMB's knowledge is on

7       that topic?

8   BY MS. JENNINGS:

9   Q   That's because you have never spoken to anyone

10      at the FOMB regarding that topic; correct?

11          MS. DeCAMP:  Objection.

12          You can answer.

13  A   To the best of my recollection, that is correct.

14  BY MS. JENNINGS:

15  Q   And including outside of the context of

16      preparing for your deposition; correct?

17  A   To the best of my recollection, that is correct.

18  Q   What is EY's knowledge about whether or not the

19      Acts 30 and 31 incremental revenues were

20      diverted, retained, reallocated, or redirected

21      during fiscal years 2018 through the present?

22   A  To the best of my knowledge, EY and I am aware

23      of one instance in 2019 when those revenues were

24      used to fund police and teacher salaries.

25   Q  Outside of that, do you know if there has been

DRAFT -- NOT PROOFREAD

228

DRAFT -- NOT PROOFREAD

1       any other instances where that's occurred?

2    A  Where what has occurred?

3    Q  Where Acts 30 and 31 incremental revenues were

4       diverted, retained, reallocated, or redirected?

5    A  I'm not aware of another instance.

6           I'm not aware of another instance.

7    Q  Is it possible that there is another instance,

8       or are you saying that there was no other

9       instance?

10   A  I'm not aware of another instance.

11   Q  Have you confirmed that there have not been any

12      other instances where that's occurred?

13   A  I have not.

14   Q  You've testified earlier that you read

15      Ms. Lizette Martinez's report in connection with

16    your preparation to testify; correct?

17  A  Correct.

18  Q  Is there anything in her report, in her

19    opinions, that you agree with?

20      MS. DeCAMP:  Objection.

21  A  When I read her report and I read Mr. Brickley's

22    report, it was really a connection of trying to

23    better understand these questions.  I wasn't

24    doing a very detailed review of her analysis in

25    her expert report.

                DRAFT -- NOT PROOFREAD
                                                    229
                DRAFT -- NOT PROOFREAD

1       So I don't have a point of view on what she

2     submitted.  I haven't reviewed the documents and

3     such that shrewd.

4  BY MS. JENNINGS:

5  Q  But you reviewed her report; correct?

6  A  I did read through it briefly, yes.

7  Q  Is there anything that you read in her report

8     that you agree with?

9  A  Not that I can recall, no.

10  Q  Is there anything that you disagree with in her

11    report?

12  A  The notion of the connectivity and the notion of

13      the highway funding being redistributed back to

14      HTA, I disagree with that, with that approach.

15      I don't believe that's an accurate

16      representation of how the budgets are

17      constructed.

18   Q   And why is that?

19   A   Because they are not directly connected.

20   Q   And where does that --

21          Where does your understanding come from in

22      that regard?

23   A   EY's knowledge and work on the budgeting process

24      each year.

25   Q   Anything else you disagree with in the report?

DRAFT -- NOT PROOFREAD
                                                 230
DRAFT -- NOT PROOFREAD

1          MS. DeCAMP:  Objection.  Objection.  That

2      is not within the scope of the topics, but you

3      can ask him for his personal opinion.

4   BY MS. JENNINGS:

5   Q   You said it was a document that you reviewed in

6      connection with preparing for the testimony; so

7      I think it's fair game.

8          I will ask you in the context of the

9      30(b)(6).  You can make your objection and he

10      can answer the question.

11              MS. DeCAMP:  I object.  It is not -- it is

12      EY's position that that is not within the scope

13      of the topics, particularly given his testimony

14      about the purpose for which he was reviewing the

15      report.

16              But I will permit him to answer the

17      question as an individual.

18  BY MS. JENNINGS:

19  Q   Just for the record, I disagree, but you can

20      answer the question.  We can fight over it

21      another time as to whether it's in your personal

22      knowledge or within the scope your testimony

23      here today as a 30(b)(6) witness.

24  A   In my -- can you actually repeat the question

25      one more time.

                    DRAFT -- NOT PROOFREAD
                                                    231
                    DRAFT -- NOT PROOFREAD

1   Q   Let me try to find it.

2               You identified one area in the Martinez

3       report that you disagreed with, and I'm asking

4       you is there anything else in the report that

5       you disagree with?

6   A   In my personal capacity, that's the one

7    connection that comes to mind.  I do not recall

8    another area that I disagree with in particular.

9  Q  You have not spoken to anyone from the FOMB to

10    find out whether there have been any revenues of

11    or due to the HTA that were diverted, retained,

12    reallocated, or redirected during fiscal years

13    2018 through the present in connection with your

14    preparation to testify today; correct?

15        MR. MERVIS:  Note my objection to the form.

16  A  To the best of my recollection, that is correct.

17  BY MS. JENNINGS:

18  Q  You haven't spoken to anyone from the FOMB

19    outside of -- prior to preparing for your

20    deposition regarding this topic; correct?

21  A  With regard to which topic?

22  Q  The one that we're discussing which is -- I can

23    repeat it for you.

24        Whether there have been any revenues of or

25    due to the HTA that were diverted, retained,

DRAFT -- NOT PROOFREAD

232

DRAFT -- NOT PROOFREAD

1    reallocated, or redirected during fiscal years

2    2018 through the present?

3  A  I understand.  Thank you for clarifying.

4           To the best of my recollection, that is

5      correct.  I have not.

6  Q   Ms -- withdrawn.

7           The Proskauer attorneys who attended your

8      prep session did not provide you with any

9      information in connection with these topics;

10     correct?

11          MR. MERVIS:  Objection to form.

12  A   In connection to which topics?

13  BY MS. JENNINGS:

14  Q   I'm sorry.  This topic, the one that we just

15     discussed.  I can read it again if you need me

16     to.

17  A   If you can, that would be helpful.

18  Q       "Whether there have been any revenues of or

19     due to the HTA that were diverted, retained,

20     reallocated, or redirected during fiscal years

21     2018 through the present."

22          MR. MERVIS:  Objection to the form.

23  A   That is correct.  To the best of my

24     recollection, they did not provide me any

25     information on that topic.

```
 1  BY MS. JENNINGS:

 2  Q   You didn't try to get any information regarding

 3      that topic from anyone from the FOMB; correct?

 4  A   To the best of my recollection, I did not.  No.

 5  Q   Did Proskauer inform you that Ms. Jaresko is the

 6      most knowledgeable person at the oversight board

 7      to answer questions regarding this topic?

 8          MR. MERVIS:  Again, I do have a possible

 9      work product concern, but I am fine with him

10      answering the question so long as, Taleah,

11      you'll agree it's not a waiver of work product

12      claims with respect to any other question or

13      answer.

14          MS. JENNINGS:  Agreed.

15          MR. MERVIS:  Do you need the question read

16      back, Adam?

17          THE WITNESS:  No.

18  A   No.  To the best of my recollection, no, nobody

19      mentioned -- nobody from Proskauer mentioned

20      that to me.

21  BY MS. JENNINGS:

22  Q   Do you know, as you sit here as a 30(b)(6)

23      witness, whether the FOMB undertook any efforts

24      to evaluate whether to divert, retain,

25      reallocate, or redirect revenues -- by
```

DRAFT -- NOT PROOFREAD

234

DRAFT -- NOT PROOFREAD

```
 1      "revenues," I'm limiting it to revenues of or

 2      due to the HTA?

 3            MS. DeCAMP:  Objection.

 4            You can answer.

 5            MR. MERVIS:  Object to the form.

 6            MS. DeCAMP:  You can answer.

 7   A  To the best of my recollection, I'm not aware of

 8      those efforts.

 9   BY MS. JENNINGS:

10   Q  Are you aware of whether the FOMB has any

11      knowledge about any efforts it undertook to

12      evaluate whether to divert, retain, reallocate,

13      or redirect revenues in that way?

14   A  I'm only aware of one instance in 2019.

15   Q  And other than that, you're not aware of whether

16      the FOMB has knowledge of other instances;

17      correct?

18   A  I am not aware.  That is correct.

19   Q  You did not do anything to try to find out

20      whether the FOMB has knowledge of other

21      instances; correct?

22   A  That is correct.
```

23   Q   Proskauer did not provide you any information to

24       help you testify on this topic; correct?

25   A   To the best of my recollection, I can't think of

                    DRAFT -- NOT PROOFREAD
                                                        235
                    DRAFT -- NOT PROOFREAD

1        any information that was provided on the topic

2        to me.

3    Q   No one at Proskauer informed you that

4        Ms. Jaresko is the most knowledgeable person on

5        the board to answer questions about any such

6        efforts undertaken by the FOMB; correct?

7            MR. MERVIS:  I'm going to try a shorter

8        version.

9            I'm all right with the witness answering

10       that question so long as you agree, Taleah, that

11       in providing an answer, there will be no waiver

12       of any work product claim by the board as to any

13       other question or answer.

14           MS. JENNINGS:  Agreed.

15           MR. MERVIS:  Do you need that back?

16           MS. JENNINGS:  Ms. Court Reporter, can you

17       please read that one back.

18           (The requested text was read by the

19       reporter.)

20   A   To the best of my recollection, that is correct.

21       No one at Proskauer informed me of that.

22   BY MS. JENNINGS:

23   Q   Is Ms. Jaresko aware that you were providing

24       30(b)(6) testimony today?

25           MR. MERVIS:  Object to the form.


                    DRAFT -- NOT PROOFREAD
                                                    236
                    DRAFT -- NOT PROOFREAD

 1           MS. DeCAMP:  Objection.

 2           You can answer.

 3   A   I have not had a direct discussion with

 4       Ms. Jaresko about that, about that topic.  It's

 5       my understanding she is aware.

 6   BY MS. JENNINGS:

 7   Q   And is your --

 8           Does your understanding come from anyone

 9       other than counsel for EY?

10   A   No.

11   Q   Did anyone direct you not to speak to

12       Ms. Jaresko about any of the 30(b)(6) topics?

13           MS. DeCAMP:  Objection.

14           You can answer that "Yes" or "No."

15   A   No.

16   BY MS. JENNINGS:

17   Q   So you did not tell Ms. Jaresko that you were

18       providing testimony at the 30(b)(6) deposition

19       today?

20   A   This morning I sent her a note saying I will be

21       out of pocket for most of the day in my

22       deposition, but that was purely just so she knew

23       if she needed to contact someone on the EY team

24       to contact one of my colleagues.  Other than

25       that one email note there's been no discussion

                    DRAFT -- NOT PROOFREAD
                                                    237
                    DRAFT -- NOT PROOFREAD

1        with Natalie on the topic of my 30(b)(6)

2        deposition that I was a part of.

3    Q   And are you aware of whether she was a part of

4        any -- this is a "Yes" or "No" question.

5            Whether Ms. Jaresko was a part of any

6        discussions concerning this 30(b)(6) deposition.

7            Just a "Yes" or "No" question?

8            MS. DeCAMP:  Object to the form.

9    A   Yes.

10   BY MS. JENNINGS:

11   Q   And do you know how many discussions she was a

12       part of?

13           MS. DeCAMP:  Objection.

14   A    No.

15   BY MS. JENNINGS:

16   Q    Did Ms. Jaresko ask you anything about the

17        30(b)(6) deposition that you would be sitting

18        for today?

19   A    No.

20   Q    Did anybody other than -- or who knows that

21        you're here providing 30(b)(6) testimony today?

22            MR. MERVIS:  Objection to the form.

23   A    Well, I -- the people that I'm aware of that I'm

24        aware are representatives from EY including my

25        counsel, Ms. DeCamp; representatives from

DRAFT -- NOT PROOFREAD
                                                    238
DRAFT -- NOT PROOFREAD

1    Proskauer, most of whom are here; Mr. Mervis;

2    and then I don't know if the filing of the

3    response was public and whoever could have

4    pulled it from the public docket but that's

5    generally who I'm aware of that are aware.

6        In that same email that I sent to Natalie

7    this morning which was the first communication I

8    had with her on the matter, I included her chief

9    of staff and two other senior board staff

10   representatives who I'm working with on

11    unrelated matters, but they're topical and

12    timely, and so I wanted to make sure they knew I

13    would be unavailable.  That's all the people I

14    can think of.

15  BY MS. JENNINGS:

16  Q   So prior to your email today, are you aware of

17      whether anyone from the FOMB knew that you would

18      be providing 30(b)(6) testimony today?

19  A   I am unaware of who may have known.

20  Q   Putting aside their identities, do you know if

21      anyone from the FOMB was aware that you would be

22      providing 30(b)(6) testimony other than learning

23      it from your email that you just described this

24      morning?

25  A   It's possible I may have mentioned it once or

DRAFT -- NOT PROOFREAD
                                                      239
DRAFT -- NOT PROOFREAD

1    twice to one of the senior board staff

2    representatives in the past.  It was not in the

3    context of providing information analysis.  It

4    was more than I couldn't respond to their

5    questions because I was focused on this instead.

6  Q   Who was that, that you had that conversation

7      with?

```
 8   A   I wouldn't classify it as "conversations."

 9           I would classify it as a "comment."  The

10       one person that comes to mind is Herman owe

11       heyed da, one of the board staff members that I

12       work with quite frequently on a number of

13       topics.

14   Q   When did you inform him of that or make that

15       comment to him?

16   A   Probably within the last week, I would say.

17   Q   Is there anyone else at the FOMB who to my

18       knowledge knew that you would be providing

19       30(b)(6) testimony in connection with this

20       matter?

21   A   I believe the chief -- the chief of staff and

22       deputy chief of staff are aware.

23   Q   And when did they become aware?

24           MR. MERVIS:  Object to the form.

25   A   I believe they became aware when there were
```

                    DRAFT -- NOT PROOFREAD
                                                    240
                    DRAFT -- NOT PROOFREAD

```
 1   prior discussions with Ms. Jaresko that I was

 2   not a part of.  Prior discussion about

 3   Ms. Jaresko or EY providing testimony as a

 4   30(b)(6).
```

5    BY MS. JENNINGS:

6    Q   And when did that discussion take place, to your

7        knowledge?

8    A   To the best of my recollection, within the last

9        month, maybe.  Yeah.

10   Q   How long did you know that you would be

11       providing 30(b)(6) testimony in this proceeding?

12           MR. MERVIS:  Objection to the form.

13           THE WITNESS:  I can answer?

14           MS. DeCAMP:  You can answer.

15   BY MS. JENNINGS:

16   Q   Yes.

17   A   Within the last month, I would say.

18   Q   And when you say "within the last month," was it

19       a month ago?  Was it anytime within the past 30

20       days?  Give me some sense of what you're talking

21       about?

22   A   I honestly -- I don't recall the specific day

23       and the specific week.  I'm aware that there

24       were conversations about whether EY was

25       well-positioned to be the respondent and the

                    DRAFT -- NOT PROOFREAD
                                                    241
                    DRAFT -- NOT PROOFREAD

1        need for EY to receive a subpoena requesting

2    testimony as a declarant in response to that

3    said subpoena.

4         I don't know the timing of all that because

5    I was not involved in those discussions.  And I

6    just recall that they all occurred really within

7    the last, I would say, month.  Maybe within the

8    last two months at the most but that's really

9    the last month that I recall.

10  Q   Was it your understanding that if EY was going

11      to provide a 30(b)(6), sit for a 30(b)(6)

12      deposition, you would be the representative

13      testifying at the deposition?

14         MR. MERVIS:  Object to the form.

15  A   I know there were some discussions internally

16      about who the best positioned person would be,

17      the most knowledgeable person would be, to be

18      the respondent, and I was selected as that

19      person.

20  BY MS. JENNINGS:

21  Q   You're also designated as a witness who may

22      provide testimony during the plan confirmation

23      hearing; is that right?

24  A   I am, yes.

25  Q   And is your testimony going to concern any of

DRAFT -- NOT PROOFREAD

242

DRAFT -- NOT PROOFREAD

1    the six topics identified on the 30(b)(6)

2    subpoena that was sent to EY?

3          We can pull those up, if you need it.  Do

4    you need it?

5          MR. MERVIS:  Well, he wasn't -- Taleah, he

6    wasn't noticed about his trial testimony.

7          MS. JENNINGS:  I'm asking about topics

8    relating to this 30(b)(6).  So why don't we get

9    the 30(b)(6) notice up so he can see it.

10         MR. GARCIA:  I can get it up on the screen.

11         Alejandro, please.

12   BY MS. JENNINGS:

13   Q   Let's look at Topic 1.  Just take an opportunity

14       to look at that Topic 1.

15   A   So I have not been noticed --

16         MR. MERVIS:  Hold on.  There's no question,

17       as far as I can tell.

18   BY MS. JENNINGS:

19   Q   Have you read Topic 1?

20   A   I have.

21   Q   And with regard to --

22         You're going to be submitting a declaration

23   in connection with the plan confirmation

24      hearing; correct?

25          MS. DeCAMP:  That's a "Yes" or "No."

DRAFT -- NOT PROOFREAD
                                                    243
DRAFT -- NOT PROOFREAD

1   A   Yes.

2   BY MS. JENNINGS:

3   Q   And is the testimony in your declaration going

4       to concern at all the topic that is identified

5       here as Number 1?

6           MR. MERVIS:  So I object.  I don't

7       understand why in this deposition it's

8       appropriate for you to ask that question.  I

9       mean --

10          Look, I object.

11          MS. JENNINGS:  Put it this way -- why don't

12      we do it this way:  I may come back to 1, but

13      why don't we start with 2, which is a topic you

14      are here to discuss.

15          MR. MERVIS:  Well --

16          MS. JENNINGS:  Let me get my question out.

17      You may have the same objection, you may not.

18      I'll certainly have a different answer to your

19      objection with regard to 2.

20          MR. MERVIS:  Fair enough.

21    BY MS. JENNINGS:

22    Q    Why don't you take a look at Topic 2 and read

23         that.

24    A    Okay.  I've read it.

25    Q    Okay.  And will you be providing any testimony

                    DRAFT -- NOT PROOFREAD
                                                          244
                    DRAFT -- NOT PROOFREAD

1     in your declaration regarding the topic listed

2     here under -- with the Number 2?

3          MS. DeCAMP:  "Yes" or "No."

4          MR. MERVIS:  Also, let me --

5          I object to the form.  The difficulty --

6     this topic in my mind is unintelligible or close

7     to it.  It's a pretty --

8          MS. JENNINGS:  Let's not have speaking

9     objections.  You're getting into a speaking

10    objection, and I want to cut that short --

11         MR. MERVIS:  Yeah, let's not --

12         MS. JENNINGS:  -- because it guides the

13    witness.

14         If you have an objection, then let's talk

15    about it, but regarding, you know, what you're

16    saying right now is inappropriate.

17         MR. MERVIS:  I have an objection which is

18      that this question goes beyond the scope of

19      these topics that the witness was noticed for.

20          MS. JENNINGS:  I'm talking about a topic

21      that he was noticed for.

22          MR. MERVIS:  That doesn't make it

23      appropriate.  That doesn't make it appropriate

24      about asking him what his trial testimony --

25          MS. JENNINGS:  Why don't you guys decide

DRAFT -- NOT PROOFREAD

245

DRAFT -- NOT PROOFREAD

1      whether you're going to direct him not to

2      answer.  I'm going to stand by my question.

3      It's directly related to the topics that he's

4      here for and whether -- if he's testifying about

5      something relating to the topics, then I want to

6      know what that testimony is going to be because

7      it should be disclosed in connection with this

8      topic that's listed here that he is prepared and

9      designated to testify about.

10    BY MS. JENNINGS:

11    Q  So I'll ask again:  Is the subject of your

12      declaration, does it concern at all testimony

13      relating to Topic Number 2?

14          MS. DeCAMP:  I object to the question as

15      outside the scope of the deposition topics, but,

16      Adam, you can answer that "Yes" or "No."

17          MR. MERVIS:  I object to the form.

18  A   Can you read the question.

19  BY MS. JENNINGS:

20  Q   Yes.

21          Why don't you read Number 2.  Does your

22      declaration that --

23          Have you already started to read your

24      declaration?

25  A   I have, yes.

DRAFT -- NOT PROOFREAD
                                                    246
DRAFT -- NOT PROOFREAD

1   Q   And the testimony contained in your declaration,

2       does any of it relate to Topic Number 2?

3           MR. MERVIS:  I object.  The way that's

4       phrased, I would ask that the witness not answer

5       that question.

6           I was okay with the way you did it before,

7       but that's a direct invasion of work product.

8           THE WITNESS:  Antoinette, can I --

9           MS. DeCAMP:  Could you read back the

10      question.

11          MS. JENNINGS:  Let me ask a better

12      question.  I think I know where Mr. Mervis -- I

13      think I see his problem.

14          MR. MERVIS:  Yeah, you probably do.

15  BY MS. JENNINGS:

16  Q   Are you going to provide testimony in the plan

17      confirmation hearing, to the best of your

18      knowledge, regarding Topic Number 2?

19          MS. DeCAMP:  "Yes" or "No."

20          MR. MERVIS:  Just I object to the form.  I

21      have no other concern right now.

22  A   To the best of my knowledge, no.

23  BY MS. JENNINGS:

24  Q   And same question for Topic Number 3.

25          MS. JENNINGS:  Are you able to scroll down

                    DRAFT -- NOT PROOFREAD
                                                      247
                    DRAFT -- NOT PROOFREAD

1       a little bit so the full 3 is showing?

2           Thank you.

3   BY MS. JENNINGS:

4   Q   Are you going to be providing testimony at the

5       plan confirmation hearing regarding Topic

6       Number 3?

7           MS. DeCAMP:  Same objection.  You can

8       answer "Yes" or "No."

9          MR. MERVIS:  And I object to the form.

10    A    To the best of my knowledge, no.

11    BY MS. JENNINGS:

12    Q    And let's move to Number 4.  Is it your

13         understanding that you will be testifying

14         regarding the topic -- at the plan confirmation

15         hearing regarding the topic listed here on this

16         30(b)(6) subpoena as Topic Number 4?

17          MS. DeCAMP:  Same objection.

18          You can answer "Yes" or "No."

19          MR. MERVIS:  Same objection to form.

20    A    To the best of my knowledge, no.

21    BY MS. JENNINGS:

22    Q    And with regard to Number 5, same question:  Is

23         it your understanding that you'll be providing

24         testimony regarding this topic at the plan

25         confirmation hearing?

                    DRAFT -- NOT PROOFREAD
                                                      248
                    DRAFT -- NOT PROOFREAD

1          MS. DeCAMP:  Same objection.

2          You can answer "Yes" or "No."

3          MR. MERVIS:  I have the same objection to

4          form.

5     A    To the best of my knowledge, no.

6    BY MS. JENNINGS:

7    Q    And same question with regard to 6.

8            MS. DeCAMP:  And same objection.

9            You can answer "Yes" or "No."

10           MR. MERVIS:  Same objection to form.

11   A    To the best of my knowledge, no.

12           MS. JENNINGS:  Let's scroll back up to

13       Number 1.

14   BY MS. JENNINGS:

15   Q    Will you be providing testimony, to the best of

16       your knowledge, at the plan confirmation hearing

17       regarding Topic Number 1?

18           MS. DeCAMP:  Same objection.

19           You can answer "Yes" or "No."

20           MR. MERVIS:  And same objection to form.

21   A    To the best of my knowledge, no.

22           MS. JENNINGS:  I probably am done.  I just

23       want to look over my notes.  Maybe a five-minute

24       break would help.

25           MR. MERVIS:  That's fine.  We'll come back

                  DRAFT -- NOT PROOFREAD
                                              249
                  DRAFT -- NOT PROOFREAD

1    at --

2            MS. JENNINGS:  5:00.

3          MR. MERVIS:  -- 5:00.

4          THE VIDEOGRAPHER:  I'll take us off the

5     record at 4:55.

6          (A recess was taken.)

7          THE VIDEOGRAPHER:  Back on the record at

8     5:00 PM.

9          MR. MERVIS:  I don't know.  Is Taleah

10     actually on the -- maybe not.

11          MR. GARCIA:  She's going to be on in a

12     minute.  Sorry about that.

13          MR. MERVIS:  I have no questions.

14          THE VIDEOGRAPHER:  Ms. Jennings, we are now

15     on the record.  You may proceed.

16   BY MS. JENNINGS:

17   Q   Mr. Chepenik, I have no further questions at

18     this time.

19          MS. JENNINGS:  I, like Mr. Garcia, reserve

20     all rights on behalf of my client.  I think

21     that's enough to say while we're in the presence

22     of you.

23          Okay.  Arturo, you're on mute.  I will want

24     to say something before we close the record, but

25     anyone else who needs to ask questions, I guess

                    DRAFT -- NOT PROOFREAD

DRAFT -- NOT PROOFREAD

1    we can open it up for them.

2        MR. GARCIA:  I also don't have any further

3    questions; so does anybody in the deposition,

4    any other party have any questions of

5    Mr. Chepenik?

6        I will take that as a no; so Taleah?

7        MS. JENNINGS:  I just want to state for the

8    record, and Mr. Chepenik can stay or he can go

9    for this.

10       MR. MERVIS:  For the record -- hold on.

11   For the record, he can sign off.  You don't need

12   to waste time.

13       MS. JENNINGS:  Who doesn't need to waste

14   time?

15       MR. MERVIS:  Adam.

16       MS. JENNINGS:  Oh, yes.  I don't need Adam.

17   We're closed with regard to Adam.

18       MR. GARCIA:  Mr. Chepenik, thank you very

19   much for your time today.  Good to meet you.

20   And coffee on me next time you're in San Juan.

21       THE WITNESS:  Certainly, Mr. Garcia.  The

22   board's offices are right next to yours, I

23   believe.

24       MR. GARCIA:  I know.  I know they are.  And

25      we will not discuss anything with regard to your

DRAFT -- NOT PROOFREAD
251
DRAFT -- NOT PROOFREAD

1       testimony or the PROMESA case.

2           Thank you.

3           THE WITNESS:  Bye-bye.

4           MS. JENNINGS:  I do want to stay on the

5       record for a minute.

6           MR. MERVIS:  Yeah.  Yeah, I didn't think

7       Adam needed to be --

8           MS. JENNINGS:  I just want to state for the

9       record, you know, it's clear that

10      Mr. Chepenik -- Chepenik, excuse me, did not

11      prepare to testify in the way that the parties

12      have agreed that he would be here to testify.

13          He did not try to determine anything within

14      the FOMB's knowledge.

15          As you know, we served an initial 30(b)(6)

16      on the FOMB.  We were told that a representative

17      from EY was best situated to testify on those

18      topics and that you would be -- FOMB would be

19      sort of coordinate an EY representative

20      testifying in response to our 30(b)(6) subpoena

21      to the FOMB.

22      And I think --

23      I can actually quote during one of our

24    meet-and-confers on this issue, when we said we

25    would be going to court, it was, you know, a

DRAFT -- NOT PROOFREAD

252

DRAFT -- NOT PROOFREAD

1    Proskauer representative said, "It's just a

2    piece of paper.  You are getting the 30(b)(6)

3    that you want from the FOMB.  It's just a piece

4    of paper.  Someone from EY will be here to

5    testify, but they need a subpoena because of

6    their internal protocols and processes and

7    procedures."

8    So I am disappointed in what happened today

9    and what Mr. Chepenik was not prepared to do

10    today, and I think absent -- you know, because

11    of the schedule right now, how tight it is, we

12    think we need to go to court very quickly on

13    this, I want to open up the floor for a

14    meet-and-confer so that if there's, you know,

15    something you guys want to do to fix the

16    situation, you can.

17    But right now, we feel like we were misled

18    to walk away from the FOMB 30(b)(6,) and we are

19      not too happy about it.

20              MS. DeCAMP:  Wait.  Ms. Jennings, can I

21      make one comment, and then I'll sign off because

22      this is really more of a discussion between

23      Proskauer and the DRA parties.

24              It is Ernst & Young's position that the

25      witness was adequately prepared to testify to

DRAFT -- NOT PROOFREAD
                                                    253
DRAFT -- NOT PROOFREAD

1       the topics as they relate to the work that

2       Ernst & Young did for the board, which is

3       what -- how I read the stipulation.

4               You guys can have your discussions either

5       way.

6               Ernst & Young is taking the position that

7       we fulfilled our obligation in producing a

8       witness for purposes of this -- for purposes of

9       this deposition.

10              I note it is 5:05, and we've been going

11      since 9:30 this morning with a couple of breaks,

12      including an hour break for lunch; so I believe

13      six -- more than six hours of testimony kind of

14      evidences that the witness was prepared to

15      testify regarding the topics.

16          There were five topics, six hours of

17     testimony.  We believe EY was -- the witness was

18     adequately prepared.

19          I think any other discussions -- I don't

20     need to be part of because that really is

21     between the parties.  Ernst & Young is not a

22     party in this matter; so unless anyone has any

23     objection, I also will sign off and leave the

24     rest of any meet-and-confer discussions to you

25     guys.

                    DRAFT -- NOT PROOFREAD
                                              254
                    DRAFT -- NOT PROOFREAD

1          MR. GARCIA:  Ms. DeCamp, before you leave,

2     I would like the videographer to let us know how

3     much time has elapsed.

4          THE VIDEOGRAPHER:  We've been on the record

5     for five hours and 22 minutes and counting.

6          MR. GARCIA:  Okay.  All right.  That was my

7     guesstimate.  So five hours, 24 minutes.

8          Taleah, go ahead.

9          I don't have anything else for you,

10     Ms. DeCamp.  I wanted for you to understand how

11     much time is spent.

12          MS. DeCAMP:  Thank you, Mr. Garcia.  I

13    appreciate it.

14         MR. GARCIA:  Thank you very much, by the

15    way.

16         MS. DeCAMP:  Sure.  Bye.

17         MR. MERVIS:  So my colleague, partner,

18    Margaret Dale, is on the video.  I have my own

19    thoughts about what you said, Taleah, but I'll

20    let Margaret, I'm sure she'll express them more

21    eloquently.

22         I'll turn the floor over to her.

23         MS. DALE:  Thanks, Mike.  This is Margaret

24    Dale.

25         Taleah or Ms. Jennings, however we're doing

                  DRAFT -- NOT PROOFREAD
                                              255
                  DRAFT -- NOT PROOFREAD

1     this, we disagree with your position.  You were

2     not misled.

3          We told you from the get-go that someone at

4     EY would be in the best position to answer these

5     topics on behalf of the board, and we said we

6     would adopt that testimony in its entirety.

7          That's what we've done.  And so I don't

8     have time -- I'm already past my 5:00 that I

9     stayed on for this because I figured you were

10      about to make some statement on the record.

11          So I'm happy to have another

12      meet-and-confer, if you want to, tomorrow, can't

13      do it tonight, if that makes sense.  If not, you

14      can make whatever application you want to the

15      Court, and we will address it.

16          I believe in the stipulation that you

17      signed, you indicated that you would not be

18      making any further efforts to change any kind

19      of -- the schedule.

20          And so I'm not sure exactly what you're

21      looking for.  But as I said, happy to talk

22      later, tomorrow, if that makes sense; and if it

23      doesn't make sense, we'll just respond to your

24      request to the Court.

25          MS. JENNINGS:  Yes.  I mean, you have other

DRAFT -- NOT PROOFREAD

256

DRAFT -- NOT PROOFREAD

1       colleagues if you have to jump.  I understand.

2       We're all busy.

3           If there's one of your other colleagues who

4       wants to continue discussing; if not, then I

5       think we are really -- there's nothing more to

6       discuss if you're not going to produce an

7       appropriate 30(b)(6) witness in response to our

8       30(b)(6) notice to the FOMB, who actually has

9       knowledge and educates themselves on the FOMB's

10      knowledge, then I think really the only thing

11      left for us to do is go to court on it.

12           MS. DALE:  Okay.  You take whatever steps

13      you need to.  Thanks a lot.

14           MS. JENNINGS:  Thank you.

15           MR. GARCIA:  Thank you, all.

16           MR. MERVIS:  So we're off the record now?

17           MR. GARCIA:  Michael, for the record, I

18      fully agree with Taleah.  I think that the

19      witness -- contrary to what Margaret is saying,

20      I don't think the witness -- especially the last

21      round of questions, I don't believe the witness

22      was properly prepared to be a 30(b)(6) witness.

23           And I don't believe that you have complied

24      with the provisions of the stipulation as so

25      ordered by the Court.  But, you know, we'll

DRAFT -- NOT PROOFREAD

257

DRAFT -- NOT PROOFREAD

1       discuss that further, and if need be, we'll come

2       back to you and go to court, if we have to.

3            MS. DALE:  Okay.

4              MR. MERVIS:  Bye, everyone.

5              THE VIDEOGRAPHER:  I'll officially take us

6        off the record at 5:09.  Thank you.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DRAFT -- NOT PROOFREAD