# EXHIBIT A

```
                                                            Page 1

 1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF PUERTO RICO
 2     _____
       In re:                        PROMESA
 3                                    Title III
       THE FINANCIAL OVERSIGHT
 4     AND MANAGEMENT BOARD FOR
       PUERTO RICO,
 5
          as representative of
 6
       THE COMMONWEALTH OF           Case No.17-BK-3283
 7     PUERTO RICO, et al.,          (Jointly Administered)
       THE COMMONWEALTH OF
 8     PUERTO RICO, et al.,
 9                  Debtors.
       _____
10     In re:                        PROMESA
                                      Title III
11     THE FINANCIAL OVERSIGHT
       AND MANAGEMENT BOARD OF
12     PUERTO RICO,
13        as representative of
                                      Case No. 17-BK-3566
14     THE EMPLOYEES RETIREMENT
       SYSTEM OF THE GOVERNMENT
15     OF THE COMMONWEALTH OF
       PUERTO RICO,
16
                    Debtor.
17     _____
       In re:                        PROMESA
18                                    Title III
       THE FINANCIAL OVERSIGHT
19     AND MANAGEMENT BOARAD FOR
       PUERTO RICO,
20
          as representative of
21                                    Case No. 19-BK-5523
       PUERTO RICO PUBLIC
22     BUILDINGS AUTHORITY,
23                  Debtor.
       _____
24
25                        *   *   *
```

Page 2

1          Remote videoconferenced deposition of

2   MARTI P. MURRAY, Witness herein, called by

3   Cantor-Katz Collateral Monitor, LLC, GDB Debt

4   Recovery Authority, (DRA), for cross-examination

5   pursuant to the Federal Rules of Civil Procedure,

6   taken before me, April L. Crites, RPR, RMR, CRR, a

7   Notary Public in and for the State of Ohio, in

8   East Hampton, New York, on Wednesday,

9   October 13, 2021, at 9:31 a.m., Atlantic Standard

10  Time.

11                    *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                       I  N  D  E  X

2             EXAMINATIONS CONDUCTED                PAGE

3                   Marti P. Murray

4       Cross-Examination By Ms. Jennings...........  10

5

6                           *   *   *

7                         EXHIBITS

8       MARKED              DESCRIPTION               PAGE

9    Exhibit 1      Expert Report of Marti P.          20
                    Murray, September 13, 2021

10

     Exhibit 2      Independent Contractor             28
11                  Services Agreement The
                    Brattle Group, Inc.,
12                  Effective Date:  March 25,
                    2019

13

     Exhibit 3      Disclosure Statement For the       39
14                  Seventh Amended Title III
                    Joint Plan of Adjustment of
15                  the Commonwealth of Puerto
                    Rico, et al.

16

17                        *   *   *

18

19

20

21

22

23

24

25

Page 4

```
 1   APPEARANCES: (All parties appeared remotely)
 2       On behalf of the Cantor-Katz Collateral
         Monitor, LLC, as Collateral Monitor for GDB
 3       Debt Recovery Authority:
 4           Schulte Roth & Zabel, LLP
 5       By:  Noah N. Gillespie, Esquire
             Jacqueline Maero Blaskowski, Esquire
 6           Douglas S. Mintz, Esquire
             901 Fifteenth Street, NW
 7           Suite 800
             Washington, D.C.  20005
 8           202-729-7483
             202-469-4614
 9           noah.gillespie@srz.com
             jacqueline.maeroblaskowski@srz.com
10           douglas.mintz@srz.com
11           -- and --
12           Taleah E. Jennings, Esquire
             Douglas I. Koff, Esquire
13           919 Third Avenue
             New York, New York 10022
14           212-756-2773
             taleah.jennings@srz.com
15           douglas.koff@srz.com
16       On behalf of the Financial Oversight and
         Management Board as Representative for the
17       Debtors:
18           Proskauer Rose LLP
19       By:  Margaret A. Dale, Esquire
             Chantel L. Febus, Esquire
20           Julia D. Alonzo, Esquire
             Laura E. Stafford, Esquire
21           Eleven Times Square
             8th Avenue and 41st Street
22           New York, New York  10036-8299
             212-969-3315
23           mdale@proskauer.com
             cfebus@proskauer.com
24           jalonzo@proskauer.com
             lstafford@proskauer.com
25
             -- and --
```

Page 5

```
 1   APPEARANCES: (Continued)
 2           Proskauer Rose LLP (continued)
 3     By:  Lary A. Rappaport, Esquire
             Michael Firestein, Esquire
 4           2029 Century Park East
             Suite 2400
 5           Los Angeles, California 90067-3010
             310-284-5669
 6           lrappaport@proskauer.com
             mfirestein@proskauer.com
 7
             -- and --
 8
             Corey I. Rogoff, Esquire
 9           1001 Pennsylvania Avenue, N.W.
             Suite 600, South
10           Washington, D.C.  20004
             202-416-6884
11           crogoff@proskauer.com
12           -- and --
13           O'Neill & Borges, LLC
14           Gabriel A. Miranda, Esquire
             250 Munoz Rivera Avenue
15           American International Plaza
             Suite 800
16           San Juan, Puerto Rico  00918-1813
             787-282-5713
17           gabriel.miranda@oneillborges.com
18     On behalf of Ambac Assurance Corporation:
19           Milbank, LLP
20     By:  Jonathan Ohring, Esquire
             55 Hudson Yards
21           New York, New York  10001-2163
             212-530-5147
22           johring@milbank.com
23     /
24     /
25     /
```

```
                                                   Page 6

 1   APPEARANCES: (Continued)
 2       On behalf of the Financial Guaranty Insurance
         Company (FGIC):
 3
             Butler Snow, LLP
 4
         By:  Adam M. Langley, Esquire
 5            Crescent Center
              6075 Poplar Avenue
 6            Suite 500
              Memphis, Tennessee 38119
 7            901-680-7316
              adam.langley@butlersnow.com
 8
         On behalf of the Official Committee of Retired
 9       Employees:
10           Jenner & Block, LLP
11       By:  Laura E. Pelanek, Esquire
              353 North Clark Street
12            43rd Floor
              Chicago, Illinois  60654-3456
13            312-840-7255
              lpelanek@jenner.com
14
         On behalf of AmeriNational Community
15       Services, LLC:
16           McConnell Valdes, LLC
17       By:  Arturo J. Garcia-Sola, Esquire
              Alejandro J. Cepeda-Diaz, Esquire
18            270 Munoz Rivera Avenue
              Seventh Floor
19            Hato Rey, Puerto Rico  00918
              787-250-5632
20            ajg@mcvpr.com
              ajc@mcvpr.com
21
         /
22
         /
23
         /
24
         /
25
```

```
                                                      Page  7

 1    APPEARANCES: (Continued)
 2       On behalf of National Public Finance Guarantee
         Corporation:
 3
             Weil Gotshal & Manges, LLP
 4
         By:  Lauren Fairman, Esquire
 5            Robert S. Berezin, Esquire
              Stephanie Morrison, Esquire
 6            767 Fifth Avenue
              New York, New York  10153-0119
 7            212-310-8728
              lauren.fairman@weil.com
 8            robert.berezin@weil.com
              stephanie.morrison@weil.com
 9
         On behalf of the National Public Finance
10       Guarantee Corporation:
11            Adsuar Muniz Goyco Seda &
              Perez-Ochoa, PSC:
12
         By:  Alexandra Casellas-Cabrera, Esquire
13            268 Munoz Rivera Avenue
              Suite 1400
14            San Juan, Puerto Rico  00918
              787-756-9000
15            acasellas@amgprlaw.com
16       On behalf of Assured Guaranty Corp. and
         Assured Guaranty Municipal Corp.:
17
              Cadwalader, Wickersham & Taft, LLP
18
         By:  William J. Natbony, Esquire
19            Casey John Servais, Esquire
              200 Liberty Street
20            New York, New York  10281
              212-504-6351
21            bill.natbony@cwt.com
              casey.servais@cwt.com
22
         /
23
         /
24
         /
25
```

Page 8

```
 1    APPEARANCES: (Continued)
 2       On behalf of the QTCB Noteholder Group:
 3            Morgan Lewis & Bockius, LLP
 4       By:  David K. Shim, Esquire
              One State Street
 5            Hartford, Connecticut  06103-3178
              860-240-2535
 6            david.shim@morganlewis.com
 7       On behalf of the Puerto Rico Fiscal Agency and
         Financial Advisory Authority:
 8
              O'Melveny & Myers, LLP
 9
         By:  Mohammed Yassin, Esquire
10            Peter Friedman, Esquire
              7 Times Square
11            Times Square Tower
              New York, New York  10036
12            212-728-5971
              myassin@omm.com
13            pfriedman@omm.com
14            -- and --
15            Joseph Roth, Esquire
              610 Newport Center Drive
16            17th Floor
              Newport Beach, California  92660
17            949-823-7102
              joeroth@omm.com
18
      Also Present:
19
              Kroll:
20
                  Edmond Esses
21
              Brattle:
22
                  Julia Zhu
23
              Schulte Roth & Zabel:
24
                  Matthew G. Pinos
25
```

```
                                              Page 9

 1    APPEARANCES: (Continued)

 2            Veritext:

 3                    Stephen Troncone, Videographer

 4                    Karen Patterson, Account Rep.

 5                    Paul Baker, Concierge

 6                    Manny Valenciano, Account Rep.

 7                         *   *   *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 10

1              THE VIDEOGRAPHER:  Okay.  We are now

2    on the video record.

3              Today is October 13, 2021.  The time

4    is approximately 9:31 Eastern time.

5              We are here in the matter of the

6    insolvency proceedings for the Commonwealth of

7    Puerto Rico to take the deposition of Marti

8    Murray.

9              Counsel will be identified on the

10   stenographic record, and the court reporter may

11   proceed.

12                   MARTI P. MURRAY

13   of lawful age, Witness herein, having been first

14   duly cautioned and sworn, as hereinafter

15   certified, was examined and said as follows:

16                   CROSS-EXAMINATION

17   BY MS. JENNINGS:

18        Q.   Good morning, Ms. Murray.  How are

19   you today?

20        A.   Good morning.

21        Q.   My name is Taleah Jennings.  I'm

22   with the law firm of Schulte Roth & Zabel.  We

23   represent Cantor-Katz Collateral Monitor, and I

24   am joined with my colleagues from Schulte, Noah

25   Gillespie and Jacqueline Maero Blaskowski.  I'm

Page 79

1              THE WITNESS:  It depends on the

2     context.

3     BY MS. JENNINGS:

4              Q.    Okay.  So let's take a look at

5     paragraph 62 in your report.

6                    There's your word "context."

7                    The first sentence says, In this

8     context.  Do you know what context you're

9     referring to there?

10             A.    The context of my report.

11             Q.    Okay.  So, In this context,

12    consistency means that there are no material

13    provisions in the plan relating to the three

14    categories of focus that conflict with the 2021

15    certified fiscal plan, and vice versa.

16                   Do you see that sentence?

17             A.    Yes.

18             Q.    And so in this context, which you

19    said is the context of your report, what does --

20    what are material provisions?

21             A.    The material provisions relating to

22    the treatment of various stakeholders in the

23    plan.

24                   MS. JENNINGS:  Okay.  Can you read

25    that answer back, Ms. Court Reporter?  I just

Page 80

1    want to make sure I got it.

2                    (Thereupon, the record was read.)

3    BY MS. JENNINGS:

4         Q.   Okay.  And what are those

5    provisions?

6                    What provisions are you considering

7    material?  That's what I'm trying to get at.

8         A.   How much money has to be set aside

9    up front based on the treatment for certain

10   creditors and what payment obligations are being

11   created on a going-forward basis based on the

12   terms of the plan of adjustment.

13        Q.   Okay.  And here it says there's --

14   you talk about three categories of focus.

15                   What are those three categories?

16        A.   I believe that refers to the

17   System 2000 treatment, the emergency reserve

18   treatment, and the pension reserve trust.

19        Q.   Is that your understanding?

20                   I -- I'm a little confused by your

21   statement that you believe it refers.  Do you

22   know what those refer to?

23        A.   I believe that's what it is.  I'd

24   have -- I'd have to go back and talk to the team

25   about it.

1          Q.   You don't know what your -- your
2     sentence in here in your report is referring to
3     without speaking to your team?
4          A.   My understanding is that's what it
5     refers to.
6          Q.   But you can't state that with
7     confidence without speaking to your team?
8               MS. DALE:  Objection.
9               THE WITNESS:  I'd have to go back
10    and check with the team.
11    BY MS. JENNINGS:
12         Q.   And in paragraph 62, you say that,
13    Consistency does not mean that all provisions are
14    identical.
15              Do you see that?  I'm
16    paraphrasing --
17         A.   Yes.
18         Q.   -- but that's what the sentence
19    says.
20              And you say that provisions may not
21    be identical among other reasons because there
22    are timing differences relating to when the 2021
23    certified fiscal plan and the plan were each
24    finalized, and because certain negotiations'
25    results were not necessarily known at the time of

Page 84

1          MS. DALE:  Objection.

2          Misstates her testimony.

3          THE WITNESS:  There was no third

4    category of opinion.  The categories may have

5    been arranged differently at some point, covering

6    the same information.

7    BY MS. JENNINGS:

8          Q.   So there may have been categories

9    one, two, and three, instead of categories one

10   and two?  But you don't recall --

11         A.   I --

12         Q.   -- one way or the other?

13         A.   I don't recall.

14         Q.   Would you need to check with your

15   team on that?

16         A.   Yes.

17         Q.   Paragraph 63 talks about -- where it

18   states that you were able to verify -- something

19   just changed.  Okay, there it is.

20          That you were able to verify no

21   inconsistencies with regard to your two

22   categories outlined, between the plan and the

23   200 -- 2021 certified fiscal plan from

24   information contained in those two documents as

25   well as additional documents or analyses.

Page 85

1              Do you see that?
2         A.   Yes.
3         Q.   And if we can go to page 100 of your
4    report, Appendix C.  Actually, it's not page 100.
5    Let me see.  Page 95.
6              All right.  This spans across a
7    couple pages.  Are these the documents that you
8    considered in connection with the opinions
9    provided in your report?
10        A.   Yes.
11        Q.   And are there any other documents
12   that you reviewed outside of these documents --
13        A.   Yes.
14        Q.   -- in connection -- excuse me?
15        A.   What was -- you didn't finish your
16   question.
17        Q.   Are there any other documents that
18   you reviewed in connection with preparing your
19   report?
20        A.   Yes.
21        Q.   Which documents?
22        A.   I don't know, because I didn't think
23   they were relevant.
24        Q.   Do you have any idea of how many
25   documents you reviewed that -- in connection with

Page 86

1    the preparation of your report that you

2    ultimately -- that you determined were not

3    relevant?

4              A.   I don't have a firm number.

5              Q.   Is it a handful?  Is it dozens?

6              A.   I don't real -- I can't give you a

7    number.

8              Q.   Where did you come across these

9    documents?

10             A.   I mean, the -- I may have read an

11   article.  It -- I looked at it, it wasn't

12   relevant.  I didn't -- it's -- it didn't -- it --

13   it did not contribute to my analysis or

14   evaluation or the formation of my opinions.

15             Q.   Do you have a list of those

16   documents anywhere?

17             A.   I don't know.  I'd have to check

18   with the team.

19             Q.   Who on your team would you check

20   with to determine if you have a list of the

21   documents that you reviewed and considered

22   irrelevant?

23             A.   Gara Paulson.

24             Q.   And are these -- would the documents

25   be maintained electronically?

Page 91

1   or analysis so that I could evaluate...

2                   I can't tell you, sitting here

3   today, which documents on my list -- and I cannot

4   tell you every single document on that list that

5   may have had some analysis.

6                   I am pointing out to you certain

7   documents on the list that it's evident to me

8   looking at it that it's analysis, but there may

9   be others.  So I can't give you an exhaustive

10  list.

11          Q.   But there's no analyses outside of

12  what's listed on these Documents Considered list,

13  right?

14          A.   Not that I'm aware of.

15          Q.   Well, you would be aware if you had

16  considered them, right; there's none that exist

17  that are not listed on this Appendix C?

18          A.   No, not that I'm aware of.  And

19  the -- they should be cited in the body of the

20  report as well, whatever analysis we relied on.

21          Q.   What is -- there is an analysis

22  cited called the Sources and Use of Funds

23  Analysis.  What is that?  And is that contained

24  in one of these documents?

25          A.   Can you show me where it's cited,

```
                                              Page 92
 1    please?
 2            Q.    Yeah.   I'll give you an example.
 3    Paragraph 65.
 4            A.    It does cite it at footnote 97.
 5            Q.    I see the citation.
 6                  I'm asking you, where -- where the
 7    analysis -- what's the analysis?  Or where is it?
 8    Is it in a document?
 9            A.    It's in one of the -- it's in a
10    document that I believe is on the documents -- in
11    the document list.
12            Q.    Do you know which document it is in?
13            A.    I believe it is in -- but I would
14    have to check with the team.  But I think it's in
15    the document that's referred to as the FOMB
16    Commonwealth Cash Position Presentation of
17    August 23, 2021.
18            Q.    Okay.  We'll take a look.
19                  And is there -- is it titled Sources
20    and Uses of Fund Analysis?  Do you know -- or do
21    you recall what it looks like or how many pages
22    the analysis is?
23            A.    I believe that the file title is
24    what's shown in footnote 97.  That's the name of
25    the file.  And I think that that document is one
```

Page 97

1  considering the documents listed below, a review
2  was performed of those portions of documents that
3  were relevant to Brattle's analysis and
4  evaluation of the issues addressed in this
5  report.
6              Do you see that?
7        A.   Yes.
8        Q.   And where it says, A review was
9  performed, was that a review by you or someone
10  else?
11             I mean, did you review all of these
12  documents that are listed in Appendix C?
13        A.   In connection with preparing
14  Appendix C?
15        Q.   In connection with preparing your
16  report.
17        A.   I reviewed many of them.  I can't
18  say I reviewed every single one.
19        Q.   And so when it says a review was
20  performed, was a review performed by someone else
21  of the documents that you didn't review?
22        A.   Yes.
23        Q.   By whom?
24        A.   Gara Paulson and other members of
25  the team.

Page 98

1          Q.   Can you identify the documents that
2    you did not review on this report?
3          A.   I can't review -- I can't recall
4    having reviewed the latest audited financial
5    statement for the debtors.
6          Q.   Anything else?
7          A.   An example -- I can't recall having
8    reviewed the Certified COFINA Fiscal Plan.  I may
9    have; I just don't recall it.
10         Q.   Anything else?
11         A.   I can't recall reviewing the Amended
12   Order and Judgment Confirming the Third Amended
13   Title III Plan of Adjustment of Puerto Rico Sales
14   Tax Financing Corporation.
15         Q.   Anything else?
16         A.   I can't read -- I can't recall
17   reviewing -- I don't know.  Actually, I may have
18   reviewed that.  The Capital Appreciation Bonds,
19   Fiscal Notes, March 2016.  Current Interest
20   Bonds, Law Insider.  I can't recall one way or
21   the other.  I may have read those.
22              (Notary interruption.)
23   BY MS. JENNINGS:
24         Q.   Are you done with your list?
25         A.   I mean, it's a long list of

1   documents that I need to review to answer your

2   question, and in some cases I can't recall

3   whether I looked at it or not.

4         Q.   You don't know whether you read

5   something --

6         A.   Most of these -- most of these

7   documents I did review.

8         Q.   And it says, A review was performed

9   of those portions of documents that were relevant

10  to The Brattle Analysis.

11              The Brattle Analysis is your report,

12  right?

13        A.   Yes.

14        Q.   And who determined which portions of

15  documents were relevant to your report?

16        A.   I can't say there was any one person

17  that determined that.  It would be a team effort.

18        Q.   Do you have any record of which

19  portions were deemed relevant to your report?

20        A.   Do I have the record?  Personally?

21        Q.   Does anyone have a record?

22             Does a record exist?

23        A.   I believe so.

24        Q.   In what form?

25        A.   I -- I couldn't tell you that.

Page 109

1    you've already testified about?

2          A.   I'm not sure I understand your

3    question.

4          Q.   Commercially -- commercially

5    reasonable.  When you conclude that something is

6    commercially reasonable in the context that you

7    just testified to, is that your own judgment, or

8    is it pursuant to some test or objective standard

9    that you know of?

10         A.   Well, in this case, the debt

11   sustainability analysis includes a number of

12   metrics that are deemed relevant in determining

13   what a reasonable level of debt might be.

14              So in this case, I am considering

15   metrics, and I am -- that are -- that are metrics

16   that are provided, and I am evaluating where the

17   Commonwealth falls in relation to those metrics.

18         Q.   Based on your judgment?

19         A.   And -- and I am saying in relation

20   to those metrics, it's reasonable.

21         Q.   Based on your judgment?

22         A.   Yes.

23         Q.   This is actually a good segue into

24   your Opinion 4, which is the reasonableness of

25   settlements that was reached by the debtors.

Page 110

1           And if I understand your Opinion

2    Number 4 correctly, your Opinion Number 4 is that

3    the settlements reached by the debtors

4    were reasonable -- are reasonable; is that right?

5           A.   Commercially reasonable, yes.

6           Q.   Okay.  When you say -- are you

7    making a distinction between reasonable and

8    commercially reasonable in your response?

9           A.   Well, I'm not providing a legal

10   opinion as to what reasonable may or may not be

11   in some context.  I'm not here to provide legal

12   opinion.  I am an expert on bankruptcy and

13   restructuring and restructuring negotiations, and

14   I'm saying in the context of bankruptcy and

15   restructuring negotiations that the settlements

16   are reasonable.  Commercially reasonable.

17          Q.   Okay.  But are you -- I'm just --

18   I -- I'm -- I don't know if it's wordplay or not.

19   I just want to make sure I understand your

20   testimony.

21               Is it that the settlements are, in

22   your words, commercially reasonable, or that the

23   settlements are reasonable?

24               MS. DALE:  Objection.

25   BY MS. JENNINGS:

Page 111

```
 1            Q.    What is your testimony?
 2            A.    The settlements are reasonable, and
 3    when I use that word, I'm not providing legal
 4    opinion as to what reasonable may be as
 5    judicially determined.
 6                  I am saying as an industry
 7    practitioner and someone who's been involved with
 8    bankruptcy and restructurings now for 35 years,
 9    that I view the settlements as reasonable.
10            Q.    And have you ever provided expert
11    testimony on the reasonableness of a settlement?
12            A.    I provided testimony on
13    reasonableness in a number of matters.
14            Q.    Well, I -- I'm not sure I follow.
15                  Do you -- can you -- can you answer
16    my question with a yes or no answer?
17                  Have you provided expert testimony
18    regarding -- ever -- regarding whether a
19    settlement was reasonable?
20            A.    Yeah.  I may have.  I have to go
21    through my CV.
22            Q.    Go through it, because I'd like
23    to -- I would like you to do that.
24            A.    I have given testimony on the
25    reasonableness of reserves that should be set
```

Page 112

1    aside.

2              Q.    That's not my question, Ms. Murray.

3              A.    I don't know that I've given

4    testimony specifically on whether a settlement is

5    reasonable.  I've given testimony in other

6    bankruptcy and restructuring-related topics about

7    reaching settlements and restructurings.  And

8    I've been retained as an expert in matters that

9    relate to reaching settlements and bankruptcies

10   and restructurings.  And I have also served as a

11   financial advisor in bankruptcies and

12   restructurings.

13             Q.    Okay.  I think Ms. Dale would like

14   to take a break at this point.  I just want to

15   ask one question.

16                   During the last break, did you speak

17   to anybody?

18             A.    Yes.

19             Q.    Who did you speak to?

20             A.    I spoke to counsel.

21             Q.    And what was the -- did you speak

22   about your testimony?

23             A.    No.

24             Q.    What was the topic of the

25   conversation?