# EXHIBIT A

```
                                            Page 1

 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF PUERTO RICO
 2
                Case Number 17 BK 3283-LTS
 3                  PROMESA Title III
 4
    In re:                            )
 5                                    )
    THE FINANCIAL OVERSIGHT AND       )
 6  MANAGEMENT BOARD FOR PUERTO RICO. )
                                      )
 7      as representative of          )
                                      )
 8  THE COMMONWEALTH OF PUERTO RICO,  )
    et al.,                           )
 9                                    )
                        Debtors,      )
10
11
12
13
14   REMOTE VIDEO-RECORDED DEPOSITION OF OJAS N. SHAH
15
16
17
18          The remote video-recorded deposition upon
    oral examination of OJAS N. SHAH, a witness
19  remotely sworn by me, Tara Gandel Hudson, RPR, CRR,
    a Notary Public in and for the County of Hancock,
20  State of Indiana, taken on behalf of Cantor-Katz
    Collateral Monitor LLC, with the witness located in
21  Florham Park, Morris County, New Jersey, on the 6th
    day of October, 2021, scheduled to commence at
22  9:30 a.m., pursuant to the Federal Rules of Civil
    Procedure with written notice as to the time and
23  place thereof.
24
25
```

```
                                                Page 2

 1                   APPEARANCES
                (All appearing remotely.)
 2
 3   For the Cantor-Katz Collateral Monitor, LLC, as
     Collateral Monitor for GDB Debt Recovery Authority
 4
               Noah Gillespie
 5             Jacqueline Maero Blaskowski
               SCHULTE ROTH & ZABEL LLP
 6             901 Fifteenth Street NW
               Suite 800
 7             Washington, D.C.  20005
               202.729.7470
 8             noah.gillespie@srz.com
               jacqueline.maeroblaskowski@srz.com
 9
               Douglas I. Koff
10             SCHULTE ROTH & ZABEL LLP
               919 Third Avenue
11             New York, NY  10022
               212.756.2000
12             douglas.koff@srz.com
13
14   For the Financial Oversight and Management Board as
     Representative for the Debtors:
15
               Michael Mervis
16             Margaret A. Dale
               Joshua A. Esses
17             PROSKAUER
               Eleven Times Square
18             New York, NY  10036
               212.969.3000
19             mmervis@proskauer.com
               mdale@proskauer.com
20             jesses@proskauer.com
21             Scott Cooper
               PROSKAUER
22             2029 Century Park
               Suite 2400
23             310.557.2900
               scooper@proskauer.com
24
25
```

Page 3

1                    APPEARANCES
                (All appearing remotely.)

2

3    For the Financial Oversight and Management Board as
     Representative for the Debtors:

4

                  William D. Dalsen
5                 PROSKAUER
                  One International Place
6                 Boston, MA  02110-2600
                  617.526.9429
7                 wdalsen@proskauer.com

8

                  Gabriel A. Miranda
9                 O'NEILL & BORGES LLC
                  250 Munoz Rivera Avenue
10                Suite 800
                  San Juan, Puerto Rico  00918-1813
11                787.764.8181
                  gabriel.miranda@oneillborges

12

13

     For Ambac Assurance Corporation:

14

                  Alexandra Paslawsky
15                MILBANK LLP
                  55 Hudson Yards
16                New York, NY  10001-2163
                  212.530.5511
17                apaslawsky@milbank.com

18

19   For Financial Guaranty Insurance Company (FGIC):

20                Candice M. Carson
                  BUTLER SNOW
21                2911 Turtle Creek Blvd
                  Suite 1400
22                Dallas, TX  75219
                  419.680.5500
23                candice.carson@butlersnow.com

24

25

```
                                                 Page 4

 1                   APPEARANCES
                 (All appearing remotely.)
 2

 3     For the Official Committee of Unsecured Creditors:
 4             Leah Lopez
               PAUL HASTINGS
 5             200 Park Avenue
               New York, NY  10166
 6             212.318.6043
               leahlopez@paulhastings.com
 7

 8     For the Official Committee of Retired Employees:
 9             Laura E. Pelanek
               JENNER & BLOCK
10             353 N. Clark Street
               Chicago, IL
11             312.222.9350
               lpelanek@jenner.com
12

13     For the National Public Finance Guarantee Corporation:
14             Robert Berezin
               Colin McGrath
15             Stephanie Morrison
               WEIL, GOTSHAL & MANGES
16             767 Fifth Avenue
               New York, NY  10153-0119
17             212.310.8000
               robert.berezin@weil.com
18             colin.mcgrath@weil.com
               stephanie.morrison@weil.com
19

20     For the Assured Guaranty Corp. and Assured Guaranty
       Municipal Corp.:
21
               Casey John Servais
22             CADWALADER WICKERSHAM & TAFT LLP
               200 Liberty Street
23             New York, NY  10281
               212.504.6193
24             casey.servais@cwt.com
25
```

Page 5

1                    APPEARANCES
                 (All appearing remotely.)
2

3   For the QTCB Noteholder Group:
4            David K. Shim
             MORGAN LEWIS & BOCKIUS
5            One State Street
             Hartford, CT   06103-3178
6            860.240.2580
             david.shim@morganlewis.com
7

8

    For the National Public Finance Guarantee Corporation:
9

             Alexandra C. Casellas-Cabrera
10           ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA, PSC
             208 Ponce de Leon Avenue
11           Popular Center building
             16th Floor
12           San Juan, PR   00918
             787.281.1816
13           acasellas@amgprlaw.com
14

15  For the Witness, Ojas N. Shah:
16           Andrew B. Joseph
             FAEGRE DRINKER
17           600 Campus Drive
             Florham Park, NY   07932
18           Indianapolis, IN   46204
             973.549.7000
19           andrew.joseph@faegredrinker.con
20

21

22

23

24

25

Page 6

1                    APPEARANCES
                (All appearing remotely.)
2
3    For the Puerto Rico Fiscal Agency and Financial
     Advisory Authority:
4
5            Peter Friedman
             O'MELVENY & MYERS
6            1625 Eye Street, NW
             Washington, D.C.  20006
7            202.383.5302
             pfriedman@omm.com
8
             Ashley Pavel
9            Joseph L. Roth
             O'MELVENY & MYERS
10           610 Newport Center Drive
             17th Floor
11           Newport Beach, CA  9266-
             949.823.7138
12           apavel@omm.com
             joeroth@omm.com
13
14   ALSO PRESENT:
15           Roy Berman, Law Clerk, Morrison & Foerster
             Edmond Esses, Kroll
16           Matthew Pinos, Law Clerk, SRZ
             David W. Prager, Kroll
17           Clint Thomas, Technician
             Steven Troncone, Videographer
18           Manny Valenciano, Veritext
19
20
21
22
23
24
25

Page 7

1
2
                    INDEX OF EXAMINATION
3                                                      PAGE
4   DIRECT EXAMINATION ............................11
         Questions by Noah Gillespie
5
6
7
8                    INDEX OF EXHIBITS
                                                      PAGE
9   Deposition Exhibit:

10  Exhibit 1 - Analysis of Creditor Recoveries ...49
                    should the Title III Case be
11                  Dismissed for Creditors of the
                    Commonwealth of Puerto Rico
12
    Exhibit 2 - Debtors' Opening Expert Reports ...61
13                  and Disclosures
14  Exhibit 3 - 104 Governor-Duties and powers ....84
15  Exhibit 4 - FOMB_CONF_88825, Spreadsheet .....105
16  Exhibit 5 - Disclosure Statement for the .....121
                    Seventh Amended Title III Joint
17                  Plan of Adjustment of the
                    Commonwealth of Puerto Rico, et al.
18
    Exhibit 6  - Puerto Rico's Proposed Plan ....133
19                  of Adjustment Benefits
20  Exhibit 7 - CR Legislation Approved by .......147
                    Congress Has Medicaid Funding
21                  Measure for Puerto Rico and USVI,
                    CDL Cancellation Language
22
23
24
25

Page 8

1    (9:41 a.m.)

2              THE VIDEOGRAPHER:  Okay.  We are now on the

3         video record.  Today is October 6, 2021.  Time

4         is approximately 9:41 a.m.

5              We are here in the matter of the insolvency

6         proceedings for The Commonwealth of Puerto Rico

7         to take the deposition of Ojas Shah.

8              The court reporter may proceed.

9                        OJAS SHAH,

10   having been first duly sworn to tell the truth, the

11   whole truth and nothing but the truth relating to

12   said matter, was examined and testified as follows:

13        MR. GILLESPIE:  Good morning everybody.  My

14        name is Noah Gillespie, and I'm an attorney with

15        Schulte Roth & Zabel.  And together with the law

16        firm McConnell Valdes, we represent certain

17        creditors known in this proceeding as the DRA

18        parties.

19             I'm joined today by Doug Koff and

20        Jacqueline Maero Blaskowski of my firm and also

21        certain colleagues from McConnell Valdes.

22             Before we went on the record, we had a

23        discussion just to note that the witness has a

24        keyboard and computer screen, computer monitor

25        in front of him.

Page 36

1      modeling you could do, you know, to prepare a

2      perspective and, you know, help try and, you

3      know, further thinking on how to size what that

4      hole may be, absent whatever the government may

5      have been doing at that time.

6  Q   How does the work that you personally were doing

7      between 2017 and 2019 relate, if at all, to the

8      best interest test report?

9          MR. MERVIS:  Objection to form.

10         MR. JOSEPH:  Objection to form.

11         Go ahead.

12 A   I'm not sure there is much of a correlation

13     other than it involved a level of modeling.  It

14     has a financial aspect to it.

15         Obviously, there is a cash component which,

16     you know, is helpful, but it's not -- none of

17     that work directly informs the best interest

18     analysis.

19 BY MR. GILLESPIE:

20 Q   Is the same true for the work that your team was

21     doing from 2017 to 2019?

22 A   Yeah.  I don't think it would be different.

23 Q   So then you --

24         We kind of left off at 2019.

25 A   Yes.

Page 37

1   Q   Were there other projects that you were involved
2       with from 2019 onward other than the best
3       interest test report?
4   A   That was certainly my primary responsibility.  I
5       don't recall any other discrete projects other
6       than, as I've referenced earlier, as a member of
7       our team, there's certainly a level of QC or
8       others on other work product produced by the
9       team that I would have done, but those were not
10      individual projects.
11  Q   When did you start work on what's now the best
12      interest test report?
13          MR. MERVIS:  Object to the form.
14  A   There would have been some --
15          MR. GILLESPIE:  What's the nature of the
16      objection?
17          MR. MERVIS:  What's that?
18          MR. GILLESPIE:  I'm sorry, Mr. Mervis.
19      What's the nature of the objection?
20          MR. MERVIS:  The nature of the objection is
21      I don't think your question is sufficiently
22      precise when you say "best interest test report"
23      because there have been multiple iterations over
24      time.
25

1          Sorry about that.  I don't have it on my
2     screen, and I think others may not.
3          MR. GILLESPIE:  Why don't we have that put
4     up on the Screen Share so that everyone can see
5     it easily as well.
6          MR. JOSEPH:  Okay.  This is Andrew
7     speaking.  Both myself and the witness have the
8     document in front of us on the screen.
9          MR. GILLESPIE:  Mr. Thomas, are you able to
10    screen-share for the benefit of the others?
11         THE TECHNICIAN:  Sure.  I didn't know if
12    you wanted me to do it or not.  I'll bring it
13    up.
14         Sorry.  My computer kind of stuttered for a
15    second.  It's on the screen now.
16         MR. GILLESPIE:  Very good.  I can see that.
17 BY MR. GILLESPIE:
18 Q   Mr. Shah, are you able to see the Screen Share
19    as well?
20 A   Yes.
21 Q   Mr. Shah, is this your report?
22         MR. JOSEPH:  Can he scroll through it.
23    What we're looking at is the first page.  He's
24    got the ability on the screen; so you don't need
25    to do it up there.

Page 49

1    A    I've scrolled through, really fast, the first

2         30, 40 pages, but, yes, this looks like my

3         report.

4              (Deposition Exhibit 1 was presented for

5         identification.)

6              MR. GILLESPIE:  And I'll note for the

7         record that what we marked for identification

8         as Shah Exhibit 1 bears some docket stamps from

9         the docket in the main proceeding which are

10        17628-16.

11   BY MR. GILLESPIE:

12   Q    Mr. Shah, do you stand behind this report?

13   A    I do.

14   Q    What was McKinsey's assignment in connection

15        with this report?

16   A    We were asked to prepare an analysis on the

17        recoveries that creditors could receive should

18        the Title III cases be dismissed.

19   Q    What conclusions did you reach?

20              MR. MERVIS:  Objection to form.

21              MR. JOSEPH:  Objection to form.

22   A    My conclusions.

23              The analysis has a series of outputs that

24        estimate a range of recoveries.  That would be

25        our, I use your term, "conclusions."  Although

Page 124

1    BY MR. GILLESPIE:

2    Q   I'll ask more generally.

3            Is there anywhere we would see, in your

4        uses of cash analysis, any of the creditor fees

5        from the settlements in this case?

6            MR. JOSEPH:  Objection to form.

7            MR. MERVIS:  Same objection.

8    A   The settlements under the plan wouldn't be part

9        of the analysis excluding the plan; so no.

10   BY MR. GILLESPIE:

11   Q   Understood.

12           We can return to Exhibit Number 1.  Let's

13       look at page 6, please.

14           So we're going to talk now about liquidity.

15   A   Okay.

16   Q   I would direct your attention, first of all, to

17       Footnote 10 that's at the bottom of this page 6.

18   A   Sorry.  I was still on the wrong doc.  Let me go

19       back.

20           Yeah, sure.  Footnote 10.  Okay.

21   Q   And you see they talk about there's -- about

22       cash restrictions, and then there are other

23       categories labeled there such as "Not Reviewed,"

24       "Potentially Unavailable Cash."

25           Did you examine any of these other

Page 125

1       categories mentioned in Footnote 10?

2    A   Help me understand what you mean by "examine."

3    Q   So the analysis elsewhere on page 6 and also in

4        the table called Exhibit 1 on page 6, do you see

5        how it's talking about the amount of

6        unrestricted cash?

7    A   That's right.

8    Q   So when you're trying to calculate unrestricted

9        cash, did you review any of these categories

10       that were labeled: Not Reviewed; Potentially

11       Unavailable Cash; Potentially Inaccessible Cash?

12   A   I'm struggling on what you mean by "review."

13           We did what we say we did.  And as

14       identified above in the reference, this

15       information was taken from the cash analysis

16       prepared by the FOMB, and, as we say in

17       Footnote 10, use -- those identified as legally

18       restricted were determined to be restricted.

19   Q   The end of the footnote goes on to say that

20       these other categories are considered

21       unrestricted?

22   A   That's right.  That's the approach we took.

23   Q   Did you do any work to independently determine

24       what was restricted or unrestricted cash?

25   A   And I think this was asked earlier, but, no, we

Page 126

1      did not.

2   Q   So then we went --

3          We discussed this -- some of the paragraphs

4      and tables on this page before, and we talked

5      about how there was roughly $11 billion as of

6      June 30, 2021?

7   A   That was the estimate, yes.

8   Q   And that that estimate was a projection based on

9      a figure from June 30, 2020?

10  A   That's correct.

11         MR. GILLESPIE:  Let's return to Exhibit 5,

12     the very long one, and let's please go to

13     page 178.

14         Mr. Thomas, I'm still seeing page 421.  Can

15     we move the Screen Share to page 178.

16         MR. JOSEPH:  Wrong doc.  It's the -- he's

17     going back to the disclosure statement,

18     Exhibit 5, page 178.

19         MR. GILLESPIE:  Yes.

20  A   Okay.  178.  Mm-hmm.

21  BY MR. GILLESPIE:

22  Q   So there's a table in the middle of the page,

23     and there's a line that says:

24         "CW Subtotal."

25         Do you see that?

Page 127

1   A    CW Subtotal, yes.

2   Q    And under Unrestricted, it reflects 11 billion,

3        609 million, and some dollars?

4   A    Okay.

5   Q    Do you see that this is the balance -- this is

6        based on the balance as of March 31 of 2021?

7   A    That's correct.

8   Q    If we go back to Exhibit 1, what would the table

9        of Exhibit 1 look like if we started from the

10       March 2021 balance?

11           MR. MERVIS:  I object to the form.

12  A    I don't know.  I can't calculate that just

13       sitting here today.

14           MR. MERVIS:  I don't know what happened.

15           THE WITNESS:  Yes.  Sorry.

16           MR. MERVIS:  The screen went blank.

17           MR. JOSEPH:  You disappeared for a second.

18           Did you get his answer?

19           MR. GILLESPIE:  I got the answer.

20           MR. KOFF:  The screen's still blank here.

21           MR. JOSEPH:  You know, just five seconds,

22       it went dark, and you guys are back.

23           So go ahead, Noah.

24           MR. GILLESPIE:  We're back.

25

Page 128

1    BY MR. GILLESPIE:

2    Q    Here in Exhibit 1, let's go ahead to page 26.

3              MR. GILLESPIE:  Mr. Thomas, I don't know if

4         we can navigate to page 26.

5              THE TECHNICIAN:  I thought you said

6         Exhibit 6.  I'm sorry.

7              MR. GILLESPIE:  No.

8              THE TECHNICIAN:  There you go.  26.

9              MR. GILLESPIE:  Thank you.

10   BY MR. GILLESPIE:

11   Q    So, Mr. Shah, let's look here on page 26 at what

12        you've called Exhibit 16.

13   A    Okay.

14   Q    Can I direct your attention to the Starting Cash

15        figures in the --

16   A    Okay.

17   Q    How did you calculate the Starting Cash amounts

18        here?

19   A    These amounts come from that table we were just

20        looking at.

21   Q    Maybe we should go back to that table and you

22        can just walk us through.

23             THE TECHNICIAN:  And what page is the last

24        table on?

25             MR. GILLESPIE:  It's on page 6.

Page 129

1        THE TECHNICIAN:  Thank you.

2   A    Okay.

3        So your question is to walk through this

4        calculation?

5   BY MR. GILLESPIE:

6   Q    Let's take it piece by piece.

7            I see here, in what you've labeled

8        Exhibit 1 on page 6 of Shah Exhibit 1, we can

9        start with just the Unrestricted, CW Cash

10       Balance.

11           And as of June 30, 2021 --

12  A    Uh-huh.

13  Q    -- that is listed as 11 thousand 4, which means

14       11 billion, 4 million dollars?

15  A    That's correct.

16  Q    And so then why don't you walk us down the table

17       from there, just the different steps that gets

18       us to the cash available.

19  A    So the 11 billion 4 is adjusted for the minimum

20       cash requirements required for the Commonwealth,

21       which are estimated between one two and 1.7; and

22       the nine three O four to nine eight O four is

23       simply the eleven zero zero four subtracting the

24       one seven zero zero and the one two zero zero.

25  Q    Understood.

Page 130

1           So if we go back to page 26.

2    A    Mm-hmm.  Yes.

3    Q    You see the starting cash there is either of

4         those two values.  There's the left column, the

5         starting cash is equal to 9.3 billion, and the

6         column to the right of that, we're starting cash

7         at 9.8 billion; is that right?

8    A    Correct.

9    Q    If we go down to page 28.

10   A    Page 28.  Okay.

11   Q    This is called Appendix 4.

12            So, you know, could you tell us how you

13        arrived at the 1.2 to 1.7 range for the minimum

14        cash requirements?

15            MR. MERVIS:  Objection to the form.

16   A    The 1.2 to 1.7 is per the analysis that's

17        depicted here, looking at benchmarks, and this

18        analysis is -- it was also included in the

19        FOMB's cash report that we discussed previously

20        and where the cash analysis is contained.

21   BY MR. GILLESPIE:

22   Q    So let's look at I think it's the fourth item,

23        Community Disaster Loans.

24            Do you see that?

25   A    I do, yes.

Page 131

1   Q   The description there is that U.S. Treasury gave

2       Puerto Rico access to CDLs as needed.  And so

3       this is a measure --

4           Is it fair to say this is a measure based

5       on Puerto Rico?

6           MR. JOSEPH:  Objection to form.

7           MR. MERVIS:  I object to the form.

8   A   I can't comment on what U.S. Treasury based its

9       analysis on.

10  BY MR. GILLESPIE:

11  Q   The description says here:

12          "The U.S. Treasury gave Puerto Rico access

13      to CDLs."

14          And that's what that row of this Exhibit 19

15      is representing; is that right?

16  A   That's correct.  What that row represents is, as

17      it says there, where the U.S. Treasury, with

18      respect to accessing CDLs, had kind of set its

19      target.

20  Q   In here, the range, based on CDLs, is from

21      800 million to $1.1 billion?

22          MR. MERVIS:  Object to the form.

23  A   That's what the chart says, yes.

24  BY MR. GILLESPIE:

25  Q   And if we're --

Page 132

1    A    Actually, no, that's not.

2    Q    Okay.

3    A    So what the chart says is that the Treasury set

4         the reserve target at 1.1 billion.  It was

5         increased from 800 -- at some point, there was

6         probably an initial target at 800, which was

7         then raised to 1.1.  That's what that says.

8    Q    And the row above it is labeled "Municipality

9         Comparable"?

10   A    That's correct.

11   Q    And the description references the City of

12        Detroit?

13   A    That's correct.

14   Q    And based on this metric, the description says:

15            "Correspondingly, Puerto Rico would retain

16        $1 billion."

17            Is that right?

18   A    That's what that line says; correct.

19            MR. GILLESPIE:  Jacque, if I could please

20        have you mark Tab 6, please.

21            THE TECHNICIAN:  It's there already.

22            MR. GILLESPIE:  Pull that up, please.  I'll

23        direct your attention to page 18.

24            MR. JOSEPH:  Identify for the record what

25        this is.

Page 133

1          MR. GILLESPIE:  This is a presentation

2     available on the FOMB's website, which is dated

3     September 17 of this year.

4          (Deposition Exhibit 6 was presented for

5     identification.)

6          MR. JOSEPH:  Thank you.

7   BY MR. GILLESPIE:

8   Q   We're looking at page 18, and I would direct

9     your attention to the box that's on the bottom

10    right.

11         Let me know when you're there.

12  A   I am here.

13  Q   You'll see that there's an entry for Min Cash

14    Balance?

15  A   Min?  Maybe you can draw -- I'm just not seeing

16    it.

17         MR. JOSEPH:  Is it 18 of the slide or is it

18    18 of the --

19  A   You said there's a box?  No.

20  BY MR. GILLESPIE:

21  Q   I'm looking at Shah Exhibit 6, and it's page 18.

22    When you look at it, there's an 18 on the bottom

23    right of the page.

24         MR. JOSEPH:  Yeah.  Got it.

25

Page 134

1    BY MR. GILLESPIE:

2    Q    I'm looking at the box on the bottom right that

3         starts with 4,900 million for CW Public Corps.?

4    A    Yes.

5    Q    And a few lines down from that, there's an entry

6         for Min Cash Balance?

7    A    Yes.

8    Q    The value there is $1 billion?

9    A    That's -- that's there.  Yes.

10   Q    We can return back it Exhibit 1.  My question

11        is --

12            Let's see.  We looked at the starting cash

13        amounts that resulted from the minimum cash

14        requirements that we were talking about.

15            Do you remember that?

16   A    Yes.

17   Q    Has McKinsey looked into different starting cash

18        amounts?

19            MR. MERVIS:  Objection to form.

20            MR. JOSEPH:  Same objection.

21            Go ahead.

22   A    Again, you're asking have we done an analysis?

23        We have not done an analysis on cash.

24   BY MR. GILLESPIE:

25   Q    Are you familiar with the emergency reserve

Page 135

1       fund?

2    A   Can you help me understand what "familiar"

3        means.

4    Q   Have you heard of an emergency reserve fund for

5        Puerto Rico?

6    A   Yes.  It's a piece of the fiscal plan.

7    Q   In your analysis, are these funds considered

8        restricted?

9    A   They are not.

10   Q   Look at Exhibit 1, page 4.

11   A   So we're going back to Exhibit 1.  All right.

12       Okay.

13   Q   The third bullet point says:

14           "The transfer of 130 million per year

15       through fiscal year 2028 to the reserve for

16       emergency fund outlined in the fiscal plan is

17       assumed not to occur."

18   A   That's correct.

19   Q   If we look back at Exhibit 6, again on page 18,

20       I'll direct your attention to the line below the

21       Minimum Cash Balance.

22           Do you see there's an item for Disaster

23       Revolver?

24   A   I see that there's an item for Disaster

25       Revolver, yes.

Page 136

1   Q   It says it has a value of $750 million?

2   A   That's right.

3   Q   And this box that we've been talking about on

4       page 18 is connected to a label that says:

5           "CW cash retained by the government"?

6   A   That's what it says, yes.

7   Q   Mr. Shah, I want to take you back a little bit.

8       We're talking about one of the earlier projects

9       that you did for the Commonwealth.

10          MR. GILLESPIE:  Mr. Thomas, we can take

11      down the Screen Share for this moment.

12  A   Okay.

13  BY MR. GILLESPIE:

14  Q   I don't know if you remember the testimony,

15      Mr. Shah, about one of the projects that you

16      worked on for the FOMB before was liquidity

17      monitoring?

18  A   That's right.

19  Q   And there may have been other liquidity analysis

20      that you also worked on.  I apologize, I forgot

21      the name of --

22  A   Sure.  Yes.

23  Q   So I'm wondering has any of that work been

24      refreshed more recently by you and your team?

25  A   No.

Page 137

1    Q    So do you know where the Commonwealth is in

2         terms of its liquidity position this fiscal

3         year, one way or another?

4    A    It's not something I track regularly.

5    Q    We've mentioned a few times in passing something

6         that you referred to as the "resource envelope"?

7    A    That's correct.

8              MR. GILLESPIE:  It may help if we pull up

9         Exhibit 1 again and look at page 4.

10   BY MR. GILLESPIE:

11   Q    Let me know when you're there.

12   A    Okay.  Page 4.  Yes.

13   Q    So there are bullet points for the Resource

14        Envelope, Outstanding Debt, and Priorities for

15        Distribution of Funds?

16   A    That's right.

17   Q    How did you know what the priorities for

18        distribution of funds should be?

19   A    This was a combination of the legal assumptions

20        here as well as conversations with counsel.

21   Q    Based on your analysis, what assets did you

22        consider available to creditors?

23             MR. MERVIS:  I object to the form.

24             MR. JOSEPH:  Yeah, I also object.

25   A    The analysis assumes the resource envelope, as

Page 138

1      it's defined here.

2   BY MR. GILLESPIE:

3   Q   I see.

4           Does the resource envelope in your analysis

5       include COFINA-related funds?

6           MR. MERVIS:  Objection to the form.

7   A   Again, give me -- I need more information to

8       understand what funds you're referring to.

9   BY MR. GILLESPIE:

10  Q   It might help if we look, for example --

11          Start with this.

12          Mr. Shah, are you familiar with an agency

13      in Puerto Rico called COFINA?

14  A   I am familiar with the term "COFINA."

15  Q   So what I'm trying to understand is whether or

16      not the resource envelope here includes any

17      assets related to COFINA.

18          MR. MERVIS:  Objection to the form.

19  A   When you say "assets related to COFINA," can you

20      be a little more specific so I can answer the

21      question.

22  BY MR. GILLESPIE:

23  Q   I can ask it more generally.

24          When you are calculating the resource

25      envelope, did you include assets that belong or

Page 139

1        might be determined by court to belong to any of

2        the instrumentalities of Puerto Rico?

3              MR. JOSEPH:  Objection.  Form.

4              MR. MERVIS:  Yeah, I object to the form.

5   A    Again, I have to know specifically what assets

6        you're referring to to be able to answer the

7        question.

8   BY MR. GILLESPIE:

9   Q    What does the resource envelope include?

10  A    So the resource envelope includes -- as we've

11       outlined here, it includes CRIM revenues; it

12       includes conditionally allocable revenues; it

13       includes any appropriations that can get pulled

14       back from IFCUs; and it includes the surplus

15       generated under the fiscal plan when excluding

16       these other three items because they are already

17       accounted for so we're not double counting.

18              Plus there's an assumption that with the

19       confirmation of an ERS plan, there is a certain

20       amount of ERSs that will come back to the

21       Commonwealth as available.

22  Q    So are there any assets of the Commonwealth that

23       are not included in the resource envelope?

24              MR. MERVIS:  Objection to the form.

25              MR. JOSEPH:  Same objection.

Page 140

1   A   I mean, I don't -- when you say "any assets," I

2       don't know what that refers to.

3   BY MR. GILLESPIE:

4   Q   First of all, is restricted cash included in the

5       resource envelope?

6   A   Is restricted cash -- no.

7           As it states here, it's the cash on hand

8       available for debt service, and we've just

9       walked through how we calculate that.

10  Q   How would your conclusion change if the resource

11      envelope included all of the Commonwealth's

12      assets except for earmarked federal funds?

13          MR. JOSEPH:  Objection to form.  Calls for

14      speculation.

15  A   I don't know.  I have no way to answer that

16      question just sitting here today.

17  BY MR. GILLESPIE:

18  Q   You and your team conducted the analysis in

19      Exhibit 1 based on the resource envelope that

20      you've described; correct?

21  A   That's correct.

22  Q   Do you have an understanding of whether the

23      resource envelope would be greater than the one

24      that you assumed if it included all of the

25      Commonwealth's assets except for federal funds?

1          MR. MERVIS:  Object to the form.

2          MR. JOSEPH:  Same objection.

3          Go ahead.

4     A   I don't know.  I would have to understand what

5         those assets are and what contribution they

6         would make to the resource envelope.

7     BY MR. GILLESPIE:

8     Q   Is there unrestricted cash in Puerto Rico aside

9         from earmarked federal funds?

10         MR. MERVIS:  Objection to the form.

11    A   I don't understand.  Can you repeat that

12        question.  Is there what?

13    BY MR. GILLESPIE:

14    Q   My question is is there unrestricted cash beyond

15        earmarked federal funds?

16    A   I don't know how to answer that question.  I

17        don't know.

18    Q   In your analysis, you reached an estimate of the

19        amount of unrestricted cash that the

20        Commonwealth holds?

21    A   Yes.  We have an estimate for that number.

22    Q   Do you have an understanding of the components

23        that go into that total of unrestricted cash?

24    A   We have the components outlined in the board's

25        cash analysis.

Page 147

1          MR. JOSEPH:  I'm good with a break now.

2          MR. KOFF:  Well, let's finish up the line

3     of questioning, if you want, and then take a

4     break; right?  I mean, unless you're done.

5          MR. GILLESPIE:  I think this is an

6     appropriate time to break.

7          THE VIDEOGRAPHER:  Going off the record at

8     2:24.

9          (A recess was taken.)

10          THE VIDEOGRAPHER:  We are back on the

11     record at 2:38.

12          MR. GILLESPIE:  I'll ask Jacque to

13     introduce Tab 7.

14          THE TECHNICIAN:  Should be ready.

15  BY MR. GILLESPIE:

16  Q   Mr. Shah, let me know when you have that

17     available to you.

18  A   I have it here.

19          (Deposition Exhibit 7 was presented for

20     identification.)

21  Q   I'll let you review it as much as you like.  My

22     question for you is, you know, are you aware of

23     the Biden administration's potential

24     improvements to Medicaid funding for

25     Puerto Rico?

Page 148

1   A    This is the first I'm seeing this; so I'd have

2        to read it to try and understand it.

3   Q    That was not a factor in your report?

4            MR. JOSEPH:  I think he just said he has to

5        read it to understand what it is; so let's let

6        him do that.

7            MR. GILLESPIE:  Sure.

8   A    Okay.

9   BY MR. GILLESPIE:

10  Q    Mr. Shah, now that you've had a chance to review

11       Exhibit 7, did you consider potential

12       improvements to Medicaid funding from the Biden

13       administration in your analysis?

14  A    Did I consider potential improvements?  No, I

15       haven't considered any potential improvements.

16           MR. GILLESPIE:  We can take down the Screen

17       Share.

18  BY MR. GILLESPIE:

19  Q    Mr. Shah, I think you said earlier that your

20       analysis in what we are looking at today as

21       Exhibit 1 deals with the --

22           (Reporter request for clarification.)

23  Q    Mr. Shah, I think you were telling us earlier

24       today your analysis in what we've been looking

25       at as Exhibit 1 deals with the scenario where

Page 149

1      the Title III case is dismissed?

2   A   That's correct.

3   Q   And so that's essentially a nonbankruptcy

4       scenario?

5   A   That's correct.

6   Q   So in the nonbankruptcy scenario, if Puerto Rico

7       has a bigger surplus in the future, what will

8       that mean for creditors' recoveries?

9           MR. JOSEPH:  Objection to form.

10  A   In a nonbankruptcy scenario, if the creditors

11      have -- or if the Commonwealth, you said, has

12      more surplus?  Is that what you said --

13  BY MR. GILLESPIE:

14  Q   Yes.

15  A   -- in the future?

16          It should mean that that surplus will

17      benefit some creditor.

18  Q   What is your understanding of the best interest

19      test?

20          MR. JOSEPH:  Objection to form.

21          (Reporter clarification.)

22          MR. MERVIS:  Yeah.  I object to the form.

23  A   I don't understand the question.  Maybe you can

24      provide a little bit of context.  Is it a

25      general question?  What is concept?  Context?

Page 150

1      It's hard to answer.

2   BY MR. GILLESPIE:

3   Q   In Exhibit 1 that we were looking at throughout

4       the course of the day, it's entitled "Best

5       Interest Test Report"; right?

6   A   The report I've prepared is an analysis of

7       creditor recoveries, which is what the title

8       says.  The exhibit here is titled "Best Interest

9       report."  Yes.

10  Q   In your view, were you looking at whether or not

11      the best interest test was satisfied?

12          MR. JOSEPH:  Objection.  Form.

13          Go ahead.

14  A   This report is a report estimating what

15      recoveries would be available if the Title III

16      was dismissed.  That's what this report does.

17  BY MR. GILLESPIE:

18  Q   Did you consider whether or not the plan of

19      adjustment in this case satisfies the best

20      interest test?

21          MR. JOSEPH:  Object to the form.

22          MR. MERVIS:  Yeah, object to the form.

23  A   Again, this report outlines the recoveries -- an

24      estimate of likely recoveries should the

25      Title III cases be dismissed.

# EXHIBIT B

Page 1

<pre>
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF PUERTO RICO
 2
                    PROMESA TITLE III
 3                CASE NO. 17 BK 3283-LTS
 4
    In re:                              )
 5                                      )
    THE FINANCIAL OVERSIGHT             )
 6  AND MANAGEMENT BOARD FOR            )
    PUERTO RICO,                        )
 7                                      )
          as representative of          )
 8                                      )
    THE COMMONWEALTH OF PUERTO RICO,    )
 9  THE EMPLOYEES RETIREMENT SYSTEM OF  )
    THE GOVERNMENT OF THE COMMONWEALTH  )
10  OF PUERTO RICO, AND THE PUERTO      )
    RICO PUBLIC BUILDINGS AUTHORITY,    )
11                                      )
            Debtors.                    )
12
13
14
            REMOTE VIDEO-RECORDED DEPOSITION
15
                         OF
16
                  GAURAV MALHOTRA
17
18
            The remote video-recorded deposition upon
19  oral examination of GAURAV MALHOTRA, a witness
    remotely sworn by me, Tara Gandel Hudson, RPR, CRR,
20  a Notary Public in and for the County of Hancock,
    State of Indiana, taken on behalf of the
21  Cantor-Katz Collateral Monitor, LLC, as Collateral
    Monitor for GDB Debt Recovery Authority, with the
22  witness located in Chicago, Cook County, Illinois,
    on the 15th day of October, 2021, scheduled to
23  commence at 9:30 a.m. AST/8:30 a.m. CDT, pursuant
    to the Federal Rules of Civil Procedure with
24  written notice as to the time and place thereof.
25
</pre>

```
                                                        Page 2

 1                    APPEARANCES
                 (All appearing remotely.)
 2

    For the Cantor-Katz Collateral Monitor, LLC, as
 3  Collateral Monitor for GDB Debt Recovery Authority:
 4          Douglas I. Koff
            Thomas L. Mott
 5          Erika Simonson
            SCHULTE ROTH & ZABEL LLP
 6          919 Third Avenue
            New York, NY  10022
 7          212.756.2000
            douglas.koff@srz.com
 8          thomas.mott@srz.com
            erika.simonson@srz.com
 9

    For the Financial Oversight and Management Board as
10  Representative for Debtors:
11          Ehud Barak
            Margaret A. Dale
12          Marc Palmer
            Chantel L. Febus
13          Jeffrey Levitan
            PROSKAUER ROSE LLP
14          Eleven Times Square
            New York, NY  10036
15          212.969.3000
            jlevitan@proskauer.com
16          ebarak@proskauer.com
            mdale@proskauer.com
17          mpalmer@proskauer.com
            cfebus@proskauer.com
18
            Scott P. Cooper
19          PROSKAUER ROSE LLP
            2029 Century Park East
20          Suite 2400
            Los Angeles, CA  90067-3010
21          310.557.2900
            scooper@proskauer.com
22
            Laura Stafford
23          PROSKAUER ROSE LLP
            One International Place
24          Boston, MA  02110-2600
            617.526.9600
25          lstafford@proskauer.com
```

```
                                                           Page  3

 1                        APPEARANCES
                          (continued)
 2                   (All appearing remotely.)
 3
      For Ambac Assurance Corporation:
 4
              Alexandra Paslawsky
 5            MILBANK LLP
              55 Hudson Yards
 6            New York, NY  10001-2163
              212.530.5000
 7            apaslawsky@milbank.com
 8
      For the Financial Guaranty Insurance Company (FGIC):
 9
              Candice M. Carson
10            BUTLER SNOW LLP
              2911 Turtle Creek Boulevard
11            Suite 1400
              Dallas, TX  75219
12            469.680.5500
              candice.carson@butlersnow.com
13
14    For the Official Committee of Retired Employees:
15            Landon S. Raiford
              JENNER & BLOCK LLP
16            353 North Clark Street
              Chicago, IL  60654-3456
17            312.222.9350
              lraiford@jenner.com
18
19    For National Public Finance Guarantee Corporation:
20            Colin McGrath
              Alexander Whitelaw
21            WEIL GOTSHAL & MANGES LLP
              767 Fifth Avenue
22            New York, NY  10153-0119
              colin.mcgrath@weil.com
23            alexander.whitelaw@weil.com
24
25
```

```
                                                   Page 4

 1                     APPEARANCES
                      (continued)
 2             (All appearing remotely.)
 3   For National Public Finance Guarantee Corporation:
 4          Kirsten Erichsen
            WEIL GOTSHAL & MANGES LLP
 5          110 Fetter Lane
            London, EC4A1AY, UK
 6          44.20.7903.1000
            kirsten.erichsen@weil.com
 7
            Manuel Lopez-Maeso
 8          ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC
            268 Munoz Rivera Avenue
 9          Suite 1400
            San Juan, PR  00918
10          787.657.9000
            malopez@amgprlaw.com
11
12   For Assured Guaranty Corp. and Assured Guaranty
     Municipal Corp.:
13
            Richard C. Solow
14          CADWALADER WICKERSHAM & TAFT LLP
            200 Liberty Street
15          New York, NY  10281
            212.504.6000
16          richard.solow@cwt.com
17
     For the QTCB Noteholder Group:
18
            David L. Lawton
19          MORGAN LEWIS & BOCKIUS LLP
            One State Street
20          Hartford, CT  06103-3178
            860.240.2700
21          david.lawton@morganlewis.com
22
23
24
25
```

```
                                          Page 5

 1                    APPEARANCES
                      (continued)
 2          (All appearing remotely.)
 3   For the Puerto Rico Fiscal Agency and Financial
     Advisory Authority:
 4
             Mohammad Saleh Yassin
 5           O'MELVENY & MYERS LLP
             7 Times Square
 6           New York, NY  10036
             212.326.2000
 7           msyassin@omm.com
 8           Ashley Pavel
             O'MELVENY & MYERS LLP
 9           610 Newport Center Drive
             17th Floor
10           Newport Beach, CA  92660
             949.823.6900
11           apavel@omm.com
12
     For U.S. Bank National Association and U.S. Bank Trust
13   National Association as Trustee/Fiscal Agent to certain
     Puerto Rico Bonds:
14
             Sara Posner
15           HOGAN LOVELLS
             390 Madison Avenue
16           New York, NY  10017
             212.918.3000
17           sara.posner@hoganlovells.com
18
     For the witness, Gaurav Malhotra:
19
             Antoinette DeCamp
20           ERNST & YOUNG
             Associate General Counsel
21           Washington, D.C.
22
23
24
25
```

Page 6

1                   APPEARANCES
                   (continued)
2              (All appearing remotely.)

3

4   ALSO PRESENT:
5           Edmond Esses, Kroll
            David Prager, Kroll
6           Matthew G. Pinos, Law Clerk, SRZ
            Roy Berman, Law Clerk, Morrison & Foerster
7           Ashley Weringa, Law Clerk, Proskauer
            Paul Baker, Technician
8           Kurt Henschel, Videographer
            Karen Patterson, Veritext

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1

                    INDEX OF EXAMINATION
2                                                      PAGE
3    DIRECT EXAMINATION .........................12
         Questions by Thomas L. Mott
4

5

                    INDEX OF EXHIBITS
6

     Deposition Exhibit:
7

     Exhibit 1 - 9-12-17 Ernst & Young Service .....57
8                   Agreement
9    Exhibit 2 - Amendment No. 4 to Statement of ...66
                    Work in Connection with Title III
10                  of PROMESA
11   Exhibit 3 - Independent Contractor Services ...69
                    Agreement, Ernst & Young Puerto
12                  Rico LLC, Effective Date:  July 1,
                    2020
13

     Exhibit 4 - Debtors' Opening Expert Reports ...90
14                  and Disclosures
15   Exhibit 5 - 9-15-21 letter; Jaresko to Hon. ..143
                    Pedro Pierluisi Urrutia, Hon. Jose
16                  Luis Dalmau Santiago, Hon. Rafael
                    Hernandez Montanez
17

     Exhibit 6 - 9-24-21 letter; Skeel to Hon. ....148
18                  Pedro Pierluisi Urrutia, Hon. Jose
                    Luis Dalmau Santiago, Hon. Rafael
19                  Hernandez Montanez
20   Exhibit 7 - 10-14-21 letter; Skeel to Hon. ...150
                    Pedro Pierluisi Urrutia, Hon. Jose
21                  Luis Dalmau Santiago, Hon. Rafael
                    Hernandez Montanez
22

23

24

25

```
                                                 Page 8

 1   (9:34 a.m. AST/8:34 a.m. CDT)

 2          THE VIDEOGRAPHER:  We are on the record at

 3      8:34.  Today's date is August [sic] 15, 2021.

 4      This is The Matter of the Insolvency Proceedings

 5      for The Commonwealth of Puerto Rico.

 6          The witness today is located in Chicago,

 7      Illinois.  This deposition is being recorded

 8      with video and stenographically by Veritext via

 9      Zoom.

10          Tara, would you like appearances on the

11      record or just noted stenographically?

12          THE REPORTER:  That's up to counsel.

13          MS. DALE:  They don't need to be on the

14      record from my perspective.

15          MR. MOTT:  I wouldn't think so.  We have

16      quite a few people here.  So if just the people

17      participating or who plan to participate want to

18      put appearance on the record, that would work

19      for me.

20          My name is Tom Mott.  I'm an attorney with

21      Schulte Roth & Zabel together with the law firm

22      of McConnell Valdes.  We represent certain

23      creditors in this litigation known as the DRA

24      parties.  I'm joined today by my colleagues Doug

25      Koff and Erika Simonson.  I'm not sure who from
```

```
 1     McConnell is here, but I know there's some

 2     people on from McConnell as well.

 3          I guess, Margaret, why don't you take it

 4     away.

 5          MS. DALE:  Hi.  I'm Margaret Dale from

 6     Proskauer Rose on behalf of the oversight board

 7     and the witness.

 8          MS. DeCAMP:  Antoinette DeCamp in the

 9     general counsel's office of Ernst & Young on

10     behalf of Ernst & Young and the witness.

11          MR. MOTT:  And Antoinette, were you

12     planning on being on camera or --

13          MS. DeCAMP:  I had gone -- I can go on

14     camera.  I had gone off camera so that the

15     witness can see both you and himself because of

16     that.  So I can go on camera if you prefer, or I

17     can stay off and make sure the witness can see

18     you when you're questioning him.

19          MR. MOTT:  So was the technical difficulty

20     figured out such that this works, with all four

21     of us on camera, or does Antoinette need to stay

22     off camera in order for Mr. Malhotra to be able

23     to see.

24          THE WITNESS:  I can see you now.

25          MR. MOTT:  If that's all right with you,
```

Page 10

1          Ms. DeCamp, I would prefer you're on camera.

2                MS. DeCAMP:   Sure.

3                MR. MOTT:   Before we begin today, I would

4          like the record to reflect as we're all aware

5          that this deposition is proceeding remotely with

6          all of us appearing via videoconferencing and

7          the witness in a separate location and all of us

8          in separate locations due to the COVID-19

9          pandemic.

10               I hope everyone is keeping safe, and I

11         trust we can all be cognizant of these technical

12         difficulties and try to remain professional and

13         avoid speaking over each other so that we can

14         get through this deposition as efficiently as we

15         can.

16               MS. DALE:   I'm sorry, Tom, just to

17         interrupt for a sec.

18               I am in the conference room with the

19         witness.   Just want to make that clear on the

20         record.

21               MR. MOTT:   Sorry about that.

22               MS. DALE:   Of course.

23               MR. MOTT:   Thank you.

24               For exhibits, we will be using the Egnyte

25         system through Veritext.   And my colleague Erika

Page 11

1         Simonson will be marking and publishing the

2         exhibits throughout the deposition so that

3         everyone participating can see the exhibits, and

4         the witness and whomever is accessing Egnyte is

5         able to scroll through and review the exhibits

6         in real time.

7              And so just before we begin, I'd like to

8         confirm that objections today will be only as to

9         form and privilege, and all other objections are

10        reserved; and that the objection of one party

11        will suffice to reserve the rights of all other

12        parties.

13             Is that okay with you guys?

14             MS. DALE:  That's acceptable.

15             MS. DeCAMP:  Agreed.

16             MR. MOTT:  Okay, good.

17             Oh, yes.  Of course.

18             Thank you.  The court reporter will swear

19        the witness and you may then proceed.

20                       GAURAV MALHOTRA,

21   having been first duly sworn to tell the truth, the

22   whole truth and nothing but the truth relating to

23   said matter, was examined and testified as follows:

24

25

Page 12

1   DIRECT EXAMINATION,

2       QUESTIONS BY THOMAS L. MOTT:

3   Q   Mr. Malhotra, I'll be the person asking you

4       questions today.  And I'd appreciate it if you

5       would let me finish my question before

6       answering, and I'll let you finish your answers

7       before I ask you any follow-ups.

8           Do you understand?

9   A   I do.

10  Q   And just to ensure a clear transcript, we would

11      like you to answer all of my questions verbally.

12          Because this is a remote deposition, if you

13      have any technical difficulties, please let us

14      know.  For instance, if you can't hear a

15      question, just pipe in, pipe up, and we'll get

16      that sorted out.

17          If any of my questions are unclear, or if

18      you don't understand any of my questions, please

19      let me know.  I'll do my best to clarify.  And,

20      you know, if you don't understand the question,

21      then I'll rephrase it.

22          From time to time your counsel might object

23      to my questions, but even if they do object,

24      you're still required to answer my question

25      unless they instruct you not to and you intend

Page 71

1      understanding.  I am not sure, actually.  I

2      believe so.

3   Q   Do you know how much the FOMB is paying per hour

4      for you to be testifying here?

5          MS. DALE:  Objection.  He doesn't know

6      whether he's being paid to testify here.

7          MR. MOTT:  I believe he said "I believe so"

8      so --

9   A   I believe my billable rate on this -- in this

10     matter is discounted to either $900 an hour or

11     somewhere in that neighborhood.

12  BY MR. MOTT:

13  Q   And when you say "discounted," what do you mean

14     by that?

15  A   It's discounted.

16  Q   Discounted from what?

17  A   From what -- another engagement, what my

18     chargeable rate would be.

19  Q   What would your chargeable rate be typically?

20         MS. DeCAMP:  Objection.

21         MS. DALE:  Objection to the form.

22  A   I think 925 or 950.  I don't recall.

23  BY MR. MOTT:

24  Q   Do you know why your chargeable rate has been

25     discounted in connection with this matter?

Page 72

1        MS. DeCAMP:  Objection.

2    A    Over the first -- course of the first two or

3         three years, I recall, I think we have not

4         charged any rate increases on the engagement in

5         terms of billable hourly rates.

6    BY MR. MOTT:

7    Q    So initially, your hourly rate wasn't discounted

8         but because of -- because of raises in

9         connection with your chargeable rate on other

10        matters, it's now discounted here?

11        MS. DeCAMP:  Objection to form.

12   A    Can you rephrase that question, please.

13   BY MR. MOTT:

14   Q    It's not worth it, honestly.

15        Do you know if you were paid any different

16        rate in connection with your preparations for

17        testifying here as opposed to the actual day of

18        testimony?

19        MS. DeCAMP:  Objection.

20   A    Yes.

21   BY MR. MOTT:

22   Q    Are you being paid in connection with the

23        declaration that you drafted?

24        MS. DeCAMP:  Objection.

25   A    Yes.

Page 73

1    BY MR. MOTT:

2    Q    And that declaration includes expert testimony?

3             MS. DeCAMP:   Objection.

4             MS. DALE:   Objection.   Calls for a legal

5        conclusion.

6    A    My testimony is of a nonretained expert and --

7    BY MR. MOTT:

8    Q    And you're getting compensated for providing

9        your nonretained expert opinion; is that

10       correct?

11            MS. DeCAMP:   Objection.   Objection.

12            You can answer.

13   A    Yes.

14   BY MR. MOTT:

15   Q    Do you have an engagement letter specific to

16       your providing testimony in connection with the

17       restructuring of Puerto Rico?

18   A    My belief is that it should be covered under one

19       of our existing statements of work.

20   Q    So there's a statement of work that sets out,

21       within the scope of its services, your providing

22       expert testimony?

23            MS. DeCAMP:   Objection.   Foundation and

24       form.

25   A    There is an engagement letter in the context of

Page 74

1      ERS where I provided expert testimony, as I

2      mentioned earlier.

3  BY MR. MOTT:

4  Q   Right.

5          And so with respect to the plan

6      confirmation proceedings, is there a separate

7      engagement letter with respect to that

8      testimony, or is your engagement still through

9      the ERS engagement letter?

10         MS. DeCAMP:   Objection.

11  A   No, on the ERS engagement letter.  As a part of

12      our ongoing work as part of the existing

13      statements of work, I would provide a testimony,

14      but not as a part of the ERS-specific engagement

15      letter.

16  BY MR. MOTT:

17  Q   Right.

18         So there is a statement of work in the

19      Ernst & Young agreement with the oversight board

20      that sets out your providing testimony; is that

21      correct?

22  A   I would have to go back and confirm.  But as you

23      saw earlier, you know, the work that we have

24      done in the context of plan feasibility, I do

25      not recall whether specifically the words of

1       testimony are or are not listed in the statement

2       of work.  I do not recall.

3           But the work around plan feasibility is

4       sort of what my testimony is about.

5  Q   Right.  But you're not --

6           You're getting paid to provide that

7       testimony; is that right?

8           MS. DeCAMP:  Objection.  Form.

9  A   That is my assumption.

10 BY MR. MOTT:

11 Q   And do you know if Adam Chepenik is also being

12      compensated for his testimony?

13          MS. DeCAMP:  Objection.  Foundation, form.

14 A   Yes.  We're all a part of the same engagement

15      letter that we are working off of, which calls

16      out how we are getting compensated, how EY is

17      getting compensated.

18 BY MR. MOTT:

19 Q   Several weeks ago when you were contacted by

20      Proskauer and told that you would potentially be

21      providing testimony in connection with the plan

22      confirmation proceedings, was there any

23      discussion of amending the scope of any

24      statements of work in order to encapsulate that

25      testimony?

Page 93

1       likely be followed by reorganization; is that

2       right?

3              MS. DeCAMP:  Objection to the form.

4       Hypothetical.

5    BY MR. MOTT:

6    Q   You can answer.

7    A   That was a hypothetical.  I really can't go into

8        percentages of likelihood one way or the other

9        based on the assumptions that are in the fiscal

10       plan in conjunction with the obligations that

11       have been entered into as a part of the

12       settlements.

13             My testimony is that it is not likely that

14       the Commonwealth will have to go through another

15       financial reorganization.

16   Q   Why --

17             Sorry.  I didn't mean to talk over you.

18   A   That's all I had to say.  Sorry.

19   Q   Why, in your opinion, is confirmation of the

20       plan not likely to be followed by the need for

21       further financial reorganization?

22   A   So when I look at the revenues in the fiscal

23       plan and of what is included and what is not

24       included, and I look at the expenses in the

25       fiscal plan, and I look at the overall creditor

1      settlements, those all combined together do not

2      raise the fact that the Commonwealth -- do not

3      raise a concern that the Commonwealth will have

4      to default on its obligation that it is entering

5      into based on those assumptions.

6          So I don't know if that answers your

7      question.

8   Q  It sounds like it is because there's a whole lot

9      of money, and it's going to be sufficient to

10     cover all the obligations; is that right?

11  A  I wouldn't say there's a whole lot of money.

12          I look at these things as a balance on what

13     are the assumptions that are going into revenues

14     and expenses, both up and down.

15  Q  Yeah.

16  A  So it's a balance.

17  Q  Right.  But it's --

18          Well, is it a close call, in your mind,

19     whether or not the plan is going to likely need

20     to be followed by reorganization, or is it a

21     pretty clear-cut determination for you?

22  A  I think based on the current assumptions, I find

23     it that the Commonwealth is unlikely to have to

24     default based on the current assumptions.

25          But if those assumptions change, you know,

Page 95

1       the results change, and the testimony of the

2       opinion changes.

3   Q   But your current opinion, based on the current

4       assumptions, is that it's not likely to be

5       followed by a need for reorganization?

6   A   That is correct.

7   Q   And based on the current assumptions, you think

8       it's a relatively small chance that there is

9       further reorganization needed, or is it a close

10      call?

11  A   It's not likely that there is a need for a

12      financial reorganization.  That's what I'm

13      comfortable saying.

14  Q   So you're not comfortable getting any more

15      specific than saying it's not likely?  Are you

16      comfortable saying it's highly unlikely to be

17      followed by the need under the current

18      assumptions?

19  A   I'm comfortable saying what the -- what my

20      current --

21          The way it's framed currently in terms of

22      not likely.

23  Q   When you say based on your current assumptions,

24      are those your assumptions, or have those

25      assumptions been provided to you by counsel?

Page 96

1   A   Those are the -- I refer to the assumptions on

2       the fiscal plan combined with, you know, what is

3       in the disclosure statement.

4           That's what I sort of refer to, you know,

5       in terms of what is in the plan or not in the

6       plan combined with the overall settlements that

7       are proposed in the plan.

8   Q   Do you have any reason to believe that any of

9       those current assumptions are not correct?

10  A   No.  I wouldn't -- no.

11          MR. MOTT:  It's 12:30 or just about.  Do

12      you think we could take half an hour for lunch,

13      or do you need more than half an hour?

14          MS. DALE:  I'll just let you know we're in

15      Chicago where it's 11:30.

16          MR. MOTT:  Oh, my gosh.  Do you want to go.

17          MR. KOFF:  Can we go off the record.

18          THE VIDEOGRAPHER:  Off the record at 11:29.

19          (A recess was taken between 12:29 p.m. AST

20      and 1:19 p.m. AST.)

21          THE VIDEOGRAPHER:  We are on the record at

22      12:19.

23  BY MR. MOTT:

24  Q   So going back to the document we were just

25      looking at.

Page 97

1          So with respect to the first opinion:

2          "That confirmation of the plan is not

3      likely to be followed by the need for further

4      financial reorganization."

5          The next paragraph sets forth several bases

6      for that opinion.

7          The first that I wanted to talk about was

8      actually the fourth basis listed.

9          Your:

10         "Experience in providing financial

11     restructuring advisory services in public sector

12     restructuring."

13         I know we talked a little bit about

14     Detroit.  I'm just wondering if, in your own

15     words, you can tell me a little bit more about

16     how your experience has informed this opinion.

17   A   Sure.  Sure.

18         It's in the context of looking at long-term

19     projections over a long-term time frame and

20     ascertaining that, you know, the public sector

21     entity can meet its obligations.

22         And at the same time, just provide, in

23     those projections at least, the cost of the key

24     components of the cost of actually operating the

25     government, you know, any other reliance on new

Page 98

1      money or new resources coming into the public

2      sector entity.

3          So that's sort on the context of how I look

4      at it, based on the work that I've done

5      elsewhere as well.

6  Q   Have you been a part of any restructurings where

7      the restructured public entity, you know, after

8      the adjustment was actually -- it needed to be

9      reorganized again shortly after?

10 A   No.

11 Q   Are you aware of any restructurings where there

12     was a need shortly following readjustment for

13     further reorganization?

14 A   Not from the top of my head, no.

15 Q   And do you think that's because each of these --

16     or, strike that.  Sorry.

17         So are you basing --

18         This aspect of your basis for the opinion,

19     is it based specifically on your work in

20     connection with other restructurings, or does it

21     also include with respect to your work on

22     Puerto Rico?

23 A   It is a combination of the work that I've done

24     in other restructurings and the current set of

25     assumptions in Puerto Rico's restructure.

Page 99

1  Q   So going up to the first basis listed, you're

2      feeling:

3          "That confirmation of the plan is not

4      likely to be followed by the need for further

5      financial reorganization."

6          Item 1 in that paragraph reads or refers

7      to:

8          "Forecasts of revenues, expenditures,

9      budgets, and the amounts necessary for the

10     Commonwealth to make payments that will be due

11     pursuant to the plan."

12         I'm wondering what forecasts are you

13     referring to here?

14  A   The forecasts that are in the fiscal plan.

15  Q   And were you provided with these forecasts, you

16     know, in the same way that everyone else was

17     provided with the fiscal plan, or were you made

18     aware of these forecasts previous to that?

19         MS. DeCAMP:  Objection.

20         MS. DALE:  Objection to the form of the

21     question.

22         We're not going to get into how the fiscal

23     plan was constructed; so if that's where you're

24     going, I'm going to direct him not to answer

25     that question.  But if you just want to know

Page 100

1       when he became aware of the fiscal plan, that's

2       fine.

3             MR. MOTT:   I was more curious as to when he

4       became -- when he first reviewed the forecasts

5       that form the basis of this first opinion, was

6       it in connection with a published version of the

7       fiscal plan, or was it before then?

8    A   The April 2021 fiscal plan is published, and

9        that's what I'm using, too, as the basis for my

10       testimony.

11   BY MR. MOTT:

12   Q   Great.  Thanks.

13             Do you know how these forecasts were

14       developed, generally?

15   A   You know, I have a general understanding, but

16       the fiscal plan -- model in the fiscal plan has

17       predominantly been developed by McKinsey.

18   Q   And the fiscal plan sets forth several

19       assumptions that were relied on in making these

20       forecasts; is that right?

21   A   The fiscal plan is based on assumptions, yes.

22   Q   And do you have any knowledge about how those

23       assumptions came to be?

24             MS. DALE:  Again, we're not going to be

25       litigating the fiscal plan.  The plan is what it

Page 120

1          MS. DALE:  Objection.  Calls for a

2     hypothetical.

3  A   If the ratio --

4          If the revenues are lower, all the debt

5     service is higher, and from a ratio perspective

6     in the metric, just for the debt to own-source

7     revenues, you know, the calculation is

8     different, that is one of the aspects.  That's

9     the aspect that I am looking at.

10         The debt sustainability analysis looks at

11    various other components of inputs into the debt

12    sustainability analysis; so the one I looked at

13    was the debt to own-source revenues.

14 BY MR. MOTT:

15  Q   And that was going to be my next question.

16         The debt sustainability analysis in the

17    certified fiscal plan involves several different

18    discrete analyses, one of them being this

19    analysis regarding debt service to own-source

20    revenue; is that right?

21  A   Yes.

22  Q   Am I right, Mr. Malhotra, that your opinion with

23    respect to -- your focus is on the debt service

24    to own-source revenue with respect to your

25    testimony here and not the other pieces of the

Page 121

1       debt sustainability analysis in the fiscal plan?

2   A   That is correct.

3   Q   Is that because the debt service to own-source

4       revenue was Ernst & Young's only focus or your

5       only focus with respect to this particular

6       opinion?

7   A   The debt to own-source revenue was one of the

8       main criteria that the board was focused on.

9   Q   But besides the debt service to own-source

10      revenue analysis, what other aspects are there

11      of the debt sustainability analysis in the

12      fiscal plan?

13  A   I don't have the fiscal plan in front of me, but

14      there were, I think, three or four other metrics

15      that are listed in the fiscal plan that we can

16      go through.

17  Q   Okay.  I just was curious.

18          So the first basis for the opinion that:

19          "The financial obligations provided for in

20      the plan are consistent with the debt

21      sustainability analysis in the fiscal plan" --

22          -- is that there was structured debt

23      service and other financial obligations provided

24      for in the plan.

25          I'm wondering what the "other financial

Page 122

1           obligations provided for in the plan" refer to?

2   A    Yeah.  I mean -- I'm trying to think.  It's

3        really the debt service on the current interest

4        bonds, and the COFINA debt service collectively

5        is the way I think about the total debt service.

6   Q    So that's the restructured debt service.  But

7        are there any other financial obligations that

8        are encapsulated by the other financial

9        obligations provided for in the plan?

10  A    Not that I can think of off the top of my head,

11       no.

12  Q    So on the second basis listed for the second

13       opinion, it's the debt sustainability analysis

14       that I think we've already talked about.  Let me

15       just make sure I've covered everything.

16           MS. DALE:  Tom, I just lost connectivity to

17       the exhibit; so hold on a second.

18           MR. MOTT:  Oh, yeah.

19           MS. DALE:  I apologize.

20           MR. MOTT:  No worries.

21           MS. DALE:  Okay.  I got it back.  Sorry.

22           MR. MOTT:  Great.

23  BY MR. MOTT:

24  Q    So the debt sustainability analysis in the

25       fiscal plan, do you know who was responsible for

Page 123

1       that piece of the fiscal plan?

2   A   I think it was Citi.

3   Q   And was Ernst & Young or you involved in any way

4       with that work?

5           MS. DALE:  Objection to the form.

6   A   Not that I recall specifically.

7   BY MR. MOTT:

8   Q   And the debt sustainability analysis listed in

9       the 2021 fiscal plan, when did you first become

10      aware of that analysis?

11  A   I'm trying to recall whether a version of that

12      was also in the 2020 fiscal plan, but I don't

13      recall off the top of my head right now.

14          It may actually have been in an earlier

15      fiscal plan as well.

16          I don't know.  It was during the construct

17      of the fiscal plan, and then the fiscal plan was

18      finally published.

19  Q   In the exhibit, it says that:

20          "The restructured debt service and other

21      financial obligations provided for in the plan;

22      and the debt sustainability analysis in the

23      fiscal plan" --

24          -- are two bases for that second opinion,

25      but it says that those are -- among other

Page 124

1    things.

2         It says, "Among other things," these are

3    your two bases.

4         I'm wondering if that's just a catchall, or

5    if there's anything in addition to those two

6    bases that provide a basis for the opinion that

7    the financial obligations provided for in the

8    plan are consistent with the debt sustainability

9    analysis in the 2021 certified fiscal plan for

10   the Commonwealth.

11        MS. DALE:  Objection to the form.  I don't

12   see those words.

13 A  I'm just going to pull up because I can't -- I

14   lost this; my screen gets locked.  Give me a

15   moment.

16        MS. DALE:  Page 7.

17        MR. MOTT:  You are right.  That is only in

18   respect to Topic i and Topic iii.

19        Sorry about that.

20        While we're at it, though, and going

21   back -- and apology to be switching courses

22   here.

23 BY MR. MOTT:

24 Q  With respect to your opinion that:

25        "Confirmation of the plan is not likely to

Page 125

1       be followed by the need for further financial

2       reorganization" --

3             -- do you have any other bases for that

4       opinion other than those listed as (a), (b),

5       (c), or (d) in the first full paragraph of

6       page 7 of the document?

7   A   No.

8   Q   Okay.  So that "among other things" language, if

9       we were to strike it out, we wouldn't be missing

10      out on any meaning?

11  A   My testimony is not done yet so --

12  Q   Do you expect to --

13            Sorry.  Go ahead.

14  A   As of now, you know, these four components cover

15      the basis of my testimony, but that could

16      change.

17  Q   Okay.  Thank you.

18            Moving onto the third opinion listed in the

19      preceding paragraph that:

20            "The financial impact of preempted

21      Commonwealth statutes, or portions thereof, is

22      inconsistent with the financial requirement of

23      PROMESA."

24            What preempted Commonwealth statutes are

25      you referring to here?

Page 126

1   A   So there is an exhibit in the plan of adjustment

2       that lists the preempted statutes.

3   Q   And were you involved in putting together that

4       list?

5   A   That list is in the plan of adjustment.  I don't

6       recall putting that list together.

7   Q   Did you have any input in making that list?

8   A   For the plan of adjustment, I don't recall.

9   Q   Do you have any experience in interpreting

10      Commonwealth statutes?

11          MS. DALE:  Objection to the form.

12  A   I'm not an attorney; so I'm more focused on the

13      math in terms of the impact versus anything

14      else.

15  BY MR. MOTT:

16  Q   So you have no view one way or the other of

17      whether or not these statutes were, in fact,

18      preempted?  It's more just listed in the plan as

19      preempted, and you go from there?

20  A   My understanding is PROMESA has preempted these

21      statutes, and they are listed in the plan as

22      being preempted; so that's my understanding.

23      And, you know, in the context of the revenues

24      that are in the fiscal plan --

25  Q   Mm-hmm.

Page 127

1    A    -- on the assumption that these are all

2         preempted.

3    Q    Right.  But you're not making any determinations

4         one way or the other as to whether or not the

5         statutes were, in fact, preempted.

6              You're basing the fact that they are

7         preempted on the fact that they are listed in

8         the fiscal plan as having been preempted?

9    A    Yes.  I'm relying on the fiscal plan and the

10        plan of adjustment that all these are preempted.

11   Q    Right.

12             Why, in your opinion, is the financial

13        impact of these preempted Commonwealth statutes

14        inconsistent with the financial requirements of

15        PROMESA?

16   A    Well, you know, if I think about it, there's

17        three buckets of these different statutes, and

18        each of them in general would otherwise require

19        appropriations that are not available either in

20        the fiscal plan or the budget to be made.

21             So that's the reason they are inconsistent.

22   Q    Would you set forth the three buckets that you

23        were referring to?

24   A    Yes.  They are included in that exhibit in the

25        plan of adjustment.

1  Q   They are described in like three different

2      categories; am I right?

3  A   Yes.

4  Q   Okay.  When you say that they each require

5      appropriations that are not available in the

6      plan, isn't it the case that the plan can be

7      changed in order to allow for such

8      appropriations?

9          MS. DALE:  Objection.  Calls for a

10     hypothetical.

11 BY MR. MOTT:

12 Q   The plan hasn't been confirmed; the plan is not

13     some in-cement thing.

14         When you say that the appropriations are

15     not available in the plan, isn't it the case the

16     plan could be changed in order to make such

17     appropriations available?

18         MS. DALE:  Objection.

19 A   That is a hypothetical.  I know they are not in

20     the fiscal year '22 budget.

21 BY MR. MOTT:

22 Q   But it's possible?

23         MS. DALE:  Objection.  Calls for

24     speculation.

25 A   Fiscal year '22 budget is already in place.

Page 129

1          I mean, I don't know what the process is
2       for anything else, but I know they are not in
3       the plan or the budget currently.
4    BY MR. MOTT:
5    Q   What are the financial requirements of PROMESA
6       that this document is referring to here?
7          MS. DALE:   Objection to the form.
8    A   Well, it's really in the context of the -- what
9       is listed in the fiscal plan and thereby the
10      budget, which are sort of the financial
11      documents that I'm referring to.
12   BY MR. MOTT:
13   Q   So when it says that:
14         "The financial impact of preempted
15      Commonwealth statutes, or portions thereof, is
16      inconsistent with the financial requirements of
17      PROMESA" --
18         -- do you really mean the financial
19      requirements of -- you say the budgets or the
20      plan?
21   A   Yes.  The budgets, the fiscal plan, are what I
22      am referring to.
23   Q   So would it be more clear to say inconsistent
24      with the financial requirements of the budgets
25      and the plan?

Page 130

```
 1   A   I don't know if I can answer that because I feel
 2       that the fiscal plan -- and this is sort of the
 3       critical driving document from a financial
 4       standpoint under PROMESA.  So that is sort of
 5       what I was referring to in terms of the
 6       financial impact; that at the end of the day,
 7       the fiscal plan that has been certified by the
 8       board under PROMESA, what is that -- you know,
 9       what is the financial impact of that relative to
10       the statutes that have been preempted.
11   Q   How are you defining that "financial impact"?
12       Impact to whom?
13   A   To the government and to, you know, the -- it's,
14       in my view, more of a comparison of not the
15       "who," but the "what" with respect to the
16       statutes' financial impact compared to what is
17       in the fiscal plan in the budget.
18   Q   The first basis listed for the third opinion
19       referred to here is:
20           "The appropriations or the appropriations
21       based on mathematical formulas described in each
22       of the Commonwealth statutes at issue."
23           And maybe my --
24           What does it mean by "the appropriations
25       based on mathematical formulas" as opposed to
```

Page 131

1      just "the appropriations"?

2  A   There are some statutes that call for a certain

3      percentage of general fund revenues to be

4      appropriated.

5          That is an example, for instance, of what

6      you just asked.

7  Q   Is that one of the --

8          Those statutes that have the formulas, are

9      those in one of the buckets, the three buckets

10     we're talking about?  Is that one of the ways

11     those buckets are categorized or --

12 A   No.  The buckets are a little bit different, but

13     the individual statutes within the buckets then

14     talk about specific formulas.

15         But the formulas itself are not necessarily

16     the categories of the buckets.

17 Q   Taking the next two bases for the third opinion

18     because they seem to be interrelated.

19         The second bases is:

20         "The application of formula appropriations

21     described in the statutes to the revenue sources

22     identified in the statutes to estimate how those

23     specific appropriations would have been in

24     fiscal years 2021 and 2022."

25         MS. DALE:  Just misspoke in terms of

Page 138

1       the plan are consistent with the debt

2       sustainability analysis in the 2021 certified

3       fiscal plan for the Commonwealth" --

4            -- are you basing that opinion on your

5       firsthand experience working the matter since

6       2017 through 2018, 2019, and 2020, or are you

7       basing it off of work that you've done in the

8       last several months, putting together your

9       testimony in connection with the plan

10      confirmation proceedings?

11           MS. DALE:  Object to form.

12   A   The work around the -- the comparison of that

13      ratio, you know, has been a topic that has been

14      looked at throughout and as, you know, actually

15      laid out in that fiscal plan.

16           So I will say that what I am using is what

17      is in the fiscal plan and the plan of adjustment

18      as on file.

19   BY MR. MOTT:

20   Q   Have you come to your opinion that:

21           "The financial obligations provided for in

22      the plan are consistent with the debt

23      sustainability analysis in the 2021 certified

24      fiscal plan for the Commonwealth" --

25           -- since the 2021 certified fiscal plan for

Page 139

1        the Commonwealth was put on file?

2    A   Yes.  After it's been put on file.

3    Q   And do you recall when the 2021 certified fiscal

4        plan for the Commonwealth was put on file?

5    A   I think it was certified in April of 2021.

6    Q   And in determining whether or not the financial

7        obligations provided for in the plan are

8        consistent with that certified plan, did you

9        make that determination or support that

10       determination in connection with preparing for

11       your testimony for the plan confirmation

12       proceedings?

13   A   Could you ask me that question again, please.

14   Q   I don't specifically recall it.  Could the court

15       reporter please read it back.

16           (The requested text was read by the

17       reporter.)

18           MS. DALE:  Object to form.

19   A   It's still hard for me to follow that question.

20   BY MR. MOTT:

21   Q   Your opinion that:

22           "The financial obligations provided for in

23       the plan are consistent with the debt

24       sustainability analysis" --

25           -- have you come to that opinion and

Page 140

1    supported that opinion in connection with

2    drafting your testimony?

3  A  Yes.  On that particular ratio, yes.

4  Q  Thank you.

5       With respect to the third item of your

6    opinion that:

7       "The financial impact of preempted

8    statutes, or portions thereof, is inconsistent

9    with the financial requirements of PROMESA" --

10      -- which we now know is financial

11   requirements of the fiscal plan.

12      (Reporter request for clarification.)

13      MR. MOTT:  I'll start over.

14      MS. DALE:  I objected, but he's starting

15   over.

16 BY MR. MOTT:

17  Q  With respect to your opinion that:

18      "The financial impact of preempted

19   Commonwealth statutes, or portions thereof, is

20   inconsistent with the financial requirements of

21   PROMESA" --

22      -- did you come to that opinion in

23   connection with preparing your testimony in

24   connection with the plan confirmation

25   proceedings?

Page 160

1           MS. DALE:  I'm going to direct you not to
2       answer that question because it intrudes upon
3       our privilege.
4   BY MR. MOTT:
5   Q   Mr. Malhotra, are you going to take Ms. Dale's
6       direction?
7   A   Yes.
8   Q   And your declaration, it includes some fact
9       testimony, I assume, but it also includes some
10      opinion testimony; is that right?
11  A   Yes.
12  Q   And does it include expert opinion testimony?
13          MS. DALE:  Objection.  Calls for a legal
14      conclusion.  Asked and answered.
15  A   I have not been retained as an expert.  I'm a
16      nonretained expert.
17  BY MR. MOTT:
18  Q   When's the first time you heard that phrase,
19      "nonretained expert"?
20  A   A few weeks ago when --
21          MS. DALE:  That's the answer.  A few weeks
22      ago.
23  BY MR. MOTT:
24  Q   And who used that phrase "nonretained expert"?
25          Where did you come to learn that phrase a

Page 161

```
 1      few weeks ago?

 2   A  It was either Proskauer or our own counsel is

 3      where I probably heard it.

 4   Q  You don't recall if it was Proskauer or if it

 5      was Ms. DeCamp?

 6   A  I do not.

 7   Q  Going back to the comments to your first draft,

 8      were any of Proskauer's edits to the draft, did

 9      any of them touch on your opinion testimony?

10         MS. DALE:  I'm going to direct you not to

11      answer that question.  It's invading our

12      privilege.

13         MR. MOTT:  Could you, Ms. Dale, explain how

14      that's invading your privilege?

15         MS. DALE:  No.  I don't have to make an

16      explanation to you, Tom.

17         MR. MOTT:  Because we're talking about a

18      Rule 26(a)(2)(C) expert fact witness who is

19      putting their witness declaration together for

20      their testimony at trial; so I'm wondering where

21      your privilege assertion is coming from.

22         MS. DALE:  We disagree with you.

23         Communications with Mr. Malhotra and his

24      lawyers regarding his testimony are privileged,

25      except to the extent that we gave him facts,
```

Page 162

1      data, or assumptions upon which we are telling

2      him to incorporate in his testimony.

3            We had this conversation before, and we

4      have given you anything that -- we represented

5      that if there were communications with facts,

6      data, or assumptions, we would provide those to

7      you.  We looked.  We didn't find any.

8            So now, the back-and-forth that we've been

9      having over the draft of his declaration is

10     privileged, and we're not going to allow

11     Mr. Malhotra to answer questions about that.

12           I think I've already given some latitude

13     here to allow you to ask some questions about

14     the drafting process because I don't think that,

15     you know, how many drafts there were is

16     necessarily privileged, but, you know, to

17     start --

18           Anyway, that's my position.

19  BY MR. MOTT:

20  Q   So, Mr. Malhotra, are you going to take

21     Ms. Dale's direction not to answer my question

22     regarding whether or not Proskauer had any

23     comments with respect to your opinion testimony?

24  A   Yes.

25           MR. MOTT:  That's all the questions that I

Page 163

1    have, but I know that there are other

2    participants, including my colleagues from

3    McConnell.  I'm not sure if they are on.

4         But to the extent that McConnell has any

5    questions or any of the other participants here

6    have questions or if the oversight board has any

7    questions for Mr. Malhotra, the floor is now

8    open.

9         MS. DALE:  Okay.  Well, we have no

10   questions for our witness; so I think that

11   closes the deposition.

12        MR. MOTT:  Just before we go off the

13   record, I would like the record to reflect that

14   we're reserving all rights with respect to the

15   privilege disputes that have been discussed

16   here.

17        I understand, Ms. Dale, your position, but

18   the DRA parties have a very opposite view of

19   whether or not witness declarations of

20   Rule 26(a)(2)(C) witnesses are within your

21   privilege, given that we're talking about his

22   testimony at trial.

23        And he's not a reporting expert.  He's --

24   as you made sure that he knew how to call

25   himself -- a nonretained expert.  Those

Page 164

1      declarations, those drafts are not privileged in

2      our view.  So we may be speaking to the Court

3      about it.

4           MS. DALE:  Good luck with that.  Thanks

5      very much.

6           THE VIDEOGRAPHER:  Off the record at

7      2:37 p.m.

8           (Time noted:  3:37 p.m. AST/2:37 p.m. CST.)

9           AND FURTHER THE DEPONENT SAITH NOT.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 165

1    STATE OF INDIANA              )

                                   )  SS:

2    COUNTY OF HANCOCK             )

3        I, Tara Gandel Hudson, RPR, CRR, a Notary

4    Public in and for the County of Hancock, State of

5    Indiana at large, do hereby certify that the

6    deponent, GAURAV MALHOTRA, was by me remotely sworn

7    to tell the truth, the whole truth, and nothing but

8    the truth in the aforementioned matter;

9        That the foregoing deposition was taken on

10   behalf of the Cantor-Katz Collateral Monitor, LLC,

11   as Collateral Monitor for GDB Debt Recovery

12   Authority, with the witness located in Chicago,

13   Cook County, Illinois, on the 15th day of October,

14   2021, scheduled to commence at 9:30 a.m AST,

15   pursuant to the Federal Rules of Civil Procedure;

16       That said deposition was taken down

17   stenographically and transcribed to English under

18   my direction, and that the transcript is a true

19   record of the testimony received remotely of said

20   deponent; and that the signature of said deponent

21   to his deposition was requested;

22       That the parties were represented by their

23   counsel as aforementioned.

24       I do further certify that I am a disinterested

25   person in this cause of action; that I am not a

# EXHIBIT C

| | |
|---|---|
| **From:** | Stafford, Laura <lstafford@proskauer.com> |
| **Sent:** | Thursday, October 7, 2021 5:44 PM |
| **To:** | Mott, Thomas L.; Mervis, Michael T.; Koff, Douglas; Firestein, Michael A.; 'Lizzie M. Portela Fernández'; Arturo J. Garcia-Sota; Mintz, Doug; Jennings, Taleah; Nayuan Zouairabani; 'Alejandro J. Cepeda Diaz'; 'antionette.decamp@ey.com' |
| **Cc:** | Dale, Margaret A.; Alonzo, Julia D.; Rappaport, Lary Alan; 'rcamara@ferraiouli.com'; Atara Miller; 'hburgo@cabprlaw.com'; Howard R. Hawkins, Jr.; Luis A. Oliver-Fraticelli; Robert S. Berezin; Jonathan D. Polkes; Maria E. Pico; Martin A. Sosland; James E. Bailey III; 'lsepulvado@smlawpr.com'; 'jroach@reedsmith.com'; 'dmonserrate@gmail.com'; 'alan.brilliant@dechert.com'; 'jrapisardi@omm.com'; 'Luis Marini'; 'Carolina Velaz Rivero'; 'Hermann Bauer (Hermann.Bauer@oneillborges.com)'; 'antionette.decamp@ey.com'; Rosen, Brian S.; Carmen D. Conde Torres; Luisa S. Valle Castro; 'Pavel, Ashley'; 'Friedman, Peter'; 'Rapisardi, John J.'; 'McKeen, Elizabeth L.'; 'lmarini@mpmlawpr.com'; Barak, Ehud; 'cvelaz@mpmlawpr.com'; 'Roth, Joseph L.'; Jennings, Taleah; Prather, J. Eric; William Natbony; JOhring; Atara Miller; Adam M. Langley; Martin A. Sosland; Robert S. Berezin; 'Collins, Reed'; 'McGrath, Colin'; Mark C. Ellenberg; Howard R. Hawkins, Jr.; Thomas J. Curtin; Casey J. Servais; Levitan, Jeffrey W.; Triggs, Matthew; Gillespie, Noah; Cooper, Scott P.; Alonzo, Julia D.; 'Joseph, Andrew B' |
| **Subject:** | RE: Plan Confirmation - Deposition Notices |

Tom –

Mr. Herriman is not familiar with, and will not testify regarding, the amount deemed allowed with respect to CW/HTA Claims, as set forth in Section 2.2(a) of the Plan.  Mr. Herriman is also not familiar with, and will not testify regarding, the best interests test analysis, as reflected in Exhibit P to the Seventh Amended Disclosure Statement (as amended with respect to PBA only on October 3, 2021).  As set forth in the Debtors' Opening Expert Reports and Disclosures [ECF No. 18097], Mr. Herriman will testify regarding the reasonableness of the assumptions made with respect to the anticipated allowed amount of general unsecured claims against the Commonwealth, ERS, and PBA, which was used as an input to the best interests test analysis.