(P. de la C. 1003)

# LEY

Para crear la "Ley para Ponerle Fin a la Quiebra de Puerto Rico", establecer las disposiciones y condiciones para aprobar la oferta, venta y emisión de los diferentes tipos de Bonos de Obligación General, así como para disponer la creación de los Instrumentos de Valor Contingente; establecer la política pública de protección y el mecanismo de restitución de fondos de los municipios afectados por cualesquiera recortes impuestos por el Plan de Ajuste propuesto como parte del procedimiento de Título III de PROMESA; establecer la política pública de protección a las pensiones de nuestros retirados; reconocer las pensiones vigentes como deudas del Gobierno de Puerto Rico  y su inalterabilidad; establecer la declaración de política pública sobre temas de educación superior, cubiertas médicas de empleados públicos y los ciudadanos, así como para el desarrollo económico; establecer un mecanismo que le permita al Gobierno del Estado Libre Asociado de Puerto Rico adelantar los términos de pagos y cancelación de la deuda; establecer un grupo de trabajo conjunto entre la Rama Legislativa, la Rama Ejecutiva y la Junta de Supervisión Fiscal; derogar la Ley Núm. 39 del 13 de mayo de 1976, según enmendada; enmendar el inciso (a) del Artículo 3 de la Ley Núm. 147 de 18 de junio de 1980, según enmendada; enmendar el Artículo 3 y el inciso (m) del Artículo 7, así como derogar los Artículos 25 y 34 y renumerar los Artículos 25-A y 35 como los Artículos 25 y 34, respectivamente, de la Ley Núm. 44 de 21 de junio de 1988, según enmendada; se deroga el inciso (e) de la Ley 22-2000, según enmendada, y se renumeran los actuales incisos f y g como los nuevos incisos e y f, respectivamente; se deroga el inciso (l) del Artículo 1.03(B) de la Ley 351-2000, según enmendada, y se renumeran los actuales incisos m, n, ñ, o, y p como los nuevos incisos, l, m, n, ñ, y o, respectivamente; enmendar el inciso (h) del Artículo 2.02 de la Ley 351-2000, según enmendada; enmendar el Artículo 8 de la Ley 179-2002, según enmendada; enmendar el Artículo 31 de la Ley 272-2003, según enmendada; añadir un nuevo Artículo 7A a la Ley 103-2006, según enmendada; enmendar la Sección 3060.11 y eliminar la Sección 3060.11A de la Ley 1-2011, según enmendada; derogar la Ley Núm. 39 del 13 de mayo de 1976, según enmendada; enmendar el Artículo 7.018 y el Artículo 7.027 de la Ley 107-2020, según enmendada; enmendar el inciso (h) del Artículo 3 de la Ley Núm. 230 de 12 de julio de 1974, según enmendada, a los fines de tomar los pasos afirmativos necesarios para encaminar la salida de Puerto Rico del procedimiento de quiebras creado al amparo del Título III de la Ley PROMESA; cumplir con las disposiciones de la referida ley federal respecto a las condiciones mínimas necesarias para la culminación de la Junta de Supervisión y Administración Financiera; la vigencia de esta ley queda condicionada a cero recortes en las pensiones; y para otros fines relacionados.

EXPOSICIÓN DE MOTIVOS

En el año 2016, con el objetivo de proveerle un mecanismo al Gobierno de Puerto Rico para renegociar su deuda y controlar la potencial avalancha de reclamaciones por parte de sus acreedores, el Congreso de EE.UU. promulgó la ley federal conocida como la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico, conocida como PROMESA. Esta ley estableció, en su Título III, un procedimiento de quiebras que incorporaba una amplia porción de las disposiciones del Código de Quiebras, al cual Puerto Rico tendría acceso en aras de reestructurar su monumental deuda. De igual forma, creó una entidad que tomaría el control de todos los aspectos presupuestarios, financieros y de administración fiscal de Puerto Rico denominada *Financial Oversight and Management Board*, o Junta de Supervisión y Administración Financiera (JSAF). En efecto, la JSAF pasaría a supervisar y controlar esencialmente todos los aspectos fiscales y presupuestarios del Gobierno del Estado Libre Asociado de Puerto Rico.

El 3 de mayo de 2017, la JSAF, presentó una petición de reestructuración de deuda al amparo del Título III de PROMESA. La presentación de esta petición ante el Tribunal de Título III dio comienzo al procedimiento de quiebras más grande en la historia de los mercados municipales de EE.UU., al cual pertenecen los bonos y las obligaciones del Estado Libre Asociado de Puerto Rico. Para tener presente la magnitud de este evento debe considerarse que se estimaba que el Estado Libre Asociado tendría que reestructurar $35 mil millones como parte del mencionado proceso de restructuración.

Tras más de cuatro años de presentada la petición de quiebras al amparo del Título III de PROMESA, la Junta ha presentado una séptima versión enmendada del Plan de Ajuste o Reestructuración de la Deuda (PDA) para Puerto Rico ante el Tribunal de Título III. Este Plan es el resultado de varios años de negociación entre la JSAF, en su calidad de representante exclusivo de Puerto Rico ante el Tribunal de Título III, y un sinnúmero de clases de acreedores de obligaciones del Gobierno central.

La alternativa a estos escenarios es la aprobación del Plan, con el acuerdo de política pública que se expone en esta Ley que incluye cero recortes a las pensiones y los siguientes acuerdos en bienestar del pueblo de Puerto Rico:

1.  Proteger las pensiones de nuestros retirados. Este objetivo tiene el propósito de evitar recortes a las pensiones del 100% de los retirados. Esta protección estará establecida en la presente legislación y en cualquier legislación futura. Para lograr ese objetivo, se dispone en esta Ley una cláusula específica sobre este asunto.

2.  Asignación fija de $500 millones de presupuesto para la Universidad de Puerto Rico por un periodo de cinco años, congelando los recortes

programados. Esta meta tiene el propósito de conservar la capacidad de la UPR para llevar a cabo su vital misión educativa y asegurando los recursos necesarios para garantizar la acreditación de todos sus programas y lograr un acceso justo para aquellos estudiantes que tengan necesidades económicas.

3.      Creación del Fondo Fiduciario de Becas Universitarias. Esta iniciativa tiene el propósito de crear un fideicomiso de inversión para preservar el capital que se otorgaría para las becas de los estudiantes de la UPR, según la disponibilidad de los fondos.

4.      Proteger la totalidad de las aportaciones a los planes médicos de los empleados del gobierno central, evitando los recortes propuestos. Esta iniciativa tiene el propósito de identificar los fondos que eviten la reducción de las aportaciones a los planes de salud de los empleados públicos del gobierno central para sus seguros médicos. Esta medida beneficiaría a más de 60,000 trabajadores y familias puertorriqueñas.

5.      Asignar los fondos necesarios para los municipios. Este objetivo pretende otorgar estabilidad fiscal de los municipios y la continuidad de los servicios esenciales que ofrecen. Específicamente, la legislatura propone, además, que las partidas no utilizadas para el pago de las obligaciones de deuda municipal luego de la adopción del plan de ajuste reviertan a los municipios.

6.      Endosar la creación del fondo especial para la igualdad social. Esta propuesta – a ser legislada próximamente – pretende crear un fondo permanente que tenga la encomienda de combatir la pobreza y la desigualdad social; otorgándole prioridad en sus asignaciones a la atención de las necesidades de las comunidades marginadas, el programa de educación especial, los grupos poblacionales más vulnerables, combatir la deserción escolar, establecer un plan integrado para las personas sin hogar e incrementar, de forma gradual, las asignaciones para las entidades sin fines de lucro, de autogestión comunitaria y de base de fe, para ofrecer servicios directos, según la disponibilidad de fondos.

7.      Establecer la meta de que el 100% de la población tenga cubierta médica.  El propósito de esta iniciativa es extender y/o facilitar el acceso a cubiertas médicas a unos 225,000 ciudadanos que hoy carecen de planes médicos, según la disponibilidad de fondos.

8.      Creación del Fondo de Inversión Estratégico para el Desarrollo Económico que inyecte una inversión continua. Esta iniciativa propone la creación de

Case:17-03283-LTS   Doc#:18700-4   Filed:10/24/21   Entered:10/24/21 14:46:44   Desc:
Exhibit Exhibit 4 - HB 1003 as approved by the Senate on October 6   2021   Page 4 of 53

4

un Fondo de Inversión Estratégica dividido en cuatro categorías: (1) inversiones para cerrar las brechas de habilidades básicas; (2) programas de capitalización de pequeñas empresas; y (3) el desarrollo de programas de crecimiento empresarial mediante la capitalización empresarial, según la disponibilidad de fondos; y (4) capitalización del sector cooperativista.

9.   Establecer un mecanismo que le permita al Gobierno de Puerto Rico adelantar los términos de pagos y cancelación de deuda. Este mecanismo tiene el único propósito de autorizar al Gobierno de Puerto Rico a refinanciar los acuerdos de pagos de la deuda, con el único objetivo de acelerar o saldar los pagos acordados, de conformidad a la situación fiscal futura y sin afectar los servicios esenciales y prioritarios del Gobierno de Puerto Rico.

10.   Establecer grupo de trabajo conjunto entre la Rama Legislativa, la Rama Ejecutiva y la Junta de Supervisión Fiscal. Esta iniciativa tiene el objetivo de diseñar la legislación que sea necesaria para asegurarnos que, una vez concluya el proceso de reestructuración de la deuda pública, el Gobierno de Puerto Rico no vuelva a endeudarse sin tener los recursos económicos para cumplir sus obligaciones del pago; ni vuelva a repetirse las prácticas indebidas de aprobar presupuestos desbalanceados, con estimados de ingresos irreales o gastos excesivos. Igualmente, se propone el eventual traspaso de toda la información, sistemas, recursos y métodos de contabilidad que al presente están bajo la custodia de la Junta de Supervisión Fiscal, sobre los procesos financieros del Gobierno de Puerto Rico, para ser utilizados por el Gobierno de Puerto Rico como parte de sus responsabilidades fiscales.

De ser ratificado por el Gobierno y los acreedores, y posteriormente confirmado por el Tribunal de Título III, representaría el último peldaño en el proceso de reestructuración de la deuda de Puerto Rico. Este Plan incorpora los acuerdos alcanzados con las diversas clases de acreedores de obligaciones del Gobierno Central. Estas clases incluyen a los bonistas de obligaciones generales, sindicatos de empleados públicos, el Comité de Acreedores No Asegurados y el Comité Oficial de Retirados, entre otros.

En total, los acuerdos incluidos en el PDA reducen la deuda pública del Gobierno Central en aproximadamente un 50%. Es decir, la deuda pública se reduciría de aproximadamente $70 mil millones a $34 mil millones y la deuda de bonos de Obligaciones Generales (GO) y de la Autoridad de Edificios Públicos se reduciría de $18.8 mil millones a $7.4 mil millones. A su vez, el pago anual de la deuda pública de Puerto Rico se reduciría a aproximadamente $3,300 millones a $1,100 millones. Asimismo el servicio de la deuda del Estado Libre Asociado se reduciría de un 25% a un 7.5%, cifra que representa la mitad del máximo constitucional permitido. En términos prácticos,

estas reducciones representan más dinero en las arcas del gobierno, lo cual implica que Puerto Rico tendrá una nueva oportunidad de invertir en su gente a través de mejoras a la infraestructura, de sufragar los costos de los servicios esenciales que está llamado a ofrecer; y de prepararse para y atender futuras emergencias.

Para alcanzar esta reducción de la deuda gubernamental, la Ley PROMESA requiere que la Asamblea Legislativa de Puerto Rico apruebe legislación que viabilice la emisión de una serie de bonos de obligaciones generales (GO) y la creación de instrumentos de valor contingente (IVC) que garanticen el pago de ciertas reclamaciones. Debe destacarse que los IVC también disponen para la creación de un fideicomiso que eventualmente garantice el pago de pensiones, el disfrute del gobierno de hasta $200 millones de fondos generados en exceso a las proyecciones contenidas en los Planes Fiscales de 2020 y 2021, y otros mecanismos de repago.

En esencia, el Gobierno Central debe emitir nuevos bonos de obligaciones generales, y autorizar la creación de los IVC. Los IVC solo serían pagaderos al cumplirse determinadas métricas de recaudos del impuesto sobre ventas y uso (IVU) y, en el caso de una porción limitada de los IVCs, la porción del arbitrio federal al ron que el Departamento del Tesoro Federal transfiere al Gobierno del Estado Libre Asociado de Puerto Rico. Es decir, solo se pagaría hasta un máximo específico de deuda si ciertas condiciones están presentes.

A tenor con la Sección 314 de PROMESA, y con la recién firmada Ley 42-2021, el Gobierno de Puerto Rico tiene la obligación de aprobar la presente legislación para viabilizar la aprobación del Plan y la posterior salida de la Junta de Supervisión Fiscal.

Que quede meridianamente claro que la política pública de la presente Asamblea Legislativa es de cero recortes a los pensionados. La política pública de la Asamblea Legislativa es reconocer como deuda del Gobierno del Estado Libre Asociado, las pensiones según el estado de derecho al momento de aprobada esta Ley. Por lo que no se realizará recorte, disminución o alteración a las pensiones que reciben los retirados del Sistema de Retiro de Empleados Públicos, Maestros y la Judicatura.

Esta Asamblea Legislativa no ha perdido de perspectiva que nuestros pensionados, a diferencia de otros grupos de acreedores, ya sufrieron recortes en sus pensiones como resultado de la aprobación de estatutos que, con el propósito de prevenir la insolvencia de los sistemas de retiro del gobierno, redujeron los beneficios de pensión, aumentaron la cantidad de aportaciones de los empleados y elevaron la edad de retiro para los planes de pensión de cada uno de los tres sistemas principales de retiro del Gobierno. Por tanto, las Ramas Legislativa y Ejecutiva han sido enfáticas en que la política pública de Puerto Rico es de cero recortes a las pensiones. A estos fines, se dispone que quedará inmediatamente sin vigencia esta ley y cualquier transacción, emisión o gestión relacionada con la misma será nula si se ordena y se procede con algún recorte a las

pensiones de los empleados gubernamentales en el Plan de Ajuste o Reestructuración. La vigencia de esta ley queda condicionada a cero recortes en las pensiones.

Los municipios son el ente gubernamental más cercano a nuestra población. La crisis y los planes fiscales han impactado los ingresos de nuestros ayuntamientos. En la medida en que el PDA logre recortes a la deuda estatal, estas economías deberán solventar específicamente medidas de recolección y disposición de residuos, desperdicios y para implementar programas de reciclaje en los municipios, a fin de que los ayuntamientos puedan garantizar estos servicios tan fundamentales e indispensables para garantizar y mejorar la calidad de vida de nuestra ciudadanía.

La Asamblea Legislativa continuará impulsando propuestas que defiendan el mejor interés del pueblo. En esta hazaña, confiamos en que la Rama Legislativa contará con el apoyo del Ejecutivo para guiar a Puerto Rico en el camino por recorrer. La aprobación del Presupuesto General de Puerto Rico para el año fiscal 2021-2022, Res. Conj. 8-2021, fue un paso correcto en esa dirección. También lo es la aprobación de esta medida, que permitirá que el actual Presupuesto General se convierta en el primer presupuesto balanceado de cuatro. Al finalizar este proceso, Puerto Rico habrá cumplido con la mitad de los requisitos dispuestos por PROMESA. La presente Ley cimienta el esfuerzo histórico, multisectorial y de consenso de ponerle fin a la Junta de Supervisión Fiscal.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

**CAPÍTULO 1.- DISPOSICIONES GENERALES.**

**ARTÍCULO 101.- TÍTULO.**

Esta Ley se conocerá y podrá ser citada como la "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

**ARTÍCULO 102.- DECLARACIÓN DE INTENCIÓN Y POLÍTICA PÚBLICA**

La política pública de la Asamblea Legislativa es reconocer como deuda del Gobierno del Estado Libre Asociado, las pensiones según el estado de derecho al momento de aprobada esta Ley. Por lo que no se realizará recorte, disminución o alteración a las pensiones que reciben los retirados del Sistema de Retiro de Empleados Públicos, Maestros y la Judicatura.

La presente legislación es cónsona con los objetivos de la Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico (Puerto Rico Oversight, Management and Economic Stability Act, o PROMESA, por sus siglas en inglés) y se adopta al amparo del estado de derecho vigente. Con el propósito específico de viabilizar

las metas que se expresan a continuación, la Asamblea Legislativa del Estado Libre Asociado afirma que tiene la intención de cumplir con los procesos y mecanismos establecidos en la Ley Federal Promesa; y, a la misma vez, lograr los siguientes objetivos de política pública:

1. Tomar las acciones afirmativas requeridas para concretar la salida exitosa del Estado Libre Asociado de Puerto Rico del proceso de quiebras dispuesto en el Título III de la Ley federal PROMESA;

2. Viabilizar el acceso del Estado Libre Asociado de Puerto Rico a los mercados crediticios a corto y largo plazo, obteniendo tasas de interés razonables, para cumplir con las necesidades prestatarias de nuestro Gobierno local.

3. Perfeccionar la aprobación del primero de cuatro presupuestos balanceados, legislado y firmado por las Ramas Legislativa y Ejecutiva, respectivamente, el pasado 30 de junio de 2021; y que fuera identificada como la Resolución Conjunta Número 8-2021;

4. Ejercer todas las acciones necesarias para lograr que la Junta de Supervisión Fiscal concluya sus labores de monitoreo financiero lo antes posible y de forma ordenada.

5. Se declara que el Gobierno del Estado Libre Asociado de Puerto Rico, tendrá como asuntos prioritarios de política pública, los siguientes objetivos:

   a. Proteger las pensiones de nuestros retirados. Este objetivo tiene el propósito de evitar recortes a las pensiones del 100% de los retirados. Esta protección estará establecida en la presente legislación y en cualquier legislación futura. Para lograr ese objetivo, se dispone en esta Ley una cláusula específica sobre este asunto.

   b. Asignación fija de $500 millones de presupuesto para la Universidad de Puerto Rico por un periodo de cinco años, congelando los recortes programados. Esta meta tiene el propósito de conservar la capacidad de la UPR para llevar a cabo su vital misión educativa y asegurando los recursos necesarios para garantizar la acreditación de todos sus programas y lograr un acceso justo para aquellos estudiantes que tengan necesidades económicas.

   c. Creación del Fondo Fiduciario de Becas Universitarias. Esta iniciativa tiene el propósito de crear un fideicomiso de inversión

para preservar el capital que se otorgaría para las becas de los estudiantes de la UPR, según la disponibilidad de los fondos.

d.      Proteger la totalidad de las aportaciones a los planes médicos de los empleados del Gobierno Central, evitando los recortes propuestos. Esta iniciativa tiene el propósito de identificar los fondos que eviten la reducción de las aportaciones a los planes de salud de los empleados públicos del Gobierno Central para sus seguros médicos. Esta medida beneficiaría a más de 60,000 trabajadores y familias puertorriqueñas.

e.      Asignar los fondos necesarios para los municipios. Este objetivo pretende otorgar estabilidad fiscal de los municipios y la continuidad de los servicios esenciales que ofrecen. Específicamente, la legislatura propone, además, que las partidas no utilizadas para el pago de las obligaciones de deuda municipal luego de la adopción del plan de ajuste reviertan a los municipios.

f.      Endosar la creación del fondo especial para la igualdad social. Esta propuesta – a ser legislada próximamente – pretende crear un fondo permanente que tenga la encomienda de combatir la pobreza y la desigualdad social; otorgándole prioridad en sus asignaciones a la atención de las necesidades de las comunidades marginadas, el programa de educación especial, los grupos poblacionales más vulnerables, combatir la deserción escolar, establecer un plan integrado para las personas sin hogar e incrementar, de forma gradual, las asignaciones para las entidades sin fines de lucro, de autogestión comunitaria y de base de fe, para ofrecer servicios directos, según la disponibilidad de fondos.

g.      Establecer la meta de que el 100% de la población tenga cubierta médica y hacer una evaluación del sistema de salud con una asignación total de un $1 millón de dólares.  El propósito de esta iniciativa es extender y/o facilitar el acceso a cubiertas médicas a unos 225,000 ciudadanos que hoy carecen de planes médicos, según la disponibilidad de fondos.

h.      Creación del Fondo de Inversión Estratégico para el Desarrollo Económico que inyecte una inversión total de trescientos ($300) millones de dólares para cinco (5) años. Esta iniciativa propone la creación de un Fondo de Inversión Estratégica dividido en cuatro categorías: (1) inversiones para cerrar las brechas de habilidades básicas; (2) programas de capitalización de pequeñas empresas; (3)

el desarrollo de programas de crecimiento empresarial mediante la capitalización empresarial, y (4) capitalización del sector cooperativista, según la disponibilidad de fondos.

i.   Establecer un mecanismo que le permita al Gobierno de Puerto Rico adelantar los términos de pagos y cancelación de deuda. Este mecanismo tiene el único propósito de autorizar al Gobierno de Puerto Rico a refinanciar los acuerdos de pago de la deuda, con el único objetivo de acelerar o saldar los pagos acordados, de conformidad a la situación fiscal futura y sin afectar los servicios del Gobierno de Puerto Rico.

j.   Establecer grupo de trabajo conjunto entre la Rama Legislativa, la Rama Ejecutiva y la Junta de Supervisión Fiscal. Esta iniciativa tiene el objetivo de diseñar la legislación que sea necesaria para asegurarnos que, una vez concluya el proceso de reestructuración de la deuda pública, el Gobierno de Puerto Rico no vuelva a endeudarse sin tener los recursos económicos para cumplir sus obligaciones del pago; ni vuelva a repetirse las prácticas indebidas de aprobar presupuestos desbalanceados, con estimados de ingresos irreales o gastos excesivos. Igualmente, se propone el eventual traspaso de toda la información, sistemas, recursos y métodos de contabilidad que al presente están bajo la custodia de la Junta de Supervisión Fiscal, sobre los procesos financieros del Gobierno de Puerto Rico, para ser utilizados por el Gobierno de Puerto Rico como parte de sus responsabilidades fiscales.

Las Transacciones de Reestructuración de deuda autorizadas mediante la presente Ley están totalmente sujetas y condicionadas a que la Junta de Supervisión y Administración Financiera (JSAF) enmiende su Plan Fiscal para incluir todas las disposiciones contenidas en el inciso 5 de esta Sección.

Quedará inmediatamente sin vigencia esta ley y cualquier transacción, emisión o gestión relacionada con la misma será nula si se ordena y se procede con algún recorte a las pensiones de los empleados gubernamentales en el Plan de Ajuste o Reestructuración. La vigencia de esta ley queda condicionada a cero recortes en las pensiones.

## ARTÍCULO 103.- DEFINICIONES.

(a)   5.5% del IVU:  significa los ingresos y recaudos presentes y futuros generados por la porción del impuesto sobre ventas y uso establecido bajo las Secciones

4020.01 y 4020.02 del Subcapítulo D del Código de Rentas Internas de Puerto Rico que corresponde a la tasa contributiva del cinco y medio por ciento (5.5%).

(b)     Acuerdos Complementarios: significa el Plan, la Orden de Confirmación, el Contrato de Bonos de Obligación General, la forma de los Bonos de Obligación General, el Contrato de IVC, la forma de los IVCs, y cualquier otro acuerdo o instrumento relacionado o suscrito con relación a, o en apoyo de, una Transacción de Reestructuración y de conformidad con, o en apoyo de, el Plan o una Modificación Elegible.

(c)     ACT: significa la Autoridad de Carreteras y Transportación de Puerto Rico, creada en virtud de la Ley Núm. 74 de 23 de junio de 1965, según enmendada o su ley sucesora.

(d)     ADCC: significa la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, creada en virtud de la Ley 351-2000, según enmendada o su ley sucesora.

(e)     AEP: significa la Autoridad de Edificios Públicos de Puerto Rico, creada en virtud de la Ley Núm. 56 de 19 de junio de 1958, según enmendada, o su ley sucesora.

(f)     AFI: significa la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, creada en virtud de la Ley Núm. 44 de 21 de junio de 1988, según enmendada, o su ley sucesora.

(g)     AMA: significa la Autoridad Metropolitana de Autobuses de Puerto Rico, creada en virtud de la Ley Núm. 5 de 11 de mayo de 1959, según enmendada, o su ley sucesora.

(h)     Año Fiscal:  significa el año fiscal del Estado Libre Asociado, que empieza el 1ro de julio y termina el 30 de junio.

(i)     Bonos de Obligación General: significa los bonos de obligación general emitidos por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General de conformidad con esta Ley, el Plan y la Orden de Confirmación, y cualesquiera bonos de obligación general emitidos subsiguientemente por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General de acuerdo a y consistente con los términos del Plan para retirar, refinanciar o cancelar bonos de obligación general originalmente emitidos conforme al Plan y la Orden de Confirmación.

(j)     Código de Puerto Rico: significa la Ley 1-2011, según enmendada, conocida como el "Código de Rentas Internas para Puerto Rico de 2011."

(k)     Condición de Rendimiento Superior del Arbitrio al Ron: significa que los Ingresos del Arbitrio al Ron del Estado Libre Asociado en un año fiscal, calculados

conforme a, y neto de, aquellas deducciones permitidas conforme al Plan y establecidas en el Contrato de IVC, exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para dicho año fiscal.

(l)    Condición de Rendimiento Superior del IVU: significa que los recaudos del IVU Medido o del Impuesto Sustituto Medido, según sea el caso, en cualquier año fiscal exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para dicho año fiscal.

(m)    Contrato de Bonos de Obligación General: significa uno o más contratos de fideicomiso, escrituras, resoluciones y cualesquiera suplementos o enmiendas relacionadas, o contratos o acuerdos similares, relacionados a los Bonos de Obligación General a ser otorgados y suscritos por el Representante del Gobernador autorizando: (1) la emisión de los Bonos de Obligación General y describiendo sus términos; y (2) el pago de los Costos de Financiamiento, cada uno de conformidad con los términos del Plan.

(n)    Contrato de IVC: significa uno o más contratos de fideicomiso, escrituras, resoluciones y cualesquiera otros suplementos o enmiendas relacionadas, o contratos o acuerdos similares, relacionados a los IVCs a ser otorgados y suscritos por el Estado Libre Asociado autorizando: (1) la emisión de los IVCs por el Estado Libre Asociado y la descripción de sus términos; y (2) el pago de los Costos de Financiamiento de los IVCs, cada uno conforme a los términos del Plan.

(o)    Costos de Financiamiento: significa los costos asociados a las Transacciones de Reestructuración, incluyendo, pero sin limitarse a, los costos, honorarios y gastos para (i) emitir, pagar o repagar los Bonos de Obligación General y los IVCs, según aplicable, ya sea que los costos sean incurridos tras la emisión de dichos Bonos de Obligación General o IVCs o durante el término de dichos instrumentos, (ii) efectuar pagos según requeridos por los Acuerdos Complementarios, (iii) pagar cualquier sello, emisión o impuesto similar y otros cargos relacionados a la Transacción de Reestructuración (si alguno), (iv) prepararse para y efectuar las Transacciones de Reestructuración, y (v) llevar a cabo todas las actividades en curso relacionadas a las Transacciones de Reestructuración. Para evitar dudas, los Costos de Financiamiento también incluyen los honorarios y gastos administrativos previos y posteriores al cierre incurridos con relación a los Acuerdos Complementarios.

(p)    Entidad Gubernamental: significa cualquier agencia, departamento, oficina, corporación pública, fideicomiso, fondo, sistema, instrumentalidad, subdivisión política, autoridad fiscal o municipio del Estado Libre Asociado.

(q)    Estado Libre Asociado: significa el Estado Libre Asociado de Puerto Rico creado en virtud de las disposiciones del Artículo 1 de la Constitución del Estado Libre Asociado de Puerto Rico.

(r)     Fecha de Efectividad: significa la fecha en la que el Plan entre en vigor conforme a sus términos.

(s)     Fiduciario de los Bonos de Obligación General: significa el o los fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados de conformidad con los términos y condiciones del Contrato de Bonos de Obligación General.

(t)     Fiduciario de los IVC: significa el o los fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados conforme a los términos y condiciones del Contrato de IVC.

(u)     Fondo del Servicio de la Deuda: significa un fondo del servicio de la deuda establecido de conformidad con el Contrato de Bonos de Obligación General.

(v)     Impuesto Sustituto Medido: significa toda o una porción de un impuesto de aplicabilidad general en el Estado Libre Asociado que, mediante un cambio en la ley, o mediante acción ejecutiva o judicial sea legislado para sustituir completamente el IVU Medido o que de lo contrario constituya una medida similar o comparable de actividad económica en el Estado Libre Asociado, en cada caso de conformidad con los términos del Contrato de IVC.

(w)     Ingresos del Arbitrio al Ron del Estado Libre Asociado: significa el total de los recaudos del arbitrio a los licores destilados impuesto bajo el Código de Rentas Internas de los Estados Unidos de 1986 (según enmendado de tiempo en tiempo) recibidos por el Estado Libre Asociado, según documentado en el reporte del Departamento del Tesoro Federal de la actividad mensual del arbitrio neto pagado al Estado Libre Asociado y certificado por el Departamento de Hacienda de Puerto Rico o en cualquier otro reporte análogo según establecido en el Contrato de IVC.

(x)     IVCs o Instrumentos de Valor Contingente: significa, en el colectivo, las notas de obligación general emitidas bajo el Contrato de IVC de conformidad con esta Ley, el Plan y la Orden de Confirmación, que consisten en los IVCs de Obligación General y los IVCs "Clawback".

(y)     IVCs "Clawback": significa una serie de IVCs emitidos bajo el Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de la deuda emitida por ACT, ADCC, AFI y AMA. Para evitar dudas, los IVCs "Clawback" podrán emitirse en una o más subseries, incluyendo, pero sin limitarse a, la Subserie de las Reclamaciones del Arbitrio al Ron.

(z)     IVC de Obligación General: significa una serie de IVCs emitidos bajo el Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de o están relacionadas a deuda de obligación general del Estado Libre Asociado, incluyendo deuda directa o garantizada.

(aa)     IVU Medido: significa el 5.5% del IVU recaudado por el Estado Libre Asociado durante un año fiscal, menos aquellos ingresos transferidos al Fondo para el Desarrollo de la Industria de las Artes, Ciencias y Cinematografía conforme a la Sección Núm. 4050.06 del Código de Puerto Rico (o utilizado para cualquier otro propósito establecido por ley), hasta Tres Millones Doscientos Cuarenta Mil Dólares ($3,240,000.00) por año fiscal.

(bb)     Ley: significa esta "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

(cc)     Máximo Agregado de los IVCs "Clawback": significa, inicialmente a partir de la Fecha de Efectividad, $5,239,002,764. El Máximo Agregado de los IVCs "Clawback" se reducirá cada año fiscal en una cantidad igual a los pagos efectuados bajo los IVCs "Clawback" conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior del IVU. En adición, la porción del Máximo Agregado de los IVCs "Clawback" asignados a la Subserie de las Reclamaciones del Arbitrio al Ron se reducirá aún más cada año fiscal en una cantidad igual a los pagos efectuados bajo la Subserie de Reclamaciones del Arbitrio al Ron conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior del Arbitrio al Ron.

(dd)     Máximo Agregado de los IVC de Obligación General: significa, inicialmente desde la Fecha de Efectividad, $3,500,000,000. El Máximo Agregado de los IVC de Obligación General se reducirá anualmente por una cantidad igual a los pagos efectuados en los IVC de Obligación General conforme al Contrato de IVC.

(ee)     Modificación Elegible: significa una "Modificación Elegible" para ADCC y/o AFI aprobada conforme al Título VI de PROMESA.

(ff)     Orden de Confirmación:   significa la orden del Tribunal de Título III confirmando el Plan.

(gg)     Persona: significa cualquier persona natural o jurídica, incluyendo, pero sin limitarse a, el Estado Libre Asociado, cualquier Entidad Gubernamental, o cualquier firma, sociedad, empresa conjunta, fideicomiso, sucesión, compañía de responsabilidad limitada, corporación de individuos, asociación o corporación pública o privada, organizada o existente bajo las leyes de Puerto Rico, de los Estados Unidos de América, de cualquier estado u otra jurisdicción, o cualquier estado, municipio, subdivisión

política, autoridad fiscal, agencia o instrumentalidad de los Estados Unidos de América, cualquier estado o cualquier otra jurisdicción, o cualquier combinación de las anteriores.

(hh)   Plan: significa el Plan de Ajuste conjunto para el Estado Libre Asociado, SRE y AEP (y cualquier otra Entidad Gubernamental incluida en dicho plan) confirmado bajo el Título III de PROMESA, incluyendo los anejos relacionados, según estos puedan ser enmendados, suplementados o modificados de tiempo en tiempo.

(ii)   PROMESA:  significa la Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et seq., según enmendada o modificada.

(jj)   Reclamaciones Existentes:  significa las reclamaciones en contra del Estado Libre Asociado, AEP, SRE, ACT, AFI, ADCC y AMA.

(kk)   Representante del Gobernador: significa el Gobernador, el Secretario de Hacienda o cualquier otro oficial de una Entidad Gubernamental designado por el Gobernador mediante Orden Ejecutiva para cumplir con los propósitos y mandatos de la presente Ley en representación del Estado Libre Asociado de Puerto Rico.

(ll)   Secretario de Hacienda: significa el Secretario del Departamento de Hacienda del Estado Libre Asociado, creada en virtud del Plan de Reorganización Núm. 3 de 22 de junio de 1994, según enmendado, o su ley sucesora.

(mm)  Sistemas de Retiro del Estado Libre Asociado: significa el Sistema de Retiro de Empleados del Gobierno, según definido en el inciso (nn) del presente Artículo, el Sistema de Retiro de Maestros de Puerto Rico y el Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico.

(nn)   SRE: significa el Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, creado en virtud de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada o su ley sucesora.

(oo)   Subserie de Reclamaciones del Arbitrio al Ron: significa una subserie de los IVCs "Clawback" emitidos bajo el Contrato de IVC con relación a las reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de, o están relacionadas a, los Ingresos del Arbitrio al Ron del Estado Libre Asociado retenidos por el Estado Libre Asociado y no transferidos a AFI.

(pp)   Transacciones de Reestructuración: significa cada una de las transacciones contempladas por, o en apoyo a, el Plan o una Modificación Elegible, incluyendo, pero sin limitarse a, la emisión de los Bonos de Obligación General y los IVCs y la cancelación

o la extinción de las Reclamaciones Existentes conforme al Plan o una Modificación Elegible, según sea el caso.

## ARTÍCULO 104. – AUTORIZACIÓN DE ACCIONES POR LAS ENTIDADES GUBERNAMENTALES.

No obstante cualquier disposición, prohibición o restricción establecida en cualquier ley, orden, regla o reglamento del Estado Libre Asociado, cada entidad gubernamental requerida a tomar o llevar a cabo cualquier acción necesaria o conveniente para implementar el Plan y/o las Transacciones de Reestructuración queda por la presente autorizada a llevar a cabo y deberá llevar a cabo todas aquellas acciones necesarias o convenientes para implementar el Plan o las Transacciones de Reestructuración, sin estar sujeta a los requisitos de cualquier disposición, prohibición o restricción establecida en cualquier otra ley, orden, regla o reglamento, incluyendo, pero sin limitarse a, (a) negociar, entrar en y suscribir cualquier acuerdo, escritura, certificado o documento, y (b) desembolsar o transferir fondos según provisto y/o requerido en el Plan. La autorización provista en este Artículo será suficiente para que el Representante del Gobernador, a nombre del Estado Libre Asociado, y cualquier director ejecutivo, presidente u oficial de rango y autoridad similar, a nombre de la Entidad Gubernamental que representa, pueda llevar a cabo cualquier acción contemplada en el Plan y/o en las Transacciones de Reestructuración y ninguna otra autorización, incluyendo, pero sin limitarse a, la autorización de cualquier junta de directores, comisión, departamento, o regulador de Puerto Rico, será requerida. Para evitar dudas, la autorización aquí establecida será tan amplia y suficiente como lo permita el estado de derecho vigente para permitir que el Estado Libre Asociado pueda establecer, financiar, y de otra manera implantar cualquiera y todas las disposiciones y/o mecanismos incluidos en el Plan para proteger las pensiones de los empleados gubernamentales retirados. Además, la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico queda por la presente autorizada a requerirle a cualquier Entidad Gubernamental que cumpla con los requisitos establecidos en este Artículo.

Sin limitar la generalidad de lo anterior y no obstante cualquier disposición de cualquier ley del Estado Libre Asociado, en o antes de la Fecha de Efectividad, el Representante del Gobernador queda por la presente autorizado a: (a) aprobar la oferta, venta y emisión de los Bonos de Obligación General y los IVCs según contemplado en el Plan y dispuesto en los Capítulos 2 y 3 de esta Ley, respectivamente; (b) proveer para la cancelación y extinción de las Reclamaciones Existentes conforme a y de acuerdo con los términos del Plan o de una Modificación Elegible, según aplicable; (c) autorizar el pago de los Costos de Financiamiento de conformidad con los términos del Plan; (d) aprobar la forma del Contrato de los Bonos de Obligación General, del Contrato de IVC, y de los otros Acuerdos Complementarios y otorgar el Contrato de los Bonos de Obligación General, el Contrato de IVC y los otros Acuerdos Complementarios a nombre del Estado Libre Asociado; (e) incluir en los Acuerdos Complementarios cualquier pacto, término u

otra condición según pueda ser requerida por el Plan, incluyendo (1) consentir a nombre del Estado Libre Asociado a la aplicación de las leyes del Estado de Nueva York para gobernar e interpretar dichos Acuerdos Complementarios, y la jurisdicción de cualquier tribunal estatal o federal, con relación a cualquier demanda o procedimiento relacionado con los Bonos de Obligación General, los IVCs, los Acuerdos Complementarios y/o cualesquiera otros asuntos relacionados a las Transacciones de Reestructuración, y (2) la creación de gravámenes sobre los dineros, valores y otros activos depositados con el Fiduciario de los Bonos de Obligación General o el Fiduciario de los IVCs a beneficio de los tenedores de los Bonos de Obligación General y los IVCs, respectivamente; y (f) llevar a cabo cualesquiera y todas otras acciones necesarias o convenientes para efectuar las Transacciones de Reestructuración. Para evitar dudas, no obstante la aplicación de las leyes del Estado de Nueva York para gobernar e interpretar cualquier Acuerdo Complementario, la autorización por el Estado Libre Asociado del Contrato de Bonos de Obligación General y el Contrato de IVC y la emisión por el Estado Libre Asociado de los Bonos de Obligación General y los IVCs se gobernarán por las leyes del Estado Libre Asociado, disponiéndose que, sujeto a los términos del Contrato de Bonos de Obligación General y el Contrato de IVC, los tenedores de los Bonos de Obligación General y de los IVCs, respectivamente, tendrán aquellos derechos y remedios de tenedores de deuda pública del Estado Libre Asociado establecidos en las Secciones 2 y 8 del Artículo VI de la Constitución del Estado Libre Asociado.

La autorización para emitir bonos conferida mediante la presente Ley estará limitada únicamente a aquellos bonos contemplados por y requeridos para implementar el Plan, y se hará conforme lo establezcan el propio Plan, los Contratos de Obligación General, la Orden de Confirmación y los demás Acuerdos Complementarios. El Gobernador de Puerto Rico o su Representante deberán solicitar la autorización de la Asamblea Legislativa para cualquier emisión posterior que sea distinta a la aquí permitida.

## ARTÍCULO 105: PROTECCIÓN DE LAS PENSIONES DE LOS RETIRADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO.

El gobierno del Estado Libre Asociado, por la presente, declara que es la política pública de la más alta prioridad proteger las pensiones de sus servidores públicos, que son uno de los grupos más importantes de nuestra sociedad. Como parte esencial de esta política pública, la protección de las pensiones de todos nuestros retirados es un compromiso esencial e inquebrantable. Por lo tanto, en relación a las pensiones de los retirados del Gobierno, se dispone lo siguiente:

(a)     Todas las pensiones de los retirados del Gobierno del Estado Libre Asociado acumuladas hasta la fecha de esta Ley, que estén reconocidas en las leyes de Puerto Rico vigentes a la fecha de la presente Ley, por la presente, se reconocen como deudas contraídas por el Gobierno de Puerto

Rico y por virtud de esta legislación, quedan protegidas y excluidas de todo tipo de recortes o reducciones presupuestarias. Esta protección de beneficios acumulados protege a los pensionados de cualquier reducción a cualquier pensión acumulada hasta la Fecha de Efectividad incluida en el Plan de Ajuste; y se dispone, en la medida en que la ley lo permita, que, en la Orden de Confirmación del Plan de Ajuste, se considerarán los pagos de las pensiones en su nivel actual acumulados hasta la de Fecha Efectividad como deuda no sujeta a reducción por la Junta de Supervisión Financiera al amparo de PROMESA. Esta protección incluye la presente legislación que autoriza la emisión de bonos para la reestructuración de la deuda y cualquier legislación futura, incluyendo planes fiscales futuros, que comprometan ingresos del Gobierno del Estado Libre Asociado. Cualquier transacción de deuda al amparo de esta o cualquier ley futura, deberá cumplir con este requisito.

(b)     Para cumplir con la política pública de honrar la totalidad de las pensiones presentes, la Asamblea Legislativa deberá consignar los ingresos necesarios para el pago de las mismas en el presupuesto de cada año fiscal correspondiente.

## CAPÍTULO 2 – LOS BONOS DE OBLIGACIÓN GENERAL

## ARTÍCULO 201.- EMISIÓN DE LOS BONOS DE OBLIGACIÓN GENERAL.

(a)     A partir y luego de la Fecha de Efectividad, el Representante del Gobernador, estará autorizado para aprobar la oferta, venta y emisión de los Bonos de Obligación General, de tiempo en tiempo, de conformidad con las disposiciones del Contrato de Bonos de Obligación General, la Orden de Confirmación, el Plan y de los demás Acuerdos Complementarios, hasta una cantidad agregada inicial de principal de $7,414,063,543.25, y para aprobar la oferta, venta y emisión, de tiempo en tiempo, de Bonos de Obligación General adicionales, sujeto a las limitaciones contempladas en el Plan y establecidas en el Contrato de Bonos de Obligación General para retirar, refinanciar o cancelar los Bonos de Obligación General originalmente emitidos conforme al Plan y a la Orden de Confirmación.

(b)     Los Bonos de Obligación General incluirán bonos de interés corriente y bonos de revalorización de capital, estarán fechados, devengarán intereses, y vencerán en la fecha o fechas, que no excederán treinta (30) años de su fecha o fechas de emisión, y serán redimibles o podrán ser prepagados, en cada caso, en la medida en que sea aplicable y según sea determinado por el Representante del Gobernador, como representante del

Estado Libre Asociado, y autorizado en el Contrato de Bonos de Obligación General de conformidad y consistente con el Plan.

El Representante del Gobernador, como representante del Estado Libre Asociado, determinará la forma de los Bonos de Obligación General y la manera de emitir los Bonos de Obligación General, y establecerá la denominación o denominaciones de los Bonos de Obligación General y el lugar o los lugares de pago de los mismos y sus otros términos, todo de conformidad y consistente con el Plan. A discreción del Representante del Gobernador, los Bonos de Obligación General podrán ser emitidos en una o más series separadas.

(c)     Los Bonos de Obligación General serán obligaciones legales, válidas y vinculantes del Estado Libre Asociado, emitidos conforme al Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, y serán pagaderos conforme a los términos del Contrato de Bonos de Obligación General y de los otros Acuerdos Complementarios.

(d)     Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en cualquier Bono de Obligación General autorizado bajo esta Ley deje de ocupar su cargo previo a la entrega de dichos Bonos de Obligación General, dicha firma o facsímil de la firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos como si dicho oficial hubiese permanecido en su cargo hasta dicha entrega. Además, cualquier Bono de Obligación General podrá contener la firma o facsímil de la firma de aquellas personas que, al momento de la emisión de dicho bono, sean los oficiales autorizados a firmarlo, pero que, en la fecha del Bono de Obligación General, no ocupaban su puesto.

(e)     Los Bonos de Obligación General emitidos de conformidad con las disposiciones de esta Ley se considerarán instrumentos negociables bajo las leyes de Puerto Rico.

(f)     Los Bonos de Obligación General autorizados por esta Ley se podrán emitir como bonos de cupón o en forma registrada, o ambos, según se establezca en el Contrato de Bonos de Obligación General.

## ARTÍCULO 202.- COMPROMISO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE IMPONER CONTRIBUCIONES.

La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado quedan por la presente comprometidos para el pago puntual del principal e interés de los Bonos de Obligación General emitidos bajo las disposiciones de esta Ley, según y cuándo venzan de conformidad con los términos del Contrato de Bonos de Obligación General. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar el principal e interés de los Bonos de Obligación General según venzan

o tras su redención o prepago de conformidad con el Contrato de Bonos de Obligación General, de los recursos disponibles del Estado Libre Asociado en el año fiscal en que dicho pago sea requerido, y las disposiciones de esta Ley con relación al pago de principal e interés en los Bonos de Obligación General se considerarán una obligación continua para que el Secretario de Hacienda haga dichos pagos, aunque no se hayan hecho asignaciones específicas para dichos propósitos. El Representante del Gobernador queda por la presente autorizado y dirigido a incluir en el Contrato de Bonos de Obligación General el compromiso que aquí establece el Estado Libre Asociado de Puerto Rico con relación a los Bonos de Obligación General, y deberá establecerse en dichos Bonos de Obligación General que la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico están comprometidos para el pago de los mismos.

## ARTÍCULO 203.- FONDO DEL SERVICIO DE LA DEUDA; GRAVAMEN ESTATUTARIO.

(a)     Se autoriza al Representante del Gobernador a establecer el Fondo de Servicio de la Deuda con el Fiduciario de los Bonos de Obligación General para el pago de los Bonos de Obligación General. Hasta que los Bonos de Obligación General hayan sido completamente pagados o satisfechos de conformidad con sus términos, mensualmente, el Estado Libre Asociado de Puerto Rico depositará con el Fiduciario de los Bonos de Obligación General una suma en efectivo en la cantidad agregada igual a (i) una sexta parte (1/6) de la obligación semianual del Estado Libre Asociado de Puerto Rico con relación al pago de interés devengado sobre los Bonos de Obligación General y (ii) una doceava parte (1/12) de la obligación anual del Estado Libre Asociado de Puerto Rico con relación al pago del principal de los Bonos de Obligación General. Dichos fondos deberán mantenerse e invertirse por el Fiduciario de los Bonos de Obligación General de conformidad con las disposiciones del Contrato de Bonos de Obligación General.

(b)     A partir de la emisión, los Bonos de Obligación General estarán garantizados automáticamente por un gravamen estatutario de primer rango sobre los fondos depositados en el Fondo de Servicio de la Deuda, incluyendo cualquier ingreso o recaudos generados de dichos fondos. Dicho gravamen estatutario de primer rango se creará, surtirá efecto y se perfeccionará automáticamente, y será válido y vinculante a partir y luego de la Fecha de Efectividad, sin que sea necesario acto o acuerdo alguno por ninguna otra Persona. No será necesario otorgar, suscribir ni inscribir instrumento alguno en ningún récord oficial ni en registro u oficina del gobierno alguna para perfeccionar o continuar teniendo dicho gravamen estatutario de primer rango o para establecer o mantener la prioridad aquí establecida. El gravamen establecido en este Artículo será válido, vinculante y ejecutable, y estará perfeccionado contra todas las Personas que tengan reclamaciones de cualquier tipo de daños, contractuales, o de cualquier otro tipo contra el Estado Libre Asociado o sus activos independientemente de si dichas Personas fueron notificadas sobre dicho gravamen.

## ARTÍCULO 204.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.

Los Bonos de Obligación General, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con relación a los Bonos de Obligación General y la transferencia de los Bonos de Obligación General, estarán, en todos momentos, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos), tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas. Los tenedores y beneficiarios de los Bonos de Obligación General no tendrán que rendir planillas o cualquier otro reporte de contribuciones o requisito similar con relación al Estado Libre Asociado o cualquier Entidad Gubernamental por razón de tener, ser dueño de o transferir Bonos de Obligación General.

## ARTÍCULO 205.- CONVENIOS DEL ESTADO LIBRE ASOCIADO.

El Estado Libre Asociado de Puerto Rico, con la intención de quedar contractualmente obligado, por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y subsiguientes de los Bonos de Obligación General que, hasta que todas las obligaciones relacionadas a dichos bonos hayan sido completamente satisfechas, de conformidad con sus términos, el Estado Libre Asociado de Puerto Rico se obliga a lo siguiente:

(a) no llevar a cabo ninguna acción que (1) impida el depósito mensual de los fondos en el Fondo del Servicio de la Deuda conforme al Artículo 203 de esta Ley, (2) limite o altere los derechos del Estado Libre Asociado de Puerto Rico de conformidad con el Plan y la Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los tenedores de los Bonos de Obligación General o (3) perjudique los derechos y remedios de los tenedores de los Bonos de Obligación General;

(b) hacer y llevar a cabo todos los actos permitidos por ley y que sean razonablemente necesarios o deseables para asegurar que el pago de interés a los tenedores de cualesquiera Bonos de Obligación General esté exento de pago de contribuciones federales, y que sea y continúe estando excluido del ingreso bruto para propósitos de contribuciones sobre ingresos federales, en la medida en que aplique; y

(c) causará que cualquier Plan Fiscal del Estado Libre Asociado de Puerto Rico presentado a la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA luego de la Fecha de Efectividad incluya disposiciones para el pago en cada año fiscal del principal e intereses sobre los Bonos de Obligación General de conformidad con los términos del Contrato de Bonos de Obligación General; y

(d) en la medida necesaria para cumplir con sus obligaciones de pagar los Bonos de Obligación General, aplicará (i) el producto del impuesto a la propiedad del 1.03%

recaudado conforme a la Ley 107-2020, según enmendada, conocida como "Código Municipal de Puerto Rico", por el Centro de Recaudación de Ingresos Municipales del Estado Libre Asociado de Puerto Rico, (ii) cualquier dinero que surja de la operación del Artículo VI, Sección 8 de la Constitución del Estado Libre Asociado de Puerto Rico y (iii) cualquier otro recurso disponible del Estado Libre Asociado de Puerto Rico para el pago del principal y los intereses (y el valor acumulado) sobre dichos Bonos de Obligación General; disponiéndose que (A) este convenio no le concede a los tenedores de dichos Bonos de Obligación General un gravamen sobre dichos ingresos, dineros y recursos, y (B) para propósitos del cumplimiento con este convenio, en la medida en que dichos ingresos, dineros y recursos se transfieran al Fondo General del Estado Libre Asociado de Puerto Rico, se considerará que los pagos de principal e intereses (y del valor acumulado) realizados a los tenedores de los Bonos de Obligación General provenientes del Fondo General del Estado Libre Asociado de Puerto Rico se han hecho de dichos ingresos, dineros y recursos en el orden establecido anteriormente.

## CAPÍTULO 3 – LOS INSTRUMENTOS DE VALOR CONTINGENTE

## ARTÍCULO 301.- EMISIÓN DE LOS IVCS.

(a)     A partir y luego de la Fecha de Efectividad, el Representante del Gobernador estará autorizado para aprobar la oferta, venta y emisión, conforme a los términos del Contrato de IVC, la Orden de Confirmación, el Plan y los Acuerdos Complementarios, de IVCs en dos subseries – los IVCs de Obligación General y los IVCs "Clawback" – hasta una cantidad agregada de $3,500,000,000 y $5,239,002,764, respectivamente. Cada serie de los IVCs podrá incluir una o más subseries.

(b)     Los IVCs tendrán fecha y vencerán en el tiempo o tiempos que determine el Representante del Gobernador, como representante del Estado Libre Asociado de Puerto Rico, y autorizados en el Contrato de IVC, disponiéndose que los IVCs de Obligación General vencerán no más tarde del Año Fiscal 2044 y que los IVCs "Clawback" vencerán no más tarde del Año Fiscal 2052. Los IVCs no devengarán intereses y estarán sujetos a redención según sea determinado por el Representante del Gobernador y autorizado en el Contrato de IVC de conformidad y consistente con el Plan. El Representante del Gobernador determinará la forma de los IVCs y la manera de emitir los IVCs, y establecerá la denominación o denominaciones de los IVCs y el lugar o los lugares de pago de los mismos y sus otros términos, todo de conformidad y consistente con el Plan.

(c)     Los IVCs serán obligaciones legales, válidas y vinculantes del Estado Libre Asociado de Puerto Rico, emitidos de conformidad con el Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, y pagaderos de conformidad con los términos del Contrato de IVC y de los Acuerdos Complementarios, disponiéndose que, de conformidad con el Contrato de IVC:

(1)   no se hará pago alguno a los tenedores de los IVCs (a menos que sean tenedores de la Subserie de Reclamaciones del Arbitrio al Ron bajo las circunstancias establecidas en el inciso (2) a continuación) en un año fiscal a menos que durante el año fiscal anterior ocurra una Condición de Rendimiento Superior del IVU;

(2)   no se hará pago alguno en un año fiscal a los tenedores de la Subserie de Reclamaciones del Arbitrio al Ron a menos que durante el año fiscal anterior ocurra una Condición de Rendimiento Superior del IVU o una Condición de Rendimiento Superior del Arbitrio al Ron;

(3)   no se hará pago alguno a los tenedores de IVCs de Obligación General o a los IVCs "Clawback" en exceso del Máximo Agregado de los IVCs de Obligación General o del Máximo Agregado de los IVCs "Clawback", respectivamente;

(4)   a partir de la fecha de vencimiento de cada serie de los IVCs, si el Estado Libre Asociado de Puerto Rico ha hecho todos los pagos requeridos bajo dichas series conforme al Contrato de IVC, se considerará que todas las obligaciones del Estado Libre Asociado de Puerto Rico bajo dichas series han sido satisfechas y que las series no están en circulación, aun si no se llegó al Máximo Agregado de los IVCs de Obligación General o el Máximo Agregado de los IVC "Clawback", según sea el caso, para dicha fecha.

(d)   Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en cualesquiera IVCs autorizados bajo esta Ley deje de ocupar su cargo antes de la entrega de dichos IVCs, dicha firma o facsímil de firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos como si dicho oficial hubiese permanecido en su puesto hasta dicha entrega. Además, cualesquiera IVCs podrán tener la firma o facsímil de firma de aquellas personas que, al momento en que se emitan dichos bonos, sean los oficiales adecuados para firmarlos, pero que, en la fecha de los IVCs, no hayan estado ocupando sus puestos.

(e)   Los IVCs emitidos conforme al Contrato de IVC son pagarés del Estado Libre Asociado de Puerto Rico para todos los propósitos y se considerarán instrumentos negociables bajo las leyes de Puerto Rico.

(f)   Los IVCs autorizados por esta Ley se emitirán de forma registrada.

(g)   Solamente para propósitos de calcular el servicio anual máximo de la deuda pública del Estado Libre Asociado de Puerto Rico conforme al Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, se asumirá que el servicio de la deuda pagadero bajo los IVCs en cualquier año fiscal será igual a las cantidades máximas que

podrían ser pagaderas durante dicho año fiscal bajo los IVCs de conformidad con el Contrato de IVC.

(h) Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier año fiscal no menoscabarán bajo concepto alguno las obligaciones y reservas creadas por la Corporación del Fondo de Interés Apremiante (COFINA).

## ARTÍCULO 302.- COMPROMISO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE IMPONER CONTRIBUCIONES.

La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico quedan por la presente irrevocablemente comprometidos para el pago puntual de los IVCs emitidos bajo las disposiciones de esta Ley según y cuándo venzan de conformidad con los términos del Contrato de IVC. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar los IVCs según venzan o al momento de ser redimidos de conformidad con el Contrato de IVC, de los recursos del Estado Libre Asociado de Puerto Rico en el año fiscal en que dicho pago sea requerido, y las disposiciones de esta Ley relacionadas al pago de los IVCs se considerarán una obligación continua del Secretario de Hacienda para hacer los pagos en el año fiscal en que dicho pago sea requerido, aun si no se han hecho asignaciones específicas para dicho propósito. El Representante del Gobernador queda por la presente autorizado y dirigido a incluir en el Contrato de IVC el compromiso que aquí establece el Estado Libre Asociado de Puerto Rico con relación a los IVCs, y se establecerá en dichos IVCs que la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico están comprometidos para el pago de los mismos.

## ARTÍCULO 303.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.

Los IVCs, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con relación a los IVCs y la transferencia de los IVCs, estarán, en todos momentos, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera todas las retenciones relacionadas). Si los IVCs se emiten originalmente a un fideicomiso, las distribuciones que haga dicho fideicomiso a sus beneficiarios atribuibles a pagos o ingresos recibidos por el fideicomiso con relación a los IVCs y la transferencia de los IVCs por el fideicomiso, si se permitiera, así como la transferencia del interés en dicho fideicomiso, estarán, en todo momento, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado de Puerto Rico o por cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas). Los tenedores y beneficiarios de los IVCs y/o de un interés en el fideicomiso que sea dueño de los IVCs no tendrán que rendir planillas o cualquier otro

reporte de contribuciones o requisito similar con relación al Estado Libre Asociado de Puerto Rico o cualquier Entidad Gubernamental por razón de tener, ser dueño de o transferir IVCs.

## ARTÍCULO 304.- CONVENIOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO.

El Estado Libre Asociado de Puerto Rico, con la intención de quedar contractualmente obligado, por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y subsiguientes de los IVCs que, hasta que todas las obligaciones con relación a dichos bonos hayan sido completamente pagadas o satisfechas de conformidad con sus términos, el Estado Libre Asociado de Puerto Rico:

(a)     no llevará a cabo acción alguna que:

(i)     limite o altere los derechos del Estado Libre Asociado de Puerto Rico de conformidad con el Plan y la Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los tenedores de los IVCs;

(ii)     perjudique los derechos y remedios de los tenedores de los IVCs; o

(iii)     limite la habilidad de los tenedores de los IVCs de monitorear el rendimiento del IVU Medido y de los Ingresos del Arbitrio al Ron del Estado Libre Asociado de Puerto Rico disponibles para el pago de los IVCs (de conformidad con el Plan y según establecido en el Contrato de IVC); disponiéndose, sin embargo, que lo anterior no impedirá que el Estado Libre Asociado de Puerto Rico pueda ejercer su poder, mediante un cambio en la ley, de eliminar el IVU Medido, o reemplazar el IVU Medido con un Impuesto Sustituto Medido, cada uno de conformidad con el Contrato de IVC, que protegerá a los tenedores de los IVC de que dicha eliminación o reemplazo reduzca la probabilidad de que la Condición de Rendimiento Superior del IVU se cumpla; y disponiéndose además que el Estado Libre Asociado de Puerto Rico divulgará a tiempo la información que pueda ser requerida bajo el Contrato de IVC con relación al IVU Medido, los recaudos del impuesto sobre ventas y uso, y cualesquiera ajustes a los umbrales base del 5.5% del IVU realizados de conformidad con el Contrato de IVC;

(b)     causará que cualquier Plan Fiscal del Estado Libre Asociado de Puerto Rico presentado a la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA luego de la Fecha de Efectividad, mientras dicha entidad esté presente y en funciones en Puerto Rico incluya disposiciones para el pago en cada año fiscal del principal de e intereses sobre los IVCs de conformidad con los términos del Contrato de IVC en la medida en que la Condición de Rendimiento Superior del IVU o la Condición

de Rendimiento Superior del Arbitrio al Ron, según sean aplicables, ocurran durante el año fiscal anterior.

## CAPÍTULO 4 – MUNICIPIOS

## ARTÍCULO 401.- FONDO EXTRAORDINARIO

Se crea el "Fondo Extraordinario para Atender el Recogido y Disposición de Residuos, Desperdicios y para Implementar Programas de Reciclaje en los Municipios", en adelante el "Fondo Extraordinario", el cual estará dentro del "Fondo de Equiparación de los Municipios" dispuesto en el Artículo 7.015 de la Ley 107-2020, según enmendada, pero en una cuenta separada de otros ingresos de dicho fondo, y que se utilizará para los propósitos específicos dispuestos en esta Ley.

## ARTÍCULO 402.- Declaración de Política Pública

El Gobierno de Puerto Rico por la presente declara que es la política pública del Estado Libre Asociado de Puerto Rico el garantizar a su población el recogido y disposición eficiente de la basura, desperdicios sólidos, escombros, así como la implementación de programas de reciclaje para atender estos residuos, por lo que en la medida que el Plan de Ajuste de la Deuda incluya reducciones en el monto de la deuda garantizada estas economías que se generarán deberán hacerse accesibles a los municipios para que puedan brindar estos servicios.

## ARTÍCULO 403.- REMISIÓN DE AHORROS EN EL PAGO DE DEUDA AL FONDO EXTRAORDINARIO

El Fondo Extraordinario establecido en el Artículo 401 de esta Ley se nutrirá de una asignación anual del Fondo General, la cual será equivalente a la reducción de deuda estatal del Plan de Ajuste de Deuda basada en la contribución del 1.03 de la propiedad mueble e inmueble, la cual no será menor de sesenta y dos millones de dólares ($62,000,000).

## ARTÍCULO 404.- PROPÓSITOS DEL FONDO EXTRAORDINARIO

Los municipios solo podrán acceder a los recursos económicos del Fondo Extraordinario aquí dispuesto, exclusiva y específicamente, para los propósitos descritos a continuación:

(a)     recogido y disposición de basura;

(b)     recogido y disposición desperdicios sólidos;

(c)      recogido y disposición de escombros;

(d)      implementación, recogido y disposición de reciclaje.

## ARTÍCULO 405.- FÓRMULA DE DISTRIBUCIÓN ENTRE MUNICIPIOS

A fin de lograr una justa distribución de los recursos del Fondo Extraordinario, se utilizará los siguientes criterios para determinar las cantidades a las que pueden tener acceso los municipios:

(a)      El total de personas beneficiarias del Programa de Asistencia Nutricional, per cápita, según certificación al efecto emitida por el Departamento de la Familia, que sea determinado en el año fiscal inmediatamente anterior o en el año fiscal más próximo que se tenga la información.

(b)      El presupuesto funcional per cápita de cada municipio, del año fiscal inmediatamente anterior o del año fiscal más próximo que se tenga la información.

(c)      El valor tasado de la propiedad tributable per cápita ubicada dentro de los límites territoriales de cada municipio, correspondiente al año fiscal inmediatamente anterior o al año fiscal más próximo que se tenga la información.

(d)      La población del municipio por milla cuadrada, según el último censo decenal.

La metodología para la distribución será determinada por los parámetros dispuestos en este Artículo, pero podrán incorporarse aquellos parámetros existentes para la distribución de los recursos del Fondo de Equiparación de los Municipios, siempre y cuando no sean contrarios a los propósitos y objetivos aquí descritos, por la Junta de Gobierno del CRIM. La aplicación de dicha metodología deberá beneficiar aquellos municipios que reciben el menor ingreso por contribución sobre la propiedad u otras fuentes, así como a los municipios con el mayor número de dependientes del Programa de Asistencia Nutricional y de mayor densidad poblacional.

## CAPÍTULO 5– ENMIENDA Y DEROGACIÓN DE CIERTAS LEYES PARA ALLEGAR FONDOS AL FONDO GENERAL Y GARANTIZAR QUE TODA LEGISLACIÓN CUMPLA CON LA DISPONIBILIDAD DE FONDOS ESTABLECIDOS EN EL PLAN FISCAL.

## ARTÍCULO 501.- SE ENMIENDA EL INCISO (A) DEL ARTÍCULO 3 DE LA LEY NÚM. 147 DE 18 DE JUNIO DE 1980, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"Artículo 3.- Facultades y Deberes de la Oficina de Gerencia y Presupuesto.

(a)     La Oficina de Gerencia y Presupuesto bajo las reglas, reglamentos, instrucciones y órdenes que el Gobernador prescribiere, asesorará al Primer Ejecutivo, a la Asamblea Legislativa y a los organismos gubernamentales en los asuntos de índole presupuestarios, programáticos y de gerencia administrativa, así como en asuntos de naturaleza fiscal relativos a sus funciones; llevará a cabo las funciones necesarias que permitan al Gobernador someter a la Asamblea Legislativa la propuesta del Presupuesto General del Gobierno, de conformidad con el Artículo 4 de esta Ley, incluyendo las Corporaciones Públicas. A su vez, velará por que la ejecución y administración del presupuesto por parte de los organismos públicos se conduzcan de acuerdo con las leyes y resoluciones de asignaciones, con las más sanas y adecuadas normas de administración fiscal y gerencial, y en armonía con lo dispuesto por el Plan de Crecimiento Económico y Fiscal aprobado de conformidad con la Ley de Responsabilidad Fiscal y de Revitalización Económica de Puerto Rico (el "Plan Fiscal y de Crecimiento Económico") y con los propósitos programáticos para los cuales se asignan o proveen los fondos públicos. Evaluará los programas y actividades de los organismos públicos en términos de economía, eficiencia y efectividad y le someterá al Gobernador informes con recomendaciones para la implantación de las mismas. Además, preparará y mantendrá el control de todos aquellos documentos fiscales y presupuestarios que sean necesarios para la administración del presupuesto y efectuará los cambios, enmiendas o ajustes que se ameriten, sujeto a las disposiciones legales y normas establecidas por la Asamblea Legislativa, y el Gobernador. A estos fines, y con el propósito de que la Asamblea Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas. Presentará junto al Secretario de Hacienda un informe detallado con respecto a las proyecciones de ingresos y gastos del año fiscal siguiente y correspondiente al Presupuesto General propuesto ante la Asamblea Legislativa en un término que no excederá cinco (5) días calendario luego de la presentación de la propuesta de Presupuesto General del Gobierno del Estado Libre Asociado de Puerto Rico por parte del Gobernador. Se mantendrá atento a las nuevas corrientes y tendencias en el ámbito presupuestario y gerencial de la administración pública para evaluar y adaptar aquellas técnicas, métodos y enfoques que apliquen al campo administrativo local, tanto en la formulación y ejecución del presupuesto como en la evaluación de programas, el análisis gerencial y la auditoría operacional y administrativa. Además, deberá proponer aquella legislación que se considere necesaria y conveniente para incorporar dichos enfoques y tendencias a nuestro proceso presupuestario y administrativo.

(b)     …"

**ARTÍCULO 502.- SE ENMIENDA EL ARTÍCULO 3 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, CONOCIDA COMO LA LEY DE LA AUTORIDAD PARA EL FINANCIAMIENTO DE LA INFRAESTRUCTURA DE PUERTO RICO, PARA QUE LEA COMO SIGUE:**

"**Artículo 3.- Definiciones**

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán los significados que se indican a continuación, a no ser que del contexto se entienda claramente otra cosa:

(a) …

…

(j) Fondo de Desarrollo — Significará el Fondo de Desarrollo de Infraestructura creado bajo el Artículo 25 de esta Ley, conforme a lo dispuesto en la Ley Núm. 54 de 4 de Agosto de 1997 (27 L.P.R.A. § 431 et seq.)

(k) …

…

(r) Cuenta del Corpus — Significará la Cuenta del Corpus del Fondo de Desarrollo según se establece en el inciso (a) del Artículo 25 de esta Ley. Los rendimientos de capital que genere esta cuenta deberán utilizarse según se establece en el Artículo 25 de esta Ley.

(s) Cuentas adicionales — Significará cuentas creadas dentro del Fondo de Desarrollo, además de la Cuenta del Corpus, que sean necesarias para llevar a cabo los propósitos de esta Ley, según se establece en el inciso (a) del Artículo 25 de esta Ley."

**ARTÍCULO 503.- SE ENMIENDA EL INCISO (M) DEL ARTÍCULO 7 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7. – Poderes Generales.

La Autoridad tendrá todos los poderes necesarios y convenientes para llevar a cabo y efectuar los propósitos y disposiciones de esta Ley, incluyendo, pero sin que se entienda como limitación, lo siguiente:

(a) …

…

Case:17-03283-LTS Doc#:18700-4 Filed:10/24/21 Entered:10/24/21 14:46:44 Desc:
Exhibit Exhibit 4 - HB 1003 as approved by the Senate on October 6 2021 Page 29 of 53

29

(m) Hipotecar o pignorar cualquier propiedad para el pago del principal de y los intereses sobre cualesquiera bonos emitidos por la Autoridad o bonos emitidos por una entidad beneficiada, y pignorar la totalidad o parte de los ingresos que la Autoridad recibiese.

(n) …

…"

**ARTÍCULO 504.- SE DEROGAN LOS ARTÍCULOS 25 Y 34 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, Y SE RENUMERAN LOS ARTÍCULOS 25-A y 35 COMO LOS ARTÍCULOS 25 y 34, RESPECTIVAMENTE.**

**ARTÍCULO 505.- SE ENMIENDA EL ARTÍCULO 23.01 DE LA LEY 22-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 23.01. — Procedimiento para el pago de derechos.

Todo dueño de un vehículo de motor, sujeto al pago de derechos anuales de permiso pagará en cualquier colecturía de rentas internas de cualquier municipio, en el lugar que designe el Secretario del Departamento de Hacienda, en las estaciones oficiales de inspección, bancos o en el lugar que designe el Secretario, los derechos que correspondan al vehículo para cada año, según se indican estos en la notificación que al efecto deberá enviarle el Secretario. Los derechos por este concepto se pagarán anticipadamente por todo el año excepto que cuando al momento de pagar los derechos resten menos de seis (6) meses para la próxima renovación, solo se requerirá el pago equivalente a los meses que resten por transcurrir en la fecha en que se devengan, contándose las fracciones de meses como un mes completo. Esta disposición aplicará a todos los vehículos de motor, independientemente de la cantidad que paguen por derecho de licencia por año. Al recibo de los derechos correspondientes, el colector expedirá el permiso para vehículo de motor que consistirá del formulario de notificación emitido por el Secretario, con las debidas anotaciones y firma del colector, indicativas de que se ha efectuado el pago de los derechos. Junto con el permiso, el colector entregará el correspondiente marbete o placas de número, según sea el caso. Solo se exhibirá un (1) marbete del vehículo de motor durante el año de vigencia del pago de derechos. Se autoriza al Secretario a que, previa consulta con el Secretario de Hacienda, adopte un Reglamento a los fines de conceder un descuento de hasta diez por ciento (10%) a aquellos conductores que opten por adquirir y pagar anticipadamente marbetes multianuales para sus vehículos. El dueño de la estación de inspección depositará en una cuenta especial para que el Departamento de Hacienda haga transferencias diarias de los marbetes expedidos. El Departamento de Hacienda aprobará un reglamento para estos fines, en el cual requerirá una fianza y seguros para garantizar que se reciban los recaudos de los marbetes vendidos. El cargo por servicio que cobre la estación de inspección, el banco o

cualquier otro lugar que designe el Secretario de Hacienda no será mayor de cinco dólares ($5). En los casos referentes a derechos de exámenes, incluyendo licencias de aprendizaje, expedición de duplicado de licencias, renovación de licencias de conducir, traspaso de vehículos y todo otro cobro de derechos, se utilizarán comprobantes de pago, sellos de rentas internas o cualquier otro mecanismo de pago que establezca el Secretario de Hacienda."

**ARTÍCULO 506. - SE DEROGA EL INCISO (E) DEL ARTÍCULO 23.02 DE LA LEY 22-2000, SEGÚN ENMENDADA, Y SE RENUMERAN LOS ACTUALES INCISOS F Y G COMO LOS NUEVOS INCISOS E y F, RESPECTIVAMENTE, PARA QUE LEA COMO SIGUE:**

(a)…

…

(d) …

(e) …

(f) …

**ARTÍCULO 507. - SE DEROGA EL INCISO (L) DEL ARTÍCULO 1.03(B) DE LA LEY 351-2000, SEGÚN ENMENDADA, Y SE RENUMERAN LOS ACTUALES INCISOS M, N, Ñ, O, Y P, COMO LOS NUEVOS INCISOS L, M, N, Ñ, Y O, RESPECTIVAMENTE PARA QUE LEA COMO SIGUE:**

"Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán el significado indicado a continuación, a menos que del contexto surja otro significado:

(a)    …

…

(l) …

(m) …

(n) …

(ñ) …

(o) …"

## ARTÍCULO 508. - SE ENMIENDA EL INCISO (H) DEL ARTÍCULO 2.02 DE LA LEY 351-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"**Artículo 2.02 – Poderes Específicos de la Autoridad.**

La Autoridad tendrá las siguientes facultades y derechos:

(a) …

(h) Tomar préstamos con el propósito de financiar los costos del Centro, los proyectos de mejoramiento y proyectos en las parcelas privadas o el Distrito y cumplir con cualquiera de sus propósitos y poderes corporativos, a discreción de la Junta; hacer y emitir bonos negociables de la Autoridad; garantizar el pago de dichos bonos, o cualquier parte de los mismos, mediante la prenda, hipoteca, cesión o escritura de fideicomiso de propiedades de la Autoridad localizadas en o fuera del Distrito, cargos por beneficio, otros ingresos, rentas, cuotas, recibos y cualquier interés en contratos, arrendamientos o subarrendamientos; entrar en cualesquiera acuerdos con los compradores o tenedores de dichos bonos o con otras personas con las cuales la Autoridad está obligada con relación a cualquier bono, emitido o por ser emitido, según la Autoridad considere aconsejable, los cuales constituirán contratos con dichos compradores o tenedores; obtener cualquier facilidad que aumente su capacidad para tomar dinero a préstamo o emitir deuda o que aumente su liquidez con relación a cualesquiera bonos en la forma en que la Autoridad determine ventajosa; y, en general, proveer garantías para el pago de los bonos y los derechos de los tenedores de estos."

(i)…

…"

## ARTÍCULO 509.- SE ENMIENDA EL ARTÍCULO 8 DE LA LEY 179-2002, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"Artículo 8.- Las agencias gubernamentales, los municipios, así como las entidades recipientes de asignaciones de fondos públicos los utilizarán para los fines establecidos en la resolución conjunta correspondiente y de ninguna manera, dispondrán de los mismos para otros propósitos o fines que no estén señalados de manera categórica y específica en la resolución conjunta aprobada.

Cualquier cambio o modificación de los propósitos o fines establecidos en la resolución conjunta original, conllevará el inicio o repetición por la Asamblea Legislativa de todos los procedimientos.

El cumplimiento con estas resoluciones conjuntas, asignando fondos públicos, se hará siguiendo las normas y procedimientos aplicables a los municipios y a las instrumentalidades gubernamentales. Con excepción de las personas naturales, todos los contratos suscritos y cualquiera otro documento legal estarán sujetos a las leyes del Estado Libre Asociado de Puerto Rico y serán interpretados de acuerdo a las mismas.

Con el propósito de que la Asamblea Legislativa pueda analizar que las asignaciones o reasignaciones de fondos públicos dispuestos en esta Ley cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas."

**ARTÍCULO 510.- SE ENMIENDA EL ARTÍCULO 31 DE LA LEY 272-2003, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 31. — Disposición de Fondos.

La Oficina de Turismo distribuirá las cantidades recaudadas por concepto del Impuesto fijado en el Artículo 24 de esta Ley, de la siguiente manera:

(i) dos (2) por ciento del Impuesto total recaudado ingresará mensualmente a los fondos generales de la Oficina de Turismo para cubrir los gastos de operación, manejo y distribución de los recaudos del Impuesto, o para cualquier otro uso que disponga la Oficina de Turismo. (ii) cinco (5) por ciento del Impuesto total recaudado ingresará mensualmente al Fondo General del Departamento de Hacienda para los Años Fiscales 2005-2006 y 2006-2007, a las arcas de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008- 2009, y a partir del Año Fiscal 2009-2010 a las arcas de la Oficina de Turismo. A partir del año en que la Autoridad certifique al Departamento de Hacienda y a la Oficina de Turismo, el inicio de las operaciones del Centro de Convenciones, y durante los diez (10) años subsiguientes, este cinco por ciento (5%) estará disponible para cubrir cualquier déficit, si alguno, que surja de las operaciones de las facilidades que opera la Autoridad del Distrito del Centro de Convenciones, en reserva que mantendrá la Oficina de Turismo. Disponiéndose, sin embargo, que para cada año fiscal y/o cada vez que la Autoridad del Distrito del Centro de Convenciones proponga presentar un presupuesto que exceda el déficit de dos millones quinientos mil (2,500,000) dólares, el presupuesto de la Autoridad del Distrito del Centro de Convenciones deberá ser presentado a la Junta de Directores de la Autoridad a la Oficina de Turismo y al Secretario de Hacienda para los Años Fiscales 2005-2006 y 2006-2007 y a la Junta de Directores de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 en una reunión específica a estos fines, y a la Junta de Directores de la Autoridad y a la Oficina de Turismo, comenzando el Año Fiscal 2010-2011 en adelante. Este cinco por ciento (5%) se mantendrá disponible durante cada año fiscal en una cuenta de reserva especial que

mantendrá la Oficina de Turismo para cubrir cualquier déficit en exceso de dos millones quinientos mil (2,500,000) dólares, que surja de la operación de las facilidades de la Autoridad del Distrito del Centro de Convenciones. Para cada año fiscal, cualquier sobrante, luego de cubrir dicho déficit operacional, si alguno, se liberará de la reserva especial y estará disponible para el uso del Departamento de Hacienda para los Años Fiscales 2005-2006 y 2006-2007, de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 y a partir del Año Fiscal 2010-2011 para el uso de la Oficina de Turismo. A partir del Año Fiscal 2015-2016, y durante los cinco (5) años subsiguientes, este cinco por ciento (5%) será transferido mediante aportaciones trimestrales por el Departamento a la Autoridad para cubrir los costos asociados exclusivamente a la operación del Centro de Convenciones de Puerto Rico. Disponiéndose, sin embargo, que para cada año fiscal la Autoridad del Distrito del Centro de Convenciones deberá presentar sus estados financieros auditados, conjuntamente con un informe evidenciando el uso de los fondos transferidos según establecido en los incisos (ii) y (iv) de este apartado a la Junta de Directores de la Autoridad y al Director de la Oficina de Turismo, en una reunión específica a esos efectos. Si al finalizar algún año fiscal tales estados financieros auditados reflejan una ganancia neta, la Autoridad del Distrito del Centro de Convenciones devolverá a la Oficina de Turismo la cantidad generada como ganancia neta sin exceder el monto total transferido por la Oficina de Turismo a la Autoridad del Distrito del Centro de Convenciones en ese mismo año fiscal, por virtud de los incisos (ii) y (iv) de este apartado. (iii) dos millones quinientos mil (2,500,000) dólares serán transferidos por la Oficina de Turismo a la Autoridad del Distrito del Centro de Convenciones en aportaciones trimestrales de seiscientos veinticinco mil (625,000.00) dólares para cubrir los costos asociados exclusivamente a la operación del Distrito del Centro de Convenciones. Disponiéndose, sin embargo, que para cada año fiscal y/o cada vez que se proponga presentar un presupuesto modificado, el presupuesto de la Autoridad del Centro de Convenciones deberá ser presentado a la Junta de Directores de la Autoridad y Director Ejecutivo de la Oficina de Turismo, en una reunión específica a esos efectos. Esta cantidad será transferida según establecido en este apartado a partir del Año Fiscal 2015-2016, y por un período de cinco (5) años. (iv) Hasta cuatro millones (4,000,000) de dólares se mantendrán disponibles durante cada año fiscal, en una cuenta de reserva especial que mantendrá la Oficina de Turismo para gastos operacionales dedicados a los asuntos especializado del sector, sus gastos y/o la fiscalización e implementación por este del Contrato de Servicios de Mercadeo de Destino contemplado en el Artículo 8 de la "Ley para la Promoción de Puerto Rico como Destino". (v) El remanente que resulte después de las asignaciones y reservas dispuestas en los incisos (i), (ii), (iii) y (iv), hasta un tope de veinticinco millones (25,000,000) de dólares, se le asignarán a la Corporación. Los fondos asignados a la Corporación serán utilizados por esta para la promoción, mercadeo, desarrollo y fortalecimiento de la industria turística en Puerto Rico. Si el remanente excediera los veinticinco millones (25,000,000) de dólares, dicho exceso será utilizado por la Oficina de Turismo para el desempeño de sus funciones dedicados a los asuntos especializado del sector y sus gastos. La Oficina de Turismo del

Departamento de Desarrollo Económico y Comercio le someterá mensualmente a la Autoridad y a la Corporación un desglose de los recaudos por concepto del impuesto."

**ARTÍCULO 511.- SE AÑADE UN NUEVO ARTÍCULO 7A A LA LEY 103-2006, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7A.- Deber Ministerial de la Oficina de Gerencia y Presupuesto

Con el propósito de que la Asamblea Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de treinta (30) días laborales contados a partir desde que se le son requeridas. Dicha certificación deberá incluir la cantidad exacta disponible, sea mayor o menor a la dispuesta en la medida en consideración.

Al emitir la certificación oficial, la Oficina de Gerencia y Presupuesto garantiza la disponibilidad de dichos fondos. Una certificación oficial en donde se informe que los fondos están comprometidos para una obra o uso específico distinto a lo dispuesto en la medida legislativa que se solicita deberá venir acompañada con la evidencia de la obligación, copia de las facturas y cualquier otra información pertinente que demuestre la no disponibilidad de dichos fondos.

El proceso para requerir las certificaciones oficiales de disponibilidad de fondos por parte de las comisiones legislativas no requerirá de ningún formulario o trámite especial, solo requerirá una misiva de la comisión legislativa solicitando la certificación que se trate.

Cuando cualquier comisión permanente, especial o conjunta de la Asamblea Legislativa de Puerto Rico presente cualquier informe recomendando la aprobación de alguna medida legislativa en la cual se haya solicitado una certificación oficial tendrá que incluir en el referido informe una sección titulada "Deber Ministerial de la Oficina de Gerencia y Presupuesto referente a disponibilidad de fondos". En esta Sección, se aseverará el impacto fiscal, si alguno, que se estime la aprobación de la medida tendría sobre los presupuestos de las agencias, departamentos, organismos, instrumentalidades o corporaciones públicas. Si la Oficina de Gerencia y Presupuesto no emite la correspondiente certificación en el tiempo dispuesto en este Artículo, se incluirá en dicha Sección del informe el siguiente texto: "La Oficina de Gerencia y Presupuesto no suministró la certificación oficial de disponibilidad de fondos en el tiempo dispuesto por ley incumpliendo con el deber ministerial dispuesto en la Ley 103-2006, según enmendada, mejor conocida como "Ley para la Reforma Fiscal del Gobierno del Estado Libre Asociado de Puerto Rico de 2006".

**ARTÍCULO 512.- SE ENMIENDA LA SECCIÓN 3060.11 DE LA LEY 1-2011, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

Sección 3060.11 – Disposición de Fondos.

"El producto de los impuestos y derechos de licencia recaudados por virtud de este Subtítulo ingresará en el Fondo General del Tesoro de Puerto Rico."

**ARTÍCULO 513.- SE ELIMINA LA SECCIÓN 3060.11A DE LA LEY 1-2011, SEGÚN ENMENDADA.**

**ARTÍCULO 514.- SE DEROGA LA LEY NÚM. 39 DEL 13 DE MAYO DE 1976, SEGÚN ENMENDADA.**

**ARTÍCULO 515.- SE ENMIENDA EL ARTÍCULO 7.018 DE LA LEY 107-2020, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7.018 – Fondos – Fideicomisos; Distribución

Los fondos en el fideicomiso general que el CRIM establece con el Fiduciario Designado según el inciso (c) del Artículo 7.003 de este Capítulo, serán distribuidos por el CRIM en el orden de prioridad que a continuación se indica:

(a) La cantidad que corresponda a la contribución especial del 1.03% será depositado en el Fondo General.

(b) …

(c) …

…"

**ARTÍCULO 516.- SE ENMIENDA EL ARTÍCULO 7.027 DE LA LEY 107-2020, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7.027 – Recaudación e Ingreso de Contribuciones en Fondos y Aplicación del Producto de las Contribuciones (Fondo de Redención de Bonos)

El producto de las contribuciones que se imponen por los Artículos 7.025 y 7.026 ingresará al fideicomiso general establecido por el CRIM con la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF), de conformidad con el Capítulo I de este libro.

(a)  El producto de las contribuciones especiales sobre la propiedad impuesta por el Artículo 7.026 ingresará al Fondo General.

(b)  …
(c)  …

(d)  …"

## ARTÍCULO 517.- SE ENMIENDA EL INCISO (H) DEL ARTÍCULO 3 DE LA LEY NÚM. 230 DE 12 DE JULIO DE 1974, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"Cuando se usen en esta Ley, los siguientes términos tendrán el significado que aquí se dispone:

(a)      …

(b)      …

 …

(h)      Entidades corporativas –Significa todo organismo gubernamental, incluyendo las corporaciones públicas, con o sin tesoro independiente y con o sin autonomía fiscal y presupuestaria, los municipios del Gobierno de Puerto Rico y sus instrumentalidades.

(i)      …

 …"

## ARTÍCULO 518.- "Las transacciones del Plan de Ajuste no se pueden utilizar para mitigar causas de acción al amparo de la Ley 3-2013, según enmendada.

## CAPÍTULO 6 – DISPOSICIONES MISCELÁNEAS

## Artículo 601.-Prohibición del menoscabo de las Obligaciones de la Corporación del Fondo de Interés Apremiante (COFINA)

Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier Año Fiscal no menoscabarán bajo concepto alguno las obligaciones de la Corporación del Fondo de Interés Apremiante (COFINA), incluyendo las obligaciones y reservas creadas.

**Artículo 602.-Autorización al Representante del Gobernador**

Las responsabilidades, facultades, deberes y autorizaciones concedidas por la presente Ley al Representante del Gobernador, estará limitada exclusivamente a lo dispuesto en esta Ley y no a futuras emisiones de deudas".

**Artículo 603.- Separabilidad.**

Si cualquier cláusula, párrafo, subpárrafo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

Disponiéndose, sin embargo, que la separabilidad de este Artículo no será de aplicación al Artículo 605. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales no hagan cumplir las Transacciones de Reestructuración y sus respectivas autorizaciones en los Artículos 104, 201 y 301 si se deja sin efecto, invalida o declare inconstitucional la condición suspensiva para evitar cualquier recorte o congelación de pensiones a empleados gubernamentales en el Plan de Ajuste, o las disposiciones de los Artículos 102 o 105 de esta Ley.

**Artículo 604.- Supremacía.**

Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición general o específica de cualquier otra ley o reglamento del Gobierno que sea inconsistente con esta Ley. Si hubiera conflicto entre las versiones en inglés y en español de los Capítulos 1, 2 y 3 de esta Ley, prevalecerá la versión en inglés.

**Artículo 605.- Vigencia.**

Esta Ley comenzará a regir inmediatamente luego de su aprobación, excepto por el Capítulo 5 de esta Ley, el cual comenzará a regir en la Fecha de Efectividad. Quedará

inmediatamente sin vigencia esta ley y cualquier transacción, emisión o gestión relacionada con la misma será nula si se ordena y se procede con algún recorte a las pensiones de los empleados gubernamentales en el Plan de Ajuste o Reestructuración. La vigencia de esta ley queda condicionada a cero recortes en las pensiones.

**ENGLISH VERSION OF THIS ACT**

**CHAPTER 1: GENERAL PROVISIONS**

**Article 101.- Title**

This Act shall be known and may be cited as the "Ending Puerto Rico's Bankruptcy Act."

**ARTICLE 102- PUBLIC POLICY STATEMENT OF THE COMMONWEALTH GOVERNMENT**

This legislation is consistent with the objectives of the Puerto Rico Oversight, Management and Economic Stability Act (PROMESA) and is adopted under the current rule of law. With the specific purpose of making the goals set forth below viable, the Legislature of the Commonwealth affirms that it intends to comply with the processes and mechanisms established in PROMESA; and, at the same time, to achieve the following public policy objectives:

1.     To take the affirmative actions required to concretize the successful exit of the Commonwealth of Puerto Rico from the bankruptcy process provided in Title III of PROMESA;

2.     To make feasible the access of the Commonwealth of Puerto Rico to the short and long-term credit markets, obtaining reasonable interest rates, in order to meet the borrowing needs of our local government.

3.     To perfect the approval of the first of four balanced budgets, legislated, and signed by the Legislative and Executive Branches, respectively, on June 30, 2021; and which was identified as Joint Resolution Number 8-2021;

4.     To take all necessary actions to ensure that the Fiscal Oversight Board concludes its financial monitoring work as soon as possible and in an orderly manner.

5.     It is hereby declared that the Government of the Commonwealth of Puerto Rico shall have the following objectives as priority public policy matters:

a.   **To protect the pensions of our retirees.** The purpose of this objective is to avoid cuts to the pensions of 100% of retirees. This protection will be established in the present legislation and in any future legislation. To achieve this objective, a specific clause on this matter is provided in this law.

b.   **Fixed allocation of $500 million in the budget for the University of Puerto Rico for a period of five years, freezing programmed cuts.** This goal is intended to preserve the capacity of the UPR to carry out its vital educational mission and ensure the necessary resources to guarantee the accreditation of all its programs and achieve fair access for those students who have financial need.

c.   **Creation of the University Scholarship Trust Fund.** The purpose of this initiative is to create an investment trust to preserve the capital that would be granted for scholarships for UPR students, depending on the availability of funds.

d.   **Protect the totality of the contributions to the medical plans of central government employees, avoiding the proposed cuts.** The purpose of this initiative is to identify funds to avoid the reduction of contributions to the health plans of public employees of the central government for their health insurance. This measure would benefit more than 60,000 Puerto Rican workers and families.

e.   **Allocate the necessary funds for municipalities.** This objective seeks to provide fiscal stability to the municipalities and the continuity of the essential services they offer. Specifically, the Legislature also proposes that the funds not used for the payment of municipal debt obligations after the adoption of the adjustment plan revert to the municipalities.

f.   **Endorse the creation of the special fund for social equality.** This proposal - to be legislated soon - intends to create a permanent fund with the task of combating poverty and social inequality; giving priority in its allocations to the attention of the needs of marginalized communities, the special education program, the most vulnerable population groups, fights against school dropouts, establishing an integrated plan for the homeless, and gradually increasing allocations for non-profit, community self-management and faith-based entities to offer direct services, according to the availability of funds.

g.   **Establish the goal of 100% of the population having medical coverage.** The purpose of this initiative is to extend and/or facilitate access to medical

coverage to some 225,000 citizens who currently lack medical plans and evaluation of the health system with and allocation of one million dollars, subject to the availability of funds.

h.   **Creation of the Strategic Investment Fund for Economic Development to inject and  for a combined total of three hundred million dollars ($300, 000,000.00) for a period of five (5) years investment.** This initiative proposes the creation of a Strategic Investment Fund divided into four categories: (1) investments to close basic skills gaps; (2) small business capitalization programs; (3) the development of business growth programs through business capitalization and (4) for the capitalization of cooperativism sector, subject to the availability of funds;.

i.   **Establish a mechanism that allows the Government of Puerto Rico to advance the terms of payments and cancellation of debt.** This mechanism has the sole purpose of authorizing the Government of Puerto Rico to refinance the debt payment agreements, to accelerate or pay off the agreed debt, in accordance with the future fiscal situation and without affecting the services of the government of Puerto Rico.

j.   **Establish a joint working group between the Legislative Branch, the Executive Branch, and the Fiscal Oversight Board.** The purpose of this initiative is to design the necessary legislation to ensure that, once the public debt restructuring process is concluded, the Government of Puerto Rico does not go back into debt without having the economic resources to meet its payment obligations; nor will the improper practices of approving unbalanced budgets, with unrealistic revenue estimates or excessive expenditures be repeated. Likewise, the eventual transfer of all information, systems, resources and accounting methods that are currently under the custody of the Fiscal Oversight Board, regarding the financial processes of the Government, to be used by the Government of Puerto Rico as part of its fiscal responsibilities, is also proposed.

The Debt Restructuring Transactions authorized by means of this Law are fully subject and conditioned to Financial Oversight and Management Board (FOMB) amending its Fiscal Plan to include all the provisions contained in subsection (5) of this section."

**Article 103.- Definitions.**

(a)   5.5% SUT: means the present and future revenues and collections generated by the portion of the sales and use tax imposed by the Government of Puerto Rico

pursuant to Sections 4020.01 and 4020.02 of Subchapter D of the Puerto Rico Internal Revenue Code that corresponds to a tax rate of five and one-half percent (5.5%).

(b)     Ancillary Agreements: means the Plan, the Confirmation Order, the GO Bond Indenture, the form of the GO Bonds, the CVI Indenture, the form of the CVIs, and any other agreement or instrument (including any trust) related thereto or entered into in connection with, or in furtherance of, a Restructuring Transaction and in accordance with, or in furtherance of, the Plan or a Qualifying Modification.

(c)     HTA: means the Puerto Rico Highways and Transportation Authority.

(d)     CCDA: means the Puerto Rico Convention Center District Authority.

(e)     PBA: means the Puerto Rico Public Buildings Authority.

(f)     PRIFA: means the Puerto Rico Infrastructure Financing Authority.

(g)     MBA: means the Puerto Rico Metropolitan Bus Authority.

(h)     Fiscal Year:  means the fiscal year of the Commonwealth, which begins on July 1 and ends on June 30.

(i)     GO Bonds: means the general obligation bonds issued by the Commonwealth under the GO Bond Indenture pursuant to this Act, the Plan, and the Confirmation Order, and any general obligation bonds subsequently issued by the Commonwealth under the GO Bond Indenture in accordance and consistent with the terms of the Plan to retire, refinance or defease general obligation bonds originally issued pursuant to the Plan and the Confirmation Order.

(j)     PR Code: means Act No. 1-2011, as amended, and known as the "Internal Revenue Code for a New Puerto Rico."

(k)     Rum Tax Outperformance Condition: means that Commonwealth Rum Tax Revenues in any given Fiscal Year, calculated in accordance with and net of permitted deductions contemplated by the Plan and set forth in the CVI Indenture, exceed the thresholds contemplated by the Plan and set forth in the CVI Indenture for such Fiscal Year.

(l)     SUT Outperformance Condition: means that the Measured SUT or the Substitute Measured Tax collections, as applicable, in any given Fiscal Year exceed the thresholds contemplated by the Plan and set forth in the CVI Indenture for such Fiscal Year.

(m)     GO Bond Indenture: means one or more trust agreements, indentures, resolutions and any supplements or amendments thereto, or similar contracts or agreements, pertaining to the GO Bonds to be executed and delivered by the Governor's Designee authorizing: (1) the issuance of the GO Bonds and describing the terms thereof; and (2) the payment of the Financing Costs, each in accordance with the terms of the Plan.

(n)     CVI Indenture: means one or more trust agreements, indentures, resolutions and any supplements or amendments thereto, or similar contracts or agreements, pertaining to the CVIs to be executed and delivered by the Commonwealth authorizing: (1) the issuance of the CVIs by the Commonwealth and describing the terms thereof; and (2) the payment of the Financing Costs of the CVIs, each in accordance with the terms of the Plan.

(o)     Financing Costs: means the costs associated with the Restructuring Transactions, including, without limitation, the costs, fees and expenses to (i) issue, service or repay the GO Bonds and the CVIs, as applicable, whether such costs are incurred upon issuance of such GO Bonds or CVIs or over the term of such instruments, (ii) make payments as required by the applicable Ancillary Agreements, (iii) pay any stamp, issuance or similar taxes and other charges related to the Restructuring Transactions (if any), (iv) prepare for and enter into the Restructuring Transactions, and (v) perform any ongoing activities relating to the Restructuring Transactions. For the avoidance of doubt, Financing Costs also includes pre-closing and post-closing administrative fees and expenses incurred in connection with the applicable Ancillary Agreements.

(p)     Government Entity: means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

(q)     Commonwealth: means the Commonwealth of Puerto Rico.

(r)     Effective Date: means the date on which the Plan becomes effective in accordance with its terms.

(s)     GO Bonds Trustee: means the trustee(s) or replacement trustee(s), as the case may be, appointed in accordance with the terms and conditions of the GO Bond Indenture.

(t)     CVI Trustee: means the trustee(s) or replacement trustee(s), as the case may be, appointed in accordance with the terms and conditions of the CVI Indenture.

(u)     Debt Service Fund: shall mean a debt service fund established pursuant to the GO Bond Indenture.

(v)     Substitute Measured Tax: means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Indenture.

(w)     Commonwealth Rum Tax Revenues: means the total collections of the excise tax on distilled spirits imposed under the U.S. Internal Revenue Code of 1986 (as amended from time to time) received by the Commonwealth as documented in the U.S. Department of the Treasury monthly detailed activity report of net excise tax paid to the Commonwealth and certified by the Puerto Rico Department of Treasury.

(x)     CVIs or Contingent Value Instruments: means, collectively, the general obligation notes issued under the CVI Indenture pursuant to this Act, the Plan, and the Confirmation Order, consisting of the GO CVIs and the Clawback CVIs.

(y)     Clawback CVIs:  means a series of CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to debt issued by HTA, CCDA, PRIFA and MBA. For the avoidance of doubt, the Clawback CVIs may be issued in one or more subseries, including, without limitation, the Rum Tax Claims Subseries.

(z)     GO CVI: means a series of CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to direct or guaranteed general obligation debt of the Commonwealth.

(aa)     Measured SUT: means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code (or used for any other purpose established by law), up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

(bb)     Act means the "Act to End Puerto Rico's Banktrupcy."

(cc)     Clawback CVI Lifetime Cap: means, initially as of the Effective Date, $5,239,002,764.  The Clawback CVI Lifetime Cap shall be reduced each Fiscal Year in an amount equal to payments made on the Clawback CVIs pursuant to the CVI Indenture upon, and as a result of, the occurrence of an SUT Outperformance Condition. In addition, the portion of the Clawback CVI Lifetime Cap allocable to the Rum Tax Claims Subseries shall be further reduced each Fiscal Year in an amount equal to payments made on the Rum Tax Claims Subseries pursuant to the CVI Indenture upon, and as a result of, the occurrence of a Rum Tax Outperformance Condition.

(dd)   GO CVI Lifetime Cap: means, initially as of the Effective Date, $3,500,000,000.   The GO CVI Lifetime Cap is reduced annually in an amount equal to payments made on the GO CVIs pursuant to the CVI Indenture.

(ee)   Qualifying Modification: means a "Qualifying Modification" for CCDA and/or PRIFA approved pursuant to Title VI of PROMESA.

(ff)   Confirmation Order:  means the order of the Title III Court confirming the Plan.

(gg)   Person: means any natural person or legal entity, including, but not limited to, the Commonwealth, any Government Entity, or any firm, partnership, joint venture, trust, estate, limited liability company, corporation of individuals, association, or public or private corporation, organized or existing under the laws of Puerto Rico, the United States of America, any state or any other jurisdiction, or any state, municipality, political subdivision, taxing authority, agency or instrumentality of the United States of America, any state or any other jurisdiction, or any combination thereof.

(hh)   Plan: means the joint Plan of Adjustment for the Commonwealth, ERS, and PBA (and any other Government Entity included in any such plan) confirmed under Title III of PROMESA, including the exhibits and schedules thereto, as the same may be amended, supplemented, or modified from time to time.

(ii)   PROMESA:  means the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq., as it may be amended or modified.

(jj)   Existing Claims:  means claims against the Commonwealth, PBA, ERS, HTA, PRIFA, CCDA, and MBA.

(kk)   Governor's Designee: means the Governor, the Secretary of the Treasury or such other officer of a Government Entity as may be designated by the Governor through Executive Order.

(ll)   Secretary of the Treasury: means the Secretary of the Treasury of the Commonwealth.

(mm) Commonwealth Retirement Systems: means the ERS, the Teacher's Retirement System and the Judicial Retirement System.

(nn)   ERS: means the Retirement System of the Employees of the Government of the Commonwealth of Puerto Rico.

(oo)   Rum Tax Claims Subseries: means a subseries of Clawback CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to Commonwealth Rum Tax Revenues retained by the Commonwealth and not transferred to PRIFA.

(pp)   Restructuring Transactions: means each of the transactions contemplated by, or in furtherance of, the Plan or a Qualifying Modification, including, without limitation, the issuance of the GO Bonds, the CVIs, and any trust related thereto and the cancellation and extinguishment of the Existing Claims pursuant to the Plan or a Qualifying Modification, as applicable.

## Article 104. – Authorization on Actions of Government Entities.

Notwithstanding any provision, prohibition or restriction of any law, order, rule or regulation of the Commonwealth, each Government Entity required to take or perform any action necessary or convenient to carry out the Plan and/or a Restructuring Transaction is hereby authorized to take and shall take any such actions necessary or convenient to carry out the Plan and/or a Restructuring Transaction, without being subject to the requirements of any provision, prohibition, or restriction of any other law, order, rule or regulation, including, but not limited to, (a) negotiating, entering into and executing any agreement, deed, certificate or document, and (b) disbursing or transferring funds as provided for and/or required by the Plan. The authorization provided by this Article 103 shall be sufficient for the Governor's Designee, on behalf of the Commonwealth, and any executive director, president or officer of similar rank and authority, on behalf of the Government Entity they represent, to take any action contemplated by the Plan and/or a Restructuring Transaction and no other authorization shall be required, including the authorization of any board of directors, commission, department, or Puerto Rico regulator. For the avoidance of doubt, the authorization granted herein is as broad and sufficient as legally necessary to enable the Commonwealth to establish, fund, and otherwise implement any and all provisions and/or mechanisms included in the Plan to safeguard the pensions of retired government employees. Moreover, the Puerto Rico Fiscal Agency and Financial Advisory Authority is hereby authorized to require any Government Entity to comply with the requirements of this Article.

Without limiting the generality of the foregoing and notwithstanding any provision of any law of the Commonwealth, on and after the Effective Date, the Governor's Designee shall be authorized to: (a) approve the offering, sale and issuance of the GO Bonds and the CVIs as contemplated by the Plan and provided in Chapters 2 and 3 of this Act, respectively; (b) provide for the cancellation and extinguishment of the Existing Claims pursuant to and in accordance with the terms of the Plan or a Qualifying Modification, as applicable; (c) authorize the payment of the Financing Costs in accordance with the terms of the Plan; (d) approve the form of the GO Bond Indenture,

CVI Indenture, and other Ancillary Agreements and enter into the GO Bond Indenture, the CVI Indenture and other Ancillary Agreements on behalf of the Commonwealth; (e) include in the Ancillary Agreements any covenant, term, or other condition as may be required by the Plan, including (1) consenting on behalf of the Commonwealth to the application of the laws of the State of New York to govern and interpret such Ancillary Agreements, and the jurisdiction of any state or federal court with respect to any suit or proceeding related to the GO Bonds, the CVIs, the Ancillary Agreements and/or any other matters related to the Restructuring Transactions, and (2) the creation of liens over the money, securities and other assets on deposit with the GO Bonds Trustee or the CVI Trustee for the benefit of the holders of GO Bonds and CVIs, respectively; and (f) take any and all other actions necessary or convenient to carry out the Restructuring Transactions. For the avoidance of doubt, notwithstanding the application of the laws of the State of New York to govern and interpret any Ancillary Agreement, the authorization by the Commonwealth of the GO Bond Indenture and the CVI Indenture and the issuance by the Commonwealth of the GO Bonds and the CVIs shall be governed by the laws of the Commonwealth, provided that, subject to the terms of the GO Bond Indenture and the CVI Indenture, the holders of the New GO Bonds and the CVIs, respectively, shall be entitled to such rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

The authorization to issue bonds conferred by the Present Act will be limited exclusively to the bonds mentioned and required to implement the Plan and will be done in accordance with the Plan, the GO Indentures, the Confirmation Order, and the other Ancillary Agreements. The Governor of Puerto Rico or his designee must request the authorization of the Legislative Assembly for any future bond issuance that is separate from the one hereby authorized.

## ARTICLE 105 - PUBLIC POLICY; PROTECTION OF THE PENSIONS OF THE RETIREES OF THE GOVERNMENT OF THE COMMONWEALTH.

The Government of the Commonwealth of Puerto Rico hereby declares that it is public policy of the highest priority to protect the pensions of its public servants, who are one of the most important groups in our society. As an essential part of this public policy, the protection of the pensions of all our retirees is an important and unwavering commitment. Therefore, with regard to the pensions of government retirees, it is hereby provided as follows:

(a)     All pensions of the retirees of the government of the Commonwealth that have accrued through the date of this Act, which are recognized under the laws of Puerto Rico in effect as of the date of this Act, are hereby recognized as debts contracted by the Government of Puerto Rico and by virtue of this legislation, are protected and excluded from all types of budget cuts or reductions. This protection of accrued benefits protects

against any reduction to any pension accrued through the Effective Date included in the Plan of Adjustment but not against accruals of any sort that would have accrued after the Effective Date; and it is provided, to the extent allowed by law, that in the Order of Confirmation of the Plan of Adjustment, pension payments at their current level as accrued through the Effective Date will be considered as debt not subject to reduction by the Fiscal Oversight Board under PROMESA. This protection includes the present legislation authorizing the issuance of bonds for debt restructuring and any future legislation, including future fiscal plans, that commit revenues of the government of the Commonwealth. Any debt transaction under this or any future Act shall comply with this requirement.

(b)     In order to comply with the public policy of honoring all present pensions, the Legislature will appropriate the necessary revenues for the payment thereof in the budget of each corresponding fiscal year. The provisions of this Article are not severable from the rest of the Act, should this Article be struck down.

## CHAPTER 2 – THE GENERAL OBLIGATION BONDS

### Article 201.- Issuance of the General Obligation Bonds.

(a)     From and after the Effective Date, the Governor's Designee shall be authorized to approve the offering, sale and issuance of the GO Bonds, from time to time, pursuant to the terms of the GO Bond Indenture, the Confirmation Order, the Plan and the other Ancillary Agreements, up to an aggregate principal amount of $7,414,063,543.25, and to approve the offering, sale and issuance, from time to time, of additional GO Bonds, subject to the limitations contemplated by the Plan and set forth in GO Bond Indenture, to retire, refinance or defease GO Bonds originally issued pursuant to the Plan and the Confirmation Order.

(b)     The GO Bonds shall include current interest bonds and capital appreciation bonds,  shall be dated, shall bear interest at such rate, shall mature at such time or times, not exceeding thirty (30) years from their date or dates of issuance, and shall be subject to redemption or prepayment, in each case, to the extent applicable and as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the GO Bond Indenture in accordance and consistent with the Plan. The Governor's Designee, as representative of the Commonwealth, shall determine the form of the GO Bonds and the manner of execution of the GO Bonds, and shall fix the denomination or denominations of the GO Bonds and the place or places of payment thereon and the other terms thereof, all in accordance and consistent with the Plan. At the discretion of the Governor's Designee, the GO Bonds may be issued in one or more separate series.

(c)     The GO Bonds shall be legal, valid and binding obligations of the Commonwealth, issued pursuant to Article VI, Section 2 of the Commonwealth Constitution, and payable in accordance with the terms of the GO Bond Indenture and the other Ancillary Agreements.

(d)     When any official whose signature or facsimile thereof appears on any GO Bond authorized under this Act ceases to hold office before the delivery of said GO Bonds, said signature or facsimile shall, nevertheless, be valid and sufficient, it being deemed for all purposes as if such official had remained in office until such delivery. Furthermore, any GO Bond may bear the signature or facsimile of those persons who, at the time said bond is executed, are the proper officials to sign it, but who, on the date of the GO Bond, were not holding office.

(e)     The GO Bonds issued pursuant to the provisions of this Act shall be deemed to be negotiable instruments under the laws of Puerto Rico.

(f)     The GO Bonds authorized by this Act may be issued as coupon bonds or in registered form, or both, as determined in the GO Bond Indenture.

## Article 202.- Pledge of Good Faith, Credit and Taxing Power.

The good faith, credit and taxing power of the Commonwealth are hereby irrevocably pledged for the prompt payment of principal and interest on the GO Bonds issued under the provisions of this Act as and when due in accordance with the terms of the GO Bond Indenture. The Secretary of the Treasury is hereby authorized and directed to pay the principal and interest on the GO Bonds as they mature or upon their earlier redemption or prepayment in accordance with the GO Bond Indenture, from available resources (recursos disponibles) of the Commonwealth in the Fiscal Year in which such payment is required, and the provisions of this Act concerning the payment of the principal and interest on the GO Bonds shall be deemed a continuing appropriation for the Secretary of the Treasury to make such payments, even if no specific appropriations are made for such purpose. The Governor's Designee is hereby authorized and directed to include in the GO Bond Indenture the commitment which the Commonwealth hereby enters into with respect to the GO Bonds, and it shall be stated on said GO Bonds that the good faith, credit and taxing power of the Commonwealth are thus pledged.

## Article 203.- Debt Service Fund; Statutory Lien

(a)     The Governor's Designee is hereby authorized to establish the Debt Service Fund with the GO Bonds Trustee for the payment of the GO Bonds. Until the GO Bonds have been paid or satisfied in full in accordance with their terms, on each calendar month, the Commonwealth shall deposit with the GO Bonds Trustee cash in the aggregate amount equal to (i) one-sixth (1/6) of the Commonwealth's semi-annual obligation with

respect to the payment of interest to accrue on the GO Bonds and (ii) one twelfth (1/12) of the Commonwealth's annual obligation with respect to the payment of principal on the GO Bonds. Such funds shall be held and invested by the GO Bonds Trustee in accordance with the provisions of the GO Bond Indenture.

(b)      Upon their issuance, the GO Bonds shall automatically be secured by a first priority statutory lien over the funds deposited in the Debt Service Fund, including any income and revenues generated therefrom. Such first priority statutory lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person. No instrument needs to be executed or delivered or recorded in any official record or in any government registry or office in order to perfect or continue such first priority statutory lien or to establish or maintain the priority thereof, and such lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of such lien.

## Article 204.- Tax Exemption.

The GO Bonds, including, but not limited to, any payments or income with respect to the GO Bonds and the transfer of the GO Bonds, shall, at all times, be totally exempt from all kinds of taxes (including, without limitation, income taxes), assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith. Holders and beneficial owners of the GO Bonds shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Commonwealth or any Government Entity by reason of holding, owning or transferring the GO Bonds.

## Article 205.- Commonwealth Covenants.

The Commonwealth, with the intent of being contractually bound, hereby agrees and covenants for the benefit of all initial and subsequent holders of GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will:

(a)      take no action that would (1) impair the monthly deposit of funds to the Debt Service Fund pursuant to Article 203 hereof, (2) limit or alter the rights vested in the Commonwealth in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the GO Bonds or (3) impair the rights and remedies of the holders of the GO Bonds;

(b)      do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any federally tax-

exempt GO Bonds shall be and remain excludable from gross income for federal income tax purposes, to the extent applicable;

(c)     cause any post-Effective Date Fiscal Plan of the Commonwealth submitted to the Financial Oversight and Management Board for Puerto Rico under PROMESA to include provisions for the payment in each Fiscal Year of the principal of and interest on the GO Bonds in accordance with the terms of the GO Bond Indenture; and

(d)     to the extent necessary to satisfy its obligations to pay the GO Bonds, apply (i) the proceeds of the 1.03% property tax levied pursuant to Act 107-2020, as amended, and collected by the Municipal Revenues Collection Center of the Commonwealth, (ii) any monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution, and (iii) any other available resources (recursos disponibles) of the Commonwealth to the payment of the principal of and interest (and accreted value) on such GO Bonds; provided that (A) this covenant is not intended to grant to the holders of such GO Bonds any lien on such proceeds, monies and resources, and (B) for purposes of compliance with this covenant, to the extent that such proceeds, monies and resources are transferred to the Commonwealth's General Fund, payments of principal and interest (and accreted value) made to the holders of the GO Bonds from the Commonwealth's General Fund shall be deemed to have been made from such proceeds, monies and resources in the order set forth above.

## CHAPTER 3 – THE CONTINGENT VALUE INSTRUMENTS

**Article 301.- Issuance of the CVIs.**

(a)     From and after the Effective Date, the Governor's Designee shall be authorized to approve the offering, sale and issuance, pursuant to the terms of the CVI Indenture, the Confirmation Order, the Plan and the Ancillary Agreements, of CVIs in two subseries – the GO CVIs and the Clawback CVIs – up to an aggregate notional amount of $3,500,000,000 and $5,239,002,764, respectively. Each series of CVIs may include one or more subseries.

(b)     The CVIs shall be dated and mature at such time or times as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the CVI Indenture, provided that the GO CVIs shall mature no later than Fiscal Year 2044 and the Clawback CVIs shall mature no later than Fiscal Year 2052. The CVIs shall not bear interest and shall be subject to redemption as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the CVI Indenture in accordance and consistent with the Plan. The Governor's Designee, as representative of the Commonwealth, shall determine the form of the CVIs and the manner of execution of the CVIs, and shall fix the denomination or denominations of the

Case:17-03283-LTS  Doc#:18700-4  Filed:10/24/21  Entered:10/24/21 14:46:44  Desc:
Exhibit Exhibit 4 - HB 1003 as approved by the Senate on October 6  2021  Page 51 of 53

51

CVIs and the place or places of payment thereon and the other terms thereof, all in accordance and consistent with the Plan.

(c)     The CVIs shall be legal, valid and binding obligations of the Commonwealth, issued pursuant to Article VI, Section 2 of the Commonwealth Constitution, and payable in accordance with the terms of the CVI Indenture and the other Ancillary Agreements, provided that, pursuant to the CVI Indenture:

(1)     no payments shall be made to the holders of the CVIs (other than the Rum Tax Claims Subseries under the circumstances set forth in clause (2) below) in any given Fiscal Year unless an SUT Outperformance Condition occurred during the prior Fiscal Year;

(2)     no payments shall be made to the holders of the Rum Tax Claims Subseries in any given Fiscal Year unless either an SUT Outperformance Condition or a Rum Tax Outperformance Condition occurred during the prior Fiscal Year

(3)     no payments shall be made to the holders of the GO CVIs or the Clawback CVIs in excess of the GO CVI Lifetime Cap or the Clawback CVI Lifetime Cap, respectively;

(4)     as of the maturity date of each series of CVIs, if the Commonwealth has made all payments required to be made on such series pursuant to the CVI Indenture, all of the obligations of the Commonwealth under such series shall be deemed to have been satisfied and the series shall no longer be deemed to be outstanding, even if the GO CVI Lifetime Cap or the Clawback CVI Lifetime Cap, as applicable, has not been reached as of such date.

(d)     When any official whose signature or facsimile thereof appears on any CVIs authorized under this Act ceases to hold office before the delivery of said CVIs, said signature or facsimile shall, nevertheless, be valid and sufficient, it being deemed for all purposes as if such official had remained in office until such delivery. Furthermore, any CVIs may bear the signature or facsimile of those persons who, at the time said bond is executed, are the proper officials to sign it, but who, on the date of the CVIs, were not holding office.

(e)     The CVIs issued pursuant to the CVI Indenture are notes of the Commonwealth for all purposes and shall be deemed to be negotiable instruments under the laws of Puerto Rico.

(f)     The CVIs authorized by this Act shall be issued in registered form.

(g)     Solely for purposes of calculating the maximum annual debt service payable on the Commonwealth's public debt pursuant to Article VI, Section 2 of the Commonwealth Constitution, the debt service payable on the CVIs in any given Fiscal Year shall be deemed to be equal to the maximum amounts that could be payable with respect to the CVIs during such Fiscal Year in accordance with the CVI Indenture.

(h)     The debt service payable to CVIs in any given Fiscal Year will not impair under any concept the debts, obligations, and reserves created by COFINA.

## Article 302.- Pledge of Good Faith, Credit and Taxing Power.

The good faith, credit and taxing power of the Commonwealth are hereby irrevocably pledged for the prompt payment of the CVIs issued under the provisions of this Act as and when due in accordance with the terms of the CVI Indenture. The Secretary of the Treasury is hereby authorized and directed to pay the CVIs as they become due or upon their earlier redemption in accordance with the CVI Indenture, from available resources (recursos disponibles) of the Commonwealth in the Fiscal Year in which such payment is required, and the provisions of this Act concerning the payment of the CVIs shall be deemed a continuing appropriation for the Secretary of the Treasury to make such payments in the Fiscal Year in which such payment is required, even if no specific appropriations are made for such purpose. The Governor's Designee is hereby authorized and directed to include in the CVI Indenture the commitment which the Commonwealth hereby enters into with respect to the CVIs, and it shall be stated on said CVIs that the good faith, credit and taxing power of the Commonwealth are thus pledged.

## Article 303.- Tax Exemption.

The CVIs, including, but not limited to, any payments or income with respect to the CVIs and the transfer of the CVIs, shall, at all times, be totally exempt from all kinds of taxes (including, without limitation, income taxes), assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith. The holders and beneficial owners of the CVIs shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Commonwealth or any Government Entity by reason of holding, owning or transferring the CVIs.

## Article 304.- Commonwealth Covenants.

The Commonwealth, with the intent of being contractually bound, hereby agrees and covenants for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect to the CVIs have been paid or satisfied in full in accordance with their terms the Commonwealth will:

(a)      take no action that would:

(i)      limit or alter the rights vested in the Commonwealth in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the CVIs;

(ii)      impair the rights and remedies of the holders of the CVIs; or

(iii)      impair the ability of the holders of the CVIs to track performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the payment of the CVIs (in accordance with the Plan and as set forth in the CVI Indenture); provided, however, that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of the CVIs from such elimination or replacement reducing the likelihood that SUT Outperformance Condition will be satisfied; and provided further that the Commonwealth shall provide for the timely disclosure of such information as may be required by the CVI Indenture regarding the Measured SUT, sales and use tax collections, and any adjustments to the 5.5% SUT baseline thresholds made pursuant to the CVI Indenture; and

(b)      cause any post-Effective Date Fiscal Plan of Commonwealth submitted to the Financial Oversight and Management Board for Puerto Rico pursuant to PROMESA to include provisions for the payment in each Fiscal Year of the amounts due on the CVIs in accordance with the terms of the CVI Indenture to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition, as applicable, occurs during the prior Fiscal Year.

**CHAPTER 4 – PUBLIC POLICY ON MUNICIPALITIES**

Chapter 4 is only enacted in Spanish. Refer to Spanish version.

**CHAPTER 5 – AMENDMENT AND REPEAL OF CERTAIN LAWS FOR THE DEPOSIT OF FUNDS IN THE GENERAL FUND AND GUARANTEE THAT AL:L LEGISLATION COMPLIES WITH THE AVAILABILITY OF FUNDS ESTABLISHED IN THE FISCAL PLAN**

Chapter 5 is only enacted in Spanish. Refer to Spanish version.

**CHAPTER 6 – MISCELLANEOUS PROVISIONS**

Chapter 6 is only enacted in Spanish. Refer to Spanish version.