# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| IN RE: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
|     as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | |
|                Debtors.[1] | |

# DECLARATION OF DAVID SKEEL
## IN RESPECT OF CONFIRMATION OF PLAN OF
## ADJUSTMENT FOR THE COMMONWEALTH OF PUERTO RICO, ET AL.

I, David A. Skeel, Jr., hereby declare and state as follows:

1.      I am the Chairman of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or "Board"), the sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

("PBA") pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA").  The Commonwealth, ERS and PBA are also collectively referred to as the "Debtors").

2.      I submit this declaration (the "Declaration") in respect of confirmation of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 17627] (as may be amended, supplemented, or modified further, the "Plan") and in response to certain objections interposed to confirmation of the Plan. I have reviewed the Plan and any capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

3.      My statements set forth in this Declaration are based on my personal knowledge except where I reference specific documents or communications as the basis of my statements. In those instances where I reference a specific document or communication, the specific document or communication either is not being offered to prove the truth of the matter asserted in the statement or, I am informed, is otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible.

4.      I am familiar with, and have reviewed: (i) the Plan; (ii) the *Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 17628] (the "Disclosure Statement"), as approved by an order of the Title III Court, dated August 2, 2021 [Case No. 17-BK-3283-LTS, ECF No. 17639]; (iii) the *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 18470] (the "Plan Supplement"); (iv) the various PSAs (including, the AFSCME PSA, the GO/PBA PSA, the PRIFA BANs Stipulation, the ERS Stipulation, the HTA/CCDA PSA, and the PRIFA PSA, as defined below, and collectively,

the "PSAs") entered into by the Oversight Board and certain parties in support of confirmation of the Plan; and (v) the 2021 Certified Fiscal Plan for Puerto Rico (the "2021 Certified Fiscal Plan").

5.    As described below, in my role as Chairman of the Oversight Board, I believe (i) the settlements embodied in the various PSAs and other agreements referenced below, and incorporated into the Plan, are reasonable and fair, and (ii) the Plan is consistent with the 2021 Fiscal Plan.

## I.    My Background and Experience, the Role of the Oversight Board, and Efforts Toward a Consensual Restructuring

6.    I received my Juris Doctorate from the University of Virginia School of Law in 1987, and my Bachelor of Arts degree in Zoology and English from University of North Carolina at Chapel Hill in 1983.

7.    I am the S. Samuel Arsht Professor of Corporate Law at the University of Pennsylvania Law School, a position I have held since 2004. I have been a Professor of Law at the University of Pennsylvania Law School since 1999.

8.    My research and academic focus is on bankruptcy and restructuring law. I have authored, co-authored or edited several books on this topic, including *Bankruptcy*, *Debt's Dominion: A History of Bankruptcy Law in America,* and *When States Go Broke: The Origins, Context, and Solutions for the American States in Fiscal Crisis.* I have written over 50 academic articles on issues related to bankruptcy and debt restructuring, including issues arising in bankruptcies of municipalities and sovereign entities. I have also written numerous short articles for newspapers and other similar publications, including *The Wall Street Journal, The New York Times,* and *The Washington Post*.

9.    I have been a member of the American College of Bankruptcy since 2009. In 2016, I co-founded the University of Pennsylvania Institute for Restructuring Studies. Among other

things, the Institute hosts conferences and other events related to restructuring and offers resources to enhance the understanding of restructuring and bankruptcy. In June 2016, I was appointed by Chief Justice John Roberts to the Advisory Committee on Bankruptcy Rules.

10.    On June 30, 2016, President Obama signed into law PROMESA. The primary goals of PROMESA are to meet Puerto Rico's immediate need to provide its residents effective services, to formulate a debt restructuring, and to implement fiscal reform leading to a sustainable economy, fiscal responsibility, and access to the capital markets on reasonable terms. To achieve those goals, PROMESA established an independent entity within Puerto Rico's government—the Oversight Board—as the sole representative of any debtor entity in a Title III case, with the exclusive authority to propose a plan of adjustment and the mandate to restore the Commonwealth fiscal responsibility and market access.

11.    On August 31, 2016, I was one of seven individuals appointed by President Barack Obama to serve on the Oversight Board for a term of three years, and, on January 6, 2021, I was reappointed by President Donald J. Trump. On October 6, 2020, I was designated Chairman of the Oversight Board. None of the members of the Oversight Board receive compensation for our service.

12.    Since its establishment, the Oversight Board has focused on addressing Puerto Rico's unsustainable debt burden and achieving its mandates under PROMESA. Accordingly, in 2017, the Oversight Board commenced Title III cases for the Commonwealth (the "Commonwealth Title III Case"), the Puerto Rico Sales Tax Financing Corporation ("COFINA"), ERS (the "ERS Title III Case"), the Puerto Rico Highways and Transportation Authority ("HTA" and the "HTA Title III Case"), and the Puerto Rico Electric Power Authority ("PREPA"), and in 2019, for PBA (the "PBA Title III Case," and together with the Commonwealth Title III Case and

4

the ERS Title III Case, the "Title III Cases"). The Oversight Board already has accomplished several milestones towards fiscal responsibility of the Commonwealth, including, among other things, (i) restructuring the debt of the Government Development Bank for Puerto Rico ("GDB") under Title VI of PROMESA, approving GDB's Qualifying Modification and modifying approximately $4 billion of GDB's debt; and (ii) restructuring the debt of COFINA pursuant to a plan of adjustment under Title III of PROMESA, which reduced COFINA's debt by thirty-two percent (32%), and resulted in approximately $17.5 billion in debt service savings.

13.   The Oversight Board is continuing to work on achieving its mandates and to help Puerto Rico attain fiscal responsibility, gain access to capital markets, and achieve renewed economic prosperity and growth. I believe the Plan marks a significant step towards achieving the Oversight Board's objectives. The Plan embodies agreements with numerous claimholder constituencies resulting from the Oversight Board's extensive negotiations with those constituencies, and reflects the Oversight Board's ability to garner substantial support for the Plan. To date, the Oversight Board has executed agreements with a wide range of claimholders, including: (i) certain holders of general obligation bonds issued by (or guaranteed by) the Commonwealth (the "GO Bonds," and the holders of GO Bonds, the "GO Bondholders") and bonds issued by PBA (the "PBA Bonds," and the holders of PBA Bonds, the "PBA Bondholders"), including traditional municipal investors and monoline bond insurers; (ii) certain holders of bonds issued by ERS (the "ERS Bonds," and the holders of ERS Bonds, the "ERS Bondholders"); (iii) certain holders and insurers of bonds issued by HTA (the "HTA Bonds," and the holders of HTA Bonds, the "HTA Bondholders"); (iv) certain holders and insurers of bonds issued by the Puerto Rico Convention Center District Authority ("CCDA") (the "CCDA Bonds," and the holders of CCDA Bonds, the "CCDA Bondholders"); (v) certain holders and insurers of bonds issued by the

Puerto Rico Infrastructure Financing Authority ("PRIFA") (the "PRIFA Bonds," and the holders of PRIFA Bonds, the "PRIFA Bondholders"); (vi) the Official Committee of Unsecured Creditors (the "UCC"); (viii) the Official Committee of Retirees (the "Retiree Committee"), and (vii) the American Federation of State, County, and Municipal Employees and certain affiliates (collectively, "AFSCME"). The Oversight Board also reached an agreement in principle with the American Federation of Teachers ("AFT") and its local affiliates, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical (collectively, "AMPR"). This agreement, however, was subject to ratification by simple majority vote of AMPR's members. On September 28, 2021, the Oversight Board was informed by representatives of AFT and AMPR that the members voted against ratifying this agreement.

14. The Oversight Board was represented in negotiations of the above-referenced PSAs by its principal financial advisors, PJT Partners and Citigroup, and its legal counsel, Proskauer Rose LLP ("Proskauer"). The Oversight Board's advisors made regular presentations to the Oversight Board in person or by telephone, including at its weekly sessions, as well as at meetings with smaller groups of Oversight Board members and one-on-one. I attended virtually all, if not all, of those group meetings and telephone conferences. These presentations updated the Oversight Board on how the key features of the negotiations were evolving over the course of the parties' discussions. The Oversight Board also discussed the negotiations regarding the PSAs at additional strategy sessions.

15. At our regular meetings, the other members of the Oversight Board and I provided feedback to our advisors regarding our views concerning the appropriate structure for the PSAs and the ultimate terms of the agreements. The advisors incorporated that feedback into the

proposals and counterproposals that were sent to the various PSA counterparties and, in most circumstances, the Court-appointed Mediation Team (the "Mediation Team").

16.     The Board and its advisors also discussed best and worst case scenarios for the outcome of pending and potential litigations brought by and against the Oversight Board and the Debtors.  Our advisors, including Proskauer, provided us with assessments of the strengths and weaknesses of the arguments asserted or that could be asserted by various parties under PROMESA.  Although the details of these analyses are privileged, I believe the Oversight Board's advisors provided me (and the other members of the Oversight Board) with the information needed to assess and understand the potential risks that litigation posed, including risks and expense of continued litigation to the Oversight Board's overarching goals of the Commonwealth exiting Title III, achieving fiscal responsibility, and regaining access to the capital markets.  The Oversight Board weighed all these factors against our strategic goals for the Commonwealth.

## II.     The Plan Settlement Agreements

17.     As referenced above, and described generally below, following the filing of the Commonwealth, ERS, and PBA Title III Cases, the Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, led by Chief Judge Barbara J. Houser of the United States Bankruptcy Court for the Northern District of Texas, and continued to negotiate directly with various constituencies, all in an effort to build support for the restructuring of Commonwealth debt.  I participated in many of the negotiation and mediation sessions on behalf of the Oversight Board.  And, for those I did not attend personally, I received real-time detailed reporting of what transpired from either the Executive Director, Natalie Jaresko, the Oversight Board's advisors, or both.  Those negotiations resulted in certain agreements with various stakeholders in furtherance of continued development of and additional support for the Plan.  The key disputes and litigation resolved by each agreement

and the key terms of each agreement, are summarized below, and are described in further detail in the Declaration of Natalie A. Jaresko, Executive Director of the Oversight Board.

18.     On May 31, 2019, the Oversight Board entered into a plan support agreement (the "Initial PSA") with certain holders of approximately $3 billion of GO Bond Claims and PBA Bond Claims regarding the framework of a plan of adjustment that would resolve (i) disputes regarding the validity and related rights of the GO Bonds and PBA Bonds, and (ii) disputes between the Commonwealth and PBA regarding the characterization of certain purported leases, the amount of any administrative rent that may be owed by the Commonwealth for the use of PBA facilities following the commencement of the Commonwealth Title III Case, and the ownership of certain PBA facilities. Although the Initial PSA outlined the provisions of a potential plan of adjustment for the Debtors, it was subject to certain conditions precedent, including, without limitation, the negotiation and agreement as to the terms of new securities to be issued under with the proposed plan. Following entry into the Initial PSA, the Oversight Board, under the guidance of the Mediation Team, continued to negotiate with creditors to generate further consensus among the parties, including, but not limited to, other holders and insurers of GO Bonds and PBA Bonds.

19.     On June 7, 2019, the Oversight Board reached an agreement with (a) the Retiree Committee regarding, among other things, the treatment of ERS, JRS, and TRS benefits pursuant to the Plan, and (b) AFSCME regarding, among other things, return of contributions of all public employees to ERS under the System 2000 plan, modifications to a collective bargaining agreement, and AFSCME's consent to the treatment of ERS benefits pursuant to the Plan (the "AFSCME PSA"). *See* Disclosure Statement, Exhibit G; Plan, Exhibit G. In making this statement, I recognize there are on-going discussions concerning matters regarding the Plan and,

in particular, treatment of pension claims, and if necessary, I will supplement this Declaration to reflect the results of those discussions.

20.    On September 27, 2019, the Debtors filed the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 8765] (the "Initial Plan"). The Initial Plan contained the material terms outlined in the Initial PSA, but the parties had not yet reached an agreement with respect to the terms of certain of the securities proposed to be issued.

21.    Following the filing of the Initial Plan, the Oversight Board continued to negotiate with various stakeholders to generate further support for a plan of adjustment. Upon reaching a new agreement in principle with groups (including those party to the Initial PSA) holding a majority of outstanding PBA Bonds and GO Bonds holding over $8 billion collectively (and, inclusive of Claims held by parties who executed joinders thereto, over $10 billion), the Oversight Board (and the parties to the Initial PSA) terminated the Initial PSA and executed a plan support agreement, dated February 9, 2020 (the "2020 GO/PBA PSA"). The 2020 GO/PBA PSA provided a revised framework for the treatment of PBA Bonds and GO Bonds and settled all challenges to the validity, priority, and secured status of such bonds.

22.    Consistent with the terms of the 2020 GO/PBA PSA, on February 28, 2020, the Oversight Board filed an amended proposed plan of adjustment and related disclosure statement [ECF Nos. 11946 and 11947, respectively]. The Oversight Board promptly pursued a hearing on the adequacy of information contained in the disclosure statement and, on March 10, 2020, the Title III Court entered an order [ECF No. 12187] establishing June 3-4, 2020 as the dates for such hearing.

23.    However, due to the spread of COVID-19 globally and throughout Puerto Rico, and its effects on the people and economy of Puerto Rico, the Oversight Board sought to adjourn

the hearing to consider approval of the disclosure statement and related deadlines [ECF No. 12549]. More importantly, the COVID-19 pandemic caused an unprecedented public health crisis, which required the Government to immediately establish a curfew and mandate business closures. As of March 2021, the reported statistics show Puerto Rico had experienced approximately 97,713 cases of COVID-19 and 2,113 deaths caused by the virus. Moreover, the economy suffered, as unemployment on the island doubled and hotel reservations reportedly fell by 95% as tourism decreased dramatically. The Government's statistics show the effects of the sudden constriction in household income was felt across the island, as retail sales plummeted in April 2020 to just 38% of February 2020 levels. The uncertain combined impact of increased expenditures and decreased revenues were projected to significantly impair the Commonwealth's budget.

24.     Given the impact of the virus on the Commonwealth's economy, residents and local businesses, the Oversight Board entered into further mediation and private sessions with the parties to the 2020 GO/PBA PSA, again under the guidance of the Mediation Team. As a result of these mediation sessions, on February 23, 2021, the Oversight Board announced the termination of the 2020 GO/PBA PSA and the execution of a new plan support agreement with groups holding a majority of outstanding PBA Bonds and GO Bonds (as amended, the "GO/PBA PSA"), Exhibit B to the Disclosure Statement.

25.     The GO/PBA PSA, together with the restructuring of COFINA's debt, reduces the Commonwealth's debt service by approximately 62%, from $90.4 billion to $34.1 billion (*see* Disclosure Statement at 35). The GO/PBA also (i) provides for a proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico Constitutional debt limit, (ii) provides for the issuance of new bonds and contingent value instruments ("CVIs"), along with the payment of certain amounts in cash,

resolving the bondholders' claims against the Commonwealth; (iii) resolves the outstanding disputes between the Commonwealth and PBA, and (iv) provides for the resolution of disputes regarding the PRIFA bond anticipation notes ("PRIFA BANs") pursuant to a stipulation, dated as of February 22, 2021 (the "PRIFA BANs Stipulation").

26.     Following entry into the GO/PBA PSA, the Oversight Board continued to work to develop consensual resolutions with the greatest number of stakeholders possible. In pursuit of this goal, the Oversight Board engaged with additional interested parties under the guidance of the Mediation Team, as led by Judge Houser, and ultimately reached several additional agreements with various stakeholders as support for the Commonwealth's restructuring grew. On March 9, 2021, the Oversight Board reached an agreement (amended on April 2, 2021) with certain groups of ERS Bondholders and Bank of New York Mellon ("BNYM"), as fiscal agent, regarding the proposed treatment and settlement of disputes relating to ERS Bonds (the "ERS Stipulation"), Exhibit E to the Disclosure Statement.

27.     The ERS Stipulation, among other things, (i) provides a global resolution of disputes regarding the validity of ERS Bonds and related rights of ERS Bondholders and the extent of the alleged liens supporting the obligations thereunder, (ii) resolves the administrative expense claims filed by certain ERS Bondholders, (iii) provides a resolution of disputes regarding certain legal challenges to the Commonwealth's post-petition enactment of a "pay as you go" system for payment of pension benefits to retirees, and (iv) provides for the payment of $373 million in cash to the holders of ERS Bonds, as well as the proceeds from the sale of certain ERS assets to the Commonwealth.

28.     On May 5, 2021, the Oversight Board reached an agreement with certain holders and insurers of HTA Bonds and CCDA Bonds, regarding the proposed treatment and settlement

of, among other things, certain "clawback claims" against the Commonwealth (the "HTA/CCDA PSA"), Exhibit C to the Disclosure Statement. The HTA/CCDA PSA, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA PSA, (iv) provides for the bondholders and insurers to support the Plan, (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA, and (vi) presents a template for the resolution of the CCDA Bonds pursuant to Title VI of PROMESA.

29.   On July 12, 2021, the Oversight Board reached an agreement in principle with the UCC regarding, among other things, proposed recoveries for classes of general unsecured claimholders while resolving the UCC's objections to the Plan and other Plan-related disputes.

30.   Additionally, on July 27, 2021, the Oversight Board reached an agreement with certain holders and insurers of PRIFA Bonds resolving certain litigation among the parties, setting forth the terms of new securities to be issued pursuant to the Plan, and setting forth the agreement of the parties to support the plans of adjustment for the Commonwealth and PRIFA consistent with the PRIFA Related Plan Support Agreement (the "PRIFA PSA"), Exhibit D to the Disclosure Statement. The PRIFA PSA, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the

PRIFA PSA, (iv) provides for the bondholders and insurers to support the Plan, and (v) presents the foundation for a restructuring of the PRIFA Bonds pursuant to Title VI of PROMESA.

31.     I have reviewed the GO/PBA PSA, the PRIFA BANs Stipulation, the ERS Stipulation, the HTA/CCDA PSA, the PRIFA PSA, and the AFSCME PSA, and since I participated in many mediation sessions in which they were negotiated and agreed with approving the Oversight Board's execution of them, am generally familiar with their respective business terms. Below I describe why I believe each of the settlements is fair, reasonable and necessary to achieve a global consensual restructuring in the Title III cases.

### A.     The Plan Settlement Agreements are Reasonable and Fair

32.     As Chairman of the Oversight Board, as noted, I often participated in the Oversight Board's discussions and negotiations with respect to the GO/PBA PSA, the PRIFA BANs Stipulation, the ERS Stipulation, the HTA/CCDA PSA, the PRIFA PSA, and the AFSCME PSA. In executing each of these PSAs, and agreeing to their terms and conditions, the Oversight Board considered, among other things, (i) the extensive, good faith and arm's-length negotiations (led by the Mediation Team) among representatives of the Oversight Board, its consultants, and representatives of certain claim holders, (ii) the risks and expenses (and time commitment) relating to the substantial litigation remaining concerning the disputes identified above with respect to the GO and PBA Bonds, PRIFA BANs, ERS Bonds, and HTA, CCDA and PRIFA Bonds (collectively, the "Plan Litigation"), all of which are resolved by the PSAs, (iii) the potential for litigation and attendant risks and costs associated with the labor-related disputes ("Labor Disputes"), and (iv) the central components of each of the PSAs. For the reasons described below, I believe that each of the PSAs is fair and reasonable and a necessary component of a largely consensual plan.

33.     Each of the PSAs was reached following months of negotiations directed by the Mediation Team and/or other informal discussions that included party representatives, legal and financial advisors, and involved vigorous debate and discussion on both sides. Based on my participation in the negotiations leading to the PSAs, I believe the negotiations were conducted at arms' length and in good faith.

34.     The Plan Litigation resolved by the PSAs involves extraordinarily complex, high-stake disputes and, because these are the first Title III cases litigated under PROMESA, novel legal issues. Collectively, billions of dollars were at stake. From the Oversight Board's perspective, the consequence of the GO Bondholders prevailing on their priority argument, or the HTA, PRIFA, or CCDA bondholders prevailing on their property interest contentions, would have inflicted grave harm on the Commonwealth and its residents because the Commonwealth, in either situation, would have lost control of billions of dollars of revenues needed to sustain the Commonwealth, Instead, the revenues would have been payable to the GO Bondholders and/or the HTA, PRIFA, and CCDA bondholders.  This would have prevented the Oversight Board from developing fiscal plans and budgets necessary to carry out its statutory mission.  While the Oversight Board believes the risk of a materially adverse outcome in connection with the various litigations was materially less than fifty percent based on judicial decisions rendered to date and believed it ultimately should prevail in those litigations, an adverse determination in any one or more of the actions could have been catastrophic for the Commonwealth's restructuring efforts. A small risk of a negative and grave outcome was imprudent to undertake once settlement was possible on the terms in the Plan.

35.     For example, if the litigation relating to the GO Bonds and PBA Bonds were resolved adversely to the Oversight Board, the Commonwealth, and/or PBA, the economic burden on the Commonwealth would render impossible the creation of a sustainable economy with market

access, deplete the Debtors' resources available for other creditors, and, in practical terms, unravel years of critical restructuring efforts. I understand, for instance, if it were determined that the respective bondholders in the Lien Challenge Actions held valid and perfected security interests or statutory liens that fully secured more than $6 billion in claims, those claims would potentially be entitled to full recovery. Any plan of adjustment that did not provide full recovery on account of such secured claims may have been unconfirmable. Moreover, an adverse result in the Lien Challenge Actions could have set a precedent for approximately $11.5 billion in remaining GO Bond, PBA Bond, and other bonds allegedly guaranteed by the Commonwealth. An adverse result in the litigation regarding the characterization of certain purported PBA leases could result in administrative expense treatment for rents due on the alleged leases, requiring payment of approximately $401.6 million in annual "rent" under the PBA Leases. I believe avoiding those risks by a reasonable settlement was and is the prudent path.

36.     Similarly, if the PRIFA BANs Litigation, regarding whether (i) debt issued by certain Commonwealth instrumentalities and guaranteed by the Commonwealth violated the Constitutional Debt Limit and (ii) whether the Commonwealth's guarantees may be avoided as fraudulent transfers, were resolved adversely to the Commonwealth, the Commonwealth could be obligated to uphold its guarantee of the PRIFA BANs, resulting in at least $83.5 million in claims.

37.     If the ERS-related litigation were resolved adversely to the Oversight Board, the Commonwealth, and/or ERS, it could result in significant liability of the Commonwealth and/or ERS. If, for example, the enactment of Joint Resolution 188 and/or Act 106 were determined to give rise to nondischargeable administrative expense claims and/or nondischargeable Takings Clause claims in favor of the ERS Bondholders, any plan of adjustment that did not provide for full payment of these claims, which total in excess of $3 billion, may have been unconfirmable.

Even if the ERS Bondholders did not have nondischargeable claims, the ERS Bond Claims could result in unsecured claims against the Commonwealth in an amount in excess of $3 billion, which would have diluted the recovery of other holders of unsecured claims against the Commonwealth. Further, if the disputes regarding the scope of alleged liens held by ERS Bondholders were resolved in favor of the ERS Bondholders, such resolution could potentially give rise to a secured claim against the Commonwealth and/or ERS of over $2 billion.

38.     Similarly, if the litigation relating to the HTA Bonds, CCDA Bonds, and PRIFA Bonds concerning certain revenues historically appropriated and transferred by the Commonwealth to HTA, CCDA and PRIFA were resolved adversely to the Commonwealth, it could result in significant liability of the Commonwealth that could have to be satisfied in cash. If, for example, it were determined that the Commonwealth impermissibly retained those revenues, the Commonwealth could be required to use over $1 billion of Commonwealth funds to pay holders and monoline insurers of HTA Bonds, CCDA Bonds, and PRIFA Bonds. Likewise, if the retention of those revenues were determined to give rise to nondischargeable administrative expense claims and/or nondischargeable Takings Clause claims, any plan of adjustment that does not provide for full payment of these claims, which totaled over a $1 billion, could be unconfirmable. Further, if the Commonwealth were required to resume appropriating and transferring the revenues to HTA, CCDA and PRIFA, these monies would be unavailable for use by the Commonwealth. As with the other disputes described above and resolved by the various agreements reached, I believe that settlement is by far the wiser path—and on terms the Commonwealth and the other Debtors can afford, while still being able to provide the necessary government services to the citizenry of Puerto Rico.

39.     Likewise, the Labor Disputes resolved by the AFSCME PSA related to AFSCME's

support for the Plan and execution of new, modified CBAs. In addition to certain pension reforms,

the AFSCME PSA incorporates certain Right-Sizing Provisions of the proposed CBA amendments

that provide the Commonwealth with more flexibility to address its current and future workforce.

In negotiating the terms of the AFSCME PSA, the Oversight Board considered, among other

things, (a) the critical importance of the public employee constituencies to the Commonwealth's

future, (b) the difficulty in achieving union and member support for the pension modifications

contemplated by the AFSCME PSA and the Plan, (c) the significant cost and risk of litigation

regarding opposition to such pension modifications without AFSCME's support, (d) the

substantial benefits of amendments to the AFSCME CBAs that will, among other things, give the

Commonwealth more flexibility to right-size material components of its labor force than exist

under the current AFSCME CBAs, and (e) the extensive discussions among representatives of the

Oversight Board, its consultants, the Commonwealth government, and AFSCME to develop a

consensus regarding the terms of the AFSCME PSA.

40.     If the Labor Disputes were not resolved (in part) through the AFSCME PSA, the

Oversight Board may have been required to undergo costly, uncertain and lengthy litigation over

the subject AFSCME CBAs to accomplish its goals of reforming the Commonwealth's significant

pension liabilities and achieving labor measures contained in the amended CBAs, the outcome of

which would be uncertain.

41.     Moreover, based upon the Oversight Board's review of the Commonwealth's future

financial obligations and evaluation of Commonwealth obligations to employees under multiple

recovery scenarios, I believe the terms of the AFSCME PSA (i) ensure that pensioners maintain

an ability to support themselves without requiring additional future support from the

17

Commonwealth, and (ii) create a sustainable way to maintain an appropriate size and cost of its workforce on an ongoing basis. As noted above in paragraph 19, in making this statement, I recognize there are on-going discussions concerning matters regarding the treatment of pension claims, and if necessary, I will supplement this Declaration to reflect the results of those discussions.

42.  The government employees represented by AFSCME are critical to both the fiscal and operational future of the Commonwealth. Without the settlements embodied in the AFSCME PSA, disputes with AFSCME could result in strained relationships with government employees. The AFSCME PSA also eliminates the risk of costly, time-consuming and uncertain litigation with AFSCME regarding the Labor Disputes and consensually and favorably establishes terms for new AFSCME CBAs. Under the terms of the AFSCME PSA, AFSCME members receive many of their requested benefits and modifications to the applicable CBAs, and AFSCME members have the opportunity to share in any upside of the Commonwealth's fiscal future. I believe these terms will incentivize governmental employees to maximize efficiencies.

43.  In light of the potential dramatic financial impact on the Commonwealth, if any of the Plan Litigations were resolved adversely to the Commonwealth, or if the referenced agreements were not reached regarding the AFSCME CBAs and Labor Disputes, the restructuring contemplated by the Plan would become far more difficult, and likely lead to an inferior result.

44.  Additionally, the PSAs resolve countless proofs of claim, adversary proceedings, contested matters, and disputes related to the Plan. The Plan Litigation has been vigorously litigated, and, if continued to be litigated to conclusion, would continue to take up enormous amounts of time and resources (judicial and otherwise), and no matter the outcome, undoubtedly would be appealed by the unsuccessful side, resulting in further delays and protracted litigation,

all of which would come at a substantial cost to the Commonwealth, because of both the significant expenses that would be incurred in such litigation and the potential impact any such litigation would have on the Commonwealth's ability to exit Title III. The Plan Litigation has been, and I believe would continue to be, extremely expensive to litigate. As I observed above, the likelihood all the disputed issues would be resolved in the Commonwealth's favor is not certain. Resolution of the Plan Litigation avoids any such uncertainty, and the delay and significant expense it entailed.

45.    Beyond avoiding the cost and expense of litigation, the PSAs also avoid the risk of adverse litigation results that could, among other things, dilute recoveries of other Commonwealth claimholders and jeopardize a consensual restructuring. The PSAs free up consideration, which saved value that can be (and was) used to obtain additional support for achieving a nearly completely consensual confirmation of the Plan.

46.    I believe the PSAs and the resolution of the disputes embodied therein are the product of extensive adversarial, arms'-length negotiations among sophisticated parties. These PSAs resolve billions of dollars of claims against the Commonwealth, PBA and ERS, avoid time consuming and expensive litigation, obtained significant support for a consensual restructuring, and in my judgment, provide a fair and reasonable solution to extraordinarily complex disputes and are in the best interest of the Commonwealth and its stakeholders.

**III.    The Plan is Consistent with the Applicable Fiscal Plan for the Debtors**

47.    The Oversight Board has oversight responsibility for Puerto Rico's fiscal plans under Title II of PROMESA. PROMESA contemplates the Oversight Board and the Government will work together to adopt a fiscal plan, but grants the Oversight Board the power to develop and certify its own fiscal plan if the Government does not provide it with a proposed fiscal plan it determines to certify.

48.     The Oversight Board developed and certified its own fiscal plan for the Commonwealth on June 29, 2018, which contained many fiscal measures the Oversight Board considered necessary to right-size the Government.  Over the last several years, the Oversight Board has certified further revised Commonwealth fiscal plans to reflect new information, updated financial projections, and account for additional natural disaster and public health crises.  These measures included, among other things, allocating funds to strengthen Puerto Rico's public healthcare system, human capital, and telecommunications infrastructure; addressing critical infrastructure gaps in public hospitals; instituting and expanding the use of Electronic Health Record programs; and expanding access to care through development of telehealth infrastructure.

49.     On April 23, 2021, the Oversight Board certified the 2021 Certified Fiscal Plan. The 2021 Certified Fiscal Plan factored in the economic and fiscal impact of the COVID-19 pandemic as well as substantial federal and local stimulus, the slower than expected disaster relief funding spending, and the updated estimates of the potential impact of structural reforms.

50.     Similarly, as part of the Title III process, Section 104(j)(2) of PROMESA requires the Oversight Board to certify the submission or modification of the Plan.  Section 104(j)(3) of PROMESA provides that the Oversight Board may certify the filing of the Plan only if it determines, in its sole discretion, that the Plan is consistent with the 2021 Certified Fiscal Plan. On July 30, 2021, the Oversight Board certified submission of the Plan.

51.     During the certification process for the Plan and the 2021 Certified Fiscal Plan, the Oversight Board's advisors made regular presentations to the Oversight Board in person or by telephone, including at its weekly sessions, as well as at meetings with smaller groups of Oversight Board members and one-on-one.  These presentations updated the Oversight Board on how the key features of the Plan and 2021 Certified Fiscal Plan were evolving during their development.

The Oversight Board also conducted separate strategy sessions to discuss the Plan and 2021 Certified Fiscal Plan.

52.     Based on my review of the Plan and the 2021 Certified Fiscal Plan, the debt levels under the Plan are consistent with the debt levels set forth in the 2021 Certified Fiscal Plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 25, 2021                                    */s/ David A. Skeel, Jr.*
      Shushan, NY                                    David A. Skeel, Jr.
                                                     Oversight Board, Chairman