# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DECLARATION OF STEVEN ZELIN OF PJT PARTNERS LP ON BEHALF OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO IN RESPECT OF CONFIRMATION OF SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I, Steven Zelin, hereby declare:

1. I am a Partner, Global Head of the Restructuring and Special Situations Group ("RSSG"), Head of RSSG in the Americas, and a member of the management committee at PJT Partners LP ("PJT"), a global investment banking firm listed on the New York Stock Exchange with its principal offices at 280 Park Avenue, New York, New York 10017.

2. I submit this declaration (this "Declaration") in respect of confirmation of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (together with all exhibits, and as amended, modified, and supplemented, the "Plan"), and in response to certain objections interposed to confirmation of the Plan.[2]

3. My statements set forth in this Declaration are based on my personal knowledge except where I reference specific documents or communications as the basis of my statements.  In those instances where I reference a specific document or communication, the specific document or communication either is not being offered to prove the truth of the matter asserted in the statement or, I am informed, is otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible.

4. Where this Declaration provides opinion testimony, in addition to the above, the opinions set forth herein are based on (i) my understanding of information shared with me by other members of the PJT team working directly with me or under my supervision and direction; (ii) additional information of the types generally relied on by others who have similar experience and expertise in my field such as information provided by the Oversight Board and its advisors,

---

[2] Capitalized terms used but not otherwise defined herein shall have the same meanings given to such terms as in the Plan.

and other interested parties and their respective advisors concerning the restructuring, and/or (iii) my experience in the industry as described below.

5.     My testimony in this Declaration is broken down into seven sections.  The first section provides my background and qualifications.  The second section details certain Plan settlement negotiations, including negotiations of the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement (collectively, the "PSAs") and agreement with the Official Committee of Unsecured Creditors (the "UCC"). The third section provides the amounts payable under the Plan, including cash and debt service payments to be made pursuant to the Plan.  The fourth section explains why the Plan is consistent with the applicable Fiscal Plan certified by the Oversight Board.  The fifth section provides a summary of the terms and structure of the contingent value instruments ("CVIs") to be distributed under the Plan.  The sixth section provides a summary of the fees being paid pursuant to the various PSAs, including Consummation Costs and Restriction Fees.  The seventh section summarizes the Plan's release, exculpation, and injunction provisions.

I.     **Background and Qualifications**

6.     PJT is a leading global financial advisory firm with more than 800 employees in nine offices in the U.S., Europe, and Asia.  The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, and fund placement.  PJT is an industry leader in advising companies and creditors in all aspects of complex restructurings and bankruptcies.

7.     I have worked as a restructuring advisor on a full-time basis since 1988, with over thirty-three (33) years of experience exclusively representing debtors, creditors, investors and other stakeholders in distressed transactions.  Prior to PJT's spinoff from The Blackstone Group ("Blackstone") on October 1, 2015, I was a Senior Managing Director in Blackstone's

Restructuring & Reorganization Group, where I was employed for more than seventeen years.  I joined Blackstone in 1998 from Ernst & Young LLP ("E&Y"), where I was a partner in E&Y's Restructuring and Reorganization Group.  I have a Masters of Business Administration with a concentration in finance from New York University's Stern School of Business and a Bachelor of Science in accounting from the University of Albany.

8.      I have significant experience in negotiating settlements as part of complex restructurings.  Some of my most notable publicly-disclosed formal and informal assignments include the following: AbitibiBowater, Inc.; Acosta, Inc.; American Axle & Manufacturing, Inc.; Caesars Entertainment Corporation; Clearwire Corporation; Cumulus Media, Inc.; Delphi Corporation; Energy Future Holdings; Enron Corporation; Entergy New Orleans; Ford Motor Company; General Motors Corporation; The Goodyear Tire & Rubber Company; Houston Sports Authority; iHeartMedia, Inc.; Intelsat S.A.; Intrawest ULC; Jefferson County, Alabama; Kerzner International Holdings Limited; Lightsquared Inc.; Ligado Inc.; Marvel Entertainment Group, Inc.; Motorola (re: Iridium LLC); Pacific Gas & Electric; PHI, Inc.; R.H. Macy & Company; Samson Resources; SemGroup, L.P.; TerreStar Corporation/TerreStar Networks Inc.; Vencor, Inc.; Verso Paper Corporation; Walter Energy, Inc.; Washington Mutual, Inc.; and Xerox Corporation.  In the past four years, in addition to these chapter 11 cases, I have testified and/or submitted declarations in the following cases (excluding declarations solely related to retention, conflicts, or fee applications): *In re Intelsat S.A.*, (Bankr. E.D.Va.); *In re Cumulus Media, Inc.* (Bankr. S.D.N.Y.); *In re Acosta* (Bankr. D. Del.); *In re PHI, Inc.* (Bankr. N.D. Tex.); *In re Samson Resources Corp.* (Bankr. D. Del); and *In re Walter Energy* (Bankr. N.D. Ala).

9.      I applied this experience when I participated in and oversaw numerous settlement negotiation sessions with members of, and advisors to, the Oversight Board, along with the other

ultimate parties to the PSAs and their respective principals and advisors (both financial and legal),

and the Court-appointed mediation team led by Chief Judge Barbara J. Houser of the United States

Bankruptcy Court for the Northern District of Texas (the "Mediation Team").

10.    In that regard, I participated in the development of the amount and structure of

consideration to be provided upon the Effective Date of the Plan, including cash, new debt

instruments, and CVIs, the latter of which was a key component of several of the PSAs.  My work

on the CVIs was informed by my experience developing similar instruments in other

restructurings.

11.    I also applied my restructuring experience when advising the Oversight Board in

its evaluation of the propriety and amount of Consummation Costs and Restriction Fees provided

in certain of the PSAs and the Plan, as well as the release, injunction and exculpation provisions

in the Plan.

### A.    PJT's Engagement by the Oversight Board

12.    PJT was first engaged by the Oversight Board on or around February 2, 2019 as its

investment banker and financial advisor. Since that time, I and other employees of PJT, under my

direction and supervision, have performed various tasks including the following:  (i) provided

strategic advice with regard to restructuring or refinancing of the Debtors' obligations;

(ii) reviewed and evaluated the Debtors' capital structure, debt capacity, and potential alternative

capital structures; (iii) participated in negotiations conducted by the Mediation Team among the

Oversight Board, as a representative of the Debtors, and their claimholders and other interested

parties; (iv) assisted in the evaluation of the Debtors' current fiscal situation; (v) assisted in the

development of financial data and presentations to the Oversight Board, various claimholders and

other third parties; (vi) analyzed the financial liquidity and evaluated alternatives to improve such

liquidity for the Commonwealth and certain of its instrumentalities, agencies and public

5

corporations; (vii) analyzed various restructuring scenarios and the potential impact of those scenarios on the Debtors as well as recoveries of the stakeholders impacted by the restructuring; (viii) worked with other Oversight Board professionals to consider different litigation outcomes and their effect on potential restructuring; and (ix) considered valuations of securities offered by the Debtors in connection with a potential restructuring.

## II.     The PSAs Were Negotiated At Arm's-Length and In Good Faith

13.     In my role as a senior financial advisor to the Oversight Board, I was intimately involved in the negotiations with various constituents concerning a number of the PSAs and agreements, including the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, and agreement with the UCC.  I personally participated in the vast majority of the negotiations and discussions concerning those settlements and I have read and am familiar with the terms of the settlements, each as set forth in the Plan.  In my opinion, and as described in more detail below, given my participation in the negotiations concerning each of those settlements and my professional experience negotiating many other complex restructuring transactions (many of which are noted above), the settlements reached, both individually and taken as a whole, are reasonable under the facts and circumstances of these cases.

### A.     Background of Plan Settlement Negotiations

14.     In May 2019, the Oversight Board reached agreement with several major groups of claimholders on the treatment of their respective claims, pursuant to a separate plan support agreement, supported by over $3 billion in bonds.  The Plan Support Agreement, dated as of May 31, 2019 (the "2019 PSA"), among the Oversight Board, and certain holders of GO Bonds and PBA Bonds, included the compromise and settlement of a key dispute concerning whether leases between the Commonwealth and PBA were true leases for purposes of Bankruptcy Code section 365 or were disguised financings or other debts of the Commonwealth.  My understanding is that

if they were true leases, PBA would have had administrative claims for rent from the Commonwealth and the PBA bondholders would have been entitled to all or part of the rents in addition to being entitled to payments on behalf of the Commonwealth's guaranty of the PBA debt they held. Conversely, if they were not true leases, my understanding is that PBA would only have prepetition general unsecured claims against the Commonwealth. The 2019 PSA settled that dispute and also included resolution of disputes concerning the GO Bonds relating to the validity (constitutional debt limit), priority, and secured status of those bonds, but permitted holders of GO Bonds the opportunity to opt out of the settlement to litigate such disputes. To the extent certain holders chose this "opt-out" path, I understand that litigation regarding certain issues would continue as to the opt-out creditors only.

15.     In July 2019, the Court stayed a number of adversary proceedings and contested matters, including certain of the challenges listed above, and directed all parties and parties in interest in those proceedings to participate in discussions and communications facilitated by the Mediation Team, to prioritize and develop efficient approaches to the resolution of issues that had to be litigated, settled or otherwise resolved to achieve confirmation of a plan of adjustment. [ECF No. 8244]  Among the issues subject to the Court-ordered stay and mediation directive were the unresolved issues concerning validity, secured status (if any), and priority of each of the GO Bonds, PBA Bonds, the scope of (and other challenges to) the asserted liens of the ERS Bonds, HTA Bonds, CCDA Bonds and PRIFA Bonds as well as certain other disputes between the Debtors and various claimholder groups. *Id.*

16.     Consistent with its obligations pursuant to the 2019 PSA, the Oversight Board proposed an initial plan of adjustment, dated September 27, 2019 [ECF No. 8765] (the "Initial Plan"), which embodied, among other agreements, the 2019 PSA. Additionally, the Oversight

Board commenced the Title III case for PBA on September 27, 2019.  Thereafter, the Oversight

Board continued to engage stakeholders in negotiations facilitated by the Mediation Team to build

greater support for the Initial Plan.  The negotiations resulted in an agreement in principle that

provided a revised framework for the treatment of PBA Bonds and GO Bonds, including the

proposed settlement of the unresolved challenges to the validity, priority, and secured status of

later-issued bonds.  As such, the agreement had greater support among stakeholders than the 2019

PSA.  The Oversight Board terminated the 2019 PSA and the new agreement was memorialized

in a Plan Support Agreement, dated February 9, 2020 (the "2020 PSA"), among the Oversight

Board (as representative of the Commonwealth, ERS, and PBA) and holders of approximately $8

billion in GO Bonds and PBA Bonds at the time of execution of the PSA.  On February 28, 2020,

and following execution of the 2020 PSA, the Oversight Board filed an amended proposed plan of

adjustment [ECF No. 11946] and related disclosure statement [ECF No. 11947].

17.    In March 2020, however, in response to the spread of COVID-19 globally and

throughout Puerto Rico, and its effects on the people and economy of Puerto Rico, the Oversight

Board asked for, and the Title III Court granted, adjournment of both (i) the hearing the Title III

Court had set to consider approval of the then-pending disclosure statement and (ii) related

deadlines.  [ECF No. 12485]  Specifically, the Oversight Board, as well as the parties to the 2020

PSA, needed to assess the pandemic's impact on Puerto Rico, and the challenging recovery for the

Commonwealth from the pandemic, before the Oversight Board could support progress on any

revised plan of adjustment or disclosure statement to be considered by the Court.  As part of this

evaluative process, in or around June 2020, the Oversight Board certified the next Commonwealth

Fiscal Plan and corresponding Commonwealth budget (the "2020 Fiscal Plan").  With the

Mediation Team, the Oversight Board then resumed discussions with AAFAF, on the one hand,

and Commonwealth claimholders (including those that were party to the 2020 PSA (the "2020 PSA Creditors")), on the other hand, taking into consideration the modifications needed, if any, to be proposed in light of the uncertainty created by COVID-19.  These discussions, in which I participated, concerned further efforts to achieve consensual resolution of the disputes regarding, among others, the GO Bonds, PBA Bonds, ERS Bonds, and HTA Bonds, CCDA Bonds and PRIFA Bonds, as described in more detail below.

**B.    Negotiations Concerning the GO/PBA Plan Support Agreement**

18.    As noted above, in the summer of 2020, the Oversight Board resumed negotiations concerning a consensual restructuring and resolution of disputes regarding the GO bonds and PBA bonds.  These negotiations included (a) group or individual informational and mediation sessions (as and when scheduled by the Mediation Team) and (b) informal sessions with the Commonwealth and many other claimholder parties.   In providing the information in this Declaration, I am aware of the "Mediation Agreement" and the associated privilege and the prohibition on disclosing the contents of specific negotiations with various parties as set forth therein.  Accordingly, I am disclosing only those facts outside the confidentiality obligations of the Mediation Agreement.

19.    Mediation sessions in which I participated resulted in the Oversight Board and 2020 PSA Creditors exchanging written proposals on August 18, 2020 and August 24, 2020, respectively, which were publicly disclosed on September 30, 2020.  Following the exchange of proposals, several 2020 PSA Creditors filed a motion on October 6, 2020 asking the Court to impose deadlines with respect to prosecution, solicitation, and confirmation of plans of adjustment for the Commonwealth and PBA.  [ECF No. 14478]  In an effort to stimulate further discussions and, ultimately, a consensual resolution, on October 29, 2020, the Court set a deadline of February 10, 2021 for the Oversight Board to file a term sheet and a motion for approval of a proposed

timetable for filing an amended plan and proposed disclosure statement. [ECF No. 14987]
Mediation sessions re-commenced shortly thereafter.

20.     The negotiation sessions in which I participated between the Oversight Board and
2020 PSA Creditors included representatives of the various stakeholder parties, as well as the
parties' respective legal and financial advisors.  During the many mediation sessions that occurred
between August 2020 and February 2021, I observed robust discussion among all in attendance
concerning the disputed issues, the parties' respective legal and economic positions, and potential
means to achieve a consensual debt restructuring.

21.     Throughout, I continued to be involved in numerous formal and informal
discussions in which the Oversight Board and its financial and legal advisors engaged with
individual claimholders—both 2020 PSA Creditors as well as other notable parties in interest—
and their respective advisors.  Although, as noted above, I will not disclose the specifics of any
discussions that took place in these informal sessions or in the negotiations under the auspices of
the Mediation Team, the parties and their advisors (legal and financial) actively participated and
strenuously advocated for their respective positions.

22.     Working toward the Court-imposed deadline, and as a result of the months of
negotiations, mediations and informal discussions, on February 9, 2021, the Oversight Board, as
representative of the Commonwealth, reached an amended agreement in principle with GO and
PBA bondholders on the terms of an amended plan of adjustment and a new GO/PBA plan support
agreement.  On February 22, 2021, the agreement was memorialized in the GO/PBA PSA (as later
amended and restated) with holders of in excess of $11.7 billion of CW Bond Claims and PBA
Bond Claims, including certain traditional municipal investors and monoline bond insurers
Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (collectively, "Assured"),

Syncora Guarantee Inc. ("Syncora"), and National Public Finance Guarantee Corp. ("National"), in their limited capacities as agreed in the GO/PBA PSA.  The GO/PBA PSA resolves outstanding disputes with holders of GO Bonds and PBA Bonds, including, but not limited to, disputes concerning the bonds' validity, priority and asserted secured status.  Shortly thereafter, on March 8, 2021 (and pursuant to the Court's directive), the Oversight Board filed the Commonwealth's Second Amended Title III Joint Plan of Adjustment ("Second Amended Plan") [ECF No. 15976] and associated disclosure statement [ECF No. 15977], which reflected the settlements achieved in the GO/PBA PSA.

23.     The constituencies who participated in the above-described negotiations were instrumental in the development of the GO/PBA PSA and the Second Amended Plan.  The negotiations leading to the execution of the GO/PBA PSA were at arm's length and in good faith and led to a compromise of contested positions between the parties to the GO/PBA PSA.  The GO/PBA PSA avoids the time, expense and uncertainty of continued litigation, as well as the risk of an all-or-nothing outcome for both sides, which would have the potential of thwarting the restructuring efforts.

24.     Based on my participation in the settlement discussions, and experience in the negotiation and resolution of other complex restructurings, under the totality of the facts and circumstances, including but not limited to the Certified Fiscal Plan, the Commonwealth's cash resources, and potential risks resulting from then-outstanding litigation, I believe the settlement provided under the GO/PBA PSA constitutes a reasonable settlement of the parties' disputes concerning the GO bonds and PBA bonds.

### C.     Negotiations Concerning the ERS Stipulation

25.     Although the Second Amended Plan provided holders of ERS Bond Claims an option to settle and compromise their claims, significant ERS-related litigation was still pending

concerning, among other things, the validity of the ERS Bonds, the scope and perfection of the

ERS bondholders' alleged security interest, asserted administrative expense, and constitutional

claims by ERS bondholders under the Puerto Rico and U.S. Constitutions based on the

Commonwealth's enactment of PayGo Legislation (collectively, the "ERS Litigation").  Parties to

the ERS Litigation had been engaged in negotiations over various disputes and the treatment of

the ERS Bond Claims in a Commonwealth plan of adjustment, but had not reached agreement by

the time an agreement in principle with GO and PBA bondholders had been finalized.

26.     Accordingly, once the Second Amended Plan was filed, the Oversight Board, again

guided by the Mediation Team, continued to seek a consensual resolution of the ERS bonds and

claims raised by ERS bondholders.  Discussions regarding a consensual resolution to the ERS

Litigation and treatment of the ERS Bond Claims were undertaken in earnest beginning in late

February 2021.  I personally participated in the negotiations.  These sessions included active

participation by the Oversight Board as representative of the Commonwealth and ERS, and two

large ERS bondholder groups (represented by Jones Day and White & Case), as well as the parties'

respective legal and financial advisors.  Pursuant to the Mediation Team's directive, the Oversight

Board and the principal ERS bondholder groups exchanged written proposals in late February and

early March 2021, which were informed by, among other factors, various legal rulings rendered

by the Title III Court, the United States Court of Federal Claims, and the United States Court of

Appeals for the First Circuit concerning the ERS Bonds as well as the outstanding ERS Litigation

and possible outcomes.  I helped develop the proposals prepared and delivered by the Oversight

Board to the various ERS bondholder groups.  I am aware that the formal mediation sessions were

also supplemented by additional informal discussions among the parties and their respective

advisors.  The negotiations, both formal and informal, involved strenuous debate regarding the parties' individual and collective positions.

27.      On March 9, 2021, the Oversight Board, on behalf of the Commonwealth and ERS, on one hand, and various ERS bondholder groups, on the other hand, entered into a *Stipulation (A) Providing for Due Diligence Period, (B) Allowing Claims of ERS Bondholders, (C) Staying Pending Litigation, and (D) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment*.  Among other things, the stipulation provided for a period during which due diligence would be conducted with respect to ERS's private equity portfolio and the parties would negotiate terms concerning its disposition.  I was involved directly in these continued discussions.  The parties ultimately entered into an amended and restated stipulation on April 2, 2021 (the "ERS Stipulation"), which removed the automatic transfer of the private equity portfolio and provided for a put-call framework to account for the disposition of ERS's private equity portfolio.  Over 70% of the ERS bondholders, representing more than $2 billion in asserted claims, have signed on to the ERS Stipulation.  In exchange for the consideration to be provided to ERS Bondholders pursuant to the Plan, all matters comprising the ERS Litigation are to be released.

28.      In my view, the parties involved in the negotiation of the ERS Stipulation invested substantial time and effort in the negotiations, discussed all material facts and theories, and were instrumental in determining the eventual treatment of ERS Bond Claims pursuant to the Plan.  Their participation in the negotiations and development of the ERS Stipulation helped shape a consensual restructuring that includes resolution of the entire ERS Title III Case.  The ERS Stipulation avoids the significant time, expense, and uncertainty that would have been involved if the numerous matters comprising the ERS Litigation had continued to conclusion, including the

risk of a potentially significant adverse judgment either in the US District Court or in the Court of Special Claims.  In addition, the ERS Stipulation built additional support for the global consensual restructuring that had been proposed in the Second Amended Plan and helped to sustain that support going forward.

29.     Under the totality of the facts and circumstances, including the hard-fought negotiations among the Oversight Board and the ERS bondholders, the parties' conflicting positions and the risk of further adverse rulings in either direction, the consideration provided in and litigation resolved by the ERS Stipulation, and the additional support obtained for the resolution of the Title III cases, it is my opinion that the settlement provided for in the ERS Stipulation is reasonable.

**D.     Negotiations Concerning the HTA/CCDA Plan Support Agreement**

30.     The Second Amended Plan also provided for treatment of claims against the Commonwealth by holders and insurers of HTA, CCDA and PRIFA bonds (the "Monoline" insurers) arising from or related to the Commonwealth's retention of certain funds historically appropriated and transferred to HTA, CCDA and PRIFA, respectively (the "Revenue Bond Claims").  However, at the time of the filing of the Second Amended Plan, no specific agreement had been reached with those claim holders.  In fact, I am aware that, at the time of the filing of the Second Amended Plan, significant litigation concerning Revenue Bond Claims against the Commonwealth remained pending between the Oversight Board, as representative of the Commonwealth, on the one hand, and the Monolines (among others), on the other hand, concerning, among other things, alleged property, security interest, trust, or other equitable ownership interests in those certain revenues retained by the Commonwealth.

31.     Following the filing of the Second Amended Plan and execution of the GO/PBA PSA in February 2021, and contemporaneous with negotiations concerning the ERS Stipulation, I

am aware that negotiations occurred regarding the possibility of achieving a consensual resolution of the treatment of the Revenue Bond Claims and restructuring of the HTA Bonds and CCDA Bonds that could involve the Monolines and others.  And, after execution of the ERS Stipulation on April 2, 2021, the focus of the Oversight Board's negotiations continued in respect of the Revenue Bond Claims.

32.     Over the ensuing weeks, I am aware that the Oversight Board and the Monolines (through their respective advisors and directly with one another) engaged in formal mediation sessions as well as informal discussions.  The negotiations sought to resolve any claims arising from or related to the funds historically appropriated and transferred to HTA and CCDA by the Commonwealth, including claims of a property or other interest in those revenues, regardless of whether the revenues were actually transferred by the Commonwealth to HTA and CCDA, respectively.

33.     The mediation sessions, which I attended, were directed by the Mediation Team and required the exchange of written proposals.  The negotiation sessions involved representatives of the Oversight Board, as representative of the Commonwealth and the Puerto Rico Highways and Transportation Authority ("HTA"), and the Monolines, and their legal and financial advisors. I observed and participated in many vigorous discussions concerning the parties' respective positions, and I received and reviewed the proposals presented by the Oversight Board in an effort to achieve settlement of these claims.

34.     As a result of these negotiations, on May 5, 2021, the Oversight Board, as representative of the Commonwealth and HTA, certain holders of HTA Bond Claims, certain holders of CCDA Bond Claims (both as defined in the HTA/CCDA PSA), Assured and National entered into the HTA/CCDA PSA.  The HTA/CCDA PSA was signed by holders of in excess of

$2 billion of claims regarding the HTA Bonds, including more than 85% of HTA 1968 Bonds, nearly 50% of HTA 1998 Senior Bonds, and nearly 40% of holders of claims regarding CCDA Bonds. Among other things, the HTA/CCDA PSA provided the framework to resolve the Revenue Bond Claims against the Commonwealth.

35.     In my opinion, achieving consensual resolution of the Revenue Bond Claims with Assured and National was essential to the eventual treatment of the Revenue Bond Claims against the Commonwealth in the Plan. The HTA/CCDA PSA resolved costly and time-consuming litigation against the Commonwealth as it concerned Assured and National, and avoided uncertainty regarding resolution of that litigation. It was also the linchpin necessary to facilitate negotiations and settlement with other defendants in the Revenue Bond Claims litigation. An adverse ruling in the Revenue Bond Claims litigation would have placed at risk certain revenue streams the Commonwealth had forecasted to be available to pay the PBA Bonds and GO Bonds. In addition, the HTA/CCDA PSA built upon the support garnered for the Second Amended Plan through the GO/PBA PSA and ERS Stipulation. The Oversight Board had now reached agreement on a consensual restructuring with approximately 80% of the GO/PBA bondholders, in excess of 70% of the ERS bondholders, and three of the five Monolines (Assured, Syncora and National).

36.     Based on my participation in the settlement discussions, and experience in the negotiation and resolution of other complex restructurings, under the totality of the facts and circumstances, including but not limited to the Certified Fiscal Plan, the Commonwealth's cash resources, additional support obtained for a consensual restructuring, and potential risks resulting from then-outstanding litigation, I believe the settlement provided for under the HTA/CCDA PSA constitutes a reasonable settlement of the parties' disputes.

16

37.     On May 11, 2021, following entry into the ERS Stipulation and HTA/CCDA PSA, the Oversight Board filed the Third Amended Title III Joint Plan of Adjustment (the "Third Amended Plan") [ECF No. 16740] and associated disclosure statement [ECF No. 16741], which reflected these agreements.

### E.     Negotiations Concerning the UCC

38.     The Third Amended Plan also provided for treatment of claims against the Commonwealth by holders of General Unsecured Claims.  However, at the time of the filing of the Third Amended Plan, no specific agreement had been reached with those claimholders.  In fact, I am aware that, at the time of the filing of the Third Amended Plan, significant litigation concerning General Unsecured Claims against the Commonwealth remained pending between the Oversight Board, as representative of the Commonwealth, on the one hand, and the UCC, on the other hand, concerning, among other issues, the settlement of the GO Priority and Validity litigations, treatment of Commonwealth pensioners, and restrictions on the use of Commonwealth cash. In an effort to garner further support for a consensual plan, additional mediation and negotiating sessions took place with the UCC.  I attended those sessions and believe the debate and exchange of legal theories and economic positions was robust and vigorous.  On July 12, 2021, the Oversight Board, on behalf of the Debtors, reached an agreement with the UCC.  That agreement resolved, among other things, disputes about proposed recoveries for classes of general unsecured creditors.  The agreement was memorialized in a letter dated July 12, 2021.

39.     As a result of the agreement reached with the UCC, on July 12, 2021, the Oversight Board filed the Fifth Amended Title III Joint Plan of Adjustment [ECF No. 17307] and associated disclosure statement [ECF No. 17308].

**F.**     **Negotiations Concerning the PRIFA Plan Support Agreement**

40.     Following entry into the HTA/CCDA PSA, and while discussions were occurring with representatives of the UCC, I continued to participate in negotiations, undertaken with the assistance and guidance of the Mediation Team, between the Oversight Board, on behalf of the Commonwealth, and certain Monolines—Ambac Assurance Corp. ("Ambac") and Financial Guaranty Insurance Company ("FGIC") (neither of which had joined the HTA/CCDA PSA at that time)—concerning a possible consensual restructuring of the PRIFA Bonds and claims against the Commonwealth arising from or related to the PRIFA Bonds.  Over the course of several weeks, there were numerous mediation sessions and informal discussions between representatives of the Oversight Board, Ambac and FGIC, and their respective advisors.   There was compelling advocacy and powerful bargaining exhibited by all participants.

41.     I am aware that, during the course of the negotiations, Ambac and FGIC executed joinders to the HTA/CCDA PSA, subject to the right to terminate the HTA/CCDA PSA, solely as to themselves, on or prior to July 26, 2021.  Meanwhile, negotiations continued among the parties concerning claims related to proceeds of rum tax revenues covered over by the United States government to the Commonwealth and then historically transferred to PRIFA by the Commonwealth, but that had been retained by the Commonwealth in recent years.  As a result of these negotiations, on July 27, 2021, the Oversight Board, as representative of the Commonwealth, certain holders of PRIFA Bond Claims, including Ambac and FGIC (in the limited capacities agreed in the PRIFA Plan Support Agreement), entered into the PRIFA Plan Support Agreement.  As part of that agreement, Ambac and FGIC also agreed to be bound to the terms of the HTA/CCDA PSA, without any further right to terminate.

42.     I believe the positions taken by Ambac and FGIC had major impacts on the development of the Plan insofar as it concerns treatment of Revenue Bond Claims against the

Commonwealth with respect to rum tax revenues historically conditionally appropriated to PRIFA, and because the joinders of Ambac and FGIC to the HTA/CCDA PSA were now binding. The joinders of Ambac and FGIC to the HTA/CCDA PSA and the execution of the PRIFA Plan Support Agreement resolved the remaining Revenue Bond Claims litigation against the Commonwealth as it concerned the Monolines, avoiding the time, expense and uncertainty associated with that litigation. By virtue of the PRIFA Plan Support Agreement, the Oversight Board also obtained additional support for the Plan—which now included the support of all Monolines. Notably, the settlements with the Monolines embedded in the HTA/CCDA PSA and the PRIFA Plan Support Agreement resolve substantial risk for all parties. To the extent the Commonwealth was unsuccessful in the Revenue Bond Claims litigation, the claimholders might have had a property interest in billions of dollars of Commonwealth funds, which would have made the GO/PBA settlement unattainable and brought the restructuring efforts to a halt.

43.    Based on my participation in the settlement discussions, and experience in the negotiation and resolution of other complex restructurings, under the totality of the facts and circumstances, including but not limited to the Certified Fiscal Plan, the Commonwealth's cash resources, the additional support obtained for a consensual restructuring, and the potential risks resulting from then-outstanding litigation, I believe the settlement provided for under the PRIFA Plan Support Agreement constitutes a reasonable settlement of the parties' disputes.

44.    As a result of the agreement reached, on July 27, 2021, the Oversight Board filed the Sixth Amended Title III Joint Plan of Adjustment [ECF No. 17516] and associated disclosure statement [ECF No. 17517].

45.    At a July 29, 2021 hearing on the disclosure statement for the Sixth Amended Title III Joint Plan of Adjustment, the Title III Court approved the disclosure statement subject to

modifications to be made as noted by the Oversight Board and the Title III Court at the hearing. On July 30, 2021, the Oversight Board filed the Plan (the Seventh Amended Title III Joint Plan of Adjustment) [ECF No. 17627] and the associated Disclosure Statement [ECF No. 17628] (each as defined above) reflecting those modifications.

46.    As of the filing of this Declaration, the GO/PBA PSA has the support of over $17.5 billion in CW Bond Claims and PBA Bond Claims (over 94%, based on the results of the CUSIP exchange provided to PJT professionals by Globic Advisors and holdings provided to professionals at PJT by claimholders), the ERS Stipulation has the support of over $2.2 billion in ERS Bond Claims (over 70%, based on the reported holdings of ERS Stipulation signatories), the PRIFA Plan Support Agreement has the support of over $1.4 billion in claims (over 70%, per EMMA filing dated August 5, 2021), and the HTA/CCDA PSA has the support of (i) $384 million of CCDA claims (100%), (ii) over $700 million of HTA 68 claims (over 85%), and (iii) over $2.1 billion of HTA 98 Senior Claims (over 67%, based on the EMMA filing dated July 16, 2021).

## III.    **Amounts Payable under the Plan**

47.    I am familiar with three types of payments to be made upon the Effective Date of the Plan: 1) cash, 2) new debt issued by the Commonwealth in the form of New GO Bonds, and 3) CVIs.  I was not specifically involved in the negotiation of cash payments or other deferred payments for certain pension reserves as provided for in the Plan, which are not addressed in this Declaration.  I understand that topic will be addressed by other declarants.  However, I was intimately involved in the negotiations over and development of consideration to be paid in connection with other claimholders, including, for example, holders of GO Bonds, PBA Bonds, ERS Bonds and the Monolines (in their capacities, among others, as holders or insurers of HTA, CCDA, and PRIFA bonds).

### A.   Cash Payments

48.   The Plan and related transactions provide for the payment of cash on the Effective Date and over time.  The cash consideration proposed to be paid pursuant to the Plan to financial creditors can be summarized as follows:

| ($ in millions) | Class Number | Plan Reference | Amount |
|---|---|---|---|
| CW Bonds Claims and PBA Bond Claims | 1-11, 15-50 | §§ 5.1-15.1, 19.1-54.1 | $6,624 |
| PBA/DRA Secured Claims, PBA General Unsecured Claims, and PBA/DRA Unsecured Claims | 12-14 | §§ 16.1-18.1 | 61 |
| Allowed Dairy Producer Claims | 53 | § 57.1 | 31 |
| Eminent Domain Claims, CW General Unsecured Claims, and Convenience Claims[1] | 54, 58, 68 | §§ 58.1, 62.1, 72.1 | 575 |
| Allowed Med Center Claims | 56 | § 60.1 | 147 |
| ERS Bondholders[2] | 65 | § 69.1 | 444 |
| ERS General Unsecured Claims | 66 | § 70.1 | 1 |
| Federal Claims[3] | 69 | § 73.1 | 1,110 |
| CW/PRIFA Rum Tax Claims | 61 | § 65.1 | 194 |
| PSA Fees[4] | n.a. | §§ 3.3, 3.5-3.9, 86.1(b)(xvi) | 661 |
| **Total** | | | **$9,846** |

Note: Total cash paid on the Effective Date is estimated to be $8.2 billion.

(1) Does not include net recoveries from the Avoidance Actions Trust. Pursuant to Sections 1.273 and 62.1(a) of the Plan, recoveries are subject to a cap of 40%. Any net recoveries by the Avoidance Actions Trust will not count towards attaining such cap. Amount does not reflect (i) up to $15 million in cash from the CW General Unsecured Claims recovery that will fund the Avoidance Actions Trust nor (ii) up to $3 million in cash that may be paid to compensate UCC appointees to the Avoidance Actions Trust Board and their counsel. Includes $65 million in cash estimated to fund Convenience Claims recovery. $575 million of payments to GUC Reserve anticipated to occur in installments through December 31, 2025.

(2) In addition to $373 million of cash upon the Effective Date, reflects right to receive a future payment of $70.75 million from the Commonwealth if the Commonwealth purchases the ERS Private Equity Portfolio.

(3) Payments to Federal Claims anticipated to occur in installments, beginning on the third anniversary of the Effective Date and continuing for forty years thereafter.

(4) Reflects amounts anticipated to be paid by Commonwealth; does not reflect certain fees per HTA/CCDA PSA, including restriction fees and consummation costs. PRIFA PSA and Structuring Fees per PRIFA PSA §§ 6.1-6.2.

### B. New GO Bonds

49. The Plan provides that the Reorganized Commonwealth will issue New GO Bonds on the Effective Date in the form of current interest bonds (CIBs) and capital appreciation bonds (CABs) having an aggregate original principal amount of $7,414 million. The CIBs are issued in an aggregate principal amount and accrue interest over the life of the bond, with interest paid and principal amortized (paid) periodically on certain specified dates. The CABs, on the other hand, are issued at an initial principal amount that accretes at a specified rate, and the accreted principal is paid on certain specified dates. The aggregate amount owed, including all principal and interest over the life of the New GO Bonds from the deemed issuance date of July 1, 2021 to the maturity of the final New GO Bond on July 1, 2046, is $10,915 million.

#### 1. New Current Interest Bonds

50. The current interest bonds consist of $6,683 million in aggregate principal amount of New GO CIBs, in a series of eleven staggered maturity dates spanning from 2023 to 2046. Interest will be paid to creditors each January 1 and July 1 and principal will be paid each July 1 until the New GO CIBs have been paid or satisfied in full in accordance with their terms through the last maturity date of the New GO CIBs in 2046. As discussed below, the Plan provides for the amortization of principal and payment of interest over time to the holders of such bonds, with the final interest payment, as well as any remaining principal, owed on specified maturity dates.

51. The total interest accruing through all eleven maturity dates aggregates to $3,164 million. Accordingly, assuming timely payment, the aggregate amount owed over the life of the New GO CIBs is $9,847 million. The aggregate principal amortization and interest payment ("Total Debt Service") of the New GO CIBs on a yearly basis, as well as the breakdown of the Total Debt Service into potential tax-exempt and taxable portions, is detailed in pages 1-4 of Exhibit I to the Plan.

### 2.      New Capital Appreciation Bonds

52.      The Plan provides for the issuance of two series of capital appreciation bonds (CABs):  (i) $288 million in aggregate original principal amount of New GO 5.0% CABs maturing July 1, 2024 and (ii) $443 million in aggregate original principal amount of New GO 5.375% CABs maturing July 1, 2033 (collectively, the "New GO CABs").  The New GO CABs do not provide for the payment of cash interest to holders over time, but rather for interest to accrete at the specified rate beginning July 1, 2021.  The sum of the principal and accreted interest (at a given time, the "Accreted Value") is then paid on July 1 in certain specified years.  In aggregate, the Accreted Value payments pertaining to the New GO CABs are $1,068 million, composed of: (i) $318 million on account of New GO 5.0% CABs and (ii) $750 million on account of New GO 5.375% CABs.  The payments set forth in Exhibit I of the Plan represent the cash flow obligations over time with respect to the New GO CABs.

### 3.      Aggregate Annual Debt Service[3]

53.      The aggregate annual aggregate tax-supported debt service payments, including those contemplated by the Plan to service the New GO Bonds and the restructured COFINA bonds are as follows:

---

[3]      Based on amounts per Exhibit I to the Plan and May 27, 2021 Certified Fiscal Plan for COFINA.

| ($ in millions) | CIB Principal Amortization | CIB Interest | CAB Accreted Value Amort. | Aggregate GO Debt Service | COFINA | Total Tax-Supported Debt |
|---|---|---|---|---|---|---|
| 7/1/2022 | $373 | $312 | $106 | $790 | $466 | $1,256 |
| 7/1/2023 | 372 | 293 | 106 | 771 | 485 | 1,256 |
| 7/1/2024 | 371 | 274 | 106 | 752 | 504 | 1,256 |
| 7/1/2025 | 369 | 256 | | 625 | 525 | 1,150 |
| 7/1/2026 | 367 | 237 | | 604 | 546 | 1,150 |
| 7/1/2027 | 363 | 219 | | 582 | 568 | 1,150 |
| 7/1/2028 | 358 | 201 | | 559 | 591 | 1,150 |
| 7/1/2029 | 352 | 183 | 150 | 685 | 615 | 1,300 |
| 7/1/2030 | 345 | 165 | 150 | 660 | 640 | 1,300 |
| 7/1/2031 | 336 | 148 | 150 | 634 | 666 | 1,300 |
| 7/1/2032 | 326 | 131 | 150 | 607 | 693 | 1,300 |
| 7/1/2033 | 311 | 118 | 150 | 579 | 721 | 1,300 |
| 7/1/2034 | 294 | 106 | | 400 | 750 | 1,150 |
| 7/1/2035 | 276 | 94 | | 370 | 780 | 1,150 |
| 7/1/2036 | 256 | 82 | | 338 | 812 | 1,150 |
| 7/1/2037 | 234 | 70 | | 304 | 846 | 1,150 |
| 7/1/2038 | 210 | 60 | | 270 | 880 | 1,150 |
| 7/1/2039 | 183 | 50 | | 233 | 917 | 1,150 |
| 7/1/2040 | 154 | 42 | | 195 | 955 | 1,150 |
| 7/1/2041 | 125 | 34 | | 159 | 991 | 1,150 |
| 7/1/2042 | 131 | 28 | | 159 | 991 | 1,150 |
| 7/1/2043 | 136 | 23 | | 159 | 991 | 1,150 |
| 7/1/2044 | 142 | 18 | | 159 | 991 | 1,150 |
| 7/1/2045 | 147 | 12 | | 159 | 991 | 1,150 |
| 7/1/2046 | 153 | 6 | | 159 | 991 | 1,150 |
| **Total** | **$6,683** | **$3,164** | **$1,068** | **$10,915** | **$18,903** | **$29,818** |

## C.   CVIs

54.   The Plan also provides that the Reorganized Commonwealth will issue (i) GO CVIs in the aggregate original notional amount of $3,500 million having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original notional amount of $5,239 million having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051.

55.   The Commonwealth's obligation to pay the CVIs arises only if certain outperformance conditions specified in the Plan and the CVI indenture occur.   Specifically, as discussed in detail below, the Plan provides for the establishment of threshold metrics based on revenue projections contained in the applicable Certified Fiscal Plan (based on the specific formulae relevant to each CVI, described in detail below).   Only if actual revenues exceed the established threshold at the end of a given fiscal year will an obligation to pay come into being

within the amount of the outperformance, and even if it does, such payments are subject to certain annual and lifetime maximum caps.  Accordingly, in my view, payment of CVIs is neutral with respect to the applicable Fiscal Plans as aggregate outperformance will exceed aggregate potential payments to CVIs.

56.     As mentioned, the payments to CVIs are subject to certain annual and cumulative lifetime dollar caps, as specified in the Plan.  Accordingly, the maximum *potential* annual and aggregate lifetime payments, assuming an obligation to pay arises at all, are projected as follows:

| (*$ in millions*) | GO CVI | Clawback CVI (ex. PRIFA) | Clawback CVI (PRIFA) | Total |
|---|---|---|---|---|
| 7/1/2022 | $200 | $128 | $77 | $405 |
| 7/1/2023 | 200 | 128 | 77 | 405 |
| 7/1/2024 | 200 | 128 | 77 | 405 |
| 7/1/2025 | 200 | 128 | 77 | 405 |
| 7/1/2026 | 200 | 128 | 77 | 405 |
| 7/1/2027 | 200 | 128 | 77 | 405 |
| 7/1/2028 | 200 | 128 | 77 | 405 |
| 7/1/2029 | 200 | 128 | 77 | 405 |
| 7/1/2030 | 200 | 128 | 77 | 405 |
| 7/1/2031 | 200 | 128 | 77 | 405 |
| 7/1/2032 | 200 | 128 | 77 | 405 |
| 7/1/2033 | 200 | 128 | 77 | 405 |
| 7/1/2034 | 200 | 128 | 77 | 405 |
| 7/1/2035 | 200 | 128 | 77 | 405 |
| 7/1/2036 | 200 | 128 | 77 | 405 |
| 7/1/2037 | 200 | 128 | 77 | 405 |
| 7/1/2038 | 200 | 128 | 66 | 393 |
| 7/1/2039 | 100 | 128 | – | 228 |
| 7/1/2040 | – | 274 | – | 274 |
| 7/1/2041 | – | 274 | – | 274 |
| 7/1/2042 | – | 274 | – | 274 |
| 7/1/2043 | – | 274 | – | 274 |
| 7/1/2044 | – | 274 | – | 274 |
| 7/1/2045 | – | 269 | – | 269 |
| 7/1/2046 | – | – | – | – |
| 7/1/2047 | – | – | – | – |
| 7/1/2048 | – | – | – | – |
| 7/1/2049 | – | – | – | – |
| 7/1/2050 | – | – | – | – |
| 7/1/2051 | – | – | – | – |
| **Total** | **$3,500** | **$3,937** | **$1,302** | **$8,739** |

Source: Plan Exhibits J and M.

The maximum potential aggregate lifetime payments under the CVIs is $8,739 million.

25

IV.     **Consistency with Fiscal Plan**

57.     I have reviewed the Commonwealth's Fiscal Plans, including the most recent Fiscal Plan certified by the Oversight Board on April 23, 2021 (the "2021 Fiscal Plan"). It is my understanding based on this review that the 2021 Fiscal Plan provides a blue print for the Commonwealth to achieve, among other things, fiscal responsibility and access to capital markets. The 2021 Fiscal Plan contains a debt sustainability analysis ("DSA"), which creates a range established by the Oversight Board as the amount of debt and long-term capacity of the Government to pay debt service on its debt. Per my understanding of the 2021 Fiscal Plan, which contains the DSA, the aggregate original principal amount and Total Debt Service of the New GO Debt and COFINA debt falls within the bounds of the debt range implied by the DSA.

58.     The cash payments due on the Effective Date do not count as debt for purposes of the DSA because the cash payments do not create a debt obligation after the Effective Date. Any cash payments under the CVIs do not count as debt for purposes of the DSA because the CVIs are only payable out of outperformance. The CVI payments are contingent in nature and are, by definition, paid from cash available relative to baseline Fiscal Plan projections, as applicable.

59.     Accordingly, the payments contemplated under the Plan are, in my opinion, consistent with the applicable Fiscal Plan.

V.      **The Terms and Structure of the CVIs**

A.      **Rationale for CVIs**

60.     The Plan provides for the issuance of CVIs on the Effective Date. A CVI is an instrument that gives a holder the right to receive payments if certain financial metrics are achieved. The development of the CVIs included a review of comparable structures issued by municipalities, countries, states, sovereignties, or other industries or markets in which CVIs have been utilized. In my experience, contingent instruments are commonly used in restructuring

26

transactions, both in corporate cases and in settings involving sovereign entities. The CVIs contemplated by the Plan include revenue-based performance benchmarks, and provide payments to CVI holders, but only if the benchmarks are exceeded—and further, only with respect to certain portions of that outperformance. The CVIs under the Plan limit any obligation to pay to those situations in which (i) SUT revenues (defined below) exceed the projections for the 2020 Fiscal Plan and/or (ii) Rum Tax revenues exceed the projections for the 2021 Fiscal Plan, as described in greater detail below.

61.     The CVIs served a vital purpose in the negotiations for the debtors and creditors. For creditors who believed the Fiscal Plan understated projected revenues, the CVI provided them additional distributions if they were correct. Conversely, the Debtors could protect themselves by committing to greater distributions to creditors only if actual results exceeded projections. For the purposes of the negotiation, the CVIs provided to creditors reduced the amount of cash and debt consideration required in the Plan, consistent with the Oversight Board's revised outlook in the aftermath of the COVID-19 pandemic.

62.     The Commonwealth collects or receives various types of revenues each year (for example, individual income taxes and corporate income taxes, sales and use taxes ("SUT"), and transfers from the Federal government). The metrics underlying the various outperformance conditions related to the CVIs are tied to the following revenues: (i) an amount calculated to represent the portion of the SUT that corresponds to a 5.5% tax rate ("5.5% SUT"), and (ii) federal excise taxes on rum produced in Puerto Rico (the "Rum Tax") covered over by the U.S. government to the Commonwealth.

63.     I understand the Commonwealth's 2020 and 2021 Fiscal Plans are modeled on the Oversight Board's projections as to the Commonwealth's collection of 5.5% SUT and receipt of

Rum Tax cover over through 2051. The outperformance conditions for the CVIs are based on the Commonwealth exceeding the applicable baselines in a given year. Accordingly, the CVIs are designed to permit holders of CVIs, in effect, to "share" in incremental future 5.5% SUT and Rum Tax cover over cash flows *beyond* what is projected by the 2020 and 2021 Fiscal Plans, respectively.

64. In operation, the actual 5.5% SUT and Rum Tax revenues are measured against the 2020 Fiscal Plan and 2021 Fiscal Plan, respectively, to determine: (1) whether the outperformance metric has been met; and (2) if so, the amount of the Commonwealth's general obligation to holders of CVIs. The actual 5.5% SUT and Rum Tax revenues are therefore not actually shared or allocated to pay holders of CVIs; they only serve as a trigger in calculating potential outperformance. Any payments due to holders of CVIs are payable by the Commonwealth on a *pari passu* basis with other general obligation debt.

65. From the perspective of the Commonwealth, this mechanism limits the Commonwealth's obligation to pay the CVIs only to those fiscal years in which revenues outperform the applicable baseline and, further, limits the amount of that obligation to only a portion of such outperformance. Should actual revenues be less than the applicable baseline, the Commonwealth will have no obligation to make payment with respect to the applicable CVIs. Because the Commonwealth will retain a portion of the amount of revenue outperformance, incentives exist for the Commonwealth to achieve the applicable outperformance conditions in any given year and for every year.

66. In sum, the CVIs are designed to (i) not impact the Commonwealth's debt sustainability as determined by the Oversight Board in the Fiscal Plan; (ii) share outperformance

with the Commonwealth to provide aligned incentive for outperformance; and (iii) allow for holders of CVIs to participate monetarily in a portion of such outperformance.

**B.    Key Terms of CVIs**

**1.    SUT-based CVI Outperformance Conditions**

67.    Outperformance for CVIs under the Plan is calculated by comparing actual tax revenues at the end of a given Fiscal Year to a specified baseline, which is derived from tax revenue projections in the 2020 and 2021 Fiscal Plans.  Specifically, with respect to CVIs utilizing SUT-based conditions, the baseline amount is the projection underlying the 2020 Fiscal Plan for 5.5% SUT excluding CINE funds of $3.24 million per year for fiscal years 2022 to 2051 (the "SUT Baseline").  A chart that depicts the SUT Baseline over time is attached to the Plan as Annex 5 to Exhibit J.  At the end of each fiscal year, the cumulative outperformance and the annual outperformance above the SUT Baseline for that year will be calculated.  Holders of CVIs utilizing SUT-based conditions (on an aggregate basis) will be entitled to receive the lesser of: (i) 90% of the cumulative outperformance (less prior distributions on account of the applicable SUT-based CVI) and (ii) 95% of the annual outperformance, if any.  The Commonwealth retains the remaining proportion of the outperformance amount (10% of cumulative or 5% of annual outperformance, as applicable).  The amount eligible for distribution for SUT-based outperformance is then distributed to GO CVI holders and Clawback CVI holders according to the respective formulae specified in the Plan.

68.    By way of illustration, the below chart shows the calculated outperformance amount, the amount retained by the Commonwealth, and the amounts distributed to SUT-based CVI holders *if* the actual revenues for future years are the amounts projected in the 2021 Fiscal Plan.  The numbers in the 2021 Fiscal Plan shown as outperformance are *only for illustrative purposes*—the calculation of the outperformance, if any, will take place at the end of the Fiscal

Year based on *actual* revenues collected.  Accordingly, projections that show the CVIs utilizing
SUT-based conditions as receiving payments do not indicate that outperformance will actually be
achieved. The following chart prepared under my supervision and direction illustrates the nature
of the calculations.

**ILLUSTRATIVE SUT CVI PAYMENTS ASSUMING APRIL 2021 FISCAL PLAN[4]**
($ in millions)



### 2.    Rum Tax-based Outperformance Conditions

69.    With respect to the CVI provided to PRIFA creditors, the outperformance
conditions depend on both the SUT-based conditions described above, as well as outperformance
of Rum Tax receipts. For this latter condition, the baseline is the amount of Rum Tax allocated to
the Commonwealth's general fund, as projected in the 2021 Fiscal Plan for fiscal years 2022 to
2051 (the "Rum Tax Baseline").  Each year, the Rum Tax is assessed and collected by the United
States, and subsequently covered over to the Commonwealth based on a United States statute that
has been periodically amended.   The 2021 Fiscal Plan projects for a certain portion to be

---

[4]      Source: Exhibit J to the Plan; April 2021 Fiscal Plan.

appropriated to and covered over to the Commonwealth based on a base amount of $10.50 per proof-gallon cover-over rate (although the base amount is $13.25 per proof-gallon cover-over rate for the rest of calendar year 2021). Of the total amount appropriated and covered over, certain portions are allocated to the following entities: a Science and Technology Trust, the rum producers (as an incentive), the Conservation Trust, and PRIDCO. The remaining amount is allocated to the general fund each year, which amount, as mentioned above, serves as the Rum Tax Baseline. Amounts that are covered over to the Commonwealth on account of the Rum Tax that exceed the Rum Tax Baseline is the outperformance amount.

70.     At the end of each fiscal year, the cumulative outperformance and the annual outperformance above the Rum Tax Baseline for that year will be calculated. Holders of Rum Tax-based CVIs (on an aggregate basis) will be entitled to receive the lesser of: (i) 40% of the cumulative outperformance (less prior distributions on account of Rum Tax-based CVI payments), (ii) 50% of the annual outperformance, and (iii) $30 million. The Commonwealth retains the remaining portion of the outperformance amount, if any (*i.e.*, 60% of cumulative outperformance or 50% of annual outperformance, and, if the in-year payment to CVI holders has reached $30 million, any additional amounts available, as applicable). Additionally, the Commonwealth retains outperformance on account of an increase in the base cover over (i.e., above $10.50 / proof-gallon) above $88 million annually. As with the SUT-based CVIs, the obligation to make a payment to bondholders is a general obligation of the Commonwealth and *pari passu* with other Commonwealth obligations.

71.     Rum Tax outperformance may occur for various reasons, such as if the rate of cover-over by the United States is above $10.50 per proof-gallon (which is the cover over as projected in the 2021 Fiscal Plan for calendar years 2022 and beyond) and/or rum consumption

31

increases.  By way of illustration, the below chart prepared under my supervision and direction

shows the calculated outperformance amount, the amount retained by the Commonwealth, and the

amount distributed to Rum Tax-based CVI holders if the U.S. government extends the future rate

of appropriation and cover-over (which is currently $13.25 per proof-gallon but is set to decrease

to $10.50 per proof gallon at the end of calendar year 2021 absent extending legislation) to remain

at $13.25 per proof-gallon. As with the SUT projection, the hypothetical projection of

appropriation and cover-over is only for illustrative purposes—the calculation of the

outperformance, if any, will take place at the end of the Fiscal Year based on *actual* Rum Tax

cover-over received and deposited to the general fund after allocation to the other entities specified.

**ILLUSTRATIVE RUM TAX-BASED CVI PAYMENTS BASED ON APRIL 2021
FISCAL PLAN, WITH ASSUMPTION THAT $2.75/PROOF-GALLON
SUPPLEMENTAL COVER OVER EXTENDED BEYOND CY2021[5]**
($ in millions)



---

[5]          Source: Exhibit M to the Plan. Prepared under my supervision and direction.

32

### 3.     Annual and Lifetime Caps on Payment

72.     In addition to being contingent on achieving revenue outperformance, CVIs provide for dollar amount annual and lifetime maximum payments.  Annual caps may include amounts from previous year carryforwards, but are subject to a total annual specified dollar cap, as described in the Plan.  The annual caps and lifetime caps applicable to the CVIs can be summarized in the following chart prepared under my supervision and direction as follows:

| ($ in millions) | GO CVI | Clawback CVI | PRIFA Rum Tax CVI |
|---|---|---|---|
| Metric to Measure Outperformance | 5.5% SUT (2020 FP) | 5.5% SUT (2020 FP) | Rum Tax (2021 FP) |
| Term | 22 years | 30 years | 30 years |
| Lifetime Cap ($) | $3,500 | $5,239 | $1,302[1] |
| Annual Cap ($) | $200 | Years 1-22: $175 Years 23-30: $375 | $30 |
| Maximum Annual Payment ($) | $400 | Years 1-22: $350 Years 23-30: $750 | $30 |
| **Subject to Waterfall Sharing % (Lesser of)** | | | |
| Cumulative | | 50% | n.a. |
| Annual | | 75% | n.a. |
| **Not Subject to Waterfall Sharing % (Lesser of)** | | | |
| Cumulative | n.a. | 40% | 40% |
| Annual | n.a. | 95% | 50% |

(1) PRIFA Rum Tax CVI lifetime cap included in Clawback CVI Lifetime Cap (i.e., not incremental).

### 4.     CVI Recipients

73.     On the Effective Date, the CVIs will be distributed to various holders of claims specified in the Plan.  As set forth in Annex 3 to Exhibit J of the Plan, GO CVIs, which utilize solely SUT-based conditions, will be allocated as follows to the following classes of claims:

| GO CVI Allocation Summary | | |
|---|---|---|
| **Claim** | **Applicable Classes** | **GO CVI Allocation %** |
| Vintage CW Bond Claim | Classes 15, 16, 17, 18, 19, 20, 21, 22 | 32.244% |
| 2011 CW Series D/E/PIB Bond Claim | Classes 36, 37, 38, 39 | 3.514% |
| 2011 CW Bond Claim | Classes 30, 31, 32, 33 | 2.479% |
| 2012 CW Bond Claim | Classes 40, 41, 42, 43 | 15.157% |
| 2014 CW Bond Claim, 2014 CW Guarantee Bond Claims | Classes 46, 47, 48, 49, 50 | 20.266% |
| Vintage CW Guarantee Claims | Classes 23, 24, 25, 26, 27, 28, 29 | 15.194% |
| 2011 CW Guarantee Bond Claims | Classes 34, 35 | 7.552% |
| 2012 CW Guarantee Bond Claims | Classes 44, 45 | 3.594% |

74.     As set forth in Annex 4 to Exhibit J of the Plan, SUT-based Clawback CVIs will be issued to the holders (including insurers) of the following claims in the following allocation:

| Clawback CVI Allocation Summary | | |
|---|---|---|
| **Claim** | **Applicable Classes** | **Clawback CVI Allocation %** |
| CW/HTA Claims | Class 59 | 68.6% |
| CW/Convention Center Claims | Class 60 | 4.0% |
| CW/PRIFA Rum Tax Claims | Class 61 | 27.0% |
| CW/MBA Claims | Class 62 | 0.4% |

75.     With respect to CW/PRIFA Rum Tax Claims (claims arising from PRIFA Bonds), holders or insurers of PRIFA Bonds will receive CVIs that combine the 27.0% allocation of SUT-based Clawback CVIs and all Rum Tax-based CVI under one indenture.

76.     The allocation of the CVIs to various claim types is a product of arms'-length and hard-fought negotiations with the holders of those claims, culminating in the applicable PSAs and ultimately, the Plan.

**C.      The CVIs are Fair and Reasonable Under the Circumstances**

77.     In my experience, the CVIs to be issued pursuant to the Plan are consistent with the use of contingent instruments in restructuring transactions and their terms are within the general scope of contingent instruments utilized in other large, complex restructurings. Specifically,

34

contingent instruments (for example, warrants in corporate cases) are common in circumstances where creditors dispute the future value of an asset. More tailored contingent instruments, such as these CVIs, are used in situations where monetization of new equity issued pursuant to a plan is difficult, or, as here, non-existent. The CVIs employ an outperformance metric that is objective and reliable. The limitations imposed on payment of CVIs, both in terms of annual and cumulative outperformance calculations and annual and lifetime payment caps, reflect the potential ebb and flow of tax revenues over time and seek to avoid outsized payments in any particular year or a windfall to the CVI holders. The CVI provides a mechanism that, on the one hand, ensures the Commonwealth will not be obligated to pay more debt than it could afford, and on the other hand, provides the holder of the CVI the chance to participate in the financial upside if projections are exceeded. Accordingly, I believe the CVIs are fair and reasonable in light of the global resolution embodied by the Plan.

## VI.    Plan Settlement Fees[6]

### A.    PSA Fees under the Plan

78.    The Plan and related transactions provide for the payment of various fees and costs agreed-to under the various settlement agreements (collectively, the "PSA Fees"). The PSA Fees are listed below. As discussed in detail in Parts VI.B–D, the PSA fees are in my view, among other things, (i) in exchange for the pre-confirmation obligations incurred by fee recipients, including the agreement to "lock up" their bonds and to support Plan confirmation, and the efforts of recipients to structure, negotiate, execute, and deliver the PSAs, (ii) essential to incentivizing applicable parties to negotiate and enter into the PSAs, (iii) of relatively small magnitude when

---

[6]    Capitalized terms used but not otherwise defined in this Section VI shall have the same meanings given to such terms as in the Plan, and if not defined therein, as in the applicable PSA.

compared to the respective claims and the remaining consideration anticipated to be distributed to applicable claimholders per the Plan, (iv) the consequence of the hard-fought and arms'-length negotiations engaged in by the parties to the various settlements, and (v) an integral part of the entire settlement struck among the PSA parties.

79.     It is important to understand that when creditors engage in negotiations, their respective professionals frequently negotiate deals and documents that are ultimately used by all claimholders in their classes.   Therefore, the benefit of the documentation and associated consideration is for all creditors within a class, but only those creditors directly involved in the negotiations are obligated to pay advisors' fees.  This disproportionate burden is one of the primary reasons why fees are required to develop and document settlements.   Some fees can also compensate applicable creditors for other benefits received by the Debtors, such as the benefit of creditors becoming restricted from trading while negotiating a settlement and, should those creditors sell their claim, of having any subsequent purchasers committed to the negotiated settlement.

80.     Pursuant to the GO/PBA Plan Support Agreement, the Plan provides for the following PSA Fees:

- *GO/PBA Consummation Costs.*  Creditors party to the GO/PBA Plan Support Agreement at its execution on February 22, 2021 (Initial GO/PBA PSA Creditors) are entitled to a pro rata share of cash in an amount equal to 1.50% of the aggregate amount of such holders' or insurers' PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (without duplication).  The GO/PBA Consummation Costs are in consideration for the fees and expenses incurred by such holders or insurers in connection with the negotiation and execution of the GO/PBA Plan Support Agreement and the prosecution of the approval of the Disclosure Statement and confirmation of the Plan.

- *GO/PBA Restriction Fee.* GO/PBA PSA Creditors will receive a GO/PBA Restriction Fee in an aggregate amount equal to the product of (a) 1.321% times (b) the outstanding principal amount of GO Bonds and PBA Bonds held on the effective date, plus interest accrued thereon during the period up to, but not including, the Commonwealth Petition Date and the PBA Petition Date, respectively.  The GO/PBA Restriction Fee is in

consideration for executing the GO/PBA Plan Support Agreement and agreeing to tender and "lock-up" such party's bonds in accordance with the terms of the GO/PBA Plan Support Agreement.

- **Retail Support Fee**.  In the event that a class of Retail Investors (Classes 7, 9, 11, 16, 31, 38, 41, and 47) votes to accept the Plan, the members of such class shall be entitled to receive their pro rata share of such class's allocable share of up to Fifty Million Dollars ($50,000,000.00) in an amount equal to (a) 1.321% times (b) the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim, held by such accepting Class of Retail Investors.  The balance of the Retail Support Fee remaining after initial allocation to accepting Retail Investor classes will be reallocated pro rata to accepting Retail Investor classes and Initial GO/PBA Restriction Fee Creditors.

81.    As Retail Investors were initially not eligible to join the GO/PBA PSA, the Retail Support Fee was designed to deliver the same amount of fee consideration, as a percentage of claim amount held, to Retail Investors as to recipients of the GO/PBA Restriction Fee.  Thus the Retail Support Fee was designed to achieve economic parity for Retail Investors *vis-à-vis* the recipients of the GO/PBA Restriction Fee without requiring Retail Investors to sign the GO/PBA PSA and agree to its terms and conditions, including the obligation to support the Plan and the "lock up" provisions.

82.    However, following the initial entry into the GO/PBA PSA, the Initial GO/PBA PSA parties amended the original agreement to expand the number of creditors eligible to receive the fee and consequently facilitate an exchange to provide an alternate CUSIP identifier for the PSA bonds. With that revised agreement, retail creditors were provided the option to either (i) participate in the exchange with all other bondholders, thereby receiving the same PSA fee as other Restriction Fee parties, or (ii) as originally contemplated, receive the Retail Support Fee if the creditor identifies as a retail investor and the retail class votes to accept the Plan.

83.    Pursuant to the ERS Stipulation, the Plan provides for the following PSA Fee:

- **ERS Restriction Fee**.  In exchange for executing and delivering the ERS Stipulation, and agreeing to all its terms and conditions, including to "lock-up" ERS Bonds in accordance

37

with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee) will be entitled to receive, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims held as of April 2, 2021) of $75,000,000.00.

84.     The HTA/CCDA PSA provides for the following PSA Fees:

- *HTA Consummation Costs.* To compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA PSA and HTA transactions related to the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of HTA 68 Bond Claims or HTA 98 Senior Bond Claims, will be entitled to receive an amount equal to 1.00% of such claims, payable as an administrative expense claim, in an aggregate amount not greater than $125,000,000.00.  The HTA Consummation Costs will not be paid pursuant to the Plan, but rather will be paid by HTA pursuant to a plan of adjustment to be filed by the Oversight Board, as representative of HTA in the HTA Title III Case.

- *HTA Restriction Fee.* In exchange for executing the HTA/CCDA PSA, and agreeing to all its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA PSA, subject to the entry of the Confirmation Order, each HTA Restriction Fee Creditor holding or insuring HTA 68 Bonds or HTA 98 Senior Bonds will be entitled to receive the HTA Restriction Fee in the form of an allowed administrative expense claim, payable in cash in an amount equal to the HTA Restriction Fee Percentage multiplied by the aggregate amount of HTA 68 Bonds and HTA 98 Senior Bonds held or insured by such HTA Restriction Fee Creditor as of the expiration of the HTA/CCDA PSA Restriction Fee Period. In all circumstances, the sum of the aggregate HTA Restriction Fee plus the HTA Consummation Costs shall not exceed $125,000,000.00. The HTA Restriction Fee will not be paid pursuant to the Plan, but rather will be paid by HTA pursuant to a plan of adjustment to be filed by the Oversight Board, as representative of HTA in the HTA Title III Case, if and when such plan is confirmed.

- *CCDA Consummation Costs*. To compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA PSA and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, will be entitled to receive an amount equal to 1.00% of such Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than $15,000,000.00.

- *CCDA Restriction Fee*. In exchange for executing the HTA/CCDA PSA, and agreeing to all its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA PSA, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds will be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in cash in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims held or insured by such CCDA Restriction Fee Creditor as of the expiration of the

38

HTA/CCDA PSA Restriction Fee Period.  In all circumstances, the sum of the aggregate
PSA Restriction Fee plus the Consummation Costs attributable to a CCDA Holder's
CCDA Bond Claims shall not exceed $15,000,000.00.

- ***Clawback Structuring Fees***. In exchange for executing the HTA/CCDA PSA, agreeing to
  all its terms and conditions, and structuring the payments to be made in accordance with the
  Settlement Summary annexed thereto as Exhibit "J", subject to the entry of an order
  approving the transactions contemplated by the HTA/CCDA PSA related to the Plan, on the
  HTA Effective Date, Assured and National shall be entitled to receive, and the
  Commonwealth shall pay, in cash, to Assured and National the amounts of $39,300,000.00
  and $19,300,000.00, respectively.

85.     The PRIFA Plan Support Agreement provides for the following PSA Fees:

- ***PRIFA Restriction Fee.*** In exchange for executing the PRIFA Plan Support Agreement,
  and agreeing to all its terms and conditions, including the agreement to "lock-up" its
  bonds in accordance with the terms of the PRIFA Plan Support Agreement, subject to the
  entry of an order approving a qualifying modification of bonds issued by PRIFA pursuant
  to Title VI of PROMESA (the "PRIFA Qualifying Modification"), each PSA Restriction
  Fee Creditor holding or insuring PRIFA Bonds will be entitled to receive the PSA
  Restriction Fee in the form of an allowed administrative expense claim, payable in cash
  in an amount equal to the Restriction Fee Percentage multiplied by the aggregate amount
  of PRIFA Bonds held or insured by such Restriction Fee Creditor as of the expiration of
  the PSA Restriction Fee Period. In all circumstances, the aggregate PSA Restriction Fee
  shall not exceed $10,000,000.00.  The PRIFA Restriction Fee is to be paid by the
  Commonwealth on the effective date of the PRIFA Qualifying Modification.

- ***Rum Tax Structuring Fee.*** In exchange for executing the PRIFA Plan Support
  Agreement, agreeing to all its terms and conditions, and structuring the payments to be
  made in accordance with the Settlement Summary annexed thereto as Exhibit "F",
  subject to the entry of the order approving the PRIFA Qualifying Modification, on the
  effective date of the PRIFA Qualifying Modification, the Commonwealth shall pay, in
  cash, the Rum Tax Structuring Fees to Ambac and FGIC in the amounts of
  $34,750,000.00 and $21,750,000.00, respectively.

86.     The aggregate restriction fees and other fees total to $600 million.  The aggregate

consummation costs total $201 million.  In total, the PSA Fees aggregate to $801 million. This

represents 2.6% of the $30.5 billion of allowed claims receiving fees (which excludes Metropolitan

Bus Authority and general unsecured claims) and 2.4% of the $33.3 billion in total allowed claims

(which includes the Metropolitan Bus Authority and estimated general unsecured claims). The

PSA Fees can be summarized in the below chart prepared under my supervision and direction as follows:

| ($ in millions) | GO / PBA | ERS | HTA[1] | CCDA[2] | PRIFA[3] | Total |
|---|---|---|---|---|---|---|
| **Consummation Costs** | | | | | | |
| Fee ($) | $177 | $– | $23 | $1 | $– | **$201** |
| Claims Receiving ($) | 11,779 | – | 2,252 | 150 | – | |
| % of Claims Receiving | 1.5% | – | 1.0% | 1.0% | – | |
| % of Total Claims | 0.9% | – | 0.4% | 0.4% | – | |
| **Retail Support Fee** | | | | | | |
| Fee ($) | $50 | $– | $– | $– | $– | **$50** |
| Claims Receiving ($) | n.a. | – | – | – | – | |
| % of Claims Receiving | 1.3% | – | – | – | – | |
| % of Total Claims | n.a. | – | – | – | – | |
| **Restriction Fees** | | | | | | |
| Fee ($) | $234 | $75 | $102 | $14 | $10 | **$435** |
| Claims Receiving ($) | 17,735 | 2,256 | 3,324 | 384 | 1,478 | |
| % of Claims Receiving | 1.3% | 3.3% | 3.1% | 3.5% | 0.7% | |
| % of Total Claims | 1.2% | 2.4% | 1.6% | 3.5% | 0.5% | |
| **Structuring Fees[4]** | | | | | | |
| Fee ($) | $– | $– | $55 | $4 | $57 | **$115** |
| Claims Receiving ($) | – | – | 2,147 | 150 | 1,101 | |
| % of Claims Receiving | – | – | 2.6% | 2.6% | 5.1% | |
| % of Total Claims | – | – | 0.9% | 1.0% | 2.9% | |
| **MEMO** | | | | | | |
| Total Claims | $18,754 | $3,169 | $6,258 | $384 | $1,929 | **$30,493** |
| Total Fees | 461 | 75 | 180 | 19 | 67 | **801** |
| Total Fees Paid by Commonwealth | 461 | 75 | 55 | 4 | 67 | **661** |

Source: Plan, HTA/CCDA PSA, and PRIFA PSA.

(1) HTA Consummation Costs and PSA Fee paid pursuant to HTA Plan. Receiving claims as of HTA petition date, aggregate HTA claim as of Commonwealth petition date.

(2) CCDA Consummation Costs and PSA Fee contemplated to be paid from CCDA funds.

(3) Claims shown as of Commonwealth petition date.

(4) Assured / National Structuring Fee illustratively allocated pro rata to HTA and CCDA based on claims receiving the fee.

## B.    Obligations of Fee Recipients

87.    The PSA Fee recipients, as signatories to plan settlements, are required under the respective settlement agreements to undertake or refrain from taking certain actions, including: not to sell or otherwise transfer their applicable claims, not to file any additional proofs of claim against the Commonwealth, to support approval of the Disclosure Statement, to support the

continued stay of various litigation proceedings, to vote for the Plan, to support prosecution and

confirmation of the Plan, and to not vote for, consent to, or support any modification of the Plan

or a Plan that is not proposed by the Oversight Board.

      **C.**     **Consideration for Consummation Costs, Restriction Fees, and Structuring Fees**

88.     The PSA Fees were bargained-for during the course of Plan negotiations and are

not on account of PSA Fees recipients' claims. The consummation costs are provided in

consideration of the fees and expenses incurred by holders or insurers of settled claims in

connection with the negotiation and execution of their applicable PSA and, among other things,

the prosecution of the approval of the Disclosure Statement and confirmation of the Plan, which

has taken a significant amount of time and effort to negotiate and file due to the complexity of

these cases and intervening external events that complicated the situation such as natural disasters

and  the COVID-19 pandemic.  As consideration for their efforts in assisting in the formulation of

the Plan (which has garnered significant creditor support), continuing to assist in the finalization

of definitive agreements and ancillary documents, and the costs incurred in those and other efforts,

the Oversight Board determined that it was fair and reasonable for the recipients to be paid the

consummation costs.

89.     The restriction fees are to compensate signatories to the PSAs for, among other

things, executing the applicable PSA and agreeing to all its terms and conditions, including the

agreement to support the Plan and "lock-up" their respective bonds in accordance with the terms

of the PSA.  Such a restriction on the transfer of their bonds greatly increases the chances the

signatories to the PSA will participate in and support the Plan, thereby increasing the chances that

Plan confirmation can be achieved.

90.     The structuring fees are to compensate signatories to applicable PSAs for their efforts in developing the consideration and mechanics in connection with Clawback CVIs (in the case of Clawback Structuring Fees) and Rum Tax-based CVIs (in the case of Rum Tax Structuring Fees).

### D.     PSA Fees are Fair and Reasonable Under the Circumstances

91.     As discussed above, the PSA Fee recipients negotiated the terms of the Plan settlements and were integral to the development of the Plan settlements.  Over the course of years of negotiations, PSA Fee recipients, through their contributions to the development of Plan settlements, benefited all stakeholders within their respective classes.  The inclusion of such fees in the respective PSAs, based on my understanding and participation in the negotiations leading to each agreement described above, was essential to incentivize the parties to negotiate for an extended period of time.

92.     Additionally, and based on my observations, the PSA Fees incentivized the applicable parties to support, and undertake actions that support, confirmation of the Plan, including support for the approval of the Disclosure Statement.  Without PSA Fees, building consensus and encouraging parties to engage in negotiations, bargain for their applicable positions, and ultimately document their agreements would have been significantly more difficult.  Without such participation and support, chances of resolution, Plan development, and Plan confirmation would have been diminished or would have substantially prolonged these cases.

93.     The PSA Fees are also a consequence of the hard-fought and arms'-length negotiations engaged in by the parties to the various settlements and are an integral part of the entire settlement struck among the PSA parties.  And, in my experience, fees and costs similar to the PSA Fees are a customary component of settlements in large, complex restructurings.  They are included in many complex restructurings in which I have been involved.  Accordingly, the

PSA Fees are fair and reasonable in light of the global resolution achieved by the settlements culminating in the Plan.

## VII.    <u>Releases, Exculpation and Injunction Provisions</u>

94.     The Debtors and claimholders agreed to discharge and release certain Claims and Causes of Action against one another in furtherance of the complete resolution of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case, and the Debtors' collective and individual restructuring.  These agreements are premised, in part, on the need for certainty that claims arising, in whole or in part, before the Effective Date would be resolved once the Plan is confirmed.

95.     As described below, I believe, based on my review of the Plan, my participation in the negotiation of the PSAs, and my prior restructuring experience, the release, exculpation and injunction provisions in the Plan are essential to the Debtors' restructuring, and a consensual restructuring could not be successfully accomplished without these provisions.

### A.     The Releases are Appropriate and Essential to the Reorganization

96.     The Plan's release provisions include, among other provisions, subject to certain exclusions as set forth in the Plan, (i) a release by the GO/PBA Creditors (solely in their capacity as Creditors of the Debtors), which includes the Monolines, against certain government parties, including the Oversight Board, AAFAF, and the Debtors, of certain Claims and Causes of Action arising prior to the Plan Effective Date, including the Revenue Bond Claims litigation and the Lift Stay Motions, and (ii) a release by the Debtors and Reorganized Debtors of Claims and Causes of Action related to the Debtors and their assets in the Title III Cases.  For the reasons described below, I believe the releases contemplated by the Plan are appropriate and essential to the Debtors' successful reorganization.

### 1.   Consensual Releases by GO/PBA Creditors

97.     The Plan's release of Claims or Causes of Action by the GO/PBA PSA Creditors against the Oversight Board, its committees and subcommittees, AAFAF, and the Debtors, of certain Claims and Causes of Action, including those related to the Revenue Bond Claims Litigation and Lift Stay Motions, is a key component of the Plan and explicitly agreed-to by the releasing parties.  Litigation over such Claims and Causes of Action was hard-fought and remained active as between the Commonwealth, on the one hand, and the Monolines (who would ultimately become GO/PBA PSA Creditors) on the other, even as other creditor groups had previously agreed to the terms of settlement with the Commonwealth in, for example, the 2019 PSA and the 2020 PSA.  By agreeing to settle these disputes, the GO/PBA PSA Creditors provided a clear benefit to the Debtors by eliminating the need to incur additional costs, and mitigating the substantial risk associated with, further litigation.  The Commonwealth's debt burden was also reduced in the process.  The release of these claims by the GO/PBA PSA Creditors as part of that settlement thus marked a major step forward toward building a broader base of consensus for the Plan.

98.     I believe these releases are necessary and essential to the Plan.  They were negotiated with key stakeholders in the robust, arms'-length process described above.  That process led to broad support for the restructuring framework contemplated by the Plan, including the release provisions.

### 2.   Releases Granted by Debtors

99.     To create global peace upon the effectiveness of the Plan, the Debtors and Reorganized Debtors agreed to release Claims and Causes of Action against, among other entities, the Government Parties, official committees, and PSA Creditors.  Generally speaking, section 92.5 of the Plan releases Claims based upon or related to acts, omissions, or other circumstances related to the Title III cases or the Debtors.

44

100.     A release of key negotiating claimholders and debtor fiduciaries is customary in a restructuring and I believe it would have been nearly impossible to convince the PSA Creditors and statutory committees to participate in negotiations and agree to settle, discharge, and release claims against the Debtors had they not understood that the Debtors would be releasing claims against them.  Therefore, absent the Debtors' releases, the chance of a consensual resolution would necessarily have been diminished.

101.     The Debtors' releases are consistent with the consensual nature of the Plan.  The Plan is a global compromise and integrated settlement of claims and causes of action among the Debtors and key stakeholders, embodied in the provisions of Article II of the Plan.  All parties involved in the negotiation and development of the Plan benefit from the certainty the releases provide.  The Debtors' releases incentivized PSA Creditors to support, and undertake actions to support, the Plan and its confirmation, without fear of baseless lawsuits in the future.  In exchange for the Debtors' and Reorganized Debtors' (and their Related Persons') releases, the Debtors secured the substantial concessions reflected in the settlements and, ultimately, the Plan.  I believe this would have been substantially less likely without the Debtors' releases.

102.     The parties receiving releases all made significant contributions to the negotiation and development of the Plan, and incurred costs and expenses during the course of their participation in the negotiations.

103.     In my view, and based on my experience, the releases granted by the Debtors constitute a sound exercise of the Debtors' business judgment.  Such releases, taken as a whole and given the totality of the circumstances, are fair, reasonable, and in the best interests of the Debtors.  It is in the Debtors' interest to fully and finally resolve the Commonwealth, ERS, and

PBA Title III Cases and the releases provided substantially increased the likelihood of success the Debtors would be able to do so.

104.    In sum, the categories of releases contemplated by the Plan are consistent with those I have seen in the vast majority of complex restructuring transactions in which I have been involved.  Without the releases, the parties would be faced with the prospect of ongoing litigation over the complex, intertwined claims of the various claimholder constituencies against the Commonwealth.  This would be an expensive and value-destructive endeavor for all involved and would have the potential to upset the balance built into the PSAs and struck by the Plan.  For example, the Lien Challenge Actions, if restarted, I understand would involve multiple billions of dollars in claims and alleged priority over the Commonwealth's available resources.

105.    The Plan's release provisions were a product of the same robust, mediator-supervised negotiations described above that led to the PSAs.  The deliberate and independent process of negotiating these agreements helped to ensure the reasonableness of the releases insofar as stakeholders had an opportunity to be heard as to the scope and content of the Plan's releases.

106.    The releases also facilitated broad support of the Plan.  In my experience, plan releases are customary and would be expected by the parties to any complex restructuring transaction.  Similar release provisions were approved in the COFINA Title III case.  Based on my experience, I do not believe the parties to the PSAs would have entered into those agreements absent the Plan's release provisions.  The discharge and release of claims by claimholders and the Debtors provides the parties with assurance that their disputes will be fully and finally resolved upon confirmation of the Plan, and help to enable the prompt, efficient conclusion of these Title III cases by providing for a comprehensive resolution and settlement of these disputes.

**B.      The Plan Does Not Provide for Third-Party Releases**

107.    Based on my understanding of the Plan and the negotiations that led to it, the Plan's

releases are intended to be limited to those that are necessary to effect the Debtors' successful

restructuring.  Except as explicitly agreed-to by creditors in their respective PSAs, the Plan is not

intended to release any claims of a creditor of the Debtors, in its capacity as such, against a party

that is not a Debtor. To the extent there is any inconsistency between the Plan and that intention,

it is my understanding the Plan will be modified to reflect that intention.

**C.      The Releases Provide for Appropriate Carve-Outs**

108.    There are also specific exclusions from the Released Claims and Causes of Action.

Among others, the Plan does not release Claims or Causes of Action against PREPA arising from

or related to PREPA-issued bonds, including Monoline-issued insurance relating to such bonds.

The Plan provides that such claims and causes of action will be addressed in PREPA's Title III

case.   I believe this is appropriate because PREPA-related claims are not addressed in the

settlements that form the basis for the Plan.

109.    Certain claims, causes of action, or other rights or powers held by the SEC, the

United States, and parties to certain Underwriter Actions (as that term is defined in section 1.495

of the Plan) are also carved out from the Plan's releases.  Likewise, as confirmed by the definition

of Released Claims, *see* Plan, section 1.424, claims against CCDA, HTA, MBA, PFC, PRASA,

PRIDCO, PRIFA, UPR, and PREPA are not released under the Plan, which entities are or may be

subject to their own PROMESA proceedings.  These carve-outs help to ensure that only those

releases that are reasonable and necessary to Plan confirmation are being provided.

**D.      The Plan's Exculpation Provisions Are Customary and Narrowly Tailored**

110.    Section 92.7 of the Plan provides for exculpation of the Government Parties, PSA

Creditors, Retiree Committee, Creditors' Committee, AFSCME, and the Monolines for, among

other things, any act taken consistent with the Plan or in connection with the formation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan.  All parties being exculpated in the Plan played roles in the negotiation of the Plan and the settlements that enabled the Plan.

111.    The exculpation being provided here is customary in the restructuring context for parties and their professionals in connection with their efforts toward negotiating a consensual resolution with broad support.  An exculpation (subject to certain customary carve-outs for certain intentional wrongdoing) incentivizes all parties to negotiate freely without fear of liability that will slow down the negotiations.  Having been present at the negotiations, I believe the expectation that parties would be exculpated incentivized claimholders to participate in the negotiations, support, and undertake actions that support, confirmation of the Plan without fear of future baseless lawsuits.  Failing to approve the exculpation provisions would likely expose the parties to litigation after months of good faith negotiations.

112.    It is my belief the Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to the Plan.  The Plan's exculpation provisions are not intended to alter the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful misconduct.

### E.    The Plan's Injunction Provisions Are Customary and Narrowly Tailored

113.    The Plan's injunction provisions are necessary to the reorganization and are fair to those parties involved.  My understanding is that the injunction ensures that the releases and exculpations discussed above are preserved and enforced by prohibiting legal action concerning the Released Claims, and avoiding the time, burden and expense that could be incurred if parties were permitted to pursue Released Claims.  The Plan's injunction provisions are narrowly-tailored to serve just that purpose.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October 25, 2021
New York, New York

 

 

Steven Zelin