# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DECLARATION OF JUAN SANTAMBROGIO IN RESPECT OF CONFIRMATION OF SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, *et al.*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I, Juan Santambrogio, hereby declare and state as follows:

1. I am a Managing Director in the Restructuring Advisory Services practice at Ernst & Young LLP ("EY"). I hold a Masters in Business Administration from the Darden Graduate School of Business Administration, University of Virginia, and bachelor degrees in accounting and business administration from the Catholic University of Argentina. I have over 20 years of experience in financial restructuring advising private and public sector clients. Prior to joining EY in 2011, I was a Managing Director in the restructuring practice of FTI Consulting and prior to that I was a Director in the restructuring division of Macquarie Capital (USA) Inc., a leading merchant bank.

2. I have experience advising private and public sector clients in complex financial restructuring situations including in-court and out-of-court transactions. I have also advised secured lender groups, unsecured creditor committees and other parties in interest in distressed transactions. I have experience in developing and/or evaluating long-term financial projections, short-term liquidity forecasts, collective bargaining agreements and retirement plans for entities in financial distress.

3. EY was first engaged by the Oversight Board on or around February 15, 2017. Since that time, EY's other professionals and I have, among other tasks: (i) advised the Oversight Board in relation to the collective bargaining agreements of the Government of Puerto Rico, its instrumentalities, and public corporations, (ii) advised the Oversight Board in negotiation/mediation with the unions to address key labor related issues, (iii) advised the Oversight Board in its analysis of the estimated impact of potential negotiated positions on the Fiscal Plan, the certified budget, and the Plan, and (iv) advised the Oversight Board in the development of long-term financial projections and in the Oversight Board's analysis of the funds available for creditors.

2

4. During EY's engagement, I was involved in (i) advising the Oversight Board in assessing the financial impact of certain terms negotiated with labor unions and the Committee of Retirees, (ii) advising the Oversight Board in relation to the cash available at the Commonwealth, and (iii) advising the Oversight Board in the analysis of long-term financial projections. In this role, I have been and am in regular contact with the members of the Oversight Board, and its other advisors.

5. I submit this declaration (the "Declaration") in connection with the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (the "Plan"). I have reviewed the Plan and, to the extent that terms are capitalized but not defined in this Declaration, such terms shall have the meanings assigned to them in the Plan.

6. My statements set forth in this Declaration are based on my personal knowledge except where I reference specific documents or communications as the basis of my statements. In those instances where I reference a specific document or communication, I am not offering the documents to prove the truth of the content in those documents, or, I am informed, are otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible.

7. As described in more detail below, based upon my personal experience, as well as my review of the Plan and the Fiscal Plan for the Commonwealth certified by the Oversight Board on April 23, 2021 (the "Fiscal Plan"), I believe the Plan and the financial impact of the settlement discussed herein are consistent with the Fiscal Plan.

I. **AFSCME CBAs**

8. I understand that many of the Commonwealth's employees are represented by unions, including local affiliates of the American Federation of State, City, and Municipal Employees ("AFSCME").

9. AFSCME is one of the largest trade unions of public employees in the United States and maintains two local chapters in Puerto Rico: Servidores Publicos Unidos and AFSCME Council 95 and Capitulo de Retirados de SPU. In addition, AFSCME is affiliated with the following local union chapters: (a) the Parole Board and Local 3584, (b) the Department of Consumer Affairs and Local 3986, (c) the Department of Correction and Rehabilitation and Local 3500-Unit B Correctional Officers (ACU), (d) the Department of Correction and Rehabilitation/Bureau of Juvenile Institutions and Local 3559 (ACU), (e) the Department of Education and Local 3840, which covers only employees within AFSCME jurisdiction of PASO), (f) the Department of Natural and Environmental Resources and Local 2082-Unit A, (g) Department of Natural and Environmental Resources and Local 3647 (Ranger Corps), (h) the Department of Transportation and Public Works and Local 3889, (i) the Department of Labor and Human Resources/Vocational Rehabilitation Administration and Local 3251, (j) the Department of the Family and Local 3227-Unit A, (k) the Department of the Family and Local 3234-Unit B (UPETEC), (l) the Bureau of Forensic Sciences and Local 2099, (m) the Department of Correction and Rehabilitation/Pretrial Services Program and Local 3573 (ACU), and (n) the Bureau of Transport and Other Public Services and Local 3897.

10. AFSCME, together with its local chapters and union affiliates, reportedly represent more than 9,000 current employees of the Commonwealth. The employment terms between such represented employees and the Commonwealth are governed in part by various collective bargaining agreements (the "AFSCME CBAs").

## II. Settlement with AFSCME

11. During the course of these Title III Cases, the Oversight Board engaged in negotiations with several of the Commonwealth's unions regarding consensual modifications to collective bargaining agreements, including the AFSCME CBAs. EY advised the Oversight Board on the financial impact of the proposed modifications. I estimate the financial impact of the terms negotiated by the Oversight Board with AFSCME are consistent with the financial projections in the Commonwealth's fiscal plan. These negotiations resulted in an agreement with AFSCME.

12. On June 7, 2019, negotiations with AFSCME culminated in a Plan Support Agreement with AFSMCE (the "AFSCME PSA") which provides for AFSCME's support of the Plan, while providing certain benefits to AFSCME's members in exchange for its support. The AFSCME PSA provides for AFSCME's support for modified terms of the AFSCME CBAs, along with its consent to the restructuring of the Commonwealth's applicable pension obligations, pursuant to the Plan. I have reviewed, and am familiar with, the AFSCME PSA. I believe the terms of the AFSCME PSA are accurately reflected in Exhibit G to the Plan.

13. The AFSCME PSA was put forth for a ratification vote by AFSCME's members, which vote passed with 92% of members voting in favor.

## III. Pension Reforms

### A. Pension Cuts

14. Pursuant to the Plan, certain pension benefits for active participants who accrued retirement benefits above $1,500 per month by the time the ERS defined benefit plan was frozen will be reduced by 8.5%, subject to a minimum monthly benefit of $1,500. This minimum monthly benefit amount was increased by the Oversight Board from $1,200 per month, as included in the

5

AFSCME PSA. A description of the terms of the proposed pension cuts is provided in the Declaration of Sheva Levy (the "Levy Declaration"), filed concurrently herewith. I recognize there are on-going discussions concerning matters regarding the Plan and, in particular, treatment of pension claims, and if necessary, I will supplement this Declaration to reflect the results of those discussions.

### B. ERS Active Participants

15. It is my understanding that public employees, including those represented by AFSCME, are entitled to receive certain pension benefits under certain pension systems. AFSCME members are participants in the ERS pension system. For a description of the various retirement plans under ERS, in which all AFSCME/local members were participants, I refer to the Levy Declaration, filed concurrently herewith.

16. Some, but not all, AFSCME members have accrued defined benefits under the ERS pension plan. The accrued pension claims of active ERS employees hired before January 1, 2000, which includes some AFSCME members, are classified in Class 51G of the Plan. A description of the terms of the proposed pension treatment for members of the ERS pension system is provided in the Levy Declaration.

17. Additionally, ERS employees, including certain AFSCME members hired on or after January 1, 2000, and before July 1, 2017, were enrolled in "hybrid," or notional retirement accounts, whereby employee contributions were tracked in notional accounts and credited with notional interest until retirement, at which time the account would be converted into a lifetime annuity. This Retirement Savings Account Program ("System 2000") was created to provide an employee-funded retirement benefit administered by ERS. The accrued pension claims of active ERS employees hired on or after January 1, 2000 and before July 1, 2017, which includes some

6

AFSCME members, are classified in Class 51J of the Plan. Under the Plan, System 2000 participants who are active employees will receive the amount of their contributions to System 2000 (and payments on account of the Act 3 Plan as defined and described further below) through June 30, 2017, plus interest accrued thereon through the Petition Date, in segregated individual accounts.

18. Employees in Class 51G hired before January 1, 2000 who were enrolled in the ERS defined benefit plan were subject to the freeze of future accruals of defined benefits that occurred in 2013. These employees were then enrolled in a separate hybrid saving plan similar to System to 2000 pursuant to Act 3-2013 (the "Act 3 Plan"). The Plan provides that all ERS participants with accrued Act 3 balances will not have any modifications to their benefits resulting from their Act 3 contributions. Additionally, the Plan reflects the fact that the Oversight Board and AFSCME agreed that each employee in Class 51 G will also receive a payment of $2,600 into their Act 106 defined contribution account on or around the Effective Date to approximate the value of any interest that would have accrued between the Commonwealth Petition Date and their respective retirement dates.

19. The Fiscal Plan estimates savings from the ERS/TRS/JRS pension cut to be approximately $1.9 billion over 30 years. The contributions and corresponding interest of System 2000 participants is estimated to be approximately $1.2 billion and the payment to Act 3 participants is estimated at approximately $100 million.

C. **Benefit Restoration**

20. I understand the Oversight Board agreed to provide pension beneficiaries with an opportunity to share in the potential excess cash surplus to be generated by the Commonwealth in the future to fully or partially restore the Plan's cuts to monthly retirement benefits, as applicable.

7

21. Under the Plan, during the period from the Benefit Reduction Date up to and including the conclusion of Fiscal Year 2033, if in a particular Fiscal Year, the Excess Cash Surplus is equal to or greater than $100,000,000.00, then ten percent (10%) of such Excess Cash Surplus will be (a) allocated and applied pro rata to each retiree based on the amount of total reductions experienced by each such retiree during such Fiscal Year, and (b) paid to any such participant on or before October 1 following the conclusion of such Fiscal Year. I further understand based on the terms of the Plan, that no pensioner would receive more than they would otherwise have been entitled to outside of Title III, by capping such Benefit Restoration at the Monthly Benefit Reduction multiplied by twelve (12) for each such participant for a particular Fiscal Year.

IV. **Additional benefits to AFSCME members**

    A. **Fiscal Plan Surplus Sharing Agreement**

22. Additionally, the Plan provides a mechanism for all public rank-and-file employees either represented by AFSCME or not represented by any union to share in any excess surplus above and beyond the surplus projected in the certified fiscal plan in effect as of the Effective Date of the Plan. This arrangement provides for a bonus pool for public employees to the extent the Commonwealth outperforms the projections included in the certified fiscal plan in effect as of the Plan's Effective Date by more than $100 million. Under the Plan, if the Excess Cash Surplus is lower than $100 million, no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than $100 million, 25% of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool, to be shared proportionally among AFSCME-represented participants and all other eligible Commonwealth employees. Under the AFSCME PSA, all recipients of this

8

amount will have the choice to allocate any portion of their bonus to their defined contribution retirement account, with the remainder to be distributed in cash.

### B. One-Time Payments

23. Moreover, the AFSCME PSA, as implemented by the Plan, provides for certain one-time payments to AFSCME affiliated unions and members as follows: (a) a signing bonus of $500 per member; (b) a payment of Five Million Dollars ($5,000,000.00) to AFSCME, as compensation for its efforts serving as the lead negotiator of and as a signatory to the AFSCME PSA; and (c) an additional payment of Five Million Dollars ($5,000,000.00) to AFSCME, to be disbursed as a cash bonus to its members.

### V. Pension Reserve Trust

24. Finally, the Oversight Board agreed to establish a Pension Reserve Trust under the Plan, which will be held in trust for the sole benefit of retirees.

25. Pursuant to the Plan, the Commonwealth will make annual contributions to the Pension Reserve Trust from the Commonwealth General Fund for eight (8) Fiscal Years beginning in the Fiscal Year in which the Effective Date occurs, in an amount no less than $175 million per year. In addition, for any Fiscal Year ending after the Effective Date in which the projected fiscal plan surplus is at least $1.750 billion, the Commonwealth shall make a contribution to the Pension Reserve Trust from the Commonwealth General Fund in an amount equal to 25% of the projected fiscal plan surplus that year (the "Base Contribution"). The Plan further provides that the Commonwealth should also make an initial contribution of $5 million to the Pension Reserve Trust to fund its administrative fees, costs, and expenses.

26. In the Plan, the Commonwealth also must make additional contributions to the Pension Reserve Trust on an annual basis equal to: (a) the lower of the actual primary surplus for

9

such Fiscal Year or the projected fiscal plan primary surplus for such Fiscal Year, minus the sum of (i) the Base Contribution for such Fiscal Year, plus (ii) the Commonwealth debt service obligation pursuant to the Plan for such Fiscal Year, plus (iii) two hundred million dollars ($200,000,000.00); provided, however, that, in all instances, such additional amount cannot be negative, and (b) subject to applicable laws, including, without limitation, Titles I and II of PROMESA, such additional amounts as the Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust.

27. Based on the current Fiscal Plan's projections, I estimate the Commonwealth contributions to the Pension Reserve Trust will total approximately $2.1 billion during the eight years of funding. Based on the Oversight Board assumed annual return on investment for the Pension Reserve Trust of 4.5%, by fiscal year 2030, the Pension Reserve Trust would have a balance of $2.6 billion.

## VI. Fiscal Plan Measures

28. In connection with the AFSCME PSA, the parties negotiated and agreed upon modifications to the AFSCME CBAs, which modifications provide the Commonwealth with more flexibility to comply with the fiscal measures contemplated in the Fiscal Plan, while providing the public employees with contractual certainty and certain economic incentives. The Plan provides the AFSCME CBAs will be rejected, in exchange for which the Commonwealth will execute new, modified CBAs consistent with the AFSCME PSA.

29. In the event the Commonwealth needs to carry out downsizing of personnel to comply with the provisions of the Fiscal Plan, AFSCME and the Oversight Board agreed to modify the AFSCME CBAs to permit such workforce downsizing. Specifically, AFSCME agreed to suspend and/or refrain from enforcing for a period of five (5) years any and all provisions or

clauses applicable to their represented employees that are contained in laws, collective bargaining agreements, agreements, policies, employee handbooks, contracts, certifications, rules, regulations, and conditions of employment that would otherwise conflict with the Right-Sizing Provisions (as defined below) of the modified AFSCME CBAs.

30. The "Right-Sizing Provisions" of the proposed CBA amendments under the AFSCME PSA, which can be found described under the heading "Termination/Layoffs" of Exhibit G to the Plan, generally provide (i) the Commonwealth may implement any reassignment of positions and relocation of personnel, subject to compliance with certain seniority provisions, when its budgetary interests require it to avoid layoffs, and (ii) in view of the current state of fiscal emergency, the scarcity of fiscal resources, the gravity of the problems that the Commonwealth faces and the urgency required to address such fiscal problems, the Commonwealth is exempted from exhausting measures such as retraining employees, the enjoyment of accrued vacations, the enjoyment of unpaid leave, a reduction in work hours, or demotions, prior to implementing any layoffs. Under the Right-Sizing Provisions, the Commonwealth is required to first seek volunteers for reassignment and relocation and, to the extent there are insufficient volunteers, it can involuntarily reassign or relocate the least senior qualified employees, as necessary.

31. The AFSCME PSA, as implemented by the Plan, provides the Commonwealth will cover the cost of basic medical coverage equal to at least $170 per month for all employees regardless of marital status or relationship. Furthermore, the AFSCME PSA provides that employees will be entitled to have an exclusive representative negotiate the health benefits and medical plans on their behalf and bring such health plan options to a vote before the employees. In addition, the Commonwealth has agreed to expand vacation and sick leave accruals, and honor

11

15 holidays each calendar year, which holidays will be paid at time and a half for employees required to work.

### VII. Consistency with Fiscal Plan

32. As the result of my work on EY's engagements with the Oversight Board, I am familiar with the final terms of the AFSCME PSA and the AFSCME CBAs.

33. I have reviewed both the Plan and the Fiscal Plan certified by the Oversight Board and am familiar with each document. Based upon my review of the Plan and the Fiscal Plan.

34. It is my opinion that, based on my review of those documents, all the labor and pension provisions contemplated in the AFSCME PSA and the Plan are consistent with the Fiscal Plan certified by the Oversight Board.

Dated: October 25, 2021 /s/ *Juan Santambrogio*
Alpharetta, Georgia            Juan Santambrogio