## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                 Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**DECLARATION OF GAURAV MALHOTRA OF ERNST & YOUNG LLP IN RESPECT OF CONFIRMATION OF SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT FOR THE COMMONWEALTH OF PUERTO RICO, ET AL.**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) the Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA" as its Spanish acronym) (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I, Gaurav Malhotra,  hereby declare that:

1.      I am a Principal and Head of the U.S. Restructuring Practice at Ernst & Young LLP ("EY").  I submit this declaration (this "Declaration") in support of confirmation of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (together with all exhibits, and as amended, modified, and supplemented, the "Plan").[2]

2.      My statements set forth in this Declaration are based on my personal knowledge except where I reference specific documents or communications as the basis of my statements.  In those instances where I reference a specific document or communication, I am informed that the specific document or communication either is not being offered to prove the truth of the matter asserted in the statement or, I am informed, is otherwise admissible because, for instance, it is a self-authenticating public record or can be otherwise authenticated and shown to be admissible. Where my Declaration provides opinion testimony, in addition to the above, the opinions set forth herein are based on (i) my understanding of information shared with me by other members of the EY team working directly with me or under my supervision and direction; (ii) information provided by the Oversight Board and its advisors, and other interested parties and their respective advisors concerning the restructuring, and/or (iii) my experience in the industry as described below.

### Background and Qualifications

3.      I received a Masters of Business Administration from Case Western Reserve University with a dual major in Finance and Business Policy.  I have over 20 years' experience in financial and operational restructuring.  Prior to joining EY in 2009, I was a Director in the restructuring division of Macquarie Capital (USA) Inc., a leading merchant bank.  I am a Chartered

---

[2] Capitalized terms used but not otherwise defined herein shall have the same meanings given to such terms as in the Plan.

Financial Analyst and a member of both the Turnaround Management Association and the Association of Insolvency and Restructuring Advisors.

4.     I have advised numerous private and public sector stakeholders and entities, including the City of Detroit, in evaluating strategic alternatives and executing complex restructuring transactions. I have experience with both in-court and out-of-court restructuring processes, and also have extensive experience in leading complex negotiations with secured and unsecured creditors on behalf of distressed entities. In addition to assisting in evaluating the impact of restructuring alternatives, I have significant experience in liquidity analyses, cash flow forecasting and business plan development, among other things.

5.     Some of my private sector engagements include Briggs & Stratton, Collins & Aikman Corporation, Delta Air Lines, Inc., Eagle Picher, Liberty Medical Supply, Inc, and Shiloh Industries, Inc., in addition to others. In the public sector, I have been involved in the restructuring efforts of the Detroit Public Schools and the City of Detroit, in addition to other large public sector clients. These engagements—and many others—involved debt and liquidity analyses, cash forecasting and related projections of revenues and expenses. I have previously submitted declarations in connection with plan confirmation proceedings, including the confirmation proceedings for the City of Detroit.

<u>**EY's Engagement by the Oversight Board**</u>

6.     EY was first engaged by the Oversight Board on or around February 15, 2017. Since that time, I and EY's other professionals have, among other tasks: (i) advised on analysis of base year expenditure projections for the certified budgets; (ii) advised on the assessment of financial projections and framework to analyze the financial impact of various restructuring scenarios; (iii) provided strategic advice during mediation sessions and negotiations with major creditor and retiree groups; (iv) advised on the development of financial analyses related to plan

feasibility;  (v) assisted in the review and analysis of funds available for creditors and potential creditor recoveries; and (vi) provided restructuring insight and observations on debt restructuring alternatives relative to other distressed municipal restructurings.

7.      In providing these services, I and EY's other professionals have engaged in due diligence of the Debtors' operations, including their financial affairs, assets, capital structure, contractual arrangements, financing documents, cash flows, revenue and expense projections, and other related material information to build a foundation for a restructuring strategy.

8.      I am familiar with the certified 2020 Fiscal Plan ("2020 Fiscal Plan") and the certified 2021 Fiscal Plan ("2021 Fiscal Plan," and together with the 2020 Fiscal Plan, the "Certified Fiscal Plans") among other reasons because the budgets that I and the EY team prepare rely on the revenue and expense projections incorporated into the Certified Fiscal Plans.  In addition, I am familiar with the Plan and the various plan support agreements executed in connection with the Plan, as well as their terms, because I provided advice to the Oversight Board as the Oversight Board developed those plan support agreements, in particular, regarding the impact of those agreements on the revenue and expense projections incorporated into the Certified Fiscal Plans.

### The Commonwealth's Financial Obligations Pursuant to the Plan

9.      The Plan provides for the following types of payments: (1) cash on the Effective Date, (2) new debt issued by the Commonwealth in the form of New GO Bonds, and (3) contingent value instruments ("CVIs").  In addition, the Plan contemplates payments to retirees of pensions and other benefits in reduced amounts, as well as additional payments to Commonwealth employees.

*Cash Payments*

10.     The Plan provides for the payment of cash on the Effective Date and over time.

The cash consideration proposed by the Plan can be summarized as follows:

- $6.624 billion for CW Bond Claims and PBA Bond Claims (Classes 1–11; 15–50) (*see* Plan §§ 5.1–15.1, 19.1–54.1);

- $61.1 million for PBA/DRA Secured Claims, PBA General Unsecured Claims, and PBA/DRA Unsecured Claims (Classes 12–14) (*see* Plan §§ 16.1–18.1);

- $31.0 million for holders of Allowed Dairy Producer Claims (Class 53) (*see* Plan § 57.1);

- up to $575 million for holders of Eminent Domain Claims and CW General Unsecured Claims (Classes 54, 58) (*see* Plan §§ 58.1, 62.1), which includes up to $65 million for Convenience Claims (Class 68) (Plan § 72.1);

- up to $146.8 million for holders of Allowed Med Center Claims (Class 56) (*see* Plan § 60.1);

- $373 million in cash distributions to ERS Bond holders made available from the Commonwealth's purchase of ERS assets (*see* Plan § 1.218);

- $500,000 for ERS General Unsecured Claims (Class 66) (Plan § 70.1);

- $193.5 million for the benefit of holders of CW/PRIFA Rum Tax Claims (*see* Plan § 1.413); and

- up to $801 million in total PSA Fees[3].

*New GO Bonds*

11.     The Plan provides the Reorganized Commonwealth will issue New GO Bonds on

the Effective Date with eleven different maturity dates, having an aggregate original principal

---

[3] This includes $460 million in consummation costs, restriction fees, and retail support fees for GO/PBA (Plan § 3.3, 3.5, and 3.6), $75 million in restriction fees per ERS stipulation (Plan § 3.7), $125 million in consummation costs and restriction fees for HTA (*see* HTA/CCDA Plan Support Agreement § 1.2), $15 million in consummation costs and restriction fees for CCDA (Plan § 3.8 and 3.9), $59 million in structuring fees for Assured/National (Plan § 86.1(b)(xvi), $10 million in restriction fees for PRIFA (*see* PRIFA Plan Support Agreement § 6.1), and $57 million in structuring fees for AMBAC/FGIC (*see* PRIFA Plan Support Agreement § 6.2).

amount of $7,414,063,543.25, consisting of: (i) $6,683,315,000.00 in aggregate principal amount of New GO "CIBs" (*i.e.*, current interest bonds), (ii) $442,506,553.50 in aggregate principal amount of New GO 5.375% "CABs" (*i.e.*, capital appreciation bonds), and (iii) $288,241,989.75 in aggregate principal amount of New GO 5.0% CABs (collectively, "New GO Bonds").

12.     The aggregate amount owed, including all principal and interest over the life of the New GO Bonds from the deemed issuance date of July 1, 2021 to the maturity of the final New GO Bond on July 1, 2046, is $10,914,969,303.20.  Interest that accrues on the New GO Bonds will be paid on July 1, 2021 and each January 1 and July 1 thereafter until the New GO Bonds have been paid or satisfied in full in accordance with their terms.

1.     New Current Interest Bonds

13.     The New GO CIBs comprise a series of eleven current interest bonds of staggered maturity dates spanning from 2023 to 2046.  The total principal amount of New GO CIBs issued is $6.683 billion, with total interest accruing through all eleven maturity dates aggregating to $3.164 billion.  Accordingly, assuming timely payment, the aggregate amount owed over the life of the New GO CIBs is $9.847 billion.

14.     The New GO CIBs have a deemed issuance date of July 1, 2021.  Accordingly, the Commonwealth's schedule of payment amounts is fixed regardless of when the Effective Date occurs.

2.     New Capital Appreciation Bonds

15.     The New GO CABs comprise two series of capital appreciation bonds:  New GO 5.0% CABs maturing July 1, 2024 with an initial principal of $288.2 million and New GO 5.375% CABs maturing July 1, 2033 with an initial principal of $442.5 million (collectively, the "New GO CABs"). The New GO CABs do not provide for the payment of interest to holders over time, but rather for interest to accrete at the specified rate and be added to the principal and compounded.

The sum of the principal and accreted interest is then amortized in certain years. Aggregate payments in respect of the New GO CABs will be $1.068 billion, composed of: (i) $318 million on account of New GO 5.0% CABs and (ii) $750 million on account of New GO 5.375% CABs.

### 3.   Aggregate Annual Debt Service, Contributed Monthly

16.     The Plan provides for a Debt Service Fund to be established. On the first business day of each month after the Effective Date until the obligations of the applicable New GO Bonds are satisfied, the Commonwealth will deposit the portion of principal (or Accreted Value) and accrued interest for that month into the Debt Service Fund. Specifically, with respect to accrued interest on the New GO CIBs, one-sixth of the next semi-annual interest payment due will be deposited per month. With respect to principal on the New GO CIBs and Accreted Value on the New GO CABs, one-twelfth of the next yearly amount due will be deposited.

17.     The aggregate contributions on a yearly basis to the Debt Service Fund contemplated by the Plan to service the New GO Bonds are as follows:

| Date (7/1/FY) | CIB Principal Amortization | CIB Interest | CAB Accreted Value Amortization | Aggregate Total GO Debt Service |
|---|---|---|---|---|
| 2022 | $372,660,000.00 | $311,618,300.00 | $105,968,971.50 | $790,249,293.50 |
| 2023 | 372,390,000.00 | 292,985,300.00 | 105,969,766.35 | 771,347,089.35 |
| 2024 | 371,350,000.00 | 274,365,800.00 | 105,970,000.00 | 751,687,824.00 |
| 2025 | 369,470,000.00 | 255,798,300.00 | - | 625,270,325.00 |
| 2026 | 366,675,000.00 | 237,324,800.00 | - | 604,001,826.00 |
| 2027 | 362,890,000.00 | 218,991,050.00 | - | 581,883,077.00 |
| 2028 | 358,030,000.00 | 200,846,550.00 | - | 558,878,578.00 |
| 2029 | 352,010,000.00 | 182,945,050.00 | 149,997,523.50 | 684,954,602.50 |
| 2030 | 344,740,000.00 | 165,344,550.00 | 149,997,764.30 | 660,084,344.30 |
| 2031 | 336,095,000.00 | 148,107,550.00 | 149,998,089.75 | 634,202,670.75 |
| 2032 | 325,990,000.00 | 131,302,800.00 | 149,998,937.80 | 607,293,769.80 |
| 2033 | 311,050,000.00 | 118,263,200.00 | 150,000,000.00 | 579,315,233.00 |
| 2034 | 294,385,000.00 | 105,821,200.00 | - | 400,208,234.00 |
| 2035 | 275,890,000.00 | 94,045,800.00 | - | 369,937,835.00 |
| 2036 | 256,025,000.00 | 81,793,250.00 | - | 337,820,286.00 |
| 2037 | 233,995,000.00 | 70,364,900.00 | - | 304,361,937.00 |
| 2038 | 209,660,000.00 | 59,848,850.00 | - | 269,510,888.00 |
| 2039 | 182,860,000.00 | 50,338,850.00 | - | 233,200,889.00 |

| | | | | |
|---|---|---|---|---|
| 2040 | 153,520,000.00 | 41,844,650.00 | - | 195,366,690.00 |
| 2041 | 124,765,000.00 | 34,465,050.00 | - | 159,232,091.00 |
| 2042 | 130,875,000.00 | 28,354,600.00 | - | 159,231,642.00 |
| 2043 | 136,110,000.00 | 23,119,600.00 | - | 159,231,643.00 |
| 2044 | 141,555,000.00 | 17,675,200.00 | - | 159,232,244.00 |
| 2045 | 147,220,000.00 | 12,013,000.00 | - | 159,235,045.00 |
| 2046 | 153,105,000.00 | 6,124,200.00 | - | 159,231,246.00 |
| Total | $6,683,315,000.00 | $3,163,702,400.00 | $1,067,901,053.20 | $10,914,969,303.20 |

18.     The aggregate contributions in the schedule above thus represent the annual cash flow obligations of the Commonwealth with respect to the New GO Bonds.

*CVIs*

19.     The Plan also provides for the issuance of (i) GO CVIs in the aggregate original notional amount of $3.5 billion, having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original notional amount of $5.239 billion having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051.

20.     The Commonwealth's obligation to pay under the CVIs arises only if certain outperformance conditions specified in the Plan and the CVI indentures occur. Specifically, the Plan provides for the establishment of threshold metrics based on tax revenue projections contained in Certified Fiscal Plans. Only if actual revenues exceed the established threshold at the end of a given fiscal year will an obligation to pay come into being, subject to certain caps.

*Pension Obligations*

21.     In addition to the payments described above, the Plan provides for (1) payments of pension and other post-employment benefits to retired Commonwealth employees in reduced amounts; (2) the restoration of contributions made by Commonwealth employees to the System 2000 program; and (3) payments to a Pension Reserve Trust. I recognize there are on-going

discussions concerning matters regarding the Plan and, in particular, treatment of pension claims, and if necessary, I will supplement this Declaration to reflect the results of those discussions.

22.      The Plan provides that certain participants in ERS, TRS, and JRS will experience reductions in their monthly pension benefits, pursuant to a formula described in Plan § 1.337. The Plan also provides that future benefit accruals for TRS and JRS will be frozen and that any future cost-of-living-adjustments ("COLAs") will be eliminated.

23.      The Plan provides that participants in System 2000 will not be subject to benefit reductions. Instead, they will receive the amount of their contributions to System 2000 from its enactment until June 30, 2017. Each System 2000 participant's contributions will be deposited into the member's defined contribution account established pursuant to Act 106-2017. The Oversight Board has estimated the aggregate sum of contributions plus interest accrued thereon to be $1.2 billion.[4]

24.      The Plan also provides for the establishment of a Pension Reserve Trust. The Pension Reserve Trust will receive an initial contribution of $5,000,000 on the Plan's Effective Date. In addition, for the eight fiscal years occurring after the fiscal year in which the Plan's Effective Date occurs, the Plan provides that the Commonwealth will make a contribution to the Pension Reserve Trust in an amount equal to (1) the Base Contribution, $175,000,000, or in the event that, for any fiscal year the projected Fiscal Plan Surplus as set forth in the Fiscal Plan in effect as of the Effective Date is equal to or greater than One Billion Seven Hundred Fifty Million Dollars ($1,750,000,000), such Base Contribution amount shall increase to an amount equal to twenty-five percent (25%) of the projected Fiscal Plan Surplus for such fiscal year, plus (2) an

---

[4] See *Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth, et al.*, [ECF No. 17628] (the "Disclosure Statement") at 468.

additional amount calculated as (*i*) the lower of the actual primary surplus for such fiscal year and the projected Fiscal Plan primary surplus for such fiscal year, minus (*ii*) the sum of the Base Contribution, plus the Commonwealth's debt service obligations pursuant to the Plan for such fiscal year, plus $200,000,000.   Plan § 83.2.[5]

*Obligations to AFSCME Members Pursuant to the Plan*

25.      The Plan also provides for additional payments to be made to current employees who are members of certain public employee unions affiliated with AFSCME and non-union rank and file employees.

26.      Pursuant to the Plan, the Commonwealth's monthly contribution for healthcare benefits to Commonwealth employees who are members of AFSCME affiliated unions and non-union rank and file employees will increase from $125 per employee per month to $170 per employee per month.   *See* Plan, Exhibit G. In addition, the Plan provides for $500 signing bonuses to each member of an AFSCME-affiliated union.   Further, if the Commonwealth has an Excess Cash Surplus above and beyond the projected Fiscal Plan Surplus contained in the Fiscal Plan in effect on the Plan's Effective Date, and that cash surplus, after any obligation to pay under the CVIs, is greater than $100,000,000, 25% of that Excess Cash Surplus will be allocated to an Upside

---

[5] For example, if the FY23 Fiscal Plan Surplus (after CVI payments) were $1 billion, the Base Contribution would be $175 million and the Additional Contribution would be $0. In this scenario, no amount would be available for the Additional Contribution after taking into consideration the Debt Service of $790 million (New GO/PBA Bonds and 5.0% CAB), the Base Contribution of $175 million, and the amount retained by the Commonwealth up to the $200 million threshold. However, if the FY23 Fiscal Plan Surplus (after CVI payments) were $2 billion, there would be a Base Contribution of $500 million (25% of $2 billion), and an Additional Contribution of $510 million.   The Additional Contribution would equal $2 billion, less the Base Contribution of $500 million, less the Debt Service of $790 million, and less the $200 million retained by the Commonwealth.

Bonus Participation pool for the benefit of members of the AFSCME-affiliated unions and other non-union rank and file employees. *See* Plan, Exhibit G.

*Total Financial Obligations Pursuant to the Plan*

27.      In addition to the cash payments identified above, the Plan also provides the Debtors shall transfer ACR-eligible claims pursuant to the terms of the ACR Order, and, upon transfer, all such claims shall be reconciled and paid in full in the ordinary course of business, as provided by the ACR Order. Plan § 82.7. The Commonwealth has reserved $229 million for payment of claims resolved using the ACR Procedures. *See Cash Bridge*, dated August 23, 2021, Debtors' Exhibit 30. Further, the Plan provides ERS Bondholders a right to receive a future payment of $70.75 million from the purchase of the ERS Private Equity Portfolio (*see* Plan § 1.218)

28.      Together, total Plan consideration—including upfront cash consideration, cash to be used to fund recoveries for ERS, PBA, and Commonwealth general unsecured claimholders, Convenience Claims, the Commonwealth's purchase of ERS's assets, the cash provided to Clawback creditors, the ACR claims reserve, and the consideration to be provided to the Dairy Producers and the 330 Medical Centers—totals approximately $9 billion. Amounts to be paid pursuant to the Plan to current and former employees—including $1.2 billion paid to participants in System 2000, $15 million potential union bonus payments, and $100 million in payments related to Act 1 and Act 447, which is comprised of a $2,600 payment for each Active ERS Participant Claim—total $1.315 billion. In addition, the Plan provides for certain contributions into the Pension Reserve Trust based on the formula described in paragraph 24 above, which would be a minimum of $1.4 billion (eight years of funding the minimum Base Contribution amount of $175 million). Further, the Plan also provides for the Commonwealth to continue to pay pensioners

their monthly benefits, as modified by the Plan. Because any contingent payments will only materialize if the Commonwealth is doing better than projected in the 2020 Fiscal Plan and 2021 Fiscal Plan, as applicable, these amounts do not include the value of contingent payments, such as payments on CVIs, payments of Upside Participation Bonus, or payments of Benefit Restoration.

### Confirmation of the Plan Is Not Likely to Be Followed by the Need for Further Unanticipated Financial Reorganization

29.     In my opinion, confirmation of the Plan is not likely to be followed by the need for further financial reorganization not contemplated in the Plan. That is true notwithstanding the fact that, based on the 2021 Fiscal Plan projections, deficits after debt service are projected to reemerge in approximately FY 2035. By the time deficits are projected to emerge, the amount of Commonwealth general obligation debt outstanding will only be $2.1 billion, as compared to pre-petition debt liabilities of $30.5 billion. My conclusion that the Commonwealth will not likely need further reorganization notwithstanding projected deficits is based on a number of factors, including the following: (*i*) the Plan reduces the Commonwealth's overall debt; (*ii*) the Plan includes multiple provisions designed to insulate the Commonwealth from downside risks; (*iii*) based on the Wolfe Report, to avoid default, the Commonwealth can implement certain reforms the Oversight Board identified that could result in additional liquidity, which could eliminate the projected deficit; and (iv) the Plan—and the financial projections incorporated into the 2021 Fiscal Plan—do not take into account potential upside factors which, if they materialize, would result in additional liquidity.[6]

---

[6] This additional liquidity is shared with creditors via, *inter alia*, the CVIs, the Upside Participation Bonus, and potential pension and benefit restorations.

*The Plan Reduces the Debtors' Debt*

30.     Prior to the Plan, the Commonwealth owed $30.5 billion, consisting of $18.8 billion in general obligation and guaranteed debt, HTA owed $6.2 billion to HTA bondholders, PRIFA owed $1.9 billion to PRIFA bondholders, CCDA owed $384 million to CCDA bondholders, MBA owed $30 million to MBA bondholders, and ERS owed $3.2 billion to ERS bondholders.[7]  The Commonwealth also faced approximately $2.75 billion in claims from general unsecured claimholders, which brings the total Commonwealth obligation to a total of $33.3 billion.  Average annual Commonwealth pre-petition debt service was approximately $2.1 billion, of which general obligation and guaranteed debt service was $1.3 billion, HTA debt service was $294 million, PRIFA debt service was $140 million, CCDA debt service was $30 million, MBA was $10 million, and ERS debt service was $271 million.[8]

31.     After confirmation, the Commonwealth's general obligation and guaranteed debt will be approximately $7.4 billion, considerably lower than $30.5 billion pre-restructuring.  The Plan also resolves claims against the Commonwealth from holders of HTA, PRIFA, and CCDA claims (although HTA's debt will be restructured according to a separate plan of adjustment for HTA, which has not yet been filed).  ERS debt will be completely eliminated, and all pre-petition general unsecured claims will be paid.  Post confirmation, debt service is significantly lower than pre-petition debt service mentioned above.  The Commonwealth's average debt service during the first ten years will total approximately $666 million per year, which is initially $790 million in FY 2022 and decreases thereafter.

---

[7] Public Meeting - September 17, 2021 - Presentation - Plan of Adjustment, Debtors' Exhibit 31, https://drive.google.com/file/d/1VBhnesfOFYFD246uL88rOTJvFYvGUzrY/view
[8] Public Meeting - September 17, 2021 - Presentation - Plan of Adjustment, Debtors' Exhibit 31, https://drive.google.com/file/d/1VBhnesfOFYFD246uL88rOTJvFYvGUzrY/view
Average pre-petition debt service FY2022-2031

32.     Over 50% of the newly issued debt under the Plan will have amortized within 10 years of its issuance date.  Debt levels will continuously decline and remain low until full repayment of the Commonwealth's general obligation and guaranteed debt, which is projected to occur in FY 2046.  Thereafter, the only commitments that will remain outstanding will be the CVIs and COFINA debt.  The CVIs are paid only if specific revenues outperform projections, and COFINA debt is serviced via a pledged portion of sales and use tax.

*Certain Plan Provisions Mitigate the Impact of Potential Financial Underperformance*

33.     The Plan incorporates several provisions—the Pension Reserve Trust, the CVI structures, and the Debt Management Policy—that were structured to attempt to mitigate the impact of potential financial underperformance and the effects of projected deficits.

34.     The Plan provides that the Pension Reserve Trust will be funded during the first eight years after Plan confirmation through annual contributions of the Base Contribution, which is $175 million, or in the event that, for any fiscal year, the projected Fiscal Plan Surplus as set forth in the Fiscal Plan in effect as of the Effective Date is equal to or greater than One Billion Seven Hundred Fifty Million Dollars ($1,750,000,000), such Base Contribution amount shall increase to an amount equal to twenty-five percent (25%) of the projected Fiscal Plan Surplus for such fiscal year, plus additional amounts as calculated pursuant to section 83.2 of the Plan and described at paragraph 24 above.  The Plan also requires the Pension Reserve Trust to be "managed by an independent entity whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust . . . ."  Plan § 83.2.  By contributing substantial sums to the Pension Reserve Trust while the Commonwealth is experiencing surpluses, the Plan reduces the risk that funds will not be available for the payment of retiree benefits if deficits reemerge.  The Pension Reserve Trust therefore reduces the likelihood

the Commonwealth will need to either borrow additional funds to meet its pension obligations, or be forced to cut pensions, if the projected deficits materialize. Further, by requiring the Pension Reserve Trust to be independently and professionally managed, the Plan attempts to insulate and protect the funding available to pay retiree pensions from political or economic influences.

35.    The CVIs are also structured to try to protect the Commonwealth from potential adverse economic outcomes. Any actual revenues that exceed the amounts projected in the certified fiscal plan are therefore in excess of such levels, as determined by the Oversight Board. The Commonwealth's 2020 and 2021 Fiscal Plans are modeled on the Oversight Board's projections as to the Commonwealth's collection of the sales and use tax, 5.5% of which is Commonwealth available resources, and receipt of Rum Tax through 2051. The outperformance conditions for the CVIs are based on the Commonwealth exceeding the applicable fiscal plan projections in a given year. Accordingly, the CVIs are designed to permit holders of CVIs, in effect, to "share" in incremental future 5.5% SUT and Rum Tax cash flow beyond what is projected by the fiscal plans.

36.    The Plan provides that the CVIs are payable when two outperformance conditions are triggered: (i) cumulative outperformance, and (ii) annual outperformance. Cumulative outperformance is a measurement of the amount by which *actual* cumulative revenues for all prior applicable years (less prior distributions) exceed cumulative *projected* revenues for all prior applicable years. Annual outperformance is a measurement of the amount by which *actual* revenues in a given fiscal year exceed *projected* revenues for that year. Distributions are based on the lesser of a specified percentage of annual and cumulative outperformance.

37.    Should actual revenues be less than required to satisfy the outperformance conditions, the Commonwealth has no obligation under the applicable CVIs to make payment.

Further, as explained above, payments on the CVIs are triggered only when both cumulative *and* annual outperformance occurs. Structuring the CVIs in this manner is designed to protect the Commonwealth from having to make substantial CVI payouts when, for example, it experiences one year of outperformance after experiencing several years of underperformance.

38. In addition, the Plan incorporates a Debt Management Policy and a 7.94% Comprehensive Cap on all Net Tax-Supported Debt. Plan § 74.4. The Comprehensive Cap applies to all debt issued pursuant to the Plan (except New GO CABs or payments on CVIs), as well as "any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax-supported debt obligations issued other than pursuant to the Plan or in connection with the Plan or any Commonwealth Instrumentality Plan." *Id.* The Comprehensive Cap therefore limits the Commonwealth's future ability to borrow, which is designed to reduce risk by ensuring debt service is affordable in relation to revenue levels, while providing some flexibility for potential future debt issuances.

39. The Plan also requires the Commonwealth to "maintain and comply with a Debt Management Policy designed to ensure that certain past debt issuance practices of the Commonwealth are not repeated." Plan § 74.5. That Debt Management Policy must include at least the following provisions: (*i*) long-term borrowing should be incurred for capital improvements only; (*ii*) all tax-supported borrowing must mature within thirty years of its date of issuance; (*iii*) all tax-supported debt must begin to amortize within two years of its original issuance date, with certain limited exceptions; and (*iv*) refinancings should be permitted only if they result in cash flow savings in every applicable fiscal year, with certain limited exceptions. *Id.*

15

40.     Together, the Comprehensive Cap and the Debt Management Policy are designed to limit the Commonwealth's ability to engage in financial practices such as "scoop and toss" borrowing, even in the event projected deficits materialize.

*Potential Upside Factors Not Incorporated in the Fiscal Plan*

41.     I have also reviewed the *Expert Report of Andrew Wolfe (Corrected)*, dated September 13, 2021 [ECF No. 18151-1] (the "Wolfe Report"). Dr. Wolfe opines regarding certain structural reforms the Commonwealth could undertake which, if implemented, would produce sufficient revenues to allow for the full repayment of the Commonwealth's restructured post-confirmation debt service, as provided for in the Plan. Dr. Wolfe identifies several structural reforms which, if implemented by the Commonwealth government, would improve the Commonwealth's growth, creating a sustainable level of financial resources and improving the Commonwealth's cash flows such that it is capable of meeting the debt service contemplated by the Plan.

42.     Dr. Wolfe identifies three areas of potential structural reforms: (*i*) reforms to labor markets; (*ii*) ease of doing business reforms; and (*iii*) taxation reforms. Wolfe Rep. at ¶ 11. Within these three areas, Dr. Wolfe divides his proposed reforms into three categories. *Id.* at ¶ 15. Category 1 reforms are reforms that were recommended by the Oversight Board in the 2021 Fiscal Plan that have been evaluated as to their impact on financial growth, and whose impacts are incorporated into the Fiscal Plan's projections. *Id.* Category 2 reforms were recommended by the Oversight Board in the 2021 Fiscal Plan as additional structural measures that should be adopted by the Commonwealth, but whose impact has not been incorporated into the 2021 Fiscal Plan's revenue projections. *Id.* Category 3 reforms are reforms that were not discussed in the 2021 Fiscal

Plan, but which, in Dr. Wolfe's opinion, should be adopted by the Commonwealth to further stimulate growth. *Id*.

43.     Dr. Wolfe concludes that, if the areas of Category 2 and 3 reforms are implemented by the Commonwealth, the Commonwealth will build additional cumulative surpluses of approximately $30 billion over the period of FY 2022 – FY 2046. *Id*. at ¶ 27. Based on Dr. Wolfe's analysis, then, implementation of the Category 2 and 3 reforms described in his report would not only reverse the Commonwealth's projected deficits, but would provide sufficient cumulative surpluses to enable the Commonwealth to pay the debt service contemplated by the Plan. However, the execution of these reforms is subject to significant implementation risk.

*Additional Reforms and Measures*

44.     Based on my work advising the Board, I am aware of additional potential upside scenarios not addressed by the Wolfe Report which, if they materialize, could result in additional cumulative surplus available to pay debt service.

45.     For example, historically, the Medicaid program in the Commonwealth operates with an annual ceiling on federal financial reimbursement participation, referred to as the Section 1108 cap or Section 1108 allotment (§ 1108(g) of the Social Security Act). The federal government reimburses expenses in an amount matching local funding up to the specified annual Section 1108 allotment. Section 1108 also establishes the rate at which the Commonwealth is reimbursed for Medicaid program expenses, known as the Federal Medical Assistance Percentage ("FMAP"). This reimbursement rate is set at 55% of authorized expenditures for the majority of Medicaid participants. The federal reimbursement rate for a smaller portion of the Commonwealth Medicaid population that gained access to Medicaid under the expansion of the Patient Protection and Affordable Care Act is 90%. Since 2011, Congress has repeatedly authorized additional

temporary federal funding for the Commonwealth's Medicaid program through the passage of time-limited appropriations, such as the Patient Protection and Affordable Care Act and the Bipartisan Budget Act of 2018. Congress's actions have generally addressed both the allotment cap and the FMAP reimbursement rate.

46.     The current Fiscal Plan projections assume supplemental Medicaid funding for Puerto Rico will begin to phase out after the first quarter of FY 2022 (ending September 30, 2021). If this phase out occurs, the federal share of Medicaid funding for Puerto Rico will be limited by statute to the Section 1108 annual cap (currently approximately $400 million) and a statutory Federal Medical Assistance Percentage reimbursement rate of 55%. As reflected in the 2021 Fiscal Plan, this would increase the Commonwealth's share of Medicaid costs from approximately $300 million in FY 2021 to over $2.0 billion annually. I am aware, however, that the Centers for Medicare and Medicaid Services ("CMS") recently announced its interpretation of the Social Security Act to set the cap of federal Medicaid funds at a level higher than assumed in the 2021 Fiscal Plan. The validity of the new CMS interpretation is uncertain, however, and remains subject to legal and political challenge.

47.     It is my understanding that there are ongoing discussions in Congress that may extend supplemental Medicaid funding for Puerto Rico for several years. It remains uncertain whether additional Medicaid funding will be allocated to Puerto Rico, and if so, what the amount of that funding will be. However, this additional federal funding, if it materializes, could increase available cumulative surplus starting in FY 2022.

48.     In addition, a case currently pending before the Supreme Court, *U.S. v. Vaello-Madero*, No. 20-303, could impact future federal funding for Puerto Rico. The plaintiff in *Vaello-Madero* challenges a statute that provides Supplemental Security Income to residents of the fifty

U.S. states, the District of Columbia, and the Northern Mariana Islands, but does not provide the same benefits to residents of Puerto Rico. Because the outcome of the case is as yet unknown the potential financial impact of this decision on the Commonwealth's cumulative surplus for FY 2022 – FY 2046 is uncertain. However, if Congress were obligated to provide Supplemental Security Income to residents of Puerto Rico, that additional federal funding could further increase the Commonwealth's economic activity.

49.     As described in the Disclosure Statement, going forward, a certain level of unrestricted cash will be retained to help maintain uninterrupted government operations when unforeseen fiscal challenges emerge.[9] The Oversight Board considered a variety of methodologies in determining the range of unrestricted cash required. Ultimately, after analyzing the recommended values from each approach the unrestricted cash balance range presented to the Oversight Board was $1.2 billion to $1.7 billion.

50.     In addition to the unrestricted cash balance, the Oversight Board agreed to fund a temporary $750 million disaster aid revolving line of credit ("Revolving Fund") from the Commonwealth. The purpose of the Revolving Fund is to finance FEMA Permanent Work and Hazard Mitigation Grant Program ("HMGP") disaster relief projects of central government agencies, public corporations, instrumentalities, and municipalities in Puerto Rico ("Sub-Recipients") unable to secure other sources of funding.[10] As described in more detail in Paragraph

---

[9]     *See* Disclosure Statement at 169-173.
[10]    Eligible Sub-Recipients must have incurred qualifying permanent work damage under FEMA's Public Assistance program and HMGP projects for incurred damages as a result of Hurricane Maria (DR- 4339-PR), Hurricane Irma (DR-4336-PR), or the earthquakes declared in January 2020 under DR- 4473-PR.

15, the Revolving Fund monies will eventually be provided to creditors in the form of a 5.375% Capital Appreciation Bond.

51.    The Fiscal Plan also calls for the continued funding of an emergency reserve ("Emergency Reserve") to quickly respond to natural disasters.[11]   In line with International Monetary Fund guidance, the Oversight Board's yearly certified fiscal plans for the Commonwealth (starting in 2018) provide the Commonwealth will set aside $130 million annually for a period of ten years into an Emergency Reserve until the reserve balance reaches $1.3 billion, or 2% of Puerto Rico's fiscal year 2018 Gross National Product.[12]

52.    While the aforementioned upsides and cash reserves exist, there are also downside risks in the Plan.  The financial forecasts incorporated in the 2021 Fiscal Plan include assumptions the Commonwealth will implement certain structural reforms that will improve the productivity of the economy of Puerto Rico, thereby increasing growth and associated revenues.  If, instead, those structural reforms were assumed not to be implemented, this change in assumptions, without changing any other variables, would reduce the Commonwealth surplus by $30.7 billion, or an average of $1.0 billion per year lower total surplus between FY 2022 and FY 2051.

53.    Further, the 2021 Fiscal Plan financial forecast includes assumptions related to federal disaster relief funding related to the hurricanes and earthquakes that have struck in recent

---

[11]    2021   Certified   Fiscal   Plan   for   Puerto   Rico,   page   57. https://drive.google.com/file/d/1reetKnfKsa1uR-A0u9l3FM6PfGamHCrx/view   (last   accessed October 21, 2021).

[12]    GNP is used instead of Gross Domestic Product ("GDP") because GNP is the measure of national income that best ties to the base for tax collections.   *See, e.g.*, *Declaration of Andrew Wolfe in support of Urgent Motion of Debtor Puerto Rico Electric Power Authority For Entry of Interim and Final Orders (A) Authorizing Postpetition Secured Financing, (B) Granting Priming Liens And Providing Superpriority Administrative Expense Claims, (C) Modifying The Automatic Stay, (D) Scheduling a Final Hearing, and (E) Granting Related Relief*, No. 17-03283 (Jan. 27, 2018) [ECF No. 2298-2], at 6 n.4.

years. Specifically, the 2021 Fiscal Plan forecast assumes the Government and its instrumentalities will have the capacity to execute on large-scale reconstruction projects, and that the federal government will fund those projects at the levels assumed in the 2021 Fiscal Plan. If, instead, the amount assumed to be spent by the Commonwealth Government on reconstruction and recovery were to be spent at 50% of the currently assumed level between FY 2022 and FY 2051, this change in assumption without changing any other variables would result in $9.1 billion lower surplus between FY 2022 and FY 2051, or an average decrease in surplus of $304 million per year.

54.     To conclude, while there is sufficient surplus to meet the obligations under the Plan if the Commonwealth implements certain measures or if certain exogenous events occur, there is also a downside risk the Commonwealth will not adopt and implement the required measures, or that the exogenous events will not occur. However, since the availability of sufficient surplus to cover the deficit is, for the most part, in the hands of the Commonwealth, and the Commonwealth will be incentivized to create sufficient surplus for its own use and to prevent a return to insolvency, I conclude that confirmation of the Plan will not likely be followed by a need for further reorganization.

## Financial Obligations Imposed by the Plan Are Not Inconsistent with the Debt Sustainability Analysis

55.     As a result of my experience advising the Oversight Board, I am familiar with the Debt Sustainability Analysis ("DSA") contained in the 2021 Fiscal Plan.[13] The DSA provides parameters limiting how much debt and debt service the Commonwealth should reasonably carry on an annual basis. The DSA does not set discrete amounts of debt and debt service. Rather, it

---

[13] See 2021 Commonwealth Fiscal Plan at 64-71.

provides metrics showing the amounts of debt that would put the Commonwealth within the same debt range as groups of states based on different economic and demographic statistics.

56.     To develop that framework, the DSA reviews five different metrics utilized by credit rating agencies to assess debt levels across U.S. states. The DSA utilizes U.S. states as a benchmark for Puerto Rico because, like other U.S. states, Puerto Rico does not control its own currency, lacks access to restructuring support from large international institutions such as the International Monetary Fund or the World Bank, and has traditionally relied on the U.S. municipal long-term bond market. In addition, Puerto Rico's bonds have traditionally been rated by the same rating agency analyst groups that assign ratings to mainland U.S. states. The DSA then applies credit rating agency metrics against several different benchmark groups of U.S. states to arrive at an assessment of Puerto Rico's debt load based on long-term projections and the metrics of Puerto Rico's peer states.

57.     In particular, the DSA section of the 2021 Commonwealth Fiscal Plan provides a range of levels for sustainable debt capacity. The DSA utilizes the following five metrics identified in the two Moody's reports:

- *Debt service to own-source revenues.* This metric analyzes annual debt service revenue relative to "own-source revenues," or revenues generated by the state or territory. This ratio is calculated by dividing total annual debt service by total own-source government revenues calculated by subtracting federal transfers from total government revenues.

- *Fixed costs to own-source revenues.* This metric analyzes annual debt service and pension costs relative to revenues generated by the state or territory. This ratio is calculated by summing annual debt service, pension, and other post-employment

benefits (for example, retiree healthcare), and dividing that total by total own-source government revenues.

- *Debt per capita*. This metric analyzes net tax-supported debt relative to population. This ratio is calculated by dividing net tax-supported debt by the total population of the state or territory.

- *Debt to GDP*. This metric analyzes net tax-supported debt outstanding relative to the state or territory's gross domestic product. This ratio is calculated by dividing total net tax-supported debt by gross domestic product.

- *Debt to state personal income*. This metric analyzes net tax-supported debt outstanding relative to a state or territory's aggregate personal income. This ratio is calculated by dividing net tax-supported debt by aggregate personal income.

58.     To determine whether the debt service obligations imposed by the proposed Plan are consistent with the DSA, I considered the schedule of annual debt service payments the Commonwealth will owe pursuant to the Plan over a 25-year term,[14] and compared them to the 2021 Fiscal Plan's projections of the Commonwealth's own-source revenues for FY 2021 through FY 2051. The 2021 Commonwealth Fiscal Plan projects the Commonwealth's debt policy revenues will be $16.2 billion in FY 2022, and will increase to $21.1 billion by FY 2051.[15]

59.     In the Oversight Board's determination, the debt service to own-source revenues metric was the most relevant to ascertain that the restructured debt levels under the Plan are consistent with the DSA. Puerto Rico's post-confirmation debt service will be 7.3% of own-source

---

[14] *See* Plan Exhibit 1, reflecting Schedule of Cash Flows of New GO Bonds.

[15] *See* 2021 Commonwealth Fiscal Plan at 304. The Commonwealth's debt policy revenues include the portion of the SUT allocated to COFINA.

revenues in FY 2022 and the average over the 30-year period from FY 2022 through FY 2051 is 6.4%, including COFINA. The metric utilizing post-confirmation debt service places Puerto Rico below the average of the top 10 most indebted U.S. States of 9.2% and closer to the average of the top 25 most indebted U.S. States of 6.5%. The Plan leaves the Commonwealth with debt levels that reduce the debt service to own source revenue metric from 25% pre-restructuring[16] down to 7.3% post-confirmation (see Exhibit 1).

60.     Other financial obligations contemplated by the Plan—including anticipated cash payments and payments pursuant to the CVIs—are not assessed by the DSA, and are therefore not incorporated into this analysis, primarily because cash payments on the Effective Date do not create debt burdens and CVI payments come from revenues exceeding projections. The cash payments and CVIs are also not contemplated by the DSA because they are not bonded debt that must be serviced on an annual basis. Furthermore, CVI payments are contingent in nature and are, by definition, incremental to the 2021 Fiscal Plan's projections.

61.     Accordingly, the debt service contemplated under the Plan is, in my opinion, consistent with the DSA incorporated into the 2021 Fiscal Plan.

### The Financial Impact of Preempted Commonwealth Statutes, or Portions Thereof, Is Inconsistent with PROMESA

62.     I have reviewed Exhibit "K" to the proposed Plan. Exhibit "K" contains a schedule of statutes that the Oversight Board identified as providing for the appropriation of Commonwealth funds. The statutes identified in Exhibit "K" are listed in three sections: (*i*) Section I, "Commonwealth good faith and credit pledge statutes"; (*ii*) Section II, "Statutes appropriating Commonwealth revenues"; and (*iii*) Section III, "TRS and JRS statutes." The statutes identified

---

[16] Public Meeting - September 17, 2021 - Presentation - Plan of Adjustment, Debtors' Exhibit 31, https://drive.google.com/file/d/1VBhnesfOFYFD246uL88rOTJvFYvGUzrY/view

in Section I of Exhibit "K" are further divided into three subsections: (*i*) subsection A, "General Obligation Bonds"; (*ii*) subsection B, "General Obligation Loans"; and (iii) subsections C to F, which are Commonwealth guaranties of certain bond issuances by Commonwealth public corporations. Based upon my review and analysis of the appropriations provided for in the statutes and available Commonwealth revenues potentially subject to those appropriations, I estimate that Commonwealth appropriations pursuant to those statutes would have been at least $5.8 billion in FY 2022. To arrive at that figure, I reviewed the referenced statutes to understand the appropriations described therein, and used the 2021 Fiscal Plan to estimate how much those specific appropriations would have been in FY 2022.

63.     The statutes identified in Section I of Exhibit "K" generally require the Commonwealth to use its revenues to repay its general obligation and guaranteed debt in full. I reviewed the pre-petition debt service amounts in Exhibit 156 of the 2021 Fiscal Plan associated with outstanding general obligation bonds to determine the amount of debt service the Commonwealth would owe in FY 2022 in respect of each of the outstanding General Obligation Bonds. The amount of Commonwealth revenues that would be needed to pay in full all scheduled debt service on outstanding general obligation bonds for FY 2022 would be more than $1.7 billion, if permitted by a certified budget of the Oversight Board.

64.     The statutes identified in Section II of Exhibit "K" generally require the Commonwealth to transfer certain revenues to numerous other entities to spend on various purposes. These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The

amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.[17]

65.     Lastly, the statutes identified in Section III of Exhibit "K" provide, *inter alia*, for the Commonwealth to provide pension and other benefits or payments to various retirees who participated in the ERS, TRS, or JRS retirement systems at statutorily specified rates. I am familiar with the projected retirement benefits to be paid by the Commonwealth to pensioners who participate in the retirement systems under the "pay as you go" funding arrangement established by Act 106-2017.  I am also familiar with the retirement benefits to be paid by the Commonwealth to individuals who participate in the TRS and the JRS retirement systems.  Based on information made available to me by the Commonwealth regarding the total number of participants in TRS and JRS to whom the Commonwealth owes payments, and the amount of pension benefit payments and other benefits owed to such retirees, I reviewed the amount of pension benefit payments and other benefits calculated in the 2021 Fiscal Plan that would be paid to the Commonwealth's retirees in FY 2022.  The amount of Commonwealth revenues that would need to be spent on TRS and JRS pension benefit payments and other benefits or payments in FY 2022, if permitted by a certified budget of the Oversight Board, is $984 million.

66.     The certified budget, excluding federal funds, for the Commonwealth of Puerto Rico for FY 2022 appropriated approximately $13.6 billion.  Accordingly, if all Commonwealth appropriations described herein were required to be transferred, the Oversight Board would be

---

[17] For example, the Commonwealth statute 18 LPRA 621-1, as amended by and including Act 66-2014 requires that 8.7% of the general fund be appropriated to the University of Puerto Rico ("UPR") for any fiscal year after FY15.  The general fund budgeted revenues for FY22 were $10.112 billion which implies a statute appropriation for UPR of $880 million.

unable to control approximately 43% of the total certified Commonwealth budget, excluding federal funds.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on October 25, 2021
Chicago, Illinois

_____
Gaurav Malhotra

Exhibit  1

| $ in millions | FY 2022 | FY 2022 - 2051 Average |
|---|---|---|
| Debt service[1] | $    1,150.0 | |
| Own source revenue[2] | $  15,793.9 | |
| Debt to own source revenue | 7.3% | 6.4% |
| | | |
| Debt Service, % of own source revenue[3] | | |
| Top 10 most indebted U.S. States | 9.2% | |
| Top 25 most indetbed U.S. States | 6.5% | |

Notes

1.  Reflects post-restructuring debt service.  Source: Plan of Adjustment, Exhibit I and Exhibit 157 of the 2021 Certified Fiscal Plan

2.  FY2022 reflects the average of FY20 and FY21 debt policy revenues in accordance with Article IV of the Debt Responsibility Act. Source: Exhibit 157 of the 2021 Certified Fiscal Plan and 2021 CFP Model, 30 Year tab

3. 2021 Certified Fiscal Plan, Exhibit 30: Key Debt ratios For U.S. States