## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE<br>EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, AND THE PUERTO RICO PUBLIC<br>BUILDINGS AUTHORITY,<br><br>                  Debtors.[1] | PROMESA<br><br>Title III<br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF FILING PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW IN CONNECTION WITH
## CONFIRMATION OF THE SEVENTH AMENDED TITLE III JOINT PLAN
## OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

**PLEASE TAKE NOTICE** that, on July 30, 2021, the Financial Oversight and

Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the

Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the

Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings

Authority ("PBA"), pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and*

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four
(4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto
Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales
Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal
Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-
3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of
the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal
Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS)
(Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy
Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as
Bankruptcy Case numbers due to software limitations).

*Economic Stability Act* ("PROMESA")[2] (the Oversight Board, in its capacity as representative of the Commonwealth, ERS, and PBA, is referred to as the "Debtors"), filed the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (the "Plan") and corresponding *Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17628] (the "Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that, on August 2, 2021, the Court entered (i) the *Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures* [ECF No. 17639], establishing a schedule and procedures relating to solicitation of creditor votes upon the Plan, and setting the hearing to consider confirmation of the Plan to begin on November 8, 2021, and (ii) the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* [ECF No. 17640] (the "Confirmation Procedures Order"), establishing, among other things, October 25, 2021 as the deadline for the Debtors to file an initial proposed findings of fact and conclusions of law in support of confirmation of the Plan.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Confirmation Procedures Order, attached hereto as **Exhibit A** is the proposed *Findings of Fact and Conclusions of Law in*

---

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

*Connection with Confirmation of the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*

   **PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III Cases are available (a) free of charge by visiting https://cases.primeclerk.com/puertorico or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

Dated: October 25, 2021
       San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Brian S. Rosen
(Admission *pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/  Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

## Exhibit A

**Proposed Findings of Fact and Conclusions of Law**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re: | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III No. 17 BK 3283-LTS |
|     as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, |  |
|                     Debtors.[1] |  |

## [DRAFT] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH CONFIRMATION OF THE SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

LAURA TAYLOR SWAIN, United States District Judge

Before the Court is the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated July 30, 2021 (Docket Entry No. 17628 in Case No. 17-3283)[2] (as modified pursuant to any revisions made at or subsequent to the Confirmation Hearing as set forth in the Confirmation Order, including the Plan Supplement, and as may be modified pursuant to section 313 of PROMESA, the "Plan")[3] filed by the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), and together with the Commonwealth and ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Debtors pursuant to PROMESA Section 315(b).[4]  The following documents have been filed by the Debtors in connection with confirmation of the Plan:

(a) *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18470) (the "Plan Supplement");

(b) *Affidavit of Service of Solicitation Materials* (Docket Entry No. 18635), *Affidavit of Service of Solicitation Materials* (Docket Entry No. 18689), and *Affidavit of Service of Solicitation Materials* (Docket Entry No. 18690) (collectively, the "Mailing Affidavits");

---

[2]   All docket references are to entries in Case No. 17-3283 unless otherwise indicated.

[3]   Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

[4]   The Court previously entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, submission, and tabulation of votes and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices in connection therewith, and approving the form of notice of the Confirmation Hearing.  Moreover, the Court previously entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640).

(c) *Affidavit of Publication and Radio Advertisements* (Docket Entry No. 18688) (the "Publication Affidavit" and, together with the Mailing Affidavits, the "Service Affidavits");

(d) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. _____);

(e) *Memorandum of Law in Support of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. _____);

(f) *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18729);

(g) *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18731);

(h) *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18726);

(i) *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18734);

(j) *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18730);

(k) *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18738);

(l) *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18736);

(m) *Declaration of Adam Chepenik in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18735);

(n) *Declaration of Sheva Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18737);

(o) *Declaration of Jay Herriman in Respect of Confirmation of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18732);

(p) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. _____);

(q) *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725); and

(r) *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724);

Oppositions to confirmation of the Plan were filed by the following parties: (i) PFZ Properties, Inc. (Docket Entry Nos. 9223, 16969, 18418, and 18486); (ii) Sucesión Pastor Mandry Mercado (Docket Entry Nos. 12701, 16481, 17062, and 17998); (iii) Vicente Pérez Acevedo and Corporación Marcaribe Investment (Docket Entry No. 16668); (iv) Antonio Martin Cervera (Docket Enrty No. 16871); (v) Maria Teresita Martin (Docket Entry No. 16872); (vi) Wanda Ortiz Santiago (Docket Entry Nos. 16939 and 17175); (vii) Nancy I. Negron-Lopez (Docket Entry No. 16955); (viii) the Ad Hoc Group of FGIC Noteholders (Docket Entry No. 17001); (ix) Demetrio Amador Inc. (Docket Entry Nos. 17005 and 18582); (x) Suiza Dairy Corp. (Docket Entry Nos. 17013, 17526, and 18593); (xi) Maruz Real Estate Corp. (Docket Entry No. 17016); (xii) Group Wage Creditors (Docket Entry No. 17021); (xiii) Yashei Rosario (Docket Enrty Nos. 17047 and 17116); (xiv) AAFAF (Docket Entry Nos. 17202 and 18592); (xv) Ana A. Nunez Velazquez (Docket Entry Nos. 17436 and 17438); (xvi) Vaquería Tres Monjitas, Inc. (Docket Entry Nos. 18091 and 18637); (xviii) Edgardo Marquez Lizardi (Docket Entry Nos. 18111 and 18249); (xix)

Maria M. Ortiz Morales (Docket Entry No. 18396); (xx) Arthur Samodovitz (Docket Entry No.
18433); (xxi) the Constitutional Debt Group, GO Group, LCDC, and QTCB Group (Docket Entry
No. 18453); (xxii) Ambac (Docket Entry No. 18479; (xxiii) Miguel Luna de Jesus (Docket Entry
No. 18485); (xxiv) Ismael L. Purcell Soler and Alys Collazo Bougeois (Docket Entry No. 18504);
(xxv) Mildred Batista De Leon (Docket Entry No. 18505); (xxvi) Javier Alejandrino Osorio
(Docket Entry No. 18506); (xxvii) Service Employees International Union (Docket Entry No.
18511); (xxviii) Mapfre PRAICO Insurance Company (Docket Entry Nos. 18512 and 18513);
(xxix) Ana A. Nunez Velazquez (Docket Entry No. 18529); (xxx) certain creditors who filed
actions in the United States District Court for the District of Puerto Rico (Docket Entry No. 18535);
(xxxi) Med Centro, Inc. (Docket Entry No. 18538); (xxxii) Asociación De Jubilados De La
Judicatura De Puerto Rico (Docket Entry Nos. 18548 and 18549); (xxxiii) Cooperativa de Ahorro
y Crédito Vegabajeña (Docket Entry No. 18551); (xxxiv) International Union, UAW (Docket
Entry No. 18558); (xxxv) Maruz Real Estate Corp. (Docket Entry No. 18563); (xxxvi) LORTU-
TA Ltd, Inc., La Cuarterola, Inc., Juaza, Inc., and the Conjugal Partnership Composed of Juan
Zalduondo Viera and Magdalena Machicote Ramery (Docket Entry No. 18564); (xxxvii) Sucn. De
Frank Torres Ortiz & Aurea Rodriguez (Docket Entry No. 18565); (xxxviii) Finca Matilde, Inc.
(Docket Entry Nos. 18566 and 18570); (xxxix) the Internal Revenue Service (Docket Entry No.
18567); (xl) certain ERS bondholders (Docket Entry No. 18569); (xli) the University of Puerto
Rico Retirement System Trust (Docket Entry No. 18573); (xlii) Peter C. Hein (Docket Entry No.
18575); (xliii) Miriam E. Lima Colón, Betzaida Feliciano Concepción, and Angel L. Méndez
González (Docket Entry No. 18583); (xliv) Asociatión de Maestros Puerto Rico and Asociación
de Maestros de Puerto Rico-Local Sindical (Docket Entry No. 18585); (xlv) the Underwriter
Defendants (Docket Entry No. 18587); (xlvi) the Bank of New York Mellon (Docket Entry No.

5

18588); (xlv) the Creditors' Committee (Docket Entry No. 18589); (xlvi) the DRA Parties (Docket

Entry Nos. 18590 and 18636); (xlvii) certain credit unions (Docket Entry No. 18594); (xlviii)

Community Health Foundation of P.R. Inc. (Docket Entry No. 18604); (xlix) Quest Diagnostics

of Puerto Rico, Inc. (Docket Entry No. 18560); (l) U.S. Bank Trust Association and U.S. Bank

National Association (Docket Entry Nos. 18631 and 18634); and Nilsa Candelario (Docket Entry

No. 18663).  In addition, the Debtors have received letters in opposition to confirmation of the

Plan, which were not filed with the Court, from: (a) Luiz Roldan Ruiz; (b) Antonia Medina

Rodriquez; and (c) Aida Iris Santiago Torres.  Further, oppositions to the initial proposed

confirmation order (Docket Entry No. 18447) were filed by the following parties: (1) Assured

(Docket Entry No. 18645); (2) Peter C. Hein (Docket Entry No. 18647); (3) Suiza Dairy Corp.

(Docket Entry No. 18651); (4) the Creditors' Committee (Docket Entry No. 18658); (5) Bank of

New York Mellon (Docket Entry No. 18662); (6) Finca Matilde, Inc. (Docket Enrty No. 18670);

(7) the Retiree Committee (Docket Entry No. 18679); (8) the DRA Parties (Docket Entry No.

18685); and (9) Ambac (Docket Entry No. 18694).

Statements in support of confirmation of the Plan were filed by the following parties: (i)

the Retiree Committee (Docket Entry No. 18562); (ii) National (Docket Entry No. 18574); (iii)

Assured (Docket Entry No. 18584); (iv) FGIC (Docket Entry No. 18595); and (v) Ambac (Docket

Entry No. 18601).

The Court heard argument and received evidence in connection with confirmation of the

Plan at a hearing held from November 8–23, 2021 (the "Confirmation Hearing").[5]  The Court has

---

[5]   At the Confirmation Hearing, the Court also considered approval of the *Qualifying Modification Pursuant to
PROMESA Title VI for the Puerto Rico Infrastructure Financing Authority* (Case No. 21-1492, Docket Entry No.
1, Ex. A) and *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Convention Center
District Authority* (Case No. 21-1493, Docket Entry No. 1, Ex. A).

carefully considered the Plan, as well as the supporting and opposing submissions, and the witness testimony and voluminous briefing and written evidence submitted by the parties.  The Court has also reviewed and considered carefully hundreds of letters and email messages submitted by members of the public and has listened carefully to the oral remarks made on the record at the Confirmation Hearing by members of the public.  For the following reasons, the Plan is hereby confirmed and the objections are overruled.

### Introduction

In 2017, the Oversight Board initiated unprecedented proceedings to restructure the debts of the Commonwealth and certain of its instrumentalities pursuant to Title III of PROMESA.  At the outset of these historic proceedings, the Court emphasized that the goal of Title III and the Court's goal in overseeing these cases would be to find a path forward for Puerto Rico, its citizens, and the others who hold stakes in its future, including the financial investors who hold obligations or are otherwise dependent on Puerto Rico for their financial wellbeing.  On February 4, 2019, this Court confirmed the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Docket Entry Nos. 5047 and 5048), for the Puerto Rico Sales Tax Financing Corporation ("COFINA") and approved the settlement between the Commonwealth and COFINA (Docket Entry No. 5045) that divides rights to a significant flow of tax revenues between the two debtors that were involved in complex litigation regarding the ownership of such tax revenues.  The settlement of such dispute paved the way for the design of a plan of adjustment for the Commonwealth that meets PROMESA's goals of achieving fiscal responsibility and access to capital markets for the benefit of the Commonwealth, its people, and its many other stakeholders.

The Plan represents a significant next step on the path towards Puerto Rico's financial recovery, economic stability, and prosperity, and a consensual resolution of complex litigation involving many of the Debtors' key stakeholders. The resolutions embodied in the Plan resulted from arm's length negotiations, many of which were facilitated by the Mediation Team appointed by the Court. After considering the applicable legal standards and the evidence, the Court finds that the Plan is necessary and compliant with the relevant legal standards and is essential to ensure that Puerto Rico is on a path that will restore its access to capital markets as it builds a stronger economy. Importantly, the Plan addresses only the Commonwealth, ERS, and PBA's assets and liabilities, and not those of other instrumentalities, including HTA and PREPA.

## Findings of Fact and Conclusions of Law

1.   <u>Findings and Conclusions</u>.  This memorandum (this "<u>Memorandum</u>") constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and PROMESA Section 310. To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such. Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Memorandum, the Confirmation Order, or the Plan.

2.   <u>Jurisdiction</u>.  This Court has exclusive jurisdiction over the Title III Cases pursuant to PROMESA Section 306(a). Venue is proper before this Court pursuant to PROMESA Section 307(a). Pursuant to Section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the Debtors, wherever located. To the extent necessary, pursuant to PROMESA Section 305, the

Oversight Board has granted consent to, and the Plan provides for, this Court's exercise of jurisdiction over the property and revenues of the Debtors as necessary to approve and authorize the implementation of this Memorandum, the Confirmation Order, and the Plan.

3.      Judicial Notice.  The Court takes judicial notice of the dockets of the Title III Cases, the appellate court dockets of any and all appeals filed from any order entered or opinion issued by the Court in the Title III Cases, and the following litigations and adversary proceedings, each as defined in the Plan, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings related thereto: (a) the Ambac Action, (b) the Appointments Related Litigation, (c) the Clawback Actions, (d) the ERS Litigation, (e) the ERS Recovery Actions, (f) the ERS Takings Action, (g) the FGIC Action, (h) the Gracia Gracia CW Action, (i) the Gracia Gracia Federal Action, (j) the Lift Stay Motions, (k) the Med Center Litigation, (l) the Med DC Action, (m) the National Action, (n) the PBA Litigation, (o) the PRIFA BANs Litigation, (p) the SCC Action, (q) the Uniformity Litigation, (r) the Invalidity Actions, (s) the Lien Challenge Actions, and (t) the Causes of Action set forth in Exhibit B to the Plan.

4.      Burden of Proof.  The Debtors have the burden of proving the elements of PROMESA Section 314 and, to the extent applicable to consideration of confirmation of the Plan, Rule 9019 of the Bankruptcy Rules, by a preponderance of the evidence.  The Debtors have met their burden with respect to each element of PROMESA Section 314 and, to the extent applicable to consideration of confirmation of the Plan, Bankruptcy Rule 9019.

### General Background

**I.   The Oversight Board and Title III Cases**

5.     For more than a decade, Puerto Rico has been facing an unprecedented fiscal and economic crisis.  The positions assumed and actions taken in the past caused Puerto Rico to lose access to the capital markets and precipitated the collapse of Puerto Rico's public finance system.  These actions accelerated the contraction of Puerto Rico's economy and increased the outmigration of residents of Puerto Rico.  The situation has been further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017, the earthquakes that occurred in early 2020, and the COVID-19 pandemic.

6.     On June 30, 2016, the United States enacted PROMESA, and the Oversight Board was established pursuant to PROMESA Section 101(b).  (Jaresko Decl. ¶ 7).  Pursuant to Section 4 of PROMESA and Article VI of the United States Constitution, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

7.     On August 31, 2016, President Obama appointed the Oversight Board's original seven voting members.  (Jaresko Decl. ¶ 8).  The Oversight Board currently has its full complement of seven members.  (Jaresko Decl. ¶ 8).

8.     On September 30, 2016, the Oversight Board designated ERS and PBA as "covered instrumentalities" pursuant to PROMESA Section 101(d).

9.     On May 3, 2017, the Oversight Board issued a restructuring certification, pursuant to Sections 104(j) and 206 of PROMESA, and filed a voluntary petition for relief for the Commonwealth pursuant to Section 304(a) of PROMESA, commencing the Commonwealth Title III Case.

10.     On May 21, 2017, the Oversight Board issued a restructuring certification, pursuant to Sections 104(j) and 206 of PROMESA, and filed a voluntary petition for relief for ERS pursuant to Section 304(a) of PROMESA, commencing the ERS Title III Case.

11.     On June 15, 2017, the U.S. Trustee appointed the Creditors' Committee in the Commonwealth Title III Case (Docket Entry No. 338) and, on August 25, 2017, the U.S. Trustee amended that appointment to provide that the Creditors' Committee would also serve in the ERS Title III Case (Docket Entry No. 1171).  On June 15, 2017, the U.S. Trustee appointed the Retiree Committee in the Commonwealth Title III Case.  (Docket Entry No. 340).

12.     On June 29, 2017, the Court entered an order granting the joint administration of the Commonwealth Title III Case and the ERS Title III Case, for procedural purposes only.  (Case No. 17-3655, Docket Entry No. 156).

13.     On September 27, 2019, the Oversight Board issued a restructuring certification, pursuant to Sections 104(j) and 206 of PROMESA, and filed a voluntary petition for relief for PBA pursuant to Section 304(a) of PROMESA, commencing the PBA Title III Case.

14.     On October 9, 2019, the Court entered an order granting the joint administration of the PBA Title III Case with the existing Title III Cases (Case No. 19-5523, Docket Entry No. 13).

## II.     The Plan Support Agreements, Plan, and Disclosure Statement

15.     The Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, and negotiated directly with various constituencies, in an effort to build support for the restructuring of the Commonwealth, ERS, and PBA's debt.  Those negotiations culminated in certain agreements with various stakeholders in furtherance of the successful implementation of the Plan.  (Jaresko Decl. ¶ 29); Skeel Decl. ¶ 17).

16.     On May 31, 2019, the Oversight Board entered into a plan support agreement (the "2019 PSA") with certain holders of approximately $3 billion of GO Bond Claims and PBA Bond Claims regarding the framework of a plan of adjustment that would resolve (i) disputes regarding the validity and related rights of the GO Bonds and PBA Bonds, and (ii) disputes between the Commonwealth and PBA regarding the characterization of certain purported leases, the amount of any administrative rent that may be owed by the Commonwealth for the use of PBA facilities following the commencement of the Commonwealth Title III Case, and the ownership of certain PBA facilities.  Following entry into the Initial PSA, the Oversight Board, under the guidance of the Mediation Team, continued to negotiate with its creditors to generate further consensus among the parties, including, but not limited to, other holders and insurers of GO Bonds and PBA Bonds. (Jaresko Decl. ¶ 30; Skeel Decl. ¶ 18).

17.     On June 7, 2019, the Oversight Board (i) reached an agreement with the Retiree Committee regarding, among other things, the treatment of ERS, JRS, and TRS benefits pursuant to the Plan, and (b) entered into the AFSCME Plan Support Agreement regarding, among other things, return of contributions of all public employees to ERS under the System 2000 plan, and modifications to a collective bargaining agreement and AFSCME's consent to the treatment of ERS benefits pursuant to the Plan.  (Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12; Skeel Decl. ¶ 19).  The AFSCME Plan Support Agreement provides for AFSCME's support for modified terms of collective bargaining agreements, along with its consent to the restructuring of the Commonwealth's pension obligations, pursuant to the Plan.  (Santambrogio Decl. ¶ 12).

18.     On September 27, 2019, the Debtors filed the Initial Plan (as defined below), containing the material terms outlined in the 2019 PSA.  On the same date, the Oversight Board commenced the PBA Title III Case.  (Jaresko Decl. ¶ 32).  Following the filing of the Initial Plan,

the Oversight Board continued to negotiate with various stakeholders to generate further support

for a plan of adjustment.  On February 9, 2020, the Oversight Board and certain holders of GO

Bonds and PBA Bonds holding over $8 billion in Claims (and, inclusive of Claims held by parties

who executed joinders thereto, over $10 billion) disclosed they had reached a global settlement in

principle outlined in a plan support agreement (the "2020 PSA").  (Jaresko Decl. ¶ 33; Skeel Decl.

¶ 21).  On February 28, 2020, in furtherance of the 2020 PSA, the Oversight Board filed the First

Amended Plan (as defined below), a disclosure statement in connection with the First Amended

Plan (Docket Entry No. 11947) (the "2020 Disclosure Statement"), and a motion seeking approval

of that disclosure statement (Docket Entry No. 11950).  (Jaresko Decl. ¶ 34).

19.     On March 10, 2020, the Court entered an order scheduling a hearing to consider the

adequacy of information contained in the 2020 Disclosure Statement and setting related deadlines.

(Docket Entry No. 12187).  Shortly thereafter, in response to the COVID-19 pandemic and its

effects on the people and economy of Puerto Rico, the Oversight Board filed a motion (Docket

Entry No. 12485) seeking to adjourn the hearing to consider approval of the 2020 Disclosure

Statement and related deadlines, which the Court granted on March 27, 2020 (Docket Entry No.

12549).  (Skeel Decl. ¶ 23).

20.     On October 29, 2020, the Court entered the *Order on Joint Motion of PSA Creditors

Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose

Deadlines for Plan of Adjustment* (Docket Entry No. 14987) (the "Plan Scheduling Order"), which

directed the Oversight Board to file, on or before February 10, 2021, the proposed terms of a plan

of adjustment and a motion for approval of a proposed timetable for filing an amended plan and

proposed disclosure statement, among other things.

21.     Due to the impact of the pandemic, the Oversight Board re-engaged with the parties to the 2020 PSA and entered into further mediation sessions with the assistance and guidance of the Mediation Team.  (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24).  On February 16, 2021, the Court entered the *Order Granting Urgent Motion of the Financial Oversight and Management Board for Puerto Rico Requesting Extension of Deadlines for Submission of Plan or Adjustment or Term Sheet with Respect Thereto* (Docket Entry No. 15849), extending the February 10, 2021 deadline set forth in the Plan Scheduling Order to March 8, 2021.

22.     On February 23, 2021, the Oversight Board announced the termination of the 2020 PSA and the execution of the Initial PSA, dated as of February 22, 2021, among the Oversight Board, as representative of the Debtors, and the Initial GO/PBA PSA Creditors.  (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24).  On March 8, 2021, in furtherance of the Initial PSA, the Oversight Board filed the Second Amended Plan (as defined below) and a disclosure statement in connection with the Second Amended Plan.

23.     On April 2, 2021, the Oversight Board entered into the ERS Stipulation which, among other things, (i) provides a global resolution of disputes regarding the validity and related rights of ERS Bonds and the extent of the alleged liens supporting the obligations thereunder, (ii) resolves the administrative expense claims filed by certain ERS Bondholders, (iii) provides a resolution of disputes regarding certain legal challenges to the Commonwealth's post-petition enactment of a "pay as you go" system for payment of pension benefits to retirees, and (iv) provides for the payment of $373 million in cash to the holders of ERS Bonds, as well as the proceeds from the sale of certain ERS assets to the Commonwealth. (Jaresko Decl. ¶ 38–39; Skeel Decl. ¶ 26–27).

24.     On May 5, 2021, the Oversight Board entered into the HTA/CCDA Plan Support Agreement with certain holders and insurers of bonds issued by HTA and CCDA which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA Plan Support Agreement, (iv) provides for the bondholders and insurers to support the Plan, and (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA.  (Jaresko Decl. ¶ 40; Skeel Decl. ¶ 28).

25.     On May 11, 2021, in furtherance of the HTA/CCDA Plan Support Agreement, the Debtors filed the Third Amended Plan (as defined below) and a disclosure statement in connection with the Third Amended Plan (Docket Entry No. 16741).  On May 13, 2021, the Debtors filed a motion seeking approval of such disclosure statement (Docket Entry No. 16756).  On June 29, 2021, the Debtors filed the Fourth Amended Plan (as defined below) and a disclosure statement in connection with the Fourth Amended Plan (Docket Entry No. 17192).

26.     On July 12, 2021, the Oversight Board (i) entered into the GO/PBA Plan Support Agreement, which amended and restated the Initial PSA (Jaresko Decl. ¶ 122) and (ii) reached an agreement in principle with the Creditors' Committee which proposed recoveries for Classes of unsecured claimholders and resolved the Creditors' Committee's objections to the Plan.  (Jaresko Decl. ¶ 41).  The GO/PBA Plan Support Agreement, together with the restructuring of COFINA's debt, reduces the Commonwealth's debt service (including principal and interest from restructured COFINA bonds) by approximately 62%, from $90.4 billion to $34.1 billion.  The GO/PBA Plan

Support Agreement also (i) provides for a proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico Constitutional debt limit, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and PBA, and (iv) provides for the resolution of disputes regarding the PRIFA BANs pursuant to the PRIFA BANs Stipulation. (Jaresko Decl. ¶ 37; Skeel Decl. ¶ 25).   Also on July 12, 2021, in furtherance of the GO/PBA Plan Support Agreement, the Debtors filed the Fifth Amended Plan (as defined below) and a disclosure statement in connection with the Fifth Amended Plan (Docket Entry No. 17308).

27.     On July 27, 2021, the Oversight Board entered into the PRIFA Plan Support Agreement, which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the PRIFA PSA, (iv) provides for the bondholders and insurers to support for the Plan, and (v) presents the foundation for a restructuring of the PRIFA Bonds pursuant to Title VI of PROMESA.  (Jaresko Decl. ¶ 42; Skeel Decl. ¶ 30).  Also on July 27, 2021, in furtherance of the PRIFA Plan Support Agreement, the Debtors filed the Sixth Amended Plan (as defined below) and a disclosure statement in connection with the Sixth Amended Plan.  (Docket Entry No. 17516).

28.     On July 30, 2021, the Debtors filed the Plan and a disclosure statement in connection with the Plan (Docket Entry No. 17628) (the "Disclosure Statement").

29.     On August 2, 2021, the Court entered an order (Docket Entry No. 17639) (the "Disclosure Statement Order"), among other things (a) approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, (b) establishing (1) October 19, 2021 at 5:00 p.m. (Atlantic Standard Time) as the Confirmation Objection Deadline, (2) October 4, 2021 at 5:00 p.m. (Atlantic Standard Time) as the deadline by which (i) ballots to accept or reject the Plan were required to be received by the Solicitation Agent (the "Voting Deadline") and (ii) elections regarding the form of distributions were required to be effectuated through ATOP (the "Election Deadline"), and (c) scheduling a hearing from November 8–23, 2021 to consider confirmation of the Plan.  On September 27, 2021, the Court entered an order (Docket Entry No. 18258) extending the Voting Deadline to October 18, 2021 at 5:00 p.m. (Atlantic Standard Time) and, on October 1, 2021, the Court entered an order (Docket Entry No. 18360) extending the Election Deadline to October 18, 2021 at 5:00 p.m. (Atlantic Standard Time).

30.     Consistent with the Disclosure Statement Order, the Debtors caused the Solicitation Agent to distribute Solicitation Packages to all holders of Claims entitled to vote.  The Solicitation Packages contained, among other things: (a) the Confirmation Hearing Notice setting forth the time, date, and place of the Confirmation Hearing, (b) the Disclosure Statement Order (without the exhibits thereto) and the Disclosure Statement (together with all exhibits thereto, including the Plan), (c) the appropriate form of Ballot or Notice, if any, with instructions for voting and/or making any applicable election and, as applicable, a pre-addressed, pre-paid return envelope, (d) with respect to Class 51, the Retiree Committee Letter and Information Guide, and (e) with respect to Classes 54, 58, and 66, the Creditors' Committee Letter.  (Mailing Affidavits; Pullo Decl. ¶ [  ]).

## Compliance with PROMESA Sections 104(j) and 313

31.     The Oversight Board must certify the submission or modification of a plan of adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or modifying such plan of adjustment.  See PROMESA § 104(j)(1)–(2).  The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that it is consistent with the applicable certified fiscal plan.  See id. § 104(j)(4).  Further, the Oversight Board, after the issuance of a certification pursuant to PROMESA Section 104(j), may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of PROMESA Title III.  See id. § 313.  After the Oversight Board files a modification, the plan as modified becomes the Plan.

32.     The Oversight Board has complied with its obligations pursuant to PROMESA Sections 104(j) and 313.  On April 23, 2021, the Oversight Board certified the Commonwealth's current fiscal plan, which includes ERS and PBA (the "Fiscal Plan").  (Jaresko Decl. ¶ 28).

33.     On September 27, 2019, the Oversight Board certified the submission of the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 8765) (the "Original Plan") upon a determination, in the Oversight Board's sole discretion, that the Original Plan was consistent with the Fiscal Plan.  (Exhibit 122).  Accordingly, the Oversight Board submitted the submission of the Original Plan in accordance with PROMESA Section 104(j).

34.     On February 28, 2020, the Oversight Board certified the modification of the Original Plan and the submission of the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 11946) (the "First Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the First Amended Plan was

consistent with the Fiscal Plan.  (Exhibit 123).  Accordingly, the Oversight Board submitted the modification of the Original Plan and the submission of the First Amended Plan in accordance with PROMESA Section 104(j).

35.     On March 8, 2021, the Oversight Board certified the modification of the First Amended Plan and the submission of the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 15976) (the "Second Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Second Amended Plan was consistent with the Fiscal Plan.  (Exhibit 124).  Accordingly, the Oversight Board submitted the modification of the First Amended Plan and the submission of the Second Amended Plan in accordance with PROMESA Section 104(j).

36.     On May 11, 2021, the Oversight Board certified the modification of the Second Amended Plan and the submission of the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 16740) (the "Third Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Third Amended Plan was consistent with the Fiscal Plan.  (Exhibit 125).  Accordingly, the Oversight Board submitted the modification of the Second Amended Plan and the submission of the Third Amended Plan in accordance with PROMESA Section 104(j).

37.     On June 29, 2021, the Oversight Board certified the modification of the Third Amended Plan and the submission of the *Fourth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17194) (the "Fourth Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Fourth Amended Plan was consistent with the Fiscal Plan.  (Exhibit 126).  Accordingly, the Oversight Board submitted the

modification of the Third Amended Plan and the submission of the Fourth Amended Plan in accordance with PROMESA Section 104(j).

38.    On July 12, 2021, the Oversight Board certified the modification of the Fourth Amended Plan and the submission of the *Fifth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17306) (the "Fifth Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Fifth Amended Plan was consistent with the Fiscal Plan.  (Exhibit 127).  Accordingly, the Oversight Board submitted the modification of the Fourth Amended Plan and the submission of the Fifth Amended Plan in accordance with PROMESA Section 104(j).

39.    On July 26, 2021, the Oversight Board certified the modification of the Fifth Amended Plan and the submission of the *Sixth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17516) (the "Sixth Amended Plan") upon a determination, in the Oversight Board's sole discretion, that the Sixth Amended Plan was consistent with the Fiscal Plan.  (Exhibit 128).  Accordingly, the Oversight Board submitted the modification of the Fifth Amended Plan and the submission of the Sixth Amended Plan in accordance with PROMESA Section 104(j).

40.    On July 30, 2021, the Oversight Board certified the modification of the Sixth Amended Plan and the submission of the Plan upon a determination, in the Oversight Board's sole discretion, that the Plan was consistent with the Fiscal Plan.  (Exhibit 129).  Accordingly, the Oversight Board submitted the modification of the Sixth Amended Plan and the submission of the Plan in accordance with PROMESA Section 104(j).

41.    For the reasons explained herein, the Plan meets the requirements of PROMESA; the Original Plan and the First, Second, Third, Fourth, Fifth, and Sixth Amended Plans met the

requirements of PROMESA to the same extent that the Plan meets the requirements of PROMESA; and the Oversight Board has complied with all applicable provisions of PROMESA. Accordingly, the Oversight Board modified the Original Plan and the First, Second, Third, Fourth, Fifth, and Sixth Amended Plans in accordance with PROMESA Section 313, and the Seventh Amended Plan has become the "Plan."

## Compliance with PROMESA Section 314(b)

A. **PROMESA § 314(b)(1):** *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

42.     As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents.  Plan at 1.  In addition, as detailed below, the Plan satisfies the requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), and 1123(d) of the Bankruptcy Code.

### i.     Bankruptcy Code Section 1122(a)

43.     With the exception of Administrative Expense Claims and Professional Claims, which need not be classified, Article IV of the Plan designates the Classification of Claims.  Such classification complies with section 1122(a) of the Bankruptcy Code because each Class contains only claims that are either all unsecured Claims or are all secured Claims secured by the same collateral.  (Jaresko Decl. ¶ 47).  The Plan designates the following sixty-nine (69) Classes of Claims:

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage PBA Bond Claims | Class 1 | PBA |
| Vintage PBA Bond Claims (Assured) | Class 2 | PBA |
| Vintage PBA Bond Claims (National) | Class 3 | PBA |
| Vintage PBA Bond Claims (Ambac) | Class 4 | PBA |
| Vintage PBA Bond Claims (FGIC) | Class 5 | PBA |
| Vintage PBA Bond Claims (Syncora) | Class 6 | PBA |

| Claim | Class | Debtor(s) |
|---|---|---|
| Retail Vintage PBA Bond Claims | Class 7 | PBA |
| 2011 PBA Bond Claims | Class 8 | PBA |
| Retail 2011 PBA Bond Claims | Class 9 | PBA |
| 2012 PBA Bond Claims | Class 10 | PBA |
| Retail 2012 PBA Bond Claims | Class 11 | PBA |
| PBA/DRA Secured Claim | Class 12 | PBA |
| PBA General Unsecured Claims | Class 13 | PBA |
| PBA/DRA Unsecured Claim | Class 14 | PBA |
| Vintage CW Bond Claims | Class 15 | Commonwealth |
| Retail Vintage CW Bond Claims | Class 16 | Commonwealth |
| Vintage CW Bond Claims (Assured) | Class 17 | Commonwealth |
| Vintage CW Bond Claims (National) | Class 18 | Commonwealth |
| Vintage CW Bond Claims (Ambac) | Class 19 | Commonwealth |
| Vintage CW Bond Claims (FGIC) | Class 20 | Commonwealth |
| Vintage CW Bond Claims (Syncora) | Class 21 | Commonwealth |
| Vintage CW Bond Claims (Taxable Election) | Class 22 | Commonwealth |
| Vintage CW Guarantee Bond Claims | Class 23 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Assured) | Class 24 | Commonwealth |
| Vintage CW Guarantee Bond Claims (National) | Class 25 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Ambac) | Class 26 | Commonwealth |
| Vintage CW Guarantee Bond Claims (FGIC) | Class 27 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 28 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 29 | Commonwealth |
| 2011 CW Bond Claims | Class 30 | Commonwealth |
| Retail 2011 CW Bond Claims | Class 31 | Commonwealth |
| 2011 CW Bond Claims (Assured) | Class 32 | Commonwealth |
| 2011 CW Bond Claims (Taxable Election) | Class 33 | Commonwealth |
| 2011 CW Guarantee Bond Claims | Class 34 | Commonwealth |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 35 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims | Class 36 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 37 | Commonwealth |

22

| Claim | Class | Debtor(s) |
|---|---|---|
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 38 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 39 | Commonwealth |
| 2012 CW Bond Claims | Class 40 | Commonwealth |
| Retail 2012 CW Bond Claims | Class 41 | Commonwealth |
| 2012 CW Bond Claims (Assured) | Class 42 | Commonwealth |
| 2012 CW Bond Claims (Taxable Election) | Class 43 | Commonwealth |
| 2012 CW Guarantee Bond Claims | Class 44 | Commonwealth |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 45 | Commonwealth |
| 2014 CW Bond Claims | Class 46 | Commonwealth |
| Retail 2014 CW Bond Claims | Class 47 | Commonwealth |
| 2014 CW Bond Claims (Taxable Election) | Class 48 | Commonwealth |
| 2014 CW Guarantee Bond Claims | Class 49 | Commonwealth |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 50 | Commonwealth |
| Retired ERS Participant Below-Threshold Claims | Class 51A | Commonwealth |
| Retired JRS Participant Below-Threshold Claims | Class 51B | Commonwealth |
| Retired TRS Participant Below-Threshold Claims | Class 51C | Commonwealth |
| Retired ERS Participant Above-Threshold Claims | Class 51D | Commonwealth |
| Retired JRS Participant Above-Threshold Claims | Class 51E | Commonwealth |
| Retired TRS Participant Above-Threshold Claims | Class 51F | Commonwealth |
| Active ERS Participant Claims | Class 51G | Commonwealth |
| Active JRS Participant Claims | Class 51H | Commonwealth |
| Active TRS Participant Claims | Class 51I | Commonwealth |
| System 2000 Participant Claims | Class 51J | Commonwealth |
| VTP Payroll Participant Below-Threshold Claims | Class 51K | Commonwealth |
| VTP Payroll Participant Above-Threshold Claims | Class 51L | Commonwealth |

23

| Claim | Class | Debtor(s) |
|---|---|---|
| AFSCME Claims | Class 52 | Commonwealth |
| Dairy Producer Claims | Class 53 | Commonwealth |
| Eminent Domain Claims | Class 54 | Commonwealth |
| Energy Incentive Claims | Class 55 | Commonwealth |
| Med Center Claims | Class 56 | Commonwealth |
| Tax Credit Claims | Class 57 | Commonwealth |
| CW General Unsecured Claims | Class 58 | Commonwealth |
| CW/HTA Claims | Class 59 | Commonwealth |
| CW/Convention Center Claims | Class 60 | Commonwealth |
| CW/PRIFA Rum Tax Claims | Class 61 | Commonwealth |
| CW/MBA Claims | Class 62 | Commonwealth |
| CW Appropriations Claims | Class 63 | Commonwealth |
| Section 510(b) Subordinated Claims | Class 64 | Commonwealth, ERS, and PBA |
| ERS Bond Claims | Class 65 | ERS |
| ERS General Unsecured Claims | Class 66 | ERS |
| Gracia-Gracia Claims | Class 67 | Commonwealth |
| Convenience Claims | Class 68 | Commonwealth and ERS |
| Federal Claims | Class 69 | Commonwealth |

44.     The classification of Claims set forth in the Plan is reasonable and was not done to control the outcome of voting to accept or reject the Plan, as the classification is based upon differences in the legal nature and/or priority of such Claims in accordance with applicable law. To the extent unsecured Claims are separately classified, it is not to gerrymander an accepting Class.   Rather, separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims.   (Jaresko Decl. ¶ 48).

45.     All holders of Claims in Classes 1–11 hold PBA Bonds and allege the same guarantee against the Commonwealth, but are separately classified based on three factors: the year in which the bonds were issued, whether the bonds are insured and, if so, the insurer, and whether

24

the bondholder is a retail investor.  Classification depending on year of issuance is based on differences in the risk profile associated with each issuance potentially having violated the debt service limit set forth in Article VI, section 2 of the Commonwealth Constitution, with the treatment of Classes varying based on how much risk of disallowance of the Claims existed for each Class.  Holders of insured bonds issued the same year are separately classified because the insurance agreements provide bondholders different rights.  Thus, the holders of Claims in Classes 1–11 are classified by whether the PBA Bonds they hold: (a) were issued prior to 2011 and are (i) uninsured (Class 1), (ii) uninsured and held by a Retail Investor (Class 7), (iii) insured by Assured (Class 2), National (Class 3), Ambac (Class 4), FGIC (Class 5), or Syncora (Class 6); (b) were issued in 2011 and are (i) uninsured (Class 8), or (ii) uninsured and held by a Retail Investor (Class 9); or (c) were issued in 2012 and are (i) uninsured (Class 10), or (ii) uninsured and held by a Retail Investor (Class 11).  (Jaresko Decl. ¶ 48).

46.     Bond Claims against the Commonwealth in Classes 15–50 are classified separately based on the date of bond issuance, whether the bonds are insured and, if so, the insurer, and whether the bondholder is a retail investor as follows: (a) whether the bonds were issued prior to March 2011 (Classes 15–29), March or later in 2011 (Classes 30–39), in 2012 (Classes 40–45), or 2014 (Classes 46–50), and (b) whether the bonds are (i) uninsured (Classes 15, 23, 30, 34, 36, 40, 44, 46, and 49) and held by Retail Investors (Classes 16, 31, 38, 41, and 47), or (ii) insured by Assured (Classes 17, 24, 32, and 42), National (Classes 18 and 25), Ambac (Classes 19 and 26), FGIC (Classes 20 and 27), or Syncora (Classes 21 and 28).  (Jaresko Decl. ¶ 49).

47.     Based on the elections offered pursuant to the Plan, certain Vintage CW Bonds, Vintage CW Guarantee Bond Claims, 2011 CW Bond Claims, 2011 CW Guarantee Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond Claims, and 2014

CW Guarantee Bond Claims, to the extent elections were made, were shifted to other Classes (Classes 22, 29, 33, 35 39, 43, 48, and 50, respectively) to denote the holders of such Claims' election made to receive taxable distributions on account of their bonds, and the alternative form of distribution elected.  (Jaresko Decl. ¶ 49).  Only Puerto Rico Investors could elect to receive taxable bonds because, unlike mainland U.S. investors, Puerto Rico Investors are generally not subject to U.S. federal income taxation.  (Brownstein Decl. ¶ 16).  When Puerto Rico Investors elect taxable treatment, it increases the likelihood that a greater amount of tax-exempt bonds will be available for mainland U.S. bondholders.  (Brownstein Decl. ¶ 16).

48.      Active and retired employees holding pension Claims comprise Classes 51A–51L. These current and former employees are integral to the basic provision of governmental services to the Commonwealth's residents and the Government could not function without them. Moreover, the best interests of the Commonwealth and all of its stakeholders are served by ensuring pensioners receive a minimum monthly benefit to maintain the ability to support themselves without requiring additional future support from the Commonwealth.  These pension Claims are further classified separately based on whether the pensioners (a) are retired (Classes 51A–F, K, and L) or active (Classes 51G–J), (b) are participants in ERS (Classes 51A, 51D, and 51G), JRS (Classes 51B, 51E, and 51H), TRS (Classes 51C, 51F, and 51I), System 2000 (51J), or participated in a voluntary termination program (Classes 51K and 51L), because each program had different funding sources as of the Commonwealth Petition Date, with different levels of underfunding, and (c) receive a Total Monthly Benefit above (Classes 51D-F and 51L) or below (Classes 51A-C and 51K) a minimum threshold of $1,500.  (Jaresko Delc. ¶ 50–51).

49.      Claims held by AFSCME, related to certain collective bargaining agreements between AFSCME affiliates and the Commonwealth that will occur pursuant to the Plan, are

classified in Class 52, separately from general unsecured claims.  The separate classification is compelled because the treatment of these claims is the adoption of a new collective bargaining agreement.  This treatment is inapplicable to other Classes of unsecured Claims and it is beneficial to the Commonwealth and all its stakeholders to provide such treatment as opposed to the payment of the Claims.  AFSCME and its local affiliates collectively constitute one Puerto Rico's primary public employee unions, and is an important bargaining unit whose members provide the Commonwealth's public services.  (Jaresko Decl. ¶ 52).  Separate classification of these claims is reasonable, justified, and supported by a governmental purpose.  No other collective bargaining agreement is being rejected pursuant to the Plan.

50.     The Claims held by Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc.—the Commonwealth's primary producers and source of dairy for the population—are classified separately in Class 53.  It is very costly and difficult for Puerto Rico to consistently import dairy, which has a short shelf life—a fact underscoring the importance of the domestic dairy industry to the Commonwealth and its residents.  Further, dairy production is one of the key issues of food security on the Island.  In addition, the dairy industry is one of the Commonwealth's largest agricultural industries and employs a significant number of Puerto Rico's residents.  It is reasonable and justified to separately classify such Claims and provide such Class with an enhanced 50% recovery, ensuring that such integral Claimants do not suffer further financial hardship and impair an industry vital to the health of the Commonwealth's citizens  (Jaresko Decl. ¶ 53).  Accordingly, it is reasonable, justified, and supported by a governmental purpose to classify separately claims held by large dairy producers.

51.     Eminent domain Claims are separately classified in Class 54.  Those claimants assert constitutional Claims based upon an alleged seizure of property pursuant to the

Commonwealth's eminent domain power, and are partially secured by deposits submitted by the Commonwealth with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims (though the claimants contend they are fully secured based on the Fifth Amendment of the U.S. Constitution). The amount of the Claim in excess of the deposit, if any, will receive the same treatment as other general unsecured creditors. (Jaresko Decl. ¶ 54). These Claims are classified separately because the treatment of this Class settles the claimholders' Fifth Amendment Claims, which would entitle the Claims to payment if the claimholders' Fifth Amendment argument were correct.

52.     Claims in Class 55 arise from, or relate to, the Energy Incentive Act, which provides tax incentives for citizens who undertake certain clean-energy projects to reduce their household's energy use. Pursuant to the Plan, such Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue. (Jaresko Decl. ¶ 55). It is in the Commonwealth's best interests to promote the reasonable governmental purpose of supporting residents who are taking steps to address climate change and who took those steps in reliance upon the availability of such tax deductions under the Energy Incentive Act.

53.     Class 56 consists of all Claims of certain federally qualified health centers arising from or relating to the Medicaid Act, 42 U.S.C. § 1396a(bb). Separate classification of such Claims is reasonable and justified because such Claims are held by integral members of the Commonwealth who continue to provide critical medical treatment to innocent third parties, particularly while in the midst of a global pandemic, and are payable through Medicare/Medicaid funds from the federal government which are earmarked for the payment of such claims and not available to other general unsecured claimholders. Separate classification of such Class and enhanced treatment on account of its Claims through the receipt of a 50% recovery is reasonable

28

and justified to support such critical services and ensure that medical providers on the Island are not underfunded.  (Jaresko Decl. ¶ 56).

54.     Class 57 consists of Claims (other than Energy Incentive Claims) relating to refunds or credits for the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, or an economic incentive law, in each case resulting in income tax credits, deductions, or carryforwards.  Such Tax Credit Claims were designed and implemented by the Government of the Commonwealth to incentivize certain behavior and to benefit the Commonwealth and support the economy as a whole.  Pursuant to the Plan, such Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue.  (Jaresko Decl. ¶ 57).  Accordingly, it is reasonable and in the best interests of the Commonwealth and its economy to continue to honor such tax incentives upon which residents and local businesses have relied, and to separately classify such Claims.

55.     Class 63 consists of Claims arising from or related to indebtedness only payable from appropriations of the Commonwealth legislature.  Such claimants have significantly lesser rights than holders of CW General Unsecured Claims, as they have no ability to compel payment of their Claims and hold only contingent rights to payment to the extent appropriated by the government of the Commonwealth.  (Jaresko Decl. ¶ 58).

56.     Class 64 consists of Claims determined pursuant to a Final Order to be subject to section 510(b) of the Bankruptcy Code.  (Jaresko Decl. ¶ 59).  Section 510(b) of the Bankruptcy Code subordinates such Claims to other general unsecured claims, and that such Claims are only eligible to receive a recovery pursuant to the Plan once all other unsecured creditors have been paid in full.  Because these Claims have a lower priority than general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant separate classification and treatment.

57.    As each Class contains Claims that are similarly situated to each other, the Plan satisfies the requirements of section 1122(a) of the Bankruptcy Code.

**ii.    Bankruptcy Code Section 1122(b)**

58.    Class 68 consists of Convenience Claims, consisting of Claims equal to or less than $20,000, or Claims which the holder elects to reduce to $20,000 pursuant to the Plan.  Any holder of multiple Claims in an aggregate amount of $40,000 or more may elect to reduce all such Claims to an aggregate amount of $40,000 and be treated within Class 68.  (Plan Sections 1.162–1.163, Article LXXII).  The separate classification of Convenience Claims is reasonable and necessary to ease the administrative burden on the Debtors.

59.    The Plan satisfies the requirements of section 1122(b) of the Bankruptcy Code.

**iii.    Bankruptcy Code Section 1123(a)(1)**

60.    Section 4.1 of the Plan designates sixty-nine (69) separate Classes of Claims for the Debtors, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code.

61.    The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

**iv.    Bankruptcy Code Section 1123(a)(2)**

62.    Section 84.1 of the Plan specifies that Claims in Classes 1 through 12, 14 through 50, 51B, 51D through 51I, 51L, 52 through 54, 56, 58 through 66, and 69 are impaired.  Section 84.2 of the Plan specifies that Claims in Classes 13, 51A, 51C, 51J, 51K, 55, 57, 67, and 68 are unimpaired.

63.    The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

**v.    Bankruptcy Code Section 1123(a)(3)**

64.     Articles V through XVI, XVIII through LIV, Sections 55.2, 55.4 through 55.9, 55.12, Articles LVI through LVIII, LX, LXII through LXX, and LXXIII of the Plan identify the treatment of each Class of Claims impaired by the Plan.

65.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

**vi.     Bankruptcy Code Section 1123(a)(4)**

66.     Articles V through LXXIII of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.

67.     Certain parties are receiving Consummation Costs, Restriction Fees, or Retail Support Fees pursuant to the Plan and in accordance with the plan support agreements negotiated by the Oversight Board.  These costs are critical components of the Plan Settlement Agreements that made development of the Plan possible.  In consideration for their efforts in assisting in the formulation of the Plan, and to compensate the PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the GO/PBA PSA and HTA/CCDA PSA, it is fair and reasonable for the PSA Creditors to be paid the Consummation Costs.  Additionally, in exchange for agreeing to support the Plan and to tender or "lock up", as applicable, the parties' bonds in accordance with each of the GO/PBA PSA and HTA/CCDA PSA, it is fair and reasonable to make PSA Restriction Fees available to such parties.  Similarly, in exchange for executing the ERS Stipulation and agreeing to all of its terms and conditions, including agreeing to support the Plan and to "lock up" their ERS Bonds in connection with the ERS Stipulation, it is fair and reasonable to make an ERS Restriction Fee available to each ERS bondholder party to the ERS Stipulation.  In addition, as part of the negotiations culminating in the GO/PBA PSA, a similar "restriction fee" will be available to Retail Investors who did not have the opportunity to tender

and exchange their bonds to join the GO/PBA PSA.  Providing Retail Investors an opportunity to receive similar payments is fair and reasonable, balances the interests of various creditor constituencies, and is beneficial to reduce the risk of potentially costly cramdown litigation in connection with Plan confirmation.  (Jaresko Decl. ¶ 216).

68.     The Consummation Costs, Restriction Fees, and Retail Support Fees are not awarded on account of the creditors' Claims, but as consideration for their actions in facilitating the settlements embodied in the Plan.  Such fees were essential to negotiate for an extended period of time and incentivized the creditors party to the plan support agreements to support confirmation of the Plan.  Without such fees, building consensus and encouraging parties to engage in negotiations and ultimately document their agreements would have been significantly more difficult, and Plan confirmation would have been less likely or substantially prolonged.  (Zelin Decl. ¶ 91–92).  Such fees are also the result of arm's length negotiations engaged in by the parties and are an integral part of the settlements reached between the parties.  (Zelin Decl. ¶ 93).  The Consummation Costs, Restriction Fees, and Retail Support Fees are fair and reasonable. Accordingly, payment of these fees is consistent with section 1123(a)(4) of the Bankruptcy Code.

### vii.    Bankruptcy Code Section 1123(a)(5)

69.     Various provisions of the Plan provide adequate and proper means for its implementation:

- Article III provides for the payment of Administrative Expense Claims required to be paid on the Effective Date;

- Section 74.1 provides for the issuance and distribution of the New GO Bonds;

- Section 74.2 provides for the issuance and distribution of the CVIs;

- Section 74.5 ensures the feasibility of the Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated;"

- Section 76.1 provides, subject to Sections 76.5 and 76.7 of the Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) of PBA and relating to the lease or sublease of PBA Property, (b) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (c) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement, or (d) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement . . . ." Although the Plan initially provided for the assumption of all leases or subleases of PBA Property, pursuant to modifications to the Plan, such leases and subleases shall be deemed rejected.

- Article LXXVII provides for distributions to be made to holders of all Allowed Claims under the Plan;

- Article LXXVIII provides for the Avoidance Actions Trust Assets to vest in the Avoidance Actions Trust, to be administered by the Avoidance Actions Trustee, and provides for the semi-annual distribution of liquidated Avoidance Actions Trust Assets to the beneficiaries thereof;

- Section 81.2 vests in the Disbursing Agent, among other things, the power to issue distributions contemplated by the Plan;

- Article LXXXII provides for the Debtors to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article LXXXIII provides for the funding and administration of the Pension Reserve Trust under the Plan;

- Article LXXXVIII provides that, "[o]n the Effective Date all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule;" and

33

- Section 92.1 provides for the re-vesting of assets: "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order).

(Jaresko Decl. ¶ 67).

70.     The Plan Supplement contains, among other things, the forms of (a) the New GO Bond Trust Agreement, (b) the CVI Trust Agreement, (c) the Avoidance Actions Trust Agreement, (d) the ERS Trust Agreement, (e) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (f) the Supplemental Ambac Election Notice, (g) the Assured Custodial Trust Documents, (h) the FGIC Custodial Trust Agreement, and (i) the Syncora Custodial Trust Documents.   The Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

71.     The Court's conclusion under Bankruptcy Code section 1123(a)(5), made applicable by PROMESA Section 301(a), that there are adequate means to implement the Plan rests on, among other things, Act [___] authorizing the new debt to be issued under the Plan with the full faith and credit of the Commonwealth, as long as the Plan does not include Monthly Benefit Reductions to pension payments.   Authorization of the new debt under Act [___] is unaffected by the freezes in the accruals of higher pension benefits and eliminations of cost of living adjustments.

72.     The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

**viii.    Bankruptcy Code Section 1123(b)(1)**

73.     Article LXXXIV of the Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired.

74.     The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

**ix.    Bankruptcy Code Section 1123(b)(2)**

34

75.     Section 76.1 of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which any Debtor is a party are rejected, "except for any Executory Contract and Unexpired Lease (a) of PBA and relating to the lease or sublease of PBA Property, (b) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (c) that is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement or (d) that has been registered with the Office of the Comptroller of Puerto Rico or has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date."  Plan § 76.1; see also Plan Supplement at Exhibit E.

76.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

**x.     Bankruptcy Code Section 1123(b)(3)(A)**

77.     The Plan incorporates, among other things, the settlements and compromises set forth in the AFSCME Plan Support Agreement, the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement, and the Retiree Committee Plan Support Agreement.  Further, the Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA

Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes: (a) set forth in

the Debt Related Objections challenging, among other things, the validity, priority, secured status

and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the

2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the

2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the

Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW

Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive

revenues historically conditionally appropriated to CCDA, HTA, the Metropolitan Bus Authority

("MBA"), and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the

provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status

and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS

Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA,

including, without limitation, the resolution of (i) the claims and Causes of Action currently being

litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim,

and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims

that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h)

set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center

Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA

BANs Litigation.  (Jaresko Decl. ¶ 71).  Such settlements and compromises are in the best interests

of the Debtors and their creditors, and within the range of reasonableness.

78.     Each of the plan support agreements was reached following months of negotiations

directed by the Mediation Team and/or other informal discussions that included party

representatives, legal and financial advisors, and involved vigorous debate and discussion on both

sides.  These negotiations were conducted at arms' length and in good faith.  (Skeel Decl. ¶ 33).

The litigation resolved by the plan support agreements involves extraordinarily complex, high-

stake disputes and, because these are the first Title III cases litigated under PROMESA, novel legal

issues.  Collectively, billions of dollars were at stake.  The consequence of the GO Bondholders

prevailing on their priority argument, or the HTA, PRIFA, or CCDA bondholders prevailing on

their property interest contentions, would have inflicted grave harm on the Commonwealth and its

residents because the Commonwealth, in either situation, would have lost control of billions of

dollars of revenues needed to sustain the Commonwealth.  This would have prevented the

Oversight Board from developing fiscal plans and budgets necessary to carry out its statutory

mission.  A small risk of a negative and grave outcome was imprudent to undertake once settlement

was possible on the terms in the Plan.  (Skeel Decl. ¶ 34).  The settlements embodied in the Plan

also avoid the uncertainty, delay, and significant expense that would result from continued

litigation.  (Skeel Decl. ¶ 44).

79.     The Plan is the result of extensive arms' length negotiations among the Government

Parties and significant creditor constituencies, including the PSA Creditors, each of which was

represented by sophisticated counsel, and the compromises and settlements among the

Government Parties and various PSA Creditors form the very foundation of the Plan.  In the

absence of such compromises and settlements, the Debtors' emergence from Title III would likely

be significantly delayed by further litigation and burdened by additional expense, which could

impair the Debtors' ability to successfully adjust their debts, thereby prejudicing recovery for all

creditors and raising further uncertainties regarding the Debtors' financial condition.

80.     Each of the compromises and settlements incorporated into the Plan (a) is made in

good faith, furthers the policies and purposes of PROMESA, is fair, equitable, and reasonable; (b)

is in the best interests of the Debtors, their creditors, and all other affected Persons with respect to the Claims, Causes of Action, and other matters resolved by such compromises and settlements; (c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law. Further, the Plan will fairly and consensually resolve numerous pending adversary proceedings and appeals, each of which raises difficult and complex issues. The Plan thus incorporates a complex series of interrelated compromises and settlements that resolve the most significant potential obstacles to confirmation of a plan of adjustment. Moreover, since the compromises and settlements are inextricably interwoven, they all hinge on one another and the approval of all these compromises and settlements is required in order to satisfy the conditions to the Effective Date set forth in the Plan.

81.    Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### xi.    Bankruptcy Code Section 1123(b)(3)(B)

82.    Article LXXVIII of the Plan provides for, among other things, the transfer of the Avoidance Actions to the Avoidance Actions Trust. Section 79.1 of the Plan provides: "Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Bankruptcy Court."

83.    Further, Section 82.1(a) of the Plan provides that: "[e]xcept with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall

object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise, or withdraw any objections to Claims, without approval of the Title III Court."

84.     The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

**xii.     Bankruptcy Code Section 1123(b)(4)**

85.     The Plan provides for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio, subject to certain conditions.  (Jaresko Decl. ¶ 76).  Specifically, Section 69.2 of the Plan provides that the Commonwealth, up to and including April 10, 2023, "shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . .   In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023."  However, "[i]n the event that neither the Commonwealth Election nor the Bondholder Election shall have been exercised, on April 25,

2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . .”  Pursuant to Section 69.1 of the Plan, in either scenario, the proceeds of the purchase of the ERS Private Equity Portfolio, along with the $373 million in cash, shall be distributed to holders of Allowed ERS Bond Claims.

86.     The Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

**xiii.     Bankruptcy Code Section 1123(b)(5)**

87.     Articles V through XVI, XVIII through LIV, Sections 55.2, 55.4 through 55.9, 55.12, Articles LVI through LVIII, LX, LXII through LXX, and LXXIII of the Plan modify the rights of holders of Claims in the impaired Classes.  Article XVII, Sections 55.1, 55.3, 55.10, and 55.11, Articles LIX, LXI, LXXI, and LXXII of the Plan leave the holders of unimpaired Claims rights unaffected pursuant to the Plan.

88.     The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

**xiv.     Bankruptcy Code Section 1123(b)(6)**

89.     Article XCII of the Plan provides for, among other things, (a) certain releases, injunctions, and exculpations described below in paragraphs 152–161 and (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of New GO Bonds and CVIs.  (Jaresko Decl. ¶ 78).

90.     The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

**xv.     Bankruptcy Code Section 1123(d)**

91.     Section 76.4 of the Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed and assigned, pursuant to the Plan.  All cure amounts will be determined in accordance with the

underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the Plan. (Jaresko Decl. ¶ 79).

92.     The Plan is consistent with section 1123(d) of the Bankruptcy Code.

**xvi.     Bankruptcy Code Section 1129(a)(2)**

93.     The Debtors have (i) complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court, and (ii) complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the Plan.  (Pullo Decl. ¶ [  ]).

94.     The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement, and sought and received input and comment thereon from other parties in interest.  This Court approved the Disclosure Statement as containing adequate information and meeting the requirements of sections 1125 and 1126 of the Bankruptcy Code.  (Jaresko Decl. ¶ 80).  The Debtors have properly solicited and tabulated votes on the Plan.  (Jaresko Decl ¶ 80; see generally Pullo Decl.).

95.     The Oversight Board, as proponent of the Plan, is the duly-appointed representative of the Debtors in their Title III Cases as provided pursuant to PROMESA and is in all respects consistent with applicable law.

96.     The Debtors have complied with section 1129(a)(2) of the Bankruptcy Code.

**xvii.     Bankruptcy Code Section 1129(a)(3)**

97.     The Plan was proposed in good faith with the legitimate purpose to provide a means for the Debtors to achieve fiscal responsibility and access to capital markets, consistent with the

purposes of PROMESA.  (Jaresko Decl. ¶ 81).  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Title III Cases, the Plan itself, the lengthy process leading to the Plan's formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the Plan's prosecution.  The Debtors' good faith is evident from the facts and records of the Title III Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Title III Cases, including related adversary proceedings.  The Plan (including the settlements and compromises contained therein) is the result of extensive arm's length negotiations among the parties, including through mediation led by Chief Bankruptcy Judge Houser.

98.     The Oversight Board has worked tirelessly to develop consensus with creditors and to evaluate the Commonwealth's and its instrumentalities' current and future financial circumstances.  These circumstances have been subject to constant change as the Oversight Board, the Commonwealth, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic.  (Jaresko Decl. ¶ 82).  The Plan and Disclosure Statement represent the culmination of those efforts and the substantial input of each key stakeholder.

99.     The Plan (including all other agreements, documents, and instruments necessary to effectuate the Plan) achieves a rational adjustment of the Debtors' debts, and properly distributes value to creditors based upon their respective priorities, including through the implementation of parties' elections with respect to distributions.  The Plan was proposed with the legitimate and honest purpose of implementing the settlement and compromise of numerous risky and costly

disputes, while avoiding protracted litigation that could delay distributions to creditors.  (Jaresko Decl. ¶ 83).

100.    The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xviii.    Bankruptcy Code Section 1129(a)(6)**

101.    The Plan does not provide for any rate changes by the Debtors and, accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply.

**xix.    Bankruptcy Code Section 1129(a)(8)**

102.    Pursuant to the Disclosure Statement Order, the Court approved the Disclosure Statement and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and directed the Debtors to solicit acceptances and rejections of the Plan, as well as certain elections with respect thereto. (Disclosure Statement Order ¶¶ B, 7–19).  Prior to the transmission of the Disclosure Statement, the Debtors did not solicit acceptances of the Plan from any holders of Claims.

103.    The Solicitation Packages were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Disclosure Statement Order.  (Mailing Affidavits).

104.    The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure Statement, Confirmation Hearing dates, Confirmation Objection Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III Cases; (ii) provided adequate and sufficient notice of such deadlines, the method of voting or making an election of distribution pursuant to the Plan; and the date, time, and location of the Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make an informed decision to accept or reject the Plan and to make any election provided thereunder; (iv) were in

43

compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the Title III Cases.  (See Service Affidavits).

105.   No other or further notice with respect to the Plan or the Confirmation hearing is required.  Based upon the foregoing, the Debtors and their successors, predecessors, control persons, representatives, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, managers, employees, attorneys, and advisors of the foregoing (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their activities relating to the solicitation of acceptances of the Plan or elections thereunder and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities pursuant to the Plan and, therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of securities pursuant to the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 92.7 of the Plan.

106.   Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (Pullo Decl. ¶ [  ]).

107.   Certain Classes either voted to reject, or were deemed to reject, the Plan (the "Rejecting Classes").   Notwithstanding such rejection and deemed rejection, the Plan is confirmable because it satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to the Rejecting Classes.

### xx.   Bankruptcy Code Section 1129(a)(10)

108.   At least one Class of each of the Commonwealth creditors' impaired Claims, PBA creditors' impaired Claims, and ERS creditors' impaired Claims has accepted the Plan. Accordingly, the Plan complies with section 1129(a)(10) of the Bankruptcy Code.

### xxi.   Bankruptcy Code Section 1129(b)(1)

109.   The Plan's treatment of Claims in the Rejecting Classes is proper because, as is described further below, the Plan does not discriminate unfairly and is fair and equitable with respect to such Claims.  (Jaresko Decl. ¶ 87).

110.   Accordingly, the Plan complies with section 1129(b)(1) of the Bankruptcy Code.

### xxii.   Bankruptcy Code Section 1129(b)(2)

111.   The Plan's treatment of Claims in the Rejecting Classes is proper because the Plan provides all holders of Claims in the Rejecting Classes with what they can reasonably expect under the circumstances of the Title III Cases.  Because there are no equity holders in chapter 9 cases, the "absolute priority" rule cannot be applied.  Instead, the requirement that a Plan be "fair and equitable" requires that, where a debtor seeks nonconsensual confirmation of a plan, the rejecting creditors will receive all that they can reasonably expect under the circumstances.  The

45

commencement of the Title III Cases was precipitated by the Debtors' untenable debt burden, a severe cash shortage, and the economic decline and outmigration eroding the Debtors' revenues. The creditor recoveries proposed in the Plan were calculated and/or negotiated to reasonably compensate holders of Claims while enabling the Debtors to avoid a recurrence of these financial difficulties and to institute necessary reforms to ensure the Debtors' fiscal responsibility and access to capital markets.

112.    In addition, Class 54 is the only class of secured Claims in the Plan, and section 1129(b)(2)(A) is satisfied with respect to such Class.  Holders of Claims in Class 54 will receive the cash deposits securing their Claims as payment in full on account of the secured portion of such Claims.  (Jaresko Decl. ¶ 88).  Although Class 12 is entitled "PBA/DRA Secured Claims," the DRA Parties' Claim is unsecured.  Only a UCC-1 was filed in connection with the Claim, and perfection of a security interest in real property requires the proper execution and filing of a mortgage.  No such mortgage was filed.  Further, the UCC-1 expired and no extension was filed. These issues are currently being litigated.  (Jaresko Decl. ¶ 88).  The security interest alleged by the holders of Claims in Class 12 relates to a lien on proceeds emanating from any sale of certain governmental property.  To the extent the Court determines holder of Claims in Class 12 hold secured Claims, the Plan will be modified to provide that such Claims are satisfied by the retention of their lien on the applicable governmental properties and will be satisfied upon any future sale of such properties to the extent of the net proceeds of any such sale.  (Jaresko Decl. ¶ 89).

113.    Accordingly, the Plan complies with section 1129(b)(2) of the Bankruptcy Code with respect to Claims in the Rejecting Classes.

**B.  PROMESA § 314(b)(2):** *The Plan Fully Complies with the Provisions in Title III of PROMESA.*

114.     Except as otherwise provided for or permitted by orders of the Court, the Oversight Board has complied with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order since it commenced the Title III Cases, including in transmitting the Solicitation and in tabulating the votes and elections with respect to the Plan.   (See generally Jaresko Decl. and Pullo Decl.).

115.     The Plan complies with PROMESA Section 314(b)(2).

**C. PROMESA § 314(b)(3):** *The Debtors Are Not Prohibited by Law from Taking any Action Necessary to Carry Out the Plan.*

116.     The Plan contains no provisions which would require the Debtors to violate Commonwealth law that is not preempted.  The Plan contemplates that certain legislation will be enacted by the Government on or prior to the Effective Date of the Plan, authorizing the transactions contemplated thereunder.  The legislation would, among other things, authorize the issuance of (a) the CVIs, and (b) the New GO Bonds, consistent with the terms set forth in the Plan and the plan support agreements.  Local legislation is not required to issue debt under a Title III plan of adjustment, however the proposed Plan requires such legislation because creditors wanted it as part of their settlements.  (Jaresko Decl. ¶ 92)  Pursuant to Puerto Rico law, legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor.  See, e.g., Brau v. ELA, 2014 TSPR 26, 190 D.P.R. 315, 337, 2014 WL 997526 (P.R. Feb. 21, 2014); Partido Socialista Puertorriqueño v. ELA, 107 D.P.R. 590, 7 P.R. Offic. Trans. 653, 727, 1978 WL 48833 (P.R. Oct. 5, 1978), holding modified by Partido Independentista Puertorriqueño v. CEE, 120 D.P.R. 580, 1988 JTS 23, 20 P.R. Offic. Trans. 607, 1988 WL 580845 (P.R. Mar. 7, 1988) ("To begin with, laws are presumed to be constitutional and the movant [objector] should place the courts in a position to decide by introducing evidence to sustain the facts alleged, and then stating the legal arguments on which its assignment of

47

unconstitutionality is based, specifically mentioning the constitutional provisions involved and the

legal precedents supporting its assignment.").

117.    The Plan contains no provisions that would require it to violate the Contracts Clause

of the Constitution of the United States.  The Contracts Clause provides that no state shall pass

any law impairing the obligation of contracts.  U.S. Const. art. I, § 10, cl. 1.  While a state or

territory cannot make a law impairing the obligation of contracts, Congress is empowered to do so

pursuant to Article I, Section 8 of the Constitution, which provides that Congress shall have the

power to establish uniform laws on the subject of bankruptcies throughout the United States.  U.S.

Const. art. I, § 8, cl. 4.  It has long been recognized that one of the fundamental goals of bankruptcy

law is to adjust the debtor-creditor relationship, that is, to alter contract rights.  See In re City of

Stockton, Cal., 478 B.R. 8, 14–15 (Bankr. E.D. Cal. 2012).  "While bankruptcy law endeavors to

provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired,

that does not change the starring role of contract impairment in bankruptcy."  Id. at 16.  Congress

is, therefore, "expressly vested with the power of passing [bankruptcy] laws, and is not prohibited

from passing laws impairing the obligation of contracts."   Id. at 15 (citing Sturges v.

Crowninshield, 17 U.S. 122, 191 (1819)).  Further, confirmation of the Plan does not implicate the

Contracts Clause because it is not a legislative action.  A federal court's confirmation of a

reorganization plan under federal law cannot violate the Contract Clause.  See Pension Ben. Guar.

Corp. v. R.A. Gray & Co., 467 U.S. 717, 732 n.9 (1984) (holding that the Contract Clause does

not apply to non-legislative actions).  It follows that this Court may approve the Plan pursuant to

PROMESA, a federal law enacted by Congress with the express purpose of allowing Puerto Rico

to achieve fiscal responsibility and access to the capital markets through, inter alia, adjustment of

its debts and those of its instrumentalities, without offending the Constitution.  Even if the

48

Contracts Clause could be implicated by confirmation of the Plan, nothing in the Plan would violate the Contracts Clause.  In considering claims brought under the Contracts Clause, courts must "reconcile the strictures of the Contract[s] Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens."  United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011).  In doing so, courts apply a two-pronged test: they examine first "whether the state law has . . . operated as a substantial impairment of a contractual relationship," and then, if the law has, "whether the impairment was reasonable and necessary to serve an important government purpose."  Id.  No party objecting to confirmation of the Plan has established that any impairment of their contractual rights would be "substantial" and, regardless, confirmation serves an important government purpose in light of the ongoing fiscal crisis in Puerto Rico.

118.    The Plan contains no provisions that would violate the Takings Clause of the Constitution of the United States.  The proper analytical framework for addressing the Takings Clause is set forth in Penn Central Transportation v. City of New York, 438 U.S. 104, 124 (1978). See Patriot Portfolio v. Weinstein (In re Weinstein), 164 F.3d 677, 685 (1st Cir. 1999) (applying Penn Central analysis to constitutional challenge to lien avoidance pursuant to section 522(f) of the Bankruptcy Code).  Pursuant to that test, courts consider three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action."  Id.  Considering the first factor, the Court notes that the Plan will not result in the total destruction of the value of property interests.  Pursuant to the terms of the Plan, bondholders will receive substantial value in new secured bonds and, in some cases, cash. Furthermore, based upon the record before it, the Court finds that the resolution of substantial legal challenges to the

structure underlying the existing bonds provides significant value to the bondholders.  Second,

although the proposed treatment of bondholders' claims may interfere with certain bondholders'

subjective investment expectations, bondholders' reasonable expectations must take account of the

claims and potential claims that have been the subject of the substantial litigation that the Plan,

which was negotiated with the assistance of the Mediation Team, proposes to resolve. Cf. New

Haven Inclusion Cases, 399 U.S. 392, 492 (1970) (noting that security holders "invested their

capital in a public utility that does owe an obligation to the public [and thereby] assumed the risk

that in any depression or any reorganization the interests of the public would be considered as well

as theirs") (quotation marks omitted)).  Third, the character of the governmental action strongly

supports the Court's conclusion that the Plan does not result in an unconstitutional taking.  The

proposals are not physical invasions of property by the government.  Rather, the restructuring of

the relationships between the Debtors and their bondholders, using the powers established by

Congress in PROMESA, is a quintessential example of a "public program adjusting the benefits

and burdens of economic life to promote the common good." Penn Cent. Transp. Co., 438 U.S. at

124.  Furthermore, even if the restructuring proposed by the Plan results in a Fifth Amendment

"taking" of bondholder property, the Court is satisfied that the value to be received by bondholders

pursuant to the Plan constitutes just compensation.  Here, creditors will receive consideration that

is discounted by settlements that recognize significant litigation risks, the allocation of

distributions was determined via a long mediation and settlement process among sophisticated

parties, and creditors have ratified the result by voting in favor of the Plan.  These characteristics

of the settlements and the Plan and the circumstances under which they were developed provide

sufficient proof that the consideration to be received by bondholders pursuant to the Plan

constitutes just compensation within the meaning of the Takings Clause.  The objections to the

Plan and Settlement Agreement based upon the Takings Clause of the United States Constitution are therefore overruled.

119.     Section 89.3 of the Plan provides: "As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, are held preempted. Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, and such laws shall not be enforceable to facilitate payment of such indebtedness, directly or indirectly, and shall not be enforceable if enforcement thereof would be inconsistent with any provision of PROMESA having continuing applicability and effectiveness. Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on Exhibit "K" hereto and (b) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on Exhibit "K" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal." Plan § 89.3.  Accordingly, pursuant to Section 4 of PROMESA, all laws, rules, and regulations giving rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA are preempted by PROMESA and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations.  Pursuant to PROMESA Section 4, to the extent not previously ruled preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth, other than budgets certified by the Oversight Board, inconsistent with

PROMESA, have been preempted.  Such preempted laws include, without limitation, laws enacted

prior to June 30, 2016, that provide for transfers or other appropriations after the enactment of

PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any

agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy

indebtedness or for any other purpose, and such laws shall not be enforceable for any purpose.

Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA

include, without limitation, (i) those listed on Exhibit K to the Plan, and (ii) sections 6 and 8 of

Article VI of the Puerto Rico Constitution insofar as they could be applied to each debt discharged

pursuant to the Plan, but not to new debt issued pursuant to the Plan, and (b) all litigation in which

any Government Party is a defendant, over whether Commonwealth law listed on Exhibit K to the

Plan is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and

the parties thereto shall provide the Oversight Board prompt notice of such dismissal.  To avoid

the future re-creation of the debts and claims discharged herein, each of the preempted laws is

preempted permanently.

     120.    The Plan complies with PROMESA Section 314(b)(3).

**D. PROMESA § 314(b)(4):** *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date.*

     121.    Section 3.1 of the Plan provides: "On the later to occur of (a) the Effective Date

and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the

Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in

Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such

Allowed Administrative Expense Claim in accordance with such other terms no more favorable to

the claimant than as may be agreed upon by and between the holder thereof and the Reorganized

Debtors; provided, however, that Allowed Administrative Expense Claims representing

52

indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be

paid in full and performed by the Reorganized Debtors in accordance with the terms and subject

to the conditions of any agreement governing, investment evidencing, or other document relating

to such transactions; and, underlined provided, underlined further, that, if any such ordinary course expense is not billed,

or a written request for payment is not made, within one hundred fifty (150) days after the Effective

Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to,

or receive, a distribution pursuant to the Plan."

122.     Consummation Costs, Restriction Fees, and Retail Support Fees will be paid in

Cash on the Effective Date.   All other Allowed Administrative Expense Claims, if any, will

likewise be paid pursuant to Section 3.1 of the Plan.

123.     The Plan complies with PROMESA Section 314(b)(4).

**E.  PROMESA § 314(b)(5):** *The Plan Has Obtained all Necessary Legislative, Regulatory, and Electoral Approvals.*

124.     The Plan has obtained all necessary legislative, regulatory, and electoral approvals.

Further, by approving and certifying the Fiscal Plan, the Oversight Board provided approval for

the issuance of securities contemplated by the Plan as required by PROMESA Section 207.

**F.  PROMESA § 314(b)(6):** *The Plan Is Feasible and in the Best Interests of Creditors.*

125.     The Plan complies with PROMESA Section 314(b)(6) because it is feasible and in

the best interests of creditors.

**i.   Feasibility**

**a.  The Plan is Feasible as to ERS**

126.     The Plan is feasible with respect to ERS, as ERS no longer has pensions and other

obligations to beneficiaries, which obligations now lie with the Commonwealth following the

enactment of Act 106.   Pursuant to the Plan, ERS's assets are being sold and transferred to the

Commonwealth in exchange for $373 million and the agreement to purchase the ERS Private
Equity Portfolio for $70,750,000, subject to certain conditions. ERS's obligations include
distributing the $373 million in cash received from the Commonwealth to the holders of Allowed
ERS Bond Claims, as well as payments to holders of Allowed ERS General Unsecured Claims in
a *de minimis* amount. (Jaresko Decl. ¶ 98).

127. ERS will place the ERS Private Equity Portfolio in the ERS Trust, which will then
be purchased by either the Commonwealth or holder(s) of Allowed ERS Bond Claims on or before
April 25, 2023 for no less than $70,750,000, which funds will be distributed to holders of Allowed
ERS Bond Claims. ERS will dissolve after the Effective Date of the Plan and all remaining assets
of ERS will be deemed sold and transferred to the Commonwealth. ERS will therefore have no
material obligations after the Effective Date. (Jaresko Decl. ¶ 99). Accordingly, the Plan is
feasible with respect to ERS and is not likely to result in the need for a further restructuring of ERS.

### b. The Plan is Feasible as to PBA

128. The Plan is feasible with respect to PBA, as PBA holds sufficient cash to pay its
obligations to all of its creditors under the Plan, including the Claims on account of loans made by
GDB to PBA. Further, the Plan provides for the rejection, as of the Effective Date, of all leases
and subleases of PBA's properties to departments, agencies, instrumentalities, authorities, public
corporations, and municipalities of the Commonwealth, subject to the execution of a master lease
with the Commonwealth which shall provide for lease payments in exchange for the use and
occupancy of leased premises in an amount necessary to satisfy its obligations on a go-forward
basis. (Jaresko Decl. ¶ 100). Accordingly, the Plan is feasible with respect to PBA and is not
likely to result in the need for a further restructuring of PBA.

### c. The Plan is Feasible as to the Commonwealth

129.    The Plan is feasible with respect to the Commonwealth.  The Plan provides for the following types of payments: (1) cash on the Effective Date, (2) new debt issued by the Commonwealth in the form of New GO Bonds, and (3) CVIs.  In addition, the Plan contemplates payments to retirees of pensions and other benefits in reduced amounts, as well as additional payments to Commonwealth employees.  (Malhotra Decl. ¶ 9).

130.    The Plan provides for the payment of Cash on the Effective Date and over time, in the aggregate amount of approximately $8 billion, plus up to $801 million in consummation costs, restriction fees, and retail support fees.  (See Malhotra Decl. ¶ 10).

131.    The Plan provides the Reorganized Commonwealth will issue New GO Bonds on the Effective Date with eleven different maturity dates, having an aggregate original principal amount of $7,414,063,543.25.  (Malhotra Decl. ¶ 11).  The aggregate amount owed, including all principal and interest over the life of the New GO Bonds from the deemed issuance date of July 1, 2021 to the maturity of the final New GO Bond on July 1, 2046, is $10,914,969,303.20.  (Malhotra Decl. ¶ 12).  The Plan provides for a Debt Service Fund to be established.  On the first business day of each month after the Effective Date until the obligations of the applicable New GO Bonds are satisfied, the Commonwealth will deposit the portion of principal and accrued interest for that month into the Debt Service Fund.  (Malhotra Decl. ¶ 16).

132.    The Plan provides for the issuance of (i) GO CVIs in the aggregate original notional amount of $3.5 billion, having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original notional amount of $5.239 billion, having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051.  (Malhotra Decl. ¶ 19).  The Commonwealth's obligation to pay under the CVIs arises only if certain outperformance conditions specified in the Plan and the CVI indentures occur.

55

Specifically, the Plan provides for the establishment of threshold metrics based on tax revenue projections contained in Certified Fiscal Plans.  Only if actual revenues exceed the established threshold at the end of a given fiscal year will an obligation to pay come into being, subject to certain caps.  (Malhotra Decl. ¶ 20).

133.    In addition, the Plan provides for (i) payments of pension and other post-employment benefits to retired Commonwealth employees in reduced amounts, (ii) the restoration of contributions made by Commonwealth employees to the System 2000 program, and (iii) payments to the Pension Reserve Trust.  (Malhotra Decl. ¶ 21).  The Plan provides certain participants in ERS, TRS, and JRS will experience reductions in their monthly pension benefits, pursuant to the formula described in Section 1.337 of the Plan.  The Plan also provides that future benefit accruals for TRS and JRS will be frozen and that any future cost of living adjustments will be eliminated.  (Malhotra Decl. ¶ 22).  Participants in System 2000 will not be subject to benefit reductions, but instead will receive the amount of their contributions to System 2000 from its enactment until June 30, 2017.  The aggregate sum of such contributions plus interest accrued thereon is approximately $1.2 billion.  (Malhotra Decl. ¶ 23).  The Pension Reserve Trust will receive an initial contribution of $5 million on the Effective Date and, for the next eight fiscal years, the Commonwealth will make a contribution in an amount equal to (1) the Base Contribution, $175 million or, for any fiscal year in which the projected Fiscal Plan Surplus set forth in the Fiscal Plan is equal to or greater than $1.75 billion, an amount equal to twenty-five percent (25%) of that amount, plus (2) an additional amount calculated as (i) the lower of the actual primary surplus for such fiscal year and the projected Fiscal Plan surplus for such fiscal year, minus (ii) the sum of the Base Contribution, plus the Commonwealth's debt service obligations pursuant to the Plan for such fiscal year, plus $200 million.  (Malhotra Decl. ¶ 24).

134.    The Plan also provides for additional payments to be made to current employees

who are members of certain public employee unions affiliated with AFSCME and non-union rank

and file employees.   Pursuant to the Plan, the Commonwealth's monthly contribution for

healthcare benefits to Commonwealth employees who are members of AFSCME affiliated unions

will increase from $125 per employee per month to $170 per employee per month.  In addition,

the Plan provides for certain bonuses to members of AFSCME-affiliated unions and non-union

rank and file employees.  (Malhotra Decl. ¶ 25–26).

135.    The Plan also provides the Debtors shall transfer ACR-eligible claims pursuant to

the ACR Order, which claims shall be reconciled and paid in the ordinary course of business.  The

Commonwealth has reserved $229 million for payment of such claims.  Further, the Plan provides

ERS Bondholders a right to receive a future payment of $70.75 million from the purchase of the

ERS Private Equity Portfolio.  (Malhotra Decl. ¶ 27).

136.    Together, the Plan consideration totals approximately $11.7 billion.  (See Malhotra

Decl. ¶ 28).

137.    Confirmation of the Plan is not likely to be followed by the need for further

financial reorganization not contemplated in the Plan.  That is true notwithstanding the fact that,

based on the 2021 Fiscal Plan projections, deficits after debt service are projected to reemerge in

approximately FY 2035.   By the time deficits are projected to emerge, the amount of

Commonwealth general obligation debt outstanding will only be $2.1 billion, as compared to pre-

petition debt liabilities of $30.5 billion.   The Commonwealth will not likely need further

reorganization notwithstanding projected deficits due to a number of factors, including the

following: (i) the Plan reduces the Commonwealth's overall debt; (ii) the Plan includes multiple

provisions designed to insulate the Commonwealth from downside risks; (iii) the Commonwealth

can implement certain reforms the Oversight Board identified that could result in additional liquidity, which could eliminate the projected deficit; and (iv) the Plan does not take into account potential upside factors which, if they materialize, would result in additional liquidity.  (See Malhotra Decl. ¶ 29).

138.    Further, the Plan significantly reduces the Debtors' debt.  After confirmation, the Commonwealth's general obligation and guaranteed debt will be approximately $7.4 billion, considerably lower than $30.5 billion pre-restructuring, and all ERS debt will be eliminated. (Malhotra Decl. ¶ 31).  Prior to the Plan, annual Commonwealth debt service was approximately $2.1 billion, and post-confirmation, the Commonwealth's average annual debt service during the first ten years will be approximately $666 million.  (Malhotra Decl. ¶ 30–31).  Over 50% of the newly issued debt under the Plan will have amortized within 10 years of its issuance date.  Debt levels will continuously decline and remain low until full repayment of the Commonwealth's general obligation and guaranteed debt, which is projected to occur in fiscal year 2046.  Thereafter, the only commitments that will remain outstanding will be the CVIs and COFINA debt.  The CVIs are paid only if specific revenues outperform projections, and COFINA debt is serviced via a pledged portion of sales and use tax.  (Malhotra Decl. ¶ 32).

139.    In addition, several Plan provisions—the Pension Reserve Trust, the CVI structures, and the Debt Management Policy—mitigate the impact of potential financial underperformance and the effects of projected deficits.  (Malhotra Decl. ¶ 33).  There are also potential upside factors not incorporated into the Plan which, if they occur, will produce additional revenues.  These factors include structural reforms the Commonwealth could undertake, a potential increase in Medicaid funding, and other federal funding.  (See Malhotra Decl. ¶ 41–53).  The Commonwealth will also establish an emergency reserve and a certain level of unrestricted cash,

58

and the Oversight Board has agreed to fund a temporary disaster aid revolving line of credit, which mitigate against potential downside risks.  (Malhotra Decl. ¶ 49–51).

140.     Accordingly, the Plan is feasible with respect to the Commonwealth and is not likely to result in the need for a further restructuring of the Commonwealth.

    **ii.**   **Best Interests Test**

141.     As in chapter 9 of the Bankruptcy Code, PROMESA's "best interests" test differs substantially from the chapter 11 "best interests" requirement.  In chapter 11, the test requires a court to determine whether an individual creditor would receive more if the chapter 11 debtor were to liquidate its assets.  Cf. In re City of Detroit, Mich., 524 B.R. 147, 212–13 (Bankr. E.D. Mich. 2014) (comparing the "best interests" tests in chapter 9 and chapter 11 of the Bankruptcy Code). In contrast, the "best interests" test pursuant to PROMESA requires the Court to consider "whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by [the] plan."  48 U.S.C.A. § 2174(b)(6) (West 2017).

142.     PROMESA's best interests test requires that creditors of each Debtor in the aggregate receive an equal or greater recovery on their Claims pursuant to the Plan as they would outside of Title III.  An analysis of creditor recoveries in such hypothetical circumstances requires application of a number of assumptions, including (i) estimates of the resources that would be available for debt service, which requires an assessment of available cash, revenues, and operating expenses in the absence of a confirmed plan of adjustment; (ii) the outstanding creditor obligations due and payable that would exist outside of Title III; and (iii) the priority in which creditor claims would be paid outside Title III, which in certain circumstances requires consideration of assumptions regarding the potential of the outcome of litigation matters.  (Shah Decl. ¶ 8).

143. The recoveries for all claimholders of each Debtor pursuant to the Plan in the aggregate is greater than the range or greater than the range of the projected recoveries for such claimholders in the aggregate if the Title III Cases were dismissed for each of the Debtors, as demonstrated by the best interest test reports attached to the Shah Declaration as Exhibits A, B, and C. (Shah Decl. ¶ 35, Exs. A, B, and C).

144. Classes 15–22, 30–33, 36–43, and 46–50 represent the claims of holders of GO Bonds. These Classes include claims for all Constitutional Debt except for PBA Bonds, which are included separately in the Plan. The claims in such classes total an estimated $14.1 billion, and, pursuant to the Plan, are projected to receive $10.3 billion in fixed consideration, consisting of cash and bonds. (Shah Decl. ¶ 45). Additionally, Classes 23–29, 34–35, and 44–45 represent the claims of holders of debt with a Commonwealth guarantee. Specifically, these classes represent the deficiency claim against the Commonwealth for PBA Bonds, which have a Commonwealth guarantee. The claims in such classes total an estimated $3.6 billion, and, pursuant to the Plan, are projected to receive $2.6 billion in consideration. (Shah Decl. ¶ 46). The additional Classes of Claims against the Commonwealth, excluding pension claims and claims arising from rejected collective bargaining agreements, include Dairy Producer Claims (Class 53), Med Center Claims (Class 56), Tax Credit Claims (Class 57), Commonwealth General Unsecured Claims (Class 58), *Gracia-Gracia* Claims (Class 67), and Convenience Claims (Class 68) (which include approximately $50,000 of ERS claims). The Claims in such Classes total an estimated $5.1 billion, and, pursuant to the Plan, are projected to receive $2.7 billion in consideration, consisting of cash and bonds. Federal Claims (Class 69) total an estimated $1.1 billion and are projected to receive 100% recovery pursuant to the Plan. (Shah Decl. ¶ 47). In the aggregate, excluding Federal Claims, there is an estimated $22.8 billion in Claims asserted against the Commonwealth, which

are projected to receive $15.7 billion pursuant to the Plan, for an aggregate recovery for all claimholders of 69%.  (Shah Decl. ¶ 48).

145.    Pursuant to the Plan, exclusive of the payment of the ERS Restriction Fee, ERS Bondholders are projected to receive a recovery of approximately $444 million on $3.169 billion of Claims, and ERS General Unsecured Claims are projected to receive a recovery of 100% on approximately $300,000 of Claims, for an implied aggregate recovery of 14%.  (Shah Decl. ¶ 54).

146.    Pursuant to the Plan, all PBA Bondholders are projected to receive a recovery of $1.1 billion against PBA, exclusive of recoveries on their guarantee claims against the Commonwealth.  The Plan provides that the PBA/DRA Secured Claim, PBA General Unsecured Claims, and PBA/DRA Unsecured Claims, will receive recoveries of approximately $6.6 million, $41.0 million, and $13.4 million, respectively.  Accordingly, all holders of Claims against PBA are projected to receive an implied aggregate recovery of $1.1 billion, or 21%.  (Shah Decl. ¶ 59).

147.    For each Debtor, creditors in the aggregate will receive a percentage recovery on their Claims pursuant to the Plan that is within the range or greater than projected recoveries outside of Title III.  (Shah Decl. ¶ 13).  Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face great uncertainty, financial and political instability, and significant lawsuits.  In such environment the Government will face significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms.  Without the benefit of the uptick in growth from these reforms, overall economic growth and tax revenue will be lower, reducing the amounts available to pay all creditors.  (Shah Decl. ¶ 12).  Accordingly, the Court finds that the Plan is in the best interests of creditors within the meaning of section 314(b)(6) of PROMESA.

**G.  PROMESA § 314(b)(7):** *Fiscal Plan Compliance*.

61

148.    The Plan is consistent in all respects with the Fiscal Plan.  Nothing contained in the Plan would violate or otherwise interfere with the Fiscal Plan.  (Jaresko Decl. ¶ 103).  The Fiscal Plan provides a blueprint for the Commonwealth to achieve, among other things, fiscal responsibility and access to capital markets, and contains a debt sustainability analysis ("DSA"), which creates a range established by the Oversight Board as the amount of debt and long-term capacity of the Government to pay debt service on its debt.  (Zelin Decl. ¶ 57).  The aggregate principal and total debt service of the New GO Bonds falls within the bounds of the debt range implied by the DSA.  (Zelin Decl. ¶ 57).  The cash payments due on the Effective Date do not count as debt for purposes of the DSA because the cash payments do not create a debt obligation after the Effective Date.  Any cash payments under the CVIs do not count as debt for purposes of the DSA because the CVIs are only payable out of outperformance.  The CVI payments are contingent in nature and are, by definition, paid from cash available relative to baseline Fiscal Plan projections.  (Zelin Decl. ¶ 58).  The debt levels under the Plan are consistent with the debt levels set forth in the Fiscal Plan.  (Skeel Decl. ¶ 52).

149.    The Plan freezes accruing benefits and eliminates all subsequent cost of living adjustments under Act 91-2004, amended by 160-2013 for TRS, and under Act 12-1954, amended by 162-2013, for JRS.  The Fiscal Plan for the Commonwealth includes the same freezes and eliminations.  The Court's conclusion that the Plan is consistent with the Fiscal Plan is dependent on, among other things, such freezes and eliminations being in the Plan.

150.    Accordingly, the Plan complies with PROMESA Section 314(b)(7).

## H. Nullification of Laws Conditioning Debt Authorization on Elimination of Freeze of Accruing Pension Benefits and Cost of Living Adjustments.

151.    All parties in interest, including without limitation, the Governor and the Legislature each know the Plan's consistency with the Fiscal Plan, feasibility, and implementation

are each dependent on the freezes in the accruals of higher pension benefits and eliminations of cost of living adjustments referred to in paragraph 71 above.  Neither the Governor nor the Legislature nor any other party has contended Act [___] or any other law causes the new debt issued under the Plan to be unauthorized by Act [___] due to the freezes in the accruals of higher pension benefits and eliminations of cost of living adjustments.  To the extent Act [___] or any other law is interpreted to mean such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized, Act [___] and such other laws, if any, are nullified pursuant to PROMESA Sections 104(k) and 108 to the limited extent of eliminating such impact on the debt's authorization.

<u>**The Releases, Exculpations, and Injunctions Pursuant to the Plan**</u>

152.    The Plan includes certain discharge, release, exculpation, and injunction provisions, which are essential to the Debtors' restructuring, and a consensual restructuring could not be successfully accomplished without these provisions.

153.    A critical element of the Plan is the complete resolution of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case.  To achieve this, the Debtors and claimholders agreed to a mutual release of all Claims and Causes of Action arising, in whole or in part, prior to the Effective Date.  (Jaresko Decl. ¶ 218).  The Debtors' releases incentivized claimholders to support, and undertake actions to support, the Plan and its confirmation, without fear of lawsuits in the future.  Certain creditors would not have supported the Plan absent its release provisions.  (Jaresko Decl. ¶ 219).  Further, the releases of claims by the Debtors impact only those parties that made a significant contribution to the negotiation and development of the Plan and incurred cost and expense during their essential participation in negotiations.  (Jaresko Decl. ¶ 221).  The Plan's discharges and releases likewise provide the Debtors and Reorganized Debtors

63

with assurance that the restructuring balance struck by the Plan will not be upset by further claims against the Reorganized Debtors after the Effective Date.  (Jaresko Decl. ¶ 220).

### A. Releases

154.    The Plan's release provisions include, among other provisions, subject to certain exclusions as set forth in the Plan: (i) a release by the GO/PBA Creditors (solely in their capacity as Creditors of the Debtors), which includes the Monolines, against certain government parties, including the Oversight Board, AAFAF, and the Debtors, of certain Claims and Causes of Action arising prior to the Plan Effective Date, including the Revenue Bond Claims litigation and the Lift Stay Motions, and (ii) a release by the Debtors and Reorganized Debtors of Claims and Causes of Action related to the Debtors and their assets in the Title III Cases.  (Zelin Decl. ¶ 96).

155.    The Plan's release of Claims or Causes of Action by the GO/PBA PSA Creditors against the Oversight Board, its committees and subcommittees, AAFAF, and the Debtors, of certain Claims and Causes of Action, including those related to the Revenue Bond Claims Litigation and Lift Stay Motions, is a key component of the Plan.  Litigation over such Claims and Causes of Action was hard-fought and remained active as between the Commonwealth, on the one hand, and the Monolines (who would ultimately become GO/PBA PSA Creditors) on the other. By agreeing to settle these disputes, the GO/PBA PSA Creditors provided a clear benefit to the Debtors by eliminating the need to incur additional costs, and mitigating the substantial risk associated with, further litigation.  (Zelin Decl. ¶ 97).  To create global peace upon the effectiveness of the Plan, the Debtors and Reorganized Debtors agreed to release Claims and Causes of Action against, among other entities, the Government Parties, official committees, and PSA Creditors.  (Zelin Decl. ¶ 99).  The Plan's release provisions were essential to get the key

64

stakeholders to engage in negotiations over a potential consensual release of claims against the Commonwealth.  (Zelin Decl. ¶ 100).

156.     The parties receiving releases all made significant contributions to the negotiation and development of the Plan and incurred costs and expenses during the course of their essential participation in the negotiations.   (Zelin Decl. ¶ 103).   The releases granted by the Debtors constitute a sound exercise of the Debtors' judgment.  They are fair, reasonable, and in the best interests of the Debtors.

157.     The Plan does not provide for third-party releases; the Plan's releases are limited to those necessary to effect the Debtors' successful restructuring.  Except as explicitly agreed to by the creditors in their respective plan support agreements, the Plan does not release any claims of a creditor of the Debtors, in its capacity as such, against a party that is not a Debtor.  (Jaresko Decl. ¶ 223).  Further, Sections 92.2(d), (e), and (f) of the Plan carve out from the Released Claims certain claims, causes of action, or other rights or powers that are held by the Securities and Exchange Commission, the United States, and parties to certain Underwriter Actions.  Likewise, as confirmed by the definition of Released Claims (see Plan, section 1.424), claims against CCDA, HTA, MBA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA, which are or may be subject to their own restructuring proceedings, and Avoidance Actions generally are not released under the Plan.  These carve-outs ensure that only those releases that are reasonable and necessary to Plan confirmation are being provided.  (Jaresko Decl. ¶ 224).

158.     The releases contemplated by the Plan are appropriate and essential to the Debtors' successful reorganization.

**B.  Exculpation**

159.    Section 92.7 of the Plan provides for exculpation of the Government Parties, PSA Creditors, Retiree Committee, UCC, AFSCME, and the Monolines for, among other things, any acts taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan and the settlements contained therein (including, but not limited to, the Plan Settlement Agreements). (Jaresko Decl. ¶ 225; Zelin Decl. ¶ 110).  The Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to the Plan.  All of the parties being exculpated in the Plan played a key role in the negotiation of the Plan and the settlements that enabled the Plan.  The Plan's exculpation provisions do not alter the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful misconduct.  (Jaresko Decl. ¶ 226; Zelin Decl. ¶ 110, 112).

**C.  Injunction**

160.    The Plan's injunction provisions (Sections 92.3, 92.9, and 92.11) are necessary to the reorganization and are fair to those parties involved.  The injunction ensures that the releases and exculpations discussed above are preserved and enforced by prohibiting legal action concerning the Released Claims, avoiding the time, burden and expense that could be incurred if parties were permitted to pursue Released Claims.  The Plan's injunction provisions are narrowly-tailored to serve that purpose.  (Zelin Decl. ¶ 113).

161.    The releases, exculpation provisions, and injunctions pursuant to the Plan are integral and critical parts of the Plan and the compromises and settlements implemented pursuant to the Plan.  The approval of such releases is a condition to the occurrence of the Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such releases and

66

injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and

supporting the settlement and treatment of their respective Claims, Causes of Action, and other

rights pursuant to the Plan.  Accordingly, such provisions are justified and warranted based upon

the circumstances of the Title III Cases and the consideration being provided by all Released

Parties in connection with the Plan.

162.    To maintain and protect the integrity and feasibility of the Plan, while the Oversight

Board is in existence, any and all governmental units and any officer or employee thereof shall

neither recreate by statute, regulation, rule, policy, or executive order nor repay by any means, any

debt discharged by the Plan without the Oversight Board's express prior written consent.  Without

limitation, the debt referred to herein includes any and all pension obligations frozen in amount

such that they shall not increase from their levels in existence on the Effective Date of the Plan.

## Validity of Bonds and CVIs

163.    Pursuant to Section 4 of PROMESA, as well as sections 944[6] and 1123 of the

Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court

---

[6]  Section 944(b)(3) of the requires the Court, as a condition to providing a discharge, to determine the validity of
obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such
obligations. 11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D.
Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated
by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state
laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive
power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the City of Stockton v. City of
Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2;
Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70
(E.D. Cal. 2010) (additional citations omitted)).  As set forth in the leading bankruptcy treatise, "[t]he requirement
of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds
being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination
of the court on that issue should be binding in the future."  6 Alan N. Resnick & Henry J. Sommer, Collier On
Bankruptcy § 944.03[1][b] (16th ed. 2013); See also, Order Confirming Third Amended Plan for the Adjustment
of Debts of the City of San Bernardino, California, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In
accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the
Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . . ."); Order Confirming
Eighth Amended Plan for the Adjustment of Debts of the City of Detroit, dated November 12, 2014, ¶ 86 ("[I]n
accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon
the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the

determines that the New GO Bonds and CVIs, and the covenants by the Commonwealth for the

benefit of the holders of the New GO Bonds and CIVs, are legal, valid, binding, and enforceable

obligations of the Reorganized Debtors benefitting from the following protections, each of which

is legal, valid, binding, and enforceable against the Reorganized Debtors, the Commonwealth, and

other persons and entities, as applicable, under Puerto Rico, New York, and federal law:

a. The Confirmation Order is full, final, complete, conclusive, and binding and shall
not be subject to collateral attack or other challenge in any court or other forum,
except as permitted under applicable law.

b. The New GO Bond Legislation and the CVI Legislation are incorporated into Act
No. [    ]-2021, which has been validly enacted by the Commonwealth and is valid.

c. The CVIs are bonds or notes within the meaning of Section 2 of Article VI of the
Commonwealth Constitution to which the Commonwealth may legally pledge its
full faith, credit and taxing power under the Commonwealth Constitution and
applicable Puerto Rico law for the payment of principal and interest.

d. Pursuant to the New GO Bond Legislation and the CVI Legislation, the
Commonwealth has validly pledged its full faith, credit and taxing power under the
Commonwealth Constitution and applicable Puerto Rico law for the payment of
principal and interest with respect to the New GO Bonds and payment with respect
to the CVIs.

---

benefit of . . . ."); *Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for
Jefferson County, Alabama*, dated November 6, 2013, ¶ 37 ("Pursuant to Bankruptcy Code sections 1123(a),
1123(b), and 944(a), as well as general principles of federal supremacy, the provisions of this Confirmation Order,
the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable
notwithstanding any otherwise applicable nonbankruptcy law.").

e.   Pursuant to the New GO Bonds Legislation and other applicable law, upon the issuance of the New GO Bonds, the New GO Bonds shall be secured by a first priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over the funds deposited in the Debt Service Fund, including any revenues generated therefrom, which statutory first lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person, and shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms.

f.   The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights in the Plan and in the Confirmation Order).

g.   The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, creates the valid pledge and the valid lien upon the right, title and interest of the Commonwealth in such funds in favor of the Trustee (for the benefit of the holders of the New GO Bonds) which it purports to create, subject only to the provisions of the New GO Bonds Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and

69

on the terms and conditions set forth in the New GO Bonds Indenture and each applicable supplemental indenture.

h.  The Commonwealth has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

i.  The Plan meets all conditions set forth in the New GO Bond Legislation and the CVI Legislation for issuance of the New GO Bonds and CVIs.

j.  Upon the enactment of the New GO Bond Legislation and the CVI Legislation, and execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

k.  At the time of issuance and delivery of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVIs a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [___] DAY OF [_____], 2021.

## Miscellaneous Provisions

164.   Plan Supplement.  All materials contained in the Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is or shall be required.  See Service Affidavits; Plan Supplement.

165.   Satisfaction of Confirmation Requirements.  Based on the foregoing, the Plan satisfies the requirements for confirmation set forth in PROMESA Section 314.

166.   Oversight Board Certification.  For purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

167.   Implementation.  All documents necessary to implement the Plan, including those contained in the Plan Supplement and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  Without limiting the generality of the foregoing, the Debtors, prior to the Effective Date, and Reorganized Debtors, from and after the Effective Date, are authorized to consummate the transactions contemplated in the Plan and Plan Supplement.  The execution, delivery, or performance by the Debtors or Reorganized Debtors, as the case may be, of any documents in connection with the Plan Supplement, and compliance by the Debtors or Reorganized Debtors, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

168.  <u>Good Faith</u>.  The Debtors will be acting in good faith if they proceed to (i)
consummate the Plan and the agreements, settlements, transactions, and transfers contemplated
thereby and (ii) take the actions authorized and directed by the Confirmation Order.

169.  <u>Retention of Jurisdiction</u>.  This Court may properly and, upon the Effective Date
shall, to the extent consistent with Article XCI of the Plan, retain subject matter jurisdiction (and
exclusive subject matter jurisdiction to the extent it was granted exclusive subject matter
jurisdiction) over all matters arising out of, and related to, the Title III Cases, including, without
limitation, all Causes of Action not otherwise released pursuant to the Plan and the matters set
forth in Section 91.1 of the Plan and section 1142(b) of the Bankruptcy Code.  The Court shall
retain jurisdiction until such time as the New GO Bonds, the GO CVIs, the Clawback CVIs, and
the Rum Tax CVIs have been paid in full or otherwise satisfied in accordance with their terms to
ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to
specific performance.

170.  Without limiting the generality of any of the foregoing, the Court shall retain
jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and remedies
of the bonds issued pursuant to the plan, (ii) enter and implement such orders as may be necessary
or appropriate to execute, implement, or consummate the provisions of the Plan, (iii) adjudicate
any and all controversies, suits, or issues that may arise regarding the validity of any action taken
by any entity pursuant to or in furtherance of the Plan or the Confirmation Order including, without
limitation, issuance of bonds, and (iv) to enforce prohibitions against any subsequent collateral
attack on provisions contained in the Plan and the Confirmation Order.

171.  <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the
extent that an exhibit to the Plan or any document entered into in connection with the Plan or Plan

Supplement provides otherwise, the rights, duties, and obligations arising pursuant to the Plan shall be governed by, and construed in accordance with, PROMESA (including the provisions of the Bankruptcy Code make applicable pursuant to section 301 of PROMESA), and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

172.   Enforceability.  Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of this Memorandum, the Confirmation Order, and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement (as such documents may be further modified and filed with the Court prior to the Effective Date) provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall constitute valid legal obligations of the Debtors and valid provisions to pay or secure payment of the bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and shall be enforceable in accordance with their terms.

## Conclusion

For the foregoing reasons, the Court is concurrently entering its *Order and Judgment Confirming Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*

Dated: [          ], 2021

_____
LAURA TAYLOR SWAIN
United States District Judge

73