**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**THE GOVERNOR OF PUERTO RICO AND THE PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY'S LIMITED OBJECTION TO (I) THE
SEVENTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT
OF THE COMMONWEALTH OF PUERTO RICO, *ET AL.*; AND (II) THE PROPOSED
<u>ORDER AND JUDGMENT CONFIRMING THE PLAN</u>**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the elected Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5233-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1
BACKGROUND ............................................................................................................................ 6
      A.    The Government's Commitment to Ending the Title III Cases ................. 6
      B.    The Plan Is Conditioned On Obtaining Legislation, ................................. 7
      C.    The Plan's Proposed Monthly Benefit Reduction ..................................... 8
OBJECTION .................................................................................................................................. 10
    I.    THE PLAN CANNOT BE CONFIRMED WITHOUT LEGISLATION ........... 10
    II.    THE MONTHLY BENEFIT REDUCTION IS BOTH IMPROPER AND
UNNECESSARY FOR PLAN CONFIRMATION ............................................. 11
    III.    OBJECTION TO THE CONFIRMATION ORDER ......................................... 13
RESERVATION OF RIGHTS ....................................................................................................... 16
CONCLUSION .............................................................................................................................. 16

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re City of Detroit*,
 524 B.R. 147 (Bankr. E.D. Mich. 2014) .................................................................................. 11

*In re City of Stockton, California*,
 542 B.R. 261 (Bankr. App. 9th Cir. 2015) .............................................................................. 11

*In re Commonwealth of Puerto Rico*,
 Case No. 17-03283 (D.P.R. October 10, 2021) ......................................................... 1, 2, 4, 10

*In re Fin. Ovrsght. & Mgmt. Bd. for P.R.*,
 987 F. 3d 173 (1st Cir. 2021) .................................................................................................. 11

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
 Mgmt. Bd. for P.R.)*,
 330 F.Supp.3d 685 (D.P.R. 2018) ........................................................................................... 14

**STATUTES**

11 U.S.C. § 1142(b) ...................................................................................................................... 14

48 U.S.C. § 2149 ........................................................................................................................... 15

Act 2-2017 ....................................................................................................................................... 1

PROMESA § 314(b)(5) .................................................................................................................. 2

**OTHER AUTHORITIES**

Fin. Oversight And Mgt. Bd. For Puerto Rico Statement (October 8, 2021) ........................ 2

Get the Facts: Income from Pensions, Pension Rights Center,
 http://www.pensionrights.org/publications/statistic/income-pensions (last
 visited October 13, 2021) .......................................................................................................... 3

*Pierluisi Acknowledges Senate Version of PoA Bill Needs Corrections but Calls
 on Oversight Board to Respect Commonwealth's No-Pension-Cut Stance;
 Deems Senate's Claims Regarding UPR, Municipal and Economic
 Development Funding 'Reasonable'*, Reorg Research (October 12, 2021
 5:27 pm (EST)), https://app.reorg.com/v3#/items/intel/1869?item_id=157190 ...................... 7

**CONSTITUTIONAL PROVISIONS**

Puerto Rico CONST. Art. IV, § 4 .................................................................................................. 1

Puerto Rico CONST. Art. VI, § 2 .............................................................................................. 2, 8

The Governor of Puerto Rico[2] and the Puerto Rico Fiscal Agency and Financial Advisory Authority, acting pursuant to the authority granted to it under the *Puerto Rico Fiscal Agency and Financial Advisory Authority Act*, Act 2-2017 ("AAFAF," and collectively with the Governor of Puerto Rico, the "Government"), respectfully submit this limited objection with respect to (i) the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] (the "Plan")[3] filed by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board" or the "Board"), and (ii) the *Order and Judgment Confirming Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, filed by the Board on October 10, 2021 [ECF No. 18447] (the "Confirmation Order"), and state as follows:

**PRELIMINARY STATEMENT**

1. The current Plan requires the enactment of legislation to support the issuance of debt instruments. This need permeates the Plan, the transaction documents filed with the Plan Supplement (including the applicable bond indentures) are explicitly premised on the enactment of legislation,[4] the Oversight Board has repeatedly stated that if legislation is not enacted the Board

---

[2] The Governor is objecting in his capacity as the duly elected officer charged with faithfully executing the laws of Puerto Rico. *See* Puerto Rico CONST. Art. IV, § 4.

[3] Capitalized used but not otherwise defined herein have the meanings ascribed to them in the Plan.

[4] *See, e.g.,* Plan § 74.1(e), (f) (noting certain monthly and annual allocations the Reorganized Commonwealth shall covenant pursuant to the New GO Bonds Legislation); § 74.2(b) (noting that the issuance of the Clawback CVIs are subject to the CVI Legislation's provisions); Notice of Submission of Plan Supplement and Plan Related Documents by the Commonwealth of Puerto Rico, et al. (the "Plan Supplement"), *In re The Fin. Oversight & Mgmt. Bd. For Puerto Rico*, Case No. 17-03283 (D.P.R. Oct. 10, 2021), ECF No. 18470 at 4, n.5 ("The annexed draft legislation, passed by the House of Representatives of Puerto Rico provides for the issuances of the general obligation bonds and the contingent value instruments"); Plan Supplement at 4, n.6 ("The annexed draft legislation, passed by the Senate of Puerto Rico, provides for the issuances of the general obligation bonds and the contingent value instruments"); Plan Supplement, Ex. A (the New GO Bond Trust Agreement) § 2.01 (authorizing the issuance of the new general obligation Bonds, which specifically require legislation to secure the amounts deposited into the debt service fund); Plan Supplement, Ex. B (the CVI Trust Indenture) at 2 ("This Trust Agreement provides for the issuance by the Commonwealth of the Notes to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and *authorized under the CVI Legislation*, and the rights and remedies of the holders from time to time of the Notes.") (emphasis added).

will withdraw the Plan,[5] and the largest creditor constituencies have all reserved the right to reverse their votes in favor of the Plan if legislation is not enacted.[6] In addition, PROMESA conditions confirmation of a plan of adjustment on obtaining all legislative approvals required under applicable law.[7] And under Puerto Rico law legislation is necessary to issue debt instruments backed by the full faith and credit of the Commonwealth.[8] Given that, as of the moment of filing this objection, legislation to support the issuance of the New GO Bonds and CVIs under the Plan has not been enacted, this threshold in PROMESA has not been satisfied.

2. The Government, however, strongly believes it is time to end these Title III cases and is working with both chambers of the Legislative Assembly to enact the requisite legislation. The Government is confident that such legislation can be enacted—as soon as today—and that the Government can sufficiently address the Board's concerns with the form of such legislation. The Government is focused fully on that effort. And encourages the Board to allow the legislative process to conclude before making any abrupt decisions about alternative paths. However, if the Board elects to withdraw the Plan and potentially renegotiate the terms of an amended plan with the Commonwealth's financial creditors, the Government reserves any and all rights to object to such amended plan.

---

[5] *See* FIN. OVERSIGHT AND MGMT. BD. FOR PUERTO RICO STATEMENT (dated October 8, 2021) (concluding that if House Bill 1003 is passed without certain amendments, "the Oversight Board would be forced to withdraw the proposed Plan of Adjustment from the U.S. District Court.").

[6] Reservation of Rights of PSA Creditors Regarding Ballots Cast With Respect to Seventh Amended Plan of Adjustment, *In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, Case No. 17-03283 (D.P.R. Oct. 11, 2021), ECF No. 18453; Joinder to PSA Creditors' Reservation of Rights Regarding Ballots Cast with Respect to Seventh Amended Plan of Adjustment, *In re The Fin. Oversight & Mgmt. Bd. for Puerto Rico*, Case No. 17-03283 (D.P.R. Oct. 13, 2021), ECF No. 18479.

[7] *See* PROMESA § 314(b)(5); 48 U.S.C. § 2174(b)(5).

[8] *See* PUERTO RICO CONST. Art. VI, § 2.

3. In addition to the Plan's need for legislation, the Plan's Monthly Benefit Reduction[9] cannot be sustained. Although the Board has advised the Government it would accept legislation that is conditioned on the elimination of the Monthly Benefit Reduction, such legislation has not been obtained and the Monthly Benefit Reduction remains in the Plan. Thus, the Government has no choice but to object to such Monthly Benefit Reduction.

4. To put the Monthly Benefit Reduction in perspective, the average monthly public pension benefit for federal and state pensions is approximately $2,300 and $1,800 respectively.[10] Here, the Oversight Board seeks to cut monthly pension benefits for retirees receiving more than $1,500 a month—far less than the federal and state average. If these cuts are imposed on any segment of retirees (who are among the most vulnerable in Puerto Rico's society), retirees may be pushed to the federal poverty level and unable to pay for basic life necessities, thereby increasing the future cost of Puerto Rico's welfare programs. This result does not align with PROMESA's goals, which as this Court has recognized includes specific protections for retirees:

> [T]he flexibility to separately classify and treat claims from different unsecured creditors potentially strengthens Title III debtors' ability to propose plans of adjustment that protect the viability of the government and its instrumentalities, and the ability of the government to continue to provide services to its people, and to ensure the economic viability of the territory. ***For example, PROMESA contains multiple provisions that are protective of pensions, and separately classifying and treating pension claims or employee claims could potentially contribute to that broader goal***.[11]

5. The Oversight Board has previously asserted the proposed Monthly Benefit Reduction would reduce the Government's expenses, which is allegedly necessary to restructure

---

[9] Defined as "Monthly Benefit Modification" in the Plan. *See* Plan § 1.337. The provisions with respect to the freeze of defined benefits for Puerto Rico's teachers and judges are distinct from the Monthly Benefit Reduction and are separately addressed in the Plan.

[10] Get the Facts: Income from Pensions, PENSION RIGHTS CENTER, http://www.pensionrights.org/publications/statistic/income-pensions (last visited Oct. 13, 2021).

[11] Disclosure Statement Hrg. Tr. at 80:13–25 (emphasis added).

- 3 -

Puerto Rico's debts and strengthen the economy. But in adopting this position, the Board overlooks the long-term human cost of such cuts, particularly given the cuts retirees have already sustained. In 2013, the Government passed three separate laws to reduce pension benefits, increase the amount of employee contributions, and raise the retirement age under the pension plans at each of the Government's three primary retirement systems. According to the Board's own expert report issued in September 2019, those laws resulted in benefit reductions as high as 82% for some participants.[12] And since 2007, most retirees have not received cost of living adjustments, reducing the real-world value of pension payments due to inflation.[13] By the Board's own estimates, the absence of cost of living adjustments will cause retirees to lose 39% of the purchasing power of their already-reduced pensions in the 30 years after retirement.[14]

6.  Most importantly, the Monthly Benefit Reduction is not necessary to protect Puerto Rico's pension system. In 2017, pension funds were nearly depleted and retirees were at risk of not receiving pension benefits from a deeply underfunded trust due to decades of insufficient contributions and unlawful borrowings. To ensure this disastrous result never occurred, the Government signed into law Act No. 106 of 2017 ("Act 106"), which transformed Puerto Rico's pension systems into a "pay-as-you-go" system that stabilized pension benefits and ensured that the Commonwealth would backstop pension payments. Over the last several years, the Government has advanced substantial economic reforms that has enabled it to successfully assume responsibility for Puerto Rico's unfunded and bankrupt pension system. And even putting aside

---

[12] PROMESA Section 211 Report on the Puerto Rico Retirement Systems, *Disclosure Statement for The Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al*. (the "Disclosure Statement"), *In re The Fin. Oversight & Mgmt. Bd. For Puerto Rico*, Case No. 17-03283 (D.P.R. Jul. 30, 2021), ECF No. 17628, Ex. J at vii, 13.

[13] *Id*.

[14] *Id*.

such financial improvements, the incremental savings to the Commonwealth from eliminating the cuts is *de minimis*: as the Government will show, the proposed Monthly Benefit Reduction in the ERS, TRS, and JRS retirement systems is forecast to result in savings to the Commonwealth that are approximately one half of one percent of the general budget. Given the relatively small amount of potential savings, compared to the importance of providing income to pensioners, the Commonwealth would be able to satisfy this obligation by reducing spending in other areas or finding other sources of revenues, thus rendering the cuts unnecessary.

7. The Oversight Board's position on the Monthly Benefit Reduction also fails to account for the already adverse economic conditions retirees face. Puerto Rico residents receive unequal treatment under federal funding statutes as compared to citizens of U.S. states, pay the highest sales and use tax in the United States, and suffer a poverty rate of 43.1% (more than double that of the highest state poverty rate of 19.7% in Mississippi). In addition, the impact of two devastating hurricanes in 2017, earthquakes since 2019, and the persistent COVID-19 pandemic have destroyed the homes and livelihoods of thousands of Island residents.

8. With respect to the proposed freeze of the defined benefit plans for Puerto Rico's teachers and judges, the Government acknowledges that the Asociación de Maestros Puerto Rico and the Asociación de Maestros de Puerto Rico-Local Sindical (collectively, "AMPR"), have objected to the freeze and raised several legal arguments as to why the Plan cannot implement it. Whether a plan of adjustment approved under PROMESA can impose a freeze and override Puerto Rico law on this issue—an issue that has real impacts for Puerto Rico's devoted teachers—is a matter that will be decided as part of the confirmation proceedings.

9. The Government has demonstrated its commitment to fiscal responsibility, including working with the Oversight Board to restructure Puerto Rico's debt in a sustainable

manner. Doing so does not require any Monthly Benefit Reduction. The Government supports the Plan's economic terms and fervently believes it is time to resolve the Title III cases. To this end, the Government has played an indispensable role in pursuing confirmation of the Plan. Among other things, the Government took the lead in drafting nearly all transaction documents (including the applicable bond indentures), helped launch solicitation of the Title VI Qualifying Modifications for PRIFA and CCDA as contemplated by various plan support agreements, and continues to work with various Commonwealth agencies to ensure that the Government is in position to execute the Plan if confirmed.

10. Notwithstanding these efforts, the Oversight Board has insisted on a route that puts the Plan confirmation in jeopardy. While Puerto Rico continues to face significant challenges, it cannot fix its problems on the backs of Puerto Rico's public service retirees.

## BACKGROUND

### A. The Government's Commitment to Ending the Title III Cases

11. The Government has worked with the Oversight Board to facilitate Puerto Rico's debt restructuring process, end its fiscal crisis, and end the Commonwealth's time in Title III. While the Governor has consistently opposed the Monthly Benefit Reduction, his administration has also played a critical role in the Title III restructuring efforts.

12. Prior to the Plan's filing, AAFAF was not only an active participant in multiple litigations against the Debtors' largest creditors, but also in the Oversight Board's settlement negotiations with the GO bondholders, ERS bondholders, monolines, and unsecured creditors. Once settlement negotiations concluded, AAFAF provided the Oversight Board with constructive comments to the Plan and Disclosure Statement. These complied with the Governor's mandate

that the Plan's provisions provide Puerto Rico's economy with a path to grow and prosper, while protecting the most vulnerable in Puerto Rico's society from another round of sacrifices.

13. The Government's efforts to advance the Plan's economic terms are unquestionable. Governor Pierluisi is on record stating that the "most important thing at the end of the day is to approve a mechanism to issue the restructured bonds."[15] The Governor and his administration will continue to promote these crucial proposals, as they have since the day the Governor took office. But the Governor must oppose a plan that cuts pensions for current retirees..

**B.    The Plan Is Conditioned On Obtaining Legislation,**

14. Legislation is required to implement the most critical aspects of the Plan, including issuance of the New GO Bonds and the CVIs, both of which are to be backed by the good faith

---

[15] *Pierluisi Acknowledges Senate Version of PoA Bill Needs Corrections but Calls on Oversight Board to Respect Commonwealth's No-Pension-Cut Stance; Deems Senate's Claims Regarding UPR, Municipal and Economic Development Funding 'Reasonable'*, REORG RESEARCH (October 12, 2021 5:27 pm (EST)), https://app.reorg.com/v3#/items/intel/1869?item_id=157190 (last visited Oct. 25, 2021).

and credit of the Commonwealth.[16] The Plan recognizes the need for legislation for this purpose.[17]

The Disclosure Statement does, too.[18]

15. In addition, several key elements of the Plan rely on Puerto Rico legislation, including the following (among others):

- **Statutory Lien** — The Plan provides that the New GO Bonds will be secured by a statutory lien over funds deposited in a Debt Service Fund and a Debt Service Reserve Fund.[19]

- **Commonwealth Non-Impairment Covenant** — Legislation is required for the Commonwealth to provide a non-impairment covenant with respect to the rights and remedies of the holders of the New GO Bonds and the CVIs.[20]

- **New York law** — Under Puerto Rico law, legislation is required to authorize the application of the laws of the State of New York to the New GO Bonds and the CVIs, as contemplated by the Plan.[21]

C. **The Plan's Proposed Monthly Benefit Reduction**

16. The Plan divides active and retired employee retirement benefit claims into 12 classes: Class 51A through Class 51L. The treatment of these classes under the Plan are elaborated upon in the Disclosure Statement.[22]

17. Among other things, under the Plan, certain pension benefits in ERS, TRS, and JRS accrued by active and retired employees before May 3, 2017, that exceed $1,500 per month, are

---

[16] *See* Puerto Rico CONST. Art. VI, § 2 (providing that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly).

[17] *See, e.g.,* Plan § 82.1 (listing as a condition to the Effective Date that "[a]ll (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, including, without limitation, the New GO Bonds Legislation and the CVI Legislation, have been obtained or enacted or entered and not revoked or reversed . . ."); § 1.145 (defining CVI Legislation as "[t]he legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the GO CVIs and the Clawback CVIs, which legislation may be part of, or included in, the New GO Bonds Legislation"); § 1.322 (defining the New GO Bonds Legislation as the "legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the New GO Bonds consistent with the terms set forth herein and in the GO/PBA Plan Support Agreement."); § 12.30 (defining the GO CVIs are defined as "the general obligation securities . . . to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the GO CVI Indenture *and the CVI Legislation*.") (emphasis added); § 1.320 (defining the New GO Bonds as "(a) New GO CIBs, (b) New GO 5.375% CABs, and (c) New GO 5.0% CABs . . . .to be issued on the Effective Date by the Commonwealth in accordance with

subject to the Monthly Benefit Reduction.[23] For any individual whose total Monthly Retirement Benefit (exclusive of the Monthly Medical Insurance Plan Contribution) exceeds $1,500 per month, the Plan provides for a cut up to 8.5% to the total Monthly Retirement Benefit, up to the point at which the total monthly benefit would fall below $1,500 per month.[24]

18. Retirees subject to the Monthly Benefit Reduction are eligible for partial or total restoration of the benefit for any fiscal year (up and until 2033) that the Commonwealth achieves a budget surplus of more than $100 million beyond the surplus projected in the Fiscal Plan.[25] In such case, 10% of the excess surplus would be distributed to retirees on a pro-rata basis to restore

---

the terms and conditions of the Plan, the Confirmation Order, the New GO Bonds Indenture, *and the New GO Bonds Legislation*") (emphasis added).

[18] *See* Disclosure Statement at 61 ("the New GO Bonds will be issued pursuant to the New GO Bonds Indenture and New GO Bonds Legislation.").

[19] *See* Plan § 86.1(b)(vii) (including as a condition to the effectiveness of the Plan that "pursuant to the New GO Bonds Legislation and other applicable law, upon deposit of monies in the Debt Service Fund and the Debt Service Reserve Fund, there shall be statutory first liens on such monies for the purposes of securing payment of the New GO Bonds. . . ").

[20] *See* Disclosure Statement at 493 ("The Definitive Documents, including the New GO Bonds Indenture, the New GO Bonds Legislation and/or the Confirmation Order, will contain customary terms, conditions and covenants, including, without limitation, covenants by Reorganized Commonwealth that it will, among other things (i) take no action that would . . . impair the rights and remedies of the holders of the New GO Bonds . . .").

[21] *See* Plan § 74.1(k) ("The New GO Bonds Indenture and the New GO Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law.").

[22] Disclosure Statement at 448–72.

[23] *Id.* at 48. The System 2000 Active Participants (Class 51J), are not subject to the Monthly Benefit Reduction. *Id.* at 48 n.85. Rather, Class 51J will receive the amount of their contributions from 2000 through June 30, 2017, plus interest through May 3, 2017. Such amount will be deposited into the Act 106-2017 defined contribution accounts. If the amount of contributions plus interest through the Petition Date is less than or equal to $1,500,000,000.00, on the Effective Date, each holder will receive their share of such aggregate amount. If the total amount exceeds $1,500,000,000.00, the Oversight Board and AFSCME will develop a payment plan to pay out the remaining balance in excess of $1,500,000,000.00. *Id.* at 467.

[24] *Id.* at 48. For Active ERS Participant Claims (Class 51G), the portion of the calculated pension related to annuitized Law 3 contributions plus interest accrued through May 3, 2017 is exempt from the benefit reduction formula. *Id.* at 460. Furthermore, Class 51G participants with contributions under Law 3 and accrued benefits under Law 1 or Law 447 who are actively employed will receive a one-time contribution of $2,600 to their Act 106 defined contribution accounts. *Id.* at 460–61.

[25] *Id.* at 49.

partially or fully the benefit reduction for such year.[26] If the excess surplus is less than $100 million, no restoration payments will be made for that year unless additional restoration payments are included in the certified budget.[27]

**OBJECTION**

### I. THE PLAN CANNOT BE CONFIRMED WITHOUT LEGISLATION

19. The current Plan is premised on the enactment of supporting legislation. Indeed, the Plan reflects the need for legislation over and over. Moreover, the various transaction documents filed as part of the Plan Supplement are also explicitly premised on legislation.[28] And the largest creditor groups supporting the Plan have informed the Court that the "passage of Legislation to implement the transactions contemplated by the Plan was a crucial component of the overall agreement reached by the PSA Creditors with the Oversight Board" and that such creditors reserve the right to ultimately vote against the Plan "in the event that the Legislation is not in fact enacted prior to the Confirmation Hearing."[29]

20. Consequently, the current Plan can only proceed to confirmation if legislation is enacted to enable the issuance of the New GO Bonds and CVIs. Absent legislation, the Plan and all supporting documents need to be extensively modified (presumably to incorporate the Board's unchartered and novel legal theory that the Plan can be implemented without new legislation under super-charged theories of preemption or using defunct laws). The Government reserves all rights to object to any amended plan in all respects.

---

[26] *Id.*

[27] *Id.*

[28] *See supra* n. 4

[29] Reservation of Rights of PSA Creditors Regarding Ballots Cast With Respect to Seventh Amended Plan of Adjustment, *In re Commonwealth of Puerto Rico*, Case No. 17-03283 (D.P.R. October 11, 2021), ECF No. 18453; Joinder to PSA Creditors' Reservation of Rights Regarding Ballots Cast with Respect to Seventh Amended Plan of Adjustment, *In re Commonwealth of Puerto Rico*, Case No. 17-03283 (D.P.R. October 13, 2021), ECF No. 18479.

## II. THE MONTHLY BENEFIT REDUCTION IS BOTH IMPROPER AND UNNECESSARY FOR PLAN CONFIRMATION

21. The Government opposes the Monthly Benefit Reduction because it is unnecessary to confirm the Plan. Chapter 9 cases do not require impairing retirees' pension claims. The City of Stockton's chapter 9 case left pension obligations intact despite objections from a major creditor whose claims were substantially impaired.[30] On appeal, the Plan's treatment of retirees was affirmed, with the court concluding that "the record reflects that the City had to take into account a number of legitimate business and economic considerations in negotiating the differential Plan arrangements for dealing with pensions, employee compensation and health care benefits for its current employees and retirees."[31]

22. The same result should occur here. Nothing compels a Monthly Benefit Reduction. "[C]ourts [in municipal bankruptcies] have engaged in somewhat free-form equitable balancing, explicitly allowing municipalities to consider all sorts of policy considerations in devising plans of adjustment."[32] Among PROMESA's most important policy considerations are specific protections for retirees, as recognized by this Court:

> [T]he flexibility to separately classify and treat claims from different unsecured creditors potentially strengthens Title III debtors' ability to propose plans of adjustment that protect the viability of the government and its instrumentalities, and the ability of the government to continue to provide services to its people, and to ensure the economic viability of the territory. ***For example, PROMESA contains multiple provisions that are protective of pensions, and separately classifying and treating pension claims or employee claims could potentially contribute to that broader goal***.[33]

---

[30] *In re City of Stockton, Cal.*, 542 B.R. 261, 267–69 (9th Cir. BAP 2015)

[31] *Id*; *see also In re City of Detroit*, 524 B.R. 147, 257 (Bankr. E.D. Mich. 2014) (citing Michigan's constitutional protection of pensions to justify the plan's preferential treatment of Detroit's workers and retirees).

[32] *In re The Fin. Oversight. & Mgmt. Bd. for Puerto Rico*, 987 F. 3d 173, 182 (1st Cir. 2021) (citing Aurelia Chaudhury et. al., *Junk Cities: Resolving Insolvency Crises in Overlapping Municipalities*, 107 Calif. L. Rev. 459, 517 (2019)).

[33] Disclosure Statement Hearing Transcript at 80:13–25.

23. Moreover, Puerto Rico's public sector retirees have been impaired by a reduction to their benefits prior to (and in some instances during) the commencement of the Commonwealth's Title III case. Over the last 30 years, the Commonwealth has implemented several pension cuts that have reduced retiree benefits and frozen or diminished cost of living adjustments. For example:

- The Legislature enacted Act 1 of 1990 and Act 305 of 1999, each of which addressed structural imbalances at ERS and reduced prospective benefit accruals for ERS members hired after April 1, 1990 and on or after January 1, 2000, respectively. Notably, while Act 1 and Act 305 did not impair pensioners, the reduced benefit accruals for prospective employees established lower benefit accrual rates, slowed the increase in ERS liabilities, and helped preserve additional cash at the Commonwealth.

- The Legislature later enacted Act 3 of 2013, which went further than Act 1 and Act 305 by effecting a broad overhaul of ERS that froze certain defined benefit accruals, increased employee contributions, and increased the retirement age to 68. As a result, Act 3 reduced ERS' actuarial accrued liability by $3.27 billion (from $24.28 billion to $21.01 billion or 13.5%).

- In addition, ERS retirees have not received a cost of living adjustment in over 14 years. Consequently, the Commonwealth's retirees have experienced a significant reduction in purchasing power today relative to the last cost of living adjustment in 2008.

According to the Oversight Board's own expert report, the foregoing laws resulted in benefit reductions as high as 82% for some participants.[34] The Oversight Board acknowledges the significance of these cuts in its best interests test analysis.[35]

24. Imposing the Monthly Benefit Reduction also fails basic economics. Pushing Puerto Rico's retirees close to poverty will stress the Government's already strained social services programs and increase the future cost of Puerto Rico's welfare programs. This may require Puerto

---

[34] Disclosure Statement, Ex. J at vii, 13.

[35] *See* Disclosure Statement, Ex. N, App. 5 at 7 (stating that "Puerto Rico cut public pensions significantly before PROMESA was enacted . . .").

Rico to spend resources beyond those needed to pay pension benefits in the first place. Further, if Puerto Rico removes funds from the Puerto Rico economy by taking it from on-island pensioners who will likely spend it on these necessities, the economy may suffer and never reach its full potential.

25. Most importantly, as the Government will show, the incremental savings to the Commonwealth that would result from including the Monthly Benefit Reduction in the Plan are miniscule: they are projected to be, on average, well under 1% of total general fund budget in every fiscal through 2051. The small amount saved by imposing this compared to the importance of providing income to pensioners shows that the proposed cuts lack an economic rationale.

### III. OBJECTION TO THE CONFIRMATION ORDER

26. The currently proposed Confirmation Order includes several provisions designed to prevent the Government from freely exercising its political and governmental powers. These provisions include:

- Requiring the Governor and Legislature to "us[e] all their political and governmental powers" only to "enact[] any enabling legislation required by, and solely to the extent set forth in, the Plan;"[36]

- Preventing the Governor and Legislature from "enact[ing], adopt[ing], or implement[ing] any law, rule, regulation, or policy" that is "reasonably likely" to impede the Plan's implementation as "determined by the Oversight Board;"[37]

- Preventing the Governor and Legislature from repealing, changing, or negating existing laws;[38]

- Compelling the Governor to direct the executive branch to take certain actions under the Plan;[39]

---

[36] Confirmation Order ¶ 21.

[37] *Id.* ¶¶ 20, 69.

[38] *See id.* ¶ 70.

[39] *See id.* ¶¶ 20, 69.

- 13 -

- Dictating conditions for the Board's termination under PROMESA section 209;[40] and

- Transferring the Board's post-termination enforcement rights to parties in interest,[41]

27. The foregoing provisions should be either eliminated or significantly amended in the final Confirmation Order for at least three reasons. *First*, as this Court has already recognized, the Oversight Board and Government have separate but complementary roles under PROMESA to effectuate Congress' restructuring goals. While the Board has significant authority over fiscal matters and plan of adjustment proposals, Congress expressly preserved the Government's "political and governmental powers"—which include its powers to control Puerto Rico "by legislation"—under PROMESA section 303.[42] This means that, if the Oversight Board seeks to confirm a plan of adjustment that requires new legislation (as the current Plan does), the Board cannot use the Court to compel the Government to enact the precise legislation it wants. Instead, the Board must obtain "buy-in from the elected officials and legislators" to adopt the necessary provisions voluntarily.[43] The Board cannot use the Confirmation Order as an end-run around section 303 to force the Government to pass legislation against its will.

28. *Second*, the Board seeks to use the Court's authority under Bankruptcy Code section 1142(b) to compel Government action post-confirmation. Bankruptcy Code section 1142(b) allows the Court to enter orders mandating the Government to "execute or deliver any instrument" or "perform any other act" necessary to consummate a plan.[44] But this provision does not authorize the Court to require a debtor to take any and all post-confirmation actions; its only

---

[40] *See id.* ¶ 3(N).

[41] *See id.* ¶ 69.

[42] 48 U.S.C. § 2163.

[43] *Rosselló Nevares v. The Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F.Supp.3d 685, 701 (D.P.R. 2018).

[44] 11 U.S.C. § 1142(b).

- 14 -

purpose is to force a debtor to take ministerial actions that are already specifically mandated under the plan. Where a plan affords the debtor discretion in implementing a plan provision, Bankruptcy Code section 1142(b) cannot be invoked to require a specific action that another party desires, unless that action is expressly required by the plan. Here, the Board seeks to do just that by broadly requiring the Governor to direct the executive branch to implement the Plan as the Board directs.[45] This language is improper and should be removed from the Confirmation Order.

29. *Third*, the Board improperly seeks to use the Confirmation Order to control the timing and terms of its future termination. Under PROMESA section 209, the Board can only seek termination after, among other things, Puerto Rico experiences four consecutive fiscal years where expenditures do not exceed revenues.[46] In order to control when the four-year period commences, the Board seeks a provision in the Confirmation Order that only allows for a valid expenditure-to-revenues calculation after Puerto Rico's debt is discharged under the Plan.[47] In addition, the Board seeks a provision that would transfer the Board's powers to enforce the Plan to parties in interest (rather than the Government) after the Board terminates.[48] Both of these provisions are well beyond the scope of section 209 and, at any rate, are premature because the Board is not terminating as a result of the Plan. Accordingly, the Court need not make any section 209 determinations in the Confirmation Order and all parties should simply retain the rights they have under the statute until the proper time when the Board is ready to terminate in the future.

30. For these reasons, the proposed Confirmation Order should not be approved unless paragraphs 3(N), 20, 21, 69, and 70 are eliminated or (at the least) significantly amended. In

---

[45] *See* Confirmation Order ¶¶ 20, 69.

[46] *See* 48 U.S.C. § 2149.

[47] *See* Confirmation Order ¶ 3(N).

[48] *See id.* ¶ 69.

addition, the proposed Confirmation Order incorporates Findings of Fact and Conclusions of Law that the Board has not yet filed with the Court or shared with the Government.[49] The Findings of Fact and Conclusions of Law may include several legal conclusions regarding the preemption of certain Puerto Rico laws,[50] and include several provisions that validate the issuance of bonds based on legislation.[51] At this time, it remains unclear which bases the Board will rely upon in establishing the bases for the Findings of Fact and Conclusions of Law unless and until necessary legislation to consummate and implement the current Plan transactions is enacted. The Government, therefore, reserves all rights to supplement this objection related to issues that may be included in the Findings of Fact and Conclusions of Law.

31. ***In the event that the requisite legislation to support the Plan is enacted prior to entry of the Confirmation Order, the Government anticipates that it will be able to work with the Oversight Board to consensually resolve these objections.***

## RESERVATION OF RIGHTS

32. The Government reserves all rights to: (i) raise and expand on any issue set forth herein at the Plan confirmation hearing or at any time at or before confirmation; (ii) object to any amended plan or confirmation order filed by the Oversight Board; and (iii) to join any other objection to the Plan or Confirmation Order.

## CONCLUSION

33. The Government respectfully requests that this Court deny confirmation of the Plan to the extent (i) the requisite legislation is not enacted; or (ii) the Monthly Benefit Reduction has not been eliminated from the Plan.

---

[49] *See* Confirmation Order ¶ 3.

[50] *See id.* ¶ 3(B).

[51] *See id.* ¶¶ 3(D)-(M).

WHEREFORE, the Government respectfully requests that the Plan be denied to the extent it includes the Monthly Benefit Reduction or the requisite legislation is not enacted.

Dated: October 26, 2021
San Juan, Puerto Rico

Respectfully submitted,

| | |
|---|---|
| /s/ *John J. Rapisardi* | */s/ Luis C. Marini-Biaggi* |
| John J. Rapisardi | Luis C. Marini-Biaggi |
| Maria J. DiConza | USDC No. 222301 |
| Matthew P. Kremer | Email: lmarini@mpmlawpr.com |
| (Admitted *Pro Hac Vice*) | |
| **O'MELVENY & MYERS LLP** | Carolina Velaz-Rivero |
| 7 Times Square | USDC No. 300913 |
| New York, New York 10036 | E:mail: cvelaz@mpmlawpr.com |
| Tel: (212) 326-2000 | |
| Fax: (212) 326-2061 | **MARINI PIETRANTONI MUÑIZ LLC** |
| | MCS Plaza, Suite 500 |
| -and- | 255 Ponce de León Ave. |
| | San Juan, Puerto Rico 00917 |
| Peter Friedman | Tel: (787) 705-2171 |
| (Admitted *Pro Hac Vice*) | Fax: (787) 936-7494 |
| 1625 Eye Street, NW | |
| Washington, D.C. 20006 | |
| Tel: (202) 383-5300 | |
| Fax: (202) 383-5414 | |
| | |
| *Attorneys for Hon. Pedro R. Pierluisi and the Puerto Rico Fiscal Agency and Financial Advisory Authority* | *Attorneys for Hon. Pedro R. Pierluisi and the Puerto Rico Fiscal Agency and Financial Advisory Authority* |