

KOBRE & KIM | DISPUTES AND INVESTIGATIONS

# The Financial Oversight & Management Board for Puerto Rico

## Independent Investigator

# FINAL INVESTIGATIVE REPORT

Kobre & Kim LLP | AUGUST 20, 2018

Exhibit B

# THE INDEPENDENT INVESTIGATOR'S

# FINAL INVESTIGATIVE REPORT

Exhibit B

00032

# THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO

## SPECIAL INVESTIGATION COMMITTEE

## INDEPENDENT INVESTIGATOR'S

## FINAL INVESTIGATIVE REPORT

*

SUBMITTED BY:

THE FINANCIAL OVERSIGHT & MANAGEMENT
BOARD FOR PUERTO RICO

SPECIAL INVESTIGATIVE COMMITTEE

INDEPENDENT INVESTIGATOR

KOBRE & KIM LLP

Pursuant to The Puerto Rico Oversight, Management and Economic Stability Act of 2016, Sections 101(b), 104(o) and PROMESA Investigative Procedures Sections 1.3(10), 2.1(b)(1), 3.1(a).

# EXECUTIVE SUMMARY

## Findings and Recommendations[1]

As of May 3, 2017, Puerto Rico had approximately $74 billion of bond debt and $49 billion of unfunded pension liabilities. For an economy of Puerto Rico's size, the burden of this debt has been catastrophic—it has been a financial, and ultimately a humanitarian, catastrophe. The toll it has taken on the people of Puerto Rico begs a pressing question: How did it happen?

This Report, like the Independent Investigation upon which it is based, aims to answer that question based on the facts. On the same basis, it offers recommendations for the people of Puerto Rico, and the policymakers who represent them, to consider in making sure they never have to go through all this again.

On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee, retained Kobre & Kim LLP as the Independent Investigator. The mandate was to conduct an investigation under PROMESA into the factors contributing to Puerto Rico's fiscal crisis, as well as Puerto Rico's issuance of debt. Following interviews with over 100 witnesses and review of thousands of documents, as discussed in detail in Part I, we find the following:

---

[1] All capitalized terms in this Executive Summary are used consistently with the definitions set forth in the Defined Terms, attached as Appendix A.

When the Possession Tax Credit's ten-year phase-out period terminated in 2006, Puerto Rico faced a declining population, increasing unemployment, mounting budgetary issues (amplified by a lack of transparency into the spending of the Puerto Rico-Related Entities, as well as delayed disclosure of audited financial reports), and escalating pension liabilities. Instead of implementing long-term plans to stimulate the Puerto Rico economy, to balance the budget and to fund ERS during the Relevant Period, Puerto Rico's political branches and GDB turned to the debt markets for shorter-term fixes. The short-term fixes included, among others: (i) the creation of the SUT, a portion of which purportedly secured issuances by COFINA; (ii) the entry into swap arrangements to generate cash to close budget gaps; (iii) an increase in deficit financing; and (iv) the issuance of Puerto Rico-Related Bonds that were purportedly secured by contributions to ERS.

With some of these structures, the Puerto Rico-Related Entities incurred billions of dollars of liability, but did not include those amounts when calculating how close Puerto Rico was to reaching its Constitutional Debt Limit. At times, in the absence of certain regulations we will discuss, underwriters sold the Puerto Rico-Related Bonds through Local CEFs in which only Puerto Rico investors purchased shares. Many of those Local CEFs were also managed by affiliates of the same investment banks that underwrote the Puerto Rico-Related Bonds in which the Local CEFs were invested.

GDB, in its dual role as fiscal agent and lender, enabled the Puerto Rico-Related Entities (particularly the Public Utilities and HTA) to subsist on appropriations from the General Fund, short-term cash influxes from GDB, and bond proceeds. This was done instead of holding the Puerto Rico-Related Entities accountable for their debts, ensuring that Issuers of revenue bonds actually collected sufficient revenues to repay those bonds, or demanding fiscal responsibility and independence. As the Puerto Rico-Related Entities amassed unsustainable levels of debt, the CRAs became increasingly concerned about the Puerto Rico-Related Entities' perpetual reliance on support from Puerto Rico and GDB, among other factors. The CRAs ultimately implemented a series of credit rating downgrades for Puerto Rico-Related Bonds at various points between 2012 and 2014, with most of those bonds reaching "junk" status between February and June of 2014.

As each of the Puerto Rico-Related Entities lost access to the capital markets, the short-term fixes strained the liquidity of Puerto Rico and GDB until it simply became untenable. Eventually, many of the Puerto Rico-Related Entities sought bankruptcy relief in the Title III Proceedings.

Below, we present a summary of our primary findings relating to each aspect of our Independent Investigation. We also provide an overview of certain recommendations stemming from those findings. We developed these recommendations on the basis of the evidence we reviewed, with the goals of restoring Puerto Rico's access to the capital markets and reducing the likelihood of another debt crisis.

# PART IX
# CALCULATION OF THE CONSTITUTIONAL DEBT LIMIT

The Constitutional Debt Limit found in Section 2 of Article VI of the Puerto Rico Constitution limits the amount of debt that Puerto Rico may issue directly in the form of bonds or notes for which it has pledged its "full faith credit and taxing power," as well as how much debt it may guarantee. The provision limits the amount of debt that Puerto Rico may issue or guarantee based on a multi-part calculation of the mathematical relationship between future debt service payments, prior-year guarantee payments and average revenues (the "Debt Limit Calculation"), as discussed in Part IX.A below.

As part of our investigation, we explored Puerto Rico's interpretation of the Constitutional Debt Limit and its historical practices to ensure compliance with it. We sought to determine the extent to which Puerto Rico's interpretation or application of the Debt Limit Calculation may have contributed to the debt crisis.

Based on our investigation, and as discussed further below, we find as follows:

- Puerto Rico has historically interpreted the Constitutional Debt Limit to require that only the following be included in the Debt Limit Calculation: (i) direct obligations for which it is has pledged its full faith, credit and taxing power; and (ii) certain debt servicing payments on bonds or notes it has guaranteed. In other words, debt issued by the public corporations (unless that debt is guaranteed by Puerto Rico) is not included in the Debt Limit Calculation and is not limited by the Constitutional Debt Limit;

253

Exhibit B

00036

- Based on the plain text of the provision, Puerto Rico's interpretation that non-guaranteed debt of public corporations is not included in the Debt Limit Calculation appears uncontroversial and, based on our research, is not the subject of litigation;

- However, the fact that Puerto Rico's Constitutional Debt Limit does not limit debt issued by its public corporations (unless guaranteed)—although not unusual in US states and territories—means that a significant portion of debt that is ultimately attributable to Puerto Rico's public sector, and that substantially contributed to the financial crisis, was not subject to the limit. A substantial portion of the $74 billion in public sector debt constitutes non-guaranteed debt of the public corporations;

- Puerto Rico has interpreted the Constitutional Debt Limit as a debt service limit. That is, the limit is tied to future annual debt service payments and prior-year guarantee payments, not based on the absolute amount of debt issued. That interpretation appears uncontroversial and, based on our research, is not the subject of litigation;

- Multiple witnesses informed us that, as a consequence of the future debt service feature of the limit, GDB worked with the underwriters to structure the future debt service payments to avoid a Constitutional Debt Limit violation;

- Puerto Rico has also interpreted the Constitutional Debt Limit to require that the Debt Limit Calculation include debt that it has guaranteed, but only to the extent that: (i) the issuer (a public corporation, for example) is unable to make debt service payments; and (ii) Puerto Rico is required to do so under its guaranty;

- Puerto Rico's interpretation concerning guaranteed debt is the subject of ongoing litigation about debt service payments on the bonds that PBA issued ("PBA Bonds"), and we express no view as to that interpretation. We did, however, investigate Puerto Rico's understanding of its compliance with the Constitutional Debt Limit. Based on our investigation, we did not find evidence that any Puerto Rico official believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violated the Constitutional Debt Limit; and

- We also investigated the practices Puerto Rico employed to confirm compliance with the Constitutional Debt Limit. Based on our investigation, we conclude that Puerto Rico employed a reasonably robust process involving a number of players, as well as consultation with counsel. The players included the Secretary of the Treasury, career officials at GDB, bond counsel, the underwriters and, to a limited extent, the PRDOJ.

A. **The Constitutional Debt Limit Provision and Debt Limit Calculation**

The Constitutional Debt Limit is set forth in Section 2 of Article VI of the Puerto Rico Constitution. The relevant portion of that section reads as follows:

> [N]o direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be

254

pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year; . . . and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.[1]

Put more simply, under this provision, Puerto Rico may not issue general obligation debt (*i.e.*, bonds or notes to which it has pledged its full faith and credit and taxing power) or guarantee debt if it will cause a certain calculation to exceed 15%. That calculation is as follows:

As to any issuance or guaranty of debt,

- (A) the sum of

  - (i) the maximum future annual debt service (principal and interest "payable in any fiscal year") on all of its outstanding general obligation debt (including the issuance in question),

  plus

  - (ii) any amounts Puerto Rico has paid in the previous fiscal year on account of any bonds or notes it guaranteed,

  cannot exceed 15% of

- (B) Puerto Rico's average annual "internal revenues" based on averaging the prior two fiscal years.

---

[1] P.R. Const. art. VI, § 2.

"Internal revenues" consists principally of income taxes, property taxes, sales and use taxes (excluding the portion allocated by law to COFINA) and excise taxes.[2] And so, in short, item (A)(i), plus item (A)(ii), cannot be greater than 15% of item (B).

The following example, taken from the Official Statement for the 2014 GO Bond Issuance, illustrates the calculation. In this example, according to the Official Statement:

- The maximum future annual debt service for Puerto Rico's outstanding general obligation debt (including the bonds in question) (*i.e.*, item (A)(i) in the previous paragraph) was $1,161,777,697;

- The amounts paid by Puerto Rico in the previous fiscal year on account of bonds or notes it guaranteed (*i.e.*, item (A)(ii) in the previous paragraph) was $17,315,000;

- The sum of $1,161,777,697 and $17,315,000 equals $1,179,092,697;

- The average of Puerto Rico's annual internal revenues in the previous two fiscal years (*i.e.*, item (B) in the previous paragraph) was $8,307,097,000; and

- Dividing $1,197,092,697 by $8,307,000 yields 14.2%, which is less than 15%.[3]

To determine the maximum future annual debt service, Puerto Rico determines the debt service requirements on its outstanding GO Bonds for future years. For variable rate bonds (where the interest rates fluctuate), Puerto Rico uses the maximum legal rate (12%). It then determines the maximum annual requirement. In this example, it is shown to be $1,161,777.697 for fiscal year ended 2016.[4]

In Section C below, we discuss where the numbers that fed into the above calculation came from. But first, we discuss how the scope of the Constitutional Debt Limit was historically interpreted by Puerto Rico.

**B.  Puerto Rico's Interpretation of the Constitutional Debt Limit and Debt Limit Calculation**

As part of our investigation, we examined how Puerto Rico interpreted and applied the Constitutional Debt Limit and Debt Limit Calculation during the Relevant Period.

**1.  Public Corporation Debt Is Generally Not Included**

First, Puerto Rico interpreted the Constitutional Debt Limit to require the Debt Limit Calculation to include: (i) direct general obligations of Puerto Rico; and (ii) as discussed further below in subsection (3), certain payments on debt obligations that Puerto Rico may guarantee. In

---

[2] *See, e.g.*, Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 31 (2014).
[3] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).
[4] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 34 (2014).

other words, as interpreted by Puerto Rico, the Debt Limit Calculation does not include debt issued by the public corporations if that debt is not guaranteed by Puerto Rico (such as non-guaranteed revenue bonds issued by PREPA, for instance). This interpretation appears consistent with the plain text of the provision and, based on our research, does not appear to be the subject of litigation.

Our investigation included interviews of a number of former Secretaries of Justice, whose role in GO Bond issuances included issuing an opinion that the bonds constitute valid and binding general obligations of Puerto Rico. One former Secretary of Justice we interviewed commented that the provisions of the Constitutional Debt Limit clearly refer to "direct obligations" of Puerto Rico and that the public corporations, even though instrumentalities of Puerto Rico (like the Issuers) are separate and distinct entities from Puerto Rico. The senior official commented that this explains why there are many instrumentalities in Title III Proceedings.

This interpretation helps explain how public sector debt (which includes debt of the public corporations) could reach $74 billion notwithstanding the Constitutional Debt Limitation. In short, a substantial portion of that $74 billion was in the form of non-guaranteed public corporation debt, to which the Constitutional Debt Limit was understood not to apply.

We note that it is not unusual for US states and territories to apply debt limitations solely to general obligation debt. Nor is it unusual that this specifically defined nature of the debt limitation coincides with a growth in nonguaranteed debt. Indeed, a 1961 report by the Advisory Commission on Intergovernmental Relations ("ACIR"), titled "State Constitutional and Statutory Restrictions on Local Government Debt," notes the prevalence of debt limitations that only cover general obligation debt:

> One feature of these State-imposed restrictions [concerning debt limits] deserves emphasis—the fact that they do not encompass all types of local bond issues, but commonly apply only to local governments' issuance of full faith and credit debt. Various legal doctrines and devices by which local governments can issue nonguaranteed or "revenue" debt, usually exempt from such state restrictions, have developed widely. In recent years, there has been an extremely rapid growth of "unrestricted" local debt.[5]

The ACIR also observed the resulting rapid growth of nonguaranteed debt to finance projects traditionally financed through general obligation debt:

> Nonguaranteed debt originally developed to finance utility-type operations of local governments, such as water supply. It was later broadened (with Federal backing) to provide for local public housing projects. As recently as 1957, the bulk of all local nonguaranteed debt outstanding had been incurred for these two kinds of purposes. But the past few years have witnessed a rapid

---

[5] U.S. Advisory Comm'n on Intergovernmental Relations, *State Constitutional and Statutory Restrictions on Local Government Debt*, 2 (1961).

extension of the so-called "revenue bond" device to finance types of projects traditionally financed by full faith and credit borrowing . . . .[6]

It is for Puerto Rico's political branches to consider and decide whether the Constitutional Debt Limit should be broadened or legislation enacted to restrict debt issued by any of the public corporations. Alternatively, other constitutional or legislative positions directed specifically to the debt of the public corporations could be considered as a way to address debt that is outside Article VI, Section 2, but should nonetheless by limited or maintained.

### 2. The Constitutional Debt Limit Is Based On Debt Service, Not the Absolute Amount of Debt

Second, Puerto Rico has interpreted the Constitutional Debt Limit to be based on future debt service and prior-year guarantee payments (and their relationship to prior-year revenues), not based on total amount of debt issued or guaranteed. This interpretation appears consistent with the plain text of the provision and, based on our research, does not appear to be the subject of litigation.

Because the Debt Limit Calculation includes future annual debt service payments, Puerto Rico could attempt to avoid a violation by structuring the servicing payments in a certain way. For example, a longer maturity on a bond being issued could result in lower annual payments so as to fit the issuance within the 15% limit. According to multiple witnesses, GDB historically worked with the underwriters to manage the debt and structure the service payments to avoid a violation. Based on our investigation, it appears this interpretation was shared among the participants responsible for ensuring compliance with the Constitutional Debt Limit and that the practice of managing debt to avoid a violation was understood to be permissible.

We also note that Puerto Rico is not alone in tying its debt limitations to debt service payments. A number of US states have debt limits that, like Puerto Rico, are calculated based on annual debt service. In Tennessee and Hawaii, for example, debt service on public debt cannot exceed 10% and 18.5% of annual revenues, respectively.[7]

### 3. Guaranteed Debt and PBA Bonds

Third, Puerto Rico has interpreted the Constitutional Debt Limit to require that the Debt Limit Calculation include debt that it has guaranteed, but only to an extent. Specifically, under Puerto Rico's interpretation, debt service payments on guaranteed debt are not included in the Debt Limit Calculation unless the issuer of the debt is unable to make payment and Puerto Rico is required to make payment under its guarantee. In other words, while debt service payments that Puerto Rico is required to make under its guaranty *are* included in the Debt Limit Calculation (as item (A)(ii) of the calculation discussed above), debt service payments either that the issuer makes or that Puerto Rico is not required under its guaranty to make *are not* included.

---

[6] U.S. Advisory Comm'n on Intergovernmental Relations, *State Constitutional and Statutory Restrictions on Local Government Debt*, 25–26 (1961).

[7] *See* Tenn. Code Ann. § 9-9-105(c)(1) (West 2018); Haw. Const. Art. 7, § 13.

Puerto Rico's interpretation may be relevant to a dispute concerning Puerto Rico's guaranty of PBA Bonds, which we discuss below. In light of this ongoing litigation, we express no view about whether this interpretation is consistent with the plain text of the provision.

### (a) Puerto Rico's Treatment of Guaranteed Debt, In General

We learned that Puerto Rico has had a longstanding practice of only including in the Debt Limit Calculation debt servicing payments that Puerto Rico was required to pay. In addition, we found that Puerto Rico's practice and interpretation concerning guaranteed debt has been disclosed repeatedly, at least as far back as 2007. For example, Puerto Rico's *Financial Information and Operating Data Report* dated July 1, 2007 (appended to the official statement for Public Improvement Bonds of 2007, Series A) described this interpretation in relation to certain guaranteed PRASA bonds, as follows:

> Annual debt service payments on the PRASA guaranteed bonds have been paid by PRASA since fiscal year 2006 and, thus, such payments are not now included now [sic] in the calculation of the 15% debt limitation. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.[8]

Later reports made this point even more clearly:

> Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.[9]

Similarly, official statements for the PBA Bonds state as follows:

> As provided above, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the issuers of such guaranteed bonds are unable to make such payments and the Commonwealth is therefore required to make such payments under

---

[8] Commonwealth of P.R., *Official Statement for Public Improvement Bonds of 2007, Series A*, I-27 (2007).
[9] Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series 2009 A*, I-38 (2009).

its guarantee, in which case such debt service would be included in the calculation of the 15% constitutional debt limitation.[10]

Although witnesses confirmed that Puerto Rico's interpretation was part of a longstanding practice, no witness we asked was able to identify specific legal authority or a Secretary of Justice opinion upon which Puerto Rico relied for this particular point. And we did not find any, either.

We are aware of various opinions by former Secretaries of Justice that address a similar, but not identical, issue. Those opinions were provided in connection with the issuance of various guaranteed bonds and concluded that amounts "required to be paid" by Puerto Rico under a guaranty constitute "public debt" within the meaning of Section 8 of Article VI of the Puerto Rico Constitution.[11] But this speaks to the rights of holders in the event that Puerto Rico has insufficient resources to satisfy its obligations. It does not specifically address the extent to which debt service payments should be included in the Debt Limit Calculation.

### (b) **PBA Bonds**

PBA is a public corporation. The PBA Bonds add an additional layer of complexity to the question of how the Debt Limit Calculation should be applied because, as discussed further below, Puerto Rico has not only guaranteed the PBA Bonds with a pledge of its full faith, credit and taxing power, but the PBA Bonds themselves are payable from rental payments on facilities rented to governmental entities and Puerto Rico has guaranteed those rental payments with a pledge of its full faith, credit and taxing power. As discussed below, certain creditors maintain that debt service payments on PBA Bonds should be included in the Debt Limit Calculation.

PBA owns a number of buildings—including office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops and related facilities—that it leases to various governmental entities, such as departments, agencies, instrumentalities and municipalities of the Government. It has issued PBA Bonds, approximately $ 4.1 billion of which are were outstanding as of February 2017.[12]

---

[10] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Bonds, Series R*, 24 (2011); *see also* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 10 (2014) ("The Constitution of Puerto Rico provides that the Commonwealth shall not guarantee any obligation evidenced by bonds or notes if (a) the sum of (i) the total amount payable in any fiscal year on account of principal of and interest on all the Direct Obligations already issued and (ii) the amount paid by the Commonwealth in the next preceding fiscal year on account of Guaranteed Obligations exceeds (b) 15% of the average of the total annual internal resources of the Commonwealth for the two preceding fiscal years. Accordingly, debt service payable on Guaranteed Obligations is *not* taken into consideration for purposes of the debt limit *unless* the Commonwealth is required to pay such debt service pursuant to its guarantee and the Commonwealth may continue to guarantee bonds and notes issued by its instrumentalities as long as the 15% limitation is not exceeded.") (emphasis added).
[11] *See, e.g.*, P.R. Aqueduct & Sewer Auth., *Official Statement for Revenue Refunding Bonds, 2008 Series A, 2008 Series B*, 7–8 (2008).
[12] P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

PBA Bonds are payable from and secured by a pledge of the rental payments owed by the governmental entity that leased the building.[13] In other words, Puerto Rico has guaranteed the rental payments owed by the governmental entity, and the PBA Bonds are secured by that guaranty.[14] In addition, Puerto Rico has guaranteed payment of the principal of and interest on the PBA Bonds themselves.[15] For both the guaranty of rental payments and the guaranty of payment on PBA Bonds, Puerto Rico has pledged its full faith, credit and taxing power.[16]

According to the official statements for the PBA Bonds, under a 2001 agreement designed to reduce the frequency and length of delays in rent payments, each month the Treasury Department forwarded to GDB funds for PBA rental payments, which were deposited into a PBA account at GDB. Portions of the rental payments were used to cover debt service on PBA Bonds.

As noted, Puerto Rico has not included either the rental payments or debt service payments on the PBA Bonds in the Debt Limit Calculation because it understood that no payments under its guaranty were required.[17]

In one of the Title III adversary proceedings, holders of senior bonds issued by COFINA ("COFINA Senior Bondholders") have argued that, due to the nature of Puerto Rico's guarantees, the "rental obligations and payments" by Puerto Rico should have been included as future debt service payments in the Debt Limit Calculation.[18] They argue that, due to the nature of the arrangements, it is an "illusion" that Puerto Rico does not have a "direct full faith and credit obligation to PBA bond investors" and that "the Court must look to the substance of the transaction in determining that the PBA debt should be counted against the constitutional debt limit."[19]

The COFINA Senior Bondholders contend that the effect of not including the future debt service on PBA Bonds in the Debt Limit Calculation was to increase the total permissible debt. They claim that properly including the future payments on PBA Bonds in the calculation would

---

[13] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 1 (2012).
[14] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 17 (2012).
[15] *See* Act of July 2, 2012, No. 131, 2012 P.R. Laws 380, 380 ("Act No. 17 of April 11, 1968, as amended . . . provided that the Government of Puerto Rico would guarantee the payment of the principal of and interest on bonds issued by the PBA and specified by the latter for any of the purposes authorized by law.").
[16] *See, e.g.*, Act of July 2, 2012, No. 131, § 1, 2012 P.R. Laws 380, 381–82; P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 1, 17 (2012).
[17] *See, e.g.*, P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 22 (2012) ("No payments under the Commonwealth guaranty have been required to date for any of the Authority's bonds.").
[18] Mot. and Incorporated Mem. of Law at 32, *Lex Claims, LLC v. Alejandro Garcia-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.
[19] Mot. and Incorporated Mem. of Law at 32, *Lex Claims, LLC v. Alejandro Garcia-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.

result in the Constitutional Debt Limit having been exceeded by March 2011 and that by March 2014 the debt level would have been approximately 17.5%, in excess of the 15% limit.[20]

We are aware of no ruling by Puerto Rico courts on the constitutionality of the practice and take no position as to the merits of the COFINA Senior Bondholders' argument.

As part of our investigation, we sought to determine whether there was any evidence that Puerto Rico understood its practice of not including debt service payments on PBA Bonds to violate the Constitutional Debt Limit. Based on our investigation, we found no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violates the Constitutional Debt Limit. As noted, according to witnesses, Puerto Rico had a longstanding practice of treating direct debt and guaranteed debt differently for purposes of the Debt Limit Calculation. And several witnesses stated that they were not aware of anyone expressing the view that PBA Bonds should be included in the Debt Limit Calculation. In addition, we note that the Puerto Rico Commission for the Comprehensive Audit of the Public Credit reported that "[t]he computational methods used by GDB appeared to be arithmetically correct, performed in a manner consistent with protocol employed in years past, and supported by the opinion of outside bond counsel."[21] Moreover, through at least the 2013 fiscal year, independent auditors opined that the debt limit had not been exceeded.[22]

### 4. Swap Termination Fee Payments

Puerto Rico has also interpreted the Constitutional Debt Limit not to require that the Debt Limit Calculation include certain Swap termination fee payments. As discussed in Part XIII, a Swap is a type of complex financial transaction into which certain Issuers entered, that transfers the risk of interest rate fluctuations between the Issuer and its counterparty. Swap agreements often provide for the payment of certain "termination fees" triggered by certain credit events.

Through Act No. 39 of August 1, 2005 ("Act 39-2005"), Puerto Rico pledged the "good faith, the credit and the power to impose taxes of the Commonwealth" for amounts payable—interest, specifically—under Swap agreements entered into by Puerto Rico as well as by the PBA.[23] Act 39 expressly excludes, however, any amount payable or to be paid by Puerto Rico in termination fees for Puerto Rico Basis Swaps and PBA Swaps from the Debt Limit Calculation. Specifically, with regard to Puerto Rico Basis Swaps, Act 39 provides:

> In the case of a qualified basis swaps agreement, the amount paid to the other party by the Commonwealth as payment for terminating the agreement shall constitute neither interest nor principal nor shall it be deemed as a component of the service of the debt of the

---

[20] Mot. and Incorporated Mem. of Law at 32-33, *Lex Claims, LLC v. Alejandro García-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.

[21] P.R. Comm'n for the Comprehensive Audit of the Pub. Credit, *Pre-audit Survey Report*, 20 (2016).

[22] P.R. Comm'n for the Comprehensive Audit of the Pub. Credit, *Pre-audit Survey Report*, 20 (2016).

[23] Art. 3 § 5 & Art. 4 § 2(b), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

Commonwealth for purpose of Section 2 of Article VI of the Constitution of Puerto Rico.[24]

Additionally, with regard to PBA, Act 39 provides:

> For the purpose of the calculation of the constitutional limit of the public debt under Section 2 of Article VI of the Constitution of Puerto Rico, any amount payable or to be paid by the Commonwealth under the Guarantee with respect to any payment for the termination of a Qualified Interest Rate Exchange Agreement of [PBA] shall neither constitute the principal, nor the interest, nor shall it be deemed to be a component of the service of the debt of the Authority or of the Commonwealth.[25]

There is no provision in Act 39 that states specifically whether or not termination fees in connection with non-basis Puerto Rico swaps should be counted toward to the Constitutional Debt Limit.

As discussed further in Parts XIII and XVI, Puerto Rico has taken the position that Swap termination payments payable by Puerto Rico, even though a "good faith" and credit obligation, are not to be included in the Debt Limit Calculation. According to the official statement for the 2014 GO Bond Issuance, the payment does not need to be included because "it is not a payment of principal of or interest on general obligation debt of the Commonwealth."[26] The official statement acknowledges, however, that "the exclusion of such amounts from the debt limit has to this point never been ruled upon by any court."[27]

Based on our investigation, we found no evidence that Puerto Rico personnel believed the interpretation was incorrect, although we note that witnesses we asked had little recollection of any discussions concerning this issue.

From 2008 to 2014, annual net and gross amounts paid net swap termination fees paid were as follows. As discussed further in Part XVI, an argument could be made that these payments should have been included in the Debt Limit Calculation, which may have had the effect of decreasing the amount Puerto Rico could borrow within the Constitutional Debt Limit.

---

[24] Art. 3 § 3(g), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).
[25] Art. 4 § 4(g), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).
[26] Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).
[27] Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).

**Figure IX.A: Puerto Rico and PBA Swap Termination Fees by Fiscal Year**

| Fiscal year ended | Net termination payments | Gross termination payments |
|---|---|---|
| 2008 | (9,536,750.00) | (9,536,750.00) |
| 2009 | (24,640,000.00) | (36,770,000.00) |
| 2010 | 246,000.00 | (12,454,000.00) |
| 2011 | (58,552,030.00) | (58,552,030.00) |
| 2012 | (125,386,600.00) | (125,386,600.00) |
| 2013 | - | - |
| 2014 | (101,234,600.00) | (101,234,600.00) |

### C. Puerto Rico's Process For Ensuring Compliance With The Constitutional Debt Limit

We also investigated the practices Puerto Rico employed to confirm compliance with the Constitutional Debt Limit. Based on our investigation, we conclude that Puerto Rico employed a reasonably robust process involving a number of players and advice of counsel. The players included the Secretary of the Treasury, GDB, bond counsel, the underwriters, and, to a limited extent, the PRDOJ.

#### 1. The Secretary of the Treasury's Certificate

In connection with any GO Bond offering, the Secretary of the Treasury issued a certificate, titled the "Certificate as to the Borrowing Power of the Commonwealth of Puerto Rico under Section 2 of Article VI of the Commonwealth Constitution" ("Certificate of Borrowing Power"), which sets out the figures for the debt limit calculation described in Part IX.A.[28] The Certificate of Borrowing Power is included in the closing binder. It forms part of the basis for bond counsel's opinion that the bonds constitute valid and binding general obligations of Puerto Rico, and the figures are consistent with those provided in the official statement.

For example, consistent with the figures set forth above in Part IX.A, the Certificate of Borrowing Power for the 2014 GO Bond Issuance states that:

---

[28] See, e.g., Treasury of Commonwealth of P.R., *Certificate as to the Borrowing Power of the Commonwealth of Puerto Rico under Section 2 of Article III of the Commonwealth Constitution* (Mar. 17, 2014) (on file with P.R. Dep't of Treasury).

264

- The annual revenues transferred into the Treasury for each of the previous two fiscal years with certain exceptions ($8,357,838,000 for fiscal year ended 2012 and $8,256,356,000 for fiscal year ended 2013) as well as the average of those two numbers: $8,307,097,000 (*i.e.*, item (B) above);

- The total principal amount of the bonds or notes issued by Puerto Rico for which the full faith, credit and taxing power are pledged;

- The maximum future annual debt service on the bonds and notes identified in the previous bullet payable in any fiscal year (in this case being fiscal year ended 2016): $1,161,777.697 (*i.e.*, item (A)(i) above); and

- The total amounts paid by Puerto Rico in fiscal year ended 2013 on account of bonds or notes guaranteed by Puerto Rico: $17,315,000 (*i.e.*, item (A)(ii) above).

Finally, the Certificate of Borrowing Power also provided a calculation of the estimated "borrowing margin," or the difference between the figure of item (A) above and the 15% of item (B) above. In the case of the 2014 GO Bond Issuance, that figure was 0.806% (15.000% minus 14.194%), reflecting a near maximum debt level.

### 2. GDB

Based on the statements of multiple witnesses, we learned that the numbers set forth in the Certificate of Borrowing Power were provided by the finance department at GDB. Individuals primarily responsible for these numbers were career employees, and the person largely responsible for general obligation debt calculations for much of the Relevant Period had many years of experience. A former high-level GDB official explained that the GDB finance department maintained an Excel spreadsheet of internal revenues and bond issuances that was used to perform the calculation. The GDB official explained that the finance department would confirm the internal revenues based on information the Department of Treasury maintained online.

In performing any necessary calculations (such as the maximum future annual debt service, which assumes an interest rate of 12%), GDB finance would confer with and rely upon bond counsel and in-house counsel at GDB.

As noted, the calculation was also included in the official statements, which, like the Certificate of Borrowing Power, were signed by the Secretary of the Treasury. We learned that, before the official statements were signed, there were meetings among the Secretary of the Treasury and members of GDB management, including the GDB President and in-house counsel, at which the calculation was discussed.

### 3. Bond Counsel

Multiple former high-ranking GDB and PRDOJ officials stated that the Debt Limit Calculation, including what was to be included and not included, was reviewed and approved by bond counsel. One former high-ranking GDB witness reported that on local issuances, Puerto Rico counsel advised regarding the Constitutional Debt Limit. As noted, a former high-ranking GDB witness told us GDB relied on counsel's advice.

A former bond counsel witness conveyed that counsel reviewed the calculations and made sure the calculation process was consistent with counsel's understanding of how the calculation was supposed to be performed. Another former bond counsel also stated that counsel would ask questions to confirm whether certain debt issuances were accounted for, although they would ultimately rely upon the accuracy of the numbers.

As part of the issuance, bond counsel would issue an opinion stating that the bonds constitute valid and binding general obligations of Puerto Rico.[29]

### 4. Underwriters' Counsel

We learned that underwriters and their counsel provided an additional check on Puerto Rico's compliance with the Constitutional Debt Limit. This is because underwriters had strong interest during the Relevant Period to avoid underwriting and marketing debt securities that might later be found to have been unlawfully issued.

One underwriters' counsel witness stated that the underwriters relied on the calculations provided by GDB and bond counsel's opinion that the Constitutional Debt Limit had been respected for a given issuance. A bond counsel witness reported that underwriters' counsel would also check to make sure the calculation was consistent with underwriters' understanding of how the calculation should be performed and would ask questions about what items were included and excluded from the calculation. The witness stated that underwriters' counsel would review the calculations but not look behind the numbers.

A former high-ranking GDB official, as well as underwriter witnesses, stated that underwriters' counsel independently performed the constitutionally required calculations. The underwriter witness conveyed that the underwriter received advice from counsel about how to perform the calculations. Significantly, our investigation revealed no evidence that, at any point during the Relevant Period, underwriters' counsel reached a conclusion that any constitutional calculation by GDB resulted in an unlawful offering.

Multiple witnesses explained that the underwriters worked with GDB to structure the debt service to ensure compliance with the Constitutional Debt Limit provision. This was possible because the Puerto Rico Constitution, as discussed above, did not limit the total debt. Rather, it limited future annual direct debt service payments (and payments in the more recent fiscal year on guaranteed debt) to no more than 15% of the average revenue for the prior two fiscal years.

### 5. PRDOJ

Finally, The Secretary of Justice issued an opinion concluding that "the Bonds constitute valid obligations of the Commonwealth . . . ."[30] Multiple PRDOJ witnesses stated, however, that

---

[29] *See, e.g.*, Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, II-1–II-2 (2014).
[30] Inquiry No. 14-142-A, Op. Sec. Just. César R. Miranda Rodríguez, 2 (Mar. 17, 2014) (on file with P.R. Dep't of Justice).

PRDOJ did not perform or check the Debt Limit Calculation figures that appeared in official statements, instead deferring to GDB's calculations.

### D. The Balanced Budget Provision and the Maximum Debt Maturity Provision

We also note two other provisions in the Puerto Rico Constitution that may be implicated by the Government's issuance of debt: the balanced budget provision and the maximum debt maturity provision.

The balanced budget provision is located at Section 7 of Article VI of the Puerto Rico Constitution. Based on the English version of the Constitution, the text reads: "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law." This may lead a reader to conclude that debt may not be issued in order to finance budgetary shortfalls, because appropriations (*i.e.*, expenditures) may not exceed total revenues. However, as discussed in Part IV of this Report, a 1974 opinion issued by a Puerto Rico Secretary of Justice has been interpreted to mean that Puerto Rico is permitted to use proceeds of debt issuances as an available resource to prepare a balanced budget. We are not aware of any contrary Secretary of Justice legal opinion, and no court appears to have interpreted this provision of the Puerto Rico Constitution.

The maximum debt maturity provision is located in Section 2 of Article VI. It provides that no general obligation bonds or notes "for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date." As noted in Part IV of this Report, Puerto Rico regularly refinanced debt by "scooping and tossing"—that is, issuing new Puerto Rico-Related Bonds and using at least a portion of the proceeds to pay off old Puerto Rico-Related Bonds. We briefly discuss potential arguments that could be made as to the "scoop and toss" practice and compliance with the maximum debt maturity provision in Part IV.

### E. Conclusion

In summary, the evidence we reviewed supports the conclusion that Puerto Rico employed a reasonably robust process for these Debt Limit Calculations. In addition, we did not find any evidence that Puerto Rico's government personnel believed that Puerto Rico's interpretation of the Constitutional Debt Limit was wrong or that Puerto Rico performed the Debt Limit Calculation incorrectly.

Nevertheless, in light of Puerto Rico's debt crisis, Puerto Rico should consider whether it may be worthwhile for its judiciary to review the meaning of Section 2 of Article VI of the Puerto Rico Constitution, as well as the methods pursuant to which Puerto Rico determines the types of debt servicing payments to be included within the Debt Limit Calculation. Significantly, the Constitutional Debt Limit did not prevent the issuance of legal, but ultimately unsustainable, amounts of public debt.