As requested by the Oversight Board, the Commonwealth prepared and presented the Oversight Board with various drafts of a revised fiscal plan for the Commonwealth and certain of its instrumentalities. Notwithstanding the Commonwealth's efforts, on April 19, 2018, the Oversight Board certified its own version of a revised fiscal plan for the Commonwealth and certain of its instrumentalities. After further negotiations between the Government and the Oversight Board regarding certain labor reform requirements, the Oversight Board re-certified the revised fiscal plan on May 30, 2018 based on the commitment that legislation would be enacted to convert Puerto Rico into an at-will employment jurisdiction through the repeal of Act No. 80 of 1976, as amended ("Act 80").

On June 29, 2018, the Oversight Board certified a new, revised fiscal plan for Puerto Rico (the "Revised Commonwealth Fiscal Plan") due to the failure to repeal Act 80 and convert Puerto Rico to an at-will employment jurisdiction as required by the fiscal plans certified on April 19, 2018 and re-certified on May 30, 2018. The Revised Commonwealth Fiscal Plan covers a six-year period, from fiscal year 2018 to fiscal year 2023. Although the Revised Commonwealth Fiscal Plan adopted significant parts from the draft fiscal plans presented by the Commonwealth, it differs in certain material aspects from the Commonwealth's proposals. The Oversight Board also certified a budget for the Commonwealth for fiscal year 2019 that is based on the Revised Commonwealth Fiscal Plan (the "Fiscal Year 2019 Certified Budget"). On July 5, 2018, the Governor and AAFAF filed an adversary complaint against the Oversight Board in the Commonwealth's Title III proceeding, which seeks a declaration that certain actions taken by the Oversight Board, including related to the Revised Commonwealth Fiscal Plan and the budget, exceed its powers under PROMESA and abrogate the rights of the Government. The complaint also seeks injunctive relief that would prohibit the Oversight Board from enforcing certain disputed provisions of the Revised Commonwealth Fiscal Plan and the budget. The Oversight Board filed a motion to dismiss this complaint on July 12, 2018 and the matters were argued before the court on July 25, 2018. On August 7, 2018, the court issued an order granting in part and denying in part the Oversight Board's motion to dismiss.

On August 1, 2018, the Oversight Board announced that it would commence a process to further revise the Revised Commonwealth Fiscal Plan. Revisions would incorporate, among other things, fiscal year 2018 actuals and revised federal disaster estimates, which the Oversight Board indicated should improve the Revised Commonwealth Fiscal Plan's revenue projections. The revisions would also include the correction of a recently discovered forecasting error, which results in the demographic projections in the Revised Commonwealth Fiscal Plan being too negative. The Oversight Board indicated that, due to the per capita rate of healthcare spending, this error leads to a projected surplus over 30 years for the Commonwealth that is too high by approximately $4 billion.

On August 21, 2018, the Commonwealth prepared and presented to the Oversight Board a revised draft of the Revised Commonwealth Fiscal Plan. On August 30, 2018, the Oversight Board notified the Commonwealth that the revised draft of the Revised Commonwealth Fiscal Plan required certain revisions before it could be certified. In particular, the Oversight Board required changes or adjustments in the macroeconomic, revenue and expenditure projections used by the Commonwealth and the structural reforms and fiscal measures proposed by the Commonwealth. On September 10, 2018, the Commonwealth presented the Oversight Board with a further revision of the Revised Commonwealth Fiscal Plan. On October 22, 2018, the Oversight Board published a draft of the Commonwealth fiscal plan that it planned to adopt and, on October 23, 2018, the Oversight Board adopted the revised Commonwealth fiscal plan (the "October Revised Commonwealth Fiscal Plan").

The following summary describes certain provisions of the October Revised Commonwealth Fiscal Plan. This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the October Revised Commonwealth Fiscal Plan, which the Oversight Board has indicated will be amended and which may be further amended in the future. In addition, the October Revised Commonwealth Fiscal Plan is forward looking and the ability of the Commonwealth to achieve the various objectives outlined therein is subject to substantial uncertainty, including as a result of events and conditions outside of the Commonwealth's control.

The October Revised Commonwealth Fiscal Plan addresses the finances of central government agencies, certain other government agencies and certain public corporations and instrumentalities but excludes those entities for which an independent fiscal plan has been or is being developed. As a result, entities such as GDB, PREPA, the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), the HTA, UPR, COFINA and the Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico ("COSSEC") are not included in the October Revised Commonwealth Fiscal Plan. Other entities excluded from the October Revised Commonwealth Fiscal Plan include The Children's Trust Fund, municipalities, the Puerto Rico Public Finance Corporation, the Puerto Rico Municipal Finance Corporation, the Puerto Rico Municipal Finance Agency and certain other special, independent funds created by the Commonwealth for particular purposes.

The October Revised Commonwealth Fiscal Plan estimates an 8.0% contraction in real gross national product in fiscal year 2018, but projects a marked increase in macroeconomic growth for fiscal year 2019 that gradually decreases until fiscal year 2023, assuming that the structural reforms outlined in the October Revised Commonwealth Fiscal Plan are implemented. This macroeconomic growth projection takes into account a projected population decline during the period covered by the October Revised Commonwealth Fiscal Plan of approximately 5.5%. The October Revised Commonwealth Fiscal Plan also includes financial projections that are largely driven by macroeconomic projections. Without the fiscal and structural measures included in the October Revised Commonwealth Fiscal Plan, the cumulative surplus for the six-year period covered by the October Revised Commonwealth Fiscal Plan was expected to total $3.9 billion before the payment of any debt service. After the application of the fiscal measures provided for under the October Revised Commonwealth Fiscal Plan, and the fiscal impact of the structural reforms described therein, the October Revised Commonwealth Fiscal

DRA Ex. 225

Plan projects a surplus of approximately $17 billion for the applicable six-year period before the payment of any debt service. In addition, the October Revised Commonwealth Fiscal Plan projects increased revenues buoyed by a positive macroeconomic trajectory resulting from significant disaster relief funding stimulus, as well as federal Medicaid funding. The October Revised Commonwealth Fiscal Plan includes illustrative estimates of the implied debt capacity of the Commonwealth and the instrumentalities covered by the plan, based on a range of interest rates and assuming a 30-year term for such debt. Such estimates confirm the need for significant debt restructuring and write-downs.

The October Revised Commonwealth Fiscal Plan seeks to achieve its objectives through the implementation of a myriad of structural and fiscal reforms. Structural reforms include human capital and welfare reforms, ease of doing business reforms, power sector reforms and infrastructure reform and capital investment. Human capital and welfare reforms are geared to address Puerto Rico's low labor participation rate by making it easier and more affordable to create jobs in Puerto Rico and to enable more people to work in Puerto Rico through initiatives articulated in the October Revised Commonwealth Fiscal Plan. These initiatives include implementing education targets for higher proficiency in Spanish, English and STEM subjects, providing workforce training opportunities, enacting and implementing more flexible and less costly labor laws and regulations, including those to establish employment benefits at levels that are competitive with other jurisdictions, and creating incentives to work through welfare reforms and local earned income tax credit benefits.

Structural reforms articulated in the October Revised Commonwealth Fiscal Plan are also centered on making Puerto Rico more competitive in the global economy. For example, ease of doing business reforms are geared to attract new investments and business by making it easier to do business in Puerto Rico. These initiatives include improving current World Bank Ease of Doing Business rankings, digitalizing government services and modernizing systems, reducing regulatory burdens, such as licensing and other requirements, minimizing tax compliance costs and simplifying permitting and startup costs. Energy sector reform is also critical for residents and businesses alike because affordable, reliable and resilient electricity should lead to economic development. Initiatives in this field include lowering electric rates, rebuilding resilient infrastructure, diversifying the fuel mix and updating technologies, establishing efficient and robust transmission and distribution systems, and putting a strong and independent expert regulator in place.

The October Revised Commonwealth Fiscal Plan also articulates infrastructure reforms geared towards the goal of providing better service for residents and businesses. The October Revised Commonwealth Fiscal Plan proposes centralized administration of federal recovery funds in order to set government priorities that will guide future infrastructure investment. These reforms are expected to lead to an accelerated infrastructure reconstruction process and a sustainable funding and financing model. Finally, it is expected that these reforms will lead to procurement and delivery practices in line with best practices in the United States and around the world.

The October Revised Commonwealth Fiscal Plan also provides for significant fiscal reform in order to achieve the objectives set forth therein. Fiscal reform initiatives are concentrated on reducing government expenditures through rightsizing, reforming historically high cost programs and implementing measures to assure transparency, balanced budgets and fiscal controls.

The October Revised Commonwealth Fiscal Plan sets forth measures to reduce government expenditures through rightsizing initiatives that promote a more efficient and affordable government to provide necessary services. Key to these initiatives is a consolidation of agencies and shared services, which is anticipated to lead to personnel reductions mainly through attrition and retirement. Government reform will also aim to achieve reductions and/or elimination of subsidies, reduction of bureaucracy through regionalization initiatives and lower costs for goods and services through procurement reform.

The October Revised Commonwealth Fiscal Plan also calls for healthcare and pension reform. As two of the major budget items for the Commonwealth, cost savings in respect of these systems could be significant. The Government recently achieved a healthcare reform objective by implementing a simple, unified regional system to drive efficiency and cost reductions. Healthcare reform objectives would also include consolidation of health-related government agencies to address redundancy and overlap. New technologies would be used to detect fraud and overuse in order to control costs. Finally, cost control through standardization of fees and limitations on emergency room use and increased generic (as opposed to brand-name) drug use would also be implemented. With respect to pension reform, the October Revised Commonwealth Fiscal Plan would freeze defined benefit accumulations, establish individual retirement accounts to protect employee contributions, provide for a 10% pension benefit reduction which would not be applicable to those with combined pension and social security benefits of below $1,000 per month, and enroll in the Social Security program those government workers that currently do not participate in such program (mainly teachers, police officers and judges).

Fiscal reform will also address the Commonwealth's tax and financial reporting apparatus. With respect to tax reform, the October Revised Commonwealth Fiscal Plan will aim to reduce unfairness and improve compliance and capture rates by broadening the tax base, implementing a unified tax payment system and other new technology, increasing collection personnel, adjusting existing taxes and revenues, and reducing certain taxes while maintaining revenue neutrality. These changes will be coupled with the creation of the Office of the Chief Financial Officer, which will be tasked with establishing and maintaining controls over Commonwealth finances. The primary objectives of this office will be to centralize treasury and liquidity management and reporting functions, through budget development and monitoring and contract and personnel policy compliance oversight. It will also drive standardization of accounting systems and implement other processes to ensure timely publication of the Commonwealth's audited financial statements.

DRA Ex. 225

**Description of the Commonwealth's PROMESA Filings**

Section 405 of PROMESA imposed a temporary stay on litigation related to the financial indebtedness of Commonwealth government entities, which expired on May 1, 2017. Following the expiration of the temporary stay, on May 3, 2017, the Oversight Board issued a restructuring certification pursuant to Sections 104(j) and 206 of PROMESA and filed a voluntary petition for relief on behalf of, and at the request of, the Commonwealth, commencing a case under Title III of PROMESA in the United States District Court for the District of Puerto Rico, Case No. 17-03283 (the "Commonwealth Title III Case"). The Oversight Board has similarly issued a restructuring certificate and filed voluntary petitions for the following entities (collectively, with the Commonwealth Title III Case, the "Title III Cases"):

- Puerto Rico Sales Tax Financing Corporation, Case No. 17-03284, commenced on May 5, 2017;

- Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Case No. 17-03566, commenced on May 21, 2017;

- Puerto Rico Highways and Transportation Authority, Case No. 17-03567, commenced on May 21, 2017;

- Puerto Rico Electric Power Authority, Case No. 17-0478, commenced on July 3, 2017.

The Title III Cases have been consolidated for procedural purposes only and are being jointly administered under Case No. 17-03283. On May 5, 2017, U.S. Supreme Court Chief Justice John Roberts selected U.S. District Court Judge Laura Taylor Swain (S.D.N.Y.) to preside over the Title III Cases pursuant to Section 308(a) of PROMESA. Upon the commencement of each of the Title III Cases, an automatic stay immediately went into effect pursuant to Sections 362 and 922 of the Bankruptcy Code, as made applicable to the Title III Cases pursuant to Section 301(a) of PROMESA.

The deadline for filing proofs of claim against the debtors in each of the pending Title III cases was June 29, 2018, at 4:00 p.m. (Atlantic Standard Time) (the "Bar Date"). As of the Bar Date, approximately 170,000 proofs of claim were filed against the Title III debtors. As of the date hereof, no plan of adjustment has been proposed or confirmed in any of the Title III cases.

**DRA Ex. 225**

## THE GDB RESTRUCTURING ACT

The GDB Restructuring Act was enacted on August 24, 2017, and amended on July 18, 2018, and establishes the legal framework for the wind down of GDB and the restructuring of its financial indebtedness. To this end, the GDB Restructuring Act provides for (i) the creation of the Issuer and the delegation and limitation of its powers, (ii) the creation of the GDB Public Entity Trust (the "Public Entity Trust") and the delegation and limitation of its powers, (iii) the determination of the balances of certain liabilities of GDB and other government entities, (iv) the authorization for the transfer of certain assets and obligations of GDB to each of the Issuer and to the Public Entity Trust, (v) the authorization for the Issuer to issue the New Bonds and provide for the terms of such bonds, (vi) the creation of the statutory lien that will secure the New Bonds, (vii) the authorization of certain disbursements from GDB related thereto, (viii) the amendment of certain laws to replace GDB with a designated trustee (which may be AAFAF or one or more private financial institution(s) designated by AAFAF), (ix) the confirmation of the validity of certain Loans made by GDB, (x) the confirmation of the validity of the transactions performed pursuant to the GDB Restructuring Act and the release of any claims by government entities against GDB and (xi) the lack of authority and standing of government entities to challenge the GDB Restructuring Act, the Qualifying Modification, or any other transactions contemplated by the GDB Restructuring Act in any local or federal court.

Below is a summary description of certain provisions of the GDB Restructuring Act, which does not purport to be complete and is qualified in its entirety by reference to the full text of the GDB Restructuring Act.

**Purpose of the Issuer**

The GDB Restructuring Act provides that the Issuer was created for the purposes of:

(i)     issuing the New Bonds in order to (a) implement the Qualifying Modification, (b) facilitate compliance with the GDB Fiscal Plan, and (c) facilitate the funding of essential government or public services by the Government of the Commonwealth (the "Government"); and

(ii)    owning and managing the Restructuring Property.

The Issuer is expected to enter into the Servicing Agreement with the Servicer, pursuant to which the Servicer will be responsible for all management of the Restructuring Property (including all day-to-day operations in respect thereof). For additional information regarding the Servicing Agreement, see "*Servicing Agreement*" in this Offering Memorandum.

The GDB Restructuring Act states that the Issuer was created and constituted to exercise essential government and public functions, and that the performance by the Issuer of the activities and powers granted under the GDB Restructuring Act are considered and constitute an essential function of the Commonwealth for the good of the people of the Commonwealth. The Issuer will not be operated for the purpose of making a profit, and no part of the revenues or assets of the Issuer will inure to the benefit of or be distributable to any private person or entity, except to service and pay the New Bonds and pay fees and costs for actual services rendered as herein provided or as otherwise required to carry out the intent of the GDB Restructuring Act.

In the GDB Restructuring Act, the Legislative Assembly found that the Qualifying Modification (i) has a public purpose and is in the best interests of the people of Puerto Rico, (ii) is fair and equitable for all creditors of GDB, (iii) is necessary to ensure compliance with the GDB Fiscal Plan, (iv) achieves fiscal responsibility for the people of Puerto Rico by providing for an orderly restructuring of the liabilities of GDB, (v) settles and resolves potential claims between GDB and other government entities, and (vi) permits the provision of essential public services by the Commonwealth and other government entities.

The provisions of Act 219-2012, as amended, known as the Puerto Rico Trusts Act, will not be applicable to the Issuer.

For additional information on the Issuer, see "*The Issuer*" in this Offering Memorandum.

**Permitted Activities**

The GDB Restructuring Act provides that the Issuer will not engage in any activity other than:

(i)     receiving the Transferred Property and owning the Restructuring Property described below in "*The Restructuring Property*" and the other property of the Issuer and the Collections thereon;

(ii)    adopting resolutions of the Board of Trustees authorizing: (a) the issuance of the New Bonds and describing the terms thereof, (b) receipt of the Transferred Property and ownership of the Restructuring Property, subject to the statutory lien and (c) the payment of certain financing costs associated with the Qualifying Modification;

DRA Ex. 225

(iii)    issuing:

(a)    the New Bonds; and

(b)    the Additional Bonds, if any;

(iv)    entering into the Transaction Documents;

(v)    servicing or contracting for the servicing of the Restructuring Property and the New Bonds and for administrative services;

(vi)    collecting, receiving, owning, enforcing, monitoring, selling and protecting the Restructuring Property or otherwise authorizing any of the foregoing, in accordance with the Transaction Documents and for the sole purpose of realizing on, or preserving, the value of the Restructuring Property or the Collections thereon, including, without limitation, by initiating necessary legal action (subject to Article 207 of the GDB Restructuring Act);

(vii)    fully accounting for and making or contracting with the Servicer and the Indenture Trustee to account for or make all payments and allocating partial payments, in accordance with the Bond Indenture and the Transaction Documents;

(viii)    entering into contracts and taking any other necessary or convenient actions with respect to realizing the maximum value of the Restructuring Property (subject to Article 207 of the GDB Restructuring Act), including related to the collection, enforcement, sale, monitoring, protection, forbearance or settlement thereof consistent with the terms and conditions of the Transaction Documents;

(ix)    preparing or directing the Servicer to prepare reports and financial statements as required by the Transaction Documents, including filing continuing disclosure reports in accordance with the Disclosure Agreement (with substantially all of the content of such reports to be prepared by others, including the Servicer, the Collateral Monitor and the auditor of the Issuer);

(x)    using or directing the use of the Restructuring Property in accordance with the Transaction Documents;

(xi)    making an election under Section 301.7701-3 of the U.S. Treasury Regulations promulgated under the U.S. Tax Code (as defined herein); and

(xii)    taking any and all other actions as may be necessary or appropriate to effectuate this transaction.

Additionally, the GDB Restructuring Act grants the Issuer certain ancillary powers described in Article 205 of the GDB Restructuring Act, in order to carry out its authorized activities. Pursuant to the provisions of said Article 205, the Issuer is expected to enter into certain agreements with third-party service providers, including the Servicer, related to, among other things, all management of the Restructuring Property (including all day-to-day operations in respect thereof). Therefore, many of the functions authorized to be carried out by the Servicer pursuant to the GDB Debt Restructuring Act, including, without limitation, those referenced in items (v) through (x), above, will be carried out by the Servicer pursuant to the Servicing Agreement. For more information, see "*Service Providers*" below.

**Prohibited Actions**

Pursuant to Article 206 of the GDB Restructuring Act, the Issuer will be prohibited from taking any of the following actions: (i) merging or consolidating, directly or indirectly, with any person, (ii) incurring, guaranteeing or otherwise becoming obligated to pay any debt or other obligations other than the New Bonds and certain other costs, (iii) pledging, creating or recording liens on any of its properties (including the Restructuring Property), other than the statutory lien securing the payment of the New Bonds and certain other costs, (iv) engaging in any business activities other than as expressly authorized by the GDB Restructuring Act, (v) dissolving, liquidating, transferring or selling any or all of the Restructuring Property, except as permitted by the GDB Restructuring Act and the Transaction Documents, and (vi) taking any other action that is inconsistent with the Issuer's purpose as set forth in the GDB Restructuring Act or ancillary thereto.

71

DRA Ex. 225

**The Issuer and the Qualifying Modification**

*Authorization of the New Bonds.* In order to authorize the issuance of the New Bonds, the Issuer must adopt one or more resolutions providing for the (i) issuance of the New Bonds and the terms thereof, (ii) receipt of the Transferred Property (described as the "Restructuring Authority Assets" in the GDB Restructuring Act) and the ownership of the Restructuring Property, and (iii) payment of certain costs and expenses, each in accordance with the terms of the Qualifying Modification.

*Transfer of the Transferred Property.* Pursuant to the GDB Restructuring Act, on the Closing Date and from time to time thereafter, all legal and equitable right, title and interest in and to, and claims and causes of action to enforce, the Transferred Property will be transferred by GDB to the Issuer. For additional information on the Transferred Property, see "*The Restructuring Property*" in this Offering Memorandum.

*Source of Repayment of the New Bonds.* The New Bonds will be payable solely from the Restructuring Property, in accordance with the terms of the Bond Indenture and the other Transaction Documents, without recourse to the credit or any other assets of the Issuer or GDB (other than pursuant to the Keepwell Agreement). Moreover, the New Bonds will not constitute a debt of the Commonwealth or of any public corporation or instrumentality of the Commonwealth other than as a special limited obligation of the Issuer as described herein.

*Creation of Statutory Lien on the Restructuring Property.* Upon the issuance of the New Bonds, the New Bonds will be secured by a statutory lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders. Such lien will be senior to any other lien encumbering the Restructuring Property (except for valid liens and encumbrances existing as of the effective date of the GDB Restructuring Act or that arise in the ordinary course of business after the effective date of the GDB Restructuring Act and are existing as of the Closing Date, in each case with respect to any Real Property Assets and any personal property assets related thereto that are part of the Restructuring Property) and may be enforced subject to the provisions of the GDB Restructuring Act and pursuant to the terms of the Transaction Documents. Such statutory lien will occur automatically and will be perfected, valid and binding from and after the Closing Date, in any case without any further act or agreement. No instrument needs to be delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory lien or to establish or maintain the priority thereof. No commingling of any Restructuring Property with any other property of GDB or any other party will limit, defeat, impair or interfere with such statutory lien.

*Appointment of a Receiver.* Upon the occurrence of an event of default under certain of the Transaction Documents and the continuation of such event of default for a period of 30 days or as otherwise provided in the Transaction Documents, any Bondholder or Bondholders (subject to any contractual limitation as to a specific percentage of such holders (see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Remedies*")), or trustee therefor, will have the right to apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage, and control the property of the Issuer, including the Restructuring Property, and will exercise all the rights and powers of the Issuer with respect to such property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby.

*Participating Bond Claims; Keepwell Agreement.* Once the holders of Participating Bond Claims receive the New Bonds, such holders will not have any recourse against GDB with respect to such Participating Bond Claims. Notwithstanding the foregoing, GDB will enter into the Keepwell Agreement for the benefit of the Issuer and the Bondholders. For additional information on the Participating Bond Claims and the Keepwell Agreement, see "*The Restructuring Property—Detailed Description of the Restructuring Property*" and "*The Keepwell Agreement*" in this Offering Memorandum.

*Non-Impairment Covenant.* The Commonwealth agrees and covenants with any person that acquires the New Bonds that it will not, and no Commonwealth government entity will be authorized to, impair, limit, restrict, rescind, delay or modify the rights or powers of the Issuer, the Indenture Trustee or the Bondholders under the GDB Restructuring Act or under or in respect of the Restructuring Property, or the Issuer's ability to meet its obligations to its bondholders until the New Bonds, together with the interest thereon, and all amounts and obligations under the Transaction Documents, have been completely paid in full in cash or are otherwise discharged in accordance with their terms; *provided, however,* that any actions or omissions by the Commonwealth or by any Commonwealth government entity relating to appropriations or funding pursuant to the Revised Commonwealth Fiscal Plan will not be deemed to be a violation of such covenant. The Commonwealth further agrees and covenants that no amendment to the GDB Restructuring Act would impair, limit, restrict, delay or modify any obligation or commitment of (i) the Issuer to the Bondholders or (ii) GDB to the Bondholders under the Keepwell Agreement.

DRA Ex. 225

**GDB Public Entity Trust**

*Purpose of the Trust.* The Public Entity Trust was established in order to address GDB's deposit liabilities to non-municipal government entities, including federal funds as may be determined by AAFAF, and the municipalities having claims in respect of federal funds on deposit with GDB, as determined by AAFAF (the "Designated Depositors"). The Designated Depositors are not holders of Participating Bond Claims that will be restructured through the issuance of New Bonds by the Issuer. As a result, certain specified assets of GDB that are not part of the Restructuring Property securing the New Bonds will be transferred to the Public Entity Trust and will constitute the source of any distributions provided to the Designated Depositors. These specified assets consist of Loans to public agencies and departments of the Commonwealth that are primarily payable from legislative appropriations, with a principal balance of approximately $890.6 million as of the Cutoff Date (but reflecting the Closing Date Adjustments, as defined herein).

*Establishment of the Trust.* In order to create the Public Entity Trust, GDB is authorized to execute a deed of trust (the "Public Entity Deed of Trust") to be effective as of the Closing Date, creating and establishing the Public Entity Trust for the benefit of the Designated Depositors and providing for the terms and conditions related to the operation thereof. The Public Entity Trust will be a public trust and governmental instrumentality of Puerto Rico, independent and separate from any other Commonwealth government entity (including, without limitation, GDB and the Issuer). The Public Entity Deed of Trust will set forth the manner in which the assets identified by the Public Entity Deed of Trust, legal and equitable title for which is to be irrevocably transferred by GDB to the Public Entity Trust (the "Public Entity Trust Assets"), will be distributed among the Designated Depositors. The Secretary of Treasury of the Commonwealth is also authorized to appear in the Public Entity Deed of Trust on behalf of the Designated Depositors and to agree to the terms and conditions contained therein. The provisions of Act 219-2012, as amended, known as the Puerto Rico Trusts Act, will not be applicable to the Public Entity Trust.

*Transfer of Public Entity Trust Assets.* GDB is authorized to transfer, on or after the Closing Date, the Public Entity Trust Assets to the Public Entity Trust, and the Public Entity Trust is authorized to assume, effective as of the Closing Date, the Designated Deposits, pursuant to the Public Entity Deed of Trust in order to satisfy the conditions of the Qualifying Modification. A portion of the Public Entity Trust Assets will be transferred to the Public Entity Trust on the Closing Date and the remainder of the Public Entity Trust Assets, or any portion thereof, will be transferred to the Public Entity Trust in one or more series of transactions, as set forth in the Public Entity Deed of Trust (as defined in the GDB Restructuring Act). A transfer of the Public Entity Trust Assets by GDB to the Public Entity Trust pursuant to the Public Entity Deed of Trust will be an irrevocable, non-avoidable and absolute transfer of all of GDB's legal and equitable right, title and interest (as a true sale), and not a pledge or other financing, of the Public Entity Trust Assets. Upon the transfer of the Public Entity Trust Assets to the Public Entity Trust and the assumption by the Public Entity Trust of the Designated Deposits, the Designated Depositors will, immediately and forever, and without further actions or documentation, cease to have any right, interest or claim against GDB or any of its assets, or any successors or assigns thereof (other than the Public Entity Trust).

*Residual Equity Interest in the Issuer.* Effective as of the Closing Date, the Public Entity Trust will have a residual equity interest in the Issuer, pursuant to which it will receive a distribution of the remaining assets of the Issuer, if any, after the New Bonds, certain costs in connection with the restructuring of GDB and other indebtedness of the Issuer have been paid in cash in full or otherwise discharged pursuant to the terms of the Transaction Documents. The Public Entity Trust will have no rights or remedies in respect of such residual equity interest other than the right to a distribution, if any, upon the dissolution of the Issuer, in accordance with the GDB Restructuring Act and the Transaction Documents.

*Trustee of the Public Entity Trust.* The trustee of the Public Entity Trust will have such powers as are conferred to it in the Public Entity Deed of Trust. GDB will initially act as trustee of the Public Entity Trust, *provided* that AAFAF will be authorized to act as trustee or to designate any other person to act as trustee of the Public Entity Trust upon GDB's resignation or in the event that GDB is otherwise unable to continue acting as trustee of the Public Entity Trust, as determined by AAFAF.

**Determination and Payment of Certain Government Obligations**

*Recalculation of Non-Municipal Obligations.* Notwithstanding any other law of the Government, effective as of the Closing Date, the balance of liabilities owed between any non-municipal Commonwealth government entity, on a dollar-for-dollar basis, and GDB will be automatically determined by applying the outstanding balance of any deposit of such entity against the outstanding balance of any Loan made to such government entity by GDB or of any bond or note of such entity held by GDB as of such date (other than any loan, bond or note of a non-municipal government entity secured by a mortgage over real property) in a manner consistent with the conditions of the Qualifying Modification without the need for any further action. Such application will be effected by reducing any remaining installments of principal in inverse order of maturity and will not otherwise affect the repayment schedule of the corresponding bond, note or loan.

*Recalculation of Municipal Obligations.* Pursuant to the provisions of the Municipal Financing Act, GDB provided Loans to municipalities that were evidenced as bonds, notes or other evidences of indebtedness. These bonds, notes and loans would be fully drawn upon their execution and their proceeds would remain on deposit with GDB in accounts created for the particular municipality. The GDB Restructuring Act provides that the remaining balance of these bonds, notes and loans will be reduced by the undisbursed

**DRA Ex. 225**

balance of any such proceeds held in GDB deposit accounts, which undisbursed remaining balance will be certified by AAFAF. The reduction will be automatic and without the need for further action by GDB and will be effected by reducing any remaining installment on such bonds, notes and loans in inverse order of maturity. The repayment schedule of these bonds, notes and loans will not be otherwise affected. Moreover, upon such reduction, future interest payments will be determined based on the remaining balance of such bond, note or loan. The GDB Restructuring Act does not limit or prohibit municipalities from refinancing their bonds, notes or loans through other financial institutions pursuant to the Municipal Financing Act.

Any remaining deposit of a municipality held at GDB as of the Closing Date (other than deposits identified by AAFAF as consisting of federal funds) will be automatically reduced, effective as of the Closing Date, on a dollar-for-dollar basis, from the outstanding principal amount of any corresponding bond, note and/or loan of such municipality (excluding the loans that are collateral for secured deposit accounts), relative to the type of corresponding deposit, as determined by AAFAF, in a manner consistent with the Qualifying Modification. Such application will be effected in ascending order of outstanding loan balances. In cases where deposits are not enough to pay the bond, note or loan in full, the application will be effected by reducing installments of principal in inverse order of maturity without affecting the repayment schedule of the bond, note or loan.

The remaining balances of the liabilities of each municipality and non-municipal Commonwealth government entity to GDB after giving effect to the transactions contemplated by the GDB Restructuring Act will be those certified by AAFAF. All future interest payments on said bonds, notes and/or loans will be computed based on the remaining balance of such liabilities pursuant to the GDB Restructuring Act and as certified by AAFAF.

Nothing contained in the GDB Restructuring Act will be construed to prohibit or limit municipalities from refinancing their current bonds, notes or loans through another financial institution pursuant to the Municipal Financing Act.

*Payment of Excess CAE.* The GDB Restructuring Act requires GDB to pay, in cash, on or prior to the Closing Date, to each municipality that has deposit claims against GDB for Excess CAE (as defined herein) certified by GDB prior to January 2017 corresponding to fiscal years 2015, 2016, and 2017 (such Excess CAE, "2015-17 Excess CAE"), an amount equal to 55% of such municipality's undisbursed 2015-17 Excess CAE, consistent with the conditions of the Qualifying Modification. Any remainder will be deemed fully discharged, no municipality will have any further rights to such amounts, and GDB will have no further liability or obligation, with respect thereto. For the avoidance of any doubt, 2015-17 Excess CAE does not include, and the GDB Restructuring Act does not address, those proceeds of the special additional tax which AAFAF has certified as surplus from the Municipal Debt Redemption Fund (as defined in the Municipal Financing Act) after January 1, 2017 pursuant to Article 20(e) of the Municipal Financing Act, corresponding to fiscal years 2017 and beyond and which are deposited in the Municipal Financing Act accounts created in financial institutions outside of GDB in the name or for the benefit of each municipality.

*Limitation and Mediation of Certain Claims against Municipalities.* The GDB Restructuring Act provides that all claims against a municipality related to a capital improvement project financed with a bond, note or loan subject to recalculation will be stayed from the Closing Date to June 30, 2019. The stay, however, does not apply to the commencement or continuation of litigation in order to participate in mediation related to the stayed claim. The goal of such mediation is to establish an alternate repayment plan or other satisfactory resolution of such claim and reflect such an arrangement in the municipality's fiscal year 2020 budget. Notwithstanding the stay, municipalities may still make payments related to such stayed claims.

**Certain Additional Provisions**

*Confirmation of Loans.* The GDB Restructuring Act provides that all loans made by GDB to a Commonwealth government entity, including municipalities, prior to the effective date of the GDB Restructuring Act are confirmed and continue to be valid and binding obligations of the applicable entity in accordance with their terms.

*Binding Effect of the Qualifying Modification; Lack of Authority to Challenge.* The GDB Restructuring Act provides that the Qualifying Modification will be valid and binding with respect to all government entities, including municipalities, as of the Closing Date. Moreover, the GDB Restructuring Act provides that no Commonwealth government entity will have any further rights or claims against GDB, the Issuer or the Public Entity Trust, other than those expressly provided in the GDB Restructuring Act, the Transaction Documents and the Public Entity Deed of Trust, and that each Commonwealth government entity is deemed to forever waive, release and discharge GDB, the Issuer and the Public Entity Trust, and any officers, directors, employees, agents and other representatives thereof, from any and all such claims. Finally, pursuant to the GDB Restructuring Act, no Commonwealth government entity, including municipalities, will have authority or standing to challenge the GDB Restructuring Act, the Qualifying Modification or the other transactions contemplated in the GDB Restructuring Act in any local or federal court.

**DRA Ex. 225**

*Trust for the Benefit of Retired Employees.* In anticipation of the final wind-down of GDB pursuant to the GDB Fiscal Plan, notwithstanding any other law to the contrary, GDB is authorized to execute a deed of trust to create and establish a trust for the benefit of persons that retired from GDB pursuant to applicable pre-retirement programs (and any other beneficiary under said programs), to transfer to such trust funds to satisfy GDB's obligations under said pre-retirement programs (consistent with the GDB Fiscal Plan), and to take any and all actions necessary or convenient in furtherance of the foregoing. GDB may not transfer to such trust any asset that is not an Excluded GDB Asset. AAFAF is also authorized and empowered to act as trustee of such trust (or to designate any other entity to act as trustee thereof) and to take any and all actions necessary or convenient in furtherance of the foregoing. This trust will be a governmental instrumentality and will be totally exempt from, and will not be required to pay, any kind of taxes, assessments, licenses, stamps, fees or other similar charges levied by the Government or any government entity upon any of the property it owns, possesses, holds or uses or on its activities, or upon any income, payment or gain derived therefrom. The provisions of Act 219-2012, as amended, known as the "Trusts Act" will be applicable to the trust created for this purpose.

**DRA Ex. 225**

**USE OF PROCEEDS**

The Issuer will not receive any cash proceeds in this offering. Instead, the Issuer will (i) receive the Transferred Property from GDB and (ii) will issue the New Bonds to the holders of the Participating Bond Claims.

DRA Ex. 225

**SERVICE PROVIDERS**

**The Servicer**

*Description of the Servicer*. AmeriNational Community Services, LLC ("AmeriNat"), a national firm providing loan servicing and other specialized financial services, will manage the Restructuring Property (AmeriNat or any successor thereof appointed in accordance with the terms of the Qualifying Modification, the "Servicer") pursuant to the terms of a servicing agreement (the "Servicing Agreement") by and between the Issuer and the Servicer. In August 2017, AAFAF issued a request for proposals with regard to the engagement of the Servicer, and AmeriNat was selected by AAFAF with the approval of the parties to the Restructuring Support Agreement as the Servicer based on its response to such request for proposals.

AmeriNat provides loan servicing for loan portfolios owned or originated by government, quasi-government, financial institutions, private investors and non-profit entities nationwide. Founded in 1975, AmeriNat manages loans and related deposits for approximately 300 city, county, state and non-governmental organization clients from its offices in Downey, California; Albert Lea, Minnesota; Baltimore, Maryland; Tampa, Florida; Wailuku, Hawaii and San Juan, Puerto Rico.

*Duties of the Servicer.* The Servicer, for the benefit of the Issuer and the Bondholders, will manage, service, administer and make Collections on the Restructuring Property in accordance with the terms of the Servicing Agreement, which will provide, among other things, that the Servicer will act (a) in accordance with applicable laws and regulations and the terms of the provisions of such Restructuring Property, (b) consistent with the Servicer's standard servicing procedures (if applicable), (c) in accordance with the other express terms of the Servicing Agreement, which for the avoidance of doubt will include the limitations described in "*The Restructuring Property—Management of the Restructuring Property*" and (d) with reasonable care, using the same degree of skill and attention that a prudent lender or asset manager would exercise with respect to comparable assets that it services for itself or others (i) with a view to the timely collection of all periodic payments due on the Loans that make up the Restructuring Property and a duty to maximize the realizable value (in present value terms) of the Restructuring Property and (ii) without regard to any relationship that the Servicer may have with the related obligor or any other creditor of such obligor (collectively, the "Accepted Servicing Practices"). In addition, the Servicer will be permitted to engage one or more third parties to perform all or a portion of its servicing obligations at the Servicer's expense, which expense is subject to reimbursement to the extent provided in the Servicing Agreement. Such an appointment does not relieve the Servicer of its obligations or liability for managing the Restructuring Property in accordance with the provisions of the Servicing Agreement. The Servicer is also responsible for preparing on behalf of the Issuer the periodic continuing disclosure filings described under "*Continuing Disclosure*."

**The Indenture Trustee**

*Description of the Indenture Trustee.* Wilmington Trust, N.A., a national banking association, will serve as the indenture trustee (the "Indenture Trustee") pursuant to the terms of a bond indenture (the "Bond Indenture") by and between the Issuer and the Indenture Trustee. In December 2017, AAFAF issued a request for proposals with regard to the engagement of the Indenture Trustee, and Wilmington Trust, N.A. was selected as the Indenture Trustee based on its response to such request for proposals.

Wilmington Trust, N.A., a national banking association and a member of the Federal Reserve System and the FDIC, commenced operations on October 2, 1995. The deposit liabilities of Wilmington Trust, N.A. are insured by the FDIC through the Deposit Insurance Fund. The main office of Wilmington Trust, N.A. is located at 1100 North Market Street, Wilmington, Delaware 19890. As of March 31, 2018, Wilmington Trust, N.A. had total assets of $3.376 billion, deposits of $2.808 billion and shareholder's equity of $540 million.

*Duties of the Indenture Trustee*. The Indenture Trustee will be required to perform only those duties specifically required of it under the Bond Indenture. Generally, if no Bond Indenture Event of Default has occurred and is continuing, those duties will be limited to the administration of the payment of principal and interest on the New Bonds as required by the Bond Indenture and the receipt of the various certificates, reports or other instruments required to be furnished to the Indenture Trustee under the Bond Indenture. The Indenture Trustee will not have any obligation or responsibility to monitor or enforce the Servicer's compliance with its duties under the Servicing Agreement. The Indenture Trustee will not be charged with knowledge of a failure by the Servicer to perform its duties under the Servicing Agreement unless the Indenture Trustee obtains actual knowledge of such failure as will be specified in the Bond Indenture. The Indenture Trustee will make no representations as to the validity or sufficiency of the Bond Indenture, the New Bonds (other than the execution and authentication thereof) or of any Restructuring Property or related documents and will not be accountable for the use or application by the Servicer of any funds paid to the Servicer in respect of the New Bonds(or the Restructuring Property) or the investment of any monies by the Servicer before such monies are deposited into the Collection Account.

The Indenture Trustee will, on behalf of the Bondholders, engage the Collateral Monitor and enter into the Collateral Monitor Agreement. The Collateral Monitor may be removed and replaced by the Indenture Trustee for cause and must be removed and replaced by the Indenture Trustee at the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, in each case, which removal decision may be rescinded and annulled by Bondholders holding not less than a majority in

**DRA Ex. 225**

principal amount of the New Bonds then outstanding. Upon the removal of the Collateral Monitor, the Indenture Trustee will notify the Issuer and the Bondholders and accept nominations from the Bondholders for successor Collateral Monitor candidates. The Indenture Trustee will then submit to a vote of the Bondholders each such nominated candidate and the successor Collateral Monitor will be the candidate receiving the votes of Bondholders holding not less than a plurality in principal amount of the New Bonds voting. If the Bondholders fail to nominate any successor Collateral Monitor candidates, the Indenture Trustee will notify the Issuer, and the Issuer will undertake a competitive process to identify and designate a successor Collateral Monitor. The Indenture Trustee will engage such successor Collateral Monitor on terms substantially similar to those in the Collateral Monitor Agreement of the then-outgoing Collateral Monitor (or on terms otherwise negotiated by the Indenture Trustee after consultation with Bondholders, in the Indenture Trustee's discretion) for a preliminary 60-day period, during which time the terms of engagement of the successor Collateral Monitor (and, in the case of a successor Collateral Monitor designated by the Issuer, the identity of such successor Collateral Monitor) will be subject to objection by the Bondholders. If the New Bond Requisite Holders do not object within 60 days, the successor Collateral Monitor's engagement will become final, subject to the terms and conditions of such successor Collateral Monitor's Collateral Monitor Agreement. If the Indenture Trustee is unable or unwilling to engage the Collateral Monitor for any reason at any time, another entity, acting on behalf of the Bondholders, may engage the Collateral Monitor pursuant to the same terms outlined herein.

In addition, the Indenture Trustee will have an obligation to provide, upon request, the Servicer with copies of any documents in its possession relating to the Restructuring Property. The Indenture Trustee will make available to the Servicer such copies or originals of documents as are necessary or desirable to permit the Servicer to service, manage, or otherwise enforce contractual rights with respect to the Restructuring Property.

The Indenture Trustee will be under no obligation to exercise any of the rights or powers vested in it by the Bond Indenture or to institute, conduct or defend any litigation under the Bond Indenture or in relation to the Bond Indenture at the request, order or direction of any of the Bondholders pursuant to such agreements unless such Bondholders have offered to the Indenture Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities that may be incurred therein or thereby. For additional information, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture*" in this Offering Memorandum.

The Indenture Trustee's liability in connection with the issuance and the sale of the New Bonds is limited solely to the express obligations described in the Bond Indenture. The Indenture Trustee may resign at any time by providing written notice of its resignation to the Issuer. If the Indenture Trustee resigns, the Issuer will be obligated to appoint a successor thereto. The Issuer may also remove the Indenture Trustee if (i) the Indenture Trustee ceases to meet the qualifications as such under the Bond Indenture, (ii) the Indenture Trustee becomes legally unable to act, (iii) the Indenture Trustee is adjudged bankrupt or insolvent or (iv) a receiver or other public officer will take charge of the Indenture Trustee or its property. In such circumstances, the Issuer will be obligated to promptly appoint a successor Indenture Trustee. Any resignation or removal of the Indenture Trustee and appointment of a successor thereto will not become effective until acceptance of the appointment by such successor. If a successor Indenture Trustee does not take office within 30 days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Issuer or Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

GDB, the Issuer and their respective affiliates may maintain normal commercial banking relations with the Indenture Trustee and its respective affiliates. The Bond Indenture will provide that the Issuer will pay the fees and expenses of the Indenture Trustee in connection with its duties under the Bond Indenture. The Bond Indenture will further provide that the Indenture Trustee will be entitled to indemnification by the Issuer for, and will be held harmless against, any loss, liability or expense incurred in connection with the performance of its duties (including reasonable and documented attorneys' fees and fees and expenses incurred in the enforcement of the Issuer's obligations) under the Bond Indenture not resulting from its own willful misconduct, bad faith or gross negligence. The Indenture Trustee will notify the Issuer promptly of any claim for which it may seek indemnity; *provided* that, failure by the Indenture Trustee to provide such notification will not relieve the Issuer of its obligations under the Bond Indenture if no prejudice to the Issuer will have resulted from such failure. The Issuer need not reimburse any expense or indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, bad faith or gross negligence.

**The Collateral Monitor**

*Description of the Collateral Monitor*. Cantor-Katz Collateral Monitor LLC ("Cantor-Katz"), a Delaware limited liability company, will serve as the collateral monitor (Cantor-Katz or any successor thereof appointed in accordance with the terms of the Qualifying Modification, the "Collateral Monitor") pursuant to the terms of a collateral monitor agreement (the "Collateral Monitor Agreement") by and between the Indenture Trustee, on behalf of the Bondholders, and the Collateral Monitor. The Issuer will enter into a fee letter with the Collateral Monitor (the "Collateral Monitor Fee Letter") under which the Issuer will agree to pay to the Collateral Monitor from amounts in the Collection Account the fees, expenses, indemnification and other amounts owed to the Collateral Monitor under the Collateral Monitor Agreement. Matthew Cantor and Richard Katz will operate and carry out the obligations of the Collateral Monitor. In January 2018, AAFAF issued a request for proposals with regard to the engagement of the Collateral Monitor, and Cantor-Katz was selected as the Collateral Monitor based on its response to such request for proposals.

78

**DRA Ex. 225**

**Matthew Cantor.** Mr. Cantor has over twenty years of experience in corporate restructurings. Since 2012, he has held the position of Executive Vice President of Legal Affairs and Chief General Counsel at Lehman, where he is responsible for Lehman's legal strategy in connection with the liquidation of its assets and resolution of disputed claims. Prior to Lehman, Mr. Cantor founded and operated a distressed and event-driven credit fund, which managed at its peak over $500 million. In addition, Mr. Cantor has practiced business reorganization and restructuring law as a member of the law firms of Weil, Gotshal & Manges LLP and Kirkland & Ellis LLP.

**Richard Katz.** Mr. Katz is also a part of the post-reorganization team at Lehman, where he has been primarily responsible for managing the unwind of its distressed corporate credit and residential mortgage portfolios and intercompany claims and derivative exposures since 2012. In addition to Lehman, Katz has served on the post-reorganization boards of directors of MF Global Holdings Ltd., LBI ehf. (previously Landsbanki Islands, an insolvent Icelandic bank), and SunEdison, Inc. Mr. Katz also spent 18.5 years at Goldman, Sachs & Co. in a variety of risk management and investment positions, including as a workout officer and as the portfolio manager of the High Yield Distressed Investing Desk, Goldman Sachs's broker/dealer-based proprietary trading group for event driven situations (such as distress and bankruptcy) in corporate credit.

David Pauker, one of the members of the Issuer's Board of Trustees, is also one of seven members of the board of directors of post-reorganization Lehman and is the chairman of the board's legal affairs committee. As mentioned above, Matthew Cantor is executive vice president and chief legal officer of Lehman and Richard Katz is an employee of Lehman. Messrs. Cantor and Katz report directly to Lehman's CEO and do not report to Mr. Pauker.

***Duties of the Collateral Monitor.*** The Collateral Monitor will be responsible for monitoring the activities of the Servicer and the condition and performance of the Restructuring Property. The Collateral Monitor will also be responsible for reporting to the Bondholders.

Specifically, the Collateral Monitor will be responsible for, among other things, overseeing the Servicer's efforts to maximize the realizable present value of the Restructuring Property by reviewing all material transactions in respect of the Restructuring Property (which may not be entered into without the Collateral Monitor's consent or non-objection), meeting regularly with the Servicer, monitoring possible Servicer Defaults and notifying the Bondholders of any possible Servicer Replacement Events, reviewing and approving, as appropriate, the Issuer Operating Expenses Cap and any Issuer Operating Expenses above the Issuer Operating Expenses Cap and preparing the Semiannual Bondholder Report.

The Collateral Monitor will be given not less than ten days' prior written notice of any material transaction in respect of the Restructuring Property or any Additional Recovery Authority Loan, including any waiver, modification, amendment, consent, other accommodation, sale, settlement or other disposition, which may be entered into (or approved) by the Servicer (on behalf of the Issuer). Such transaction may be consummated only if the Collateral Monitor does not, within such ten-day period, reasonably object in writing to such transaction on the grounds that such transaction is not commercially reasonable (or that the Collateral Monitor has received inadequate information or time to make such a determination). At the time of delivery of such written notice by the Servicer, the Servicer shall be required to provide the Collateral Monitor with access to the Servicer and all information necessary in order to make a determination as to the commercial reasonableness of such waiver, modification, amendment, consent, other accommodation, sale, settlement or other disposition, but the Collateral Monitor will have no right to participate in discussion or negotiations (in any form) with obligors on the Restructuring Property.

At the conclusion of each Collection Period, the Servicer will provide the Collateral Monitor with a report of, among other things, all interest and amortization collections on the Municipal Loan Assets. The Collateral Monitor will compare these actual cash flows to the Municipal Loans Collection Schedule, which is attached to this Offering Memorandum as Appendix D, as adjusted to reflect any modification to the amortization schedule of any of the Municipal Loan Assets pursuant to the agreements entered into by the Servicer and Collateral Monitor in connection with the settlement of certain claims and objections raised by San Juan, as described under "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Various Municipalities—Settlement Agreement with the Municipality of San Juan.*" For additional information, see "*Appendix D: Scheduled Collections on the Municipal Loan Assets,*" attached to this Offering Memorandum. The Collateral Monitor will then determine whether the cumulative shortfall, if any, of the actual Municipal Loan Assets cash flow as compared to the Municipal Loans Collection Schedule (as adjusted) flows from July 1, 2018 through the date on which the relevant Collection Period ends (each such date, a "Test Date") is less than 10% as of the end of the Collection Period (the "Compliance Test"). If the cumulative shortfall is 10% or more as of any applicable Test Date, a Servicer Default will have occurred. For additional information on Servicer Defaults, see "*Servicing Agreement—Removal of Servicer,*" in this Offering Memorandum.

The Collateral Monitor will also be responsible for initiating the Servicer removal process and for reviewing (and, if necessary, participating in) the Servicer replacement designation process. For additional information on the Servicer removal and replacement process, see "*Servicing Agreement—Removal of Servicer*" in this Offering Memorandum.

DRA Ex. 225

**Reports to Bondholders**

In addition to the information required to be provided by the Issuer pursuant to the Disclosure Agreement (see *"Continuing Disclosure"*), the Transaction Documents will require the following additional information to be prepared and made available to Bondholders:

(a)  The Servicing Agreement will require the Servicer, on or prior to each Determination Date, to prepare and provide to the Issuer, the Collateral Monitor, the Indenture Trustee and other specified parties a report (the "Payment Date Report") to be delivered or made available to the Bondholders on or prior to the related Payment Date. Each such Payment Date Report will include (to the extent applicable) the following information:

1.  the amount of Available Cash for the related Payment Date, and the calculation thereof;

2.  the aggregate amount paid or distributed in respect of interest on the New Bonds on such Payment Date, if any;

3.  the aggregate amount of any shortfall of funds available to pay interest on the New Bonds on such Payment Date after giving effect to all payments of interest on such Payment Date, if any;

4.  the aggregate amount paid or distributed in respect of principal on the New Bonds on such Payment Date, if any;

5.  the aggregate outstanding principal amount (including PIK Amounts) of the New Bonds before and after giving effect to payments on such Payment Date;

6.  the amount of fees, expenses and indemnification amounts due and payable to each of the Servicer, the Collateral Monitor and the Indenture Trustee before and after giving effect to payments on such Payment Date, and the amount of any remaining unpaid amounts from prior Payment Dates; and amounts due in respect of any other Issuer Expenses on such Payment Date, before and after giving effect to payments on such Payment Date;

7.  the aggregate amount of all Issuer Expenses that have been paid or reimbursed through withdrawals from the Collection Account or otherwise corresponding to the related Collection Period, the aggregate amount of such Issuer Expenses corresponding to each of the Servicer, the Collateral Monitor, the Indenture Trustee and the Issuer, and the individual amount of each such material Issuer Expense;

8.  the aggregate amount of Collections for the related Collection Period; and

9.  the budget for the following six-month period (the "Semiannual Budget") providing the calculation for the Fees and Expenses Reserve, which will include (i) the amounts set aside in the Fees and Expenses Reserve corresponding to the estimated fees, expenses and indemnification amounts expected to be payable to, or in respect of, each of the Servicer, the Collateral Monitor and the Indenture Trustee, (ii) the estimated Issuer Expenses other than those set forth in the foregoing (i) expected to be incurred by the Issuer, and (iii) the estimated amount of any expected individual material Issuer Expense; and any item included in the Semiannual Budget for which no amount is set aside in the Fees and Expenses Reserve.

(b)  The Servicing Agreement will also require the Servicer to prepare and provide to the Issuer, the Collateral Monitor, the Indenture Trustee and other specified parties a report (the "Quarterly Budget Report") to be delivered or made available to the Bondholders on or prior to the date that is 45 days after the end of each fiscal quarter that is not the end of a Collection Period (the "Quarterly Budget Report Date"). Each such Quarterly Budget Report will include (to the extent applicable) the following information:

1.  the aggregate amount of all Issuer Expenses that have been paid or reimbursed through withdrawals from the Collection Account or otherwise corresponding to the related fiscal quarter, the aggregate amount of such Issuer Expenses corresponding to each of the Servicer, the Collateral Monitor, the Indenture Trustee and the Issuer, and the individual amount of each such material Issuer Expense; and

2.  the aggregate amount of Collections for such fiscal quarter.

(c)  The Collateral Monitor Agreement will require the Collateral Monitor, on or prior to the date that is 120 days after the last day of each Collection Period (the "Semiannual Bondholder Report Date"), to prepare and provide to the Issuer, the Servicer, the Indenture Trustee and other specified parties a report (the "Semiannual Bondholder Report") regarding such Collection Period to be delivered or made available to the Bondholders on or prior to such Semiannual

DRA Ex. 225

Bondholder Report Date. Each such Semiannual Bondholder Report will include the following information with respect to such Collection Period:

1.  the results of the Compliance Test;

2.  the Collateral Monitor's assessment of the Servicer's performance and compliance with the Accepted Servicing Practices;

3.  delinquency and loss information with respect to the Restructuring Property for the related Collection Period, in accordance with agreed upon reporting standards identified in the Servicing Agreement;

4.  a brief description of any material actions taken in respect of the Restructuring Property, including material modifications, extensions or waivers to the Restructuring Property's terms, fees, penalties or payments during the related Collection Period, or that have cumulatively become material over time;

5.  a brief description of any actions taken in respect of non-performing Restructuring Property, including all Loans that are more than 90 days past due and all real estate, cash and other non-interest-bearing assets;

6.  a brief description of any Servicer conflicts-of-interest; and

7.  any other information the Collateral Monitor determines, in its sole discretion, is relevant to the interests of Bondholders.

The Bond Indenture will require the Indenture Trustee to provide each Payment Date Report, Quarterly Budget Report and Semiannual Bondholder Report to the MSRB through the EMMA website (http://emma.msrb.org) on or prior to the relevant deadline as set forth above.

See also *"The Servicing Agreement—Reporting to Indenture Trustee, Collateral Monitor and Issuer."*

**Fees and Expenses of the Service Providers**

Below is a description of the fees and expenses expected to be payable on each Payment Date to the Servicer, the Indenture Trustee and the Collateral Monitor. Additionally, under certain circumstances to be described in the Servicing Agreement, the Bond Indenture and the Collateral Monitor Agreement, the Servicer, the Indenture Trustee or the Collateral Monitor, respectively, will be entitled to additional payments for out of pocket expenses incurred and pursuant to indemnification obligations.

*Servicer.*

On the Closing Date, the Issuer will pay the Servicer $225 per Loan transferred on the Closing Date to the Issuer for management by the Servicer (the "Initial Portfolio Transfer Fee").

On each Payment Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments*," the Issuer will pay the Servicer a semi-annual fee (the "Servicing Fee") calculated, with respect to each Collection Period, as the sum of (i) $225 per Loan transferred to the Issuer subsequent to the Closing Date and during such Collection Period, (ii) 0.120% of the aggregate principal amount of the performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iii) 0.025% of the aggregate principal amount of the non-performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iv) 3.000% of Net Collections generated during such Collection Period upon the sale or settlement of any Loan constituting Restructuring Property and (v) 3.000% of Net Collections generated upon the sale of any Real Property Asset during such Collection Period, subject to the limitations described herein. The Servicer will also be entitled to reimbursement or payment by the Issuer for certain expenses and indemnification amounts incurred in connection with the performance of its duties under the Servicing Agreement.

The Servicing Fee and such expenses and indemnification may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds, in each case, subject to the terms and conditions contained in the Servicing Agreement.

For purposes of calculating the Servicing Fee, (a) the term "Net Collections" means cash Collections in respect of the Restructuring Property net of any documented Reimbursable Servicer Expenses related to realizing such Collections and (b) the term

**DRA Ex. 225**

"settlement" means, with respect to any Loan, a disposition, other than a sale, resulting in cash Collections. For the avoidance of doubt, if a non-performing Loan is restructured, all amounts due thereon will be considered to have been paid for purposes of its classification so long as all amounts due under the Loan's restructured terms have been paid.

### *Collateral Monitor.*

In accordance with the payment priority in "*Payments to Bondholders—Priority of Payments,*" the Issuer will pay the Collateral Monitor, for each Collection Period, a fee (the "Collateral Monitor Fee") calculated as the sum of (a) with respect to each Type A Asset and Type C Asset, 0.500% of cash Collections, plus an additional 2.500% of cash Collections during a Step-Up Fee Period and (b) with respect to each Type B Asset, 0.500% of cash Collections. The aggregate Collateral Monitor Fees for any six consecutive Collection Periods may not exceed $9.0 million, provided that if the amount resulting from the calculation in the preceding sentence plus the aggregate Collateral Monitor Fees for the prior five Collection Periods exceeds $9.0 million, such excess may be added to the Collateral Monitor Fee due in any of the following five Collection Periods, subject to the cap described in this sentence. In certain circumstances specified in the Collateral Monitor Agreement, upon the termination of Cantor-Katz's engagement as Collateral Monitor, Cantor-Katz may be entitled to true-up payments (i) to compensate Cantor-Katz for services provided prior to such termination but for which all or a portion of the related Step-Up Fee Period occurs after such termination, in which case, Cantor-Katz will be entitled to continue to receive a fee equal to 2.500% of cash Collections relating to such Step-Up Period and (ii) to compensate Cantor-Katz in the event it is terminated without cause prior to the third anniversary of the Closing Date, in which case, Cantor-Katz will be entitled to continue to receive a fee equal to 0.500% of cash Collections until the third anniversary of the Closing Date. The Collateral Monitor will also be entitled to reimbursement for certain expenses and certain indemnification amounts. The Collateral Monitor Fee, the true-up payments (if any) and such expenses and indemnification amounts may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds.

For purposes of calculating the Collateral Monitor Fee, the following definitions apply:

"Type A Asset" means each Real Property Asset, Municipal Loan Asset and Additional Recovery Authority Loan (after transferred to the Issuer).

"Type B Asset" means each PRASA Loan and the HTA Bonds that constitute Restructuring Property.

"Type C Asset" means each Loan and other obligation that constitutes Restructuring Property that is not a Type A Asset or a Type B Asset.

"Credit Event" means, with respect to a Type A Asset, either of the following events, as of the date on which the Servicer has actual knowledge thereof: i) a default by the obligor in the payment of any amount due to the Issuer, or a default by the obligor in the payment of any amount due under indebtedness to another person, which default is continuing and remains uncured after the expiration of any cure period provided in the applicable Loan documents or otherwise 15 days, or ii) a filing by, or in respect of, the obligor of proceedings under any Bankruptcy Law.

"Step-Up Fee Period" means (a) with respect to each Type A Asset, (i) the period beginning on the occurrence of a Credit Event and ending on (but including) the earlier of (A) the date on which such Credit Event is cured and (B) the date on which the cumulative length of time of the Step-Up Fee Periods that have been applied to such asset equals 18 months, and (ii) the period beginning on the date of the consummation of a restructuring transaction in respect of such asset and ending on (but including) the fifth anniversary of the date on which the Issuer receives a material payment in respect of such asset following the consummation of such restructuring transaction, and (b) with respect to each Type C Asset, the period beginning on the Closing Date and ending on (but including) the fifth anniversary of the date on which the Issuer receives a material payment in respect of such asset, in each case subject to certain limitations set forth in the Collateral Monitor Agreement. "Material payment," as used in this defined term, will be determined based on thresholds set forth in the Collateral Monitor Agreement.

### *Indenture Trustee.*

On each Payment Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments,*" the Issuer will pay the Indenture Trustee a semi-annual fee of $2,500 (the "Indenture Trustee Fee"). The Indenture Trustee will also be entitled to reimbursement or payment by the Issuer for all expenses and indemnification amounts incurred in connection with the performance of its duties under the Bond Indenture. The Indenture Trustee Fee and such expenses and indemnification amounts will be paid from Collections on the Restructuring Property prior to any payments on the New Bonds. In addition to the Indenture Trustee Fee, the Indenture Trustee will be entitled to compensation in the amount of $100 per report to Bondholders that it files on the EMMA website pursuant to the Bond Indenture (which reports are described under "—*Reports to Bondholders*" above) or per notice of any event pursuant to the Disclosure Agreement (which events are described under "*Continuing Disclosure*" in this Offering Memorandum) should the Indenture Trustee at any time serve as Dissemination Agent with respect to the Disclosure Agreement.

DRA Ex. 225

## MUNICIPALITIES

### General

Pursuant to Article VI, Section 1 of the Commonwealth Constitution, the Legislative Assembly has the power to create, abolish, consolidate and reorganize municipalities, and to determine their organization and functions. It has recently been reported that the fiscal difficulties faced by many municipalities have led to discussions regarding the creation of regional consortia or municipal consolidation. Pursuant to the Commonwealth Constitution, however, no law abolishing or consolidating municipalities may take effect until ratified in a referendum by a majority of the qualified electors voting in said referendum in each of the municipalities to be abolished or consolidated. For a discussion of the risks related to the formation of regional consortia or the consolidation of municipalities on the Municipal Loan Assets, see "Risk Factors—*Risks Related to Obligors on the Restructuring Property—Risks Related to Municipal Obligors and Their Operations—The fiscal and financial challenges faced by many municipalities may lead to the creation of regional consortiums or ultimately to their consolidation with larger, more solvent municipalities. To the extent municipal consolidation occurs, it is unclear what effect, if any, such consolidation would have on the outstanding obligations of the consolidated municipalities.*"

The Autonomous Municipalities Act sets forth the general provisions regarding the organization and functions of municipal governments.Each municipality is a political legal entity with full legislative and administrative powers in every area of municipal government and with legal personality, separate and independent from the Commonwealth's central government. Each of the municipal governments consists of its Mayor and a Municipal Legislature, each of which are elected by the residents of the applicable municipality every four years. The Mayor is responsible, among other matters, for: (i) establishing and carrying out the policies and the ordinances of the Municipal Legislature, (ii) overseeing the day-to-day operations of the municipal government, and (iii) appointing the heads of the various municipal departments. The Municipal Legislature is responsible, among other matters, for (i) adopting municipal ordinances and resolutions, (ii) adopting the budget for each fiscal year, and (iii) approving the appointment by the Mayor of the heads of the various municipal departments.

Pursuant to the provisions of PROMESA, political subdivisions of the Commonwealth, such as municipalities, are included in the definition of "territorial instrumentalities." PROMESA authorizes the Oversight Board to designate territorial instrumentalities as "covered territorial instrumentalities," which makes such entities subject to the oversight and other powers of the Oversight Board, such as having to obtain Oversight Board approval in order to perform certain actions that in the past they could carry out without the Oversight Board's review or approval. Such designation would also make municipalities potentially eligible to seek relief pursuant to Title III or Title VI of PROMESA. As of the date of this Offering Memorandum, no municipality has yet been designated as a covered territorial instrumentality.

Information in this section relating to the municipalities, municipal revenues and other similar information has been provided from the sources indicated and the Issuer has not independently verified such information.

### Population, Income and Employment

The following table shows the estimated population of each municipality in the years indicated below and the percentage changes ("Δ") in estimated population for each municipality compared to the previous year for which an estimate is provided.

| | | | | Population | | | | |
|---|---|---|---|---|---|---|---|---|
| Municipality | 1990 | 2000 | | 2010 | | 2016 | |
| | | | Δ | | Δ | | Δ |
| Adjuntas | 19,436 | 19,159 | -1.4% | 19,472 | 1.6% | 18,314 | -5.9% |
| Aguada | 36,038 | 42,110 | 16.8% | 41,912 | -0.5% | 38,938 | -7.1% |
| Aguadilla | 59,448 | 64,701 | 8.8% | 60,765 | -6.1% | 54,582 | -10.2% |
| Aguas Buenas | 25,497 | 28,680 | 12.5% | 28,653 | -0.1% | 26,471 | -7.6% |
| Aibonito | 25,000 | 26,504 | 6.0% | 25,874 | -2.4% | 23,605 | -8.8% |
| Añasco | 25,300 | 28,338 | 12.0% | 29,265 | 3.3% | 27,540 | -5.9% |
| Arecibo | 93,531 | 100,142 | 7.1% | 96,273 | -3.9% | 87,939 | -8.7% |
| Arroyo | 18,904 | 19,141 | 1.3% | 19,572 | 2.3% | 18,236 | -6.8% |
| Barceloneta | 20,976 | 22,406 | 6.8% | 24,827 | 10.8% | 24,467 | -1.5% |
| Barranquitas | 25,672 | 29,057 | 13.2% | 30,323 | 4.4% | 28,977 | -4.4% |
| Bayamón | 220,295 | 224,001 | 1.7% | 207,626 | -7.3% | 184,374 | -11.2% |
| Cabo Rojo | 38,700 | 47,030 | 21.6% | 50,970 | 8.3% | 49,361 | -3.2% |
| Caguas | 133,581 | 140,732 | 5.4% | 142,863 | 1.5% | 132,164 | -7.5% |
| Camuy | 29,050 | 35,276 | 21.4% | 35,124 | -0.4% | 32,434 | -7.7% |
| Canóvanas | 36,956 | 43,542 | 17.8% | 47,696 | 9.5% | 46,477 | -2.6% |
| Carolina | 177,942 | 185,522 | 4.3% | 176,421 | -4.9% | 158,457 | -10.2% |
| Cataño | 34,446 | 30,058 | -12.7% | 28,082 | -6.6% | 24,968 | -11.1% |
| Cayey | 46,556 | 47,435 | 1.9% | 48,109 | 1.4% | 44,796 | -6.9% |
| Ceiba | 17,157 | 17,903 | 4.3% | 13,612 | -24.0% | 11,937 | -12.3% |
| Ciales | 18,119 | 19,734 | 8.9% | 18,752 | -5.0% | 17,021 | -9.2% |
| Cidra | 35,751 | 42,787 | 19.7% | 43,483 | 1.6% | 40,599 | -6.6% |
| Coamo | 33,920 | 37,719 | 11.2% | 40,578 | 7.6% | 39,558 | -2.5% |
| Comerío | 20,247 | 20,117 | -0.6% | 20,790 | 3.3% | 19,699 | -5.2% |
| Corozal | 33,172 | 36,831 | 11.0% | 37,129 | 0.8% | 34,408 | -7.3% |

83

DRA Ex. 225

**Population**

| Municipality | 1990 | 2000 | Δ | 2010 | Δ | 2016 | Δ |
|---|---|---|---|---|---|---|---|
| Culebra | 1,548 | 1,868 | 20.7% | 1,820 | -2.6% | 1,797 | -1.3% |
| Dorado | 30,823 | 34,170 | 10.9% | 38,238 | 11.9% | 37,536 | -1.8% |
| Fajardo | 36,960 | 40,662 | 10.0% | 36,876 | -9.3% | 32,219 | -12.6% |
| Florida | 8,762 | 12,373 | 41.2% | 12,688 | 2.5% | 11,988 | -5.5% |
| Guánica | 20,020 | 21,862 | 9.2% | 19,377 | -11.4% | 16,897 | -12.8% |
| Guayama | 41,642 | 44,368 | 6.5% | 45,275 | 2.0% | 42,063 | -7.1% |
| Guayanilla | 21,609 | 23,063 | 6.7% | 21,523 | -6.7% | 19,125 | -11.1% |
| Guaynabo | 93,033 | 100,217 | 7.7% | 97,798 | -2.4% | 89,307 | -8.7% |
| Gurabo | 28,910 | 36,998 | 28.0% | 45,563 | 23.1% | 47,269 | 3.7% |
| Hatillo | 32,841 | 39,036 | 18.9% | 41,978 | 7.5% | 40,676 | -3.1% |
| Hormigueros | 15,239 | 16,638 | 9.2% | 17,250 | 3.7% | 16,290 | -5.6% |
| Humacao | 55,274 | 59,185 | 7.1% | 58,375 | -1.4% | 53,895 | -7.7% |
| Isabela | 39,259 | 44,539 | 13.4% | 45,653 | 2.5% | 42,744 | -6.4% |
| Jayuya | 15,563 | 17,317 | 11.3% | 16,640 | -3.9% | 14,984 | -10.0% |
| Juana Díaz | 45,313 | 50,608 | 11.7% | 50,733 | 0.2% | 47,309 | -6.7% |
| Juncos | 30,741 | 36,550 | 18.9% | 40,349 | 10.4% | 39,477 | -2.2% |
| Lajas | 23,335 | 26,299 | 12.7% | 25,704 | -2.3% | 23,434 | -8.8% |
| Lares | 29,133 | 34,369 | 18.0% | 30,631 | -10.9% | 26,629 | -13.1% |
| Las Marías | 9,342 | 11,040 | 18.2% | 9,868 | -10.6% | 8,645 | -12.4% |
| Las Piedras | 28,036 | 34,651 | 23.6% | 38,714 | 11.7% | 38,049 | -1.7% |
| Loíza | 29,368 | 32,509 | 10.7% | 30,017 | -7.7% | 26,583 | -11.4% |
| Luquillo | 18,135 | 19,836 | 9.4% | 20,055 | 1.1% | 18,660 | -7.0% |
| Manatí | 38,842 | 45,523 | 17.2% | 44,042 | -3.3% | 39,941 | -9.3% |
| Maricao | 6,207 | 6,444 | 3.8% | 6,277 | -2.6% | 5,786 | -7.8% |
| Maunabo | 12,348 | 12,746 | 3.2% | 12,215 | -4.2% | 11,074 | -9.3% |
| Mayagüez | 100,291 | 98,329 | -2.0% | 88,793 | -9.7% | 77,748 | -12.4% |
| Moca | 33,068 | 39,757 | 20.2% | 40,101 | 0.9% | 37,117 | -7.4% |
| Morovis | 25,391 | 30,074 | 18.4% | 32,651 | 8.6% | 31,603 | -3.2% |
| Naguabo | 22,640 | 23,865 | 5.4% | 26,773 | 12.2% | 26,448 | -1.2% |
| Naranjito | 27,945 | 29,752 | 6.5% | 30,387 | 2.1% | 28,805 | -5.2% |
| Orocovis | 21,213 | 23,847 | 12.4% | 23,419 | -1.8% | 21,529 | -8.1% |
| Patillas | 19,636 | 20,160 | 2.7% | 19,248 | -4.5% | 17,472 | -9.2% |
| Peñuelas | 22,604 | 26,689 | 18.1% | 24,215 | -9.3% | 21,117 | -12.8% |
| Ponce | 187,661 | 186,166 | -0.8% | 165,721 | -11.0% | 145,278 | -12.3% |
| Quebradillas | 21,510 | 25,511 | 18.6% | 25,895 | 1.5% | 24,201 | -6.5% |
| Rincón | 12,267 | 14,783 | 20.5% | 15,203 | 2.8% | 14,380 | -5.4% |
| Río Grande | 45,790 | 52,458 | 14.6% | 54,293 | 3.5% | 51,009 | -6.0% |
| Sabana Grande | 22,908 | 25,914 | 13.1% | 25,339 | -2.2% | 23,163 | -8.6% |
| Salinas | 28,392 | 31,139 | 9.7% | 31,043 | -0.3% | 28,846 | -7.1% |
| San Germán | 35,004 | 37,102 | 6.0% | 35,625 | -4.0% | 32,321 | -9.3% |
| San Juan | 437,584 | 434,488 | -0.7% | 394,251 | -9.3% | 347,052 | -12.0% |
| San Lorenzo | 35,289 | 41,043 | 16.3% | 41,023 | 0.0% | 38,174 | -6.9% |
| San Sebastián | 38,911 | 44,165 | 13.5% | 42,347 | -4.1% | 38,202 | -9.8% |
| Santa Isabel | 19,366 | 21,726 | 12.2% | 23,289 | 7.2% | 22,277 | -4.3% |
| Toa Alta | 44,502 | 64,652 | 45.3% | 74,279 | 14.9% | 73,980 | -0.4% |
| Toa Baja | 89,539 | 93,574 | 4.5% | 89,465 | -4.4% | 80,207 | -10.3% |
| Trujillo Alto | 61,432 | 75,845 | 23.5% | 74,760 | -1.4% | 68,242 | -8.7% |
| Utuado | 34,980 | 35,331 | 1.0% | 33,054 | -6.4% | 29,564 | -10.6% |
| Vega Alta | 34,627 | 38,005 | 9.8% | 39,945 | 5.1% | 38,230 | -4.3% |
| Vega Baja | 56,125 | 61,930 | 10.3% | 59,547 | -3.8% | 53,674 | -9.9% |
| Vieques | 8,609 | 9,119 | 5.9% | 9,305 | 2.0% | 8,825 | -5.2% |
| Villalba | 23,652 | 27,990 | 18.0% | 26,003 | -6.8% | 23,113 | -11.1% |
| Yabucoa | 36,533 | 39,135 | 7.1% | 37,880 | -3.2% | 34,358 | -9.3% |
| Yauco | 42,147 | 46,330 | 9.9% | 41,841 | -9.7% | 36,673 | -12.4% |
| Total | 3,527,593 | 3,810,605 | 8.0% | 3,721,525 | -2.3% | 3,411,307 | -8.3% |

Source: U.S. Census Bureau

DRA Ex. 225

The following table shows the median household income figures for the period from 2012 to 2016 for each municipality.

**Median Household Income (2012-2016)**

| Municipality | Income | Municipality | Income | Municipality | Income |
|---|---|---|---|---|---|
| Adjuntas | $11,296 | Fajardo | $19,482 | Naguabo | $18,973 |
| Aguada | $15,543 | Florida | $16,793 | Naranjito | $18,828 |
| Aguadilla | $17,191 | Guánica | $13,242 | Orocovis | $14,662 |
| Aguas Buenas | $15,409 | Guayama | $15,078 | Patillas | $13,975 |
| Aibonito | $18,145 | Guayanilla | $14,848 | Peñuelas | $16,764 |
| Añasco | $17,712 | Guaynabo | $33,979 | Ponce | $16,561 |
| Arecibo | $16,796 | Gurabo | $31,070 | Quebradillas | $15,641 |
| Arroyo | $16,387 | Hatillo | $18,480 | Rincón | $17,784 |
| Barceloneta | $15,549 | Hormigueros | $20,589 | Río Grande | $22,990 |
| Barranquitas | $14,778 | Humacao | $19,349 | Sabana Grande | $14,877 |
| Bayamón | $24,612 | Isabela | $15,947 | Salinas | $16,540 |
| Cabo Rojo | $17,088 | Jayuya | $15,893 | San Germán | $14,988 |
| Caguas | $24,278 | Juana Díaz | $20,231 | San Juan | $21,395 |
| Camuy | $17,206 | Juncos | $19,084 | San Lorenzo | $16,916 |
| Canóvanas | $20,426 | Lajas | $12,785 | San Sebastián | $13,866 |
| Carolina | $28,611 | Lares | $12,410 | Santa Isabel | $15,295 |
| Cataño | $18,562 | Las Marías | $13,132 | Toa Alta | $29,578 |
| Cayey | $20,577 | Las Piedras | $20,119 | Toa Baja | $23,889 |
| Ceiba | $20,038 | Loíza | $18,154 | Trujillo Alto | $30,427 |
| Ciales | $12,511 | Luquillo | $19,658 | Utuado | $15,875 |
| Cidra | $21,846 | Manatí | $18,534 | Vega Alta | $18,312 |
| Coamo | $18,453 | Maricao | $11,909 | Vega Baja | $17,634 |
| Comerío | $13,164 | Maunabo | $18,815 | Vieques | $17,535 |
| Corozal | $14,733 | Mayagüez | $15,017 | Villalba | $18,974 |
| Culebra | $20,956 | Moca | $14,157 | Yabucoa | $16,308 |
| Dorado | $28,133 | Morovis | $17,649 | Yauco | $14,666 |

Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-year Estimates

The following table provides the average unemployment rates in each municipality for the years indicated below, and the percentage changes ("Δ") in the unemployment rate for each municipality compared to the previous year for which an estimate is provided.

**Unemployment Rate (%)**

| Municipality | 1990 | 2000 | Δ | 2010 | Δ | 2017 | Δ |
|---|---|---|---|---|---|---|---|
| Adjuntas | 16.5 | 12.5 | -4.0 | 19.6 | 7.1 | 15.1 | -4.5 |
| Aguada | 19.8 | 13.1 | -6.7 | 19.5 | 6.4 | 12.9 | -6.6 |
| Aguadilla | 18.7 | 13.2 | -5.5 | 20.4 | 7.2 | 14.6 | -5.8 |
| Aguas Buenas | 17.7 | 10.0 | -7.7 | 22.2 | 12.2 | 12.6 | -9.6 |
| Aibonito | 11.8 | 11.7 | -0.1 | 19.4 | 7.7 | 14.2 | -5.2 |
| Anasco | 19.2 | 12.5 | -6.7 | 19.3 | 6.8 | 12.5 | -6.8 |
| Arecibo | 15.8 | 11.2 | -4.6 | 18.0 | 6.8 | 11.7 | -6.3 |
| Arroyo | 21.6 | 14.6 | -7.0 | 23.0 | 8.4 | 17.9 | -5.1 |
| Barceloneta | 18.7 | 12.8 | -5.9 | 24.5 | 11.7 | 14.1 | -10.4 |
| Barranquitas | 12.3 | 10.9 | -1.4 | 17.7 | 6.8 | 11.5 | -6.2 |
| Bayamon | 9.6 | 7.6 | -2.0 | 12.9 | 5.3 | 7.5 | -5.4 |
| Cabo Rojo | 17.8 | 9.6 | -8.2 | 16.6 | 7.0 | 13.7 | -2.9 |
| Caguas | 14.0 | 9.3 | -4.7 | 15.6 | 6.3 | 9.1 | -6.5 |
| Camuy | 15.9 | 10.5 | -5.4 | 16.5 | 6.0 | 11.6 | -4.9 |
| Canovanas | 15.5 | 12.0 | -3.5 | 17.8 | 5.8 | 9.8 | -8.0 |
| Carolina | 8.3 | 7.9 | -0.4 | 13.0 | 5.1 | 7.6 | -5.4 |
| Cataño | 10.4 | 9.3 | -1.1 | 15.2 | 5.9 | 9.1 | -6.1 |
| Cayey | 17.8 | 11.4 | -6.4 | 15.8 | 4.4 | 10.2 | -5.6 |
| Ceiba | 16.6 | 10.7 | -5.9 | 20.7 | 10.0 | 13.5 | -7.2 |
| Ciales | 18.2 | 14.2 | -4.0 | 27.0 | 12.8 | 16.2 | -10.8 |
| Cidra | 15.2 | 10.5 | -4.7 | 15.7 | 5.2 | 8.5 | -7.2 |
| Coamo | 17.8 | 11.6 | -6.2 | 21.9 | 10.3 | 16.2 | -5.7 |
| Comerío | 20.9 | 12.0 | -8.9 | 22.2 | 10.2 | 11.7 | -10.5 |
| Corozal | 12.7 | 9.9 | -2.8 | 17.3 | 7.4 | 11.3 | -6.0 |
| Culebra | 6.1 | 5.9 | -0.2 | 10.2 | 4.3 | 4.2 | -6.0 |
| Dorado | 12.0 | 8.1 | -3.9 | 12.0 | 3.9 | 7.0 | -5.0 |
| Fajardo | 17.4 | 11.8 | -5.6 | 20.1 | 8.3 | 13.3 | -6.8 |
| Florida | 21.1 | 12.5 | -8.6 | 22.1 | 9.6 | 14.5 | -7.6 |
| Guánica | 22.5 | 15.8 | -6.7 | 25.6 | 9.8 | 18.2 | -7.4 |
| Guayama | 22.0 | 12.8 | -9.2 | 23.5 | 10.7 | 15.8 | -7.7 |
| Guayanilla | 22.0 | 15.6 | -6.4 | 24.4 | 8.8 | 16.5 | -7.9 |
| Guaynabo | 5.9 | 5.5 | -0.4 | 8.5 | 3.0 | 5.2 | -3.3 |
| Gurabo | 15.7 | 8.9 | -6.8 | 14.0 | 5.1 | 7.4 | -6.6 |
| Hatillo | 16.6 | 11.2 | -5.4 | 16.4 | 5.2 | 14.1 | -2.3 |
| Hormigueros | 15.0 | 10.6 | -4.4 | 16.4 | 5.8 | 12.9 | -3.5 |
| Humacao | 17.3 | 12.2 | -5.1 | 21.1 | 8.9 | 13.9 | -7.2 |
| Isabela | 16.2 | 14.0 | -2.2 | 20.0 | 6.0 | 13.4 | -6.6 |
| Jayuya | 12.4 | 12.5 | 0.1 | 19.5 | 7.0 | 12.7 | -6.8 |
| Juana Diaz | 20.6 | 12.6 | -8.0 | 18.0 | 5.4 | 13.0 | -5.0 |
| Juncos | 16.5 | 10.9 | -5.6 | 18.7 | 7.8 | 11.5 | -7.2 |
| Lajas | 19.2 | 12.9 | -6.3 | 22.8 | 9.9 | 19.4 | -3.4 |

85

**DRA Ex. 225**

**Unemployment Rate (%)**

| Municipality | 1990 | 2000 | Δ | 2010 | Δ | 2017 | Δ |
|---|---|---|---|---|---|---|---|
| Lares | 18.3 | 11.5 | -6.8 | 19.9 | 8.4 | 18.4 | -1.5 |
| Las Marías | 16.1 | 13.9 | -2.2 | 18.3 | 4.4 | 20.0 | 1.7 |
| Las Piedras | 16.6 | 12.2 | -4.4 | 19.5 | 7.3 | 12.0 | -7.5 |
| Loíza | 12.6 | 11.6 | -1.0 | 16.8 | 5.2 | 9.5 | -7.3 |
| Luquillo | 20.2 | 12.8 | -7.4 | 20.5 | 7.7 | 13.0 | -7.5 |
| Manatí | 17.7 | 13.4 | -4.3 | 18.8 | 5.4 | 10.7 | -8.1 |
| Maricao | 14.6 | 12.2 | -2.4 | 18.3 | 6.1 | 19.8 | 1.5 |
| Maunabo | 21.4 | 14.3 | -7.1 | 24.7 | 10.4 | 17.1 | -7.6 |
| Mayagüez | 16.5 | 12.3 | -4.2 | 18.7 | 6.4 | 13.5 | -5.2 |
| Moca | 22.4 | 13.0 | -9.4 | 20.4 | 7.4 | 14.8 | -5.6 |
| Morovis | 16.9 | 12.9 | -4.0 | 22.8 | 9.9 | 12.6 | -10.2 |
| Naguabo | 19.5 | 12.1 | -7.4 | 21.4 | 9.3 | 11.2 | -10.2 |
| Naranjito | 16.1 | 9.3 | -6.8 | 20.3 | 11.0 | 11.9 | -8.4 |
| Orocovis | 17.1 | 13.5 | -3.6 | 22.4 | 8.9 | 14.4 | -8.0 |
| Patillas | 24.5 | 14.5 | -10.0 | 26.3 | 11.8 | 19.6 | -6.7 |
| Peñuelas | 22.1 | 14.4 | -7.7 | 24.2 | 9.8 | 17.5 | -6.7 |
| Ponce | 16.5 | 11.6 | -4.9 | 17.1 | 5.5 | 11.6 | -5.5 |
| Quebradillas | 17.2 | 11.8 | -5.4 | 19.6 | 7.8 | 15.8 | -3.8 |
| Rincón | 18.1 | 13.0 | -5.1 | 18.5 | 5.5 | 15.4 | -3.1 |
| Río Grande | 15.2 | 11.5 | -3.7 | 15.2 | 3.7 | 9.7 | -5.5 |
| Sabana Grande | 17.5 | 12.2 | -5.3 | 21.6 | 9.4 | 16.9 | -4.7 |
| Salinas | 28.4 | 13.8 | -14.6 | 26.0 | 12.2 | 19.1 | -6.9 |
| San Germán | 19.0 | 13.4 | -5.6 | 18.4 | 5.0 | 15.6 | -2.8 |
| San Juan | 8.4 | 7.4 | -1.0 | 10.3 | 2.9 | 6.9 | -3.4 |
| San Lorenzo | 17.7 | 10.9 | -6.8 | 17.4 | 6.5 | 12.9 | -4.5 |
| San Sebastián | 25.8 | 14.1 | -11.7 | 22.2 | 8.1 | 17.7 | -4.5 |
| Santa Isabel | 29.3 | 11.7 | -17.6 | 20.7 | 9.0 | 13.5 | -7.2 |
| Toa Alta | 10.6 | 6.9 | -3.7 | 12.0 | 5.1 | 7.8 | -4.2 |
| Toa Baja | 8.0 | 7.4 | -0.6 | 12.7 | 5.3 | 8.1 | -4.6 |
| Trujillo Alto | 6.9 | 6.8 | -0.1 | 10.5 | 3.7 | 5.9 | -4.6 |
| Utuado | 16.3 | 12.3 | -4.0 | 20.8 | 8.5 | 13.9 | -6.9 |
| Vega Alta | 13.0 | 9.1 | -3.9 | 17.2 | 8.1 | 10.8 | -6.4 |
| Vega Baja | 16.0 | 11.1 | -4.9 | 20.8 | 9.7 | 12.4 | -8.4 |
| Vieques | 12.7 | 13.2 | 0.5 | 18.6 | 5.4 | 13.7 | -4.9 |
| Villalba | 23.0 | 12.9 | -10.1 | 22.0 | 9.1 | 19.6 | -2.4 |
| Yabucoa | 22.0 | 15.2 | -6.8 | 25.4 | 10.2 | 16.4 | -9.0 |
| Yauco | 20.8 | 12.2 | -8.6 | 21.4 | 9.2 | 17.3 | -4.1 |

Source: U.S. Census Bureau

## Municipal Revenues

Municipal revenues are principally derived from *ad valorem* property taxes, sales and use taxes, municipal license fees ("*patente municipal*"), and Commonwealth Contributions (as defined herein).

The table below summarizes the revenues of each municipality for fiscal year 2016 (complete revenue information for fiscal year 2017 is not yet available for all municipalities). There is no assurance that actual municipal revenues for fiscal year 2018 and subsequent fiscal years will be similar to those shown below, especially since there is still significant uncertainty as to the full extent of the effect of Hurricanes Irma and María on municipal revenues. In particular, revenues derived from property taxes, sales and use taxes and municipal license fees for fiscal year 2018 and subsequent fiscal years could be significantly lower than those shown below as a result of the hurricanes. Moreover, and as further discussed below, the Revised Commonwealth Fiscal Plan contemplates significant reductions in Commonwealth Contributions to municipalities and the ultimate elimination of such contributions in fiscal year 2024.

**Municipal Revenues**
**Fiscal Year 2016**

| Municipality | Property Taxes | | Sales and Use Tax | Municipal License Tax | Intergovernmental Transfers[3] | Federal Grants and Awards | Other Revenues[4] | Total Revenues |
|---|---|---|---|---|---|---|---|---|
| | Special Additional Tax[1] | Basic Tax[2] | | | | | | |
| Adjuntas | $242,625 | $816,883 | $841,841 | $167,885 | $6,313,212 | $1,597,652 | $534,022 | $10,514,120 |
| Aguada | 1,468,786 | 2,150,630 | 1,973,063 | 1,342,751 | 7,822,882 | 4,364,426 | 4,238,858 | 23,361,396 |
| Aguadilla | 6,411,783 | 9,508,095 | 4,533,836 | 9,670,687 | 4,716,390 | 9,537,408 | 4,862,651 | 49,240,850 |
| Aguas Buenas | 1,003,774 | 1,540,760 | 1,097,866 | 633,871 | 8,472,108 | 2,125,606 | 395,398 | 15,269,383 |
| Aibonito | 690,766 | 6,447,336 | 1,031,481 | 1,838,818 | 1,662,913 | 1,629,704 | 455,748 | 13,756,766 |
| Añasco | 1,403,405 | 3,023,163 | 1,839,821 | 1,966,811 | 5,717,040 | 1,524,746 | 1,630,518 | 17,105,504 |
| Arecibo | 8,394,401 | 11,345,504 | 3,972,189 | 7,649,336 | 9,031,803 | 8,146,409 | 3,889,229 | 52,428,871 |
| Arroyo | 1,108,997 | 1,443,023 | 776,890 | 917,647 | 7,926,380 | 3,183,909 | 737,919 | 16,094,765 |
| Barceloneta | 2,273,849 | 6,488,468 | 9,035,843 | 7,175,760 | 6,255,370 | 19,829,718 | 2,617,253 | 53,676,261 |
| Barranquitas | 429,632 | 7,748,282 | 614,513 | 762,311 | 1,952,470 | 1,877,965 | 1,189,149 | 14,574,322 |
| Bayamón | 31,454,633 | 49,096,771 | 27,405,434 | 33,893,973 | 13,861,389 | 47,011,119 | 18,064,916 | 220,788,235 |
| Cabo Rojo | 4,405,671 | 7,540,797 | 2,281,698 | 2,250,347 | 3,111,962 | 1,558,460 | 4,367,312 | 25,516,247 |
| Caguas | 23,295,578 | 33,527,320 | 21,077,117 | 23,191,310 | 12,768,425 | 27,350,263 | 7,926,614 | 149,136,627 |
| Camuy | 1,360,219 | 2,406,184 | 1,378,048 | 912,506 | 7,541,375 | 2,978,940 | 909,100 | 17,486,372 |
| Canóvanas | 3,871,261 | 9,407,813 | 3,480,216 | 5,394,089 | 1,834,026 | 2,096,603 | 1,964,988 | 28,048,996 |
| Carolina | 35,265,026 | 49,852,213 | 24,338,050 | 28,588,865 | 11,307,196 | 17,591,299 | 14,491,545 | 181,434,194 |

DRA Ex. 225

**Municipal Revenues**
**Fiscal Year 2016**

| Municipality | Property Taxes | | Sales and Use Tax | Municipal License Tax | Intergovernmental Transfers[3] | Federal Grants and Awards | Other Revenues[4] | Total Revenues |
|---|---|---|---|---|---|---|---|---|
| | Special Additional Tax[1] | Basic Tax[2] | | | | | | |
| Cataño................ | 9,368,552 | 17,245,614 | 4,942,442 | 10,789,863 | 5,148,092 | 681,743 | 2,454,909 | 50,631,215 |
| Cayey................. | 7,755,825 | 8,988,135 | 4,472,472 | 6,761,591 | 6,238,294 | 11,192,972 | 6,826,575 | 52,235,864 |
| Ceiba................. | 652,493 | 1,772,902 | 910,054 | 297,012 | 7,163,388 | 959,326 | 1,334,729 | 13,089,904 |
| Ciales................ | 557,362 | 1,151,277 | 1,113,958 | 410,157 | 6,814,710 | 1,736,274 | 995,890 | 12,779,628 |
| Cidra................. | 3,951,320 | 5,018,886 | 1,951,933 | 9,494,974 | 8,640,297 | 2,854,423 | 864,210 | 32,776,043 |
| Coamo................. | 1,633,414 | 2,820,143 | 1,541,554 | 1,329,832 | 10,332,113 | 4,149,996 | 1,462,467 | 23,269,519 |
| Comerío............... | 333,391 | 697,809 | 799,414 | 503,245 | 10,608,789 | 2,108,446 | 708,434 | 15,759,528 |
| Corozal............... | 627,808 | 1,976,406 | 833,337 | 1,068,216 | 8,198,674 | 1,685,366 | 845,718 | 15,235,525 |
| Culebra .............. | 182,039 | 498,739 | 1,645,318 | 202,775 | 3,425,402 | 1,111,400 | 469,615 | 7,535,288 |
| Dorado................ | 8,208,126 | 10,439,939 | 3,912,511 | 5,471,990 | 2,737,654 | 7,501,921 | 3,011,848 | 41,283,989 |
| Fajardo............... | 5,661,853 | 5,782,577 | 4,841,531 | 5,715,703 | 8,989,529 | 7,496,588 | 2,038,845 | 40,526,626 |
| Florida............... | 262,921 | 622,297 | 937,056 | 242,388 | 6,552,960 | 1,743,041 | 181,027 | 10,541,690 |
| Guánica............... | 891,608 | 880,598 | 869,971 | 389,689 | 8,231,363 | 2,159,449 | 2,553,133 | 15,975,811 |
| Guayama............... | 5,814,869 | 5,590,076 | 3,280,570 | 6,265,552 | 9,709,949 | 14,631,339 | 2,383,694 | 47,386,049 |
| Guayanilla............ | 794,929 | 1,509,049 | 1,186,242 | 1,010,507 | 7,295,840 | 1,651,124 | 2,230,059 | 15,677,750 |
| Guaynabo.............. | 38,589,647 | 47,317,694 | 16,200,326 | 41,851,236 | 11,085,151 | 18,253,639 | 21,647,741 | 194,945,434 |
| Gurabo................ | 6,498,812 | 6,434,017 | 2,544,742 | 3,306,090 | 4,979,051 | 1,847,677 | 1,275,535 | 26,885,924 |
| Hatillo............... | 4,541,607 | 6,183,678 | 5,194,647 | 4,553,714 | 6,350,836 | 1,543,024 | 2,902,333 | 31,269,839 |
| Hormigueros........... | 1,935,032 | 1,748,488 | 1,950,264 | 1,686,421 | 5,171,389 | 2,296,038 | 3,253,042 | 18,040,674 |
| Humacao............... | 6,706,851 | 13,241,678 | 6,145,231 | 18,190,200 | 5,370,731 | 13,982,536 | 2,815,887 | 66,453,114 |
| Isabela............... | 2,349,829 | 3,512,964 | 3,098,189 | 2,842,159 | 7,121,842 | 3,937,329 | 4,811,472 | 27,673,784 |
| Jayuya................ | 269,633 | 1,006,808 | 1,018,936 | 1,741,923 | 9,794,759 | 1,475,859 | 2,036,196 | 17,344,114 |
| Juana Díaz ........... | 1,832,999 | 3,850,577 | 2,375,554 | 2,227,653 | 6,645,754 | 8,561,612 | 1,605,456 | 27,099,605 |
| Juncos................ | 3,467,085 | 4,885,020 | 1,839,517 | 16,882,709 | 9,739,625 | 2,999,325 | 3,730,207 | 43,543,488 |
| Lajas................. | 1,459,357 | 2,419,152 | 1,452,128 | 696,630 | 8,060,000 | 2,276,553 | 446,442 | 16,810,262 |
| Lares................. | 1,056,867 | 1,896,394 | 1,040,948 | 703,745 | 8,614,503 | 1,628,961 | 1,263,282 | 16,204,700 |
| Las Marías ........... | 184,548 | 5,185,081 | 1,372,386 | 111,929 | 2,711,514 | 1,619,215 | 322,105 | 11,506,778 |
| Las Piedras .......... | 2,952,004 | 4,466,269 | 1,143,151 | 4,210,036 | 6,097,767 | 1,152,891 | 4,742,364 | 24,764,482 |
| Loíza................. | 1,141,302 | 2,021,456 | 878,539 | 444,246 | 7,516,473 | 786,344 | 350,378 | 13,138,738 |
| Luquillo.............. | 1,590,691 | 2,317,638 | 1,415,431 | 814,786 | 5,524,588 | 2,758,219 | 1,655,219 | 16,076,572 |
| Manatí................ | 4,619,569 | 7,609,710 | 5,235,436 | 10,674,953 | 5,987,218 | 11,738,061 | 4,086,547 | 49,951,494 |
| Maricao............... | 111,411 | 4,202,449 | 1,339,639 | 193,001 | 692,465 | - | 1,444,518 | 7,983,483 |
| Maunabo............... | 350,379 | 794,382 | 1,423,697 | 149,630 | 8,074,875 | 3,643,363 | 1,125,240 | 15,561,566 |
| Mayagüez.............. | 18,913,010 | 19,855,442 | 11,493,438 | 12,062,443 | 12,494,202 | 15,562,412 | 18,152,121 | 108,533,068 |
| Moca.................. | 1,276,155 | 2,579,765 | 1,448,294 | 1,201,995 | 7,543,259 | 1,184,866 | 2,214,164 | 17,448,498 |
| Morovis............... | 758,023 | 7,882,978 | 1,453,225 | 858,313 | 1,836,745 | 2,006,052 | 1,023,865 | 15,819,201 |
| Naguabo............... | 1,203,099 | 2,179,476 | 1,237,002 | 880,815 | 7,495,652 | 1,823,418 | 591,718 | 15,411,180 |
| Naranjito............. | 339,383 | 1,792,707 | 1,490,501 | 1,117,855 | 8,364,522 | 2,525,843 | 1,244,049 | 16,874,860 |
| Orocovis.............. | 273,200 | 986,762 | 804,792 | 415,987 | 9,467,047 | 8,560,128 | 1,999,356 | 22,507,272 |
| Patillas.............. | 743,307 | 1,244,315 | 977,379 | 456,413 | 8,420,192 | 2,269,916 | 321,095 | 14,432,617 |
| Peñuelas.............. | 1,281,631 | 3,391,885 | 837,540 | 6,964,630 | 6,954,671 | 6,487,159 | 1,391,835 | 27,309,351 |
| Ponce................. | 18,162,203 | 31,415,805 | 18,516,458 | 18,619,305 | 13,053,325 | 30,481,238 | 5,615,076 | 135,863,410 |
| Quebradillas.......... | 639,362 | 2,127,184 | 1,201,026 | 747,816 | 7,462,866 | 4,551,851 | 1,904,646 | 18,634,751 |
| Rincón ............... | 953,661 | 1,569,808 | 1,386,087 | 520,886 | 5,226,130 | 1,441,943 | 2,848,816 | 13,947,331 |
| Río Grande ........... | 3,796,677 | 8,285,177 | 3,220,010 | 2,771,506 | 5,052,943 | 1,473,962 | 1,518,403 | 26,118,678 |
| Sabana Grande........ | 1,006,700 | 1,929,118 | 1,163,451 | 916,756 | 8,227,720 | 8,071,989 | 3,006,115 | 24,321,849 |
| Salinas............... | 1,360,425 | 2,165,673 | 1,446,450 | 1,087,898 | 9,258,335 | 1,204,166 | 830,518 | 17,353,465 |
| San Germán........... | 2,928,774 | 2,774,029 | 2,197,578 | 3,360,481 | 6,244,904 | 3,890,192 | 9,015,686 | 30,411,644 |
| San Juan.............. | 100,381,300 | 146,028,288 | 63,990,660 | 116,178,099 | 32,318,411 | 121,459,566 | 99,623,549 | 679,979,873 |
| San Lorenzo........... | 2,377,748 | 3,473,695 | 1,821,003 | 3,029,178 | 9,011,483 | 1,696,325 | 1,675,509 | 23,084,941 |
| San Sebastián........ | 1,894,435 | 4,119,953 | 2,260,252 | 1,938,993 | 8,276,602 | 6,882,102 | 1,777,225 | 27,149,562 |
| Santa Isabel.......... | 702,907 | 2,414,772 | 2,350,297 | 1,530,503 | 5,183,516 | 1,124,664 | 1,292,709 | 14,599,368 |
| Toa Alta.............. | 3,971,503 | 5,544,891 | 2,043,696 | 1,791,268 | 5,248,028 | 2,686,204 | 5,046,773 | 26,332,363 |
| Toa Baja.............. | 14,042,059 | 13,061,915 | 7,196,043 | 9,657,954 | 5,371,136 | 15,151,042 | 2,787,982 | 67,268,131 |
| Trujillo Alto......... | 7,550,320 | 9,294,333 | 3,671,025 | 3,941,500 | 8,046,627 | 5,313,454 | 1,493,647 | 39,310,906 |
| Utuado................ | 675,042 | 1,816,289 | 1,530,548 | 603,128 | 7,971,095 | 8,290,352 | 521,599 | 21,408,053 |
| Vega Alta............. | 1,022,956 | 8,392,276 | 2,189,714 | 2,463,891 | 2,233,192 | 943,541 | 2,356,941 | 19,602,511 |
| Vega Baja............. | 5,117,318 | 5,437,321 | 3,021,969 | 5,847,149 | 5,987,156 | 11,973,769 | 6,790,903 | 44,175,585 |
| Vieques............... | 680,922 | 1,014,548 | 1,057,829 | 557,899 | 9,004,679 | 1,492,219 | 902,272 | 14,710,368 |
| Villalba.............. | 670,201 | 1,056,509 | 899,512 | 1,727,490 | 8,812,621 | 2,843,704 | 985,124 | 16,995,161 |
| Yabucoa............... | 1,586,835 | 2,257,664 | 1,231,723 | 3,754,460 | 11,009,768 | 2,462,863 | 871,638 | 23,174,951 |
| Yauco ................ | 3,337,629 | 3,965,969 | 2,521,126 | 2,265,479 | 8,440,362 | 3,913,140 | 1,484,524 | 25,928,229 |
| Total ................ | $447,081,324 | $684,399,691 | $339,243,658 | $494,861,612 | $583,937,725 | $572,336,361 | $335,438,195 | $3,457,298,566 |

[1] Includes revenues from the Special Additional Tax (as defined below) received by municipalities during fiscal year 2016, revenues from the Special Additional Tax corresponding to fiscal year 2016 not collected at year-end, and funds received from the Commonwealth as compensation for the Special Additional Tax revenues foregone as a result of the Property Tax Exemptions.

[2] Includes revenues from the Basic Tax (as defined below) received by municipalities during fiscal year 2016, revenues from the Basic Tax corresponding to fiscal year 2016 not collected at year-end, and funds received from the Commonwealth as compensation for the Basic Tax revenues foregone as a result of the Property Tax Exemptions (as defined below).

[3] Includes Commonwealth Contributions (other than those related to the Property Tax Exemptions), electricity consumption by the municipality under the contribution-in-lieu-of-taxes mechanism and other funds received by the municipalities from the Commonwealth and other Commonwealth government entities.

[4] Includes revenues derived from construction excise taxes, service charges, interest on deposits, among others.

Source: Audited financial statements for each municipality for fiscal year 2016.

**DRA Ex. 225**

**Municipal Property Tax Collections and Commonwealth Contributions**

**Fiscal Year Ended June 30,**

| Municipality | 2015 | | | 2016 | | | 2017 | | |
|---|---|---|---|---|---|---|---|---|---|
| | From Municipal Taxpayers | From Commonwealth Contributions | Total | From Municipal Taxpayers | From Commonwealth Contributions | Total | From Municipal Taxpayers | From Commonwealth Contributions | Total |
| Carolina......... | 63,344,327 | 15,051,652 | 78,395,979 | 62,424,354 | 15,248,247 | 77,672,601 | 66,096,255 | 14,820,741 | 80,916,996 |
| Cataño........... | 19,091,544 | 6,088,513 | 25,180,058 | 18,757,775 | 6,310,881 | 25,068,656 | 18,974,050 | 6,283,305 | 25,257,355 |
| Cayey........... | 13,032,805 | 2,761,793 | 15,794,598 | 13,441,909 | 2,671,040 | 16,112,949 | 13,434,444 | 2,642,599 | 16,077,043 |
| Ceiba ........... | 1,665,381 | 4,463,752 | 6,129,133 | 1,778,228 | 4,462,039 | 6,240,267 | 1,879,493 | 4,434,677 | 6,314,169 |
| Ciales........... | 1,392,166 | 4,762,197 | 6,154,363 | 1,462,277 | 4,754,596 | 6,216,873 | 1,422,532 | 4,805,748 | 6,228,280 |
| Cidra........... | 7,094,575 | 3,797,635 | 10,892,210 | 8,045,233 | 3,513,979 | 11,559,211 | 8,055,764 | 3,656,909 | 11,712,673 |
| Coamo ......... | 3,501,994 | 5,392,244 | 8,894,238 | 3,620,688 | 5,398,708 | 9,019,396 | 3,916,859 | 5,320,898 | 9,237,757 |
| Comerío......... | 920,914 | 6,831,642 | 7,752,555 | 955,050 | 6,857,993 | 7,813,043 | 1,002,757 | 6,887,814 | 7,890,571 |
| Corozal ......... | 2,331,105 | 6,446,631 | 8,777,736 | 2,858,537 | 6,335,077 | 9,193,614 | 2,617,057 | 6,444,054 | 9,061,111 |
| Culebra ......... | 712,899 | 1,921,156 | 2,634,055 | 652,015 | 1,950,945 | 2,602,960 | 824,337 | 1,905,742 | 2,730,079 |
| Dorado........... | 15,695,245 | 1,972,684 | 17,667,929 | 15,872,644 | 1,936,280 | 17,808,925 | 16,474,099 | 1,820,733 | 18,294,832 |
| Fajardo........... | 12,034,477 | 3,624,067 | 15,658,544 | 11,841,946 | 3,692,822 | 15,534,768 | 12,601,838 | 3,495,961 | 16,097,799 |
| Florida ......... | 694,205 | 5,192,859 | 5,887,064 | 753,408 | 5,194,361 | 5,947,770 | 959,315 | 5,167,500 | 6,126,815 |
| Guánica......... | 1,806,232 | 4,917,129 | 6,723,361 | 1,813,602 | 4,927,825 | 6,741,427 | 1,932,067 | 4,914,559 | 6,846,626 |
| Guayama......... | 11,788,639 | 2,217,681 | 14,006,320 | 12,161,185 | 2,071,737 | 14,232,923 | 12,246,046 | 2,022,270 | 14,268,316 |
| Guayanilla ....... | 2,245,581 | 4,438,356 | 6,683,937 | 1,537,997 | 4,640,268 | 6,178,265 | 1,564,256 | 4,674,530 | 6,238,786 |
| Guaynabo....... | 72,251,037 | 6,674,890 | 78,925,927 | 69,954,578 | 7,336,911 | 77,291,489 | 72,126,938 | 6,551,112 | 78,678,050 |
| Gurabo........... | 10,627,603 | 3,188,783 | 13,816,386 | 11,204,903 | 3,124,017 | 14,328,920 | 10,277,233 | 3,275,863 | 13,553,102 |
| Hatillo........... | 9,836,067 | 3,136,803 | 12,972,870 | 9,396,627 | 3,237,629 | 12,634,255 | 9,507,401 | 3,184,286 | 12,691,686 |
| Hormigueros.. | 3,105,736 | 3,603,671 | 6,709,407 | 3,342,041 | 3,575,378 | 6,917,419 | 3,339,828 | 3,600,592 | 6,940,420 |
| Humacao....... | 15,895,950 | 2,709,230 | 18,605,180 | 17,212,168 | 2,397,647 | 19,609,815 | 18,371,625 | 2,220,852 | 20,592,477 |
| Isabela........... | 6,336,950 | 4,614,958 | 10,951,908 | 6,440,286 | 4,608,385 | 11,048,671 | 7,357,374 | 4,419,988 | 11,777,361 |
| Jayuya........... | 1,034,561 | 4,748,175 | 5,782,736 | 1,146,362 | 4,729,525 | 5,875,887 | 1,021,976 | 4,804,401 | 5,826,377 |
| Juana Díaz ..... | 4,313,729 | 4,283,818 | 8,597,546 | 4,352,286 | 4,298,044 | 8,650,329 | 4,936,430 | 4,147,335 | 9,083,764 |
| Juncos........... | 5,889,689 | 4,376,426 | 10,266,115 | 4,703,474 | 4,773,755 | 9,477,229 | 7,498,956 | 3,920,849 | 11,419,805 |
| Lajas........... | 2,952,700 | 4,520,537 | 7,473,237 | 2,948,951 | 4,532,559 | 7,481,510 | 3,043,341 | 4,512,406 | 7,555,747 |
| Lares........... | 2,115,198 | 6,256,430 | 8,371,628 | 2,415,921 | 6,202,910 | 8,618,830 | 2,498,637 | 6,214,273 | 8,712,910 |
| Las Marías..... | 982,146 | 4,677,651 | 5,659,797 | 517,523 | 4,846,334 | 5,363,856 | 619,958 | 4,839,282 | 5,459,241 |
| Las Piedras .... | 5,317,303 | 3,567,201 | 8,884,504 | 5,314,746 | 3,590,956 | 8,905,702 | 5,339,612 | 3,605,327 | 8,944,939 |
| Loíza........... | 2,506,708 | 6,515,351 | 9,022,059 | 2,395,648 | 6,575,223 | 8,970,872 | 2,596,807 | 6,560,101 | 9,156,908 |
| Luquillo......... | 3,988,138 | 3,416,384 | 7,404,521 | 4,161,073 | 3,380,906 | 7,541,979 | 4,005,505 | 3,426,178 | 7,431,683 |
| Manatí........... | 9,551,519 | 4,420,462 | 13,971,981 | 10,083,840 | 4,155,871 | 14,239,712 | 10,222,302 | 4,156,574 | 14,378,876 |
| Maricao......... | 401,100 | 3,811,719 | 4,212,819 | 443,996 | 3,819,314 | 4,263,311 | 435,957 | 3,851,474 | 4,287,432 |
| Maunabo......... | 837,446 | 5,211,536 | 6,048,982 | 890,202 | 5,211,200 | 6,101,401 | 959,611 | 5,218,049 | 6,177,661 |
| Mayagüez....... | 28,715,755 | 4,626,000 | 33,341,755 | 29,889,166 | 4,375,047 | 34,264,212 | 29,059,727 | 4,471,872 | 33,531,599 |
| Moca........... | 2,991,013 | 5,560,614 | 8,551,626 | 3,167,229 | 5,531,430 | 8,698,658 | 3,821,134 | 5,421,508 | 9,242,642 |
| Morovis........ | 2,085,846 | 6,423,825 | 8,509,670 | 2,104,196 | 6,456,009 | 8,560,205 | 2,610,978 | 6,344,186 | 8,955,165 |
| Naguabo......... | 2,622,580 | 4,701,490 | 7,324,070 | 2,590,206 | 4,752,757 | 7,342,963 | 2,768,134 | 4,749,651 | 7,517,784 |
| Naranjito....... | 2,679,241 | 6,448,399 | 9,127,640 | 2,463,435 | 6,526,451 | 8,989,886 | 2,517,612 | 6,581,677 | 9,099,288 |
| Orocovis........ | 1,189,857 | 6,734,943 | 7,924,800 | 1,316,681 | 6,709,037 | 8,025,718 | 1,300,596 | 6,759,339 | 8,059,935 |
| Patillas........... | 1,347,339 | 5,132,546 | 6,479,885 | 1,846,956 | 4,998,931 | 6,845,888 | 1,503,814 | 5,138,467 | 6,642,281 |
| Peñuelas......... | 3,830,558 | 3,658,232 | 7,488,790 | 3,813,692 | 3,677,088 | 7,490,779 | 3,550,072 | 3,781,069 | 7,331,141 |
| Ponce........... | 45,214,758 | 7,549,466 | 52,764,224 | 42,603,545 | 7,917,629 | 50,521,174 | 43,011,644 | 7,864,698 | 50,876,342 |
| Quebradillas... | 2,086,445 | 5,154,843 | 7,241,288 | 2,119,039 | 5,175,663 | 7,294,702 | 2,224,674 | 5,183,985 | 7,408,659 |
| Rincón ......... | 2,992,459 | 3,935,549 | 6,928,008 | 2,824,464 | 4,026,037 | 6,850,501 | 3,076,141 | 3,969,764 | 7,045,906 |
| Río Grande .... | 11,079,941 | 2,332,976 | 13,412,916 | 10,692,070 | 2,533,080 | 13,225,150 | 11,250,062 | 2,350,403 | 13,600,465 |
| Sabana Grande | 1,924,347 | 4,988,830 | 6,913,177 | 2,010,189 | 4,989,673 | 6,999,862 | 2,164,380 | 4,986,597 | 7,150,977 |
| Salinas ......... | 2,638,595 | 5,114,750 | 7,753,344 | 2,900,361 | 5,077,788 | 7,978,149 | 3,151,680 | 5,025,653 | 8,177,332 |
| San Germán... | 4,858,197 | 4,590,057 | 9,448,254 | 5,014,761 | 4,540,811 | 9,555,573 | 5,187,322 | 4,525,549 | 9,712,872 |
| San Juan....... | 203,091,822 | 24,667,208 | 227,759,030 | 202,587,331 | 25,111,701 | 227,699,032 | 206,876,376 | 23,935,969 | 230,812,345 |
| San Lorenzo... | 4,688,137 | 5,558,955 | 10,247,091 | 4,721,683 | 5,567,232 | 10,288,915 | 4,845,279 | 5,560,550 | 10,405,829 |
| San Sebastián. | 4,388,717 | 5,331,684 | 9,720,400 | 4,970,589 | 5,167,529 | 10,137,918 | 5,019,043 | 5,180,915 | 10,199,957 |
| Santa Isabel... | 3,847,029 | 3,801,933 | 7,648,962 | 3,850,880 | 3,849,629 | 7,700,508 | 4,088,363 | 3,822,082 | 7,910,446 |
| Toa Alta......... | 7,967,950 | 4,608,991 | 12,576,941 | 7,754,320 | 4,737,894 | 12,492,214 | 8,663,348 | 4,510,127 | 13,173,475 |
| Toa Baja ....... | 19,582,968 | 5,989,415 | 25,572,383 | 19,437,321 | 6,099,438 | 25,536,758 | 19,858,539 | 6,008,174 | 25,866,712 |
| Trujillo Alto... | 12,105,224 | 5,302,513 | 17,407,737 | 12,471,685 | 5,294,715 | 17,766,400 | 12,663,441 | 5,276,191 | 17,939,632 |
| Utuado........... | 1,913,266 | 6,362,827 | 8,276,093 | 2,538,273 | 6,168,860 | 8,707,133 | 2,070,561 | 6,368,039 | 8,438,600 |
| Vega Alta....... | 6,503,030 | 3,741,809 | 10,244,839 | 6,289,577 | 3,872,511 | 10,162,087 | 6,496,986 | 3,827,942 | 10,324,928 |
| Vega Baja....... | 9,243,665 | 4,591,762 | 13,835,427 | 8,669,538 | 4,725,856 | 13,395,394 | 9,017,985 | 4,667,143 | 13,685,127 |
| Vieques......... | 1,828,363 | 3,436,117 | 5,264,480 | 1,719,799 | 3,491,287 | 5,211,085 | 1,762,556 | 3,497,262 | 5,259,819 |
| Villalba......... | 1,299,054 | 6,459,034 | 7,758,089 | 1,364,519 | 6,468,397 | 7,832,916 | 1,440,667 | 6,480,833 | 7,921,499 |
| Yabucoa......... | 3,104,207 | 5,390,349 | 8,494,556 | 3,174,069 | 5,383,563 | 8,557,632 | 3,196,044 | 5,411,253 | 8,607,297 |
| Yauco ........... | 5,278,705 | 4,845,390 | 10,124,096 | 5,280,177 | 4,902,066 | 10,182,243 | 5,653,533 | 4,838,628 | 10,492,161 |
| Total ............. | $896,612,402 | $410,600,001 | $1,307,212,403 | $899,781,387 | $411,791,394 | $1,311,572,781 | $931,420,092 | $406,550,243 | $1,337,970,335 |
| % of Total Revenues....... | 68.59% | 31.41% | 100.00% | 68.60% | 31.40% | 100.00% | 69.61% | 30.39% | 100.00% |

Source: CRIM

89

DRA Ex. 225

The following table shows total municipal revenues during fiscal years 2012 through 2016.

**Historical Municipal Revenues**
**Previous Fiscal Years**

| Municipality | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Adjuntas | $15,698,257 | $14,184,029 | $14,434,016 | $12,324,782 | $10,514,120 |
| Aguada | 23,672,898 | 21,230,706 | 24,408,027 | 23,256,344 | 23,361,396 |
| Aguadilla | 60,235,423 | 56,042,176 | 52,923,037 | 52,119,300 | 49,240,850 |
| Aguas Buenas | 15,124,972 | 15,239,816 | 16,940,525 | 16,622,251 | 15,269,383 |
| Aibonito | 17,949,648 | 16,610,497 | 13,785,171 | 13,409,765 | 13,756,766 |
| Añasco | 17,516,737 | 19,276,478 | 18,146,342 | 19,508,920 | 17,105,504 |
| Arecibo | 64,549,731 | 65,171,177 | 54,245,898 | 62,847,992 | 52,428,871 |
| Arroyo | 14,244,566 | 14,035,820 | 16,212,605 | 16,581,525 | 16,094,765 |
| Barceloneta | 39,708,895 | 40,707,106 | 40,961,851 | 50,032,320 | 53,676,261 |
| Barranquitas | 17,520,342 | 19,060,364 | 21,330,749 | 21,548,371 | 14,574,322 |
| Bayamón | 209,306,862 | 219,322,560 | 211,305,334 | 202,496,290 | 220,788,235 |
| Cabo Rojo | 31,998,892 | 29,285,293 | 28,213,598 | 26,227,660 | 25,516,247 |
| Caguas | 160,263,044 | 151,575,364 | 154,966,858 | 148,836,386 | 149,136,627 |
| Camuy | 22,579,883 | 28,720,603 | 20,709,064 | 18,714,324 | 17,486,372 |
| Canóvanas | 35,435,530 | 33,612,157 | 31,000,751 | 28,142,330 | 28,048,996 |
| Carolina | 190,033,376 | 187,528,211 | 192,783,992 | 228,869,011 | 181,434,194 |
| Cataño | 47,792,700 | 49,483,717 | 46,631,606 | 49,335,776 | 50,631,215 |
| Cayey | 44,977,559 | 49,666,728 | 50,065,211 | 52,438,825 | 52,235,864 |
| Ceiba | 12,892,982 | 10,900,632 | 12,294,421 | 11,867,655 | 13,089,904 |
| Ciales | 18,669,243 | 16,708,330 | 12,877,829 | 13,612,526 | 12,779,628 |
| Cidra | 29,421,705 | 27,874,330 | 30,651,654 | 31,383,572 | 32,776,043 |
| Coamo | 20,582,329 | 22,088,861 | 26,233,824 | 24,234,421 | 23,269,519 |
| Comerío | 14,963,566 | 15,112,700 | 16,740,783 | 15,918,097 | 15,759,528 |
| Corozal | 18,638,011 | 20,524,545 | 17,777,306 | 17,154,843 | 15,235,525 |
| Culebra | 6,183,361 | 6,703,372 | 7,074,240 | 7,866,770 | 7,535,288 |
| Dorado | 36,300,149 | 37,727,416 | 40,000,325 | 39,945,296 | 41,283,989 |
| Fajardo | 40,384,035 | 41,333,238 | 44,444,745 | 40,120,320 | 40,526,626 |
| Florida | 9,165,518 | 12,081,008 | 10,423,820 | 10,757,595 | 10,541,690 |
| Guánica | 13,018,629 | 14,819,491 | 14,788,817 | 14,864,737 | 15,975,811 |
| Guayama | 48,177,295 | 47,481,836 | 47,550,152 | 61,827,197 | 47,586,049 |
| Guayanilla | 16,760,855 | 15,071,751 | 16,630,167 | 15,444,591 | 15,677,750 |
| Guaynabo | 208,351,458 | 201,254,292 | 191,134,843 | 191,453,695 | 194,945,434 |
| Gurabo | 28,268,926 | 25,764,432 | 28,120,275 | 31,358,805 | 26,885,924 |
| Hatillo | 27,189,814 | 23,948,614 | 27,675,918 | 30,263,525 | 31,269,839 |
| Hormigueros | 16,349,406 | 15,897,280 | 17,197,178 | 17,611,685 | 18,040,674 |
| Humacao | 66,285,039 | 69,209,024 | 64,700,528 | 68,505,651 | 66,453,114 |
| Isabela | 31,107,999 | 30,447,832 | 33,863,644 | 29,602,572 | 27,673,784 |
| Jayuya | 21,062,756 | 16,950,736 | 19,390,489 | 16,874,503 | 17,344,114 |
| Juana Díaz | 29,146,625 | 26,574,208 | 31,038,495 | 29,436,376 | 27,099,605 |
| Juncos | 41,230,123 | 38,472,400 | 37,977,308 | 39,116,828 | 43,543,488 |
| Lajas | 13,689,174 | 15,233,168 | 15,059,542 | 16,666,880 | 16,810,262 |
| Lares | 17,561,487 | 18,059,469 | 16,548,982 | 14,196,482 | 16,204,700 |
| Las Marías | 11,328,512 | 12,196,775 | 10,631,252 | 9,976,669 | 11,506,778 |
| Las Piedras | 22,657,831 | 20,781,924 | 20,923,850 | 22,795,716 | 24,764,482 |
| Loíza | 18,158,883 | 17,829,760 | 14,722,320 | 12,779,661 | 13,138,738 |
| Luquillo | 15,452,752 | 16,354,853 | 16,967,619 | 16,849,828 | 16,076,572 |
| Manatí | 47,044,195 | 47,501,842 | 43,484,890 | 58,976,488 | 49,951,494 |
| Maricao | 13,332,727 | 10,106,320 | 8,909,176 | 8,897,252 | 7,983,483 |
| Maunabo | 13,286,341 | 14,417,499 | 17,809,321 | 21,107,678 | 15,561,566 |
| Mayagüez | 100,116,191 | 96,342,179 | 99,737,489 | 97,291,002 | 108,533,068 |
| Moca | 19,068,501 | 16,907,408 | 20,361,440 | 16,981,861 | 17,448,498 |
| Morovis | 19,778,100 | 15,679,860 | 15,311,967 | 15,406,794 | 15,819,201 |
| Naguabo | 16,869,871 | 17,596,932 | 15,810,241 | 16,269,258 | 15,411,180 |
| Naranjito | 19,135,309 | 19,577,497 | 19,216,854 | 19,475,703 | 16,874,860 |
| Orocovis | 31,829,792 | 29,143,704 | 22,496,784 | 22,356,085 | 22,507,272 |
| Patillas | 15,875,036 | 15,656,330 | 15,286,580 | 13,820,706 | 14,432,617 |
| Peñuelas | 32,276,613 | 28,878,166 | 28,703,328 | 29,105,093 | 27,309,351 |
| Ponce | 174,794,228 | 167,315,984 | 151,829,915 | 147,314,790 | 135,863,410 |
| Quebradillas | 15,247,355 | 16,247,784 | 17,282,543 | 18,305,271 | 18,634,751 |
| Rincón | 13,153,321 | 13,238,449 | 15,435,331 | 13,184,062 | 13,947,331 |
| Río Grande | 28,317,999 | 27,418,383 | 29,800,931 | 25,937,082 | 26,118,678 |
| Sabana Grande | 22,992,514 | 23,610,728 | 24,977,598 | 26,871,271 | 24,321,849 |
| Salinas | 17,126,687 | 15,988,486 | 16,981,255 | 16,647,710 | 17,353,465 |
| San Germán | 27,291,277 | 26,159,622 | 29,936,252 | 28,479,390 | 30,411,644 |
| San Juan | 695,415,194 | 657,975,980 | 660,354,223 | 675,896,830 | 679,979,873 |
| San Lorenzo | 24,294,077 | 21,743,252 | 24,979,857 | 23,490,467 | 23,084,941 |
| San Sebastián | 32,342,722 | 28,913,823 | 26,660,594 | 25,022,213 | 27,149,562 |
| Santa Isabel | 18,111,318 | 19,715,418 | 18,486,967 | 15,144,026 | 14,599,368 |
| Toa Alta | 26,037,609 | 25,832,522 | 25,165,758 | 27,720,566 | 26,332,363 |
| Toa Baja | 82,161,582 | 79,127,873 | 70,823,249 | 68,166,612 | 67,268,131 |
| Trujillo Alto | 42,413,195 | 40,442,582 | 41,967,498 | 39,435,887 | 39,510,906 |
| Utuado | 30,856,197 | 22,546,842 | 22,845,103 | 22,194,723 | 21,408,053 |
| Vega Alta | 24,128,472 | 24,823,613 | 20,971,001 | 23,021,960 | 19,602,511 |
| Vega Baja | 43,299,725 | 44,020,000 | 43,407,167 | 42,690,430 | 44,175,585 |
| Vieques | 15,481,474 | 14,239,341 | 13,481,038 | 15,807,038 | 14,710,368 |
| Villalba | 16,845,314 | 15,087,677 | 18,925,392 | 17,776,280 | 16,995,161 |

DRA Ex. 225

**Historical Municipal Revenues**
**Previous Fiscal Years**

| Municipality | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| Yabucoa | 27,875,324 | 25,217,353 | 25,664,387 | 23,812,701 | 23,174,951 |
| Yauco | 37,347,824 | 29,164,259 | 27,895,849 | 25,945,310 | 25,928,229 |
| Total | $3,625,753,892 | $3,518,792,787 | $3,491,790,137 | $3,538,351,205 | $3,457,298,566 |

(1) Includes revenues derived from construction excise taxes, service charges, interest on deposits, among others.

Sources: Audited financial statements for each municipality for fiscal years 2012 through 2016.

### *Major Categories of Revenue*

#### *Municipal Property Taxes*

Municipalities are authorized to impose municipal property taxes pursuant to Act No. 83 of August 30, 1991, as amended (the "Municipal Tax Act"). Specifically, the Municipal Tax Act authorizes municipalities to impose the following property taxes: (i) a special additional tax (the "Special Additional Tax" or "CAE" by its Spanish acronym) over real and personal property within each municipality, without limitation as to rate or amount, and (ii) a basic property tax to fund operating expenses up to a maximum amount of 6% of the assessed valuation on all real property within such municipality and up to a maximum amount of 4% of the assessed valuation on all personal property within such municipality (collectively, the "Basic Tax"). A portion of the Basic Tax levied by a municipality is transferred to other municipalities by operation of the Matching Fund (as defined herein). For additional information regarding the Matching Fund, see "*Municipal Matching Fund*" below.

The Special Additional Tax rates for all municipalities for fiscal year 2019 vary from 1.20% to 5.50% of the assessed valuation, in the case of real property, and from 1.00% to 5.50% of the assessed valuation, in the case of personal property. The fiscal year 2019 Basic Tax rate for all municipalities is 6.00% of the assessed valuation, in the case of real property (except for the Municipality of Hatillo, where the Basic Tax rate for real property is 5.72%), and varies from 3.00% to 4.00% of the assessed valuation, in the case of personal property. In the aggregate, current property tax rates (including the Special Additional Tax and the Basic Tax) for the municipalities vary from 8.03% to 12.33% of the assessed valuation, in the case of real property, and from 5.80% to 9.83% of the assessed valuation, in the case of personal property.

Under the Municipal Financing Act, each municipality is required to levy the Special Additional Tax in such amount as will be required for the payment of its general obligation Loans for which such municipality has pledged its good faith, credit and taxing power ("Municipal General Obligations"). The proceeds of the Special Additional Tax are required by law to be deposited in the GO Redemption Fund (as defined herein) and used for the payment of Municipal General Obligations. To the extent that the funds in a municipality's GO Redemption Fund exceed the amount necessary to cover 12 months' debt service on such municipality's then outstanding Municipal General Obligations, as determined by AAFAF, and to pay such municipality's statutory debts (certain debts with Commonwealth government entities and public corporations), the Municipal Financing Act requires the disbursement of any such excess to the municipality, at its request, once during each fiscal year. Such excess is generally referred to as "Excess CAE." In calculating the 12 months' debt service reserve, AAFAF assumes the refinancing of the Municipal General Obligations that certain municipalities have with private financial institutions that include Balloon Payments (as defined herein) prior to the due date of such Balloon Payments, and, therefore, assumes a long-term straight line amortization based on the contractual principal and interest payments, but amortizing any Balloon Payments.

Basic Tax revenues are used primarily by municipalities to cover their operating expenses and to pay debt service on their special obligation Loans. Furthermore, the municipality's Basic Tax revenues are also available to make debt service payments on Municipal General Obligations to the extent that the Special Additional Tax revenues, together with monies on deposit in the municipality's GO Redemption Fund, are not sufficient to cover such debt service.

The Municipal Tax Act provides for an exemption from the Special Additional Tax and Basic Tax on the first $15,000 of assessed valuation of primary personal residences of individuals (the "$15,000 Real Property Exemption") and an exemption from personal property taxes on the first $50,000 of assessed valuation of personal property owned by businesses that have gross revenues of less than $150,000 per annum (the "$50,000 Personal Property Exemption"). Act No. 16 of May 31, 1960 also provides for an exemption of 0.20% of the assessed valuation of all taxable property within the municipalities (the "0.20% Exemption" and, collectively with the $15,000 Real Property Exemption, and the $50,000 Personal Property Exemption, the "Property Tax Exemptions").

The Commonwealth has historically made annual appropriations to the municipalities from its general fund as compensation for the amount of the revenues foregone as a result of the Property Tax Exemptions. Under the Municipal Tax Act, however, appropriations from the Commonwealth will not be provided to cover any amount of property taxes which any municipality elects to forgive for primary personal residences registered for the first time after January 1, 1992, or for personal property of certain businesses

91

**DRA Ex. 225**

registered for the first time after July 1, 1991. Moreover, annual Commonwealth Contributions to municipalities corresponding to the Property Tax Exemptions decreased significantly in fiscal years 2018 and 2019 and are expected to further significantly decrease in the coming years as a result of the reductions contemplated by the Revised Commonwealth Fiscal Plan. As a result of the recent reductions in the level of Commonwealth Contributions to municipalities, municipalities have not received compensation for the amounts foregone as a result of the Property Tax Exemption since fiscal year 2018.

Real property taxes are assessed based on 1957-1958 property values, as no general real property reassessment has been made since then. Real property taxes are payable semi-annually on January 1 and July 1 of each year. Taxpayers are entitled to receive a discount of 10% or 5% of the total real property tax owed if the corresponding payment is made within 30 days or between 31 and 60 days of receipt of the invoice, respectively. Interest is charged on delinquent real property taxes at the rate of 10%, with a surcharge of up to 10% of the tax owed.

Personal property taxes are assessed on the net book value (or, if the net book value does not reasonably reflect the fair market value, the fair market value) of all taxable personal property as of January 1 of each year. Personal property tax returns must be filed on or before May 15 of each year, and estimated personal property tax payments are due quarterly on August 15, November 15, February 15, and May 15 of each year. Each year, taxpayers are required to make estimated personal property tax payments equal to the lesser of (i) 90% of their estimated personal property tax for the current taxable year or (ii) 100% of the total tax reflected on their personal property tax return of the prior taxable year. Any difference between estimated and actual personal property taxes is required to be paid by, or reimbursed to, the taxpayer upon the filing of the personal property tax return for the corresponding taxable year. A 5% discount for early payment is available for taxpayers that pay, on or before August 15 of each year, at least 100% of the self-assessed tax for the preceding taxable year. In the event of non-payment or underpayment of any installment, 5% of the unpaid amount is added to the tax. Interest is charged on delinquent personal property taxes at the rate of 10%, with a surcharge of up to 15% of the tax owed (or up to 40% if the delinquency also involves failure to file the required tax return).

The table below sets forth the Special Additional Tax rate and the Basic Tax rate for each municipality for fiscal year 2019.

**Property Tax Rates (%)**

| Municipality | Special Additional Tax Rate (Real Property) | Special Additional Tax Rate (Personal Property) | Basic Tax Rate (Real Property) | Basic Tax Rate (Personal Property) |
|---|---|---|---|---|
| Adjuntas | 1.50 | 1.50 | 6.00 | 4.00 |
| Aguada | 2.00 | 2.00 | 6.00 | 4.00 |
| Aguadilla | 3.50 | 2.00 | 6.00 | 4.00 |
| Aguas Buenas | 3.50 | 3.50 | 6.00 | 4.00 |
| Aibonito | 2.50 | 2.50 | 6.00 | 4.00 |
| Añasco | 2.85 | 2.85 | 6.00 | 4.00 |
| Arecibo | 4.80 | 3.50 | 6.00 | 4.00 |
| Arroyo | 3.50 | 3.50 | 6.00 | 4.00 |
| Barceloneta | 3.50 | 3.50 | 6.00 | 4.00 |
| Barranquitas | 2.50 | 2.50 | 6.00 | 4.00 |
| Bayamón | 2.75 | 2.75 | 6.00 | 4.00 |
| Cabo Rojo | 3.25 | 2.00 | 6.00 | 4.00 |
| Caguas | 3.50 | 3.50 | 6.00 | 4.00 |
| Camuy | 3.50 | 2.00 | 6.00 | 4.00 |
| Canóvanas | 3.50 | 3.50 | 6.00 | 4.00 |
| Carolina | 4.50 | 4.50 | 6.00 | 4.00 |
| Cataño | 3.50 | 3.50 | 6.00 | 4.00 |
| Cayey | 3.75 | 3.75 | 6.00 | 4.00 |
| Ceiba | 2.50 | 1.25 | 6.00 | 3.72 |
| Ciales | 3.50 | 3.50 | 6.00 | 4.00 |
| Cidra | 5.50 | 5.50 | 6.00 | 4.00 |
| Coamo | 3.50 | 3.50 | 6.00 | 4.00 |
| Comerío | 2.25 | 2.25 | 6.00 | 4.00 |
| Corozal | 3.00 | 3.00 | 6.00 | 4.00 |
| Culebra | 2.00 | 2.00 | 6.00 | 4.00 |
| Dorado | 3.75 | 4.00 | 6.00 | 4.00 |
| Fajardo | 3.50 | 2.00 | 6.00 | 4.00 |
| Florida | 3.50 | 3.50 | 6.00 | 4.00 |
| Guánica | 3.75 | 3.75 | 6.00 | 4.00 |
| Guayama | 3.25 | 3.25 | 6.00 | 4.00 |
| Guayanilla | 4.00 | 4.00 | 6.00 | 4.00 |
| Guaynabo | 3.25 | 3.25 | 6.00 | 4.00 |
| Gurabo | 5.00 | 3.00 | 6.00 | 4.00 |
| Hatillo | 2.50 | 2.50 | 5.72 | 3.72 |
| Hormigueros | 3.00 | 3.00 | 6.00 | 4.00 |
| Humacao | 2.00 | 2.00 | 6.00 | 4.00 |
| Isabela | 2.50 | 2.50 | 6.00 | 4.00 |
| Jayuya | 1.25 | 1.25 | 6.00 | 4.00 |
| Juana Díaz | 2.50 | 3.50 | 6.00 | 4.00 |

**DRA Ex. 225**

**Property Tax Rates (%)**

| Municipality | Special Additional Tax Rate (Real Property) | Special Additional Tax Rate (Personal Property) | Basic Tax Rate (Real Property) | Basic Tax Rate (Personal Property) |
|---|---|---|---|---|
| Juncos | 4.50 | 4.50 | 6.00 | 4.00 |
| Lajas | 5.50 | 5.50 | 6.00 | 4.00 |
| Lares | 3.25 | 3.25 | 6.00 | 4.00 |
| Las Marías | 1.35 | 1.35 | 6.00 | 4.00 |
| Las Piedras | 3.50 | 2.00 | 6.00 | 4.00 |
| Loíza | 4.90 | 4.90 | 6.00 | 4.00 |
| Luquillo | 2.00 | 2.00 | 6.00 | 4.00 |
| Manatí | 2.75 | 2.75 | 6.00 | 4.00 |
| Maricao | 3.50 | 1.00 | 6.00 | 4.00 |
| Maunabo | 3.00 | 2.00 | 6.00 | 4.00 |
| Mayagüez | 3.75 | 3.75 | 6.00 | 4.00 |
| Moca | 2.75 | 1.75 | 6.00 | 4.00 |
| Morovis | 4.00 | 2.25 | 6.00 | 4.00 |
| Naguabo | 3.00 | 1.70 | 6.00 | 4.00 |
| Naranjito | 3.00 | 3.00 | 6.00 | 4.00 |
| Orocovis | 1.20 | 1.20 | 6.00 | 4.00 |
| Patillas | 3.50 | 3.50 | 6.00 | 4.00 |
| Peñuelas | 1.75 | 1.75 | 6.00 | 4.00 |
| Ponce | 5.50 | 5.50 | 6.00 | 4.00 |
| Quebradillas | 2.00 | 2.00 | 6.00 | 4.00 |
| Rincón | 4.00 | 4.00 | 6.00 | 4.00 |
| Río Grande | 3.50 | 2.00 | 6.00 | 4.00 |
| Sabana Grande | 3.50 | 3.50 | 6.00 | 4.00 |
| Salinas | 3.50 | 3.50 | 6.00 | 4.00 |
| San Germán | 3.25 | 2.75 | 6.00 | 4.00 |
| San Juan | 3.50 | 3.50 | 6.00 | 4.00 |
| San Lorenzo | 3.40 | 3.40 | 6.00 | 4.00 |
| San Sebastián | 2.25 | 2.00 | 6.00 | 3.00 |
| Santa Isabel | 4.00 | 4.00 | 6.00 | 4.00 |
| Toa Alta | 4.50 | 3.50 | 6.00 | 4.00 |
| Toa Baja | 5.00 | 5.00 | 6.00 | 4.00 |
| Trujillo Alto | 3.75 | 3.75 | 6.00 | 4.00 |
| Utuado | 2.00 | 2.00 | 6.00 | 4.00 |
| Vega Alta | 1.85 | 1.85 | 6.00 | 4.00 |
| Vega Baja | 3.50 | 3.50 | 6.00 | 4.00 |
| Vieques | 4.00 | 4.00 | 6.00 | 4.00 |
| Villalba | 2.75 | 3.50 | 6.00 | 4.00 |
| Yabucoa | 4.00 | 4.00 | 6.00 | 4.00 |
| Yauco | 3.50 | 3.50 | 6.00 | 4.00 |

Source: CRIM

The following table provides, for each municipality, the percentage of its property tax revenues derived from real property taxes and personal property taxes during fiscal year 2017.

**Property Tax Collections**

| Municipality | Real Property | Personal Property | Municipality | Real Property | Personal Property |
|---|---|---|---|---|---|
| Adjuntas | 84% | 16% | Juncos | 76% | 24% |
| Aguada | 74% | 26% | Lajas | 84% | 16% |
| Aguadilla | 66% | 34% | Lares | 75% | 25% |
| Aguas Buenas | 83% | 17% | Las Marías | 85% | 15% |
| Aibonito | 68% | 32% | Las Piedras | 71% | 29% |
| Añasco | 64% | 36% | Loíza | 86% | 14% |
| Arecibo | 66% | 34% | Luquillo | 85% | 15% |
| Arroyo | 69% | 31% | Manatí | 58% | 42% |
| Barceloneta | 51% | 49% | Maricao | 70% | 30% |
| Barranquitas | 65% | 35% | Maunabo | 91% | 9% |
| Bayamón | 50% | 50% | Mayagüez | 59% | 41% |
| Cabo Rojo | 86% | 14% | Moca | 70% | 30% |
| Caguas | 55% | 45% | Morovis | 79% | 21% |
| Camuy | 77% | 23% | Naguabo | 76% | 24% |
| Canóvanas | 69% | 31% | Naranjito | 63% | 37% |
| Carolina | 57% | 43% | Orocovis | 81% | 19% |
| Cataño | 30% | 70% | Patillas | 81% | 19% |
| Cayey | 54% | 46% | Peñuelas | 78% | 22% |
| Ceiba | 92% | 8% | Ponce | 52% | 48% |
| Ciales | 82% | 18% | Quebradillas | 77% | 23% |
| Cidra | 60% | 40% | Rincón | 86% | 14% |
| Coamo | 76% | 24% | Río Grande | 81% | 19% |
| Comerío | 77% | 23% | Sabana Grande | 71% | 29% |
| Corozal | 68% | 32% | Salinas | 72% | 28% |

93

DRA Ex. 225

**Property Tax Collections**

| Municipality | Real Property | Personal Property | Municipality | Real Property | Personal Property |
|---|---|---|---|---|---|
| Culebra | 88% | 12% | San Germán | 64% | 36% |
| Dorado | 76% | 24% | San Juan | 60% | 40% |
| Fajardo | 68% | 32% | San Lorenzo | 64% | 36% |
| Florida | 82% | 18% | San Sebastián | 73% | 27% |
| Guánica | 80% | 20% | Santa Isabel | 46% | 54% |
| Guayama | 68% | 32% | Toa Alta | 85% | 15% |
| Guayanilla | 72% | 28% | Toa Baja | 51% | 49% |
| Guaynabo | 57% | 43% | Trujillo Alto | 71% | 29% |
| Gurabo | 78% | 22% | Utuado | 77% | 23% |
| Hatillo | 43% | 57% | Vega Alta | 73% | 27% |
| Hormigueros | 60% | 40% | Vega Baja | 59% | 41% |
| Humacao | 70% | 30% | Vieques | 83% | 17% |
| Isabela | 65% | 35% | Villalba | 67% | 33% |
| Jayuya | 66% | 34% | Yabucoa | 74% | 26% |
| Juana Díaz | 67% | 33% | Yauco | 60% | 40% |

Source: CRIM

*Sales and Use Taxes*

Act No. 117-2006 originally imposed the Commonwealth sales and use tax and authorized municipalities to impose a sales and use tax of 1.5%. However, the FAM Act subsequently changed this framework, imposing a required municipal sales and use tax of 1.0% (the "Municipal SUT") and reallocating the remaining 0.5% to the FAM, a fund created to provide a financial mechanism to finance the debt of the municipalities. Pursuant to Act No. 19-2014, as amended, the Municipal SUT is collected by the Municipal Financing Corporation ("COFIM" by its Spanish acronym). COFIM deposits the first monies collected from the Municipal SUT into the COFIM Redemption Fund until the amounts on deposit therein equal 30% of the revenues attributable to the Municipal SUT or a fixed amount set forth in Act No. 19-2014, as amended. After the required deposits into the COFIM Redemption Fund have been made, excess revenues from the Municipal SUT are distributed to the municipalities based on the sales occurring in each municipality. To the extent the money on deposit in the COFIM Redemption Fund is not used to pay COFIM debt, such amounts are distributed to the municipalities, after the payment of any outstanding advances made by GDB to the municipalities under the COFIM Act. As of the date of this Offering Memorandum, COFIM does not have any debts outstanding. As a result, funds in the COFIM Redemption Fund are available to be disbursed to municipalities, after the payment of any outstanding advances made by GDB to the municipalities under the COFIM Act.

Similar to the Commonwealth sales and use tax, the Municipal SUT is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. Certain items, such as fuel, crude oil and petroleum products and vehicles, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth sales and use tax or the Municipal SUT. Furthermore, unlike the Commonwealth sales and use tax, the Municipal SUT does not apply to services rendered to other merchants or to certain designated professional services.

*Municipal License Tax (Patente)*

Act No. 113 of July 10, 1974, as amended, known as the "Municipal License Tax Act," authorizes the imposition of a municipal license tax (a volume of business tax or "patente") on gross revenues of for-profit entities (not otherwise totally or partially exempt) engaged in any industry or business in a municipality in Puerto Rico. The municipal license tax is imposed based on the volume of business attributable to the operations carried on by the business in each municipality. The municipal license tax rate varies depending on the municipality, but it cannot exceed 0.5% of gross revenues in the case of non-financial businesses and 1.5% of gross revenues in the case of financial businesses.

Each municipality collects the municipal license tax. The municipal license tax declaration is due every year on or before the fifth working day after April 15. The municipal license tax may be paid in two equal installments. The first installment must be paid between July 1 and July 15 following the due date for filing the declaration and the second installment must be paid between January 1 and January 15 of the following year. If the total municipal license tax due is paid on the due date for filing the declaration, a 5% discount for prompt payment will apply.

*Intergovernmental Transfers*

Municipalities receive contributions from the Commonwealth and other Commonwealth government entities. The majority of such contributions are established in the Municipal Tax Act and the CRIM Act, which provide for the following Commonwealth contributions to the municipalities: (i) 2.50% of the net internal revenues of the Commonwealth's general fund; (ii) 35% of the annual net revenues derived from the operation of the additional lottery system created by Act No. 10 of May 24, 1989, as amended (the amounts in clauses (i) and (ii), collectively, the "Designated Commonwealth Contributions"); and (iii) an annual amount from the

94

**DRA Ex. 225**

Commonwealth's general fund to compensate the municipalities for the Property Tax Exemptions (the amounts in clauses (i) through (iii) the "Commonwealth Contributions"). The contributions in items (i) and (iii) above are subject to appropriations for such purposes being included in the Commonwealth's budget for the corresponding fiscal year. The Commonwealth Contributions are collected or received by CRIM on behalf of each municipality and are allocated by CRIM among the municipalities in accordance with the Municipal Tax Act and the CRIM Act, to the extent sufficient appropriations are received to make all distributions required by such statutes. Municipalities also receive contributions for other purposes, such as the development of specific projects or activities, through appropriations from the Legislative Assembly.

Pursuant to the Revised Commonwealth Fiscal Plan, Commonwealth Contributions, other than the portion corresponding to revenues from the operation of the additional lottery, were reduced by $150 million in fiscal year 2018 and by an additional $45 million in fiscal year 2019 (from approximately $370 million in fiscal year 2017 to approximately $220 million in fiscal year 2018 and approximately $175 million in fiscal year 2019). The Revised Commonwealth Fiscal Plan provides for additional reductions in such appropriations every fiscal year, holding appropriations constant at approximately 45-50% of current levels starting in fiscal year 2022, before ultimately phasing out all appropriations in fiscal year 2024. Furthermore, the transfers received by CRIM from the Commonwealth related to the additional lottery system for distribution among the municipalities during fiscal year 2018 were approximately 34% lower than those received in fiscal year 2017, primarily as a result of the impact of Hurricanes Irma and María on the additional lottery revenues. As a result of the foregoing, Commonwealth Contributions decreased significantly in fiscal year 2018 and are expected to further significantly decrease subsequent fiscal years, resulting in municipalities not receiving from CRIM all distributions required under the Municipal Tax Act and the CRIM Act.

*Federal Grants*

Municipalities are eligible to receive financial assistance under various federal programs. The use of funds received by municipalities under federal assistance programs is restricted by the applicable laws and regulations establishing the program. As a result, such funds are only available for use by municipalities for the purposes and to the extent authorized by such laws and regulations. While the amount of federal assistance received by municipalities in fiscal year 2018 may be higher than that received in previous fiscal years, due to the amount of federal emergency management funds received and to be received by municipalities related to the recovery efforts after Hurricanes Irma and María, such federal assistance may not fully compensate for the reduction in tax revenues and the increase in expenses of the municipalities in fiscal year 2018 related to the hurricanes.

**CRIM**

Prior to July 1, 1993, the Secretary of the Treasury collected all municipal taxes upon real and personal property (which includes intangible property) in each municipality. Since July 1, 1993, pursuant to the CRIM Act, CRIM has assumed the Secretary of the Treasury's responsibilities relating to the collection and distribution of such taxes. CRIM is primarily responsible for the appraisal, assessment, notice of imposition, and collection of all municipal property taxes. Act No. 77-2017, however, granted municipalities the authority to collect property taxes directly and to take any action to embargo or foreclose on taxpayer property with prior notice to CRIM. Prior to such amendment, certain municipalities were authorized to collect property taxes directly pursuant to various agreements between CRIM and such municipalities, which require that any funds collected by the municipality be deposited with CRIM. Although the recent amendment also provides that funds collected by the municipalities must be deposited with CRIM, CRIM has yet to approve the regulation that would provide for the enforcement of these provisions. Approximately 97% of all property taxes collected during fiscal year 2017 were collected by CRIM and approximately 3% were collected by the municipalities pursuant to the aforementioned agreements with CRIM. However, a greater percentage of property taxes may be collected by municipalities in subsequent fiscal years as a result of the enactment of Act No. 77-2017 and upon CRIM's approval of the corresponding regulation.

CRIM is governed by a board (the "CRIM Board") composed of the Executive Director of AAFAF, the Commissioner of Municipal Affairs, five mayors belonging to the Governor's political party, and four mayors belonging to the minority party. The mayors elected as members of the CRIM Board hold office for a term of four years (and not more than two consecutive terms) and until their successors have been appointed. The Executive Director of CRIM since February 2018 is Reinaldo Paniagua, and CRIM's principal offices are located at Carretera #1, Km. 17.2, Antiguo Edificio Cruz Azul, San Juan, Puerto Rico 00919. In addition, CRIM operates nine regional centers located in the municipalities of Aguadilla, Arecibo, Bayamón, Caguas, Carolina, Humacao, Mayagüez, Ponce, and San Juan.

Real property is assessed by CRIM (and, in certain cases, by municipalities) and personal property is self-assessed. The current gross assessed valuations for real property and personal property taxes for all municipalities are approximately $8,002 million and $4,624 million, respectively. These assessment values have not been adjusted to reflect the Property Tax Exemptions. As discussed above, no real property reassessment has been made in the Commonwealth since 1958. Therefore, all real property taxes are assessed on the basis of the replacement cost of the related real property in fiscal year 1957-58 values, regardless of when any improvement on such property was constructed.

**DRA Ex. 225**

*Municipal Matching Fund*

The CRIM Act established the Municipal Matching Fund (the "Matching Fund") into which CRIM is required to deposit the total amount collected on account of Basic Taxes and the Commonwealth Contributions (other than the portion corresponding to the compensation for the Property Tax Exemptions). Certain monies in the Matching Fund (the "Equalization Monies") are available to CRIM in order to guaranty that each municipality will receive revenues in an amount at least equivalent to that received from Equalization Monies in the previous fiscal year. The Equalization Monies are made up of: (i) the Designated Commonwealth Contributions; and (ii) a portion of the Basic Tax equal to 1% of the assessed value of personal property and 3% of the assessed value of real property collected by each municipality (the "Designated Basic Tax").

All Equalization Monies are allocated to the municipalities as follows: *first*, as may be required so that each municipality receives at least the same amount of aggregate revenues received during the previous fiscal year on account of Equalization Monies, using first the Designated Commonwealth Contributions, and then, to the extent necessary, the Designated Basic Tax; *second*, Designated Basic Tax revenues remaining in the Equalization Monies are allocated to the municipalities in proportion to the amount by which revenues from their Basic Tax in such fiscal year exceed their Basic Tax revenues in the previous fiscal year; and *third*, to all municipalities based on certain economic and demographic criteria specified in the CRIM Act. The remaining Matching Fund monies are returned to the municipalities whose Basic Tax levies gave rise to such remaining monies, and are used, with their other revenues, to meet operating expenses.

**Municipal Expenses**

Municipalities assume either partial or full responsibility for providing services related to public safety, health, welfare, culture and recreation, education, economic development and other general services to their residents. A significant portion of municipal expenditures are related to the provision of such services. Other major expenditures incurred by municipalities include operating expenses related to municipal management, debt service on outstanding bonds and notes, and pension payments to retired employees. Furthermore, following the impact of Hurricanes Irma and María, municipalities have had to incur and will need to continue to incur significant extraordinary expenses. Such additional expenditures could adversely affect the ability of municipalities to provide certain of the services they have historically provided to their residents while continuing to honor their financial obligations and could require the implementation of extraordinary expense reduction and liquidity management measures.

*Municipal Services.* A brief description of each major category of services currently provided by municipalities follows.

Safety. Each municipality is served by a municipal police department, in addition to the Commonwealth's police department. Each municipal police department is charged with preventing, discovering and investigating crimes committed within the jurisdictional limits of the municipality and enforcing the ordinances and regulations promulgated by the municipality. Each municipal police department operates independently, with the highest authority in the direction of the municipal police being vested in the Mayor of the corresponding municipality.

Health and Welfare. Each municipality is included in the Commonwealth's Health Insurance Program. This program provides health insurance coverage for qualifying low income residents through a managed care system. Under this program, the Government selects, through a bidding system, one private health insurance company in each of the several designated regions in Puerto Rico and pays such insurance company the premiums for each eligible beneficiary in such region. The municipalities pay the Government an amount mandated by law to cover part of the insurance premium paid by the Government for its qualifying residents. Certain municipalities also own or operate hospitals and other healthcare facilities. Further, municipalities operate various types of social welfare programs for the benefit of their residents.

Culture and Recreation. Each municipality develops and promotes a variety of cultural and recreational activities and projects that contribute to the development and appreciation of, among other things, history of each municipality and of Puerto Rico, the arts, literature, cinema, sports, and folklore.

Public Works. Each municipality is responsible for coordinating, among other things, garbage collections, cleaning and maintenance of municipal parks, streets, canals, streams, flood pumps and roads and other services relating to the construction, renovation and maintenance of the municipality's infrastructure.

*Operating Expenses*

Municipalities incur significant expenses related to the management and administration of the municipality, including payroll and professional services.

DRA Ex. 225

*Debt Service*

Pursuant to the Municipal Financing Act, municipalities are authorized to borrow money to be evidenced by bonds, notes or other instruments. These include Municipal General Obligations, Operational Loans, Sales Tax Obligations, and Revenue Bonds, among others. A significant portion of the municipalities' revenues are devoted to the payment of debt service on their outstanding indebtedness. For a discussion related to the risks of the amount of issued and outstanding municipal debt on the Municipal Loan Assets, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property—Risks Related to Municipal Obligors and Their Operations— Municipal governments have a significant amount of issued and outstanding indebtedness and, to the extent that their source of revenues is affected by the economy, severe weather events and other external factors, they may be unable to sustain expenses associated with providing essential services to their residents while continuing to honor their debt obligations as they come due.*"

### *Pension Obligations*

Substantially all full-time employees of the municipalities participated in ERS. Prior to fiscal year 2018, each municipality was required to make employer contributions to ERS based on a statutory percentage of the municipality's payroll, and ERS would pay pension and other benefits to retirees using the employer and employee contributions it received and its own assets. As ERS exhausted its liquidity, however, the Commonwealth enacted Act 106, which requires that all employers that participate in ERS, including municipalities, transfer to the Commonwealth during each fiscal year an amount equal to the actual pension and other benefits to be paid to retirees of such employer during said fiscal year. These amounts could represent a material increase in the historical pension benefit expense of the municipalities. The aggregate amount required to be transferred by municipalities to the Commonwealth under the pay-as-you-go system during fiscal year 2018 was approximately \$160.5 million, of which the Commonwealth had received only approximately \$47 million as of May 31, 2018. Pursuant to Act 106, the Retirement Board established under such law may require CRIM to transfer from the unencumbered property taxes of a municipality any amounts owed by such municipality under the pay-as-you-go system. For additional information regarding the potential impact of the pay-as-you-go system on municipalities and the Municipal Loan Assets, see "*Risk Factors—Risks Related to Municipal Obligors and their Operations—The depletion of the assets of the public pension system in which municipalities participated and the change to a pay-as-you-go model could result in a material increase in the pension benefit expenses payable by the municipalities that could materially adversely affect the financial condition of some municipalities and their ability to meet their obligations in full, including the Municipal Loan Assets.*"

## Budgeting Process

The Mayor of each municipality is responsible for preparing and submitting a draft balanced general budget resolution to the applicable Municipal Legislature no later than May of each year. The draft budget resolution must include a budget message and a financing plan. The budget message must include a summary of the principal budget aspects and justification for the principal budget requests. The financing plan must provide, among other things, a summary of municipal expenditures by category, such as salaries, wages, materials, services and permanent works for the upcoming fiscal year, a detailed estimate of resources to cover expenditures, a comparative statement of proposed appropriations and information with respect to each program and its objectives.

The Mayor is required to include in the draft general budget resolution the following items, in order of priority:

1. interest and amortization payments on public municipal debt;

2. other statutory obligations or expenses;

3. payment of judgments;

4. amounts necessary to cover any prior year deficit;

5. amounts required to be paid by the municipality under established contractual commitments;

6. expenses and obligations required to be included by law; and

7. other operating expenses.

Pursuant to the Autonomous Municipalities Act, the Municipal Legislature may amend the budget resolution, but it may not eliminate or reduce the items set forth in items 1 through 5 above (among others). The Municipal Legislature is required to approve and submit the budget to the Mayor no later than by mid-June of each year, and the Mayor has six days after receipt to approve it or return it to the Municipal Legislature for amendments.

DRA Ex. 225

**Overview of Fiscal Situation of Municipalities**

The Commonwealth has been experiencing economic contraction for more than a decade and is currently in the midst of a profound fiscal and economic crisis. Municipalities also face similar challenges. Persistent economic contraction in the Commonwealth has impaired the ability of municipalities to generate tax and other revenues to support their operations and provide services to their residents. Municipal revenues also have been and will continue to be adversely impacted as a result of the decrease in Commonwealth Contributions contemplated in the Revised Commonwealth Fiscal Plan. Furthermore, following the impact of Hurricanes Irma and María, municipalities have had to incur significant extraordinary expenditures, while also experiencing a decrease in revenues. The hurricanes have also negatively affected the Commonwealth's economy and exacerbated the ongoing fiscal crisis, which could also further negatively affect the fiscal situation of its municipalities. For additional discussion of the challenges faced by the Commonwealth, see "*Description of the Commonwealth and its Current Financial Condition—Description of the Commonwealth's Economy and Fiscal Challenges*" in this Offering Memorandum.

Pursuant to the Revised Commonwealth Fiscal Plan, municipalities operate with an annual operating deficit of approximately $260 million and will need to undergo substantial operating model changes or else risk increasing such deficit to approximately $500 million annually, due to, among other things, the additional reductions in Commonwealth Contributions contemplated by the Revised Commonwealth Fiscal Plan.

The Center for Public Policy Research (the "CPPR"), an independent non-profit research organization, published in July 2017 a report titled "Municipal Financial Health Index" (the "Report"), which analyzes and compares the fiscal health of the Commonwealth's municipalities (other than 10 municipalities that did not submit their audited financial statements on time to the CPPR) using various metrics. According to the Report, during fiscal year 2016: (i) 42 municipalities (62% of the municipalities covered by the Report), had an excess of expenditures over revenues, (ii) 36 municipalities (53% of the municipalities covered by the Report) experienced a decrease in their net assets compared to the prior fiscal year, (iii) 34 municipalities (50% of the municipalities covered by the Report) experienced a decrease in their general fund balances compared to the prior fiscal year, (iv) 30 municipalities (44% of the municipalities covered by the Report) had a negative general fund balance, (v) 27 municipalities (40% of the municipalities covered by the Report) used more than 15% of their general fund revenues for the payment of debt service, and (vi) 30 municipalities (44% of the municipalities covered by the Report) received more than 40% of their revenues from the Commonwealth.

The index developed by CPPR to assess the financial health of the municipalities considers the following factors: liquidity, fiscal discipline, debt, and the ability of the municipality to cover its operations with its own recurring revenues. Based on the foregoing factors, the following 10 municipalities were assigned the highest scores in the Report (indicating relatively stronger fiscal health): Fajardo, Isabela, Aibonito, Culebra, Hatillo, Rincón, Cayey, Naguabo, and Peñuelas. The following 10 municipalities were assigned the lowest scores (indicating relatively weaker fiscal health): Salinas, Gurabo, Cabo Rojo, Guayama, Arecibo, Maunabo, Ciales, Ponce, Toa Alta and Arroyo. The following 10 municipalities are not covered by the Report, as they failed to submit their audited financial statements on time to the CPPR: Canóvanas, Ceiba, Cidra, Guánica, Lajas, Loíza, Santa Isabel, Toa Baja, Villalba, and Yauco.

As discussed above, the impact of Hurricanes Irma and María and the reduction in Commonwealth Contributions have resulted in a reduction in municipal revenues and are expected to place additional stress on the fiscal situation of the Commonwealth's municipalities. It is still, however, too early to know the full extent of the impact of the hurricanes and the reduction in Commonwealth Contributions on the economic and fiscal situation of municipalities.

**Federal Community Disaster Loans**

Certain municipalities have obtained CDL Loans from the U.S. federal government under the Community Disaster Loan program of the Stafford Act. The purpose of the CDL Loans is to allow municipalities to continue providing essential services as they recover from hurricanes Irma and María. FEMA announced on July 24, 2018 that nearly $210 million has been approved in CDL Loans for 51 Commonwealth municipalities, up to $5 million per municipality. Loan applications are still pending for other municipalities. The CDL Loans are payable from and secured by a pledge of the municipality's revenues for each year while any of such municipality's CDL Loans are outstanding. Under the Stafford Act, the CDL Loans may be forgiven under certain circumstances. However, to the extent the CDL Loans are not forgiven and a municipality defaults on its CDL Loan, FEMA is authorized to take action to recover the outstanding principal plus related interest under federal debt collection authorities, including administrative offset against other federal funds payable to the municipality and/or referral to the U.S. Department of Justice for judicial enforcement of collection.

**Recent and Pending Legislation Impacting Municipalities**

A number of measures have been filed in the Legislative Assembly in recent months to provide financial assistance and liquidity to municipalities, particularly in the aftermath of Hurricanes Irma and María. Several of such measures have been enacted into law. For instance, recently enacted legislation (i) authorizes municipalities to use certain legislative appropriations, originally assigned for other purposes, for hurricane relief efforts, (ii) amends the Autonomous Municipalities Act to allow municipalities to amortize their existing

**DRA Ex. 225**

debts for up to 45 years (instead of 40 years) for financial statement purposes, and (iii) authorizes government entities to establish payment plans for the debts owed to them by municipalities.

Certain other bills have been approved by the Legislative Assembly, but vetoed by the Governor, including Senate Bill 535, which sought to authorize municipalities to obtain Loans secured by the Excess CAE, and provided that the amount of Excess CAE of each municipality would be determined by CRIM (rather than the Designated Trustee, as currently provided by the Municipal Financing Act). Senate Bill 550 was also recently approved by the Legislative Assembly but vetoed by the Governor. Such bill sought to create an integrated system for the collection and management of property taxes through the establishment of a public-private partnership. Finally, Senate Bill 745, which was also approved by the Legislative Assembly and vetoed by the Governor, would have eliminated the requirement that the Designated Trustee ensure the payment of a municipality's statutory debts (certain debts with Commonwealth government entities and public corporations) prior to disbursing any Excess CAE to such municipality. In the case of Senate Bill 745, the Senate voted to override the Governor's veto. The House of Representatives, however, has not voted to override the Governor's veto as of the date of this Offering Memorandum. For additional information regarding Excess CAE, see *"The Restructuring Property— Detailed Description of the Restructuring Property—Municipal General Obligations"* in this Offering Memorandum.

Several other measures have been filed in the Legislative Assembly, but have not been approved as of the date of this Offering Memorandum, including a measure to eliminate personal property taxes and increase the municipal license tax (House Bill 1411) and a measure to authorize the appraisal of real properties by private appraisers for purposes of real property tax assessments (Senate Bill 857). The latter also seeks to establish that, in the case of properties appraised by private appraisers, real property taxes would be assessed based on 10.55% of the current appraisal value (rather than on 1957-1958 property values) and that all real property tax proceeds derived from such properties would be deposited in the Matching Fund (rather than segregating the portion corresponding to Special Additional Tax for deposit in the GO Redemption Fund). AAFAF has formally expressed its opposition to the enactment of House Bill 1411 and Senate Bill 857 through memoranda (*ponencias*) sent to the relevant legislative commissions.

Finally, there were recent reports regarding a possible elimination of the portion of the personal property taxes corresponding to taxes on inventory in connection with the recent tax reform approved by the Legislative Assembly (House Bill 1544). Such bill, as approved by the Legislative Assembly, does not eliminate such taxes. However, it has been reported that certain legislators are continuing to evaluate such alternative and could be filing legislation to such effect during the next legislative session. The elimination of the portion of personal property taxes corresponding to taxes on inventory, especially if a substitute revenue source is not identified, could aversely affect the financial condition of the municipalities and the repayment of the Municipal Loan Assets.

DRA Ex. 225

**THE RESTRUCTURING PROPERTY**

On the Closing Date, and from time to time thereafter, GDB will transfer the Transferred Property to the Issuer pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement. Simultaneously with the transfer of the Transferred Property and the issuance of the New Bonds, automatically and without further action, pursuant to the GDB Restructuring Act, the New Bonds will be secured by a statutory lien on the Transferred Property and all Collections thereon (*i.e.*, the Restructuring Property) in favor of the Indenture Trustee for the benefit of the Bondholders. Such statutory lien will attach automatically to any GDB Retained Loan or other asset transferred to the Issuer from GDB after the Closing Date. On and after the Closing Date, the Issuer's assets are expected to consist solely of the Restructuring Property. As described under "*The Issuer—Relationship of the Issuer to GDB; Information Regarding Transferred Property*," the Issuer has not participated in the preparation or review of the information regarding the Restructuring Property or the expected Collections on the Restructuring Property, all of which was provided for use in this Offering Memorandum by GDB.

**Summary Characteristics of the Restructuring Property**

The Restructuring Property will include all legal and equitable right, title and interest in and to, and claims and causes of action to enforce, the Transferred Property and the Collections. The Transferred Property will be made up of a non-homogeneous pool of assets, which have differing rights, conditions and characteristics, and which consist primarily of Loans (as defined herein) of Commonwealth government entities. As used herein, "Loans" means all loans, bonds, notes, lines of credit, letters of credit, interim receipts, reimbursement obligations, subrogation rights, recovery rights, other borrowing titles, obligations of insurance and other financial indebtedness for borrowed money, with each such type of financing referred to herein as a "Loan." Pursuant to the GDB Restructuring Act, the outstanding amount of all Loans of a Commonwealth government entity with GDB will be reduced as of the Closing Date by the amount of the deposits of such Commonwealth government entity with GDB in the manner described in this Offering Memorandum under "*The GDB Restructuring Act—Determination and Payment of Certain Government Obligations.*"

The outstanding balances of all Loans that will be part of the Transferred Property are shown in this section as of the Cutoff Date (but considering any reductions in Loan balances resulting from debt service payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date), reflecting the adjustments to be effected pursuant to the GDB Restructuring Act as of the Closing Date (the "Closing Date Adjustments") based on estimated deposit balances as of the Cutoff Date. The Closing Date Adjustments, however, will be effected pursuant to the GDB Restructuring Act on the Closing Date based on the mutual liabilities of GDB and the other Commonwealth government entities as of such date.

All Loan balances shown in this section are preliminary and may vary through the Closing Date, including as a result of the Closing Date Adjustments and payments received or interest accrued on the Loans, among other factors. Furthermore, the Closing Date Adjustments may affect the Maturity Date of certain Loans, since such adjustments will be made by reducing principal installments in inverse order of maturity based on certain specific criteria. The maturity dates shown herein in respect of the Municipal Loan Assets reflect the impact of the Closing Date Adjustments. The maturity dates shown for the other Loans that are part of the Restructuring Property, however, do not reflect the impact of such adjustments.

Below is a brief description of each major category of assets included in the Restructuring Property. For additional information on the Restructuring Property, see "*Detailed Description of the Restructuring Property*" in this Offering Memorandum and, for a discussion of certain material risks associated with the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property*" in this Offering Memorandum.

*Municipal Loan Assets.* The Transferred Property will include various types of Loans made by GDB to Commonwealth municipalities (collectively, the "Municipal Loan Assets"). As of the Cutoff Date (but considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date), the Municipal Loan Assets had an aggregate outstanding principal balance of approximately $1,244.5 million. As of July 3, 2018, Loans representing approximately 92.7% of the aggregate principal balance outstanding of such Municipal Loan Assets (or approximately $1,154 million) were current, and approximately 97.1% of the aggregate principal balance outstanding of all Municipal Loan Assets (or approximately $1,209 million) were classified by GDB as performing Loans. For additional information on how Loans are classified as "current," "performing" or "non-performing," see "*Delinquency and Credit Status of the Loans Comprising the Restructuring Property*" below. These are the only Loans that will be part of the Transferred Property transferred to the Issuer on the Closing Date that were current or classified as performing as of the Cutoff Date. As a result, the Municipal Loan Assets are expected to provide most of the Collections that the Issuer will receive on the Restructuring Property. It is uncertain, however, if and how reduced tax collections by municipalities in the aftermath of Hurricanes Irma and María and other factors, such as the reduction in Commonwealth Contributions to municipalities pursuant to the Revised Commonwealth Fiscal Plan, will affect the payment of the Municipal Loan Assets and whether the amount of non-performing Municipal Loan Assets will increase following the next payment date in January 2019. For additional discussion regarding these risks, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property—The full effect of the damage caused by Hurricanes Irma and María, which struck the Commonwealth in September 2017, is currently unknown, but was significant and may have a material adverse effect on the Commonwealth and its economy, the obligors on the Restructuring Property, the Collections on the Restructuring Property*

100

**DRA Ex. 225**

and the Issuer's ability to make payments on the New Bonds" and *"Risk Factors—Risks Related to Municipal Obligors and their Operations—The Revised Commonwealth Fiscal Plan provides for the reduction and eventual elimination of a substantial portion of the central government's subsidy to municipalities, which may adversely affect the ability of municipal governments to continue providing essential services and servicing their debt obligations."*

     The Municipal Loan Asset obligors with the five largest principal amounts outstanding are the municipalities of San Juan, Guaynabo, Ponce, Toa Baja and Aguadilla, with outstanding principal balances as of the Cutoff Date (but considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date) of approximately $220.7 million, $92 million, $71.0 million, $66.1 million, and $55.0 million, respectively. As of the Cutoff Date (but considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date), the aggregate outstanding principal balance of the 10 Municipal Loan Asset obligors with the largest outstanding principal balances is approximately $668.9 million, or approximately 53.8% of all Municipal Loan Assets. The Issuer and the Servicer (on behalf of the Issuer) will have all rights and powers that GDB has in respect of the Municipal Loan Assets, as of immediately prior to the Closing Date, except that (i) the Issuer and the Servicer (on behalf of the Issuer) may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser (as defined herein) and (ii) neither the Issuer nor the Servicer will be able to unilaterally increase the interest rate on the Loans. For additional information on such limitations, see "—*Management of the Restructuring Property,*" below.

     ***Commonwealth Loan Assets.*** The Transferred Property will include several Loans made by GDB to the Commonwealth that benefit from a pledge of the Commonwealth's good faith, credit and taxing power (the "Commonwealth Loan Assets"). As of the Cutoff Date, the Commonwealth Loan Assets had an aggregate outstanding principal balance of approximately $169.4 million and are classified by GDB as non-performing. As further discussed in *"Description of the Commonwealth and its Current Fiscal Condition"* in this Offering Memorandum, the Commonwealth is facing a severe fiscal and economic crisis, is currently in the process of restructuring its debts, including the Commonwealth Loan Assets, in a court-supervised proceeding under Title III of PROMESA, and was impacted by two major hurricanes in 2017. As a result, it is uncertain what recovery, if any, the Issuer will receive on the Commonwealth Loan Assets. In light of the financial condition of the Commonwealth, significant Collections on the Commonwealth Loan Assets are not expected, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections. Moreover, the Issuer is subject to limitations on its exercise of rights and remedies in respect of the Commonwealth Loan Assets. For additional information on such limitations, see "—*Management of the Restructuring Property,*" below.

     ***Commonwealth Guaranteed Loan Asset.*** The Transferred Property will include a bond issued by the Port of the Americas Authority (the "PAA") to GDB that is guaranteed by the Commonwealth and benefits from a pledge of the Commonwealth's good faith, credit and taxing power (the "Commonwealth Guaranteed Loan Asset"). As of the Cutoff Date, the Commonwealth Guaranteed Loan Asset had an outstanding principal balance of approximately $225.5 million and is classified by GDB as non-performing. The PAA does not have a recurring source of revenue and has been historically dependent on legislative appropriations and other Commonwealth subsidies, which the Commonwealth is no longer in a position to provide due to its own fiscal and economic challenges. As a result, it is expected that Collections, if any, on the Commonwealth Guaranteed Loan Asset will come from the Commonwealth under its guarantee, rather than from the PAA. However, the Commonwealth's obligation under its guarantee of the Commonwealth Guaranteed Loan Asset is subject to the Commonwealth's ongoing debt restructuring proceeding under Title III of PROMESA. As a result, it is uncertain what recovery, if any, the Issuer will receive on the Commonwealth Guaranteed Loan Asset. Given the fiscal condition of the Commonwealth and the PAA, which has been further adversely impacted by Hurricanes Irma and María, significant Collections on the Commonwealth Guaranteed Loan Asset are not expected, and the Collection Schedule included herein reflects the assumption that such Loan will not generate Collections. Moreover, the Issuer is subject to limitations on its exercise of rights and remedies in respect of the Commonwealth Guaranteed Loan Asset. For additional information on such limitations, see "—*Management of the Restructuring Property,*" below.

     ***Public Corporation Loan Assets.*** The Transferred Property will include Loans made by GDB to various public corporations and instrumentalities of the Commonwealth (the "Public Corporation Loan Assets"). As of the Cutoff Date, the Public Corporation Loan Assets had an aggregate outstanding principal balance of approximately $2,670.8 million and are classified by GDB as non-performing. The Public Corporation Loan Assets consist of a non-homogeneous pool of assets with differing rights, source of repayments and characteristics. However, all Public Corporation Loan Assets have been materially adversely affected by the financial and economic condition of the Commonwealth and its instrumentalities and, more recently, as a result of the impact of Hurricanes Irma and María. Moreover, obligations of HTA with an outstanding principal balance of approximately $1,924.9 million constitute approximately 72.1% of the Public Corporation Loan Assets' outstanding principal balance. HTA is facing significant fiscal challenges and is currently in the process of restructuring its debts, including those to be included as part of the Transferred Property, in a court-supervised proceeding under Title III of PROMESA. While formal debt restructuring proceedings under PROMESA have not been commenced for the other Public Corporation Loan Asset obligors, such entities are also facing significant fiscal challenges and may need to avail themselves of such proceedings in the future. Moreover, the Issuer is subject to limitations on its exercise of rights and remedies in respect of the Public Corporation Loan Assets. For additional information on such limitations, see "—*Management of the Restructuring Property,*" below. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Public Corporation Loan Assets are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

DRA Ex. 225

*GDB Retained Loan Rights.* The Transferred Property will include the Beneficial Interest in, and the proceeds of (such Beneficial Interest and proceeds, the "GDB Retained Loan Rights"), the GDB Retained Loans, including the Additional Recovery Authority Loans (as defined herein), that will be retained and continue to be serviced by GDB on the Closing Date, pursuant to, and on the terms set forth in, the Qualifying Modification. As of the Cutoff Date (but considering any payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date), the GDB Retained Loans had an aggregate outstanding principal balance of approximately $1,131.8 million, of which approximately $144.6 million corresponds to Additional Recovery Authority Loans. All of the GDB Retained Loans (other than the Additional Recovery Authority Loans) are classified by GDB as non-performing. The obligors on the GDB Retained Loans are public instrumentalities of the Commonwealth that face fiscal and economic challenges similar to those faced by the obligors on the Public Corporation Loan Assets. As a result, the amounts, if any, to be received by the Issuer in respect of the GDB Retained Loan Rights are uncertain at this time and are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans (other than the Additional Recovery Authority Loans) will not generate Collections.

All Additional Recovery Authority Loans were classified by GDB as performing as of the Cutoff Date, *provided that,* as further discussed below, a portion of the 2001 CRIM Loan (as defined herein) with an outstanding principal balance of approximately $26.9 million, had been placed by GDB in non-accrual status as of the Cutoff Date. Each Additional Recovery Authority Loan will be transferred to the Issuer as Transferred Property on the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (b) 18 months after the Closing Date. GDB will have certain duties to the Issuer with respect to the GDB Retained Loans and, upon the transfer of the Additional Recovery Authority Loans and any other GDB Retained Loan (at GDB's discretion) to the Issuer, the Issuer will be subject to limitations on its exercise of rights and remedies in respect of such Loan to the same extent as with respect to the Public Corporation Loan Assets.

"Beneficial Interest" means, with respect to any asset or cause of action, the beneficial interest therein, and the right to receive the proceeds (net of expenses associated with realizing such proceeds) thereof, in each case, after giving effect to the rights of GDB as set forth herein; provided that GDB will have no duty to pursue any cause of action on account of a beneficial interest therein and will have the absolute discretion to settle, offset against claims of GDB, or release such cause of action.

For additional information on such duties and limitations, see "*—Management of the Restructuring Property,*" below.

*Real Property Assets.* The Transferred Property will include certain real property located in Puerto Rico (the "Real Property Assets") that was transferred to GDB by the Commonwealth and various public corporations in full or partial payment of Loans of such entities with GDB. As of the dates of the respective appraisals, conducted between 2013 and 2017, the Real Property Assets originally expected to be part of the Transferred Property had an aggregate appraised value of approximately $56.3 million. The aggregate book value of the Real Property Assets, however, was approximately $37.5 million as of December 31, 2017, and the Collections Schedule included herein assumes aggregate Collections of approximately $33.8 million in respect of the Real Property Assets through July 2019 (after the payment of estimated expenses related to the sale of such Real Property Assets), and no Collections with respect to such assets thereafter. However, after the Cutoff Date, GDB sold four of the Real Property Assets that were previously contemplated would be transferred to the Issuer on the Closing Date and for which the Collection Schedule assumed $22.5 million in Collections during 2018 and 2019. The net proceeds of the sale of such Real Property Assets, which were approximately $15.6 million (excluding approximately $900,000 held in escrow pending the satisfaction of certain conditions), are part of the Cash Assets (as defined herein) to be transferred to the Issuer on the Closing Date. GDB is also in negotiations to sell certain of the remaining Real Property Assets. To the extent the sale of any other Real Property Asset is completed prior to the Closing Date, the net proceeds of such sale will also be part of the Cash Assets (as defined herein). The aggregate book value as of December 31, 2017 and the aggregate appraisal value as of the date of the respective appraisals of the remaining Real Property Assets are $17.8 million and $23.1 million, respectively. The realizable value of the Real Property Assets, however, may be significantly lower than the foregoing values and may further decrease in the aftermath of Hurricanes Irma and María.

*Other Loan Assets.* The Transferred Property will include (i) rights associated with a reverse repurchase agreement by and between the Puerto Rico Housing Finance Authority ("HFA") and GDB (the "Repurchase Agreement") and (ii) certain Loans to non-government entities (the "Private Loans" and, collectively with the Repurchase Agreement, the "Other Loan Assets"). The outstanding balance of the obligations of HFA under the Repurchase Agreement was approximately $19.6 million as of the Cutoff Date, and the aggregate outstanding principal balance of the Private Loans was approximately $0.5 million as of the Cutoff Date. The Private Loans include approximately $0.1 million in mortgage Loans (the "Mortgage Loans"). All of the Other Loan Assets (other than the Mortgage Loans) are classified by GDB as non-performing as of the Cutoff Date. The Mortgage Loans were classified by GDB as performing as of the Cutoff Date. It is uncertain what recovery, if any, the Issuer will receive on the Other Loan Assets. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Other Loan Assets are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

*Cash Assets.* The Transferred Property will include the Cash Assets, which will consist of all cash and cash equivalents of GDB as of the Closing Date in excess of (a) the Cash Adjustments (as defined herein) required to pay the permitted uses for which such Cash Adjustments are reserved and (b) $10 million in Excess Reserved Cash, which shall be used to satisfy an obligation of GDB under

DRA Ex. 225

the Committee Settlement Stipulation as described herein. As used herein, "Cash Adjustments" means the cash and cash adjustments to be retained by GDB on the Closing Date in the aggregate amount of: (i) the Specified Cash Assets, (ii) cash in the amount of $57.3 million to be used to pay any transaction costs of the Qualifying Modification, including professional fees and expenses of GDB, AAFAF and the professionals to be paid pursuant to the Restructuring Support Agreement, (iii) the 2015-17 Excess CAE Settlement Amount (as defined herein), (iv) cash in the amount of $20 million to be distributed to the Public Entity Trust in satisfaction of certain of GDB's obligations under the Committee Settlement Stipulation (the "Committee Fixed Settlement Amount") (for further information regarding the Committee Settlement Stipulation, see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"), and (v) cash in the amount of $7 million to be distributed to Siemens Transportation Partnership Puerto Rico, S.E. in satisfaction of GDB's obligations under the Siemens Settlement (for further information regarding the Siemens Settlement, see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Siemens Transportation Partnership Puerto Rico, S.E.*").

GDB had approximately $488.3 million in cash as of the Cutoff Date, net of the Cash Adjustments and including payments received by GDB on July 2, 2018 in respect of debt service due on July 1, 2018 (by virtue of rollover to the next business day). Such amount has varied since the Cutoff Date as a result of GDB's operational expenses, cash received by GDB from the repayment of Loans and the sale of Real Property Assets, among other factors. The Cash Assets expected to be transferred to the Issuer on the Closing Date amount to approximately $493.4 million.

*Causes of Action Rights*. The Transferred Property will include (i) the Beneficial Interest in all Causes of Action of GDB, including contingent or unknown causes of action (other than any causes of action to enforce assets that constitute Transferred Property and the Excluded Causes of Action) (such causes of action, the "Retained Causes of Action") and (ii) the Litigation Proceeds (subject to the limitations set forth herein) (the Transferred Property described in (i) and (ii) are referred to collectively herein as the "Causes of Action Rights"). However, the Issuer will not have the right to commence or direct any litigation or other enforcement action in respect of, or to sell, transfer or dispose of the Causes of Action. The value of the Causes of Action Rights, if any, cannot be determined at this time. In addition, GDB will retain all Litigation Proceeds and shall be authorized to use such proceeds (net of any expenses associated with realization of such proceeds) solely to (a) satisfy or resolve any contingent and unliquidated claims against GDB arising on or before the Closing Date (other than those resolved pursuant to the Qualifying Modification or the GDB Restructuring Act) and (b) comply with certain of its obligations under the Committee Settlement Stipulation as described herein (see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"). Upon GDB's sole determination that all such contingent and unliquidated claims and all such obligations under the Committee Settlement Stipulation have been satisfied or resolved, GDB shall transfer to the Issuer the remaining Litigation Proceeds in GDB's possession or control at such time and all Litigation Proceeds received by GDB thereafter within fifteen days after the receipt thereof. For the avoidance of doubt (i) the retention of the Retained Causes of Action by GDB will not affect any rights or defenses of GDB or any third parties with respect to such Retained Causes of Actions; and (ii) none of the Transferred Property (other than the Litigation Proceeds), the GDB Retained Loans, the Cash Adjustments or the proceeds of any of the foregoing shall be used to satisfy or resolve any such contingent and unliquidated claims against GDB.

*Unknown Assets*. The Transferred Property will include the Unknown Assets, which consist of any other assets of GDB in existence at any point from the Cutoff Date up to and including the Closing Date (whether or not identified as of the Cutoff Date) that do not constitute Excluded GDB Assets and are not otherwise identified as Transferred Property. The value of the Unknown Assets, if any, cannot be determined at this time.

The following table shows the allocation of the Transferred Property among such classes of assets as of the Cutoff Date (in the case of Loans, the table reflects the Closing Date Adjustments and considers payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date).

DRA Ex. 225

**Allocation of the Transferred Property**

| Asset Class | Balance (in millions) [(1)] | % of Transferred Property |
|---|---|---|
| Municipal Loan Assets [(2)] | $1,244.5 | 20.8% |
| Commonwealth Loan Assets [(2)] | $169.4 | 2.8% |
| Commonwealth Guaranteed Loan Asset [(2)] | $225.5 | 3.8% |
| Public Corporation Loan Assets [(2)] | $2,670.8 | 44.6% |
| GDB Retained Loans [(3)] | $1,131.8 | 18.9% |
| Real Property Assets [(4)] | $37.5 | 0.6% |
| Other Loan Assets [(2)] | $20.1 | 0.3% |
| Cash Assets [(5)] | $488.3 | 8.2% |
| Causes of Action Rights | N/A [(6)] | N/A [(6)] |
| Unknown Assets | N/A [(7)] | N/A [(7)] |
| Total | $5,988.0 | 100% |

(1) Balance shown does not include accrued and unpaid interest.

(2) Reflects the aggregate outstanding principal balance as of the Cutoff Date, net of the Closing Date Adjustments (if applicable) and considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date.

(3) Reflects the aggregate outstanding principal balance as of the Cutoff Date of the GDB Retained Loans, although the Transferred Property includes the GDB Retained Loan Rights, rather than the GDB Retained Loans themselves.

(4) Reflects the aggregate book value of the Real Property Assets as of December 31, 2017.

(5) Reflects the amount of cash and cash equivalents held by GDB as of the Cutoff Date (adjusted for debt service payments received by GDB on July 2, 2018), net of the Cash Adjustments (as estimated at the time of the launch of the Solicitation). The amount of the Cash Adjustments has varied since then as a result of, among other things, increased transaction expenses and expenses related to the settlement of litigation (including the Committee Settlement Stipulation and the Siemens Settlement).

(6) The value of Causes of Action Rights cannot be determined.

(7) The value of Unknown Assets cannot be determined.

Source: GDB

After the Cutoff Date, GDB sold four of the Real Property Assets that were previously contemplated would be transferred to the Issuer on the Closing Date. The book value of the remaining Real Property Assets is approximately $17.8 million. Moreover, GDB's cash has also varied since the Cutoff Date as a result of GDB's operational expenses, cash received by GDB from the repayment of Loans and the sale of Real Property Assets, among other factors. The Cash Assets expected to be transferred to the Issuer on the Closing Date amount to approximately $493.4 million.

**Excluded GDB Assets**

Pursuant to the GDB Restructuring Act and the Qualifying Modification, certain of GDB's assets will not be transferred by GDB to the Issuer, and will not make up any portion of the Transferred Property (the "Excluded GDB Assets"). The Excluded GDB Assets consist exclusively of: (i) the GDB Retained Loans, *provided* that the Beneficial Interests in such GDB Retained Loans will be Transferred Property that is transferred to the Issuer on the Closing Date and all proceeds of such GDB Retained Loans will constitute Transferred Property and be promptly transferred to the Issuer upon receipt thereof, *provided further* that if GDB, at its option, transfers to the Issuer any such Loans at any time, such transferred Loans will constitute Transferred Property upon such transfer, and *provided further* that each of the Additional Recovery Authority Loans will be transferred to the Issuer and will constitute Transferred Property on the date that is the earlier of (x) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (y) 18 months after the Closing Date, (ii) cash and cash equivalents consisting of (A) Cash Adjustments required to pay the permitted uses for which such Cash Adjustments are reserved and (B) up to $10 million in Excess Reserved Cash (as defined herein), if any, to satisfy certain of GDB's obligations under the Committee Settlement Stipulation (see "*Litigation— Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"), (iii) the Retained Causes of Action (except the Beneficial Interest therein), (iv) causes of action (a) to enforce Loans that constitute Public Entity Trust Assets or (b) that GDB asserts, or is a party to, exclusively in its capacity as the former fiscal agent and financial advisor to the Government and its instrumentalities and for which the primary economic beneficiary of such cause of action, as of the Closing Date, is a Commonwealth government entity other than GDB, which will be treated as property of those Government entities with an economic interest in such cause of action ((a) and (b), collectively, the "Excluded Causes of Action"), (v) Loans to public agencies and departments of the Commonwealth primarily payable from legislative appropriations, with a principal balance of approximately $890.6 million as of the Cutoff Date (but reflecting the Closing Date Adjustments), to be identified in the Transfer Agreement and transferred to the Public Entity Trust on or after the Closing Date (the "Public Entity Trust Assets"), (vi) Loans with an outstanding principal balance of approximately $12.5 million as of the Cutoff Date securing an account in the name of Asociación de Empleados del ELA (the "Secured Deposit Account") and (vii) office furniture, equipment and other supplies owned by GDB and used in the ordinary course of GDB's business (excluding all such property relating to the Real Property Assets that are Transferred Property), if any; *provided* that any Excess Reserved Cash in excess of $10 million (the

**DRA Ex. 225**

"Residual GDB Cash Assets") will constitute Transferred Property and will be transferred to the Issuer as set forth in the Transfer Agreement.

"Excess Reserved Cash" means the Cash Adjustments in excess of the amounts required to pay the permitted uses for which cash is reserved, if any.

The "Specified Cash Assets" will equal the sum of (a) the Vendor Claim Reserve (as defined herein), (b) $19 million to be transferred by GDB to a new trust pursuant to Article 705 of the GDB Restructuring Act for the payment of certain obligations of GDB to former employees under several pre-retirement programs and (c) $26.5 million for operating cash requirements of GDB and the Public Entity Trust; *provided* that the Vendor Claim Reserve Residual will constitute Transferred Property and, once identified, such Vendor Claim Reserve Residual will be delivered to the Issuer as set forth in the following paragraph.

Cash in the amount of $15 million to be set aside and used for the settlement of claims asserted against GDB by parties that provided goods and services to GDB in the ordinary course of business (such amount at any time, the "Vendor Claim Reserve"), which claims are disputed by GDB on the Closing Date or for which payment has not yet become due ("Open or Disputed Vendor Claims"), will remain at GDB in a separate account subject to a perfected security interest in favor of the Issuer securing GDB's obligation to transfer the Vendor Claim Reserve Residual to the Issuer. Any cash or cash equivalents remaining in the account in respect of the Vendor Claim Reserve after the payment of all Open or Disputed Vendor Claims determined by GDB to be valid (the "Vendor Claim Reserve Residual") will be Excess Reserved Cash.

**Management of the Restructuring Property**

The GDB Restructuring Act and the Qualifying Modification establish certain rights and limitations regarding the management of the Restructuring Property by the Issuer, the Servicer and the Indenture Trustee, as applicable. Pursuant to the Servicing Agreement and as required under the terms of the Bond Indenture, the Issuer will delegate to the Servicer all management of the Restructuring Property (including all day-to-day operations in respect thereof), subject to the rights and limitations established in the GDB Restructuring Act and the Qualifying Modification. Therefore, pursuant to the GDB Restructuring Act, the Qualifying Modification and the Servicing Agreement, the Restructuring Property will be managed in accordance with the following:

1. The Servicer (on behalf of the Issuer) will have all rights and powers that GDB has in respect of the Municipal Loan Assets, as of immediately prior to the Closing Date, except (i) that the Servicer (on behalf of the Issuer) may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser and (ii) as provided in item (8) below.

   An "Approved Purchaser" is a person or entity that is (i) a private or public bank operating in Puerto Rico that holds, or held at any time since the effective date of the GDB Restructuring Act, Loans issued by one or more Commonwealth municipalities or (ii) otherwise approved by AAFAF or another agent designated by the Commonwealth, which entity may take into account the public policy goals of the Commonwealth, which approval will not be unreasonably withheld (taking into account such public policy goals) if so requested.

2. The Servicer (on behalf of the Issuer) will have the right to exercise remedies in respect of the Public Corporation Loan Assets, the Commonwealth Loan Assets, and the Commonwealth Guaranteed Loan Asset, but solely to the extent necessary to assure that funds that are available for debt service from the obligors under such Loans (consistent with applicable Oversight Board-approved fiscal plans, if any, and Oversight Board-approved budgets, if any) are applied to such Loans in accordance with the applicable Loan documents, legal priority and the security or other pledge rights benefiting the same. Furthermore, the Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to preserve, protect or defend any priority, security or other pledge rights benefiting such Public Corporation Loan Assets, Commonwealth Loan Assets, and Commonwealth Guaranteed Loan Asset. For any such Loan where the obligor is in a proceeding under Title III or Title VI of PROMESA and such obligor has other creditors that have the same legal priority, security or pledge rights as the Issuer, the Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to ensure that the Issuer receives treatment in such proceedings that is the same as that provided to other creditors that have the same legal priority, security or pledge rights.

3. The Servicer (on behalf of the Issuer) may transfer, assign, sell or otherwise dispose of the Restructuring Property (other than the Municipal Loan Assets), or interests in such property, without the consent of AAFAF or any other agent of the Commonwealth provided that such sale is consistent with the servicing standards set forth in the Servicing Agreement.

4. The Servicer (on behalf of the Issuer) may not enter into any material modification, extension, accommodation, sale or other disposition of any Restructuring Property unless the Collateral Monitor has been given 10 days' prior written notice of such transaction and has not reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable.

5. Any modification by GDB of the Additional Recovery Authority Loans will (i) not include any provision that would result in

DRA Ex. 225

the removal of any lien, security or other pledge rights benefiting such Loan except to the extent required for the sale of any such collateral where the proceeds of that collateral will be immediately made available to the Issuer and (ii) be approved, if such modification occurs prior to the Closing Date, by the financial advisor to the Ad Hoc Group (as defined in the Restructuring Support Agreement) or, if such modification occurs after the Closing Date, by the Servicer as commercially reasonable (provided, for the avoidance of doubt, that the Servicer's approval of such modification may only be given after the Collateral Monitor has received 10 days' prior written notice of the approval of the modification and has not objected).

6.  In respect of the GDB Retained Loans, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on such Loans, *provided* that it will not be required to bring any action seeking to obtain a judgment against such public entity or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of such Loans.

7.  None of the Issuer, the Servicer, or any other person or entity (other than GDB) will have the right to commence or direct any litigation or other enforcement action in respect of, or sell, transfer or dispose of the Causes of Action.

8.  None of the Issuer, the Servicer, or any other person or entity will have the right to unilaterally increase the fixed interest rate or variable interest rate spread, as applicable, on the Municipal Loan Assets, the Public Corporation Loan Assets, the Commonwealth Loan Assets or the Commonwealth Guaranteed Loan Asset, and such Loans will continue to bear interest at the applicable fixed or variable rates in effect on the Closing Date, as such rates are certified by GDB and AAFAF. In accordance with the Restructuring Support Agreement, such interest rates have not been adjusted downward by GDB since at least March 27, 2018 and will not be adjusted downward by GDB at any time prior to or after the Closing Date.

9.  The Indenture Trustee (upon the occurrence and during the continuance of a Bond Indenture Event of Default or as otherwise provided in the Bond Indenture) and any subsequent holder of any Restructuring Property (upon the sale or transfer of any such Restructuring Property pursuant to the Servicing Agreement) will be subject to all limitations (including the limitations on the exercise of remedies set forth herein) applicable to the Issuer and the Servicer and, unless otherwise contractually limited, will have all rights and remedies in respect of the Restructuring Property to the same extent as the Issuer and the Servicer, except that neither the Indenture Trustee nor any subsequent holder of any Restructuring Property will be bound by the standards set forth in the Servicing Agreement or be required to obtain the Collateral Monitor's consent to dispose of the Restructuring Property or any interest in such assets.

For the avoidance of doubt, the foregoing rights and limitations regarding the management of the Restructuring Property by the Servicer are also applicable to the Issuer pursuant to the GDB Restructuring Act.

GDB, AAFAF and San Juan entered into a settlement agreement to resolve San Juan's claims against GDB and San Juan's objections to the Qualifying Modification. As part of such settlement, the Servicer and the Collateral Monitor entered into certain agreements regarding the Municipal Loan Assets, as described under "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Various Municipalities—Settlement of Litigation with the Municipality of San Juan.*"

### Origination of the Loans Comprising the Restructuring Property

GDB is a public corporation and instrumentality of the Commonwealth created under Act No. 17 of September 23, 1948, as amended (the "GDB Enabling Act"). One of GDB's main functions under the GDB Enabling Act was to provide financing to the Commonwealth, its instrumentalities and its municipalities. GDB traditionally served as interim lender to such entities in anticipation of the issuance of bonds and notes and provided Loans to such entities to finance capital works, budget deficits, and collateral requirements under swap agreements, and to meet mandatory payment obligations. The Loans comprising the Restructuring Property (other than the Private Loans) were originated by GDB in its statutory role as lender to Commonwealth government entities, and pursuant to applicable legislation.

The Municipal Loan Assets, which are expected to provide most of the Collections from the Restructuring Property, were originated by GDB in accordance with the provisions of the Municipal Financing Act. GDB, in its prior capacity as fiscal agent and financial advisor to the Commonwealth, its instrumentalities and its municipalities, was required to determine if each municipality had sufficient available legal margin and payment capacity, as applicable, to incur such Loans pursuant to the requirements of the Municipal Financing Act and the regulations issued thereunder. As further discussed below, GDB expected to be able to monetize the Municipal General Obligations, which are a significant portion of the Municipal Loan Assets, through the sale of such Loans to the Puerto Rico Municipal Finance Agency ("MFA"), which historically issued bonds secured by the revenues generated by Municipal General Obligations acquired by MFA. However, an MFA transaction was not completed and, as a result, GDB was not able to monetize such Loans.

106

DRA Ex. 225

A significant portion of the remaining Loans were originated by GDB in anticipation of the issuance of long-term debt by the Commonwealth and the other obligors thereunder or were otherwise expected to be repaid with the proceeds of future bond issuances or from future legislative appropriations. At the time of the origination of most of such Loans, the Commonwealth and its instrumentalities had investment grade credit ratings and reasonable access to the capital markets. However, as the economic and fiscal situation of the Commonwealth deteriorated, and the credit ratings of the Commonwealth and its instrumentalities were downgraded to non-investment grade, such entities lost access to the capital markets. The lack of access to the capital markets, coupled with deteriorating economic and fiscal conditions in the Commonwealth, resulted in the Commonwealth and its instrumentalities not being able to repay their indebtedness to GDB.

**General Characteristics of the Transferred Property**

Below is certain data regarding the composition of the Municipal Loan Assets, which are expected to provide the majority of the Collections generated by the Restructuring Property, and of the other Loans constituting Restructuring Property as of the Closing Date (consisting of the Commonwealth Loan Assets, the Commonwealth Guaranteed Loan Asset, the Public Corporation Loan Assets, and the Private Loans), which have been classified by GDB as non-performing (except for the Mortgage Loans) and are not expected to generate material Collections (and for which the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections). The following information is based on unaudited information of GDB about the assets to be included in the Transferred Property as of the Cutoff Date (but considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date). For information on the risks relating to the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property.*" For additional discussion of risks related to the Issuer and the information contained herein, see "*Risk Factors—Risks Related to the Issuer.*"

**Municipal Loan Assets**

**General Characteristics**
**Municipal Loan Assets**

| | |
|---|---|
| Aggregate Outstanding Principal Balance | $1,244.5 million |
| Range of Principal Balances | $557–$64.3 million |
| Weighted Average Effective APR[1] | 5.46% |
| Range of Effective APRs[2] | 2.34%–7.75% |
| Weighted Average Maturity Date[3] | July 1, 2032 |
| Range of Maturity Dates[4] | January 1, 2019– July 1, 2040 |

(1)  Weighted by principal balance as of the Cutoff Date. Most of the Municipal Loan Assets bear interest at variable rates, based on the three-month London Interbank Offered Rate ("LIBOR") or the U.S. Prime Rate (the "Prime Rate") plus a spread, subject to a legal interest rate limit of 12%. Certain of the Municipal Loan Assets are also subject to an interest rate floor (ranging from 2.3% to 7.0%).

(2)  Excludes three Loans with an aggregate principal balance of approximately $1.19 million, each of which has a 0% stated interest rate.

(3)  Weighted by principal balance as of the Cutoff Date. Excludes approximately $19 million in principal amount of Municipal Lines of Credit with past due maturities.

(4)  Excludes approximately $19 million in principal amount of Municipal Lines of Credit with past due maturities.

Source: GDB

**Non-Municipal Loan Assets**

**Characteristics**
**Non-Municipal Loan Assets**

| | |
|---|---|
| Aggregate Outstanding Principal Balance | $4,217.7 million |
| Range of Principal Balances[1] | $6 – $398 million |
| Weighted Average Effective APR[2] | 3.48% |
| Range of Effective APRs | 4.11%–12% |
| Weighted Average Maturity Date[3] | July 1, 2025 |
| Range of Maturity Dates[4] | December 31, 1991 –January 1, 2045 |

(1)  The principal balances of the Private Loans range from $6 to $89,532 and the principal balances of the Commonwealth Loan Assets, the Commonwealth Guaranteed Loan Asset and the Public Corporation Loan Assets range from $995,450 to $398 million.

(2)  Weighted by principal balance as of the Cutoff Date. Certain of the Loans bear interest at variable rates, based on LIBOR or the Prime Rate plus a spread, subject to a floor (ranging from 6.0%-6.5%), and a legal interest rate limit of 12%.

(3)  Weighted by principal balance as of the Cutoff Date. Includes approximately $1.9 billion in Loans with past due maturities or no stated maturity dates. Based on contracted maturity dates (not including impact of Closing Date Adjustments).

**DRA Ex. 225**

Source: GDB

## Delinquency and Credit Status of the Loans Comprising the Restructuring Property

The table below presents the aggregate outstanding principal balance of Loans in each category and subcategory of Restructuring Property assets that were current two business days after the Cutoff Date (i.e., the day after the July 1, 2018 payments were due by virtue of rollover to the next business day from the Cutoff Date) and those that, as of such date, were past due by the number of days specified in each column below. Furthermore, the table also illustrates the outstanding principal balance of the Loans in each category and subcategory of the Restructuring Property that were classified by GDB as performing and non-performing as of such date. A Loan is classified by GDB as performing if it is current or not more than 90 days past due and as non-performing if it is more than 90 days past due. Past due loans classified as performing in the table below would become non-performing if they become 90 days or more past due.

The data presented herein is for illustrative purposes only and may not accurately reflect the ability of an obligor to repay its Loans when due. For instance, Loans that have been refinanced, restructured or for which a payment plan has been established due to the obligor being unable to repay the debt service as originally scheduled are not deemed by GDB to be, and not reflected herein as, past due, to the extent that the obligor has complied with the refinanced or restructured Loan or payment plan. Therefore, the obligors of certain Loans that are shown as current or performing Loans may not actually have the resources to honor their obligations as they become due. In particular, even though all Municipal General Obligations are reflected as current in the table below, certain municipalities did not have sufficient funds in the Municipal Public Debt Redemption Fund (the "GO Redemption Fund") account at Banco Popular de Puerto Rico ("BPPR") to make the full principal and interest payments on their Municipal General Obligations due on July 1, 2018, and made such payments with an extraordinary aggregate disbursement of approximately $5.2 million from such municipalities' deposits with GDB. Such deficiency was primarily due to (i) a portion of the GO Redemption Fund being deposited with GDB and subject to restrictions on withdrawal and (ii) decreased property tax collections following Hurricanes Irma and María. For additional information regarding the July 1, 2018 payment on Municipal General Obligations, see "*Detailed Description of the Restructuring Property—Municipal Loan Assets—Municipal General Obligations—Estimated Fiscal Year 2018 Debt Service Coverage,*" below.

Furthermore, there is no assurance that the Issuer's delinquency experience with respect to the Restructuring Property will be similar to that described below. In particular, it is uncertain if and how reduced tax collections by municipalities in the aftermath of Hurricanes Irma and María and other factors, such as the reduction in Commonwealth Contributions to municipalities pursuant to the Revised Commonwealth Fiscal Plan, will affect the payment of the Municipal Loan Assets and whether the amount of non-performing Municipal Loan Assets will increase following the next payment date on January 1, 2019. For additional information on the risks relating to the effect of Hurricanes Irma and María on the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property.*"

**Loan Delinquency Statistics[1]**

| Category | Performing | | | Non-Performing | | Total Outstanding Principal Balance |
|---|---|---|---|---|---|---|
| | Current | 1–29 days past due | 30–89 days past due | 90–179 days past due | > 180 days past due | |
| Municipal Loan Assets ............................ | | | | | | |
| *Municipal General Obligations* .................. | $768,628,411 | - | - | - | - | $768,628,411 |
| *Sales Tax Obligations* ............................ | 308,409,058 | $5,206,271 | - | - | - | 313,615,329 |
| *Operational Loans* ............................... | 77,112,314 | - | - | - | - | 77,112,314 |
| *Revenue Loans* ................................... | - | 49,692,375 | - | - | - | 49,692,375 |
| *Municipal Lines of Credit* ...................... | - | - | - | - | $35,473,554 | 35,473,554 |
| Commonwealth Loan Assets ........................ | - | - | - | - | 169,438,038 | 169,438,038 |
| Commonwealth Guaranteed Loan Asset ............ | - | - | - | - | 225,533,700 | 225,533,700 |
| Public Corporation Loan Assets .................... | - | - | - | - | 2,670,798,011 | 2,670,798,011 |
| Private Loans ........................................ | 131,918 | - | - | - | 339,948 | 471,866 |
| GDB Retained Loans ................................ | 117,769,180 | - | - | - | 1,014,053,886 | 1,131,823,066 |
| Total ............................................... | $1,272,050,881 | $54,898,646 | - | - | $4,115,637,137 | $5,442,586,664 |

[1] Loan balances are shown as of the Cutoff Date but considering any payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date, and reflecting the Closing Date Adjustments.

Source: GDB

DRA Ex. 225

**Detailed Description of the Restructuring Property**

### *Municipal Loan Assets*

The Municipal Loan Assets consist of Loans issued by GDB to Puerto Rico municipalities pursuant to the Municipal Financing Act and are divided into the following sub-categories: (i) Municipal General Obligations, payable primarily from *ad valorem* taxes and backed by the good faith, credit and taxing power of the issuing municipality, (ii) special obligation Loans of municipalities payable from the municipal sales and use tax ("Sales Tax Obligations"), (iii) special obligation Loans of municipalities payable from the operating revenues of such municipalities (the "Operational Loans"), (iv) Loans of municipalities payable primarily from the revenues generated by the project or system financed with the bond proceeds (the "Revenue Loans") and (v) lines of credit issued by GDB to municipalities and which do not have a specified source of repayment (the "Municipal Lines of Credit"). The Sales Tax Obligations, the Operational Loans, the Revenue Loans and the Municipal Lines of Credit are not general obligations of the municipalities and are not backed by the good faith, credit and taxing power of the municipalities.

The following table summarizes the distribution of the Municipal Loan Assets among the different subcategories. The general characteristics of each subcategory are described below. Each of the following Loan balances is shown as of the Cutoff Date, reflecting the Closing Date Adjustments and considering payments received by GDB on July 2, 2018 by virtue of rollover to the next business day from the Cutoff Date. For additional discussion regarding the GDB Restructuring Act and the Closing Date Adjustments, see *"The GDB Restructuring Act—Determination and Payment of Certain Government Obligations."*

**Allocation of the Municipal Loan Assets**

| Subcategory of Municipal Loan Assets | Outstanding Principal Balance (in millions)[1] | % of Total Outstanding Principal Balance of Municipal Loan Assets |
|---|---|---|
| Municipal General Obligations | $768.6 | 62% |
| Sales Tax Obligations | 313.6 | 25% |
| Operational Loans | 77.1 | 6% |
| Revenue Loans | 49.7 | 4% |
| Municipal Lines of Credit | 35.5 | 3% |
| Total | $1,244.5 | 100% |

[1] Does not include accrued and unpaid interest.

Source: GDB

### *Municipal General Obligations*

*General.* The Municipal General Obligations are Loans of a municipality payable from *ad valorem* taxes, without limitation as to rate or amount, on all taxable real and personal property within the boundaries of such municipality. The good faith, credit and taxing power of each municipality are pledged to the payment of its Municipal General Obligations. As authorized pursuant to the Municipal Financing Act and the municipal resolutions or ordinances authorizing the issuance of Municipal General Obligations, the Municipal General Obligations that will be part of the Restructuring Property are evidenced by interim receipts (the "Interim Receipts") issued by the corresponding municipality pending the issuance of final bonds or notes. Pursuant to the Interim Receipts, municipalities are required to issue definitive bonds or notes to the holder thereof upon the surrender of the Interim Receipt to GDB. The corresponding definitive bonds or notes have not been issued as of the Cutoff Date and will not be issued prior to the Closing Date and, therefore, GDB continues to hold the Interim Receipts and will transfer the Interim Receipts to the Issuer on the Closing Date. Pursuant to the terms of the Interim Receipts, the holder thereof is entitled to all rights and privileges of a holder of definitive bonds or notes, which includes, without limitation, the payment of the scheduled debt service and the protections afforded to other Municipal General Obligation holders under the Municipal Financing Act and other relevant statutes.

Pursuant to the Interim Receipts, interest on the Municipal General Obligations is payable semi-annually on January 1 and July 1 of each year, and principal is payable annually on July 1 of each year. The Interim Receipts also provide that the Municipal General Obligations bear interest at the rate of 12% per annum or at such other rate or rates of interest as may be determined by GDB. GDB has set the rate for the Municipal General Obligations at variable rates (with limited exceptions) based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12% and an interest rate floor (ranging from 2.34% to 7%). Pursuant to the GDB Restructuring Act, none of the Issuer, the Servicer, or any other person or entity will have the right to unilaterally increase the interest rate (that is, increase the spread over the applicable benchmark rate) on the Municipal General Obligations, and such Loans will continue to bear interest at the applicable variable rates in effect as of the Closing Date, as such rates are certified by AAFAF and GDB. In accordance with the Restructuring Support Agreement, such interest rates have not been adjusted downward by GDB since at least March 27, 2018 and will not be adjusted downward by GDB at any time prior to or after the Closing Date.

**DRA Ex. 225**

The following table shows the Municipal General Obligations that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments and considering payments received by GDB on July 2, 2018 by virtue of rollover to the next business day from the Cutoff Date.

**Municipal General Obligations**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Municipal General Obligations |
|---|---|---|---|---|---|
| Adjuntas | $1,019,613 | 2 | 3.6% | 7/1/2029 | 0.1% |
| Aguada | 1,010,120 | 2 | 4.0% | 7/1/2031 | 0.1% |
| Aguadilla | 17,933,585 | 7 | 5.2% | 7/1/2035 | 2.3% |
| Aguas Buenas | 749,130 | 1 | 3.6% | 7/1/2025 | 0.1% |
| Aibonito | 491,714 | 2 | 5.9% | 7/1/2037 | 0.1% |
| Añasco | 1,155,714 | 2 | 3.6% | 7/1/2033 | 0.2% |
| Arecibo | 10,062,892 | 6 | 6.0% | 7/1/2038 | 1.3% |
| Arroyo | 1,690,628 | 3 | 4.6% | 7/1/2031 | 0.2% |
| Barceloneta | 13,686,063 | 8 | 4.8% | 7/1/2036 | 1.8% |
| Cabo Rojo | 13,972,290 | 3 | 6.3% | 7/1/2038 | 1.8% |
| Caguas | 9,493,042 | 2 | 6.3% | 7/1/2038 | 1.2% |
| Camuy | 1,274,981 | 2 | 4.4% | 7/1/2026 | 0.2% |
| Canóvanas | 11,453,179 | 6 | 6.3% | 7/1/2034 | 1.5% |
| Cayey | 11,073,466 | 5 | 5.3% | 7/1/2033 | 1.4% |
| Ceiba | 285,405 | 1 | 6.3% | 7/1/2034 | 0.0% |
| Ciales | 2,000,062 | 3 | 6.3% | 7/1/2036 | 0.3% |
| Cidra | 4,870,671 | 2 | 4.3% | 7/1/2032 | 0.6% |
| Coamo | 2,949,771 | 3 | 5.3% | 7/1/2036 | 0.4% |
| Comerío | 634,585 | 2 | 6.3% | 7/1/2035 | 0.1% |
| Corozal | 1,800,136 | 1 | 6.3% | 7/1/2027 | 0.2% |
| Dorado | 30,081,215 | 14 | 5.9% | 7/1/2036 | 3.9% |
| Florida | 228,380 | 1 | 6.3% | 7/1/2030 | 0.0% |
| Guánica | 2,462,204 | 2 | 6.1% | 7/1/2037 | 0.3% |
| Guayama | 9,873,390 | 2 | 6.3% | 7/1/2026 | 1.3% |
| Guayanilla | 3,682,000 | 6 | 5.3% | 7/1/2034 | 0.5% |
| Guaynabo | 70,531,737 | 8 | 6.1% | 7/1/2035 | 9.2% |
| Gurabo | 16,338,398 | 5 | 4.4% | 7/1/2034 | 2.1% |
| Hormigueros | 87,659 | 1 | 3.6% | 7/1/2021 | 0.0% |
| Isabela | 3,355,590 | 3 | 4.7% | 7/1/2027 | 0.4% |
| Jayuya | 433,339 | 2 | 5.6% | 7/1/2035 | 0.1% |
| Juana Díaz | 5,289,736 | 4 | 4.7% | 7/1/2033 | 0.7% |
| Juncos | 18,957,183 | 5 | 5.4% | 7/1/2034 | 2.5% |
| Lajas | 3,738,484 | 2 | 5.6% | 7/1/2039 | 0.5% |
| Las Piedras | 10,353,160 | 3 | 6.2% | 7/1/2036 | 1.3% |
| Loíza | 4,781,767 | 6 | 5.5% | 7/1/2037 | 0.6% |
| Luquillo | 3,440,270 | 3 | 4.1% | 7/1/2032 | 0.4% |
| Manatí | 15,425,246 | 8 | 5.7% | 7/1/2037 | 2.0% |
| Maricao | 397,774 | 2 | 3.8% | 7/1/2028 | 0.1% |
| Maunabo | 2,468,948 | 4 | 5.3% | 7/1/2034 | 0.3% |
| Mayagüez | 8,745,791 | 2 | 6.3% | 7/1/2026 | 1.1% |
| Moca | 3,646,820 | 5 | 5.6% | 7/1/2034 | 0.5% |
| Morovis | 574,115 | 1 | 6.3% | 7/1/2025 | 0.1% |
| Naguabo | 1,194,909 | 1 | 6.3% | 7/1/2036 | 0.2% |
| Naranjito | 4,631,961 | 2 | 5.3% | 7/1/2034 | 0.6% |
| Orocovis | 741,599 | 2 | 3.6% | 7/1/2031 | 0.1% |
| Patillas | 3,027,864 | 3 | 6.0% | 7/1/2036 | 0.4% |
| Peñuelas | 3,464,464 | 4 | 3.8% | 7/1/2032 | 0.5% |
| Ponce | 59,462,949 | 7 | 6.3% | 7/1/2038 | 7.7% |
| Quebradillas | 2,196,688 | 3 | 4.7% | 7/1/2031 | 0.3% |
| Río Grande | 14,202,727 | 5 | 5.2% | 7/1/2037 | 1.8% |
| Sabana Grande | 1,521,765 | 3 | 5.5% | 7/1/2033 | 0.2% |
| Salinas | 5,870,496 | 4 | 6.0% | 7/1/2037 | 0.8% |
| San Germán | 408,250 | 1 | 7.0% | 7/1/2025 | 0.1% |
| San Juan | 185,908,419 | 6 | 5.8% | 7/1/2038 | 24.2% |
| San Lorenzo | 8,401,111 | 6 | 5.2% | 7/1/2037 | 1.1% |

110

**DRA Ex. 225**

**Municipal General Obligations**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Municipal General Obligations |
|---|---|---|---|---|---|
| San Sebastián..................... | 7,904,699 | 7 | 6.0% | 7/1/2038 | 1.0% |
| Santa Isabel....................... | 10,183,094 | 5 | 5.6% | 7/1/2034 | 1.3% |
| Toa Alta ............................ | 10,874,853 | 5 | 6.0% | 7/1/2029 | 1.4% |
| Toa Baja ........................... | 63,209,257 | 7 | 6.0% | 7/1/2037 | 8.2% |
| Trujillo Alto...................... | 19,175,274 | 6 | 6.0% | 7/1/2038 | 2.5% |
| Utuado.............................. | 84,284 | 1 | 3.6% | 7/1/2019 | 0.0% |
| Vega Alta.......................... | 2,342,898 | 2 | 6.3% | 7/1/2024 | 0.3% |
| Vega Baja ......................... | 14,351,790 | 10 | 5.6% | 7/1/2035 | 1.9% |
| Vieques............................. | 2,785,152 | 4 | 5.6% | 7/1/2036 | 0.4% |
| Villalba ............................ | 556,302 | 2 | 6.0% | 7/1/2031 | 0.1% |
| Yabucoa............................ | 7,210,235 | 5 | 5.4% | 7/1/2038 | 0.9% |
| Yauco ............................... | 16,417,111 | 16 | 6.1% | 7/1/2038 | 2.1% |
| Total ................................ | $768,628,411 | 269 | - | - | 100% |

Source: GDB

*Source of Repayment.* The principal source of payment for Municipal General Obligations is the Special Additional Tax, which, as provided by the Municipal Tax Act, may be imposed by a municipality without limitation as to rate or amount on all taxable real and personal property within a municipality. Under the Municipal Financing Act, each municipality is required to levy the Special Additional Tax in such amounts as will be required for the payment of all its outstanding Municipal General Obligations. The Special Additional Tax rates for municipalities for fiscal year 2019 vary from 1.2% to 5.5% of the applicable assessed valuation in the case of real property and from 1.0% to 4.9% of the applicable assessed valuation in the case of personal property. Real property taxes in the Commonwealth are assessed based on fiscal year 1957-1958 property values, since no real property reassessment has been made since then. Construction taking place after fiscal year 1957-1958 has been assessed on the basis of what the value of the property would have been in fiscal year 1957-1958.

Real property taxes are payable semi-annually on January 1 and July 1 of each year and personal property taxes are payable annually on May 1 of each year. Certain specific discounts are established by law in both cases to incentivize early or prompt payment. *Ad valorem* taxes on real and personal property, including the Special Additional Tax, are generally collected on behalf of the municipalities by CRIM. Act No. 77-2017, however, granted municipalities the authority to collect property taxes directly and to take any action to embargo or foreclose on taxpayer property with prior notice to CRIM. Prior to such amendment, certain municipalities were authorized to take such actions pursuant to various agreements between CRIM and such municipalities, which require that any funds collected by the municipality be deposited with CRIM. Although the recent amendment also provides that funds collected by the municipalities must be deposited with CRIM, CRIM has yet to approve the regulation that would provide for the enforcement of these provisions. Approximately 97% of all property taxes collected during fiscal year 2017 were collected by CRIM and approximately 3% were collected by the municipalities pursuant to the aforementioned agreements with CRIM. However, a greater percentage of property taxes may be collected by municipalities in subsequent fiscal years as a result of the enactment of Act No. 77-2017 and upon CRIM's approval of the corresponding regulation. For additional information regarding municipal property taxes see, *"Municipalities— Municipal Revenues—Major Categories of Revenue—Municipal Property Taxes"* in this Offering Memorandum.

The proceeds of the Special Additional Tax are required by law to be deposited in the GO Redemption Fund and used for the payment of Municipal General Obligations. To the extent that the funds in a municipality's GO Redemption Fund exceed the amount necessary to cover 12 months' debt service on such municipality's then outstanding Municipal General Obligations, as determined by AAFAF, and to pay such municipality's statutory debts (certain debts with Commonwealth government entities and public corporations), the Municipal Financing Act requires the disbursement of such excess to the municipality, at its request, once during each fiscal year. Such excess is generally referred to as "Excess CAE." The Municipal General Obligations that are part of the Restructuring Property consist of long-term Loans provided by GDB with level debt service payments that amortize such Loans through their maturity date. Certain municipalities, however, have outstanding Municipal General Obligations with private financial institutions with shorter maturities and whose amortization schedules include bullet maturities or balloon payments ("Balloon Payments"). In calculating the 12 months' debt service reserve for purposes of disbursing Excess CAE, AAFAF assumes the refinancing of such Loans on or before the due date of any Balloon Payments and, therefore, assumes a long-term straight line amortization based on the contractual principal and interest payments, but amortizing any Balloon Payments. Hence, if a municipality is unable to refinance any scheduled Balloon Payments under similar repayment terms, the 12 months' debt service reserve may not be sufficient to cover in full the next payments of principal and interest due on such municipality's Municipal General Obligations. For a discussion of the risks related to the Balloon Payments on the municipalities' Loans with private financial institutions, see *"Risk Factors—Risks Related to the Restructuring Property—General Risks Related to the Restructuring Property—Certain assets that constitute the Restructuring Property share their source of repayment*

DRA Ex. 225

*with Loans made by private financial institutions with different repayment terms than those contained by the Restructuring Property and may result in reductions to Collections on the Restructuring Property."*

Prior to the enactment of the GDB Restructuring Act, the Municipal Financing Act provided that the GO Redemption Fund would constitute a trust established by CRIM with GDB. Until 2015, the entire GO Redemption Fund was deposited with GDB. In June 2015, CRIM filed a mandamus action against GDB in the Court of First Instance, San Juan Part, requesting that GDB execute a deed of trust with respect to the GO Redemption Fund. CRIM and GDB settled such case and executed the corresponding deed of trust in November 2015. Pursuant to such deed of trust, the GO Redemption Fund was divided into two separate sub-funds, one of which would be invested in GDB deposits and used for the payment of Municipal General Obligations held by GDB, and the other one would be invested in certain qualified instruments and used for the payment of Municipal General Obligations held by private financial institutions and MFA (known as the "Private Sub-Fund"). The Private Sub-Fund was, and continues to be as of the Cutoff Date, invested in deposits with BPPR. This structure was in place until April 2016, when, upon the imposition of restrictions on the withdrawal of funds on deposit with GDB, no additional Special Additional Tax revenues were transferred to GDB. Thereafter, all Special Additional Tax revenues have been deposited by CRIM at BPPR and have been kept in two accounts as follows: (i) in the Private Sub-Fund, an amount based on the debt service payable on the Municipal General Obligations held by private financial institutions and MFA and (ii) in a separate account at BPPR, an amount based on the debt service payable on the Municipal General Obligations held by GDB.

As of the Cutoff Date, of the approximately $563.9 million in the GO Redemption Fund, approximately $238.5 million is on deposit with GDB and approximately $325.4 million is on deposit with BPPR. However, as recognized by the GDB Restructuring Act and the Qualifying Modification, funds on deposit with GDB are no longer considered available for the payment of Municipal General Obligations or otherwise available to the municipalities given GDB's current financial situation and the applicable restrictions on withdrawals of GDB deposits. Approximately $39.3 million of the GO Redemption Fund monies on deposit with GDB correspond to proceeds of the Special Additional Tax that were certified by GDB as Excess CAE of certain municipalities in fiscal years 2015 through 2017 ("2015-17 Excess CAE"). Pursuant to the GDB Restructuring Act, 55% of such 2015-17 Excess CAE, or approximately $21.6 million, has been or will be disbursed to the corresponding municipalities on or prior to the Closing Date, and the remaining 45% of the 2015-17 Excess CAE, or approximately $17.7 million, will be discharged. Of the total amounts required to be disbursed to municipalities in satisfaction of their 2015-17 Excess CAE, approximately $2.5 million remains to be disbursed as of the date of this Offering Memorandum (the "2015-17 Excess CAE Settlement Amount").

The GDB Restructuring Act amended the Municipal Financing Act to, among other things, replace GDB with the "Designated Trustee," as trustee of the GO Redemption Fund. As amended, the Municipal Financing Act provides that the "Designated Trustee" will be AAFAF or one or more private financial institutions designated by AAFAF. AAFAF has recently assumed such responsibility, and AAFAF and CRIM are expected to execute a new deed of trust in respect of the municipal funds collected by CRIM. On and after the Closing Date, the GO Redemption Fund is expected to consist of one account to be held at a private financial institution, with separate accounting within such account for each municipality.

*Security*. The Municipal Financing Act provides for a first lien in respect of Municipal General Obligations that operates as follows: (i) the Special Additional Tax is collected and transferred to the GO Redemption Fund, (ii) to the extent that a municipality's funds in the GO Redemption Fund are insufficient to satisfy the payment in full of such municipality's Municipal General Obligations, as determined by the Designated Trustee, CRIM will deposit in the GO Redemption Fund other revenues subject to the first lien to cover such insufficiency, and (iii) the Designated Trustee will use the funds in the GO Redemption Fund to pay, on behalf of the municipality, the principal and interest on such municipality's Municipal General Obligations. The Municipal Financing Act provides that the Special Additional Tax and other amounts deposited in the GO Redemption Fund are to be utilized first for the payment of the principal of and premium, if any, and interest on each municipality's Municipal General Obligations. The nature of the lien provided for in the Municipal Financing Act, however, has recently been subject to challenge. For further information regarding such challenge, see *"Risk Factors — Risks Related to the Restructuring Property—General Risks Related to the Restructuring Property—The statutory provisions purporting to secure, dedicate or pledge the revenue streams benefiting the Loans that constitute Restructuring Property are untested and may prove to be ineffective in bankruptcy or otherwise."*

*Flow of Funds*. The following diagram illustrates the flow of funds for the payment of Municipal General Obligations. For a description of the flow of funds under the Bond Indenture after deposit in the Collection Account, see *"Summary of Distributions of Cash from the Collection Account"* in this Offering Memorandum.

DRA Ex. 225



---

(1) Municipalities are authorized to collect property taxes directly pursuant to individual agreements with CRIM and will be able to collect property taxes pursuant to certain amendments introduced by Act No. 77-2017 upon approval of regulation to that effect by CRIM.

(2) As further discussed under "*Municipalities*" in this Offering Memorandum, municipalities receive certain appropriations from the Commonwealth's general fund that are distributed by the Commonwealth to CRIM and by CRIM to the applicable municipalities.

(3) Pursuant to the Municipal Financing Act, the Designated Trustee will request that CRIM transfer additional property tax revenues of a municipality to the extent that the funds in the GO Redemption Fund corresponding to such municipality are insufficient for the payment of its Municipal General Obligations. See "*Municipalities*" in this Offering Memorandum for information regarding the Matching Fund.

(4) Pursuant to the Municipal Financing Act, municipalities may request the disbursement of funds in the GO Redemption Fund in excess of the required 12-month reserve one time during each fiscal year.

DRA Ex. 225

*Estimated Fiscal Year 2018 Debt Service Coverage*. The following table presents for each municipality a debt service coverage ratio analysis based on (i) the aggregate contractual debt service due on all outstanding Municipal General Obligations of such municipality on January 1, 2018 and July 1, 2018, (ii) the aggregate debt service due on all outstanding Municipal General Obligations of such municipality on January 1, 2018 and July 1, 2018 assuming a long-term straight line amortization (based on the contractual principal and interest payments, but amortizing any Balloon Payments), (iii) the funds of each municipality on deposit in the GO Redemption Fund as of July 1, 2017 (excluding amounts attributable to the former GO Redemption Fund held at GDB as of such date) after the payment of the Municipal General Obligation debt service due on such date, and (iv) the preliminary estimates of Special Additional Tax collections of such municipality during fiscal year 2018.

Column A of the table below reflects that certain municipalities had negative balances in the GO Redemption Fund as of July 1, 2017 after the payment of the Municipal General Obligation debt service due on such date. Such negative balances were primarily due to (i) the exclusion of GO Redemption Fund monies on deposit with GDB (due to the applicable restrictions on the withdrawal of such deposits imposed in April 2016) and (ii) differing timing of inflows and outflows from the GO Redemption Fund. However, most municipalities made the debt service payments due on July 1, 2017 in full on such date and the remaining municipalities made such payments pursuant to three-month payment plans agreed upon by GDB. The July 1, 2017 payments on Municipal General Obligations were made in full, notwithstanding that certain municipalities did not have sufficient funds in the GO Redemption Fund account at BPPR as of such date to pay the full amount of principal and interest due on their Municipal General Obligations on such date, because the aggregate balance in the GO Redemption Fund account at BPPR as of July 1, 2017 was sufficient to pay the debt service due on such date on all municipalities' outstanding Municipal General Obligations. This resulted in various municipalities having negatives balances in the GO Redemption Fund following the July 1, 2017 payments (*i.e.*, the municipalities that did not have sufficient funds deposited in the GO Redemption Fund as of July 1, 2017 to cover in full the payments due on such date). Such deficits were subsequently replenished from Special Additional Tax collections of the corresponding municipality during fiscal year 2018.

The municipalities of Bayamón, Caguas, Carolina and Fajardo had Balloon Payments due on July 1, 2018 on their Municipal General Obligations with private financial institutions. As reflected in column H of the table below, such municipalities' starting balances in the GO Redemption Fund in fiscal year 2018, combined with their estimated Special Additional Tax collections during fiscal year 2018, were not sufficient to pay all contractual debt service (including the Balloon Payments) due by each municipality on January 1, 2018 and July 1, 2018. However, such Balloon Payments are in the process of being refinanced and, in certain cases, their maturity dates were extended for a short period pending such refinancing.

For a discussion of the risks related to the Balloon Payments on municipal Loans held by private financial institutions with respect to the Municipal Loan Assets, see "*Risk Factors–Risks Related to the Restructuring Property–Certain assets that constitute the Restructuring Property share their source of repayment with Loans made by private financial institutions with different repayment terms than those contained by the Restructuring Property and may result in reductions to Collections on the Restructuring Property*."

A debt service coverage ratio of less than 1 in column I of the table below reflects that the starting balance of a municipality in the GO Redemption Fund in fiscal year 2018, combined with the estimated Special Additional Tax collections of such municipality during fiscal year 2018, was not sufficient to cover all debt service due on January 1, 2018 and July 1, 2018 on such municipality's Municipal General Obligations, excluding Balloon Payments due on July 1, 2018. Even though column I reflects a debt service coverage ratio of less than 1 for certain municipalities, all municipalities made the required debt service payments (excluding Balloon Payments) in full on their due dates. In certain cases, the municipality had sufficient funds on deposit in the GO Redemption Fund at BPPR to cover in full the debt service due on such date (due primarily to funds deposited in the GO Redemption Fund during fiscal year 2017 corresponding to Special Additional Taxes levied in fiscal year 2017 and thus not reflected in the table below). In other cases, the municipalities completed such payments with an extraordinary aggregate disbursement of approximately $5.2 million from such municipalities' deposits with GDB. As discussed above, other property tax revenues of a municipality are also available to pay its Municipal General Obligations to the extent that the municipality's funds in the GO Redemption Fund and Special Additional Tax collections are insufficient. However, such application was not requested in order to allow municipalities to continue to use such funds to provide essential services to their residents.

The estimated Special Additional Tax collections for each municipality shown below are preliminary and subject to change. Actual Special Additional Tax collections for each municipality during fiscal year 2018 are not yet available. Furthermore, there is no assurance that actual Special Additional Tax collections in fiscal year 2019 and subsequent fiscal years will be similar to those shown below, as Special Additional Tax collections may be adversely impacted by a number of factors, including factors related to the impact of Hurricanes Irma and María. For additional information on the risks relating to general economic conditions and the effect of Hurricanes Irma and María on the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property*."

114

DRA Ex. 225

2018 Debt Service Coverage
Municipal General Obligations

| | A | B | C = (A+B) | D | E | F=B/D | G=C/D | H=B/E | I=C/E |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Debt Service Coverage Ratio based on Contractual Debt Service | | Debt Service Coverage Ratio based on Debt Service Excluding Balloon Payments | |
| Municipality | Starting Balance in GO Redemption Fund (1) | Special Additional Tax (CAE) Collections (2) | GO Redemption Fund Starting Balance and CAE Collections (3) | Contractual Debt Service (4) | Debt Service Excluding Balloon Payments (5) | CAE Collections | GO Redemption Fund Starting Balance and CAE Collections | CAE Collections | GO Redemption Fund Starting Balance and CAE Collections |
| Adjuntas | $19,094 | $198,941 | $218,035 | $112,584 | $112,584 | 1.77 | 1.94 | 1.77 | 1.94 |
| Aguada | 274,177 | $984,329 | 1,258,506 | 1,207,902 | 1,207,902 | 0.81 | 1.04 | 0.81 | 1.04 |
| Aguadilla | 184,490 | $4,107,701 | 4,292,191 | 4,927,798 | 4,927,798 | 0.83 | 0.87 | 0.83 | 0.87 |
| Aguas Buenas | 327,862 | $691,177 | 1,019,038 | 357,345 | 357,345 | 1.93 | 2.85 | 1.93 | 2.85 |
| Aibonito | 101,099 | $353,056 | 454,156 | 418,250 | 418,250 | 0.84 | 1.09 | 0.84 | 1.09 |
| Añasco | 638,020 | $1,295,095 | 1,933,115 | 793,661 | 793,661 | 1.63 | 2.44 | 1.63 | 2.44 |
| Arecibo | 1,290,540 | $5,493,976 | 6,784,516 | 5,780,806 | 5,780,806 | 0.95 | 1.17 | 0.95 | 1.17 |
| Arroyo | 335,775 | $650,805 | 986,580 | 591,330 | 591,330 | 1.10 | 1.67 | 1.10 | 1.67 |
| Barceloneta | 1,131,217 | $4,176,364 | 5,307,581 | 3,674,509 | 3,674,509 | 1.14 | 1.44 | 1.14 | 1.44 |
| Barranquitas | (204,162) | $480,416 | 276,253 | 549,102 | 549,102 | 0.87 | 0.50 | 0.87 | 0.50 |
| Bayamón | 2,350,190 | $21,567,283 | 23,917,473 | 11,491,820 | 22,715,868 | 0.42 | 0.46 | 0.95 | 1.05 |
| Cabo Rojo | 764,445 | $3,612,014 | 4,376,459 | 3,023,658 | 3,023,658 | 1.19 | 1.45 | 1.19 | 1.45 |
| Caguas | 1,727,882 | $15,394,488 | 17,122,370 | 29,720,105 | 16,423,488 | 0.52 | 0.58 | 0.94 | 1.04 |
| Camuy | 211,429 | $898,169 | 1,109,597 | 748,583 | 748,583 | 1.20 | 1.48 | 1.20 | 1.48 |
| Canóvanas | 542,671 | $3,252,318 | 3,794,988 | 3,000,921 | 3,000,921 | 1.08 | 1.26 | 1.08 | 1.26 |
| Carolina | (5,718,069) | $29,078,096 | 23,360,027 | 32,890,545 | 28,180,545 | 0.88 | 0.71 | 1.03 | 0.83 |
| Cataño | 485,719 | $7,803,128 | 8,288,847 | 5,036,416 | 5,036,416 | 1.55 | 1.65 | 1.55 | 1.65 |
| Cayey | 1,385,240 | $5,478,851 | 6,864,090 | 4,801,341 | 4,801,341 | 1.14 | 1.43 | 1.14 | 1.43 |
| Ceiba | 100,054 | $432,909 | 532,963 | 382,310 | 382,310 | 1.13 | 1.39 | 1.13 | 1.39 |
| Ciales | 243,523 | $437,924 | 681,446 | 415,160 | 415,160 | 1.05 | 1.64 | 1.05 | 1.64 |
| Cidra | 864,807 | $2,791,500 | 3,656,307 | 2,739,387 | 2,739,387 | 1.02 | 1.33 | 1.02 | 1.33 |
| Coamo | 210,922 | $1,279,139 | 1,490,061 | 1,036,485 | 1,036,485 | 1.23 | 1.44 | 1.23 | 1.44 |
| Comerío | 120,075 | $237,185 | 357,259 | 265,201 | 265,201 | 0.89 | 1.35 | 0.89 | 1.35 |
| Corozal | 481,406 | $793,018 | 1,274,424 | 721,287 | 721,287 | 1.10 | 1.77 | 1.10 | 1.77 |
| Culebra | 10,369 | $168,255 | 178,624 | 34,762 | 34,762 | 4.84 | 5.14 | 4.84 | 5.14 |
| Dorado | 1,294,306 | $6,440,191 | 7,734,496 | 6,459,393 | 6,459,393 | 1.00 | 1.20 | 1.00 | 1.20 |
| Fajardo | 659,478 | $4,097,555 | 4,757,033 | 16,644,766 | 3,234,766 | 0.25 | 0.29 | 1.27 | 1.47 |
| Florida | 16,407 | $237,592 | 253,999 | 46,254 | 46,254 | 5.14 | 5.49 | 5.14 | 5.49 |
| Guánica | 136,998 | $673,845 | 810,842 | 586,586 | 586,586 | 1.15 | 1.38 | 1.15 | 1.38 |
| Guayama | 179,979 | $4,312,287 | 4,492,266 | 4,569,524 | 4,569,524 | 0.94 | 0.98 | 0.94 | 0.98 |
| Guayanilla | 16,015 | $569,356 | 585,371 | 824,059 | 824,059 | 0.69 | 0.71 | 0.69 | 0.71 |
| Guaynabo | 152,565 | $26,767,829 | 26,920,395 | 29,046,276 | 29,046,276 | 0.92 | 0.93 | 0.92 | 0.93 |
| Gurabo | 895,255 | $4,600,128 | 5,495,383 | 3,149,369 | 3,149,369 | 1.46 | 1.74 | 1.46 | 1.74 |
| Hatillo | 791,428 | $3,316,506 | 4,107,934 | 1,233,820 | 1,233,820 | 2.69 | 3.33 | 2.69 | 3.33 |
| Hormigueros | 536,592 | $1,176,078 | 1,712,670 | 931,434 | 931,434 | 1.26 | 1.84 | 1.26 | 1.84 |
| Humacao | 542,821 | $4,424,042 | 4,966,863 | 4,702,880 | 4,702,880 | 0.94 | 1.06 | 0.94 | 1.06 |
| Isabela | 1,118,482 | $1,920,874 | 3,039,356 | 944,344 | 944,344 | 2.03 | 3.22 | 2.03 | 3.22 |
| Jayuya | 172,577 | $186,182 | 358,758 | 144,799 | 144,799 | 1.29 | 2.48 | 1.29 | 2.48 |
| Juana Díaz | 474,692 | $1,409,548 | 1,884,240 | 1,187,376 | 1,187,376 | 1.19 | 1.59 | 1.19 | 1.59 |
| Juncos | 327,571 | $2,210,516 | 2,538,087 | 2,683,861 | 2,683,861 | 0.82 | 0.95 | 0.82 | 0.95 |
| Lajas | 249,817 | $1,022,976 | 1,272,794 | 701,968 | 701,968 | 1.46 | 1.81 | 1.46 | 1.81 |
| Lares | 29,546 | $751,581 | 781,128 | 307,650 | 307,650 | 2.44 | 2.54 | 2.44 | 2.54 |
| Las Marías | 97,079 | $82,504 | 179,583 | 91,778 | 91,778 | 0.90 | 1.96 | 0.90 | 1.96 |
| Las Piedras | 193,976 | $1,863,379 | 2,057,354 | 1,750,315 | 1,750,315 | 1.06 | 1.18 | 1.06 | 1.18 |
| Loíza | 163,972 | $845,635 | 1,009,607 | 673,427 | 673,427 | 1.26 | 1.50 | 1.26 | 1.50 |
| Luquillo | 201,766 | $1,066,568 | 1,268,334 | 805,670 | 805,670 | 1.32 | 1.57 | 1.32 | 1.57 |
| Manatí | 1,113,022 | $3,137,013 | 4,250,035 | 3,719,061 | 3,719,061 | 0.84 | 1.14 | 0.84 | 1.14 |
| Maricao | (134,607) | $115,627 | (18,980) | 285,196 | 285,196 | 0.41 | (0.07) | 0.41 | (0.07) |
| Maunabo | 89,899 | $248,421 | 338,320 | 310,527 | 310,527 | 0.80 | 1.09 | 0.80 | 1.09 |
| Mayagüez | 3,937,612 | $11,627,717 | 15,565,329 | 10,161,081 | 10,161,081 | 1.14 | 1.53 | 1.14 | 1.53 |
| Moca | (110,563) | $900,316 | 789,753 | 893,275 | 893,275 | 1.01 | 0.88 | 1.01 | 0.88 |
| Morovis | 304,435 | $701,964 | 1,006,399 | 666,149 | 666,149 | 1.05 | 1.51 | 1.05 | 1.51 |
| Naguabo | 237,459 | $743,947 | 981,406 | 446,835 | 446,835 | 1.66 | 2.20 | 1.66 | 2.20 |
| Naranjito | 36,921 | $778,305 | 815,225 | 882,456 | 882,456 | 0.88 | 0.92 | 0.88 | 0.92 |
| Orocovis | 127,181 | $194,476 | 321,656 | 175,295 | 175,295 | 1.11 | 1.83 | 1.11 | 1.83 |
| Patillas | 184,351 | $529,830 | 714,181 | 524,746 | 524,746 | 1.01 | 1.36 | 1.01 | 1.36 |
| Peñuelas | (528,481) | $898,780 | 370,299 | 1,214,472 | 1,214,472 | 0.74 | 0.30 | 0.74 | 0.30 |
| Ponce | 3,276,284 | $17,002,142 | 20,278,426 | 13,765,390 | 13,765,390 | 1.24 | 1.47 | 1.24 | 1.47 |
| Quebradillas | 65,698 | $510,154 | 575,852 | 440,860 | 440,860 | 1.16 | 1.31 | 1.16 | 1.31 |
| Rincón | 175,028 | $703,974 | 879,002 | 654,132 | 654,132 | 1.08 | 1.34 | 1.08 | 1.34 |
| Río Grande | 597,020 | $3,770,036 | 4,367,057 | 2,376,799 | 2,376,799 | 1.59 | 1.84 | 1.59 | 1.84 |
| Sabana Grande | 58,074 | $603,909 | 661,982 | 788,467 | 788,467 | 0.77 | 0.84 | 0.77 | 0.84 |
| Salinas | 231,127 | $1,008,636 | 1,239,764 | 1,047,695 | 1,047,695 | 0.96 | 1.18 | 0.96 | 1.18 |
| San Germán | 779,671 | $1,727,408 | 2,507,078 | 1,448,770 | 1,448,770 | 1.19 | 1.73 | 1.19 | 1.73 |
| San Juan | 11,569,757 | $79,408,306 | 90,978,064 | 68,353,422 | 68,353,422 | 1.16 | 1.33 | 1.16 | 1.33 |
| San Lorenzo | 406,069 | $1,707,572 | 2,113,641 | 1,820,995 | 1,820,995 | 0.94 | 1.16 | 0.94 | 1.16 |
| San Sebastián | 461,986 | $1,317,117 | 1,779,103 | 1,424,104 | 1,424,104 | 0.92 | 1.25 | 0.92 | 1.25 |
| Santa Isabel | 123,615 | $1,645,935 | 1,769,550 | 1,546,313 | 1,546,313 | 1.06 | 1.14 | 1.06 | 1.14 |
| Toa Alta | 1,563,082 | $3,178,298 | 4,741,380 | 2,464,685 | 2,464,685 | 1.29 | 1.92 | 1.29 | 1.92 |
| Toa Baja | 2,496,121 | $9,280,160 | 11,776,281 | 10,287,447 | 10,287,447 | 0.90 | 1.14 | 0.90 | 1.14 |
| Trujillo Alto | 1,356,230 | $4,575,064 | 5,931,294 | 4,551,701 | 4,551,701 | 1.01 | 1.30 | 1.01 | 1.30 |
| Utuado | 279,963 | $499,017 | 778,980 | 293,224 | 293,224 | 1.70 | 2.66 | 1.70 | 2.66 |
| Vega Alta | (193,540) | $1,627,037 | 1,433,497 | 2,089,857 | 2,089,857 | 0.78 | 0.69 | 0.78 | 0.69 |
| Vega Baja | 1,270,884 | $3,467,570 | 4,738,454 | 3,860,459 | 3,860,459 | 0.90 | 1.23 | 0.90 | 1.23 |
| Vieques | 134,604 | $594,042 | 728,646 | 486,246 | 486,246 | 1.22 | 1.50 | 1.22 | 1.50 |
| Villalba | 245,109 | $426,341 | 671,451 | 310,225 | 310,225 | 1.37 | 2.16 | 1.37 | 2.16 |

DRA Ex. 225

2018 Debt Service Coverage
Municipal General Obligations

| | A | B | C = (A+B) | D | E | F=B/D | G=C/D | H=B/E | I=C/E |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Debt Service Coverage Ratio based on Contractual Debt Service | | Debt Service Coverage Ratio based on Debt Service Excluding Balloon Payments | |
| Municipality | Starting Balance in GO Redemption Fund Collections [1] | Special Additional Tax (CAE) Collections [2] | GO Redemption Fund Starting Balance and CAE Collections [3] | Contractual Debt Service [4] | Debt Service Excluding Balloon Payments [5] | CAE Collections | GO Redemption Fund Starting Balance and CAE Collections | CAE Collections | GO Redemption Fund Starting Balance and CAE Collections |
| Yabucoa | 521,697 | $1,110,274 | 1,631,971 | 1,309,963 | 1,309,963 | 0.85 | 1.25 | 0.85 | 1.25 |
| Yauco | 781,995 | $2,074,190 | 2,856,185 | 2,285,385 | 2,285,385 | 0.91 | 1.25 | 0.91 | 1.25 |
| Total | $47,587,796 | $335,744,886 | $383,332,682 | $373,092,048 | $312,899,480 | 0.90 | 1.03 | 1.07 | 1.22 |

1) Represents the funds on deposit in the GO Redemption Fund at BPPR as of July 1, 2017 after the payment of the debt service on Municipal General Obligations (including the Municipal General Obligations held by GDB, private financial institutions and MFA) due on such date. Excludes funds in the GO Redemption Fund on deposit with GDB.

2) Represents the estimated Special Additional Tax collections of each municipality during fiscal year 2018. Estimates are based on actual property tax collections in fiscal year 2018, but the allocation of the Special Additional Tax collections among the municipalities is estimated based on historical trends. As a result, the estimates included herein are preliminary and subject to change. Furthermore, the amounts included in this column do not represent the amounts deposited in the GO Redemption Fund for each municipality during fiscal year 2018. Actual deposits in the GO Redemption Fund for each municipality may be greater or lower than those shown in this column.

3) Represents (a) funds on deposit in the GO Redemption Fund at BPPR as of July 1, 2017 after the payment of the debt service on Municipal General Obligations (including the Municipal General Obligations held by GDB, private financial institutions and MFA) due on such date and (b) estimated Special Additional Tax collections of each municipality during fiscal year 2018 (preliminary and subject to change).

4) Represents aggregate contractual debt service payments due on each municipality's outstanding Municipal General Obligations (including the Municipal General Obligations held by GDB, private financial institutions and MFA) on January 1, 2018 and July 1, 2018, including any Balloon Payments. Not affected by the Closing Date Adjustments.

5) Represents aggregate debt service payments due on each municipality's outstanding Municipal General Obligations (including the Municipal General Obligations held by GDB, private financial institutions and MFA) on January 1, 2018 and July 1, 2018 assuming a long-term straight line amortization (based on the contractual principal and interest payments, but amortizing any Balloon Payments). Not affected by the Closing Date Adjustments.

Sources: GDB and CRIM

*Ability of Municipalities to Issue Municipal General Obligations.* Prior to approving any proposed issue of Municipal General Obligations, AAFAF (previously, GDB) is required to verify that the municipality has GO Available Legal Margin and GO Payment Capacity (as such terms are defined herein) to incur such additional Municipal General Obligations. As provided by the Commonwealth Constitution, the Legislative Assembly has fixed a limitation for the issuance of municipal obligations for the payment of which the good faith, credit and taxing power of each municipality may be pledged. The principal amount outstanding of any such Municipal General Obligations may not exceed 10% of the aggregate assessed valuation of the taxable property within such municipality (the "GO Legal Margin," and the amount by which such municipality's GO Legal Margin exceeds a municipality's outstanding Municipal General Obligations, the "GO Available Legal Margin"). The Municipal Financing Act provides that, in calculating the GO Available Legal Margin of a municipality, the amount of outstanding Municipal General Obligations of such municipality is reduced by the amount of the excess, if any, of the funds deposited in such municipality's GO Redemption Fund over the amount of accrued but unpaid interest on such general obligation debt.

The Municipal Financing Act also requires that in order for a municipality to issue additional Municipal General Obligations, such municipality must have sufficient "payment capacity." The Municipal Financing Act provides that a municipality has sufficient "payment capacity" to incur additional Municipal General Obligations if available funds of such municipality in the GO Redemption Fund that are available for the payment of its Municipal General Obligations, and the annual amounts collected with respect to such municipality's Special Additional Tax, as projected by AAFAF (previously, GDB), will be sufficient to service to maturity the municipality's outstanding Municipal General Obligations and the additional proposed Municipal General Obligations ("GO Payment Capacity"). In calculating the GO Payment Capacity, AAFAF assumes the refinancing of the Municipal General Obligations that certain municipalities have with private financial institutions that include Balloon Payments prior to the due date of such Balloon Payments, and, therefore, assumes a long-term straight line amortization (based on the contractual principal and interest payments, but amortizing any Balloon Payments). Hence, even if a municipality is determined to have sufficient GO Payment Capacity to incur Municipal General Obligations, it may not be able to cover scheduled debt service payments due on all of its outstanding Municipal General Obligations if, among other things, it is not able to refinance Balloon Payments under similar repayment terms.

As discussed above, a portion of the GO Redemption Fund (consisting of approximately $238.5 million) was deposited with GDB and is subject to the GDB Restructuring Act and the Qualifying Modification. Given the applicable restrictions on the withdrawal of GDB deposits, such deposits have not been included for purposes of the calculation of the GO Legal Margin and the GO Payment Capacity since 2017.

### Sales Tax Obligations

*General.* The Sales Tax Obligations are special obligation Loans of a municipality evidenced by bonds or notes payable from a portion of the Commonwealth's sales and use tax revenues (the "Commonwealth SUT") allocated by law to municipalities. The Sales

116

DRA Ex. 225

Tax Obligations are issued pursuant to the Municipal Financing Act and the FAM Act. The good faith, credit and taxing power of the municipalities are not pledged for the payment of Sales Tax Obligations.

Interest on the Sales Tax Obligations is payable semi-annually on January 1 and July 1 of each year, and principal is payable annually on July 1 of each year. The Sales Tax Obligations bear interest at variable rates based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12% and an interest rate floor (ranging from 2.59% to 6%).

The following table shows the Sales Tax Obligations that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments and considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day from the Cutoff Date:

**Sales Tax Obligations**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principle Balance of Sales Tax Obligations |
|---|---|---|---|---|---|
| Adjuntas | $5,431,735 | 2 | 5.1% | 7/1/2034 | 1.7% |
| Aguadilla | 5,202,536 | 2 | 3.6% | 7/1/2032 | 1.7% |
| Aguas Buenas | 2,923,137 | 1 | 6.3% | 7/1/2034 | 0.9% |
| Aibonito | 3,657,224 | 2 | 5.0% | 7/1/2034 | 1.2% |
| Añasco | 1,129,097 | 2 | 3.6% | 7/1/2033 | 0.4% |
| Arecibo | 6,483,921 | 4 | 6.3% | 7/1/2036 | 2.1% |
| Arroyo | 4,184,827 | 2 | 4.1% | 7/1/2033 | 1.3% |
| Barceloneta | 4,715,225 | 4 | 4.7% | 7/1/2035 | 1.5% |
| Barranquitas | 1,341,654 | 1 | 3.6% | 7/1/2028 | 0.4% |
| Bayamón | 22,807,997 | 3 | 4.5% | 7/1/2035 | 7.3% |
| Cabo Rojo | 5,206,271 | 2 | 6.3% | 7/1/2030 | 1.7% |
| Caguas | 15,821,556 | 5 | 5.1% | 7/1/2036 | 5.0% |
| Camuy | 3,047,030 | 2 | 4.1% | 7/1/2035 | 1.0% |
| Cataño | 1,966,170 | 1 | 6.3% | 7/1/2034 | 0.6% |
| Cayey | 2,155,024 | 1 | 6.3% | 7/1/2023 | 0.7% |
| Ceiba | 1,542,779 | 2 | 6.3% | 7/1/2038 | 0.5% |
| Ciales | 3,610,558 | 3 | 5.9% | 7/1/2032 | 1.2% |
| Cidra | 2,791,688 | 2 | 4.3% | 7/1/2034 | 0.9% |
| Coamo | 3,948,534 | 7 | 5.1% | 7/1/2035 | 1.3% |
| Comerío | 2,128,745 | 1 | 3.6% | 7/1/2027 | 0.7% |
| Corozal | 3,643,012 | 3 | 6.3% | 7/1/2035 | 1.2% |
| Culebra | 419,857 | 1 | 3.6% | 7/1/2024 | 0.1% |
| Dorado | 2,949,490 | 2 | 3.6% | 7/1/2032 | 0.9% |
| Florida | 2,654,666 | 1 | 6.3% | 7/1/2036 | 0.8% |
| Guánica | 2,482,849 | 3 | 4.6% | 7/1/2032 | 0.8% |
| Guayanilla | 4,778,420 | 3 | 5.0% | 7/1/2035 | 1.5% |
| Guaynabo | 21,547,494 | 1 | 3.6% | 7/1/2031 | 6.9% |
| Gurabo | 12,739 | 1 | 6.3% | 7/1/2019 | 0.0% |
| Hormigueros | 1,114,989 | 2 | 5.4% | 7/1/2030 | 0.4% |
| Isabela | 1,507,651 | 1 | 6.3% | 7/1/2030 | 0.5% |
| Jayuya | 5,516,757 | 3 | 5.0% | 7/1/2035 | 1.8% |
| Juana Díaz | 4,803,951 | 4 | 4.6% | 7/1/2035 | 1.5% |
| Juncos | 2,692,874 | 5 | 6.3% | 7/1/2036 | 0.9% |
| Lajas | 2,992,147 | 2 | 4.7% | 7/1/2034 | 1.0% |
| Las Marías | 3,523,455 | 4 | 3.9% | 7/1/2035 | 1.1% |
| Las Piedras | 3,570,981 | 3 | 5.2% | 7/1/2035 | 1.1% |
| Loíza | 315,980 | 1 | 6.3% | 7/1/2030 | 0.1% |
| Luquillo | 1,186,758 | 1 | 3.6% | 7/1/2027 | 0.4% |
| Manatí | 6,486,126 | 3 | 4.2% | 7/1/2032 | 2.1% |
| Maricao | 4,862,847 | 3 | 5.4% | 7/1/2035 | 1.6% |
| Maunabo | 6,398,824 | 5 | 4.7% | 7/1/2037 | 2.0% |
| Moca | 3,777,285 | 3 | 6.3% | 7/1/2033 | 1.2% |
| Morovis | 5,812,555 | 3 | 5.1% | 7/1/2035 | 1.9% |
| Naguabo | 1,525,294 | 1 | 6.3% | 7/1/2028 | 0.5% |
| Naranjito | 4,379,120 | 3 | 5.0% | 7/1/2036 | 1.4% |
| Orocovis | 1,619,546 | 3 | 6.3% | 7/1/2026 | 0.5% |
| Patillas | 5,083,768 | 3 | 5.2% | 7/1/2035 | 1.6% |
| Peñuelas | 4,554,611 | 3 | 4.6% | 7/1/2035 | 1.5% |

117

DRA Ex. 225

**Sales Tax Obligations**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principle Balance of Sales Tax Obligations |
|---|---|---|---|---|---|
| Ponce | 11,490,616 | 1 | 3.6% | 7/1/2028 | 3.7% |
| Quebradillas | 1,403,857 | 1 | 6.3% | 7/1/2029 | 0.4% |
| Río Grande | 3,600,286 | 2 | 6.3% | 7/1/2032 | 1.1% |
| Sabana Grande | 38,652 | 1 | 6.3% | 7/1/2019 | 0.0% |
| Salinas | 4,236,608 | 3 | 6.3% | 7/1/2036 | 1.4% |
| San Germán | 668,064 | 1 | 3.6% | 7/1/2031 | 0.2% |
| San Juan | 34,830,374 | 2 | 4.2% | 7/1/2032 | 11.1% |
| San Lorenzo | 4,112,791 | 3 | 5.8% | 7/1/2037 | 1.3% |
| San Sebastián | 5,571,053 | 3 | 5.0% | 7/1/2032 | 1.8% |
| Santa Isabel | 5,365,463 | 2 | 4.5% | 7/1/2033 | 1.7% |
| Toa Alta | 808,064 | 1 | 6.3% | 7/1/2029 | 0.3% |
| Toa Baja | 2,837,599 | 1 | 6.3% | 7/1/2035 | 0.9% |
| Trujillo Alto | 3,402,638 | 2 | 4.0% | 7/1/2033 | 1.1% |
| Utuado | 1,716,617 | 1 | 3.6% | 7/1/2028 | 0.5% |
| Vega Alta | 135,744 | 1 | 6.3% | 7/1/2019 | 0.0% |
| Vega Baja | 4,569,725 | 3 | 4.3% | 7/1/2032 | 1.5% |
| Vieques | 2,403,657 | 1 | 3.6% | 7/1/2033 | 0.8% |
| Villalba | 2,857,658 | 6 | 3.9% | 7/1/2033 | 0.9% |
| Yabucoa | 4,544,126 | 3 | 4.9% | 7/1/2035 | 1.4% |
| Yauco | 8,712,011 | 3 | 5.4% | 7/1/2035 | 2.8% |
| Total | $313,615,329 | 161 | - | - | 100% |

Source: GDB

*Source of Repayment.* The FAM Act requires the Commonwealth to deposit in the FAM an amount equal to the product of the Commonwealth SUT collected during a fiscal year multiplied by a fraction whose numerator will be 0.5% and whose denominator will be the rate of the Commonwealth SUT. The FAM is currently held on deposit at BPPR and, pursuant to the FAM Act, is administered by COFIM.

The amounts received by the FAM are divided into three separate funds as follows: (i) an amount equal to 40% of the Commonwealth SUT deposited in the FAM (*i.e.*, product of the Commonwealth SUT collected during a fiscal year multiplied by a fraction whose numerator is 0.2% and whose denominator is the rate of the Commonwealth SUT) is transferred to the FAM structure's Municipal Redemption Fund (the "FAM Redemption Fund"), (ii) an amount equal to 40% of the Commonwealth SUT deposited in the FAM (*i.e.*, the product of the Commonwealth SUT collected during a fiscal year multiplied by a fraction whose numerator is 0.2% and whose denominator is the rate of the Commonwealth SUT) is transferred to the Municipal Development Fund (the "Development Fund"), and (iii) an amount equal to 20% the Commonwealth SUT deposited in the FAM (*i.e.*, the product of the Commonwealth SUT collected during a fiscal year multiplied by a fraction whose numerator is 0.1% and whose denominator is the rate of the Commonwealth SUT) is transferred to the Municipal Improvement Fund (the "Improvement Fund"). The FAM Redemption Fund is distributed among the municipalities pursuant to a predetermined formula provided by Act 1-2011, as amended (the "PR Code"), which is based on the amounts collected in each municipality during the prior fiscal year. In turn, the Development Fund is distributed among the municipalities pursuant to a predetermined formula provided by the PR Code, which is based on each municipality's budget and population. Finally, funds in the Improvement Fund are distributed pursuant to legislative appropriations.

Sales Tax Obligations are payable from the sales and use tax revenues required by law to be deposited in the FAM Redemption Fund. In addition, Section 4050.08 of the Puerto Rico Internal Revenue Code Act 1-2011, as amended, authorizes municipalities to elect to transfer all or a portion of the funds in such municipality's Development Fund to the FAM Redemption Fund to increase their borrowing capacity. The funds so transferred from the Development Fund to the FAM Redemption Fund are also available for the payment of Sales Tax Obligations. All municipalities (except for the municipalities of Guayama, Hatillo, Isabela, and Sábana Grande) have elected to transfer to the FAM Redemption Fund all or a portion of the funds allocated by law to the Development Fund. Furthermore, the municipalities of Bayamón, Cabo Rojo, Carolina, Guaynabo, Mayaguez, Ponce and San Juan waived their rights to the Development Fund pursuant to Section 4050.07 of the PR Code.

The funds in the FAM Redemption Fund are required by law to be applied for the payment of Sales Tax Obligations. The Sales Tax Obligations that are part of the Restructuring Property, however, may be effectively subordinated to the payment of other Sales Tax Obligations secured by a security interest in municipal sales and use taxes granted by municipalities to private financial institutions to secure such Loans. For additional discussion regarding these risks, see *"Risk Factors—Risks Related to the Restructuring Property— Sales Tax Obligations may be judicially determined not to be secured by a lien on municipal sales and use taxes and to be effectively subordinated to Loans payable from municipal sales and use taxes granted by private financial institutions to certain municipalities."*

118

DRA Ex. 225

For additional information regarding municipal sales and use taxes see, "*Municipalities—Municipal Revenues—Major Categories of Revenue—Sales and Use Taxes*" in this Offering Memorandum.

*Flow of Funds*. The following diagram illustrates the flow of funds for the payment of the Sales Tax Obligations. For a description of the flow of funds under the Bond Indenture after deposit in the Collection Account, see "*Summary of Distributions of Cash from the Collection Account*" in this Offering Memorandum.



---

(1)     First revenues up to the "Pledged Sales Tax Base Amount" for the particular fiscal year are deposited with the COFINA Trustee. Then, an amount equal to the amount deposited with the COFINA Trustee is transferred to the Commonwealth's general fund. All other amounts after the Commonwealth has received such amount are divided equally between COFINA and the Commonwealth.

(2)     Funds remaining after the payment of COFIM expenses are transferred to the corresponding municipality.

(3)     Pursuant to the FAM Act, certain municipalities have elected for the funds in the Municipal Development Fund to be transferred to the FAM Redemption Fund. In such cases, such revenues are also available for the payment of Sales Tax Obligations.

(4)     Since 2014, the 1% sales and use tax allocated to COFIM flows directly from the point of sale to a COFIM account at Banco Popular, without going through the Unified Internal Revenue System.

DRA Ex. 225

*Estimated Fiscal Year 2018 Debt Service Coverage*. The following table presents for each municipality a debt service coverage ratio analysis based on (i) the aggregate contractual debt service due on all outstanding Sales Tax Obligations of such municipality on January 1, 2018 and July 1, 2018, (ii) the funds of each municipality on deposit in the FAM Redemption Fund as of July 1, 2017 after the payment of Sales Tax Obligation debt service due on such date, and (iii) the preliminary estimates of sales and use tax collections of such municipality during fiscal year 2018 available for the payment of Sales Tax Obligations.

No municipalities had Balloon Payments due on their Sales Tax Obligations on January 1, 2018 or July 1, 2018, but some municipalities may have Balloon Payments on their Sales Tax Obligations with private financial institutions on subsequent payment dates. For a discussion of the risks related to the Balloon Payments on municipal Loans held by private financial institutions with respect to the Municipal Loan Assets, see "*Risk Factors–Risks Related to the Restructuring Property–Certain assets that constitute the Restructuring Property share their source of repayment with Loans made by private financial institutions with different repayment terms than those contained by the Restructuring Property and may result in reductions to Collections on the Restructuring Property*."

A debt service coverage ratio of less than 1 in column G of the table below reflects that the starting balance of a municipality in the FAM Redemption Fund in fiscal year 2018, combined with the estimated sales tax collections of such municipality during fiscal year 2018 available for the payment of debt service on its Sales Tax Obligations, was not sufficient to cover all debt service due on January 1, 2018 and July 1, 2018. All municipalities made the debt service payments on their Sales Tax Obligations in full on such dates, except for the municipality of Cabo Rojo, for which column G of the table below reflects a coverage of less than 1, and which was unable to make in full the debt service payments due on July 1, 2018 on its Sales Tax Obligations.

The estimated sales and use tax collections of each municipality shown below are preliminary and subject to change. Furthermore, there is no assurance that actual sales and use tax collections in fiscal year 2019 and subsequent fiscal years will be similar to those shown below, as future sales and use tax collections may be adversely impacted by a number of factors, including factors related to general economic conditions and the impact of Hurricanes Irma and María. For additional information on the risks relating to the effect of Hurricanes Irma and María on the Restructuring Property, see "*Risk Factors—Risks Related to the Obligors on the Restructuring Property*" and "*Risk Factors—Risks Related to the Restructuring Property*."

Fiscal Year 2018 Debt Service Coverage
Sales Tax Obligations

| | A | B | C | D=A+B+C | E | F=(B+C)/E | G=D/E |
|---|---|---|---|---|---|---|---|
| | | | | | | Debt Service Coverage Ratio based on Contractual Debt Service | |
| Municipality | FAM Redemption Fund Starting Balance [1] | .20% FAM Redemption Fund Collections [2] | Contributed Portion of .20% Development Fund [2] | FAM Redemption Fund Starting Balance and SUT Collections Available for Debt Service [4] | Contractual Debt Service [5] | SUT Collections Available for Debt Service | FAM Redemption Fund Starting Balance and SUT Collections Available for Debt Service |
| Adjuntas...................... | $169,025 | $19,530 | $1,134,737 | $1,323,292 | $564,973 | 2.04 | 2.34 |
| Aguada........................ | 93,180 | 230,546 | 587,443 | 911,170 | 485,418 | 1.69 | 1.88 |
| Aguadilla.................... | 105,342 | 744,533 | 457,786 | 1,307,660 | 685,602 | 1.75 | 1.91 |
| Aguas Buenas............. | 122,688 | 86,016 | 421,295 | 629,999 | 354,541 | 1.43 | 1.78 |
| Aibonito...................... | 188,338 | 199,834 | 752,190 | 1,140,361 | 699,735 | 1.36 | 1.63 |
| Añasco........................ | 25,050 | 161,242 | 333,939 | 520,232 | 106,655 | 4.64 | 4.88 |
| Arecibo....................... | 282,575 | 702,597 | 459,984 | 1,445,157 | 784,230 | 1.48 | 1.84 |
| Arroyo ....................... | 95,350 | 76,084 | 403,150 | 574,584 | 347,463 | 1.38 | 1.65 |
| Barceloneta................ | 123,273 | 792,734 | 155,599 | 1,071,605 | 509,135 | 1.86 | 2.10 |
| Barranquitas............... | 93,978 | 127,105 | 575,892 | 796,975 | 458,343 | 1.53 | 1.74 |
| Bayamón[6] ................ | 737,700 | 4,241,767 | - | 4,979,467 | 3,101,127 | 1.37 | 1.61 |
| Cabo Rojo[6]............... | - | 333,255 | - | 333,255 | 769,860 | 0.43 | 0.43 |
| Caguas........................ | 483,968 | 3,303,481 | 475,771 | 4,263,220 | 1,837,702 | 2.06 | 2.32 |
| Camuy ........................ | 69,038 | 160,773 | 321,413 | 551,224 | 316,971 | 1.52 | 1.74 |
| Canóvanas................... | 13,650 | 477,309 | 449,158 | 940,117 | 445,538 | 2.08 | 2.11 |
| Carolina[6]................... | 872,114 | 3,682,968 | - | 4,555,082 | 4,251,088 | 0.87 | 1.07 |
| Cataño........................ | 164,793 | 774,782 | 126,546 | 1,066,120 | 527,715 | 1.71 | 2.02 |
| Cayey.......................... | 141,050 | 787,843 | 350,679 | 1,279,572 | 678,896 | 1.68 | 1.88 |
| Ceiba.......................... | 58,825 | 48,133 | 459,672 | 566,630 | 225,058 | 2.26 | 2.52 |
| Ciales......................... | 119,888 | 53,630 | 839,693 | 1,013,211 | 454,961 | 1.96 | 2.23 |
| Cidra.......................... | 72,950 | 247,341 | 467,614 | 787,906 | 439,210 | 1.63 | 1.79 |
| Coamo ........................ | 116,958 | 158,308 | 693,398 | 968,663 | 367,943 | 2.31 | 2.63 |
| Comerío...................... | 43,563 | 58,212 | 408,699 | 510,473 | 295,415 | 1.58 | 1.73 |
| Corozal ...................... | 132,375 | 154,005 | 331,261 | 617,641 | 428,516 | 1.13 | 1.44 |
| Culebra ...................... | 26,175 | 35,809 | 260,000 | 321,984 | 110,840 | 2.67 | 2.90 |
| Dorado........................ | 94,425 | 651,934 | 333,245 | 1,079,604 | 462,519 | 2.13 | 2.33 |
| Fajardo........................ | - | 732,038 | 428,246 | 1,160,284 | - | - | - |
| Florida ....................... | 94,153 | 29,661 | 381,612 | 505,425 | 276,154 | 1.49 | 1.83 |
| Guánica...................... | 71,513 | 64,988 | 750,319 | 886,820 | 480,595 | 1.70 | 1.85 |
| Guayama..................... | 17,550 | 480,459 | - | 498,009 | 394,088 | 1.22 | 1.26 |
| Guayanilla.................. | 142,175 | 65,940 | 784,841 | 992,956 | 463,726 | 1.83 | 2.14 |
| Guaynabo[6] ............... | 470,625 | 2,627,026 | - | 3,097,651 | 2,041,389 | 1.29 | 1.52 |
| Gurabo....................... | 102,215 | 319,169 | 459,364 | 880,748 | 314,900 | 2.47 | 2.80 |
| Hatillo....................... | 259,448 | 1,058,907 | - | 1,318,354 | 399,285 | 2.65 | 3.30 |

120

**DRA Ex. 225**

Fiscal Year 2018 Debt Service Coverage
Sales Tax Obligations

| | A | B | C | D=A+B+C | E | F=(B+C)/E | G=D/E |
|---|---|---|---|---|---|---|---|
| | | | | | | Debt Service Coverage Ratio based Contractual Debt Service | |
| Municipality | FAM Redemption Fund Starting Balance [1] | .20% FAM Redemption Fund Collections [2] | Contributed Portion of .20% Development Fund[3] | FAM Redemption Fund Starting Balance and SUT Collections Available for Debt Service [4] | Contractual Debt Service[5] | SUT Collections Available for Debt Service | FAM Redemption Fund Starting Balance and SUT Collections Available for Debt Service |
| Hormigueros............... | 78,580 | 234,014 | 361,098 | 673,692 | 236,359 | 2.52 | 2.85 |
| Humacao..................... | 209,869 | 1,048,473 | 324,213 | 1,582,555 | 777,188 | 1.77 | 2.04 |
| Isabela........................ | 105,463 | 429,262 | – | 534,725 | 277,314 | 1.55 | 1.93 |
| Jayuya........................ | 186,809 | 71,475 | 830,808 | 1,089,092 | 578,656 | 1.56 | 1.88 |
| Juana Díaz ................ | 123,450 | 321,202 | 656,133 | 1,100,786 | 464,908 | 2.10 | 2.37 |
| Juncos........................ | 104,975 | 226,799 | 337,391 | 669,165 | 526,402 | 1.07 | 1.27 |
| Lajas .......................... | 79,663 | 113,913 | 761,436 | 955,012 | 375,960 | 2.33 | 2.54 |
| Lares.......................... | 16,900 | 126,152 | 310,385 | 453,437 | 146,619 | 2.98 | 3.09 |
| Las Marías.................. | 66,215 | 15,227 | 650,000 | 731,442 | 265,639 | 2.50 | 2.75 |
| Las Piedras................. | 145,425 | 203,362 | 566,854 | 915,641 | 449,041 | 1.72 | 2.04 |
| Loíza.......................... | 20,800 | 62,209 | 404,858 | 487,867 | 58,916 | 7.93 | 8.28 |
| Luquillo ..................... | 168,063 | 125,692 | 876,542 | 1,170,297 | 662,187 | 1.51 | 1.77 |
| Manatí........................ | 176,533 | 654,638 | 397,727 | 1,228,898 | 707,095 | 1.49 | 1.74 |
| Maricao...................... | 165,788 | 5,797 | 975,000 | 1,146,584 | 727,861 | 1.35 | 1.58 |
| Maunabo..................... | 153,713 | 16,376 | 1,192,403 | 1,362,492 | 661,843 | 1.83 | 2.06 |
| Mayagüez[6] ................ | 708,749 | 1,659,926 | – | 2,368,675 | 1,779,034 | 0.93 | 1.33 |
| Moca.......................... | 164,450 | 148,013 | 679,714 | 992,178 | 492,676 | 1.68 | 2.01 |
| Morovis...................... | 155,563 | 121,805 | 749,841 | 1,027,209 | 504,277 | 1.73 | 2.04 |
| Naguabo..................... | 84,825 | 93,067 | 347,667 | 525,559 | 273,703 | 1.61 | 1.92 |
| Naranjito.................... | 137,900 | 180,582 | 551,900 | 870,382 | 430,961 | 1.70 | 2.02 |
| Orocovis .................... | 56,963 | 88,483 | 398,944 | 544,389 | 347,441 | 1.40 | 1.57 |
| Patillas ...................... | 174,875 | 62,017 | 876,081 | 1,112,973 | 591,475 | 1.59 | 1.88 |
| Peñuelas..................... | 105,900 | 88,940 | 540,116 | 734,955 | 356,447 | 1.76 | 2.06 |
| Ponce[6]....................... | 339,183 | 2,679,227 | – | 3,018,409 | 2,213,061 | 1.21 | 1.36 |
| Quebradillas............... | 105,788 | 102,027 | 396,630 | 604,445 | 282,922 | 1.76 | 2.14 |
| Rincón ....................... | 14,665 | 113,913 | 241,678 | 370,256 | 193,322 | 1.84 | 1.92 |
| Río Grande................. | 123,425 | 407,520 | 262,320 | 793,265 | 462,550 | 1.45 | 1.71 |
| Sabana Grande............ | 3,738 | 109,036 | – | 112,773 | 61,993 | 1.76 | 1.82 |
| Salinas ....................... | 155,838 | 157,921 | 770,285 | 1,084,043 | 491,563 | 1.89 | 2.21 |
| San Germán ................ | 97,933 | 273,548 | 245,160 | 616,640 | 312,707 | 1.66 | 1.97 |
| San Juan[6] .................. | 1,101,763 | 9,814,099 | – | 10,915,862 | 6,157,502 | 1.59 | 1.77 |
| San Lorenzo................ | 138,820 | 220,063 | 542,342 | 901,225 | 521,757 | 1.46 | 1.73 |
| San Sebastián.............. | 151,550 | 286,150 | 580,607 | 1,018,307 | 541,001 | 1.60 | 1.88 |
| Santa Isabel................ | 140,965 | 300,950 | 674,013 | 1,115,927 | 503,348 | 1.94 | 2.22 |
| Toa Alta...................... | 184,925 | 265,231 | 560,197 | 1,010,353 | 585,984 | 1.41 | 1.72 |
| Toa Baja ..................... | 104,975 | 1,108,201 | 456,727 | 1,669,903 | 286,402 | 5.46 | 5.83 |
| Trujillo Alto................ | 68,125 | 477,075 | 71,511 | 616,711 | 270,697 | 2.03 | 2.28 |
| Utuado ........................ | 107,375 | 135,017 | 718,029 | 960,421 | 434,126 | 1.96 | 2.21 |
| Vega Alta.................... | 156,163 | 288,366 | 593,257 | 1,037,786 | 687,171 | 1.28 | 1.51 |
| Vega Baja ................... | 152,850 | 391,486 | 609,772 | 1,154,108 | 614,716 | 1.63 | 1.88 |
| Vieques....................... | 41,766 | 97,334 | 513,265 | 652,365 | 271,507 | 2.25 | 2.40 |
| Villalba...................... | 55,958 | 55,635 | 340,833 | 452,425 | 268,037 | 1.48 | 1.69 |
| Yabucoa..................... | 117,034 | 139,423 | 585,613 | 842,070 | 376,852 | 1.92 | 2.23 |
| Yauco ......................... | 245,820 | 338,726 | 642,832 | 1,227,378 | 768,111 | 1.28 | 1.60 |
| Total ........................... | $12,604,066 | $47,546,329 | $35,197,732 | $95,348,127 | $52,076,868 | 1.59 | 1.83 |

(1)    Represents the funds on deposit in each municipality's FAM Redemption Fund on July 1, 2017 after the payment of the debt service on Sales Tax Obligations (including the Sales Tax Obligations held by GDB and private financial institutions) due on such date.

(2)    Represents estimated collections on the .20% sales and use tax required to be deposited in the FAM Redemption Fund during fiscal year 2018. Estimates are based on actual sales and use tax collections in fiscal year 2018, but the allocation of such collections among the municipalities is estimated based on historical trends and the formula established in the PR Code. As a result, the estimates included herein are preliminary and subject to change.

(3)    Represents estimated collections during fiscal year 2018 on the portion of each municipality's sales and use taxes allocated to such municipality's Development Fund that the municipality elected to transfer to its FAM Redemption Fund. Estimates are based on actual sales and use tax collections in fiscal year 2018, but the allocation of such collections among the municipalities is estimated based on historical trends and the formula established in the PR Code. As a result, the estimates included herein are preliminary and subject to change.

(4)    Represents the sum of (a) the funds on deposit in each municipality's FAM Redemption Fund on July 1, 2017 after the payment of the debt service on Sales Tax Obligations (including the Sales Tax Obligations held by GDB and private financial institutions) due on such date and (b) estimated collections during fiscal year 2018 of municipal sales and use taxes available for the payment of debt service on a municipality's Sales Tax Obligations (preliminary and subject to change) consisting of (i) the .20% sales and use tax required to be deposited in the FAM Redemption Fund and (ii) the portion of each municipality's sales and use taxes allocated to such municipality's Development Fund that the municipality elected to transfer to its FAM Redemption Fund.

(5)    Represents aggregate contractual debt service payments due on each municipality's outstanding Sales Tax Obligations (including the Sales Tax Obligations held by GDB and private financial institutions) on January 1, 2018 and July 1, 2018. No municipalities had Balloon Payments due on their Sales Tax Obligations on such dates. Not affected by Closing Date Adjustments.

(6)    Municipality waived all rights to the Development Fund pursuant to Section 4050.07 of the PR Code.

Source: GDB

121

DRA Ex. 225

*Ability of Municipalities to Issue Sales Tax Obligations.* Pursuant to the Municipal Financing Act, Sales Tax Obligations are not subject to the limitations on margin capacity applicable to Municipal General Obligations or other special obligation debt. The regulation issued under the Municipal Financing Act, however, requires that in order for a municipality to be able to issue additional Sales Tax Obligations, such municipality must have sufficient "payment capacity." Pursuant to such regulation, a municipality has sufficient "payment capacity" to incur additional Sales Tax Obligations if the deposits in such municipality's FAM Redemption Fund and the annual amounts collected with respect to such municipality's FAM Redemption Fund, based on the average of such collections in the prior two fiscal years, will be sufficient to service to maturity the municipality's outstanding sales tax debt and the additional proposed sales tax debt. In calculating a municipality's payment capacity to issue Sales Tax Obligations, AAFAF assumes the refinancing of the Sales Tax Obligation that certain municipalities have with private financial institutions that include Balloon Payments prior to the due date of such Balloon Payments, and, therefore, assumes a long-term straight line amortization based on the contractual principal and interest payments, but amortizing any Balloon Payments. Hence, even if a municipality is determined to have sufficient payment capacity to incur Sales Tax Obligations, it may not be able to cover scheduled debt service payments due on all of its Sales Tax Obligations if, among other things, it is not able to refinance Balloon Payments under similar repayment terms.

### Operational Loans

*General.* The Operational Loans are special obligation Loans of a municipality payable from such municipality's operating revenues. The good faith, credit and taxing power of the municipalities are not pledged for the payment of the Operational Loans.

Interest on the Operational Loans is payable semi-annually on January 1 and July 1 of each year, and principal is payable annually on July 1 of each year. Operational Loans bear interest at variable rates (with limited exceptions) based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12%. Certain of the Operational Loans are also subject to an interest rate floor (ranging from 2.34% to 6%).

The following table shows the Operational Loans that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments and considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day from the Cutoff Date:

**Operational Loans**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Operational Loans |
|---|---|---|---|---|---|
| Adjuntas | $6,463,267 | 1 | 5.3% | 7/1/2036 | 8.4% |
| Aguadilla | 1,923,296 | 1 | 3.6% | 7/1/2026 | 2.5% |
| Añasco | 1,647,868 | 2 | 3.5% | 7/1/2027 | 2.1% |
| Arecibo | 8,108,497 | 2 | 4.1% | 7/1/2028 | 10.5% |
| Barceloneta | 5,903,472 | 2 | 6.3% | 7/1/2038 | 7.7% |
| Caguas | 7,948,330 | 2 | 3.6% | 7/1/2033 | 10.3% |
| Camuy | 1,663,389 | 1 | 3.6% | 7/1/2029 | 2.2% |
| Ciales | 13,145 | 1 | 3.6% | 7/1/2020 | 0.0% |
| Cidra | 890,565 | 1 | 3.6% | 7/1/2023 | 1.2% |
| Coamo | 4,666,620 | 1 | 6.3% | 7/1/2029 | 6.1% |
| Corozal | 318,787 | 1 | 4.9% | 7/1/2032 | 0.4% |
| Guánica | 629,967 | 1 | 3.3% | 7/1/2025 | 0.8% |
| Guayanilla | 464,064 | 1 | 3.6% | 7/1/2027 | 0.6% |
| Gurabo | 1,471,751 | 1 | 3.6% | 7/1/2027 | 1.9% |
| Jayuya | 537,587 | 2 | 3.6% | 7/1/2029 | 0.7% |
| Juana Díaz | 346,142 | 1 | 6.3% | 7/1/2020 | 0.4% |
| Juncos | 1,509,286 | 1 | 3.6% | 7/1/2027 | 2.0% |
| Las Marías | 817,991 | 3 | 4.9% | 7/1/2028 | 1.1% |
| Loíza | 254,720 | 1 | 3.6% | 7/1/2028 | 0.3% |
| Manatí | 992,933 | 1 | 3.3% | 7/1/2026 | 1.3% |
| Maricao | 416,954 | 1 | 3.3% | 7/1/2025 | 0.5% |
| Maunabo | 2,138,676 | 1 | 6.3% | 7/1/2038 | 2.8% |
| Moca | 161,308 | 1 | 3.6% | 7/1/2025 | 0.2% |
| Morovis | 3,144,566 | 4 | 3.9% | 7/1/2027 | 4.1% |
| Naranjito | 877,519 | 2 | 6.3% | 7/1/2035 | 1.1% |
| Orocovis | 40,410 | 1 | 6.3% | 7/1/2019 | 0.1% |
| Peñuelas | 3,996,515 | 3 | 3.5% | 7/1/2030 | 5.2% |
| Quebradillas | 1,385,121 | 2 | 3.4% | 7/1/2027 | 1.8% |
| Sabana Grande | 1,298,986 | 3 | 3.3% | 7/1/2025 | 1.7% |
| Salinas | 666,848 | 2 | 3.6% | 7/1/2028 | 0.9% |
| San Germán | 9,757,788 | 1 | 6.3% | 7/1/2038 | 12.7% |

DRA Ex. 225

**Operational Loans**

| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Operational Loans |
|---|---|---|---|---|---|
| San Lorenzo | 206,180 | 1 | 3.6% | 7/1/2020 | 0.3% |
| Santa Isabel | 1,205,316 | 2 | 3.6% | 7/1/2027 | 1.6% |
| Vega Alta | 188,183 | 1 | 3.6% | 7/1/2020 | 0.2% |
| Vieques | 2,023,444 | 3 | 3.5% | 7/1/2027 | 2.6% |
| Villalba | 1,583,961 | 1 | 3.6% | 7/1/2032 | 2.1% |
| Yabucoa | 473,766 | 2 | 4.2% | 7/1/2030 | 0.6% |
| Yauco | 975,097 | 3 | 3.6% | 7/1/2028 | 1.3% |
| Total | $77,112,314 | 61 | - | - | 100% |

Source: GDB

*Source of Repayment.* Operational Loans are payable from a municipality's operating revenues, consisting primarily of remittances made by CRIM to each municipality. Although a municipality's Operational Loans are payable from its operating revenues, a municipality may pledge such revenues for the payment of other debts. Moreover, such revenues may also be available to pay debt service on its Municipal General Obligations, with priority over special obligation debt (including the Operational Loans), in the event that such municipality's Special Additional Tax revenues are insufficient for the payment of its Municipal General Obligations. Therefore, a municipality's Operational Loans are effectively subordinated to its Municipal General Obligations. Further, since the funds in the FAM Redemption Fund are required by law to be used for various purposes, including for the payment of Sales Tax Obligations, prior to being disbursed to a municipality, a municipality's Operational Loans are also effectively subordinated to such other obligations.

The Operational Loans that are a part of the Restructuring Property are unsecured and do not have a lien on the municipality's operating revenues or on any other particular revenue or asset of a municipality. As a result, such Operational Loans may be effectively subordinated to the payment of other Loans secured by a security interest in municipal operational revenues granted by municipalities to private financial institutions to secure such Loans.

*Ability to Issue Special Obligation Debt.* Prior to approving any proposed issue of special obligation Loans (other than Sales Tax Obligations), AAFAF (previously, GDB) is required to verify that the municipality has SO Available Legal Margin and SO Payment Capacity (each such term as defined below) to incur such additional special obligation debt. Pursuant to the Municipal Financing Act, no municipality may incur special obligation debt if the annual payment of the principal and interest on such debt, together with the annual payment of the principal and the interest on all other special obligation debt of the municipality outstanding at that time (excluding Sales Tax Obligations), exceeds 10% of the average recurring operating income of the municipality for the two fiscal years immediately preceding the fiscal year in which it will issue such debt (the "SO Available Legal Margin").

The regulation issued under the Municipal Financing Act also requires that in order for a municipality to be able to issue additional special obligation debt, such municipality must have sufficient "payment capacity." Such regulation provides that a municipality has sufficient "payment capacity" to incur additional special obligation debt if the annual payment of the principal and the interest on all special obligation debt of the municipality outstanding at that time is less than 10% of the average recurring operating income of the municipality for the two fiscal years immediately preceding the fiscal year in which it will issue such debt (the "SO Payment Capacity"). In calculating the SO Payment Capacity, AAFAF assumes the refinancing of the special obligations that certain municipalities have with private financial institutions that include Balloon Payments prior to the due date of such Balloon Payments, and, therefore, assumes a long-term straight line amortization based on the contractual principal and interest payments, but amortizing any Balloon Payments. Hence, even if a municipality is determined to have sufficient SO Payment Capacity to incur special obligations, it may not be able to cover scheduled debt service payments due on all of its outstanding special obligations if it is not able to refinance Balloon Payments under similar repayment terms.

*Revenue Loans*

*General.* Revenue Loans are Loans incurred by a municipality to finance the development of a particular project or system. The good faith, credit and taxing power of the municipalities are not pledged for the payment of its Revenue Loans.

Interest on the Revenue Loans is payable semi-annually on January 1 and July 1 of each year, and principal is payable annually on July 1 of each year. Certain of the Revenue Loans bear interest at variable rates based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12% and an interest rate floor (ranging from 2.59% to 7%). Several Revenue Loans bear interest at fixed rates of 6% or 7%.

DRA Ex. 225

The following table shows the Revenue Loans that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments:

| | | | Revenue Loans | | |
|---|---|---|---|---|---|
| Municipality | Outstanding Principal Balance | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Revenue Loans |
| Aguadilla | $13,848,627 | 2 | 6.2% | 7/1/2037 | 27.9% |
| Barceloneta | 4,450,000 | 2 | 5.4% | 7/1/2034 | 9.0% |
| Bayamon | 7,200,000 | 1 | 6.3% | 7/1/2028 | 14.5% |
| Manati | 12,876,584 | 2 | 6.1% | 7/1/2038 | 25.9% |
| Morovis | 1,318,207 | 1 | 6.3% | 7/1/2024 | 2.7% |
| San Germán | 2,840,283 | 2 | 6.3% | 7/1/2036 | 5.7% |
| Santa Isabel | 43,500 | 1 | 6.0% | 7/1/2019 | 0.1% |
| Trujillo Alto | 3,809,657 | 1 | 7.0% | 7/1/2033 | 7.7% |
| Vega Alta | 1,436,000 | 4 | 3.2% | 7/1/2021 | 2.9% |
| Villalba | 1,869,517 | 2 | 6.3% | 7/1/2040 | 3.8% |
| Total | $49,692,375 | 18 | - | - | 100% |

Source: GDB

*Source of Repayment.* Pursuant to the Municipal Financing Act, income generated by projects financed with Revenue Loans will be used by the municipality in the following order of priority: *first*, to pay all operating and maintenance expenses of the project; *second*, to provide reserves for the operation and maintenance and the repair and replacement of the project; *third*, to pay the principal, and the premium, if any, and the interest on the revenue bonds for the payment of which the income of the revenue generating project has been committed or otherwise encumbered and to provide for the corresponding reserves; *fourth*, to pay the principal, the premium, if any, and the interest on any other obligation which is not backed by an encumbrance or other lien on the income of the project, but was issued to provide resources to pay the cost of such project; and *fifth*, any surplus from the income of the revenue generating project, after complying with the preceding items, may be transferred to the general fund of the municipality and used for any other legal purpose of the municipality. The Revenue Loans that will form part of the Restructuring Property are not secured by a lien or encumbrance on the revenues generated by the corresponding project or system. Therefore, the repayment thereof falls within the fourth order of priority, subordinated to the payment of the project's operating and maintenance expenses, repair and replacement reserves and the repayment of any Loan secured by a pledge of the revenues generated by the project.

In addition, pursuant to the Municipal Financing Act, to the extent that the revenues generated by a specific project are insufficient for the payment of debt service on such municipality's Revenue Loans related that project, CRIM will retain funds from such municipality's monthly remittances of operating revenues in the amount necessary to cover such insufficiency.

### *Municipal Lines of Credit*

*General.* The Municipal Lines of Credit consist of Loans granted by GDB to various municipalities to finance the construction of capital projects. The Municipal Lines of Credit were either (i) issued in anticipation of the issuance of Revenue Loans and expected to be paid from the revenues generated by the financed project, but which project was not ultimately completed, and the Revenue Loans were not issued or (ii) payable from future legislative appropriations by the Commonwealth, which the Legislative Assembly is not required to make. The good faith, credit and taxing power of the municipalities are not pledged for the payment of its Municipal Lines of Credit.

Certain Municipal Lines of Credit bear interest at variable rates based on LIBOR or the Prime Rate plus a spread, subject to a legal interest rate limit of 12% and an interest rate floor (ranging from 2.59% to 6.25%). Several Municipal Lines of Credit bear interest at fixed rates ranging from 3.57% or 6.62% and two Municipal Lines of Credit do not accrue interest.

DRA Ex. 225

The following table shows the Municipal Lines of Credit that are part of the Restructuring Property as of the Cutoff Date, reflecting the Closing Date Adjustments:

| | | Lines of Credit | | | | |
|---|---|---|---|---|---|---|
| Municipality | Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Weighted Average Effective Annual Interest Rate | Maturity Date | % of Total Outstanding Principal Balance of Municipal Lines of Credit |
| Aguadilla | $16,092,093 | $3,844,333 | 1 | 6.3% | 12/13/2024 | 45.4% |
| Arecibo | 2,529,739 | 221,174 | 1 | 3.6% | 4/24/2010 | 7.1% |
| Cayey | 4,214,441 | 685,195 | 1 | 4.6% | 7/6/2015 | 11.9% |
| Coamo | 113,709 | 41,511 | 1 | 6.3% | 2/15/2014 | 0.3% |
| Guánica | 347,153 | - | 2 | 0.0% | 6/30/2024 | 1.0% |
| Hatillo | - | 221,760 | 1 | N/A | 6/30/2012 | 0.0% |
| Jayuya | 998,100 | 236,253 | 1 | 5.5% | 10/30/2014 | 2.8% |
| Juncos | 8,870,921 | 3,219,714 | 1 | 6.6% | 12/31/2017 | 25.0% |
| Las Marías | 92,992 | 29,381 | 1 | 6.0% | 6/30/2015 | 0.3% |
| Rincón | - | 54,466 | 2 | N/A | 6/10/2017 | 0.0% |
| San Sebastián | 2,214,406 | 476,506 | 1 | 5.0% | 6/30/2007 | 6.2% |
| Total | $35,473,554 | $9,030,292 | 10 | - | - | 100% |

Source: GDB

***Source of Repayment.*** The Municipal Lines of Credit are unsecured obligations of a municipality that do not have a designated source of repayment or whose source of repayment consists of future legislative appropriations by the Commonwealth, which the Legislative Assembly is not required to make. As a result, the Municipal Lines of Credit have a delinquency rate that is much higher than that of the other sub-categories of Municipal Loan Assets. As shown above under "*Delinquency and Credit Status of the Loans Comprising the Restructuring Property,*" all Municipal Lines of Credit that are part of the Restructuring Property are classified by GDB as non-performing as of the Cutoff Date. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Municipal Lines of Credit are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

***Commonwealth Loan Assets***

***General.*** The Commonwealth Loan Assets comprise four general obligation Loans made by GDB to the Commonwealth in 2012 and 2013 with an aggregate outstanding principal balance as of the Cutoff Date of approximately $169.4 million, plus accrued and unpaid interest as of the Cutoff Date of approximately $40.9 million. Such Loans were issued by the Commonwealth pursuant to legislation enacted by the Legislative Assembly authorizing the Commonwealth to issue such debt and to pledge its good faith, credit and taxing power for the repayment thereof. The Commonwealth Loan Assets are payable on June 30 of each year, bear interest at a variable rate equal to the Prime Rate, plus 150 basis points, subject to a floor of 6% and a legal interest rate limit of 12%, and mature on June 30, 2041, 2042 and 2043.

The Commonwealth's financial obligations are currently subject to a temporary moratorium pursuant to various executive orders issued under Act 21-2016, as amended (the "Moratorium Act") and Act 5-2017, as amended (the "Fiscal Responsibility Act"). Moreover, the Commonwealth is currently in the midst of a debt restructuring proceeding pursuant to the provisions of Title III of PROMESA. As a result, the Issuer's recovery, if any, on the Commonwealth Loan Assets will be determined in such proceeding and cannot be estimated at this time. Moreover, litigation and claims against the Commonwealth, including litigation and claims related to the Commonwealth Loan Assets, are subject to the automatic stay that came into effect upon the filing of the Title III petition. For additional discussion of such proceeding, see "*Description of the Commonwealth and its Current Financial Condition—Description of the Commonwealth's PROMESA Filings.*"

On May 25, 2018, GDB filed a proof of claim in the Commonwealth's Title III proceeding (Claim No. 29485) in respect of all indebtedness owed by the Commonwealth to GDB as of the commencement date of the Commonwealth's Title III proceeding under PROMESA (May 3, 2017). Such proof of claim includes, among other things, a claim for $169,438,036 of principal and $28,849,289 of pre-petition interest in respect of the Commonwealth Loan Assets. GDB's asserted claim against the Commonwealth does not account for the Closing Date Adjustments, and, as with all proofs of claim filed in the Commonwealth's Title III proceeding, is subject to review by parties in interest and, if objected to, subsequent allowance by order of the District Court whether pursuant to an order confirming a plan of adjustment or otherwise. For a discussion of certain risks related to the treatment of the Commonwealth Loan Assets in the Commonwealth's Title III proceeding, see "*Risk Factors—Risks Related to the Restructuring Property—Creditors of the Commonwealth, HTA or other obligors on the Restructuring Property could seek to equitably subordinate the Loans made by GDB to such obligors in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*"

DRA Ex. 225

The following table shows the Loans that are part of the Commonwealth Loan Assets as of the Cutoff Date:

**Commonwealth Loan Assets**

| Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Effective Annual Interest Rate | Final Maturity Date | % of Total Outstanding Principal Balance of Commonwealth Loan Assets |
|---|---|---|---|---|---|
| $21,095,310 | $4,693,108 | 1 | 6.3% | 6/30/2041 | 12.5% |
| 63,135,000 | 16,517,694 | 1 | 6.3% | 6/30/2042 | 37.5% |
| 50,419,093 | 13,049,573 | 1 | 6.3% | 6/30/2043 | 29.8% |
| 34,788,635 | 6,595,534 | 1 | 6.3% | 6/30/2043 | 20.5% |
| $169,438,038 | $40,855,910 | 4 | - | - | 100% |

Source: GDB

*Source of Repayment*. The Commonwealth Loan Assets benefit from a pledge of the Commonwealth's good faith, credit and taxing power and, as a result, constitute "public debt" of the Commonwealth under Article VI, Section 8 of the Commonwealth Constitution. The Commonwealth Loan Assets are part of the approximately $13,606 million in principal amount of Commonwealth general obligations subject to the Commonwealth's Title III proceeding. Pursuant to Article VI, Section 8 of the Commonwealth Constitution, public debt of the Commonwealth constitutes a first claim on the Commonwealth's "available resources." What revenues constitute available resources of the Commonwealth for purposes of such constitutional provision is currently subject to ongoing litigation. There is also ongoing litigation regarding the priority of the Commonwealth's general obligation debt *vis a vis* its expenses related to the provision of essential services and other governmental functions. As a result, the Issuer's potential recovery under the Commonwealth Loan Assets will depend, among other things, on the outcome of such litigation.

*Security*. The Commonwealth Loan Assets are not secured by a lien on specific revenues on the Commonwealth. As a result, the Commonwealth Loan Assets will likely be treated as unsecured debt within the Commonwealth's Title III proceeding.

*Limitation on Enforcement and Collection Actions*. The Issuer is subject to limitations on its exercise of rights and remedies in respect of the Commonwealth Loan Assets. For additional information on such limitations, see "—*Management of the Restructuring Property*" above.

### Commonwealth Guaranteed Loan Asset

*General*. The Commonwealth Guaranteed Loan Asset consists of a refinancing bond issued by the PAA to GDB in 2014 with an outstanding principal balance of approximately $225.5 million as of the Cutoff Date, plus accrued and unpaid interest of $56.7 million, and which is guaranteed by the Commonwealth (the "PAA Bond"). The PAA Bond is payable on August 1 of each year, bears interest at an annual rate of 9.5% and matures on January 1, 2045.

The Commonwealth's financial obligations, including obligations under its guarantees, are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act. Moreover, the Commonwealth is currently in the midst of a debt restructuring proceeding pursuant to the provisions of Title III of PROMESA. As a result, the Issuer's recovery, if any, on the Commonwealth Guaranteed Loan Asset will be determined in such proceeding and cannot be estimated at this time. Moreover, litigation and claims against the Commonwealth, including litigation and claims related to the Commonwealth Guaranteed Loan Asset, are subject to the automatic stay that came into effect upon the filing of the Title III petition. For additional discussion of such proceeding, see "*Description of the Commonwealth and its Current Financial Condition—Description of the Commonwealth's PROMESA Filings.*"

On May 25, 2018, GDB filed a proof of claim in the Commonwealth's Title III proceeding (Claim No. 29485) in respect of all indebtedness owed by the Commonwealth to GDB as of the commencement date of the Commonwealth's Title III proceeding under PROMESA (May 3, 2017). Such proof of claim includes a claim for $225,553,700 of principal and $37,178,151 of pre-petition interest in respect of the Commonwealth Guaranteed Loan Asset. GDB's asserted claim against the Commonwealth does not account for the Closing Date Adjustments, and, as with all proofs of claim filed in the Commonwealth's Title III proceeding, is subject to review by parties in interest and, if objected to, subsequent allowance by order of the District Court whether pursuant to an order confirming a plan of adjustment or otherwise. For a discussion of certain risks related to the treatment of the Commonwealth Guaranteed Loan Asset in the Commonwealth's Title III proceeding, see "*Risk Factors—Risks Related to the Restructuring Property—Creditors of the Commonwealth, HTA or other obligors on the Restructuring Property could seek to equitably subordinate the Loans made by GDB to such obligors in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*"

126

**DRA Ex. 225**

*Source of Repayment*. The Commonwealth Guaranteed Loan Asset is a direct obligation of the PAA. The PAA, however, does not have a recurring source of revenue and has been historically dependent on legislative appropriations and other Commonwealth subsidies for its operations and to meet its financial obligations, which the Commonwealth is no longer in a position to provide due to its own fiscal and economic challenges. As a result, it is expected that Collections, if any, on the Commonwealth Guaranteed Loan Asset will come from the Commonwealth under its guarantee, rather than from the PAA. Pursuant to Act No. 409-2004, as amended, the payment of the PAA Bond is backed by the good faith, credit and taxing power of the Commonwealth, to the extent that the revenues and other monies of the PAA are insufficient for the payment thereof. The Commonwealth Guaranteed Loan Asset is part of the approximately $5,920 million in general obligation guarantees included in the Commonwealth's Title III proceeding. For further discussion regarding the sources of repayment of the Commonwealth's public debt, see "*Commonwealth Loan Assets—Source of Repayment*" in this Offering Memorandum. For a discussion regarding risks related to the treatment of the guarantee, see "*Risk Factors—Risks Related to the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Assets—Although the Commonwealth Guaranteed Loan Asset is guaranteed by the Commonwealth and benefits from a pledge of the Commonwealth's good faith, credit and taxing power, the guaranty and pledge may be subject to challenge in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*"

*Security*. The Commonwealth Guaranteed Loan Asset is not secured by a lien on specific revenues of the PAA or the Commonwealth. As a result, the Commonwealth Guaranteed Loan Asset will likely be treated as unsecured debt within the Commonwealth's Title III proceeding.

*Limitation on Enforcement and Collection Actions*. The Issuer is subject to limitations on its exercise of rights and remedies in respect of the Commonwealth Guaranteed Loan Asset. For additional information on such limitations, see "*—Management of the Restructuring Property*" above.

### Public Corporation Loan Assets

The Public Corporation Loan Assets comprise various Loans made by GDB to several public corporations and instrumentalities of the Commonwealth with an aggregate outstanding principal balance as of the Cutoff Date of approximately $2,670.8 million. The Public Corporation Loan Assets have differing rights, sources of repayment and characteristics. However, all Public Corporation Loan Assets are classified by GDB as non-performing as of the Cutoff Date. The Public Corporation Loan Assets are not backed by the good faith, credit and taxing power of the Commonwealth.

The Public Corporation Loan Assets bear interest at variable rates, subject, in most cases, to a floor (ranging from 5% to 7%) and a cap (ranging from 8% to the legal interest rate limit of 12%). While certain of the Loan documents for the Public Corporation Loans authorized GDB to unilaterally modify the applicable interest rates on such Loans, pursuant to the GDB Restructuring Act, none of the Issuer, the Servicer, or any other person or entity will have the right to unilaterally increase the fixed interest rate or variable interest rate spread, as applicable, on such Public Corporation Loan Assets, and such Loans will continue to bear interest at the applicable fixed or variable rates in effect as of the Closing Date, as such rates are certified by AAFAF and GDB. In accordance with the Restructuring Support Agreement, such interest rates have not been adjusted downward by GDB since at least March 27, 2018 and will not be adjusted downward by GDB at any time prior to or after the Closing Date.

Pursuant to the GDB Restructuring Act, the Issuer is subject to limitations on its exercise of rights and remedies in respect of the Public Corporation Loan Assets. For additional information on such limitations, see "*—Management of the Restructuring Property,*" above. Given the foregoing, the Collections, if any, to be received by the Issuer in respect of the Public Corporation Loan Assets are uncertain at this time, but are not expected to be significant, and the Collection Schedule included herein reflects the assumption that such Loans will not generate Collections.

DRA Ex. 225

The following table summarizes the Public Corporation Loans that will be part of the Restructuring Property. All Loan balances shown in this section with respect to Public Corporation Loan Assets are the balances as of the Cutoff Date, reflecting the Closing Date Adjustments.

**Public Corporation Loan Assets**

| Obligor | Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date[1] | % of Total Outstanding Principal Balance of Public Corporation Loans |
|---|---|---|---|---|---|---|
| HTA Loans[2][6] | $1,724,903,305 | $537,849,114 | 23 | 6.25% | 1/31/2016 | 64.6% |
| HTA Bonds[2] | 200,000,000 | 19,989,041 | 1 | 12.00% | 7/1/2028 | 7.5% |
| Ports Authority[2][3] | 266,575,179 | 75,213,947 | 5 | 6.33% | 12/5/2044 | 10.0% |
| PBA | 140,718,828 | 57,273,889 | 4 | 6.52% | 6/30/2044 | 5.3% |
| CCDA | 142,838,039 | 39,095,185 | 3 | 6.97% | 6/30/2027 | 5.3% |
| PRIDCO[2] | 53,116,550 | 13,874,502 | 4 | 6.65% | 6/30/2040 | 2.0% |
| PRSWMA[4] | 50,292,645 | 19,357,127 | 4 | 7.00% | 6/30/2040 | 1.9% |
| PRASA[5] | 53,607,940 | 10,872,063 | 1 | 6.25% | 3/31/2019 | 2.0% |
| Port Authority of Ponce | 20,762,619 | 5,366,333 | 1 | 7.18% | 6/30/2044 | 0.8% |
| Agricultural Development[2] | 15,287,458 | 3,218,765 | 1 | 5.00% | 3/1/2027 | 0.6% |
| PAA (Loan) | 1,700,000 | 596,000 | 1 | 8.00% | 10/31/2014 | 0.1% |
| Interagency Committee | 995,449 | 380,393 | 1 | 6.75% | 3/14/2013 | 0.0% |
| Total | $2,670,798,011 | $783,086,359 | 49 | - | - | 100% |

(1) Does not account for the impact of Closing Date Adjustments.

(2) As defined herein.

(3) Includes the Ports Authority Reimbursement Obligations and the Ports Authority Loans, as defined herein.

(4) Puerto Rico Solid Waste Management Authority.

(5) Puerto Rico Aqueduct and Sewer Authority.

(6) Balance reflects the full offset of HTA's deposits with GDB against the HTA Loans notwithstanding that, pursuant to an agreement between Financial Guaranty Insurance Company ("FGIC") and GDB settling FGIC's objection to the Title VI proceeding (the "FGIC Settlement"), approximately $8.5 million of HTA deposits will not be applied to offset HTA Loans on the Closing Date pending a determination as to whether, consistent with the pertinent agreements and applicable law, such deposits can be subject to the Closing Date Adjustments.

Source: GDB

More detailed information related to the Public Corporation Loan Assets of the obligors with Loans having an aggregate outstanding principal balance of more than $100 million as of the Cutoff Date and an overview of the other Public Corporation Loan Assets is included below.

### *Puerto Rico Highways and Transportation Authority.*

HTA is responsible for highway construction in Puerto Rico. Such construction was historically financed by debt (interim notes and revenue bonds), revenues of HTA, and federal and Commonwealth grants. According to its preliminary financial information, HTA reported an operating loss of approximately $458.2 million for fiscal year 2017, compared to net operating losses of approximately $432.1 million and $408.4 million for fiscal years 2016 and 2015, respectively. As of December 31, 2017, HTA's total debt was approximately $5,911.1 million, consisting of approximately $4,177.4 million of public bonds and approximately $1,733.7 million of Loans from GDB (not accounting for the Closing Date Adjustments).

HTA is the single largest net debtor of GDB. HTA's indebtedness to GDB that will be part of the Restructuring Property (after the Closing Date Adjustments) will consist of: (i) $1,725 million in Loans made by GDB to HTA that are payable primarily from, and secured by a pledge of, the Act 30-31 Revenues (as defined herein) (the "HTA Loans") (balance reflects the full offset of HTA's deposits with GDB against the HTA Loans notwithstanding that, pursuant to the FGIC Settlement, approximately $8.5 million of HTA deposits will not be applied to offset HTA Loans on the Closing Date pending a determination as to whether, consistent with the pertinent agreements and applicable law, such deposits can be subject to the Closing Date Adjustment) and (ii) $200 million in Transportation Revenue Bonds, Series A, issued by HTA under Resolution No. 98-06 (the "98 Resolution") adopted by HTA on February 26, 1998 (the "HTA Bonds" and, collectively with the HTA Loans, the "HTA Debt").

HTA's financial obligations are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act. Moreover, HTA is currently in the process of restructuring its liabilities pursuant to Title III of PROMESA. As a result, the Issuer's recovery, if any, on the HTA Debt will be determined in such proceeding and cannot be estimated at this time. Moreover, litigation and claims against HTA, including litigation and claims related to the HTA Debt, are subject to the automatic stay that came into effect upon the filing of the Title III petition.

**DRA Ex. 225**

On May 25, 2018, GDB filed a proof of claim in HTA's Title III proceeding (Claim No. 29533) in respect of all amounts owed by HTA to GDB under the HTA Debt as of the commencement date of HTA's Title III proceeding under PROMESA (May 21, 2017). On June 29, 2018, GDB filed an amended and restated proof of claim in HTA's Title III proceeding. Such proof of claim includes a claim for $1,733,697,499 of principal and $420,390,698 in pre-petition interest in respect of the HTA Loans and for $200,000,000 of principal and $1,886,368 of pre-petition interest in respect of HTA Bonds. GDB's asserted claim against HTA does not account for the Closing Date Adjustments, and, as with all proofs of claim filed in HTA's Title III proceeding, is subject to review by parties in interest and, if objected to, subsequent allowance by order of the District Court whether pursuant to an order confirming a plan of adjustment or otherwise. For a discussion of certain risks related to the treatment of the HTA Debt in HTA's Title III proceeding, see *"Risk Factors—Risks Related to the Restructuring Property—Creditors of the Commonwealth, HTA or other obligors on the Restructuring Property could seek to equitably subordinate the Loans made by GDB to such obligors in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA."*

*HTA Loans.* All HTA Loans have matured and bear interest at a variable rate equal to the Prime Rate plus 150 basis points, subject to a floor of 6% and a legal cap of 12%. The HTA Loans are payable primarily from, and secured by a pledge of, the revenues allocated by the Commonwealth to HTA by Act No. 30-2013 and Act No. 31-2013 (collectively, the "Act 30-31 Revenues"). The Act 30-31 Revenues consist of (i) revenues from the increase in the Commonwealth's petroleum products excise tax introduced by Act No. 31-2013 (generating approximately $62.6 million in fiscal year 2017), (ii) the portion of the motor vehicle license fees in excess of the $15 pledged for the payment of certain of HTA's outstanding public bonds (generating approximately $60.6 million in fiscal year 2017), and (iii) $20 million of the Commonwealth's cigarette excise tax each fiscal year. The pledge of the Act 30-31 Revenues, however, is subject to Article VI, Section 8 of the Commonwealth Constitution and, thus, conditioned upon such revenues in any given fiscal year not being necessary for the payment of debt service on the Commonwealth's general obligation debt (which, as discussed above, is currently not being paid). To the extent that other revenues of the Commonwealth are insufficient for the payment of the Commonwealth's general obligation debt, the Act 30-31 Revenues may be "clawed-back" by the Commonwealth and applied to pay debt service on such debt. Further, according to the security agreement pursuant to which HTA granted a security interest on the Act 30-31 Revenues to secure the HTA Loans, such security interest is subordinated to the security interest (if any) of the holders of public bonds issued by HTA with respect to the Act 30-31 Revenues. While GDB believes that there are no superior liens on the Act 30-31 Revenues, certain HTA bondholders have asserted in HTA's Title III proceeding that they have a superior lien on a substantial portion of such revenues. For discussion regarding the risks related to such claims, see *"Risk Factors—Risks Related to the Public Corporation Loan Assets—HTA, which is the largest obligor on the Public Corporation Loan Assets, has currently sought relief pursuant to the provisions of Title III of PROMESA and is in the process of restructuring its obligations. As a result, the HTA Debt (as defined herein) will be restructured and recoveries pursuant to these obligations, if any, are uncertain at this time."*

The Act 30-31 Revenues have not been applied to the payment of the HTA Loans since December 2015 as result of the Commonwealth's and HTA's financial difficulties, the retention by the Commonwealth of such funds pursuant to the exercise of the "clawback" in fiscal year 2016 and the suspension of the transfer of such funds thereafter pursuant to the Moratorium Act. The legality of the exercise of the "clawback" by the Commonwealth and the constitutionality of the Commonwealth's actions under the Moratorium Act and subsequent legislation are currently being challenged in several legal proceedings.

*HTA Bonds.* The HTA Bonds bear interest at a fixed annual rate of 12% and mature on July 1, 2028. The HTA Bonds (along with other HTA bonds issued under the 98 Resolution) are payable primarily from, and secured by a pledge of: (i) the Commonwealth's petroleum product excise tax revenues allocated to HTA pursuant to Act 34-1997, as amended, up to $120 million each fiscal year (the "Crude Oil Revenues"), (ii) certain tax and fee revenues pledged for the payment of bonds issued by HTA under Resolution No. 68-18, adopted June 13, 1968 (the "68 Resolution") upon the cancellation of such bonds (the "68 Resolution Revenues"), and (iii) tolls or charges imposed by HTA for the use of any of the toll facilities other than those pledged for the payment of the bonds issued under the 68 Resolution (the "Toll Revenues"). The pledge of the Crude Oil Revenues and the 68 Resolution Revenues, however, is subject to Article VI, Section 8 of the Commonwealth Constitution and, thus, conditioned upon such revenues in any given fiscal year not being necessary for the payment of debt service on the Commonwealth's general obligation debt (which, as discussed above, is currently not being paid). To the extent that other revenues of the Commonwealth are insufficient for the payment of the Commonwealth's general obligation debt, the Crude Oil Revenues and the 68 Resolution Revenues may be "clawed-back" by the Commonwealth and applied to pay debt service on such debt.

The Crude Oil Revenues and the 68 Resolution Revenues have not been applied for the payment of HTA's bonds since December 2015 as a result of the retention of such funds by the Commonwealth due to the exercise of the "clawback" and the suspension of the transfer of such funds pursuant to the Moratorium Act. The Toll Revenues have also not been applied to the payment of HTA's bonds since May 2016, when HTA's obligation to transfer such funds to the trustee of its bonds was suspended pursuant to the Moratorium Act. As provided above, the legality of the exercise of the "clawback" by the Commonwealth and the constitutionality of the Commonwealth's actions under the Moratorium Act and subsequent legislation are currently being challenged in several legal proceedings.

DRA Ex. 225

*Puerto Rico Ports Authority.* The Puerto Rico Ports Authority (the "Ports Authority") owns and operates all major airport and seaport facilities in Puerto Rico, except for Puerto Rico's principal airport which has been operated by a private consortium since 2013. The Ports Authority derives revenues from a variety of sources, including charges on airplane fuel sales, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. The Ports Authority's financial statements reported a decrease in net position of approximately $22.4 million in fiscal year 2017 (unaudited and subject to change) and of approximately $10 million in fiscal year 2016.

The indebtedness of the Ports Authority that will be part of the Transferred Property consists of (i) obligations of the Ports Authority (the "Ports Authority Reimbursement Obligations") arising under a Letter of Credit Disbursement and Reimbursement Agreement by and between GDB and the Ports Authority (the "Reimbursement Agreement") relating to all unreimbursed draws honored by GDB (or its successors or assigns) under a direct-pay letter of credit issued by GDB (the "GDB Letter of Credit") in connection with the Puerto Rico Infrastructure Financing Authority Revenue Bonds (Ports Authority Project) (the "PRIFA Bonds") and (ii) two Loans made by GDB to the Ports Authority (the "Ports Authority Loans").

*Ports Authority Reimbursement Obligations.* PRIFA issued the PRIFA Bonds pursuant to a Loan and Trust Agreement by and among PRIFA, the Ports Authority and The Bank of New York Mellon, dated as of December 1, 2011 (the "Loan and Trust Agreement"). The proceeds of the PRIFA Bonds were loaned by PRIFA to the Ports Authority. Pursuant to the Loan and Trust Agreement, the PRIFA Bonds are payable primarily from draws on the GDB Letter of Credit and from payments made by the Ports Authority under the credit facility extended by PRIFA. Pursuant to the Reimbursement Agreement, the Ports Authority has an obligation to reimburse GDB for any payments made by GDB under the GDB Letter of Credit. The Ports Authority Reimbursement Obligations correspond to payments made by GDB under the GDB Letter of Credit, which the Ports Authority is required to reimburse to GDB pursuant to the Reimbursement Agreement.

The Ports Authority Reimbursement Obligations are obligations of the Ports Authority secured by a lien upon and security interest in the Ports Authority's Revenues (as defined in the Trust Agreement, dated as of January 1, 1972, as amended and supplemented as of December 1, 2011, by and among the Ports Authority, The Bank of New York Mellon, as successor trustee, and Banco Popular de Puerto Rico, as successor co-trustee) and any rights to receive the same. In accordance with the Reimbursement Agreement, amounts owed by the Ports Authority to GDB under the Ports Authority Reimbursement Obligations were due no later than 3:00 p.m. on the date of each draw, *provided* that if the draw was not reimbursed in full by the Ports Authority to GDB on such date, interest would accrue on the amount of each draw at the Prime Rate plus 150 basis points, but in no event less than 6% per annum and, *provided further* that, to the extent that the full amount of the draw was not reimbursed to GDB within 10 days following each draw, interest would accrue thereafter at a rate equal to 400 basis points over the then-applicable rate. Notwithstanding such provision, due to the Ports Authority's inability to pay the Reimbursement Obligations, GDB has continued to accrue interest on such Loans at the Prime Rate plus 150 basis points.

The obligations of GDB under the GDB Letter of Credit and the obligations of the Ports Authority to make transfers to the trustee of the PRIFA Bonds relating to payments under the underlying credit facility are currently suspended pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act. While the obligations of the Ports Authority under the Ports Authority Reimbursement Obligations are not currently suspended or subject to a moratorium, all Ports Authority Reimbursement Obligations are classified by GDB as non-performing.

The following table provides an overview of the Ports Authority Reimbursement Obligations, as of the Cutoff Date, and additional information regarding such obligations is set forth below.

**Ports Authority Reimbursement Obligations**

| Outstanding Principal Balance | Accrued and Unpaid Interest | Effective Annual Interest Rate | Maturity Date[1] | % of Total Ports Authority Reimbursement Obligations |
|---|---|---|---|---|
| $69,405,015 | $19,764,900 | 6.25% | 12/1/2018 | 35.4% |
| 90,058,014 | 25,420,646 | 6.25% | 2/1/2019 | 45.9% |
| 36,847,625 | 10,215,150 | 6.25% | 3/1/2019 | 18.7% |
| $196,310,654 | $55,400,696 | - | - | 100.0% |

(1)     Does not account for the impact of Closing Date Adjustments.

Source: GDB

DRA Ex. 225

In addition to the draws honored by GDB prior to the Closing Date identified in the table above, The Bank of New York Mellon made a final draw request to GDB in May 2017 for $190,630,000 and $9,398,112 on account of principal and interest, respectively, due on the PRIFA Bonds. This draw request is a Participating Bond Claim for which New Bonds are to be issued pursuant to the Qualifying Modification. For the avoidance of doubt, any rights of GDB under the Reimbursement Agreement arising out of the issuance of, or any payments on, the New Bonds in respect of such outstanding draw requests under the GDB Letter of Credit will be included in the Transferred Property.

*Ports Authority Loans.* The Ports Authority Loans consist of two Loans made by GDB to the Ports Authority in 2008 (the "2008 Ports Authority Loan") and 2014 (the "2014 Ports Authority Loan") for the development of certain projects. The Ports Authority Loans are classified by GDB as non-performing as of the Cutoff Date. The following table summarizes certain information regarding the Ports Authority Loans as of the Cutoff Date, and additional information regarding each of the Loans is set forth below.

| | | | | | |
|---|---|---|---|---|---|
| | **Ports Authority Loans** | | | | |
| | Outstanding Principal Balance | Accrued and Unpaid Interest | Effective Annual Interest Rate | Maturity Date[1] | % of Total Outstanding Principal Balance of Ports Authority Loans |
| 2008 Ports Authority Loan | $40,941,805 | $13,227,500 | 6.25% | 6/30/2023 | 60.1% |
| 2014 Ports Authority Loan | 29,322,720 | 6,585,751 | 7.00% | 12/05/2044 | 39.9% |
| Total | $70,264,525 | $19,813,251 | - | - | 100.0% |

(1)   Does not account for the impact of Closing Date Adjustments.

Source: GDB

*2008 Ports Authority Loan.* The 2008 Ports Authority Loan was granted by GDB to the Ports Authority to finance the construction of the project known as the "San Juan Waterfront Project" in Puerta de Tierra. Pursuant to the loan agreement, the 2008 Ports Authority Loan is payable from the proceeds of the sale or lease of parcels in the San Juan Waterfront Project and from legislative appropriations. Interest on the 2008 Ports Authority Loan is payable monthly and the entire principal amount of the Loan is payable at maturity on June 30, 2023, *provided* that, pursuant to the loan agreement, to the extent that no appropriations are made for the payment of such Loan, the maturity thereof will be extended to June 30, 2026. The Loan bears interest at a variable rate equal to LIBOR plus 150 basis points, subject to a 6% floor, and, pursuant to the loan agreement, to the extent that the entire principal amount of the Loan is not paid at maturity, the Loan will bear interest thereafter at a rate equal to 200 basis points above the then-applicable interest rate.

The 2008 Ports Authority Loan is secured by a mortgage in the principal amount of $180 million over a parcel of land located in San Juan, having an area of approximately 38.93 *cuerdas* and which is commonly known as the "San Juan Waterfront Parcel." The mortgage, however, is junior to other liens encumbering the San Juan Waterfront Parcel. Moreover, the fair market value of the San Juan Waterfront Parcel as of the Cutoff Date is unknown, but is likely significantly lower than the principal amount of the mortgage. An appraisal of the San Juan Waterfront Parcel dated as of February 12, 2010 estimated the market value of the San Juan Waterfront Parcel to be approximately $55 million as of such date, which is approximately 30% of the principal amount of the mortgage. While a more recent appraisal has not been obtained by GDB, the fair market value of the San Juan Waterfront Parcel as of the Cutoff Date could be materially lower than that estimated in the 2010 appraisal, since property values in Puerto Rico have continued to decrease since then.

*2014 Ports Authority Loan.* The 2014 Ports Authority Loan was granted by GDB to the Ports Authority to refinance certain outstanding indebtedness of the Ports Authority and for the development of a maintenance, repair and overhaul facility in the Rafael Hernández Airport in Aguadilla (the "Aguadilla Airport"). Pursuant to the loan agreement, principal and interest on the 2014 Ports Authority Loan are payable annually. The Loan bears interest at a rate equal to LIBOR plus 150 basis points, with a floor of 7%. To the extent that the entire principal amount of the Loan is not paid at maturity, the Loan will bear interest thereafter at a rate equal to 400 basis points above the then-applicable interest rate.

Pursuant to the loan agreement, the 2014 Ports Authority Loan is payable from (i) future legislative appropriations, (ii) lease payments required to be made by Lufthansa Technik Puerto Rico, LLC ("LTPR") in excess of a minimum rent determined by the Ports Authority under a certain Lease Agreement by and between LTPR, Ports Authority and Puerto Rico Industrial Development Company ("PRIDCO") dated as of April 10, 2014 with respect to several areas in the Aguadilla Airport (the "LTPR Lease"), (iii) proceeds of future bond issuances, (iv) the Ports Authority's interest with respect to a rent support letter of credit in the maximum amount of $3 million issued by Commerzbank AG to support LTPR's rent payment obligations under the LTPR Lease, (v) proceeds from the sale of the PRIDCO Mortgaged Properties (as defined herein), and (vi) to the extent the foregoing sources of payment are insufficient for the payment of debt service on the 2014 Ports Authority Loan, any other revenues of the Ports Authority. The 2014 Ports Authority Loan is secured by an assignment of the payments required to be made by LTPR under the LTPR Lease in excess of a minimum rent determined by the Ports Authority and a mortgage in the aggregate principal amount of $4 million over four real properties owned by PRIDCO and located in the municipalities of Caguas, Guayama and San Juan (the "PRIDCO Mortgaged Properties"). The mortgages are junior to various easements encumbering the PRIDCO Mortgaged Properties. The fair market value of the PRIDCO Mortgaged

131

**DRA Ex. 225**

Properties as of the Cutoff Date is unknown, but could be significantly lower than the principal amount of the mortgage. Furthermore, the amount of rental payments assigned to secure the obligations of the Ports Authority under the 2014 Ports Authority Loan is controlled by the Ports Authority, since only such rental payments made by LTPR in excess of the minimum rent determined by the Ports Authority are pledged to secure such obligations. As a result, the actual value of such assignment is unquantifiable.

*Puerto Rico Public Buildings Authority.* PBA was created to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations and instrumentalities of the Commonwealth, and has issued public bonds to finance such facilities. PBA's public bonds, which are guaranteed by the Commonwealth, are payable from lease payments that are largely derived from legislative appropriations. Approximately $4,176 million aggregate principal amount of PBA issued public bonds are outstanding, which are currently subject to a moratorium and are not being paid.

The Transferred Property will include four Loans (the "PBA Loans") of PBA with an aggregate outstanding principal balance as of the Cutoff Date of approximately $141 million. Unlike the bonds issued by PBA in the capital markets, the PBA Loans are not guaranteed by the Commonwealth and, thus, the Commonwealth's good faith, credit and taxing power is not pledged for the payment thereof. Moreover, all financial obligations of PBA are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act, and the PBA Loans are classified by GDB as non-performing as of the Cutoff Date. The PBA Loans may be classified into two categories, as described below.

The following table summarizes certain information regarding the PBA Loans as of the Cutoff Date, and additional information regarding each of the Loans is set forth below.

**PBA Loans**

| | Outstanding Principal Balance | Accrued and Unpaid Interest | Effective Annual Interest Rate | Maturity Date[1] | % of Total Outstanding Principal Balance of PBA Loans |
|---|---|---|---|---|---|
| 2006 PBA Loan | $49,995,337 | $15,263,013 | 7.00% | 6/30/2018 | 35.5% |
| Other PBA Loans | 12,110,752 | 7,165,180 | 6.25% | 6/30/2044 | 8.6% |
| | 39,204,590 | 16,919,542 | 6.25% | 6/30/2044 | 27.9% |
| | 39,408,149 | 17,926,154 | 6.25% | 6/30/2044 | 28.0% |
| Total | $140,718,828 | $57,273,889 | – | – | 100% |

(1) Does not account for the impact of Closing Date Adjustments.

Source: GDB

*2006 PBA Loan.* The Transferred Property will include a Loan made by GDB to PBA in 2006, the proceeds of which were used by PBA to finance its operating expenses and refinance certain outstanding indebtedness (the "2006 PBA Loan"). The 2006 PBA Loan has an outstanding principal balance of as of the Cutoff Date of approximately $50 million and matures on June 30, 2018. Pursuant to the loan agreement, the 2006 PBA Loan bears interest at a fixed rate equal to 7%. The 2006 PBA Loan is an unsecured obligation of PBA payable from (i) the rental income received by PBA from the lease or sublease of real estate properties to other Commonwealth government entities, (ii) proceeds from the sale or disposition of certain real property, and (iii) proceeds of future bond issuances. Moreover, the 2006 PBA Loan is secured by a security interest in the proceeds of the sale or disposition of two real properties located in San Juan consisting of the buildings where the Commonwealth's Department of Justice and Treasury Department are currently located. Such security interest, however, is subordinated to all rights of holders of outstanding PBA bonds in respect of such funds.

*Other PBA Loans.* The remaining PBA Loans that will form part of the Transferred Property consist of three Loans made by GDB to PBA to finance the acquisition and development of certain facilities or improvements by PBA in anticipation of the issuance of revenue bonds by PBA. Such Loans have an aggregate outstanding principal balance of approximately $90 million as of the Cutoff Date. Pursuant to the loan agreements, interest on the PBA Loans is payable monthly in arrears (no later than 10 days from the receipt of an invoice from GDB), and principal is payable at maturity. Pursuant to the applicable loan agreements, such Loans bear interest at a variable rate equal to the Prime Rate, plus 150 basis points, subject to a 6% floor and a legal interest rate limit of 12%, *provided* that, after their maturity, each Loan will bear interest at a rate equal to 2% over the then-applicable interest rate. The Loans are unsecured obligations of PBA payable from (i) the proceeds of future PBA bond issuances and (ii) the revenues received by PBA in respect of rental payments corresponding to the facilities financed with the corresponding Loans, which facilities are not identified in the Loan documents.

*Puerto Rico Convention Center District Authority.* CCDA was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Rosselló González Convention Center and designated private parcels located within the Convention Center District in San Juan. The convention center opened on November 17, 2005. CCDA also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum (the "Agrelot Coliseum"). CCDA has approximately $386.4 million in outstanding bonds issued in March 2006 to finance the convention center, which are payable from a portion of the hotel room tax. CCDA's bonds are subject to a moratorium and are currently not being paid.

DRA Ex. 225

GDB issued three Loans to CCDA, which have an aggregate outstanding principal balance as of the Cutoff Date of approximately $142.8 million (the "CCDA Loans"). All financial obligations of CCDA are currently subject to a temporary moratorium pursuant to various executive orders issued under the Moratorium Act and the Fiscal Responsibility Act, and the CCDA Loans are classified by GDB as non-performing as of the Cutoff Date.

The following table summarizes certain information regarding the CCDA Loans as of the Cutoff Date, and additional information regarding each Loan is set forth below.

**CCDA Loans**

| | Outstanding Principal Balance | Accrued and Unpaid Interest | Effective Annual Interest Rate | Maturity Date[1] | % of Total Outstanding Principal Balance of PBA Loans |
|---|---|---|---|---|---|
| 1996 CCDA Loans.................. | $138,423,659 | $37,816,283 | 7.00% | 6/30/2027 | 96.9% |
| 2013 CCDA Loan.................. | 4,414,379 | 1,278,901 | 6.00% | 9/30/2014 | 3.1% |
| Total ............................... | $142,838,038 | $39,095,185 | - | - | 100% |

(1)  Does not account for the impact of Closing Date Adjustments.

Source: GDB

*1996 CCDA Loans.* The CCDA Loans include Loans originally made by GDB to PBA in 1996 to finance the development of the Agrelot Coliseum. Such Loans (the "1996 CCDA Loans") were assumed by CCDA in 2004 following the transfer of the Agrelot Coliseum property to CCDA. The 1996 CCDA Loans have an outstanding principal balance of approximately $138.4 million as of the Cutoff Date. Pursuant to the loan agreement, interest on the 1996 CCDA Loans is payable monthly in arrears (no later than 10 days from the receipt of an invoice from GDB), and principal is payable at its maturity on June 30, 2027. The Loans bear interest at a fixed rate equal to 7%. The 1996 CCDA Loans are unsecured and, pursuant to the loan agreement, are payable from appropriations from the Legislative Assembly.

*2013 CCDA Loan.* The CCDA Loans include a Loan originally made by GDB to CCDA to finance the acquisition by CCDA through eminent domain of a parcel commonly known as Parcel C located in the Convention Center District in San Juan ("Parcel C"). Such Loan (the "2013 CCDA Loan") has an outstanding principal balance of approximately $4.4 million as of the Cutoff Date. Pursuant to the loan agreement, the entire outstanding principal balance of the Loan, plus accrued interest, was due on September 30, 2014. The 2013 CCDA Loan bears interest at a fixed rate equal to 6%. The 2013 CCDA Loan is unsecured and, pursuant to the loan agreement, is payable solely from the proceeds of the sale or other revenues generated by CCDA from Parcel C, with no recourse to other assets of CCDA. While the Loan documents contemplated the constitution of a mortgage over Parcel C to secure CCDA's obligations under the 2013 CCDA Loan, such mortgage was not ultimately constituted and the eminent domain proceeding pursuant to which CCDA acquired title to Parcel C is still ongoing due to challenges brought by the previous owner of such property.

*Other Public Corporation Loan Assets.* The remaining Public Corporation Loan Assets, which constitute approximately 7% of all Public Corporation Loan Assets, consist of 13 Loans to seven public corporations and instrumentalities of the Commonwealth with an aggregate outstanding principal balance as of the Cutoff Date of approximately $195.8 million. The outstanding principal balances of the individual Loans range from approximately $995,449 to $53.6 million. These Public Corporation Loan Assets are mostly unsecured and payable from legislative appropriations or proceeds of future bond issuances, with the following exceptions: (i) a Loan to the Comprehensive Fund for the Agricultural Development of Puerto Rico (the "Agricultural Development Fund") with an outstanding principal balance as of the Cutoff Date of approximately $15.3 million, which is secured by a security interest in the proceeds of certain revenues allocated to the Agricultural Development Fund pursuant to Act No. 165-2001, as amended, and Act No. 166-2001, as amended, corresponding to Commonwealth excise taxes on sugar and imported coffee, respectively, but which are not currently being transferred by the Commonwealth's Department of Treasury to the Agricultural Development Fund, and (ii) a Loan to PRIDCO with an aggregate principal balance as of the Cutoff Date of approximately $24.7 million, which is secured by a security interest in the product and net proceeds of the sale or disposition of 27 real properties owned by PRIDCO. All of these Loans are classified by GDB as non-performing as of the Cutoff Date.

### GDB Retained Loan Rights

The Transferred Property will include the Beneficial Interest in, and the proceeds of (such Beneficial Interest and proceeds are referred to herein as the GDB Retained Loan Rights), the GDB Retained Loans, including the Additional Recovery Authority Loans, that will be retained and continue to be serviced by GDB, pursuant to, and on the terms set forth in, the Qualifying Modification. The GDB Retained Loans consist of Loans granted by GDB to several public corporations and instrumentalities with an aggregate principal balance as of the Cutoff Date of approximately $1,131.8 million, of which the Additional Recovery Authority Loans comprise approximately $144.6 million. The "Additional Recovery Authority Loans" are Loans to CRIM, Economic Development Bank for Puerto Rico ("EDB"), and University Medical Services, Inc. ("SMU"), further described below.

133

DRA Ex. 225

Pursuant to the GDB Restructuring Act and the Qualifying Modification, GDB will be required to transfer the proceeds of the GDB Retained Loans to the Issuer as soon as practicable but in no event later than 15 days after receipt thereof. Other than the Additional Recovery Authority Loans (upon the transfer thereof to GDB as provided below) and the Beneficial Interest in the GDB Retained Loans, the GDB Retained Loans will not be part of the Transferred Property.

As explained above under "—*Management of the Restructuring Property*," pursuant to the Qualifying Modification, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on the GDB Retained Loans, *provided* that it will not be required to bring any action seeking to obtain a judgment against a public entity that is an obligor on a GDB Retained Loan or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material information relating to any modification, restructuring or similar transaction in respect of such Loans.

The Additional Recovery Authority Loans will be transferred to GDB as Transferred Property on the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (b) 18 months after the Closing Date. Upon the required transfer of the Additional Recovery Authority Loans to the Issuer and upon the transfer of any other GDB Retained Loan to the Issuer at the discretion of GDB, the Issuer will be subject to the limitations on its exercise of rights and remedies in respect of such Loan to the same extent as with respect to the Public Corporation Loan Assets. For additional information on such duties and limitations, see "—*Management of the Restructuring Property*" above.

All GDB Retained Loans (other than the Additional Recovery Authority Loans) are classified by GDB as non-performing. All Additional Recovery Authority Loans were classified by GDB as performing as of the Cutoff Date, *provided that*, as further discussed below, a portion of the 2001 CRIM Loan (as defined herein) with a principal balance of $26.9 million, had been placed by GDB in non-accrual status as of the Cutoff Date.

The following table provides an overview of certain additional information regarding the GDB Retained Loans as of the Cutoff Date (but considering any payments received by GDB on July 2, 2018 by virtue of rollover to the next business day from the Cutoff Date), and a brief description of each Additional Recovery Authority Loan follows.

**GDB Retained Loan Rights[1]**

| Obligor | Outstanding Principal Balance | Accrued and Unpaid Interest | Number of Loans | Weighted Average Effective Annual Interest Rate | Final Maturity Date[2] | % of Total Outstanding Principal Balance of GDB Retained Loans |
|---|---|---|---|---|---|---|
| ASEM[3] | $282,447,692 | $64,161,740 | 1 | 6.25% | 11/30/2022 | 25% |
| Special Communities[4] | 240,708,020 | 92,889,979 | 1 | 7.00% | 6/30/2040 | 21% |
| ASES[5] | 182,196,066 | 41,817,876 | 1 | 6.25% | 10/31/2022 | 16% |
| CRIM | 129,083,721 | 19,350,423 | 2 | 4.11% | 7/1/2032 | 11% |
| Cancer Center[6] | 120,482,398 | 20,509,820 | 2 | 6.55% | 12/31/2043 | 11% |
| TDF[7] | 44,925,998 | - | 3 | - | - | 4% |
| EDB Loan[8] | 6,556,583 | 0 | 1 | 6.00% | 6/1/2026 | 1% |
| EDB Deposit[9] | 35,122,200 | 0 | 1 | N/A | N/A | 3% |
| Cantera Peninsula[10] | 37,791,088 | 10,007,699 | 2 | 7.00% | 6/30/2040 | 3% |
| PRIFA | 37,361,150 | 8,897,649 | 1 | 6.25% | 6/30/2017 | 3% |
| SMU[6] | 8,988,973 | - | 1 | 6.25% | 6/30/2025 | 1% |
| PPP[11] | 6,159,177 | 949,295 | 1 | 6.25% | 1/31/2016 | 1% |
| Total | $1,131,823,066 | $258,584,482 | 17 | - | - | 100% |

(1) Additional Recovery Authority Loans are identified in bold.

(2) Does not account for the impact of Closing Date Adjustments.

(3) Puerto Rico Medical Services Administration.

(4) Special Communities Perpetual Trust.

(5) Puerto Rico Health Insurance Administration.

(6) Puerto Rico Comprehensive Cancer Center.

(7) Puerto Rico Tourism Development Fund.

(8) As defined herein.

(9) Non-performing overnight deposit of GDB at EDB.

(10) Cantera Peninsula Integral Development Company.

(11) Puerto Rico Public-Private Partnerships Authority.

Source: GDB

*CRIM Loans*. CRIM is a municipal entity of the Commonwealth that is primarily responsible for assessing and collecting real and personal property taxes for the benefit of the municipalities. Loans to CRIM comprising Additional Recovery Authority Loans consist of two Loans made by GDB to CRIM in 2001 (the "2001 CRIM Loan") and 2002 (the "2002 CRIM Loan") that have an aggregate outstanding principal balance as of the Cutoff Date of approximately $129.1 million.

*2001 CRIM Loan*. The 2001 CRIM Loan was made by GDB to CRIM pursuant to Act No. 42-2000 to cover CRIM's operational deficit resulting from excess remittances made by CRIM to municipalities based on estimates of annual property tax

134

**DRA Ex. 225**