# Debtors' Ex. 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF SUBMISSION OF
## PLAN SUPPLEMENT AND PLAN RELATED
## DOCUMENTS BY THE COMMONWEALTH OF PUERTO RICO, ET AL.

**PLEASE TAKE NOTICE** that the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA")[2] and Section 1.395 of the *Seventh Amended Title III Joint Plan of Adjustment of*

---

1 The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations)

2 PROMESA is codified at 48 U.S.C. §§ 2101–2241.

*the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 17627] (as may be further amended, modified, or supplemented, the "Plan"),[3] has filed the *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (the "Plan Supplement"), a copy of which is attached hereto as **Exhibit A**, containing documents listed on **Schedule 1** hereto (collectively, the "Plan Related Documents").

PLEASE TAKE FURTHER NOTICE that the Plan Related Documents remain subject to negotiations with parties in interest, and the Oversight Board, the Commonwealth, ERS, and PBA reserve the right to amend, modify, or supplement any of the Plan Related Documents up to and including the entry of an order confirming the Plan (and, in conjunction therewith, approval of the Plan Related Documents).

PLEASE TAKE FURTHER NOTICE that the rights of all parties in interest, including, but not limited to, the Oversight Board, the Commonwealth, ERS, and PBA, and the other parties to the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, Creditors' Committee Agreement, Retiree Committee Plan Support Agreement, and AFSCME Plan Support Agreement, with respect to the form of the Plan Related Documents, are expressly preserved and the exercise or waiver of any consent rights are expressly preserved.

PLEASE TAKE FURTHER NOTICE that all documents filed in these Title III cases are available (a) free of charge by visiting https://cases.primeclerk.com/puertorico or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

---

3 Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

Dated: October 11, 2021
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and*
*Management Board as representative for the*
*Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and*
*Management Board as representative for the*
*Debtors*

**Schedule 1**

**List of Exhibits in the Plan Supplement[4]**

| Exhibit A: | New GO Bond Trust Agreement |
|---|---|
| Exhibit B: | CVI Trust Agreement |
| Exhibit C: | Avoidance Actions Trust Agreement |
| Exhibit D: | ERS Trust Agreement |
| Exhibit E: | Schedule of Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit F: | Supplemental Ambac Election Notice |
| Exhibit G: | Assured Custodial Trust Documents |
| Exhibit H: | FGIC Custodial Trust Agreement |
| Exhibit I: | Syncora Custodial Trust Documents |
| Exhibit J: | Draft Legislation as approved by the House of Representatives of Puerto Rico[5] |
| Exhibit K: | Draft Legislation as approved by the Senate of Puerto Rico[6] |

---

[4] The Plan Related Documents remain subject to negotiation with parties in interest and the rights of all parties in interest, including, but not limited to, the Oversight Board, the Commonwealth, ERS, and PBA, and the other parties to the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, Creditors' Committee Agreement, Retiree Committee Plan Support Agreement, and AFSCME Plan Support Agreement, with respect to the form of documents contained in the Plan Supplement, are expressly reserved and the exercise or waiver of any consent rights are expressly preserved.

[5] The annexed draft legislation, passed by the House of Representatives of Puerto Rico provides for the issuances of the general obligation bonds and the contingent value instruments, and is required to be included in the Plan Supplement. However, as set forth in a published statement of the Oversight Board, see Oversight Board Statement, dated October 8, 2021, the Oversight Board does not support the current version of the draft legislation, asserts that it is inconsistent with the proposed Plan, and reserves all rights in connection therewith.

[6] The annexed draft legislation, passed by the Senate of Puerto Rico, provides for the issuances of the general obligation bonds and the contingent value instruments, and is required to be included in the Plan Supplement. However, as set forth in a published statement of the Oversight Board, see Oversight Board Statement, dated October 8, 2021, the Oversight Board does not support the current version of the draft legislation, asserts that it is inconsistent with the proposed Plan, and reserves all rights in connection therewith.

## Exhibit A

**Plan Supplement**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                      Debtors.[7] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## PLAN SUPPLEMENT AND PLAN RELATED DOCUMENTS OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

---

[7] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations)

## Table of Contents [8]

| Exhibit A: | New GO Bond Trust Agreement |
|---|---|
| Exhibit B: | CVI Trust Agreement |
| Exhibit C: | Avoidance Actions Trust Agreement |
| Exhibit D: | ERS Trust Agreement |
| Exhibit E: | Schedule of Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit F: | Supplemental Ambac Election Notice |
| Exhibit G: | Assured Custodial Trust Documents |
| Exhibit H: | FGIC Custodial Trust Agreement |
| Exhibit I: | Syncora Custodial Trust Documents |
| Exhibit J: | Draft Legislation as approved by the House of Representatives of Puerto Rico [9] |
| Exhibit K: | Draft Legislation as approved by the Senate of Puerto Rico [10] |

---

[8] The Plan Related Documents remain subject to negotiation with parties in interest and the rights of all parties in interest, including, but not limited to, the Oversight Board, the Commonwealth, ERS, and PBA, and the other parties to the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, Creditors' Committee Agreement, Retiree Committee Plan Support Agreement, and AFSCME Plan Support Agreement, with respect to the form of documents contained in the Plan Supplement, are expressly reserved and the exercise or waiver of any consent rights are expressly preserved.

[9] The annexed draft legislation, passed by the House of Representatives of Puerto Rico provides for the issuances of the general obligation bonds and the contingent value instruments, and is required to be included in the Plan Supplement. However, as set forth in a published statement of the Oversight Board, see Oversight Board Statement, dated October 8, 2021, the Oversight Board does not support the current version of the draft legislation, asserts that it is inconsistent with the proposed Plan, and reserves all rights in connection therewith.

[10] The annexed draft legislation, passed by the Senate of Puerto Rico, provides for the issuances of the general obligation bonds and the contingent value instruments, and is required to be included in the Plan Supplement. However, as set forth in a published statement of the Oversight Board, see Oversight Board Statement, dated October 8, 2021, the Oversight Board does not support the current version of the draft legislation, asserts that it is inconsistent with the proposed Plan, and reserves all rights in connection therewith.

# **EXHIBIT A**

New GO Bond Trust Agreement

DRAFT 10/11/2021

**TRUST AGREEMENT**


**by and between**


**COMMONWEALTH OF PUERTO RICO**


**and**


**_____, as Trustee**


_____

**Dated as of _____ xx, 2021**

_____


Relating to the
Commonwealth of Puerto Rico
General Obligation Restructured Bonds

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND INTERPRETATION ................................................................ 3

Section 1.01    Definitions ................................................................................................. 3
Section 1.02    Rules of Construction ............................................................................... 13

ARTICLE II. AUTHORIZATION, ISSUANCE OF BONDS AND SERIES 2021A BONDS .. 14

Section 2.01    Authorization of Bonds ............................................................................. 14
Section 2.02    Provisions for Issuance of Bonds .............................................................. 14
Section 2.03    Supplemental Trust Agreements ............................................................... 16
Section 2.04    Maturity Dates, Principal Amounts and Interest Rates for Series 2021A-1 Current Interest Bonds ............................................................................. 17
Section 2.05    Maturity Dates, Principal Amounts and Interest Rates for Series 2021A-1 Capital Appreciation Bonds ...................................................................... 18
Section 2.06    Maturity Dates, Principal Amounts and Interest Rates for Series 2021A-2 Bonds ........................................................................................................ 18
Section 2.07    Interest Payments and Interest Accretion ................................................. 18

ARTICLE III. GENERAL TERMS AND PROVISIONS OF BONDS ..................................... 19

Section 3.01    Place and Medium of Payment .................................................................. 19
Section 3.02    Legends ...................................................................................................... 20
Section 3.03    CUSIP Numbers ........................................................................................ 20
Section 3.04    Execution and Authentication ................................................................... 20
Section 3.05    Interchangeability of Bonds ...................................................................... 21
Section 3.06    Transfer and Registry ................................................................................ 21
Section 3.07    Transfer of Bonds ...................................................................................... 21
Section 3.08    Regulations with Respect to Exchanges and Transfers ............................ 22
Section 3.09    Bonds Mutilated, Destroyed, Lost or Stolen ............................................ 22
Section 3.10    Book Entry Bonds ..................................................................................... 23
Section 3.11    Preparation of Definitive Bonds; Temporary Bonds ................................ 24

ARTICLE IV. REDEMPTION OF BONDS .............................................................................. 24

Section 4.01    Authorization of Redemption .................................................................... 24
Section 4.02    Redemption at the Election of the Commonwealth ................................... 24
Section 4.03    Redemption Other Than at Commonwealth's Election .............................. 25
Section 4.04    Redemption Prices and Terms of Series 2021A Bonds .............................. 25
Section 4.05    Selection of Bonds to be Redeemed .......................................................... 31
Section 4.06    Notice of Redemption ................................................................................ 31
Section 4.07    Payment of Redeemed Bonds .................................................................... 32

ARTICLE V. STATUTORY LIEN ON MONEYS IN DEBT SERVICE FUND; FUNDS AND ACCOUNTS; COMMONWEALTH REVENUES AND APPLICATION THEREOF ... 33

Section 5.01    Statutory Lien in Debt Service Fund ......................................................... 33
Section 5.02    Establishment of Funds and Accounts ...................................................... 33

# TABLE OF CONTENTS
## (continued)

**Page**

Section 5.03    Application of Bond Proceeds ............................................. 34
Section 5.04    Application of Money in the Costs of Issuance Fund................... 34
Section 5.05    Application of Moneys ...................................................... 35
Section 5.06    Debt Service Fund........................................................... 35
Section 5.07    Arbitrage Rebate Fund ..................................................... 36
Section 5.08    Transfer of Investments ................................................... 36

ARTICLE VI. SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS ..... 37

Section 6.01    Security for Deposits........................................................ 37
Section 6.02    Investment of Funds and Accounts Held by the Trustee ............. 37
Section 6.03    Liability for Investments ................................................... 38

ARTICLE VII. PARTICULAR COVENANTS............................................. 38

Section 7.01    Payment of Principal and Interest....................................... 38
Section 7.02    Pledge of Good Faith and Credit; Bonds Constitute Public Debt...... 38
Section 7.03    Deemed Annual Allocation................................................ 38
Section 7.04    Powers as to Bonds ........................................................ 39
Section 7.05    Further Assurance .......................................................... 39
Section 7.06    Offices for Payment and Registration of Bonds ...................... 39
Section 7.07    General....................................................................... 39
Section 7.08    Non-Impairment Covenant ............................................... 40
Section 7.09    Tax Exemption Covenant ................................................. 40
Section 7.10    Comprehensive Cap on Net Tax Supported Indebtedness............. 40
Section 7.11    Fiscal Plan................................................................... 41
Section 7.12    Continuing Disclosure ..................................................... 41
Section 7.13    IRS Favorable Tax Determination ...................................... 41

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT ..... 41

Section 8.01    Appointment and Acceptance of Trustee.............................. 41
Section 8.02    Appointment and Acceptance of Paying Agents ...................... 41
Section 8.03    Responsibilities of Trustee and Paying Agents ....................... 42
Section 8.04    Property Held in Trust .................................................... 42
Section 8.05    Rights of the Trustee and the Paying Agent .......................... 42
Section 8.06    Compensation and Indemnification ..................................... 44
Section 8.07    Permitted Acts.............................................................. 45
Section 8.08    Resignation of Trustee .................................................... 45
Section 8.09    Removal of Trustee ........................................................ 45
Section 8.10    Successor Trustee and/or Paying Agent ............................... 45
Section 8.11    Transfer of Rights and Property to Successor Trustee................ 46
Section 8.12    Merger or Consolidation of the Trustee................................ 47
Section 8.13    Ancillary Agreements ..................................................... 47

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE IX. SUPPLEMENTAL TRUST AGREEMENTS ........................................................ 47

Section 9.01   Modification and Amendment without Consent ................................................. 47
Section 9.02   Supplemental Trust Agreements Effective with Consent of Bondholders ........ 48
Section 9.03   General Provisions Relating to Supplemental Trust Agreements..................... 49

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT ....................................................... 49

Section 10.01   Powers of Amendment.................................................................................... 49
Section 10.02   Consent of Bondholders................................................................................. 50
Section 10.03   Modifications by Unanimous Consent............................................................ 51
Section 10.04   Mailing .......................................................................................................... 51
Section 10.05   Exclusion of Bonds ....................................................................................... 51
Section 10.06   Notation on Bonds ......................................................................................... 51

ARTICLE XI. DEFAULTS AND REMEDIES ......................................................................... 51

Section 11.01   Events of Default ........................................................................................... 51
Section 11.02   No Acceleration with Respect to the Bonds .................................................. 52
Section 11.03   Enforcement of Remedies.............................................................................. 52
Section 11.04   Priority of Payments after Default ................................................................ 53
Section 11.05   Termination of Proceedings ........................................................................... 54
Section 11.06   Bondholders' Direction of Proceedings ........................................................ 54
Section 11.07   Control by Holders of Bonds; Limitations..................................................... 54
Section 11.08   Actions by Trustee; Possession of Bonds by Trustee Not Required ............... 55
Section 11.09   Waiver and Non–Waiver of Default ............................................................... 55
Section 11.10   Notice of Event of Default............................................................................. 55
Section 11.11   Remedies Not Exclusive ............................................................................... 55

ARTICLE XII. DEFEASANCE ............................................................................................... 55

Section 12.01   Defeasance ..................................................................................................... 55

ARTICLE XIII. EXECUTION OF INSTRUMENTS BY BONDHOLDERS  AND PROOF
OF OWNERSHIP OF BONDS ................................................................................................. 58

Section 13.01   Evidence of Signatures of Bondholders and Ownership of Bonds................... 58

ARTICLE XIV. MISCELLANEOUS ....................................................................................... 58

Section 14.01   Preservation and Inspection of Documents.................................................... 58
Section 14.02   Money and Funds Held for Particular Bonds ................................................ 59
Section 14.03   Cancellation of Bonds................................................................................... 59
Section 14.04   No Recourse under Trust Agreement or on the Bonds .................................... 59
Section 14.05   Severability of Invalid Provision ................................................................... 59
Section 14.06   Parties of Interest ......................................................................................... 59
Section 14.07   Certain Provisions Relating to Capital Appreciation Bonds............................ 59

- iii -

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| Section 14.08 | Notices | 60 |
| Section 14.09 | Headings | 60 |
| Section 14.10 | Governing Laws | 60 |
| Section 14.11 | Retention of Jurisdiction of Title III Court | 60 |
| Section 14.12 | Signatures and Counterparts | 61 |
| Section 14.13 | Successors and Assigns | 61 |
| Section 14.14 | Conflicts | 61 |

EXHIBIT A – FORM OF SERIES 2021A CURRENT INTEREST BONDS ............................ A-1
EXHIBIT B – FORM OF SERIES 2021A-1 CAPITAL APPRECIATION BONDS ................ B-1
EXHIBIT C – ACCRETED VALUE TABLE ............................................................ C-1
EXHIBIT D – CONFIRMATION ORDER ................................................................ D-1
[EXHIBIT E – CONTINUING DISCLOSURE AGREEMENT ...................................... E-1]

4842-1351-5245.14

## TRUST AGREEMENT

**THIS TRUST AGREEMENT,** dated as of _____ xx, 2021, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and _____, as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Bondholders that it has authorized this Trust Agreement.

## R E C I T A L S

[to be updated as proceedings progress]

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below), the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were [the resolution of certain claims relating to the Commonwealth's direct and guaranteed general obligation debt and certain other liabilities of the Commonwealth] and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Bonds (as defined below) pursuant to this Trust Agreement.

On October \_\_\_, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the Act (as defined below) which, among other things authorized the issuance of the Series 2021A Bonds.

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the Act, the Title III Court made a binding determination that the Bonds are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Commonwealth law and federal law:

a.  The Confirmation Order is full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

b.  The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and the Plan.

c.  All provisions herein made to pay or secure payment of the Bonds, including the Commonwealth's good faith[1], credit and taxing power pledge herein, are legal, valid, binding, and enforceable, including, without limitation, covenants not to impair such property, as adequate protection for the property rights conferred under the Plan, the Act and the Confirmation Order.

d.  At the time of issuance and delivery of the Bonds, the Commonwealth is hereby authorized and directed to have stamped or written on each of the Bonds a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2021

All things have been done which are necessary to make the Bonds, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust agreement for the security of the Bonds, in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Bonds are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Bonds as follows:

This Trust Agreement provides for the following transactions:

(a)  issuance by the Commonwealth of its general obligations to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the Act:

(b)  the statutory lien on moneys deposited into the Debt Service Fund (as defined herein) established herein; and

---

[1]  "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution. "Good faith" is the literal translation of the term "buena fe". See Article VI, Section 2 of the Commonwealth's Constitution.

(c)     the rights and remedies of the holders from time to time of the Commonwealth's Bonds.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, the moneys on deposit in the Debt Service Fund shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Bonds issued and to be issued hereunder, without preference, priority or distinction as to participation in the moneys on deposit in the Debt Service Fund, and the benefit and protection thereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Bonds shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if (a)(i) the Commonwealth or its successors or assigns shall well and truly pay or cause to be paid the Principal (as defined below) of Bonds with interest, according to the provisions set forth in the Bonds, respectively, and each of them or (ii) shall provide for the payment of Bonds by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement, and (b) shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth, then, provided no Bonds remain Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby and by the Act shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Act, the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Bonds are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Bonds are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions**.  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust

- 3 -

Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

**"AAFAF"** means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

**"Accreted Value"** means, with respect to the Capital Appreciation Bonds, as of the date of calculation, the principal amount at initial issuance thereof, plus interest thereon to such date of calculation, capitalized semiannually on each Valuation Date at the accretion rate stated in Section 2.05 herein or within the applicable Supplemental Trust Agreement until paid at stated maturity, or prior redemption permitted by the terms of the applicable Supplemental Trust Agreement or after stated maturity following payment default by the Commonwealth, assuming that between Valuation Dates such Accreted Value increases in equal daily amounts on the basis of a 360-day year of twelve 30-day months; *provided, however*, that Accreted Value shall be, as of the time of the Commonwealth actually makes a Sinking Fund Installment payment or other payment required or permitted to be made on such Capital Appreciation Bond, reduced by the amount, if any, that such payment exceeds accrued interest on such Capital Appreciation Bond from the prior Valuation Date.

**"Act"** means Act No. _____-2021.

["**Ancillary Agreements**" means the Trust Agreement, the Confirmation Order, the Plan and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.]

**"Arbitrage Rebate Fund"** means the fund so designated, created and established pursuant to Section 5.02 hereof.

**"Authorized Denominations"** means, with respect to the Series 2021A-1 Capital Appreciation Bonds, $1.00 principal amount in Maturity Value, or any integral multiple thereof, and with respect to Series 2021A Current Interest Bonds, $1.00 in Principal amount or any integral multiple thereof.

**"Authorized Officer"** means (a) in the case of the Commonwealth, the Governor of the Commonwealth, the Secretary of Treasury or such other officer of a Government Entity as may be designated by the Governor through executive order, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by-laws of the Trustee.

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

- 4 -

"**Bond**" means any bond, including the Series 2021A Bonds, of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof and, with respect to the Refunding Bonds the applicable Supplemental Trust Agreement.

"**Bondholder**", "**Holder of Bonds**" or "**Holder**" or any similar term, when used with reference to a Bond or Bonds, means the registered owner thereof; *provided, however*, that for purposes of this Trust Agreement, in the case of any Insured Bonds, the applicable Bond Insurer shall be treated as (i) the sole Holder of the Insured Bonds insured by such Bond Insurer for the purpose of consenting to any modification or amendment, exercising any voting right or privilege, giving any consent or direction, or taking any action that the Holders of such Insured Bonds are entitled to take pursuant to the provisions of this Trust Agreement pertaining to defaults and remedies and the duties and obligations of the Trustee, and (ii) an additional Holder of the Insured Bonds insured by such Bond Insurer for purposes of receiving any notices or exercising any rights to inspect documents provided for under this Trust Agreement.

"**Bond Insurance Policy**" means a municipal bond insurance policy, if any, issued by a Bond Insurer that guarantees payment of Principal of and interest on Insured Bonds.

"**Bond Insurer**" means the provider of a Bond Insurance Policy, if any, specified in a Supplemental Trust Agreement.

"**Book Entry Bond**" means a Bond issued to and registered in the name of a Depository for the participants in such Depository.

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

"**Capital Appreciation Bond**" means any Bond as to which interest is capitalized on each Valuation Date therefor and is stated to be payable only at the maturity or prior redemption thereof.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder.

"**Comprehensive Cap**" has the meaning ascribed to such term in the Debt Responsibility Act.

"**Confirmation Order**" means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

["**Costs of Issuance**" means the items of expense to be paid by the Commonwealth which are incurred prior to, upon and during a reasonable period of time after issuance of the Bonds of a Series, in each case in connection with the authorization, sale and issuance of the Bonds, which items of expense may include, but not be limited to, underwriting discount or fees, structuring fees, placement fees, document printing and reproduction costs, filing and recording fees, costs of credit ratings, initial fees and charges of a Depository or the Trustee and its counsel, other legal fees and charges, professional consultants' fees, fees and charges for execution, transportation and

safekeeping of the Bonds, premiums, fees and charges for insurance on the Bonds, and other costs, charges and fees in connection with the foregoing.]

["**Costs of Issuance Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.]

"**Debt Management Policy**" means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act.

"**Debt Policy Revenues**" means, collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue assigned to, or owned by, the Puerto Rico Sales Tax Financing Corporation or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan (as defined in the Plan), (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further, that, for purposes of illustration, with respect to Fiscal Year 2020, and as reflected in the CW Fiscal Plan (as defined in the Plan), "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six hundred Thousand Dollars ($15,146,600,000.00).

"**Debt Responsibility Act**" shall mean Act No. 101-2020, as the same may be amended, modified or supplemented.

"**Debt Service Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Defeasance Security**" means:

(a)     a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)     any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; **provided** that at the time an investment therein is made such U.S.

Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

**"Depository"** means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement authorizing a Series of Bonds to serve as securities depository for Bonds of such Series, or any successor of any of the foregoing, as applicable.

**"Effective Date"** means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

**"Electronic Means"** means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

**"Eligible Investments"** means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)     Defeasance Securities;

(b)     interest-bearing general obligations of the United States of America;

(c)     United States of America treasury bills and other non-interest-bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)     short-term discount U.S. Government Obligations;

(e)     certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)     banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)     commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)     tax-exempt securities exempt from federal arbitrage provisions applicable to investments of proceeds of the Commonwealth's tax-exempt debt obligations, provided that such securities must be rated by at least two Rating Services (with one such Rating Service being S&P or Moody's) no less than AA (or equivalent) and no less than the rating on the Bonds, and provided, further, that any such

- 7 -

securities must be in book-entry form through The Depository Trust Company or a comparable depository;

(i)     domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(j)     Investment Agreements that are fully collateralized by Eligible Investments; and

(k)     domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

"**EMMA**" means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

"**Event of Default**" has the meaning given to such term in Section 11.01 hereof.

"**Fiscal Plan**" means a Fiscal Plan (as defined by Section 5(10) of PROMESA) of the Commonwealth, certified by the Oversight Board.

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings and its successors.

"**General Fund**" means the Commonwealth's primary operating fund.

"**Government Entity**" means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

"**Instructions**" has the meaning given to such term in Section 8.05.

"**Insured Bond**" means a Bond issued hereunder and designated as an Insured Bond in the Supplemental Trust Agreement authorizing the issuance thereof.

"**Interest Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Interest Payment Date**" means each January 1 and July 1; provided, however, that with respect to the Series 2021A Bonds that are not issued as Capital Appreciation Bonds, such term also includes the Effective Date.

- 8 -

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date.

"**Maturity Value**" means, with respect to a Series 2021A-1 Capital Appreciation Bond, the Accreted Value due at stated maturity if no Sinking Fund Installment on such Bond is paid prior to stated maturity.

["**Monthly Disbursement Date**" means the first Business Day of each calendar month.]

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**Outstanding**", when used in reference to Bonds, means, as of a particular date, all such Bonds authenticated and delivered hereunder and under any applicable Supplemental Trust Agreement except:

(a)     any Bonds canceled by the Trustee at or before such date;

(b)     any Bonds deemed to have been paid in accordance with Section 12.01 hereof;

(c)     any Bond canceled or paid pursuant to Section 3.09 and Section 4.07 hereof or any Bond in lieu of or in substitution for which another Bond, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof; and

(d)     for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Bonds hereunder, any Bond deemed to not be Outstanding in accordance with Section 10.05 hereof.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Bonds of any Series, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"**Plan**" means the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code, and the terms thereof.

"**Principal**" means collectively, the principal payment required to be made on a Bond on its final maturity date and each Sinking Fund Installment of a Bond due on a Principal Payment Date.

"**Principal Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Principal Payment Date**" means each July 1.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a)    a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b)    a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c)    a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d)     the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e)     a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meet the applicable rating requirements set forth above.

**"Quarter in Interest"** means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date.  In the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Bonds (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

**"Rating Confirmation"** means the written confirmation of a relevant Rating Service to the effect that the rating assigned, without regard to any insurance or other credit enhancement, to each of the Bonds rated by such Rating Service will remain unchanged and will not be withdrawn, suspended or reduced as a consequence of some act or occurrence.

**"Rating Service"** means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

**"Record Date"** means, when used in relation to the Bonds of a Series, the date specified as the record date for such Bonds in the Supplemental Trust Agreement authorizing such Bonds.

**"Redemption Date"** means each date of redemption specified in Section 4.04 hereof for the redemption of Series 2021A-1 Capital Appreciation Bonds.

**"Redemption Price"** when used with respect to a Bond, means the Principal amount of such Bond plus the applicable premium, if any, payable upon redemption prior to maturity thereof pursuant hereto or to the applicable Supplemental Trust Agreement.

**"Refunding Bonds"** means any of the Bonds issued to refund, refinance or defease other Bonds in compliance with the provisions of Section 2.02 hereof.

**"Restructuring Transaction"** means the transactions contemplated by, or in furtherance of, the Plan.

**"S&P"** means S&P Global Ratings and its successors.

**"Secretary of Treasury"** means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

**"Serial Bonds"** means the Bonds so designated in a Supplemental Trust Agreement.

4842-1351-5245.14

"**Series**" means with respect to Bonds, all of the Bonds authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Trust Agreement authorizing such Bonds as a separate Series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article III, Section 4.07 or Section 10.06 hereof, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions.

"**Series 2021A Bonds**" means the Commonwealth's Restructured General Obligation Bonds, Series 2021A authorized and issued pursuant to Article II of this Trust Agreement, which consist of, collectively, the Series 2021A-1 Bonds and the Series 2021A-2 Bonds.

"**Series 2021A Current Interest Bonds**" means collectively, the Series 2021A-1 Current Interest Bonds and the Series 2021A-2 Bonds.

"**Series 2021A-1 Bonds**" means the Series 2021A Bonds that are issued as Tax Exempt Bonds, which consist of, collectively, the Series 2021A-1 Capital Appreciation Bonds and the Series 2021A-1 Current Interest Bonds.

"**Series 2021A-1 Capital Appreciation Bonds**" means the Series 2021A-1 Bonds issued as Capital Appreciation Bonds, which have stated maturity dates of July 1, 2024 and July 1, 2033.

"**Series 2021A-1 Current Interest Bonds**" means the Series 2021A-1 Bonds issued as current interest bonds, which have stated maturity dates of July 1, 2023, July 1, 2025, July 1, 2027, July 1, 2029, July 1, 2031, July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041 and July 1, 2046.

"**Series 2021A-2 Bonds**" means the Series 2021A Bonds other than the Series 2021A-1 Bonds, which Series 2021A-2 Bonds have a stated maturity date of July 1, 2041 and are current interest bonds. Subject to Section 7.13 of this Trust Agreement, the Series 2021A-2 Bonds are Taxable Bonds.

"**Sinking Fund Installment**" means, as of any date of computation, the amount of money required to be paid on a single future July 1 for the retirement of any Bonds which mature after said future July 1, but does not include any amount payable by the Commonwealth by reason only of the maturity of a Bond.

"**Statutory Lien**" means the statutory first lien on the amounts deposited into the Debt Service Fund established with the Trustee for the purpose of securing the payment of the Bonds, including any income and revenues generated therefrom, which statutory first lien is created under and imposed by Article [203] of the Act.

"**Supplemental Trust Agreement**" means any trust agreement of the Commonwealth amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**Taxable Bond**" means all Bonds issued pursuant to this Trust Agreement other than Tax Exempt Bonds.

"**Tax Exempt Bond**" means any Bond as to which Transaction Counsel has rendered an opinion to the effect that interest on it is excluded from gross income for purposes of federal income taxation.

**"Term Bond"** means a Bond so designated and payable from Sinking Fund Installments.

**"Title III Cases"** has the meaning given to such term in the Recitals.

**"Title III Court"** has the meaning given to such term in the Recitals.

**"Transaction Counsel"** means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

**"Trust Agreement"** means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

**"Trustee"** means the bank or trust company appointed as Trustee for the Bonds pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

**"U.S. Government Obligation"** means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

**"Valuation Date"** means with respect to any Capital Appreciation Bond, each January 1 and July 1; provided, however, that with respect to the Series 2021A Bonds that are issued as Capital Appreciation Bonds, such term also includes the Effective Date.

**Section 1.02  Rules of Construction.** Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement. All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated. All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

**"$"** and **"dollars"** each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

# ARTICLE II.

## AUTHORIZATION, ISSUANCE OF BONDS AND SERIES 2021A BONDS

**Section 2.01 Authorization of Bonds.** (a) There are hereby authorized to be issued Bonds of the Commonwealth to be designated as "Commonwealth of Puerto Rico General Obligation Restructured Bonds," which, in accordance with, and as provided by, Article [203] of the Act are secured by the Statutory Lien. The aggregate principal amount of Bonds which may be executed, authenticated and delivered is not limited except as provided hereby and in the Act, the Plan, the Confirmation Order, and the terms and conditions authorized by the Commonwealth and set forth in the Ancillary Agreements.

(b) On the Effective Date, the Commonwealth is hereby authorized to issue, with a deemed issuance date of July 1, 2021, and deliver the Series 2021A Bonds in two subseries (i) the Series 2021A-1 Bonds, consisting of (A) $5,861,055,000 aggregate principal amount of the Series 2021A-1 Current Interest Bonds and (B) $1,170,550,000 aggregate principal amount in Maturity Value of Series 2021-A Capital Appreciation Bonds and (ii) $822,260,000 aggregate principal amount of Series 2021A-2 Bonds. Each maturity of the Series 2021A Bonds is hereby designated as a Term Bond. The Series 2021A-1 Bonds are Tax Exempt Bonds and are hereby designated "Commonwealth of Puerto Rico General Obligation Restructured Bonds, Series 2021A-1" and the Series 2021A-2 Bonds are hereby designated "Commonwealth of Puerto Rico General Obligation Restructured Bonds, Series 2021A-2 (Taxable)".[2] Subject to Section 7.13 of this Trust Agreement, the Series 2021A-2 Bonds are Taxable Bonds.

(c) The form of the Series 2021A Current Interest Bonds is attached hereto as Exhibit A. The form of the Series 2021A-1 Capital Appreciation Bonds is attached hereto as Exhibit B.

**Section 2.02 Provisions for Issuance of Bonds**[3]. The Commonwealth shall issue Bonds under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Authorized Officer of the Commonwealth, or his or her designee; provided, however, that such direction may not conflict with the terms of this Trust Agreement, the Act, the Plan or the Confirmation Order. The Series 2021A Bonds are permitted to be issued as provided herein. The issuance of any Series of Refunding Bonds permitted to be issued hereunder shall be authorized by a Supplemental Trust Agreement or Supplemental Trust Agreements. The Bonds of a Series authorized to be issued shall be executed by the Commonwealth and delivered to the Trustee. Such Bonds shall from time to time and in such amounts as directed by the Commonwealth be authenticated by the Trustee and by it delivered to or upon the order of the Commonwealth upon receipt of the consideration therefor and upon delivery to the Trustee of:

(a) a copy of this Trust Agreement and, with respect to any Series of Bonds other than the Series 2021A Bonds, the Supplemental Trust Agreement authorizing such Bonds, certified by an Authorized Officer of the Commonwealth;

---

[2]  NTD: Amounts are preliminary.

[3]  NTD: The Secretary of Justice opinion and Secretary of Justice certificate are under review.

(b)　a written order as to the delivery of such Bonds, signed by an Authorized Officer of the Commonwealth, describing the Bonds to be delivered, designating the Person(s) to whom such Bonds are to be delivered and stating the consideration for such Bonds;

(c)　[an opinion of the Secretary of Justice of the Commonwealth to the effect that (i) the Trust Agreement and, if any, the applicable Supplemental Trust Agreement authorizing the Series of Bonds have been duly and lawfully authorized, executed and delivered by the Commonwealth; (ii) the Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are valid and binding upon the Commonwealth and enforceable in accordance with their terms; (iii) the Commonwealth is duly authorized and entitled to issue such Series of Bonds and, upon the execution and delivery thereof and upon authentication by the Trustee, such Series of Bonds will be duly and validly issued and will constitute valid and binding general obligations of the Commonwealth for which the good faith, credit and taxing power of the Commonwealth are irrevocably pledged and entitled to the benefits of the Trust Agreement; (iv) all legal authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by this Trust Agreement and, with respect to any Series of Bonds other than the Series 2021A Bonds, the Supplemental Trust Agreement authorizing such Bonds, are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes; (v) no litigation is pending, or, to the best of his or her knowledge, threatened (a) to restrain or enjoin the issuance or delivery of any of the Bonds, (b) in any way contesting or affecting any authority for or the validity of this Trust Agreement, the applicable Supplemental Trust Agreement, the Bonds, the issuance of the Bonds, or the repayment of other indebtedness of the Commonwealth as set forth in this Trust Agreement, (c) in any way contesting the power of the Authorized Officer of the Commonwealth to issue the Bonds or the power of the Commonwealth to sell the Bonds, or (d) in any way contesting the pledge of the good faith, credit and taxing power of the Commonwealth to the prompt payment of the Principal of and interest on the Bonds; ***provided, however,*** that such opinion of the Secretary of Justice of the Commonwealth may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determinations address and provide for such matters; ***provided, further,*** that such opinion of Secretary of Justice of the Commonwealth may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy, and (vi) the Bonds constitute "public debt" within the meaning of Sections 2 and 8 of Article VI of the Puerto Rico Constitution;]

(d)　[a certificate signed by the Secretary of the Treasury relating to (i) authorization and due execution of the Bond documents; (ii) signature of the Bonds and a statement that, based upon the Secretary of Justice's opinion, no litigation of the type described in Section 2.02(c)(v) is pending or, to the best of his or her knowledge, threatened; (iii) order to authenticate and deliver the Bonds; (vi) application of proceeds of the Bonds and (vii) as of the date of issuance of the Bonds, the Commonwealth is in compliance with any applicable debt limits, including the Comprehensive Cap and any applicable debt limit (if any) contained in the Constitution, and such certificate shall describe any assumptions with respect to the calculation of such debt limit;]

(e)　[a certificate of AAFAF regarding the resolution approving the issuance of the Bonds and confirming its recommendations to the Governor of the Commonwealth and the Secretary of Treasury as to the details of the Bonds;]

4842-1351-5245.14

(f)     [an opinion of Transaction Counsel to the effect that (i) the Trust Agreement and any applicable Supplemental Trust Agreement authorizing the Series of Bonds have been duly and lawfully authorized, executed and delivered by the Commonwealth; (ii) the Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are valid and binding upon the Commonwealth and enforceable in accordance with their terms; (iii) the Commonwealth is duly authorized and entitled to issue such Series of Bonds and, upon the execution and delivery thereof and upon authentication by the Trustee, such Series of Bonds will be duly and validly issued and will constitute valid and binding general obligations of the Commonwealth for which the good faith, credit and taxing power of the Commonwealth are irrevocably pledged and entitled to the benefits of the Trust Agreement; and (iv) all legal authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by this Trust Agreement and, with respect to any Series of Bonds other than the Series 2021A Bonds, the Supplemental Trust Agreement authorizing such Bonds, are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes; ***provided, however,*** that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; ***provided, further***, that such opinion of Transaction Counsel may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy; and]

(g)     for each issuance of Refunding Bonds, a certificate of an Authorized Officer of the Commonwealth demonstrating that upon the issuance of such Series of Refunding Bonds:

> (A)     the final maturity date of the Refunding Bonds is not later than thirty (30) years from the original scheduled maturity date of the Outstanding Bonds to be refunded; and
>
> (B)     upon the issuance of any Refunding Bonds, (1) there is no increase in the amount of Principal and interest due on Outstanding Bonds in any Fiscal Year and (2) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Commonwealth in its Debt Management Policy; provided, however, that refinancings without cash flow savings in any Fiscal Year are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and debt service due in any Fiscal Year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

**Section 2.03  Supplemental Trust Agreements**.  Each Supplemental Trust Agreement authorizing the issuance of Refunding Bonds shall specify the following:

(a)     The authorized principal amount of such Series of Bonds;

(b)     The date or dates of the Bonds, the maturity date or dates and Principal amounts of each maturity of the Bonds of such Series, the amount and date of each Sinking Fund Installment,

- 16 -

as applicable, and which Bonds of such Series are Serial Bonds or Term Bonds, if any, and the Record Date or Record Dates of the Bonds of such Series;

(c)     The interest rate or rates, if any, on the Bonds of such Series and the first date on which interest on the Bonds of such Series shall be payable; ***provided, however,*** in no event shall a Holder of Bonds be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon) other than overdue interest that accrues at the regular non-penalty rate of the applicable Bond or interest accruing on such overdue interest at the regular non-penalty rate of the applicable Bond;

(d)     If all or a portion of the Bonds of such Series are Capital Appreciation Bonds, the Valuation Dates for such Bonds and the Accreted Value on each such Valuation Date;

(e)     The denomination or denominations of and the manner of numbering and lettering of the Bonds of such Series;

(f)     The Redemption Price or Redemption Prices, if any, and, subject to Article IV hereof, the redemption terms, if any, for the Bonds of such Series;

(g)     Provisions for the sale or exchange of the Bonds of such Series and for the delivery thereof;

(h)     The form of the Bonds of such Series and the form of the Trustee's certificate of authentication thereon, and whether any Bonds of such Series are to be issued as Book Entry Bonds and the Depository therefor;

(i)     Directions for the application of the proceeds of the Bonds of such Series;

(j)     If all or a portion of such Bonds will be issued as Insured Bonds, the terms and conditions for payment of such Insured Bonds under the applicable Bond Insurance Policy; ***provided, however,*** in no event shall the Holder of Insured Bonds or the Bond Insurer be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon); and

(k)     Any other provisions deemed advisable by an Authorized Officer of the Commonwealth not in conflict with the provisions hereof or of any Ancillary Agreement.

**Section 2.04  Maturity Dates, Principal Amounts and Interest Rates for Series 2021A-1 Current Interest Bonds**.  The Series 2021A-1 Current Interest Bonds shall bear interest at such rates and shall mature on July 1 of each year set forth below and in the amounts set forth below:

| Year | Principal Amount | Interest Rate | CUSIP |
|------|------------------|---------------|-------|
| 2023 | $745,050,000 | 5.000% | |
| 2025 | 740,820,000 | 5.000 | |
| 2027 | 729,565,000 | 5.000 | |
| 2029 | 710,040,000 | 5.000 | |
| 2031 | 680,835,000 | 5.000 | |
| 2033 | 637,040,000 | 4.000 | |
| 2035 | 448,580,000 | 4.000 | |
| 2037 | 255,660,000 | 4.000 | |
| 2041 | 204,600,000 | 4.000 | |
| 2046 | 708,865,000 | 4.000 | |

**Section 2.05  Maturity Dates, Principal Amounts and Interest Rates for Series 2021A-1 Capital Appreciation Bonds**[4].  The Series 2021A-1 Capital Appreciation Bonds shall accrue and accrete at such rates and shall mature on July 1 of each year set forth below and in the Maturity Value set forth below:

| Year | Initial Accreted Amount | Maturity Value[†] | Interest Rate | CUSIP |
|------|-------------------------|-------------------|---------------|-------|
| 2024 | $288,241,989.75 | $334,275,000.00 | 5.000% | |
| 2033 | 442,506,553.50 | $836,275,000.00 | 5.375 | |

[†]  "Maturity Value" reflects Accreted Value at maturity if no Sinking Fund Installment are made prior to stated maturity.

**Section 2.06  Maturity Dates, Principal Amounts and Interest Rates for Series 2021A-2 Bonds**.  The Series 2021A-2 Bonds shall bear interest at such rates and shall mature on July 1 of each year set forth below and in the amounts set forth below:

| Year | Principal Amount | Interest Rate | CUSIP |
|------|------------------|---------------|-------|
| 2041 | $822,260,000 | 5.000% | |

**Section 2.07  Interest Payments and Interest Accretion**.  (a)  The Series 2021A Current Interest Bonds shall bear interest from July 1, 2021 until paid (whether at maturity, prior redemption or after maturity following payment default by the Commonwealth), payable on the Effective Date and semiannually thereafter on each Interest Payment Date, at the rates provided above.  Interest on the Series 2021A Current Interest Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months.  Interest shall accrue on overdue interest and Principal at the rates provided above, and shall compound on each Interest Payment Date.  All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2021A Current Interest Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

---

[4]NTD: Amounts are preliminary.

4842-1351-5245.14

(b)    Interest on the Series 2021A-1 Capital Appreciation Bonds shall accrue and accrete from July 1, 2021 until paid (whether at maturity, prior redemption or after maturity following payment default by the Commonwealth).  Interest on the Series 2021A-1 Capital Appreciation Bonds will not be paid on a current basis, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Commonwealth).  See "Exhibit C - Table of Accreted Value for the Series 2021A-1 Capital Appreciation Bonds" for the Accreted Values for Series 2021A-1 Capital Appreciation Bonds on each Valuation Date, assuming that no Sinking Fund Installment will be made prior to stated maturity. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF BONDS

**Section 3.01   Place and Medium of Payment**.  The Bonds shall be payable, with respect to interest, Principal and Redemption Price, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Bonds (as provided in Section 3.10 hereof) as otherwise provided in Section 4.07 hereof, upon presentation and surrender of Bonds, the Principal or Redemption Price of such Bonds shall be payable at the designated corporate trust office of the Trustee.  Interest on the Bonds shall be paid by check mailed to the registered owner thereof at the address thereof as it appears on the registry books of the Commonwealth or if authorized by the Supplemental Trust Agreement authorizing a Series of Bonds by wire transfer to such registered owner of the Bonds of such Series. For purposes of this Section, interest is payable on an Interest Payment Date to the registered owner of a Bond at the close of business on the Record Date for such Bond.  All payments of Principal or Redemption Price of or interest on Bonds shall specify the CUSIP number or numbers of the Bonds in connection with which such payment is made.  All payments of Principal and interest shall be rounded to the nearest $1.00.

The Bonds of each Series shall be issued in the form of fully registered Bonds without coupons.

Bonds of each Series issued prior to the first Interest Payment Date thereof shall be dated as of the date specified in the Supplemental Trust Agreement authorizing the issuance thereof. Bonds of each Series issued on or subsequent to the first Interest Payment Date thereof shall be dated as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be an Interest Payment Date, in which case they shall be dated as of such date of authentication; ***provided, however,*** that if, as shown by the records of the Trustee, interest on the Bonds of any Series has not been paid as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, the Bonds of such Series issued in lieu of Bonds surrendered for transfer or exchange shall be dated as of the date through which interest has been paid in full on the Bonds surrendered or, if no interest has been paid on the Bonds surrendered since their authentication, as of the date of authentication of the surrendered Bonds.  Bonds of each Series shall bear interest from (and including) their date and shall bear interest on overdue interest at the interest rate of such Bonds, which shall capitalize

- 19 -

on each Interest Payment Date. For the avoidance of doubt, if any Principal of, or accrued interest on, a Bond is not paid when due, such Principal and interest shall remain due and payable until paid.

All Bonds of each Series shall mature and/or have Sinking Fund Installments on July 1 of the year or years fixed herein with respect to the Series 2021A Bonds or by the Supplemental Trust Agreement authorizing the issuance of Refunding Bonds. Interest on all Bonds (other than Capital Appreciation Bonds) shall be payable on each Interest Payment Date of each year. The first installment of interest due on the Bonds of a Series may be for such period as the Commonwealth shall fix herein with respect to the Series 2021A Bonds or in the Supplemental Trust Agreement authorizing the issuance thereof of the Refunding Bonds.

**Section 3.02 Legends**. The Bonds may contain, or have endorsed thereon, such provisions, specifications and descriptive words not inconsistent herewith or with any Supplemental Trust Agreement authorizing the same, as may be necessary or desirable and as may be determined by the Commonwealth prior to their delivery. The Series 2021A Bonds shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [ ] DAY OF [ ], 2021."

**Section 3.03 CUSIP Numbers**. The Commonwealth shall provide for the assignment of CUSIP numbers for all Bonds ((including a separate CUSIP for each Series (and, where applicable, the subseries of such Series evidenced by such subseries' stated maturity date) of the Series 2021A-1 Current Interest Bonds, the Series 2021A-1 Capital Appreciation Bonds, the Series 2021A-2 Bonds and any future Series (and, where applicable, subseries of such Series evidenced by such subseries' stated maturity date) of Bonds issued pursuant to a Supplemental Trust Agreement) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Bondholders as a convenience to Bondholders; ***provided, however,*** that any such notice may state that no representation is made as to the correctness of such number either as printed on such Bonds or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Bond or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption. The Commonwealth shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Bond of which the Commonwealth has knowledge. The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04 Execution and Authentication**. The Bonds shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer of the Commonwealth, or in such other manner as may be permitted by law. In case any one or more of the officers or employees who shall have signed any of the Bonds shall cease to be such officer or employee before the Bonds so signed shall have been actually authenticated and delivered by the Trustee, such Bonds may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Bonds had not ceased to hold such offices or be so employed. Any Bond may be signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Bond shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Bonds such Persons may not have been so authorized or have held such office or employment.

4842-1351-5245.14

The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth herein with respect to the Series 2021A Bonds or in the Supplemental Trust Agreement authorizing the issuance of the Bonds, executed manually by the Trustee. Only such Bonds as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of the Commonwealth shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Bonds**.   Bonds, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same Series, maturity and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry**.   So long as any of the Bonds remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or transfer. So long as any of the Bonds remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Bonds at the designated corporate trust office of the Trustee.

**Section 3.07   Transfer of Bonds**.   Each Bond shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in Person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer. Upon the transfer of any such Bond, the Commonwealth shall cause to be issued in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity and tenor as the surrendered Bond.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Bond shall be registered upon the books of the Commonwealth as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the Principal or Redemption Price of and, subject to the provisions of Section 3.01 hereof with respect to Record Dates, interest on such Bond and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall

- 21 -

be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary. The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

**Section 3.08   Regulations with Respect to Exchanges and Transfers**.  In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions hereof.  All Bonds surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Bonds, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Bond upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer.  The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Bonds of any Series during the period beginning on the Record Date for such Bonds immediately preceding an Interest Payment Date on such Bonds and ending on such Interest Payment Date, or, in the case of any proposed redemption of Bonds of such Series, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Bonds Mutilated, Destroyed, Lost or Stolen**.  In case any Bond shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, tenor and Principal amount as the Bond so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for such Bond so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.  All Bonds so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth.  In case any Bond which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth may, instead of issuing a Bond in exchange or substitution therefor, pay or authorize the payment of such mutilated Bond upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Bond, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.

- 22 -

**Section 3.10   Book Entry Bonds**.  Anything herein to the contrary notwithstanding, the Series 2021A Bonds shall be authorized and issued as Book Entry Bonds and any other Bonds may be authorized and issued as Book Entry Bonds in accordance with the Supplemental Trust Agreement authorizing such Bonds.

For all purposes of the Trust Agreement the Holder of a Book Entry Bond shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Bond or to any direct or indirect participant in such Depository.  Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Bond with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Bond, (b) the delivery to any participant of the Depository, the beneficial owner of such Bond or any other Person, other than the Depository, of any notice with respect to such Bond, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Bond or any other Person, other than the Depository, of any amount with respect to the Principal or Redemption Price of, or interest on, such Bond.  The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Bond for the purpose of (x) payment of the Principal or Redemption Price of and interest on such Bond, (y) giving notices of redemption and of other matters with respect to such Bond, (z) registering transfers with respect to such Bond, and for all other purposes whatsoever.  The Trustee shall pay all Principal or Redemption Price of and interest on such Bond only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such Principal or Redemption Price and interest to the extent of the sum or sums so paid.  No Person other than the Depository shall receive a Bond or other instrument evidencing the Commonwealth's obligation to make payments of the Principal or Redemption Price thereof and interest thereon.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Bond which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Bond to the Trustee; *provided, however,* that the Trustee shall maintain records as to each such payment and of the Principal amount of such Bond Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Bond.

The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Bond or any other Person, may terminate the services of the Depository with respect to a Book Entry Bond if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Bonds or (b) a continuation of the requirement that all of the Outstanding Bonds of like Series issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Bonds, and the Commonwealth shall terminate the services of the Depository upon receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Bonds for which the Depository is serving as Depository.

- 23 -

Upon the termination of the services of a Depository with respect to a Book Entry Bond, or upon the resignation of a Depository with respect to a Book Entry Bond, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Bonds shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by Bondholders transferring or exchanging such Bonds, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11   Preparation of Definitive Bonds; Temporary Bonds**.   The definitive Bonds of each Series shall be lithographed or printed on steel engraved borders, except that Book Entry Bonds may be typewritten.   Until the definitive Bonds of any Series are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds, except as to the denominations thereof and as to exchangeability for registered Bonds, one or more temporary Bonds, substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Bonds.   The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Bonds of the same aggregate Principal amount, Series and maturity as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds issued pursuant hereto.

All temporary Bonds surrendered in exchange for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF BONDS

**Section 4.01   Authorization of Redemption**.   Bonds subject to redemption prior to maturity pursuant hereto or to a Supplemental Trust Agreement shall be redeemable, in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein or in the Supplemental Trust Agreement authorizing such Series.

**Section 4.02   Redemption at the Election of the Commonwealth**.   In the case of any redemption of Bonds other than as provided in Section 4.03 hereof, the Commonwealth shall give

written notice to the Trustee of its election to redeem, of the Series and of the Principal amounts and Redemption Prices of the Bonds of each maturity of such Series to be redeemed. Such notice shall be given not less than thirty (30) days prior to the redemption date. The Series, maturities and Principal amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein (including, without limitation, Section 4.05 below) or in the Supplemental Trust Agreement authorizing such Series. The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee in the Debt Service Fund, is sufficient to redeem on the redemption date at the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, all of the Bonds to be so redeemed.

**Section 4.03 Redemption Other Than at Commonwealth's Election**. Whenever by the terms hereof (with respect to the Series 2021A Bonds) or of a Supplemental Trust Agreement the Trustee is required to redeem Bonds through the application of mandatory Sinking Fund Installments, the Trustee shall select the Bonds of the Series and maturities to be redeemed in the manner provided in Section 4.05 hereof, give the notice of redemption and pay out of money available therefor the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, to the appropriate Paying Agents in accordance with the terms of this Article IV.

**Section 4.04 Redemption Prices and Terms of Series 2021A Bonds**. The Series 2021A Current Interest Bonds shall be subject to redemption prior to maturity as provided in this Section 4.04.

(a) *Optional Redemption*. The Series 2021A Current Interest Bonds maturing on or before July 1, 2031 are not subject to optional redemption prior to stated maturity. The Series 2021A-1 Capital Appreciation Bonds maturing on July 1, 2024 are not subject to optional redemption prior to stated maturity.

The Series 2021A-1 Current Interest Bonds maturing on July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041, and July 1, 2046 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2031 through June 30, 2032 | 103% |
| July 1, 2032 through June 30, 2033 | 102% |
| July 1, 2033 through June 30, 2034 | 101% |
| On and after July 1, 2034 | 100% |

The Series 2021A-1 Capital Appreciation Bonds maturing on July 1, 2033 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| On or after July 1, 2031 | 100% of Accreted Value |

- 25 -

The Series 2021A-2 Bonds maturing on July 1, 2041 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2031 through June 30, 2032 | 103% |
| July 1, 2032 through June 30, 2033 | 102% |
| July 1, 2033 through June 30, 2034 | 101% |
| On and after July 1, 2034 | 100% |

(b)     *Mandatory Redemption for the Series 2021A-1 Current Interest Bonds*.  The Series 2021A-1 Current Interest Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2021A-1 Current Interest Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.  Unless none of the Series 2021A-1 Current Interest Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) of this Trust Agreement permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2021A-1 Current Interest Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2021A-1 Current Interest Bonds:

$745,050,000
Series 2021A-1
Current Interest Bonds
maturing July 1, 2023

| Year | Amount[*] |
|---|---|
| 2022 | $ 372,660,000 |
| 2023[†] | 372,390,000 |

[†] Stated maturity.

$740,820,000
Series 2021A-1
Current Interest Bonds
maturing July 1, 2025

| Year | Amount[*] |
|---|---|
| 2024 | $ 371,350,000 |
| 2025[†] | 369,470,000 |

[†] Stated maturity.

- 26 -

$729,565,000
Series 2021A-1
Current Interest Bonds
maturing July 1, 2027

| Year | Amount[*] |
|------|-----------|
| 2026 | $ 366,675,000 |
| 2027[†] | 362,890,000 |

[†] Stated maturity.

$710,040,000
Series 2021A-1
Current Interest Bonds
maturing July 1, 2029

| Year | Amount[*] |
|------|-----------|
| 2028 | $ 358,030,000 |
| 2029[†] | 352,010,000 |

[†] Stated maturity.

$680,835,000
Series 2021A-1
Current Interest Bonds
maturing July 1, 2031

| Year | Amount[*] |
|------|-----------|
| 2030 | $ 344,740,000 |
| 2031[†] | 336,095,000 |

[†] Stated maturity.

$637,040,000
Series 2021A-1
Current Interest Bonds
maturing July 1, 2033

| Year | Amount[*] |
|------|-----------|
| 2032 | $ 325,990,000 |
| 2033[†] | 311,050,000 |

[†] Stated maturity.

4842-1351-5245.14

**$448,580,000**
**Series 2021A-1**
**Current Interest Bonds**
**maturing July 1, 2035**

| Year | Amount[*] |
|------|-----------|
| 2034 | $ 294,385,000 |
| 2035[†] | 154,195,000 |

_____
[†] Stated maturity.

**$255,660,000**
**Series 2021A-1**
**Current Interest Bonds**
**maturing July 1, 2037**

| Year | Amount[*] |
|------|-----------|
| 2036 | $ 137,290,000 |
| 2037[†] | 118,370,000 |

_____
[†] Stated maturity.

**$204,600,000**
**Series 2021A-1**
**Current Interest Bonds**
**maturing July 1, 2041**

| Year | Amount[*] |
|------|-----------|
| 2038 | $ 97,300,000 |
| 2039 | 64,880,000 |
| 2040 | 29,640,000 |
| 2041[†] | 12,780,000 |

_____
[†] Stated maturity.

**$708,865,000**
**Series 2021A-1**
**Current Interest Bonds**
**maturing July 1, 2046**

| Year | Amount[*] |
|------|-----------|
| 2042 | $ 130,875,000 |
| 2043 | 136,110,000 |
| 2044 | 141,555,000 |
| 2045 | 147,220,000 |
| 2046[†] | 153,105,000 |

_____
[†] Stated maturity.

    (c)    *Mandatory Redemption for the Series 2021A-1 Capital Appreciation Bonds*. The Series 2021A-1 Capital Appreciation Bonds shall be subject to redemption, in part, through

- 28 -

application of Sinking Fund Installments as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Accreted Value calculated to the Redemption Date of each Series 2021A-1 Capital Appreciation Bond or portion thereof to be redeemed. Unless none of the Series 2021A-1 Capital Appreciation Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) of this Trust Agreement permitting amounts to be credited to part or all of any one or more Sinking Fund Installments, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2021A-1 Capital Appreciation Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2021A-1 Capital Appreciation Bonds:

$288,241,989.75 Initial Accreted Value
Series 2021A-1
Capital Appreciation Bonds
maturing July 1, 2024

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|------|------|------|------|
| 2022 | $100,862,061.30 | $105,968,971.50 | $116,970,000.00 |
| 2023 | 96,003,057.15 | 105,969,766.35 | 111,335,000.00 |
| 2024†† | 91,376,871.30 | 105,970,000.00 | 105,970,000.00 |

\* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

$442,506,553.50 Initial Accreted Value
Series 2021A-1
Capital Appreciation Bonds
maturing July 1, 2033

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|------|------|------|------|
| 2029 | $98,129,013.00 | $149,997,523.50 | $185,450,000.00 |
| 2030 | 93,059,851.80 | 149,997,764.30 | 175,870,000.00 |
| 2031 | 88,252,614.90 | 149,998,089.75 | 166,785,000.00 |
| 2032 | 83,694,073.80 | 149,998,937.80 | 158,170,000.00 |
| 2033†† | 79,371,000.00 | 150,000,000.00 | 150,000,000.00 |

\* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

(d) *Mandatory Redemption of the Series 2021A-2 Bonds*. The Series 2021A-2 Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed herein, at the Redemption Price

- 29 -

of one hundred per centum (100%) of the Principal amount of each Series 2021A-2 Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption. Unless none of the Series 2021A-2 Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2021A-2 Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2021A-2 Bonds:

$822,260,000
Series 2021A-2
Current Interest Bonds
maturing July 1, 2041

| Year | Amount |
|------|--------|
| 2035 | $121,695,000 |
| 2036 | 118,735,000 |
| 2037 | 115,625,000 |
| 2038 | 112,360,000 |
| 2039 | 117,980,000 |
| 2040 | 123,880,000 |
| 2041[†] | 111,985,000 |

[†] Stated maturity.

(e)   *Credit Against Sinking Fund Installments*.  There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on a Series 2021A Current Interest Bond entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 2021A Current Interest Bond (A) purchased by the Commonwealth with moneys in the Debt Service Fund pursuant to Section 5.06(b) of this Trust Agreement, (B) redeemed at the option of the Commonwealth pursuant to paragraph (a) of this Section, (C) purchased by the Commonwealth and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of this Trust Agreement.  Series 2021A Current Interest Bonds purchased pursuant to Section 5.06(b) of this Trust Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section.  Series 2021A Current Interest Bonds redeemed at the option of the Commonwealth, purchased by the Commonwealth (other than pursuant to Section 5.06(b) of this Trust Agreement), or deemed to have been paid in accordance with Section 12.01 of this Trust Agreement shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Commonwealth shall specify in a written direction of an Authorized Officer of the Commonwealth delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2021A Current Interest Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2021A Current Interest Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of this

- 30 -

Trust Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

    **Section 4.05  Selection of Bonds to be Redeemed**.  [Unless otherwise provided in the Supplemental Trust Agreement authorizing the issuance of Bonds of a Series, in the event of redemption of less than all of the Outstanding Bonds of like Series, maturity and tenor, the Trustee shall assign to each Outstanding Bond of the Series, maturity and tenor to be redeemed a distinctive number for each unit of the Principal amount of such Bond equal to the lowest denomination in which the Bonds of such Series are authorized to be issued and shall select by lot, using such method of selection as it shall deem proper in its discretion, from the numbers assigned to such Bonds as many numbers as, at such unit amount equal to the lowest denomination in which the Bonds of such Series are authorized to be issued for each number, shall equal the Principal amount of such Bonds to be redeemed.  [In making such selections the Trustee may draw the Bonds by lot (i) individually or (ii) by one or more groups, the grouping for the purpose of such drawing to be by serial numbers (or, in the case of Bonds of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued, by the numbers assigned thereto as in this Section 4.05 provided) which end in the same digit or in the same two digits.  In case, upon any drawing by groups, the total Principal amount of Bonds drawn shall exceed the amount to be redeemed, the excess may be deducted from any group or groups so drawn in such manner as the Trustee may reasonably determine.  The Trustee may in its discretion assign numbers to portions of Bonds and select part of any Bond for redemption.  The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; *provided, however,* that only so much of the Principal amount of each such Bond of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued shall be redeemed as shall equal the lowest denomination in which the Bonds of such Series are authorized to be issued for each number assigned to it and so selected.

    For purposes of this Section 4.05, the lowest denomination in which a Capital Appreciation Bond is authorized to be issued shall be the lowest Accreted Value authorized to be due at maturity on such Bonds.

    Notwithstanding the foregoing, in the event that a Depository shall be the registered owner of all of such Bonds of the Series being redeemed, if less than all of the Bonds of a particular Series are called for redemption, the Commonwealth shall select the maturity or maturities of such Series to be redeemed and the Depository, on behalf of the Trustee, shall select the Bonds within the same maturity of such Series to be redeemed by means of a random lottery and in any event in accordance with the applicable practices of the Depository.][5]

    **Section 4.06  Notice of Redemption**.  Whenever Bonds are to be redeemed, the Trustee shall give notice of the redemption of the Bonds in the name of the Commonwealth which notice shall specify:  (a) the Bonds to be redeemed which shall be identified by the designation of the Bonds given in accordance with Article II hereof; (b) the maturity dates and interest rates or accretion rates of the Bonds to be redeemed and the date of such Bonds; (c) the numbers and other distinguishing marks of the Bonds to be redeemed, including CUSIP numbers; (d) the redemption date; (e) the Redemption Price, if then known; (f) with respect to each such Bond, the Principal amount thereof to be redeemed; (g) that, except in the case of Book Entry Bonds, such Bonds will

---

[5]    NTD: Under discussion.

4842-1351-5245.14

be redeemed at the designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (h) that no representation is made as to the correctness of the CUSIP number either as printed on the Bonds or as contained in such notice and that an error in a CUSIP number as printed on a Bond or as contained in such notice shall not affect the validity of the proceedings for redemption; and (i) if the Commonwealth's obligation to redeem the Bonds is subject to conditions, a statement to that effect and of the conditions to such redemption. Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue. Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid (i) to the registered owners of the Bonds which are to be redeemed, at their last known addresses, if any, appearing on the registration books, and (ii) to the Bond Insurer (if any) insuring the Bonds to be redeemed, at the Bond Insurer's last known address, not more than ten (10) Business Days prior to the date such notice is given. Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders of the Bonds to be redeemed in the manner provided herein. Such certificate shall be conclusive evidence that such notice was given in the manner required hereby. The failure of any Holder of a Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Bonds.

The Trustee shall, if any of the Bonds to be redeemed are Book Entry Bonds, transmit a copy of the notice of redemption to the Depository for such Book Entry Bonds not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Bonds are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Bond and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Bonds. This paragraph shall not alter the Trustee's obligation to transmit a notice of redemption to the Bond Insurer as provided in the preceding paragraph.

Any notice of redemption given pursuant to this Section 4.06 which states that it is conditional upon receipt by the Trustee of money sufficient to pay the Redemption Price of such Bonds or upon the satisfaction of any other condition, may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied. Notice of such rescission shall be given by the Trustee to affected Bondholders as promptly as practicable upon the failure of such condition or the occurrence of such other event.

**Section 4.07   Payment of Redeemed Bonds**. Notice having been given in the manner provided in Section 4.06 hereof, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, except as otherwise provided in Section 3.10 hereof upon presentation and surrender of such Bonds, at the office or offices specified in such notice, and, in the case of Bonds presented by other than the registered owner, together with a

written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date; ***provided, however,*** that payment of the Redemption Price may be paid by wire transfer to such registered owner if so authorized in the Supplemental Trust Agreement that authorized the Bonds of the Series to be redeemed. If there shall be called for redemption less than all of the Principal amount of a registered Bond, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the Principal amount of the registered Bond so surrendered, Bonds of like Series, maturity and tenor in any of the authorized denominations. If, on the redemption date, money for the redemption of all Bonds or portions thereof of any like Series, maturity and tenor to be redeemed, together with interest accrued and unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, interest on the Bonds or portions thereof so called for redemption shall cease to accrue and such Bonds shall no longer be considered to be Outstanding hereunder. If such money shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## ARTICLE V.

## STATUTORY LIEN ON MONEYS IN DEBT SERVICE FUND; FUNDS AND ACCOUNTS; COMMONWEALTH REVENUES AND APPLICATION THEREOF

**Section 5.01  Statutory Lien in Debt Service Fund**. To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants, automatically, upon the issuance of the Bonds, the Statutory Lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys deposited in the Debt Service Fund established herein, which Statutory Lien shall remain in full force and effect until the Bonds have been paid or satisfied in full in accordance with their terms. The Statutory Lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the Statutory Lien. Furthermore, pursuant to this Trust Agreement, the funds established hereunder (with the exception of the Arbitrage Rebate Fund [and the Costs of Issuance Fund]), are hereby pledged to secure the repayment of the Bonds. The Commonwealth agrees that, as of the commencement date of any future insolvency proceeding commenced by or on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise), the automatic stay pursuant to 11 U.S.C. Section 362 shall be deemed waived with respect to monies on deposit in the Debt Service Fund, and the Commonwealth shall consent to any motion for relief from the automatic stay filed by the Trustee or any beneficial owner of the Bonds filed pursuant to this Section 5.01.

**Section 5.02  Establishment of Funds and Accounts**. (a)  The following funds and separate accounts within funds are hereby established and shall be held, in trust for the benefit of the Holders of the Bonds and maintained by the Trustee:

Costs of Issuance Fund; and
Debt Service Fund, comprised of:
Interest Account; and
Principal Account

(b)    The Arbitrage Rebate Fund is hereby established and created and shall be held by the Trustee for the benefit of the Commonwealth. The Arbitrage Rebate Fund is not subject to the Statutory Lien or contractual lien.

(c)    Each such fund may contain one or more accounts or subaccounts, for purposes of internal accounting, as necessary for arbitrage calculations or as the Commonwealth may otherwise deem proper. All money at any time deposited in any fund, account or subaccount created hereby or by any Supplemental Trust Agreement or required hereby or thereby (other than the Arbitrage Rebate Fund) to be created shall be held in trust for the benefit of the Holders of Bonds, but shall nevertheless be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.03   Application of Bond Proceeds**.  Upon the receipt of proceeds from the sale of a Series of Bonds, the Commonwealth shall apply such proceeds as specified in the Supplemental Trust Agreement authorizing such Series. No deposit of proceeds shall be made in connection with the issuance of the Series 2021A Bonds; provided that, on the Effective Date, the Secretary of Treasury shall transfer into the Debt Service Fund such additional amounts as may be necessary to account for the Bonds being issued as of July 1, 2021.

Accrued interest, if any, received upon the delivery of a Series of Bonds shall be deposited in the Debt Service Fund unless all or any portion of such amount is to be otherwise applied as specified in the Supplemental Trust Agreement authorizing such Series.

**Section 5.04   Application of Money in the Costs of Issuance Fund**.  [(a) As soon as practicable after the delivery of each Series of Bonds, there shall be deposited into each account within the Costs of Issuance Fund the amount, if any, required to be deposited therein pursuant to the Supplemental Trust Agreement authorizing such Series.

(b)    Except as otherwise provided in this Article V and in any applicable Supplemental Trust Agreement, money in the Costs of Issuance Fund shall be used only to pay the Costs of Issuance of the Bonds payable by the Commonwealth. Such payments shall be made by the Trustee upon the direction of an Authorized Officer of the Commonwealth that sets forth in reasonable detail the purpose of the payment, the amount of such payment and the name of the payee. If such payment is to be made by bank wire, such direction shall include the routing and account numbers of the payee. If such payment is to be made by check, such direction shall include the address of the payee. The Trustee shall rely fully on any such written direction delivered pursuant to this Section and shall not be required to make any investigation in connection therewith.

(c)    The money remaining in the Costs of Issuance Fund after paying or making provision in accordance with the direction of an Authorized Officer of the Commonwealth for the payments required to be made pursuant to paragraph (b) of this Section, including any Costs of Issuance then unpaid, shall be applied by the Trustee in the following order of priority:

- 34 -

*First*, to the Arbitrage Rebate Fund, the amount determined by the Commonwealth to be required to be deposited therein; and

*Second*, to the Debt Service Fund, any balance remaining therein.]

**Section 5.05   Application of Moneys**.  Commencing on the first day of each Fiscal Year, on each [Monthly Disbursement Date,] the Secretary of Treasury shall transfer to the Trustee and the Trustee shall apply such amounts as follows and in the following order of priority; ***provided, however***, that on the Effective Date the Secretary of the Treasury shall deposit such additional amounts as may be necessary to account for the issuance of the Bonds from July 1, 2021:[6]

*First*:  To the following accounts:

(i)     the Interest Account of the Debt Service Fund, one-sixth (1/6) of the amount of the interest payable on the Bonds on the next Interest Payment Date; and

(ii)     the Principal Account of the Debt Service Fund, one-twelfth (1/12) of the amount of Principal and Sinking Fund Installment due on the next Principal Payment Date;

*Second*:  Upon the written direction of an Authorized Officer of the Commonwealth, to the Arbitrage Rebate Fund moneys on deposit in the amount set forth in such direction.

**Section 5.06   Debt Service Fund**.  (a)   The Trustee shall pay out of the Debt Service Fund the Principal of and interest on all Outstanding Bonds as the same is due and payable. Amounts paid to a Paying Agent for payments pursuant to this Section shall be irrevocably pledged to and applied to such payments.

(b)     Notwithstanding the provisions of this Section, the Commonwealth may, at any time but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price equal to the Principal amount (with respect to Bonds that are not Capital Appreciation Bonds) or the Accreted Value (with respect to Capital Appreciation Bonds) thereof plus interest accrued and unpaid to the date of such purchase, Term Bonds to be redeemed from such Sinking Fund Installment; provided that the portion of such purchase price funded from the Principal Account shall not exceed the amount of the upcoming Sinking Fund Installment due on such purchased bond and the portion of such purchase price funded from the Interest Account shall not exceed the amount of interest accrued and unpaid on such purchased bond to the date of such purchase; provided further that in the case of Capital Appreciation Bonds, no portion of the purchase price may be funded from the Interest Account.  Any Term Bond so purchased or otherwise purchased and delivered to the Trustee shall be canceled upon receipt thereof by the Trustee and evidence of such cancellation shall be given to the Commonwealth.  The Principal amount or Accreted Value, as applicable, of each Term Bond so canceled shall be credited against the Sinking Fund Installment due on such date.

(c)     Money in the Debt Service Fund in excess of the amount required to be deposited therein in accordance with Section 5.05 herein, shall at the written direction of an Authorized

---

[6]     NTD: Manner of payment of trustee fees under discussion.

Officer of the Commonwealth, upon payment or satisfaction in full of the Bonds, be withdrawn and transferred to the Commonwealth.

**Section 5.07    Arbitrage Rebate Fund**.  The Trustee shall deposit to the Arbitrage Rebate Fund any money delivered to it by the Commonwealth for deposit therein and, notwithstanding any other provisions of this Article V, shall transfer to the Arbitrage Rebate Fund, in accordance with written directions of an Authorized Officer of the Commonwealth, money on deposit in any other funds or accounts held by the Trustee hereunder at such times and in such amounts as shall be set forth in such written directions of the Commonwealth.

Money on deposit in the Arbitrage Rebate Fund shall be applied by the Trustee in accordance with the direction of an Authorized Officer of the Commonwealth only for the purpose of making payments to the Department of the Treasury of the United States of America at such times and in such amounts as the Commonwealth shall determine, based on an opinion of Transaction Counsel, to be required by the Code to be rebated to the Department of the Treasury of the United States of America.  As of any date, money on deposit in the Arbitrage Rebate Fund which an Authorized Officer of the Commonwealth determines to be in excess of the amount required to be so rebated as of such date, shall be transferred (a) to the Debt Service Fund, if the amount then on deposit in the Debt Service Fund is less than the sum of the amounts required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and (b) to the extent not required to be deposited in the Debt Service Fund, may at the direction of an Authorized Officer of the Commonwealth, either be retained therein or transferred to the Commonwealth.

If and to the extent required by the Code, the Commonwealth shall periodically, at such times as may be required to comply with the Code, determine or cause to be determined the amount required by the Code to be rebated to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (a) transfer or direct the Trustee to transfer from any other of the funds and accounts held hereunder and deposit to the Arbitrage Rebate Fund, such amount as the Commonwealth shall have determined to be necessary in order to enable it to comply with its obligation to rebate money to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (b) pay out of the Arbitrage Rebate Fund to the Department of the Treasury of the United States of America the amount, if any, required by the Code to be rebated thereto.

**Section 5.08    Transfer of Investments**.    Whenever money in any fund or account established hereunder is to be paid in accordance herewith to another such fund or account, such payment may be made, in whole or in part, by transferring to such other fund or account investments held as part of the fund or account from which such payment is to be made, whose value, together with the money, if any, to be transferred, is equal to the amount of the payment then to be made; *provided, however,* that no such transfer of investments would result in a violation of any investment standard or guideline applicable to such fund.

- 36 -

# ARTICLE VI.

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

**Section 6.01   Security for Deposits.**  All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Commonwealth and the Holders of the Bonds in such manner as may then be required by applicable federal or Commonwealth laws and regulations regarding security, by Eligible Investments of a market value at least equal at all times to the amount of the deposit so held by the Trustee.  The Trustee shall have no obligation for the payment of interest on moneys properly held by it that are uninvested hereunder.

**Section 6.02   Investment of Funds and Accounts Held by the Trustee**.  (a)   Subject to the limitations set forth in this paragraph, money held hereunder, if permitted by law, shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the direction of an Authorized Officer of the Commonwealth given in writing.

(b)      The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments.  Ratings of permitted investments shall be determined at the time of purchase of such permitted investments.  The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)      Obligations purchased or other investments made as an investment of money in any fund or account held under the provisions hereof shall be deemed at all times to be a part of such fund or account and the income or interest earned, profits realized or losses suffered by a fund or account due to the investment thereof shall be credited or charged, as the case may be, to such fund or account.

(d)      In computing the amount in any fund or account held by the Trustee under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)      Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.  Except as otherwise provided herein, such investments shall be sold by the Commonwealth or by the Trustee at the direction of the Authorized Officer of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the fund or account in which such investment is held.  The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the amounts required to be on deposit in each fund and account hereunder and of the details of all investments held for the credit of each fund and account in its custody under the provisions hereof as of the end of the preceding month and as to whether such investments comply with the provisions of paragraphs (a) and (b) of this Section.  The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the

4842-1351-5245.14

preceding month. The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in each such fund and account in the previous month.

(f) Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.03  Liability for Investments**.  Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Bonds as follows:

**Section 7.01  Payment of Principal and Interest**.  The Commonwealth shall pay or cause to be paid every Bond, including interest thereon, on the dates and at the places and in the manner provided in this Trust Agreement and in the Bonds.

**Section 7.02  Pledge of Good Faith and Credit; Bonds Constitute Public Debt**.  The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Principal of and the interest on the Bonds authorized by this Trust Agreement.  The Bonds constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution.  The Secretary of Treasury is authorized and directed to pay the Principal of and the interest of the Bonds as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required.  Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Bonds in the amounts and at the times required by Section 5.05 hereof.  For the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03  Deemed Annual Allocation**.  Pursuant to the Act, the Commonwealth shall, to the extent necessary to satisfy its obligations to pay the Bonds, apply (i) the proceeds of the 1.03% property tax levied pursuant to Act No. 107-2020, as amended, and collected by the Municipal Revenues Collection Center of the Commonwealth, (ii) any monies arising from the operation of Section 8 of Article VI of the Constitution, and (iii) any other available resources (*recursos disponibles*) of the Commonwealth to the payment of the Principal of and the interest (and accreted value) on the Bonds; provided that (A) this covenant is not intended to grant to the Holders of the Bonds any lien on such proceeds, monies and resources until deposited pursuant to the provisions hereof, and (B) for purposes of compliance with this covenant, to the extent that

- 38 -

such proceeds, monies and resources are transferred to the Commonwealth's General Fund, payments of principal and interest (and accreted value) made to the Holders of the Bonds from the Commonwealth's General Fund shall be deemed to have been made from such proceeds, monies and resources in the order set forth herein.

**Section 7.04   Powers as to Bonds**.  Pursuant to the Act, the Plan, and the Confirmation Order, the Commonwealth is duly authorized to create and issue the Bonds and to execute the Trust Agreement and each Supplemental Trust Agreement.  The Commonwealth further represents that all corporate action on the part of the Commonwealth to that end has been duly and validly taken.  Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Bonds and the provisions hereof and of each Supplemental Trust Agreement are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof and of each Supplemental Trust Agreement.  The Commonwealth further covenants that its good faith, credit and taxing power pledge in support of the Bonds is a valid, binding and legally enforceable pledge of the Commonwealth.  The Commonwealth further covenants that it shall not fail to at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the Statutory Lien and all of the rights of the Trustee for the benefit of the Holders of Bonds under the Trust Agreement and each Supplemental Trust Agreement against all claims and demands of all Persons whomsoever.

**Section 7.05   Further Assurance**.  The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the Statutory Lien and the pledge of its good faith, credit and taxing power set forth herein, or which the Commonwealth may hereafter become bound to pledge or assign.

**Section 7.06   Offices for Payment and Registration of Bonds**.  Unless all of the Bonds are Book Entry Bonds, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Bonds may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee. The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Bonds of the Series authorized thereby or referred to therein may be presented for payment.  The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Bonds may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Bonds.  The provisions of this Section shall be subject to the provisions of Section 3.01 hereof.

**Section 7.07   General**.  The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the date of issuance of Bonds, all conditions, acts and things required by the Plan and the statutes of the Commonwealth, including the Act, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds, shall exist, have happened and have been performed.

Section 7.08  **Non-Impairment Covenant**.  The Commonwealth, for the benefit of all initial and subsequent Holders of Bonds, covenants and agrees that, until all obligations with respect to this Trust Agreement and the Bonds have been paid or otherwise satisfied in full in accordance with their terms, the Commonwealth will not take any action that would:

(a)  Impair the monthly deposits of interest and Principal required by [Article 203] of the Act and Section 5.05 hereof,

(b)  limit or alter the rights vested in Holders of Bonds in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the Holders of the Bonds,

(c)  impair the rights and remedies of the Holders of the Bonds.

Section 7.09  **Tax Exemption Covenant.**  The Commonwealth covenants that it shall not take any action that would, or fail to take any action, if such failure would cause interest on the Tax Exempt Bonds to become includable in gross income for federal income tax purposes and that it will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the Holders of any Tax Exempt Bonds shall be and remain excludable from gross income for federal income tax purposes.

Section 7.10  **Comprehensive Cap on Net Tax Supported Indebtedness**.  For so long as any portion of the Series 2021A Bonds shall remain outstanding, the Commonwealth shall maintain a Comprehensive Cap on all net tax supported debt for purposes of the limitation on the issuance of additional net tax supported debt set forth in Article VI of the Debt Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues (as defined in the Plan) as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues (as defined in the Plan) required to pay the maximum annual debt service on the COFINA Bonds (as defined in the Plan) outstanding as of the Effective Date.  Subject in all respects to the terms of the Plan, debt service payments on Series 2021A-1 Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or PRIFA (as defined in the Plan), in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap.  In connection with the issuance of Net Tax Supported Indebtedness, the Secretary of Treasury shall certify that such Net Tax Supported Indebtedness is being issued in compliance with the Comprehensive Cap.  Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Bonds issued under this Trust Agreement, and the validity of such Net Tax Support Indebtedness shall not be subject to legal challenge.  In calculating Debt Policy Revenues for purposes of this Section 7.10 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

**Section 7.11  Fiscal Plan.**  Any post-Effective Date Fiscal Plan proposed by the Commonwealth will include provisions for the payment in each Fiscal Year of Principal and interest (and Accreted Value) on the Bonds.

**Section 7.12  Continuing Disclosure**.  The Commonwealth covenants that it will enter into a continuing disclosure agreement in substantially the form attached hereto as Exhibit E. [scope of continuing disclosure and cure periods under consideration].  An event of default under such continuing disclosure agreement, including the failure to timely provide the notices or information described therein shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the continuing disclosure agreement.

**Section 7.13  IRS Favorable Tax Determination**.  The Commonwealth shall use reasonable best efforts to obtain from the Internal Revenue Service (the "IRS") a determination with respect to the tax-exemption of Taxable Bonds, if any, issued on the Effective Date (the "Effective Date Taxable Bonds") or an opinion of Transaction Counsel with respect to the tax-exemption of the Effective Date Taxable Bonds (such determination or opinion, a "Favorable Determination") that the ratio of the aggregate principal amount of Effective Date Taxable Bonds to the total aggregate principal amount of Bonds issued on the Effective Date is less than thirteen percent (13%).  In the event that the Favorable Determination is obtained subsequent to the Effective Date and the new ratio is less than thirteen percent (13%), then the Holders of the Effective Date Taxable Bonds affected by the Favorable Determination shall be invited to exchange (the "Exchange Offer") the Effective Date Taxable Bonds for tax-exempt bonds (the "Converted Bonds") and, subject to the application of all reasonable expenses incurred by the Commonwealth in connection with the Exchange Offer, the interest rate on the Converted Bonds shall be the same as the Effective Date Taxable Bonds of the same type, interest rate, series and maturity; provided, however, that, such Converted Bonds shall be accompanied by the favorable opinion of Transaction Counsel that the interest, other than pre-issuance accrued interest on such Converted Bonds, and on the Effective Date Taxable Bonds exchanged for such Converted Bonds from the original date of delivery of such Effective Date Taxable Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from United States of America, state, Commonwealth and local income taxation.  In the event that an Favorable Determination is not obtained, this covenant shall terminate upon the earlier to occur: (1) December 15, 2021, (2) notification by the IRS to the Commonwealth that the IRS is unable to issue a favorable private letter ruling, closing agreement or other type of determination with respect to the tax-exemption of the Effective Date Taxable Bonds, and (3) an amendment of this Trust Agreement following a receipt of a Favorable Determination and consummation of the Exchange Offer.

# ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01  Appointment and Acceptance of Trustee**.  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02  Appointment and Acceptance of Paying Agents**.  In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Bonds of any Series

in the Supplemental Trust Agreement authorizing such Bonds or in the manner provided herein or in such Supplemental Trust Agreement or shall appoint such Paying Agent or Paying Agents prior to the authentication and delivery of the Bonds so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent. Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03 Responsibilities of Trustee and Paying Agents**. The recitals of fact contained herein and in each Supplemental Trust Agreement and in the Bonds shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same. Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof, of any Supplemental Trust Agreement or of any Bonds, or in respect of the security afforded hereby or by each Supplemental Trust Agreement, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof. Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to: (i) the issuance of the Bonds for value; (ii) the application of the proceeds thereof except to the extent that such proceeds are received by it in its capacity as Trustee or Paying Agent; or (iii) the application of any money paid to the Commonwealth or others in accordance herewith and with each Supplemental Trust Agreement except as to the application of any money paid to it in its capacity as Trustee or Paying Agent. Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder and under each Supplemental Trust Agreement except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and of each Supplemental Trust Agreement and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein and in each Supplemental Trust Agreement, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee. If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04 Property Held in Trust**. All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof and of each Supplemental Trust Agreement shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof and of each Supplemental Trust Agreement.

**Section 8.05 Rights of the Trustee and the Paying Agent**. The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties. The Trustee and any Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Commonwealth, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

4842-1351-5245.14

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder and under any Supplemental Trust Agreement, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth. Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof and of the Supplemental Trust Agreement upon the faith thereof, but in its reasonable discretion the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence. Except as otherwise expressly provided herein and in each Supplemental Trust Agreement, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof and of any Supplemental Trust Agreement by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Bonds relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Bonds.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Bonds or Majority in Interest of Outstanding Bonds, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("**Instructions**"); provided, however, that the Commonwealth shall provide to

- 43 -

the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a Person is to be added or deleted from the listing. If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling. The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer. The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth. Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to negligence or willful misconduct of the Trustee. The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06  Compensation and Indemnification.**  Unless otherwise provided, the Commonwealth shall pay to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder and under the applicable Supplemental Trust Agreement, and also all reasonable, necessary and documented expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder and under the applicable Supplemental Trust Agreement. None of the provisions contained herein or in any Supplemental Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

- 44 -

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07  Permitted Acts.**  The Trustee may become the owner of or may deal in Bonds as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Bonds or to effect or aid in any reorganization growing out of the enforcement hereof or of the Bonds or any Supplemental Trust Agreement whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Bonds in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08  Resignation of Trustee.**  The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder and under each Supplemental Trust Agreement by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Bonds by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books or, in the case of a Bond Insurer, at such Bond Insurer's last known address, Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; ***provided, however,*** that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09  Removal of Trustee.**  The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon thirty (30) days' written notice by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondholders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth.  The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof or of any Supplemental Trust Agreement with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Bonds.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10  Successor Trustee and/or Paying Agent.**  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer

- 45 -

shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; **provided, nevertheless,** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Bonds, at their last addresses appearing on the registry books or, in the case of a Bond Insurer, at such Bond Insurer's last known address. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor.  Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby and by each Supplemental Trust Agreement.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any entity or Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee**.  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder and under each Supplemental Trust Agreement, with like effect as if originally appointed as Trustee.  However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein.  Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties

- 46 -

or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth.

**Section 8.12   Merger or Consolidation of the Trustee**.  Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance.  In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

**Section 8.13   Ancillary Agreements.**  The Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements**.**

# ARTICLE IX.

## SUPPLEMENTAL TRUST AGREEMENTS

**Section 9.01   Modification and Amendment without Consent**.  Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)      To provide for the issuance of a Series of Bonds under and in accordance with (and, for the avoidance of doubt, not in any way contrary to or inconsistent with) the provisions hereof and to prescribe the terms and conditions pursuant to which such Bonds may be issued, paid or redeemed;

(b)      To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Bonds, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that such additional covenants and agreements shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(c)      To prescribe further limitations and restrictions upon the issuance of Refunding Bonds by the Commonwealth which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect including the limitations and restrictions set forth in the Act and the Plan;

(d)      To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that same shall be for the equal benefit and security of all Bonds, without discrimination or preference;

- 47 -

(e)     To confirm, as further assurance, the Statutory Lien, and the subjection to the Statutory Lien, of the Commonwealth's right title and interest in the monies deposited hereunder, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(f)     To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective until after all Bonds of any Series of Bonds Outstanding as of the effective date of such Supplemental Trust Agreement shall cease to be Outstanding, and all Bonds issued under such Supplemental Trust Agreements shall contain a specific reference to the modifications contained in such subsequent Supplemental Trust Agreement;

(g)     With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the last paragraph of this Section 9.01, adversely affect the interests of the Bondholders in any respect.

(h)     [To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective unless there has been delivered to the Trustee (i) a Rating Confirmation on the Outstanding Bonds and (ii) an opinion of Transaction Counsel to the effect that the same is not inconsistent with this Trust Agreement and will not adversely affect the exclusion of interest on any Tax Exempt Bond from gross income for purposes of federal income taxation, *provided, however,* this clause (i) shall be inapplicable unless the Outstanding Bonds are rated at least Baa3/BBB- (or equivalent) by at least two Rating Services (with one such Rating Service being S&P or Moody's).]

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement [is required in connection with amendments or supplements to the Confirmation Order or the Plan or] will not materially adversely affect: (i) the excludability of interest on the Tax Exempt Bonds from gross income of the Holders for federal income tax purposes, and (ii) with respect to a modification or amendment made pursuant to paragraphs (b) – (i) above, the rights of the Holders of the Bonds in any other materially adverse respect.

For the avoidance of doubt, no Supplemental Trust Agreement shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 with the consent of each affected Holder.

**Section 9.02 Supplemental Trust Agreements Effective with Consent of Bondholders**.  The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Bondholders in accordance with Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

4842-1351-5245.14

**Section 9.03 General Provisions Relating to Supplemental Trust Agreements**. The Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX, Article X or Section 7.05 hereof. Nothing contained in this Article IX or Article X hereof shall affect or limit the rights or obligations of the Commonwealth to make, do, execute or deliver any Supplemental Trust Agreement, act or other instrument pursuant to the provisions of Section 7.04 hereof or the right or obligation of the Commonwealth to execute and deliver to the Trustee or any Paying Agent any instrument elsewhere herein provided or permitted to be delivered to the Trustee or any Paying Agent.

A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, the Rating Confirmation, if any is required by Section 9.01(i), and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms. The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Commonwealth, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall give written notice thereof to each Rating Service then providing a rating on the Outstanding Bonds at the request of the Commonwealth and shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and EMMA under the CUSIPs for the Outstanding Bonds.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT

**Section 10.01 Powers of Amendment**. (a) Except as provided in Section 9.01 hereof, any modification or amendment hereof and of the rights and obligations of the Commonwealth and of the Holders of the Bonds hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Bonds Outstanding at the time such consent is given, or (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Bonds of each Series so affected and Outstanding at the time such consent is given; *provided, however,* that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series, maturity and tenor remain Outstanding, the consent of the Holders of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.

(b) No such modification or amendment shall, without the prior written consent of the Holder of such Bond, permit a change in the provisions related to the timing or amount of any payment on the Bonds, including, without limitation, any change in the currency to be used to pay Principal of and interest on the Bonds, any change in the amount or date of any Sinking Fund

- 49 -

Installment, payment of Principal or any other payment, the terms of redemption or maturity of the Principal of any Outstanding Bond or of any installment of interest thereon or a reduction in the Principal amount or the Redemption Price thereof or in the rate of interest thereon. Further, no such modification or amendment shall, without the prior written consent of the Holder of such Bond, reduce the percentages or otherwise affect the classes of Bonds the consent of the Holders of which is required to effect any such modification or amendment. Further, no waiver of any default or compliance with any provisions of this Section 10.01(b) shall be granted without the prior written consent of the Holder of such Bond.

(c)     For the purposes of this Section 10.01, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Bonds of such Series in any respect. The Trustee may in its discretion reasonably determine whether or not, in accordance with the foregoing provisions, the Bonds of any particular Series or maturity would be affected by any modification or amendment hereof and any such determination shall be binding and conclusive on the Commonwealth and all Holders of Bonds. If the Trustee does not make such a determination, the Trustee shall obtain an opinion of Transaction Counsel as to whether the Bonds of any particular Series or maturity would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth and all Holders of Bonds.

**Section 10.02 Consent of Bondholders**. The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section. Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Bonds. A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Bonds for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Bonds. Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Bonds specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided. Any such consent shall be binding upon the Holder of the Bonds giving such consent and on any subsequent Holder of such Bonds (whether or not such subsequent Holder has notice thereof). At any time after the Holders of the required percentages of Bonds shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Bonds and will be effective as provided in this Section, shall be given to the Bondholders by mailing such notice to Bondholders or by Electronic Means. The Commonwealth shall file with the Trustee proof of giving such notice. Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Bonds at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; **provided, however**, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such

- 50 -

action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient so long as consistent with the Supplemental Trust Agreement.

**Section 10.03 Modifications by Unanimous Consent**. The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Bonds may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Bonds then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04 Mailing**. Any provision in this Article X for the mailing of a notice or other document to Bondholders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Bonds then Outstanding at such Person's address, if any, appearing upon the registry books of the Commonwealth, (b) to the Trustee, and (c) to the Bond Insurer at its last known address.

**Section 10.05 Exclusion of Bonds**. Bonds owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be entitled with respect to such Bonds to give any consent or take any other action provided for herein. At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of the Commonwealth, upon which the Trustee may rely, describing all Bonds so to be excluded.

**Section 10.06 Notation on Bonds**. Bonds delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Bond Outstanding at such effective date and upon presentation of his Bond for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Bond by the Trustee as to any such action. If the Commonwealth or the Trustee shall so determine, new Bonds so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Bond then Outstanding shall be exchanged, without cost to such Bondholder, for Bonds of the same Series and maturity then Outstanding, upon surrender of such Bonds.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default**. An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a) Payment of the Principal or Redemption Price of any Bond shall not be made by the Commonwealth when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or

4842-1351-5245.14

(b)     Payment of an installment of interest on any Bond shall not be made by the Commonwealth when the same shall become due and payable; or

(c)     The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Bonds or in any Supplemental Trust Agreement on the part of the Commonwealth to be performed, other than the provisions of Section 7.12 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, unless, if such default is capable of being cured but is not capable of being cured within forty-five (45) days, the Commonwealth has commenced to cure such default within forty-five (45) days and does cure such default within ninety (90) days of the date the default initially occurred; or

(d)     the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Bonds to be impaired, and such impairment affects the enforceability of or payments on the Bonds, or any Person to be released from any covenants or obligations with respect to the Bonds.

**Section 11.02 No Acceleration with Respect to the Bonds.**   There shall be no right of acceleration with respect to the Bonds.

**Section 11.03 Enforcement of Remedies**.  (a)  If an Event of Default occurs and is continuing, the Trustee shall make payments in accordance with Section 11.04 below.

(b)     If an Event of Default under Section 11.01(a) and (b) occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (*recursos disponibles*) of the Commonwealth to the payment of the Bond, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(c)     If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, seek specific performance of any relevant provisions of this Trust Agreement or any relevant Supplemental Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(d)     Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

In the enforcement of any remedy hereunder and under each Supplemental Trust Agreement the Trustee shall be entitled to sue for, enforce payment of, and receive any and all amounts then, or during any default becoming, and at any time remaining, due from the

- 52 -

Commonwealth for Principal or interest or otherwise under any of the provisions of the Trust Agreement or of any Supplemental Trust Agreement or of the Bonds, with interest on overdue payments of the Principal of or interest on the Bonds at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under any Supplemental Trust Agreement and under such Bonds, including the fees and expenses of the Trustee and its attorneys and other agents, without prejudice to any other right or remedy of the Trustee or of the Holders of such Bonds, and to recover and enforce judgment or decree against the Commonwealth but solely as provided herein, in any Supplemental Trust Agreement and in such Bonds, for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect in any manner provided by law, the money adjudged or decreed to be payable.

**Section 11.04  Priority of Payments after Default**.  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder and under each Supplemental Trust Agreement shall not be sufficient to pay the Principal of and interest on the Bonds as the same become due and payable, the money held by the Trustee hereunder and under each Supplemental Trust Agreement together with any money then available or thereafter becoming available to pay the Principal of and interest on the Bonds, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows, *pro rata*:

> (A)  To the payment to the persons entitled thereto of all installments of interest then due in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference; and

> (B)  To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Bonds or to any other person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date (which shall be on an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of Principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Bonds are Outstanding and unpaid shall be paid and applied in accordance with Section 5.05 hereof.

**Section 11.05  Termination of Proceedings**.  In case any proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Bondholders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been commenced.

**Section 11.06  Bondholders' Direction of Proceedings**.  Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Bonds shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder, under each Supplemental Trust Agreement or otherwise, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy available pursuant to Section 11.03, provided, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof and of each Supplemental Trust Agreement, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of counsel to the Trustee would be unjustly prejudicial to Bondholders not parties to such direction.

**Section 11.07  Control by Holders of Bonds; Limitations**.  No Holder of any of the Bonds shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof.  Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Bonds secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all proceedings at law or in equity shall be instituted and maintained for the benefit of all Holders of the Outstanding Bonds.  Notwithstanding any other provision hereof, the Holder of any Bond shall have the right which is absolute and unconditional to receive payment of the Principal of (and premium, if any) and interest on such Bond on the stated maturity expressed in such Bond (or, in the case of redemption, on the redemption date or, in the case of interest, on the Interest Payment Date on

- 54 -

which such interest is due) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

**Section 11.08 Actions by Trustee; Possession of Bonds by Trustee Not Required**. All rights of action hereunder or under any of the Bonds secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Bonds or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Bonds to which such action relates, subject to the provisions hereof.

**Section 11.09 Waiver and Non–Waiver of Default**. No delay or omission of the Trustee or any Bondholder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Bondholders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall waive any default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; *provided, however,* the Trustee may not waive any default if it has received a direction from not less than a Quarter in Interest of the Outstanding Bonds that such default may not be waived by the Trustee; *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10 Notice of Event of Default**. The Trustee shall give notice of each Event of Default hereunder known to the Trustee to AAFAF and the Commonwealth, within ten (10) days after knowledge of the occurrence thereof, and to the Holders of Bonds within thirty (30) days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice; *provided, however*, that failure to provide notice to AAFAF or the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Bondholders. In the case of the Holders of the Bonds, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Bonds, as the names and addresses of such Holders appear on the books for registration and transfer of Bonds as kept by the Trustee and to the Bond Insurer at its last known address.

**Section 11.11 Remedies Not Exclusive**. No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## ARTICLE XII.

## DEFEASANCE

**Section 12.01 Defeasance**. (a) If the Commonwealth shall pay or cause to be paid to the Holder of a Bond the Principal or Redemption Price of and interest thereon, at the times and in the manner stipulated therein, herein, and in the applicable Supplemental Trust Agreement, then all

rights granted hereby and by the Act to such Bond (including without limitation, the Statutory Lien) shall be discharged and satisfied.  In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth, and all money or investments thereof held by it pursuant hereto and to the applicable Supplemental Trust Agreement which are being held for the sole benefit of such Bonds and which are not required for the payment or redemption of Bonds of the same Series as such Bond shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Commonwealth, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the amount required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of an Authorized Officer of the Commonwealth, shall be transferred to the Commonwealth.

(b)    Bonds for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee for the benefit of the Holders of the Bonds (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section.  All Outstanding Bonds of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)    in case any of said Bonds are to be redeemed on any date prior to their maturity, the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Bonds; and

(ii)    there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay when due the Principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the Redemption Date or maturity date thereof, as the case may be; and

(iii)    in the event said Bonds are not by their terms subject to redemption within the next succeeding sixty (60) days, the Commonwealth shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said Bonds at their last known addresses appearing on the registration books, a notice to the Holders of such Bonds that the deposit required by (ii) above has been made with the Trustee and that said Bonds are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; and

- 56 -

(iv)  the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Bond having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, (B)  such defeasance is in accordance with the terms hereof and (C) with respect to a Tax Exempt Bond, such defeasance will not adversely affect the exclusion of interest on such Tax Exempt Bond from gross income for purposes of federal income taxation.

The Commonwealth shall give written notice to the Trustee of its selection of the Series and maturity payment of which shall be made in accordance with this Section.  The Trustee shall select the Bonds of like Series and maturity payment of which shall be made in accordance with this Section in the manner provided in Section 4.05 hereof.  Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; ***provided, however,*** that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due the Principal or Redemption Price, if applicable, of and interest to become due on said Bonds on and prior to such redemption date or maturity date hereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such money so deposited, shall, to the extent certified by the Trustee to be in excess of the amounts required hereinabove to pay the Principal or Redemption Price, if applicable, of and interest on such Bonds, as realized, shall be applied by the Trustee as follows:  first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Commonwealth, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the amount required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of an Authorized Officer of the Commonwealth, shall be retained therein or, upon confirmation of the nationally recognized verification agent that sufficient monies remain to effectuate the defeasance pursuant to this Article XII, transferred to the Commonwealth.

(c)  Anything herein to the contrary notwithstanding, any money held by the Trustee or a Paying Agent in trust for the payment and discharge of any of the Bonds of a Series or the interest thereon which remain unclaimed for three (3) years after the date when all of the Bonds of such Series have become due and payable, either at their stated maturity dates or by call for earlier redemption, if such money was held by the Trustee or Paying Agent at such date, or for three (3) years after the date of deposit of such money if deposited with the Trustee or Paying Agent after said date when all of the Bonds of such Series become due and payable, or three (3) years after the date when the Principal or Redemption Price of or interest on the Bonds for which said money is held was due and payable, shall, at the written request of the Commonwealth, be repaid by the Trustee or Paying Agent to the Commonwealth as its absolute property and free from trust, and the Trustee or Paying Agent shall thereupon be released and discharged with respect thereto and the Holders of Bonds shall look only to the Commonwealth for the payment of such Bonds.

4842-1351-5245.14

# ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY BONDHOLDERS AND PROOF OF OWNERSHIP OF BONDS

**Section 13.01 Evidence of Signatures of Bondholders and Ownership of Bonds**. Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Bonds may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Bonds in Person or by his or their attorneys duly appointed in writing. Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Bonds, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the Person or Persons executing any such instrument on behalf of a corporate Bondholder may be established without further proof if such instrument is signed by a Person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Bonds and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books. Any request, consent or vote of the owner of any Bond shall bind all future owners of such Bond in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith. The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

# ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01 Preservation and Inspection of Documents**. All documents received by the Trustee from the Commonwealth or from Bondholders under the provisions hereof or of any Supplemental Trust Agreement shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Commonwealth, any Bondholder, and their agents and their representatives, any of whom may make copies thereof; ***provided, however,*** that with respect to inspection by a Bondholder a written request of such Bondholder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

4842-1351-5245.14

**Section 14.02 Money and Funds Held for Particular Bonds**. The amounts held by the Trustee or any Paying Agent for the payment of the Principal or Redemption Price of and interest on the Bonds due on any date with respect to particular Bonds shall, pending such payment, be set aside and held in trust by it for the benefit of the Holders of such Bonds entitled thereto, and for the purposes hereof such Principal or Redemption Price of and interest on such Bonds, due after such date thereof, shall no longer be considered to be unpaid upon such payment.

**Section 14.03 Cancellation of Bonds**. The Trustee or any Paying Agent shall forthwith cancel all Bonds which have been redeemed or paid and shall dispose of such Bonds in accordance with its customary procedures. No such Bonds shall be deemed Outstanding Bonds hereunder and no Bonds shall be issued in lieu thereof.

**Section 14.04 No Recourse under Trust Agreement or on the Bonds**. All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no recourse shall be had for the payment of the Principal or Redemption Price of or interest on the Bonds or for any claims based thereon, hereon or on the Supplemental Trust Agreement against any member, officer or employee of the Commonwealth or any Person executing the Bonds, all such liability, if any, being expressly waived and released by every Holder of Bonds by the acceptance of the Bonds.

**Section 14.05 Severability of Invalid Provision**. If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein or in any Supplemental Trust Agreement on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of such Supplemental Trust Agreement or of the Bonds.

**Section 14.06 Parties of Interest**. Nothing herein or in any Supplemental Trust Agreement adopted pursuant to the provisions hereof, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Paying Agents and the Holders and, to the extent provided in this Trust Agreement and any Supplemental Trust Agreement, any Bond Insurer any rights, remedies or claims hereunder or by reason hereof or of any Supplemental Trust Agreement or any covenant, condition or stipulation thereof. All covenants, stipulations, promises and agreements herein or in any Supplemental Trust Agreement contained by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents, the Holders and the Bond Insurer. Any Bond Insurer of any Insured Bonds issued under this Trust Agreement is an express third party beneficiary of this Trust Agreement and of any applicable Supplemental Trust Agreement.

**Section 14.07 Certain Provisions Relating to Capital Appreciation Bonds**. For the purposes of receiving payment of the Redemption Price if a Capital Appreciation Bond is redeemed prior to maturity, the then current Accreted Value of such Bond shall be deemed to be its Principal amount. In computing the Principal amount of Bonds held by the registered owner of

- 59 -

a Capital Appreciation Bond in giving to the Commonwealth or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose whatsoever, the Accreted Value of such Bond as at the immediately preceding Valuation Date shall be deemed to be its principal amount. Notwithstanding any other provision hereof, the amount payable at any time with respect to the Principal of and interest on any Capital Appreciation Bond be equal to its Accreted Value thereof at such time plus redemption premium, if any.

**Section 14.08 Notices**. Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto or to any Supplemental Trust Agreement shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Commonwealth, _____, _____, San Juan, PR _____; in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at _____, _____, _____ _____, attention: Corporate Trust; in the case of the Commonwealth or the Secretary of Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901; and in the case of AAFAF, addressed to [           ], or, in each case, to such other individual and at such other address as the Person to be notified shall have specified by notice to the other Persons. Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any series of Bonds, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Bonds of the Series to the Commonwealth's dissemination agent for distribution through the EMMA system. The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing. The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph. The sole remedy for failure of the Trustee to perform is specific performance.

Any notice provided to the Commonwealth shall also be provided to AAFAF.

**Section 14.09 Headings**. Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.10 Governing Laws**. This Trust Agreement and the Bonds shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Bonds; ***provided, however***, that the authorization of this Trust Agreement and the issuance of the Bonds by the Commonwealth shall be governed by the laws of the Commonwealth; and, ***provided, further***, that the holders of the Bonds shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Constitution.

**Section 14.11 Retention of Jurisdiction of Title III Court**. The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan and the Confirmation Order, including, without limitation, with respect to the payment of the Bonds and the enforcement of the remedies set forth herein to the fullest extent permitted by law.

Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Bonds (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.12 Signatures and Counterparts**.  This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

**Section 14.13 Successors and Assigns**.  Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 14.14 Conflicts.**  All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

[Remainder of page intentionally left blank; signature page follows]

- 61 -

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement as of the date first written above.

**COMMONWEALTH OF PUERTO RICO**


By: _____
Name:
Title:


**[TRUSTEE NAME],** as Trustee


By: _____
Name:
Title:

Signature page to Trust Agreement]

4842-1351-5245.14

EXHIBIT A

FORM OF SERIES 2021A CURRENT INTEREST BOND

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2021**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number: ___                                                              $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION RESTRUCTURED BONDS
[SERIES 2021A-1][SERIES 2021A-2]

| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| % | | | |

Registered Owner:    CEDE & CO.

Principal Amount:    _____ DOLLARS

A-1

4842-1351-5245.14

The **COMMONWEALTH OF PUERTO RICO** (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the **REGISTERED OWNER** named above or registered assigns or legal representatives, on the **MATURITY DATE** specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the **PRINCIPAL AMOUNT** specified above and to pay interest thereon from the date hereof or from the January 1 or July 1 next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a January 1 or July 1, in which case from such date, at the Interest Rate per annum specified above, until payment of such Principal Amount, such interest to the payment hereof being payable semi-annually on the first (1ˢᵗ) day of each January and July (each, an "Interest Payment Date"). The Principal Amount of this bond is payable upon presentation and surrender hereof at the corporate trust office of the Trustee hereinafter mentioned. Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date. Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of [**NAME OF TRUSTEE**], as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Trust Agreement, or at the option of any owner of $1,000,000 or more in aggregate Principal amount of the Series 2021A Current Interest Bonds, by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment. The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date. All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on this bond. To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants a statutory lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys on deposit in the Debt Service Fund established under the Trust Agreement.

This bond is one of a duly authorized issue of bonds of the Commonwealth designated as "General Obligation Restructured Bonds, [Series 2021A-1] [Series 2021A-2]" (herein called the "Series 2021A Bonds"). The Series 2021A Bonds are issued pursuant to a Trust Agreement, by and between the Commonwealth and [NAME OF TRUSTEE] as trustee (the "Trustee"), dated as of _____, 2021 (the "Trust Agreement") and [ACT]. The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth. Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable. The Trust Agreement may be amended to the extent and in the manner provided therein.

Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

This Series 2021A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Trust Agreement for the purposes set forth in the Trust Agreement.

The Series 2021A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Commonwealth, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Trust Agreement, the Plan and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2021A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This bond is transferable, as provided in the Trust Agreement, only upon the books of the Commonwealth maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2021A Bond or Bonds in the same aggregate Principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Commonwealth and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

A-3

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this bond to be signed in its name and on its behalf Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by its Secretary of the State (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2021A Bonds, all as of the Dated Date specified above.

_____
Governor of the Commonwealth of Puerto Rico

_____
Secretary of the Treasury of Puerto Rico

**ATTEST:**

_____
Secretary of State

A-4

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the General Obligation Restructured Bonds, Series 2021A, of the Commonwealth of Puerto Rico.

**[NAME OF TRUSTEE]**, as Trustee

By: _____
Authorized Signatory

Date of authentication: _____, 2021

A-5

4842-1351-5245.14

ASSIGNMENT

FOR VALUE RECEIVED:   _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____

Please print or typewrite name and address,
including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated:   _____        _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

A-6

4842-1351-5245.14

EXHIBIT B

FORM OF SERIES 2021A-1 CAPITAL APPRECIATION BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2021**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number: ___                                                                              $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION RESTRUCTURED BONDS,
SERIES 2021A-1

| ACCRETION RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|

Registered Owner:     CEDE & CO.

Principal Amount at Issuance:     _____ DOLLARS

B-1

Maturity Value[7]: _____ DOLLARS

    The **COMMONWEALTH OF PUERTO RICO** (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the **REGISTERED OWNER** named above or registered assigns or legal representatives, on the **MATURITY DATE** specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the **MATURITY VALUE** specified above on the Maturity Date stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement) upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned.  Interest on this bond shall accrete at the **ACCRETION RATE** set forth above and shall not be payable on a current basis but shall be compounded, and added to Principal, on the Effective Date and on each January 1 and July 1 (each, a "Valuation Date") such that the **PRINCIPAL AMOUNT AT ISSUANCE** specified above shall accrete to equal the **MATURITY VALUE** specified above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement).  Interest shall accrete on overdue interest and Principal at the rate provided above, and shall compound on each Valuation Date.  Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of **[NAME OF TRUSTEE]**, as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts.  All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

    The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on this bond.  To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants a statutory lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys on deposit in the Debt Service Fund established under the Trust Agreement.

    This bond is one of a duly authorized issue of bonds of the Commonwealth designated as "General Obligation Restructured Bonds, Series 2021A-1" (herein called the "Series 2021A Bonds").  The Series 2021A Bonds are issued pursuant to a Trust Agreement, by and between the Commonwealth and [NAME OF TRUSTEE] as trustee (the "Trustee), dated as of _____, 2021 (the "Trust Agreement") and [ACT].  The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

    Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

---

[7]    Reflects Accreted Value at maturity if no Sinking Fund Installment are made prior to stated maturity.

This Series 2021A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Trust Agreement for the purposes set forth in the Trust Agreement.

The Series 2021A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Trust Agreement.  Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Commonwealth, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Trust Agreement, the Plan and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2021A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This bond is transferable, as provided in the Trust Agreement, only upon the books of the Commonwealth maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2021A Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity and accretion rate, shall be issued to the transferee in exchange therefor as provided in the Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Commonwealth and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this bond to be signed in its name and on its behalf Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by its Secretary of the State (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2021A Bonds, all as of the Dated Date specified above.

_____
Governor of the Commonwealth of Puerto Rico

_____
Secretary of the Treasury of Puerto Rico

**ATTEST:**

_____
Secretary of State

4842-1351-5245.14

B-4

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the General Obligation Restructured Bonds, Series 2021A, of the Commonwealth of Puerto Rico.

**[NAME OF TRUSTEE]**, as Trustee

By: _____

Authorized Signatory

Date of authentication: _____, 2021

B-5

4842-1351-5245.14

ASSIGNMENT

FOR VALUE RECEIVED: _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____

Please print or typewrite name and address,
including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated: _____

_____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

B-6

EXHIBIT C

ACCRETED VALUE TABLE

4842-1351-5245.14

EXHIBIT D

CONFIRMATION ORDER

**EXHIBIT B**

CVI Trust Agreement

Draft: 10/11/2021

**TRUST AGREEMENT**

**(relating to CVIs)**

**by and between**

**COMMONWEALTH OF PUERTO RICO**

**and**

**_____, as Trustee**

_____

**Dated as of _____ xx, 2021**

_____

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS AND INTERPRETATION ............................................................. 3
    Section 1.01    Definitions ..................................................................... 3
    Section 1.02    Rules of Construction .................................................. 22

ARTICLE II. AUTHORIZATION AND ISSUANCE OF NOTES ........................................ 22
    Section 2.01    Authorization of Notes ................................................ 22
    Section 2.02    Provisions for Issuance of Notes ................................ 24

ARTICLE III. GENERAL TERMS AND PROVISIONS OF NOTES ................................. 25
    Section 3.01    Place and Medium of Payment.................................... 25
    Section 3.02    Legends ....................................................................... 25
    Section 3.03    CUSIP Numbers .......................................................... 25
    Section 3.04    Execution and Authentication .................................... 26
    Section 3.05    Interchangeability of Notes ........................................ 26
    Section 3.06    Transfer and Registry ................................................. 26
    Section 3.07    Transfer of Notes ........................................................ 26
    Section 3.08    Regulations with Respect to Exchanges and Transfers........................ 27
    Section 3.09    Notes Mutilated, Destroyed, Lost or Stolen .............. 27
    Section 3.10    Book Entry Notes ....................................................... 28
    Section 3.11    Preparation of Definitive Notes; Temporary Notes .............................. 29

ARTICLE IV. REDEMPTION OF NOTES ............................................................................. 30
    Section 4.01    Authorization of Redemption..................................... 30
    Section 4.02    Extraordinary Redemption of GO CVIs at Election of Commonwealth ....................................................... 30
    Section 4.03    Extraordinary Redemption of Clawback CVIs at Election of Commonwealth .......................................... 30
    Section 4.04    Extraordinary Redemption at the Election of the Commonwealth ........ 30
    Section 4.05    Selection of Notes to be Redeemed............................ 30
    Section 4.06    Notice of Redemption ................................................ 31
    Section 4.07    Payment of Redeemed Notes ..................................... 31

ARTICLE V. LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;  PLEDGED DEPOSITS AND APPLICATION THEREOF ................................................................. 33
    Section 5.01    Lien on Trust Estate ................................................... 33
    Section 5.02    Establishment of Funds and Accounts ...................... 33
    Section 5.03    Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition............................ 34
    Section 5.04    Subject to Waterfall Outperformance Amount and Annual Waterfall Payment....................................... 37
    Section 5.05    Not Subject to Waterfall Outperformance Amount ................................ 40
    Section 5.06    Rum Tax CVI Annual Payment Amount .................... 41
    Section 5.07    HTA Clawback CVI Priority Distribution Waterfall ............................. 42
    Section 5.08    CVIs Payment Fund .................................................... 43
    Section 5.09    Trustee and Independent Consultant Expenses Fund............................. 44

4820-1003-9275.14

ARTICLE VI. INVESTMENT OF FUNDS ................................................................. 45

Section 6.01   Investment of Funds ................................................................. 45
Section 6.02   Liability for Investments ........................................................... 46

ARTICLE VII. PARTICULAR COVENANTS ......................................................... 46

Section 7.01   Payment of Notes ...................................................................... 46
Section 7.02   Pledge of Good Faith, Credit and Taxing Power of
               Commonwealth ......................................................................... 46
Section 7.03   Powers as to Notes ................................................................... 46
Section 7.04   Further Assurance ..................................................................... 47
Section 7.05   Offices for Payment and Registration of Notes ...................... 47
Section 7.06   General ...................................................................................... 47
Section 7.07   Non-Impairment Covenant ...................................................... 47
Section 7.08   Baseline SUT Reduction and SUT True-Up ........................... 48
Section 7.09   Substitute Measured Tax .......................................................... 49
Section 7.10   Tax Covenant ............................................................................ 49
Section 7.11   Rum Tax Reporting ................................................................... 49
Section 7.13   Fiscal Plan.  The ....................................................................... 50

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT .... 51

Section 8.01   Appointment and Acceptance of Trustee ................................ 51
Section 8.02   Appointment and Acceptance of Paying Agents .................... 51
Section 8.03   Responsibilities of Trustee and Paying Agents ...................... 51
Section 8.04   Property Held in Trust .............................................................. 51
Section 8.05   Rights of the Trustee and the Paying Agent ........................... 51
Section 8.06   Compensation and Indemnification ......................................... 53
Section 8.07   Permitted Acts .......................................................................... 54
Section 8.08   Resignation of Trustee ............................................................. 54
Section 8.09   Removal of Trustee ................................................................... 54
Section 8.10   Successor Trustee and/or Paying Agent .................................. 55
Section 8.11   Transfer of Rights and Property to Successor Trustee ............ 55
Section 8.12   Merger or Consolidation of the Trustee .................................. 56
Section 8.13   Ancillary Agreements ............................................................... 56

ARTICLE IX. AMENDMENTS TO TRUST AGREEMENT ................................. 56

Section 9.01   Modification and Amendment without Consent ..................... 56
Section 9.02   Supplemental Trust Agreements Effective with Consent of
               Holders ...................................................................................... 57
Section 9.03   General Provisions Relating to Supplemental Trust Agreements .......... 57

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF
HOLDERS ............................................................................................................... 58

Section 10.01   Powers of Amendment ............................................................ 58
Section 10.02   Consent of Holders .................................................................. 58
Section 10.03   Modifications by Unanimous Consent .................................... 59
Section 10.04   Mailing ..................................................................................... 59
Section 10.05   Exclusion of Notes ................................................................... 59
Section 10.06   Notation on Notes .................................................................... 60

ARTICLE XI. DEFAULTS AND REMEDIES ........................................................................ 60

    Section 11.01   Events of Default.................................................................. 60
    Section 11.02   No Acceleration with Respect to the Notes .......................... 61
    Section 11.03   Enforcement of Remedies ................................................... 61
    Section 11.04   Priority of Payments after Default ...................................... 61
    Section 11.05   Termination of Proceedings ................................................ 62
    Section 11.06   Holders' Direction of Proceedings ...................................... 62
    Section 11.07   Control by Holders of Notes; Limitations............................. 63
    Section 11.08   Actions by Trustee; Possession of Notes by Trustee Not Required....... 63
    Section 11.09   Waiver and Non–Waiver of Default ..................................... 64
    Section 11.10   Notice of Event of Default .................................................. 64
    Section 11.11   Remedies Not Exclusive ..................................................... 64

ARTICLE XII. DEFEASANCE ............................................................................................ 64

    Section 12.01   Discharge and Defeasance .................................................. 64

ARTICLE XIII. EXECUTION OF INSTRUMENTS BY NOTE HOLDERS AND PROOF
OF OWNERSHIP OF NOTES ........................................................................................... 65

    Section 13.01   Evidence of Signatures of Holders and Ownership of Notes................. 65

ARTICLE XIV. MISCELLANEOUS .................................................................................... 66

    Section 14.01   Preservation and Inspection of Documents............................ 66
    Section 14.02   Money and Funds Held for Particular Notes........................... 66
    Section 14.03   Cancellation of Notes ......................................................... 66
    Section 14.04   No Recourse under Trust Agreement or on the Notes ............ 66
    Section 14.05   Severability of Invalid Provision........................................... 67
    Section 14.06   Parties of Interest............................................................... 67
    Section 14.07   Notices.............................................................................. 67
    Section 14.08   Headings........................................................................... 67
    Section 14.09   Governing Laws ................................................................. 67
    Section 14.10   Retention of Jurisdiction of Title III Court ........................... 68
    Section 14.11   Signatures and Counterparts................................................ 68
    Section 14.12   Successors and Assigns....................................................... 68
    Section 14.13   Conflicts ........................................................................... 68


Attachment 1     5.5% SUT Baseline
Attachment 2     PRIFA Rum Tax CVI Outperformance Metric
Attachment 3     GO CVI Allocation Summary
Attachment 4     Clawback CVI Allocation Summary
Attachment 5     Form of GO CVI (includes variations for different GO CVI Subseries)
Attachment 6     Form of Clawback CVI (includes variations for different Clawback CVI
                 Subseries and Sub-Subseries)
Attachment 7     Calculations relating to GO CVIs and Clawback CVIs Payments
Attachment 8     Illustrative scenarios of the calculation of the Subject to Waterfall
                 Outperformance Amount
Attachment 9     Illustrative scenarios of the calculation of the Not Subject to Waterfall
                 Outperformance Amount

| Attachment 10 | Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount |
| Attachment 11 | Continuing Disclosure Agreement |

EXHIBIT A - CONFIRMATION ORDER

# TRUST AGREEMENT

THIS TRUST AGREEMENT, dated as of _____ xx, 2021, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and _____, as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Holders that it has authorized this Trust Agreement.

# R E C I T A L S

[to be updated as proceedings progress]

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Case, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below) attached hereto as Exhibit A, the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were [the resolution of certain claims relating to the Commonwealth's general obligation bonds and certain other liabilities of the Commonwealth] and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Notes (as defined below) pursuant to this Trust Agreement.

On October __, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the CVI Legislation (as defined below) which, among other things, authorized the issuance of the Notes and the irrevocable pledge of the good faith[1], credit and taxing power of the Commonwealth for the prompt payment of the Notes when due.

---

[1] "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution. "Good faith" is the literal translation of the term "buena fe". See Article VI, Section 2 of the Commonwealth's Constitution.

4820-1003-9275.14

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the CVI Legislation, the Title III Court made a binding determination that the Notes are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Puerto Rico law and federal law: [to be updated consistent with final Plan]

a. The Confirmation Order is a judicial determination pursuant to Section 4 of PROMESA, and is full, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

b. The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and the Plan.

c. All provisions herein made to pay or secure payment of the Notes are legal, valid, binding, and enforceable, including, without limitation, the covenants provided for herein.

d. At the time of issuance and delivery of the Notes, the Commonwealth is hereby authorized and directed to have stamped or written on each of the Notes a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2021

All things have been done which are necessary to make the Notes, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust indenture for the security of the Notes, in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Notes are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Notes as follows:

This Trust Agreement provides for the issuance by the Commonwealth of the Notes to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the CVI Legislation, and the rights and remedies of the holders from time to time of the Notes.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, amounts available for the payment of the Notes shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Notes issued and to be issued hereunder, without preference, priority or distinction as to participation in the Trust Estate, and the benefit and protection thereof of one Note over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Notes shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if the Commonwealth or its successors or assigns shall well and truly pay or cause to be paid the Notes, according to the provisions set forth in the Notes, respectively and each of them or shall provide for the payment of Notes by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement and shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth, then, provided no Notes remain Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Notes are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Notes are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions.**  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

"**5.5% SUT**" means the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

"**5.5% SUT Baseline**" reflects the baseline projections of the 5.5% SUT set forth in Attachment 1 hereto. Upon the occurrence of a Baseline SUT Reduction, an SUT True-Up or the substitution of a Substitute Measured Tax for the 5.5% SUT, the Commonwealth shall prepare and substitute a revised Attachment 1 for the then applicable Attachment 1 as provided in Sections 7.08 and 7.09 hereof.

"**AAFAF**" means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

"**Allowed**" has the meaning set forth in the Plan.

"**Allowed Claim**" means a Claim, to the extent it is or has become Allowed.

"**Ancillary Agreements**" means the Trust Agreement, the Confirmation Order, the Plan and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.

"**Annual Clawback CVI Carryforward Amount**" has the meaning set forth in Section 5.04(c)(ii)(B) or (C) hereof, as applicable.

"**Annual GO CVI Carryforward Amount**" has the meaning set forth in Section 5.04(c)(i)(B) hereof.

"**Annual Waterfall Payment**" has the meaning set forth in Section 5.04(e) and (f) hereof, as applicable.

"**Authorized Officer**" means (a) in the case of the Commonwealth, the Secretary of Treasury and his or her designees, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by–laws of the Trustee.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

"**Base Cover Over**" means $10.50 per proof gallon of the Rum Tax, or such lesser amount per proof gallon of the Rum Tax required to be covered over to the Commonwealth by the U.S. Department of Treasury pursuant to the U.S. Code.

**"Base Cover Over Revenues"** means the product of (a) Commonwealth Rum Tax Revenues, and (b) the ratio of the Base Cover Over divided by the sum of (1) the Supplemental Cover Over and (2) the Base Cover Over.

**"Baseline SUT Reduction"** has the meaning set forth in Section 7.08(b) hereof.

**"Book Entry Note"** means a Note issued to and registered in the name of a Depository for the participants in such Depository.

**"Business Day"** means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

[**"Calculation Agent"** means the Person serving in such capacity under the Calculation Agent Agreement from time to time. The Calculation Agent shall be an Independent Consultant for all purposes of this Trust Agreement.

**"Calculation Agent Agreement"** means the Calculation Agent Agreement, dated as of _____, 2021, by and among the Commonwealth, the Calculation Agent and the Trustee, as amended or supplemented from time to time.]

**"Causes of Action"** has the meaning set forth in the Plan.

**"CCDA"** means the Puerto Rico Convention Center District Authority.

**"Claim"** means any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

**"Clawback CVI Annual Not Subject to Waterfall Payment Amount"** means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.05 hereof.

**"Clawback CVI Annual Payment Amount"** means, for each Fiscal Year, the sum of the Clawback CVI Annual Not Subject to Waterfall Payment Amount plus the Clawback CVI Annual Subject to Waterfall Payment Amount.

**"Clawback CVI Annual Subject to Waterfall Payment Amount"** means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

**"Clawback CVI Carryforward Balance"** has the meaning attributed under Section 5.04(c)(ii).

"**Clawback CVI Lifetime Cap**" means a total of $5,239,002,764 paid from both Clawback CVI Annual Not Subject to Waterfall Payment Amounts and Clawback CVI Subject to Waterfall Payment Amounts, and, with respect to the PRIFA Rum Tax Clawback CVIs only, from the Rum Tax CVI Annual Payment Amount, of which (a) $3,697,668,995 is allocable for Allowed CW/HTA Claims; (b) $217,228,391 is allocable for Allowed CW/Convention Center Claims; (c) $22,580,090 is allocable for Allowed CW/MBA Claims, and (d) $1,301,525,288 is allocable for Allowed CW/PRIFA Rum Tax Claims.

"**Clawback CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the Clawback CVIs, calculated as provided in Section 5.04(b)(v) or (vi) hereof, as applicable.

"**Clawback CVIs**" means, collectively, the general obligation securities, other than the GO CVIs, issued as Notes pursuant to this Trust Agreement, the payment for which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement. For the avoidance of doubt, unless otherwise provided in this Trust Agreement, the term "Clawback CVI" as used in this Trust Agreement refers to the security representing the interests of the Holders thereof to payments from (a) the Subject to Waterfall Outperformance Amounts, (b) the Not Subject to Waterfall Payment Amounts, and (c) solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amounts.

"**Clawback CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid cumulatively an amount equal to the Clawback CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2051, in the event an SUT Outperformance Condition has not occurred in the prior Fiscal Year, and (2) the CVIs Annual Payment Amount Payment Date in 2051, in the event an SUT Outperformance Condition has occurred in the prior Fiscal Year.

"**Commonwealth**" has the meaning given to such term in the Recitals.

"**Commonwealth Rum Tax Revenues**" means the total Rum Tax collections received by the Commonwealth as documented within the U.S. Department of the Treasury monthly detailed activity report of net excise tax due to the Commonwealth and certified by the Puerto Rico Department of Treasury or any equivalent documentation of such collections that the U.S. Department of the Treasury and/or Puerto Rico Department of Treasury may choose to adopt.

"**Comprehensive Cap**" has the meaning ascribed to such term in the Debt Responsibility Act.

"**Confirmation Order**" means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

"**CVI Legislation**" means the legislation to be enacted on or prior to the Effective Date authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the GO CVIs and the Clawback CVIs and the irrevocable pledge of the good faith, credit and taxing power of the Commonwealth for the prompt payment of the Notes when due, which legislation may be part of, or included in, the New GO Bonds Legislation.

"**CVIs Annual Payment Amount**" means, for each Fiscal Year, an amount equal to the sum of the Clawback CVI Annual Payment Amount plus the GO CVI Annual Payment Amount plus, solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amount.

"**CVIs Annual Payment Amount Calculation Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [October 1][2] of the next Fiscal Year.

"**CVIs Annual Payment Amount Payment Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [November 1] of the next Fiscal Year.

"**CVIs Annual Payment Amount Verification Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [October 15] of the next Fiscal Year.

"**CVIs Maximum Payment Amounts**" means the Clawback CVI Lifetime Cap, the Clawback CVI Maximum Annual Payment, the GO CVI Lifetime Cap, the GO CVI Maximum Annual Payment, and the PRIFA Rum Tax Clawback CVIs Lifetime Cap, as applicable.

"**CVIs Outperformance Condition Determination Date**" means, for each Fiscal Year, [September 1] of the next Fiscal Year.

"**CVIs Payment Fund**" means the fund established in accordance with Section 5.08.

"**CW/Convention Center Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-

---

[2] Bracketed dates in this Trust Agreement are under discussion pending confirmation of, among other things, when the information that is necessary for making the determination of the SUT Outperformance Condition and the Rum Tax Outperformance Condition is available and, following such determinations that either or both of such conditions have occurred, the timing of calculations and verification and related challenges, if any.

2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.

"**CW/Convention Center Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/HTA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751(a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.

"**CW/HTA Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths' percent (68.6%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/MBA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order.

"**CW/MBA Clawback Recovery**" means the aggregate recovery by holders of Allowed CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/PRIFA Rum Tax Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the PRIFA Bonds.

"**CW/PRIFA Rum Tax Clawback Recovery**" means the aggregate recovery by holders of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**Debt Management Policy**" means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act.

"**Debt Policy Revenues**" means, collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue assigned to, or owned by, the Puerto Rico Sales Tax Financing Corporation or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan (as defined in the Plan), (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further, that, for purposes of illustration, with respect to Fiscal Year 2020, and as reflected in the CW Fiscal Plan (as defined in the Plan), "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six hundred Thousand Dollars ($15,146,600,000.00).

"**Debt Responsibility Act**" shall mean Act No. 101-2020, as the same may be amended, modified or supplemented.

"**Defeasance Security**" means:

(a)     a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)     any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; ***provided*** that at the time an investment therein is made such U.S. Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

"**Depository**" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement to serve as securities depository for the Notes, or any successor of any of the foregoing, as applicable.

**"Effective Date"** means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

**"Electronic Means"** means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

**"Eligible Investments"** means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)        Defeasance Securities;

(b)        interest-bearing general obligations of the United States of America;

(c)        United States treasury bills and other non-interest bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)        short-term discount U.S. Government Obligations;

(e)        certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)        banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)        commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)        domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(i)        Investment Agreements that are fully collateralized by Eligible Investments; and

(j)        domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

**"EMMA"** means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the

purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

"**Event of Default**" has the meaning given to such term in Section 11.01 hereof.

"**Extraordinary Redemption Payment Account**" means the account established by Section 5.02(f) hereof.

"**Final Order**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

"**Fiscal Plan**" means the Fiscal Plan of the Commonwealth adopted in a Fiscal Year.

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings and its successors.

"**GDB**" means Government Development Bank for Puerto Rico.

"**GDB HTA Loans**" means, collectively, the loans, if any, made to HTA by GDB and now held by the GDB Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

"**General Fund**" means the Commonwealth's primary operating fund.

"**GO CVI Annual Payment Amount**" means the amount due and payable to the Holders of the GO CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

"**GO CVI Carryforward Balance**" has the meaning attributed under Section 5.04(c)(i).

"**GO CVI Lifetime Cap**" means $3,500,000,000.

"**GO CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the GO CVIs, calculated as provided in Section 5.04(b)(iv) hereof.

"**GO CVI Notional Amount**" means Three Billion Five Hundred Million Dollars ($3,500,000,000.00) in aggregate initial notional amount as of the Effective Date.

"**GO CVIs**" means, collectively, the general obligation securities, other than the Clawback CVIs, issued as Notes pursuant to this Trust Agreement, the payment for which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement.

"**GO CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the GO CVIs have been paid cumulatively an amount equal to the GO CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2043, in the event an SUT Outperformance Condition has not occurred in the Fiscal Year ending on June 30, 2043, and (2) the CVIs Annual Payment Amount Payment Date in 2043, in the event an SUT Outperformance Condition has occurred in the Fiscal Year ending on June 30, 2043.

"**Holder**" or any similar term, when used with reference to a Note or Notes, means the registered owner thereof.

"**HTA**" means the Puerto Rico Highways and Transportation Authority.

"**HTA Bonds**" has the meaning set forth in the Plan.

"**HTA Clawback CVI**" means the Clawback CVI to be issued on account of Allowed CW/HTA Claims.

"**Independent**" when used with respect to any specified person or entity means such a person or entity who (1) is not the Commonwealth, any instrumentality thereof, or any employee of the Commonwealth or any of its instrumentalities, (2) does not have any direct financial interest or material indirect financial interest in this Trust Agreement, the Notes or the Commonwealth or any of its instrumentalities (other than in connection with the services to be provided as Independent Consultant, and (3) is not connected with the Commonwealth, any of its instrumentalities, any party to this Trust Agreement, or any officer, employee, promoter, underwriter, trustee, partner, director, member or person of the foregoing performing similar functions (other than under this Agreement and any agreement pursuant to which it provides the Independent Consultant services.

"**Independent Consultant**" means an Independent third party performing certain designated functions hereunder chosen by the Commonwealth. An Independent Consultant may be chosen for any or all of the functions requiring an Independent Consultant hereunder. Such Independent Consultant shall be nationally recognized and professionally qualified to provide the services of the type required to be performed by such Independent Consultant hereunder.

"**Instructions**" has the meaning given to such term in Section 8.05.

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.

"**Measured SUT**" means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code [(or used for any other purpose established by law)] up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

"**MBA**" means the Metropolitan Bus Authority.

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**New GO Bonds Legislation**" Act No. _____-2021.

"**Note**" means any security of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof to evidence the interests of (a) the Holders of the Clawback CVIs to receive their proportionate shares of the Clawback CVI Annual Payment Amounts and, in the case of the Holders of the PRIFA Rum Tax Clawback CVIs only, to receive the Rum Tax CVI Annual Payment Amounts, and (b) the Holders of the GO CVIs to receive their proportionate shares of the GO CVI Annual Payment Amounts.

"**Not Subject to Waterfall Clawback CVI**" represents the portion of payments to the Holders of the Clawback CVIs made from the Not Subject to Waterfall Outperformance Amounts.

"**Not Subject to Waterfall Clawback CVIs Payment Account**" means the account established by Section 5.02(d) hereof.

"**Not Subject to Waterfall Clawback CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Amount Payment Date, the amount to be deposited into the Not Subject to Waterfall Clawback CVIs Payment Account equal to the payments due to the Holders of the Clawback CVIs from the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Amount Payment Date.

"**Not Subject to Waterfall Outperformance Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.05(a) hereof.

"**Outperformance Amount**" means, for each Fiscal Year in which an SUT Outperformance Condition has occurred, the amount by which the Measured SUT exceeds the 5.5% SUT Baseline reflected in Attachment 1 hereto, as such Attachment 1 may be revised from time to time in accordance with the terms hereof.

"**Outstanding**", when used in reference to Notes, means, as of a particular date, all such Notes authenticated and delivered hereunder except:

(a)    any Notes canceled by the Trustee at or before such date;

(b)    any Notes deemed to have been paid in accordance with Section 12.01 hereof;

(c)    any Note canceled or paid pursuant to Section 3.09 and Section 4.07 hereof or any Note in lieu of or in substitution for which another Note, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof;

(d)    for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Notes hereunder, any Note deemed to not be Outstanding in accordance with Section 10.05 hereof;

(e)    GO CVIs on and after the GO CVIs Final Maturity Date, solely to the extent all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid; and

(f)    Clawback CVIs on and after the Clawback CVIs Final Maturity Date, solely to the extent all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid; provided, however, the Sub-Subseries of Clawback CVIs relating to the CW/HTA Claims, namely the HTA 68 Bond Claims, the HTA 98 Senior Bond Claims, the HTA 98 Sub Bond Claims and the GDB HTA Loans, which are payable in that order of priority, shall be deemed no longer Outstanding when such Holders have been paid their respective notional amounts set forth in Attachment 4 hereto in full prior to the Clawback CVIs Final Maturity Date.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Notes, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

"**Permitted Rum Tax Waterfall Deductions**" means the sum of the following:

(a)    Science and Technology Trust – $5,000,000 transferred to the Puerto Rico Science, Research and Technology Trust Fund Account;

(b)    Rum Producer Incentive Payments – as described in the definition of "**Rum Producer Incentive Payments**";

       (c)    <u>Conservation Trust</u> – the amount transferred to the Puerto Rico Conservation Trust Account – calculated as the product of (1) Supplemental Cover Over Revenues and (2) 1/6th; and

       (d)    PRIDCO – the amount transferred to the Puerto Rico Industrial Development Company Account – calculated as the lesser of (1) $5,000,000 and (2) 2.5% multiplied by the Commonwealth Rum Tax Revenues.

**"Person"** means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

**"Plan"** means the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms thereof.

**"PRIFA"** means the Puerto Rico Infrastructure Financing Authority.

**"PRIFA Bonds"** means, collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and (d) Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

**"PRIFA Related Plan Support Agreement"** means the PRIFA Related Plan Support Agreement, dated as of [July 27, 2021], by and among the Oversight Board, the Commonwealth, certain holders of PRIFA Bond Claims, and certain other signatories, as amended or supplemented from time to time.

**"PRIFA Rum Tax CVI Annual Payment Amount"** means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.06 hereof.

**"PRIFA Rum Tax Clawback CVIs"** means the Subseries of Clawback CVIs that are the only Subseries of Clawback CVIs that are the beneficiaries of the Rum Tax CVI Annual Payment Amounts.

**"PRIFA Rum Tax Clawback CVIs Lifetime Cap"** means $1,301,525,288 of the Clawback CVI Lifetime Cap, allocable to the PRIFA Rum Tax Clawback CVIs.

**"PRIFA Rum Tax Clawback CVIs Payment Account"** means the account established by Section 5.02(e) hereof.

"**PRIFA Rum Tax Clawback CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Amount Payment Date, the amount to be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account equal to the payments due to the Holders of the PRIFA Rum Tax Clawback CVIs from (a) the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, (b) the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, and (c) the Rum Tax CVI Annual Payment Amounts as calculated in accordance with Section 5.06 hereof, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Amount Payment Date.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

"**Puerto Rico Science, Research and Technology Trust Fund Account**" means [  ].

"**Puerto Rico Conservation Trust Account**" means [  ].

"**Puerto Rico Industrial Development Company Account**" means [  ].

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a) a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b) a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

16

(c) a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d) the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e) a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meet the applicable rating requirements set forth above.

**"Quarter in Interest"** means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs. Subject to the foregoing, in the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Notes (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

**"Rating Service"** means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

**"Record Date"** means, when used in relation to Notes of a Series, the date which is fifteen (15) days before the date of payment or action to be taken, whether or not such fifteenth day is a Business Day.

**"Redemption Price"** when used with respect to a Note, means the price established for such redemption in accordance with Article IV hereof and as set forth in the notice of redemption relating thereto.

**"Remaining Clawback CVI Lifetime Cap"** means, as the context requires, (a) the initial Clawback CVI Lifetime Cap as it relates to the Clawback CVIs collectively, or as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, (b) less the notional amounts of the Clawback CVIs redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment

Amount Payment Date or each extraordinary redemption date in accordance with Section 4.03 hereof.

"**Remaining GO CVI Lifetime Cap**" means (a) the initial GO CVI Lifetime Cap, (b) less the notional amounts of the GO CVIs redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Amount Payment Date or each extraordinary redemption date in accordance with Section 4.02 hereof.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan.

"**Rum Tax**" means the federal excise taxes on rum and distilled spirits produced in Puerto Rico and sold in the United States that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the U.S. Code.

"**Rum Producer Incentive Payments**" means the total amount of incentive payments actually shared with and paid to the rum tax producers as stipulated in their respective contracts with the Commonwealth, which percentage is, as of the date of this Trust Agreement, 46%. Solely for purposes of calculating the Rum Tax Outperformance Condition, such percentage is not permitted to exceed the following amounts in the following Fiscal Years: (a) for Fiscal Years ending June 30, 2022 through June 30, 2031, 46%; (b) for Fiscal Years ending June 30, 2032 through June 30, 2036, 48%; and (c) for Fiscal Years ending June 30, 2037 through June 30, 2051, 50%. Any increase in the total amount of incentive payments actually shared with and paid to the rum tax producers in accordance with their respective contracts in excess of the maximum percentages set forth in the preceding sentence will not affect the Rum Tax Outperformance Metric. For the avoidance of doubt, the Rum Producer Incentive Payments may be increased beyond the limits set forth in this definition at the Commonwealth's discretion, however any payments made in excess of such limits will not affect the Rum Tax Outperformance Condition calculation and payment of the Rum Tax CVI Annual Payment Amount.

"**Rum Tax CVI Annual Payment Amount**" means, for each Fiscal Year in which a Rum Tax Outperformance Condition has occurred, the amount calculated as provided in Section 5.06 hereof.

"**Rum Tax Outperformance Condition**" means that Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric in any given Fiscal Year. A Rum Tax Outperformance Condition may occur in Fiscal Years in which an SUT Outperformance Condition has not occurred.

"**Rum Tax Outperformance Metric**" reflects the baseline projections of 100% of the Waterfall General Fund Rum Tax Collections within the Commonwealth's 2021 Fiscal Plan projections set forth in Attachment 1 hereto.

"**S&P**" means S&P Global Ratings and its successors.

"**Sales Tax**" means the sales and use tax, including any replacement or similar sales and use tax, imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter

D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

**"Secretary of Treasury"** means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

**"Series"** means either Clawback CVIs or GO CVIs.

**"Series 2021A-1 Capital Appreciation Bonds"** means the Commonwealth's General Obligation Bonds, Series 2021A-1 Bonds.

**"Subject to Waterfall Clawback CVI"** represents the portion of payments to the Holders of the Clawback CVIs made from the Subject to Waterfall Outperformance Amounts.

**"Subject to Waterfall CVIs Payment Account"** means the account established by Section 5.02(b) hereof.

**"Subject to Waterfall Clawback CVIs Payment Account Deposit"** means, for each CVIs Annual Payment Amount Payment Date, the amount to be deposited into the Subject to Waterfall Clawback CVIs Payment Account equal to the payments due to the Holders of the GO CVIs and due to the Holders of the Clawback CVIs from the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Amount Payment Date.

**"Subject to Waterfall Outperformance Amount"** means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.04(a) hereof.

**"Subseries"** means the four categories of Claims of the Clawback CVIs – the CW/Convention Center Subseries, the CW/HTA Claims Subseries, the CW/MBA Claims Subseries and the CW/PRIFA Rum Tax Claims Subseries.

**"Substitute Measured Tax"** means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

**"Sub-Subseries"** means, as the context requires, the following four Sub-Subseries of Clawback CVIs within the Subseries relating to CW/HTA Claims: (i) HTA 68 Bond Claims; (ii) HTA 98 Senior Bond Claims; (iii) HTA 98 Sub Bond Claims; and (iv) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

**"Supplemental Cover Over"** means the amount per proof-gallon of the Rum Tax that the U.S. Department of Treasury covers over to the Commonwealth, less the Base Cover Over, for the applicable Fiscal Year.

**"Supplemental Cover Over Revenues"** means the product of (a) the Commonwealth Rum Tax Revenues, and (b) the ratio of the Supplemental Cover Over divided by the sum of (1)

the Supplemental Cover Over and (2) the Base Cover Over. For purposes of calculating the Rum Tax CVI Annual Payment Amount in Section 5.06 hereof, the maximum amount of Supplemental Cover Over Revenues in each applicable Fiscal Year is the Supplemental Cover Over Revenues Cap.

"**Supplemental Cover Over Revenues Cap**" means $88,000,000.

"**Supplemental Trust Agreement**" means any trust agreement of the Commonwealth amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**SUT Outperformance Condition**" means that the 5.5% SUT (or the Substitute Measured Tax if substituted as permitted herein) collected exceeds the 5.5% SUT Baseline (as adjusted or revised in Attachment 1 as herein provided) in any given Fiscal Year. An SUT Outperformance Condition may occur in any Fiscal Year even if a Rum Tax Outperformance Condition has not occurred in such Fiscal Year.

"**SUT True-Up**" has the meaning set forth in Section 7.08(c) and (d) hereof.

"**Title III Case**" has the meaning given to such term in the Recitals.

"**Title III Court**" has the meaning given to such term in the Recitals.

"**Transaction Counsel**" means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

"**Treasury Rate**" means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI or the Clawback CVI, as the case may be, being redeemed.

"**Trust Agreement**" means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

"**Trust Estate**" means, other than the Trustee and Independent Consultant Expenses Fund, (a) for the benefit of the Holders of the GO CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account and the GO CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the GO CVIs; (b) for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs; (c) with respect to the PRIFA Rum Tax Clawback CVIs, all of the

20

Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the PRIFA Rum Tax Clawback CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the PRIFA Rum Tax Clawback CVIs; and (d) in each case, the Trustee's right to receive any such money, securities and other assets relating to each of the foregoing, as applicable, wheresoever located.

"**Trustee**" means the bank or trust company appointed as Trustee for the Notes pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

"**Trustee and Independent Consultant Expenses**" means the reasonable and verified permitted costs, fees and expenses of the Trustee and the Independent Consultants arising out of or incurred in connection with carrying out and administering their respective duties hereunder, but excludes certain expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, including, without limitation, the enforcement of remedies under Article XI hereof, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim, as more fully described in Section 8.06 hereof.

"**Trustee and Independent Consultant Expenses Advances**" means (a) the amount initially deposited into the Trustee and Independent Consultant Expenses Fund in accordance with Section 2.02(b) hereof, and (b) the amount of Trustee and Independent Consultant Expenses advanced by the Commonwealth in each Fiscal Year following Fiscal Years in which neither an SUT Outperformance Condition nor a Rum Tax Outperformance Condition has occurred as provided in Section 5.03(a) hereof in order to fund the Trustee and Independent Consultant Expenses Fund in an amount equal to the Trustee and Independent Consultant Expenses Cap.

"**Trustee and Independent Consultant Expenses Cap**" means an annual amount not to exceed $_____.

"**Trustee and Independent Consultant Expenses Fund**" means the Trustee and Independent Consultant Expenses Fund so designated, created and established pursuant to Section 5.02(a) hereof.

"**Trustee and Independent Consultant Expenses Funding Amount**" means, as of each CVIs Annual Payment Amount Calculation Date, the sum of (a) the amount by which the Trustee and Independent Consultant Expenses Cap for such Fiscal Year exceeds the amount on deposit in the Trustee and Independent Consultant Expenses Fund, plus (b) all Trustee and Independent Consultant Expenses Advances not previously reimbursed to the Commonwealth.

"**U.S. Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage

Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

**"U.S. Presidential Declaration of Disaster"** means the declaration of a disaster by the President of the United States under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, P.L. 100-707, as amended or supplemented from time to time, and any comparable successor legislation.

**"Waterfall General Fund Rum Tax Collections"** means (a) Waterfall Cover Over Revenues less (b) Permitted Rum Tax Waterfall Deductions.

**"Waterfall Cover Over Revenues"** means the sum of (a) Waterfall Supplemental Cover Over Revenues plus (b) Base Cover Over Revenues.

**"Waterfall Supplemental Cover Over Revenues"** means the lesser of (a) Supplemental Cover Over Revenues and (b) the Supplemental Cover Over Revenues Cap.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement.  All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## AUTHORIZATION AND ISSUANCE OF NOTES

**Section 2.01   Authorization of Notes.**

(a)      There are hereby authorized to be issued Notes of the Commonwealth in two series – the "GO CVIs" and the "Clawback CVIs."  The Notes shall be issued in authorized denominations of one dollar ($1.00) and integral multiples thereof.

(b)      On the Effective Date, the Commonwealth shall deliver the GO CVIs in the original GO CVI Notional Amount to those beneficiaries entitled to receive the same as provided

in the Plan. The GO CVIs shall be deemed issued on July 1, 2021. The GO CVIs shall mature on the earlier of (a) the date when the Holders of the GO CVIs have been paid an amount equal to the GO CVI Lifetime Cap and (b) [July 1], 2043, subject to the final GO CVI Annual Payment Amount being paid no later than the GO CVIs Final Maturity Date (with the GO CVIs remaining Outstanding until such time as all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid). Payments to the Holders of the GO CVIs shall not exceed in the aggregate the GO CVI Lifetime Cap.

(c)     The Clawback CVIs shall be issued in the original aggregate notional amount of $5,239,002,764 in four Subseries designated as "Allowed CW/HTA Claims," "Allowed CW/Convention Claims," "Allowed CW/PRIFA Rum Tax Claims" and "Allowed CW/MBA Claims."

(i)     Within the Subseries relating to "Allowed CW/HTA Claims," there shall be issued four Sub-Subseries: (A) HTA 68 Bond Claims; (B) HTA 98 Senior Bond Claims; (C) HTA 98 Sub Bond Claims; and (D) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

(ii)     On the Effective Date,  the Commonwealth shall deliver (A) $3,697,668,995 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/HTA Claims, of which (w) $179,462,539 shall be allocated to the Sub-Subseries relating to HTA 68 Bond Claims; (x) $1,833,405,578 shall be allocated to the Sub-Subseries relating to HTA 98 Senior Bond Claims; (y) $207,294,178 shall be allocated to the Sub-Subseries relating to HTA 98 Sub Bond Claims; and (z) the remaining $1,477,506,700 shall be allocated to the Sub-Subseries relating to GDB HTA Loans; (B) $217,228,391 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/Convention Claims; (C) $1,301,525,288 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/PRIFA Rum Tax Claims; and (D) $22,580,090 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/MBA Claims, all as provided in the Plan.

(iii)     The Clawback CVIs shall be deemed issued on July 1, 2021. The Clawback CVIs shall mature on the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid an amount equal to the initial Clawback CVI Lifetime Cap, and (b) on [July 1,] 2051, subject to the final Clawback CVI Annual Payment Amount being paid no later than the Clawback CVIs Final Maturity Date (with the Clawback CVIs remaining Outstanding until such time as all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid). Payments to the Holders of the Clawback CVIs shall not exceed in the aggregate the Clawback CVI Lifetime Cap. From the Clawback CVI Lifetime Cap, payments to the Holders of the Clawback CVIs for the Allowed CW/HTA Claims shall not exceed in the aggregate $3,697,668,995, which are further limited within each Sub-Subseries to the amounts allocated thereto; payments to the Holders of the Clawback CVIs for the Allowed CW/Convention Center Claims shall not exceed in the aggregate $217,228,391;

payments to the Holders of the Clawback CVIs for the Allowed CW/PRIFA Rum Tax Claims shall not exceed in the aggregate $1,301,525,288; and payments to the Holders of the Clawback CVIs for the Allowed CW/MBA Claims shall not exceed in the aggregate the $22,580,090, all as provided in the Plan.

(d)     The Notes are general obligations of the Commonwealth payable in the manner more particularly provided herein, subject to the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition. The Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution and applicable Puerto Rico law to the payment of the Notes in accordance with the terms of Section 7.02 hereof.[3]

(e)     The form of the GO CVI Note is attached hereto as Attachment 5. The form of the Clawback CVI is attached hereto as Attachment 6.

**Section 2.02   Provisions for Issuance of Notes.** The Commonwealth shall issue Notes under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Secretary of Treasury of the Commonwealth, or his or her designee; ***provided***, ***however***, that such direction may not conflict with the terms of this Trust Agreement, the CVI Legislation, the Plan or the Confirmation Order. The Notes authorized to be issued in accordance with the terms of this Section 2.02 shall be executed by the Commonwealth and delivered to the Trustee. Such Notes shall, as directed by the Commonwealth, be authenticated by the Trustee upon delivery to the Trustee of:

(a)     a copy of this Trust Agreement authorizing such Notes, certified by an Authorized Officer of the Commonwealth;

(b)     delivery by the Commonwealth to the Trustee of an amount equal to the Trustee and Independent Consultant Expenses Cap for deposit into the Trustee and Independent Consultant Expenses Fund;

(c)     a written order as to the delivery of such Notes, signed by an Authorized Officer of the Commonwealth, describing the Notes to be delivered and designating the Person(s) to whom such Notes are to be delivered; and

(d)     [an opinion of Transaction Counsel with respect to validity, legality and enforceability of the Notes and the good faith, credit and taxing power pledge of the Commonwealth and with respect to such other matters as are customary in connection with the issuance of the Notes; provided, however, that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; provided, further, that such opinion of Transaction Counsel may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy].

---

[3] **Commonwealth pledge of its good faith, credit and taxing power is contingent on passage of the legislation.**

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF NOTES

**Section 3.01  Place and Medium of Payment.**  Amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be payable in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Notes, upon presentation and surrender of Notes, such Notes shall be payable at the designated corporate trust office of the Trustee, and amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be paid by check mailed to the registered owner thereof as of the Record Date at the address thereof as it appears on the registry books of the Commonwealth or by wire transfer to such registered owner of the Notes if such registered Owner owns at least one million dollars ($1,000,000) initial notional amount of Notes of the GO CVIs or any of the Subseries of the Clawback CVIs.

Notes shall be initially dated as of July 1, 2021.  Notes of each Series and Subseries issued on or subsequent to the first CVIs Annual Payment Amount Payment Date shall be dated as of the CVIs Annual Payment Amount Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be a CVIs Annual Payment Amount Payment Date, in which case they shall be dated as of such date of authentication; ***provided, however,*** that if, as shown by the records of the Trustee, no CVIs Annual Payment Amount has been paid as of the CVIs Annual Payment Amount Payment Date immediately preceding the date of authentication thereof by the Trustee, the Notes of such Series issued in lieu of Notes surrendered for transfer or exchange shall be dated as of the date through which the last CVIs Annual Payment Amount has been paid in full on the Notes surrendered or, if no CVIs Annual Payment Amount has been paid on the Notes surrendered since their authentication, as of the date of authentication of the surrendered Notes.

**Section 3.02  Legends.**  The Notes shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGEMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2021."

**Section 3.03  CUSIP Numbers.**  The Commonwealth shall provide for the assignment of CUSIP numbers for all Notes of all Series and Subseries (including a separate CUSIP number for each Subseries, or, in the case of a Subseries that has Sub-Subseries, a separate CUSIP number for each Sub-Subseries) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Holders as a convenience to Holders; ***provided, however,*** that any such notice may state that no representation is made as to the correctness of such number either as printed on such Notes or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Note or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption.  The Commonwealth shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Note of which the Commonwealth has knowledge.  The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication.**  The Notes shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer thereof, or in such other manner as may be permitted by law.  In case any one or more of the officers or employees who shall have signed any of the Notes shall cease to be such officer or employee before the Notes so signed shall have been actually authenticated and delivered by the Trustee, such Notes may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Notes had not ceased to hold such offices or be so employed.  Any Note may be signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Note shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Notes such Persons may not have been so authorized or have held such office or employment.

The Notes of each Series and Subseries shall bear thereon a certificate of authentication, in the form set forth in the forms of Notes annexed hereto, executed manually by the Trustee.  Only such Notes as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Note shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee.  Such certificate of the Trustee upon any Note executed on behalf of the Commonwealth shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Notes.**   Notes, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate notional amount of Notes of the same Series, Subseries and Sub-Subseries and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry.**  So long as any of the Notes remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Notes; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Note entitled to registration or transfer.  So long as any of the Notes remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Notes at the designated corporate trust office of the Trustee.

**Section 3.07   Transfer of Notes.**  Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Note shall be registered upon the books of the Commonwealth as the absolute owner of such Note, whether such Note shall be overdue or not, for the purpose of receiving payment of, or on account of, the Notes, subject to the provisions of Section 3.01 hereof with respect to Record Dates, and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Note to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary. The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

**Section 3.08   Regulations with Respect to Exchanges and Transfers.** In all cases in which the privilege of exchanging Notes or transferring Notes is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Notes in accordance with the provisions hereof. All Notes surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee. For every such exchange or transfer of Notes, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer. Notwithstanding any other provisions hereof, the cost of preparing each new Note upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer. The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Notes of any Series or Subseries during the period beginning on the Record Date for such Notes immediately preceding a CVIs Annual Payment Amount Payment Date relating to such Notes and ending on such CVIs Annual Payment Amount Payment Date, or, in the case of any proposed other redemption of Notes of such Series or Subseries, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Notes Mutilated, Destroyed, Lost or Stolen.** In case any Note shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Note of like Series, Subseries and Sub-Subseries, tenor and notional amount as the Note so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Note, upon surrender and cancellation of such mutilated Note or in lieu of and substitution for such Note so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and

paying such expenses as the Commonwealth and the Trustee may incur in connection therewith. All Notes so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth. In case any Note which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth may, instead of issuing a Note in exchange or substitution therefor, pay or authorize the payment of such mutilated Note upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Note, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.

**Section 3.10    Book Entry Notes.**  Anything herein to the contrary notwithstanding, Notes shall be authorized and issued as Book Entry Notes.

For all purposes of the Trust Agreement, the Holder of a Book Entry Note shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Note or to any direct or indirect participant in such Depository. Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Note with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Note, (b) the delivery to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any notice with respect to such Note, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any amount with respect to the CVIs Annual Payment Amount and Redemption Prices relating to such Note. The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Note for the purpose of (x) payment of the CVIs Annual Payment Amount and Redemption Prices relating to such Note, (y) giving notices of redemption and of other matters with respect to such Note, (z) registering transfers with respect to such Note, and for all other purposes whatsoever. The Trustee shall pay the CVIs Annual Payment Amount and Redemption Prices relating to such Note only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such CVIs Annual Payment Amount and Redemption Prices to the extent of the sum or sums so paid. No Person other than the Depository shall receive a Note or other instrument evidencing the Commonwealth's obligation to make payments of the CVIs Annual Payment Amount.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Note which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Note to the Trustee; ***provided, however,*** that the Trustee shall maintain records as to each such payment and of the notional amount of such Note Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Note.

4820-1003-9275.14

The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Note or any other Person, may terminate the services of the Depository with respect to a Book Entry Note if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Notes or (b) a continuation of the requirement that all of the Outstanding Notes of like Series, Subseries and/or Sub-Subseries issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Notes, and the Commonwealth shall terminate the services of the Depository upon receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Notes for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Note, or upon the resignation of a Depository with respect to a Book Entry Note, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Notes shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by the Holders transferring or exchanging such Notes, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11  Preparation of Definitive Notes; Temporary Notes.**  The definitive Notes of each Series and Subseries shall be lithographed or printed on steel engraved borders, except that Book Entry Notes may be typewritten.  Until the definitive Notes of any Series or Subseries are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Notes, but subject to the same provisions, limitations and conditions as the definitive Notes, except as to the denominations thereof and as to exchangeability for registered Notes, one or more temporary Notes, substantially of the tenor of the definitive Notes in lieu of which such temporary Note or Notes are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Notes.  The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Notes for exchange and the cancellation of such surrendered temporary Notes the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Notes of the same aggregate notional amount and Series, Subseries and Sub-Subseries as the temporary Notes surrendered.  Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and security as definitive Notes issued pursuant hereto.

All temporary Notes surrendered in exchange for a definitive Note or Notes shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF NOTES

**Section 4.01    Authorization of Redemption.**  Notes are subject to mandatory redemption in accordance with their respective rights to payment from CVIs Annual Payment Amounts. Notes shall be additionally redeemable from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein.

**Section 4.02    Extraordinary Redemption of GO CVIs at Election of Commonwealth.** The GO CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.02 shall be verified by an Independent Consultant.

**Section 4.03    Extraordinary Redemption of Clawback CVIs at Election of Commonwealth.**  The Clawback CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.03 shall be verified by an Independent Consultant.

**Section 4.04    Extraordinary Redemption at the Election of the Commonwealth.**  In the case of any extraordinary redemption of Notes in accordance with the provisions of Section 4.02 or 4.03 hereof from moneys other than CVIs Annual Payment Amounts, the Commonwealth shall give written notice to the Trustee of its election to redeem, whether such Notes are GO CVIs or Clawback CVIs, the notional amount to be redeemed, and the Redemption Prices of the Notes to be redeemed.  Such notice shall be given to the Trustee not less than forty-five (45) days prior to the redemption date.  The Series, Subseries and Sub-Subseries of Notes and notional amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein, including any priority of payment with respect to such Series, Subseries and/or Sub-Subseries as provided herein.  The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee hereunder, is sufficient to redeem on the redemption date at the Redemption Price thereof, all of the Notes or portions thereof to be so redeemed.

**Section 4.05    Selection of Notes to be Redeemed.**  In the event of redemption of less than all of the Outstanding Notes of like Series, Subseries or Sub-Subseries, the Trustee shall select the Notes to be redeemed (i) on a pro rata basis to the extent practicable, or, (ii) in the case of Book Entry Notes, where pro rata redemption is not possible, in accordance with the applicable

procedures of the Depository. Notes selected shall be in amounts of $1.00 or whole multiples of $1.00 in excess thereof, except that if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1.00, shall be redeemed.

Section 4.06    **Notice of Redemption.**    Whenever Notes are to be redeemed in accordance with Sections 4.02 and 4.03, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth which notice shall specify:  (a) the Notes to be redeemed which shall be identified by the designation of the Notes given in accordance with Article II hereof; (b) the numbers and other distinguishing marks of the Notes to be redeemed, including CUSIP numbers; (c) the redemption date; (d) the Redemption Price (including the Redemption Price thereof); (e) with respect to each such Note, the notional amount thereof to be redeemed; (f) that, except in the case of Book Entry Notes, such Notes will be redeemed at the designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (g) that no representation is made as to the correctness of the CUSIP number either as printed on the Notes or as contained in such notice and that an error in a CUSIP number as printed on a Note or as contained in such notice shall not affect the validity of the proceedings for redemption; and (h) if the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Note to be redeemed the Redemption Price thereof.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books.  Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders of the Notes to be redeemed in the manner provided herein.  Such certification shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.  [The Trustee shall make available to the Holders of Notes subject to redemption a copy of the notice of redemption under procedures established by the Trustee.]

Section 4.07    **Payment of Redeemed Notes.**    Notice having been given in the manner provided in Section 4.06 hereof, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, except as

otherwise provided in Section 3.10 hereof upon presentation and surrender of such Notes, at the office or offices specified in such notice, and, in the case of Notes presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Notes, or portions thereof, shall be paid at the Redemption Price; *provided, however,* that payment of the Redemption Price may be paid by wire transfer as provided in the first paragraph of Section 3.01 hereof. If there shall be called for redemption less than all of the notional amount of a registered Note, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Note, without charge to the owner thereof, for the unredeemed balance of the notional amount of the registered Note so surrendered, Notes of like Series, Subseries and Sub-Subseries and tenor in any of the authorized denominations. If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes or portions thereof to be redeemed shall no longer be considered to be Outstanding hereunder. If such money shall not be so available on the redemption date, such Notes or portions thereof shall continue to be payable as herein provided as if such redemption had not been noticed.

## ARTICLE V.

## LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS; PLEDGED DEPOSITS AND APPLICATION THEREOF

**Section 5.01   Lien on Trust Estate.**   The Commonwealth hereby grants, upon the issuance of the Notes, a lien on the Trust Estate in favor of the Trustee for the benefit of the Holders of the Notes, all as reflected in the definition of "Trust Estate".  The lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the lien.  [Such lien shall be perfected automatically, without further need for notice, recording or control, if and to the extent so provided in the Confirmation Order.][4]

**Section 5.02   Establishment of Funds and Accounts.**

(a)      The Trustee shall establish a Trustee and Independent Consultant Expenses Fund, which fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee. Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.03(d) hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses.

(b)      The Trustee shall establish a CVIs Payments Fund and, within such CVIs Payments Fund, (i) a Subject to Waterfall CVIs Payment Account, and, within such Subject to Waterfall CVIs Payment Account, a (A) GO CVIs Subaccount and (B) a Clawback CVIs Subaccount, (ii) a Not Subject to Waterfall Clawback CVIs Payment Account, (iii) a PRIFA Rum Tax Clawback CVIs Payment Account, and (iv) an Extraordinary Redemption Payment Account, and, within such Extraordinary Redemption Payment Account, a (A) GO CVIs Subaccount, (B) Clawback CVIs Subaccount and (C) PRIFA Rum Tax Clawback CVIs Subaccount, which fund, accounts and subaccounts shall constitute a portion of the Trust Estate and shall be held in trust for the benefit of the Holders as provided herein and maintained by the Trustee.

(c)      The GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account and the GO CVIS Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs as provided herein, including Section 5.04 hereof.

(d)      The Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall Clawback CVIs Payment Account and the Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the Holders of the PRIFA Rum Tax Clawback CVIs, as provided herein, including Section 5.05 hereof.

---

[4] Subject to review of Puerto Rico law and confirmation this is legally enforceable.

4820-1003-9275.14

(e)     The PRIFA Rum Tax Clawback CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs as provided herein, including Sections 5.05 and 5.06 hereof.

(f)     The Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Notes subject to redemption in accordance with Sections 4.02 and 4.03 hereof.  The GO CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs.  The Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs.  The PRIFA Rum Tax Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs.

(g)     The moneys in each such fund, account and subaccount shall be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.03   Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition.**

(a)     By no later than each CVIs Outperformance Condition Determination Date, commencing after the end of the Fiscal Year ending on June 30, 2022, the Commonwealth shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year.  The Commonwealth shall provide written notice to the Trustee as to whether an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has or has not occurred within five Business Days of such CVIs Outperformance Condition Determination Date.  The Trustee shall provide written notice to the Holders of the Notes as to whether an SUT Outperformance Condition has or has not occurred within three Business Days of its receipt from the Commonwealth of the notice set forth above.  The Trustee shall provide written notice to the Holders of the PRIFA Rum Tax Clawback CVIs as to whether a Rum Tax Outperformance Condition has or has not occurred within three Business Days of its receipt from the Commonwealth of the notice set forth above.  The Commonwealth shall thereafter undertake to calculate the amounts required to be calculated in accordance with Section 5.03(b) hereof by on or prior to the CVIs Annual Payment Amount Calculation Date.  The Commonwealth shall within [two] Business Days of the CVIs Outperformance Condition Determination Date also provide to the [Independent Consultant] [Calculation Agent] retained to verify the calculations in accordance with this Section 503 such other information as shall be reasonably requested by the [Independent Consultant] [Calculation Agent] and then available to allow the [Independent Consultant] [Calculation Agent] to begin its work to verify such calculations on or prior to the CVIs Annual Payment Amount Verification Date.  [Calculation Agent Agreement to provide mechanism for determining and verifying calculations relating to the occurrence or non-occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, the sharing of information relating to the foregoing and the challenge process, together with remedies.]

(b)     By no later than each CVIs Annual Payment Amount Calculation Date, whether or not an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Commonwealth shall calculate the Trustee

34

and Independent Consultant Expenses Funding Amount. By no later than each CVIs Annual Payment Amount Calculation Date, (i) if an SUT Outperformance Condition has occurred with respect to the prior Fiscal Year, the Commonwealth shall calculate the Subject to Waterfall Outperformance Amount as provided in Section 5.04 hereof, and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 hereof, and (ii) if a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Commonwealth shall calculate the Rum Tax CVI Annual Payment Amount, if any, as provided in Section 5.06 hereof. In each case, the Commonwealth shall calculate the amount by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Amount Payment Date on a schedule in substantially the form of Attachment 7 hereto. The Commonwealth shall also provide on such schedule calculations as to the revised amounts of the applicable Remaining Clawback CVI Lifetime Cap and the Remaining GO CVI Lifetime Cap, by Series, Subseries and Sub-Subseries, taking into consideration the amounts to be applied on the CVIs Annual Payment Amount Payment Date. The Commonwealth shall provide notice of the amounts so calculated to the [Independent Consultant] [Calculation Agent] retained to verify such calculations within [two] Business Days of the CVIs Annual Payment Amount Calculation Date. The Commonwealth shall also provide to such [Independent Consultant] [Calculation Agent] such other information as shall be reasonably requested by the [Independent Consultant] [Calculation Agent] to allow the [Independent Consultant] [Calculation Agent] to verify such calculations on or prior to the CVIs Annual Payment Amount Verification Date.

(c) By no later than each CVIs Annual Payment Amount Verification Date following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, [Independent Consultant] [Calculation Agent] shall review the calculations made by the Commonwealth. The [Independent Consultant] [Calculation Agent] shall either verify the calculations made by the Commonwealth or work with the Commonwealth to agree upon the calculations to be verified. In each case, the Commonwealth shall calculate, and shall have verified by [Independent Consultant] [Calculation Agent], the amount by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Amount Payment Date, and such other information described in Section 5.03(b), as set forth on a schedule in substantially the form of Attachment 7 hereto. [Calculation Agent Agreement to provide mechanism for determining calculations relating to the foregoing and the challenge process, together with remedies, prior to final verification.] Upon such verification, the Commonwealth shall provide notice to the Trustee of the amounts described in the preceding sentence, within five Business Days of such verification. The Trustee shall provide written notice to the Holders of the Notes of the amounts calculated by the Commonwealth and verified by the Independent Consultant within three Business Days of its receipt from the Commonwealth of the notice set forth in the preceding sentence. [Scope of information and availability to Holders to be addressed in Calculation Agent Agreement.]

(d) To the extent that an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred, the Commonwealth shall transfer to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date, subject to the CVIs Maximum Payment Amounts, an amount equal to the sum of the Subject to Waterfall Outperformance Amount, the Not Subject to Waterfall Outperformance Amount, if any,

35

and the Rum Tax CVI Annual Payment Amount, if any, together with written directions on the amounts, if any, that are to be deposited into each Subaccount of the Subject to Waterfall CVIs Payment Account (in an amount equal to the Subject to Waterfall CVIs Payment Account Deposit), the Not Subject to Waterfall CVIs Payment Account (in an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit) and the PRIFA Rum Tax Clawback CVIs Payment Account (in an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit). Upon receipt by the Trustee from the Commonwealth of the amounts described in the preceding sentence, (i) an amount equal to the Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Subject to Waterfall CVIs Payment Account and portions thereof shall be deposited into the Subaccounts therein as hereinafter provided, (ii) an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Not Subject to Waterfall CVIs Payment Account, and (iii) an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account. The moneys deposited into the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Payment Account shall be held by the Trustee uninvested until the payment to the respective Holders. Contemporaneously with such deposits, the Commonwealth shall transfer to the Trustee an additional amount equal to the Trustee and Independent Consultant Expenses Funding Amount for deposit into the Trustee and Independent Consultant Expenses Fund. The moneys deposited into the Trustee and Independent Consultant Expenses Fund may be invested as provided in Article VI hereof.

(e)     No payments (other than from the PRIFA Rum Tax Clawback CVIs Payment Account if a Rum Tax Outperformance Condition has occurred) shall be made to the Holders of the Notes in Fiscal Years following Fiscal Years in which an SUT Outperformance Condition has not occurred.

(f)     No payments shall be made to the Holders of the GO CVIs in excess of the GO CVI Annual Payment Amount or the GO CVI Lifetime Cap, as applicable.

(g)     No payments shall be made to the Holders of the Clawback CVIs in excess of the Clawback CVI Annual Payment Amount or the Clawback CVI Lifetime Cap, as applicable.

(h)     No payments shall be made to the Holders of the PRIFA Rum Tax Clawback CVIs from the Rum Tax CVI Annual Payment Amount in excess of the amount calculated in accordance with Section 5.06(a) hereof or the PRIFA Rum Tax Clawback CVIs Lifetime Cap.

(i)     [The Trustee shall provide for the timely posting of the following final notices and verified information on EMMA[5]:

(A)     notices of the occurrence of an SUT Outperformance Condition and a Rum Tax Outperformance Condition as provided in Section 5.03(a) hereof; and

_____

[5] Subject to review to ensure that all information is made publicly available and not to limited group of investors.

(B)    the verified information as provided in Section 5.03(c) hereof, including a copy of the final Attachment 7 relating thereto.]

**Section 5.04   Subject to Waterfall Outperformance Amount and Annual Waterfall Payment.**

(a)    The Subject to Waterfall Outperformance Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022 (with such calculation identifying any Subject to Waterfall Outperformance Amount associated with the Fiscal Year ending June 30, 2022), following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; provided, however, for the avoidance of doubt, the Subject to Waterfall Outperformance Amount is subject to the aggregate GO CVI Maximum Annual Payment and the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)    fifty percent (50%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to (A) the Holders of the GO CVIs and (B) the Holders of Clawback CVIs from Subject to Waterfall Outperformance Amounts; and

(ii)    seventy-five percent (75%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred.

(b)    For purposes of calculating the Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)    the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount, less the Trustee and Independent Consultant Expenses Funding Amount, is the "annual Outperformance" referred to in Section 5.04(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.04(a)(i) above as described in Section 5.04(b)(ii) below, as well as the 75% of "annual Outperformance" amount for purposes of Section 5.04(a)(ii) above;

(ii)    the "annual Outperformance" amount calculated in accordance with Section 5.04(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance" referred to in Section 5.04(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)    the Commonwealth will then calculate the lesser of 50% of the "cumulative Outperformance" amount and 75% of the "annual Outperformance" amount;

(iv)    the GO CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the GO CVI Carryforward Balance and $200,000,000 and (B) $400,000,000;

(v)    until the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the Clawback CVI Carryforward Balance and $175,000,000 and (B) $350,000,000; and

(vi)    beginning in the Fiscal Year after the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance and $375,000,000 and (ii) $750,000,000.

(c)    For purposes of subsection (b) above,

(i)    the "GO CVI Carryforward Balance" shall be calculated as follows:

(A)    for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)    for each Fiscal Year thereafter, the Annual GO CVI Carryforward Amount shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $200,000,000 and (B) CVI payments (if any) made to the Holders of the GO CVIs in the prior Fiscal Year.  The Annual GO CVI Carryforward Amount from the current Fiscal Year shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance from the prior Fiscal Year; and

(C)    to the extent there is a positive GO CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2043, the Commonwealth will not owe any further amount to the Holders of the GO CVIs.

(ii)    the "Clawback CVI Carryforward Balance" shall be calculated as follows:

(A)    for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)    for each year thereafter during the period described in Section 5.04(b)(vi), the Annual Clawback CVI Carryforward Balance shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $175,000,000 and (B) aggregate CVI payments made to the Holders of Clawback CVIs (if any) in the prior Fiscal Year.  The Annual Clawback CVI Carryforward Amount from the

38

current Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year;

(C)  for each year during the period described in Section 5.04(b)(v), the Annual Clawback CVI Carryforward Amount shall be calculated as the difference between (which for the avoidance of doubt, may be a positive or negative number) (y) $375,000,000 and (z) aggregate CVI payments made (if any) to the Holders of Clawback CVIs in the prior Fiscal Year. The Annual Clawback CVI Carryforward Amount from the current Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year; and

(D)  to the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2051, the Commonwealth will not owe any further amount to the Holders of the Clawback CVIs.

Illustrative scenarios of the calculation of the Subject to Waterfall Outperformance Amount are set forth in Attachment 8.

(d)  For purposes of Section 5.04(a)(i), for the avoidance of doubt, amounts paid to the Holders of the Clawback CVIs will first be allocated to Subject to Waterfall Clawback CVIs (from Subject to Waterfall Payments) for purposes of calculation of payments previously made.

(e)  Until the GO CVIs Final Maturity Date, the Subject to Waterfall Outperformance Amount shall be distributed as follows as the Annual Waterfall Payment:

(i)  the first $100,000,000 shall be paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto;

(ii)  the next $11,111,111 shall be paid to the holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto; and

(iii)  thereafter, any remaining available moneys in the Annual Waterfall Payment shall be shared with ninety percent (90%) being paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto, and the remaining ten percent (10%) being paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

(f)  Beginning in the Fiscal Year following the GO CVIs Final Maturity Date, subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, the Subject to Waterfall Outperformance Amount shall be distributed one hundred percent (100%) to the Holders of the Clawback CVIs until the Clawback CVIs Final Maturity Date.

**Section 5.05   Not Subject to Waterfall Outperformance Amount.**

(a)      The Not Subject to Waterfall Outperformance Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; ***provided***, ***however***, for the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount is subject to the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)      forty percent (40%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of Clawback CVIs from the Not Subject to Waterfall Outperformance Amounts; and

(ii)      ninety-five percent (95%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred, less payments previously made to (A) the Holders of GO CVIs and (B) the Holders of Clawback CVIs from the Subject to Waterfall Outperformance Amounts for the corresponding Fiscal Year.

(b)      For purposes of calculating the Not Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)      the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount, less the Trustee and Independent Consultant Expenses Funding Amount, is the "annual Outperformance" referred to in Section 5.05(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.05(a)(i) above as described in Section 5.05(b)(ii) below, as well as the 95% of "annual Outperformance" amount for purposes of Section 5.05(a)(ii) above;

(ii)      the "annual Outperformance" amount calculated in accordance with Section 5.05(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a  Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance"  referred to in Section 5.05(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)      the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount and 95% of the "annual Outperformance" amount; and

(iv)    the Clawback CVI Maximum Annual Payment shall be calculated in the same manner as in Section 5.04(b)(v) and (vi) hereof.

(c)    For purposes of subsection (b) above, the Clawback CVI Carryforward Balance shall be calculated in the same manner as Section 5.04(c)(ii).

(d)    For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted.

(e)    Subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, one hundred percent (100%) of the Not Subject to Waterfall Outperformance Amount shall be paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

Illustrative scenarios of the calculation of the Not Subject to Waterfall Outperformance Amount are set forth in Attachment 9.

### Section 5.06    Rum Tax CVI Annual Payment Amount.

(a)    The Rum Tax CVI Annual Payment Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of a Rum Tax Outperformance Condition and shall be equal to the lesser of the following:

(i)    forty percent (40%) of cumulative Outperformance of the Waterfall General Fund Rum Tax Collections relative to the Rum Tax Outperformance Metric (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of the PRIFA Rum Tax Clawback CVIs on account of previous Rum Tax CVI Annual Payment Amounts;

(ii)    fifty percent (50%) of annual Outperformance of the Waterfall General Fund Rum Tax Collections above the Rum Tax Outperformance Metric, measured at the conclusion of each Fiscal Year; and

(iii)    $30 million.

(b)    For purposes of calculating the Rum Tax CVI Annual Payment Amount in accordance with subsection (a) above,

(i)    the Commonwealth shall first calculate the amount by which the actual Waterfall General Fund Rum Collections in the prior Fiscal Year exceeded the Rum Tax Outperformance Metric for such Fiscal Year as set forth in the then applicable Attachment 2, which amount is the "annual Outperformance" referred to in Section 5.06(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.06(a)(i) above as described in Section

41

5.06(b)(ii) below, as well as the 50% of "annual Outperformance" amount for purposes of Section 5.06(a)(ii) above;

(ii)     the "annual Outperformance" amount calculated in accordance with Section 5.06(b)(i) above is added to (if a positive number during a Fiscal Year in which a Rum Tax Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which a Rum Tax Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance" referred to in Section 5.06(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations; and

(iii)     the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount, 50% of the "annual Outperformance" amount, and $30,000,000.

Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount are set forth in Attachment 10.

**Section 5.07   HTA Clawback CVI Priority Distribution Waterfall.**

Subject only to a Final Order, including with respect to the GDB Loan Priority Determination, to the contrary and notwithstanding any other provision of this Trust Agreement:

(a)     All moneys to be applied by the Trustee under this Trust Agreement on account of the HTA Clawback CVI shall be applied as follows:

(i)     First, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 68 Bond Claims, up to $179,462,539, until such amount has been paid in full;

(ii)     Second, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Senior Bond Claims, up to $1,833,405,578, until such amount has been paid in full;

(iii)     Third, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Sub Bond Claims, up to $207,294,178, until such amount has been paid in full;

(iv)     Fourth, following payment of the amounts above in full, to the Sub-Subseries related to the GDB HTA Loans up to $1,477,506,700.

(b)     No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries in the above waterfall have been paid in full.

(c)     Pending entry of a Final Order with respect to the GDB Loan Priority Determination: (i) all monies to be applied by the Trustee under this Trust Agreement in payment

42

or satisfaction of all amounts due and unpaid to the Sub-Subseries of HTA Clawback CVI related to the HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims, shall be subject to the HTA Clawback CVI Payment Reserve; and (ii) the HTA Clawback CVI otherwise allocable to Holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to the Holders of the GDB HTA Loans.

Upon an order with respect to the GDB Loan Priority Determination becoming a Final Order, funds in the HTA Clawback CVI Payment Reserve and any undistributed HTA Clawback CVI shall be released to Holders of the Sub-Subseries of HTA Clawback CVI related to the HTA 98 Bonds or GDB HTA Loans, as the case may be, based upon (i) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of the GDB Loan Priority Determination, and (ii) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, according to the priorities set forth in this Section 5.07.

**Section 5.08   CVIs Payment Fund.**

(a)     In connection with the preparation of Attachment 7 on any CVIs Annual Payment Amount Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall calculate the amount to be deposited into each Subaccount in the Subject to Waterfall CVIs Payment Account that are payable to (i) the Holders of the GO CVIs, (ii) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, and (iii) the Holders of the PRIFA Rum Tax Clawback CVIs. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, and (ii) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account. Moneys deposited into the Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Notes entitled to payment therefrom on the CVIs Annual Payment Amount Payment Date as provided in Section 5.04(e) and (f) hereof and Attachments 2 and 3 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (iii) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(b)     In connection with the preparation of Attachment 7 on any CVIs Annual Payment Amount Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall calculate the Not Subject to Waterfall Outperformance Amount to be distributed pursuant to the provisions of Section 5.05 hereof. The Commonwealth shall then calculate the amounts from the Not Subject to Waterfall Outperformance Amount that are payable to (i) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, and (ii) the Holders of the PRIFA Rum Tax Clawback CVIs. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the Not Subject to Waterfall CVIs Payment Account. Moneys deposited into

4820-1003-9275.14

the Not Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Clawback CVIs (other than the Holders of the PRIFA Rum Tax Clawback CVIs) on the CVIs Annual Payment Amount Payment Date as provided in Section 5.05 and Attachment 4 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (ii) shall be paid by the Commonwealth to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(c)     Amounts calculated in accordance with Section 5.08(a)(iii) and Section 5.08(b)(ii) shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account when received by the Trustee. To the extent a Rum Tax Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall transfer, subject to the PRIFA Rum Tax Clawback CVIs Lifetime Cap, an amount equal to the Rum Tax CVI Annual Payment Amount, if any, to the Trustee no later than one Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account. Moneys deposited into the PRIFA Rum Tax Clawback CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of PRIFA Rum Tax Clawback CVIs on the CVIs Annual Payment Amount Payment Date.

(d)     No later than one Business Day before any extraordinary redemption date noticed by the Commonwealth in accordance with Sections 4.02 or 4.03 hereof, the Commonwealth shall transfer to the Trustee an amount necessary to provide for the payment of the Redemption Price of the Notes being redeemed for deposit into the Extraordinary Redemption Payment Account. Moneys deposited in connection with the extraordinary redemption of GO CVIs shall be deposited into the GO CVIs Subaccount. Moneys deposited in connection with the extraordinary redemption of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs shall be deposited into the Clawback CVIs Subaccount. Moneys deposited in connection with the extraordinary redemption of PRIFA Rum Tax Clawback CVIs shall be deposited into the of PRIFA Rum Tax Clawback CVIs Subaccount. Moneys deposited into the Extraordinary Redemption Payment Account shall be held uninvested by the Trustee and distributed from the appropriate Subaccount to the Holders of the Notes being redeemed as directed in writing by an Authorized Officer of the Commonwealth.

**Section 5.09     Trustee and Independent Consultant Expenses Fund.**

(a)     The Trustee and Independent Consultant Expenses Fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee. Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.03(d) hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses, in each case upon written requisition signed by an Authorized Officer of the Commonwealth.

(b)     In the event at any time the amounts on deposit in the Trustee and Independent Consultant Expenses Fund are insufficient to pay the amounts due to the Trustee and the Independent Consultants in accordance with their agreements with the Commonwealth, the

Commonwealth will make provisions for such payment with the Trustee and such Independent Consultants. Nothing in this Trust Agreement shall be construed as requiring that amounts payable to the Trustee and such Independent Consultants be paid solely from the amounts on deposit in the Trustee and Independent Consultant Expenses Fund, such Fund provides an alternative mechanism for such payments.

## ARTICLE VI.

## INVESTMENT OF FUNDS

**Section 6.01   Investment of Funds**.

(a)      Moneys in the CVIs Payment Fund and the accounts therein shall be held uninvested by the Trustee. The Trustee shall have no obligation for the payment of interest on moneys held by it in the CVIs Payment Fund and the accounts therein.

(b)      Subject to the limitations set forth in this paragraph, moneys held in the Trustee and Independent Consultant Expenses Fund shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the written direction of an Authorized Officer of the Commonwealth. The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments. Ratings of permitted investments shall be determined at the time of purchase of such permitted investments. The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)      Obligations purchased or other investments made as an investment of money in the Trustee and Independent Consultant Expenses Fund held under the provisions hereof shall be deemed at all times to be a part of such fund and the income or interest earned, profits realized or losses suffered by the Trustee and Independent Consultant Expenses Fund due to the investment thereof shall be credited or charged, as the case may be, to the Trustee and Independent Consultant Expenses Fund.

(d)      In computing the amount in the Trustee and Independent Consultant Expenses Fund under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)      Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section. Except as otherwise provided herein, such investments shall be sold by the Commonwealth or by the Trustee at the written direction of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the Trustee and Independent Consultant Expenses Fund. The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the details of all

45

investments held for the credit of the Trustee and Independent Consultant Expenses Fund as of the end of the preceding month. The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month. The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in the Trustee and Independent Consultant Expenses Fund in the previous month.

(f) Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.02  Liability for Investments.** Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Notes as follows:

**Section 7.01  Payment of Notes.** Subject to the limitations herein, including the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition and the CVIs Maximum Payment Amounts, the Commonwealth shall pay or cause to be paid every Note, on the dates and at the places and in the manner provided herein and in the Notes according to the true intent and meaning thereof.

**Section 7.02  Pledge of Good Faith, Credit and Taxing Power of Commonwealth**. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notes as and when due in accordance with this Trust Agreement. The Notes constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution. The Secretary of Treasury is authorized and directed to pay the Notes as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required. Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Notes in the amounts and at the times required by Section 5.03(b) hereof. For the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03  Powers as to Notes.** Pursuant to the CVI Legislation, the Plan and the Confirmation Order, the Commonwealth is duly authorized to execute and deliver the Notes and to execute the Trust Agreement. The Commonwealth further represents that all corporate action

4820-1003-9275.14

on the part of the Commonwealth to that end has been duly and validly taken. Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Notes and the provisions hereof are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof. The Commonwealth further represents that its good faith, credit and taxing power pledge in support of the Notes is a valid, binding and legally enforceable pledge of the Commonwealth. The Commonwealth further covenants that it shall not fail at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the lien created by Section 5.01 and all of the rights of the Trustee for the benefit of the Holders of Notes under the Trust Agreement against all claims and demands of all Persons whomsoever.

Section 7.04   **Further Assurance.**  The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the pledge and lien provided for herein, or which the Commonwealth may hereafter become bound to pledge or assign.

Section 7.05   **Offices for Payment and Registration of Notes.**  Unless all of the Notes are Book Entry Notes, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Notes may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee. The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Notes authorized thereby or referred to herein may be presented for payment. The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Notes may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Notes. The provisions of this Section shall be subject to the provisions of Section 3.10 hereof.

Section 7.06   **General**.  The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the Effective Date, all conditions, acts and things required by the Plan and the statutes of the Commonwealth, including the Act, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Notes, shall exist, have happened and have been performed.

Section 7.07   **Non-Impairment Covenant**.  The Commonwealth, for the benefit of all initial and subsequent Holders of the Notes, covenants and agrees that, until all obligations with respect to this Trust Agreement and the Notes have been paid or otherwise satisfied in accordance with their respective terms, the Commonwealth will not:

(a)   take any action that would impair the rights and remedies of the Holders of the Notes;

47

      (b)     limit or restrict the rights or powers of the appropriate officers of the Commonwealth to fulfill the terms of any agreements made with respect to the Notes; or

      (c)     impair the ability of the Holders of the Notes to track performance of the Measured SUT and the Waterfall General Fund Rum Tax Collections;

*provided*, *however*, the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with this Trust Agreement, which shall protect Holders of the Notes from such elimination or replacement reducing the likelihood that an SUT Outperformance Condition will occur; and, *provided*, *further*, that the Commonwealth shall provide for the timely posting with EMMA by the Commonwealth of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction.

### Section 7.08    [Baseline SUT Reduction and SUT True-Up.]

      (a)     [The 5.5% SUT Baseline set forth in Attachment 1 hereto reflects the statutory and administrative provisions of the law governing the imposition and collection of the 5.5% SUT as of the Effective Date. No adjustments to the 5.5% SUT Baseline shall be made for exemptions or holidays that are included in the Puerto Rico Internal Revenue Code (Sections 4030.01 through 4030.27 thereof) as of the Effective Date.

      (b)     In the event that subsequent to the Effective Date, exemptions or holidays are created during a U.S. Presidential Declaration of Disaster for a period not to exceed thirty (30) days and only for emergency-related categories of spend, the 5.5% SUT Baseline shall be reduced by an amount equal to the estimated impact on collections of the 5.5% SUT resulting from any such exemptions or holidays (the "Baseline SUT Reduction"). The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the Baseline SUT Reduction.

      (c)     In the event that subsequent to the Effective Date, any other exemptions or holidays of any kind are implemented with respect to the 5.5% SUT (including any exemptions or holidays created during a U.S. Presidential Declaration of Disaster for a period exceeding thirty (30) days or for categories of spend other than emergency-related categories of spend, the Measured SUT shall be increased by an amounts equal to the estimated impact on collections of the 5.5% SUT resulting from such exemptions or holidays ("SUT True-Up"). The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the SUT True-Up.

      (d)     To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, the Commonwealth shall adjust the Measured SUT for each Fiscal Year to maintain the same amount of outperformance had the Measured SUT remained at 5.5% by multiplying (i) the projected Measured SUT generated at the lower rate by (ii) the fraction equal to 5.5% divided by the lower

rate. Such an adjustment shall be considered an SUT True-Up for purposes of this Section 7.08. The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the SUT True-Up due to such an adjustment.

(e)    For the calculation of either the Baseline SUT Reduction or SUT True-Up, the calculation shall be determined by the Secretary of Treasury and verified by an Independent Consultant.   Verification by an Independent Consultant shall be binding on both the Commonwealth and the Holders of the Notes.  [discuss methodology for verification]

(f)    Within ten Business Days of the verification by an Independent Consultant of the final calculation of any Baseline SUT Reduction or SUT True-Up, the Commonwealth shall post such calculations and supporting narrative with EMMA under all of the CUSIP numbers applicable to the Notes. ]

**Section 7.09    [Substitute Measured Tax. ]**

(a)    [The Commonwealth may substitute a 5.5% SUT with a Substitute Measured Tax, subject to the satisfaction of the requirements set forth in this Section 7.09.

(b)    The Substitute Measured Tax shall be all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

(c)    _____]

**Section 7.10    Tax Covenant.**

(a)    The Commonwealth will take all reasonable best efforts to provide that payments or redemptions made with respect to the Notes shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the Notes may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding, that may otherwise be applicable to such payments or redemptions.

(b)    The Commonwealth will take all reasonable best efforts to cause the Notes to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities, to effectuate such tax-exemption.

**Section 7.11    Comprehensive Cap on Net Tax Supported Indebtedness.**  For so long as any portion of the Notes shall remain outstanding, the Commonwealth shall maintain a Comprehensive Cap on all net tax supported debt for purposes of the limitation on the issuance of additional net tax supported debt set forth in Article VI of the Debt Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues (as defined in the Plan) as and when measured in accordance with the Debt Responsibility Act, including a

49

secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues (as defined in the Plan) required to pay the maximum annual debt service on the COFINA Bonds (as defined in the Plan) outstanding as of the Effective Date. Subject in all respects to the terms of the Plan, debt service payments on Series 2021A-1 Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or PRIFA (as defined in the Plan), in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap. In connection with the issuance of Net Tax Supported Indebtedness, the Secretary of Treasury shall certify that such Net Tax Supported Indebtedness is being issued in compliance with the Comprehensive Cap. Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Notes issued under this Trust Agreement, and the validity of such Net Tax Support Indebtedness shall not be subject to legal challenge. In calculating Debt Policy Revenues for purposes of this Section 7.11 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

Section 7.12   **Rum Tax Reporting**. [reporting obligations and audit rights to be developed]

Section 7.13   **Creation of Liens**. The Commonwealth shall not create or cause to be created any lien or charge on the Trust Estate, other than as provided in Section 5.01 hereof.

Section 7.14   **Fiscal Plan.** Any Fiscal Plan certified after the Effective Date will include provisions for the payment in each Fiscal Year of, to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition is satisfied in the prior Fiscal Year, any amounts due and owing on the CVIs in accordance with the terms hereof; provided, however, that nothing in the Fiscal Plan shall be deemed to be a determination that an SUT Outperformance Condition or a Rum Tax Outperformance Condition has occurred with respect to any such Fiscal Year or shall create an obligation of the Commonwealth to make any payments with respect thereto, it being the intention of this Trust Agreement that such determinations and related obligations shall be governed by the provisions of Article V hereof.

Section 7.15   **Continuing Disclosure**. The Commonwealth covenants that, in connection with the sale, delivery or marketing of the Notes, it will enter into a continuing disclosure agreement in substantially the form attached hereto as Attachment 11 hereto. [NTD: scope of continuing disclosure to be discussed, and to include notification by the Commonwealth to the Trustee of any continuing default under this Trust Agreement]. An event of default under such continuing disclosure agreement, including the failure to timely provide the notices or information described therein shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the continuing disclosure agreement.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee.**  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents.**  In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Notes of any Series, Subseries or Sub-Subseries so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent.  Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents.**  The recitals of fact contained herein and in the Notes shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof or of any Notes, or in respect of the security afforded hereby, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to the application of any money paid to or by the Commonwealth or others in accordance herewith except as to the application of any money paid to it in its capacity as Trustee or Paying Agent.  Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee.  If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   Property Held in Trust.**  All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof.

**Section 8.05   Rights of the Trustee and the Paying Agent.**  The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties.  The Trustee and any

51

Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Commonwealth, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof upon the faith thereof, but in its reasonable discretion the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence.  Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Notes relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Notes, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Notes.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Notes or Majority in Interest of Outstanding Notes, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

4820-1003-9275.14

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("Instructions"); *provided*, *however*, that the Commonwealth shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a person is to be added or deleted from the listing. If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling. The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer. The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth. Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to negligence or willful misconduct of the Trustee. The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06 Compensation and Indemnification.** Unless otherwise provided, there shall be paid from the Trustee and Independent Consultant Expenses Fund to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder, and also all reasonable, necessary and documented expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder. The Commonwealth agrees to pay the foregoing, other than expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, including, without limitation, the enforcement of remedies under Article XI hereof, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim. None of the provisions contained herein shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is

53

reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts.**   The Trustee may become the owner of or may deal in Notes as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Notes or to effect or aid in any reorganization growing out of the enforcement hereof or of the Notes whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Notes in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08   Resignation of Trustee.**   The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Notes by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books. Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; ***provided, however,*** that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09   Removal of Trustee.**   The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon 30 day's written notice by the Holders of a Quarter in Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth.   The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Notes.   No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.   A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof,

shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10   Successor Trustee and/or Paying Agent.**  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; ***provided, nevertheless,*** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Notes, at their last addresses appearing on the registry books. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor.  Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee.**  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally appointed as Trustee.  However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of

conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein. Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth.

**Section 8.12 Merger or Consolidation of the Trustee.** Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, *provided* such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance. In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

**Section 8.13 Ancillary Agreements**. The Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements.

## ARTICLE IX.

## AMENDMENTS TO TRUST AGREEMENT

**Section 9.01 Modification and Amendment without Consent.** Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a) To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Notes, *provided* such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements, in the CVI Legislation or in the Act; *provided* that such additional covenants and agreements shall be for the equal benefit and security of all Notes, without discrimination or preference;

(b) [To provide for revisions based upon a Baseline SUT Reduction, SUT True-Up or Substitute Measured Tax as permitted by Sections 7.08 and 7.09 hereof];

(c) To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements, the Plan, the Confirmation Order, the CVI

Legislation or in the Act; provided that same shall be for the equal benefit and security of all Notes, without discrimination or preference;

        (d)      To confirm, as further assurance, the lien, and the subjection to the lien, of the Commonwealth's right title and interest in the Trust Estate, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Notes, without discrimination or preference; and

        (e)      With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the last paragraph of this Section 9.01, adversely affect the interests of the Holders in any respect.

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement is authorized pursuant to this Section 9.01 and will not materially adversely affect the rights of the Holders of the Notes in any materially adverse respect.

For the avoidance of doubt, no Supplemental Indenture shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 hereof with the consent of each affected Holder.

**Section 9.02   Supplemental Trust Agreements Effective with Consent of Holders.** The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Holders and the rights of the Secretary of Treasury in accordance with and subject to the provisions of Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

**Section 9.03   General Provisions Relating to Supplemental Trust Agreements.** The Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX or Article X hereof.  A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms.  The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Commonwealth, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective,

shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and EMMA under the CUSIPs for the Outstanding Notes.

# ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF HOLDERS

**Section 10.01 Powers of Amendment.**

(a)    Except as provided in Section 9.01 hereof, any modification or amendment hereof or of the rights and obligations of the Commonwealth and of the Holders of the Notes hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Notes Outstanding at the time such consent is given, or (ii) in case less than all of the several Series, Subseries or Sub-Subseries of Notes then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Notes of each Series, Subseries or Sub-Subseries so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Notes of any specified like Series or Subseries and tenor remain Outstanding, the consent of the Holders of such Notes shall not be required and such Notes shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Notes under this Section.

(b)    No such modification or amendment shall, without the prior written consent of the Holder of such Note, permit a change in the provisions related to the timing or amount of any payment on the Notes, including, without limitation, any change in the currency to be used to pay the Notes, any change in the amount or date of any payment, the terms of redemption of any Outstanding Note or a reduction in the notional amount thereof.  Further, no such modification or amendment shall, without the prior written consent of the Holder of such Note, reduce the percentages or otherwise affect the classes of Notes the consent of the Holders of which is required to effect any such modification or amendment.  Further, no waiver of any default or compliance with any provision of this Section 10.01 shall be granted without the prior written consent of the Holder of such Note.

(c)    For the purposes of this Section 10.01, a Series, Subseries or Sub-Subseries shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Notes of such Series, Subseries or Sub-Subseries in any respect or diminishes (or is likely to diminish) the recovery of or the amount likely to be paid on account of such Series, Subseries or Sub-Subseries in any respect.  [The Trustee shall obtain an opinion of Transaction Counsel as to whether the Notes of any particular Series, Subseries or Sub-Subseries would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth, the Trustee and all Holders of Notes.]

**Section 10.02 Consent of Holders.**  The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section.  Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized

4820-1003-9275.14

Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Notes. A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Notes of any Series, Subseries or Sub-Subseries affected by such modification or amendment for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Notes. Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Notes specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided. For purposes of calculating the required percentage of Notes consenting to a modification or amendment, any such consent shall be binding upon the Holder of the Notes of such Series, Subseries or Sub-Subseries affected giving such consent and on any subsequent Holder of such Notes (whether or not such subsequent Holder has notice thereof). At any time after the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries affected shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries and will be effective as provided in this Section, shall be given to the Holders by mailing such notice to Holders or by Electronic Means. The Commonwealth shall file with the Trustee proof of giving such notice. Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Notes of such Series, Subseries or Sub-Subseries affected at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; **_provided, however_**, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient.

**Section 10.03 Modifications by Unanimous Consent.** The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Notes may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Notes then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04 Mailing**. Any provision in this Article X for the mailing of a notice or other document to Holders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Notes then Outstanding at such Person's address, if any, appearing upon the registry books of the Commonwealth, and (b) to the Trustee.

**Section 10.05 Exclusion of Notes.** Notes owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall

not be entitled with respect to such Notes to give any consent or take any other action provided for herein. At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of the Commonwealth, upon which the Trustee may rely, describing all Notes so to be excluded.

**Section 10.06 Notation on Notes.** Notes delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Note Outstanding at such effective date and upon presentation of his Note for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Note by the Trustee as to any such action. If the Commonwealth or the Trustee shall so determine, new Notes so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Note then Outstanding shall be exchanged, without cost to such Holder, for Notes of the same Series or Subseries then Outstanding, upon surrender of such Notes.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default.** An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a) Following the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, the Commonwealth shall fail to pay to the Holders of the Notes the amounts due and payable hereunder by the CVIs Annual Payment Amount Payment Date or any applicable extraordinary redemption date; or

(b) The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Notes on the part of the Commonwealth to be performed, other than the provisions of Section 7.15 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which the Event of Default relates, unless, if such default is capable of being cured but is not capable of being cured within forty-five (45) days, the Commonwealth has commenced to cure such default within forty-five (45) days and does cure such default within ninety (90) days of the date the default initially occurred; or

(c) the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Notes or the security provided for in this Trust Agreement to be impaired, and such impairment affects the enforceability of or payments on the Notes, or any Person to be released from any covenants or obligations with respect to the Notes.

60

**Section 11.02 No Acceleration with Respect to the Notes.** There shall be no right of acceleration with respect to the Notes.

**Section 11.03 Enforcement of Remedies.**

(a) If an Event of Default occurs under Section 11.01(a) and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (recursos disponibles) of the Commonwealth resources to the payment of the Notes, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(b) If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates shall, seek any other remedies that are available under applicable law or in equity to any other holder of a Commonwealth bond to which its good faith, credit and taxing power are pledged. If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates shall, seek specific performance of any relevant provisions of this Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(c) Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

**Section 11.04 Priority of Payments after Default.** If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder shall not be sufficient to pay the amounts on the Notes as the same become due and payable, the money held by the Trustee hereunder together with any money then available or thereafter becoming available to pay the Notes, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows:

First: To the payment of amounts due to the Trustee and Paying Agents under Section 8.06;

Second:

(i) from amounts collected from the exercise of remedies relating to an Event of Default relating to Subject to Waterfall Outperformance Amounts, to the payment to the Holders of the GO CVIs and the Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been

61

distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Subject to Waterfall Outperformance Amount occurred;

(ii)    from amounts collected from the exercise of remedies relating to an Event of Default relating to Not Subject to Waterfall Outperformance Amounts, to the payment to the Holders of Not Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Not Subject to Waterfall Outperformance Amount occurred; and

(iii)   from amounts collected from the exercise of remedies relating to an Event of Default relating to the Rum Tax CVI Annual Payment Amount, to the payment to the Holders of the PRIFA Rum Tax Clawback CVIs to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Rum Tax CVI Annual Payment Amount occurred.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future. The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Notes or to any other Person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee. Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date upon which such application is to be made. The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Notes are Outstanding and unpaid shall be paid to the Commonwealth.

**Section 11.05 Termination of Proceedings.** In case any Proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such Proceeding had been commenced in the case of discontinuance of abandonment or the provisions of this Trust Agreement shall be modified in accordance with any determination by the entity making such determination if the Proceedings were determined adversely to the Trustee.

**Section 11.06 Holders' Direction of Proceedings.** Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall have the right by an instrument in writing executed and delivered to the

Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder with respect to such Event of Default, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy related to such Event of Default available pursuant to Section 11.03, **provided**, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Holders not parties to such direction. Notwithstanding the foregoing, (a) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Not Subject to Waterfall Outperformance Amount, including the calculation or application thereof, only the Holders of the Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding, and (b) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Rum Tax CVI Annual Payment Amount, including the calculation or application thereof, only the Holders of the PRIFA Rum Tax Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding.

**Section 11.07 Control by Holders of Notes; Limitations**. No Holder of any of the Notes shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued. Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law. Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Notes secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all Proceedings shall be instituted and maintained for the benefit of all Holders of the Outstanding Notes. Notwithstanding any other provision hereof, the Holder of any Note shall have the right which is absolute and unconditional to receive payment of the amounts due on such Note expressed in such Note (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder, and the Holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution and in the Plan, the Confirmation Order and the CVI Legislation.

**Section 11.08 Actions by Trustee; Possession of Notes by Trustee Not Required.** All rights of action hereunder or under any of the Notes secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Notes or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Notes to which such action relates, subject to the provisions hereof.

**Section 11.09 Waiver and Non–Waiver of Default**. No delay or omission of the Trustee or any Holder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall waive such default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; *provided, however,* the Trustee may not waive any default if it has received a direction from not less than a Quarter in Interest of the Outstanding Notes to which such default relates that such default may not be waived by the Trustee; *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10 Notice of Event of Default**. The Trustee shall promptly give notice of each Event of Default hereunder known to the Trustee to AAFAF and the Commonwealth and to the Holders of Notes, unless such Event of Default shall have been remedied or cured before the giving of such notice; *provided, however*, that failure to provide notice to AAFAF and the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Holders. In the case of the Holders of the Notes, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Notes, as the names and addresses of such Holders appear on the books for registration and transfer of Notes as kept by the Trustee.

**Section 11.11 Remedies Not Exclusive**. No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## ARTICLE XII.

## DEFEASANCE

### Section 12.01 Discharge and Defeasance.

(a)     If the Commonwealth shall pay or cause to be paid to the Holder of a Note the Remaining Clawback CVI Lifetime Cap or the Remaining GO CVI Lifetime Cap, as applicable, then all rights granted hereby to such Note (including without limitation, the lien) shall be discharged and satisfied. In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth.

(b)     Notes for the redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such redemption) at the redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed

64

in paragraph (a) of this Section. All Outstanding Notes of any Series or Subseries shall prior to the redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

      (i)    the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Notes; and

      (ii)    there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay the Remaining Clawback CVI Lifetime Cap or Remaining GO CVI Lifetime Cap, as applicable, on the redemption date; and

      (iii)    the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Note having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, and (B) such defeasance is in accordance with the terms hereof.

Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of said Notes; **provided, however,** that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due said Notes on such redemption date.

## ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY NOTE HOLDERS
## AND PROOF OF OWNERSHIP OF NOTES

**Section 13.01 Evidence of Signatures of Holders and Ownership of Notes.** Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Notes may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Notes in person or by his or their attorneys duly appointed in writing. Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Notes, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Holder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank

or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the Person or Persons executing any such instrument on behalf of a corporate Holder may be established without further proof if such instrument is signed by a Person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Notes and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books. Any request, consent or vote of the owner of any Note shall bind all future owners of such Note in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith. The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

## ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01 Preservation and Inspection of Documents.** All documents received by the Trustee from the Commonwealth or from Holders under the provisions hereof shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Commonwealth, any Holder and their agents and their representatives, any of whom may make copies thereof; *provided, however,* that with respect to inspection by a Holder a written request of such Holder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

**Section 14.02 Money and Funds Held for Particular Notes.** The amounts held by the Trustee or any Paying Agent for the payment of particular Notes due on any particular date shall, pending such payment, be irrevocably set aside and held in trust by it for the Holders of such Notes entitled thereto, and for the payments on such Notes, with the amounts so set aside and validly and irrevocably held in trust for the Holders of such Notes, shall no longer be considered to be unpaid upon such payment.

**Section 14.03 Cancellation of Notes.** The Trustee or any Paying Agent shall forthwith cancel all Notes which have been redeemed or paid, or upon the Clawback CVIs Final Maturity Date in the case of the Clawback CVIs and the GO CVIs Final Maturity Date in the case of the GO CVIs, and shall dispose of such Notes in accordance with its customary procedures. No such Notes shall be deemed Outstanding Notes hereunder and no Notes shall be issued in lieu thereof.

**Section 14.04 No Recourse under Trust Agreement or on the Notes.** All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no recourse shall be had for the payment of the Notes or for any claims based thereon, hereon against

any member, officer or employee of the Commonwealth or any Person executing the Notes, all such liability, if any, being expressly waived and released by every Holder of Notes by the acceptance of the Notes.

**Section 14.05 Severability of Invalid Provision.** If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of the Notes.

**Section 14.06 Parties of Interest.** Nothing herein, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Paying Agents and the Holders any rights, remedies or claims hereunder or by reason hereof or any covenant, condition or stipulation thereof. All covenants, stipulations, promises and agreements herein by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents and the Holders.

**Section 14.07 Notices.** Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Commonwealth, _____, _____, San Juan, PR _____; and in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at _____, _____, _____ _____, attention: Corporate Trust; in the case of the Commonwealth or the Secretary of Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901, or, in each case, to such other individual and at such other address as the Person to be notified shall have specified by notice to the other Persons. Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any Series or Subseries of Notes, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Notes of the Series or Subseries to the Commonwealth's dissemination agent for distribution through the EMMA system. The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing. The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph. The sole remedy for failure of the Trustee to perform is specific performance.

**Section 14.08 Headings.** Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.09 Governing Laws.** This Trust Agreement and the Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly

within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Notes; *provided*, *however*, that the authorization of this Trust Agreement and the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

**Section 14.10 Retention of Jurisdiction of Title III Court.** The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan and the Confirmation Order, including, without limitation, with respect to the payment of the Notes and the enforcement of the remedies set forth herein to the fullest extent permitted by law. Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Notes (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.11 Signatures and Counterparts.** This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

**Section 14.12 Successors and Assigns.** Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 14.13 Conflicts**. All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

**[Remainder of page intentionally left blank; signature page follows]**

4820-1003-9275.14

### Attachment 1

### 5.5% SUT BASELINE

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $1,282,901,069.30 |
| 2023 | 1,279,617,661.88 |
| 2024 | 1,301,220,703.34 |
| 2025 | 1,315,295,083.41 |
| 2026 | 1,345,037,783.09 |
| 2027 | 1,377,398,882.61 |
| 2028 | 1,403,141,426.98 |
| 2029 | 1,414,785,980.78 |
| 2030 | 1,427,393,695.32 |
| 2031 | 1,437,998,166.98 |
| 2032 | 1,447,406,781.79 |
| 2033 | 1,428,210,572.57 |
| 2034 | 1,426,102,595.91 |
| 2035 | 1,429,798,842.15 |
| 2036 | 1,438,540,327.00 |
| 2037 | 1,452,657.050.02 |
| 2038 | 1,477,755,111.63 |
| 2039 | 1,495,355,971.13 |
| 2040 | 1,518,089,898.19 |
| 2041 | 1,541,405,892.18 |
| 2042 | 1,565,457,864.38 |
| 2043 | 1,590,148,747.39 |
| 2044 | 1,616,252,365.93 |
| 2045 | 1,642,150,220.79 |
| 2046 | 1,668,748,988.64 |
| 2047 | 1,696,060,240.60 |
| 2048 | 1,724,082,302.73 |
| 2049 | 1,752,859,808.94 |
| 2050[§] | 1,781,536,796.27 |
| 2051[§] | 1,810,682,942.40 |

[§] May 2020 Fiscal Plan contains projections through FY2049. FY2050 and FY2051 baseline calculated using FY 2049 projections and the average growth rate from FY2045-FY2049.

Attachment 1-1

**Attachment 2**

**PRIFA RUM TAX CVI OUTPERFORMANCE METRIC**

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $208,569,215.76 |
| 2023 | 200,354,469.05 |
| 2024 | 201,031,406.80 |
| 2025 | 201,692,902.40 |
| 2026 | 202,348,675.07 |
| 2027 | 202,998,555.87 |
| 2028 | 203,632,157.16 |
| 2029 | 204,259,404.03 |
| 2030 | 204,869,786.20 |
| 2031 | 205,473,363.12 |
| 2032 | 206,059,507.07 |
| 2033 | 206,627,882.49 |
| 2034 | 207,188,744.83 |
| 2035 | 207,731,302.94 |
| 2036 | 208,265,935.46 |
| 2037 | 208,781,748.91 |
| 2038 | 209,289,240.57 |
| 2039 | 209,788,269.00 |
| 2040 | 210,278,694.61 |
| 2041 | 210,749,432.35 |
| 2042 | 211,211,199.81 |
| 2043 | 211,674,906.69 |
| 2044 | 212,129,474.13 |
| 2045 | 212,574,772.82 |
| 2046 | 213,021,852.71 |
| 2047 | 213,459,499.22 |
| 2048 | 213,898,852.55 |
| 2049 | 214,339,919.35 |
| 2050 | 214,782,706.32 |
| 2051 | 215,227,220.15 |

4820-1003-9275.14

**Attachment 3**

**GO CVI Allocation Summary**

| Claim | GO CVI Allocation % |
|---|---|
| Vintage CW Bond Claim | 32.244 |
| 2011 CW Series D/E/PIB Bond Claim | 3.514 |
| 2011 CW Bond Claim | 2.479 |
| 2012 CW Bond Claim[6] | 15.157 |
| 2014 CW Bond Claim[7] | 20.266 |
| Vintage CW Guarantee Claim | 15.194 |
| 2011 CW Guarantee Bond Claim | 7.552 |
| 2012 CW Guarantee Bond Claim | 3.594 |

---

[6] 2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA Helicopter loan.

[7] 2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports Bonds.

Attachment 3-1

**Attachment 4**

**Clawback CVI Allocation Summary**

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[8] | 68.6 |
| payable in the following order of priority: | |
| First, HTA 68 Bond Claims up to $179,462,539; | |
| Second, HTA 98 Senior Bond Claims up to $1,833,405,578[9]; | |
| Third, HTA 98 Sub Bond Claims up to $207,294,178[7]; and | |
| Fourth, GDB HTA Loans up to $1,477,506,700. | |
| Allowed CW/Convention Center Claims | 4.0 |
| Allowed CW/PRIFA Rum Tax Claims | 27.0 |
| Allowed CW/MBA Claims | 0.4 |

---

[8] Capitalized terms have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement; the waterfall is implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination.

[9] To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI to be held in reserve in an amount equal to the difference of (a) the amount of cash that would be due to holders and insurers of the HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds minus (b) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.

4820-1003-9275.14

**Attachment 5**

**FORM OF GO CVI**
**(includes variations for different GO CVI Subseries)**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2021.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-___                                                        $3,500,000,000

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS, SUBJECT TO THE
OCCURRENCE OF CERTAIN CONDITIONS

Attachment 5-1

| Subseries[10] | GO CVI Allocation Percentage | CUSIP No. |
|---|---|---|
| Vintage CW Note Claims | 32.244% | |
| 2011 CW Series D/E/PIB Note Claim | 3.514 | |
| 2011 CW Note Claim | 2.479 | |
| 2012 CW Note Claim | 15.157 | |
| 2014 CW Note Claim | 20.266 | |
| Vintage CW Guarantee Claim | 15.194 | |
| 2011 CW Guarantee Note Claim | 7.552 | |
| 2012 CW Guarantee Note Claim | 3.594 | |

Registered Owner: Cede & Co.

Initial Notional Amount and GO CVI Lifetime Cap: Three Billion Five Hundred Million Dollars

1.    All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of _____, 2021 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and _____, as Trustee and Paying Agent. Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable. The Trust Agreement may be amended to the extent and in the manner provided therein.

2.    The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Amount Payment Dates (the [November 1] following a Fiscal Year in which an SUT Outperformance Condition has occurred), or earlier upon redemption as hereinafter referred to, up to the GO CVI Lifetime Cap specified above.

3.    The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the GO CVIs Final Maturity Date of an SUT Outperformance Condition, (b) the annual limitations hereinafter referred to, and (c) the GO CVI Lifetime Cap, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the corporate trust office of the Trustee and Paying Agent, in _____, _____ (the "Corporate Trust Office"). This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition on [November 1] of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition occurred (the "CVIs Annual Payment Amount Payment Date"). The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

---

[10] Note: the Holders of each Subseries shall receive a Note identifying only their respective Subseries and related GO CVI Allocation percentage.

4.     The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof.  The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.     This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $3,500,000,000, known as "Commonwealth of Puerto Rico GO CVIs", issued under the authority of and in full compliance with the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order").

6.     In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs".  This Note is a GO CVI.  The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement.  The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement.

7.     The Commonwealth will determine if an SUT Outperformance Condition has occurred on each CVIs Outperformance Condition Determination Date, which is [September 1] of each Fiscal Year, beginning [September 1], 2022.  An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement.  Once the amount of the excess is determined and verified by an Independent Consultant, such excess amount is used first to fund an account used to pay certain Trustee costs and expenses or reimburse the Commonwealth for advancing such Trustee and Independent Consultant costs and expenses, and then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.     These Notes are subject to mandatory redemption on each CVIs Annual Payment Amount Payment Date, subject to the limitations described in the Trust Agreement, in amounts equal to the GO CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all GO CVIs on such CVIs Annual Payment Amount Payment Date, but in no event in an amount that in the aggregate exceeds the GO CVI Lifetime Cap prior to the GO CVIs Final Maturity Date.

9.     The GO CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the GO CVIs have been paid in an amount equal to the GO CVI Lifetime Cap, and (b) (1) [September 1], 2043, if an SUT Outperformance Condition did not occur during the prior Fiscal Year, and (2) [November 1], 2043, if an SUT Outperformance Condition did occur during the prior Fiscal Year, whether or not the Holders of all GO CVIs have been paid in the aggregate an amount

Attachment 5-3

equal to the GO CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

10. The GO CVIs are also subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVIs.

11. Whenever Notes or portions thereof are to be redeemed in accordance with paragraph 10 hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed. If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice. Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books. The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

12. The Trustee shall, if any of the Notes or portions thereof to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

13. Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price. If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series and Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

14. If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

15. The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof. At the corporate trust office of the Trustee, in _____, _____, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

16.      Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series and Subseries and tenor as the surrendered Note.

17.      The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

18.      This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

19.      It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank]*

Attachment 5-5

4820-1003-9275.14

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this Note to be executed with the facsimile signature of the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the _____ day of _____, 2021.

 [Facsimile signature]_____
Secretary of the Treasury of Puerto Rico

(SEAL)

Attest:

[Facsimile signature]_____
Secretary of State of Puerto Rico

CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

_____, as Trustee

By:_____
        Authorized Officer

Date of authentication: _____

4820-1003-9275.14

FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ attorney to register the transfer of the within Note
on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____    Guaranteed by: _____


NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

Attachment 5-8

## Attachment 6

### FORM OF CLAWBACK CVI
### (includes variations for different Clawback CVI Subseries and Sub-Subseries)

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2021.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-___                                                                $[_____][11]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS, SUBJECT TO THE
OCCURRENCE OF CERTAIN CONDITIONS

---

[11] To reflect Notional Amount for each Subseries and Sub-Subseries of the Clawback CVIs.

4820-1003-9275.14

| Subseries[12] | Clawback CVI Allocation Percentage | CUSIP No. |
|---|:---:|:---:|
| Allowed CW/HTA Claims[13] | 68.6% | |
| payable in the following order of priority: | | |
| First, HTA 68 Bond Claims up to $179,462,539; | | |
| Second, HTA 98 Senior Bond Claims up to $1,833,405,578[14]; | | |
| Third, HTA 98 Sub Bond Claims up to $207,294,178[10]; and | | |
| Fourth, GDB HTA Loans up to $1,477,506,700 | | |
| Allowed CW/Convention Center Claims | 4.0 | |
| Allowed CW/PRIFA Rum Tax Claims | 27.0 | |
| Allowed CW/MBA Claims | 0.4 | |

Registered Owner: Cede & Co.

Initial Notional Amount and Series/Subseries/Sub-Subseries Clawback CVI Lifetime Cap: _____ Dollars

1.      All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of _____, 2021 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and _____, as Trustee and Paying Agent.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

2.      The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Amount Payment Dates (the [November 1] following a Fiscal Year in which an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][15] has occurred), or earlier upon redemption as hereinafter referred to, up to the Clawback CVI Lifetime Cap specified above.

---

[12] Note: the Holders of each Subseries and Sub-Subseries shall receive a Note identifying only their respective Subseries/Sub-Subseries and related Clawback CVI Allocation percentage and priority.

[13] Clawback CVIs issued to the holders of the Allowed CW/HTA Claims will be issued in Sub-Subseries to the Holders of the HTA 68 Bond Claims, HTA 98 Senior Bond Claims, HTA 98 Sub Bond Claims and GDB HTA Loans to recognize their respective priorities of payment for the notional amounts listed above.

[14] To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI will be held in reserve as described in paragraph [9] hereof.

[15] To be included in PRIFA Rum Tax Clawback CVIs

3.      The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the Clawback CVIs Final Maturity Date of an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11], (b) the annual limitations hereinafter referred to, and (c) the Clawback CVI Lifetime Cap applicable to this Note, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the corporate trust office of the Trustee and Paying Agent, in _____, _____ (the "Corporate Trust Office"). This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition on [November 1] of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11] occurred (the "CVIs Annual Payment Amount Payment Date"). The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

4.      The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof. The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.      This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $[_____], known as "Commonwealth of Puerto Rico Clawback CVIs", issued under the authority of and in full compliance with the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order").

6.      In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs". This Note is a Clawback CVI. The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement. The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement. [If this Note is a PRIFA Rum Tax Clawback CVI, this Note is additionally payable from the Rum Tax CVI Annual Payment Amount.][11]

7.      The Commonwealth will determine if an SUT Outperformance Condition [and/or a Rum Tax Outperformance Condition][11] has occurred on each CVIs Outperformance Condition Determination Date, which is [September 1] of each Fiscal Year, beginning [September 1], 2022. An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement. [A Rum Tax Outperformance Condition in any Fiscal Year will occur if the Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric for

Attachment 6-3

that Fiscal Year set forth in the Trust Agreement][11].  Once the amount of the excess is determined and verified by an Independent Consultant, such excess amount is used first to fund an account used to pay certain Trustee costs and expenses or reimburse the Commonwealth for advancing such Trustee costs and expenses, and then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.      These Notes are subject to mandatory redemption on each CVIs Annual Payment Amount Date in an amount equal to the Clawback CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all Clawback CVIs on such CVIs Annual Payment Amount Payment Date, but in no event in an amount that in the aggregate exceeds the Clawback CVI Lifetime Cap prior to the Clawback CVIs Final Maturity Date.

9.      [This Note is an Allowed CW/HTA Claims Subseries, so amounts distributed on the CVIs Annual Payment Amount Payment Date from the Clawback CVI Allocation Percentage allocated to the Allowed CW/HTA Claims Subseries shall be distributed in the following order of priority: first to the Holders of the Sub-Subseries relating to HTA 68 Bond Claims until such Holders receive $179,462,539; second to the Holders of the Sub-Subseries relating to HTA 98 Senior Bond Claims until such Holders receive $1,833,405,578; third to the Holders of the Sub-Subseries relating to HTA 98 Sub Bond Claims until such Holders receive $207,294,178; and fourth to the Holders of the Sub-Subseries relating to GDB HTA Loans until such Holders receive $1,477,506,700.  No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries have been paid in full.][16]

10.     [This Note is part of the Sub-Subseries that relates to HTA 98 Senior Bond Claims or HTA 98 Sub Bond Claims, so, to the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI are to be held in reserve in an amount equal to the difference of (a) the amount of cash that would be due to holders and insurers of the HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds minus (b) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is pari passu with respect to payment on account of the HTA 98 Bonds.][17]

11.     [This Note is a PRIFA Rum Tax Clawback CVI and is additionally payable from PRIFA Rum Tax CVI Annual Payment Amounts.][11]

12.     The Clawback CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the Clawback CVIs have been paid in an amount equal to the Clawback CVI Lifetime Cap, and (b) (1) [September 1], 2051, if an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11] did not occur during the prior Fiscal Year, and (2) [November 1], 2051, if an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11] did occur during the prior Fiscal Year, whether or not the Holders of all Clawback CVIs have been

---

[16] To be included in Clawback CVIs relating to Allowed CW/HTA Claims.

[17] To be included in Clawback CVIs relating to HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims.

paid in the aggregate an amount equal to the Clawback CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

13. The Clawback CVIs are subject to redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVIs.

14. Whenever Notes are to be redeemed in accordance with paragraph [13] hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed. If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice. Such notice shall be given by mailing a copy of such notice not less than twenty (20) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books. The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

15. The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than twenty (20) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

16. Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price. If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

17. If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

18. The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof. At the corporate trust office of the Trustee, in _____, _____, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

19.     Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

20.     The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

21.     This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

22.     It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank]*

4820-1003-9275.14

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this Note to be executed with the facsimile signature of the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the _____ day of _____, 2021.

 

                         [Facsimile signature]_____
                         Secretary of the Treasury of Puerto Rico

(SEAL)

Attest:

[Facsimile signature]_____
Secretary of State of Puerto Rico

CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

_____, as Trustee

By:_____

Authorized Officer

Date of authentication: _____

Attachment 6-8

FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to register the transfer of the within Note on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____ Guaranteed by: _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

4820-1003-9275.14

**Attachment 7**

Commonwealth of Puerto Rico

Calculations relating to GO CVIs and Clawback CVIs Payments

(calculations attached)

For Fiscal Year Ending:  June 30, 20__

CVIs Outperformance Condition Determination Date:  September 1, 20__

      SUT Outperformance Condition has/has not occurred.

      Rum Tax Outperformance Condition has/has not occurred.

CVIs Annual Payment Amount Calculation Date:  October 1, 20__

CVIs Annual Payment Amount Verification Date:  October 15, 20__

CVIs Annual Payment Amount Payment Date:  November 1, 20__

4820-1003-9275.14

Calculations Relating to GO CVIs Upon Occurrence of SUT Outperformance Condition

(calculations attached)

Subject to Waterfall Outperformance Amount:  $_____

      Less:  Amount applied to Trustee and Independent Consultant Expenses:

           Deposit to Trustee and Independent Consultant Expenses Fund:  $_____

           Reimbursement to Commonwealth for advances:  $_____

      Payment to Holders of GO CVIs:  $_____ (deposit to GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account)

      Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs: $_____ (deposit to Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account)

      Payment to Holders of PRIFA Rum Tax Clawback CVIs:  $_____ (deposit to PRIFA Rum Tax Clawback CVIs Payment Account)

Remaining GO CVI Lifetime Cap as of June 30, 20__:  $_____

Remaining GO CVI Lifetime Cap after CVIs Annual Payment Amount Payment Date:  $_____

Application of Subject to Waterfall Outperformance Amount to GO CVIs (from GO CVIs Subaccount): $_____

      Amount per $1 Authorized Denomination of GO CVI:  $0._____

| Claim | GO CVI % | Current Unit Distribution | Prior Unit Distribution | Total Distribution |
|---|---|---|---|---|
| Vintage CW Bond | 32.244 | | | |
| 2011 CW Series D/E/PIB Bond | 3.514 | | | |
| 2011 CW Bond | 2.479 | | | |
| 2012 CW Bond | 15.157 | | | |
| 2014 CW Bond | 20.266 | | | |
| Vintage CW Guarantee | 15.194 | | | |
| 2011 CW Guarantee Bond | 7.552 | | | |
| 2012 CW Guarantee Bond | 3.594 | | | |

Attachment 7-2

Calculations Relating to Clawback CVIs Upon Occurrence of
<u>SUT Outperformance Condition and/or Rum Tax Outperformance Condition</u>

(calculations attached)

Not Subject to Waterfall Outperformance Amount: \$_____

     Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs:
         \$_____ (deposit to Not Subject to Waterfall CVIs Payment Account)

     Payment to Holders of PRIFA Rum Tax Clawback CVIs: \$_____ (deposit to
         PRIFA Rum Tax Clawback CVIs Payment Account)

Amount Payable to Holders of Clawback CVIs other than Holders of PRIFA Rum Tax Clawback
     CVIs:

     From Clawback CVIs Subaccount of the Subject to Waterfall Payment Amount:
     \$_____

     From Not Subject to Waterfall Payment Amount: \$_____

        Total: \$_____

     Amount per \$1 Authorized Denomination: \$0._____

Amount Payable to Holders of PRIFA Rum Tax Clawback CVIs:

     From Clawback CVIs Subaccount of the Subject to Waterfall Payment Amount:
     \$_____

     From Not Subject to Waterfall Payment Amount: \$_____

     From Rum Tax CVI Annual Payment Amount: \$_____

        Total: \$_____

     Amount per \$1 Authorized Denomination: \$0._____

Remaining Clawback CVI Lifetime Cap as of June 30, 20__: \$_____

Remaining Clawback CVI Lifetime Cap after CVIs Annual Payment Amount Payment Date:
\$_____

Attachment 7-3

| Claim | Remaining Lifetime Cap Before Distribution | Current Distribution | Remaining Lifetime Cap After Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
|     HTA 68 Bond (first priority) | | | |
|     HTA 98 Senior Bond (second priority) | | | |
|     HTA 98 Sub Bond (third priority) | | | |
|     GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |
| CW/MBA | | | |

| Claim | Current Unit Distribution | Prior Unit Distribution | Total Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
|     HTA 68 Bond (first priority) | | | |
|     HTA 98 Senior Bond (second priority) | | | |
|     HTA 98 Sub Bond (third priority) | | | |
|     GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |
| CW/MBA | | | |

Attachment 7-4

4820-1003-9275.14

**Attachment 8**

**Illustrative scenarios of the calculation of the
Subject to Waterfall Outperformance Amount**

**Attachment 9**

**Illustrative scenarios of the calculation of the
Not Subject to Waterfall Outperformance Amount**

4820-1003-9275.14

**Attachment 10**

**Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount**

4820-1003-9275.14

# EXHIBIT C

Avoidance Actions Trust Agreement

## AVOIDANCE ACTION TRUST AGREEMENT

**AVOIDANCE ACTIONS TRUST AGREEMENT,** dated as of [●], 2021 (this "<u>Trust Agreement</u>"), by and among the Financial Oversight and Management Board for Puerto Rico in its capacity as Title III representative of the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), the Employees Retirement System of the Government of the Commonwealth ("<u>ERS</u>") and the Puerto Rico Public Buildings Authority ("<u>PBA</u>" and, together with the Commonwealth and ERS, the "<u>Debtors</u>"); [●], as trustee (together with any successor or additional Trustee appointed under the terms hereof, the "<u>Trustee</u>") of the Commonwealth Avoidance Actions Trust (the "<u>Avoidance Actions Trust</u>"); and, solely with respect to <u>Sections 1.3</u> and <u>9.10</u>, the Financial Oversight and Management Board for Puerto Rico on behalf of itself and its committees (the "<u>FOMB</u>").

<u>Section 9.14</u> hereof contains a list of capitalized terms used herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Modified Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated November [●], 2021, (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "<u>Plan</u>").

## RECITALS

A.      On June 30, 2016, the President of the United States signed into law legislation passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act ("<u>PROMESA</u>"), 48 U.S.C. § 2101 *et seq.*. Titles III and VI of PROMESA provide for debt restructurings for Puerto Rico and its instrumentalities.

B.      The FOMB commenced Title III cases for the Commonwealth, ERS, and PBA on May 3, 2017, May 5, 2017, and September 27, 2019, respectively (the "<u>Title III Cases</u>").

C.      On July 30, 2021, the Commonwealth filed the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "<u>Seventh Amended Plan</u>"), and the disclosure statement relating to the Plan (as amended, the "<u>Disclosure Statement</u>") with the Title III Court.

D.      On November [●], 2021, the Debtors filed the Plan, which contained certain other modifications to the Seventh Amended Plan.

E.      On [●], 2021, the Title III Court entered an order confirming the Plan (the "<u>Confirmation Order</u>"), which became effective on the Effective Date.

F.      The Plan provides for the creation of the Avoidance Actions Trust on or before the Effective Date to hold, manage and administer the Avoidance Actions Trust Assets and distribute the proceeds thereof, if any, to the Avoidance Actions Trust Beneficiaries, in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order.

G.      The Avoidance Actions Trust is being created on behalf of, and for the benefit of, the Avoidance Actions Trust Beneficiaries.

H.  The Trustee shall have all powers necessary to implement the provisions of this Trust Agreement and administer the Avoidance Actions Trust, including the power to:  (i) prosecute for the benefit of the Avoidance Actions Trust Beneficiaries through Trust Professionals any Avoidance Action or other causes of action that may from time to time be held by the Avoidance Actions Trust; (ii) preserve, maintain and liquidate the Avoidance Actions Trust Assets; (iii) distribute the Avoidance Actions Trust proceeds to the Avoidance Actions Trust Beneficiaries; and (iv) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order or in any other agreement executed pursuant to the Plan, in each case subject to the provisions of <u>Sections 6.5</u>, <u>6.7</u>, and **Error! Reference source not found.** hereof regarding limitation on the Trustee and the oversight and consent rights of the Trust Advisory Board (as defined herein), and the Title III Court as provided for herein.

I.  The Avoidance Actions Trust is organized for the sole purpose of liquidating and distributing the Avoidance Actions Trust Assets, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

J.  The Avoidance Actions Trust is intended to qualify as a "Liquidating Trust" under the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>") and the regulations promulgated thereunder (the "<u>Treasury Regulations</u>"), specifically Treasury Regulations section 301.7701-4(d) and, as such, as a "grantor trust" for United States federal income tax purposes with the Avoidance Actions Trust Beneficiaries treated as the grantors and owners of the Avoidance Actions Trust.

K.  Pursuant to the Plan, the Trust is intended to be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.

L.  In accordance with the Plan, the Trust is further intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Debtors and the Trustee agree as follows:

**AGREEMENT**

## ARTICLE I

## <u>DECLARATION OF TRUST</u>

1.1  <u>Creation of Trust</u>.  The Debtors and the Trustee, pursuant to the Plan and the Confirmation Order, hereby constitute and create the Avoidance Actions Trust, which shall bear the name "Commonwealth Avoidance Actions Trust." In connection with the exercise of the

Trustee's power hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit.

      1.2    Purpose of Avoidance Actions Trust. The sole purpose of the Avoidance Actions Trust is to implement the Plan on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries, and to serve as a mechanism for liquidating, converting to Cash and distributing the Avoidance Actions Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

      1.3    Transfer of Avoidance Actions Trust Assets. On the Effective Date, the Debtors shall transfer, for the sole benefit of the Avoidance Actions Trust Beneficiaries, and in accordance with the Plan and the Confirmation Order, all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the Plan and Confirmation Order. On the Effective Date, the Commonwealth shall fund the Avoidance Actions Trust, on a one time basis, in the amount of [___] Dollars ($[●]) (the "Administrative Funding"). Any portion of the Administrative Funding that is not used to fund the activities of the Avoidance Actions Trust shall be distributed in accordance with Section 4.2. The FOMB shall reasonably cooperate with the reasonable requests of the Trustee in connection with the transfer by the Debtors of the Avoidance Actions Trust Assets pursuant to this Section 1.3.

      1.4    No Rights of Debtors. Following the Effective Date and the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors shall have no authority or control over the Trust Assets, including no rights to appear in, prosecute, compromise, or otherwise direct the litigation or settlement of the Avoidance Actions, except as may be necessary to ensure, and for the sole purpose of ensuring, the full transfer of control and authority over the Avoidance Actions Trust Assets to the Avoidance Actions Trust. The Debtors agree to take whatever actions may be reasonably necessary, including seeking the amendment of complaints or the restatement of tolling agreements, to ensure that all such authority and control over the Avoidance Actions and other Trust Assets is so transferred to the Trust. The limitations on the Debtors' rights in this subsections shall not prejudice the ability of any of the Debtors to appear in or provide testimony in Avoidance Actions or other litigation in order to fulfil the Debtors' cooperation obligations set forth in Section 9.10 hereof.

      1.5    Appointment and Acceptance of Trustee. As set forth in the Confirmation Order, the members of the Trust Advisory Board hereby designate [●] to serve as the initial Trustee under the Plan. The Trustee accepts the Avoidance Actions Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery to the Trustee, on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the Avoidance Actions Trust Assets, upon the terms and subject to the conditions set forth herein, in the Plan and in the Confirmation Order. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Avoidance Actions Trust and not otherwise. The Trustee shall have the authority to bind the

Avoidance Actions Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

1.6 <u>Liquidation of Avoidance Actions Trust Assets</u>. The Trustee shall, in an expeditious but commercially reasonable manner and subject to the provisions of the Plan (including Article LXXVIII of the Plan), the Confirmation Order and the other provisions of this Trust Agreement, liquidate and convert to Cash the Avoidance Actions Trust Assets, make timely distributions in accordance with the terms hereof and the Plan and not unduly prolong the existence of the Avoidance Actions Trust. The Trustee shall exercise reasonable business judgment and liquidate the Avoidance Actions Trust Assets to maximize net recoveries; <u>provided</u>, <u>however</u>, that the Trustee shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the maximization of recoveries and the determinations and actions of the Trustee shall in all cases be subject to the limitations provided elsewhere herein. Subject to the terms of this Trust Agreement, such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action of the Avoidance Actions Trust or through the sale or other disposition of the Avoidance Actions Trust Assets (in whole or in combination, and including the sale of any claims, rights or causes of action of the Avoidance Actions Trust). The Trustee may incur any reasonable and necessary expenses in connection with the liquidation or conversion into Cash of the Avoidance Actions Trust Assets or in connection with the administration of the Avoidance Actions Trust and, to the extent that any Administrative Funding is available, such expenses shall first be deducted from the Administrative Funding. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

1.7 <u>No Reversion to Debtors</u>. In no event shall any part of the Avoidance Actions Trust Assets revert to or be distributed to any Debtor or Reorganized Debtor.

1.8 <u>Incidents of Ownership</u>. The Avoidance Actions Trust Beneficiaries shall be the sole beneficiaries of the Avoidance Actions Trust and the Avoidance Actions Trust Assets, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in <u>Section 6.2</u> hereof.

1.9 <u>Privileges and Obligation to Respond to Ongoing Investigations</u>.

(a) All attorney-client privileges, work product protections and other immunities or protections from disclosure held by the Debtors ("<u>Privileges</u>") shall be transferred, assigned and delivered to the Avoidance Actions Trust, without waiver and in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors, and shall vest in the Trustee solely in its capacity as such (and any other Person whom the Trustee, with the consent of the Trust Advisory Board, may designate; it being understood that, as of the date of this Trust Agreement, the Trustee shall designate the Trust Advisory Board, solely in its capacity as such, as well as any other Person designated in this Trust Agreement). The FOMB, the Debtors, as the case may be, and the Trustee are authorized to take all necessary actions to effectuate the sharing and vesting of such Privileges.

4

(b)     Pursuant to Federal Rule of Evidence 502(d) (to the extent Rule 502(d) is relevant, notwithstanding the fact that the FOMB, the Debtors and the Trustee are joint holders of certain attorney-client privileges, work product protections or other immunities or protections from disclosure), no Privileges shall be waived by disclosure to the Trustee, the Avoidance Actions Trust's professionals, or the Trust Advisory Board of the FOMB's or the Debtors' information subject to attorney-client privileges, work product protections or other immunities or protections from disclosure, or by disclosure among the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board of information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board. The Trustee shall be obligated to respond, on behalf of the Debtors, and with their reasonable cooperation, to all information demands with respect to the Avoidance Actions. The Trustee, with the prior written consent of the Trust Advisory Board, the FOMB and AAFAF, may waive Privileges that are held solely by the FOMB or the Debtors (including the deliberative process privilege) and/or the Avoidance Actions Trust solely if and to the extent the Trustee, with the consent of the Trust Advisory Board, the FOMB and AAFAF, determines in good faith that doing so is in the best interests of the Avoidance Actions Trust and its beneficiaries.

(c)     The Trustee may disclose information that is subject to attorney-client privileges, work product protections or other immunities held by FOMB only (i) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies, or (ii) as otherwise required by law, subject to AAFAF's consent and the procedure described in the next sentence insofar as it applies. If the Trustee or the Trust Advisory Board receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Trustee and/or the Trust Advisory Board, the party or parties who receives such request will (A) pursue all reasonable steps to maintain the applicable privileges, protections or immunities from disclosure, including, if necessary, to maintain the privileges, protections or immunities from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, (B) notify the Trustee or the Trust Advisory Board, as the case may be, (C) notify AAFAF, (D) allow the Trustee or the Trust Advisory Board, as the case may be, reasonable time under the circumstances to seek a protective order against and/or otherwise object to the production of such material, and (E) unless required by law, not disclose the materials in question unless and until any objection raised by the Trustee or the Trust Advisory Board is resolved in favor of disclosure. For the avoidance of doubt, this Section 1.9(c) does not limit the Trustee's obligations under Section 1.9(b) to seek, and be granted, AAFAF and Trust Advisory Board consent prior to waiving Privileges held by the Debtors or Avoidance Action Trust.

## ARTICLE II

## AVOIDANCE ACTIONS TRUST BENEFICIARIES

2.1     Conflicting Claims. If any conflicting claims or demands are made or asserted with respect to an Avoidance Actions Trust Interest, the Trustee shall be entitled, in its sole and absolute discretion, to refuse to comply with any such conflicting claims or demands. In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the Avoidance Actions Trust Interest subject to the claims or demands involved, or any part thereof,

and the Trustee shall refer such conflicting claims or demands to the Title III Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands. In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands. The Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the Avoidance Actions Trust and the Trustee (the occurrence of either (a) or (b) in this Section 2.1 being referred to as a "Dispute Resolution"). Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, if any, in accordance with the terms of such Dispute Resolution. Any payment of any interest or income should be net of any taxes attributable thereto in accordance with Section 5.3.

2.2　　Rights of Avoidance Actions Trust Beneficiaries. Each Avoidance Actions Trust Beneficiary shall be entitled to participate in the rights and benefits due to an Avoidance Actions Trust Beneficiary hereunder according to the terms of its Avoidance Actions Trust Interest. The interest of an Avoidance Actions Trust Beneficiary is hereby declared and shall be in all respects personal property. Except as expressly provided hereunder, an Avoidance Actions Trust Beneficiary shall have no title to, right to, possession of, management of or control of the Avoidance Actions Trust or the Avoidance Actions Trust Assets or to any right to call for a partition or division of such assets or to require an accounting. No surviving spouse, heir or devisee of any deceased Avoidance Actions Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Avoidance Actions Trust Assets, but the whole title to the Avoidance Actions Trust Assets shall be vested in the Trustee and the sole interest of each Avoidance Actions Trust Beneficiary shall be the rights and benefits given to such Person under this Trust Agreement and the Plan.

2.3　　Evidence of Avoidance Actions Trust Interest. Ownership of an Avoidance Actions Trust Interest in the Avoidance Actions Trust will be evidenced by the recording of such ownership in an electronic book-entry system (the "Book Entry System") maintained either by the Avoidance Actions Trust or an agent of the Avoidance Actions Trust and containing information provided by the Debtors or an agent of the Debtors. An Avoidance Actions Trust Beneficiary shall be deemed the "holder of record" (hereinafter "holder") of such Avoidance Actions Trust Beneficiary's Avoidance Actions Trust Interest(s) for purposes of all applicable United States federal and state laws, rules and regulations, including all applicable Commonwealth laws, rules and regulations. The Trustee shall, upon the written request of a holder of an Avoidance Actions Trust Interest, provide reasonably adequate documentary evidence of such holder's Avoidance Actions Trust Interest, as indicated in the Book Entry System. The expense of providing such documentation shall be borne by the requesting holder.

2.4　　Claims Reports. Within sixty (60) days after the Effective Date, the Debtors shall arrange for the Trustee to receive a report (the "Initial Claims Report") regarding Avoidance Actions Trust Interests containing (a) an updated claims register for General Unsecured Claims, and (b) a written report of the status of any previously filed objections to General Unsecured Claims and the status of any reconciliations of General Unsecured Claims, showing which General Unsecured Claims are Allowed Claims, which are Disputed Claims (as defined below), and which are still being evaluated for possible objection. Further, the Debtors shall arrange for the Trustee

to receive a quarterly report within fifteen (15) days of the end of each quarter (the "Quarterly Claims Report"), which report shall include all material updates to information contained in the Initial Claims Report or a previous Quarterly Claims Report, as applicable, as well as any material information omitted from such prior reports. In addition, the Debtors shall, upon reasonable request, periodically supply the Trustee with any other information the Avoidance Actions Trust may reasonably request related to the reconciliation of General Unsecured Claims and the payment of distributions to Avoidance Actions Trust Beneficiaries.

2.5    Reliance on Debtors for Information.    It is the responsibility of the Debtors, pursuant to, among other things, their cooperation obligations established herein, to provide to the Avoidance Actions Trust reasonably complete and accurate information regarding Avoidance Actions Trust Interests and to provide periodic updates regarding such information as set forth in Section 2.4 hereof. The (a) Trustee, (b) the individual(s) comprising the Trustee, as the case may be, (c) the Trust Advisory Board, and (d) the members of the Trust Advisory Board (each, a "Trust Party" and, collectively, the "Trust Parties") shall be entitled to rely on information supplied by the Debtors and their agents (including the Disbursing Agent) concerning the Avoidance Actions Trust Interests, and shall not be held liable to any party for any incompleteness or inaccuracy of such information.

2.6    Transfers of Avoidance Actions Trust Interests.

(a)    General.    Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

(b)    Book Entry System.    The Book Entry System shall include a register (which may be electronic) setting forth the names and addresses of the Avoidance Actions Trust Beneficiaries, and the amount and class of their Avoidance Actions Trust Interests from time to time. Any transfer or assignment of an Avoidance Actions Trust Interest by will, intestate succession or operation of law shall not be effective unless and until such transfer or assignment is recorded in the Book Entry System, which shall be completed as soon as practicable. Subject to Section 2.4(d) hereof, the entries in the Book Entry System shall be conclusive absent manifest error, and the Avoidance Actions Trust and the Trustee shall treat each Person whose name is recorded in the Book Entry System pursuant to the terms hereof as the owner of Avoidance Actions Trust Interests indicated therein for all purposes of this Trust Agreement, notwithstanding notice to the contrary.

(c)    Registration.    In accordance with the Plan, the Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code. If the Trustee, with the consent of the Trust Advisory Board and upon advice of counsel, determines that any class of Avoidance Actions Trust Interests may be subject to registration pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission (the "SEC") or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to Section 12 of such

statute (it being understood and agreed that the Trustee with the consent of the Trust Advisory Board shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such class). To the extent that any Administrative Funding is available, any expenses that are associated with such application for relief and/or registration shall first be deducted from the Administrative Funding. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

(d)     Further Limitations on Transfer. Notwithstanding any other provision to the contrary, the Trustee may disregard any purported transfer or assignment of Avoidance Actions Trust Interests by will, intestate succession or operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

2.7     Limited Liability. No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Avoidance Actions Trust Beneficiary, shall give rise to any liability of such Avoidance Actions Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person (except to the extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct). Avoidance Actions Trust Beneficiaries are deemed to receive the Avoidance Actions Trust Assets in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order in exchange for their Allowed Claims, without further obligation or liability of any kind (except to the extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct), but subject to the provisions of this Trust Agreement.

# ARTICLE III

## DURATION AND TERMINATION OF AVOIDANCE ACTIONS TRUST

3.1     Duration. The Avoidance Actions Trust shall become effective upon the Effective Date of the Plan and shall remain and continue in full force and effect until dissolved as provided for in Section 78.14(d) of the Plan.

3.2     Dissolution of the Avoidance Actions Trust.

(a)     The Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, on the earlier to occur of (i) all of the Avoidance Actions Trust Assets having been distributed pursuant to the Plan and this Trust Agreement and (ii) following the reconciliation of all General Unsecured Claims, the Trustee having determined, with the consent of the Trust Advisory Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit; provided, however, that in no event shall the Avoidance Actions Trust be dissolved later than five (5) years from the Effective Date unless the Title III Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or

an opinion of counsel satisfactory to the Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as a "Liquidating Trust" for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets.

(b)     If at any time the Trustee determines, in reliance upon such Trust Professionals as the Trustee may retain, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to the Avoidance Actions Trust Beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Trustee may apply to the Title III Court for authority to (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) of the type described in Section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under Section 501(a) of the IRC, and (C) that is unrelated to the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, and any insider of the Trustee, and (iii) dissolve the Avoidance Actions Trust. Upon receipt of such authority from the Title III Court, the Trustee shall notify each Avoidance Actions Trust Beneficiary.

3.3     Continuance of Avoidance Actions Trust for Winding Up. After the dissolution of the Avoidance Actions Trust and solely for the purpose of liquidating and winding up the affairs of the Avoidance Actions Trust, the Trustee shall continue to act as such until its duties have been fully performed. Upon distribution of all the Avoidance Actions Trust Assets, the Trustee shall retain the books, records and files that shall have been delivered to or created by the Trustee. At the Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six (6) years after the final distribution of the Avoidance Actions Trust Assets, subject to any joint prosecution and common interests agreement(s) to which the Trustee may be party. Provisions with respect to the destruction of documents in this Section 3.3 shall not limit the Trustee's right, prior to the dissolution of the Avoidance Actions Trust, to destroy documents that the Trustee considers no longer necessary to retain, subject to applicable law, the Plan, the Disclosure Statement and this Trust Agreement.

## ARTICLE IV

## ADMINISTRATION OF AVOIDANCE ACTIONS TRUST

4.1     Payment of Claims, Expenses and Liabilities. Subject to the Budget from time to time approved by the Trust Advisory Board in accordance with Section 4.13(b), and in accordance with Sections 6.7(j), 6.9(b), and 7.6 hereof, and except as otherwise provided herein, the Trustee shall use the Administrative Funding: (a) to pay reasonable costs and expenses of the Avoidance Actions Trust that are incurred (including any taxes imposed on the Avoidance Actions Trust, the actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets, as provided in Section 6.9 hereof, and the preservation of books and records of the Avoidance Actions Trust); (b) to satisfy other obligations or other liabilities incurred or assumed by the Avoidance Actions Trust (or to which the Avoidance Actions Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order or this Trust Agreement, including reasonable fees and costs incurred in connection with the protection, preservation, liquidation and distribution of the Avoidance Actions Trust Assets and the reasonable costs of investigating, prosecuting, resolving and/or

9

settling any Claims; (c) as reasonably necessary to meet contingent liabilities and to maintain the value of the Avoidance Actions Trust Assets during liquidation; and (d) to satisfy any other obligations of the Avoidance Actions Trust expressly set forth in the Plan, this Trust Agreement, and the Confirmation Order. Such expenses shall first be deducted from the Administrative Funding. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

4.2     Distributions.

(a)     Generally. The Trustee is required to distribute to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests, on a semi-annual basis (each such date, a "Distribution Date"), in accordance with the terms of the Plan, all unrestricted Cash then on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 4.2), except (i) Cash reserved pursuant to this Trust Agreement to fund the activities of the Avoidance Actions Trust, and (ii) such amounts as are allocable to or retained on account of Disputed Claims in accordance with Section 82.3 of the Plan to pay reasonable incurred or anticipated expenses (including any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); provided, however, that the Trustee shall not be required to make a distribution pursuant to this Section 4.3 if the aggregate net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Trustee, with the consent of the Trust Advisory Board, in accordance with applicable law, and so long as such aggregate net amount is less than Twenty-Five Million Dollars ($25,000,000.00); provided further, however, that the Trustee, with consent of the Trust Advisory Board, may decide to forego the first distribution to those Avoidance Actions Trust Beneficiaries with respect to which the Trustee, in its reasonable judgment, is not administratively prepared to make such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Trustee is administratively prepared to do so, not to exceed three (3) months from the date of the first quarterly distribution.

(b)     Payment of Distributions. Each Avoidance Actions Trust Beneficiary's share of the Avoidance Actions Trust Interests as determined pursuant to the Plan (including any Cash to be received on account of any Avoidance Actions Trust Interests) shall be allocated and distributed, and the Avoidance Actions Trust Assets shall be allocated and distributed, in accordance with Article LXXVII of the Plan.

4.3     De Minimis Distributions. No Cash payment shall be made to any holder of an Avoidance Actions Trust Interest until such time, if ever, as the amount payable thereto, in any distribution from the Avoidance Actions Trust, is equal to or greater than Ten Dollars ($10.00). Any holder of an Avoidance Actions Trust Interest on account of which the amount of Cash to be distributed pursuant to any distribution from the Avoidance Actions Trust is less than Ten Dollars ($10.00) shall be deemed to have no claim for such distribution against the Debtors, the Reorganized Debtors, the Avoidance Actions Trust or the Avoidance Actions Trust Assets. Subject to Section 4.6, any Cash not distributed pursuant to this Section 4.2 hereof shall be the property of the Avoidance Actions Trust free of any restrictions thereon, and shall be available for distribution to the other Avoidance Actions Trust Beneficiaries, in accordance with the Plan and this Trust Agreement.

10

4.4 <u>Undeliverable Distributions</u>. For purposes of this Trust Agreement, an "undeliverable" distribution shall include a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within six (6) months following the date on which such check was issued. If any distribution to the holder of a Avoidance Actions Trust Interest is undeliverable, no further distribution shall be made to such holder unless and until the Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable. All Persons ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution. Except as required by law, the Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of a Avoidance Actions Trust Interest.

4.5 <u>Interest on Avoidance Actions Trust Interests</u>. As set forth in the Plan, interest shall not accrue and be paid on the Avoidance Actions Trust Interests.

4.6 <u>Distributions After the Effective Date</u>. Distributions made after the Effective Date to holders of Avoidance Actions Trust Interests on account of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article LXXVII of the Plan.

4.7 <u>Compliance with Laws</u>. Any and all distributions of Avoidance Actions Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

4.8 <u>Fiscal Year</u>. Except for the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be the calendar year. For the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be such portion of the calendar year that the Avoidance Actions Trust is in existence.

4.9 <u>Books and Records</u>. The Trustee shall retain and preserve the Debtors' books, records and files that shall have been delivered to or created by the Trustee. Subject to <u>Section 3.3</u>, the Trustee shall maintain, in respect of the Avoidance Actions Trust and the Avoidance Actions Trust Beneficiaries and all others to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the Avoidance Actions Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the Avoidance Actions Trust and the Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including applicable tax, securities and other federal and state laws. Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Avoidance Actions Trust, or as a condition for making any payment or distribution out of the Avoidance Actions Trust Assets. The Trustee shall provide AAFAF and any member of the Trust Advisory Board with access to such books and records during normal business hours as may be reasonably requested with three (3) days' advance notice. Avoidance Actions Trust Beneficiaries holding Allowed Claims shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records; <u>provided</u>, <u>however</u>, that if so

requested, all costs associated with such inspection shall be paid in advance by such requesting Avoidance Actions Trust Beneficiary and such Avoidance Actions Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Trustee.

4.10    Cash Payments.  All distributions required to be made to the Avoidance Actions Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Trustee or, at the option of the Trustee, by wire transfer from a domestic bank selected by the Trustee or as otherwise required or provided in applicable agreements; provided, however, that Cash payments to foreign holders of Avoidance Actions Trust Interests may be made, at the option of the Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

4.11    Insurance.  The Avoidance Actions Trust shall maintain customary insurance coverage for the protection of the Trustee, the members of the Trust Advisory Board, employees and any such other persons serving as administrators and overseers of the Avoidance Actions Trust on and after the Effective Date.  The Trustee also may obtain insurance coverage it deems necessary and appropriate with respect to real and personal property which may become Avoidance Actions Trust Assets, if any.

4.12    Disputes.  To the extent a dispute arises between the Trustee and the Trust Advisory Board concerning the performance of any of the powers, duties, and/or obligations herein, the Trustee or the Trust Advisory Board may file a motion and/or other pleadings with the Title III Court and obtain advice and guidance or such other relief as may be appropriate concerning a resolution of the matter(s) in dispute between the parties.  In the event of a dispute, the Trustee and the Trust Advisory Board, as applicable, shall have the right to engage legal counsel to advise it with respect to the matter(s) in dispute and the reasonable fees and expenses of such legal counsel shall be reimbursed by the Trustee from the Administrative Funding or, if the Administrative Funding has been spent, any other unrestricted Cash in the Avoidance Actions Trust, subject to the approval of a majority of the Trust Advisory Board and subject to Section 7.5.  A motion and/or other pleading described in this Section 4.12 filed by the Trust Advisory Board may only be filed upon the consent of a majority of its members.

4.13    Reports from the Trustee

(a)    The Trustee shall deliver reports to members of the Trust Advisory Board and AAFAF not later than thirty (30) days following the end of each fiscal quarter, or less frequently as may be agreed upon between the Trustee and the Trust Advisory Board.  Such reports shall specify in reasonable detail (i) the status of any Causes of Action, Claims and litigation involving the Avoidance Actions Trust or the Avoidance Actions Trust Assets, including Avoidance Actions, including any settlements entered into by the Avoidance Actions Trust, (ii) the costs and expenses of the Avoidance Actions Trust that are incurred (including any taxes imposed on the Avoidance Actions Trust or actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets and preservation of books and records as provided in Section 4.9) during the preceding fiscal quarter and the remaining amount (if any) of the Administrative Funding, (iii) the amounts listed in clause (ii) incurred since the Effective Date, (iv) the amount of

12

Cash and other assets received by the Avoidance Actions Trust during the prior fiscal quarter, (v) the aggregate amount of Cash and other assets received by the Avoidance Actions Trust since the Effective Date, (vi) the calculation of the estimated amount of the Cash and other assets to be distributed on the next Distribution Date, including any Cash on hand that is not to be distributed pursuant to Section 4.2(a) above, (vii) the aggregate amount of distributions from the Avoidance Actions Trust to the Avoidance Actions Trust Beneficiaries since the Effective Date, and (viii) such other information as the Trust Advisory Board may reasonably request from time to time. The Trustee also shall timely prepare, file and distribute such additional statements, reports and submissions (A) as may be necessary to cause the Avoidance Actions Trust and the Trustee to be in compliance with applicable law or (B) as may be otherwise reasonably requested from time to time by the Trust Advisory Board.

(b) The Trustee shall prepare and submit to the Trust Advisory Board for approval an annual plan and budget at least thirty (30) days prior to the commencement of each fiscal year of the Avoidance Actions Trust; provided, however, that the first such annual plan and budget shall be submitted no later than forty-five (45) days after the Effective Date of the Plan. Such annual plan and budget shall set forth in reasonable detail: (i) the Trustee's anticipated actions to administer and liquidate the Avoidance Actions Trust Assets; and (ii) the anticipated expenses, including the expenses of Trust Professionals, associated with conducting the affairs of the Avoidance Actions Trust. Such annual plan and budget shall be updated and submitted to the Trust Advisory Board for review and approval on a quarterly basis, and each such quarterly update shall reflect the differences between the anticipated actions described in the annual report and actual operations of the Avoidance Actions Trust to date. Any such annual plan and budget as approved by the Trust Advisory Board is referred to herein as the "Budget". All actions by the Trustee must be substantially consistent with the then current Budget, provided that the Trustee may take action outside the Budget with the prior approval of the Trust Advisory Board.

(c) In accordance with the Plan, the Avoidance Actions Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to Sections 7(a) and 7(b) of that Investment Company Act of 1940, as amended, and section 1145 of the Bankruptcy Code. Notwithstanding the forgoing, if required to do so, and until such time as the Avoidance Actions Trust is dissolved in accordance with Section 78.14(d) of the Plan (or otherwise in accordance with this Trust Agreement), the Avoidance Actions Trust shall file with (or furnish to, as the case may be) the SEC such periodic reports as the Avoidance Actions Trust is required to file pursuant to the Exchange Act.

## ARTICLE V

## TAX MATTERS

5.1    Avoidance Actions Trust Assets Treated as Owned by Avoidance Actions Trust Beneficiaries. For all United States federal income tax purposes, all parties (including the Debtors, the Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (a) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) directly to the Avoidance

Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are allocable to Disputed Claims, to the reserve for such claims, *followed by* (b) the transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to a reserve for disputed claims) in exchange for Avoidance Actions Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Avoidance Actions Trust Assets (other than such Avoidance Actions Trust Assets as are allocable to a reserve for disputed claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

      5.2    <u>Tax Reporting</u>.

      (a)    The Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this <u>Article V</u>. To the extent and in the manner required by applicable law, the Trustee also will annually send to each holder of an Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for United States federal income tax purposes and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns. The Trustee also shall file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

      (b)    To the extent and in the manner required by applicable law, allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to a reserve for disputed claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to a reserve for disputed claims) to the holders of the Avoidance Actions Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, to the extent an in the manner required by applicable law, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. To the extent and in the manner required by applicable law, the tax book value of the Avoidance Actions Trust Assets for purposes of this <u>Section 5.2(c)</u> shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

      (c)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall (i) timely elect to treat any reserve for disputed claims

as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Trustee and the Avoidance Actions Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(d)     The Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the Avoidance Actions Trust or its assets, including any reserve for disputed claims. If, and to the extent, any Cash retained on account of Disputed Claims in the reserve for such claims is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets from such reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Trustee as a result of the resolution of such Disputed Claims.

5.3     Tax Withholdings by Trustee. The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests for all purposes of the Trust Agreement, it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution. The Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests (including social security numbers or other tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Trust Agreement. In order to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests shall be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. This identification requirement generally applies to all holders of Avoidance Actions Trust Interests, including those who hold their Claims in "street name." The Trustee may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered may treat such holder's Avoidance Actions Trust Interests as disputed; provided, however, that if such information is not furnished to the Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest; and, provided further, however, that, upon the delivery of such information by a holder of a Avoidance Actions Trust Interest, the Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; provided further, however, that if the Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Trustee for such liability (to the extent such amounts were actually distributed to such holder). Notwithstanding the above, and without limiting any of the other obligations of the Debtors or rights of the Trustee described herein, the

15

Debtors shall be required to supply to the Trustee tax information of the holders of Avoidance Actions Trust Interests that is in the possession of the Debtors and that the Trustee may reasonably request, and the Trust Parties shall be entitled to rely on such information and shall not be held liable for any omission or inaccuracy with respect to such tax information so supplied to the Trustee.

## ARTICLE VI

## POWERS OF AND LIMITATIONS ON THE TRUSTEE

6.1     Trustee.

(a)     "Trustee" means [●] so long as it continues in office, and all other Person(s) who have been duly elected and qualify as Trustee of the Avoidance Actions Trust hereunder pursuant to Section 1.4 or Article VIII. Subject to Article VIII, the Trustee shall hold office until disability, death, resignation, or the termination of the Avoidance Actions Trust in accordance with the terms set forth herein. References herein to the Trustee shall refer to the Person or Persons serving as the Trustee solely in its capacity as Trustee hereunder. The Trustee shall be subject to Puerto Rico laws governing ethics, anti-corruption, conflicts of interest, procurement, contracting, use of public funds, and public disclosure applicable to Commonwealth instrumentalities.

(b)     Subject to the express limitations set forth herein, any actions of the Trustee contemplated by this Trust Agreement shall be decided and conducted by the Trustee only.

6.2     Powers of the Trustee.

(a)     Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the Trustee shall have various powers, duties and responsibilities concerning the prosecution of certain litigation claims, the disposition of assets, the resolution of claims, and numerous other obligations relating to maximizing the proceeds of the Avoidance Actions Trust Assets and the administration of the Avoidance Actions Trust.

(b)     Nothing in this Trust Agreement shall be deemed to limit the Trust Parties' protections and benefits under the Plan or to prevent a Trust Party from taking or refraining to take any action on behalf of the Trust that, based upon the advice of counsel or other professionals, the Trust Party determines it is obligated to take or to refrain from taking in the performance of any duty that the Trust Party may owe the Avoidance Actions Trust Beneficiaries or any other Person under the Plan, Confirmation Order or this Agreement.

(c)     The Trustee shall have only such rights, powers and privileges expressly set forth in the Confirmation Order, the Plan and this Trust Agreement and as otherwise provided by applicable law. Subject to the Confirmation Order, the Plan and the provisions of this Trust Agreement, including the oversight and approvals by and of the Trust Advisory Board and the Title III Court provided herein, the Trustee shall be expressly authorized to undertake the following actions:

(i)     to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust;

(ii)     to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims or Interests are Allowed on or after the Effective Date;

(iii)     in the Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action or litigation of the Avoidance Actions Trust;

(iv)     to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust;

(v)     in the Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Trustee will be responsible;

(vi)     to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority;

(vii)     to enter into any agreements binding the Avoidance Actions Trust, and to execute, acknowledge and deliver any and all instruments that are necessary or deemed by the Trustee to be consistent with and advisable in furthering the purpose of the Avoidance Actions Trust;

(viii)     to open and maintain bank accounts on behalf of or in the name of the Avoidance Actions Trust;

(ix)     to cause the Avoidance Actions Trust to employ and pay professionals, claims agents, disbursing agents, and other agents and third parties, in accordance with the terms and limitations set forth herein;

(x)     to cause the Avoidance Actions Trust to pay all of its lawful expenses, debts, charges, taxes and other liabilities, and make all other payments;

(xi)     to cause the Avoidance Actions Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(xii)     to cause the Avoidance Actions Trust seek a determination of tax liability or refund under section 505 of the Bankruptcy Code;

(xiii)   to cause the Avoidance Actions Trust to establish out of all Avoidance Actions Trust Assets such reserves for taxes, assessments and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of the Avoidance Actions Trust;

(xiv)   to establish and maintain a website, to the extent the Trustee deems necessary, to provide notice of the Avoidance Actions Trust's activities to Avoidance Actions Trust Beneficiaries, provided that the Trustee determines, on the advice of counsel, that establishing such website does not implicate any securities or other applicable law;

(xv)   to undertake all administrative functions of the Avoidance Actions Trust, including overseeing the winding down and termination of the Avoidance Actions Trust;

(xvi)   to exercise, implement, enforce, and discharge all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

(xvii)   to take all other actions consistent with the provisions of the Plan that the Trustee deems reasonably necessary or desirable to administer the Trust.

(d)   In all circumstances, the Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

6.3   Except as otherwise provided in this Trust Agreement, the Trustee will not be required to obtain the order or approval of the Title III Court, or any other court of competent jurisdiction in, or account to the Title III Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder. Notwithstanding the foregoing, where the Trustee determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trustee will have the right to submit to the Title III Court any question or questions regarding any specific action proposed to be taken by the Trustee with respect to this Trust Agreement, the Avoidance Actions Trust, or the Avoidance Actions Trust Assets, including the administration and distribution of the Avoidance Actions Trust Assets and the termination of the Avoidance Actions Trust. Pursuant to the Plan, the Title III Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trustee.

6.4   <u>Exclusive Authority to Pursue Avoidance Actions</u>.  The Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court. The Trustee shall be the sole representative of the Debtors under section 1123(b)(3) of the Bankruptcy Code with respect to the Avoidance Actions. The Trustee shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Trust to any counterclaims that may be asserted by any defendant in an Avoidance Action. The Trustee also shall be vested with and entitled to assert all of the Debtors' rights with respect to any such counterclaims under section 558 of the Bankruptcy Code.

6.5   <u>Limitations on Trustee</u>.  The Trustee shall, on behalf of the Avoidance Actions Trust, hold the Avoidance Actions Trust out as a trust in the process of liquidation and not as an

investment company. The Trustee shall be restricted to the liquidation of the Avoidance Actions Trust Assets on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries and the distribution and application of Avoidance Actions Trust Assets for the purposes set forth in, and the conservation and protection of the Avoidance Actions Trust Assets and the administration thereof in accordance with, the provisions of this Trust Agreement, the Plan and the Confirmation Order.

6.6     Conflicts of Interest. The Trustee will appoint a disinterested Person to handle any matter where the Trustee has identified it has a conflict of interest or the Title III Court, on motion of the any party in interest, determines one exists. If the Trustee is unwilling or unable to appoint a disinterested Person to handle any such matter, the Title III Court, on notice and hearing, may do so.

6.7     Establishment of Trust Advisory Board.

(a)     The "Trust Advisory Board" means the board to be appointed in accordance with, and to exercise the duties set forth in, this Trust Agreement, which duties shall be (i) to oversee the liquidation and distribution of the Avoidance Actions Trust Assets by the Trustee in accordance with this Trust Agreement, the Plan and the Confirmation Order, (ii) to approve (or withhold approval) of those matters submitted to it for approval in accordance with the terms of this Trust Agreement, and (iii) to remove and appoint any successor to the Trustee as provided for in this Trust Agreement.

(b)     The Trust Advisory Board initially shall be comprised of (i) two (2) directors selected by the Creditors' Committee (the "Creditor Directors"), and (ii) one (1) director selected by the FOMB (the "OB Director"). The initial members of the Trust Advisory Board are set forth on Annex A hereto. Each member of the Trust Advisory Board shall have a fiduciary duty to act in the best interests of the Avoidance Actions Trust Beneficiaries as a whole. The Trust Advisory Board shall be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption, conflicts of interest, procurement, contracting, use of public funds, and public disclosure applicable to Commonwealth instrumentalities, and such provisions shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

(c)     The authority of the members of the Trust Advisory Board shall be effective as of the Effective Date and shall remain and continue in full force and effect until the Avoidance Actions Trust is dissolved in accordance with Section 3.2. The service of the members of the Trust Advisory Board shall be subject to the following:

(i)     subject to Section 6.4(d) and Section 6.4(e), the members of the Trust Advisory Board shall serve until disability, death, or resignation pursuant to clause (ii) below, or removal pursuant to clause (iii) below;

(ii)     a member of the Trust Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Trust Advisory Board. Such resignation shall be effective when a successor is appointed as provided herein;

19

(iii)    a member of the Trust Advisory Board may be removed by the unanimous vote of the other members for (a) fraud, gross negligence or willful misconduct in connection with the affairs of the Avoidance Actions Trust, or (b) cause, which shall include a breach of fiduciary duty other than as specified in the foregoing clause (a). Such removal shall be effective immediately upon such vote;

(iv)    subject to Section 6.4(d) and Section 6.4(e), in the event of a vacancy in a member's position (whether by removal, death or resignation), a new member may be appointed, (A) in the case of a Creditor Director, (i) by the Creditors' Committee, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (ii) if the Creditors' Committee has been dissolved, the remaining Creditor Director, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (B) in the case of the OB Director (i) by the FOMB, as notified in writing to the Trust Advisory Board within ten (10) Business Days, or (ii) if the FOMB has been dissolved, by AAFAF, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days. In each case, the appointment of a successor member of the Trust Advisory Board (including any appointment pursuant to Section 6.4(d) and Section 6.4(e)) shall be evidenced by the filing with the Title III Court by the Trustee of a notice of appointment, which notice shall include the name, address, and telephone number of the successor member of the Trust Advisory Board; and

(v)    immediately upon appointment of any successor member of the Trust Advisory Board, all rights, powers, duties, authority, and privileges of the predecessor member of the Trust Advisory Board hereunder shall be vested in and undertaken by the successor member of the Trust Advisory Board without any further act; and the successor member of the Trust Advisory Board shall not be liable personally for any act or omission of the predecessor member of the Trust Advisory Board.

(d)    Each member of the Trust Advisory Board shall designate (i) one or more representatives who shall attend meetings of and participate in other activities of the Trust Advisory Board, and (ii) an alternate representative to attend meetings and participate in other activities of the Trust Advisory Board when the representatives designated pursuant to clause (i) above are unavailable.

(e)    Notwithstanding anything in this Trust Agreement to the contrary, the Trust Advisory Board shall not take any action which will cause the Avoidance Actions Trust to fail to qualify as a "Liquidating Trust" for United States federal income tax purposes.

(f)    A quorum for meetings of the Trust Advisory Board shall consist of a majority of the non-recused, voting members of the Trust Advisory Board then serving; provided, however, that, for purposes of determining whether a quorum is present at such a meeting, a voting member of the Trust Advisory Board shall be deemed present if a representative of the member is attending in Person, by telephone or by proxy.

(g)    Except as expressly provided herein, the affirmative vote of a majority of the non-recused, voting members of the Trust Advisory Board shall be the act of the Trust Advisory Board with respect to any matter that requires the determination, consent, approval or

agreement of such board. If an equal number of the non-recused voting members of the Trust Advisory Board vote for and against a particular matter, the Trustee shall only in such circumstances have the authority to cast a vote with respect to such matter. Any of or all the members of the Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Trust Advisory Board participating in a meeting by this means is deemed to be present in Person at the meeting. In all matters submitted to a vote of the Trust Advisory Board, each Trust Advisory Board member shall be entitled to cast one vote, which vote shall be cast personally by such Trust Advisory Board member or by proxy. In a matter in which the Trustee cannot obtain direction or authority from the Trust Advisory Board, the Trustee may file a motion requesting such direction or authority from the Title III Court; provided, however, that any member of the Trust Advisory Board may oppose such motion.

(h)     A Trust Advisory Board member and its representative shall be recused from the Trust Advisory Board's deliberations and votes on any and all matters as to which such member has a conflicting interest. If a Trust Advisory Board member or its representative does not recuse itself from any such matter, that Trust Advisory Board member and its representative may be recused from such matter by the unanimous vote of the remaining, voting members of the Trust Advisory Board that are not recused from the matter.

(i)     Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Trust Advisory Board as evidenced by one or more written consents describing the action taken, signed by the Trust Advisory Board and filed with the minutes or proceedings of the Trust Advisory Board.

(j)     The members of the Trust Advisory Board shall be compensated as set forth in the attached Annex B hereto from the Administrative Funding. Any member of the Trust Advisory Board shall also be reimbursed by the Trustee from the Administrative Funding for its actual, reasonable out-of-pocket expenses incurred for serving on such board and for reasonable legal fees incurred by any member of the Trust Advisory Board in their capacity as such with respect to outside counsel in the same manner and priority as the compensation and expenses of the Trustee under this Trust Agreement, in accordance with the Budget, after submission of reasonably detailed receipts or invoices evidencing such expenses and the approval of such expenses by the Title III Court. Except as provided for in this Section 6.7, the members of the Trust Advisory Board shall not be entitled to receive any other form of compensation for their services provided as such members. The Budget shall include a reserve for the fees and expenses of the Trust Advisory Board.

6.8     Cooperation with Respect to Claim Allowance: The Trustee and the Debtors shall cooperate and consult each other with respect to the disallowance or allowance of claims in connection with the litigation and/or resolution of Avoidance Actions, including with respect to any issues arising under sections 502(d) or 502(h) of the Bankruptcy Code.

6.9     Agents, Employees and Professionals.

(a)     The Avoidance Actions Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain members, managers, agents, representatives, employees, officers and independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Trustee to have qualifications necessary or desirable to assist in the proper administration of the Avoidance Actions Trust (collectively, the "Trust Professionals"), on such terms as the Trustee deems appropriate, including counsel retained on a contingency-fee basis, subject to the approval of the Trust Advisory Board. None of the professionals that represented parties-in-interest in the Title III Cases shall be precluded from being engaged by the Trustee solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.

(b)     After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trustee and the Trust Advisory Board, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such Person, plus an itemized statement of expenses. The Trustee shall pay such invoices thirty (30) days after such invoices are approved by the Trustee. In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trustee or the affected party may ask the Title III Court to resolve the dispute. Such expenses shall first be deducted from the Administrative Funding. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

(c)     All payments to Trust Professionals shall be paid out of the Administrative Funding or, if all of the Administrative Funding has been spent, any remaining Avoidance Actions Trust Assets, subject to the approval of the Trust Advisory Board.

(d)     Nothing in this Agreement shall prevent the Trustee, subject to the approval of the Trust Advisory Board, from seeking and obtaining outside credit or other funding for the prosecution of the Avoidance Actions.

6.10     Investment of Avoidance Actions Trust Monies.  All monies and other assets received by the Trustee as Avoidance Actions Trust Assets (including the proceeds thereof as a result of investment in accordance with this Section 6.8) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Avoidance Actions Trust Beneficiaries, and shall not be segregated from other Avoidance Actions Trust Assets, unless and to the extent required by the Plan. The Trustee may invest any Cash (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this Section 6.8, but shall otherwise be under no liability for interest or income on any monies received by the Avoidance Actions Trust hereunder and held for distribution or payment to the Avoidance Actions Trust Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the Avoidance Actions Trust shall be administered in accordance with the general duties and obligations hereunder. The right and power of the Trustee to invest the Avoidance Actions Trust Assets, the proceeds thereof, or any income earned by the Avoidance Actions Trust, shall be limited to the right and power to: (a) invest such Avoidance Actions Trust Assets (pending distributions in accordance with the Plan or this Trust Agreement)

in either (i) short-term direct obligations of, or obligations guaranteed by, the United States of America or (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; or (b) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "Permissible Investments"); provided, however, that the scope of any Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

6.11 <u>Termination</u>. The duties, responsibilities and powers of the Trustee shall terminate on the date the Avoidance Actions Trust is wound up and dissolved in accordance with New York law pursuant to <u>Section 3.2</u> hereof, under applicable law in accordance with the Plan, by an order of the Title III Court or by entry of a final decree closing the Debtors' Title III Cases; <u>provided</u>, that <u>Sections 7.1</u>,7.2, <u>7.3</u>, <u>7.4</u> and <u>7.5</u> hereof shall survive such termination, dissolution and entry.

## ARTICLE VII

## CONCERNING THE TRUSTEE

7.1 <u>Liability to Third Persons</u>. No Avoidance Actions Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Avoidance Actions Trust Assets or the affairs of the Trustee (except to the extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct). Notwithstanding anything herein to the contrary and without limitation of section 78.15 of the Plan, neither the Trust Parties nor the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents, or agents, or any of such Person's successors and assigns shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person (including, in the case of the Trustee and members of the Trust Advisory Board, to any Trust Professionals retained by the Trustee in accordance with this Trust Agreement) in connection with the Avoidance Actions Trust Assets or the affairs of the Avoidance Actions Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a final order of the Title III Court to be due to their respective gross negligence, fraud, criminal conduct or willful misconduct, and all such persons shall look solely to the Avoidance Actions Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Avoidance Actions Trust. Other than as set forth in the Plan or in the Confirmation Order, nothing in this <u>Section 7.1</u> shall be deemed to release any Avoidance Actions Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

7.2 <u>Nonliability for Acts of Others</u>. Except as provided herein, nothing contained in this Trust Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by Trustee, the Trust Advisory Board (or its members) or the Trust Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the such persons to assume or accept any such liability, obligation or duty. Any

successor Trustee or Trust Advisory Board member may accept and rely upon any accounting made by or on behalf of any predecessor Trustee or Trust Advisory Board hereunder, and any statement or representation made as to the assets comprising the Avoidance Actions Trust Assets or as to any other fact bearing upon the prior administration of the Avoidance Actions Trust, so long as it has a good faith basis to do so. The Trustee and the Trust Advisory Board members shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue (except to the extent of the Trustee's, or the Trust Advisory Board members', fraud, gross negligence or willful misconduct). The Trustee or any successor Trustee and the Trust Advisory Board members or any successor Trust Advisory Board member shall not be liable for any act or omission of any predecessor Trustee or Trust Advisory Board member. No provision of this Trust Agreement shall require the Trustee or any Trust Advisory Board member to expend or risk his personal funds or otherwise incur any financial liability in the performance of his rights or powers hereunder if the Trustee or Trust Advisory Board member has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him.

7.3     Exculpation.  As of the Effective Date, the Trust Parties, the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns shall be and hereby are exculpated by all Persons, including Avoidance Actions Trust Beneficiaries, holders of Claims, holders of Equity interests, and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Trust Agreement or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Title III Court to have arisen out of their own respective fraud, criminal conduct, gross negligence or willful misconduct. No Avoidance Actions Trust Beneficiary, holder of a Claim, or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trust Parties, their employees, professionals, or representatives, for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order and this Trust Agreement. Any action taken or omitted to be taken with the express approval of the Title III Court or the Trust Advisory Board shall conclusively be deemed not to constitute gross negligence or willful misconduct; provided, however, that, notwithstanding any provision herein to the contrary, the Trustee shall not be obligated to comply with a direction of the Trust Advisory Board, whether or not express, that would result in a change to the distribution provisions of this Trust Agreement and the Plan. In such instance, the Trustee shall request, within fourteen (14) days, the Title III Court's ratification of its determination not to comply with a direction of the Trust Advisory Board.

7.4     Limitation of Liability.  The Trustee, the members of the Trust Advisory Board, and the Trust Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances, except for those resulting from acts arising out of their own fraud, willful misconduct, or gross negligence.

7.5     Indemnity.     The Trust Parties and their respective employees, agents and professionals (each, an "Indemnified Party"), shall not be liable to the Avoidance Actions Trust

Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except those acts arising out of their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence. Any indemnification claim of the Trust Parties and the other parties entitled to indemnification under this subsection shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets. The Trust Parties shall be entitled to rely, in good faith, on the advice of their retained professionals. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

7.6 <u>Compensation and Expenses</u>. The Trustee (including the Person(s) serving as or comprising the Trustee) shall receive compensation for its services, to be paid out of the Administrative Funding, in accordance with <u>Annex C</u> hereto. In addition, the Trustee shall be entitled, with the consent of the Trust Advisory Board, and subject to the approval of the Title III Court, to reimburse itself from the Administrative Funding on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan so long as it falls within the amounts provided for in the budget; otherwise, approval of the Trust Advisory Board is required.

## ARTICLE VIII

## <u>SUCCESSOR TRUSTEE</u>

8.1 <u>Resignation</u>. The Trustee may resign from the Avoidance Actions Trust by giving at least sixty (60) days' prior written notice thereof to each member of the Trust Advisory Board. Such resignation shall become effective on the later to occur of (a) the date specified in such written notice and (b) the effective date of the appointment of a successor Trustee in accordance with <u>Section 8.4</u> hereof and such successor's acceptance of such appointment in accordance with <u>Section 8.5</u> hereof.

8.2 <u>Removal</u>. The Trustee may be removed by a majority vote of the members of the Trust Advisory Board. Such removal shall become effective on the date specified in such action by the Trust Advisory Board.

8.3 <u>Effect of Resignation or Removal</u>. The resignation, removal, incompetency, bankruptcy or insolvency of the Trustee shall not operate to terminate the Avoidance Actions Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by the Trustee. All fees and expenses properly incurred by the Trustee prior to the resignation, incompetency or removal of the Trustee shall be paid from the Avoidance Actions Trust Assets, unless such fees and expenses are disputed by (a) the Trust Advisory Board, or (b) the successor Trustee, in which case the Title III Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trustee that are subsequently allowed by the Title III Court shall be paid from the Avoidance Actions Trust

Assets. In the event of the resignation or removal of the Trustee, such Trustee shall: (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee or directed by the Title III Court to effect the termination of such Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Trustee all documents, instruments, records and other writings related to the Avoidance Actions Trust as may be in the possession of such Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

8.4    <u>Appointment of Successor</u>.  In the event of the death, resignation, removal, incompetency, bankruptcy or insolvency of the Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by the unanimous Trust Advisory Board; <u>provided</u>, <u>however</u>, that under no circumstance shall the successor Trustee be a director or officer of any Affiliate of the Avoidance Actions Trust.

8.5    <u>Acceptance of Appointment by Successor Trustee</u>.  Any successor Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Title III Court for filing and to the Trust Advisory Board and, in case of the Trustee's resignation, to the resigning Trustee. Thereupon, such successor Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Avoidance Actions Trust with like effect as if originally named Trustee. The resigning or removed Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such resigning or removed Trustee hereunder and shall, as directed by the Title III Court or reasonably requested by such successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Trustee.

## ARTICLE IX

## <u>MISCELLANEOUS PROVISIONS</u>

9.1    <u>Governing Law</u>.  This Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles of conflicts of laws; <u>provided</u>, <u>however</u>, that the authorization of this Trust Agreement by the Debtors shall be governed by the laws of the Commonwealth, and the Trust Advisory Board shall be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption, conflicts of interest, procurement, contracting, use of public funds, and public disclosure applicable to Commonwealth instrumentalities, and such provisions shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

9.2    <u>Jurisdiction</u>.  Subject to the proviso below, the parties agree that the Title III Court shall have exclusive jurisdiction over the Avoidance Actions Trust and the Trustee, including the administration and activities of the Avoidance Actions Trust and the Trustee, and, pursuant to the Plan, the Title III Court has retained such jurisdiction; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the Trustee shall have power and authority to bring any action in any court of competent jurisdiction (including the Title III Court) to prosecute any Claims or Causes of Action assigned to the Avoidance Actions Trust.

9.3    Severability.  If any provision of this Trust Agreement or the application thereof to any Person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

9.4    Notices.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, sent by facsimile transmission or e-mail, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(i)    if to the Trustee, to:

[●]

with a copy to:

[●]

(ii)    if to members of the Trust Advisory Board, then to each of;

[●]

[●]

[●]

(iii)    if to any Avoidance Actions Trust Beneficiary, to the last known address of such Avoidance Actions Trust Beneficiary according to the Debtors' Schedules, such Avoidance Actions Trust Beneficiary's proof of claim or the lists of record holders provided to the Trustee; and

(iv)    if to the FOMB

Financial Oversight and Management Board for Puerto Rico
268 Muñoz Rivera Ave,
Suite 1107 San Juan, PR 00918-1813
Attn: Natalie A. Jaresko, Executive Director

With a copy to:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq. Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

AND

O'Neill & Borges LLC
250 Muñoz Rivera Ave,
Suite 800
San Juan, PR 00918-1813
Attn: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944


(v)      if to each of the Debtors or the Post-Effective Date Debtors:


The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Executive Director


AND

The Employees Retirement System of the Government of the
Commonwealth of Puerto Rico
PO Box 42003
San Juan, PR 00940-2203
Attn: Executive Director

AND

The Puerto Rico Public Buildings Authority
PO Box 41029
San Juan, PR 00940-1029
Attn: Executive Director

With a copy to:

Proskauer Rose LLP
Eleven Times Square

New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
          Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

AND

Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Executive Director

With a copy to:

O'Melveny & Myers LLP
Seven Times Square
New York, NY 10036
Attn:   John Rapisardi, Esq.
          Peter Friedman, Esq.
          Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061

9.5     Deemed Delivery. All notices shall be effective and shall be deemed delivered: (a) if by personal delivery, delivery service or courier, on the date of delivery; (b) if by electronic mail or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (c) if by mail, on the date of receipt. Any Party from time to time may change its address, facsimile number or other information for the purpose of notices to that Party by giving notice specifying such change to the other Parties hereto.

9.6     Headings. The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

9.7     Actions Taken on a Date Other Than A Business Day. If any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

9.8     Relationship to the Plan. The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). Additionally, the Trustee and the Trust Advisory Board may seek any orders from the Title III Court, upon notice and a hearing in furtherance of implementation of the

Plan, the Confirmation Order and this Trust Agreement. However, to the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (a) *first*, this Trust Agreement; (b) *second*, the Confirmation Order; and (c) *third*, the Plan.

9.9     Entire Trust Agreement. This Trust Agreement (including the recitals and annexes hereto), the Plan and the Confirmation Order constitute the entire agreement and understanding by and among the parties and supersede all prior and contemporaneous agreements or understandings, statements, or exchanges by and among the parties or any other person with respect to the subject matter hereof.

9.10    Cooperation. Each of the Debtors and the FOMB shall turn over or otherwise make available to the Trustee at no cost to the Avoidance Actions Trust or the Trustee, all books and records (or copies thereof) and other information, in each as may be reasonably requested by the Trustee, including (a) all communications by and between the FOMB and its professionals and the Avoidance Action defendants, and (b) all data and documents the FOMB and its professionals have received from the Avoidance Action defendants through the "information exchange" process contemplated by the *Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee and the Official Committee of Unsecured Creditors to (i) Establish Litigation Case Management Procedures and (ii) Establish Procedures for Approval of Settlements* [Docket No. 7941].

The Debtors and the FOMB further agree to reasonably cooperate with the Trustee in carrying out its duties hereunder, including by, among other things: (i) delivering to the Trustee work product developed by their respective professionals in connection with the prosecution of the Avoidance Actions, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors', the FOMB's, books and records; (ii) following the Effective Date, participating in meetings with the Trustee, at the Trustee's reasonable request and at such times and upon such notice as does not unreasonably interfere with the operations of such party, for purposes of coordinating the transition of the Avoidance Actions Trust Assets; (iii) providing assistance in discovery responses and witness testimony as is reasonably necessary for the resolution of the Avoidance Actions; and (iv) maintaining all data rooms, hard drives and other media containing information and/or documents related to the Avoidance Actions, as reasonably requested by the Trustee, to facilitate access to such information and/or documents.

Notwithstanding the foregoing or anything else that may be to the contrary herein, the FOMB shall not be required to disclose any information or work product if the same constitutes or relates to communications between a committee of the FOMB and another part or a member of the FOMB; provided, however, that the FOMB shall provide to the Trustee the relevant portion of any memoranda or other documents containing research or analysis concerning legal or factual issues arising in the Avoidance Actions, regardless of whether such memoranda or other documents were shared between a committee of the FOMB and another part or a member of the FOMB.

9.11    Amendment and Waiver. Any provision of this Trust Agreement may be amended or waived by the Trustee with the unanimous consent of all voting members of the Trust Advisory

Board. Notwithstanding this <u>Section 9.9</u>, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the Avoidance Actions Trust to liquidate in an expeditious but orderly manner the Avoidance Actions Trust Assets in accordance with Treasury Regulations section 301.7701-4(d) and <u>Section 1.2</u>.

9.12    <u>Confidentiality</u>.    The Trust Parties and their advisors, including the Trust Professionals (each a "<u>Confidential Party</u>" and, collectively, the "<u>Confidential Parties</u>") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor or the FOMB to which any of the Avoidance Actions Trust Assets relates; <u>provided</u>, <u>however</u>, that such information may be disclosed if: (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process. including subpoena or other court order or other applicable laws or regulations. If any Confidential Party is requested to divulge confidential information pursuant to clause (b) above, such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trustee (or the Trust Advisory Board in case the Trustee is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee (or the Trust Advisory Board, as applicable) in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

9.13    <u>Rules of Construction</u>.  Except where the context otherwise may require, (a) words of any gender include the other gender, and (b) words importing the singular number shall include the plural number and *vice versa*. All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement. The terms "hereof", "hereto", "herein" and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement. The terms "include", "includes" and "including" shall be construed as if followed by the words "without limitation".

9.14    <u>Counterparts</u>.  This Trust Agreement may be executed with counterpart signature pages or in any number of counterparts, each of which counterparts shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument. A facsimile, portable document file (PDF) or other electronic transmission signature of any party shall be considered to have the same binding legal effect as an original signature.

9.15    <u>Intention of Parties to Establish Avoidance Actions Trust</u>. This Trust Agreement is intended to create a Avoidance Actions Trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

9.16    <u>Definitions</u>.

**"AAFAF"** shall have the meaning ascribed to such term in the Plan.

**"Administrative Funding"** shall have the meaning ascribed to such term in <u>Section 1.3</u> hereof.

**"ADR Procedures"** shall have the meaning ascribed to such term in the Plan.

**"Allowed Claim"** shall have the meaning ascribed to such term in the Plan.

**"Avoidance Actions Trust"** shall have the meaning ascribed to such term in the Recitals.

**"Avoidance Actions Trust Assets"** shall have the meaning ascribed to such term in the Plan and, for the avoidance of doubt, shall include the account an Banco Popular with account number [INSERT NUMBER].

**"Avoidance Actions Trust Beneficiaries"** shall have the meaning ascribed to such term in the Plan.

**"Avoidance Actions Trust Interests"** shall have the meaning ascribed to such term in the Plan.

**"Bankruptcy Code"** shall have the meaning ascribed to such term in the Plan.

**"Bankruptcy Rules"** shall have the meaning ascribed to such term in the Plan.

**"Book Entry System"** shall have the meaning ascribed to such term in <u>Section 2.3</u> hereof.

**"Budget"** shall have the meaning ascribed to such term in <u>Section 4.12</u> hereof.

**"Business Day"** shall have the meaning ascribed to such term in the Plan.

**"Cash"** shall have the meaning ascribed to such term in the Plan.

**"Commonwealth"** shall have the meaning ascribed to such term in the Recitals.

**"Confidential Party"** shall have the meaning ascribed to such term in <u>Section 9.10</u> hereof.

**"Confidential Parties"** shall have the meaning ascribed to such term in <u>Section 9.10</u> hereof.

**"Confirmation Hearing"** shall have the meaning ascribed to such term in the Plan.

**"Confirmation Order"** shall have the meaning ascribed to such term in the Background.

**"Creditors' Committee"** shall have the meaning ascribed to such term in the Plan.

**"Creditor Directors"** shall have the meaning ascribed to such term in <u>Section 6.4</u> hereof.

**"CW General Unsecured Claim"** shall have the meaning ascribed to such term in the Plan.

**"Debtors"** shall have the meaning ascribed to such term in the Recitals.

**"Disbursing Agent"** shall have the meaning ascribed to such term in the Plan.

**"Disclosure Statement"** shall have the meaning ascribed to such term in the Background.

**"Dispute Resolution"** shall have the meaning ascribed to such term in <u>Section 2.1</u> hereof.

**"Disputed Claim"** shall have the meaning ascribed to such term in the Plan but shall include, in the period prior to the Debtors' deadline to object to claims, all Claims that have not been Allowed.

**"Distribution Date"** shall have the meaning ascribed to such term in <u>Section 4.2</u> hereof.

**"Effective Date"** shall have the meaning ascribed to such term in the Plan.

**"Eminent Domain Claim"** shall have the meaning ascribed to such term in the Plan.

**"ERS"** shall have the meaning ascribed to such term in the Recitals.

**"ERS General Unsecured Claim"** shall have the meaning ascribed to such term in the Plan.

**"Exchange Act"** shall have the meaning ascribed to such term in <u>Section 2.4</u> hereof.

**"Final Order"** shall have the meaning ascribed to such term in the Plan.

**"FOMB"** shall have the meaning ascribed to such term in the Recitals.

**"General Unsecured Claims"** shall have the meaning ascribed to such term in the Plan.

**"Holder"** shall have the meaning ascribed to such term in <u>Section 2.3</u> hereof.

**"Indemnified Party"** shall have the meaning ascribed to such term in <u>Section 7.5</u> hereof.

**"IRC"** shall have the meaning ascribed to such term in the Background.

**"IRS"** shall have the meaning ascribed to such term in the Plan.

**"OB Director"** shall have the meaning ascribed to such term in <u>Section 6.4</u> hereof.

**"PBA"** shall have the meaning ascribed to such term in the Recitals.

**"Permissible Investments"** shall have the meaning ascribed to such term in <u>Section 6.8</u> hereof.

**"Person"** shall have the meaning ascribed to such term in the Plan.

**"Plan"** shall have the meaning ascribed to such term in the Recitals.

**"Privileges"** shall have the meaning ascribed to such term in <u>Section 1.10</u> hereof.

33

**"PROMESA"** shall have the meaning ascribed to such term in the Background.

**"Reorganized Debtors"** shall have the meaning ascribed to such term in the Plan.

**"SEC"** shall have the meaning ascribed to such term in <u>Section 2.4(c)</u> hereof.

**"Title III Cases"** shall have the meaning ascribed to such term in the Background.

**"Title III Court"** shall have the meaning ascribed to such term in the Plan.

**"Treasury Regulations"** shall have the meaning ascribed to such term in the Background.

**"Trust Advisory Board"** shall have the meaning ascribed to such term in <u>Section 6.4</u> hereof.

**"Trust Agreement"** shall have the meaning ascribed to such term in the Recitals.

**"Trust Professionals"** shall have the meaning ascribed to such term in <u>Section 6.7</u> hereof.

**"Trustee"** shall have the meaning ascribed to such term in the Recitals.

[Remainder of Page Blank — Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

**THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: _____
     Name:  Natalie Jaresko
     Title:   Executive Director

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: _____
     Name:  Natalie Jaresko
     Title:   Executive Director

**PUERTO RICO PUBLIC BUILDINGS AUTHORITY**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: _____
     Name:  Natalie Jaresko
     Title:   Executive Director

**And, solely with respect to Sections 1.3 and 9.10 hereof,**

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**

By: _____
     Name:  Natalie Jaresko
     Title:   Executive Director

[TRUSTEE]

By: _____
     Name:
     Title:    [Trustee [Title within Institution]]

**Annex A**

<u>Initial Trust Advisory Board Members</u>

*Creditor Directors*:

1.      [●]
2.      [●]

*OB Director*:

3.      [●]

**Annex B**

Compensation of Trust Advisory Board

**Annex C**

Trustee Compensation[1]

---

[1] <u>Note</u>  The Plan specifies that "The individual(s) serving as or comprising the Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the Title III Court."

**EXHIBIT D**

ERS Trust Agreement

## ERS TRUST AGREEMENT

**ERS TRUST AGREEMENT**, dated as of [●], 2021 (this "Trust Agreement"), between the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole representative of the Commonwealth of Puerto Rico (the "Commonwealth"), and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico in the Title III Cases ("ERS" and together with the Commonwealth, the "Debtors"), and [●], as trustee (together with any successor or additional trustee appointed under the terms hereof, including qualifying as such pursuant to Section 2.4 or Article X hereof, the "Trustee") of the ERS Trust (the "ERS Trust"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated July 30, 2021, including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time (the "Plan") and the ERS Stipulation.

## RECITALS

A.    On June 30, 2016, the President of the United States signed into law legislation passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101 *et seq.*

B.    The Oversight Board commenced cases pursuant to Title III of PROMESA for the Commonwealth and ERS on May 3, 2017 and May 21, 2017, respectively, (the "Title III Cases") by filing petitions with the United States District Court for the District of Puerto Rico (the "Title III Court").

C.    On April 2, 2021, the Debtors and certain ERS bondholders filed with the Title III Court an Amended and Restated Stipulation (A) Allowing Claims of such ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of such ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment (the "ERS Stipulation").

D.    On July 30, 2021, the Commonwealth filed the Plan and the disclosure statement relating to the Plan with the Title III Court.

E.    On [●], 2021, the Title III Court entered an order confirming the Plan (the "Confirmation Order").

F.    Since April 2, 2021, monies totaling [●] have been distributed to ERS in connection with ERS's investment in the ERS private equity portfolio, and deposited into a segregated account established by the ERS that shall be used solely for the purposes set forth in the Plan, the ERS Stipulation and this Trust Agreement (the "Segregated Account").

G.    The Plan and the ERS Stipulation provide for the creation of an ERS Trust to hold the ERS's interests in the ERS private equity portfolio and pursuant to which ERS shall continue to manage such assets up to and including the purchase thereof in accordance with the terms and provisions of the Plan.

H.    The ERS Trust will be organized for the sole purpose of holding the ERS's interests

in the ERS Private Equity Portfolio up to and including the purchase thereof, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the ERS Trust.

I.       The Trustee shall have all powers necessary to implement the provisions of this Trust Agreement and administer the ERS Trust, including the power to: (i) prosecute for the benefit of the ERS Trust Beneficiaries through Trust Professionals any causes of action that may from time to time be held by the ERS Trust; (ii) preserve, maintain and liquidate the ERS Private Equity Portfolio; (iii) distribute the ERS Trust proceeds to the ERS Trust Beneficiaries; and (iv) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order or in any other agreement executed pursuant to the Plan, in each case subject to the provisions of <u>Article VIII</u> hereof regarding limitation on the Trustee and the Title III Court as provided for herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Debtors and the Trustee agree as follows:

**AGREEMENT**

**ARTICLE I**

**<u>DEFINITIONS</u>**

1.1     <u>Recitals</u>. The recitals set forth above are unincorporated by reference and are explicitly made a part of this Trust Agreement.

1.2     <u>Definitions</u>. The following definitions shall apply to and constitute part of this Trust Agreement and all schedules, exhibits and annexes hereto.

"**Administrative Funding**" shall mean funds set aside from the Segregated Account reasonably determined by the Debtors prior to the Effective Date to be necessary to fund the activities of the ERS Trust, which amount shall be Fifty Thousand Dollars ($50,000).

"**Allowed ERS Bond Claims**" shall mean Claims arising from or related to the ERS Bonds that are or have become allowed by the Title III Court.

"**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as applicable to the Title III Cases.

"**Beneficiary Closing Date**" shall mean April 20, 2023.

"**Beneficiary Election**" shall mean the option of each ERS Trust Beneficiary to purchase the ERS Private Equity Portfolio and the ERS Trust Interests in accordance with the terms of the Plan.

2

"**Beneficiary Election Purchase Price**" shall mean (a) Seventy Million Seven Hundred Fifty Dollars ($70,750,000.00) <u>plus</u> (b) such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchases thereof pursuant to the Beneficiary Election that have not been previously reimbursed to the Commonwealth.

"**Book Entry System**" shall mean an electronic book-entry system maintained either by the ERS Trust or an agent of the ERS Trust for the purpose of recording the ownership of ERS Trust Interests.

"**Business Day**" shall mean a day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required to close by law or executive order.

"**Cash**" shall mean lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

"**Claims**" shall mean any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

"**Commonwealth**" shall mean the Commonwealth of Puerto Rico.

"**Commonwealth Election**" shall mean the right of the Commonwealth to purchase the ERS Private Equity Portfolio in accordance with the terms and provisions of the Plan and <u>Section 4.1</u> hereof.

"**Commonwealth Mandatory Closing Date**" shall mean a date no later than April 25, 2023.

"**Commonwealth Option Closing Date**" shall mean April 25, 2023.

"**Confidential Party**" shall mean each of the Trustee and its employees, members, agents, professionals and advisors, including the Trust Professionals.

"**Debtors**" shall mean, collectively, the Commonwealth of Puerto Rico in the Title III cases, and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

"**Disclosure Statement**" shall mean that certain disclosure statement relating to the Plan filed by the Commonwealth, dated July 30, 2021.

"**Dispute Resolution**" shall mean, in connection with any conflicting claims or demands made or asserted with respect to an ERS Trust Interest, either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the ERS Trust and the Trustee.

"**Effective Date**" shall mean the first (1st) Business Day on which (i) all the conditions precedent to confirmation of the Plan specified in Section 85.1 of the Plan shall have been satisfied or waived, as provided in Section 85.2 of the Plan, and (ii) all the conditions precedent to the substantial consummation of the Plan and occurrence of the Effective Date specified in Section 86.1 of the Plan shall have been satisfied or waived as provided in Section 86.2 of the Plan.

"**Encumbrances**" shall mean interests that (i) are not free and clear of any and all mortgages or (ii) have pledges, security interests, options, rights of first offer, unmet capital calls, encumbrances or other restrictions or limitations of any nature whatsoever.

"**Entity**" shall mean A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

"**ERS Bondholders**" shall mean, collectively, holders of ERS Bonds as of the Effective Date.

"**ERS Bonds**" shall mean, collectively, (a) the non-recourse Senior Pension Funding Bonds, Series A, issued by ERS in the original principal amount of One Billion Five Hundred Eighty-Eight Million Eight Hundred Ten Thousand Seven Hundred Ninety-Nine Dollars and Sixty Cents ($1,588,810,799.60), (b) the non-recourse Senior Pension Funding Bonds, Series B, issued by ERS in the original principal amount of One Billion Fifty-Eight Million Six Hundred Thirty-Four Thousand Six Hundred Thirteen Dollars and Five Cents ($1,058,634,613.05) and (c) the non-recourse Senior Pension Funding Bonds, Series C, issued by ERS in the original principal amount of Three Hundred Million Two Hundred Two Thousand Nine Hundred Thirty Dollars ($300,202,930.00), which, as of the ERS Petition Date, inclusive of compounded amounts, were in the aggregate outstanding principal amount of Three Billion One Hundred Sixty-Eight Million Six Hundred Ninety-Eight Thousand Seven Hundred Seventy-Six Dollars and Fifty-Five Cents ($3,168,698,776.55).

"**ERS Portfolio Price**" shall mean Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

"**ERS Private Equity Portfolio**" shall mean, collectively, the portfolio of private equity interests held by ERS as of the Effective Date.

"**ERS Trust Assets**" shall mean the ERS Private Equity Portfolio, the Segregated Account, and such other property held from time to time by the ERS Trust pursuant to this Trust Agreement and any earnings, including interest, on any of the foregoing.

"**ERS Trust Beneficiaries**" shall mean, collectively, the holders of Allowed ERS Bond Claims.

4

"**ERS Trust Interest**" shall mean an interest in the ERS Trust allocated to each ERS Trust Beneficiary in an amount equal to such beneficiary's pro rata share of the Allowed ERS Bond Claims as of the Effective Date.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Final Order**" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

"**holder**" shall mean an ERS Trust Beneficiary that is "holder of record" of such ERS Trust Beneficiary's ERS Trust Interest.

"**Indemnified Party**" shall mean the Trustee or the Person(s) comprising the Trustee, as the case may be, and their respective employees, agents and professionals.

"**IRC**" shall means The United States Internal Revenue Code of 1986, as amended from time to time.

"**IRS**" shall mean the Internal Revenue Service, an agency of the United States Department of Treasury.

"**Net Allowed ERS Bond Claims**" shall mean collectively, (a) Allowed ERS Bond Claims minus (b) the amount of adequate protection payments received by a holder of such Allowed ERS Bond Claims from and after the ERS Petition Date, calculated on a CUSIP-by-CUSIP basis.

"**Permissible Investments**" shall mean, collectively, (i) short-term direct obligations of, or obligations guaranteed by, the United States of America or (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof.

"**Person**" shall mean an individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political

5

subdivision thereof, or any other form of legal entity.

"**Privileges**" shall mean all attorney-client privileges, work product protections, and other immunities or protections from disclosure held by the Debtors.

"**Reorganized Debtor**" shall mean the Debtors, from and after the Effective Date.

"**SEC**" shall mean the Securities and Exchange Commission.

"**Title III**" shall mean Title III of PROMESA.

"**Trust Professionals**" shall mean employees, officers and independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Trustee to have qualifications necessary or desirable to assist in the proper administration of the ERS Trust.

## ARTICLE II

## DECLARATION OF TRUST

2.1    Creation of Trust.  The Debtors and the Trustee, pursuant to the Plan and the Confirmation Order, hereby constitute and create the ERS Trust, which shall bear the name "ERS Trust."  In connection with the exercise of the Trustee's power hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit.

2.2    Purpose of ERS Trust.  The sole purpose of the ERS Trust is to implement the Plan and the ERS Stipulation on behalf, and for the benefit, of the holders of Allowed ERS Bond Claims, and to serve as a mechanism for ERS converting to cash and distributing the ERS Private Equity Portfolio, or interest therein, in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the ERS purpose of the ERS Trust.

2.3    Transfer of ERS Private Equity Portfolio.

(a)    On the Effective Date, and in accordance with the Plan, the ERS Stipulation, and the Confirmation Order, ERS shall transfer to the ERS Trust, for the sole benefit of the ERS Trust Beneficiaries, the ERS Private Equity Portfolio, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the Plan, the ERS Stipulation, the Confirmation Order and this Trust Agreement.

(b)    Prior to the Effective Date, ERS shall not transfer or liquidate the ERS Private Equity Portfolio; provided, however, that assets within the ERS Private Equity Portfolio may be liquidated in the ordinary course pursuant to applicable terms and conditions of the respective underlying agreements, with the proceeds thereof being deposited into the Segregated Account.

(c)     On the Effective Date, the Administrative Funding shall be set aside from the Segregated Account.  If there is insufficient cash in the Segregated Account necessary to satisfy the Administrative Funding on the Effective Date, the Commonwealth shall fund any cash shortfalls; provided, however, that, upon sufficient cash existing in the Segregated Account, including, without limitation, up to and including the Commonwealth Option Closing Date, the Beneficiary Closing Date or the Commonwealth Mandatory Closing Date, as applicable, the Trustee shall cause monies to be paid from the Segregated Account to reimburse the Commonwealth for such funded shortfall amounts. Under no circumstances shall the Trustee use any amounts of the Administrative Funding to settle capital calls associated with the ERS Private Equity Portfolio.

(d)     The transfer of the ERS Private Equity Portfolio shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

(e)     Any quarterly cash distributions or other proceeds from the ERS Private Equity Portfolio shall be deposited into the Segregated Account.  If there is insufficient cash in the Segregated Account from distributions made from the ERS Private Equity Portfolio necessary to satisfy any capital commitments with respect thereto, from and after the Effective Date, the Commonwealth shall fund any cash shortfalls; provided, however, that, upon sufficient cash existing in the Segregated Account, including, without limitation, up to and including the Commonwealth Option Closing Date, the Beneficiary Closing Date or the Commonwealth Mandatory Closing Date, as applicable, ERS shall cause monies to be paid from the Segregated Account to reimburse the Commonwealth for such funded shortfall amounts.

(f)     Upon delivery of the ERS Private Equity Portfolio to the ERS Trust, the Debtors shall be discharged and deemed released from all liability with respect to the delivery of such distributions, and exculpated for any and all claims and causes of action asserted with the ERS Private Equity Portfolio during the period up to and including delivery thereof into the ERS Trust.

(g)     The ERS Private Equity Portfolio and all other property held from time to time by the ERS Trust pursuant to this Trust Agreement and any earnings, including interest, on any of the foregoing shall be applied by the Trustee in accordance with the terms hereof, the Plan, the ERS Stipulation, and the Confirmation Order for the benefit of the ERS Trust Beneficiaries, and for no other party, subject to the further covenants, conditions and terms hereinafter set forth.

2.4     Appointment and Acceptance of Trustee.  As set forth in the Confirmation Order, the Debtors hereby designate [●] to serve as the initial Trustee of the ERS Trust.  The Trustee hereby accepts the ERS Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery to the Trustee, on behalf, and for the benefit, of the ERS Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the ERS Trust Assets, upon the terms and subject to conditions set forth herein, in the Plan, the ERS Stipulation, and in the Confirmation Order.  The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the ERS Trust and not otherwise.  The Trustee shall have the authority to bind the ERS Trust within the limitations set forth herein, but shall for all purposes hereunder be acting solely in the capacity as Trustee, and not individually.

2.5     No Reversion to Debtors. In no event shall any part of the ERS Trust Assets revert to or be distributed to any Debtor or Reorganized Debtor, except pursuant to the sale of the ERS Private Equity Portfolio as provided in Article IV hereof.

2.6     Incidents of Ownership. Except as provided in the Plan, the Confirmation Order, and/or the ERS Stipulation, the ERS Trust Beneficiaries shall be the sole beneficiaries of the ERS Trust and the ERS Trust Assets, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in Section 8.2 hereof.

2.7     Privileges and Obligation to Respond to Ongoing Investigations.

(a)     All attorney-client privileges, work product protections, and other immunities or protections from disclosure held by the Debtors shall be transferred, assigned, and delivered to the ERS Trust, without waiver, and shall vest in the Trustee solely in its capacity as such (and any other Person whom the Trustee may designate, as well as any other Person designated in this Trust Agreement).

(b)     Pursuant to Federal Rule of Evidence 502(d) (to the extent Rule 502(d) is relevant, notwithstanding the fact that the Debtors and the Trustee are joint holders of certain attorney-client privileges, work product protections or other immunities or protections from disclosure), no Privileges shall be waived by disclosure between or to the Trustee of the Debtors' information subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure, or by disclosure among the Debtors and the Trustee that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the Debtors and the Trustee. The Trustee shall be obligated to respond, on behalf of the Debtors, to all information demands with respect to the ERS Private Equity Portfolio and the ownership thereof from and after the Effective Date. The Trustee may waive Privileges that are held solely by the Debtors and/or the ERS Trust in the event and to the extent the Trustee determines in good faith that doing so is in the best interests of the ERS Trust and its beneficiaries.

(c)     The Trustee may disclose information that is subject to attorney-client privileges, work product protections, or other immunities only (i) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies, or (ii) as otherwise required by law, subject to the procedure described in the next sentence insofar as it applies. If the Trustee receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Trustee, the Trustee will (A) pursue all reasonable steps to maintain the applicable privileges, protections or immunities from disclosure, including, if necessary, to maintain the privileges, protections or immunities from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, and (B) unless required by law, not disclose the materials in question unless and until any objection raised by the Trustee is resolved in favor of disclosure.

## ARTICLE III

## ERS TRUST BENEFICIARIES

3.1 <u>Conflicting Claims</u>. If any conflicting claims or demands are made or asserted with respect to an ERS Trust Interest, the Trustee shall be entitled, in its sole and absolute discretion, to refuse to comply with any such conflicting claims or demands. In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the ERS Trust Interest subject to the claims or demands involved, or any part thereof, and the Trustee shall refer such conflicting claims or demands to the Title III Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands or such other court of competent jurisdiction. In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands. The Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the ERS Trust and the Trustee. Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, if any, together with any interest thereon to be paid in accordance with <u>Section 6.6</u> hereof, in accordance with the terms of such Dispute Resolution. Any payment of any interest or income should be net of any taxes attributable thereto in accordance with <u>Section 7.3</u> hereof.

3.2 <u>Rights of ERS Trust Beneficiaries</u>. Each ERS Trust Beneficiary shall be entitled to participate in the rights and benefits due to an ERS Trust Beneficiary hereunder according to the terms of its ERS Trust Interest. The interest of an ERS Trust Beneficiary is hereby declared and shall be in all respects personal property. Except as expressly provided hereunder, an ERS Trust Beneficiary shall have no title to, right to, possession of, management of or control of the ERS Trust or the ERS Private Equity Portfolio or to any right to call for a partition or division of such assets or to require an accounting.

3.3 <u>Evidence of ERS Trust Interest</u>. Ownership of an ERS Trust Interest will be evidenced by the recording of such ownership in the Book Entry System. An ERS Trust Beneficiary shall be deemed the "holder of record" of such ERS Trust Beneficiary's ERS Trust Interest for purposes of all applicable United States federal and state laws, rules and regulations, including all applicable Commonwealth laws, rules and regulations. The Trustee shall, upon the written request of a holder of an ERS Trust Interest, provide reasonably adequate documentary evidence of such holder's ERS Trust Interest, as indicated in the Book Entry System. The expense of providing such documentation shall be borne by the requesting holder.

3.4 <u>Transfers of ERS Trust Interests</u>.

(a) <u>General</u>. ERS Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

(b) <u>Book Entry System</u>. Pursuant to the Book Entry System, the ERS Trust shall maintain, or cause the agent of the ERS Trust to maintain, a register (which may be electronic) setting forth the names and addresses of the ERS Trust Beneficiaries, and the amount and class of

their ERS Trust Interests from time to time. Any transfer or assignment of an ERS Trust Interest by operation of law shall not be effective unless and until such transfer or assignment is recorded in the Book Entry System, which shall be completed as soon as practicable. Subject to <u>Section 3.4(d)</u> hereof, the entries in the Book Entry System shall be conclusive absent manifest error, and the ERS Trust and the Trustee shall treat each person whose name is recorded in the Book Entry System pursuant to the terms hereof as the owner of ERS Trust Interests indicated therein for all purposes of this Trust Agreement, notwithstanding notice to the contrary.

(c) <u>Registration</u>. If the Trustee, upon advice of counsel, determines that any ERS Trust Interests may be subject to registration pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, the Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to Section 12 of such statute (it being understood and agreed that the Trustee shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such class). To the extent that any Administrative Funding is available, any expenses that are associated with such application for relief and/or registration shall first be deducted from the Administrative Funding.

(d) <u>Further Limitations on Transfer</u>. Notwithstanding any other provision to the contrary, the Trustee may disregard any purported transfer or assignment of ERS Trust Interests by operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

3.5 <u>Limited Liability</u>. No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any ERS Trust Beneficiary, shall give rise to any liability of such ERS Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person, except to the extent of the ERS Trust Beneficiary's fraud, gross negligence, or willful misconduct. ERS Trust Beneficiaries are deemed to receive the ERS Private Equity Portfolio in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order in exchange for their Allowed Claims without further obligation or liability of any kind (except to the extent of the ERS Trust Beneficiary's fraud, gross negligence, or willful misconduct), but subject to the provisions of this Trust Agreement.

**ARTICLE IV**

**PURCHASE OF ERS PRIVATE EQUITY PORTFOLIO**

4.1 <u>Commonwealth Option to Purchase ERS Private Equity Portfolio</u>. From the Effective Date up to and including April 10, 2023, the Commonwealth shall have the right, but not the obligation, to purchase the ERS Private Equity Portfolio in accordance with the following provisions:

(a) <u>Purchase Price</u>. If the Commonwealth elects to purchase the ERS Private Equity Portfolio, the Commonwealth shall pay the ERS Portfolio Price, less such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts related to the ERS Trust during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Commonwealth Election that have not been previously reimbursed.

(b) <u>Notice</u>. If the Commonwealth elects to purchase the ERS Private Equity Portfolio pursuant to <u>Section 4.1</u> hereof, the Commonwealth shall provide written, unconditional, and irrevocable notice thereof to holders of Allowed ERS Bond Claims on or prior April 10, 2023.

(c) <u>Closing</u>. Purchase of the ERS Private Equity Portfolio pursuant to the Commonwealth Election shall close on or prior to the Commonwealth Option Closing Date and the Commonwealth shall pay the ERS Portfolio Price by wire transfer of immediately available funds to the Trustee on the Commonwealth Option Closing Date. At the closing of any purchase consummated pursuant to the Commonwealth Election, the Trustee shall deliver to the Commonwealth a certificate or certificates (or other appropriate instruments of transfer) representing the ERS Private Equity Portfolio, accompanied by all necessary stock transfer taxes paid and stamps affixed, if necessary, against receipt of the ERS Portfolio Price.

(d) <u>Closing Representations and Warranties</u>. At the closing of any purchase consummated pursuant to the Commonwealth Election, the ERS Trust shall represent and warrant to the Commonwealth that:

  (i) the ERS Trust has good and valid title to the ERS Private Equity Portfolio;

  (ii) the ERS Trust has all the necessary power and authority and has taken all necessary action to sell the ERS Private Equity Portfolio as contemplated by this <u>Section 4.1</u>; and

  (iii) the ERS Private Equity Portfolio interests are free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, unmet capital calls, encumbrances or other restrictions or limitations of any nature whatsoever, other than (A) Encumbrances arising under the securities laws, (B) Encumbrances arising under the constitutional documents of the Persons to which the ERS Private Equity Portfolio interests relate, including partnership agreements, limited liability corporation agreements, shareholder agreements, charters and bylaws, and other similar documents, agreements and instruments, and (C) Encumbrances created by, through, or under the Commonwealth.

(e) <u>Cooperation</u>. The Trustee shall take all actions as may be reasonably necessary to consummate the Commonwealth Election contemplated by this <u>Section 4.1</u>, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(f) <u>Distribution</u>. Upon consummation, the Trustee shall distribute the proceeds from the Commonwealth Election, without setoff or deduction for taxes, to the ERS Trust Beneficiaries pro rata in accordance with their respective beneficial interests in the ERS Trust; <u>provided</u>, <u>however</u>, that, for purposes of distribution, calculations shall be based upon the amount of

Net Allowed ERS Bond Claims after deduction of amounts as may be permitted to pay back the Commonwealth.

4.2    <u>ERS Trust Beneficiary</u> <u>Option to Purchase ERS Private Equity Portfolio.</u>  If the Commonwealth declines to exercise the Commonwealth Election option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, each ERS Trust Beneficiary shall have the option, but not the obligation, to exercise the Beneficiary Election in accordance with the following provisions:

(a)    <u>Purchase Price</u>.  The ERS Trust Beneficiaries that exercise the Beneficiary Election shall pay the Beneficiary Election Purchase Price.  The Trustee shall notify each ERS Trust Beneficiary that determines to exercise the Beneficiary Election of the full Beneficiary Election Purchase Price promptly following such ERS Trust Beneficiary's notice of Beneficiary Election, as provided in this <u>Section 4.2</u>.

(b)    <u>Notice</u>.  If one or more ERS Trust Beneficiaries determines to exercise the Beneficiary Election, the Trustee shall provide written, unconditional, and irrevocable notice thereof to the other ERS Trust Beneficiaries on or prior April 15, 2023.

(c)    <u>Closing</u>.  If more than one ERS Trust Beneficiary determines to exercise the Beneficiary Election, the purchasing ERS Trust Beneficiaries shall pay Beneficiary Election Purchase Price on a pro rata basis based upon the amount of such ERS Trust Beneficiaries' respective Allowed ERS Bond Claims, no later than the Beneficiary Closing Date.  The purchasing ERS Trust Beneficiaries shall pay the Beneficiary Election Purchase Price by wire transfer of immediately available funds to the Trustee on the Beneficiary Closing Date.  At the closing of any purchase consummated pursuant to the Beneficiary Election, the Trustee shall deliver to the purchasing ERS Trust Beneficiaries a certificate or certificates (or other appropriate instruments of transfer) representing the ERS Private Equity Portfolio, accompanied by all necessary stock transfer taxes paid and stamps affixed, if necessary, against receipt of the Beneficiary Election Purchase Price.

(d)    <u>Closing Representations and Warranties</u>.  At the closing of any purchase consummated pursuant to the Beneficiary Election, the ERS Trust shall represent and warrant to each purchasing ERS Trust Beneficiary that:

(i)    the ERS Trust has good and valid title to the ERS Private Equity Portfolio;

(ii)    the ERS Trust has all the necessary power and authority and has taken all necessary action to sell the ERS Trust Interests as contemplated by this <u>Section 4.2</u>; and

(iii)    the ERS Private Equity Portfolio and the ERS Trust Interests are free and clear of any and all Encumbrances, other than (A) Encumbrances arising under the arising under securities laws, (B) Encumbrances arising under the constitutional documents of the Persons to which the ERS Private Equity Portfolio and the ERS Trust Interests relate, including partnership agreements, limited liability corporation agreements, shareholder agreements, charters and bylaws, and other similar documents, agreements

12

and instruments, and (C) Encumbrances created by, through, or under the Commonwealth.

(e)     Cooperation.  The Trustee shall take all actions as may be reasonably necessary to consummate the Beneficiary Election contemplated by this Section 4.2, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(f)     Distribution.  The Trustee shall distribute proceeds from the Beneficiary Election, net of the amounts necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Trust that have not been previously reimbursed to the Commonwealth, and without setoff or deduction for taxes, to the ERS Trust Beneficiaries pro rata in accordance with their respective beneficial interests in the ERS Trust; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.

4.3     Commonwealth Obligation to Purchase.  If neither the Commonwealth Election nor the Beneficiary Election is exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price, less such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts related to the ERS Trust during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Commonwealth Election that have not been previously reimbursed to the Commonwealth, in accordance with the following provisions:

(a)     Notice.  The Trustee will deliver notice to the Commonwealth of its obligation to purchase the ERS Private Equity Portfolio no later than [April 24,] 2023.  When providing such notice, the Trustee, on behalf of the ERS Trust, shall represent and warrant that:

(i)     the ERS Trust has good and valid title to the ERS Private Equity Portfolio;

(ii)    the ERS Trust has all the necessary power and authority and has taken all necessary action to sell the ERS Private Equity Portfolio as contemplated by this Section 4.3; and

(iii)   the ERS Private Equity Portfolio interests are free and clear of any and all Encumbrances other than (A) Encumbrances arising under the arising under securities laws, (B) Encumbrances arising under the constitutional documents of the Persons to which the ERS Private Equity Portfolio interests relate, including partnership agreements, limited liability corporation agreements, shareholder agreements, charters and bylaws, and other similar documents, agreements and instruments, and (C) Encumbrances created by, through, or under the Commonwealth.

(b)     Closing.  Purchase of the ERS Private Equity Portfolio pursuant to this Section 4.3 will close on a date no later than the Commonwealth Mandatory Closing Date.  The Commonwealth shall pay the ERS Portfolio Price by wire transfer of immediately available funds to the Trustee on the Commonwealth Mandatory Closing Date.  At the closing of any purchase consummated pursuant to the Commonwealth Mandatory Election, the Trustee shall deliver to the

13

Commonwealth a certificate or certificates (or other appropriate instruments of transfer) representing the ERS Private Equity Portfolio, accompanied by all necessary stock transfer taxes paid and stamps affixed, if necessary, against receipt of the ERS Portfolio Price.

(c) <u>Cooperation</u>. The Trustee shall take all actions as may be reasonably necessary to consummate the purchase of the ERS Private Equity Portfolio contemplated by this <u>Section 4.3</u>, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(d) <u>Distribution.</u>  The Trustee shall distribute the proceeds from the Commonwealth Mandatory Election, without setoff or deduction for taxes, to the ERS Trust Beneficiaries pro rata in accordance with their respective beneficial interests in the ERS Trust; <u>provided</u>, <u>however</u>, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.

## ARTICLE V

## <u>DURATION AND TERMINATION OF ERS TRUST</u>

5.1 <u>Duration</u>.  The ERS Trust shall become effective upon the Effective Date of the Plan and shall remain and continue in full force and effect until dissolved.

5.2 <u>Dissolution of the ERS Trust</u>.  The Trustee and the ERS Trust shall be discharged or dissolved, as the case may be, when all distributions required to be made by the Trustee under the Plan and this Trust Agreement have been made.

5.3 <u>Continuance of ERS Trust for Winding Up</u>.  After the dissolution of the ERS Trust and solely for the purpose of the ERS and winding up the affairs of the ERS Trust, the Trustee shall continue to act as such until its duties have been fully performed.  Upon purchase of the ERS Private Equity Portfolio as provided in <u>Article IV</u> hereof, the Trustee shall retain the books, records and files that shall have been delivered to or created by the Trustee.  At the Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six (6) years after the final distribution of proceeds from the sale of the ERS Private Equity Portfolio or the ERS Trust Interests, as the case may be, subject to any joint prosecution and common interests agreement(s) to which the Trustee may be party.

## ARTICLE VI

## <u>ADMINISTRATION OF ERS TRUST</u>

6.1 <u>Payment of Expenses and Liabilities</u>.  Except as otherwise provided herein, the Trustee shall use the Administrative Funding (i) to pay reasonable costs and expenses of the ERS Trust that are incurred (including any Taxes imposed on the ERS Trust, the actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and sale of the ERS Private Equity Portfolio, as provided in <u>Section 8.5</u> hereof, and the preservation of books and records of the ERS Trust), (ii) to satisfy other obligations or other liabilities incurred or assumed by the ERS Trust (or to which the ERS Private Equity Portfolio are otherwise subject) in accordance with the Plan, the ERS Stipulation, the Confirmation Order or

this Trust Agreement, including fees and costs incurred in connection with the protection, preservation, sale and distribution of the ERS Private Equity Portfolio and the costs of investigating, prosecuting, resolving and/or settling any Claims, (iii) as reasonably necessary to meet contingent liabilities and to maintain the value of the ERS Private Equity Portfolio during liquidation, and (iv) to satisfy any other obligations of the ERS Trust expressly set forth in the Plan, the ERS Stipulation, this Trust Agreement, and the Confirmation Order. Under no circumstances shall the Trustee use any amounts of the Administrative Funding to settle capital calls associated with the ERS Private Equity Portfolio.

6.2 <u>Distributions</u>.

(a) <u>Payment of Distributions</u>. The Trustee shall distribute the proceeds from the sale of the ERS Private Equity Portfolio or ERS Trust Interests, as the case may be, arising from the Commonwealth Election, the Beneficiary Election, or the Commonwealth's mandatory purchase in accordance with <u>Article IV</u> hereof to the ERS Trust Beneficiaries (or their designees), without set off or deduction for taxes; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims. Each ERS Trust Beneficiary's share of the ERS Trust Interests as determined pursuant to the Plan (including any Cash to be received on account of any ERS Trust Interests) shall be allocated and distributed in accordance with the terms and provisions of Article LXIX of the Plan.

(b) <u>De Minimis Distributions</u>. No Cash payment shall be made to any holder of a ERS Trust Interest until such time, if ever, as the amount payable thereto, in any distribution from the ERS Trust, is equal to or greater than Ten Dollars ($10.00). Any holder of an ERS Trust Interest on account of which the amount of Cash to be distributed pursuant to any distribution from the ERS Trust is less than Ten Dollars ($10.00) shall be deemed to have no claim for such distribution against the Debtors, the Reorganized Debtors, the ERS Trust or the ERS Private Equity Portfolio. Any Cash not distributed pursuant to this <u>Section 6.2</u> shall be the property of the ERS Trust free of any restrictions thereon, and shall be available for distribution to the other ERS Trust Beneficiaries, in accordance with the Plan, the ERS Stipulation, and this Trust Agreement; <u>provided</u>, <u>however</u>, that, in connection with dissolution of the ERS Trust, any amounts remaining and not distributed to ERS Trust Beneficiaries shall be distributed to the Commonwealth.

6.3 <u>Undeliverable Distributions</u>. For purposes of this Trust Agreement, an "undeliverable" distribution shall include a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within [six (6) months] following the date on which such check was issued. If any distribution to the holder of an ERS Trust Interest is undeliverable, no further distribution shall be made to such holder unless and until the Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable or as set forth in <u>Section 6.4</u> hereof. All Persons ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable

status of such distribution. Except as required by law, the Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of an ERS Trust Interest.

6.4  <u>Compliance with Laws</u>. Any and all distributions of the ERS Private Equity Portfolio shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

6.5  <u>Fiscal Year</u>. Except for the first and last years of the ERS Trust, the fiscal year of the ERS Trust shall be the calendar year. For the first and last years of the ERS Trust, the fiscal year of the ERS Trust shall be such portion of the calendar year that the ERS Trust is in existence.

6.6  <u>Books and Records</u>. The Trustee shall retain and preserve the Debtors' books, records and files that shall have been delivered to or created by the Trustee. Subject to the terms and provisions of <u>Section 5.3</u> hereof, the Trustee shall maintain, in respect of the ERS Trust and the ERS Trust Beneficiaries and all others to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the ERS Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the ERS Trust and the Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including applicable tax, securities and other federal and state laws. Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the ERS Trust, or as a condition for making any payment or distribution out of the ERS Trust Assets. ERS Trust Beneficiaries shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records; <u>provided</u>, <u>however</u>, that, if so requested, all costs associated with such inspection shall be paid in advance by such requesting ERS Trust Beneficiary and such ERS Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Trustee.

6.7  <u>Cash Payments</u>. All distributions required to be made by the Trustee to the ERS Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Trustee or, at the option of the Trustee, by wire transfer from a domestic bank selected by the Trustee or as otherwise required or provided in applicable agreements; <u>provided</u>, <u>however</u>, that Cash payments to foreign holders of ERS Trust Interests may be made, at the option of the Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

6.8  <u>Insurance</u>. The ERS Trust shall maintain customary insurance coverage for the protection of the Trustee, employees and any such other persons serving as administrators and overseers of the ERS Trust on and after the Effective Date. The Trustee also may obtain insurance coverage it deems necessary and appropriate with respect to real and personal property which may become ERS Private Equity Portfolio, if any.

6.9  <u>Disputes</u>. To the extent a dispute arises between the Trustee concerning the performance of any of the powers, duties, and/or obligations herein, the Trustee may file a motion and/or other pleadings with the Title III Court and obtain advice and guidance or such other relief as may be appropriate concerning a resolution of the matter(s) in dispute between the parties. In

16

the event of a dispute, the Trustee shall have the right to engage legal counsel to advise it with respect to the matter(s) in dispute and the reasonable fees and expenses of such legal counsel shall be reimbursed by the Trustee from the Administrative Funding or, in the event the Administrative Funding has been spent, any other unrestricted Cash in the ERS Trust, subject to <u>Section 8.12</u> hereof.

6.10 <u>Reports</u>.

(a) From the Effective Date up to, but not including, the sale of the ERS Private Equity Portfolio in accordance with the terms and provisions of <u>Article IV</u> hereof, the Commonwealth shall provide quarterly portfolio summaries to the Trustee and to holders of Allowed ERS Bond Claims that execute and deliver a non-disclosure agreement. Any information provided in such quarterly reports shall not be subject to public disclosure, except as may be required by law.

(b) The Trustee shall timely prepare, file and distribute such additional statements, reports and submissions as may be necessary to cause the ERS Trust and the Trustee to be in compliance with applicable law.

(c) Until such time as the ERS Trust is dissolved in accordance with this Agreement, the ERS Trust shall file with (or furnish to, as the case may be) the SEC such periodic reports as the ERS Trust is required to file pursuant to the Exchange Act. In addition, until the Title III cases are closed, the ERS Trust shall file Post-Confirmation Quarterly Summary Reports for each of the Title III cases with the Title III Court and, thereafter, and until such time as the ERS Trust is dissolved in accordance with this Agreement, the ERS Trust shall file with (or furnish to, as the case may be) the SEC or otherwise make available to the ERS Trust Beneficiaries quarterly reports that are substantially similar to such Post-Confirmation Quarterly Summary Reports.

# ARTICLE VII

# TAX MATTERS

7.1 <u>ERS Private Equity Portfolio Treated as Owned by ERS</u>. For all United States federal income tax purposes, all parties (including the Debtors, the Reorganized Debtors, the Trustee, and the ERS Trust Beneficiaries) shall treat the ERS as the owner of the ERS Private Equity Portfolio and the ERS Trust. No items of taxable income, gain, loss or deduction attributable to the ERS Private Equity Portfolio or the ERS Trust, as the case may be, shall be allocated to the ERS Trust Beneficiaries. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

7.2 <u>Tax Reporting</u>.

(a) The Trustee shall file tax returns for the ERS Trust treating the ERS Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this <u>Article VII</u>. The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the ERS Trust that is required by any governmental unit.

(b)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall (i) timely elect to treat any of the ERS Trust as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Trustee, the Debtors, and the ERS Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(c)     The Trustee shall be responsible for payment, out of the ERS Private Equity Portfolio, of any taxes imposed on the ERS Trust or its asset.

7.3     <u>Tax Withholdings by Trustee</u>. The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the ERS Trust Beneficiaries. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of ERS Trust Beneficiaries for all purposes of the Trust Agreement. The Trustee shall be authorized to collect such tax information from the ERS Trust Beneficiaries (including social security numbers or other tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the ERS Trust Agreement. In order to receive distributions, all ERS Trust Beneficiaries shall be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. This identification requirement generally applies to all ERS Trust Beneficiaries, including those who hold their Claims in "street name." The Trustee may refuse to make a distribution to any ERS Trust Beneficiary that fails to furnish such information in a timely fashion, and until such information is delivered may treat such ERS Trust Beneficiary's interests as disputed; <u>provided</u>, <u>however</u>, that, upon the delivery of such information by an ERS Trust Beneficiary, the Trustee shall make such distribution to which the ERS Trust Beneficiary is entitled, without additional interest occasioned by such beneficiary's delay in providing tax information; and, <u>provided</u>, <u>further</u>, that, if such information is not furnished to the Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to such ERS Trust Beneficiary; and, <u>provided</u>, <u>further</u>, <u>however</u>, that, if the Trustee fails to withhold in respect of amounts received or distributable with respect to any such beneficiary and the Trustee is later held liable for the amount of such withholding, such beneficiary shall reimburse the Trustee for such liability (to the extent such amounts were actually distributed to such beneficiary).

7.4     If the Trustee, acting in its reasonable discretion, determines that the Trust is not eligible to be characterized as a grantor trust, including as a result of a change in law or administrative guidance, the Trustee shall be authorized to take such actions to characterize the Trust as a partnership for U.S. federal, state, and local tax purposes that the Trustee determines are reasonably necessary, including the preparation of any forms and elections, establishment of capital accounts in accordance with the rules of Treasury Regulations Section 1.704 1(b)(2)(iv), and revisions to this Trust Agreement, and any related fees and expenses associated therewith

(including reasonable legal and accounting expenses) shall be a cost of the Trust. The Trust shall not elect to be treated as an association taxable as a corporation under Section 301.7701-3(a) of the Treasury Regulations for federal income tax purposes.

## ARTICLE VIII

## THE TRUSTEE

8.1     Trustee.

(a)     Subject to the terms and provisions of Article IX hereof, the Trustee shall hold office until the termination of the ERS Trust in accordance with the terms set forth herein. References herein to the Trustee shall refer to the Person or Persons serving as the Trustee solely in its or their capacity as trustees hereunder.

(b)     Subject to the express limitations set forth herein, any actions of the Trustee contemplated by this Trust Agreement shall be decided and conducted by the Trustee only.

8.2     Powers of the Trustee.

(a)     Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the Trustee shall have various powers, duties and responsibilities concerning the prosecution of certain litigation claims, the disposition of assets, the resolution of claims, and numerous other obligations relating to the administration of the ERS Trust.

(b)     The Trustee shall have only such rights, powers and privileges expressly set forth in the Confirmation Order, the Plan, the ERS Stipulation and this Trust Agreement and as otherwise provided by applicable law.  Subject to the Confirmation Order, the Plan, the ERS Stipulation and the provisions of this Trust Agreement, including the oversight and approvals by and of the Title III Court provided herein, the Trustee shall be expressly authorized to undertake the following actions (and, except with respect to Section 8.2(b)(vi) hereof, to delegate such authority to such representatives or agents of the Trustee as the Trustee may nominate from time to time):

(i)     to open bank accounts, and to hold, manage, convert to Cash, and distribute the ERS Private Equity Portfolio;

(ii)     to hold the ERS Private Equity Portfolio for the benefit of the ERS Trust Beneficiaries, whether their interests are Allowed on or after the Effective Date;

(iii)     to timely notify the Commonwealth of all capital calls related to the ERS Private Equity Portfolio;

(iv)     to monitor and enforce the implementation of the Plan;

(v)     to file all tax and regulatory forms, returns, reports, and other documents required with respect to the ERS Trust;

19

(vi) to take all actions and create any document necessary to implement the Plan;

(vii) to hold, manage, and distribute Cash or non-Cash ERS Private Equity Portfolio interests obtained through the exercise of its power and authority; and

(viii) to act as a signatory to the Debtors solely with the respect to the ERS Private Equity Portfolio.

(c) In all circumstances, the Trustee shall comply with applicable law and shall otherwise act in the best interest of all ERS Trust Beneficiaries, and the Trustee shall act in furtherance of the purpose of the ERS Trust.

(d) Except as otherwise provided in this Trust Agreement, the Trustee will not be required to obtain the order or approval of the Title III Court, or any other court of competent jurisdiction in, or account to the Title III Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder. Notwithstanding the foregoing, where the Trustee determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trustee will have the right to submit to the Title III Court any question or questions regarding any specific action proposed to be taken by the Trustee with respect to this Trust Agreement, the ERS Trust, or the ERS Private Equity Portfolio, including the administration and distribution of the ERS Private Equity Portfolio and the termination of the ERS Trust. Pursuant to the Plan, the Title III Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trustee.

8.3     <u>Limitations on Trustee</u>. The Trustee shall, on behalf of the ERS Trust, hold the ERS Trust out as a trust in the process of liquidation and not as an investment company. The Trustee shall be restricted to holding the ERS Private Equity Portfolio on behalf, and for the benefit, of the ERS Trust Beneficiaries and the distribution and application of proceeds from the sale of the ERS Private Equity Portfolio or ERS Trust Interests, as the case may be, for the purposes set forth in, and the conservation and protection of the ERS Private Equity Portfolio and the administration thereof in accordance with, the provisions of this Trust Agreement, the ERS Stipulation, the Plan and the Confirmation Order.

8.4     <u>Actions Taken on a Day Other Than A Business Day</u>. In the event that any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

8.5     <u>Agents, Employees and Professionals</u>.

(a) The ERS Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain Trust Professionals, on such terms as the Trustee deems appropriate. None of the professionals that represented parties-in-interest in the Title III Cases shall be precluded from being engaged by the Trustee solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.

(b)　　After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trustee, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses. Subject to the approval of the Trustee, the Trustee shall pay such invoices thirty (30) days after such invoices are approved In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trustee or the affected party may ask the Title III Court to resolve the dispute.

(c)　　All payments to Trust Professionals shall be paid out of the Administrative Funding or, if all of the Administrative Funding has been spent, any unrestricted Cash remaining in the Segregated Account.

8.6　　<u>Investment of ERS Trust Monies</u>. All monies and other assets received by the Trustee as ERS Trust Assets (including the proceeds thereof as a result of investment in accordance with this <u>Section 8.6)</u> shall, until distributed or paid over as herein provided, be held in trust for the benefit of the ERS Trust Beneficiaries, in the Segregated Account, unless and to the extent required by the Plan. The Trustee shall promptly invest any such monies (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this <u>Section 8.6</u>, but shall otherwise be under no liability for interest or income on any monies received by the ERS Trust hereunder and held for distribution or payment to the ERS Trust Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the ERS Trust shall be administered in accordance with the general duties and obligations hereunder. The right and power of the Trustee to invest the ERS Trust Assets, the proceeds thereof, or any income earned by the ERS Trust, shall be limited to the right and power to: (a) invest such ERS Trust Assets (pending distributions in accordance with the Plan or this Trust Agreement) in Permissible Investments, or (b) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000.

8.7　　<u>Termination</u>. The duties, responsibilities and powers of the Trustee shall terminate on the date the ERS Trust is wound up and dissolved in accordance with New York law pursuant to <u>Section 5.2</u> hereof; <u>provided</u>, <u>however</u>, that the duties, responsibilities and powers set forth in <u>Sections 8.8</u>, <u>8.9</u>, and <u>8.10</u> hereof shall survive such termination, dissolution and entry.

8.8　　<u>Liability to Third Persons</u>. No ERS Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the ERS Trust Assets or the affairs of the Trustee, except to the extent of the ERS Trust Beneficiary's fraud, gross negligence, or willful misconduct. The Trustee and the Trust Professionals shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person (including, in the case of the Trustee to any Trust Professionals retained by the Trustee in accordance with this Trust Agreement) in connection with the ERS Trust Assets or the affairs of the ERS Trust (except to the extent of the Trustee's or Trust Professional's fraud, gross negligence, or willful misconduct) and shall not be liable with respect to any action taken or omitted to be taken in good faith, and all such persons shall look solely to the ERS Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the ERS Trust. Other than as set forth in the Plan, the ERS Stipulation or in the Confirmation Order, nothing in this <u>Section 8.8</u> shall be

deemed to release any ERS Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

8.9 <u>Nonliability of Trustee for Acts of Others</u>. Except as provided herein, nothing contained in this Trust Agreement, the ERS Stipulation, the Plan or the Confirmation Order shall be deemed to be an assumption by the Trustee or the Trust Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the Trustee to assume or accept any such liability, obligation or duty. Any successor Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Trustee hereunder, and any statement or representation made as to the assets comprising the ERS Trust Assets or as to any other fact bearing upon the prior administration of the ERS Trust, so long as it has a good faith basis to do so. The Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. The Trustee or any successor Trustee shall not be liable for any act or omission of any predecessor Trustee nor have a duty to enforce any claims against any predecessor Trustee on account of any such act or omission. No provision of this Trust Agreement shall require the Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to the Trustee.

8.10 <u>Exculpation</u>. As of the Effective Date, the Trustee and the Trust Professionals shall be and hereby are exculpated by all Persons, including ERS Trust Beneficiaries, holders of Claims and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Trust Agreement, the ERS Stipulation or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Title III Court to have arisen out of their own respective intentional fraud, criminal conduct, gross negligence or willful misconduct. No ERS Trust Beneficiary, holder of a Claim or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trustee, the ERS Trust, the employees, professionals or representatives of either the Trustee or the ERS Trust (including the Trust Professionals), for making payments in accordance with, or for implementing, the provisions of the Plan, the ERS Stipulation, the Confirmation Order and this Trust Agreement. Any action taken or omitted to be taken with the express approval of the Title III Court shall conclusively be deemed not to constitute gross negligence or willful misconduct.

8.11 <u>Limitation of Liability</u>. The Trustees and the Trust Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances, except to the extent of the Trustees' or Trust Professionals' fraud, gross negligence, or willful misconduct.

8.12 <u>Indemnity</u>. Each Indemnified Party shall not be liable to the ERS Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of the Trustee, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the ERS Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of the Trustee, except for any actions

22

or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Trustee and the other parties entitled to indemnification under this subsection shall be satisfied solely from the ERS Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the ERS Trust Interests and any other claim to or interest in such assets. The Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals. The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

      8.13   <u>Compensation and Expenses</u>.

      (a)   The Trustee (including the Person(s) serving as or comprising the Trustee) shall receive compensation for its services, to be paid out of the Administrative Funding. In addition, the Trustee shall be entitled, subject to the approval of the Title III Court, to reimburse itself from the Administrative Funding on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan.

      (b)   The annual compensation of the Trustee shall be [●].

# ARTICLE IX

## SUCCESSOR ERS TRUSTEES

      9.1   <u>Resignation</u>. The Trustee may resign from the ERS Trust by giving at least sixty (60) days' prior written notice thereof to the ERS Trust Beneficiaries. Such resignation shall become effective on the later to occur of (a) the date specified in such written notice and (b) the effective date of the appointment of a successor Trustee in accordance with <u>Section 9.4</u> hereof and such successor's acceptance of such appointment in accordance with <u>Section 9.5</u> hereof.

      9.2   <u>Removal</u>. The Trustee may be removed by a majority vote of the ERS Trust Beneficiaries. Such removal shall become effective on the date specified in such action.

      9.3   <u>Effect of Resignation or Removal</u>. The resignation, removal, incompetency, bankruptcy or insolvency of the Trustee shall not operate to terminate the ERS Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by the Trustee. All fees and expenses properly incurred by the Trustee prior to the resignation, incompetency or removal of the Trustee shall be paid from the ERS Trust Assets, unless such fees and expenses are disputed by the successor Trustee, in which case the Title III Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trustee that are subsequently allowed by the Title III Court shall be paid from the ERS Trust Assets. In the event of the resignation or removal of the Trustee, such Trustee shall: (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee or directed by the Title III Court to effect the termination of such Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Trustee all documents, instruments, records and other writings related to the ERS Trust as may be in the possession of such Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

9.4 <u>Appointment of Successor</u>. In the event of the death, resignation, removal, incompetency, bankruptcy or insolvency of the Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by a majority of ERS Trust Beneficiaries; <u>provided</u>, <u>however</u>, that, under no circumstance, shall the successor Trustee be a director or officer of any Affiliate of the ERS Trust. In the event that a successor Trustee is not appointed within thirty (30) days after the date of such vacancy, the Title III Court, upon its own motion or the motion of an ERS Trust Beneficiary, shall appoint a successor Trustee.

9.5 <u>Acceptance of Appointment by Successor Trustee</u>. Any successor Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Title III Court for filing and to the ERS Trust Beneficiaries and, in case of the Trustee's resignation, to the resigning Trustee. Thereupon, such successor Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the ERS Trust with like effect as if originally named Trustee and shall be deemed appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). The resigning or removed Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such resigning or removed Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Trustee.

## ARTICLE X

## <u>MISCELLANEOUS PROVISIONS</u>

10.1 <u>Governing Law</u>. This Trust Agreement shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Agreement; <u>provided, however,</u> that the authorization of this Trust Agreement by Commonwealth shall be governed by the laws of the Commonwealth.

10.2 <u>Jurisdiction</u>. Subject to the proviso below, the parties agree that the Title III Court shall have exclusive jurisdiction over the ERS Trust and the Trustee, including the administration and activities of the ERS Trust and the Trustee, and, pursuant to the Plan, the Title III Court has retained such jurisdiction; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the Trustee shall have power and authority to bring any action in any court of competent jurisdiction (including the Title III Court) to prosecute any causes of action assigned to the ERS Trust.

10.3 <u>Severability</u>. In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

24

10.4    Notices.   Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, sent by email, facsimile transmission, nationally recognized overnight delivery service or mailed by first-class mail:

  (i)     if to the Trustee, to:

       [●]

       with a copy to:

       [●]

  (ii)    if to any ERS Trust Beneficiary, to the last known address of such ERS Trust Beneficiary according to the Debtors' Schedules, such ERS Trust Beneficiary's proof of claim or the lists of record holders provided to the Trustee; and

  (iii)   if to the Debtors:

       The Commonwealth of Puerto Rico
       c/o Fiscal Agency and Financial Advisory Authority
       Roberto Sánchez Vilella (Minillas) Government Center
       De Diego Ave. Stop 22
       San Juan, Puerto Rico 00907
       Attn: Office of the Executive Director

       and

       The Employees Retirement System of the Government of the Commonwealth of Puerto Rico
       PO Box 42003
       San Juan, PR 00940-2203
       Attn: Cecile Tirado Soto

       with a copy to:

       O'Melveny & Myers LLP
       Seven Times Square
       New York, NY 10036
       Attn:   John Rapisardi, Esq.
            Peter Friedman, Esq.
            Maria J. DiConza, Esq.
       Tel: (212) 326-2000
       Fax: (212) 326-2061

       and

       Proskauer Rose LLP

Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

10.5    Headings.  The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

10.6    Relationship to the Plan.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan, the ERS Stipulation, and the Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan, the ERS Stipulation, and the Confirmation Order (which may amend or supplement the Plan).  Additionally, the Trustee may seek any orders from the Title III Court, upon notice and a hearing in furtherance of implementation of the Plan, the ERS Stipulation, the Confirmation Order and this Trust Agreement.  However, to the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, the ERS Stipulation or the Confirmation Order, each document shall have controlling effect in the following rank order: (a) *first*, this Trust Agreement, (b) *second*, the Confirmation Order, (c) *third*, the Plan, and (d) *forth*, the ERS Stipulation.

10.7    Entire Trust Agreement.  This Trust Agreement (including the recitals and annex hereto), the Plan and the Confirmation Order constitute the entire agreement and understanding by and among the parties and supersede all prior and contemporaneous agreements or understandings by and among the parties with respect to the subject matter hereof.

10.8    Cooperation.  The Debtors shall turn over or otherwise provide a copy to the Trustee at no cost to the ERS Trust or the Trustee, all books and records reasonably required by the Trustee to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the Trustee in carrying out its duties hereunder, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors' books and records.

10.9    Amendment and Waiver.  Any provision of this Trust Agreement may be amended or waived by the Trustee.  Notwithstanding this Section 10.9, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the ERS Trust.

10.10   Confidentiality.  The Trustee and its employees, members, agents, professionals and advisors, including the Trust Professionals shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the ERS Private Equity Portfolio relates; provided, however, that such information may be disclosed if:  (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process, including to subpoena or other court order or other applicable laws or regulations. In the event that any Confidential Party is requested to divulge confidential information pursuant to this clause (b), such Confidential Party shall promptly, in advance of making such disclosure,

provide reasonable notice of such required disclosure to the Trustee to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure. The Trustee shall not disclose any non-public information to any ERS Trust Beneficiary unless and until such ERS Trust Beneficiary has executed a non-disclosure agreement relating to such information.

10.11   <u>Rules of Construction</u>.  Except where the context otherwise may require, (a) words of any gender include the other gender, and (b) words importing the singular number shall include the plural number and *vice versa*.  All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement.  The terms "hereof", "hereto", "herein" and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement.  The terms "include", "includes" and "including" shall be construed as if followed by the words "without limitation".

10.12   <u>Counterparts</u>.  This Trust Agreement may be executed with counterpart signature pages or in any number of counterparts, each of which counterparts shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument.  A facsimile, portable document file (PDF) or other electronic transmission signature of any party shall be considered to have the same binding legal effect as an original signature.

[Remainder of Page Blank — Signature Page Follows]

27

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO

By: /s/ _____

    Name:   Natalie Jaresko
    Title:   Executive Director

THE COMMONWEALTH OF PUERTO RICO

By: /s/ _____

    Name:
    Title:

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO

By: /s/ _____

    Name:
    Title:

[●]

By: /s/ _____

    Name:
    Title:

**Annex A**

[CUSIP info]

## **EXHIBIT E**

Schedule of Executory Contracts and Unexpired Leases to be Assumed

None.

# **EXHIBIT F**

Supplemental Ambac Election Notice

**Form of Election Notice for Holders of Claims in Classes 4 and 26 [EXCERPT]**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, THE
EMPLOYEES RETIREMENT SYSTEM OF THE
GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO, AND THE PUERTO RICO PUBLIC
BUILDINGS AUTHORITY,

                              Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

## ELECTION NOTICE
## FOR AMBAC BOND HOLDERS WITH CLAIMS IN CLASSES 4 AND 26

This Notice (the "**Notice**") is being sent to the beneficial holders of Vintage PBA Bond Claims (Ambac) and Vintage CW Guarantee Bond Claims (Ambac) arising on account of Ambac Insured Bonds, which are insured by Ambac Assurance Corporation ("**Ambac**"). These securities give rise to Claims in Classes 4 and 26 of the *Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, the "**Plan**").[2] Although Ambac has the right to cast the vote on account of Claims arising from Ambac Insured Bonds to accept or reject the Plan, the holders are entitled to elect their form of treatment under the Plan.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the Plan.

Each holder of an Allowed Vintage PBA Bond Claim (Ambac)[3] and Allowed Vintage CW Guarantee Bond Claim (Ambac) ("**Allowed Ambac Insured Bond Claims**")[4] has the option to elect to receive on the Effective Date, or as soon as reasonably practicable thereafter, in full consideration, satisfaction, release, and exchange of such holder's claims and rights under the Ambac Insurance Policies:

**Ambac Commutation Treatment (Option 1)**: On the Effective Date, or as soon as reasonably practicable thereafter, you will receive the Ambac Commutation Consideration, distributable by or at the direction of Ambac in its sole and absolute discretion pursuant to Section 75.5 of the Plan. The Ambac Commutation Consideration consists of (i) your Pro Rata Share of the applicable Ambac Plan Consideration, plus (ii) Cash from Ambac in an amount equal to 2.5% of your Allowed Ambac Insured Bond Claims, in full and complete satisfaction, release, and discharge of any further obligation of Ambac with respect to the applicable Ambac Insurance Policies (and, by making such election, you will be deemed to have agreed to commute the Ambac Insurance Policies relating to your Allowed Ambac Insured Bond Claims). For the avoidance of doubt, the Ambac Commutation Consideration shall not include any percentage of the Consummation Costs and/or the PSA Restriction Fee allocable to Ambac under the Plan.

If you elect the Ambac Commutation Treatment (Option 1), (i) you will not receive any payments from Ambac under the Ambac Insurance Policies on account of accrued and unpaid interest on and after July 1, 2021 (the deemed issuance date of the New GO Bonds), and to the extent any accrued interest is or has been paid by Ambac under the applicable Ambac Insurance Policy relating to your Allowed Ambac Insured Bond Claims after such date, such amount shall be credited against the Cash you, your successors, transferees or assigns are otherwise entitled to receive as Ambac Commutation Consideration and (ii) you will have no other or further rights under or with respect to the applicable Ambac Insurance Policy or any of the Ambac Non-Commutation Treatment options described in Section 75.5(b) of the Plan or with respect to the Ambac Non-Commutation Treatment (Option 2) below, and all of Ambac's obligations under the applicable Ambac Insurance Policy shall be fully and finally satisfied, released and discharged.

**Ambac Non-Commutation Treatment (Option 2)**: You will receive the Ambac Non-Commutation Treatment, being an amount equal to the Ambac Acceleration Price, in Cash on the Effective Date, or as soon as reasonably practicable thereafter, in full and final discharge of Ambac's obligations under the Ambac Insurance Policy related to your Allowed Ambac Insured Bond Claims and Ambac shall receive the Ambac Plan

---

[3] Holders making an election pursuant to Section 75.5 of the Plan with respect to such holders' Allowed Vintage PBA Bond Claims (Ambac) shall be deemed to have made the same election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claims (Ambac).

[4] Any calculations and/or payments to be made to you based on, or in relation to, your Allowed Ambac Insured Bond Claims pursuant to the options set out herein will take into account any payments of principal and/or accrued interest already made to you by Ambac pursuant to the terms of the relevant Ambac Insurance Policies. For avoidance of doubt, you shall not be compensated for any amounts already paid to you pursuant to the terms of the relevant Ambac Insurance Policies.

Consideration that would be otherwise allocable to you, your successors, transferees or assigns on account of the Allowed Ambac Insured Bond Claims. For the avoidance of doubt, the Ambac Acceleration Price will include interest through the date of payment.

***If you fail to make a valid election or submit an election for less than all of your claims (in which case, such election will be void and of no force and effect), you will be deemed to have elected to commute the Ambac Insurance Policies, to release and discharge Ambac's obligations thereunder, and to receive distributions in accordance with the <u>Ambac Commutation Treatment (Option 1).</u>***

**Form of Election Notice for Holders of Claims in Class 19**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA<br>Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | (Jointly Administered) |
| Debtors.[1] | |

## ELECTION NOTICE
## FOR AMBAC BOND HOLDERS WITH CLAIMS IN CLASS 19

This Notice (the "**Notice**") is being sent to the beneficial holders of Vintage CW Bond Claims (Ambac) arising on account of Ambac Insured Bonds, which are insured by Ambac Assurance Corporation ("**Ambac**"). These securities give rise to Claims in Class 19 of the *Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (as the same may be updated, supplemented, amended and/or otherwise modified from time to time, the "**Plan**").[2] Although Ambac has the right to cast the vote on account of Claims arising from Ambac Insured Bonds to accept or reject the Plan, the holders are entitled to elect their form of treatment under the Plan.

Each holder of an Allowed Vintage CW Bond Claim (Ambac) (an "**Allowed Ambac Insured Bond Claim**")[3] has the option to elect to receive on the Effective Date, or as soon as reasonably

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2]  Unless otherwise defined herein, each capitalized term used herein shall have the meaning given to it in the Plan.

[3]  Any calculations and/or payments to be made to you based on, or in relation to, your Allowed Ambac Insured Bond Claims pursuant to the options set out herein will take into account any payments of principal and/or accrued

practicable thereafter, in full consideration, satisfaction, release, and exchange of such holder's claim and rights under the Ambac Insurance Policies:

**Ambac Commutation Treatment (Option 1)**:  On the Effective Date, or as soon as reasonably practicable thereafter, you will receive the Ambac Commutation Consideration, distributable by or at the direction of Ambac in its sole and absolute discretion pursuant to Section 75.5 of the Plan.  The Ambac Commutation Consideration consists of (i) your Pro Rata Share of the applicable Ambac Plan Consideration, plus (ii) Cash from Ambac in an amount equal to 3.5% of your Allowed Ambac Insured Bond Claim, in full and complete satisfaction, release, and discharge of any further obligation of Ambac with respect to the applicable Ambac Insurance Policies (and, by making such election, you will be deemed to have agreed to commute the Ambac Insurance Policies relating to your Allowed Ambac Insured Bond Claim).  For the avoidance of doubt the Ambac Commutation Consideration shall not include any percentage of the Consummation Costs and/or the PSA Restriction Fee allocable to Ambac under the Plan.

If you elect the Ambac Commutation Treatment (Option 1), (i) you will not receive any payments from Ambac under the Ambac Insurance Policies on account of accrued and unpaid interest on and after July 1, 2021 (the deemed issuance date of the New GO Bonds), and to the extent any accrued interest is or has been paid by Ambac under the applicable Ambac Insurance Policy related to your Allowed Ambac Insured Bond Claims after such date, such amount shall be credited against the Cash you, your successors, transferees or assigns are otherwise entitled to receive as Ambac Commutation Consideration and (ii) you will have no other or further rights under or with respect to the applicable Ambac Insurance Policy or any of the Ambac Non-Commutation Treatment options described in Section 75.5(b) of the Plan or with respect to the Ambac Non-Commutation Treatment (Option 2) below, and all of Ambac's obligations under the applicable Ambac Insurance Policy shall be fully and finally satisfied, released and discharged.

**Ambac Non-Commutation Treatment (Option 2)**:  You will receive the Ambac Non-Commutation Treatment, being an amount equal to the Ambac Acceleration Price, in Cash on the Effective Date, or as soon as reasonably practicable thereafter, in full and final discharge of Ambac's obligations under the Ambac Insurance Policy related to your Allowed Ambac Insured Bond Claims and Ambac shall receive the Ambac Plan Consideration that would be otherwise allocable to you, your successors, transferees or assigns on account of the Allowed Ambac Insured Bond Claims.  For the avoidance of doubt, the Ambac Acceleration Price will include interest through the date of payment.

***If you fail to make a valid election or submit an election for less than all of your claims (in which case, such election will be void and of no force and effect), you will be deemed to have elected to commute the Ambac Insurance Policies, to release and discharge Ambac's obligations***

---

interest already made to you by Ambac pursuant to the terms of the relevant Ambac Insurance Policies.  For the avoidance of doubt, you shall not be compensated for any amounts already paid to you pursuant to the terms of the relevant Ambac Insurance Policies.

*thereunder, and to receive distributions in accordance with the <u>Ambac Commutation Treatment (Option 1).</u>*

# **EXHIBIT G**

Assured Custodial Trust Documents

## SUPPLEMENTAL DISCLOSURES RELATED TO ASSURED BONDHOLDER ELECTION 2

Section 75.1(b) of the Plan provides that each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of two Assured Bondholder Elections, namely "Assured Bondholder Election 1" and "Assured Bondholder Election 2". Each eligible Assured Insured Bondholder who elects, or is deemed to elect, Assured Bondholder Election 2 will opt into a custodial trust (each such trust, as applicable, an "Assured Trust") on terms substantially similar those reflected in (i) the relevant form "Standard Terms to Trust Agreement" included as an Exhibit in this Plan Supplement, and (ii) the relevant form "Trust Agreement" included as an Exhibit in this Plan Supplement (together, and as they may be modified prior to implementation, the "Trust Agreement"). The Assured Trust will issue Trust Units that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policies, (B) certain Assured New Securities, and (C) certain cash allocable to the Assured Legacy Bondholders under the Plan, in accordance with terms acceptable to Assured.

**Before electing, or being deemed to elect, Assured Bondholder Election 2, eligible Assured Insured Bondholders should carefully consider this supplemental disclosure (the "Supplemental Disclosure") identifying certain risk factors specifically related to Assured Bondholder Election 2. The risk factors identified in this Supplemental Disclosure are not the only risks related to Assured Bondholder Election 2, and do not necessarily reflect the relative importance of various risks. Any one or more of the factors identified in this Supplemental Disclosure, and other factors not described in this Supplemental Disclosure, could affect recoveries under Assured Bondholder Election 2, and there can be no assurance that other risk factors not discussed in this Supplemental Disclosure will not become material in the future. Eligible Assured Insured Bondholders who elect, or are deemed to elect, Assured Bondholder Election 2, will be deemed to have assumed the related risks identified in this Supplemental Disclosure.**

Capitalized terms used in this Supplemental Disclosure, but not defined herein, shall have the meanings given to them in (i) the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 17627 (D.P.R. July 30, 2021) (the "Plan"), (ii) the Trust Agreement, or (iii) the Disclosure Statement, as applicable. This Supplemental Disclosure is subject in all respects to the terms and provisions of the Plan and the Trust Agreement.

**Assured is not providing any tax advice to Assured Insured Bondholders, and Assured makes no representations to Assured Insured Bondholders regarding the tax consequences of electing, or being deemed to elect, Assured Bondholder Election 2, the tax status of the Assured Trust or the tax consequences of owning or disposing of Trust Units. U.S. Holders are strongly urged to consult their own tax advisors regarding the tax consequences of electing, or being deemed to elect, Assured Bondholder Election 2, the tax status of the Assured Trust or the tax consequences of owning or disposing of Trust Units. In no event shall the Trustee for the Assured Trust, the Depositors, or Assured be liable for any liabilities, costs or expenses of the Assured Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise**

taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to any act or omission by the Trustee in breach of its obligations under the Trust Agreement.

## I.  Risks Related to Assured Bondholder Election 2.

### A.  The Tax Treatment of the Assured Trust Is Uncertain.

The Assured Trust will likely take the position that it is a grantor trust for U.S. federal income tax purposes. To the extent the Assured Trust is treated as a grantor trust, each Trust Unit Holder will be treated as receiving its Trust Unit(s) in exchange of its relevant Allowed Assured Insured Bond Claims and its interest in the Assured Insurance Policies, and as owning a pro rata undivided interest in the Trust Assets held in the Assured Trust, each to the extent of its pro rata interest in the Trust Units.  U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trust.

To the extent Trust Unit Holders are treated as owning their pro rata share of the Trust Assets under a grantor trust, they will be treated as if they had received distributions under the Plan directly and as owners of their pro-rated portion of the Trust Assets, including the New GO Bonds and the GO CVIs.  Interest on a portion of such New GO Bonds is expected to be excluded from gross income for U.S. federal income tax purposes (such interest, the "Assured Trust Tax-Exempt Interest").  There can be no assurance that the Assured Trust Tax-Exempt Interest, to the extent it is generally excluded from gross income for federal income tax purposes, will retain such exclusion in respect of the Trust Unit Holders.  No opinion of counsel or IRS ruling has been, or will be, requested regarding whether any payments of Assured Trust Tax-Exempt Interest that are passed through to the Trust Unit Holders will retain their exclusion from gross income for federal income tax purposes.  U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trust Tax-Exempt Interest.

It is possible that the IRS may assert, and a court may so hold, that the Assured Trust is properly characterized in a manner other than as a grantor trust for U.S. federal income tax purposes. Such alternative characterizations (principally, treating the Trust Units as taxable debt of Assured or treating the Assured Trust as subject to corporate level tax) could result in different (and materially adverse) tax consequences to the Assured Trust and the Trust Unit Holders (including treating all income received with respect to the Trust Units as fully taxable income or possibly imposing a corporate tax on the Assured Trust, thereby reducing distributions to Trust Unit Holders).

The Assured Trust has not sought and will not seek either a ruling from the IRS or an opinion of counsel with respect to its status as a grantor trust, the nature of the Trust Units issued by the Assured Trust, or the character, timing or exemption from taxable income of any income generated by any asset held by the Assured Trust.  As a result, there can be no assurance that the Assured Trust will be treated as a grantor trust, that the Trust Units will be treated as interests in such trust or that any of the Trust Assets will be treated as producing tax-exempt income or the timing of such income.

**U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax classification of the Assured Trust and the Trust Units (particularly the associated tax consequences in case the Assured Trust is not classified as a grantor trust (such that the Trust Units are treated as taxable debt of Assured or the Assured Trust is treated as subject to corporate level tax) for U.S. federal income tax purposes), as well as the character, timing or exemption from taxable income of any income generated by any asset held by the Assured Trust.**

### B. <u>Risks Related to Taxation of Ownership and Sale or Disposition of the Trust Units</u>.

To the extent that each Trust Unit Holder is treated as owning its pro rata share of the applicable outstanding New GO Bonds, GO CVIs, and other Trust Assets, including the related Assured Insurance Policies, it will be entitled to payments attributable to such Trust Assets. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the New GO Bonds, see "—Taxation of New GO Bonds and CVIs" in the Disclosure Statement for a discussion of the U.S. federal income tax consequences of owning the New GO Bonds. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the GO CVIs, see "—Taxation of New GO Bonds and CVIs" in the Disclosure Statement for a discussion of the U.S. federal income tax consequences of owning the GO CVIs. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the Assured Insurance Policies, the taxation of amounts received by the Assured Trust and passed through to the Trust Unit Holders in respect of payments on the Assured Insurance Policies is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of payments under the Assured Insurance Policies and the possibility of material adverse tax consequences to the Trust Unit Holders.

Pursuant to Section 75.1(c) of the Plan, the applicable Assured Insurance Policies and the Trust Agreement, Assured will retain the right to pay the Acceleration Price to the Assured Trust and fully satisfy its obligations with respect to the Assured Legacy Bonds held by the Assured Trust and the related Assured Insurance Policies at any time after the Effective Date upon 30 days' notice to the relevant holders and the Assured Trust. To the extent that Assured exercises this option, the Assured Trust will terminate and the Trust Unit Holders will receive only their pro-rata share of the Acceleration Price. As discussed above in respect to payments on the Assured Insurance Policies generally, the taxation of the receipt of the Acceleration Price by the Assured Trust and its distribution to the Trust Unit Holders is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the receipt of the Acceleration Price by the Assured Trust and the possibility of material adverse tax consequences to the Trust Unit Holders.

Certain aspects of the U.S. federal income tax treatment of owning and disposing of a Trust Unit are uncertain. **U.S. Holders are strongly urged to consult their tax advisors regarding the ownership, sale and disposition of the Trust Units in their individual circumstances.**

C. **Prepayment and Reinvestment Risks, Including Related to the Assured Advancement Option.**

Promptly following receipt thereof by the Trustee for the Assured Trust, and subject to any deductions provided for in the Trust Agreement, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Assured Trust. Each such Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution.

This prompt "pass-through" of Assured Trust income, and the resulting simultaneous reduction of the accrued and unpaid interest on, principal amount of, and/or Compounded Amount of the Assured Legacy Bonds may result in Trust Unit Holders receiving payments on account of such interest, principal, or Compounded Amount prior to the applicable Original Scheduled Interest Payment Dates, Original Scheduled Principal Payment Dates, and/or Maturity Date of the Assured Legacy Bonds.

Pursuant to the Assured Advancement Option, and in accordance with the Assured Insurance Policies and Section(s) 75.1(c) and/or 75.1(d) of the Plan, Assured will also have the option to satisfy its payment obligations with respect to any Assured Legacy Bonds CUSIP by paying the applicable Acceleration Price or redemption price at any time after the Effective Date upon 30 days' notice to the relevant holders and the Assured Trust. Payment of the applicable Acceleration Price or redemption price with respect to any Assured Legacy Bonds CUSIP shall satisfy and discharge all of Assured's obligations under the applicable Assured Insurance Policy with respect to such Assured Legacy Bonds CUSIP.

As a result of any such prepayment(s) of interest, principal, or Compounded Amount, including pursuant to the Assured Advancement Option, Trust Unit Holders may need to reinvest funds at a lower interest rate than that provided for under the Assured Legacy Bonds. Any reinvestment risk will be borne exclusively by the Trust Unit Holders.

**Assured is not providing any tax advice to Assured Insured Bondholders and Assured makes no representations to Assured Insured Bondholders regarding the tax consequences of electing any Assured Bondholder Election or receiving the Acceleration Price. U.S. Holders that elect any Assured Bondholder Election are strongly urged to consult their own tax advisors regarding the tax treatment of such election and the receipt of the Acceleration Price.**

**DRAFT 10/11/2021**

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

_____

TRUST AGREEMENT

among

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF
PUERTO RICO, as Depositor [and]

[Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO
PUBLIC BUILDINGS AUTHORITY, as Depositor],

[ASSURED GUARANTY CORP.] [OR] [ASSURED GUARANTY MUNICIPAL CORP.],

[],
as Trustee

and

[],
as Delaware Trustee

DATED AS OF

[●]

_____

## TABLE OF CONTENTS

Page

SECTION 1.        STANDARD TERMS ...................................................................... 1

SECTION 2.        DEFINED TERMS ......................................................................... 1

SECTION 3.        ORGANIZATION OF TRUST ...................................................... 2

SECTION 4.        NOTIONAL AMOUNT ................................................................. 3

SECTION 5.        FORMS OF TRUST UNITS .......................................................... 3

SECTION 6.        SCHEDULES ................................................................................. 3

SECTION 7.        PATRIOT ACT............................................................................... 3

SECTION 8.        GOVERNING LAW; VENUE; JURY WAIVER ......................... 3

SECTION 9.        FORCE MAJEURE ........................................................................ 4

SECTION 10.       INTENT OF PARTIES ................................................................... 4

SECTION 11.       NON-PETITION............................................................................. 7

SECTION 12.       CERTAIN TERMS REGARDING THE DEPOSITOR[S]............................ 7

## TRUST AGREEMENT

THIS TRUST AGREEMENT, dated as of [●] (this "Agreement"), is hereby executed by and among Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO (the "Commonwealth" [or the "Depositor"]) [and] [Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA", and together with the Commonwealth, the "Depositors")], and [ASSURED GUARANTY CORP. ("Assured")] [OR] [ASSURED GUARANTY MUNICIPAL CORP. ("Assured")], [], a national banking association, as trustee (the "Trustee") and [], [a national banking association,] as Delaware trustee (the "Delaware Trustee", and together with the Trustee, the "Trustees") under this Agreement and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), all the provisions of which are incorporated herein and shall be a part of this Agreement as if set forth herein in full (this Agreement with the Standard Terms so incorporated, the "Trust Agreement").

## PRELIMINARY STATEMENT

The parties are entering into the Trust Agreement for purposes of forming the [Name of Series] Assured Custodial Trust, a Delaware statutory trust (the "Trust"). In furtherance of the structure approved in the Commonwealth Plan and in order to facilitate the implementation thereof, the Trust is being established by the Depositor[s] and the Trustees solely for the benefit of and on behalf of the applicable Assured Legacy Bondholders holding Assured Legacy Bonds CUSIP [] that elected, or are deemed to have elected, Assured Bondholder Election 2 pursuant to the terms and provisions of the Commonwealth Plan. Except for the establishment of the Trust and the deposit therein pursuant to the Commonwealth Plan at the election (or deemed election) of the applicable Assured Legacy Bondholders, the Depositor[s] shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof. The Trustees shall file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware on the date hereof. The Trust shall issue beneficial ownership interests consisting of trust units to be known as the "Trust Units" and each holder of a Trust Unit, a "Trust Unit Holder" or "Holder". Each Trust Unit shall have a separate CUSIP and shall be issued in global form and be transferable through the Depository.

**Section 1.**     **Standard Terms**.

The Trustees acknowledge that the Standard Terms prescribe certain obligations of the Trustees with respect to the Trust and the Trust Units. The Trustees agree to observe and perform such prescribed duties, responsibilities and obligations, and acknowledge that the Standard Terms (including without limitation, the rights, protections, indemnities and immunities afforded to the Trustees thereunder) are and shall be a part of this Agreement to the same extent as if set forth herein in full.

**Section 2.**     **Defined Terms**.

With respect to the Trust Units and in addition to the definitions set forth in the Standard Terms, the following provisions shall govern the defined terms set forth below. To the extent the meanings assigned to the defined terms set forth below are inconsistent with the meanings assigned

to such terms in the Standard Terms, the meanings assigned herein shall control. Capitalized terms used herein but not defined herein or in the Standard Terms shall have the meanings ascribed to them in the Commonwealth Plan.

"**Bankruptcy Code**": The Bankruptcy Reform Act of 1978, as amended from time to time, and as codified as 11 U.S.C. Section 101 et seq.

"**Delaware Trust Statute**": Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code § 3801 *et seq.,* as the same may be amended from time to time.

"**Delaware Trustee**": [], not in its individual capacity but solely in its capacity as Delaware Trustee hereunder, its successor in interest or any successor Delaware Trustee appointed as herein provided.

"**Maturity Date**": [●], the original maturity date of the relevant Assured Legacy Bonds (prior to acceleration).

"**Trustee**": [], in its capacity as Trustee hereunder, its successor in interest or any successor trustee appointed as herein provided.

"**Trustees**": The Delaware Trustee and the Trustee.

"**U.S.A. PATRIOT Act**": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

**Section 3.** <u>**Organization of Trust**</u>.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of a Certificate of Trust of the Trust (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "[[Name of Series] Assured Custodial Trust]" in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the parties hereto that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that the Trust Agreement (including the Standard Terms) constitutes the governing instrument of the Trust. Notwithstanding any other provision of this Agreement to the contrary, the Trustees are hereby authorized and directed to, and shall, on the date hereof, execute and file the Certificate of Trust with the Secretary of State in the form attached as <u>Exhibit B</u> hereto. The Trustee shall have power and authority, and is hereby authorized and empowered to take all actions on behalf of the Trust as set forth in the Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Trust Unit Holders and Assured.

**Section 4.**    <u>**Notional Amount**</u>.

The aggregate Notional Amount of the Trust Units that may be executed and delivered under this Agreement is limited to the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) as of the Effective Date of the Assured Legacy Bonds deposited into the Trust.

**Section 5.**    <u>**Forms of Trust Units**</u>.

The Trust Units shall be substantially in the form attached as <u>Exhibit A</u> hereto.  Each Trust Unit shall be issued in global form and be transferable through the Depository.

**Section 6.**    <u>**Schedules**</u>.

<u>Schedule I</u> is attached hereto and incorporated herein by reference as contemplated herein or by the Standard Terms.

**Section 7.**    <u>**Patriot Act**</u>.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees.  The parties to this Trust Agreement agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A. PATRIOT Act.

**Section 8.**    <u>**Governing Law; Venue; Jury Waiver**</u>.

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW

EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 9.** **Force Majeure**.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**Section 10.** **Intent of Parties**.

(a) The parties hereto intend that, for all purposes, the transfer to the Trust of the Trust Estate shall be, and shall be construed as, a transfer of such Trust Estate on behalf of the applicable Assured Legacy Bondholders in lieu of a transfer of such assets to the Trust directly by the applicable Assured Legacy Bondholders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Effective Date, the Depositor[s] will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Depositor[s] or of the [Depositor's estate] [Depositors' respective estates] in the event of a liquidation, reorganization, or similar proceeding of the Depositor[s] and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b) The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Depositor[s].

(c) Notwithstanding anything to the contrary in the Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Trust Unit Holders, Assured, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not and neither Trustee shall directly take any action that to its actual knowledge would constitute any of the following):

4

(i)     engage in any business or engage in any activity other than those activities expressly permitted under Section 2.03 of the Standard Terms and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in the Trust Agreement;

(ii)    acquire or own any assets other than the Trust Estate or lease (as lessor) any assets;

(iii)   fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including, but not limited to, in order to perform its obligations under the Trust Agreement;

(iv)    fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)     fail to act solely in its own name or in the name of the Trustee on behalf of the Trust through duly authorized agents in the conduct of its activities;

(vi)    provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)   have its debts or other obligations guaranteed by any other person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)  commingle its assets or liabilities with those of any other Person;

(ix)    fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)     divert funds for any purpose other than as set forth in the Trust Agreement;

(xi)    enter into any contract, agreement or transaction with any Trust Unit Holders, the Depositor[s], Assured, principal or other affiliate of the Trust, or any shareholder, general partner, member, principal or affiliate thereof, except as expressly authorized in the Trust Agreement;

(xii)   maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)  incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by the Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)    perform any duties or obligations of the Depositor[s] or any other Person;

(xv)    make any loans or advances to any third party, including, without limitation, any Trust Unit Holder, Depositor or Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)    fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)    fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)    identify itself as a department or division of any other Person;

(xix)    fail to observe all formalities required of a Delaware statutory trust;

(xx)    fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Depositor[s] to sell any assets, or make any capital contribution, to the Trust;

(xxi)    conduct any oral or written communication, including, without limitation, letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee on behalf of the Trust;

(xxii)    (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing;

(xxiii)    supplement, modify, amend, restate, replace, waive or repeal this <u>Section 10 or Sections 2.03, 2.04, 9.01 or 9.03</u> of the Standard Terms, or the definitions used in such Sections, in each case except for any supplement, modification, amendment or restatement of any such provision that (x) corrects any error and (y) would not (individually or together with other changes) be reasonably likely to cause the Trust to no longer be a "special purpose entity" in accordance with applicable law and standards; or

(xxiv)  supplement, modify, amend, restate, replace, waive or repeal any portion of this Trust Agreement or the Standard Terms except as expressly permitted by <u>Section 9.01</u> of the Standard Terms.

(d) Failure of the Trust, the Depositor[s], Assured, any Trust Unit Holder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this <u>Section 10</u> shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e)  To the extent that any provision of this <u>Section 10</u> conflicts with, violates or otherwise is in contravention with any other provision of the Trust Agreement or the Standard Terms, the parties hereto and each Trust Unit Holder agree that the terms set forth in this <u>Section 10</u> shall be controlling as expressly set forth herein.

**Section 11.     <u>Non-Petition</u>**.  The Depositor, Assured, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Trust Unit Holders, by electing (or being deemed to elect) Assured Bondholder Election 2, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another person, the Trustee may file appropriate proofs of claim. For the avoidance of doubt, no adequate remedy at law exists with respect to any breach this Section 11, and specific performance shall in all circumstances be available as a remedy for the enforcement of this Section 11.

**Section 12.     <u>Certain Terms Regarding the Depositor[s]</u>**.  For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)      The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Holders of the Trust Units shall be extinguished.  The Trust Units are not obligations of, and are not guaranteed by, the Depositor[s], and no recourse shall be had against any Officer, director, manager, employee, security holder or incorporator of the Depositor[s], or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)      The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Depositor[s] assume[s] no responsibility for their correctness.  The Depositor[s] make[s] no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)      In purchasing any Trust Units in certificated form, the purchaser shall be required to acknowledge, represent to and agree, and in purchasing any Book-Entry Beneficial Interests in the Trust Units the purchaser shall be deemed to acknowledge, represent and agree, that none of the Depositor[s] nor any of [its] [their] affiliates, is acting

7

as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor[s] or any of [its] [their] affiliates.

(iv)     The Depositor[s] shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

**IN WITNESS WHEREOF**, the Depositor[s], Assured, the Trustee and the Delaware Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**COMMONWEALTH OF PUERTO RICO,**
As Depositor

By: _____
Name: _____
Its: _____

[**PUERTO RICO PUBLIC BUILDINGS AUTHORITY,**
As Depositor

By: _____
Name: _____
Its: _____]

**[ASSURED GUARANTY CORP.] [ASSURED GUARANTY MUNICIPAL CORP.]**

By: _____
Name: _____
Its: _____

[],
As Delaware Trustee

By: _____
Name: _____
Its: _____

[]**,**
As Trustee

By: _____
Name: _____
Its: _____

## SCHEDULE I

### Assured Legacy Bonds Schedule

| CUSIP | Tax-Exempt/Taxable | Outstanding Principal Amount (or Compounded Amount) as of the Effective Date | Accrued and Unpaid Interest as of the Effective Date |
|-------|--------------------|---------------------------------------|------------------------------|
| [●] | [●] | [●] | [●] |

## EXHIBIT A

FORM OF TRUST UNIT CERTIFICATE

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST, AS DEFINED HEREIN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS CERTIFICATE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE DEPOSITOR[S], THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT IN RESPECT OF AN INDIRECT INTEREST IN THE NEW SECURITIES UNDERLYING THE UNITS.

[NAME OF TRUST]

Trust Unit Certificate No. __

Notional Amount: _____

CUSIP:  [●]

Each Trust Unit represented by this Certificate is one of a duly authorized issue of Certificates designated as the Trust Units (herein collectively called the "Units"), and representing a beneficial ownership interest in the Trust Estate created by the Trust Agreement referred to below.

This certifies that CEDE & CO. is the registered owner of the Notional Amount of Trust Units evidenced by this Certificate.  Capitalized terms used but not defined herein have the meanings assigned to such terms in the Trust Agreement and Standard Terms referred to below and the Trust Agreement contains rules as to construction that shall be applicable herein.

The Trust was created pursuant to a Trust Agreement (the "Trust Agreement") dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "Depositor[s]"), [Assured Guaranty Corp.] [OR] [Assured Guaranty Municipal Corp.] ("Assured"), [], (the "Trustee") and [] (the "Delaware Trustee", which term includes any successor under the Trust Agreement, and together with the Trustee, the "Trustees"), and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), a summary of certain of the pertinent provisions of which is set forth hereinafter.  This Certificate is issued under and is subject to the terms, provisions and conditions of the Trust Agreement, to which Trust Agreement the Holder of this Certificate by virtue of its acceptance hereof assents and by which such Holder is bound. Distributions on this Certificate shall be made by the Trust Unit Paying Agent under the Trust Agreement.

This Certificate is issued under the Trust Agreement to which reference is hereby made for a statement of the respective rights thereunder of the Depositor[s], the Trustees, Assured and the Holder of the Certificate and the terms upon which the Certificate is executed and delivered.

This Certificate does not bear interest.  Distributions on this Certificate represent a combination of certain interest and/or principal payments made on the New Securities and certain other payments which derive from the Trust Estate and may vary from period to period. Each such Distribution shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution, as set forth in the Standard Terms.

In certain circumstances, Assured may instruct the Trustee in writing to sell the New Securities (the "Subject Bonds") underlying the Units for cash (a "Bond Sale"). The Holder of this

Certificate shall have the option to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs and Tax Costs, in lieu of receiving a pro rata share of the actual net cash proceeds from the Bond Sale, as set forth in the Standard Terms.

This Certificate is not subject to repurchase by the Trust at the option of the Holder of this Certificate.

The Holder, by its acceptance of this Certificate, agrees that it will look solely to the funds allocated pursuant to the Trust Agreement for distribution hereunder and that none of the Trustee or the Trust Unit Paying Agent in their individual capacities nor the Depositor[s] [is] [are] personally liable to such Holder for any amount payable under this Certificate or the Trust Agreement, subject in the case of the Trustee to any liability under the Trust Agreement, provided that the foregoing shall not prevent the Holder from appearing or litigating any such proceeding after it has been instituted.

The Holder, by its acceptance of this Certificate hereby agrees that (i) the Trust Agreement is executed and delivered by [], not individually or personally, but solely as Trustee in the exercise of the powers and authority conferred upon and vested in it, and pursuant to instructions set forth therein, (ii) each of the representations, undertakings and agreements herein made on the part of the Trustee or the Trust is made and intended not as personal representations, undertakings or agreements of [], (iii) nothing herein contained shall be construed as creating or imposing any liability upon [], individually or personally, or the Depositor[s] to perform any covenant, either express or implied, contained herein, all such liability, if any, is hereby expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and such waiver shall bind any third party making a claim by or through one of the parties hereto, and (iv) under no circumstances shall [] or the Depositor[s] be personally liable for the payment of any indebtedness or expenses of the Trust, or be personally liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under the Trust Agreement.

The Holder, by its acceptance of this Certificate, covenants and agrees that it will not at any time institute against the Depositor[s], Assured or the Trust, or join in any institution against the Depositor[s], Assured or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to this Certificate or the Trust Agreement, that no adequate remedy at law exists with respect to any breach of such covenant and agreement, and that specific performance shall in all circumstances be available as a remedy for any breach of such covenant and agreement.

Distributions on this Certificate will be made as provided in the Trust Agreement by the Trust Unit Paying Agent by wire transfer to such Holder without the presentation or surrender of this Certificate or the making of any notation hereon. Except as otherwise provided in the Trust Agreement and notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Trust Unit Paying Agent of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency maintained by the Unit Registrar for that purpose.

A-3

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this Certificate has been executed by the manual signature of an authorized officer of the Trustee and the certificate of authentication hereon shall have been executed by an authorized officer of the Unit Registrar, or an authenticating agent by manual signature, this Certificate shall not entitle the Holder hereof to any benefit under the Trust Agreement or be valid for any purpose.

THIS CERTIFICATE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and not in its individual capacity, has caused this Certificate to be duly executed.

[NAME OF SERIES] ASSURED CUSTODIAL TRUST

By:  [],
not in its individual capacity, but solely as Trustee


By:_____
    Authorized Signatory


Dated:  _____


## CERTIFICATE OF AUTHENTICATION


This is the Certificate referred to in the within-mentioned Trust Agreement.


[],
not in its individual capacity, but solely as Unit Registrar


By:_____
    Authorized Signatory


Dated:  _____

**[TRUST NAME]**

**REVERSE OF TRUST UNIT CERTIFICATE**

The Certificate does not represent an obligation of, or an interest in, Assured, the Trustee, or any Affiliates of each of them and no recourse may be had against any such parties or their assets, except as expressly set forth or contemplated herein or in the Trust Agreement. In addition, this Certificate is not guaranteed by any governmental agency or instrumentality and is limited in right of payment to certain collections and recoveries with respect to the Trust Estate, all as more specifically set forth herein and under the Trust Agreement. A copy of the Trust Agreement may be examined by any Holder upon written request during normal business hours at the principal office of the Trustee and at such other places, if any, designated by the Trustee.

The Trust Agreement (including the Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured. The Trust Agreement (including the Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

a) except as otherwise provided in the Trust Agreement (including the Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

b) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

c) alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

d) amend <u>Section 9.01</u> of the Standard Terms without the consent of each Trust Unit Holder;

e) adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in a), b), or c) without the consent of the Trust Unit Holders evidencing at least a majority of the Trust Units (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; or

f) reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

As provided in the Trust Agreement and subject to certain limitations therein set forth, including the limitations set forth in Article V of the Standard Terms, the transfer of this Certificate is registrable in the Certificate Register upon the surrendering of this Certificate for registration of

transfer at the offices or agencies of the Unit Registrar, accompanied by a written instrument of transfer in form satisfactory to the Unit Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon a new Certificate will be issued to the designated transferee. The initial Unit Registrar appointed under the Trust Agreement is the Trustee.

No service charge will be made for any such registration of transfer or exchange, but the Trustee or the Unit Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith or any expense incurred thereby.

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

The obligations and responsibilities created by the Trust Agreement and the Trust shall terminate upon the payment to the Holders of the Trust Units of all amounts required to be paid to them pursuant to the Trust Agreement, the disposition of all property held as part of the Trust Estate and payment of any costs, expenses and indemnities due and owing to the Trustees under the Trust Agreement or of any other costs or expenses as provided in the Trust Agreement.

**ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned hereby sell(s) and assign(s) and transfer(s) unto

_____

_____

(Please print or type name and address, including postal zip code, of assignee and social security number or employer identification number)

_____

the within Certificate stating in the names of the undersigned in the Certificate Register and does hereby irrevocably constitute and appoint

_____

to transfer such Certificate in such Certificate Register of the Trust.

I [we] further direct the Unit Registrar to issue a new Certificate of like principal to the above-named assignee and deliver such Certificate to the following address:

_____

_____

Dated:_____      _____
                                 Signature by or on behalf of Assignor

_____
        Authorized Officer       _____
                                 Signature Guaranteed

_____      _____
      Name of Institution        NOTICE: The signature(s) of this assignment must
                                 correspond with the name(s) on the face of this
                                 Certificate without alteration or any change
                                 whatsoever. The signature must be guaranteed by a
                                 participant in the Securities Transfer Agents
                                 Medallion Program, the New York Stock Exchange
                                 Medallion Signature Program or the Stock
                                 Exchanges Medallion Program. Notarized or
                                 witnessed signatures are not acceptable as
                                 guaranteed signatures.

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for the information of the Unit Registrar.

Distributions shall be made by wire transfer in immediately available funds to

_____

for the account  of

_____

account number _____ or, if mailed by check, to

_____

_____.

Applicable reports and statements should be mailed to

_____.

This information is provided by _____the

assignee named above, or _____ as its agent.

## EXHIBIT B

FORM OF CERTIFICATE OF TRUST OF
[NAME OF SERIES] ASSURED CUSTODIAL TRUST

THIS Certificate of Trust of [[Name of Series] Assured Custodial Trust (the "Trust"), is being duly executed and filed by the undersigned, as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801 *et seq.*) (the "Act").

1. NAME. The name of the statutory trust formed hereby is "[Name of Series] Assured Custodial Trust."

2. DELAWARE TRUSTEE. The name and business address of the trustee of the Trust in the State of Delaware are [].

3. EFFECTIVE DATE. This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

[],
as Delaware Trustee

By:_____
Name:
Title:

[],
as Trustee

By:_____
Name:
Title:

B-1

# EXHIBIT C

FORM OF TRUSTEE CERTIFICATION - UNDERLYING INSURED SECURITY

The undersigned hereby certifies as follows to COMMONWEALTH OF PUERTO RICO [AND PUERTO RICO PUBLIC BUILDINGS AUTHORITY], as depositor[s] (the "Depositor[s]") with respect to the Bonds listed on Schedule I of the applicable Trust Agreement (the "Assured Legacy Bonds"):

(1) [], as trustee (the "Trustee") of [[Name of Series] Assured Custodial Trust (the "Trust") is in possession of a certificate evidencing the Assured Legacy Bonds; or

(2) The Trustee has received confirmation from the depository of such Assured Legacy Bonds or a direct or indirect participant thereof that such Assured Legacy Bonds are beneficially owned by the Trust for the benefit of the Trust Unit Holders.

Capitalized terms used but not defined herein have the meanings assigned to such terms in the [Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Depositor[s], [Assured Guaranty Corp.] [OR] [Assured Guaranty Municipal Corp.], the Trustee, and [], as Delaware trustee, which incorporates by reference the Standard Terms to Trust Agreement, dated as of [●].


[],
as Trustee


By:_____
Name:
Title:

Date: [insert Effective Date]

**STANDARD TERMS**

**TO**

**TRUST AGREEMENT**

Estado Libre Asociado de Puerto Rico, whose name in English is COMONWEALTH
OF PUERTO RICO, as Depositor,

Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO
RICO PUBLIC BUILDINGS AUTHORITY, as Depositor,

ASSURED GUARANTY CORP.,

ASSURED GUARANTY MUNICIPAL CORP.,

[],
as Trustee,

and

[],
as Delaware Trustee,

Custodial Trust Units

Dated as of [●]

# TABLE OF CONTENTS

**Page**

RECITALS ........................................................................................................ 1

STANDARD PROVISIONS ............................................................................ 1

ARTICLE I  DEFINITIONS ........................................................................... 1
    Section 1.01.    Defined Terms. ..........................................................1
    Section 1.02.    Other Definitional Provisions. ...................................9

ARTICLE II  TRUST ESTATE ..................................................................... 9
    Section 2.01.    Trust Assets.................................................................9
    Section 2.02.    Acceptance by the Trustee..........................................11
    Section 2.03.    Purpose, Activities of the Trust. ................................11
    Section 2.04.    Limitations of the Trust. ............................................12
    Section 2.05.    Voting Rights. .............................................................13

ARTICLE III  ADMINISTRATION OF THE TRUST ................................. 13
    Section 3.01.    Accounts. ....................................................................13
    Section 3.02.    Distributions; Prior to Maturity Date or in Connection with Assured Advancement Option. .................................14
    Section 3.03.    Assured Advancement Option. ...................................15
    Section 3.04.    Sale of New Securities. ...............................................15
    Section 3.05.    Adjustments to Principal Amounts and Compounded Amounts..................................................................17
    Section 3.06.    Payments on Assured Insurance Policies.....................18
    Section 3.07.    Exchange of Trust Units for Trust Assets.....................19
    Section 3.08.    Payments at Maturity Date...........................................20

ARTICLE IV  REPORTING/REMITTING TO TRUST UNIT HOLDERS .................. 21
    Section 4.01.    Statements to Trust Unit Holders.................................21
    Section 4.02.    Compliance with Withholding Requirements................21

ARTICLE V  TRUST UNITS ......................................................................... 22
    Section 5.01.    The Trust Units. ..........................................................22
    Section 5.02.    Book-Entry Trust Units................................................22
    Section 5.03.    Registration of and Limitation on Transfers and Exchanges of Units..................................................................23
    Section 5.04.    No Obligation to Register. ...........................................24
    Section 5.05.    Mutilated, Destroyed, Lost or Stolen Units. .................24
    Section 5.06.    Persons Deemed Owners. ............................................24
    Section 5.07.    Appointment of Trust Unit Paying Agent.....................24

i

## TABLE OF CONTENTS
### (continued)

Page

ARTICLE VI  CONCERNING THE TRUSTEE ............................................................ 25
    Section 6.01.    Duties of Trustee ........................................................... 25
    Section 6.02.    Certain Matters Affecting the Trustee. ........................... 26
    Section 6.03.    Trustee Not Liable for Trust Units or Securities. .......... 28
    Section 6.04.    Trustee May Own Units. ................................................. 29
    Section 6.05.    Trustee's Fees and Expenses. ......................................... 29
    Section 6.06.    Eligibility Requirements for Trustee, Successor Trustee,
        and Trust Unit Paying Agent. ...................................... 30
    Section 6.07.    Resignation and Removal of the Trustee. ...................... 30
    Section 6.08.    Successor Trustee ........................................................... 31
    Section 6.09.    Merger or Consolidation of Trustee ............................... 32
    Section 6.10.    Reserved ......................................................................... 32
    Section 6.11.    Appointment of Custodians. .......................................... 32
    Section 6.12.    Trustee May Enforce Claims Without Possession of Trust
        Units. ............................................................................ 32
    Section 6.13.    Trustee Indemnity ......................................................... 32

ARTICLE VII  TERMINATION OF TRUST ............................................................ 33
    Section 7.01.    Termination; No Redemption Rights ............................. 33
    Section 7.02.    Procedure for Termination. ............................................ 33

ARTICLE VIII  TAX PROVISIONS ........................................................................ 34
    Section 8.01.    Grantor Trust Provisions ............................................... 34
    Section 8.02.    Characterization. ............................................................ 34
    Section 8.03.    Grantor Trust Administration. ....................................... 35
    Section 8.04.    Reports to Trust Unit Holders and Tax Authorities ...... 35

ARTICLE IX  MISCELLANEOUS PROVISIONS .................................................... 37
    Section 9.01.    Amendment of Trust Agreement. ................................... 37
    Section 9.02.    Counterparts. .................................................................. 38
    Section 9.03.    Limitation on Rights of Trust Unit Holders ................... 38
    Section 9.04.    Notices. .......................................................................... 39
    Section 9.05.    Severability of Provisions. ............................................. 40
    Section 9.06.    Third-Party Beneficiaries. .............................................. 40
    Section 9.07.    Acts of Trust Unit Holders ............................................. 40
    Section 9.08.    Headings. ....................................................................... 40
    Section 9.09.    No Waiver; Cumulative Remedies. ................................ 40
    Section 9.10.    Merger and Integration. ................................................. 41
    Section 9.11.    The Delaware Trustee ..................................................... 41

ii

## RECITALS

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO (the "Commonwealth"), Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA", and together with the Commonwealth, the "Depositors"), and ASSURED GUARANTY CORP. and ASSURED GUARANTY MUNICIPAL CORP. (together or individually, as applicable, "Assured") have entered into a Trust Agreement (the "Trust Agreement") with [], [a national banking association], as trustee (the "Trustee") and [], [a national banking association], as Delaware trustee (the "Delaware Trustee" and together with the Trustee, the "Trustees"), which Trust Agreement provides for the issuance of trust units ("Trust Units"), each evidencing a beneficial ownership interest in the property owned by the Trust created by the Trust Agreement. These Standard Terms are a part of, and are incorporated by reference into, the Trust Agreement.

## STANDARD PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made in the Trust Agreement, the Depositors, Assured and the Trustees agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01. *Defined Terms*.**

Except as otherwise specified herein or in the Trust Agreement or as the context may otherwise require, whenever used herein, the following words and phrases shall have the meanings specified in this Article. Capitalized words and phrases used herein but not defined herein shall, when applied to a Trust, have the meanings set forth in or pursuant to the Trust Agreement.

"**Acceleration Price**": With respect to an Assured Legacy Bond, an amount equal to the outstanding principal amount of such bond plus the accrued and unpaid interest thereon.

"**Accreted Value**": As defined in the New GO Bonds Indenture.

"**Adverse Trust Event**": has the meaning set forth in Section 8.03 hereof.

"**Affiliate**": Any person or entity controlling, controlled by or under common control with the Depositor, Assured or the Trustee, as the context may require. "Control" means the power to direct the management and policies of a person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative to the foregoing.

"**Assured Acceleration Option**": Assured's right, in accordance with the terms of the Assured Insurance Policies and Section 75.1(c) of the Commonwealth Plan, to elect to

1

discharge its payment obligations with respect to any Assured Legacy Bonds CUSIP prior to the stated Maturity Date thereof by paying the applicable Acceleration Price to the holders thereof.

"**Assured Advancement Option**": Either (a) the Assured Acceleration Option or (b) the rights assigned by the Commonwealth or PBA to Assured pursuant to Section 75.1(d) of the Commonwealth Plan to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were the Commonwealth or PBA for such purpose, such that any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Acceleration Price.

"**Assured Bondholder Election 2**": As defined in the Commonwealth Plan.

"**Assured Deferred Expenses**": Any Trustee Costs or Trust expenses paid in cash to the Trustee or the Trust by Assured.

"**Assured Insurance Policies**": The insurance policies, including insurance policies issued in the secondary market, pursuant to which Assured insured payments of principal and interest with respect to the Assured Legacy Bonds.

"**Assured Insured Bonds**": As defined in the Commonwealth Plan.

"**Assured Insurer Event**": A default by Assured on its payment obligations under an applicable Assured Insurance Policy, which default is continuing.

"**Assured Legacy Bondholder**": The beneficial holder of an Assured Legacy Bond.

"**Assured Legacy Bond**": Any Assured Insured Bond the beneficial holder of which has validly elected, or is deemed to have elected, Assured Bondholder Election 2.

"**Assured Legacy Bonds CUSIP**": Any maturity of Assured Legacy Bonds that bears a unique CUSIP such that such maturity of Assured Legacy Bonds is separately identifiable from other maturities of Assured Legacy Bonds with unique CUSIPs.

"**Assured Legacy Bonds Distribution**": The New GO Bonds, [the Commonwealth Plan Cash Distributions], the GO CVIs, and any other property allocable to holders of Assured Legacy Bonds in their capacity as such under the Commonwealth Plan (which, if Assured elects to insure such New GO Bonds, shall include the applicable insurance policy insuring such New GO Bonds), but excluding (A) New GO Bonds, [Commonwealth Plan Cash Distributions], GO CVIs, and other property allocable to holders of Assured Insured Bonds other than Assured Legacy Bonds under the Commonwealth Plan, (B) New GO Bonds, [Commonwealth Plan Cash Distributions], GO CVIs, and other property allocable to Assured as a beneficial owner of GO Bonds or PBA Bonds under the Commonwealth Plan, or (C) any other consideration that Assured is entitled to receive in accordance with the terms of the Commonwealth Plan (including, without limitation, Consummation Costs, PSA Restriction Fees, or Clawback Structuring Fees, each as defined in the Commonwealth Plan).

"**Assured Reimbursement Amount**": An amount sufficient to reimburse Assured for all payments made by Assured under an Assured Insurance Policy for a particular Assured Legacy Bonds CUSIP, and payment of which to Assured shall be a requirement of the Unit Exchange Election.

"**Beneficial Owner**": With respect to any Trust Unit, the Person who is registered as owner of that Trust Unit in the books of the Depository for that Trust Unit or in the books of a Depository Participant, or in the books of an indirect participant for which a Depository Participant acts as agent.

"**Bond Documents**": The bond resolutions, indentures, trust agreements, or similar agreements pursuant to which (i) the Assured Legacy Bonds, (ii) the New GO Bonds, and (iii) the GO CVIs were issued.

"**Bond Election**": As defined in Section 3.04(b) hereof.

"**Bond Sale**": As defined in Section 3.04(a) hereof.

"**Bonds**": Collectively, (i) the GO Bonds, (ii) the PBA Bonds, and (iii) the New GO Bonds.

"**Business Day**": Any day that is not a Saturday, Sunday, holiday, or other day on which commercial banking institutions in the City of New York, the city of San Juan, Puerto Rico or the State of Delaware or, if different, the city and state in which the Corporate Trust Office is located are authorized or obligated by law or executive order to be closed.

"**Capital Appreciation Bond**": An Assured Legacy Bond that is a capital appreciation bond.

"**Cash Account**": As defined in Section 3.01(c) hereof.

"**Cash Proceeds**": As defined in Section 3.04(b) hereof.

"**Code**": The Internal Revenue Code of 1986, as amended.

"**Commonwealth Plan**": The Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 17627, including as amended or superseded, but in all events solely to the extent in form and substance reasonably satisfactory to Assured and otherwise consistent with the Commonwealth PSA and HTA/CCDA PSA.

"**Commonwealth Plan Cash Distributions**": Any cash distributions allocable to Assured Legacy Bondholders on account of Assured Legacy Bonds under the Commonwealth Plan, but, for the avoidance of doubt, excluding any Consummation Costs, PSA Restriction Fees, or Clawback Structuring Fees payable to Assured, each as defined in the Commonwealth Plan.

"**Commonwealth PSA**": That certain Amended and Restated Plan Support agreement, dated as of July 12, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Compounded Amount**": With respect to any Capital Appreciation Bond, the compounded amount thereof.

"**Confirmation Order**": The order of the United States District Court for the District of Puerto Rico confirming the Commonwealth Plan in accordance with Section 314(b) of PROMESA and section 1129 of the Bankruptcy Code.

"**Corporate Trust Office**": The principal corporate trust office of the Trustee at which at any particular time its corporate trust business shall be administered.

"**Current Interest Bond**": An Assured Legacy Bond that is a current interest bond.

"**Custodian**": The Trustee or the agent for the Trustee which shall hold all or a portion of the Trust Estate, or documents relating thereto, with respect to a specific Trust.

"**CVI Account**": As defined in Section 3.01(d) hereof.

"**Depository**": The Depository Trust Company, or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the SEC thereunder.

"**Depository Participant**": A broker, dealer, bank, other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"**Distribution**": Any distribution to Trust Unit Holders made pursuant to Section 3.02.

"**Effective Date**": The effective date of the Commonwealth Plan.

"**EMMA**" The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP for each Trust Unit to which such document relates.

"**Extraordinary Expenses**": As defined in Section 6.05(b) hereof.

"**Fee Agreement**": An agreement dated as of the date hereof providing for the Trustees' recovery from or reimbursement by the Trust of certain reasonable compensation, certain reasonable expenses, costs, and disbursements, and certain Extraordinary Expenses.

"**Floor Price**": The minimum weighted average sale price required to be obtained for the Subject Bonds with respect to any Bond Sale, as determined by Assured.

"**GO CVI**": As defined in the Commonwealth Plan.

"**GO Bonds**": As defined in the Commonwealth Plan.

"**GO Payments**": Payments received by the Trustee on account of GO CVI or GO Bonds.

"**GO Payment Shortfall**": As defined in Section 3.06(c) hereof.

"**Grantor Trust Provisions**": Subpart E of Subchapter J of Chapter 1 of the Code and Section 7701 of the Code, and final Treasury Regulations, published rulings, notices and announcement, promulgated thereunder, as the foregoing may be in effect from time to time.

"**HTA/CCDA PSA**": That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds, each as defined therein, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Insurance Policy Account**": As defined in Section 3.01(e) hereof.

"**Insured Amount**": As of any date, (i) in the case of a Current Interest Bond, the accrued and unpaid interest on, and outstanding principal amount of, such Current Interest Bond as of such date, or (ii) in the case of a Capital Appreciation Bond, the Compounded Amount as of such date.

"**Maturity Date**": As defined in the Trust Agreement.

"**New GO Bonds**": As defined in the Commonwealth Plan, and including the Taxable New GO Bonds and Tax-Exempt New GO Bonds.

"**New GO Bonds Indenture**": As defined in the Commonwealth Plan.

"**New Securities**": Collectively, the New GO Bonds and the GO CVIs.

"**Notice of Claim and Certificate**": As defined in Section 3.06(a) hereof.

"**Notional Amount**": The amount of Trust Units issued as provided in the Trust Agreement.

"**Officer**": When used with respect to the Trustees, any senior vice president, any vice president, any assistant vice president, any assistant treasurer, any trust officer, any assistant secretary in the Corporate Trust Office of the Trustees, or any other officer of the Trustees

5

customarily performing functions similar to those performed by the persons who at the time shall be such officers, and also to whom with respect to a particular corporate trust matter such matter is referred because of such officer's knowledge of and familiarity with the particular subject. With respect to any other Person, the chairman of the board, the president, a vice president (however designated), the treasurer or controller.

"**Opinion of Counsel**": A written opinion of either (a) nationally recognized counsel who is reasonably acceptable to the parties to whom it is delivered, or (b) internal counsel to Assured or any of its Affiliates.

"**Original Scheduled Interest Payment Date**": With respect to a Current Interest Bond, a date, other than the Maturity Date, on which a scheduled payment of interest is due in respect of such Current Interest Bond in accordance with the terms of the applicable Assured Insurance Policy.

"**Original Scheduled Payment Date**": An Original Scheduled Interest Payment Date or Original Scheduled Principal Payment Date, as applicable, including, without limitation, the Maturity Date.

"**Original Scheduled Principal Payment Date**": A date on which a scheduled payment of principal or Compounded Amount is due in respect of such Current Interest Bond or Capital Appreciation Bond, as applicable, in accordance with the terms of the applicable Assured Insurance Policy, including, without limitation, the Maturity Date.

"**Paying Agent**": The paying agent for the GO Bonds.

"**Payment Shortfall**" As defined in Section 3.06(a) hereof.

"**Person**": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency, instrumentality, or political subdivision thereof.

"**PBA Bonds**": As defined in the Commonwealth Plan.

"**PBA Fiscal Agent**": The fiscal agent for the PBA Bonds.

"**Principal Amount Reduction**": As defined in Section 3.05(c) hereof.

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

"**pro rata**": Unless otherwise stated, any pro rata payment or distribution made to, or any pro rata allocation of any cost or expense borne by, (i) Holders of Trust Units for a particular Assured Legacy Bonds CUSIP shall be calculated based on the Notional Amount of Trust Units issued with respect to such Assured Legacy Bonds CUSIP, and (ii) all Holders of Trust Units without regard to Assured Legacy Bonds CUSIP shall be calculated based on the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of the Assured Legacy Bonds underlying such Trust Units.

"**Reorganized Debtors**": As defined in the Commonwealth Plan.

"**Requisite Trust Unit Holders**": With respect to any Trust, Holders of a majority (measured by outstanding principal amount or, in the case of Capital Appreciation Bonds, the Compounded Amount of the underlying Assured Legacy Bonds CUSIP) of Trust Units.

"**Sale Notice**": As defined in Section 3.04(a) hereof.

"**Sale Notice Period**": As defined in Section 3.04(b) hereof.

"**SEC**": The Securities and Exchange Commission.

"**Secondary Market Assured Legacy Bonds**": The Assured Legacy Bonds that are insured through Assured Insurance Policies issued in the secondary market.

"**Securities**": Collectively, the Assured Legacy Bonds and the New Securities.

"**Securities Act**": The Securities Act of 1933, as amended.

"**Standard Terms**": These Standard Terms, as amended or supplemented, incorporated by reference into the Trust Agreement.

"**Subject Bonds**": As defined in Section 3.04(a) hereof.

"**Target Price**": With respect to any Bond Sale, the then-current trading price of the Subject Bonds, as measured by the most recently available sale price for no less than $1,000,000 of the Subject Bonds, as quoted on a nationally recognized exchange or a "bid" price on an electronic trading system such as Bloomberg L.P. posted within 10 Business Days prior to the date of the Sale Notice, or if no such price is available, a bona fide bid quote provided for no less than $1,000,000 of the Subject Bonds by an independent broker-dealer operating in the over-the-counter market.

"**Tax Costs"**: As defined in Section 8.04(c) hereof.

"**Taxable Bond Account**": As defined in Section 3.01(b) hereof.

"**Taxable GO Bonds**": Any GO Bonds that were taxable bonds.

"**Taxable New GO Bonds**": New GO Bonds that are not initially issued as tax-exempt bonds (if any).

"**Tax-Exempt Bond Account**": As defined in Section 3.01(a) hereof.

"**Tax-Exempt New GO Bonds**": New GO Bonds that are tax-exempt bonds.

"**Termination Notice**": As defined in Section 7.02 hereof.

"**Treasury Regulations**": Regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of regulations, including

proposed or temporary regulations shall include analogous provisions of final Treasury Regulations as well as any successor or replacement Treasury Regulations.

"**Trust**": With respect to each Assured Legacy Bonds CUSIP, the separate trust formed pursuant to the applicable Trust Agreement.

"**Trust Assets**"**:** With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Legacy Bonds CUSIP; (i) such Assured Legacy Bonds CUSIP (including the related rights under the applicable Assured Insurance Policy, or in the case of Secondary Market Assured Legacy Bonds, the custody receipts evidencing a beneficial ownership interest in such Secondary Market Assured Legacy Bonds and the related rights under the applicable Assured Insurance Policy); (ii) the pro rata share of each asset comprising the Assured Legacy Bonds Distribution that is allocable to beneficial holders of such Assured Legacy Bonds CUSIP based on the Acceleration Price of such Assured Legacy Bonds CUSIP as of the Effective Date and the Acceleration Price of all Assured Legacy Bonds as of the Effective Date; (iii) any other property that Assured may determine, in its sole discretion, to deposit in the applicable Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP; and (iv) any proceeds of any of the foregoing.

"**Trust Unit Holder**" or "**Holder**": As applicable, (i) a Beneficial Owner of a Trust Unit, or (ii) Assured, to the extent Assured has been subrogated to the rights of a Beneficial Owner of a Trust Unit Holder.

"**Trust Unit Paying Agent**": The paying agent appointed pursuant to Section 5.07 hereof.

"**Trustee Costs**": As defined in Section 6.05(a) hereof.

"**Trust Estate**": Collectively, and with respect to any Trust, (a) the Trust Assets deposited and held in such Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP, and (b) any other property deposited and held in such Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP (if any).

"**Trust Unit**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Insured Bonds CUSIP, the certificated trust unit(s) to be issued by such Trust to beneficial holders of such Assured Insured Bonds CUSIP, as further defined in the Trust Agreement.

"**Unit Exchange Election**": As defined in Section 3.07(a) hereof.

"**Unit Register**" and "**Unit Registrar**": The register maintained and the registrar appointed pursuant to Section 5.03 hereof.

"**U.S. Person**": A person who is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Voting Rights**": Any voting or control rights granted to holders of Securities.

**Section 1.02.** *Other Definitional Provisions.*

The words "hereof," "herein" and "hereunder" and words of similar import when used in these Standard Terms shall refer to these Standard Terms as a whole and not to any particular provision of these Standard Terms, and Section, subsection, Annex and Exhibit references are to these Standard Terms unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." Any reference to any document in these Standard Terms shall be deemed to include any amendment, restatement, supplement or modification thereto.

# ARTICLE II

# TRUST ESTATE

**Section 2.01.** *Trust Assets.*

Pursuant to and in accordance with the Trust Agreement and the Commonwealth Plan, upon the Effective Date:

(a) The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding a particular Assured Legacy Bonds CUSIP, deposit the New GO Bonds allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP. The Trustee shall establish and maintain a Tax-Exempt Bond Account into which any such Tax-Exempt New GO Bonds shall be deposited, and a Taxable Bond Account into which any such Taxable New GO Bonds shall be deposited; provided, however, that the Trustee shall transfer any Taxable New GO Bonds that become Tax-Exempt New GO Bonds (if any) from the Taxable Bond Account to the Tax-Exempt Bond Account.[1]

---

[1] *Secondary Market Assured Legacy Bonds*: This footnote describes how the holders of Secondary Market Assured Legacy Bonds will receive Trust Units under this Agreement and how assets distributed under the Plan on account of such ownership interests will be transferred from the custodian of the existing custodial arrangement to the Trustee under this Agreement.

This Agreement will be used to administer assets distributed under the Plan for the beneficial owners of interests in Assured Legacy Bonds (including Secondary Market Assured Legacy Bonds) that elect Assured Bondholder Election 2 under the Plan. By electing (or being deemed to have elected) Assured Bondholder Election 2, each beneficial holder of custody receipts evidencing a beneficial ownership interest in the Secondary Market Assured Legacy Bonds (including FGIC-insured bonds insured by Assured in the secondary market) and the respective Assured Insurance Policy shall be deemed to have deposited such custody receipts into the respective Trust in exchange for Trust Units evidencing a pro rata beneficial ownership interest in the related Trust Assets, which shall include such custody receipts.

The custodian of the existing custodial arrangements will receive the distributions contemplated by the Plan (or in the case of FGIC-insured bonds insured by Assured in the secondary market, the distribution of certificates representing an interest in the newly established FGIC bond trust) on account of the existing custody receipts and will transfer those new assets and the applicable existing insurance policies to the Trustee of the newly created Trusts as part of the Trustee (as the holder of all such custody receipts) and Assured collapsing the existing custodial arrangement. The Trustee will then deposit those new assets and existing insurance policies into the appropriate Trust accounts described herein (and will hold the extinguished legacy bonds in its own account).

(b)     The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding a particular Assured Legacy Bonds CUSIP, deposit the Commonwealth Plan Cash Distributions allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP.  The Trustee shall establish and maintain a Cash Account into which any such Commonwealth Plan Cash Distributions shall be deposited.

(c)     The Commonwealth shall, on behalf of each of the Assured Legacy Bondholders holding a particular Assured Legacy Bonds CUSIP, deposit the GO CVIs allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP.  The Trustee shall establish and maintain a CVI Account into which any such GO CVIs shall be deposited.

(d)     The Paying Agent and the PBA Fiscal Agent shall, on behalf of each of the Assured Legacy Bondholders holding a particular Assured Legacy Bonds CUSIP, transfer the Assured Insurance Policy for that Assured Legacy Bonds CUSIP and any and all agreements, documents and instruments relating to such Assured Insurance Policy that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Assured Legacy Bondholders into the applicable Trust.

(e)     The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding a particular Assured Legacy Bonds CUSIP, transfer any and all agreements, documents and instruments relating to the Assured Insurance Policy for that Assured Legacy Bonds CUSIP that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Assured Legacy Bondholders into the applicable Trust.

(f)     The Assured Legacy Bondholders shall deposit their Assured Legacy Bonds into the Trust for the applicable Assured Legacy Bonds CUSIP, and, in the event any Assured Legacy Bondholder fails to so deposit its Assured Legacy Bond(s) as of the Effective Date, such Assured Legacy Bondholder's Assured Legacy Bond(s) shall be deemed deposited into the applicable Trust for the relevant Assured Legacy Bonds CUSIP as of the Effective Date.  The Trustee shall establish and maintain an Insurance Policy Account into which such Assured Legacy Bonds CUSIP shall be deposited.  Pursuant to Section 77.6 of the Plan, the Assured Legacy Bonds deposited (or deemed deposited) into the Trust shall not be cancelled and all rights and remedies under the existing Assured Legacy Bonds and the applicable Bond Documents (other than payment obligations of the Depositors and the continuation of any lien granted as security for such Assured Legacy Bonds) shall remain in

---

The Trustee will then receive payments and administer distributions in connection with the Trust Assets in accordance with this Agreement until the Trust is terminated.

The unique characteristics of certain of the Secondary Market Assured Legacy Bonds and the attributes of their current custodial arrangements will require that the documentation establishing and implementing the Trusts for such interests be tailored to the specifics of such bonds/arrangements.  For example, the Trust(s) established to hold trust certificates in the newly created FGIC bond trust(s) will hold those trust certificates and the related Assured Insurance Policy instead of newly issued GO Bonds (and assets distributed in connection therewith) and the Trust documentation will have to be revised accordingly.  Some Secondary Market Assured Legacy Bonds are insured by both Assured Guaranty Corp. and Assured Guaranty Municipal Corp. and will require provisions to address how those policies are to be drawn on in order to make Distributions.

full force and effect solely to the extent necessary to preserve any claims relating to the Assured Legacy Bonds deposited in the Trust under the applicable Assured Insurance Policy. Such existing Assured Legacy Bonds shall not form the basis for the assertion of any claim against the Depositors or the Reorganized Debtors. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

**Section 2.02.** *Acceptance by the Trustee.*

(a)     By its execution of the Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all documents, instruments, and other property delivered to it or received by it from time to time with respect to the Trust Assets and all other assets included in the definition of Trust Estate, in each case in trust for the exclusive use and benefit of all present and future Trust Unit Holders. The Trustee represents and warrants that, except as expressly permitted by the Trust Agreement, (i) it has not and will not, other than in its capacity as trustee for the benefit of the Trust Unit Holders, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of the Trust Agreement, and (ii) it has not encumbered or transferred, and will not encumber or transfer, its right, title or interest in the Trust Estate.

(b)     With respect to the Securities, the Trustee shall, on the Effective Date, deliver to the applicable Depositor(s) a certification substantially in the form of Exhibit C to the Trust Agreement certifying that it is either (i) in possession of a certificate evidencing the applicable  Securities, or (ii) it has received confirmation from a depository of such Securities or a direct or indirect participant thereof that the Securities acquired by the Trust on such Effective Date are legally owned by the Trust for the benefit of the Trust Unit Holders.

(c)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

**Section 2.03.** *Purpose, Activities of the Trust.*

It is the intention of the parties hereto that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to the following:

(a)     receiving, accepting, and holding in trust the Trust Estate;

(b)     creating one or more accounts or sub-accounts in accordance with the terms of the Trust Agreement (including these Standard Terms);

(c)     making claims and receiving payments under the Assured Insurance Policies;

(d)     receiving payments pursuant to the Commonwealth Plan and the securities issued thereunder;

11

(e)      issuing one or more series of Trust Units to holders of Assured
Legacy Bonds in accordance with the terms of the Trust Agreement (including these
Standard Terms);

(f)      making distributions to the Trust Unit Holders in accordance with the
terms of the Trust Agreement (including these Standard Terms);

(g)      coordinating communications with Trust Unit Holders through the
Depository;

(h)      following, accepting or acting upon any instruction or direction from
Assured or the Requisite Trust Unit Holders, as applicable, in each case only as expressly
permitted in the Trust Agreement;

(i)      making public disclosures on EMMA and similar means of
distribution;

(j)      making disclosures and sharing information with Bloomberg L.P. for
disclosure on its trading platform and with other similar services; and

(k)      engaging in those activities that are necessary, suitable or convenient
to accomplish the foregoing or are incidental thereto.

### Section 2.04.  *Limitations of the Trust.*

(a)      Except as otherwise provided herein, the affairs of the Trust will be
managed by or under the direction of the Trustee.  None of the Depositors, the Reorganized
Debtors, or Assured, or any of their respective Affiliates will have authority to act for, or to
assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity
as Trustee.

(b)      The Trust will keep correct and complete books and records of
accounts and minutes of the meetings and other proceedings of the Trust.  Any resolutions,
agreements and other instruments will be continuously maintained by the Trustee as official
records of the Trust.

(c)      The Trust will provide for its own operating expenses and liabilities
from the Trust Estate.  General overhead and administrative expenses of the Trust will not be
charged or otherwise allocated to the Depositors, the Reorganized Debtors, or Assured or
their respective Affiliates.

(d)      All oral and written communications, including letters, invoices,
contracts, statements and applications, will be made solely in the name of the Trust if related
to the Trust.

(e)      There will be no guarantees made by the Trust with respect to
obligations of the Depositors, the Reorganized Debtors, or Assured or their respective
Affiliates.  There will not be any indebtedness relating to borrowings or loans between the

Trust, the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates; provided, that, Assured may own Trust Units.

(f)     The Trust will act solely in its own name, or in the Trustee's name on the Trust's behalf, and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to the Depositors, the Reorganized Debtors, or Assured or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates; or (iii) induce any such third party to reasonably rely on the creditworthiness of the Depositors, the Reorganized Debtors, or Assured or any other affiliated or unaffiliated entity in its dealings with the Trust.

(g)     The Trust will maintain a Delaware Trustee with its office in the State of Delaware.

(h)     The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

**Section 2.05.  *Voting Rights*.**

(a)     Assured shall be deemed the sole holder of the Voting Rights with respect to the Securities held by the Trust.

## ARTICLE III

## ADMINISTRATION OF THE TRUST

**Section 3.01.  *Accounts*.**

The Trustee shall establish and maintain the following accounts for the Trust to be held in trust for the benefit of the Trust Unit Holders:

(a)     Tax-Exempt Bond Account. An account into which the Trustee shall deposit the Tax-Exempt New GO Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Tax-Exempt Bond Account**"), including any Taxable New GO Bonds that become Tax-Exempt New GO Bonds;

(b)     Taxable Bond Account. An account into which the Trustee shall deposit Taxable New GO Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Taxable Bond Account**");

(c)     Cash Account. An account into which the Trustee shall deposit the Commonwealth Plan Cash Distributions allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Cash Account**");

13

(d)     CVI Account. An account into which the Trustee shall deposit the GO CVIs allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**CVI Account**"); and

(e)     Insurance Policy Account. An account into which the Trustee shall deposit the applicable Assured Legacy Bonds CUSIP insured by the applicable Assured Insurance Policy (or any other securities, monies, proceeds or property received on account of or in exchange therefor) (the "**Insurance Policy Account**").

**Section 3.02.  *Distributions; Prior to Maturity Date or in Connection with Assured Advancement Option.***

(a)     Tax-Exempt Distributions.  Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New GO Bonds deposited in the Tax-Exempt Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

(b)     Taxable Distributions. Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New GO Bonds deposited in the Taxable Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

(c)     CVI Distributions.  Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the GO CVIs deposited in the CVI Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

(d)     Insurance Policy Distributions.  Promptly following receipt thereof by the Trustee, the Trustee shall, subject to Section 3.06(c), be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Tax Costs as of the date of distribution.  Notwithstanding anything herein or elsewhere to the contrary, no Trustee Costs shall be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured

14

Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

(e)     Other Cash Distributions.  Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including any Commonwealth Plan Cash Distributions deposited in the Cash Account, net of of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

### Section 3.03.  *Assured Advancement Option.*

(a)     Assured shall have the right to exercise the Assured Advancement Option with thirty (30) days' prior written notice to the relevant Assured Legacy Bond Holders and/or Trust Unit Holders.  Upon the exercise of any Assured Advancement Option and the payment of the applicable Acceleration Price or redemption price with respect to any Assured Legacy Bonds CUSIP, the Trustee shall be required to disburse such Acceleration Price or redemption price to the Trust Unit Holders of the relevant Trust as set forth in Section 3.02 above, net of the allocable portion of any outstanding Tax Costs as of the date of distribution, and Assured shall become fully subrogated to all of the rights of such Trust Unit Holders, including, upon the termination of the relevant Trust, rights to any then remaining Trust Assets.  Upon the disbursement of such Acceleration Price or redemption price to the relevant Trust Unit Holders as set forth above, the Trust Units of such Trust shall be retired, such Trust shall be terminated, and the Trustee shall deliver the remaining Trust Assets of such Trust to or at the direction of Assured.  At any time on or after the date of receipt of such Trust Assets, Assured shall have the right to sell all or certain of the New Securities constituting part of such Trust Assets for value, including by (i) selling all or certain of the applicable Tax-Exempt New GO Bonds constituting part of such Trust Assets for value as tax-exempt bonds, (ii) selling all or certain of the Taxable New GO Bonds constituting part of such Trust Assets for value as taxable bonds, and (iii) selling all or certain of the GO CVIs constituting part of such Trust Assets.

(b)     Payment of the applicable Acceleration Price or redemption price with respect to any Assured Insured Bond shall satisfy and discharge all of Assured's obligations under the applicable Assured Insurance Policy with respect to such Assured Insured Bond.

### Section 3.04.  *Sale of New Securities.*

(a)     At any time and from time to time prior to the Maturity Date, so long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall have the right to instruct the Trustee to sell any New Securities of any series, in a minimum aggregate principal amount (or, with respect to capital appreciation bonds, a minimum aggregate current Accreted Value) of $1,000,000 (taking into account for such minimum, all concurrent sales of such series of New Securities in the Trusts) (it being understood that such minimum shall not be applicable if all New Securities of such series held as part of the Trust Assets are included in such sale) (or any other securities or property received on account thereof or in exchange therefor) (the "**Subject Bonds**") that are part of the Trust Assets for cash (a "**Bond Sale**").  Prior to any Bond Sale, Assured will notify the

15

Trustee of the intended Bond Sale and will direct the Trustee to immediately distribute through the Depository a sale notice (the "**Sale Notice**") to all applicable Trust Unit Holders.

(b)     The Sale Notice will include (i) a statement identifying the Subject Bonds, the principal amount (or, with respect to capital appreciation bonds, current Accreted Value) of Subject Bonds to be sold, the applicable Target Price and Floor Price, (ii) a statement regarding the right of each applicable Trust Unit Holder to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs and Tax Costs (the "**Bond Election**"), in lieu of receiving a pro rata share of the actual net cash proceeds ("**Cash Proceeds**") from the Bond Sale and (iii) a statement that the Bond Sale will only be executed if the weighted average price obtainable for the Subject Bonds (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) is equal to or greater than the Floor Price.  Trust Unit Holders that determine to make a Bond Election must make the election through the Depository within two (2) Business Days after the Depository receives the Sale Notice (the "**Sale Notice Period**").

(c)     Following the Sale Notice Period,

(i)     If any applicable Trust Unit Holders make valid Bond Elections, an amount of Subject Bonds representing a proportion of the Subject Bonds equivalent to such Trust Unit Holders' aggregate pro rata ownership of all applicable Trust Units shall be reserved from the Bond Sale and shall instead be distributed pro rata to each such Trust Unit Holder making a valid Bond Election (any such distribution to be rounded down to the nearest minimum denomination, with any reduction as a result of such rounding down to be distributed to such Trust Unit Holders in cash).  In order to make a valid Bond Election, a Trust Unit Holder shall be required to pay to the Trustee such Trust Unit Holder's allocable portion of any outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period.  To the extent a Trust Unit Holder has not paid its allocable portion of any such outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period, the Bond Election will be deemed invalid.

(ii)     Applicable Trust Unit Holders that did not make a valid Bond Election will promptly receive a pro rata share of Cash Proceeds from the sale of Subject Bonds (not subject to a valid Bond Election), net of the allocable portion of any outstanding Trustee Costs and Tax Costs, and less any Cash Proceeds distributed as a result of rounding in accordance with Section 3.04(c)(i) to Trust Unit Holders making valid Bond Elections.

(iii)     If the Trustee is unable to agree, prior to executing the sale of any of the Subject Bonds, to a sale of all Subject Bonds not subject to a valid Bond Election for a weighted average price (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) equal to or greater than the Floor Price, the Trustee shall not sell or distribute any Subject Bonds, the Bond Sale shall be cancelled, and the Trustee shall send a notice, at the sole cost of Assured, to the applicable Trust Unit Holders through the Depository stating that

16

such Bond Sale was cancelled, after which any future sale of the Subject Bonds shall be required to be made pursuant to a new Sales Notice.

**Section 3.05.** *Adjustments to Principal Amounts and Compounded Amounts.*

(a)     Each Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution.  For the purposes of such reduction, any deduction from any Distribution in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash as part of the Distribution and shall reduce the applicable accrued and unpaid interst amount, outstanding principal amount, or Compounded Amount accordingly.  For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly.  As set forth in Section 3.02(d), Trustee Costs shall not be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

(b)     Any Bond Sale resulting in a distribution of Cash Proceeds or Subject Bonds to Trust Unit Holders, as the case may be, shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case as of the date the Cash Proceeds of such Bond Sale are distributed by the Trustee to the applicable Trust Unit Holders and in an amount equal to the aggregate Cash Proceeds from such Bond Sale distributed to the applicable Trust Unit Holders.  For the purposes of such reduction, any deduction from the Cash Proceeds in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash and shall reduce the applicable accrued and unpaid interst amount, outstanding principal amount, or Compounded Amount accordingly.  Further, for purposes of this Section 3.05(b), the aggregate Cash Proceeds shall be calculated as if each applicable Trust Unit Holder that took actual delivery of Subject Bonds had received the same amount of cash per Unit as a Trust Unit Holder that did not make a Bond Election, or if all applicable Trust Unit Holders participating in the Bond Sale made a Bond Election, the aggregate Cash Proceeds shall be calculated as if all Subject Bonds were sold at a net price equal to the Target Price.  For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly.  As set forth in Section 3.02(d), Trustee Costs shall not be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

17

(c)     If any Assured Legacy Bonds CUSIP is subject to mandatory sinking fund redemptions, any reduction of the outstanding principal amount or Compounded Amount, as applicable, of such Assured Legacy Bonds CUSIP pursuant to Section 3.05(a) or (b) (a "**Principal Amount Reduction**") shall automatically result in the dollar-for-dollar reduction of the mandatory sinking fund redemption obligations for purposes of the Assured Insurance Policy insuring such Assured Legacy Bonds CUSIP, with such reduction to be applied sequentially against such mandatory sinking fund redemptions starting with the first mandatory sinking fund redemption occurring after such Principal Amount Reduction.

(d)     If the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero at any time, Assured shall be entitled to any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, and/or the Insurance Policy Account, as applicable.

(e)     For the avoidance of doubt, it is expressly understood and agreed that to the extent the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero prior to the Maturity Date, as of the date the principal amount (or Compounded Amount, as applicable) is reduced to zero, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any remaining Trust Assets, the Trust shall terminate in accordance with the provisions of Article VII hereof.

### Section 3.06.   *Payments on Assured Insurance Policies.*

(a)     After taking into account any adjustments made pursuant to Section 3.05, if there are insufficient funds (determined without taking into account any securities or other non-cash Trust Assets) in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, and the Insurance Policy Account to satisfy the accrued and unpaid interest and/or unpaid principal due on an Original Scheduled Payment Date (the amount of any such shortfall, the "**Payment Shortfall**"), then at least five (5) Business Days prior to such Original Scheduled Payment Date, the Trustee shall deliver a notice in the form attached hereto as Exhibit A (a "**Notice of Claim and Certificate**") to Assured.  Assured agrees that such notice provided by the Trustee shall constitute a valid notice of the type required under the applicable Assured Insurance Policy in order for the Trustee to draw on the applicable Assured Insurance Policy, and the Trustee shall make draws on the applicable Assured Insurance Policy to make payment, from the Insurance Policy Account, of any accrued and unpaid interest or any unpaid principal due on the Original Scheduled Payment Date.  The Trustee is authorized to take all actions necessary to draw on the Assured Insurance Policies for such purposes, including actions that, under the applicable Assured Insurance Policies and related agreements, would otherwise be taken by the Paying Agent or the PBA Fiscal Agent, and the Trustee shall have all powers and authority of the Paying Agent or the PBA Fiscal Agent, as applicable, for such purposes.

18

(b)     If and to the extent Assured fails to make any payment at the time, in the amount and in the manner set forth herein, the Trustee shall take all necessary or desirable actions to enforce the applicable Assured Insurance Policy (including, to the extent applicable, as and when directed by the Requisite Trust Unit Holders as set forth in Section 6.01 hereof).

(c)     If the Trustee receives GO Payments, (i) after the Trustee draws on an Assured Insurance Policy pursuant to Section 3.06(a), but (ii) prior to the Trustee using the amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date, then the Trustee shall (x) distribute and apply the GO Payments received in accordance with Sections 3.02 and 3.05, (y) only apply amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal to the extent the GO Payments received are insufficient (the amount of such insufficiency, the "**GO Payment Shortfall**") to pay the accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date such that the amounts so applied are not in excess of the GO Payment Shortfall and (z) promptly return to Assured any amounts drawn on the Assured Insurance Policy that are in excess of such GO Payment Shortfall.

**Section 3.07.    *Exchange of Trust Units for Trust Assets.***

(a)     At any time on, or prior to, the Maturity Date, a Trust Unit Holder may exchange its Trust Units for a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, and the CVI Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Trustee Costs, Tax Costs, and Assured Reimbursement Amount (the "**Unit Exchange Election**"), provided that the Trust Unit Holder must provide thirty (30) days' prior written notice of such Unit Exchange Election by submitting the form attached hereto as Exhibit B to the Trustee.

(b)     Upon a Unit Exchange Election, the expiration of the [thirty day (30)] notice period set forth in Section 3.07(a) hereof and the presentation and surrender of the applicable Trust Units at the office of the Trustee therein designated on that date, the Trustee shall distribute to such Trust Unit Holder a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, or the CVI Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, which shall be paid to Assured, the Trustee, or the relevant tax or governmental authority, as applicable (provided that, if cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, each applicable Trust Unit Holder may elect to pay in cash its applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of its share of remaining Trust Assets, or instruct the Trustee to liquidate all or a portion of its share of such Trust Assets and satisfy the applicable Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs out of such Trust Assets prior to such distribution).  For the avoidance of doubt, the Assured Reimbursement

19

Amount must be paid to Assured prior to the distribution of the applicable Trust Assets to the Trust Unit Holder.

(c)     Upon distribution of such Trust Assets in accordance with <u>Section 3.07(b)</u> hereof, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

**Section 3.08.**  *Payments at Maturity Date.*

(a)     If, (i) in the case of Current Interest Bonds, the outstanding principal amount or accrued and unpaid interest amount, or (ii) in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the Assured Legacy Bonds at the Maturity Date is expected to be greater than zero, no later than thirty (30) calendar days and no earlier than thirty-five (35) calendar days prior to the Maturity Date, Assured shall direct the Trustee to deliver through the Depository a notice of maturity (the "**Maturity Notice**") in the form attached hereto as <u>Exhibit C</u> to all applicable Trust Unit Holders.  The Maturity Notice will include (i) a statement identifying the Maturity Date and (ii) a statement regarding the right of each Trust Unit Holder to receive a Distribution (or multiple Distributions) in the aggregate amount of a pro rata share of the Insured Amount corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date, in either case, to be paid to the Trustee by Assured and/or from the other Trust Assets.  Notwithstanding anything herein to the contrary, Assured's failure to direct the Trustee to deliver a Maturity Notice or the Trustee's or Depository's failure to deliver a Maturity Notice to Trust Unit Holders in accordance with this <u>Section 3.08</u> shall not affect or delay the occurrence of the applicable Maturity Date, or affect the amounts to be paid to Trust Unit Holders on the Maturity Date.

(b)     <u>Reserved</u>.

(c)     On the Maturity Date, after giving effect to any Distribution made from other Trust Assets on the Maturity Date, and subject to Assured having received a Notice of Claim and Certificate in accordance with <u>Section 3.06</u> hereof, Assured shall pay to the Trustee, and the Trustee shall distribute to all Trust Unit Holders, a pro rata share of the Payment Shortfall, if any, net of any Tax Costs, following which Assured shall be entitled to any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account and/or the Insurance Policy Account, as applicable.

(d)     On the Maturity Date, after giving effect to any Distributions made on the Maturity Date (including the payment and distribution of any Payment Shortfall (in accordance with <u>Section 3.08(c)</u> hereof)), (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured

20

Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any Remaining Trust Assets, the Trust shall terminate in accordance with the provisions of Article VII hereof.

## ARTICLE IV

## REPORTING/REMITTING TO TRUST UNIT HOLDERS

**Section 4.01.** *Statements to Trust Unit Holders.*

No later than three (3) days after the date on which the Trustee makes any Distribution to any Trust Unit Holder, the Trustee shall prepare and post a statement to EMMA, substantially in the form attached hereto as Exhibit D, and upon request, deliver such statement by mail to any Trust Unit Holder, setting forth:

(a) With respect to the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Acccount, and the Insurance Policy Account, distributions made from each such account during the month and during the year to date (on an aggregate and per unit basis);

(b) The accrued and upaid interest on, and principal amount of (or Compounded Amount, as applicable) as of the month end of the relevant Assured Legacy Bonds CUSIP (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per unit basis);

(c) Any other distributions made to Trust Unit Holders;

(d) Any required tax reporting for such period; and

(e) All other information required to complete Exhibit D.

The Trustee shall also make disclosures and share information with Bloomberg L.P. for disclosure on its trading platform and with other similar services as is reasonably requested by such services.

**Section 4.02.** *Compliance with Withholding Requirements.*

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to Trust Unit Holders that the Trustee reasonably believes are applicable under the Code. The consent of Trust Unit Holders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to any Trust Unit Holder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to such Trust Unit Holders the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Trust Unit Holder in the amount of the withholding and shall thereby reduce amounts otherwise distributable to such Trust Unit Holder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## TRUST UNITS

**Section 5.01.  *The Trust Units.***

Each series of Trust Units shall bear unique CUSIPs and shall be freely tradable and transferable through the Depository Trust Company.  So long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall be deemed the sole holder of the New Securities deposited in the respective Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings. In addition, Assured shall be fully subrogated to the rights of the respective Trust Unit Holders in respect of the New Securities deposited in the respective Trusts.

The Trust Units shall be designated in the Trust Agreement.  Unless otherwise specified in the Trust Agreement, the Trust Units in the aggregate will represent the entire beneficial ownership interest in the Trust Estate.  The Trust Units will be substantially in the forms annexed to the Trust Agreement.  Unless otherwise provided in the Trust Agreement, the Trust Units will be issuable in book-entry form, in denominations equal to the denomination of the applicable underlying Assured Legacy Bonds or any integral multiple of the amount specified therein.  Each Trust Unit will share ratably in all Trust Assets of the applicable Trust and in all rights of the related Trust Unit Holders.

Upon original issue, the Trust Units shall be executed and delivered by the Trustee and the Trustee shall cause the Trust Units to be authenticated by the Unit Registrar upon receipt by the Trustee of the documents specified in <u>Section 2.02</u>.  The Trust Units shall be executed by manual signature on behalf of the Trustee by an authorized Officer.  Trust Units bearing the manual signatures of individuals who were at any time the proper Officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Trust Units or did not hold such offices at the date of such Trust Units.  No Trust Unit shall be entitled to any benefit under the Trust Agreement or be valid for any purpose, unless there appears on such Trust Unit a certificate of authentication as set forth on such certificate executed by manual signature on behalf of the Unit Registrar by a duly authorized Officer of the Unit Registrar, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Trust Unit has been duly authenticated and delivered hereunder.  All Trust Units shall be dated the date of their execution.

**Section 5.02.  *Book-Entry Trust Units.***

(a)    The Trust Units will be represented initially by one or more book-entry certificates registered in the name designated by the Depository.  Notwithstanding anything herein to the contrary, the Trustee may for all intents and purposes (including the making of payments on the Trust Units) deal with the Depository as the authorized representative of the Beneficial Owners of the Trust Units as if the Depository were the sole Trust Unit Holder for purposes of this Agreement for as long as those Trust Units are

22

registered in the name of the Depository. The rights of Beneficial Owners of the Trust Units shall be limited to those established by law, the Trust Agreement and agreements between such Beneficial Owners and the Depository and Depository Participants. Requests and directions from, and votes of, the Depository, as Holder, shall not be deemed to be inconsistent if they are made with respect to different Beneficial Owners. Subject to <u>Section 5.03</u> below, a Trust Unit may not be transferred by the Depository except to another Depository that agrees to hold the Trust Unit for the account of the respective Depository Participants and Beneficial Owners.

(b) The Trustee will not have any liability to any person for any aspect of the records relating to or payment made on account of Beneficial Owners of the Trust Units held by the Depository, for monitoring or restricting any transfer of beneficial ownership in a Trust Unit or for maintaining, supervising or reviewing any records relating to such Beneficial Owners.

**Section 5.03.** *Registration of and Limitation on Transfers and Exchanges of Units.*

The Trustee shall cause to be kept at its Corporate Trust Office a Unit Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Trust Units and of transfers and exchanges of Trust Units as provided in the Trust Agreement (including these Standard Terms). The Trustee will initially serve as Unit Registrar for the purpose of registering Trust Units and transfers and exchanges of Trust Units as herein provided.

Subject to <u>Section 5.04</u>, upon surrender for registration of transfer of any Trust Unit at the Corporate Trust Office of the Trustee or at any other office or agency of the Trustee maintained for such purpose, the Trustee shall execute and the Unit Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Trust Units of a like aggregate Notional Amount.

At the option of the Trust Unit Holders, each Trust Unit may be exchanged for other Trust Units with a like aggregate Notional Amount and in authorized denominations, upon surrender of such Trust Unit to be exchanged at any such office or agency. Whenever any Trust Units are so surrendered for exchange, the Trustee shall execute and cause the Unit Registrar to authenticate and deliver the Trust Units which the Trust Unit Holder making the exchange is entitled to receive. Every Trust Unit presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in the form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Trust Unit Holders shall be made for any transfer or exchange of Trust Units, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Trust Units.

All Trust Units surrendered for transfer and exchange shall be disposed of by the Unit Registrar in accordance with its customary procedures.

The Trustee will cause the Unit Registrar (unless the Trustee is acting as Unit Registrar) to provide notice to the Trustee of each transfer of a Trust Unit, and will provide the Trustee with an updated copy of the Unit Register on January 1 of each year.

**Section 5.04.  *No Obligation to Register.***

The Trustee is not obligated to register or qualify any Trust Unit under the Securities Act or any other securities laws.

**Section 5.05.  *Mutilated, Destroyed, Lost or Stolen Units.***

If (a) any mutilated Trust Unit is surrendered to the Trustee or the Unit Registrar, or the Trustee and the Unit Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Trust Unit, and (b) there is delivered to the Trustee and the Unit Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual knowledge by the Trustee or the Unit Registrar that such Trust Unit has been acquired by a bona fide purchaser, the Trustee shall execute and deliver and the Unit Registrar shall authenticate, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Trust  Unit, a new Trust Unit of like tenor.  Upon the issuance of any new Trust Unit under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trust Unit Registrar) connected therewith.  Any replacement Trust Unit issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the destroyed, lost or stolen Trust Unit shall be found at any time.

**Section 5.06.  *Persons Deemed Owners*.**

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

**Section 5.07.  *Appointment of Trust Unit Paying Agent.***

The Trustee shall serve as the initial Trust Unit Paying Agent hereunder and thereafter, may appoint any other Trust Unit Paying Agent for the purpose of making distributions to Trust Unit Holders; provided, however, that any replacement Trust Unit Paying Agent shall be required to meet the eligibility requirement set forth in Section 6.06 and shall not increase the Trustee Costs hereunder.  The Trustee shall cause such Trust Unit Paying Agent to execute and deliver to the Trustee an instrument in which such Trust Unit Paying Agent shall agree with the Trustee that such Trust Unit Paying Agent will hold all sums held by it for the payment to Trust Unit Holders in trust for the benefit of the Trust Unit Holders entitled thereto until such sums shall be paid to the Trust Unit Holders.  All funds remitted by the Trustee to any

such Trust Unit Paying Agent for the purpose of making distributions shall be paid to Trust Unit Holders as soon as practicable following receipt thereof by the Trust Unit Paying Agent and any amounts not so paid shall be returned as soon as practicable to the Trustee.

## ARTICLE VI

## CONCERNING THE TRUSTEE

**Section 6.01.** *Duties of Trustee.*

Every provision of the Trust Agreement (including these Standard Terms) relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement and no implied covenants or obligations shall be read into the Trust Agreements against the Trustee.

The Trustee shall (at the direction of the Requisite Trust Unit Holders) take all necessary or desireable actions to enforce the Assured Insurance Policies as set forth herein.

The Trustee shall deliver to all Trust Unit Holders copies of all notices and written communications received from Depositors or the Reorganized Debtors as they relate to the Bonds and/or the GO CVIs.

Except as provided in Section 6.02 hereof, no provision of the Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act or willful misconduct; *provided, however,* that:

(a) The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(b) The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights (or such other percentage as may be specified herein) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New Securities or exercising any trust or power conferred upon the Trustee with respect to the New Securities, under the Trust Agreement;

(c) The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Trust Unit Holders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Assured Insurance Policies or exercising any trust or power conferred upon the Trustee with respect to the Assured Insurance Policies, under the Trust Agreement; and

25

(d)     Any determination of gross negligence or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

### Section 6.02.  *Certain Matters Affecting the Trustee.*

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties.  Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by the Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of any of the Trust Unit Holders, pursuant to the provisions of the Trust Agreement, unless such Trust Unit Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Trust Agreement (including these Standard Terms);

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of the Trust

26

Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)    The Trustee may execute any of the trusts or powers under the Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under the Trust Agreement;

(h)    Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 6.01;

(i)    The Trustee shall not be deemed to have notice of any matter unless one of its Officers has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, the applicable Depositor(s), the Trust or the Trust Agreement;

(j)    None of the provisions of the Trust Agreement or these Standard Terms shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)    Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)    The permissive rights of the Trustee to perform any discretionary act enumerated in the Trust Agreement or these Standard Terms shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence or willful misconduct;

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)    The Trustee shall have no duty (A) to see to any recording, filing, or depositing of the Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or

27

(D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to the Trust Agreement (including these Standard Terms) believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o) The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of the Trust Agreement, these Standard Terms or any related document;

(p) The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under the Trust Agreement or these Standard Terms, and shall have a duty only to accept such collateral or funds delivered to it in accordance with the Trust Agreement (including these Standard Terms);

(q) In connection with its preparation of any required tax reporting for Beneficial Owners of the Trust Units, the Trustee shall, if necessary, (i) on a quarterly basis for each calendar year, request one Depository participant list, (ii) on an annual basis, contact each Depository participant identified on the Depository participant lists and request such Beneficial Owner information as shall be necessary to permit the Trustee to prepare the applicable tax return for such calendar year, and (iii) to the extent that a participant provides partial or incomplete Beneficial Owner information, make a second and final attempt to contact the participant or such Beneficial Owner (to the extent such Beneficial Owner's contact information has been provided to the Trustee) to obtain such additional information in order to permit the Trustee to prepare the applicable tax return for such Beneficial Owner for that calendar year;

(r) The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(s) The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Trust Agreement; and

(t) All rights of action under the Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Trust Units, subject to the provisions of the Trust Agreement.

### Section 6.03.  *Trustee Not Liable for Trust Units or Securities.*

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement and in the Trust Units.  The Trustee makes no representations or warranties as to the validity or sufficiency of the Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Trust Units) or of the Securities or related documents.  The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the Securities or

28

deposited in or withdrawn from the Trust in accordance with the Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with <u>Sections 3.01 and 3.02</u>. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the Bond Documents.

### Section 6.04. *Trustee May Own Units.*

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

### Section 6.05. *Trustee's Fees and Expenses.*

(a) Pursuant to the Fee Agreement, the Trustee shall be entitled to receive from the Trust (i) compensation agreed upon in writing (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under the Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee and (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements (other than Extraordinary Expenses) incurred or made by the Trustee in accordance with any of the provisions of the Trust Agreement (including but not limited to the fees, expenses and disbursements of its counsel and of all persons not regularly in its employ), in each case to the extent set forth in such fee agreement and (y) Extraordinary Expenses reimbursable pursuant to <u>Section 6.05(b)</u> (collectively, the "**Trustee Costs**"). All such Trustee Costs shall be paid pursuant to the terms of the Fee Agreement and may be reimbursed to the Trustee in accordance with the provisions of <u>Section 3.02</u> hereof. As set forth in <u>Section 3.02(d)</u>, Trustee Costs shall not be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

(b) In addition, the Trustee (including in its capacities as the Unit Registrar and Paying Agent) shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Trust Unit Holders against the Depositors, the Reorganizd Debtors, the Trust, or the Trustee except for proceedings, litigation or enforcement actions that relate to the Trustee's grossly negligent action, grossly negligent failure to act or its own willful misconduct (the "**Extraordinary Expenses**"). The Trustee may make withdrawals from the Trust to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of $150,000 in the aggregate for the Trusts of Extraordinary Expenses in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; provided, however, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received security or indemnity reasonably satisfactory to it for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in

29

excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit of $100,000 applicable for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust and provided further that the foregoing shall not limit the payment of any amounts to which the Trustee is entitled pursuant to its indemnification rights set forth in <u>Section 6.13</u> with respect to defending the Trustee against any claim asserted by any Person.

(c)     For the avoidance of doubt, the Depositors shall not be liable for any Trustee Costs or Extraordinary Expenses.

**Section 6.06.   *Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent.***

The Trustee, any successor Trustee, and any successor Trust Unit Paying Agent shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Depositors or Assured; (ii) is neither affilliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is regularly acting as a trustee in the municipal finance market.  If such corporation publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee, successor Trustee, or successor Trust Unit Paying Agent shall cease to be eligible in accordance with the provisions of this Section, such Trustee, successor Trustee, or successor Trust Unit Paying Agent shall resign immediately in the manner and with the effect specified in <u>Section 6.07</u>.

**Section 6.07.   *Resignation and Removal of the Trustee.***

(a)     The Trustee may at any time resign and be discharged from the trusts created pursuant to a Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee.  Upon receiving such notice of resignation, Assured shall promptly appoint a successor trustee meeting the requirements set forth in <u>Section 6.06</u> by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee.  A copy of such instrument shall be delivered to the Trust Unit Holders and posted to EMMA by the successor trustee.  If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)      If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 6.06 and shall fail to resign after written request therefor by Assured, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then Assured may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)      Assured may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 6.08 hereof.  The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including without limitation, the costs and expenses incurred in connection with any such succession.

Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 6.08 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession.

Notwithstanding the replacement of the Trustee pursuant to this Section 6.07, the rights, benefits, protections and indemnities afforded to the Trustee under this Article VI shall continue to the benefit of the retiring Trustee.

**Section 6.08.  *Successor Trustee.***

Any successor trustee appointed as provided in Section 6.07 shall execute, acknowledge and deliver to the Trust Unit Holders and to the predecessor trustee an instrument accepting such appointment under the Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor thereunder, with the like effect as if originally named as trustee therein.  The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under the Trust Agreement and the Trust Unit Holders and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 6.06 hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under the Trust Agreement and (b) mail notice of the succession of such trustee under the Trust Agreement to all Holders of Trust Units at their addresses as shown in the Unit Register.

### Section 6.09. *Merger or Consolidation of Trustee.*

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Trust Agreement provided such corporation shall be eligible under the provisions of Section 6.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

### Section 6.10. *Reserved.*

### Section 6.11. *Appointment of Custodians.*

The Trustee may appoint one or more Custodians to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to Article VI, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Trust Unit Holders. Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Custodian may not be an Affiliate of the Depositors or Assured. The Trustee is responsible for the fees and expenses of any Custodian appointed hereunder.

### Section 6.12. *Trustee May Enforce Claims Without Possession of Trust Units.*

All rights of action and claims under the Trust Agreement or the Trust Units may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Trust Unit Holders in respect of which such judgment has been recovered.

### Section 6.13. *Trustee Indemnity*

32

The Trustees' rights to claim indemnification for losses that they may incur with respect to the Trust Agreement (incorporating these Standard Terms) and each other document contemplated by the foregoing to which either of the Trustees is a party shall be as set forth in Annex I hereto, subject, with respect to Extraordinary Expenses, to the provisions of Section 6.05(b).

## ARTICLE VII

## TERMINATION OF TRUST

**Section 7.01.  *Termination; No Redemption Rights.***

Upon the indefeasible cancellation or other indefeasible termination of the relevant Assured Insurance Policy, the Trust (including the respective obligations and responsibilities under the Trust Agreement of the Trustee and Assured) shall terminate upon (i) the distribution to Assured or to Trust Unit Holders, as applicable, of any remaining Trust Assets held by or on behalf of the Trustee and required hereunder to be so distributed in accordance with the provisions of Section 3.03, 3.04, 3.05 3.07, or 3.08 hereof, (ii) payment in full of any Trustee Costs due and owing to the Trustee under the Trust Agreement (including these Standard Terms), (iii) payment in full of any Assured Deferred Expenses due and owing to Assured under the Trust Agreement (including these Standard Terms), (iv) payment in full of any known Tax Costs due and owing to any tax or governmental authority, and (v) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of the Trust Agreement have been complied with.  In no event shall the Trust be terminated or the Securities be redeemed (except in the case of a redemption of the Securities permitted under the terms of the Bond Documents) or otherwise released from the Trust Estate [(except pursuant to, and in accordance with, Sections 3.04 and 3.07 hereof)] without the prior express written consent of Assured if either (i) the relevant Assured Insurance Policy has not been indefeasibly terminated or (ii) Assured has not been indefeasibly paid in full for any amounts owed pursuant to the Commonwealth Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

**Section 7.02.  *Procedure for Termination.***

During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice by letter to the Trust Unit Holders specifying: (a) the anticipated final distribution date; (b) that the final payment of the Trust Units will be made upon presentation and surrender of Trust Units at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurance of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "**Termination Notice**").  The Trustee shall provide a copy of the Termination Notice to the Unit Registrar at the time such Termination Notice is given to Trust Unit Holders.

If the Requisite Trust Unit Holders do not object in writing within thirty (30) days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trustee shall be dissolved, wound up, and terminated.

Upon the dissolution, wind up and termination of the Trust and the Trust Agreement, the Trustee or Delaware Trustee is authorized to file a certificate of cancellation with the Secretary of State.

<h1 style="text-align:center">ARTICLE VIII</h1>

<h2 style="text-align:center">TAX PROVISIONS</h2>

**Section 8.01.** *Grantor Trust Provisions.*

The Trustee, the Depositors, the Trust Unit Holders (by their acceptance of the Trust Units and Book-Entry Beneficial Interests) and Assured each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (b) the Trust is formed to facilitate direct investment in the Trust Assets, and (c) the Trustee (at the direction of Assured and/or the Requisite Trust Unit Holders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Trust Unit Holder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and Assured each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

**Section 8.02.** *Characterization.*

Each Trust Unit Holder acknowledges and agrees to treat the Trust Units and the Book-Entry Beneficial Interests as undivided interests in the Trust Estate.

### Section 8.03.  *Grantor Trust Administration.*

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Trust Unit Holders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Trust Unit Holders.  The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust under the Grantor Trust Provisions.  The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Trust Unit Holders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "**Adverse Trust Event**"), unless the Trustee has obtained or received an Opinion of Counsel from counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Trust Unit Holders) to the effect that the contemplated action will not result in an Adverse Trust Event.  None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act.  The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

### Section 8.04.  *Reports to Trust Unit Holders and Tax Authorities*

(a)     The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority.

(b)     Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust.  In no event shall the Trustee, the Depositors, or Assured be liable for any liabilities, costs or expenses of the Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or

35

addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to any act or omission by the Trustee in breach of its obligations under this Trust Agreement.

(c)     If any tax, duty, assessment, or other governmental charge is imposed, levied or assessed on the Trust, or if the Trust becomes subject to deduction, withholding, or other charge or assessment from, or with respect to, any amounts received by the Trust or any distributions made by the Trust, such tax, duty, assessment or other governmental charge, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) (collectively, the "**Tax Costs**") shall be the sole responsibility of, charged to and payable by the Trust Unit Holders on a pro rata basis.  To the extent known prior to the termination of the Trust, all Tax Costs that are withheld, collected, charged, assessed, or levied shall be paid by the Trustee from the Trust Assets and income to the applicable taxing or governmental authority and any amounts so withheld, collected and/or paid to the applicable taxing or governmental authority shall be deemed to have been paid as distributions to the applicable Trust Unit Holders and treated in accordance with the provisions of the Trust Agreement applicable to Tax Costs.  To the extent any Tax Costs become known after the termination of the Trust, the former Trust Unit Holders of such Trust shall remain responsible for such Tax Costs on a pro rata basis.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Trust Unit Holder with respect to a Trust Unit shall be that Trust Unit Holder's sole responsibility.

(f)     For the purposes of this <u>Article VIII</u> of these Standard Terms and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to Holder, Trust Unit Holder, or Beneficial Owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes.  By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Articles, Sections, or provisions hereof.

(g)     Notwithstanding any other provision of the Trust Agreement (including these Standard Terms), Assured makes no representations, warranties, or guarantees, and shall have no liability, with respect to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.  By electing, or being deemed to elect, Assured Bondholder Election 2, all Trust Unit Holders expressly agree to hold Assured harmless, and not to seek to impose any liabiltiy on Assured, related to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.

# ARTICLE IX

# MISCELLANEOUS PROVISIONS

**Section 9.01.** *Amendment of Trust Agreement.*

Promptly following the execution of the Trust Agreement, the Trustee shall post full and complete copies of the Trust Agreement (including these Standard Terms) on EMMA. The Trust Agreement (including these Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured.  The Trust Agreement (including these Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

(a)     except as otherwise provided in the Trust Agreement (including these Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

(b)     compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

(c)     alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

(d)     amend this <u>Section 9.01</u> without the consent of each Trust Unit Holder;

(e)     adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in (a), (b), or (c) without the consent of the Trust Unit Holders evidencing at least a majority of such Trust Units in the applicable Trust (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; or

(f)     reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

Prior to executing any amendment permitted by this <u>Article IX,</u> (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Counsel and an Officer's Trust Unit stating that the execution of such amendment is authorized or permitted by the Trust Agreement and that all conditions precedent have been met.  The Trustee may, but shall not be

37

obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under the Trust Agreement, these Standard Terms or otherwise.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Trust Unit Holder and shall post a copy of such amendment to EMMA.

The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Trust Unit Holders shall be subject to such reasonable regulations as the Trustee may prescribe.

### Section 9.02. *Counterparts.*

The Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

### Section 9.03. *Limitation on Rights of Trust Unit Holders.*

The death or incapacity of any Trust Unit Holder shall not operate to terminate the Trust Agreement or the Trust, nor entitle such Trust Unit Holder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Trust Unit Holder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Trust Unit Holders from time to time as partners or members of an association; nor shall any Trust Unit Holder be under any liability to any third person by reason of any action taken by the parties to the Trust Agreement pursuant to any provision hereof.

Except with respect to enforcement of the applicable Assured Insurance Policies in accordance with the terms hereof, no Trust Unit Holder shall have any right by virtue of any provision of the Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Trust Agreement, unless the Requisite Trust Unit Holders shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Trust Agreement, and the Trustee, for 15 days after its receipt of such request shall have neglected or refused to institute any such action, suit or proceeding. It is understood and intended, and expressly covenanted by each Trust Unit Holder with every other Trust Unit Holder and the Trustee, that no one or more Holders of Trust Units shall have any right in any manner whatever by virtue of any provision of the Trust Agreement to affect, disturb or prejudice the rights of the Holders of any other Trust Units, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Trust Agreement, except in the manner therein provided and for the equal, ratable and common benefit of all Trust Unit Holders. For the protection and enforcement of the

provisions of this Section, each and every Trust Unit Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

In the event that an authorized officer of the Trustee receives a request for its consent to any amendment, modification or waiver of these Standard Terms, the Trust Agreement or any other document thereunder or relating thereto, or receives any other solicitation for any action with respect to the Securities or Assured Insurance Policies, the Trustee shall mail a notice of such proposed amendment, modification, waiver, solicitation or action to each of the Trust Unit Holders within five (5) days of receipt thereof. The Trustee shall request instructions from the Trust Unit Holders as to whether or not to consent to or vote to accept such amendment, modification, waiver, solicitation or action.

The Trustee shall consent or vote proportionally in accordance with the written direction of the Trust Unit Holders; provided, however, that the Trustee shall not:

(a) without the prior written consent of any Trust Unit Holder, consent or affirmatively vote on behalf of such Trust Unit Holder on any matter that would: (i) terminate the Trust, (ii) except as expressly provided herein, sell some or all of the assets of the Trust; (iii) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy; and

(b) without the prior written consent of Assured, consent or affirmatively vote on any matter that would amend, modify or waive any agreement in such a manner as to adversely impact Assured. Any such determination as to whether any such amendment, modification or waiver adversely impacts Assured shall be made in the sole and absolute discretion of Assured and such determination shall be promptly provided by notice to the Trustee and the Trust Unit Holders. The Trustee shall not be liable to any Trust Unit Holder or any other Person for refusing to consent or affirmatively vote on such a matter in accordance with such written direction of Assured.

**Section 9.04.** *Notices.*

All demands and notices under the Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service, to (a) in the case of the Trustee if the Trustee is [●], the notice address for the Trustee is [●]. If the Trustee is not [●], the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Trustee, (b) in the case of the Delaware Trustee, if the Delaware Trustee is [●], the notice address for the Delaware Trustee is [●]. If the Delaware Trustee is not [●], the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Delaware Trustee, and (c) in the case of the Depositors, [●], or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Depositors. Any notice required or permitted to be mailed to a Trust Unit Holder shall be given by first-class mail, postage prepaid, or by express delivery service, at the address of such Trust Unit Holder as shown in the Unit Register. Notice may also be delivered by email in accordance with a

39

separate side letter agreement entered into between the parties. Any notice so mailed within the time prescribed in the Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Trust Unit Holder receives such notice. A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above. A copy of any notice given hereunder to any other party shall be delivered to the Trustee.

### Section 9.05. *Severability of Provisions.*

If any one or more of the covenants, agreements, provisions or terms of the Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of the Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of the Trust Agreement or of the Trust Units or the rights of the Holders thereof.

### Section 9.06. *Third-Party Beneficiaries.*

Assured, the Trust Unit Holders and their successors and assigns shall be third-party beneficiaries of the provisions of the Trust Agreement (inclding these Standard Terms). For the avoidance of doubt, beneficial holders of Trust Units are third party beneficiaries to the extent necessary to allow them to enforce the applicable Assured Insurance Policies as set forth herein. Nothing in these Standard Terms or the Trust Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Trust Unit Holders and Assured, any benefit or any legal or equitable right, remedy or claim under the Trust Agreement (including these standard terms).

### Section 9.07. *Acts of Trust Unit Holders.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Trust Agreement (including these Standard Terms) to be given or taken by Trust Unit Holders or a class of Trust Unit Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Trust Unit Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of the Trust Agreement (including these Standard Terms) and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Unit Register.

### Section 9.08. *Headings.*

Section and subsection headings in these Standard Terms are included herein for convenience of reference only and shall not constitute a part of these Standard Terms for any other purpose or be given any substantive effect.

### Section 9.09. *No Waiver; Cumulative Remedies.*

No failure to exercise and no delay in exercising, on the part of any party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

**Section 9.10.  *Merger and Integration.***

These Standard Terms and the Trust Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by the Trust Agreement (including these Standard Terms).

**Section 9.11.  *The Delaware Trustee***

(a)     The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of Section 3807(a) of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware.  It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b)     The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Trust Unit Holders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement. The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees.

(c)     The Delaware Trustee may be removed by Assured upon thirty days prior written notice to the Delaware Trustee.  The Delaware Trustee may resign upon thirty days prior written notice to Assured.  No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to Assured, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware.  If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, Assured or the Trust Unit Holders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the party bringing the petition.

(d)     Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the

41

successor Delaware Trustee under the Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)     The Trust shall be responsible for the payment of any fees or expenses of the Delaware Trustee.  The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under the Trust Agreement and with respect to the Trust as the Trustee; however, any such indemnification shall be made pursuant to the terms of a separate indemnification agreement and shall not be payable from the Trust Estate, except as expressly provided herein.  No amendment or waiver of any provision of the Trust Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent.

## ANNEX I

INDEMNIFICATION PROVISIONS

(i) The Trust shall indemnify each of the Trustees or any predecessor Trustees and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense, including taxes (other than taxes based upon, measured by or determined by the income of the Trustees), arising out of or in connection with the acceptance or administration of the Trust hereunder, including the costs and expenses of defending itself against any claim asserted by any other Person or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct.

(ii) The Trustees shall have the right to employ separate counsel in any such action or proceeding and participate in the investigation and defense thereof, and the Trust shall pay the reasonable fees and expenses of such separate counsel; provided, however, that the Trustees may only employ separate counsel at the expense of the Trust if in the reasonable judgement of the Trustees (i) a conflict of interest exists by reason of common representation or (ii) there are legal defenses available to the Trustees that are different from or are in addition to those available to the Trust or if all parties commonly represented do not agree as to the action (or inaction) of counsel.

## <u>EXHIBIT A</u>

NOTICE OF CLAIM AND CERTIFICATE

[Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.]
1633 Broadway
New York, NY 10019
Attention: [●]
E-Mail: [●]

   Reference is made to the [Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.] ("**Assured**"), [●], (the "**Trustee**") and [●] (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Notice of Claim and Certificate is delivered pursuant to Section 3.06(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement and the Policy (as defined below).

   The undersigned, a duly authorized officer of Trustee, in its capacity as Trustee for the Trust, hereby certifies to Assured, with reference to the Trust Agreement and Municipal Bond Insurance Policy No. [●], dated [●], 20[●] (the "**Policy**"), issued in respect of the [Name of Series of Bonds] (the "**Assured Legacy Bonds CUSIP**") and deposited into the Trust, that:

   (i)  The Trustee is the validly appointed Trustee and Trust Unit Paying Agent under the Trust Agreement.

   (ii)  The sum of all amounts on deposit (or scheduled to be on deposit) with the Trustee and available for distribution to the Trust Unit Holders pursuant to the Trust Agreement will be $[●] (such amount, the "**Payment Shortfall**") less than the principal and interest of $[●] (the "**Scheduled Payments**") Due for Payment under the Policy and Trust Agreement on [●], 20[●] (the "**Payment Date**").

   (iii)  The Trustee is hereby making a claim under the Policy and Trust Agreement for the Payment Shortfall to be applied to the payment of Scheduled Payments.

   (iv)  The Trustee agrees that, following its receipt of funds from Assured, it shall (a) hold such amounts in trust and, subject to Section 3.06(c) of the Trust Agreement, apply the same directly to the payment of Scheduled Payments when due; (b) not apply such funds for any other purpose; (c) not commingle such funds with other funds held by the Trustee, and (d) maintain an accurate record of such payments with respect to each Trust Unit and the corresponding claim on the Policy.

(v)     The Trustee, on behalf of the Trust Unit Holders, hereby assigns to Assured any rights of the Trust Unit Holders with respect to the Trust Assets to the extent that the principal amount (or Compounded Amount, as applicable) of the Assured Legacy Bonds CUSIP is reduced to zero.  The foregoing assignment is in addition to, and not in limitation of, rights of subrogation otherwise available to Assured in respect of such payments.  The Trustee shall take such action and deliver such instruments as may be reasonably requested or required by Assured to effectuate the purpose or provisions of this clause (v) and the applicable terms in the Trust Agreement.

(vi)     The Trustee, on behalf of the Trust Unit Holders, hereby acknowledges and agrees that, so long as Assured shall not be in default in its payment obligations under the Policy, Assured may at any time during the continuation of any proceeding by or against the Depositor under the United States Bankruptcy Code (if applicable) or any other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "**Insolvency Proceeding**"), direct all matters with respect to the Trust Units or Trust Assets relating to such Insolvency Proceeding, including without limitation, (A) all matters relating to any claim in connection with an Insolvency Proceeding seeking the avoidance as a preferential transfer of any payment made to the Trust or Trustee or in connection with the Trust Units (a "**Preference Claim**"), (B) the direction of any appeal of any order relating to any Preference Claim at the expense of Assured, and (C) the posting of any surety, supersedeas or performance bond pending any such appeal. In addition, and without limiting the foregoing, the Trustee hereby agrees that Assured shall be subrogated to the rights of each Trust Unit Holder in any Insolvency Proceeding to the extent it is subrogated pursuant to section (vii) below, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Insolvency Proceeding.

(vii)     Assured shall, to the extent it makes any Scheduled Payments on the Trust Units under the Policy and Trust Agreement, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Policy and the Trust Agreement.

(viii)     The Trustee hereby requests that the Payment Shortfall be deposited into the Insurance Policy Account by bank wire transfer or other immediately available funds using the following wiring instructions:

| | |
|---|---|
| Correspondent Bank: | [_____] |
| Fed ABA No: | [_____] |
| Account Name: | [_____] |
| Account  No: | [_____] |
| Beneficiary A/C Name: | [_____] |
| Reference: | [_____] |

This Notice of Claim and Certificate may be revoked at any time by written notice of such revocation by the Trustee to Assured.

IN WITNESS WHEREOF, the Trustee has executed and delivered this Notice of Claim and Certificate as of the [ ● ]th day of [ ● ], 20[ ● ].

[ ● ], as Trustee

By:_____
    Name:
    Title:

For Assured or
Trustee Use Only
Wire transfer sent on _____ By _____
Confirmation Number _____

-3-

<u>**Appendix I**</u>

<u>**Debt Service Payment for []/[]/20[]**</u>

| Description of Bond Issue | CUSIP | Outstanding Amount | Maturity | Rate | Principal Insured Amount | Principal | Interest | Total | Insurer | Policy No. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | _____ | | | _____ | _____ | _____ | _____ | | |
| | | _____ | | | _____ | _____ | _____ | _____ | | |

A-1

**EXHIBIT B**

FORM UNIT EXCHANGE ELECTION NOTICE
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
Trust Unit Certificate No(s). __
Notional Amount: _____
CUSIP: [●]

[Trustee Name]
[Trustee Address]

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), [], (the "**Trustee**") and [] (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Unit Exchange Election Notice is delivered pursuant to Section 3.07(a) of the Standard Terms. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

By delivering this Unit Exchange Election Notice, we hereby give [thirty (30)] days' written notice of our exercise of a Unit Exchange Election with respect to the Trust Unit(s) corresponding to the Trust Unit Certificate No(s). referenced above and direct the Trustee to distribute a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, or the CVI Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, as applicable, no later than [Date], in accordance with the [delivery] instructions below. We understand that such distribution will not be made until the applicable Trust Units are presented and surrendered at the office of the Trustee therein designated on that date.

If cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, we:

☐ (A) Elect to pay in cash the applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of our share of remaining Trust Assets

☐ (B) Instruct the Trustee to liquidate all or a portion of its share of such Trust Assets and satisfy the applicable Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs out of such Trust Assets prior to such distribution.

By making a Unit Exchange Election, we acknowledge and agree that upon distribution of the Trust Assets in accordance with Section [3.07(b)] of the Standard Terms, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

[Please include delivery instructions for the distribution of Trust Assets to be receive on account of this Unit Exchange Election]

[Please Include any other relevant information]

[],
as Trust Unit Holder


By:_____
Name:
Title:

B-2

## EXHIBIT C

FORM OF NOTICE OF MATURITY
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
CUSIP No.: [●]

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), [], (the "**Trustee**") and [] (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Notice of Maturity is delivered pursuant to Section 3.08(a) of the Standard Terms. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

1. Maturity Date. Prior to acceleration, the Assured Legacy Bonds were scheduled to mature on [●] (the "**Maturity Date**").

2. Trust Unit Holder Distribution. As a Trust Unit Holder, you are entitled receive a Distribution (or multiple Distributions) in the amount of a pro rata share of the Insured Amount on the Maturity Date corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date.

3. [Include any other relevant information required by the Depository or otherwise.]

**EXHIBIT D**

FORM OF NOTICE TO TRUST UNIT HOLDERS

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]
STATEMENT FOR THE MONTH ENDED [●], 20___

**POSTED TO EMMA**
**[] as Trustee**

**1. Trust Units**

| | For the month ended [●], 20___ | | Year to date [●], 20___ | | As of [●], 20___ |
|---|---|---|---|---|---|
| | Aggregate distributions | Per Unit distributions | Aggregate distributions | Per Unit distributions | Aggregate principal or Accreted Value of New GO Bonds or GO CVIs (by CUSIP)[1] |
| Tax-Exempt Bond Account | $ | $ | $ | $ | |
| Taxable Bond Account | $ | $ | $ | $ | |
| Cash Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| CVI Account | $ | $ | $ | $ | |
| Insurance Policy Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

---

[1] Or any other securities or property received in respect thereof or in exchange therefor.

E-1

2. **Aggregate Payment /Insured Amount Reporting for [Assured Legacy Bonds CUSIP]**

As of [ ● ]

    a. <u>Current Interest Bonds</u>: Payments Made to Date on [Assured Legacy Bonds CUSIP]

        i. Aggregate Interest Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

            **Total** _____; Per Trust Unit _____

            1. Aggregate Interest Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

                **Total** _____; **Per Trust Unit** _____

            2. Aggregate Interest Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

                **Total** _____; **Per Trust Unit** _____

        ii. Aggregate Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

            **Total** _____; **Per Trust Unit** _____

            1. Aggregate Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

                **Total** _____; **Per Trust Unit** _____

            2. Aggregate Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]: _____

                **Total** _____; **Per Trust Unit** _____

        iii. Aggregate Interest and Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below): _____

            1. Aggregate Interest and Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP] (sum of (i)(1) and (ii)(1) above):

                **Total** _____; **Per Trust Unit** _____

       2. Aggregate Interest and Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP] (sum of (i)(2) and (ii)(2) above):

        **Total** _____; **Per Trust Unit** _____

  b. <u>Capital Appreciation Bonds</u>: Payments Made to Date on [Assured Legacy Bonds CUSIP]

    i. Aggregate Compounded Amount Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

      **Total** _____; **Per Trust Unit** _____

       1. Aggregate Compounded Amount Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

        **Total** _____; **Per Trust Unit** _____

       2. Aggregate Compounded Amount Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

        **Total** _____; **Per Trust Unit** _____

  c. <u>Insured Amount</u> for [Assured Legacy Bonds CUSIP]: _____

3. **Other distributions to Trust Unit Holders**

    [_____]

4. **Tax Reporting**

    [_____]

# **EXHIBIT H**

FGIC Custodial Trust Agreement

**Butler Snow Draft – 10/11/21**

[_____] CUSTODIAL TRUST [1]

TRUST AGREEMENT

among

Commonwealth of Puerto Rico,

Financial Guaranty Insurance Company,

[Custodial Trustee Bank],
(as Trustee)

and

[Custodial Trustee Bank],
(as Delaware Trustee)

---

[1] Form of Custodial Trust to be formed for each CUSIP of FGIC Insured Bonds under the Plan. FGIC reserves the right to form one or more master trusts on a per-policy basis provided that each CUSIP shall be treated substantially the same as provided herein.

# Table of Contents

ARTICLE I ............................................................................................................ 1
    Section 1.1   Definitions ...................................................................................... 1

    Section 1.2   Rules of Construction ..................................................................... 7

    Section 1.3   Article and Section References ....................................................... 7

ARTICLE II ........................................................................................................... 8
    Section 2.1   Creation of Trust. ........................................................................... 8

    Section 2.2   Trust Assets. ................................................................................... 8

    Section 2.3   Acceptance by Trustee. .................................................................. 9

    Section 2.4   Purpose, Activities of the Trust. .................................................... 9

    Section 2.5   Limitations of the Trust. .............................................................. 10

ARTICLE III ........................................................................................................ 11
    Section 3.1   Accounts. ...................................................................................... 11

    Section 3.2   Investment of Funds in the Collection Accounts. ....................... 12

    Section 3.3   FGIC Insurance Policy and Effect of Distributions. ................... 12

    Section 3.4   Distributions. ............................................................................... 14

    Section 3.5   Threshold Event or Permitted Sale Event. .................................. 14

    Section 3.6   Surrendered Units. ....................................................................... 14

    Section 3.7   FGIC Election to Accelerate Policy Payments. ......................... 15

ARTICLE IV ........................................................................................................ 16
    Section 4.1   Statements to Unitholders. ........................................................... 16

    Section 4.2   Compliance with Withholding Requirements. ............................. 16

ARTICLE V .......................................................................................................... 17
    Section 5.1   The Units. ..................................................................................... 17

    Section 5.2   The Certificate; Book-Entry-only System. .................................. 17

    Section 5.3   Mutilated, Destroyed, Lost and Stolen Certificate. .................... 18

    Section 5.4   No Obligation to Register. ........................................................... 19

    Section 5.5   Persons Deemed Owners. ............................................................. 19

    Section 5.6   Cancellation. ................................................................................. 19

ARTICLE VI ........................................................................................................ 19
    Section 6.1   Voting Rights with Respect to New GO Bonds and GO CVIs. ... 19

ARTICLE VII ....................................................................................................... 20
    Section 7.1   Duties of Trustee. ........................................................................ 20

Section 7.2   Certain Matters Affecting the Trustee.................................................. 21

Section 7.3   Trustee Not Liable for Units or New GO Bonds or GO CVIs. ................. 23

Section 7.4   Trustee May Own Units. ....................................................................... 24

Section 7.5   Trustee's Fees and Expenses................................................................ 24

Section 7.6   Eligibility Requirements for Trustee and Successor Trustee. .................... 25

Section 7.7   Resignation and Removal of the Trustee. ............................................... 25

Section 7.8   Successor Trustee.................................................................................. 26

Section 7.9   Merger or Consolidation of Trustee. ...................................................... 27

Section 7.10 Appointment of Trustee Custodians......................................................... 27

Section 7.11 Trustee May Enforce Claims Without Possession of Certificate. .............. 27

Section 7.12 Trustee Indemnity. ................................................................................. 28

Section 7.13 Acceptance by Trustees, Representations and Warranties of Trustees. ....... 28

ARTICLE VIII..................................................................................................................... 29

Section 8.1   Realization Upon Default. ..................................................................... 29

ARTICLE IX ....................................................................................................................... 30

Section 9.1   Termination; No Redemption Rights. ..................................................... 30

Section 9.2   Procedure for Termination. ................................................................... 30

ARTICLE X ........................................................................................................................ 31

Section 10.1 Grantor Trust Provisions. ...................................................................... 31

Section 10.2 Characterization. ................................................................................... 31

Section 10.3 Grantor Trust Administration.................................................................. 31

Section 10.4 Reports to Unitholders and Tax Authorities. ............................................ 32

ARTICLE XI ....................................................................................................................... 33

Section 11.1 Amendment of Trust Agreement.............................................................. 33

Section 11.2 Counterparts. ........................................................................................ 34

Section 11.3 Limitation on Rights of Unitholders. ....................................................... 34

Section 11.4 Notices.................................................................................................. 34

Section 11.5 Severability of Provisions. ...................................................................... 35

Section 11.6 Acts of Unitholders. ............................................................................... 35

Section 11.7 Headings. .............................................................................................. 35

Section 11.8 No Waiver; Cumulative Remedies. .......................................................... 36

Section 11.9 Merger and Integration. .......................................................................... 36

Section 11.10   The Delaware Trustee. ..................................................................... 36

Section 11.11   Patriot Act. .................................................................................... 37

Section 11.12   Governing Law; Venue Jury Waiver. ....................................................... 37

Section 11.13   Force Majeure. .......................................................................................... 38

Section 11.14   Intent of Parties. ....................................................................................... 38

Section 11.15   Non-Petition. ............................................................................................ 41

Section 11.16   Certain Terms Regarding the Commonwealth. ....................................... 41

Section 11.17   Certain Terms Regarding FGIC. ............................................................. 41

[_____] CUSTODIAL TRUST

**TRUST AGREEMENT**

**THIS TRUST AGREEMENT**, dated as of _____, 2021 (this "Trust Agreement" or this "Agreement"), with respect to the [_____] Custodial Trust (the "Trust"), by and among the Commonwealth of Puerto Rico (the "Commonwealth"), Financial Guaranty Insurance Company ("FGIC"), [Custodial Trustee Bank], as trustee (the "Trustee"), and [Custodial Trustee Bank], as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees", and with the Commonwealth and FGIC, collectively, the "Parties").

**WHEREAS**, in furtherance of the structure approved in the Commonwealth's Plan of Adjustment (as defined below) and in order to facilitate the implementation thereof, the Trust is being established by the Commonwealth and the Trustees solely for the benefit of and on behalf of the Unitholders (as defined below) and FGIC;

**WHEREAS**, except for the establishment of the Trust and the deposits therein pursuant to the Plan (as defined below) or as contemplated hereby, the Commonwealth shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

**WHEREAS**, the Trust is one of the FGIC Trusts contemplated by Section 75.4(a) of the Plan and is being formed for the purposes of (i) holding the Covered FGIC Insured Bonds (as defined below), (ii) receiving FGIC Plan Consideration (as defined in the Plan) allocable or distributable in accordance with Section 24.1 of the Plan to the Original Holders (as defined below), each component of which is identified on Exhibit A hereto (collectively, the "Allocable Plan Consideration"), (iii) being the sole holder and beneficiary of the Covered FGIC Insurance Policy (as defined below), and (iv) issuing a single class of beneficial ownership interests consisting of trust units that shall be assigned a CUSIP, be issued in global form and be registered in the name of and transferable through the Depositary.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Trust Agreement, the Parties hereby agree as follows;

**ARTICLE I**

**Definitions; Construction**

Section 1.1    Definitions

 (a) Capitalized terms used in this Trust Agreement, and not otherwise defined in this Trust Agreement, shall have the respective meanings assigned to such terms in the Plan.

 (b) Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

1

"Affiliate": With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Cash Acceleration Payment": The meaning specified in Section 3.7.

"Cash Payment": The meaning specified in Section 3.3(b).

"Certificate": A definitive certificate substantially in the form attached as Exhibit [__] evidencing the Units and issued by the Trust pursuant to Article V hereof.

"Certificate of Trust":  The Certificate of Trust of the Trust substantially in the form attached as Exhibit [  ] hereto.

"Closing Date": [            ], 2021, the effective date of the Plan.

"Code": The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Corporate Trust Office": The Trustee's offices at _____, or such other addresses as the Trustee may designate from time to time by notice to the Unitholders and FGIC.

"Covered FGIC Insured Bonds": The FGIC Insured Bonds held or beneficially owned by the Original Holders in the aggregate principal amount specified on Exhibit A, which are deposited into the Trust on the Closing Date and thereafter held by the Trust (as such bonds may be deemed to be paid, reduced or satisfied in accordance with the terms of this Trust Agreement or the FGIC Insurance Policy).

"Covered FGIC Insurance Policy": The FGIC Insurance Policy solely insofar as it applies and relates to the Covered FGIC Insured Bonds, including, for the avoidance of doubt, all rights relating to payments (if any) required to be made by FGIC in respect of any DPO and DPO Accretion associated with such Covered FGIC Insured Bonds under such FGIC Insurance Policy in accordance with the terms and conditions of the FGIC Rehabilitation Plan.  For the avoidance of doubt, (i) all FGIC Insured Bonds other than the Covered FGIC Insured Bonds shall be deemed no longer covered by the FGIC Insurance Policy as of the Closing Date for all purposes, and (ii) neither the Trust nor the Trustee shall have any rights under the FGIC Insurance Policy except in respect of the Covered FGIC Insured Bonds.

"Delaware Trustee": The meaning specified in the preamble hereto and any successor Delaware Trustee appointed in accordance with Section 11.10.

2

"Delaware Trustee Fee": The fees set forth in the Trustee Fee Letter.

"Delaware Trust Statute": Chapter 38 of Title 12 of the Delaware Code.

"Depositary": DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DPO": The meaning specified in the FGIC Rehabilitation Plan.

"DPO Accretion": The meaning specified in the FGIC Rehabilitation Plan.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"DTC Participant": With respect to the Depositary, a Person who has an account with the Depositary or clears through or maintains a custodial relationship with a Person who has an account with the Depositary.

"Eligible Account": A non-interest bearing account, held in the United States in the name of the Trustee for the benefit of the Trust, the Unitholders and FGIC, which is a segregated account maintained with either (1) a Federal or State chartered depository institution that has (x) a short-term deposit or unsecured debt rating of at least "A-1" and "P-1" by S&P and Moody's respectively, (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" and "A2" by S&P and Moody's, respectively and (z) a combined capital and surplus of at least U.S.$200,000,000 or (2) the corporate trust department of such a Federal or State-chartered deposit institution.

"EMMA": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP for the Units.

"Executive Officer": With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Extraordinary Expense": The meaning specified in Section 7.5(b).

"Fair Market Value" means, in respect of any New GO Bond or GO CVI as of any date of determination, the lower of (i) the price for such New GO Bond or GO CVI, as applicable, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price for such New GO Bond or GO CVI, as applicable, as of such Business Day, and (ii) the fair market price for such

3

New GO Bond or GO CVI, as applicable, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Trustee, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"FGIC Insurance Policy": The existing insurance policy issued by FGIC with respect to the FGIC Insured Bonds [and other bonds previously issued by the Commonwealth], which is listed on Exhibit A hereto, as modified by the FGIC Rehabilitation Plan and this Trust Agreement.

"FGIC Insurance Policy Collection Account": The meaning specified in Section 3.1(a).

"FGIC Insured Bonds": The bonds previously issued by the Commonwealth, which are described and the CUSIP for which is identified on Exhibit A hereto.

"FGIC Rehabilitation Plan": The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

"General Collection Account": The meaning specified in Section 3.1(a).

"GO CVI Distribution Date": With respect to each series of GO CVIs, each date specified in the GO CVI Indenture or CVI Legislation on which distributions of amounts due on such securities are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Moody's": Moody's Investors Service, Inc.

"New GO Bond Distribution Date": With respect to each series of New GO Bonds, each date specified in the applicable New GO Bonds Indenture or New GO Bonds Legislation on which distributions of principal or interest on such bonds are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Notional Amount": With respect to the Units as of any date of determination, the amount of Trust Units issued as provided in this Trust Agreement on the Closing Date, excluding any Units that may have been surrendered or canceled or otherwise are no longer outstanding on or prior to such date.

"Officer's Certificate": A certificate signed by an Executive Officer of the applicable Person and delivered to the Trustee.

"Opinion of Counsel": A written opinion of counsel, who may be counsel to FGIC.

"Original Holder": Each holder of an Allowed FGIC Insured Bond Claim on the Closing Date arising from FGIC Insured Bonds (other than FGIC), as provided in Section 75.4(a) of the Plan.

"Permitted Sale Event": With respect to any series of New GO Bonds or the GO CVIs, the satisfaction of all of the following requirements:

(i)     FGIC is not in default under the Covered FGIC Insurance Policy;

(ii)     FGIC shall have instructed the Trustee, by delivering a direction and notice in the form of Exhibit [_] attached hereto, to sell some or all of (A) such series of New GO Bonds, or (B) the GO CVIs and setting forth the Permitted Sale Price for such New GO Bonds or such GO CVIs, as applicable;

(iii)     The Trustee shall have provided notice to Unitholders in accordance with the notice requirements set forth in Section 11.4 hereof (a) notifying Unitholders of the instruction of FGIC described in clause (i) above and the Permitted Sale Price set forth in such instruction and (b) requesting that any Unitholders objecting to such proposed sale provide written notice of such objection to the Trustee; and

(iv)     The Trustee shall not have received a written objection from the Requisite Unitholders (determined as of the date of the notice described in clause (ii) above) with respect to such proposed sale within seven (7) Business Days of the date the notice provided in clause (iii) above is provided.

"Permitted Sale Price": With respect to any Permitted Sale Event regarding some or all of any series of New GO Bonds or the GO CVIs, the price equal to the percentage of the par amount of such New GO Bonds or of the outstanding notional amount of such GO CVIs set forth in the related notice and direction delivered by FGIC to the Trustee.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment" or "Plan": The Seventh Amended Joint Plan of Adjustment of the Commonwealth, the Commonwealth's Employees Retirement System and the Puerto Rico Public Buildings Authority, Case No. 17 BK 3283-LTS, filed on July 30, 2021, as amended, modified or supplemented from time to time.

"pro rata": With respect to any payment or distribution, or any allocation of any cost or expense, to Unitholders hereunder, pro rata shall be calculated based on the Notional Amount of the Units then outstanding.

"Proof of Policy Claim Form": The Proof of Policy Claim Form required to be filed in order to submit a policy claim to FGIC in accordance with the FGIC Rehabilitation Plan.

"Record Date":  With respect to any distribution to be made to Unitholders: (i) based on the Cash to be deposited into the Trust on the Closing Date, the Closing Date, (ii) based on any scheduled payment of principal or interest in respect of any series of New GO Bonds, the tenth day preceding the related New GO Bond Distribution Date, (iii) based on any scheduled payment of any amount due in respect of GO CVIs, the tenth day preceding the related GO CVI Distribution

5

Date, and (iv) based on any other funds deposited or to be deposited in the General Collection Account or any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, the Record Date established by the Trustee pursuant to Section 3.4(b), provided that if such tenth day under clause (ii) or (iii) above is not a Business Day, the Record Date shall be the preceding Business Day.

"Responsible Officer": With respect to the Trustee, any officer within the Corporate Trust Office of the Trustee, including any Vice President, Assistant Vice President, Secretary, Assistant Secretary, Executive Director or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and who shall have direct responsibility for the administration of this Trust Agreement and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Requisite Unitholders": As of any date, Unitholders holding more than fifty (50) percent of the Notional Amount of the Trust Units as of such date, excluding from both the numerator and the denominator the Notional Amount of any Trust Units held by FGIC.

"Secretary of State": The meaning specified in Section 2.1.

"State": Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P": S&P Global Ratings.

"Threshold Price": With respect to the New GO CIBs, the New GO 5.375% CABs, the New GO 5.0% CABs and the GO CVIs, the respective prices set forth on Schedule I.

"Threshold Event": With respect to any series of New GO Bonds or the GO CVIs, the receipt by the Trustee of a notice by FGIC that the current market price of such series of New GO Bonds or the GO CVIs exceeds the Threshold Price for such series of New GO Bonds or the GO CVIs, coupled with a written instruction from FGIC to sell some or all of such series of New GO Bonds or the GO CVIs.

"Trust": The trust created by this Trust Agreement as specified in the preamble hereto.

"Trust Agreement": The meaning specified in the preamble hereto.

"Trust Assets" or "Trust Estate": The property, assets and rights set forth in clauses (a), (b) and (c) of Section 2.2, and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Trustee": The meaning specified in the preamble hereto and any successor Trustee appointed pursuant to Section 7.6 or Section 7.8.

"Trustee Costs": The meaning specified in Section 7.5(a).

"Trustee Fee Letter": The letter agreement dated on or before the Closing Date setting forth the fees and expenses of the Trustees.

"Trustees": Collectively, the Trustee and the Delaware Trustee.

"United States": The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unitholder": The Person in whose name a Unit is registered in the records of the Depositary on any date of determination.

"Units" or "Trust Units":  The single class of beneficial ownership interests in the Trust evidenced by the Certificate.

"U.S.A. PATRIOT Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

Section 1.2      Rules of Construction

Unless the context otherwise requires:

(i)      a term has the meaning assigned to it;

(ii)      an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United Statesfrom time to time;

(iii)      "or" is not exclusive;

(iv)      the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)      the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)      the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3      Article and Section References

All Article and Section references used in this Trust Agreement, unless otherwise provided, are to Articles and Sections in this Trust Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearingwithin a particular paragraph of a Section is a reference to such Section as a whole.

7

## ARTICLE II

## TRUST ESTATE

Section 2.1    Creation of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of the Certificate of Trust with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name written above the heading of this Trust Agreement, in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the Parties that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustees are hereby authorized and directed to, and shall, on the date hereof file the Certificate of Trust with the Secretary of State. The Trustee shall have power and authority, and is hereby authorized and empowered, to take all actions on behalf of the Trust as set forth in this Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and FGIC.

Section 2.2    Trust Assets.

Pursuant to and in accordance with this Trust Agreement and the Plan, on the Closing Date:

(a)    The Commonwealth shall, on behalf of the Original Holders and as required by Section 75.4(a) of the Plan, deposit into the Trust (i) the Allocable Plan Consideration comprising Cash, New GO Bonds and GO CVIs as specified on Exhibit A hereto; and (ii) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy;

(b)    The Depositary shall, on behalf of the Original Holders and as required by Section 75.4(a) of the Plan, deposit all Covered FGIC Insured Bonds into the Trust. All rights and remedies under or with respect to the Covered FGIC Insured Bonds and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the Covered FGIC Insurance Policy (including the rights with respect to any related DPO and DPO Accretion under the FGIC Rehabilitation Plan) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy; and

(c)    Each holder/beneficiary of the Covered FGIC Insurance Policy shall, on behalf of the Original Holders and as required by Section 75.4(a) of the Plan, deposit, or be deemed to have deposited, into the Trust the Covered FGIC Insurance Policy and relinquished all rights thereunder to the Trustee, on the Closing Date and thereafter.

Section 2.3      Acceptance by Trustee.

(a)      By its execution of this Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all Trust Assets, including all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets, in each case in trust for the exclusive use and benefit of all present and future Unitholders. The Trustee represents and warrants that, except as expressly permitted by this Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of this Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)      The Trustee shall, on the Closing Date, deliver to the Depositary a certification [substantially in the form of Exhibit [_] hereto] that, with respect to the Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs, either (i) it is in possession of a certificate or certification evidencing the Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs, or (ii) it has received confirmation from a depository of such Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs or a direct or indirect participant thereof that each of the Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs are beneficially owned by the Trust for the benefit of the Unitholders and FGIC.

(c)      Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

Section 2.4      Purpose, Activities of the Trust.

It is the intention of the Parties that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to, the following:

(a)      accept the conveyance, assignment and transfer of the Trust Assets pursuant to the Plan or as contemplated by this Trust Agreement;

(b)      create one or more accounts or sub-accounts in accordance with the terms of this Trust Agreement;

(c)      make claims and assignments and receive payments under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and this Trust Agreement;

(d)      receive payments pursuant to the Plan;

(e)      issue the Trust Units to the Original Holders and the corresponding Certificate to the Depositary or its nominee in accordance with the terms of this Trust Agreement;

(f)      make distributions to the [Depositary and] Unitholders in accordance with the terms of this Trust Agreement;

(g)     coordinate Unitholder communications through the Depositary;

(h)     follow, accept or act upon any instruction or direction from FGIC or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(i)     hold the Trust Assets;

(j)     sell or assign New GO Bonds and GO CVIs or portions thereof only as expressly provided in Section 3.5 or 3.6 hereof;

(k)     effectuate Unitholder Elections as provided in Section 3.6 hereof;

(l)     make public disclosures on EMMA and the "Muni" section of Bloomberg L.P. and similar means of distribution as contemplated by this Trust Agreement;

(m)     make disclosures and share information with Bloomberg L.P. for disclosure on its trading platform and with other similar services, pursuant to Section 4.1 hereof, to the extent reasonably available to the Trustee;

(n)     make payments and distributions and contemplated by this Trust Agreement;

(o)     otherwise perform its obligations in accordance with, and take such other actions as are expressly provided for or permitted under, the terms of this Trust Agreement; and

(p)     engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 2.5     <u>Limitations of the Trust</u>.

(a)     Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee. Neither the Commonwealth or FGIC nor any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

(b)     The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust. Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)     The Trust will provide for its own operating expenses and liabilities from the Trust Assets. General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Commonwealth or FGIC or their respective Affiliates;

(d)     All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

(e)    There will be no guarantees made by the Trust with respect to obligations of the Commonwealth or FGIC or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust and the Commonwealth or FGIC or their respective Affiliates; provided that FGIC or its Affiliates may own Trust Units;

(f)    The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to the Commonwealth or FGIC or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Commonwealth or FGIC or their respective Affiliates; or (iii) induce any third party to reasonably rely on the creditworthiness of the Commonwealth or FGIC or any other affiliated or unaffiliated entity in its dealings with the Trust;

(g)    The Trust will maintain a Delaware Trustee with its office in the State of Delaware; and

(h)    The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

## ARTICLE III

## ADMINISTRATION OF TRUST

Section 3.1    <u>Accounts</u>.

(a)    The Trustee has established and will maintain Eligible Accounts (i) to hold all amounts received on or in respect of the Trust Assets except the Covered FGIC Insurance Policy (the "<u>General Collection Account</u>") and (ii) to hold all amounts received on account of the Covered FGIC Insurance Policy (including, any amounts received on account of DPO or DPO Accretion) (the "<u>FGIC Insurance Policy Collection Account</u>"), each held in trust for the benefit of the Unitholders and FGIC. The Trustee shall deposit all cash received pursuant to clause (a) of Section 2.2 into the General Collection Account on the Closing Date. The Trustee has established and will maintain separate custodial accounts into which (i) the New GO Bonds and GO CVIs received pursuant to clause (a) of Section 2.2 shall be deposited on the Closing Date, to be held in trust for the benefit of the Unitholders and FGIC, and (ii) the Covered FGIC Insured Bonds and the Covered FGIC Insurance Policy received pursuant to clauses (b) and (c) of Section 2.2 shall be deposited on the Closing Date, to be held in trust for the benefit of the Unitholders. Each of the General Collection Account and the FGIC Insurance Policy Collection Account and such other accounts shall be under the sole dominion and control of the Trustee, and the Trustee shall be entitled to look solely to the General Collection Account for payment of its fees and expenses from time to time in accordance with the terms of this Trust Agreement.  All distributions to Unitholders shall be made only from cash on deposit in either the General Collection Account or the FGIC Insurance Policy Collection Account in accordance with the terms hereof.

(b)     If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within five (5) Business Days establish a new General Collection Account or FGIC Insurance Policy Collection Account, as applicable, meeting the conditions specified in such definition and transfer any cash on deposit in the General Collection Account or FGIC Insurance Policy Collection Account to such new General Collection Account or FGIC Insurance Policy Collection Account, and from the date such new General Collection Account or FGIC Insurance Policy Collection Account is established, it shall be the General Collection Account or FGIC Insurance Policy Collection  Account under this Trust Agreement.

(c)     The Trustee shall give notice to FGIC and Unitholders of the location of each Eligible Account and other account and to the proposed new location of any Eligible Account or other account prior to any change thereof.

Section 3.2     <u>Investment of Funds in the Collection Accounts</u>.

Amounts in the General Collection Account and the FGIC Insurance Policy Collection Account shall not be invested.

Section 3.3     <u>FGIC Insurance Policy and Effect of Distributions</u>.

(a)     The Trust holds the Covered FGIC Insured Bonds and is the sole Person entitled under the terms of the Covered FGIC Insured Bonds to payment thereof.  Accordingly, the Trust is and shall be the sole "Bondholder" entitled to assert claims and receive payments under or with respect to the Covered FGIC Insurance Policy.

(b)     The Trustee shall have the sole authority to assert, and shall assert, claims under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and to take all actions required to enforce the Covered FGIC Insurance Policy, including in the event that FGIC fails to make any payment when due under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy. The Trustee shall be authorized to take, and shall take, subject to its rights and protections herein, all actions it deems necessary or advisable to satisfy any and all conditions to the obligations to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO or DPO Accretion related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan. The following are conditions to FGIC's obligation to make any such payment, and the Trustee is authorized and directed to satisfy such conditions: (i) the Trustee shall have submitted to FGIC with respect to each claim a fully completed and duly executed Proof of Policy Claim Form in accordance with the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, and (ii) with respect to each such payment (other than on account of DPO Accretion) relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "<u>Cash Payment</u>"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit [x] with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, which assignments in each case shall be required to be acknowledged in writing by the Depositary before delivery to FGIC (or its fiscal agent).

(c)     All claims that are properly submitted to FGIC by the Trustee under the Covered FGIC Insurance Policy shall be paid to the extent permitted by FGIC under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, subject to satisfaction of any conditions to such payments, including the conditions set forth in this Trust Agreement. All payments to the Trustee under or with respect to the Covered FGIC Insurance Policy shall be deposited into the FGIC Insurance Policy Collection Account on the date received if received prior to 11:00 a.m. New York time, on any Business Day or, if received after such time on any Business Day, on the following Business Day.  In the event that FGIC has defaulted in its payment obligations under the Covered FGIC Insurance Policy, the Requisite Unitholders shall have the right to direct the Trustee in writing to take, and the Trustee is authorized to take, and shall take, any and all actions necessary or desirable to enforce and recover such payment obligations.

(d)     Each distribution of cash to the Unitholders from the General Collection Account shall automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy.  All payments from the FGIC Insurance Policy Collection Account under or with respect to the Covered FGIC Insurance Policy arising from or related to principal of or interest on the Covered FGIC Insured Bonds (other than on account of DPO Accretion) shall be deemed to automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of or the accrued and unpaid interest on the Covered FGIC Insured Bonds, respectively. For the avoidance of doubt, all payments on account of a claim for accrued and unpaid interest due shall reduce on a dollar-for-dollar basis the outstanding interest amount of the Covered Insured Bonds, and all payments of a claim for principal shall reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds.

(e)     If at any time the principal amount of the Covered FGIC Insured Bonds shall be reduced to zero, then thereafter each distribution of cash to the Unitholders under this Trust Agreement (other than distributions from the FGIC Insurance Policy Collection Account on account of payments made by FGIC under or with respect to the Covered FGIC Insurance Policy) shall automatically and immediately reduce on a dollar-for-dollar basis the accrued and unpaid interest, if any, due on the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy. If at any time the principal amount of and the accrued and unpaid interest on the Covered FGIC Insured Bonds and the DPO Accretion balance under the Covered FGIC Insurance Policy shall be reduced to zero, then (i) the Covered FGIC Insurance Policy shall be indefeasibly canceled, (ii) within three (3) Business Days thereafter, the Trustee shall (x) first, assign to FGIC ownership of the Trust Assets held by the Trust at that time to the extent required to reimburse FGIC for any unreimbursed payments previously made under the Covered FGIC Insurance Policy and (y) second, distribute to the Unitholders any remaining Trust Assets, and (iii) upon making such assignment and distributions (if any), the Units shall be deemed to be redeemed in full and the Trust shall terminate in accordance with the provisions of Article IX hereof.

(f)     Each of FGIC and each Unitholder shall have and retain all rights set forth in the Plan applicable to it, including those set forth in Section 75.4 of the Plan.

(g)    In addition to any other rights FGIC may have hereunder or otherwise, due to the subrogation rights under the Covered FGIC Insurance Policy, upon making each Cash Payment or Cash Acceleration Payment to the Trust, FGIC shall automatically become the owner of a proportionate share (as described in Section 3.3(b)) of the Trust Assets held by the Trust and shall be fully subrogated to all of the Trust's rights therein, including any payments on or in respect thereof.

Section 3.4    <u>Distributions</u>.

(a)    All cash received by the Trust or the Trustee from any source shall be applied and distributed in accordance with the terms of this Trust Agreement. Within [one (1) Business Day] of the Trust's receipt of (i) the Cash to be deposited into the Trust pursuant to clause (a) of Section 2.2 on the Closing Date, (ii) any scheduled payment of principal or interest in respect of any series of the New GO Bonds, or (iii) any scheduled payment due on the GO CVIs, the Trustee shall distribute such amounts, net of any outstanding Trustee Costs that are due and payable as of the related distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

(b)    The Trustee shall establish the Record Date for the distribution of (i) any other funds deposited or to be deposited in the General Collection Account or (ii) any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, and the Trustee shall send notice to the Unitholders of such Record Date and the related anticipated distribution date of such amounts, in accordance with Section 11.4, in each case not later than [one (1) Business Day] after the Trust's receipt of such funds or payments.  Such Record Date shall be at least 10 days and no more than 15 days after the date such notice is posted on EMMA and Bloomberg L.P. On such distribution date, the Trustee shall distribute such amounts, in the case of clause (i) net of any outstanding Trustee Costs that are due and payable as of such distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

(c)    Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary.

Section 3.5    <u>Threshold Event or Permitted Sale Event</u>.

(a)    The Trustee shall not sell any New GO Bonds or GO CVIs except upon a Threshold Event or Permitted Sale Event and subject the terms of Section 3.5(b), provided that the Trustee shall be authorized to make the assignments contemplated by Sections 3.3 and 3.6.

(b)    Upon the occurrence of a Threshold Event or Permitted Sale Event with respect to which FGIC has instructed the Trustee in writing to sell some or all of one or more series of New GO Bonds or the GO CVIs, the Trustee shall sell such New GO Bonds or GO CVIs, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Trustee by FGIC, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price in the case of a Threshold Event or the

14

applicable Permitted Sale Price in the case of a Permitted Sale Event, and (iii) all proceeds of such sales shall be deposited into the General Collection Account.

Section 3.6        Surrendered Units.

(a)        Subject to satisfaction of the conditions set forth in Section 3.6(b), any Unitholder may, at any time and from time to time, elect to surrender Units held by such Unitholder (as confirmed by the Depositary) to the Trustee for cancellation (the "Surrendered Units") in exchange for an assignment to such Unitholder of its proportional percentage of the New GO Bonds and GO CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, by giving written notice thereof to FGIC and the Trustee (a "Unitholder Election").

(b)        The following conditions must be satisfied to permit and effectuate any Unitholder Election: (i) FGIC shall, in its sole discretion, have consented in writing to such Unitholder Election, (ii) the Surrendered Units shall be cancelled by the Trustee with an automatic and immediate corresponding reduction in the aggregate Notional Amount of the Units and the Trustee shall deliver written notice of such cancellation and reduction to the Depositary, (iii) the outstanding principal amount of the Covered FGIC Insured Bonds shall automatically and immediately be reduced on a proportionate dollar-for-dollar basis (based on the proportion of the Notional Amount of such Surrendered Units to the aggregate Notional Amount of the Units at that time) with an automatic and immediate corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy, which reductions shall be acknowledged by the Trustee, and (iv) such Unitholder shall execute and deliver a release, in form and substance satisfactory to FGIC, releasing all rights and claims of any kind it may have relating to the Surrendered Units or the Covered FGIC Insurance Policy subject to receipt of consideration, if any, to be paid by FGIC.. Upon satisfaction of such conditions, the Trustee shall assign to the Unitholder ownership of the applicable proportional percentage of the New GO Bonds and GO CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time. FGIC's consent to any Unitholder Election shall not limit its right, in its sole discretion, to deny its consent to any other Unitholder Election.

Section 3.7        FGIC Election to Accelerate Policy Payments.

(a)        Section 3.7(b) shall apply to the Trust and the Covered FGIC Insurance Policy as of the date  that is thirty (30) Business Days following the Closing Date unless the Requisite Unitholders  notify the Trustee in writing prior to such date of their election that Section 3.7(b) shall not so apply.

(b)        Pursuant to the Plan, the payment of the principal of the Covered FGIC Insured Bonds was accelerated and such Covered FGIC Insured Bonds are due and payable at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon, or 100% of accreted amounts thereon, to the date of payment.  FGIC is not obligated to pay any claims on an accelerated basis under the Covered FGIC Insurance Policy. FGIC shall have the right, in its sole and absolute discretion, to elect at any time to permit a claim

15

under the Covered FGIC Insurance Policy in the amount of such acceleration price at such time (regardless of whether the Trustee shall have submitted a claim therefor to FGIC) and to make payment to the Trustee in respect of such permitted claim under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan; provided, however, that FGIC shall not be obligated to make all or any portion of such payment, unless and until, with respect to the portion of such payment relating to the principal of the Covered FGIC Insured Bonds, which will be paid or deemed to be paid by FGIC in cash (the "Cash Acceleration Payment"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit [x] with respect to a proportionate share (based on the proportion of such Cash Acceleration Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, which assignments in each case shall be required to be acknowledged in writing by the Depositary before delivery to FGIC (or its fiscal agent).

(c)     At any time, Requisite Unitholders can notify the Trustee of an election that Section 3.7(b) shall apply notwithstanding a prior election under Section 3.7(a), and such notice will be effective upon agreement by FGIC within [30] Business Days of such notification.

## ARTICLE IV

## REPORTING/REMITTING TO UNITHOLDERS

Section 4.1     Statements to Unitholders.

On a quarterly basis, the Trustee shall prepare and post a statement to EMMA, and the "Muni" section of Bloomberg L.P., in the form attached hereto as Exhibit [ ], and provide notice of such statement in accordance with the Notice provisions of Section 11.4 setting forth:

(a)     all distributions made from the General Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis), identifying the portion thereof attributable to the amount of (i) asset sales; (ii) principal and interest payments; and (iii) CVI payments;

(b)     all distributions made from the FGIC Insurance Policy Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis);

(c)     the principal amount (or accreted amount, as applicable) as of the quarter end of each CUSIP of New GO Bonds and GO CVI held by the Trust (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per Unit basis);

(d)     the DPO balance and DPO Accretion balance associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy as of the quarter end, to the extent such information has been furnished to the Trustee by FGIC;

(e)     the principal amount of, and the accrued and unpaid interest on, the Covered FGIC Insured Bonds as of the end of the quarter, together with a description of the changes in such amounts during the quarter;

(f)     any notices received by the Trustee from FGIC in connection with any required DPO and DPO Accretion payments associated with the Covered FGIC Insured Bonds under the Covered FGIC Policy; and

(g)     any required tax reporting for such period.

The Trustee shall also make disclosures and share information with Bloomberg L.P. for disclosure on the "Muni" section of its trading platform and with other similar services as is reasonably requested by such services, to the extent available to the Trustee..

Section 4.2     Compliance with Withholding Requirements.

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depositary and the Unitholders that the Trustee reasonably believes are applicable under the Code. The consent of the Depositary and the Unitholders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to the Depositary or any Unitholder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depositary or such Unitholder the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depositary or Unitholder, as the case may be, in the amount of the withholding for all purposes and shall thereby reduce amounts otherwise distributable to the Depositary or such Unitholder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## THE UNITS

Section 5.1     The Units.

(a)     The Units shall be evidenced by the Certificate issued by the Trustee to the Depositary in accordance with Section 5.2(a).

(b)     The aggregate Notional Amount of the Units issued under this Trust Agreement shall be limited to the aggregate outstanding principal amount of the Covered FGIC Insured Bonds as of the Closing Date that are deposited into the Trust on the Closing Date, as shown on Exhibit [A]. The beneficial ownership of the Units as of the Closing Date shall be allocated by the Depositary among the Original Holders on a proportionate basis based on their respective Covered FGIC Insured Bonds that are deposited into the Trust on the Closing Date.

(c)     All Units issued under this Trust Agreement shall be evidenced by the same Certificate, subject to the requirements of the Depositary, and otherwise identical in all respects. All Units issued under this Trust Agreement shall be in all respects equally and ratably entitled to the benefits hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery, and shall be held and transferable only through the Depositary.

17

(d)     No additional interests in the Trust other than the Certificate and the Units shall be issued hereunder, except in accordance with Section 5.3.

Section 5.2     The Certificate; Book-Entry-only System.

(a)     On the Closing Date, upon deposit of all of the Trust Assets into the Trust pursuant to the Plan of Adjustment and as provided in Section 2.2, the Trustee shall issue to the Depositary the initial Certificate by executing and delivering the Certificate, on behalf of this Trust, with the manual or facsimile signature of an authorized officer or other agent of the Trustee.

(b)     The Trust shall employ a book-entry-only system of registration with respect to the Certificate and Units.  Consistent with DTC book-entry provisions, one typewritten Certificate shall be prepared and registered in the name of the Depositary.  There shall be no physical delivery of the Certificate or Units to the Unitholders or other beneficial owners.

(c)     Each Trustee is hereby authorized to take all actions required for the global Certificate and Units to be eligible under the rules and regulations of the Depositary for investment and trading as uncertificated securities.  DTC is hereby appointed as the initial Depositary, with Cede & Co., a nominee thereof, being the initial registered owner of the Certificate. In the event that any Depositary resigns or is removed, the Trustee shall select a substitute Depositary. Notwithstanding anything herein to the contrary, the Trust and Trustee, and any agent of the Trust or any Trustee, may treat any Depositary in whose name any Certificate is registered as the owner of the Units for all purposes. For so long as the Depositary is the registered owner of the Certificate, procedures with respect to the transmission of notices and the, transfer of ownership and payment of Units shall be in accordance with arrangements between the Trustee and the Depositary. The Certificate shall be issued in global form and the Units represented thereby shall be freely tradeable and transferable through the Depositary.

(d)     Notwithstanding anything herein to the contrary, so long as the Certificate is registered in the name of the Depositary, the Trust and the Trustee shall have no responsibility or obligation to any Depositary participant, indirect participant or beneficial owner of the Certificate or Units. Without limiting the immediately preceding sentence, the Trust and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of any Depositary or any Depositary participant or indirect participant with respect to any beneficial ownership interest in the Certificate, (ii) the delivery to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any notice with respect to the Certificate or Units, including any notice of Record Date, distribution date, payment, redemption or tender, or (iii) the payment to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any amount with respect to Units or Certificate. The rights of Unitholders shall be limited to those established by law and agreements between the Unitholders and the Depositary and Depositary participants and as provided herein.

(e)     A CUSIP number will be imprinted on the Certificate, but such CUSIP shall not constitute a part of the contract evidenced by the Certificate or Units. The Trustee shall seek to have such CUSIP be a "Muni" CUSIP quoted in the "Muni" section of Bloomberg L.P. As a

18

convenience to the Depositary and Unitholders, the Trust and the Trustees may use such CUSIP in any notices to the Depositary and Unitholders.

Section 5.3    Mutilated, Destroyed, Lost and Stolen Certificate.

(a)    If (i) any mutilated Certificate is presented to the Trustee or (ii) the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Trustee such security or indemnity as it may require to save it harmless, and the Trustee has not received notice that such Certificate (and the Units represented thereby) has been acquired by a bona fide purchaser, then, in each case, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

(b)    Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Certificate holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)    Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Assets to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement.

(d)    The terms of this Section shall apply, *mutatis mutandis*, with respect to the Units, provided that any costs, taxes or expenses in connection therewith or with respect to a required indemnity shall be borne by the Trustee and deemed an Extraordinary Trust Expense.

(e)    The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

Section 5.4    No Obligation to Register.

The Trustee is not obligated to register or qualify any Certificate or Unit under the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder, or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

Section 5.5    Persons Deemed Owners.

Subject to Section 5.3, but notwithstanding anything else in this Trust Agreement, the Trustee and any agent of the Trustee may treat the Depositary or its nominee in whose name the Certificate is registered as the owner of the Units on the related distribution date for the purpose of receiving distributions on such Units and for all other purposes whatsoever and neither the

19

Trustee, nor any agent of the Trustee shall be affected by notice to the contrary. All distributions made hereunder to the Depositary or its nominee, or upon its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon the Units.

Section 5.6    Cancellation.

All Units evidenced by any Certificate surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee. The Trustee and no one else will cancel all such Units surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Units in accordance with its customary procedures. The Certificate shall not be authenticated in lieu of or in exchange for any Units canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

# ARTICLE VI

## NEW GO BONDS AND GO CVIS

Section 6.1    Voting Rights with Respect to New GO Bonds and GO CVIs.

(a)    Within two (2) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the New GO Bonds or the GO CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Trustee shall deliver a copy of such notice to FGIC and the Unitholders.

(b)    The voting and direction rights allocable to the owners of the New GO Bonds and GO CVIs (or any other securities or property received in respect thereof or in exchange therefor) pursuant to the terms thereof (including voting and direction rights in respect of remedies) ("Voting Rights") shall be allocated to FGIC unless FGIC is in default under the Covered FGIC Insurance Policy (a "Voting Rights Condition"). Upon the written request of FGIC, subject to the immediately preceding sentence, the Trustee shall vote in accordance with any instruction set forth in such written request. Upon the occurrence and continuation of a Voting Rights Condition, the Voting Rights will be deemed to be held on a pro rata basis by the Unitholders, and the Trustee may act at the direction of the Requisite Unitholders.

# ARTICLE VII

## CONCERNING THE TRUSTEE

Section 7.1    Duties of Trustee.

(a)    Every provision of this Trust Agreement relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VII.

20

(b)     The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(c)     The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desirable actions to enforce the Covered FGIC Insurance Policy against FGIC as set forth herein.

(d)     The Trustee shall deliver to all Unitholders copies of all notices and written communications received from the Commonwealth as they relate to the New GO Bonds and GO CVIs.

(e)     Except as provided in Section 7.2 hereof, no provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, bad faith or willful misconduct; provided, however, that:

(i)     The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of FGIC relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New GO Bonds or GO CVIs exercising any trust or power conferred upon the Trustee with respect to the New GO Bonds or GO CVIs, under this Trust Agreement;

(iii)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Covered FGIC Insurance Policy or exercising any trust or power conferred upon the Trustee with respect to the Covered FGIC Insurance Policy, under this Trust Agreement; and

(iv)     Any determination of gross negligence or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

Section 7.2    Certain Matters Affecting the Trustee.

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in

21

accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of this Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of the Requisite Unitholders, pursuant to the provisions of this Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by FGIC or the Requisite Unitholders; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)     The Trustee may execute any of the trusts or powers under this Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under this Trust Agreement;

(h)     Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 7.1;

(i)     The Trustee shall not be deemed to have notice of any matter unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, the Commonwealth, the Trust or this Trust Agreement;

22

(j)    None of the provisions of this Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)    Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)    The permissive rights of the Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence, bad faith or willful misconduct;

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)    The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to this Trust Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)    The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of this Trust Agreement or any related document;

(p)    The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under this Trust Agreement, and shall have a duty only to accept such collateral or funds delivered to it in accordance with this Trust Agreement;

(q)    In connection with its preparation of any required tax reporting for beneficial owners of the Trust Units, the Trustee shall, if necessary, (i) on a quarterly basis for each calendar year, request one Depositary participant list, (ii) on an annual basis, contact each Depositary participant identified on the Depositary participant lists and request such beneficial owner information as shall be necessary to permit the Trustee to prepare the applicable tax return for such calendar year, and (iii) to the extent that a participant provides partial or incomplete beneficial owner information, make a second and final attempt to contact the participant or such beneficial owner (to the extent such beneficial owner's contact information has been provided to

the Trustee) to obtain such additional information in order to permit the Trustee to prepare the applicable tax return for such beneficial owner for that calendar year;

(r) The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(s) The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement; and

(t) All rights of action under this Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units or the Certificate, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the provisions of this Trust Agreement.

Section 7.3    Trustee Not Liable for Units or New GO Bonds or GO CVIs.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement and in the Trust Units or Certificate. The Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Certificate) or of the New GO Bonds, GO CVIs, the Covered FGIC Insured Bonds, the Covered FGIC Insurance Policy or related documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the New GO Bonds or GO CVIs or deposited in or withdrawn from the Trust in accordance with this Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Article III. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the New GO Bond Legislation or the New GO Bond Indentures.

Section 7.4    Trustee May Own Units.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 7.5    Trustee's Fees and Expenses.

(a) Pursuant to the Trustee Fee Letter, (1) the Trustee shall be entitled to receive from the Trust (i) compensation agreed upon in writing (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under this Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee and (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements (other than Extraordinary Expenses) incurred or made by the Trustee in accordance with any of the provisions of this Trust Agreement (including the fees, expenses and disbursements of its counsel and of all persons not regularly in its employ), in each case to the extent set forth in the Trustee Fee Letter, and (y) Extraordinary Expenses reimbursable pursuant to Section 7.5(b) and (2) the Delaware Trustee shall be entitled

24

to receive from the Trust the Delaware Trustee Fee (collectively, the "<u>Trustee Costs</u>"). All such Trustee Costs shall be made pursuant to the terms of the Trustee Fee Letter and may be reimbursed to the Trustee in accordance with the provisions of Section 3.4 hereof.

(b)     In addition, the Trustee shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against the Commonwealth, the Trust, or the Trustee except for proceedings, litigation or enforcement actions that relate to the Trustee's grossly negligent action, grossly negligent failure to act, bad faith or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review (the "<u>Extraordinary Expenses</u>"). The Trustee may make withdrawals from the Trust to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of Extraordinary Expenses set forth in the Trustee Fee Letter in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; <u>provided</u>, <u>however</u>, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received security or indemnity reasonably satisfactory to it for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit set forth in the Trustee Fee Letter for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust and provided further that the foregoing shall not limit the payment of any amounts to which the Trustee is entitled pursuant to its indemnification rights set forth in Section 7.12 with respect to defending the Trustee against any claim asserted by any Person.

(c)     For the avoidance of doubt, neither the Commonwealth nor FGIC shall be liable for any Trustee Costs.

Section 7.6     <u>Eligibility Requirements for Trustee and Successor Trustee</u>.

The Trustee and any successor Trustee shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Commonwealth or FGIC; (ii) is neither affiliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is a nationally recognized financial institution and fiduciary regularly acting as a trustee in the municipal finance market. If such corporation or national banking association publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee or successor Trustee shall cease to be eligible in accordance with the

provisions of this Section, such Trustee or successor Trustee shall resign immediately in the manner and with the effect specified in Section 7.7.

Section 7.7    Resignation and Removal of the Trustee.

(a)    The Trustee may at any time resign and be discharged from the trusts created pursuant to this Trust Agreement by giving 60 days written notice, which shall be posted to EMMA and the "Muni" section of Bloomberg L.P. by the Trustee. Upon receiving such notice of resignation, FGIC shall promptly appoint a successor trustee meeting the requirements set forth in Section 7.6 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Unitholders and posted to EMMA and the "Muni" section of Bloomberg L.P. by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)    If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 7.6 and shall fail to resign after written request therefor by FGIC or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then FGIC or the Requisite Unitholders may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)    FGIC, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(d)    The Requisite Unitholders, with the written consent of FGIC (which consent shall not be unreasonably withheld or delayed by FGIC in the event the Trustee is in default of its obligations hereunder to enforce the Covered FGIC Insurance Policy), may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(e)    Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 7.8 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including the costs and expenses incurred in connection with any such succession.

(f)     Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 7.8 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including the costs and expenses incurred in connection with any such succession. In the event the Trustee is removed due to a request by the Requisite Unitholders pursuant to Section 7.7(b), then the fees and expenses of the successor trustee incurred in connection with any such succession shall be the sole responsibility of the Unitholders requesting such removal.

(g)     The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

(h)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the rights, benefits, protections and indemnities afforded to the Trustee under this ARTICLE VII shall continue to the benefit of the retiring Trustee.

Section 7.8     Successor Trustee.

(a)     Any successor trustee appointed as provided in Section 7.7 shall execute, acknowledge and deliver to the Unitholders, FGIC and the predecessor trustee an instrument accepting such appointment under this Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under this Trust Agreement and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)     No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 7.6 hereof.

(c)     Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA and the "Muni" section of Bloomberg L.P. notice of the succession of such trustee under this Trust Agreement and (b) mail notice of the succession of such trustee under this Trust Agreement to all Unitholders at their addresses as shown in the records of the Depositary.

Section 7.9     Merger or Consolidation of Trustee.

Any Person into which the Trustee may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under this Trust Agreement, provided

27

such Person shall be eligible under the provisions of Section 7.6, without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

Section 7.10     Appointment of Trustee Custodians.

The Trustee may appoint one or more custodians (each a "Trustee Custodian") to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Trustee Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to ARTICLE VII, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Trustee Custodian for the benefit of the Unitholders. Each Trustee Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Trustee Custodian may not be an Affiliate of the Commonwealth or FGIC. The Trustee is responsible for the fees and expenses of any Trustee Custodian appointed hereunder.

Section 7.11     Trustee May Enforce Claims Without Possession of Certificate.

All rights of action and claims under this Trust Agreement or the Certificate may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Unitholders in respect of which such judgment has been recovered.

Section 7.12     Trustee Indemnity.

The Trustees' rights to claim indemnification for losses that they may incur with respect to this Trust Agreement shall be as set forth in Annex I hereto, subject, with respect to Extraordinary Expenses, to the provisions of Section 7.5(b).

Section 7.13     Acceptance by Trustees, Representations and Warranties of Trustees.

The Trustees each hereby undertake to perform their respective obligations set forth herein. The Trustee hereby agrees to hold the Trust Assets, as trustee in trust on behalf of the Trust upon the terms and conditions and for the use and benefit of the Unitholders as herein set forth. The Trustees each as to itself hereby represent and warrant to each of the Commonwealth, FGIC, holder of the Certificate and holders of the Units that as of the Closing Date:

(a)     it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(b)     it has full corporate power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary

28

corporate action to authorize the execution, delivery and performance by it of this Trust Agreement, including the execution and delivery of the Certificate on behalf of the Trust;

(c)     the execution and delivery of this Trust Agreement by it and its performance of and compliance with the terms of this Trust Agreement will not violate its certificate of incorporation, association or other constituent documents or by-laws or

(d)     constitute a default under, or result in the material breach or acceleration of, any material contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets;

(e)     as of the Closing Date, this Trust Agreement has been duly executed and delivered by it and, assuming the due authorization, execution and delivery of this Trust Agreement by each of the other parties hereto, constitutes the legal, valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(f)     it is not in violation, and the execution and delivery of this Trust Agreement by it and its performance and compliance with the terms thereof will not constitute a violation, of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over it or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of it or its properties or on the performance of its duties hereunder;

(g)     there are no actions or proceedings against, or investigations of, it pending, or, to its knowledge, threatened, before any court, administrative agency or other tribunal (i) that could reasonably be expected to prohibit its entering into this Trust Agreement, (ii) seeking to prevent the issuance of the Certificate contemplated by this Trust Agreement or (iii) that could reasonably be expected to materially affect the performance by it of its obligations under, or the validity or enforceability against it of, this Trust Agreement; and

(h)     no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by it of, or compliance by it with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date, other than the filing of the Certificate of Trust with the Secretary of State.

(i)     The representations and warranties of the Trustees set forth in this Section shall survive the receipt of the Trust Assets by the Trustee and shall survive the delivery of this Trust Agreement by the Trustees to the Commonwealth.

## ARTICLE VIII

## DEFAULT ON NEW GO BONDS OR GO CVIs

29

Section 8.1     Realization Upon Default.

(a)     The Trustee shall assert claims under the New GO Bonds or GO CVIs and the Covered FGIC Insurance Policy, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder following any default thereunder, with respect to the Covered FGIC Insurance Policy, in accordance with Section 3.3(b) hereof and, with respect to the New GO Bonds or GO CVIs, in accordance with Section 6.1(b) hereof.

(b)     If there is a breach, a default or an event of default with respect to any New GO Bond or GO CVI and such breach, default or event of default is known to the Trustee, the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC as promptly as practicable, and, in any event, within two (2) Business Days after such breach, default or event of default becomes known to the Trustee. However, if the Trustee receives notice of an anticipated payment default with respect to any New GO Bond or the GO CVIs, the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC within two (2) Business Days after receipt of such notice.

(c)     The foregoing provisions of this Section 8.1 shall apply equally to any other securities or property received in respect of the New GO Bonds or GO CVIs or in exchange therefor.

## ARTICLE IX

## TERMINATION OF TRUST

Section 9.1     Termination; No Redemption Rights.

Upon the indefeasible cancellation or other indefeasible termination or discharge of the Covered FGIC Insurance Policy or FGIC's obligations thereunder, the Trust (including the respective obligations and responsibilities under this Trust Agreement of the Trustee and FGIC) shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the New GO Bonds and GO CVIs) held by or on behalf of the Trustee and required hereunder to be so paid or distributed, (ii) payment in full of any Trustee Costs due and owing to the Trustee under this Trust Agreement, and (iii) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of this Trust Agreement have been complied with. In no event shall the Trust be terminated or the New GO Bonds or GO CVIs be redeemed (except in the case of a redemption of the New GO Bonds or GO CVIs permitted under the terms of the New GO Bond Indentures or the New GO Bond Legislation) or otherwise released from the Trust Estate without the prior express written consent of FGIC if either (i) the Covered FGIC Insurance Policy or FGIC's obligations thereunder has not been indefeasibly terminated or discharged, or (ii) FGIC has not been indefeasibly paid in full for any amounts owed pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

Section 9.2     Procedure for Termination.

(a)     During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice to the Unitholders in accordance with Section 11.4 specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of the Certificate at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "Termination Notice").

(b)     If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

(c)     Upon the dissolution, wind up and termination of the Trust and this Trust Agreement, the Trustee or Delaware Trustee is authorized to file a certificate of cancellation with the Secretary of State.

## ARTICLE X

## TAX PROVISIONS

Section 10.1     Grantor Trust Provisions.

The Trustee, the Commonwealth, the Unitholders (by their acceptance of the Trust Units) and FGIC each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of FGIC and/or the Requisite Unitholders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701- 4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the

31

meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and FGIC each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 10.2    <u>Characterization</u>.

Each Unitholder acknowledges and agrees to treat the Trust Units as undivided interests in the Trust Estate.

Section 10.3    <u>Grantor Trust Administration</u>.

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust as provided in Section 10.1 hereof. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "<u>Adverse Trust Event</u>"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

Section 10.4    <u>Reports to Unitholders and Tax Authorities</u>.

(a)    The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority.

(b)    Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustee, FGIC or the Commonwealth be liable for any liabilities, costs or expenses of the Trust or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to any act or omission by the Trustee in breach of its obligations under this Trust Agreement.

(c)    If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall be charged to and payable by the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been paid as a Distribution to the applicable Unitholders.

(d)    The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)    All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's sole responsibility.

(f)    For the purposes of this ARTICLE X and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to holder, Unitholder, or beneficial owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Article and other provisions hereof.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1    <u>Amendment of Trust Agreement</u>.

(a)    This Trust Agreement may not be amended, waived or supplemented without the prior written consent of FGIC. This Trust Agreement may be amended, waived or

supplemented from time to time by FGIC and the Trustee without the consent of any other Party or the Depositary or any Unitholders; provided, however, that no such amendment shall:

       (i)    reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of such Unitholder;

       (ii)    alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Unitholder affected;

       (iii)    amend this Section 11.1 without the written consent of each Unitholder; or

       (iv)    amend the definition of Requisite Unitholders without the written consent of all Unitholders; or

       (v)    adversely affect in any material respect the interests of the Unitholders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of the Requisite Unitholders.

       (b)    Prior to executing any amendment permitted by this ARTICLE X, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise.

       (c)    Promptly following the execution of this Trust Agreement, the Trustee shall post full and complete copies of this Trust Agreement on EMMA and the "Muni section of Bloomberg L.P. Promptly after the execution of any amendment to this Trust Agreement, the Trustee shall furnish a copy of such amendment to the Depositary for distribution to each Unitholder and shall post a copy of such amendment on EMMA and the "Muni section of Bloomberg L.P.

       (d)    The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe in coordination with the Depositary.

Section 11.2    Counterparts.

       This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of

manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 11.3    <u>Limitation on Rights of Unitholders</u>.

(a)    The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the Parties or any of them.

(b)    No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the Parties, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the Parties pursuant to any provision hereof.

(c)    No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement or any of the Trust Assets. Nothing in this paragraph shall be construed to limit in any manner the ability of any Party (notwithstanding the ownership by such Party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to this Trust Agreement or to enforce in any manner its rights as a party hereunder.

Section 11.4    <u>Notices</u>.

All demands and notices under this Trust Agreement shall be in writing. All demands and notices under this Trust Agreement shall be deemed to have been duly given to each Party other than FGIC when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to such Party at (a) in the case of the Trustee, _____, (b) in the case of the Delaware Trustee, _____, and (c) in the case of the Commonwealth, _____, or in each of the above cases such other address as may hereafter be furnished by such Party to each other Party in writing. All demands and notices under this Trust Agreement shall be deemed to have been duly given to FGIC when transmitted by email to FGIC at both of the following email addresses: [_____], or at such other email addresses as may hereafter be furnished by FGIC Party to each other Party in writing. Unless a different means of giving notice or communication to Unitholders is specified herein, any notice or communication required or permitted to be given to a Unitholder shall be transmitted to the Depositary in accordance with its procedures. Any notice or communication so transmitted to the

Depositary within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given to the Unitholders at the time of transmission, whether or not and regardless of when any Unitholder actually receives such notice or communication. A copy of any notice given hereunder to any other Party shall be delivered to the Trustee. The Trustee shall post all notices delivered hereunder to EMMA and the "Muni" section of Bloomberg L.P. within five (5) Business Days of receiving such notice or a copy of such notice, as applicable.

Section 11.5    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Trust Agreement or of the Trust Units or the related rights of the Unitholders.

Section 11.6    Acts of Unitholders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Trust Agreement to be given or taken by Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee and ownership of the Units held by such Unitholders is confirmed by Depositary. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Depositary.

Section 11.7    Headings.

Article and Section headings in this Trust Agreement are included herein for convenience of reference only and shall not constitute a part of this Trust Agreement for any other purpose or be given any substantive effect.

Section 11.8    No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 11.9    Merger and Integration.

36

This Trust Agreement and the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Trust Agreement.

Section 11.10  The Delaware Trustee.

(a)  The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of Section 3807(a) of the Delaware Trust Statute that the Trust have at least one trustee with a principal place of business in the State of Delaware. It is understood and agreed by the Parties that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b)  The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Trust Statute. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Unitholders, it is hereby understood and agreed by the other Parties that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees.

(c)  The Delaware Trustee may be removed by FGIC with the written consent of the Requisite Unitholders upon thirty days prior written notice to the Delaware Trustee. The Delaware Trustee may resign upon thirty days prior written notice to FGIC. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to FGIC, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware. If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, FGIC or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the party bringing the petition.

(d)  Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor Delaware Trustee under this Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the Parties, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)  The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under this Trust Agreement and with respect to the Trust as the Trustee; however, any such indemnification shall be made pursuant to the terms of a separate indemnification agreement and shall not be payable from the Trust Estate, except as expressly provided herein. No amendment or waiver of any provision of this Trust Agreement which

37

adversely affects the Delaware Trustee shall be effective against it without its prior written consent. This provision shall survive the resignation or removal of the Delaware Trustee.

Section 11.11 <u>Patriot Act</u>.

The Parties acknowledge that in accordance with Section 326 of the U.S.A.PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The Parties agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A.PATRIOT Act.

Section 11.12 <u>Governing Law; Venue Jury Waiver</u>.

THIS TRUST AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDERTHIS TRUST AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLYBASED UPON, ARISING OUT OF, OR LEADING TO THIS TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS TRUST AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS TRUST AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS TRUST AGREEMENT OR IN CONNECTION WITH THIS TRUST AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS TRUST AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS TRUST AGREEMENT. EACH PARTY TO THIS TRUST AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 11.13 <u>Force Majeure</u>.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces beyond their control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustees shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 11.14   Intent of Parties.

(a)      The Parties intend that, for all purposes, the transfer to the Trust of the Trust Estate pursuant to Section 2.2 in each case shall be, and shall be construed as, a transfer thereof to the Trust on behalf of the Original Holders in lieu of a transfer thereof to the Trust directly by the Original Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Closing Date, the Commonwealth will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Commonwealth or the Commonwealth's estate in the event of a liquidation, reorganization, or similar proceeding of the Commonwealth and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The Parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b)      The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Commonwealth.

(c)      Notwithstanding anything to the contrary in this Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Unitholders, FGIC, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not, and neither Trustee shall directly take any action that to its actual knowledge would, violate any of the following):

(i)      engage in any business or engage in any activity other than those activities expressly permitted in this Trust Agreement and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in this Trust Agreement;

(ii)      acquire or own any assets other than the Trust Estate or lease any assets;

(iii)      fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including in order to perform its obligations under this Trust Agreement;

        (iv)    fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

        (v)    fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

        (vi)    provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

        (vii)    have its debts or other obligations guaranteed by any other Person or hold itself out as responsible for the debts or other obligations of any other Person;

        (viii)    commingle its assets or liabilities with those of any other Person;

        (ix)    fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

        (x)    divert funds for any purpose other than as set forth in this Trust Agreement;

        (xi)    enter into any contract, agreement or transaction with any Unitholders, the Commonwealth, FGIC, any principal or other Affiliate of the Trust, or any shareholder, general partner, member, principal or Affiliate thereof, except as expressly authorized herein;

        (xii)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

        (xiii)    incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by this Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

        (xiv)    perform any duties or obligations of the Commonwealth or any other Person;

        (xv)    make any loans or advances to any third party, including any Unitholder, the Commonwealth or any Affiliate of the Trust, or any principal or Affiliate thereof;

        (xvi)    fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii) fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii) identify itself as a department or division of any other Person;

(xix) fail to observe all formalities required of a Delaware statutory trust;

(xx) fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Commonwealth to sell any assets, or make any capital contribution, to the Trust;

(xxi) conduct any oral or written communication, including letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee; or

(xxii) (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing.

(d)  Failure of the Trust, the Commonwealth, FGIC, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 11.14 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e)  To the extent that any provision of this Section 11.14 conflicts with, violates or otherwise is in contravention with any other provision of this Trust Agreement, the Parties and each Unitholder agree that the terms set forth in this Section 11.14 shall be controlling as expressly set forth herein.

Section 11.15  Non-Petition.

The Commonwealth, FGIC, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the

event a bankruptcy or similar proceeding is instituted against the Trust by another Person, the Trustee may file appropriate proofs of claim.

Section 11.16 <u>Certain Terms Regarding the Commonwealth</u>.

For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i) The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Unitholders shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, the Commonwealth, and no recourse shall be had against any officer, director, manager, employee, security holder or incorporator of the Commonwealth, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii) The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Commonwealth assumes no responsibility for their correctness. The Commonwealth makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii) In purchasing any Trust Units the purchaser shall be deemed to acknowledge, represent and agree, that none of the Commonwealth nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Commonwealth or any of its affiliates.

(iv) The Commonwealth shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

Section 11.17 <u>Certain Terms Regarding FGIC</u>.

(a) In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to FGIC with respect to each of the following:

(i) any determination or intention of the Trustee or the Delaware Trustee to resign or terminate its duties hereunder;

(ii) the amount of any cash received by the Trust, and the date on which it was received; and

(iii) the amount of, and the Record Date and distribution date for, any distributions that the Trust is required to make to Unitholders.

(b)     The Trustee shall promptly furnish FGIC with copies of each report, notice or other communication sent to Unitholders. The Trustee shall seek to discuss and consult with FGIC regarding the same before sending them to Unitholders.

(c)     The Trustee, upon FGIC's request, shall provide additional information with respect to the Trust or the Trust Assets, including requesting from the Commonwealth information concerning the New GO Bonds of the GO CVIs and thereafter providing any such information received to FGIC.

(d)     The Trustee, upon FGIC's request, will discuss and consult with FGIC regarding matters concerning (i) the Covered FGIC Insured Bonds and FGIC's remaining obligations under the Covered FGIC Insurance Policy, including claims that the Trustee intends to assert thereunder, and (ii) the New GO Bonds and the GO CVIs held by the Trust.


**IN WITNESS WHEREOF**, the Parties have caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

[ADD SIGNATURE BLOCKS]

43

# EXHIBIT A

FGIC Insurance Policy Number:

FGIC Insured Bonds description and CUSIP:

Covered FGIC Insured Bond principal amount: [$_____] in aggregate principal amount

Allocable Plan Consideration:

    Cash:

    New GO CIBs:

    New GO 5.0% CABs:

    New GO 5.375% CABs:

    GO CVIs:

# EXHIBIT B

## FORM OF QUARTERLY NOTICE TO UNITHOLDERS

## [TBD with Miller Buckfire]

61139615.v13
61139615.v17

1

# EXHIBIT I

Syncora Custodial Trust Documents

**DRAFT 10/11/2021**

[[NAME OF SERIES] SYNCORA CUSTODIAL TRUST]

_____

TRUST AGREEMENT[1]

among

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO, as Depositor [and]

[Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY, as Depositor],

SYNCORA GUARANTEE INC,

[],
as Trustee

and

[],
as Delaware Trustee

DATED AS OF

[●]

_____

---

[1] All provisions of this Trust Agreement remain subject to ongoing review and revision by Synora Guarantee Inc.

## TABLE OF CONTENTS

Page

SECTION 1. STANDARD TERMS ................................................................... 1

SECTION 2. DEFINED TERMS ..................................................................... 1

SECTION 3. ORGANIZATION OF TRUST ..................................................... 2

SECTION 4. NOTIONAL AMOUNT ............................................................... 3

SECTION 5. FORMS OF TRUST UNITS ......................................................... 3

SECTION 6. SCHEDULES ............................................................................. 3

SECTION 7. PATRIOT ACT ........................................................................... 3

SECTION 8. GOVERNING LAW; VENUE; JURY WAIVER ........................... 3

SECTION 9. FORCE MAJEURE ...................................................................... 4

SECTION 10. INTENT OF PARTIES ............................................................... 4

SECTION 11. NON-PETITION ........................................................................ 7

SECTION 12. CERTAIN TERMS REGARDING THE DEPOSITOR[S] ............ 7

TRUST AGREEMENT

THIS TRUST AGREEMENT, dated as of [●] (this "Agreement"), is hereby executed by and among Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO (the "Commonwealth" [or the "Depositor"]) [and] [Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA", and together with the Commonwealth, the "Depositors")], and SYNCORA GUARANTEE INC. ("Syncora"), [], a [national banking association], as trustee (the "Trustee") and [], [a national banking association,] as Delaware trustee (the "Delaware Trustee", and together with the Trustee, the "Trustees") under this Agreement and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), all the provisions of which are incorporated herein and shall be a part of this Agreement as if set forth herein in full (this Agreement with the Standard Terms so incorporated, the "Trust Agreement").

PRELIMINARY STATEMENT

The parties are entering into the Trust Agreement for purposes of forming the [Name of Series] Syncora Custodial Trust, a Delaware statutory trust (the "Trust"). In furtherance of the structure approved in the Commonwealth Plan and in order to facilitate the implementation thereof, the Trust is being established by the Depositor[s] and the Trustees solely for the benefit of and on behalf of the applicable Syncora Legacy Bondholders holding Syncora Legacy Bonds CUSIP [] that elected, or are deemed to have elected, Syncora Non-Commutation Consideration pursuant to the terms and provisions of the Commonwealth Plan. Except for the establishment of the Trust and the deposit therein pursuant to the Commonwealth Plan at the election (or deemed election) of the applicable Syncora Legacy Bondholders, the Depositor[s] shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof. The Trustees shall file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware on the date hereof. The Trust shall issue beneficial ownership interests consisting of trust units to be known as the "Trust Units" and each holder of a Trust Unit, a "Trust Unit Holder" or "Holder".

**Section 1.**     **Standard Terms**.

The Trustees acknowledge that the Standard Terms prescribe certain obligations of the Trustees with respect to the Trust and the Trust Units. The Trustees agree to observe and perform such prescribed duties, responsibilities and obligations, and acknowledge that the Standard Terms (including without limitation, the rights, protections, indemnities and immunities afforded to the Trustees thereunder) are and shall be a part of this Agreement to the same extent as if set forth herein in full.

**Section 2.**     **Defined Terms**.

With respect to the Trust Units and in addition to the definitions set forth in the Standard Terms, the following provisions shall govern the defined terms set forth below. To the extent the meanings assigned to the defined terms set forth below are inconsistent with the meanings assigned to such terms in the Standard Terms, the meanings assigned herein shall control. Capitalized terms

used herein but not defined herein or in the Standard Terms shall have the meanings ascribed to them in the Commonwealth Plan.

"**Bankruptcy Code**": The Bankruptcy Reform Act of 1978, as amended from time to time, and as codified as 11 U.S.C. Section 101 et seq.

"**Delaware Trust Statute**": Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code § 3801 *et seq.,* as the same may be amended from time to time.

"**Delaware Trustee**": [], not in its individual capacity but solely in its capacity as Delaware Trustee hereunder, its successor in interest or any successor Delaware Trustee appointed as herein provided.

"**Maturity Date**": [●], the original maturity date of the relevant Syncora Legacy Bonds (prior to acceleration).

"**Trustee**": [], in its capacity as Trustee hereunder, its successor in interest or any successor trustee appointed as herein provided.

"**Trustees**": The Delaware Trustee and the Trustee.

"**U.S.A. PATRIOT Act**": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

## Section 3.    Organization of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of a Certificate of Trust of the Trust (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "[[Name of Series] Syncora Custodial Trust]" in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the parties hereto that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that the Trust Agreement (including the Standard Terms) constitutes the governing instrument of the Trust. Notwithstanding any other provision of this Agreement to the contrary, the Trustees are hereby authorized and directed to, and shall, on the date hereof, execute and file the Certificate of Trust with the Secretary of State in the form attached as Exhibit B hereto. The Trustee shall have power and authority, and is hereby authorized and empowered to take all actions on behalf of the Trust as set forth in the Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Trust Unit Holders and Syncora.

2

**Section 4.** <u>**Notional Amount**</u>.

(a) The aggregate Notional Amount of the Trust Units that may be executed and delivered under this Agreement is limited to the Acceleration Price as of the Effective Date of the Syncora Legacy Bonds deposited into the Trust.

**Section 5.** <u>**Forms of Trust Units**</u>.

The Trust Units shall be substantially in the form attached as <u>Exhibit A</u> hereto. Each Trust Unit shall be issued in global form.

**Section 6.** <u>**Schedules**</u>.

<u>Schedule I</u> is attached hereto and incorporated herein by reference as contemplated herein or by the Standard Terms.

**Section 7.** <u>**Patriot Act**</u>.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The parties to this Trust Agreement agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A. PATRIOT Act.

**Section 8.** <u>**Governing Law; Venue; Jury Waiver**</u>.

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR IN CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR

OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 9.** **Force Majeure**.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**Section 10.** **Intent of Parties**.

(a) The parties hereto intend that, for all purposes, the transfer to the Trust of the Trust Estate shall be, and shall be construed as, a transfer of such Trust Estate on behalf of the applicable Syncora Legacy Bondholders in lieu of a transfer of such assets to the Trust directly by the applicable Syncora Legacy Bondholders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Effective Date, the Depositor[s] will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Depositor[s] or of the [Depositor's estate] [Depositors' respective estates] in the event of a liquidation, reorganization, or similar proceeding of the Depositor[s] and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b) The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Depositor[s].

(c) Notwithstanding anything to the contrary in the Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Trust Unit Holders, Syncora, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not and neither Trustee shall directly take any action that to its actual knowledge would constitute any of the following):

4

(i)     engage in any business or engage in any activity other than those activities expressly permitted under Section 2.03 of the Standard Terms and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in the Trust Agreement;

(ii)     acquire or own any assets other than the Trust Estate or lease (as lessor) any assets;

(iii)     fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including, but not limited to, in order to perform its obligations under the Trust Agreement;

(iv)     fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)     fail to act solely in its own name or in the name of the Trustee on behalf of the Trust through duly authorized agents in the conduct of its activities;

(vi)     provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)     have its debts or other obligations guaranteed by any other person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)     commingle its assets or liabilities with those of any other Person;

(ix)     fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)     divert funds for any purpose other than as set forth in the Trust Agreement;

(xi)     enter into any contract, agreement or transaction with any Trust Unit Holders, the Depositor[s], Syncora, principal or other affiliate of the Trust, or any shareholder, general partner, member, principal or affiliate thereof, except as expressly authorized in the Trust Agreement;

(xii)     maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)     incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by the Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)   perform any duties or obligations of the Depositor[s] or any other Person;

(xv)   make any loans or advances to any third party, including, without limitation, any Trust Unit Holder, Depositor or Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)   fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)   identify itself as a department or division of any other Person;

(xix)   fail to observe all formalities required of a Delaware statutory trust;

(xx)   fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Depositor[s] to sell any assets, or make any capital contribution, to the Trust;

(xxi)   conduct any oral or written communication, including, without limitation, letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee on behalf of the Trust;

(xxii)   (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing;

(xxiii)   supplement, modify, amend, restate, replace, waive or repeal this Section 10 or Sections [2.03, 2.04, 9.01 or 9.03] of the Standard Terms, or the definitions used in such Sections, in each case except for any supplement, modification, amendment or restatement of any such provision that (x) corrects any error and (y) would not (individually or together with other changes) be reasonably likely to cause the Trust to no longer be a "special purpose entity" in accordance with applicable law and standards; or

(xxiv) supplement, modify, amend, restate, replace, waive or repeal any portion of this Trust Agreement or the Standard Terms except as expressly permitted by <u>Section 9.01</u> of the Standard Terms.

(d) Failure of the Trust, the Depositor[s], Syncora, any Trust Unit Holder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this <u>Section 10</u> shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e) To the extent that any provision of this <u>Section 10</u> conflicts with, violates or otherwise is in contravention with any other provision of the Trust Agreement or the Standard Terms, the parties hereto and each Trust Unit Holder agree that the terms set forth in this <u>Section 10</u> shall be controlling as expressly set forth herein.

**Section 11.** <u>**Non-Petition**</u>. The Depositor[s], Syncora, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Trust Unit Holders, by electing (or being deemed to elect) Syncora Commutation Consideration, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another person, the Trustee may file appropriate proofs of claim. For the avoidance of doubt, no adequate remedy at law exists with respect to any breach this Section 11, and specific performance shall in all circumstances be available as a remedy for the enforcement of this Section 11.

**Section 12.** <u>**Certain Terms Regarding the Depositor[s]**</u>. For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i) The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Holders of the Trust Units shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, the Depositor[s], and no recourse shall be had against any Officer, director, manager, employee, security holder or incorporator of the Depositor[s], or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii) The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Depositor[s] assume[s] no responsibility for their correctness. The Depositor[s] make[s] no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii) In purchasing any Trust Units in certificated form, the purchaser shall be required to acknowledge, represent to and agree, and in purchasing any Book-Entry Beneficial Interests in the Trust Units the purchaser shall be deemed to acknowledge, represent and agree, that none of the Depositor[s] nor any of [its] [their] affiliates, is acting

as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor[s] or any of [its] [their] affiliates.

(iv)     The Depositor[s] shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

**IN WITNESS WHEREOF**, the Depositor[s], Syncora, the Trustee and the Delaware Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**COMMONWEALTH OF PUERTO RICO,**
As Depositor

By: _____
Name: _____
Its: _____

[**PUERTO RICO PUBLIC BUILDINGS
AUTHORITY,**
As Depositor

By: _____
Name: _____
Its: _____]

**SYNCORA GUARANTEE INC.**
By: _____
Name: _____
Its: _____

[],
As Delaware Trustee

By: _____
Name: _____
Its: _____

[],
As Trustee

By: _____
Name: _____
Its: _____

**SCHEDULE I**

## EXHIBIT A

FORM OF TRUST UNIT CERTIFICATE

**EXHIBIT B**

FORM OF CERTIFICATE OF TRUST OF
[NAME OF SERIES] SYNCORA CUSTODIAL TRUST

## EXHIBIT C

FORM OF TRUSTEE CERTIFICATION - UNDERLYING INSURED SECURITY

# **EXHIBIT D**

PAYMENT SCHEDULE FOR SYNCORA LEGACY BONDS CUSIP []

**STANDARD TERMS**

**TO**

**TRUST AGREEMENT[1]**

Estado Libre Asociado de Puerto Rico, whose name in English is COMONWEALTH OF PUERTO RICO, as Depositor,

Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY, as Depositor,

SYNCORA GUARANTEE INC.,

[],
as Trustee,

and

[],
as Delaware Trustee,

Custodial Trust Units

Dated as of [●]

---

[1] All provisions of these Standard Terms to Trust Agreement remain subject to ongoing review and revision by Syncora Guarantee Inc.

## TABLE OF CONTENTS

Page

RECITALS ............................................................................................................ 1

STANDARD PROVISIONS ................................................................................. 1

ARTICLE I  DEFINITIONS .................................................................................. 1
    Section 1.01.    Defined Terms. ........................................................ 1
    Section 1.02.    Other Definitional Provisions. ................................ 9

ARTICLE II  TRUST ESTATE ............................................................................. 9
    Section 2.01.    Trust Assets. ........................................................... 9
    Section 2.02.    Acceptance by the Trustee. .................................... 11
    Section 2.03.    Purpose, Activities of the Trust. ............................ 11
    Section 2.04.    Limitations of the Trust. ........................................ 12
    Section 2.05.    Voting Rights........................................................... 13

ARTICLE III  ADMINISTRATION OF THE TRUST.......................................... 13
    Section 3.01.    Accounts.................................................................. 13
    Section 3.02.    Distributions; Prior to Maturity Date or in Connection with Syncora Advancement Option. .............................. 14
    Section 3.03.    Syncora Advancement Option. ............................... 15
    Section 3.04.    Reserved.................................................................. 15
    Section 3.05.    Adjustments to Principal and Interest Amounts. ......................... 17
    Section 3.06.    Payments on Syncora Insurance Policies; Prior to Maturity Date.................................................................. 18
    Section 3.07.    Reserved.................................................................. 18
    Section 3.08.    Payments on Syncora Insurance Policies; Maturity Date............. 19

ARTICLE IV  REPORTING/REMITTING ............................................................ 21
    Section 4.01.    Reports to Syncora and Trust Unit Holders. .............................. 21
    Section 4.02.    Compliance with Withholding Requirements. ............................ 21

ARTICLE V  TRUST UNITS .................................................................................. 21
    Section 5.01.    The Trust Units. ...................................................... 21
    Section 5.02.    Book-Entry Trust Units. ......................................... 22
    Section 5.03.    Registration of and Limitation on Transfers and Exchanges of Units.................................................................. 23
    Section 5.04.    No Obligation to Register. ...................................... 23
    Section 5.05.    Mutilated, Destroyed, Lost or Stolen Units................................ 24
    Section 5.06.    Persons Deemed Owners......................................... 24
    Section 5.07.    Appointment of Trust Unit Paying Agent. ................................. 24

## TABLE OF CONTENTS
### (continued)

ARTICLE VI  CONCERNING THE TRUSTEE..........................................................25
    Section 6.01.    Duties of Trustee........................................................... 25
    Section 6.02.    Certain Matters Affecting the Trustee. ....................... 26
    Section 6.03.    Trustee Not Liable for Trust Units or Securities. ........................ 28
    Section 6.04.    Trustee May Own Units. ............................................... 29
    Section 6.05.    Trustee's Fees and Expenses. ...................................... 29
    Section 6.06.    Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent. ............................................... 30
    Section 6.07.    Resignation and Removal of the Trustee. ................................... 30
    Section 6.08.    Successor Trustee.......................................................... 31
    Section 6.09.    Merger or Consolidation of Trustee. ........................................ 32
    Section 6.10.    Reserved...................................................................... 32
    Section 6.11.    Appointment of Custodians. ........................................ 32
    Section 6.12.    Trustee May Enforce Claims Without Possession of Trust Units.......................................................................... 32
    Section 6.13.    Trustee Indemnity ........................................................ 33

ARTICLE VII  TERMINATION OF TRUST...........................................................33
    Section 7.01.    Termination; No Redemption Rights........................... 33
    Section 7.02.    Procedure for Termination........................................... 33

ARTICLE VIII  TAX PROVISIONS.........................................................................34
    Section 8.01.    Grantor Trust Provisions. ............................................ 34
    Section 8.02.    Characterization............................................................ 35
    Section 8.03.    Grantor Trust Administration...................................... 35
    Section 8.04.    Reports to Trust Unit Holders and Tax Authorities .................... 35

ARTICLE IX  MISCELLANEOUS PROVISIONS ...................................................37
    Section 9.01.    Amendment of Trust Agreement.................................. 37
    Section 9.02.    Counterparts. ................................................................ 38
    Section 9.03.    Limitation on Rights of Trust Unit Holders. ............................... 38
    Section 9.04.    Notices. ........................................................................ 39
    Section 9.05.    Severability of Provisions............................................. 40
    Section 9.06.    Third-Party Beneficiaries. ........................................... 40
    Section 9.07.    Acts of Trust Unit Holders. ......................................... 40
    Section 9.08.    Headings....................................................................... 41
    Section 9.09.    No Waiver; Cumulative Remedies. ............................. 41
    Section 9.10.    Merger and Integration. ............................................... 41
    Section 9.11.    The Delaware Trustee ................................................. 41

## RECITALS

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO (the "Commonwealth"), Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA", and together with the Commonwealth, the "Depositors"), and SYNCORA GUARANTEE INC. ("Syncora") have entered into a Trust Agreement (the "Trust Agreement") with [], [a national banking association], as trustee (the "Trustee") and [], [a national banking association], as Delaware trustee (the "Delaware Trustee" and together with the Trustee, the "Trustees"), which Trust Agreement provides for the issuance of trust units ("Trust Units"), each evidencing a beneficial ownership interest in the property owned by the Trust created by the Trust Agreement. These Standard Terms are a part of, and are incorporated by reference into, the Trust Agreement.

## STANDARD PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made in the Trust Agreement, the Depositors, Syncora and the Trustees agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01.  *Defined Terms*.**

Except as otherwise specified herein or in the Trust Agreement or as the context may otherwise require, whenever used herein, the following words and phrases shall have the meanings specified in this Article. Capitalized words and phrases used herein but not defined herein shall, when applied to a Trust, have the meanings set forth in or pursuant to the Trust Agreement.

"**Acceleration Price**": With respect to an Syncora Legacy Bond, an amount equal to the outstanding principal amount of such bond plus the accrued and unpaid interest thereon.

"**Adverse Trust Event**": has the meaning set forth in Section 8.03 hereof.

"**Affiliate**": Any person or entity controlling, controlled by or under common control with the Depositor, Syncora or the Trustee, as the context may require. "Control" means the power to direct the management and policies of a person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative to the foregoing.

"**Beneficial Owner**": With respect to any Trust Unit, the Person who is registered as owner of that Trust Unit in the books of the Depository for that Trust Unit or in the books of a Depository Participant, or in the books of an indirect participant for which a Depository Participant acts as agent.

1

"**Bond Documents**": The bond resolutions, indentures, trust agreements, or similar agreements pursuant to which (i) the Syncora Legacy Bonds, (ii) the New GO Bonds, and (iii) the GO CVIs were issued.

"**Bonds**": Collectively, (i) the GO Bonds, (ii) the PBA Bonds, and (iii) the New GO Bonds.

"**Business Day**": Any day that is not a Saturday, Sunday, holiday, or other day on which commercial banking institutions in the City of New York, the city of San Juan, Puerto Rico or the State of Delaware or, if different, the city and state in which the Corporate Trust Office is located are authorized or obligated by law or executive order to be closed.

"**Cash Account**": As defined in Section 3.01(c) hereof.

"**Code**": The Internal Revenue Code of 1986, as amended.

"**Commonwealth Plan**": The Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 17627, including as amended or superseded, but in all events solely to the extent in form and substance reasonably satisfactory to Syncora and otherwise consistent with the Commonwealth PSA.

"**Commonwealth Plan Cash Distributions**": Any cash distributions allocable to Syncora Legacy Bondholders on account of Syncora Legacy Bonds under the Commonwealth Plan, but, for the avoidance of doubt, excluding any Consummation Costs and PSA Restriction Fees payable to Syncora, each as defined in the Commonwealth Plan.

"**Commonwealth PSA**": That certain Amended and Restated Plan Support agreement, dated as of July 12, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Syncora, solely in its capacity as an insurer, and asserted holder, deemed holder, or subrogee with respect to GO Bonds and PBA Bonds, among other parties, including as amended or superseded, but in all events only to the extent Syncora remains a party thereto.

"**Confirmation Order**": The order of the United States District Court for the District of Puerto Rico confirming the Commonwealth Plan in accordance with Section 314(b) of PROMESA and section 1129 of the Bankruptcy Code.

"**Corporate Trust Office**": The principal corporate trust office of the Trustee at which at any particular time its corporate trust business shall be administered.

"**Custodian**": The Trustee or the agent for the Trustee which shall hold all or a portion of the Trust Estate, or documents relating thereto, with respect to a specific Trust.

"**CVI Account**": As defined in Section 3.01(d) hereof.

"**Depository**": The Depository Trust Company, or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the SEC thereunder.

"**Depository Participant**": A broker, dealer, bank, other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"**Distribution**": Any distribution to Trust Unit Holders made pursuant to Section 3.02.

"**Effective Date**": The effective date of the Commonwealth Plan.

"**EMMA**:" The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP for each Trust Unit to which such document relates.

"**Extraordinary Expenses**": As defined in Section 6.05(b) hereof.

"**Fee Agreement**": An agreement dated as of the date hereof providing for the Trustees' recovery from or reimbursement by the Trust of certain reasonable compensation, certain reasonable expenses, costs, and disbursements, and certain Extraordinary Expenses.

"**GO CVI**": As defined in the Commonwealth Plan.

"**GO Bonds**": As defined in the Commonwealth Plan.

"**GO Payments**": Payments received by the Trustee on account of GO CVI or GO Bonds.

"**Grantor Trust Provisions**": Subpart E of Subchapter J of Chapter 1 of the Code and Section 7701 of the Code, and final Treasury Regulations, published rulings, notices and announcement, promulgated thereunder, as the foregoing may be in effect from time to time.

"**Insurance Policy Account**": As defined in Section 3.01(e) hereof.

"**Insured Amount**": As of any date, the accrued and unpaid interest on, and outstanding principal amount of, such Legacy Syncora Bond as of such date.

"**Maturity Date**": As defined in the Trust Agreement.

"**Maturity Notice**": As defined in Section 3.08(a) hereof.

"**Maturity Shortfall**": As defined in Section 3.08(b) hereof.

"**New GO Bonds**": As defined in the Commonwealth Plan, and including the Taxable New GO Bonds and Tax-Exempt New GO Bonds.

"**New Securities**": Collectively, the New GO Bonds and the GO CVIs.

"**Notice of Nonpayment**": As defined in Section 3.08(b) hereof.

3

"**Notional Amount**": The amount of Trust Units issued as provided in the Trust Agreement.

"**Officer**": When used with respect to the Trustees, any senior vice president, any vice president, any assistant vice president, any assistant treasurer, any trust officer, any assistant secretary in the Corporate Trust Office of the Trustees, or any other officer of the Trustees customarily performing functions similar to those performed by the persons who at the time shall be such officers, and also to whom with respect to a particular corporate trust matter such matter is referred because of such officer's knowledge of and familiarity with the particular subject. With respect to any other Person, the chairman of the board, the president, a vice president (however designated), the treasurer or controller.

"**Opinion of Counsel**": A written opinion of either (a) nationally recognized counsel who is reasonably acceptable to the parties to whom it is delivered, or (b) internal counsel to Syncora or any of its Affiliates.

"**Original Scheduled Interest Payment Date**": With respect to a Legacy Syncora Bond, a date, other than the Maturity Date, on which a scheduled payment of interest is due in respect of such Legacy Syncora Bond in accordance with the terms of the applicable Syncora Insurance Policy.

"**Original Scheduled Payment Date**": An Original Scheduled Interest Payment Date or Original Scheduled Principal Payment Date, as applicable, and as set forth at Exhibit D to the applicable Trust Agreement.

"**Original Scheduled Principal Payment Date**": With respect to a Legacy Syncora Bond, a date, other than the Maturity Date, on which a scheduled payment of principal is due in respect of such Legacy Syncora Bond in accordance with the terms of the applicable Syncora Insurance Policy.

"**Paying Agent**": The paying agent for the GO Bonds.

"**Person**": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency, instrumentality, or political subdivision thereof.

"**PBA Bonds**": As defined in the Commonwealth Plan.

"**PBA Fiscal Agent**": The fiscal agent for the PBA Bonds.

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

"**pro rata**": Unless otherwise stated, any pro rata payment or distribution made to, or any pro rata allocation of any cost or expense borne by, (i) Holders of Trust Units for a particular Syncora Legacy Bonds CUSIP shall be calculated based on the Notional Amount of Trust Units issued with respect to such Syncora Legacy Bonds CUSIP, and (ii) all Holders of

Trust Units without regard to Syncora Legacy Bonds CUSIP shall be calculated based on the outstanding principal amount of the Syncora Legacy Bonds underlying such Trust Units.

"**Reorganized Debtors**": As defined in the Commonwealth Plan.

"**Requisite Trust Unit Holders**": With respect to any Trust, Holders of a majority (measured by outstanding principal amount), of Trust Units.

"**SEC**": The Securities and Exchange Commission.

"**Secondary Market Syncora Legacy Bonds**": The Syncora Legacy Bonds that are insured through Syncora Insurance Policies issued in the secondary market.

"**Securities**": Collectively, the Syncora Legacy Bonds and the New Securities.

"**Securities Act**": The Securities Act of 1933, as amended.

"**Shortfall**": As defined in Section 3.06(b) hereof.

"**Standard Terms**": These Standard Terms, as amended or supplemented, incorporated by reference into the Trust Agreement.

"**Syncora Acceleration Option**": Syncora's right, in accordance with the terms of the Syncora Insurance Policies and Section 75.3(c) of the Commonwealth Plan, to elect to discharge its payment obligations with respect to any Syncora Legacy Bonds CUSIP prior to the stated Maturity Date thereof by paying the applicable Acceleration Price to the holders thereof.

"**Syncora Advancement Option**": Either (a) the Syncora Acceleration Option or (b) the rights assigned by the Commonwealth or PBA to Syncora pursuant to Section 75.3(d) of the Commonwealth Plan to redeem and call the Syncora Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Syncora as if it were the Commonwealth or PBA for such purpose, such that any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Acceleration Price.

"**Syncora Non-Commutation Treatment**": As defined in the Commonwealth Plan.

"**Syncora Deferred Expenses**": Any Trustee Costs or Trust expenses paid in cash to the Trustee or the Trust by Syncora.

"**Syncora Insurance Policies**": The insurance policies, including insurance policies issued in the secondary market, pursuant to which Syncora insured payments of principal and interest with respect to the Syncora Legacy Bonds.

"**Syncora Insured Bonds**": As defined in the Commonwealth Plan.

5

"**Syncora Insurer Event**": A default by Syncora on its payment obligations under an applicable Syncora Insurance Policy, which default is continuing.

"**Syncora Legacy Bondholder**": The beneficial holder of an Syncora Legacy Bond.

"**Syncora Legacy Bond**": Any Syncora Insured Bond the beneficial holder of which has validly elected, or is deemed to have elected, Syncora Non-Commutation Treatment .

"**Syncora Legacy Bonds CUSIP**": Any maturity of Syncora Legacy Bonds that bears a unique CUSIP such that such maturity of Syncora Legacy Bonds is separately identifiable from other maturities of Syncora Legacy Bonds with unique CUSIPs.

"**Syncora Legacy Bonds Distribution**": The New GO Bonds, [the Commonwealth Plan Cash Distributions], the GO CVIs, and any other property allocable to Syncora Legacy Bondholders in their capacity as such under the Commonwealth Plan, but excluding (A) New GO Bonds, [Commonwealth Plan Cash Distributions], GO CVIs, and other property allocable to holders of Syncora Insured Bonds other than Syncora Legacy Bonds under the Commonwealth Plan, (B) New GO Bonds, [Commonwealth Plan Cash Distributions], GO CVIs, and other property allocable to Syncora as a beneficial owner of GO Bonds or PBA Bonds under the Commonwealth Plan, or (C) any other consideration that Syncora is entitled to receive in accordance with the terms of the Commonwealth Plan (including, without limitation, Consummation Costs and PSA Restriction Fees, each as defined in the Commonwealth Plan).

"**Syncora Reimbursement Amount**": An amount sufficient to reimburse Syncora for all payments made by Syncora under an Syncora Insurance Policy for a particular Syncora Legacy Bonds CUSIP, and payment of which to Syncora shall be a requirement of the Unit Exchange Election.

"**Tax Costs**": As defined in Section 8.04(c) hereof.

"**Taxable Bond Account**": As defined in Section 3.01(b) hereof.

"**Taxable New GO Bonds**": New GO Bonds that are not initially issued as tax-exempt bonds (if any).

"**Tax-Exempt Bond Account**": As defined in Section 3.01(a) hereof.

"**Tax-Exempt New GO Bonds**": New GO Bonds that are tax-exempt bonds.

"**Termination Notice**": As defined in Section 7.02 hereof.

"**Treasury Regulations**": Regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of regulations, including proposed or temporary regulations shall include analogous provisions of final Treasury Regulations as well as any successor or replacement Treasury Regulations.

"**Trust**": With respect to each Syncora Legacy Bonds CUSIP, the separate trust formed pursuant to the applicable Trust Agreement.

"**Trust Assets**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Syncora Legacy Bonds CUSIP; (i) such Syncora Legacy Bonds CUSIP (including the related rights under the applicable Syncora Insurance Policy, or in the case of Secondary Market Syncora Legacy Bonds, the custody receipts evidencing a beneficial ownership interest in such Secondary Market Syncora Legacy Bonds and the related rights under the applicable Syncora Insurance Policy); (ii) the pro rata share of each asset comprising the Syncora Legacy Bonds Distribution that is allocable to beneficial holders of such Syncora Legacy Bonds CUSIP based on the Acceleration Price of such Syncora Legacy Bonds CUSIP as of the Effective Date and the Acceleration Price of all Syncora Legacy Bonds as of the Effective Date; (iii) any other property that Syncora may determine, in its sole discretion, to deposit in the applicable Trust for the benefit of the beneficial holders of the applicable Syncora Legacy Bonds CUSIP; and (iv) any proceeds of any of the foregoing.

"**Trust Unit Holder**" or "**Holder**": As applicable, (i) a Beneficial Owner of a Trust Unit, or (ii) Syncora, to the extent Syncora has been subrogated to the rights of a Beneficial Owner of a Trust Unit Holder.

"**Trust Unit Paying Agent**": The paying agent appointed pursuant to Section 5.07 hereof.

"**Trustee Costs**": As defined in Section 6.05(a) hereof.

"**Trust Estate**": Collectively, and with respect to any Trust, (a) the Trust Assets deposited and held in such Trust for the benefit of the beneficial holders of the applicable Syncora Legacy Bonds CUSIP, and (b) any other property deposited and held in such Trust for the benefit of the beneficial holders of the applicable Syncora Legacy Bonds CUSIP (if any).

"**Trust Unit**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Syncora Insured Bonds CUSIP, the certificated trust unit(s) to be issued by such Trust to beneficial holders of such Syncora Insured Bonds CUSIP, as further defined in the Trust Agreement.

"**Unit Register**" and "**Unit Registrar**": The register maintained and the registrar appointed pursuant to Section 5.03 hereof.

"**U.S. Person**": A person who is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Voting Rights**": Any voting or control rights granted to holders of Securities.

**Section 1.02.** *Other Definitional Provisions.*

The words "hereof," "herein" and "hereunder" and words of similar import when used in these Standard Terms shall refer to these Standard Terms as a whole and not to any particular provision of these Standard Terms, and Section, subsection, Annex and Exhibit references are

to these Standard Terms unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." Any reference to any document in these Standard Terms shall be deemed to include any amendment, restatement, supplement or modification thereto.

## ARTICLE II

## TRUST ESTATE

**Section 2.01.  *Trust Assets.***

Pursuant to and in accordance with the Trust Agreement and the Commonwealth Plan, upon the Effective Date:

(a)     The Depositors shall, on behalf of each of the Syncora Legacy Bondholders holding a particular Syncora Legacy Bonds CUSIP, deposit the New GO Bonds allocable to such Syncora Legacy Bonds CUSIP into the Trust for that Syncora Legacy Bonds CUSIP. The Trustee shall establish and maintain a Tax-Exempt Bond Account into which any such Tax-Exempt New GO Bonds shall be deposited, and a Taxable Bond Account into which any such Taxable New GO Bonds shall be deposited; provided, however, that the Trustee shall transfer any Taxable New GO Bonds that become Tax-Exempt New GO Bonds (if any) from the Taxable Bond Account to the Tax-Exempt Bond Account.[2]

(b)     The Depositors shall, on behalf of each of the Syncora Legacy Bondholders holding a particular Syncora Legacy Bonds CUSIP, deposit the Commonwealth

---

[2] ***Secondary Market Syncora Legacy Bonds***: This footnote describes how the holders of Secondary Market Syncora Legacy Bonds will receive Trust Units under this Agreement and how assets distributed under the Plan on account of such ownership interests will be transferred from the custodian of the existing custodial arrangement to the Trustee under this Agreement.

This Agreement will be used to administer assets distributed under the Plan for the beneficial owners of interests in Syncora Legacy Bonds (including Secondary Market Syncora Legacy Bonds) that elect the Syncora Non-Commutation Treatment under the Plan. By electing the Syncora Non-Commutation Treatment, each beneficial holder of custody receipts evidencing a beneficial ownership interest in the Secondary Market Syncora Legacy Bonds and the corresponding rights under the applicable Syncora Insurance Policy shall be deemed to have deposited such custody receipts into the respective Trust in exchange for Trust Units evidencing a pro rata beneficial ownership interest in the related Trust Assets, which shall include such custody receipts.

The custodian of the existing custodial arrangements will receive the distributions contemplated by the Plan on account of the existing custody receipts and will transfer those new assets and the applicable existing insurance policies to the Trustee of the newly created Trusts as part of the Trustee (as the holder of all such custody receipts) and Syncora collapsing the existing custodial arrangement. The Trustee will then deposit those new assets and existing insurance policies into the appropriate Trust accounts described herein (and will hold the extinguished legacy bonds in its own account). The Trustee will then receive payments and administer distributions in connection with the Trust Assets in accordance with this Agreement until the Trust is terminated.

The unique characteristics of certain of the Secondary Market Syncora Legacy Bonds and the attributes of their current custodial arrangements may require that the documentation establishing and implementing the Trusts for such interests be tailored to the specifics of such bonds/arrangements.

Plan Cash Distributions allocable to such Syncora Legacy Bonds CUSIP into the Trust for that Syncora Legacy Bonds CUSIP. The Trustee shall establish and maintain a Cash Account into which any such Commonwealth Plan Cash Distributions shall be deposited.

(c)     The Commonwealth shall, on behalf of each of the Syncora Legacy Bondholders holding a particular Syncora Legacy Bonds CUSIP, deposit the GO CVIs allocable to such Syncora Legacy Bonds CUSIP into the Trust for that Syncora Legacy Bonds CUSIP. The Trustee shall establish and maintain a CVI Account into which any such GO CVIs shall be deposited.

(d)     The Paying Agent and the PBA Fiscal Agent shall, on behalf of each of the Syncora Legacy Bondholders holding a particular Syncora Legacy Bonds CUSIP, transfer the Syncora Insurance Policy for that Syncora Legacy Bonds CUSIP and any and all agreements, documents and instruments relating to such Syncora Insurance Policy that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Syncora Legacy Bondholders into the applicable Trust.

(e)     The Depositors shall, on behalf of each of the Syncora Legacy Bondholders holding a particular Syncora Legacy Bonds CUSIP, transfer any and all agreements, documents and instruments relating to the Syncora Insurance Policy for that Syncora Legacy Bonds CUSIP that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Syncora Legacy Bondholders into the applicable Trust.

(f)     The Syncora Legacy Bondholders shall deposit their Syncora Legacy Bonds into the Trust for the applicable Syncora Legacy Bonds CUSIP, and, in the event any Syncora Legacy Bondholder fails to so deposit its Syncora Legacy Bond(s) as of the Effective Date, such Syncora Legacy Bondholder's Syncora Legacy Bond(s) shall be deemed deposited into the applicable Trust for the relevant Syncora Legacy Bonds CUSIP as of the Effective Date. The Trustee shall establish and maintain an Insurance Policy Account into which such Syncora Legacy Bonds CUSIP shall be deposited. Pursuant to Section 77.6 of the Plan, the Syncora Legacy Bonds deposited (or deemed deposited) into the Trust shall not be cancelled and all rights and remedies under the existing Syncora Legacy Bonds and the applicable Bond Documents (other than payment obligations of the Depositors and the continuation of any lien granted as security for such Syncora Legacy Bonds) shall remain in full force and effect solely to the extent necessary to preserve any claims relating to the Syncora Legacy Bonds deposited in the Trust under the applicable Syncora Insurance Policy. Such existing Syncora Legacy Bonds shall not form the basis for the assertion of any claim against the Depositors or the Reorganized Debtors. The Syncora Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

Section 2.02.  *Acceptance by the Trustee.*

(a)     By its execution of the Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all documents, instruments, and other property delivered to it or received by it from time to time with respect to the Trust Assets and all other assets included in the definition of Trust Estate, in each case in trust for the exclusive use and

9

benefit of all present and future Trust Unit Holders. The Trustee represents and warrants that, except as expressly permitted by the Trust Agreement, (i) it has not and will not, other than in its capacity as trustee for the benefit of the Trust Unit Holders, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of the Trust Agreement, and (ii) it has not encumbered or transferred, and will not encumber or transfer, its right, title or interest in the Trust Estate.

(b)     With respect to the Securities, the Trustee shall, on the Effective Date, deliver to the applicable Depositor(s) a certification substantially in the form of Exhibit [C] to the Trust Agreement certifying that it is either (i) in possession of a certificate evidencing the applicable Securities, or (ii) it has received confirmation from a depository of such Securities or a direct or indirect participant thereof that the Securities acquired by the Trust on such Effective Date are legally owned by the Trust for the benefit of the Trust Unit Holders.

(c)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

### Section 2.03.  *Purpose, Activities of the Trust.*

It is the intention of the parties hereto that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to the following:

(a)     receiving, accepting, and holding in trust the Trust Estate;

(b)     creating one or more accounts or sub-accounts in accordance with the terms of the Trust Agreement (including these Standard Terms);

(c)     making claims and receiving payments under the Syncora Insurance Policies;

(d)     receiving payments pursuant to the Commonwealth Plan and the securities issued thereunder;

(e)     issuing one or more series of Trust Units to holders of Syncora Legacy Bonds in accordance with the terms of the Trust Agreement (including these Standard Terms);

(f)     making distributions to the Trust Unit Holders in accordance with the terms of the Trust Agreement (including these Standard Terms);

(g)     coordinating communications with Trust Unit Holders through the Depository;

(h)     following, accepting or acting upon any instruction or direction from Syncora or the Requisite Trust Unit Holders, as applicable, in each case only as expressly permitted in the Trust Agreement;

(i)     making public disclosures on EMMA and similar means of distribution;

10

(j)      making disclosures and sharing information with Bloomberg L.P. for disclosure on its trading platform and with other similar services; and

(k)      engaging in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto.

**Section 2.04.   *Limitations of the Trust.***

(a)      Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee.  None of the Depositors, the Reorganized Debtors, or Syncora, or any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee.

(b)      The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust.  Any resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust.

(c)      The Trust will provide for its own operating expenses and liabilities from the Trust Estate.  General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositors, the Reorganized Debtors, or Syncora, or any of their respective Affiliates.

(d)      All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust.

(e)      There will be no guarantees made by the Trust with respect to obligations of the Depositors, the Reorganized Debtors, or Syncora, or any of their respective Affiliates.  There will not be any indebtedness relating to borrowings or loans between the Trust, the Depositors, the Reorganized Debtors, or Syncora, or any of their respective Affiliates; underlined provided, that Syncora may own Trust Units.

(f)      The Trust will act solely in its own name, or in the Trustee's name on the Trust's behalf, and through its or the Trustee's duly authorized officers or agents in the conduct of its activities.  The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to the Depositors, the Reorganized Debtors, or Syncora, or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositors, the Reorganized Debtors, Syncora or any of their respective Affiliates; or (iii) induce any such third party to reasonably rely on the creditworthiness of the Depositors, the Reorganized Debtors, Syncora or any other affiliated or unaffiliated entity in its dealings with the Trust.

(g)      The Trust will maintain a Delaware Trustee with its office in the State of Delaware.

(h)     The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

**Section 2.05.  *Voting Rights.***

Syncora shall be deemed the sole holder of the Voting Rights with respect to the Securities held by the Trust.

## ARTICLE III

## ADMINISTRATION OF THE TRUST

**Section 3.01.  *Accounts.***

The Trustee shall establish and maintain the following accounts for the Trust to be held in trust for the benefit of the Trust Unit Holders:

(a)     Tax-Exempt Bond Account. An account into which the Trustee shall deposit the Tax-Exempt New GO Bonds allocable to the applicable Syncora Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Tax-Exempt Bond Account**"), including any Taxable New GO Bonds that become Tax-Exempt New GO Bonds;

(b)     Taxable Bond Account. An account into which the Trustee shall deposit Taxable New GO Bonds allocable to the applicable Syncora Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Taxable Bond Account**");

(c)     Cash Account. An account into which the Trustee shall deposit the Commonwealth Plan Cash Distributions allocable to the applicable Syncora Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Cash Account**");

(d)     CVI Account. An account into which the Trustee shall deposit the GO CVIs allocable to the applicable Syncora Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**CVI Account**"); and

(e)     Insurance Policy Account. An account into which the Trustee shall deposit the applicable Syncora Legacy Bonds CUSIP insured by the applicable Syncora Insurance Policy (or any other securities, monies, proceeds or property received on account of or in exchange therefor) (the "**Insurance Policy Account**").

**Section 3.02.  *Distributions; Prior to Maturity Date or in Connection with Syncora Advancement Option.***

(a)     Tax-Exempt Distributions.  Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis

12

to Trust Unit Holders, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date, on account of the New GO Bonds deposited in the Tax-Exempt Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

(b)     <u>Taxable Distributions</u>.     Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date, on account of the New GO Bonds deposited in the Taxable Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

(c)     <u>CVI Distributions</u>.     Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date, on account of the GO CVIs deposited in the CVI Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

(d)     <u>Insurance Policy Distributions</u>.     Promptly following receipt thereof by the Trustee, the Trustee shall, subject to <u>Section 3.06(b)</u>, be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date, on account of the Syncora Insurance Policy insuring the Syncora Legacy Bonds CUSIP deposited in the Insurance Policy Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

(e)     <u>Other Cash Distributions</u>.     Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including any Commonwealth Plan Cash Distributions, deposited in the Cash Account, net of of the allocable portion of any outstanding Trustee Costs and Tax Costs as of the date of distribution.

**Section 3.03.     *Syncora Advancement Option.***

(a)     Syncora shall have the right to exercise the Syncora Advancement Option with ten (10) Business Days' prior written notice to the relevant Syncora Legacy Bond Holders and/or Trust Unit Holders.  Upon the exercise of any Syncora Advancement Option and the payment of the applicable Acceleration Price or redemption price with respect to any Syncora Legacy Bonds CUSIP, the Trustee shall be required to disburse such Acceleration Price or redemption price to the Trust Unit Holders of the relevant Trust as set forth in <u>Section 3.02</u> above, net of the allocable portion of any outstanding Tax Costs as of the date of distribution, and Syncora shall become fully subrogated to all of the rights of such Trust Unit

13

Holders, including, upon the termination of the relevant Trust, rights to any then remaining Trust Assets. Upon the disbursement of such Acceleration Price or redemption price to the relevant Trust Unit Holders as set forth above, the Trust Units of such Trust shall be retired, such Trust shall be terminated, and the Trustee shall deliver the remaining Trust Assets of such Trust to or at the direction of Syncora. At any time on or after the date of receipt of such Trust Assets, Syncora shall have the right to sell all or certain of the New Securities constituting part of such Trust Assets for value, including by (i) selling all or certain of the applicable Tax-Exempt New GO Bonds constituting part of such Trust Assets for value as tax-exempt bonds, (ii) selling all or certain of the Taxable New GO Bonds constituting part of such Trust Assets for value as taxable bonds, and (iii) selling all or certain of the GO CVIs constituting part of such Trust Assets.

(b)     Payment of the applicable Acceleration Price or redemption price with respect to any Syncora Insured Bond shall satisfy and discharge all of Syncora's obligations under the applicable Syncora Insurance Policy with respect to such Syncora Insured Bond.

**Section 3.04.  *Reserved*.**

**Section 3.05.  *Adjustments to Principal and Interest Amounts*.**

Each Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction, <u>first</u>, of any accrued and unpaid interest on, and <u>second</u>, of the outstanding principal amount of, such Legacy Syncora Bonds. For the purposes of such reduction, any deduction from any Distribution in respect of Tax Costs and Trustee Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash as part of the Distribution and shall reduce the applicable accrued and unpaid interest amount, outstanding principal amount.

**Section 3.06.  *Payments on Syncora Insurance Policies; Prior to Maturity Date*.**

(a)     Prior to the Maturity Date, after taking into account any adjustments made pursuant to Section 3.05, the Trustee shall make draws on the applicable Syncora Insurance Policy, by delivering notice to Syncora in the form of Exhibit A,[3] in order to make payment, from the Insurance Policy Account, of any accrued and unpaid interest due on an Original Scheduled Interest Payment Date or of any unpaid principal due on an Original Scheduled Principal Payment Date with respect to the relevant Syncora Legacy Bonds CUSIP as reflected on Exhibit D to the Trust Agreement. The Trustee is authorized to take all actions, and to provide all notices, necessary to draw on the Syncora Insurance Policies for such purposes, including actions that, under the applicable Syncora Insurance Policies and related agreements, would otherwise be taken by the Paying Agent or the PBA Fiscal Agent, and the Trustee shall have all powers and authority of the Paying Agent or the PBA Fiscal Agent, as applicable, for such purposes.

(b)     If the Trustee receives GO Payments, (i) after the Trustee draws on an Syncora Insurance Policy pursuant to Section 3.06(a), but (ii) prior to the Trustee using the

---

[3] [Exhibit G to reflect reductions in amounts owed as a result of ayments made or to be made by the Trust on a "pass-through" basis prior to, or contemporaneously with such notice being delivered.]

amounts drawn from the Syncora Insurance Policy to pay accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date, then the Trustee shall (x) distribute and apply the GO Payments received in accordance with Sections 3.02 and 3.05, (y) only apply amounts drawn from the Syncora Insurance Policy to pay accrued and unpaid interest and/or unpaid principal to the extent the GO Payments received are insufficient (the amount of such insufficiency, the "**Shortfall**") to pay the accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date such that the amounts so applied are not in excess of the Shortfall and (z) promptly return to Syncora any amounts drawn on the Syncora Insurance Policy that are in excess of such Shortfall.

**Section 3.07.  *Reserved.***

**Section 3.08.  *Payments on Syncora Insurance Policies; Maturity Date.***

Payments at Maturity Date. If, the outstanding principal amount or accrued and unpaid interest amount of the Syncora Legacy Bonds at the Maturity Date is expected to be greater than zero, no later than thirty (30) calendar days and no earlier than thirty-five (35) calendar days prior to the Maturity Date, Syncora shall direct the Trustee to deliver through the Depository a notice of maturity (the "**Maturity Notice**") in the form attached hereto as Exhibit B to all applicable Trust Unit Holders. The Maturity Notice will include (i) a statement identifying the Maturity Date and (ii) a statement regarding the right of each Trust Unit Holder to receive a Distribution (or multiple Distributions) in the aggregate amount of a pro rata share of the Insured Amount corresponding to the outstanding principal amount of, and accrued and unpaid interest on, such Syncora Legacy Bonds as of the Maturity Date, to be paid to the Trustee by Syncora and/or from the other Trust Assets. Notwithstanding anything herein to the contrary, Syncora's failure to direct the Trustee to deliver a Maturity Notice or the Trustee's or Depository's failure to deliver a Maturity Notice to Trust Unit Holders in accordance with this Section 3.08 shall not affect or delay the occurrence of the applicable Maturity Date, or affect the amounts to be paid to Trust Unit Holders on the Maturity Date.

(a)  At least five (5) Business Days prior to the Maturity Date (but not greater than ten (10) Business Days prior to the Maturity Date) the Trustee shall deliver a notice, in the form attached hereto as Exhibit C (a "**Notice of Nonpayment**"), to Syncora if there are insufficient funds (determined without taking into account any securities or other non-cash Trust Assets) in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, and the Insurance Policy Account to satisfy the Insured Amount after taking into account any adjustments made pursuant to Section 3.05 hereof (the amount of any such shortfall, the "**Maturity Shortfall**"). Syncora agrees that such notice provided by the Trustee shall constitute a valid notice of the type required under the applicable Syncora Insurance Policy in order for the Trustee to draw on the applicable Syncora Insurance Policy in the amount of the Maturity Shortfall.

(b)  On the Maturity Date, after giving effect to any Distribution made from other Trust Assets on the Maturity Date, Syncora shall pay to the Trustee, and the Trustee shall distribute to all Trust Unit Holders, a pro rata share of the Maturity Shortfall, if any, net of any Tax Costs, following which Syncora shall be entitled to any remaining non-cash Trust Assets

in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, and/or the CVI Account, as applicable.

(c)    On the Maturity Date, after giving effect to any Distributions made on the Maturity Date (including the payment and distribution of any Maturity Shortfall (in accordance with Section 3.08(c) hereof)), (i) the applicable Trust Units shall be cancelled; (ii) all of Syncora's obligations under the applicable Syncora Insurance Policies and Syncora Legacy Bonds will be satisfied and discharged; (iii) the applicable Syncora Insurance Policies shall be indefeasibly cancelled; and (iv) the Trust shall terminate in accordance with the provisions of Article VII hereof.

(d)    For the avoidance of doubt, it is expressly understood and agreed that to the extent the principal amount of the applicable Syncora Legacy Bonds CUSIP is reduced to zero prior to the Maturity Date, as of the date the principal amount is reduced to zero: (i) the applicable Trust Units shall be cancelled; (ii) all of Syncora's obligations under the applicable Syncora Insurance Policies and Syncora Legacy Bonds will be satisfied and discharged; (iii) the applicable Syncora Insurance Policies shall be indefeasibly cancelled; and (iv) the Trust shall terminate in accordance with the provisions of Article VII hereof.

(e)    If and to the extent Syncora fails to make any payment at the time, in the amount and in the manner set forth herein, the Trustee shall take all necessary or desirable actions to enforce the applicable Syncora Insurance Policy (including, to the extent applicable, as and when directed by the Requisite Trust Unit Holders as set forth in Section 6.01 hereof).

(f)    For the purposes of drawing under the applicable Syncora Insurance Policy (and for all other purposes under the applicable Syncora Insurance Policy), Syncora acknowledges and agrees that:

(i)    the Trustee is authorized and directed to take such action and provide such documents, including, without limitation, a Notice of Nonpayment or similar notice, in order to make a demand for payment under the Syncora Insurance Policy; and

(ii)    the Requisite Trust Unit Holders have the right to direct the Trustee in writing to take, and the Trustee is authorized to take any actions under, provide such documents under, and to enforce, pursue, or recover claims under or in respect of, the applicable Syncora Insurance Policy as set forth in Section 6.01 hereof.

## ARTICLE IV

## REPORTING/REMITTING

**Section 4.01.  *Reports to Syncora and Trust Unit Holders.***

No later than three (3) days after the date on which the Trustee make any Distribution to any Trust Unit Holder, the Trustee shall forward or cause to be forwarded to Syncora and each Trust Unit Holder a statement, substantially in the form attached hereto as Exhibit D, setting forth:

16

(a)     With respect to the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Acccount, and the Insurance Policy Account, distributions made from each such account during the month and during the year to date (on an aggregate and per unit basis);

(b)     The accrued and unpaid interest on, and principal amount of, of the relevant Syncora Legacy Bonds CUSIP (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per unit basis);

(c)     Any other distributions made to Trust Unit Holders; and

(d)     Any required tax reporting for such period.

### Section 4.02.  *Compliance with Withholding Requirements.*

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to Trust Unit Holders that the Trustee reasonably believes are applicable under the Code. The consent of Trust Unit Holders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to any Trust Unit Holder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to such Trust Unit Holders the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Trust Unit Holder in the amount of the withholding and shall thereby reduce amounts otherwise distributable to such Trust Unit Holder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## TRUST UNITS

### Section 5.01.  *The Trust Units.*

So long as a Syncora Insurer Event is not occurring under the applicable Syncora Insurance Policy, Syncora shall be deemed the sole holder of the New Securities deposited in the respective Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings. In addition, Syncora shall be fully subrogated to the rights of the respective Trust Unit Holders in respect of the New Securities deposited in the respective Trusts.

The Trust Units shall be designated in the Trust Agreement. Unless otherwise specified in the Trust Agreement, the Trust Units in the aggregate will represent the entire beneficial ownership interest in the Trust Estate. The Trust Units will be substantially in the forms annexed to the Trust Agreement. Unless otherwise provided in the Trust Agreement, the Trust Units will be issuable in book-entry form, in denominations of authorized Notional Amounts as described in the definition thereof. Each Trust Unit will share ratably in all Trust Assets of the applicable Trust and in all rights of the related Trust Unit Holders.

17

Upon original issue, the Trust Units shall be executed and delivered by the Trustee and the Trustee shall cause the Trust Units to be authenticated by the Unit Registrar upon receipt by the Trustee of the documents specified in Section 2.02. The Trust Units shall be executed by manual signature on behalf of the Trustee by an authorized Officer. Trust Units bearing the manual signatures of individuals who were at any time the proper Officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Trust Units or did not hold such offices at the date of such Trust Units. No Trust Unit shall be entitled to any benefit under the Trust Agreement or be valid for any purpose, unless there appears on such Trust Unit a certificate of authentication as set forth on such certificate executed by manual signature on behalf of the Unit Registrar by a duly authorized Officer of the Unit Registrar, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Trust Unit has been duly authenticated and delivered hereunder. All Trust Units shall be dated the date of their execution.

**Section 5.02.** *Book-Entry Trust Units.*

(a) The Trust Units will be represented initially by one or more book-entry certificates registered in the name designated by the Depository. Notwithstanding anything herein to the contrary, the Trustee may for all intents and purposes (including the making of payments on the Trust Units) deal with the Depository as the authorized representative of the Beneficial Owners of the Trust Units as if the Depository were the sole Trust Unit Holder for purposes of this Agreement for as long as those Trust Units are registered in the name of the Depository. The rights of Beneficial Owners of the Trust Units shall be limited to those established by law, the Trust Agreement and agreements between such Beneficial Owners and the Depository and Depository Participants. Requests and directions from, and votes of, the Depository, as Holder, shall not be deemed to be inconsistent if they are made with respect to different Beneficial Owners. Subject to Section 5.03 below, a Trust Unit may not be transferred by the Depository except to another Depository that agrees to hold the Trust Unit for the account of the respective Depository Participants and Beneficial Owners.

(b) The Trustee will not have any liability to any person for any aspect of the records relating to or payment made on account of Beneficial Owners of the Trust Units held by the Depository, for monitoring or restricting any transfer of beneficial ownership in a Trust Unit or for maintaining, supervising or reviewing any records relating to such Beneficial Owners.

**Section 5.03.** *Registration of and Limitation on Transfers and Exchanges of Units.*

The Trustee shall cause to be kept at its Corporate Trust Office a Unit Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Trust Units and of transfers and exchanges of Trust Units as provided in the Trust Agreement (including these Standard Terms). The Trustee will initially serve as Unit Registrar for the purpose of registering Trust Units and transfers and exchanges of Trust Units as herein provided.

18

Subject to Section 5.04, upon surrender for registration of transfer of any Trust Unit at the Corporate Trust Office of the Trustee or at any other office or agency of the Trustee maintained for such purpose, the Trustee shall execute and the Unit Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Trust Units of a like aggregate Notional Amount.

At the option of the Trust Unit Holders, each Trust Unit may be exchanged for other Trust Units with a like aggregate Notional Amount and in authorized denominations, upon surrender of such Trust Unit to be exchanged at any such office or agency. Whenever any Trust Units are so surrendered for exchange, the Trustee shall execute and cause the Unit Registrar to authenticate and deliver the Trust Units which the Trust Unit Holder making the exchange is entitled to receive. Every Trust Unit presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in the form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Trust Unit Holders shall be made for any transfer or exchange of Trust Units, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Trust Units.

All Trust Units surrendered for transfer and exchange shall be disposed of by the Unit Registrar in accordance with its customary procedures.

The Trustee will cause the Unit Registrar (unless the Trustee is acting as Unit Registrar) to provide notice to the Trustee of each transfer of a Trust Unit, and will provide the Trustee with an updated copy of the Unit Register on January 1 of each year.

**Section 5.04.** *No Obligation to Register.*

The Trustee is not obligated to register or qualify any Trust Unit under the Securities Act or any other securities laws.

**Section 5.05.** *Mutilated, Destroyed, Lost or Stolen Units.*

If (a) any mutilated Trust Unit is surrendered to the Trustee or the Unit Registrar, or the Trustee and the Unit Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Trust Unit, and (b) there is delivered to the Trustee and the Unit Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual knowledge by the Trustee or the Unit Registrar that such Trust Unit has been acquired by a bona fide purchaser, the Trustee shall execute and deliver and the Unit Registrar shall authenticate, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Trust Unit, a new Trust Unit of like tenor. Upon the issuance of any new Trust Unit under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trust Unit Registrar) connected therewith. Any replacement Trust Unit issued pursuant to this Section shall constitute complete and indefeasible evidence of

ownership in the Trust, as if originally issued, whether or not the destroyed, lost or stolen Trust Unit shall be found at any time.

### Section 5.06.  *Persons Deemed Owners*.

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

### Section 5.07.  *Appointment of Trust Unit Paying Agent.*

The Trustee shall serve as the initial Trust Unit Paying Agent hereunder and thereafter, may appoint any other Trust Unit Paying Agent for the purpose of making distributions to Trust Unit Holders; provided, however, that any replacement Trust Unit Paying Agent shall be required to meet the eligibility requirement set forth in Section 6.06. The Trustee shall cause such Trust Unit Paying Agent to execute and deliver to the Trustee an instrument in which such Trust Unit Paying Agent shall agree with the Trustee that such Trust Unit Paying Agent will hold all sums held by it for the payment to Trust Unit Holders in trust for the benefit of the Trust Unit Holders entitled thereto until such sums shall be paid to the Trust Unit Holders. All funds remitted by the Trustee to any such Trust Unit Paying Agent for the purpose of making distributions shall be paid to Trust Unit Holders as soon as practicable following receipt thereof by the Trust Unit Paying Agent and any amounts not so paid shall be returned as soon as practicable to the Trustee.

## ARTICLE VI

## CONCERNING THE TRUSTEE

### Section 6.01.  *Duties of Trustee.*

Every provision of the Trust Agreement (including these Standard Terms) relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement and no implied covenants or obligations shall be read into the Trust Agreements against the Trustee.

The Trustee shall (at the direction of the Requisite Trust Unit Holders) take all necessary or desireable actions to enforce the Syncora Insurance Policies as set forth herein.

The Trustee shall deliver to all Trust Unit Holders copies of all notices and written communications received from Depositors or the Reorganized Debtors as they relate to the Bonds and/or the GO CVIs.

Except as provided in <u>Section 6.02</u> hereof, no provision of the Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act or willful misconduct; *provided, however,* that:

(a)     The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(b)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Syncora or, in the event that the Voting Rights are held by a party other than Syncora, Holders of Trust Units entitled to a majority of the Voting Rights (or such other percentage as may be specified herein) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New Securities or exercising any trust or power conferred upon the Trustee with respect to the New Securities, under the Trust Agreement;

(c)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Trust Unit Holders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Syncora Insurance Policies or exercising any trust or power conferred upon the Trustee with respect to the Syncora Insurance Policies, under the Trust Agreement; and

(d)     Any determination of gross negligence or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

**Section 6.02.** *Certain Matters Affecting the Trustee.*[4]

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter

---

[4] All provisions related to the Trustee and the Delaware Trustee are subject to review by the prospective Trustee and Delaware Trustee, as applicable.

be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by the Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of any of the Trust Unit Holders, pursuant to the provisions of the Trust Agreement, unless such Trust Unit Holders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Trust Agreement (including these Standard Terms);

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Syncora, or in the event that the Voting Rights are held by a party other than Syncora, Trust Unit Holders entitled to a majority of the Voting Rights; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of the Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)     The Trustee may execute any of the trusts or powers under the Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under the Trust Agreement;

(h)     Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 6.01;

(i)     The Trustee shall not be deemed to have notice of any matter unless one of its Officers has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, the applicable Depositor(s), the Trust or the Trust Agreement;

(j)     None of the provisions of the Trust Agreement or these Standard Terms shall require the Trustee to expend or risk its own funds or otherwise to incur any liability,

financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)     Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)     The permissive rights of the Trustee to perform any discretionary act enumerated in the Trust Agreement or these Standard Terms shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence or willful misconduct;

(m)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of the Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to the Trust Agreement (including these Standard Terms) believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of the Trust Agreement, these Standard Terms or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under the Trust Agreement or these Standard Terms, and shall have a duty only to accept such collateral or funds delivered to it in accordance with the Trust Agreement (including these Standard Terms);

(q)     In connection with its preparation of any required tax reporting for Beneficial Owners of the Trust Units, the Trustee shall, if necessary, (i) on a quarterly basis for each calendar year, request one Depository participant list, (ii) on an annual basis, contact each Depository participant identified on the Depository participant lists and request such Beneficial Owner information as shall be necessary to permit the Trustee to prepare the applicable tax return for such calendar year, and (iii) to the extent that a participant provides partial or incomplete Beneficial Owner information, make a second and final attempt to contact the participant or such Beneficial Owner (to the extent such Beneficial Owner's contact

23

information has been provided to the Trustee) to obtain such additional information in order to permit the Trustee to prepare the applicable tax return for such Beneficial Owner for that calendar year;

(r)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(s)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Trust Agreement; and

(t)     All rights of action under the Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Trust Units, subject to the provisions of the Trust Agreement.

### Section 6.03.  *Trustee Not Liable for Trust Units or Securities.*

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement and in the Trust Units. The Trustee makes no representations or warranties as to the validity or sufficiency of the Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Trust Units) or of the Securities or related documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the Securities or deposited in or withdrawn from the Trust in accordance with the Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Sections 3.01 and 3.02. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the Bond Documents.

### Section 6.04.  *Trustee May Own Units.*

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

### Section 6.05.  *Trustee's Fees and Expenses.*

(a)     Pursuant to the Fee Agreement, the Trustee shall be entitled to receive from the Trust (i) compensation agreed upon in writing (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under the Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee and (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements (other than Extraordinary Expenses) incurred or made by the Trustee in accordance with any of the provisions of the Trust Agreement (including but not limited to the fees, expenses and disbursements of its counsel and of all persons not regularly in its employ), in each case to the extent set forth in such fee agreement and (y) Extraordinary Expenses reimbursable pursuant

to Section 6.05(b) (collectively, the "**Trustee Costs**"). All such Trustee Costs shall be paid pursuant to the terms of the Fee Agreement and may be reimbursed to the Trustee in accordance with the provisions of Section 3.02 hereof.

(b)     In addition, the Trustee (including in its capacities as the Unit Registrar and Paying Agent) shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Trust Unit Holders against the Depositors, the Reorganizd Debtors, the Trust, or the Trustee except for proceedings, litigation or enforcement actions that relate to the Trustee's grossly negligent action, grossly negligent failure to act or its own willful misconduct (the "**Extraordinary Expenses**"). The Trustee may make withdrawals from the Trust to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of $150,000 in the aggregate for the Trusts of Extraordinary Expenses in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; provided, however, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received security or indemnity reasonably satisfactory to it for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit of $100,000 applicable for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust and provided further that the foregoing shall not limit the payment of any amounts to which the Trustee is entitled pursuant to its indemnification rights set forth in Section 6.13 with respect to defending the Trustee against any claim asserted by any Person.

(c)     For the avoidance of doubt, the Depositors shall not be liable for any Trustee Costs or Extraordinary Expenses.

**Section 6.06.** *Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent.*

The Trustee, any successor Trustee, and any successor Trust Unit Paying Agent shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Depositors or Syncora; (ii) is neither affilliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is regularly acting as a trustee in the municipal finance market. If such corporation publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published.

In case at any time any Trustee, successor Trustee, or successor Trust Unit Paying Agent shall cease to be eligible in accordance with the provisions of this Section, such Trustee, successor Trustee, or successor Trust Unit Paying Agent shall resign immediately in the manner and with the effect specified in Section 6.07.

### Section 6.07. *Resignation and Removal of the Trustee.*

(a)     The Trustee may at any time resign and be discharged from the trusts created pursuant to a Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, Syncora shall promptly appoint a successor trustee meeting the requirements set forth in Section 6.06 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Trust Unit Holders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)     If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 6.06 and shall fail to resign after written request therefor by Syncora, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then Syncora may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)     Syncora may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 6.08 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including without limitation, the costs and expenses incurred in connection with any such succession.

Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 6.08 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession. Notwithstanding the replacement of the Trustee pursuant to this Section 6.07, the rights, benefits, protections and indemnities afforded to the Trustee under this Article VI shall continue to the benefit of the retiring Trustee.

**Section 6.08.** *Successor Trustee.*

Any successor trustee appointed as provided in Section 6.07 shall execute, acknowledge and deliver to the Trust Unit Holders and to the predecessor trustee an instrument accepting such appointment under the Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor thereunder, with the like effect as if originally named as trustee therein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under the Trust Agreement and the Trust Unit Holders and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 6.06 hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under the Trust Agreement and (b) mail notice of the succession of such trustee under the Trust Agreement to all Holders of Trust Units at their addresses as shown in the Unit Register.

**Section 6.09.** *Merger or Consolidation of Trustee.*

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Trust Agreement provided such corporation shall be eligible under the provisions of Section 6.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 6.10.** *Reserved.*

**Section 6.11.** *Appointment of Custodians.*

The Trustee may appoint one or more Custodians to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to Article VI, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Trust Unit Holders. Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Custodian may not be an Affiliate of the Depositors or Syncora. The Trustee is responsible for the fees and expenses of any Custodian appointed hereunder.

**Section 6.12.** *Trustee May Enforce Claims Without Possession of Trust Units.*

All rights of action and claims under the Trust Agreement or the Trust Units may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Trust Unit Holders in respect of which such judgment has been recovered.

**Section 6.13.** *Trustee Indemnity*

The Trustees' rights to claim indemnification for losses that they may incur with respect to the Trust Agreement (incorporating these Standard Terms) and each other document contemplated by the foregoing to which either of the Trustees is a party shall be as set forth in Annex I hereto, subject, with respect to Extraordinary Expenses, to the provisions of Section 6.05(b).

# ARTICLE VII

# TERMINATION OF TRUST

**Section 7.01.** *Termination; No Redemption Rights.*

Upon the indefeasible cancellation or other indefeasible termination of the relevant Syncora Insurance Policy, the Trust (including the respective obligations and responsibilities under the Trust Agreement of the Trustee and Syncora shall terminate upon (i) the distribution to Syncora or to Trust Unit Holders, as applicable, of any remaining Trust Assets held by or on behalf of the Trustee and required hereunder to be so distributed in accordance with the provisions of Section 3.03, 3.04, 3.07, or 3.08 hereof, (ii) payment in full of any Trustee Costs due and owing to the Trustee under the Trust Agreement (including these Standard Terms), (iii) payment in full of any Syncora Deferred Expenses due and owing to Syncora under the Trust Agreement (including these Standard Terms), (iv) payment in full of any known Tax Costs due and owing to any tax or governmental authority, and (v) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of the Trust Agreement have been complied with. In no event shall the Trust be terminated or the Securities be redeemed (except in the case of a redemption of the Securities permitted under the terms of the Bond Documents) or otherwise released from the Trust Estate [(except pursuant to, and in accordance with, Sections 3.04 and 3.07 hereof)] without the prior express written consent of Syncora if either (i) the relevant Syncora Insurance Policy has not been indefeasibly terminated or (ii) Syncora has not been indefeasibly paid in full for any amounts owed pursuant to the Commonwealth Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

**Section 7.02.** *Procedure for Termination.*

During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice by letter to the Trust Unit Holders specifying: (a) the anticipated final distribution date; (b) that the final payment of the Trust Units will be made upon presentation and surrender of Trust Units at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurance of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "**Termination Notice**"). The Trustee shall provide a copy of the Termination Notice to the Unit Registrar at the time such Termination Notice is given to Trust Unit Holders.

If the Requisite Trust Unit Holders do not object in writing within thirty (30) days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

Upon the dissolution, wind up and termination of the Trust and the Trust Agreement, the Trustee or Delaware Trustee is authorized to file a certificate of cancellation with the Secretary of State.

## ARTICLE VIII

## TAX PROVISIONS

### Section 8.01. *Grantor Trust Provisions.*

The Trustee, the Depositors, the Trust Unit Holders (by their acceptance of the Trust Units and Book-Entry Beneficial Interests) and Syncora each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets, and (c) the Trustee (at the direction of Syncora), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Trust Unit Holder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any

29

authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and Syncora each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

### Section 8.02. *Characterization.*

Each Trust Unit Holder acknowledges and agrees to treat the Trust Units and the Book-Entry Beneficial Interests as undivided interests in the Trust Estate.

### Section 8.03. *Grantor Trust Administration.*

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Trust Unit Holders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Trust Unit Holders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust under the Grantor Trust Provisions. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Trust Unit Holders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "**Adverse Trust Event**"), unless the Trustee has obtained or received an Opinion of Counsel from counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Trust Unit Holders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

### Section 8.04. *Reports to Trust Unit Holders and Tax Authorities*

(a) The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority.

(b)     Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustee, the Depositors, or Syncora be liable for any liabilities, costs, or expenses of the Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to any act or omission by the Trustee in breach of its obligations under this Trust Agreement.

(c)     If any tax, duty, assessment, or other governmental charge is imposed, levied or assessed on the Trust, or if the Trust becomes subject to deduction, withholding, or other charge or assessment from, or with respect to, any amounts received by the Trust or any distributions made by the Trust, such tax, duty, assessment or other governmental charge, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) (collectively, the "**Tax Costs**") shall be the sole responsibility of, charged to and payable by the Trust Unit Holders on a pro rata basis. To the extent known prior to the termination of the Trust, all Tax Costs that are withheld, collected, charged, assessed, or levied shall be paid by the Trustee from the Trust Assets and income to the applicable taxing or governmental authority and any amounts so withheld, collected and/or paid to the applicable taxing or governmental authority shall be deemed to have been paid as distributions to the applicable Trust Unit Holders and treated in accordance with the provisions of the Trust Agreement applicable to Tax Costs. To the extent any Tax Costs become known after the termination of the Trust, the former Trust Unit Holders of such Trust shall remain responsible for such Tax Costs on a pro rata basis.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Trust Unit Holder with respect to a Trust Unit shall be that Trust Unit Holder's sole responsibility.

(f)     For the purposes of this Article VIII of these Standard Terms and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to Holder, Trust Unit Holder, or Beneficial Owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Articles, Sections, or provisions hereof.

31

(g)     Notwithstanding any other provision of the Trust Agreement (including these Standard Terms), Syncora makes no representations, warranties, or guarantees, and shall have no liability, with respect to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units. By electing, or being deemed to elect, the Syncora Non-Commutation Treatment, all Trust Unit Holders expressly agree to hold Syncora harmless, and not to seek to impose any liabiltiy on Syncora, related to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.

## ARTICLE IX

### MISCELLANEOUS PROVISIONS

**Section 9.01.**  *Amendment of Trust Agreement.*

Promptly following the execution of the Trust Agreement, the Trustee shall post full and complete copies of the Trust Agreement (including these Standard Terms) on EMMA. The Trust Agreement (including these Standard Terms) may not be amended, waived or supplemented without the prior written consent of Syncora. The Trust Agreement (including these Standard Terms) may be amended, waived or supplemented from time to time by Syncora and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

(a)     except as otherwise provided in the Trust Agreement (including these Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

(b)     compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Syncora Insurance Policy without the written consent of each Holder of Trust Units affected;

(c)     [reserved];

(d)     amend this Section 9.01 without the consent of the Holder of each Trust Unit;

(e)     adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in (a), (b), or (c) without the consent of the Trust Unit Holders evidencing at least a majority of such Trust Unit Holders holding Trust Units in the applicable Trust (measured by the outstanding par amount of the underlying Syncora Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Syncora; or

(f)    reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

Prior to executing any amendment permitted by this Article IX, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Counsel and an Officer's Trust Unit stating that the execution of such amendment is authorized or permitted by the Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under the Trust Agreement, these Standard Terms or otherwise.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Trust Unit Holder and shall post a copy of such amendment to EMMA.

The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Trust Unit Holders shall be subject to such reasonable regulations as the Trustee may prescribe.

**Section 9.02.  *Counterparts.***

The Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

**Section 9.03.  *Limitation on Rights of Trust Unit Holders.***

The death or incapacity of any Trust Unit Holder shall not operate to terminate the Trust Agreement or the Trust, nor entitle such Trust Unit Holder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Trust Unit Holder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Trust Unit Holders from time to time as partners or members of an association; nor shall any Trust Unit Holder be under any liability to any third person by reason of any action taken by the parties to the Trust Agreement pursuant to any provision hereof.

Except with respect to enforcement of the applicable Syncora Insurance Policies in accordance with the terms hereof, no Trust Unit Holder shall have any right by virtue of any provision of the Trust Agreement to institute any suit, action or proceeding in equity or at law

upon or under or with respect to the Trust Agreement, unless the Requisite Trust Unit Holders shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Trust Agreement, and the Trustee, for 15 days after its receipt of such request shall have neglected or refused to institute any such action, suit or proceeding. It is understood and intended, and expressly covenanted by each Trust Unit Holder with every other Trust Unit Holder and the Trustee, that no one or more Holders of Trust Units shall have any right in any manner whatever by virtue of any provision of the Trust Agreement to affect, disturb or prejudice the rights of the Holders of any other Trust Units, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Trust Agreement, except in the manner therein provided and for the equal, ratable and common benefit of all Trust Unit Holders. For the protection and enforcement of the provisions of this Section, each and every Trust Unit Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

In the event that an authorized officer of the Trustee receives a request for its consent to any amendment, modification or waiver of these Standard Terms, the Trust Agreement or any other document thereunder or relating thereto, or receives any other solicitation for any action with respect to the Securities or Syncora Insurance Policies, the Trustee shall mail a notice of such proposed amendment, modification, waiver, solicitation or action to each of the Trust Unit Holders within five (5) days of receipt thereof. The Trustee shall request instructions from the Trust Unit Holders as to whether or not to consent to or vote to accept such amendment, modification, waiver, solicitation or action.

The Trustee shall consent or vote proportionally in accordance with the written direction of the Trust Unit Holders; provided, however, that the Trustee shall not:

(a) without the prior written consent of any Trust Unit Holder, consent or affirmatively vote on behalf of such Trust Unit Holder on any matter that would: (i) terminate the Trust, (ii) except as expressly provided herein, sell some or all of the assets of the Trust; (iii) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Syncora Insurance Policy; and

(b) without the prior written consent of Syncora, consent or affirmatively vote on any matter that would amend, modify or waive any agreement in such a manner as to adversely impact Syncora. Any such determination as to whether any such amendment, modification or waiver adversely impacts Syncora shall be made in the sole and absolute discretion of Syncora and such determination shall be promptly provided by notice to the Trustee and the Trust Unit Holders. The Trustee shall not be liable to any Trust Unit Holder or any other Person for refusing to consent or affirmatively vote on such a matter in accordance with written direction of Syncora.

**Section 9.04.** *Notices.*

All demands and notices under the Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service, to (a) in the case of the Trustee if the Trustee is [●], the notice address for the Trustee is [●]. If the Trustee is not [●], the notice address shall be

the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Trustee, (b) in the case of the Delaware Trustee, if the Delaware Trustee is [●], the notice address for the Delaware Trustee is [●]. If the Delaware Trustee is not [●], the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Delaware Trustee, and (c) in the case of the Depositors, [●], or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Depositors. Any notice required or permitted to be mailed to a Trust Unit Holder shall be given by first-class mail, postage prepaid, or by express delivery service, at the address of such Trust Unit Holder as shown in the Unit Register. Notice may also be delivered by email in accordance with a separate side letter agreement entered into between the parties. Any notice so mailed within the time prescribed in the Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Trust Unit Holder receives such notice. A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above. A copy of any notice given hereunder to any other party shall be delivered to the Trustee.

### Section 9.05. *Severability of Provisions.*

If any one or more of the covenants, agreements, provisions or terms of the Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of the Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of the Trust Agreement or of the Trust Units or the rights of the Holders thereof.

### Section 9.06. *Third-Party Beneficiaries.*

Syncora, the Trust Unit Holders and their successors and assigns shall be third-party beneficiaries of the provisions of the Trust Agreement (inclding these Standard Terms). For the avoidance of doubt, beneficial holders of Trust Units are third party beneficiaries to the extent necessary to allow them to enforce the applicable Syncora Insurance Policies as set forth herein. Nothing in these Standard Terms or the Trust Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Trust Unit Holders and Syncora, any benefit or any legal or equitable right, remedy or claim under the Trust Agreement (including these standard terms).

### Section 9.07. *Acts of Trust Unit Holders.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Trust Agreement (including these Standard Terms) to be given or taken by Trust Unit Holders or a class of Trust Unit Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Trust Unit Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee. Proof of execution of any such instrument or of a writing appointing any such agent shall be

sufficient for any purpose of the Trust Agreement (including these Standard Terms) and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Unit Register.

### Section 9.08. *Headings.*

Section and subsection headings in these Standard Terms are included herein for convenience of reference only and shall not constitute a part of these Standard Terms for any other purpose or be given any substantive effect.

### Section 9.09. *No Waiver; Cumulative Remedies.*

No failure to exercise and no delay in exercising, on the part of any party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

### Section 9.10. *Merger and Integration.*

These Standard Terms and the Trust Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by the Trust Agreement (including these Standard Terms).

### Section 9.11. *The Delaware Trustee*

(a) The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of Section 3807(a) of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware. It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b) The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Trust Unit Holders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Agreement. The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees.

(c) The Delaware Trustee may be removed by Syncora upon thirty days prior written notice to the Delaware Trustee. The Delaware Trustee may resign upon thirty days prior written notice to Syncora. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably

acceptable to Syncora, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware. If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, Syncora or the Trust Unit Holders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the party bringing the petition.

(d)     Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor Delaware Trustee under the Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)     The Trust shall be responsible for the payment of any fees or expenses of the Delaware Trustee. The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under the Trust Agreement and with respect to the Trust as the Trustee; however, any such indemnification shall be made pursuant to the terms of a separate indemnification agreement and shall not be payable from the Trust Estate, except as expressly provided herein. No amendment or waiver of any provision of the Trust Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent.

## **ANNEX I**

INDEMNIFICATION PROVISIONS

# EXHIBIT A

NOTICE OF DRAW ON SYNCORA INSURANCE POLICY
[[NAME OF SERIES] SYNCORA CUSTODIAL TRUST]

# **EXHIBIT B**

FORM OF NOTICE OF MATURITY
[[NAME OF SERIES] SYNCORA CUSTODIAL TRUST]

# EXHIBIT C

FORM OF NOTICE OF NONPAYMENT
[[NAME OF SERIES] SYNCORA CUSTODIAL TRUST]

## EXHIBIT D

FORM OF DISTRIBUTION REPORTING NOTICE
[[NAME OF SERIES] SYNCORA CUSTODIAL TRUST]

STATEMENT AS OF [●], 20__

# EXHIBIT J

Draft Legislation as approved by the House of Representatives of Puerto Rico[1]

---

[1] The annexed draft legislation, passed by the House of Representatives of Puerto Rico provides for the issuances of the general obligation bonds and the contingent value instruments, and is required to be included in the Plan Supplement. However, as set forth in a published statement of the Oversight Board, see Oversight Board Statement, dated October 8, 2021, the Oversight Board does not support the current version of the draft legislation, asserts that it is inconsistent with the proposed Plan, and reserves all rights in connection therewith.

**(TEXTO DE APROBACION FINAL POR LA CAMARA)**
**(30 DE SEPTIEMBRE DE 2021)**

## ESTADO LIBRE ASOCIADO DE PUERTO RICO

19na Asamblea
Legislativa

2da Sesión
Ordinaria

# CÁMARA DE REPRESENTANTES

# P. de la C. 1003

27 DE SEPTIEMBRE DE 2021

Presentado por los representantes *Hernández Montañez, Varela Fernández, Matos García, Santa Rodríguez y Torres Cruz*

Referido a la Comisión de Hacienda y Presupuesto

**LEY**

Para crear la "Ley para Ponerle Fin a la Quiebra de Puerto Rico", establecer las disposiciones y condiciones para aprobar la oferta, venta y emisión de los diferentes tipos de Bonos de Obligación General, así como para disponer la creación de los Instrumentos de Valor Contingente; establecer la política pública de protección y el mecanismo de restitución de fondos de los municipios afectados por cualesquiera recortes impuestos por el Plan de Ajuste propuesto como parte del procedimiento de Título III de PROMESA; derogar la Ley Núm. 39 del 13 de mayo de 1976, según enmendada, conocida como "Ley para Proveer para la Transferencia Mensual al Fondo Especial para la Amortización y Redención de Obligaciones Generales Evidenciadas por Bonos y Pagarés"; enmendar el inciso (a) del Artículo 3 de la Ley Núm. 147 de 18 de junio de 1980, según enmendada, conocida como "Ley Orgánica de la Oficina de Gerencia y Presupuesto"; enmendar el Artículo 3 y el inciso (m) del Artículo 7, así como eliminar los Artículos 25 y 34 y reenumerar los Artículos 25-A y 35 como los Artículos 25 y 34, respectivamente, de la Ley Núm. 44 de 21 de junio de 1988, según enmendada, conocida como "Ley de la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico"; enmendar los Artículos 23.01 y 23.02 de la Ley 22-2000, según enmendada, conocida como "Ley de Vehículos y Tránsito de Puerto Rico"; enmendar el Artículo 1.03 (b) y el inciso (h) del Artículo 2.02 de la Ley 351-2000, según enmendada, conocida como "Ley del Distrito del

Centro de Convenciones de Puerto Rico"; enmendar el Artículo 8 de la Ley 179-2002, según enmendada; enmendar el Artículo 31 de la Ley 272-2003, según enmendada, conocida como "Ley del Impuesto sobre el Canon por Ocupación de Habitación del Estado Libre Asociado de Puerto Rico"; añadir un nuevo Artículo 7A a la Ley 103-2006, según enmendada; enmendar la Sección 3060.11 y eliminar la Sección 3060.11A de la Ley 1-2011, según enmendada, conocida como "Código de Rentas Internas de Puerto Rico de 2011"; y enmendar el inciso (a) del Artículo 7.018 y el inciso (a) del Artículo 7.027 de la Ley 107-2020, según enmendada, conocida como "Código Municipal de Puerto Rico"; a los fines de tomar los pasos afirmativos necesarios para encaminar la salida de Puerto Rico del procedimiento de quiebras creado al amparo del Título III de la Ley PROMESA; cumplir con las disposiciones de la referida ley federal respecto a las condiciones mínimas necesarias para la culminación de la Junta de Supervisión y Administración Financiera; y para otros fines relacionados.

## EXPOSICIÓN DE MOTIVOS

A comienzos del año 2006, el liderato político puertorriqueño se planteaba crear mecanismos legales y políticos para remediar la condición económica que arrastraba Puerto Rico desde hacía varias décadas. Esto debido a, entre otros factores, la terminación del incentivo al sector manufacturero. Como resultado de los acontecimientos, en el 2013, en un esfuerzo conjunto, distintos sectores gubernamentales y privados intentaron incluir a Puerto Rico en el Capítulo 9 del Código de Quiebras Federal, el cual no obtuvo el respaldo del Congreso. En el 2015, en una colaboración entre el Ejecutivo y el Legislativo, buscaron atender la situación de la deuda nacional estableciendo un mecanismo local similar al creado mediante el citado Código. Dicha iniciativa fue posteriormente invalidada por ser contraria a la Constitución de los Estados Unidos de América, al ser la quiebra materia de campo ocupado por ley federal.

Posteriormente, en el 2016, con el objetivo de proveerle un respiro al Gobierno de Puerto Rico en torno a la potencial avalancha de reclamaciones por parte de sus acreedores, el Congreso de EE.UU. promulgó la ley federal conocida como la Ley PROMESA. Esta ley estableció, en su Título III, un procedimiento de quiebras que incorporaba una amplia porción de las disposiciones del Código de Quiebras, al cual Puerto Rico tendría acceso en aras de restructurar su monumental deuda. De igual forma, creó una entidad que tomaría el control de todos los aspectos presupuestarios, financieros y de administración fiscal de Puerto Rico denominada *Federal Oversight and Management Board*, o Junta de Supervisión y Administración Financiera (JSAF). En efecto, la JSAF pasaría a supervisar y controlar esencialmente todos los aspectos fiscales y presupuestarios del gobierno del Estado Libre Asociado de Puerto Rico.

Aun cuando la referida legislación había sido aprobada, el gobierno de Puerto Rico realizó múltiples intentos para alcanzar acuerdos de consenso con diversos grupos de

acreedores. A pesar de sus esfuerzos, la intención del Gobierno no prosperó. Así, el 3 de mayo de 2017, la JSAF, presentó una petición de restructuración de deuda al amparo del Título III de PROMESA. La presentación de esta petición ante el Tribunal de Título III dio comienzo al procedimiento de quiebras más grande en la historia de los mercados municipales de EE.UU., al cual pertenecen los bonos y las obligaciones del Estado Libre Asociado de Puerto Rico. Para tener presente la magnitud de este evento debe considerarse que se estimaba que el Estado Libre Asociado tendría que restructurar $35 mil millones como parte del susodicho proceso de restructuración.

Este proceso no solo conllevaría un litigio altamente técnico y contencioso, sino que obligaría al liderato gubernamental puertorriqueño a cumplir con los planes fiscales diseñados y certificados por la JSAF. Por virtud de la Ley PROMESA, los planes fiscales certificados tienen fuerza de ley y su inobservancia legitima a la Junta a acudir al Tribunal de Título III para que dicho foro haga valer la intención de la citada ley federal.

Sumado a lo anterior, el gobierno de Puerto Rico lleva enfrentándose a eventos imprevistos desde el 2017. Estos eventos han afectado el potencial de recuperación económica de Puerto Rico y alargado el costoso proceso de Título III. Las consecuencias del paso de los huracanes Irma y María, los terremotos de la zona suroeste de Puerto Rico y la actual pandemia del COVID-19 continúan afectando a nuestra Isla hoy día. Estos eventos incidieron negativa y profundamente en el quehacer diario de nuestra sociedad y, colateralmente, alargaron la presencia de la Junta en Puerto Rico.

Tras más de cuatro años de presentada la petición de quiebras al amparo del Título III de PROMESA, la Junta ha presentado una séptima versión enmendada del Plan de Ajuste o Reestructuración de la Deuda (PDA) para Puerto Rico ante el Tribunal de Título III. Este Plan es el resultado de varios años de negociación entre la JSAF, en su calidad de representante exclusivo de Puerto Rico ante el Tribunal de Título III, y un sinnúmero de clases de acreedores de obligaciones del Gobierno central.

Se estima que, como parte del referido proceso de Título III, el Pueblo de Puerto Rico ha incurrido en costos de litigio que, incluyendo las negociaciones con las distintas clases de acreedores y los honorarios de abogado del proceso de reestructuración, rondan entre $300 y $500 millones. En este contexto, la negativa de actuar sobre el Plan de Reestructuración propuesto por la JSAF, o la omisión de considerarlo de manera objetiva y responsable, podría representar un riesgo de volver al comienzo del proceso de negociación.

Lo anterior necesariamente conllevaría un peligro real de (i) incurrir en costos que alcancen o superen las cifras ya incurridas; (ii) un levantamiento de la prohibición de cobro establecida mediante el mecanismo de paralización o *stay* conferido por el procedimiento de quiebras, potenciando una avalancha de reclamaciones de cobro por parte de los acreedores; y (iii), extender de forma indefinida la presencia y el mandato de

la JSAF en nuestro sistema de gobierno. Algunas partes involucradas en la quiebra del País sugieren que el Tribunal de Título III también ostenta el poder de imponerle el Plan de Ajuste al Gobierno sin el aval de la Asamblea Legislativa.

La alternativa a estos escenarios es la aprobación del Plan, que, de ser ratificado por el Gobierno y los acreedores, y posteriormente confirmado por el Tribunal de Título III, representaría el último peldaño en el proceso de restructuración de la deuda de Puerto Rico. Este Plan incorpora los acuerdos alcanzados con las diversas clases de acreedores de obligaciones del Gobierno Central. Estas clases incluyen a los bonistas de obligaciones generales, sindicatos de empleados públicos, el Comité de Acreedores No Asegurados y el Comité Oficial de Retirados, entre otros.

En total, los acuerdos incluidos en el PDA reducen la deuda pública del Gobierno central en aproximadamente un 50%. Es decir, la deuda pública se reduciría de aproximadamente $70 mil millones, a $34 mil millones y la deuda de bonos de Obligaciones Generales (GO) y de la Autoridad de Edificios Públicos se reduciría de $18.8 mil millones a $7.4 mil millones. A su vez, el pago anual de la deuda pública de Puerto Rico se reduciría a aproximadamente de $3,300 millones a $1.1 mil millones. Así mismo, el margen prestatario del Estado Libre Asociado se reduciría de un 25% a un 7.5%, cifra que representa la mitad del máximo constitucional permitido. En términos prácticos, estas reducciones representan más dinero en las arcas del gobierno, lo cual implica que Puerto Rico tendrá una nueva oportunidad de invertir en su gente a través de mejoras a la infraestructura, de sufragar los costos de los servicios esenciales que está llamado a ofrecer; y de prepararse para y atender futuras emergencias.

Para alcanzar esta reducción de la deuda gubernamental, la Ley PROMESA requiere que la Asamblea Legislativa de Puerto Rico apruebe legislación que viabilice la emisión de una serie de bonos de obligaciones generales (GO) y la creación de instrumentos de valor contingente (IVC) que garanticen el pago de ciertas reclamaciones. Debe destacarse que los IVC también disponen para la creación de un fideicomiso que eventualmente garantice el pago de pensiones, el disfrute del gobierno de hasta $200 millones de fondos generados en exceso a las proyecciones contenidas en los Planes Fiscales de 2020 y 2021, y otros mecanismos de repago.

En esencia, el Gobierno central debe emitir alrededor de $7.4 mil millones en nuevos bonos de obligaciones generales, y autorizar la creación de los IVC. Los IVC solo serían pagaderos al cumplirse determinadas métricas de recaudos del impuesto sobre ventas y uso (IVU) y, en el caso de una porción limitada de los IVCs, la porción del arbitrio federal al ron que el Departamento del Tesoro Federal transfiere al Gobierno de Puerto Rico. Es decir, solo se pagaría hasta un máximo específico de deuda si ciertas condiciones están presentes.

A tenor con la Sección 314 de PROMESA, y con la recién firmada Ley 42-2021, el Gobierno de Puerto Rico tiene la obligación de aprobar la presente legislación para viabilizar la aprobación del Plan y la posterior salida de la Junta de Supervisión Fiscal. Debemos tener presente que la  Ley 42, *supra*, expresamente revocó el poder que hasta ese momento ostentaba el Gobernador de emitir deuda sin intervención legislativa bajo múltiples estatutos. De esta manera, resulta necesario que esta Asamblea Legislativa y el Ejecutivo continúen su ya histórica colaboración, con el objetivo de aprobar la legislación que permita la emisión de bonos requerida y que, a su vez, autorice la creación de los IVC arriba descritos.

Si bien el PDA propone múltiples aspectos positivos para Puerto Rico, y a pesar de que su aprobación encaminaría el fin del proceso de Título III para la Isla, también le impone una carga financiera a los pensionados públicos al proponer un recorte general de 8.5% en las pensiones de nuestros retirados.

Que quede meridianamente claro que la política pública de la presente Asamblea Legislativa es de cero recortes a los pensionados.

Esta Asamblea Legislativa no ha perdido de perspectiva que nuestros pensionados, a diferencia de otros grupos de acreedores, ya sufrieron recortes en sus pensiones como resultado de la aprobación de estatutos que, con el propósito de prevenir la insolvencia de los sistemas de retiro del gobierno, redujeron los beneficios de pensión, aumentaron la cantidad de aportaciones de los empleados y elevaron la edad de retiro para los planes de pensión de cada uno de los tres sistemas principales de retiro del Gobierno. Por tanto, las Ramas Legislativa y Ejecutiva han sido enfáticas en que la política pública de Puerto Rico es de cero recortes a las pensiones.

Los municipios son el ente gubernamental más cercano a nuestra población. La crisis y los planes fiscales han impactado los ingresos de nuestros ayuntamientos. En la medida en que el PDA logre recortes a la deuda estatal, estas economías deberán solventar específicamente medidas de recolección y disposición de residuos, desperdicios y para implementar programas de reciclaje en los municipios, a fin de que los ayuntamientos puedan garantizar estos servicios tan fundamentales e indispensables para garantizar y mejorar la calidad de vida de nuestra ciudadanía.

La Asamblea Legislativa continuará impulsando propuestas que defiendan el mejor interés del Pueblo. En esta hazaña, confiamos en que la Rama Legislativa contará con el apoyo del Ejecutivo para guiar a Puerto Rico en el camino por recorrer. La aprobación del Presupuesto General de Puerto Rico para el año fiscal 2021-2022, Res. Conj. 8-2021, fue un paso correcto en esa dirección. También lo es la aprobación de esta medida, que permitirá que el actual Presupuesto General se convierta en el primer presupuesto balanceado de cuatro. Al finalizar este proceso, Puerto Rico habrá cumplido con la mitad de los requisitos dispuestos por PROMESA. La presente Ley cimienta el

esfuerzo histórico, multisectorial y de consenso de ponerle fin a la Junta de Supervisión Fiscal.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

1    **CAPÍTULO 1.- DISPOSICIONES GENERALES.**

2    **ARTÍCULO 101.- TÍTULO.**

3    Esta Ley se conocerá y podrá ser citada como la "Ley para Ponerle Fin a la Quiebra

4    de Puerto Rico".

5    **ARTÍCULO 102.- DECLARACIÓN DE INTENCIÓN Y POLÍTICA PÚBLICA**

6    La presente legislación es cónsona con los objetivos de la Ley para la Supervisión,

7    Administración y Estabilidad Económica de Puerto Rico (*Puerto Rico Oversight,*

8    *Management and Economic Stability Act*, o PROMESA, por sus siglas en inglés) y se adopta

9    al amparo del estado de derecho vigente, con el propósito específico de viabilizar los

10   siguientes objetivos, los cuales, a su vez, son los requisitos estatutarios para la

11   terminación del mandato de la Junta de Supervisión y Administración Financiera (JSAF)

12   creada por virtud del referido estatuto federal:

13       1. Tomar las acciones afirmativas requeridas para cumplir con el mandato

14          inequívoco del Pueblo de Puerto Rico de culminar el menoscabo de nuestro

15          sistema republicano y democrático de gobierno puertorriqueño;

16       2. Concretar la salida exitosa del Estado Libre Asociado de Puerto Rico del

17          proceso de quiebras dispuesto en el Título III de la Ley PROMESA;

1        3. Viabilizar el acceso del Estado Libre Asociado de Puerto Rico a los mercados

2           crediticios a corto y largo plazo, a tasas de interés razonables, para cumplir con

3           las necesidades prestatarias de nuestro gobierno local;

4        4. Perfeccionar la aprobación del primero de cuatro presupuestos balanceados,

5           legislado y firmado por las Ramas Legislativa y Ejecutiva, respectivamente, el

6           pasado 30 de junio de 2021 como la Resolución Conjunta 8-2021;

7        5. Ejercer todas las acciones necesarias para que la salida de la JSAF ocurra lo

8           antes posible.

9        6. Las Transacciones de Restructuración de deuda autorizadas mediante la

10          presente Ley, están totalmente sujetas y condicionadas a que la Junta de

11          Supervisión y Administración Financiera (JSAF) no apruebe recorte alguno a

12          las pensiones de los empleados gubernamentales retirados en el Plan de Ajuste

13          o Reestructuración.

14        La presente legislación no busca legitimar el mandato ni la gestión de la JSAF. Al

15  contrario, se promueve con el único propósito de adelantar aquellas acciones

16  estrictamente necesarias y requeridas por la citada ley federal para facilitar la salida de la

17  referida entidad de manera responsable tan pronto como sea viable. En este contexto, se

18  enfatiza que la intención inequívoca de la Asamblea Legislativa y de la JSAF al impulsar

19  la promulgación del presente estatuto es precisamente asegurar dicha salida. Por la

20  presente declaración se reconoce que la JSAF no tiene la autoridad de perpetuar su

21  existencia más allá de las condiciones establecidas en la Ley PROMESA, sea mediante el

1   Plan de Ajuste o Reestructuración cuya implementación se viabiliza en esta Ley, o

2   mediante su interpretación del citado estatuto federal.

3   En consideración a lo anterior, se establece que la política pública del Estado Libre

4   Asociado de Puerto Rico en torno a la Ley PROMESA y la existencia de la JSAF es dar

5   aquellos pasos requeridos para terminar con el mandato de esta entidad, siempre que las

6   medidas promulgadas e implementadas no vulneren la voluntad del Pueblo, perpetúen

7   el menoscabo de nuestro sistema de gobierno ni atenten contra los sectores más

8   vulnerables de la sociedad puertorriqueña.

9   En la medida en que las propuestas que sometan o acciones que sean requeridas

10  por la JSAF atenten contra la presente política pública, el gobierno del Estado Libre

11  Asociado de Puerto Rico tomará todas las acciones que estime necesarias y pertinentes

12  para defender los mejores intereses de nuestra ciudadanía.

13  **ARTÍCULO 103.- DEFINICIONES.**

14  (a)   5.5% del IVU:   significa los ingresos y recaudos presentes y futuros

15  generados por la porción del impuesto sobre ventas y uso establecido bajo las Secciones

16  4020.01 y 4020.02 del Subcapítulo D del Código de Rentas Internas de Puerto Rico que

17  corresponde a la tasa contributiva del cinco y medio por ciento (5.5%).

18  (b)   Acuerdos Complementarios: significa el Plan, la Orden de Confirmación, el

19  Contrato de Bonos de Obligación General, la forma de los Bonos de Obligación General,

20  el Contrato de IVC, la forma de los IVCs, y cualquier otro acuerdo o instrumento

21  relacionado o suscrito con relación a, o en apoyo de, una Transacción de Restructuración

22  y de conformidad con, o en apoyo de, el Plan o una Modificación Elegible.

1    (c)    ACT: significa la Autoridad de Carreteras y Transportación de Puerto Rico.

2    (d)    ADCC: significa la Autoridad del Distrito del Centro de Convenciones de

3    Puerto Rico.

4    (e)    AEP: significa la Autoridad de Edificios Públicos de Puerto Rico.

5    (f)    AFI: significa la Autoridad para el Financiamiento de la Infraestructura de

6    Puerto Rico.

7    (g)    AMA: significa la Autoridad Metropolitana de Autobuses de Puerto Rico.

8    (h)    Año Fiscal: significa el año fiscal del Estado Libre Asociado, que empieza

9    el 1ro de julio y termina el 30 de junio.

10    (i)    Bonos de Obligación General: significa los bonos de obligación general

11    emitidos por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General

12    de conformidad con esta Ley, el Plan y la Orden de Confirmación, y cualesquiera bonos

13    de obligación general emitidos subsiguientemente por el Estado Libre Asociado bajo el

14    Contrato de Bonos de Obligación General de acuerdo a y consistente con los términos del

15    Plan para retirar, refinanciar o cancelar bonos de obligación general originalmente

16    emitidos conforme al Plan y la Orden de Confirmación.

17    (j)    Código de Puerto Rico: significa la Ley 1-2011, según enmendada, conocida

18    como el "Código de Rentas Internas para un Nuevo Puerto Rico."

19    (k)    Condición de Rendimiento Superior del Arbitrio al Ron: significa que los

20    Ingresos del Arbitrio al Ron del Estado Libre Asociado en un Año Fiscal, calculados

21    conforme a, y neto de, aquellas deducciones permitidas conforme al Plan y establecidas

1    en el Contrato de IVC, exceden los umbrales contemplados en el Plan y establecidos en

2    el Contrato de IVC para dicho Año Fiscal.

3         (l)      Condición de Rendimiento Superior del IVU: significa que los recaudos del

4    IVU Medido o del Impuesto Sustituto Medido, según sea el caso, en cualquier Año Fiscal

5    exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para

6    dicho Año Fiscal.

7         (m)     Contrato de Bonos de Obligación General: significa uno o más contratos de

8    fideicomiso, escrituras, resoluciones y cualesquiera suplementos o enmiendas

9    relacionadas, o contratos o acuerdos similares, relacionados a los Bonos de Obligación

10   General a ser otorgados y suscritos por el Representante del Gobernador autorizando: (1)

11   la emisión de los Bonos de Obligación General y describiendo sus términos; y (2) el pago

12   de los Costos de Financiamiento, cada uno de conformidad con los términos del Plan.

13        (n)      Contrato de IVC: significa uno o más contratos de fideicomiso, escrituras,

14   resoluciones y cualesquiera otros suplementos o enmiendas relacionadas, o contratos o

15   acuerdos similares, relacionados a los IVCs a ser otorgados y suscritos por el Estado Libre

16   Asociado autorizando: (1) la emisión de los IVCs por el Estado Libre Asociado y la

17   descripción de sus términos; y (2) el pago de los Costos de Financiamiento de los IVCs,

18   cada uno conforme a los términos del Plan.

19        (o)      Costos de Financiamiento: significa los costos asociados a las Transacciones

20   de Restructuración, incluyendo, pero sin limitarse a, los costos, honorarios y gastos para

21   (i) emitir, pagar o repagar los Bonos de Obligación General y los IVCs, según aplicable,

22   ya sea que los costos sean incurridos tras la emisión de dichos Bonos de Obligación

1  General o IVCs o durante el término de dichos instrumentos, (ii) efectuar pagos según

2  requeridos por los Acuerdos Complementarios, (iii) pagar cualquier sello, emisión o

3  impuesto similar y otros cargos relacionados a la Transacción de Restructuración (si

4  alguno), (iv) prepararse para y efectuar las Transacciones de Restructuración, y (v) llevar

5  a cabo todas las actividades en curso relacionadas a las Transacciones de Restructuración.

6  Para evitar dudas, los Costos de Financiamiento también incluyen los honorarios y gastos

7  administrativos previos y posteriores al cierre incurridos con relación a los Acuerdos

8  Complementarios.

9  (p)  Entidad Gubernamental: significa cualquier agencia, departamento,

10  oficina, corporación pública, fideicomiso, fondo, sistema, instrumentalidad, subdivisión

11  política, autoridad fiscal o municipio del Estado Libre Asociado.

12  (q)  Estado Libre Asociado: significa el Estado Libre Asociado de Puerto Rico.

13  (r)  Fecha de Efectividad: significa la fecha en la que el Plan entre en vigor

14  conforme a sus términos.

15  (s)  Fiduciario de los Bonos de Obligación General: significa el o los

16  fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados de

17  conformidad con los términos y condiciones del Contrato de Bonos de Obligación

18  General.

19  (t)  Fiduciario de los IVC: significa el o los fiduciario(s) o el o los fiduciario(s)

20  sustituto(s), según sea el caso, nombrados conforme a los términos y condiciones del

21  Contrato de IVC.

1        (u)     Fondo del Servicio de la Deuda: significa un fondo del servicio de la deuda

2 establecido de conformidad con el Contrato de Bonos de Obligación General.

3        (v)     Impuesto Sustituto Medido: significa toda o una porción de un impuesto

4 de aplicabilidad general en el Estado Libre Asociado que, mediante un cambio en la ley,

5 sea legislado para sustituir completamente el IVU Medido o que de lo contrario

6 constituya una medida similar o comparable de actividad económica en el Estado Libre

7 Asociado, en cada caso de conformidad con los términos del Contrato de IVC.

8        (w)    Ingresos del Arbitrio al Ron del Estado Libre Asociado: significa el total de

9 los recaudos del arbitrio a los licores destilados impuesto bajo el Código de Rentas

10 Internas de los Estados Unidos de 1986 (según enmendado de tiempo en tiempo)

11 recibidos por el Estado Libre Asociado, según documentado en el reporte del

12 Departamento del Tesoro Federal de la actividad mensual del arbitrio neto pagado al

13 Estado Libre Asociado y certificado por el Departamento de Hacienda de Puerto Rico o

14 en cualquier otro reporte análogo según establecido en el Contrato de IVC.

15        (x)     IVCs o Instrumentos de Valor Contingente: significa, en el colectivo, los

16 pagarés de obligación general emitidas bajo el Contrato de IVC de conformidad con esta

17 Ley, el Plan y la Orden de Confirmación, que consisten en los IVCs de Obligación General

18 y los IVCs "Clawback".

19        (y)     IVCs "Clawback": significa una serie de IVCs emitidos bajo el Contrato de

20 IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan

21 que surgen de la deuda emitida por ACT, ADCC, AFI y AMA. Para evitar dudas, los IVCs

1    "Clawback" podrán emitirse en una o más subseries, incluyendo, pero sin limitarse a, la

2    Subserie de las Reclamaciones del Arbitrio al Ron.

3    (z)    IVC de Obligación General: significa una serie de IVCs emitidos bajo el

4    Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado

5    permitidas bajo el Plan que surgen de o están relacionadas a deuda de obligación general

6    del Estado Libre Asociado, incluyendo deuda directa o garantizada.

7    (aa)    IVU Medido: significa el 5.5% del IVU recaudado por el Estado Libre

8    Asociado durante un Año Fiscal, menos aquellos ingresos transferidos al Fondo para el

9    Desarrollo de la Industria de las Artes, Ciencias y Cinematografía conforme a la Sección

10    Núm. 4050.06 del Código de Puerto Rico (o utilizado para cualquier otro propósito

11    establecido por ley), hasta Tres Millones Doscientos Cuarenta Mil Dólares ($3,240,000.00)

12    por Año Fiscal.

13    (bb)    Ley: significa esta "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

14    (cc)    Máximo Agregado de los IVCs "Clawback": significa, inicialmente a partir

15    de la Fecha de Efectividad, $5,239,002,764. El Máximo Agregado de los IVCs "Clawback"

16    se reducirá cada Año Fiscal en una cantidad igual a los pagos efectuados bajo los IVCs

17    "Clawback" conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una

18    Condición de Rendimiento Superior del IVU. En adición, la porción del Máximo

19    Agregado de los IVCs "Clawback" asignados a la Subserie de las Reclamaciones del

20    Arbitrio al Ron se reducirá aún más cada Año Fiscal en una cantidad igual a los pagos

21    efectuados bajo la Subserie de Reclamaciones del Arbitrio al Ron conforme al Contrato

1  de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior

2  del Arbitrio al Ron.

3    (dd)   Máximo Agregado de los IVC de Obligación General: significa, inicialmente

4  desde la Fecha de Efectividad, $3,500,000,000.  El Máximo Agregado de los IVC de

5  Obligación General se reducirá anualmente por una cantidad igual a los pagos efectuados

6  en los IVC de Obligación General conforme al Contrato de IVC.

7    (ee)   Modificación Elegible: significa una "Modificación Elegible" para ADCC

8  y/o AFI aprobada conforme al Título VI de PROMESA.

9    (ff)   Orden de Confirmación:  significa la orden del Tribunal de Título III

10  confirmando el Plan.

11    (gg)   Persona: significa cualquier persona natural o jurídica, incluyendo, pero sin

12  limitarse a, el Estado Libre Asociado, cualquier Entidad Gubernamental, o cualquier

13  firma, sociedad, empresa conjunta, fideicomiso, sucesión, compañía de responsabilidad

14  limitada, corporación de individuos, asociación o corporación pública o privada,

15  organizada o existente bajo las leyes de Puerto Rico, de los Estados Unidos de América,

16  de cualquier estado u otra jurisdicción, o cualquier estado, municipio, subdivisión

17  política, autoridad fiscal, agencia o instrumentalidad de los Estados Unidos de América,

18  cualquier estado o cualquier otra jurisdicción, o cualquier combinación de las anteriores.

19    (hh)   Plan: significa el Plan de Ajuste conjunto para el Estado Libre Asociado,

20  SRE y AEP (y cualquier otra Entidad Gubernamental incluida en dicho plan) confirmado

21  bajo el Título III de PROMESA, incluyendo los anejos relacionados, según estos puedan

22  ser enmendados, suplementados o modificados de tiempo en tiempo.

1       (ii)     PROMESA: significa la Ley de Supervisión, Administración, y Estabilidad

2 Económica de Puerto Rico, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et

3 seq., según enmendada o modificada.

4       (jj)     Reclamaciones Existentes: significa las reclamaciones en contra del Estado

5 Libre Asociado, AEP, SRE, ACT, AFI, ADCC y AMA.

6       (kk)     Representante del Gobernador: significa el Gobernador, el Secretario de

7 Hacienda o cualquier otro oficial de una Entidad Gubernamental designado por el

8 Gobernador mediante Orden Ejecutiva para cumplir con los propósitos y mandatos de la

9 presente Ley en representación del Estado Libre Asociado de Puerto Rico.

10       (ll)     Secretario de Hacienda: significa el Secretario del Departamento de

11 Hacienda del Estado Libre Asociado.

12       (mm)  Sistemas de Retiro del Estado Libre Asociado: significa el Sistema de Retiro

13 de Empleados del Gobierno, según definido en el inciso (nn) del presente Artículo, el

14 Sistema de Retiro de Maestros de Puerto Rico y el Sistema de Retiro de la Judicatura del

15 Estado Libre Asociado de Puerto Rico.

16       (nn)   SRE: significa el Sistema de Retiro de Empleados del Gobierno del Estado

17 Libre Asociado de Puerto Rico.

18       (oo)    Subserie de Reclamaciones del Arbitrio al Ron: significa una subserie de los

19 IVCs "Clawback" emitidos bajo el Contrato de IVC con relación a las reclamaciones

20 contra el Estado Libre Asociado permitidas bajo el Plan que surgen de, o están

21 relacionadas a, los Ingresos del Arbitrio al Ron del Estado Libre Asociado retenidos por

22 el Estado Libre Asociado y no transferidos a AFI.

1       (pp)   Transacciones de Restructuración: significa cada una de las transacciones

2   contempladas por, o en apoyo a, el Plan o una Modificación Elegible, incluyendo, pero

3   sin limitarse a, la emisión de los Bonos de Obligación General y los IVCs y la cancelación

4   o la extinción de las Reclamaciones Existentes conforme al Plan o una Modificación

5   Elegible, según sea el caso.

6   **ARTÍCULO 104. – AUTORIZACIÓN DE ACCIONES POR LAS ENTIDADES**

7   **GUBERNAMENTALES.**

8       Cada Entidad Gubernamental requerida a tomar o llevar a cabo cualquier acción

9   necesaria o conveniente para implementar el Plan y/o las Transacciones de

10   Restructuración queda por la presente autorizada a llevar a cabo y deberá llevar a cabo

11   todas aquellas acciones necesarias o convenientes para implementar el Plan o las

12   Transacciones de Restructuración, incluyendo, pero sin limitarse a, (a) negociar, entrar

13   en y suscribir cualquier acuerdo, escritura, certificado o documento, y (b) desembolsar o

14   transferir fondos según provisto y/o requerido en el Plan. La autorización provista en

15   este Artículo será suficiente para que el Representante del Gobernador, a nombre del

16   Estado Libre Asociado, y cualquier director ejecutivo, presidente u oficial de rango y

17   autoridad similar, a nombre de la Entidad Gubernamental que representa, pueda llevar

18   a cabo cualquier acción contemplada en el Plan y/o en las Transacciones de

19   Restructuración. Para evitar dudas, la autorización aquí establecida será tan amplia y

20   suficiente como lo permita el estado de derecho vigente para permitir que el Estado Libre

21   Asociado pueda establecer, financiar, y de otra manera implantar cualquiera y todas las

22   disposiciones y/o mecanismos incluidos en el Plan para proteger las pensiones de los

1    empleados gubernamentales retirados. Además, la Autoridad de Asesoría Financiera y

2    Agencia Fiscal de Puerto Rico queda por la presente autorizada a requerirle a cualquier

3    Entidad Gubernamental que cumpla con los requisitos establecidos en este Artículo.

4          En o antes de la Fecha de Efectividad, el Representante del Gobernador queda por

5    la presente autorizado a: (a) aprobar la oferta, venta y emisión de los Bonos de Obligación

6    General y los IVCs según contemplado en el Plan y dispuesto en los Capítulos 2 y 3 de

7    esta Ley, respectivamente; (b) proveer para la cancelación y extinción de las

8    Reclamaciones Existentes conforme a y de acuerdo con los términos del Plan o de una

9    Modificación Elegible, según aplicable; (c) autorizar el pago de los Costos de

10   Financiamiento de conformidad con los términos del Plan; (d) aprobar la forma del

11   Contrato de los Bonos de Obligación General, del Contrato de IVC, y de los otros

12   Acuerdos Complementarios y otorgar el Contrato de los Bonos de Obligación General, el

13   Contrato de IVC y los otros Acuerdos Complementarios a nombre del Estado Libre

14   Asociado; (e) incluir en los Acuerdos Complementarios cualquier pacto, término u otra

15   condición según pueda ser requerida por el Plan, incluyendo (1) consentir a nombre del

16   Estado Libre Asociado a la aplicación de las leyes del Estado de Nueva York para

17   gobernar e interpretar dichos Acuerdos Complementarios, y la jurisdicción de cualquier

18   tribunal estatal o federal, con relación a cualquier demanda o procedimiento relacionado

19   con los Bonos de Obligación General, los IVCs, los Acuerdos Complementarios y/o

20   cualesquiera otros asuntos relacionados a las Transacciones de Restructuración, y (2) la

21   creación de gravámenes sobre los dineros, valores y otros activos depositados con el

22   Fiduciario de los Bonos de Obligación General o el Fiduciario de los IVCs a beneficio de

1   los tenedores de los Bonos de Obligación General y los IVCs, respectivamente; y (f) llevar

2   a cabo cualesquiera y todas otras acciones necesarias o convenientes para efectuar las

3   Transacciones de Restructuración. Para evitar dudas, no obstante la aplicación de las

4   leyes del Estado de Nueva York para gobernar e interpretar cualquier Acuerdo

5   Complementario, la autorización por el Estado Libre Asociado del Contrato de Bonos de

6   Obligación General y el Contrato de IVC y la emisión por el Estado Libre Asociado de los

7   Bonos de Obligación General y los IVCs se gobernarán por las leyes del Estado Libre

8   Asociado, disponiéndose que, sujeto a los términos del Contrato de Bonos de Obligación

9   General y el Contrato de IVC, los tenedores de los Bonos de Obligación General y de los

10   IVCs, respectivamente, tendrán aquellos derechos y remedios de tenedores de deuda

11   pública del Estado Libre Asociado establecidos en las Secciones 2 y 8 del Artículo VI de

12   la Constitución del Estado Libre Asociado.

13        La autorización para emitir bonos conferida mediante la presente Ley estará

14   limitada únicamente a aquellos bonos contemplados por y requeridos para implementar

15   el Plan, y se hará conforme lo establezcan el propio Plan, los Contratos de Obligación

16   General, la Orden de Confirmación y los demás Acuerdos Complementarios. El

17   Gobernador de Puerto Rico o su Representante deberán solicitar la autorización de la

18   Asamblea Legislativa para cualquier emisión posterior que sea distinta a la aquí

19   permitida.

# CAPÍTULO 2 – LOS BONOS DE OBLIGACIÓN GENERAL

**ARTÍCULO 201.- EMISIÓN DE LOS BONOS DE OBLIGACIÓN GENERAL.**

(a)    A partir y luego de la Fecha de Efectividad, el Representante del Gobernador, estará autorizado para aprobar la oferta, venta y emisión de los Bonos de Obligación General, de tiempo en tiempo, de conformidad con las disposiciones del Contrato de Bonos de Obligación General, la Orden de Confirmación, el Plan y de los demás Acuerdos Complementarios, hasta una cantidad agregada inicial de principal de $7,414,063,543.25, y para aprobar la oferta, venta y emisión, de tiempo en tiempo, de Bonos de Obligación General adicionales, sujeto a las limitaciones contempladas en el Plan y establecidas en el Contrato de Bonos de Obligación General para retirar, refinanciar o cancelar los Bonos de Obligación General originalmente emitidos conforme al Plan y a la Orden de Confirmación.

(b)    Los Bonos de Obligación General incluirán bonos de interés corriente y bonos de revalorización de capital, estarán fechados, devengarán intereses, y vencerán en la fecha o fechas, que no excederán treinta (30) años de su fecha o fechas de emisión, y serán redimibles o podrán ser prepagados, en cada caso, en la medida en que sea aplicable y según sea determinado por el Representante del Gobernador, como representante del Estado Libre Asociado, y autorizado en el Contrato de Bonos de Obligación General de conformidad y consistente con el Plan. El Representante del Gobernador, como representante del Estado Libre Asociado, determinará la forma y manera de emitir de los Bonos de Obligación General y establecerá su denominación o denominaciones, el lugar o los lugares de pago y sus demás términos, conforme a y consistente con el Plan. A

1   discreción del Representante del Gobernador, los Bonos de Obligación General podrán

2   ser emitidos en una o más series separadas.

3   (c)    Los Bonos de Obligación General serán obligaciones legales, válidas y

4   vinculantes del Estado Libre Asociado, emitidos conforme al Artículo VI, Sección 2 de la

5   Constitución del Estado Libre Asociado, y serán pagaderos conforme a los términos del

6   Contrato de Bonos de Obligación General y de los otros Acuerdos Complementarios.

7   (d)    Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en

8   cualquier Bono de Obligación General autorizado bajo esta Ley deje de ocupar su cargo

9   previo a la entrega de dichos Bonos de Obligación General, dicha firma o facsímil de la

10   firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos

11   como si dicho oficial hubiese permanecido en su cargo hasta dicha entrega. Además,

12   cualquier Bono de Obligación General podrá contener la firma o facsímil de la firma de

13   aquellas personas que, al momento de la emisión de dicho bono, sean los oficiales

14   autorizados a firmarlo, pero que, en la fecha del Bono de Obligación General, no

15   ocupaban su puesto.

16   (e)    Los Bonos de Obligación General emitidos de conformidad con las

17   disposiciones de esta Ley se considerarán instrumentos negociables bajo las leyes de

18   Puerto Rico.

19   (f)    Los Bonos de Obligación General autorizados por esta Ley se podrán emitir

20   como bonos de cupón o en forma registrada, o ambos, según se establezca en el Contrato

21   de Bonos de Obligación General.

1 **ARTÍCULO 202.- EMPEÑO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE**

2 **IMPONER CONTRIBUCIONES.**

3 La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre

4 Asociado quedan por la presente empeñados para el pago puntual del principal e interés

5 de los Bonos de Obligación General emitidos bajo las disposiciones de esta Ley según y

6 cuándo venzan de conformidad con los términos del Contrato de Bonos de Obligación

7 General. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar

8 el principal e interés de los Bonos de Obligación General según venzan o tras su redención

9 o prepago de conformidad con el Contrato de Bonos de Obligación General, de los

10 recursos disponibles del Estado Libre Asociado en el Año Fiscal en que dicho pago sea

11 requerido. Las disposiciones de esta Ley con relación al pago de principal e interés en los

12 Bonos de Obligación General se considerarán una obligación continua para que el

13 Secretario de Hacienda haga dichos pagos, aunque no se hayan hecho asignaciones

14 específicas para dichos propósitos. Se autoriza e instruye al Representante del

15 Gobernador a incluir en el Contrato de Bonos de Obligación General el compromiso que

16 aquí establece el Estado Libre Asociado con relación a los Bonos de Obligación General.

17 Los Bonos de Obligación General establecerán que la buena fe, el crédito y el poder de

18 imponer contribuciones del Estado Libre Asociado están empeñados para el pago de las

19 obligaciones allí establecidas.

1 **ARTÍCULO 203.- FONDO DEL SERVICIO DE LA DEUDA; GRAVAMEN**

2 **ESTATUTARIO.**

3      (a)    Se autoriza al Representante del Gobernador a establecer el Fondo de

4 Servicio de la Deuda con el Fiduciario de los Bonos de Obligación General para el pago

5 de los Bonos de Obligación General. Hasta que los Bonos de Obligación General hayan

6 sido completamente pagados o satisfechos de conformidad con sus términos,

7 mensualmente, el Estado Libre Asociado depositará con el Fiduciario de los Bonos de

8 Obligación General una suma en efectivo en la cantidad agregada igual a (i) una sexta

9 parte (1/6) de la obligación semi anual del Estado Libre Asociado con relación al pago de

10 interés devengado sobre los Bonos de Obligación General y (ii) una doceava parte (1/12)

11 de la obligación anual del Estado Libre Asociado con relación al pago del principal de los

12 Bonos de Obligación General. Dichos fondos deberán mantenerse e invertirse por el

13 Fiduciario de los Bonos de Obligación General de conformidad con las disposiciones del

14 Contrato de Bonos de Obligación General.

15      (b)    A partir de la emisión, los Bonos de Obligación General estarán

16 garantizados automáticamente por un gravamen estatutario de primer rango sobre los

17 fondos depositados en el Fondo de Servicio de la Deuda, incluyendo cualquier ingreso o

18 recaudos generados de dichos fondos. Dicho gravamen estatutario de primer rango se

19 creará, surtirá efecto y se perfeccionará automáticamente, y será válido y vinculante a

20 partir y luego de la Fecha de Efectividad, sin que sea necesario acto o acuerdo alguno por

21 ninguna otra Persona. No será necesario otorgar, suscribir ni inscribir instrumento

22 alguno en ningún récord oficial ni en registro u oficina del gobierno alguna para

1   perfeccionar o continuar teniendo dicho gravamen estatutario de primer rango o para

2   establecer o mantener la prioridad aquí establecida. El gravamen establecido en este

3   Artículo será válido, vinculante y ejecutable, y estará perfeccionado contra todas las

4   Personas que tengan reclamaciones de cualquier tipo de daños, contractuales, o de

5   cualquier otro tipo contra el Estado Libre Asociado o sus activos independientemente de

6   si dichas Personas fueron notificadas sobre dicho gravamen.

7   **ARTÍCULO 204.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.**

8   Los Bonos de Obligación General, incluyendo, pero sin limitarse a, cualesquiera

9   pagos o ingresos con relación a los Bonos de Obligación General y la transferencia de los

10   Bonos de Obligación General, estarán, en todos momentos, totalmente exentos de todo

11   tipo de contribuciones (incluyendo, pero sin limitarse, a contribuciones sobre ingresos),

12   tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por

13   cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas.

14   Los tenedores y beneficiarios de los Bonos de Obligación General no tendrán que rendir

15   planillas o cualquier otro reporte de contribuciones o requisito similar con relación al

16   Estado Libre Asociado o cualquier Entidad Gubernamental por razón de tener, ser dueño

17   de o transferir Bonos de Obligación General.

18   **ARTÍCULO 205.- CONVENIOS DEL ESTADO LIBRE ASOCIADO.**

19   El Estado Libre Asociado, con la intención de quedar contractualmente obligado,

20   por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y

21   subsiguientes de los Bonos de Obligación General que, hasta que todas las obligaciones

1  relacionadas a dichos bonos hayan sido completamente satisfechas, de conformidad con

2  sus términos, el Estado Libre Asociado se obliga a lo siguiente:

3       (a)    no llevar a cabo ninguna acción que (1) impida el depósito mensual de los

4  fondos en el Fondo del Servicio de la Deuda conforme al Artículo 203 de esta Ley, (2)

5  limite o altere los derechos del Estado Libre Asociado de conformidad con el Plan y la

6  Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los

7  tenedores de los Bonos de Obligación General o (3) perjudique los derechos y remedios

8  de los tenedores de los Bonos de Obligación General;

9       (b)    hacer y llevar a cabo todos los actos permitidos por ley y que sean

10  razonablemente necesarios o deseables para asegurar que el pago de interés a los

11  tenedores de cualesquiera Bonos de Obligación General esté exento de pago de

12  contribuciones federales, y que sea y continúe estando excluido del ingreso bruto para

13  propósitos de contribuciones sobre ingresos federales, en la medida en que aplique; y

14       (c)    causar que cualquier Plan Fiscal del Estado Libre Asociado incluya

15  disposiciones para el pago en cada Año Fiscal del principal de e intereses sobre los Bonos

16  de Obligación General de conformidad con los términos del Contrato de Bonos de

17  Obligación General; y

18       (d)    en la medida necesaria para cumplir con sus obligaciones de pagar los Bonos

19  de Obligación General, aplicará (i) el producto del impuesto a la propiedad del 1.03%

20  recaudado conforme a la Ley 107-2020, según enmendada, conocida como "Código

21  Municipal de Puerto Rico, por el Centro de Recaudación de Ingresos Municipales del

22  Estado Libre Asociado de Puerto Rico, (ii) cualquier dinero que surja de la operación del

1    Artículo VI, Sección 8 de la Constitución del Estado Libre Asociado y (iii) cualquier otro

2    recurso disponible del Estado Libre Asociado para el pago del principal y los intereses (y

3    el valor acumulado) sobre dichos Bonos de Obligación General; disponiéndose que (A)

4    este convenio no le concede a los tenedores de dichos Bonos de Obligación General un

5    gravamen sobre dichos ingresos, dineros y recursos, y (B) para propósitos del

6    cumplimiento con este convenio, en la medida en que dichos ingresos, dineros y recursos

7    se transfieran al Fondo General del Estado Libre Asociado, se considerará que los pagos

8    de principal e intereses (y del valor acumulado) realizados a los tenedores de los Bonos

9    de Obligación General provenientes del Fondo General del Estado Libre Asociado se han

10   hecho de dichos ingresos, dineros y recursos en el orden establecido anteriormente.

11   **CAPÍTULO 3 – LOS INSTRUMENTOS DE VALOR CONTINGENTE**

12   **ARTÍCULO 301.- EMISIÓN DE LOS IVCS.**

13   (a)    A partir y luego de la Fecha de Efectividad, el Representante del

14   Gobernador estará autorizado para aprobar la oferta, venta y emisión, conforme a los

15   términos del Contrato de IVC, la Orden de Confirmación, el Plan y los Acuerdos

16   Complementarios, de IVCs en dos subseries – los IVCs de Obligación General y los IVCs

17   "Clawback" – hasta una cantidad agregada de $3,500,000,000 y $5,239,002,764,

18   respectivamente. Cada serie de los IVCs podrá incluir una o más subseries.

19   (b)    Los IVCs tendrán fecha y vencerán en el tiempo o tiempos que determine

20   el Representante del Gobernador, como representante del Estado Libre Asociado, y

21   autorizados en el Contrato de IVC, disponiéndose que los IVCs de Obligación General

22   vencerán no más tarde del Año Fiscal 2044 y que los IVCs "Clawback" vencerán no más

1    tarde del Año Fiscal 2052. Los IVCs no devengarán intereses y estarán sujetos a redención

2    según sea determinado por el Representante del Gobernador y autorizado en el Contrato

3    de IVC de conformidad y consistente con el Plan. El Representante del Gobernador

4    determinará la forma de los IVCs y la manera de emitir los IVCs, y establecerá la

5    denominación o denominaciones de los IVCs y el lugar o los lugares de pago de los

6    mismos y sus otros términos, todo de conformidad y consistente con el Plan.

7        (c)    Los IVCs serán obligaciones legales, válidas y vinculantes del Estado Libre

8    Asociado, emitidos de conformidad con el Artículo VI, Sección 2 de la Constitución del

9    Estado Libre Asociado, y pagaderos de conformidad con los términos del Contrato de

10   IVC y de los Acuerdos Complementarios, disponiéndose que, de conformidad con el

11   Contrato de IVC:

12       (1)   no se hará pago alguno a los tenedores de los IVCs (a menos que sean

13       tenedores de la Subserie de Reclamaciones del Arbitrio al Ron bajo las

14       circunstancias establecidas en el inciso (2) a continuación) en un Año Fiscal a

15       menos que durante el Año Fiscal anterior ocurra una Condición de Rendimiento

16       Superior del IVU;

17       (2)   no se hará pago alguno en un Año Fiscal a los tenedores de la Subserie

18       de Reclamaciones del Arbitrio al Ron a menos que durante el Año Fiscal anterior

19       ocurra una Condición de Rendimiento Superior del IVU o una Condición de

20       Rendimiento Superior del Arbitrio al Ron;

21       (3)   no se hará pago alguno a los tenedores de IVCs de Obligación General

22       o a los IVCs "Clawback" en exceso del Máximo Agregado de los IVCs de

1  Obligación General o del Máximo Agregado de los IVCs "Clawback",
2  respectivamente;

3      (4)  a partir de la fecha de vencimiento de cada serie de los IVCs, si el Estado
4  Libre Asociado ha hecho todos los pagos requeridos bajo dichas series conforme
5  al Contrato de IVC, se considerará que todas las obligaciones del Estado Libre
6  Asociado bajo dichas series han sido satisfechas y que las series no están en
7  circulación, aun si no se llegó al Máximo Agregado de los IVCs de Obligación
8  General o el Máximo Agregado de los IVC "Clawback", según sea el caso, para
9  dicha fecha.

10  (d)  Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en
11  cualesquiera IVCs autorizados bajo esta Ley deje de ocupar su cargo antes de la entrega
12  de dichos IVCs, dicha firma o facsímil de firma será, no obstante, válida y suficiente, y se
13  considerará para todos los propósitos como si dicho oficial hubiese permanecido en su
14  puesto hasta dicha entrega. Además, cualesquiera IVCs podrán tener la firma o facsímil
15  de firma de aquellas personas que, al momento en que se emitan dichos bonos, sean los
16  oficiales adecuados para firmarlos, pero que, en la fecha de los IVCs, no hayan estado
17  ocupando sus puestos.

18  (e)  Los IVCs emitidos conforme al Contrato de IVC son pagarés del Estado
19  Libre Asociado para todos los propósitos y se considerarán instrumentos negociables bajo
20  las leyes de Puerto Rico.

21  (f)  Los IVCs autorizados por esta Ley se emitirán de forma registrada.

1    (g)    Solamente para propósitos de calcular el servicio anual máximo de la deuda

2    pública del Estado Libre Asociado conforme al Artículo VI, Sección 2 de la Constitución

3    del Estado Libre Asociado, se asumirá que el servicio de la deuda pagadero bajo los IVCs

4    en cualquier Año Fiscal será igual a las cantidades máximas que podrían ser pagaderas

5    durante dicho Año Fiscal bajo los IVCs de conformidad con el Contrato de IVC.

6    (h)    Se establece que los servicios de la deuda pagadero bajo los IVCs en

7    cualquier Año Fiscal no menoscabarán bajo concepto alguno las obligaciones y reservas

8    creadas por la Corporación del Fondo de Interés Apremiante (COFINA).

9    **ARTÍCULO 302.- EMPEÑO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE**

10   **IMPONER CONTRIBUCIONES.**

11   La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre

12   Asociado quedan por la presente irrevocablemente empeñados para el pago puntual de

13   los IVCs emitidos bajo las disposiciones de esta Ley según y cuándo venzan de

14   conformidad con los términos del Contrato de IVC. El Secretario de Hacienda queda por

15   la presente autorizado y dirigido a pagar los IVCs según venzan o al momento de ser

16   redimidos de conformidad con el Contrato de IVC, de los recursos del Estado Libre

17   Asociado en el Año Fiscal en que dicho pago sea requerido, y las disposiciones de esta

18   Ley relacionadas al pago de los IVCs se considerarán una obligación continua del

19   Secretario de Hacienda para hacer los pagos en el Año Fiscal en que dicho pago sea

20   requerido, aun si no se han hecho asignaciones específicas para dicho propósito. El

21   Representante del Gobernador queda por la presente autorizado y dirigido a incluir en

22   el Contrato de IVC el compromiso que aquí establece el Estado Libre Asociado con

1   relación a los IVCs, y se establecerá en dichos IVCs que la buena fe, el crédito y el poder

2   de imponer contribuciones del Estado Libre Asociado están empeñados para el pago de

3   los mismos.

4   **ARTÍCULO 303.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.**

5       Los IVCs, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con

6   relación a los IVCs y la transferencia de los IVCs, estarán, en todos momentos, totalmente

7   exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones

8   sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre

9   Asociado o por cualquier Entidad Gubernamental, y de cualesquiera y todas las

10   retenciones relacionadas). Si los IVCs se emiten originalmente a un fideicomiso, las

11   distribuciones que haga dicho fideicomiso a sus beneficiarios atribuibles a pagos o

12   ingresos recibidos por el fideicomiso con relación a los IVCs y la transferencia de los IVCs

13   por el fideicomiso, si se permitiera, así como la transferencia del interés en dicho

14   fideicomiso, estarán, en todo momento, totalmente exentos de todo tipo de

15   contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas,

16   licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier

17   Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas). Los

18   tenedores y beneficiarios de los IVCs y/o de un interés en el fideicomiso que sea dueño

19   de los IVCs no tendrán que rendir planillas o cualquier otro reporte de contribuciones o

20   requisito similar con relación al Estado Libre Asociado o cualquier Entidad

21   Gubernamental por razón de tener, ser dueño de o transferir IVCs.

1  **ARTÍCULO 304.- CONVENIOS DEL ESTADO LIBRE ASOCIADO DE PUERTO**

2  **RICO.**

3      El Estado Libre Asociado, con la intención de quedar contractualmente obligado,

4  por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y

5  subsiguientes de los IVCs que, hasta que todas las obligaciones con relación a dichos

6  bonos hayan sido completamente pagadas o satisfechas de conformidad con sus

7  términos, el Estado Libre Asociado:

8      (a)    no llevará a cabo acción alguna que:

9          (i)    limite o altere los derechos del Estado Libre Asociado de

10              conformidad con el Plan y la Orden de Confirmación para cumplir con los

11              términos de cualesquiera acuerdos con los tenedores de los IVCs;

12          (ii)    perjudique los derechos y remedios de los tenedores de los IVCs; o

13          (iii)    limite la habilidad de los tenedores de los IVCs de monitorear el

14              rendimiento del IVU Medido y de los Ingresos del Arbitrio al Ron del

15              Estado Libre Asociado disponibles para el pago de los IVCs (de

16              conformidad con el Plan y según establecido en el Contrato de IVC);

17              disponiéndose, sin embargo, que lo anterior no impedirá que el Estado

18              Libre Asociado pueda ejercer su poder, mediante un cambio en la ley, de

19              eliminar el IVU Medido, o reemplazar el IVU Medido con un Impuesto

20              Sustituto Medido, cada uno de conformidad con el Contrato de IVC, que

21              protegerá a los tenedores de los IVC de que dicha eliminación o reemplazo

22              reduzca la probabilidad de que la Condición de Rendimiento Superior del

1    IVU se cumpla; y disponiéndose además que el Estado Libre Asociado

2    divulgará a tiempo la información que pueda ser requerida bajo el Contrato

3    de IVC con relación al IVU Medido, los recaudos del impuesto sobre ventas

4    y uso, y cualesquiera ajustes a los umbrales base del 5.5% del IVU

5    realizados de conformidad con el Contrato de IVC;

6    (b)    causará que cualquier Plan Fiscal del Estado Libre Asociado presentado a

7    la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA

8    luego de la Fecha de Efectividad, mientras dicha entidad esté presente y en funciones en

9    Puerto Rico incluya disposiciones para el pago en cada Año Fiscal del principal de e

10   intereses sobre los IVCs de conformidad con los términos del Contrato de IVC en la

11   medida en que la Condición de Rendimiento Superior del IVU o la Condición de

12   Rendimiento Superior del Arbitrio al Ron, según sean aplicables, ocurran durante el Año

13   Fiscal anterior.

14   **CAPÍTULO 4 – MUNICIPIOS**

15   **ARTÍCULO 401.- FONDO EXTRAORDINARIO**

16   Se crea el "Fondo Extraordinario para Atender el Recogido y Disposición de

17   Residuos, Desperdicios y para Implementar Programas de Reciclaje en los Municipios",

18   en adelante el "Fondo Extraordinario", el cual estará dentro del "Fondo de Equiparación

19   de los Municipios" dispuesto en el Artículo 7.015 de la Ley 107-2020, según enmendada,

20   pero en una cuenta separada de otros ingresos de dicho fondo, y que se utilizará para los

21   propósitos específicos dispuestos en esta Ley.

22   **ARTÍCULO 402.-** Declaración de Política Pública

1    El Gobierno de Puerto Rico por la presente declara que es la política pública del

2    Estado Libre Asociado el garantizar a su población el recogido y disposición eficiente de

3    la basura, desperdicios sólidos, escombros, así como la implementación de programas de

4    reciclaje para atender estos residuos, por lo que en la medida que el Plan de Ajuste de la

5    Deuda incluya reducciones en el monto de la deuda garantizada estas economías que se

6    generarán deberán hacerse accesibles a los municipios para que puedan brindar estos

7    servicios.

8    **ARTÍCULO 403.- REMISIÓN DE AHORROS EN EL PAGO DE DEUDA AL FONDO**

9    **EXTRAORDINARIO**

10   El Fondo Extraordinario establecido en el Artículo 401 de esta Ley se nutrirá de

11   una asignación anual del Fondo General, la cual será equivalente a la reducción de deuda

12   estatal del Plan de Ajuste de Deuda basada en la contribución del 1.03 de la propiedad

13   mueble e inmueble, la cual no será menor de sesenta y dos millones de dólares

14   ($62,000,000).

15   **Artículo 404.- PROPÓSITOS DEL FONDO EXTRAORDINARIO**

16   Los municipios solo podrán acceder a los recursos económicos del Fondo

17   Extraordinario aquí dispuesto, exclusiva y específicamente, para los propósitos descritos

18   a continuación:

19   (a)    recogido y disposición de basura;

20   (b)    recogido y disposición desperdicios sólidos;

21   (c)    recogido y disposición de escombros;

22   (d)    implementación, recogido y disposición de reciclaje.

1 **Artículo 405.- FÓRMULA DE DISTRIBUCIÓN ENTRE MUNICIPIOS**

2     A fin de lograr una justa distribución de los recursos del Fondo Extraordinario, se

3 utilizará los siguientes criterios para determinar las cantidades a las que pueden tener

4 acceso los municipios:

5     (a)     El total de personas beneficiarias del Programa de Asistencia Nutricional,

6 per cápita, según certificación al efecto emitida por el Departamento de la Familia, que

7 sea determinado en el año fiscal inmediatamente anterior o en el año fiscal más próximo

8 que se tenga la información.

9     (b)     El presupuesto funcional per cápita de cada municipio, del año fiscal

10 inmediatamente anterior o del año fiscal más próximo que se tenga la información.

11     (c)     El valor tasado de la propiedad tributable per cápita ubicada dentro de los

12 límites territoriales de cada municipio, correspondiente al año fiscal inmediatamente

13 anterior o al año fiscal más próximo que se tenga la información.

14     (d)     La población del municipio por milla cuadrada, según el último censo

15 decenal.

16     La metodología para la distribución será determinada por los parámetros

17 dispuestos en este artículo, pero podrán incorporarse aquellos parámetros existentes para

18 la distribución de los recursos del Fondo de Equiparación de los Municipios, siempre y

19 cuando no sean contrarios a los propósitos y objetivos aquí descritos, por la Junta de

20 Gobierno del CRIM. La aplicación de dicha metodología deberá beneficiar aquellos

21 municipios que reciben el menor ingreso por contribución sobre la propiedad u otras

1  fuentes, así como a los municipios con el mayor número de dependientes del Programa

2  de Asistencia Nutricional y de mayor densidad poblacional.

3  **CAPÍTULO 5– ENMIENDA Y DEROGACIÓN DE CIERTAS LEYES PARA ALLEGAR**

4  **FONDOS AL FONDO GENERAL Y GARANTIZAR QUE TODA LEGISLACIÓN**

5  **CUMPLA CON LA DISPONIBILIDAD DE FONDOS ESTABLECIDOS EN EL PLAN**

6  **FISCAL.**

7  **ARTÍCULO 501.- SE ENMIENDA EL INCISO (A) DEL ARTÍCULO 3 DE LA LEY**

8  **NÚM. 147 DE 18 DE JUNIO DE 1980, SEGÚN ENMENDADA, PARA QUE LEA**

9  **COMO SIGUE:**

10  "Artículo 3.- Facultades y Deberes de la Oficina de Gerencia y Presupuesto.

11  (a) La Oficina de Gerencia y Presupuesto bajo las reglas, reglamentos,

12  instrucciones y órdenes que el Gobernador prescribiere, asesorará al Primer Ejecutivo, a

13  la Asamblea Legislativa y a los organismos gubernamentales en los asuntos de índole

14  presupuestarios, programáticos y de gerencia administrativa, así como en asuntos de

15  naturaleza fiscal relativos a sus funciones; llevará a cabo las funciones necesarias que

16  permitan al Gobernador someter a la Asamblea Legislativa la propuesta del Presupuesto

17  General del Gobierno, de conformidad con el Artículo 4 de esta Ley, incluyendo las

18  Corporaciones Públicas. A su vez, velará por que la ejecución y administración del

19  presupuesto por parte de los organismos públicos se conduzcan de acuerdo con las leyes

20  y resoluciones de asignaciones, con las más sanas y adecuadas normas de administración

21  fiscal y gerencial, y en armonía con lo dispuesto por el Plan de Crecimiento Económico y

22  Fiscal aprobado de conformidad con la Ley de Responsabilidad Fiscal y de Revitalización

1    Económica de Puerto Rico (el "Plan Fiscal y de Crecimiento Económico") y con los

2    propósitos programáticos para los cuales se asignan o proveen los fondos públicos.

3    Evaluará los programas y actividades de los organismos públicos en términos de

4    economía, eficiencia y efectividad y le someterá al Gobernador informes con

5    recomendaciones para la implantación de las mismas. Además, preparará y mantendrá

6    el control de todos aquellos documentos fiscales y presupuestarios que sean necesarios

7    para la administración del presupuesto y efectuará los cambios, enmiendas o ajustes que

8    se ameriten, sujeto a las disposiciones legales y normas establecidas por la Asamblea

9    Legislativa, y el Gobernador. A estos fines, y con el propósito de que la Asamblea

10   Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal

11   Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer

12   y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las

13   medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de

14   cinco (5) días laborables contados a partir desde que se le son requeridas. Presentará junto

15   al Secretario de Hacienda un informe detallado con respecto a las proyecciones de

16   ingresos y gastos del año fiscal siguiente y correspondiente al Presupuesto General

17   propuesto ante la Asamblea Legislativa en un término que no excederá cinco (5) días

18   calendario luego de la presentación de la propuesta de Presupuesto General del Gobierno

19   del Estado Libre Asociado de Puerto Rico por parte el Gobernador. Se mantendrá atento

20   a las nuevas corrientes y tendencias en el ámbito presupuestario y gerencial de la

21   administración pública para evaluar y adaptar aquellas técnicas, métodos y enfoques que

22   apliquen al campo administrativo local, tanto en la formulación y ejecución del

1   presupuesto como en la evaluación de programas, el análisis gerencial y la auditoría

2   operacional y administrativa. Además, deberá proponer aquella legislación que se

3   considere necesaria y conveniente para incorporar dichos enfoques y tendencias a

4   nuestro proceso presupuestario y administrativo.

5        (b)    …"

6   **ARTÍCULO 502.- SE ENMIENDA EL ARTÍCULO 3 DE LA LEY 44 DE 21 DE JUNIO**

7   **DE 1988, SEGÚN ENMENDADA, CONOCIDA COMO LA LEY DE LA AUTORIDAD**

8   **PARA EL FINANCIAMIENTO DE LA INFRAESTRUCTURA DE PUERTO RICO,**

9   **PARA QUE LEA COMO SIGUE:**

10      **Artículo 3.- Definiciones**

11      "Las siguientes palabras y términos, cuando sean usados o se haga referencia a los

12   mismos en esta Ley, tendrán los significados que se indican a continuación, a no ser que

13   del contexto se entienda claramente otra cosa:

14      (a) …

15      …

16      (j) Fondo de Desarrollo — Significará el Fondo de Desarrollo de Infraestructura

17   creado bajo el Artículo 25 de esta Ley, conforme a lo dispuesto en la Ley Núm. 54 de 4 de

18   Agosto de 1997 (27 L.P.R.A. § 431 et seq.)

19      (k) …

20      …

1    (r) Cuenta del Corpus — Significará la cuenta del corpus del Fondo de Desarrollo

2    según se establece en el inciso (a) del Artículo 25 de esta Ley. Los rendimientos de capital

3    que genere esta cuenta deberán utilizarse según se establece en el Artículo 25 de esta Ley.

4    (s) Cuentas adicionales — Significará cuentas creadas dentro del Fondo de

5    Desarrollo, además de la Cuenta del Corpus, que sean necesarias para llevar a cabo los

6    propósitos de esta Ley, según se establece en el inciso (a) del Artículo 25 de esta Ley."

7    **ARTÍCULO 503.- SE ENMIENDA EL INCISO (M) DEL ARTÍCULO 7 DE LA LEY 44**

8    **DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

9    Artículo 7. – Poderes Generales.

10    La Autoridad tendrá todos los poderes necesarios y convenientes para llevar a

11    cabo y efectuar los propósitos y disposiciones de esta Ley, incluyendo, pero sin que se

12    entienda como limitación, lo siguiente:

13    "(a) …

14    (m) Hipotecar o pignorar cualquier propiedad para el pago del principal de y los

15    intereses sobre cualesquiera bonos emitidos por la Autoridad o bonos emitidos por una

16    entidad beneficiada, y pignorar la totalidad o parte de los ingresos que la Autoridad

17    recibiese."

18    **ARTÍCULO 504.- SE DEROGAN LOS ARTÍCULOS 25 Y 34 DE LA LEY 44 DE 21 DE**

19    **JUNIO DE 1988, SEGÚN ENMENDADA, Y SE REENUMERAN LOS ARTÍCULOS 25-**

20    **A y 35 COMO LOS ARTÍCULOS 25 y 34, RESPECTIVAMENTE.**

21    **ARTÍCULO 505.- SE ENMIENDA EL ARTÍCULO 23.01 DE LA LEY 22-2000, SEGÚN**

22    **ENMENDADA, PARA QUE LEA COMO SIGUE:**

1        "Artículo 23.01. — Procedimiento para el pago de derechos.

2        Todo dueño de un vehículo de motor, sujeto al pago de derechos anuales de

3    permiso pagará en cualquier colecturía de rentas internas de cualquier municipio, en el

4    lugar que designe el Secretario del Departamento de Hacienda, en las estaciones oficiales

5    de inspección, bancos, o en el lugar que designe el Secretario, los derechos que

6    correspondan al vehículo para cada año, según se indican éstos en la notificación que al

7    efecto deberá enviarle el Secretario. Los derechos por este concepto se pagarán

8    anticipadamente por todo el año excepto que cuando al momento de pagar los derechos

9    resten menos de seis (6) meses para la próxima renovación, solo se requerirá el pago

10   equivalente a los meses que resten por transcurrir en la fecha en que se devengan,

11   contándose las fracciones de meses como un mes completo. Esta disposición aplicará a

12   todos los vehículos de motor, independientemente de la cantidad que paguen por

13   derecho de licencia por año. Al recibo de los derechos correspondientes, el colector

14   expedirá el permiso para vehículo de motor que consistirá del formulario de notificación

15   emitido por el Secretario, con las debidas anotaciones y firma del colector, indicativas de

16   que se ha efectuado el pago de los derechos. Junto con el permiso, el colector entregará el

17   correspondiente marbete o placas de número, según sea el caso. Sólo se exhibirá un (1)

18   marbete del vehículo de motor durante el año de vigencia del pago de derechos. Se

19   autoriza al Secretario a que, previa consulta con el Secretario de Hacienda, adopte un

20   Reglamento a los fines de conceder un descuento de hasta diez por ciento (10%) a aquellos

21   conductores que opten por adquirir y pagar anticipadamente marbetes multianuales para

22   sus vehículos. El dueño de la estación de inspección depositará en una cuenta especial

1  para que el Departamento de Hacienda haga transferencias diarias de los marbetes

2  expedidos. El Departamento de Hacienda aprobará un reglamento para estos fines, en el

3  cual requerirá una fianza y seguros para garantizar que se reciban los recaudos de los

4  marbetes vendidos. El cargo por servicio que cobre la estación de inspección, el banco o

5  cualquier otro lugar que designe el Secretario de Hacienda no será mayor de cinco dólares

6  ($5). En los casos referentes a derechos de exámenes, incluyendo licencias de aprendizaje,

7  expedición de duplicado de licencias, renovación de licencias de conducir, traspaso de

8  vehículos y todo otro cobro de derechos, se utilizarán comprobantes de pago, sellos de

9  rentas internas o cualquier otro mecanismo de pago que establezca el Secretario de

10  Hacienda."

11  **ARTÍCULO 506.- SE ENMIENDA EL ARTÍCULO 23.02 DE LA LEY 22-2000, SEGÚN**

12  **ENMENDADA, PARA QUE LEA COMO SIGUE:**

13  "Artículo 23.02. — Derechos a pagar. Con relación a los derechos a pagar bajo esta

14  Ley, se seguirán las normas siguientes:

15  (a) …

16  …

17  (e)…

18  (f)…"

19  **ARTÍCULO 507. - SE ENMIENDA EL ARTÍCULO 1.03(B) DE LA LEY 351-2000,**

20  **SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

21  Artículo 1.03 (b). — Definiciones.

1       Las siguientes palabras y términos, cuando sean usados o se haga referencia a los

2   mismos en esta Ley, tendrán el significado indicado a continuación, a menos que del

3   contexto surja otro significado:

4       (a) …

5       …

6       (l) …

7       (m) …

8       (n) …

9       (ñ) …

10      (o) …"

11  **ARTÍCULO 508. - SE ENMIENDA EL INCISO (H) DEL ARTÍCULO 2.02 DE LA LEY**

12  **351-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

13      **Artículo 2.02 – Poderes Específicos de la Autoridad.**

14      "La Autoridad tendrá las siguientes facultades y derechos"

15      (a) …

16      (h) Tomar préstamos con el propósito de financiar los costos del Centro, los

17  proyectos de mejoramiento y proyectos en las parcelas privadas o el Distrito y cumplir

18  con cualquiera de sus propósitos y poderes corporativos, a discreción de la Junta; hacer

19  y emitir bonos negociables de la Autoridad; garantizar el pago de dichos bonos, o

20  cualquier parte de los mismos, mediante la prenda, hipoteca, cesión o escritura de

21  fideicomiso de propiedades de la Autoridad localizadas en o fuera del Distrito, cargos

22  por beneficio, otros ingresos, rentas, cuotas, recibos y cualquier interés en contratos,

1   arrendamientos o subarrendamientos; entrar en cualesquiera acuerdos con los

2   compradores o tenedores de dichos bonos o con otras personas con las cuales la

3   Autoridad está obligada con relación a cualquier bono, emitido o por ser emitido, según

4   la Autoridad considere aconsejable, los cuales constituirán contratos con dichos

5   compradores o tenedores; obtener cualquier facilidad que aumente su capacidad para

6   tomar dinero a préstamo o emitir deuda o que aumente su liquidez con relación a

7   cualesquiera bonos en la forma en que la Autoridad determine ventajosa; y, en general,

8   proveer garantías para el pago de los bonos y los derechos de los tenedores de éstos."

9   **ARTÍCULO 509.- SE ENMIENDA EL ARTÍCULO 8 DE LA LEY 179-2002, SEGÚN**

10  **ENMENDADA, PARA QUE LEA COMO SIGUE:**

11      "Artículo 8.- Las agencias gubernamentales, los municipios, así como las entidades

12  recipientes de asignaciones de fondos públicos los utilizarán para los fines establecidos

13  en la resolución conjunta correspondiente y de ninguna manera, dispondrán de los

14  mismos para otros propósitos o fines que no estén señalados de manera categórica y

15  específica en la resolución conjunta aprobada.

16      Cualquier cambio o modificación de los propósitos o fines establecidos en la

17  resolución conjunta original, conllevará el inicio o repetición por la Asamblea Legislativa

18  de todos los procedimientos.

19      El cumplimiento con estas resoluciones conjuntas, asignando fondos públicos, se

20  hará siguiendo las normas y procedimientos aplicables a los municipios y a las

21  instrumentalidades gubernamentales. Con excepción de las personas naturales, todos los

1     contratos suscritos y cualquiera otro documento legal estarán sujetos a las leyes del

2     Estado Libre Asociado de Puerto Rico y serán interpretados de acuerdo a las mismas.

3         Con el propósito de que la Asamblea Legislativa pueda analizar que las

4     asignaciones o reasignaciones de fondos públicos dispuestos en esta Ley cumplen con el

5     Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial

6     de proveer y enviar una certificación oficial que valide la disponibilidad de fondos

7     respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas

8     en un plazo de cinco (5) días laborales contados a partir desde que se le son requeridas."

9     **ARTÍCULO 510.- SE ENMIENDA EL ARTÍCULO 31 DE LA LEY NÚM. 272 DE 9 DE**

10     **SEPTIEMBRE DE 2003, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

11         "Artículo 31. — Disposición de Fondos.

12     La Oficina de Turismo distribuirá las cantidades recaudadas por concepto del Impuesto

13     fijado en el Artículo 24 de esta Ley, de la siguiente manera:

14         (i) dos (2) por ciento del Impuesto total recaudado ingresará mensualmente a los

15     fondos generales de la Oficina de Turismo para cubrir los gastos de operación, manejo y

16     distribución de los recaudos del Impuesto, o para cualquier otro uso que disponga la

17     Oficina de Turismo. (ii) cinco (5) por ciento del Impuesto total recaudado ingresará

18     mensualmente al Fondo General del Departamento de Hacienda para los Años Fiscales

19     2005-2006 y 2006-2007, a las arcas de la Compañía de Parques Nacionales para los Años

20     Fiscales 2007-2008 y 2008-2009, y a partir del Año Fiscal 2009-2010 a las arcas de la Oficina

21     de Turismo. A partir del año en que la Autoridad certifique al Departamento de Hacienda

22     y a la Oficina de Turismo, el inicio de las operaciones del Centro de Convenciones, y

1    durante los diez (10) años subsiguientes, este cinco por ciento (5%) estará disponible para

2    cubrir cualquier déficit, si alguno, que surja de las operaciones de las facilidades que

3    opera la Autoridad del Distrito del Centro de Convenciones, en reserva que mantendrá

4    la Oficina de Turismo. Disponiéndose, sin embargo, que para cada año fiscal y/o cada

5    vez que la Autoridad del Distrito del Centro de Convenciones proponga presentar un

6    presupuesto que exceda el déficit de dos millones quinientos mil (2,500,000) dólares, el

7    presupuesto de la Autoridad del Distrito del Centro de Convenciones deberá ser

8    presentado a la Junta de Directores de la Autoridad a la Oficina de Turismo y al Secretario

9    de Hacienda para los Años Fiscales 2005-2006 y 2006-2007 y a la Junta de Directores de la

10   Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 en una

11   reunión específica a estos fines, y a la Junta de Directores de la Autoridad y a la Oficina

12   de Turismo, comenzando el Año Fiscal 2010-2011 en adelante. Este cinco por ciento (5%)

13   se mantendrá disponible durante cada año fiscal en una cuenta de reserva especial que

14   mantendrá la Oficina de Turismo para cubrir cualquier déficit en exceso de dos millones

15   quinientos mil (2,500,000) dólares, que surja de la operación de las facilidades de la

16   Autoridad del Distrito del Centro de Convenciones. Para cada año fiscal, cualquier

17   sobrante, luego de cubrir dicho déficit operacional, si alguno, se liberará de la reserva

18   especial y estará disponible para el uso del Departamento de Hacienda para los Años

19   Fiscales 2005-2006 y 2006-2007, de la Compañía de Parques Nacionales para los Años

20   Fiscales 2007-2008 y 2008-2009 y a partir del Año Fiscal 2010-2011 para el uso de la Oficina

21   de Turismo. A partir del Año Fiscal 2015-2016, y durante los cinco (5) años subsiguientes,

22   este cinco por ciento (5%) será transferido mediante aportaciones trimestrales por el

1    Departamento a la Autoridad para cubrir los costos asociados exclusivamente a la

2    operación del Centro de Convenciones de Puerto Rico. Disponiéndose, sin embargo, que

3    para cada año fiscal la Autoridad del Distrito del Centro de Convenciones deberá

4    presentar sus estados financieros auditados, conjuntamente con un informe evidenciando

5    el uso de los fondos transferidos según establecido en los incisos (ii) y (iv) de este

6    apartado a la Junta de Directores de la Autoridad y al Director de la Oficina de Turismo,

7    en una reunión específica a esos efectos. Si al finalizar algún año fiscal tales estados

8    financieros auditados reflejan una ganancia neta, la Autoridad del Distrito del Centro de

9    Convenciones devolverá a la Oficina de Turismo la cantidad generada como ganancia

10   neta sin exceder el monto total transferido por la Oficina de Turismo a la Autoridad del

11   Distrito del Centro de Convenciones en ese mismo año fiscal, por virtud de los incisos (ii)

12   y (iv) de este apartado. (iii) dos millones quinientos mil (2,500,000) dólares serán

13   transferidos por la Oficina de Turismo a la Autoridad del Distrito del Centro de

14   Convenciones en aportaciones trimestrales de seiscientos veinticinco mil (625,000.00)

15   dólares para cubrir los costos asociados exclusivamente a la operación del Distrito del

16   Centro de Convenciones. Disponiéndose, sin embargo, que para cada año fiscal y/o cada

17   vez que se proponga presentar un presupuesto modificado, el presupuesto de la

18   Autoridad del Centro de Convenciones deberá ser presentado a la Junta de Directores de

19   la Autoridad y Director Ejecutivo de la Oficina de Turismo, en una reunión específica a

20   esos efectos. Esta cantidad será transferida según establecido en este apartado a partir del

21   Año Fiscal 2015-2016, y por un período de cinco (5) años. (iv) Hasta cuatro millones

22   (4,000,000) de dólares se mantendrán disponibles durante cada año fiscal, en una cuenta

1    de reserva especial que mantendrá la Oficina de Turismo para gastos operacionales

2    dedicados a los asuntos especializado del sector, sus gastos y/o la fiscalización e

3    implementación por este del Contrato de Servicios de Mercadeo de Destino contemplado

4    en el Artículo 8 de la "Ley para la Promoción de Puerto Rico como Destino". (v) El

5    remanente que resulte después de las asignaciones y reservas dispuestas en los incisos

6    (i), (ii), (iii) y (iv), hasta un tope de veinticinco millones (25,000,000) de dólares, se le

7    asignarán a la Corporación. Los fondos asignados a la Corporación serán utilizados por

8    esta para la promoción, mercadeo, desarrollo y fortalecimiento de la industria turística

9    en Puerto Rico. Si el remanente excediera los veinticinco millones (25,000,000) de dólares,

10   dicho exceso será utilizado por la Oficina de Turismo para el desempeño de sus funciones

11   dedicados a los asuntos especializado del sector y sus gastos. La Oficina de Turismo del

12   Departamento de Desarrollo Económico y Comercio le someterá mensualmente a la

13   Autoridad y a la Corporación un desglose de los recaudos por concepto del impuesto."

14   **ARTÍCULO 511.- SE AÑADE UN NUEVO ARTÍCULO 7A A LA LEY 103-2006, SEGÚN**

15   **ENMENDADA, PARA QUE LEA COMO SIGUE:**

16        "Artículo 7A.- Deber Ministerial de la Oficina de Gerencia y Presupuesto

17        Con el propósito de que la Asamblea Legislativa pueda analizar que las medidas

18   legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto

19   tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la

20   disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por

21   las comisiones legislativas en un plazo de treinta (30) días laborables contados a partir

1   desde que se le son requeridas. Dicha certificación deberá incluir la cantidad exacta

2   disponible, sea mayor o menor a la dispuesta en la medida en consideración.

3        Al emitir la certificación oficial, la Oficina de Gerencia y Presupuesto garantiza la

4   disponibilidad de dichos fondos. Una certificación oficial en donde se informe que los

5   fondos están comprometidos para una obra o uso específico distinto a la dispuesto en la

6   medida legislativa que se solicita deberá venir acompañada con la evidencia de la

7   obligación, copia de las facturas y cualquier otra información pertinente que demuestre

8   la no disponibilidad de dichos fondos.

9        El proceso para requerir las certificaciones oficiales de disponibilidad de fondos

10  por parte de las comisiones legislativas no requerirá de ningún formulario o trámite

11  especial, solo requerirá una misiva de la comisión legislativa solicitando la certificación

12  que se trate.

13       Cuando cualquier comisión permanente, especial o conjunta de la Asamblea

14  Legislativa de Puerto Rico presente cualquier informe recomendando la aprobación de

15  alguna medida legislativa en la cual se haya solicitado una certificación oficial tendrá que

16  incluir en el referido informe una sección titulada "Deber Ministerial de la Oficina de

17  Gerencia y Presupuesto referente a disponibilidad de fondos". En esta Sección, se

18  aseverará el impacto fiscal, si alguno, que se estime la aprobación de la medida tendría

19  sobre los presupuestos de las agencias, departamentos, organismos, instrumentalidades

20  o corporaciones públicas. Si la Oficina de Gerencia y Presupuesto no emite la

21  correspondiente certificación en el tiempo dispuesto en este Artículo, se incluirá en dicha

22  sección del informe el siguiente texto: "La Oficina de Gerencia y Presupuesto no

1     suministró la certificación oficial de disponibilidad de fondos en el tiempo dispuesto por

2     ley incumpliendo con el deber ministerial dispuesto en la Ley 103-2006, según

3     enmendada, mejor conocida como "Ley para la Reforma Fiscal del Gobierno del Estado

4     Libre Asociado de Puerto Rico de 2006".

5     **ARTÍCULO 512.- SE ENMIENDA LA SECCIÓN 3060.11 DE LA LEY NÚM. 1 DE 31 DE**

6     **ENERO DE 2011, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

7     Sección 3060.11 – Disposición de Fondos.

8     "El producto de los impuestos y derechos de licencia recaudados por virtud de

9     este Subtítulo ingresará en el Fondo General del Tesoro de Puerto Rico."

10     **ARTÍCULO 513.- SE ELIMINA LA SECCIÓN 3060.11 A DE LA LEY NÚM. 1 DE 31 DE**

11     **ENERO DE 2011, SEGÚN ENMENDADA.**

12     **ARTÍCULO 514.- SE DEROGA LA LEY NÚM. 39 DEL 13 DE MAYO DE 1976, SEGÚN**

13     **ENMENDADA.**

14     **ARTÍCULO 515.- SE ENMIENDA EL ARTÍCULO 7.018 DE LA LEY 107-2020, SEGÚN**

15     **ENMENDADA, PARA QUE LEA COMO SIGUE:**

16     "Artículo 7.018 – Fondos – Fideicomisos; Distribución

17     Los fondos en el fideicomiso general que el CRIM establece con el Fiduciario Designado

18     según el inciso (c) del Artículo 7.003 de este Capítulo, serán distribuidos por el CRIM en

19     el orden de prioridad que a continuación se indica:

20     (a) La cantidad que corresponda a la contribución especial del 1.03% será depositado

21        en el Fondo General.

22     (b) …

1   (c) …

2        …"

3   **ARTÍCULO 516.- SE ENMIENDA EL ARTÍCULO 7.027 DE LA LEY 107-2020, SEGÚN**

4   **ENMENDADA, PARA QUE LEA COMO SIGUE:**

5   Artículo 7.027 – Recaudación e Ingreso de Contribuciones en Fondos y Aplicación del

6   Producto de las Contribuciones (Fondo de Redención de Bonos)

7   El producto de las contribuciones que se imponen por los Artículos 7.025 y 7.026 ingresará

8   al fideicomiso general establecido por el CRIM con la Autoridad de Asesoría Financiera

9   y Agencia Fiscal de Puerto Rico (AAFAF), de conformidad con el Capítulo I de este libro.

10      (a) El producto de las contribuciones especiales sobre la propiedad impuesta por el

11          Artículo 7.026 ingresará al Fondo General.

12      (b) …

13      (c) …

14      (d) …"

15  **CAPÍTULO 6 – DISPOSICIONES MISCELÁNEAS**

16  **Artículo 601.-Prohibición del menoscabo de las Obligaciones de la Corporación del**

17  **Fondo de Interés Apremiante (COFINA)**

18      Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier Año

19  Fiscal no menoscabarán bajo concepto alguno las obligaciones de la Corporación del

20  Fondo de Interés Apremiante (COFINA), incluyendo las obligaciones y reservas creadas.

1  **Artículo 602.-Autorización al Representante del Gobernador**

2     Las responsabilidades, facultades, deberes y autorizaciones concedidas por la

3  presente Ley al Representante del Gobernador, estará limitada exclusivamente a lo

4  dispuesto en esta Ley y no a futuras emisiones de deudas"

5  **Artículo 603.- Separabilidad.**

6     Si cualquier clausula, párrafo, subpárrafo, acápite o parte de esta Ley fuera

7  anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará,

8  perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará

9  limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición,

10  sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así

11  hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una

12  circunstancia de cualquier clausula, párrafo, subpárrafo, oración, palabra, letra, artículo,

13  disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley

14  fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal

15  efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas

16  Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e

17  inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las

18  disposiciones y la aplicación de esta Ley, aunque se deje sin efecto, anule, invalide,

19  perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto,

20  invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

21  **Artículo 604.- Supremacía.**

1    Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición

2    general o especifica de cualquier otra ley o reglamento del Gobierno que sea inconsistente

3    con esta Ley.

4    **Artículo 605.- Vigencia.**

5    Esta Ley comenzará a regir inmediatamente luego de su aprobación, excepto por

6    el Capítulo 5 de esta Ley, el cual comenzará a regir en la Fecha de Efectividad. Las

7    Transacciones de Restructuración de deuda autorizadas mediante la presente Ley, están

8    totalmente sujetas y condicionadas a que la Junta de Supervisión y Administración

9    Financiera (JSAF) no apruebe recorte alguno a las pensiones de los empleados

10   gubernamentales retirados en el Plan de Ajuste o Reestructuración."

# EXHIBIT K

Draft Legislation as approved by the Senate of Puerto Rico[1]

---

[1] The annexed draft legislation, passed by the Senate of Puerto Rico, provides for the issuances of the general obligation bonds and the contingent value instruments, and is required to be included in the Plan Supplement.  However, as set forth in a published statement of the Oversight Board, see Oversight Board Statement, dated October 8, 2021, the Oversight Board does not support the current version of the draft legislation, asserts that it is inconsistent with the proposed Plan, and reserves all rights in connection therewith.

**(P. de la C. 1003)**

# LEY

Para crear la "Ley para Ponerle Fin a la Quiebra de Puerto Rico", establecer las disposiciones y condiciones para aprobar la oferta, venta y emisión de los diferentes tipos de Bonos de Obligación General, así como para disponer la creación de los Instrumentos de Valor Contingente; establecer la política pública de protección y el mecanismo de restitución de fondos de los municipios afectados por cualesquiera recortes impuestos por el Plan de Ajuste propuesto como parte del procedimiento de Título III de PROMESA; establecer la política pública de protección a las pensiones de nuestros retirados; reconocer las pensiones vigentes como deudas del Gobierno de Puerto Rico y su inalterabilidad; establecer la declaración de política pública sobre temas de educación superior, cubiertas médicas de empleados públicos y los ciudadanos, así como para el desarrollo económico; establecer un mecanismo que le permita al Gobierno del Estado Libre Asociado de Puerto Rico adelantar los términos de pagos y cancelación de la deuda; establecer un grupo de trabajo conjunto entre la Rama Legislativa, la Rama Ejecutiva y la Junta de Supervisión Fiscal; derogar la Ley Núm. 39 del 13 de mayo de 1976, según enmendada; enmendar el inciso (a) del Artículo 3 de la Ley Núm. 147 de 18 de junio de 1980, según enmendada; enmendar el Artículo 3 y el inciso (m) del Artículo 7, así como derogar los Artículos 25 y 34 y renumerar los Artículos 25-A y 35 como los Artículos 25 y 34, respectivamente, de la Ley Núm. 44 de 21 de junio de 1988, según enmendada; se deroga el inciso (e) de la Ley 22-2000, según enmendada, y se renumeran los actuales incisos f y g como los nuevos incisos e y f, respectivamente; se deroga el inciso (l) del Artículo 1.03(B) de la Ley 351-2000, según enmendada, y se renumeran los actuales incisos m, n, fl, o, y p como los nuevos incisos, l, m, n, fl, y o, respectivamente; enmendar el inciso (h) del Artículo 2.02 de la Ley 351-2000, según enmendada; enmendar el Artículo 8 de la Ley 1792002, según enmendada; enmendar el Artículo 31 de la Ley 272-2003, según enmendada; añadir un nuevo Artículo 7A a la Ley 103-2006, según enmendada; enmendar la Sección 3060.11 y eliminar la Sección 3060.11A de la Ley 1-2011, según enmendada; derogar la Ley Núm. 39 del 13 de mayo de 1976, según enmendada; enmendar el Artículo 7.018 y el Artículo 7.027 de la Ley 107-2020, según enmendada; enmendar el inciso (h) del Artículo 3 de la Ley Núm. 230 de 12 de julio de 1974, según enmendada, a los fines de tomar los pasos afirmativos necesarios para encaminar la salida de Puerto Rico del procedimiento de quiebras creado al amparo del Título III de la Ley PROMESA; cumplir con las disposiciones de la referida ley federal respecto a las condiciones mínimas necesarias para la culminación de la Junta de Supervisión y Administración Financiera; la vigencia de esta ley queda condicionada a cero recortes en las pensiones; y para otros fines relacionados.

EXPOSICIÓN DE MOTIVOS

En el año 2016, con el objetivo de proveerle un mecanismo al Gobierno de Puerto Rico para renegociar su deuda y controlar la potencial avalancha de reclamaciones por parte de sus acreedores, el Congreso de EE.UU. promulgó la ley federal conocida como la Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico, conocida como PROMESA. Esta ley estableció, en su Título III, un procedimiento de quiebras que incorporaba una amplia porción de las disposiciones del Código de Quiebras, al cual Puerto Rico tendría acceso en aras de reestructurar su monumental deuda. De igual forma, creó una entidad que tomaría el control de todos los aspectos presupuestarios, financieros y de administración fiscal de Puerto Rico denominada *Financial Oversight and Management Board*, o Junta de Supervisión y Administración Financiera (JSAF). En efecto, la JSAF pasaría a supervisar y controlar esencialmente todos los aspectos fiscales y presupuestarios del Gobierno del Estado Libre Asociado de Puerto Rico.

El 3 de mayo de 2017, la JSAF, presentó una petición de reestructuración de deuda al amparo del Título III de PROMESA. La presentación de esta petición ante el Tribunal de Título III dio comienzo al procedimiento de quiebras más grande en la historia de los mercados municipales de EE.UU., al cual pertenecen los bonos y las obligaciones del Estado Libre Asociado de Puerto Rico. Para tener presente la magnitud de este evento debe considerarse que se estimaba que el Estado Libre Asociado tendría que reestructurar $35 mil millones como parte del mencionado proceso de restructuración.

Tras más de cuatro años de presentada la petición de quiebras al amparo del Título III de PROMESA, la Junta ha presentado una séptima versión enmendada del Plan de Ajuste o Reestructuración de la Deuda (PDA) para Puerto Rico ante el Tribunal de Título III. Este Plan es el resultado de varios años de negociación entre la JSAF, en su calidad de representante exclusivo de Puerto Rico ante el Tribunal de Título III, y un sinnúmero de clases de acreedores de obligaciones del Gobierno central.

La alternativa a estos escenarios es la aprobación del Plan, con el acuerdo de política pública que se expone en esta Ley que incluye cero recortes a las pensiones y los siguientes acuerdos en bienestar del pueblo de Puerto Rico:

1.  Proteger las pensiones de nuestros retirados. Este objetivo tiene el propósito de evitar recortes a las pensiones del 100% de los retirados. Esta protección estará establecida en la presente legislación y en cualquier legislación futura. Para lograr ese objetivo, se dispone en esta Ley una cláusula específica sobre este asunto.

2.  Asignación fija de $500 millones de presupuesto para la Universidad de Puerto Rico por un periodo de cinco años, congelando los recortes

programados. Esta meta tiene el propósito de conservar la capacidad de la UPR para llevar a cabo su vital misión educativa y asegurando los recursos necesarios para garantizar la acreditación de todos sus programas y lograr un acceso justo para aquellos estudiantes que tengan necesidades económicas.

3. Creación del Fondo Fiduciario de Becas Universitarias. Esta iniciativa tiene el propósito de crear un fideicomiso de inversión para preservar el capital que se otorgaría para las becas de los estudiantes de la UPR, según la disponibilidad de los fondos.

4. Proteger la totalidad de las aportaciones a los planes médicos de los empleados del gobierno central, evitando los recortes propuestos. Esta iniciativa tiene el propósito de identificar los fondos que eviten la reducción de las aportaciones a los planes de salud de los empleados públicos del gobierno central para sus seguros médicos. Esta medida beneficiaría a más de 60,000 trabajadores y familias puertorriqueñas.

5. Asignar los fondos necesarios para los municipios. Este objetivo pretende otorgar estabilidad fiscal de los municipios y la continuidad de los servicios esenciales que ofrecen. Específicamente, la legislatura propone, además, que las partidas no utilizadas para el pago de las obligaciones de deuda municipal luego de la adopción del plan de ajuste reviertan a los municipios.

6. Endosar la creación del fondo especial para la igualdad social. Esta propuesta – a ser legislada próximamente – pretende crear un fondo permanente que tenga la encomienda de combatir la pobreza y la desigualdad social; otorgándole prioridad en sus asignaciones a la atención de las necesidades de las comunidades marginadas, el programa de educación especial, los grupos poblacionales más vulnerables, combatir la deserción escolar, establecer un plan integrado para las personas sin hogar e incrementar, de forma gradual, las asignaciones para las entidades sin fines de lucro, de autogestión comunitaria y de base de fe, para ofrecer servicios directos, según la disponibilidad de fondos.

7. Establecer la meta de que el 100% de la población tenga cubierta médica. El propósito de esta iniciativa es extender y/o facilitar el acceso a cubiertas médicas a unos 225,000 ciudadanos que hoy carecen de planes médicos, según la disponibilidad de fondos.

8. Creación del Fondo de Inversión Estratégico para el Desarrollo Económico que inyecte una inversión continua. Esta iniciativa propone la creación de

un Fondo de Inversión Estratégica dividido en cuatro categorías: (1) inversiones para cerrar las brechas de habilidades básicas; (2) programas de capitalización de pequeñas empresas; y (3) el desarrollo de programas de crecimiento empresarial mediante la capitalización empresarial, según la disponibilidad de fondos; y (4) capitalización del sector cooperativista.

9.    Establecer un mecanismo que le permita al Gobierno de Puerto Rico adelantar los términos de pagos y cancelación de deuda. Este mecanismo tiene el único propósito de autorizar al Gobierno de Puerto Rico a refinanciar los acuerdos de pagos de la deuda, con el único objetivo de acelerar o saldar los pagos acordados, de conformidad a la situación fiscal futura y sin afectar los servicios esenciales y prioritarios del Gobierno de Puerto Rico.

10.    Establecer grupo de trabajo conjunto entre la Rama Legislativa, la Rama Ejecutiva y la Junta de Supervisión Fiscal. Esta iniciativa tiene el objetivo de diseñar la legislación que sea necesaria para asegurarnos que, una vez concluya el proceso de reestructuración de la deuda pública, el Gobierno de Puerto Rico no vuelva a endeudarse sin tener los recursos económicos para cumplir sus obligaciones del pago; ni vuelva a repetirse las prácticas indebidas de aprobar presupuestos desbalanceados, con estimados de ingresos irreales o gastos excesivos. Igualmente, se propone el eventual traspaso de toda la información, sistemas, recursos y métodos de contabilidad que al presente están bajo la custodia de la Junta de Supervisión Fiscal, sobre los procesos financieros del Gobierno de Puerto Rico, para ser utilizados por el Gobierno de Puerto Rico como parte de sus responsabilidades fiscales.

De ser ratificado por el Gobierno y los acreedores, y posteriormente confirmado por el Tribunal de Título III, representaría el último peldaño en el proceso de reestructuración de la deuda de Puerto Rico. Este Plan incorpora los acuerdos alcanzados con las diversas clases de acreedores de obligaciones del Gobierno Central. Estas clases incluyen a los bonistas de obligaciones generales, sindicatos de empleados públicos, el Comité de Acreedores No Asegurados y el Comité Oficial de Retirados, entre otros.

En total, los acuerdos incluidos en el PDA reducen la deuda pública del Gobierno Central en aproximadamente un 50%. Es decir, la deuda pública se reduciría de aproximadamente $70 mil millones a $34 mil millones y la deuda de bonos de Obligaciones Generales (GO) y de la Autoridad de Edificios Públicos se reduciría de $18.8 mil millones a $7.4 mil millones. A su vez, el pago anual de la deuda pública de Puerto Rico se reduciría a aproximadamente de $3,300 millones a $1,100 millones. Asimismo el servicio de la deuda del Estado Libre Asociado se reduciría de un 25% a un 7.5%, cifra que representa la mitad del máximo constitucional permitido. En términos prácticos,

estas reducciones representan más dinero en las arcas del gobierno, lo cual implica que Puerto Rico tendrá una nueva oportunidad de invertir en su gente a través de mejoras a la infraestructura, de sufragar los costos de los servicios esenciales que está llamado a ofrecer; y de prepararse para y atender futuras emergencias.

Para alcanzar esta reducción de la deuda gubernamental, la Ley PROMESA requiere que la Asamblea Legislativa de Puerto Rico apruebe legislación que viabilice la emisión de una serie de bonos de obligaciones generales (GO) y la creación de instrumentos de valor contingente (IVC) que garanticen el pago de ciertas reclamaciones. Debe destacarse que los IVC también disponen para la creación de un fideicomiso que eventualmente garantice el pago de pensiones, el disfrute del gobierno de hasta $200 millones de fondos generados en exceso a las proyecciones contenidas en los Planes Fiscales de 2020 y 2021, y otros mecanismos de repago.

En esencia, el Gobierno Central debe emitir nuevos bonos de obligaciones generales, y autorizar la creación de los IVC. Los IVC solo serían pagaderos al cumplirse determinadas métricas de recaudos del impuesto sobre ventas y uso (IVU) y, en el caso de una porción limitada de los IVCs, la porción del arbitrio federal al ron que el Departamento del Tesoro Federal transfiere al Gobierno del Estado Libre Asociado de Puerto Rico. Es decir, solo se pagaría hasta un máximo específico de deuda si ciertas condiciones están presentes.

A tenor con la Sección 314 de PROMESA, y con la recién firmada Ley 42-2021, el Gobierno de Puerto Rico tiene la obligación de aprobar la presente legislación para viabilizar la aprobación del Plan y la posterior salida de la Junta de Supervisión Fiscal.

Que quede meridianamente claro que la política pública de la presente Asamblea Legislativa es de cero recortes a los pensionados. La política pública de la Asamblea Legislativa es reconocer como deuda del Gobierno del Estado Libre Asociado, las pensiones según el estado de derecho al momento de aprobada esta Ley. Por lo que no se realizará recorte, disminución o alteración a las pensiones que reciben los retirados del Sistema de Retiro de Empleados Públicos, Maestros y la Judicatura.

Esta Asamblea Legislativa no ha perdido de perspectiva que nuestros pensionados, a diferencia de otros grupos de acreedores, ya sufrieron recortes en sus pensiones como resultado de la aprobación de estatutos que, con el propósito de prevenir la insolvencia de los sistemas de retiro del gobierno, redujeron los beneficios de pensión, aumentaron la cantidad de aportaciones de los empleados y elevaron la edad de retiro para los planes de pensión de cada uno de los tres sistemas principales de retiro del Gobierno. Por tanto, las Ramas Legislativa y Ejecutiva han sido enfáticas en que la política pública de Puerto Rico es de cero recortes a las pensiones. A estos fines, se dispone que quedará inmediatamente sin vigencia esta ley y cualquier transacción, emisión o gestión relacionada con la misma será nula si se ordena y se procede con algún recorte a las

pensiones de los empleados gubernamentales en el Plan de Ajuste o Reestructuración. La vigencia de esta ley queda condicionada a cero recortes en las pensiones.

Los municipios son el ente gubernamental más cercano a nuestra población. La crisis y los planes fiscales han impactado los ingresos de nuestros ayuntamientos. En la medida en que el PDA logre recortes a la deuda estatal, estas economías deberán solventar específicamente medidas de recolección y disposición de residuos, desperdicios y para implementar programas de reciclaje en los municipios, a fin de que los ayuntamientos puedan garantizar estos servicios tan fundamentales e indispensables para garantizar y mejorar la calidad de vida de nuestra ciudadanía.

La Asamblea Legislativa continuará impulsando propuestas que defiendan el mejor interés del pueblo. En esta hazaña, confiamos en que la Rama Legislativa contará con el apoyo del Ejecutivo para guiar a Puerto Rico en el camino por recorrer. La aprobación del Presupuesto General de Puerto Rico para el año fiscal 2021-2022, Res. Conj. 8-2021, fue un paso correcto en esa dirección. También lo es la aprobación de esta medida, que permitirá que el actual Presupuesto General se convierta en el primer presupuesto balanceado de cuatro. Al finalizar este proceso, Puerto Rico habrá cumplido con la mitad de los requisitos dispuestos por PROMESA. La presente Ley cimienta el esfuerzo histórico, multisectorial y de consenso de ponerle fin a la Junta de Supervisión Fiscal.

*DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:*

**CAPÍTULO 1.- DISPOSICIONES GENERALES.**

**ARTÍCULO 101.- TÍTULO.**

Esta Ley se conocerá y podrá ser citada como la "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

**ARTÍCULO 102.- DECLARACIÓN DE INTENCIÓN Y POLÍTICA PÚBLICA**

La política pública de la Asamblea Legislativa es reconocer como deuda del Gobierno del Estado Libre Asociado, las pensiones según el estado de derecho al momento de aprobada esta Ley. Por lo que no se realizará recorte, disminución o alteración a las pensiones que reciben los retirados del Sistema de Retiro de Empleados Públicos, Maestros y la Judicatura.

La presente legislación es cónsona con los objetivos de la Ley para la Supervisión, Administración y Estabilidad Económica de Puerto Rico (Puerto Rico Oversight, Management and Economic Stability Act, o PROMESA, por sus siglas en inglés) y se adopta al amparo del estado de derecho vigente. Con el propósito específico de viabilizar

las metas que se expresan a continuación, la Asamblea Legislativa del Estado Libre Asociado afirma que tiene la intención de cumplir con los procesos y mecanismos establecidos en la Ley Federal Promesa; y, a la misma vez, lograr los siguientes objetivos de política pública:

1. Tomar las acciones afirmativas requeridas para concretar la salida exitosa del Estado Libre Asociado de Puerto Rico del proceso de quiebras dispuesto en el Título III de la Ley federal PROMESA;

2. Viabilizar el acceso del Estado Libre Asociado de Puerto Rico a los mercados crediticios a corto y largo plazo, obteniendo tasas de interés razonables, para cumplir con las necesidades prestatarias de nuestro Gobierno local.

3. Perfeccionar la aprobación del primero de cuatro presupuestos balanceados, legislado y firmado por las Ramas Legislativa y Ejecutiva, respectivamente, el pasado 30 de junio de 2021; y que fuera identificada como la Resolución Conjunta Número 8-2021;

4. Ejercer todas las acciones necesarias para lograr que la Junta de Supervisión Fiscal concluya sus labores de monitoreo financiero lo antes posible y de forma ordenada.

5. Se declara que el Gobierno del Estado Libre Asociado de Puerto Rico, tendrá como asuntos prioritarios de política pública, los siguientes objetivos:

    a. Proteger las pensiones de nuestros retirados. Este objetivo tiene el propósito de evitar recortes a las pensiones del 100% de los retirados. Esta protección estará establecida en la presente legislación y en cualquier legislación futura. Para lograr ese objetivo, se dispone en esta Ley una cláusula específica sobre este asunto.

    b. Asignación fija de $500 millones de presupuesto para la Universidad de Puerto Rico por un periodo de cinco años, congelando los recortes programados. Esta meta tiene el propósito de conservar la capacidad de la UPR para llevar a cabo su vital misión educativa y asegurando los recursos necesarios para garantizar la acreditación de todos sus programas y lograr un acceso justo para aquellos estudiantes que tengan necesidades económicas.

    c. Creación del Fondo Fiduciario de Becas Universitarias. Esta iniciativa tiene el propósito de crear un fideicomiso de inversión

para preservar el capital que se otorgaría para las becas de los estudiantes de la UPR, según la disponibilidad de los fondos.

d.      Proteger la totalidad de las aportaciones a los planes médicos de los empleados del Gobierno Central, evitando los recortes propuestos. Esta iniciativa tiene el propósito de identificar los fondos que eviten la reducción de las aportaciones a los planes de salud de los empleados públicos del Gobierno Central para sus seguros médicos. Esta medida beneficiaría a más de 60,000 trabajadores y familias puertorriqueñas.

e.      Asignar los fondos necesarios para los municipios. Este objetivo pretende otorgar estabilidad fiscal de los municipios y la continuidad de los servicios esenciales que ofrecen. Específicamente, la legislatura propone, además, que las partidas no utilizadas para el pago de las obligaciones de deuda municipal luego de la adopción del plan de ajuste reviertan a los municipios.

f.      Endosar la creación del fondo especial para la igualdad social. Esta propuesta – a ser legislada próximamente – pretende crear un fondo permanente que tenga la encomienda de combatir la pobreza y la desigualdad social; otorgándole prioridad en sus asignaciones a la atención de las necesidades de las comunidades marginadas, el programa de educación especial, los grupos poblacionales más vulnerables, combatir la deserción escolar, establecer un plan integrado para las personas sin hogar e incrementar, de forma gradual, las asignaciones para las entidades sin fines de lucro, de autogestión comunitaria y de base de fe, para ofrecer servicios directos, según la disponibilidad de fondos.

g.      Establecer la meta de que el 100% de la población tenga cubierta médica y hacer una evaluación del sistema de salud con una asignación total de un $1 millón de dólares. El propósito de esta iniciativa es extender y/o facilitar el acceso a cubiertas médicas a unos 225,000 ciudadanos que hoy carecen de planes médicos, según la disponibilidad de fondos.

h.      Creación del Fondo de Inversión Estratégico para el Desarrollo Económico que inyecte una inversión total de trescientos ($300) millones de dólares para cinco (5) años. Esta iniciativa propone la creación de un Fondo de Inversión Estratégica dividido en cuatro categorías: (1) inversiones para cerrar las brechas de habilidades básicas; (2) programas de capitalización de pequeñas empresas; (3)

el desarrollo de programas de crecimiento empresarial mediante la capitalización empresarial, y (4) capitalización del sector cooperativista, según la disponibilidad de fondos.

i.  Establecer un mecanismo que le permita al Gobierno de Puerto Rico adelantar los términos de pagos y cancelación de deuda. Este mecanismo tiene el único propósito de autorizar al Gobierno de Puerto Rico a refinanciar los acuerdos de pago de la deuda, con el único objetivo de acelerar o saldar los pagos acordados, de conformidad a la situación fiscal futura y sin afectar los servicios del Gobierno de Puerto Rico.

j.  Establecer grupo de trabajo conjunto entre la Rama Legislativa, la Rama Ejecutiva y la Junta de Supervisión Fiscal. Esta iniciativa tiene el objetivo de diseñar la legislación que sea necesaria para asegurarnos que, una vez concluya el proceso de reestructuración de la deuda pública, el Gobierno de Puerto Rico no vuelva a endeudarse sin tener los recursos económicos para cumplir sus obligaciones del pago; ni vuelva a repetirse las prácticas indebidas de aprobar presupuestos desbalanceados, con estimados de ingresos irreales o gastos excesivos. Igualmente, se propone el eventual traspaso de toda la información, sistemas, recursos y métodos de contabilidad que al presente están bajo la custodia de la Junta de Supervisión Fiscal, sobre los procesos financieros del Gobierno de Puerto Rico, para ser utilizados por el Gobierno de Puerto Rico como parte de sus responsabilidades fiscales.

Las Transacciones de Reestructuración de deuda autorizadas mediante la presente Ley están totalmente sujetas y condicionadas a que la Junta de Supervisión y Administración Financiera (JSAF) enmiende su Plan Fiscal para incluir todas las disposiciones contenidas en el inciso 5 de esta Sección.

Quedará inmediatamente sin vigencia esta ley y cualquier transacción, emisión o gestión relacionada con la misma será nula si se ordena y se procede con algún recorte a las pensiones de los empleados gubernamentales en el Plan de Ajuste o Reestructuración. La vigencia de esta ley queda condicionada a cero recortes en las pensiones.

## ARTÍCULO 103.- DEFINICIONES.

(a)  5.5% del IVU: significa los ingresos y recaudos presentes y futuros generados por la porción del impuesto sobre ventas y uso establecido bajo las Secciones

4020.01 y 4020.02 del Subcapítulo D del Código de Rentas Internas de Puerto Rico que corresponde a la tasa contributiva del cinco y medio por ciento (5.5%).

(b)      Acuerdos Complementarios: significa el Plan, la Orden de Confirmación, el Contrato de Bonos de Obligación General, la forma de los Bonos de Obligación General, el Contrato de IVC, la forma de los IVCs, y cualquier otro acuerdo o instrumento relacionado o suscrito con relación a, o en apoyo de, una Transacción de Reestructuración y de conformidad con, o en apoyo de, el Plan o una Modificación Elegible.

(c)      ACT: significa la Autoridad de Carreteras y Transportación de Puerto Rico, creada en virtud de la Ley Núm. 74 de 23 de junio de 1965, según enmendada o su ley sucesora.

(d)      ADCC: significa la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, creada en virtud de la Ley 351-2000, según enmendada o su ley sucesora.

(e)      AEP: significa la Autoridad de Edificios Públicos de Puerto Rico, creada en virtud de la Ley Núm. 56 de 19 de junio de 1958, según enmendada, o su ley sucesora.

(f)      AFI: significa la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, creada en virtud de la Ley Núm. 44 de 21 de junio de 1988, según enmendada, o su ley sucesora.

(g)      AMA: significa la Autoridad Metropolitana de Autobuses de Puerto Rico, creada en virtud de la Ley Núm. 5 de 11 de mayo de 1959, según enmendada, o su ley sucesora.

(h)      Año Fiscal: significa el año fiscal del Estado Libre Asociado, que empieza el 1ro de julio y termina el 30 de junio.

(i)      Bonos de Obligación General: significa los bonos de obligación general emitidos por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General de conformidad con esta Ley, el Plan y la Orden de Confirmación, y cualesquiera bonos de obligación general emitidos subsiguientemente por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General de acuerdo a y consistente con los términos del Plan para retirar, refinanciar o cancelar bonos de obligación general originalmente emitidos conforme al Plan y la Orden de Confirmación.

(j)      Código de Puerto Rico: significa la Ley 1-2011, según enmendada, conocida como el "Código de Rentas Internas para Puerto Rico de 2011."

(k)      Condición de Rendimiento Superior del Arbitrio al Ron: significa que los Ingresos del Arbitrio al Ron del Estado Libre Asociado en un año fiscal, calculados

conforme a, y neto de, aquellas deducciones permitidas conforme al Plan y establecidas en el Contrato de IVC, exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para dicho año fiscal.

(l)     Condición de Rendimiento Superior del IVU: significa que los recaudos del IVU Medido o del Impuesto Sustituto Medido, según sea el caso, en cualquier año fiscal exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para dicho año fiscal.

(m)     Contrato de Bonos de Obligación General: significa uno o más contratos de fideicomiso, escrituras, resoluciones y cualesquiera suplementos o enmiendas relacionadas, o contratos o acuerdos similares, relacionados a los Bonos de Obligación General a ser otorgados y suscritos por el Representante del Gobernador autorizando: (1) la emisión de los Bonos de Obligación General y describiendo sus términos; y (2) el pago de los Costos de Financiamiento, cada uno de conformidad con los términos del Plan.

(n)     Contrato de IVC: significa uno o más contratos de fideicomiso, escrituras, resoluciones y cualesquiera otros suplementos o enmiendas relacionadas, o contratos o acuerdos similares, relacionados a los IVCs a ser otorgados y suscritos por el Estado Libre Asociado autorizando: (1) la emisión de los IVCs por el Estado Libre Asociado y la descripción de sus términos; y (2) el pago de los Costos de Financiamiento de los IVCs, cada uno conforme a los términos del Plan.

(o)     Costos de Financiamiento: significa los costos asociados a las Transacciones de Reestructuración, incluyendo, pero sin limitarse a, los costos, honorarios y gastos para (i) emitir, pagar o repagar los Bonos de Obligación General y los IVCs, según aplicable, ya sea que los costos sean incurridos tras la emisión de dichos Bonos de Obligación General o IVCs o durante el término de dichos instrumentos, (ii) efectuar pagos según requeridos por los Acuerdos Complementarios, (iii) pagar cualquier sello, emisión o impuesto similar y otros cargos relacionados a la Transacción de Reestructuración (si alguno), (iv) prepararse para y efectuar las Transacciones de Reestructuración, y (v) llevar a cabo todas las actividades en curso relacionadas a las Transacciones de Reestructuración. Para evitar dudas, los Costos de Financiamiento también incluyen los honorarios y gastos administrativos previos y posteriores al cierre incurridos con relación a los Acuerdos Complementarios.

(p)     Entidad Gubernamental: significa cualquier agencia, departamento, oficina, corporación pública, fideicomiso, fondo, sistema, instrumentalidad, subdivisión política, autoridad fiscal o municipio del Estado Libre Asociado.

(q)     Estado Libre Asociado: significa el Estado Libre Asociado de Puerto Rico creado en virtud de las disposiciones del Artículo 1 de la Constitución del Estado Libre Asociado de Puerto Rico.

(r)     Fecha de Efectividad: significa la fecha en la que el Plan entre en vigor conforme a sus términos.

(s)     Fiduciario de los Bonos de Obligación General: significa el o los fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados de conformidad con los términos y condiciones del Contrato de Bonos de Obligación General.

(t)     Fiduciario de los IVC: significa el o los fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados conforme a los términos y condiciones del Contrato de IVC.

(u)     Fondo del Servicio de la Deuda: significa un fondo del servicio de la deuda establecido de conformidad con el Contrato de Bonos de Obligación General.

(v)     Impuesto Sustituto Medido: significa toda o una porción de un impuesto de aplicabilidad general en el Estado Libre Asociado que, mediante un cambio en la ley, o mediante acción ejecutiva o judicial sea legislado para sustituir completamente el IVU Medido o que de lo contrario constituya una medida similar o comparable de actividad económica en el Estado Libre Asociado, en cada caso de conformidad con los términos del Contrato de IVC.

(w)     Ingresos del Arbitrio al Ron del Estado Libre Asociado: significa el total de los recaudos del arbitrio a los licores destilados impuesto bajo el Código de Rentas Internas de los Estados Unidos de 1986 (según enmendado de tiempo en tiempo) recibidos por el Estado Libre Asociado, según documentado en el reporte del Departamento del Tesoro Federal de la actividad mensual del arbitrio neto pagado al Estado Libre Asociado y certificado por el Departamento de Hacienda de Puerto Rico o en cualquier otro reporte análogo según establecido en el Contrato de IVC.

(x)     IVCs o Instrumentos de Valor Contingente: significa, en el colectivo, las notas de obligación general emitidas bajo el Contrato de IVC de conformidad con esta Ley, el Plan y la Orden de Confirmación, que consisten en los IVCs de Obligación General y los IVCs "Clawback".

(y)     IVCs "Clawback": significa una serie de IVCs emitidos bajo el Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de la deuda emitida por ACT, ADCC, AFI y AMA. Para evitar dudas, los IVCs "Clawback" podrán emitirse en una o más subseries, incluyendo, pero sin limitarse a, la Subserie de las Reclamaciones del Arbitrio al Ron.

(z)      IVC de Obligación General: significa una serie de IVCs emitidos bajo el Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de o están relacionadas a deuda de obligación general del Estado Libre Asociado, incluyendo deuda directa o garantizada.

(aa) IVU Medido: significa el 5.5% del IVU recaudado por el Estado Libre Asociado durante un año fiscal, menos aquellos ingresos transferidos al Fondo para el Desarrollo de la Industria de las Artes, Ciencias y Cinematografía conforme a la Sección Núm. 4050.06 del Código de Puerto Rico (o utilizado para cualquier otro propósito establecido por ley), hasta Tres Millones Doscientos Cuarenta Mil Dólares ($3,240,000.00) por año fiscal.

(bb) Ley: significa esta "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

(cc) Máximo Agregado de los IVCs "Clawback": significa, inicialmente a partir de la Fecha de Efectividad, $5,239,002,764. El Máximo Agregado de los IVCs "Clawback" se reducirá cada año fiscal en una cantidad igual a los pagos efectuados bajo los IVCs "Clawback" conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior del IVU. En adición, la porción del Máximo Agregado de los IVCs "Clawback" asignados a la Subserie de las Reclamaciones del Arbitrio al Ron se reducirá aún más cada año fiscal en una cantidad igual a los pagos efectuados bajo la Subserie de Reclamaciones del Arbitrio al Ron conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior del Arbitrio al Ron.

(dd) Máximo Agregado de los IVC de Obligación General: significa, inicialmente desde la Fecha de Efectividad, $3,500,000,000. El Máximo Agregado de los IVC de Obligación General se reducirá anualmente por una cantidad igual a los pagos efectuados en los IVC de Obligación General conforme al Contrato de IVC.

(ee) Modificación Elegible: significa una "Modificación Elegible" para ADCC y/o AFI aprobada conforme al Título VI de PROMESA.

(ff)      Orden de Confirmación: significa la orden del Tribunal de Título III confirmando el Plan.

(gg) Persona: significa cualquier persona natural o jurídica, incluyendo, pero sin limitarse a, el Estado Libre Asociado, cualquier Entidad Gubernamental, o cualquier firma, sociedad, empresa conjunta, fideicomiso, sucesión, compañía de responsabilidad limitada, corporación de individuos, asociación o corporación pública o privada, organizada o existente bajo las leyes de Puerto Rico, de los Estados Unidos de América, de cualquier estado u otra jurisdicción, o cualquier estado, municipio, subdivisión

política, autoridad fiscal, agencia o instrumentalidad de los Estados Unidos de América, cualquier estado o cualquier otra jurisdicción, o cualquier combinación de las anteriores.

(hh) Plan: significa el Plan de Ajuste conjunto para el Estado Libre Asociado, SRE y AEP (y cualquier otra Entidad Gubernamental incluida en dicho plan) confirmado bajo el Título III de PROMESA, incluyendo los anejos relacionados, según estos puedan ser enmendados, suplementados o modificados de tiempo en tiempo.

(ii)    PROMESA: significa la Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et seq., según enmendada o modificada.

(jj)    Reclamaciones Existentes: significa las reclamaciones en contra del Estado Libre Asociado, AEP, SRE, ACT, AFI, ADCC y AMA.

(kk) Representante del Gobernador: significa el Gobernador, el Secretario de Hacienda o cualquier otro oficial de una Entidad Gubernamental designado por el Gobernador mediante Orden Ejecutiva para cumplir con los propósitos y mandatos de la presente Ley en representación del Estado Libre Asociado de Puerto Rico.

(ll)    Secretario de Hacienda: significa el Secretario del Departamento de Hacienda del Estado Libre Asociado, creada en virtud del Plan de Reorganización Núm. 3 de 22 de junio de 1994, según enmendado, o su ley sucesora.

(mm) Sistemas de Retiro del Estado Libre Asociado: significa el Sistema de Retiro de Empleados del Gobierno, según definido en el inciso (nn) del presente Artículo, el Sistema de Retiro de Maestros de Puerto Rico y el Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico.

(nn) SRE: significa el Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, creado en virtud de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada o su ley sucesora.

(oo) Subserie de Reclamaciones del Arbitrio al Ron: significa una subserie de los IVCs "Clawback" emitidos bajo el Contrato de IVC con relación a las reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de, o están relacionadas a, los Ingresos del Arbitrio al Ron del Estado Libre Asociado retenidos por el Estado Libre Asociado y no transferidos a AFI.

(pp) Transacciones de Reestructuración: significa cada una de las transacciones contempladas por, o en apoyo a, el Plan o una Modificación Elegible, incluyendo, pero sin limitarse a, la emisión de los Bonos de Obligación General y los IVCs y la cancelación

15

o la extinción de las Reclamaciones Existentes conforme al Plan o una Modificación Elegible, según sea el caso.

## ARTÍCULO 104. - AUTORIZACIÓN DE ACCIONES FOR LAS ENTIDADES GUBERNAMENTALES.

No obstante cualquier disposición, prohibición o restricción establecida en cualquier ley, orden, regla o reglamento del Estado Libre Asociado, cada entidad gubernamental requerida a tomar o llevar a cabo cualquier acción necesaria o conveniente para implementar el Plan y/o las Transacciones de Reestructuración queda por la presente autorizada a llevar a cabo y deberá llevar a cabo todas aquellas acciones necesarias o convenientes para implementar el Plan o las Transacciones de Reestructuración, sin estar sujeta a los requisitos de cualquier disposición, prohibición o restricción establecida en cualquier otra ley, orden, regla o reglamento, incluyendo, pero sin limitarse a, (a) negociar, entrar en y suscribir cualquier acuerdo, escritura, certificado o documento, y (b) desembolsar o transferir fondos según provisto y/o requerido en el Plan. La autorización provista en este Artículo será suficiente para que el Representante del Gobernador, a nombre del Estado Libre Asociado, y cualquier director ejecutivo, presidente u oficial de rango y autoridad similar, a nombre de la Entidad Gubernamental que representa, pueda llevar a cabo cualquier acción contemplada en el Plan y/o en las Transacciones de Reestructuración y ninguna otra autorización, incluyendo, pero sin limitarse a, la autorización de cualquier junta de directores, comisión, departamento, o regulador de Puerto Rico, será requerida. Para evitar dudas, la autorización aquí establecida será tan amplia y suficiente como lo permita el estado de derecho vigente para permitir que el Estado Libre Asociado pueda establecer, financiar, y de otra manera implantar cualquiera y todas las disposiciones y/o mecanismos incluidos en el Plan para proteger las pensiones de los empleados gubernamentales retirados. Además, la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico queda por la presente autorizada a requerirle a cualquier Entidad Gubernamental que cumpla con los requisitos establecidos en este Artículo.

Sin limitar la generalidad de lo anterior y no obstante cualquier disposición de cualquier ley del Estado Libre Asociado, en o antes de la Fecha de Efectividad, el Representante del Gobernador queda por la presente autorizado a: (a) aprobar la oferta, venta y emisión de los Bonos de Obligación General y los IVCs según contemplado en el Plan y dispuesto en los Capítulos 2 y 3 de esta Ley, respectivamente; (b) proveer para la cancelación y extinción de las Reclamaciones Existentes conforme a y de acuerdo con los términos del Plan o de una Modificación Elegible, según aplicable; (c) autorizar el pago de los Costos de Financiamiento de conformidad con los términos del Plan; (d) aprobar la forma del Contrato de los Bonos de Obligación General, del Contrato de IVC, y de los otros Acuerdos Complementarios y otorgar el Contrato de los Bonos de Obligación General, el Contrato de IVC y los otros Acuerdos Complementarios a nombre del Estado Libre Asociado; (e) incluir en los Acuerdos Complementarios cualquier pacto, término u

16

otra condición según pueda ser requerida por el Plan, incluyendo (1) consentir a nombre del Estado Libre Asociado a la aplicación de las leyes del Estado de Nueva York para gobernar e interpretar dichos Acuerdos Complementarios, y la jurisdicción de cualquier tribunal estatal o federal, con relación a cualquier demanda o procedimiento relacionado con los Bonos de Obligación General, los IVCs, los Acuerdos Complementarios y/o cualesquiera otros asuntos relacionados a las Transacciones de Reestructuración, y (2) la creación de gravámenes sobre los dineros, valores y otros activos depositados con el Fiduciario de los Bonos de Obligación General o el Fiduciario de los IVCs a beneficio de los tenedores de los Bonos de Obligación General y los IVCs, respectivamente; y (f) llevar a cabo cualesquiera y todas otras acciones necesarias o convenientes para efectuar las Transacciones de Reestructuración. Para evitar dudas, no obstante la aplicación de las leyes del Estado de Nueva York para gobernar e interpretar cualquier Acuerdo Complementario, la autorización por el Estado Libre Asociado del Contrato de Bonos de Obligación General y el Contrato de IVC y la emisión por el Estado Libre Asociado de los Bonos de Obligación General y los IVCs se gobernarán por las leyes del Estado Libre Asociado, disponiéndose que, sujeto a los términos del Contrato de Bonos de Obligación General y el Contrato de IVC, los tenedores de los Bonos de Obligación General y de los IVCs, respectivamente, tendrán aquellos derechos y remedios de tenedores de deuda pública del Estado Libre Asociado establecidos en las Secciones 2 y 8 del Artículo VI de la Constitución del Estado Libre Asociado.

La autorización para emitir bonos conferida mediante la presente Ley estará limitada únicamente a aquellos bonos contemplados por y requeridos para implementar el Plan, y se hará conforme lo establezcan el propio Plan, los Contratos de Obligación General, la Orden de Confirmación y los demás Acuerdos Complementarios. El Gobernador de Puerto Rico o su Representante deberán solicitar la autorización de la Asamblea Legislativa para cualquier emisión posterior que sea distinta a la aquí permitida.

## ARTÍCULO 105: PROTECCIÓN DE LAS PENSIONES DE LOS RETIRADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO.

El gobierno del Estado Libre Asociado, por la presente, declara que es la política pública de la más alta prioridad proteger las pensiones de sus servidores públicos, que son uno de los grupos más importantes de nuestra sociedad. Como parte esencial de esta política pública, la protección de las pensiones de todos nuestros retirados es un compromiso esencial e inquebrantable. Por lo tanto, en relación a las pensiones de los retirados del Gobierno, se dispone lo siguiente:

(a) Todas las pensiones de los retirados del Gobierno del Estado Libre Asociado acumuladas hasta la fecha de esta Ley, que estén reconocidas en las leyes de Puerto Rico vigentes a la fecha de la presente Ley, por la presente, se reconocen como deudas contraídas por el Gobierno de Puerto

Rico y por virtud de esta legislación, quedan protegidas y excluidas de todo tipo de recortes o reducciones presupuestarias. Esta protección de beneficios acumulados protege a los pensionados de cualquier reducción a cualquier pensión acumulada hasta la Fecha de Efectividad incluida en el Plan de Ajuste; y se dispone, en la medida en que la ley lo permita, que, en la Orden de Confirmación del Plan de Ajuste, se considerarán los pagos de las pensiones en su nivel actual acumulados hasta la de Fecha Efectividad como deuda no sujeta a reducción por la Junta de Supervisión Financiera al amparo de PROMESA. Esta protección incluye la presente legislación que autoriza la emisión de bonos para la reestructuración de la deuda y cualquier legislación futura, incluyendo planes fiscales futuros, que comprometan ingresos del Gobierno del Estado Libre Asociado. Cualquier transacción de deuda al amparo de esta o cualquier ley futura, deberá cumplir con este requisito.

(b)       Para cumplir con la política pública de honrar la totalidad de las pensiones presentes, la Asamblea Legislativa deberá consignar los ingresos necesarios para el pago de las mismas en el presupuesto de cada año fiscal correspondiente.

## CAPÍTULO 2 – LOS BONOS DE OBLIGACIÓN GENERAL

## ARTÍCULO 201.- EMISIÓN DE LOS BONOS DE OBLIGACIÓN GENERAL.

(a)       A partir y luego de la Fecha de Efectividad, el Representante del Gobernador, estará autorizado para aprobar la oferta, venta y emisión de los Bonos de Obligación General, de tiempo en tiempo, de conformidad con las disposiciones del Contrato de Bonos de Obligación General, la Orden de Confirmación, el Plan y de los demás Acuerdos Complementarios, hasta una cantidad agregada inicial de principal de $7,414,063,543.25, y para aprobar la oferta, venta y emisión, de tiempo en tiempo, de Bonos de Obligación General adicionales, sujeto a las limitaciones contempladas en el Plan y establecidas en el Contrato de Bonos de Obligación General para retirar, refinanciar o cancelar los Bonos de Obligación General originalmente emitidos conforme al Plan y a la Orden de Confirmación.

(b)       Los Bonos de Obligación General incluirán bonos de interés corriente y bonos de revalorización de capital, estarán fechados, devengarán intereses, y vencerán en la fecha o fechas, que no excederán treinta (30) años de su fecha o fechas de emisión, y serán redimibles o podrán ser prepagados, en cada caso, en la medida en que sea aplicable y según sea determinado por el Representante del Gobernador, como representante del

Estado Libre Asociado, y autorizado en el Contrato de Bonos de Obligación General de conformidad y consistente con el Plan.

El Representante del Gobernador, como representante del Estado Libre Asociado, determinará la forma de los Bonos de Obligación General y la manera de emitir los Bonos de Obligación General, y establecerá la denominación o denominaciones de los Bonos de Obligación General y el lugar o los lugares de pago de los mismos y sus otros términos, todo de conformidad y consistente con el Plan. A discreción del Representante del Gobernador, los Bonos de Obligación General podrán ser emitidos en una o más series separadas.

(c)   Los Bonos de Obligación General serán obligaciones legales, válidas y vinculantes del Estado Libre Asociado, emitidos conforme al Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, y serán pagaderos conforme a los términos del Contrato de Bonos de Obligación General y de los otros Acuerdos Complementarios.

(d)   Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en cualquier Bono de Obligación General autorizado bajo esta Ley deje de ocupar su cargo previo a la entrega de dichos Bonos de Obligación General, dicha firma o facsímil de la firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos como si dicho oficial hubiese permanecido en su cargo hasta dicha entrega. Además, cualquier Bono de Obligación General podrá contener la firma o facsímil de la firma de aquellas personas que, al momento de la emisión de dicho bono, sean los oficiales autorizados a firmarlo, pero que, en la fecha del Bono de Obligación General, no ocupaban su puesto.

(e)   Los Bonos de Obligación General emitidos de conformidad con las disposiciones de esta Ley se considerarán instrumentos negociables bajo las leyes de Puerto Rico.

(f)   Los Bonos de Obligación General autorizados por esta Ley se podrán emitir como bonos de cupón o en forma registrada, o ambos, según se establezca en el Contrato de Bonos de Obligación General.

## ARTÍCULO 202.- COMPROMISO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE IMPONER CONTRIBUCIONES.

La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado quedan por la presente comprometidos para el pago puntual del principal e interés de los Bonos de Obligación General emitidos bajo las disposiciones de esta Ley, según y cuándo venzan de conformidad con los términos del Contrato de Bonos de Obligación General. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar el principal e interés de los Bonos de Obligación General según venzan

o tras su redención o prepago de conformidad con el Contrato de Bonos de Obligación General, de los recursos disponibles del Estado Libre Asociado en el año fiscal en que dicho pago sea requerido, y las disposiciones de esta Ley con relación al pago de principal e interés en los Bonos de Obligación General se considerarán una obligación continua para que el Secretario de Hacienda haga dichos pagos, aunque no se hayan hecho asignaciones específicas para dichos propósitos. El Representante del Gobernador queda por la presente autorizado y dirigido a incluir en el Contrato de Bonos de Obligación General el compromiso que aquí establece el Estado Libre Asociado de Puerto Rico con relación a los Bonos de Obligación General, y deberá establecerse en dichos Bonos de Obligación General que la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico están comprometidos para el pago de los mismos.

## ARTÍCULO 203.- FONDO DEL SERVICIO DE LA DEUDA; GRAVAMEN ESTATUTARIO.

(a) Se autoriza al Representante del Gobernador a establecer el Fondo de Servicio de la Deuda con el Fiduciario de los Bonos de Obligación General para el pago de los Bonos de Obligación General. Hasta que los Bonos de Obligación General hayan sido completamente pagados o satisfechos de conformidad con sus términos, mensualmente, el Estado Libre Asociado de Puerto Rico depositará con el Fiduciario de los Bonos de Obligación General una suma en efectivo en la cantidad agregada igual a (i) una sexta parte (1/6) de la obligación semianual del Estado Libre Asociado de Puerto Rico con relación al pago de interés devengado sobre los Bonos de Obligación General y (ii) una doceava parte (1/12) de la obligación anual del Estado Libre Asociado de Puerto Rico con relación al pago del principal de los Bonos de Obligación General. Dichos fondos deberán mantenerse e invertirse por el Fiduciario de los Bonos de Obligación General de conformidad con las disposiciones del Contrato de Bonos de Obligación General.

(b) A partir de la emisión, los Bonos de Obligación General estarán garantizados automáticamente por un gravamen estatutario de primer rango sobre los fondos depositados en el Fondo de Servicio de la Deuda, incluyendo cualquier ingreso o recaudos generados de dichos fondos. Dicho gravamen estatutario de primer rango se creará, surtirá efecto y se perfeccionará automáticamente, y será válido y vinculante a partir y luego de la Fecha de Efectividad, sin que sea necesario acto o acuerdo alguno por ninguna otra Persona. No será necesario otorgar, suscribir ni inscribir instrumento alguno en ningún récord oficial ni en registro u oficina del gobierno alguna para perfeccionar o continuar teniendo dicho gravamen estatutario de primer rango o para establecer o mantener la prioridad aquí establecida. El gravamen establecido en este Artículo será válido, vinculante y ejecutable, y estará perfeccionado contra todas las Personas que tengan reclamaciones de cualquier tipo de daños, contractuales, o de cualquier otro tipo contra el Estado Libre Asociado o sus activos independientemente de si dichas Personas fueron notificadas sobre dicho gravamen.

## ARTÍCULO 204.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.

Los Bonos de Obligación General, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con relación a los Bonos de Obligación General y la transferencia de los Bonos de Obligación General, estarán, en todos momentos, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse, a contribuciones sobre ingresos), tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas. Los tenedores y beneficiarios de los Bonos de Obligación General no tendrán que rendir planillas o cualquier otro reporte de contribuciones o requisito similar con relación al Estado Libre Asociado o cualquier Entidad Gubernamental por razón de tener, ser dueño de o transferir Bonos de Obligación General.

## ARTÍCULO 205.- CONVENIOS DEL ESTADO LIBRE ASOCIADO.

El Estado Libre Asociado de Puerto Rico, con la intención de quedar contractualmente obligado, por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y subsiguientes de los Bonos de Obligación General que, hasta que todas las obligaciones relacionadas a dichos bonos hayan sido completamente satisfechas, de conformidad con sus términos, el Estado Libre Asociado de Puerto Rico se obliga a lo siguiente:

(a) no llevar a cabo ninguna acción que (1) impida el depósito mensual de los fondos en el Fondo del Servicio de la Deuda conforme al Artículo 203 de esta Ley, (2) limite o altere los derechos del Estado Libre Asociado de Puerto Rico de conformidad con el Plan y la Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los tenedores de los Bonos de Obligación General o (3) perjudique los derechos y remedios de los tenedores de los Bonos de Obligación General;

(b) hacer y llevar a cabo todos los actos permitidos por ley y que sean razonablemente necesarios o deseables para asegurar que el pago de interés a los tenedores de cualesquiera Bonos de Obligación General esté exento de pago de contribuciones federales, y que sea y continúe estando excluido del ingreso bruto para propósitos de contribuciones sobre ingresos federales, en la medida en que aplique; y

(c) causará que cualquier Plan Fiscal del Estado Libre Asociado de Puerto Rico presentado a la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA luego de la Fecha de Efectividad incluya disposiciones para el pago en cada año fiscal del principal e intereses sobre los Bonos de Obligación General de conformidad con los términos del Contrato de Bonos de Obligación General; y

(d) en la medida necesaria para cumplir con sus obligaciones de pagar los Bonos de Obligación General, aplicará (i) el producto del impuesto a la propiedad del 1.03%

recaudado conforme a la Ley 107-2020, según enmendada, conocida como "Código Municipal de Puerto Rico", por el Centro de Recaudación de Ingresos Municipales del Estado Libre Asociado de Puerto Rico, (ii) cualquier dinero que surja de la operación del Artículo VI, Sección 8 de la Constitución del Estado Libre Asociado de Puerto Rico y (iii) cualquier otro recurso disponible del Estado Libre Asociado de Puerto Rico para el pago del principal y los intereses (y el valor acumulado) sobre dichos Bonos de Obligación General; disponiéndose que (A) este convenio no le concede a los tenedores de dichos Bonos de Obligación General un gravamen sobre dichos ingresos, dineros y recursos, y (B) para propósitos del cumplimiento con este convenio, en la medida en que dichos ingresos, dineros y recursos se transfieran al Fondo General del Estado Libre Asociado de Puerto Rico, se considerará que los pagos de principal e intereses (y del valor acumulado) realizados a los tenedores de los Bonos de Obligación General provenientes del Fondo General del Estado Libre Asociado de Puerto Rico se han hecho de dichos ingresos, dineros y recursos en el orden establecido anteriormente.

## CAPÍTULO 3 – LOS INSTRUMENTOS DE VALOR CONTINGENTE

## ARTÍCULO 301.- EMISIÓN DE LOS IVCS.

(a) A partir y luego de la Fecha de Efectividad, el Representante del Gobernador estará autorizado para aprobar la oferta, venta y emisión, conforme a los términos del Contrato de IVC, la Orden de Confirmación, el Plan y los Acuerdos Complementarios, de IVCs en dos subseries – los IVCs de Obligación General y los IVCs "Clawback" – hasta una cantidad agregada de $3,500,000,000 y $5,239,002,764, respectivamente. Cada serie de los IVCs podrá incluir una o más subseries.

(b) Los IVCs tendrán fecha y vencerán en el tiempo o tiempos que determine el Representante del Gobernador, como representante del Estado Libre Asociado de Puerto Rico, y autorizados en el Contrato de IVC, disponiéndose que los IVCs de Obligación General vencerán no más tarde del Año Fiscal 2044 y que los IVCs "Clawback" vencerán no más tarde del Año Fiscal 2052. Los IVCs no devengarán intereses y estarán sujetos a redención según sea determinado por el Representante del Gobernador y autorizado en el Contrato de IVC de conformidad y consistente con el Plan. El Representante del Gobernador determinará la forma de los IVCs y la manera de emitir los IVCs, y establecerá la denominación o denominaciones de los IVCs y el lugar o los lugares de pago de los mismos y sus otros términos, todo de conformidad y consistente con el Plan.

(c) Los IVCs serán obligaciones legales, válidas y vinculantes del Estado Libre Asociado de Puerto Rico, emitidos de conformidad con el Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, y pagaderos de conformidad con los términos del Contrato de IVC y de los Acuerdos Complementarios, disponiéndose que, de conformidad con el Contrato de IVC:

(1)   no se hará pago alguno a los tenedores de los IVCs (a menos que sean tenedores de la Subserie de Reclamaciones del Arbitrio al Ron bajo las circunstancias establecidas en el inciso (2) a continuación) en un año fiscal a menos que durante el año fiscal anterior ocurra una Condición de Rendimiento Superior del IVU;

(2)   no se hará pago alguno en un año fiscal a los tenedores de la Subserie de Reclamaciones del Arbitrio al Ron a menos que durante el año fiscal anterior ocurra una Condición de Rendimiento Superior del IVU o una Condición de Rendimiento Superior del Arbitrio al Ron;

(3)   no se hará pago alguno a los tenedores de IVCs de Obligación General o a los IVCs "Clawback" en exceso del Máximo Agregado de los IVCs de Obligación General o del Máximo Agregado de los IVCs "Clawback", respectivamente;

(4)   a partir de la fecha de vencimiento de cada serie de los IVCs, si el Estado Libre Asociado de Puerto Rico ha hecho todos los pagos requeridos bajo dichas series conforme al Contrato de IVC, se considerará que todas las obligaciones del Estado Libre Asociado de Puerto Rico bajo dichas series han sido satisfechas y que las series no están en circulación, aun si no se llegó al Máximo Agregado de los IVCs de Obligación General o el Máximo Agregado de los IVC "Clawback", según sea el caso, para dicha fecha.

(d)   Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en cualesquiera IVCs autorizados bajo esta Ley deje de ocupar su cargo antes de la entrega de dichos IVCs, dicha firma o facsímil de firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos como si dicho oficial hubiese permanecido en su puesto hasta dicha entrega. Además, cualesquiera IVCs podrán tener la firma o facsímil de firma de aquellas personas que, al momento en que se emitan dichos bonos, sean los oficiales adecuados para firmarlos, pero que, en la fecha de los IVCs, no hayan estado ocupando sus puestos.

(e)   Los IVCs emitidos conforme al Contrato de IVC son pagarés del Estado Libre Asociado de Puerto Rico para todos los propósitos y se considerarán instrumentos negociables bajo las leyes de Puerto Rico.

(f)   Los IVCs autorizados por esta Ley se emitirán de forma registrada.

(g)   Solamente para propósitos de calcular el servicio anual máximo de la deuda pública del Estado Libre Asociado de Puerto Rico conforme al Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, se asumirá que el servicio de la deuda pagadero bajo los IVCs en cualquier año fiscal será igual a las cantidades máximas que

podrían ser pagaderas durante dicho año fiscal bajo los IVCs de conformidad con el Contrato de IVC.

(h) Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier año fiscal no menoscabarán bajo concepto alguno las obligaciones y reservas creadas por la Corporación del Fondo de Interés Apremiante (COFINA).

## ARTÍCULO 302.- COMPROMISO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE IMPONER CONTRIBUCIONES.

La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico quedan por la presente irrevocablemente comprometidos para el pago puntual de los IVCs emitidos bajo las disposiciones de esta Ley según y cuándo venzan de conformidad con los términos del Contrato de IVC. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar los IVCs según venzan o al momento de ser redimidos de conformidad con el Contrato de IVC, de los recursos del Estado Libre Asociado de Puerto Rico en el año fiscal en que dicho pago sea requerido, y las disposiciones de esta Ley relacionadas al pago de los IVCs se considerarán una obligación continua del Secretario de Hacienda para hacer los pagos en el año fiscal en que dicho pago sea requerido, aun si no se han hecho asignaciones específicas para dicho propósito. El Representante del Gobernador queda por la presente autorizado y dirigido a incluir en el Contrato de IVC el compromiso que aquí establece el Estado Libre Asociado de Puerto Rico con relación a los IVCs, y se establecerá en dichos IVCs que la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico están comprometidos para el pago de los mismos.

## ARTÍCULO 303.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.

Los IVCs, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con relación a los IVCs y la transferencia de los IVCs, estarán, en todos momentos, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera todas las retenciones relacionadas). Si los IVCs se emiten originalmente a un fideicomiso, las distribuciones que haga dicho fideicomiso a sus beneficiarios atribuibles a pagos o ingresos recibidos por el fideicomiso con relación a los IVCs y la transferencia de los IVCs por el fideicomiso, si se permitiera, así como la transferencia del interés en dicho fideicomiso, estarán, en todo momento, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas). Los tenedores y beneficiarios de los IVCs y/o de un interés en el fideicomiso que sea dueño de los IVCs no tendrán que rendir planillas o cualquier otro

24

reporte de contribuciones o requisito similar con relación al Estado Libre Asociado de Puerto Rico o cualquier Entidad Gubernamental por razón de tener, ser dueño de o transferir IVCs.

## ARTÍCULO 304.- CONVENIOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO.

El Estado Libre Asociado de Puerto Rico, con la intención de quedar contractualmente obligado, por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y subsiguientes de los IVCs que, hasta que todas las obligaciones con relación a dichos bonos hayan sido completamente pagadas o satisfechas de conformidad con sus términos, el Estado Libre Asociado de Puerto Rico:

(a)     no llevará a cabo acción alguna que:

(i)     limite o altere los derechos del Estado Libre Asociado de Puerto Rico de conformidad con el Plan y la Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los tenedores de los IVCs;

(ii)    perjudique los derechos y remedios de los tenedores de los IVCs; o

(iii)   limite la habilidad de los tenedores de los IVCs de monitorear el rendimiento del IVU Medido y de los Ingresos del Arbitrio al Ron del Estado Libre Asociado de Puerto Rico disponibles para el pago de los IVCs (de conformidad con el Plan y según establecido en el Contrato de IVC); disponiéndose, sin embargo, que lo anterior no impedirá que el Estado Libre Asociado de Puerto Rico pueda ejercer su poder, mediante un cambio en la ley, de eliminar el IVU Medido, o reemplazar el IVU Medido con un Impuesto Sustituto Medido, cada uno de conformidad con el Contrato de IVC, que protegerá a los tenedores de los IVC de que dicha eliminación o reemplazo reduzca la probabilidad de que la Condición de Rendimiento Superior del IVU se cumpla; y disponiéndose además que el Estado Libre Asociado de Puerto Rico divulgará a tiempo la información que pueda ser requerida bajo el Contrato de IVC con relación al IVU Medido, los recaudos del impuesto sobre ventas y uso, y cualesquiera ajustes a los umbrales base del 5.5% del IVU realizados de conformidad con el Contrato de IVC;

(b)     causará que cualquier Plan Fiscal del Estado Libre Asociado de Puerto Rico presentado a la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA luego de la Fecha de Efectividad, mientras dicha entidad esté presente y en funciones en Puerto Rico incluya disposiciones para el pago en cada año fiscal del principal de e intereses sobre los IVCs de conformidad con los términos del Contrato de IVC en la medida en que la Condición de Rendimiento Superior del IVU o la Condición

25

de Rendimiento Superior del Arbitrio al Ron, según sean aplicables, ocurran durante el año fiscal anterior.

## CAPÍTULO 4 – MUNICIPIOS

## ARTÍCULO 401.- FONDO EXTRAORDINARIO

Se crea el "Fondo Extraordinario para Atender el Recogido y Disposición de Residuos, Desperdicios y para Implementar Programas de Reciclaje en los Municipios", en adelante el "Fondo Extraordinario", el cual estará dentro del "Fondo de Equiparación de los Municipios" dispuesto en el Artículo 7.015 de la Ley 107-2020, según enmendada, pero en una cuenta separada de otros ingresos de dicho fondo, y que se utilizará para los propósitos específicos dispuestos en esta Ley.

## ARTÍCULO 402.- Declaración de Política Pública

El Gobierno de Puerto Rico por la presente declara que es la política pública del Estado Libre Asociado de Puerto Rico el garantizar a su población el recogido y disposición eficiente de la basura, desperdicios sólidos, escombros, así como la implementación de programas de reciclaje para atender estos residuos, por lo que en la medida que el Plan de Ajuste de la Deuda incluya reducciones en el monto de la deuda garantizada estas economías que se generarán deberán hacerse accesibles a los municipios para que puedan brindar estos servicios.

## ARTÍCULO 403.- REMISIÓN DE AHORROS EN EL PAGO DE DEUDA AL FONDO EXTRAORDINARIO

El Fondo Extraordinario establecido en el Artículo 401 de esta Ley se nutrirá de una asignación anual del Fondo General, la cual será equivalente a la reducción de deuda estatal del Plan de Ajuste de Deuda basada en la contribución del 1.03 de la propiedad mueble e inmueble, la cual no será menor de sesenta y dos millones de dólares ($62,000,000).

## ARTÍCULO 404.- PROPÓSITOS DEL FONDO EXTRAORDINARIO

Los municipios solo podrán acceder a los recursos económicos del Fondo Extraordinario aquí dispuesto, exclusiva y específicamente, para los propósitos descritos a continuación:

(a)     recogido y disposición de basura;

(b)     recogido y disposición desperdicios sólidos;

(c)     recogido y disposición de escombros;

(d)     implementación, recogido y disposición de reciclaje.

## ARTÍCULO 405.- FÓRMULA DE DISTRIBUCIÓN ENTRE MUNICIPIOS

A fin de lograr una justa distribución de los recursos del Fondo Extraordinario, se utilizará los siguientes criterios para determinar las cantidades a las que pueden tener acceso los municipios:

(a)     El total de personas beneficiarias del Programa de Asistencia Nutricional, per cápita, según certificación al efecto emitida por el Departamento de la Familia, que sea determinado en el año fiscal inmediatamente anterior o en el año fiscal más próximo que se tenga la información.

(b)     El presupuesto funcional per cápita de cada municipio, del año fiscal inmediatamente anterior o del año fiscal más próximo que se tenga la información.

(c)     El valor tasado de la propiedad tributable per cápita ubicada dentro de los límites territoriales de cada municipio, correspondiente al año fiscal inmediatamente anterior o al año fiscal más próximo que se tenga la información.

(d)     La población del municipio por milla cuadrada, según el último censo decenal.

La metodología para la distribución será determinada por los parámetros dispuestos en este Artículo, pero podrán incorporarse aquellos parámetros existentes para la distribución de los recursos del Fondo de Equiparación de los Municipios, siempre y cuando no sean contrarios a los propósitos y objetivos aquí descritos, por la Junta de Gobierno del CRIM. La aplicación de dicha metodología deberá beneficiar aquellos municipios que reciben el menor ingreso por contribución sobre la propiedad u otras fuentes, así como a los municipios con el mayor número de dependientes del Programa de Asistencia Nutricional y de mayor densidad poblacional.

## CAPÍTULO 5– ENMIENDA Y DEROGACIÓN DE CIERTAS LEYES PARA ALLEGAR FONDOS AL FONDO GENERAL Y GARANTIZAR QUE TODA LEGISLACIÓN CUMPLA CON LA DISPONIBILIDAD DE FONDOS ESTABLECIDOS EN EL PLAN FISCAL.

## ARTÍCULO 501.- SE ENMIENDA EL INCISO (A) DEL ARTÍCULO 3 DE LA LEY NÚM. 147 DE 18 DE JUNIO DE 1980, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"Artículo 3.- Facultades y Deberes de la Oficina de Gerencia y Presupuesto.

(a)     La Oficina de Gerencia y Presupuesto bajo las reglas, reglamentos, instrucciones y órdenes que el Gobernador prescribiere, asesorará al Primer Ejecutivo, a la Asamblea Legislativa y a los organismos gubernamentales en los asuntos de índole presupuestarios, programáticos y de gerencia administrativa, así como en asuntos de naturaleza fiscal relativos a sus funciones; llevará a cabo las funciones necesarias que permitan al Gobernador someter a la Asamblea Legislativa la propuesta del Presupuesto General del Gobierno, de conformidad con el Artículo 4 de esta Ley, incluyendo las Corporaciones Públicas. A su vez, velará por que la ejecución y administración del presupuesto por parte de los organismos públicos se conduzcan de acuerdo con las leyes y resoluciones de asignaciones, con las más sanas y adecuadas normas de administración fiscal y gerencial, y en armonía con lo dispuesto por el Plan de Crecimiento Económico y Fiscal aprobado de conformidad con la Ley de Responsabilidad Fiscal y de Revitalización Económica de Puerto Rico (el "Plan Fiscal y de Crecimiento Económico") y con los propósitos programáticos para los cuales se asignan o proveen los fondos públicos. Evaluará los programas y actividades de los organismos públicos en términos de economía, eficiencia y efectividad y le someterá al Gobernador informes con recomendaciones para la implantación de las mismas. Además, preparará y mantendrá el control de todos aquellos documentos fiscales y presupuestarios que sean necesarios para la administración del presupuesto y efectuará los cambios, enmiendas o ajustes que se ameriten, sujeto a las disposiciones legales y normas establecidas por la Asamblea Legislativa, y el Gobernador. A estos fines, y con el propósito de que la Asamblea Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas. Presentará junto al Secretario de Hacienda un informe detallado con respecto a las proyecciones de ingresos y gastos del año fiscal siguiente y correspondiente al Presupuesto General propuesto ante la Asamblea Legislativa en un término que no excederá cinco (5) días calendario luego de la presentación de la propuesta de Presupuesto General del Gobierno del Estado Libre Asociado de Puerto Rico por parte del Gobernador. Se mantendrá atento a las nuevas corrientes y tendencias en el ámbito presupuestario y gerencial de la administración pública para evaluar y adaptar aquellas técnicas, métodos y enfoques que apliquen al campo administrativo local, tanto en la formulación y ejecución del presupuesto como en la evaluación de programas, el análisis gerencial y la auditoría operacional y administrativa. Además, deberá proponer aquella legislación que se considere necesaria y conveniente para incorporar dichos enfoques y tendencias a nuestro proceso presupuestario y administrativo.

(b)     …"

**ARTÍCULO 502.- SE ENMIENDA EL ARTÍCULO 3 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, CONOCIDA COMO LA LEY DE LA AUTORIDAD PARA EL FINANCIAMIENTO DE LA INFRAESTRUCTURA DE PUERTO RICO, PARA QUE LEA COMO SIGUE:**

"**Artículo 3.- Definiciones**

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán los significados que se indican a continuación, a no ser que del contexto se entienda claramente otra cosa:

(a) …

…

(j)  Fondo de Desarrollo — Significará el Fondo de Desarrollo de Infraestructura creado bajo el Artículo 25 de esta Ley, conforme a lo dispuesto en la Ley Núm. 54 de 4 de Agosto de 1997 (27 L.P.R.A. § 431 et seq.)

(k) …

…

(r)  Cuenta del Corpus — Significará la Cuenta del Corpus del Fondo de Desarrollo según se establece en el inciso (a) del Artículo 25 de esta Ley. Los rendimientos de capital que genere esta cuenta deberán utilizarse según se establece en el Artículo 25 de esta Ley.

(s)  Cuentas adicionales — Significará cuentas creadas dentro del Fondo de Desarrollo, además de la Cuenta del Corpus, que sean necesarias para llevar a cabo los propósitos de esta Ley, según se establece en el inciso (a) del Artículo 25 de esta Ley."

**ARTÍCULO 503.- SE ENMIENDA EL INCISO (M) DEL ARTÍCULO 7 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7. – Poderes Generales.

La Autoridad tendrá todos los poderes necesarios y convenientes para llevar a cabo y efectuar los propósitos y disposiciones de esta Ley, incluyendo, pero sin que se entienda como limitación, lo siguiente:

(a) …

…

(m) Hipotecar o pignorar cualquier propiedad para el pago del principal de y los intereses sobre cualesquiera bonos emitidos por la Autoridad o bonos emitidos por una entidad beneficiada, y pignorar la totalidad o parte de los ingresos que la Autoridad recibiese.

(n) …

…"

**ARTÍCULO 504.- SE DEROGAN LOS ARTÍCULOS 25 Y 34 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, Y SE RENUMERAN LOS ARTÍCULOS 25-A y 35 COMO LOS ARTÍCULOS 25 y 34, RESPECTIVAMENTE.**

**ARTÍCULO 505.- SE ENMIENDA EL ARTÍCULO 23.01 DE LA LEY 22-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 23.01. — Procedimiento para el pago de derechos.

Todo dueño de un vehículo de motor, sujeto al pago de derechos anuales de permiso pagará en cualquier colecturía de rentas internas de cualquier municipio, en el lugar que designe el Secretario del Departamento de Hacienda, en las estaciones oficiales de inspección, bancos o en el lugar que designe el Secretario, los derechos que correspondan al vehículo para cada año, según se indican estos en la notificación que al efecto deberá enviarle el Secretario. Los derechos por este concepto se pagarán anticipadamente por todo el año excepto que cuando al momento de pagar los derechos resten menos de seis (6) meses para la próxima renovación, solo se requerirá el pago equivalente a los meses que resten por transcurrir en la fecha en que se devengan, contándose las fracciones de meses como un mes completo. Esta disposición aplicará a todos los vehículos de motor, independientemente de la cantidad que paguen por derecho de licencia por año. Al recibo de los derechos correspondientes, el colector expedirá el permiso para vehículo de motor que consistirá del formulario de notificación emitido por el Secretario, con las debidas anotaciones y firma del colector, indicativas de que se ha efectuado el pago de los derechos. Junto con el permiso, el colector entregará el correspondiente marbete o placas de número, según sea el caso. Solo se exhibirá un (1) marbete del vehículo de motor durante el año de vigencia del pago de derechos. Se autoriza al Secretario a que, previa consulta con el Secretario de Hacienda, adopte un Reglamento a los fines de conceder un descuento de hasta diez por ciento (10%) a aquellos conductores que opten por adquirir y pagar anticipadamente marbetes multianuales para sus vehículos. El dueño de la estación de inspección depositará en una cuenta especial para que el Departamento de Hacienda haga transferencias diarias de los marbetes expedidos. El Departamento de Hacienda aprobará un reglamento para estos fines, en el cual requerirá una fianza y seguros para garantizar que se reciban los recaudos de los marbetes vendidos. El cargo por servicio que cobre la estación de inspección, el banco o

cualquier otro lugar que designe el Secretario de Hacienda no será mayor de cinco dólares ($5). En los casos referentes a derechos de exámenes, incluyendo licencias de aprendizaje, expedición de duplicado de licencias, renovación de licencias de conducir, traspaso de vehículos y todo otro cobro de derechos, se utilizarán comprobantes de pago, sellos de rentas internas o cualquier otro mecanismo de pago que establezca el Secretario de Hacienda."

**ARTÍCULO 506. - SE DEROGA EL INCISO (E) DEL ARTÍCULO 23.02 DE LA LEY 22-2000, SEGÚN ENMENDADA, Y SE RENUMERAN LOS ACTUALES INCISOS F Y G COMO LOS NUEVOS INCISOS E y F, RESPECTIVAMENTE, PARA QUE LEA COMO SIGUE:**

(a)...

...

(d)   …

(e)   ...

(f)...

**ARTÍCULO 507. - SE DEROGA EL INCISO (L) DEL ARTÍCULO 1.03(B) DE LA LEY 351-2000, SEGÚN ENMENDADA, Y SE RENUMERAN LOS ACTUALES INCISOS M, N, Ñ, O, Y P, COMO LOS NUEVOS INCISOS L, M, N, Ñ, Y O, RESPECTIVAMENTE PARA QUE LEA COMO SIGUE:**

"Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán el significado indicado a continuación, a menos que del contexto surja otro significado:

(a)     …

...

(l) ...

(m)   …

(n)    ...

(ñ) ...

(o) ..."

## ARTÍCULO 508. - SE ENMIENDA EL INCISO (H) DEL ARTÍCULO 2.02 DE LA LEY 351-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"**Artículo 2.02 – Poderes Específicos de la Autoridad.**

La Autoridad tendrá las siguientes facultades y derechos:

(a) ...

(h) Tomar préstamos con el propósito de financiar los costos del Centro, los proyectos de mejoramiento y proyectos en las parcelas privadas o el Distrito y cumplir con cualquiera de sus propósitos y poderes corporativos, a discreción de la Junta; hacer y emitir bonos negociables de la Autoridad; garantizar el pago de dichos bonos, o cualquier parte de los mismos, mediante la prenda, hipoteca, cesión o escritura de fideicomiso de propiedades de la Autoridad localizadas en o fuera del Distrito, cargos por beneficio, otros ingresos, rentas, cuotas, recibos y cualquier interés en contratos, arrendamientos o subarrendamientos; entrar en cualesquiera acuerdos con los compradores o tenedores de dichos bonos o con otras personas con las cuales la Autoridad está obligada con relación a cualquier bono, emitido o por ser emitido, según la Autoridad considere aconsejable, los cuales constituirán contratos con dichos compradores o tenedores; obtener cualquier facilidad que aumente su capacidad para tomar dinero a préstamo o emitir deuda o que aumente su liquidez con relación a cualesquiera bonos en la forma en que la Autoridad determine ventajosa; y, en general, proveer garantías para el pago de los bonos y los derechos de los tenedores de estos."

(i)...

..."

## ARTÍCULO 509.- SE ENMIENDA EL ARTÍCULO 8 DE LA LEY 179-2002, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"Artículo 8.- Las agencias gubernamentales, los municipios, así como las entidades recipientes de asignaciones de fondos públicos los utilizarán para los fines establecidos en la resolución conjunta correspondiente y de ninguna manera, dispondrán de los mismos para otros propósitos o fines que no estén señalados de manera categórica y específica en la resolución conjunta aprobada.

Cualquier cambio o modificación de los propósitos o fines establecidos en la resolución conjunta original, conllevará el inicio o repetición por la Asamblea Legislativa de todos los procedimientos.

El cumplimiento con estas resoluciones conjuntas, asignando fondos públicos, se hará siguiendo las normas y procedimientos aplicables a los municipios y a las instrumentalidades gubernamentales. Con excepción de las personas naturales, todos los contratos suscritos y cualquiera otro documento legal estarán sujetos a las leyes del Estado Libre Asociado de Puerto Rico y serán interpretados de acuerdo a las mismas.

Con el propósito de que la Asamblea Legislativa pueda analizar que las asignaciones o reasignaciones de fondos públicos dispuestos en esta Ley cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas."

## ARTÍCULO 510.- SE ENMIENDA EL ARTÍCULO 31 DE LA LEY 272-2003, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"Artículo 31. — Disposición de Fondos.

La Oficina de Turismo distribuirá las cantidades recaudadas por concepto del Impuesto fijado en el Artículo 24 de esta Ley, de la siguiente manera:

(i) dos (2) por ciento del Impuesto total recaudado ingresará mensualmente a los fondos generales de la Oficina de Turismo para cubrir los gastos de operación, manejo y distribución de los recaudos del Impuesto, o para cualquier otro uso que disponga la Oficina de Turismo. (ii) cinco (5) por ciento del Impuesto total recaudado ingresará mensualmente al Fondo General del Departamento de Hacienda para los Años Fiscales 2005-2006 y 2006-2007, a las arcas de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008- 2009, y a partir del Año Fiscal 2009-2010 a las arcas de la Oficina de Turismo. A partir del año en que la Autoridad certifique al Departamento de Hacienda y a la Oficina de Turismo, el inicio de las operaciones del Centro de Convenciones, y durante los diez (10) años subsiguientes, este cinco por ciento (5%) estará disponible para cubrir cualquier déficit, si alguno, que surja de las operaciones de las facilidades que opera la Autoridad del Distrito del Centro de Convenciones, en reserva que mantendrá la Oficina de Turismo. Disponiéndose, sin embargo, que para cada año fiscal y/o cada vez que la Autoridad del Distrito del Centro de Convenciones proponga presentar un presupuesto que exceda el déficit de dos millones quinientos mil (2,500,000) dólares, el presupuesto de la Autoridad del Distrito del Centro de Convenciones deberá ser presentado a la Junta de Directores de la Autoridad a la Oficina de Turismo y al Secretario de Hacienda para los Años Fiscales 2005-2006 y 2006-2007 y a la Junta de Directores de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 en una reunión específica a estos fines, y a la Junta de Directores de la Autoridad y a la Oficina de Turismo, comenzando el Año Fiscal 2010-2011 en adelante. Este cinco por ciento (5%) se mantendrá disponible durante cada año fiscal en una cuenta de reserva especial que

mantendrá la Oficina de Turismo para cubrir cualquier déficit en exceso de dos millones quinientos mil (2,500,000) dólares, que surja de la operación de las facilidades de la Autoridad del Distrito del Centro de Convenciones. Para cada año fiscal, cualquier sobrante, luego de cubrir dicho déficit operacional, si alguno, se liberará de la reserva especial y estará disponible para el uso del Departamento de Hacienda para los Años Fiscales 2005-2006 y 2006-2007, de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 y a partir del Año Fiscal 2010-2011 para el uso de la Oficina de Turismo. A partir del Año Fiscal 2015-2016, y durante los cinco (5) años subsiguientes, este cinco por ciento (5%) será transferido mediante aportaciones trimestrales por el Departamento a la Autoridad para cubrir los costos asociados exclusivamente a la operación del Centro de Convenciones de Puerto Rico. Disponiéndose, sin embargo, que para cada año fiscal la Autoridad del Distrito del Centro de Convenciones deberá presentar sus estados financieros auditados, conjuntamente con un informe evidenciando el uso de los fondos transferidos según establecido en los incisos (ii) y (iv) de este apartado a la Junta de Directores de la Autoridad y al Director de la Oficina de Turismo, en una reunión específica a esos efectos. Si al finalizar algún año fiscal tales estados financieros auditados reflejan una ganancia neta, la Autoridad del Distrito del Centro de Convenciones devolverá a la Oficina de Turismo la cantidad generada como ganancia neta sin exceder el monto total transferido por la Oficina de Turismo a la Autoridad del Distrito del Centro de Convenciones en ese mismo año fiscal, por virtud de los incisos (ii) y (iv) de este apartado. (iii) dos millones quinientos mil (2,500,000) dólares serán transferidos por la Oficina de Turismo a la Autoridad del Distrito del Centro de Convenciones en aportaciones trimestrales de seiscientos veinticinco mil (625,000.00) dólares para cubrir los costos asociados exclusivamente a la operación del Distrito del Centro de Convenciones. Disponiéndose, sin embargo, que para cada año fiscal y/o cada vez que se proponga presentar un presupuesto modificado, el presupuesto de la Autoridad del Centro de Convenciones deberá ser presentado a la Junta de Directores de la Autoridad y Director Ejecutivo de la Oficina de Turismo, en una reunión específica a esos efectos. Esta cantidad será transferida según establecido en este apartado a partir del Año Fiscal 2015-2016, y por un período de cinco (5) años. (iv) Hasta cuatro millones (4,000,000) de dólares se mantendrán disponibles durante cada año fiscal, en una cuenta de reserva especial que mantendrá la Oficina de Turismo para gastos operacionales dedicados a los asuntos especializado del sector, sus gastos y/o la fiscalización e implementación por este del Contrato de Servicios de Mercadeo de Destino contemplado en el Artículo 8 de la "Ley para la Promoción de Puerto Rico como Destino". (v) El remanente que resulte después de las asignaciones y reservas dispuestas en los incisos (i), (ii), (iii) y (iv), hasta un tope de veinticinco millones (25,000,000) de dólares, se le asignarán a la Corporación. Los fondos asignados a la Corporación serán utilizados por esta para la promoción, mercadeo, desarrollo y fortalecimiento de la industria turística en Puerto Rico. Si el remanente excediera los veinticinco millones (25,000,000) de dólares, dicho exceso será utilizado por la Oficina de Turismo para el desempeño de sus funciones dedicados a los asuntos especializado del sector y sus gastos. La Oficina de Turismo del

34

Departamento de Desarrollo Económico y Comercio le someterá mensualmente a la Autoridad y a la Corporación un desglose de los recaudos por concepto del impuesto."

## ARTÍCULO 511.- SE AÑADE UN NUEVO ARTÍCULO 7A A LA LEY 103-2006, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"Artículo 7A.- Deber Ministerial de la Oficina de Gerencia y Presupuesto

Con el propósito de que la Asamblea Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de treinta (30) días laborables contados a partir desde que se le son requeridas. Dicha certificación deberá incluir la cantidad exacta disponible, sea mayor o menor a la dispuesta en la medida en consideración.

Al emitir la certificación oficial, la Oficina de Gerencia y Presupuesto garantiza la disponibilidad de dichos fondos. Una certificación oficial en donde se informe que los fondos están comprometidos para una obra o uso específico distinto a lo dispuesto en la medida legislativa que se solicita deberá venir acompañada con la evidencia de la obligación, copia de las facturas y cualquier otra información pertinente que demuestre la no disponibilidad de dichos fondos.

El proceso para requerir las certificaciones oficiales de disponibilidad de fondos por parte de las comisiones legislativas no requerirá de ningún formulario o trámite especial, solo requerirá una misiva de la comisión legislativa solicitando la certificación que se trate.

Cuando cualquier comisión permanente, especial o conjunta de la Asamblea Legislativa de Puerto Rico presente cualquier informe recomendando la aprobación de alguna medida legislativa en la cual se haya solicitado una certificación oficial tendrá que incluir en el referido informe una sección titulada "Deber Ministerial de la Oficina de Gerencia y Presupuesto referente a disponibilidad de fondos". En esta Sección, se aseverará el impacto fiscal, si alguno, que se estime la aprobación de la medida tendría sobre los presupuestos de las agencias, departamentos, organismos, instrumentalidades o corporaciones públicas. Si la Oficina de Gerencia y Presupuesto no emite la correspondiente certificación en el tiempo dispuesto en este Artículo, se incluirá en dicha Sección del informe el siguiente texto: "La Oficina de Gerencia y Presupuesto no suministró la certificación oficial de disponibilidad de fondos en el tiempo dispuesto por ley incumpliendo con el deber ministerial dispuesto en la Ley 103-2006, según enmendada, mejor conocida como "Ley para la Reforma Fiscal del Gobierno del Estado Libre Asociado de Puerto Rico de 2006".

**ARTÍCULO 512.- SE ENMIENDA LA SECCIÓN 3060.11 DE LA LEY 1-2011, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

Sección 3060.11 – Disposición de Fondos.

"El producto de los impuestos y derechos de licencia recaudados por virtud de este Subtítulo ingresará en el Fondo General del Tesoro de Puerto Rico."

**ARTÍCULO 513.- SE ELIMINA LA SECCIÓN 3060.11A DE LA LEY 1-2011, SEGÚN ENMENDADA.**

**ARTÍCULO 514.- SE DEROGA LA LEY NÚM. 39 DEL 13 DE MAYO DE 1976, SEGÚN ENMENDADA.**

**ARTÍCULO 515.- SE ENMIENDA EL ARTÍCULO 7.018 DE LA LEY 107-2020, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7.018 – Fondos – Fideicomisos; Distribución

Los fondos en el fideicomiso general que el CRIM establece con el Fiduciario Designado según el inciso (c) del Artículo 7.003 de este Capítulo, serán distribuidos por el CRIM en el orden de prioridad que a continuación se indica:

(a)  La cantidad que corresponda a la contribución especial del 1.03% será depositado en el Fondo General.

(b)  ...

(c)  ...

..."

**ARTÍCULO 516.- SE ENMIENDA EL ARTÍCULO 7.027 DE LA LEY 107-2020, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7.027 – Recaudación e Ingreso de Contribuciones en Fondos y Aplicación del Producto de las Contribuciones (Fondo de Redención de Bonos)

El producto de las contribuciones que se imponen por los Artículos 7.025 y 7.026 ingresará al fideicomiso general establecido por el CRIM con la Autoridad de Asesoría Financiera y Agencia Fiscal de Puerto Rico (AAFAF), de conformidad con el Capítulo I de este libro.

(a)   El producto de las contribuciones especiales sobre la propiedad impuesta por el Artículo 7.026 ingresará al Fondo General.

(b)   ...

(c)   ...

(d)   ...”

**ARTÍCULO 517.- SE ENMIENDA EL INCISO (H) DEL ARTÍCULO 3 DE LA LEY NÚM. 230 DE 12 DE JULIO DE 1974, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

“Cuando se usen en esta Ley, los siguientes términos tendrán el significado que aquí se dispone:

(a)      …

(b)      …

…

(h)      Entidades corporativas –Significa todo organismo gubernamental, incluyendo las corporaciones públicas, con o sin tesoro independiente y con o sin autonomía fiscal y presupuestaria, los municipios del Gobierno de Puerto Rico y sus instrumentalidades.

(i)      …

…”

**ARTÍCULO 518.- “Las transacciones del Plan de Ajuste no se pueden utilizar para mitigar causas de acción al amparo de la Ley 3-2013, según enmendada.**

**CAPÍTULO 6 – DISPOSICIONES MISCELÁNEAS**

**Artículo 601.-Prohibición del menoscabo de las Obligaciones de la Corporación del Fondo de Interés Apremiante (COFINA)**

Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier Año Fiscal no menoscabarán bajo concepto alguno las obligaciones de la Corporación del Fondo de Interés Apremiante (COFINA), incluyendo las obligaciones y reservas creadas.

Artículo 602.-Autorización al Representante del Gobernador

Las responsabilidades, facultades, deberes y autorizaciones concedidas por la presente Ley al Representante del Gobernador, estará limitada exclusivamente a lo dispuesto en esta Ley y no a futuras emisiones de deudas".

Artículo 603.- Separabilidad.

Si cualquier cláusula, párrafo, subpárrafo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

Disponiéndose, sin embargo, que la separabilidad de este Artículo no será de aplicación al Artículo 605. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales no hagan cumplir las Transacciones de Reestructuración y sus respectivas autorizaciones en los Artículos 104, 201 y 301 si se deja sin efecto, invalida o declare inconstitucional la condición suspensiva para evitar cualquier recorte o congelación de pensiones a empleados gubernamentales en el Plan de Ajuste, o las disposiciones de los Artículos 102 o 105 de esta Ley.

Artículo 604.- Supremacía.

Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición general o específica de cualquier otra ley o reglamento del Gobierno que sea inconsistente con esta Ley. Si hubiera conflicto entre las versiones en inglés y en español de los Capítulos 1, 2 y 3 de esta Ley, prevalecerá la versión en inglés.

Artículo 605.- Vigencia.

Esta Ley comenzará a regir inmediatamente luego de su aprobación, excepto por el Capítulo 5 de esta Ley, el cual comenzará a regir en la Fecha de Efectividad. Quedará

inmediatamente sin vigencia esta ley y cualquier transacción, emisión o gestión relacionada con la misma será nula si se ordena y se procede con algún recorte a las pensiones de los empleados gubernamentales en el Plan de Ajuste o Reestructuración. La vigencia de esta ley queda condicionada a cero recortes en las pensiones.

## ENGLISH VERSION OF THIS ACT

## CHAPTER 1: GENERAL PROVISIONS

## Article 101.- Title

This Act shall be known and may be cited as the "Ending Puerto Rico's Bankruptcy Act."

## ARTICLE 102- PUBLIC POLICY STATEMENT OF THE COMMONWEALTH GOVERNMENT

This legislation is consistent with the objectives of the Puerto Rico Oversight, Management and Economic Stability Act (PROMESA) and is adopted under the current rule of law. With the specific purpose of making the goals set forth below viable, the Legislature of the Commonwealth affirms that it intends to comply with the processes and mechanisms established in PROMESA; and, at the same time, to achieve the following public policy objectives:

1.      To take the affirmative actions required to concretize the successful exit of the Commonwealth of Puerto Rico from the bankruptcy process provided in Title III of PROMESA;

2.      To make feasible the access of the Commonwealth of Puerto Rico to the short and long-term credit markets, obtaining reasonable interest rates, in order to meet the borrowing needs of our local government.

3.      To perfect the approval of the first of four balanced budgets, legislated, and signed by the Legislative and Executive Branches, respectively, on June 30, 2021; and which was identified as Joint Resolution Number 8-2021;

4.      To take all necessary actions to ensure that the Fiscal Oversight Board concludes its financial monitoring work as soon as possible and in an orderly manner.

5.      It is hereby declared that the Government of the Commonwealth of Puerto Rico shall have the following objectives as priority public policy matters:

a. **To protect the pensions of our retirees.** The purpose of this objective is to avoid cuts to the pensions of 100% of retirees. This protection will be established in the present legislation and in any future legislation. To achieve this objective, a specific clause on this matter is provided in this law.

b. **Fixed allocation of $500 million in the budget for the University of Puerto Rico for a period of five years, freezing programmed cuts.** This goal is intended to preserve the capacity of the UPR to carry out its vital educational mission and ensure the necessary resources to guarantee the accreditation of all its programs and achieve fair access for those students who have financial need.

c. **Creation of the University Scholarship Trust Fund.** The purpose of this initiative is to create an investment trust to preserve the capital that would be granted for scholarships for UPR students, depending on the availability of funds.

d. **Protect the totality of the contributions to the medical plans of central government employees, avoiding the proposed cuts.** The purpose of this initiative is to identify funds to avoid the reduction of contributions to the health plans of public employees of the central government for their health insurance. This measure would benefit more than 60,000 Puerto Rican workers and families.

e. **Allocate the necessary funds for municipalities.** This objective seeks to provide fiscal stability to the municipalities and the continuity of the essential services they offer. Specifically, the Legislature also proposes that the funds not used for the payment of municipal debt obligations after the adoption of the adjustment plan revert to the municipalities.

f. **Endorse the creation of the special fund for social equality.** This proposal - to be legislated soon - intends to create a permanent fund with the task of combating poverty and social inequality; giving priority in its allocations to the attention of the needs of marginalized communities, the special education program, the most vulnerable population groups, fights against school dropouts, establishing an integrated plan for the homeless, and gradually increasing allocations for non-profit, community self-management and faith-based entities to offer direct services, according to the availability of funds.

g. **Establish the goal of 100% of the population having medical coverage**. The purpose of this initiative is to extend and/or facilitate access to medical

coverage to some 225,000 citizens who currently lack medical plans and evaluation of the health system with and allocation of one million dollars, subject to the availability of funds.

h.   Creation of the Strategic Investment Fund for Economic Development to inject and for a combined total of three hundred million dollars ($300,000,000.00) for a period of five (5) years investment. This initiative proposes the creation of a Strategic Investment Fund divided into four categories: (1) investments to close basic skills gaps; (2) small business capitalization programs; (3) the development of business growth programs through business capitalization and (4) for the capitalization of cooperativism sector, subject to the availability of funds;.

i.   Establish a mechanism that allows the Government of Puerto Rico to advance the terms of payments and cancellation of debt. This mechanism has the sole purpose of authorizing the Government of Puerto Rico to refinance the debt payment agreements, to accelerate or pay off the agreed debt, in accordance with the future fiscal situation and without affecting the services of the government of Puerto Rico.

j.   Establish a joint working group between the Legislative Branch, the Executive Branch, and the Fiscal Oversight Board. The purpose of this initiative is to design the necessary legislation to ensure that, once the public debt restructuring process is concluded, the Government of Puerto Rico does not go back into debt without having the economic resources to meet its payment obligations; nor will the improper practices of approving unbalanced budgets, with unrealistic revenue estimates or excessive expenditures be repeated. Likewise, the eventual transfer of all information, systems, resources and accounting methods that are currently under the custody of the Fiscal Oversight Board, regarding the financial processes of the Government, to be used by the Government of Puerto Rico as part of its fiscal responsibilities, is also proposed.

The Debt Restructuring Transactions authorized by means of this Law are fully subject and conditioned to Financial Oversight and Management Board (FOMB) amending its Fiscal Plan to include all the provisions contained in subsection (5) of this section."

Article 103.- Definitions.

(a)   5.5% SUT: means the present and future revenues and collections generated by the portion of the sales and use tax imposed by the Government of Puerto Rico

pursuant to Sections 4020.01 and 4020.02 of Subchapter D of the Puerto Rico Internal Revenue Code that corresponds to a tax rate of five and one-half percent (5.5%).

(b)　　Ancillary Agreements: means the Plan, the Confirmation Order, the GO Bond Indenture, the form of the GO Bonds, the CVI Indenture, the form of the CVIs, and any other agreement or instrument (including any trust) related thereto or entered into in connection with, or in furtherance of, a Restructuring Transaction and in accordance with, or in furtherance of, the Plan or a Qualifying Modification.

(c)　　HTA: means the Puerto Rico Highways and Transportation Authority.

(d)　　CCDA: means the Puerto Rico Convention Center District Authority.

(e)　　PBA: means the Puerto Rico Public Buildings Authority.

(f)　　PRIFA: means the Puerto Rico Infrastructure Financing Authority.

(g)　　MBA: means the Puerto Rico Metropolitan Bus Authority.

(h)　　Fiscal Year: means the fiscal year of the Commonwealth, which begins on July 1 and ends on June 30.

(i)　　GO Bonds: means the general obligation bonds issued by the Commonwealth under the GO Bond Indenture pursuant to this Act, the Plan, and the Confirmation Order, and any general obligation bonds subsequently issued by the Commonwealth under the GO Bond Indenture in accordance and consistent with the terms of the Plan to retire, refinance or defease general obligation bonds originally issued pursuant to the Plan and the Confirmation Order.

(j)　　PR Code: means Act No. 1-2011, as amended, and known as the "Internal Revenue Code for a New Puerto Rico."

(k)　　Rum Tax Outperformance Condition: means that Commonwealth Rum Tax Revenues in any given Fiscal Year, calculated in accordance with and net of permitted deductions contemplated by the Plan and set forth in the CVI Indenture, exceed the thresholds contemplated by the Plan and set forth in the CVI Indenture for such Fiscal Year.

(l)　　SUT Outperformance Condition: means that the Measured SUT or the Substitute Measured Tax collections, as applicable, in any given Fiscal Year exceed the thresholds contemplated by the Plan and set forth in the CVI Indenture for such Fiscal Year.

(m)     GO Bond Indenture: means one or more trust agreements, indentures, resolutions and any supplements or amendments thereto, or similar contracts or agreements, pertaining to the GO Bonds to be executed and delivered by the Governor's Designee authorizing: (1) the issuance of the GO Bonds and describing the terms thereof; and (2) the payment of the Financing Costs, each in accordance with the terms of the Plan.

(n)     CVI Indenture: means one or more trust agreements, indentures, resolutions and any supplements or amendments thereto, or similar contracts or agreements, pertaining to the CVIs to be executed and delivered by the Commonwealth authorizing: (1) the issuance of the CVIs by the Commonwealth and describing the terms thereof; and (2) the payment of the Financing Costs of the CVIs, each in accordance with the terms of the Plan.

(o)     Financing Costs: means the costs associated with the Restructuring Transactions, including, without limitation, the costs, fees and expenses to (i) issue, service or repay the GO Bonds and the CVIs, as applicable, whether such costs are incurred upon issuance of such GO Bonds or CVIs or over the term of such instruments, (ii) make payments as required by the applicable Ancillary Agreements, (iii) pay any stamp, issuance or similar taxes and other charges related to the Restructuring Transactions (if any), (iv) prepare for and enter into the Restructuring Transactions, and

(v)     perform any ongoing activities relating to the Restructuring Transactions. For the avoidance of doubt, Financing Costs also includes pre-closing and post-closing administrative fees and expenses incurred in connection with the applicable Ancillary Agreements.

(p)     Government Entity: means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

(q)     Commonwealth: means the Commonwealth of Puerto Rico.

(r)     Effective Date: means the date on which the Plan becomes effective in accordance with its terms.

(s)     GO Bonds Trustee: means the trustee(s) or replacement trustee(s), as the case may be, appointed in accordance with the terms and conditions of the GO Bond Indenture.

(t)     CVI Trustee: means the trustee(s) or replacement trustee(s), as the case may be, appointed in accordance with the terms and conditions of the CVI Indenture.

(u)     Debt Service Fund: shall mean a debt service fund established pursuant to the GO Bond Indenture.

(v)    Substitute Measured Tax: means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Indenture.

(w)    Commonwealth Rum Tax Revenues: means the total collections of the excise tax on distilled spirits imposed under the U.S. Internal Revenue Code of 1986 (as amended from time to time) received by the Commonwealth as documented in the U.S. Department of the Treasury monthly detailed activity report of net excise tax paid to the Commonwealth and certified by the Puerto Rico Department of Treasury.

(x)    CVIs or Contingent Value Instruments: means, collectively, the general obligation notes issued under the CVI Indenture pursuant to this Act, the Plan, and the Confirmation Order, consisting of the GO CVIs and the Clawback CVIs.

(y)    Clawback CVIs: means a series of CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to debt issued by HTA, CCDA, PRIFA and MBA. For the avoidance of doubt, the Clawback CVIs may be issued in one or more subseries, including, without limitation, the Rum Tax Claims Subseries.

(z)    GO CVI: means a series of CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to direct or guaranteed general obligation debt of the Commonwealth.

(aa) Measured SUT: means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code (or used for any other purpose established by law), up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

(bb) Act means the "Act to End Puerto Rico's Banktrupcy."

(cc) Clawback CVI Lifetime Cap: means, initially as of the Effective Date, $5,239,002,764. The Clawback CVI Lifetime Cap shall be reduced each Fiscal Year in an amount equal to payments made on the Clawback CVIs pursuant to the CVI Indenture upon, and as a result of, the occurrence of an SUT Outperformance Condition. In addition, the portion of the Clawback CVI Lifetime Cap allocable to the Rum Tax Claims Subseries shall be further reduced each Fiscal Year in an amount equal to payments made on the Rum Tax Claims Subseries pursuant to the CVI Indenture upon, and as a result of, the occurrence of a Rum Tax Outperformance Condition.

(dd) GO CVI Lifetime Cap: means, initially as of the Effective Date, $3,500,000,000. The GO CVI Lifetime Cap is reduced annually in an amount equal to payments made on the GO CVIs pursuant to the CVI Indenture.

(ee) Qualifying Modification: means a "Qualifying Modification" for CCDA and/or PRIFA approved pursuant to Title VI of PROMESA.

(ff) Confirmation Order: means the order of the Title III Court confirming the Plan.

(gg) Person: means any natural person or legal entity, including, but not limited to, the Commonwealth, any Government Entity, or any firm, partnership, joint venture, trust, estate, limited liability company, corporation of individuals, association, or public or private corporation, organized or existing under the laws of Puerto Rico, the United States of America, any state or any other jurisdiction, or any state, municipality, political subdivision, taxing authority, agency or instrumentality of the United States of America, any state or any other jurisdiction, or any combination thereof.

(hh) Plan: means the joint Plan of Adjustment for the Commonwealth, ERS, and PBA (and any other Government Entity included in any such plan) confirmed under Title III of PROMESA, including the exhibits and schedules thereto, as the same may be amended, supplemented, or modified from time to time.

(ii) PROMESA: means the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq., as it may be amended or modified.

(jj)        Existing Claims: means claims against the Commonwealth, PBA, ERS, HTA, PRIFA, CCDA, and MBA.

(kk) Governor's Designee: means the Governor, the Secretary of the Treasury or such other officer of a Government Entity as may be designated by the Governor through Executive Order.

(ll) Secretary of the Treasury: means the Secretary of the Treasury of the Commonwealth.

(mm) Commonwealth Retirement Systems: means the ERS, the Teacher's Retirement System and the Judicial Retirement System.

(nn) ERS: means the Retirement System of the Employees of the Government of the Commonwealth of Puerto Rico.

(oo) Rum Tax Claims Subseries: means a subseries of Clawback CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to Commonwealth Rum Tax Revenues retained by the Commonwealth and not transferred to PRIFA.

(pp) Restructuring Transactions: means each of the transactions contemplated by, or in furtherance of, the Plan or a Qualifying Modification, including, without limitation, the issuance of the GO Bonds, the CVIs, and any trust related thereto and the cancellation and extinguishment of the Existing Claims pursuant to the Plan or a Qualifying Modification, as applicable.

## Article 104. – Authorization on Actions of Government Entities.

Notwithstanding any provision, prohibition or restriction of any law, order, rule or regulation of the Commonwealth, each Government Entity required to take or perform any action necessary or convenient to carry out the Plan and/or a Restructuring Transaction is hereby authorized to take and shall take any such actions necessary or convenient to carry out the Plan and/or a Restructuring Transaction, without being subject to the requirements of any provision, prohibition, or restriction of any other law, order, rule or regulation, including, but not limited to, (a) negotiating, entering into and executing any agreement, deed, certificate or document, and (b) disbursing or transferring funds as provided for and/or required by the Plan. The authorization provided by this Article 103 shall be sufficient for the Governor's Designee, on behalf of the Commonwealth, and any executive director, president or officer of similar rank and authority, on behalf of the Government Entity they represent, to take any action contemplated by the Plan and/or a Restructuring Transaction and no other authorization shall be required, including the authorization of any board of directors, commission, department, or Puerto Rico regulator. For the avoidance of doubt, the authorization granted herein is as broad and sufficient as legally necessary to enable the Commonwealth to establish, fund, and otherwise implement any and all provisions and/or mechanisms included in the Plan to safeguard the pensions of retired government employees. Moreover, the Puerto Rico Fiscal Agency and Financial Advisory Authority is hereby authorized to require any Government Entity to comply with the requirements of this Article.

Without limiting the generality of the foregoing and notwithstanding any provision of any law of the Commonwealth, on and after the Effective Date, the Governor's Designee shall be authorized to: (a) approve the offering, sale and issuance of the GO Bonds and the CVIs as contemplated by the Plan and provided in Chapters 2 and 3 of this Act, respectively; (b) provide for the cancellation and extinguishment of the Existing Claims pursuant to and in accordance with the terms of the Plan or a Qualifying Modification, as applicable; (c) authorize the payment of the Financing Costs in accordance with the terms of the Plan; (d) approve the form of the GO Bond Indenture,

CVI Indenture, and other Ancillary Agreements and enter into the GO Bond Indenture, the CVI Indenture and other Ancillary Agreements on behalf of the Commonwealth; (e) include in the Ancillary Agreements any covenant, term, or other condition as may be required by the Plan, including (1) consenting on behalf of the Commonwealth to the application of the laws of the State of New York to govern and interpret such Ancillary Agreements, and the jurisdiction of any state or federal court with respect to any suit or proceeding related to the GO Bonds, the CVIs, the Ancillary Agreements and/or any other matters related to the Restructuring Transactions, and (2) the creation of liens over the money, securities and other assets on deposit with the GO Bonds Trustee or the CVI Trustee for the benefit of the holders of GO Bonds and CVIs, respectively; and (f) take any and all other actions necessary or convenient to carry out the Restructuring Transactions. For the avoidance of doubt, notwithstanding the application of the laws of the State of New York to govern and interpret any Ancillary Agreement, the authorization by the Commonwealth of the GO Bond Indenture and the CVI Indenture and the issuance by the Commonwealth of the GO Bonds and the CVIs shall be governed by the laws of the Commonwealth, provided that, subject to the terms of the GO Bond Indenture and the CVI Indenture, the holders of the New GO Bonds and the CVIs, respectively, shall be entitled to such rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

The authorization to issue bonds conferred by the Present Act will be limited exclusively to the bonds mentioned and required to implement the Plan and will be done in accordance with the Plan, the GO Indentures, the Confirmation Order, and the other Ancillary Agreements. The Governor of Puerto Rico or his designee must request the authorization of the Legislative Assembly for any future bond issuance that is separate from the one hereby authorized.

## ARTICLE 105 - PUBLIC POLICY; PROTECTION OF THE PENSIONS OF THE RETIREES OF THE GOVERNMENT OF THE COMMONWEALTH.

The Government of the Commonwealth of Puerto Rico hereby declares that it is public policy of the highest priority to protect the pensions of its public servants, who are one of the most important groups in our society. As an essential part of this public policy, the protection of the pensions of all our retirees is an important and unwavering commitment. Therefore, with regard to the pensions of government retirees, it is hereby provided as follows:

(a)     All pensions of the retirees of the government of the Commonwealth that have accrued through the date of this Act, which are recognized under the laws of Puerto Rico in effect as of the date of this Act, are hereby recognized as debts contracted by the Government of Puerto Rico and by virtue of this legislation, are protected and excluded from all types of budget cuts or reductions. This protection of accrued benefits protects

against any reduction to any pension accrued through the Effective Date included in the Plan of Adjustment but not against accruals of any sort that would have accrued after the Effective Date; and it is provided, to the extent allowed by law, that in the Order of Confirmation of the Plan of Adjustment, pension payments at their current level as accrued through the Effective Date will be considered as debt not subject to reduction by the Fiscal Oversight Board under PROMESA. This protection includes the present legislation authorizing the issuance of bonds for debt restructuring and any future legislation, including future fiscal plans, that commit revenues of the government of the Commonwealth. Any debt transaction under this or any future Act shall comply with this requirement.

(b)     In order to comply with the public policy of honoring all present pensions, the Legislature will appropriate the necessary revenues for the payment thereof in the budget of each corresponding fiscal year. The provisions of this Article are not severable from the rest of the Act, should this Article be struck down.

## CHAPTER 2 – THE GENERAL OBLIGATION BONDS

### Article 201.- Issuance of the General Obligation Bonds.

(a)     From and after the Effective Date, the Governor's Designee shall be authorized to approve the offering, sale and issuance of the GO Bonds, from time to time, pursuant to the terms of the GO Bond Indenture, the Confirmation Order, the Plan and the other Ancillary Agreements, up to an aggregate principal amount of $7,414,063,543.25, and to approve the offering, sale and issuance, from time to time, of additional GO Bonds, subject to the limitations contemplated by the Plan and set forth in GO Bond Indenture, to retire, refinance or defease GO Bonds originally issued pursuant to the Plan and the Confirmation Order.

(b)     The GO Bonds shall include current interest bonds and capital appreciation bonds, shall be dated, shall bear interest at such rate, shall mature at such time or times, not exceeding thirty (30) years from their date or dates of issuance, and shall be subject to redemption or prepayment, in each case, to the extent applicable and as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the GO Bond Indenture in accordance and consistent with the Plan. The Governor's Designee, as representative of the Commonwealth, shall determine the form of the GO Bonds and the manner of execution of the GO Bonds, and shall fix the denomination or denominations of the GO Bonds and the place or places of payment thereon and the other terms thereof, all in accordance and consistent with the Plan. At the discretion of the Governor's Designee, the GO Bonds may be issued in one or more separate series.

(c) The GO Bonds shall be legal, valid and binding obligations of the Commonwealth, issued pursuant to Article VI, Section 2 of the Commonwealth Constitution, and payable in accordance with the terms of the GO Bond Indenture and the other Ancillary Agreements.

(d) When any official whose signature or facsimile thereof appears on any GO Bond authorized under this Act ceases to hold office before the delivery of said GO Bonds, said signature or facsimile shall, nevertheless, be valid and sufficient, it being deemed for all purposes as if such official had remained in office until such delivery. Furthermore, any GO Bond may bear the signature or facsimile of those persons who, at the time said bond is executed, are the proper officials to sign it, but who, on the date of the GO Bond, were not holding office.

(e) The GO Bonds issued pursuant to the provisions of this Act shall be deemed to be negotiable instruments under the laws of Puerto Rico.

(f) The GO Bonds authorized by this Act may be issued as coupon bonds or in registered form, or both, as determined in the GO Bond Indenture.

## Article 202.- Pledge of Good Faith, Credit and Taxing Power.

The good faith, credit and taxing power of the Commonwealth are hereby irrevocably pledged for the prompt payment of principal and interest on the GO Bonds issued under the provisions of this Act as and when due in accordance with the terms of the GO Bond Indenture. The Secretary of the Treasury is hereby authorized and directed to pay the principal and interest on the GO Bonds as they mature or upon their earlier redemption or prepayment in accordance with the GO Bond Indenture, from available resources (recursos disponibles) of the Commonwealth in the Fiscal Year in which such payment is required, and the provisions of this Act concerning the payment of the principal and interest on the GO Bonds shall be deemed a continuing appropriation for the Secretary of the Treasury to make such payments, even if no specific appropriations are made for such purpose. The Governor's Designee is hereby authorized and directed to include in the GO Bond Indenture the commitment which the Commonwealth hereby enters into with respect to the GO Bonds, and it shall be stated on said GO Bonds that the good faith, credit and taxing power of the Commonwealth are thus pledged.

## Article 203.- Debt Service Fund; Statutory Lien

(a) The Governor's Designee is hereby authorized to establish the Debt Service Fund with the GO Bonds Trustee for the payment of the GO Bonds. Until the GO Bonds have been paid or satisfied in full in accordance with their terms, on each calendar month, the Commonwealth shall deposit with the GO Bonds Trustee cash in the aggregate amount equal to (i) one-sixth (1/6) of the Commonwealth's semi-annual obligation with

respect to the payment of interest to accrue on the GO Bonds and (ii) one twelfth (1/12) of the Commonwealth's annual obligation with respect to the payment of principal on the GO Bonds. Such funds shall be held and invested by the GO Bonds Trustee in accordance with the provisions of the GO Bond Indenture.

(b)     Upon their issuance, the GO Bonds shall automatically be secured by a first priority statutory lien over the funds deposited in the Debt Service Fund, including any income and revenues generated therefrom. Such first priority statutory lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person. No instrument needs to be executed or delivered or recorded in any official record or in any government registry or office in order to perfect or continue such first priority statutory lien or to establish or maintain the priority thereof, and such lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of such lien.

## Article 204.- Tax Exemption.

The GO Bonds, including, but not limited to, any payments or income with respect to the GO Bonds and the transfer of the GO Bonds, shall, at all times, be totally exempt from all kinds of taxes (including, without limitation, income taxes), assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith. Holders and beneficial owners of the GO Bonds shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Commonwealth or any Government Entity by reason of holding, owning or transferring the GO Bonds.

## Article 205.- Commonwealth Covenants.

The Commonwealth, with the intent of being contractually bound, hereby agrees and covenants for the benefit of all initial and subsequent holders of GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will:

(a)     take no action that would (1) impair the monthly deposit of funds to the Debt Service Fund pursuant to Article 203 hereof, (2) limit or alter the rights vested in the Commonwealth in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the GO Bonds or (3) impair the rights and remedies of the holders of the GO Bonds;

(b)     do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any federally tax-

exempt GO Bonds shall be and remain excludable from gross income for federal income tax purposes, to the extent applicable;

(c)      cause any post-Effective Date Fiscal Plan of the Commonwealth submitted to the Financial Oversight and Management Board for Puerto Rico under PROMESA to include provisions for the payment in each Fiscal Year of the principal of and interest on the GO Bonds in accordance with the terms of the GO Bond Indenture; and

(d)      to the extent necessary to satisfy its obligations to pay the GO Bonds, apply (i) the proceeds of the 1.03% property tax levied pursuant to Act 107-2020, as amended, and collected by the Municipal Revenues Collection Center of the Commonwealth, (ii) any monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution, and (iii) any other available resources (recursos disponibles) of the Commonwealth to the payment of the principal of and interest (and accreted value) on such GO Bonds; provided that (A) this covenant is not intended to grant to the holders of such GO Bonds any lien on such proceeds, monies and resources, and (B) for purposes of compliance with this covenant, to the extent that such proceeds, monies and resources are transferred to the Commonwealth's General Fund, payments of principal and interest (and accreted value) made to the holders of the GO Bonds from the Commonwealth's General Fund shall be deemed to have been made from such proceeds, monies and resources in the order set forth above.

## CHAPTER 3 – THE CONTINGENT VALUE INSTRUMENTS

## Article 301.- Issuance of the CVIs.

(a)      From and after the Effective Date, the Governor's Designee shall be authorized to approve the offering, sale and issuance, pursuant to the terms of the CVI Indenture, the Confirmation Order, the Plan and the Ancillary Agreements, of CVIs in two subseries – the GO CVIs and the Clawback CVIs – up to an aggregate notional amount of $3,500,000,000 and $5,239,002,764, respectively. Each series of CVIs may include one or more subseries.

(b)      The CVIs shall be dated and mature at such time or times as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the CVI Indenture, provided that the GO CVIs shall mature no later than Fiscal Year 2044 and the Clawback CVIs shall mature no later than Fiscal Year 2052. The CVIs shall not bear interest and shall be subject to redemption as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the CVI Indenture in accordance and consistent with the Plan. The Governor's Designee, as representative of the Commonwealth, shall determine the form of the CVIs and the manner of execution of the CVIs, and shall fix the denomination or denominations of the

CVIs and the place or places of payment thereon and the other terms thereof, all in accordance and consistent with the Plan.

(c)    The CVIs shall be legal, valid and binding obligations of the Commonwealth, issued pursuant to Article VI, Section 2 of the Commonwealth Constitution, and payable in accordance with the terms of the CVI Indenture and the other Ancillary Agreements, provided that, pursuant to the CVI Indenture:

(1)    no payments shall be made to the holders of the CVIs (other than the Rum Tax Claims Subseries under the circumstances set forth in clause (2) below) in any given Fiscal Year unless an SUT Outperformance Condition occurred during the prior Fiscal Year;

(2)    no payments shall be made to the holders of the Rum Tax Claims Subseries in any given Fiscal Year unless either an SUT Outperformance Condition or a Rum Tax Outperformance Condition occurred during the prior Fiscal Year

(3)    no payments shall be made to the holders of the GO CVIs or the Clawback CVIs in excess of the GO CVI Lifetime Cap or the Clawback CVI Lifetime Cap, respectively;

(4)    as of the maturity date of each series of CVIs, if the Commonwealth has made all payments required to be made on such series pursuant to the CVI Indenture, all of the obligations of the Commonwealth under such series shall be deemed to have been satisfied and the series shall no longer be deemed to be outstanding, even if the GO CVI Lifetime Cap or the Clawback CVI Lifetime Cap, as applicable, has not been reached as of such date.

(d)    When any official whose signature or facsimile thereof appears on any CVIs authorized under this Act ceases to hold office before the delivery of said CVIs, said signature or facsimile shall, nevertheless, be valid and sufficient, it being deemed for all purposes as if such official had remained in office until such delivery. Furthermore, any CVIs may bear the signature or facsimile of those persons who, at the time said bond is executed, are the proper officials to sign it, but who, on the date of the CVIs, were not holding office.

(e)    The CVIs issued pursuant to the CVI Indenture are notes of the Commonwealth for all purposes and shall be deemed to be negotiable instruments under the laws of Puerto Rico.

(f)    The CVIs authorized by this Act shall be issued in registered form.

52

(g)    Solely for purposes of calculating the maximum annual debt service payable on the Commonwealth's public debt pursuant to Article VI, Section 2 of the

Commonwealth Constitution, the debt service payable on the CVIs in any given Fiscal Year shall be deemed to be equal to the maximum amounts that could be payable with respect to the CVIs during such Fiscal Year in accordance with the CVI Indenture.

(h)     The debt service payable to CVIs in any given Fiscal Year will not impair under any concept the debts, obligations, and reserves created by COFINA.

## Article 302.- Pledge of Good Faith, Credit and Taxing Power.

The good faith, credit and taxing power of the Commonwealth are hereby irrevocably pledged for the prompt payment of the CVIs issued under the provisions of this Act as and when due in accordance with the terms of the CVI Indenture. The Secretary of the Treasury is hereby authorized and directed to pay the CVIs as they become due or upon their earlier redemption in accordance with the CVI Indenture, from available resources (recursos disponibles) of the Commonwealth in the Fiscal Year in which such payment is required, and the provisions of this Act concerning the payment of the CVIs shall be deemed a continuing appropriation for the Secretary of the Treasury to make such payments in the Fiscal Year in which such payment is required, even if no specific appropriations are made for such purpose. The Governor's Designee is hereby authorized and directed to include in the CVI Indenture the commitment which the Commonwealth hereby enters into with respect to the CVIs, and it shall be stated on said CVIs that the good faith, credit and taxing power of the Commonwealth are thus pledged.

## Article 303.- Tax Exemption.

The CVIs, including, but not limited to, any payments or income with respect to the CVIs and the transfer of the CVIs, shall, at all times, be totally exempt from all kinds of taxes (including, without limitation, income taxes), assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith. The holders and beneficial owners of the CVIs shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Commonwealth or any Government Entity by reason of holding, owning or transferring the CVIs.

## Article 304.- Commonwealth Covenants.

The Commonwealth, with the intent of being contractually bound, hereby agrees and covenants for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect to the CVIs have been paid or satisfied in full in accordance with their terms the Commonwealth will:

(a)    take no action that would:

(i)    limit or alter the rights vested in the Commonwealth in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the CVIs;

(ii)    impair the rights and remedies of the holders of the CVIs; or

(iii)    impair the ability of the holders of the CVIs to track performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the payment of the CVIs (in accordance with the Plan and as set forth in the CVI Indenture); provided, however, that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of the CVIs from such elimination or replacement reducing the likelihood that SUT Outperformance Condition will be satisfied; and provided further that the Commonwealth shall provide for the timely disclosure of such information as may be required by the CVI Indenture regarding the Measured SUT, sales and use tax collections, and any adjustments to the 5.5% SUT baseline thresholds made pursuant to the CVI Indenture; and

(b)    cause any post-Effective Date Fiscal Plan of Commonwealth submitted to the Financial Oversight and Management Board for Puerto Rico pursuant to PROMESA to include provisions for the payment in each Fiscal Year of the amounts due on the CVIs in accordance with the terms of the CVI Indenture to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition, as applicable, occurs during the prior Fiscal Year.

## CHAPTER 4 – PUBLIC POLICY ON MUNICIPALITIES

Chapter 4 is only enacted in Spanish. Refer to Spanish version.

## CHAPTER 5 – AMENDMENT AND REPEAL OF CERTAIN LAWS FOR THE DEPOSIT OF FUNDS IN THE GENERAL FUND AND GUARANTEE THAT AL:L LEGISLATION COMPLIES WITH THE AVAILABILITY OF FUNDS ESTABLISHED IN THE FISCAL PLAN

Chapter 5 is only enacted in Spanish. Refer to Spanish version.

## CHAPTER 6 – MISCELLANEOUS PROVISIONS

Chapter 6 is only enacted in Spanish. Refer to Spanish version.