**NEW ISSUE – FULL BOOK-ENTRY**                                                                                    **NOT RATED**

*INTEREST ON THE NEW BONDS (AS DEFINED HEREIN) IS NOT EXCLUDED FROM GROSS INCOME FOR FEDERAL INCOME TAX PURPOSES. FOR A MORE COMPLETE DISCUSSION OF U.S. FEDERAL INCOME TAX CONSIDERATIONS WITH RESPECT TO THE NEW BONDS, SEE "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS" IN THIS OFFERING MEMORANDUM.*

## GDB DEBT RECOVERY AUTHORITY

## GDB DEBT RECOVERY AUTHORITY BONDS (TAXABLE)

### $2,597,754,625 AGGREGATE PRINCIPAL AMOUNT OF 7.500% BONDS DUE 2040

The GDB Debt Recovery Authority (the "Issuer") is a newly formed statutory public trust and governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth") created pursuant to the GDB Restructuring Act (as defined herein) enacted by the Legislative Assembly of the Commonwealth (the "Legislative Assembly") for the purpose of receiving the Transferred Property (as defined herein) from Banco Gubernamental de Fomento para Puerto Rico (Government Development Bank for Puerto Rico, herein "GDB") and issuing the 7.500% GDB Debt Recovery Authority Bonds (Taxable) due 2040 (the "New Bonds"). The Issuer was created by the GDB Restructuring Act to facilitate the restructuring of certain of GDB's indebtedness pursuant to a Qualifying Modification under Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") (such Qualifying Modification as so certified by the Financial Oversight and Management Board (the "Oversight Board") under Section 601(g)(2)(A) of PROMESA, the "Qualifying Modification"). The Qualifying Modification was certified by the United States District Court for the District of Puerto Rico on November 7, 2018 as required under PROMESA.

The New Bonds will be issued by the Issuer in exchange for Participating Bond Claims (as defined in the Solicitation Statement referred to herein) held by creditors of GDB in order to effect the Qualifying Modification (holders of such New Bonds, the "Bondholders"). The New Bonds will be issued pursuant to the provisions of that certain Bond Indenture, dated as of the Closing Date (as defined herein), as amended or supplemented (the "Bond Indenture"), by and between the Issuer and Wilmington Trust, N.A., as trustee (the "Indenture Trustee"). The New Bonds will bear interest at 7.500% per annum, payable semi-annually in arrears, and are secured by a first priority statutory lien on the Restructuring Property (as defined herein). The New Bonds are further described herein. To the extent there is insufficient Available Cash (as defined herein) on any Payment Date (as defined herein) to pay in full in cash all interest accrued during the Interest Period (as defined herein) preceding such Payment Date on the New Bonds, such accrued interest on the New Bonds will be paid in cash pro rata to the extent of and from Available Cash and the principal of the New Bonds will accrue an amount equal to the amount of any Available Cash shortfall (each such amount of shortfall, a "PIK Amount"). Principal payments on the New Bonds will be made from Available Cash to the extent available after the payment of all accrued interest with respect to any Payment Date, thereby reducing the outstanding principal balance of the New Bonds by such amount. In addition, on the Closing Date or as soon thereafter as reasonably practicable (the "Special First Payment Date"), the Issuer will apply all Cash Assets (as defined herein) received from GDB on the Closing Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments*," making payments on the New Bonds after the payment or retention, as applicable, of the other amounts required pursuant to such payment priority. The Final Scheduled Payment Date (as defined herein) on the New Bonds is August 20, 2040 (which date may be delayed, as described herein), and the Payment Dates are the Special First Payment Date and, thereafter, each February 20 and August 20 (each such date, a "Payment Date").

**Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts).**

*The inside cover page contains additional information on the Final Scheduled Payment Date, interest rate and other information on the New Bonds.*

THE NEW BONDS ARE SPECIAL LIMITED OBLIGATIONS OF THE ISSUER AND ARE NOT INDEBTEDNESS OR LIABILITIES OF GDB, THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY ("AAFAF," BY ITS SPANISH ACRONYM), THE COMMONWEALTH OR ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER. THE NEW BONDS ARE NOT BACKED BY THE GOOD FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH NOR ARE THEY PAYABLE OR SECURED BY GDB, AAFAF OR ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER. THE NEW BONDS WILL REPRESENT INDEBTEDNESS SOLELY OF THE ISSUER AND WILL NOT BE PAYABLE OR GUARANTEED BY GDB, AAFAF, THE COMMONWEALTH, ANY OF THE COMMONWEALTH'S PUBLIC INSTRUMENTALITIES OR POLITICAL SUBDIVISIONS, OTHER THAN THE ISSUER, OR ANY OTHER PERSON OR ENTITY. THE NEW BONDS ARE SPECIAL LIMITED OBLIGATIONS OF THE ISSUER PAYABLE SOLELY FROM, SECURED SOLELY BY, AND HAVING RECOURSE SOLELY TO, THE RESTRUCTURING PROPERTY (AS DEFINED HEREIN); PROVIDED, THAT, IN LIMITED CIRCUMSTANCES, THE ISSUER, THE INDENTURE TRUSTEE AND THE BONDHOLDERS, AS APPLICABLE, MAY HAVE CERTAIN CLAIMS AGAINST GDB PURSUANT TO THE KEEPWELL AGREEMENT (AS DEFINED HEREIN). THE ISSUER DOES NOT HAVE ANY TAXING AUTHORITY.

Investing in the New Bonds involves significant risks. Prior to making any decisions with respect to the New Bonds, you should carefully read this entire Offering Memorandum and consult with your legal, financial and tax advisors to analyze the terms and risks of the New Bonds. For additional information on certain of the risks relating to the New Bonds, see "*Risk Factors*" in this Offering Memorandum. Further, the U.S. federal income tax classification of the New Bonds and consequent tax treatment of their holders is uncertain. For a more complete discussion of this uncertainty and of the Issuer's intended tax reporting treatment of the New Bonds, see "*Certain U.S. Federal Income Tax Considerations*" in this Offering Memorandum.

Certain legal matters will be passed upon for the Issuer by its U.S. counsel, King & Spalding LLP, and its Puerto Rico counsel, Cancio Covas & Santiago, LLP; for the Issuer and GDB by the Secretary of Justice of Puerto Rico; for GDB by its General Counsel; for GDB and AAFAF by their U.S. counsel, O'Melveny & Myers LLP, and their Puerto Rico counsel, Pietrantoni Méndez & Alvarez LLC; and for the Dealer Managers by their counsel, Squire Patton Boggs (US) LLP. However, due solely to litigation, it is not expected that a legal opinion with respect to the validity or enforceability of the New Bonds will be delivered. See "*Risk Factors —Risks Related to the New Bonds and the Keepwell Agreement—Certain closing conditions and closing deliverables, including legal opinions, with respect to the Qualifying Modification will differ in type and scope from closing conditions and closing deliverables that are typically required in municipal debt offering transactions*" and "*Litigation*."

It is expected that the New Bonds will be available for delivery in book-entry-only form through the facilities of The Depository Trust Company on or about November 29, 2018.

*BofA Merrill Lynch*                                                                                    *Barclays*

Dated: November 7, 2018

DRA Ex. 226

## MATURITY AND PRICING SCHEDULE

| Final Scheduled Payment Date | Aggregate Principal Amount | Interest Rate | CUSIP[†] |
|---|---|---|---|
| August 20, 2040, as may be extended as described herein | $2,597,754,625 | 7.500% | 36829QAA3 |

---

[†] CUSIP® is a registered trademark of the American Bankers Association. CUSIP Global Services (CGS) is managed on behalf of the American Bankers Association by S&P Capital IQ. Copyright© 2017 CUSIP Global Services. All rights reserved. CUSIP® data herein is provided by CUSIP Global Services. This data is not intended to create a database and does not serve in any way as a substitute for the CGS database. CUSIP® numbers are provided for convenience of reference only. None of the Issuer, GDB, AAFAF, the Oversight Board, the Dealer Managers or their respective agents or counsel assume responsibility for the use or accuracy of such numbers.

DRA Ex. 226

# TABLE OF CONTENTS

IMPORTANT INFORMATION ............................................................................................................................................................3
WHERE YOU CAN FIND MORE INFORMATION
    AND INCORPORATION BY REFERENCE.........................................................................................................................4
CAUTIONARY STATEMENT CONCERNING
    FORWARD-LOOKING STATEMENTS AND HYPOTHETICAL SCENARIOS .................................................................4
DISCLAIMERS................................................................................................................................................................................5
SUMMARY......................................................................................................................................................................................6
SUMMARY OF PARTIES TO THE TRANSACTION.....................................................................................................................9
SUMMARY OF FLOW OF COLLECTIONS ON THE RESTRUCTURING PROPERTY..............................................................10
SUMMARY OF DISTRIBUTIONS OF CASH FROM THE COLLECTION ACCOUNT................................................................11
SUMMARY OF TERMS OF NEW BONDS...................................................................................................................................12
RISK FACTORS............................................................................................................................................................................32
THE ISSUER.................................................................................................................................................................................57
GDB .............................................................................................................................................................................................60
DESCRIPTION OF THE COMMONWEALTH AND ITS CURRENT FINANCIAL CONDITION .................................................63
THE GDB RESTRUCTURING ACT .............................................................................................................................................70
USE OF PROCEEDS....................................................................................................................................................................76
SERVICE PROVIDERS.................................................................................................................................................................77
MUNICIPALITIES .........................................................................................................................................................................83
THE RESTRUCTURING PROPERTY .........................................................................................................................................100
THE KEEPWELL AGREEMENT .................................................................................................................................................138
DESCRIPTION OF THE NEW BONDS AND THE BOND INDENTURE .....................................................................................139
COLLECTIONS ON THE RESTRUCTURING PROPERTY AND CALCULATION OF AVAILABLE CASH ...............................151
PAYMENTS TO BONDHOLDERS ..............................................................................................................................................154
TRANSFER AGREEMENT ..........................................................................................................................................................155
SERVICING AGREEMENT ..........................................................................................................................................................158
CERTAIN PUERTO RICO TAX CONSIDERATIONS...................................................................................................................167
CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS....................................................................................................170
ERISA CONSIDERATIONS .........................................................................................................................................................179
INFORMATION CONCERNING OFFERING RESTRICTIONS IN CERTAIN JURISDICTIONS OUTSIDE THE
    UNITED STATES....................................................................................................................................................................181
LITIGATION.................................................................................................................................................................................183
CONTINUING DISCLOSURE......................................................................................................................................................191
DEALER MANAGERS .................................................................................................................................................................194
LEGAL MATTERS.......................................................................................................................................................................194
MISCELLANEOUS......................................................................................................................................................................195
APPENDIX A: INDEX OF DEFINED TERMS IN THIS OFFERING MEMORANDUM.................................................................196
APPENDIX B: THE TRANSFERRED PROPERTY .....................................................................................................................203
APPENDIX C: GDB RETAINED LOANS ....................................................................................................................................217
APPENDIX D: SCHEDULED COLLECTIONS ON THE MUNICIPAL LOAN ASSETS ..............................................................218
APPENDIX E: SCHEDULED COLLECTIONS ON THE MUNICIPAL LOAN ASSETS, THE ADDITIONAL
    RECOVERY AUTHORITY LOANS AND PROCEEDS FROM THE SALE OF REAL PROPERTY ASSETS ...............220
APPENDIX F: HYPOTHETICAL AMORTIZATION OF THE NEW BONDS ...............................................................................221
APPENDIX G: CONTINGENT AND UNLIQUIDATED CLAIMS...................................................................................................225

---

## IMPORTANT INFORMATION

You should read this entire Offering Memorandum in full before making any decisions with respect to the New Bonds.

You are solely responsible for making your own independent appraisal of all matters that you deem appropriate in evaluating the New Bonds. You should not construe the contents of this Offering Memorandum as investment, legal or tax advice. You should consult your own legal, financial and tax advisors regarding the characteristics and risks of the New Bonds.

DRA Ex. 226

The Issuer and GDB have reviewed the information contained in this Offering Memorandum and to the best of their knowledge, based upon information provided by and representations by GDB, the information contained in this Offering Memorandum is accurate and complete as of the date hereof. The information contained or incorporated by reference in this Offering Memorandum may only be accurate as of the date hereof or the dates of the documents incorporated by reference herein. The delivery of this Offering Memorandum will not, under any circumstances, create any implication that the information contained in this Offering Memorandum is current as of any time subsequent to the date of such information or that there has been no change in the information set out in it or in the affairs of the Issuer since the date of this Offering Memorandum. For additional discussion of risks related to the Issuer and the information contained herein, see "*Risk Factors—Risks Related to the Issuer.*"

No person has been authorized to give any information or to make any representation about the Issuer or the New Bonds not included in this Offering Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Issuer or any of its respective agents or affiliates.

---

## WHERE YOU CAN FIND MORE INFORMATION
## AND INCORPORATION BY REFERENCE

The Issuer is "incorporating by reference" into this Offering Memorandum certain information it may file after the date hereof with the Municipal Securities Rulemaking Board's Electronic Municipal Market Access ("EMMA") system. This means that the Issuer is disclosing important information to you by referring you to these filings. The information that the Issuer incorporates by reference is considered to be part of this Offering Memorandum. Unless expressly stated herein, the Issuer does not incorporate by reference any other documents that the Issuer, GDB or AAFAF (as defined herein) has filed with EMMA prior to the date hereof. You should not rely on any such previously filed information, unless otherwise expressly incorporated herein.

Any statement contained in this Offering Memorandum or in a document (or part thereof) incorporated or considered to be incorporated by reference into this Offering Memorandum will be considered to be modified or superseded for purposes of this Offering Memorandum to the extent that a statement contained in any other subsequently filed document (or part thereof) that is or is considered to be incorporated by reference in this Offering Memorandum modifies or supersedes that statement. The modifying or superseding statement need not state that it has modified or superseded a prior statement or include any other information set forth in the document that it modifies or supersedes. Any statement so modified or superseded will not be considered, except as so modified or superseded, to constitute part of this Offering Memorandum.

Unless expressly stated herein, the information contained on each of the Issuer's, GDB's, AAFAF's and the Oversight Board's websites is not incorporated by reference into this Offering Memorandum and you should not consider such information to be part of this Offering Memorandum.

---

## CAUTIONARY STATEMENT CONCERNING
## FORWARD-LOOKING STATEMENTS AND HYPOTHETICAL SCENARIOS

Certain statements contained in this Offering Memorandum and the documents incorporated by reference herein are not descriptions of historical facts, but instead are forecasts, hypotheticals and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Issuer, including those risks identified in "*Risk Factors*" in this Offering Memorandum. In this respect, the words "may," "will," "could," "continue," "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements. All projections, hypothetical scenarios, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement; actual results may differ materially from those expressed or implied by forward-looking statements. The Issuer cannot assure you that any forward-looking statements will prove to be correct. The Issuer is under no obligation to (and expressly disclaims any obligation to) update or alter any forward-looking statements whether as a result of new information, future events or otherwise, except as required by law.

The hypothetical scenarios set forth in this Offering Memorandum were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information. The hypothetical scenarios set forth in this Offering Memorandum have been provided by GDB, were prepared on a reasonable basis and reflect the best estimates and judgments as of the Cutoff Date (as defined herein); however, such hypothetical scenarios are based on a number of important assumptions and limitations and involve substantial uncertainty, including with respect to items outside of the Issuer's control. Such hypothetical scenarios have not been updated to reflect certain changes to the Restructuring Property, to the Issuer's anticipated expenses post-closing, and to the aggregate principal amount of New Bonds to be issued after the Cutoff Date, which

4

are described under "*The Restructuring Property*" and "*Litigation*" in this Offering Memorandum. However, GDB believes that the aggregate effect of such subsequent developments will not materially change such hypothetical scenario analysis. Furthermore, such prospective financial information is not fact and should not be relied upon as being indicative of future results, and you are cautioned not to place undue reliance on the prospective financial information. No independent auditors have compiled, examined or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. No independent auditors have been consulted in connection with the preparation of the prospective financial information set forth in this Offering Memorandum. For additional discussion of risks related to the Issuer and the information contained herein, see "*Risk Factors— Risks Related to the Issuer.*"

<hr />

## DISCLAIMERS

This Offering Memorandum does not constitute an offer or an invitation to acquire the New Bonds in any jurisdiction in or from which, or to or from any person to or from whom, it is unlawful to make such offer or invitation under applicable securities laws. The distribution of this Offering Memorandum in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Memorandum comes are required to inform themselves about, and to observe, any such restrictions.

The Dealer Managers have provided the following sentence for inclusion in this Offering Memorandum: The Dealer Managers have reviewed the information in this Offering Memorandum in accordance with, and as part of, their responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Dealer Managers do not guarantee the accuracy or completeness of such information.

**The New Bonds, if and when issued, will not have been recommended by any federal or state securities commission or regulatory authority (including the Oversight Board and AAFAF). Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Offering Memorandum. Any representation to the contrary is a criminal offense.**

<hr />

DRA Ex. 226

## SUMMARY

*The following information highlights selected information from this Offering Memorandum. It does not contain all of the information that may be important to a holder of the New Bonds. For a more complete understanding of the Issuer and the New Bonds, we urge you to read this entire Offering Memorandum carefully, including the sections entitled "Risk Factors," "Cautionary Statement Concerning Forward-Looking Statements and Hypothetical Scenarios" and "Where You Can Find More Information and Incorporation by Reference."*

### Overview

Upon the terms and subject to the conditions set forth in this Offering Memorandum (as may be supplemented and amended from time to time, this "Offering Memorandum"), the Issuer is offering the New Bonds.

The Issuer is a newly formed statutory public trust and governmental instrumentality of the Commonwealth created pursuant to the GDB Restructuring Act by the Legislative Assembly. On the date on which the Issuer issues the New Bonds (the "Closing Date"), which will be the soonest date reasonably practicable following entry of the District Court order approving the Qualifying Modification and satisfaction of the other conditions set forth in the Restructuring Support Agreement, and from time to time thereafter, GDB will transfer certain specified assets (collectively, the "Transferred Property") to the Issuer pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement (as defined herein). The New Bonds will be secured by a statutory lien on the Transferred Property and any assets, collections, fees, charges, proceeds, revenues, rents, insurance payments, income or other funds generated by, or received by the Issuer, the Servicer (as defined herein) or GDB in respect of the Transferred Property on or after the Cutoff Date (as defined herein), including in respect of the administration or reinvestment thereof (collectively, the "Collections" and, together with the Transferred Property, the "Restructuring Property"). On and after the Closing Date, the Issuer's assets are expected to consist solely of the Restructuring Property. For additional information on the Issuer and the Restructuring Property, see "*The Issuer*" and "*The Restructuring Property*," respectively, in this Offering Memorandum.

The New Bonds have a 7.500% annual coupon rate, payable on the Special First Payment Date and, thereafter, on each February 20 and August 20 (in cash or in kind, as further explained below), and will be secured by a first priority statutory lien on the Restructuring Property. For each $1,000 of Participating Bond Claims (calculated, for the avoidance of doubt, as principal plus unpaid interest accrued up to, but not including, the Closing Date) exchanged in the Qualifying Modification, holders of such claims will receive New Bonds having a face amount equal to $550. Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts).

**The New Bonds are special limited obligations of the Issuer and are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or secured by GDB, AAFAF or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer.** The New Bonds will represent indebtedness solely of the Issuer and will not be payable or guaranteed by GDB, AAFAF, the Commonwealth, any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer, or any other person or entity.

The New Bonds are special limited obligations of the Issuer payable solely from, secured solely by, and having recourse solely to, the Restructuring Property; *provided* that, in limited circumstances, the Indenture Trustee and the Bondholders, as applicable, may have certain claims against GDB pursuant to the Keepwell Agreement. The Issuer does not have any taxing authority. For additional information on the terms and conditions of the New Bonds, see "*Description of the New Bonds and the Bond Indenture*" in this Offering Memorandum.

The New Bonds are complex financial instruments and holding the New Bonds involves substantial risks. Prior to making any decisions with respect to the New Bonds, you should carefully read this entire Offering Memorandum and consult with your legal, financial and tax advisors to analyze the terms and risks of the New Bonds. For additional information on certain of the risks relating to the New Bonds, see "*Risk Factors*" in this Offering Memorandum.

### The Issuer

The Issuer is a newly formed statutory public trust and governmental public instrumentality of the Commonwealth created by Article 201 of the GDB Restructuring Act. The Issuer is independent and separate from any other governmental instrumentality of the Commonwealth and is independently operated and governed by a Board of Trustees. The GDB Restructuring Act restricts the Issuer from engaging in activities other than those specifically prescribed therein.

DRA Ex. 226

The Issuer is not expected to own any assets or property other than the Restructuring Property. The New Bonds are special limited obligations of the Issuer payable solely from, secured solely by, and having recourse solely to, the Restructuring Property; *provided* that, in limited circumstances, the Indenture Trustee and the Bondholders, as applicable, may have certain claims against GDB pursuant to the Keepwell Agreement. For additional information on the Restructuring Property and the Keepwell Agreement, see "*The Restructuring Property*" and "*The Keepwell Agreement*" in this Offering Memorandum. The Issuer will have limited internal administrative support and will for the most part depend on third-party service providers to perform its functions. The Issuer is not expected to have any officers or employees other than the Executive Director, who will be a member of the Board of Trustees. All management of the Restructuring Property (including all day-to-day operations in respect thereof) will be conducted on behalf of the Issuer by the Servicer and other service providers pursuant to contractual arrangements, herein described. See "*Service Providers*" in this Offering Memorandum.

Each New Bond will represent a special limited obligation of the Issuer. The New Bonds are the only securities being offered hereby. The Issuer may not issue securities other than the New Bonds. Except for the New Bonds and the obligations to pay certain costs in connection with the restructuring of GDB, the Issuer is prohibited from incurring indebtedness or making Loans (as defined herein) to any other person, although the Issuer may incur expenses after the Closing Date as contemplated herein.

For additional information on the Issuer, see "*The Issuer*" in this Offering Memorandum.

### The Servicer

The Servicer will be engaged to act as the servicer of the Restructuring Property and will manage the Restructuring Property pursuant to the Servicing Agreement. For additional information on the Servicer and the Servicing Agreement, see "*Service Providers— The Servicer*" and "*Servicing Agreement*," respectively, in this Offering Memorandum.

### The Solicitation and Approval

On August 9, 2018, GDB and AAFAF used the Solicitation Statement to commence the solicitation of votes (the "Solicitation") seeking creditor approval of the Qualifying Modification under Title VI of PROMESA. In September 2018, the Solicitation was concluded with (i) Eligible Voters (as defined in the Solicitation Statement) holding over 50% of the outstanding principal amount of outstanding Participating Bonds (as defined in the Solicitation Statement) in each Pool (as defined in the Solicitation Statement) voting to approve the Qualifying Modification; and (ii) Eligible Voters holding over 66 2/3% of the outstanding principal amount of outstanding Participating Bonds in each Pool that voted in the Solicitation voting to approve the Qualifying Modification.

Epiq Corporate Restructuring, as Calculation Agent for the Solicitation, reported that for the GDB Bond Claims Pool (as defined in the Solicitation Statement), over 74.8% of the aggregate principal amount of Participating Bond Claims in the GDB Bond Claims Pool voted and, of those that voted in such pool, over 94.7% of the Participating Bond Claims voted to approve the Qualifying Modification, reflecting over 72.9% of the aggregate principal amount. For the Guaranteed Bond Claims Pool (as defined in the Solicitation Statement), 100% of the aggregate principal amount of the Participating Bond Claims in such pool voted to approve the Qualifying Modification.

On November 6, 2018, the United States District Court for the District of Puerto Rico held the hearing to consider the Approval Application (as defined herein) and, after considering all arguments, filings, and evidence regarding approval of the Qualifying Modification, approved the Qualifying Modification on the record, and entered the order approving the Qualifying Modification on November 7, 2018.

For more information, see *"GDB"* in this Offering Memorandum.

### The Qualifying Modification and Mutual Releases

The Qualifying Modification will result in the organized restructuring of certain portions of GDB's indebtedness pursuant to the creditor collective action procedures set forth in Title VI of PROMESA. Specifically, upon the consummation of the Qualifying Modification, all of the Participating Bond Claims will be mandatorily exchanged for the New Bonds, and GDB will transfer the Transferred Property (as defined herein) to the Issuer and enter into a keepwell agreement with the Issuer and the Indenture Trustee, to be dated as of the Closing Date (the "Keepwell Agreement"), in consideration for the Issuer's issuance of the New Bonds and the resulting cancellation of the Participating Bond Claims. Upon the exchange of Participating Bond Claims for New Bonds, and GDB's, the Issuer's and the Indenture Trustee's execution of the Keepwell Agreement (as described herein), all Participating Bond Claims will be extinguished and cancelled and holders of such Participating Bond Claims will immediately and forever cease to have any rights, interests or claims against GDB or any of its assets, or any successors or assigns thereof in respect of such Participating Bond Claims, other than as set forth in the Keepwell Agreement.

DRA Ex. 226

The Qualifying Modification provides for the Mutual Releases that are part of the overall settlement of claims by and among GDB and the holders of the Participating Bond Claims. GDB, the Issuer, holders of Participating Bond Claims who vote in favor of the Qualifying Modification and those who vote to reject the Qualifying Modification or do not vote and, in either case, do not mark the Ballot to indicate their desire not to participate in the Mutual Releases, and certain other parties will each be deemed to have released each other from all Claims (as defined herein), Causes of Action (as defined herein) and liabilities. Notwithstanding anything to the contrary, the Mutual Releases will not release (i) any Claim in respect of any obligation of any party under the Qualifying Modification or any document, instrument or agreement executed to implement the terms of the Qualifying Modification, including, but not limited to, the Restructuring Support Agreement, the Transfer Agreement, the New Bonds and the Bond Indenture, and any obligation of GDB in connection with the transfer of the Transferred Property to the Issuer, (ii) any Claim of GDB or the Issuer in respect of the enforcement of any asset constituting Restructuring Property or a GDB Retained Loan, including, but not limited to, in connection with the performance or repayment of any Loan owed to GDB or the Issuer including, without limitation, the Loans listed on Appendices B and C to this Offering Memorandum, (iii) any Claim in respect of any obligation of any party under the Keepwell Agreement, (iv) any Claim of a holder of a Participating Bond Claim against the Indenture Trustee under the Bond Indenture or (v) any Claim of the Indenture Trustee against the Issuer or the holders of Participating Bond Claims. In addition, any holder of Participating Bond Claims that, after the Voting Deadline, takes any action to object to, interfere with, delay or impede consummation of, the Qualifying Modification (before or after the District Court enters an order with respect to the Qualifying Modification) will not receive a release from, or to the extent the Closing Date has occurred such release will be revoked by, GDB or any other Release Party (as defined herein) pursuant to the Mutual Releases regardless of whether such party grants a release hereunder.

The Mutual Releases operate in addition to any claims barred by operation of law under Section 601(m)(2) of PROMESA, which provides that, upon entry of a District Court order approving the Qualifying Modification, the Qualifying Modification shall be valid and binding on any person or entity asserting claims or other rights in respect of the Bonds (as defined herein) subject to the Qualifying Modification. The Qualifying Modification may have broad implications for claims in respect of holders' Participating Bond Claims. Holders should consult with their legal and other advisors in respect of any such claims that may be affected thereby, including by operation of Section 601(m)(2) of PROMESA.

## Risk Factors

The New Bonds are complex financial instruments and holding the New Bonds involves substantial risks. These risks include, among other things, risks related to the fact that the Issuer has no on-going business and limited assets (*i.e.*, the Restructuring Property) from which payments on the New Bonds can be derived and that there is material ongoing litigation relating to the Qualifying Modification (as defined herein), the Issuer and the New Bonds, any of which may have a material adverse impact on the Issuer's ability to pay interest in cash as it comes due and make principal payments on the New Bonds. As further described herein, because principal and interest due on the New Bonds are expected to exceed the amounts that are anticipated to be collected on the Restructuring Property, Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts). Prior to making any decisions with respect to the New Bonds, you should carefully read this entire Offering Memorandum and consult with your legal, financial and tax advisors to analyze the terms and risks of the New Bonds. See "*Risk Factors*" in this Offering Memorandum and the accompanying disclosure herein for a discussion of these and certain other factors that you should consider before making any decisions with respect to the New Bonds.

DRA Ex. 226

## SUMMARY OF PARTIES TO THE TRANSACTION

This chart provides only a simplified overview of the relationships between the key parties to the transaction. For additional information, see the more detailed descriptions found in this Offering Memorandum.



1. The Issuer is a newly formed statutory public trust and governmental instrumentality of the Commonwealth created pursuant to the GDB Restructuring Act. For additional information on the Issuer, see "*The Issuer*" in this Offering Memorandum.

2. On the Closing Date, the New Bonds will be issued by the Issuer to holders of Participating Bond Claims in exchange for such Participating Bond Claims and the Participating Bond Claims will be concurrently cancelled. For additional information on the Participating Bond Claims, see "*The GDB Restructuring Act*" in this Offering Memorandum.

3. On the Closing Date, and from time to time thereafter in accordance with the Transfer Agreement, GDB will transfer the Transferred Property to the Issuer, pursuant to the GDB Restructuring Act and the Qualifying Modification. For additional information on the Transferred Property, see "*The Restructuring Property*" and "*Appendix B: The Transferred Property*" in this Offering Memorandum. Pursuant to the Qualifying Modification, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on the GDB Retained Loans (subject to the limitations described herein) and (b) provide the Issuer, the Servicer, and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of such Loans. For additional information on the GDB Retained Loans and GDB's duties in respect thereof, see "*The Restructuring Property*" in this Offering Memorandum.

4. Concurrently with the exchange of the Participating Bond Claims for the New Bonds and the transfer of the Transferred Property to the Issuer, GDB will enter into the Keepwell Agreement with the Issuer and the Indenture Trustee, which will provide that if any Restructuring Property is returned or conveyed to GDB for any reason, or if the transfer thereof to the Issuer is deemed invalid or void for any reason, GDB will take such steps as may be necessary to irrevocably retransfer or reconvey such Restructuring Property to the Indenture Trustee to be applied to payments in respect of the New Bonds in accordance with the terms of the Transaction Documents. Furthermore, under the Keepwell Agreement, GDB will indemnify and hold the Bondholders harmless from and against all damages and losses suffered or incurred by the Bondholders as the result of any legislative action or determination by a court of competent jurisdiction causing the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee and the Bondholders in respect of the Restructuring Property or the New Bonds to be impaired, rescinded or avoided or otherwise rendered not enforceable in accordance with their terms, subject to certain limitations described herein. For additional information on the Keepwell Agreement, see "*The Keepwell Agreement*" in this Offering Memorandum.

5. The Issuer is independent and separate from any other governmental instrumentality of the Commonwealth and is independently operated and governed by the Board of Trustees, the members of which are appointed as described herein. For additional information on the Board of Trustees, see "*The Issuer—Board of Trustees*" in this Offering Memorandum.

6. The Servicer will act as servicer for the Restructuring Property pursuant to the Servicing Agreement. The Servicer will handle all Collections, administer defaults, delinquencies and adjustments and otherwise manage the Restructuring Property. The Servicer, as described below, will also have responsibility for preparing certain reports for the Bondholders. For additional information on the Servicer and the Servicing Agreement, see "*Service Providers—The Servicer*" and "*Servicing Agreement*," respectively, in this Offering Memorandum.

7. The Indenture Trustee will serve as trustee of the New Bonds pursuant to the Bond Indenture, which provides for the terms and conditions of the New Bonds. For additional information on the Indenture Trustee and the Bond Indenture, see "*Service Providers—The Indenture Trustee*" and "*Description of the New Bonds and the Bond Indenture*" in this Offering Memorandum.

8. The Indenture Trustee will engage the Collateral Monitor to, among other things, monitor the activities of the Servicer and the condition and performance of the Restructuring Property and deliver a semi-annual report to the Bondholders, the Issuer and the Servicer. For additional information on the Collateral Monitor, see "*Service Providers—The Collateral Monitor*" in this Offering Memorandum.

DRA Ex. 226

## SUMMARY OF FLOW OF COLLECTIONS ON THE RESTRUCTURING PROPERTY

This chart provides only a simplified overview of the flow of Collections on the Restructuring Property. For additional information, see "*Collections on the Restructuring Property and Calculation of Available Cash*" in this Offering Memorandum.



---

1. For example, with respect to the General Municipal Obligations (as defined herein), property taxes that are used to pay these Loans (as defined herein) are collected by CRIM (as defined herein) (or the municipal obligors on the General Municipal Obligations, which then deposit such tax revenues with CRIM), and then deposited by CRIM into the GO Redemption Fund (as defined herein) held at Banco Popular de Puerto Rico, before being paid to the Servicer in satisfaction of the relevant General Municipal Obligation on each payment date for such Loans. For additional information on the General Municipal Obligations, see "*The Restructuring Property—Detailed Description of the Restructuring Property—Municipal General Obligations*" in this Offering Memorandum.

DRA Ex. 226

## SUMMARY OF DISTRIBUTIONS OF CASH FROM THE COLLECTION ACCOUNT

This chart provides only a simplified overview of the distributions to be made from the Collection Account. For additional information, see *"Payments to Bondholders"* in this Offering Memorandum.

| CASH IN THE COLLECTION ACCOUNT |
| :---: |
| (Collections on the Restructuring Property and interest thereon) |

1ST

| HOLDBACK FOR FEES AND EXPENSES RESERVE |
| :---: |
| (on each Payment Date, an amount equal to the amount of cash reasonably expected to be required to pay all Issuer Expenses (as defined herein) that are capable of estimation (which will not include, for the avoidance of doubt, amounts owed in respect of the New Bonds and Servicing Fee and Collateral Monitor Fee determined on the basis of cash Collections) through the next Determination Date (as defined herein) based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees (such amount, the "Fees and Expenses Reserve") will be retained in the Collection Account) |

2ND

| THIRD-PARTY FEES AND EXPENSES |
| :---: |
| (on each Payment Date or otherwise as such amounts become due, make payments to each of the Servicer, the Indenture Trustee and the Collateral Monitor, of the respective amount of any fees, expenses and indemnification amounts due to it, and to the Issuer or other applicable third party, the amount of any other due and payable Issuer Expenses, including Reimbursable Servicer Expenses (as defined herein), subject, as applicable, to the Issuer Operating Expenses Cap (as defined herein) and other applicable restrictions on Issuer Expenses described herein; *provided*, for the avoidance of doubt, that the payment of all Issuer Expenses validly incurred and payable from the Collection Account pursuant to the terms of the Transaction Documents as described herein will be paid prior to the calculation of Available Cash, notwithstanding any shortfall in the Fees and Expenses Reserve for the applicable semi-annual period) |



| AVAILABLE CASH |
| :---: |

3RD

| BONDHOLDERS |
| :---: |
| (on each Payment Date, accrued and unpaid cash interest on the New Bonds with respect to such Payment Date) |

4TH

| BONDHOLDERS |
| :---: |
| (on each Payment Date, outstanding principal amount) |

DRA Ex. 226

## SUMMARY OF TERMS OF NEW BONDS

*The following information highlights selected information from this Offering Memorandum and provides a general overview of the terms and conditions of the New Bonds. To understand all of the terms and conditions of the New Bonds, you should carefully read this entire Offering Memorandum, including any documents incorporated by reference herein, and consult with your legal, financial and tax advisors before making any decisions with respect to the New Bonds.*

**Parties**

| | |
|---|---|
| **Issuer** | GDB Debt Recovery Authority (the "Issuer"), a newly formed statutory public trust and governmental instrumentality of the Commonwealth created pursuant to the GDB Restructuring Act. |
| **GDB** | Government Development Bank for Puerto Rico ("GDB"). |
| **Servicer** | AmeriNational Community Services, LLC ("AmeriNat") or its successor, as may be appointed from time to time (the "Servicer"). |
| | The Servicer will manage the Restructuring Property. The Servicer will handle all Collections, administer defaults, delinquencies and adjustments and otherwise manage the Restructuring Property. The Servicer will manage the Restructuring Property until the Servicing Agreement is terminated pursuant to the Servicer's resignation or removal or otherwise, as further described in *"Servicing Agreement—Termination"* and *"Servicing Agreement—Removal of Servicer"* in this Offering Memorandum. |
| **Indenture Trustee** | Wilmington Trust, N.A., a national banking association (the "Indenture Trustee"). |
| **Collateral Monitor** | Cantor-Katz Collateral Monitor LLC ("Cantor-Katz"), a Delaware limited liability company, or its successor, as may be appointed from time to time (the "Collateral Monitor"). |
| | The Collateral Monitor will be responsible for, among other things, monitoring the activities of the Servicer and the condition and performance of the Restructuring Property and preparing and delivering (via the Indenture Trustee) a semi-annual report to the Indenture Trustee, for dissemination to the Bondholders, the Issuer and the Servicer. |
| **The New Bonds** | 7.500% GDB Debt Recovery Authority Bonds (Taxable) due 2040. |
| **Amortization of the New Bonds** | The Issuer's ability to pay interest on the New Bonds in cash and make principal payments on the New Bonds is entirely dependent upon Collections on the Restructuring Property. Based on current projections and as further described in *"Collections on the Restructuring Property and Calculation of Available Cash—Collection Schedule and Yield Considerations"* and *"Payments to Bondholders—Hypothetical Amortization of the New Bonds"* in this Offering Memorandum, Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts). **In addition, and as further described herein, the Collections on the Restructuring Property may be materially and adversely affected by events and circumstances outside of the Issuer's control, which may result in actual Collections on the Restructuring Property being materially less than those reflected in the Collection Schedule included herein.** For additional information regarding the assumptions underlying the Collection Schedule, see *"Collections on the Restructuring Property and Calculation of Available Cash—Collection Schedule and Yield Considerations"* and *"Payments to Bondholders—Hypothetical Amortization of the New Bonds"* in this Offering Memorandum. |

DRA Ex. 226

| | |
|---|---|
| **Additional Bonds** | After the Closing Date, in addition to the New Bonds offered pursuant to this Offering Memorandum, the Issuer may be required, pursuant to the terms of the Qualifying Modification and consistent with the terms of the Bond Indenture, to authorize from time to time the issuance of additional New Bonds (the "Additional Bonds") under the Bond Indenture in respect of certain contingent claims against GDB that are described in Appendix G. For a description of the contingent claims, see "*Description of the New Bonds and the Bond Indenture—Additional Bonds*" and "*Appendix G: Contingent and Unliquidated Claims*" attached to this Offering Memorandum. |
| | From time to time after the Closing Date, solely upon receipt of instructions from GDB or AAFAF, the Issuer will authorize such Additional Bonds in the amount(s) specified by GDB or AAFAF, as applicable, and will execute and deliver such Additional Bonds in accordance with such instructions from GDB or AAFAF. |
| | The Additional Bonds and the previously issued New Bonds will be part of the same series under the Bond Indenture and the Additional Bonds will be issued in the same form as the previously issued New Bonds; provided, however, if the Additional Bonds are not fungible with the previously issued New Bonds for U.S. federal income tax purposes, such Additional Bonds will be issued with a different CUSIP number from the previously issued New Bonds. |
| | For additional information regarding the Additional Bonds, see "*Description of the New Bonds and the Bond Indenture—Additional Bonds*" in this Offering Memorandum. |
| **Key Documents** | |
| **Bond Indenture** | The bond indenture, dated as of the Closing Date, as amended or supplemented (the "Bond Indenture"), entered into by and between the Issuer and the Indenture Trustee, will provide the terms and conditions of the New Bonds. |
| | For additional information on the Bond Indenture, see "*Description of the New Bonds and the Bond Indenture*" in this Offering Memorandum. |
| **GDB Restructuring Act** | Act No. 109 of August 24, 2017, as amended by Act No. 147 of July 18, 2018, known as the "Government Development Bank for Puerto Rico Debt Restructuring Act" (the "GDB Restructuring Act"). |
| | For additional information on the GDB Restructuring Act, see "*The GDB Restructuring Act*" in this Offering Memorandum. |
| **Transfer Agreement** | The transfer agreement entered into by and between the Issuer and GDB (the "Transfer Agreement"), will document the transfer of the Transferred Property by GDB to the Issuer, pursuant to the GDB Restructuring Act and the Qualifying Modification. |
| | For additional information on the Transfer Agreement, see "*Transfer Agreement*" in this Offering Memorandum. |
| **Servicing Agreement** | The servicing agreement entered into by and between the Issuer and the Servicer (the "Servicing Agreement"), will govern the Servicer's management of the Restructuring Property and Collections with respect thereto. |
| | For additional information on the Servicing Agreement, see "*Servicing Agreement*" in this Offering Memorandum. |
| **Collateral Monitor Agreement** | The Collateral Monitor Agreement (as defined herein) will be entered into by the Indenture Trustee, on behalf of the Bondholders, and the Collateral Monitor. The Collateral Monitor Agreement will govern the duties and rights of the Collateral Monitor with respect to its monitoring, consultation, reporting and other duties. The Issuer will enter into a fee letter with the Collateral Monitor (the "Collateral Monitor Fee Letter") under which the Issuer will agree to pay to the Collateral Monitor from amounts in the Collection Account the fees, expenses, indemnification and other amounts owed to the Collateral Monitor under the Collateral Monitor Agreement. |

DRA Ex. 226

| **Transaction Documents** | The Bond Indenture, the New Bonds, the Transfer Agreement, the Servicing Agreement, the Keepwell Agreement, the Disclosure Agreement (as defined herein), the Collateral Monitor Agreement, the Collateral Monitor Fee Letter and any other agreement or instrument entered into by the Issuer or GDB to secure the obligations of the Issuer or GDB under any of the foregoing are collectively referred to herein as the "Transaction Documents." |
|---|---|

**Relevant Dates**

| **Closing Date** | November 29, 2018 (the "Closing Date"). |
|---|---|
| **Cutoff Date** | July 1, 2018 (the "Cutoff Date"). The Issuer will be entitled to all Collections on, including all proceeds, interest and any other distribution or payment in respect of, the Restructuring Property received by or on behalf of GDB on or after the Cutoff Date. |
| **Date of Statistical Data** | Unless otherwise indicated, the data concerning the Transferred Property in this Offering Memorandum is based on the Transferred Property as of the Cutoff Date. |
| **Collection Period** | The period commencing on the first day of the calendar month that is six calendar months preceding each Payment Date and ending on the last day of the calendar month immediately preceding each Payment Date (or, in the case of the first Collection Period, from and including the Closing Date and ending on the last day of the calendar month immediately preceding the first Payment Date following the Special First Payment Date) (the "Collection Period"). |
| **Determination Dates** | The Business Day immediately preceding each Payment Date (each, a "Determination Date"). |
| **Payment Dates** | The Special First Payment Date (as defined herein) and, thereafter, each February 20 and August 20 (each such date, a "Payment Date"), provided that if any such Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date, but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay. |

A "Business Day" is any day except:

- a Saturday or Sunday; or

- a day on which banks in New York, New York, or San Juan, Puerto Rico, are authorized by law, regulation or governmental order to remain closed.

| **Special First Payment Date** | On the Closing Date, or as soon thereafter as reasonably practicable (the "Special First Payment Date"), the Issuer will apply all Cash Assets received from GDB on the Closing Date in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments*," to make payments on the New Bonds after the payment or retention, as applicable, of the other amounts required pursuant to such payment priority. |
|---|---|
| **Final Scheduled Payment Date** | The final scheduled payment date for the New Bonds is August 20, 2040 (such date, or thereafter as such date may be delayed by vote of the Bondholders pursuant to the procedure described in the paragraph below, the "Final Scheduled Payment Date"). **Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts).** For additional information, see "*—The New Bonds—Amortization of the New Bonds*" above. |

If the Issuer fails to pay all outstanding amounts on the New Bonds on or prior to the Final Scheduled Payment Date, the Indenture Trustee may, or upon the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. For additional information regarding the treatment of the New Bonds and the Restructuring Property at and after the Final Scheduled Payment Date, including if the aggregate

DRA Ex. 226

| | principal amount of the New Bonds has not been repaid in full on or before such date, see "—*Liquidation of the Restructuring Property*" and "—*Bond Indenture Events of Default*" below. |
|---|---|
| **Payment Record Date** | See "—*Registration of the New Bonds*" below. So long as the New Bonds are in book-entry form, the Issuer will make payments on the New Bonds to the related holders of record on the day immediately preceding the related Payment Date (the "Payment Record Date"); *provided* that if the New Bonds are issued in definitive form, the Payment Record Date will be the last day of the calendar month preceding the month during which the related Payment Date occurs and *provided, further*, that the Payment Record Date with respect to the Special First Payment Date will be the Closing Date or as soon thereafter as reasonably practicable. |
| **Suspension of Trade Settlements** | To facilitate the exchange of Participating Bond Claims for the New Bonds and the payment of the Special First Payment, the settlement of trades in Participating Bond Claims are expected to be suspended by DTC (as defined herein) just prior to the mandatory exchange of Participating Bond Claims for New Bonds, in accordance with DTC's customary procedures, and the settlement of trades in New Bonds will be suspended from such date until the Special First Payment has been processed by DTC, which is expected to occur on the second business day after the Closing Date or as soon as practicable thereafter. Holders of Participating Bond Claims who wish to settle trades of Participating Bond Claims or the New Bonds during such period should consult their advisors to prevent a failed settlement. |
| **Registration of the New Bonds** | Interests in the New Bonds will generally be held through The Depository Trust Company ("DTC") in the United States or Clearstream Banking, S.A. ("Clearstream Banking") or Euroclear Bank SA/NV ("Euroclear"), as operator for the Euroclear System. This is referred to as book-entry form. Bondholders will not receive a definitive bond, except under limited circumstances.<br><br>For additional information, see "*Description of the New Bonds and the Bond Indenture—Book-Entry Registration*" and "*Description of the New Bonds and the Bond Indenture—Definitive Bonds*" in this Offering Memorandum. |
| **Structural Summary** | |
| **The Transferred Property and Related Data** | The Transferred Property will be transferred by GDB to the Issuer on the Closing Date, and from time to time thereafter, pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement. The Issuer's only source of funds to make payments on the New Bonds will be the Restructuring Property, which initially will consist solely of the Transferred Property.<br><br>The Transferred Property will include all of GDB's legal and equitable right, title and interest in and to, and claims and causes of action to enforce, the following: |

- various types of Loans (as defined herein) made by GDB to Commonwealth municipalities (collectively, the "Municipal Loan Assets");

- several Loans made by GDB to the Commonwealth that benefit from a pledge of the Commonwealth's good faith, credit and taxing power (the "Commonwealth Loan Assets");

- a bond issued by the Port of the Americas Authority (the "PAA") to GDB that is guaranteed by the Commonwealth and benefits from a pledge of the Commonwealth's good faith, credit and taxing power (the "Commonwealth Guaranteed Loan Asset");

- Loans made by GDB to various public corporations and instrumentalities of the Commonwealth (the "Public Corporation Loan Assets");

- (i) rights associated with a reverse repurchase agreement (the "Repurchase Agreement") by and between the Puerto Rico Housing Finance Authority ("HFA") and GDB and (ii) certain Loans to non-government entities (the "Private Loans" and, collectively with the Repurchase Agreement, the "Other Loan Assets");

DRA Ex. 226

■   the Beneficial Interest (as defined herein) in, and the proceeds of (such Beneficial Interest and proceeds, the "GDB Retained Loan Rights"), certain specified public entity Loans (the "GDB Retained Loans"), including the Additional Recovery Authority Loans (as defined herein), that will be retained and continue to be serviced by GDB pursuant to, and on the terms set forth in, the Qualifying Modification;

■   upon the date on which GDB is required, or chooses at its option, to transfer any GDB Retained Loan, such GDB Retained Loan transferred or to be transferred;

■   certain real property in Puerto Rico (the "Real Property Assets");

■   all cash and cash equivalents of GDB as of the Closing Date in excess of (a) the Cash Adjustments (as defined herein) required to pay the permitted uses for which such Cash Adjustments are reserved and (b) $10 million in Excess Reserved Cash, which shall be used to satisfy an obligation of GDB under the Stipulation Resolving the Objections of the Official Committee of Unsecured Creditors of all Title III Debtors (Other than COFINA) to the Approval Application, The Government Development Bank for Puerto Rico, Case No. 18-CV-1561-LTS (D. P.R. Oct. 9, 2018) ECF No. 18 (the "Committee Settlement Stipulation") as described herein (such cash and cash equivalents in excess of (a) and (b) being the "Cash Assets"). As used herein, "Cash Adjustments," means the cash and cash adjustments to be retained by GDB on the Closing Date in the aggregate amount of: (i) the Specified Cash Assets, (ii) cash in the amount of $57.3 million to be used to pay any transaction costs of the Qualifying Modification, including professional fees and expenses of GDB, AAFAF and the professionals to be paid pursuant to the Restructuring Support Agreement, (iii) the 2015-17 Excess CAE Settlement Amount, (iv) the Committee Fixed Settlement Amount of $20 million cash (for further information regarding the Committee Settlement Stipulation, see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"), and (v) cash in the amount of $7 million to be distributed to Siemens Transportation Partnership Puerto Rico, S.E. in satisfaction of GDB's obligations under the Siemens Settlement (for further information regarding the Siemens Settlement, see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Siemens Transportation Partnership Puerto Rico, S.E.*");

■   (i) the Beneficial Interest in all causes of action of GDB, including contingent or unknown causes of action (other than any causes of action to enforce assets that constitute Transferred Property and the Excluded Causes of Action (as defined herein) (such causes of action, the "Retained Causes of Action") and (ii) the Litigation Proceeds (as defined herein and subject to the limitations set forth herein) (the Transferred Property described in (i) and (ii) are referred to collectively herein as the "Causes of Action Rights");

■   all other assets of GDB that are in existence at any point from the Cutoff Date up to and including the Closing Date (whether or not identified as of the Cutoff Date) that do not constitute Excluded GDB Assets (as defined herein) and are not otherwise identified as Transferred Property (the "Unknown Assets"); and

■   all Collections in respect of the foregoing, from and after the Cutoff Date.

"Beneficial Interest" means, with respect to any asset or cause of action, the beneficial interest therein, and the right to receive the proceeds (net of expenses associated with realizing such proceeds) thereof, in each case, after giving effect to the rights of GDB as set forth herein; *provided* that GDB will have no duty to pursue any cause of action on account of a beneficial interest therein and will have the absolute discretion to settle, offset against claims of GDB, or release such cause of action.

All Transferred Property in existence on the Closing Date will be irrevocably assigned and transferred to the Issuer on the Closing Date; *provided* that GDB will take any necessary steps to complete the transfer of any Unknown Assets and any otherwise unidentifiable assets within fifteen days after the discovery or identification thereof. Any proceeds in respect of the GDB Retained

DRA Ex. 226

Loans will be transferred to the Issuer within fifteen days after the receipt thereof. GDB will retain all proceeds of the Causes of Action ("Litigation Proceeds") and shall be authorized to use such proceeds (net of any expenses associated with realization of such proceeds) solely to (a) satisfy or resolve any contingent and unliquidated claims against GDB arising on or before the Closing Date (other than those resolved pursuant to the Qualifying Modification or the GDB Restructuring Act) and (b) comply with certain of its obligations under the Committee Settlement Stipulation as described herein (see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"). Upon GDB's sole determination that all such contingent and unliquidated claims and all such obligations under the Committee Settlement Stipulation have been satisfied or resolved, GDB shall transfer to the Issuer the remaining Litigation Proceeds in GDB's possession or control at such time and all Litigation Proceeds received by GDB thereafter within fifteen days after the receipt thereof. For the avoidance of doubt (i) the retention of the Retained Causes of Action by GDB will not affect any rights or defenses of GDB or any third parties with respect to such Retained Causes of Actions; and (ii) none of the Transferred Property (other than the Litigation Proceeds), the GDB Retained Loans, the Cash Adjustments or the proceeds of any of the foregoing shall be used to satisfy or resolve any such contingent and unliquidated claims against GDB.

Each Additional Recovery Authority Loan will be transferred to the Issuer no later than the earlier of (a) the effective date of a modification, restructuring or similar transaction in respect of such Loan and (b) 18 months after the Closing Date. Each other GDB Retained Loan may be transferred to the Issuer at any time at GDB's discretion.

Unless otherwise indicated, the data concerning the Transferred Property presented throughout this Offering Memorandum is based on unaudited information of GDB about the assets to be included in the Transferred Property as of the Cutoff Date. The Issuer makes no representation as to the amount or value of the Transferred Property, the status of the obligors on such Transferred Property or as to any information contained herein regarding the projected Collections on such Transferred Property.

The following table shows the allocation of the Transferred Property among such classes of assets as of the Cutoff Date based on information provided by GDB (in the case of Loans, the allocation reflects the Closing Date Adjustments and considers payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date) (for information as of the date hereof regarding the Transferred Property, see "*The Restructuring Property—Summary Characteristics of the Restructuring Property*"):

**Allocation of the Transferred Property**

| Asset Class | Balance (in millions)[1] | % of Transferred Property |
|---|---|---|
| Municipal Loan Assets[2] | $1,244.5 | 20.8% |
| Commonwealth Loan Assets[2] | $169.4 | 2.8% |
| Commonwealth Guaranteed Loan Asset[2] | $225.5 | 3.8% |
| Public Corporation Loan Assets[2] | $2,670.8 | 44.6% |
| GDB Retained Loans[3] | $1,131.8 | 18.9% |
| Real Property Assets[4] | $37.5 | 0.6% |
| Other Loan Assets[2] | $20.1 | 0.3% |
| Cash Assets[5] | $488.3 | 8.2% |
| Causes of Action Rights | N/A[6] | N/A[6] |
| Unknown Assets | N/A[7] | N/A[7] |
| Total | $5,988.0 | 100% |

(1) Balance shown does not include accrued and unpaid interest.

(2) Reflects the aggregate outstanding principal balance as of the Cutoff Date, net of the Closing Date Adjustments (if applicable) and considering payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date.

(3) Reflects the aggregate outstanding principal balance as of the Cutoff Date of the GDB Retained Loans, although the Transferred Property includes the GDB Retained Loan Rights, rather than the GDB Retained Loans themselves.

DRA Ex. 226

(4) Reflects the aggregate book value of the Real Property Assets as of December 31, 2017.

(5) Reflects the amount of cash and cash equivalents held by GDB as of the Cutoff Date (adjusted for debt service payments received by GDB on July 2, 2018), net of the Cash Adjustments (as estimated at the time of the launch of the Solicitation). The amount of the Cash Adjustments has varied since then as a result of, among other things, increased transaction expenses and expenses related to the settlement of litigation (including the Committee Settlement Stipulation and the Siemens Settlement).

(6) The value of Causes of Action Rights cannot be determined.

(7) The value of Unknown Assets cannot be determined.

Source: GDB

After the Cutoff Date, GDB sold four of the Real Property Assets that were previously contemplated would be transferred to the Issuer on the Closing Date. The book value of the remaining Real Property Assets is approximately $17.8 million. Moreover, GDB's cash has also varied since the Cutoff Date as a result of GDB's operational expenses, cash received by GDB from the repayment of Loans and the sale of Real Property Assets, among other factors. The Cash Assets expected to be transferred to the Issuer on the Closing Date amount to approximately $493.4 million.

As of the Cutoff Date, the Municipal Loan Assets, which are expected to provide the majority of the Collections generated by the Restructuring Property, had the following characteristics:

**General Characteristics Municipal Loan Assets**

| | |
|---|---|
| Aggregate Outstanding Principal Balance ........................... | $1,244.5 million |
| Range of Principal Balances................................................. | $557–$64.3 million |
| Weighted Average Effective APR[1] ...................................... | 5.46% |
| Range of Effective APRs[2] .................................................. | 2.34%–7.75% |
| Weighted Average Maturity Date[3] ...................................... | July 1, 2032 |
| Range of Maturity Date[4] .................................................... | January 1, 2019–July 1, 2040 |

[1] Weighted by principal balance as of the Cutoff Date. Most of the Municipal Loan Assets bear interest at variable rates, based on the three-month London Interbank Offered Rate ("LIBOR") or the U.S. Prime Rate (the "Prime Rate") plus a spread, subject to a legal interest rate limit of 12%. Certain of the Municipal Loan Assets are also subject to an interest rate floor (ranging from 2.3% to 7.0%).

[2] Excludes three Loans with an aggregate principal balance of approximately $1.19 million, each of which has a 0% stated interest rate.

[3] Weighted by principal balance as of the Cutoff Date. Excludes approximately $19 million in principal amount of Municipal Lines of Credit with past due maturities.

[4] Excludes approximately $19 million in principal amount of Municipal Lines of Credit with past due maturities.

Source: GDB

The table below presents the aggregate outstanding principal balance of Loans in each category and subcategory of Restructuring Property assets that were current two business days after the Cutoff Date (i.e., the day after the July 1, 2018 payments were due by virtue of rollover to the next business day from the Cutoff Date) and those that, as of such date, were past due by the number of days specified in each column below. Furthermore, the table also illustrates the outstanding principal balance of the Loans in each category and subcategory of the Restructuring Property that were classified by GDB as performing and non-performing as of such date.

**Loan Delinquency Statistics[1]**

| Performing | Non-Performing |
|---|---|

---

18

DRA Ex. 226

| Category | Current | 1–29 days past due | 30–89 days past due | 90–179 days past due | > 180 days past due | Total Outstanding Principal Balance |
|---|---|---|---|---|---|---|
| Municipal Loan Assets ..... | | | | | | |
| *Municipal General* | | | | | | |
| *Obligations* ........... | $768,628,411 | - | - | - | - | $768,628,411 |
| *Sales Tax Obligations* | 308,409,058 | $5,206,271 | - | - | - | 313,615,329 |
| *Operational Loans* ..... | 77,112,314 | - | - | - | - | 77,112,314 |
| *Revenue Loans*.......... | - | 49,692,375 | - | - | - | 49,692,375 |
| *Municipal Lines of* | | | | | | |
| *Credit*................. | - | - | - | - | $ 35,473,554 | 35,473,554 |
| Commonwealth Loan | | | | | | |
| Assets........................... | - | - | - | - | 169,438,038 | 169,438,038 |
| Commonwealth | | | | | | |
| Guaranteed Loan Asset..... | - | - | - | - | 225,533,700 | 225,533,700 |
| Public Corporation Loan | | | | | | |
| Assets ............................ | - | - | - | - | 2,670,798,011 | 2,670,798,011 |
| Private Loans.................. | 131,918 | - | - | - | 339,948 | 471,866 |
| GDB Retained Loans......... | 117,769,180 | - | - | - | 1,014,053,886 | 1,131,823,066 |
| Total................................ | $1,272,050,881 | $54,898,646 | - | - | $4,115,637,137 | $5,442,586,664 |

[1] Loan balances are shown as of the Cutoff Date but considering any payments received by GDB on July 2, 2018, by virtue of rollover to the next business day after the Cutoff Date, and reflecting the Closing Date Adjustments.

Source: GDB

For additional information on the Transferred Property, see "*The Restructuring Property*" and "*Appendix B: The Transferred Property*" in this Offering Memorandum.

**Excluded GDB Assets**       Pursuant to the GDB Restructuring Act and the Qualifying Modification, certain of GDB's assets will not be transferred by GDB to the Issuer, and will not make up any portion of the Transferred Property (the "Excluded GDB Assets"). The Excluded GDB Assets consist exclusively of (i) the GDB Retained Loans, provided that the Beneficial Interests in such GDB Retained Loans will be Transferred Property that is transferred to the Issuer on the Closing Date and all proceeds of such GDB Retained Loans will constitute Transferred Property and be promptly transferred to the Issuer upon receipt thereof, *provided further* that if GDB, at its option, transfers to the Issuer any such Loans at any time, such transferred Loans will constitute Transferred Property upon such transfer, and *provided further* that each of the Additional Recovery Authority Loans will be transferred to the Issuer and will constitute Transferred Property on the date that is the earlier of (x) the effective date of a modification, restructuring or similar transaction in respect of such Additional Recovery Authority Loan and (y) 18 months after the Closing Date, (ii) cash and cash equivalents consisting of (A) Cash Adjustments required to pay the permitted uses for which such Cash Adjustments are reserved and (B) up to $10 million in Excess Reserved Cash (as defined herein), if any, to satisfy certain of GDB's obligations under the Committee Settlement Stipulation (see "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA)*"), (iii) the Retained Causes of Action (except the Beneficial Interest therein), (iv) causes of action (a) to enforce Loans that constitute Public Entity Trust Assets or (b) that GDB asserts, or is a party to, exclusively in its capacity as the former fiscal agent and financial advisor to the Government and its instrumentalities and for which the primary economic beneficiary of such cause of action, as of the Closing Date, is a Commonwealth government entity other than GDB, which will be treated as property of those Government entities with an economic interest in such cause of action ((a) and (b), collectively, the "Excluded Causes of Action"), (v) Loans to public agencies and departments of the Commonwealth primarily payable from legislative appropriations, with a principal balance of approximately $890.6 million as of the Cutoff Date (but reflecting the Closing Date Adjustments), to be identified in the Transfer Agreement and transferred to the Public Entity Trust on or after the Closing Date (the "Public Entity Trust Assets"), (vi) Loans with an outstanding principal balance of approximately $12.5 million as of the Cutoff Date securing an account in the name of Asociación de Empleados del ELA (the "Secured Deposit Account") and (vii) office furniture, equipment and other supplies owned by GDB and used in the ordinary course of GDB's business (excluding all such property relating to the Real Property Assets that are Transferred Property), if any; *provided* that any Excess Reserved Cash in excess of $10 million (the "Residual GDB Cash Assets") will constitute Transferred Property and will be transferred to the Issuer as set forth in the Transfer Agreement.

DRA Ex. 226

"Excess Reserved Cash" means the Cash Adjustments in excess of the amounts required to pay the permitted uses for which cash is reserved, if any.

The "Specified Cash Assets" will equal the sum of (a) the Vendor Claim Reserve (as defined herein), (b) $19 million to be transferred by GDB to a new trust pursuant to Article 705 of the GDB Restructuring Act for the payment of certain obligations of GDB to former employees under several pre-retirement programs and (c) $26.5 million for operating cash requirements of GDB and the Public Entity Trust; *provided* that the Vendor Claim Reserve Residual will constitute Transferred Property and, once identified, such Vendor Claim Reserve Residual will be delivered to the Issuer as set forth in the following paragraph.

Cash in the amount of $15 million to be set aside and used for the settlement of claims asserted against GDB by parties that provided goods and services to GDB in the ordinary course of business (such amount at any time, the "Vendor Claim Reserve"), which claims are disputed by GDB on the Closing Date or for which payment has not yet become due ("Open or Disputed Vendor Claims"), will remain at GDB in a separate account subject to a perfected security interest in favor of the Issuer securing GDB's obligation to transfer the Vendor Claim Reserve Residual to the Issuer. Any cash or cash equivalents remaining in the account in respect of the Vendor Claim Reserve after the payment of all Open or Disputed Vendor Claims determined by GDB to be valid (the "Vendor Claim Reserve Residual") will be Excess Reserved Cash.

For additional information regarding the characteristics of the Excluded GDB Assets as of the Cutoff Date, see "*The Restructuring Property—Excluded GDB Assets*" and "*Appendix C: GDB Retained Loans*" in this Offering Memorandum.

**Management of the Restructuring Property**

The GDB Restructuring Act and the Qualifying Modification establish certain rights and limitations regarding the management of the Restructuring Property by the Issuer, the Servicer and the Indenture Trustee, as applicable. Pursuant to the Servicing Agreement and as required under the terms of the Bond Indenture, the Issuer will delegate to the Servicer all management of the Restructuring Property (including all day-to-day operations in respect thereof), subject to the rights and limitations established in the GDB Restructuring Act and the Qualifying Modification. Therefore, pursuant to the GDB Restructuring Act, the Qualifying Modification and the Servicing Agreement, the Restructuring Property will be managed in accordance with the following:

1.  The Servicer (on behalf of the Issuer) will have all rights and powers that GDB has in respect of the Municipal Loan Assets, as of immediately prior to the Closing Date, except (i) that the Servicer (on behalf of the Issuer) may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser and (ii) as provided in item (8) below.

    An "Approved Purchaser" is a person or entity that is (i) a private or public bank operating in Puerto Rico that holds, or held at any time since the effective date of the GDB Restructuring Act, Loans issued by one or more Commonwealth municipalities or (ii) otherwise approved by AAFAF or another agent designated by the Commonwealth, which entity may take into account the public policy goals of the Commonwealth, which approval will not be unreasonably withheld (taking into account such public policy goals) if so requested.

2.  The Servicer (on behalf of the Issuer) will have the right to exercise remedies in respect of the Public Corporation Loan Assets, the Commonwealth Loan Assets, and the Commonwealth Guaranteed Loan Asset, but solely to the extent necessary to assure that funds that are available for debt service from the obligors under such Loans (consistent with applicable Oversight Board-approved fiscal plans, if any, and Oversight Board-approved budgets, if any) are applied to such Loans in accordance with the applicable Loan documents, legal priority and the security or other pledge rights benefiting the same. Furthermore, the Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to preserve, protect or defend any priority, security or other pledge rights benefiting such Public Corporation Loan Assets, Commonwealth Loan Assets and Commonwealth Guaranteed Loan Asset. For any such Loan where the obligor is in a proceeding under Title III or Title VI of PROMESA and such obligor has other creditors that have the same legal priority, security or pledge rights as the Issuer, the

DRA Ex. 226

Servicer (on behalf of the Issuer) will have all rights and powers to exercise remedies necessary to ensure that the Issuer receives treatment in such proceedings that is the same as that provided to other creditors that have the same legal priority, security or pledge rights.

3.  The Servicer (on behalf of the Issuer) may transfer, assign, sell or otherwise dispose of the Restructuring Property (other than the Municipal Loan Assets), or interests in such property, without the consent of AAFAF or any other agent of the Commonwealth; provided, that such sale is consistent with the servicing standards set forth in the Servicing Agreement.

4.  The Servicer (on behalf of the Issuer) may not enter into any material modification, extension, accommodation, sale or other disposition of any Restructuring Property unless the Collateral Monitor has been given ten days' prior written notice of such transaction and has not reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable.

5.  Any modification by GDB of the Additional Recovery Authority Loans will (i) not include any provision that would result in the removal of any lien, security or other pledge rights benefiting such Loan except to the extent required for the sale of any such collateral where the proceeds of that collateral will be immediately made available to the Issuer and (ii) be approved, if such modification occurs prior to the Closing Date, by the financial advisor to the Ad Hoc Group (as defined in the Restructuring Support Agreement) or, if such modification occurs after the Closing Date, by the Servicer as commercially reasonable (provided, for the avoidance of doubt, that the Servicer's approval of such modification may only be given after the Collateral Monitor has received ten days' prior written notice of the approval of the modification and has not objected).

6.  In respect of the GDB Retained Loans, GDB will have a contractual duty to (a) use commercially reasonable best efforts to maximize the return on such Loans, provided that it will not be required to bring any action seeking to obtain a judgment against such public entity or seeking to foreclose upon any of its assets except, in each case, insofar as is necessary to preserve the payment or lien priority or rights in respect of such Loans and (b) provide the Issuer, the Servicer and the Collateral Monitor with all material communications and other materials relating to any modification, restructuring or similar transaction in respect of such Loans.

7.  None of the Issuer, the Servicer, or any other person or entity (other than GDB) will have the right to commence or direct any litigation or other enforcement action in respect of, or sell, transfer or dispose of the Causes of Action.

8.  None of the Issuer, the Servicer or any other person or entity will have the right to unilaterally increase the fixed interest rate or variable interest rate spread, as applicable, on the Municipal Loan Assets, the Public Corporation Loan Assets, the Commonwealth Loan Assets or the Commonwealth Guaranteed Loan Asset, and such Loans will continue to bear interest at the applicable fixed or variable rates in effect on the Closing Date, as such rates are certified by GDB and AAFAF. In accordance with the Restructuring Support Agreement, such interest rates have not been adjusted downward by GDB since at least March 27, 2018 and will not be adjusted downward by GDB at any time prior to or after the Closing Date.

9.  The Indenture Trustee (upon the occurrence and during the continuance of a Bond Indenture Event of Default (as defined herein) or as otherwise provided in the Bond Indenture) and any subsequent holder of any Restructuring Property (upon the sale or transfer of any such Restructuring Property pursuant to the Servicing Agreement) will be subject to all limitations (including the limitations on the exercise of remedies set forth herein) applicable to the Issuer and the Servicer and, unless otherwise contractually limited, will have all rights and remedies in respect of the Restructuring Property to the same extent as the Issuer and the Servicer, except that neither the Indenture Trustee nor any subsequent holder of any Restructuring Property will be bound by the standards set

DRA Ex. 226

forth in the Servicing Agreement or be required to obtain the Collateral Monitor's consent to dispose of the Restructuring Property or any interest in such assets.

For the avoidance of doubt, the foregoing rights and limitations regarding the management of the Restructuring Property by the Servicer are also applicable to the Issuer pursuant to the GDB Restructuring Act. For additional information on the management of the Restructuring Property, see "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum.

GDB, AAFAF and San Juan entered into a settlement agreement to resolve San Juan's claims against GDB and San Juan's objections to the Qualifying Modification. As part of such settlement, the Servicer and the Collateral Monitor entered into certain agreements regarding the Municipal Loan Assets, as described under "*Litigation—Dismissed and/or Settled Litigation and Objections to the Qualifying Modification—Settlement of Litigation with Various Municipalities—Settlement of Litigation with the Municipality of San Juan.*"

**Keepwell Agreement**

On the Closing Date, GDB will enter into the Keepwell Agreement with the Issuer and the Indenture Trustee, which will provide that if any Restructuring Property is returned or conveyed to GDB for any reason, or if the transfer thereof to the Issuer is deemed invalid or void for any reason, GDB will take such steps as may be necessary to irrevocably retransfer or reconvey such Restructuring Property to the Indenture Trustee to be applied to payments in respect of the New Bonds in accordance with the terms of the Transaction Documents (or if such retransfer or reconveyance violates any law or court order, to take such other actions as may be necessary such that the Bondholders receive the economic equivalent thereof), until payment in full of the New Bonds with any remaining balance delivered to the Issuer.

The Keepwell Agreement will further provide that GDB will indemnify and hold the Bondholders (collectively, the "Indemnified Parties") harmless from and against all damages and losses suffered or incurred by the Indemnified Parties as the result of any legislative action or determination by a court of competent jurisdiction causing the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the Bondholders in respect of the Restructuring Property or the New Bonds to be impaired, rescinded or avoided or otherwise rendered not enforceable in accordance with their terms (the "Covered Losses"); provided that an impairment resulting from an immaterial diminution in value of the Restructuring Property will not independently give rise to a claim for indemnification; provided further that an Indemnified Party will not be entitled to indemnification for Covered Losses to the extent the circumstances giving rise to such Covered Losses result from the actions of such Indemnified Party or the actions of the Indenture Trustee taken at the direction of such Indemnified Party. For the avoidance of doubt, it is the intention of the parties that such indemnification and hold harmless provision will give rise to claims in favor of the Indemnified Parties against GDB in an amount such that, after giving effect to such claims and any distributions thereon, including in any bankruptcy, insolvency, receivership or similar proceedings in respect of GDB, the Indemnified Parties will be fully compensated for the Covered Losses, subject to the proviso in the foregoing sentence.

Under the terms of the Keepwell Agreement, the Bondholders will be express third-party beneficiaries of the Keepwell Agreement and will be entitled to the rights and benefits thereunder and may enforce the provisions thereof, as if they were parties thereto, notwithstanding (i) any waiver or other action by the Issuer or (ii) any legislative action or determination by a court resulting, in the case of (ii), in the rescission, avoidance or other unenforceability of the Qualifying Modification, the New Bonds or the rights or liens of the Issuer, the Indenture Trustee or the Bondholders in respect of the Restructuring Property or the New Bonds.

For additional information on the Keepwell Agreement, see "*The Keepwell Agreement*" in this Offering Memorandum.

**Transfer and Lien**

The transfer of the Transferred Property by GDB to the Issuer will be a "true sale" or "true transfer" pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement. Pursuant to the GDB Restructuring Act and the Qualifying Modification, after such transfer, creditors and other claimants against GDB will no longer have any interest or right to the Transferred Property or any Collections thereon.

DRA Ex. 226

Simultaneously with the issuance of the New Bonds, automatically and without further action, pursuant to the GDB Restructuring Act, the New Bonds and all obligations thereunder will be secured by a statutory lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders.

**Review of Transferred Property**

In connection with the transactions described herein, GDB has performed a review of the Transferred Property and will make certain limited representations and warranties about the Transferred Property in the Transfer Agreement.

**Servicer's Compensation**

On the Closing Date, the Issuer will pay the Servicer $225 per Loan transferred to the Issuer on the Closing Date for management by the Servicer (the "Initial Portfolio Transfer Fee").

On each Payment Date, the Issuer will pay the Servicer a semi-annual fee (the "Servicing Fee") calculated, with respect to each Collection Period, as the sum of (i) $225 per Loan transferred to the Issuer subsequent to the Closing Date and during such Collection Period, (ii) 0.120% of the aggregate principal amount of the performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iii) 0.025% of the aggregate principal amount of the non-performing Loans outstanding during such Collection Period, as measured by the unpaid principal balance as of the beginning of the Collection Period, and prorated for any such Loans sold, settled or otherwise disposed of during such Collection Period, (iv) 3.000% of Net Collections (as defined herein) generated during such Collection Period upon the sale or settlement of any Loan constituting Restructuring Property and (v) 3.000% of Net Collections generated upon the sale of any Real Property Asset during such Collection Period, subject to the limitations described herein. The Servicer will also be entitled to reimbursement or payment by the Issuer for certain expenses and indemnification amounts incurred in connection with the performance of its duties under the Servicing Agreement. The Servicing Fee and such expenses and indemnification may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds, in each case, subject to the terms and conditions contained in the Servicing Agreement.

For additional information regarding the compensation payable to the Servicer, see "*Servicing Agreement—Servicing Compensation and Payment of Expenses*" in this Offering Memorandum.

**Indenture Trustee's Compensation**

On each Payment Date, in accordance with the payment priority in "*Payments to Bondholders—Priority of Payments*," the Issuer will pay the Indenture Trustee a semi-annual fee of $2,500 (the "Indenture Trustee Fee"). The Indenture Trustee will also be entitled to reimbursement or payment by the Issuer for all expenses and indemnification amounts incurred in connection with the performance of its duties under the Bond Indenture. The Indenture Trustee Fee and such expenses and indemnification amounts will be paid from Collections on the Restructuring Property prior to any payments on the New Bonds. The Indenture Trustee will also be entitled to compensation for any report it files on the EMMA website pursuant to the Bond Indenture or notice of any event it files on the EMMA website as Dissemination Agent, if applicable.

For additional information regarding fees, expenses and indemnification amounts reimbursable or payable to the Indenture Trustee, see "*Service Providers—Fees and Expenses of the Service Providers—Indenture Trustee*" in this Offering Memorandum.

DRA Ex. 226

| | |
|---|---|
| **Collateral Monitor's Compensation** | The Issuer will pay the Collateral Monitor, for each Collection Period, a fee (the "Collateral Monitor Fee") based on a percentage of the cash Collections received during such Collection Period for each asset constituting Restructuring Property. Different rates apply to the Collections on different assets depending on the type and performing status of the asset in addition to other factors, and the applicable rate for an asset is subject to change over time. The aggregate Collateral Monitor Fees for any six consecutive Collection Periods may not exceed \$9.0 million, provided that if the amount resulting from the calculation in the preceding sentence plus the aggregate Collateral Monitor Fees for the prior five Collection Periods exceeds \$9.0 million, such excess may be added to the Collateral Monitor Fee due in any of the following five Collection Periods, subject to the cap described in this sentence. In certain circumstances specified in the Collateral Monitor Agreement, upon termination of Cantor-Katz's engagement as Collateral Monitor, Cantor-Katz may be entitled to true-up payments to compensate it for services provided prior to such termination but for which cash Collections are not yet realized by the Issuer or to compensate it for removal without cause prior to the third anniversary of the Closing Date. The Collateral Monitor will also be entitled to reimbursement for certain expenses and certain indemnification amounts. The Collateral Monitor Fee, true-up payments (if any) and such expenses and indemnification amounts may be material and will be paid from Collections on the Restructuring Property prior to making any payments on the New Bonds.

For additional information regarding fees, expenses and indemnification amounts reimbursable or payable to the Collateral Monitor, see "*Service Providers—Fees and Expenses of the Service Providers—Collateral Monitor*" in this Offering Memorandum. |
| **Board of Trustees' Annual Compensation** | Annual compensation for the members of the Board of Trustees of the Issuer is expected to be \$75,000 per year for each member of the Board of Trustees; *provided*, that the Executive Director of the Issuer is expected to be paid an additional amount of \$75,000 per year. The members of the Board of Trustees are also expected to be paid the sum of \$125,000 each as compensation for their work in connection with the issuance of the New Bonds and the structuring of the exchange. For additional information on the compensation of the Board of Trustees, see "*The Issuer—Board of Trustees—Board Member Annual Compensation and Board Expenses*" in this Offering Memorandum. |

DRA Ex. 226

| | |
|---|---|
| **Interest and Principal Payments** | **Interest Rate** |

The New Bonds will bear interest at 7.500% per annum until payment of the principal amount thereon has been made or duly provided for.

**Interest Accrual and Payment**

Interest due on each Payment Date will be that which has accrued during the period from and including the immediately preceding Payment Date on which interest has been paid (in cash or in kind) (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid (each such period, an "Interest Period"). Interest on the New Bonds will be calculated on an actual/360 basis. This means that the interest due on the New Bonds on each Payment Date will be the product of: (i) the principal amount of the New Bonds outstanding on that Payment Date (including, for the avoidance of doubt, previously accrued PIK Amounts (as defined herein)), before giving effect to the payment of principal on that date, (ii) the interest rate and (iii) the number of days from and including the immediately preceding Payment Date (or, in the case of the Special First Payment Date, from and including the Closing Date) to, but excluding, the Payment Date on which such interest is to be paid divided by 360.

To the extent there is insufficient Available Cash on any Payment Date to pay in full in cash all interest accrued during the Interest Period preceding such Payment Date on the New Bonds, such accrued interest on the New Bonds will be paid in cash pro rata to the extent of and from Available Cash, and principal of the New Bonds will accrue an amount equal to the amount of any Available Cash shortfall (each such amount of shortfall, a "PIK Amount"). Following an increase in the principal amount of the New Bonds as a result of the accrual of a PIK Amount, the New Bonds will bear interest on the then-outstanding principal, which will include such accrued PIK Amount.

**Principal Payments**

Principal payments on the New Bonds will be made from Available Cash on each Payment Date to the extent available after all accrued interest with respect to such Payment Date has been paid in full in cash, thereby reducing the outstanding principal balance of the New Bonds by such amount.

For additional information regarding the payment of interest and principal on the New Bonds, see "*Description of the New Bonds and the Bond Indenture—Payments of Interest*," "*Description of the New Bonds and the Bond Indenture—Payments of Principal*" and "*Payments to Bondholders*" in this Offering Memorandum.

| | |
|---|---|
| **Priority of Payments** | The Indenture Trustee will make payments from amounts in the Collection Account (as defined herein) or will retain amounts in the Collection Account, as applicable, in the following order of priority: |

1. *Holdback for Fees and Expenses Reserve* — on each Payment Date, an amount equal to the amount of cash reasonably expected to be required to pay all Issuer Expenses that are capable of estimation (which will not include, for the avoidance of doubt, amounts owed in respect of the New Bonds and Servicing Fee and Collateral Monitor Fee determined on the basis of cash Collections) through the next Determination Date based on a good faith estimate prepared by the Servicer and approved by the Collateral Monitor and the Board of Trustees (such amount, the "Fees and Expenses Reserve") will be retained in the Collection Account;

2. *Third-Party Fees and Expenses* — on each Payment Date or otherwise as such amounts become due, make payments to each of the Servicer, the Indenture Trustee and the Collateral Monitor, of the respective amount of any fees, expenses and indemnification amounts due to it, and to the Issuer or other applicable third party, the amount of any other due and payable Issuer Expenses, including Reimbursable Servicer Expenses, subject, as applicable, to the Issuer Operating Expenses Cap and other applicable restrictions on Issuer Expenses described herein; *provided*, for the avoidance of doubt, that the payment of all

DRA Ex. 226

Issuer Expenses validly incurred and payable from the Collection Account pursuant to the terms of the Transaction Documents as described herein will be paid prior to the calculation of Available Cash, notwithstanding any shortfall in the Fees and Expenses Reserve for the applicable semi-annual period;

3. *Current Interest on the New Bonds* — on each Payment Date, make payments to the Bondholders of accrued and unpaid interest on the New Bonds relating to such Payment Date; and

4. *New Bond Principal* — on each Payment Date, make payments to the Bondholders until the principal amount of the New Bonds is reduced to zero.

**Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts).**

For additional information regarding the priority of payments on the New Bonds, see "*Collections on the Restructuring Property and Calculation of Available Cash—Calculation of Available Cash*" and "*Payments to Bondholders—Priority of Payments*" in this Offering Memorandum.

**Issuer Operating Expenses Cap**

Unless otherwise consented to by the Collateral Monitor, which consent may not be unreasonably withheld, the Issuer may not incur Issuer Operating Expenses (as defined herein) after the Closing Date exceeding, in the aggregate, (i) $650,000 per year through the first Payment Date following the first Annual Filing Date (prorated for any partial years) and (ii) an amount to be determined by the Board of Trustees for each year thereafter, which amount shall not exceed $650,000 and shall be subject to the consent of the Collateral Monitor, which consent may not be unreasonably withheld (it being understood that such amounts are expected to decrease after the first Payment Date following the first Annual Filing Date) (the "Issuer Operating Expenses Cap").

"Issuer Operating Expenses" means all expenses, liabilities or other obligations of the Issuer other than Excluded Expenses and amounts owed in respect of the New Bonds.

"Excluded Expenses" means (a) amounts to be paid for any transaction costs of the Qualifying Modification, including the professional fees and expenses of GDB, AAFAF, the Issuer and the professionals required to be paid pursuant to the Restructuring Support Agreement, (b) amounts owed to, or on behalf of, the Servicer, the Indenture Trustee or the Collateral Monitor (including, in each case, in respect of reimbursable expenses) under the Transaction Documents and (c) expenses arising from (i) Bondholder solicitations required under the terms of the Bond Indenture, (ii) litigation brought against or reasonably brought by the Issuer or the Board of Trustees (including any related legal fees and indemnification costs), (iii) the creation and distribution of information for U.S. tax reporting purposes, (iv) directors and officers insurance or (v) auditing fees.

"Issuer Expenses" means Issuer Operating Expenses and Excluded Expenses.

DRA Ex. 226

| | |
|---|---|
| **Liquidation of the Restructuring Property** | Subject to the limitations as described in "*The Restructuring Property—Management of the Restructuring Property*" herein, the Servicer will be required to use commercially reasonable efforts to liquidate all remaining Restructuring Property, if any, as soon as reasonably practicable after, and in no event later than the end of the month of the date that is four months following (or such other date thereafter as reasonably agreed to by the Issuer, the Servicer and the Collateral Monitor) the Final Scheduled Payment Date, unless either (i) all principal, interest and any other amounts owing on the New Bonds have been paid or (ii) following a solicitation of veto conducted by the Issuer prior to the then-current Final Scheduled Payment Date, Bondholders holding not less than 25% in principal amount of the New Bonds for which votes are submitted vote against such liquidation and to delay the Final Scheduled Payment Date by a one-year period; *provided* that if the Board of Trustees, in consultation with the Collateral Monitor, determines in good faith that the expected Collections to be generated in respect of the Restructuring Property after the Final Scheduled Payment Date are unreasonably small in comparison to the expected cost to continue to manage such Restructuring Property, no such solicitation of veto will occur and the Servicer will liquidate the remaining Restructuring Property. The proceeds from such liquidation will constitute Collections on the Restructuring Property and, as such, will be deposited in the Collection Account and distributed in accordance with the Bond Indenture based on the payment priority set forth in "*Payments to Bondholders—Priority of Payments*" on the date that is six months after the Final Scheduled Payment Date (or such other date thereafter as reasonably determined by the Issuer, the Servicer and the Collateral Monitor), including as the Final Scheduled Payment Date may be extended (such distribution date, the "Liquidation Payment Date"). The process described above will apply to the initial Final Scheduled Payment Date and each subsequent Final Scheduled Payment Date resulting from a delay of the then-applicable Final Scheduled Payment Date.

Upon the liquidation of all remaining Restructuring Property and distribution of all remaining Collections in accordance with the requisite payment priority, the Bondholders will have no further claims against the Issuer in respect of the New Bonds. For additional information regarding the termination of the Issuer and liquidation of the Restructuring Property, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Termination of the Bond Indenture*" in this Offering Memorandum. |
| **Termination of the Bond Indenture** | With respect to the New Bonds, the obligations of the Servicer, GDB, the Collateral Monitor and the Indenture Trustee, as the case may be (except as otherwise provided in the Servicing Agreement, the Collateral Monitor Agreement, the Transfer Agreement or the Bond Indenture, as applicable), will terminate upon the surrender or redemption (as applicable) and cancellation of all New Bonds and the payment of all principal, interest and other amounts required to be paid to Bondholders pursuant to the Bond Indenture, which will occur upon the earlier of (i) the surrender for payment in full of all principal, interest and any other amounts owing on the New Bonds, (ii) the redemption of the New Bonds for a pro rata distribution of all remaining Available Cash in accordance with the Bond Indenture after termination (in accordance with the terms of the applicable Loan documents) of all Restructuring Property and (iii) the redemption of the New Bonds for a pro rata distribution of all remaining Available Cash in accordance with the Bond Indenture, after liquidation of all remaining Restructuring Property or, if no such liquidation occurs, a pro rata distribution of all remaining Available Cash, if any, in each case, in accordance with the terms of the Bond Indenture. |
| **Remaining Interest** | Following the termination of the Bond Indenture, the remaining assets of the Issuer, if any, will be distributed to the Public Entity Trust (as defined herein) on account of a residual interest it will have in the Issuer. |
| **Servicer Removal** | Subject to the procedures set forth below, the Servicer may be removed and replaced by the Bondholders upon the occurrence of a Servicer Default (as defined herein) that is material to the interests of the Bondholders (a "Servicer Replacement Event"). The Collateral Monitor will notify the Indenture Trustee and the Issuer when (a) the Collateral Monitor believes, in good faith, that a Servicer Default has occurred and is continuing and (b) the Collateral Monitor believes, in its sole discretion, that such Servicer Default is material to the interests of the Bondholders. Such notice from the Collateral Monitor will give a detailed narrative and explanation of (i) the facts supporting the evaluation of the Collateral Monitor, (ii) the possible effects on the interests of the Bondholders and (iii) the recommendation of the Collateral Monitor regarding the possible Servicer Replacement Event. The Servicer will have the opportunity to provide a written explanation of such Servicer Default to the Collateral Monitor and the Issuer; *provided* that notwithstanding any such |

DRA Ex. 226

explanation, the Collateral Monitor's decision to give notice of a possible Servicer Replacement Event, and such notice actually given, will not be subject to challenge by the Servicer or any other person or entity. The Indenture Trustee will make available to the Bondholders the Collateral Monitor's notice along with the recommendation, if any, of the Issuer regarding the possible Servicer Replacement Event.

Promptly upon the Collateral Monitor's notice of a possible Servicer Replacement Event, but in no event later than 30 days thereafter, the Indenture Trustee will issue a posting on the EMMA website or other similar public posting and a Bondholder vote will be solicited regarding whether a Servicer Replacement Event has occurred and, as a consequence, the Servicer should be replaced. If the New Bond Requisite Holders do not deliver affirmative votes in respect of the solicitation, which will have a period of not less than 30 days and not more than 60 days, the Servicer Default and possible Servicer Replacement Event will be deemed waived. If the New Bond Requisite Holders deliver affirmative votes in respect of the solicitation, a Servicer Replacement Event will have occurred and, upon the Servicer's receipt of notice by the Indenture Trustee of the results of the Bondholder vote, the Servicer's appointment under the Servicing Agreement will be terminated pending the appointment of a successor Servicer. The Issuer will then initiate a competitive process, reasonably satisfactory to the Collateral Monitor, for the identification of a possible successor Servicer, who must be "qualified" and "independent" (as such terms are defined in the Transaction Documents), of recognized national standing and with the requisite expertise and Spanish-speaking capability. The Issuer (or, if the Issuer fails to act within 45 days of such vote, the Collateral Monitor) will then designate a successor Servicer acceptable to the Collateral Monitor for a preliminary 60-day period on terms of engagement acceptable to the Collateral Monitor. Any approval of the successor Servicer or terms of its engagement required from the Collateral Monitor may not be unreasonably withheld. The Collateral Monitor will then give notice to the Indenture Trustee, and the Indenture Trustee will make such notice available to the Bondholders, of (a) the successor Servicer, (b) the terms of the successor Servicer's engagement, (c) the terms of the preliminary 60-day engagement period and opportunity for Bondholder objection, (d) any additional information the Collateral Monitor would like to provide and (e) any additional information the Issuer would like to provide. If the New Bond Requisite Holders do not object to the identity or terms of the successor Servicer's engagement within 60 days after the Bondholders receipt of such notice, the successor Servicer's engagement will become final, subject to the terms and conditions of such Servicer's Servicing Agreement. If a successor Servicer is not appointed within six months after the delivery of affirmative votes of the New Bond Requisite Holders in respect of the solicitation, the Servicer Replacement Event and underlying Servicer Default will be deemed waived and the Servicer will remain in place.

Servicer Defaults include, without limitation:

a) for cause, as set forth under the terms and conditions of the Servicing Agreement;

b) failure to meet the Compliance Test (as defined herein);

c) failure to timely deliver the information necessary to verify the Compliance Test;

d) failure to use commercially reasonable efforts to maximize the value of the Restructuring Property (subject to the limitations described in "The Restructuring Property—Management of the Restructuring Property" in this Offering Memorandum); and

e) entering into any modifications, extensions or accommodations in respect of the Restructuring Property that are, individually or in the aggregate, not commercially reasonable (subject to the limitations described in "The Restructuring Property—Management of the Restructuring Property" in this Offering Memorandum).

For additional information regarding removal of the Servicer, see "*Servicing Agreement—Removal of Servicer*."

DRA Ex. 226

| | |
|---|---|
| **Bond Indenture Events of Default** | Bond Indenture Events of Default are: |

a) a failure by the Issuer to accrue any PIK Amount as required or to make any required payment from Available Cash in respect of any of the New Bonds on the date on which the same is due;

b) a failure by the Issuer to observe or perform any covenant or agreement (other than a covenant or agreement referred to in clause (a) above) contained in the Bond Indenture, and such failure continues or is not cured for a period of 60 days after written notice by the Indenture Trustee or Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding;

c) the Issuer, pursuant to or within the meaning of any U.S. federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation PROMESA (collectively, "Bankruptcy Laws"): (i) commences proceedings to be adjudicated bankrupt or insolvent; (ii) consents to the institution of bankruptcy or insolvency proceedings against it; (iii) files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law; (iv) consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property; *provided*, for the avoidance of doubt, that any such official appointed in respect of an obligor under any Restructuring Property will not constitute a Bond Indenture Event of Default under this clause (c)(iv); (v) makes a general assignment for the benefit of its creditors; (vi) is deemed to be a covered territorial instrumentality under PROMESA or is otherwise determined to be subject to oversight under applicable Bankruptcy Law; or (vii) takes any corporate or similar action in furtherance of any of the foregoing;

d) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (i) is for relief against the Issuer in a proceeding in which the Issuer is to be adjudicated bankrupt or insolvent; (ii) approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of the Issuer under any Bankruptcy Law; (iii) appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of the Issuer for all or any substantial part of the property of the Issuer; *provided*, for the avoidance of doubt, that any such order or decree entered in respect of an obligor under any Restructuring Property will not constitute a Bond Indenture Event of Default under this clause (d)(iii); or orders the liquidation, dissolution or winding up of the Issuer and the order or decree remains unstayed and in effect for 60 consecutive days;

e) any legislation is enacted, governmental action is taken (including any action by the Government, the Commonwealth instrumentalities or any Government-controlled or managed entities, including entities with directors or management controlled or appointed by the Government and any failure by the Government or any Commonwealth instrumentality to observe or perform the non-impairment covenant set forth in Article 407 of the GDB Restructuring Act (as in effect as of the Closing Date)) or any party (other than an obligor on the Restructuring Property) is determined by a final, non-appealable order or admitted in writing by the Issuer to have rights that, in any such case, adversely affect (i) the receipt of current or future Collections on the Restructuring Property to which the Issuer is entitled (other than by reason of (A) a failure, delay or default of the obligor under such Restructuring Property, (B) an obligor being subject to a proceeding under PROMESA or to any provision thereof or (C) changes in taxation or restrictions on the enforcement of rights or remedies, so long as such changes or restrictions are not directed solely at the Issuer, the Restructuring Property, the New Bonds or the Bondholders relative to any other entity, asset, security or security holder) in respect of assets having an aggregate value on the Closing Date of $25 million or more (as determined by the face amount of any such asset, in the case of Loans, or the book value of any such asset, in the case of other assets) or (ii) the binding effect or enforcement of, in accordance with their

respective terms, the GDB Restructuring Act (as in effect as of the Closing Date), the Qualifying Modification, the Public Entity Trust, the Bond Indenture, the New Bonds or the liens on the Restructuring Property;

f)  any entry of a judgment against the Issuer in the amount of $10 million or more;

g)  the occurrence of an event of default by GDB under the Transfer Agreement; and

h)  the Issuer permits the validity or effectiveness of the Transaction Documents to be impaired, and such impairment affects the enforceability of or payments on the New Bonds, or any person to be released from any covenants or obligations with respect to the New Bonds.

If a Bond Indenture Event of Default occurs and is continuing, the Indenture Trustee may, or upon direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will, declare the principal of such New Bonds and accrued but unpaid interest and any other amounts owed thereon to be immediately due and payable, in the order of priority specified for payments.

Following a Bond Indenture Event of Default, the Indenture Trustee may exercise any remedies available under applicable law (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*," in this Offering Memorandum), but may exercise remedies only if (i) Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, consent to such exercise or (ii) the proceeds of such exercise are sufficient to pay in full the principal of and the accrued interest and any other amounts owed on the outstanding New Bonds at the date of such exercise. In addition, the Indenture Trustee must institute proceedings to collect amounts due and exercise such remedies if Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, direct the Indenture Trustee to do so. Notwithstanding the foregoing, the Indenture Trustee may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser.

In addition, if a Bond Indenture Event of Default occurs and is continuing, or the Issuer fails to pay all outstanding amounts on the New Bonds by the Final Scheduled Payment Date, the Indenture Trustee may, or upon the direction of Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will, apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage and control the Restructuring Property for the benefit of the Bondholders and will exercise all the rights and powers of the Issuer with respect to such Restructuring Property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby.

For additional information regarding Bond Indenture Events of Default, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Bond Indenture Events of Default; Rights Upon Bond Indenture Event of Default*" and "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Remedies*" in this Offering Memorandum.

| **Tax Considerations** | For information regarding important tax-related matters, see "*Certain Puerto Rico Tax Considerations*" and "*Certain U.S. Federal Income Tax Considerations*" in this Offering Memorandum. |
|---|---|
| **ERISA Considerations** | For information regarding important ERISA-related matters, see "*ERISA Considerations*" in this Offering Memorandum. |
| **Minimum Denominations** | The New Bonds will be issued in minimum denominations of $1.00 and integral multiples of $1.00 in excess thereof. |

DRA Ex. 226

| | |
|---|---|
| **Exemption from Registration; No Registration Rights** | The New Bonds have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), in reliance upon exemptions contained in the Securities Act. The registration or qualification of the New Bonds in accordance with applicable provisions of laws of the jurisdictions to which the New Bonds may be subject and the exemption from registration or qualification in such jurisdictions cannot be regarded as a recommendation thereof. Neither the Securities and Exchange Commission nor any state securities commission or regulatory authority (including the Oversight Board and AAFAF) has passed upon the merits of the New Bonds or the accuracy or completeness of this Offering Memorandum. Any representation to the contrary may be a criminal offense.

The Bondholders will not have the benefit of any exchange or registration rights. |
| **Certain Other Considerations** | The Issuer will rely on an exclusion or exemption from the definition of "investment company" under the Investment Company Act of 1940, as amended (the "Investment Company Act"), contained in Section 2(b) of the Investment Company Act, although there may be additional exclusions or exemptions available to the Issuer. |

DRA Ex. 226

# RISK FACTORS

*The New Bonds involve significant risks. You should carefully consider the risk factors set forth below regarding the New Bonds, as well as all other information contained or incorporated by reference into this Offering Memorandum. The following risk factors are not the only risks the Issuer faces, are not meant to be a complete list of risks associated with the New Bonds and do not necessarily reflect the relative importance of various risks. Additional risks and uncertainties not currently known to the Issuer or that the Issuer does not currently consider to be material, or that are generally applicable to all governmental instrumentalities, also may materially and adversely affect the Issuer, the Restructuring Property and the Issuer's ability to make payments on the New Bonds. You are advised to consider the following risk factors, among others, and to review the other information contained or incorporated by reference into this Offering Memorandum before making any decisions with respect to the New Bonds. Any one or more of the factors discussed herein, and other factors not described herein, could lead to a decrease in the market value and the liquidity of the New Bonds. There can be no assurance that other risk factors not discussed below will not become material in the future.*

### Neither the Oversight Board nor any federal or state securities commission or regulatory authority has approved or disapproved the New Bonds or passed on the adequacy or accuracy of this Offering Memorandum.

On July 12, 2017, the Oversight Board certified the Restructuring Support Agreement, as amended, as a "Qualifying Modification" pursuant to Section 601(g)(2)(A) of PROMESA. On May 8, 2018, due to certain amendments agreed to among the parties, the Oversight Board re-certified the Restructuring Support Agreement, as amended, as a "Qualifying Modification" pursuant to Section 601(g)(2)(A) of PROMESA. The certification and re-certification of the Restructuring Support Agreement by the Oversight Board relates solely to compliance with the requirements of PROMESA as set forth in Section 601(g)(2)(A). Neither the Oversight Board nor any federal or state securities commission or regulatory authority has approved or disapproved the New Bonds or passed upon the adequacy or accuracy of this Offering Memorandum.

### Bondholders should not expect to receive payment in full in cash of principal and interest on the New Bonds and, as a result, the New Bonds are expected to trade at a significant discount to their stated principal amount.

The Issuer's ability to pay interest in cash and make principal payments is entirely dependent upon Collections on the Restructuring Property. Based on current projections, and as further described in "*Collections on the Restructuring Property and Calculation of Available Cash—Collection Schedule and Yield Considerations*" and "*Payments to Bondholders—Hypothetical Amortization of the New Bonds*" in this Offering Memorandum, Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all such payments of interest and principal (including any PIK Amounts). **In addition, and as further described herein, the Collections on the Restructuring Property may be materially and adversely affected by events and circumstances outside of the Issuer's control, which may result in actual Collections on the Restructuring Property being materially less than those reflected in the Collection Schedule included herein.** As a result, the New Bonds are expected to trade at a significant discount to their stated principal amount. For additional information regarding the assumptions underlying the Collection Schedule, see "*Collections on the Restructuring Property and Calculation of Available Cash—Collection Schedule and Yield Considerations*" and "*Payments to Bondholders— Hypothetical Amortization of the New Bonds*" in this Offering Memorandum. See also "*Risks Related to the New Bonds and the Keepwell Agreement—Bondholders must rely for repayment only upon Collections generated in respect of the Restructuring Property, which are not expected to be sufficient to make all payments of interest and principal (including PIK Amounts) on the New Bonds.*"

### Risks Related to the Issuer

### The Issuer is a newly formed statutory public trust and governmental instrumentality with limited operations and administrative support and will delegate most of its administration (including actions with respect to Collections) to third-party service providers.

The Issuer has been formed for the purpose of acquiring the Restructuring Property and making payments on the New Bonds from Collections on the Restructuring Property. The Issuer will have limited internal administrative support and will for the most part depend on third-party service providers to perform its functions. The Issuer is not expected to have any officers or employees other than the Executive Director, who will be a member of the Board of Trustees. All management of the Restructuring Property (including all day-to-day operations in respect thereof) will be conducted on behalf of the Issuer by the Servicer and other service providers pursuant to contractual arrangements, herein described. In particular, all actions with respect to the Collections and all collateral relating to the New Bonds will be performed by the Servicer. The Issuer will have a limited ability to amend the Servicing Agreement and agreements with third-party service providers with respect to the New Bonds generally. The service providers will only be required to provide services at standards set forth in their respective agreements. Therefore, even if the services provided by third-party service providers are at sub-optimal levels, it may be difficult or impossible to change the levels of service other than as provided for in the applicable agreement with such service provider, and any such change could take time to accomplish. Furthermore, the Issuer can provide no assurances that such service providers will not default or breach such contractual agreements. As well, even if the Servicer defaults or breaches the Servicing Agreement, including for lack of performance by the Servicer, the Issuer will not have an independent right to

DRA Ex. 226

terminate the Servicing Agreement. Even if the Collateral Monitor believes that a Servicer Replacement Event has occurred, if the required votes are not received from the Bondholders to replace the Servicer, the Servicer will continue to manage the Restructuring Property, which may adversely affect Collections thereon. For additional information, see "*Service Providers.*"

***The financial information contained herein, including the information related to the Transferred Property, is based upon GDB's books and records and publicly available information as of the date hereof or the date to which such information relates, as applicable; no audit or independent examination of such information was performed.***

The financial information contained herein, including the information related to the Transferred Property, has not been, and will not be, audited or reviewed by any independent accounting firm or third party and is limited in scope. Although GDB believes that it has used its reasonable efforts to assure the accuracy of the financial information provided herein, there can be no assurance that the financial information contained herein is without material inaccuracies or inconsistencies. In addition, the historical data provided in this Offering Memorandum relating to Collections on the Loans that make up the Transferred Property may differ substantially from future Collections. The Issuer has not independently verified the financial information contained herein, including information relating to the Transferred Property, the status of the obligors on such Transferred Property or as to any information contained herein regarding the projected Collections on such Transferred Property. Furthermore, certain events that are not within the control of the Issuer may materially impact future Collections on the Transferred Property. As a result, you are cautioned not to place undue reliance on any of the financial information contained herein. For additional discussion of the risks related to the Restructuring Property and the obligors thereunder, see "*Risks Related to the Restructuring Property*" and "*Risks Related to the Obligors on the Restructuring Property.*"

***The commencement by the Issuer of a proceeding under Title III of PROMESA or a similar proceeding could result in losses or delays in payments on the New Bonds.***

If the Issuer were to become subject to a proceeding under Title III of PROMESA or a similar proceeding, the Bondholders may experience losses or delays in payments on the New Bonds. If a Title III proceeding is commenced on behalf of the Issuer, a creditor, including the Indenture Trustee and the Bondholders, would be prohibited from repossessing the Restructuring Property from the Issuer without court approval. Moreover, PROMESA permits a debtor to continue to retain and to use collateral and the proceeds, products, rents or profits of the collateral, even though the debtor is in default under the applicable debt instruments, *provided* that a secured creditor is given adequate protection of its interest in such collateral, under bankruptcy principles, as incorporated in PROMESA. It is impossible to predict how long payments on the New Bonds could be delayed following commencement of a Title III proceeding for the Issuer, whether or when the Indenture Trustee would be permitted to repossess or dispose of the Restructuring Property, and whether or to what extent the Bondholders would be compensated for any delay in payment or loss of value of the collateral as a result of the requirements of "adequate protection."

Furthermore, in the event that the presiding court in a Title III proceeding determines that the value of the Restructuring Property is not sufficient to repay all amounts due on the New Bonds, the Bondholders would have "undersecured claims," as to the difference. PROMESA does not permit the payment of accrued interest, costs and attorney's fees for "undersecured claims" during the debtor's bankruptcy case. Additionally, the Indenture Trustee's ability to foreclose on or the Servicer's ability to monetize the Restructuring Property on the Bondholders' behalf is limited by the Transaction Documents and may be subject to the consent of third parties and practical problems associated with the realization of the Indenture Trustee's lien on the Restructuring Property.

***The Issuer, the Servicer (on behalf of the Issuer) and the Indenture Trustee will have limited rights with respect to the Loans that are part of the Restructuring Property, which may reduce the value of such assets and limit the amount of Available Cash for payments on the New Bonds.***

The GDB Restructuring Act and the Qualifying Modification establish certain rights and limitations regarding the management of the Restructuring Property by the Issuer, the Servicer and the Indenture Trustee, as applicable. The Issuer will delegate all management of the Restructuring Property (including all day-to-day operations in respect thereof) to the Servicer pursuant to the Servicing Agreement, subject to the rights and limitations established in the GDB Restructuring Act and the Qualifying Modification. Pursuant to the GDB Restructuring Act and the Servicing Agreement, the Servicer (on behalf of the Issuer) will have the right to exercise remedies in respect of the Commonwealth Loan Assets, the Commonwealth Guaranteed Loan Asset, and the Public Corporation Loan Assets solely to the extent necessary to assure that funds that are available for debt service from the obligors under such Loans (consistent with applicable Oversight Board-approved fiscal plans, if any, and Oversight Board-approved budgets, if any) are applied to such Loans in accordance with the applicable Loan documents, legal priority and the security or other pledge rights benefiting such Loans. Furthermore, pursuant to the GDB Restructuring Act and the Servicing Agreement, the Servicer (on behalf of the Issuer) will be entitled to rights and remedies necessary to preserve, protect or defend any security or other pledge rights benefiting such Loans. For any such Loan where the obligor on such Loan is in proceedings under Title III or Title VI of PROMESA and such obligor has other creditors that have the same legal priority, security or pledge rights as the Issuer, the Servicer (on behalf of the Issuer) and the Indenture Trustee, as applicable, will be entitled to rights and remedies necessary to ensure that the Issuer receives treatment in such proceeding that is the same as that provided to other creditors that have the same legal priority, security or pledge rights as the Issuer.

DRA Ex. 226

The Servicer (on behalf of the Issuer) may sell or otherwise dispose of the Restructuring Property (other than the Municipal Loan Assets), *provided* that such sale must be consistent with the servicing standards set forth in the Servicing Agreement, including the limitations on the ability to pursue enforcement actions described in the preceding paragraph. The Servicer (on behalf of the Issuer) may transfer, assign or sell the Municipal Loan Assets only to an Approved Purchaser. For the avoidance of doubt, the foregoing rights and limitations regarding the management of the Restructuring Property by the Servicer are also applicable to the Issuer pursuant to the GDB Restructuring Act.

The Servicer (on behalf of the Issuer) may not enter into any material modification, extension, accommodation, sale or other disposition of any Restructuring Property unless the Collateral Monitor has been given 10 days' prior written notice of such transaction and has not reasonably objected to such transaction on the grounds that such transaction is not commercially reasonable.

The Indenture Trustee (upon the occurrence and during the continuance of a Bond Indenture Event of Default or as otherwise provided in the Bond Indenture) and any subsequent holder of Restructuring Property (upon the sale or transfer of any such Restructuring Property pursuant to the Servicing Agreement) will be subject to all limitations (including the limitations on the enforcement of remedies described herein) applicable to the Issuer and the Servicer, except that neither the Indenture Trustee nor any subsequent holder of any Restructuring Property will be bound by the standards set forth in the Servicing Agreement or be required to obtain the Collateral Monitor's consent to dispose of the Restructuring Property or any interest in such assets.

The foregoing limitations may significantly limit the ability of the Issuer, the Servicer (on behalf of the Issuer) and the Indenture Trustee to realize as much value in respect of the Loans that are part of the Restructuring Property as they would be able to do if they were allowed to pursue enforcement actions or sell the Loans without limitation.

### Risks Related to the New Bonds and the Keepwell Agreement

*Bondholders must rely for repayment only upon Collections generated in respect of the Restructuring Property, which are not expected to be sufficient to make all payments of interest and principal (including PIK Amounts) on the New Bonds.*

The Issuer is a newly formed statutory public trust and governmental instrumentality of the Commonwealth created by the GDB Restructuring Act. The Issuer will have substantially no assets until the Transferred Property is transferred to the Issuer from GDB, nor any liabilities until the New Bonds are issued. The New Bonds are special limited obligations of the Issuer secured solely by the Restructuring Property and the only sources of payment on the New Bonds are Collections received on the Restructuring Property. The value of the Restructuring Property may increase or decrease after the Closing Date, and Collections on the Restructuring Property are expected to be materially less than the Restructuring Property's notional value.

A substantial portion of the Restructuring Property consists of non-performing assets. Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts). This result would only improve if the Issuer is able to realize significant recoveries in respect of the currently non-performing portions of the Restructuring Property, including Loans to the Commonwealth and distressed public corporations that may be difficult to realize upon, and if such recoveries in respect of the currently non-performing portions of the Restructuring Property outweigh the impact of any currently performing assets becoming non-performing. No assurance can be made that significant recoveries on such non-performing Loans will be achieved or that a significant amount of currently performing assets will not become non-performing.

*Although the New Bonds are called bonds, they are complex financial instruments with unique characteristics and risks that are unlike those typically found in debt securities and may not be suitable for all investors.*

Although the New Bonds are called bonds, they are complex financial instruments with unique characteristics and risks that are unlike those typically found in debt securities. For instance, among other things, the New Bonds are expected to incur significant paid-in-kind interest and will be solely paid from Collections derived from the Restructuring Property after payment of certain costs and expenses. As a result, Bondholders should not expect to receive payment in full in cash of principal and interest due on the New Bonds. While there are scenarios that may result in full payment of principal and interest on the New Bonds, there is considerable uncertainty as to whether the Restructuring Property will provide sufficient cash flow to make all payments of interest and principal (including any PIK Amounts). Because of the unique nature of the Issuer, the New Bonds and the sources of payments on the New Bonds, substantial uncertainty and risk exist with respect to the New Bonds that may not exist with other debt investments. The New Bonds may not be a suitable investment for all investors, including any investor that requires a regular or predictable schedule of payments or payment on specific dates. You should carefully read this entire Offering Memorandum and consult with your legal, financial and tax advisors to understand the prepayment, reinvestment and default risks, the tax consequences of an investment and the interaction of these factors before making any decisions with respect to the New Bonds.

DRA Ex. 226

*Concurrently with the consummation of the Qualifying Modification, GDB, the Issuer and the Indenture Trustee will enter into the Keepwell Agreement. However, the Keepwell Agreement is not expected to provide a source of recovery to Bondholders other than in limited circumstances.*

Concurrently with the consummation of the Qualifying Modification, GDB, the Issuer and the Indenture Trustee will enter into the Keepwell Agreement. The Keepwell Agreement is different than other similarly named instruments. Following the consummation of the Qualifying Modification, GDB will have little to no assets remaining, but will be required, under the Keepwell Agreement, to provide certain covenants and indemnifications to the Bondholders as described further in "*The Keepwell Agreement*" in this Offering Memorandum. Furthermore, GDB will not be subject to covenants requiring the maintenance of any financial ratios. As such, the Keepwell Agreement is not expected to provide a source of recovery to Bondholders other than in limited circumstances.

*The New Bonds are special limited obligations of the Issuer and are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth, nor are they payable or secured by GDB, AAFAF or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The Issuer does not have any taxing authority.*

The New Bonds are special limited obligations of the Issuer payable solely from, secured solely by, and having recourse solely to, the Restructuring Property. The New Bonds are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or secured by GDB, AAFAF or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds represent indebtedness solely of the Issuer and will not be insured or guaranteed by GDB, AAFAF, the Commonwealth, the Servicer, the Collateral Monitor, the Indenture Trustee or any of their respective affiliates, any Commonwealth government entity or any other person. The Issuer does not have any taxing authority.

*Acceleration of the New Bonds upon a Bond Indenture Event of Default may not provide an effective remedy because such an acceleration will not change the timing or amount of the Collections on the Restructuring Property and the liquidation of the Restructuring Property may result in lower recoveries on the New Bonds.*

Certain events, including events that are not within the control of the Issuer, may result in Bond Indenture Events of Default and cause, or permit Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding to cause, acceleration of all outstanding New Bonds. Following a Bond Indenture Event of Default resulting in an acceleration of the New Bonds, the Indenture Trustee, if directed by Bondholders holding not less than 25% in principal amount of the New Bonds then outstanding, will liquidate the Restructuring Property (subject to the limitations described in "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum) and apply the proceeds to the payment of the New Bonds. However, because a majority of the Collections generated by the Restructuring Property is expected to come from the Municipal Loan Assets, which the Indenture Trustee may only sell to an Approved Purchaser, and since an acceleration of the New Bonds will not change the timing or amount of the Collections on such Restructuring Property, acceleration of the New Bonds may not be an effective remedy. In addition, the Issuer cannot predict how long it would take to liquidate the Restructuring Property. It is not anticipated that the amounts received from a sale in these circumstances will be sufficient to pay all amounts owed to the Bondholders, and there is significant risk that the Bondholders would receive lower recoveries on the New Bonds after acceleration. All outstanding New Bonds may be affected by any shortfall in liquidation proceeds.

*If the Restructuring Property generates insufficient cash, the interest obligations on the New Bonds will be paid in the form of additional principal amount on the New Bonds, referred to herein as PIK Amounts, rather than in cash, which will increase a Bondholder's exposure to the New Bonds and intensify the risks related to the New Bonds.*

If the Restructuring Property generates insufficient cash, the interest obligations on the New Bonds will be paid in the form of additional principal amount on the New Bonds, referred to herein as PIK Amounts, rather than in cash, which will increase a Bondholder's exposure to the New Bonds and intensify the risks related to the New Bonds. Because the anticipated Collections on the Restructuring Property are not expected to be sufficient to pay in full in cash all interest on the New Bonds as it comes due, it is anticipated that the New Bonds will accrue significant PIK Amounts.

*Failure to pay interest in the form of cash or principal on the New Bonds due to there being insufficient Available Cash will not constitute a Bond Indenture Event of Default.*

The amount of cash interest and principal required to be paid to the Bondholders on each Payment Date prior to the Final Scheduled Payment Date is limited to the Issuer's Available Cash on the applicable Payment Date. Therefore, if there is insufficient Available Cash to pay all accrued interest in cash or make principal payments on the New Bonds on an applicable Payment Date, the Issuer's failure to pay all interest in cash or make principal payments on the New Bonds, as applicable, on such Payment Date will not,

DRA Ex. 226

by itself, result in the occurrence of a Bond Indenture Event of Default. Notwithstanding the foregoing, the failure to accrue PIK Amounts as required will result in the occurrence of a Bond Indenture Event of Default. For additional information on the termination of the Bond Indenture and the Final Scheduled Payment Date, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Termination of the Bond Indenture*" in this Offering Memorandum.

### *The absence of a secondary market for the New Bonds or a lack of liquidity in the secondary markets could limit Bondholders' ability to resell any New Bonds or adversely affect the market value of the New Bonds.*

The New Bonds will not be listed on any securities exchange, and no financial institution has agreed to make a market in the New Bonds. Therefore, the secondary market for the New Bonds is expected to be limited, and Bondholders may not be able to sell the New Bonds when they want to do so or obtain the price that they wish to receive for the New Bonds, and, as a result, could suffer significant losses. These risks are exacerbated by the unique characteristics of the New Bonds, which are complex financial instruments that are unlike most other municipal or asset-backed securities. As a result, many prospective purchasers may be unwilling or unable to purchase the New Bonds.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. While conditions in the financial markets and the secondary markets have improved, periods of illiquidity could occur again and affect the secondary market, thereby materially adversely affecting the value of the New Bonds and limiting Bondholders' ability to sell the New Bonds. Concerns with the Commonwealth's fiscal crisis may also adversely affect the market value and liquidity of the New Bonds.

In addition, the issuance of the New Bonds is not anticipated to comply with the requirements of Articles 404-410 of Regulation (EU) No. 575/2013 of the European Parliament and of the Council of June 26, 2013, known as the Capital Requirements Regulation, and similar rules applicable to certain investors subject to regulation in member states of the European Economic Area. Lack of compliance with the Capital Requirements Regulation and similar rules may preclude certain investors from purchasing the New Bonds. As a result, Bondholders may be unable to obtain the price that they wish to receive for the New Bonds and, consequently, may suffer significant losses.

### *An adverse rating of the New Bonds could adversely affect the market price of the New Bonds.*

The Issuer does not anticipate seeking a rating for the New Bonds from any rating agency. However, a rating agency may nonetheless issue an unsolicited rating on the New Bonds, employing quantitative and qualitative factors, including the Issuer's actual or perceived financial strength, the prospects for payment of principal and interest on the New Bonds, the impact of the Commonwealth's fiscal crisis, and other macroeconomic conditions in the Commonwealth or otherwise. Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice. Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of the Issuer's indebtedness or placing the Issuer on negative outlook for possible future downgrading. Such action may be taken at any time and is beyond the Issuer's control. The downgrade or withdrawal of any credit rating of Issuer's indebtedness, including the New Bonds, or placing the Issuer on negative outlook for possible future downgrading may have a negative effect on the value of the New Bonds.

### *GDB is subject to claims that will not be satisfied or discharged prior to or as a result of the consummation of the Qualifying Modification. GDB being subject to a proceeding under Title III of PROMESA or similar proceedings could result in losses or delays in payments on the New Bonds.*

GDB is subject to claims that will not be satisfied or discharged prior to or as a result of the consummation of the Qualifying Modification. If GDB were to become subject to a proceeding under Title III of PROMESA or a similar proceeding, Bondholders could experience losses or delays in the payments on the New Bonds. On or prior to the Closing Date, GDB will transfer the Transferred Property to the Issuer pursuant to the GDB Restructuring Act and the Qualifying Modification and in accordance with the Transfer Agreement. However, if GDB were to become subject to a proceeding under Title III of PROMESA or a similar proceeding, the court in such Title III or similar proceeding could find that the Restructuring Property would be subject to such proceeding. Such risk is exacerbated by the fact that many of these questions are matters of first impression where there is not a well-developed body of case law surrounding proceedings under PROMESA, especially with respect to Title VI of PROMESA, pursuant to which the Qualifying Modification will be implemented. If a court were to find that the Restructuring Property would be subject to such proceeding, Bondholders could experience losses or delays in payments on the New Bonds as a result of, among other things:

- the "automatic stay" that prevents certain secured creditors from exercising remedies against a debtor in bankruptcy without permission from the court;

- provisions of PROMESA that permit substitution of collateral in certain circumstances; and

- certain competing claims to GDB's property.

DRA Ex. 226

In addition, since these matters are largely questions of first impression where the applicable court will not have the benefit of a well-developed body of case law, the final resolution of such items may be subject to substantial delay. Such delay, and the uncertainty related thereto, may have a material adverse effect on the value of the New Bonds and the ability of the Issuer to make timely payments thereon.

*Although the New Bonds will be automatically secured by a statutory lien on the Transferred Property and all Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders, pursuant to the GDB Restructuring Act, such rights of the Bondholders may be adversely affected by issues generally associated with the realization of liens on collateral.*

Simultaneously with the issuance of the New Bonds, automatically and without further action, pursuant to the GDB Restructuring Act, the New Bonds will be secured by a statutory lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders. Pursuant to the GDB Restructuring Act, the statutory lien securing the New Bonds will occur automatically and will automatically be perfected, valid and binding from and after the issuance of the New Bonds, without further act or agreement and will be senior to any other lien encumbering the Restructuring Property (except for certain existing and ordinary course liens). The GDB Restructuring Act further provides that no instrument needs to be delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory lien or to establish or maintain the priority thereof, and the Bond Indenture will contain further assurances with respect to the lien and any after-acquired property. The Issuer is prohibited, pursuant to the GDB Restructuring Act, from pledging, creating or recording liens on any of its properties (including the Restructuring Property) other than the pledge to secure the payment of the New Bonds and the obligations to pay certain costs in connection with the restructuring of GDB. However, notwithstanding the foregoing, no court has had the opportunity to opine on the validity of such lien, and the same may be challenged notwithstanding the GDB Restructuring Act. The occurrence of any such events may negatively impact the liens on the Restructuring Property or the priority of the lien in favor of the Bondholders against third parties. Moreover, the Indenture Trustee may be unable to realize the full value of the collateral due to the practical challenges generally associated with the realization of liens on collateral.

*Certain closing conditions and closing deliverables, including legal opinions, with respect to the Qualifying Modification will differ in type and scope from closing conditions and closing deliverables that are typically required in municipal debt offering transactions.*

Given the unique nature of the Qualifying Modification, certain closing conditions and closing deliverables, including legal opinions, with respect to the Qualifying Modification will differ in type and scope from those typically required in municipal debt offering transactions. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Qualifying Modification will differ materially from and be more limited than those typical requirements, including but not limited to the fact that, due solely to litigation (see "*Litigation*"), it is not expected that a legal opinion with respect to the validity or enforceability of the New Bonds will be delivered.

*Any future issuances of Additional Bonds to holders of contingent claims may dilute the value of the New Bonds.*

After the Closing Date, the Issuer may be required to authorize from time to time the issuance of Additional Bonds under the Bond Indenture in respect of certain contingent claims against GDB that are described in Appendix G. Any such issuance of Additional Bonds may dilute the value of the then-existing New Bonds by decreasing the total amount of Available Cash to be paid to then-existing Bondholders pro rata. For a description of the contingent claims, see "*Description of the New Bonds and the Bond Indenture—Additional Bonds*" and "*Appendix G: Contingent and Unliquidated Claims*" attached to this Offering Memorandum.

### Risks Related to the Obligors on the Restructuring Property

#### *General Risks Related to the Obligors on the Restructuring Property*

*Due to the concentration of the obligors on the Restructuring Property in the Commonwealth and their reliance on payment of taxes by residents and businesses in the Commonwealth, the Issuer's ability to receive Collections on the Restructuring Property will be highly impacted by adverse conditions prevailing in the Commonwealth, regardless of the conditions (economic and otherwise) in the United States as a whole or globally.*

As noted above, the New Bonds are entirely dependent on the Collections and other recoveries on the Restructuring Property. Therefore, risks in relation to payments and Collections on the Restructuring Property will significantly and directly affect Bondholder recoveries on the New Bonds. As of the Cutoff Date, substantially all of the obligors on the Loans constituting Restructuring Property were municipalities or instrumentalities of the Commonwealth or the Commonwealth itself and the Real Property Assets were physically located in the Commonwealth. Because of the geographic concentration of obligors and assets in the Commonwealth, as well as the fact that the majority of the obligors are similarly situated, the Issuer will be highly impacted by any existing or future adverse conditions (economic or otherwise) in the Commonwealth, regardless of the conditions in the United States as a whole or globally. As further discussed herein, the Commonwealth is currently experiencing a severe fiscal and economic crisis and was significantly impacted by

DRA Ex. 226

two major hurricanes in September 2017, Hurricanes Irma and María. The Issuer's ability to make payments on the New Bonds will be adversely affected if the relevant obligors on the Restructuring Property are unable to make timely payments.

The obligors' ability to make timely payments on the Restructuring Property is affected by a variety of factors, many of which are outside of their control. For instance, future extreme weather conditions or natural disasters affecting the Commonwealth could cause substantial business disruptions, economic losses, unemployment and an economic downturn in the Commonwealth resulting in municipal obligors being unable to make timely payments on the Restructuring Property. Similarly, terrorist attacks, war or armed hostilities between countries or non-state actors, or the fear of such events, could adversely affect the economy of the Commonwealth resulting in obligors being unable to make timely payments on the Restructuring Property. Outbreaks of SARS, bird flu, swine flu, the Zika virus, Ebola or other pandemic diseases, or the fear of such events, could provoke responses, including government-imposed travel restrictions, which could negatively affect the economy of the Commonwealth and the ability of obligors to make timely payments on the Restructuring Property.

*Actions by the obligors on the Restructuring Property and third parties may impact the Issuer's ability and right to collect payments on the Restructuring Property, which may materially impact the Available Cash that exists for distribution to Bondholders.*

If obligors on the Restructuring Property or third parties contest the Issuer's right to Collections on the Restructuring Property or the GDB Restructuring Act, the Issuer may be forced to expend significant resources in defending its right to such Collections and, ultimately, if unsuccessful, the Issuer's ability to make timely payments on the New Bonds may be negatively impacted. Furthermore, political, legislative and legal action in the Commonwealth may impact the obligors' ability to make timely payments on the Restructuring Property. If a court or the Legislative Assembly were to limit or block the payments on the Restructuring Property by obligors, the obligors on the Restructuring Property may not make timely payments on the Restructuring Property and the Issuer's ability to make payments on the New Bonds may be adversely affected.

Similarly, the fiscal and economic crisis in the Commonwealth has substantially impacted the financial health of the obligors on the Restructuring Property and such obligors could seek relief or protection under PROMESA, in particular if they are unable to continue providing basic services while continuing to honor their debt service obligations. Pursuant to the provisions of PROMESA, political subdivisions of the Commonwealth (such as municipalities) and public corporations, are included in the definition of "territorial instrumentalities." PROMESA authorizes the Oversight Board to designate territorial instrumentalities as "covered territorial instrumentalities," which makes such entities subject to the oversight and other powers of the Oversight Board, such as having to obtain Oversight Board approval in order to perform certain actions that in the past they could carry out without the Oversight Board's review or approval. These approval rights, in turn, could lead to delays in implementing programs that in the past could be implemented without third-party review or approval and cause such entities to lose operational flexibility, which may affect their ability to honor their obligations when due.

The designation of an entity as a covered territorial instrumentality may result in significant expenditure increases, including additional expenditures related to the contracting of additional staff and consultants for the preparation of fiscal plans, periodic reports and statistics and to comply with other requirements. Such additional expenditures may further reduce the revenues available to those entities for the provision of basic services. This designation would also make certain obligors potentially eligible to seek relief pursuant to Title III or Title VI of PROMESA. Holders of obligations of such entities may be subject to involuntary reductions of interest or principal (or both) on such obligations as a result of restructuring proceedings under PROMESA. The Commonwealth and the Puerto Rico Highways and Transportation Authority ("HTA"), which are each obligors on the Restructuring Property, have already commenced proceedings pursuant to Title III. No municipality has yet been designated as a covered territorial instrumentality. If restructurings of obligors on the Restructuring Property under Title III or Title VI or PROMESA were achieved, the Issuer's ability to make payments on the New Bonds may be adversely affected if such restructuring results in reductions in principal and interest collectible on assets included in the Restructuring Property.

*The Commonwealth's ongoing fiscal and economic crisis and global economic developments could adversely affect the performance and market value of the New Bonds.*

The Commonwealth is in the midst of a profound fiscal and economic crisis, which has affected many of the Commonwealth's public instrumentalities and municipalities. The Commonwealth's gross national product contracted in real terms in every year except one between fiscal year 2007 and fiscal year 2017 (inclusive). According to the Puerto Rico Planning Board's latest economic forecast (published in April 2017), gross national product is also projected to further contract by 1.5% during fiscal year 2018. In addition, these forecasts were compiled prior to the recent disruption caused by Hurricanes Irma and María, which are expected to further negatively affect economic growth. The Revised Commonwealth Fiscal Plan, which accounts for the impact of Hurricanes Irma and María, estimates a 16.1% contraction in real gross national product in fiscal year 2018, without considering the impact of disaster relief funding or the measures and structural reforms contemplated by the plan. Taking into account such factors, the Revised Commonwealth Fiscal Plan estimates an 8.0% contraction in real gross national product in fiscal year 2018.

DRA Ex. 226

Factors that may continue to adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy, changes in federal policy, the cost of repairs and rebuilding from severe weather events, United States and global economic and trade conditions, population decline, epidemics or pandemics of communicable diseases, the Commonwealth's high level of debt and the ongoing debt restructuring proceedings. Thus far, efforts by the Commonwealth to alleviate the recession have been unsuccessful, and it is not expected that the recession will end in the near to medium term.

Population decline has had, and may continue to have, an adverse impact on the Commonwealth's economic growth. According to the United States Census Bureau, the population of the Commonwealth decreased by 2.2% from 2000 to 2010, and by an estimated 6.8% from 2010 to 2015, driven primarily by a falling birth rate, a rising death rate, and migration to the United States mainland. The U.S. Census Bureau estimates suggest that the Commonwealth continued to lose population during fiscal year 2017 as well. Although it is too soon to accurately forecast the full effect and impact of the recent disruption caused by Hurricanes Irma and María, it is anticipated that population decline will accelerate. Reductions in population, particularly of working-age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short or medium term. In addition, the average age of the population of the Commonwealth is increasing, due mainly to a reduction in the birth rate and the migration of younger people to the United States mainland. This phenomenon is likely to affect every sector of the economy to the extent that the local consumer base is diminished and the local labor force fails to meet the demand for workers. Moreover, this trend increases the demand for health and other services provided by the Commonwealth and its municipalities, and the relative cost to the Commonwealth and its municipalities of providing such services.

Events in the global financial markets, including downgrades of sovereign debt, devaluation of currencies by foreign governments and slowing economic growth, have caused or may cause a significant reduction in liquidity in the secondary market for asset-backed securities, which could adversely affect the market value of the New Bonds and limit the ability of an investor to sell its New Bonds. On June 23, 2016, the United Kingdom voted in a referendum to discontinue its membership in the European Union. On March 29, 2017, the United Kingdom provided formal notice to the European Council stating its intention to leave the European Union. The exit of the United Kingdom or any other country out of the European Union or the abandonment by any country of the euro may have a destabilizing effect on all Eurozone countries and their economies and a negative effect on the global economy as a whole. No prediction or assurance can be made as to the effect that these developments may have on the Commonwealth's economy and, consequently, on the rate of delinquencies and/or losses on the Restructuring Property or the market value of the New Bonds.

If the recession in the Commonwealth continues or is exacerbated by other regional or global economic downturns, as the case may be, the ability of municipalities or instrumentalities within the Commonwealth to make timely payments on the Restructuring Property may be impaired and the values of the Real Property Assets could further decrease, which could lead to increased delinquencies and losses on the Restructuring Property and could in turn reduce the expected cash payments on the New Bonds as they become due.

*The full effect of the damage caused by Hurricanes Irma and María, which struck the Commonwealth in September 2017, is currently unknown, but was significant and may have a material adverse effect on the Commonwealth and its economy, the obligors on the Restructuring Property, the Collections on the Restructuring Property and the Issuer's ability to make payments on the New Bonds.*

In September 2017, Hurricanes Irma and María struck the Commonwealth. The physical damage from such storms was significant and widespread and there was substantial damage to the Commonwealth's power grid, infrastructure, buildings, residences and other structures. The U.S. federal government approved a major disaster declaration for the Commonwealth, and the Federal Emergency Management Agency has made federal disaster assistance available to the Commonwealth. Recovery efforts continue throughout the Commonwealth.

It is not possible at present to quantify with any certainty the medium-term or long-term impacts of Hurricanes Irma and María on the Commonwealth and its economy, the obligors on the Restructuring Property, the Collections on the Restructuring Property or the Issuer's ability to make payments on the New Bonds, any offsetting economic benefit that may result from recovery and rebuilding activities or the amount of additional resources from federal, Commonwealth and other local sources that will be required. In particular, the Municipal Loan Assets, on which the Issuer will substantially rely to fund payments on the New Bonds, are primarily dependent on property and sales and use tax collections, which may be impaired for an unknown period following the hurricanes. No assurances can be given as to the impact of Hurricanes Irma and María or other future severe weather events on the Commonwealth and its economy, the obligors on the Restructuring Property, the Collections on the Restructuring Property and the Issuer's ability to make payments on the New Bonds.

*The Commonwealth's macroeconomic data may not accurately reflect the performance of its economy and that of its municipalities.*

The Puerto Rico Planning Board has acknowledged the existence of certain significant deficiencies in the calculation of its macroeconomic data. The deficiencies relate mostly to the deflators of the components of trade-related services and, in some cases, monetary accounts of certain components of gross national product. As a result, the historical rate of change in gross national product

DRA Ex. 226

at constant prices (real gross national product change) and at current prices (nominal gross national product change) could have been either overstated or understated for several years. It is still too early to determine how these deficiencies have affected, or will affect, the Commonwealth's macroeconomic data. Until such time as these revisions are finalized and fully applied to the Commonwealth's macroeconomic data, there is no assurance that previously reported macroeconomic data accurately reflects the performance of the economy of the Commonwealth.

### *Risks Related to Municipal Obligors and their Operations*

*Municipal governments have a significant amount of issued and outstanding indebtedness and, to the extent that their source of revenues is affected by the economy, severe weather events and other external factors, they may be unable to sustain expenses associated with providing essential services to their residents while continuing to honor their debt obligations as they come due.*

Municipal governments have a significant amount of issued and outstanding debt. These debt obligations were issued based on available debt margins provided by various laws. The current and prolonged fiscal, financial and economic crisis of the Commonwealth, however, has led to a decline in economic activity subject to municipal taxes, which has reduced municipal revenues. This trend has been further aggravated by the impact of Hurricanes Irma and María. Moreover, municipal governments have also been forced to dedicate more of their limited resources to providing essential services to their residents. This has been exacerbated recently by high expenditures relating to Hurricanes Irma and María. Therefore, a debt burden that may have been manageable at the time of incurrence has become more burdensome for most municipalities. As a result, municipal governments may be unable to sustain the growing expenses required to maintain basic municipal operations, such as security and trash removal, in addition to their debt service obligations.

*Many municipalities are considered autonomous entities under Commonwealth law and there is no repository of municipal economic data. As a result, there is no assurance that the available information regarding the economies of the municipalities is accurate or complete.*

Many of the larger municipalities operate pursuant to the provisions of Act No. 81-1991, as amended, known as the "Autonomous Municipalities Act." Based on the provisions of this law, such municipalities operate as quasi-independent entities within the Commonwealth. These municipalities provide basic services to their residents, collect municipal revenues and enforce municipal revenue laws and gather data regarding their municipalities. As quasi-independent entities, these municipalities are not required to provide much public data regarding their operations and their financial condition, other than their budgets, audited financial statements and other data as may be required to obtain Loans or other financings. Municipal financial data, however, is typically published and available at the Office of the Municipal Commissioner and information about tax revenues is typically available from CRIM, but the publication of data is often substantially delayed. As a result, the economic and operating data regarding these municipalities may be limited, not up-to-date, and may not have been prepared with sufficient safeguards to confirm its accuracy and completeness. Therefore, the Issuer, the Servicer and the Bondholders may not have access to reliable financial and operational information to assess the creditworthiness of each municipality, including their ability to make payments on the Municipal Loan Assets.

*The Revised Commonwealth Fiscal Plan provides for the reduction and eventual elimination of a substantial portion of the central government's subsidy to municipalities, which may adversely affect the ability of municipal governments to continue providing essential services and servicing their debt obligations.*

Municipal entities have historically relied upon subsidy payments from the Commonwealth's central government for some of their budget. In some cases, these subsidy payments have represented a substantial portion of such municipal entities' revenue. Pursuant to the Revised Commonwealth Fiscal Plan, aggregate appropriations from the Commonwealth to municipalities were decreased by $150 million in fiscal year 2018 and by an additional $45 million in fiscal year 2019 (from approximately $370 million in fiscal year 2017 to approximately $220 million in fiscal year 2018 and approximately $175 million in fiscal year 2019). The Revised Commonwealth Fiscal Plan provides for additional reductions in Commonwealth appropriations to municipalities every fiscal year, holding appropriations constant at approximately 45-50% of current levels starting in fiscal year 2022 before ultimately phasing out all appropriations in fiscal year 2024. These appropriations were intended in part to replace foregone *ad valorem* taxes due to the exemption available for owner-occupied residential property, and were typically deposited into the Municipal Matching Fund and allocated to municipalities pursuant to Act No. 80 of August 30, 1991, as amended (the "CRIM Act"). Municipalities traditionally use the funds received from the central government to fund municipal services and capital improvement in order to provide services to its residents. The gradual reduction of these appropriations will have an adverse effect on most municipalities to the extent they are unable to replace this revenue source or reduce their expenses, but may have a disproportionate effect on municipalities with a smaller tax base and which rely heavily on such appropriations. It has been reported that municipalities are currently contemplating various initiatives in order to mitigate the impact caused by the loss of a portion of the central government appropriations, including through proposed changes in legislation. As of the date hereof, however, no such legislative changes have been implemented. There is no assurance that municipalities will be able to replace this revenue source and, to the extent they are unable to make such replacement, they may be unable to continue to sustain expenses associated with providing the same level of essential services to their residents while honoring debt payment obligations, including the Municipal Loan Assets, as they become due.

DRA Ex. 226

*The depletion of the assets of the public pension system in which municipalities participated and the change to a pay-as-you-go model could result in a material increase in the pension benefit expenses payable by the municipalities that could materially adversely affect the financial condition of some municipalities and their ability to meet their obligations in full, including the Municipal Loan Assets.*

All municipalities previously participated in the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("ERS"), a statutory trust created by Puerto Rico law that administers a cost-sharing, multiple-employer, hybrid-defined benefit plan. Historically, participating employers were required to contribute to ERS an amount determined by statute and established as a percentage of payroll, rather than an amount determined on an actuarial basis. This resulted in a historical underfunding of ERS, with actual employer contributions averaging approximately 32.7% of what were the annual required contributions determined actuarially. Following the pension reform legislation enacted in fiscal year 2013, all participating employers in ERS were required to make additional contributions to ERS, but most employers, including the Commonwealth and various municipalities, were unable to meet such additional contributions. As a result, ERS is now insolvent and has depleted its liquid assets. To address this problem, which threatens pension payments to thousands of retired public employees in the Commonwealth, including retired municipal employees, the Commonwealth enacted Act 106-2017, adopted on August 23, 2017 ("Act 106"), which, among other matters, adopts a pay-as-you-go model for the continuing payment of public pension benefits. Under this model, the Commonwealth will continue to honor public pension benefits and participating employers, including municipalities, are required to pay to the Commonwealth an amount determined by AAFAF corresponding to the actual payments of pension benefits to retirees and beneficiaries of each particular participating employer. Most municipalities and many public corporations were unable to make all payments required to be made by them to the Commonwealth to cover the pension benefits of their retirees under the new pay-as-you-go model during fiscal year 2018 and therefore still owe significant sums to the Commonwealth with respect thereto. Pursuant to Act 106, the Retirement Board established under such law may require CRIM to transfer from the unencumbered property taxes of a municipality any amounts owed by such municipality under the pay-as-you-go system. Amounts required to be paid by the municipalities under the pay-as-you-go system could represent a material increase in the historical pension benefits expenses payable by the municipalities, adversely affecting their financial condition and ability to meet their obligations in full, including the Municipal Loan Assets.

*Municipal governments may now have to provide essential services that were previously provided by the Commonwealth's central government, which may adversely affect their ability to service their debt obligations.*

The Revised Commonwealth Fiscal Plan provides for reductions in services that the Commonwealth traditionally provided. Moreover, HTA, which is currently in a proceeding under Title III of PROMESA, provides services related to the Commonwealth's transportation infrastructure, such as road maintenance and repairs. To the extent the Commonwealth and certain public corporations responsible for capital improvement and maintenance to basic infrastructure are unable to adequately cover these responsibilities, municipal governments may have to step in and undertake to provide such services. In certain cases, municipal governments may seek to divert limited resources, subject to or in contravention of restrictions on the use of such resources under applicable law, in order to undertake such services and, in other cases, municipal governments may not have the resources or expertise to provide the services at the required level. To the extent municipal governments seek to divert resources to cover these services, and are able to do so pursuant to or in contravention of then-current applicable law, their ability to service their debt on a timely basis may be affected. If, on the other hand, municipal governments are unable to ensure basic services to their residents and such inability causes a deterioration of economic activity and property values in the municipality, their revenues may be adversely affected and they may become unable to service their debt on a timely basis, including the Municipal Loan Assets.

*Municipal revenues are dependent on legislation enacted by the Legislative Assembly and any amendments to such legislation may have an adverse effect on the ability of municipalities to collect revenues.*

Municipalities are created by the Legislative Assembly and their rights and powers are granted by legislation. Although municipalities are authorized by the Constitution of the Commonwealth of Puerto Rico (the "Commonwealth Constitution") to impose taxes, the nature and extent of most of those taxes are provided for by the Legislative Assembly. As a result, changes or amendments to Commonwealth legislation that authorizes municipalities to impose certain taxes may adversely affect their ability to raise and collect revenues.

Moreover, the Legislative Assembly also has the power to exempt entities from taxes, including municipal taxes. For example, various economic development laws enacted by the Legislative Assembly over the past years have exempted certain businesses from the payment of real property, personal property and other municipal taxes as an incentive to promote their establishment in the Commonwealth. To the extent the Legislative Assembly continues to enact legislation that exempts businesses from municipal taxes, municipalities may be adversely affected as their tax base is reduced and their ability to collect revenues is reduced. Furthermore, there is certain pending legislation that, if ultimately approved, could adversely affect Collections on the Municipal Loans Assets. For a discussion of such pending legislation, see "*Municipalities—Recent and Pending Legislation Impacting Municipalities*" in this Offering Memorandum.

DRA Ex. 226

*Municipalities may be subject to additional or new federal and local regulations that may increase their operational expenses and capital improvement requirements and, as a result, materially adversely affect their ability to service their debt obligations while maintaining essential services.*

Prevailing economic conditions in the Commonwealth have limited the amount of revenues collected by municipalities. These revenues, in turn, have been spread thin by the demand for additional services provided by municipalities to their residents. For example, municipal governments typically have owned or operated landfills and have provided waste disposal services to their residents. Many of these landfill operations are not compliant with local and federal environmental regulations and many municipal governments do not have the resources required to bring these operations into compliance. If these landfills are not brought into legal and regulatory compliance, municipalities may be required to stop their operation and find an alternative to waste disposal for its residents, which could result in an increase of operating expenses as the municipality finds waste disposal alternatives. If municipal governments are unable to comply with applicable laws and regulations with respect to certain of their operations or if they are unable to comply with additional local or federal regulations imposed on municipal operations, municipalities may be unable to assume such additional expenses without severely affecting their ability to continue providing other basic services. As a result, if municipal expenses increase due to additional local or federal regulation, municipalities may be unable to continue providing services at current levels and this, in turn, may affect their ability to cover debt service on their outstanding debt, including the Municipal Loan Assets.

*The fiscal and financial challenges faced by many municipalities may lead to the creation of regional consortiums or ultimately to their consolidation with larger, more solvent municipalities. To the extent municipal consolidation occurs, it is unclear what effect, if any, such consolidation would have on the outstanding obligations of the consolidated municipalities.*

As of the date of this Offering Memorandum, the Commonwealth has 78 municipalities. Many of these municipalities are small and may not have a significant revenue base to maintain independent operations. It has been reported that this has led to discussions regarding the creation of regional consortia, which would allow for the administrative consolidation of smaller municipalities with larger municipalities that have a robust tax base in the form of significant private commercial activity. Although municipal consolidation has also been discussed, the Commonwealth's Constitution requires the affirmative vote of a majority of the residents of a municipality in order to consolidate or abolish such municipality. To the extent municipalities form regional consortia or consolidate, it is unclear what would happen to such municipality's outstanding debt, and which entity would be responsible for its payment. It is unclear whether the larger municipality would assume such debt or if such municipality would be able to refuse to assume such debt to the extent its particular debt load is close to, or would be in excess of, its allowed borrowing margin. As a result, the Issuer may have difficulty recovering amounts due on the Municipal Loan Assets of the municipalities that either form a regional consortium or consolidate into one another.

*Municipal governments may be unable to raise additional revenues without undermining economic activity.*

Municipal governments currently impose a myriad of municipal taxes, including real property taxes, personal property taxes, municipal license taxes, sales and use taxes, and construction excise taxes, among others. Through the years, municipal governments have been forced to slowly increase these taxes in order to raise revenues to maintain municipal services and service their debt. Although many municipalities may continue to increase the rates at which these taxes are imposed, the population loss caused by the Commonwealth's economic conditions make increasing tax rates less effective. As a result, municipal governments may not be able to effectively increase their taxes without undermining economic activity in their municipalities. This, in turn, may lead to municipalities being unable to raise additional revenues, which could materially affect the municipality's ability to honor its obligations, including the Municipal Loan Assets, while continuing to provide essential services.

*Municipal governments may not have sufficient borrowing margin or access to financing and may be unable to continue funding their public works programs and operational deficits.*

In the past, municipalities have financed their public works programs and operational deficits through borrowings. A municipality's ability to borrow, however, is limited by law. If a municipality has reached its borrowing limit, it cannot legally incur additional debt payable from that revenue source. GDB historically served as an important source of liquidity to municipal governments by providing financing to such entities. However, given GDB's current financial situation and the orderly wind down of its operations contemplated in the GDB Fiscal Plan, GDB is no longer in a position to provide such financings. While certain municipalities may be able to obtain financing from private financial institutions to continue funding their public work programs and operations, others may not be able to obtain such financing. To the extent municipalities are unable to borrow funds to finance their public works programs and operations, they may be unable to continue providing adequate municipal services to their residents, which may cause those residents or businesses to move to other municipalities, thus affecting the municipality's tax base. This may lead to a decrease in revenues and the municipality's inability to honor its obligations, including those constituting Restructuring Property, when due, while continuing to provide essential services.

DRA Ex. 226

*Municipal governments will begin paying for their consumption of electricity, which may significantly increase their operating expenses and adversely affect their ability to honor their obligations when due.*

Historically, municipal governments have paid for the electric power they receive from the Puerto Rico Electric Power Authority ("PREPA") through a contribution-in-lieu-of-taxes mechanism. This mechanism, set in place by the Legislative Assembly, had allowed municipalities to offset their entire electric consumption bill to compensate them for foregone tax revenue related to the properties owned by PREPA in such municipality. As a result of this mechanism, in the past, municipalities typically did not have to pay for electric power with their internal revenues. This mechanism was recently modified by the Legislative Assembly by providing for a cap on the electric consumption expense that could be compensated by a municipal government and requiring a gradual reduction of municipal government electric consumption. As a result, municipal governments will now have to use their internal revenues to cover any electric consumption expense in excess of those covered by the contribution-in-lieu-of-taxes mechanism. Furthermore, PREPA's fiscal plan, as approved by the Oversight Board, requires additional changes to the contribution-in-lieu-of-taxes mechanism. PREPA's fiscal plan also contemplates the privatization of the Commonwealth's electric system, which may lead to stricter payment and collection policies for all PREPA customers. As a result, municipalities may have to start using an even greater proportion of municipal revenues to pay for electric service at their facilities. There is no assurance that municipalities will have sufficient available resources to assume this added expense and, consequently, some municipalities may be required to divert resources from debt repayment, including payments on Municipal Loan Assets, other programs and essential services in order to cover the cost of electricity.

*To the extent a municipality defaults on Loans granted to it by the U.S. federal government under the Community Disaster Loan Program, the U.S. federal government may exercise certain rights that could adversely affect the ability of the municipality to continue providing essential services and pay debt service on its other Loans, including the Municipal Loan Assets.*

Certain municipalities have obtained Loans (the "CDL Loans") from the U.S. federal government under the Community Disaster Loan program of the Robert Stafford Disaster Relief and Emergency Assistance Act (the "Stafford Act"). The CDL Loans are payable from and secured by a pledge of the municipality's revenues for each year while any of such municipality's CDL Loans are outstanding. Under the Stafford Act, the CDL Loans may be forgiven under certain circumstances. However, to the extent the CDL Loans are not forgiven and a municipality defaults on its CDL Loan, Federal Emergency Management Agency ("FEMA") is authorized to take action to recover the outstanding principal plus related interest under federal debt collection authorities, including administrative offset against other federal funds payable to the municipality and/or referral to the U.S. Department of Justice for judicial enforcement of collection. To the extent FEMA exercises any such rights, the ability of municipalities to continue providing essential services and pay debt service on their other Loans, including the Municipal Loan Assets, may be adversely affected.

### Risks Related to the Restructuring Property

#### *General Risks Related to the Restructuring Property*

*The Restructuring Property that is currently classified as performing solely consists of the Municipal Loan Assets and the Additional Recovery Authority Loans. To the extent such Loans do not perform as expected, the Collections expected to be received by the Issuer may be significantly reduced.*

The only performing Loans to be held by the Issuer as of the Closing Date are Municipal Loan Assets, of which approximately 97.1% (or Loans with a principal balance of approximately $1,209 million) were classified by GDB as performing as of the Cutoff Date. As a result, a substantial majority of Collections to be generated by the Restructuring Property is expected to be derived from the Municipal Loan Assets. The Restructuring Property also includes the Beneficial Interest in, and the proceeds of the GDB Retained Loans, including the Additional Recovery Authority Loans. The Additional Recovery Authority Loans, which are required to be transferred by GDB to the Issuer after the Closing Date in accordance with the Transfer Agreement, are also performing as of the Cutoff Date. Although the Municipal Loan Assets and the Additional Recovery Authority Loans have been performing to date, the future performance of such Loans is subject to many risks and, to the extent these risks materialize, either in whole or in part, such Loans may generate significantly less Collections than expected. As a result, any defaults in the Municipal Loan Assets or the Additional Recovery Authority Loans may result in the Issuer receiving lower Collections than expected, which would adversely affect the amount expected to be paid to the Bondholders.

A substantial amount of the Loans that are part of the Restructuring Property accrue interest at a variable rate typically determined by an underlying benchmark plus a spread. Although the interest rate on such Loans is capped at 12% pursuant to Puerto Rico law, the current interest rate accruing on such Loans is substantially below 12%. In particular, any increase in the interest rate applicable to the Municipal Loan Assets may further strain the municipalities' finances and undermine their ability to continue paying their obligations as they come due. There is no assurance that the Municipal Loan Assets and the Additional Recovery Authority Loans will continue to perform as expected in an increasing interest rate environment.

DRA Ex. 226

*Ongoing or future litigation challenging the treatment of certain claims against GDB or settlement of such claims under the Qualifying Modification and/or the GDB Restructuring Act could adversely affect the value of the Restructuring Property.*

There is certain pending or threatened litigation by holders of claims against GDB challenging the treatment of their claims under the Qualifying Modification and/or the GDB Restructuring Act. Certain parties, for example, have commenced litigation claiming that they are entitled to the return of funds purportedly held "in escrow" without any reduction or impairment. Similarly, certain municipalities claim that certain of their deposits with GDB were held "in trust" and are not subject to being diminished or impaired as other deposit claims. While GDB believes that the treatment of claims against GDB under the Qualifying Modification and the GDB Restructuring Act is appropriate and intends to defend any lawsuit challenging such treatment, there can be no assurance that GDB will prevail in any litigation. A judicial ruling adverse to GDB or a settlement could result in some claimants receiving more from their claims than currently projected, thus reducing the value of the Restructuring Property.

*Future litigation against GDB based on its past role as fiscal agent and financial advisor of the Commonwealth and its instrumentalities could adversely affect the Restructuring Property.*

On September 6, 2017, the Oversight Board hired the firm of Kobre & Kim, LLP ("Kobre") to perform an investigation of the debt issuance practices of the Commonwealth and its instrumentalities. As part of the investigation, Kobre conducted many interviews, including of past and current officers of GDB. On August 20, 2018, Kobre issued its Final Investigative Report (the "Kobre Report") with its findings as to the Commonwealth's past debt issuance and disclosure practices. Although the Kobre Report is not intended to assign fault to any party, the Kobre Report addresses a broad range of potentially actionable conduct and claims against various parties, which include concerns regarding GDB's role as fiscal agent and financial advisor. As a result, creditors and other third parties may commence litigation trying to impose liability on GDB for its role in the Commonwealth's debt issuance and disclosure policies. While GDB believes that its performance as financial advisor and fiscal agent was consistent with applicable law and intends to defend any lawsuit raising such claims, there can be no assurance that GDB will prevail in any litigation. A judicial ruling adverse to GDB or a settlement could result in a reduction in the value of the Restructuring Property.

*While the Restructuring Property has a high notional value, the Issuer's ability to make payments to the Bondholders will depend upon Collections on the Restructuring Property rather than such notional value.*

While the Restructuring Property has a high notional value, the Collections on the Restructuring Property are not expected to be equivalent to such notional value. As such, the Issuer's ability to make payments to the Bondholders will depend upon Collections on the Restructuring Property rather than such notional value. For additional information on the sources of payment on the New Bonds, see "*Risks Related to the New Bonds and the Keepwell Agreement—Bondholders must rely for repayment only upon Collections generated in respect of the Restructuring Property, which are not expected to be sufficient to pay in full in cash all interest as it comes due or pay all principal amounts (including PIK Amounts) of the New Bonds.*"

*Certain assets that constitute the Restructuring Property share their source of repayment with Loans made by private financial institutions with different repayment terms than those contained by the Restructuring Property and may result in reductions to Collections on the Restructuring Property.*

The Restructuring Property consists mainly of intragovernmental Loans with debt service schedules that typically do not include balloon payments. Many of the governmental entities that borrowed from GDB, including many municipalities, also entered into loan agreements with private financial institutions. Such private Loans, however, contain payment terms that differ from those entered into with GDB, including the structuring of debt service schedules with balloon payments. In the past, such governmental entities were able to refinance balloon payments with GDB or private financial institutions. In the future, however, GDB will not be available to refinance such payments, and governmental entities may have to honor their debt service obligations as they come due unless they are able to secure private financing. In particular, municipalities have entered into Loans with private financial institutions that are payable from the same source of funds as the Loan assets included in the Restructuring Property. If a municipality is required to honor a balloon payment, the amount due may significantly reduce the amounts available for payment of the municipality's other obligations secured from the same source, including Loans that are part of the Restructuring Property. To the extent municipalities are required to cover balloon payments in the future, there is no assurance that municipalities will be able to cover debt service payments due under the Restructuring Property in their entirety, which may significantly reduce Collections on the Restructuring Property.

*Future Collections on the Restructuring Property are subject to substantial risk and may materially deviate from GDB's historical Collections and the Collection Schedule set forth in this Offering Memorandum, due in part to conditions and events outside of the control of the Issuer and Bondholders. Such change may reduce Bondholder recoveries on the New Bonds or adversely affect the market value of the New Bonds.*

Future Collections on the Restructuring Property are subject to substantial risks, including those described herein, and may materially deviate from GDB's historical Collections and the Collection Schedule set forth in this Offering Memorandum. While the Restructuring Property primarily consists of Loans with fixed payment schedules, the overall mix of the Restructuring Property and the

44

DRA Ex. 226

non-performing status of the various Loans therein make the Collection Schedule for the Restructuring Property subject to substantial change, due in part to conditions and events outside of the control of the Issuer and the Bondholders. If such schedule of payments changes, the amount of Collections will change and may adversely affect recoveries on the New Bonds. For instance, the Restructuring Property includes certain current Loans that have annual percentage rates ("APRs") that are less than the interest rates on the New Bonds. To the extent that obligors on current Loans with higher APRs are able to prepay or refinance their Loans at lower interest rates, such repayment may result in the Issuer holding Restructuring Property that will generate even lower Collections available to make current cash payments of interest on or principal of the New Bonds.

The Collection Schedule and all hypothetical scenarios presented in this Offering Memorandum are indicative only and there can be no assurance that actual Collections on the Restructuring Property or actual amortization of the New Bonds will not materially deviate from such Collection Schedule and hypothetical scenarios.

*Unpredictable Collections on the Restructuring Property may cause earlier than expected principal payments on the New Bonds, resulting in reduced returns on investment and reinvestment risk. The subordination of payments on the New Bonds to the Servicing Fee, the Collateral Monitor Fee and other Issuer Expenses may also result in reduced or delayed cash payments of principal and interest on the New Bonds.*

Bondholders may receive payments of principal on the New Bonds earlier than expected. If that happens, Bondholders may not be able to reinvest the principal received at a rate as high as the rate on the New Bonds. Early Collections on the Restructuring Property may shorten the life of the New Bonds in a way that cannot be fully predicted. The rate of Collections on the Restructuring Property may be influenced by a variety of economic and other factors. It is not possible to fully predict the actual rate of Collections on the Restructuring Property. Bondholders will bear any reinvestment risks resulting from a faster or slower rate of payments of the Restructuring Property.

Bondholders that receive payments of principal earlier than expected are exposed to greater reinvestment risk, and Bondholders that receive payments of principal later than expected are exposed to greater risk of loss. In either case, the yields on the New Bonds could be materially and adversely affected by Collections that differ from the Collection Schedule set forth herein.

In addition, the New Bonds are subject to risk because payments of principal and interest on the New Bonds on each Payment Date are subordinated to the payment of the Servicing Fee, the Collateral Monitor Fee and certain other amounts payable to the Servicer, Collateral Monitor and the Indenture Trustee in respect of fees, expenses and indemnification amounts and other Issuer Expenses. This subordination could result in reduced or delayed cash payments of principal and interest on the New Bonds.

*The Restructuring Property primarily consists of receivables in respect of intergovernmental transactions and the formal documentation of such transactions may not be comprehensive. As a result, it may be difficult to determine what rights, if any, the Issuer has with respect to certain of the assets included in the Restructuring Property and its ability to collect on such obligations may be significantly limited.*

The Restructuring Property mainly consists of assets created as a result of intergovernmental transactions. In many instances, these intergovernmental transactions were not fully documented because the authority or requirement to provide the Loans and its source of repayment is set forth in applicable law. Moreover, GDB did not have a need to comprehensively and formally document these transactions because it did not have a real expectation of selling this portfolio and, in those cases where Loans could be securitized through the Municipal Financing Authority ("MFA"), it had the contractual right of modifying the Loan documents to what would then be required by MFA. As a result, the formal documentation evidencing the Restructuring Property is not as comprehensive as those documents that typically evidence Loans in the private sector. Moreover, the Loan documents evidencing these assets may have inconsistent provisions or differing rights, depending on when they were prepared and by whom. Therefore, the Issuer may have difficulty in determining what rights, other than those provided by law, if any, it has under the Loans and which of those rights it may be able to enforce effectively. This, in turn, may affect the amount of the Collections to be received by the Issuer in respect of the Restructuring Property and the amounts that will be available to make payments on the New Bonds. For example, Municipal General Obligations are evidenced by Interim Receipts (as defined herein), which are simple notes that were issued to GDB with the expectation that such receipts would be replaced with definitive bonds upon the completion of a securitization transaction through MFA. The Interim Receipts were not replaced with definitive bonds because an MFA transaction was not completed.

*The statutory provisions purporting to secure, dedicate or pledge the revenue streams benefiting the Loans that constitute Restructuring Property are untested and may prove to be ineffective in bankruptcy or otherwise.*

Municipal governments are authorized to borrow against several of their revenue sources. This authority to borrow is set forth in different laws, which usually provide how the obligations will be incurred, how a particular revenue source will be used or dedicated to pay such obligations and how the proceeds derived from such borrowing may be used by the municipality. The efficacy of such statutory provisions in a bankruptcy context or otherwise has not been challenged or resolved before a Commonwealth court. However, the Oversight Board, in litigation commenced by the Municipality of San Juan, argued that the statutory language providing for the

DRA Ex. 226

incurrence of Municipal General Obligations falls short of creating a statutory lien. The issue of whether such sources of revenue constitute "special revenues" under applicable bankruptcy law has also not been raised or resolved before a court. Such lawsuits and any other challenges to the sources of payment for such obligations may result in payments being interrupted or the Loans being treated as unsecured obligations or being otherwise impaired, which may adversely affect the Issuer's recovery.

*The foreclosure of liens or the enforcement of other rights securing Loans included as part of the Restructuring Property may be unavailable to the extent the obligor on such Loan seeks relief under Title III of PROMESA.*

The Servicer (on behalf of the Issuer) may be unable to foreclose on liens or enforce other rights securing Loans of obligors that have sought or hereinafter seek relief pursuant to the provisions of Title III of PROMESA as a result of the application of the automatic stay on enforcement of remedies that would become effective upon the filing of the Title III petition. Moreover, revenues received by the corresponding entity subsequent to the filing of the Title III petition may not be subject to such liens, which may adversely affect the Issuer's recovery.

*Creditors of the Commonwealth, HTA or other obligors on the Restructuring Property could seek to equitably subordinate the Loans made by GDB to such obligors in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*

The allowance, classification, and treatment of claims under a plan of adjustment approved in a proceeding under Title III of PROMESA may take into account the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, as incorporated by section 301 of PROMESA, or otherwise. There is a risk that creditors of the Commonwealth, HTA, or another obligor on the Restructuring Property in a pending or future Title III proceeding could object to a plan of adjustment for such entity on the basis that the Loans made by GDB to such obligor should be reclassified or subordinated in a Title III plan of adjustment. Generally, courts consider the following factors in determining whether to equitably subordinate a claim: (i) whether the creditor was engaged in inequitable conduct, (ii) whether the misconduct injured other creditors or gave an unfair advantage to the creditor in question, and (iii) whether subordination would be consistent with the provisions of the Bankruptcy Code. Insiders and affiliates may be held to a higher standard than are unaffiliated third parties.

*The Restructuring Property securing the New Bonds includes certain Loan proceeds that will not be transferred to the Issuer until received by GDB after the Closing Date. Although the New Bonds will be secured by a lien on the Beneficial Interest in such Loans, the lien on such proceeds received by GDB after a hypothetical GDB Title III filing could be subject to challenge.*

Pursuant to the GDB Restructuring Act, the New Bonds will be automatically secured by a statutory lien on the Restructuring Property, which includes the right to receive the proceeds of, and 100% of the Beneficial Interests in, any property remaining at GDB as of the Closing Date, the net proceeds of which are required to be transferred to the Issuer once received by GDB after the Closing Date. Notwithstanding the foregoing, there is a risk that the lien on such proceeds to be transferred after the Closing Date could be challenged if GDB commences a proceeding under Title III of PROMESA prior to receiving such proceeds.

*The payment statistics provided by GDB may not accurately reflect the delinquency of the Transferred Property and, as a result, the Transferred Property's actual performance may be worse than presented.*

In the past, GDB acted as an intergovernmental bank and provided financing to government entities in order to fund their operations and capital improvement programs. In certain instances, the financing provided could not be timely paid by such government entity and GDB would negotiate a refinancing or a Loan modification that would extend the amortization of the Loan in order to provide such entity some additional time to pay. In certain instances, this process was repeated with government entities that, at that time, did not have the capacity to repay their Loans. As a result, the payment information related to the Loans that compose the Restructuring Property may not accurately represent the performance of the portfolio to the extent that the information related to these refinancing and Loan modifications are not captured by the financial information presented. This means that entities that are shown as current or performing may not actually have the resources to honor their obligations as they become due and that the information regarding delinquencies contained herein may be understated. Therefore, the Collections may be significantly delayed or significantly less than those shown in the Collection Schedule.

DRA Ex. 226

*Collections on ad valorem real and personal property taxes, which constitute the principal source of payment of certain Municipal Loan Assets, may be adversely affected as a result of a number of factors, including recent legislation, changes to applicable law and the lack of sufficient resources to adequately assess and collect such taxes.*

*Ad valorem* taxes imposed by the municipalities, which are property taxes assessed based on the value of the property, are collected by the Municipal Revenues Collection Center ("CRIM" by its Spanish acronym). CRIM is a municipal instrumentality of the Commonwealth created by law. CRIM's enabling act delegates many functions related to collection of property taxes to CRIM, such as assessing, collecting and distributing the funds collected as a result of *ad valorem* taxes. CRIM is authorized to charge municipalities a commission of up to 5.0% of total Basic Tax revenues collected in order to fund its operations.

On August 6, 2017, Act No. 77-2017 was enacted, which amended certain provisions related to the imposition and collection of *ad valorem* taxes. In particular, municipalities were granted the authority to collect such taxes and to take any action to embargo or foreclose on taxpayer property with prior notice to CRIM. Prior to such amendment, certain municipalities were authorized to take such actions pursuant to various agreements between CRIM and such municipalities, which required that any funds collected by the municipality be deposited with CRIM. Although the amendment also provides that funds collected by the municipalities must be deposited with CRIM, CRIM has yet to approve the regulation that would provide for the implementation of these provisions. Moreover, the amendment provides that municipalities that exercise these powers are not required to pay CRIM the commission of up to 5.0% of total Basic Tax revenues collected. To the extent that municipalities begin to implement these provisions and forego paying CRIM's commission, CRIM's operational revenues may be significantly reduced and its ability to perform its functions may be adversely affected. If CRIM is unable to continue performing its collection responsibilities, all municipalities, including those without the necessary financial resources, would be forced to undertake these assessment and collection functions in order to secure their *ad valorem* tax revenue streams. Considering CRIM has centralized many functions that would have to be decentralized, municipalities may not have the resources to implement an alternate collection system to effectively replace CRIM. As a result, any change in the CRIM structure and powers as a result of this or any other future legislation could significantly affect a municipality's ability to continue to honor its debt obligations, including the Municipal Loan Assets, as they become due while continuing to provide essential services to its residents.

Furthermore, like many government entities in the Commonwealth, CRIM has been affected by the fiscal and financial challenges of the Commonwealth and the recent severe weather events. Specifically, CRIM's responsibilities require sufficient personnel to make field visits and assess the value of new properties or improvements to existing properties in order to impose and collect *ad valorem* taxes. CRIM also requires personnel to review records and inspect real property in order to verify that such properties have not been modified in a way that would require the owner to pay additional *ad valorem* taxes. Moreover, CRIM has to carry out these assessments and review duties in a limited period of time because the statute of limitations to assess the value of new real properties or improvements on existing properties is five years and, in many cases, CRIM has not been able to make such assessments within such timeframe. After the statute of limitations has run, CRIM and the municipality lose their legal right to impose *ad valorem* taxes retroactively for periods prior to five years before the date of assessment on such new property or improvement. Therefore, CRIM's limited resources and personnel may adversely affect municipal revenue collections to the extent that CRIM is unable to properly and timely assess the *ad valorem* taxes attributable to real property in a municipality and, thereafter, collect such *ad valorem* taxes. This failure could lead to municipalities receiving less than potential collections and an inability by the affected municipality to honor its obligations as they become due, including the Municipal Loan Assets.

Finally, it has recently been reported that certain legislators are considering filing legislation to eliminate the portion of the personal property taxes corresponding to taxes on inventory. The elimination of such taxes, especially if a substitute revenue source is not identified, could aversely affect the financial condition of the municipalities and the repayment of the Municipal Loan Assets. For a discussion of recent and pending legislation impacting municipalities, see "*Municipalities—Recent and Pending Legislation Impacting Municipalities*" in this Offering Memorandum.

*Ad valorem taxes collected on real property in a municipality are assessed by converting current property values to the property values prevailing in 1957, which results in municipalities being unable to realize the collections that would be due on the current value of such property. Moreover, it is unclear how any change to the manner in which ad valorem taxes are imposed may affect such collections.*

*Ad valorem* taxes are assessed based on fiscal year 1957–1958 property values. No real property reassessment has been made since fiscal year 1957–1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in fiscal year 1957–1958. As a result, assessed valuations of real property are usually substantially lower than actual market values of such property. In addition, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available. For years, administrations of different political parties and economists have identified this practice as one that needs to be reformed in order to capture the current value of real property when assessing taxes. This system, however, has not been reformed due to the complexity and the resources required to complete such task. To the extent the *ad valorem* tax system remains unchanged, municipalities will be unable to realize tax revenues in respect of the increases in real property values over the last 60 years.

DRA Ex. 226

Notwithstanding the foregoing, and in light of the Commonwealth's depressed economy and the state of the real estate market, it is unclear how any change to the manner in which *ad valorem* taxes are imposed may affect municipal *ad valorem* tax revenues.

### *Risks Related to the Municipal General Obligations*

*There is no judicial precedent in the Commonwealth for the enforcement of a municipal pledge of its good faith, credit and taxing power and it is unclear whether a court could order a municipality and its municipal legislature to increase taxes in order to pay its General Obligations.*

The documents evidencing the Municipal General Obligations, in accordance with Act No. 64-1996, as amended, known as the Municipal Financing Act (the "Municipal Financing Act"), provide that the good faith, credit and taxing power of the municipality are pledged to the payment of the Municipal General Obligations. The Commonwealth's Supreme Court has never had the opportunity to rule on whether holders of Municipal General Obligations have the right to compel the municipal legislature to increase taxes in the event that *ad valorem* taxes are insufficient to pay the Municipal General Obligations, or to rule on how such right, if determined to exist, could be enforced.

*Although Municipal General Obligations are paid primarily from a municipality's Special Additional Tax and the rate at which such tax is imposed is not capped, municipalities may be unable to continue raising such tax due to the current economic conditions prevailing in the Commonwealth.*

The Municipal Financing Act provides that the principal source of repayment for municipal general obligations is the Special Additional Tax. The Special Additional Tax is an *ad valorem* tax that municipalities impose on real property located in their territorial bounds and the rate at which such tax is imposed is not capped by law. Although a municipality is required by law to increase such Special Additional Tax to a level that would allow it to continue honoring its obligations as they become due, a municipality's ability to raise the Special Additional Tax from current levels may be limited by prevailing economic conditions in the Commonwealth. Raising the Special Additional Tax may cause business to relocate to other municipalities and lead to reduced collections. As a result, a municipality may be limited in its ability to raise the Special Additional Tax and, if raised, such Special Additional Tax may not produce the collections required to continue honoring its municipal debt service while continuing to provide essential services to its residents.

### *Risks Related to Sales Tax Obligations*

*A municipality's authority to impose or collect the municipal sales and use tax may be affected by temporary tax holidays, amendments or modifications approved by the Legislative Assembly or by ongoing or future litigation challenging such authority.*

A portion of the municipal obligations included in the Restructuring Property are payable from municipal sales and use tax collections. The Commonwealth's Internal Revenue Code authorizes and requires municipalities to impose a sales and use tax of 1.0% on taxable items and provides for an additional 0.5% municipal sales and use tax that is deposited, on behalf of the municipalities, in the Municipal Administration Fund (the "FAM" by its Spanish acronym). Sales Tax Obligations are payable from a portion of the municipal sales and use taxes deposited in the FAM. Although these funds are allocated to the municipalities, the authority to impose such taxes and collect them derives from legislation approved by the Legislative Assembly. Moreover, the authorized uses of these funds are set forth in laws enacted by the Legislative Assembly. To the extent the Legislative Assembly deems it necessary to amend these laws to modify the rate at which the taxes are imposed or their authorized uses, the municipalities would be significantly adversely affected and their ability to collect municipal sales and use tax revenues could be reduced. In addition, a municipality's authority to collect sales and use taxes could also be temporarily affected by the declaration of sales and use tax holidays by the Commonwealth's central government. For example, current law provides for a three-day sales and use tax holiday during the back-to-school period. Also, the Governor is authorized to declare sales and use tax holidays during declared emergencies, which authority the Governor exercised following Hurricanes Irma and María by temporarily suspending the application of sales and use taxes on processed foods due to the lack of electric power for a significant period of time. The Governor also suspended the application of sales and use taxes to goods sold and services provided by merchants with annual sales of $1 million or less from November 20, 2017 to December 31, 2017.

Traditionally, municipal taxes and revenues, such as the municipal sales and use tax, were considered not to constitute "available resources" of the Commonwealth for purposes of Section 8 of Article VI of the Commonwealth's Constitution subject to the Commonwealth "clawback" for the payment of its general obligation debt. Holders of the Commonwealth's general obligation bonds, however, have recently claimed in the Title III proceeding that they have rights over these municipal sales and use taxes. To the extent that holders of the Commonwealth's general obligation bonds are successful in this claim, municipalities would be deprived of their municipal sales and use tax collections and the Sales Tax Obligations could lose their source of repayment for an indefinite period of time. Moreover, to the extent that municipal sales and use tax revenues are clawed back, municipal obligations payable from a municipality's operational funds, such as the Operational Loans, would also be adversely affected due to the decrease in resources available to cover debt service.

DRA Ex. 226

*Sales Tax Obligations are payable from municipal sales and use tax collections, which may be materially adversely affected by prevailing economic conditions and continued population decline, and, to the extent municipal sales and use tax collection are insufficient, municipalities may be unable to honor their obligation to pay Sales Tax Obligations when due.*

Unlike Municipal General Obligations, which benefit from a pledge of the municipality's good faith, credit and taxing power, Sales Tax Obligations are principally payable from municipal sales and use tax collections deposited in the FAM. Sales and use tax collections are dependent on economic activity and have experienced a reduction due to economic conditions in the Commonwealth, which is in the midst of a severe recession since 2006 that has been exacerbated by the impact of Hurricanes Irma and María. In an attempt to limit these reductions, the Commonwealth and municipal governments have broadened the base of the tax and, in the case of the Commonwealth, significantly increased the rates at which they are applied. This, in turn, has caused a further reduction in consumer spending and consumption, which continues to affect sales and use tax collections. As a result, a continued decline in sales and use tax collections, either as a result of prevailing economic conditions or additional increases in sales and use tax rates, may significantly adversely affect sales and use tax collections and the funds available to pay Sales Tax Obligations. Moreover, to the extent sales and use tax collections are reduced, holders of Sales Tax Obligations may not receive payment in full, if at all. Finally, to the extent that municipal sales and use taxes deposited in the FAM are insufficient to cover debt service on Sales Tax Obligations, there are no alternative dedicated revenue streams. As a result, if municipal sales and use tax collections decline and the municipality does not use other available resources to cover debt service on such Sales Tax Obligations, holders of Sales Tax Obligations may not receive full payment on such municipal debt and may have limited or no recourse against other municipal funds.

*Sales Tax Obligations may be judicially determined not to be secured by a lien on municipal sales and use taxes and to be effectively subordinated to Loans payable from municipal sales and use taxes granted by private financial institutions to certain municipalities.*

Act No. 18-2014, as amended (the "FAM Act"), which created the FAM, provides for the deposit of 0.5% of the sales and use tax into a segregated account to be used to pay Sales Tax Obligations and for other specified purposes. The Municipal Financing Act and the FAM Act authorize municipalities to issue obligations payable from a portion of the sales and use tax allocated to them under the FAM structure. The language through which the sales and use tax funds are dedicated to the payment of the Sales Tax Obligations has not been challenged or resolved by a Commonwealth court. If a court were to determine that this statutory language does not constitute an effective lien, holders of Sales Tax Obligations may not be able to seek effective enforcement of the municipality's obligation to pay such obligations.

In addition, the Municipal Financing Act authorizes municipalities to obtain financing from private financial institutions payable from municipal sales and use taxes deposited into the Municipal Redemption Fund that is part of the FAM. In granting these Loans, private financial institutions have entered into security agreements with the municipalities and created contractual liens over the municipal sales and use taxes that constitute the source of repayment for those Loans. To the extent it is determined that the statutory language providing for the issuance of Sales Tax Obligations does not constitute an effective lien, payment of these obligations may be effectively subordinated to the Loans payable from the municipal sales and use taxes in which a contractual security interest has been granted to private financial institutions to secure such Loans.

### Risks Related to Operational Loans

*Operational Loans issued by municipalities are unsecured Loans that are subordinated to Municipal General Obligations.*

Operational Loans issued by municipalities are unsecured and do not have a lien on any particular revenue or asset of a municipality. Although a municipality is required to pay its Operational Loans from operating revenues, a municipality may pledge its revenues for the payment of other debts. To the extent that municipal revenue is pledged for the payment of debt other than Operational Loans, a municipality may not have enough resources to cover its debt service payments in respect of its Operational Loans in full. Moreover, holders of Operational Loans may not have any effective means of enforcing their obligations. As a result, holders of Operational Loans may have a higher risk of payment default than holders of other types of municipal debt.

Operational Loans are also subordinated in payment priority to Municipal General Obligations. This means that municipalities are required to cover the payment of debt service on their Municipal General Obligations before applying any available funds to the payment of their Operational Loans. As a result, to the extent a municipality experiences financial and economic difficulties that reduce its revenues, such municipality may not have sufficient resources to pay its Operational Loans after covering the payments due on its Municipal General Obligations.

Finally, the Municipal Financing Act authorizes municipalities to obtain financing from private financial institutions payable from operational revenues. In granting these Loans, private financial institutions have entered into security agreements with the municipalities and created contractual liens over certain municipal operational revenues that constitute the source of repayment for those Loans. Since the Operational Loans constituting part of the Restructuring Property are not secured by a lien, payment of these obligations may be effectively subordinated to the Loans payable from the municipal operational revenues in which a contractual security interest has been granted to private financial institutions to secure such Loans.

DRA Ex. 226

*Risks Related to Municipal Revenue Loans*

*Municipal Revenue Loans, which are not backed by the municipality's good faith, credit and taxing power, are payable primarily from the revenues generated by the project for which the Loan proceeds were used and debt service payments are legally subordinated to the expenses required to operate and maintain the project and to the payment of other municipal Loans, if any, secured by a lien on the revenues generated by such project.*

Municipal Revenue Loans are payable primarily from the revenues generated by the project for which such Loan was originally granted and are not backed by the municipality's good faith, credit and taxing power. This means that a municipality may have pledged or may hereafter pledge the revenues received from a project as security for the payment of other obligations. Moreover, the Municipal Financing Act provides that debt service due on a project that is not secured by a lien on the revenues generated by the project is paid only after the expenses related to the maintenance and operation of a project and the debt service on any obligation secured by a lien on the project's revenues have been paid. This means that debt service on Municipal Revenue Loans may be subordinated in priority of payment to the operational and maintenance expenses of the project and to the payment of any other municipal indebtedness secured by a lien on the revenues generated by the same project. To the extent the revenue generated by a project is not sufficient to cover such expenses and such other municipal indebtedness, the municipality may not have sufficient revenue to cover debt service on the Municipal Revenue Loans in full. Finally, holders of Municipal Revenue Loans do not have a right to enforce the payment of their obligations by requiring the use of any particular revenue stream and may not have recourse to sufficient municipal resources in order to collect their debt in full.

### *Risks Related to Municipal Lines of Credit*

*Municipal Lines of Credit do not have an identifiable source of repayment. As a result, municipalities may not be able to honor their obligations to pay debt service on the Municipal Lines of Credit when due and may not be required by law to apply any particular resources to cover such obligations.*

The Municipal Lines of Credit were either (i) granted in anticipation of the issuance of revenue bonds that were not ultimately issued or (ii) payable from future legislative appropriations, which the Legislative Assembly has not made. As a result, Municipal Lines of Credit do not have an identifiable source of repayment. Moreover, Municipal Lines of Credit are not secured by a lien, or backed by the municipality's good faith, credit and taxing power and are not payable in a particular manner or from a particular source set forth in law. Therefore, if a municipality does not honor its obligation to pay debt service on the Municipal Lines of Credit when due, it may not be required by law to apply any particular resources to cover such obligations.

### *Risks Related to the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset*

*The Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are classified by GDB as non-performing and are currently subject to a payment moratorium. As a result, and given the deteriorated fiscal and economic condition of the Commonwealth and its instrumentalities, recoveries on the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are subject to significant uncertainty and could be minimal.*

All of the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are classified by GDB as non-performing as of the Cutoff Date. Such Loans are also currently subject to a payment moratorium pursuant to various executive orders issued under Act 21-2016, as amended, and Act 5-2017, as amended. Moreover, the Commonwealth and its instrumentalities are in the midst of a profound fiscal and economic crisis, which has been further aggravated by the impact of Hurricanes Irma and María. As a result, recoveries, if any, on the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are subject to significant uncertainty and could be minimal.

*The Commonwealth has sought relief pursuant to the provisions of Title III of PROMESA, which provides for the restructuring of its outstanding debt obligations. As a result, the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset are subject to being restructured in the Commonwealth's Title III proceeding and recoveries pursuant to these obligations, if any, are uncertain at this time.*

The Commonwealth is currently in the midst of a Title III proceeding pursuant to the provisions of PROMESA in order to restructure its debts. Through the years, the Commonwealth issued a significant amount of general obligation debt, similar to that included in the Restructuring Property. The Commonwealth's general obligation debt is not secured by a specific lien and will likely be treated as unsecured debt within a Title III proceeding. As a result, it is uncertain what recovery, if any, the Issuer will receive on the Commonwealth Loan Assets and the Commonwealth Guaranteed Loan Asset.

DRA Ex. 226

*Although the Commonwealth Guaranteed Loan Asset is guaranteed by the Commonwealth and benefits from a pledge of the Commonwealth's good faith, credit and taxing power, the guaranty and pledge may be subject to challenge in an insolvency, bankruptcy or similar proceeding, including under Title III of PROMESA.*

The Commonwealth Guaranteed Loan Asset is guaranteed by the Commonwealth and such guaranty benefits from a pledge of the Commonwealth's good faith, credit and taxing power. The Commonwealth is currently in the midst of a proceeding under Title III of PROMESA, in which the Commonwealth Guaranteed Loan Asset could be restructured. There is significant uncertainty regarding the treatment of the guaranty under Title III of PROMESA. If successful, a challenge to all or a portion of the guaranty could adversely affect the Issuer's recovery on the Commonwealth Guaranteed Loan Asset.

### Risks Related to the Public Corporation Loan Assets

*The Public Corporation Loan Assets are classified by GDB as non-performing, and some of them are currently subject to a payment moratorium. As a result, and given the deteriorated fiscal and economic condition of the Commonwealth and its instrumentalities, recoveries on the Public Corporation Loan Assets are subject to significant uncertainty and could be minimal.*

All of the Public Corporation Loan Assets are classified by GDB as non-performing as of the Cutoff Date. Certain of such Loans are also currently subject to a payment moratorium pursuant to various executive orders issued under Act 21-2016, as amended, and Act 5-2017, as amended. Moreover, the Commonwealth and its instrumentalities are in the midst of a profound fiscal and economic crisis, which has been further aggravated by the impact of Hurricanes Irma and María. As a result, recoveries, if any, on the Public Corporation Loan Assets are subject to significant uncertainty and could be minimal.

*HTA, which is the largest obligor on the Public Corporation Loan Assets, has currently sought relief pursuant to the provisions of Title III of PROMESA and is in the process of restructuring its obligations. As a result, the HTA Debt (as defined herein) will be restructured and recoveries pursuant to these obligations, if any, are uncertain at this time.*

HTA is the largest obligor included in the Public Corporation Loan Assets with approximately $1.7 billion in outstanding principal of HTA Loans and approximately $200 million in outstanding principal of HTA Bonds. HTA is currently in the midst of a Title III proceeding pursuant to the provisions of PROMESA in order to restructure its debts. Through the years, HTA issued a significant amount of debt secured by various sources of revenue, such as toll revenues and taxes and fees conditionally assigned to it by the Commonwealth, which are subject to first being used by the Commonwealth to pay its general obligation debt pursuant to the provisions of the Commonwealth Constitution, and which are currently being retained by the Commonwealth and not being applied to the payment of HTA's debts pursuant to several executive orders issued under the Moratorium Act (as defined herein). The portion of the HTA Debt corresponding to HTA Bonds is also payable from toll revenues generated by HTA. However, such revenues are also not currently being applied to the payment of the HTA Bonds pursuant to an executive order issued under the Moratorium Act. As a result, it is uncertain what recovery, if any, the Issuer will receive on the HTA Debt. Furthermore, HTA bondholders have asserted in HTA's Title III proceeding that they have a superior lien on a substantial portion of the revenues securing the HTA Loans. Although GDB believes that there are no superior liens on such revenues, if bondholders were to prevail in such arguments, the recovery on the HTA Loans would be substantially impaired.

*The other public corporations that are obligors on the Public Corporation Loan Assets portfolio are also "covered territorial instrumentalities" pursuant to PROMESA and may seek relief under Title VI or Title III of PROMESA in the future. As a result, debt obligations owed by public corporations may be restructured and recoveries pursuant to these obligations, if any, are uncertain at this time.*

The public corporations that constitute the obligors on the Public Corporation Loan Assets are "covered territorial instrumentalities" under PROMESA and may seek to restructure their debts in the future pursuant to Title VI or Title III of PROMESA. To the extent that any of these public corporations seek to restructure their debts, it is uncertain what recoveries, if any, holders of their Loans will receive.

### Risks Related to the Real Property Assets

*The appraisals provided for the Real Property Assets have not been recently updated and the values provided therein may no longer be current because the real property market in the Commonwealth has been and continues to be materially adversely affected by economic conditions and could be further affected by the impact of Hurricanes Irma and María.*

The real estate market in the Commonwealth continues to be materially adversely affected by prevailing economic conditions and could be further affected as a result of the impact of Hurricanes Irma and María. Real estate values have declined and, given the prevailing economic conditions in the Commonwealth and the aftermath of Hurricanes Irma and María, could continue to decline in the foreseeable future. Some of the appraisals for the Real Property Assets have not been recently updated. In light of the negative real estate market conditions in the Commonwealth, the realizable value of the Real Property Assets will likely be significantly below what is

DRA Ex. 226

shown in the appraisals and could be significantly below what is assumed in the Collection Schedule. Moreover, the Issuer may be unable to find a willing buyer for any of the Real Property Assets and, therefore, be unable to realize any value for such asset, which may also adversely affect Collections.

### *The Real Property Assets may have title defects or restrictions on transfer that could affect the Issuer's ability to realize value from such assets.*

GDB will transfer the Real Property Assets to the Issuer on an "as is, where is" basis. As a result, the Issuer will receive the Real Property Assets with any and all defects or restrictions on transfer such assets had when held by GDB. Specifically, certain Real Property Assets are subject to title defect and restrictions on transfer that may materially adversely affect the Issuer's ability to realize any value on such assets. To the extent any such title defects or restrictions on transfer cannot be cured or addressed, the Issuer may be unable to sell such assets and realize any value with respect to such asset. This, in turn, may materially reduce Collections on the Real Property Assets.

### **Risks Related to the GDB Restructuring Act and Future Judicial and Legislative Actions**

### *The Issuer was created, the Transferred Property is being transferred by GDB to the Issuer and the New Bonds are being issued pursuant to the GDB Restructuring Act, which is newly enacted legislation that has not been validated by judicial decisions.*

The GDB Restructuring Act, which was enacted on August 24, 2017 and amended on July 18, 2018, may be challenged by judicial action by any party affected by its provisions. While the Commonwealth and GDB believe that the GDB Restructuring Act is constitutional and intend to defend its constitutionality, there can be no assurance that the final resolution of any challenge will be consistent with the Commonwealth's and GDB's position. An adverse judicial determination regarding the constitutionality of the GDB Restructuring Act or certain of its provisions (such as the transfer of the Transferred Property and/or the settlement of certain claims effected thereunder) could, among other things, affect the validity or enforceability of the Transaction Documents, including the New Bonds, and the New Bonds' source of repayment. Defending such litigation could also involve substantial fees and expenses, and the costs of such defense would have to be paid out of Collections before the determination of Available Cash for payment on the New Bonds.

Furthermore, the GDB Restructuring Act, by its terms, strips the government entities of the Commonwealth of authority and standing to challenge the GDB Restructuring Act, the Qualifying Modification and all related transactions.

In addition, there is uncertainty associated with the New Bonds because there is no judicial experience interpreting the provisions of the GDB Restructuring Act. Judicial interpretations of the GDB Restructuring Act, including those related to the enforcement of liens created thereunder, could affect the value of the New Bonds and the recovery thereunder.

### *Notwithstanding the GDB Restructuring Act's non-impairment provisions, future legislative action could reduce the value of the New Bonds.*

Notwithstanding the GDB Restructuring Act's non-impairment provisions, future action by the Legislative Assembly could change the GDB Restructuring Act in ways that affect the security and sources of payment on the New Bonds. Any such action would be subject to the Commonwealth's statutory covenant to the Bondholders that it will not impair, limit, restrict, rescind, delay or modify the rights and powers of the Issuer, the Indenture Trustee or the holder of the New Bonds under the GDB Restructuring Act or under or in respect of the Restructuring Property, or the Issuer's ability to meet its obligations to Bondholders, until the New Bonds have been paid in full or are otherwise discharged. Any such action, as well as the litigation that likely would ensue, might adversely affect the value of the New Bonds and the recoveries on the New Bonds. Furthermore, the enforcement of any rights against the Commonwealth under the Commonwealth's statutory non-impairment covenant may be subject to the exercise of judicial discretion and limitations on legal remedies against the Commonwealth or the enforcement of the non-impairment covenant.

In addition, other future actions by the Legislative Assembly that do not violate the Commonwealth's statutory non-impairment covenant could also materially adversely affect the value of the New Bonds and the recoveries on the New Bonds.

DRA Ex. 226

**Risks Related to GDB and the Service Providers**

*The Issuer's expenses, including third-party service providers' compensation, may change prior to the Final Scheduled Payment Date, and such changes may be material. Since all such expenses will be paid from Collections on the Restructuring Property prior to making any payments to Bondholders, if the amounts of such expenses are material or increase prior to the Final Scheduled Payment Date, the amount of Available Cash available for distribution to the Bondholders will be reduced, which may have a material adverse effect on the Bondholders' ability to receive cash payments of interest and principal on the New Bonds.*

The Issuer's actual expenses prior to the Final Scheduled Payment Date are currently unknown. A large portion of the Issuer's expenses will consist of compensation paid to third-party service providers, and the amounts of such compensation may vary significantly prior to the Final Scheduled Payment Date from the expected amounts described herein, and such differences may affect the value of, and return on, the New Bonds. For instance, the hypothetical amortization of the New Bonds includes estimates for Issuer Expenses, including payments to third-party service providers, as further described in "*Payments to Bondholders—Hypothetical Amortization of the New Bonds*" and "*Appendix F: Hypothetical Amortization of the New Bonds*" in this Offering Memorandum.

While the Issuer has described the terms of its contractual arrangements with third-party service providers, including compensation amounts for such services, there can be no assurance that the actual compensation ultimately paid by the Issuer will not change materially prior to the Final Scheduled Payment Date. In addition, the Issuer Operating Expenses Cap excludes the payment of certain amounts. See "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Certain Covenants of the Issuer*." Furthermore, since all such expenses will be paid from Collections on the Restructuring Property prior to making any payments to Bondholders, if such amounts are material, or if they increase prior to the Final Scheduled Payment Date, the amount of Available Cash available for distribution to the Bondholders will be reduced, which may have a material adverse effect on the Bondholders' ability to receive cash payments of interest and principal on the New Bonds.

*Total Collections on the Restructuring Property will be impacted by, among other things, the Servicer's ability to appropriately manage the Restructuring Property and the costs and expenses incurred to do so.*

Total Collections on the Restructuring Property will be impacted by, among other things, the Servicer's ability to appropriately manage the Restructuring Property and the costs and expenses incurred to do so. The Restructuring Property is made up of a complex, non-homogenous pool of Loans and other assets that have a diverse mix of terms, rights, obligations, obligors and maturities. In addition, a large amount of the Restructuring Property is in various stages of default because the obligors thereunder have failed to make payments when due or otherwise comply with the terms and conditions of their Loans. As such, servicing the Restructuring Property is a complex undertaking and there can be no assurance that the Servicer will be successful in optimizing Collections on the Restructuring Property. Transitions of servicing obligations and changes to collection practices on the Restructuring Property may exacerbate this risk and have a material adverse effect on Collections on the Restructuring Property. In addition, the Servicer's ability to manage the Restructuring Property will differ in material ways from GDB's historical servicing of the Restructuring Property. For example, the Servicer will not have the ability to lend additional funds to the obligors on the Restructuring Property.

*Servicing of the Restructuring Property may be negatively affected by GDB's operational wind down.*

As a result of downsizing at GDB and its operational wind down that has already occurred in accordance with the GDB Fiscal Plan, GDB does not have the number, or experience level, of personnel necessary to adequately apprise the Servicer on how to manage the Restructuring Property in a manner consistent with past practice. After the transfer of the Transferred Property to the Issuer, there may be disruptions in servicing due to the time and process involved in transferring files and information. These and other factors may negatively impact the amount and timing of Collections, which could reduce the amount of Available Cash as of any Payment Date available to make payments on the New Bonds.

*GDB will make limited representations regarding the Transferred Property, and there will be no recourse to GDB for any deficiencies in the Transferred Property.*

GDB will make limited representations regarding the Transferred Property. To the extent there are deficiencies in the Transferred Property or the enforceability thereof, the Issuer will have no recourse to GDB or any other party.

DRA Ex. 226

*Any transfer of the servicing of the Restructuring Property from the Servicer to a successor Servicer, including after a Servicer Replacement Event, may result in additional costs, increased servicing fees by such successor Servicer or a diminution in servicing performance, including higher delinquencies and defaults, all of which may have an adverse effect on payments on the New Bonds.*

If a Servicer Replacement Event occurs, the Servicer may be removed by the Bondholders and replaced by the Issuer or the Collateral Monitor, as further described in "*Servicing Agreement—Removal of Servicer*" in this Offering Memorandum. In the event of the removal of the Servicer and the appointment of a successor Servicer, the Issuer cannot predict:

- the cost of the transfer of servicing to the successor;

- the ability of the successor to perform the obligations and duties of the Servicer under the Servicing Agreement, including ensuring timely Collections on the Restructuring Property; or

- the servicing fees charged by the successor.

Furthermore, the Issuer and the Collateral Monitor, as applicable, may experience difficulties in appointing a successor Servicer. During any transition phase, it is possible that normal servicing activities could be disrupted, resulting in increased delinquencies and/or defaults on the Restructuring Property, which could lead to delays or reductions in the payments on the New Bonds.

Additionally, because the Servicer may be paid the Servicing Fee based on a percentage of the value of the Restructuring Property, the Servicing Fee may be reduced as the amount of Restructuring Property decreases over time. At some point, if the need arises to obtain a successor Servicer, the fee that such successor Servicer would earn, if such fee were similarly calculated, might not be sufficient to induce a potential successor Servicer to agree to manage the remaining Restructuring Property, which could result in increased delinquencies and/or defaults on the Restructuring Property.

*The insolvency, bankruptcy or similar proceedings of the Servicer could give the Servicer the right to reject the Servicing Agreement, delay the appointment of a successor Servicer and, consequently, delay or reduce payments on the New Bonds.*

In the event of a Servicer Default resulting solely from certain events of insolvency or the bankruptcy of the Servicer, there is a chance that neither the Indenture Trustee nor the Bondholders would be able to appoint a successor Servicer or prevent the Servicer from appointing a sub-servicer, as the case may be, without the consent or action, respectively, of the bankruptcy trustee and/or the bankruptcy court, and delays in the collection of payments on the Restructuring Property may occur. Any delay in the collection of payments on the Restructuring Property would delay or reduce payments to Bondholders.

*Collections on the Restructuring Property could be affected by the Servicer's consolidation of or change in servicing operations.*

From time to time, the Servicer may update its systems in order to improve operating efficiency, update technology and enhance services, among other things. In connection with such updates, the Servicer could experience disruptions in activities both during and following the rollout of the new systems or platforms caused by, among other things, periods of system downtime and periods devoted to user training. These and other implementation related difficulties could contribute to higher delinquencies of payment on the Restructuring Property. It is not possible to predict with any degree of certainty all of the potential adverse consequences that may be experienced but, if such adverse consequences are experienced, they could impact the Issuer's ability to make payments on the New Bonds.

**Risks Related to the Tax Treatment of the New Bonds**

*The Exchange of Participating Bond Claims for New Bonds will be a taxable event to U.S. Holders.*

The exchange of Participating Bond Claims for New Bonds will constitute a taxable exchange of the Participating Bond Claims for U.S. federal income tax purposes. Therefore, a U.S. Holder (as defined in "*Certain U.S. Federal Income Tax Considerations*") will recognize gain or loss equal to the difference between the amount realized on the exchange (except to the extent attributable to accrued and unpaid interest) and the U.S. Holder's adjusted tax basis in the Participating Bond Claims on the date of the exchange. To the extent that any portion of the aggregate consideration received by a U.S. Holder pursuant to the exchange is attributable to accrued and unpaid interest on a Claim, such portion generally will be includable in gross income as ordinary interest income if such accrued interest has not been included previously in gross income for U.S. federal income tax purposes. The extent to which such consideration will be considered attributable to accrued interest is unclear. See "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bond*" and "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Accrued Interest.*"

DRA Ex. 226

*Classification of the New Bonds as debt of the Issuer for U.S. federal income tax purposes is subject to uncertainty.*

The Issuer intends to report the New Bonds as indebtedness of the Issuer rather than equity or another form of interest for U.S. federal income tax purposes. However, there is uncertainty as to the appropriate tax classification of the New Bonds. Thus, there is no assurance the Issuer's intended treatment of the New Bonds as indebtedness of the Issuer for U.S. federal income tax purposes would withstand a challenge by the Internal Revenue Service (the "IRS"). If the New Bonds were to be characterized as an interest that is not debt for U.S. federal income tax purposes, the resulting tax consequences to a U.S. Holder of such New Bonds could be materially different and potentially less favorable than the consequences to a U.S. Holder if the New Bonds were treated as debt. See "*Certain U.S. Federal Income Tax Considerations—Characterization of the New Bonds as Debt of the Issuer*" and "*Certain U.S. Federal Income Tax Considerations—Tax Consequences if the New Bonds Are Not Treated as Debt for U.S. Federal Income Tax Purposes.*"

### *The New Bonds will be taxed differently than the existing Participating Bond Claims.*

The New Bonds are complex financial instruments and it is expected that the tax consequences to a U.S. Holder of holding New Bonds will differ substantially from the U.S. tax consequences of holding Participating Bond Claims. For instance, certain U.S. Holders of Participating Bond Claims hold financial instruments that are exempt from U.S. federal income taxation and such exemption will not be available with respect to the New Bonds. Moreover, as discussed below, the manner in which interest accruals will be calculated and taxed to U.S. Holders of the New Bonds may result in materially greater tax as compared to the way in which U.S. Holders have been taxed while holding Participating Bond Claims.

### *If the New Bonds are classified as an interest that is not debt for tax purposes, the state and local tax exemptions could be impacted.*

Existing U.S. law provides that bonds issued by an instrumentality of the Commonwealth are generally exempt from state and local income taxation. However, whether that exemption would apply to the New Bonds if they are re-characterized as an interest that is not debt for tax purposes is uncertain. See "*Certain U.S. Federal Income Tax Considerations—Characterization of the New Bonds as Debt of the Issuer*" and "*Certain U.S. Federal Income Tax Considerations—Tax Consequences if the New Bonds Are Not Treated as Debt for U.S. Federal Income Tax Purposes—Tax Consequences to U.S. Holders—State and Local Income Taxation.*"

### *The manner in which interest accruals should be calculated with respect to the New Bonds for U.S. tax purposes is subject to uncertainty.*

There is uncertainty regarding the appropriate method for determining how interest accruals on the New Bonds should be determined for U.S. federal income tax purposes.

The Issuer intends to treat the New Bonds as "contingent payment debt instruments" under the applicable Regulations (as defined herein). Under this characterization, interest accruals on the New Bonds will be determined under original issue discount principles, and each U.S. Holder, regardless of its method of accounting for U.S. federal income tax purposes, will be required to accrue interest income on the New Bonds on a constant yield basis at the "comparable yield" (as defined herein) that will be determined (along with the "projected payment schedule" resulting in such yield) by the Issuer at the time of issuance of the New Bonds. These interest accruals will be adjusted upward or downward to reflect any difference between the actual and projected amounts of the contingent payments on the New Bonds during the year. In addition, any gain recognized by a U.S. Holder on the sale or other disposition of a New Bond will be treated as ordinary interest income, and any loss will be an ordinary loss to the extent of the interest previously included in gross income and, thereafter, as a capital loss. See "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Ownership of New Bonds—Interest Accruals and Adjustments to Accruals on the New Bonds*" and "*Certain U.S. Federal Income Tax Considerations —Tax Consequences to U.S. Holders—Ownership of New Bonds—Sale, Exchange or Retirement of the New Bonds.*"

The Issuer's intended treatment of the New Bonds as contingent payment debt instruments, as well as the manner in which interest accruals are to be calculated under the Regulations with respect to the New Bonds assuming such treatment is correct, are both subject to uncertainty. Accordingly, there is a risk that the IRS may challenge the Issuer's intended treatment of the New Bonds or assumptions for calculating interest and original issue discount accruals for a U.S. Holder's tax reporting purposes. For example, the IRS could assert that the "comparable yield" or "projected payment schedule" used by the Issuer to determine interest accruals under the Regulations governing contingent payment debt instruments is incorrect. Alternatively, the IRS could assert that interest accruals should be determined under the methodology described in Section 1272(a)(6) of the U.S. Tax Code by asserting that principal payments on the New Bonds could be accelerated due to excess Available Cash arising from prepayments on the Restructuring Property. If any challenge by the IRS were to be successful, it could materially affect the timing and amounts of taxable income a U.S. Holder should have reported in the affected years, possibly resulting in an overstatement or understatement of tax as well as interest and penalties on any underpayments. Accordingly, holders should consult their tax advisors regarding the accrual of interest on the New Bonds and the consequences of the application of different accrual rules. See "*Certain U.S. Federal Income Tax Considerations —Tax Consequences to U.S. Holders—Ownership of New Bonds—Interest Accruals and Adjustments to Accruals on the New Bonds.*"

DRA Ex. 226

*U.S. Holders may be required to report interest income in certain years in excess of the amount of interest actually paid to such holders in those years, resulting in "phantom income" for U.S. federal income tax purposes.*

As discussed above, U.S. Holders will be required to include interest on the New Bonds in gross income for U.S. federal income tax purposes as it accrues over the term of the New Bonds under original issue discount principles, regardless of such U.S. Holder's method of accounting. If interest accruals exceed the cash payments on a New Bond in any year, a U.S. Holder will have "phantom income" in that year, which may be substantial. See "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Ownership of New Bonds—Treatment of the New Bonds as Contingent Payment Debt Instruments*" and "*Certain U.S. Federal Income Tax Considerations—Tax Consequences to U.S. Holders—Exchange of Participating Bond Claims for New Bonds—Issue Price of New Bonds*."

*All holders should read the discussion of the United States federal income tax consequences of the purchase, ownership, and the disposition of the New Bonds that is contained in this Offering Memorandum under the heading "Certain U.S. Federal Income Tax Considerations."*

DRA Ex. 226

## THE ISSUER

### Overview

The Issuer is a newly formed statutory public trust and governmental public instrumentality of the Commonwealth created by Article 201 of the GDB Restructuring Act. The Issuer is independent and separate from any other governmental instrumentality of the Commonwealth and is independently operated and governed by a board of trustees (the "Board of Trustees" or the "Board"). The GDB Restructuring Act restricts the Issuer from engaging in activities other than those specifically prescribed therein, as described in "—*Purpose and Permitted Activities*" below.

The Issuer is not expected to own any assets or property other than the Restructuring Property and will have a limited amount of funds in order to cover its operating expenses. While GDB, pursuant to Article 403 of the GDB Restructuring Act, transferred certain funds to the Issuer prior to the Closing Date to help cover the Issuer's operating expenses through the Closing Date, after the Closing Date the Issuer's operating expenses will be paid solely out of Collections on the Restructuring Property, subject to certain limitations. For additional information on the Issuer's Operating Expenses, see "—*Issuer's Operations and Expense*" below.

Each New Bond will represent a special limited obligation of the Issuer. The New Bonds (including the Additional Bonds, if any) are the only securities to be issued by the Issuer. Except for the New Bonds, and the obligation to pay certain costs in connection with the restructuring of GDB and the ongoing obligations of the Issuer in connection with the New Bonds, the Issuer is prohibited from incurring any indebtedness and from making Loans to any person.

The Issuer will engage the Servicer to act as the servicer of the Restructuring Property and to manage the Restructuring Property pursuant to the Servicing Agreement. For additional information on the Servicer, see "*Service Providers—The Servicer*" in this Offering Memorandum.

The Issuer's fiscal year end will occur on the 30th day of June each year, unless such fiscal year end is changed by the Issuer, *provided that* such change may be made only if it would have no impact on the timing or amount of payments on the New Bonds.

### Purpose and Permitted Activities

The GDB Restructuring Act creates the Issuer in order to effectuate the restructuring of certain liabilities of GDB. To this end, the Issuer is authorized to issue the New Bonds to the holders of the liabilities of GDB that are subject to and bound by the Qualifying Modification.

The GDB Restructuring Act authorizes the Issuer to carry out certain limited activities and prohibits the Issuer from taking certain actions. Many of the activities authorized to be carried out by the Issuer pursuant to the GDB Debt Restructuring Act, including, without limitation, those related to all management of the Restructuring Property (including all day-to-day operations in respect thereof), will be carried out by the Servicer pursuant to the Servicing Agreement. For additional information regarding permissible activities of, or restrictions on, the Issuer and the Servicer pursuant to the GDB Restructuring Act, see "*The GDB Restructuring Act—Permitted Activities,*" "*The GDB Restructuring Act—Prohibited Actions*" and "*The Restructuring Property—Management of the Restructuring Property*" in this Offering Memorandum.

Furthermore, the activities of the Issuer will also be limited contractually under the Bond Indenture. For additional information regarding permissible activities of or restrictions on the Issuer pursuant to the Bond Indenture, see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Certain Covenants of the Issuer*" in this Offering Memorandum.

### Board of Trustees

#### Board Composition

The Issuer's business and affairs are managed under the direction of its Board of Trustees, which consists of three members who are appointed by, and serve at the pleasure of, the Governor. Each member of the Board of Trustees (i) is appointed for a three-year term and may serve for consecutive terms as an appointed member, (ii) is entitled to one vote, and (iii) must satisfy the independence and qualification standards set forth in the Qualifying Modification and the Transaction Documents (including that no member of the Board of Trustees may be an officer, employee or director of any government entity of the Commonwealth (other than the Issuer) and that the members of the Board of Trustees must have executive experience in finance or with respect to assets like the Restructuring Property and be otherwise qualified to serve on the Board of Trustees).

The members of the Board of Trustees are required to select a chairperson from among themselves. David Pauker has been elected as the Chairperson of the Board, Matthew Karp has been elected as the Secretary of the Issuer and Jorge Padilla has been elected as the Executive Director of the Issuer.

DRA Ex. 226

In the event of a vacancy in the Board of Trustees due to death, removal, resignation or otherwise, the Governor will appoint a successor that meets the independence and qualification standards set forth in the Transaction Documents and Qualifying Modification, including that no member may be an officer, employee or director of the Commonwealth or any instrumentality thereof (other than the Issuer) and must have executive experience in finance or with respect to assets like the Restructuring Property and be otherwise qualified to serve on the Board of Trustees, to serve the remainder of the unexpired term of the member that created the vacancy.

### *Initial Board Members*

On February 6, 2018, the Governor announced the appointment of the three initial members of the Board of Trustees of the Issuer. Below is a list of the initial members of the Board of Trustees and their respective ages and positions, and a brief account of the business experience of each.

| Name | Age | Position |
|---|---|---|
| David Pauker | 59 | Board Member/Chairperson |
| Jorge L. Padilla | 62 | Board Member/Executive Director |
| Matthew Karp | 44 | Board Member/Secretary |

**David Pauker:** Mr. Pauker has more than 25 years of experience as a financial consultant and turnaround manager specializing in underperforming companies and troubled investments. He has been a senior advisor to institutional investors, lenders and management in connection with companies in consumer products, energy and natural resources, financial services, manufacturing, media and telecommunications, real estate, retail, textile and apparel and other industries. He is a member of the board of directors of post-confirmation Lehman Brothers Holdings, Inc. ("Lehman"), appointed pursuant to the Lehman bankruptcy plan in 2012, and was chairman of the board from 2015-2016. He is a member of the board of the Rescap Liquidating Trust created under the bankruptcy plan for Residential Capital, and served as an independent director during the restructurings of Terraform Power and Interstate Bakeries. Mr. Pauker spent 25 years at Goldin Associates, LLC, a leading national restructuring advisory firm, including 14 years as its executive managing director, and left the firm in 2015. From 2016 to 2017, he served as Chief Restructuring Officer of Essar Steel Minnesota. Mr. Pauker has served variously as Interim Chief Executive Officer, Chief Operating Officer and Chief Restructuring Officer for numerous companies undergoing significant transition and has advised clients in connection with many of the largest restructurings of the past 25 years. He is a fellow of the American College of Bankruptcy and an active member of the board of directors of Social Accountability International, a global nonprofit that promotes worker rights. Mr. Pauker received a JD from Columbia University School of Law in 1984 and a BS from Cornell University in 1981.

**Jorge L. Padilla:** Mr. Padilla is retired from a 29-year career with island insurer Universal Group Inc., where he served in diverse roles, including principal financial officer and president of its finance division from 2005 to 2014. At Universal Group Inc., Mr. Padilla managed an investment portfolio of over $2 billion and the negotiation of several major transactions. From 1979 to 1985, Mr. Padilla served as an Audit Manager at Deloitte & Touche. Mr. Padilla is also a board member of U.S. Income Tactical Fund LLC, an investment fund based in Puerto Rico, and Converge, a Puerto Rico based international reinsurer. Mr. Padilla is a Certified Public Accountant and is an active member of the Puerto Rico CPA Society, the AICPA and the Puerto Rico Financial Analyst Association. Mr. Padilla received his B.B.A. in Accounting and Finance from the University of Puerto Rico in 1979.

**Matthew Karp:** Since 2017, Mr. Karp has held the position of Head of Americas for Amstar Group LLC, a real estate investment firm with $1.1 billion in assets, where he is responsible for U.S. acquisitions and new business initiatives as well as overseeing the asset management of existing positions. He has been involved in the acquisition and rehabilitation of real estate in Puerto Rico for approximately a decade. From 2016 to 2017, Mr. Karp served as Partner and Head of Real Estate of TriSpan LLP, where he directed all elements of investment strategy and capital deployment within the real estate division. From 2010 to 2016, Mr. Karp served as Partner and Chief Acquisitions Officer at CPG Real Estate (f/k/a Caribbean Property Group), where he oversaw CPG's acquisition and investment strategy and execution including the acquisition of over $2 billion of non-performing loans acquired from a variety of Commonwealth financial institutions. In addition, while with CPG Real Estate, Mr. Karp established CPG Island Servicing in San Juan which executed the servicing and asset management functions for the workout of these distressed assets. From 2004 to 2010 Mr. Karp served as Vice President at Cerberus Capital Management, where he was a senior investment professional responsible for underwriting and originating opportunistic real estate debt and equity investments. Mr. Karp received an MBA from Columbia Business School in 2004 and a BS from Cornell University in 1997.

DRA Ex. 226

### *Actions by the Board of Trustees*

A majority of the members of the Board of Trustees serving at the time will constitute a quorum to make decisions or exercise any power or function of the Issuer, and the affirmative vote of a majority of the members of the Board of Trustees at the time serving is necessary for any action that the Board may take. Any one or more members may participate in a meeting of the Board of Trustees by teleconference or similar communications equipment, which will constitute presence in person at the meeting. Any action necessary or allowed in any meeting of the Board of Trustees will be authorized with no need for a meeting, insofar as all members of the Board of Trustees give their written consent concerning such action. For additional information on the functions and powers of the Board of Trustees, see "—*Purpose and Permitted Activities*," above.

It is anticipated that the Board of Trustees will adopt rules and procedures governing its activities under the GDB Restructuring Act, which may be amended from time to time. In addition, the Board of Trustees may delegate to one or more members, officers, agents and employees such powers and duties as the Board of Trustees may deem appropriate in accordance with the GDB Restructuring Act and the Qualifying Modification.

### *Issuer's Operations and Expenses*

The Issuer is not expected to have any officers or employees other than the Executive Director, who will be a member of the Board of Trustees. Jorge L. Padilla has been designated as the Issuer's initial Executive Director. The Issuer will engage the Servicer and delegate thereto all management of the Restructuring Property (including all day-to-day operations in respect thereof) pursuant to the Servicing Agreement. Furthermore, the Issuer is entering into a continuing disclosure undertaking with respect to the New Bonds, but certain components of the Annual Report required under the Disclosure Agreement are expected to be prepared by the Servicer pursuant to the Servicing Agreement.

The Issuer will incur certain expenses, including for the compensation of service providers, which may be material. Issuer Expenses as described herein (subject, in certain instances, to the Issuer Operating Expenses Cap and other restrictions set forth herein) will be paid from Collections on the Restructuring Property prior to making any payments to Bondholders. For additional information on the Issuer's operating expenses, see "*Collections on the Restructuring Property and Calculation of Available Cash—Fees and Expenses Reserve*" and "*Service Providers—Fees and Expenses of the Service Providers*" in this Offering Memorandum.

### *Board Member Annual Compensation and Board Expenses*

Annual compensation for the members of the Board of Trustees of the Issuer is expected to be $75,000 per year for each member of the Board of Trustees; *provided*, that the Executive Director of the Issuer is expected to be paid an additional amount of $75,000 per year. The members of the Board of Trustees are also expected to be paid the sum of $125,000 each as compensation for their work in connection with the issuance of the New Bonds and the structuring of the exchange. The Chairperson of the Board and the Secretary of the Board shall serve as such without additional compensation beyond that paid for serving as a Board member. The Issuer shall also reimburse the members of the Board of Trustees for their reasonable and actual out-of-pocket expenses, including, but not limited to, travel, lodging and meal expenses incurred in connection with meetings or other business of the Issuer.

### *Indemnification; Directors and Officers Insurance*

The Issuer's by-laws require the Issuer to indemnify the members of the Board of Trustees to the fullest extent permitted under Commonwealth law against liabilities that may arise by reason of their service to the Issuer, and to advance expenses reasonably incurred as a result of any proceeding against them for which they could be indemnified. The Issuer will also obtain directors' and officers' insurance coverage. Indemnification payments by the Issuer, including legal fees and expenses, and the cost of such directors' and officers' insurance coverage will constitute Issuer Expenses and will be payable from Collections on the Restructuring Property prior to making any payments to Bondholders as described above under "*Issuer's Operations and Expenses*."

### Relationship of the Issuer to GDB; Information Regarding Transferred Property

The GDB Restructuring Act requires that the Issuer keep its assets and liabilities separate and distinct from GDB and any other entity and further provides that any delay in transferring the Transferred Property to the Issuer or commingling of assets will not defeat or impair the Issuer's ownership of the Restructuring Property.

The Issuer has not independently verified the information in this Offering Memorandum relating to the Commonwealth, the Transferred Property, the municipalities or any other entities responsible for payments on the Transferred Property, or the status of repayment of the amounts due on the Transferred Property, nor has the Issuer participated in the preparation of, or verified any information in this Offering Memorandum relating to projected Collections on the Transferred Property, all of which has been prepared by or at the direction of GDB for use in this Offering Memorandum.

DRA Ex. 226

GDB is a public corporation and governmental instrumentality of the Commonwealth, which was created by the Legislative Assembly of the Commonwealth (the "Legislative Assembly") in 1948 to aid the government of the Commonwealth (the "Government") in performing its fiscal duties and in more effectively carrying out its responsibility to develop the economy of the Commonwealth. Historically, GDB's principal functions were to: (i) act as fiscal agent, paying agent and financial advisor to the Government and its instrumentalities, public corporations and municipalities, (ii) provide interim and long-term financing to the Government and its instrumentalities, public corporations and municipalities, and to private parties for economic development and (iii) act as depositary of funds for the Government and its instrumentalities, public corporations and municipalities.

Over time, GDB was also called upon to provide the Government and its instrumentalities, public corporations and municipalities financial support during periods of financial distress with the Government, leveraging GDB's strong access to the capital markets to provide financial support to troubled public entities and assist them in regaining financial stability.

As a result, GDB's liquidity and financial condition was largely dependent on the ability of such entities to repay their Loans with GDB. During 2013, the Commonwealth and its public corporations experienced a significant increase in credit spreads and limited market access, which adversely affected GDB's liquidity position because those conditions led to delays in the repayment by the Commonwealth and its public corporations of their Loans to GDB and, at the same time, caused the Commonwealth and its public corporations to increase their reliance on GDB for their financing needs. In February 2014, the principal credit rating agencies downgraded the credit of the Commonwealth and most of its public corporations, including GDB, to below investment grade categories, which resulted in, among other things, further difficulties in accessing the bond market to meet their financing needs. The worsening of the fiscal and economic crisis and the rapid deterioration of the financial condition of the Commonwealth and its public corporations after fiscal year 2014 significantly affected GDB's liquidity position and its ability to continue to provide financing to such entities and honoring its obligations as they became due.

On April 6, 2016, the Government enacted the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act* (the "Moratorium Act"), which granted the governor of the Commonwealth (the "Governor") the authority to, among other things, (i) implement a moratorium on debt service payments, (ii) redirect certain revenues assigned to public entities for the payment of their obligations to the payment of essential services and (iii) temporarily stay related creditor remedies. In connection with the Moratorium Act, the former Governor, Alejandro Garcia Padilla, issued a number of executive orders, including orders to declare a moratorium on the payment of debt service by various government entities. As it pertains to GDB, the former Governor issued executive orders under the Moratorium Act to: (i) declare a state of emergency at GDB, (ii) impose restrictions on the withdrawal of funds deposited with GDB and of other disbursements by GDB, and (iii) implement a moratorium on the payment of debt service on GDB's outstanding notes. As a result of such actions, since July 2016, there have been no debt service payments on GDB's notes, and, since April 2016, deposit disbursements have only been allowed pursuant to the executive orders issued under the Moratorium Act.

Also, on April 6, 2016, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" by its Spanish acronym) was created under the Moratorium Act for the purpose of assuming GDB's role as fiscal agent, financial advisor and reporting agent to the Commonwealth and its instrumentalities and municipalities. In January 2017, AAFAF's role was expanded to include additional responsibilities related to the restructuring of the indebtedness of the Commonwealth and its instrumentalities and to oversee compliance with the fiscal plans and budgets of said entities approved by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") pursuant to PROMESA. As a result of the transfer of GDB's fiscal agency and financial advisory functions to AAFAF, GDB's role was limited to serving as agent to collect on its Loan portfolio and disbursing deposits pursuant to strict priority guidelines.

On February 21, 2017, pursuant to PROMESA, AAFAF and GDB prepared and submitted to the Oversight Board a fiscal plan for GDB (the "February 2017 GDB Fiscal Plan"). The February 2017 GDB Fiscal Plan acknowledged that there was no clear path for the long-term viability of GDB based on its then-current financial condition. The February 2017 GDB Fiscal Plan assumed approximately $2.0 billion of total cash inflows to be collected through fiscal year 2027, including approximately (i) $56 million from appropriation Loans through the end of fiscal year 2017, (ii) $1.8 billion of cash flow based on contracted interest and amortization schedules of the municipal Loans that were performing as of such date, and (iii) $133 million of cash flow based on several Loans of Commonwealth instrumentalities that were performing as of such date. The February 2017 GDB Fiscal Plan also assumed approximately $2.1 billion of total cash outflows through fiscal year 2027 based on (x) essential services required to wind-down operations and (y) approximately $2.0 billion of distributable cash flow to be allocated to GDB depositors and other creditors. The February 2017 GDB Fiscal Plan did not resolve the mechanism by which scheduled distributable cash flow should be allocated among GDB's depositors and other creditors.

The Oversight Board certified the February 2017 GDB Fiscal Plan on April 28, 2017. Then, on May 15, 2017, AAFAF, GDB and certain of GDB's creditors entered into a Restructuring Support Agreement (the "Initial Restructuring Support Agreement" and, as amended, modified or supplemented, the "Restructuring Support Agreement") to effectuate a consensual restructuring of certain of GDB's indebtedness through a Title VI proceeding under PROMESA. For additional information on PROMESA and Title VI

DRA Ex. 226

thereunder, see "—*PROMESA*" below. The Initial Restructuring Support Agreement was consistent with the underlying strategy of the GDB Fiscal Plan, namely providing for a transaction resulting in an orderly wind-down of GDB's operations. The Initial Restructuring Support Agreement also resolved the mechanism by which distributable cash flow would be allocated among GDB's various creditors and provided greater clarity as to how GDB's operations would be wound down.

On June 30, 2017, AAFAF and GDB submitted a revised fiscal plan (the "June 2017 GDB Fiscal Plan") to the Oversight Board to, among other things, reflect: (i) a reduction in operating expenses consistent with the Restructuring Support Agreement and wind-down of GDB's operations, (ii) a reduction in the minimum amount of cash on hand to be held by the Issuer and GDB after the transfer of the Transferred Property (as defined herein) to the Issuer, (iii) an adjustment of the projected sale dates for the real estate portfolio properties to incorporate activity since the February 2017 GDB Fiscal Plan was certified and (iv) the inclusion of third-party servicing fees for the Restructuring Property (as defined herein) commencing in 2019. On July 12, 2017, the Oversight Board issued a unanimous written consent certifying the June 2017 GDB Fiscal Plan and certifying the Initial Restructuring Support Agreement as a Voluntary Agreement and a Qualifying Modification under Sections 104(i)(1) and 601(g)(2), respectively, of PROMESA.

In September 2017, Hurricanes Irma and María struck the Commonwealth causing severe and widespread damage, including substantial damage to the Commonwealth's power grid, infrastructure, residences and other structures. The hurricanes placed additional strain on the already fragile economic condition of the Commonwealth and its municipalities. As a result, GDB and its creditors began extensive discussions on the impact of the hurricanes on GDB, the Qualifying Modification and the related transactions.

On October 20, 2017, December 20, 2017, and March 20, 2018, AAFAF, GDB and certain of GDB's creditors entered into the First Amendment to the Restructuring Support Agreement, the Second Amendment to the Restructuring Support Agreement and the Third Amendment to the Restructuring Support Agreement, respectively, to, among other things, extend certain transaction milestones between GDB and its creditors as negotiations continued.

On April 6, 2018, AAFAF, GDB and certain of GDB's creditors entered into the Fourth Amendment to the Restructuring Support Agreement, to, among other things: (i) further refine and restructure the terms of the Qualifying Modification, including simplifying the overall transaction structure, (ii) provide additional relief to municipalities as they recover from the hurricanes and (iii) ensure that the Issuer will receive additional assets in the restructuring.

On March 21, 2018, AAFAF and GDB submitted a revised fiscal plan (the "March 2018 GDB Fiscal Plan") to the Oversight Board to, among other things, amend the June 2017 GDB Fiscal Plan consistent with the Fourth Amendment to the Restructuring Support Agreement to reflect: (i) the adjustment of certain financial assumptions based on information available post-Hurricanes Irma and María, (ii) the inclusion of certain terms of the Restructuring Support Agreement providing for, on the Closing Date, the application of the full amount of a municipality's deposits with GDB against the balance of any Loan owed by such municipality to GDB and (iii) the completion of GDB's wind-down and substantial termination of its operations, with GDB remaining a legal entity without operations beyond those related to the completion of the Qualifying Modification and the management of certain assets thereafter. On April 20, 2018, the Oversight Board issued a unanimous written consent certifying the March 2018 GDB Fiscal Plan (so certified, the "GDB Fiscal Plan").

On May 8, 2018, the Oversight Board issued a unanimous written consent (i) re-certifying the Restructuring Support Agreement, as amended, as a Voluntary Agreement and a Qualifying Modification under Sections 104(i)(1) and 601(g)(2), respectively, of PROMESA, (ii) notifying GDB that Epiq Corporate Restructuring is reasonably acceptable to serve as the Calculation Agent and Information Agent for the Solicitation under Sections 601(k) and 601(l), respectively, of PROMESA, and (iii) certifying the GDB Bond Claims Pool (as defined in the Solicitation Statement) and the Guaranteed Bond Claims Pool (as defined in the Solicitation Statement) as separate Pools (as defined in PROMESA) and the only Pools of the Qualifying Modification pursuant to Section 601(d) of PROMESA.

On June 8, 2018 and August 3, 2018, AAFAF, GDB and certain of GDB's creditors entered into the Fifth Amendment to the Restructuring Support Agreement and the Sixth Amendment to the Restructuring Support Agreement, respectively, to, among other things, further extend certain transaction milestones between GDB and its creditors as negotiations continued.

On August 9, 2018, subject to the terms and conditions set forth in the Solicitation Statement, dated August 9, 2018 (the "Solicitation Statement"), GDB and AAFAF commenced the solicitation of votes (the "Solicitation") seeking creditor approval of the Qualifying Modification under Title VI of PROMESA.

On August 10, 2018, GDB and AAFAF filed the *Application of the Government Development Bank for Puerto Rico and the Puerto Rico Fiscal Agency and Financial Advisory Authority, Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act, for Approval of the Qualifying Modification for GDB* [ECF No. 1] (the "Approval Application"), thereby commencing the action under Title VI of PROMESA. Concurrently with the filing of the Approval Application, GDB and AAFAF filed the *Motion for an Order Approving Procedures and Setting a Schedule for Approval of the Qualifying Modification for the Government Development Bank for Puerto Rico* [ECF No. 4]. On September 17, 2018, the court entered the *Order*

DRA Ex. 226

*Approving Procedures and Setting a Schedule for Approval of the Qualifying Modification for the Government Development Bank for Puerto Rico* [ECF No. 148] (the "Procedures Order"). Pursuant to the Procedures Order, the court set certain deadlines related to asserting objections to, and seeking discovery regarding, the Qualifying Modification.

GDB and AAFAF received several objections and reservations of rights related to the Qualifying Modification, including from (i) National Public Finance Guarantee Corporation with respect to the federal funds deposited at GDB; (ii) National Public Finance Guarantee Corporation, Ambac Assurance Corporation, Assured Guaranty Corp. and Assured Municipal Corp. in connection with the preservation of certain claims under the Qualifying Modification; (iii) Fidelity and Deposit Company of Maryland and Zurich American Insurance Company; (iv) the Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA); (v) Fundacion Biblioteca Rafael Hernandez Colon, Inc. and Fundacion Sila M. Calderon, Inc.; (vi) Siemens Transportation Partnership Puerto Rico, S.E.; (vii) the Municipality of San Juan; and (viii) the United States of America. *See* ECF Nos. 13, 15, 18, 21, 22, 59, 95, 136, 159, 160, 192, 201, 203. GDB and AAFAF ultimately reached settlements with each of the objecting parties, resolving all objections to the Qualifying Modification. *See* ECF Nos. 157, 175, 187, 238, 251. Certain of these objections and the resulting settlement are described in more detail under "*Litigation*" in this Offering Memorandum.

On September 20, 2018, Epiq Corporate Restructuring, as Calculation Agent, filed the *Declaration of Jane Sullivan of Epiq Corporate Restructuring, as Calculation Agent, Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Qualifying Modification Under Title VI of PROMESA* [ECF No. 156], indicating that (i) Eligible Voters (as defined in the Solicitation Statement) holding over 50% of the outstanding principal amount of outstanding Participating Bonds (as defined in the Solicitation Statement) in each Pool voted to approve the Qualifying Modification; and (ii) Eligible Voters holding over 66 2/3% of the outstanding principal amount of outstanding Participating Bonds in each Pool that voted in the Solicitation voted to approve the Qualifying Modification. Epiq Corporate Restructuring reported that for the GDB Bond Claims Pool, over 74.8% of the aggregate principal amount of Participating Bond Claims in the GDB Bond Claims Pool voted and, of those that voted in such pool, over 94.7% of the Participating Bond Claims voted to approve the Qualifying Modification, reflecting over 72.9% of the aggregate principal amount. For the Guaranteed Bond Claims Pool, 100% of the aggregate principal amount of the Participating Bond Claims in such pool voted to approve the Qualifying Modification.

On November 6, 2018, the court held the hearing to consider the Approval Application and, after considering all arguments, filings, and evidence regarding approval of the Qualifying Modification, approved the Qualifying Modification on the record. On November 7, 2018, the court entered the *Findings of Fact, Conclusions of Law, and Order Approving Qualifying Modification for the Government Development Bank for Puerto Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act* [ECF No. 270] (the "Approval Order").

DRA Ex. 226

# DESCRIPTION OF THE COMMONWEALTH AND ITS CURRENT FINANCIAL CONDITION

*The description of the Commonwealth below is intended to provide you with background information on the Commonwealth and its financial condition. The New Bonds are special limited obligations of the Issuer and are not indebtedness or liabilities of GDB, AAFAF, the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The New Bonds are not backed by the good faith, credit and taxing power of the Commonwealth nor are they payable or secured by GDB, AAFAF or any of the Commonwealth's public instrumentalities or political subdivisions, other than the Issuer. The Issuer does not have any taxing authority.*

## The Commonwealth

*General.* The Commonwealth is an island located in the Caribbean approximately 1,600 miles southeast of New York City. It has an area of approximately 3,500 square miles and a population estimated by the United States Census Bureau of approximately 3.34 million as of July 1, 2017.

The Commonwealth came under United States sovereignty pursuant to the Treaty of Paris of 1898. Puerto Ricans have been citizens of the United States since 1917. In 1950, the United States Congress authorized the Commonwealth to draft and approve its own Constitution, which was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of the Commonwealth, amended and ratified by the United States Congress, and subsequently approved by the President of the United States in 1952. The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative and judicial branches of government. The current Governor, Ricardo Rosselló, was sworn into office for a four-year term on January 2, 2017. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.

The people of the Commonwealth are citizens of the United States but do not vote in Presidential elections and are represented in Congress by a non-voting Resident Commissioner. Most federal taxes, except those such as Social Security and Medicare taxes, are not levied in the Commonwealth.

The United States and the Commonwealth share a common defense, market and currency. In general terms, the Commonwealth historically exercised virtually the same control over its internal affairs as do the 50 states. Recently, as a result of the current fiscal crisis that affects the Commonwealth, the United States Congress enacted PROMESA, which established the Oversight Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs.

*Description of the Commonwealth's Public Corporations and Instrumentalities.* In the Commonwealth, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the Commonwealth. Public corporations may obtain revenues from rates charged for services or products but, as described further below, many receive sizable subsidies from the Commonwealth. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are ascribed to departments of the Commonwealth. Capital improvements of most of the larger public corporations have been financed historically by revenue bonds issued under trust agreements or bond resolutions or by notes or other obligations issued under loan agreements.

Through the years, many public corporations and other instrumentalities have traditionally relied on subsidies, in the form of appropriations from the general fund of the Commonwealth and/or assignments of Commonwealth taxes or other revenues, to fund a material portion of their operations. Certain of these instrumentalities, including the Puerto Rico Health Insurance Administration, the Puerto Rico Medical Services Administration, the Puerto Rico Integrated Transit Authority, the Puerto Rico and Island Municipalities Maritime Transport Authority, the Metropolitan Bus Authority, HTA and the University of Puerto Rico ("UPR"), provide essential services to the residents of the Commonwealth and rely heavily on such subsidies to fund their day-to-day operations. Other subsidized public corporations, like the Public Buildings Authority ("PBA"), provide essential services to the Commonwealth's central government, which are in turn necessary to provide essential services to Commonwealth residents.

Commonwealth appropriations and tax revenues are also a principal source of funding for certain public corporations dedicated to fiscal and advisory functions (*e.g.*, AAFAF), infrastructure development (*e.g.*, the Puerto Rico Infrastructure Financing Authority ("PRIFA") and the Puerto Rico Public Private Partnerships Authority), air and maritime transportation and logistics (*e.g.*, the PAA), and economic, tourism and cultural promotion (*e.g.*, the Puerto Rico Tourism Company, the Puerto Rico Convention Center District Authority ("CCDA"), the Puerto Rico Industrial Development Company (primarily with respect to the Special Fund for Economic Development and the Rums of Puerto Rico Program) and the Institute of Puerto Rican Culture). In addition, the Legislative Assembly has assigned tax and fee revenues, by law, to certain of these public corporations.

Other public corporations, such as the Puerto Rico Sales Tax Financing Corporation ("COFINA," by its Spanish acronym) and the Puerto Rico Public Finance Corporation ("PFC"), have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (in the case of COFINA) or appropriations (in the case of PFC) as their sole source of repayment.

DRA Ex. 226

Notwithstanding the Commonwealth's substantial level of support, certain of these public corporations suffer from significant annual operating losses and carry material amounts of accounts payable (particularly to other government entities such as the State Insurance Fund, ERS, PREPA and the Puerto Rico Aqueduct and Sewer Authority). If the Commonwealth's financial condition does not improve, it may be unable to continue to support these operations at the same level without taking action to reduce other expenses or increase revenues. This may result in reduced services to the Commonwealth's population. However, since some of the services provided by these public corporations are essential to maintain health, public safety and welfare, the Commonwealth may prioritize the funding of such services over financial or other obligations.

## Description of the Commonwealth's Economy and Fiscal Challenges

*General.* The Commonwealth and most of its public corporations are in the midst of a profound fiscal crisis. Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues. During the past 12 years, the Commonwealth's balance sheet has significantly deteriorated due to years of economic recession, recurring budget deficits, the financing of recurrent expenses with long-term debt and the failure to adequately fund legacy obligations, such as pensions.

A framework for understanding the fiscal challenges faced by the Commonwealth during the next decade was first outlined in a 2015 report commissioned by GDB and prepared by Anne O. Krueger, Ranjit Teja and Andrew Wolfe (the "Krueger Report"), which analyzed the Commonwealth's macroeconomic condition and proposed a strategy to address the Commonwealth's financial crisis by implementing policies relating to certain structural reforms, financial reform and public debt and institutional credibility. The framework outlined in the Krueger Report was further developed and refined in the Fiscal and Economic Growth Plan presented to then-Governor Alejandro García Padilla in September 2015, which was prepared by the Working Group for the Fiscal and Economic Recovery of Puerto Rico created by Governor Padilla in June 2015. This framework sought to compare the resources and expenditures that the Commonwealth (and most of its public corporations) expected to collect and incur, respectively, on a consolidated basis, during the next 10 years assuming no changes to current laws and policies. The analysis of the Krueger Report highlighted the need to measure the Commonwealth's financial health not on the basis of the Commonwealth's general fund (the Commonwealth's principal accounting fund for its operating expenses) exclusively, but rather on a more comprehensive and consolidated manner that captures the cost of legacy liabilities, including debt and pensions, the results of operations of those Commonwealth public corporations that provide essential government services and that are directly supported by the Commonwealth's taxes or appropriations and the cost of necessary capital expenditures.

The Commonwealth's balance sheet deterioration, combined with continued structural imbalances between revenues and expenditures and the Commonwealth's inability to access the capital markets, resulted in the Commonwealth and certain of its instrumentalities becoming unable to make scheduled debt payments while continuing to provide government services and ultimately being placed into debt restructuring proceedings under Title III of PROMESA. For additional information regarding such proceedings, see "*Description of the Commonwealth's PROMESA Filings*," in this Offering Memorandum.

*The Commonwealth's Economy.* The Commonwealth's economy entered a recession in the fourth quarter of fiscal year 2006, and the Commonwealth's gross national product ("GNP") has contracted (in real terms) every fiscal year between 2007 and 2017, with the exception of fiscal year 2012. The slight GNP growth in fiscal year 2012 was due mainly to the large number of stimuli and deficit spending injected into the Commonwealth's economy during the period and not as a result of economic recovery.

The Puerto Rico Planning Board (the "Planning Board") has the legal responsibility of creating an annual Economic Report to the Governor and the Legislative Assembly, presenting the Commonwealth's economic outlook and an analysis of its economic behavior. According to the Planning Board's report released in January 2018, the Commonwealth's real GNP for fiscal years 2016 and 2017 decreased by 1.3% and 2.4%, respectively. The Planning Board's GNP forecast for fiscal year 2018, which was released in April 2017 and has not been revised, projects a contraction of 1.5%. In each case, such analysis does not account for the impact of Hurricanes Irma or María, which are expected to have a materially adverse effect on the Commonwealth's GNP. All macroeconomic accounts for fiscal year 2017 shown in this Offering Memorandum are preliminary until the revised figures for fiscal year 2017 are released and the forecasts for fiscal year 2018 is revised. The Planning Board could revise back more than two years to the extent it obtains more complete information.

In fiscal year 2017, preliminary aggregate personal income in the Commonwealth was $64.5 billion and personal income per capita was $19,140.

The dominant sectors of the Commonwealth's economy are manufacturing and services. The manufacturing sector has undergone fundamental changes in recent years as a result of the elimination of certain tax incentives under the U.S. Tax Code and an increased concentration in higher-wage, high-technology industries, such as pharmaceuticals, computer products, biotechnology, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities and other services, leads all sectors in providing employment.

DRA Ex. 226

The economy of the Commonwealth is closely linked to the United States economy, as most of the external factors that affect the Commonwealth's economy (other than oil prices) are determined by the policies and performance of the United States economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation and tourist expenditures. During fiscal year 2017, approximately 78% of the Commonwealth's exports went to the United States mainland, which was also the source of approximately 53% of the Commonwealth's imports.

Certain information regarding current economic activity is available in the form of the Economic Development Bank for Puerto Rico ("BDE") Economic Activity Index ("BDE-EAI"), a coincident indicator of ongoing economic activity. This index, shown in the following graph (published by GDB from December 2009 to March 2016, and by AAFAF from April 2016 to September 2018), is composed of several variables (total payroll employment based on the Establishment Survey, total electric power generation, cement sales and consumption of gasoline) that highly correlate to the Commonwealth's real GNP. However, the BDE-EAI does not measure the real GNP annual growth rates. Since the BDE-EAI is generated with only four variables, it is more volatile than the real GNP figures. This means that both increments and declines reflected in the BDE-EAI amplify the corresponding movements of the real GNP. The BDE-EAI for September 2018 was 121.5, an increase of 5.2% compared to September 2017, the first year-over-year increase in 69 consecutive months. On a year-to-date basis (from July 2018 to September 2018), the index increased 1.5% when compared to the same period in 2017 mainly due to the recovery efforts in the aftermath of Hurricanes Irma and María. For more information about the BDE-EAI methodology and recent modifications to reduce volatility, see BDE's website at www.bde.pr.com under "Puerto Rico Economic Data."

**Economic Activity Index**



*Recurrent Deficits.* One of the principal causes of the Commonwealth's current fiscal crisis has been its inability to increase its revenues and reduce its expenditures in order to avoid recurrent structural deficits. These deficits have historically been funded with borrowings from either the public bond market or governmental institutions, such as GDB, and by deferring the cost of certain legacy liabilities. The practice of issuing long-term debt to pay for current operational expenses, together with the failure to properly fund legacy liabilities such as employee retirement benefits, the ballooning cost of healthcare and the contraction of the revenue base due to prevailing economic conditions, have led to a material deterioration in the Commonwealth's consolidated net position, as calculated pursuant to Generally Accepted Accounting Principles in the United States. The Commonwealth's financial statements for fiscal year 2015, which are the most recent audited financial statements for the Commonwealth, reflect a total net position deficit of approximately $67,038 million for the Commonwealth's primary government.

*Employment.* Total average annual employment, as measured by the Commonwealth's Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey" (which is generally used for the computation of the unemployment and participation rates), has decreased in recent years. The reduction in total employment began in the fourth quarter of fiscal year 2007, when total employment was 1,244,425, and continued consistently until the first half of fiscal year 2015, after which it mostly stabilized. According to the most recent Household Survey released in July 2018, total employment in the Commonwealth in

DRA Ex. 226

June 2018 was approximately 996,000, a 1% increase from total employment of approximately 985,000 in June 2017. Similarly, such Household Survey reports an unemployment rate of approximately 9.3% in June 2018, a 1% decrease from an unemployment rate of approximately 10.3% in June 2017.

According to the Establishment Survey (also known as the Payroll Survey), which is a survey generally used to measure employment across the various sectors of the economy, total payroll non-farm employment decreased by 1% during fiscal year 2017 as compared to fiscal year 2016. Total private employment also fell during fiscal year 2017 by 0.6%, which translates to a reduction of almost 4,000 employees, as compared to the same period for the prior fiscal year.

*Economic Legislative Initiatives.* In order to address the fragile state of the Commonwealth's economy and spur economic growth, the Legislative Assembly has enacted legislation designed to strengthen the Commonwealth's competitiveness in the global economy. For example, the Legislative Assembly enacted an amendment to the legal framework of its public-private partnership law to leverage the private sector's expertise and resources by strengthening the mechanisms through which private parties can present projects to the government and undertake the studies required to establish public-private partnerships in the Commonwealth. The Government has also proposed comprehensive tax, ease of doing business and power sector reforms aimed at promoting economic development.

*Aggregate Debt Burden of the Commonwealth and its Instrumentalities.* As of March 31, 2017, the aggregate outstanding principal amount of debt of the Commonwealth and its instrumentalities was approximately $72.1 billion (including accreted interest on capital appreciation bonds). Of this amount, approximately $55.9 billion represents General Obligation bonds, debt payable from Commonwealth taxes or appropriations and debt of tax-supported public corporations.

For fiscal year 2018, the aggregate scheduled annual debt service on all bonds and notes issued by the Commonwealth and its instrumentalities was approximately $4.6 billion. The debt burden of the Commonwealth and its instrumentalities significantly increased during the past decade. A significant portion of the debt issued during this period was used to cover operational expenses of the Commonwealth and its public corporations.

The Commonwealth's ratio of tax-supported debt to revenue is more than double that of Connecticut, the state with the highest debt-to-revenue ratio, and almost seven times the U.S. state median. The Commonwealth's tax-supported debt per capita, as a share of GDP and as a share of personal income, is also disproportionally high when compared to mainland jurisdictions. Both the Krueger Report and the Revised Commonwealth Fiscal Plan (as described herein) concluded that the Commonwealth's debt burden was unsustainable and has to be restructured.

*Pension Liabilities.* In addition to debt service on outstanding bonds, notes and other financial debt obligations, one of the most significant expenditures faced by the Commonwealth and its public corporations are pension benefits payable to retired employees. Prior to fiscal year 2018, Commonwealth employees, together with employees of certain public corporations and municipalities, participated in the following three principal retirement systems: ERS, the Puerto Rico System of Annuities and Pensions for Teachers ("TRS") and the Retirement System for the Judiciary of the Commonwealth of Puerto Rico ("JRS" and, together with ERS and TRS, the "Retirement Systems"). ERS is the largest of the three Retirement Systems. The combined Retirement Systems' net pension liability was approximately $49 billion as of June 30, 2015.

Given the insolvency and impending exhaustion of ERS's liquid assets, on May 29, 2017, the Oversight Board, at the request of ERS, filed a voluntary petition for relief in the District Court to commence a debt restructuring proceeding under Title III of PROMESA for ERS. Furthermore, on August 2017, the Legislative Assembly enacted Act 106, pursuant to which the Commonwealth adopted a "pay-as-you-go" system for the payment of pension benefits. Under Act 106, the Commonwealth makes pension payments from its general fund. The Retirement Systems are required to transfer to the Commonwealth their remaining liquid assets and the public corporations and municipalities are required to reimburse the Commonwealth the amounts necessary to meet pension benefit payments to their respective retirees (in lieu of the prior statutory employer contributions payable to the Retirement Systems). The Fiscal Year 2019 Certified Budget (as defined herein) for the Commonwealth includes approximately $2.5 billion to cover the "pay-as-you-go" expense. Most municipalities and many public corporations were unable to make all payments required to be made by them to the Commonwealth to cover the pension benefits of their retirees under the new pay-as-you-go model during fiscal year 2018 and therefore still owe significant sums to the Commonwealth with respect thereto.

## The Commonwealth Fiscal Plan

On March 13, 2017, the Oversight Board certified a fiscal plan for the Commonwealth (the "Commonwealth Fiscal Plan"), which was prepared by AAFAF on behalf of the Commonwealth and the government entities covered therein. As a result of the aftermath of Hurricanes Irma and María, on October 31, 2017, the Oversight Board announced a process to revise the fiscal plan for the Commonwealth. The Oversight Board recognized that the hurricanes fundamentally changed Puerto Rico's reality and that a revised fiscal plan for the Commonwealth must take that new reality into account.

66

DRA Ex. 226

As requested by the Oversight Board, the Commonwealth prepared and presented the Oversight Board with various drafts of a revised fiscal plan for the Commonwealth and certain of its instrumentalities. Notwithstanding the Commonwealth's efforts, on April 19, 2018, the Oversight Board certified its own version of a revised fiscal plan for the Commonwealth and certain of its instrumentalities. After further negotiations between the Government and the Oversight Board regarding certain labor reform requirements, the Oversight Board re-certified the revised fiscal plan on May 30, 2018 based on the commitment that legislation would be enacted to convert Puerto Rico into an at-will employment jurisdiction through the repeal of Act No. 80 of 1976, as amended ("Act 80").

On June 29, 2018, the Oversight Board certified a new, revised fiscal plan for Puerto Rico (the "Revised Commonwealth Fiscal Plan") due to the failure to repeal Act 80 and convert Puerto Rico to an at-will employment jurisdiction as required by the fiscal plans certified on April 19, 2018 and re-certified on May 30, 2018. The Revised Commonwealth Fiscal Plan covers a six-year period, from fiscal year 2018 to fiscal year 2023. Although the Revised Commonwealth Fiscal Plan adopted significant parts from the draft fiscal plans presented by the Commonwealth, it differs in certain material aspects from the Commonwealth's proposals. The Oversight Board also certified a budget for the Commonwealth for fiscal year 2019 that is based on the Revised Commonwealth Fiscal Plan (the "Fiscal Year 2019 Certified Budget"). On July 5, 2018, the Governor and AAFAF filed an adversary complaint against the Oversight Board in the Commonwealth's Title III proceeding, which seeks a declaration that certain actions taken by the Oversight Board, including related to the Revised Commonwealth Fiscal Plan and the budget, exceed its powers under PROMESA and abrogate the rights of the Government. The complaint also seeks injunctive relief that would prohibit the Oversight Board from enforcing certain disputed provisions of the Revised Commonwealth Fiscal Plan and the budget. The Oversight Board filed a motion to dismiss this complaint on July 12, 2018 and the matters were argued before the court on July 25, 2018. On August 7, 2018, the court issued an order granting in part and denying in part the Oversight Board's motion to dismiss.

On August 1, 2018, the Oversight Board announced that it would commence a process to further revise the Revised Commonwealth Fiscal Plan. Revisions would incorporate, among other things, fiscal year 2018 actuals and revised federal disaster estimates, which the Oversight Board indicated should improve the Revised Commonwealth Fiscal Plan's revenue projections. The revisions would also include the correction of a recently discovered forecasting error, which results in the demographic projections in the Revised Commonwealth Fiscal Plan being too negative. The Oversight Board indicated that, due to the per capita rate of healthcare spending, this error leads to a projected surplus over 30 years for the Commonwealth that is too high by approximately $4 billion.

On August 21, 2018, the Commonwealth prepared and presented to the Oversight Board a revised draft of the Revised Commonwealth Fiscal Plan. On August 30, 2018, the Oversight Board notified the Commonwealth that the revised draft of the Revised Commonwealth Fiscal Plan required certain revisions before it could be certified. In particular, the Oversight Board required changes or adjustments in the macroeconomic, revenue and expenditure projections used by the Commonwealth and the structural reforms and fiscal measures proposed by the Commonwealth. On September 10, 2018, the Commonwealth presented the Oversight Board with a further revision of the Revised Commonwealth Fiscal Plan. On October 22, 2018, the Oversight Board published a draft of the Commonwealth fiscal plan that it planned to adopt and, on October 23, 2018, the Oversight Board adopted the revised Commonwealth fiscal plan (the "October Revised Commonwealth Fiscal Plan").

The following summary describes certain provisions of the October Revised Commonwealth Fiscal Plan. This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the October Revised Commonwealth Fiscal Plan, which the Oversight Board has indicated will be amended and which may be further amended in the future. In addition, the October Revised Commonwealth Fiscal Plan is forward looking and the ability of the Commonwealth to achieve the various objectives outlined therein is subject to substantial uncertainty, including as a result of events and conditions outside of the Commonwealth's control.

The October Revised Commonwealth Fiscal Plan addresses the finances of central government agencies, certain other government agencies and certain public corporations and instrumentalities but excludes those entities for which an independent fiscal plan has been or is being developed. As a result, entities such as GDB, PREPA, the Puerto Rico Aqueduct and Sewer Authority ("PRASA"), the HTA, UPR, COFINA and the Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico ("COSSEC") are not included in the October Revised Commonwealth Fiscal Plan. Other entities excluded from the October Revised Commonwealth Fiscal Plan include The Children's Trust Fund, municipalities, the Puerto Rico Public Finance Corporation, the Puerto Rico Municipal Finance Corporation, the Puerto Rico Municipal Finance Agency and certain other special, independent funds created by the Commonwealth for particular purposes.

The October Revised Commonwealth Fiscal Plan estimates an 8.0% contraction in real gross national product in fiscal year 2018, but projects a marked increase in macroeconomic growth for fiscal year 2019 that gradually decreases until fiscal year 2023, assuming that the structural reforms outlined in the October Revised Commonwealth Fiscal Plan are implemented. This macroeconomic growth projection takes into account a projected population decline during the period covered by the October Revised Commonwealth Fiscal Plan of approximately 5.5%. The October Revised Commonwealth Fiscal Plan also includes financial projections that are largely driven by macroeconomic projections. Without the fiscal and structural measures included in the October Revised Commonwealth Fiscal Plan, the cumulative surplus for the six-year period covered by the October Revised Commonwealth Fiscal Plan was expected to total $3.9 billion before the payment of any debt service. After the application of the fiscal measures provided for under the October Revised Commonwealth Fiscal Plan, and the fiscal impact of the structural reforms described therein, the October Revised Commonwealth Fiscal

DRA Ex. 226

Plan projects a surplus of approximately $17 billion for the applicable six-year period before the payment of any debt service. In addition, the October Revised Commonwealth Fiscal Plan projects increased revenues buoyed by a positive macroeconomic trajectory resulting from significant disaster relief funding stimulus, as well as federal Medicaid funding. The October Revised Commonwealth Fiscal Plan includes illustrative estimates of the implied debt capacity of the Commonwealth and the instrumentalities covered by the plan, based on a range of interest rates and assuming a 30-year term for such debt. Such estimates confirm the need for significant debt restructuring and write-downs.

The October Revised Commonwealth Fiscal Plan seeks to achieve its objectives through the implementation of a myriad of structural and fiscal reforms. Structural reforms include human capital and welfare reforms, ease of doing business reforms, power sector reforms and infrastructure reform and capital investment. Human capital and welfare reforms are geared to address Puerto Rico's low labor participation rate by making it easier and more affordable to create jobs in Puerto Rico and to enable more people to work in Puerto Rico through initiatives articulated in the October Revised Commonwealth Fiscal Plan. These initiatives include implementing education targets for higher proficiency in Spanish, English and STEM subjects, providing workforce training opportunities, enacting and implementing more flexible and less costly labor laws and regulations, including those to establish employment benefits at levels that are competitive with other jurisdictions, and creating incentives to work through welfare reforms and local earned income tax credit benefits.

Structural reforms articulated in the October Revised Commonwealth Fiscal Plan are also centered on making Puerto Rico more competitive in the global economy. For example, ease of doing business reforms are geared to attract new investments and business by making it easier to do business in Puerto Rico. These initiatives include improving current World Bank Ease of Doing Business rankings, digitalizing government services and modernizing systems, reducing regulatory burdens, such as licensing and other requirements, minimizing tax compliance costs and simplifying permitting and startup costs. Energy sector reform is also critical for residents and businesses alike because affordable, reliable and resilient electricity should lead to economic development. Initiatives in this field include lowering electric rates, rebuilding resilient infrastructure, diversifying the fuel mix and updating technologies, establishing efficient and robust transmission and distribution systems, and putting a strong and independent expert regulator in place.

The October Revised Commonwealth Fiscal Plan also articulates infrastructure reforms geared towards the goal of providing better service for residents and businesses. The October Revised Commonwealth Fiscal Plan proposes centralized administration of federal recovery funds in order to set government priorities that will guide future infrastructure investment. These reforms are expected to lead to an accelerated infrastructure reconstruction process and a sustainable funding and financing model. Finally, it is expected that these reforms will lead to procurement and delivery practices in line with best practices in the United States and around the world.

The October Revised Commonwealth Fiscal Plan also provides for significant fiscal reform in order to achieve the objectives set forth therein. Fiscal reform initiatives are concentrated on reducing government expenditures through rightsizing, reforming historically high cost programs and implementing measures to assure transparency, balanced budgets and fiscal controls.

The October Revised Commonwealth Fiscal Plan sets forth measures to reduce government expenditures through rightsizing initiatives that promote a more efficient and affordable government to provide necessary services. Key to these initiatives is a consolidation of agencies and shared services, which is anticipated to lead to personnel reductions mainly through attrition and retirement. Government reform will also aim to achieve reductions and/or elimination of subsidies, reduction of bureaucracy through regionalization initiatives and lower costs for goods and services through procurement reform.

The October Revised Commonwealth Fiscal Plan also calls for healthcare and pension reform. As two of the major budget items for the Commonwealth, cost savings in respect of these systems could be significant. The Government recently achieved a healthcare reform objective by implementing a simple, unified regional system to drive efficiency and cost reductions. Healthcare reform objectives would also include consolidation of health-related government agencies to address redundancy and overlap. New technologies would be used to detect fraud and overuse in order to control costs. Finally, cost control through standardization of fees and limitations on emergency room use and increased generic (as opposed to brand-name) drug use would also be implemented. With respect to pension reform, the October Revised Commonwealth Fiscal Plan would freeze defined benefit accumulations, establish individual retirement accounts to protect employee contributions, provide for a 10% pension benefit reduction which would not be applicable to those with combined pension and social security benefits of below $1,000 per month, and enroll in the Social Security program those government workers that currently do not participate in such program (mainly teachers, police officers and judges).

Fiscal reform will also address the Commonwealth's tax and financial reporting apparatus. With respect to tax reform, the October Revised Commonwealth Fiscal Plan will aim to reduce unfairness and improve compliance and capture rates by broadening the tax base, implementing a unified tax payment system and other new technology, increasing collection personnel, adjusting existing taxes and revenues, and reducing certain taxes while maintaining revenue neutrality. These changes will be coupled with the creation of the Office of the Chief Financial Officer, which will be tasked with establishing and maintaining controls over Commonwealth finances. The primary objectives of this office will be to centralize treasury and liquidity management and reporting functions, through budget development and monitoring and contract and personnel policy compliance oversight. It will also drive standardization of accounting systems and implement other processes to ensure timely publication of the Commonwealth's audited financial statements.

DRA Ex. 226

**Description of the Commonwealth's PROMESA Filings**

Section 405 of PROMESA imposed a temporary stay on litigation related to the financial indebtedness of Commonwealth government entities, which expired on May 1, 2017. Following the expiration of the temporary stay, on May 3, 2017, the Oversight Board issued a restructuring certification pursuant to Sections 104(j) and 206 of PROMESA and filed a voluntary petition for relief on behalf of, and at the request of, the Commonwealth, commencing a case under Title III of PROMESA in the United States District Court for the District of Puerto Rico, Case No. 17-03283 (the "Commonwealth Title III Case"). The Oversight Board has similarly issued a restructuring certificate and filed voluntary petitions for the following entities (collectively, with the Commonwealth Title III Case, the "Title III Cases"):

- Puerto Rico Sales Tax Financing Corporation, Case No. 17-03284, commenced on May 5, 2017;

- Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Case No. 17-03566, commenced on May 21, 2017;

- Puerto Rico Highways and Transportation Authority, Case No. 17-03567, commenced on May 21, 2017;

- Puerto Rico Electric Power Authority, Case No. 17-0478, commenced on July 3, 2017.

The Title III Cases have been consolidated for procedural purposes only and are being jointly administered under Case No. 17-03283. On May 5, 2017, U.S. Supreme Court Chief Justice John Roberts selected U.S. District Court Judge Laura Taylor Swain (S.D.N.Y.) to preside over the Title III Cases pursuant to Section 308(a) of PROMESA. Upon the commencement of each of the Title III Cases, an automatic stay immediately went into effect pursuant to Sections 362 and 922 of the Bankruptcy Code, as made applicable to the Title III Cases pursuant to Section 301(a) of PROMESA.

The deadline for filing proofs of claim against the debtors in each of the pending Title III cases was June 29, 2018, at 4:00 p.m. (Atlantic Standard Time) (the "Bar Date"). As of the Bar Date, approximately 170,000 proofs of claim were filed against the Title III debtors. As of the date hereof, no plan of adjustment has been proposed or confirmed in any of the Title III cases.

DRA Ex. 226

# THE GDB RESTRUCTURING ACT

The GDB Restructuring Act was enacted on August 24, 2017, and amended on July 18, 2018, and establishes the legal framework for the wind down of GDB and the restructuring of its financial indebtedness. To this end, the GDB Restructuring Act provides for (i) the creation of the Issuer and the delegation and limitation of its powers, (ii) the creation of the GDB Public Entity Trust (the "Public Entity Trust") and the delegation and limitation of its powers, (iii) the determination of the balances of certain liabilities of GDB and other government entities, (iv) the authorization for the transfer of certain assets and obligations of GDB to each of the Issuer and to the Public Entity Trust, (v) the authorization for the Issuer to issue the New Bonds and provide for the terms of such bonds, (vi) the creation of the statutory lien that will secure the New Bonds, (vii) the authorization of certain disbursements from GDB related thereto, (viii) the amendment of certain laws to replace GDB with a designated trustee (which may be AAFAF or one or more private financial institution(s) designated by AAFAF), (ix) the confirmation of the validity of certain Loans made by GDB, (x) the confirmation of the validity of the transactions performed pursuant to the GDB Restructuring Act and the release of any claims by government entities against GDB and (xi) the lack of authority and standing of government entities to challenge the GDB Restructuring Act, the Qualifying Modification, or any other transactions contemplated by the GDB Restructuring Act in any local or federal court.

Below is a summary description of certain provisions of the GDB Restructuring Act, which does not purport to be complete and is qualified in its entirety by reference to the full text of the GDB Restructuring Act.

## Purpose of the Issuer

The GDB Restructuring Act provides that the Issuer was created for the purposes of:

(i) issuing the New Bonds in order to (a) implement the Qualifying Modification, (b) facilitate compliance with the GDB Fiscal Plan, and (c) facilitate the funding of essential government or public services by the Government of the Commonwealth (the "Government"); and

(ii) owning and managing the Restructuring Property.

The Issuer is expected to enter into the Servicing Agreement with the Servicer, pursuant to which the Servicer will be responsible for all management of the Restructuring Property (including all day-to-day operations in respect thereof). For additional information regarding the Servicing Agreement, see "*Servicing Agreement*" in this Offering Memorandum.

The GDB Restructuring Act states that the Issuer was created and constituted to exercise essential government and public functions, and that the performance by the Issuer of the activities and powers granted under the GDB Restructuring Act are considered and constitute an essential function of the Commonwealth for the good of the people of the Commonwealth. The Issuer will not be operated for the purpose of making a profit, and no part of the revenues or assets of the Issuer will inure to the benefit of or be distributable to any private person or entity, except to service and pay the New Bonds and pay fees and costs for actual services rendered as herein provided or as otherwise required to carry out the intent of the GDB Restructuring Act.

In the GDB Restructuring Act, the Legislative Assembly found that the Qualifying Modification (i) has a public purpose and is in the best interests of the people of Puerto Rico, (ii) is fair and equitable for all creditors of GDB, (iii) is necessary to ensure compliance with the GDB Fiscal Plan, (iv) achieves fiscal responsibility for the people of Puerto Rico by providing for an orderly restructuring of the liabilities of GDB, (v) settles and resolves potential claims between GDB and other government entities, and (vi) permits the provision of essential public services by the Commonwealth and other government entities.

The provisions of Act 219-2012, as amended, known as the Puerto Rico Trusts Act, will not be applicable to the Issuer.

For additional information on the Issuer, see "*The Issuer*" in this Offering Memorandum.

## Permitted Activities

The GDB Restructuring Act provides that the Issuer will not engage in any activity other than:

(i) receiving the Transferred Property and owning the Restructuring Property described below in "*The Restructuring Property*" and the other property of the Issuer and the Collections thereon;

(ii) adopting resolutions of the Board of Trustees authorizing: (a) the issuance of the New Bonds and describing the terms thereof, (b) receipt of the Transferred Property and ownership of the Restructuring Property, subject to the statutory lien and (c) the payment of certain financing costs associated with the Qualifying Modification;

DRA Ex. 226

     (iii)     issuing:

           (a)     the New Bonds; and

           (b)     the Additional Bonds, if any;

     (iv)     entering into the Transaction Documents;

     (v)     servicing or contracting for the servicing of the Restructuring Property and the New Bonds and for administrative services;

     (vi)     collecting, receiving, owning, enforcing, monitoring, selling and protecting the Restructuring Property or otherwise authorizing any of the foregoing, in accordance with the Transaction Documents and for the sole purpose of realizing on, or preserving, the value of the Restructuring Property or the Collections thereon, including, without limitation, by initiating necessary legal action (subject to Article 207 of the GDB Restructuring Act);

     (vii)     fully accounting for and making or contracting with the Servicer and the Indenture Trustee to account for or make all payments and allocating partial payments, in accordance with the Bond Indenture and the Transaction Documents;

     (viii)     entering into contracts and taking any other necessary or convenient actions with respect to realizing the maximum value of the Restructuring Property (subject to Article 207 of the GDB Restructuring Act), including related to the collection, enforcement, sale, monitoring, protection, forbearance or settlement thereof consistent with the terms and conditions of the Transaction Documents;

     (ix)     preparing or directing the Servicer to prepare reports and financial statements as required by the Transaction Documents, including filing continuing disclosure reports in accordance with the Disclosure Agreement (with substantially all of the content of such reports to be prepared by others, including the Servicer, the Collateral Monitor and the auditor of the Issuer);

     (x)     using or directing the use of the Restructuring Property in accordance with the Transaction Documents;

     (xi)     making an election under Section 301.7701-3 of the U.S. Treasury Regulations promulgated under the U.S. Tax Code (as defined herein); and

     (xii)     taking any and all other actions as may be necessary or appropriate to effectuate this transaction.

     Additionally, the GDB Restructuring Act grants the Issuer certain ancillary powers described in Article 205 of the GDB Restructuring Act, in order to carry out its authorized activities. Pursuant to the provisions of said Article 205, the Issuer is expected to enter into certain agreements with third-party service providers, including the Servicer, related to, among other things, all management of the Restructuring Property (including all day-to-day operations in respect thereof). Therefore, many of the functions authorized to be carried out by the Servicer pursuant to the GDB Debt Restructuring Act, including, without limitation, those referenced in items (v) through (x), above, will be carried out by the Servicer pursuant to the Servicing Agreement. For more information, see "*Service Providers*" below.

**Prohibited Actions**

     Pursuant to Article 206 of the GDB Restructuring Act, the Issuer will be prohibited from taking any of the following actions: (i) merging or consolidating, directly or indirectly, with any person, (ii) incurring, guaranteeing or otherwise becoming obligated to pay any debt or other obligations other than the New Bonds and certain other costs, (iii) pledging, creating or recording liens on any of its properties (including the Restructuring Property), other than the statutory lien securing the payment of the New Bonds and certain other costs, (iv) engaging in any business activities other than as expressly authorized by the GDB Restructuring Act, (v) dissolving, liquidating, transferring or selling any or all of the Restructuring Property, except as permitted by the GDB Restructuring Act and the Transaction Documents, and (vi) taking any other action that is inconsistent with the Issuer's purpose as set forth in the GDB Restructuring Act or ancillary thereto.

DRA Ex. 226

**The Issuer and the Qualifying Modification**

*Authorization of the New Bonds.* In order to authorize the issuance of the New Bonds, the Issuer must adopt one or more resolutions providing for the (i) issuance of the New Bonds and the terms thereof, (ii) receipt of the Transferred Property (described as the "Restructuring Authority Assets" in the GDB Restructuring Act) and the ownership of the Restructuring Property, and (iii) payment of certain costs and expenses, each in accordance with the terms of the Qualifying Modification.

*Transfer of the Transferred Property.* Pursuant to the GDB Restructuring Act, on the Closing Date and from time to time thereafter, all legal and equitable right, title and interest in and to, and claims and causes of action to enforce, the Transferred Property will be transferred by GDB to the Issuer. For additional information on the Transferred Property, see "*The Restructuring Property*" in this Offering Memorandum.

*Source of Repayment of the New Bonds.* The New Bonds will be payable solely from the Restructuring Property, in accordance with the terms of the Bond Indenture and the other Transaction Documents, without recourse to the credit or any other assets of the Issuer or GDB (other than pursuant to the Keepwell Agreement). Moreover, the New Bonds will not constitute a debt of the Commonwealth or of any public corporation or instrumentality of the Commonwealth other than as a special limited obligation of the Issuer as described herein.

*Creation of Statutory Lien on the Restructuring Property.* Upon the issuance of the New Bonds, the New Bonds will be secured by a statutory lien on the Restructuring Property in favor of the Indenture Trustee for the benefit of the Bondholders. Such lien will be senior to any other lien encumbering the Restructuring Property (except for valid liens and encumbrances existing as of the effective date of the GDB Restructuring Act or that arise in the ordinary course of business after the effective date of the GDB Restructuring Act and are existing as of the Closing Date, in each case with respect to any Real Property Assets and any personal property assets related thereto that are part of the Restructuring Property) and may be enforced subject to the provisions of the GDB Restructuring Act and pursuant to the terms of the Transaction Documents. Such statutory lien will occur automatically and will be perfected, valid and binding from and after the Closing Date, in any case without any further act or agreement. No instrument needs to be delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory lien or to establish or maintain the priority thereof. No commingling of any Restructuring Property with any other property of GDB or any other party will limit, defeat, impair or interfere with such statutory lien.

*Appointment of a Receiver.* Upon the occurrence of an event of default under certain of the Transaction Documents and the continuation of such event of default for a period of 30 days or as otherwise provided in the Transaction Documents, any Bondholder or Bondholders (subject to any contractual limitation as to a specific percentage of such holders (see "*Description of the New Bonds and the Bond Indenture—Bond Indenture—Remedies*")), or trustee therefor, will have the right to apply to any Commonwealth or federal court of competent jurisdiction in the Commonwealth for the appointment of a receiver for the Issuer. Such receiver so appointed will have, hold, use, operate, manage, and control the property of the Issuer, including the Restructuring Property, and will exercise all the rights and powers of the Issuer with respect to such property as the Issuer itself might do. Such receiver will act under the direction and supervision of the court and will at all times be subject to the orders and decrees of the court and may be removed thereby.

*Participating Bond Claims; Keepwell Agreement.* Once the holders of Participating Bond Claims receive the New Bonds, such holders will not have any recourse against GDB with respect to such Participating Bond Claims. Notwithstanding the foregoing, GDB will enter into the Keepwell Agreement for the benefit of the Issuer and the Bondholders. For additional information on the Participating Bond Claims and the Keepwell Agreement, see "*The Restructuring Property—Detailed Description of the Restructuring Property*" and "*The Keepwell Agreement*" in this Offering Memorandum.

*Non-Impairment Covenant.* The Commonwealth agrees and covenants with any person that acquires the New Bonds that it will not, and no Commonwealth government entity will be authorized to, impair, limit, restrict, rescind, delay or modify the rights or powers of the Issuer, the Indenture Trustee or the Bondholders under the GDB Restructuring Act or under or in respect of the Restructuring Property, or the Issuer's ability to meet its obligations to its bondholders until the New Bonds, together with the interest thereon, and all amounts and obligations under the Transaction Documents, have been completely paid in full in cash or are otherwise discharged in accordance with their terms; *provided, however*, that any actions or omissions by the Commonwealth or by any Commonwealth government entity relating to appropriations or funding pursuant to the Revised Commonwealth Fiscal Plan will not be deemed to be a violation of such covenant. The Commonwealth further agrees and covenants that no amendment to the GDB Restructuring Act would impair, limit, restrict, delay or modify any obligation or commitment of (i) the Issuer to the Bondholders or (ii) GDB to the Bondholders under the Keepwell Agreement.

DRA Ex. 226

**GDB Public Entity Trust**

*Purpose of the Trust.* The Public Entity Trust was established in order to address GDB's deposit liabilities to non-municipal government entities, including federal funds as may be determined by AAFAF, and the municipalities having claims in respect of federal funds on deposit with GDB, as determined by AAFAF (the "Designated Depositors"). The Designated Depositors are not holders of Participating Bond Claims that will be restructured through the issuance of New Bonds by the Issuer. As a result, certain specified assets of GDB that are not part of the Restructuring Property securing the New Bonds will be transferred to the Public Entity Trust and will constitute the source of any distributions provided to the Designated Depositors. These specified assets consist of Loans to public agencies and departments of the Commonwealth that are primarily payable from legislative appropriations, with a principal balance of approximately $890.6 million as of the Cutoff Date (but reflecting the Closing Date Adjustments, as defined herein).

*Establishment of the Trust.* In order to create the Public Entity Trust, GDB is authorized to execute a deed of trust (the "Public Entity Deed of Trust") to be effective as of the Closing Date, creating and establishing the Public Entity Trust for the benefit of the Designated Depositors and providing for the terms and conditions related to the operation thereof. The Public Entity Trust will be a public trust and governmental instrumentality of Puerto Rico, independent and separate from any other Commonwealth government entity (including, without limitation, GDB and the Issuer). The Public Entity Deed of Trust will set forth the manner in which the assets identified by the Public Entity Deed of Trust, legal and equitable title for which is to be irrevocably transferred by GDB to the Public Entity Trust (the "Public Entity Trust Assets"), will be distributed among the Designated Depositors. The Secretary of Treasury of the Commonwealth is also authorized to appear in the Public Entity Deed of Trust on behalf of the Designated Depositors and to agree to the terms and conditions contained therein. The provisions of Act 219-2012, as amended, known as the Puerto Rico Trusts Act, will not be applicable to the Public Entity Trust.

*Transfer of Public Entity Trust Assets.* GDB is authorized to transfer, on or after the Closing Date, the Public Entity Trust Assets to the Public Entity Trust, and the Public Entity Trust is authorized to assume, effective as of the Closing Date, the Designated Deposits, pursuant to the Public Entity Deed of Trust in order to satisfy the conditions of the Qualifying Modification. A portion of the Public Entity Trust Assets will be transferred to the Public Entity Trust on the Closing Date and the remainder of the Public Entity Trust Assets, or any portion thereof, will be transferred to the Public Entity Trust in one or more series of transactions, as set forth in the Public Entity Deed of Trust (as defined in the GDB Restructuring Act). A transfer of the Public Entity Trust Assets by GDB to the Public Entity Trust pursuant to the Public Entity Deed of Trust will be an irrevocable, non-voidable and absolute transfer of all of GDB's legal and equitable right, title and interest (as a true sale), and not a pledge or other financing, of the Public Entity Trust Assets. Upon the transfer of the Public Entity Trust Assets to the Public Entity Trust and the assumption by the Public Entity Trust of the Designated Deposits, the Designated Depositors will, immediately and forever, and without further actions or documentation, cease to have any right, interest or claim against GDB or any of its assets, or any successors or assigns thereof (other than the Public Entity Trust).

*Residual Equity Interest in the Issuer.* Effective as of the Closing Date, the Public Entity Trust will have a residual equity interest in the Issuer, pursuant to which it will receive a distribution of the remaining assets of the Issuer, if any, after the New Bonds, certain costs in connection with the restructuring of GDB and other indebtedness of the Issuer have been paid in cash in full or otherwise discharged pursuant to the terms of the Transaction Documents. The Public Entity Trust will have no rights or remedies in respect of such residual equity interest other than the right to a distribution, if any, upon the dissolution of the Issuer, in accordance with the GDB Restructuring Act and the Transaction Documents.

*Trustee of the Public Entity Trust.* The trustee of the Public Entity Trust will have such powers as are conferred to it in the Public Entity Deed of Trust. GDB will initially act as trustee of the Public Entity Trust, *provided* that AAFAF will be authorized to act as trustee or to designate any other person to act as trustee of the Public Entity Trust upon GDB's resignation or in the event that GDB is otherwise unable to continue acting as trustee of the Public Entity Trust, as determined by AAFAF.

**Determination and Payment of Certain Government Obligations**

*Recalculation of Non-Municipal Obligations.* Notwithstanding any other law of the Government, effective as of the Closing Date, the balance of liabilities owed between any non-municipal Commonwealth government entity, on a dollar-for-dollar basis, and GDB will be automatically determined by applying the outstanding balance of any deposit of such entity against the outstanding balance of any Loan made to such government entity by GDB or of any bond or note of such entity held by GDB as of such date (other than any loan, bond or note of a non-municipal government entity secured by a mortgage over real property) in a manner consistent with the conditions of the Qualifying Modification without the need for any further action. Such application will be effected by reducing any remaining installments of principal in inverse order of maturity and will not otherwise affect the repayment schedule of the corresponding bond, note or loan.

*Recalculation of Municipal Obligations.* Pursuant to the provisions of the Municipal Financing Act, GDB provided Loans to municipalities that were evidenced as bonds, notes or other evidences of indebtedness. These bonds, notes and loans would be fully drawn upon their execution and their proceeds would remain on deposit with GDB in accounts created for the particular municipality. The GDB Restructuring Act provides that the remaining balance of these bonds, notes and loans will be reduced by the undisbursed

DRA Ex. 226

balance of any such proceeds held in GDB deposit accounts, which undisbursed remaining balance will be certified by AAFAF. The reduction will be automatic and without the need for further action by GDB and will be effected by reducing any remaining installment on such bonds, notes and loans in inverse order of maturity. The repayment schedule of these bonds, notes and loans will not be otherwise affected. Moreover, upon such reduction, future interest payments will be determined based on the remaining balance of such bond, note or loan. The GDB Restructuring Act does not limit or prohibit municipalities from refinancing their bonds, notes or loans through other financial institutions pursuant to the Municipal Financing Act.

Any remaining deposit of a municipality held at GDB as of the Closing Date (other than deposits identified by AAFAF as consisting of federal funds) will be automatically reduced, effective as of the Closing Date, on a dollar-for-dollar basis, from the outstanding principal amount of any corresponding bond, note and/or loan of such municipality (excluding the loans that are collateral for secured deposit accounts), relative to the type of corresponding deposit, as determined by AAFAF, in a manner consistent with the Qualifying Modification. Such application will be effected in ascending order of outstanding loan balances. In cases where deposits are not enough to pay the bond, note or loan in full, the application will be effected by reducing installments of principal in inverse order of maturity without affecting the repayment schedule of the bond, note or loan.

The remaining balances of the liabilities of each municipality and non-municipal Commonwealth government entity to GDB after giving effect to the transactions contemplated by the GDB Restructuring Act will be those certified by AAFAF. All future interest payments on said bonds, notes and/or loans will be computed based on the remaining balance of such liabilities pursuant to the GDB Restructuring Act and as certified by AAFAF.

Nothing contained in the GDB Restructuring Act will be construed to prohibit or limit municipalities from refinancing their current bonds, notes or loans through another financial institution pursuant to the Municipal Financing Act.

*Payment of Excess CAE.* The GDB Restructuring Act requires GDB to pay, in cash, on or prior to the Closing Date, to each municipality that has deposit claims against GDB for Excess CAE (as defined herein) certified by GDB prior to January 2017 corresponding to fiscal years 2015, 2016, and 2017 (such Excess CAE, "2015-17 Excess CAE"), an amount equal to 55% of such municipality's undisbursed 2015-17 Excess CAE, consistent with the conditions of the Qualifying Modification. Any remainder will be deemed fully discharged, no municipality will have any further rights to such amounts, and GDB will have no further liability or obligation, with respect thereto. For the avoidance of any doubt, 2015-17 Excess CAE does not include, and the GDB Restructuring Act does not address, those proceeds of the special additional tax which AAFAF has certified as surplus from the Municipal Debt Redemption Fund (as defined in the Municipal Financing Act) after January 1, 2017 pursuant to Article 20(e) of the Municipal Financing Act, corresponding to fiscal years 2017 and beyond and which are deposited in the Municipal Financing Act accounts created in financial institutions outside of GDB in the name or for the benefit of each municipality.

*Limitation and Mediation of Certain Claims against Municipalities.* The GDB Restructuring Act provides that all claims against a municipality related to a capital improvement project financed with a bond, note or loan subject to recalculation will be stayed from the Closing Date to June 30, 2019. The stay, however, does not apply to the commencement or continuation of litigation in order to participate in mediation related to the stayed claim. The goal of such mediation is to establish an alternate repayment plan or other satisfactory resolution of such claim and reflect such an arrangement in the municipality's fiscal year 2020 budget. Notwithstanding the stay, municipalities may still make payments related to such stayed claims.

**Certain Additional Provisions**

*Confirmation of Loans.* The GDB Restructuring Act provides that all loans made by GDB to a Commonwealth government entity, including municipalities, prior to the effective date of the GDB Restructuring Act are confirmed and continue to be valid and binding obligations of the applicable entity in accordance with their terms.

*Binding Effect of the Qualifying Modification; Lack of Authority to Challenge.* The GDB Restructuring Act provides that the Qualifying Modification will be valid and binding with respect to all government entities, including municipalities, as of the Closing Date. Moreover, the GDB Restructuring Act provides that no Commonwealth government entity will have any further rights or claims against GDB, the Issuer or the Public Entity Trust, other than those expressly provided in the GDB Restructuring Act, the Transaction Documents and the Public Entity Deed of Trust, and that each Commonwealth government entity is deemed to forever waive, release and discharge GDB, the Issuer and the Public Entity Trust, and any officers, directors, employees, agents and other representatives thereof, from any and all such claims. Finally, pursuant to the GDB Restructuring Act, no Commonwealth government entity, including municipalities, will have authority or standing to challenge the GDB Restructuring Act, the Qualifying Modification or the other transactions contemplated in the GDB Restructuring Act in any local or federal court.

DRA Ex. 226

*Trust for the Benefit of Retired Employees.* In anticipation of the final wind-down of GDB pursuant to the GDB Fiscal Plan, notwithstanding any other law to the contrary, GDB is authorized to execute a deed of trust to create and establish a trust for the benefit of persons that retired from GDB pursuant to applicable pre-retirement programs (and any other beneficiary under said programs), to transfer to such trust funds to satisfy GDB's obligations under said pre-retirement programs (consistent with the GDB Fiscal Plan), and to take any and all actions necessary or convenient in furtherance of the foregoing. GDB may not transfer to such trust any asset that is not an Excluded GDB Asset. AAFAF is also authorized and empowered to act as trustee of such trust (or to designate any other entity to act as trustee thereof) and to take any and all actions necessary or convenient in furtherance of the foregoing. This trust will be a governmental instrumentality and will be totally exempt from, and will not be required to pay, any kind of taxes, assessments, licenses, stamps, fees or other similar charges levied by the Government or any government entity upon any of the property it owns, possesses, holds or uses or on its activities, or upon any income, payment or gain derived therefrom. The provisions of Act 219-2012, as amended, known as the "Trusts Act" will be applicable to the trust created for this purpose.

DRA Ex. 226

**USE OF PROCEEDS**

The Issuer will not receive any cash proceeds in this offering. Instead, the Issuer will (i) receive the Transferred Property from GDB and (ii) will issue the New Bonds to the holders of the Participating Bond Claims.

DRA Ex. 226