Information Technology Service (PRITS). This approval is expected to be granted by the end of April 2021. As soon as the contract is approved by PRITS, the vendor will proceed to install and configure modules related to this system. This process can take up to a month, nonetheless, the agencies expect to finalize implementation of the PDMP before the end of the Fiscal Year 2021.

These improvements to the PDMP should result in the strengthening of monitoring capacities, use of data, and access to statistics on prescriptions of controlled substances; the provision of timely and reliable information on providers and patients; and the proactive identification of potentially problematic or illegal behaviors related to opioid prescription.

In addition, DOH must develop public awareness campaigns and education on the prevention of, misuse and overdose of opioids across health regions. Moreover, they must continue to evaluate the action plan for the provision of opioid treatment and forensic analysis, in collaboration with relevant government agencies. Action items related to Opioid Prevention are outlined in *Exhibit* 104 under the required implementation actions DOH must achieve.

*Loan forgiveness program and endowment fund*

This investment is to fund an independently-managed loan forgiveness program and endowment fund which will support healthcare students and residents (e.g., medical, dental, nursing) who commit to serving in rural and underserved areas.

Actions to retain healthcare professionals in Puerto Rico were deemed necessary to address the escalating healthcare professional shortages of the Island. It is estimated that as of 2018, two-thirds of primary care physicians in Puerto Rico were older than 55 years, as compared with a national rate of 43%.[281] Prior to the COVID-19 pandemic the Island had already faced with shortages of medical due to a myriad of factors including recent natural disasters and economic challenges.

Over the past decade, retention issues of healthcare professionals that have obtained advanced degrees from medical programs and/or completed residency programs have increased substantially.  In a study conducted by the Robert Graham Centre it is reported that only four out of every ten graduates of family medicine residencies from 2011 to 2017 remained on the Island in 2018.  Puerto Rico's new family physician retention rate was placed among the lowest in the nation.  During that time period, 111 family medicine residents graduated among the Island's four residency programs.  Of those 111 graduates, only 45 remained practicing in Puerto Rico in 2018, yielding a retention rate of 40.5%.[282]

Upon successful completion of residency programs, recent medical school graduates are often attracted by potential career opportunities with higher salaries on the mainland.  Through this Medical Student Loan Forgiveness Program, the Oversight Board seeks to decrease the percentage of provider to population gap by both increasing the retention rate of recent medical student graduates through economic incentives for medical students who attend and graduate from medical programs of universities in Puerto Rico as well as attracting medical students from the mainland to healthcare job opportunities on the Island. The economic incentives will be in the form of a medical student loan forgiveness program to be awarded to eligible students or residents upon completion of approved worked experience with program partnered organizations.

The 2020 Fiscal Plan allocated a total of $30 million over two fiscal years to be used to establish an independently managed loan forgiveness program in order to incentivize doctors to practice in underserved areas in Puerto Rico. Funding in the amount of $10 million were budgeted during Fiscal Year 2020 and $20 million were budgeted for Fiscal Year 2021. Under this program, each medical student or resident would be eligible for up to $25,000 of loan forgiveness per year of service – up to four years – in underserved areas and the program would be administered by an

---

281 Bureau of Health Workforce Health Resources and Services Administration (HRSA) – Designated Health Professional Shortage
    Areas Statistics; Third Quarter of Fiscal Year 2020, Designated HPSA Quarterly Summary, June 30, 2020
282 Robert Graham Center Report: A Shrinking Primary Care Workforce in Puerto Rico, Dec 13, 2019

independent third party. Action items that must be achieved for this initiative are outlined in *Exhibit 104* under required implementation actions.

*Hospital Accreditation*

During FY2020 and FY2021, $6 million each year ($12 million total) was allocated to ASSMCA's Dr. Ramón Fernández Marina Río Piedras Psychiatric Hospital to enable the hospital to receive accreditation by the CMS. The hospital lost its accreditation in 2009, and since then has been unable to bill for services rendered to their Medicaid and Medicare patient population.

The additional funds were intended to be used to increase care standards by making physical repairs to the hospital and improving staffing levels in order to comply with CMS regulations. In addition, ASSMCA was allocated $43.8 million in CAPEX funds during FY2020 (extended to be used during FY2021) to purchase anti-ligature beds, eliminate hanging points and to perform capital improvements to the hospital's structure and other facilities.

To date, the hospital has not yet received certification, though there are plans in place to receive it in Fiscal Year 2023. The certification process can take years to achieve, though the agency argues that recent delays in the process have been mainly due to the COVID-19 pandemic, specifically with the recruitment of personnel. Agency claims recruitment is now limited as workforce has been hesitant to work on site and unwilling to be exposed to COVID-19. Additionally, in order for the hospitals to be compliant with regulatory agencies, ASSMCA must perform capital improvement projects to address infrastructure issues raised by regulatory agencies. These capital improvement projects have been delayed for months due to an existing backlog of requests at GSA. However, GSA has confirmed that these projects have been prioritized and expects to have all RFP's published by the end of FY2021. The 2021 Fiscal Plan allocates ASSMCA $10 million over two years, starting in FY2022 to comply with minimum staffing levels at the hospital so that the regulatory requirement is met.

Achieving this certification is of upmost importance to ensure that the people of Puerto Rico have access to accredited mental and behavioral health inpatient services within the public healthcare system. Additionally, being able to bill for services rendered to the Medicaid and Medicare patient population will increase revenues, which can then be reinvested in hospital infrastructure and programs for further improvements.   ASSMCA aims to achieve the CMS Accreditation by September 2022. In order to achieve this the agency must first accomplish several steps including but not limited to: 1) recruitment of the necessary personnel to comply with minimum staffing levels, 2) creation of rules, policies and procedures among the different functional areas, 3) finalizing capital improvement projects directly related to the hospital accreditation, 4) CMS inspector visit, and 5) receive a visit from the Joint Commission auditors. Once the hospital has received the letter of recommendation and accreditation from CMS and the Joint Commission, the hospital can start billing for the Medicaid and Medicare patient populations. Action items that must be achieved by ASSMCA for this initiative are outlined in *Exhibit 104* under required implementation actions.

ASEM has the only Trauma Hospital on the Island providing specialized care to adult and pediatric patients with multiple body trauma. This includes the Virgin Islands as well. Additionally, the Adult University Hospital is the only supra tertiary public hospital of Puerto Rico. Both institutions serve as an Academy Program for different health professionals where 24 Residency Programs are offered. These Residency Programs include Neurosurgery, Anesthesiology, Dermatology, Surgery, Physical Medicine and Rehabilitation, Neurology, Diagnostic Radiology, Nuclear Medicine, Cardiology, Infectious Diseases, Hematology and Oncology, Nephrology, Rheumatology, Gastroenterology, Endocrinology, Allergy and Immunology, Infectology, Obstetrics and Gynecology, Orthopedics, Ophthalmology, Otolaryngology and Head & Neck, Pathology and Laboratory Medicine, Urology, and Combined Internal Medicine & Pediatrics. During April 2021, the Accreditation Council for Graduate Medical Education (ACGME) withdrew the accreditation (effective July 1st, 2022) for the Neurosurgery Residency Program, which had been in probation for the past years. Some of the

DRA Ex. 236

ACGME findings were related to deficiencies found in both academic and clinical staff support required - not previously addressed by ASEM and UDH. As such, the 2021 Fiscal Plan allocates a $15.2 million budget to be used to hire additional House Staff and Clinical Staff (General Nurses, Licensed Practical Nurses, Direct Patient Care Clerks, etc.) which will directly support the continuity of the 24 Residency Programs at the institutions. The $15.2 million appropriation will be split among ASEM and UDH according to information presented by the agencies.

*Implementation of Electronic Health Records at the Cancer Center*

The 2021 Fiscal Plan allocates to the Cancer Center a $20 million investment over two years, contingent upon Cancer Center completing certain actions. By May 2021, the Cancer must provide a Business Plan detailing specific actions the Center will take to become sustainable by FY2024. If this is completed, the Cancer Center will have access to a $10 million appropriation for FY2022 which will be held under the custody of OMB. Meanwhile, the Center must also focus on EHR implementation during FY2022. This will allow the Center to properly and timely bill health insurance provides, increase their collections and reduce margins of error in the billing process. If EHR implementation is completed in FY2022, the Center will have access to an additional $10 million during FY2023. The Center must transition to be self-sufficient and rely on their own revenues starting in FY2024. Specific action items that the Cancer Center must achieve are detailed in *Exhibit 104* under required implementation actions.

*Maintaining Direct Patient Care Staffing Levels*

The 2021 Fiscal Plan includes additional funding for Direct patient care employees working at the Department of Health. Additionally, all personnel measures impacting the Intellectual Disability Program within the Department of Health have been reversed, as such, the Program can comply with the minimum budget established by the court.

*Fulfilling federal requirements*

The 2021 Fiscal Plan allocates funding for fulfillment of three federal requirements:

- **Intellectual Disability Program:** The Puerto Rico Division of Services for People with Intellectual Disabilities is required to have certain standards for services, and state appropriations to the program must be fully utilized to meet those standards. A Federal Court found that Puerto Rico failed to use state funds allocated for this purpose from FY2015-FY2019. Accordingly, the 2021 Fiscal Plan allocates $20 million over four years (FY2021-FY2025) in order to reimburse the program. Additionally, as mentioned above, measures related to personnel have been eliminated.

- **Health 330 Centers:** Puerto Rico is required to cover the difference between "reasonable costs" and what is reimbursed by the Medicaid Program for federally qualified health centers (FQHCs). The 2021 Fiscal Plan includes annual funding to cover these "wraparound payments."

- **Psychiatric hospital:** The 2021 Fiscal Plan ensures that the annual budget for the Psychiatric Hospital in Rio Piedras is a minimum of $23 million. To do this, the 2021 Fiscal Plan allocates an incremental $5 million in FY2022 and FY2023 to enable the facility to earn its Medicare certification. Certification will drive increased revenues, which can be reinvested in the hospital to maintain full compliance with the consent decree.

### 15.4.2   *Overview of efficiency actions*

During FY2021, DOH was not required to achieve additional savings over those required in FY2020 – this pause was to progress on implementation efforts across key operational efficiencies.  All savings associated to such pause are reinstated in FY2022. From FY2022 to FY2025, DOH must achieve the personnel and non-personnel savings outlined in *Exhibit 104.*

DRA Ex. 236

EXHIBIT 103: DEPARTMENT OF HEALTH MEASURES SUMMARY OF IMPACT



*Consolidating administrative and support functions*

Consolidation of health agencies will enable efficiencies in administrative and support areas, including Management, General Administration, Auxiliary Services, IT, and a portion of Hospital Administration. In addition, operational efficiencies are expected to be realized through elimination of duplicative programs across agencies. For example, labor-intensive and/or paper-based processes are expected to be streamlined through digitization and implementation of software solutions.

Thus far, efforts to achieve required savings in this area have focused on consolidation. In FY2019, DOH conducted an analysis to identify support-function savings that could be achieved through consolidation. Legislation to enable consolidation of DOH and ASES was submitted in December 2019, however, approval was not recommended by the Senate's Health Commission of their 18th Legislative Assembly. As a result, progress towards the future-state organization has stalled, with agencies citing the need for the passage of legislation and leadership alignment as the prerequisite for implementation. Although there exists a need to formalize structural consolidation remains outstanding, it is critical for health agencies to identify efficiency opportunities (e.g., back-office operational improvements, cross-agency coordination, program consolidation) to drive operational changes and achieve savings notwithstanding. To date, efforts to achieve operational improvements (e.g., implementation of time and attendance reporting, digitalization of finance processes) within health agencies have been stagnant.

Efforts must be undertaken to streamline internal management processes and enable identification of further efficiencies. This must include completing a capacity analysis to identify duplicative roles and programs across health agencies that must be reduced or centralized. By December 2020, DOH was expected to complete such analysis and report that all back-office roles and positions by activity and program were assessed. As of March 2021, DOH has contracted the services of a third party to complete a capacity analysis and expects to complete it by the end of FY2021. At that time, DOH must take action and implement efficiencies and task centralizations as identified by the capacity analysis. Action items related to the Capacity Analysis are outlined in the required implementation actions found in *Exhibit 104*.

*Rightsizing of non-administrative health personnel*

As the Puerto Rican population declines, spending on non-administrative payroll such as allied health professionals is expected to decline. There are several ways to decrease this spend without impacting health services. For example, wages should be aligned with fair market value to reduce turnover and the associated spend on temporary/overtime workers, and roles and responsibilities

DRA Ex. 236

should be optimized to skill level and wage rate (e.g., nurses should practice at the "top of their license"). Expected savings for this category were determined using the Government's analysis of need and attrition for DOH and ASEM. Furthermore, health agencies should also optimize staff placement wherever possible. Best practice hospital management tools, such as shift management software, should be used to maximize efficiency. For example, the planning of nurse staffing needs is currently done manually at UDH, which limits the opportunity of allocating resources timely and efficiently depending on Hospital occupancy.

DOH hospitals reported underspending in payroll during FY2021, however, no real long-term savings have been achieved, as the underspending was not related to achieving efficiencies but instead due to the availability of the Coronavirus Relief Funds (CRF) because DOH and ASEM were able to pay for regular payroll expenses via the Program for Emergency Assistance to Public Hospitals. Meanwhile, hospitals have yet to implement best-practice operational tools to manage personnel. Currently, personnel and/or payroll records remain decentralized and outdated. Accordingly, health agencies have been unable to provide consistent and comprehensive historical or current data on clinical staff roles. Some hospitals report target staff-to-patient ratios, but data on utilization, patient flows, and staffing levels is not consistently collected nor digitalized. Furthermore, human resources processes (e.g., payroll, hiring) are overly complicated and inefficient.

Simplification and streamlining of these processes will reduce administrative burden and improve operational efficiency. Public hospitals must utilize IT investments to implement digital clinical management tools that can enable consistent data collection, reporting, and identification of opportunities for operational optimization.

*Consolidating regional Medicaid offices*

At the end of FY2018, the Medicaid Program within DOH had 85 offices that provided face-to-face service to the public across the 78 municipalities. To date, the Medicaid program has successfully reduced the number of offices to 66. These 66 offices are located across 78 municipalities. Savings from this Medicaid office consolidation (which relate to savings on office space and equipment rental, utility expenses, and cleaning services) reached ~$440,000 in FY2019 (out of a total of $500,000 required), and additional office location consolidations were being considered; however, due to COVID-19 this effort had been deprioritized. During FY2022 DOH must re engage in this initiative and achieve the full amount of savings ($500,000 required) by June of 2022 as outlined in the required implementation actions found in *Exhibit 104*.

Reducing the Medicaid office and regional hospital office footprint eliminates duplication of effort and allows DOH to provide more robust services at strategic locations. In addition, DOH, through the Medicaid Program and in connection with ASES, must redesign the Medicaid eligibility and enrollment process to be more web-based, managed care organization MCO-dependent, and hospital-centric, and to encourage the use of digital services to improve data management. Key priorities going forward relate to operational improvements and digitization of the Medicaid eligibility and enrollment process, which are discussed in *Section 16.3.1*.

*Optimizing supply chain management*

Implementation of procurement best practices and leveraging economies of scale must also be extended to non-healthcare categories (e.g., office and general maintenance supplies, security services). Such initiatives are expected to be enabled by agency consolidation and operational streamlining. While ASEM has made progress in achieving savings on medical supplies (*Exhibit 104*), non-hospital procurement savings have been minimal across health agencies. To help expedite savings initiatives, the Government must leverage its ability to utilize the General

DRA Ex. 236

Services Administration's (GSA) procurement services and rates for non-hospital related purchases.[283] Full utilization of these services can drive additional procurement savings.

With the upcoming centralization of procurement employees into GSA, as established by the new GSA Regulation 9230, additional efficiencies within the supply chain management process must result in the savings outlined by the 2021 Fiscal Plan. Procurement savings specific to hospitals are discussed in *Chapter 16*.

*Transforming hospital management*

Due to the level of spending and rising costs of medical supplies, services and equipment, there is a significant opportunity to improve procurement efficiency for hospitals and health systems by focusing on commodity standardization and sourcing, indirect spending (analyzing insourcing versus outsourcing opportunities), and physician preference item optimization.

ASEM was created to serve as a central procurement office for the member institutions of the Puerto Rico Medical Center to create economies of scale for medical supplies, devices, and services. Over time, procurement costs have increased at a higher rate than those of the broader healthcare industry, while procurement processes have become decentralized across the institutions that ASEM was created to serve.

Efforts to address this issue have started with the UDH working with ASEM to centralize purchasing and establish competitive bidding. These early efforts have yielded reported savings of ~$11 million as reported by ASEM[284]. However, the opportunity exists for more health agencies and facilities (e.g., HOPU) to participate in procurement centralization, and efforts must be made to expedite this cross-agency cooperation. For FY2022, ASEM must focus on identifying common administrative services (i.e. maintenance, cleaning, security services) and medical supplies across health agencies and public corporations with opportunities for savings through procurement centralizations as outlined in the required implementation actions found in *Exhibit 104*.

Holistic hospital transformation efforts must also reduce payroll spend through clinical labor optimization, which is captured in *Chapter 16*. To date, the health agencies have made successful progress toward a full implementation of Electronic Health Records (EHR), except for the UPR Comprehensive Cancer Center (CCCUPR), where implementation remains in process with completion scheduled for mid FY2022. For those hospitals that have made substantial progress toward EHR implementation, financial savings from deployment and use have not yet materialized, as reported.

The Cancer Center attributes delays in implementing EHR to the contract approval process. The absence of EHR at CCCUPR not only affects the level and quality of patient care, but also leads to delays in the billing cycle. These delays in turn decrease collection rates with insurance providers, affecting the hospital's revenues. By FY2022, the Cancer Center must go live with the EHR. As discussed in *Chapter 16*, hospitals must leverage available IT investments to implement digital clinical management tools in the near-term.

*Restructuring ASEM and Revenue Cycle Management (RCM)*

Optimized revenue cycle management allows hospitals to establish the most advanced, efficient, and effective clinical services registration, improve effective billing of services, timely collection on account receivables, as well as health care utilization and patient discharge management. By working with analytics experts, ASEM will increase the speed and accuracy of claims processing, improve collection rates with external payors, and maximize revenue.

ASEM had already selected a vendor to outsource revenue cycle management through a competitive process and expected to finalize an outsourcing contract by February 2020. However,

---

[283] GSA order OGP 4800.2l (July 19, 2016).
[284] Reported by ASEM: Strategic Plan FY2020-2021 dated January 4, 2021

DRA Ex. 236

launch of the project was significantly delayed due to the COVID-19 pandemic and delays in the contracting process. ASEM has now resumed its efforts and expects the contract to be signed during the third quarter of FY2021.

The Revenue Cycle Management contractor began providing service to ASEM and UDH in mid-March 2021. The RCM will be implemented in a three-phase approach. The first phase has already been completed and consisted of on-boarding staff for a period of two weeks by providing training and hands on practice/shadowing of the tasks they must execute. The next step includes a pre-operational phase where the RCM contractor will continue to train staff and hold operational meetings to discuss areas of improvement and opportunities with the clinical and administrative teams. In the final phase, the RCM contractor would be fully operational and in charge by mid-June 2021.

Given the recent implementation of the RCM, no savings or increased revenue and collections have been achieved to date. For FY2022, ASEM must continue with the implementation of the RCM and review and monitor the current providers performance as outlined in the required implementation actions found in *Exhibit 104*.

### 15.4.3   Required implementation actions

To achieve the 2021 Fiscal Plan requirements, the DOH grouping must complete key operational efficiencies as outlined in *Exhibit 104*.

EXHIBIT 104: REQUIRED IMPLEMENTATION ACTIONS FOR THE DEPARTMENT OF HEALTH

| | Required implementation actions | Deadline | Status |
|---|---|---|---|
| To be completed in FY2021 | Launch ASEM revenue cycle management (RCM) initiative with engaged vendor | May 2020 | Completed |
| | Develop near-term and long-term plan to improve clinical operation, data consolidation, including identification of hospital management software / solutions | June 2020 | Delayed – December 2021 |
| | Identify common administrative and medical supplies across health agencies and public hospitals with opportunities for savings through procurement centralization | June 2020 | Delayed – December 2021 |
| | Develop plan to hire additional nurses to maintain staffing levels, and optimize deployment across DOH facilities | September 2020 | Delayed – July 2021 |
| | Identify 10+ sites (e.g., FQHCs, community centers) outside San Juan for potential installation of telehealth portal | September 2020 | Completed |
| | Identify opioid treatment initiatives / organizations for investment and partnership with DOH | September 2020 | Completed |
| | Finalize design of medical student scholarship and identify potential federal matching funding | September 2020 | Completed |
| | Develop proposal for hospital capital improvement projections, including recommended vendors, detailed cost estimates, and timelines for completion | September 2020 | Completed |
| | Conduct capacity analysis to identify duplicative roles and positions across agencies/programs and opportunities for centralization of duplicative tasks | December 2020 | Delayed – June 2021 |
| | Work with providers to develop action plan to enable telehealth, including required tools/software | December 2020 | Completed |
| | Centralize procurement of identified administrative and medical supplies within ASEM | December 2020 | Delayed – June 2022 |
| | Enact legislation to consolidate DOH and ASES and launch consolidation implementation efforts | March 2021 | Delayed - TBD |

DRA Ex. 236

| | Required implementation actions | Deadline | Status |
|---|---|---|---|
| To be completed in FY2022 | Cancer Center- Develop Business Plan to become sustainable by FY2024. | May 2021 | Completed |
| | Publish RFP to identify third party vendor for the Medical Student Loan Forgiveness Program | June 2021 | Delayed – December 2021 |
| | DOH- Execute public awareness campaigns on Opioid prevention and provide an update on the Prescription Drug Monitoring System | June 2021 (ongoing) | Delayed – December 2021 |
| | ASSMCA- Provide monthly reports on CMS accreditation status | June 2021 (ongoing) | Delayed – July 2021 |
| | Select vendor a third party vendor for the Loan Forgiveness Program and sign contract | September 2021 | Completed |
| | ASEM -Review the current providers performance on the RCM, report savings and KPI's. | December 2021 | Completed |
| | DOH- Complete the procurement, purchase and installation of the Telehealth Portals | December 2021 | Completed |
| | Cancer Center- Fully Implement Electronic Health Records | June 2022 | Completed |
| | DOH- Finalize all Medicaid office closures to achieve the full savings projected in the Fiscal Plan | June 2022 | Delayed – June 2021 |
| | ASSMCA- achieve CMS accreditation and start billing for Medicare and Medicaid patients | September 2022 | Completed |
| | Cancer Center- Become self-sufficient and rely on SRF's by FY2024 | June 2023 | Delayed – June 2022 |

## 15.5   Department of Public Safety (DPS)

The Department of Public Safety (DPS) is an agency grouping which was approved by Puerto Rico's Legislature in 2017 (Act 20) and includes seven bureaus responsible for **ensuring safety and security for all residents of the Island** (*Exhibit 105*). The DPS grouping includes the following agencies[285]:

### EXHIBIT 105: LIST OF BUREAUS IN DEPARTMENT OF PUBLIC SAFETY GROUPING[1]

1. Puerto Rico Police Bureau (PRPB)
2. Firefighters Corps
3. Emergency Medical Services Corps
4. Emergency Management and Disaster Administration Bureau
5. 9-1-1 Services Governing Board
6. Special Investigation Unit
7. Department of Public Safety

1 Bureau of Forensic Science Institute will remain separate of the Department of Public Safety grouping

Of all Commonwealth agencies, the second largest agency by spend and personnel is the Puerto Rico Police Bureau (PRPB), representing ~85% of total DPS spend. Based on reports as of July 2017, over 2,000 of the 13,000 sworn officers in the Police were fulfilling administrative roles. This situation has persisted since 2013, when a consent decree agreement with the U.S. Department of Justice on reform measures compelled PRPB to conduct a staffing allocation and resources study to assess the proper size of the police force. This study, completed in May 2018, found that PRPB needed to rebalance its workforce and move sworn officers to non-administrative roles to improve personnel resource allocation and maximize public safety. The 2021 Fiscal Plan adopted key recommendations from the study to outline necessary efficiency actions, including transitioning sworn officers to the field, adding civilians to backfill

285 Forensics Sciences has been maintained as an independent agency per Act 135-2020. Fiscal Plan savings expectations for agencies do not change if they are determined to remain independent versus consolidating. As such, 2021 Fiscal Plan targets for Forensics will not change

DRA Ex. 236

administrative roles, and increasing police salaries to bring to competitive levels as compared to the mainland by FY2021.

For other DPS bureaus, the 2021 Fiscal Plan requires consolidation of back-office functions and optimization of non-personnel spend, while allocating funds for priorities such as consent decree compliance, materials and equipment, and salary increases for the Firefighters Corps. Specific investments and other funding are outlined below.

To date, the Department of Public Safety has made some progress towards consolidating back-office roles through the creation of a shared services structure within DPS, partially implemented a time and attendance system, and digitized all forms (including the CAD system/incident reporting). The formation of a shared services structure within DPS, although implemented in FY2021, has added bureaucracy, and created additional hurdles related to Procurement and Recruitment affecting the performance of the agencies within the umbrella. As a result, the Institute of Forensic Science of Puerto Rico, separated from DPS effective December 1, 2020 and took with it all efficiency measures related to the Institute.

As of March 2020, PRPB reported that ~1,200 of 11,650 sworn officers were still performing administrative roles. A combination of high historic attrition rates, the agency's continued inability to hire additional civilian staff, and a push for headcount reductions through Voluntary Transition Programs (VTP) has led to a shortage of field officers and increased overtime spend. PRPB implemented two academies and recruited 263 cadets in FY2020 to address this shortage, but despite these efforts, PRPB has struggled to hire civilians and to enable more cadets and sworn officers to move into field roles.

Recruitment difficulties – for front and administrative roles - continues to be a major hurdle amongst other DPS bureaus as well.  The Fire Bureau will begin their first academy since 2016 during May 2021, mainly due to delays in candidate selection. The Emergency Medical Services Bureau has yet to recruit staff for 44 vacant positions during FY2021. As such, the 2021 Fiscal Plan highlights the need to drive actual changes in processes and back-office efficiencies, as relying on retirement incentive programs to reduce frontline staff has the potential to negatively impact service levels. The currently unfolding COVID-19 crisis further necessitates DPS bureaus to resolve recruitment issues by utilizing payroll investments provided by the 2021 Fiscal Plan (see below) to maintain service levels.

### 15.5.1  *Investments in safeguarding public safety*

The 2021 Fiscal Plan included continued investment in public safety for Puerto Rico. The below detailed investments were intended to enable the Bureaus to hire and retain frontline employees and work with proper and sufficient equipment. Investments included:

- **Sworn police officer salary increase (~$160 million per year):** The 2021 Fiscal Plan continued the provision of funds to support the 30% increase in salary relative to FY2019 levels (which already included a $1,500 raise per sworn officer instituted at the beginning of FY2019), provided in two installments of 15% each in FY2020 and FY2021. It also maintained increased funds for life and disability insurance ($250 per year per sworn officer), employer Social Security contributions for all police starting in FY2020, and Law 70 contributions.

- **Investments in the Police Bureau for Capital Expenditures ($20 million per year):** The 2021 Fiscal Plan provides additional funds for new vehicles and fleet replacement.

- **Investment in Firefighter salaries (~$2.65 million per year):** The 2021 Fiscal Plan provides the funding required to preserve the $1,500 salary increase for firefighters in FY2022.

- **Investments in personnel for Emergency Medical Corps (EMS):** Since 2017, EMS has registered an improvement in its response time by 14 minutes despite facing attrition of ~100 paramedics. Considering the unfolding COVID-19 emergency, the 2020 Fiscal Plan

DRA Ex. 236

provided funding to the Bureau to recruit additional paramedics and further improve response time to U.S. mainland standards. Therefore, the 2021 Fiscal Plan continues to provide an annual investment of $1.1 million towards the recruitment of paramedics and dispatchers.

- **PRPB reform:** $20 million annual investment in 212 areas of police improvement for three consecutive years since FY2020. The 2021 Fiscal Plan includes funding to meet the requirements of the agreement/consent decree.

- **Police overtime:** The 2020 Fiscal Plan included $6.58 million funding for overtime pay and implementation and maintenance of the Kronos electronic timekeeping and overtime management system. An additional $6.6 million will be provided during by the 2021 Fiscal Plan during FY2022.

- **Investments in personnel and materials for Institute of Forensics:** $4.7 million in payroll to enable the hiring of forensics scientists, pathologists, examiners, and DNA specialists. The 2021 Fiscal Plan continues an investment in Forensic Sciences Institute of $2.3 million, for this same purpose. Additionally, the Institute received a $3.017 million appropriation to renovate their Autopsy facilities, including $1.625 million for new equipment.

### 15.5.2 Overview of efficiency measures

DPS was not required to achieve additional savings in FY2021 over those required in FY2020. This delay in incremental measures was intended to provide funding urgently needed to implement efficiency efforts. However, from FY2022 to FY2025, DPS must achieve the personnel and non-personnel savings outlined in *Exhibit 106*.

EXHIBIT 106: DEPARTMENT OF PUBLIC SAFETY MEASURES SUMMARY OF IMPACT



*Transferring sworn officers out of administrative roles and into the field*

As of March 2020, PRPB reported 11,650 sworn officers, of whom ~1,200 are still performing administrative roles. Contrary to what the 2020 Fiscal Plan specified, the amount of sworn officers performing administrative tasks has increased significantly during the past year, to 1,476 as of December 2020.

DRA Ex. 236

In accordance with the 2021 Fiscal Plan, PRPB should replace sworn officers currently performing civilian duties—such as mechanics, radio operators, record and report keepers, area command statistics compilers, and maintenance workers—with less expensive civilian personnel, and transfer sworn officers out into communities. In doing so, PRPB will be able to provide better services by enabling more officers to work in the field with the community, while reducing overall expenditures for the Bureau.

Fiscal Plans require PRPB to transfer more than 1,000 sworn officers to non-administrative roles between FY2020 and FY2025 and hire an additional ~900 civilian personnel to perform the administrative functions, while also pursuing efficiency measures to reduce the overall need for administrative personnel. PRPB must accomplish this by pursuing process optimization, digitizing incident reporting, automating time and attendance systems, and consolidating statistical reporting. Furthermore, DPS must streamline vehicle maintenance processes through superior scheduling and procurement protocols, which can reduce the need for vehicle maintenance staff, as detailed in *Exhibit 107*.

To achieve additional efficiencies, PRPB must consolidate police stations, transit units, and specialized units to reduce the amount of administrative personnel required (e.g., station desk officers, station commanders and directors, stations auxiliary commanders and directors, and vehicle managers). Simultaneously, PRPB must eliminate units and divisions which perform duplicative services already provided by other agencies within the Government (e.g., the Divers Unit, the Rescue Squad Division).

PRPB has made good progress on these goals, including successfully deploying and implementing a time and attendance system for more than 50% of the Bureau (with plans to deploy it across all PRPB precincts by June 2021) and updating to the latest software version of its incident reporting system (TIBURON/CAD).

However, PRPB is still behind on overall process improvements, as well as its goal of moving more sworn officers into the field. The Bureau still has ~1,476 sworn officers serving in administrative roles, with overtime expenses still above budgeted amounts. This is due to a lack of real back office operational improvement, struggles to hire civilian personnel, and overall attrition rates, as recruited cadets help maintain a steady level of sworn officers. The 2021 Fiscal Plan specifies that there should be 11,842 active sworn officers and 1,413 active civilians/back-office personnel in FY2022. Currently, there are 11,454 and 457, respectively.

The Bureau has reported no savings from back-office efficiencies. Further, as of February 2021, DPS reported that 49 officers in administrative roles had been replaced by 90 civilian employees. This is not in line with the partial back-fill targets required in the 2021 Fiscal Plan. Efforts to implement two academies and recruit 252 cadets in FY2021, along with an ongoing Academy with 126 cadets, have not solved current staffing shortages.

The Bureau has also struggled to recruit civilians for administrative roles, despite multiple attempts to recruit from civilian staff within government as well as external efforts. In FY2021, PRPB launched external recruitment for 130 of the 228 roles stated by the 2021 Fiscal Plan. Only 90 civilians have been recruited as of February 2021. The Department claims the limited hiring is due to non-competitive salaries for the civilian roles, additional requirements (such as thorough background checks), and academic/professional experience needed to qualify. DPS claims to have implemented multiple recruitment drives, both within the Government as well as externally, to recruit for accounting and IT back-office roles, which they consider extremely difficult to recruit. However, DPS has not provided evidence to substantiate claims of non-competitive salaries or a plan for addressing any of these claimed obstacles.

Without focused action, PRPB will be unable to achieve the actions required to transform its operations and ensure it can move more sworn officers onto the streets to improve public safety on the Island.

DRA Ex. 236

*Reducing overtime*

PRPB spent approximately ~$50 million on overtime in FY2018, excluding the emergency overtime needs resulting from Hurricane María. This level of overtime is considerably higher than overtime for police forces in comparably sized U.S. mainland states. For instance, Connecticut, which has a similar population to Puerto Rico, spent only ~$28 million on a comparable basis in 2017. This gap persists despite the fact that Connecticut's total police spend per capita is ~$140 less than that of Puerto Rico.[286] Fiscal Plans have therefore required PRPB to reduce paid overtime by 60% by FY2023, in part through the operational efficiencies noted above, as well as by moving more sworn officers into the field and deploying more effective staffing models.

While PRPB reduced overtime spend in FY2019, FY2020 and FY2021 saw sharp increases driven by a shortage of field officers and failure to hire civilian staff. Additional systemic factors, such as paying current pay rates for previously incurred overtime, also contributed to the increase in overtime pay. Based on the latest information from the PRPB, the Police Bureau had already spent $25 million on overtime as of January 2021, almost the same as the annual spend for FY2020.

Tracking and managing overtime in Puerto Rico is further complicated by the manual nature of the process and a lack of centralized reporting. As a result, DPS does not have visibility into the quantity of overtime for a given period. To address this issue, a system to track overtime hours (SITAS) has been successfully implemented in nine Police areas, accounting for more than 50% of the current PRPB workforce. Full implementation of time and attendance tracking is scheduled to be completed by June 2021. After fully implementing the Kronos/SITAS time & attendance tool, the Bureau must properly track overtime and reduced yearly expenses to the $20 million savings required in the 2021 Fiscal Plan by outlining an implementation plan to reduce overtime expenses, as detailed in *Exhibit 107*.

The Bureau should continue to advance efforts to improve tracking and management of overtime to avoid unnecessary costs in future years. Furthermore, the SITAS/Kronos tool must be used to identify specific areas and timeframes with unusually high overtime expenses.

*Driving other DPS agency personnel efficiencies*

The other DPS bureaus[287] were required to consolidate back-office functions into the centralized DPS administrative agency starting in FY2019, with a goal of 50% reduction in transitory workers (excluding PRPB, PRFB, and EMS).

Measurable progress has been made at DPS in this consolidation. To date, approximately 350 employees[288] have transferred to DPS from across the seven Bureaus. After the departure of the Institute of Forensics Sciences from the DPS grouping, the total amount was reduced to 315 employees. DPS has also established direct reporting lines and process integration across the remaining six bureaus for Procurement, Legal, Communications, Human Resources and Finance, and has migrated all Bureaus onto standardized system software for key back-office functions (e.g., accounting, finance, procurement). This should further ease the transition to centralized back-office operations beginning FY2021.

Although DPS now has a budget to fund centralized back-office roles, procedures and key performance indicators still need to be established. This is especially true for Recruitment and Procurement, where multiple duplicative manual processes are performed in both areas. The Oversight Board has yet to receive a proper staffing and capacity analysis of current personnel, including detailed information of year-to-date procurement activity. DPS must provide monthly implementation reports, as per reporting requirements, regarding recruitment and procurement

---

[286] Connecticut Office of the State Comptroller; census data 2014; FBI Crime Justice Information Services
[287] Excluding 9-1-1
[288] Including more than 200 positions that are currently vacant (204 as of December 2020)

DRA Ex. 236

activity and progress for all Bureaus, including Capital Expenditure reports and vacant positions filled, as detailed in *Exhibit 107*.

The Firefighter Corps and the Special Investigations Bureau have both adopted the time and attendance system (Kronos) for administrative roles. DPS has confirmed plans for other agencies to adapt this same system, but an implementation timeline has yet to be proposed. A time and attendance tool, including a timeline schedule of full implementation across all Bureaus, needs to be established for all pending front and back-office personnel in order to enable better transparency in personnel time allocation and payroll expenditures. Time and attendance for the remaining personnel in all DPS Bureaus must be established by June 30, 2022, as detailed in *Exhibit 107*.

*Optimizing all DPS agency non-personnel spending*

DPS must achieve procurement savings of 30% in FY2018 spend base. To do so, DPS should centralize and consolidate purchasing for all DPS agencies, leverage the negotiating power of the federal General Services Administration, utilize e-auctions, and launch competitive Requests for Proposal (RFPs) for outsourcing responsibilities. Even though procurement has been centralized within the DPS Shared Services structure, they will have to coordinate directly with GSA as the Government's central procurement agency for all purchases of the Bureaus and re-engineer their processes as the Shared Services structure has become less effective due to multiple manual processes. DPS must use FY2021 appropriations to address these issues, eliminating all current manual procedures by June 30, 2022, as detailed in *Exhibit 107*.

While DPS has identified ~35 contracts for potential consolidation in the future, no estimated savings for those contracts has been communicated. For FY2022 DPS must implement the milestones as detailed in *Exhibit 107* regarding procurement improvements.

### 15.5.3   *Required implementation actions*

To achieve the 2021 Fiscal Plan expectations, the Department of Public Safety grouping must complete key operational efficiencies as outlined in *Exhibit 107*.

DRA Ex. 236

EXHIBIT 107: DEPARTMENT OF PUBLIC SAFETY REQUIRED IMPLEMENTATION ACTIONS

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed in FY2022 | Define a plan to increase expense categorization and reporting transparency, which could include adding descriptors in PRDE's internal financial systems (e.g., SIFDE) | • December 2020 | • Completed |
| | Evaluate current transportation spend and services in order to ensure that all students that are eligible (per IEP or regular eligibility guidelines) receive transportation services | • December 2020 | • Delayed – July 2021 |
| | Evaluate facilities spend and create an implementation plan to capture all facilities spend at PRDE (e.g., spend from OMEP) in a more streamlined manner and to be able to differentiate spend between maintenance, capital expenditures and custodians | • December 2020 | • Delayed – December 2021 |
| | Create a facilities master plan that assesses and the need of PRDE facilities portfolio in order to ensure that spend is prioritized according to need and PRDE's long-term facilities strategy | • May 2021 | • Delayed – July 2021 |
| | Implement updates to the transportation system and resolve all pending items identified to comply with USDE requirements and thus be able to leverage Federal Funds to cover part of student transportation costs | • July 2021 | • Not Started |
| | Create a facilities master plan that assesses the need of PRDE facilities portfolio in order to ensure that spend is prioritized according to need and PRDE's long-term facilitates strategy (PRDE must share all versions of such plan with the Oversight Board) | • July 2021 | • Not Started |
| | Evaluate improved spending transparency given new subclassifications within SIFDE and identify savings achieved as well as potential opportunities to meet Fiscal Plan savings target | • October 2021 | • Not Started |
| | Prepare and submit the Annual Procurement Plan to GSA, as required by Law 73-2019, and prepare a similar plan for professional services to be contracted during the next fiscal year | • March 2022 | • Not Started |

## 15.6   Department of Corrections and Rehabilitation (DCR)

The Department of Corrections grouping (*Exhibit 108*) consists of two agencies: the Department of Corrections (DCR), which manages the functions and policies of the Puerto Rican correctional system;[289] and the Correctional Health Department (CH), which provides healthcare to the incarcerated people under the jurisdiction of DCR. In FY2018, DCR reported a total employee headcount of 6,695, for an adult incarcerated population of 9,385 and juvenile population of 156. The agencies had a combined FY2018 budget of $419 million.

EXHIBIT 108: LIST OF AGENCIES IN FUTURE STATE DEPARTMENT OF CORRECTIONS AND REHABILITATION GROUPING



1  Department of Corrections and Rehabilitation          2  Correctional Health Department

*Department of Corrections (DCR)*

While operating an aging prison system dependent on outdated technology does necessitate a relatively high staffing level, the actual number of employees at DCR is substantially higher than comparable benchmarks. For example, DCR's FY2018 FTE-to-inmate ratio was 0.71, significantly higher than the 75th percentile for correctional staffing ratios in mainland U.S. states (0.54 FTEs per inmate).[290] Currently, as of March 2021, the FTE-to-inmate ratio is even higher – at 0.82 – largely due to reductions in the prisoner population not accompanied by reductions in staff.

In addition to its inmate population, DCR also served 7,122 community program participants in FY2018 (a population three-fourths the size of the total carceral population). In contrast,

---

289 This includes all penal institutions and rehabilitation facilities for men, women, and juveniles
290 NASBO, FBI, BJS databases

DRA Ex. 236

mainland U.S. states with FTE-to-inmate ratios near 0.54 serve nearly 3.6 times as many community program participants as the number of incarcerated adults in state prisons[291]. Additionally, while most U.S. state prison systems are near 100% utilization, as of March 2021 Puerto Rico facility utilization is 73%, which only considers habitable spaces.[292]

*Correctional Health (CH)*

To deliver healthcare services to incarcerated people, CH employs a hybrid management model comprising of in-house direct care providers and contracted healthcare delivery through third-party healthcare providers (e.g., Physicians, Mental health professionals). While most states in the U.S. have a direct-care model or use staff for administration and outsource healthcare, CH's model is relatively complex and unique, with the contracted vendor directly managing CH's roster staff. In FY2018, CH spent $8,499 per incarcerated person to provide healthcare services, while median spend across U.S. mainland states was $5,763.[293]

*Juvenile Programs*

In 1994, the United States filed a complaint against the Commonwealth of Puerto Rico and some named officials for subjecting juveniles confined in residential facilities to conditions that deprived them of their federal rights. The Commonwealth and the named Commonwealth officials agreed to settle the matter with the United States, culminating in the comprehensive 1997 Settlement Agreement. On December 12, 1997, the U.S. District Court for the District of Puerto Rico ("USDC") entered the Settlement Agreement as an Order. The USDC appointed a Monitor to ensure compliance with the provisions in the Settlement Agreement. In a report made for 2019, the Monitor concluded that the Department of Correction and Rehabilitation was non-compliant on three (3) provisions and partially compliant on twenty-one (21) of the remaining thirty (30) provisions in the court approved Settlement Agreement. The non and partial compliance provisions were related to inadequate staffing levels, which hinder the security of the juveniles, and to facility conditions. To address these issues, the Federal Monitor concluded in a report that an adequate staffing analysis and a separate budget for the Juvenile Program would be conducive towards good management.

In April 2020, the USDC ordered the establishment of a separate budget for the Juvenile Program in the amount of $22 million to ensure the Juvenile Program would have the necessary resources to operate and condition the juvenile facilities. Going forward, the Certified Budget will continue to segregate the Juvenile Program budget at a granular concept code level.

The Oversight Board has not seen any progress towards achieving operational efficiencies by DCR or CH. DCR's system-wide utilization of space for adult prisons continues to decline, coming in at 56% utilization as of February 2021. This decline has primarily been driven by government restrictions relating to COVID-19, as courts were closed for the first months of the pandemic and no pre-trial cases could be seen. This forced DCR to release some pre-trial incarcerated people, as the agency is not allowed to house them for more than 6 months if not convicted of a crime. As a result, the adult incarcerated population in DCR declined by 19% from June 2020 to February 2021, up from an average decline of 6% per year from 2014 and early 2020. However, total DCR employees have declined by just 4% per year since 2014.

Following the earthquakes, DCR closed a severely damaged facility in Ponce, and two other facilities were partially evacuated. This required two formerly-consolidated facilities to be reopened in order to temporarily house transferred inmates. As of 2021, DCR has stabilized its distribution of inmates to the proper facilities. However, a new challenge arose this year with the advent of COVID-19. Positive test results among incarcerated people and DCR employees has complicated operations, as agency safety protocols have necessitated the use of some facilities for quarantine. In light of these operational challenges, it is imperative for DCR to identify

---

291 Bureau of Justice Statistics, 2014
292 Bureau of Justice Statistics, 2014
293 Pew Trust "Prison Health Care: Costs and Quality" Report, 2017

DRA Ex. 236

inefficiencies currently embedded in the system and enhance Puerto Rico's correctional facilities, thereby making existing spaces more operationally useful and optimizing delivery of healthcare service to its inmates.

While in FY2021, DCR and CH were not held to any incremental measures, DCR and CH are expected to continue agency efficiencies in FY2022 to continue moving toward a more efficient staffing model and facility footprint. To enable progress, the Oversight Board made a one-time investment of $500,000 for a feasibility study to identify major areas in disrepair and in need of capital investment. Unfortunately, the completion date of this study was delayed due to COVID-19 from December 2020 to May 2021. As a result, the agency has paused any further consolidations. This will continue to impact potential savings, as DCR has yet to show procurement savings resulting from the large incarcerated population decline in FY2021.The Oversight Board strongly believes that DCR must focus more carefully on how it spends its resources so that it can more successfully deliver on its mission to protect inmate and staff safety.

The 2021 Fiscal Plan also includes explicit funding to enable DCR to measure and monitor federal consent decree requirements, including:

- **Corrections reform:** The 2021 Fiscal Plan ensures funding to achieve minimum confinement standards and inmate support at Puerto Rico Corrections facilities.

- **Juvenile corrections:** The U.S. District Court required a $22 million budget for the FY2021 Juvenile program following a joint recommendation from the Juvenile Program and the Federal Monitor. The 2021 Fiscal Plan includes funding to meet the requirements of the Court.

- **Correctional Health reform:** The Fiscal Plan provides funding to meet correctional health requirements based on the Carlos Morales Feliciano case.

### 15.6.1  *Overview of efficiency measures*

For FY2021, the 2020 Fiscal Plan did not require additional savings for DCR and CH. This pause was meant to allow the agencies to implement urgent efficiency efforts. However, from FY2022 to FY2026, DCR must achieve the personnel and non-personnel savings outlined in *Exhibit 109*.

EXHIBIT 109: DEPARTMENT OF CORRECTIONS AND REHABILITATION MEASURES SUMMARY OF IMPACT



Run-rate savings from agency efficiency measures[1], $M

| | Non-personnel | Personnel | xx Incremental measure |

| | FY20 | FY21 | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|---|---|
| Incremental measure | | (29) | 34 | 9 | 2 | 2 | 2 |
| Total | 96 | 67 | 102 | 111 | 113 | 114 | 116 |
| Non-personnel | 30 | 26 | 34 | 35 | 36 | 36 | 37 |
| Personnel | 66 | 42 | 68 | 76 | 77 | 78 | 79 |

1 Excluding investments and other funding increases

DRA Ex. 236

*Optimizing the FTEs-to-inmate ratio*

**Personnel savings must be captured by reducing DCR FTEs per inmate.** The agency is required to meet target FTE-to-Inmate ratio of 0.63 by FY2023. This is a slight increase from the bottom-quartile U.S. states' benchmark of 0.54, which was the target ratio in past Fiscal Plans.[294] Considering the minimum staffing needs established by law for juvenile facilities and DCR's obligations towards community program participants (through socio-penal technicians), DCR must achieve headcount reduction targets by rightsizing administrative staff roles and redirecting correctional officers currently working in administrative or civilian roles. Despite the requirements of the 2020 Certified Fiscal Plan on this issue, the FTE ratio has increased from 0.67 in June 2020 to 0.82 as of February 2021 reporting; as the inmate population continues to decline due to COVID-19 implications.

DCR must achieve these personnel reductions by employing back-office process efficiencies (see *Exhibit 110* below). These include building internal capacity, increasing access to information technology, establishing clear measurement tools for identifying progress in implementation and quality of services rendered, identifying and training staff to assume leadership positions in Finance and Operations, having increased control over its budget, and strengthening quality assurance systems. The Oversight Board believes these changes are necessary to establish better administration of services provided to both DCR employees and to the adult and juvenile incarcerated populations.

*Consolidating adult facilities*

To bring the system in line with the requirements of the population and to increase utilization across all prison facilities, DCR is required to consolidate its footprint to reach an overall system utilization of 93% (see *Exhibit 110*). This must be achieved while maintaining appropriate separation of different inmate risk profiles and populations, including men, women, and juveniles, as required.

DCR's facilities are technologically outdated with rapidly deteriorating infrastructure. Repairs are needed for plumbing, electric, roof sealings and gate repairs, among other concerns. In FY2021 DCR was required to conduct a facility footprint and consolidation assessment study with the objectives of: (1) diagnosing the current state of infrastructure across its facilities; (2) identifying capex investment needs; and (3) identifying opportunities for additional facility consolidation. This assessment was meant to serve as a guiding tool for DCR to implement the consolidation of facilities following an overarching and comprehensive approach. Unfortunately, due to the pandemic, the study was delayed from December 2020 with results being provided at the end of FY2021. The delays were attributed to a long hiring process and the vendor not being able to travel to the Island due to COVID-19 concerns.

DCR reported consolidating five prisons before FY2018 in addition to closing four prison facilities, including two juvenile facilities – a departure from 2020 Fiscal Plan expectations. However, DCR has continued to operate those facilities, at least in part, using them as storage, administrative offices, or program offices (e.g., community program, special arrests). As a result, no savings from the closure of these facilities have been achieved.

Meanwhile, despite the reported consolidation of facilities, system-wide utilization rates for facilities that house inmates continue to be low. DCR is now operating a total of 33 facilities with a total capacity of 12,643. With an incarcerated population of 7,125, this implies a utilization rate of just 56%. This indicates potential for DCR to further consolidate additional facilities.

Almost 23% of DCR's total capacity is reportedly 'uninhabitable'. To enable improvement in habitability of this excess space, the Oversight Board provided DCR a one-time capex allocation of $19.2 million in FY2020. However, the agency did not utilize these funds to improve habitability of spaces, instead spending the funds on regular roof repairs, perimeter gates repairs,

---

294 Census data, 2014; Bureau of Justice Statistics, 2014

DRA Ex. 236

infrastructure repairs and purchase/installation of power generators. Given the lower inmate population, DCR has consistently pointed to the uninhabitable spaces in large prisons. Making these spaces habitable is key to the further consolidation of DCR facilities.[295]

Completion of the feasibility study will provide additional clarity and further direction as to which facilities are ideal for additional consolidation, either by investing in repairs to uninhabitable spaces and or by making the general repairs needed to existing facilities.

Once the vendor provides the final recommendation at the end of FY2021, agency must analyze and establish their plan to implement the results of the study. Agency must prioritize implementing the consolidation of its footprint and operational consolidation must still be realized for the agency to achieve savings. DCR must cease operations in facilities not currently used to house inmates and, accordingly, wind down maintenance and operating costs. At a minimum, DCR should shut off utilities (electricity, water) at these facilities, and identify opportunities to enable transfer of ownership wherever possible. Agency continues to use closed facilities for other needs, such as storage, as well as reopening previously closed facilities to temporarily move inmates due to the January 2020 earthquakes and to accommodate special needs created by the COVID-19 pandemic. Capital improvements for facility modernization (e.g., electronic monitoring through installation of security cameras, automated gates, etc.) should also be expected to reduce dependence on front-line personnel and enable personnel efficiencies.

Overall, the 2021 Fiscal Plan expects 40% of non-personnel operating expenditures to be captured by FY2025 for each closed facility by consolidating the physical footprint, winding down contracts, and other levers. The remaining operating expenditures should be transferred to support population increases in the remaining facilities.

*Reducing procurement spend*

DCR FY2018 total addressable spent totaled $52.5 million on procurement. It was determined that these costs could be reduced through leveraging the negotiating power of the Federal General Services Administration, utilizing e-auctions, launching competitive Requests for Proposal (RFPs), centralizing purchasing to the greatest extent possible, and outsourcing/contracting responsibilities.

Procurement efficiency measures included a $5.6 million HMO contract savings, and $5.1 million in procurement efficiencies. In FY2019 and FY2020, DCR reported ~$4 million in procurement savings through renegotiating its HMO contract for the delivery of correctional health services, and closing administrative offices and the juvenile facility at Humacao. However, in that same period, DCR has not met the additional annual saving goal of $5.1 million in procurement efficiencies.

In FY2021, which saw a decline in the incarcerated population of 9%, DCR reported savings only on food costs, while other contracted services either maintained or increased spend. Furthermore, this savings in food costs is expected to be reduced or eliminated when the agency changes its food provider before FY2022. This change will result in paying more per plate, with added services such as management of commissary stores, laundry and equipment replacement for the managed areas without proportional changes in those in-house costs.

For FY2022, DCR is required to continue procurement savings as the inmate population declines. Possible correctional facility consolidations in FY2022 will drive savings opportunities for the agency as long as they implement feasibility study recommendations to continue to eliminate its facility footprint.

---

[295] As of January 2021 data, 11 facilities with the lowest utilization rates had 925 inmates who could be transferred to the remaining facilities to increase system wide utilization rates to 91%

DRA Ex. 236

*Improving management of prisoner healthcare*

In FY2018, the Government spent $8,499 per inmate for correctional healthcare. The 2021 Fiscal Plan required the Government to bring per-inmate spend in line with the 50th percentile of U.S. states and unlock savings by renegotiating existing contracts, launching competitive RFPs for key contracts with terms more in-line with mainland spending practices, reconsidering level of service due to the currently declining prison population, and strategically evaluating insourcing options. As of FY2021 CH has implemented a generic medicine program across all facilities, with the goal of reducing medicine expenditure.

Furthermore, CH is expected to achieve personnel efficiencies of $8.2 million as per FY2018 baseline. In order to achieve savings, agency needs to reevaluate its staffing policies for administrative and support roles (such as paraprofessionals, pharmacists, etc.), and implement back-office process efficiencies and/or centralization/digitization of common tasks across facilities (see *Exhibit 110* below).

CH reported achieving procurement savings in FY2019 through efficient inventory management, renegotiating procurement contracts with rebates, implementing generic drug buying policy, and enacting new medication formulary and clinical management.[296] The Oversight Board provided one-time additional funding of $8 million to cover projected overspend. However, the agency continues to struggle to implement the efficiency savings required by the 2020 Fiscal Plan. Even as DCR has achieved procurement savings through renegotiating the correctional health HMO contract and food services contract, there are still opportunities to evaluate potential savings on other contracts in Correctional Health, including those for sub-contractors. CH is required to achieve savings of $4.6 million in FY2022 (see *Exhibit 110* below).[297]

### 15.6.2   Required implementation actions.

To achieve the 2021 Fiscal Plan requirements, the Department of Corrections and Rehabilitation grouping must complete key operational efficiencies as outlined in *Exhibit 110*.

EXHIBIT 110: DEPARTMENT OF CORRECTIONS REQUIRED IMPLEMENTATION ACTIONS

| Areas of focus | Required implementation action | Deadline | Status | New Deadline |
|---|---|---|---|---|
| Consolidate agencies | Provide outline for facility footprint and consolidations assessment study | July 2020 | Completed | N/A |
| | Publish facility footprint and consolidation assessment study listing facilities to be considered for consolidation or investment required to improve habitability of spaces | December 2020 | Delayed | May 2021 |
| | Implement plan to consolidate additional facilities and improve habitability of spaces to improve system level utilization of existing spaces and provide supporting documentation (e.g., RFP documents submitted to proceed with consolidation) | March 2021 | Delayed | March 2022 |
| Rightsizing personnel | Implement back-office process redesign (e.g., digitization of record keeping) to achieve personnel efficiencies and reach FY2022 headcount targets | July 2020 | Delayed | December 2021 |
| | Outline initiatives to reduce headcount in order to achieve target headcount in FY2022 and onward | March 2021 | Delayed | September 2021 |
| Optimize procurement spend | Provide facility-level data on opex spend, list of procurement contracts and outline initiatives to achieve procurement efficiencies in FY2022 | September 2020 | Completed | N/A |
| Redesign correctional health program | Provide updated roster of Correctional Health employees (direct, contracted) outlining key roles and responsibilities to validate current staffing levels | July 2020 | Completed | N/A |
| | Provide assessment of healthcare spend per inmate and identify initiatives to generate personnel or opex savings | December 2020 | Completed | N/A |

---

296 As reported by Physicians HMO – correctional health administration and management vendor.
297 Contract with Carolina Catering was established prior to FY2020. However, ongoing legal proceedings with Trinity catering (prior vendor) has delayed implementation of the new contract.

DRA Ex. 236

## 15.7    Department of Economic Development and Commerce (DDEC)

The Department of Economic Development and Commerce (DDEC) includes a consortium of agencies critical to incentivize and support the revitalization and transformation of Puerto Rico's economy. To promote growth, DDEC must enable high-impact projects, energize existing industries, and facilitate the attraction of off-Island investments to strengthen and modernize the Island's economy. Additionally, the Department manages a variety of youth and workforce development programs meant to foster qualities (e.g. entrepreneurship, job-preparedness) crucial to a growing economy. Finally, DDEC and its component agencies are charged with the implementation of structural reforms (e.g. overhauling permitting) to transform Puerto Rico into a more competitive business, tourist, and investment destination.

To ensure streamlined economic development and realize efficiencies, seven agencies have been slated for full front- and back-office consolidation into DDEC, with three more agencies to be assigned to the Department. Assigned agencies will consolidate their back offices into DDEC, but retain separate front offices. The agencies to be consolidated are as shown below (*Exhibit 111*).

EXHIBIT 111: LIST OF AGENCIES IN FUTURE STATE DEPARTMENT OF ECONOMIC DEVELOPMENT GROUPING

| | | | |
|---|---|---|---|
| 1 | Department of Economic Development and Commerce (DDEC) | 6 | Commonwealth of Puerto Rico Regional Center Corporation |
| 2 | Puerto Rico Industrial Development Company | 7 | Local Redevelopment Authority for Roosevelt Roads |
| 3 | Puerto Rico Trade and Export Company | 8 | Permits Management Office |
| 4 | Office of Industrial Tax Exemption | 9 | Puerto Rico Tourism Company |
| 5 | State Office of Energy Policy | 10 | Planning Board |

### 15.7.1    *Overview of efficiency measures*

From FY2022 to FY2026, DDEC must achieve the savings outlined in *Exhibit 112*.

DRA Ex. 236

EXHIBIT 112: DEPARTMENT OF ECONOMIC DEVELOPMENT MEASURES SUMMARY OF IMPACT



*Consolidating operations and rightsizing personnel*

The 2021 Fiscal Plan requires DDEC to consolidate 10 entities, which is expected to yield significant personnel and non-personnel savings. This consolidation requires DDEC to clearly define each agency's responsibilities, which will limit costs and prevent overlapping duties. Each agency's responsibilities must also be distinguished from those of Discover Puerto Rico (DPR), currently responsible for attracting off-Island tourists, groups, and conventions, and Invest Puerto Rico (IPR), which is charged with attracting offshore investments from businesses.

The 2021 Fiscal Plan requires DDEC to realize front and back-office personnel efficiencies as the Department consolidates other agencies. Specifically, DDEC should reduce front-line personnel by 20% by FY2022 to produce a streamlined and efficient organization. In line with the findings of a Government analysis that identified a redundancy in service of back-office personnel across the Department, DDEC should also consolidate back-office operations to reduce back-office headcount by 41% by FY2022.[298] Further, DDEC should establish a set of key performance indicators, targets, and milestones for each of its subsidiaries to measure the performance of its subsidiaries and partners and act to address issues.

To date, DDEC has made substantial progress by operationally consolidating 70% of agencies. The seven agencies have moved to a centralized accounting and payroll systems. Pending entities includes the Puerto Rico Tourism Company (PRTC), Roosevelt Roads (RR) and Planning Board (PB).

Although DDEC has integrated seven of ten agencies and merged agencies' back-offices into one, targets are at-risk due to PB, PRTC and RR. DDEC has struggled to integrate PB's back-office due to the lack of cooperation from the agency. However, in October 2020, Planning Board identified 36 employees that can be transferred to DDEC without affecting the agency's operations. This list was given to DDEC, but DDEC did not proceed with the transfer of these employees. As a result, PB's management sent an updated list in March 2021, with only 17 identified employees. Planning Board's consolidation into DDEC must be finalized in FY2022 (see *Exhibit 113*).

At the beginning of FY2021, PRTC transferred approximately 157 employees to the Gaming Commission. Currently, the agency has 209 employees, of which 46 are front-office (22%), 136

---

298 DDEC analysis, 2018

are back-office (65%), and 27 are working in another agency (13%). In addition to the consolidation of PRTC as a program under DDEC, efforts to reduce back-office personnel in the agency are pivotal for the operational efficiency of PRTC.

The required capacity analysis for the future state of DDEC explaining the various offices and the required personnel remains incomplete. The 2021 Fiscal Plan requires the agency to commence the project as soon as possible and have it finalized by September 2021 (see *Exhibit 113*).

Further, DDEC has so far reduced headcount only through Voluntary Transition Programs (VTP) or natural attrition. To achieve personnel reductions in a manner that does not compromise short-term or long-term operational capabilities, DDEC will need to analyze its personnel base and develop a targeted plan for what roles could be rationalized (see *Exhibit 113*).

*Achieving non-personnel efficiencies*

DDEC must reduce non-personnel spend by 30% by FY2022. DDEC has yet to initiate its procurement reform, which should aim to generate savings through contract renegotiations. Going forward, DDEC must focus on reviewing all its procurement contracts and identifying top contenders for contract consolidation or renegotiation.

In addition to reducing procurement spend, DDEC was required to consolidate its physical footprint to accommodate all programmatic areas and back-office personnel, and manage all tax exemptions, grants and credits under one centralized Department. Previously it was intended that employees should be consolidated in two main buildings, but current management decided to consolidate all personnel in PRIDCO's Hato Rey building located in Roosevelt Avenue. To date, DDEC consolidated all of its employees, with the exception of Planning Board and Tourism, into the Hato Rey building.

### 15.7.2   *Required implementation actions*

DDEC has a set of required implementation actions which will dictate the operational efficiency of the grouping moving forward. In FY2022, DDEC must achieve the following:

- Finalize the physical and operational consolidation of the agencies (including PRTC and Planning Board);
- Conduct an operational needs assessment to identify excess resources and reduce superfluous front- and back-office personnel;
- Start and finalize the procurement contract renegotiations;
- Publish the quarterly reports.

During FY2021, DDEC was given an implementation milestone, to publish quarterly reports on the agency's website detailing all economic incentive donation/subsidy amounts given to private corporations. If they achieved the milestone, up to $1.8 million would be provided per quarter for their operational budget. DDEC has published the quarterly reports, thus receiving the incentives for the first two quarters of FY2021. For FY2022, the implementation milestone will be applied as in FY2021 and it is expected the agency will improve the quarterly reporting to expand on the description of the economic activity, include return on investment (ROI), NAICS industry code and number of employees (see *Exhibit 113*).

To achieve the 2021 Fiscal Plan requirements, the Department of Economic Development and Commerce must complete key operational efficiencies as outlined in *Exhibit 113*.

DRA Ex. 236

**EXHIBIT 113: DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE REQUIRED IMPLEMENTATION ACTIONS**

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed in FY2022 | • Publish quarterly reports in the agency's website detailing all economic incentive donation/subsidy amounts given to private corporations | Quarterly<br>• Q1 – October 2021<br>• Q2 – January 2022<br>• Q3 – April 2022<br>• Q4 – July 2022 | • On track |
| | • Identify which procurement contracts have been renegotiated or are pending renegotiation or elimination (across all consolidated and ascribed DDEC entities) to the Oversight Board | • June 2020 | • Delayed – September 2021 |
| | • Conduct operational needs assessment across all consolidated and ascribed entities (including PRTC and JP) to identify where to reduce front- and back-office personnel without inhibiting the performance of DDEC agencies | • September 2020 | • Delayed – September 2021 |
| | • Finalize the consolidation of the physical footprint of all consolidated DDEC agencies | • September 2020 | • Completed |
| | • Reduce excess front- and back-office headcount across all DDEC agencies (excluding PRTC and JP) | • March 2021 | • Delayed – March 2022 |
| | • Execute the administrative actions (e.g. systems integration) required to consolidate PRTC and ascribe JP | • March 2021 | • Delayed – March 2022 |
| | • Finalize procurement contract renegotiations | • June 2021 | • Delayed – March 2022 |
| | • Consolidate PB's key back-office personnel into DDEC's back office | • June 2021 | • Delayed – March 2022 |
| | • Reduce excess front- and back-office headcount from PRTC and back-office personnel from JP in line with September 2021 operational needs assessment | • June 2021 | • Delayed – June 2022 |

## 15.8   Puerto Rico Innovation and Technology Services (PRITS)

### 15.8.1   *Context and current technology landscape in the Government of Puerto Rico*

The Puerto Rico Innovation and Technology Services (PRITS) was created to establish an administrative structure responsible for technology strategy across the Government of Puerto Rico.

The 2017 Executive Order that established PRITS gave it the following responsibilities, among others:

- Integration of technology into government management
- Promotion of public, private and academic projects in the technological field
- Creation of a digital platform to integrate the different components and government entities
- Generation of a system of tax payment and bank transfers under Hacienda
- Development of a public accountability system

In March 2019, an additional Executive Order reinforced the additional leadership roles and responsibilities of PRITS, including transferring the responsibilities of the Office of the Chief Information Officer (CIO) to PRITS  and establishing the role of the Chief Information and Innovation Officer (CIIO). The CIIO is in charge of integrating and streamlining the Government's information and communication technology processes.

In July 2019, the Government enacted Act 75-2019, making PRITS the office of the Executive Branch responsible for implementing, developing, and coordinating the Government's public policy on innovation, and information technology ("IT"). However, PRITS's first few years were marked by delays in the development and adoption of key technological reforms, as well as insufficient oversight of the use of technological resources.

DRA Ex. 236

To better enable PRITS to carry out its responsibilities, the Oversight Board approved its FY2021 budget of $70 million. These funds included a $2.5 million payroll increase for new skilled personnel and over $30 million in additional operational expenses for investments in cybersecurity, centralized data centers, strategy and operations, cloud services, and the implementation of centralized telecommunication services.

During FY2021, PRITS made some progress in improving transparency and accountability of IT spend across government. For example, the Proposal Evaluation Guidelines ("PEG") were implemented to standardize criteria used by PRITS to evaluate innovation and technology proposals submitted by the Government Agencies. Additionally, PRITS has improved oversight by establishing better communication with agency information officers and developing an inventory of available technology infrastructure and applications used by the government agencies.

In addition to these accomplishments, however, PRITS has room to make more effective use of its technology resources and available funding. First, PRITS still has room for improvement in integrating its IT infrastructure (e.g., on-premises data centers and cloud storage) and services (e.g., applications) across the Government. During FY2021, PRITS was granted $10 million for centralized data center strategy and operations, cloud services and new equipment. Such funding should have been utilized by PRITS for investments in centralized IT infrastructure and the migration of existing government services into such centralized IT infrastructure. These efforts would significantly reduce the need for infrastructure and cloud services at the agency level, which, in many instances, are being underutilized. The agency has not yet been able to provide a detailed plan for the integration of services and applications identified in its inventory. PRITS also still needs to make meaningful progress in the implementation of centralized telecommunication services and cybersecurity strategy and operations.

Second, although PRITS was granted $3.3 million in FY2021 for full staffing (including specialized resources), the agency suffered significant delays in formalizing a Government-approved organizational structure. In fairness, these delays coincided with other bureaucratic obstacles in the recruitment process, such as the electoral ban and outdated job classifications not reflective of agency staffing needs. Nonetheless, delays in the recruitment of key positions such as Chief Information Security Officer (CISO), and Chief technology Officer (CTO), as well as personnel with expertise in solution development, operations and technology architecture, resulted in a ~$1 million Payroll underspend and ultimately hindered the agency's ability to meet implementation deadlines.

The Government and PRITS need to prioritize the creation of centralized teams with the specialized skills needed to accelerate infrastructure consolidation and improve the Government's ability to deliver new technology solutions. Agencies continue to rely too heavily on external vendors rather than building the capabilities of PRITS to lead and manage these initiatives. Similarly, there continues to be unclear accountability for technologies developed at the agency level. As a result, pieces of infrastructure are developed and managed separately, with dispersed accountability, creating a complex web of oversight, incremental cost, and ineffective systems. Additionally, while it is apparent that certain agencies are taking advantage of the centralized cloud infrastructure by moving additional services into the cloud, the savings and existing budgets associated with the operational costs of on-premises data centers and other related expenses are not being transferred to PRITS.

As provided by the Act 75 of 2019, the Governor has the authority to transfer to PRITS personnel, funds, budgets, documents, records, equipment, materials, and files of any other IT operational area of any agency, for use in the purposes and purposes of the Act. The Government and PRITS should work together to ensure that PRITS has the necessary resources to fulfill its mandate of centralizing and standardizing the management of the information technologies and innovation areas of government.

DRA Ex. 236

### 15.8.2   *Importance of digital modernization*

It is critical that the Government make effective use of its technology resources. The Government, via PRITS, must continue to improve its capabilities in digital delivery to achieve critical benefits, including:

- **Reducing expenses and improving reliability through data-center consolidation.** Since 2016, the Federal Government has closed 210 tiered data centers, and over 3,000 non-tiered data centers.  To realize the full benefit of this action, PRITS must implement best practices at the state and federal level. These should include increasing use of virtualization, freezing new data centers unless compelling justification exists, and exploring the use of cross-agency shared services.

- **Rationalizing the application portfolio to ensure that Government-wide resources are directed to the highest priority initiatives.**   Modern governments face substantially higher demand for technology services than can be fulfilled. In a resource-constrained environment, disciplined application portfolio management can ensure alignment between IT spend and government priorities. Accordingly, PRITS must implement a Government-wide application rationalization effort which prioritizes proven solutions. These are likely to include creating a portfolio management governance approach; establishing a baseline inventory of applications; assessing the business value and total cost of ownership of the applications; scoring/ranking applications; and creating a forward-looking plan to migrate the portfolio to higher-value uses.

- **Enhancing cybersecurity to prevent costly data breaches.** As cyber threats continue to proliferate, government agencies globally have adopted cybersecurity-specific risk management practices. PRITS must improve the Government's cyber defenses by developing a government-wide view of "crown jewels" in the technology ecosystem that must be protected, providing policy guidance to agencies setting forth evolving standards and requirements, and coordinating delivery of specialized expertise across government where the need arises.

- **Improving transparency and accountability of IT spend across government, and focusing on value for IT dollar spending**. PRITS will realize its greatest impact when stakeholders are given a clear line of sight into where IT spending is going, and what value is being delivered. Encouraging agencies spending government resources to provide this transparency should therefore be a core focus for PRITS, rather than pursuing a centralized effort that treats transparency as incremental to existing IT spending.

### 15.8.3   *Required implementation actions*

In line with the four key initiatives stated above, PRITS must achieve the following objectives and milestones *(Exhibit 114)*.

DRA Ex. 236

EXHIBIT 114: PUERTO RICO INNOVATION AND TECHNOLOGY SERVICES REQUIRED IMPLEMENTATION ACTIONS

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed in FY2021 | Establish process and protocols for IT contract review[1] of government agencies to create greater transparency on IT spend and needs of infrastructure or cloud services | September 2020 | Completed |
| To be completed in FY2022 | Develop strategy to consolidate Cloud services and on premise data-centers with a detailed migration plan to drive consolidation of infrastructure during FY2021 | December 2020 | Delayed – October 2021 |
| | Provide a structured and exhaustive portfolio of digital initiatives, prioritizing by impact, feasibility and relevance for Central Government Agencies | December 2020 | Delayed – October 2021 |
| | Ensure critical cybersecurity infrastructure, processes and control systems are set in place by PRITS and adopted by government agencies to minimize risks through clearly defined governance structures | December 2020 | Delayed – October 2021 |
| | Create a protocol for PRITS to review all technology-related budget requests as part of the FY2022 Budget cycle | December 2020 | Delayed – December 2021 |
| | Develop plan to consolidate current personnel spending and establish cross-functional teams by identifying personnel in government agencies with specialized technology skills to be centralized | June 2021 | Delayed – December 2021 |

1. Does not apply for contracts that require a formal RFP process

## 15.9   Legislative Assembly

As of FY2017, the size of the Puerto Rican Legislative Assembly was significantly larger than comparable legislatures in U.S. mainland states, even when accounting for the demands of full-time legislatures and excluding the money that the Legislature spends on supporting non-profit organizations. Puerto Rico spent $34.16 per resident on addressable legislature expenditure, while the weighted average expenditure per capita for comparable "full-time" U.S. mainland legislatures (e.g., in Michigan, California, New York, and Pennsylvania) was $13.11. The variance persists even when legislative expenditure is considered as a percentage of GDP. As such, reductions to the size and funding of the Legislature are necessary to bring it in line with benchmarks and optimize government funds.

As remarked earlier in this chapter, the Legislative Assembly is required to achieve additional savings in FY2022 over that required in FY2021 of ~$12 million. Refer to *Exhibit 115* for annual savings that must be achieved through FY2026.

DRA Ex. 236

EXHIBIT 115: LEGISLATIVE ASSEMBLY MEASURES SUMMARY OF IMPACT



## 15.10  General Court of Justice

The General Court of Justice, although to a lesser extent, was similarly over U.S. mainland cost benchmarks in FY2018 (by ~35% when compared to the median cost of mainland full-time Judiciaries). As such, the 2021 Fiscal Plan continues to require that the Court maintains agency efficiency measures equivalent to a 10% reduction in their annual budget, amount that the Court cut in his FY2018 budget. Therefore, it will not be required to achieve additional savings in FY2021 or in future years.

EXHIBIT 116: GENERAL COURT OF JUSTICE MEASURES SUMMARY OF IMPACT



## 15.11  State Elections Commission

The State Elections Commission (SEC or "CEE" by its Spanish acronym) is charged with administering elections for the Commonwealth. Given this important role, every effort must be made to ensure that SEC can thoroughly execute its mandate to promote and enable voter rights for the people of Puerto Rico in the most efficient, simplest, and least costly ways. The Oversight

DRA Ex. 236

Board is deeply committed to supporting elections that are conducted in a fair, free, and open manner. Consistent with this objective, the Oversight Board also requires the SEC to adapt its processes to bring down the Island's cost of election administration closer to that of mainland states.

On June 20th 2020, after the certification of the 2020 Fiscal Plan, the Government of Puerto Rico enacted Act 58-2020, restructuring SEC's operations in alignment with the Oversight Board's January 2019 recommendation. Act 58 modernizes SEC's operations by providing for the implementation of an Electronic Poll Book, the elimination of separate voter ID cards, the expansion of mail-in Early and Absentee voting, and the eventual elimination of "Juntas de Inscripción Permanentes" (JIPS), which should be replaced by more consolidated State Centers for Integrated Voter Services.

In compliance with Act 58-2020, the SEC has eliminated 160 positions and created 15 new ones. However, the agency has expressed that it does not intend to reduce personnel, which maintains payroll spend at a level not supported by the 2021 Fiscal Plan as SEC's current 656 headcount includes 338 positions not stipulated in Act 58-2020, ultimately accounting for an excess of $8.5 million in Payroll. Additionally, the SEC is still evaluating how the agency will implement the other changes stipulated by Act 58. This delay hinders the savings and efficiencies that are expected after restructuring. The Oversight Board's 2021 Fiscal Plan continues to expect the SEC to reduce its steady state (non-election year) expenditures by 32% by FY2022 (based on FY2018 spend).

To enable the SEC to seamlessly administer expected FY2021 electoral activities, the Oversight Board approved extending one-time funding of $7 million in FY2020 for the presidential and local primaries, both of which were rescheduled to FY2021 due to the COVID19 pandemic. The 2020 Fiscal Plan also provided $9 million for the FY2021 general elections and the same amount every four years thereafter. Following both the 2020 Fiscal Plan and budget certifications, the Oversight Board addressed SEC's late requests for further resources by allocating an additional $2.3 million for primaries, $11.2 million for the general elections, $3.5 million for a referendum and $0.8 million in federal fund matching for the agency to execute its mission of ensuring the democratic process. Unfortunately, SEC experienced significant confusion and delays in the vote counting process, later claiming that it was unprepared to manage the significant increase in mail-in votes. Finally, SEC ended up returning ~$3 million of its allocated funds after the election, highlighting administrative failures within the agency.

Given the escalation of funding over the past two years and the continued struggles of the SEC to meet its mandate, the agency needs to rethink its operations to conduct a fairer, more transparent and efficient electoral process that assures the rights of all constituents of the Commonwealth of Puerto Rico.  Moreover, SEC should fully capitalize on the decreased workload of this upcoming non-election year to enact real progress on agency efficiencies.

DRA Ex. 236



EXHIBIT 117: STATE ELECTIONS COMMISSION MEASURES SUMMARY OF IMPACT

## 15.12 Agencies that promote public integrity and transparency

There is wide agreement that driving a successful fiscal transformation within the Government of Puerto Rico will require public integrity and transparency at every turn. Within the Government, several agencies are dedicated to maintaining this oversight and fiscal responsibility; namely, the Office of the Comptroller, and the Office of Government Ethics. In line with the priorities of the Governor, the functioning of these agencies is critical to achieving the goals and ensuring the long-term sustainability of the 2020 Fiscal Plan. Accordingly, the budgets for the Office of the Comptroller and the Office of Government Ethics will not be affected by agency-specific rightsizing measures, but must still achieve Christmas bonus reduction, uniform healthcare, and utilities savings.

## 15.13 All other agencies

To date, implementation progress and engagement has varied across the smaller Government agencies. Some agencies are developing meaningful tools and creative solutions to achieve savings. For example, the Department of Agriculture is planning digital solutions to reduce personnel, while the Department of Environment's green tourism initiative envisions creating job opportunities and tax revenues. Still, many agencies have not planned to implement their respective changes effectively, resulting in slow progress to reach their savings targets. The Government of Puerto Rico must continue looking for ways to reduce back-office expenditures, align staffing levels to the volume of services required, and upgrade those services needed to accommodate for current conditions.

Some success has been achieved to date in these areas. For instance, the Prosecutor Panel was able to reduce staffing levels during several months of the year to reflect the lower volume of work. The Utility Commission was able to consolidate all back-office functions and move into one office/building. The Puerto Rico Education Council was able to consolidate State Departments in under 90 days, and saved over $400 thousand by reducing office footprint. Finally, the Office of Women's Advocacy successfully provided its employees with the necessary equipment to process increased call volume after the COVID-19 emergency declaration.

DRA Ex. 236

### 15.13.1 *Required implementation actions*

To achieve the 2021 Fiscal Plan requirements, all agency groupings must complete key operational efficiencies as outlined in *Exhibit 118*, with particular requirements associated with the Department of Natural Resources.

EXHIBIT 118: REQUIRED IMPLEMENTATION ACTIONS FOR OTHER AGENCY GROUPINGS

| Action item | Deadline |
|---|---|
| ▪ Enact legislation for agencies consolidation | ▪ September 2020 |
| ▪ Conduct an analysis of non-personnel spend and prioritize major savings opportunities to be pursued | ▪ September 2020 |
| ▪ Develop detailed plan and timeline for achieving required utilities savings | ▪ September 2020 |
| ▪ Develop target organizational structure and plans for achieving personnel rightsizing; Share with FOMB | ▪ December 2020 |
| ▪ Fully transition to target organizational state and implement personnel rightsizing | ▪ June 2022 |

### 15.13.2 *Required implementation actions related to the Volkswagen Diesel Emissions Environmental Mitigation Trust*

The 2021 Fiscal Plan also notes the existence of funding from the Volkswagen Diesel Emissions Environmental Mitigation Trust. This funding has been available since January 29, 2018, but has gone unused due to Government delays in meeting the necessary requirements for accessing funds from the trust, as well as in the recruitment of necessary personnel for the development and implementation of the mitigation projects.

On March 27, 2020, the Department of Natural and Environmental Resources was designated as Puerto Rico's lead agency for this project, and a high-level action plan has since been developed. Moreover, on September 30, 2020, an Administrative Order with guidelines to evaluate and select proposals was issued, and public notice was published on October 2020 through major newspapers to notify interested parties of the availability of funds under the Mitigation Action Project. Several proposals were submitted thereafter for evaluation. On March 30, 2021, a committee was established to evaluate proposals and the members appointed are being notified. The Department of Natural and Environmental Resources (DNER) expects the committee will evaluate and select approved proposals to then begin the disbursement of funds in the near term.

EXHIBIT 119: REQUIRED IMPLEMENTATION ACTIONS RELATED TO THE VOLKSWAGEN DIESEL EMISSIONS ENVIRONMENTAL MITIGATION TRUST

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed in FY2022 | ▪ Begin disbursement of funds from the Volkswagen Diesel Emission Environmental Trust pursuant to the Second Mitigation Action Plan (DNER) | ▪ October 2020 | ▪ Delayed – September 2021 |

In summary, the implementation of agency efficiency measures is necessary to achieve a sustainable and effective Government for Puerto Rico. Fiscal measures should aim to reduce costs while improving the quality of important services. Unfortunately, the Government has too often opted to maintain balanced budgets through quick wins such as incentivized retirement programs that have impaired direct service functions, instead of driving initiatives and reengineering processes that will result in efficient services and spending.

DRA Ex. 236

The 2021 Fiscal Plan requires continuation of rightsizing measures to further reduce operating budgets, while focusing valuable resources on improved government service delivery and prioritization of investments into rekey areas requested by the Governor. Notwithstanding the pause in fiscal measures included in the 2020 Fiscal Plan to achieve full implementation of previous measures, few agencies took full advantage and made significant implementation progress. Although the Oversight Board is cognizant that natural disasters and the COVID-19 pandemic have challenged government implementation, efforts must restart with urgency. Time is of the essence to implement the changes needed to bring Puerto Rico closer to fiscal sustainability paired with government efficiency.

# Chapter 16. Medicaid investments and reform

## 16.1 Current State of Puerto Rico's Medicaid program

In 2019, ~37% of local residents received their health coverage through the Commonwealth's state-run Medicaid program ("Plan Vital", formerly known as "Mi Salud"). The percent of local residents receiving benefits via Plan Vital increases to 46% when considering the addition of dual-eligible who are also in one of the Island's Medicare Advantage programs (Platinos). This share of the population enrolled in Medicaid/CHIP-funded health insurance exceeds that of any U.S. state.[299]

In addition to its large covered population, Puerto Rico has lagged mainland U.S. states in both health outcomes and access. The Urban Institute's 2017 assessment of Puerto Rico's health care infrastructure and system performance cited the Island's aging population and high rates of poverty as partial contributors to the high rates of some chronic conditions such as hypertension and diabetes compared to mainland U.S. states[300]. Puerto Rico also has higher premature birth and infant mortality rates, and higher rates of adults reporting fair or poor health.[301,302] Puerto Rico also contains 72 "medically underserved areas," as defined by the U.S. Department of Health and Human Services. These medically underserved areas have shortages of primary medical care, dental or mental health providers.[303]

Two separate agencies are responsible for the administration and provision of the Plan Vital. The Department of Health is the single state agency for the administration of Medicaid, via the Puerto Rico Medicaid Program (PRMP). PRMP oversees enrollment and eligibility processes, and also operates the Medicaid Management Information System (MMIS). Meanwhile, the Puerto Rico Health Insurance Administration (ASES, by its Spanish acronym) is responsible for negotiating, managing, and implementing the provision of Medicaid benefits, primarily through contracts with private managed care organizations (MCOs), pharmacy benefit managers (PBMs) and other health services organizations.

Plan Vital consists of four primary eligibility groups: federally-qualified Medicaid recipients; expanded federally-qualified Medicaid recipients; Children's Health Insurance Program (CHIP); and the Commonwealth's self-funded health insurance program, which covers low-income adults who do not qualify for federal programs but qualify under the eligibility criteria established by the local government. The first three programs are eligible for federally matching at varying rates, known as the Federal Medical Assistance Percentage (FMAP). The Vital program also covers dual-

---

299 Kaiser Family Foundation, "Medicaid State Fact Sheets: Percent of People Covered by Medicaid/CHIP, 2019"
300 Perreira, Krista et al. "Puerto Rico Health Care Infrastructure Assessment." Urban Institute, January 2017
301 Puerto Rico infant mortality rate is 6.16 per 1000 vs. U.S. mainland 5.2 per 1000. "Puerto Rico," World Factbook (Washington, DC: CIA)
302 Health Disparities Research Framework Adaptation to Reflect Puerto Rico's Socio-Cultural Context, Internal Journal of Environmental Research and Public Health; Published November 18, 2020
303 As reported on HHS HRSA website (data accessed March 30 2021)

DRA Ex. 236

eligible, those who meet the eligibility standards for both federal Medicaid and Medicare. For dual-eligible who are enrolled in Medicare Advantage plans, the Commonwealth provides an additional "wrap-around" payment of roughly $10 per-member, per-month.

Because federal-matching funds for Medicaid in U.S. territories is subject to an annual cap, the federal portion of the Vital program revenues functions more like a block grant than a traditional Medicaid reimbursement system. Medicaid expenditures eligible for federal matching are projected to exceed available funding every year. As a result, the Commonwealth's projected fiscal outlays are very sensitive to rising healthcare costs, as the Commonwealth absorbs 100% of all incremental costs beyond the capped federal reimbursement.

Since 2011, Puerto Rico has received temporary relief from rising healthcare costs through increased levels of federal reimbursement that temporarily raised or eliminated the cap. The two most substantial inflows of federal funds came from the 2010 Affordable Care Act and the 2018 Bipartisan Budget Act. More recently, the 2019 Further Consolidated Appropriations Act provided supplemental federal funding (up to $5.7B total) to Puerto Rico's Medicaid program through September 30, 2021 (first quarter in FY2022). In addition, the law temporarily raised Puerto Rico's FMAP—the portion of Medicaid expenditures that federal funds can cover—from the standard level of 55% to 76% for most populations. Finally, in response to the COVID-19 pandemic, the Families First Coronavirus Response Act was passed in March 2020. This act further increased both the available federal funds, adding an additional $183 million, and the FMAP, which rose an additional 6.2% for most eligibility groups (slightly less for CHIP population). The additional 6.2% FMAP has been extended with the Public Health Emergency until at least December 31, 2021.

Without new federal legislation, the available federal funds will return to statutory levels, the standard cap, on October 1, 2021 (see *Chapter 5* for more information on Medicaid federal funds). This "Medicaid fiscal cliff" means that in the absence of federal action, the Commonwealth will be responsible for more than 80% of its annual healthcare expenditures, placing a significantly higher burden on the General Fund expenditures compared to any past program year over the last decade.

Given the uncertainty regarding future federal reimbursement levels, the 2021 Fiscal Plan assumes funding based only on current enacted legislation. In light of the lack of a permanent or long term federal funding policy, and the significant portion of the population reliant on Medicaid for healthcare, it is important that the Commonwealth always be prepared to fund these services. It is therefore crucial for ASES to take advantage of the additional runway provided by recent federal legislation and put in place required reforms to reduce the long-term growth rate of healthcare expenditures.

## 16.2   Medicaid investments

Puerto Rico's healthcare system has experienced significant strain stemming from the hurricanes, earthquakes, and the COVID-19 pandemic. These events are expected to have amplified provider shortages and create increases in demand for health services, particularly behavioral health care. In a survey conducted by the Office of Inspector General at the U.S. Department of Health and Human Services (HHS-OIG) across 45 states, the District of Columbia, and Puerto Rico, hospitals reported that the COVID-19 pandemic has significantly strained the health care delivery system[304]. Given these turbulent circumstances and the uncertain outlook with respect to the COVID-19 pandemic in the long term, the FY2020 Fiscal Plan included incremental investments in the health system. Such investments were made possible through federal funding made available by the 2020 Further Consolidated Appropriations Act. As a result, the following section outlines certain priority investments that will apply through September 30, 2021 (the expiration

---

304 Hospitals Reported That the COVID-19 Pandemic Has Significantly Strained Health Care Delivery, OEI-09-21-00140 (hhs.gov)

DRA Ex. 236

of supplemental federal funding). These investments include providing Hepatitis C drug coverage and increasing reimbursement rates to specialty and primary care providers and hospitals.

Moreover, during FY2021, the Oversight Board entered into an agreement with the Government of Puerto Rico to temporarily expand the coverage of the Medicaid Program to more than 200,000 local residents during the COVID-19 pandemic.  The Government of Puerto Rico achieved this by submitting a State Plan Amendment (SPA) to the CMS with a sunset date of September 30, 2021, the same date that the increased Medicaid funding provided by the Federal Government is set to expire. Enrollment of these new beneficiaries started as early as December 2020.

**Increase provider reimbursement rates ($155 million):** Reimbursement rates for Government Health Plan (GHP) providers lag those of Medicaid programs in other states and territories. For example, from July 2016 to July 2017 primary care services were reimbursed at 19% of the Puerto Rico Medicare fee-for-service rate, while these services are reimbursed at 66% of the Medicare rate nationally. Also, maternity services were reimbursed at 50% of the Puerto Rico Medicare fee-for-service rate while these services are reimbursed at 81% of Medicare rate nationally. Low reimbursement rates place pressure on providers and may lead to shortages, lack of access to certain specialty services, and lengthy wait times. These investments will last until September 30, 2021 and ASES will increase provider reimbursement rates as follows**:**

- **Establish a 70% of Medicare reimbursement floor for outpatient physician services ($100 million)**: Pursuant to a provision in the 2020 Further Consolidated Appropriations Act, ASES will establish a reimbursement floor for physician services set at 70% of the Medicare fee-for-service rate. The costs associated with the investment will be included in the Managed Care Organization PMPM capitation rate. In turn, the MCOs will be contractually obligated to reimburse all contracted providers at the rate of at least 70% of the Puerto Rico Medicare fee schedule.

- **Increase sub-capitation payment for primary care physician (PCP) services ($10 million)**: Almost all primary care services are paid through sub-capitation arrangements, wherein MCOs pay Primary Medical Groups (PMGs) a fixed, monthly rate per member treated. To improve access to primary and preventive services, ASES will include a 10% increase in the PMPM sub-capitation rate paid to PMGs for contract year 2020.

- **Increase reimbursement rates for hospitals ($45 million)**: According to the latest available CMS Hospital Cost Reports, over 50% of Puerto Rico hospitals reported net losses. Given the high portion of the population covered by Medicaid, Puerto Rico hospitals are disproportionately affected by reimbursement rates of the Medicaid program, which are lower than those of most other payers. These conditions jeopardize the ability for hospitals to operate and re-invest in their infrastructure. To support the ability of hospitals to meet the needs of Puerto Rico, ASES will increase reimbursement rates. Specifically, ASES will mandate that MCOs increase reimbursements for inpatient services through an episode-based payment schedule.

**Hepatitis C drug coverage ($50 million):** Puerto Rico's Medicaid plan did not previously provide coverage for drugs that cure the Hepatitis C virus. There are approximately 14,000 local residents that are eligible for treatment and could be cured by making these drugs available to them. Granting coverage for these drugs will significantly increase the quality of lives for affected individuals. Furthermore, in the long term, it is estimated that savings can be achieved due to the avoidance of costs related to the treatment of Hepatitis C virus such as decompensated cirrhosis and liver transplants. This coverage will be available to affected Medicaid recipients from March 2020 – September 30, 2021.

**Medicaid IT ($25 million):** Funding for capital expenditures and operational support to enable the Puerto Rico Medicaid Program to improve and modernize technology for eligibility processing and enrollment verification, and invest in analytics to identify fraud, waste, and abuse, claims cost optimization opportunities and inform value-based program design.

241

DRA Ex. 236

## 16.3   Medicaid reform measures

The goal of the Puerto Rican public health insurance system is to fund high-quality healthcare services to all residents in need and, in doing so, cultivate a healthier population, especially as it relates to lowering the Island's disproportionally high rates of chronic conditions. To ensure the system can continue to support the vulnerable populations who rely on its services, Puerto Rico will need to improve the efficiency and effectiveness of its health insurance plan by "bending the healthcare cost curve" on premium inflation, which is reflective of escalating expenditures of healthcare delivery on the Island.

Puerto Rico's healthcare system has faced significant challenges from recent events. Unfavorable trends instigated by the hurricanes (e.g., provider shortages, outstanding infrastructure needs) persist and have been amplified by the earthquakes and the COVID-19 pandemic. These circumstances make progress against healthcare measures challenging, although the availability of additional federal funding has enabled a more tempered path to achieving the target end-state for the healthcare system.

This section outlines several categories of actions the Government is required to execute to both curb the growth rate in per capita health care expenditure as well as shift the overall public health system toward higher-value care. In each of the below measures, the plan seeks to avoid reduction in service quality for beneficiaries. Such reforms include improving program integrity and quality relative to cost. Program integrity initiatives help to ensure that eligibility decisions are made correctly; prospective and enrolled providers meet federal and state participation requirements; services provided to enrollees are medically necessary and appropriate; and provider payments are made in the correct amount and for appropriate services[305]. Moreover, under value-based care, providers are reimbursed based on their ability to improve quality of care in a cost-effective manner or lower costs while maintaining standards of care, rather than the volume of care they provide[306].

These efforts are needed to keep Medicaid cost growth at sustainable levels to ensure that the Commonwealth Medicaid program can effectively deliver quality care to the approximately 37% of local residents who rely on Plan Vital for medical insurance. The measure savings in the 2021 Fiscal Plan are designed to lower premium expenditures across Medicaid and CHIP. After federal funds are capped in October 2021, the Commonwealth budget will realize nearly all (97%) the savings from health reform measures, thereby curbing inflationary growth in the program.[307] These reforms will keep Medicaid cost growth at sustainable levels and ensure that the Commonwealth Medicaid program can effectively deliver quality care to the ~37% of local residents who rely on Plan Vital for medical insurance. While the Government must achieve all savings to curb long-term costs, the 2021 Fiscal Plan surplus will only consider savings that accrue to the Commonwealth.

Total run-rate savings must reach ~$328 million by FY2025 (off the FY2025 baseline of approximately $3.4 billion). After FY2025, the expected savings from health reforms continue to increase as baseline expenditures increase (*Exhibit 120*). Since the baseline healthcare expenditures of the Commonwealth are projected to grow at inflation rates much higher than general Island inflation, unchecked growth would contribute to a significant deficit. Therefore, the Government must act urgently to implement these value-based reforms to sustain its public health system. This action includes building the infrastructure and data systems required to execute more advanced payment reform models and quality monitoring across the Island.

---

305 Program integrity : MACPAC, Accessed March 30, 2021
306 CMS Issues New Roadmap for States to Accelerate Adoption of Value-Based Care to Improve Quality of Care for Medicaid Beneficiaries | CMS
307 Approximately three percent of the measures savings will continue to flow back to the Federal Government in the form of reduced matching support for the CHIP program, where federal funding remains uncapped. The 2021 Fiscal Plan surplus will only consider savings that accrue to the Commonwealth

DRA Ex. 236

To-date, the Government has realized some savings through the implementation of initiatives aimed at controlling healthcare cost inflation. These initiatives include more effective management of the Prescription Drug List and the launch of a single-region managed care model in 2018. This new model is expected to continue to yield cost savings relative to quality of care delivered through greater competition among managed care providers, increased patient choice, and reduced administrative costs. However, these reforms are just two of many shifts towards value-based care Puerto Rico must make if it is going to sustain its public health insurance program.

### EXHIBIT 120: MEDICAID REFORM SUMMARY OF IMPACT



Summary of Healthcare (Medicaid) reform impact[1], $M

Program integrity[2]   Value-based payments[3]

1 Total impact on premium-related expenditures for Medicaid, including both federal and Commonwealth share of savings
2 Includes savings from Fraud, Waste, and Abuse reduction and enrollment verification
3 Includes savings from Diagnosis Related Group-based payment model and other value-based reforms

#### 16.3.1   Medicaid reforms to improve program integrity

The 2021 Fiscal Plan includes savings between FY2022 and FY2025 that will be achieved through initiatives that improve program integrity. Program integrity activities are meant to ensure that federal and state taxpayer dollars are spent appropriately on delivering quality, necessary care and preventing fraud, waste, and abuse from taking place[308]. Program integrity initiatives will help to ensure that the Government is performing accurate enrollment verifications and minimizing fraud, waste, and abuse.

In 2016, the U.S. Government Accountability Office (GAO) reported that Managed Care Organizations (MCOs) in U.S. territories have not consistently reported improper payments to providers billing to the system, and that many MCOs face conflicts of interest in finding and eliminating fraud.[309] In a report released in February 2021, GAO found that seven of the eight selected Puerto Rico procurements[310] did not include important steps to promote competition and mitigate the risk for fraud, waste, and abuse, underscoring the need for federal oversight.[311]

Typical fraud, waste, and abuse reduction programs in other state Medicaid programs and health insurers have been able to achieve 1-3% cost savings. These savings have been reached through pre-payment review (e.g., reviewing claims before payment to identify outliers/issues); auditing and enforcement units to investigate suspicious behavior; advanced analytics capabilities to identify inefficient or fraudulent activities in post-payment review, such as identification of

---

308 "Program integrity : MACPAC", Accessed March 30, 2021
309 "Medicaid and CHIP Increased Funding in U.S. Territories Merits Improved Program Integrity Efforts." GAO.gov, April 2016
310 According to the report, these eight procurements represent a non-generalizable sample of Puerto Rico Medicaid procurements that were in effect as of April 1, 2020. They represented approximately 97% of the total costs of Puerto Rico's Medicaid procurements in effect at that time
311 "Medicaid: CMS Needs to Implement Risk-Based Oversight of Puerto Rico's Procurement Process." GAO.gov, February 5, 2021. Accessed March 20, 2021

DRA Ex. 236

"impossible" utilization (e.g., billing for over 24 hours of service in one day) or frequently repeated, high value procedures; and long-term policy or organizational transformation. Pursuant to federal requirements, ASES has established a contracting reform plan to improve procurement and contracting prices as well as combat fraudulent, wasteful, and abusive contracts.

In addition, it is imperative for Medicaid programs to deploy robust enrollment verification, in order to ensure that coverage is offered only to eligible individuals. In December 2020, the Office of Inspector General at the U.S. Department of Health and Human Services performed a Risk Assessment of Puerto Rico's Medicaid Program and identified the beneficiary eligibility process as a high-risk area. Specifically, the HHS-OIG noted weaknesses related to Puerto Rico's post-eligibility determination process for validating beneficiary eligibility. Outdated, missing, or inaccurate beneficiary eligibility information may limit the effectiveness of the eligibility validation process and increase the risk that ineligible applicants will be enrolled in the Puerto Rico Medicaid program[312]. Full compliance with Medicaid Eligibility Quality Control (MEQC) requirements and establishment of an asset verification system that utilizes 3rd party data sources can strengthen enrollment verification.[313]

Puerto Rico has taken meaningful steps towards improving program integrity. These include the integration of ASES data with the MMIS.  During FY2021, CMS approved the certification of Phase 2 of Puerto Rico's MMIS, clearing the way for the PRMP to begin planning Phase 3 implementation. MMIS Phase 3 includes the Design, Development and Implementation (DDI) phase, expected to kick off by January 2022; improving the Payment Error Rate Measurement (PERM) and MEQC. Other steps taken towards promoting program integrity in prior years include the establishment of a Medicaid Fraud Control Unit (MFCU) and Program Integrity Unit (PIU), and the improvement in enrollment verification through employer certification and Public Assistance Reporting Information System (PARIS) checks.

While Puerto Rico has taken steps towards improving its Medicaid Program integrity, opportunities for further improvement remain. Limited recoupments from MCO investigations suggest that more can be done to mitigate fraud, waste and abuse. Furthermore, practices in other states support the development of additional program integrity tools in parallel to building MMIS capabilities, such as leveraging analytics vendors on a contingent bases to identify savings related to improper payments. Finally, in their report to Congress, ASES has stated they face challenges with reporting data since the same is limited to the provider level and, therefore, the eligibility systems and data sets cannot track fraudulent activity performed by beneficiaries. Issues with enrollment verification can be improved by instituting an Asset Verification System and partnering with key out-migration states to conduct enrollment checks. Pursuant to the 2020 Further Consolidated Appropriations Act, Puerto Rico must continue to make progress to meet CMS's PERM and MEQC requirements.

### 16.3.2   *Medicaid reforms to improve quality relative to cost*

Pursuing value-based improvement initiatives with demonstrated success are required to help the Commonwealth "bend the curve" on healthcare inflation without jeopardizing outcomes. There are several potential sources of value in Puerto Rico's healthcare system. These sources of value are opportunities to reduce wasteful healthcare spending and increase efficiency while improving quality of care and health outcomes.

Examples of best practice for value-based payment models include implementing a Diagnosis Related Group (DRG) based payment model where providers are reimbursed a fixed amount to fully treat a patient with a given medical condition. These models help control medical costs by incentivizing providers to deliver cost-effective care without sacrificing quality, while also improving the effectiveness of Medicaid service delivery by standardizing the measurement of

---

[312] Risk Assessment of Puerto Rico Medicaid Program, A-02-20-01011 (hhs.gov). December 11, 2020

[313] GAO "Medicaid Eligibility: Accuracy of Determinations and Efforts to Recoup Federal Funds Due to Errors," January 2020

patient acuity across providers and reducing the administrative burden associated with reimbursement. Another potential source of value lies in reducing emergency room (ER) visits. Prior to Hurricane María and the reforms, local residents utilized the ER three times as often as peers on the U.S. mainland, with estimates as high as 90% of ER visits occurring for non-emergency care that could be treated in lower cost settings.[314] Successfully shifting unnecessary ER visits to lower-cost settings, such as primary care offices or urgent care, could save tens of millions of dollars annually.

Moreover, there are several other additional value-based reforms that should be implemented to achieve cost savings. New approaches that emphasize care coordination and align incentives between patients, providers, and payors can produce improvements in health outcomes while lowering costs. Direct pay-for-performance quality bonuses provide special incentives to care for members with high-cost needs like behavioral health. Care coordination models like patient centered medical homes have been quite effective at improving outcomes for members with chronic conditions, empowering primary care providers to work closely with patients and manage treatment plans across multiple care providers.[315] Given the preponderance of chronic conditions and potential rising behavioral and mental health needs in the wake of Hurricane María, better access and coordination of multiple comorbidities across populations will become increasingly important.[316]

Additional opportunity exists through reduction of both inpatient length of stay and hospital readmissions. Puerto Rico's inpatient length of stay was 1.5 times the U.S. average in 2014,[317] and 35 out of 41 Puerto Rico hospitals show readmission rates above the U.S. average of 15.3%[318]. Hospital readmissions occur when patients are discharged from hospitals but must return for additional treatment for the same condition. This can occur when patients are not adequately prepared to return home due to lack of education, lack of access to follow-up care, challenges with prescription drugs, among other factors. MCOs can incentivize both reduced hospital readmissions and shorter length of stay through improved discharge planning, as well as by increasing weekend staffing to manage discharges. Similar value-based programs piloted in mainland states have typically saved 2-10% of costs. In Puerto Rico, value-based reforms may result in lower-than-average savings due to the breadth of other simultaneous savings measures being implemented for Vital, as well as the challenges associated with recent natural disasters and the COVID-19 pandemic. Nevertheless, these structural changes to reimbursement and care delivery present the most viable path to long-term sustainability for the program.

Pursuant to the opportunities described above, ASES has developed a plan for implementing a modern DRG-based prospective payment system for inpatient services provided by short-term acute care hospitals. ASES has begun using a case mix adjustment that adjusts the payment to each hospital from the inpatient hospital funding pool based on the severity of conditions that each hospital treats, relative to each other. According to ASES the DRG-based prospective payment system will create financial incentives for hospitals to improve coding and documenting practices, reduce lengths of stay, reduce utilization of unnecessary ancillary services and reduce rates of avoidable complications and hospital-acquired conditions. ASES originally planned to launch this payment model in July 2021. However, due to the delicate position hospitals were in during the pandemic, this go-live date has been postponed to October 2021. Even though the Government has stated that the implementation of DRG will not achieve immediate savings, this effort is necessary for the Government to fund the long-term health needs of Puerto Rico.

314 JEL Consulting analysis (Dec 30, 2106) of ASES data and Puerto Rico Community Survey, Public Use Microdata, 2014. Estimates exclude Platino beneficiaries
315 Patient-Centered Primary Care Collaborative, "Benefits of Implementing the Primary Care Medical Home: A Review of Cost & Quality Results, 2012" (Sept 2012)
316 Thomas Huelskoetter, Center for American Progress, "Hurricane Katrina's Health Care Legacy" (August 15, 2015)
317 As of 2014. JEL Consulting analysis (Dec 30, 2106) of ASES data and Puerto Rico Community Survey, Public Use Microdata, 2014. Estimates exclude Platino beneficiaries
318The disparity in hospital quality metrics between Puerto Rico and the U.S. - V2A (v2aconsulting.com), December 2, 2019

EXHIBIT 121: REQUIRED IMPLEMENTATION ACTIONS FOR MEDICAID REFORM

| | Required implementation actions | Deadline | Status |
|---|---|---|---|
| To be completed in FY2021 | Incorporate language requiring participation in DRG-based payment model in MCO contract | May 2020 | Completed |
| | Define key performance indicators and savings target measures for Medicaid program integrity initiatives (e.g., fraud, waste, and abuse reduction, enrollment verification) | June 2020 | Delayed – June 2021 |
| | Complete assessment for the need for additional third party vendors to develop an Asset Verification System and analytics for fraud, waste, and abuse reduction and enrollment verification | June 2020 | Delayed – June 2021 |
| | Identify and design additional value-based incentives (e.g., direct pay-for-performance quality bonuses) for inclusion in future MCO agreements, including timeline and plan for implementation | December 2020 | Delayed – September 2021 |
| | Develop plan to incorporate Medicaid program integrity key performance indicators and savings targets into future MCO contracts, including design for associated incentives and penalties | December 2020 | Delayed – September 2021 |
| | Complete Phase II of PRMMIS development and migrate financial and enrollment processes to the platform | June 2021 | Completed |
| | Draft plans to meet PERM and MEQC requirements and receive CMS approval | June 2021 | On track |
| To be completed in FY2022 | Change the current CMS-64 Claiming Methodology to properly account for Rebates | September 2021 | On track |
| | Start Phase III of PRMMIS development | September 2021 | On track |
| | Launch DRG-based payment model | July 2021 | Delayed – October 2021 |

## 16.4   Joining the Medicaid Drug Rebate Program: Opportunities and drawbacks

Under CMS Rule 84 FR 64783, U.S. Territories will be required to join the federal Medicaid Drug Rebate Program (MDRP) on April 1, 2022,[319] unless they apply for and receive a waiver. Currently, Puerto Rico operates its own drug rebate program whereby the Commonwealth negotiates or utilizes pre-negotiated agreements with drug manufacturers to return a portion of cost for prescription drugs (expected to be $264 million in FY2022). These funds enter the Commonwealth budget as Special Revenue Funds and are applied directly against the costs of Medicaid premiums. However, Puerto Rico has expressed its intention to join the MDRP program in the next fiscal year.

Puerto Rico's potential entry into the MDRP is expected to yield higher rebate rates from drug manufacturers compared to those the Commonwealth currently has in place. Partly to enable entry into the federal program, the Government has also indicated its intention to update its accounting systems and the methodology by which it reports prescription drug utilization to the Centers for Medicare and Medicaid Services (CMS). In doing so, Puerto Rico will also begin sharing a portion of the rebate revenue with the Federal Government to the extent it reduces the costs eligible for federal matching. The Board is working with the Government to estimate the net financial impact and timing of the shift to the MDRP, including by seeking guidance from CMS on what revenues, if any, must be shared with the Federal Government.

---

[319] "Medicaid Program; Covered Outpatient Drug; Further Delay of Inclusion of Territories in Definitions of States and United States." Federal Register, 11 November 2019. Accessed 16 April 2021

DRA Ex. 236

# Chapter 17. Tax compliance and fees enhancement

## 17.1   Current state and future vision for tax environment

Puerto Rico's current tax system suffers from structural complexity, instability, internal inconsistency, inefficient administration, and inadequate enforcement. There have been at least 11 major revisions to Puerto Rico's tax code since 1994, including at least six adjustments since 2013.[320] This has allowed for persistent problems with non-compliance, worsened by a lack of an integrated approach to addressing non-compliance. Much of the Government's revenue is highly concentrated in collections from a handful of multi-national corporations. The Government has also issued an assortment of credits, deductions, and incentives that add to the system's complexity and further erode the tax base. Furthermore, audit and enforcement activity in recent years has been limited, which creates risks of increased levels of non-compliance.

In response to these challenges, the Government has taken actions to improve tax compliance. It has taken steps to improve information reporting to better detect under-reporting of income and over-usage of deductions and credits, notably through recent changes to information reporting requirements included in Act 257-2018. These changes create greater interdependencies among taxpayers and the information they are obligated to report, which is expected to enable greater oversight and verification of the information being reported to the Government. Enhanced usage of data can help Hacienda better isolate risk and focus its compliance and enforcement resources. Hacienda has also expanded its SUT internet sales collections through regulations enabled with the passage of Act 40-2020. Hacienda is driving improvements in its culture and organization to boost enforcement capabilities, and digitizing the process of filing taxes, to lighten the burden of compliance on taxpayers.

With the publication of the first Tax Expenditure Report in September 2019 (see *Section 17.3.1*), policymakers now have the data necessary to review, assess, and adjust the use of individual tax expenditures to ensure that these foregone revenues are leading to positive economic development on the Island.

## 17.2   Administrative tax initiatives to increase revenue collections

Through implementation of administrative tax reform and realization of measures included in prior fiscal plans, the Government has captured incremental revenues through, among others, the implementation of SURI, which are now included in the baseline FY2021 General Fund revenue forecast.

---

[320] Reforms include: Act 40-2013, the "Tax Burden Redistribution and Adjustment Act;" Act 120-2014, the "Small and Medium Business Job Generation and Retention Act;" Act 72-2015, the "Adjustments to the Internal Revenue Code of 2011;" Administrative Orders 2017-01 and 2017-05; and Act 257-2018, the "2018 Puerto Rico Tax Reform Act."

DRA Ex. 236

EXHIBIT 122: REVENUE MEASURES SUMMARY OF IMPACT



Summary of tax compliance and fees enhancement measures impact, $M

### 17.2.1   Improve compliance rate

**The Government has made significant progress in its compliance efforts.** The 2020 Fiscal Plan included a ramp-up of 3 years, meeting 100% of targets by FY2023, to achieve a target 5% net uplift in annual revenues due to enhanced compliance across the major tax lines (personal income tax, corporate income tax, and SUT) – inclusive of implementation costs. Given the collections seen for the previous year and because all the necessary activities to achieve this have been implemented (e.g., the implementation of SURI, the collection of SUT on internet sales, among others), the 2021 Fiscal Plan accelerates the full value of the measures from FY2023 to FY2021.

Nevertheless, Hacienda should continue to undertake the initiatives set forth immediately below. These initiatives can boost voluntary compliance and will allow Hacienda to continue collecting the total taxes as expected in the 2021 Fiscal Plan. The goal should be to reduce the cost of compliance and simultaneously raise the cost of non-compliance, through a combination of an increased likelihood of identifying non-compliant taxpayers and evaders, and more effective and enforceable penalties.[321] Therefore, the 2021 Fiscal Plan requires the Government to:

- **Continue to use new systems and processes to identify and remediate non-compliance.** Hacienda has taken steps to make it harder to abuse deductions and credits to avoid tax liability, for example by only allowing taxpayers to claim certain deductions and exemptions if their return is prepared by a certified public accountant following agreed upon procedures.

- **Reduce the complexity of the tax system and process of filing taxes** to make it easier for individuals and businesses to pay their taxes correctly. As detailed further in *Section 9.4*, improving the process of for filing and paying taxes is critical for improving ease of doing business, and helps boost voluntary compliance.

- **Improve use of data and analytics to address non-compliance.** Small and medium taxpayers account for a significant share of the unpaid and underpaid taxes, but only a tiny fraction of these taxpayers receive full-scale audits due to the significant time and cost investment needed. While a traditional IRS audit costs an average of $2,278 per case,

---

[321] Xenia Velez presentation to the Oversight Board (Nov. 30, 2017), 3

DRA Ex. 236

automated notices or letters can be executed for $52 to $274 per case.[322] Hacienda is receiving increasing filings of information returns that can be used to better identify risk and focus compliance resources. Hacienda should implement data-driven, tiered compliance approaches which, over time will enable Puerto Rico to reach a significantly larger share of nonpayers.

■ **Improve collection of taxes on online purchases.** This has been implemented as part of Act 40-2020; which allowed the Government to reach agreements with remote sellers and marketplace facilitators. The results from this implementation have been also included as part of the forecasted SUT compliance gains in the 2021 Fiscal Plan and are expected to continue to be administered going forward. The Government should continue to expand agreements with remote sellers on a regular basis.

### 17.2.2   *Right-rate other taxes and fees*

On the other hand, the 2021 Fiscal Plan incorporates the value of collections from Medical Marijuana Tax and Airbnb (Room tax) tax which have been updated to reflect the value of actuals for FY2020 and FY2021 as of January 2021.

**Medical marijuana tax.** Legislation has been enacted and enforced to tax medical marijuana. Based on information provided by the Government, total collections for FY2019 and FY2020 were approximately ~$13 million and ~$18 million per year respectively. The revenue collected from this initiative continues to be part of the revenue incorporated in the 2021 Fiscal Plan.[323]

**Online Rental Platforms Tax.** Legislation has been enacted to apply a 7% hotel room tax to all rental platforms, resulting in a projected annual revenue increase of ~$8 million. Going forward, the Government should analyze collections under this provision using the estimated number and value of online rentals and, where there are differences between expected and collected revenues, should identify corrective actions to work with the rental platform providers to ensure all taxes owed are collected.

### 17.2.3   *Improve tax yield from Other General Fund revenue sources*

The 2021 Fiscal Plan also incorporates additional revenue collections as a measure to reflect improved collections of Partnerships and Other Excise taxes.

**Partnerships.** As discussed in *Chapter 5*, Partnership income taxes have significantly increased since FY2020 due to the enactment and enforcement of Act 60-2019. While most of this increase is attributed to a shift in the tax baseline (as taxes previously paid at the individual/corporate level are now paid at the partnership level), the 2021 Fiscal Plan incorporates ~$25 million of recurring income from Partnerships as a tax administration measure, resulting from improved tax compliance achieved by Hacienda.

**Other Excise Taxes.** As discussed in *Chapter 5*, there has been an increased yield in Other Excise Taxes collections, which began at the launch of Hacienda's new integrated tax platform in FY2019. The 2021 Fiscal Plan attributes ~$75 million of the increase in recurring income from other excise taxes tax administration measure, achieved as a result of improved tax compliance. This measure is inclusive of Hacienda's efforts to increase collections of Tobacco taxes (included as a measure in prior fiscal plans). Analysis provided by Hacienda suggests that part of the increase in collections coming from Other Excise Taxes is from tobacco taxes. Hacienda is working to refine the allocations of these other excise taxes to more specific categories.

---

[322] IRS Enforcement Results, TIGTA Filing Season Audit, IRS Taxpayer Advocate, GAO

[323] Projected receipts include $1.5 million of dedicated revenues for the medical marijuana council established in 2017-Act 42 and controlled substances monitoring in 2017-Act 70

DRA Ex. 236

Hacienda must take all necessary steps to ascertain proper classification of all excise tax revenues collected through SURI on a timely basis, but not later than December 2021.

## 17.3    Implementation and enforcement of revenue measures

The following implementation plan details the continuation of the Commonwealth's efforts to improve tax administration.

### 17.3.1   Creation of a tax expenditure report and regular reporting

In order to provide a critical element of fiscal responsibility and transparency, the Government must regularly produce a tax expenditure report, which includes a comprehensive list of revenue losses attributable to provisions of the Puerto Rican tax code that deviate from the tax structures benchmark law. It is essential to know how much revenue is foregone because of tax incentives and to periodically review such expenditures to ensure they continue to meet their strategic objective. Having a clear and accurate understanding of what the Government spends through tax expenditures is critical to ensuring the expenditures are continuing to contribute to economic growth and opportunity.[324]

In response to the 2019 Fiscal Plan requirements, the Government published its inaugural Tax Expenditure Report in September 2019 for tax expenditures associated with tax year 2017. For the first time in Puerto Rico's history, taxpayers and the Government have better visibility into the full scope of tax expenditures being offered, together with a description and approximate cost of each expenditure. As shown in *Exhibit 123*, the 2017 Tax Expenditures Report provided many key insights into Puerto Rico's use of tax expenditures as an economic development tool, including the fact Puerto Rico issues more than 300 tax incentives with total foregone revenue in excess of $21 billion. This analysis also revealed, for the first time, as illustrated in *Exhibit 124* and *Exhibit 125*, that Puerto Rico offers a far more generous tax incentive program far more generous than virtually every other jurisdiction in the U.S. as a share of the economy or total tax collections.

---

[324] Tax Policy Center, Urban Institute & Brookings Institution, "State Income Tax Expenditures"

DRA Ex. 236

**EXHIBIT 123: TAX EXPENDITURES IN PUERTO RICO RELATIVE TO OTHER JURISDICTIONS**

Total tax expenditures by count[1]

|  | Credits | Deductions | Exclusions | Exemptions | Preferential Tax rate | Deferrals | Total |
|---|---|---|---|---|---|---|---|
| Individual | 28 | 10 | 8 | 47 | 11 | - | 104 |
| Corporations | 62 | 9 | 3 | 35 | 27 | 6 | 142 |
| SUT | - | - | 4 | 23 | - | - | 27 |
| Excise tax | 1 | - | 16 | 12 | - | - | 29 |
| Total | 91 | 19 | 31 | 117 | 38 | 6 | 302 |

Total tax expenditures by dollar amount[1], $ in million

|  | Credits | Deductions | Exclusions | Exemptions | Preferential Tax rate | Deferrals | Total |
|---|---|---|---|---|---|---|---|
| Individual | $76 | $348 | $187 | $446 | $203 | - | $1,260 |
| Corporations | 144 | 13 | 5 | 72 | 15,864 | - | 16,098 |
| SUT | - | - | 580 | 2,765 | - | - | 3,345 |
| Excise tax | 8 | - | 471 | 13 | - | - | 491 |
| Total | $152 | $13 | $1,056 | $2,850 | $15,846 | - | $21,194 |

1 Puerto Rico's Tax expenditure report identifies $26.4 bn of tax expenditure. However, some of the components of this total are estimates of the SUT base, rather than the revenue forgone from a tax on that base (i.e., SUT rate * base). These estimates were adjusted accordingly for SUT tax expenditures related to vehicles, electricity, gasoline, and water.
SOURCE: 2017 Tax Expenditures Report

**EXHIBIT 124: TOTAL ESTIMATED TAX EXPENDITURE AS SHARE OF GROSS STATE PRODUCT**



Note: Gross States Product (GSP) data is gathered from the Bureau of Economic Analysis (BEA). Alabama, Connecticut and Ohio do not include tax expenditures that arise from federal income tax, further no state produces an entirely comprehensive set of tax expenditure estimates. As a result, some of the variance between states is due to differences in levels of this comprehensiveness. *Tax expenditure estimates for the US are for 2020 and reflect Tax Cuts and Jobs Act of 2017 changes in tax policy. US tax total is not reduced for the cost of the refundable portion of tax credits, including the Earned Income Tax Credit

SOURCE: Bureau of Economic Analysis (BEA)

DRA Ex. 236

EXHIBIT 125: TOTAL TAX EXPENDITURE AS A SHARE OF TOTAL TAXES



Note: Total tax expenditure includes tax expenditures associated with total individual income tax, corporate income tax, SUT, and excise tax as well as other taxes included in state tax expenditure reports (excluding property tax). Similarly, total taxes include all taxes other than property tax. Alabama, Connecticut and Ohio do not include tax expenditures which arise from federal income tax, further no state produces an entirely comprehensive set of tax expenditure estimates. As a result, some of the variance between states is due to differences in levels of this comprehensiveness.

For tax expenditures reporting to maintain its relevance and maximize its impact on the policy making process, regular reviews of each tax incentive must be completed to assess whether each incentive is meeting its policy objective (including an assessment of benefits along with costs).

All tax expenditures should undergo periodic technical reviews with a presumption each credit will be prohibited unless sufficient justification exists to maintain the incentive. The default position for all tax expenditures should be that the burden of proof of effectiveness lies with the tax expenditure. Absent a compelling justification, the tax expenditure should be eliminated. Simply because an incentive was offered in the past does not mean it meets the policy objectives in Puerto Rico's future.

Going forward, the estimates in the tax expenditures report must also be systematically incorporated into the annual fiscal plan and budget review process. This means the estimates need to be considered in conjunction with direct spending proposals at the executive review and legislative levels and as a component of the budget envelope for agencies responsible for related direct spending programs. As an example, to force a legislative discussion, other states automatically sunset certain tax expenditures, which expire unless the incentives are proactively renewed, or states will explicitly cap the level of incentives offered.

For that milestone to be achieved, the tax expenditure report must be produced annually on a timely and efficient basis. In fact, the publication of the first tax expenditures report, in September 2019, stated the second annual report would be published in March 2020. The Government, moreover, should already have published the 2018 and 2019 calendar years tax expenditure reports, in accordance with the timing stipulated in the 2020 Fiscal Plan. As of the certification of this 2021 Fiscal Plan, however, that milestone has not yet been met. The 2018 Tax Expenditures Report must now be published no later than May 31, 2021[325]. Additionally, going forward the Government must publish the annual report by December 31st of each calendar year.

Additional revisions must also be incorporated into future tax expenditure reporting. This includes a multi-year expenditure forecast, a policy rationale for each incentive, a year-end assessment of tax incentives granted to each intended target, and a trend analysis of tax revenue

---

325 On March 30, 2021 the Oversight Board issued a letter to the Secretary of Treasury providing detailed comments on the Commonwealth's tax expenditures.

DRA Ex. 236

collections.  More specifically, future Tax Expenditure Reports must include the cost of each tax expenditure for the current year and at least the prior two years. The Tax Expenditure Reports must also forecast the expected revenue collections and losses for at least the next five years from the date the report is produced.  As future Tax Expenditure Reports become more normalized, the forecast can also start accounting for behavioral effects of each incentive and the macroeconomic or other dynamic effects in the cost estimates.

Future Tax Expenditure Reports must also broaden the universe of tax expenditures included in the reports.  The inaugural report included deviations from major revenue sources, including individual income taxes, personal income taxes, sale and gross receipts taxes and excise taxes. However, non-corporate business income tax analysis, property taxes, and certain other taxes were not included; going forward, they should be included in this report. In addition, the exclusion of Act 154 taxes from the report may need to be reconsidered and or its legitimacy confirmed. Including an inventory of all tax credits, cash grants, deductions, exemptions, preferential tax rate, tax liability deferral and any other tax incentives where amounts allocated can materially impact the Commonwealth's financials will make the report more comprehensive.

Rationalizing the amount of tax expenditures offered by the Government is smart and prudent fiscal management.  This can only be done in a comprehensive way through the production of the annual tax expenditure report on a timely basis.[326]

### 17.3.2   *Tax incentives code reform*

The current tax incentives code structure has high fiscal costs – in excess of $400 million – but does not provide enough visibility to allow for clear tracking of these tax concessions and the returns they generate for Puerto Rico's economic growth. Past studies, based on limited available economic data, have indicated that while some tax incentives led to positive returns on investment, many others do not yield similar results.

That is what led the Commonwealth to enact Act 60-2019 (the "Puerto Rico Tax Incentives Code" or "Incentives Code"), which amended the tax incentives code and adopted a new legal and administrative framework to normalize the way in which new incentives are created, approved, processed, and monitored.  Not all laws established in Act 60-2019 were repealed and replaced, creating confusion as to whether the Treasury Department should follow guidelines imposed by these still-active statues or those imposed by the Incentives Code. To fully effectuate the goal of the Incentives Code, and to limit confusion, the Government should take action and repeal the remaining statutes, still in effect that were merged into the Incentives Code. To evaluate the fiscal benefit from each incentive, the Incentives Code uses a Return on Investment ("ROI") approach combined with an assessment of fiscal multipliers to prioritize high value-added incentives relative to those that do not generate sufficient economic return. The Incentives Code, however, does not include explicit caps on, reductions to, or the elimination of any specific incentives. Rather, the purpose of the Incentives Code is to measure the ROI of tax and economic incentives by grouping them under a transparent and uniform code.

Through the Incentives Code, the term, rate, and characteristics of incentives offered are harmonized across industries and credits. The Incentives Code also creates a centralized Incentives Office for Businesses in Puerto Rico at DDEC and establishes an Incentives Concession Portal to centralize, standardize, and streamline the processes related to the application and approval of decrees, cash grants, tax credits, subsidies, and other incentives.

Act 60-2019 also required the public disclosure of beneficiaries of certain tax expenditures. In accordance with that requirement, DDEC disclosed (on January 30, 2020) that 8,364 companies and individuals received certain tax incentives. The online database offers the name of the grantee, the type of benefit, and the decree's issue date. DDEC released the relevant information for recipients that receive benefits from the following Acts: Act 14-2017 (Physician Retention); Act

---

[326] Ibid.

20-2012 (Exportation of Services); Act 22-2012 (Investor Relocation); Act 273-2012 (International Financial Center Regulatory Act); and Act 27-2011 (Film Production). DDEC subsequently released additional data on February 11, 2020, disclosing recipients of the following tax expenditures: Act 73-2008 (Economic Incentives for the Development of Puerto Rico Act); and Act 83-2010 (Puerto Rico Green Energy Incentives Act). During FY2021, DDEC had a milestone budgeting incentive to publish quarterly reports on the agency's website detailing all economic incentive donations and subsidies to private corporations from FY2017 to the present date. DDEC has accordingly published the quarterly reports on their website.

Many provisions of Act 60-2019, before they can be implemented, require the drafting and approval of regulations, including prior Oversight Board review and approval.[327] The promulgation of such regulations was included as part of the process during FY2021 and such regulations must continue to be drafted and approved during FY2022.

The lack of transparency and high cost of these tax concessions warrants further revisions to the Incentives Code such that tax incentives are structured in a way that is more likely to be beneficial to the Commonwealth. A multipronged approach is needed. This approach must include limiting the DDEC Secretary's discretion in awarding incentives, specifying in more detail the meaningful information to be submitted in the annual public reporting required by the statute, establishing a more robust audit process with meaningful penalties for firms that are found to be out of compliance or failing to provide the anticipated benefits, and establishing an ROI based standard of program evaluation that will meaningfully discriminate among projects so that incentives are concentrated on those projects most likely to provide net economic benefits to the commonwealth.

This can most easily be accomplished through the drafting and approval of Act 60-2019's regulations, including prior Oversight Board review and approval. Specifically, these regulations must, at minimum, include the following provisions:

- **Deconcentrated authority and distributed oversight.** At the moment, excess discretionary authority for determination of eligibility, terms and award of tax incentives and grants is concentrated with a single official of the Commonwealth Government, the DDEC Secretary. Act 60-2019 regulations combined with an Executive Order by the Governor should establish an Economic Incentives Review Board, with the DDEC Secretary as Chair, to advise and confirm incentive awards, the terms of these awards, the process and methods involved in the evaluation of award proposals, annual award limits, oversight and reporting requirements, and consultation with affected agencies and municipalities. In addition to the DDEC Secretary, this body should be composed of senior fiscal office holders within the Commonwealth Government who do not report to the DDEC Secretary, such as, for example, (i) Treasury Secretary, (ii) Puerto Rico Fiscal Agency and Financial Advisory Authority Executive Director, (iii) Director of Office of Management and Budget, and (iv) Chief Investment Officer.

- **Evaluation standards for tax incentive and grant award should be balanced.** Act 60-2019 established a positive ROI as the primary standard for determining incentive awards. The standard as currently operationalized, however, lacks balance. Benefits are defined more comprehensively and extensively than are costs, resulting in an ROI standard that does not assure net benefit actually accrues to the Commonwealth. The ROI standard operationalized by the implementing regulations should consider opportunity costs to the Commonwealth and any consideration of direct, indirect and induced benefits, and should also require consideration of direct, indirect and induced cost for the ROI standard to meaningfully reflect net outcomes for the Commonwealth.

- **Limited time duration and sunset and review.** Any decree or incentive granted under Act 60-2019 should be for a specifically identified and limited amount of time. Typically, this should be no more than 5 years based on facts and circumstances, and extraordinary processes

---

[327] Pursuant to PROMESA section 204(b)(4) and the Oversight Board's policy with respect thereto, proposed rules, regulations, administrative orders and executive orders covered by said policy, including all regulations under Act 60-2019, must be submitted to the Oversight Board before being issued to ensure compliance with the certified 2021 Commonwealth Fiscal Plan

DRA Ex. 236

of review and approval should be required of any decree granted for a period in excess of 5 years. All decrees should specify and expiration date. No decrees should be extended without reapplication. Annual reports to the Legislature should include an evaluation of the efficacy of incentive programs and each program should undergo extensive review every 3 years which includes a recommendation on its continuation or termination and the detailed basis for that recommendation.

- **Budgeting incentives.** Cash grants require annual appropriation. All incentives, however, should be limited. Annual limits should be placed on the aggregate scale of incentives that can be offered each year. The estimated revenue loss calculated in the ROI should form the basis of determining annual revenue costs and the aggregate of these costs should be limited annually. Additional awards should be deferred to the following year once annual limits are reached. The accuracy of estimated revenue losses should be confirmed in subsequent program reports.

- **Revenue neutrality.** Firm limits should be established to limit the set of potentially eligible projects to ensure, with confidence, these projects satisfy development objectives and remain revenue neutral and consistent with the certified 2021 Fiscal Plan. Within the ROI methodology, the fiscal analysis of projects should assure at minimum they are revenue neutral.

- **Consultation with affected agencies and municipalities.** All affected agencies and jurisdictions should be consulted regarding the offering of tax incentives and the Commonwealth Government should not be permitted to commit the tax resources of a municipality toward a tax incentive without that municipality's active concurrence. Procedures should be established to minimize the risk that municipalities' tax resources are committed toward a tax incentive without a mutual agreement in place ensuring that the incentive is in both governments' best interests.

- **Public reporting of incentive recipient performance and audit.** Regular reporting of incentive effectiveness is required through publication of an Annual Incentive Effectiveness Report. The Act 60-2019 regulations should also provide meaningful guidance on how required project performance measures will be obtained or calculated. The annual report should include detail sufficient to maintain transparency and accountability. Similar to the DDEC transparency portal, it should publicly disclose recipients, type and level of performance on incentives and expected public benefits. To assure that recipients comply with the terms of incentive decrees, audits should be periodically performed in the form of detailed desk reviews of compliance reports and on-site audits of books and facilities. Audit selection and review should be based on the decision of an audit committee, rather than at the discretion of a single official. An important feature to consider including are random audits incorporating a full onsite review of performance targets related to, for example, facilities, employment documentation, charitable contributions, investment, local purchases, and exports.

### 17.3.3  Principle of revenue neutrality

Puerto Rico needs to drive toward more formality and increased compliance within the tax base, but it cannot lose revenues in the process. Therefore, any tax reform or tax law initiative that the Government undertakes or pursues during a year within the 2021 Fiscal Plan period must be revenue neutral, that is, all tax reductions must be accompanied by specific, offsetting revenue measures of the same amount that are identified in the enabling legislation. Each tax measure must also include confidence building elements, such as behavioral adjustments and reasonable capture rates. To ensure revenue neutrality, the implementation of any tax law initiative must occur sequentially, with the Government ensuring that initiatives are paid for before rates are reduced. Enforcement mechanisms that yield additional revenues must be part of any tax initiative package that results in a tax revenue decrease to prevent a scenario where tax reductions

are not accompanied by sufficient offsetting revenue measures identified in the enabling legislation.

### 17.3.4  *Required implementation actions*

To achieve the 2021 Fiscal Plan revenue measures, certain action items must be implemented according to the schedule described in *Exhibit 126*:

EXHIBIT 126: REVENUE MEASURES REQUIRED IMPLEMENTATION ACTIONS

| Required implementation action | Deadline |
| --- | --- |
| • Implement process to estimate the impact of compliance efforts on revenue collections to inform future program priorities | • June 2021 |
| • Publish an annual Tax Expenditures Report that identifies and quantifies all tax expenditures (including tax exclusions, exemptions, adjustments, deductions, subtractions, credits, abatements, deferrals, rebates, and special rules). | • December 2021 |
| • Implement process to ascertain proper classification of all excise tax revenues collected through SURI | • December 2021 |
| • Conduct an analysis on the estimated number and value of online rentals to compare with the total collections from Online Rental Platforms Tax. | • December 2021 |

# Chapter 18. Reduction in appropriations to UPR

## 18.1   Current state and vision

The central Government provides a range of appropriations, including to the University of Puerto Rico (UPR), Puerto Rico's 78 municipalities, the Highways and Transportation Authority (HTA), and "other" recipients (typically private industry or non-profit institutions).

The UPR, founded in 1903, is Puerto Rico's largest and main university system. Its mission is to serve the people of Puerto Rico, contribute to the development and enjoyment of the fundamental values of Puerto Rican culture, and uphold the ideals of a democratic society. To advance its mission, UPR strives to provide high-quality education and create new knowledge in the Arts, Sciences, and Technology. UPR has a history of academic excellence, with 694 degree-granting academic and professional certification programs, including six first-level professional degree programs and 34 PhD programs. The university system is also an important center of research; for example, the Río Piedras campus is classified as a high research activity university by the Carnegie Foundation (one of only 335 U.S. universities to receive such a designation) and there are 79 separate research centers across the university system. UPR plays a critical role in providing avenues for social and economic advancement, with 68% of students receiving Pell grants.[328]

In FY2018, UPR was 67% subsidized (~$678 million in annual appropriations) by state and local funds, compared to an average 25% state and local subsidization for U.S. public universities.[329] In FY2018, UPR's undergraduate tuition was less than one-third of the U.S. average for public universities, even after adjusting for per-capita income, and more than 40% below the average

---

328 UPR 2012-2017 Strategic Plan
329 UPR, IPEDs 2016, College Board

tuition of private universities on the Island.[330] Yet, during the past decade, UPR has seen a 24% enrollment decline (17% since FY2018) with an additional drop of 5.2% expected through FY2023 across both graduate and undergraduate populations. Moreover, UPR consists of 11 independent campuses with minimal shared services or administrative consolidation. UPR has reduced its exposures to subsidies from the Commonwealth, and has made some progress in various measures, such as increasing undergraduate tuition, increasing the contribution to pension plans, and slightly increasing graduate tuition. Some other areas require additional progress, including diversification of revenues, implementation of tuition and scholarship systems, renewal and maintenance of infrastructure, addressing operational inefficiencies, and consolidation of the back-office.

## 18.2   Key initiatives to reduce appropriations

Reducing the Commonwealth appropriation to UPR must lead to run-rate savings of ~$283 million by FY2025 (*Exhibit 127*).

EXHIBIT 127: REDUCTION IN UPR APPROPRIATIONS MEASURES SUMMARY OF IMPACT STUDENTS



A reduction in the appropriation for UPR was determined in 2017 through a collaborative process with the Government to identify reasonable, sustainable measures to bring UPR closer to U.S. mainland public university tuition and administrative cost benchmarks, while maintaining (and in many cases improving) the performance of the system, which serves as a primary economic growth engine of the Island. It reflects both the declining enrollment of the university as well as the sizeable opportunity to diversify revenue sources, transform operations through greater utilization of shared services and other administrative streamlining across its 11 campuses.

In light of the COVID-19 pandemic, last year, the Oversight Board provided a one-year pause (for FY2021) in the further reduction of UPR's annual appropriation to enable UPR to focus all its efforts on implementing the efficiencies previously required and not yet completed. For FY2022, the 2021 Fiscal Plan expects the appropriation to be reduced to $466 million. Thereafter, a gradual decrease in the UPR appropriation will continue as previously envisioned to ~$455 million by FY2025.

---

330 Represents the average across the Ana G. Mendez University system, Inter-American University, Sacred Heart University, and Polytechnic University for SY18-19

DRA Ex. 236

The Oversight Board is analyzing the formal guidance released by the U.S. Department of Education on how to calculate the Maintenance of Effort (MOE) requirements associated with the federal funding provided by the COVID-19 stimulus packages (i.e., CARES, CRRSA and ARP Acts), and will determine what, if any, implications the MOE requirements have on the Commonwealth, UPR, and PRDE funding provided in the 2021 Fiscal Plan and FY2022 Commonwealth Budget.

## 18.3   Establish an independent needs-based scholarship fund for UPR

The UPR 2021 Fiscal Plan includes a measure to increase tuition, thereby bringing UPR more in line with other public U.S. universities in terms of own-source revenues, and ensuring that those who can afford university pay for attending. At the same time, the Commonwealth has created a needs-based UPR scholarship fund, whose intent is to ensure the tuition-related measures do not impact the ability of students with demonstrated financial need to afford a UPR education.

The 2021 Fiscal Plan allocates funds to establish an independently-managed needs-based scholarship fund to benefit the students of the university system. The Commonwealth will contribute $35 to $51 million per year for scholarships to be managed by an external third party. In April 2020, an RFP process was started in order to provide Fund Administration Services and Trust Services to AAFAF with respect to the scholarship endowment trust fund. The RFP was awarded in May 2020 to Fundación Comunitaria. The fund is expected to award the first scholarships in August 2021, as the application process will be conducted by June of the same year. During FY2021, $43 million was added to the fund and an additional $47 million is expected to be added for FY2022. The Oversight Board urges the Government of Puerto Rico to continue this implementation so students who cannot otherwise afford tuition in Puerto Rico are able to through this program. The need-based scholarship will guarantee that those who need the resources get them.

# Chapter 19. Municipal services reform

## 19.1   Current state

All of Puerto Rico's 78 municipalities are recipients of the Commonwealth municipal appropriation. To incentivize a new operating model between the central and municipal governments, as well as municipal operational changes, prior Fiscal Plans reduced this appropriation. In FY2018, the total municipal appropriation was $220 million (a reduction of $110 million relative to the prior year). In FY2019, it was reduced to $176 million, and in FY2020, as stipulated in the 2019 Fiscal Plan, it was further reduced to $132 million. This amount remained the same for FY2021 as a planned reduction was paused to provide support to municipalities during the COVID-19 pandemic, but the appropriation will be phased-out and eliminated by FY2025. The transfer in FY2022 will decrease to $88 million. Given this decrease and the eventual phase out of transfers to municipalities, the imperative to execute strategic efforts to increase revenues, maximize investment of federal recovery funds and decrease operational costs to maintain fiscal sustainability is critical.

Municipalities are often on the front lines of providing individual and community services and were demonstrably engaged in COVID-19 response and recovery. This recovery is in addition to ongoing efforts to recover from the natural disasters of hurricanes and earthquakes. Through stimulus measures, including the ARP Act and CARES Act, as well as significant disaster relief funds, municipalities will receive substantial, time limited, financial aid to support economic

DRA Ex. 236

redevelopment. Their siloed operations and limited local capacity to manage relief funding creates obstacles to leveraging funding effectively to promote necessary economic development and fiscal recovery.

Prior to, and in recovery from the pandemic, there has been little meaningful progress on redefining the relationship between the territorial Government and municipalities, almost no decentralization of responsibilities, and no fiscal decentralization. Moreover, municipalities have made little (if any) progress towards implementing the fiscal discipline required to reduce reliance on Commonwealth appropriations and better reflect a declining population in many areas. This lack of fiscal management was further stressed by the COVID-19 pandemic, threatening the ability of municipalities to provide necessary services, such as health, sanitation, public safety, and emergency services to their residents, and forcing them to prioritize expenditures. Based on the lack of progress to date and entrenchment of the municipal governance including municipal legislatures, comprehensive changes including consolidation of services are required as individual municipalities cannot accomplish significant impacts to the municipal cost structure.

### 19.1.1   *Municipal reliance on Commonwealth funding*

The level of municipal dependency on intergovernmental income is highlighted in *Exhibit 128* below. Transfers of intergovernmental income includes both an equalization fund and lottery transfers. The lottery transfers will be maintained as the equalization fund portion phases out by FY2025. In FY2019, the General Fund of 37 of the 78 municipalities were 40% or more dependent upon funding from the Central Government. As the equalization fund portion of these transfers phases out, municipal revenues will become increasingly stressed.

EXHIBIT 128: MUNICIPAL DEPENDENCY ON INTERGOVERNMENTAL TRANSFERS AS A PERCENTAGE OF FY19 REVENUE[1]



1 Only 57 of the 78 municipalities reported yearly results to ABRE for each year between 2010 and 2018. To avoid any misleading comparisons, only these municipalities are analyzed throughout this section

A further review of historical trends of municipalities' fiscal condition validates the challenge of operating with declining resources. Data analysis produced by ABRE Puerto Rico, a non-profit that evaluates municipality finances, from "fully-reporting" municipalities with declining revenues from the period of FY2010 through FY2019 (*Exhibit 129*), which demonstrates a pattern of inability to operate within budget targets[331]

---

[331] "Fully-reporting" municipalities are defined as the 55 municipalities (out of the 78 total) that reported yearly results to ABRE Puerto Rico for each year between 2010 and 2019. To avoid any misleading comparisons due to inconsistent data availability, only these municipalities are analyzed throughout this section

DRA Ex. 236

EXHIBIT 129: GENERAL FUND REVENUES AND EXPENDITURES[1]



† To avoid any misleading comparisons, only "fully-reporting" municipalities are analyzed throughout this section

From FY2010 to FY2019, these municipalities' aggregate General Fund balances fluctuated between positive and negative values from negative $55 million to positive $39 million (*Exhibit 130*). Shortfalls have put further financial strain on the following years budget, driving negative fund balances that have required persistent Commonwealth support and/or increased borrowing.

EXHIBIT 130: FULLY-REPORTING MUNICIPALITIES' END-OF-YEAR GENERAL FUND BALANCES



In total, municipalities have been able to reduce long-term debt (excluding pensions), but this is primarily due to limited access to credit, particularly after the liquidation of the Government Development Bank (GDB) (*Exhibit 131*).

DRA Ex. 236

**EXHIBIT 131: FULLY-REPORTING MUNICIPALITIES' DEBT AND DEBT PAYMENTS**



On the revenue side, improving collections has the potential to increase annual revenues for municipalities. The Municipal Revenue Collection Center (CRIM, by its Spanish acronym), which operates property tax collection on behalf of municipalities, must establish a program to improve collections on existing properties, reclassify properties that are currently erroneously categorized (residential vs. commercial), and pursue strategies to enhance collections. Current year collections have averaged approximately 68% in recent years, which is well below comparable U.S. jurisdictions. Low compliance rates and thousands of properties in Puerto Rico that do not appear on the property tax rolls affect the revenue productivity and fairness of the property tax system. CRIM has the responsibility for virtually every aspect of property tax administration, including developing a cadastral survey, identifying taxable parcels, developing and maintaining an appraisal manual, developing tax records, calculating the valuation for all real property, notifying taxpayers of their respective obligations, and collecting the real and personal property tax. Although CRIM currently delegates services to select municipalities via collaboration agreements for functions such as appraisals, collections, verifications, and investigations, municipal governments still have limited roles in the administration of the property tax. Thus, enhancing the effectiveness of CRIM is critical for municipal revenues and services.

*Act 29-2019*

On April 15, 2020, the Title III court issued a decision granting summary judgment to the Oversight Board on several of its claims against the Governor and the Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym). The court issued a mandatory permanent injunction precluding the enforcement of Act 29-2019 and declared Act 29-2019 a nullity because it violated various provisions of PROMESA. The Title III court's order became effective on May 7, 2020. The effect of this nullification required municipalities to cover their own employees' PayGo and healthcare costs going forward and to reimburse the Commonwealth for its costs resulting from the impact of Act 29-2019 during its effective period. For FY2020, the PayGo and healthcare obligations were approximately $166 million and $32 million, respectively. The Oversight Board, the Government, and CRIM agreed that the combined amount due, $198 million, would be partially offset by the FY2020 Commonwealth transfer of $132 million (that was transferred to CRIM in accordance with the 2019 Fiscal Plan and Certified Budget). Under Act 29-2019, CRIM retained these funds and did not remit them to the municipalities as part of the Equalization Fund. Therefore, CRIM transferred the $132 million to the Health Insurance Administration (ASES, by its Spanish acronym) and the Retirement System for Employees of the Government of Puerto Rico (ERS) to partially repay the FY2020 PayGo and ASES debt. The $132 million was allocated proportionally to the municipalities based on their projected FY2020 PayGo and ASES debt.

DRA Ex. 236

After accounting for this transfer, the nullification of Act 29-2019 resulted in the municipalities together owing $66 million to the Commonwealth for their employees' FY2020 PayGo and healthcare contributions. This amount equated to approximately 3% of the total municipality General Fund budgets in FY2020 (~$2 billion), although the impact varied on a municipality-by-municipality basis. The remaining $66 million had to be repaid according to the repayment waterfall in *Exhibit 132*. This repayment waterfall focuses on incremental revenues that municipalities had not considered in their FY2020 or FY2021 budgets. Therefore, the financial impact on municipalities was minimized.

Since the beginning of FY2021, CRIM, AAFAF, and the municipalities have been working closely with the Oversight Board to implement the repayment waterfall and pay the outstanding FY2020 PayGo and healthcare debt. Funds have been prioritized to pay PayGo debt first before paying healthcare debt. The first three (3) steps of the repayment waterfall have been completed. As of March 2021, the outstanding FY2020 PayGo debt is $2 million. Similarly, the outstanding FY2020 healthcare debt is $18 million. The combined debt outstanding of $20 million, which is approximately 10% of the original debt outstanding, will be repaid through steps 4 and 5 of the repayment waterfall. CRIM and AAFAF have been working since July 2020 to retain expert services to support valuation of the property tax debt and associated tax liens, which is projected to be worth approximately $400 million, based on a third party's previous proposal to purchase the portfolio. On August 17, 2020, CRIM and AAFAF issued a request for proposals (RFP), responses to which were due on August 28, 2020. Three proposals were received. After reviewing the proposals, CRIM and AAFAF requested additional information on the methodology and approach that the candidates would use to ensure an acceptable confidence level in the data, assuming data validation and cleanup were required in the initial phase of the work. Therefore, an addendum to the RFP was issued on November 5, 2020. By November 13, 2020, the three proposing firms submitted their responses to the addendum, explaining their proposed methodologies and adjusting their proposed fee structures to reflect the incremental work. To date, CRIM and AAFAF have yet to finalize the selection of the third-party experts to support the data clean-up and portfolio valuation. Therefore, given this delay, CRIM will not be able to sell the portfolio by the end of FY2021, which is step 4 of the repayment waterfall. As a result, in order to repay any outstanding FY2020 PayGo and healthcare debt, CRIM must offset an amount equal to $1/12^{th}$ of the outstanding debt monthly, beginning on December 31, 2021. This will ensure that the debt is fully repaid by the end of FY2022, as required by this 2021 Fiscal Plan and in accordance with Step 5 of the repayment waterfall. Nevertheless, CRIM and AAFAF must sell the portfolio by FY2022 to provide municipalities with additional revenue.

DRA Ex. 236

EXHIBIT 132: REPAYMENT WATERFALL

| Repayment waterfall | Description |
|---|---|
| Step 1 – Offset outstanding obligation against electronic lottery funds true up | • CRIM identified $17.6 million of Electronic Lottery proceeds from FY2016 & FY2017 previously not remitted to CRIM as required by Law<br>• Use these funds to offset a portion of the remaining obligation of $66 million |
| Step 2 – Offset outstanding obligation against excess CAE rebate | • If tax collections exceed the amount needed to cover annual debt service on CAE loans, municipalities receive this excess at the end of the year<br>• Use these funds to further offset remaining obligations after Step 1 |
| Step 3 – Offset outstanding obligation against the final FY2020 liquidation | • CRIM projects annual municipal advances at the beginning of each fiscal year and remits funds based on projections monthly<br>• After the fiscal year ends, CRIM reconciles actual collections to remittances and liquidates any excess to the corresponding municipality<br>• Use these funds to further offset remaining obligations after Steps 1 and 2 |
| Step 4 – Offset outstanding obligation against the collection of aged Accounts Receivable | • CRIM will value and plan to monetize its portfolio of accounts receivable by the end of FY2021. This action is projected to result in up to $400 million in proceeds<br>• Proceeds from the sale of this portfolio shall be paid to the Commonwealth to further offset remaining obligations after Steps 1, 2 and 3 |
| Step 5 – Offset outstanding obligation against municipal advances | • If FY2020 PayGo and health care obligations are not fully repaid after Steps 1, 2, 3 and 4, CRIM should offset the municipality's monthly advances until the remaining obligation is repaid in full<br>• To minimize the impact of offsets, CRIM must undertake revenue enhancing measures to secure additional revenues that could then offset the remaining liability due<br>• If CRIM does not achieve its revenue-enhancing measures by the end of FY2022, a series of collection measures will be enacted. These measures include the establishment of a lockbox mechanism to control all cash receipts and disbursements and an immediate offset of 25% of the outstanding obligation from property tax advances<br>• These offsets continue in varying amounts until the obligation is fully repaid<br>• If the balance of the FY2020 health care and PayGo obligations is not paid down by the end of FY2022, the budgeted monthly Commonwealth transfer will be placed on hold until such time as the requirement is met |

# 19.2   Disaster relief and the COVID-19 pandemic

### 19.2.1   Accelerating post-disaster relief at municipalities

Puerto Rico has experienced historic and unprecedented disasters since 2017. The impact of Hurricanes Irma and María, as well as a magnitude 6.4 earthquake on January 7, 2020 (and the subsequent aftershocks), resulted in significant damage to the infrastructure and economy, and prompted material out-migration. The Federal Government has supported post-hurricane reconstruction in the municipalities primarily through FEMA's Public Assistance (PA) Program, Community Disaster Loans (CDLs), and 406 Hazard Mitigation Grant Program (HMGP). FEMA processes PA Program grant funding according to the type of work the applicant undertakes. Eligible work must be required as a result of the declared incident, be located in the designated area, and be the legal responsibility of the applicant. Eligible work is classified into different categories: Emergency work and Permanent work. Permanent work projects are considered either large or small. Projects above a certain amount are considered "large." The threshold corresponds to the annually adjusted small project maximum, which is adjusted annually for inflation. For FY2018, when hurricanes Irma and María made landfall, that threshold was $123,100. For small projects, final funding is based on the estimate at the time of project approval and certification of project completion is required when the project is done. Unlike large projects where the applicant completes the project and is later reimbursed for the project costs, small projects are paid out upon obligation. Given the liquidity issues facing many of the municipalities, the Government made the obligation of small projects a priority in the Island's recovery.

In addition to the aid provided through the FEMA PA Program, CDLs are provided to municipalities that have suffered a substantial loss of revenues as a result of a disaster and that can demonstrate a need for federal financial assistance to perform critical functions such as payroll, supplies, and maintenance materials related to disaster operations. 78 of the 78 municipalities have received over $306 million from the Federal Government to make up for lost

DRA Ex. 236

revenues due to the hurricanes in the form of CDLs. 15 municipalities affected by the 2020 earthquakes also received approximately $55 million in assistance in the form of CDL loans (see *Exhibit 133*).

EXHIBIT 133: POST-HURRICANE RECONSTRUCTION FEDERAL FUNDS FOR MUNICIPALITIES

| Source of funding | Allocated funds, $M | Disbursements, $M |
|---|---|---|
| FEMA Public Assistance | 1,600 | 177 |
| CDLs for hurricane relief | 306 | 285 |
| CDLs for earthquake relief | 55 | 32 |
| **Total** | **1,961** | **494** |

SOURCE: PRDE Personnel roster December 2020

Municipalities and Puerto Rican residents have also received disaster funding through Individual Assistance programs, Small Business Administration (SBA) Loans, Department of Housing Community Development Block Grant Disaster Recovery (CDBG-DR) programs, and Department of Transportation funding.

On December 7, 2019, the Oversight Board approved the Government's request to establish a "State Recovery Fund" that would fund advances to eligible Small Projects under the FEMA PA Program, which many municipalities required due to a lack of liquidity.[332] The State Recovery Fund was financed solely from a reprogramming of the $100 million FY2020 Certified Budget appropriation under the custody of the Office of Management and Budget (OGPe, by its Spanish acronym) designated as "Cost share of public assistance" and is to be used only for Small Projects (as defined above). The Oversight Board also included several requirements from the Government as a precondition of approval of this State Recovery Fund. Since the establishment of this State Recovery Fund, COR3 has informed the Oversight Board that $92.5 million would be returned to OGP, given other mechanisms have been put in place to expedite Small Projects and the funds are no longer required by the municipalities.[333] The fund was made available to municipalities from early 2020 to late spring of 2020. During the term of availability few municipalities completed the process to access these funds as the rate of obligation of small projects increased dramatically and Municipalities began to receive the funds to carry out the projects. Thus, the fund was no longer necessary and  funds could be re-programmed and used to address other needs.

The 2020 Fiscal Plan included the use of $51.4 million requested for the first required steps of demolition and debris removal as a result of the earthquakes in the southwestern region of the Island. These funds were appropriated to the Puerto Rico Department of Housing to administer for municipalities to carry out the FEMA Private Property Debris Removal and Demolition program (PPDR). Debris removal from private property is generally the responsibility of individual private property owners leveraging private funding, such as insurance, to cover the cost. However, if private property owners are not available because they have evacuated, the state or local government may need to enter the private property to remove debris considered an immediate threat to the lives, health, and safety of its residents.[334] The municipalities of Guayanilla, Guánica, Ponce, Yauco, and Peñuelas received approval from FEMA and COR3 to administer their own PPDR programs. In order for municipalities to have access to these funds, they had to enter into a Memorandum of Understanding (MOU) with Vivienda. To date, four out of these five municipalities have completed the MOU stage and a total of **$12.4 million** has been advanced to begin demolition work. As part of the agreement with Vivienda, municipalities must work with COR3 to request the reimbursement for eligible expenses under this program. The

---

332 Oversight Board letters dated December 7 and December 14, 2019
333 COR3 letter to the Oversight Board dated April 14, 2020
334 Public Assistance Debris Removal Guide FEMA 325/July2007

reimbursement will then be used in the second stage of the redevelopment of the southwest region.

After the demolition and debris removal, the next step or second stage should be the development of an integrated and comprehensive plan for the long-term economic reconstruction of the southwest region, focusing on rebuilding with resiliency and taking into account the changes in the economy in a post-COVID world, the patterns of migration from the area, and the potentially-permanent risks to populations from the earthquakes and erosion after the hurricanes, among other factors. This plan should be developed in coordination with Vivienda and other relevant state and federal agencies.

On March 16, 2021, Governor Pierluisi announced the reallocation of CDBG-DR City Revitalization funds overseen by Vivienda. This reallocation will increase the funds to the municipalities from an initial $600 million obligation to $1 billion, with an addition of $400 million. These funds were initially obligated on February 20, 2020 and the funds must be used by September 18, 2024. Additionally, the Governor allocated $10 million to municipalities for administrative expenses. *Exhibit 134* below details the total disaster relief funds allocated to each municipality. The Board also approved $14.9 million of support from the General fund Emergency Reserve to 18 municipalities directly impacted by the earthquakes.

EXHIBIT 134: DISASTER RELIEF FUNDING ALLOCATIONS TO MUNICIPALITIES, $K

| Municipality | FEMA PA | CDBG-DR | TOTAL | Municipality | FEMA PA | CDBG-DR | TOTAL | Municipality | FEMA PA | CDBG-DR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Municipality | 2,044 | 8,543 | 4,735 | Fajardo | 2,478 | 11,862 | 14,340 | Fajardo | 2,478 | 11,862 | 14,340 |
| Adjuntas | 8,966 | 10,827 | 8,130 | Florida | 2,245 | 8,180 | 10,424 | Florida | 2,245 | 8,180 | 10,424 |
| Aguada | 2,608 | 11,997 | 28,182 | Guánica | 2,484 | 9,638 | 12,122 | Guánica | 2,484 | 9,638 | 12,122 |
| Aguadilla | 4,660 | 9,313 | 5,908 | Guayama | 6,371 | 15,048 | 21,418 | Guayama | 6,371 | 15,048 | 21,418 |
| Aguas Buenas | 6,608 | 9,754 | 5,482 | Guayanilla | 6,185 | 9,687 | 15,873 | Guayanilla | 6,185 | 9,687 | 15,873 |
| Aibonito | 8,281 | 10,158 | 6,471 | Guaynabo | 7,107 | 13,193 | 20,300 | Guaynabo | 7,107 | 13,193 | 20,300 |
| Añasco | 3,667 | 15,881 | 41,800 | Gurabo | 6,838 | 10,158 | 16,996 | Gurabo | 6,838 | 10,158 | 16,996 |
| Arecibo | 5,175 | 9,982 | 4,715 | Hatillo | 2,792 | 10,185 | 12,977 | Hatillo | 2,792 | 10,185 | 12,977 |
| Arroyo | 3,812 | 9,593 | 5,737 | Hormigueros | 1,644 | 8,510 | 10,155 | Hormigueros | 1,644 | 8,510 | 10,155 |
| Barceloneta | 4,318 | 9,661 | 6,717 | Humacao | 5,613 | 13,995 | 19,609 | Humacao | 5,613 | 13,995 | 19,609 |
| Barranquitas | 17,263 | 20,140 | 68,655 | Isabela | 5,474 | 10,886 | 16,361 | Isabela | 5,474 | 10,886 | 16,361 |
| Bayamón | 8,260 | 15,406 | 27,166 | Jayuya | 10,338 | 8,010 | 18,348 | Jayuya | 10,338 | 8,010 | 18,348 |
| Cabo Rojo | 10,230 | 22,997 | 54,357 | Juana Díaz | 6,129 | 12,289 | 18,419 | Juana Díaz | 6,129 | 12,289 | 18,419 |
| Caguas | 3,386 | 9,441 | 7,155 | Juncos | 6,335 | 10,015 | 16,350 | Juncos | 6,335 | 10,015 | 16,350 |
| Camuy | 7,610 | 12,864 | 23,547 | Lajas | 2,708 | 11,264 | 13,972 | Lajas | 2,708 | 11,264 | 13,972 |
| Canóvanas | 21,606 | 21,321 | 55,470 | Lares | 2,721 | 9,108 | 11,829 | Lares | 2,721 | 9,108 | 11,829 |
| Carolina | 6,296 | 9,630 | 5,642 | Las Marías | 3,534 | 8,964 | 12,498 | Las Marías | 3,534 | 8,964 | 12,498 |
| Cataño | 2,824 | 18,296 | 21,319 | Las Piedras | 4,827 | 10,074 | 14,901 | Las Piedras | 4,827 | 10,074 | 14,901 |
| Cayey | 2,808 | 11,650 | 4,048 | Loíza | 8,053 | 14,550 | 22,603 | Loíza | 8,053 | 14,550 | 22,603 |
| Ceiba | 2,453 | 9,677 | 4,520 | Luquillo | 3,431 | 8,593 | 12,024 | Luquillo | 3,431 | 8,593 | 12,024 |
| Ciales | 9,111 | 10,194 | 19,612 | Manatí | 5,012 | 11,256 | 16,268 | Manatí | 5,012 | 11,256 | 16,268 |
| Cidra | 7,916 | 10,559 | 8,388 | Maricao | 7,613 | 8,559 | 16,172 | Maricao | 7,613 | 8,559 | 16,172 |
| Coamo | 3,417 | 9,518 | 4,937 | Maunabo | 11,061 | 8,769 | 19,830 | Maunabo | 11,061 | 8,769 | 19,830 |
| Comerío | 7,511 | 10,467 | 7,436 | Mayagüez | 11,148 | 14,977 | 26,126 | Mayagüez | 11,148 | 14,977 | 26,126 |
| Corozal | 376 | 9,257 | 3,165 | Moca | 3,225 | 10,010 | 13,235 | Moca | 3,225 | 10,010 | 13,235 |
| Culebra | 7,073 | 10,793 | 8,042 | Morovis | 5,059 | 10,342 | 15,402 | Morovis | 5,059 | 10,342 | 15,402 |

SOURCE: COR3, AAFAF, Congressional reports on ARP allocations

### 19.2.2 *COVID-19 pandemic and municipal support*

Municipalities have received continuous Government and federal aid to address increased expenses associated with COVID-19 response and recovery actions. The most significant of this recovery funding are the allocations associated with the ARP Act.

On March 28, 2020, the Oversight Board approved the Commonwealth's plan to provide $100 million as part of the COVID-19 Emergency Measures Support Package. Municipalities received

$50 million per month for two months with the funds distributed to each municipality using a 3-tier approach based on municipal population levels of $1 million, $1.35 million and $1.75 million.

Further, the 2020 Fiscal Plan provided a one-year pause in the further reduction of Commonwealth appropriations to municipalities; accordingly, the FY2021 appropriation remained at $132 million. This additional financial support for municipalities was intended to be used to effectively implement strategies to improve municipalities' financial sustainability by instituting critical changes in operating structure, sharing costs through consolidated services, and improving revenue collection.

In addition, the Governor signed an executive order that adopts the "Strategic Plan for Disbursement" of the $2.2 billion allocated to Puerto Rico by the Coronavirus Relief Fund (CRF) created by the Federal Government through the CARES Act, which assigned $100 million to be transferred to the municipalities for eligible expenses related to COVID-19. Another $100 million in funding was available under the CARES Act to reimburse allowable COVID-related expenses incurred by the municipalities. In July 2020, the Governor expanded the available funds by another $100 million for a total of $200 million overseen by AAFAF. Municipalities are responsible for documenting and tracking all expenses for reimbursement.

In February 2021, the Governor announced the disbursement of an additional $100 million from the CARES Act to assist the municipalities with the mitigation of the effects of the pandemic. Each municipality will receive $1 million and the remaining $22 million will be distributed among the municipalities with the greatest economic difficulties.

### EXHIBIT 135: COVID-19 FUNDING ALLOCATIONS TO MUNICIPALITIES, $K

| Municipality | CW Support | CARES Act | ARP | TOTAL | Municipality | CW Support | CARES Act | ARP | TOTAL | Municipality | CW Support | CARES Act | ARP | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjuntas | 1,000 | 2,066 | 1,669 | 4,735 | Fajardo | 1,350 | 2,808 | 13,242 | 17,400 | Naguabo | 1,350 | 2,581 | 2,477 | 6,408 |
| Aguada | 1,350 | 3,252 | 3,528 | 8,130 | Florida | 1,000 | 2,000 | 1,088 | 4,088 | Naranjito | 1,350 | 2,678 | 2,629 | 6,658 |
| Aguadilla | 1,750 | 4,085 | 22,347 | 28,182 | Guánica | 1,000 | 2,000 | 1,479 | 4,479 | Orocovis | 1,000 | 2,241 | 1,944 | 5,185 |
| Aguas Buenas | 1,000 | 2,523 | 2,386 | 5,908 | Guayama | 1,350 | 3,422 | 17,584 | 22,356 | Patillas | 1,000 | 2,000 | 1,559 | 4,559 |
| Aibonito | 1,000 | 2,357 | 2,125 | 5,482 | Guayanilla | 1,000 | 2,081 | 1,694 | 4,776 | Peñuelas | 1,000 | 2,181 | 1,851 | 5,032 |
| Añasco | 1,350 | 2,605 | 2,515 | 6,471 | Guaynabo | 1,750 | 6,138 | 22,395 | 30,283 | Ponce | 1,750 | 9,093 | 61,904 | 72,747 |
| Arecibo | 1,750 | 6,030 | 34,020 | 41,800 | Gurabo | 1,350 | 3,890 | 4,528 | 9,767 | Quebradillas | 1,000 | 2,406 | 2,203 | 5,610 |
| Arroyo | 1,000 | 2,058 | 1,657 | 4,715 | Hatillo | 1,350 | 3,407 | 3,770 | 8,527 | Rincón | 1,000 | 2,000 | 1,313 | 4,313 |
| Barceloneta | 1,000 | 2,456 | 2,281 | 5,737 | Hormigueros | 1,000 | 2,000 | 1,492 | 4,492 | Río Grande | 1,350 | 3,947 | 17,595 | 22,892 |
| Barranquitas | 1,350 | 2,701 | 2,665 | 6,717 | Humacao | 1,750 | 4,108 | 21,695 | 27,554 | Sabana Grande | 1,000 | 2,332 | 2,087 | 5,420 |
| Bayamón | 1,750 | 11,388 | 55,517 | 68,655 | Isabela | 1,350 | 3,481 | 18,387 | 23,217 | Salinas | 1,350 | 2,665 | 2,608 | 6,623 |
| Cabo Rojo | 1,350 | 3,916 | 21,900 | 27,166 | Jayuya | 1,000 | 2,000 | 1,335 | 4,335 | San Germán | 1,350 | 2,855 | 16,988 | 21,193 |
| Caguas | 1,750 | 8,647 | 43,960 | 54,357 | Juana Díaz | 1,350 | 3,742 | 18,321 | 23,413 | San Juan | 1,750 | 20,542 | 183,849 | 206,141 |
| Camuy | 1,350 | 2,872 | 2,933 | 7,155 | Juncos | 1,350 | 3,341 | 3,668 | 8,360 | San Lorenzo | 1,350 | 3,209 | 3,460 | 8,019 |
| Canóvanas | 1,350 | 3,742 | 18,455 | 23,547 | Lajas | 1,000 | 2,351 | 2,116 | 5,467 | San Sebastián | 1,350 | 3,180 | 16,563 | 21,093 |
| Carolina | 1,750 | 10,020 | 43,700 | 55,470 | Lares | 1,000 | 2,490 | 2,334 | 5,824 | Santa Isabel | 1,000 | 2,302 | 2,039 | 5,341 |
| Cataño | 1,000 | 2,419 | 2,223 | 5,642 | Las Marías | 1,000 | 2,000 | 762 | 3,762 | Toa Alta | 1,750 | 5,420 | 20,700 | 27,870 |
| Cayey | 1,350 | 3,603 | 16,366 | 21,319 | Las Piedras | 1,350 | 3,271 | 3,558 | 8,179 | Toa Baja | 1,750 | 5,558 | 26,454 | 33,762 |
| Ceiba | 1,000 | 2,000 | 1,048 | 4,048 | Loíza | 1,000 | 2,507 | 2,361 | 5,867 | Trujillo Alto | 1,750 | 4,907 | 20,800 | 27,458 |
| Ciales | 1,000 | 2,000 | 1,520 | 4,520 | Luquillo | 1,000 | 2,084 | 1,698 | 4,782 | Utuado | 1,350 | 2,681 | 2,634 | 6,665 |
| Cidra | 1,350 | 3,351 | 14,911 | 19,612 | Manatí | 1,350 | 3,288 | 18,150 | 22,788 | Vega Alta | 1,350 | 3,213 | 3,467 | 8,030 |
| Coamo | 1,350 | 3,353 | 3,686 | 8,388 | Maricao | 1,000 | 2,000 | 522 | 3,522 | Vega Baja | 1,750 | 4,070 | 19,331 | 25,151 |
| Comerío | 1,000 | 2,144 | 1,793 | 4,937 | Maunabo | 1,000 | 2,000 | 992 | 3,992 | Vieques | 1,000 | 2,000 | 806 | 3,806 |
| Corozal | 1,350 | 2,982 | 3,105 | 7,436 | Mayagüez | 1,750 | 5,390 | 35,463 | 42,602 | Villalba | 1,000 | 2,312 | 2,055 | 5,366 |
| Culebra | 1,000 | 2,000 | 165 | 3,165 | Moca | 1,350 | 3,141 | 3,354 | 7,846 | Yabucoa | 1,350 | 2,981 | 3,104 | 7,435 |
| Dorado | 1,350 | 3,218 | 3,475 | 8,042 | Morovis | 1,350 | 2,862 | 2,916 | 7,128 | Yauco | 1,350 | 3,060 | 14,554 | 18,964 |
| | | | | | | | | | | Total | 100,050 | 278,000 | 949,826 | 1,327,876 |

SOURCE: COR3, AAFAF, Congressional reports on ARP allocations

On March 11, 2021, President Biden signed the American Rescue Plan (ARP) Act into law, which contains $1.9 trillion in overall U.S. national spending to support relief and economic recovery efforts. The ARP Act provides a total of $350 billion in assistance to states, counties, municipalities, territories and tribal governments to cover expenses, make up for lost revenue,

DRA Ex. 236

and ease the overall economic impact from the COVID-19 pandemic. Specific to municipalities is the $130.2 billion to local governments from the Coronavirus Local Fiscal Recovery Fund:

- $65.1 billion to counties, allocated based on each county's share of the U.S. national population.

- $45.6 billion to metropolitan cities (cities with 50,000 or more people), allocated by an average of one of two sets of economic ratios, to be determined by the U.S. Secretary of the Treasury.

- $19.5 billion to municipalities with fewer than 50,000 people (to be distributed by the applicable state), allocated based on each municipality's share of the overall population of municipalities

Puerto Rico's municipalities are estimated to receive approximately $950 million under ARP. Local government funds will be distributed in two equal tranches, the first by May 10, 2021, and the second by March 11, 2022. Funds for all other municipalities (and any counties that are not political subdivisions of a state) will be distributed to the states for redistribution by May 10, 2021, and the states must distribute allocated amounts to such municipalities within 30 days of receipt, although a state may request a 30-day extension—and in certain cases additional extensions—due to administrative burden.

Funds allocated from each of the State Fiscal Recovery Fund and Local Fiscal Recovery Fund may be used to:

- Respond to the COVID-19 emergency and address its economic effects, including through aid to households, small businesses, nonprofits, and impacted industries such as tourism and hospitality.

- Provide premium pay to essential employees of state or local governments or make grants to the employers of essential employees. Premium pay may not exceed $13 per hour or $25,000 per worker.

- Provide government services to the extent of any revenue reduction resulting from COVID-19.

- Make investments in water, sewer and broadband infrastructure.

- All funds must be spent on costs incurred on or before December 31, 2024.

- State and local governments cannot use the funds to make pension payments.

- State and local governments may transfer funds to private nonprofit groups, public benefit corporations involved in passenger or cargo transportation, and special-purpose units of state or local governments.

- State and local governments must provide periodic reports to the Secretary of the Treasury giving a detailed accounting of the uses of funds and, in the cases of states, all modifications to the states' tax revenue sources.

## 19.3   Vision and reform needed to transform municipal services

The significant opportunity associated with ARP and other recovery funds provide municipalities an opportunity to make meaningful investments towards their fiscal sustainability. Municipalities must engage in evidence-based investments in driving efficiencies in operations to lower expenses while increasing revenues through economic development, improved tax collections and business growth. Yet, for many of the 78 municipalities, reducing their individual cost structures will be insufficient in the face of rising operational costs and without the ongoing benefit of governmental transfers. Current levels of fiscal stability, level of population decline, and economic opportunities vary across the 78 municipalities. Furthermore, many municipalities

which have greater dependency upon Commonwealth transfers as a source of revenue are at increased risk of fiscal distress as transfers continue to decline.

Thus, the Government will need to develop a solution to streamline and consolidate municipal services throughout Puerto Rico. Otherwise, the Government faces the prospect of expanding municipal operating deficits, further deteriorating infrastructure, and worsening service delivery.

To enhance stakeholder discussion on this issue, in June 2020 the Oversight Board published a policy paper examining a new government structure between the Commonwealth and municipal governments.[335] The report included design parameters around decentralization and municipal service consolidation. While the Oversight Board did not advocate for eliminating municipal governments, it did call for a comprehensive statutory overhaul to lay a solid foundation for reform. In March 2021, an Executive Order was signed by Governor Pierluisi, the Mayor's Association, and the Mayor's Federation to create the 'Committee for the Decentralization of Municipal Affairs.' The Committee, composed of one representative from each political party and led by the Secretary for Municipal Affairs would be responsible for identifying potential services and competencies that could be gradually transferred from the Central Government to the municipalities, along with the respective required funding. The Committee is expected to submit a report by May 18, 2021 listing their ideas. Top-down changes to the delivery of government services is critical to achieving impact on cost structures given the entrenched local governance structure with 78 municipal governments and their legislatures. The Committee's recommended implementation plan must prioritize changing the cost structure of service delivery as well as shifting responsibilities.

A new decentralized model could improve the delivery of services by centralized Commonwealth agencies which are historically untimely and lack responsiveness. Such a model has the potential to dramatically increase capacity to respond to a crisis and improve service delivery at a local level. Unfortunately, most municipalities do not (individually) have the administrative or financial capacity to operate programs currently provided by the Commonwealth. Many also lack the economies of scale necessary to be efficient with programs such as the Administration for Child Support Enforcement (ASUME, by its Spanish acronym), Administration for Families and Children (ADFAN, by its Spanish acronym), or Vivienda. However, a consolidated municipal service structure could enable the delegation of certain Commonwealth responsibilities to local governments. Such a model could yield municipal and Commonwealth savings, and a portion of those savings could be reinvested back into the municipalities where savings are realized.

In addition, a more integrated government structure could help implement locally based economic development strategies, which are more viable at a regional level than on an individual municipality basis. On the revenue side, service consolidation could further enhance the coordination of property tax collection by standardizing and automating processes and integrating data and information systems. The Oversight Board is committed to helping the Government and all the municipal governments throughout a reform process, with ideas, insight, and design support, if , and only if, the proposed solution reduces the costs of services provided by municipalities through service consolidation.

### 19.3.1   *Oversight Board's municipal pilot*

The Oversight Board initiated the Pilot program in May 2019 when it designated all 78 Puerto Rican municipalities as covered entities under PROMESA. The 10 municipalities in the Pilot were Aibonito, Barranquitas, Camuy, Cidra, Comerío, Isabela, Quebradillas, San Sebastián, Orocovis and Villalba, reflecting diverse political representation, size, and financial strength. The Pilot provided important insights into the scope of financial problems municipalities face and the deep-rooted systemic challenges that must be overcome to enable fiscal sustainability. Although the Pilot ends on June 30, 2021, the Oversight Board will continue its work with municipal

---

[335] Cruz, Arnaldo. "Essay: Rethinking Government, A New Commonwealth-Muni Partnership." Puerto Rico Financial Oversight and Management Board. Accessed April 21, 2021

governments with the launch of three municipal incentive funds available to all 78 municipalities. The Oversight Board will work with any and all that are eager to benefit from this program and will continue to provide support to help improve municipalities' fiscal stability by working with mayors on identifying and adopting leading local government practices on efficient spending, economic development, and maximization of federal funds.

**EXHIBIT 136: MAP OF MUNICIPALITIES PARTICIPATING IN THE OVERSIGHT BOARD'S PILOT PROGRAM**



### 19.3.2  Incentivizing consolidation of services

To further incentivize service consolidation, the 2020 Fiscal Plan established funds to assist the municipalities to achieve fiscal sustainability. By consolidating services, municipalities will be able to significantly reduce costs and generate additional revenues through economic development and other potential initiatives. Municipalities that voluntarily consolidate services will be eligible to receive a one-time financial incentive upon certification of such action by the Oversight Board. To fund this initiative, the 2020 Fiscal Plan set aside $22 million in each fiscal year through FY2025 for distribution among municipalities that complete service consolidations. The amount distributed to each participating municipality will be determined in coordination between AAFAF and the Oversight Board and is dependent on the savings or revenue generation achieved. The fund is expected to commence under AAFAF in the fourth quarter of 2021.  FY2021 funding not disbursed is authorized to rollover to FY2022.  The annual funding commitment will be reviewed each year through FY2025 based on municipal participation in the fund.

*School and Road Maintenance Funds*

As provided for in the 2020 Commonwealth Fiscal Plan, the Oversight Board committed to support all 78 municipalities through the creation of school and road maintenance funds.  These funds will help municipalities through:

- Defraying maintenance costs often covered by municipalities instead of responsible Commonwealth agencies

- Detailing requirements between Commonwealth agencies and municipalities for roads and school maintenance

- Establishing processes to fund such requirements

For school maintenance, the 2020 Fiscal Plan made available $2.5 million for FY2021, which has been extended to FY2022 if not disbursed.  Within this incentive fund, municipalities are reimbursed for maintenance costs associated with their Public Building Authority (AEP for its Spanish acronym) managed schools.  377 schools managed by AEP in 76 municipalities are eligible to participate. This represents $6,631 available funding per school. Municipalities are

269

required to establish a memorandum of understanding with AEP on specific maintenance costs which can be covered.

For road maintenance, the 2020 Fiscal Plan made available $10 million for FY2021, which has been extended to FY2022. Within this incentive fund, municipalities can be reimbursed for maintenance costs associated with their secondary and tertiary roads through coordination with the Department of Transportation and Public Works (DTOP for its Spanish acronym). 78 municipalities with 6,553 kilometers of roads are eligible to participate. This represents $1,526 available funds per kilometer. Municipalities are required to establish a memorandum of understanding with DTOP on specific maintenance costs which can be covered and may include primary roads.

### 19.3.3 *Property tax reform*

CRIM plays an important role in supporting Puerto Rico's municipalities in their economic and social development by ensuring an efficient process for collecting and distributing real and personal property taxes, which are important revenue sources for municipalities. For FY2021, property taxes represent approximately 30% of the aggregate general fund budget for municipalities.

Historically, the taxable value of real and personal property has been significantly reduced by tax exemptions and exonerations, which have a negative impact on the municipalities that rely on property taxes to fund essential services. Puerto Rico offers considerably more tax breaks both in terms of number and notional value compared to other U.S. jurisdictions. For example, in FY2020, more than 50% of the real and personal property tax base was eliminated through these exemptions and exonerations. In addition, CRIM's tax roll does not include all the properties in Puerto Rico, nor does it accurately reflect the taxable value of some properties as significant home improvements have not been properly appraised. Similarly, due to outdated systems, there are high levels of delinquencies with collection rates for current year real property tax billings well below comparable jurisdictions, standing at approximately 68%. This has resulted in a large accounts receivable balance. Therefore, it is essential that CRIM seize all opportunities to maximize property tax collections by improving compliance to help municipalities reduce the reliance on the Commonwealth transfer and achieve long-term fiscal sustainability.

CRIM is continually undergoing an operational transformation centered around replacing outdated and inefficient applications and hardware, implementing best practices for business continuity, re-engineering processes to improve services to municipalities and taxpayers, and establishing a more data-driven culture. These initiatives should serve as the foundation for CRIM to implement strategies for successfully enhancing tax revenue collections. In addition, CRIM is undertaking various measures to improve collaboration with other government agencies and update the tax rolls to accurately reflect property taxable value and ownership. These measures will allow CRIM to better capture unrealized property tax revenues by increasing tax compliance and improving overall collection rates. Based on implementation planning discussions with CRIM management, CRIM estimates these initiatives could produce:

- $69 million of additional annual revenue from raising real property tax compliance from 68% to 76%

- $166 million of additional annual revenue from registering properties and home improvements not on the tax roll

- $89 million of additional annual revenue from fixing incorrect mailing addresses in the billing system

- $400 million of one-time revenue from selling the accounts receivable portfolio

- Additional revenue-enhancing measures are identified in CRIM's 2021 Fiscal Plan

EXHIBIT 137: REDUCTION IN MUNICIPAL APPROPRIATIONS UNDER STATUS QUO SCENARIO



# Chapter 20. Pension reform

## 20.1   Current state of and required changes to pension reform

The Government operates three public employee retirement systems in Puerto Rico: The Employees' Retirement System (ERS), the Teachers' Retirement System (TRS), and the Judiciary Retirement System (JRS). The systems have different tiers of benefit formulas, some of which are traditional defined benefit pensions based upon years of service and final salary, while others are hybrid cash balance plans. Under the hybrid cash balance plans, employees have notional accounts credited with contributions and interest, and upon retirement, benefits are payable as an annuity. Different benefit tiers apply to employees based upon the year in which they were hired. Per the latest data available, each of the systems included the following liabilities: [336]

- **ERS:** 233,000 total participants covered (113,000 active employees, 120,000 retirees and other beneficiaries); with $1.5 billion in annual benefits and $31 billion in total actuarial liability[337]

- **TRS:** 77,000 total participants covered (32,000 active employees, 45,000 retirees and other beneficiaries); with $0.8 billion in annual benefits and $17 billion in total actuarial liability

- **JRS:** 840 total participants covered (381 active employees, 459 retirees and other beneficiaries); with $25 million in annual benefits and $0.7 billion in total actuarial liability

**All employees have historically made contributions toward their benefits, albeit at different rates**. Most regular government employees (including police officers as of January 1, 2020) also participate in Social Security, which includes both employer and employee contributions; most teachers and judges do not participate.

---

336 All liability estimates are as of July 1, 2017. Benefit estimates and headcounts are based on census data as of July 1, 2017
337 Coverage counts do not include participants who are terminated and owed a deferred vested benefit as this participant data is unavailable. The liability for these participants is estimated via a load in the actuarial liability

DRA Ex. 236

**EXHIBIT 138: PUBLIC EMPLOYEE RETIREMENT SYSTEMS OVERVIEW (PRIOR TO PLAN OF ADJUSTMENT)**

| Group | Defined Benefit Component | Hybrid Cash Balance Component | Defined Contribution Component | Social Security Coverage |
|---|---|---|---|---|
| ERS - Hired Jan 1, 2000 or later | None | Based on employee contributions and a share of investment earnings prior to July 1, 2017 | Based on employee contributions beginning July 1, 2017 | Police – Yes[1] Others – Yes |
| ERS - Hired before 2000 | Based on years of service and salary, frozen as of June 30, 2013 | Based on employee contributions and a share of investment earnings from June 30, 2013 to July 1, 2017 | Based on employee contributions beginning July 1, 2017 | Police – Yes[1] Others – Yes |
| TRS - Hired Aug 1, 2014 or later | None | None | Based on employee contributions | No |
| TRS - Hired before Aug 1, 2014 | Based on salary and years of service | None | None | No |
| JRS - Hired Jul 1, 2014 or later | Reduced formula based on salary and years of service | Based on employee contributions and a share of investment earnings | None | No |
| JRS — Hired before Jul 1, 2014 | Based on salary and years of service | None | None | No |

1 Police officers were enrolled in Social Security effective as of January 1, 2020.

**Over many decades, successive Governments have failed to adequately fund these retirement plans, and today the ERS, TRS, and JRS are insolvent**. In fact, Commonwealth PayGo expenditures to provide pension benefits are expected to continue constituting over 20% of General Fund expenditures without further action, as detailed below (*Exhibit 139*).

**EXHIBIT 139: PAYGO EXPENDITURES COMPARED TO OVERALL GENERAL FUND EXPENDITURES, PRE-MEASURES**



1 Includes only General Fund portion of Medicaid and social programs; excludes intergovernmental transfers and General Fund Capex

In accordance with Section 211 of PROMESA, the Oversight Board published a detailed report in September 2019 on the Commonwealth's retirement systems.[338] This report provides a

---

338 EY, PROMESA Section 211 Report on the Puerto Rico Retirement Systems, September 2019

DRA Ex. 236

comprehensive analysis of the retirement systems' legal structure, operations, and benefit provisions, as well as additional detail related to the history of management of these funds and actions by the Commonwealth that led to the insolvency of these plans. The report outlines that several factors contributed to the historical underfunding, including inadequate employer contribution levels; the enactment of special laws granting new benefits without adequate funding for said benefits; early retirement programs; debt issuance the ERS system could not support; and mortgage, personal and cultural loans made to participants. Moreover, it clearly illustrates the systems' critical underfunding (see *Exhibit 140*) and urgent need for reform.

EXHIBIT 140: FUNDING LEVELS OF ERS, TRS, AND JRS AS OF JUNE 30, 2016



As previously stated, these retirement plans have depleted the assets that were set aside to pay benefits. Further, the employer contributions were not transferred as anticipated.[339] Satisfying pension commitments to current retirees and future retirees and their families is not only important to these individuals but also important to Puerto Rico's economy as retirees spend virtually all their income on the Island. **Action must be taken to identify a level of benefits that Puerto Rico can afford and devise a plan for the Government to fund these revised benefits**.

The Commonwealth has already taken critical steps toward a more stable pension system. Benefits for System 2000 ERS employees hired after January 1, 2000 were transitioned to a hybrid cash balance design with a benefit level based solely on the level of employee contributions. Subsequently, various legislation passed from 2013 through 2017 ceased accruals under the unsustainable ERS and TRS defined benefit (DB) plans (though TRS reform was subsequently partially overturned). As part of this reform, benefits for all ERS employees and for TRS employees hired after August 1, 2014 were transitioned to a hybrid cash balance plan design. With Act 106-2017, the Commonwealth transitioned to a new PayGo pension system, was required to liquidate assets of the three systems to help fund benefits owed, and has moved the assets of recently hired TRS members (and future contributions of ERS and TRS members) into segregated accounts. Hybrid accounts of System 2000 members were not similarly moved into segregated accounts. Now, almost four years after the provisions of Act 106-2017 went into effect, Puerto Rico's retirement systems must be further reformed to reduce costs and maintain adequate funding for current and future retirees. The measures included herein will have an average annual

---

[339] Legislative attempts to increase employer contributions to the pension trust were passed, including the Additional Uniform Contribution payments for ERS (Act 32-2013) and the Annual Additional Contribution for TRS and JRS (Act 160-2013 and Act 162-2013), however, large portions went unpaid and/or were not fully implemented prior to elimination by Act 106-2017

impact of approximately $59 million through FY2026, once fully implemented by the start of FY2023. Reductions to benefits have also been structured to **protect lower-income retirees**, who otherwise could become impoverished and therefore be forced to rely upon government "safety net" benefits.

**Only with pension reform can the Government help restore both fiscal balance and the promise for current and future retirees to safeguard their assets and their future pensions.**

## 20.2  Proposed pension reform initiatives

Based on the measures herein, restructuring the pension systems will lead to $198 million in savings from FY2022 to FY2026, as shown below (*Exhibit 141*).

EXHIBIT 141: PENSION REFORM SUMMARY OF IMPACT



1 Post-measures
2 System 2000 removal savings are in exchange for a one-time payment of ~$1.5 billion per Section 20.2.4

### 20.2.1  *Freeze Defined Benefit accumulation for JRS/TRS and enroll employees in a Defined Contribution plan with segregated accounts*

TRS members hired prior to August 1, 2014 and all JRS members are currently accruing benefits under the defined benefit components of their retirement plans. ERS members and TRS members hired after August 1, 2014 transitioned to hybrid cash balance plans. TRS members hired after August 1, 2014 have subsequently had their hybrid accounts segregated from the DB plan by Act 106-2017. These segregated balances, along with ERS and TRS contributions made after June 30, 2017, have been transitioned to DC accounts effective June 2020. **To avoid creating future pension liabilities and to adequately fund the pensions future retirees, the JRS, the JRS and remaining TRS benefit accruals must be frozen by January 1, 2022.** Members will retain the benefits they have accrued to date, subject to the benefit reduction discussed below. Future benefits must be based on contributions and earnings in new defined contribution retirement accounts. This will result in consistent and equitable treatment across ERS, TRS, and

DRA Ex. 236

JRS, where all employees will contribute to segregated DC accounts. Going forward, employees should have certainty that their contributions and investment returns will be safeguarded for the future through managing their own segregated accounts.

The DB freeze savings over time produce significant savings (growing to over $300 million per year by FY2044) which will play a significant role in restoring long-term adequate funding. The freeze will be implemented through the Plan of Adjustment and is slated to take effect in January 2022.

The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects:

- Participants eligible to retire at the freeze date retain eligibility to retire at any time based on the benefit that has accrued through the freeze date. Otherwise:

  - Individuals that have yet to vest in a benefit amount will be allowed the opportunity to earn additional service towards vesting after the freeze; the benefit upon vesting will be calculated based on service as of the freeze date, with prorations of the full 10-year benefit based on years of service less than 10 years for judges with shorter tenures;

  - Certain judges within six months of service as of the freeze of reaching 30-year enhanced service benefits will be granted six months to grow into a modified enhanced 30-year benefit;

  - Normal retirement eligibility will be delayed up to three years for those not yet eligible for retirement as of the freeze date;

- Future Cost of Living Adjustments (COLAs) will be eliminated;

- Minimum benefits and bonuses will be eliminated for future retirements;

- The ability to purchase additional years of service will be eliminated; and

- Future terminations due to disability will be entitled to the same benefits as regular terminations.

### 20.2.2  8.5% pension benefit reduction

Notwithstanding the reduction in expenditures throughout the Commonwealth's budget, contractual debt service remains unaffordable. Retirement plan participants, like other unsecured claimholders, therefore face a reduction of up to 8.5% in the amounts paid to them by the Commonwealth.[340] **A reduction in pensions (with protections for participants close to the poverty level) is necessary for the Commonwealth to achieve long-term fiscal stability.** The goal is a balanced approach to restore fiscal health to Puerto Rico while ensuring that cuts to retirement benefits occur in a manner that protects any retirees from falling into poverty. The proposed reduction, while significantly smaller as a percentage reduction than those faced by other unsecured claims, including general obligation (GO) bondholder claims and General Unsecured Claims, will still represent a significant reduction in retirement income for many retirees. This treatment is similar to the level of reduction in pension benefits relative to reductions faced by other creditors that has been seen with other government systems facing pension funding crises.[341]

---

[340] As per the terms of the Plan Support Agreement reached between the Oversight Board and Retiree Committee on June 7, 2019 and first reflected in the 2020 Fiscal Plan. In comparison, the 2019 Fiscal Plan included a reduction that was expressed as a marginal reduction to benefits above a threshold that varied by position and was indexed, resulting in a 10% average reduction in monthly pension benefits (including medical insurance bonuses). The revised formulation is a simplified 8.5% flat reduction to the monthly pension benefits (excluding medical insurance bonuses) that is limited by a single $1,500 per month threshold ($1,200 per month in the 2020 Fiscal Plan), below which benefits are not reduced

[341] For example, in Detroit and Rhode Island, pension cuts ranged from 0-30% across beneficiary categories

DRA Ex. 236

Although the benefit reduction will be 8.5%, this reduction will not apply to those with monthly pension benefits of less than $1,500 per month and will not reduce anyone's monthly benefits below such level.[342] This represents an enhancement to the original threshold of $1,200 agreed under the Plan Support Agreement reached with the Committee of Retirees, which was already a smaller reduction than the original terms proposed by the Oversight Board.  As a result of this change, the threshold is now above the average benefits for teachers of $1,450[343] and average benefit of $1,322 for police (neither of which have access to Social Security). *Exhibit 142* illustrates the current distribution of participants by monthly benefit amount across the Commonwealth's retirement systems.

EXHIBIT 142: DISTRIBUTION OF BENEFIT AMOUNTS BY RETIREMENT SYSTEM

| Monthly benefit amount | ERS | | TRS | | JRS | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of pensioners | % of total pensioners | Number of pensioners | % of total pensioners | Number of pensioners | % of total pensioners |
| Up to $1,000 | 71,065 | 59.6% | 12,634 | 27.6% | 37 | 6.9% |
| $1,000 - $1,200 | 9,539 | 8.0% | 3,932 | 8.6% | 8 | 1.5% |
| $1,200 - $1,500 | 12,545 | 10.5% | 8,728 | 19.1% | 23 | 4.3% |
| $1,500 - $2,000 | 12,815 | 10.7% | 7,648 | 16.7% | 34 | 6.4% |
| $2,000 - $3,000 | 9,509 | 8.0% | 12,436 | 27.2% | 51 | 9.6% |
| Over $3,000 | 3,778 | 3.2% | 322 | 0.7% | 380 | 71.3% |

Under this approach, **about 72% of current retirees would receive no reduction in their benefits and no retiree will experience a benefit reduction of more than 8.5%** (*Exhibit 143*).

This formula will also apply to benefits earned through the petition date by current employees who have yet to retire. Overall, about 82% of retirees and future retirees would receive no reduction to their benefits.

---

342 The reduction formula is determined as follows: (1) Calculate the average monthly pension by adding the regular monthly, pension amount, the special law pension, and 1/12 of the Christmas, Summer, and Medicine Bonus payments; (2) Reduce these monthly benefits by 8.5%; (3) Reductions are limited such that the total benefit level (as defined above) is not reduced below $1,500 per month
343 Based on information from ERS as of July 1, 2019

EXHIBIT 143: DISTRIBUTION OF BENEFIT REDUCTION



Distribution of benefit reduction for 2021 Fiscal Plan entities, % of retirees

The 2021 Fiscal Plan assumes that this 8.5% reduction shall take effect on July 1, 2022.

### 20.2.3  *Covering more government workers in Social Security*

Currently, teachers and judges do not participate in Social Security. They do not pay into the program, nor does the Government make a Social Security contribution on their behalf. Unlike ERS members, teachers and judges are entirely reliant on their government pensions for income in retirement. This places them at risk given that government retirement plans are poorly funded. Effective January 1, 2020, police officers, who were similarly situated previously, began actively participating in Social Security.

These groups are exempt from Social Security because of the "Section 218" agreement between the Commonwealth and the Social Security Administration, which stipulates that certain government employees have wages that are includable for Social Security and subject to Federal Insurance Contributions Act (FICA) taxes while others may be exempt from Social Security if they participate in a "qualified replacement plan." Section 218 of the Social Security law provides guidance as to what constitutes a "qualified retirement plan," such as a defined benefit plan with a minimum benefit level or a defined contribution plan in which total employee and employer contributions equal to at least 7.5% of employee wages. Teachers and judges are both in job classifications that, under the Section 218 agreement, are exempted if such a "qualified replacement plan" exists. Under the current TRS and JRS retirement plans, this requirement is met and, therefore, such employees are exempted from Social Security.

Covering these workers under Social Security will provide them with diversified sources of income in retirement, and Social Security's progressive benefit formula will provide a stronger safety net for lower-paid employees. Workers will typically earn greater retirement benefits under Social Security, based on a 6.2% employee contribution and a 6.2% employer (government) match, than they would in a DC plan funded only with a 6.2% employee contribution. For example, a typical full-career government employee retiring with a salary of $35,000 will be entitled to a Social Security benefit of approximately $16,000, in addition to the benefit the employee builds in their defined contribution retirement account.

DRA Ex. 236

Social Security retirement benefits are only provided for those who have ten years of covered earnings. Therefore, it would not be worthwhile for older workers, who may not meet the ten-year threshold and do not have other employment in which they were covered by Social Security, to be covered under Social Security. For this reason, only teachers and judges *under the age of 45* shall be covered under Social Security. This can be accomplished without either an employee referendum or new federal legislation by freezing the TRS and JRS plans and reducing the defined contributions for current teachers and judges under the age of 45 and all teachers and judges hired in the future to an amount lower than the 7.5% required by Section 218. This step will trigger mandatory enrollment in Social Security. Concurrently, lowering the employee defined contribution for younger workers will address the loss of take-home pay they would suffer by having to contribute the 6.2% Social Security payroll tax. This approach is consistent with the approach used to implement Social Security participation for police officers in FY2020.

### 20.2.4  System 2000 settlement

Following the agreement with AFSCME documented in the AFSCME Plan Support Agreement, the Plan of Adjustment includes specific treatment for certain ERS plan participants known as System 2000 members. These are generally ERS members hired on or after January 1, 2000.

Employees who joined ERS on or after January 1, 2000 were enrolled in a hybrid cash balance plan. The hybrid account balances were credited with the employee contributions made to the plan and interest that was connected to the overall ERS trust return. As a result of Act 106-2017, these accounts were frozen as of June 30, 2017 and no longer were credited with either employee contributions or interest.

For participants who have not yet retired, providing access to a market interest return can help the participant in achieving greater retirement benefits than the System 2000 contributions. In lieu of receiving a future benefit from ERS, System 2000 participants will receive the value of their contributions and any interest accrued under the terms of the plan through the Commonwealth (approximately $1.5 billion) petition date as a deposit into their Act 106-2017 accounts.

For ERS participants hired prior to January 1, 2000, defined benefits accrued and payable under Act 1 and Act 447 were frozen as of June 30, 2013 by Act 3-2013. As a result, from July 1, 2013 through June 30, 2017, these employees also accrued benefits under a hybrid plan from employee contributions and interest associated with ERS trust returns similar to System 2000. These benefits are annuitized and paid out along with the defined benefits calculated under Act 1 / Act 447. As this portion of the benefit is largely based on employee contributions, the 8.50% benefit reduction described above will not be applied to the annuitized value of these hybrid accounts.

### 20.2.5  Other Plan of Adjustment provisions

The Plan of Adjustment provides that a pension reserve trust will be established and funded to ensure that future PayGo benefits can be supported regardless of the future economic or political situation in the Commonwealth. The trust will be independently managed by a committee whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations[344]. Funding for the pension reserve trust is to be provided according to a formula based on the Commonwealth's annual surpluses.[345]

In order to ensure that retirees may benefit from the Commonwealth's outperformance of 2020 Fiscal Plan financial projections, the Plan of Adjustment also contemplates a mechanism whereby

---

[344] Article LXXX, Governance and Provisions regarding Pension Reserve, Section 80.2, page 118 of the Amended Plan of Adjustment published during March 8, 2021

[345] Please refer to Article LXXX – Governance and Provisions Regarding Pension Reserve in the March 8, 2021 Amended Plan of Adjustment for additional detail

DRA Ex. 236

retirees subject to the aforementioned reduction in monthly pension benefits may see that reduction partially, or even fully, restored in cases where the Commonwealth materially exceeds the financial projections in the Fiscal Plan that is certified by the Oversight Board and is in effect as of the Effective Date of the Plan of Adjustment.[346]

Due to the contingent nature of these provisions, neither the contributions to the pension reserve trust nor the restoration of pension benefits are included in the 2021 Fiscal Plan projections. For additional detail on these and all other Plan of Adjustment provisions, please refer to the published Plan of Adjustment, available on the Oversight Board website, as the authoritative source for information.[347]

The Oversight Board recognizes that there will be costs associated with implementing the various pension related provisions of the Plan of Adjustment. Therefore, the Oversight Board intends to allocate funds that can be accessed for the execution of these provisions based on services that need to be rendered.

## 20.3   Implementation and enforcement of pensions measures

Advance work will be necessary to prepare the systems for the JRS / TRS freeze and pensions reductions, as well as to ensure proper communications with all Puerto Rican pension recipients. The May 2020 Certified Fiscal Plan assumed the full implementation of pension reform measures by January 1, 2022. Given implementation delays, the 2021 Fiscal Plan assumes that full implementation of pension reform measures will not occur until July 1, 2022.

### 20.3.1   Defined Contribution plan implementation

After almost three years since Act 106-2017 introduced the Defined Contribution accounts for most of the Commonwealth employees, and multiple letters and statements issued by the Oversight Board regarding the importance of implementing these accounts, individual accounts for participants were funded and employees received access to view and manage their account balances in June 2020. In addition to government employees being able to view their account balances, they now have the ability to select their investments, designate their beneficiaries, transfer balances to other investment funds and increase their contributions. Prior to this, employee contributions to their Defined Contribution accounts were held in a temporary trust with nominal interest accruals. By fully funding the individual accounts, the participants are being provided access to their market returns implicitly as promised by the Government. Current and future public sector workers can now have confidence that the funds being invested toward their retirement are being treated with the appropriate level of care and afforded the opportunity to grow over time. It is precisely because the Government has no financial obligation for these retirement benefits, that the Government must continue honoring its fiduciary obligation for implementing the Act 106 plan and transferring employee contribution in a timely manner (i.e. by 15th day of the following month).

During this implementation delay, the Oversight Board repeatedly identified instances where the Government has failed to ensure employee withholdings are transferred immediately to the temporary trust where account balances are being held. On April 30, 2019 and subsequently on February 21, 2020, the Oversight Board notified the Commonwealth that it had identified agencies that had withheld employee contributions intended for participants DC accounts but had failed to transfer these dollars to the Retirement System. As a result of this follow-up and ongoing monitoring by the Oversight Board, the Oversight Board made pertinent referrals to the Department of Justice, and individual contributions has decreased  97%. The Oversight Board

---

[346] Please refer to the definition of "Benefit Restoration" and Article XLII - Provisions For Treatment Of Active And Retired Employee Retirement Benefit Claims (Class 39A Through 39E) in the March 8, 2021 Amended Plan of Adjustment for additional detail

[347] The Plan of Adjustment is available from the Oversight Board as amended during March 8, 2021

DRA Ex. 236

continues to urge the Government of Puerto Rico to instruct agencies, municipalities, public corporations, and those entities that manage government payroll to deduct and immediately address the transfer of these individual contributions. A failure to honor this fiduciary obligation increases the risk of insufficiency in retirement income, the potential futility of the benefit offering, and the diminishing viability of employment in the public sector.

Additionally, during 2020 the Oversight Board made a recommendation to the Government pursuant Section 205 of PROMESA for legislative intervention to amend Act 106 in order to define the default investment option as a target data life-cycle fund, rather than a principal preservation fund once the transition to the Defined Contribution plan became complete. The Oversight Board believes that the default investment option offered by the Defined Contribution Plan should encourage participants to adequately invest their accounts to generate retirement stability. The current default option of the principal preservation fund is inadequate for this task, and as such the Oversight Board feels it is important to change the default investment option to the target date life-cycle fund. This vehicle produces significantly higher long term returns by providing access to higher returning investments during the period of participants' lives when they are better able to handle the risk. While the Government has declined to take the Board's suggestion on this matter, the Oversight Board remains committed to promoting this change since the default option of a principal preservation fund, as currently provided under Act 106, is inadequate for retirement readiness.

In addition, the Oversight Board believes that the use of a principal protection fund as the default investment option is not compliant with fiduciary responsibilities under the Employee Retirement Income Security Act of 1974 (ERISA). The use of target date funds as an investment option, however, is largely supported by similar plans in both the private sector and is consistent with the investment vehicles used by many other governments.

As part of meeting its fiduciary responsibility, in selecting which target date funds to offer, the Commonwealth should select funds that have a demonstrated track record of appropriate management and achieving returns that are justified by their fees. This will provide Commonwealth employees with the tools they need to be adequately prepared for retirement.

After the Oversight Board's recommendation, the Government declined to implement. The Oversight Board urges the Government to reevaluate or continue to provide constant education to DC participants so that each individual can manage their investment options and make decisions that best benefit individually.

### 20.3.2  *Monitoring of pension related legislative activity*

The Oversight Board has been actively monitoring a series of Acts and proposed legislation that has sought to expand the retirement system for the Commonwealth.  The Oversight Board has, on numerous occasions, expressed concern over the compliance of these pieces of legislation with the provisions of PROMESA.

In August 2020, the Commonwealth enacted Act 80-2020 granting an incentivized retirement program for certain ERS participants, Act 81-2020 granting enhanced benefits to members of the Puerto Rico Police Ranking System, Fire Fighters Corps Bureau, Puerto Rico Custody Officers Corps, and medical emergency technicians of the Medical Emergency Corps Bureau and the Municipal Medical Emergency System, and Act 82-2020 granting credit to retirement benefits arising from unused sick leave balances for participants under the Teachers Retirement System. Contrary to the requirements of PROMESA, the Commonwealth did not provide sufficient financial analysis to demonstrate that any additional costs generated by these Acts would be offset with savings identified by the Commonwealth.  In connection with multiple meetings with the legislature and other stakeholders regarding this and other pending Acts, the Oversight Board has asked the Government to delay implementation of each of these laws until a full and accurate study has been performed to ensure that the Commonwealth has identified a significant source of savings to pay for the costs of the benefits provided under the laws. On November 20, 2020, the

280

DRA Ex. 236

Commonwealth notified the Oversight Board that these laws would not be implemented until an agreement was reached with the Oversight Board concerning the financial viability of each Act. In the meantime, the Government has proposed House Bill 164 which would further expand the number of participants eligible for enhanced benefits under Act 80, and House Bill 265 which would do the same to Act 81.  On April 6, 2021 the Government provided an initial analysis summarizing the data for participants who had applied for benefits under Act 80 (prior to any amendments proposed under House Bill 164). The Government identified that of 10,553 participants applying for the law, 6,564 were in positions identified as essential, potentially requiring replacement, and concluded that of the 67 municipalities and 82 agencies and public corporations with applicants, only 16 municipalities and 11 agencies and public corporations would see savings in year 1.  This analysis and the associated data are in the process of being reviewed by the Oversight Board.

House Bill 120 ("HB120") was introduced by the Legislature in January 2021 and purports to dictate the only terms of a plan of adjustment for the Commonwealth with which the Commonwealth government will be permitted to cooperate to restructure the Commonwealth's enormous debt.  The Bill would eliminate all pension reforms contemplated by the 2021 Fiscal Plan (including the freeze of benefit accruals under TRS and JRS and 8.5% cut to benefits over $1,500), along with all essential reforms implemented under Act 106-2017 ("Act 106"), and would reinstate all public pension systems as they existed prior to Act 106, and consolidate the source of funding of these unsustainable benefit obligations into one new retirement trust.  The Oversight Board has communicated through letters on January 29, 2021 and February 20, 2021 that it believes the provisions of this law are in violation of PROMESA, rest on false economic assumptions, create an insufficient level of pension funding, reinstates a defined benefit plan in conflict with the 2021 Fiscal Plan, mortgages the future by establishing a vastly underfunded defined benefit plan, and makes false promises to participants.

In addition, the Government has proposed House Bill 533 ("HB 533") which intends to permit those retirees who left the Government through an Early Retirement Program, such as the proposed Act 80, to be eligible for reemployment and House Bill 523 ("HB 523") which grants a vested contractual right to individual pensions in order to prevent impairment under the legal proceedings held in accordance with Title III of PROMESA. These pieces of legislation are under review by the Oversight Board, which actively communicates with the Government to ensure consistency with the requirements of PROMESA. It is important to mention that several historical factors contributed to the underfunded status of the Retirement Systems, such as inadequate employer contribution levels, the enactment of special laws granting new benefits without adequate funding for said benefits, early retirement program or voluntary transition programs, debt issuance that ERS system ultimately could not support, mortgage, personal and cultural loans made to participants. The Oversight Board continues to monitor to ensure that past mistakes are not repeated through new pension legislation such as the laws and bills described above.

## 20.4   PayGo Compliance

In addition to establishing the Defined Contribution Plan, the passage of Act 106-2017 established the Pay-as-you-Go ("PayGo") system. The PayGo system, under which pension benefits are paid out of the annual Commonwealth budget rather than via amounts previously set aside into pension trust funds, was implemented to ensure the continued payment of benefits to retirees given that the ERS, TRS, and JRS trust funds were effectively insolvent. Currently, PayGo obligations represent approximately 20% of General Fund expenditures.

Section 2.1(b) of Act 106-2017 establishes a PayGo Fee that is "equal to the amount paid to Retirees and Beneficiaries of each covered entity." The responsibility for entities to pay this Fee and the authority of the Office of Management and Budget to collect the fee is further outlined in the legislation. Section 2.1(f) authorizes the Office of Management and Budget to "withhold from

DRA Ex. 236

the appropriations made to the agencies of the Government of Puerto Rico, the necessary amounts for the payment of the Pay-Go Fee, if it determines that such withholding is necessary to ensure that covered entities fulfill their obligation." Section 3.5(2) further subjects any entity who fails to remit the Fee to a series of corrective actions, including the following:

- A demand by the Retirement Board for the immediate transfer of the Pay-Go fee or delinquent contribution

- The Secretary of Treasury may make adjustments to the "accounts, obligations, and advances that the Department of Treasury must remit to the delinquent employer"

- The Municipal Revenue Collection Center, "CRIM", may remit the Pay-Go fee or delinquent contribution from the "unencumbered balance of the property tax and other revenues that the Municipalities are entitled to receive."

- The Office of Management and Budget may withhold any form of appropriations to agencies necessary to meet the Pay-Go Fee obligation

The Oversight Board continuously monitors the status of entity compliance with paying the Pay-Go Fee. *Exhibit 144* demonstrates the significant level of PayGo debt owed by Commonwealth Government Entities and Municipalities as of May 15, 2020.

EXHIBIT 144: CURRENT PAYGO DEBT FOR MUNICIPALITIES AND PUBLIC CORPORATIONS

| Entity type | FY2018 debt, $M | FY2019 debt, $M | FY2020 debt, $M | FY2021 debt, $M | Total¹ $M |
|---|---|---|---|---|---|
| Municipality | 19 | 75 | 5 | 47 | 154 |
| Commonwealth Government entities | 43 | 19 | 11 | 54 | 120 |
| **Total** | **62** | **95** | **16** | **101** | **274** |

1 Total PayGo Debt as of February 2021 per AFAAF Monthly Report 6(A) February PayGo Report provided during April 15, 2021

There has been an effort to have delinquent agencies and municipalities to enter into payment plans to resolve historic PayGo debt. As of February 15, 2021, municipalities and public corporations have executed repayment plans, with two other active negotiations ongoing for the municipalities of San Juan and Guaynabo. Signed payment plans account for ~$48 million of the $274 million in outstanding debt. The Oversight Board will continue to closely monitor the municipalities budget and compliance with current year PayGo debt and the execution of Payment Plans.

It is important to mention that after the Act 29-2019 per Title III Court ruling on April 15, 2020, the Oversight Board engaged with the Retirement Board, CRIM and Municipalities concerning the implementation of a repayment waterfall that Municipalities received from Excess CAE (refer to CRIM 2021 Fiscal Plan, Section 7.4 for further information). The Oversight Board reached out as well after becoming aware that FY2020 Payment Plans were being executed regardless of the repayment waterfall and notified Retirement Board the inconsistency with the implementation agreed. However, the Oversight Board made clear for prior periods municipalities with FY2018 and/or FY2019 debts must enter into payment plans for such periods in accordance with certified Commonwealth and CRIM Fiscal Plans and Article 2.1 of Law 106-2017, as amended.

EXHIBIT 145: MUNICIPALITIES REQUIRING PAY-GO PAYMENT PLAN EXECUTION

| Municipality | PayGo Debt not in Payment Plan | Amount of Debt, $ |
|---|---|---|
| **Arecibo** | FY2018 Debt | 1,846,779 |
| **Maricao** | FY2018 Debt | 284,596 |
| | FY2019 Debt | 494,941 |
| **Cataño** | FY2019 Debt | 134,584 |
| **San Juan** | FY2018 Debt | 9,415,391 |
| | FY2019 Debt | 56,025,885 |

The Oversight Board has further discussed with AAFAF possible remedies to further reduce the outstanding debt. AAFAF has the authority under Section 8(e) of Act 2 – 2017 to appoint a representative to oversee compliance with the execution of the 2021 Fiscal Plan, including compliance with the requirement that future and past due PayGo Fees be remitted in a timely fashion. Further, Section 8(b)(iv) of Act 2 – 2017 permits that when reports indicate an entity's cash flows are not consistent with the Certified Budget, AAFAF may "direct and perform banking transactions on behalf of the appropriate entities of the Government of Puerto Rico to make debt service payments, among others." The Oversight Board and AAFAF have discussed actions including, but not limited to, withholding general fund revenues and/or debiting existing cash accounts to satisfy PayGo Fee debt.

Proper long-term health of the PayGo system requires constant compliance with and monitoring of the PayGo Fees as set forth in Act 106-2017. Failure to ensure these payments continue to be made would threaten the ability of the General Fund to sustain pension payments in the long-term and ultimately harm the welfare of Commonwealth retirees.

### Pension Working Groups

**Social Security:** The Oversight Board reached out to the Government on February 27, 2020 to convene an interagency working group (the "Social Security Working Group") to ensure the effective and timely implementation of Social Security for teachers and judges. The expansion of access to Social Security for public workers has been a goal since the 2017 Fiscal Plan, and the Social Security Working Group has been created to prevent additional delays in ensuring that public employees are eligible for this benefit, particularly in light of past delays and challenges experienced as part of the implementation process. On July 19, 2019, the Governor enacted legislation (Act 71-2019) to allow for the participation of police officers in Social Security. Multiple Fiscal Plans, including the 2019 Fiscal Plan, called for police officers to have access to Social Security no later than July 1, 2019. To provide adequate funding, the certified Commonwealth budgets also provided the appropriations needed for the Police Bureau to fund their Social Security contributions. Nevertheless, the implementation of Social Security for police was delayed by six months to January 1, 2020.

The Social Security Working Group will be addressing the lessons learned from the implementation of Social Security for police officers, payroll implementation, and optional participation election with the participation of members selected by the Government from AAFAF, the Department of Education, the Retirement Board, the Department of the Treasury, and the Office of Court Administration, as well as representation from the teachers' union.

Additional Working Groups are being formed to facilitate the establishment of the Pension Reserve Trust, including establishment of an independent board to oversee the Trust, and

DRA Ex. 236

coordinate with ERS regarding administrative functions post Act 106-2017. These Working Groups are being formed based on needs identified as a result of on-going discussions between the Oversight Board and various agencies in connection with the Oversight Board's focus on the timely payment of pensions to the Commonwealth's retirees.

The Working Groups have been regularly meeting, developing timelines, and assigning the tasks necessary to meet this goal, including educational materials for all teachers and judges. In connection with this, and at the Oversight Board's recommendation, the Social Security Working Group is also participating in implementation discussions related to the Defined Contribution plan so that all retirement related withholdings are coordinated. This is important in particular for police whose minimum Defined Contribution requirements have been reduced to 2.3%, with an additional 6.2% being withheld for Social Security FICA purposes. Based on the terms of their Section 218 agreement, police that want to maintain their eligibility for Social Security coverage cannot be allowed to contribute to their Defined Contribution accounts more than the 7.5% bar for a qualified replacement plan under Social Security law. Similar protocols will also need to be in place for teachers and judges that eventually are enrolled in Social Security.[348]

The 2021 Fiscal Plan expects the Working Groups to accomplish the milestones outlined in *Exhibit 146* below.

### 20.4.1  Required implementation actions

To achieve the 2021 Fiscal Plan pension reform measures, certain action items must be implemented according to the schedule described in *Exhibit 146*. Multiple steps are needed to implement each of these action items.

EXHIBIT 146: REQUIRED IMPLEMENTATION ACTIONS FOR PENSION REFORM

| | Action item | Target date | Sample intermediate steps |
|---|---|---|---|
| **To be completed by FY2022** | ▪ **Enroll teachers and judges** under age 45, as well as new hires, **in Social Security** | ▪ June 2021 | ▪ Establish controls to prevent DC contributions from exceeding 7.5% if enrolled in Social Security |
| | | ▪ August 2021 | ▪ Draft legislation to reduce DC contributions to 2.3% to teachers/judges under 45 and new hires |
| | | ▪ October 2021 | ▪ Communicate changes to members |
| | | ▪ October 2021 | ▪ Design reporting and reconciliation steps required for Social Security Administration compliance |
| | | ▪ December 2021 | ▪ Update PRDE and Office of Court Administration payroll systems to reflect revised withholdings |
| | | ▪ January 2022 | ▪ Confirm law modified to reflect TRS/JRS freeze prior to enrollment in Social Security |
| | ▪ **Implement JRS / TRS freeze** and transition to segregated DC accounts | ▪ September 2021 | ▪ Update processes to allow for DC deposits on 15th of following month |
| | | ▪ October 2021 | ▪ Communicate changes to members |
| | | ▪ December 2021 | ▪ Establish and provide access DC accounts for judges and pre-2014 teachers |
| | | ▪ January 2022 | ▪ Update pension calculation systems to reflect frozen benefit provisions |
| | ▪ **Implement 8.5% pension reduction** | ▪ November 2021 | ▪ Collect census data for determination of benefit subject to cut |
| | | ▪ April 2022 | ▪ Update ERS pension calculation systems for cut formula, including $1,500 threshold |
| | | ▪ April 2022 | ▪ Communicate changes to members |
| | | ▪ May 2022 | ▪ Update ERS/Hacienda records for benefit amount post cut |
| | | ▪ July 2022 | ▪ Establish pension reserve trust and define governance protocols, including: independent board, investment policy and mechanisms for transferring surplus |

The implementation of these milestones is the combined responsibilities of AAFAF, Treasury Department, Department of Education, Retirement Board, and the Office of Court Administration. These agencies are actively participating in Working Groups towards

---

348 Internal Revenue Service, "Federal State Reference Guide", 2020

284

achievement of these key milestones. The Oversight Board continues to urge the Working Groups outlined above to take responsibility for identifying all intermediate milestones, as well as establishing the necessary detailed timelines and responsibilities so that these steps will be complete when the Plan of Adjustment is approved.

# Chapter 21. Ensuring successful implementation and fiscal controls

As discussed in *Chapter 14*, the Office of the Chief Financial Officer (OCFO) has broad responsibility for improving fiscal management as outlined in the 2021 Fiscal Plan. Below are specific details regarding the necessary implementation steps and reporting required by the 2021 Fiscal Plan.

## 21.1   Implementation architecture

Developing a centrally run Project Management Office (PMO) is an important step toward ensuring the implementation and tracking of the core operational transformation and agency efficiency measures that will achieve savings targets under the 2021 Fiscal Plan. The Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym) should serve as the central PMO with defined reporting to the Governor of all economic and transformation measures. The PMO should be run by AAFAF's senior leadership, regularly coordinate across the Office of Management and Budget (OMB) and the Office of the Administration and Transformation of Human Resources (OATRH, by its Spanish acronym), work directly and frequently with Agency PMOs, and report directly to the Governor's office.

Individual Agency PMOs should be established with direct reporting to the PMO. Each agency head shall be responsible for developing and implementing a PMO structure that best fits their respective agency groupings. They are expected to coordinate across all agencies in their grouping, lead reforms for the grouping and be responsible for achieving their agency grouping savings targets. Through this PMO structure, the Government will be positioned to effectively manage and implement the 2021 Fiscal Plan. As such:

- Designated agency heads should lead the Agency PMOs and report directly to AAFAF.

- Agency PMOs should undertake the required work to implement initiatives.

- The daily activities of PMOs should be managed and undertaken by staff knowledgeable in the relevant subject matter areas, and assigned members should meet regularly with PMO leadership to report on progress and facilitate necessary decision-making.

- Agency PMOs shall be responsible for assembling a taskforce to: complete validation and definition of full scope of projects and priorities, finalize reporting tools and tracking responsibilities, and perform ongoing weekly tracking and reporting.

The PMOs should ensure continued implementation progress through robust tracking and reporting tools that foster growth in transparency and ownership, including:

- **Project charters** that establish the goals and structures of measures, identify risks and obstacles, and establish metrics and KPIs.

- **Implementation plans** with detailed layouts of each activity required for accomplishing sub-measures, risks / mitigants for each activity, clear leaders and owners for each activity,

DRA Ex. 236

and metrics and KPIs. These should include a "live" calendar of updates and status of each measure.

- **Implementation dashboard / tracker** that provides a single snapshot of the entire transformation plan; and allows management to know the status of each initiative in a distinct status: Complete; In Progress; Delays; Major Issues. This tracker will allow the Oversight Board to monitor progress and ensure enforcement of measures and reforms.

- **Sub-measure dashboards** that provide "zoomed in" views of a specific sub-measure, display progress with details / commentary on project status, include agreed upon milestones / dates to track progress, and provide mitigation plans.

- **Implementation monthly reports** that provide a more detailed perspective on progress, including several key reporting elements: a) headcount by regular and transitory with more details in specific agency cases, b) budget to actuals by cost category and concept, c) milestones progress, d) KPIs/leading indicators, e) achieved savings to date. These reports provide important codification of progress as well as context for monthly meetings where agencies, OCFO and Oversight Board representatives can hold meaningful discussions on progress, items at risk and ongoing mitigating activities.

## 21.2   Oversight Board and OCFO implementation collaboration

The Oversight Board has played, and will continue to play, an active role in overseeing all aspects of Fiscal Plan implementation. The OCFO must provide the Oversight Board and its staff the information needed to effectively track the status of key initiatives included in the 2021 Fiscal Plan, which is necessary to measure overall progress against the fiscal and budget objectives outlined therein.

For example, the OCFO will provide Oversight Board staff with key management information on a timely basis, including:

- Implementation plans submitted by individual PMOs

- Progress reviews (including milestones and metrics) against key structural and fiscal measures

- Reviews of key implementation risks, including assessments of the likelihood of realization, potential impact, and potential mitigations

- Monthly progress reports submitted by individual PMOs

## 21.3   Reporting on Fiscal Plan reforms

**The fiscal and structural reforms described in the 2021 Fiscal Plan represent a significant and transformative effort across the Government.** As such, there are strict reporting requirements needed to ensure savings and growth targets are being achieved on time, and to identify any major risks to reform to course correct at an early stage.

**To date, however, the Government has struggled with implementing reforms and reporting on this implementation in a timely manner.** Progress has, as a result, been inconsistent and incomplete, and many agencies appear unprepared to meet savings targets. While some progress on measures has been made, many reforms are delayed or not occurring. In cases where certain reforms will not occur, the Government must achieve these savings through other means.

286

DRA Ex. 236

**The Government shall produce monthly performance reports**, which shall be submitted to the Oversight Board on the 15th of each month, demonstrating the progress made on all key reform areas. Agency efficiency savings that have been realized should be broken down by grouping and agency across payroll and non-payroll savings (as well as on an object level where needed) and display the performance of the realized agency efficiency savings for each agency against the projections as set forth herein. Implementation reports should explicitly explain how budget-to-actuals reports tie to agency actions and reforms, and what is driving major discrepancies. Reporting shall also include detail on use of funds for professional services, as well as within the Other (or "englobadas") cost concept, such that these expenses can be appropriately managed. Currently, less than 30% of agency groupings have consistently provided implementation reporting. The Government must improve reporting such that it and the Oversight Board can hold agencies accountable for achieving savings through the implementation of fiscal measures.

If, after any fiscal quarter, the projected agency efficiency savings for any grouping is not realized, the shortfall from that fiscal quarter will be added to the agency efficiency savings target for the corresponding grouping for the following quarter. As needed, the Oversight Board will also hold public hearings to review implementation progress. Should there be underperformance in agency efficiency savings for any grouping, the Oversight Board may rely on its powers and rights pursuant to PROMESA to take measures to enforce reductions in the amount of unrealized savings.

## 21.4   Ensuring fiscal controls and transparency

Consistent with *Chapter 15*, the OCFO must improve fiscal governance, accountability, and internal controls over the Government's finances and budget. To ensure that there is transparency into the Government's progress toward meeting its savings targets, the Government must meet the following milestones (*Exhibit 147*).

DRA Ex. 236

## EXHIBIT 147: FISCAL CONTROLS & REPORTING KEY IMPLEMENTATION MILESTONES

| | Reporting Requirement | Closing of the 1st Reporting Period | Cadence for FOMB Reporting [A] | Cadence for Public Reporting [A] | Reporting Requirement Source |
|---|---|---|---|---|---|
| **I. Cash Reporting** | A. Treasury Single Account (TSA) Liquidity (Actuals vs. Liquidity Plan) | 10/26/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | B. Consolidated TSA Including Agency Detail (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | C. Independently Forecasted Component Units (IFCUs) (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | D. Liquidity - Office of the Comptroller, Senate, House of Representatives, Judiciary Branch, Civil Rights Commission, OMBUDSMAN (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | E. Summary of Bank Account for the Government of Puerto Rico and its Instrumentalities | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| **II. Additional Actuals Reporting** | A. Budget to Actual Report - Including Revenues (including gross revenues, tax credits collected, and net revenues) [1] | | | | Fiscal Plan |
| | 1. General Fund | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | 2. Non-General Fund Funds (including Special Revenue Funds) [2,3] | 10/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 3. Federal Funds | 10/31/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | 4. IFCUs | 10/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 5. Comptroller, Senate, House of Representatives, Judiciary, Civil Rights Commission, OMBUDSMAN | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | B. Central Government Payroll and Headcount | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | C. PCU Payroll and Headcount [4] | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | D. Central Government 3rd Party Accounts Payable | 10/26/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | E. Central Government Invoice Processing KPIs | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | F. Tax Credits | | | | Fiscal Plan |
| | 1. Liability | 12/31/2018 | Quarterly | Quarterly (beginning 1/31/19) | Fiscal Plan |
| | 2. New credits granted | 12/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 3. Credits used (direct impact on collections) | 12/31/2018 | Monthly | Monthly | Fiscal Plan |
| | 4. Tax Expenditure Report | 12/31/2018 | Yearly | Yearly | Fiscal Plan |
| | G. DATRM Attendance for the Preceding 4-Week Period | 12/31/2018 | Monthly | Monthly | Fiscal Plan |
| | H. Emergency Reserve Fund Quarterly Reporting | 5/15/2020 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | I. Budget to Actual CAPEX Report | 11/15/2020 | Monthly | Quarterly | Fiscal Plan |
| | J. Prior Year Fund Extensions and Releases | 8/15/2021 | Monthly | Monthly | Fiscal Plan |
| | K. Quarterly budget to actual revenues, expenditures, and cash flows, together with a variance analysis, of the territorial government during the preceding quarter | 10/31/2018 | Quarterly | Quarterly | Fiscal Plan |
| | L. Revised Year End Quarterly budget to actual revenues, expenditures, and cash flows, together with a variance analysis, of the territorial govt. during the preceding quarter (60 days after year-end) | 8/31/2019 | Annual | Annual | Fiscal Plan |
| **III. Measures and Reforms Reporting (Progress Reports) [5,6]** | A. Structural Reforms [4] | | | | |
| | 1. Labor Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Ease of Doing Business Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Energy Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Infrastructure Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | B. Fiscal Measures [4] | | | | |
| | 1. Office of the Chief Financial Officer | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Revenue Measures | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Pension Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Healthcare Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | C. Agency Efficiencies | | | | |
| | 1. Agriculture | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Corrections | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Culture | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Economic Development | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 5. Environmental | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 6. Executive Offices | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 7. Finance Commission | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 8. Office of the CFO | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 9. Healthcare | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 10. Justice | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 11. Labor | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 12. Land | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 13. Ombudsman | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 14. Public Safety | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 15. Public Works | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 16. Social Welfare | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 17. State | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 18. Universities | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 19. Utilities Commission | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 20. Education | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 21. Independent Agencies | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| **IV. Macroeconomic Indicators** | Macroeconomic Indicators | 12/31/2018 | Quarterly | Quarterly | Fiscal Plan |
| **V. Recovery Funding Reporting** | A. Uses/Disbursement Related to Hurricane Assistance (PWs) | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | B. Department of Housing | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | C. Highways and Transportation Authority | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | D. TSA Vendor Disbursements | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| **VI. PayGo Receivables and Contributions Reporting** | PayGo Receivables and Contributions Reporting | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| **VII. Certifications and Others** | A. Quarterly revenue forecast update | 10/31/2018 | 45 days after end of every quarter | n/a | Budget |
| | B. Certify that no appropriation of any previous fiscal year (except for appropriations covered by the exceptions authorized in the budget) has been used to cover any expense during the prior fiscal quarter | 12/31/2018 | 15 days after end of every quarter | n/a | Budget |
| | C. Certify that no amount of the (i) Social Security Reserve or (ii) Emergency Reserve has been used to cover any expenses during the prior fiscal quarter | 12/31/2018 | 15 days after end of every quarter | n/a | Budget |
| | D. Payroll transfers per Law 9-2017 | 12/31/2018 | Monthly | n/a | Fiscal Plan |
| | E. Signed legislation Compliance Certificates | n/a | 7 days after a bill is signed by the Governor | n/a | PROMESA |
| | F. Sabana file submission | n/a | n/a | n/a | Budget |
| | G. Quarterly budget submission | n/a | n/a | n/a | Budget |

1 Revenues must include gross revenues received, less tax refunds; SRF revenues must be included.
2 The following fund types are included in non-GF reporting: (1) FAM (Fondos Especiales Estatales or Special State Funds) – This fund type should only include revenue designated by specific laws; (2) OI (Otros Ingresos or Other Income) – This fund type should only include non-recurring revenue with specific expenses tied to it. No recurring income should be included or 'recognized' under this fund type OI; and (3) IP (Ingresos Propios or Own Income) – This fund type should only include revenue generated by the agencies or public corporation through their services.
3 The monthly deliverable must include: (1) All revenues and expenses for the current PY; (2) The cash balance for each fund type as of the beginning of the Fiscal Year; (3) The raw cash earned during the current fiscal year; and (4) the net cash balance.
4 The report must include (1) the fund type, (2) overtime amounts; and (3) the breakdown of benefits.
5 Implementation plans must be provided for each agency under each agency grouping the full list of the agencies is included in the Appendix of the Fiscal Plan.
6 Reporting must include: (a) Monthly monitoring by each government agency of key performance indicators for each of the fiscal reform measures; (b) Monthly self-reported realized savings achieved year to date by agency and agency groupings; (c) Implementation dashboard / tracker that provides status of each initiative in a distinct status; (d) Sub-measures dashboard

A Unless otherwise specified, monthly reporting to the Oversight Board must be received 15 days after the end of a reporting period.
B Unless otherwise specified, public reporting must be published 30 days after the end of a reporting period.
C Report shall be structured in a way that allows for the confidentiality of the agreements to be maintained, but the overall (summarized) numbers and trends to be available to the public.

288

DRA Ex. 236

In addition to meeting the above milestones, the Government must proceed according to the following budgetary requirements:

- The Department of the Treasury will remit to: the Legislative Branch and its components, the Judicial Branch, the University of Puerto Rico (UPR), and the non-profit entities that receive funds from the General Fund, monthly and in advance, the budgetary allotments corresponding to one-twelfth (1/12) of the budget allocation provided herein for such entities. The one-twelfth monthly allocation to each entity (except with respect to the Judicial Branch) shall be subject to the 2.5% withholding set forth in the section below during the first three quarters of FY2022.

- The Director of the OMB may authorize the encumbrance and disbursement of up to 97.5% of each appropriation intended for encumbrance and disbursement during the first three quarters of FY2022. The Director of OMB shall withhold the remaining 2.5% of each appropriation until after the end of the third quarter of FY2022. Such withheld percentage of each appropriation shall only be encumbered and disbursed during the fourth quarter of FY2022 if (1) the first eight months of actual General Fund revenues reported to the Oversight Board reach the revenue forecast in the 2021 Fiscal Plan for that period and (2) the encumbrance and disbursement is approved first by the Oversight Board and then authorized by the Director of OMB. If actual General Fund revenues for the first eight months of the FY2022 fail to reach the revenue forecast for that period, the amount of the withheld percentage of each appropriation that may be encumbered and disbursed shall be reduced proportionally according to the negative budget variance between projected and actual General Fund revenues. Notwithstanding the foregoing, PayGo appropriations, Consent Decree amounts, Housing and Transportation Authority (HTA) appropriations, economic incentive funds and distributions, cigarette and rum distributions, allocations of SUT to FAM and agencies in the Department of Public Safety and in the Health groupings, as defined in the 2021 Fiscal Plan, shall not be subject to the 2.5% withholding requirement.

- Notwithstanding any statement here to the contrary, the appropriations listed in the General Fund in Budget FY2022 under (1) Allocation of the Sales and Use Tax (SUT) to the Municipal Administration Fund (FAM, by its Spanish acronym) (excluding Debt Portion); (2) Outflow of the Special Fund for Economic Development (FEDE, by its Spanish acronym) Portion of Corp. Income Taxes and Non-Resident Withholding; and, (3) cigarette and rum distributions, are entirely dependent on the level of revenues collected therefrom and, as such, the disbursements of those appropriations will be gradual and subject to the actual collections thereunder. No expenditure, pledge, or obligation of any such funds may be made until such time as the revenues are actually collected and received.

- No later than 45 days after the closing of each quarter of FY2022, the Secretary of Treasury shall revise the projected net revenues of the General Fund for FY2022 (the "Quarterly Revision") and notify the revision to the Director of the OMB, the Governor and the Oversight Board. The Quarterly Revision shall project future revenues based on actual General Fund revenues and include revisions to the assumptions used to generate the General Fund's net revenue projections.

- All appropriations authorized in any prior fiscal year, including appropriations without a specific fiscal year, are eliminated and no disbursement of public funds may be covered by such appropriations, except the following which the 2021 Fiscal Plan redeploys as current appropriations, subject to Oversight Board adjustment at any time: (1) appropriations authorized in the fiscal year to carry out permanent improvements that have been encumbered, accounted for and kept on the books but not exceeding two fiscal years on the books; (2) appropriations in the Certified Budget for equipment with procurement cycles that extend beyond the end of the fiscal year, which are encumbered on or before June 30, 2022; (3) the portion of the appropriations authorized for fiscal year that have been encumbered on or before June 30 of such fiscal year, which shall be kept in the books for 60 days after the termination of that fiscal year and after those 60 days no amount shall be drawn against such

portion for any reason; (4) the appropriation in the amount $130 million for the emergency reserve included in the FY2021 Certified Budget and required by *Section 5.2.8* in the 2021 Fiscal Plan (the "Emergency Reserve"); (5) the unobligated portion of the Public Assistance Federal Fund Matching appropriation included in the FY2021 Certified Budget; (6) the unused appropriations for the UPR Scholarships Fund included in the FY2019, FY2020, and FY2021 Certified Budgets, which is held under the custody of the Department of Treasury; (7) unused appropriations for use in audit services held at the Department of Treasury; (8) FY2021 unused General Funds intended for Medicaid related expenditures; (9) unused Title III funds; (10) reported unused funds from Department of Health's Mental Disability program until the end of the following fiscal year; (11) unused Special Revenue Funds collected during prior fiscal years for Ports Authority, Puerto Rico Convention Center District Authority and Puerto Rico Tourism Company, but limited to the amount of the FY2022 Special Revenue Funds appropriation; (12) reported unused funds from Department of Correction and Rehabilitation's Juvenile program; (13) unused appropriations for State unemployment insurance, disability insurance, and chauffeur's insurance, which are held under the custody of the Department of Labor and Human Resources; and (14) unused appropriations for milestones and incentives held under the custody of OMB as approved; (15) unused appropriations for municipal voluntary cost sharing milestone; (16) unused appropriations for the school and road maintenance funds; and (17) FY2021 unused General Funds intended for Catastrophic Illness Fund related expenditures. In addition, this restriction on the use of appropriations of prior fiscal years shall not apply to: (i) programs financed in whole or in part with federal funds; or (ii) orders by the United States district court with jurisdiction over all matters under Title III of PROMESA; or (iii) matters pertaining to any consent decree or injunction, or an administrative order or settlement entered into with a federal agency, with respect to federal programs.

■ On or before July 31, 2021, the Treasury Secretary, Executive Director of the Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym), and the Director of the OMB shall provide to the Oversight Board a certification indicating the amounts of unused FY2021 appropriations for all items of the previous section. If the Government fails to submit said certification, the amount of unused funds in items 1 and 2 will not carry over to the following fiscal year.

■ Each power of OMB, AAFAF or the Department of the Treasury, including the authorities granted under Act 230-1974, as amended, known as the "Puerto Rico Government Accounting Act" ("Act 230"), to authorize the reprogramming or extension of appropriations of prior fiscal years is hereby suspended.

■ The Oversight Board must approve in writing, in advance, any reprogramming requests for any appropriations approved in this budget.   For the avoidance of doubt, this prohibition includes any reprogramming of any amount, line item, or expenditure provided in this budget, regardless of whether it is an intra-agency reprogramming.

■ The Governor shall submit to the Oversight Board all reporting requirements set forth on *Exhibit 147* of the 2021 Fiscal Plan according to the reporting cadence described therein. In addition, if the Oversight Board approves a reprogramming pursuant to the section above, the immediately subsequent report by the Governor must illustrate the specific implementation of such reprogramming, including the amount, the source of the reprogrammed amount identified by government entity and expenditure concept, the Government entity that received such amount, and the expenditure concept to which it was applied.

■ In addition, the Governor shall submit to the Oversight Board a comprehensive reporting package in a similar format to that required and provided in accordance with Section 203 of PROMESA for the following specified programs within different agencies:  (1) Department of Education's (PRDE) Special Education Program; (2) PRDE's Remedio Provisional Program (3) Department of Health's (DOH) Adult Hospital Program; (4) DOH's Pediatric Hospital Program; (5) DOH's Hospital Universitario Dr. Ramón Ruiz Arnau (HURRA) Bayamón

DRA Ex. 236

Hospital Program; (6) DOH's 330 Centers Payments; (7) DOH's Intellectual Disability Program, (8) Mental Health and Anti-Addiction Services Administration's (ASSMCA, by its Spanish acronym) Río Piedras Hospital Program, and (9) the Department of Correction and Rehabilitation's (DCR) Juvenile Program. Program reporting must include and clearly detail budget to actuals on a concept level basis, any reprogramming of funds within the program, and any reprogramming of funds to/from other programs or agencies.

■ In addition, in order to ensure maximum and proper use of federal funds, such as, but not limited to, (1) DRF, (2) CARES, (3) FFCRA, (4) CRRSAA, (5) and ARP, the Governor shall submit a work plan before any disbursement of funds. Improved reporting will help prevent and combat actual, and claims of, misuse, fraud, waste, and abuse. Therefore, the Governor shall also submit weekly reports that detail any disbursements and use of federal funds received. Weekly reporting shall include a list of all awards broken down by agency, program, category, recipient, and sub-recipient detailing (1) date award was granted; (2) date award expires/renews; (3) total award amount (split into payroll/non-personnel); (4) total award encumbrances and disbursements from prior fiscal years (split into payroll/non-personnel); (5) total award encumbrances and disbursements for the current fiscal year (split into payroll/non-personnel); and (6) total remaining award amount (split into payroll/non-personnel). The Governor shall also provide, as requested, performance metrics with regards, but not limited to, time required to submit claims, time required to submit compliance reporting, and time required to collect reimbursement claims.

■ In addition, the Governor shall submit to the Oversight Board a monthly reporting package detailing capital expenditure spending by agency and by project including details for expenditures which have RFPs issued, which contracts have been awarded, and which are in process.

■ Furthermore, the Governor shall submit to the Oversight Board a monthly reporting package detailing all of PRDE's salary and other payroll expenses within four categories: (1) Central Administrative Personnel; (2) Regional Administrative Personnel; (3) Regional School Support Personnel; and (4) School Personnel as established in this FY2022 Certified Budget resolution. In order to assess compliance and guarantee accountability, PRDE must submit such monthly reporting detailing salary and payroll expenses by the categories established herein along with a salaries and payroll reconciliation of funds disbursed and actual expenses recorded.

■ The reports required pursuant to this section are in addition to the reports that the Governor must submit to the Oversight Board in accordance with Section 203 of PROMESA.

■ In conjunction with the reports that the Governor must submit to the Oversight Board no later than 15 days after the last day of each quarter of FY2022, pursuant to Section 203 of PROMESA, the Treasury Secretary, Executive Director of AAFAF and the Director of the OMB shall each certify to the Oversight Board: (1) that no appropriation of any previous fiscal year (except for the appropriations covered by the exceptions in the sections above) have been used to cover any expense; and (2) the Director of the OMB shall certify to the Oversight Board that no amount of (i) the Emergency Reserve and (ii) the unallocated capital expenditures under the custody of OMB has been obligated unless authorized in accordance with the section below.

■ The Emergency Reserve, the unallocated capital expenditures, healthcare investments reserve, technology reserve, milestones reserve, and the economic incentive fund under the custody accounts of OMB and the Department of Treasury, respectively, as detailed in the Certified Budget for FY2020, FY2021, and FY2022 may not be used to cover any allocation or expense whatsoever without the approval of the Oversight Board. The economic incentive funds held under the custody of the Department of Treasury will be released on a quarterly basis after a formal reapportionment is submitted by the Department of Economic Development and Commerce (DDEC, by its Spanish acronym), reviewed and approved by

DRA Ex. 236

OMB, and submitted to the Oversight Board for review, and the Oversight Board provides its authorization to release such funding. Exceptions to the economic incentive fund release may apply upon meeting all of the specified criteria listed on the Milestones and Incentives Appendix.

- The Emergency Reserve is intended to expedite response activities and, upon request, provide the Commonwealth Agencies and affected local governments with capital in the event of an emergency of such severity and magnitude that effective response exceeds the capacity of current budget resources and federal disaster assistance is not available or not yet available to respond to the emergency. Moreover, the Emergency Reserve is intended for extraordinary events like natural disasters or as otherwise agree with the Board and that are generally outside of human control and unpreventable. The Emergency Fund is not intended to mitigate emergencies related to operational inefficiencies.

  – Accessing Emergency Reserve funds shall require: (1) a State of Emergency declaration, by the Governor of the Commonwealth, in accordance with Article 6.10 of Act 20-2017, as amended, known as the Puerto Rico Public Safety Department Act; (2) OMB shall request of the Oversight Board access to the emergency reserve fund for a finite period, indicating the agency or local government that will receive the advance, the amount of the advance, usage of funds requested and the PR Emergency Disaster Management (PREMA) request number from WEBEOC platform, as well as the projected re-payment date of the funds; (3) amounts approved by the Oversight Board and disbursed to the Government shall be replenished not later than the following fiscal year; (4) agencies and municipalities, recipients of state emergency reserve funds, shall update OMB on a quarterly basis about the Public Assistance process with FEMA.

  – OMB shall request Emergency Reserve funds exclusively for the use of Government agencies and affected local governments. The agencies and affected local governments must be in an emergency declared area and the Emergency Reserve funds must be used for response activities related to the declared event. Non-profits, public corporations outside of the commonwealth, and individuals are not eligible applicants for advances through the Emergency Reserve fund.

  – OMB shall submit quarterly reports to Oversight Board detailing the status of Emergency Reserve funds, amounts provided to agencies and affected local governments, amount of funds expended, amount of funds remaining, and updated projected re-payment dates. Agencies and local governments that received funds from the Emergency Reserve are required to file with FEMA a Request for Public Assistance (RPA) and Project Worksheet to ensure maximum federal fund reimbursements are replenished into the Emergency Reserve. As a rule, OMB shall offset late repayment by agencies and local governments with other Commonwealth funding to repay the Emergency Reserve on time.

- Cost share matching funds are restricted for use on approved projects/requirements under FEMA's Individual Assistance, Public Assistance, and Hazard Mitigation programs. Any unused cost share matching funds in a given fiscal year may be rolled over to the following fiscal year and are subject to the same restrictions. The use of these funds must be coordinated with CDBG-DR and CDBG-MIT in meeting cost share requirements.

- Funds to cover parametric insurance will be made available upon reaching the following milestones and after the approval and authorization from the Oversight Board.

  (1) Develop a sophisticated insurance plan to develop a comprehensive program that considers the available markets, costs, meeting O&M requirements, and levels of coverage.
  - Conduct a risk analysis including hazards/perils covered
  - Analysis of expected O&M requirements on a building by building basis
  - Identify the types and extent of insurance needed to protect against risk and meet O&M requirements

DRA Ex. 236

- Identifying insurance gaps between O&M requirements and insurance that is reasonably available
- Identify the authority for developing, implementing, and enforcing the plan
- The financial arrangement structure for funding the plan and pay for losses, which includes a system for fixed contributions, a formalized plan to pay losses as they occur, and how funds will be distributed

(2) Prioritizing insurance and strategically consider options to supplement the existing insurance coverage:
- Identify how the Commonwealth will meet Flood Insurance requirements
- Consider broader / expanded limits on existing policies
- Consider a separate excess insurance policy that provides coverage above the current limits
- Consider a Parametric policy and CAT Bond or a hybrid combination of the two to provide supplemental or excess coverage

(3) Engage the Insurance Commissioner
- Establishing the criteria for the Insurance Commissioner's certification of the insurance coverage that is reasonably available

■ Funding for the Central American and the Caribbean Games will be held under the custody of OMB and made available following the selection of the host and subject to a determination on whether any or all of the funding is eligible for American Rescue Plan (ARP) Act funds.

■ As a rule, necessary for the responsible disbursement of budgetary allocations for operating and other expenses, OMB shall withhold from any of the allocations to the agencies of the Executive Branch the amounts necessary to pay for the PayGo contribution, unemployment insurance, or taxes withheld from their employees, when OMB determines that such a withholding is necessary to ensure compliance with these obligations by the agencies concerned. Any such amounts withheld by OMB shall solely be reprogrammed to pay the corresponding outstanding obligations related to PayGo contributions, unemployment insurance, or taxes withheld from employees.

■ Additional General Funds may be made available to agencies upon reaching certain, specified milestones and after the approval and authorization from the Oversight Board. Once the respective milestones are achieved, agencies must provide a formal notice and submit supporting data corroborating such achievement for the Oversight Board's review.

■ OMB and the Department of the Treasury are authorized to establish the necessary mechanisms to ensure that when implementing the concept of mobility, pursuant to the provisions of Act 8-2017, as amended, known as the "Puerto Rico Human Resources Management and Transformation in the Government Act," the corresponding transfer of funds allocated to payroll and related costs of said employee are to be carried out simultaneously.

■ The Secretary of Treasury, the Director of the OMB, and the Treasurer and Executive Director of each agency or public corporation covered by the 2021 Fiscal Plan shall be responsible for not spending or encumbering during FY2022 any amount that exceeds the appropriations authorized for FY2022. This prohibition applies to every appropriation set forth in a budget certified by the Oversight Board, including appropriations for payroll and related costs. The Executive Director of AAFAF and the Director of the OMB shall also certify to the Oversight Board by September 30, 2021 that no amount was spent or encumbered that exceeded the appropriations in the Certified Budget for FY2021.

■ For the avoidance of doubt, any reference within the budget to AAFAF, the Department of Treasury, or OMB, or any of their respective officers, shall apply to any successor thereof.

■ On or before July 31, 2021, the Governor shall provide to the Oversight Board budget projections of General Fund revenues and expenditures for each quarter of FY2022, which must be consistent with the corresponding budget certified by the Oversight Board (the

DRA Ex. 236

"Quarterly Budget"). The Quarterly Budget shall be provided to the Oversight Board in Excel format and include detailed allocations by agency, public corporation, fund type and concept of spend. Together with the report that the Governor must provide under Section 203 of PROMESA not later than 15 days after the last day of each quarter, the Governor shall provide a quarterly variance analysis that is consistent with modified accrual accounting.

- If during the fiscal year the Government fails to comply with the liquidity and budgetary savings measures required by this 2021 Fiscal Plan, the Oversight Board may take all necessary corrective action, including the measures provided in PROMESA Sections 203 and 204.

- Pursuant to Section 204 (b)(2) of PROMESA, the Oversight Board has maintained since November 6, 2017 a Contract Review Policy to require prior Oversight Board approval of contracts with a value of $10 million or more to assure that they "promote market competition" and "are not inconsistent with the approved fiscal plan." The Policy applies to any contract or series of related contracts, inclusive of any amendments, modifications or extensions, with an aggregate expected value of $10 million or more, that is proposed to be entered into by the Commonwealth (which includes the Executive, Legislative, and Judicial branches of government) or any covered instrumentality. In addition, the Oversight Board may select to review contracts below the $10 million threshold for these purposes, on a random basis or at its own discretion. Specifically, in the case of the Puerto Rico Electric Power Authority ("PREPA") the contract review threshold has been reduced to $250,000 exclusively for contracts which are payable from PREPA's "Professional & Technical Outsourced Services" and "PREPA Restructuring and Title III" budget lines. Consequently, all proposed contracts (or series of related contracts) that meet such threshold and are classified as Consulting Services Contracts by the Office of the Comptroller of Puerto Rico (and any applicable sub-categories) must be submitted to the Oversight Board for review and approval prior to execution. For all other PREPA contracts, the Oversight Board maintains the current $10 million threshold. Similarly, in the case of the University of Puerto Rico, the Oversight Board lowered the UPR's contract review threshold to $2 million for all contracts. Finally, in order to further ensure certain contracts promote market competition, the Oversight Board may require, at its own discretion, the Commonwealth or any covered instrumentality, to give it access to ongoing procurement processes for the execution of new contracts.

Moreover, pursuant to Section 204(b)(4) of PROMESA, the Oversight Board has maintained since August 6, 2018 a Policy for the Review of Rules, Regulations, and Orders to be issued by the Executive Branch of the Commonwealth of Puerto Rico. This Policy is aimed at ensuring that certain rules, regulations, administrative orders, and executive orders proposed to be issued by the Governor (or the head of any department or agency) "are not inconsistent with the approved fiscal plan." The Policy requires prior Oversight Board approval of any rule, regulation, administrative order, or executive order that is proposed to be issued in connection with or that concerns financial aspects, or which has the potential to impact fiscal governance, accountability, or internal controls of the Commonwealth or any covered instrumentality under the most recent Certified Fiscal Plan. The above implementation and fiscal controls requirements are important tools to ensure the Government can make meaningful progress towards achieving the goals of the 2021 Fiscal Plan.

### 21.4.1   *Skills and knowhow transfer from consultants to public sector personnel*

The lack of adequate human capital planning in the Government has led to the excessive delegation of critical responsibilities to government contractors and consultants. Contractors and consultants are often performing day-to-day planning and management functions within agencies, instead of being limited to temporary, short-term projects which do not require full time employment or other similar items. Additionally, agencies' pervasive reliance upon contractors for increasingly critical tasks can result in a lack of transparency of true government expenses. Professional services costs can exceed the cost of comparable full-time employees as contractors

and consultants often have additional contractual remuneration and benefits (i.e., travel expenses) creating needless tension and budgetary shortfalls at the Commonwealth agencies.

Consequently, the Commonwealth should work on reducing its professional services spending to enable the professionalization of the civil service and reduce the reliance on outside consultants. Starting in FY2022, professional consulting contracts should include provisions requiring adequate transfer of skills and technical knowledge, from consultants to pertinent public sector personnel to the extent that the contract reflects recurring work that could be done by appropriately trained government staff.

Specifically, contracts must detail the functions carried out by consultants, as per their applicable Scopes of Work and establish clear plans to ensure that agencies create internal teams of appropriately trained and experienced employees to carry out such functions upon the expiration of consulting contracts. Additionally, agencies will need to establish clear expectations with consultants that internal knowledge transfer and technical training is a key priority. Therefore, shared responsibility and progress should be measured and monitored for the purposes of contract compliance and performance.

Accordingly, agencies should strive to ensure that both the creation of internal teams and the transfer of knowledge to such teams are completed within the applicable timeframes of proposed contracts.

DRA Ex. 236

# PART VI. Conclusion

**The 2021 Fiscal Plan is the result of five years of intensive work sessions, dialogue, stakeholder engagement, and experience working to establish the conditions for economic recovery and growth for the benefit of residents of Puerto Rico.** Across these activities, the Oversight Board and the Government have collaborated to create a deep and rich fact base to underpin their work and have remained focused on creating an integrated approach to restoring fiscal sustainability and economic opportunity for future generations of local residents. The starting point for this 2021 Fiscal Plan involved numerous structural inhibitors to growth, over $120 billion in outstanding debt and unfunded pension obligations, and the devastating impact from a historically destructive set of natural disasters.

**Yet in the aftermath of hurricanes, earthquakes, and the COVID-19 pandemic—with a new gubernatorial administration and over $120 billion in federal support mechanisms being made available to enable the Island to rebuild—Puerto Rico now has a unique opportunity to take control of its future destiny through implementation of broad-based economic reforms and fiscal measures.**

**First priority must be the implementation of transformational structural reforms that will change the nature of Puerto Rico's economic development trajectory and provide the residents of the Island with a better and more prosperous future.** COVID-19 federal relief and disaster relief-related spending will provide economic buoyancy in the coming years. However, to achieve meaningful economic growth in the long term, Puerto Rico must use this time to achieve timely and robust implementation of structural reforms, to enhance workforce development and labor productivity and to create a better environment for businesses and investors to create jobs. Without sustained dedication to implementing the 2021 Fiscal Plan structural reforms, and the ambition to pursue additional structural reforms in the future, the challenges that have held back the economy will not be addressed, and the Government will have lost its window to restore long-term opportunity to the people of Puerto Rico. The 2021 Fiscal Plan lays out a series of practical and proven growth-oriented structural reforms and investments, which, when coupled with the federal reconstruction funds, can ensure that the Island can rebuild better in the wake of the pandemic and other natural disasters.

**Second, reorganizing the way government services are delivered, as well as improving their delivery and efficacy on the Island, is critical.** The 2021 Fiscal Plan includes, in order to achieve sustainable and quality delivery of public services, investments aimed at enabling agency implementation of fiscal measures, enhancing frontline services, strengthening the technology sector, and cultivating a high-performing public workforce. Amongst the different investments the 2021 Fiscal Plan includes resources to provide broadband access for all residents as well as to begin a comprehensive civil service reform aimed at empowering civil servants by strengthening their skills and performance management and hence provide better quality public services. However, the Government must take the actions necessary to ensure a healthy fiscal future for the Island. As Puerto Rico embarks on a new era of fiscal responsibility, maintaining balanced budgets becomes a critical part of a path towards growth.

**The Puerto Rico Government has a unique opportunity to seize the current moment—with substantial federal support—to transform the Island's trajectory. The Oversight Board stands ready to work in partnership with the Government to achieve this vital outcome.**

DRA Ex. 236

# Appendix

## Chapter 22. Model presentation

The 2021 Fiscal Plan addresses the finances of central government agencies, component units, and other agencies. Agencies for which an independent 2021 Fiscal Plan is being developed have not been consolidated into the 2021 Fiscal Plan and are only represented to the extent they impact the Commonwealth (*Exhibit 148, Exhibit 149, Exhibit 150*).

EXHIBIT 148: MAJOR ENTITIES INCLUDED IN AND EXCLUDED FROM THE 2021 FISCAL PLAN



1 GDB , HTA, and UPR have separate and apart fiscal plans from the Central Government; HTA and UPR receive General Fund appropriations
2. Major CUs include the following IFCUs: ASEM, ASES, PRITA, Ports, PBA, ADEA, AAFAF, HFA, SIFC, PRCCDA
Note: Housing Finance Authority, resources from the Cap Funds (money transferred by HUD for financing projects and repayment of bonds) are not contemplated in the 2020 Fiscal Plan.

DRA Ex. 236

## EXHIBIT 149: LIST OF ENTITIES COVERED BY THE 2021 FISCAL PLAN

| Agency Code | Agency | Agency Code | Agency |
|---|---|---|---|
| 8 | Office of the Comptroller | 139 | Parole Board |
| 10 | General Court of Justice | 152 | Elderly and Retired People Advocate Office |
| 11 | Traffic Safety Commission | 153 | Advocacy for Persons with Disabilities of the CW of Puerto Rico |
| 15 | Office of the Governor | 155 | State Historic Preservation Office |
| 16 | Office of Management and Budget | 161 | Infrastructure Financing Authority |
| 18 | Planning Board | 162 | Public Building Authority (PBA) |
| 21 | Emergency and Disaster Management Admin Agency | 165 | Land Authority |
| 22 | Office of The Commissioner of Insurance | 167 | Company for the Integral Development of Cantera's Peninsula |
| 23 | Department of State | 168 | Ports Authority |
| 24 | Department of the Treasury | 177 | Land Administration |
| 28 | Commonwealth Election Commission | 180 | Tourism Company |
| 29 | Federal Affairs Administration | 186 | Culebra Conservation and Development Authority |
| 30 | Office of Admin and Transformation of Human Resources | 187 | Health Insurance Administration (ASES) |
| 31 | General Services Administration | 188 | Puerto Rico and the Caribbean Cardiovascular Center Corporation |
| 34 | Investigation, Prosecution and Appeals Commission | 189 | Institute of Forensics Sciences |
| 37 | Civil Rights Commission | 191 | Musical Arts and Stagecraft Corporation |
| 38 | Department of Justice | 192 | Fine Arts Center Corporation |
| 40 | Puerto Rico Police Department | 193 | Office of Government Ethics |
| 41 | Special Investigations Office | 195 | Economic Development Bank |
| 42 | Puerto Rico Firefighter Corps | 196 | Public Broadcasting Corporation |
| 43 | Puerto Rico National Guard | 198 | Farm Insurance Corporation |
| 45 | Department of Public Safety | 200 | Special Independent Prosecutor's Panel |
| 49 | Department of Transportation and Public Works | 211 | AFICA |
| 50 | Department of Natural and Environmental Resources | 215 | Conservatory of Music Corporation |
| 55 | Department of Agriculture | 220 | Correctional Health |
| 60 | Citizen's Advocate Office (Ombudsman) | 221 | Emergency Medical Services Corps |
| 62 | Cooperative Development Commission | 231 | Health Advocate Office |
| 67 | Department of Labor and Human Resources | 235 | Housing Financing Authority (HFA) |
| 68 | Labor Relations Board | 236 | Fondo de Innovación para el Desarrollo Agrícola de Puerto Rico (FIDA) |
| 69 | Department of Consumer Affairs | 238 | Port of the Americas Authority |
| 70 | State Insurance Fund Corporation (SIFC) | 241 | Administration for Integral Development of Childhood |
| 71 | Department of Health | 264 | Martin Peña Canal ENLACE Project Corporation |
| 75 | Office of the Financial Institutions Commissioner | 265 | Roosevelt Roads Naval Station Redevelopment |
| 78 | Department of Housing | 268 | Institute of Statistics |
| 79 | Automobile Accidents Compensation Administration (ACAA) | 271 | Puerto Rico Innovation and Technology Services |
| 81 | Department of Education | 272 | Office of the Inspector General |
| 82 | Institute of Puerto Rican Culture | 276 | Public-Private Partnership Authority |
| 87 | Department of Sports and Recreation | 277 | Agricultural Enterprises Development Administration (ADEA) |
| 90 | Medical Services Administration (ASEM) | 279 | Public Service Appeals Commission |
| 95 | Mental Health and Addiction Services Administration | 281 | Office of the Election Comptroller |
| 96 | Women's Advocate Office | 285 | Puerto Rico Integrated Transport Authority (PRITA) |
| 100 | Legislative Assembly | 286 | Ponce Port Authority |
| 105 | Industrial Commission | 288 | UPR Comprehensive Cancer Center |
| 106 | Public Housing Administration | 293 | Center for Research, Education and Medical Services for Diabetes |
| 109 | School of Plastic Arts | 295 | Fiscal Agency and Financial Advisory Authority (AAFAF) |
| 119 | Department of Economic Development and Commerce | 297 | Financial Oversight and Management Board for Puerto Rico |
| 120 | Veterans Advocate Office | 298 | Public Service Regulatory Board |
| 121 | 911 Service Governing Board | 303 | Convention Center of District Authority (PRCCDA) |
| 122 | Secretariat of the Department of the Family | 310 | Municipal Finance Corporation |
| 123 | Department of the Family | 311 | Gaming Commission |
| 124 | Families and Children Administration | 312 | Retirement Board of the Government of Puerto Rico |
| 126 | Vocational Rehabilitation Administration | 329 | Socio-Economic Development Office |
| 127 | Administration for Socioeconomic Development of the Family | | Additional (Electronic) Lottery |
| 137 | Department of Correction and Rehabilitation | | Traditional Lottery |
| 138 | Institutional Trust of the National Guard of Puerto Rico | | Unemployment Insurance Fund |

DRA Ex. 236

**EXHIBIT 150: LIST OF ENTITIES EXCLUDED FROM THE 2021 FISCAL PLAN**

| Entities issuing standalone Fiscal Plan | Entities excluded from Fiscal Plan |
|---|---|
| Development Bank for PR | Agency Fund (Special Deposit Fund) |
| Aqueduct and Sewer Authority | Commonwealth of Puerto Rico Regional Center Corporation |
| Municipal Revenues Collection Center (CRIM) | Public Finance Corporation (PFC) |
| PR Electric Power Authority | Puerto Rico Government Investment Trust Fund |
| PR Highways and Transportation Authority[1] | Puerto Rico Municipal Finance Agency |
| Puerto Rico Industrial Development Company | Puerto Rico Water Pollution Control Revolving Fund |
| University of Puerto Rico[2] | Puerto Rico Industrial Development Company |
| Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives | Safe Drinking Water Treatment Revolving Loan Fund |
| | The Children's Trust Fund |
| | Tourism Development Fund |

1 Commonwealth Fiscal Plan includes HTA general fund appropriations
2 Commonwealth Fiscal Plan includes UPR general fund appropriations

# Chapter 23. Macroeconomic projections

## 23.1 Economic and demographic trends

### EXHIBIT 151: MACROECONOMIC TRENDS



Macroeconomic trajectory: Total GNP, $B Fiscal Years ending June 30th

DRA Ex. 236