# Debtors' Ex. 112

Debtors' Ex. 112

# EXHIBIT A

# UNITED STATES DISTRICT COURT

# DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO,

as representative of

THE COMMONWEALTH OF PUERTO
RICO, THE EMPLOYEES RETIREMENT
SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO,
AND THE PUERTO RICO PUBLIC
BUILDINGS AUTHORITY,

Debtors.

No. 17 BK 3283-LTS

EXPERT REPORT OF

# MARTI P. MURRAY

**SEPTEMBER 13, 2021**

## TABLE OF CONTENTS

I.   **Qualifications** ................................................................................................................1

II.   **Scope of Engagement** ....................................................................................................4

III.   **Summary of Opinions** ...................................................................................................6

     A.   Opinion #1: The Plan of Adjustment and the 2021 CFP are consistent, as it relates to the Debtors' up-front cash needs and sustainable debt service levels.  I see nothing in the Plan relating to these elements that would be likely to impede the Debtors' ability to otherwise achieve or exceed the financial performance projected in the 2021 CFP. Specifically, the Plan and the 2021 CFP are consistent because:......................................6

         1.   Implementation of the Plan will leave the Debtors with sufficient cash, consistent with the up-front cash needs anticipated as part of the 2021 Certified Fiscal Plan; and ...........................................................................................................6

         2.   Implementation of the Plan will result in a level of future non-contingent debt service that is consistent with sustainable debt levels as set forth in the 2021 Certified Fiscal Plan. ..........................................................................................6

     B.   Opinion #2: Implementation of the proposed treatment of the pension plans for ERS, JRS, and TRS is already reflected in the 2021 Certified Fiscal Plan, and will therefore not negatively impact the Debtors' ability to achieve the 2021 Certified Fiscal Plan. .....6

     C.   Opinion #3: Implementation of the Plan and achievement of the 2021 Certified Fiscal Plan are not dependent on new borrowings and, as a result the borrowing restrictions incorporated into the Plan should not impede the Debtors' ability to achieve the 2021 Certified Fiscal Plan. ..................................................................................................6

     D.   Opinion #4: The settlements underpinning the Plan were reached between sophisticated parties over a more than four year period, in a manner consistent with typical custom and practice for complex debt restructurings.  The major stakeholder parties were represented by sophisticated counsel and financial advisors, with each stakeholder group well-equipped to act in its own economic best interest.  The settlements are reasonable and consistent with what would be expected in deal negotiations between sophisticated parties undertaken as part of a complex debt restructuring. .......................7

IV.   **Background** ...................................................................................................................7

     A.   Puerto Rico's insolvency ...................................................................................................7

     B.   PROMESA, the FOMB, and the Title III Cases ...............................................................8

     C.   Over the course of the Title III Cases, Puerto Rico has been tested by a series of natural disasters and by the COVID-19 pandemic ......................................................................11

     D.   The Title III mediation process ........................................................................................12

     E.   The 2021 Certified Fiscal Plan ........................................................................................14

     F.   The Debt restructuring as contemplated under the Plan ..................................................17

         1.   Pre-petition debt and allowed claims under the Plan ..............................................17

         2.   Proposed post-emergence debt obligations under the Plan .....................................17

3.   Summary of the Plan's anticipated impact on the Debtors' debt levels and debt service ......................................................................................................19

G.   Puerto Rico's pension system & related financial obligations ..........................................20

1.   Pre-PROMESA, Puerto Rico's pension system obligations were close to completely underfunded ..............................................................................20

2.   The Plan's proposed treatment of legacy pension obligations .................................22

H.   Remaining pending disputes with respect to the Plan ...................................................25

1.   Remaining disputes regarding the pension plan ...................................................25

2.   Remaining dispute with the DRA Parties ...........................................................25

**V.   Opinions and Discussion ..................................................................................................25**

A.   Opinion #1: The Plan of Adjustment and the 2021 CFP are consistent, as it relates to the Debtors' up-front cash needs and sustainable debt service levels.  I see nothing in the Plan relating to these elements that would be likely to impede the Debtors' ability to otherwise achieve or exceed the financial performance projected in the 2021 CFP ........25

1.   Implementation of the Plan will leave the Debtors with sufficient cash, consistent with the up-front cash needs anticipated as part of the 2021 Certified Fiscal Plan .27

2.   Implementation of the Plan will result in a level of future debt service that is consistent with sustainable debt levels as set forth in the 2021 Certified Fiscal Plan ...................................................................................................29

B.   Opinion #2: Implementation of the proposed treatment of the pension plans for ERS, JRS, and TRS is already reflected in the 2021 Certified Fiscal Plan, and will therefore not negatively impact the Debtors' ability to achieve the 2021 Certified Fiscal Plan ....45

1.   Social security ...............................................................................................47

2.   System 2000 removal .......................................................................................48

C.   Opinion #3: Implementation of the Plan and achievement of the 2021 Certified Fiscal Plan are not dependent on new borrowings, and, as a result the borrowing restrictions incorporated into the Plan should not impede the Debtors' ability to achieve the 2021 Certified Fiscal Plan .........................................................................................49

D.   Opinion #4: The settlements underpinning the Plan were reached between sophisticated parties over a more than four year period, in a manner consistent with typical custom and practice for complex debt restructurings.  The major stakeholder parties were represented by sophisticated counsel and financial advisors, with each stakeholder group well-equipped to act in its own economic best interest.  The settlements are reasonable and consistent with what would be expected in deal negotiations between sophisticated parties undertaken as part of a complex debt restructuring ........................52

1.   The Stakeholders were sophisticated parties represented by qualified counsel and advisors .........................................................................................................52

2.   The Debtors have been successful at reaching agreements with major creditor groups over an extensive negotiation process over more than four years ..............56

3.   The settlements reached are reasonable ............................................................59

4.   The FOMB has determined that the settlements are fair, equitable, and reasonable .......................................................................................................72

**VI. Conclusion** ................................................................................................................**74**

**Appendix A : The debtors have reached agreements with major stakeholder groups** .........**76**

**Appendix B : Expert CV of Marti P. Murray** ........................................................................**79**

**Appendix C : Documents Considered** ...................................................................................**95**

## I.    QUALIFICATIONS

1.  I am a Principal with The Brattle Group ("Brattle"), a consulting firm.  I am the Co-Practice Leader for the Bankruptcy & Restructuring Practice, and the Practice Leader for the Alternative Investments Practice, encompassing, among other things, engagements relating to hedge funds and private equity.

2.  As part of what is now close to a forty-year career, I have spent approximately 35 years in the bankruptcy and restructuring field including, among other things, having held senior management and oversight roles with investment funds specializing in distressed and bankrupt companies, an investing specialty commonly referred to as distressed debt investing ("Distressed Debt Investing").  After retiring from active portfolio management in 2009, I have been engaged as a financial advisor to debtors and stakeholders in connection with out-of-court restructurings and bankruptcies.  I have also consulted on issues relating to, among other things, industry custom and practice for debt restructurings, bankruptcy plans of reorganization, financial forecasting and projections, the valuation of businesses and securities, solvency, fraudulent conveyance, claims estimation, and damages analyses.

3.  I commenced my career in finance and credit in 1982, when I joined Bank of America ("BofA").  I completed BofA's formal credit training program and became a relationship manager for Fortune 500 clients in the consumer and industrial products sector.  I was responsible for the extension of credit to BofA's client base, and the delivery of a suite of services offered by the bank to its corporate clients.

4.  In 1987, I entered the alternative investment management industry.  At that time, I joined Oppenheimer & Co. ("Oppenheimer") to work for a Portfolio Manager for the Oppenheimer Horizon Fund—one of the first hedge funds specifically established for Distressed Debt Investing.  There, I worked at as an Investment Analyst, evaluating potential debt and equity investments for the fund, making buy/sell recommendations to the Portfolio Manager, and subsequently monitoring investments for which I was responsible.

1

5. In 1990, I joined Furman Selz Incorporated ("Furman"), a broker-dealer owned by Xerox at the time, to oversee its Distressed Debt Investing department. As a Senior Managing Director and department head, my responsibilities included investing capital in the distressed debt, bank debt, and high-yield asset classes on the firm's behalf and for Xerox. I was also responsible for developing a money management business around the Distressed Debt Investing specialty, and I launched a number of hedge fund investment vehicles and separately managed accounts for outside investors.

6. In 1995, I founded Murray Capital Management, Inc. ("Murray Capital"), an SEC-registered investment adviser. I served as the President and Portfolio Manager of Murray Capital. Murray Capital specialized in Distressed Debt Investing, taking positions at all levels of the capital structure of distressed and bankrupt companies, from senior secured loans and first mortgages to second lien debt instruments, unsecured bonds, trade claims, preferred stock, common stock, and various forms of derivatives. Peak client capital under management at Murray Capital grew to approximately $750 million, with the client base consisting of pension funds, university endowments, fund-of-funds, family offices, and high net worth individuals. I had ultimate responsibility for all aspects of the firm's business, including, among other things, fund formation, marketing, client services, fund operations, research, portfolio management, hedging strategies, trading, and compliance.

7. I ran Murray Capital from 1995 until early 2008, at which point the Distressed Debt Investing business of Murray Capital was acquired by Babson Capital, the money management division of the insurance company Mass Mutual. I joined Babson Capital and ran the Distressed Debt Investing department there until my retirement from active portfolio management in late 2009.

8. In my capacity as a Distressed Debt Investing hedge fund professional and portfolio manager for 23 years, a significant portion of my time was dedicated to working on debt restructurings. As part of managing a Distressed Debt Investing investment portfolio, I reviewed most of the major bankruptcy cases in the United States for the purposes of evaluating potential investments or monitoring existing ones. I frequently served on ad-hoc and official creditors' committees formed as part of a bankruptcy or restructuring process, including in the bankruptcies or

2

restructurings of Dow Corning, Global Power Equipment Group, Inc, Werner Ladder, Evergreen International Aviation, Inc., Scotia Pacific Company LLC, and Satmex, among others. I also participated in backstopping the rights offering for Solutia, a chemical company seeking to emerge from bankruptcy. In these capacities, I participated in negotiating the terms of numerous restructurings, working with outside counsel and financial advisors.

9. Later, in my capacity as a financial advisor, I advised numerous companies and debt and equity stakeholders in connection with debt restructurings and bankruptcies, including in connection with the bankruptcies or restructurings of the W Hotel and Condominiums in Boston, The Dolan Company, Component Hardware Group, Pulse Electronics, and Chesapeake Energy. I have also been engaged by bankruptcy trustees, including as Special Consultant in the case of Fletcher International, Ltd. Bermuda. The work I oversaw in that matter was reflected in the Trustee's Report and Disclosure Statement filed with the U.S. Bankruptcy Court for the Southern District of New York in November 2013.

10. I have been engaged as a testifying expert or financial advisor in over twenty matters relating to financial distress, bankruptcy, and restructuring/dissolution. Those in the public domain include: In re WeWork Litigation, In re Altaba, Inc., Chesapeake Energy Corporation, SW Boston Hotel Venture LLC, et al., GSC Group, Inc., et al., The Dolan Company, In re Sears Holding Corporation, et al., et al., In re Neiman Marcus Group LTD LLC, et al.; and In re Petters Company, Inc., et al., In re Fletcher International, Ltd., SEC v. James Thomas Bramlette, SEC v. Paul Alar, West Mountain, In the matter of Lynn Tilton, Patriarch Partners, LLC et al.; Ramius Private Select Ltd., et al., v. Sacha Lainovic, et al., and Public Sector Pension Investment Board v. Saba Capital Management, L.P.. In certain of these cases I was retained as an expert by the Securities and Exchange Commission.

11. In addition to my professional responsibilities, over the years, I have taught as an Adjunct Professor at the NYU Stern School of Business. Between 2001 and 2013, I taught graduate level courses in Bankruptcy and Distressed Debt Investing, as well as in Valuation/Equity Analysis.

12. As a result of my education, training, career as a Distressed Debt Investing portfolio manager, my work as a financial advisor and expert, and my teaching experience, I am thoroughly

familiar with industry custom and practice for bankruptcies and restructurings from a practitioner's perspective, including as it relates to the negotiation of plans, plan feasibility, claims objections, financial analysis, financial forecasting and projections, valuation, and other issues relevant to this matter.

13. I hold the designation of Certified Valuation Analyst ("CVA"), awarded by the National Association of Certified Valuators and Analysts ("NACVA"). I regularly attend training on a variety of valuation topics and obtain CPE (Continuing Professional Education) credit necessary to maintain the CVA credential. I am also a Certified Fraud Examiner (a "CFE").

14. I received a BA from Colgate University in 1981 with a major in World Affairs and Chinese and an MBA in Finance from the NYU Stern School of Business in 1986.

15. A copy of my CV is attached hereto as Appendix B. Brattle is being compensated for my work at the hourly rate of $1,100. Staff at Brattle have assisted me by performing work at my direction. All of the opinions and conclusions stated in this report are my own. Brattle's compensation is not contingent upon the outcome of this case.

## II.    SCOPE OF ENGAGEMENT

16. I have been engaged by Proskauer Rose LLP ("Proskauer" or "Counsel") in its capacity as counsel for The Financial Oversight and Management Board for Puerto Rico (the "FOMB" or the "Oversight Board") in connection with the Confirmation Hearing for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of Puerto Rico, and the Puerto Rico Public Buildings Authority (Dkt. 17628-1) (the "Plan of Adjustment" or the "Plan").

17. I have been asked to provide my expert opinion as to whether implementation of the key financial elements of the Plan is consistent with the Fiscal Plan for Puerto Rico, dated April 23, 2021, as certified by the FOMB (the "2021 Certified Fiscal Plan", or the "2021 CFP").[1]

---

[1]    The 2021 Certified Fiscal Plan is Exhibit H to the Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (Dkt. 17628-8).

Specifically, I have been asked to determine: (i) whether implementation of the Plan will leave Puerto Rico with sufficient cash reserves, consistent with the up-front cash needs outlined in the 2021 CFP; and (ii) whether implementation of the Plan will result in a level of future debt service that is consistent with sustainable debt levels, as discussed in the 2021 CFP.

18. I have also been asked to provide my expert opinion as to: (i) whether the proposed treatment of pension liabilities associated with the Employee Retirement System ("ERS"), the Teachers' Retirement System ("TRS"), and the Judiciary Retirement System ("JRS") is already reflected in the 2021 CFP, and will therefore not negatively impact Puerto Rico's ability to achieve the fiscal plan; (ii) whether implementation of the Plan and achievement of the Fiscal Plan is dependent on new borrowings and, if so, whether those new borrowings would be in violation of the borrowing restrictions incorporated into the Plan; and (iii) whether certain settlements reached in connection with the Plan are reasonable.

19. Section III of this report contains a summary of my opinions.  Section IV provides relevant background information.  Section V includes a detailed discussion of my opinions.  The opinions expressed herein are based on the application of my professional expertise and my experience as a bankruptcy and restructuring practitioner to the materials I have reviewed to-date, as listed in Appendix C.  I may seek to supplement or modify my opinions to the extent new information becomes available.

## III.   SUMMARY OF OPINIONS

A.   OPINION #1: THE PLAN OF ADJUSTMENT AND THE 2021 CFP ARE
CONSISTENT, AS IT RELATES TO THE DEBTORS' UP-FRONT CASH
NEEDS AND SUSTAINABLE DEBT SERVICE LEVELS.  I SEE NOTHING
IN THE PLAN RELATING TO THESE ELEMENTS THAT WOULD BE
LIKELY TO IMPEDE THE DEBTORS' ABILITY TO OTHERWISE
ACHIEVE OR EXCEED THE FINANCIAL PERFORMANCE PROJECTED
IN THE 2021 CFP.  SPECIFICALLY, THE PLAN AND THE 2021 CFP ARE
CONSISTENT BECAUSE:

1.   **Implementation of the Plan will leave the Debtors with sufficient cash,
consistent with the up-front cash needs anticipated as part of the 2021
Certified Fiscal Plan; and**

2.   **Implementation of the Plan will result in a level of future non-
contingent debt service that is consistent with sustainable debt levels
as set forth in the 2021 Certified Fiscal Plan.**

B.   OPINION #2: IMPLEMENTATION OF THE PROPOSED TREATMENT OF
THE PENSION PLANS FOR ERS, JRS, AND TRS IS ALREADY
REFLECTED IN THE 2021 CERTIFIED FISCAL PLAN, AND WILL
THEREFORE NOT NEGATIVELY IMPACT THE DEBTORS' ABILITY TO
ACHIEVE THE 2021 CERTIFIED FISCAL PLAN.

C.   OPINION #3: IMPLEMENTATION OF THE PLAN AND ACHIEVEMENT
OF THE 2021 CERTIFIED FISCAL PLAN ARE NOT DEPENDENT ON
NEW BORROWINGS AND, AS A RESULT THE BORROWING
RESTRICTIONS INCORPORATED INTO THE PLAN SHOULD NOT
IMPEDE THE DEBTORS' ABILITY TO ACHIEVE THE 2021 CERTIFIED
FISCAL PLAN.

D.   OPINION #4: THE SETTLEMENTS UNDERPINNING THE PLAN WERE
REACHED BETWEEN SOPHISTICATED PARTIES OVER A MORE THAN
FOUR YEAR PERIOD, IN A MANNER CONSISTENT WITH TYPICAL
CUSTOM AND PRACTICE FOR COMPLEX DEBT RESTRUCTURINGS.
THE MAJOR STAKEHOLDER PARTIES WERE REPRESENTED BY
SOPHISTICATED COUNSEL AND FINANCIAL ADVISORS, WITH EACH
STAKEHOLDER GROUP WELL-EQUIPPED TO ACT IN ITS OWN
ECONOMIC BEST INTEREST.  THE SETTLEMENTS ARE REASONABLE
AND CONSISTENT WITH WHAT WOULD BE EXPECTED IN DEAL
NEGOTIATIONS BETWEEN SOPHISTICATED PARTIES UNDERTAKEN
AS PART OF A COMPLEX DEBT RESTRUCTURING.

## IV.   BACKGROUND

### A.   PUERTO RICO'S INSOLVENCY

20.   Over the past several decades, the Commonwealth of Puerto Rico ("Puerto Rico" or the
"Commonwealth") has experienced a period of severe economic decline.[2]  In the 11 year period
between 2007 and 2018, the real GNP of the Commonwealth experienced near uninterrupted
contraction each year.[3]  In recent years, Puerto Rico's fiscal crisis has resulted from a contracting
economy, population declines, and changes in tax status and available credits under the U.S. tax
code for manufacturing companies as well as the negative impact of a series of natural disasters.[4]

21.   By 2016, Puerto Rico faced an unsustainable debt burden that included more than $72 billion in
funded debt issued by more than a dozen public entities, and more than $50 billion in unfunded
pension liabilities to current and future retirees.[5]  The Commonwealth has not paid interest or
principal on its general obligation bonds or Commonwealth-guaranteed obligations since July 1,

---

[2]   Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of
Puerto Rico, et al., July 30, 2021, Dkt. 17628, p. 1 (the "Disclosure Statement").

[3]   Disclosure Statement, Dkt. 17628, p. 179.

[4]   Disclosure Statement, Dkt. 17628, p. 1.

[5]   Financial Oversight and Management Board website, "Debt", https://oversightboard.pr.gov/debt/.

2016.[6]  As a result of its dire financial condition and failure to pay its debts, Puerto Rico lost the ability to access the municipal bond market and other funding sources traditionally used to finance government operations.[7]

22. Puerto Rico's dire financial situation has also caused a humanitarian crisis for over three million U.S. citizens living in Puerto Rico, as basic healthcare, legal, and education services have been impaired.[8]  For instance, by January 2016, the lack of government funding caused some hospitals to begin closing floors and curtailing services.  As of June 2017, Puerto Rico's unemployment rate was 10.1%, which was one of the highest levels in the U.S.[9]  Since 2006 nearly 10% of the Puerto Rican population has left Puerto Rico in search of better opportunities.[10]

### B.  PROMESA, THE FOMB, AND THE TITLE III CASES

23. In an effort to address the ongoing fiscal and humanitarian crisis in Puerto Rico, President Obama signed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") into law on June 30, 2016.[11]  Among other things, PROMESA established the FOMB.[12]

---

[6]   Disclosure Statement, Dkt. 17628, p. 90.

[7]   Letter from Jacob L. Lew, Secretary of the Treasury, to Paul Ryan, Speaker, U.S. House of Representatives January 15, 2016, https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

[8]   Disclosure Statement, Dkt. 17628, p. 1; Letter from Jacob L. Lew, Secretary of the Treasury, to Paul Ryan, Speaker, U.S. House of Representatives January 15, 2016, https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

[9]   FOMB, Puerto Rico's Proposed Plan of Adjustment Benefits, p.2, August 23, 2021.

[10]  Letter from Jacob L. Lew, Secretary of the Treasury, to Paul Ryan, Speaker, U.S. House of Representatives January 15, 2016, https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

[11]  Disclosure Statement, Dkt. 17628, at Exhibit H Certified Commonwealth Fiscal Plan §2.1 Enactment of PROMESA.

[12]  Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101 et seq., June 30, 2016, Title 1- Establishment and Organization of Oversight Board SEC. 101 Financial Oversight and Management Board.

24. The FOMB's stated purpose is to enable Puerto Rico to "achieve fiscal responsibility and access to the capital markets."[13]  The FOMB has the authority, in its sole discretion, to certify annual budgets and multi-year fiscal plans.[14]  The FOMB has certified budgets of the Commonwealth for each of fiscal years 2018-2022.[15]

25. Title III of PROMESA provides for the Commonwealth to establish debt restructurings under a court-supervised, quasi-bankruptcy process similar to those under Chapter 9 of the U.S. Bankruptcy Code applicable to municipalities.[16]  The FOMB is the sole representative of any debtor in a Title III case, with the exclusive authority to propose a plan of adjustment.[17]

26. Commencing in May 2017, the FOMB filed voluntary petitions for relief and commenced Title III cases for the following entities (the "Debtors"), among others:[18]

- The Commonwealth on May 3, 2017,

- The Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") on May 21, 2017, and

- The Puerto Rico Public Buildings Authority ("PBA") on September 27, 2019.

---

[13]  PROMESA Title 1- Establishment and Organization of Oversight Board SEC. 101 (a) Purpose.

[14]  Disclosure Statement, Dkt. 17628, p. 1-2 and 192-194.  The FOMB will terminate when it certifies that: "(i) the Commonwealth has adequate access to short-term and long-term capital markets at reasonable interest rates to meet its borrowing needs and (ii) for at least four consecutive Fiscal Years: (a) the Commonwealth has developed its budgets in accordance with modified accrual accounting standards and (b) the expenditures made by the Commonwealth during each such Fiscal Year did not exceed its revenues during that year, as determined in accordance with modified accrual accounting standards." Disclosure Statement, Dkt. 17628, p. 194.

[15]  Disclosure Statement, Dkt. 17628, p. 198; July 1, 2021 FOMB letter certifying the FY 2022 budget https://oversightboard.pr.gov/budgets-2/ accessed September 12, 2021.

[16]  Disclosure Statement, Dkt. 17628, p. 1-2 and 192.

[17]  Disclosure Statement, Dkt. 17628, p. 2.

[18]  Disclosure Statement, Dkt. 17628, p. 4.  The FOMB also filed Title III petitions for the Puerto Rico Sales Tax Financing Corporation ("COFINA") on May 5, 2017, the Puerto Rico Highways and Transportation Authority ("HTA") on May 21, 2017, and the Puerto Rico Electric Power Authority ("PREPA") on July 2, 2017.  The scope of this report is limited to the Title III cases of the Commonwealth, ERS, and PBA.

9

27. The Title III cases have provided protection to the Commonwealth from creditor debt-enforcement actions that could "inflict irreparable damage on Puerto Rico's economy."[19]

28. On September 27, 2019, the FOMB filed an initial plan of adjustment on behalf of the Debtors, after reaching plan support agreements with several major creditor groups.[20] Between 2019 and 2021, and under the guidance of a court-appointed mediation team, the FOMB continued to negotiate with creditors and gained additional support for its restructuring plan. The initial plan was amended several times. On July 30, 2021, the FOMB filed the Plan and the accompanying disclosure statement (the "Disclosure Statement").[21] The Disclosure Statement was approved on August 2.[22]

29. The Court has set October 4, 2021 as the deadline for voting on the Plan, and October 19, 2021 as the deadline to file objections to confirmation of the Plan.[23] The confirmation hearing is scheduled to begin on November 8, 2021.[24]

30. As part of the Title III cases for the Debtors, the U.S. Trustee appointed two statutory committees – an Unsecured Creditors' Committee (the "UCC"), and the Official Retirement Committee of the Government of Puerto Rico ("COR").[25] COR is comprised of eight members who represent the collective interests of the retirees of the government. The members of COR were selected by the U.S. Trustee, and COR represents the pensioners of the ERS, TRS, and JRS

---

[19]  2021 CFP, Dkt. 17628-8, p. 18-19.

[20]  Disclosure Statement Dkt. 17628, p.10.

[21]  Disclosure Statement, Dkt. 17628 and Seventh Amended Title III Joint Plan Of Adjustment of the Commonwealth of Puerto Rico, et al., Dkt. 17628-1 (the "Plan").

[22]  Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice And Confirmation Schedule, (IV) Approving Solicitation Packages And Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures, Dkt. 17639, p. 7. "The Debtors shall cause the Balloting Agent to complete the mailing of the Confirmation Hearing Notice in accordance with the Bankruptcy Rules and Local Rules on or before the later of August 5, 2021 and five (5) business days after entry of this Order."

[23]  Disclosure Statement, Dkt. 17628, p. 16.

[24]  Disclosure Statement, Dkt. 17628, p. 16.

[25]  Disclosure Statement, Dkt. 17628, p. 260.

retirement systems in relation to their pension and health benefits.[26]  COR members include former judges, teachers, and other government employees.[27]  The UCC is comprised of union and service providers.[28]

31.  The FOMB has stated that it is committed to a "once and done" approach to the Debtors' restructuring, so as to put Puerto Rico in the position so that it does not face insolvency again.[29] As part of this effort, the Plan proscribes the restructuring of approximately $35 billion in debt and other claims, and more than $50 billion in accumulated pension liabilities.[30]  After giving effect to the Plan, the reorganized Debtors will have $7.4 billion in new non-contingent debt,[31] representing an approximate 65% reduction from their $21.9 billion legacy debt burden.[32]

32.  As part of the Title III process, the FOMB must certify the Plan.  To certify the Plan, the FOMB must, among other things, determine, in its sole discretion, that the Plan is consistent with the 2021 Certified Fiscal Plan.[33]

    C.  OVER THE COURSE OF THE TITLE III CASES, PUERTO RICO HAS BEEN TESTED BY A SERIES OF NATURAL DISASTERS AND BY THE COVID-19 PANDEMIC

33.  Over the approximately four-year period since the commencement of the Title III cases, Puerto Rico has been tested by multiple natural disasters, including hurricanes Irma and Maria in 2017, more than 1,000 earthquakes of magnitude 3 or greater during 2020 alone, six of which were

---

[26]  Schedule 6(a) to the Disclosure Statement Order, Dkt. 17639-36.

[27]  Schedule 6(a) to the Disclosure Statement Order, Dkt. 17639-36.

[28]  Disclosure Statement, Dkt. 17628, p. 260.

[29]  2021 CFP, Dkt. 17628-8, at 2.3.1 Progress on requirement #1: Adequate access to credit markets at reasonable interest rates, p. 21.

[30]  2021 CFP, Dkt. 17628-8, p. 22.

[31]  New GO Bonds as described later in this report.

[32]  See Table 2.

[33]  PROMESA Title 1- Establishment and Organization of Oversight Board SEC. 103 (j)(3) Condition For Plans of Adjustment..

over a 5.5 magnitude, and by the COVID-19 pandemic.[34]  As a result of hurricanes María and Irma, the Commonwealth expects to receive significant federal aid pursuant to various disaster aid statutes that assist with the rebuilding and reconstruction of damages infrastructure.  In response to the earthquakes, on January 6, 2020, President Trump signed a major disaster declaration, authorizing disaster assistance funding for Puerto Rico.[35]  Puerto Rico is to receive $13.2 billion in federal relief to combat COVID-19, comprised of $2.2 billion from the Coronavirus Aid, Relief and Economic Security Act (CARES Act) in March 2020, $7 billion of stimulus relief from the Consolidated Appropriations Act passed in December 2020, and $4 billion as part of the American Rescue Plan Act of 2021 passed in March 2021.[36]

### D.   THE TITLE III MEDIATION PROCESS

34. On June 23, 2017, a mediation team was appointed by the Title III Court, consisting of five judges, to "further the goal of the successful, consensual resolution of the issues raised" in the Title III cases (the "Mediation Team").[37]  Each member of the Mediation Team has served as a judicial mediator to "facilitate confidential settlement negotiations of any and all issues and proceedings arising in the Title III cases and proceedings."[38]  Chief Bankruptcy Judge Barbara Houser has served as the leader of the Mediation Team (the "Mediation Team Leader").[39]

35. On July 24, 2019, in order to efficiently identify and resolve key issues to achieve confirmation of a plan of adjustment, and to avoid piecemeal litigation of overlapping issues, the Title III Court ordered the stay of various adversary proceedings and contested matters through November 30, 2019 and instituted mandatory mediation facilitated by the Mediation Team Leader as a means for stakeholders to engage in discussions and resolve issues.[40]  The parties

---

[34]   Disclosure Statement, Dkt. 17628, p. 4-5.

[35]   Disclosure Statement, Dkt. 17628, p. 5.

[36]   Disclosure Statement, Dkt. 17628, p. 5-6.

[37]   Order Approving Mediation Team, June 23, 2017, Dkt. 430, p. 2.

[38]   Order Approving Mediation Team, June 23, 2017, Dkt. 430, p. 2.

[39]   Order Approving Mediation Team, June 23, 2017, Dkt. 430, p. 2.

[40]   Order regarding Stay Period and Mandatory Mediation, July 24, 2019, Dkt. 8244, p. 1-2.

required to participate in mediation consisted of major stakeholders in the Title III case, including the FOMB, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"),[41] the UCC, the COR, the Ad Hoc Group of General Obligation Bondholders, and Ambac Assurance Corporation (in connection with PRIFA rum taxes and GO/PBA Bonds).[42] The adversary proceedings and contested matters involved a wide range of key issues.

36. As ordered by the Court, the Mediation Team 1) addressed the scheduling issues relevant to the confirmation of plan(s) of adjustment for the Title III debtors; and 2) engaged relevant parties in substantive mediation sessions in connection with pending adversary proceedings and contested matters.[43] Extensive mediated negotiations resulted in certain agreements among major stakeholders, including a plan support agreement dated February 9, 2020 between the FOMB and a group of GO/PBA bondholders that collectively held $8 billion in GO/PBA bond claims (the "2020 PSA").[44]

37. Since then, the FOMB has had further discussions under the guidance of the Mediation Team with AAFAF and creditors that were parties to the 2020 PSA, in light of the uncertainty created by COVID-19.[45] The FOMB also engaged with the Government, the monoline insurers, the UCC, COR, and various unions, in mediated negotiations and discussions "designed to establish a framework and timeline for the development for a consensual debt restructuring."[46] These

---

[41]   AAFAF was created on April 6, 2016 for the purpose of "acting as fiscal agent, financial advisor and reporting agent of the Commonwealth, its agencies, instrumentalities, subdivisions, public corporations and/or municipalities, and to assist such entities in confronting the fiscal and economic emergency that Puerto Rico is experiencing.  The FAFAA assumed the fiscal agency and financial advisory responsibilities that were previously held by the Government Development Bank (GDB)." Commonwealth of Puerto Rico, Basic Financial Statements and Required Supplementary Information, June 30, 2018, Exhibit N to the Disclosure Statement, Dkt. 17628-14, p. 45.

[42]   Order regarding Stay Period and Mandatory Mediation, July 24, 2019, Dkt. 8244, p. 2 and Appendix I.

[43]   Amended Report and Recommendation of the Mediation Team, February 10, 2020, Dkt. 10756, p. 1-2.

[44]   Amended Report and Recommendation of the Mediation Team, February 10, 2020, Dkt. 10756, p. 8. See also, FOMB Media Release, "Oversight Board Reaches New, More Favorable Agreement to Restructure $35 Billion of Liabilities," February 9, 2020.  This PSA was superseded by the operative GO/PBA PSA dated July 12, 2021, as discussed later in this report.

[45]   Disclosure Statement, Dkt. 17628, p. 12.

[46]   Disclosure Statement, Dkt. 17628, p. 12.

13

negotiations have resulted in additional agreements and settlements reached with major stakeholders, and iterations of proposed plans of adjustment reflecting such settlements, as discussed later in Opinion 4.

### E.   THE 2021 CERTIFIED FISCAL PLAN

38.   As discussed, in accordance with PROMESA, the FOMB has oversight responsibility for Puerto Rico's fiscal plan.[47]  The FOMB is required to deliver a schedule for the purpose of developing, submitting, approving, and certifying Puerto Rico's fiscal plan.[48]  PROMESA contemplates the FOMB and the Government will work together to adopt a fiscal plan, but grants the FOMB the power to develop and certify its own fiscal plan if the Government does not provide it with a proposed fiscal plan it determines to certify.[49]  The FOMB may certify a proposed fiscal plan if, in the FOMB's sole discretion, it meets 14 statutory requirements set forth in PROMESA.[50]

39.   On January 19, 2021, the FOMB announced that it would conduct its annual process to certify a fiscal plan and requested that the Government propose an updated fiscal plan on February 20, 2021.[51]  Subsequently, the deadline was extended to March 8, 2021 at the request of the Government.[52]  The Government submitted a draft fiscal plan on March 8, 2021, which the FOMB determined was inconsistent with PROMESA.[53]  The Government submitted a revised fiscal plan on March 26, 2021.[54]  The Oversight Board published a draft fiscal plan on April 22, 2021 and certified it on April 23, 2021 (the "2021 Certified Fiscal Plan", or the "2021 CFP").[55]

---

[47]   2021 CFP, Dkt. 17628-8, p. 18 (PROMESA establishes two primary mechanisms for restoring fiscal responsibility.  First, Titles I, II, IV, and V of PROMESA create the Financial Oversight and Management Board (FOMB or Oversight Board) for Puerto Rico and provide it powers and duties governing the review and certification of multi-year fiscal plans, annual budgets, major contracts and strategic infrastructure projects.").

[48]   PROMESA Title II – Responsibilities of Oversight Board Sec. 201. (a) In General.

[49]   Disclosure Statement, Dkt. 17628, p. 194.

[50]   Disclosure Statement, Dkt. 17628, p. 194.

[51]   Disclosure Statement, Dkt. 17628, p. 243.

[52]   Disclosure Statement, Dkt. 17628, p. 244.

[53]   Disclosure Statement, Dkt. 17628, p. 244.

[54]   Disclosure Statement, Dkt. 17628, p. 244.

[55]   Disclosure Statement, Dkt. 17628, p. 244.

40. The 2021 CFP covers the 30 year period from FY 2022 through FY 2051.[56]  The 2021 CFP covers the finances of "central government agencies, component units, and other agencies."[57] The 2021 CFP lays out a set of structural reforms that FOMB believes if successfully implemented, would enable Puerto Rico to begin to grow again, including "Human capital and welfare reform", "K-12 education reform", "Ease of doing business reform", "Power sector reform", and "Infrastructure reform."[58]

41. The 2021 CFP includes a set of fiscal measures that aim to create fiscal controls and accountability, including the establishment of the Office of the CFO, consolidation of agency operations, Medicaid reform, enhanced tax compliance, reduction of appropriations, and pension reform (collectively, "Fiscal Measures").[59]  The 2021 CFP shows the Commonwealth's projected fiscal deficit before Fiscal Measures, as well as the surplus (or deficit) post Fiscal Measures.  The 2021 CFP shows that, after implementation of such Fiscal Measures, pre-debt service surpluses are projected for the next fourteen years, through FY 2035.  For periods thereafter, it is projected that the Commonwealth will have to have implemented additional measures identified by the FOMB in the 2021 CFP to remain in surplus.

42. The 2021 CFP includes a framework for addressing the budget deficits that are projected to develop in the outer years.  The 2021 CFP proposes the following additional measures to address the projected deficits in outer years[60]:

    a.  Additional Medicaid Funding: Securing approximately $1 billion in additional permanent federal funding for Medicaid per year which would increase the FY 2022 – FY 2051 surplus by approximately $20 billion if implemented in FY 2031;

    b.  Healthcare Expense Growth: Imposing a cap on total healthcare expenditure growth, which would save approximately $14 billion if implemented in FY 2031;

---

[56]  2021 CFP Model, '30-Year Projections' tab.

[57]  2021 CFP, Dkt. 17628-8, Appendix Chapter 22.  Model Presentation.  A number of entities have their own fiscal plan, including, among others, the PR Electric Power Authority, the PR Highways and Transportation Authority.  See Exhibit 148, Exhibit 149 & Exhibit 150: List of Entities Excluded from the 2021 CFP.

[58]  2021 CFP, Dkt. 17628-8, p. 11-12 at Executive Summary.

[59]  2021 CFP, Dkt. 17628-8, p. 13.

[60]  2021 CFP, Dkt. 17628-8, p. 63.

15

    c.   Private Sector Labor Reform: repeal Law 80 of May 30, 1976, which would make Puerto Rico an employment at-will jurisdiction. This reform would reduce the cost of hiring workers on the island and is projected to increase the FY 2022 – FY 2051 surplus by approximately $13 billion if implemented in FY 2031;

    d.   Ease of Doing Business Reform: institute trading across borders reform, repeal restrictive and inefficient regulations, and implement a comprehensive reform of the Puerto Rico transportation system. These reforms are projected to increase the FY 2022 – FY 2051 surplus by approximately $4 billion if implemented by FY 2031;

    e.   Tax System Overhaul: lower the statutory marginal tax rates and broaden the tax base through the elimination of many exemptions, deductions, credits, and incentives. This reform would simplify the tax paying structure and is projected to increase the FY 2022 – FY 2051 surplus by approximately $11 billion if implemented in FY 2031;

    f.   Pharmaceutical and Medical Devices Manufacturing: grow the sector to build upon the already established physical infrastructure, human capital, and regulatory processes in place (the fiscal impact of which has not been quantified in the 2021 CFP).

43. The 2021 CFP also notes certain risks to the long-term projections based on uncertainty around specific variables. These uncertainties include[61]:

    a.   The extent to which economic activity will recover from the COVID-19 pandemic, and the time it will take to return to pre-pandemic economic levels;

    b.   The extent to which there are delays or failures to implement structural reforms;

    c.   The extent to which federal funding is lower than expected;

    d.   The extent to which there is less efficient spending on capital than projected;

    e.   The extent to which there are unforeseen demographic shifts;

    f.   The extent to which there are external shocks or natural disasters;

    g.   The extent to which there is a loss of Government focus on fiscal discipline once the Oversight Board is terminated.

44. Any of these factors could affect the revenue and expense projections included in the 2021 CFP.

---

[61]   2021 CFP, Dkt. 17628-8, p. 63-64.

16

F.   THE DEBT RESTRUCTURING AS CONTEMPLATED UNDER THE PLAN

### 1.   Pre-petition debt and allowed claims under the Plan

45.  As of May 3, 2017, the filing date of the Commonwealth's Title III case (the "Commonwealth
Petition Date"), the Debtors had approximately $21.9 billion of debt, consisting of $18.75 billion
combined Commonwealth general obligation bonds ("GO Bonds") and PBA bonds ("PBA
Bonds") and $3.2 billion ERS bonds ("ERS Bonds"), in addition to $2.75 billion of estimated
Commonwealth General Unsecured Claims ("CW GUCs") outstanding.[62]

46.  The Plan makes provisions for 69 classes of claims (80 if including sub-categories), totalling $42
billion in allowed claims, not including pension obligations.[63]   Sixty-one of the 80 classes are
voting classes, 18 of which are insured bond claims where the insurers[64] are entitled to vote to
accept or reject the Plan on behalf of the beneficial holders of the bond claims.[65]   Eight classes
are under the Plan and are deemed to have accepted the Plan; two classes will not receive any
distribution under the Plan and are deemed to have rejected the Plan.[66]

### 2.   Proposed post-emergence debt obligations under the Plan

47.  The Plan contemplates the issuance of New GO Bonds in the approximate principal amount of
$7.4 billion, consisting of $6.7 billion in current interest bonds ("CIBs") and $731 million in
capital appreciation bonds ("CABs"), as shown in Table 1 below.   CIBs are bonds whose interest
is payable on a semi-annual basis, with principal due at maturity.[67]   In the case of CABs, interest

---

[62]   PoA Overview _(8.23.21)_vFINAL.pptx p. 11.

[63]   Class 51 consists of 12 sub-categories listed as Class 51A through Class 51L. Disclosure Statement, Dkt. 17628, p. 19-24.

[64]   The insurers referenced above are Ambac Assurance Corporation ("Ambac"), Assured Guaranty Corp., Assured Guaranty Municipal Corp., and/or their affiliates (collectively, "Assured"), Financial Guaranty Insurance Corporation ("FGIC"), National Public Finance Guarantee Corporation ("National"), and Syncora Guarantee Inc. ("Syncora").

[65]   Disclosure Statement, Dkt. 17628, p. 62-65.

[66]   Class 51 consists of 12 sub-categories listed as Class 51A through Class 51L. Disclosure Statement, Dkt. 17628, p. 19-24. See also, Order Approving the Disclosure Statement, Dkt. 17639, p. 4-5.

[67]   "Current Interest Bonds," Law Insider, https://www.lawinsider.com/dictionary/current-interest-bonds accessed September 13, 2021.

accrues and compounds throughout the bond period, and is payable along with the principal at the bond's maturity.[68]  The CIBs and CABs issued under the Plan amortize beginning in FY 2022.[69]

### TABLE 1: NEW GO BONDS SUMMARY

| Maturity | | | Original Principal | Interest Rate | Taxable Status | Callable |
|---|---|---|---|---|---|---|
| | [A] | | [B] | [C] | [D] | [E] |
| CIBs | | | | | | |
| 7/1/2023 | [1] | $ | 745,050,000.00 | 5.000% | Exempt | No |
| 7/1/2025 | [2] | | 740,820,000.00 | 5.000% | Exempt | No |
| 7/1/2027 | [3] | | 729,565,000.00 | 5.000% | Exempt | No |
| 7/1/2029 | [4] | | 710,040,000.00 | 5.000% | Exempt | No |
| 7/1/2031 | [5] | | 680,835,000.00 | 5.000% | Exempt | No |
| 7/1/2033 | [6] | | 637,040,000.00 | 4.000% | Exempt | Yes |
| 7/1/2035 | [7] | | 448,580,000.00 | 4.000% | Exempt | Yes |
| 7/1/2037 | [8] | | 255,660,000.00 | 4.000% | Exempt | Yes |
| 7/1/2041 | [9] | | 204,600,000.00 | 4.000% | Exempt | Yes |
| 7/1/2041 | [10] | | 822,260,000.00 | 5.000% | Taxable | Yes |
| 7/1/2046 | [11] | | 708,865,000.00 | 4.000% | Exempt | Yes |
| **CIB Total** | **[12]** | **$** | **6,683,315,000.00** | | | |
| CABs | | | | | | |
| 7/1/2024 | [13] | $ | 288,241,989.75 | 5.000% | Exempt | No |
| 7/1/2033 | [14] | | 442,506,553.50 | 5.375% | Exempt | No |
| **CAB Total** | **[15]** | **$** | **730,748,543.25** | | | |
| **New GO Bonds Total** | **[16]** | **$** | **7,414,063,543.25** | | | |

Sources and Notes:

Disclosure Statement, Dkt. 17628, p. 26-29.

[6]-[11]: Callable on 7/1/2031 @ 103; on 7/1/2032 @ 102; on 7/1/2033 @ 101; and on 7/1/2034 @ 100.

---

[68]   "Capital Appreciation Bonds", FiscalNotes, March 2016, https://comptroller.texas.gov/economy/fiscal-notes/2016/march/cab.php accessed September 13, 2021.

[69]   Plan Exhibits I-3, I-4, and I-5.

[13]: Sinking fund redemption dates: 7/1/2022 and 7/1/2023.

[14]: Sinking fund redemption dates: 7/1/2029, 7/1/2030, 7/1/2031, and 7/1/2032.

48. In addition to the New GO Bonds, the Plan also proposes to issue contingent value instruments ("CVIs") that give a holder the right to receive payments if the Commonwealth's collection of sales and use tax ("SUT") exceeds certain thresholds.[70]  Two categories of CVIs, GO CVIs and Clawback CVIs, will be issued to holders of certain classes of claims.[71]

### 3.    Summary of the Plan's anticipated impact on the Debtors' debt levels and debt service

49. Table 2 below shows the debt burden and average annual debt service expense of the Debtors, both before and after implementation of the Plan.

**TABLE 2: SUMMARY OF PLAN'S IMPACT ON DEBT LEVELS AND NON-CONTINGENT DEBT SERVICE**

|  |  | Debtors Before Plan ($ in millions) [A] | Debtors After Plan ($ in millions) [B] | % change [C] |
|---|---|---|---|---|
| Total Non-Contingent Debt | [1] | $21,923 | $7,414 | *-66%* |
| Average Annual Non-Contingent Debt Service | [2] | $1,603 | $666 | *-58%* |

Sources and Notes:

[1]: Puerto Rico FOMB Presentation "Puerto Rico's Proposed Plan of Adjustment Benefits," p.11. Includes GO/PBA and ERS debt.

[2]: Puerto Rico FOMB Presentation "Puerto Rico's Proposed Plan of Adjustment Benefits," p. 11.  Includes GO/PBA and ERS debt.  Average debt service for FY2022-2031.  Debt after POA includes CABs.

[C]: [B]/[A] - 1.

---

[70]    Disclosure Statement, Dkt. 17628, p. 29.

[71]    Disclosure Statement, Dkt. 17628, p. 30-31.

### G. PUERTO RICO'S PENSION SYSTEM & RELATED FINANCIAL OBLIGATIONS

#### 1. Pre-PROMESA, Puerto Rico's pension system obligations were close to completely underfunded

50. In addition to approximately $21.9 billion[72] in funded debt claims and $2.75 billion in estimated GUCs, the Title III Debtors also face claims relating to legacy pension plans that, as of June 30, 2016, represented an actuarial liability of more than $50 billion.[73] There are virtually no assets held in reserve to satisfy these liabilities, and as a result, the Commonwealth's pension systems are virtually 100% underfunded and insolvent, and have been for some time.[74]

51. The Commonwealth of Puerto Rico has historically maintained three distinct pension plans - the Employees' Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), the Teachers' Retirement System ("TRS"), and the Judiciary Retirement Systems ("JRS"). ERS represents the largest of Puerto Rico's pension obligations.[75] ERS was created in 1951 to provide pension and other benefits to retired government employees.[76] It is the primary multi-employer retirement system in Puerto Rico.[77] TRS is the second largest of Puerto Rico's pension obligations. TRS was established in 1951 to provide pension and other benefits to teachers and other employees of the Puerto Rico Department of Education.[78] JRS is the smallest of the pension obligations, and was created in 1954 to provide pension and other benefits to judges and other employees of the Judiciary Branch of the Commonwealth. [79]

---

[72] PoA Overview_(8.23.21)_vFINAL.pptx p. 11. Reflects $18.75 billion of GO/PBA debt, $3.17 billion of ERS debt, and an estimated $2.75 billion of General Unsecured Claims (GUCs).

[73] 2021 CFP, Dkt. 17628-8, Exhibit 140.

[74] 2021 CFP, Dkt. 17628-8, p. 272 - 273 Exhibit 140.

[75] 2021 CFP, Dkt. 17628-8, Exhibit 140.

[76] Exhibit J to the Disclosure Statement, Dkt 17628-10, p. 1.

[77] Exhibit J to the Disclosure Statement, Dkt 17628-10, p. iv.

[78] Exhibit J to the Disclosure Statement, Dkt 17628-10, p. 1.

[79] Exhibit J to the Disclosure Statement, Dkt 17628-10, p. 1-2.

20

52. Employer contributions to these pension plans were historically defined as a percentage of compensation for employees in the retirement systems.[80]  For decades, the population of active participants declined, and the population of retirees receiving retirement benefits grew.  As a result, payroll-based contributions were insufficient to fund the retirement systems.[81]  Figure 1 below shows the net asset balance and funded ratios for ERS and TRS from 2000 to 2018, as presented in a 2019 report prepared by Ernst & Young.[82]

**FIGURE 1: NET ASSET BALANCE AND FUNDED RATIOS OF ERS AND TRS FROM 2000 TO 2018**



Sources and Notes:

September 2019 PROMESA Section 211 Report on the Puerto Rico Retirement Systems, Exhibit J

to the Disclosure Statement, Dkt 17628-10, p. ix.

---

[80]  Exhibit J to the Disclosure Statement, Dkt 17628-10, p. ix.

[81]  Exhibit J to the Disclosure Statement, Dkt 17628-10, p. ix.

[82]  JRS accounts for a much smaller portion of Puerto Rico's pension obligations and is not included in this portion of Ernst & Young's analysis. JRS had 364 members as of July 1, 2015 compared to 118,657 ERS members and 32,952 TRS members. As of June 30, 2016 JRS had an actuarial accrued liability of approximately $650 million, versus ERS and TRS which had a liability of $36.43 billion and $18.17 billion, respectively. *See* Exhibit J to the Disclosure Statement, PROMESA Section 211 Report on Puerto Rico Retirement Systems p. 2; 2021 CFP, Dkt. 17628-8, Exhibit 140 p. 273.

53. As shown in Figure 1 above, as of June 30, 2016, ERS had negative net assets of $1.2 billion. The negative net asset balance results from the fact that ERS issued $3.1 billion in debt, in the form of a pension obligation bond in 2008 (the "ERS Debt"). As of June 30, 2016, the balance of the ERS Debt more than offset $2.4 billion in gross assets held by ERS.[83]

54. Prior to PROMESA, Puerto Rico had implemented certain pension reforms. For example, in 1999, the ERS defined benefit structure was closed to new plan members who joined on or after January 1, 2000. To provide an alternative for employees who joined after that time, the Commonwealth established a retirement savings account program referred to as System 2000 ("System 2000"), which was an employee-funded retirement benefit administered by ERS.[84] Later, in 2013, the Commonwealth froze all defined benefits for ERS members hired prior to January 1, 2000.[85]

55. Rather than funding pension obligations from available reserves, the Commonwealth has been on a "pay as you go" basis, referred to as PayGo ("PayGo"). PayGo was established in 2017 pursuant to Act 106.[86] PayGo expenses include ERS, TRS, and JRS benefit payments and other expenses, and exclude Social Security costs.[87]

## 2. The Plan's proposed treatment of legacy pension obligations

56. The Plan contains four key provisions designed to address the Commonwealth's legacy pension obligations. First, the Plan calls for a freeze of benefits in defined benefit plans for TRS and JRS beneficiaries. Second, it includes an 8.5% reduction in pension benefits for those beneficiaries receiving in excess of $1,500 per month, with a floor of $1,500 per month. According to an analysis incorporated into the 2021 CFP, it is estimated that, based on the currently proposed treatment of the pension plans, 72% of total current retirees across the three plans will receive no

---

[83] Exhibit J to the Disclosure Statement, Dkt 17628-10, p. iv.

[84] Exhibit J to the Disclosure Statement, Dkt 17628-10, p. 9.

[85] Disclosure Statement, Dkt. 17628, p. 81.

[86] Disclosure Statement, Dkt. 17628, p. 82.

[87] 2021 CFP, Dkt. 17628-8, Exhibit 141 p. 274 showing PayGo expenses from FY 2022 to FY 2026 which correspond to 2021 CFP Model, tab 'Pensions', Row 72.

reduction in benefits under the proposed Plan.[88]  Third, the Commonwealth will commence making additional social security contributions in 2022 (for teachers and judges not currently enrolled).  Lastly, in exchange for a one-time payment of approximately $1.2 billion, retirees under the System 2000 plan will be removed from the Commonwealth's pension plan liability.[89]

57.  The financial effect these adjustments to the Commonwealth's pension obligations post-emergence are shown in Figure 2 below.  The blue Total Savings line shows the positive financial impact of the pension modifications on the Commonwealth's annual surplus.  It reflects the benefit of both the 8.5% pension benefit cut (savings indicated by the red bars) and the TRS and JRS benefit freeze (indicated by the gray bars), partially offset by increased costs associated with the expansion of Social Security (indicated by the light blue offsetting bars).  The modifications under the Plan will initially result in more expensive pension costs of $38 million in FY 2022 because of increased contributions to Social Security, but then the modifications will result in savings of $36 to $116 million per year from FY 2023 to 2032, and to over $200 million per year beginning in FY 2037.[90]

---

[88]   2021 CFP, Dkt. 17628-8, Exhibit 143 p. 276.
[89]   2021 CFP, Dkt. 17628-8, Exhibit 141 p. 274.
[90]   2021 CFP, 'Pension' tab, Row 70.

## FIGURE 2: SUMMARY OF THE FINANCIAL IMPACT OF THE PLAN'S PROPOSED PENSION MODIFICATIONS



Sources and Notes:

2021 CFP Model, tab 'Pensions'.  See also Exhibit 141 to the 2021 CFP at p. 274.  I understand that the System 2000 benefits reflected as a saving on p. 274 of the 2021 CFP are reflected as a reduction to ERS payments in the 2021 CFP model, rather than as a measure.  As a result, the savings resulting from the System 2000 agreement are not included in Figure 2 above.

58.  The Plan provides for the establishment and funding of a pension reserve trust to ensure that future PayGo benefits can be paid.[91]  The Plan also envisions a snap back mechanism in which, under certain circumstances, the pension payments could be restored to prior levels based on the Commonwealth's future financial performance.  Under this mechanism, through FY 2033 if the

---

[91]  The pension reserve trust is to be funded over an eight year period.  See PoAOverview_(8.23.21)_vFINAL.pptx, p. 16.

Commonwealth's cash surplus is $100 million or more than that forecast in the certified fiscal plan in effect as of the Effective Date, then 10% of the surplus amount will be allocated on a pro rata basis to each ERS, TRS, or JRS participant who previously experienced a benefit reduction as a result of implementation of the Plan.[92]

### H. REMAINING PENDING DISPUTES WITH RESPECT TO THE PLAN

#### 1. Remaining disputes regarding the pension plan

59. The Puerto Rico legislature has passed and signed into law a bill providing that the Government will not enact legislation approving any new bond issuance for the reorganized Debtors if the Plan impairs retiree pensions.[93] In mid-June the Puerto Rico Fiscal Agency and Financial Advisory Authority ("FAFAA") restated this position in a filing in the Title III proceedings.[94]

#### 2. Remaining dispute with the DRA Parties

60. The DRA Parties (defined later in this report) have indicated that they intend to object to the confirmation of the Plan.[95]

## V. OPINIONS AND DISCUSSION

### A. OPINION #1: THE PLAN OF ADJUSTMENT AND THE 2021 CFP ARE CONSISTENT, AS IT RELATES TO THE DEBTORS' UP-FRONT CASH NEEDS AND SUSTAINABLE DEBT SERVICE LEVELS. I SEE NOTHING IN THE PLAN RELATING TO THESE ELEMENTS THAT WOULD BE LIKELY TO IMPEDE THE DEBTORS' ABILITY TO OTHERWISE ACHIEVE OR EXCEED THE FINANCIAL PERFORMANCE PROJECTED IN THE 2021 CFP

61. I have been asked to evaluate whether there are inconsistencies between the Plan and the 2021 CFP, based on particular provisions of both, specifically as reflected in categories (1) and (2) in

---

[92] Plan, p. 15. *See also* p. 49 for the definition of "Participant"; p. 31 for the definition of "Excess Cash Surplus".

[93] Disclosure Statement, Dkt. 17628, p. 584-585.

[94] Robert Slavin, "Puerto Rico Oversight Board says local legislation not needed for debt adjustment," The Bond Buyer, June 30, 2021.

[95] Disclosure Statement, Dkt. 17628, p. 559.

Opinion #1 below.  I reviewed underlying documentation and certain analyses provided to me in order to develop a sufficient basis to conclude as to whether there are any inconsistencies related to the categories identified.

62.  In this context, consistency means that there are no material provisions in the Plan relating to the three categories of focus that conflict with the 2021 CFP, and vice versa.  It does not mean that all provisions in the Plan and the 2021 CFP are necessarily identical.  Provisions may not be identical, among other reasons, because there are timing differences relating to when the 2021 CFP and the Plan were each finalized.[96]  In addition, negotiations with stakeholders have been ongoing, and the results of all negotiations were not necessarily known as of the time the 2021 CFP was certified.  For instance the results of negotiations relating to collective bargaining agreements were not known as of the date of certification.  I have been asked by counsel to assume that a modified fiscal plan will be issued that will address the results of these later negotiations.

63.  For certain of the categories identified in (1) and (2) below, I was able to verify there were no inconsistencies between the Plan and the 2021 CFP from the information contained in those documents themselves.  In other cases, I obtained additional documentation or analysis so that I could evaluate whether the Plan and the 2021 CFP were consistent across each of the categories I identified.

64.  I conclude that the Plan and the 2021 CFP are consistent in all material respects, as it relates to categories (1) and (2) below.  A detailed discussion of my opinions and conclusions follows.

---

[96]  I note that the 2021 CFP was certified on April 23, 2021.  As of that date, the Debtors had submitted the 2nd Amended Plan.  The disclosure statement for the 7th Amended Plan was approved on July 30, 2021.  As a result, there is a timing difference of approximately three months between the certification of the 2021 CFP and the operative Plan.  *See* Second Amended Title III Joint Plan of Adjustment dated March 8, 2021.  The Third Amended Title III Joint Plan of Adjustment is dated May 11, 2021.

### 1.   Implementation of the Plan will leave the Debtors with sufficient cash, consistent with the up-front cash needs anticipated as part of the 2021 Certified Fiscal Plan

65.   The sources and uses of funds analysis prepared in connection with the Debtors' planned emergence from the Title III cases (the "Sources and Uses of Funds Analysis") indicates that the Debtors will emerge with a level of cash that is consistent with the cash necessary to implement undertakings referenced in the 2021 Certified Fiscal Plan, including the System 2000 settlement, and the provision in the 2021 CFP requiring that funds be set aside for an emergency reserve.

66.   The Sources and Uses of Funds Analysis includes a payment of $1.2 billion for System 2000 participants upon emergence, which is consistent with the 2021 CFP.[97]

67.   The Plan and the 2021 CFP are also consistent with respect to setting aside funds for a planned emergency reserve.  Due to its location, Puerto Rico has been prone to a series of natural disasters, including hurricanes and earthquakes.  Puerto Rico's inability to invest in infrastructure makes the impact of these natural disasters more severe than they otherwise would be.[98]  The FOMB has stipulated that Puerto Rico must set aside annual appropriations into an emergency reserve ("Emergency Reserve"), to ensure that the Government has adequate funds to respond to emergency situations, including those arising as a result of natural disasters.[99]  Based on guidance provided by the International Monetary Fund to other Caribbean islands, the FOMB concluded that Puerto Rico should reserve $130 million per year for ten years, so that the

---

[97]   System 2000 Participant Claims under the Plan include claims accrued under System 2000 and Act 3 (Plan p. 59).  Act 3 froze benefits accrued under Acts 1 and 447 for ERS participants hired prior to January 1, 2000 (2021 CFP, p. 278).  Settlements with both have been reflected in the Plan and discussed in the 2021 CFP, See PoA Overview_(8.23.21)_vFINAL.pptx at p. 15 showing $1,202 mm for System 2000 and $100mm for Act 1/447; 2021 CFP at p.278 stating System 2000 participants would receive approximately $1.5 billion under the terms of the Plan.

[98]   "3 Lessons from Puerto Rico: Mitigating the Health Effects of Future Hurricanes", Harvard Business Review, May 30, 2018, available at: https://hbr.org/2018/05/3-lessons-from-puerto-rico-mitigating-the-health-effects-of-future-hurricanes.

[99]   Disclosure Statement, Dkt. 17628, p. 173. ("Board concluded Puerto Rico must also set aside appropriations annually into an emergency reserve…The purpose of the emergency reserve is different than that of the liquidity balance.  It is designed specifically to ensure the government has adequate funds available to respond rapidly to emergency situations, such as natural disasters.").

Emergency Reserve eventually totals $1.3 billion.[100] The FOMB must approve any disbursements of these funds.[101]

68. The Sources and Uses of Funds Analysis projects an Emergency Reserve of $390 million upon emergence, which is consistent with the 2021 CFP.[102]  The 2021 CFP also accounts for the $130 million annual appropriation to the Emergency Reserve from FY 2022 through FY 2028, for a total of $910 million additional anticipated appropriations.[103]  As a result, the $130 million annual appropriation to the Emergency Reserve that is described in the Disclosure Statement is consistent with the amounts reflected in the 2021 CFP.[104]

69. As stated, the Plan also calls for the funding of a pension reserve trust.  Funding of the pension reserve trust has not been reflected in the 2021 CFP.  I have been asked to assume the funding of the pension reserve trust will be reflected in a later fiscal plan, and will not result in the Commonwealth realizing a deficit before debt service any earlier than projected in the 2021 CFP.

70. Based on the Sources and Uses of Funds Analysis, the available cash balance for the Commonwealth[105] upon emergence after Plan-related disbursements have been made is projected to be approximately $2.43 billion, before taking the Emergency Reserve into account.  Including the Emergency Reserve of $390 million, the available cash balance is expected to be

---

[100]  Disclosure Statement, Dkt. 17628, p. 173. ("Following International Monetary Fund guidance provided to other Caribbean islands, the Oversight Board concluded this emergency reserve must eventually total $1.3 billion, or approximately 2.0% of Fiscal Year 2018 GNP, by reserving $130 million per year for 10 years.").

[101]  Disclosure Statement, Dkt. 17628, p. 173. ("The Oversight Board authorized the use of up to $260 million of the cumulative 2019 and 2020 budgeted reserve for earthquake and COVID-19 relief.").

[102]  Cash bridge 8-23-2021.pptx at p.3; 2021 CFP at p.57 ("Starting in FY2019, the Commonwealth must set aside $130 million annually into an emergency reserve that is to total $1.3 billion, or ~2.0% of FY2018 GNP.").

[103]  2021 CFP Model at tab 'Expense Build' (Row 53).

[104]  Disclosure Statement, Dkt. 17628, p. 173. ("Following International Monetary Fund guidance provided to other Caribbean islands, the Oversight Board concluded this emergency reserve must eventually total $1.3 billion, or approximately 2.0% of Fiscal Year 2018 GNP, by reserving $130 million per year for 10 years…As of December 31, 2020, the reserve account held $301 million, which is lower than the $390 million from the accumulation of budgeted reserves from Fiscal Years 2019 ($130 million), 2020 ($130 million) and 2021 ($130 million.").

[105]  Includes cash balance available in the Commonwealth's centralized cash management system the Treasury Single Account ("TSA") and cash from CRIM, PREPA, PRASA, PRIDCO, GDB, UPR, COSSEC and COFINA.  See Presentation titled "The Commonwealth Retains Significant Cash at p. 2" (Cash bridge 8-23-2021.pptx).

approximately $2.82 billion. A cash balance of approximately $2.82 billion represents 51.3 days of FY 2022 general fund expenditures, as shown in Table 3 below:

**TABLE 3: PUERTO RICO CASH BALANCE ON EMERGENCE**
**($ IN MILLIONS)**

| No. | Description | Value |
|-----|-------------|-------|
| [1] | Cash Balance at Emergence | $2,426 |
| [2] | Emergency Reserve Balance at Emergence | $390 |
| [3] | Total Cash Balance at Emergence | $2,816 |
| [4] | Projected FY 2022 General Fund Expenditures | $19,771 |
| [5] | Number of Days' of FY 22 General Fund Expenditures Funded by Total Cash Balance | 51.3 days |

Sources and Notes:

[1], [2]: FOMB, Commonwealth Cash Position Presentation, August 23, 2021, p.3.

[3]: [1]+[2]

[4]: 2021 CFP, p.301

[5]: ([3] / [4])*360

### 2. Implementation of the Plan will result in a level of future debt service that is consistent with sustainable debt levels as set forth in the 2021 Certified Fiscal Plan

71. PROMESA requires each Commonwealth Fiscal Plan to contain a debt sustainability analysis ("Debt Sustainability Analysis" or "DSA").[106] The DSA provides a framework for evaluating how much debt the Commonwealth can carry based on various economic and demographic statistics.

72. I have evaluated whether the debt proposed to be issued under the Plan is consistent with the DSA incorporated into the 2021 CFP. I conclude that it is. This conclusion is based upon my review of both the amount and terms of the to-be issued debt, as compared to the Debt Sustainability Analysis incorporated into the 2021 CFP.

---

[106] PROMESA Section 201(b)(1)(I).

> *a.  Debt burden before and after the Plan*

73.  As noted, the Plan calls for the issuance of $7.4 billion in new debt, and anticipates that debt service will initially total $790 million in FY 2022, decreasing each year thereafter as the outstanding principal amount of debt outstanding amortizes.[107]  Over 50% of the new debt issued under the Plan will be amortized within ten years of the July 2021 deemed issuance date.[108]  This level of debt service is far lower than what the Debtors had pre-PROMESA, when they were burdened with debt service of approximately $1.8 billion annually.[109]

74.  Table 3 and Table 4 below show what the projected surplus (or deficit) of the Commonwealth would have been if the Commonwealth continued to be burdened with its legacy pre-petition debt service.  Table 3 covers the first 10 years of the projection period, while Table 4 covers the following 20 years (the "Out Years").

75.  Puerto Rico's pre-petition legacy debt service obligations would result in the Commonwealth experiencing a fiscal deficit after debt service each year beginning in FY 2022 through FY 2051, the final year of the 2021 CFP projection period.  As shown in Table 3 below, for the first ten years, the annual deficit would begin at $33 million and increase to as much as over $1.3 billion in FY 2028.  In the Out Years, as shown in Table 4, the Commonwealth's deficit would increase to over $2.2 billion.

---

[107]  Plan Exhibits I-2 (showing total beginning principal of $6.68 billion on the Current Interest Bonds and total debt service of $684 million in FY 2022); I-5 showing total initial principal of $288 million on the 5.0% CABs and $443 million on the 5.375% CABs.  Beginning debt balance = $6.68 billion + $288 million + $443 million = $7.4 billion.  FY 2022 debt service assumes the $106 million of the 5.0% CABs is redeemed in FY 2022. FY 2022 debt service = $684 million + $106 million = $790 million.

[108]  PSA Announcement Presentation (2021.02.23) vFinal.pdf at p. 7.

[109]  Legacy debt service as reflected in the 2021 CFP.  Includes GO, PBA, and ERS debt service as well as debt service on the PRIFA, Convention Center, and Public Finance Corporation debt.  The financial projections presented as part of the 2021 CFP do not reflect the intended debt structure of the Commonwealth post-emergence, including what will be due on the CIB, the CAB, and the CVIs to be issued under the Plan.  Instead, the projections incorporated into the 2021 CFP include pre-petition contractual debt service obligations.  See 2021 CFP at p. 62, FN 3 to Exhibit 27; *See also* 2021 CFP model at tab 'Aggregate – DS' showing historical Commonwealth debt service of $1.8 billion in FY 2018-2021.

30

**TABLE 3: 2021 CFP FINAICAL PROJECTIONS FOR THE COMMONWEALTH OF PUERTO
RICO AFTER LEGACY PRE-PETITION DEBT SERVICE – FY 2022 – 2031**

|  |  | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 | FY 2027 | FY 2028 | FY 2029 | FY 2030 | FY 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Surplus (Deficit) | [1] | 1,716 | 1,320 | 1,071 | 1,265 | 1,334 | 1,478 | 1,407 | 1,346 | 1,217 | 1,009 |
| Pre-Petition Debt Service | [2] | (1,749) | (1,764) | (1,674) | (1,679) | (1,668) | (1,813) | (2,771) | (1,995) | (1,904) | (1,867) |
| Surplus (Deficit) after Pre-Petition Debt | [3] | (33) | (444) | (603) | (414) | (334) | (336) | (1,363) | (649) | (687) | (858) |

Sources and Notes:

[1]: 2021 CFP Model '30-Year Projections' Row 120.

[2]: 2021 CFP Model '30-Year Projections' Row 121.

[3]: [1]+[2].

**TABLE 4: CFP FINAICAL PROJECTIONS FOR THE COMMONWEALTH OF PUERTO RICO
AFTER LEGACY PRE-PETITION DEBT SERVICE – OUT-YEARS**

|  |  | FY 2032 | FY 2033 | FY 2034 | FY 2035 | FY 2036 | FY 2037 | FY 2038 | FY 2039 | FY 2040 | FY 2041 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Surplus (Deficit) | [1] | 802 | 609 | 401 | 207 | (119) | (324) | (481) | (629) | (775) | (1,149) |
| Pre-Petition Debt Service | [2] | (1,716) | (1,640) | (1,780) | (1,653) | (1,144) | (1,093) | (1,115) | (1,150) | (1,049) | (990) |
| Surplus (Deficit) after Pre-Petition Debt | [3] | (913) | (1,030) | (1,379) | (1,446) | (1,264) | (1,417) | (1,596) | (1,779) | (1,824) | (2,138) |

|  |  | FY 2042 | FY 2043 | FY 2044 | FY 2045 | FY 2046 | FY 2047 | FY 2048 | FY 2049 | FY 2050 | FY 2051 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Surplus (Deficit) | [1] | (1,234) | (1,331) | (1,437) | (1,544) | (1,627) | (1,737) | (1,865) | (1,992) | (2,105) | (2,237) |
| Pre-Petition Debt Service | [2] | (368) | (193) | (163) | (163) | (163) | (50) | (50) | (50) | (50) | (50) |
| Surplus (Deficit) after Pre-Petition Debt | [3] | (1,602) | (1,524) | (1,599) | (1,706) | (1,790) | (1,787) | (1,914) | (2,042) | (2,154) | (2,286) |

Sources and Notes:

[1]: 2021 CFP Model '30-Year Projections' Row 120.

[2]: 2021 CFP Model '30-Year Projections' Row 121.

[3]: [1]+[2].

76. Table 5 and Table 6 below then show what the Commonwealth's projected surplus (or deficit) will be assuming the Plan is consummated and the new debt is issued.[110]  As evidenced by Table 5 and Table 6, the Plan greatly reduces the Commonwealth's non-contingent annual debt burden.

77. As shown in Table 5, under the Plan the Commonwealth is projected to have an annual fiscal surplus after non-contingent debt service through FY 2031, ranging from $319 million to over $900 million.  As shown in Table 6, in the Out Years, the Commonwealth is not projected to have a fiscal deficit after non-contingent debt service until FY 2035.  As discussed, there are additional measures the FOMB believes the Commonwealth can implement prior to FY 2035 to avoid this deficit in the Out Years.

**TABLE 5: 2021 CFP FINANCIAL PROJECTIONS FOR THE COMMONWEALTH OF PUERTO RICO AFTER PLAN NON-CONTINGENT DEBT SERVICE - FY 2022-FY 2031**

| | | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 | FY 2027 | FY 2028 | FY 2029 | FY 2030 | FY 2031 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Surplus (Deficit) | [1] | 1,716 | 1,320 | 1,071 | 1,265 | 1,334 | 1,478 | 1,407 | 1,346 | 1,217 | 1,009 |
| Non-Contingent Debt Service under Plan | | | | | | | | | | | |
| Current Interest Bonds | [2] | (684) | (665) | (646) | (625) | (604) | (582) | (559) | (535) | (510) | (484) |
| CAB 5.0% 2024 | [3] | (106) | (106) | (106) | - | - | - | - | - | - | - |
| CAB 5.375% 2033 | [4] | - | - | - | - | - | - | - | (150) | (150) | (150) |
| Total Non-Contingent Debt Service | [5] | (790) | (771) | (752) | (625) | (604) | (582) | (559) | (685) | (660) | (634) |
| Surplus (Deficit) after Non-Contingent Debt Service | [6] | 926 | 549 | 319 | 640 | 730 | 896 | 849 | 661 | 557 | 375 |

Sources and Notes:

[1]: 2021 CFP '30-Year Projections' Row 120.

[2]: Plan Exhibit I-2.

[3]: Plan Exhibit I-5.

[4]: Plan Exhibit I-5.

[5]: [2]+[3]+[4].

[6]: [1]+[5].

---

[110]  Table 5 and Table 6 below do not include contingent debt payments that need to be made if the Commonwealth outperforms projections.

**TABLE 6: COMMONWEALTH OF PUERTO RICO 2021 CFP PROJECTIONS AFTER PLAN
NON-CONTINGENT DEBT SERVICE – OUT YEARS**

| | | FY 2032 | FY 2033 | FY 2034 | FY 2035 | FY 2036 | FY 2037 | FY 2038 | FY 2039 | FY 2040 | FY 2041 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Surplus (Deficit) | [1] | 802 | 609 | 401 | 207 | (119) | (324) | (481) | (629) | (775) | (1,149) |
| Non-Contingent Debt Service under Plan | | | | | | | | | | | |
| Current Interest Bonds | [2] | (457) | (429) | (400) | (370) | (338) | (304) | (270) | (233) | (195) | (159) |
| CAB 5.0% 2024 | [3] | - | - | - | - | - | - | - | - | - | - |
| CAB 5.375% 2033 | [4] | (150) | - | - | - | - | - | - | - | - | - |
| **Total Non-Contingent Debt Service** | **[5]** | **(607)** | **(429)** | **(400)** | **(370)** | **(338)** | **(304)** | **(270)** | **(233)** | **(195)** | **(159)** |
| **Surplus (Deficit) after Non-Contingent Debt Service** | **[6]** | **195** | **180** | **0** | **(163)** | **(457)** | **(628)** | **(751)** | **(862)** | **(970)** | **(1,308)** |

| | | FY 2042 | FY 2043 | FY 2044 | FY 2045 | FY 2046 | FY 2047 | FY 2048 | FY 2049 | FY 2050 | FY 2051 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Surplus (Deficit) | [1] | (1,234) | (1,331) | (1,437) | (1,544) | (1,627) | (1,737) | (1,865) | (1,992) | (2,105) | (2,237) |
| Non-Contingent Debt Service under Plan | | | | | | | | | | | |
| Current Interest Bonds | [2] | (159) | (159) | (159) | (159) | (159) | - | - | - | - | - |
| CAB 5.0% 2024 | [3] | - | - | - | - | - | - | - | - | - | - |
| CAB 5.375% 2033 | [4] | - | - | - | - | - | - | - | - | - | - |
| **Total Non-Contingent Debt Service** | **[5]** | **(159)** | **(159)** | **(159)** | **(159)** | **(159)** | **-** | **-** | **-** | **-** | **-** |
| **Surplus (Deficit) after Non-Contingent Debt Service** | **[6]** | **(1,393)** | **(1,490)** | **(1,596)** | **(1,703)** | **(1,787)** | **(1,737)** | **(1,865)** | **(1,992)** | **(2,105)** | **(2,237)** |

Sources and Notes:

[1]: 2021 CFP '30-Year Projections' Row 120.

[2]: Plan Exhibit I-2.

[3]: Plan Exhibit I-5.

[4]: Plan Exhibit I-5.

[5]: [2]+[3]+[4].

[6]: [1]+[5].

### b.  *Debt sustainability analysis*

78.  Pursuant to PROMESA, the 2021 CFP incorporates a DSA.[111]  I have evaluated whether the
anticipated post-emergence debt levels and the related debt service will result in contractual debt

---

[111]  2021 CFP, p. 64.

levels and debt service that are consistent with the DSA (the "Sustainable Debt Levels"). I have concluded that the anticipated debt levels and debt service provided for under the Plan are consistent with the Sustainable Debt Levels.

79. In providing a framework for how much debt service the Commonwealth can reasonably carry going forward, the DSA considers a number of factors. The DSA does not include a bright line test for debt incurrence, but rather provides a framework to apply when considering how much debt the Commonwealth should incur going forward. Among other things, the DSA benchmarks certain credit rating agency metrics across U.S. states.[112] It assesses debt levels based on five metrics defined in two reports published by Moody's Investors Service ("Moody's"), as follows:[113]

a. Debt service to own-source revenues ("Own-Source Revenues")[114]: Shows the amount of annual debt service revenue relative to revenues generated by the state. Calculated as (Annual Debt Service) / (Total Governmental Revenue - Funds Received from Federal Sources)[115];

b. Fixed costs to Own-Source Revenues: shows the amount of annual debt service and pension costs relative to revenues generated by the state. Calculated as (Annual Debt Service +

---

[112] The DSA concluded that U.S. states were the best comparables for analyzing Puerto Rico's debt sustainability, as opposed to sovereigns, because Puerto Rico does not control its own currency, has no access to IMF restructuring support programs or other similar international relief funding packages, and traditionally has been reliant on access to the same long-term municipal bond market used by mainland U.S. states to finance their capital needs (2021 CFP, p. 64).

[113] 2021 CFP, p. 65 ("Metrics for debt sustainability: Viewing U.S. states as the most comparable group for benchmarking Puerto Rico, the DSA uses the debt ratio metrics in the May 12, 2020 Moody's Investors Service (Moody's) report "Medians – State debt declined in 2019, but likely to grow in coming years" and the "Fixed Costs" ratio metrics in Exhibit 30 of the September 18, 2020 Moody's report "Medians – Pension and Other Postemployment Benefits (OPEB) liabilities fell in fiscal 2019 ahead of jump in 2020" to develop a range of levels for sustainable debt capacity").

[114] My calculation of Debt-to-Own-Source Revenues reflects only debt and revenues pertaining to the debtors covered by the Plan and included in the 2021 CFP. For the purpose of my analysis I have excluded COFINA debt from these calculations, given that it is not a debtor under the Plan, and the Own-Source Revenues sourced from the 2021 CFP exclude the Sales and Use Tax revenues allocated for the payment of COFINA debt service. See 2021 CFP Model at 'SUT Build' Row 78 showing COFINA allocations reducing the Commonwealth's Sales and Use Tax revenues.

[115] See "Medians – State debt declined in 2019, but likely to grow in coming years", *Moody's Investors Service*, May 12, 2020, p. 10 FN 1 for the definition of own-source revenues.

34

Pension + Other Post-Employment Benefits) / (Total Governmental Revenue - Funds Received from Federal Sources)[116];

c.   Debt per capita: shows the amount of governmental debt outstanding relative to the state's population. Calculated as (Net Tax Supported Debt / Population)[117];

d.   Debt to GDP: shows the amount of governmental debt outstanding relative to the state's gross domestic product. Calculated as (Net Tax Supported Debt / GDP)[118];

e.   Debt to state personal income: shows the amount of governmental debt outstanding relative to the state's aggregate personal income. Calculated as (Net Tax Supported Debt / Personal Income).[119]

80.   The Debt Sustainability Analysis reflects the average U.S. state, as well as the top-ten and top-25 most indebted U.S. states by each metric, and the top-ten least indebted states.[120] The DSA measures a state's indebtedness based on the five metrics described above, which assess the total amount of debt outstanding as well as the annual debt service burden of a state relative to the various economic indicators.

---

[116] "Medians – Pension and Other Postemployment Benefits (OPEB) liabilities fell in fiscal 2019 ahead of jump in 2020", *Moody's' Investors Service,* September 8, 2020 p. 4 ("fixed costs (debt, pension and OPEB obligations)"); p. 27 (Own-source revenue is the total governmental revenue, less funds received from federal sources plus net transfers in, as reported in audited financial statements.").

[117] Excludes COFINA debt for the same reasons described in FN 114. *See also* 2021 CFP Exhibit 30, p. 66 ("Debt service, % of own-source revenues"); "Medians – State debt declined in 2019, but likely to grow in coming years", *Moody's Investors Service*, May 12, 2020, p. 5 ("Own-source revenue is reported total governmental revenue less funds received from federal sources.")

[118] "Medians – State debt declined in 2019, but likely to grow in coming years", *Moody's Investors Service*, May 12, 2020, p. 8.

[119] "Medians – State debt declined in 2019, but likely to grow in coming years", *Moody's Investors Service*, May 12, 2020, p. 6.

[120] A state's level of indebtedness is not necessarily indicative of its credit rating, because a state's level of debt can be a reflection of political or other factors. See "Medians - State debt rose 2.5% in 2020, spurred by pandemic-linked borrowing", *Moody's Investors* Service, June 14, 2021, p. 6, ("The debt and debt service ratios of some states are relatively high because they issue debt for purposes that in other states would be financed at the local level, such as for schools or mass transit. Some states' debt service ratios rank higher than their NTSD ratios because of conservative debt management practices, such as rapid debt amortization. Conversely, some states' debt service ratios rank relatively lower because of the use of capital appreciation bonds or long maturity schedules.").

81. The Plan includes a schedule of annual debt service payments that are applicable post-restructuring.[121]  I considered the debt service schedules provided for under the Plan and evaluated the resulting debt service in light of the metrics contained in the DSA.  I have compared Puerto Rico's metrics to the table contained in Exhibit 30 of the 2021 CFP, which shows key debt ratios for U.S. states as ranked by Moody's.[122]  As indicated in the tables below, based upon the Commonwealth's restructured post-confirmation debt as provided in the Plan, Puerto Rico's debt sustainability metrics will be more in line with, or even compare favorably to, U.S. states that currently are rated Investment Grade ("Investment Grade") by three major credit ratings agencies.[123]

82. Table 7 shows Puerto Rico's debt service as a percentage of Own-Source Revenues as compared to other U.S. states.[124]  This ratio compares the FY 2022 restructured post-confirmation debt service amount under the Plan to the Own-Source Revenues available for the payment of the debt service as projected in the 2021 CFP.[125]

---

[121]  Exhibit I to the Plan.

[122]  With the exclusion of Debt to Personal Income, as I was not able to source aggregate Personal Income data for Puerto Rico.

[123]  Investment-Grade Bonds are "Bonds that are believed to have a lower risk of default and receive higher ratings by the credit rating agencies, namely bonds rated Baa (by Moody's) or BBB (by S&P and Fitch) or above. These bonds tend to be issued at lower yields than less creditworthy bonds." SEC "Investment-grade Bond (or High-grade Bond), https://www.investor.gov/introduction-investing/investing-basics/glossary/investment-grade-bond-or-high-grade-bond accessed September 9, 2021.

[124]  State metrics are as shown in the 2021 CFP, which are sourced from the May 12, 2020 Moody's report "Medians - State debt declined in 2019, but likely to grow in coming years" as of 2019 calendar year-end. See 2021 CFP p. 65 and Moody's report p. 12.

[125]  Debt service is highest in FY 2022, after which the Commonwealth's debt amortizes resulting in lower annual debt service payments (Plan Exhibit I-2, I-5).  Own-Source Revenues consist of total Commonwealth revenues in the 2021 CFP less federal transfers calculated as Total Commonwealth Revenues post-measures (2021 CFP Model '30-Year Projections' Row 57) less Federal Funds received (2021 CFP Model '30-Year Projections' Row 47).

**TABLE 7: MOODY'S KEY DEBT RATIOS FOR U.S. STATES – RANKING OF DEBT SERVICE
AS A PERCENT OF OWN-SOURCE REVENUES FOR U.S. STATES AS SHOWN IN THE DSA**

|  | | Debt Service, % of Own-Source Revenues [A] | Fitch [B] | Moody's [C] | S&P [D] |
|---|---|---|---|---|---|
| 1 | Connecticut | 14.7% | AA- | Aa3 | A+ |
| 2 | Massachusetts | 10.5% | AA+ | Aa1 | AA |
| 3 | Hawaii | 9.8% | AA | Aa2 | AA+ |
| 4 | New Jersey | 9.6% | A- | A3 | BBB+ |
| 5 | Kentucky | 9.3% | AA- | Aa3 | A |
| 6 | Illinois | 9.0% | BBB- | Baa3 | BBB |
| 7 | New York | 7.5% | AA+ | Aa2 | AA+ |
| 8 | Washington | 7.3% | AA+ | Aaa | AA+ |
| 9 | Maryland | 6.8% | AAA | Aaa | AAA |
| 10 | Mississippi | 6.4% | AA | Aa2 | AA |
| ... | | | | | |
| **16** | **Puerto Rico under Plan*** | **4.9%** | | | |
| | | | | | |
| | Average of Lowest 10 States | 0.9% | | | |
| | Average of Lowest 25 States | 2.1% | | | |
| | Average of All States | 4.3% | | | |
| | Average of Highest 25 States | 6.5% | | | |
| | Average of Highest 10 States | 9.2% | | | |
| | **Puerto Rico without Plan**** | **10.6%** | | | |

Sources and Notes:

* Puerto Rico under the Plan based upon FY 2022 debt service of $801.2 million and FY 2022 projections of Own-Source Revenue (total revenue minus federal transfers) contained in 2021 CFP. See 2021 CFP Model, tab "30-Yr Projection" and Exhibit I to the Plan.

** Puerto Rico without the Plan assuming pre-petition debt levels and FY 2022 projections of Own-Source Revenue (total revenue minus federal transfers) contained in 2021 CFP. See 2021 CFP Model, tab "30-Yr Projection."

[A]: 2021 CFP, Exhibit 30; Moody's, "State Government – US: Medians - Pension and OPEB liabilities fell in fiscal 2019 ahead of jump in 2020," September 8, 2020, p.21. Note that the value for Illinois is inconsistent with Moody's report sourced in the CFP. I have relied on the list as presented in the Moody's report.

[B]: Fitch Ratings, accessed September 12, 2021.

[C]: Moody's, "Medians - State debt rose 2.5% in 2020, spurred by pandemic-linked borrowing," June 14, 2021, p.7.

[D]: S&P Global Ratings, U.S. State Ratings and Outlooks: Current List, September 2, 2021.

83. As shown in Table 7 above, based on the terms of the Plan, the Commonwealth's restructured post-confirmation debt service will be 4.9% of own-source revenues. This represents a significant reduction from its pre-PROMESA legacy debt structure, where debt service (excluding COFINA) represented 10.6% of own-source revenues.

84. The Commonwealth's debt to Own-Source Revenues metric for restructured post-confirmation debt service compares favorably with U.S. states. It is well below the top ten average of 6.5% and closer to the mean for all U.S. states of 4.3%.[126] As shown in Table 7 above, Puerto Rico's debt coverage metric, measuring debt service as a percentage of Own-Source Revenues, is superior to that of many states with Investment Grade ratings from the major credit ratings agencies. From FY 2022 to FY 2046 (the year the debt fully amortizes), Puerto Rico's debt service to Own-Source Revenues is projected to average just 2.6%. Figure 3 below provides a bar chart that compares Puerto Rico's legacy debt service burden to its going forward debt service metric pro-forma for the Plan and to the debt service burden of various U.S. states.

---

[126]  As described in FN 114, for the purpose of evaluating consistency between the Plan and the 2021 CFP this ratio excludes COFINA debt and revenues allocated for the payment of COFINA debt service.

FIGURE 3: DEBT TO OWN-SOURCE REVENUES OF THE COMMONWEALTH OF PUERTO RICO AS COMPARED TO OTHER U.S. STATES BEFORE AND AFTER THE PLAN



Sources and Notes:

2021 CFP Exhibit 29 at p. 65.

2021 CFP Model, tab "30-Yr Projection."

Plan Exhibit I.

85. Table 8 shows Puerto Rico's metric based on measuring fixed costs as a percentage of Own-Source Revenues. As stated, fixed costs take into account pension and other retirement costs, in addition to debt service.

**TABLE 8: MOODY'S KEY DEBT RATIOS FOR U.S. STATES – RANKING OF FIXED COSTS AS A PERCENT OF OWN-SOURCE REVENUES FOR U.S. STATES AS SHOWN IN THE DSA**

|   | | FIxed Costs, % of Own-Source Revenues [A] | Fitch [B] | Moody's [C] | S&P [D] |
|---|---|---|---|---|---|
| 1 | Connecticut | 31.0% | AA- | Aa3 | A+ |
| 2 | Illinois | 27.3% | BBB- | Baa3 | BBB |
| 3 | Kentucky | 23.5% | AA- | Aa3 | A |
| 4 | Hawaii | 22.1% | AA | Aa2 | AA+ |
| 5 | New Jersey | 21.3% | A- | A3 | BBB+ |
| **6** | **Puerto Rico under Plan*** | **19.1%** | | | |
| 7 | Massachusetts | 18.6% | AA+ | Aa1 | AA |
| 8 | Maryland | 15.9% | AAA | Aaa | AAA |
| 9 | Pennsylvania | 13.8% | AA- | Aa3 | A+ |
| 10 | West Virginia | 13.7% | AA | Aa2 | AA- |
| 11 | Rhode Island | 13.1% | AA | Aa2 | AA |
| | | | | | |
| | Average of Lowest 10 States | 3.1% | | | |
| | Average of Lowest 25 States | 5.1% | | | |
| | Average of All States | 9.7% | | | |
| | Average of Highest 25 States | 14.3% | | | |
| | Average of Highest 10 States | 20.0% | | | |
| | **Puerto Rico without Plan**** | **24.6%** | | | |

Sources and Notes:

* Puerto Rico under Plan based upon fixed costs, summing FY 2022 debt service of $801.2 million and All-In Retirement Spend (excluding current Social Security) of $2.35 billion, and FY 2022 projections of Own-Source Revenue (total revenue minus federal transfers) contained in 2021 CFP. See 2021 CFP Model, tabs "30-Yr Projection" and "Pensions" and Exhibit I to the Plan.

** Puerto Rico without Plan assuming FY 2022 fixed costs, summing pre-petition debt levels and pre-petition All-In Retirement Spend (excluding Social Security), and FY 2022 projections of Own-Source Revenue (total revenue minus federal transfers) contained in 2021 CFP. See 2021 CFP Model, tabs "30-Yr Projection" and "Pensions."

[A]: 2021 CFP, Exhibit 30; Moody's, "State Government – US: Medians - Pension and OPEB liabilities fell in fiscal 2019 ahead of jump in 2020," September 8, 2020, p.21. Note that the states

listed are inconsistent with the Moody's report sourced in the 2021 CFP, but the values
correspond.  I have relied on the list as presented in the Moody's report.

[B]: Fitch Ratings, accessed September 12, 2021.

[C]: Moody's, "Medians - State debt rose 2.5% in 2020, spurred by pandemic-linked borrowing,"
June 14, 2021, p.7.

[D]: S&P Global Ratings, U.S. State Ratings and Outlooks: Current List, September 2, 2021.

86.   As shown in Table 8, after taking into account the pension measures to be implemented under
the Plan and the reduced debt service, the Commonwealth's fixed costs as a percentage of Own-
Source Revenues decreased from 24.6% without the Plan, to 19.1%, moving Puerto Rico from
the third highest indebted state to the sixth according to this metric.

87.   Table 9 below shows Puerto Rico's metrics based on debt per capita as compared to U.S. states.

**TABLE 9: MOODY'S KEY DEBT RATIOS FOR U.S. STATES – RANKING OF NET TAX-SUPPORTED DEBT PER CAPITA FOR U.S. STATES AS SHOWN IN THE DSA**

| | | Net Tax-Supported Debt per Capita [A] | Fitch [B] | Moody's [C] | S&P [D] |
|---|---|---|---|---|---|
| 1 | Connecticut | $6,637 | AA- | Aa3 | A+ |
| 2 | Massachusetts | $6,258 | AA+ | Aa1 | AA |
| 3 | Hawaii | $5,528 | AA | Aa2 | AA+ |
| 4 | New Jersey | $4,125 | A- | A3 | BBB+ |
| 5 | New York | $3,314 | AA+ | Aa2 | AA+ |
| 6 | Delaware | $3,289 | AAA | Aaa | AAA |
| 7 | Illinois | $2,635 | BBB- | Baa3 | BBB |
| 8 | Washington | $2,579 | AA+ | Aaa | AA+ |
| **9** | **Puerto Rico under Plan*** | **$2,532** | | | |
| 10 | Maryland | $2,323 | AAA | Aaa | AAA |
| 11 | Rhode Island | $2,308 | AA | Aa2 | AA |
| | | | | | |
| | Average of Lowest 10 States | $209 | | | |
| | Average of Lowest 25 States | $500 | | | |
| | Average of All States | $1,505 | | | |
| | Average of Highest 25 States | $2,511 | | | |
| | Average of Highest 10 States | $3,900 | | | |
| | **Puerto Rico without Plan**** | **$7,486** | | | |

Sources and Notes:

 * Puerto Rico under Plan based upon emergence debt of $7.4 billion and FY 2022 population projections contained in 2021 CFP.  See 2021 CFP Model, tab "30-Yr Projection" and Exhibit I to the Plan.

** Puerto Rico without Plan assuming pre-petition debt levels and FY 2022 population projections contained in 2021 CFP.  See Fiscal Plan Spreadsheet, tab "30-Yr Projection" and Puerto Rico FOMB Presentation "Puerto Rico's Proposed Plan of Adjustment Benefits," p. 19.  Outstanding debt includes GO/PBA and ERS.

[A]: Fiscal Plan, Exhibit 30; Moody's, "State Government – US: Medians - State debt declined in 2019, but likely to grow in coming years," May 12, 2020, p.6.

[B]: Fitch Ratings, accessed September 12, 2021.

42

[C]: Moody's, "Medians - State debt rose 2.5% in 2020, spurred by pandemic-linked borrowing," June 14, 2021, p.7.

[D]: S&P Global Ratings, U.S. State Ratings and Outlooks: Current List, September 2, 2021.

88. As indicated in Table 9 above, Puerto Rico's debt per capita post implementation of the Plan would be $2,532 per capita, placing it in the same range as many other states that carry Investment Grade ratings from the major credit ratings agencies.  Based on the debt per capita metric, Puerto Rico would rank as the ninth most indebted state as compared to these other states, out of a total of 11.  Pre-PROMESA, Puerto Rico's debt metric was $7,486 in debt per capita, which would have placed Puerto Rico as the most indebted, based on this metric.

89. Table 10 below shows Puerto Rico's debt as a percentage of GDP, both before and after the Plan. Prior to the Plan Puerto Rico's debt totalled 26.2% of GDP – over three times as high as the most indebted U.S. state.  After implementation of the Plan, Puerto Rico ranks more in-line with a number of states with Investment Grade ratings.

**TABLE 10: MOODY'S KEY DEBT RATIOS FOR U.S. STATES – RANKING OF NET TAX-SUPPORTED DEBT AS A PERCENTAGE OF GDP FOR U.S. STATES AS SHOWN IN THE DSA**

| | Net Tax-Supported Debt, % of GDP [A] | Fitch [B] | Moody's [C] | S&P [D] |
|---|---|---|---|---|
| 1 Connecticut | 8.3% | AA- | Aa3 | A+ |
| 2 Hawaii | 8.1% | AA | Aa2 | AA+ |
| 3 Massachusetts | 7.2% | AA+ | Aa1 | AA |
| **4 Puerto Rico under Plan*** | **6.7%** | | | |
| 5 New Jersey | 5.7% | A- | A3 | BBB+ |
| 6 Mississippi | 4.8% | AA | Aa2 | AA |
| 7 Kentucky | 4.7% | AA- | Aa3 | A |
| 8 Delaware | 4.3% | AAA | Aaa | AAA |
| 9 West Virginia | 3.9% | AA | Aa2 | AA- |
| 10 Rhode Island | 3.9% | AA | Aa2 | AA |
| 11 New York | 3.7% | AA+ | Aa2 | AA+ |
| | | | | |
| Average of Lowest 10 States | 0.4% | | | |
| Average of Lowest 25 States | 0.9% | | | |
| Average of All States | 2.3% | | | |
| Average of Highest 25 States | 3.8% | | | |
| Average of Highest 10 States | 5.4% | | | |
| **Puerto Rico without Plan**** | **21.3%** | | | |

Sources and Notes:

* Puerto Rico under the Plan based upon emergence debt of $7.4 billion and FY 2022 GDP projections of $102.91 billion from IMF.  See Exhibit I to the Plan and IMF DataMapper.

** Puerto Rico without the Plan assuming pre-petition debt levels and FY 2022 population projections contained in 2021 CFP.  See 2021 CFP Model, tab "30-Yr Projection" and Puerto Rico FOMB Presentation "Puerto Rico's Proposed Plan of Adjustment Benefits," p. 19.  Outstanding debt includes GO/PBA and ERS.

[A]: Fiscal Plan, Exhibit 30; Moody's, "State Government – US: Medians - Pension and OPEB liabilities fell in fiscal 2019 ahead of jump in 2020," September 8, 2020, p.19.

[B]: Fitch Ratings, accessed September 12, 2021.

[C]: Moody's, "Medians - State debt rose 2.5% in 2020, spurred by pandemic-linked borrowing," June 14, 2021, p.7.

[D]: S&P Global Ratings, U.S. State Ratings and Outlooks: Current List, September 2, 2021.

B.   OPINION #2: IMPLEMENTATION OF THE PROPOSED TREATMENT OF
THE PENSION PLANS FOR ERS, JRS, AND TRS IS ALREADY
REFLECTED IN THE 2021 CERTIFIED FISCAL PLAN, AND WILL
THEREFORE NOT NEGATIVELY IMPACT THE DEBTORS' ABILITY TO
ACHIEVE THE 2021 CERTIFIED FISCAL PLAN

90.   The treatment of the ERS, TRS, and JRS pensions under the Plan is consistent with the 2021
CFP.  As discussed, the Plan calls for (i) an 8.5% reduction to pension benefits across the three
plans in excess of $1,500 per month, but with no reduction that would result in a pensioner
receiving less than $1,500 per month if they would have otherwise been entitled to at least
$1,500[127], (ii) with respect to the TRS and JRS plans, a freeze of the defined benefits for JRS and
TRS retirees, imposed as of the Plan Effective Date, defined as the first business day on which
all the conditions precedent to the confirmation and substantial consummation of the Plan have
been met[128] (provided that if AMPR members ratify its plan support agreement with the
Oversight Board, the freeze of TRS benefit accruals will be the six month anniversary of the Plan
Effective Date),[129]  and (iii) the contribution of  $1.2 billion on behalf of System 2000
members.[130]

91.   Other modifications to the TRS and JRS pensions stipulated under the Plan are also reflected in
the 2021 CFP.[131] These include a delay in retirement eligibility and the elimination of bonuses,
minimum monthly benefit, enhanced disability benefits, and the cost-of-living adjustment.  Each
of these provisions is reflected in the 2021 CFP, as summarized in Table 11 below.

---

[127]   Plan, p. 53 ("Benefit Reduction"); POA Overview_(8.23.21)_vFINAL.pptx, p. 12

[128]   2021 CFP at 20.2.1 page 274.  A freeze was imposed on ERS defined benefit plans for employees hired prior to
2000 as of June 30, 2013.  2021 CFP, Exhibit 138; Plan, p. 27 ("Effective Date").

[129]   Plan, F-1 (defining Freeze Date as Effective Date without the AMPR PSA); Plan, F-10 (defining Freeze Date as
the six-month anniversary of the Effective Date with AMPR PSA treatment).

[130]   PoA Overview_(8.23.21)_vFINAL.pptx at p. 15.

[131]   Certain modifications, including Elimination of Occupational and One-Year Salary Death Benefits (JRS),
Elimination of Free Post-Retirement Death Benefit (JRS), Suspension of Benefits (TRS), Defined Contribution
Transfer from Prior Plans (TRS) have not been reflected as separate line items in the 2021 CFP but I have been
advised have been incorporated into the financial projections.

45

**TABLE 11: SUMMARY OF PENSION BENEFIT MODIFICATIONS IN THE PLAN AS COMPARED TO THE 2021 CFP**

|  |  | JRS | TRS | ERS | **2021 CFP** |
|---|---|:---:|:---:|:---:|:---:|
|  |  | [A] | [B] | [C] | **[D]** |
| 8.5% Reduction to Pension Benefits in Excess of $1,500 | [1] | ✓ | ✓ | ✓ | ☑ |
| Defined Benefit Freeze | [2] | ✓ | ✓ | N/A | ☑ |
| Delay in Retirement Eligibility | [3] | ✓ | ✓ | N/A | ☑ |
| Elimination of Cost-of-Living Adjustment (COLA) | [4] | ✓ | N/A | N/A | ☑ |
| Elimination of Bonuses | [5] | ✓ | N/A | N/A | ☑ |
| Elimination of Enhanced Disability Benefits | [6] | ✓ | ✓ | N/A | ☑ |
| Elimination of Minimum Benefit | [7] | N/A | ✓ | N/A | ☑ |
| Elimination of Service Purchase | [8] | N/A | ✓ | N/A | ☑ |

Sources and Notes:

[A][1]: Disclosure Statement at p.48.

[A][2] to [A][8]: Plan at E-3, E-4.

[B][1]: Disclosure Statement at p.48.

[B][2] to [B][8]: Plan at F-2, F-3.

[C][1]: Disclosure Statement at p.48.

[D][1] to [D][8]: 2021 CFP at pp.273-277.

92.     Under the Plan, these changes are slated to go into effect either on the Effective Date[132] or six months after the Effective Date.  The 2021 CFP assumes (a) the freeze of the JRS pension plan

---

[132]  As described above, if AMPR's membership votes to ratify its plan support agreement with the Oversight Board, the freeze of the TRS pension plan will occur on the six month anniversary of the Plan Effective Date. The Plan also provides the benefit reductions will commence on "[t]he date that is the later to occur of (a) July

will go into effect on January 1, 2022 ("Freeze Date") and (b) the freeze of the TRS plan and the

8.5% benefit reduction will take effect on July 1, 2022 ("Benefit Reduction Date").[133]  Assuming

the Effective Date occurs on or before December 31, 2021, the freeze of the JRS pension plan

will occur by January 1, 2022 and the pension cuts will commence as of July 1, 2022.  If AMPR

members do not ratify the plan support agreement with the Oversight Board, the freeze of the

TRS pension plan will also occur by January 1, 2022.  However, if AMPR members ratify the

plan support agreement, the TRS freeze will occur six months after the Plan Effective Date,

which would be approximately July 1, 2022, consistent with the 2021 CFP.  It is therefore my

opinion that the timing of the freezes and cuts under the Plan is consistent with the 2021 CFP.

### 1.  Social security

93.  In conjunction with the pension benefit cuts discussed above, the Plan also calls for expanded

Social Security benefits for certain TRS and JRS members.  All TRS members hired after the

Freeze Date and all teachers under the age of 45 as of the Freeze Date will also be enrolled in

Social Security on a mandatory basis, and those 45 and older as of the Freeze Date may choose

to be enrolled on a voluntary basis within 60 days of the Effective Date.[134]  All judges hired after

the Freeze Date and all judges under the age of 45 will be enrolled in Social Security on a

mandatory basis.[135]  Judges 45 and older may choose to be enrolled in Social Security on a

voluntary basis, and must enroll within 60 days of the Effective Date.[136]

94.  The 2021 CFP accounts for the costs to the Commonwealth associated with the expanded Social

Security benefits.  The 2021 CFP states that teachers and judges under the age of 45 will be

covered under Social Security, and that those hired in the future will be mandatorily enrolled in

---

1, 2022 and (b) the first July 1st following the Effective Date; provided, however, that, in the event that the
period between the Effective Date and the first subsequent July 1st is less than one hundred eighty (180) days,
then the "Benefit Reduction Date" shall be the first day of the first calendar month one hundred eighty (180)
days after the Effective Date." Plan, ¶ 1.117.

[133]  2021 CFP, p. 274, 277.

[134]  Plan, F-4.

[135]  Plan, E-7.

[136]  Plan, E-8.

Social Security.[137]  The expansion of Social Security is reflected as an increased cost going forward in the 2021 CFP.[138]

### 2. System 2000 removal

95. As stated, commencing on January 1, 2000, new employees within the ERS system participated in an employee-funded retirement plan administered by ERS known as System 2000.  These funds were pooled with the ERS funds, and large portions of employee contributions were used to pay benefits to current pensioners rather than being set aside for future retirees.[139]

96. The Plan provides that System 2000 balances, with accrued interest, in the approximate amount of $1.2 billion, will be segregated and paid for the benefit of System 2000 participants,[140] and System 2000 members will no longer be entitled to future system administered benefits.[141] Instead, under the Plan these funds will be used to pay System 2000 members their pro rata share of their contributions made from 2000 through June 30, 2017, plus accrued interest.[142] Amounts will be deposited into the defined contribution accounts established under Act 106-2017.[143]

97. Given that the estimated amount of the System 2000 balances, plus interest, is less than $1.5 billion, the entirety of these funds will be paid for the benefit of participants on or around the Effective Date.[144]  The $1.2 billion required for the benefit of System 2000 members is reflected in the disbursements expected as part of the Plan.[145]

---

[137] 2021 CFP, p. 278.

[138] 2021 CFP, Exhibit 141, p. 274; *See also* 2021 CFP model at tab 'Pensions' (Row 64) and tab 'Measures Build' (Row 54).  I have been advised that the 2021 CFP also assumes a 50% opt-in rate for teachers over the age of 45, and that the 2021 CFP does not incorporate the voluntary enrollment of judges 45 and older, but that it is projected to be a de minimis cost for the Commonwealth.

[139] Disclosure Statement, p. 81; Exhibit J to the Disclosure Statement, PROMESA Section 211 Report on Puerto Rico Retirement Systems, p. 9.

[140] Disclosure Statement, Dkt. 17628, p. 52-53; PoA Overview_(8.23.21)_vFINAL.pptx at p. 15 showing $1.2 billion allocated to the payment of System 2000 balances.

[141] Plan, p. G-15.

[142] Plan, p. 99.  Actual amounts are expected to be $1.2 billion.  See PoA Overview_(8.23.21)_vFINAL.pptx, p. 15.

[143] Disclosure Statement, Dkt. 17628, p. 467.

[144] Plan, p. 99.

[145] See PoA Overview_(8.23.21)_vFINAL.pptx, p. 15.

98.   The 2021 CFP reflects the segregation and termination of the System 2000 benefits.[146] The Plan is consistent with the 2021 CFP with respect to changes to System 2000.

          C.     OPINION #3: IMPLEMENTATION OF THE PLAN AND ACHIEVEMENT OF THE 2021 CERTIFIED FISCAL PLAN ARE NOT DEPENDENT ON NEW BORROWINGS, AND, AS A RESULT THE BORROWING RESTRICTIONS INCORPORATED INTO THE PLAN SHOULD NOT IMPEDE THE DEBTORS' ABILITY TO ACHIEVE THE 2021 CERTIFIED FISCAL PLAN

99.   The Borrowing Restrictions contained in the Plan are consistent with the 2021 CFP because the 2021 CFP does not show a need for incremental borrowing.  After Plan debt service is incorporated into 2021 CFP projections, the Commonwealth still does not show a projected deficit after debt service for the next 14 years.[147]

100.  The Plan imposes certain borrowing restrictions on the Commonwealth.  Under the Plan, the Commonwealth must maintain a debt management policy that includes the following limitations on debt incurred after the Effective Date:[148]

        a.     A comprehensive cap on net tax-supported debt service equal to 7.94% of Debt Policy Revenues ("Debt Policy Revenues") earned in the prior fiscal year[149];

---

[146]  2021 CFP, p. 54 ("Starting in FY2022, pensions baseline costs (reflecting System 2000 segregation) are projected to decrease progressively from $2.3 billion in FY2022 to $1.2 billion in FY2051"); p. 274, Exhibit 141 showing System 2000 removal savings.

[147]  See Table 5 and Table 6 above showing projected surplus until FY 2034 after Plan debt service.

[148]  Plan, pp. 117-118.  Debt Policy Revenues are defined in the Plan as (a) Revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Commonwealth Legislature, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy (Plan, p. 25).  Debt Policy Revenues are calculated in the 2021 CFP Model at 'Revenue Build' tab, Rows 173-175.

[149]  For the purpose of calculating the comprehensive cap, net tax-supported debt includes COFINA bonds.  Debt Policy Revenues include the funds appropriated to pay COFINA debt service.  The Debt Responsibility Act stipulates that a Debt Management Policy include a comprehensive cap on maximum annual debt service payable on net tax supported debt.  *See* Puerto Rico Debt Responsibility at Article 4; *See also* PoA Overview_(8.23.21)_vFINAL.pptx, p. 8.

      b. Debt may only be incurred to finance capital improvements or to re-finance tax-supported debt;

      c. No debt issued can have a maturity date beyond 30-years;

      d. New debt issued must start to amortize within two years of its issuance date; and

      e. Refinancing debt is only permitted if it does not increase the amount of principal and interest due in any year, with the exception of debt issued in response to natural disasters or emergencies.

101. The comprehensive cap on net tax-supported debt includes COFINA bonds, as well as the sales and use revenues pledged for the COFINA bond debt service.[150] On that basis, upon emergence the Commonwealth is expected to have net tax supported debt service equal to 7.6% of Debt Policy Revenues.[151] As shown in Figure 4 below, after implementation of the Plan, the Commonwealth's net tax-supported debt service is less than the comprehensive cap from FY 2023 through FY 2051, based on the Debt Policy Revenues projected in the 2021 CFP.[152] The Plan is consistent with the 2021 CFP with regards to this measure, because based on the revenue projections contained in the 2021 CFP, the Commonwealth has sufficient cushion under the Plan comprehensive debt cap for the entirety of the projected forecast.

---

[150] The 2021 CFP forecast reflects the pledge of a portion of annual sales and use tax revenues to COFINA creditors as per the terms of the COFINA Title III Plan of Adjustment (2021 CFP, p. 42 FN 27). These revenues are added back to the revenues in the 2021 CFP for the purpose of calculating Debt Policy Revenues (CFP Model at 'Revenue Build' tab, Rows 173-175).

[151] PoA Overview_(8.23.21)_vFINAL.pptx, p. 8, FN 1.

[152] FY 2023 is the first year I have been able to calculate the cap on net tax-supported debt as defined in the Plan, due to the fact that the cap for a given year is calculated using the Debt Policy Revenues from the prior fiscal year. FY 2022 is the first year of Debt Policy Revenues contained in the 2021 CFP Model.

**FIGURE 4: PUERTO RICO'S DEBT SERVICE AS COMPARED TO THE CAP ON NET TAX SUPPORTED DEBT UNDER THE PLAN FY 2023 – FY 2051**



Sources and Notes:

2021 CFP Model, tab 'Revenue Build.'

Disclosure Statement, p. 499.

Plan Exhibit I-2.

102.    The 2021 CFP does not show a need for any additional borrowings.[153]  After incorporating non-contingent Plan debt service, the 2021 CFP also shows no deficit after debt service until 2034.[154] In the meantime, under the Plan the Commonwealth is permitted to refinance existing debt as long as it does not result in higher principal and interest payments, with the exception of debt issued in response to natural disasters, in which case the annual debt service due can increase by up to 10% in any given year.[155]  Therefore, the Commonwealth does not need to incur additional debt in order to carry out the 2021 CFP, and the Plan borrowing restrictions will thus not interfere with implementation of the 2021 CFP.

        D.    OPINION #4: THE SETTLEMENTS UNDERPINNING THE PLAN WERE REACHED BETWEEN SOPHISTICATED PARTIES OVER A MORE THAN FOUR YEAR PERIOD, IN A MANNER CONSISTENT WITH TYPICAL CUSTOM AND PRACTICE FOR COMPLEX DEBT RESTRUCTURINGS. THE MAJOR STAKEHOLDER PARTIES WERE REPRESENTED BY SOPHISTICATED COUNSEL AND FINANCIAL ADVISORS, WITH EACH STAKEHOLDER GROUP WELL-EQUIPPED TO ACT IN ITS OWN ECONOMIC BEST INTEREST.  THE SETTLEMENTS ARE REASONABLE AND CONSISTENT WITH WHAT WOULD BE EXPECTED IN DEAL NEGOTIATIONS BETWEEN SOPHISTICATED PARTIES UNDERTAKEN AS PART OF A COMPLEX DEBT RESTRUCTURING

        **1.**    **The Stakeholders were sophisticated parties represented by qualified counsel and advisors**

103.    After the enactment of PROMESA and the commencement of the Debtors' Title III cases, the parties engaged in negotiations while also engaging in extensive litigation.[156]  Court-ordered

---

[153]  2021 CFP, p. 38-39 ("the 2021 Fiscal Plan estimates that around 60% of income support funding will be spent over the FY2020-FY2023 period.  The remaining 40% of funds is projected to be saved and/or used to pay down debt, and then is spent over a 30-year period according to the long-term consumption smoothing concept."); *See also* 2021 CFP Model at tab '30-Yr Projections' showing no additional debt borrowings incorporated into the surplus projections ("2.8.11.1_20210511_Commonwealth 2021 Fiscal Plan Model vCERTIFIED (dataroom).xlsx") (FOMB_CONF_88824).

[154]  See Table 6.

[155]  Plan, p. 118 (74.5(d)).

[156]  Disclosure Statement, Dkt. 17628, p. 87-114, 179-227, 278-380, 387-391.

stays of adversary proceedings and mandated mediation among stakeholders facilitated by the Mediation Team provided an efficient framework for identifying and resolving key issues and disputed legal positions in a streamlined manner.[157]

104. The case parties are sophisticated market participants, represented by qualified legal counsel and, in many cases, by experienced restructuring financial advisors. Table 12 below identifies legal counsel and financial advisors for the major stakeholder groups:

---

[157]  See Section IV.D.

### TABLE 12: SUMMARY OF LEGAL COUNSEL AND FINANCIAL ADVISORS TO MAJOR STAKEHOLDERS

| | Stakeholder Party | Legal Counsel | Financial Advisors |
|---|---|---|---|
| [1] | FOMB | Proskauer Rose LLP<br>O'Neill & Borges LLC | PJT Partners<br>McKinsey & Company<br>Ernst & Young<br>Citigroup Global Markets<br>DiCicco, Gulman & Company |
| [2] | Government of Puerto Rico | O'Melveny & Myers LLP<br>Law Offices of Andrés W. López, Esq. | Ankura Consulting Group, LLC |
| [3] | UCC | Paul Hastings LLP | Zolfo Cooper/AlixPartners |
| [4] | COR | Jenner & Block LLP<br>Bennazar, García & Millián, CSP | FTI Consulting |
| [5] | AFSCME | Stroock & Stroock LLP<br>(replaced Saul Ewing Arnstein & Lehr from 10/19/18) | N/A |
| [6] | AFT/AMPR | José Luis Barrios-Ramos | N/A |
| [7] | Ambac | Milbank, Tweed, Hadley & McCloy<br>Ferraiuoli LLC<br>Cooley LLP | Moelis<br>Marc Heimowitz |
| [8] | Assured | Cadwalader Wickersham & Taft<br>Casellas Alcover & Burgos, PSC | Lazard |
| [9] | FGIC | Butler Snow<br>Rexach & Picó, CSP | Exigent Partners |
| [10] | National | Weil Gotshal & Manges<br>Adsuar Muniz Goyco Seda & Perez-Ochoa, PSC<br>Seda & Perez Ochoa, PSC<br>Vicente & Cuebas | N/A |
| [11] | Syncora | Debevoise & Plimpton LLP<br>Goldman Antonetti & Cordova, LLC | Miller Buckfire & Co |
| [12] | ERS Bondholders | Jones Day<br>Delgado & Fernandez, LLC<br>White & Case LLP | N/A |
| [13] | GO and PBA Bondholders | Morrison and Foerster<br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>Willkie, Farr & Gallagher LLP<br>Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>Reichard & Escalera, LLC<br>Morgan Lewis & Bockius LLP<br>Correa Acevedo & Abesada SPC<br>Jiménez, Graffam & Lausell | Perella Weinberg Partners<br>Goldin Associates<br>Miller Buckfire & Co<br>Ducera Partners LLC |
| [14] | DRA Parties | Schulte Roth & Zabel<br>McConnell Valdes, LLC | N/A |

Sources and Notes:

Retrieved from court filings, hearing transcripts, news articles, PrimeClerk website, annual reports, Debtwire, and information from counsel.

[3]: Official Committee of Unsecured Creditors.

[4]: Official Committee of Retired Employees of the Commonwealth of Puerto Rico ("COR," by its Spanish acronym).

[5]: American Federation of State, County, and Municipal Employees, AFL_CLIO.

[6]: Collectively, the American Federation of Teachers, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical.

[7]: Ambac Assurance Corp., solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds.

[8]: Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds and HTA Bonds and CCDA Bonds.

[9]: Financial Guaranty Insurance Company, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds.

[10]: National Public Finance Guarantee Corporation ("National"), solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to GO Bonds and PBA Bonds and HTA Bonds.

[11]: Syncora Guarantee Inc., as holder of, subrogee with respect to, or insurer of GO Bond Claims and PBA Bond Claims.

[13]: See also https://www.businesswire.com/news/home/20210223005667/en/Puerto-Rico%E2%80%99s-Senior-Creditors-Agree-to-New-Bankruptcy-Exit-Plan-That-Significantly-Enhances-Commonwealth%E2%80%99s-Financial-Flexibility.

[14]: AmeriNational Community Services, LLC, as servicer for the GDB Debt Recovery Authority, and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company.

105.  A number of the key stakeholders involved in these Title III cases were also involved in the restructuring of the City of Detroit, which is viewed by some as the most comparable restructuring to that of the Commonwealth.[158]  For example, the monoline insurer parties,

---

[158]  Ambac, FGIC, National, and Syncora were also involved in the Detroit bankruptcy.  *See* related objections to the Swap Settlement Motion in Detroit's chapter 9 case, Ambac Assurance Corporation Dkt. 348, Financial Guaranty Insurance Company Dkt. 360, National Public Finance Guarantee Corporation Dkt. 353, Assured Guaranty Municipal Corp Dkt. 357 and Syncora Capital Assurance Inc. Dkt. 366.

including Ambac, FGIC, National, Assured, and Syncora had prior relevant experience given their involvement in the restructuring of the debt of the City of Detroit.[159]

> **2.** **The Debtors have been successful at reaching agreements with major creditor groups over an extensive negotiation process over more than four years**

>> *a.* *The Debtors have reached consensus with almost all major stakeholder groups*

106. Commencing in May 2019 and most recently in August 2021, the FOMB reached agreements and settlements with almost all major stakeholder groups, which agreements/settlements have been memorialized in various plan support agreements ("PSAs") and stipulations. These PSAs were subsequently incorporated into seven iterations of proposed plans of adjustment. The evolution and timing of when the Debtors were able to achieve agreement with key stakeholders is shown in Appendix A – The Debtors Have Reached Agreement with Major Stakeholder Groups.

>> *b.* *Six PSAs/stipulations have been executed in support of the Plan*

107. As of the filing of the Plan on July 30, 2021, there were six operative PSAs and/or stipulations with major stakeholder groups, as follows:

a. The GO/PBA PSA dated July 12, 2021;

b. The HTA/CCDA PSA dated May 5, 2021;

c. The PRIFA PSA dated July 27, 2021;

d. The ERS Stipulation dated April 2, 2021;

e. The Retirees Committee PSA dated June 7, 2019; and

---

[159] Detroit Disclosure statement, p. 138 and related objections to the Swap Settlement Motion in Detroit's chapter 9 case, Ambac Assurance Corporation Dkt. 348, Financial Guaranty Insurance Company Dkt. 360, National Public Finance Guarantee Corporation Dkt. 353, Assured Guaranty Municipal Corp Dkt. 357 and Syncora Capital Assurance Inc. Dkt. 366.

f. The AFSCME PSA dated June 7, 2019.

108. The FOMB has announced that, as of August 23, 2021, over 70% of GO/PBA, ERS, HTA,

CCDA, and PRIFA claims support the Plan.[160]

> c. *The UCC and COR also support the Plan*

109. In addition to the six agreements discussed above, the UCC has recommended that unsecured

creditors vote in favor of the Plan. The members of the UCC were appointed by the U.S.

Trustee. As shown in Table 12 above, the UCC has been represented in this matter by qualified

financial and legal counsel. On August 2, 2021, the Court approved the solicitation package for

soliciting claim holders to vote on the Plan, which included a letter from the UCC recommending

the Plan (the "UCC Recommendation Letter").[161] The UCC Recommendation Letter states that

the UCC has reached a global settlement with the FOMB regarding the terms of the Plan, and

that the UCC supports the Plan and urges all holders of the relevant classes of claims (Class 58

CW General Unsecured Claims, Class 54 Eminent Domain Claims, and Class 66 ERS General

Unsecured Claims) to vote to accept the Plan.[162]

110. The COR has also evidenced its support for the Plan by entering into the Retiree Committee

PSA. Throughout the proceedings, the COR has had an obligation to look out for the best

---

[160] FOMB presentation, "Puerto Rico's Proposed Plan of Adjustment Benefits," August 23, 2021. *See also*, FOMB press release, February 23, 2021; Government of Puerto Rico, Puerto Rico Fiscal Agency and Financial Advisory Authority, Municipal Secondary Market Disclosure Information Cover Sheet, Municipal Securities Rulemaking Board (MSRB), Electronic Municipal Market Access System (EMMA), Additional / Voluntary Event-Based Disclosure, July 16, 2021; Government of Puerto Rico, Puerto Rico Fiscal Agency and Financial Advisory Authority, Municipal Secondary Market Disclosure Information Cover Sheet, Municipal Securities Rulemaking Board (MSRB), Electronic Municipal Market Access System (EMMA), Additional / Voluntary Event-Based Disclosure, August 5, 2021.

[161] Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice and Confirmation Schedule, (IV) Approving Solicitation Packages and distribution procedures, (V) Approving Forms of Ballots, and Voting and election procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures, August 2, 2021, Dkt. 17639 (the "Disclosure Statement Order") and Schedule 7 Creditors' Committee Letter, Dkt. 17639-38.

[162] UCC Recommendation Letter, Schedule 7 to the Disclosure Statement Order, Dkt. 17639-38.

interests of its retiree stakeholders.[163]  The COR, comprised of individuals appointed by the U.S Trustee, includes former judges, teachers, and government retirees.  As shown in Table 12, the COR has been represented in these proceedings by qualified counsel and financial advisors.

111.  The COR is "strongly urg[ing]" that retirees vote to accept the Plan.[164]  The COR has represented that "[u]nder the COR Agreement, the Committee was able to secure much better terms for our class of retirees given our group's composition and our contribution to Puerto Rico's economy."[165]  When describing the settlement achieved with the Debtors, the COR has highlighted that over 70% of all retirees will be unaffected, equal to over 120,000 retirees; that the COR was able to achieve an increase in the $1,500 threshold from the $600 level originally offered by the FOMB, and that the maximum pension cut was reduced from a 25% cut that was originally proposed to 8.5%.  In addition, the COR has noted that contributions for medical insurance will be maintained, as compared to a $100/month deduction originally proposed, which would have affected 139,000 retirees.[166]  The COR has also noted the establishment of a reserve that will be set aside to meet pension obligations, to be funded with at least $175 million per year for eight years, as well as the possibility that benefits could be restored if certain financial performance benchmarks are met or exceeded.[167]

112.  The Plan breaks down the Debtors' stakeholders into 80 classes.  Of those 80, 10 are not entitled to vote on the Plan because they are estimated to receive either a 100% or a 0% recovery.[168]  Of

---

[163]  COR is an official committee appointed by the United States Trustee to represent and protect the collective interests of creditors that are members of the ERS, TRS, or JRS.  Retiree Committee Support Letter, Schedule 6(a) to the Disclosure Statement Order, Dkt. 17639-36.

[164]  Retiree Committee Support Letter, Schedule 6(a) to the Disclosure Statement Order, Dkt. 17639-36.

[165]  Retiree Committee Support Letter, Schedule 6(a) to the Disclosure Statement Order, Dkt. 17639-36.

[166]  Retiree Committee Information Guide, Schedule 6(b) to the Disclosure Statement Order, Dkt. 17639-37.

[167]  Retiree Committee Information Guide, Schedule 6(a) to the Disclosure Statement Order, Dkt. 17639-36.  The COR letter states that the pension reserve will be funded with $175 million per year through FY 2027, whereas the Plan calls for $175 million per year to be paid eight years following the Effective Date.

[168]  Disclosure Statement, Dkt. 17628, p. 62-65.  ("Classes of claims in which the holders of claims are unimpaired under the Plan are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes of claims in which the holders of claims will receive no recovery under the plan of adjustment are deemed to have rejected the plan of adjustment and are also not entitled to vote.").

the classes remaining, the Debtors have reached agreements and settlements with 62 of them, (or, in some cases, statutory committees charged with representing their interests).[169]

### 3. The settlements reached are reasonable

113. The agreements and settlements reached with creditors are embodied in the treatment of claims under the Plan. Table 13 summarizes the major categories of allowed claims and their recoveries, as estimated by the Debtors.

---

[169] The GO/PBA PSA relates to Classes 1-11 and 15-50 (47 classes); Retiree Committee PSA Classes 51A-51I and 51K-51L (11 classes); AFSCME PSA Class 51J; HTA/CCDA PSA Class 59; PRIFA PSA Class 61; and ERS Stipulation Class 65.

### TABLE 13: SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN

| | Claims<br>[A] | | Allowed Amount<br>[B] | Recovery<br>[C] |
|---|---|---|---|---|
| [1] | Vintage CW | $ | 5,843,252,913 | 77.56% |
| [2] | Vintage CW Guarantee | | 2,049,908,691 | 74.49% |
| [3] | 2011 CW | | 476,498,325 | 72.95% |
| [4] | 2011 CW (Series D/E/PIB) | | 645,673,111 | 76.45% |
| [5] | 2011 CW Guarantee | | 1,028,653,981 | 73.46% |
| [6] | 2012 CW | | 2,934,427,459 | 72.42% |
| [7] | 2012 CW Guarantee | | 519,408,568 | 67.32% |
| [8] | 2014 CW | | 3,836,611,111 | 67.76% |
| [9] | 2014 CW Guarantee | | 346,242,220 | 67.76% |
| **[10]** | **CW Bond Claims Total** | $ | **17,680,676,380** | |
| [11] | Vintage PBA | | 2,661,239,877 | 22.97% |
| [12] | 2011 PBA | | 1,335,422,893 | 22.97% |
| [13] | 2012 PBA | | 674,308,470 | 22.97% |
| **[14]** | **PBA Bond Claims Total** | $ | **4,670,971,240** | |
| [15] | ERS | | 3,168,698,777 | 14.00% |
| **[16]** | **ERS Bond Claims Total** | $ | **3,168,698,777** | |
| **[17]** | **All Bond Claims Total** | $ | **25,520,346,396** | |
| [18] | Active ERS | | - | 99.70% |
| [19] | Retired ERS | | - | 92.50% - 100.00% |
| [20] | Active JRS | | - | 94.50% |
| [21] | Retired JRS | | - | 91.50% - 100.00% |
| [22] | Active TRS | | - | 99.50% |
| [23] | Retired TRS | | - | 91.90% - 100.00% |
| [24] | VTP Payroll | | - | 93.80% - 100.00% |
| [25] | System 2000 | | 1,202,347,878 | 100.00% |
| **[26]** | **All Pension Claims** | $ | **1,202,347,878** | |
| [27] | AFSCME | | Not quantified | Impaired; not quantified |
| [28] | CW General Unsecured | | 2,750,000,000 | 20.40% |
| [29] | Other Unsecured and Other | | 12,698,446,586 | 0.00% - 100.00% |
| **[30]** | **Total Claims** | $ | **42,171,140,860** | |

Sources and notes:

Disclosure Statement of Seventh Amended Plan of Adjustment for Title III at p. 19-25 and 409-490.

[A]: See p. 24-25 for Bond Recovery Categories.

[B]: Includes principal and accrued and unpaid interest up to, but not including, the Petition Dates as applicable.

[C]: Excludes recovery from CVIs.

[10]: Sum of [1]-[9].

[C][11]: Excludes recovery on account of claims against the Commonwealth.  Total recovery
on account of both allowed claims against PBA and allowed claims against the Commonwealth
is estimated to be 80.4%.

[C][12]: Excludes recovery on account of claims against the Commonwealth.  Total recovery
on account of both allowed claims against PBA and allowed claims against the Commonwealth
is estimated to be 79.6%.

[C][13]: Excludes recovery on account of claims against the Commonwealth.  Total recovery
on account of both allowed claims against PBA and allowed claims against the Commonwealth
is estimated to be 74.8%.

[14]: Sum of [11]-[13].

[16]: [15].

[17]: [10] + [14] + [16].

[26]: Sum of [18]-[25].

[29]: Includes Classes 12-14, 53-57, 59-64, and 66-69.

[30]: [17] + [26] + [27]-[29].

114.   The relative recoveries under the Plan resulted from a robust negotiation process that also
reflected risks associated with certain litigations between and among the stakeholders.  As
illustrated through the examples below, the creditor groups with whom settlements were reached
faced material potential downside scenarios but also could have had some upside as a result of a
variety of litigations.  The Oversight Board, as representative of the Debtors, also faced certain
risks and downsides.  In addition, the ability to evaluate potential litigation outcomes was
complicated by the fact that, prior to these cases, there were no direct precedents under
PROMESA on which parties could reasonably rely, which based on my experience, parties to
these types of negotiations would typically consider.

115.   Based on my practitioner experience, achieving agreement from at least 15 major parties, as
shown in Appendix A to this report, would be a challenge in any bankruptcy or restructuring.
The ability to achieve such a consensus here is evidence in and of itself that the settlements are
reasonable.  As shown, in Table 12 above, all major stakeholder parties have had sophisticated

counsel and financial advisors, and have had an opportunity over an extended period of time to make best efforts to maximize the recovery of their claims.[170]

116. In evaluating the reasonableness of the settlements reached, I considered the types of challenges brought by and against various classes of creditors, and what their potential recoveries might have hypothetically been were they to prevail (an upside scenario) and what their potential recoveries might have hypothetically been were they to lose (a downside scenario). This is precisely the type of analysis I performed when acting in my capacity as a stakeholder in a bankruptcy or restructuring in evaluating the reasonableness of any proposed settlement to which I might be asked to agree. Furthermore, sophisticated investors in distressed and bankrupt entities will take the status of any litigation and challenges to their position (actual or threatened) into consideration when reasonably determining an appropriate course of action, such as agreeing to any settlement.

117. The Disclosure Statement for the Plan includes a description of all the litigations in which the various settling parties were involved.[171] In addition, the Best Interests Test Reports (the "BIT Reports") attached as Exhibit P to the Disclosure Statement provide data points for what recoveries might be for creditors of the Commonwealth, ERS, and PBA in a scenario where no Plan of Adjustment was confirmed, the Title III cases for these Debtors were dismissed, the automatic stay was lifted, and creditors pursued legal action to pursue recovery on their claims.

---

[170] In denying the motion to appoint a committee of retail bond holders Judge Swain ruled that "[a]lthough these Title III cases are complex, sophisticated parties represented by able counsel hold the same bonds owned by Mr. Hein and other retail investors, and through the course of the Title III cases, those parties have vigorously defended the validity and value of those bonds," and that "[a]lthough Movant is correct that active ad hoc groups and institutional investors with significant Commonwealth and PBA bondholdings have settled their disputes and now support the proposed Plan of Adjustment, Movant has failed to demonstrate that their support arises out of anything other than a calculated cost benefit analysis that takes into account the risks and burdens of litigating the validity and priority of their claims, including the resolution of complex intercreditor disputes that have been queued up in a host of contested matters and adversary proceedings." *See* Hearing Transcript 8/4/2021, 92:05-19. Judge Swain stated that "[e]ven if the supporting creditors do not purport to represent the interests of retail bondholder and do not have fiduciary duties towards retail bondholders, their support for the proposed Plan of Adjustment implies their belief that the Plan maximizes value for the benefit of bondholders." *See* Hearing Transcript 8/4/2021, 92:19-24.

[171] Disclosure Statement, Dkt. 17628, p. 91-113.

62

118. I considered the BIT Reports in assessing potential recovery ranges for the different stakeholders.  In that sense, the BIT Reports provide a useful data point when evaluating whether the settlements the Debtors have entered into are reasonable.[172]

### a.   The settlement reached with respect to the GO Bonds is reasonable

119. Litigation involving GO bonds presented a variety of risks for GO bondholders and other stakeholders.  For example, one of the risks identified in the litigation commenced by the Oversight Board's Special Claims Committee (the "SCC") related to challenges to the constitutionality of certain GO and PBA bond issuances that may have violated the Commonwealth's debt ceiling limit.[173]  As shown in Table 13 above, different vintages of Commonwealth GO bonds are receiving varying recoveries under the plan, of between approximately 67% and 78% of claims.  It would make sense that there could reasonably be differences in recoveries across these different GO claims, depending on the relative litigation risks facing various classes. For example, due to their vintage, certain classes had a larger risk of recovery due to the debt ceiling.

120. In that regard, the GO settlements resulted in materially better treatment of GO debt than other general unsecured debt. I understand that many parties took the position that the GO debtholders would be unsuccessful in establishing their priority over other general unsecured debt.[174] However, it stands to reason that had the GO bondholders prevailed in establishing priority, it would have practically meant that funds would have to be allocated to pay off the GO debt before payment could be made on any claims of other Commonwealth creditors, which would have constrained the Oversight Board's ability to use such funds to settle with other creditor groups. Therefore, the settlement relating to the GO debt was rational and reasonable.

---

[172]  In using the BIT Reports for this purpose, I do not mean to suggest the "best interest test" under PROMESA requires an examination of creditor recoveries on a class-by-class basis.  I understand the FOMB's position is only *aggregate* creditor recovery in and outside of Title III is relevant.  My interest in the BIT Reports is only to the extent they provide metrics for potential upside and downside recoveries for different groups of creditors.

[173]  Disclosure Statement, Dkt. 17628, p. 92.

[174]  Disclosure Statement, Dkt. 17628, p. 36-38, 91-96.

63

Case 17-03283-LTS   Doc#18087-2   Filed 09/13/21   Entered 09/13/21 23:53:25   Desc:
Debtors' Ex A11 Page 69 of 105

           *b.*   *The settlement reached with respect to the PBA Bonds is reasonable*

121. I understand that, under the Plan, holders of the PBA bonds could potentially receive recoveries from two sources – the PBA Bonds have a direct claim against PBA and they also have a claim under a Commonwealth guarantee (the "CW Guarantee").  In total, the PBA Bonds are estimated to recover 75% - 80% under the Plan through their direct recovery from PBA combined with their recovery under the CW Guarantee.[175]

122. There were a number of litigation claims that could have impacted the recovery of holders of PBA bonds.  For example, the Oversight Board challenged the validity of PBA bonds issued in or after 2012, on the basis that they may have been issued above the Commonwealth's constitutional debt limit.[176]  The UCC, together with the SCC, also challenged the validity of PBA Bonds issued on or after March 2011.[177] To the extent a particular PBA bond issuance was deemed invalid, then the downside recovery for holders of that bond issuance would be a recovery of 0%.  With respect PBA Bonds deemed valid, the BIT Report for the PBA Bonds also indicates that holders of such bonds faced a downside recovery of as low as 5% from PBA if they lack perfected security in rent payments.[178]

123. Based on my experience negotiating settlements in restructurings and bankruptcies, it is my opinion that it was reasonable for holders of the GO and PBA bonds to settle these disputed issues by accepting varying recoveries, as the alternative could have been lengthy and costly litigation with all its attendant risks and delays.

---

[175]  Disclosure Statement, Dkt 17628, p. 19-20.

[176]  Best Interests Test Reports, Exhibit P to the Disclosure Statement, Dkt. 17628, p. 99.

[177]  Disclosure Statement, Dkt 17628, p. 8 ("In 2017, the Oversight Board hired the law firm Kobre & Kim to provide a complete, independent review of the Government's debt.  In August 2018, the Oversight Board received the result of this investigation and presented the Kobre & Kim report.  Subsequently, the Oversight Board created a Special Claims Committee which has challenged approximately $6 billion worth of GO Bonds, among other debt, issued by the Commonwealth and its instrumentalities and public corporations.").

[178]   Exhibit P to the Disclosure Statement, Dkt. 17628, Best Interests Test Reports p.103.

c.  *The settlement reached with respect to the ERS Bonds is reasonable*

124.  As shown in Table 13, the ERS bonds are anticipated to receive an estimated recovery of 14%
under the Plan.  As is detailed at some length in the Disclosure Statement, there have been a
number of litigation claims and challenges regarding the ERS bonds, several of which were
decided adversely to holders of the ERS bonds by the Title III Court and the First Circuit.[179]  As a
data point, the BIT Report for ERS indicates that, in a downside scenario, the ERS bonds could
recover 4%.[180]  Given their unfavorable court decisions and the risks holders of ERS bonds still
faced in continuing litigation, I conclude that a settlement providing for a recovery of 14% is
reasonable.

d.  *The settlement reached with the UCC is reasonable*

125.  As shown in Table 13 above, unsecured creditors of the Commonwealth in Class 28 will receive
a recovery of 20.4% under the Plan.  The UCC was involved in a variety of litigations with a
number of different stakeholders.  How those litigations would resolve could have had a
significant impact on recoveries both for unsecured creditors but also, for example, holders of
GO and PBA bonds.[181]  To take one example, the UCC have argued that the claims of the
general unsecured creditors ("GUCs") should be treated pari passu with the claims of holders of
GO and PBA Bonds.[182]  Based on the data from the BIT Reports, if the Title III cases were
dismissed and if the GUCs were to prevail on that point, their recovery would be up to 69%,
which upside recovery would also require that the GO and PBA Bonds issues in or after March
2011 were deemed invalid.[183]  If all claims were pari passu, and all of the GO and PBA Bonds
were found to be valid, then the GUCs would recover 59%.[184]  However, in a scenario where the
GO and PBA Bonds were found to be senior to or have priority over general unsecured claims

---

[179]  Disclosure Statement, Dkt. 17628, p. 97-109.
[180]  Exhibit P to the Disclosure Statement, Dkt. 17628, Best Interests Test Reports, p.86.
[181]  Disclosure Statement, Dkt. 17628, p. 92-96, 103-113, 282-292, 319-329, 333-334.
[182]  Disclosure Statement, Dkt. 17628, p. 94.
[183]  Exhibit P to the Disclosure Statement, Dkt. 17628, Best Interests Test Reports, p.19.
[184]  Exhibit P to the Disclosure Statement, Dkt. 17628, Best Interests Test Reports, p.20.

and were all valid, the unsecured creditors of the Commonwealth would have a theoretical recovery of 0%.[185]

126. Based on data from the BIT Reports, I have determined that the GUCs faced a downside scenario of 0%, and an upside scenario of between 59%-69%. Under the circumstances, I conclude that it was reasonable for the Commonwealth unsecured creditors representatives (the UCC) to have settled at a recovery level of 20.4%.

127. Table 14 below provides a comparison of the recoveries outlined in the Disclosure Statement, as compared to my analysis of each group's upside and downside recoveries in a scenario in which the Title III case is dismissed, based on my review of the BIT Reports and additional analysis that I performed. Table 14 indicates that the recoveries provided in the Plan for all but one of these stakeholder groups fall within the range of what their ultimate downside or upside could have been in a scenario where the Title III case is dismissed. The only exception to this are the PBA bonds issued in or after 2012. There are a myriad of reasons that this might have been the case, and it does not mean that the settlement with that group of stakeholders was not reasonable from the Debtors standpoint or from the point of view of other stakeholders. Overall, my review and further analysis based on the BIT Reports increases my confidence level overall that the settlements reached as between the Debtors and the stakeholder groups are reasonable.

---

[185]   Exhibit P to the Disclosure Statement, Dkt. 17628, Best Interests Test Reports, p.20.

**TABLE 14: COMPARISON OF RECOVERIES TO BONDHOLDERS AND UNSECURED
CLAIMANTS REPRESENTED BY THE UCC: PLAN AND TITLE III DISMISSAL**

| | | Recovery under Plan (%) | Estimated likely range of recoveries assuming Title III cases are dismissed and automatic stay lifted (%) | |
| --- | --- | --- | --- | --- |
| | | | Low | High |
| GO Bonds Issued Before 2012 | [1] | 73.0% - 77.5% | 52% | 100% |
| GO Bonds In or After 2012 | [2] | 67.3% - 72.4% | 0% | 84% |
| PBA Bonds Issued Before March 2011 | [3] | 80.3% | 58% | 85% |
| PBA Bonds Issued after March 2011 and before 2012 | [4] | 79.5% | 0% | 82% |
| PBA Bonds Issued In or After 2012 | [5] | 74.8% | 0% | 69% |
| ERS Bonds | [6] | 14.0% | 4% | 100% |
| General Unsecured Claims (GUCs) | [7] | 20.4% | 0% | 69% |

Sources and Notes:

Recovery calculations in BIT Reports assume that PBA Bonds assert 100% claim against PBA and Commonwealth.  See Best Interest Reports, Exhibit P to Disclosure Statement, Dkt. 17628-16, pp.21 and 102.

[1]: Disclosure Statement at pp.20-21; Best Interest Reports, Exhibit P to Disclosure Statement, Dkt. 17628-16, at p.21. Lower range reflects blended recovery for all claims and assumes all outstanding claims are deemed valid. Higher range assumes that debt issued in or after March 2011 is deemed invalid.

[2]: Disclosure Statement at pp.20-21; Best Interest Reports, Exhibit P to Disclosure Statement, Dkt. 17628-16, at p.21.  Lower range assumes debt issued in or after 2012 are deemed invalid. Higher range reflects GO Bond recovery and assumes that all claims are deemed valid.

[3]: Recovery under the Plan includes cash, GO current interest and capital appreciation bonds. PSA, Exhibit B to Disclosure Statement, 17628-2, p. 127.  Recovery if Title III cases are dismissed includes recovery from PBA and CW Guarantee.  Best Interest Reports, Exhibit P to Disclosure Statement, Dkt. 17628-16, pp.21 and 102.  Lower range assumes all claims are deemed valid (52% recovery available from CW Guarantee + 6% recovery from PBA).  Higher range assumes that debt issued in or after March 2011 is deemed invalid, and that PBA bonds are pari passu with GO bonds. (75% recovery available from CW Guarantee + 10% recovery from PBA).

67

[4]: Recovery under the Plan includes cash, GO current interest and capital appreciation bonds.
PSA, Exhibit B to Disclosure Statement, 17628-2, p. 127. Recovery if Title III cases are
dismissed includes recovery from PBA and CW Guarantee. Best Interest Reports, Exhibit P to
Disclosure Statement, Dkt. 17628-16, pp.21 and 102. Lower range assumes claims are ruled
invalid. Higher range assumes that debt issued in or after 2012 is deemed invalid, and that PBA
Bonds are pari passu with GO bonds (76% recovery available from CW Guarantee + 6% recovery
from PBA).

[5]: Recovery under the Plan includes cash, GO current interest and capital appreciation bonds.
PSA, Exhibit B to Disclosure Statement, 17628-2, p. 127. Recovery if Title III cases are
dismissed includes recovery from PBA and CW Guarantee. Best Interest Reports, Exhibit P to
Disclosure Statement, Dkt. 17628-16, pp.21 and 102. Lower range assume debt issued in or after
2012 is deemed invalid. Higher range assumes that all claims are deemed valid, and that PBA
Bonds are pari passu with GO Bonds (63% recovery available from CW Guarantee + 6% recovery
from PBA).

[6]: Disclosure Statement, p.24; Best Interest Reports, Exhibit P to Disclosure Statement, Dkt.
17628-16, p.87. Higher range assumes that certain ERS assets are subject to security interests of
ERS bondholders. On June 27, 2019, however, the Title III Court ruled the ERS bondholders do
not have a perfected security interest in any post-petition employer contributions and the First
Circuit affirmed on January 30, 2020. That ruling became final and non-appealable after the
United States Supreme Court denied the ERS bondholders' request to review the First Circuit's
opinion.

[7]: Disclosure Statement, p.24; Best Interest Reports, Exhibit P to Disclosure Statement, Dkt.
17628-16, p.21. Lower range assumes that all claims are deemed valid. Higher range reflects
blended recovery for all claims and assumes debt issued in or after March 2011 is deemed invalid.

### e. The settlement reached with the COR is reasonable

128. Based on my practitioner experience with bankruptcies and restructurings, I would expect that
reasonable parties would weigh the costs and benefits of any negotiated settlement, and that
appears to be what the COR did in this instance. In urging its constituents to support the Plan,
the COR pointed out that the downside to the treatment for the retirees currently proposed would
be that the Debtors could revert to their original proposal which would have resulted in worse
treatment for the pensioners. In addition, the retirees could lose the protections of a reserve

funded annually, and forfeit the chance to have pension benefits above $1,500 per month restored, based on Puerto Rico's future financial performance.[186]

129. Given the massive unfunded pension liability faced by the Commonwealth, and given the wide variety of benefit cuts and modifications approved in prior municipal bankruptcies (see Table 15 below) and the risk of potentially deeper cuts and modifications faced by Puerto Rico's retirees, I conclude that the settlement with the COR was reasonable.

### TABLE 15: ANALYSIS OF PENSION CUTS AND FREEZES IN PUERTO RICO AND OTHER COMPARABLE US MUNICIPAL BANKRUPTCIES AND RESTRUCTURINGS (2011 – PRESENT)

| Municipality | | Year of Bankruptcy Filing/Restructuring | Year of Restructuring Plan Approval | Pension Cuts Instituted | Amount of Pension Cuts | Pension Freezes Instituted | Amount of Pension Freezes or Cost of Living Adjustment ("COLA") Reductions | % Pension Liability Funded Before Restructuring |
|---|---|---|---|---|---|---|---|---|
| County of Jefferson (AL) | [1] | 2011 | 2018 | ✘ | N/A | ✘ | N/A | Unknown |
| City of San Bernardino (CA) | [2] | 2012 | 2017 | ✘ | N/A | ✘ | N/A | * |
| City of Stockton (CA) | [3] | 2012 | 2015 | ✘ | N/A | ✘ | N/A | 85-90% |
| City of Detroit (MI) - General Retirement System | [4] | 2013 | 2014 | ✔ | 4.5% reduction in the base pension | ✔ | Elimination of COLA | 70% |
| City of Detroit (MI) - Police and Fire Retirement System | [5] | 2013 | 2014 | ✘ | N/A | ✔ | 55% reduction in COLA | 89.3% |
| City of Cranston (RI) - Poilice and Fire Departments | [6] | 2011 | 2013 | ✘ | N/A | ✔ | Forego COLA every other year for 10 years | 16.9% |
| Central Falls (RI) | [7] | 2011 | 2012 | ✔ | Up to 55% | ✔ | For some employees, COLA capped at 2% (not compounded) each year | ** |
| **Commonwealth of Puerto Rico** | **[8]** | **2017** | **N/A** | **✔** | **8.5% cut for one quarter of beneficiaries** | **✔** | **COLA eliminated** | **0%** |

Sources/Notes:

* As of June 30, 2012, the Unfunded Actuarial Accrued Liability was equal to $323.1 million.

**$80 million in unfunded pension and retiree health benefits.

There were five other bankruptcies for the following municipalities in the last decade that were dismissed and didn't result in restructuring: Harrisburg (PA); Boise County (ID); Town of Mammoth Lakes (CA); Hillview (KY); Fairfield (AL).

[2]: City of San Bernardino, Third Amended Disclosure Statement, October 14, 2016, PDF p. 20.

---

[186] Retiree Committee Support Letter, Schedule 6(a) to the Disclosure Statement Order, Dkt. 17639-36.

[3]: City of Stockton, Modified Disclosure Statement, November 15, 2013, PDF p. 31.

[4]-[5]: 4th Amended Disclosure Statement for City of Detroit, May 5, 2014, PDF p. 27.

Also See, 'The Challenge of Meeting Detroit's Pension Promises,' Pew Trust, March 2018.  Accessed via: https://www.pewtrusts.org//media/assets/2018/03/challenge_of_meeting_detroits_pension_promises_report_v6.pdf"

[6]: Note that the 2013 Initial Ordinance stipulated 10-year suspension of the COLA benefit for retirees of the Cranston Police Department and Cranston Fire Department, whereas the December 2013 Settlement changed that to COLAs being frozen every other year for the first 10 years, and capped at 1.5 percent in the 11th and 12th years and 3 percent for years 13 through 30.

Fitch, Mark, 'Rhode Island Supreme Court allows city to cut pension benefits to avoid bankruptcy,' Yankee Institute, Nov. 18, 2019.  Accessed via: https://yankeeinstitute.org/2019/11/18/rhode-island-supreme-court-allows-city-to-cut-pension-benefits-to-avoid-bankruptcy/

Smith, Gregory, 'Cranston's pension overhaul will save city millions, but court challenge remains,' Providence Journal, Feb. 8, 2014.  Accessed via: https://www.providencejournal.com/article/20140208/SPECIAL-REPORTS/302089992

Kittredge, Daniel, 'High court sides with city in pension case,' Cranston Herald, Jun. 5, 2019.  Accessed via: https://cranstononline.com/stories/high-court-sides-with-city-in-pension-case,142887

Reynolds, Mark, 'U.S. Supreme Court upholds Cranston's suspension of retiree benefits,' Dec. 12, 2019.  Accessed via: https://www.providencejournal.com/news/20191212/us-supreme-court-upholds-cranstons-suspension-of-retiree-benefits

Cranston Police Retirees Action Committee v. The City of Cranston,' US Supreme Court Write Petition Accessed via:
https://www.supremecourt.gov/DocketPDF/19/19286/114201/20190830101842957_Cranston%20Petition--PDFA.pdf

Cranston Police Retirees Action Committee v. The City of Cranston,' US Supreme Court Opinion, Issued June 3, 2019.  Accessed via: https://www.courts.ri.gov/Courts/SupremeCourt/SupremeOpinions/17-36.pdf

[7]: Bidgood, Jess, 'Plan to End Bankruptcy in Rhode Island City Gains Approval,' The New York Times, Sep. 7, 2012.  Accessed via: https://www.nytimes.com/2012/09/07/us/central-falls-ri-to-emerge-from-bankruptcy.html.

For workers who retired the youngest, pensions will be cut by up to 55 percent, although a state fund will bolster their benefits for the next five years.  Pensions at or below $10,000 a year will not be affected.

Russ, Hilary, 'Bankruptcy saves tiny Rhode Island city, but leaves scars,' Reuters, Sep. 3, 2012.  Accessed via: https://www.reuters.com/article/us-usa-rhodeisland-centralfalls-bankrupt/bankruptcy-saves-tiny-rhode-island-city-but-leaves-scars-idUSBRE88300220120904

The Fourth Amended Plan for Adjustment of Debts of the City of Central Falls, Rhode Island, July 27, 2012, Exhibit E.

Active Employees: 50% of annual salary at 20 years reduced to 50% of salary at 25 years; maximum benefit of 65% of salary after 30 years reduced to 55% of salary after 30 years; For Public Safety, COLA based on current active position amount in contract (compounded) changed to up to 2% COLA (not compounded) each year.

Retired Employees: 50% of annual salary at 20 years reduced to 40% of salary at 20 years; maximum benefit of 65% of salary after 30 years reduced to 55% of salary after 30 years; For Public Safety, COLA based on current active position amount in contract (compounded) changed to no COLA.

1% Plan - Police, Fire & Some Non-Public Safety Employees: 50% of annual salary at 20 years reduced to 40% of salary at 20 years; maximum benefit of 65% of salary after 33 years reduced to 55% of salary after 30 years; Upto 2% COLA (not compounded) each year added.

[8]: September 2019 PROMESA Section 211 Report on the Puerto Rico Retirement Systems, Exhibit H: 2021 Certified Fiscal Plan, Exhibit 140 to the Disclosure Statement, Dkt 17628-10,  April 23, 2021, PDF pp. 274 and 275-278.

ERS refers to Employee Retirement System; TRS refers to Teachers' Retirement System; JRS refers to Judiciary Retirement System.

> ### f.  The settlement reached with respect to the HTA, PRIFA and CCDA Bonds is reasonable

130. As the Disclosure Statement details, certain monoline insurers filed proofs of claims against the Debtors in connection with HTA, PRIFA, and CCDA revenue bonds.[187]  The monoline insurers asserted claims against the Commonwealth on the basis that the bonds had a security interest in certain revenues collected and retained by the Commonwealth.[188]  As part of the litigation over these issues, the monoline insurers sought to lift the automatic stay.  In denying the lift stay motions, the Title III Court found they lacked a "colorable claim" to security, except as to funds deposited in certain specific bank accounts.[189]  Although the Title III court's ruling did not definitively dispose of the monolines' claims against the Commonwealth, which claims were also the subject of adversary proceedings being litigated by the monolines and the FOMB,[190] it would have been reasonable for all parties to conclude that the monolines faced significant downside risk.

---

[187]  Disclosure Statement, Dkt. 17628, p. 318.

[188]  Disclosure Statement, Dkt. 17628, p. 164 (footnote 182), 283-292, 319, 324-329.

[189]  Disclosure Statement, Dkt. 17628, p. 285-292.

[190]  Disclosure Statement, Dkt. 17628, p. 164 (footnote 182).

131. Notwithstanding FOMB's litigation successes in the disputes with the monolines, it too (on behalf of the Commonwealth) faced a significant downside risk if the monolines ultimately prevailed. In that event, the Commonwealth may not have been able to use the disputed revenues (amounting to billions of dollars) to fund payments to GO bondholders and other creditors called for by the various PSAs.[191] That, in turn, could have required the FOMB to renegotiate the terms of the Plan with all stakeholders under very different financial circumstances.

132. The FOMB reached a settlement regarding these issues which was embodied in the HTA/CCDA PSA and the PRIFA PSA.[192] In satisfaction of their claims, the HTA, PRIFA and CCDA revenue bonds will receive 68.6%, 4%, and 27% of the Clawback CVIs, respectively, under the Plan.[193] In view of the risk inherent in this dispute, I conclude that the settlements reached with respect to the HTA, PRIFA and CCDA bonds are reasonable.

### 4. The FOMB has determined that the settlements are fair, equitable, and reasonable

133. In the Disclosure Statement, the Debtors represent that they believe that the compromises and settlements reflected in the Plan are "fair, equitable, and reasonable," and that they "provide value and certainty for the Debtors and all Creditors by eliminating significant litigation risk and expenses, and providing a framework for the Debtors to emerge from Title III expeditiously."[194]

134. As discussed, the settlements and agreements reached through mediation between the Debtors (under the authority of the FOMB) and major stakeholder groups are the result of years of negotiations among sophisticated parties. Each of the operative PSAs, as well as a letter from the FOMB to the UCC dated July 12, 2021 documenting the understanding between the FOMB and the UCC, contain a "Good Faith Negotiations" clause, in which parties acknowledge that

---

[191]   Disclosure Statement, Dkt. 17628, p. 164 FN 182.
[192]   HTA/CCDA Related Plan Support Agreement, May 5, 2021, Exhibit C to Disclosure Statement, Dkt. 17628-3; PRIFA Related Plan Support Agreement, July 27, 2021, Exhibit D to Disclosure Statement, Dkt. 17628-4.
[193]   Disclosure Statement, Dkt. 17628, p. 480 - 483.
[194]   Disclosure Statement, Dkt. 17628, p. 560.

they were represented by counsel, engaged in arm's-length negotiations regularly in reaching the agreement, and that they acted in good faith.[195]

135. Throughout the Debtors' Court-supervised Title III cases, information and participation in such settlements and agreements were made available to other stakeholders through Court filings, including the Plan and its previous iterations, as well as through press releases issued by the FOMB to the general public. Stakeholders had the ability to file objections and/or adversary proceedings to the extent they took issue with the settlements embodied in the plan(s) of adjustment. Given the rigorous process, it is my opinion that the Debtors have a reasonable basis to believe that the settlements are fair, equitable, and reasonable.

136. Based upon my review of the record, the Debtor and stakeholder parties used best efforts to reach points of compromise so that the parties could agree to a confirmable plan. Taken as a whole, the Plan is a "market clearing" deal, to which almost all major parties with an economic interest have agreed.[196] Even if a party were of the view that a certain set of stakeholders might have been able to extract a higher recovery, reasonableness is in a range given a multitude of factors that may be important to stakeholders. The existence of multi-party settlements here is, in and of itself, a test of reasonableness. I would see no commercially reasonable basis to upset the balance that has been reached, when the parties representing the economic interests at stake have agreed to the compromises incorporated into the terms of the Plan.

---

[195] See, e.g., the GO/PBA PSA, Section 8.4 Good Faith Negotiations, Dkt, 17628-2, p. 50; Financial Oversight and Management Board for Puerto Rico – Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, *et al.*, Letter Agreement on Fifth Amended Title III Plan of Adjustment, July 12, 2021 (FOMB_CONF_53030).

[196] With the exception of the DRA Parties.

## VI.   CONCLUSION

137.   Although not all risks are foreseeable with perfect accuracy, and some are outside the control of
the Title III Debtors, it is my opinion that, after the passage of over four years, it is more likely
than not that the stakeholders would have identified the foreseeable risks facing Puerto Rico.
Assuming implementation of the Plan, Puerto Rico will be able to move forward with its
rehabilitation with a significantly lower debt level, reduced pension obligations, and with
collective bargaining agreements with a five year duration.[197]

138.   Based on my experience over the course of my career with numerous restructurings, I would
expect that stakeholders would seek to maximize their own economic best interests in any
restructuring negotiation.   At the same time, based on sound custom and practice for
restructurings, stakeholders would also balance their own economic interests with a practical
understanding that a Debtors' resources and cash flow generation capacity have limits, that
compromises are oftentimes necessary, and that in this case, the Commonwealth's resources
should not be stretched to the point where it would put its ability to provide essential services to
its citizens at risk.

139.   The passage of over four years has provided sufficient time for stakeholders, who have been
represented by sophisticated counsel and financial advisors, to assess the strengths and
weaknesses of their respective negotiating positions, determine what is in their own economic
interests as stakeholders, and engage in arms-length negotiations.   In the absence of achieving
the settlements that have been reached, it is likely that the Debtors and stakeholders would be
forced to continue on with substantial and costly litigation.   While parties in restructuring
negotiations typically would like to achieve more, here, the vast majority of stakeholders are in
agreement with the FOMB that it would be advisable to achieve confirmation of the Plan as
proposed.   Doing so would be consistent with the FOMB's charter to help Puerto Rico achieve
fiscal responsibility and regain access to the capital markets.   In the end, it seems evident that the
FOMB and the stakeholder parties have found a reasonable balance best suited to serve the

---

[197]   PoA Overview_(8.23.21)_vFINAL.pptx at p. 6.

74

economic best interest of the stakeholders, while at the same time recognizing the importance of supporting the future financial health of the Commonwealth, which will ultimately inure to the future benefit of its stakeholders.


Respectfully submitted,


Dated: September 13, 2021
New York, New York


Marti P. Murray

# APPENDIX A: THE DEBTORS HAVE REACHED AGREEMENTS WITH MAJOR STAKEHOLDER GROUPS

| | | Stakeholder Groups | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Labor | Statutory Committee | Bondholders | | Monoline Insurers | | | Bondholders | | | Monoline Insurers | | Labor | Statutory Committee | Bondholders | Monoline Insurers | | Government | Bondholders |
| Date | POA | AFSCME | COR | PBA | GO | Assured (GO/PBA) | Syncora (GO/PBA) | National (GO/PBA) | ERS | HTA | CCDA | Assured (HTA/CCDA) | National (HTA) | AFT/ AMPR | UCC | PRIFA | Ambac (PRIFA) | FGIC (PRIFA) | Puerto Rico | DRA |
| | | [A] | [B] | [C] | [D] | [E] | [F] | [G] | [H] | [I] | [J] | [K] | [L] | [M] | [N] | [O] | [P] | [Q] | [R] | [S] |
| 9/27/19 | Initial POA | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| 2/28/20 | Amended POA | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| 3/8/21 | 2nd Amended POA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| 5/11/21 | 3rd Amended POA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| 6/29/21 | 4th Amended POA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| 7/12/21 | 5th Amended POA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ | ✗ |
| 7/27/21 | 6th Amended POA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ○ | ○ | ✓ | ✓ | ✓ | ✗ | ✗ |
| 7/30/21 | 7th Amended POA | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ○ | ○ | ✓ | ✓ | ✓ | ✗ | ✗ |

Sources and Notes:

Disclosure statements for plans of adjustment and exhibits to disclosure statements.

〇: Agreements in principal, subject to final documentation.

[A]: American Federation of State, County, and Municipal Employees.

[B]: Official Committee of Retired Employees of the Commonwealth of Puerto Rico ("COR," by its Spanish acronym).

[C]: Holders of the Puerto Rico Public Buildings Authority ("PBA") bond claims.

[D]: Holders of general obligation ("GO") bond claims and/or CW Guarantee bond claims.

[E]: Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds.

[F]: Syncora Guarantee Inc., as holder of, subrogee with respect to, or insurer of GO Bond Claims and PBA Bond Claims.

[G]: National Public Finance Guarantee Corporation ("National"), solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to GO Bonds and PBA Bonds

[H]: Holders of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") bond claims.

[I]: Holders of Puerto Rico Highways and Transportation Authority ("HTA") bond claims.

[J]: Holders of Puerto Rico Convention Center District Authority ("CCDA") bond claims.

[K]: Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA bonds and CCDA bonds.

[L]: National, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to HTA bonds.

[M]: Collectively, the American Federation of Teachers, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical.  On July 6, 2021, the Oversight Board reached an agreement in principal, subject to final documentation, with the parties regarding the treatment of TRS benefits.

[N]: Official Committee of Unsecured Creditors.  On July 12, 2021, the Oversight Board reached an agreement in principal, subject to final documentation, with the UCC regarding proposed recoveries for classes of general unsecured creditors.

[O]: Holders of Puerto Rico Infrastructure Financing Authority ("PRIFA") bond claims.

[P]: Ambac Assurance Corp., solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds.

[Q]: Financial Guaranty Insurance Company, solely in its capacity as insurer and asserted holder, deemed holder, or subrogee with respect to PRIFA Bonds.

[S]: AmeriNational Community Services, LLC, as servicer for the GDB Debt Recovery Authority, and Cantor-Katz Collateral Monitor LLC, a Delaware limited liability company.

[A]: American Federation of State, County, and Municipal Employees.

# APPENDIX B: EXPERT CV OF MARTI P. MURRAY

## MARTI P. MURRAY, MBA, CVA, CFE
### Principal

---

New York, NY                    +1.212.789.3650                    Marti.Murray@brattle.com

Marti P. Murray is a principal of The Brattle Group.  She is the Co-Practice Leader for the Bankruptcy & Restructuring Practice and the Practice Leader for the Alternative Investments Practice.  She has subject matter expertise in bankruptcy and restructuring, business and securities valuation, financial modeling and forecasting, claims estimation and damages analysis, alternative investment management, investment advisers, securities trading, solvency, and fraud (including Ponzi schemes).  She has had close to a 40-year career in the financial services industry, including holding leadership roles at both investment management firms and business restructuring financial advisory firms.  She has also served on numerous boards of directors and has acted as a court-appointed SEC Receiver for an investment adviser accused of fraud.

Earlier in her career, Ms. Murray was the Founder, President, and Portfolio Manager of Murray Capital Management, Inc., an SEC-registered distressed debt hedge fund firm that she ran from 1995-2008.   The distressed debt business of Murray Capital was acquired by Babson Capital in April 2008.

Ms. Murray served as an adjunct professor at the NYU Stern School of Business from 2001-2013, teaching courses in bankruptcy, distressed debt investing, and equity analysis/valuation.  While at NYU Stern, she was the recipient of awards for excellence in teaching, including the Teacher of the Year Prize.  Ms. Murray has written for numerous publications, and was a contributing author to Managing Hedge Fund Risk: From the Practitioner's Perspective, edited by Virginia Reynolds Parker, published in 2001.

Ms. Murray holds the Certified Valuation Analyst credential (CVA), awarded by the National Association of Certified Valuators and Analysts (NACVA).  Ms. Murray is also a Certified Fraud Examiner (CFE), with proven expertise in fraud prevention, detection, and deterrence.  She is a full member of the National Association of Federal Equity Receivers (NAFER) and

serves on the Board of Directors and as Audit Committee Vice Chair of the New York Chapter of the Turnaround Management Association (TMA).

## TESTIMONY

- SPCP Group, LLC v. UBS AG (Supreme Court of the State of New York)–Litigation over a failed trade of distressed bank debt.  Issued expert report and provided deposition testimony. Issues included industry custom and practice in the distressed debt trading market and analysis of mitigation strategies, including damages calculations. (August 2010) (Case No. 08-602418)

- In re SW Boston Hotel Venture LLC, et.al. (US Bankruptcy Court for the District of Massachusetts)–Litigation over bankruptcy plan feasibility, solvency, financial projections, claim amount, diminution in value of collateral, and cram-down rate of interest.  Issued expert report, and provided deposition and trial testimony. (June 2011) (Case No. 10-14535)

- J.P. Morgan Securities, Inc. v. Jason Ader, et al. (Supreme Court of the State of New York)–Litigation over financial arrangements between a hedge fund and a seed capital provider. Issued multiple expert reports and was deposed twice. (December 2011) (Case No. 09-650005)

- Riad Tawfiq Al Sadik v. Investcorp Bank BSC, et al.–Litigation over major losses suffered in 2008.  Issued three expert reports and testified at trial in the Grand Court of the Cayman Islands. (February 2012)

- Deephaven Distressed Opportunities Trading, et al. v. Imperial Capital, LLC–FINRA arbitration over liability for damages related to a failed trade of a distressed trade claim against a bankrupt company.  Issues included industry custom and practice in the distressed debt trading market, analysis and valuation of trade claims, and mitigation strategies including damages analysis.  Issued expert report and testified at arbitration. (July 2012) (Case No. 11-01891)

- In re The Dolan Company (US Bankruptcy Court for the District of Delaware)–Financial advisor and testifying valuation expert for the Official Committee of Equity Security Holders in the Dolan bankruptcy.  Issued expert report and was deposed three times on a wide range

of issues relating to business valuation, and industry custom and practice with respect to bank loan amendment fees. (May 2014) (Case No. 14-10614)

- Green v. KeyCorp (US District Court for the Western District of Texas)–Expert witness with respect to Austin Capital Management, a hedge fund-of- funds firm.  Issued expert report and was deposed twice. (August 2014) (Case No. 12-01048)

- In re GSC Group, Inc., et al. (US Bankruptcy Court for the Southern District of New York )– Retained as an expert in connection with litigation in the GSC bankruptcy over assumed management contracts for CLOs, Private Equity, and ABS CDOs, affiliate transfers, and investments made in hedge funds and CLOs.  Issued multiple expert reports, was deposed, and testified. (February 2015) (Case No. 10-14653)

- PICCIRC, LLC et al. v. Commissioner of Internal Revenue Service (US Tax Court)– Retained as an expert by the Internal Revenue Service with respect to an investment in a trade claim against Encol during its bankruptcy.  Issues included industry custom and practice with respect to hedge fund and trade claim investing, trade allocation, principal transactions, and the economic substance of the trade.  Issued expert report and testified at trial. (March 2015) (Case No. 12-04308)

- Brown Jordan International, Inc., et al. v. Christopher Carmicle (US District Court for the Southern District of Florida)–Retained as an expert by Brown Jordan.  Issued expert report and provided deposition testimony. (August 2015) (Case No. 14-61415)

- In re Sears Holding Corporation, et al. (US Bankruptcy Court for the Southern District of New York)–Retained as an expert relating to claims for diminution in value of collateral and alleged 506(c) surcharges relating to positions held by certain second lien debt holders of the Sears Bankruptcy.  Issued expert report, and provided deposition and trial testimony. (July 2019) (Case No. 18-23538)

- Retained as an expert relating to a dispute regarding a seed capital arrangement entered into between two hedge fund firms.  Issued expert report and testified at arbitration hearing. (September 2019)

- Kentucky Retirement Systems v. BHEP GP I, LLC, et al. (US District Court for the Commonwealth of Kentucky)– Retained as an expert in a litigation relating to a dispute between the manager of a private equity fund of funds and a public retirement system, which sought remedies related to alleged mismanagement of the funds.  Issued expert report and testified at hearing. (October 2019) (Case No. 18-00377)

- D.E. Shaw Composite Holdings LLC and Madison Dearborn Capital Partners IV LP v. TerraForm Power LLC and TerraForm Power, Inc. (Supreme Court of the State of New York)–Retained as an  expert with respect to the methodologies used to value earnout consideration, financial guarantees, and private equity/hedge fund industry custom and practice for the valuation of illiquid investment positions.  Issued affirmative and rebuttal expert reports and testified at deposition. (December 2019) (Case No. 16-651752)

- SEC v. Westport Capital Markets, LLC and Christopher E. McClure (US District Court District of Connecticut)–Retained as an expert by the Securities and Exchange Commission with respect to alleged conflicted transactions of an investment adviser.  Issued expert report and provided deposition and trial testimony. (March 2020) (Case No. 17-02064)

- SEC v. Dean Patrick McDermott and McDermott Investment Advisors, LLC (US District Court for the Eastern District of Pennsylvania)–Retained as an expert by the SEC in an enforcement action.  Issues included industry custom and practice in the investment advisory industry regarding conflicts of interest, disclosures, and best execution.  Issued affirmative and rebuttal reports and provided deposition testimony. (February 2021) (Case No. 19-04228)

- In re WeWork Litigation (State of Delaware Court of Chancery)–Retained as an expert relating to a dispute regarding industry best practices in the context of industry expectations regarding reasonable best efforts to finalize transaction agreements and the economic and financial consideration relating to the completion of those transactions.  Issues included industry custom and practice for investment advisers and transaction participants.  Issued affirmative and rebuttal reports and provided deposition testimony. (February 2021) (Case No. 20-0258)

- In re Altaba, Inc. (State of Delaware Court of Chancery)–Retained as an expert to opine on the amount of funds that should be conservatively held back as security for claims not yet known to Altaba or that may arise subsequent to Altaba's dissolution. Issued two expert reports, provided deposition, and trial testimony. (February 2021) (Case No. 20-0413)

- Engaged as an expert in a litigation over fees purportedly due to an alternative investment management placement agent. (June 2021)

- SEC v. Paul Alar, West Mountain, LLC (US District Court Northern District Of Georgia Atlanta Division) Retained by the SEC in an enforcement action against a fund manager. Issues included investment strategy, disclosures, valuation, and Ponzi-like schemes. Issued expert report and deposition testimony. (Case No. 20-03265) (August 2021)

## LITIGATION/CONSULTING EXPERIENCE

- Deephaven Distressed Opportunities Trading, Ltd. v. 3V Capital Master Fund Ltd., et al. (Supreme Court of the State of New York)–After claims against Imperial were dismissed in the matter of Deephaven Distressed Opportunities Trading, Ltd. et al. v. Imperial Capital, LLC, retained as an expert by 3V to defend against Deephaven. (See Deephaven matter under Testimony) (July 2012)

- William Seibold v. Camulos Partners, et al.–Compensation Dispute. Retained as expert by counsel to Camulos Partners in an arbitration. Issued expert report. (April 2013)

- SEC v. Aletheia Research and Management, Inc. and Peter J. Eichler, Jr. (US District Court for the Central District of California)–Retained as an expert by the SEC in an enforcement action. Issues included industry custom and practice in the hedge fund industry regarding allocation of trades among accounts. Issued expert report. (August 2013) (Case No. 12-10692)

- Sumitomo Mitsui Banking Corp. v. Credit Suisse, et al. (Supreme Court of the State of New York)–Retained as an expert by counsel to Credit Suisse in a litigation over rights of a bank debt participation holder in a debt restructuring. Issued expert report. (September 2013) (Case No. 10-600898)

- In re Fletcher International Ltd. (Bankruptcy Court for the Southern District of New York)– Served as Special Consultant to the bankruptcy trustee, assisting in his overall investigation of the business of Fletcher Asset Management, a registered investment adviser, and Richcourt, a fund of funds. Issues included industry custom and practice with respect to investment fund management, valuation of complex esoteric investments, investment fees, solvency, red flags, Ponzi schemes, and industry custom and practice with respect to fund managers and third party service providers. Supported Trustee in the issuance of the November 2013 Trustee's Report and Disclosure Statement. (November 2013) (Case No. 12-12796)

- In the Matter of Clean Energy Capital, LLC and Scott A. Brittenham–Retained as an expert by the SEC in an administrative proceeding brought against a private equity fund. Issues related to fees and expenses charged to the fund, the valuation of portfolio investments, and the calculation of carried interest. Issued expert report. (June 2014) (Case No. 3-15766)

- Gaming industry (State of Delaware Court of Chancery)–Retained as a consulting expert with respect to valuation, solvency, and fraudulent conveyance relating to one of the world's largest diversified casino companies. (August 2014)

- In the Matter of Lynn Tilton, Patriarch Partners, LLC et al.–Retained as an expert for the defendant in an SEC administrative proceeding involving three structured credit products that invested in distressed companies. Issued expert report. (March 2015) (Case No. 3-16462)

- Ramius Private Select Ltd., et al., v. Sacha Lainovic, at al.–Retained as an expert for defendants in a dispute between redeeming investors in a hedge fund focused on the for-profit education sector. Issues included valuation, solvency, fraudulent conveyance, Ponzi schemes, and industry custom and practice in the investment management industry. Issued expert report. (March 2016) (Case No. 12-774615)

- Retained as an expert in connection with a federal income tax case concerning a major multinational chemical company. (US Tax Court) (May 2016)

- Public Sector Pension Investment Board v. Saba Capital Management, L.P. (Supreme Court of the State of New York)–Retained as an expert for defendant in a litigation brought by a

84

former investor.  Issues included industry custom and practice with respect to marketing illiquid investments for sale, including the use of bids-wanted-in-competition, industry custom and practice with respect to valuing illiquid investment positions, hedge fund ecosystems, and fair value measurements.  Issued expert report. (June 2016) (Case No. 15-65321)

- Retained to assist counsel defend hedge fund in an SEC enforcement action relating to fund valuation.  (Supreme Court of the State of New York) (July 2016)

- Engaged by counsel to assist in the defense of a fund administrator in a potential SEC enforcement action. (December 2016)

- Engaged by counsel, on behalf of an investor, to analyze a fraudulent scheme relating to margin loans. (Supreme Court of the State of New York) (March 2017)

- Retained as an expert in a litigation arising from a failed debt restructuring. (US District Court of Nevada–Clark County) (November 2017)

- Tatiana Brunetti v. Dmitry Sergeev (Supreme Court of the State of New York)–Retained as expert in defense of claims of misappropriation of assets and as expert consultants for breach of contract and breach of fiduciary duty claims relating to restaurant investments. (November 2017) (Case No. 15-653855)

- Retained by US Government Agencies in a total of seven matters covering issues including market manipulation, distressed debt investing, trading and valuation, complex asset tracing, industry custom and practice with respect to registered investment advisers, fees and expenses, fund buyouts, trade allocations and conflicts of interest.

- Issued valuation report on an investor's interest in a commodities-focused private equity fund. (March 2018)

- Issued valuation report on privately held lodging and leisure company in connection with a major international fraud scheme.  Report included the valuation of a $100+ million litigation claim arising from an alleged breach of contract.(March 2018)

- In the Matter of VSS Fund Management LLC–Retained as an expert by the SEC in an administrative proceeding concerning registered investment adviser Veronis Suhler Stevenson ("VSS") for failure to provide the limited partners of a private equity fund it advised with material information relating to a change in the vehicle's valuation in connection with an offer by the owner and managing partner of VSS to purchase the limited partnership interests. (March 2018)

- Douglas A. Kelley, in his capacity as the court-appointed Chapter 11 Trustee of Debtors Petters Company, Inc. and PL Ltd., Inc., vs. Westford Special Situations Master Fund, L.P. et al. (US Bankruptcy Court District of Minnesota)–Retained as an expert in a litigation relating to claw-back claims stemming from the Petters Ponzi scheme. Issues included fraud, Ponzi schemes, solvency, asset tracing, and hedge fund industry custom and practice, including the calculation of management and performance fees. Issued affirmative and rebuttal reports. (May 2018) (Case No. 08-45257)

- Retained to support litigation funder in conducting due diligence for prospective new investments.

- SEC v. James Thomas Bramlette (US District Court District of Utah–Central Division)– Retained as an expert by the SEC to opine on issues related to solvency and standard of care for a fund manager in the capital raising, operation and management of a fund. Issued expert report and Declaration. (December 2018) (Case No. 18-00761)

- Investors v. Asset-Based Lending Hedge Fund–Retained as a fraudulent conveyance and solvency expert in connection with the fund's restructuring.

- Retained as an expert in a litigation relating to the valuation of a leading specialty retailer. Issued rebuttal report. (Supreme Court of the State of New York ) (October 2019)

- Retained as an expert in an adversary proceeding arising in the bankruptcy of Neiman Marcus (US District Court Southern District of Texas). Issued expert report on alleged damages incurred by the bankrupt estate and unsecured creditors resulting from certain conduct of a member of the official unsecured creditors' committee, who was pursuing an investment opportunity. (July 2020) (Case No. 20-32519)

- Engaged as an expert to calculate COVID-19 –related business interruption damages incurred by insured parties under property-casualty insurance policies. (July 2020)

- Retained by the SEC in an enforcement action.  Issues included industry custom and practice in the investment advisory industry regarding conflicted transactions, adequate disclosures, fiduciary duty of investment advisers and best execution.  Issued affirmative and rebuttal reports. (U.S. District Court for the Eastern District of Pennsylvania) (April 2021)

- Engaged as an expert to assess the reasonableness of placement agent fees in connection with capital raises and M & A transactions. (May 2021)

- Engaged as an expert in a commercial arbitration.  Issues included industry custom and practice for investment fund managers including as it relates to fiduciary duty, the importance of accurate valuation of investment positions, sham transactions, Ponzi-like schemes, and damages calculations.  Issued expert report and expert rebuttal report (JAMS Commercial Arbitration Tribunal) (July 2021)

- Engaged by the Plaintiffs' Executive Committee as an expert in a Multi District Litigation (MDL).  Issues are focused on various claims of fraudulent transfer. (August 2021)

## WORK EXPERIENCE

**The Brattle Group, Inc.**

- **Principal** (May 2019–Present)

- Professional services firm that answers complex economic, regulatory, and financial questions for corporations, law firms, and governments around the world

- Bankruptcy & Restructuring Practice Co-Leader

- Alternative Investments Practice Leader

**Murray Analytics, Inc.**

- **Founder & President** (April 2015–May 2019)

- Professional services firm specializing in corporate restructuring, financial advisory, litigation support, and complex valuation products and services

- 2017 Winner HFM Week US Service Provider Awards–Best Valuation Service–Hard to Value Assets; 2017 Finalist–Best Overall Advisory Firm; 2018 Finalist–Best Valuation Service–Hard to Value Assets

**New York University Stern School of Business**

- **Adjunct Professor** (2001–2013)

- Teaching courses in Bankruptcy and Distressed Debt Investing and Valuation/Equity Analysis

- Recipient of Teacher of the Year Prize

- Recipient of Excellence in Teaching Award

**Goldin Associates, LLC**

- Senior Managing Director and Member of Management Committee (2012–2015)

- Team leader on financial advisory engagements including for Pulse Electronics, Fletcher International, The Dolan Company, and casino industry engagement

- Numerous litigation support engagements with respect to alternative investment funds, investment advisers, trading matters, and bankruptcy/restructuring matters

**Murray & Burnaman, LLC**

- Managing Member (2009–2012)

- Co-founder of Murray & Burnaman, LLC, officially launched in October 2010

- Represented debtor and creditor constituencies in bankruptcies and out of court restructurings and provided independent third party expert witness/litigation support

**Babson Capital Management (Mass Mutual)**

- Managing Director & Head of the Distressed Debt Investing Group (2008–2009)

- The distressed debt investing business of Murray Capital Management was acquired by Babson Capital in 2008

- Ran the group as a business unit inside Babson Capital

- Invested in secured and unsecured bonds, equities, mortgages, bank debt, private claims, trade claims, options, credit default swaps, derivatives and aircraft lease debt obligations

**Murray Capital Management, Inc.**

- Founder, President & Portfolio Manager (1995–2008)

- Founded and served as President/Portfolio Manager of Murray Capital Management, an SEC registered investment adviser firm specializing in distressed debt with peak client assets under management of $750MM

- Invested in secured and unsecured bonds, equities, mortgages, bank debt, private claims, trade claims, options, credit default swaps, derivatives and aircraft lease debt obligations

**Furman Selz Incorporated**

- Senior Managing Director & Head of Distressed Debt Investing Group (1990–1995)

- Founded ReCap Partners, L.P. and ReCap International LLC

- Developed a third-party money management business in the distressed debt asset class

**Oppenheimer & Co. Inc.**

- Senior Vice President (1987–1990)

- Research Analyst for the Oppenheimer Horizon hedge funds, investing in distressed debt and private claims

**First NY Capital**

- **Associate** (1986–1987)

- Associate at boutique investment banking firm doing middle-market mergers and acquisitions, capital raises and fairness opinions

**Bank of America, N.T. & S.A.**

- Assistant Vice President (1982–1986)

- Relationship Manager for the Bank's Fortune 500 clients

- Completed Bank of America's formal credit training program

**City of New York–Department of Housing Preservation & Development**

- (1981–1982)

- Worked in unit responsible for business relocations as a result of eminent domain proceedings

## FIDUCIARY ROLES / BOARD MEMBERSHIPS

**Atlantic Asset Management, LLC**

- **Receiver** (January 2016–May 2019)
  - Atlantic Asset Management ("AAM") was a registered investment adviser specializing in fixed income investment strategies
  - AAM was the subject of an SEC enforcement action alleging securities fraud; certain of AAM's professionals are also the subject of a criminal action brought by the US Attorney's Office
  - Appointed on December 21, 2015 by Hon. William H. Pauley III, US District Court, Southern District of New York as temporary Independent Monitor and subsequently as Receiver

**Edcon**

- **Director** (February 2017–August 2018)
  - Edcon is the largest non-food retailer in South Africa, with over 1,400 stores in a variety of formats, including Edgars and Jet
  - Member of the Audit and Risk Committee

**Private For-Profit Education Company**

- Interim Advisor (June 2017–Aug 2017)
  - Provided interim management services to a for-profit education company with a focus on medical career training
  - Services included aspects of general corporate and financial management, human resources, and school accreditation

**PIMCO Income Strategy Fund, PIMCO Income Strategy Fund II**

- Director
  - Nominated by Brigade Capital Management and recommended by Institutional Shareholder Services, Inc. (ISS)

**ReCap International (BVI), Ltd.**

- Director
  - Distressed debt investment fund for non-US taxable investors

**California Coastal Communities**

- Director
  - Former NASDAQ-listed California homebuilder that went through bankruptcy proceedings
  - Member of audit committee and compensation committee

**Asphalt Green**

- Trustee
  - A not-for-profit organization dedicated to assisting individuals of all ages and backgrounds achieve health through a lifetime of sports and fitness

**Kent Place School**

- Trustee

    – An all-girls K-12 nonsectarian, college preparatory day school whose focus is to provide a superior education for young women who demonstrate strong scholastic and creative ability

## PROFESSIONAL AFFILIATIONS

- Certified Valuation Analyst (CVA), awarded by the National Association of Certified Valuators and Analysts (NACVA)

- Certified Fraud Examiner (CFE), awarded by the Association of Certified Fraud Examiners (ACFE)

- IMS ExpertServices
  - EliteXpert–invitation only membership is granted to experts identified by IMS, a leading expert witness search firm.

- Turnaround Management Association (TMA)
  - Board of Directors, NY Chapter
  - Vice-Chair, Audit Committee

- American Bankruptcy Institute (ABI)

- Association of Insolvency and Restructuring Advisors (AIRA)

- National Association of Federal Equity Receivers (NAFER)
  - Full Member–limited to individuals who have been appointed as equity receivers in complex proceedings or who have served as primary counsel or forensic accountants to a receiver

## PUBLICATIONS

- "Assessing the Reasonableness of Rights Offerings: Raising Exit Financing in a Chapter 11 Proceeding," AIRA Journal, Volume 32: Number 3 - 2019, published by AIRA (Association of Insolvency & Restructuring Advisors).

- "Assessing the Reasonableness of Rights Offerings–Raising Exit Financing in the Context of a Chapter 11 Bankruptcy Proceeding," Bankruptcy & Restructuring 2019: Expert Guide, published by Corporate LiveWire.

- "Notes from the Road–The Bankruptcy Cases Everyone is Talking About and the Issues that Make Them Controversial," ABI Young and New Members Committee Newsletter, Volume 9: Number 3, June 2011.

- Contributing Author to the First Edition, Managing Hedge Fund Risk: From the Seat of the Practitioner: Views From Investors, Counterparties, Hedge Funds and Consultants, ed. Virginia Reynolds Parker, 2000.

- Co-Author with S. Peter Valiunas of Money Jobs: Training Programs Run by Banking, Accounting, Insurance, and Brokerage Firms–And How to Get into Them, 1984.\

## PRESENTATIONS

- Invited to speak at numerous hedge fund and distressed debt industry conferences, including GAIM, 100 Women in Hedge Funds, Infovest, AIRA and VALCON, sponsored by the American Bankruptcy Institute.

- Brown Rudnick Advanced Valuation Seminar for CLE Credit (2014).  Taught seminar as part of 2013/2014 Finance and Restructuring Training: Challenges to Valuation.

- 2018 Valcon Conference sponsored by the American Bankruptcy Institute–Panelist on the topic of rights offerings.

- AIRA Panel sponsored by the Association of Insolvency and Restructuring Advisors–Panelist on the topic of net-short activism and manufactured defaults.

- 2020 Valcon Conference–Moderator and panelist on the topic of Diminution in Value Claims.

- 2020 TMA Talks by Leading Restructuring and Turnaround Professionals Webinar–Panelist on the Post Covid-19 Economy.

- 2020 IMS Insights Podcast–Marti Murray on Best Practices of a Securities and Financial Services Expert Witness.

- 2020 IMS Insights Podcast–Marti Murray on Threats and Opportunities to Private Equity from COVID-19.

**EDUCATION**

MBA in Finance, New York University Stern School of Business, 1986

B.A. in World Affairs, Chinese, Colgate University, 1981

## APPENDIX C: DOCUMENTS CONSIDERED

*In considering the documents listed below, a review was performed of those portions of documents that were relevant to Brattle's analysis and evaluation of the issues addressed in this report*

## Court Documents

- Title III Petition Filed by the Financial Oversight and Management Board for Puerto Rico on behalf of the Puerto Rico Highways and Transportation Authority (HTA) against All Parties, May 21, 2017

-  Order Appointing Mediation Team, June 23, 2017 (DN 430)

- Amended Order and Judgment Confirming the Third Amended Title III Plan Of Adjustment of Puerto Rico Sales Tax Financing Corporation, January 9, 2019 (DN 5055)

- Order Regarding Stay Period and Mandatory Mediation, July 24, 2019 (DN 8244)

- Amended Report and Recommendation of the Mediation Team, February 10, 2020 (DN 10756)

- Disclosure Statement For The Seventh Amended Title III Joint Plan Of Adjustment Of The Commonwealth Of Puerto Rico, et al., July 30, 2021 (DN 17628)

- Seventh Amended Title III Joint Plan Of Adjustment Of The Commonwealth Of Puerto Rico, et al., July 30, 2021 (DN 17628-1)

- Amended And Restated Plan Support Agreement, July 12, 2021 (DN 17628-2)

- HTA/CCDA Related Plan Support Agreement, May 5, 2021 (DN 17628-3)

- PRIFA Related Plan Support Agreement, July 27, 2012 (DN 17628-4)

- Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment (DN 17628-5)

- Retiree Committee Plan Support Agreement, June 7, 2019 (DN 17628-6)

- AFSCME Plan Support Agreement, June 7, 2019 (DN 17628-7)

- Certified Commonwealth Fiscal Plan, April 23, 2021 (DN 17628-8)

- Certified Commonwealth Budget, June 30, 2021 (DN 17628-9)

- PROMESA Section 211 Report on the Puerto Rico Retirement Systems, September 2019 (DN 17629-10)

- Summary Chart of the Debtors' Outstanding Bonds (DN 17628-11)

- List of Entities that Comprise the Commonwealth Central Government (DN 17628-12)

- Latest Audited Financial Statements for the Debtors (DN 17628-14)

- Actions to be Transferred to the Avoidance Actions Trust (DN 17628-15)

- Best Interest Test Reports (DN 17628-16)

- Certified COFINA Fiscal Plan, Certified COFINA Budget, And Latest Audited Financial Statements for COFINA (DN 17628-17)

- Illustrative Charts of Bond Recovery Distributions (DN 17628-18)

- Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice And Confirmation Schedule, (IV) Approving Solicitation Packages And Distribution Procedures, (V) Approving Forms of Ballots, and Voting and Election Procedures, (VI) Approving Notice Of Non-Voting Status, (VII) Fixing Voting, Election, and Confirmation Deadlines, and (VIII) Approving Vote Tabulation Procedures, August 2, 2021 (DN 17639)

- Brief Summarizing Primary Proof That May Be Offered in Support of Confirmation of Plan of Adjustment, August 3, 2021 (DN 17680)

- Omnibus Hearing, August 4, 2021

## *Party Documents*

- Commonwealth 2021 Fiscal Plan Model, May 11, 2021 (2.8.11.1_20210511_Commonwealth 2021 Fiscal Plan Model vCERTIFIED (dataroom)) (FOMB_CONF_88824)

- FOMB, Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, et al., Letter Agreement on Fifth Amended Title III Plan of Adjustment, July 12, 2021 (FOMB_CONF_53030)

- FOMB, Commonwealth Cash Position Presentation, August 23, 2021

- FOMB, Commonwealth of Puerto Rico Title III Case: Plan Support Agreement Presentation, February 9, 2020

- FOMB, Puerto Rico's Proposed Plan of Adjustment Benefits Presentation, August 23, 2021

*Publicly Available Documents*

- "3 Lessons from Puerto Rico: Mitigating the Health Effects of Future Hurricanes", Harvard Business Review, May 30, 2018, available at: https://hbr.org/2018/05/3-lessons-from-puerto-rico-mitigating-the-health-effects-of-future-hurricanes.

- Bidgood, Jess, "Plan to End Bankruptcy in Rhode Island Gains Approval," New York Times, September 7, 2012

- Businesswire, "Puerto Rico's Senior Creditors Agree to New Bankruptcy Exit Plan That Significantly Enhances Commonwealth's Financial Flexibility," February 23, 2021, available at https://www.businesswire.com/news/home/20210223005667/en/Puerto-Rico%E2%80%99s-Senior-Creditors-Agree-to-New-Bankruptcy-Exit-Plan-That-Significantly-Enhances-Commonwealth%E2%80%99s-Financial-Flexibility

- "By the Numbers: A Look at Municipal Bankruptcies Over the Past 20 Years," The Pew Charitable Trusts, July 6, 2020 https://www.pewtrusts.org/en/research-and-analysis/articles/2020/07/07/by-the-numbers-a-look-at-municipal-bankruptcies-over-the-past-20-years

- "Capital Appreciation Bonds", FiscalNotes, March 2016, https://comptroller.texas.gov/economy/fiscal-notes/2016/march/cab.php

- "Current Interest Bonds," Law Insider, https://www.lawinsider.com/dictionary/current-interest-bonds

- Fitch Ratings

- FOMB, Letter to Governor Pierluisi Urrutia, President Dalmau Santiago and Speaker Hernandez Montanez, July 1, 2021

- FOMB Media Release, "Oversight Board Reaches New, More Favorable Agreement to Restructure $35 Billion of Liabilities," February 9, 2020

- FOMB website, "Debt Restructurings in Progress," available at https://oversightboard.pr.gov/debt/

- In re City of Central Falls, Rhode Island, Case No. 11-13105, Fourth Amended Plan for the Adjustment of Debts of the City of Central Falls, Rhode Island, July 27, 2012

- In re City of Central Falls, Rhode Island, Case No. 11-13105, Exhibit E to the Fourth Amended Plan for the Adjustment of Debts of the City of Central Falls, Rhode Island, Comparison Table of Restructured Pension Benefits, July 27, 2012

- In re City of Detroit, Michigan, Case No. 13-53846, Fourth Amended Disclosure Statement With Respect to Fourth Amended Plan for the Adjustment of Debts of the City Of Detroit, May 5, 2014

- IMF DataMapper

- Letter from Jacob L. Lew, Secretary of the Treasury, to Paul Ryan, Speaker, U.S. House of Representatives January 15, 2016, https://www.treasury.gov/connect/blog/Pages/Secretary-Lew-Sends-Letter-to-Congress-on-Puerto-Rico.aspx.

- Moody's Investor Service, "Medians –Pensions and OPEB Liabilities Fell in Fiscal 2019 ahead of Jump in 2020," September 8, 2020

- Moody's Investor Service, "Medians – State Debt Declined in 2019, but Likely to Grow in Coming Years," May 12, 2020

- Moody's Investor Service, "Medians – State Debt Rose 2.5% in 2020, Spurred by Pandemic-Linked Borrowing," June 14, 2021

- Moody's Investor Service, "Public Pension Dashboards – 2021," August 23, 2021

- Official Statement of Governor Pedro R. Pierluisi on the Decision of Judge Laura Taylor Swain (July 14, 2021), available at https://www.aafaf.pr.gov/wp-content/uploads/Official-State-Gov-Pierluisi-Decision-Judge-Taylor-Swain.pdf

- Puerto Rico Debt Responsibility Act [Act 101-2020], "Ley de Responsabilidad en la Emisión de Deuda" [Ley 101-2020], September 24, 2020

- Puerto Rico Oversight, Management, and Economic Stability Act, "PROMESA," S.2328. Public Law. House Natural Resources (HNR). June 30, 2016. 114-187.

- Robert Slavin, "Puerto Rico Oversight Board says local legislation not needed for debt adjustment," The Bond Buyer, June 30, 2021

- Russ, Hilary. 'Bankruptcy Saves Tiny Rhode Island City, But Leaves Scars,' Reuters, Sep. 3, 2012.  Accessed via https://www.reuters.com/article/us-usa-rhodeisland-centralfalls-bankrupt/bankruptcy-saves-tiny-rhode-island-city-but-leaves-scars-idUSBRE88300220120904

- S&P Global Ratings Direct, "U.S. State Ratings and Outlooks: Current List," September 2, 2021

- "The Challenge of Meeting Detroit's Pension Promises," The Pew Charitable Trusts, March 2018, PDF p. 5 of 60.  Accessed via: https://www.pewtrusts.org/-/media/assets/2018/03/challenge_of_meeting_detroits_pension_promises_report_v6.pdf

- U.S. Department of the Treasury, "Statement by a Treasury Spokesperson on the Agreement Reached by Secretary Mnuchin on the Community Disaster Loans for Puerto Rico," March 2018, available at https://home.treasury.gov/news/press-releases/sm0331

- U.S. Securities and Exchange Commission, "Investment-grade Bond (or High-grade Bond)," https://www.investor.gov/introduction-investing/investing-basics/glossary/investment-grade-bond-or-high-grade-bond

99