# Debtors' Ex. 133

# Exhibit 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>     Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |

## JOINT STIPULATION AND ORDER

**TO THE HONORABLE COURT**

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and the

Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole

Title III representative, pursuant to section 315(b) of the *Puerto Rico Oversight, Management,*

*and Economic Stability Act* ("PROMESA"),[2] of the Commonwealth of Puerto Rico (the

"Commonwealth"), the Puerto Rico Public Buildings Authority ("PBA"), and the Employees

Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS," and

together with the Commonwealth and PBA, the "Debtors," and together with AAFAF, the

"Parties"), by and through their attorneys, hereby submit this joint stipulation and proposed

order:

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

WHEREAS, the Oversight Board, as the Commonwealth's representative pursuant to PROMESA, filed a petition on behalf of the Commonwealth for protection under Title III on May 3, 2017 (the "Commonwealth Title III Case").

WHEREAS, the Oversight Board, as ERS's representative pursuant to PROMESA, filed a petition on behalf of ERS for protection under Title III on May 21, 2017 (the "ERS Title III Case").

WHEREAS, the Oversight Board, as PBA's representative pursuant to PROMESA, filed a petition on behalf of PBA for protection under Title III on September 27, 2019 (the "PBA Title III Case").

WHEREAS, on July 30, 2021, the Oversight Board, on behalf of the Debtors, filed the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17627] ("Plan of Adjustment") and a corresponding *Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 17628] ("Disclosure Statement").[3]

WHEREAS, the Plan of Adjustment divides active and retired employee retirement benefit claims into 12 classes: Class 51A through 51L.  Plan of Adjustment, Art. LV.  Under the Plan of Adjustment, among other things, certain pension benefits in ERS, the Judiciary Retirement System ("JRS"), and the Teachers Retirement System ("TRS") are subject to reduction (the "Monthly Benefit Modification").  For any individual whose Total Monthly Benefit (exclusive of the Medical Insurance Benefit) exceeds $1,500 per month, the Plan of Adjustment provides for up to an 8.5% cut to the Total Monthly Benefit, provided the benefit net of reduction cannot fall below $1,500 per month.

---

[3] Capitalized terms not defined herein have the meaning ascribed in the Plan of Adjustment.

**WHEREAS**, the Governor of the Commonwealth of Puerto Rico and AAFAF have consistently opposed the Monthly Benefit Modification set forth in the Plan of Adjustment.

**WHEREAS**, on August 2, 2021, the Court entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith*, setting forth discovery procedures in connection with confirmation of the Plan of Adjustment [ECF No. 17640], which was amended on October 5, 2021 [ECF No. 18394] ("Procedures Order").

**WHEREAS**, on August 13, 2021, AAFAF, in accordance with the Procedures Order, served its first set of requests for production of documents ("Document Requests") and its first set of interrogatories ("Interrogatories") on the Oversight Board.  The Oversight Board, in accordance with the Procedures Order, served its responses and objections to the Document Requests and Interrogatories on August 20, 2021, and August 23, 2021, respectively.

**WHEREAS**, on August 3, 2021, September 6, 2021, and September 13, 2021, the Oversight Board and AAFAF, in accordance with the Procedures Order, served preliminary fact witness disclosures, expert witness disclosures, and expert reports.  [ECF Nos. 17679, 18041, 18044, 18094, 18096-1, 18097, 18097-1, 18097-2].  On September 13, 2021, AAFAF served on the Oversight Board the *Declaration of Fernando Batlle* (Sept. 13, 2021) [ECF No. 18096-2] ("Batlle Declaration").

**WHEREAS**, on September 13, 2021, September 14, 2021, and October 4, 2021, AAFAF, in accordance with the Procedures Order, served notices of deposition on the Oversight Board and on certain of the Oversight Board's disclosed facts and expert witnesses ("AAFAF Notices").

**WHEREAS**, (i) on September 17, 2021, the Oversight Board, in accordance with the Procedures Order, served notices of deposition on AAFAF's disclosed fact and expert witnesses, and on October 1, 2021, served AAFAF with a notice of deposition for Omar Marrero (collectively, the "Oversight Board Notices"), and (ii) on October 1, 2021, the Oversight Board, in accordance with the Procedures Order, served its first set of requests for production of documents ("Oversight Board Document Requests").

**WHEREAS**, AAFAF has agreed to withdraw the Document Requests, Interrogatories, Batlle Declaration, and AAFAF Notices; the Oversight Board has agreed to withdraw the Oversight Board Notices and Oversight Board Document Requests; and AAFAF has agreed to not call its disclosed witnesses at the hearing on the Plan of Adjustment ("Confirmation Hearing") in exchange for entering into the present stipulation. The Parties agree and stipulate to the admission of the facts below for use solely in connection with the Confirmation Hearing currently scheduled to commence on November 8, 2021.

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED as follows:**

1.      The facts set forth in the Disclosure Statement, as well as in the *Oversight Board Report on Pensions* ("Section 211 Report") [ECF No. 17628-10], with regard to (a) the structure of the Commonwealth's pensions systems (ERS, JRS, and TRS) as they existed as of the publication dates of the Disclosure Statement and Section 211 Report, (b) the structure of the Commonwealth's pensions systems (ERS, JRS, and TRS) as they existed prior to the publication dates of the Disclosure Statement and Section 211 Report, (c) the number of employees, retirees, and beneficiaries, as of June 30, 2016, with interest in those pensions systems, and (d) the history of reductions in pension benefits, were true and correct based on the supporting documentation

available as of the time of publication of each such document, specifically with regard to the

facts set forth in paragraph 2 below.

2.      The facts set forth in the Disclosure Statement, as well as in the Section 211

Report, with regard to the history of reductions in pension benefits are true and correct, as of the

publication dates of both documents.  This includes the following points:

| Proposition | Citation |
|---|---|
| "ERS, the primary multi–employer retirement system in Puerto Rico, was established by Act 447 of 1951 ("Act 447") as a Component Unit of the Government of Puerto Rico." | Section 211 Report at iv |
| "ERS is a multi–employer system, historically managed by an independent board of trustees with pooled contributions from employers and employees. The system manages pensions for 242,000 active members, retirees, and survivors from 197 employers." | Section 211 Report at iv |
| "TRS, established by Act 218 of 1951 (structure and benefits, repealed and replaced by Act 91 of 2004), and JRS, established by Act 12 of 1954, were also established as Component Units of the Government of Puerto Rico and have undergone multiple legislative reforms over time." | Section 211 Report at iv |
| "For all Retirement Systems, pension benefit formulas vary based on when an employee was hired. In 1999, for instance, the ERS defined benefit program was closed to new hires and replaced with a hybrid cash account program. As a result, starting in 2000, benefits were based on employee contributions although the withheld proceeds were deposited in the existing ERS pension trust account. A similar arrangement was implemented for TRS and JRS in 2014, although a subsequent court ruling limited the change to new hires only.  Additionally, changes were made to benefit levels in the Retirement Systems over time which increased benefit costs such as: Early retirement incentive programs[,] Cost of Living Adjustments (COLAs)[,] [and] Various bonuses, such as a Medical Insurance Contribution as well as Christmas and Summer bonuses." | Section 211 Report at vii |
| "In recent years, Act 3–2013 and Act 106–2017 resulted in some of the largest benefit reductions to date. While these acts impacted participants to varying degrees, some participants saw reductions in benefits as high as 82%." | Section 211 Report at vii |
| "These Acts imposed several notable changes: further increasing the retirement age, eliminating or reducing special law benefits, eliminating merit pensions, further increasing employee contribution requirements, and annuitizing benefit payments." | Section 211 Report at vii |
| "Since 2007, ERS and TRS retirees, with limited exceptions, have also not received Cost of Living Adjustments ('COLAs'), the absence of which can effectively be viewed as an additional benefit reduction.  Without COLAs, certain pensioners could experience a 39% loss in purchasing power 30 years after retirement." | Section 211 Report at vii |
| "While certain bonuses were eliminated prospectively for JRS members hired after | Section 211 Report at vii |

| | |
|---|---|
| December 24, 2013 and ERS and TRS members retired after July 1, 2013 and August 1, 2013, respectively, these amounts continue to be paid to members that retired before these changes went into effect." | |
| "With the establishment of PayGo under Act 106–2017, new defined contribution ("DC") accounts were to be established for all active workers not currently accruing a pension under a defined benefit formula. The Retirement Board (as defined in Act 106–2017) is empowered to manage the implementation of the DC benefit plan, including hiring service providers and financial institutions to operate the plan." | Section 211 Report at viii |
| "Since the enactment of Act 106–2017, employee contributions to the DC plan have been deposited into a separate account in the custody of the Treasury with the objective of funding individual DC accounts in the future. In January 2019, accumulated contributions to date, together with ongoing contributions, were deposited into a Temporary Trust. The final implementation of the DC benefit plans will result in these funds being transferred from the Temporary Trusts into a DC trust with individual accounts and managed by a third–party administrator." | Section 211 Report at viii |
| Section 1.1 of the Section 211 Report, including Exhibit 1 | Section 211 Report at 1-2 |
| Section 1.3 of the Section 211 Report | Section 211 Report at 5 |
| Section 2.1 of the Section 211 Report | Section 211 Report at 7 |
| Section 2.2 of the Section 211 Report | Section 211 Report at 7-8 |
| "The Government also adopted various early retirement programs to reduce the size of the government workforce." | Section 211 Report at 8 |
| "In 2019, three separate VTPs were offered which covered a total of 5,455 employees receiving $14.3 million in payments. Since 1994, more than 20 early retirement programs have been implemented." | Section 211 Report at 8 |
| Section 2.5 of the Section 211 Report, *except* for the paragraph "The use of notional accounts for which notional interest is tracked is not an uncommon benefit structure. However, the fact that these accounts were notional and not actually being tracked was not well understood by plan participants. The continued depletion of plan assets, as detailed in Section 3, resulted in the Retirement Systems using contributions made by employees participating under the notional account structure to pay benefits due immediately, rather than being invested to fund benefits payable to these employees in the future."[4] | Section 211 Report at 9-11 |
| Section 2.6 of the Section 211 Report, including Exhibit 5 | Section 211 Report at 11-13 |
| Section 2.7 of the Section 211 Report | Section 211 Report at 13 |
| Section 2.8 of the Section 211 Report, including Exhibit 6 | Section 211 Report at 13-14 |

---

[4] The Oversight Board asserts the contents of this paragraph are true and correct. Excepting this paragraph from the stipulation does not in any way constitute a waiver of any of the Oversight Board's rights outside of this stipulation, including but not limited to the right to assert that the statements made in this paragraph are true and correct.

| Appendix B of the Section 211 Report | Section 211 Report at 32-35 |
|---|---|
| Appendix F of the Section 211 Report | Section 211 Report at 44-45 |
| Appendix G of the Section 211 Report, *except* for the phrase "Contribution level not proportional to benefits paid by System and did not adjust to economic or actuarial changes that affected the level of benefits." [5] | Section 211 Report at 46 |
| Section III.A.2 of the Disclosure Statement | Disclosure Statement at 81-85 |

       3.      The following statements regarding the funded status of Puerto Rico's pension systems are true and correct:

       a.      As of June 30, 2016, the estimated actuarial liability for the three retirement systems was approximately $55 billion (as detailed in Section 1 of the Section 211 Report).

       b.      The funding standards set by the Public Pension Coordinating Council require that one or more of the following criteria is met: a Funded Ratio[6] of 100 percent; contribution rates equal to or greater than 100 percent of the actuarially determined contribution (ADC) (and referred to in other contexts as the Actuarially Required Contribution (ARC)); or there exists a plan approved by the governing body to achieve one or both of these criteria within 5 years (as detailed in Section 3.1 of the Section 211 Report).

       c.      As of June 30, 2016, the Funded Ratio for ERS was negative and for TRS was close to 0%, meaning the ERS and TRS systems, respectively, were

---

[5] The Oversight Board asserts the contents of this phrase are true and correct. Excepting this phrase from the stipulation does not in any way constitute a waiver of any of the Oversight Board's rights outside of this stipulation, including but not limited to the right to assert that the statements made in this phrase are true and correct.
[6] A funded ratio ("Funded Ratio") represents the ratio of plan assets to plan liabilities. For example, a plan with a 100% Funded Ratio has assets equal to its liabilities.

entirely and almost entirely unfunded (as detailed in Exhibit 10 of the
Section 211 Report).

4.      The following statements regarding the PayGo pension expenditures of Puerto
Rico's pension systems correctly reflect the numbers, data, assumptions, and analysis reflected in
the 2021 Fiscal Plan for the Commonwealth that the Oversight Board certified ("2021 Fiscal
Plan")[7]:

      a.      The 2021 Fiscal Plan projects that total benefit payments for the
Retirement Systems under the PayGo regime are expected to remain
steady, above $2.4 billion annually in total and above $2.1 billion annually
for those employers covered by the Fiscal Plan, through FY 2033 (after
application of all pension measures included in the 2021 Fiscal Plan,
excluding payments for System 2000 participants assumed to be settled
and administrative expenses).

      b.      As detailed in Section 4 of the Section 211 Report, PayGo pension
expenditures are expected—assuming no material changes from what is
currently in the 2021 Fiscal Plan—to constitute more than 20 percent of
General Fund expenditures in fiscal year 2023.  A detailed projection, as
contained in the 2021 Fiscal Plan, is as follows (in $ millions):

---

[7] Throughout this stipulation, AAFAF's agreement as to what is reflected in the 2021 Fiscal Plan is not a waiver of
any of AAFAF's rights outside of this stipulation.  The Government has submitted its own fiscal plans that differ
from those certified by the Oversight Board and that contain numbers, assumptions, and analyses that differ from
those in the 2021 Fiscal Plan.

| Year | PayGo[8] | General Fund Expenditures[9] | Percent of General Fund |
|------|---------:|------------------------------:|------------------------:|
| FY2023 | $2,144 | $10,385 | 21% |
| FY2024 | 2,135 | 10,307 | 21% |
| FY2025 | 2,121 | 10,319 | 21% |
| FY2026 | 2,104 | 10,424 | 20% |
| FY2027 | 2,085 | 10,564 | 20% |
| FY2028 | 2,065 | 10,732 | 19% |
| FY2029 | 2,042 | 10,790 | 19% |
| FY2030 | 2,016 | 10,946 | 18% |
| FY2031 | 1,986 | 11,164 | 18% |
| FY2032 | 1,952 | 11,322 | 17% |
| FY2033 | 1,917 | 11,517 | 17% |
| FY2034 | 1,878 | 11,715 | 16% |
| FY2035 | 1,835 | 11,902 | 15% |
| FY2036 | 1,791 | 12,090 | 15% |
| FY2037 | 1,742 | 12,296 | 14% |
| FY2038 | 1,689 | 12,501 | 14% |
| FY2039 | 1,633 | 12,719 | 13% |
| FY2040 | 1,573 | 12,948 | 12% |
| FY2041 | 1,510 | 13,419 | 11% |
| FY2042 | 1,445 | 13,639 | 11% |
| FY2043 | 1,376 | 13,877 | 10% |
| FY2044 | 1,306 | 14,126 | 9% |
| FY2045 | 1,234 | 14,383 | 9% |
| FY2046 | 1,162 | 14,620 | 8% |
| FY2047 | 1,090 | 14,893 | 7% |
| FY2048 | 1,019 | 15,186 | 7% |
| FY2049 | 949 | 15,486 | 6% |
| FY2050 | 880 | 15,764 | 6% |
| FY2051 | 813 | 16,085 | 5% |

---

[8] Represents costs for those employers covered by the 2021 Fiscal Plan, after application of pension cut and freeze described in exhibits E and F-1 in the Plan of Adjustment, excluding payments for System 2000 participants assumed to be settled and administrative expenses. The costs from non-fiscal plan entities are not included in these figures and represent additional PayGo costs that are paid and subsequently invoiced for full reimbursement by non-fiscal plan employers. AAFAF publishes a monthly report that discloses PayGo fees invoiced and collected from those employers. *See* https://aafaf.pr.gov/financial-documents/paygo-report-report-6/.

[9] Represents the 2021 Fiscal Plan amount of General Fund Expenditures after General Fund fiscal measures and excluding the impact of the tentative Union Agreement. This amount differs from the certified budget expenditures each year because the certified budget includes certain intergovernmental and other adjustments.

    c.    The 2021 Fiscal Plan projects that in Fiscal Year 2036, when Commonwealth deficits before debt service are projected to reemerge, the Government will have annual PayGo costs of approximately $2 billion for those employers covered by the Fiscal Plan (after application of pension measures, excluding payments for System 2000 participants assumed to be settled and administrative expenses).

5.    The "Sample Participant Benefit Reductions due to Act 3 and Act 106" in Exhibit 5 of the Section 211 Report is an illustrative estimate of "the impacts of [Act 3-2013 and Act 106-2017] on [a sample] participant in [each of] these three cohorts of pension participants" using the assumptions and plan provisions included in Appendix F of the Section 211 Report. The actual impacts will vary for participants in other demographics. Other than the samples below, at the Confirmation Hearing, neither the Oversight Board nor AAFAF intends to present other samples regarding benefit reductions due to Act 3-2013 and Act 106-2017 for Act 447 and Act 1 participants.[10]

    a.    For a sample participant in the cohort of an Act 447 participant, "[t]he age 61 annual pension benefit for this sample participant of $26,830 was effectively reduced by 42% as a result of the Act 3 freezes. Act 106 eliminated the notional interest benefit from the hybrid accounts, reducing the annual benefit to $14,829, for a cumulative reduction of 44%." *Id*. at 12.

---

[10] Should either the Oversight Board or AAFAF decide to present other samples regarding benefit reductions due to Act 3-2013 and Act 106-2017 for Act 447 and Act 1 participants, it must provide reasonable advance notice to the other party of its decision, and provide an opportunity for the other party to present additional evidence on this issue.

      b.     For a sample participant in the cohort of an Act 1 participant, "[t]he age 65 annual pension benefit for this sample participant of $18,898 was effectively reduced by 31% as a result of the Act 3 freezes.  Act 106 eliminated the notional interest benefit from the hybrid accounts, reducing the annual benefit to $8,868, for a cumulative reduction of 53%."  *Id.*

6.     Based on data provided by the retirement systems of Puerto Rico to the Oversight Board as of April 1, 2021 for the purpose of voting distribution and tabulation, the creditors in the Plan of Adjustment subclasses for active and retired employee benefit claims entitled to vote are as follows:

      a.     Class 51B (Retired JRS Participant Below-Threshold Claims) consists of: 125 class members.

      b.     Class 51D (Retired ERS Participant Above-Threshold Claims) consists of: 28,296 class members.  Of this amount, 5,915 class members are from non-fiscal plan employers.[11]

      c.     Class 51E (Retired JRS Participant Above-Threshold Claims) consists of: 473 class members.

      d.     Class 51F (Retired TRS Participant Above-Threshold Claims) consists of: 23,443 class members.

      e.     Class 51G (Active ERS Participant Claims) consists of:

---

[11] The class members from non-fiscal plan employers represents the total number of class members whose employer prior to retirement was HTA, PRASA, one of Puerto Rico's 78 municipalities, Ponce Muelle, AAELA, CRIM, PRIDCO, or COSSEC.  This figure represents the number of class members subject to a reduction in benefits.

        (1)      13,690 Act 447 class members.  Of this amount, 2,645 class members are from non-fiscal plan employers.[12]

        (2)      34,205 Act 1 class members.  Of this amount, 7,799 class members are from non-fiscal plan employers.[13]

f.      Class 51H (Active JRS Participant Claims) consists of:

        (1)      194 Active Participants hired prior to December 24, 2013 and benefiting under provisions in effect prior to the enactment of Law 162-2013,

        (2)      12 Active Participants hired between December 23, 2013 and July 1, 2014 benefiting under provisions in effect prior to the enactment of Law 162-2013 subject to notable distinctions (including elimination of bonus payments and reduced maximum benefits), and

        (3)      163 Active Participants hired after July 1, 2014 benefiting under Law 162-2013 provisions including the modified defined benefit formula (1.5% of average Compensation per year of Creditable Service) plus the annuitization of the Hybrid Program Contribution Account.

g.      Class 51I (Active TRS Participant Claims) consists of: 36,049 class members.

---

[12] The class members from non-fiscal plan employers represents the total number of class members whose employer prior to retirement was HTA, PRASA, one of Puerto Rico's 78 municipalities, Ponce Muelle, AAELA, CRIM, PRIDCO, or COSSEC.  This figure represents the number of class members subject to a reduction in benefits.

[13] The class members from non-fiscal plan employers represents the total number of class members whose employer prior to retirement was HTA, PRASA, one of Puerto Rico's 78 municipalities, Ponce Muelle, AAELA, CRIM, PRIDCO, or COSSEC.  This figure represents the number of class members subject to a reduction in benefits.

h.    Class 51L (VTP Payroll Participant Above-Threshold Claims) consists of: 2,468 class members.

7.    For the following sample participants, the Monthly Benefit Modification would be:

a.    A retiree with a $1,500 monthly benefit or smaller would experience a 0.00% reduction in her/his pension benefit.

b.    A retiree with monthly benefits between $1,500 and $1,640 would experience a reduction in their pension benefit smaller than 8.5%.  For instance, a retiree with a monthly benefit of $1,575 would experience a 4.76% reduction in her/his pension benefit.

c.    A retiree with a $1,640 monthly benefit or larger would experience an 8.5% reduction in her/his pension benefit.

d.    Section 1.118 of the Plan of Adjustment provides a mechanism to restore benefits that had been subject to any reduction if the Commonwealth outperforms 2021 Fiscal Plan projections.

8.    The Parties agree the following additional facts are true and correct[14]:

a.    Historically, the amount of Federal Medicaid funding the Commonwealth received has been governed by the following parameters:

(1)    The Medicaid program in the Commonwealth operates with an annual ceiling on federal financial reimbursement participation, referred to as the Section 1108 cap or

---

[14] Throughout this stipulation, AAFAF's agreement as to what is reflected in the 2021 Fiscal Plan is not a waiver of any of AAFAF's rights outside of this stipulation.  The Government has submitted its own fiscal plans that differ from those certified by the Oversight Board and that contain numbers, assumptions, and analyses that differ from those in the 2021 Fiscal Plan.

Section 1108 allotment (§ 1108(g) of the Social Security

Act).  The federal government reimburses expenses in an

amount matching local funding up to the specified annual

Section 1108 allotment.  The level of federal government

funding under the Section 1108 allotment was $366.7

million for the Commonwealth in FY2019, and although

the cap grows each year according to the Medical CPI-U,

it does not keep pace with healthcare expenditure growth.

(2)     Section 1108 also establishes the rate at which the

Commonwealth is reimbursed, known as the Federal

Medical Assistance Percentage ("FMAP").  This

reimbursement rate is set at 55% of authorized

expenditures for the majority of Medicaid participants.

The federal reimbursement rate for a smaller portion of

the Commonwealth Medicaid population that gained

access to Federal Medicaid under the expansion of the

Patient Protection and Affordable Care Act is 90%.

(3)     For each year since 2011, the Commonwealth has

received temporary relief from rising healthcare costs

through increased levels of federal reimbursement made

available through the passage of time-limited

appropriations, such as the Patient Protection and

Affordable Care Act and the Bipartisan Budget Act of

2018.  These legislative actions have generally addressed *both* the allotment cap and the FMAP described above for specific time periods.

(4)    In December 2019, when Congress enacted the Further Consolidated Appropriations Act of 2020, the legislation authorized an increase in the allowed amount of federal Medicaid reimbursement (i.e., allotment cap) to approximately $2.6 billion and $2.7 billion, respectively, for the federal fiscal years 2020 and 2021 (ending respectively September 30, 2020 and September 30, 2021).

(5)    For the two federal fiscal year period ending September 30, 2021, there was a temporary increase in the FMAP rate to 82.2% for the majority of Medicaid participants because of provisions enacted under the Consolidated Appropriations Act of 2020 and the Families First Coronavirus Response Act.

(6)    Combining the FMAP limitations and additional temporary funding, according to the Medicaid and CHIP Payment and Access Commission, the total federal Medicaid funds by federal fiscal year Puerto Rico historically received has been:

| Federal Year | Section 1108 Allotment[1] | Federal Spending | Puerto Rico Spending | Total Spending[3] |
|---|---|---|---|---|
| FY2011 | $290.6 | $514.7 | $476.3 | $991.0 |
| FY2012 | 298.7 | 887.6 | 726.2 | 1,614.0 |
| FY2013 | 309.2 | 1,091.0 | 853.0 | 1,944.0 |
| FY2014 | 321.3 | 1,201.0 | 728.0 | 1,929.0 |
| FY2015 | 329.0 | 1,521.5 | 840.5 | 2,362.0 |
| FY2016 | 335.3 | 1,630.5 | 832.0 | 2,463.0 |
| FY2017 | 347.4 | 1,631.5 | 804.8 | 2,436.3 |
| FY2018 | 359.5 | 2,290.5 | 203.0 | 2,493.5 |
| FY2019 | 366.7 | 2,645.6 | -36.3[2] | 2,609.2 |
| FY2020 | 2,716.2 | 2,516.9 | 327.9 | 2,844.7 |

[1] All amounts listed in this table are in millions of dollars.

[2] Puerto Rico reports negative territory Medicaid spending due to federal Medicaid spending exceeding total Medicaid spending.  Federal spending exceeds total spending due to negative prior period adjustments and the 100 percent FMAP that went into place in FY 2018.  Because these prior period adjustments apply to periods before the 100 percent FMAP, these negative adjustments decrease total spending to a greater extent than federal spending.

[3] Source: Medicaid and CHIP Payment and Access Commission (MACPAC), February 2021.  Excludes CHIP and Commonwealth population.  These numbers may not directly tie to the 2021 Fiscal Plan or annually certified Budget because they are not inclusive of the full set of premium / non-premium expenditures that flow through ASES and the Puerto Rico Department of Health.

(7)     The Centers for Medicare & Medicaid Services ("CMS"),

a part of the Department of Health and Human Services

("HHS"), recently announced its interpretation of the

Social Security Act to set the cap of federal Medicaid

funds at a level higher than assumed in the 2021 Fiscal

Plan.  The validity of the new CMS interpretation is

uncertain and subject to legal and political challenge.  In

the Continuing Resolution legislation passed by Congress

on September 30, 2021, the Government Accountability

Office ("GAO") has been asked to analyze "the most

plausible plain reading of how such fiscal year 2022
allotment level should be calculated." It is unclear at this
point whether the GAO will agree with the CMS reading
of the statute, and, in the event it does not agree, what the
authoritative interpretation of the law will be.

b.  The 2021 Fiscal Plan includes 30-year financial forecasts that project the
overall annual revenues and expenditures based on numerous inputs and
assumptions including, but not limited to, local and national economic
conditions, demographic trends, implementation of structural reforms and
fiscal measures, and trends in federal funding.[15]  As assumptions and
inputs change over time, the financial forecasts will also change. The
following changes in assumptions—without changing any other
variables—would have the following illustrative impacts on the financial
forecasts, although there are numerous other potential changes in
assumptions that are not examined here:

(1)  The Congressional Budget Office ("CBO") periodically
releases updated projections of US growth which are used
as an input to the fiscal plan financial forecast.  After the
April 2021 certification of the 2021 Fiscal Plan, in July
2021 CBO released an updated US economic forecast
including updated estimates of US real GDP growth and
inflation.  If those changes were incorporated into a fiscal

---

[15] For the avoidance of doubt, this statement applies only to the scope of revenues and expenditures included in the
2021 Fiscal Plan.

plan forecast without changing any other variables, the result would be an increase in the projected surplus of the Commonwealth by an average of $156 million per year. The total change in cumulative surplus from this scenario would be $4.7 billion between FY2022 and FY2051.

(2)    The 2021 Fiscal Plan financial forecast includes assumptions that the Government will implement certain structural reforms that will improve the productivity of the economy of Puerto Rico, thereby increasing growth and associated revenues.  If, instead, those structural reforms were assumed not to be implemented, this change in assumption without changing any other variables would reduce the Commonwealth surplus by $30.7 billion, or an average of $1.0 billion per year lower total surplus between FY2022 and FY2051.  The impact from this scenario in isolation would start at $9 million in FY2023, increase to $934 million by FY2036, and end at $2.4 billion in FY2051.  Further, the 2021 Fiscal Plan financial forecast includes assumptions related to federal disaster relief funding related to the hurricanes and earthquakes that have struck in recent years.  Specifically, the 2021 Fiscal Plan forecast assumes that the Government and its instrumentalities will have the

capacity to execute on large-scale reconstruction projects, and that the federal government will fund those projects at the levels assumed in the 2021 Fiscal Plan. If, instead, the amount assumed to be spent by the Commonwealth Government on reconstruction and recovery were to be spent at 50% of the currently assumed level between FY2022 and FY2051, this change in assumption without changing any other variables would result in $9.1 billion lower surplus between FY2022 and FY2051, or an average decrease in surplus of $304 million per year. The impact from this scenario in isolation would be $163 million in FY2022, increase to a peak of $599 million in FY2028, and decline to $93 million in FY2051.

c. According to the 2021 Fiscal Plan, the incremental expense to the Commonwealth, for those employers included in the 2021 Fiscal Plan, that would result from eliminating the Monthly Benefit Modification in the ERS, TRS, and JRS retirement systems, is forecast to be[16]:

---

[16] All amounts listed in millions of dollars. Cut amount represents the impact for those employers covered by the Fiscal Plan, excluding payments for System 2000 participants assumed to be settled and administrative expenses. Also excludes impact of the tentative union agreement described in Exhibit F-2 of the Plan of Adjustment, which was not accepted by AFT/AMPR. If the Plan of Adjustment is amended to raise the Monthly Benefit Modification threshold to $2,000 per month, rather than $1,500 per month, the Parties will work together to update these figures.

| Year | Cost of 8.5% Cut[17] | General Fund Expenditures[18] | Percent of General Fund |
|---|---|---|---|
| FY2023 | 90.0 | 10,385 | 0.87% |
| FY2024 | 89.9 | 10,307 | 0.87% |
| FY2025 | 89.4 | 10,319 | 0.87% |
| FY2026 | 88.6 | 10,424 | 0.85% |
| FY2027 | 87.8 | 10,564 | 0.83% |
| FY2028 | 86.7 | 10,732 | 0.81% |
| FY2029 | 85.5 | 10,790 | 0.79% |
| FY2030 | 84.3 | 10,946 | 0.77% |
| FY2031 | 82.9 | 11,164 | 0.74% |
| FY2032 | 81.3 | 11,322 | 0.72% |
| FY2033 | 79.6 | 11,517 | 0.69% |
| FY2034 | 77.7 | 11,715 | 0.66% |
| FY2035 | 75.6 | 11,902 | 0.64% |
| FY2036 | 73.3 | 12,090 | 0.61% |
| FY2037 | 70.9 | 12,296 | 0.58% |
| FY2038 | 68.3 | 12,501 | 0.55% |
| FY2039 | 65.5 | 12,719 | 0.51% |
| FY2040 | 62.6 | 12,948 | 0.48% |
| FY2041 | 59.5 | 13,419 | 0.44% |
| FY2042 | 56.4 | 13,639 | 0.41% |
| FY2043 | 53.2 | 13,877 | 0.38% |
| FY2044 | 49.9 | 14,126 | 0.35% |
| FY2045 | 46.6 | 14,383 | 0.32% |
| FY2046 | 43.3 | 14,620 | 0.30% |
| FY2047 | 39.9 | 14,893 | 0.27% |
| FY2048 | 36.6 | 15,186 | 0.24% |
| FY2049 | 33.4 | 15,486 | 0.22% |
| FY2050 | 30.3 | 15,764 | 0.19% |
| FY2051 | 27.3 | 16,085 | 0.17% |

d.  For FY2022, the general fund budget shown in the 2021 Fiscal Plan is
$10,279 million.  The certified budget for FY2022, which incorporates
certain intergovernmental and other adjustments, is $10,112 million.

---

[17] The amounts in the table above reflect only the cut effect associated with fiscal plan employers.  The effect of the 8.5% cut on costs associated with non-fiscal plan employers from which the Commonwealth collects PayGo reimbursements is not included.  *See* note 8 *supra*.

[18] Amounts listed in millions of dollars.  Represents the 2021 Fiscal Plan amount of General Fund Expenditures after General Fund fiscal measures and excluding the impact of the tentative Union Agreement.  This amount differs from the certified budget expenditures each year because the certified budget includes certain intergovernmental and other adjustments.

e.    The macroeconomic impact from a reduction in pension benefits resulting

from the Monthly Benefit Modification is estimated in the following way:

(1)    In the first year the modification would be implemented,

the modification amounts to a projected reduction in real

economic growth of approximately 0.16% points of GNP,

followed by an increase in real economic growth of

approximately 0.03% over the next five years.  There is

almost no impact on growth after FY28.

(2)    With the modifications implemented, projected

cumulative growth over FY23 - FY51 would be nearly

unchanged.

(3)    Additionally, the Monthly Benefit Modification

reductions in part are projected to create savings that can

be reinvested, further offsetting the economic impact

from the reductions.

Dated: October 25, 2021
      San Juan, Puerto Rico

Respectfully submitted,

/s/ *Peter Friedman*

John J. Rapisardi
(Admitted *Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, New York 10036
Tel: (212) 326-2000
Fax: (212) 326-2061

-and-

Peter Friedman
(Admitted *Pro Hac Vice*)
1625 Eye Street, NW
Washington, D.C. 20006
Tel: (202) 383-5300
Fax: (202) 383-5414

-and-

Elizabeth L. McKeen
Ashley M. Pavel
610 Newport Center Drive
17th Floor
Newport Beach, California 92660
Tel: (949) 823-6900
Fax: (949) 823-6994

*Attorneys for the Puerto Rico Fiscal Agency
and Financial Advisory Authority*

s/ *Luis C. Marini-Biaggi*

Luis C. Marini-Biaggi
USDC No. 222301
Carolina Velaz-Rivero
USDC No. 300913
**MARINI PIETRANTONI MUÑIZ LLC**
250 Ponce de León Ave.
Suite 900
San Juan, Puerto Rico 00918
Tel: (787) 705-2173
Fax: (787) 936-7494

*Co-attorneys for the Puerto Rico Fiscal
Agency and Financial Advisory Authority*

/s/ Martin J. Bienenstock
Martin J. Bienenstock
Brian S. Rosen
Margaret A. Dale
Michael T. Mervis
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial
Oversight and Management Board
as sole representative of the
Commonwealth of Puerto Rico, the
Puerto Rico Public Buildings
Authority, and the Employees
Retirement System of the
Government of the Commonwealth of
Puerto Rico*

/s/ Hermann D. Bauer
Hermann D. Bauer (USDC No. 215205)
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-attorneys for the Financial
Oversight and Management Board
as sole representative of the
Commonwealth of Puerto Rico, the
Puerto Rico Public Buildings
Authority, and the Employees
Retirement System of the
Government of the Commonwealth of
Puerto Rico*

**IT IS SO ORDERED:**

Dated:  October ___, 2021
          San Juan, Puerto Rico

                             _____
                             THE HONORABLE LAURA TAYLOR SWAIN
                             UNITED STATES DISTRICT JUDGE