NEW ISSUE - BOOK-ENTRY ONLY

# $1,673,595,000

## Puerto Rico Highways and Transportation Authority



$717,365,000 Highway Revenue Refunding Bonds (Series AA)
$563,650,000 Transportation Revenue Bonds (Series G)
$72,035,000 Transportation Revenue Refunding Bonds (Series H)
$320,545,000 Subordinated Transportation Revenue Bonds (Series 2003)

The Highway Revenue Refunding Bonds (Series AA) are being issued pursuant to Resolution No. 68-18 adopted by Puerto Rico Highways and Transportation Authority (the "Authority") on June 13, 1968, as amended (the "1968 Resolution"). The Transportation Revenue Bonds and the Transportation Revenue Refunding Bonds (Series G and Series H, respectively), and the Subordinated Transportation Revenue Bonds (Series 2003) are being issued pursuant to Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution").

The Series AA Bonds, the outstanding bonds of the Authority previously issued under the 1968 Resolution and any additional bonds that the Authority may from time to time issue under the 1968 Resolution (the "Highway Revenue Bonds") are payable from, and are secured by a pledge of certain revenues of the Authority, which include: (i) all current gasoline taxes, a portion of the current gas oil and diesel oil taxes and a portion of the current motor vehicle license fees allocated to the Authority by the Commonwealth of Puerto Rico; (ii) all toll revenues of the Authority's traffic facilities financed with Highway Revenue Bonds and any extensions, improvements or betterments thereto, however financed; and (iii) certain investment earnings (collectively, the "1968 Resolution Revenues").

The Series G, Series H and 2003 Subordinated Bonds (together with the Series AA Bonds, the "2003 Bonds"), the outstanding bonds of the Authority previously issued under the 1998 Resolution and any additional bonds that the Authority may from time to time issue under the 1998 Resolution are payable from, and are secured by a pledge of certain revenues of the Authority, which include: (i) the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth on certain petroleum products; (ii) toll revenues on the Authority's traffic facilities that were not financed with Highway Revenue Bonds; (iii) certain investment earnings; and (iv) the 1968 Resolution Revenues available after payment of debt service on the Authority's outstanding Highway Revenue Bonds.

All of the aforesaid revenues of the Authority that constitute taxes and license fees (but not toll revenues and investment income) are subject to being applied first to the payment of general obligation debt and of debt guaranteed by the Commonwealth of Puerto Rico, if and to the extent that all other Commonwealth revenues are not sufficient therefor.

The 2003 Bonds will have the following characteristics:

- The 2003 Bonds will be dated their date of delivery.
- The 2003 Bonds will be registered under The Depository Trust Company's book-entry only system. Purchasers of the 2003 Bonds will not receive definitive 2003 Bonds.
- Interest on the 2003 Bonds will be payable on July 1, 2003 and on each January 1 and July 1 thereafter. Interest on some of the 2003 Bonds may, after July 1, 2010, be payable other than semi-annually as described herein.
- The inside cover pages contain information concerning the maturity schedule, interest rates and prices or yields of the 2003 Bonds.
- Some of the 2003 Bonds are subject to redemption and tender for purchase as described herein.
- The scheduled payment of principal and interest on some of the 2003 Bonds will be insured by Ambac Assurance Corporation, Financial Guaranty Insurance Company, Financial Security Assurance Inc. and MBIA Insurance Corporation as indicated on the inside cover pages of this Official Statement.
- In the opinion of Bond Counsel, under existing federal laws and regulations, interest on the 2003 Bonds will be exempt from federal income taxation and the 2003 Bonds and interest thereon will be exempt from state, Commonwealth and local income taxation. However, see *Tax Exemption*, beginning on page 70 of this Official Statement for alternative minimum tax consequences with respect to interest on the 2003 Bonds, a description of certain rules that the Authority must comply with to preserve the federal tax exemption of interest, and other tax considerations.
- It is expected that settlement for the 2003 Bonds will occur on or about April 29, 2003.

**The 2003 Bonds are not a debt of the Commonwealth or any of its political subdivisions, other than the Authority, and neither the Commonwealth nor any such subdivisions, other than the Authority, shall be liable thereon.**

## Citigroup

| | | |
|---|---|---|
| **Merrill Lynch & Co.** | | **Morgan Stanley** |
| **Banc of America Securities LLC** | **Goldman, Sachs & Co.** | **JP Morgan** |
| **Lehman Brothers** | **Raymond James & Associates, Inc.** | **Samuel A. Ramírez & Co., Inc.** |
| **UBS PaineWebber Inc.** | | **Wachovia Bank, National Association** |

April 10, 2003

CONFIDENTIAL

**$1,673,595,000**
## Puerto Rico Highways and Transportation Authority

| July 1 | | Principal Amount | Interest Rate | Price or Yield | July 1 | | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|---|---|---|---|---|
| | | **$717,365,000 Highway Revenue Refunding Bonds Series AA** | | | | | **$563,650,000 Transportation Revenue Bonds Series G** | | |
| 2005 | | $20,000,000 | 5% | 2.06% | 2011 | (F) | $3,200,000 | 3½% | 3.56% |
| 2005 | | 4,060,000 | 2¼ | 2.06 | 2012 | (F) | 1,760,000 | 3⅝ | 3.70 |
| 2006 | | 36,975,000 | 5 | 2.42 | 2013 | (F) | 3,375,000 | 3¾ | 3.82 |
| 2006 | | 2,225,000 | 2¼ | 2.42 | 2014 | (F)(4) | 20,630,000 | 5¼ | 3.91 |
| 2007 | | 39,975,000 | 5 | 2.87 | 2014 | (F) | 700,000 | 3⅞ | 3.92 |
| 2007 | | 1,405,000 | 2¾ | 2.87 | 2015 | (F)(4) | 19,865,000 | 5¼ | 4.00 |
| 2008 | (F) | 13,590,000 | 5 | 2.66 | 2015 | (F) | 2,000,000 | 4 | 4.02 |
| 2008 | (F) | 20,765,000 | 2⅝ | 2.66 | 2016 | (F)(4) | 18,660,000 | 5¼ | 4.07 |
| 2009 | (F) | 2,160,000 | 5 | 3.00 | 2017 | (F)(4) | 9,760,000 | 5¼ | 4.17 |
| 2009 | (F) | 8,700,000 | 3 | 100 | 2018 | (F)(4) | 11,095,000 | 5¼ | 4.25 |
| 2010 | (F) | 23,505,000 | 5 | 3.31 | 2019 | (F)(4) | 17,190,000 | 5¼ | 4.34 |
| 2010 | (F) | 14,675,000 | 3¼ | 3.31 | 2020 | (F)(4) | 16,860,000 | 5¼ | 4.40 |
| 2011 | (F) | 2,475,000 | 3½ | 3.55 | 2021 | (F)(4) | 14,815,000 | 5¼ | 4.46 |
| 2012 | (F) | 1,060,000 | 5¼ | 3.69 | 2022 | (F)(4) | 11,115,000 | 5 | 4.58 |
| 2012 | (F) | 3,050,000 | 3⅜ | 3.69 | 2023 | | 1,150,000 | 5 | 5.07 |
| 2013 | (F) | 2,725,000 | 3¾ | 3.81 | | | | | |
| 2015 | (F)(1) | 1,825,000 | 4 | 4.02 | 2028 | (3) | 6,665,000 | 5 | 5.08 |
| 2016 | (F)(1) | 31,160,000 | 5½ | 4.07 | | | | | |
| 2016 | (F)(1) | 9,365,000 | 4 | 4.07 | 2033 | (3) | 143,760,000 | 5 | 5.10 |
| 2017 | (M)(1) | 41,725,000 | 5½ | 4.16 | | | | | |
| 2017 | (M)(1) | 520,000 | 4.1 | 4.16 | 2042 | (3) | 261,050,000 | 5 | 5.20 |
| 2018 | (M)(1) | 43,790,000 | 5½ | 4.24 | | | | | |
| 2018 | (M)(1) | 860,000 | 4⅛ | 4.24 | | | | | |
| 2019 | (M)(1) | 68,360,000 | 5½ | 4.31 | | | | | |
| 2019 | (M)(1) | 235,000 | 4¼ | 4.31 | | | | | |
| 2020 | (M)(1) | 35,875,000 | 5½ | 4.37 | | | | | |
| 2020 | (M)(1) | 325,000 | 4.3 | 4.37 | | | | | |
| 2021 | (M)(1) | 1,515,000 | 4½ | 4.56 | | | | | |
| 2022 | (M)(1) | 1,580,000 | 4.6 | 4.63 | | | | | |
| 2023 | (M)(1) | 1,655,000 | 4⅝ | 4.68 | | | | | |
| 2026 | (FS)(2)(3) | 188,395,000 | 5 | 3.60 | | | | | |
| 2028 | (3) | 9,570,000 | 5 | 5.08 | | | | | |
| 2035 | (3) | 17,990,000 | 5 | 5.12 | | | | | |
| 2035 | (A)(2)(3) | 65,275,000 | 5 | 3.60 | | | | | |

| | |
|---|---|
| (F) | Insured by Financial Guaranty Insurance Company |
| (M) | Insured by MBIA Insurance Corporation |
| (FS) | Insured by Financial Security Assurance Inc. |
| (A) | Insured by Ambac Assurance Corporation |
| (1) | No optional call |
| (2) | On July 1, 2010, the bonds will be subject to mandatory tender for purchase, subject to a successful remarketing of the bonds at that time. The Authority has agreed that these bonds will be remarketed at the first date on or after July 1, 2010 at which they can be sold in any interest rate mode and at any rate not exceeding maximum legal rate (12%). In the event the bonds cannot be remarketed on July 1, 2010, the interest rate converts, without further notice to bondholders, to 8% from July 1, 2010 until purchased. Priced to the mandatory tender date on July 1, 2010. |
| (3) | Term bond |
| (4) | Priced to the first call date on July 1, 2013. |

### $72,035,000 Transportation Revenue Refunding Bonds Series H

| July 1 | | Principal Amount | Interest Rate | Price or Yield |
|---|---|---|---|---|
| 2006 | | $485,000 | 2¼% | 2.42% |
| 2007 | | 495,000 | 2¾ | 2.87 |
| 2008 | | 510,000 | 3 | 3.19 |
| 2009 | (F) | 525,000 | 3 | 3.01 |
| 2010 | (F) | 540,000 | 3¼ | 3.32 |
| 2011 | (F) | 830,000 | 3½ | 3.56 |
| 2012 | (F) | 860,000 | 3⅝ | 3.70 |
| 2013 | (F) | 895,000 | 3¾ | 3.82 |
| 2014 | (F) | 620,000 | 3⅞ | 3.92 |
| 2015 | (F) | 645,000 | 4 | 4.02 |
| 2016 | (F) | 670,000 | 4 | 4.12 |
| 2017 | (F) | 695,000 | 4.2 | 4.22 |
| 2018 | (F) | 725,000 | 4¼ | 4.32 |
| 2019 | (F) | 755,000 | 4⅜ | 4.41 |
| 2020 | (F) | 790,000 | 4.4 | 4.49 |
| 2021 | (F) | 825,000 | 4½ | 4.56 |
| 2022 | | 860,000 | 5 | 100 |
| 2023 | | 905,000 | 5 | 5.07 |
| 2028 | (3) | 5,250,000 | 5 | 5.08 |
| 2035 | (3) | 9,880,000 | 5 | 5.12 |
| 2035 | (A)(2)(3) | 14,690,000 | 3½ | 3.63 |
| 2035 | (A)(2)(3) | 14,585,000 | 5 | 3.60 |
| 2035 | (A)(2)(3) | 15,000,000 | 4 | 3.61 |

### $320,545,000 Subordinated Transportation Revenue Bonds Series 2003

| July 1 | | Principal Amount | Interest Rate | Yield |
|---|---|---|---|---|
| 2006 | | $3,370,000 | 5% | 2.49% |
| 2006 | | 250,000 | 2.3 | 2.49 |
| 2007 | | 7,470,000 | 5 | 2.94 |
| 2007 | | 575,000 | 2¾ | 2.94 |
| 2008 | | 6,335,000 | 5 | 3.29 |
| 2008 | | 2,125,000 | 3 | 3.29 |
| 2009 | | 8,010,000 | 5 | 3.61 |
| 2009 | | 785,000 | 3⅜ | 3.61 |
| 2010 | (F) | 8,760,000 | 5¼ | 3.32 |
| 2010 | (F) | 485,000 | 3.2 | 3.32 |
| 2011 | (F) | 7,430,000 | 5¼ | 3.56 |
| 2011 | (F) | 2,290,000 | 3.4 | 3.56 |
| 2012 | (F) | 9,935,000 | 5½ | 3.70 |
| 2012 | (F) | 275,000 | 3.6 | 3.70 |
| 2013 | (F) | 9,890,000 | 5½ | 3.82 |
| 2013 | (F) | 835,000 | 3.7 | 3.82 |
| 2014 | (F)(4) | 10,585,000 | 5¼ | 3.92 |
| 2014 | (F) | 735,000 | 3.8 | 3.92 |
| 2015 | (F)(4) | 11,575,000 | 5¼ | 4.02 |
| 2015 | (F) | 325,000 | 3.9 | 4.02 |
| 2016 | (F)(4) | 11,185,000 | 5¼ | 4.12 |
| 2016 | (F) | 1,360,000 | 4 | 4.12 |
| 2017 | (F)(4) | 14,700,000 | 5¼ | 4.22 |
| 2017 | (F) | 500,000 | 4.1 | 4.22 |
| 2018 | (F)(4) | 15,000,000 | 5¼ | 4.30 |
| 2018 | (F) | 110,000 | 4.2 | 4.30 |
| 2019 | (4) | 11,025,000 | 5¾ | 4.81 |
| 2019 | | 1,320,000 | 4¾ | 4.81 |
| 2020 | (4) | 15,465,000 | 5¾ | 4.88 |
| 2021 | (4) | 16,320,000 | 5¾ | 4.93 |
| 2022 | (4) | 17,045,000 | 5¾ | 5.00 |
| 2022 | | 225,000 | 4⅞ | 5.00 |
| 2023 | | 18,265,000 | 5 | 5.10 |
| 2028 | (3) | 105,985,000 | 5 | 5.14 |

| (F) | Insured by Financial Guaranty Insurance Company |
|---|---|
| (M) | Insured by MBIA Insurance Corporation |
| (FS) | Insured by Financial Security Assurance Inc. |
| (A) | Insured by Ambac Assurance Corporation |
| (1) | No optional call |
| (2) | On July 1, 2010, the bonds will be subject to mandatory tender for purchase, subject to a successful remarketing of the bonds at that time. The Authority has agreed that these bonds will be remarketed at the first date on or after July 1, 2010 at which they can be sold in any interest rate mode and at any rate not exceeding maximum legal rate (12%). In the event the bonds cannot be remarketed on July 1, 2010, the interest rate converts, without further notice to bondholders, to 8% from July 1, 2010 until purchased. Priced to the mandatory tender date on July 1, 2010. |
| (3) | Term bond |
| (4) | Priced to the first call date on July 1, 2013. |

CONFIDENTIAL

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the 2003 Bonds by any person, in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Authority and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs or condition of the Authority or the Commonwealth since the date hereof. The Underwriters have provided the following sentences for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THE OFFERING OF THE 2003 BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE 2003 BONDS AND THE OUTSTANDING HIGHWAY REVENUE BONDS AND TRANSPORTATION REVENUE BONDS OF THE AUTHORITY AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL ON THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

Other than with respect to information concerning Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Company ("FGIC"), Financial Security Assurance Inc. ("FSA") and MBIA Insurance Corporation ("MBIA") contained under the caption *Bond Insurance* and in *Appendices IV, V, VI* and *VII*, respectively, none of the information in this Official Statement has been supplied or verified by Ambac, FGIC, FSA and MBIA, and Ambac, FGIC, FSA and MBIA make no representation or warranty, express or implied, as to (i) the accuracy or completeness of such information; (ii) the validity of the 2003 Bonds; or (iii) the tax exempt status of the interest on the 2003 Bonds.

CONFIDENTIAL

## TABLE OF CONTENTS

| | Page |
|---|---|
| OVERVIEW | 1 |
| INTRODUCTION | 3 |
| FINANCING PLAN | 5 |
| Series AA Bonds | 5 |
| Series G Bonds | 6 |
| Series H Bonds | 6 |
| 2003 Subordinated Bonds | 6 |
| Sources and Uses of Funds | 7 |
| THE 2003 BONDS | 7 |
| Description of the 2003 Bonds | 7 |
| Mandatory Tender for Purchase of Certain Series AA Bonds and Series H Bonds | 7 |
| Redemption Provisions | 8 |
| SECURITY | 11 |
| Revenues | 11 |
| Flow of Funds Under 1968 Resolution and 1998 Resolution | 12 |
| 1968 Resolution | 14 |
| 1998 Resolution | 15 |
| Replenishment of 1968 and 1998 Reserve Accounts | 16 |
| Commitment Not to Reduce Taxes and Fees | 16 |
| Special Fund | 16 |
| Prior Payment of Full Faith and Credit Obligations of the Commonwealth | 16 |
| Additional Bonds | 18 |
| Book-Entry Only System | 19 |
| Payments and Transfers | 20 |
| Discontinuance of Book-Entry Only System | 21 |
| Proposed 1968 Supplemental Resolutions | 21 |
| Consent of Highway Revenue Bondholders | 21 |
| Proposed 1998 Supplemental Resolution | 21 |
| Consent of Transportation Revenue Bondholders | 21 |
| BOND INSURANCE | 22 |
| Ambac Assurance Corporation | 22 |
| Financial Guaranty Insurance Company | 23 |
| Financial Security Assurance Inc. | 24 |
| MBIA Insurance Corporation | 25 |
| Concerning the Policies | 26 |
| THE AUTHORITY | 26 |
| General Description | 26 |
| Organization | 27 |
| Management | 28 |
| Employee Relations | 28 |
| TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES | 28 |
| Revenues | 28 |
| Operating Expenses and Capital Expenditures | 36 |
| Teodoro Moscoso Bridge | 42 |
| DEBT | 43 |
| Authority Debt | 43 |
| Principal and Interest Requirements | 44 |
| SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION | 45 |
| Definition of Certain Terms | 45 |
| Sinking Fund | 48 |
| 1968 Construction Fund | 50 |

| | Page |
|---|---|
| Defeasance | 51 |
| Issuance of Additional Bonds | 51 |
| Other Indebtedness | 52 |
| Investment of Funds | 53 |
| Modifications | 53 |
| Miscellaneous Covenants | 54 |
| SUMMARY OF CERTAIN PROVISIONS OF THE PROPOSED SUPPLEMENTAL RESOLUTIONS | 55 |
| Modification with Consent of Holders of Majority of Bonds | 55 |
| Parity Liens to Providers of Credit Facilities and Liquidity Facilities | 55 |
| Calculation of Interest Rate on Variable Rate Bonds | 55 |
| SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION | 56 |
| Definition of Certain Terms | 56 |
| Sinking Funds | 61 |
| 1998 Construction Fund | 64 |
| Defeasance | 64 |
| Issuance of Additional Bonds | 64 |
| Other Indebtedness | 66 |
| Investment of Funds | 66 |
| Modifications | 67 |
| Miscellaneous Covenants | 68 |
| SUMMARY OF CERTAIN PROVISIONS OF THE PROPOSED SUPPLEMENTAL RESOLUTION | 70 |
| TAX EXEMPTION | 70 |
| 2003 Discount Bonds | 71 |
| 2003 Premium Bonds | 71 |
| UNDERWRITING | 72 |
| VERIFICATION | 72 |
| LITIGATION | 72 |
| LEGAL MATTERS | 73 |
| LEGAL INVESTMENT | 73 |
| GOVERNMENT DEVELOPMENT BANK | 73 |
| RATINGS | 73 |
| CONTINUING DISCLOSURE | 73 |
| MISCELLANEOUS | 75 |

| APPENDIX I | FINANCIAL STATEMENTS INCLUDING THE REPORT OF ERNST & YOUNG LLP | I-1 |
| APPENDIX II | LETTER FROM THE TRAFFIC ENGINEERS | II-1 |
| APPENDIX III | FORM OF OPINIONS OF BOND COUNSEL | III-1 |
| APPENDIX IV | SPECIMEN OF AMBAC ASSURANCE CORPORATION'S BOND INSURANCE POLICY | IV-1 |
| APPENDIX V | SPECIMEN OF FINANCIAL GUARANTY INSURANCE COMPANY'S BOND INSURANCE POLICY | V-1 |
| APPENDIX VI | SPECIMEN OF FINANCIAL SECURITY ASSURANCE INC.'S BOND INSURANCE POLICY | VI-1 |
| APPENDIX VII | SPECIMEN OF MBIA INSURANCE CORPORATION'S BOND INSURANCE POLICY | VII-1 |

HTA_STAY0056083

[This page intentionally left blank]

CONFIDENTIAL

HTA_STAY0056084

# $1,673,595,000
# Puerto Rico Highways and Transportation Authority
### $717,365,000 Highway Revenue Refunding Bonds (Series AA)
### $563,650,000 Transportation Revenue Bonds (Series G)
### $72,035,000 Transportation Revenue Refunding Bonds (Series H)
### $320,545,000 Subordinated Transportation Revenue Bonds (Series 2003)

## OVERVIEW

This Official Statement sets forth information in connection with the sale by Puerto Rico Highways and Transportation Authority (the "Authority") of $717,365,000 aggregate principal amount of its Puerto Rico Highways and Transportation Authority Highway Revenue Refunding Bonds (Series AA) (the "Series AA Bonds" or the "2003 Highway Revenue Bonds"), $563,650,000 aggregate principal amount of its Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds (Series G) (the "Series G Bonds"), $72,035,000 aggregate principal amount of its Puerto Rico Highways and Transportation Authority Transportation Revenue Refunding Bonds (Series H) (the "Series H Bonds"), and $320,545,000 aggregate principal amount of its Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds (Series 2003) (the "2003 Subordinated Bonds"; together with the Series G Bonds and the Series H Bonds, the "2003 Transportation Revenue Bonds"). The 2003 Highway Revenue Bonds will be issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Authority Act"), Resolution No. 68-18 adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution"), and resolutions adopted by the Authority on April 10, 2003 in connection with the issuance of the Series AA Bonds (the "Series AA Bond Resolution"). The 2003 Transportation Revenue Bonds (said bonds together with the 2003 Highway Revenue Bonds are herein collectively called the "2003 Bonds") will be issued pursuant to the Authority Act, Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution"), and resolutions adopted by the Authority on April 10, 2003 in connection with the Series G Bonds, the Series H Bonds and the 2003 Subordinated Bonds (the "2003 Transportation Revenue Bonds Resolution"; together with the Series AA Bond Resolution, the "2003 Resolutions"). JPMorgan Chase Bank acts as fiscal agent under the 1968 Resolution (in such capacity, the "1968 Fiscal Agent") and under the 1998 Resolution (in such capacity, the "1998 Fiscal Agent").

The scheduled payment of principal of and interest on the Series AA Bonds maturing on July 1, 2008 through 2016, the scheduled payment of principal of and interest on the Series G Bonds maturing on July 1, 2011 through 2022, the scheduled payment of principal of and interest on the Series H Bonds maturing on July 1, 2009 through 2021, and the scheduled payment of principal of and interest on the 2003 Subordinated Bonds maturing on July 1, 2010 through 2018 will be insured by a municipal bond insurance policy (the "FGIC Bond Insurance Policy") to be issued by Financial Guaranty Insurance Company (the "FGIC Insured Bonds") concurrently with the delivery of the 2003 Bonds. The scheduled payment of principal of and interest on the Series AA Bonds maturing on July 1, 2017 through 2023 will be insured by a municipal bond insurance policy (the "MBIA Bond Insurance Policy") to be issued by MBIA Insurance Corporation (the "MBIA Insured Bonds") concurrently with the delivery of the 2003 Bonds. The scheduled payment of principal of and interest of the Series AA Bonds maturing on July 1, 2026 will be insured by a municipal bond insurance policy (the "FSA Bond Insurance Policy") to be issued by Financial Security Assurance Inc. (the "FSA Insured Bonds") concurrently with the delivery of the 2003 Bonds. The scheduled payment of principal of and interest on the Series AA Bonds maturing on July 1, 2035 and the scheduled payment of principal of and interest on the Series H Bonds maturing on July 1, 2035 in the principal amounts of $14,690,000, $14,585,000 and 15,000,000 (bearing interest at 3½%, 5% and 4%, respectively) will be insured by a municipal bond insurance policy (the "Ambac Bond Insurance Policy") to be issued by Ambac Assurance Corporation (the "Ambac Insured Bonds") concurrently with the delivery of the 2003 Bonds. The FGIC Insured Bonds, the MBIA Insured Bonds, the FSA Insured Bonds and the Ambac Insured Bonds are herein collectively called the "Insured Bonds."

The Authority is issuing the Series G Bonds to finance or refinance highway system improvements and a portion of the costs of construction of a new urban rail mass transit system for the San Juan metropolitan region, known as "Tren Urbano." The Authority is issuing the 2003 Subordinated Bonds to prepay an outstanding TIFIA Loan (as defined below), in whole, and achieve debt service savings. The Authority is issuing the Series AA Bonds and the Series H Bonds to refund a portion of the Authority's outstanding bonds and achieve debt service savings. See *Financing Plan*.

The Authority has heretofore issued, pursuant to the 1968 Resolution, Puerto Rico Highways and Transportation Authority Highway Revenue Bonds, of which $1,908,565,000 principal amount was outstanding as of January 1, 2003 (said bonds, the 2003 Highway Revenue Bonds, and any additional bonds that may be issued under the 1968 Resolution

1

(subject to the limitations as to the issuance of such additional bonds contained in the 1998 Resolution, as hereinafter described) are herein collectively called the "Highway Revenue Bonds").

The Authority has determined to finance its future capital requirements, after applying other available funds, through the issuance of bonds under the terms and conditions of the 1998 Resolution and has covenanted in the 1998 Resolution not to issue additional bonds under the 1968 Resolution, other than bonds whose maturity does not extend beyond July 1, 2036 and which are issued (i) to refund outstanding Highway Revenue Bonds to achieve debt service savings, or (ii) in exchange for all outstanding Puerto Rico Highways and Transportation Authority Special Facility Revenue Bonds issued under a separate trust agreement to finance the Teodoro Moscoso Bridge (the "Special Facility Revenue Bonds"), as described below. The Authority intends to refund said Special Facility Revenue Bonds by issuing its Special Facility Refunding Bonds (as defined below) in a proposed structure which would eliminate the obligation of the Authority to exchange such Special Facility Refunding Bonds for Highway Revenue Bonds in the event that the Authority assumes the obligation to pay the Special Facility Refunding Bonds, substituting said obligation instead with the obligation to exchange the Special Facility Refunding Bonds with bonds issued under the 1998 Resolution. See "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures*.

Under the 1998 Resolution, the Authority is authorized to issue bonds on a parity with the Series G Bonds and the Series H Bonds for any lawful purpose of the Authority. Pursuant to this authority, the Authority has heretofore issued Puerto Rico Highways and Transportation Authority Senior Transportation Revenue Bonds, of which $2,457,411,768 principal amount (including accreted value for capital appreciation bonds as of January 1, 2003) was outstanding as of January 1, 2003 (the "Outstanding Senior Bonds"). The Outstanding Senior Bonds, the Series G Bonds and the Series H Bonds and any additional senior bonds issued under the 1998 Resolution, as described below, are herein collectively referred to as the "Senior Transportation Revenue Bonds."

As described more fully below, the 1998 Resolution also permits the Authority to issue bonds subordinated in right of payment to the Senior Transportation Revenue Bonds for the purpose of financing transportation projects eligible for federal assistance. In August 1998, the Authority issued its $75,050,000 Subordinated Transportation Revenue Bonds (Series 1998) (Puerto Rico State Infrastructure Bank) (the "1998 SIB Bonds") under the 1998 Resolution to finance certain highway projects eligible for federal financial assistance. The 1998 SIB Bonds, the 2003 Subordinated Bonds and any additional subordinated bonds issued under the 1998 Resolution as described below, are herein collectively referred to as the "Subordinated Transportation Revenue Bonds", and said bonds, together with the Senior Transportation Revenue Bonds, are herein collectively called the "Transportation Revenue Bonds."

On August 4, 2000, the Authority also obtained a $300 million loan from the United States Department of Transportation under the Transportation Infrastructure Finance and Innovation Act of 1998, as amended (the "TIFIA Loan"), to finance a portion of the cost of construction of the Tren Urbano project. The TIFIA Loan is subordinate to the Authority's Highway Revenue Bonds and Transportation Revenue Bonds and is secured by, and is payable only to the extent of, amounts available in the 1998 Construction Fund (as defined below). This TIFIA Loan will be refunded, in whole, with the proceeds of the 2003 Subordinated Bonds. See "Additional Bonds-TIFIA Loan" under *The 2003 Bonds.*

All Highway Revenue Bonds will be secured equally and ratably under the 1968 Resolution and will be payable from 1968 Resolution Revenues (as defined below). All Senior Transportation Revenue Bonds will be secured equally and ratably under the 1998 Resolution and will be payable from 1998 Resolution Revenues (as defined below). All Subordinated Transportation Revenue Bonds will be secured equally and ratably under the 1998 Resolution (except for differences in any debt service reserve requirements related thereto as permitted by the 1998 Resolution) and will be payable from 1998 Resolution Revenues remaining after providing for the payment of debt service on Senior Transportation Revenue Bonds and providing the required debt service reserve therefor.

Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them under *Summary of Certain Provisions of the 1968 Resolution* and *Summary of Certain Provisions of the 1998 Resolution.*

This Official Statement hereby incorporates by reference *Appendix I* to the Official Statement, dated March 21, 2003, of the Commonwealth of Puerto Rico General Obligation Bonds, $95,295,0000 Public Improvement Refunding Bonds, Series 2003, known as the Financial Information and Operating Data Report of the Commonwealth (the "Commonwealth Report"), prepared by Government Development Bank for Puerto Rico, which includes economic and financial information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") and the general purpose financial statements of the Commonwealth for the fiscal year ended June 30, 2001, together with the independent auditor's report thereon, dated January 21, 2002, of KPMG LLP certified public accountants (the "Commonwealth Financial Statements"). KPMG LLP did not audit the financial statements of the pension trust funds, the public university funds, and certain activities and component units separately identified in this report. Those financial statements were audited by other auditors whose reports have been furnished to KPMG LLP, whose opinion on the general purpose

2

HTA_STAY0056086

financial statements, insofar as its relates to the amounts included in the general purpose financial statements pertaining to such activities and component units, is based solely on the reports of the other auditors.

Any official statement of the Commonwealth or of any instrumentality of the Commonwealth filed with each nationally recognized municipal securities information repository ("NRMSIR") and with the Municipal Securities Rulemaking Board ("MSRB"), or any other document filed with each NRMSIR, after the date hereof and prior to the termination of the offering of the 2003 Bonds, which supplements or amends the information appearing in the Commonwealth Report shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in any of the above described documents incorporated by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any subsequently filed document modifies or supersedes such statement. Any statement contained herein or in any of the above described documents shall also be deemed to be modified or superseded to the extent that a statement contained in any subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement. For information on how to obtain the Commonwealth Report and the Commonwealth Financial Statements, see *Miscellaneous*.

The Commonwealth expects that its Comprehensive Annual Financial Report for the fiscal year ended June 30, 2002, including its audited general purpose financial statements for such fiscal year, will be available to investors on or prior to May 1, 2003. Promptly after its release, said Report will be filed with and available from each NRMSIR.

This Official Statement, including information incorporated in this Official Statement by reference, contains certain "forward-looking statements" concerning the operations, financial condition, plans and objectives of the Authority and the Commonwealth. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, including general economic conditions, many of which are beyond the control of the Authority and the Commonwealth. The words "may", "would", "could", "will", "expect", "anticipate", "believe", "intend", "plan", "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

## INTRODUCTION

The Commonwealth established the Authority in 1965 as a public corporation and governmental instrumentality to design and oversee the construction, reconstruction and improvement of the Commonwealth's highway system. This highway system currently consists of 4,573 miles of roads, highways, bridges and tunnels, including the Luis A. Ferré (PR-52), De Diego (PR-22), PR-53 and Martínez Nadal (PR-20) toll highways. The Authority operates and maintains these toll highways and related connecting roads. The Department of Transportation and Public Works (the "Department"), through its Public Works Directorate, operates and maintains all other portions of the Commonwealth's highway system. There are also approximately 10,354 miles of local streets and adjacent roads in the Commonwealth operated and maintained at the municipal level which are not part of the Commonwealth's highway system.

Since 1968, the Authority has carried out the planning, construction, improvement and equipping of all the Commonwealth's roads, highways, bridges and tunnels pursuant to its master plan for the long-range development of the highway system, which plan is supplemented as necessary, and an ongoing five-year construction program (the "Construction Improvement Program"). During this time, the Authority has constructed highway system facilities with a total cost of approximately $13.9 billion (including construction in progress) as of December 31, 2002. This amount includes approximately $6.5 billion financed with internally generated funds, $3.6 billion financed through the issuance of Highway Revenue Bonds, $2.1 billion financed through the issuance of Transportation Revenue Bonds, $1.5 billion paid with federal assistance funds and $113 million paid with funds provided by the Legislature of Puerto Rico and other appropriations.

Legislation enacted in 1990 and 1991 expanded the Authority's power to enable it to contract for the private design, construction, operation and maintenance of roads, highways, bridges and tunnels and to implement public policy relating to the development of a multi-modal transportation system for the Commonwealth. In furtherance of these expanded powers, in 1991 the Authority entered into a concession agreement with a private company for the design, construction, operation and maintenance of a toll bridge facility known as the Teodoro Moscoso Bridge. The bridge opened to traffic in February 1994. See "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures*.

In 1994, the Authority began planning and designing and in 1996 began constructing a new mass transit rail project for the San Juan Metropolitan Region known as Tren Urbano. Through February 28, 2003, the Authority had incurred $1.97 billion in costs for this project. Tren Urbano is the largest single project included in the Authority's current

3

Construction Improvement Program. Its initial phase consists of approximately 17 km of trackway running from Bayamón to Santurce. This initial phase, which does not include the Carolina Extension described below, is expected to be fully operational by September 2003, and its total construction cost is estimated to be $2.25 billion, approximately 37.6% of which is expected to be funded by grants and other moneys from the federal government (excluding the $300 million TIFIA Loan). The Authority has contracted with various private parties for the construction of the project and has entered into a five-year contract for the operation and maintenance of the system. See "Operating Expenses and Capital Expenditures-Construction Improvement Program-Tren Urbano" under *Transportation System Revenues and Expenditures.*

All Highway Revenue Bonds issued by the Authority are and will be payable solely from, and are secured by a pledge of the Authority's 1968 Resolution Revenues. The 1968 Resolution Revenues consist of: (i) all current gasoline taxes, one-half of the current gas oil and diesel oil taxes and a portion of the current motor vehicle license fees allocated to the Authority by the Commonwealth, (ii) all toll revenues of the Traffic Facilities (as defined in the 1968 Resolution) financed with Highway Revenue Bonds and any extensions, improvements or betterments thereto however financed (the "Existing Toll Facilities Revenues"), and (iii) certain investment earnings, all as described more fully below. See "Revenues" under *Security.*

All Senior Transportation Revenue Bonds issued by the Authority are and will be payable solely from, and are secured by a pledge of, the Authority's 1998 Resolution Revenues. The 1998 Resolution Revenues consist of: (i) the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth on certain petroleum products (as defined herein), (ii) the tolls and other charges imposed by the Authority for the use of Toll Facilities (other than Existing Toll Facilities Revenues prior to the repeal and cancellation of the 1968 Resolution), (iii) certain investment earnings, all as described more fully below, and (iv) until the Highway Revenue Bonds are paid or defeased and the 1968 Resolution is repealed and canceled, Excess 1968 Resolution Revenues (as defined below) and, after the repeal and cancellation of the 1968 Resolution, all 1968 Resolution Revenues. See "1998 Resolution-Pledged Revenues" under *Security.*

Excess 1968 Resolution Revenues are 1968 Resolution Revenues remaining after their application to pay debt service on the Authority's outstanding Highway Revenue Bonds, and providing a reserve therefor. Under certain circumstances relating to the termination of the Authority's private concession agreement for the Teodoro Moscoso Bridge, such remaining 1968 Resolution Revenues would be applied to the payment of debt service on the Special Facility Revenue Bonds prior to the application of such revenues to the payment of debt service on the Transportation Revenue Bonds. In the event, however, that the Special Facility Revenue Bonds are refunded with the Special Facility Refunding Bonds as currently contemplated by the Authority, the remaining 1968 Resolution Revenues would not be applied to the payment of the Special Facility Refunding Bonds prior to their deposit with the 1998 Fiscal Agent for application in accordance with the 1998 Resolution. See the "Teodoro Moscoso Bridge-Proposed Refunding of Special Facility Revenue Bonds" under *Transportation System Revenues and Expenditures.*

Any Subordinated Transportation Revenue Bonds issued by the Authority are and will be payable from 1998 Resolution Revenues remaining after their application to pay debt service on the Senior Transportation Revenue Bonds and providing a reserve therefor. The 2003 Subordinated Bonds issued for the refunding of the TIFIA Loan will be Subordinated Transportation Revenue Bonds. See "1998 Resolution-1998 Subordinated Bond Reserve Fund" under *Security.*

All of the aforesaid taxes and license fees (but not toll revenues or investment earnings) constituting revenues of the Authority pledged under the 1968 Resolution or the 1998 Resolution are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are not sufficient therefor. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *Security* and *Debt* in the Commonwealth Report. The Commonwealth has never applied the taxes or license fees allocated to the Authority to the payment of such Commonwealth debt.

As of January 1, 2003, the aggregate outstanding debt of the Authority, including outstanding Highway Revenue Bonds, Senior Transportation Revenue Bonds, Subordinated Transportation Revenue Bonds, the TIFIA Loan and certain notes payable to Government Development Bank for Puerto Rico ("Government Development Bank"), amounted to $4,811,147,787 (including accreted value for capital appreciation bonds as of January 1, 2003).

The Authority is not pledging the fare box revenues of Tren Urbano to the payment of the Highway Revenue Bonds or the Transportation Revenue Bonds.

Neither the credit of the Commonwealth nor that of any of its political subdivisions, other than the Authority, is pledged for the payment of the 2003 Bonds.

4

HTA_STAY0056088

The financial and economic condition of the Commonwealth, including gasoline and oil prices and automobile usage, affect the level of revenues available to the Authority. In addition, the Commonwealth's appropriations for the Department affect the level of maintenance for the portion of the Commonwealth highway system which is the responsibility of the Department. Information regarding the Commonwealth is contained in the Commonwealth Report incorporated by reference herein. See *Miscellaneous*.

This Official Statement includes brief descriptions of the Authority and the Authority's transportation system, revenues and expenditures and Construction Improvement Program and summaries of the terms of the 2003 Bonds, the 1968 Resolution, the 1998 Resolution, and the various statutes affecting the Authority. Such summaries and the references to all documents referred to herein do not purport to be complete, and each summary and reference is qualified in its entirety by reference to each such document, copies of which are available from the Authority. All references to the 2003 Bonds are qualified in their entirety by reference to the definitive forms thereof and the information with respect thereto contained in the 1968 Resolution, the 1998 Resolution and the 2003 Resolutions.

## FINANCING PLAN

### Series AA Bonds

The Authority is issuing the Series AA Bonds to (i) refund a portion of the Authority's Highway Revenue Bonds in the amounts and maturities identified in the table below (the "1968 Resolution Refunded Bonds") and (ii) pay costs of issuance of the Series AA Bonds. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1968 Resolution*.

| Refunded Bonds | Maturity Date | Interest Rate | Principal Amount To be Refunded | Redemption Date | Redemption Price |
|---|---|---|---|---|---|
| 1993 Series W | | | | | |
| | 07/01/06 | (1) | $10,500,000 | 07/01/03 | 103.0% |
| | 07/01/07 | (1) | 11,100,000 | 07/01/03 | 103.0 |
| | 07/01/08 | (1) | 11,700,000 | 07/01/03 | 103.0 |
| | 07/01/10 | (1) | 13,450,000 | 07/01/03 | 103.0 |
| | 07/01/10 | (2) | 46,750,000 | 07/01/03 | 100.0 |
| | 07/01/17 | 5.500% | 58,135,000 | 07/01/03 | 101.5 |
| | 07/01/20 | 5.250 | 99,520,000 | 07/01/03 | 101.5 |
| 1993 Series X | | | | | |
| | 07/01/03 | 5.100 | 8,325,000 | At maturity | |
| | 07/01/03 | (1) | 12,000,000 | At maturity | |
| | 07/01/04 | (1) | 13,100,000 | 07/01/03 | 103.0 |
| | 07/01/05 | (1) | 13,950,000 | 07/01/03 | 103.0 |
| | 07/01/06 | (1) | 7,450,000 | 07/01/03 | 103.0 |
| | 07/01/07 | (1) | 7,750,000 | 07/01/03 | 103.0 |
| | 07/01/08 | (1) | 3,750,000 | 07/01/03 | 103.0 |
| | 07/01/09 | (1) | 3,950,000 | 07/01/03 | 103.0 |
| | 07/01/10 | (1) | 4,200,000 | 07/01/03 | 103.0 |
| | 07/01/10 | (2) | 66,150,000 | 07/01/03 | 100.0 |
| | 07/01/19 | 5.500 | 102,140,000 | 07/01/03 | 101.5 |
| | 07/01/21 | 5.250 | 106,990,000 | 07/01/03 | 101.5 |
| 1996 Series Y | | | | | |
| | 07/01/03 | 6.000 | 8,360,000 | At maturity | |
| | 07/01/04 | 6.250 | 8,865,000 | At maturity | |
| | 07/01/15 | 5.250 | 17,185,000 | 07/01/06 | 101.5 |
| | 07/01/26 | 5.500 | 121,780,000 | 07/01/06 | 101.5 |

(1) Residual interest tax-exempt securities.
(2) Floating rate auction securities.

The Authority will deposit the net proceeds of the Series AA Bonds, together with other available moneys, with the 1968 Fiscal Agent as escrow agent, under the terms of an escrow deposit agreement. The net proceeds, together with such other moneys, will be invested in Government Obligations (as defined in the 1968 Resolution) the principal of and interest on which when due, together with any moneys deposited with the 1968 Fiscal Agent remaining uninvested, will provide moneys sufficient to pay the interest coming due on the 1968 Resolution Refunded Bonds through their dates of redemption and to pay the principal of and premium, if any, on the 1968 Resolution Refunded Bonds on their dates of

5

CONFIDENTIAL

HTA_STAY0056089

redemption. The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the 1968 Resolution Refunded Bonds will be verified by Grant Thornton LLP (the "Verification Agent").

Upon the deposit with the 1968 Fiscal Agent referred to above, the 1968 Resolution Refunded Bonds will, in the opinion of Bond Counsel, no longer be deemed to be outstanding under the 1968 Resolution and the 1968 Resolution Refunded Bonds will thereupon be defeased.

**Series G Bonds**

The Authority is issuing the Series G Bonds to (i) finance or refinance various highway projects and a portion of the costs of Tren Urbano, (ii) make a deposit to the 1998 Senior Bond Reserve Account (hereinafter mentioned), and (iii) pay costs of issuance of the Series G Bonds. See "Operating Expenses and Capital Expenditures-Construction Improvement Program" under *Transportation System Revenues and Expenditures* and "1998 Resolution-1998 Senior Bond Reserve Account" under *Security*.

**Series H Bonds**

The Authority is issuing the Series H Bonds to (i) refund a portion of the Authority's Senior Transportation Revenue Bonds in the amounts and maturities identified in the table below (the "1998 Resolution Refunded Bonds," and together with the 1968 Resolution Refunded Bonds, the "Refunded Bonds") and (ii) pay costs of issuance of the Series H Bonds. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1998 Resolution.*

| Refunded Bonds | Maturity Date | Interest Rate | Principal Amount to be Refunded | Redemption Date | Redemption Price |
|---|---|---|---|---|---|
| 1998 Series A | | | | | |
| | 07/01/03 | 4.100% | $13,525,000[1] | [2] | |
| | 07/01/04 | 4.100 | 14,075,000[1] | [2] | |
| 2000 Series B | | | | | |
| | 07/01/03 | 4.875 | 4,780,000 | [2] | |
| | 07/01/04 | 4.875 | 5,015,000 | [2] | |
| | 07/01/35 | 5.875 | 36,000,000[1] | 07/01/10 | 101.0% |

(1)   Maturity partially refunded.
(2)   At maturity.

The Authority will deposit the net proceeds of the Series H Bonds, together with other available moneys, with the 1998 Fiscal Agent, as escrow agent, under the terms of an escrow deposit agreement. The net proceeds, together with such other moneys, will be invested in Government Obligations (as defined in the 1998 Resolution) the principal of and interest on which when due, together with any moneys deposited with the 1998 Fiscal Agent remaining uninvested, will provide moneys sufficient to pay the interest coming due on the 1998 Resolution Refunded Bonds through their dates of redemption and to pay the principal of and premium, if any, on the 1998 Resolution Refunded Bonds on their dates of redemption. The sufficiency of the amount so deposited, with investment earnings thereon, to accomplish the refunding of the 1998 Resolution Refunded Bonds will be verified by the Verification Agent.

Upon the deposit with the 1998 Fiscal Agent referred to above, the 1998 Resolution Refunded Bonds will, in the opinion of Bond Counsel, no longer be deemed to be outstanding under the 1998 Resolution and the 1998 Resolution Refunded Bonds will thereupon be defeased.

**2003 Subordinated Bonds**

The Authority is issuing the 2003 Subordinated Bonds to (i) prepay the TIFIA Loan in whole on April 29, 2003 at par plus accrued interest, (ii) make a deposit to the 2003 Subordinated Bonds Reserve Account (hereinafter mentioned), and (iii) pay costs of issuance of the 2003 Subordinated Bonds. The 2003 Subordinated Bonds will be issued as Subordinated Transportation Revenue Bonds under the 1998 Resolution, and as such shall be subordinated to Senior Transportation Revenue Bonds issued under the 1998 Resolution. See "Operating Expenses and Capital Expenditures-Construction Improvement Program" under *Transportation System Revenues and Expenditures* and "1998 Resolution-1998 Subordinated Bond Reserve Fund" under *Security*.

CONFIDENTIAL

HTA_STAY0056090

Sources and Uses of Funds

**Sources:**

| | |
|---|---:|
| Principal Amount of 2003 Highway Revenue Bonds | $717,365,000.00 |
| Principal Amount of 2003 Transportation Revenue Bonds | 956,230,000.00 |
| Net Original Issue Premium | 80,116,608.35 |
| Other available moneys | 67,780,398.31 |
| Total Sources ............................................................... | $1,821,492,006.66 |

**Uses:**

| | |
|---|---:|
| Deposit into 1998 Construction Fund | $522,475,000.00 |
| Payment of TIFIA Loan | 305,614,191.78 |
| Deposit to 1968 Escrow Fund | 796,880,008.08 |
| Deposit to 1998 Escrow Fund | 80,912,991.80 |
| Deposit to 1968 Reserve Account | 10,884,473.34 |
| Deposit to 1998 Senior Bond Reserve Account | 36,770,506.26 |
| Deposit to 2003 Subordinated Bonds Reserve Account | 26,512,201.26 |
| Underwriting discount and legal, printing, bond insurance and other financing expenses | 41,442,634.14 |
| Total Uses ....................................................................... | $1,821,492,006.66 |

## THE 2003 BONDS

**Description of the 2003 Bonds**

*General*

The 2003 Bonds will be issued as registered bonds without coupons, will be dated, will bear interest at the rates, will be payable at the times, and will mature on the dates and in the principal amounts set forth on the inside cover pages of this Official Statement. Principal of and premium, if any, and interest on the 2003 Bonds will be calculated on the basis of a 360-day year consisting of twelve 30-day months and will be payable in the manner described below in "Book-Entry Only System" under *The 2003 Bonds*. Some of the 2003 Bonds are subject to mandatory tender for purchase on July 1, 2010 as described under "Tender for Purchase of Series AA Bonds and Series H Bonds," below. Some of the 2003 Bonds are subject to redemption as described below under "Redemption Provisions."

**Mandatory Tender for Purchase of Certain Series AA Bonds and Series H Bonds**

The Series AA Bonds and the Series H Bonds that are identified as being subject to tender for purchase on the inside cover pages of this Official Statement (collectively, the "Mandatory Tender Bonds") are subject to mandatory tender for purchase on July 1, 2010 (the "Mandatory Tender Date"), subject to a successful remarketing, as described below. The purchase price on the Mandatory Tender Date is equal to the principal amount of the Mandatory Tender Bonds, plus accrued interest, if any, to the date of purchase, with no right of retention by the owners of such bonds. On the Mandatory Tender Date, the Mandatory Tender Bonds must be tendered for purchase by the holders thereof to the 1968 Fiscal Agent or 1998 Fiscal Agent, as appropriate. Citibank Global Markets Inc. (the "Remarketing Agent") will act as remarketing agent in connection with the Mandatory Tender Bonds pursuant to a remarketing agreement with the Authority.

Prior to the Mandatory Tender Date, the Authority will determine the initial interest rate mode or modes that will be applicable to such bonds from and after the Mandatory Tender Date. The interest rate or rates to be borne by such bonds immediately after the Mandatory Tender Date will be determined by the Remarketing Agent and will be equal to the rate or rates that, in the opinion of the Remarketing Agent, will permit the remarketing of such bonds. The interest rate or rates to be determined by the Remarketing Agent may be a fixed or variable rate, and the Mandatory Tender Bonds may be subject to subsequent remarketings. The Authority in conjunction with such remarketing may establish amortization requirements for such bonds that will result in the mandatory redemption of such bonds prior to maturity.

As of the date of this Official Statement, the Authority has not provided any liquidity facility for the payment of the purchase price payable upon the mandatory tender of the Mandatory Tender Bonds on the Mandatory Tender Date, nor is there any requirement or assurance that such liquidity facility will be obtained. The purchase price for such bonds is expected to be obtained from the remarketing thereof.

7

HTA_STAY0056091

The Remarketing Agent will use its best efforts to remarket the Mandatory Tender Bonds on the Mandatory Tender Date. On the Mandatory Tender Date, the Mandatory Tender Bonds shall be deemed to have been tendered on such date for purchase if on such date moneys sufficient to pay the purchase price thereof shall be on deposit with the 1968 Fiscal Agent and the 1998 Fiscal Agent, as appropriate, acting as tender agent.

The Authority has covenanted that it will cause the Mandatory Tender Bonds to be purchased and remarketed at the first date on or after the Mandatory Tender Date in such rate mode or modes and at a rate not exceeding maximum legal rate (currently 12% per annum) on which they can be so remarketed. Any Mandatory Tender Bonds not purchased on the Mandatory Tender Date will bear interest at the rate of 8% per annum from the Mandatory Tender Date until purchased.

### Redemption Provisions

*Optional Redemption*

The Mandatory Tender Bonds may be redeemed on or after July 1, 2010 at the option of the Authority from any available moneys (other than moneys deposited in the 1968 Sinking Fund or the 1998 Senior Bond Sinking Fund, as the case may be, in respect of an Amortization Requirement) on any date, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), at a redemption price equal to the principal amount of the Bonds to be redeemed plus accrued interest to the redemption date, without premium.

The Series AA Bonds, except for the Series AA Mandatory Tender Bonds, maturing on July 1, 2028 and 2035 may be redeemed on any date on or after July 1, 2013 at the option of the Authority, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), from any available moneys (other than moneys deposited in the 1968 Sinking Fund in respect of an Amortization Requirement) at a redemption price equal to the principal amount of the Bonds to be redeemed plus accrued interest to the redemption date, without premium.

The Series G Bonds and Series H Bonds, except for the Series H Mandatory Tender Bonds, maturing after July 1, 2013 may be redeemed on any date on or after July 1, 2013 at the option of the Authority, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), from any available moneys (other than moneys deposited in the 1998 Senior Bond Sinking Fund in respect of an Amortization Requirement), at a redemption price equal to the principal amount of the Bonds to be redeemed plus accrued interest to the redemption date, without premium.

The 2003 Subordinated Bonds maturing after July 1, 2013 may be redeemed on any date on or after July 1, 2013 at the option of the Authority, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), from any available moneys (other than moneys deposited in the 1998 Subordinated Bond Sinking Fund in respect of an Amortization Requirement) at a redemption price equal to the principal amount of the Bonds to be redeemed plus accrued interest to the redemption date, without premium.

*Mandatory Redemption*

*2003 Highway Revenue Bonds.* The 2003 Highway Revenue Bonds maturing July 1, 2026, 2028 and 2035 are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the respective Amortization Requirements for said bonds (less the amount of bonds retired by purchase from moneys in the 1968 Sinking Fund) from moneys in the 1968 Sinking Fund at par plus accrued interest in the years and amounts set forth below:

8

| | Amortization Requirements for Series AA Bonds due July 1, | | | |
|---|---|---|---|---|
| Year | 2026[1] | 2028 | 2035[1] | 2035 |
| 2020 | $35,000,000 | | | |
| 2021 | 53,705,000 | | | |
| 2022 | | | | |
| 2023 | 31,795,000 | | | |
| 2024 | 32,860,000 | $1,730,000 | | |
| 2025 | 33,960,000 | 1,820,000 | | |
| 2026 | 1,075,000* | 1,910,000 | $34,035,000 | |
| 2027 | | 2,005,000 | 3,030,000 | |
| 2028 | | 2,105,000* | 3,135,000 | |
| 2029 | | | 3,240,000 | $2,210,000 |
| 2030 | | | 3,345,000 | 2,320,000 |
| 2031 | | | 3,460,000 | 2,435,000 |
| 2032 | | | 3,575,000 | 2,560,000 |
| 2033 | | | 3,695,000 | 2,685,000 |
| 2034 | | | 3,815,000 | 2,820,000 |
| 2035 | | | 3,945,000* | 2,960,000* |
| Average life (years) | 19.60 | 23.27 | 25.67 | 29.40 |

(1) Mandatory Tender Bonds.
*   Maturity.

   *2003 Senior Transportation Revenue Bonds.* The Series G Bonds maturing July 1, 2028, 2033 and 2042 and the Series H Bonds maturing July 1, 2028 and 2035 are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the respective Amortization Requirements for said bonds (less the amount of bonds retired by purchase from moneys in the 1998 Senior Bond Sinking Fund) from moneys in the 1998 Senior Bond Sinking Fund at par plus accrued interest in the years and amounts set forth below:

| | Amortization Requirements for Series G Bonds due July 1, | | |
|---|---|---|---|
| Year | 2028 | 2033 | 2042 |
| 2024 | $1,210,000 | | |
| 2025 | 1,265,000 | | |
| 2026 | 1,325,000 | | |
| 2027 | 1,400,000 | | |
| 2028 | 1,465,000* | | |
| 2029 | | $26,005,000 | |
| 2030 | | 27,320,000 | |
| 2031 | | 28,685,000 | |
| 2032 | | 30,125,000 | |
| 2033 | | 31,625,000* | |
| 2034 | | | $33,210,000 |
| 2035 | | | 34,870,000 |
| 2036 | | | 23,700,000 |
| 2037 | | | 24,885,000 |
| 2038 | | | 26,130,000 |
| 2039 | | | 27,435,000 |
| 2040 | | | 28,810,000 |
| 2041 | | | 30,250,000 |
| 2042 | | | 31,760,000* |
| Average life (years) | 23.27 | 28.27 | 35.15 |

*   Maturity.

9

| | | | Amortization Requirements for Series H Bonds due July 1, | | |
|---|---|---|---|---|---|
| Year | 2028 | 2035 | 2035[1] | 2035[2] | 2035[3] |
| 2014 | | | $100,000 | 90,000 | 115,000 |
| 2015 | | | 105,000 | 95,000 | 115,000 |
| 2016 | | | 105,000 | 100,000 | 120,000 |
| 2017 | | | 105,000 | 105,000 | 125,000 |
| 2018 | | | 110,000 | 105,000 | 130,000 |
| 2019 | | | 115,000 | 110,000 | 135,000 |
| 2020 | | | 120,000 | 115,000 | 135,000 |
| 2021 | | | 125,000 | 115,000 | 145,000 |
| 2022 | | | 125,000 | 125,000 | 145,000 |
| 2023 | | | 135,000 | 125,000 | 150,000 |
| 2024 | $950,000 | | 135,000 | 130,000 | 160,000 |
| 2025 | 1,000,000 | | 135,000 | 135,000 | 165,000 |
| 2026 | 1,045,000 | | 145,000 | 140,000 | 165,000 |
| 2027 | 1,100,000 | | 150,000 | 145,000 | 170,000 |
| 2028 | 1,155,000* | | 155,000 | 150,000 | 180,000 |
| 2029 | | $1,215,000 | 160,000 | 155,000 | 185,000 |
| 2030 | | 1,275,000 | 165,000 | 160,000 | 190,000 |
| 2031 | | 1,335,000 | 170,000 | 165,000 | 200,000 |
| 2032 | | 1,405,000 | 3,190,000 | 3,190,000 | 3,170,000 |
| 2033 | | 1,475,000 | 3,120,000 | 3,115,000 | 3,105,000 |
| 2034 | | 1,550,000 | 3,045,000 | 3,045,000 | 3,035,000 |
| 2035 | | 1,625,000* | 2,975,000* | 2,970,000* | 2,960,000* |
| Average life (years) | 23.27 | 29.37 | 29.02 | 29.08 | 28.81 |

[1] Mandatory Tender Bonds in the principal amount of $14,690,000.
[2] Mandatory Tender Bonds in the principal amount of $14,585,000.
[3] Mandatory Tender Bonds in the principal amount of $15,000,000.
* Maturity.

*2003 Subordinated Bonds*. The 2003 Subordinated Bonds maturing July 1, 2028 are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the respective Amortization Requirements for said bonds (less the amount of bonds retired by purchase from moneys in the 1998 Subordinated Bond Sinking Fund) from moneys in the 1998 Subordinated Bond Sinking Fund at par plus accrued interest in the years and amounts set forth below:

| | Amortization Requirements for 2003 Subordinated Bonds due July 1, |
|---|---|
| Year | 2028 |
| 2024 | $19,195,000 |
| 2025 | 20,125,000 |
| 2026 | 21,145,000 |
| 2027 | 22,200,000 |
| 2028 | 23,320,000* |
| Average life (years) | 23.27 |

* Maturity.

10

HTA_STAY0056094

If during any fiscal year, the total principal amount of 2003 Bonds of a particular maturity and series retired by purchase or redemption exceeds the Amortization Requirement for such maturity and series of 2003 Bonds for such year, the Amortization Requirement for such series of 2003 Bonds shall be reduced for subsequent fiscal years in amounts aggregating such excess as shall be determined by the Authority.

*Notice of Tender for Purchase of the Mandatory Tender Bonds or of Redemption*

Notice of tender for purchase on the Mandatory Tender Date of the Mandatory Tender Bonds or of redemption of the 2003 Bonds shall be given not less than 15 days, in the case of tender for purchase, or 30 days, in the case of redemption, prior to the Mandatory Tender Date or redemption date by first-class mail, postage prepaid, to The Depository Trust Company ("DTC"), New York, New York (or if the book-entry only system has been discontinued as described below, to the registered owners of the 2003 Bonds or portions thereof to be tendered or redeemed at their addresses appearing upon the registration books). The notice of tender for purchase shall state that such tender is conditioned upon the ability of the Remarketing Agent to remarket all (and not less than all) of the Mandatory Tender Bonds on the Mandatory Tender Date and should it not be possible for the Mandatory Tender Bonds to be sold on such date, the tender will be postponed (with such owners retaining their Mandatory Tender Bonds) until such date as such bonds are able to be so remarketed. Failure to mail the notice of tender to the registered owner of any Mandatory Tender Bond will not affect the tender or remarketing of said Bond or any other Mandatory Tender Bond. Failure to mail notice of redemption to the registered owner of any 2003 Bond or any defect in such notice will not affect the redemption of any other 2003 Bond as to which proper notice shall have been duly mailed.

On the Mandatory Tender Date (or such later date to which such tender has been postponed as aforesaid), if the condition set forth above concerning the remarketing of all of the Mandatory Tender Bonds shall have been met, the Mandatory Tender Bonds shall be deemed to have been tendered on such date for purchase and interest on such bonds shall cease to accrue. If notice of redemption shall have been duly mailed as aforesaid, and if on the redemption date moneys or Government Obligations which will provide moneys sufficient for the redemption of all 2003 Bonds or portions thereof to be redeemed, together with interest to the redemption date, shall be held by the 1968 Fiscal Agent or the 1998 Fiscal Agent, as the case may be, for such payment, then interest on such 2003 Bonds or portions thereof shall cease to accrue.

*Selection of 2003 Bonds to be Redeemed*

If less than all of the 2003 Bonds of any one maturity shall be called for redemption, the particular 2003 Bonds or portions thereof to be redeemed shall be selected by the 1968 Fiscal Agent or the 1998 Fiscal Agent, as the case may be, in such manner as it in its discretion may determine to be appropriate and fair.

## SECURITY

### Revenues

*1968 Resolution Revenues.* The 1968 Resolution Revenues consist of: (i) the gross receipts of the current $0.16 per gallon excise tax on gasoline and $0.04 of the current $0.08 per gallon excise tax on gas oil and diesel oil imposed by the Commonwealth and allocated to the Authority (after any deductions for taxes on fuels used in sea and air transportation that are required to be reimbursed under certain circumstances) by Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended (the "1994 Code") (the remaining $0.04 per gallon excise tax has been allocated to the Metropolitan Bus Authority by Act No. 39 of July 19, 1997); (ii) the gross receipts derived from the $15 per vehicle increase of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 ("Act No. 9"); (iii) Existing Toll Facilities Revenues; and (iv) investment earnings on deposits to the credit of funds and accounts established under the 1968 Resolution, except for the 1968 Construction Fund. The 1968 Resolution Revenues do not include gasoline taxes, gas oil and diesel oil taxes, and motor vehicle license fees which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Highway Revenue Bonds.

*1998 Resolution Revenues.* The 1998 Resolution Revenues consist of: (i) all excise taxes on crude oil, unfinished oil and derivative products ("petroleum products"), up to $120 million per fiscal year, imposed by the Commonwealth and allocated to the Authority by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended ("Act No. 34"), which amended the 1994 Code; (ii) the tolls and other charges imposed by the Authority for the use of Toll Facilities (other than Existing Toll Facilities Revenues prior to the repeal and cancellation of the 1968 Resolution); (iii) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico allocates to the Authority in the future and which the Authority pledges to the payment of Transportation Revenue Bonds; (iv) investment earnings on

11

deposit to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund; and (v) prior to the repeal and cancellation of the 1968 Resolution, any unencumbered 1968 Resolution Revenues remaining on deposit in the 1968 Construction Fund after payment or provision for payment of debt service and required reserves on the outstanding Highway Revenue Bonds (the "Excess 1968 Resolution Revenues") and, after said repeal and cancellation, all 1968 Resolution Revenues. The 1998 Resolution Revenues do not include excise taxes on petroleum products which may be levied or collected from time to time other than the amount of such taxes described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Transportation Revenue Bonds. The excise tax on petroleum products imposed by the 1994 Code and allocated to the Authority by Act No. 34 is a different tax from the excise tax on gasoline and gas oil and diesel oil imposed by the 1994 Code and allocated to the Authority, as discussed above.

Under certain circumstances relating to the termination of the Authority's concession agreement for the Teodoro Moscoso Bridge, the Excess 1968 Resolution Revenues would be encumbered for the benefit of the holders of the Authority's Special Facility Revenue Bonds issued to finance the Teodoro Moscoso Bridge and would be required to be applied to the payment of debt service on such bonds prior to their deposit with the 1998 Fiscal Agent for application to the payment of debt service on the Transportation Revenue Bonds. See the fifth paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures*. Under the 1998 Resolution, the Authority has covenanted not to encumber, withdraw or pledge any Excess 1968 Resolution Revenues deposited in the 1968 Construction Fund except in the limited circumstance of the Authority's taking over operation of the Teodoro Moscoso Bridge and except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund.

**Flow of Funds Under 1968 Resolution and 1998 Resolution**

The following chart illustrates the flow of 1968 Resolution Revenues and 1998 Resolution Revenues into the various funds and accounts established under the 1968 Resolution and the 1998 Resolution. The chart is provided only as a summary of the flow of funds under the 1968 Resolution and the 1998 Resolution, and does not purport to be complete. Reference is made to *Summary of Certain Provisions of the 1968 Resolution* and *Summary of Certain Provisions of the 1998 Resolution,* which should be read in conjunction herewith.

12

CONFIDENTIAL

## Flow of Funds Under the 1968 and 1998 Resolutions



(1) Upon the proposed refinancing of the Special Facility Revenue Bonds related to the Teodoro Moscoso Bridge, there will be no encumbrances on the 1968 Construction Fund. See "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures*.

(2) Under the 1998 Resolution, separate accounts in the Subordinated Bond Reserve Fund may be established for Series of Subordinated Bonds with different Subordinated Reserve Requirements.

(3) Certain Authority operation and maintenance expenses are paid from the 1998 Construction Fund.

CONFIDENTIAL

HTA_STAY0056097

Upon receipt of any moneys constituting 1968 Resolution Revenues, including moneys in the Special Fund constituting 1968 Resolution Revenues received from the Department of the Treasury (see "Special Fund" below), the Authority is required under the 1968 Resolution to deposit such moneys in equal monthly amounts into the 1968 Bond Service Account and the 1968 Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Highway Revenue Bonds and in the amounts necessary for the required deposits to the 1968 Reserve Account. Any remaining 1968 Resolution Revenues (other than investment earnings) are deposited into the 1968 Construction Fund. See *Summary of Certain Provisions of the 1968 Resolution.* Under the 1998 Resolution, the Authority has agreed not to encumber or withdraw or pledge any 1968 Resolution Revenues deposited in the 1968 Construction Fund except in the limited circumstance of the Authority's taking over operation of the Teodoro Moscoso Bridge and except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund. Pursuant to the 1998 Resolution, all such 1968 Resolution Revenues deposited in the 1968 Construction Fund, to the extent not encumbered by the Authority ("Excess 1968 Resolution Revenues"), must be withdrawn monthly and transferred to the 1998 Revenue Fund for application as described below. See *Summary of Certain Provisions of the 1998 Resolution.* Under certain circumstances relating to the termination of the concession agreement for the Teodoro Moscoso Bridge, such remaining 1968 Resolution Revenues would be encumbered for the benefit of the holders of the Special Facility Revenue Bonds and would have to be applied by the Authority for the payment of debt service on such bonds. See the fifth paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures.*

Upon receipt of any moneys constituting 1998 Resolution Revenues (other than investment earnings), including moneys in the Special Fund constituting 1998 Resolution Revenues received from the Department of the Treasury, the Authority is required under the 1998 Resolution to deposit such moneys into the 1998 Revenue Fund. In addition, the Authority is required to deposit monthly into the 1998 Revenue Fund all Excess 1968 Resolution Revenues. The Authority is required to withdraw monthly from the 1998 Revenue Fund and deposit into the 1998 Senior Bond Service Account and the 1998 Senior Bond Redemption Account the respective equal monthly amounts necessary to provide for the payment of principal of and interest and premium, if any, on the Senior Transportation Revenue Bonds and deposit to the 1998 Senior Bond Reserve Account the amount necessary, if any, to replenish the 1998 Senior Bond Reserve Account. Any remaining 1998 Resolution Revenues (other than investment earnings) are then required to be deposited monthly (in the respective equal monthly amounts) first into the accounts within the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Subordinated Transportation Revenue Bonds and then, into the 1998 Subordinated Bond Reserve Fund, as required. Any remaining 1998 Resolution Revenues are then deposited into the 1998 Construction Fund and are available to the Authority for any of its authorized purposes, but subject to the payment of certain operation and maintenance expenses and repair, renewal and replacement costs, as required by the 1998 Resolution. See *Summary of Certain Provisions of the 1998 Resolution.* Once all outstanding Highway Revenue Bonds are paid or defeased and the 1968 Resolution is repealed and canceled, all revenues of the Authority formerly constituting 1968 Resolution Revenues will be deposited monthly into the 1998 Revenue Fund for application as described above.

**1968 Resolution**

*Pledged Revenues.* The Highway Revenue Bonds are payable solely from, and secured by a pledge of, the 1968 Resolution Revenues and all other moneys held for the credit of the 1968 Bond Sinking Fund, which includes the 1968 Bond Service Account, the 1968 Redemption Account and the 1968 Bond Reserve Account.

*1968 Reserve Account.* The 1968 Resolution establishes the 1968 Reserve Account, the moneys in which are to be applied to the payment of interest on the Highway Revenue Bonds and maturing principal of serial Highway Revenue Bonds whenever moneys in the 1968 Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1968 Redemption Account to satisfy any Amortization Requirements for the term Highway Revenue Bonds whenever 1968 Resolution Revenues are insufficient for such purpose. The Authority covenants to accumulate and maintain in the 1968 Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Highway Revenue Bonds and 10% of the original principal amount of each Series of Bonds outstanding (the "1968 Reserve Requirement").

On March 31, 2003, approximately $156,668,395 was on deposit in the 1968 Reserve Account. The 1968 Reserve Requirement will be $159,398,731 upon the issuance of the 2003 Highway Revenue Bonds (and the refunding of the 1968 Resolution Refunded Bonds), and such amount will be on deposit in the 1968 Reserve Account following the issuance of the 2003 Highway Revenue Bonds. The 1968 Resolution allows the Authority to use a letter of credit or insurance policy to fund the 1968 Reserve Requirement. See *Summary of Certain Provisions of the 1968 Resolution* below.

Excess moneys in the 1968 Reserve Account are transferred to the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as directed by the Authority.

14

CONFIDENTIAL HTA_STAY0056098

## 1998 Resolution

*Pledged Revenues.* The Senior Transportation Revenue Bonds are payable solely from, and secured by a pledge of, the 1998 Resolution Revenues and all other moneys held for the credit of the 1998 Senior Bond Sinking Fund, which includes the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account and the 1998 Senior Bond Reserve Account. Under certain circumstances described below, unencumbered moneys in the 1998 Construction Fund or the 1998 Subordinated Bond Sinking Fund derived from 1998 Resolution Revenues may be used to pay debt service on the Senior Transportation Revenue Bonds, if moneys in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account are insufficient therefor, prior to applying moneys in the 1998 Senior Bond Reserve Account. The Subordinated Transportation Revenue Bonds are payable solely from, and secured by a pledge of, the 1998 Resolution Revenues (subject to the prior payment in full of the Senior Transportation Revenue Bonds) and all other moneys held for the credit of the 1998 Subordinated Bond Sinking Fund, which includes the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account. In addition, the 2003 Subordinated Bonds are additionally secured by amounts held for the credit of a separate account in the 1998 Subordinated Bond Reserve Fund (the "2003 Subordinated Bonds Reserve Account").

*1998 Senior Bond Reserve Account.* The 1998 Resolution establishes a 1998 Senior Bond Reserve Account, the moneys in which are to be applied to the payment of interest on the Senior Transportation Revenue Bonds, and maturing principal of serial Senior Transportation Revenue Bonds whenever moneys in the 1998 Senior Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1998 Senior Bond Redemption Account to satisfy any Amortization Requirements for the term Senior Transportation Revenue Bonds whenever 1998 Resolution Revenues are insufficient for such purpose. The 1998 Resolution provides, however, that before the moneys in the 1998 Senior Bond Reserve Account are used to cover any insufficiency in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account, the 1998 Fiscal Agent shall cover such insufficiency by first withdrawing from the 1998 Construction Fund any unencumbered 1998 Resolution Revenues deposited therein and, to the extent such moneys are insufficient to cover said deficiency, by withdrawing moneys on deposit in the 1998 Subordinated Bond Service Account and 1998 Subordinated Bond Redemption Account.

The Authority covenants to accumulate and maintain in the 1998 Senior Bond Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Senior Transportation Revenue Bonds and 10% of the original principal amount of each Series of Senior Transportation Revenue Bonds outstanding (the "1998 Senior Bonds Reserve Requirement").

On March 31, 2003, approximately $167,396,090 was in deposit in the 1998 Senior Bond Reserve Account. The Senior Bonds Reserve Requirement will be $199,249,838 upon the issuance of the 2003 Bonds and the refunding of the 1998 Resolution Refunded Bonds, and such amount will be on deposit in the 1998 Senior Bond Reserve Account following the issuance of the 2003 Bonds. The 1998 Resolution permits any increase in the Senior Bonds Reserve Requirement to be funded over not more than five years and allows the Authority to use a letter of credit or insurance policy to fund the Senior Bonds Reserve Requirement. See *Summary of Certain Provisions of the 1998 Resolution* below.

Excess moneys in the 1998 Senior Bond Reserve Account may be retained in such Reserve Account, may be applied to the payment of outstanding notes issued by the Authority to finance temporarily any Transportation Facilities or outstanding Senior Transportation Revenue Bonds to be refunded or may be transferred to the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, or the 1998 Construction Fund, as directed by the Authority.

*1998 Subordinated Bond Reserve Fund.* The 1998 Resolution establishes a 1998 Subordinated Bond Reserve Fund, in which the Authority may establish one or more accounts to correspond to separate Series of Subordinated Transportation Revenue Bonds with different Subordinated Reserve Requirements. The moneys held for the credit of each account in the 1998 Subordinated Bond Reserve Fund are to be applied to the payment of interest on each Series of Subordinated Transportation Revenue Bonds, and maturing principal of serial Subordinated Transportation Revenue Bonds of each such Series to which such account relates whenever moneys in the 1998 Subordinated Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1998 Subordinated Bond Redemption Account to satisfy any Amortization Requirements for the term Subordinated Transportation Revenue Bonds of each such Series to which such account relates whenever 1998 Resolution Revenues are insufficient for such purpose. In the 2003 Transportation Revenue Bonds Resolution, the Authority has fixed the Subordinated Reserve Requirement for the 2003 Subordinated Bonds at the lesser of the maximum annual Principal and Interest Requirements for said bonds and 10% of the original principal amount thereof (the "2003 Subordinated Bonds Reserve Requirement"), which sum will be deposited to the credit of such account from a portion of the proceeds of the 2003 Subordinated Bonds.  The 1998 Resolution permits any increase in the applicable reserve requirement corresponding to a series of Subordinated Transportation Revenue Bonds to be funded over not more than five years and

15

allows the Authority to use a letter of credit or insurance policy to refund such reserve requirement. See *Summary of Certain Provisions of the 1998 Resolution* below.

Excess moneys in the 2003 Subordinated Bonds Reserve Account may be retained in such Reserve Account, may be applied to the payment of outstanding notes issued by the Authority to finance temporarily any Traffic Facilities or undertakings of the Authority for which Subordinated Transportation Revenue Bonds may be issued under the 1998 Resolution or outstanding Subordinated Transportation Revenue Bonds to be refunded, or may be deposited to the credit of the 1998 Subordinated Bond Service Account, the 1998 Subordinated Bond Redemption Account or the 1998 Construction Fund at the option of the Authority.

**Neither the 1968 Resolution nor the 1998 Resolution contains events of default or provides for the acceleration of the maturities of the Highway Revenue Bonds or the Transportation Revenue Bonds.**

**Replenishment of 1968 and 1998 Reserve Accounts**

Under the 1994 Code, if moneys in the 1968 Reserve Account, 1998 Senior Bond Reserve Account or any accounts established in the 1998 Subordinated Bond Reserve Fund, including the 2003 Subordinated Bonds Reserve Account (collectively, the "Reserve Accounts") are applied to cover a deficiency in the amounts necessary for payment of the principal of and interest on the Highway Revenue Bonds, Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds, respectively, the amounts used from any of the applicable Reserve Accounts to cover said deficiency shall be reimbursed to the Authority from the first amounts received in the next fiscal year or subsequent years by the Commonwealth derived from (i) any other taxes which may then be in effect on any other fuel or propellant which is used, among other purposes, to propel highway vehicles, and (ii) any remaining portion of the gasoline tax and petroleum products tax then in effect. The proceeds of said other taxes and the remainder of the gasoline tax and petroleum products tax to be used to reimburse the applicable Reserve Accounts are not deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority, and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, used to reimburse said Reserve Accounts. In the 1998 Resolution, the Authority covenants to apply any such reimbursement received first to replenish the 1968 Reserve Account, then to replenish the 1998 Senior Bond Reserve Account, and finally to replenish any accounts in the 1998 Subordinated Bond Reserve Fund.

**Commitment Not to Reduce Taxes and Fees**

The Commonwealth has agreed and committed in the 1994 Code that it will not reduce the gasoline tax below $0.16 per gallon, the tax on gas oil and diesel oil below $0.04 per gallon or the tax on petroleum products below the tax rates in effect on July 16, 1997 (as described below), and that it will not reduce the amount of any such taxes allocated to the Authority until all obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, secured by the pledge thereof are fully paid. The Commonwealth has also agreed and pledged in Act No. 9 that it will not reduce the motor vehicle license fees allocated and pledged to the payment of obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, so long as the proceeds of such fees remain pledged to the payment of such obligations.

**Special Fund**

Under the 1994 Code and Act No. 9, the proceeds of the taxes and license fees allocated to the Authority are deposited by the Department of the Treasury in a special fund (the "Special Fund") in favor of the Authority. In accordance with the Constitution of Puerto Rico, the proceeds of such taxes and license fees are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are insufficient therefor. The Commonwealth has never applied the proceeds of such taxes or license fees allocated to the Authority to the payment of such debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of such debt. For information with respect to the Commonwealth's debt and the economic and financial condition of the Commonwealth, see "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" below and *Debt* in the Commonwealth Report.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that public debt of the Commonwealth constitutes a first lien on available Commonwealth taxes and revenues. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions heretofore rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The 2003 Bonds do not constitute public debt.

16

The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle license fees allocated to the Authority by the 1994 Code and Act No. 9 are available Commonwealth taxes and revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth but, under the 1994 Code and Act No. 9, such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. Tolls and other fees and charges collected by the Authority and investment earnings are not available Commonwealth taxes and revenues.

The Commonwealth has never applied taxes or license fees allocated to the Authority to the payment of its public debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of its public debt. See *Debt* in the Commonwealth Report.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended ("Act No. 39"), the Secretary of the Treasury of Puerto Rico is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Special Fund for the Amortization of General Obligations Evidenced by Bonds and Promissory Notes (the "Commonwealth Redemption Fund"). As of the date of this Official Statement, the amount on deposit in the Commonwealth Redemption Fund complied with such requirement. Moneys in the Commonwealth Redemption Fund may also be applied to payment of other Commonwealth guaranteed obligations outstanding prior to adoption of Act No. 39. Such moneys are not available to pay the 2003 Bonds.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico (hereinafter "internal revenues") in the two fiscal years preceding the then current fiscal year. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded.

Internal revenues consist principally of income taxes, property taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury of Puerto Rico, and motor vehicle fuel taxes and license fees, which are allocated to the Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. On December 21, 1995, the Puerto Rico Aqueduct and Sewer Authority issued $400,340,000 Puerto Rico Aqueduct and Sewer Authority Refunding Bonds, guaranteed by the Commonwealth (the "PRASA Guaranteed Bonds"). On January 1, 1997, the Commonwealth began to make payments of debt service on the PRASA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. The amounts paid by the Commonwealth under the PRASA Guaranteed Bonds are taken into account for purposes of computing the above described 15% constitutional debt limitation.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth have been invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest rating category by Moody's Investors Service and Standard & Poor's Ratings Services), none of which is eligible to be used for legal defeasance under Puerto Rico law ("non-eligible investments"). Since the bonds being refunded with proceeds invested in non-eligible investments are not legally defeased, such bonds are treated as outstanding for purposes of the 15% debt limitation.

Future maximum annual debt service for the Commonwealth's currently outstanding general obligation debt is $520,565,146.25 in the fiscal year ending June 30, 2020. Debt service for the PRASA Guaranteed Bonds paid during fiscal 2002 (including for this purpose debt service payments due July 1, 2002) was $33,541,577.50. The sum of those amounts ($554,106,723.75) is equal to 8.044% of $6,888,545,000 which is the average of the adjusted internal revenues for the prior two fiscal years ended June 30, 2002. If the bonds refunded with non-eligible investments were treated as still being outstanding, the percentage referred to in the preceding sentence would be 9.868%.

Information about the Commonwealth public sector debt and debt service requirements for the Commonwealth's general obligation bonds and the Commonwealth's guaranteed debt appear in *Public Sector Debt of the Commonwealth* in the Commonwealth Report.

17

The 2003 Bonds are not a debt of the Commonwealth or any of its political subdivisions (other than the Authority), and neither the Commonwealth nor any such subdivision (other than the Authority) shall be liable thereon.

**Additional Bonds**

*Highway Revenue Bonds.* The Authority has covenanted in the 1998 Resolution that it will not issue additional Highway Revenue Bonds except bonds maturing no later than July 1, 2036, which are issued (i) to refund outstanding Highway Revenue Bonds in order to achieve debt service savings or (ii) in exchange for the outstanding Special Facility Revenue Bonds, as required under the concession agreement relating to the Teodoro Moscoso Bridge. See the last paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures.* The issuance of such Highway Revenue Bonds must meet the tests for the issuance of such bonds under the 1968 Resolution, which tests are more fully described in "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1968 Resolution.* The Authority expects that the requirement of clause (ii) above will be eliminated upon the proposed issuance of the Special Facility Revenue Refunding Bonds. See "Teodoro Moscoso Bridge" under *Construction Improvement Program.*

*Senior Transportation Revenue Bonds.* The Authority may issue additional Senior Transportation Revenue Bonds under the 1998 Resolution to provide funds for any lawful purpose of the Authority, including the payment of all or any part of the cost of Transportation Facilities (including the payment of any outstanding notes of the Authority issued for the purpose of paying all or a part of such cost); provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Senior Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate revisions made effective on or prior to the date of delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Senior Transportation Revenue Bonds and the additional Senior Transportation Revenue Bonds then to be issued and not less than 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds (including Subordinated Transportation Revenue Bonds) and the additional Senior Transportation Revenue Bonds then to be issued.

The Authority may also issue additional Senior Transportation Revenue Bonds to refund all or any part of the outstanding Senior Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum annual Principal and Interest Requirements on the Senior Transportation Revenue Bonds to be outstanding after the issuance of such additional Senior Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Senior Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Senior Transportation Revenue Bonds. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1998 Resolution.*

Any additional Senior Transportation Revenue Bonds issued under the 1998 Resolution will be on a parity with the outstanding Senior Transportation Revenue Bonds and will be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the 1998 Resolution. The Series G Bonds and the Series H Bonds are being issued as Senior Transportation Revenue Bonds.

*Subordinated Transportation Revenue Bonds.* The Authority may issue Subordinated Transportation Revenue Bonds under the 1998 Resolution to pay all or any part of the cost of any highway project or transit project eligible for financial assistance under federal legislation, provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Subordinated Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate changes made effective on or prior to delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 125% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds then to be issued.

The Authority may also issue Subordinated Transportation Revenue Bonds to refund all or any part of the outstanding Subordinated Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum Principal and Interest Requirements on the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such additional Subordinated Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements on the Subordinated Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Subordinated Transportation Revenue Bonds. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1998 Resolution.*

18

HTA_STAY0056102

In December 1997, the Authority entered into a Cooperative Agreement with the Federal Highway Administration ("FHWA"), the Federal Transit Administration ("FTA") and the Department that provides for the establishment of a State Infrastructure Bank ("SIB") under the provisions of Section 350 of the National Highway System Designation Act of 1995, which bank was capitalized 80% by federal capitalization grants and 20% by matching Authority funds. The SIB has been used to provide various forms of financial assistance to the Authority to finance eligible highway and transit projects.

In August 1998, the Authority issued its 1998 SIB Bonds in the principal amount of $75,050,000 under the 1998 Resolution. The reserve account in the Subordinated Bond Reserve Fund established as part of the security for the 1998 SIB Bonds (the "1998 SIB Reserve Account") is entitled to the benefits of an agreement with the SIB under which agreement the 1998 Fiscal Agent is authorized and directed to request funds from the depository institution holding the SIB moneys (currently the Government Development Bank), up to the full amount on deposit in the SIB, in the event it is necessary to apply moneys in such account in the Subordinated Bond Reserve Fund to pay debt service on the 1998 SIB Bonds. The Authority's obligation to repay any amounts drawn under the agreement with the SIB also will be secured by a lien on 1998 Resolution Revenues subordinate to the lien securing the Senior Transportation Revenue Bonds. See "Sinking Fund" under *Summary of Certain Provisions of the 1998 Resolution.*

The 2003 Subordinated Bonds will be secured equally and ratably with the 1998 SIB Bonds to the extent of their respective claims in the 1998 Resolution Revenues, but the balance in the 1998 SIB Reserve Account is not available to pay debt service on the 2003 Subordinated Bonds, nor will the balance in the 2003 Subordinated Bonds Reserve Account be available to pay debt service on the 1998 SIB Bonds.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from DTC and neither the Authority nor the Underwriters take any responsibility for the accuracy thereof.

DTC will act as securities depository for the 2003 Bonds. The 2003 Bonds will be issued as fully registered bonds in the name of Cede & Co. (DTC's partnership nominee) or such other nominee as may be requested by an authorized representative of DTC. One fully registered 2003 Bond will be issued for each maturity of each series of the 2003 Bonds in the aggregate principal amount of such maturity and will be deposited with DTC.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 2 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 85 countries that DTC's participants (the "Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Government Securities Clearing Corporation, MBS Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, GSCC, MBSCC, AND EECC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of the 2003 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the 2003 Bonds on DTC's records. The ownership interest of each actual purchaser of a 2003 Bond (a "Beneficial Owner") will in turn be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases, but Beneficial Owners are expected to receive written confirmation providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the 2003 Bonds will be accomplished by entries made on the books of Direct or Indirect Participants acting on behalf of

19

CONFIDENTIAL

HTA_STAY0056103

the Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interest in 2003 Bonds except in the event that use of the book-entry system for the 2003 Bonds is discontinued.

To facilitate subsequent transfers, all 2003 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of 2003 Bonds with DTC and their registration in the name of Cede & Co. effect no change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the 2003 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such 2003 Bonds are credited, which may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants to Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices will be sent to Cede & Co. If less than all of the 2003 Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the 2003 Bonds to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the 2003 Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the 2003 Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the 2003 Bonds will be made to Cede & Co. or to such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name", and will be the responsibility of such Participant and not of DTC, the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the 2003 Bonds at any time by giving reasonable notice to the Authority, the 1968 Fiscal Agent and the 1998 Fiscal Agent. Under such circumstances, in the event that a successor securities depository is not obtained, definitive 2003 Bonds are required to be printed and delivered.

The Authority may decide to discontinue use of the system of book-entry transfers through DTC (or a successor securities depository). In that event, definitive 2003 Bonds will also be printed and delivered.

**Payments and Transfers**

No assurance can be given by the Authority that DTC will make prompt transfer of payments to the Direct Participants or that Direct Participants will make prompt transfer of payments to Indirect Participants or to Beneficial Owners. The Authority is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or Participants.

*The Authority, the 1968 Fiscal Agent and the 1998 Fiscal Agent will have no responsibility or obligation to such Direct Participants, Indirect Participants, or the persons for whom they act as nominees with respect to the payments to or the providing of notice for the Direct Participants, the Indirect Participants, or the Beneficial Owners. Payments made to DTC or its nominee shall satisfy the obligations of the Authority to the extent of such payments.*

For every transfer of the 2003 Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

20

**Discontinuance of Book-Entry Only System**

In the event that such book-entry only system is discontinued for the 2003 Bonds, the following provisions will apply to the 2003 Bonds: principal of the 2003 Bonds and redemption premium, if any, thereon will be payable in lawful money of the United States of America at the principal corporate trust office of the 1968 Fiscal Agent or the 1998 Fiscal Agent, as the case may be, in New York, New York. Interest on the 2003 Bonds will be payable on each January 1 and July 1, by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1968 Fiscal Agent or the 1998 Fiscal Agent, as the case may be, as of the close of business on the record date therefor as set forth in the 1968 Resolution or the 1998 Resolution, as applicable. The 2003 Bonds will be issued only as registered bonds without coupons in authorized denominations. The transfer of the 2003 Bonds will be registrable and the 2003 Bonds may be exchanged at the principal corporate trust office of the 1968 Fiscal Agent or the 1998 Fiscal Agent, as the case may be, in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Proposed 1968 Supplemental Resolutions**

The Authority proposes to adopt a supplemental resolution (the "Variable Rate Supplement") when the consent of the owners of two-thirds in aggregate principal amount of the Highway Revenue Bonds outstanding has been obtained. Such supplemental resolution will permit the 1968 Fiscal Agent to treat Variable Rate Bonds (as defined in the 1968 Resolution) as having an assumed fixed interest rate equal to the latest five-year or one-year (if higher) average of the historical interest rates on such Bonds or based upon certain commonly used interest rate indices for the purpose of calculating Principal and Interest Requirements (as defined in the 1968 Resolution).

The Authority proposes to adopt another supplemental resolution (the "Parity Lien Supplement") when the consent of the owners of 100% of the Highway Revenue Bonds outstanding has been obtained. Such supplemental resolution will provide, among other things, for certain modifications to the amendment provisions of the 1968 Resolution, including a reduction of the $66^2/_3\%$ consent requirement for certain amendments to a majority. In addition, the Authority will be permitted to grant a parity lien on 1968 Resolution Revenues to secure reimbursement agreements with the providers of any credit facility or liquidity facility securing Highway Revenue Bonds.

**Consent of Highway Revenue Bondholders**

By purchasing the 2003 Highway Revenue Bonds, the owners of such Bonds will have consented to and approved, for themselves and future owners of such Bonds, the adoption of the proposed supplemental resolutions. Upon the issuance of the 2003 Bonds and the refunding of the 1968 Resolution Refunded Bonds, the owners of 38.39% in respect of the Variable Rate Supplement and 99.17% in respect of the Parity Lien Supplement of the aggregate principal amount of the Highway Revenue Bonds outstanding will have consented to the adoption of the respective proposed supplemental resolutions.

**Proposed 1998 Supplemental Resolution**

The Authority proposes to adopt a supplemental resolution (the "1998 Variable Rate Supplement") when the consent of the owners of a majority in aggregate principal amount of the Senior Transportation Revenue Bonds and of the Subordinate Transportation Revenue Bonds outstanding has been obtained. Such supplemental resolution will permit the 1998 Fiscal Agent to treat Transportation Revenue Bonds bearing interest at a variable rate as having an assumed fixed interest rate equal to the latest five-year or one-year (if higher) average of the historical interest rates on such bonds or based upon certain commonly used interest rate indices for the purpose of calculating Principal and Interest Requirements (as defined in the 1998 Resolution).

**Consent of Transportation Revenue Bondholders**

By purchasing the 2003 Transportation Revenue Bonds, the owners of such Bonds will have consented to and approved, for themselves and future owners of such Bonds, the adoption of the 1998 Variable Rate Supplement. Upon the issuance of the 2003 Bonds and the refunding of the 1998 Resolution Refunded Bonds, the owners of 21.05% of the aggregate principal amount of the Senior Transportation Revenue Bonds and of 81.03% of the aggregate principal amount of the Subordinated Transportation Revenue Bonds outstanding will have consented to the adoption of such supplemental resolution.

21

## BOND INSURANCE

The following has been provided by Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Company ("FGIC"), Financial Security Assurance Inc. ("FSA") and MBIA Insurance Corporation ("MBIA"), and with respect to the Ambac Insured Bonds, the FGIC Insured Bonds, the FSA Insured Bonds and the MBIA Insured Bonds, respectively, as indicated on the inside cover pages of this Official Statement for use in this Official Statement.

No representation is made by the Authority as to the accuracy or completeness of the information. Reference is made to *Appendices IV* through *VII* for specimens of the Bond Insurance Policies.

### Ambac Assurance Corporation

Ambac is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin and licensed to do business in 50 states, the District of Columbia, the Territory of Guam and the Commonwealth of Puerto Rico, with admitted assets of approximately $6,115,000,000 (unaudited) and statutory capital of approximately $3,703,000,000 (unaudited) as of December 31, 2002. Statutory capital consists of Ambac's policyholders' surplus and statutory contingency reserve. Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Moody's Investors Service and Fitch, Inc. have each assigned a triple-A financial strength rating to Ambac.

Ambac has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by Ambac will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by Ambac under policy provisions substantially identical to those contained in its financial guaranty insurance policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Authority on the Ambac Insured Bonds.

Ambac makes no representation regarding the Ambac Insured Bonds or the advisability of investing in the Ambac Insured Bonds, and makes no representation regarding, nor has it participated in the preparation of, this Official Statement other than the information supplied by Ambac and presented under the heading "Ambac Assurance Corporation".

*Available Information.* The parent company of Ambac, Ambac Financial Group, Inc. (the "Company"), is subject to the informational requirements of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and in accordance therewith files reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including the Company. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc. (the "NYSE"), 20 Broad Street, New York, New York 10005.

Copies of Ambac's financial statements prepared in accordance with statutory accounting standards are available from Ambac. The address of Ambac's administrative offices and its telephone number are One State Street Plaza, 19th Floor, New York, New York 10004 and (212) 668-0340.

*Incorporation of Certain Documents by Reference.* The following documents filed by the Company with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement: (i) the Company's Current Report on Form 8-K dated January 23, 2003 and filed on January 24, 2003; (ii) the Company's Current Report on Form 8-K dated February 25, 2003 and filed on February 28, 2003; (iii) the Company's Current Report on Form 8-K dated February 25, 2003 and filed on March 4, 2003; (iv) the Company's Current Report on Form 8-K dated March 18, 2003 and filed on March 20, 2003; (v) the Company's Current Report on Form 8-K dated March 19, 2003 and filed on March 26, 2003; (vi) the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2002 and filed on March 28, 2003; and (vii) the Company's Current Report on Form 8-K dated March 25, 2003 and filed on March 31, 2003.

All documents subsequently filed by the Company pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in "Available Information".

*Payment Pursuant to Ambac Bond Insurance Policy.* Ambac has made a commitment to issue the Ambac Bond Insurance Policy relating to the Ambac Insured Bonds effective as of the date of issuance of the 2003 Bonds. Under the terms of the Ambac Bond Insurance Policy, Ambac will pay to The Bank of New York, in New York, New York or any successor thereto (the "Insurance Trustee") that portion of the principal of and interest on the Ambac Insured Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Authority (as such terms are defined in the Ambac Bond Insurance Policy). Ambac will make such payments to the Insurance Trustee on the later of the date on which such

22

HTA_STAY0056106

principal and interest becomes Due for Payment or within one business day following the date on which Ambac shall have received notice of Nonpayment from the 1968 Fiscal Agent and/or 1998 Fiscal Agent, as the case may be. The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac.

The Ambac Bond Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac will remain obligated to pay principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates including mandatory sinking fund redemption dates. In the event of anyacceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been had there not been an acceleration.

In the event the 1968 Fiscal Agent and/or the 1998 Fiscal Agent, as the case may be, has notice that any payment of principal of or interest on an Ambac Insured Bond which has become Due for Payment and which is made to a Holder by or on behalf of the Authority has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Insurance Policy does **not** insure any risk other than Nonpayment, as defined in the Ambac Bond Insurance Policy. Specifically, the Ambac Bond Insurance Policy does **not** cover: (i) payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; and (iii) nonpayment of principal or interest caused by the insolvency or negligence of the 1968 Fiscal Agent or the 1998 Fiscal Agent, or any other trustee, paying agent or bond registrar, if any.

If it becomes necessary to call upon the Ambac Bond Insurance Policy, payment of principal requires surrender of Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac to the extent of the payment under the Ambac Bond Insurance Policy. Payment of interest pursuant to the Ambac Bond Insurance Policy requires proof of Holder entitlement to interest payments and an appropriate assignment of the Holder's right to payment to Ambac.

Upon payment of the insurance benefits, Ambac will become the owner of the Ambac Insured Bonds as to which such payment was made, appurtenant coupon, if any, or right to payment of principal or interest on such Ambac Insured Bonds and will be fully subrogated to the surrendering Holders' rights to payment.

The Ambac Bond Insurance Policy does not insure against loss relating to payments of the purchase price of Ambac Insured Bonds upon tender by a registered owner thereof or any preferential transfer relating to payments of the purchase price of Ambac Insured Bonds upon tender by a registered owner thereof.

**Financial Guaranty Insurance Company**

Concurrently with the issuance of the 2003 Bonds, FGIC will issue the FGIC Bond Insurance Policy for the FGIC Insured Bonds. The FGIC Bond Insurance Policy unconditionally guarantees the payment of that portion of the principal or accreted value (if applicable) of and interest on the FGIC Insured Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the Authority. FGIC will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal or accreted value (if applicable) and interest is due or on the business day next following the day on which FGIC shall have received telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from an owner of FGIC Insured Bonds or the 1968 Fiscal Agent and/or the 1998 Fiscal Agent, as the case may be, of the nonpayment of such amount by the Authority. The Fiscal Agent will disburse such amount due on any FGIC Insured Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in FGIC. The term "nonpayment" in respect of a FGIC Insured Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of such a Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

The FGIC Bond Insurance Policy is non-cancellable and the premium will be fully paid at the time of delivery of the 2003 Bonds. The FGIC Bond Insurance Policy covers failure to pay principal of the FGIC Insured Bonds on their respective stated maturity date or dates on which the same shall have been duly called for mandatory sinking fund

23

redemption, and not on any other date on which the FGIC Insured Bonds may have been otherwise called for redemption, accelerated or advanced in maturity, and also covers the failure to pay an installment of interest on the stated date for its payment.

Generally, in connection with its insurance of an issue of municipal securities, FGIC requires, among other things, (i) that it be granted the power to exercise any rights granted to the holders of such securities upon the occurrence of an event of default, without the consent of such holders, and that such holders may not exercise such rights without FGIC's consent, in each case so long as FGIC has not failed to comply with its payment obligations under its insurance policy; and (ii) that any amendment or supplement to or other modification of the principal legal documents are subject to FGIC's consent. The specific rights, if any, granted to FGIC in connection with its insurance of the FGIC Insured Bonds are set forth below.

This Official Statement contains a section regarding the ratings assigned to the 2003 Bonds and reference should be made to such section for a discussion of such ratings and the basis for their assignment to the FGIC Insured Bonds. Reference should be made to such section for a discussion of the ratings, if any, assigned to the Authority's outstanding uninsured bonds.

The FGIC Bond Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

FGIC is a wholly-owned subsidiary of FGIC Corporation (the "Corporation"), a Delaware holding company. The Corporation is a subsidiary of General Electric Capital Corporation ("GE Capital"). Neither the Corporation nor GE Capital is obligated to pay the debts of or the claims against FGIC. FGIC is a monoline financial guaranty insurer domiciled in the State of New York and subject to regulation by the State of New York Insurance Department. As of December 31, 2002, the total capital and surplus of FGIC was approximately $978 million. FGIC prepares financial statements on the basis of both statutory accounting principles and generally accepted accounting principles. Copies of such financial statements may be obtained by writing to FGIC at 125 Park Avenue, New York, New York 10017, Attention: Communications Department (telephone number: 212-312-3000) or to the New York State Insurance Department at 25 Beaver Street, New York, New York 10004-2319, Attention: Financial Condition Property/Casualty Bureau (telephone number: 212-480-5187).

**Financial Security Assurance Inc.**

*Bond Insurance Policy.* Concurrently with the issuance of the 2003 Bonds, FSA will issue the FSA Bond Insurance Policy. The FSA Bond Insurance Policy guarantees the scheduled payment of principal of and interest on the FSA Insured Bonds when due as set forth in the form of the FSA Bond Insurance Policy included as *Appendix VI* to this Official Statement.

The FSA Bond Insurance Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida or any other insurance law.

*Financial Security Assurance Inc.* FSA is a New York domiciled insurance company and a wholly owned subsidiary of Financial Security Assurance Holdings Ltd. ("Holdings"). Holdings is an indirect subsidiary of Dexia, S.A., a publicly held Belgian corporation. Dexia, S.A., through its bank subsidiaries, is primarily engaged in the business of public finance in France, Belgium and other European countries. No shareholder of Holdings or FSA is liable for the obligations of FSA.

At December 31, 2002, FSA's total policyholders' surplus and contingency reserves were approximately $1,876,117,000 and its total unearned premium reserve was approximately $1,055,340,000 in accordance with statutory accounting principles. At December 31, 2002, FSA's total shareholders' equity was approximately $1,971,325,000 and its total net unearned premium reserve was approximately $892,552,000 in accordance with generally accepted accounting principles.

The financial statements included as exhibits to the annual and quarterly reports filed by Holdings with the SEC are hereby incorporated herein by reference. Also incorporated herein by reference are any such financial statements so filed from the date of this Official Statement until the termination of the offering of the 2003 Bonds. Copies of materials incorporated by reference will be provided upon request to Financial Security Assurance Inc.: 350 Park Avenue, New York, New York 10022, Attention: Communications Department (telephone (212) 826-0100).

24

The FSA Bond Insurance Policy does not protect investors against changes in market value of the FSA Insured Bonds, which market value may be impaired as a result of changes in prevailing interest rates, changes in applicable ratings or other causes. FSA makes no representation regarding the FSA Insured Bonds or the advisability of investing in the FSA Insured Bonds. FSA makes no representation regarding this Official Statement, nor has it participated in the preparation thereof, except that FSA has provided to the Authority the information presented under this caption and a specimen of the FSA Bond Insurance Policy for inclusion in this Official Statement.

## MBIA Insurance Corporation

*Bond Insurance Policy.* The MBIA Bond Insurance Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Authority to the 1968 Fiscal Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the MBIA Insured Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the MBIA Bond Insurance Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the MBIA Insured Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

The MBIA Bond Insurance Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any MBIA Insured Bond. The MBIA Bond Insurance Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of MBIA Insured Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. The MBIA Bond Insurance Policy also does not insure against nonpayment of principal of or interest on the MBIA Insured Bonds resulting from the insolvency, negligence or any other act or omission of the 1968 Fiscal Agent or any other paying agent for the MBIA Insured Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the 1968 Fiscal Agent or any owner of a MBIA Insured Bond the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York,, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such MBIA Insured Bonds or presentment of such other proof of ownership of the MBIA Insured Bonds, together with any appropriate instruments to evidence the assignment of the insured amounts due on the MBIA Insured Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of the MBIA Insured Bonds in any legal proceeding related to payment of insured amounts on the MBIA Insured Bonds, such instruments being in a form satisfactory to U.S. Bank Trust National Association, in New York, New York, U.S. Bank Trust National Association shall disburse to such owners or the 1968 Fiscal Agent payment of the insured amounts due on such MBIA Insured Bonds, less any amount held by the 1968 Fiscal Agent for the payment of such insured amounts and legally available therefor.

*MBIA.* MBIA is the principal operating subsidiary of MBIA Inc., a NYSE listed company (the "Parent Company"). The Parent Company is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. MBIA has three branches, one in the Republic of France, one in the Republic of Singapore and one in the Kingdom of Spain. New York has laws prescribing minimum capital requirements, limiting classes and concentrations of investments and requiring the approval of policy rates and forms. State laws also regulate the amount of both the aggregate and individual risks that may be insured, the payment of dividends by MBIA, changes in control and transactions among affiliates. Additionally, MBIA is required to maintain contingency reserves on its liabilities in certain amounts and for certain periods of time.

MBIA does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the MBIA Bond Insurance Policy and MBIA set forth under the heading "The MBIA Bond Insurance Policy" under *Bond Insurance*. Additionally, MBIA makes no representations regarding the 2003 Bonds

25

(including the MBIA Insured Bonds) or the advisability of investing in the 2003 Bonds (including the MBIA Insured Bonds).

The MBIA Bond Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

*MBIA Information.* The Parent Company files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of the SEC filings (including the Parent Company's Annual Report on Form 10-K for the year ended December 31, 2002) are incorporated herein by reference and is available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington D.C.; (iii) over the Internet at the Parent Company's web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504. The telephone number of MBIA is (914) 273-4545.

Any documents filed by the Parent Company pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act after the date of this Official Statement and prior to the termination of the offering of the MBIA Insured Bonds offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement, shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

As of December 31, 2001, MBIA had admitted assets of $8.5 billion (audited), total liabilities of $5.6 billion (audited), and total capital and surplus of $2.9 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of September 30, 2002, MBIA had admitted assets of $9.0 billion (unaudited), total liabilities of $5.9 billion (unaudited), and total capital and surplus of $3.1 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

*Financial Strength Ratings of MBIA.* Moody's Investors Service rates the financial strength of MBIA "Aaa."

Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. rates the financial strength of MBIA "AAA."

Fitch, Inc. rates the financial strength of MBIA "AAA."

Each rating of MBIA should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the MBIA Insured Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market prices of the MBIA Insured Bonds. MBIA does not guaranty the market prices of the MBIA Insured Bonds nor does it guaranty that the ratings on the MBIA Insured Bonds will not be revised or withdrawn.

**Concerning the Policies**

As provided in the insurance agreements to be entered into by the Authority with each of Ambac, FGIC, FSA and MBIA concurrently with the delivery of their respective Bond Insurance Policies, as long as Ambac, FGIC, FSA and MBIA shall not be in default on their respective obligations under their respective Bond Insurance Policies, Ambac, FGIC, FSA and MBIA shall be deemed to be the respective owners of the 2003 Bonds insured by each of them for purposes of, among other things, the giving of consents to the adoption of any supplements to the 1968 Resolution or the 1998 Resolution, as the case may be.

## THE AUTHORITY

**General Description**

The Authority was created in 1965 to assume responsibility for the construction of roads and highways and related transportation facilities in the Commonwealth. The Authority is a separate entity from the Department for purposes of financing and constructing the Commonwealth's transportation system, but since 1971, the Secretary of

26

Transportation and Public Works (the "Secretary"), appointed by the Governor, has overseen the management of the Authority and exercises the powers of the Governing Board of the Authority.

The Authority has adopted a long-range master plan for the development of the transportation infrastructure necessary to foster and sustain the Commonwealth's economic growth and a five-year Construction Improvement Program to implement that plan. As required by the 1968 Resolution and the 1998 Resolution, the Authority supplements the master plan as necessary and annually updates the five-year Construction Improvement Program. See "Operating Expenses and Capital Expenditures-Construction Improvement Program" under *Transportation System Revenues and Expenditures*.

The Authority Act gives the Authority broad powers to carry out its responsibilities in accordance with the Department's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway and other transportation facilities owned, operated or constructed by it; the ability to set tolls and other charges for the use of the highway and other transportation facilities; and the power to issue bonds, notes or other obligations. The Authority plans and manages the construction of all major projects relating to the Commonwealth's transportation system, undertakes major repairs and maintains the toll highways. The Department maintains the Commonwealth's highway system, other than the toll highways, and undertakes construction of smaller projects. The Authority will also be responsible for the maintenance and operation of the Tren Urbano and, in connection therewith, has entered into a five-year agreement with a private company for such operation and maintenance. See "Operating Expenses and Capital Expenditures-Operation and Maintenance-Tren Urbano" under *Transportation System Revenues and Expenditures*.

The Authority made a revision of the highway classification system during fiscal year 1999. A new functional classification was implemented which includes the following categories: primary, primary urban, secondary, and tertiary.

As of December 31, 2001, the Commonwealth had 4,573 miles of highway system and 10,354 miles of local streets and adjacent roads. The highway system comprises 230 miles of primary urban system highways and 379 miles of primary system highways, which are the more important inter-regional traffic routes and include the Luis A. Ferré (PR-52), the De Diego (PR-22), PR-53 and Martínez Nadal (PR-20) toll highways, 953 miles of secondary system highways serving the needs of intra-regional traffic and 3,012 miles of tertiary highways and roads and public housing development roads serving local, intra-regional traffic.

In August 1990, the Authority Act was amended to empower the Authority to enter into concession agreements, subject to approval by a government board of adjudications, with private parties for the design, construction, operation and maintenance of highway projects. Such projects, to be owned by the Authority and the Commonwealth, could be financed by such private parties by the imposition of tolls or otherwise. To date, the only highway facility subject to a private concession agreement is the Teodoro Moscoso Bridge, which spans the San Jose Lagoon from San Juan to Carolina. See "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures*.

In March 1991, the Authority Act was further amended to authorize the Authority to work with and implement policies established by the Secretary for the purpose of developing a multi-modal transportation system for the Commonwealth to alleviate traffic congestion. In line with this expanded power, the Authority undertook the planning, design, construction and operation of the Tren Urbano. See "Operating Expenses and Capital Expenditures-Construction Improvement Program-Tren Urbano" under *Transportation System Revenues and Expenditures*.

**Organization**

To carry out its responsibilities to develop the Commonwealth's transportation system, the Authority is organized into the Executive Director's Office, which provides overall management of the Authority, and the offices of three Deputy Executive Directors, each reporting to the Executive Director. The Deputy Executive Director for Infrastructure oversees the Planning Area, which is responsible for the development of the Construction Improvement Program as well as long-range planning; the Design Area, which is responsible for designing and supervising the design by consultants of Authority projects; the Property Acquisition Area, which acquires necessary easements and rights-of-way for Authority projects; and the Construction Area, which supervises and inspects the construction work performed by the Authority's contractors. The Deputy Executive Director for Administration and Finance oversees the Finance Area, which is responsible for the financial affairs of the Authority, including budgetary services; the Human Resources Area, which provides personnel services; the Administration Area, which provides administrative support to the Authority; and the Information Technologies Area, which oversees computer operations. The Deputy Executive Director for Traffic and Toll Operations oversees all aspects of the operation, maintenance, and repair of the Martínez Nadal (PR-20), the Luis A. Ferré (PR-52), De Diego (PR-22) and PR-53 toll highways. Most construction, renovation and improvement of highway

CONFIDENTIAL

HTA_STAY0056111

facilities are performed by private contractors selected through a public bidding process mandated by the Authority Act. The Authority plans, inspects and supervises such work.

**Management**

The Secretary of Transportation and Public Works, who has ultimate managerial power over the Authority, is Dr. Fernando E. Fagundo. Dr. Fagundo was appointed Secretary by the Governor of the Commonwealth in December 19, 2002. Prior to his appointment as Secretary, Dr. Fagundo was the Executive Director of the Authority. Prior to joining the Authority, Dr. Fagundo was Engineering Director of the engineering consulting firm of CSA Group and a professor of structural engineering at the University of Florida in Gainesville, Florida. Dr. Fagundo received a B.S. degree in civil engineering as well as a master's degree in civil engineering from the University of Puerto Rico and a Ph.D. in structural engineering from Cornell University.

The Executive Director of the Authority, who oversees the Authority's operations, is Dr. Jack T. Allison. Dr. Allison was appointed Executive Director of the Authority on December 19, 2002. Prior to his appointment as Executive Director, Dr. Allison was the Authority's Deputy Executive Director. He also served as project manager of the Tren Urbano project and as President of the Board of Awards since February of 2001. Dr. Allison holds a B.S. from the University of Puerto Rico (Mayagüez campus) and a Ph.D. in industrial engineering from Texas A&M University. He has served on the faculty of the University of Puerto Rico for 26 years, including four years as the University's dean of engineering. Dr. Allison has also worked as a consultant in the private sector and has written a number of scientific papers.

The Authority retains the firm of Roy Jorgensen Associates, Inc. as independent Traffic Engineers to carry out certain responsibilities under the 1968 Resolution and the 1998 Resolution. These include an annual evaluation of the Authority's master plan and Construction Improvement Program for capital improvements and the maintenance activities of the Department and the Authority with respect to the Commonwealth's highway system. The Authority employs Ernst & Young LLP as independent accountants responsible for auditing the Authority's books and accounts.

The administrative offices of the Authority are in the Minillas Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico. The mailing address is P.O. Box 42007, San Juan, Puerto Rico 00940-2007. The telephone number is (787) 721-8787.

**Employee Relations**

As of February 10, 2003, the Authority employed 3,442 persons, of whom 745 were professionals, 627 were office workers and 2,070 were field supervisors and laborers. Of the total employees, 1,832 were regular permanent employees and 1,610 were temporary employees. The Authority believes that relations with its employees are good.

In 1987, the Puerto Rico Supreme Court classified the Authority as a "private employer" for purposes of the Commonwealth labor law provisions, permitting the Authority's employees to engage in collective bargaining. An independent union, representing approximately 960 of the Authority's 1,832 regular employees, has been certified for collective bargaining purposes. The current collective bargaining agreement expires on June 30, 2005.

## TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES

**Revenues**

Various factors affect the level of 1968 Resolution Revenues and 1998 Resolution Revenues available to the Authority, including, in particular, general economic conditions, the supply and cost of crude oil and gasoline and other oil-derived fuels. These factors have an impact on motor vehicle usage and fuel consumption and are discussed further below. In addition, decisions by the Authority as to the types and level of charges it may impose for the use of its Transportation Facilities will affect the amount of moneys available to the Authority for its authorized purposes.

*Sources of 1968 Resolution Revenues*

_General_. The major sources of the Authority's 1968 Resolution Revenues are the gasoline tax and the gas oil and diesel oil tax allocated to the Authority pursuant to the 1994 Code, the motor vehicle license fee allocated to the Authority pursuant to Act No. 9 and the toll charges on the Authority's existing toll highways, including tolls collected on any extension thereof however financed. In fiscal 2002, 1968 Resolution Revenues were derived 48% from gasoline taxes, 36% from toll charges, 8% from motor vehicle license fees, 5% from gas oil and diesel oil taxes and 3% from investment earnings. See "Historical Revenues" below.

28

*Gasoline, Gas Oil and Diesel Oil Taxes.* The 1994 Code currently imposes a $0.16 per gallon tax on gasoline and an $0.08 per gallon tax on gas oil and diesel oil, provides for the deposit of the entire $0.16 tax on gasoline and $0.04 of the tax on gas oil and diesel oil in the Special Fund and authorizes the Authority to pledge such amounts to the payment of the principal of and interest on its bonds and other obligations or for any other lawful purpose of the Authority. The Authority has pledged such tax receipts to the holders of the Highway Revenue Bonds, but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such taxes to payment of certain Commonwealth debts to the extent other Commonwealth moneys are insufficient therefor. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *Security.* The Authority has also pledged such tax receipts to the holders of the Transportation Revenue Bonds, subject to the prior application of such tax receipts to the payment of debt service on Highway Revenue Bonds and the maintenance of a reserve therefor. The Commonwealth has agreed and committed in the 1994 Code that the tax on gasoline will not be reduced below $0.16 per gallon and the tax on gas oil and diesel oil will not be reduced below $0.04 per gallon and that the amount of such taxes allocated to the Authority will not be reduced until all obligations of the Authority secured by the pledge thereof (including the 2003 Bonds), together with the interest thereon, are fully paid. Gasoline taxes and gas oil and diesel oil taxes which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph are not required to be allocated to the Authority or pledged by the Authority to the holders of the Highway Revenue Bonds or the Transportation Revenue Bonds.

Gasoline, gas oil and diesel oil taxes are collected by the Department of the Treasury. The portion of such taxes allocated to the Authority is transferred to the Authority at least monthly as such taxes are collected.

The Department of the Treasury periodically conducts audits of gasoline, gas oil, diesel oil and petroleum products importers, producers and wholesalers to verify amounts reported and paid. In addition to such audit procedures, the Authority reviews the records of the Department of the Treasury on a monthly basis for consistency with monthly reports provided to the Authority by distributors of oil, gasoline and petroleum products.

*Motor Vehicle License Fees.* Under the Vehicle and Traffic Law (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), the Commonwealth imposes annual license fees on various classes of motor vehicles. The current license fees range from $25 to $40 for passenger cars and vary for other vehicles. Act No. 9 increased the per vehicle annual motor vehicle license fees by $15 and provided for the deposit of the proceeds of the $15 increase in the Special Fund for the Authority, which may pledge such proceeds to the payment of debt service on obligations of the Authority or any other legal purpose of the Authority. As with the gasoline and gas and diesel oil taxes described above, the Authority has pledged such license fees to the holders of the Highway Revenue Bonds and, subject to the prior application of such fees to the payment of debt service on Highway Revenue Bonds and the maintenance of a reserve therefor, the Authority has also pledged such fees to the holders of the Transportation Revenue Bonds. Such fees are also collected by the Department of Treasury. The portion of such fees allocated to the Authority is transferred to the Authority at least monthly as such fees are collected. Under Act No. 9, the Commonwealth has agreed and pledged that the license fees allocated to the Authority, as described herein, will not be reduced so long as such proceeds remain pledged to the payment of such obligations.

*Tolls on Existing Toll Highways.* Until the 1968 Resolution is repealed and canceled, all tolls collected on the Authority's existing toll highways, including tolls collected on any extension thereof financed with Transportation Revenue Bonds (the Existing Toll Facilities Revenues), will constitute 1968 Resolution Revenues. As such, they are pledged to the payment of the Highway Revenue Bonds and, subject to the prior application of such toll revenues to the payment of debt service on the Highway Revenue Bonds and the maintenance of a reserve therefor, will be additionally pledged to the payment of Transportation Revenue Bonds.

Under the 1968 Resolution, the Authority has covenanted not to reduce or eliminate any tolls and other charges for the use of Traffic Facilities if such tolls and other charges have been taken into account in the calculation of 1968 Resolution Revenues for purposes of satisfying the tests for the issuance of additional bonds under the 1968 Resolution and if the 1968 Resolution Revenues for any 12 consecutive months out of the immediately preceding 15 months prior to the proposed adjustment, after adjusting such revenues for the proposed decrease in tolls, would have been less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter for all Highway Revenue Bonds then outstanding. See "Issuance of Additional Bonds" under *Summary of Certain Provisions of the 1968 Resolution.* Such tolls and other charges have been taken into account for satisfying such additional bonds' test under the 1968 Resolution.

Notwithstanding the provisions in the 1968 Resolution relating to the reduction or elimination of tolls, under the 1998 Resolution the Authority has covenanted that it will not reduce any tolls or other charges imposed for the use of its Toll Facilities unless the 1998 Resolution Revenues received by the Authority for any 12 consecutive months out of the 15 months immediately prior to such reduction (adjusted to give effect for such entire 12 months to moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate

29

changes made effective on or prior to the effective date of any such toll reduction, and tolls from Toll Facilities which have begun operations or been removed from operation during such 12 months) is at least equal to 150% and 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter for all Senior Transportation Revenue Bonds then outstanding and for all Transportation Revenue Bonds then outstanding, respectively. See "Miscellaneous Covenants" under *Summary of Certain Provisions of the 1998 Resolution.*

Tolls are currently imposed on the Luis A. Ferré toll highway (PR-52), which extends 67 miles from San Juan to Ponce, the De Diego toll highway (PR-22), which extends 52 miles from San Juan to Arecibo, and PR-53, which will connect Fajardo and Salinas upon its completion, a distance of 57 miles. Approximately 37 miles of PR-53 have been completed. The Luis A. Ferré toll highway has four toll stations in the northerly direction and three toll stations in the southerly direction, and the total minimum toll for a vehicle making a round-trip between San Juan and Ponce is currently $3.65. An extension of the Luis A. Ferré toll highway bypassing Ponce includes a toll station with a minimum toll of $0.50. The De Diego toll highway has six toll stations, and the total minimum toll for a vehicle passing through all six stations is $2.40. PR-53 currently has five toll stations with a total minimum toll of $1.55. The Martínez Nadal toll highway (PR-20), which was inaugurated in July 2000, extends 6 miles, connects PR-2 with PR-1 at the La Muda sector near Caguas and has one toll station with a minimum toll of $0.50. The Authority expects to inaugurate the first toll stations of the PR-5 toll highway (which connects PR-2 to PR-199, Las Cumbres) in fiscal 2003 and the Eastern Corridor toll highway (described under the heading "Highway Construction" under "Operating Expenses and Capital Expenditures-Construction Improvement Programs") during fiscal 2006, with minimum tolls of $0.50 and $1.00, respectively.

Currently, the toll collection and data processing equipment in place at existing toll stations of the Authority is furnished and maintained by a private entity pursuant to a lease contract that is renewed on a month-to-month basis. This lease contract provides for the furnishing, installation and maintenance of an electronic toll collection and data processing system for both its existing toll stations and all new toll stations. The system has certain security features which include, among others, a device for the collection of tolls without manual operation, a device installed in each toll lane to verify the classification of a vehicle passing through the lane, computer systems which receive, store and process toll data from the toll plazas and the toll lanes for verification, and electronic gates located as a barrier across each toll station. This toll highway security system has virtually eliminated uncollected toll highway revenues.

The Authority is currently evaluating the acquisition of a highway-speed electronic toll collection system and expects to award a contract for installation of such system by the end of fiscal 2003. The new system would be implemented and financed by one or more private sector firms. The new technology, which employs radio transmissions from transponder-equipped vehicles to plaza-mounted antennas and video systems for violation enforcement, is intended to significantly increase vehicle throughput at toll plazas without costly infrastructure expansion, which should result in reduced travel time and increased convenience for customers. Direct benefits to the Authority include reduced cost of toll collection, enhanced auditing capabilities, additional payment option offering and receipt of toll payments in advance.

The Authority's toll highway revenues have always exceeded its toll highway operation and maintenance expenses. Toll highway revenues and expenses for fiscal 2002 were $130.5 million and $37.3 million, respectively, compared to $125.7 million and $39.9 million, respectively, for fiscal 2001.

*Investment Earnings.* Moneys held for the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations. Moneys held for the credit of the 1968 Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations. Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the 1968 Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Highway Revenue Bonds outstanding. Income from investments of moneys held for the credit of the 1968 Construction Fund is not considered 1968 Resolution Revenues under the 1968 Resolution.

*Sources of 1998 Resolution Revenues*

*Petroleum Products Tax.* On July 16, 1997, the 1994 Code was amended by Act No. 34 to allocate to the Authority, beginning on July 16, 1997, the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth on petroleum products (which includes crude oil, unfinished oil and derivative products). The tax is imposed on any petroleum product introduced, consumed, sold or transferred in the Commonwealth. The petroleum products tax rate varies on a monthly basis according to an index price of crude oil determined by the Department of the Treasury (based on the market price of crude oil quoted in certain markets specified in the 1994 Code), as follows:

CONFIDENTIAL

## PETROLEUM PRODUCTS TAX RATE

| Index Price of Crude Oil (per barrel) | Rate of Tax ($ per barrel) |
|---|---|
| $0.01 to $16.00 | $6.00 |
| $16.01 to $24.00 | 5.00 |
| $24.01 to $28.00 | 4.00 |
| $28.01 and higher | 3.00 |

Petroleum products taxes are collected by the Department of the Treasury. All taxes collected, up to $11 million per month, are deposited in the Special Fund and transferred on a monthly basis to the Authority during the first ten months of the fiscal year. All taxes collected during the last two months of each fiscal year are also transferred, subject to the $120 million annual limit. If the total amount of the taxes collected by the Department of the Treasury and transferred to the Authority in any month is less than $11 million, such deficiency must be made up by the Department of the Treasury with the amount of such taxes in excess of $11 million which were collected in any prior month or which may be collected in any subsequent month of the same fiscal year.

The following table presents the number of barrels of crude oil on which the petroleum products tax was imposed, the average annual tax rate (per barrel) and the total taxes collected by the Department of the Treasury in each fiscal year since fiscal 1987 (the first full fiscal year in which the tax was collected).

### COLLECTIONS OF PETROLEUM PRODUCTS TAX

| Fiscal Year Ended June 30, | Number of Barrels Taxed (million) | Average Annual Tax Rate* ($ per barrel) | Total Tax Collected ($ million) |
|---|---|---|---|
| 1987 | 23.67 | $4.91 | $119.90 |
| 1988 | 22.13 | 4.41 | 98.54 |
| 1989 | 25.11 | 5.00 | 128.23 |
| 1990 | 22.74 | 4.91 | 112.79 |
| 1991 | 26.80 | 4.16 | 112.17 |
| 1992 | 24.07 | 5.00 | 120.37 |
| 1993 | 26.09 | 5.00 | 130.47 |
| 1994 | 28.27 | 5.42 | 152.91 |
| 1995 | 27.90 | 5.00 | 139.59 |
| 1996 | 31.55 | 5.00 | 157.74 |
| 1997 | 32.29 | 4.92 | 158.74 |
| 1998 | 32.20 | 5.33 | 171.64 |
| 1999 | 31.70 | 6.00 | 190.10 |
| 2000 | 32.20 | 4.50 | 144.80 |
| 2001 | 34.82 | 3.50 | 121.90 |
| 2002 | 35.88 | 4.42 | 158.60 |

\* The average annual tax rate is the arithmetic average of the monthly tax rate determined by the Department of the Treasury during such fiscal year. The total tax collected is the actual amount of tax collected during the fiscal year. Due to the monthly fluctuations in the tax rate, the total tax collected is different from the result produced from multiplying the number of barrels taxed by the average annual tax rate.
*Source:* Department of the Treasury and the Authority.

In the current fiscal year (which commenced on July 1, 2002), total petroleum product taxes collected through December 31, 2002 were sufficient to allow the Department of the Treasury to transfer to the Authority the maximum amount provided by law ($11 million per month, or $66 million through December 31, 2002). Although crude oil prices have been relatively high (and consequently the tax rate has been relatively low) during the current fiscal year, the Authority expects to receive the full $120 million allocated to it during this year. Since the Authority has been allocated the full amount of these taxes collected up to $120 million per fiscal year, the Authority is not affected by reductions in collections of these taxes unless such collections fall below $120 million in a fiscal year. In the event the price of crude

31

oil remains high for an extended period, as a result of a prolonged war with Iraq or otherwise, the Authority believes that petroleum products taxes collected could fall below $120 million per fiscal year, but that such collections should not fall below $110 million per fiscal year.

The 1994 Code authorizes the Authority to pledge the entire amount of petroleum products tax allocated to the Authority (not to exceed $120 million in any fiscal year) to the payment of the principal of and interest on bonds and other obligations of the Authority or for any other lawful purpose of the Authority. The Authority has pledged the petroleum products tax receipts to the holders of the Transportation Revenue Bonds (including the 2003 Transportation Revenue Bonds), but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such tax receipts to the payment of certain Commonwealth debts to the extent other Commonwealth moneys are insufficient therefor. See "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" under *Security.* The Commonwealth has agreed and committed in the 1994 Code not to eliminate or reduce the rates of excise tax on petroleum products in effect on July 16, 1997 (set forth above) and the amount of such taxes allocated to the Authority until all obligations of the Authority secured by the pledge thereof (including the 2003 Transportation Revenue Bonds), together with the interest thereon, are fully paid. Any petroleum product tax collected in excess of $120 million per fiscal year is not required to be allocated to the Authority and is not pledged by the Authority to the holders of any of its bonds.

*Tolls and Other Charges.* The Authority is authorized to impose tolls and other charges on its Transportation Facilities. Until the 1968 Resolution is repealed and canceled, all Existing Toll Facilities Revenues will constitute 1968 Resolution Revenues and are pledged to the payment of the Transportation Revenue Bonds only to the extent they become Excess 1968 Resolution Revenues. Upon the repeal and cancellation of the 1968 Resolution, the Existing Toll Facilities Revenues will constitute 1998 Resolution Revenues and will be pledged to the payment of the Transportation Revenue Bonds. To date, the only planned toll facility that would provide revenues that will constitute 1998 Resolution Revenues is the Eastern Corridor toll facility.

The Authority is not pledging the fare box revenues of Tren Urbano to the payment of the bonds issued under the 1968 Resolution or the 1998 Resolution.

The Authority Act grants to the Authority plenary power to fix, impose, alter and collect tolls and other reasonable charges for the use of the Transportation Facilities operated by the Authority or for services rendered thereby. The Authority is obligated to take into account in setting or changing such tolls and other charges those factors that will promote the use of the Transportation Facilities in the broadest and most varied manner economically possible. Prior to fixing or altering such tolls or other charges, the Authority must hold a public hearing to receive comments with respect thereto.

*Excess 1968 Resolution Revenues.* Before the repeal and cancellation of the 1968 Resolution, the Excess 1968 Resolution Revenues (which consist of all unencumbered 1968 Resolution Revenues remaining after payment of debt service and required reserves on the outstanding Highway Revenue Bonds) are included as 1998 Resolution Revenues. After the payment or defeasance of all Highway Revenue Bonds and the repeal and cancellation of the 1968 Resolution, all 1968 Resolution Revenues will become 1998 Resolution Revenues. The Authority may not repeal and cancel the 1968 Resolution so long as the termination option under the Teodoro Moscoso Bridge concession remains in effect. See the fifth paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* below. The sources of the 1968 Resolution Revenues are discussed above.

*Investment Earnings.* Moneys held for the credit of the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations. Moneys held for the credit of the 1998 Senior Bond Reserve Account and each account in the 1998 Subordinated Bond Reserve Fund shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations. Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the 1998 Senior Bond Reserve Account and each account in the 1998 Subordinated Bond Reserve Fund shall be invested in Investment Obligations which mature not later than the final maturity date of any Senior Transportation Revenue Bonds outstanding. Income from investments of moneys held for the credit of the 1998 Construction Fund is not considered 1998 Resolution Revenues under the 1998 Resolution.

### Historical Revenues

The following table presents the Authority's revenues, debt service, and debt service coverage ratio for each of the five fiscal years ended June 30, 1998 to June 30, 2002, and for each of the six-month periods ended on December 31, 2001 and 2002. Under the 1998 Resolution, the Excess 1968 Resolution Revenues representing unencumbered funds in

CONFIDENTIAL

HTA_STAY0056116

the 1968 Construction Fund must be deposited monthly in the 1998 Revenue Fund and are available for the payment of debt service on Transportation Revenue Bonds, for required deposits to the reserve accounts established thereunder and for other authorized purposes under the 1998 Resolution. See "1998 Resolution-Pledged Revenues" under *Security*.

## HISTORICAL REVENUES AND DEBT SERVICE COVERAGE
### (dollars in thousands)

| | Fiscal year ended June 30, | | | | | Six months of fiscal year ended | |
|---|---|---|---|---|---|---|---|
| | 1998 | 1999 | 2000 | 2001 | 2002 | 2002 | 2003 |
| **1968 Resolution Revenues** | | | | | | | |
| Gasoline taxes[1] | $174,632 | $168,397 | $176,737 | $169,782 | $174,885 | $85,590 | $89,427 |
| Gas oil and diesel oil taxes[2] | 17,888 | 20,711 | 22,520 | 20,491 | 18,922 | 10,176 | 8,085 |
| **Subtotal** | 192,520 | 189,108 | 199,257 | 190,273 | 193,807 | 95,766 | 97,512 |
| Motor vehicle license fees | 28,532 | 28,089 | 28,996 | 29,772 | 30,693 | 15,525 | 15,664 |
| **Subtotal** | 221,052 | 217,197 | 228,253 | 220,045 | 224,500 | 111,291 | 113,176 |
| Toll receipts | 108,803 | 116,030 | 120,524 | 125,695 | 130,498 | 64,813 | 67,412 |
| Investment Income | 18,310 | 14,314 | 16,852 | 10,260 | 10,168 | 4,352 | 5,662 |
| **Total 1968 Resolution Revenues** | **$348,165** | **$347,541** | **$365,629** | **$356,000** | **$365,166** | **$180,456** | **$186,250** |
| Debt Service on Highway Revenue Bonds | 183,433 | 180,787 | 181,988 | 181,727 | 177,400 | 90,679 | 75,279 |
| 1968 Resolution Coverage Ratio | 1.90 | 1.92 | 2.01 | 1.96 | 2.06 | - | - |
| Excess 1968 Resolution Revenues | $164,732 | $166,754 | $183,641 | $174,273 | $187,766 | $89,777 | $110,971 |
| **1998 Resolution Revenues** | | | | | | | |
| Petroleum Products Tax | $120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 66,000 | 66,000 |
| Investment Income | 900 | 3,840 | 5,069 | 7,456 | 11,198 | 5,319 | 5,684 |
| Excess 1968 Resolution Revenues | 164,732 | 166,754 | 183,641 | 174,273 | 187,766 | 89,777 | 110,578 |
| **Total 1998 Resolution Revenues** | **$285,632** | **$290,594** | **$308,710** | **$301,729** | **$318,964** | **$161,096** | **$182,655** |
| Debt service on Senior Transportation Revenue Bonds | 19,087 | 64,832 | 64,833 | 102,193 | 116,150 | 51,071 | 74,908 |
| 1998 Resolution Senior Coverage Ratio[3] | 14.96 | 4.48 | 4.76 | 2.95 | 2.75 | - | - |
| **Total 1998 Resolution Revenues Available to Pay 1998 Subordinate Transportation Revenue Bonds** | **$266,545** | **$225,762** | **$243,877** | **$199,536** | **$202,814** | **$110,025** | **$107,747** |
| Debt service on Subordinate Transportation Revenue Bonds | - | 3,426 | 3,795 | 3,795 | 3,795 | 1,898 | 1,898 |
| 1998 Resolution Senior and Subordinate Coverage Ratio | - | 4.26 | 4.50 | 2.85 | 2.66 | - | - |
| Aggregate Revenues[4] | 469,065 | 471,381 | 490,698 | 483,456 | 496,364 | 251,775 | 257,934 |
| TIFIA Loan Debt Service | - | - | - | 15,455 | 17,220 | 8,681 | 8,681 |
| Aggregate Debt Service[5] | 202,520 | 249,045 | 250,616 | 303,170 | 314,565 | 152,329 | 160,766 |
| Aggregate Coverage Ratio[6] | 2.32 | 1.89 | 1.96 | 1.59 | 1.58 | - | - |

(1) Excludes $10.2 million, $10.3 million and $2.7 million for fiscal years 1999, 2000 and 2001, respectively, in delinquent taxes owed by one taxpayer.
(2) Excludes $1.4 million, $1.5 million and $28,000 for the fiscal years 1999, 2000 and 2001, respectively, in delinquent taxes owed by one taxpayer.
(3) Equals ratio of Total 1998 Resolution Revenues to debt service on the Senior Transportation Revenue Bonds for the fiscal year in question.
(4) Represents the sum of the Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues) for the fiscal year in question.
(5) Represents the sum of Highway Revenue Bonds debt service, Transportation Revenue Bonds debt service, and the TIFIA loan payments for the fiscal year in question.
(6) Aggregate Revenues divided by Aggregate Debt Service.

The Authority's 1968 Resolution Revenues rose at a compound annual rate of 1.2% during the five-year period from fiscal 1998 through fiscal 2002 due primarily to the growth in tax collections and toll receipts.

33

Gasoline taxes, which accounted for approximately 48% of 1968 Bond Resolution Revenues for fiscal 2002, remained essentially stable during this five-year period. However, for the first six months of fiscal 2003, gasoline taxes rose by 4.2% over the same period in fiscal 2002. This increase was attributable principally to increases in consumption. The number of vehicles in the Commonwealth increased from 2.1 million to 2.2 million from fiscal 1998 to fiscal 2002. The amount of gasoline taxes collected during the 1999, 2000 and 2001 fiscal years varied significantly from the amount projected as a result of delinquencies by one gasoline wholesaler, which recently filed for bankruptcy. This wholesaler currently owes the Commonwealth Treasury Department approximately $9 million in gasoline and gas oil and diesel taxes, and approximately $170 million in other taxes. The Treasury Department expects to collect only a fraction of the amount owed. Therefore, this delinquent amount has not been included in the Authority's revenue projections. The Department of the Treasury does not anticipate that the amount of delinquent taxes owed by this wholesaler (excluding interest and penalties) will increase because its right to introduce and sell gasoline and diesel products under a bond has been revoked and the taxpayer must now pay the applicable taxes before these products may be distributed in the Commonwealth. The Authority does not expect that the bankruptcy of this wholesaler will have any material adverse impact on aggregate gasoline and gas oil and diesel oil consumption, and therefore on future revenues of the Authority.

Gas oil and diesel oil tax receipts, which accounted for approximately 5.2% of 1968 Resolution Revenues for fiscal 2002, increased during the period from fiscal 1998 through fiscal 2000, and decreased from fiscal 2000 through fiscal 2002. This decrease, which is expected to continue, resulted primarily from the Puerto Rico's Electric Power Authority's decision to increase the amount of electricity purchased from private co-generation plants using natural gas and coal as fuels. For the six months of fiscal 2003, gas oil and diesel oil taxes decreased by 22.3% over the same period in fiscal 2002, although the amount collected exceeded the amount projected for the period.

Toll receipts rose at an average compound annual rate of 4.7% during the five-year period from fiscal 1998 through fiscal 2002, increasing in every year during the period. Toll receipts have grown as a percentage of total 1968 Resolution Revenues over the last five fiscal years, from 31.2% in 1998 to 35.7% in fiscal 2002. This increase corresponded principally to the growing number of vehicles using toll roads, and the expansion of the toll highway network. For the first six months of fiscal 2003, toll receipts increased by 4.0% over the same period in fiscal 2002.

Motor vehicle license fees accounted for approximately 8.4% of annual 1968 Resolution Revenues for fiscal 2002. From fiscal 1998 to fiscal 2002, fee collections rose at an average compound annual rate of 1.9%. The increase is attributable to an increase in the number of licensed taxable vehicles, from approximately 1.9 million vehicles in fiscal 1998 to approximately 2.0 million vehicles in fiscal 2002. For the first six months of fiscal 2003, motor vehicle license fees rose by 0.9% over the same period in fiscal 2002.

The revenues allocated to the Authority from the petroleum products tax are capped at $120 million in each fiscal year. The Authority received this amount each year during the five fiscal years ending on June 30, 2002. As mentioned above, for the first six months of fiscal 2003, the Authority received the maximum amount allocated to it ($66 million), as it did during the first six months of fiscal 2002.

The foregoing discussion of past revenue growth is not intended to be predictive of future revenue growth. In particular, the Authority is anticipating that two new toll facilities, PR-5 and the Eastern Corridor (discussed below), will be coming into service prior to fiscal 2007. Economic conditions in the Commonwealth, as well as the price of oil and petroleum products and the levels of automobile registration and usage, will affect the Authority's revenues in the future.

*Projected 1968 Resolution Revenues and 1998 Resolution Revenues*

The following table presents the Authority's estimates of 1968 and 1998 Resolution Revenues, Highway Revenue Bonds and Transportation Revenue Bonds debt service and debt service coverage for each of the five fiscal years ending June 30, 2003 to June 30, 2007. The projected 1968 Resolution Revenues and 1998 Resolution Revenues shown below are based on tax rates and allocations to the Authority now in effect and debt service on Highway Revenue Bonds and Transportation Revenue Bonds currently outstanding and projected to be issued during the forecast period. Such projections are subject to periodic review and may be adjusted to reflect such factors as changes in general economic conditions, in the demand for gasoline and other petroleum products and in the levels of automobile registration and usage. The projections are based on assumptions which the Authority believes to be reasonable; however, there is no assurance that the projections will prove to be accurate.

34

HTA_STAY0056118

## PROJECTED REVENUES AND DEBT SERVICE COVERAGE

| | Fiscal year ending June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2003 | 2004 | 2005 | 2006 | 2007 |
| | | | (dollars in thousands) | | |
| 1968 Resolution Revenues | | | | | |
| Gasoline Taxes | $179,830 | $185,100 | $190,320 | $195,200 | $199,780 |
| Gas oil and diesel oil taxes | 12,670 | 13,540 | 15,400 | 19,230 | 19,420 |
| **Subtotal** | 192,500 | 198,640 | 205,720 | 214,430 | 219,200 |
| Motor vehicle license fees | 32,470 | 33,540 | 34,640 | 35,780 | 36,960 |
| **Subtotal** | 224,970 | 232,180 | 240,360 | 250,210 | 256,160 |
| Toll receipts | 135,620 | 141,150 | 146,750 | 152,410 | 158,130 |
| Investment Income | 10,300 | 14,200 | 12,900 | 10,200 | 10,300 |
| **Total 1968 Resolution Revenues** | **$370,890** | **$387,530** | **$400,010** | **$412,820** | **$424,590** |
| Debt Service on Highway Revenue Bonds | 98,764 | 120,440 | 153,746 | 146,916 | 146,781 |
| 1968 Resolution Coverage Ratio | 3.76 | 3.22 | 2.60 | 2.81 | 2.89 |
| Excess 1968 Resolution Revenues | 272,126 | 267,090 | 246,264 | 265,904 | 277,809 |
| 1998 Resolution Revenues | | | | | |
| Petroleum Products Tax | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 |
| Investment Income | 10,400 | 12,200 | 13,900 | 15,700 | 15,700 |
| Eastern Corridor Toll Receipts | - | - | - | 25,800 | 26,800 |
| Subtotal of 1998 Resolution Revenues | 130,400 | 132,200 | 133,900 | 161,500 | 162,500 |
| Excess 1968 Resolution Revenues | 272,126 | 267,090 | 246,264 | 265,904 | 277,809 |
| **Total 1998 Revenues** | **$402,526** | **$399,290** | **$380,164** | **$427,404** | **$440,309** |
| Debt Service on Senior Transportation Revenue Bonds[1] | 135,068 | 160,238 | 180,158 | 183,349 | 203,680 |
| 1998 Resolution Senior Coverage Ratio[2] | 2.98 | 2.49 | 2.11 | 2.33 | 2.16 |
| Coverage Ratio[3] Additional Bond Test, Senior Transportation Revenue Bonds | 2.02 | 2.00 | 1.91 | 1.95 | 2.01 |
| **Total 1998 Resolution Revenues Available to Pay 1998 Subordinate Transportation Revenue Bonds** | **$267,458** | **$239,052** | **$200,006** | **$244,055** | **$236,629** |
| Debt service on 1998 Subordinated Transportation Revenue Bonds | 6,654 | 20,398 | 20,398 | 24,018 | 28,269 |
| 1998 Resolution Senior and Subordinate Coverage Ratio | 2.84 | 2.21 | 1.90 | 2.06 | 1.90 |
| Aggregate Revenues[4] | 501,290 | 519,730 | 533,910 | 574,320 | 587,090 |
| TIFIA Loan Debt Service | 8,681 | - | - | - | - |
| Aggregate Debt Service[5] | 249,167 | 301,076 | 354,302 | 354,283 | 378,730 |
| Aggregate Coverage Ratio[6] | 2.01 | 1.73 | 1.51 | 1.62 | 1.55 |

(1) Assumes issuance of additional Transportation Revenue Bonds in June 2006 at an average interest rate of 7% per annum with a 30-year final maturity.

(2) Equals ratio of Total 1998 Resolution Revenues to debt service on the Senior Transportation Revenue Bonds for the fiscal year in question.

(3) This test uses as its denominator maximum annual debt service on all Senior Transportation Revenue Bonds outstanding under the 1998 Resolution (including the Senior Transportation Revenue Bonds then proposed to be issued) and as its numerator the 1998 Resolution Revenues of the Authority for the fiscal year in question. Additonal bonds test calculation assumes Mandatory Tender Bonds pay maximum allowable rate after Mandatory Tender Date in calculating maximum annual debt service.

(4) Represents the sum of the Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues) for the fiscal year in question.

(5) Represents the sum of Highway Revenue Bonds debt service, Transportation Revenue Bonds debt service, and the TIFIA loan payments for the fiscal year in question.

(6) Aggregate Revenues divided by Aggregate Debt Service.

35

Total 1968 Resolution Revenues and 1998 Resolution Revenues for the period from fiscal 2003 through fiscal 2007 are projected by the Authority to grow at a compound annual rate of 3.4% and 3.0%, respectively. The projected growth in gasoline tax revenues is based on econometric models prepared for the Authority by Applied Research, an independent firm, which project increases in disposable income in the Commonwealth. The Authority has found such projections to be the most reliable indicator of future growth in gasoline tax receipts. The Authority's projections of growth in its other revenues is based on historic trends and, in the case of toll revenues, on the additional receipts expected from the growth in traffic and the opening of new toll plazas.

In fiscal years 1998 and 2000 the Authority's actual revenues exceeded the Authority's projected revenues for such fiscal year. In fiscal 1999 actual revenues fell below the Authority's projections due to one taxpayer's failure to pay the taxes due on time, as discussed above. In fiscal 2001 and 2002 actual revenues fell below the Authority's projections due to the unanticipated downturn in the U.S. and the Commonwealth's economies.

**Operating Expenses and Capital Expenditures**

*Operation and Maintenance- Highway Facilities.* The Department has the responsibility for maintaining the Commonwealth's highway system, except for the Luis A. Ferré (PR-52), the De Diego (PR-22), PR-53 and the Martínez Nadal (PR-20) toll highways and related connecting roads, which are maintained by and at the expense of the Authority. The maintenance expenses of the Department are paid with moneys appropriated annually by the Legislature of Puerto Rico. On occasion the Authority advances funds to pay the costs of emergency repairs which are the responsibility of the Department. It is subsequently reimbursed for these advances. To the extent funds are not provided by the Legislature, the Authority has agreed under the 1998 Resolution that it will pay from available moneys in the 1998 Construction Fund the costs of maintenance of the Traffic Facilities financed with proceeds of Highway Revenue Bonds and Transportation Revenue Bonds. The 1998 Resolution requires the Authority to pay from available moneys in the 1998 Construction Fund (and not from moneys in the 1968 Construction Fund) the costs of any necessary repairs to, or renewals or replacements of, Traffic Facilities financed with proceeds of Highway Revenue Bonds and Transportation Revenue Bonds, as recommended by the Transportation Engineers.

The Authority's operation and maintenance expenses payable from available moneys in the 1998 Construction Fund consist of the expenses of operating and maintaining the toll highways and related roads and, upon completion, the Tren Urbano. Under the 1998 Resolution, these expenses are payable from available moneys in the 1998 Construction Fund after payment of debt service on the Highway Revenue Bonds and Transportation Revenue Bonds and any required deposits to the 1968 Reserve Account, the 1998 Senior Bond Reserve Account and the accounts in the 1998 Subordinated Bond Reserve Fund. Other expenses of the Authority, including its administration costs, are included in the Construction Improvement Program and are capitalized.

The following table sets forth the annual maintenance expenses paid by the Department for non-toll highways and the annual toll highway operation and maintenance expenses paid by the Authority from unencumbered moneys in the 1998 Construction Fund, for each of the five fiscal years ended June 30, 2002. The table also sets forth the Authority's projections of annual highway maintenance expenses to be paid by the Department for non-toll highways and projected annual toll highway operation and maintenance expenses to be paid by the Authority from unencumbered moneys in the 1998 Construction Fund for the five fiscal years ending June 30, 2007.

36

**HIGHWAY FACILITIES**
**OPERATION AND MAINTENANCE EXPENSES**
(in thousands)

| Fiscal Year Ended June 30, | Department | | Authority | | |
|---|---|---|---|---|---|
| | Contributions of the Authority to the Department | Non-Toll Highway Maintenance | Toll Highway Maintenance | Toll Highway Operation | Total |
| 1998 | $13,800 | $13,616 | $15,080 | $13,919 | $28,999 |
| 1999 | 10,000 | 18,000 | 16,871 | 15,573 | 32,444 |
| 2000 | 5,000 | 23,382 | 20,259 | 17,258 | 37,517 |
| 2001 | 5,000 | 25,177 | 21,130 | 18,720 | 39,850 |
| 2002 | 5,000 | 24,999 | 21,060 | 16,233 | 37,293 |
| 2003[p] | 10,000 | 26,200 | 22,110 | 19,440 | 41,550 |
| 2004[p] | 5,000 | 25,700 | 23,000 | 19,920 | 42,920 |
| 2005[p] | 5,000 | 28,900 | 23,900 | 20,870 | 44,770 |
| 2006[p] | 5,000 | 30,300 | 24,800 | 21,420 | 46,220 |
| 2007[p] | 5,000 | 30,300 | 25,800 | 21,960 | 47,760 |

(p)  Projected.

In certain years, emergency repairs to the highway system have been necessary, particularly as a result of storm or flood damage. The cost of these repairs is borne by the Department, except for the cost of repairs to the toll highways, which is borne by the Authority. The Department and the Authority generally have been reimbursed by the Federal Emergency Management Agency for some of the costs of such repairs attributable to federally designated disaster areas. The Legislature of Puerto Rico also appropriates funds from time to time for emergency repairs by the Department in addition to amounts appropriated for maintenance.

The Traffic Engineers under the 1968 Resolution and 1998 Resolution conduct an annual evaluation of the level of maintenance of the highway system. In their most recent evaluation completed in July 2002, the Traffic Engineers found that the current level of maintenance was generally adequate. For fiscal year 2000, the Authority incurred a higher increase in toll highway maintenance expense than what it had experienced in prior years due to the purchase of equipment that was not capitalized. For fiscal 2001 and subsequent years, the Authority has increased the amounts budgeted for toll highway maintenance to reflect an expanded toll highway network and increased levels of maintenance. The projected maintenance budgets for the next five fiscal year periods show an annual rate of growth of 4.3% for both non-toll roads and toll highways. The Traffic Engineers believe that the Authority's maintenance program represents an adequate level of maintenance to preserve the investment and provide an acceptable level of service. The results of the Traffic Engineers' most recent maintenance evaluation are summarized in the letter of the Traffic Engineers included as *Appendix II*.

*Operation and Maintenance - Tren Urbano.* The Authority has entered into a Systems and Test Track Turnkey Contract (the "STTT Contract") with the Siemens Transit Team ("STT") covering, among other things, the operations and maintenance of the Tren Urbano. For a more detailed discussion of the scope of the STTT Contract, see "Construction Improvement Program-Tren Urbano" below. The operations portion of the contract is for an initial term of five years with an option by the Authority to extend the term for an additional five years. Under the STTT Contract, STT is responsible for operating and maintaining the Tren Urbano and is entitled to receive for such services an annual base compensation, which is subject to an inflation adjustment for changes in the cost of labor (based on the changes to consumer price index) and materials (based on the changes to producer price index). The base compensation does not include the cost of insurance and electricity which is paid separately by the Authority. In addition, STT is entitled to receive incentive compensation based on meeting certain operating and maintenance performance measures.

The table below shows the Authority's estimate of the annual operating and maintenance expenses of the Tren Urbano for the first ten years of service. These estimates are based upon the terms of the STTT Contract and include an inflation adjustment and the Authority's estimate of the cost of insurance and electricity.

37

CONFIDENTIAL

**ESTIMATED TREN URBANO ANNUAL
OPERATING AND MAINTENANCE EXPENSES**

| Year of Service* | Estimated Annual Operation and Maintenance Cost (in millions) |
|---|---|
| 1 | $62.3 |
| 2 | 64.0 |
| 3 | 67.0 |
| 4 | 68.2 |
| 5 | 70.0 |
| Option Period | |
| 6 | 75.3 |
| 7 | 77.4 |
| 8 | 79.1 |
| 9 | 81.7 |
| 10 | 84.1 |

*Based on twelve full months of operation starting from the date when the system opens
for service.

The Authority projects that the annual net operating costs of the Tren Urbano, after deducting expected operating revenues from operating and maintenance costs, will increase during the first ten years of operation from $44.4 million to $48.7 million per year. This estimate is based, among other factors, on an annual average daily ridership of 115,000 passengers by the year 2010, and an initial ridership in the first full year of operation of 64% of the ridership expected for 2010, with such ridership growing for each year of operation. All or a portion of the net operating costs of Tren Urbano may be covered by available moneys in the 1998 Construction Fund.

*Construction Improvement Program.* As required by the 1968 Resolution and the 1998 Resolution, the Authority has developed a master plan to serve as the basis for the long-range planning of the Commonwealth's transportation facilities, which it supplements as necessary. To implement the plan, the Authority prepares a five-year Construction Improvement Program which is updated annually. The Authority has focused its current Construction Improvement Program on constructing the Tren Urbano and improving the primary and the primary urban highway facilities, while also addressing the most essential needs of secondary and tertiary roads. The Authority has also included in its Construction Improvement Program the cost of repairs, renewals and replacements to the highway system, plans for dealing with urban congestion and for local improvements, and certain capitalized expenditures.

The following table presents the Authority's current Construction Improvement Program for the five fiscal years ending June 30, 2007 and the sources of funds required to finance such program. The Construction Improvement Program is subject to various changing factors, including cost increases, variations in availability of internal and external funds, availability of qualified construction resources, the need for emergency repairs and changing traffic patterns. The Authority's projections assume no changes in the statutory taxes and license fees currently allocated to the Authority, see the table entitled "Projected Revenues and Debt Service Coverage" above, and that the Authority will not be required to assume the payment of the Special Facility Revenue Bonds relating to the Teodoro Moscoso Bridge. See "Teodoro Moscoso Bridge" below.

CONFIDENTIAL

HTA_STAY0056122

### CONSTRUCTION IMPROVEMENT PROGRAM

|  | Fiscal Year Ending June 30, (In thousands) | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
| **Sources of Funds:** | | | | | | |
| Internally generated funds[1] | $157,788 | $137,367 | $ 70,727 | $101,779 | $ 88,809 | $ 556,471 |
| Federal aid for highways | 45,178 | 45,179 | 80,608 | 80,607 | 80,607 | 332,178 |
| Federal aid for Tren Urbano[2] | 200,000 | 103,500 | 50,346 | 63,089 | 105,304 | 522,239 |
| External financing[3] | 579,699 | 361,724 | 165,922 | 88,725 | 103,280 | 1,299,351 |
| **Total** | **$982,665** | **$647,770** | **$367,603** | **$334,200** | **$378,000** | **$2,710,238** |
| **Uses of Funds:** | | | | | | |
| Design | $ 25,321 | $ 4,795 | $ 73 | $ - | $ - | $ 30,188 |
| Rights of way | 87,338 | 55,540 | 5,050 | 2,000 | - | 149,929 |
| Construction | 329,836 | 390,435 | 272,480 | 155,822 | 122,392 | 1,270,966 |
| Capitalized expenditures | 100,000 | 100,000 | 90,000 | 90,200 | 85,000 | 465,200 |
| Tren Urbano[4] | 440,170 | 97,000 | - | 86,178 | 170,608 | 793,956 |
| **Total** | **$982,665** | **$647,770** | **$367,603** | **$334,200** | **$378,000** | **$2,710,238** |

---

[1] Includes funds on hand, current revenues available after provision for debt service and reserve requirements for bonds and toll highway maintenance and operating expenses and investment income. To the extent such funds are held in the 1998 Construction Fund, the holders of the Transportation Revenue Bonds have a claim on such funds in certain circumstances.

[2] See the discussion of the Authority's Full Funding Grant Agreement with the United States Department of Transportation in "Tren Urbano" below.

[3] Includes short term financing, net proceeds of borrowing.

[4] Includes a portion of the cost of the Carolina Extension (as defined below), the construction of which is contingent upon the commitment of federal funds for this project.

In the five-year period from fiscal 1998 through fiscal 2002 the Authority expended approximately $4.06 billion on the Construction Improvement Program. The current Construction Improvement Program projects an expenditure of about $2.71 billion from fiscal 2003 through fiscal 2007, of which 29.3% represents the costs of the Tren Urbano. The current Construction Improvement Program includes $256.8 million attributable to the cost of constructing a portion of the Carolina Extension (as defined below) to Tren Urbano, the construction of which is contingent upon the availability of federal funds for this project. It also includes $108.2 million attributable to the cost of constructing the Eastern Corridor toll highway, which is also subject to certain contingencies discussed below. The federal funds corresponding to fiscal year 2002 withheld by the federal government were released by February 2003. No moneys are currently being withheld.

The Authority's internally generated funds available to finance its current Construction Improvement Program consist primarily of 1968 Resolution Revenues and the 1998 Resolution Revenues remaining after payment of debt service for the Highway Revenue Bonds and Transportation Revenue Bonds, provision of reserve requirements for the Highway Revenue Bonds and the Transportation Revenue Bonds, and payment of expenses for operating and maintaining the toll highways as well as Tren Urbano (as to the latter, beginning during the first quarter of fiscal 2004 when it is expected to become operational). Such internally generated funds are estimated to aggregate approximately $556.5 million during the five-year period from fiscal 2003 through fiscal 2007, including investment income, which is estimated at approximately $125.8 million for the five-year period.

The current Construction Improvement Program contemplates new construction borrowings, aggregating approximately $815 million of principal to produce $749 million of net proceeds from fiscal 2003 to fiscal 2007. This includes the Series G Bonds that are expected to produce $522 million in net proceeds.

*Tren Urbano.* The largest single project included in the Authority's current Construction Improvement Program is Tren Urbano, a new-start mass transit project for the San Juan metropolitan region. The initial phase of Tren Urbano consists of approximately 17 km. of trackway, running from Bayamón to Santurce, via Río Piedras and Hato Rey, and sixteen stations. The project also includes the construction of a maintenance and storage facility. The initial phase of the project is scheduled to be fully operational by September 2003.

Tren Urbano is being constructed under seven separate design/build contracts. STT is the contractor under the STTT Contract, the largest of these contracts, with a value of approximately $781 million as of December 31, 2002. The

39

CONFIDENTIAL

HTA_STAY0056123

STTT Contract includes: (i) the design and construction of two stations and a 2.6 km. test track; (ii) the design, procurement and installation of all systems for the project, such as the trackway, the train control system, and the communications system; (iii) the design and manufacturing of the vehicles; (iv) the design and construction of the maintenance and storage facility; (v) the responsibility for design and construction coordination among the several civil contracts; and (vi) operating Tren Urbano for a period of five years, with an additional five-year option exercisable by the Authority. The other six design/build contracts for the design and construction of all remaining stations and guideways, as well as other miscellaneous items, had a projected completion cost of $1.47 billion as of December 31, 2002. Total aggregate construction costs for the first phase of Tren Urbano (excluding the Carolina Extension described below), including contingency amounts and right-of-way and administrative costs is estimated to be $2.25 billion, of which $1.97 billion had been incurred through February 28, 2003. As of February 28, 2003, the construction of the first phase of Tren Urbano was 93.3% complete.

The Authority's estimate of the total cost required to complete the Tren Urbano project includes a contingency for the aggregate amount the Authority estimates, based on its past experience, that it may be required to pay to resolve various claims from contractors (mostly related to cost overruns or damages allegedly suffered because of delays in the design and construction of the project). No assurance can be given, however, that these claims will be resolved for the amounts estimated by the Authority or that the estimated cost of completing the Tren Urbano project will not increase as a result of resolving these claims or of the occurrence of other unforeseen contingencies.

To manage the Tren Urbano project, the Authority established the Tren Urbano Office. The Tren Urbano Office includes Authority staff, local and mainland design firms experienced in transit projects and local infrastructure projects, and financial and legal advisors. The Tren Urbano Office provides overall direction and management for the project. The office oversees all engineering and construction activities for the project, and is responsible for scheduling, budgeting, contract administration, risk management and quality assurance. Design review is provided by a consortium of design firms that includes DMJM+Harris, Inc. Construction oversight is provided by experienced Authority personnel and mainland consultants experienced in large transit projects.

The Tren Urbano was designated as one of four national turnkey demonstration projects by the FTA. In March 1996, the Authority entered into a Full Funding Grant Agreement with the FTA for the project in the amount of $307 million. Through February 28, 2003, approximately $194 million had been disbursed under the agreement. The Authority expects to receive the remaining $113.8 million payable under the agreement as part of the appropriations for fiscal 2003 and fiscal 2004. On August 4, 2000, the Authority borrowed $300 million from the United States Department of Transportation under the TIFIA Loan, the proceeds of which were used to pay eligible project costs incurred and to be incurred in connection with Tren Urbano. The balance of federal aid for the Tren Urbano project will come from moneys provided through the FTA by FHWA under certain formula programs established by federal law. While the Authority cannot assure the amount or timing of federal funds for the project, if federal funds are received slower or in a lesser amount than currently projected, the Authority will adjust the timing or scope of the remainder of its Construction Improvement Program, utilize lines of credit for interim funding or adjust its borrowing schedule, as necessary, to accommodate any such changes.

The Tren Urbano was designed in order to provide flexibility for future extensions. The Authority has commenced initial studies for a 10-kilometer extension from San Juan to Carolina (the "Carolina Extension"). As originally conceived, the Carolina Extension would have an estimated cost of $1 billion. The Authority does not anticipate that it will proceed with the Carolina Extension unless it can secure matching federal funds for at least 50% of construction costs. In any event, the Authority does not anticipate commencing construction of the Carolina Extension prior to fiscal year 2006. For planning purposes, the Construction Improvement Program for fiscal years 2006 and 2007 includes $86.2 million and $170.6 million, respectively, for a portion of the cost of construction of the Carolina Extension.

The size and complexity of the Tren Urbano project continue to present challenges related to the coordination among the several design/build contractors, as well as traditional construction risk factors. The Authority believes that it has made adequate provision for these factors in estimating the total cost required to complete the project. As with all of the projects contained in the Authority's Construction Improvement Program, the timetable and expenditure forecasts for the Tren Urbano are subject to change. Unforeseen circumstances could result in delays or cost escalations not currently provided for in the Authority's projections.

*Highway Construction.* Highway construction projects included by the Authority in its current Construction Improvement Program are designed to enhance the economic development of the Commonwealth. Projects include new highway construction, principally of primary roads and toll highways, and construction of improvements designed to alleviate the traffic congestion of the San Juan metropolitan area as well as to provide access to the proposed Port of the Americas, a transshipment port in the southern region of the Commonwealth, which the Governor of the Commonwealth

40

has announced the government intends to commence to construct during the next four years. It also includes reconstruction of existing highways, a bridge program and installation of safety features and other projects.

The Authority's Construction Improvement Program includes the investment of approximately $108.2 million for the construction of a portion of the Eastern Corridor, a toll highway from Carolina to Río Grande. This amount is in addition to the approximately $130 million previously incurred with respect to this toll highway. As formerly conceived, this toll highway was known as PR-66. On April 19, 2000, the construction of PR-66 was halted pursuant to an order of the Puerto Rico Supreme Court issued in an action filed by a group of citizens seeking review of the Puerto Rico Environmental Quality Board decision approving the final environmental impact statement prepared by the Authority for PR-66. As a result of the Court's order, the Authority was forced to terminate all construction contracts relating to PR-66. Prior to it being halted, the Authority had incurred approximately $130 million in the construction of PR-66. An additional $42 million in claims have been brought against the Authority by contractors related to the termination of construction contracts which contained liquidated damages clauses.

The Authority has reconceived the original PR-66 project, now re-named the Eastern Corridor, taking into account the environmental and other concerns raised by various citizen groups. On January 15, 2003, the Authority submitted a final environmental impact statement for the complete toll highway. On February 20, 2003, the Environmental Quality Board approved the final environmental impact statement and published the required notice of such approval. No objections were filed with the Environmental Quality Board or the courts, after the expiration of the 30-day period, allowing the Authority to submit the project for bidding by construction contractors. The Eastern Corridor consists of a nine-mile four lane toll highway from Carolina to Canóvanas. A possible five-mile extension to Río Grande was added in the new environmental impact statement. The Eastern Corridor is expected to reduce vehicular congestion on highway PR-3 between the San Juan metropolitan area and the eastern region of the Commonwealth. While no assurance can be given regarding the outcome or timing of the permitting process, the Authority is projecting that construction on the Eastern Corridor will commence during the summer of 2003 and that the toll highway will be finished during fiscal 2005.

Other major highway projects include the construction of sections of PR-53 from Yabucoa to Maunabo and the design of the section that will complete the toll highway from to Maunabo to Guayama, the construction of the section of PR-10 from Utuado to Adjuntas, the conversion into an expressway of the section of PR-2 from Mayagüez to Ponce to service the proposed Port of the Americas transshipment port, the widening of sections of PR-22 and the construction of new sections from Arecibo to Aguadilla to connect it to PR-2, the construction of the PR-5 toll highway connecting PR-2 to Las Cumbres Avenue and the conversion of portions of PR-1 and PR-2 in San Juan into an expressway.

The Authority receives aid for highway construction from the FHWA and the FTA. Such aid is recorded as related costs which are billed to the FHWA and the FTA, regardless of the year of appropriation. In fiscal years ended 2000, 2001 and 2002, such aid from FHWA amounted to $69.3 million, $50 million and $34.7 million, respectively.

Federal aid for highway construction is received under a number of federal programs, including those directed to construction of new roads and repair and reconstruction of existing roads. The programs provide for matching federal assistance, ranging generally from 80% to 90% of the cost of a project. The level of federal highway aid is dependent upon Congressional authorizations that are apportioned to the states, including the Commonwealth. The U.S. Department of Transportation has broad discretion to release funds for spending within the limits set by Congress. Upon its approval of a state's program, funds are reserved but not committed. Federal-aid funds are committed when the U.S. Department of Transportation approves the detailed plans for specific projects. Congress has authorized funding for the federal highway programs through September 2003 depending on the program. Federal highway legislation has liberalized certain types of federal highway aid and granted more flexibility to the states, including the Commonwealth, in the use of such aid in highway or other transportation projects. No assurance can be given that the level of federal highway aid will be maintained at the levels projected in the above table. In the event of material reductions in such aid, the Construction Improvement Program will be appropriately adjusted in the absence of internally generated funds, external financing or other sources of funds shown in the above table available to offset any such reductions.

The federal government conducts periodic audits of the federal aid it provides to the Authority to ascertain that funds are being expended consistently with the federal programs pursuant to which they are provided. Audit findings of a failure by the Authority to expend funds in compliance with federal programs could result in the withholding of federal aid for the project involved or could result in offset claims by the federal government for funds previously received by the Authority.

The Traffic Engineers under the 1968 Resolution and the Transportation Engineers under the 1998 Resolution, if different, annually review the Construction Improvement Program and the Authority's estimates of revenue sources available for its implementation. In their most recent evaluation, the Traffic Engineers concluded that the Authority's

CONFIDENTIAL

HTA_STAY0056125

current Construction Improvement Program is a reasonable response to the immediate and short-term transportation needs and is generally consistent with the Authority's long-range transportation master plan. The Traffic Engineers also concluded that revenue projections have been reasonably accurate and provide a sound basis for determining the size of future programs. The results of that review are summarized in the Traffic Engineers' letter included as *Appendix II*.

**Teodoro Moscoso Bridge**

In furtherance of its expanded powers to enter into concession agreements with private companies, the Authority entered into a concession agreement with Autopistas de Puerto Rico y Compañía, S.E. ("APR") for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge, a bridge spanning the San Jose Lagoon from San Juan to Carolina. Pursuant to the concession agreement, APR is obligated to operate and maintain the bridge for a term of 35 years, subject to extension or to earlier termination. The bridge opened in February 1994 at a cost of approximately $109.5 million. The bridge does not constitute a Traffic Facility under the 1968 Resolution or a Transportation Facility under the 1998 Resolution.

Construction of the bridge was financed through the issuance by the Authority of the Special Facility Revenue Bonds in the principal amount of $116,752,769. The proceeds of such bonds were loaned to APR, and APR has agreed to repay the loan in amounts sufficient to pay the principal of and interest on the bonds. APR's obligation in respect of the Special Facility Revenue Bonds is payable solely from the net toll revenues of the bridge, after payment of current operating expenses. As of December 31, 2002, the principal amount of Special Facility Revenue Bonds (including accretion on capital appreciation bonds) was $137,309,224. The Authority expects shortly to refinance the Special Facility Revenue Bonds by issuing its Special Facility Refunding Bonds. See "Proposed Refunding of Special Facility Revenue Bonds" below.

Under the current concession agreement, the Authority is required to replace APR with a new concessionaire in the event that traffic levels specified in the concession agreement (based on traffic projections prepared in connection with the construction of the bridge) fall below certain levels.

Since operations commenced, traffic using the bridge has been less than the levels specified in the concession agreement. As a result, APR currently has the right, but not the obligation, to terminate the concession agreement and require the Authority to assume APR's obligations to pay the Special Facility Revenue Bonds. For the twelve months of calendar 2002, the actual volume of traffic was 80.1% of the agreement's specified minimum level for such period. During calendar 2001, the actual volume of traffic was 92.7% of the current agreement's specified minimum level compared to 98% during 2000, 102% during 1999, 93% during 1998, 85% during 1997, 76% during 1996, 69% during 1995 and 62% during 1994. The decline in traffic has been caused mainly by the following factors: (1) improvements in the Baldorioty de Castro Highway in 2000 and 2001, (2) increase in toll rate in 2002, and (3) reduction in air travel in 2001 and 2002 as a result of the aftermath of the September 11, 2001 attacks. The Authority does not currently expect APR to terminate the concession agreement.

If the current concession is terminated by APR, the Authority would be required to assume the obligation to pay principal of and interest on the Special Facility Revenue Bonds, in the first instance from such net toll revenues. If such net toll revenues are insufficient to make such payment, the Authority has agreed to cover any such insufficiency with unencumbered moneys in the 1968 Construction Fund (available pursuant to clause (4) of the third paragraph under "Sinking Fund" in *Summary of Certain Provisions of the 1968 Resolution*). The Authority has further agreed that, upon the occurrence of any such insufficiency and for so long as it shall exist, the Authority shall not make any withdrawal and expenditure, pledge or encumbrance of such unencumbered 1968 Construction Fund moneys and has further agreed that until such insufficiency is cured, such unencumbered 1968 Construction Fund moneys will be subject to the lien and pledge in favor of the holders of the Special Facility Revenue Bonds.

The Authority has further agreed under the current terms of the Special Facility Revenue Bonds that, after its assumption of the obligation to repay them, it will use its best efforts to issue additional Highway Revenue Bonds under Section 208 of the 1968 Resolution to the extent permitted by said Section and exchange the Special Facility Revenue Bonds for such additional Highway Revenue Bonds so issued or redeem any such outstanding Special Facility Revenue Bonds.

*Proposed Refunding of Special Facility Revenue Bonds.* The proceeds derived from the proposed sale of the Special Facility Refunding Bonds would be loaned by the Authority to APR pursuant to a loan agreement, and such proceeds would be used to refund the Special Facility Revenue Bonds. Pursuant to the terms of the proposed issuance of the Special Facility Refunding Bonds, APR would continue operating the Teodoro Moscoso toll bridge pursuant to the aforementioned concession agreement with the Authority and the bridge would continue being owned by the Authority.

42

HTA_STAY0056126

The Special Facility Refunding Bonds would be payable primarily from net toll revenues from the bridge collected by APR, after payment of bridge operating expenses.

In the event that the proposed Special Facility Refunding Bonds are issued, the Authority has covenanted that if net toll revenues, together with available reserves and any additional funds contributed to APR by its partners, are insufficient to pay the Special Facility Refunding Bonds, or that the concession agreement is terminated, the Authority will assume the obligation to pay the Special Facility Refunding Bonds. If the Authority assumes the obligation to pay the Special Facility Refunding Bonds, the concession will be reacquired by the Authority, the concession agreement will terminate and the Authority will be required to exchange the Special Facility Refunding Bonds for new bonds issued under the 1998 Resolution, provided it meets the requirements for the issuance of such new bonds. These new bonds would be issued as either Subordinated Transportation Revenue Bonds or Senior Transportation Revenue Bonds, at the option of the Authority, and would have the same interest rates, maturity dates and redemption provisions as the Special Facility Refunding Bonds. If the Authority cannot issue such new bonds in exchange for the Special Facility Refunding Bonds, the Special Facility Refunding Bonds would continue to be payable from available net toll revenues from the bridge, and from any other revenues available to the Authority after payment of debt service on the Transportation Revenue Bonds (including the 2003 Transportation Revenue Bonds), and after payment of certain operating and maintenance expenses relating to certain of its transportation facilities. If the Authority assumes the obligation to pay the Special Facility Refunding Bonds, it would also have the option of redeeming the Special Facility Refunding Bonds, in whole or in part, at par, at any time after such assumption.

The Authority expects to issue the Special Facility Refunding Bonds and refund the outstanding Special Facility Revenue Bonds during the first half of calendar 2003.

## DEBT

### Authority Debt

The outstanding debt of the Authority as of January 1, 2003, as adjusted for the issuance of the 2003 Bonds and the refunding of the Refunded Bonds, is as follows:

|  | Outstanding as of January 1, 2003[1] | As Adjusted[2] |
|---|---|---|
|  | (in thousands) | |
| Highway Revenue Bonds[3] | $1,908,565,000 | $1,868,830,000 |
| Senior Transportation Revenue Bonds | 2,457,411,968 | 3,019,701,968 |
| Subordinated Transportation Revenue Bonds | 75,050,000 | 395,595,000 |
| Outstanding Notes[4] | 70,120,819 | 0 |
| TIFIA Loan | 300,000,000 | 0 |
| **Total** | $4,811,147,787 | $5,284,126,908 |

(1) In the case of capital appreciation bonds, includes accretion through January 1, 2003.

(2) Adjusted to exclude the Refunded Bonds, and in the case of capital appreciation bonds, includes accretion through January 1, 2003.

(3) Includes $3,120,000 Highway Revenue Bonds sold to the Farmers Home Administration. Does not include the Special Facility Revenue Bonds. See "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures.*

(4) Notes payable to the Government Development Bank for interim financing for certain capital improvements. The outstanding balance of the notes will be repaid in full from a portion of the proceeds of the Series G Bonds.

CONFIDENTIAL

HTA_STAY0056127

**Principal and Interest Requirements**

The Principal and Interest Requirements for the outstanding Highway Revenue Bonds and Transportation Revenue Bonds and the 2003 Bonds for each of the fiscal years 2003 through 2042 (after taking into account the refunding of the Refunded Bonds) are set forth in the following table:

| Years Ending June 30, | Unrefunded Revenue Bonds[1] | 2003 Bonds | | | Total Debt Service |
|---|---|---|---|---|---|
| | | Principal | Interest[2] | Total | |
| 2003 | $ 234,761,922 | $ | $14,406,058 | $ 14,406,058 | $249,167,980 |
| 2004 | 217,428,797 | | 83,648,081 | 83,648,081 | 301,076,878 |
| 2005 | 246,593,775 | 24,060,000 | 83,648,081 | 107,708,081 | 354,301,856 |
| 2006 | 228,421,526 | 43,305,000 | 82,556,731 | 125,861,731 | 354,283,257 |
| 2007 | 228,108,026 | 49,920,000 | 80,472,756 | 130,392,756 | 358,500,782 |
| 2008 | 239,240,363 | 43,325,000 | 78,032,443 | 121,357,443 | 360,597,806 |
| 2009 | 263,948,344 | 20,180,000 | 76,412,062 | 96,592,062 | 360,540,406 |
| 2010 | 237,050,139 | 47,965,000 | 75,600,318 | 123,565,318 | 360,615,457 |
| 2011 | 274,253,169 | 16,225,000 | 68,909,418 | 85,134,418 | 359,387,587 |
| 2012 | 274,258,431 | 16,940,000 | 68,213,808 | 85,153,808 | 359,412,239 |
| 2013 | 274,258,406 | 17,720,000 | 67,396,296 | 85,116,296 | 359,374,702 |
| 2014 | 260,449,944 | 33,575,000 | 66,559,138 | 100,134,138 | 360,584,082 |
| 2015 | 259,204,181 | 36,550,000 | 64,831,053 | 101,381,053 | 360,585,234 |
| 2016 | 223,719,156 | 72,725,000 | 62,978,426 | 135,703,426 | 359,422,582 |
| 2017 | 231,904,431 | 68,235,000 | 59,231,076 | 127,466,076 | 359,370,507 |
| 2018 | 228,294,681 | 71,925,000 | 55,569,818 | 127,494,818 | 355,789,499 |
| 2019 | 198,151,394 | 99,245,000 | 51,708,916 | 150,953,916 | 349,105,310 |
| 2020 | 198,120,177 | 104,685,000 | 46,294,925 | 150,979,925 | 349,100,102 |
| 2021 | 197,864,337 | 87,565,000 | 41,313,782 | 128,878,782 | 326,743,119 |
| 2022 | 237,835,068 | 31,220,000 | 37,680,280 | 68,900,280 | 306,735,348 |
| 2023 | 169,312,913 | 54,180,000 | 36,004,561 | 90,184,561 | 259,497,474 |
| 2024 | 169,307,105 | 56,370,000 | 33,833,150 | 90,203,150 | 259,510,255 |
| 2025 | 169,310,436 | 58,605,000 | 31,563,852 | 90,168,852 | 259,479,288 |
| 2026 | 169,312,517 | 60,985,000 | 29,201,120 | 90,186,120 | 259,498,637 |
| 2027 | 202,553,708 | 30,200,000 | 26,738,610 | 56,938,610 | 259,492,318 |
| 2028 | 202,555,062 | 31,665,000 | 25,286,277 | 56,951,277 | 259,506,339 |
| 2029 | 193,778,225 | 33,170,000 | 23,762,757 | 56,932,757 | 250,710,982 |
| 2030 | 196,643,050 | 34,775,000 | 22,165,967 | 56,940,967 | 253,584,017 |
| 2031 | 196,644,388 | 36,450,000 | 20,490,907 | 56,940,907 | 253,585,295 |
| 2032 | 187,639,288 | 47,215,000 | 18,734,325 | 65,949,325 | 253,588,613 |
| 2033 | 188,165,369 | 48,820,000 | 16,590,137 | 65,410,137 | 253,575,506 |
| 2034 | 188,697,206 | 50,520,000 | 14,364,215 | 64,884,215 | 253,581,421 |
| 2035 | 189,232,806 | 52,305,000 | 12,051,725 | 64,356,725 | 253,589,531 |
| 2036 | 198,755,750 | 23,700,000 | 9,648,500 | 33,348,500 | 232,104,250 |
| 2037 | 143,388,050 | 24,885,000 | 8,463,500 | 33,348,500 | 176,736,550 |
| 2038 | 143,387,263 | 26,130,000 | 7,219,250 | 33,349,250 | 176,736,513 |
| 2039 | 78,561,925 | 27,435,000 | 5,912,750 | 33,347,750 | 111,909,675 |
| 2040 | 41,785,600 | 28,810,000 | 4,541,000 | 33,351,000 | 75,136,600 |
| 2041 | 41,787,113 | 30,250,000 | 3,100,500 | 33,350,500 | 75,137,613 |
| 2042 | - | 31,760,000 | 1,588,000 | 33,348,000 | 33,348,000 |

* Totals may not add up due to rounding.

(1) Includes $3,120,000 Highway Revenue Bonds sold to the Farmers Home Administration, which mature in the year 2020 and the TIFIA Loan, until repayment in full in 2003. Does not include the Special Facility Revenue Bonds. See "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures.* The interest on certain variable rate Highway Revenue Bonds (Series W), issued in August 1993 has been calculated on the basis of the fixed interest rate payable by the Authority under a related interest rate swap agreement as permitted by the 1968 Resolution. The interest on certain variable rate Senior Transportation Revenue Bonds (Series A) has been calculated on the basis of the fixed interest rate payable by the Authority under a related interest rate swap agreement as permitted by the 1998 Resolution. Adjusted to exclude debt service on the Refunded Bonds.

(2) The interest on the Mandatory Tender Bonds after July 1, 2010 has been calculated using a rate of 3.08% plus fees of 0.27%.

Upon the issuance of the 2003 Bonds, the remaining average life of the Highway Revenue Bonds, the Transportation Revenue Bonds and the 2003 Bonds will be approximately 20.9 years.

44

## SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION

The following are brief summaries of certain provisions of the 1968 Resolution. Such statements do not purport to be complete and reference is made to the 1968 Resolution, copies of which are available from the Authority or the 1968 Fiscal Agent. The 1968 Resolution, the Highway Revenue Bonds issued thereunder and the 1968 Resolution Revenues are referred to in this summary as the "Resolution", the "Bonds" and "Revenues", respectively. The Authority proposes to amend the 1968 Resolution as described in *Summary of Certain Provisions of the Proposed Supplemental Resolution.*

### Definition of Certain Terms

"Accreted Value" means, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, an amount equal to the principal amount of such Bond on the date of original issuance plus the interest accrued on such Bond from the date of original issuance to the date of calculation or the Interest Commencement Date, as the case may be, compounded on the dates and in the manner provided for in the resolution authorizing the issuance of such Capital Appreciation Bond or Capital Appreciation and Income Bond.

"Balloon Bonds" mean any Bonds, the interest on which is payable periodically and twenty-five percent (25%) or more of the original principal amount of which matures during any one fiscal year and for which maturing principal amount Amortization Requirements have not been fixed.

"Capital Appreciation Bonds" means any Bonds as to which interest is compounded periodically on each of the applicable dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity (or extended maturity date for Extendible Maturity Bonds), earlier redemption or other payment date therefor, all as so provided by such resolution, and which may be either serial bonds or term bonds.

"Capital Appreciation and Income Bonds" means any Bonds as to which accruing interest is not paid prior to the interest payment date immediately succeeding the Interest Commencement Date specified in the resolution authorizing such Bonds and the interest on which is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either serial bonds or term bonds.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated thereunder and applicable regulations promulgated under the Internal Revenue Code of 1954, as amended.

"Extendible Maturity Bonds" means Bonds the maturities of which, by their terms, may be extended by and at the option of the holders of the Bonds or the Authority.

"1968 Fiscal Agent" means the bank or trust company appointed by the Authority and acting as fiscal agent whether original or successor pursuant to the provisions of the Resolution.

"fiscal year" means the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Authority.

"Government Obligations" means (i) direct obligations of, or obligations the payment of the principal of and interest on which are unconditionally guaranteed by, the United States of America; (ii) municipal obligations, the payment of the principal of and interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) above and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations; (iii) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i) and (ii) above held by a bank (including the 1968 Fiscal Agent) or trust company as custodian, under which the owner of said interests is the real party in interest and has the right to proceed directly and individually against the issuer of the underlying obligations described in said clauses (i) and (ii) and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated; and (iv) secured time deposits.

"Interest Commencement Date" means, with respect to any particular Capital Appreciation and Income Bonds, the date specified in the resolution authorizing the issuance of such Bonds after which interest accruing on such Bonds

45

 HTA_STAY0056129

shall be payable on a periodic basis prior to maturity, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Interim Bonds" means any Bonds issued under the Resolution on an interim basis which are expected to be repaid from the proceeds of Bonds or other indebtedness.

"Investment Obligations" means any of the following, to the extent that the same is legal for the investment of public funds under the laws of the Commonwealth:

(i)    ' Government Obligations;

(ii) obligations issued or guaranteed by any instrumentality or agency of the United States of America, whether now existing or hereafter organized, including but not limited to those of the Federal Financing Bank, Federal Home Loan Banks, the Export-Import Bank, Government National Mortgage Association and the Tennessee Valley Authority;

(iii) bankers' acceptances, certificates of deposit or time deposits of any bank, national banking association (including the 1968 Fiscal Agent), trust company or savings and loan association (including any investment in pools of such bankers acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation, are either (A) issued by a bank, trust company, or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clause (i) or (ii) above or (iv) or (v) below, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit or time deposits (or portion thereof not so insured); provided that the 1968 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(iv) obligations issued by any state or territory of the United States, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto;

(v) municipal obligations, the payment of the principal of and the interest on which is insured, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto;

(vi) any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the 1968 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clause (i) or (ii) above, provided that the 1968 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties;

(vii) commercial paper rated, or backed by a letter of credit or line of credit the issuer of which is rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto; and

(viii) any other investment obligations, which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradation within such category) by both Moody's or any successors thereto and S&P or any successors thereto.

"Principal and Interest Requirements" for any period, as applied to the Bonds of any Series, means the sum of:

(i)      the amount required to pay interest on all Bonds of such Series then outstanding which is payable on each interest payment date in such period;

(ii)     the amount required to pay principal of all serial Bonds of such Series then outstanding which is payable upon the stated maturity of such serial Bonds in such period; and

(iii)    the Amortization Requirements for the term Bonds of such Series for such period.

To the extent that the period for calculating Principal and Interest Requirements shall be a fiscal year and the first day of the next fiscal year shall be an interest or principal payment date, such first day of the next fiscal year shall be

46

included in the preceding fiscal year and not in the current fiscal year for purposes of calculating Principal and Interest Requirements.

The following rules apply in determining the amount of the Principal and Interest Requirements for any period:

(a) in the case of Variable Rate Bonds the interest rate thereon shall be assumed to be the greater of (A) one hundred ten percent (110%) of the average interest rate on such Variable Rate Bonds during the twelve months ending with the month preceding the date of calculation or such shorter period that such Variable Rate Bonds shall have been outstanding, (B) the actual rate of interest on such Variable Rate Bonds on the date of calculation and (C) the lesser of the maximum rate then permitted by law and the maximum rate permitted on such Variable Rate Bonds by the resolution authorizing the issuance thereof; provided, however, that if the Authority has notified the 1968 Fiscal Agent that a Swap agreement is in effect in respect of such Variable Rate Bonds, then for all purposes of this paragraph the interest rate on such Variable Rate Bonds shall be the Swap rate under such Swap agreement.

(b) in the case of Put Bonds, the tender date or dates shall be ignored if the source for payment of said tender is a liquidity facility and the stated periods for Amortization Requirements and the stated dates for principal payments shall be used, and in the case of Bonds secured by a credit facility or a liquidity facility, the terms of the reimbursement obligation to the issuers thereof shall be ignored and the stated periods for Amortization Requirements and the stated dates for principal payments shall be used; provided, however, that during any period after the issuer of a credit facility or a liquidity facility, as the case may be, has advanced funds thereunder, the reimbursement obligation of which is payable from and secured on a parity with the Bonds and before such amount is repaid, Principal and Interest Requirements shall include the principal amount so advanced and interest thereon, in accordance with the principal repayment schedule and interest rate or rates specified in the credit facility or liquidity facility, as the case may be, in lieu of the stated principal of and Amortization Requirements and interest on such Bonds;

(c) in the case of Extendible Maturity Bonds, the Bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date shall have been extended;

(d) in the case of Capital Appreciation Bonds, the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included during such period in which said principal and interest portions are due;

(e) in the case of Capital Appreciation and Income Bonds, the principal and interest portions of the Appreciated Value of Capital Appreciation and Income Bonds shall be included during the period in which said principal and interest portions are due;

(f) in the case of Balloon Bonds or Interim Bonds, the debt service requirements of the Balloon Bonds or Interim Bonds may be excluded and in lieu thereof the Balloon Bonds or Interim Bonds shall be viewed as debt securities having a comparable federal tax status as such Balloon Bonds or Interim Bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than 30 years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities on the date of issuance of the Balloon Bonds or Interim Bonds and issued by issuers having a credit rating, issued by Moody's or any successors thereto or S&P or any successors thereto comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g) if all or a portion of the principal of or interest on a Series of Bonds is payable from moneys irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations irrevocably set aside or deposited for such purpose on the date of computation, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the above computation shall be supported by a verification report from a nationally recognized independent certified public accountant as to the sufficiency of such moneys set aside and projected earnings.

"Put Bonds" means Bonds which by their terms may be tendered by and at the option of the holder thereof for payment prior to the stated maturity thereof.

"Reserve Account Insurance Policy" means the insurance policy, surety bond or other acceptable evidence of insurance, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of the issuer thereof. The issuer shall be a municipal bond insurer whose senior debt obligations, ranking *pari passu* with its obligations under such policy, bond or other evidence of insurance, are rated at the time of deposit to the credit of the 1968 Reserve Account in any of the three highest rating categories (without regard to any gradation within any such category) of either Moody's or any successors thereto or S&P or any successors thereto.

CONFIDENTIAL                                                                                    HTA_STAY0056131

"Reserve Account Letter of Credit" means the irrevocable, transferable letter of credit, if any, which letter of credit constitutes an unconditional senior obligation of the issuer thereof. The issuer shall be a banking association, bank or trust company or branch thereof whose senior debt obligations, ranking *pari passu* with its obligations under such letter of credit, are rated at the time of deposit to be credit of the 1968 Reserve Account in any of the three highest rating categories (without regard to any gradation within any such category) of either Moody's or any successors thereto or S&P or any successors thereto.

"1968 Reserve Requirement" means the lesser of (a) the maximum Principal and Interest Requirements for any fiscal year on account of the outstanding Bonds and (b) ten percent (10%) of the original principal amount of each Series of Bonds outstanding (determined on the basis of their initial offering prices to the public).

"1968 Revenues" means (a) all moneys received by the Authority on account of the gasoline tax allocated to the Authority by Act No. 75, approved June 23, 1965; (b) Toll Revenues; (c) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico has allocated or may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal of and interest on Bonds issued under the provisions of the Resolution; provided that written notice of such pledge has been delivered to S&P, Moody's and any other rating agency then rating the Bonds and (d) investment earnings on deposits to the credit of funds and accounts established under the Resolution, except for the Construction Fund.

"Swap agreement" means an agreement between the Authority and a Swap party whereby the Swap party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on Variable Rate Bonds at or prior to the times such interest is due and payable in consideration of the Authority's payment to the Swap party of amounts set forth in the Swap agreement.

"Swap party" means a person who is party to a Swap agreement and whose senior obligations are rated at the time of the execution and delivery of such Swap agreement in one of the three highest rating categories (without regard to gradations within a category) by (i) S&P or its successor and (ii) Moody's or its successor.

"Swap rate" means the fixed rate per annum on the principal amount of Variable Rate Bonds covered by a Swap agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the Swap party less the amount paid to the Authority by the Swap party by (ii) such principal amount of Variable Rate Bonds; provided, however, that if such Swap agreement has been in effect for less than twelve months, such percentage shall be multiplied by 360 divided by the number of days between the effective date of such Swap agreement and the date of calculation determined on the basis of 30-day month; provided, further, that if no amount has been paid under the Swap agreement, the Swap rate shall be deemed to be the fixed rate per annum contracted to be paid by the Authority to the Swap party.

"Toll Revenues" means the tolls or other charges, if any, imposed by the Authority for the use of any of its Traffic Facilities.

"Traffic Facilities" means any of the following facilities for which Bonds shall be issued under the Resolution the cost of which facilities paid from the proceeds of such Bonds shall not have been reimbursed to the Authority from funds not encumbered by the Resolution: (1) roads, avenues, streets, thoroughfares, speedways, bridges, tunnels, channels, stations, terminals, and any other land or water facilities necessary or desirable in connection with the movement of persons, freight, vehicles or vessels; (2) parking lots and structures and other facilities necessary or desirable in connection with the parking, loading or unloading of all kinds of vehicles and vessels; and (3) all property, rights, easements, and interests therein necessary or desirable for the construction, maintenance, control, operation or development of such traffic facilities.

"Variable Rate Bonds" means Bonds issued with a variable, adjustable, convertible or similar interest rate which is not fixed in percentage at the date of issue for the term thereof, but which may or may not be convertible to a fixed interest rate for the remainder of their term. (Section 101).

**Sinking Fund**

The Resolution creates the "Puerto Rico Highways Authority Highway Revenue Bonds Interest and Sinking Fund" (the "1968 Sinking Fund"). The "1968 Bond Service Account", "1968 Redemption Account" and "1968 Reserve Account" are created within the 1968 Sinking Fund. (Section 401).

48

HTA_STAY0056132

The moneys in each Account are held by the 1968 Fiscal Agent in trust and, pending application, are subject to a lien in favor of the holders of the outstanding Bonds and for the further security of such holders until paid out or transferred as provided in the Resolution. (Section 401).

All Revenues (other than investment earnings), and any other funds of the Commonwealth allocated to the Authority for the payment of principal of and interest on any Bonds, are deposited monthly with the 1968 Fiscal Agent as follows:

(1) To the 1968 Bond Service Account, an amount equal to 1/6th of the amount of interest payable on all Bonds of each Series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of principal of any serial bonds; provided, however, that the amount so deposited on account of the interest in each month after the delivery of the Bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the Bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such Bonds on such first interest payment date less the amount of any accrued interest paid on such Bonds and deposited to the credit of the 1968 Bond Service Account;

(2) To the 1968 Redemption Account, an amount equal to 1/12th of the Amortization Requirement for such fiscal year for the term bonds of each Series then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of Bonds if such principal amount of Bonds should be redeemed prior to their maturity from moneys in the 1968 Sinking Fund;

(3) To the 1968 Reserve Account, such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the 1968 Reserve Requirement; provided, however, that such deposits shall only be made to the extent necessary to make the amount then in the 1968 Reserve Account equal to the 1968 Reserve Requirement; provided, further, that in the event of an increase in the 1968 Reserve Requirement due to the issuance of additional Series of Bonds, such increase may be funded by deposits in each of the five (5) years, commencing in the fiscal year in which such additional Series of Bonds is issued, of 20% of such increase in the Reserve Requirement; and

(4) Any 1968 Revenues remaining after making the deposits referred to above shall be deposited to the credit of the 1968 Construction Fund for use by the Authority for any of its authorized purposes. (Section 401).

The requirements specified in paragraphs (1), (2) and (3) above are cumulative. (Section 401).

In lieu of any required deposit of Revenues into the 1968 Reserve Account, or in substitution for all or a portion of the moneys then on deposit in the 1968 Reserve Account, the Authority may deposit into the 1968 Reserve Account a Reserve Account Insurance Policy or a Reserve Account Letter of Credit for the benefit of the holders in an amount equal to the required deposit, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any interest payment date on which a deficiency exists which cannot be cured by moneys in any other fund or account held by the 1968 Fiscal Agent pursuant to the Resolution and available for such purpose. If a disbursement is made under the Reserve Account Insurance Policy or the Reserve Account Letter of Credit, the Authority shall be obligated either to reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement, or to deposit into the 1968 Reserve Account from Revenues, funds in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit. (Section 401).

Moneys in the 1968 Redemption Account shall be applied to the retirement of Bonds as follows:

(a) Subject to the provisions of paragraph (c) below, the 1968 Fiscal Agent shall endeavor to purchase outstanding Bonds, whether or not such Bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such Bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such Bonds if such Bonds should be called for redemption on such date from moneys in the 1968 Sinking Fund. The 1968 Fiscal Agent shall pay the interest accrued on such Bonds to the date of delivery thereof from the 1968 Bond Service Account and the purchase price from the 1968 Redemption Account, but no such purchase shall be made within 45 days next preceding any interest payment date on which such Bonds are subject to redemption except from moneys in excess of the amounts set aside or deposited for the redemption of Bonds.

(b) Subject to the provisions of paragraph (c) below, the 1968 Fiscal Agent shall call for redemption on each interest payment date on which Bonds are subject to redemption from moneys in the 1968 Sinking Fund such amount of

49

Bonds then subject to redemption as, with the redemption premium, if any, will exhaust the 1968 Redemption Account as nearly as may be; provided, however, that not less than $50,000 principal amount of Bonds shall be called for redemption at any one time.

(c) Moneys in the 1968 Redemption Account shall be applied to the purchase or redemption of Bonds in the following order:

First, the term Bonds of each Series, if any, in the order of their issuance, to the extent of the Amortization Requirement, if any, of the then current fiscal year for such term Bonds and any deficiency in preceding fiscal years in the purchase or redemption of such term Bonds under the provisions of this subdivision; provided, however, that if none of the term Bonds of a Series shall be subject to redemption from moneys in the 1968 Sinking Fund and if the 1968 Fiscal Agent shall at any time be unable to exhaust the moneys applicable to the Bonds of any such Series in the purchase of such Bonds under the provisions of paragraph (a) above, such moneys or the balance of such moneys, as the case may be, shall be retained in the 1968 Redemption Account and, as soon as it is feasible, applied to the retirement of the Bonds of such Series;

Second, to the purchase of any outstanding Bonds, whether or not such Bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

Third, term Bonds of each Series in proportion (as nearly as practicable) to the aggregate principal amount of the Bonds of each such Series originally issued; and

Fourth, after the retirement of all term Bonds, serial Bonds in the inverse order of their maturities, and to the extent that serial Bonds of different Series mature on the same date, in proportion (as nearly as practicable) to the principal amount of each Series maturing on such date. (Section 403).

All expenses in connection with such purchase or redemption shall be paid from the 1968 Construction Fund. (Section 403).

Moneys in the 1968 Reserve Account shall be used for the purpose of paying interest on the Bonds and maturing principal of serial Bonds whenever and to the extent that the moneys held for the credit of the 1968 Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1968 Redemption Account pursuant to the requirements mentioned in paragraph (2) above whenever and to the extent that the Revenues are insufficient for such purpose. Excess moneys in the 1968 Reserve Account shall be transferred to the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as directed by the Authority. (Section 404).

**1968 Construction Fund**

Moneys in the 1968 Construction Fund may be used for any authorized purpose of the Authority, including, prior to the adoption of the 1998 Resolution, the payment of the cost of maintaining, repairing and operating the Traffic Facilities and the cost of necessary renewals and replacements of Traffic Facilities. (Sections 401, 604 and 605). Before any payment or withdrawal shall be made from moneys in the 1968 Construction Fund there shall be filed with the 1968 Fiscal Agent a certificate signed by a designated officer of the Authority setting forth the amount of money to be so disbursed and stating that such money will be used to pay the costs of constructing Traffic Facilities or for other purposes permitted by the Resolution. Upon receipt of such certificate the 1968 Fiscal Agent shall withdraw from the 1968 Construction Fund and deposit to the credit of a special checking account in its commercial department in the name of the Authority the amount so specified in such certificate. The 1968 Fiscal Agent shall also at any time at the written direction of the Authority transfer any part of the moneys in the 1968 Construction Fund to the credit of the 1968 Redemption Account. (Section 405).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority may not withdraw, expend, pledge or otherwise encumber moneys held to the credit of the 1968 Construction Fund whether for the purpose of satisfying the Authority's priorities construction program or otherwise, except for the payment over to the 1998 Resolution as described in the third sentence of the fourth paragraph under "Summary of Certain Provisions of the 1998 Resolution–Sinking Funds" and except with respect to obligations with respect to the Teodoro Moscoso Bridge. See "Summary of Certain Provisions of the 1998 Resolution–Miscellaneous Covenants--Relating to the 1968 Resolution."

50

HTA_STAY0056134

**Defeasance**

If all the outstanding Bonds shall have been paid or deemed to have been paid as provided below, then and in that case the right, title and interest of the bondholders under the Resolution shall cease, terminate and become void, and such Bonds shall, except as described in the next sentence, cease to be entitled to any lien, benefit or security under the Resolution. In such event, the Authority shall repeal and cancel the Resolution and may apply any surplus in the 1968 Sinking Fund and all balances remaining in any other funds and accounts other than moneys held for the redemption or payment of Bonds to any lawful purposes of the Authority as the Secretary shall determine. Notwithstanding the foregoing, the Authority may not repeal the Resolution so long as the termination option with respect to the Teodoro Moscoso Bridge concession remains in effect. See fifth paragraph in "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures*. Under the terms of the 1998 Resolution, all such surplus and balances are required upon the repeal and cancellation of the Resolution to be transferred to the 1998 Revenue Fund.

Any outstanding Bond shall be deemed to have been paid within the meaning and with the effect expressed in the Resolution when the whole amount of the principal of, redemption premium, if any, and interest on such Bond shall have been paid or duly provided for and the conditions set forth in clause (c) below have been satisfied or when (a) in case such Bond has been called for redemption or the Authority has given irrevocable instructions to call such Bond for redemption, (b) there shall have been deposited either moneys in an amount which shall be sufficient, or Government Obligations the principal of and interest on which are sufficient, to pay when due the principal of and premium, if any, and interest due and to become due on such Bond on or prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event such Bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given irrevocable instructions to give, as soon as practicable, a notice to the holder of such Bond by first-class mail, postage prepaid, stating that the deposit in trust of moneys or such time deposits or Government Obligations required by clause (b) of this paragraph has been made and that such Bond is deemed to have been paid in accordance with the Resolution and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such Bond.

Neither the moneys nor Government Obligations deposited with the 1968 Fiscal Agent or other appropriate fiduciary institution acting as escrow agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and redemption premium, if any, and interest on the Bonds which have been defeased.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the terms of the provisions of the resolution which authorized the issuance of such Variable Rate Bonds.

Notwithstanding any of the provisions of the Resolution to the contrary, Put Bonds and Extendible Maturity Bonds may only be fully discharged and satisfied either by paying the principal of and interest on said Bonds as they become due and payable or by depositing moneys which shall be sufficient at the time of such deposit to pay when due the maximum amount of principal of and redemption premium, if any, and interest on such Put Bonds and Extendible Maturity Bonds which could become payable to the holders of such Bonds upon the exercise of any options provided to the holders of such Bonds and the Authority; provided, however, that if, at the time a deposit is made pursuant to this paragraph, the options originally exercisable on the Put Bonds and Extendible Maturity Bonds are no longer exercisable, such Bonds shall not be considered Put Bonds or Extendible Maturity Bonds for these purposes.

If any portion of the moneys deposited for the payment of the principal of and redemption premium, if any, and interest on any portion of Bonds is not required for such purpose, the Authority may use the amount of such excess, subject to certain tax covenants contained in the Resolution, free and clear of any trust, lien, security interest, pledge or assignment securing said Bonds or otherwise existing under the Resolution. (Section 901).

**Issuance of Additional Bonds**

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the purposes for which additional Bonds may be issued are limited to refunding other Bonds for debt service savings and to exchange Bonds for Special Facility Bonds. See "Additional Bonds-Highway Revenue Bonds" under *The 2003 Bonds* above in this Official Statement.

Bonds may be issued under and secured by the Resolution, subject to the conditions hereinafter described, at any time or times for the purpose of providing funds to pay the cost of Traffic Facilities, to refund all or any part of the outstanding Bonds of any one or more Series by payment at maturity or redemption at a selected redemption date or dates, including the payment of any redemption premium thereon, to fund a deposit to the 1968 Reserve Account and to pay any costs of issuance of such Bonds. (Sections 208 and 209).

51

HTA_STAY0056135

Before such Bonds shall be authenticated and delivered, there shall be filed with the 1968 Fiscal Agent, among other things, a certificate dated the date of original issuance of the Bonds, signed by the Executive Director, setting forth:

       (i)     the amount of the Revenues for any twelve (12) consecutive calendar months out of the fifteen (15) calendar months immediately preceding the month in which such certificate is signed;

       (ii)    the amount of the Toll Revenues for the twelve (12) calendar months for which the Revenues are shown in item (i) above;

       (iii)   the difference between the amounts set forth in items (i) and (ii) above;

       (iv)   the amount of the maximum Principal and Interest Requirement for any fiscal year thereafter on account of the Bonds then outstanding and the Bonds then requested to be delivered;

       (v)    the percentage derived by dividing the amount in item (i) above by the amount in item (iv) above; and

       (vi)   the percentage derived by dividing the amount in item (iii) above by the amount in item (iv) above. (Section 208).

The 1968 Fiscal Agent may only deliver such additional Bonds if the percentage shown in either item (v) or item (vi) is not less than 150%. (Section 208). The Authority need not deliver said certificate in connection with the issuance of refunding bonds if the Executive Director delivers a certificate to the effect that the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Bonds to be outstanding after the issuance of the refunding bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Bonds outstanding prior to the issuance of such refunding Bonds. (Section 209).

If the percentage shown in item (vi) of the certificate mentioned above and filed with the 1968 Fiscal Agent in connection with the issuance of any additional Bonds is less than 150%, the Authority may not reduce the tolls or other charges imposed by it for the use of its Traffic Facilities such that, as of the effective date of such reduction, the amount of Revenues for any twelve (12) consecutive calendar months out of the fifteen (15) calendar months immediately preceding such effective date, adjusted to reflect the Toll Revenues it would have received, based on the volume of traffic for such twelve (12) months, if such reduction had been in effect for such twelve (12) months, is less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all Bonds then outstanding. (Section 609).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the ability of the Authority to reduce tolls or other charges imposed by it for the use of its Toll Facilities is further restricted as described in "Miscellaneous Covenants–Level of Tolls and Other Charges" under *Summary of Certain Provisions of the 1998 Resolution*.

Any increase in the 1968 Reserve Requirement resulting from the issuance of such additional Bonds may be satisfied by equal deposits of 20% of such increase into the 1968 Reserve Account in each of the next five years beginning with the fiscal year in which such additional Bonds were issued. (Section 401).

**Other Indebtedness**

The Authority will not incur any indebtedness nor create or cause or suffer to be created any debt, lien, pledge, assignment, encumbrance or any other charge having a priority to or being on a parity with the lien on Revenues of the Bonds issued under the Resolution, except upon the conditions and in the manner provided in the Resolution. Any other indebtedness incurred by the Authority shall contain an express statement that such indebtedness is junior, inferior and subordinate in all respects to the Bonds. For purposes of the above limitation in incurrence of indebtedness, indebtedness shall not be deemed to include contracts entered into in the ordinary course of business or agreements to repay advances received from the federal government. Nothing in the Resolution shall be deemed to prohibit the Authority from entering into currency swaps, interest rate swaps or other arrangements for hedging of interest rates on any indebtedness. (Section 602).

Nothing in the Resolution is to be construed as preventing the Authority from financing any facilities authorized by the act creating the Authority by the issuance of bonds or other obligations which are not secured under the provisions of the Resolution. (Section 1001).

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority may not incur any indebtedness nor create or suffer to be created

52

HTA_STAY0056136

any lien, pledge, assignment, encumbrance or charge upon the Existing Toll Facilities or the Existing Tax and Fee Revenues ranking equally with or prior to the Bonds.

**Investment of Funds**

Moneys held for the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations, and moneys held for the credit of the 1968 Construction Fund and the 1968 Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations, which Government Obligations and Investment Obligations shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of such Fund or Accounts will be required for the purposes intended. Amounts on deposit in the 1968 Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Bonds outstanding. (Section 502).

Investment earnings on moneys on deposit to the credit of the following Fund and Accounts shall be applied as follows:

(a) investment earnings on moneys on deposit to the credit of the 1968 Construction Fund shall be retained to the credit of said Fund;

(b) investment earnings on moneys on deposit to the credit of the 1968 Reserve Account shall be retained in said Account at any time that the amounts on deposit to the credit of said Account are less than the 1968 Reserve Requirement and, if moneys on deposit therein are sufficient for such purposes, then such earnings shall be withdrawn and deposited to the credit of the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as the Authority shall direct; and

(c) investment earnings on moneys on deposit to the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall be transferred to the 1968 Construction Fund or at the option of the Authority retained in such Account. (Section 502).

In computing the amount in any Fund or Account created pursuant to the provisions of the Resolution, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such Fund or Account. The computation of the amount on deposit in or credited to the Fund and Accounts created under the Resolution and the valuation of the investments of such amount shall be performed by the 1968 Fiscal Agent as of the close of business on the last day of each fiscal year and at such other times as the Authority shall request, and such computation and valuation shall not be required to be performed at other times. (Section 503).

**Modifications**

As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the ability of the Authority to amend the Resolution will be limited. See "Miscellaneous Covenants-Relating to the 1968 Resolution" in *Summary of Certain Provisions of the 1998 Resolution.*

The Authority may adopt resolutions supplemental to the Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission, or to correct any inconsistent provisions or errors in the Resolution or any supplemental resolution, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security, or to add to the conditions, limitations and restrictions on the issuance of Bonds under the provisions of the Resolution, or to add to the covenants and agreements of the Authority in the Resolution or to surrender any right or power reserved to or conferred upon the Authority, or to make necessary changes to facilitate the issuance of Variable Rate Bonds, Capital Appreciation Bonds, Capital Appreciation and Income Bonds, Put Bonds, Extendible Maturity Bonds, Balloon Bonds, Interim Bonds and such other bonds as may be marketable from time to time, or to make changes as may evidence the right and interest of an issuer of a Credit Facility or a Liquidity Facility that secures any Series of Bonds. (Section 801).

53

The holders of not less than two-thirds in aggregate principal amount of the Bonds then outstanding shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the Resolution or in any supplemental resolution; provided, however, that nothing contained in the Resolution shall permit, or be construed as permitting, (a) an extension of the maturity of the principal of or the interest on any Bond, or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues other than the lien and pledge created by the Resolution, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to such supplemental resolution. (Section 802).

Upon the adoption of any supplemental resolution pursuant to the provisions of the Resolution, the Resolution shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under the Resolution of the Authority, the 1968 Fiscal Agent and all holders of Bonds then outstanding shall thereafter be determined, exercised and enforced in all respects under the provisions of the Resolution as so modified and amended. (Section 802).

**Miscellaneous Covenants**

*Master Plan.* The Authority covenants that the master plan for the construction of required Traffic Facilities in the Commonwealth will be supplemented periodically as necessary and that the five-year Construction Improvement Program will be updated each year to cover the Traffic Facilities to be constructed by the Authority in the ensuing five-year period. (Section 603).

*Costs of Maintenance, Repair and Operation of Traffic Facilities.* The Authority covenants that, if and to the extent funds for the purpose of maintaining, repairing and operating all Traffic Facilities financed by the Authority in whole or in part by the issuance of Bonds of the Authority under the provisions of the Resolution are not provided by the Commonwealth, the Authority will pay such costs from unencumbered funds then on deposit in the 1968 Construction Fund or from the Revenues thereafter deposited to the credit of the 1968 Construction Fund pursuant to the Resolution. (Section 604). As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority's obligations under this paragraph will be payable from moneys in the 1998 Construction Fund instead of the 1968 Construction Fund.

The Authority covenants that it will cause an annual general evaluation to be made by the Traffic Engineers of the level of maintenance of Traffic Facilities financed in whole or in part by the issuance of Bonds, which Traffic Facilities shall be, in the judgment of the Authority with the approval of the Traffic Engineers, material to the overall system of traffic facilities operated by the Authority. This evaluation is to be directed towards surface and shoulder conditions and condition of structures and signs on the Traffic Facilities. The annual report delivered by the Traffic Engineers under Section 605 of the Resolution and the Authority's obligations to cause repairs, renewal or replacements to be made to Traffic Facilities, shall pertain to the Traffic Facilities financed in whole or in part with Bond proceeds and adjudged to be material to the overall system of traffic facilities operated by the Authority. (Section 604).

*Annual Report of Traffic Engineers.* The Authority covenants that it will cause the Traffic Engineers to prepare a report each year promptly after the completion of their general evaluation of the level of maintenance of the Traffic Facilities referred to in the preceding paragraph setting forth (i) their comments with respect to any supplements or revisions made by the Authority in the master plan or in the five-year Construction Improvement Program referred to above under "Master Plan" and their recommendations as to any supplements or revisions which should be made in such plan or in the Construction Improvement Program, and (ii) their findings as to whether the Traffic Facilities have been maintained in good repair, working order and sound condition and their recommendations as to necessary repairs, renewals or replacements. (Section 605).

If it appears from such report that repairs, renewals or replacements of any such Traffic Facilities are necessary, the Authority shall promptly cause the same to made and if and to the extent that funds for such purpose have not been made available by the Commonwealth, moneys on deposit to the credit of the 1968 Construction Fund which have not theretofore been encumbered for other purposes, and moneys which are thereafter deposited to the credit of the 1968 Construction Fund pursuant to the Resolution shall first be applied for such purpose. (Section 605). As a result of the adoption of the 1998 Resolution and so long as the Authority shall have Transportation Revenue Bonds outstanding thereunder, the Authority's obligations under this paragraph will be payable from moneys in the 1998 Construction Fund instead of the 1968 Construction Fund.

54

## SUMMARY OF CERTAIN PROVISIONS
## OF THE PROPOSED SUPPLEMENTAL RESOLUTIONS

The following is a summary of certain provisions of a resolution proposing to amend the 1968 Resolution, which resolution will be adopted when the consent of the owners of 100% of the Highway Revenue Bonds has been obtained. Such statements do not purport to be complete and reference is made to the proposed supplemental resolution, copies of which are available from the Authority or the 1968 Fiscal Agent. See "Modifications" in *Summary of Certain Provisions of the 1968 Resolution* for limitations as to the ability of the Authority to modify the 1968 Resolution further. The 1968 Resolution, the Highway Revenue Bonds issued thereunder and the 1968 Resolution Revenues are referred to in this summary as the "Resolution", the "Bonds" and "Revenues", respectively.

The proposed supplemental resolution will provide as follows:

**Modification with Consent of Holders of Majority of Bonds**

Subject to the terms and provisions contained below, and not otherwise, the holders of not less than a majority in aggregate principal amount of the Bonds at the time outstanding (or in case less than all of several Series of Bonds then outstanding are affected by the supplement thereto, the holders of a majority or more in principal amount of the Bonds of the Series so affected and outstanding at the time the consent and approval are given) shall have the right, from time to time, anything contained in the Resolution to the contrary notwithstanding, to consent to and approve the adoption by the Authority of such resolution or resolutions supplemental thereto as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Resolution or in any supplemental resolution; provided, however, that nothing contained in the Resolution shall permit, or be construed as permitting, without the consent of the holders of one hundred percent (100%) of the Bonds outstanding (a) an extension of the maturity of the principal of or interest on any Bond issued thereunder (other than as provided for by the terms of an Extendible Maturity Bond), or (b) a reduction in the principal amount of any Bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues ranking prior to or on a parity with the lien or pledge created by the Resolution, except for a parity lien on or pledge of Revenues given to any provider of a credit facility or liquidity facility under any reimbursement or similar agreement, or (d) a preference or priority of any Bond or Bonds over any other Bond or Bonds, or (e) a reduction in the aggregate principal amount of the Bonds required for consent to and approval of such supplemental resolution. Nothing contained in the Resolution, however, shall be construed as making necessary the approval by bondholders of the adoption of a supplemental resolutions that would otherwise not require their consent. Except as to supplemental resolutions containing changes described in clauses (a) through (e) of the proviso to the first sentence of this paragraph, the provider of any credit facility or liquidity facility shall have the right, in lieu of the holders of Bonds secured thereby, to give consent and approval to any supplemental resolution for which the consent of the holders of such Bonds is required under the Resolution, and all references to bondholders for purposes of such consent and approval shall mean instead the provider of said credit facility or liquidity facility; provided, however, that said provider of a credit facility or liquidity facility shall not be in default on its obligations in connection with said credit facility or liquidity facility.

The consent of the holders of any Series of additional Bonds shall be deemed given if the underwriters or initial purchasers for resale consent in writing to such supplemental resolution and the nature of the amendment effected by such supplemental resolution is disclosed in the official statement or other offering document pursuant to which such series of additional Bonds is offered and sold to the public.

**Parity Liens to Providers of Credit Facilities and Liquidity Facilities**

In connection with the execution and delivery of a reimbursement or similar agreement in which the Authority agrees to reimburse a provider of a credit facility or a liquidity facility for amounts drawn on any such facility or to pay fees for any such facility, the Authority can grant a security interest and lien upon all or any portion of the Revenues to secure said reimbursement obligation on a parity with the Bonds.

**Calculation of Interest Rate on Variable Rate Bonds**

The following is a summary of certain provisions of a resolution proposing to amend the 1968 Resolution, which resolution will be adopted when the consent of owners of two-thirds in aggregate principal amount of the Highway Revenue Bonds has been obtained. Such statements do not purport to be complete and reference is made to the proposed supplemental resolution, copies of which are available from the Authority or the 1968 Fiscal Agent. See "Modifications"

CONFIDENTIAL

HTA_STAY0056139

in *Summary of Certain Provisions of the 1968 Resolution* for limitations as to the ability of the Authority to modify the 1968 Resolution further.

The proposed supplemental resolution will provide as follows:

(a) in the case of Variable Rate Bonds, the interest rate thereon shall be assumed to be (A) in the case of Variable Rate Bonds outstanding on and before the date of calculation the greater of the average interest rate on such Bonds during the sixty months or twelve months ending in either case with the month preceding the date of calculation (or such shorter period (ending with the same month as aforesaid) that such Variable Rate Bonds shall have been Outstanding), and (B) in the case of Variable Rate Bonds first being delivered on such date of calculation and are being issued (1) on the basis that interest on such Variable Rate Bonds would be excludible from gross income of the owners thereof for federal income tax purposes, the greater of the average of the Bond Market Association Swap Index (the "BMA Index") (i) for the twelve month period and (ii) the sixty month period in either case ending seven days before the date of calculation plus 100 basis points, or (2) as Variable Rate Bonds not described in clause (B)(1), the greater of the average of the London Interbank Offered Rate ("LIBOR") for the time period most closely resembling the reset period for the Variable Rate Bonds (i) for the twelve month period and (ii) for the sixty month period in either case ending seven days before the date of calculation plus 100 basis points (if the BMA Index or LIBOR shall cease to be published, the index to be used shall be that index which the Authority, in consultation with Government Development Bank for Puerto Rico, determines most closely replicates such index, as set forth in a certificate of the Executive Director filed with the Fiscal Agent); provided, however, that if the Authority has notified the Fiscal Agent that a Swap agreement is in effect in respect of Variable Rate Bonds, then for all purposes of this paragraph the interest rate on such Variable Rate Bonds shall be the Swap rate under such Swap agreement; and provided further, however, that in no event shall the interest rate so determined exceed the lesser of (x) the maximum rate then permitted by law and (y) the maximum rate permitted on such Variable Rate Bonds by the resolution authorizing the issuance thereof.

## SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION

The following are brief summaries of certain provisions of the 1998 Resolution. Such statements do not purport to be complete and reference is made to the 1998 Resolution, copies of which are available from the Authority or the 1998 Fiscal Agent. For the purposes of this summary, the term "senior bonds" shall refer to Senior Transportation Revenue Bonds; the term "Subordinated Transportation Revenue Bonds" shall refer to "Subordinated Transportation Revenue Bonds"; and the term "bonds" shall refer to "Transportation Revenue Bonds"; as those terms are used in this Official Statement.

**Definition of Certain Terms**

"Accreted Value" means, with respect to any Capital Appreciation Bond or Capital Appreciation and Income Bond, an amount equal to the principal amount of such Bond on the date of original issuance plus the interest accrued on such Bond from the date of original issuance to the date of computation or the Interest Commencement Date, as the case may be, such interest to accrue at the rate set forth in the resolution providing for the issuance of said Bond, but not exceeding the maximum rate permitted by law, compounded periodically at the times provided for in such resolution.

"Capital Appreciation Bonds" means any bonds as to which interest is compounded periodically on each of the applicable dates designated for compounding in the resolution authorizing said Bonds and payable in an amount equal to the then current Accreted Value only at the maturity, earlier redemption or other payment date therefor, all as so provided by said resolution, and which may be either serial bonds or term bonds.

"Capital Appreciation and Income Bonds" means any bonds as to which accruing interest is not paid prior to the interest payment date immediately following the Interest Commencement Date specified in the resolution authorizing such Bonds and the interest on which is compounded periodically on the dates designated in such resolution prior to the Interest Commencement Date for such Capital Appreciation and Income Bonds, and which may be either serial bonds or term bonds.

"Cost of Transportation Facilities" or "cost of Transportation Facilities" means the cost of acquisition and construction of Transportation Facilities and the cost of all labor, materials, machinery and equipment, the cost of all lands, property, rights, easements and franchises acquired, interest prior to and during construction and for any additional period authorized by law if so provided by, and subject to any limitations in, the resolution authorizing the issuance of a Series of bonds, the cost of engineering and legal services, preliminary surveys, or plans and specifications, expenses of administration properly chargeable to such construction or acquisition, legal, architectural and engineering expenses and fees, the cost of audits and of preparing and issuing the bonds, fees and expenses of the 1998 Fiscal Agent and consultants, financing charges, taxes or other governmental charges lawfully assessed during construction, claims arising

56

in connection with construction, premiums on insurance in connection with construction, premiums for bond insurance, interest rate insurance or insurance assuring availability of the amounts required to be on deposit in the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, any amounts required to be deposited in the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, initial set-up fees and annual fees for any Credit Facility or Liquidity Facility and tender agent fees and fees payable for remarketing bonds supported by any Credit Facility or Liquidity Facility during such period, as may be specified in the resolution authorizing the issuance of such Series of bonds and all other items of expense not elsewhere in this definition specified, incident to the financing or construction of any Transportation Facilities and the placing of the same in operation.

"Existing Tax and Fee Revenues" means (1) the proceeds of the sixteen cents a gallon tax imposed on gasoline and one-half of the eight cents per gallon tax imposed on gas oil and diesel oil imposed by Subtitle B of Act No. 120, approved October 31, 1994, as amended, and allocated to the Authority by Act No. 223 of November 30, 1995, as amended, and by said Act's predecessor statutes and (2) the proceeds of the $15 increase per vehicle of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act. No. 9, approved August 12, 1982.

"Existing Toll Facilities Revenues" means the tolls or other charges imposed by the Authority for the use of any Traffic Facilities financed in whole or in part by the issuance of 1968 Resolution Bonds, including any extensions, betterments or improvements to such Facilities however financed or otherwise paid for.

"Fiscal Year" means the period commencing on the first day of July of any year and ending on the last day of June of the following year or any other twelve month period designated by the Authority.

"Government Obligations" means (i) direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States Government, (ii) bonds, debentures or notes issued by any of the following Federal Agencies: Banks for Cooperatives, Federal Intermediate Credit Banks, Federal Home Loan Banks, Export-Import Bank of the United States, Government National Mortgage Association or Federal Land Banks, (iii) obligations issued or guaranteed by an agency of the United States of America or person controlled or supervised by and acting as an instrumentality of the United States of America pursuant to authority granted by the Congress, (iv) municipal obligations, the payment of the principal of and interest and redemption premium, if any, on which are irrevocably secured by obligations described in clause (i) of this definition and which obligations are not subject to redemption prior to the date on which the proceeds attributable to the principal of the obligations are to be used and have been deposited in an escrow account which is irrevocably pledged to the payment of the principal of and interest and redemption premium, if any, on such municipal obligations, and (v) evidences of ownership of proportionate interests in future interest or principal payments on obligations specified in clauses (i), (ii), (iii) and (iv) of this definition held by a bank (including the 1998 Fiscal Agent) or trust company as custodian and which underlying obligations are not available to satisfy any claim of the custodian or any person claiming through the custodian or to whom the custodian may be obligated.

"Interest Commencement Date" means, with respect to any particular Capital Appreciation and Income Bonds, the date specified in the resolution providing for the issuance of such bonds after which interest accruing on such bonds shall be payable on a periodic basis prior to maturity, with the first such payment date being the applicable interest payment date immediately succeeding such Interest Commencement Date.

"Investment Obligations" means:

(i) Government Obligations,

(ii) direct and general obligations of any state or territory of the United States of America to the payment of the principal of and interest on which the full faith and credit of such state or territory is pledged, provided that such obligations are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto,

(iii) bankers' acceptances, certificates of deposit or time deposits of any bank or national banking association (including the 1998 Fiscal Agent), trust company or savings and loan association (including any investment in pools of such bankers' acceptances, certificates of deposit or time deposits), which to the extent that such obligations are not insured by the Federal Deposit Insurance Corporation, are either (A) issued by a bank, trust company or savings and loan association having a combined capital and surplus aggregating at least $50,000,000 or (B) collateralized at all times by such securities as are described in clauses (i) or (ii) above, having a market value at least equal to the principal amount of such bankers' acceptances, certificates of deposit

57

                                                                                              HTA_STAY0056141

or time deposits (or portion thereof not so insured); provided that the 1998 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties,

(iv) any repurchase, reverse repurchase or investment agreement with any bank or trust company organized under the laws of any state of the United States or the Commonwealth or any national banking association (including the 1998 Fiscal Agent), insurance company, or government bond dealer reporting to, trading with, and recognized as a primary dealer by the Federal Reserve Bank of New York and a member of the Security Investors Protection Corporation, which agreement is secured by any one or more of the securities described in clauses (i) or (ii) above, provided that the 1998 Fiscal Agent has a perfected first security interest in the collateral and that such collateral is held free and clear of claims by third parties,

(v) obligations, whether or not insured, issued by any state or territory of the United States, or any political subdivision, agency or instrumentality thereof which are rated, on the date of investment therein, in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto,

(vi) participating shares in a mutual fund or investment pool for local government investment; provided that the investments of such mutual fund or investment pool are rated in one of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto, and S&P or any successors thereto,

(vii) (1) shares of stock in a corporation rated in the highest rating category by Moody's or any successors thereto and S&P or any successors thereto (without regard to gradations within such category) that (A) is a regulated investment company within the meaning of Section 851(a) of the Internal Revenue Code of 1986, as amended, and, meets the requirements of Section 852(a) of said Code for the calendar year; (B) invests all of its assets in obligations described in clauses (i) and (ii) above; and (C) has at least 98% of (I) its gross income derived from interest on, or gain from the sale of or other disposition of, such obligations or (II) the weighted average of its assets is represented by investments in such obligations or (2) money market accounts of the 1998 Fiscal Agent or any state or federally chartered bank, banking association, trust company or subsidiary trust company that is rated or whose parent state bank is rated in the highest short-term rating category or in one of the two highest long-term rating categories by Moody's or any successors thereto and S&P or any successors thereto (without regard to any gradations within such category), and

(viii) any other obligations permitted under the laws of the Commonwealth which are rated, or which are issued by issuers which are rated, on the date of investment therein, in any of the three highest rating categories (without regard to any gradations within any such category) by both Moody's or any successors thereto and S&P or any successors thereto, or which are collateralized by such Investment Obligations.

"Mass Transit Facilities" means the equipment, omnibus facilities, rail facilities, and real property, constituting or to constitute part of, or used or reasonably anticipated to be used in connection with the operation of, any mass transportation facility or system, and related services operated by the Authority directly or by contract, lease or other arrangements entered into by the Authority, as the foregoing may from time to time be augmented or diminished.

"1968 Resolution Bonds" means all bonds issued under the 1968 Resolution.

"Principal and Interest Requirements" means for any fiscal year, as applied to the bonds of any Series issued under the provisions of the 1998 Resolution, the sum of:

(i)     the amount required to pay the interest on all outstanding bonds of such Series which is payable after July 31 in such fiscal year and on or before July 31 in the following fiscal year,

(ii)     the amount required to pay the principal of the serial bonds of such Series then outstanding which is payable after July 31 in such fiscal year and on or before July 31 in the following fiscal year, and

(iii)     the Amortization Requirement for the term bonds of such Series for such fiscal year.

The following rules shall apply in determining the amount of the Principal and Interest Requirements for any period:

(a) in the case of Capital Appreciation Bonds, the Accreted Value of Capital Appreciation Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included when due and payable as part of the principal or Amortization Requirements in accordance with the above provisions;

CONFIDENTIAL

HTA_STAY0056142

(b) in the case of Capital Appreciation and Income Bonds, the Appreciated Value of Capital Appreciation and Income Bonds becoming due at maturity or by virtue of an Amortization Requirement shall be included when due and payable as part of the principal or Amortization Requirements in accordance with the above provisions;

(c) the interest rate on bonds issued with a variable, adjustable, convertible or similar rate of interest shall be the greater of (A)(1) the average rate of interest on such bonds for the preceding twelve months or such shorter period that such bonds shall have been outstanding, or (2) if such bonds had not been outstanding prior to the date of calculation, the rate of interest on such bonds on the date of calculation and (B) the lesser of the maximum rate then permitted by law and the maximum rate permitted on such bonds by the resolution authorizing the issuance thereof; provided, however, that if the Authority has notified the 1998 Fiscal Agent that a Swap agreement is in effect in respect of such bonds, then for all purposes of this paragraph, except for the purpose of determining the required deposits to the Senior Bond Sinking Fund or the Subordinated Bond Sinking Fund described in "Sinking Funds" below, the interest rate on such bonds shall be the Swap rate under such Swap agreement; and if such Swap rate is a variable rate, the interest rate on such bonds (except for the purpose specified above in this paragraph) shall be the average Swap rate for the preceding twelve months or such shorter period that the Swap agreement has been in effect, or if such Swap agreement has not been in effect prior to the date of calculation, the Swap rate on the date of calculation;

(d) in the case of the bonds which by their terms may be tendered at the option of the holder thereof for payment prior to maturity, the tender date or dates shall be ignored if the tender price for such bonds is payable from a letter of credit or insurance policy or similar credit or liquidity facility and the stated dates for Amortization Requirements and principal payments shall be used; provided, however, that if the issuer of the letter of credit or insurance policy or similar credit or liquidity facility has advanced funds thereunder and such amount has not been repaid, Principal and Interest Requirements shall include the repayment obligations thereof in accordance with the principal repayment schedule and interest rate or rates specified in the letter of credit or insurance policy or similar credit or liquidity facility or in the agreement with the Authority providing for the issuance of such instrument;

(e) in the case of bonds the maturity of which may be extended by and at the option of the holder of the bonds or the Authority, the bonds shall be deemed to mature on the later of the stated maturity date and the date to which such stated maturity date has been extended;

(f) in the case of bonds (A) which are expected to be repaid from the proceeds of bonds or other indebtedness or (B) on which interest is payable periodically and for which twenty-five percent (25%) or more of the principal amount matures during any one year and for which no Amortization Requirements have been established, the debt service requirements of the bonds may be excluded and in lieu thereof the bonds shall be treated, for purposes of the computation of Principal and Interest Requirements, as debt securities having a comparable federal tax status as such bonds, maturing in substantially equal annual payments of principal and interest over a period of not more than thirty (30) years from the date of issuance thereof, bearing interest at a fixed rate per annum equal to the average interest rate per annum for such debt securities issued on the date of issuance of the bonds and issued by issuers having a credit rating, issued by Moody's or any successors thereto or S&P or any successors thereto, comparable to that of the Authority, as shown by a certificate of an underwriting or investment banking firm experienced in marketing such securities; and

(g) if all or a portion of the principal of or interest on a Series of bonds is payable from moneys irrevocably set aside or deposited for such purpose, together with projected earnings thereon to the extent such earnings are projected to be from Investment Obligations irrevocably set aside or deposited for such purpose on the date of computation, such principal or interest shall not be included in determining Principal and Interest Requirements; provided that the above computation shall be supported by a verification report from a nationally recognized independent certified public accountant as to the sufficiency of such moneys set aside and projected earnings.

"Reserve Account Insurance Policy" means an insurance policy, surety bond or other acceptable evidence of insurance, which policy, bond or other evidence of insurance constitutes an unconditional senior obligation of a municipal bond insurer whose policy or bond results in the rating of municipal obligations secured by such policy or bond, at the time of deposit to the credit of the Reserve Account, in either of the two highest rating categories (without regard to any gradations within either such category) of either Moody's or any successors thereto or S&P or any successors thereto.

"Reserve Account Letter of Credit" means an irrevocable, transferable letter of credit, which letter of credit constitutes an unconditional senior obligation of a banking association, bank or trust company or branch thereof whose letter of credit results in the rating of municipal obligations secured by such letter of credit, at the time of deposit to the credit of the Reserve Account, in either of the two highest categories (without regard to any gradations within either such category) of either Moody's or any successors thereto or S&P or any successors thereto and any agreement of the type referred to in the definition of "Subordinated Reserve Requirement."

CONFIDENTIAL                                                                 HTA_STAY0056143

"Revenues" means all moneys received by the Authority on account of the crude oil tax allocated to the Authority by Act No. 34, approved July 16, 1997, as amended, all Existing Tax and Fee Revenues upon the repeal and cancellation of the 1968 Resolution, any tolls or other charges imposed by the Authority for the use of any of the Toll Facilities other than Existing Toll Facilities Revenues received by the Authority prior to the repeal and cancellation of the 1968 Resolution, the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may hereafter allocate to the Authority and expressly authorize the Authority to pledge to the payment of the principal of and interest on bonds or other obligations of the Authority and which are pledged by the Authority to the payment of the principal of and interest on bonds or other obligations issued under the provisions of the 1998 Resolution, and investment earnings on deposits to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund.

"Senior Reserve Requirement" with respect to the senior bonds means the lesser of (i) the maximum Principal and Interest Requirements for any fiscal year on account of the outstanding senior bonds and (ii) ten (10%) percent of the original principal amount of each Series of senior bonds outstanding determined on the basis of their initial offering prices to the public.

"Subordinated Reserve Requirement" with respect to any Series of Subordinated Transportation Revenue Bonds means that amount fixed from time to time by resolution of the Authority as the amount required to be held to the credit of a separate account in the Subordinated Bond Reserve Fund corresponding to such Series. For purposes of determining the amount on deposit to the credit of any such separate account, any agreement between the 1998 Fiscal Agent and a financial institution serving as the depository institution of the Commonwealth state infrastructure bank (or other similar fund) created by virtue of Section 350 of the National Highway System Designation Act of 1995, as amended (23 U.S.C. Section 101), or any similar federal legislation, pursuant to which agreement such depository institution irrevocably agrees to provide funds to the 1998 Fiscal Agent for deposit to the credit of any separate account in the Subordinated Bond Reserve Fund shall be treated as satisfying the applicable Subordinated Reserve Requirement to the extent of the maximum amount of funds so available to be provided to the 1998 Fiscal Agent for deposit to the credit of such separate account.

"Swap agreement" means an agreement between the Authority and a Swap party whereby the Swap party agrees to pay to the Authority amounts calculated on the basis of all or a portion of the interest on bonds issued under the 1998 Resolution with a variable, adjustable, convertible or similar rate of interest at or prior to the times such interest is due and payable in consideration of the Authority's payment to the Swap party of amounts set forth in the Swap agreement.

"Swap party" means a person who is party to a Swap agreement and whose senior obligations are rated at the time of the execution and delivery of such Swap agreement in one of the three highest rating categories (without regard to any gradations within any such category) by (i) S&P or its successors and (ii) Moody's or its successors.

"Swap rate" means the fixed rate per annum on the principal amount of bonds issued under the 1998 Resolution with a variable, adjustable, convertible or similar rate of interest covered by a Swap agreement equal to the percentage derived by dividing (i) the sum of the amounts in the last twelve months paid by the Authority in respect of interest on such bonds and to the Swap party less the amount paid to the Authority by the Swap party by (ii) such principal amount of bonds; provided, however, that if such Swap agreement has been in effect for less than twelve months, such percentage shall be multiplied by 360 divided by the number of days between the effective date of such Swap agreement and the date of calculation determined on the basis of 30-day months;

"Toll Facilities" means any Traffic Facilities for the use of which the Authority imposes tolls.

"Traffic Facilities" means any of the following facilities for which 1968 Resolution Bonds or bonds or other obligations shall be issued by the Authority under the provisions of the 1998 Resolution the cost of which facilities paid from the proceeds of such bonds or other obligations shall not have been reimbursed to the Authority from funds not encumbered by the 1998 Resolution or the 1968 Resolution:

(i) roads, avenues, streets, thoroughfares, speedways, bridges, tunnels, channels, stations, terminals and any other land or water facilities necessary or desirable in connection with the movement of persons, freight, vehicles or vessels;

(ii) parking lots and structures and other facilities necessary or desirable in connection with parking, loading or unloading of all kinds of vehicles or vessels; and

(iii) all property rights, easements, and interests therein necessary or desirable for the construction, maintenance, control, operation or development of such traffic facilities.

CONFIDENTIAL

HTA_STAY0056144

"Transportation Engineers" means the engineer or engineers or engineering firms or corporations at the time employed by the Authority under the provisions of the 1998 Resolution.

"Transportation Facilities" means all Traffic Facilities, all Mass Transit Facilities, and any other highway, road, transportation or other facilities or undertakings permitted from time to time by the enabling act for which bonds or other obligations shall be issued by the Authority under the provisions of the 1998 Resolution the cost of which facilities paid from the proceeds of such bonds or other obligations shall not have been reimbursed to the Authority from funds not encumbered by the 1998 Resolution.

**Sinking Funds**

The 1998 Resolution creates the "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund" (the "Senior Bond Sinking Fund"). The "Senior Bond Service Account", "Senior Bond Redemption Account" and "Senior Bond Reserve Account" are created within the Senior Bond Sinking Fund. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds Interest and Sinking Fund" (the "Subordinated Bond Sinking Fund"). The "Subordinated Bond Service Account," and "Subordinated Bond Redemption Account" are created within the Subordinated Bond Sinking Fund. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds Reserve Fund" (the "Subordinated Bond Reserve Fund"). The Authority may establish one or more accounts in the Subordinated Bond Reserve Fund to correspond to Series of Subordinated Transportation Revenue Bonds with different Subordinated Reserve Requirements. (Section 401).

The 1998 Resolution also creates the "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"). The Authority has covenanted that all Revenues (except investment earnings on deposits to the credit of the funds and accounts established under the 1998 Resolution) will be deposited when received to the credit of the Revenue Fund. Until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the Authority shall on or before the last day of the month during which the 2003 Bonds shall be issued and on or before the 25th day of each month thereafter withdraw from the 1968 Construction Fund and transfer to the credit of the Revenue Fund all unencumbered moneys held for the credit of the 1968 Construction Fund (herein "unencumbered 1968 Construction Fund moneys"), such transfer to be made on the books of the Authority as of the close of the preceding month. (Section 401).

The moneys in each Fund or Account are held by the 1998 Fiscal Agent in trust and, pending application, are subject to a lien in favor of the holders of the outstanding bonds and for the further security of such holders until paid out or transferred as provided in the 1998 Resolution. (Section 401).

All Revenues (other than investment earnings), Excess 1968 Resolution Revenues and any other funds of the Commonwealth allocated to the Authority for the payment of principal of and interest on any bonds, are withdrawn monthly from the Revenue Fund and deposited with the 1998 Fiscal Agent as follows:

(1) to the Senior Bond Service Account, an amount equal to 1/6th of the amount of interest payable on all senior bonds of each Series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of principal of any serial bonds of such Series until the amount in the Senior Bond Service Account equals the amount of interest payable on such interest payment date and the amount of such principal installment; but the amount so deposited on account of the interest in each month after the delivery of the senior bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited to the credit of the Senior Bond Service Account;

(2) to the Senior Bond Redemption Account, an amount equal to 1/12th of the Amortization Requirement for such fiscal year for the term bonds of each Series of senior bonds then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Senior Bond Sinking Fund;

(3) to the Senior Bond Reserve Account, such amount as is required to make the amount deposited to the credit of said Account in the then current fiscal year at least equal to 20% of the Senior Reserve Requirement; but such deposits

61

HTA_STAY0056145

shall only be made to the extent necessary to make the amount then in the Senior Bond Reserve Account equal to the Senior Reserve Requirement; and provided, further, that in the event of an increase in the Senior Reserve Requirement due to the issuance of additional Series of senior bonds, such increase will be funded by deposits in each of the five (5) years, commencing in the fiscal year in which such additional Series of senior bonds is issued, of 20% of such increase in the Senior Reserve Requirement;

(4) to the Subordinated Bond Service Account, an amount equal to one-sixth (1/6) of the amount of interest payable on all Subordinated Transportation Revenue Bonds of each Series on the interest payment date next succeeding and an amount equal to one-twelfth (1/12) of the next maturing installment of principal of such serial bonds of such Series until the amount in the Subordinated Bond Service Account equals the amount of interest payable on such interest payment date and the amount of such principal installment; but the amount so deposited on account of interest in each month after the delivery of the Subordinated Transportation Revenue Bonds of any Series up to and including the month immediately preceding the first interest payment date thereafter of the bonds of such Series shall be that amount which when multiplied by the number of such deposits will be equal to the amount of interest payable on such bonds on such first interest payment date less the amount of any accrued interest paid on such bonds and deposited with the 1998 Fiscal Agent to the credit of the Subordinated Bond Service Account;

(5) to the Subordinated Bond Redemption Account, an amount equal to one-twelfth (1/12) of the Amortization Requirement for such fiscal year for the term bonds of each Series of Subordinated Transportation Revenue Bonds then outstanding plus one-twelfth (1/12) of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Subordinated Bond Sinking Fund;

(6) to each separate account within the Subordinated Bond Reserve Fund, such amount, if any, of any balance remaining after making the deposits described under paragraph (1) through (5) above (allocated pro rata to each account on the basis of the corresponding Subordinated Reserve Requirements) at least equal to the respective deposit requirements corresponding to each such account established by the Authority; but no such deposits to any such account described under this paragraph will be made in any month if the amount then to the credit of such account shall be equal to the applicable Subordinated Reserve Requirement; and provided, further, that notwithstanding the above, in the event that any Subordinated Reserve Requirement increases on account of the issuance of additional Series of Subordinated Transportation Revenue Bonds, the Authority may provide for equal annual deposits as will ensure that the applicable Subordinated Reserve Requirement will be met not earlier than the end of a five year period following the issuance of such Series of Subordinated Transportation Revenue Bonds; and

(7) the balance remaining after making the deposits referred to above shall be deposited to the credit of the 1998 Construction Fund for use by the Authority for any of its authorized purposes, subject to the provisions of Sections 604 and 605 of the 1998 Resolution. (Section 401).

The requirements specified in paragraphs (1) through (6) above are cumulative. (Section 401).

The Authority further covenants that any other funds which it receives from the Commonwealth or any other source to make up any deficiencies in the amounts needed to pay the principal of and interest on any bonds issued under the provisions of the 1968 Resolution and the 1998 Resolution will be applied for such purpose first to make up any deficiencies in the amounts needed to pay the principal and interest on any 1968 Resolution Bonds and then to make up any such deficiencies needed to pay such principal of and interest on the senior bonds and then the Subordinated Transportation Revenue Bonds. (Section 401).

When the 1968 Resolution is repealed and cancelled, all moneys (other than those held for the redemption or payment of 1968 Resolution Bonds), including obligations purchased as an investment of such moneys will be withdrawn from the 1968 Construction Fund and 1968 Sinking Fund and deposited into the Revenue Fund. (Section 402).

Moneys in the Senior Bond Redemption Account shall be applied to the retirement of senior bonds as follows:

(a) Subject to the provisions of paragraph (c) below, the 1998 Fiscal Agent shall endeavor to purchase outstanding senior bonds, whether or not such bonds shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, having regard to interest rate and price, such price not to exceed the principal of such bonds plus the amount of the premium, if any, which would be payable on the next redemption date to the holders of such bonds if such bonds should be called for redemption on such date from moneys in the Senior Bond Sinking Fund. The 1998 Fiscal Agent shall pay the interest accrued on such bonds to the date of delivery thereof from the Senior Bond Service Account and the purchase price from the Senior Bond Redemption Account, but no such purchase shall be made within 45 days next preceding any interest payment date on which such bonds are subject to redemption except from moneys in excess of the amounts set aside or deposited for the redemption of senior bonds.

CONFIDENTIAL                                                                                          HTA_STAY0056146

(b) Subject to the provisions of paragraph (c) below, the 1998 Fiscal Agent shall call for redemption on each date on which senior bonds are subject to redemption from moneys in the Senior Bond Sinking Fund on the forty-fifth day prior to such redemption date such amount of senior bonds then subject to redemption as, with the redemption premium, if any, will exhaust the Senior Bond Redemption Account as nearly as may be; but not less than $50,000 principal amount of senior bonds shall be called for redemption at any one time.

(c) Moneys in the Senior Bond Redemption Account shall be applied to the purchase or redemption of senior bonds in the following order:

First, the term bonds of each Series of senior bonds, if any, in the order of their issuance, to the extent of the Amortization Requirement, if any, of the then current fiscal year for such term bonds and any deficiency in preceding fiscal years in the purchase or redemption of such term bonds under the provisions of this subdivision; but if none of the term bonds of a Series of senior bonds shall be subject to redemption from moneys in the Senior Bond Sinking Fund and if the 1998 Fiscal Agent shall at any time be unable to exhaust the moneys applicable to the bonds of any such Series in the purchase of such bonds under the provisions of paragraph (a) above, such moneys or the balance of such moneys, as the case may be, shall be retained in the Senior Bond Redemption Account and, as soon as it is feasible, applied to the retirement of the bonds of such Series;

Second, to the purchase of any outstanding senior bonds, whether or not such bonds shall then be subject to redemption, in accordance with the provisions of paragraph (a) above;

Third, term bonds of each Series of senior bonds in proportion (as nearly as practicable) to the aggregate principal amount of the bonds of each such Series originally issued; and

Fourth, after the retirement of all term senior bonds, any balance shall be applied to the retirement of serial senior bonds of each Series in proportion to the aggregate principal amount of each such Series originally issued.

All expenses in connection with such purchase or redemption shall be paid from the 1998 Construction Fund. (Section 404).

Moneys in the Senior Bond Reserve Account shall be used for the purpose of paying interest on the senior bonds and maturing principal of serial senior bonds whenever and to the extent that the moneys held for the credit of the Senior Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Senior Bond Redemption Account whenever and to the extent that the Revenues or other moneys deposited to the credit of the Revenue Fund are insufficient for such purpose; but prior to making any withdrawal from the Senior Bond Reserve Account, the 1998 Fiscal Agent shall withdraw first available unencumbered moneys in the 1998 Construction Fund and then any moneys held to the credit of the Subordinated Bond Redemption Account and then any moneys held to the credit of the Subordinated Bond Service Account in respect of the principal of any Subordinated Transportation Revenue Bonds and finally any other moneys held to the credit of the Subordinated Bond Service Account and transfer all such money so withdrawn to the Senior Bond Service Account or the Senior Bond Redemption Account in the respective amounts necessary to cure any insufficiencies in said Accounts. (Sections 405, 409 and 411).

Moneys held in the Subordinated Bond Service Account and Subordinated Bond Redemption Account will be applied to the payment of Subordinated Transportation Revenue Bonds' debt service in the same manner as moneys in the Senior Bond Service Account and the Senior Bond Redemption Account are applied to the payment of senior bonds' debt service, subject to the provisions employing moneys in the Subordinated Bond Sinking Fund to address insufficiencies in the Senior Bond Sinking Fund described in the previous paragraph. (Sections 406, 407, 411).

Money held for the credit of each account in the Subordinated Bond Reserve Fund shall be used for the purpose of paying interest on each Series of Subordinated Transportation Revenue Bonds and maturing principal of serial Subordinated Transportation Revenue Bonds of each such Series to which such account relates whenever and to the extent that the moneys held for the credit of the Subordinated Bond Service Account shall be insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the Subordinated Bond Redemption Account whenever and to the extent that the Revenues or other moneys deposited to the credit of the Revenue Fund are insufficient for such purpose. (Section 408).

The Authority may deposit into the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund, a Reserve Account Insurance Policy or a Reserve Account Letter of Credit in an amount equal to all or a portion of the applicable reserve requirement, which Reserve Account Insurance Policy or Reserve Account Letter of Credit shall be payable or available to be drawn upon, as the case may be (upon the giving of notice as required thereunder), on any interest payment date on which a deficiency exists in the applicable reserve account which cannot be otherwise cured. If a disbursement is made under the Reserve Account Insurance Policy or the Reserve Account Letter of

CONFIDENTIAL                                                                                    HTA_STAY0056147

Credit, the Authority shall be obligated either to reinstate the limits of such Reserve Account Insurance Policy or Reserve Account Letter of Credit following such disbursement, or to deposit into the Senior Bond Reserve Account or any account in the Subordinated Bond Reserve Fund from Revenues, funds in the amount of the disbursement made under such Reserve Account Insurance Policy or Reserve Account Letter of Credit, and any moneys held in any such reserve account may be applied for such purpose. (Sections 401, 405, 408).

**1998 Construction Fund**

Before any payment or withdrawal shall be made from moneys in the 1998 Construction Fund there shall be filed with the 1998 Fiscal Agent a certificate signed by a designated officer of the Authority setting forth the amount of money to be so disbursed and stating that such money will be used to pay the costs of constructing Transportation Facilities or for other authorized purposes. Upon receipt of such certificate the 1998 Fiscal Agent shall withdraw from the 1998 Construction Fund and deposit to the credit of a special checking account in its commercial department in the name of the Authority the amount so specified in such certificate. The 1998 Fiscal Agent shall also at any time at the written direction of the Authority transfer any part of the unencumbered moneys in the 1998 Construction Fund to the credit of any account in the Senior Bond Sinking Fund and shall make the transfers to the Senior Bond Service Account and Senior Bond Redemption Account to cure deposit deficiencies therein as described above. (Section 409).

**Defeasance**

If all the outstanding bonds shall have been paid or deemed to have been paid as provided below, then and in that case the rights, title and interest of the 1998 Fiscal Agent under the 1998 Resolution shall cease, terminate and become void, and such bonds shall cease to be entitled to any lien, benefit or security under the 1998 Resolution. In such event, the Authority shall repeal and cancel the 1998 Resolution and may apply any surplus in the Senior Bond Sinking Fund, Subordinated Bond Sinking Fund and all balances remaining in any other fund and accounts other than moneys held for the redemption or payment of bonds to any lawful purposes of the Authority.

Any outstanding bond shall be deemed to have been paid within the meaning and with the effect expressed in the 1998 Resolution when the whole amount of the principal of, redemption premium, if any, and interest on such bond shall have been paid or duly provided for and the conditions set forth in clause (c) below have been satisfied, when (a) in case such bond has been called for redemption or the Authority shall have given to the 1998 Fiscal Agent irrevocable instructions to call such bond for redemption, (b) there shall have been deposited with the 1998 Fiscal Agent Government Obligations the principal of and interest on which are sufficient, without any reinvestment thereof, to pay when due the principal of and premium, if any, and interest due and to become due on such bond on or prior to the redemption date or maturity date thereof, as the case may be, and (c) if such bond does not mature and is not to be redeemed within the next succeeding sixty (60) days, the Authority shall have given the 1998 Fiscal Agent irrevocable instructions to give, as soon as practicable, a notice to the holder of such bond by first-class mail, postage prepaid, stating that the deposit of moneys or Government Obligations required by clause (b) of this paragraph has been made with the 1998 Fiscal Agent or other appropriate fiduciary institution acting as escrow agent for the holder of such bond, and that such bond is deemed to have been paid in accordance with the 1998 Resolution and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal of and premium, if any, and interest on such bond.

Neither the moneys nor Government Obligations deposited with the 1998 Fiscal Agent nor principal or interest payments on any such obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of and redemption premium, if any, and interest on the bonds which have been defeased.

As to Variable Rate Bonds, the amount required for the interest thereon shall be calculated at the maximum rate permitted by the terms of the provisions of the resolution which authorized the issuance of such Variable Rate Bonds. (Section 1001).

**Issuance of Additional Bonds**

Senior bonds may be issued under and secured by the 1998 Resolution, subject to the conditions hereinafter described, at any time or times for any lawful purpose of the Authority. (Sections 208 and 209).

Before such bonds shall be delivered, there shall be filed with the 1998 Fiscal Agent, among other things, a certificate signed by the Executive Director not earlier than thirty (30) days prior to the delivery date of such bonds setting forth:

(i) the amount of Revenues received by the Authority and until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the amount of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund in each

of the fifteen (15) months immediately preceding the month in which such certificate is signed, adjusted (I) to give effect to legislation enacted on or prior to the date of delivery of such bonds that would have increased the Revenues or the amounts of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund as aforesaid if such legislation (x) had been in effect throughout such fifteen (15) months, (y) allocates additional moneys to the Authority and (z) expressly permits the Authority to pledge to the payment of the bonds issued under the provisions of the 1998 Resolution or the 1968 Resolution until the 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution and the Authority has expressly pledged such additional moneys to such payment on or prior to such date of delivery and (II) to reflect the moneys which would have been received if (A) the schedule of tolls in effect on the date of delivery of such bonds had been in effect and (B) the Toll Facilities to be financed in whole or part with the proceeds of such bonds had been in operation throughout such fifteen (15) months,

(ii) the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the senior bonds then requested to be delivered, and

(iii) the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the senior bonds then requested to be delivered; and

(iv) the percentage derived by dividing the amount in item (i) above for any twelve consecutive months by the amount in item (ii) above; and

(v) the percentage derived by dividing the amount in item (i) above for any twelve consecutive months by the amount in item (iii) above. (Section 208).

The 1998 Fiscal Agent may only deliver such additional senior bonds if the percentages shown in item (iv) and item (v) are not less than 150% and 100%, respectively. (Section 208).

The Authority need not deliver said certificate in connection with the issuance of senior bonds issued for the purpose of refunding senior bonds of any Series if the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the senior bonds to be outstanding after the issuance of such refunding senior bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the senior bonds outstanding prior to the issuance of such refunding senior bonds. (Section 209).

Subordinated Transportation Revenue Bonds may be issued under and secured by the 1998 Resolution, subject to the conditions described below, at any time or times for the purpose of paying the cost of any Transportation Facilities falling within the definition of "Federal-aid highway" or "capital projects" under Section 101 of Title 23 and Section 5302 of Title 49, respectively, of the United States Code, as such definitions may be amended from time to time, or qualifying for any other federal transportation assistance for the defraying (directly or indirectly) of such cost. (Section 210).

Before Subordinated Transportation Revenue Bonds shall be delivered, there shall be filed with the 1998 Fiscal Agent, among other things, a certificate signed by the Executive Director not earlier than thirty (30) days prior to the delivery date of such Subordinated Transportation Revenue Bonds indicating that the percentage derived by dividing (a) the amount of Revenues and Excess 1968 Resolution Revenues determined in the same manner as specified in clause (i) above by (b) the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and the Subordinated Transportation Revenue Bonds then requested to be delivered is not less than 125%. (Section 210).

Refunding Subordinated Transportation Revenue Bonds may be issued only to refund other Subordinated Transportation Revenue Bonds of any Series. The Authority need not deliver said certificate in connection with the issuance of refunding Subordinated Transportation Revenue Bonds if the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such refunding Subordinated Transportation Revenue Bonds shall be equal to or less than the maximum Principal and Interest Requirements for any fiscal year thereafter on account of the Subordinated Transportation Revenue Bonds outstanding prior to the issuance of such refunding Subordinated Transportation Revenue Bonds. (Section 211).

CONFIDENTIAL                                                                 HTA_STAY0056149

**Other Indebtedness**

The Authority will not incur any indebtedness nor create or suffer to be created any lien, pledge, assignment, encumbrance or charge upon the Revenues ranking equally with or prior to the senior bonds issued under the 1998 Resolution, except the lien and charge of the senior bonds secured by the 1998 Resolution, or ranking equally with the Subordinated Transportation Revenue Bonds except the lien and charge of the Subordinated Transportation Revenue Bonds secured by the 1998 Resolution. Any other indebtedness incurred by the Authority after the effective date of the 1998 Resolution under documents not in effect on the effective date of the 1998 Resolution shall contain a statement that such indebtedness is junior, inferior and subordinate in all respects to the bonds. For purposes of the above limitation on incurrence of indebtedness, indebtedness shall not be deemed to include contracts entered into in the ordinary course of business, agreements to repay advances received from the Federal government or agreements to repay (to the extent drawn) all or a portion of the stated amount drawn under any Credit Facility, Liquidity Facility, Reserve Account Letter of Credit or Reserve Account Insurance Policy. Nothing in the 1998 Resolution shall be deemed to prohibit the Authority from entering into currency swaps, interest rate swaps or other arrangements for hedging of interest rates on any indebtedness. (Section 602).

Nothing in the 1998 Resolution is to be construed as preventing the Authority from financing any facilities authorized by the act creating the Authority, as amended, by the issuance of bonds or other obligations which are not secured under the provisions of the 1998 Resolution. (Section 1101).

**Investment of Funds**

Moneys held for the credit of the Revenue Fund, Senior Bond Service Account, Senior Bond Redemption Account, Subordinated Bond Service Account, and Subordinated Bond Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations, and moneys held for the credit of the 1998 Construction Fund, Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations, which Government Obligations and Investment Obligations shall mature, or which shall be subject to redemption by the holder thereof at the option of such holder, not later than the respective dates when moneys held for the credit of said Fund or Accounts will be required for the purposes intended. Amounts on deposit in the Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall be invested in Investment Obligations which mature not later than the final maturity date of any senior bonds or Subordinated Transportation Revenue Bonds outstanding, as the case may be. (Section 502).

Investment earnings on moneys on deposit to the credit of the following Funds and Accounts shall be applied as follows:

(a) Investment earnings on moneys on deposit to the credit of the Senior Bond Service Account, the Senior Bond Redemption Account, the Subordinated Bond Service Account, the Subordinated Bond Redemption Account and the 1998 Construction Fund shall be transferred to the credit of or retained in the 1998 Construction Fund; but the Authority may elect to have such investment earnings remain to the credit of the Senior Bond Service Account, the Senior Bond Redemption Account, the Subordinated Bond Service Account or the Subordinated Bond Redemption Account to fund the next payment of principal of, Amortization Requirements for and interest on the senior bonds or the Subordinated Transportation Revenue Bonds, in which event the Authority shall receive a credit against the amounts required to be deposited in said Accounts as applicable;

(b) Investment earnings on moneys on deposit to the credit of the Senior Bond Reserve Account and each account in the Subordinated Bond Reserve Fund shall be retained in said accounts at any time that the respective amounts on deposit to the credit of said accounts is less than the Senior Reserve Requirement or the corresponding Subordinated Reserve Requirement, as applicable; and

(c) Investment earnings on moneys on deposit to the credit of the Revenue Fund shall be retained therein. (Section 502).

In computing the amount in any Fund or Account created pursuant to the provisions of the 1998 Resolution, obligations purchased as an investment of moneys therein shall be valued at par if purchased at par or at amortized value if purchased at other than par, plus, in each case, accrued interest. Amortized value, when used with respect to an obligation purchased at a premium above or a discount below par, means the value as of any given time obtained by dividing the total premium or discount at which such obligation was purchased by the number of days remaining to maturity on such obligation at the date of such purchase and by multiplying the amount thus calculated by the number of days having passed since such purchase; and (1) in the case of an obligation purchased at a premium by deducting the

66

product thus obtained from the purchase price, and (2) in the case of an obligation purchased at a discount by adding the product thus obtained to the purchase price. Valuation on any particular date shall include the amount of interest then earned or accrued to such date on any moneys or investments in such Fund or Account. The computation of the amount on deposit in or credited to the Fund and Accounts created under the 1998 Resolution and the valuation of the investments of such amount shall be performed by the 1998 Fiscal Agent as of the close of business on the last day of each fiscal year and at such other times as the Authority shall request, and such computation and valuation shall not be required to be performed at other times. (Section 503).

## Modifications

The Authority may adopt resolutions supplemental to the 1998 Resolution without the consent of the bondholders to cure any ambiguity, formal defect or omission, or to correct any inconsistent provisions or errors in the 1998 Resolution or any supplemental resolution, or to grant or confer upon the bondholders any additional rights, remedies, powers, authority or security, or to add to the conditions, limitations and restrictions on the issuance of bonds under the provisions of the 1998 Resolution or to add to the covenants and agreements of the Authority in the 1998 Resolution or to surrender any right or power reserved to or conferred upon the Authority, or to amend the conditions, limitations and restrictions on the issuance of Subordinated Transportation Revenue Bonds or the covenants and agreements relating to the Subordinated Transportation Revenue Bonds (as shall not adversely affect the interests of the holders of any senior bonds) as may be required to enable the Authority to comply with the provisions of any federal legislation, rules or regulations or court decisions or orders relating to the receipt by the Authority of grants or other assistance from the United States Government. (Section 801).

The holders of not less than a majority in aggregate principal amount of the senior bonds and of the Subordinated Transportation Revenue Bonds then outstanding and affected thereby shall have the right to consent to and approve the adoption of such resolution or resolutions supplemental to the 1998 Resolution as shall be deemed necessary or desirable by the Authority for the purpose of modifying, altering, amending, adding to or rescinding any of the terms and provisions contained in the 1998 Resolution or in any supplemental resolution; but nothing contained in the 1998 Resolution shall permit, or be construed as permitting, without consent of the holders of all bonds affected thereby, (a) an extension of the maturity of the principal of or the interest on any bond, or (b) a reduction in the principal amount of any bond or the redemption premium or the rate of interest thereon, or (c) the creation of a lien upon or a pledge of Revenues other than the lien and pledge created by the 1998 Resolution, or (d) a preference or priority of any bond or bonds over any other bond or bonds, or (e) a reduction in the aggregate principal amount of the bonds required for consent to such supplemental resolution, or (f) a change in the subordination provisions. (Section 802).

If at any time the Authority determines that it is necessary or desirable to adopt any supplemental resolution for any of the purposes of the above paragraph, the 1998 Fiscal Agent at the expense and request of the Authority shall cause notice of the proposed adoption of such supplemental resolution to be mailed, first class, postage prepaid, to all bondholders and to Government Development Bank for Puerto Rico. Such notice shall briefly set forth the nature of the proposed supplemental resolution and shall state that copies thereof are on file at the office of the 1998 Fiscal Agent for inspection by all bondholders. The 1998 Fiscal Agent shall not, however, be subject to any liability to any bondholder by reason of its failure to cause such notice to be mailed, and any such failure shall not affect the validity of such supplemental resolution when consented to and approved. (Section 802).

Whenever, at any time within one year after the date of the mailing of such notice, the Authority shall obtain an instrument or instruments in writing purporting to be executed by the holders of not less than a majority in aggregate principal amount of the senior bonds and of the Subordinated Transportation Revenue Bonds then Outstanding, which instrument or instruments shall refer to the proposed supplemental resolution described in such notice and shall specifically consent to and approve the adoption thereof in substantially the form of the copy thereof referred to in such notice, and the Authority shall deliver to the 1998 Fiscal Agent a certificate signed by the Executive Director that the holders of such required percentages of bonds have filed such consents, thereupon, but not otherwise, the Authority may adopt such supplemental resolution in substantially such form, without liability or responsibility to any holder of any bond, whether or not such holder shall have consented thereto. (Section 802).

If the holders of not less than a majority in aggregate principal amount of the affected senior bonds and of the affected Subordinated Transportation Revenue Bonds outstanding at the time of the adoption of such supplemental resolution shall have consented to and approved the adoption thereof, no holder of any bond shall have any right to object to the adoption of such supplemental resolution, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the adoption thereof, or to enjoin or restrain the Authority from adopting the same or from taking any action pursuant to the provisions thereof and such consent shall be binding on the holder giving such consent and upon any subsequent holder whether or not he has notice thereof. (Section 802).

67

Upon the adoption of any supplemental resolution pursuant to the provisions of the 1998 Resolution, the 1998 Resolution shall be and be deemed to be modified and amended in accordance therewith, and the respective rights, duties and obligations under the 1998 Resolution of the Authority, the 1998 Fiscal Agent and all holders of bonds then outstanding shall thereafter be determined, exercised and enforced in all respects under the provisions of the 1998 Resolution as so modified and amended. (Section 803).

**Miscellaneous Covenants**

*Master Plan.* The Authority covenants that the master plan for the construction of required Transportation Facilities in the Commonwealth will be supplemented periodically as necessary and that the five-year Construction Improvement Program will be updated each year to cover the Transportation Facilities to be constructed by the Authority in the ensuing five-year period. (Section 603).

*Costs of Maintenance, Repair and Operation of Traffic Facilities.* The Authority covenants that, if and to the extent funds for the purpose of maintaining, repairing and operating all Traffic Facilities financed by the Authority in whole or in part by 1968 Resolution Bonds and all Transportation Facilities financed by the Authority in whole or in part by bonds under the provisions of the 1998 Resolution are not provided by the Commonwealth, the Authority will pay such costs from unencumbered funds then on deposit in the 1998 Construction Fund or from the Revenues or unencumbered 1968 Construction Fund moneys thereafter deposited to the credit of the 1998 Construction Fund pursuant to the 1998 Resolution and not from funds then on deposit or thereafter deposited to the credit of the 1968 Construction Fund. (Section 604).

The Authority further covenants that it will cause an annual general evaluation to be made by the Transportation Engineers of the level of maintenance of all Traffic Facilities and Transportation Facilities financed in whole or in part by the issuance of bonds under the provisions of, respectively, the 1968 Resolution and the 1998 Resolution, which Facilities shall be, in the judgment of the Authority and of the Traffic Engineers, material to the overall system of Transportation Facilities of the Authority. (Section 604).

The Authority further covenants that it will operate or cause to be operated the Toll Facilities, any Mass Transit Facilities and all other Transportation Facilities that it may from time to time operate or cause to be operated in an efficient and economical manner, that it will at all times maintain or cause to be maintained such Transportation Facilities in good repair and in sound operating condition and that it will make or cause to be made all necessary repairs, renewals and replacements thereto. (Section 604).

*Annual Report of Traffic Engineers.* The Authority covenants that it will cause the Transportation Engineers to prepare a report each year promptly after the completion of their general evaluation of the level of maintenance, repair and operating condition of the Transportation Facilities setting forth (i) their comments with respect to any supplements or revisions made by the Authority in the master plan or in the five-year Construction Improvement Program referred to above under "Master Plan" and their recommendations as to any supplements or revisions which should be made in such plan or in the Construction Improvement Program, and (ii) their findings as to whether those Traffic Facilities have been maintained in good repair, working order and sound operating condition and their recommendations as to necessary repairs, renewals or replacements. (Section 605).

If it appears from such report that repairs, renewals or replacements of any such Facilities are necessary, the Authority shall promptly cause the same to be restored to a condition of good repair and to sound operating condition, and if and to the extent that funds for such purpose have not been made available by the Commonwealth, moneys on deposit to the credit of the 1998 Construction Fund which have not theretofore been encumbered for other purposes, and moneys which are thereafter deposited to the credit of the 1998 Construction Fund pursuant to the 1998 Resolution shall first be applied for such purpose. No funds then on deposit or thereafter deposited to the credit of the 1968 Construction Fund shall be applied for such purpose. (Section 605).

*Relating to the 1968 Resolution.* The Authority covenants that immediately upon the repeal and cancellation of the 1968 Resolution, all Existing Tax and Fee Revenues and Existing Toll Revenues shall be pledged to the payment of the principal of and premium, if any, and interest on the bonds issued under the provisions of the 1998 Resolution to the same extent and with the same effect as the pledge of Revenues and other moneys deposited to the credit of the Revenue Fund. (Section 601).

The Authority further covenants that it will cause the 1968 Resolution to be repealed and cancelled at the earliest practicable date. The Authority further covenants that, except for the proposed supplemental resolution described in *Summary of Certain Provisions of the Proposed Supplemental Resolution,* it will not adopt any resolution supplemental to the 1968 Resolution for the purpose of granting to or conferring upon the 1968 Fiscal Agent for the benefit of the holders of the bonds issued under the 1968 Resolution any additional rights, remedies, powers, authority or security that may

68

lawfully be granted to or conferred upon such holders or the 1968 Fiscal Agent, or for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the 1968 Resolution, or for the purpose of extending the maturity of any 1968 Resolution Bond or creating a lien upon or a pledge of revenues ranking prior to or on a parity with the lien or pledge created by the 1968 Resolution. Nothing shall prevent the Authority from adopting a resolution supplemental to the 1968 Resolution to cure any ambiguity or formal defect or omission in the 1968 Resolution. (Section 609).

The Authority covenants that so long as any 1968 Resolution Bonds are outstanding under the provisions of the 1968 Resolution it will cause to be made the deposits to the credit of the 1968 Construction Fund required by the 1968 Resolution. The Authority further covenants that except for any withdrawals required to be made as set forth in the third sentence of the fourth paragraph of "Sinking Funds" above, it will not withdraw, expend, pledge or otherwise encumber moneys held to the credit of the 1968 Construction Fund whether for the purpose of satisfying the Authority's Construction Improvement Program or otherwise, except for the satisfying the Authority's obligations under Section 513 of that certain trust agreement, dated as of April 1, 1992, by and between the Authority and Banco Santander Puerto Rico, successor trustee. See, "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* above in this Official Statement (Section 610).

*Use of Revenues.* The Authority covenants and agrees that, so long as any of the bonds secured by the 1968 Resolution shall be outstanding, none of the Revenues will be used for any purpose other than as provided in the 1968 Resolution and the 1998 Resolution, and that no contract or contracts will be entered into or any action taken by which the rights of the 1998 Fiscal Agent or of the bondholders might be impaired or diminished. (Section 611).

*Additional 1968 Resolution Bonds.* The Authority covenants that so long as any bonds shall be outstanding under the provisions of the 1998 Resolution it will not issue additional 1968 Resolution Bonds which mature after July 1, 2036 and except for (a) refunding bonds and (b) bonds issued for the purpose of meeting the obligations of the Authority under Section 11.4(b) of that certain Concession Agreement for the Final Design, Construction, Operation and Maintenance of a Privatized Transportation Facility, dated December 20, 1991, as amended, by and between the Authority and Autopistas de Puerto Rico y Compañía, S.E. relating to its obligations in respect of the Teodoro Moscoso Bridge. See, "Teodoro Moscoso Bridge" under *Transportation System Revenues and Expenditures* above in this Official Statement.

*Swap Agreements.* The Authority covenants that it will not enter into a Swap agreement unless it first delivers copies of the proposed Swap agreement to S&P and Moody's and any other rating agency then rating the bonds. (Section 613).

*Level of Tolls and Other Charges.* Notwithstanding any provisions in the 1968 Resolution enabling the Authority to reduce tolls or other charges, the Authority covenants that it will not reduce the tolls or other charges imposed by it for the use of its Toll Facilities unless, as of the effective date of such reduction, the Authority delivers to the 1998 Fiscal Agent a certificate, signed by the Executive Director of the Authority not earlier than thirty (30) days prior to the effective date of such reduction, setting forth:

(i) the amount of Revenues received by the Authority and, until the outstanding 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, the amount of Excess 1968 Resolution Revenues deposited to the credit of the Revenue Fund in each of the fifteen (15) months immediately preceding the month in which such certificate is signed, adjusted (I) to give effect to legislation enacted on or prior to the effective date of such reduction that would have increased the Revenues or the amounts deposited to the credit of the Revenue Fund from the 1968 Construction Fund as aforesaid if such legislation (x) had been in effect throughout such fifteen (15) months, (y) allocates additional moneys to the Authority and (z) expressly permits the Authority to pledge to the payment of the bonds issued under the provisions of the 1998 Resolution or the 1968 Resolution until the 1968 Resolution Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution and the Authority has expressly pledged such additional moneys to such payment on or prior to such date of delivery and (II) to reflect the moneys which would have been received if (A) the schedule of tolls in effect on such effective date had been in effect and (B) any Toll Facilities which have commenced operation or been removed from operation during such fifteen (15) months either had been in operation or not operating, throughout such fifteen (15) months,

(ii) the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding, and

(iii) the amount of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all senior bonds and all Subordinated Transportation Revenue Bonds theretofore issued under the provisions of the 1998 Resolution and then outstanding and it shall appear from such certificate that the percentages derived by dividing the sum

CONFIDENTIAL                                                                 HTA_STAY0056153

of the amounts shown in item (i) of such certificate for any twelve (12) consecutive months by the amount shown in item (ii) of said certificate and by the amount shown in item (iii) of said certificate, shall not be less than one hundred fifty per centum (150%) and one hundred per centum (100%), respectively. (Section 614).

## SUMMARY OF CERTAIN PROVISIONS
## OF THE PROPOSED SUPPLEMENTAL RESOLUTION

The following is a summary of certain provisions of a resolution proposing to amend the 1998 Resolution, which resolution will be adopted when the consent of owners of a majority in aggregate principal amount of the Transportation Revenue Bonds and of the Subordinated Transportation Revenue Bonds has been obtained. Such statements do not purport to be complete and reference is made to the proposed supplemental resolution, copies of which are available from the Authority or the 1998 Fiscal Agent. See "Modifications" in *Summary of Certain Provisions of the 1998 Resolution* for limitations as to the ability of the Authority to modify the 1998 Resolution further.

The proposed supplemental resolution will provide as follows:

(iii) the interest rate on bonds issued with a variable, adjustable, convertible or similar rate of interest shall be in the case of (A) in the case of such bonds outstanding on and before the date of calculation the greater of the average interest rate on such bonds during the sixty months or twelve months ending in either case with the month preceding the date of calculation (or such shorter period (ending with the same month as aforesaid) that such bonds shall have been Outstanding), and (B)  in the case of such bonds first being delivered on such date of calculation and are being issued (1) on the basis that interest on such bonds would be excludible from gross income of the owners thereof for federal income tax purposes, the greater of the average of the Bond Market Association Swap Index (the "BMA Index") (i) for the twelve month period and (ii) the sixty month period in either case ending seven days before the date of calculation plus 100 basis points, or (2) as bonds not described in clause (B)(1), the greater of the average of the London Interbank Offered Rate ("LIBOR") for the time period most closely resembling the reset period for such bonds (i) for the twelve month period and (ii) for the sixty month period in either case ending seven days before the date of calculation plus 100 basis points (if the BMA Index or LIBOR shall cease to be published, the index to be used shall be that index which the Authority, in consultation with Government Development Bank for Puerto Rico, determines most closely replicates such index, as set forth in a certificate of the Executive Director filed with the Fiscal Agent); provided, however, that if the Authority has notified the Fiscal Agent that a Swap agreement is in effect in respect of such bonds, then for all purposes of this paragraph, except for the purpose of determining the required deposits to the Senior Bond Sinking Fund or the Subordinated Bond Sinking Fund pursuant to Section 401 hereof, the interest rate on such bonds shall be the Swap rate under such Swap agreement; and if such Swap rate is a variable rate, the interest rate on such bonds (except for the purpose specified above in this paragraph) shall be the average Swap rate for the preceding sixty months (or such shorter period that the Swap agreement has been in effect), or if such Swap agreement has not been in effect prior to the date of calculation, the Swap rate on the date of calculation.

## TAX EXEMPTION

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which requirements the Authority must continue to meet after the issuance of the 2003 Bonds in order that interest on the 2003 Bonds is not included in gross income for federal income tax purposes. The Authority's failure to meet these requirements may cause interest on the 2003 Bonds to be included in gross income for federal income tax purposes, retroactive to their date of issuance. The Authority has covenanted to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the 2003 Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth, which would prevent the Authority from complying with the requirements of the Code.

In the opinion of Sidley Austin Brown & Wood LLP, Bond Counsel, subject to continuing compliance by the Authority with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the 2003 Bonds will not be includable in gross income for federal income tax purposes. Interest on the 2003 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. Interest on the 2003 Bonds will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. Sidley Austin Brown & Wood LLP is rendering no opinion on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as is provided for in the documents pertaining to the 2003

CONFIDENTIAL

HTA_STAY0056154

Bonds) or in reliance upon the advice of counsel other than such firm on the exclusion from gross income of the interest on the 2003 Bonds for federal income tax purposes. Bond Counsel is further of the opinion that, under the provisions of the Acts of Congress now in force, the 2003 Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in the Commonwealth.

Prospective purchasers of the 2003 Bonds should consult their tax advisors as to applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the 2003 Bonds will not have an adverse effect on the tax-exempt status of the 2003 Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market prices of the 2003 Bonds.

**2003 Discount Bonds**

The excess, if any, of the amount payable at maturity of any maturity of the 2003 Bonds over the issue price thereof constitutes original issue discount. The amount of original issue discount that has accrued and is properly allocable to an owner of any of the 2003 Bonds with original issue discount (a "2003 Discount Bond") will be excluded from gross income for federal income tax purposes to the same extent as interest on the 2003 Bonds. In general, the issue price of a 2003 Bond is the first price at which a substantial amount of 2003 Bonds of the same series and maturity as that 2003 Bond was sold (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents, or wholesalers) and the amount of original issue discount accrues in accordance with a constant yield method based on the compounding of interest. A purchaser's adjusted basis in a 2003 Discount Bond is to be increased by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale, redemption or other disposition of such 2003 Discount Bond for federal income tax purposes.

A portion of the original issue discount that accrues in each year to an owner of a 2003 Discount Bond that is a corporation will be included in the calculation of the corporation's federal alternative minimum tax liability. In addition, original issue discount that accrues in each year to an owner of a 2003 Discount Bond that is a regulated investment company may be included in the calculation of the distribution requirements of that investment company and may result in some of the collateral federal income tax consequences discussed herein. Consequently, an owner of a 2003 Discount Bond should be aware that the accrual of original issue discount in each year may result in an alternative minimum tax liability, additional distribution requirements or other collateral federal income tax consequences although the owner of such 2003 Discount Bond has not received cash attributable to such original issue discount in such year.

The accrual of original issue discount and its effect on the redemption, sale or other disposition of any 2003 Discount Bond that is not purchased in the initial offering at the first price at which a substantial amount of 2003 Discount Bonds of the same series and maturity is sold to the public may be determined according to rules that differ from those described above. An owner of a 2003 Discount Bond should consult his tax advisor with respect to the determination for federal income tax purposes of the amount of original issue discount with respect to such 2003 Discount Bond and with respect to state, Commonwealth and local tax consequences of owning and disposing of such 2003 Discount Bond.

**2003 Premium Bonds**

The excess, if any, of the tax basis of a 2003 Bond to a purchaser (other than a purchaser who holds such 2003 Bond as inventory, stock in trade or for sale to customers in the ordinary course of business) who purchases such 2003 Bond as part of the initial offering and at the initial offering price as set forth on the inside cover pages over the amount payable at maturity of that 2003 Bond is "Bond Premium." Bond Premium is amortized over the term of such 2003 Bond for federal income tax purposes (or in the case of a 2003 Bond with Bond Premium callable prior to its stated maturity, the amortization period and yield may be required to be determined on a basis of a call date that results in the lowest yield on such 2003 Bond). No deduction is allowed for such amortization of Bond Premium. United States Treasury regulations provide, however, that Bond Premium is treated as an offset to qualified stated interest received on such 2003

71

Bond.  An owner of such 2003 Bond is required to decrease his adjusted basis in such 2003 Bond by the amount of amortizable bond premium attributable to each taxable year such 2003 Bond is held.  An owner of such 2003 Bond should consult his tax advisor with respect to the precise determination for federal income tax purposes of the treatment of Bond Premium upon sale, redemption or other disposition of such 2003 Bond and with respect to the state, Commonwealth and local tax consequences of owning and disposing of such 2003 Bond.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the 2003 Bonds from the Authority at an aggregate discount of $10,211,148 (excludes net original issue premium) from the initial offering prices of such bonds set forth or derived from information set forth on the inside cover pages hereof.  The obligations of the Underwriters are subject to certain conditions precedent, and they will be obligated to purchase all the 2003 Bonds if any 2003 Bonds are purchased.  The 2003 Bonds may be offered and sold to certain dealers (including dealers depositing 2003 Bonds into investment trusts) and institutional purchasers at prices lower than such public offering prices and such offering prices may be changed, from time to time, by the Underwriters.

Merrill Lynch & Co. ("Merrill Lynch"), a managing underwriter, has entered into a written agreement with BBVA Capital Markets of Puerto Rico, Inc. ("BBVA Capital"), pursuant to which BBVA Capital has agreed to cooperate in connection with Merrill Lynch's provision of underwriting and investment banking services to the Authority with respect to the 2003 Bonds. Pursuant to this arrangement, the existence of which has been disclosed to the Authority and Government Development Bank, BBVA Capital will be entitled to receive a portion of Merrill Lynch's actual net profits, if any, in connection with the underwriting of the 2003 Bonds. Other similar agreements with respect to the sharing of underwriting net profits have been entered into and disclosed to the Authority and Government Development Bank by the following Underwriters: Morgan Stanley & Co. Incorporated and Popular Securities, Inc.; Banc of America Securities LLC and Oriental Financial Services Corporation; Goldman, Sachs & Co. and FirstBank Puerto Rico; Lehman Brothers Inc. and Santander Securities Corporation; Raymond James & Associates, Inc. and Prudential Securities Incorporated; JP Morgan Securities, Inc. and R-G Investments Corporation; and Wachovia Bank, National Association and Doral Securities, Inc.

## VERIFICATION

Grant Thornton LLP will verify, from the information provided to them, the mathematical accuracy as of the date of delivery of the Series AA Bonds and Series H Bonds of (i) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the principal, interest and call premium payment requirements, if any, of the Refunded Bonds (see *Plan of Financing*), and (ii) the computations of yield on both the securities and the 2003 Bonds contained in such schedules used by Bond Counsel in its determination that interest on the 2003 Bonds is excluded from gross income for federal income tax purposes. Grant Thornton LLP will express no opinion on the assumptions provided to them, nor as to the exclusion from gross income for Federal income tax purposes of the interest on the 2003 Bonds.

## LITIGATION

There is no pending litigation of any nature restraining or enjoining or seeking to restrain or enjoin the issuance, sale or delivery of the 2003 Bonds or in any way contesting or affecting the validity of the 2003 Bonds, the resolutions or the proceedings of the Authority taken with respect to the authorization, issuance or sale thereof, or the pledge or application of any moneys under the 1968 Resolution or the 1998 Resolution or the existence or powers of the Authority.

The Authority is involved as defendant in various legal proceedings arising in the normal course of its business. Many of these proceedings involve claims against the Authority based on breach of contract, claims for additional compensation under construction contracts, claims for damages from automobile accidents allegedly caused by alleged defects in highway construction or maintenance and challenges to public bidding procedures conducted by the Authority, among others. The Authority and its General Counsel do not believe that liability from any such legal proceedings, in excess of available insurance coverage and the provision for losses not covered by insurance, as shown on the financial statements, will have a material adverse effect on the financial condition of the Authority.

One of these proceedings involves a lawsuit filed by APR against the Authority seeking monetary damages in the amount of $200 million. As discussed under "Operating Expenses and Capital Expenditures - Construction Improvement Program - Highway Construction", PR-66 was a proposed toll highway from the metropolitan San Juan area to Canóvanas. PR-66 was one of two projects which the Authority originally intended to have designed, built,

CONFIDENTIAL

operated and maintained by APR through concession agreements. In February 1997, the Authority decided to design, construct, operate and maintain PR-66 as a government project instead of as a private concession. In connection therewith, APR filed a lawsuit against the Authority seeking, among others, monetary damages for lost profits in the amount of $200 million. The case is presently pending resolution of the issue of whether APR is entitled to recover lost profits from the Authority. Based on the opinion of its legal counsel, while the Authority cannot predict the outcome of this or any other litigation, the Authority does not expect the outcome of the APR lawsuit to have a material adverse effect on its 1968 Resolution Revenues, its 1998 Resolution Revenues or its operations or financial condition.

## LEGAL MATTERS

The form of opinions of Sidley Austin Brown & Wood LLP, New York, New York, Bond Counsel, is set forth in *Appendix III* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## LEGAL INVESTMENT

The 2003 Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## GOVERNMENT DEVELOPMENT BANK

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the 2003 Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the 2003 Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Series AA Bonds, Series G Bonds and Series H Bonds have been assigned ratings of "Baa1" by Moody's Investors Service, Inc. ("Moody's") and of "A" by Standard & Poor's Ratings Services ("Standard & Poor's"). The 2003 Subordinated Bonds have been assigned ratings of "Baa2" by Moody's and of "A-" by Standard & Poor's. Moody's and Standard & Poor's are expected to give the Insured Bonds ratings of "Aaa" and "AAA", respectively. The ratings reflect only the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by any or all of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the 2003 Bonds.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth and the Authority, as specifically stated hereinbelow, will agree to the following:

1. Each of the Authority and the Commonwealth will agree to file within 305 days after the end of each fiscal year beginning with its fiscal year ending on June 30, 2002, with each NRMSIR and with any Commonwealth state information depository ("SID"), core financial information and operating data for the prior fiscal year, including (i) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority and the Commonwealth, as the case may be, and information as to revenues, expenditures, financial operations and indebtedness of the Authority and the Commonwealth, as the case may be, in each case, generally found or incorporated by reference in this Official Statement; and

2. The Authority will agree to file, in a timely manner, with each NRMSIR or with the MSRB and with any SID, notice of any failure to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the 2003 Bonds if, in the judgment of the Authority or its agent, such event is material:

73

(a)     principal and interest payment delinquencies; non-payment related defaults;

(b)     unscheduled draws on debt service reserves reflecting financial difficulties; unscheduled draws on credit enhancements reflecting financial difficulties;

(c)     substitution of credit or liquidity providers, or their failure to perform; adverse opinions or events affecting the tax-exempt status of the 2003 Bonds;

(d)     modifications to rights of the holders (including Beneficial Owners) of the 2003 Bonds;

(e)     bond calls;

(f)     defeasances;

(g)     release, substitution, or sale of property securing repayment of the 2003 Bonds; and

(h)     rating changes.

With respect to the following events:

Events (d) and (e). For a description of the 2003 Bonds, see *The 2003 Bonds*. The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the 2003 Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (f). For information on the tax status of the 2003 Bonds, see *Tax Exemption*.

Event (h). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Redemption Provisions" under *The 2003 Bonds*, (ii) the only open issue is which 2003 Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondholders as required under the terms of the 2003 Bonds and the 1968 Resolution or the 1998 Resolution, as the case may be, and (iv) public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 3423856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of 2003 Bonds.

The Commonwealth expects to provide the information described in paragraph (1) above by delivering its first bond official statement that includes its financial statements for the preceding fiscal year or, if no such official statement is issued by the 305-day deadline, by delivering its Comprehensive Annual Financial Report by such deadline and a supplemental report containing other information to the extent necessary to provide the information described in paragraph 1 by such deadline.

As of the date of this Official Statement, there is no Commonwealth SID, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's J.J. Kenny Repository, 55 Water Street, 45th Floor, New York, New York 10041; FT Interactive Data, Attn. NRMSIR, 100 William Street, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above whether or not, such other events are material with respect to the 2003 Bonds, but the Authority does not undertake to provide any such notice of the occurrence of any event, except those events, if material, listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the 2003 Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all Beneficial Owners of the outstanding 2003 Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Sections 2 and 2A of Act No. 104, approved June 29, 1955, as amended (32 L.P.R.A. §3077 and §3077a), which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

74

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the 2003 Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Commonwealth; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1968 Resolution, 1998 Resolution and the 2003 Resolutions the various acts and the 2003 Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions.

There are appended to this Official Statement the audited financial statements of the Authority for the fiscal year ended June 30, 2002, together with the report of Ernst & Young LLP *(Appendix I)*, the letter of the Traffic Engineers *(Appendix II)*, the proposed form of opinions of Bond Counsel *(Appendix III)*, and a specimen of each of the Bond Insurance policies relating to the Insured Bonds *(Appendices IV, V, VI, and VII)*.

This Official Statement incorporates by reference the Commonwealth Report and the Commonwealth Financial Statements. The Commonwealth Report has been filed by the Commonwealth with the MSRB and with each NRMSIR as *Appendix I* to the Commonwealth Official Statement. The Commonwealth Financial Statements have been filed by the Commonwealth with each NRMSIR as part of the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2001.

Any official statement of the Commonwealth or of any instrumentality of the Commonwealth filed with each NRMSIR and the MSRB or any other document which supplements or amends the Commonwealth Report or the Commonwealth Financial Statements filed with the MSRB or with each NRMSIR after the date hereof and prior to the termination of the initial offering of the 2003 Bonds shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained herein or in any of the above described documents incorporated herein by reference shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report and the Commonwealth Financial Statements incorporated by reference herein. Requests for such document should be directed to Director-New York Office, Government Development Bank for Puerto Rico, 140 Broadway, 38th Floor, New York, N.Y. 10005, telephone number (212) 422-6420 or (212) 422-6422, or to Director-General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, Santurce, PR 00940, telephone number (787) 722-7060.

A copy of the Commonwealth Report and the Commonwealth Financial Statements may be obtained by contacting a NRMSIR. The address of each NRMSIR is set forth in *Continuing Disclosure* above.

The financial statements of the Authority included *in Appendix I* and the Commonwealth Financial Statements have been audited by Ernst & Young LLP, San Juan, Puerto Rico, and KPMG LLP, San Juan, Puerto Rico, respectively, as set forth in their respective reports therein. The prospective financial information of the Authority included in this Official Statement has been prepared by, and is the responsibility of the management of the Authority. Ernst & Young

CONFIDENTIAL

LLP has neither examined nor compiled the prospective financial information, and accordingly, Ernst & Young LLP does not express an opinion or any other form of assurance with respect thereto. The Ernst & Young LLP report included in *Appendix I* to this Official Statement relates to the historical financial information of the Authority. Such report does not extend to any prospective financial information (whether or not contained in this Official Statement) and should not be read to do so. The information in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC was supplied by DTC. The remaining information set forth in this Official Statement, except the information appearing in *Underwriting, Appendices II, III, IV, V, VI,* and *VII,* and the information pertaining to Ambac, FGIC, FSA and MBIA, was supplied by the Executive Director of the Authority in his official capacity as such Executive Director and is included in this Official Statement on his authority. The information pertaining to Ambac, FGIC, FSA and MBIA was supplied by Ambac, FGIC, FSA and MBIA, respectively.

The Underwriters have agreed to file this Official Statement with each NRMSIR and with the MSRB.

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**

By: _____/s/ Jack T. Allison, Ph.D_____
Executive Director

CONFIDENTIAL

HTA_STAY0056160

**APPENDIX I**

*Audited Financial Statements*

*Puerto Rico Highway and Transportation Authority*

*June 30, 2002*

CONFIDENTIAL

[This page intentionally left blank]

CONFIDENTIAL

**Ernst & Young LLP**
1000 Scotiabank Plaza
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico 00917-1989

Phone: (787) 759-8212
Fax: (787) 753-0808
Fax: (787) 753-0813
www.ey.com

## Report of Independent Auditors

Hon. José M. Izquierdo Encarnación, Secretary
Department of Transportation and Public Works,
   Commonwealth of Puerto Rico

We have audited the accompanying statement of net assets of the Puerto Rico Highway and Transportation Authority (the Authority), as of June 30, 2002, and the related statement of revenues, expenses and changes in net assets, and cash flows for the year then ended. These financial statements are the responsibility of the Authority's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States and the standards applicable to financial audits contained in *Government Auditing Standards*, issued by the Comptroller General of the United States. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Authority at June 30, 2002, and the changes in its net assets and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States.

As discussed in Note 1 to the financial statements, effective July 1, 2001, the Authority changed its accounting policy related to financial statement presentation to comply with the provisions of Governmental Accounting Standards Board Statement No. 34, *Basic Financial Statements – and Management's Discussion and Analysis – for State and Local Governments*.

The Management's Discussion and Analysis on pages 3 through 7, is not a required part of the basic financial statements but is supplementary information required by the Governmental Accounting Standards Board. We have applied certain limited procedures, which consisted principally of inquiries of management regarding the methods of measurement and presentation of the supplementary information. However, we did not audit the information and express no opinion on it.

Our audit was conducted for the purpose of forming an opinion on the financial statements taken as a whole. The accompanying supplemental schedule listed in the table of contents is presented for the purpose of additional analysis and are not a required part of the financial statements. This schedule is the responsibility of the Authority's management. Such schedule has not been subjected to the auditing procedures applied in our audit of the financial statements and, accordingly, we express no opinion on it.

I-1

CONFIDENTIAL

In accordance with *Government Auditing Standards*, we have also issued our report dated September 27, 2002 on our consideration of the Authority's internal control over financial reporting and on our tests of its compliance with certain provisions of laws, regulations, contracts and grants. This report is an integral part of an audit performed in accordance with *Government Auditing Standards* and should be read in conjunction with this report in considering the results of our audits.

*Ernst & Young LLP*

September 27, 2002

Stamp No. 1842254
affixed to original
of this report.

I-2

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Year ended June 30, 2002

MANAGEMENT'S DISCUSSION AND ANALYSIS

This Section of the Authority's financial report represents a discussion and analysis of the Authority's financial performance during the fiscal year that ended June 30, 2002. Please read in conjunction with the Authority's Financial Statements.

## FINANCIAL HIGHLIGHTS

1. Prior year data is not included due to the implementation of GASB 34. Comparisons between current and prior year results will be included commencing next year.

2. Operating revenues for fiscal year 2002 were approximately **$480 million**.

3. Operating expenses for fiscal year 2002 were **$56.7 million**.

4. Total net assets at June 30, 2002 amounted to approximately **$7.6 billion**.

5. Total capital assets (net of accumulated depreciation) were approximately **$11.8 billion.**

## OVERVIEW OF THE FINANCIAL STATEMENTS

The financial statements provide both long-term and short-term information about the Authority overall financial status. The financial statements also include notes that explain some of the information in the financial statements and provide more detailed data. The statements are followed by a section of other supplementary information that further explains and supports the information in the financial statements.

The Authority financial statements are prepared in conformity with accounting principles generally accepted in the United States as established by the Governmental Accounting Standard Board (GASB). The Authority has implemented the provisions of GASB Statement No. 34, "Basic Financial Statements and Management's Discussion and Analysis for States and Local Governments" (Statement 34) for the fiscal year beginning July 1, 2001. Under Statement 34, the operations of the Authority are accounted for as an Enterprise Fund of the Commonwealth of Puerto Rico and the financial statements are presented on the accrual basis of accounting in order to recognize the flow of economic resources.

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)

The Statements of Net Assets presents the Authority's assets and liabilities and any underlying restrictions on such assets and liabilities. Net assets-the difference between the Authority's assets and liabilities-is one-way to measure the Authority's financial health or position.

## FINANCIAL ANALYSIS OF THE AUTHORITY

### Net Assets

Net assets may serve, overtime, as a useful indicator of a government's financial position. In the case of the Authority, assets exceeded liabilities by approximately **$7.637** billion at the close of the 2002 fiscal year.

The largest portion of the Authority's net assets reflects its investment in capital assets (e.g., right of way, roads, bridges, buildings, etc.), less any related debt still outstanding used to acquire those assets. The Authority uses these capital assets to provide services and consequently, these are not available to liquidate liabilities or other spending. In addition, net assets amounting to approximately $438 million are restricted for debt service and construction.

### Changes in Net Assets

The current year change in net assets at June 30, 2002 was approximately **$274.8 million** or an increase of 4% over the restated net assets at June 30, 2001. Major components of the change in net assets consist of the following:

- Total operating revenues increased **3%** during fiscal year 2002 to approximately **$480.2** million. The major components of this increase was an increase in toll revenues of 5% and an increase in gasoline excise taxes of 3%.

- Total operating expenses decreased **4%** to approximately **$56.7** million during fiscal year

CONFIDENTIAL

HTA_STAY0056166

Puerto Rico Highway and Transportation Authority

MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)

**FINANCIAL ANALYSIS OF THE AUTHORITY (continued)**

> 2002. The decrease was mainly caused by a decrease in toll highway administration and
> maintenance of approximately 6%.

- Non-operating expenses amounted to approximately $213 million during 2002, an
  increase of approximately 12%. A major component of the increase was an increase in
  interest expense of approximately 7%.

- Contributions, primarily from the US Federal Government, amounted to approximately
  $201 million during 2002.

## CAPITAL ASSETS AND DEBT ADMINISTRATION

### Capital Assets

As of June 30, 2002 the Authority had invested approximately **$11.8 billion** in capital assets (net
of related depreciation) including roads, bridges, buildings, land and equipment.

In 1994, the Authority began planning and designing and in 1996 began construction of a new
mass transit rail project for the San Juan Metropolitan Region known as Tren Urbano. Through
June 30, 2002, the Authority has incurred approximately **$1.9 billion** in costs for this project.
Tren Urbano is the largest single project included in the Authority's current Construction
Improvement Program. Its initial phase consists of approximately 17 km. of track way running
from Bayamón to Santurce. The Authority has contracted with various private parties for the
construction of the project and has entered into a five-year contract for the operation and
maintenance of the system.

### Debt Administration

The Authority bond sales must be approved by the Secretary of Transportation and Public
Works, who exercises the powers of Governing Board of the Authority in coordination with the
Government Development Bank, Fiscal Agent of Commonwealth of Puerto Rico. It must comply
with rules and regulations of the United States Treasury Department and the United States
Securities and Exchanges Commission.

Long-term debt includes Highway Revenue Bonds issued pursuant to the 1968 Bond Resolution

CONFIDENTIAL
HTA_STAY0056167

Puerto Rico Highway and Transportation Authority

MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)

**Debt Administration (continued)**

(No. 68-18) and Senior Transportation Revenue and Subordinated Transportation Revenue Bonds issued pursuant to the 1998 Bond Resolution (No. 98-06). At June 30, 2002, the Authority had approximately $4.4 billion in Highway, Transportation Revenue and Subordinated Bonds principal amount outstanding, net of unamortized discounts and net losses on advanced refundings. That amount represents an increase of 17% from June 30, 2001, which will be used to finance the Authority Construction Improvement Program of $2.3 billion for 2002 through 2006.

More detailed information about the Authority's long-term debt is presented in notes 4 and 5 to the financial statements.

Of the approximate $4 billion in Highway, Transportation Revenues and Subordinated Bonds outstanding, approximately **$1.7 billion** is insured and rated Aaa by Moody's Investor Services (Moody's) and AAA by Standard and Poor's (S&P). Moody's and S&P rate the remaining debt Baa1/A-.

## ECONOMIC FACTORS AND NEXT'S YEARS BUDGET

The Puerto Rican economy must be analyzed as a region within the U.S. economy, being an integral part of the U.S. monetary and banking system, as well as within its territorial and custom boundaries. The main drive of the Puerto Rican economy is a huge external sector closely tied to the flow of merchandise, tourists, and capital between Puerto Rico and the Mainland. Thus, historically, the real growth rates of the Puerto Rican economy have closely followed the behavior of the U.S. economy. In fiscal year 2002, Puerto Rico experienced the consequences of the slowdown in the U.S. economy, since the U.S. Real GDP increased by only 0.8%. However, in spite of the economic slowdown, the consumption of gasoline, which is the main source of recurrent revenues of the Authority, posted a 3% increase in fiscal year 2002.

The Puerto Rican economy is expected to regain its growing path in fiscal year 2003, advancing at rates between 2% and 3% in real terms, according to the latest forecast of the Interamerican University Econometric Model. This turnaround in the performance of the Puerto Rican economy will contribute to achieve the conservative income projections of the Authority for fiscal year 2003.

I-6

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

MANAGEMENT'S DISCUSSION AND ANALYSIS (continued)

### ECONOMIC FACTORS AND NEXT'S YEARS BUDGET (continued)

The Authority adopted the 2003 fiscal year Budget on July 1, 2002. The revenues for fiscal year 2003 are projected to amount to approximately **$506.3** million. The Authority also receives aid for highway construction from the Federal Highway Authority (FHWA) and the Federal Transportation Authority (FTA). This budget includes a total of $ 801.0 million for the

Construction Improvement Program (CIP), representing an increase of about 20.7% from fiscal year 2002. The increase from fiscal year 2002 is due to strategic projects to be performed and the completion of the Tren Urbano.

Highway construction projects included by the Authority in its CIP are designed to enhance the economic development of Puerto Rico. Projects include new highway construction, principally of primary roads and toll ways, and construction improvements designed to alleviate the traffic congestion of the San Juan Metropolitan area. It also includes reconstruction of existing highway, a bridge program and installation of safety features and other projects. The major highway projects include the Tren Urbano, construction of Eastern Corridor, sections of PR-53, Yabucoa-Guayama and Yabucoa-Maunabo, PR-10 from Utuado-Adjuntas, conversion to expressway of PR-2 from Mayagüez to Ponce. PR-22 to PR-2 from Arecibo-Aguadilla, the construction of PR-5 toll way connecting PR-2 to Las Cumbres Avenue (PR-199), the relocation of PR-167 (PR-148) from Bayamón to Comerío and Naranjito, the relocation of PR-137 in Vega Baja and PR-156 in Aguas Buenas, Las Cumbres Avenue, from Trujillo Alto to Bayamón, and the conversion to expressway of PR-2.

### CONTACTING THE AUTHORITY'S FINANCIAL MANAGEMENT

This financial report is designed to provide our bondholders, patrons, and other interest parties with a general overview of the Authority's finances and to demonstrate the Authority's accountability for the money it receives. If you have question or need additional financial information, contact the Puerto Rico Highway and Transportation Authority, Finance Area, P.O. Box 42007, San Juan, Puerto Rico 00940-2007.

CONFIDENTIAL

HTA_STAY0056169

Puerto Rico Highway and Transportation Authority

Statement of Net Assets

June 30, 2002

**Assets:**

Current assets:

| | |
|---|---:|
| Cash and cash equivalents | $  33,686,851 |
| Accounts receivable, net of allowance for uncollectible accounts of $38,472,421 | 8,233,797 |
| Prepaid expenses and other assets | 3,655,200 |
| Total current assets | 45,575,848 |

Restricted assets:

| | |
|---|---:|
| Cash and cash equivalents | 65,104,447 |
| Cash and investments with trustee | 867,716,879 |
| Receivables: | |
| Puerto Rico Treasury Department | 237,829 |
| US Federal government | 5,414,197 |
| Accrued interest and other | 3,793,700 |
| Total restricted assets | 942,267,052 |

Capital assets:

| | |
|---|---:|
| Land | 1,710,911,521 |
| Construction work in progress | 4,615,205,178 |
| Property and equipment, net of accumulated depreciation of $5,518,170,536 | 5,504,163,644 |
| Total property and equipment | 11,830,280,343 |

| | |
|---|---:|
| Revenue bond issuance costs, net of accumulated amortization of $12,549,289 | 57,317,913 |
| Advances to governmental entities for construction projects | 17,881,277 |
| Total assets | $12,893,322,433 |

CONFIDENTIAL

HTA_STAY0056170

**Liabilities**
Current liabilities:

| | |
|---|---:|
| Accounts payable | $ · 10,260,907 |
| Other liabilities | 3,553,269 |
| Liabilities payable from restricted assets: | |
| Accounts payable | 300,108,489 |
| Accrued interest payable | 112,625,348 |
| Other liabilities | 9,738,978 |
| Current portion of bonds payable | 81,925,000 |
| Total current liabilities | 518,211,991 |

| | |
|---|---:|
| Long-term debt: | |
| Accrued legal claims | 18,000,000 |
| Accrued vacation and sick leave | 19,626,832 |
| Loan payable | 300,000,000 |
| Bonds Payable, net of unamortized discount of $31,231,653 and net loss on advanced refundings of $8,068,600 | 4,400,490,064 |
| Total long-term debt | 4,738,116,896 |
| | |
| Total liabilities | 5,256,328,887 |

**Net Assets**

| | |
|---|---:|
| Invested in capital assets, net of related debt | 7,169,108,191 |
| Restricted for debt service | 410,098,060 |
| Restricted for construction | 27,771,177 |
| Unrestricted | 30,016,118 |
| Total net assets | 7,636,993,546 |
| | |
| Total liabilities and net assets | $12,893,322,433 |

*See accompanying notes.*

CONFIDENTIAL

HTA_STAY0056171

# Puerto Rico Highway and Transportation Authority

## Statement of Revenues, Expenses and Changes in Net Assets

### Year ended June 30, 2002

| | |
|---|---:|
| **Operating revenues** | |
| Excise taxes: | |
| Gasoline | $ 174,884,874 |
| Diesel oil | 18,922,151 |
| Petroleum Tax | 120,000,000 |
| Vehicle license fees | 30,693,345 |
| Toll fares | 130,498,021 |
| Other | 5,156,250 |
| Total operating revenues | 480,154,641 |
| | |
| **Operating expenses** | |
| Toll highways administration and maintenance | 37,292,706 |
| General and administrative, principally Metrobus | 18,464,417 |
| Other | 968,672 |
| Total operating expenses | 56,725,795 |
| Operating income | 423,428,846 |
| | |
| Depreciation and amortization | 136,703,200 |
| | |
| **Non-operating revenues (expenses)** | |
| Interest earned on investments | 29,051,404 |
| Net increase in fair value of investments | 4,156,272 |
| Interest on TIFIA loan and line of credit | (21,104,458) |
| Interest expense on revenue bonds outstanding | (225,282,563) |
| Net non-operating expenses | (213,179,345) |
| Income before contributions | 73,546,301 |
| | |
| Contributions from US Federal government and other | 201,226,940 |
| Change in net assets | 274,773,241 |
| | |
| Net assets at beginning of the year | 1,832,373,910 |
| | |
| Cumulative effect of change in accounting principle | 5,529,846,395 |
| Net assets at beginning of year (as restated) | 7,362,220,305 |
| | |
| Net assets at end of the year | $ 7,636,993,546 |

*See accompanying notes.*

I-10

Puerto Rico Highway and Transportation Authority

Statement of Cash Flows

Year ended June 30, 2002

**Cash flows from operating activities**

| | |
|---|---:|
| Receipts from excise taxes and vehicle licenses fees | $  344,425,170 |
| Receipts from toll fares | 130,498,021 |
| Receipts from other sources, principally Metrobus fares | 2,427,065 |
| Other receipts | 43,955,765 |
| Payments to employees | (1,749,456) |
| Payments to others | (4,589,929) |
| Net cash flows provided by operating activities | 514,966,636 |

**Cash flows from non-capital financing activities**

| | |
|---|---:|
| Payments to the Department of Transportation and Public Works | (6,901,561) |
| Net cash flows used in financing activities | (6,901,561) |

**Cash flows from capital and related financing activities**

| | |
|---|---:|
| Payments of bond issuance costs | (24,133,900) |
| Receipts from Federal government and Commonwealth of Puerto Rico grants | 202,742,869 |
| Acquisition and construction of capital assets | (748,222,814) |
| Proceeds from bond issuance | 1,129,864,057 |
| Principal payments to retire revenue bonds | (489,035,000) |
| Payments of line of credit, net of advances | (40,787,860) |
| Interest payments on revenue bonds | (234,454,110) |
| Net cash flows used in financing activities | (204,026,758) |

**Cash flows from investing activities**

| | |
|---|---:|
| Purchase of investments, net of sales | (324,605,396) |
| Interest received | 28,233,941 |
| Net cash flows used in investing activities | (296,371,455) |
| Net increase in cash and cash equivalents | 7,666,862 |
| Cash and cash equivalents at beginning of year (including restricted cash of $73,181,672) | 106,458,160 |
| Cash and cash equivalents at end of year (including restricted cash of $65,104,447) | $   98,791,298 |

I-11

CONFIDENTIAL

**Reconciliation of operating income to net cash provided by
   operating activities**

| | |
|---|---:|
| Operating income | $ 423,428,846 |
| Adjustments to reconcile operating income to net cash provided by operating activities: | |
| Bad debt provision | 2,713,679 |
| Changes in assets and liabilities: | |
| Increase in accounts receivable | (1,244,373) |
| Increase in prepaid expense | (1,753,613) |
| Increase in accounts payables | 93,571,553 |
| Decrease in accrued vacation and sick leave | (1,749,456) |

| | |
|---|---:|
| Net cash flows provided by operating activities | $  514,966,636 |

*See accompanying notes.*

I-12

HTA_STAY0056174

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements

June 30, 2002

## 1. Organization and Significant Accounting Policies

The Puerto Rico Highway and Transportation Authority (the Authority) is a public corporation and instrumentality of the Commonwealth of Puerto Rico, created by Act No. 74 of June 23, 1965, as amended, to provide roads and other facilities for the movement of persons, vehicles and vessels, and for the planning, promotion and feasibility of mass transportation systems. The Authority is a component unit of the Commonwealth of Puerto Rico and accordingly is included in the general-purpose financial statements of the Commonwealth. The powers normally exercised by a Board of Directors are vested with the Commonwealth Secretary of the Department of Transportation and Public Works (DTPW). The Authority is exempt from the payment of any taxes on its revenues and properties.

The accounting policies of the Authority conform to accounting principles generally accepted in the United States as applicable to governmental units. The Governmental Accounting Standards Board (GASB) is the accepted standards setting body for establishing governmental accounting and financial reporting principles. The following is a summary of the significant accounting policies:

### Change in Accounting Principle

The Authority adopted the provisions of GASB Statement No. 34, "Basic Financial Statements – and Management's Discussion and Analysis – for State and Local Governments" (Statement 34) in fiscal year 2002, effective July 1, 2001. Statement 34 established financial and reporting standards for all state and local governments and related entities. Under Statement 34, the Authority is considered an enterprise fund of the Commonwealth of Puerto Rico. The most significant effects of the adoption of Statement 34 relates to the inclusion of general infrastructure assets in the Authority's Statement of Net Assets, net of their corresponding depreciation, the presentation of the Authority's financial statements under the accrual basis of accounting, the inclusion of management's discussion and analysis, and the presentation of the Statement of Cash Flows under the direct method.

The effect of the implementation of Statement 34 in prior fiscal years has been presented in Cumulative Effect of Change in Accounting Principle in the Statement of Revenues, Expenses and Changes in Net Assets. The major components of the Cumulative Effect of Change in Accounting Principle are as follow:

| | |
|---|---|
| Property and equipment previously recorded in general fixed assets account group and enterprise fund, net of prior years accumulated depreciation | $5,506,426,095 |
| Long-term debt previously recorded in the general long-term debt account group | 61,047,131 |
| Other | (37,626,831) |
| | $5,529,846,395 |

I-13

HTA STAY0056175

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

### Basis of Accounting

Under Statement 34, the operations of the Authority are accounted for as an enterprise fund on the accrual basis in order to recognize the flow of economic resources. Under this basis, revenues are recognized in the period in which they are earned, expenses are recognized in the period in which they are incurred, depreciation of assets is recognized, and all assets and liabilities associated with the operation of the Authority are included in the Statements of Net Assets. The principal revenues of the Authority are excise taxes and toll revenues. Operating expenses for the Authority include the costs of operating and maintaining Puerto Rico's toll highways and general and administrative expenses. All revenues and expenses not meeting this definition are reported as non-operating revenues and expenses.

The Authority adopted the provisions of Governmental Accounting Standards Board Statement No. 20 *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities that use Proprietary Fund Accounting* (GASB No. 20). In adopting GASB No. 20, the Authority elected not to apply all Statements and Interpretations of the Financial Accounting Standards Board, Accounting Principles Board Opinions and Accounting Research Bulletins of the Committee on Accounting Procedure issued after November 30, 1989.

### Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

The implementation of Statement 34 involves the use of assumptions and estimates in the determination of the cost for general infrastructure assets, such as roads, highways, bridges and land. The cost of such assets is estimated based on current costs for similar assets deflated using the general price index through the estimated average age of the assets.

### Cash Equivalents

The Authority considers all highly liquid investments with maturities of three months or less when purchased to be cash equivalents. As of June 30, 2002, cash equivalents consisted of time deposits and repurchase agreements.

CONFIDENTIAL

HTA_STAY0056176

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 1. Organization and Significant Accounting Policies (continued)

**Investments**

The Authority reports investments at fair value in the Statement of Net Assets and the changes in the fair value of investments in the statement of revenues, expenditures and changes in net assets.

**Restricted Assets**

Restricted assets of the Authority represent bond proceeds designated for construction, and other monies required to be restricted for debt service, operations, maintenance, administration, renewal, and replacement.

**Advances to the Department of Transportation and Public Works**

The Authority periodically advances funds to DTPW to carry out its participation in the construction program of the Authority. These advances are presented as non-current assets in the accompanying Statement of Net Assets.

**Capital Assets**

Cost Basis
All capital assets are recorded at historical cost or estimated historical cost. The cost of property and equipment includes costs for infrastructure assets (right-of-ways and bridges substructure and highways and bridges), toll equipment, buildings, toll facilities, and other related costs (including software) and furniture and equipment. Highways and bridges substructure includes road sub-base, grading, land clearing, embankments, and other related costs. Costs for infrastructure assets include construction costs, design and engineering fees and administrative and general expenses paid from construction monies.

Capitalization Policy
Costs to acquire additional capital assets, which replace existing assets or otherwise prolong their useful lives, are capitalized for toll equipment, buildings, toll facilities, and other related costs.

Depreciation is provided using the straight-line method over an estimated useful live of 40 years for roads and highways and 50 years for bridges. Furniture and equipment is stated at cost. Depreciation for furniture and equipment is provided using the straight-line method over an estimated useful life of 10 years.

Project costs incurred on the Tren Urbano, a mass rail transportation project, are recorded at cost and included in Construction in Progress in the accompanying Statement of Net Assets.

I-15

CONFIDENTIAL

HTA_STAY0056177

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

### 1. Organization and Significant Accounting Policies (continued)

**Unamortized Losses on Advanced Refunding**

Losses resulting from current or advanced refundings of debt are deferred and amortized over the shorter of the life of the new debt or remaining life of old debt. The amount deferred is reported as a reduction of the debt and the amount amortized is reported as a component of interest expense.

**Vacation and Sick Leave**

Employees earn annual vacation leave at the rate of 30 days per year up to a maximum permissible accumulation of 60 days for regular employees. Employees accumulate sick leave at the rate of 18 days per year. Sick leave is only payable if the regular employee resigns and has more than 10 years of employment, or retires and takes a pension. Maximum permissible accumulation for sick leave is 90 days for all employees and the excess is paid within the next year. The Authority records as a liability and as an expense the vested accumulated vacation and sick leave as benefits accrue to employees.

**Claims and Judgments**

The estimated amount of the liability for claims and judgments is recorded on the Statement of Net Assets based on the Authority's evaluation of the probability of an unfavorable outcome in the litigation of such claims and judgments. The Authority consults with legal counsel upon determining whether an unfavorable outcome is expected.

**Budgetary Data**

The Authority prepares its annual budget following the cash basis of accounting while the financial statements are presented under generally accepted accounting principles (GAAP) and standards established by the GASB. The actual results of operations presented in the Combined Statement of Revenues, Expenditures and Changes in Fund Balance - Budget and Actual - All Governmental Fund Types are in accordance with the budgetary basis of accounting to provide a meaningful comparison of actual with budget.

The Authority uses the following procedures in establishing the budgetary data reflected in the financial statements:

1. The Executive Director submits to the Commonwealth Secretary of Transportation and Public Works (the Secretary) a proposed operating budget for the fiscal year commencing the following July 1. The operating budget includes proposed expenditures and the means of financing them.

CONFIDENTIAL

HTA_STAY0056178

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**1. Organization and Significant Accounting Policies (continued)**

**Budgetary Data (continued)**

2. The budget is approved through a resolution by the Secretary.

3. After the approval of the operating budget, the Secretary is authorized to transfer budgeted amounts within any funds.

The major differences between the budgetary basis of accounting and GAAP are:

1. Revenues are recorded when payments are received (budgetary), as opposed to when earned (GAAP).

2. Expenditures are recorded when payments are made (budgetary) as opposed to when the liability is incurred (GAAP).

3. Advances to governmental entities for construction projects are recorded when paid (budgetary) as opposed to being capitalized as property and equipment when costs are incurred (GAAP).

**Bond Discounts and Bond Issuance Costs**

Bond discounts are presented as a reduction of the face amount of the bonds payable. Bond issuance costs are presented as a deferred asset on the Statement of Net Assets. The discount and issuance costs are amortized over the life of the bonds on a method that approximates the effective interest method. Amortization expense related to bond discounts was approximately $2,000,000 at June 30, 2002 and is included as a component of interest expense on the Statement of Revenues, Expenses and Changes in Net Assets. Depreciation and amortization expense includes amortization of bond issuance costs at June 30, 2002 of approximately $2,600,000.

**2. Cash, Cash Equivalents and Investments**

Cash and cash equivalents at June 30, 2002 consisted of the following:

| | |
|---|---:|
| Cash held by the Puerto Rico Department of the Treasury | $ 39,777,436 |
| Repurchase agreements | 82,357,696 |
| Restricted cash held by escrow agents | 17,927,236 |
| Puerto Rico State Infrastructure Bank deposits | 2,947,555 |
| Cash on hand and in banks | 5,577,395 |
| | 148,587,318 |
| Less checks issued in excess of bank balance | 49,796,020 |
| | $ 98,791,298 |

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 2. Cash, Cash Equivalents and Investments (continued)

Cash with the Department of the Treasury is uninsured and uncollateralized. The repurchase agreements consist of Notes from the U.S and Puerto Rico Government and collateralized mortgage obligations. These investments are held in the Authority's name.

Restricted cash amounting to $2,980,236 represents funds held in an escrow fund under an agreement with the U.S. Army Corps of Engineers (the Agreement). Under terms of the Agreement, the Authority is required to maintain escrow funds to secure performance in connection with a mitigation plan related to a construction project. The escrow funds will be released as performance is demonstrated. Restricted cash amounting to $14,947,000 represents funds held in an escrow account pursuant to a concession agreement with Autopistas de Puerto Rico y Compañía S.E. (see Note 8).

Puerto Rico State Infrastructure Bank (the SIB) deposits represent funds held by the Government Development Bank for Puerto Rico (GDB) related to the establishment of a State Infrastructure Bank account, which is dedicated solely to providing loans or other forms of financial assistance consistent with the National Highway System Designation Act of 1995. The SIB was created on June 12, 1998 pursuant to a Cooperative Agreement among the Federal Highway Administration (FHWA) and the Federal Transit Administration (FTA) of the United States Department of Transportation (FTA), and the Puerto Rico Department of Transportation and Public Works (DTPW). Under the agreement the DTPW established the SIB and designated the Authority as custodian and GDB as trustee of the SIB funds. The SIB is funded by a matching share agreement whereby on or before the date on which the Authority receives a Federal payment, the Authority must deposit an amount equaling at least 25 percent of such payment. These time deposits are held in the Authority's name.

The bank balance is covered by federal depository insurance or collateral. In bank accounts checks are issued in excess of the bank balance, and subsequent deposits are made from cash transfers to cover such checks.

The Authority is authorized to deposit funds only in institutions approved by the Department of the Treasury and such deposits should be maintained in separate accounts in the name of the Authority. Resolutions 68-18 and 98-06 (the Bond Resolutions) require that funds in the Debt Service Fund be held by the fiscal agent (The Chase Manhattan Bank, N.A.) in trust and applied as provided in the Bond Resolutions. The law governing the Authority does not limit the type of securities in which the Authority may invest. However, funds restricted for debt service must be invested only in direct obligations of the United States government, or obligations unconditionally guaranteed by the United States government, and/or interest bearing time deposits, or other similar arrangements, as provided by the Bond Resolutions. Accordingly, as permitted by the Bond Resolutions, cash and investments with trustee restricted for debt service amounting to $553,669,206 at June 30, 2002 consist of Notes from the U.S. Government and Agencies. As per the matching share agreement with FHWA, the SIB reserve consists of $15,010,735 of principal and $835,100 of interest, which are included as restricted cash and investments at June 30, 2002. These investments are held in the Authority's name.

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 2. Cash, Cash Equivalents and Investments (continued)

Investments restricted for capital projects may be made in Investment Obligations, as defined in the Bond Resolutions. Investment Obligations include time deposits of any bank, which are either issued by a bank with combined capital and surplus of at least $50 million, or collateralized by securities in direct obligations of the United States Government or guaranteed by the United States Government. Accordingly, as permitted by the Bond Resolutions, investments restricted for capital projects, amounting to $49,257,377 at June 30, 2002 consist of certain U.S. Government Securities maintained pursuant to an investment agreement with CDC Funding Corporation, which expires on February 14, 2003. These investments are held in the Authority's name.

A summary of changes in the investments restricted for capital projects related to the SIB funds at June 30, 2002 are as follow:

| | |
|---|---|
| Balance as of June 30, 2001 | $53,525,970 |
| Interest revenue | 3,544,991 |
| Construction expenditures | (7,813,584) |
| Balance as of June 30, 2002 | $49,257,377 |

A summary of changes in the investments recorded which are restricted for debt service related to the SIB funds at June 30, 2002 are as follows:

| | Reserve Account | Interest |
|---|---|---|
| Balance as of June 30, 2001 | $15,010,735 | $2,112,455 |
| Interest revenue | - | 835,100 |
| Balance as of June 30, 2002 | $15,010,735 | $2,947,555 |

CONFIDENTIAL

HTA_STAY0056181

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 3. Capital Assets

The following schedule summarizes property and equipment held by the Authority as of June 30, 2002:

|  | Beginning Balance at June 30, 2001 | Additions | Retirements | Ending Balance at June 30, 2002 |
|---|---|---|---|---|
| Land | $ 1,710,911,521 | $ - | $ - | $ 1,710,911,521 |
| Construction in progress | 3,991,649,527 | 623,555,651 | - | 4,615,205,178 |
| Roads | 8,221,714,157 | 118,572,754 | - | 8,340,286,911 |
| Bridges | 2,601,828,410 | - | - | 2,601,828,410 |
| Property and equipment | 74,229,342 | 6,094,409 | (104,892) | 80,218,859 |
|  | 16,600,332,957 | 748,222,814 | (104,892) | 17,348,450,879 |
| Less accumulated depreciation | 5,384,041,019 | 134,129,517 | - | 5,518,170,536 |
| Total | $11,216,291,938 | $614,093,297 | $(104,892) | $11,830,280,343 |

In 1994, the Authority commenced the planning and design and in 1996 the construction of a mass rail transportation system known as Tren Urbano. The initial phase of Tren Urbano consists of approximately 17 km of track way extending from Bayamón to Santurce. As of June 30, 2002, the Authority has capitalized costs amounting to approximately $1.9 billion related to this project. Total contributions from the US Federal government and the Authority's funds for this project amount to approximately $511,400,000 and $1,158,000,000, respectively. The Tren Urbano project is expected to be operational during late 2003.

## 4. Bonds Payable

Resolutions No. 68-13 and No. 98-06, adopted by the Authority on June 13, 1968 and February 26, 1998, respectively, (collectively the Bond Resolutions and individually, Resolution 68-13 and 98-06, respectively) authorize the issuance of revenue bonds (Highway Revenue Bonds under Resolution 68-13 and Transportation Revenue Bonds under Resolution 98-06) to provide moneys to pay all or a portion of the costs of construction of traffic and other transportation facilities. Bonds outstanding under the Bond Resolutions at June 30, 2002 were as follows:

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 4. Bonds Payable (continued)

| | Issue Date | Original Amount | Maturing July 1 | Interest Rate | Outstanding Amount | Unamortized (Discount) Premium | Outstanding Principal Balance |
|---|---|---|---|---|---|---|---|
| **Term bonds:** | | | | | | | |
| Subordinated Bonds | July 15, 1998 | $    58,060,000 | 2018-2028 | 5.00 | $    58,060,000 | $    (609,262) | $    57,450,738 |
| A | February 15, 1998 | 818,045,000 | 2028-2038 | 4.75-5.00 | 800,260,000 | (15,172,657) | 785,087,343 |
| B | May 15, 2000 | 386,625,000 | 2026-2039 | 5.875-6.00 | 176,135,000 | (3,162,440) | 172,972,560 |
| C | May 15, 2000 | 14,880,000 | 2029 | 6.00 | 14,880,000 | (316,195) | 14,563,805 |
| D | January 1, 2002 | 700,855,000 | 2027-2041 | 5.00-5.75 | 700,855,000 | (7,025,902) | 693,829,098 |
| W | July 15, 1993 | 292,090,000 | 2013-2020 | 5.62-5.72 | 292,090,000 | (3,133,826) | 288,956,174 |
| X | July 15, 1993 | 288,565,000 | 2013-2021 | 5.62-5.72 | 288,565,000 | (3,244,735) | 285,320,265 |
| Y | April 9, 1996 | 677,045,000 | 2011-2036 | 5.00-6.25 | 677,045,000 | (18,074,216) | 658,970,784 |
| Z | April 9, 1996 | 42,600,000 | 2018 | 5.63 | 42,600,000 | (1,098,436) | 41,501,564 |
| Total term bonds | | $3,278,765,000 | | | $3,050,490,000 | $(51,837,669) | 2,998,652,331 |
| **Serial bonds:** | | | | | | | |
| Subordinated Bonds | July 15, 1998 | $    16,990,000 | 2008-2014 | 5.25 | $    16,990,000 | $    (157,624) | 16,832,376 |
| A | February 15, 1998 | 271,730,000 | 1999-2014 | 3.90-5.50 | 234,240,000 | (2,732,402) | 231,507,598 |
| B | May 15, 2000 | 174,180,000 | 2001-2027 | 4.65-6.25 | 95,560,000 | (1,351,573) | 94,208,427 |
| E | January 1, 2002 | 284,405,000 | 2011-2024 | 5.50-5.75 | 284,405,000 | 25,606,341 | 310,011,341 |
| F | January 1, 2002 | 118,615,000 | 2003-2011 | 5.00-5.25 | 118,615,000 | 6,037,557 | 124,652,557 |
| V | June 4, 1992 | 9,960,000 | 2000-2005 | 3.50-5.88 | 1,825,000 | (2,399) | 1,822,601 |
| W | July 15, 1993 | 24,700,000 | 2009 | MCS | 24,700,000 | (189,493) | 24,510,507 |
| | July 15, 1993 | 46,750,000 | 2010 | FLOATS | 46,750,000 | (385,740) | 46,364,260 |
| | July 15, 1993 | 46,750,000 | 2006-2010 | RITES | 46,750,000 | (319,241) | 46,430,759 |
| X | July 15, 1993 | 228,695,000 | 1994-2022 | 2.85-5.10 | 122,440,000 | (803,844) | 121,636,156 |
| | July 15, 1993 | 66,150,000 | 2010 | FLOATS | 66,150,000 | (545,812) | 65,604,188 |
| | July 15, 1993 | 66,150,000 | 2003-2010 | RITES | 66,150,000 | (304,112) | 65,845,888 |
| Y | April 9, 1996 | 213,190,000 | 1997-2022 | 5.00-6.25 | 159,465,000 | (2,154,784) | 157,310,216 |
| Z | April 9, 1996 | 142,440,000 | 1996-2016 | 4.00-6.25 | 134,755,000 | (2,090,858) | 132,664,142 |
| FMHA-C | January 27, 1981 | 4,510,000 | 1983-2020 | 5.00 | 3,120,000 | - | 3,120,000 |
| Total serial bonds | | $1,715,215,000 | | | $1,421,915,000 | $ 20,606,016 | 1,442,521,016 |
| Less serial bonds payable on July 1, 2002 | | | | | | | 81,925,000 |
| Total bonds payable thereafter | | | | | | | 4,359,248,347 |
| Capital appreciation bonds: | | | | | | | |
| CAPS | Feb. 15, 1998 | $    39,868,740 | 2015-2018 | 4.95-5.075 | | | 49,310,317 |
| Total bonds payable after July 1, 2002 | | | | | | | 4,408,558,664 |
| Less net loss on advanced refundings | | | | | | | 8,068,600 |
| Total bonds payable, net of unamortized discount and net loss on advanced refundings | | | | | | | $4,400,490,064 |

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 4. Bonds Payable (continued)

During fiscal year 2002, the Authority issued the Transportation Revenue Bonds (Series D) (Series D Bonds), Transportation Revenue Refunding Bonds (Series E) (Series E Bonds), and Transportation Revenue Refunding Bonds (Series F) (Series F Bonds). The bond proceeds of Series D were used to finance or refinance a portion of the costs of Tren Urbano and various highway projects included in the Authority's current construction Improvement Program, including the payment approximately of $300,000,000 principal amount of notes issued to finance such costs initially, make a deposit to the 1998 Senior Bond Reserve Account, and pay costs of issuance of the Series D Bonds. The bond proceeds of Series E were used to advance refund a portion of the Authority's Senior Transportation Revenues Bonds (Series B) with an outstanding aggregate face amount of $286,765,000 and pay costs of issuance of the Series E Bonds. The bond proceeds of Series F were used to redeem on July 1, 2002 a portion of the Authority's Highway Revenue Bonds (Series V) in the aggregate principal amount of $125,640,000 and pay costs of issuance of the Series F Bonds.

A summary of the net proceeds of the Series D Bonds, Series E Bonds, and Series F Bonds and their application follows:

| | Series D | Series E | Series F |
|---|---|---|---|
| Principal amount | $700,855,000 | $284,405,000 | $118,615,000 |
| Less: | | | |
| Underwriters' discount | (5,012,288) | (1,681,401) | (682,882) |
| Original issue (discount) premium | (7,123,895) | 26,470,787 | 6,642,165 |
| Plus: | | | |
| Internal sources of funds | - | 1,423,885 | 5,937,820 |
| Net proceeds | $688,718,817 | $310,618,271 | $130,512,103 |
| | | | |
| Application of net proceeds: | | | |
| GDB line of credit repayment | $300,000,000 | $ - | $ - |
| Deposit to construction fund | 318,552,901 | - | - |
| Cash deposit to escrow account | - | 9,747 | 251 |
| Cost of escrow securities | - | 303,815,597 | 130,377,117 |
| Deposit to Debt Service Reserve Fund | 60,336,249 | - | - |
| Cost of issuance | 1,216,527 | 327,601 | 134,735 |
| Insurance payment | 8,613,140 | 6,465,326 | - |
| Total | $688,718,817 | $310,618,271 | $130,512,103 |

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**4. Bonds Payable (continued)**

A summary of the Series D Bonds, Series E Bonds, and Series F Bonds issued during fiscal year 2002 follows:

| | |
|---|---|
| Term Bonds: | |
| Various Fixed Rate | $ 700,855,000 |
| | |
| Serial Bonds: | |
| Various Fixed Rate | 403,020,000 |
| | |
| Total | $1,103,875,000 |

The Fixed Rate Term Bonds bear interest at rates ranging from 5% through 5.75% and mature from 2027 to 2041. The Fixed Rate Serial Bonds bear interest at rates ranging from 5.00% through 5.75% and mature from 2003 to 2024. Interest on the Term Bonds and Serial Bonds will be payable on each January 1 and July 1.

All the Series D Bonds, and the Series E Bonds maturing on July 1, 2024, may be redeemed on or after July 1, 2012 at the option of the Authority from any available moneys (other than moneys deposited in the 1998 Senior Bond Sinking Fund in respect of an Amortization Requirement) on any date either in whole or in part (in such order of maturities as the Authority may direct) at a price of 100% of the principal amount of the Bonds to be redeemed plus accrued interest at the redemption date.

The Series D Bonds are subject to redemption on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the respective Amortization Requirements for said Series D Bonds (less the amount of bonds retired by purchase from moneys in the 1998 Senior Bond Sinking Fund) from moneys in the 1998 Senior Sinking Fund at par plus accrued interest.

During fiscal year 2000, the Authority issued the Transportation Revenue Bonds (Series B) (Series B Bonds) and Transportation Revenue Refunding Bonds (Series C) (Series C Bonds). The bond proceeds of Series B were used to finance or refinance a portion of the costs of Tren Urbano and various highway projects included in the Authority's Priorities Construction Program, including the payment of a portion of $420,566,000 principal amount of notes issued to finance such costs initially held by GDB, make a deposit to the 1998 Senior Bond Reserve Account, and pay costs of issuance of the Series B Bonds. The bond proceeds of Series C were used to cancel $17,785,000 aggregate principal amount of the Authority's Transportation Revenue Bonds (Series A) due on July 1, 2038 bearing interest at 4.75%, to make a deposit to the 1998 Senior Bond Reserve Account and to pay for the costs of issuance of the Series C Bonds.

CONFIDENTIAL

HTA_STAY0056185

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**4. Bonds Payable (continued)**

A summary of the net proceeds of the Series B Bonds and Series C Bonds (collectively, the 2000 Bonds) and application of the proceeds follows:

|  | Series B | Series C |
|---|---|---|
| Principal amount | $560,805,000 | $14,880,000 |
| Plus: |  |  |
| Accrued interest | 2,096,505 | 57,040 |
| Less: |  |  |
| Underwriters' discount | 4,324,228 | 105,735 |
| Original issue discount | 10,807,840 | 340,752 |
| Net proceeds | $547,769,437 | $14,490,553 |
| Application of net proceeds: |  |  |
| GDB line of credit repayment | $150,566,000 | $ - |
| Deposit to construction fund | 354,458,273 | - |
| Purchase price of defeased bonds | - | 14,311,896 |
| Deposit to 1998 Senior Bond Reserve Account | 37,260,818 | 98,380 |
| Cost of issuance | 1,102,841 | 23,237 |
| Insurance premium | 2,285,000 | - |
| Accrued interest | 2,096,505 | 57,040 |
| Total | $547,769,437 | $14,490,553 |

A summary of the 2000 Bonds issued during fiscal year 2000 follows:

| | |
|---|---|
| Term Bonds: | |
| Various Fixed Rate | $386,625,000 |
| Serial Bonds: | |
| Various Fixed Rate | 189,060,000 |
| Total | $575,685,000 |

The Fixed Rate Serial Bonds (Series B) bear interest rates from 4.65% to 6.50% and mature from 2001 to 2027. The Series C Bonds bear interest rate of 6.00% and mature on 2029, and the Fixed Rate Term Bonds (Series B) bear interest from 5.875% to 6.00% and mature from 2026 to 2039. Interest on the 2000 Bonds is payable on each January 1 and July 1.

I-24

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**4. Bonds Payable (continued)**

The 2000 Bonds maturing after July 1, 2010, other than the 2000 Bonds maturing on July 1, 2026, may be redeemed on or after July 1, 2010 at the option of the Authority from any available moneys (other than moneys deposited in the 1998 Senior Bond Sinking Fund in respect of an Amortization Requirement) on any date either in whole or in part (in such order of maturities as the Authority may direct) at the following prices (expressed as percentages of the principal amount) plus accrued interest to the redemption date:

| **Period During Which Redeemed** | **Redemption Price** |
| --- | --- |
| July 1, 2010 through June 30, 2011 | 101% |
| July 1, 2011 and thereafter | 100% |

The 2000 Bonds maturing on July 1, 2026 may be redeemed on or after July 1, 2005 at the option of the Authority from any available moneys (other than moneys deposited in the 1998 Senior Bond Sinking Fund in respect of an Amortization Requirement) on any date either in whole or in part at the following prices (expressed as percentages of the principal amount) plus accrued interest to the redemption date:

| **Period During Which Redeemed** | **Redemption Price** |
| --- | --- |
| July 1, 2005 through June 30, 2006 | 101% |
| July 1, 2006 and thereafter | 100% |

During fiscal year 1999, the Authority issued the Subordinated Transportation Revenue Bonds (Series 1998) (Puerto Rico State Infrastructure Bank (SIB)) (the 1998 Subordinated Bonds). The bond proceeds were used to finance or refinance a portion of the costs of construction facilities included in the Authority's current Priorities Construction Program that are eligible for financial assistance under U.S. legislation.

A summary of the net proceeds of the 1998 Subordinated Bonds and application of the proceeds follows:

| | |
| --- | --- |
| Principal amount of 1998 Subordinated Bonds | $75,050,000 |
| Less: | |
| Cost of issuance, including underwriters' discount | 1,083,802 |
| Original issue discount | 1,006,198 |
| Net proceeds | $72,960,000 |
| Application of net proceeds: | |
| Deposit to construction fund | $72,960,000 |

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**4.  Bonds Payable (continued)**

A summary of the 1998 Subordinated Bonds issued during fiscal year 1999 follows:

| | |
|---|---|
| Term Bonds:<br>Fixed Rate | $58,060,000 |
| Serial Bonds | 16,990,000 |
| | $75,050,000 |

The Fixed Rate Term Bonds bear interest at 5% and mature from 2018 to 2028.  The Serial Bonds bear interest at 5.25% and mature from 2008 to 2014.  Interest on the Term Bonds and Serial Bonds is payable on each January 1 and July 1.

The principal of and interest on the 1998 Subordinated Bonds maturing on July 1 of the years 2008 through 2014 and 2018 are insured by a municipal bond insurance policy issued by MBIA Insurance Corporation.

The 1998 Subordinated Bonds maturing after July 1, 2008 may be redeemed on or after July 1, 2008, in whole or in part, at the option of the Authority at the following prices (expressed as percentages of the principal amount) plus accrued interest to the redemption date:

| Redemption Date | Redemption Price |
|---|---|
| July 1, 2008 | 101% |
| January 1, 2009 | 100-3/4% |
| July 1, 2009 | 100-1/2% |
| January 1, 2010 | 100-1/4% |
| July 1, 2010 and thereafter | 100% |

During fiscal year 1998, the Authority issued the Senior Transportation Revenue Bonds Series A (the Series A Bonds).  A summary of the Series A Bonds issued during fiscal year 1998 follows:

| | |
|---|---|
| Term Bonds:<br>Fixed Rate | $  618,045,000 |
| Variable Rate | 200,000,000 |
| | 818,045,000 |
| Serial Bonds | 271,730,000 |
| Capital Appreciation Bonds | 39,868,740 |
| | $1,129,643,740 |

I-26

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**4.  Bonds Payable (continued)**

The Fixed Rate Term Bonds bear interest rates of 4.75% to 5% and mature from 2028 to 2038. The Variable Rate Term Bonds mature on July 1, 2028. In connection with the issuance of the Variable Rate Term Bonds, on March 19, 1998, the Authority entered into an Interest Rate Swap Agreement expiring on July 1, 2028. Under the terms of the Swap Agreement the Authority will pay a fixed interest rate of 4.7075%. The Serial Bonds bear interest rates of 3.9% to 5.5% and mature from 1999 to 2014. The Capital Appreciation Bonds (CAPS) bear interest rates of 4.95% to 5.075% and mature from 2015 to 2018. Interest on the Term Bonds and Serial Bonds are payable on each January 1 and July 1. Interest on CAPS are payable at maturity in amounts equal to the original principal amounts of such bonds plus interest from their issue dates, compounded semi-annually. The maturity values for the CAPS will be $101,000,000. As of June 30, 2002, the outstanding accreted value of the CAPS is approximately $49,300,000.

The principal of and interest on the Series A Bonds maturing on July 1 of the years 2004 through 2028 are insured by a municipal bond insurance policy issued by Ambac Assurance Corporation.

The Series A Term Bonds maturing on July 1, 2028 and issued in the original principal amount of $114,360,000 and the bonds maturing on July 1, 2038 and issued in the original principal amount of $250,000,000 at the time outstanding may be redeemed on or after July 1, 2008, in whole or in part, at the option of the Authority at the following prices (expressed as percentages of the principal amount) plus accrued interest to the redemption date:

| Period during which redeemed | Redemption Price |
|---|---|
| July 1, 2008 through June 30, 2009 | 101% |
| July 1, 2009 through June 30, 2010 | 100-1/2% |
| July 1, 2010 and thereafter | 100% |

The Series A Term Bonds maturing on July 1, 2038 in the original principal amount of $253,685,000 at the time outstanding may be redeemed on or after July 1, 2018, in whole or in part, at the option of the Authority at a redemption price equal to the principal amount thereof plus accrued interest to the redemption date, without premium.

CONFIDENTIAL

HTA_STAY0056189

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**4. Bonds Payable (continued)**

After the interest rate on the Variable Rate Term Bonds has been converted to a fixed rate to maturity, they may be redeemed prior to their maturity at the option of the Authority at the following prices (expressed as percentages of the principal amount) plus accrued interest to the redemption date for the periods indicated:

| Original Length of Fixed Rate Period (Years) | Commencement Of Redemption Period | Redemption Price |
|---|---|---|
| More than 12 years | July 1, 2007 | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 10 years but not more than 12 years | July 1, 2005 | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter100% |
| More than 8 years but not more than 10 year | July 1, 2003 | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 6 years but not more than 8 years | July 1, 2001 | 101.5% declining by 0.5% on each succeeding July 1 until reaching 100% and thereafter 100% |
| More than 4 years but not more than 6 years | July 1, 2000 | 101.5% declining by 0.5% on each succeeding July 1 until reaching reaching 100% and thereafter |
| More than 3 years but not more than 4 years | July 1, 2000 | 100.5% declining to 100% on next July 1 and thereafter 100% |

During fiscal year 1996, the Authority issued the Highway Revenue Refunding Bonds (Series Y) (the Series Y Bonds) and Highway Revenue Bonds (Series Z) (the Series Z Bonds). A portion of the Series Y term bonds amounting to $67,300,000 were issued as Cap RITES. The Cap RITES Bonds will accrue interest from the date of the initial delivery through July 1, 1999 (the Scheduled Conversion Date) at a rate equal to 5.73% per annum (the Set Rate) plus the amount, if positive, obtained by subtracting 4.5% (the Level Rate) from the Variable Rate, subject to the application of the Maximum Cap RITES Rate of 11.48% per annum (the Maximum Cap RITES Rate) and thereafter at 6.25% per annum (the Constant Rate). Owners of the Cap RITES Bonds may elect on any business day prior to the applicable Scheduled Conversion Date to convert the interest to the Constant Rate.

I-28

HTA_STAY0056190

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 4. Bonds Payable (continued)

The principal of and interest on the Series Y Bonds maturing between the years 2001 through 2009, 2011 and 2012 and the principal and interest of the Series Z Bonds maturing between 2001 and 2015 are insured by a municipal bond insurance policy issued by MBIA Insurance Corporation. The principal and interest on the Series Y Bonds maturing in the years 2015, 2016 and 2021 and the principal and interest on the Series Z Bonds maturing in 2016 and 2018 are insured by a municipal bond insurance policy issued by Financial Security Assurance Inc.

The Series Y Bonds at the time outstanding maturing after July 1, 2014, other than the bonds maturing July 1, 2021 and 2036, may be redeemed on or after July 1, 2006, in whole or in part, at the option of the Authority at the following prices (expressed as percentages of the principal amount):

| Period during which redeemed | Redemption Price |
|---|---|
| July 1, 2006 through June 30, 2007 | 101-1/2% |
| July 1, 2007 through June 30, 2008 | 100-3/4% |
| July 1, 2008 and thereafter | 100% |

The Series Y Bonds maturing July 1, 2036 may be redeemed on or after July 1, 2016, in whole or in part, at the option of the Authority at a redemption price equal to the principal amount, plus accrued interest, without premium. The Series Z Bonds are not subject to optional redemption.

During fiscal year 1994, the Authority issued the Highway Revenue Refunding Bonds (Series W) (the Series W Bonds) and Highway Revenue Bonds (Series X) (the Series X Bonds) and entered into an Interest Swap Agreement (the Swap Agreement). Under the terms of the Swap Agreement, which expired on July 1, 1999, the Authority paid fixed interest rates on $101,730,000 of the Series X Bonds at rates ranging from 2.8% to 3.769%.

A portion of the Series W Bonds were delivered as Multiple Component Securities (MCS) which allow the investors to receive the separate payments of all or a portion of the principal and interest on fixed coupon bonds. Potential MCS components include principal only, interest only, floating rate, inverse floating rate, and combinations thereof. Regardless of the combination on any MCS, the Authority will pay a Linked Fixed Rate of 9%.

A portion of the Series W Bonds and the Series X Bonds (collectively, the 1993 Bonds) were issued as Residual Interest Tax-Exempt (RITES) and as Floating Auction Tax-Exempt (FLOATs) Securities. FLOAT/RITES are variable securities consisting of a dutch-auction based floater (FLOATs) and a companion inverse floater (RITES) that together produced fixed-rate interest payments for the Authority ranging from 5.20% to 5.55%.

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**4. Bonds Payable (continued)**

The 1993 Bonds, other than the MCS, the FLOAT/RITES, and Series X the bonds maturing on
July 1, 2013 and 2015, may be redeemed on or after July 1, 2003 at the option of the Authority at
the following prices (expressed as percentages of the principal amount):

| Period during which redeemed | Redemption Price |
|---|---|
| July 1, 2003 through June 30, 2004 | 101-1/2% |
| July 1, 2004 through June 30, 2005 | 100-3/4% |
| July 1, 2005 and thereafter | 100% |

The FLOATS may be redeemed on or after July 1, 2003 at the option of the Authority at a
redemption price equal to the principal amount, plus accrued interest, without premium.

The RITES may be redeemed on or after July 1, 2003 at the option of the Authority at the
following prices (expressed as percentages of the principal amount):

| Period during which redeemed | Redemption Price |
|---|---|
| July 1, 2003 through June 30, 2004 | 103% |
| July 1, 2004 through June 30, 2005 | 101-1/2% |
| July 1, 2005 and thereafter | 100% |

Changes in term and serial bonds during fiscal year 2002, were as follows:

| | Outstanding Beginning-of-Year (at face value) | Issued | Refunded | Redeemed | Outstanding End-of-Year (at face value) |
|---|---|---|---|---|---|
| Term | $2,668,830,000 | $ 700,855,000 | $330,225,000 | $ - | $3,039,460,000 |
| Serial | 1,188,735,000 | 403,020,000 | 82,180,000 | 76,630,000 | 1,432,945,000 |
| CAPS | 46,927,049 | 2,383,268 | - | - | 49,310,317 |
| | $3,904,492,049 | $1,106,258,268 | $412,405,000 | $76,630,000 | 4,521,715,317 |

|  |  |
|---|---|
| Less unamortized discount, net of premium | 31,231,653 |
| Less net deferred debit of refundings | 8,068,600 |
| | 4,482,415,064 |
| Bonds payable due on July 1, 2002 | 81,925,000 |
| | $4,400,490,064 |

I-30

CONFIDENTIAL                                                        HTA_STAY0056192

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**4. Bonds Payable (continued)**

The outstanding revenue bonds as of June 30, 2002 require future payments of principal and interest as follows:

| Year ending June 30 | Principal | Interest | Total |
|---|---|---|---|
| Due on July 1, 2002 | $    81,925,000 | $                    - | $    81,925,000 |
| 2003 | 69,425,000 | 234,745,117 | 304,170,117 |
| 2004 | 83,290,000 | 231,228,792 | 314,518,792 |
| 2005 | 87,810,000 | 226,751,837 | 314,561,837 |
| 2006 | 80,640,000 | 221,993,848 | 302,633,848 |
| 2007 | 84,815,000 | 217,785,236 | 302,600,236 |
| Thereafter | 4,033,810,317 | 3,693,001,551 | 7,726,811,868 |
| | $4,521,715,317 | $4,825,506,381 | $9,347,221,698 |

The Highway Revenue Bonds issued under Resolution 68-18 are secured by a pledge of the gross receipts of the gasoline excise taxes and one half of the gas oil and diesel oil excise taxes, $15 per vehicle per year from certain motor vehicle license fees, proceeds of any tolls or other charges which the Authority may impose for the use of certain of its traffic facilities financed with Highway Revenue Bonds and certain investment earnings.

The Transportation Revenue Bonds issued under Resolution 98-06 are secured by a pledge of petroleum products excise taxes up to $120 million per fiscal year, certain other toll revenues, revenues pledged to secure the Highway Revenues Bonds to the extent not necessary to pay such bonds and certain investment earnings. The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle license fees allocated to the Authority are available taxes and revenues under the Constitution of the Commonwealth of Puerto Rico. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth but such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose. The Commonwealth has not applied these revenues for such payments.

CONFIDENTIAL

HTA_STAY0056193

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

### 4. Bonds Payable (continued)

Each Bond Resolution further provide that receipts of pledged revenues (other than investment earnings) be deposited with the Fiscal Agent to the credit of the following accounts in the following order:

Resolution 68-18:

A. To the Bond Service Account in an amount equal to 1/6th of the amount of interest payable on all bonds of each series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of any serial bonds. In the case of variable rate bonds, the actual interest on such bonds is deposited monthly with the Fiscal Agent.

B. To the Redemption Account in an amount equal to 1/12th of the amortization requirement (as defined in Resolution 68-18) for such fiscal year for the term bonds of each series then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Sinking Fund.

C. To the Reserve Account in an amount equal to the lesser of the maximum principal and interest requirements (as defined in Resolution 68-18) for any fiscal year on all outstanding bonds and 10% of the original principal amount of each series of bonds outstanding, permit any increase in the reserve requirement to be funded over five years and allow the Authority to use a letter of credit or insurance policy to fund the reserve requirement. Excess funds in the Reserve Account can be transferred to the Construction Fund, the Bond Service Account or the Redemption Account, as determined from time to time by the Authority.

If funds in the Reserve Account are used to cover any deficiency in the Bond Service Account or the Redemption Account established under the Resolution, the law of Puerto Rico provides that the Reserve Account shall be reimbursed, subject to the provisions of the Constitution of the Commonwealth relating to payment of Commonwealth debt, from the first proceeds received by the Commonwealth in the next fiscal year or years derived from (i) any other taxes which may then be in effect on any other fuels or propellants which are used, among other purposes, to propel highway vehicles, and (ii) any remaining portion of the tax on gasoline and gas oil and diesel oil then in effect.

I-32

HTA_STAY0056194

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

### 4. Bonds Payable (continued)

Resolution 98-06:

D. Under Resolution No. 98-06, virtually identical monthly deposits of pledged revenues to those specified in the paragraphs A through C above are made into the Senior Bond Service Accounts, the Senior Bond Redemption Account and the Senior Bond Reserve Account in respect of the Transportation Revenue Bonds. After making the required deposits specified in the preceding sentence, remaining pledged revenues shall be deposited to the Subordinated Bond Service Account in an amount equal to 1/6th of the amount of interest payable on all subordinate bonds of each series on the next succeeding interest payment date and an amount equal to 1/12th of the next maturing installment of any serial subordinated bonds.

F. To the Subordinated Redemption Account in an amount equal to 1/12th of the amortization requirement (as defined in Resolution 98-06) for such fiscal year for the term bonds of each series of subordinated bonds then outstanding plus an amount equal to 1/12th of the premium, if any, which would be payable on the first redemption date in the following fiscal year on a like principal amount of bonds if such principal amount of bonds should be redeemed prior to their maturity from moneys in the Subordinated Sinking Fund.

E. To the Subordinated Reserve Account in an amount, if any, equal to any balance remaining after making the deposits described in paragraphs D. to E. above, at least equal to the respective deposit requirements corresponding to each such account established by the Authority; provided, however, that no such deposits to any such account shall be made in any month if the amount then to the credit of such account shall be equal to the applicable Subordinated Reserve requirement (as defined in Resolution 98-06); and provided, further, that notwithstanding the above, in the event that any Subordinated Reserve requirement shall have increased on account of the issuance of additional series of subordinated bonds, the Authority may provide for equal annual deposits and will ensure that the applicable Subordinated Reserve requirement be met not earlier than the end of a five year period following the issuance of such series of subordinated bonds.

H. Any revenues remaining after making the deposits referred to above shall be deposited in the Construction Fund for use by the Authority for any of its authorized purposes.

Under Resolution No. 68-18 the requirements specified in paragraphs A., B. and C. above are cumulative. Under Resolution No. 98-06 requirements from D. to F. are cumulative.

The Authority further covenants that any other funds which it receives from the Commonwealth or any other source to make up any deficiencies in the amounts needed to pay the principal of and interest on any bonds issued under the provisions of the Bond Resolutions will be applied first to any Resolution 68-18 bonds, then to the Senior Transportation Revenue Bonds and then to the Subordinated Transportation Revenue Bonds under Resolution 98-06.

I-33

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 4.  Bonds Payable (continued)

Nothing in the Bond Resolutions is to be construed as preventing the Authority from financing any facilities authorized by the Act that created the Authority, as amended, through the issuance of bonds or other obligations which are not secured under the provisions of the Bond Resolutions.

No bonds may be issued under resolution 68-18 for the purpose of obtaining new funding. Additional bonds may be issued under Resolution 98-06 for the purpose of providing funds for completing payment of the cost of any traffic facilities, including Tren Urbano, or for paying all or any part of the cost of any additional traffic facilities, including the payment of any outstanding notes of the Authority which were issued to temporarily finance the costs of the traffic facilities for which such bonds are to be issued.  Additional bonds may be issued under both Bond Resolutions for refunding at or prior to their maturity or maturities all of the outstanding bonds of any series, or a portion thereof.  However, the Authority must comply with certain requirements included in the Bond Resolutions related to revenues and maximum amounts of principal and interest prior to any additional bond issuance.

The outstanding balances as of June 30, 2002 of the bond issues defeased by the Authority are as follows:

| | |
|---|---|
| Series B | $286,765,000 |
| Series S | 140,000,000 |
| Series T | 285,000,000 |
| Series V | 125,640,000 |
| Series Y | 20,000,000 |
| Total outstanding defeased Bond issues | $857,405,000 |

As of June 30, 2002, the Statement of Net Assets reflects a net deferred debit of approximately $8,100,000 as a component of debt resulting from accounting losses or gains from the defeasance of debt. The Statement of Revenues, Expenses and Changes in Net Assets reflects the amortization of this deferral as a component of interest expense of approximately $5,800,000.

## 5.  Credit Agreement

On August 4, 2000, the Authority entered into a loan agreement of $300,000,000 with FTA pursuant to the Transportation Infrastructure Finance and Innovation Act, as amended.  The proceeds of the loan were used to cancel the outstanding balance of a line of credit amounting to $269,999,583 with GDB in connection with the Tren Urbano project.  The loan has a fixed interest rate of 5.74%.  Interest is payable each July 1 and January 1 beginning January 1, 2001 and principal is payable each July 1, beginning July 1, 2007. The loan matures on July 1, 2035.

I-34

CONFIDENTIAL

HTA_STAY0056196

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 6. Changes in Amounts Invested in Capital Assets, Net of Related Debt

The change in amounts invested in capital assets, net of related debt can be summarized as follows:

| | |
|---|---|
| Balance at the beginning of the year | $7,442,222,069 |
| Change in capital assets | 322,203,847 |
| Change in related debt | (595,317,725) |
| Balance at the end of the year | $7,169,108,191 |

## 7. Retirement Plan

The Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities (ERS) is a cost-sharing multiple-employer defined benefit pension plan sponsored by, and reported as a component unit of, the Commonwealth of Puerto Rico. All regular employees of the Authority under age 55, at the date of employment, become members of the System as a condition of their employment.

The System provides retirement, death and disability benefits pursuant to Act 447, approved on May 15, 1951, as amended, which became effective on January 1, 1952. Retirement benefits depend upon age at retirement and number of years of credited service. Benefits vest after ten years of plan participation, except for participation in System 2000 (see page 36) whose benefits vest immediately.

Participants who have attained an age of at least fifty-five (55) years and have completed at least twenty-five (25) years of creditable service or members who have attained an age of at least fifty-eight (58) years and have completed at least ten (10) years of creditable service or at age 65 with 10 years of service if hired after April, 1990, are entitled to an annual benefit, payable monthly for life.

The annuity, for which a plan member is eligible, is limited to a minimum of $200 per month and a maximum of 75% of average compensation.

Participants who have completed at least thirty years of creditable service are entitled to receive the Merit Annuity. Participants who have not attained fifty-five (55) years of age will receive 65% of the average compensation. Participants who have attained fifty-five (55) years of age will receive 75% of the average compensation. Disability retirement benefits are available to members for occupational and non-occupational disability. However, for non-occupational disability a member must have at least ten (10) years of service.

No benefit is payable if the participant receives a refund of his accumulated contributions.

I-35

CONFIDENTIAL

HTA_STAY0056197

# Puerto Rico Highway and Transportation Authority

## Notes to Financial Statements (continued)

### 7. Retirement Plan (continued)

Commonwealth Law Number 447 of 1951, as amended, requires employees hired on or before March 31, 1990 to contribute 5.775 percent for the first $550 of their monthly gross salary and 8.275 percent for the salary in excess of $550. The contribution for employees hired after April 1, 1990 is 8.275 percent of their gross salary. The Authority is required to contribute 9.275 percent of the participants' gross salaries. The contribution requirement for the year ended June 30, 2002 was approximately $8,498,000, which consisted of approximately $4,547,000 from the Authority and $3,951,000 from employees. The payroll for employees covered by the System for the year ended June 30, 2002 was approximately $47,030,000 and the Authority's total payroll cost was approximately $73,447,000. For the two preceding fiscal years the Authority contributed $4,330,000 and $4,357,000, respectively, which represented all required contributions.

Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. Disability pensions are not being granted under System 2000. The employers' contributions (9.275% of the employee's salary) will be used to fund the current plan.

System 2000 will reduce the retirement age from 65 years to 60 for those employees who joined the current plan on or after April 1, 1990.

Additional information on the System is provided in its financial statements for the year ended June 30, 1998, a copy of which can be obtained from Mrs. Marisol Marchand, Administrator, Employees' Retirement System of the Government of Puerto Rico and its Instrumentalities, PO Box 42003 Minillas Station, Santurce, P.R. 00940.

The Authority has a labor union contract that provides all union employees who work for the Authority upon retirement with the following lump-sum bonus payable at the retirement date computed as follows:

| Years worked | Amount |
|---|---|
| 10-15 years | $140 per year of service |
| 16-20 | $170 per year of service |
| 21-25 | $185 per year of service |
| 26-30 | $195 per year of service |

In addition, management employees have similar benefits under the same conditions granted to labor union personnel, as follows:

| Years worked | Amount |
|---|---|
| 10-15 years | $150 per year of service |
| 16-20 | $180 per year of service |
| 21-25 | $200 per year of service |
| 26-30 | $220 per year of service |

CONFIDENTIAL

HTA_STAY0056198

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

## 8. Commitments and Contingent Liabilities

### Construction

As of June 30, 2002, the Authority had commitments for approximately $1,006,000,000 related to construction contracts.

### Leases

The Authority has various noncancellable operating leases for office space with the Puerto Rico Public Buildings Authority and other lessors, the latest of which expires in 2025.  The rental expenses for the year ended June 30, 2002 was approximately $1,573,000.   Future rental payments as of June 30, 2002 under these leases are as follows:

| | |
|---|---:|
| 2003 | $1,381,950 |
| 2004 | 1,311,150 |
| 2005 | 76,300 |
| 2006 | 68,320 |
| 2007 | 69,724 |
| Thereafter | 1,337,700 |
| Total future rental payments required | $4,245,144 |

### Litigation

The Authority is defendant or co-defendant in various lawsuits for alleged damages. Substantially all of these cases are in connection with construction projects, which are generally either fully or partially covered by insurance.  The contractors are required, under the terms of the construction agreements, to carry adequate public liability insurance and to hold harmless the Authority from lawsuits brought on account of damages relating to the construction of the projects.

The Authority, based on legal advice, has recorded an adequate provision to cover probable losses on those claims not fully covered by insurance.  In the opinion of legal counsel, any liability in excess of the insurance coverage and/or the recorded provision that may arise from such claims would not be significant to affect to the Authority's financial position or results of operations.

CONFIDENTIAL                                                                                 HTA_STAY0056199

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**8.   Commitments and Contingent Liabilities (continued)**

**Special Revenue Facility Bonds**

In March 1992, the Authority issued Special Facility Revenue Bonds amounting to approximately $117 million for the purpose of facilitating the construction of a toll bridge, which traverses the San Jose Lagoon between the municipalities of San Juan and Carolina.

The proceeds from the sale of the bonds were transferred by the Authority to Autopistas de Puerto Rico y Compañía S.E. (the Borrower) pursuant to a loan agreement by and between the Borrower and the Authority.

The Authority and the Borrower entered into a build/transfer/operate concession agreement for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge (the Bridge). The initial term of this agreement is 35 years. Under certain circumstances, the Concession Agreement may be terminated and the Authority is then to assume all of the Borrower's obligations of the principal of and interest on the Bonds, which pursuant to the Loan Agreement will be paid from the proceeds of the use and operation of the Bridge. The Authority does not currently expect to terminate the Concession Agreement. The outstanding debt (including accrued interest) and the sinking fund balances at June 30, 2002 amounted to approximately $138,444,000 and $4,326,000, respectively.

**Metrobus**

In connection with the responsibilities of the Authority for mass transportation systems, the Metrobus project was developed. The project consists of bus operations, which are conducted by a private company under an agreement expiring in June 2003.

The contract for the operation of the Metrobus Project provides for fixed payments to the operator. Operators' compensation is based on monthly payments amounting to one-twelfth of the total annual operating costs. Toll fares, which are retained by the operator, are reduced from such payments based on toll fare estimates. In addition, the Operator has various incentive fees for meeting or exceeding various performance standards.

**Federal Assistance Programs**

The Authority participates in a number of federal financial assistance programs. These programs are subject to audits in accordance with the provisions of OMB Circular A-133 "Audits of States, Local Governments, and Non-Profit Organizations" or to compliance audits by grantor agencies. The resolution of certain previously identified questioned costs has not occurred. The amount, if any, of expenditures which may be disallowed by the granting agencies cannot be determined at this time, although the Authority expects such amounts, if any, to be immaterial.

CONFIDENTIAL

Puerto Rico Highway and Transportation Authority

Notes to Financial Statements (continued)

**8.   Commitments and Contingent Liabilities (continued)**

**Tren Urbano Project Claims**

As part of the Authority's Tren Urbano project, a number of contractors have presented claims related to the project. Claims which are at various stages of analysis to reach a final resolution amount to approximately $60,000,000 as of June 30, 2002.

From this amount, approximately $24,000,000 has been categorized as merited claims. Therefore, these amounts were included as accounts payable.  The effect of the resolution of these claims, if any, in future years would be to increase the amounts being capitalized for the Tren Urbano project and increase the accounts payable in the accompanying Statement of Net Assets.

CONFIDENTIAL

HTA_STAY0056201

Puerto Rico Highway and Transportation Authority

Combined Statement of Revenues, Expenditures
and Changes in Fund Balance

Budget and Actual - All Governmental Fund Types (Budgetary Basis)

Year ended June 30, 2002

| | Budget (Cash Basis) | Actual (Cash Basis) | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **Revenues:** | | | |
| Excise taxes and vehicle license fees | $ 354,200,000 | $ 344,425,170 | $ (9,774,830) |
| Toll fares | 131,800,000 | 130,498,021 | (1,301,979) |
| Grants: | | | |
| Federal Government | 150,000,000 | 202,741,714 | 52,741,714 |
| Commonwealth of Puerto Rico, municipalities and other | 5,000,000 | 1,155 | (4,998,845) |
| Interest and other revenue | 20,000,000 | 29,095,483 | 9,095,483 |
| Total revenues | 661,000,000 | 706,761,543 | 45,761,543 |
| **Other financing sources:** | | | |
| Bond issuance | 301,300,000 | 1,129,864,057 | 828,564,057 |
| Proceeds from Line of Credit | - | 259,212,141 | 259,212,141 |
| Total revenues and other financings sources | 962,300,000 | 2,095,837,741 | 1,133,537,741 |
| **Expenditures:** | | | |
| Construction, equipment and administrative | 393,000,000 | 394,778,717 | (1,778,717) |
| Toll highways administration and Metrobus | 51,800,000 | 55,757,123 | (3,957,123) |
| Redemption of bonds: Serial and term | - | 494,435,000 | (494,435,000) |
| Interest | 445,000,000 | 211,356,386 | 233,643,614 |
| Advances to Department of Transportation and Public Works | 5,000,000 | 6,901,561 | (1,901,561) |
| Transfers to proprietary fund | 267,000,000 | 144,761,763 | 122,238,237 |
| Total expenditures | 1,161,800,000 | 1,307,990,550 | (146,190,550) |
| Excess (deficiency) of revenues and other financing sources over/under expenditures | (199,500,000) | 787,847,191 | $ 987,347,191 |
| Funds carried forward from prior year | 199,500,000 | - | |
| Fund balance at beginning of year | - | 639,509,537 | |
| Fund balance at end of year | $ - | $ 1,427,356,728 | |

I-40

Adjustments necessary to convert the revenues and expenses and fund balances at end-of-year from GAAP basis to the budgetary basis are as follows (in thousands):

|  | Revenues | Excess of Revenues over Expenses |
|---|---|---|
| **GAAP Basis** | $714,589,257 | $ 274,773,241 |
| **Adjustment:** | | |
| Accounts receivable, accrued interest and other | (3,671,442) | (3,671,442) |
| Account payable and accrued liabilities | - | 35,030,635 |
| Increase in fair value of investments | (4,156,272) | (4,156,272) |
| Proceeds from bond issuance | - | 1,129,864,057 |
| Proceeds from lines of credit | - | 259,212,141 |
| Construction costs capitalized on GAAP basis | - | (382,247,189) |
| Toll highway administration and maintenance | - | (18,464,417) |
| Payment on redemption of bonds | - | (494,435,000) |
| Depreciation | - | 136,703,200 |
| Transfer to proprietary fund | - | (144,761,763) |
| **Per Combined Statement of Revenues, Expenditures and Changes in Fund Balances** - Budget and Actual | | |
| All Governmental Fund Types (Budgetary) | $706,761,543 | $ 787,847,191 |

I-41

HTA_STAY0056203

**Ernst & Young LLP**
1000 Scotiabank Plaza
273 Ponce de Leon Avenue
Hato Rey, Puerto Rico 00917-1989

Phone: (787) 759-8212
Fax:    (787) 753-0808
Fax:    (787) 753-0813
www.ey.com

## Report of Independent Auditors
## on Compliance and Internal Control
## Over Financial Reporting in Accordance
## with Government Auditing Standards

Hon. José M. Izquierdo Encarnación, Secretary
Commonwealth of Puerto Rico
Department of Transportation and Public Works

We have audited the financial statements of Puerto Rico Highway and Transportation Authority
(the Authority) as of and for the year ended June 30, 2002, and have issued our report thereon
dated September 27, 2002. We conducted our audit in accordance with auditing standards
generally accepted in the United States and the standards applicable to financial audits contained
in *Government Auditing Standards,* issued by the Comptroller General of the United States.

Compliance

As part of obtaining reasonable assurance about whether the Authority's financial statements are
free of material misstatement, we performed tests of its compliance with certain provisions of
laws, regulations, contracts and grants, noncompliance with which could have a direct and
material effect on the determination of financial statement amounts. However, providing an
opinion on compliance with those provisions was not an objective of our audit and, accordingly,
we do not express such an opinion. The results of our tests disclosed no instances of
noncompliance that are required to be reported under *Government Auditing Standards.*

Internal Control Over Financial Reporting

In planning and performing our audit, we considered the Authority's internal control over
financial reporting in order to determine our auditing procedures for the purpose of expressing
our opinion on the financial statements and not to provide assurance on the internal control over
financial reporting. Our consideration of the internal control over financial reporting would not
necessarily disclose all matters in the internal control over financial reporting that might be
material weaknesses. A material weakness is a condition in which the design or operation of one
or more of the internal control components does not reduce to a relatively low level the risk that
misstatements in amounts that would be material in relation to the financial statements being
audited may occur and not be detected within a timely period by employees in the normal course
of performing their assigned functions. We noted no matters involving the internal control over
financial reporting and its operation that we consider to be material weaknesses. However, we

CONFIDENTIAL

HTA_STAY0056204

noted other matters involving the internal control over financial reporting that we have reported to management of the Authority in a separate letter dated September 27, 2002.

This report is intended solely for the information and use of the Authority's management, the U.S. Department of Transportation and pass-through entities and is not intended to be and should not be used by anyone other than these specified parties.

*Ernst & Young LLP*

September 27, 2002

Stamp No. 1842255
affixed to original
of this report.

I-43

[This page intentionally left blank]

CONFIDENTIAL

APPENDIX II

# JORGENSEN
### Roy Jorgensen Associates, Inc.

## Corporate Offices

*April 10, 2003*

3735 Buckeystown Pike
Post Office Box 70
Buckeystown, MD 21717-0070

Dr. Jack T. Allison, Executive Director
Puerto Rico Highways and Transportation Authority
P.O. Box 42007
San Juan, Puerto Rico 00940-2007

Telephone: 1-301-831-1000

Dear Dr. Allison:

    This letter summarizes the results of our evaluation of the level of maintenance of the Puerto Rico Highway and Transportation Authority's Traffic Facilities and our review of the Construction Improvement Program.  Our study was conducted in accordance with Resolution No. 68-18, adopted June 13, 1968, as amended, and Resolution No. 98-06, adopted February 26, 1998.   Results of the study are documented in our Final Report, entitled "Maintenance Evaluation and Program Review – 2001-2002", dated July 2002.

Based on our field inspections, we find that the overall level of maintenance has generally been adequate to preserve the investment and provide an acceptable level of service to road users. Maintenance work methods and levels of service have been in general conformance to widely accepted maintenance practices in transportation and public works agencies in North America.

We have reviewed the 5-year Construction Improvement Program for Fiscal Years 2003-2007. In our opinion, the program is a reasonable response to the immediate and short-term transportation needs of the Commonwealth and is generally consistent with the Authority's long-range transportation master plan.  Funding for the program appears to be adequate, based on revenue projections that have been reasonably accurate in the past and provide a sound basis for determining the size of future programs.

Please let us know if you need any additional information.

Sincerely,

*William C Grenke*

William C. Grenke
Senior Consultant

II-1

HTA_STAY0056207

[This page intentionally left blank]

CONFIDENTIAL

[Proposed Form of Opinions of Bond Counsel]     APPENDIX III

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| CHICAGO | 787 SEVENTH AVENUE | BEIJING |
| DALLAS | NEW YORK, NEW YORK 10019 | GENEVA |
| LOS ANGELES | TELEPHONE 212 839 5300 | HONG KONG |
| SAN FRANCISCO | FACSIMILE 212 839 5599 | LONDON |
| WASHINGTON, D.C. | www.sidley.com | SHANGHAI |
| | FOUNDED 1866 | SINGAPORE |
| | | TOKYO |

April __, 2003

Hon. Fernando E. Fagundo
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined (a) Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended ("Act No. 74"), creating Puerto Rico Highways and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico, (b) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended among other things by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") to the Authority for use for its corporate purposes, (c) the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (d) Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including Resolution No. 68-18, adopted on June 13, 1968, as amended (the "1968 Resolution"), with respect to the Highway Revenue Bonds (hereinafter mentioned), together with a resolution adopted on April 10, 2003, with respect to the Series AA Bonds described below (the "authorizing resolution") and other proofs submitted relative to the authorization, sale and issuance of

$717,365,000

**PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
HIGHWAY REVENUE REFUNDING BONDS
(SERIES AA)**

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption and to tender prior to maturity, all as set forth in the authorizing resolution.

We have also examined one of said Series AA Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.    Act No. 74, the Puerto Rico Internal Revenue Code of 1994, the Vehicle and Traffic Law of Puerto Rico and Reorganization Plan No. 6 of 1971 are valid.

2.    Said proceedings have been validly and legally taken.

3.    Said Series AA Bonds have been duly authorized and issued to refund a portion of the outstanding bonds of the Authority issued under the 1968 Resolution.

4.    The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds"). The 1968 Resolution provides for the issuance of additional bonds under the conditions and limitations therein set forth, and the Authority has covenanted in Resolution No. 98-06, adopted on February 26, 1998, as amended (the "1998 Resolution"), to limit the issuance of such additional bonds.

5.    Said Series AA Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1968 Resolution and designated "Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund". The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a sufficient amount of the Revenues (as defined in the 1968 Resolution), together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority for the payment of its bonds and pledged by the Authority to the payment of principal and interest on the Highway Revenue Bonds (including said Series AA Bonds) as the same may become due and payable and to create and maintain a reserve therefor. Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of and the interest on all such Highway Revenue Bonds (including said Series AA Bonds) issued by the Authority under the provisions of the 1968 Resolution.

The Allocated Gasoline Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the

III-2

Authority, are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose.

6. Said Series AA Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and said Series AA Bonds are payable only out of the Revenues and other moneys of or allocated to the Authority, to the extent provided in the 1968 Resolution.

7. Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to continuing compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the 1968 Resolution and the 1998 Resolution regarding the use, expenditure and investment of Series AA Bond proceeds (and the proceeds of certain other bonds of the Authority being issued on the date hereof under the 1998 Resolution) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on said Series AA Bonds is not includable in gross income for federal income tax purposes, and (ii) said Series AA Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.

Interest on said Series AA Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of said Series AA Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income. No opinion is expressed as to the effect of any action taken or not taken after the date of this opinion without our approval (except for such action or omission to act as is otherwise provided in the 1968 Resolution or in the authorizing resolution) or in reliance upon advice of counsel other than ourselves on the exclusion from gross income of the interest on said Series AA Bonds for federal income tax purposes.

The Authority has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on said Series AA Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the said Series AA Bonds. We are not aware of any provisions of the Constitution and laws of the Commonwealth of Puerto Rico which would prevent such compliance.

Respectfully submitted,

[To be signed, "Sidley Austin Brown & Wood LLP"]

III-3

HTA_STAY0056211

# SIDLEY AUSTIN BROWN & WOOD LLP

| | | |
|---|---|---|
| CHICAGO | 787 SEVENTH AVENUE | BEIJING |
| DALLAS | NEW YORK, NEW YORK 10019 | GENEVA |
| LOS ANGELES | TELEPHONE 212 839 5300 | HONG KONG |
| SAN FRANCISCO | FACSIMILE 212 839 5599 | LONDON |
| WASHINGTON, D.C. | www.sidley.com | SHANGHAI |
| | FOUNDED 1866 | SINGAPORE |
| | | TOKYO |

April __, 2003

Hon. Fernando E. Fagundo
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined (a) Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended ("Act No. 74"), creating Puerto Rico Highways and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico, (b) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended among other things by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated (1) the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") and (2) the proceeds (up to $120 million per fiscal year) of the tax imposed on crude oil, unfinished oil and derivative products (the "Allocated Crude Oil Tax Proceeds") to the Authority for use for its corporate purposes, (c) the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (d) Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including (I) Resolution No. 68-18, adopted on June 13, 1968, as amended (the "1968 Resolution"), with respect to the Highway Revenue Bonds (hereinafter mentioned), and (II) Resolution No. 98-06, adopted on February 26, 1998, as amended (the "1998 Resolution"), together with a resolution

III-4

HTA_STAY0056212

adopted on April 10, 2003, with respect to the Series G Bonds described below (the "authorizing resolution") and other proofs submitted relative to the authorization, sale and issuance of

## $563,650,000

## PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
## TRANSPORTATION REVENUE BONDS
## (SERIES G)

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption prior to maturity, all as set forth in the authorizing resolution.

We have also examined one of said Series G Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.      Act No. 74, the Puerto Rico Internal Revenue Code of 1994, the Vehicle and Traffic Law of Puerto Rico and Reorganization Plan No. 6 of 1971 are valid.

2.      Said proceedings have been validly and legally taken.

3.      Said Series G Bonds have been duly authorized and issued to pay the cost of constructing various highway and mass transit projects included in the Authority's current Construction Improvement Program and to make a deposit to the 1998 Senior Bond Reserve Account in the Interest and Sinking Fund hereinafter mentioned.

4.      The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds"). The 1968 Resolution provides for the issuance of additional Highway Revenue Bonds under the conditions and limitations therein set forth, and the Authority has covenanted in the 1998 Resolution to limit the issuance of such additional Highway Revenue Bonds.

5.      The 1998 Resolution provides for the issuance of additional bonds on a parity with said Series G Bonds under the conditions, limitations and restrictions therein set forth (said Series G Bonds and such additional parity bonds being herein called the "Senior Transportation Revenue Bonds") for any lawful purpose of the Authority and for the purpose of refunding any bonds issued by the Authority under the 1998 Resolution and any other obligations of the Authority, including outstanding Highway Revenue Bonds. In addition, the 1998 Resolution provides for the issuance of bonds subordinate to the Senior Transportation Revenue Bonds as to their lien on the revenues and other moneys of the Authority, as described below, under the conditions, limitations and restrictions and for the purposes set forth therein (the Senior Transportation Revenue Bonds and such bonds subordinate thereto being herein collectively called the "Transportation Revenue Bonds").

III-5

HTA_STAY0056213

6.      The 1998 Resolution provides for the creation of a special fund designated
"Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the
"Revenue Fund"), and, subject to the limitations of the next two paragraphs, for the deposit to
the credit of said special fund of all moneys received by the Authority (a) from the Allocated
Crude Oil Tax Proceeds, (b) from the Allocated Gasoline Tax Proceeds, (c) from the Allocated
Additional License Fees, (d) from any tolls or other charges imposed by the Authority for the use
of any Toll Facilities and (e) from the proceeds of any other taxes, fees or charges which the
Legislature of Puerto Rico may allocate to the Authority and expressly authorizes the Authority
to pledge to the payment of the principal of and interest on bonds or other obligations issued by
the Authority and which are pledged by the Authority to the payment of the principal of and
interest on Transportation Revenue Bonds issued under the provisions of the 1998 Resolution.

The Allocated Gasoline Tax Proceeds, the Allocated Crude Oil Tax Proceeds and the
Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of
Puerto Rico may allocate to the Authority, are subject to first being applied to the payment of
interest and amortization of the public debt in accordance with the provisions of, and to the
extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such
purpose.

The 1968 Resolution provides for the prior deposit to the credit of a special fund
designated "Puerto Rico Highways and Transportation Authority Construction Fund" (herein
called the "1968 Construction Fund") of the Allocated Gasoline Tax Revenues, the Allocated
Additional License Fees and all Existing Toll Facilities Revenues (as such term is defined in the
1998 Resolution), after the required deposits of such moneys have been made to the credit of the
Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and
Sinking Fund. In the 1998 Resolution, the Authority has covenanted (i) to withdraw monthly
from the 1968 Construction Fund and deposit to the credit of the Revenue Fund until the
outstanding Highway Revenue Bonds have been paid or provision has been made for their
payment and the repeal and cancellation of the 1968 Resolution, all unencumbered moneys held
to the credit of the 1968 Construction Fund and (ii) except for the foregoing withdrawal and any
encumbrances on the moneys in the 1968 Construction Fund existing on the date of adoption of
and as provided in the 1998 Resolution, not further to encumber or otherwise withdraw or pledge
any such available moneys in the 1968 Construction Fund.

7.      Said Series G Bonds are valid and binding special obligations of the Authority
payable solely from the special fund created by the 1998 Resolution and designated "Puerto Rico
Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking
Fund". The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a
sufficient amount of the moneys held to the credit of the Revenue Fund, together with any other
funds of the Commonwealth of Puerto Rico allocated to the Authority and available under the
1998 Resolution for the payment of principal of and interest on the Senior Transportation
Revenue Bonds, to pay the principal of and interest on all Senior Transportation Revenue Bonds
(including said Series G Bonds) issued under the provisions of the 1998 Resolution as the same
may become due and payable and to create and maintain a reserve therefor. Said Interest and
Sinking Fund is pledged to and charged with the payment of the principal of and the interest on

III-6

all Senior Transportation Revenue Bonds (including said Series G Bonds) issued by the Authority under the provisions of the 1998 Resolution.

8. Said Series G Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and said Series G Bonds are payable only out of the revenues and other moneys of or allocated to the Authority, to the extent provided in the 1998 Resolution.

9. Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to continuing compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), the 1968 Resolution and the 1998 Resolution regarding the use, expenditure and investment of Series G Bond proceeds (and the proceeds of certain other Transportation Revenue Bonds and Highway Revenue Bonds being issued on the date hereof) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on said Series G Bonds is not includable in gross income for federal income tax purposes, and (ii) said Series G Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation. No opinion is expressed as to the effect of any action taken or not taken after the date of this opinion without our approval (except for such action or omission to act as is otherwise provided in the 1998 Resolution or in the authorizing resolution) or in reliance upon advice of counsel other than ourselves on the exclusion from gross income of the interest on said Series G Bonds for federal income tax purposes.

Interest on said Series G Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of said Series G Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

The Authority has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on said Series G Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the said Series G Bonds. We are not aware of any provisions of the Constitution and laws of the Commonwealth of Puerto Rico which would prevent such compliance.

Respectfully submitted,

[To be signed, "Sidley Austin Brown & Wood LLP"]

III-7

HTA_STAY0056215

# SIDLEY AUSTIN BROWN & WOOD LLP

| CHICAGO | 787 SEVENTH AVENUE | BEIJING |
|---|---|---|
| DALLAS | NEW YORK, NEW YORK 10019 | GENEVA |
| LOS ANGELES | TELEPHONE 212 839 5300 | HONG KONG |
| | FACSIMILE 212 839 5599 | |
| SAN FRANCISCO | www.sidley.com | LONDON |
| WASHINGTON, D.C. | FOUNDED 1866 | SHANGHAI |
| | | SINGAPORE |
| | | TOKYO |

April __, 2003

Hon. Fernando E. Fagundo
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined (a) Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended ("Act No. 74"), creating Puerto Rico Highways and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico, (b) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended among other things by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated (1) the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") and (2) the proceeds (up to $120 million per fiscal year) of the tax imposed on crude oil, unfinished oil and derivative products (the "Allocated Crude Oil Tax Proceeds") to the Authority for use for its corporate purposes, (c) the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (d) Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including (I) Resolution No. 68-18, adopted on June 13, 1968, as amended (the "1968 Resolution"), with respect to the Highway Revenue Bonds (hereinafter mentioned), and (II) Resolution No. 98-06, adopted on February 26, 1998, as amended (the "1998 Resolution"), together with a resolution

III-8

                                                          HTA_STAY0056216

adopted on April 10, 2003, with respect to the Series H Bonds described below (the "authorizing resolution") and other proofs submitted relative to the authorization, sale and issuance of

$72,035,000

## PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY TRANSPORTATION REVENUE REFUNDING BONDS (SERIES H)

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption and to tender prior to maturity, all as set forth in the authorizing resolution.

We have also examined one of said Series H Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.      Act No. 74, the Puerto Rico Internal Revenue Code of 1994, the Vehicle and Traffic Law of Puerto Rico and Reorganization Plan No. 6 of 1971 are valid.

2.      Said proceedings have been validly and legally taken.

3.      Said Series H Bonds have been duly authorized and issued to refund a portion of the Authority's outstanding Senior Transportation Revenue Bonds (hereinafter mentioned).

4.      The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds"). The 1968 Resolution provides for the issuance of additional Highway Revenue Bonds under the conditions and limitations therein set forth, and the Authority has covenanted in the 1998 Resolution to limit the issuance of such additional Highway Revenue Bonds.

5.      The 1998 Resolution provides for the issuance of additional bonds on a parity with said Series H Bonds under the conditions, limitations and restrictions therein set forth (said Series H Bonds and such additional parity bonds being herein called the "Senior Transportation Revenue Bonds") for any lawful purpose of the Authority and for the purpose of refunding any bonds issued by the Authority under the 1998 Resolution and any other obligations of the Authority, including outstanding Highway Revenue Bonds. In addition, the 1998 Resolution provides for the issuance of bonds subordinate to the Senior Transportation Revenue Bonds as to their lien on the revenues and other moneys of the Authority, as described below, under the conditions, limitations and restrictions and for the purposes set forth therein (the Senior Transportation Revenue Bonds and such bonds subordinate thereto being herein collectively called the "Transportation Revenue Bonds").

III-9

6.    The 1998 Resolution provides for the creation of a special fund designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"), and, subject to the limitations of the next two paragraphs, for the deposit to the credit of said special fund of all moneys received by the Authority (a) from the Allocated Crude Oil Tax Proceeds, (b) from the Allocated Gasoline Tax Proceeds, (c) from the Allocated Additional License Fees, (d) from any tolls or other charges imposed by the Authority for the use of any Toll Facilities and (e) from the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority and expressly authorizes the Authority to pledge to the payment of the principal of and interest on bonds or other obligations issued by the Authority and which are pledged by the Authority to the payment of the principal of and interest on Transportation Revenue Bonds issued under the provisions of the 1998 Resolution.

The Allocated Gasoline Tax Proceeds, the Allocated Crude Oil Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority, are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose.

The 1968 Resolution provides for the prior deposit to the credit of a special fund designated "Puerto Rico Highways and Transportation Authority Construction Fund" (herein called the "1968 Construction Fund") of the Allocated Gasoline Tax Revenues, the Allocated Additional License Fees and all Existing Toll Facilities Revenues (as such term is defined in the 1998 Resolution), after the required deposits of such moneys have been made to the credit of the Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund. In the 1998 Resolution, the Authority has covenanted (i) to withdraw monthly from the 1968 Construction Fund and deposit to the credit of the Revenue Fund until the outstanding Highway Revenue Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, all unencumbered moneys held to the credit of the 1968 Construction Fund and (ii) except for the foregoing withdrawal and any encumbrances on the moneys in the 1968 Construction Fund existing on the date of adoption of and as provided in the 1998 Resolution, not further to encumber or otherwise withdraw or pledge any such available moneys in the 1968 Construction Fund.

7.    Said Series H Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1998 Resolution and designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund". The Authority has covenanted to deposit to the credit of said Interest and Sinking Fund a sufficient amount of the moneys held to the credit of the Revenue Fund, together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority and available under the 1998 Resolution for the payment of principal of and interest on the Senior Transportation Revenue Bonds, to pay the principal of and interest on all Senior Transportation Revenue Bonds (including said Series H Bonds) issued under the provisions of the 1998 Resolution as the same may become due and payable and to create and maintain a reserve therefor. Said Interest and Sinking Fund is pledged to and charged with the payment of the principal of and the interest on

III-10

                                                                                      HTA_STAY0056218

all Senior Transportation Revenue Bonds (including said Series H Bonds) issued by the Authority under the provisions of the 1998 Resolution.

8.     Said Series H Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and said Series H Bonds are payable only out of the revenues and other moneys of or allocated to the Authority, to the extent provided in the 1998 Resolution.

9.     Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to continuing compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), the 1968 Resolution and the 1998 Resolution regarding the use, expenditure and investment of Series H Bond proceeds (and the proceeds of certain other Transportation Revenue Bonds and Highway Revenue Bonds being issued on the date hereof) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on said Series H Bonds is not includable in gross income for federal income tax purposes, and (ii) said Series H Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.  No opinion is expressed as to the effect of any action taken or not taken after the date of this opinion without our approval (except for such action or omission to act as is otherwise provided in the 1998 Resolution or in the authorizing resolution) or in reliance upon advice of counsel other than ourselves on the exclusion from gross income of the interest on said Series H Bonds for federal income tax purposes.

Interest on said Series H Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code.  The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of said Series H Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

The Authority has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on said Series H Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the said Series H Bonds. We are not aware of any provisions of the Constitution and laws of the Commonwealth of Puerto Rico which would prevent such compliance.

Respectfully submitted,

[To be signed, "Sidley Austin Brown & Wood LLP"]

III-11

CONFIDENTIAL                                                                                    HTA_STAY0056219

# SIDLEY AUSTIN BROWN & WOOD LLP

CHICAGO

DALLAS

LOS ANGELES

SAN FRANCISCO

WASHINGTON, D.C.

787 SEVENTH AVENUE
NEW YORK, NEW YORK 10019
TELEPHONE 212 839 5300
FACSIMILE 212 839 5599
www.sidley.com

FOUNDED 1866

BEIJING

GENEVA

HONG KONG

LONDON

SHANGHAI

SINGAPORE

TOKYO

April __, 2003

Hon. Fernando E. Fagundo
Secretary of Transportation and Public Works
San Juan, Puerto Rico

Dear Sir:

We have examined (a) Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended ("Act No. 74"), creating Puerto Rico Highways and Transportation Authority (hereinafter sometimes called the "Authority"), as a body corporate and politic constituting a public corporation and government instrumentality of the Commonwealth of Puerto Rico, (b) the Puerto Rico Internal Revenue Code of 1994 (Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended in particular by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended), which allocated (1) the proceeds of the sixteen cents per gallon tax imposed on gasoline and four cents of the eight cents per gallon tax on gas oil and diesel oil (the "Allocated Gasoline Tax Proceeds") and (2) the proceeds (up to $120 million per fiscal year) of the tax imposed on crude oil, unfinished oil and derivative products (the "Allocated Crude Oil Tax Proceeds") to the Authority for use for its corporate purposes, (c) the Vehicle and Traffic Law of Puerto Rico (Act No. 141 of the Legislature of Puerto Rico, approved July 20, 1960, as amended), which allocated the proceeds of the fifteen dollar increase in the motor vehicle license fees for public and private service automobiles imposed by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 (the "Allocated Additional License Fees"), to the Authority for use for its corporate purposes and (d) Reorganization Plan No. 6 of 1971 (Act No. 113 of the Legislature of Puerto Rico, approved June 21, 1968), which attached the Authority to the Department of Transportation and Public Works.

We have also examined certified copies of the proceedings of the Authority, including (I) Resolution No. 68-18, adopted on June 13, 1968, as amended (the "1968 Resolution"), with respect to the Highway Revenue Bonds (hereinafter mentioned), and (II) Resolution No. 98-06, adopted on February 26, 1998, as amended (the "1998 Resolution"), together with a resolution adopted on April 10, 2003, with respect to the Series 2003 Bonds described below (the "authorizing resolution") and other proofs submitted relative to the authorization, sale and issuance of

III-12

CONFIDENTIAL

HTA_STAY0056220

$320,545,000

## PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY
## SUBORDINATED TRANSPORTATION REVENUE BONDS (SERIES 2003)

Issued in such denominations, transferable and exchangeable, bearing interest at such rates and payable on such dates, maturing on July 1 in the years and in such principal amounts, and subject to redemption prior to maturity, all as set forth in the authorizing resolution.

We have also examined one of said Series 2003 Bonds as executed and authenticated.

From such examination we are of the opinion that:

1.      Act No. 74, the Puerto Rico Internal Revenue Code of 1994, the Vehicle and Traffic Law of Puerto Rico and Reorganization Plan No. 6 of 1971 are valid.

2.      Said proceedings have been validly and legally taken.

3.      Said Series 2003 Bonds have been duly authorized and issued to repay moneys advanced for paying the cost of constructing certain highways and other transportation facilities as specified in the 1998 Resolution and to make a deposit to the account relating to said Series 2003 Bonds in the 1998 Subordinated Bonds Revenue Fund in the Subordinated Transportation Revenue Bonds Interest and Sinking Fund (hereinafter mentioned).

4.      The Authority has heretofore issued various series of bonds under and in compliance with the provisions of the 1968 Resolution (the "Highway Revenue Bonds").  The 1968 Resolution provides for the issuance of additional Highway Revenue Bonds under the conditions and limitations therein set forth, and the Authority has covenanted in the 1998 Resolution to limit the issuance of such additional Highway Revenue Bonds.

5.      The 1998 Resolution provides for the issuance of additional bonds on a parity with said Series 2003 Bonds under the conditions, limitations and restrictions therein set forth (said Series 2003 Bonds and such additional parity bonds being herein called the "Subordinated Transportation Revenue Bonds") for the purpose of paying the cost of certain specified highway and other transportation projects and for refunding any outstanding Subordinated Transportation Revenue Bonds.  In addition, the 1998 Resolution provides for the issuance of bonds senior to the Subordinated Transportation Revenue Bonds as to their claim on the revenues and other moneys of the Authority, as described below (said bonds being herein called the "Senior Transportation Revenue Bonds"), under the conditions, limitations and restrictions set forth therein for any lawful purpose of the Authority and for the purpose of refunding any bonds issued by the Authority under the 1998 Resolution and any other obligations of the Authority, including outstanding Highway Revenue Bonds and outstanding Subordinated Transportation Revenue Bonds (the Subordinated Transportation Revenue Bonds and such Senior Transportation Revenue Bonds being herein collectively called the "Transportation Revenue Bonds").

III-13

CONFIDENTIAL

6.     The 1998 Resolution provides for the creation of a special fund designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Fund" (the "Revenue Fund"), and, subject to the limitations of the next two paragraphs, for the deposit to the credit of said special fund of all moneys received by the Authority (a) from the Allocated Crude Oil Tax Proceeds, (b) from the Allocated Gasoline Tax Proceeds, (c) from the Allocated Additional License Fees, (d) from any tolls or other charges imposed by the Authority for the use of any Toll Facilities and (e) from the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority and expressly authorizes the Authority to pledge to the payment of the principal of and interest on bonds or other obligations issued by the Authority and which are pledged by the Authority to the payment of the principal of and interest on Transportation Revenue Bonds issued under the provisions of the 1998 Resolution.

The Allocated Gasoline Tax Proceeds, the Allocated Crude Oil Tax Proceeds and the Allocated Additional License Fees, and any other taxes, fees or charges which the Legislature of Puerto Rico may allocate to the Authority, are subject to first being applied to the payment of interest and amortization of the public debt in accordance with the provisions of, and to the extent provided by, Section 8 of Article VI of the Constitution of Puerto Rico if needed for such purpose.

The 1968 Resolution provides for the prior deposit to the credit of a special fund designated "Puerto Rico Highways and Transportation Authority Construction Fund" (herein called the "1968 Construction Fund") of the Allocated Gasoline Tax Revenues, the Allocated Additional License Fees and all Existing Toll Facilities Revenues (as such term is defined in the 1998 Resolution), after the required deposits of such moneys have been made to the credit of the Puerto Rico Highways and Transportation Authority Highway Revenue Bonds Interest and Sinking Fund. In the 1998 Resolution, the Authority has covenanted (i) monthly to withdraw from the 1968 Construction Fund and deposit to the credit of the Revenue Fund until the outstanding Highway Revenue Bonds have been paid or provision has been made for their payment and the repeal and cancellation of the 1968 Resolution, all unencumbered moneys held to the credit of the 1968 Construction Fund and (ii) except for the foregoing withdrawal and any encumbrances on the moneys in the 1968 Construction Fund existing on the date of adoption of and as provided in the 1998 Resolution, not further to encumber or otherwise withdraw or pledge any such available moneys in the 1968 Construction Fund.

7.     Said Series 2003 Bonds are valid and binding special obligations of the Authority payable solely from the special fund created by the 1998 Resolution and designated "Puerto Rico Highways and Transportation Authority Subordinated Transportation Revenue Bonds Interest and Sinking Fund". Said Subordinated Transportation Revenue Bonds Interest and Sinking Fund is pledged to and charged with the payment of the principal of and the interest on all Subordinated Transportation Revenue Bonds (including said Series 2003 Bonds) issued by the Authority under the provisions of the 1998 Resolution.

8.     The Authority has covenanted to deposit to the credit of said Subordinated Transportation Revenue Bonds Interest and Sinking Fund a sufficient amount of the moneys held to the credit of the Revenue Fund, together with any other funds of the Commonwealth of Puerto Rico allocated to the Authority and available under the 1998 Resolution for the payment of principal of and interest on the Transportation Revenue Bonds, to pay the principal of and interest on all Subordinated Transportation Revenue Bonds (including said Series 2003 Bonds)

III-14

issued under the provisions of the 1998 Resolution as the same may become due and payable and to create and maintain a reserve therefor, subject, however, to the prior deposit of such moneys and other allocated funds to a special fund created by the 1998 Resolution and designated "Puerto Rico Highways and Transportation Authority Transportation Revenue Bonds Interest and Sinking Fund," which fund is pledged to and charged with the payment of the principal of and premium, if any, and interest on the Senior Transportation Revenue Bonds and the maintaining of a reserve therefor.

9.      Said Series 2003 Bonds do not constitute a debt of the Commonwealth of Puerto Rico or of any of its municipalities or other political subdivisions, and neither the Commonwealth of Puerto Rico nor any such municipality or other political subdivision is liable thereon, and said Series 2003 Bonds are payable only out of the revenues and other moneys of or allocated to the Authority, to the extent provided in the 1998 Resolution.

10.     Under the provisions of the Acts of Congress now in force and under existing regulations and judicial decisions, (i) subject to continuing compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), the 1968 Resolution and the 1998 Resolution regarding the use, expenditure and investment of Series 2003 Bond proceeds (and the proceeds of certain other Transportation Revenue Bonds and Highway Revenue Bonds being issued on the date hereof) and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on said Series 2003 Bonds is not includable in gross income for federal income tax purposes, and (ii) said Series 2003 Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation. No opinion is expressed as to the effect of any action taken or not taken after the date of this opinion without our approval (except for such action or omission to act as is otherwise provided in the 1998 Resolution or in the authorizing resolution) or in reliance upon advice of counsel other than ourselves on the exclusion from gross income of the interest on said Series 2003 Bonds for federal income tax purposes

Interest on said Series 2003 Bonds is not an item of tax preference for the purpose of computing the alternative minimum tax on individuals and corporations imposed by the Code. Such interest will, however, be includable in the computation of the alternative minimum tax on corporations imposed by the Code. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (a) ownership of said Series 2003 Bonds or (b) the inclusion in certain computations (including, without limitation, those related to the corporate alternative minimum tax) of interest that is excluded from gross income.

The Authority has covenanted to comply, to the extent permitted by the Constitution and laws of the Commonwealth of Puerto Rico, with the requirements of the Code so that interest on said Series 2003 Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the said Series 2003 Bonds. We are not aware of any provisions of the Constitution and laws of the Commonwealth of Puerto Rico which would prevent such compliance.

Respectfully submitted,

[To be signed, "Sidley Austin Brown & Wood LLP"]

III-15

[This page intentionally left blank]

CONFIDENTIAL

**APPENDIX IV**

# Ambac

## Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor:

Policy Number:

Obligations:

Premium:

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

SEAL

Secretary

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

IV-1

[This page intentionally left blank]

CONFIDENTIAL

**APPENDIX V**

**FGIC**

Financial Guaranty Insurance
Company
125 Park Avenue
New York, NY 10017
(212) 312-3000
(800) 352-0001

*A GE Capital Company*

# Municipal Bond
# New Issue Insurance Policy

| Issuer: | Policy Number: |
|---|---|
|  | Control Number:   0010001 |
| Bonds: | Premium: |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association, or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date

V-1

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                                                                   Page 1 of 2

CONFIDENTIAL                                                                                        HTA_STAY0056227

Financial Guaranty Insurance
Company
125 Park Avenue
New York, NY  10017
(212) 312-3000
(800) 352-0001

*A GE Capital Company*



## Municipal Bond
## New Issue Insurance Policy

for payment of interest.  "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                    **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

V-2

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

CONFIDENTIAL                                    HTA_STAY0056228

Financial Guaranty Insurance
Company
125 Park Avenue
New York, NY 10017
(212) 312-3000
(800) 352-0001

*A GE Capital Company*



# Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

| Policy Number: | Control Number: | 0010001 |
|---|---|---|

It is further understood that the term "Nonpayment" in respect of Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                              **Authorized Representative**

**Acknowledged as of the Effective Date written above:**

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

V-3

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form E-0002 (10/93)                              Page 1 of 1

CONFIDENTIAL                              HTA_STAY0056229

[This page intentionally left blank]

CONFIDENTIAL

APPENDIX VI

FINANCIAL SECURITY ASSURANCE®

# MUNICIPAL BOND INSURANCE POLICY

ISSUER:

BONDS:

Policy No.: -N

Effective Date:

Premium:

FINANCIAL SECURITY ASSURANCE INC. ("Financial Security"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of Financial Security, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Financial Security shall have received Notice of Nonpayment, Financial Security will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by Financial Security, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Financial Security. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by Financial Security is incomplete, it shall be deemed not to have been received by Financial Security for purposes of the preceding sentence and Financial Security shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, Financial Security shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by Financial Security hereunder. Payment by Financial Security to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of Financial Security under this Policy.

Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless Financial Security shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which has been recovered from such Owner pursuant to the

SPECIMEN

Page 2 of 2
Policy No. [N]

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to Financial Security which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

Financial Security may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to Financial Security pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to Financial Security and shall not be deemed received until received by both and (b) all payments required to be made by Financial Security under this Policy may be made directly by Financial Security or by the Insurer's Fiscal Agent on behalf of Financial Security. The Insurer's Fiscal Agent is the agent of Financial Security only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of Financial Security to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, Financial Security agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to Financial Security to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of Financial Security, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be canceled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, FINANCIAL SECURITY ASSURANCE INC. has caused this Policy to be executed on its behalf by its Authorized Officer.

[Countersignature]

FINANCIAL SECURITY ASSURANCE INC.

By _____

By _____
       Authorized Officer

A subsidiary of Financial Security Assurance Holdings Ltd.
350 Park Avenue, New York, N.Y. 10022-6022

(212) 826-0100

Form 500NY (5/90)

VI-2

HTA_STAY0056232

**APPENDIX VII**

## FINANCIAL GUARANTY INSURANCE POLICY

### MBIA Insurance Corporation
### Armonk, New York 10504

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

### [PAR]
### [LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR].

COUNTERSIGNED:

~~SPECIMEN~~

Resident Licensed Agent

_____

City, State

STD-RCS-6
4/95

MBIA Insurance Corporation

~~SPECIMEN~~

President

Attest:   _____

Assistant Secretary

VII-1

[This page intentionally left blank]

CONFIDENTIAL

[This page intentionally left blank]

CONFIDENTIAL

[This page intentionally left blank]

CONFIDENTIAL