**REOFFERING-NOT A NEW ISSUE**
**BOOK-ENTRY ONLY**

$297,945,000

# PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY

### $253,670,000 Highway Revenue Refunding Bonds (Series AA)
### Consisting of
### $188,395,000 Series AA-1 Bonds
### $65,275,000 Series AA-2 Bonds

### $44,275,000 Transportation Revenue Refunding Bonds (Series H)

**Original Issue Date: April 29, 2003**                                    **Conversion Date: July 1, 2010**

The Series AA Bonds and the Series H Bonds (collectively, the "Reoffered Bonds") are subject to tender on July 1, 2010 (the "Conversion Date"), on which date the interest rate mode on the Reoffered Bonds shall be converted from the Term Rate Mode to the Fixed Rate Mode.

The Series AA Bonds, consisting of $188,395,000 aggregate principal amount of Series AA-1 Bonds and $65,275,000 aggregate principal amount of Series AA-2 Bonds, the outstanding bonds of the Puerto Rico Highways and Transportation Authority (the "Authority") previously issued under Resolution No. 68-18 adopted by the Authority on June 13, 1968, as amended (the "1968 Resolution"), and any additional refunding bonds that the Authority may from time to time issue under the 1968 Resolution (collectively, the "Highway Revenue Bonds") are payable from, and are secured by a pledge of, certain revenues of the Authority, which include: (i) all current gasoline taxes, a portion of the current gas oil and diesel oil taxes, and a portion of the current motor vehicle license fees allocated to the Authority by the Commonwealth; (ii) all toll revenues of the Authority's traffic facilities financed with Highway Revenue Bonds and any extensions and improvements thereto; and (iii) certain investment earnings (collectively, the "1968 Resolution Revenues").

The Series H Bonds, the outstanding bonds of the Authority previously issued under Resolution No. 98-06 adopted by the Authority on February 26, 1998, as amended (the "1998 Resolution" and, together with the 1968 Resolution, the "Resolutions"), and any additional bonds that the Authority may from time to time issue under the 1998 Resolution (collectively, the "Transportation Revenue Bonds") are payable from, and are secured by a pledge of, certain revenues of the Authority, which include: (i) the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth of Puerto Rico (the "Commonwealth") on certain petroleum products; (ii) toll revenues of the Authority's traffic facilities that were not financed with Highway Revenue Bonds; (iii) certain investment earnings; and (iv) the 1968 Resolution Revenues available after payment of debt service on the Authority's outstanding Highway Revenue Bonds (collectively, the "1998 Resolution Revenues").

All of the aforesaid revenues of the Authority that constitute taxes and license fees are subject to being applied first to the payment of general obligation debt and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are not sufficient therefor.

The Reoffered Bonds have the following characteristics:

- The Reoffered Bonds are registered under The Depository Trust Company's book-entry only system. Purchasers of the Reoffered Bonds will not receive definitive bonds.

- The inside cover page of this Reoffering Circular contains information concerning the maturity schedules, interest rates and prices of the Reoffered Bonds.

- Interest on the Reoffered Bonds will be payable on each January 1 and July 1, commencing on January 1, 2011.

- The Reoffered Bonds are subject to redemption prior to maturity as set forth under "THE REOFFERED BONDS- Redemption of the Reoffered Bonds."

- The Reoffered Bonds will be issued in denominations of $5,000 principal amount and integral multiples thereof.

- The scheduled payment of principal and interest on the Series AA-1 Bonds (the "Insured Bonds"), when due, will be guaranteed under an insurance policy issued concurrently with the original delivery of the Insured Bonds by **ASSURED GUARANTY MUNICIPAL CORP. (FORMERLY KNOWN AS FINANCIAL SECURITY ASSURANCE INC.).** The Series AA-2 Bonds and the Series H Bonds are not insured.

- In connection with the original issuance of the Reoffered Bonds, Sidley Austin Brown & Wood LLP (now, Sidley Austin LLP), as bond counsel to the Authority, stated that under federal laws and regulations then in force, interest on the Reoffered Bonds is exempt from federal income taxation and the Reoffered Bonds and interest thereon are exempt from state, Commonwealth and local income taxation. In the opinion of Nixon Peabody LLP, Bond Counsel to the Authority, under existing laws, the conversion of the Reoffered Bonds to the fixed rate mode and the reoffering of the Reoffered Bonds under the terms contained in the Resolutions and the resolution of the Authority relating to the conversion and reoffering of the Reoffered Bonds, will not cause the interest on the Reoffered Bonds to be includable in the gross income of owners for Federal income tax purposes.

- However, see "TAX EXEMPTION" herein, for alternative minimum tax consequences with respect to interest on the Reoffered Bonds, a description of certain rules that the Authority must comply with to preserve the federal tax exemption of interest, and other tax considerations.

- The Reoffered Bonds will be delivered on or about July 1, 2010.

The Reoffered Bonds are not a debt of the Commonwealth or any of its political subdivisions, other than the Authority, and neither the Commonwealth nor any such subdivisions, other than the Authority, is liable thereon.

| Jefferies & Company | | | RBC Capital Markets |
|---|---|---|---|

| | Barclays Capital | | Citi |
|---|---|---|---|
| | BofA Merrill Lynch | | |
| Goldman, Sachs & Co. | J.P. Morgan | | Ramirez & Co. Inc. |
| Raymond James | UBS Financial Services Incorporated of Puerto Rico | | Wells Fargo Securities |
| BBVAPR MSD | FirstBank Puerto Rico Securities | Oriental Financial Services | Santander Securities |

June 17, 2010

CONFIDENTIAL

**$297,945,000**

**Puerto Rico Highways and Transportation Authority**

**$188,395,000 Highway Revenue Refunding Bonds (Series AA-1)** [*]

4.95% Term Bonds due July 1, 2026; Price: 100%      CUSIP[‡] 745181K89

**$65,275,000 Highway Revenue Refunding Bonds (Series AA-2)**

5.30% Term Bonds due July 1, 2035; Price: 100%      CUSIP[‡] 745181K97

**$44,275,000 Transportation Revenue Refunding Bonds (Series H)**

5.45% Term Bonds due July 1, 2035; Price: 100%      CUSIP[‡] 745190Z76

---

[*] Insured by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.).

[‡] Copyright 2010, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Authority nor the Underwriters take any responsibility for the accuracy of such numbers.

CONFIDENTIAL

No dealer, broker, sales representative or other person has been authorized by the Authority or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority or any Underwriter. This Reoffering Circular does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Reoffered Bonds by any person, in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Authority and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Reoffering Circular nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs or condition of the Authority since the date hereof.

The Underwriters have provided the following sentence for inclusion in this Reoffering Circular. The Underwriters have reviewed the information in this Reoffering Circular in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THE REOFFERING OF THE REOFFERED BONDS, THE UNDERWRITERS MAY EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICES OF THE REOFFERED BONDS AT LEVELS ABOVE THOSE WHICH MIGHT OTHERWISE PREVAIL ON THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM") makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Reoffering Circular or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE" and "APPENDIX VI - Municipal Bond Insurance Policy".

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

TABLE OF CONTENTS

INTRODUCTION..................................................... 1
RECENT DEVELOPMENTS............................... 2
Recent Developments Relating to the Authority .. 2
Recent Developments Relating to the
Commonwealth................................................... 3
REOFFERING PLAN ............................................ 6
THE REOFFERED BONDS .................................. 6
General................................................................ 6
Principal and Interest......................................... 7
Redemption of the Reoffered Bonds .................... 7
Book Entry Only System...................................... 9
Payments and Transfers ................................... 11
Discontinuance of Book Entry Only System........ 11
BOND INSURANCE ........................................... 12
Bond Insurance Policy ...................................... 12
Assured Guaranty Municipal Corp. (Formerly
known as Financial Security Assurance Inc.)....... 12
SECURITY AND SOURCES OF PAYMENT
FOR THE REOFFERED BONDS ....................... 14
Pledged Revenues ............................................. 14
Flow of Funds Under 1968 Resolution and
1998 Resolution ............................................... 15
1998 Senior Bond Reserve Account ................... 17
1968 Reserve Account ...................................... 18
Replenishment of 1968 and 1998 Reserve
Accounts........................................................... 18
Commitment Not to Reduce Taxes and Fees ...... 18
Special Fund for Deposit of Taxes and Fees
Allocated to the Authority ................................. 19
Prior Payment of Full Faith and Credit
Obligations of the Commonwealth....................... 19
Additional Bonds under the 1998 Resolution
and the 1968 Resolution.................................... 20
THE AUTHORITY ............................................... 21
General Description ........................................... 21
Organization...................................................... 22
Management....................................................... 22
Consultants........................................................ 23
Employment Relations ...................................... 23
New and Pending Legislation Affecting the
Authority ........................................................... 23

TRANSPORTATION SYSTEM REVENUES
AND EXPENDITURES........................................ 24
Revenues ........................................................... 24
Recent Operating Results ................................. 31
Operating Expenses and Capital Expenditures.... 32
DEBT.................................................................... 36
Debt of the Authority ......................................... 36
Principal and Interest Requirements of the
Reoffered Bonds................................................ 37
TAX EXEMPTION............................................... 38
Ancillary Tax Matters ........................................ 38
Changes in Law and Post Issuance Events........ 39
REOFFERING AGREEMENT ............................ 39
LITIGATION ....................................................... 40
ENVIRONMENTAL MATTERS ....................... 41
LEGAL MATTERS ............................................. 41
LEGAL INVESTMENT....................................... 42
GOVERNMENT DEVELOPMENT BANK........ 42
RATINGS............................................................. 42
CONTINUING DISCLOSURE........................... 42
MISCELLANEOUS ............................................ 44

APPENDIX I        FINANCIAL STATEMENTS
                  INCLUDING THE REPORTS
                  OF KEVANE GRANT
                  THORNTON LLP
APPENDIX II-A     FORM OF OPINION OF
                  BOND COUNSEL
APPENDIX II-B     OPINION OF BOND
                  COUNSEL DELIVERED
                  UPON ORIGINAL ISSUANCE
                  OF THE BONDS
APPENDIX III      SUMMARY OF CERTAIN
                  PROVISIONS OF THE 1968
                  RESOLUTION
APPENDIX IV       SUMMARY OF CERTAIN
                  PROVISIONS OF THE 1998
                  RESOLUTION
APPENDIX V        LETTER FROM THE
                  TRAFFIC ENGINEERS
APPENDIX VI       MUNICIPAL BOND
                  INSURANCE POLICY

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL

$297,945,000
**Puerto Rico Highways and Transportation Authority**

$253,670,000
**Highway Revenue Refunding Bonds (Series AA)**
**Consisting of**
**$188,395,000 Series AA-1 Bonds**
**$65,275,000 Series AA-2 Bonds**

$44,275,000
**Transportation Revenue Refunding Bonds (Series H)**

### INTRODUCTION

This Reoffering Circular sets forth information in connection with the reoffering and conversion by Puerto Rico Highways and Transportation Authority (the "Authority") of $253,670,000 aggregate principal amount of its Highway Revenue Refunding Bonds (Series AA) consisting of $188,395,000 aggregate principal amount of the Series AA-1 Bonds (the "Series AA-1 Bonds") and $65,275,000 aggregate principal amount of the Series AA-2 Bonds (the "Series AA-2 Bonds" and, together with the Series AA-1 Bonds, the "Series AA Bonds") and $44,275,000 aggregate principal amount of its Transportation Revenue Refunding Bonds (Series H) (the "Series H Bonds"). The Series AA Bonds and the Series H Bonds are referred to collectively as the "Reoffered Bonds."

The Reoffered Bonds were originally issued on April 29, 2003 and are subject to tender on July 1, 2010 (the "Conversion Date"). On the Conversion Date, the interest rate mode on the Reoffered Bonds will be converted from the Term Rate Mode to the Fixed Rate Mode. The Series AA Bonds were originally issued pursuant to Act No. 74 of the Legislature of Puerto Rico, approved June 23, 1965, as amended (the "Authority Act"), Resolution No. 68-18 adopted by the Authority on June 13, 1968, as previously amended (the "1968 Resolution"), and as further amended, including by a resolution adopted by the Authority on April 10, 2003. The Series H Bonds were originally issued pursuant to the Authority Act, Resolution No. 98-06 adopted by the Authority on February 26, 1998, as previously amended (the "1998 Resolution" and, together with the 1968 Resolution, the "Resolutions"); and as further amended, including by a resolution adopted by the Authority on April 10, 2003. The Bank of New York Mellon acts as fiscal agent under the 1968 Resolution (in such capacity, the "1968 Fiscal Agent") and under the 1998 Resolution (in such capacity, the "1998 Fiscal Agent").

The Authority has covenanted in the 1998 Resolution not to issue additional Highway Revenue Bonds under the 1968 Resolution, other than bonds whose maturity does not extend beyond July 1, 2036 and which are issued to refund outstanding Highway Revenue Bonds to achieve debt service savings. As of April 30, 2010, the Authority had outstanding $1.6 billion of Highway Revenue Bonds issued under the 1968 Resolution and $4.6 billion of Transportation Revenue Bonds issued under the 1998 Resolution. The Series AA Bonds are Highway Revenue Bonds and the Series H Bonds are Transportation Revenue Bonds.

In the event that other revenues of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") are not sufficient to pay general obligation bonds of the Commonwealth and bonds guaranteed by the Commonwealth, a significant portion of the Authority's revenues may be used to pay these general obligation bonds and Commonwealth guaranteed bonds. Accordingly, this Reoffering Circular incorporates by reference the Comprehensive Annual Financial Report of the Commonwealth for the Fiscal Year ended June 30, 2008, prepared by the Department of the Treasury of Puerto Rico (the "Commonwealth's Annual Financial Report"), which report includes the basic financial statements of the Commonwealth as of and for the Fiscal Year ended June 30, 2008,(the "Commonwealth Financial Statements") which have been audited by KPMG LLP, certified public accountants, as stated in their report dated August 12, 2008, accompanying the financial statements. The Commonwealth's Annual Financial Report was filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). Furthermore, this Reoffering Circular incorporates by reference the Commonwealth's Financial Information and Operating Data Report dated May 1, 2010 (the "Commonwealth Report"). The Commonwealth Report was filed by the

1

Commonwealth through EMMA. The Commonwealth Report was not prepared by the Authority, and the Authority does not assume any responsibility for its accuracy or completeness.

The Commonwealth Report includes important information about the Commonwealth, including information about its economy, historical revenues and expenditures of the Commonwealth's General Fund, and the preliminary year-end results for fiscal year 2009.

Any Official Statement of the Commonwealth or of any instrumentality of the Commonwealth or any revised Commonwealth Report filed through EMMA, or any other document filed with the MSRB, after the date hereof and prior to the termination of the reoffering of the Reoffered Bonds, which supplements or amends the information appearing in the Commonwealth Report shall be deemed to be incorporated by reference into this Reoffering Circular and to be part of this Reoffering Circular from the date of filing of such document. Any statement contained in any of the above described documents incorporated by reference shall be deemed to be modified or superseded for purposes of this Reoffering Circular to the extent that a statement contained herein modifies or supersedes such statement. Any statement contained herein or in any of the above described documents shall also be deemed to be modified or superseded to the extent that a statement contained in any subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Reoffering Circular.

This Reoffering Circular describes the terms of and security for the Reoffered Bonds and the use of proceeds of the Reoffered Bonds. Also included are summaries and descriptions of certain provisions of the 1968 Resolution and the 1998 Resolution. These descriptions and summaries do not purport to be comprehensive or definitive. All references herein to the 1968 Resolution and the 1998 Resolution are qualified in their entirety by reference to the definitive form thereof, all references to Federal and Commonwealth laws are qualified in their entirety by reference to the complete statutes, regulations and published interpretations by Federal or Commonwealth officials, and all references to the Reoffered Bonds are qualified by the forms thereof contained in the corresponding resolution and are further qualified in their entirety by reference to laws and principles of equity relating to or affecting the enforceability of creditors' rights.

This Reoffering Circular, including information incorporated in this Reoffering Circular by reference, contains certain "forward-looking statements" concerning the operations, financial condition, plans and objectives of the Authority and the Commonwealth. These statements are based upon a number of assumptions and estimates which are subject to significant uncertainties, including general economic conditions, many of which are beyond the control of the Authority and the Commonwealth. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the summaries of the 1968 Resolution and the 1998 Resolution in Appendices III and IV, respectively.

## RECENT DEVELOPMENTS

### Recent Developments Relating to the Authority

*Management Initiatives to Increase Revenues and Reduce Expenses*

*Initiatives to Increase Revenues.* The management of the Authority expects to increase its revenues through a variety of new programs and initiatives. At the request of the Authority, the Puerto Rico Transit Law was amended to lower the permitted blood alcohol level for 18-20 year-old drivers, which should permit the Authority to receive up to $11.5 million annually in additional federal funds. The Authority has also taken steps to reduce toll "leakage" and has implemented electronic tolls through the AutoExpreso system.

*Initiatives to Reduce Expenses.* The management of the Authority has recently implemented certain initiatives designed to reduce expenses and improve the Authority's finances. The Authority estimates that these initiatives will result in savings of approximately $57 million in fiscal year 2010 and approximately $78 million

2

HTA_STAY0056363

annually thereafter. These initiatives include (i) the elimination of the subsidy paid to the Metropolitan Bus Authority, which will save approximately $24 million annually; (ii) the modification of the Tren Urbano management agreement, which is expected to result in annual reductions of approximately $13.5 million in Tren Urbano operating expenses; (iii) the elimination of the $10 million annual transfer to the Department of Transportation and Public Works; and (iv) reductions in workforce expenses, which are expected to result in savings of approximately $9.5 million in fiscal year 2010 and $30.6 million annually thereafter.

### Public – Private Partnerships

The Commonwealth has established as its public policy the promotion of infrastructure public – private partnerships ("PPPs"). PPPs are collaborations between governmental and non-governmental entities to develop infrastructure projects, manage government-owned assets or provide services. One example of a PPP is the Teodoro Moscoso Bridge, owned by the Authority but operated by a private entity. Act 29 of June 8, 2009 establishes a legal framework for PPPs which includes the creation of a Public – Private Partnership Authority. On May 28, 2010, the Puerto Rico Public-Private Partnership Authority board approved a bidding process for the construction, modernization and maintenance of certain Authority projects. Included among the projects currently being considered are PPPs for some of the existing toll roads owned by the Authority, such as PR-5, PR-20, PR-22, PR-52, PR-53, and PR-66. The Authority expects that any tax-exempt bonds previously issued to fund the construction or improvement of these toll roads may be required to be redeemed, defeased or tendered for in accordance with federal tax law.

### The Authority experienced a reduction in net assets in fiscal year 2009

In fiscal year 2009, the Authority had gross revenues, consisting primarily of toll receipts, taxes, license fees and capital grants, of $732 million, and expenses of $1.002 billion, resulting in a reduction in net assets of $270 million, from $4.727 billion as of June 30, 2008, to $4.456 billion as of June 30, 2009. These expenses included $402 million of depreciation and amortization, which are non-cash expenses. See "TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES – Recent Operating Results."

### Recent Developments Relating to the Commonwealth

A significant portion of the revenues of the Authority are subject to prior claim to pay general obligation bonds of the Commonwealth and bonds guaranteed by the Commonwealth in the event that other Commonwealth revenues were not sufficient to pay these general obligation bonds and Commonwealth guaranteed bonds. Therefore, this Reoffering Circular includes the following information with respect to recent developments affecting the Commonwealth. This information has been reproduced from the Commonwealth Report.

### Economic Condition

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006. Although Puerto Rico's economy is closely linked to the United States economy, for fiscal years 2007, 2008 and 2009, Puerto Rico's real gross national product decreased by 1.2%, 2.8%, and 3.7%, respectively, while the United States economy grew at a rate of 1.8% and 2.8%, respectively, and contracted during fiscal year 2009 at a rate of 2.5%. According to the Puerto Rico Planning Board's (the "Planning Board") latest projections, which take into account the preliminary results for fiscal year 2009, the economic impact of a delay in the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), and other economic factors, the gross national product for fiscal year 2010 is forecasted to contract by 3.6%. The gross national product for fiscal year 2011, however, is forecasted to grow by 0.4%.

### Fiscal Condition

*Structural Budget Imbalance.* Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and expenditures. The structural imbalance was exacerbated during fiscal years 2008 and 2009, with recurring government expenditures significantly exceeding recurring revenues.

3

CONFIDENTIAL

Prior to fiscal year 2009, the government bridged the deficit resulting from the structural imbalance through the use of non-recurring measures, such as borrowing from Government Development Bank for Puerto Rico ("GDB") or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one time measures such as the use of derivatives and borrowings collateralized with government owned real estate. Since March 2009, the government has taken multiple steps to address and resolve this structural imbalance.

For fiscal year 2009, the estimated deficit was approximately $3.490 billion, consisting of the difference between preliminary revenues (without taking into account a one time accounting adjustment related to the sales and use tax) and estimated expenses for such fiscal year. The estimated deficit is projected to be less than $2.5 billion for fiscal year 2010 and approximately $1.0 billion for fiscal year 2011, as discussed below. The administration projects it will eliminate the deficit by fiscal year 2013.

*Results for Fiscal Year 2009.* Total preliminary General Fund revenues for fiscal year 2009 were $7.673 billion, representing a decrease of $686 million, or 8.2%, from fiscal year 2008 revenues and an increase of $73 million, or 1.0%, over the $7.6 billion revised estimate presented by the administration in February 2009. Total expenses for fiscal year 2009 were approximately $11.250 billion, consisting of budgeted General Fund expenditures of $9.484 billion and approximately $1.766 billion of additional non-budgeted expenses. The difference between preliminary General Fund revenues and total expenses for fiscal year 2009 was principally paid from proceeds of Puerto Rico Sales Tax Financing Corporation ("COFINA") by its Spanish-language acronym) bond issues pursuant to the fiscal stabilization plan described below.

*Preliminary Results for Fiscal Year 2010 (First Eight Months).* Preliminary General Fund revenues for the first eight months of fiscal year 2010 (from July 2009 through February 2010) were $4.47 billion, a decline of $318 million, or 6.6%, from the $4.79 billion of revenues for the same period in the prior fiscal year and on target with the budgeted revenues for the first eight months of fiscal year 2010. As budgeted, the decline in General Fund revenues reflects the reduction in General Fund revenues from the sales and use tax as a result of the allocation of a larger portion of such tax to COFINA (amounting to $365 million for the first eight months of fiscal year 2010), and the continuing impact of the ongoing economic recession, partly offset by the effect of the temporary and permanent revenue raising measures implemented as part of the fiscal stabilization plan described below (including $128 million in additional property taxes for the first eight months of fiscal year 2010). If the additional allocation to COFINA and additional property taxes are not taken into account, the reduction in General Fund revenues would have been $81 million, or 1.9%. The estimated General Fund revenues for fiscal year 2010 remain, as budgeted, at $7.670 billion.

Budgeted expenditures for fiscal year 2010 amount to $10.170 billion, consisting of $7.670 billion of budgeted General Fund expenditures and approximately $2.5 billion of additional expenditures to be covered from COFINA bond issues, as part of a multi-year fiscal stabilization plan to achieve fiscal balance

*Economic Plans*

*Fiscal Stabilization Plan.* In January 2009, the administration, which controls the Executive and Legislative branches of government, began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act No. 7"), seeks to achieve budgetary balance on or before fiscal year 2013, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual $2 billion operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) a bond issuance program through COFINA. The proceeds from the COFINA bond issuance program were and will be used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2009 through 2011 (and for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal year 2010, the administration began to design and intends to adopt during fiscal year 2011 a comprehensive reform of the tax system and commence to implement a long-term economic development

4

HTA_STAY0056365

plan, both of which are designed to complement the short-term economic reconstruction and supplemental stimulus initiatives described below.

As of April 30, 2010, the administration had implemented measures that are expected to result in annual savings of approximately $900 million.

*Government Reorganization Plan.* The administration has also taken the first steps to reorganize and modernize the Executive Branch. On December 11, 2009, the Governor signed Act No. 182 that seeks to reduce the number of government agencies and operational expenditures. On April 13, 2010, the administration submitted to the Legislative Assembly a bill proposing a referendum to amend the Constitution in order to restructure the Legislative Assembly by reducing the number of legislators. If the bill is approved, the referendum would be held on or prior to May 1, 2011 and any amendments to the Constitution approved in such referendum would take effect with respect to the Legislative Assembly to be installed on January 2, 2013.

*Unfunded Pension Benefit Obligations and Cash Flow Deficits of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and cash flow deficits of the three government retirement systems that are funded principally with government appropriations. As of June 30, 2009, the total unfunded accrued actuarial liability for the three retirement systems was $23.9 billion and the expected aggregate cash flow deficit for fiscal year 2010 was $640 million.

In February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The Commission is expected to submit a report to the Governor by the end of the first quarter of fiscal year 2011.

*Economic Reconstruction Plan.* In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. Puerto Rico has been awarded approximately $6.5 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of April 23, 2010, Puerto Rico has disbursed $2.8 billion in ARRA funds, or 43% of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan.* The administration has also developed the Strategic Model for a New Economy, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also proposes to (i) strengthen the labor market and encourage greater labor-force participation by bringing out-of-date labor laws and regulations in line with U.S. and international standards, (ii) adopt a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies, and (iii) adopt a comprehensive tax reform that takes into account the Commonwealth's current financial situation. In February 2010, the Governor named a committee to review the Commonwealth's tax system and propose a tax reform. The committee's report is due by September 2010 and the administration plans to file tax reform legislation during the immediately following legislative session.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. The

5

administration is currently evaluating and expects to commence procurement for eight public-private partnership priority projects during fiscal year 2011.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout Puerto Rico. These projects, some of which are ongoing, include the development of a trans-shipment port and tourism and urban redevelopment projects.

*Recalibration of Ratings of Commonwealth General Obligation Bonds*

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" with a stable outlook by Moody's, which is three categories above the previous "Baa3" rating. The administration expects that this recalibration will increase the number of potential investors for the Commonwealth's general obligation bonds and have a positive impact on the Commonwealth's financing costs.

*Proposed Fiscal Year 2011 Budget*

On April 26, 2010, the Governor submitted to the Legislative Assembly a proposed budget for fiscal year 2011. The proposed budget provides for total General Fund revenues of $8.195 billion, compared to estimated General Fund revenues of $7.670 billion for fiscal year 2010. The proposed General Fund revenues of $8.195 billion include base revenues of $7.645 billion, $241 million from tax enforcement and compliance measures, and $89 million of property taxes from the self-appraisal of real property. The proposed General Fund revenues originally included $220 million from the license fees of video lottery machines, but this measure has been withdrawn. Preparation of the budget is an ongoing process and various proposals are under review to replace these $220 million. The proposed fiscal year 2011 budget provides for total expenditures of $9.195 billion, consisting of General Fund expenditures of $8.195 billion and additional expenditures of $1.0 billion that are expected to be covered from proceeds of COFINA bond issues, including a $500 million proposed bond issue during fiscal year 2011. The proposed total expenditures for fiscal year 2011 are $975 million, or 9.6%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $2.055 billion, or 18.3%, lower than estimated total expenditures of $11.250 billion for fiscal year 2009.

## REOFFERING PLAN

The Series AA Bonds and the Series H Bonds were originally issued to refund certain bonds issued under their respective Resolutions and pay the costs of issuance of the Series AA Bonds and Series H Bonds. It is anticipated that the proceeds of the reoffering of the Reoffered Bonds will be applied to pay the purchase price of the Reoffered Bonds on the Conversion Date.

## THE REOFFERED BONDS

**General**

The Reoffered Bonds were originally issued on April 29, 2003 and are subject to tender on the Conversion Date. On the Conversion Date, the interest rate on the Reoffered Bonds will be converted from the Term Rate Mode to the Fixed Rate Mode. The Reoffered Bonds are dated as of their date of original issuance, will bear interest from the Conversion Date at the rates to maturity, and will mature on the dates and in the principal amounts set forth on the inside cover page of this Reoffering Circular. The Reoffered Bonds will be subject to redemption at the times and at the prices set forth below under the "Redemption Provisions." The Reoffered Bonds will be issued in denominations of $5,000 or any multiple thereof as described below under "Book-Entry Only System."

6

HTA_STAY0056367

**Principal and Interest**

*General*

The principal and premium, if any, on the Series AA Bonds shall be payable in lawful money of the United States of America at the designated office of the 1968 Fiscal Agent. The principal and premium, if any, on the Series H Bonds shall be payable in lawful money of the United States of America at the designated office of the 1998 Fiscal Agent. Interest shall be computed on the basis of a 360-day year consisting of twelve 30 day months.

Interest on the Reoffered Bonds will be payable on each January 1 and July 1, commencing on January 1, 2011, to the person whose name appears on the registration books of the 1968 Fiscal Agent (in the case of the Series AA Bonds) or the 1998 Fiscal Agent (in the case of the Series H Bonds) as the registered owner thereof on the 15th day of the month immediately preceding the month in which payment is due.

**Redemption of the Reoffered Bonds**

*Optional Redemption*

*Series AA Bonds*  The Series AA Bonds may be redeemed on any date on or after July 1, 2020, at the option of the Authority, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), from any available moneys (other than moneys deposited in the 1968 Sinking Fund in respect of an Amortization Requirement) at a redemption price equal to the principal amount of the Reoffered Bonds to be redeemed plus accrued interest to the redemption date, without premium.

*Series H Bonds.*  The Series H Bonds may be redeemed on any date on or after July 1, 2020, at the option of the Authority, either in whole or in part (and, if in part, in such order of maturities as the Authority may direct), from any available moneys (other than moneys deposited in the 1998 Senior Bond Sinking Fund in respect of an Amortization Requirement) at a redemption price equal to the principal amount of the bonds to be redeemed plus accrued interest to the redemption date, without premium.

*Extraordinary Optional Redemption*

The Reoffered Bonds are subject to extraordinary redemption at the option of the Authority from the proceeds of any concession agreement or similar arrangement whereby the Authority contracts with a private party for the design, construction, operation and/or maintenance of highway projects, in whole or in part, on any date on or after July 1, 2012 at a redemption price equal to the principal amount of the bonds to be redeemed plus accrued interest to the redemption date, without premium.

*Mandatory Redemption*

*Series AA-1 Bonds.*  The Series AA-1 Bonds are subject to redemption in part on July 1, 2020 and on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1968 Sinking Fund) from moneys in the 1968 Sinking Fund at par plus accrued interest in the years and amounts set forth below.

CONFIDENTIAL

HTA_STAY0056368

| Amortization Requirements for Series AA-1 Bonds | |
| --- | --- |
| **Year** | **Amount** |
| 2020 | $35,000,000 |
| 2021 | 53,705,000 |
| 2022 | - |
| 2023 | 31,795,000 |
| 2024 | 32,860,000 |
| 2025 | 33,960,000 |
| 2026[†] | 1,075,000 |

† Final Maturity

The particular bonds or portions thereof to be redeemed shall be selected by the 1968 Fiscal Agent, in such manner as it in its discretion may determine to be appropriate and fair.

*Series AA-2 Bonds.* The Series AA-2 Bonds are subject to redemption in part on July 1, 2026 and on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1968 Sinking Fund) from moneys in the 1968 Sinking Fund at par plus accrued interest in the years and amounts set forth below.

| Amortization Requirements for Series AA-2 Bonds | |
| --- | --- |
| **Year** | **Amount** |
| 2026 | $34,035,000 |
| 2027 | 3,030,000 |
| 2028 | 3,135,000 |
| 2029 | 3,240,000 |
| 2030 | 3,345,000 |
| 2031 | 3,460,000 |
| 2032 | 3,575,000 |
| 2033 | 3,695,000 |
| 2034 | 3,815,000 |
| 2035[†] | 3,945,000 |

† Final Maturity

The particular bonds or portions thereof to be redeemed shall be selected by the 1968 Fiscal Agent, in such manner as it in its discretion may determine to be appropriate and fair.

*Series H Bonds.* The Series H Bonds are subject to redemption in part on July 1, 2014 and on each July 1 immediately after the fiscal year for which there is an Amortization Requirement to the extent of the Amortization Requirement for said bonds (less the amount of bonds retired by purchase from moneys in the 1998 Senior Bond Sinking Fund) from moneys in the 1998 Senior Bond Sinking Fund at par plus accrued interest in the years and amounts set forth below.

8

CONFIDENTIAL

| Amortization Requirements for Series H Bonds | |
|---|---|
| Year | Amount |
| 2014 | $ 305,000 |
| 2015 | 315,000 |
| 2016 | 325,000 |
| 2017 | 335,000 |
| 2018 | 345,000 |
| 2019 | 360,000 |
| 2020 | 370,000 |
| 2021 | 385,000 |
| 2022 | 395,000 |
| 2023 | 410,000 |
| 2024 | 425,000 |
| 2025 | 435,000 |
| 2026 | 450,000 |
| 2027 | 465,000 |
| 2028 | 485,000 |
| 2029 | 500,000 |
| 2030 | 515,000 |
| 2031 | 535,000 |
| 2032 | 9,550,000 |
| 2033 | 9,340,000 |
| 2034 | 9,125,000 |
| 2035† | 8,905,000 |

† Final Maturity

The particular bonds or portions thereof to be redeemed shall be selected by the 1998 Fiscal Agent, in such manner as it in its discretion may determine to be appropriate and fair.

**Book-Entry Only System**

The following information concerning DTC and DTC's book-entry system has been obtained from DTC. Neither the Authority nor the Underwriters take any responsibility for the accuracy thereof. Beneficial Owners of the Reoffered Bonds should confirm this information with DTC or the DTC Participants.

DTC will act as securities depository for the Reoffered Bonds. The Reoffered Bonds will be issued as fully registered bonds in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully registered Reoffered Bond will be issued for each maturity of each series of the Reoffered Bonds in the aggregate principal amount of such maturity and will be deposited with DTC in the aggregate principal amount of the Reoffered Bonds. So long as the nominee of DTC is the registered owner of the Reoffered Bonds, such nominee, subject to the limitations set forth under "Bond Insurance", will be considered the sole owner or holder of the Reoffered Bonds for all purposes under the 1998 Bond Resolution, the 1968 Bond Resolution and any applicable laws. Except as otherwise provided below, a Beneficial Owner (as hereinafter defined) of Reoffered Bonds will not be entitled to have the Reoffered Bonds registered in such owner's name, will not be entitled to receive definitive Reoffered Bonds and will not be considered an owner or holder of the Reoffered Bonds under the 1998 Bond Resolution or the 1968 Bond Resolution.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants

9

of sales and other securities transactions in deposited securities through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, is the holding company of DTC, National Securities Clearing Corporation, and Fixed Income Clearing Corporation all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others, such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has Standard & Poor's highest rating: AAA. The DTC rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com or www.dtc.org.

Purchases of the Reoffered Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Reoffered Bonds on DTC's records. The ownership interest of each actual purchaser of each Reoffered Bond (a "Beneficial Owner") is in turn to be recorded in the Direct or Indirect Participants' records. Beneficial Owners will not receive written confirmations from DTC of their purchases. Beneficial Owners, however, are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds will be accomplished by entries made on the books of Direct or Indirect Participants acting on behalf of the Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Reoffered Bonds except in the event that use of the book-entry system for the Reoffered Bonds is discontinued.

To facilitate subsequent transfers, all Reoffered Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co. or such other nominee as may be requested by an authorized representative of DTC. The deposit of Reoffered Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Reoffered Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Reoffered Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Reoffered Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Reoffered Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Reoffered Bonds documents. For example, Beneficial Owners of Reoffered Bonds may wish to ascertain that the nominee holding the Reoffered Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices will be sent to DTC. If less than all of the Reoffered Bonds within a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in the Reoffered Bonds of such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Reoffered Bonds unless authorized by a Direct Participant in accordance with DTC's MMI procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Authority as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Reoffered Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Payment of redemption proceeds and principal and interest payments on the Reoffered Bonds will be made to Cede & Co. or to such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information

10

from the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, on the payable date in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Authority, the 1968 Fiscal Agent or the 1998 Fiscal Agent, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the 1968 Fiscal Agent or the 1998 Fiscal Agent, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

## Payments and Transfers

No assurance can be given by the Authority that DTC will make prompt transfer of payments to the Direct Participants or that Direct Participants will make prompt transfer of payments to Indirect Participants or to Beneficial Owners. The Authority is not responsible or liable for payment by DTC or Participants or for sending transaction statements or for maintaining, supervising or reviewing records maintained by DTC or its Participants.

The Authority, the 1968 Fiscal Agent, and the 1998 Fiscal Agent will have no responsibility or obligation to such Direct Participants, Indirect Participants, or the persons for whom they act as nominees with respect to the payments to or the providing of notice for the Direct Participants, the Indirect Participants, or the Beneficial Owners. Payments made to DTC or its nominee shall satisfy the obligations of the Authority to the extent of such payments.

For every transfer of the Reoffered Bonds, the Beneficial Owner may be charged a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto.

## Discontinuance of Book-Entry Only System

DTC may discontinue providing its services as securities depository with respect to the Reoffered Bonds at any time by giving reasonable notice to the Authority, the 1968 Fiscal Agent, and the 1998 Fiscal Agent. Under such circumstances, in the event that a successor securities depository is not obtained, definitive Reoffered Bonds are required to be printed and delivered. The Authority may decide to discontinue the use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, definitive Reoffered Bonds will be printed and delivered.

In the event that such book-entry only system is discontinued for the Bonds, the following provisions will apply to the Reoffered Bonds: principal of the Reoffered Bonds and redemption premium, if any, will be payable in lawful money of the United States of America at the principal corporate trust office of the 1968 Fiscal Agent or the 1998 Fiscal Agent, as the case maybe, in New York, New York. Interest on the Reoffered Bonds will be payable on each July 1 and January 1, by check mailed to the respective addresses of the registered owners thereof as shown on the registration books of the Authority maintained by the 1968 Fiscal Agent and the 1998 Fiscal Agent, as applicable, as of the close of business on the record date therefor as set forth in the 1968 Resolution and the 1998 Resolution.

The Reoffered Bonds will be issued only as registered bonds without coupons in authorized denominations. The transfer of the Reoffered Bonds will be registrable and the Reoffered Bonds may be exchanged at the principal corporate trust office of the 1968 Fiscal Agent or the 1998 Fiscal Agent, as applicable, in New York, New York upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

The Authority will have no responsibility or obligation to DTC, to Direct Participants or to Indirect Participants with respect to (1) the accuracy of any records maintained by DTC, any Direct Participant, or any Indirect Participant; (2) any notice that is permitted or required to be given to the owners of the Reoffered Bonds under the 1968 Resolution or the 1998 Resolution; (3) the selection by DTC or any Direct Participant or Indirect Participant of any person to receive payment in the event or a partial redemption of the Reoffered Bonds; (4) the

11

payment by DTC or any Direct Participant or Indirect Participant of any amount with respect to the principal or redemption premium, if any, or interest due with respect to the Reoffered Bonds; or (5) any consent given or other action taken by DTC as the owner of the Reoffered Bonds.

## BOND INSURANCE

### Bond Insurance Policy

The Insured Bonds are covered by a Municipal Bond Insurance Policy (the "Policy") issued by Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) ("AGM"). The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as Appendix VI to this Reoffering Circular.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

### Assured Guaranty Municipal Corp. (Formerly known as Financial Security Assurance Inc.)

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Assured Guaranty Municipal Holdings Inc. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure and structured finance markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

On July 1, 2009, AGL acquired the financial guaranty operations of Holdings from Dexia SA ("Dexia"). In connection with such acquisition, Holdings' financial products operations were separated from its financial guaranty operations and retained by Dexia. For more information regarding the acquisition by AGL of the financial guaranty operations of Holdings, see Item 1.01 of the Current Report on Form 8-K filed by AGL with the Securities and Exchange Commission (the "SEC") on July 8, 2009.

Effective November 9, 2009, Financial Security Assurance Inc. changed its name to Assured Guaranty Municipal Corp.

AGM's financial strength is rated "AAA" (negative outlook) by Standard and Poor's Ratings Services, a Standard & Poor's Financial Services LLC business ("S&P") and "Aa3" (negative outlook) by Moody's Investors Service, Inc. ("Moody's"). On February 24, 2010, Fitch, Inc. ("Fitch"), at the request of AGL, withdrew its "AA" (Negative Outlook) insurer financial strength rating of AGM at the then current rating level. Each rating of AGM should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of AGM in its sole discretion. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guarantee the market price of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

*Recent Developments*

*Ratings.* On May 17, 2010, S&P published a Research Update in which it affirmed its "AAA" counterparty credit and financial strength ratings on AGM. At the same time, S&P continued its negative outlook on AGM. Reference is made to the Research Update, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

In a press release dated February 24, 2010, Fitch announced that, at the request of AGL, it had withdrawn the "AA" (Negative Outlook) insurer financial strength rating of AGM at the then current rating level. Reference is

12

made to the press release, a copy of which is available at www.fitchratings.com, for the complete text of Fitch's comments.

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

There can be no assurance as to any further ratings action that Moody's or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2009, which was filed by AGL with the SEC on March 1, 2010, and AGL's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2010, which was filed by AGL with the SEC on May 10, 2010. Effective July 31, 2009, Holdings is no longer subject to the reporting requirements of the Securities and Exchange Act of 1934, as amended (the "Exchange Act").

*Capitalization of AGM*

At March 31, 2010, AGM's consolidated policyholders' surplus and contingency reserves were approximately $2,220,015,145 and its total net unearned premium reserve was approximately $2,228,912,193 in accordance with statutory accounting principles.

Incorporation of Certain Documents by Reference

Portions of the following documents filed by AGL with the SEC that relate to AGM are incorporated by reference into this Reoffering Circular and shall be deemed to be a part hereof:

(i)     The Annual Report on Form 10-K for the fiscal year ended December 31, 2009 (which was filed by AGL with the SEC on March 1, 2010); and

(ii)    The Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2010 (which was filed by AGL with the SEC on May 10, 2010).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a), 13(c), 14 or 15(d) of the Exchange Act after the filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Reoffering Circular and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.): 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the caption BOND INSURANCE – Assured Guaranty Municipal Corp. (formerly known as Financial Security Assurance Inc.) or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Reoffering Circular, except as so modified or superseded.

AGM makes no representation regarding the Reoffered Bonds or the advisability of investing in the Reoffered Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Reoffering Circular or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading "BOND INSURANCE".

13

HTA_STAY0056374

## SECURITY AND SOURCES OF PAYMENT FOR THE REOFFERED BONDS

**Pledged Revenues**

The Series AA Bonds and any other Highway Revenue Bonds issued under the 1968 Resolution are payable solely from, and secured by a pledge of, the 1968 Resolution Revenues and all other moneys held for the credit of the 1968 Sinking Fund, which includes the 1968 Bond Service Account, the 1968 Redemption Account and the 1968 Reserve Account.

*1968 Resolution Revenues.* The 1968 Resolution Revenues consist of: (i) the gross receipts of the current $0.16 per gallon excise tax on gasoline and $0.04 of the current $0.08 per gallon excise tax on gas oil and diesel oil imposed by the Commonwealth and allocated to the Authority (after any deductions for taxes on fuels used in sea and air transportation that are required to be reimbursed under certain circumstances) by the Puerto Rico Internal Revenue Code (the remaining $0.04 per gallon excise tax has been allocated to the Metropolitan Bus Authority by Act No. 39 of July 19, 1997); (ii) the gross receipts derived from the $15 per vehicle increase of annual motor vehicle license fees imposed by the Commonwealth and allocated to the Authority by Act No. 9 of the Legislature of Puerto Rico, approved August 12, 1982 ("Act No. 9"); (iii) Existing Toll Facilities Revenues; and (iv) investment earnings on deposits to the credit of funds and accounts established under the 1968 Resolution, except for the 1968 Construction Fund. 1968 Resolution Revenues do not include gasoline taxes, gas oil and diesel oil taxes, and motor vehicle license fees which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Highway Revenue Bonds.

The Series H Bonds, and any other Senior Transportation Revenue Bonds issued under the 1998 Resolution are payable solely from, and secured by a pledge of, the 1998 Resolution Revenues and all other moneys held for the credit of the 1998 Senior Bond Sinking Fund, which includes the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, and the 1998 Senior Bond Reserve Account. Under certain circumstances described below, unencumbered moneys in the 1998 Construction Fund or the 1998 Subordinated Bond Sinking Fund may be used to pay debt service on the Senior Transportation Revenue Bonds, if moneys in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account are insufficient therefor, prior to applying moneys in the 1998 Senior Bond Reserve Account.

*1998 Resolution Revenues.* The 1998 Resolution Revenues consist of: (i) all excise taxes on crude oil, unfinished oil and derivative products ("petroleum products"), up to $120 million per fiscal year, imposed by the Commonwealth and allocated to the Authority by Act No. 34 of the Legislature of Puerto Rico, approved July 16, 1997, as amended ("Act No. 34"), which amended Subtitle B of Act No. 120 of the Legislature of Puerto Rico, approved October 31, 1994, as amended (the "Puerto Rico Internal Revenue Code"); (ii) the tolls and other charges imposed by the Authority for the use of Toll Facilities (other than Existing Toll Facilities Revenues, as defined below, prior to the repeal and cancellation of the 1968 Resolution); (iii) the proceeds of any other taxes, fees or charges which the Legislature of Puerto Rico allocates to the Authority in the future and which the Authority pledges to the payment of Transportation Revenue Bonds; (iv) investment earnings on deposit to the credit of funds and accounts established under the 1998 Resolution, except for the 1998 Construction Fund; and (v) prior to the repeal and cancellation of the 1968 Resolution, any unencumbered 1968 Resolution Revenues remaining on deposit in the 1968 Construction Fund after payment or provision for payment of debt service and required reserves on the outstanding Highway Revenue Bonds (the "Excess 1968 Resolution Revenues"), and after said repeal and cancellation, all 1968 Resolution Revenues. The 1998 Resolution Revenues do not include excise taxes on petroleum products which may be levied or collected from time to time other than the amount of such taxes described in this paragraph unless allocated to the Authority and pledged by the Authority to the payment of Transportation Revenue Bonds. The excise tax on petroleum products imposed by the Puerto Rico Internal Revenue Code and allocated to the Authority by Act No. 34 is a different tax from the excise tax on gasoline and gas oil and diesel oil imposed by the Puerto Rico Internal Revenue Code and allocated to the Authority, as discussed below.

Under the 1998 Resolution, the Authority has covenanted not to encumber, withdraw or pledge any Excess 1968 Resolution Revenues deposited in the 1968 Construction Fund except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund.

14

HTA_STAY0056375

**Flow of Funds Under 1968 Resolution and 1998 Resolution**

The following chart illustrates the flow of 1968 Resolution Revenues and 1998 Resolution Revenues into the various funds and accounts established under the 1968 Resolution and the 1998 Resolution. The chart is provided only as a summary of the flow of funds under the 1968 Resolution and the 1998 Resolution, and does not purport to be complete. Reference is made to the summaries of the 1968 Resolution and the 1998 Resolution in Appendix III and Appendix IV, respectively, which should be read in conjunction herewith.

[Remainder of page intentionally left blank]

15

CONFIDENTIAL

HTA_STAY0056376

**Flow of Funds Under the 1968 and 1998 Resolutions**



(1)  Under the 1998 Resolution, separate accounts in the Subordinated Bond Reserve Fund may be established for Series of Subordinated Bonds with different Subordinated Reserve Requirements.

(2)  Certain Authority operation and maintenance expenses are paid from the 1998 Construction Fund.

16

CONFIDENTIAL

HTA_STAY0056377

Upon receipt of any moneys constituting 1968 Resolution Revenues, including moneys in the Special Fund constituting 1968 Resolution Revenues received from the Department of the Treasury (see "Special Fund" below), the Authority is required under the 1968 Resolution to deposit such moneys in equal monthly amounts into the 1968 Bond Service Account and the 1968 Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Highway Revenue Bonds and in the amounts necessary for the required deposits to the 1968 Reserve Account. Any remaining 1968 Resolution Revenues (other than investment earnings) are deposited into the 1968 Construction Fund. Under the 1998 Resolution, the Authority has agreed not to encumber or withdraw or pledge any 1968 Resolution Revenues deposited in the 1968 Construction Fund except for the transfer of Excess 1968 Resolution Revenues to the 1998 Revenue Fund, which Excess 1968 Resolution Revenues must be withdrawn monthly and transferred to the 1998 Revenue Fund for application as described below.

Upon receipt of any moneys constituting 1998 Resolution Revenues (other than investment earnings), including moneys in the Special Fund constituting 1998 Resolution Revenues received from the Department of the Treasury, the Authority is required under the 1998 Resolution to deposit such moneys into the 1998 Revenue Fund. In addition, the Authority is required to deposit monthly into the 1998 Revenue Fund all Excess 1968 Resolution Revenues. The Authority is required to withdraw monthly from the 1998 Revenue Fund and deposit into the 1998 Senior Bond Service Account and the 1998 Senior Bond Redemption Account the respective equal monthly amounts necessary to provide for the payment of principal of and interest and premium, if any, on the Senior Transportation Revenue Bonds and deposit to the 1998 Senior Bond Reserve Account the amount necessary, if any, to replenish the 1998 Senior Bond Reserve Account. Any remaining 1998 Resolution Revenues (other than investment earnings) are then required to be deposited monthly (in the respective equal monthly amounts) first into the accounts within the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account to provide for the payment of principal of and interest and premium, if any, on the Subordinated Transportation Revenue Bonds and then, into the 1998 Subordinated Bond Reserve Fund, as required. Any remaining 1998 Resolution Revenues are then deposited into the 1998 Construction Fund and are available to the Authority for any of its authorized purposes, but subject to the payment of certain operation and maintenance expenses and repair, renewal and replacement costs, as required by the 1998 Resolution. Once all outstanding Highway Revenue Bonds are paid or defeased and the 1968 Resolution is repealed and canceled, all revenues of the Authority formerly constituting 1968 Resolution Revenues will be deposited monthly into the 1998 Revenue Fund for application as described above.

**Neither the 1968 Resolution nor the 1998 Resolution contains events of default or provides for the acceleration of the maturities of the Highway Revenue Bonds or the Transportation Revenue Bonds.**

**1998 Senior Bond Reserve Account**

The 1998 Resolution establishes a 1998 Senior Bond Reserve Account, the moneys in which are to be applied to the payment of interest on the Senior Transportation Revenue Bonds, and maturing principal of serial Senior Transportation Revenue Bonds whenever moneys in the 1998 Senior Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1998 Senior Bond Redemption Account to satisfy any Amortization Requirements for the term Senior Transportation Revenue Bonds whenever 1998 Resolution Revenues are insufficient for such purpose. The 1998 Resolution provides, however, that before the moneys in the 1998 Senior Bond Reserve Account are used to cover any insufficiency in the 1998 Senior Bond Service Account or the 1998 Senior Bond Redemption Account, the 1998 Fiscal Agent shall cover such insufficiency by first withdrawing from the 1998 Construction Fund any unencumbered 1998 Resolution Revenues deposited therein and, to the extent such moneys are insufficient to cover said deficiency, by withdrawing moneys on deposit in the 1998 Subordinated Bond Service Account and 1998 Subordinated Bond Redemption Account.

The Authority covenants to accumulate and maintain in the 1998 Senior Bond Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Senior Transportation Revenue Bonds and 10% of the original principal amount of each Series of Senior Transportation Revenue Bonds outstanding (the "1998 Senior Bond Reserve Requirement"). The 1998 Resolution permits any increase in the 1998 Senior Bond Reserve Requirement to be funded over not more than five years and allows the Authority to use a letter of credit or insurance policy to fund the 1998 Senior Bond Reserve Requirement.

17

HTA_STAY0056378

On June 1, 2010, approximately $280.5 million was on deposit in the 1998 Senior Bond Reserve Account. The 1998 Senior Bond Reserve Requirement is currently fully funded with cash and cash equivalents.

Excess moneys in the 1998 Senior Bond Reserve Account may be retained in such Reserve Account, may be applied to the payment of outstanding notes issued by the Authority to finance temporarily any Transportation Facilities or outstanding Senior Transportation Revenue Bonds to be refunded or may be transferred to the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, or the 1998 Construction Fund, as directed by the Authority.

### 1968 Reserve Account

The 1968 Resolution establishes the 1968 Reserve Account, the moneys in which are to be applied to the payment of interest on the Highway Revenue Bonds and maturing principal of serial Highway Revenue Bonds whenever moneys in the 1968 Bond Service Account are insufficient for such purpose and thereafter for the purpose of making deposits to the credit of the 1968 Redemption Account to satisfy any Amortization Requirements for the term Highway Revenue Bonds whenever 1968 Resolution Revenues are insufficient for such purpose. The Authority covenants to accumulate and maintain in the 1968 Reserve Account an amount equal to the lesser of the maximum annual Principal and Interest Requirements for any fiscal year on all outstanding Highway Revenue Bonds and 10% of the original principal amount of each Series of Bonds outstanding (the "1968 Reserve Requirement"). The 1968 Resolution permits any increase in the 1968 Reserve Requirement to be funded over not more than five years and allows the Authority to use a letter of credit or insurance policy to fund the 1968 Reserve Requirement.

On June 1, 2010, approximately $140.2 million was on deposit in the 1968 Reserve Account. The 1968 Reserve Requirement is currently fully funded with cash and cash equivalents.

Excess moneys in the 1968 Reserve Account are transferred to the 1968 Construction Fund, the 1968 Bond Service Account or the 1968 Redemption Account, as directed by the Authority.

### Replenishment of 1968 and 1998 Reserve Accounts

Under the Puerto Rico Internal Revenue Code, if moneys in the 1968 Reserve Account, 1998 Senior Bond Reserve Account or any accounts established in the 1998 Subordinated Bond Reserve Fund (collectively, the "Reserve Accounts") are applied to cover a deficiency in the amounts necessary for payment of the principal of and interest on the Highway Revenue Bonds, Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds, respectively, the amounts used from any of the applicable Reserve Accounts to cover said deficiency shall be reimbursed to the Authority from the first amounts received in the next fiscal year or subsequent years by the Commonwealth derived from (i) any other taxes which may then be in effect on any other fuel or propellant which is used, among other purposes, to propel highway vehicles, and (ii) any remaining portion of the gasoline tax and petroleum products tax then in effect. The proceeds of said other taxes and the remainder of the gasoline tax and petroleum products tax to be used to reimburse the applicable Reserve Accounts are not deposited in the General Fund of the Commonwealth when collected, but are deposited instead in the Special Fund for the benefit of the Authority, and, subject to the provisions of Section 8 of Article VI of the Constitution of Puerto Rico, used to reimburse said Reserve Accounts. In the 1998 Resolution, the Authority covenants to apply any such reimbursement received first to replenish the 1968 Reserve Account, then to replenish the 1998 Senior Bond Reserve Account, and finally to replenish any accounts in the 1998 Subordinated Bond Reserve Fund.

### Commitment Not to Reduce Taxes and Fees

The Commonwealth has agreed and committed in the Puerto Rico Internal Revenue Code that it will not reduce the gasoline tax below $0.16 per gallon, the tax on gas oil and diesel oil below $0.04 per gallon or the tax on petroleum products below the tax rates in effect on July 16, 1997 (as described below), and that it will not reduce the amount of any such taxes allocated to the Authority until all obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, secured by the pledge thereof are fully paid. The Commonwealth has also agreed and pledged in Act No. 9 that it will not reduce the motor vehicle license fees

18

allocated and pledged to the payment of obligations of the Authority, including the Highway Revenue Bonds and the Transportation Revenue Bonds, so long as the proceeds of such fees remain pledged to the payment of such obligations.

**Special Fund for Deposit of Taxes and Fees Allocated to the Authority**

Under the Puerto Rico Internal Revenue Code and Act No. 9, the proceeds of the taxes and license fees allocated to the Authority are deposited by the Department of the Treasury in a special fund (the "Special Fund") in favor of the Authority. In accordance with the Constitution of Puerto Rico, the proceeds of such taxes and license fees are subject to being applied first to the payment of general obligation debt of and debt guaranteed by the Commonwealth, if and to the extent that all other Commonwealth revenues are insufficient therefor. The Commonwealth has never applied the proceeds of such taxes or license fees allocated to the Authority to the payment of such debt nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of such debt. For information with respect to the Commonwealth's debt and the economic and financial condition of the Commonwealth, see "Prior Payment of Full Faith and Credit Obligations of the Commonwealth" below and *Debt* in the Commonwealth Report.

**Prior Payment of Full Faith and Credit Obligations of the Commonwealth**

*Provision for Prior Payment.* The Constitution of Puerto Rico provides that in the event the Commonwealth has insufficient funds to pay all approved appropriations, the available resources of the Commonwealth shall be used first to pay public debt before being used for other purposes. Public debt includes bonds and notes of the Commonwealth to which the full faith, credit and taxing power of the Commonwealth are pledged, and, according to opinions heretofore rendered by the Secretary of Justice of the Commonwealth, any payments which are required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public corporations. The Reoffered Bonds do not constitute public debt.

The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle license fees allocated to the Authority by the Puerto Rico Internal Revenue Code and Act No. 9 are available Commonwealth resources under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. However, under the Puerto Rico Internal Revenue Code and Act No. 9, such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose. Tolls and other fees and charges collected by the Authority and investment earnings are not considered available Commonwealth resources.

The Commonwealth has never applied taxes or license fees allocated to the Authority to the payment of its public debt; nor has the Commonwealth ever defaulted on the payment of principal of or interest on any of its public debt. See *Debt* in the Commonwealth Report.

Under the provisions of Act No. 39 of the Legislature of Puerto Rico, approved May 13, 1976, as amended ("Act No. 39"), the Secretary of the Treasury of Puerto Rico is obligated to fund annual debt service on general obligation bonds and notes of the Commonwealth by monthly deposits into the Special Fund for the Amortization of General Obligations Evidenced by Bonds and Promissory Notes (the "Commonwealth Redemption Fund"). As of the date of this Reoffering Circular, the amount on deposit in the Commonwealth Redemption Fund complied with such requirement. Moneys in the Commonwealth Redemption Fund may also be applied to the payment of other Commonwealth guaranteed obligations outstanding prior to adoption of Act No. 39. Such moneys are not available to pay the Reoffered Bonds.

*Debt Limitation.* Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued which is payable in any fiscal year, together with any amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceeds 15% of the average annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico (hereinafter "internal revenues") in the two fiscal years preceding the then current fiscal year. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded.

CONFIDENTIAL

HTA_STAY0056380

Internal revenues consist principally of income taxes, property taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury of Puerto Rico, and motor vehicle fuel taxes and license fees, which are allocated to the Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service.

All or a portion of the proceeds of certain refunding bonds issued by the Commonwealth have been invested in guaranteed investment contracts or federal agency securities (in each case rated in the highest rating category by Moody's Investors Service and Standard & Poor's Ratings Services), none of which is eligible to be used for legal defeasance under Puerto Rico law ("non-eligible investments").

Future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $984,688,996 in the fiscal year ending June 30, 2016 (based on the assumption that the Public Improvement Refunding Bonds, Series 2004 A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, and that the Public Improvement Refunding Bonds, Series 2004 B, the Public Improvement Refunding Bonds, Series 2008 B, a portion of the Public Improvement Refunding Bonds, Series 2003 C, a portion of the Public Improvement Bonds of 2006, Series A, and a portion of the Public Improvement Refunding Bonds, Series 2007 A, each of which are also variable rate bonds, bear interest at 12% per annum). This amount is equal to 12.82% of $7,679,421,000, which is the average of the adjusted internal revenues of the Commonwealth for the two fiscal years ended June 30, 2008 and June 30, 2009. Information about the Commonwealth public sector debt and debt service requirements for the Commonwealth's general obligation bonds and the Commonwealth's guaranteed debt appear under "Debt" in the Commonwealth Report.

**The Reoffered Bonds are not a debt of the Commonwealth or any of its political subdivisions (other than the Authority), and neither the Commonwealth nor any such subdivision (other than the Authority) shall be liable thereon.**

### Additional Bonds under the 1998 Resolution and the 1968 Resolution

*Senior Transportation Revenue Bonds.* The Authority may issue additional Senior Transportation Revenue Bonds under the 1998 Resolution to provide funds for any lawful purpose of the Authority, including the payment of all or any part of the cost of Transportation Facilities (including the payment of any outstanding notes of the Authority issued for the purpose of paying all or a part of such cost); provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Senior Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate revisions made effective on or prior to the date of delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of. all outstanding Senior Transportation Revenue Bonds and the additional Senior Transportation Revenue Bonds then to be issued and not less than 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds (including Subordinated Transportation Revenue Bonds) and the additional Senior Transportation Revenue Bonds then to be issued.

The Authority may also issue additional Senior Transportation Revenue Bonds to refund all or any part of the outstanding Senior Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum annual Principal and Interest Requirements for any fiscal year on the Senior Transportation Revenue Bonds to be outstanding after the issuance of such additional Senior Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements for any fiscal year on the Senior Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Senior Transportation Revenue Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV - SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

Any additional Senior Transportation Revenue Bonds issued under the 1998 Resolution will be on a parity with the outstanding Senior Transportation Revenue Bonds and will be entitled to the equal benefit, protection and security of the provisions, covenants and agreements of the 1998 Resolution.

20

HTA_STAY0056381

*Subordinated Transportation Revenue Bonds.* The Authority may issue Subordinated Transportation Revenue Bonds under the 1998 Resolution to pay all or any part of the cost of any highway project or transit project eligible for financial assistance under federal legislation, provided that the 1998 Resolution Revenues for any 12 consecutive months of the 15 months immediately preceding the issuance of such Subordinated Transportation Revenue Bonds (adjusted to take into account for such entire 12 months moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate changes made effective on or prior to delivery of such bonds and tolls from Toll Facilities to be financed from the proceeds of such bonds) are not less than 125% of the maximum Principal and Interest Requirements for any fiscal year thereafter on account of all outstanding Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds then to be issued.

The Authority may also issue Subordinated Transportation Revenue Bonds to refund all or any part of the outstanding Subordinated Transportation Revenue Bonds of any Series without satisfying such requirement, provided that the Authority certifies that the maximum Principal and Interest Requirements for any fiscal year on the Subordinated Transportation Revenue Bonds to be outstanding after the issuance of such additional Subordinated Transportation Revenue Bonds will be equal to or less than the maximum annual Principal and Interest Requirements for any fiscal year on the Subordinated Transportation Revenue Bonds outstanding immediately prior to the issuance of the additional Subordinated Transportation Revenue Bonds. See "Issuance of Additional Bonds" in "APPENDIX IV - SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

*Highway Revenue Bonds.* The Authority may not issue additional Highway Revenue Bonds under the 1968 Resolution except bonds maturing no later than July 1, 2036, which are issued to refund outstanding Highway Revenue Bonds in order to achieve debt service savings. The issuance of such Highway Revenue Bonds must meet the tests for the issuance of such bonds under the 1968 Resolution, which tests are more fully described in "Issuance of Additional Bonds" in "APPENDIX III - SUMMARY OF CERTAIN PROVISIONS OF THE 1968 RESOLUTION."

## THE AUTHORITY

### General Description

The Authority was created in 1965 to assume responsibility for the construction of roads and highways and related transportation facilities in Puerto Rico. The Authority is a separate entity from the Department of Transportation and Public Works for purposes of financing and constructing Puerto Rico's transportation system, but since 1971, the Secretary of Transportation and Public Works (the "Secretary"), appointed by the Governor, has overseen the management of the Authority and exercises the powers of the Governing Board of the Authority.

The Authority has adopted a long-term master plan for development of the transportation infrastructure necessary to foster and sustain Puerto Rico's economic growth and a five-year Construction Improvement Program to implement that plan. (The current Construction Improvement Program covers the period from fiscal year 2010, which began on July 1, 2009, through fiscal year 2014). As required by the 1968 Resolution and the 1998 Resolution, the Authority supplements the master plan as necessary and annually updates the five-year Construction Improvement Program.

The Authority Act gives the Authority broad powers to carry out its responsibilities in accordance with the Department's overall transportation policies. These powers include, among other things, the complete control and supervision of any highway and other transportation facilities owned, operated or constructed by it; the ability to set tolls and other charges for the use of the highway and other transportation facilities; and the power to issue bonds, notes and other obligations. The Authority plans and manages the construction of all major projects relating to Puerto Rico's transportation system, undertakes major repairs and maintains the toll highways. The Department maintains Puerto Rico's highway system, other than the toll highways, and undertakes construction of smaller projects.

The Authority classifies its highways and roads within the following categories: primary, primary urban, secondary, and tertiary. As of December 31, 2009, the Commonwealth had approximately 4,635 miles of highways and 12,045 miles of local streets and roads. The highway system comprises approximately 389 miles of primary

CONFIDENTIAL

system highways, which are the more important interregional traffic routes, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,058 miles of tertiary highways and roads and public housing development roads serving local, intra-regional traffic. The primary system highways include 170.7 miles of toll roads, such as the Luis A. Ferré (PR-52), De Diego (PR-22), PR-53, Eastern Corridor (PR-66), PR-5 and Martínez Nadal (PR-20) toll highways, plus 33 miles of connecting roads and free expressways.

In August 1990, the Authority Act was amended to empower the Authority to enter into concession agreements, subject to approval by a government board of adjudications, with private parties for the design, construction, operation and maintenance of highway projects. Such projects, to be owned by the Authority and the Commonwealth, could be financed by such private parties by the imposition of tolls or otherwise. To date, the only highway facility subject to a private concession agreement is the Teodoro Moscoso Bridge, which is operated by Autopistas de Puerto Rico y Compañía, S.E.

In March 1991, the Authority Act was further amended to authorize the Authority to work with and implement policies established by the Secretary for the purpose of developing a multi-modal transportation system for the Commonwealth to alleviate traffic congestion. Pursuant to this power, the Authority undertook the planning, design, construction and operation of Tren Urbano, a mass transit rail project for the San Juan Metropolitan area. The initial phase of Tren Urbano became fully operational in fiscal year 2005. It consists of approximately 27 miles of trackway, running from Bayamón to Santurce, via Río Piedras and Hato Rey, sixteen stations and a maintenance and storage facility. Also, the Authority initially purchased 74 passenger rail cars. The total cost of this initial phase was approximately $2.419 billion, of which $685.7 million was paid with funds provided by the federal government.

**Organization**

To carry out its responsibilities to develop the Commonwealth's transportation system, the Authority is organized into the Executive Director's Office, which provides overall management of the Authority, the office of the Deputy Executive Director, who assists the Executive Director in the overall management of the Authority, and the offices of three Assistant Executive Directors, each of whom reports to the Executive Director and the Deputy Executive Director. The Assistant Executive Director for Infrastructure oversees the Planning Area, which is responsible for the development of the Construction Improvement Program as well as long-term planning, the Design Area, which is responsible for designing and supervising the design by consultants of Authority projects, the Property Acquisition Area, which acquires necessary easements and rights-of-way for Authority projects, and the Construction Area, which supervises and inspects the construction work performed by the Authority's contractors. The Assistant Executive Director for Administration and Finance oversees the Finance Area, which is responsible for the financial affairs of the Authority, including budgetary services, the Administration Area, which provides administrative support to the Authority, and the Information Technologies Area, which oversees computer operations. The Assistant Executive Director for Traffic and Toll Operations oversees all aspects of the operation, maintenance, and repair of the toll highways. Most construction, renovation and improvement of highway facilities is performed by private contractors selected through a public bidding process mandated by the Authority Act. The Authority plans, inspects and supervises such work.

**Management**

The Authority's organic law, as amended in 1971, provides that the powers and duties of the Authority shall be exercised by the Secretary of Transportation and Public Works, who replaced the Board of Directors of the Authority pursuant to the 1971 amendment to the Authority's organic law. The Authority also has an Executive Director, who oversees the Authority's day-to-day operations. As of June 1, 2010, Rubén Hernández Gregorat, MEM, PE was both the Secretary of Transportation and Public Works and the Executive Director of the Authority, having been appointed on January 5, 2009.

22

HTA_STAY0056383

Other principal officers of the Authority include the following:

| Name | Position | Date of Appointment |
|------|----------|---------------------|
| Evelyn S. Colón | Deputy Executive Director | August 21, 2009 |
| Harold Cortés | Assistant Executive Director for Infrastructure | March 2, 2009 |
| Carlos Contreras | Assistant Executive Director for Traffic and Toll Operations | February 2, 2009 |
| Brenda Gomila | Assistant Executive Director for Human Resources and Industrial Safety | June 1, 2009 |

The administrative offices of the Authority are in the Roberto Sanchez Vilella Government Center, De Diego Avenue, Stop 22, San Juan, Puerto Rico. Its mailing address is P.O. Box 42007, San Juan, Puerto Rico 00940-2007. Its telephone number is (787) 721-8787.

**Consultants**

The Authority retains the firm of Roy Jorgensen Associates, Inc. as independent traffic engineers to carry out certain responsibilities under the 1968 Resolution and the 1998 Resolution. These include an annual evaluation of the Authority's master plan and Construction Improvement Program for capital improvements and the maintenance activities of the Department and the Authority with respect to Puerto Rico's highway system.

**Employee Relations**

As of May 2010, the Authority employed 2,270 persons, substantially all of whom were permanent employees. The Authority believes that relations with its employees are good.

In 1987, the Puerto Rico Supreme Court classified the Authority as a "private employer" for purposes of Puerto Rico labor law, permitting the Authority's employees to engage in collective bargaining. An independent union, representing approximately 1,146 permanent employees, has been certified for collective bargaining purposes. The existing collective bargaining agreement of the Authority was executed in 2006 and expires on June 30, 2010. Management of the Authority and the union are currently negotiating a new agreement.

**New and Pending Legislation Affecting the Authority**

*New Legislation*

Law 125 of October 17, 2009 amended the Vehicle and Traffic Law of 2000 to provide that in cases of emergency, certain duly identified rescue, firefighting and emergency response vehicles (and military convoys during emergency mobilizations declared by the Governor of the Commonwealth or the President of the United States), shall have the right to use the AutoExpreso toll lanes. The Secretary of the Department of Transportation and Public Works must coordinate with the agencies that operate vehicles covered by the law to establish a special toll rate which may not be more than the operational costs that the Authority incurs for such use of the AutoExpreso lane.

Law 192 of December 22, 2009 amended the Vehicle and Traffic Law of 2000 and provided new guidelines for the offense of driving under the influence of intoxicating beverages. Previously, this offense had been defined for drivers over 18 years of age as operating a motor vehicle with a blood alcohol content of .08% or more. Law 192 provides the same limits for drivers 21 and older, but for drivers between the ages of 18 and 20 the

23

HTA_STAY0056384

maximum blood alcohol content while operating a motor vehicle is .02%. By increasing compliance with federal standards, the Authority can maximize federal funds. The changes implemented by Law 192 increase compliance with federal laws on drinking age and are expected to result in an additional $11.5 million in federal funds received annually by the Authority.

*Pending Legislation*

A bill has been introduced in the Puerto Rico House of Representatives which would require that fines imposed for avoidance of tolls be delivered to the Authority and dedicated to construction and maintenance of permanent highway infrastructure works and improvements. Another bill, also pending in the Puerto Rico House of Representatives, would dedicate fifty percent of administrative faults under the jurisdiction of the Commonwealth committed while operating a motor vehicle on a highway or toll bridge to the Authority to also be used for construction and maintenance of permanent highway infrastructure works and improvements.

From time to time bills have been introduced in the Legislative Assembly of Puerto Rico to exempt certain categories of individuals from the obligation to pay tolls, or to reduce the tolls payable by these individuals, including policemen, firemen, and others. Some of these bills are currently pending. The Authority has in the past opposed these types of bills and currently intends to continue to do so. No assurance can be given as to whether any of these bills will ultimately be enacted into law. However, the Authority does not believe that these bills would have a material adverse effect on the Authority.

The Authority cannot predict whether any of these bills, or any other bill affecting the Authority, will ultimately become law.

## TRANSPORTATION SYSTEM REVENUES AND EXPENDITURES

**Revenues**

Various factors affect the level of 1968 Resolution Revenues and 1998 Resolution Revenues available to the Authority, including, in particular, general economic conditions, the supply and cost of crude oil and gasoline and other oil-derived fuels. These factors have an impact on motor vehicle usage and fuel consumption and are discussed further below. In addition, decisions by the Authority as to the types and level of charges it may impose for the use of its Transportation Facilities will affect the amount of moneys available to the Authority.

*Sources of 1968 Resolution Revenues*

*General.* The major sources of the Authority's 1968 Resolution Revenues are the gasoline tax and the gas oil and diesel oil tax allocated to the Authority pursuant to the Puerto Rico Internal Revenue Code, the motor vehicle license fee allocated to the Authority pursuant to Act No. 9, and the toll charges on the Authority's existing toll highways (which do not include the Eastern Corridor), including tolls collected on any extension thereof, however financed. In fiscal year 2009, 1968 Resolution Revenues were derived 41.7% from gasoline taxes, 44.6% from toll charges, 8.7% from motor vehicle license fees, 3.3% from gas oil and diesel oil taxes, and 1.8% from investment earnings. (The sum of these percentages may not equal 100% due to rounding).

*Gasoline and Gas Oil Taxes.* The Puerto Rico Internal Revenue Code, which currently imposes a $0.16 per gallon tax on gasoline and an $0.08 per gallon tax on gas oil and diesel oil, provides for the deposit of the entire $0.16 tax on gasoline and $0.04 of the tax on gas oil and diesel oil in the Special Fund, and authorizes the Authority to pledge such amounts to the payment of the principal of and interest on its bonds and other obligations or for any other lawful purpose of the Authority. The Authority has pledged such tax receipts to the holders of the Highway Revenue Bonds, but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such taxes to payment of certain Commonwealth bonds to the extent other Commonwealth moneys are insufficient therefor. The Authority has also pledged such tax receipts to the holders of the Transportation Revenue Bonds, subject to the prior application of such tax receipts to the payment of debt service on Highway Revenue Bonds and the maintenance of a reserve therefor. The Commonwealth has agreed and committed in the Puerto Rico Internal Revenue Code that the tax on gasoline will not be reduced below $0.16 per gallon and the tax on gas oil and

24

HTA_STAY0056385

diesel oil will not be reduced below $0.04 per gallon and that the amount of such taxes allocated to the Authority will not be reduced until all obligations of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid. Gasoline taxes and gas oil and diesel oil taxes which may be levied or collected from time to time other than the amounts of the taxes and fees described in this paragraph are not required to be allocated to the Authority or pledged by the Authority to the holders of the Highway Revenue Bonds or the Transportation Revenue Bonds.

Gasoline taxes, gas oil and diesel oil taxes are collected by the Department of the Treasury. The portions of such taxes allocated to the Authority are transferred to the Authority at least monthly as such taxes are collected.

The Department of the Treasury periodically conducts an audit of gasoline, gas oil, diesel oil and petroleum products importers, producers and wholesalers to verify amounts reported and paid. In addition to such audit procedures, the Authority reviews monthly the records of the Department of the Treasury for consistency with monthly reports provided to the Authority by distributors of oil, gasoline and petroleum products.

*Motor Vehicle License Fees.* Under the Vehicle and Traffic Law (Act No. 22 of January 7, 2000, as amended), the Commonwealth imposes annual license fees on various classes of motor vehicles. The current license fees range from $25.00 to $40.00 for passenger cars and vary for other vehicles. Act No. 9 increased the per vehicle annual motor vehicle license fees by $15.00 and provided for the deposit of the proceeds of the $15.00 increase in the Special Fund, which proceeds may be pledged to the payment of debt service on obligations of the Authority or any other legal purpose of the Authority. As with the gasoline and gas and diesel oil taxes described above, the Authority has pledged such license fees to the holders of the Highway Revenue Bonds and, subject to the prior application of such fees to the payment of debt service on Highway Revenue Bonds and the maintenance of a reserve therefor, the Authority has also pledged such fees to the holders of the Transportation Revenue Bonds. Such fees are also collected by the Department of the Treasury and the portion of such fees allocated to the Authority is transferred to the Authority at least monthly, as such fees are collected. Under Act No. 9, the Commonwealth has agreed and pledged that the license fees allocated to the Authority, as described herein, will not be reduced so long as such proceeds remain pledged to the payment of such obligations.

*Tolls on Existing Toll Highways.* Until the 1968 Resolution is repealed and canceled, all tolls collected on the Authority's existing toll highways financed with Highway Revenue Bonds, including tolls collected on any extension thereof financed with Transportation Revenue Bonds (the "Existing Toll Facilities Revenues"), will constitute 1968 Resolution Revenues. As such, they are pledged to the payment of the Highway Revenue Bonds and, subject to the prior application of such toll revenues to the payment of debt service on the Highway Revenue Bonds and the maintenance of a reserve therefor, are additionally pledged to the payment of Transportation Revenue Bonds.

Under the 1968 Resolution, the Authority has covenanted not to reduce or eliminate any tolls and other charges for the use of Traffic Facilities if such tolls and other charges have been taken into account in the calculation of 1968 Resolution Revenues for purposes of satisfying the tests for the issuance of additional bonds under the 1968 Resolution and if the 1968 Resolution Revenues for any 12 consecutive months out of the immediately preceding 15 months prior to the proposed adjustment, after adjusting such revenues for the proposed decrease in tolls, would have been less than 150% of the maximum Principal and Interest Requirements for any fiscal year thereafter for all Highway Revenue Bonds then outstanding. Such tolls and other charges have been taken into account for satisfying such additional bonds test under the 1968 Resolution.

The Authority has also covenanted, under the 1998 Bond Resolution, that it will not reduce or eliminate any tolls or other charges imposed for the use of its Toll Facilities unless the 1998 Resolution Revenues received by the Authority for any 12 consecutive months out of the 15 months immediately prior to such reduction (adjusted to give effect for such entire 12 months to moneys allocated to and pledged by the Authority to the payment of the Transportation Revenue Bonds under legislation enacted and toll rate changes made effective on or prior to the effective date of any such toll reduction, and tolls from Toll Facilities which have begun operations or been removed from operation during such 12 months) is at least equal to 150% and 100% of the maximum Principal and Interest Requirements for any fiscal year thereafter for all Senior Transportation Revenue Bonds then outstanding and for all Transportation Revenue Bonds then outstanding, respectively.

25

Tolls are currently imposed on the Luis A. Ferré toll highway (PR-52), which extends 67 miles from San Juan to Ponce and has four ramps and five toll stations; the De Diego toll highway (PR-22), which extends 52 miles from San Juan to Arecibo and has one ramp and six toll stations; PR-53, which will connect Fajardo and Salinas upon its completion, a distance of 57 miles, of which 37 miles have been completed, and which has five toll stations; the Martínez Nadal Expressway (PR-20), which extends six miles, connecting PR-2 with PR-1 near Caguas, and has one toll station; PR-5, which extends 2.5 miles, connecting PR-2 to PR-199 (Las Cumbres Avenue), and has one toll station; and PR-66, which extends 6.2 miles connecting PR-3 and PR-26, and has one toll station and two ramps.

The last toll increase was in September 2005, when the Authority raised toll rates by approximately 43% in the aggregate.

In 2004, the Authority began implementing a high-speed electronic toll collection system known as AutoExpreso. This technology employs radio transmissions from transponder-equipped vehicles to plaza-mounted antennas, and video systems for violation enforcement. AutoExpreso has exceeded the Authority's usage and performance expectations. It has significantly increased vehicle circulation throughout toll plazas without costly infrastructure expansion, and has resulted in reduced travel time and increased convenience for customers. Direct benefits to the Authority include reduced cost of toll collection, enhanced auditing capabilities, additional payment option offering and receipt of toll payments in advance. AutoExpreso has been implemented on 21 of the 26 existing ramps and toll stations. Currently, approximately 40% of toll revenues are collected through AutoExpreso.

The Authority's toll highway revenues have always exceeded its toll highway operation and maintenance expenses. Toll highway revenues and operation and maintenance expenses for fiscal year 2009 were $206.5 million and $71.5 million, respectively, compared to $212.7 million and $61.2 million, respectively, for fiscal year 2008.

*Investment Earnings.* Moneys held for the credit of the 1968 Bond Service Account and the 1968 Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations. Moneys held for the credit of the 1968 Reserve Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations. Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the 1968 Reserve Account shall be invested in Investment Obligations which mature not later than the final maturity date of any Highway Revenue Bonds outstanding. Income from the investment of moneys held for the credit of the 1968 Construction Fund is not considered 1968 Resolution Revenues under the 1968 Resolution.

*Sources of 1998 Resolution Revenues*

*Petroleum Products Tax.* In 1997, the Puerto Rico Internal Revenue Code was amended by Act No. 34 to allocate to the Authority the total amount of excise taxes, up to $120 million per fiscal year, imposed by the Commonwealth on petroleum products (which include crude oil, unfinished oil and derivative products). The tax is imposed on any petroleum product introduced, consumed, sold or transferred in the Commonwealth. The petroleum products tax rate varies on a monthly basis according to an index price of crude oil determined by the Department of the Treasury (based on the market price of crude oil quoted in certain markets specified in the Puerto Rico Internal Revenue Code), as follows:

| Index Price of Crude Oil (per barrel) | Rate of Tax (per barrel) |
|---|---|
| $16.00 and lower | $6.00 |
| $16.01 to $24.00 | $5.00 |
| $24.01 to $28.00 | $4.00 |
| $28.01 and higher | $3.00 |

26

HTA_STAY0056387

Petroleum products taxes are collected by the Department of the Treasury, deposited in a Special Fund, and transferred to the Authority on a monthly basis, subject to an $11 million monthly limit and to the $120 million annual limit.  If the total amount of the taxes collected in any month is less than $11 million, such deficiency is made up with any taxes in excess of $11 million collected in any other month of the same fiscal year.

The following table presents the number of barrels of crude oil on which the petroleum products tax was imposed, the average annual tax rate (per barrel) and the total taxes collected by the Department of the Treasury in each fiscal year since fiscal year 1987 (the first full fiscal year in which the tax was collected).

### COLLECTIONS OF PETROLEUM PRODUCTS TAX

| Fiscal Year Ended June 30, | Number of Barrels Taxed (millions) | Average Annual Tax Rate[1] ($ per barrel) | Total Tax Collected ($ million) |
|---|---|---|---|
| 1987 | 23.67 | $4.91 | $119.90 |
| 1988 | 22.13 | 4.41 | 98.54 |
| 1989 | 25.11 | 5.00 | 128.23 |
| 1990 | 22.74 | 4.91 | 112.79 |
| 1991 | 26.80 | 4.16 | 112.17 |
| 1992 | 24.07 | 5.00 | 120.37 |
| 1993 | 26.09 | 5.00 | 130.47 |
| 1994 | 28.27 | 5.42 | 152.91 |
| 1995 | 27.90 | 5.00 | 139.59 |
| 1996 | 31.55 | 5.00 | 157.74 |
| 1997 | 32.29 | 4.92 | 158.74 |
| 1998 | 32.20 | 5.33 | 171.64 |
| 1999 | 31.70 | 6.00 | 190.10 |
| 2000 | 32.20 | 4.50 | 144.80 |
| 2001 | 34.82 | 3.50 | 121.90 |
| 2002 | 35.88 | 4.42 | 158.60 |
| 2003 | 34.80 | 3.50 | 121.90[2] |
| 2004 | 36.50 | 3.16 | 115.30 |
| 2005 | 37.20 | 3.00 | 110.26 |
| 2006 | 34.40 | 3.00 | 102.20 |
| 2007 | 34.60 | 3.00 | 102.76 |
| 2008 | 33.40 | 3.00 | 99.04 |
| 2009 | 34.10 | 3.00 | 101.32 |
| 2010(e) | 33.70 | 3.00 | 98.23 |

(1)   The average annual tax rate is the arithmetic average of the monthly tax rate determined by the Department of the Treasury during such fiscal year.  The total tax collected is the actual amount of tax collected during the fiscal year.  Due to the monthly fluctuations in the tax rate, the total tax collected is different from the result produced from multiplying the number of barrels taxed by the average annual tax rate.

(2)   Does not include $11.0 million collected from taxes in arrears paid by a delinquent insolvent taxpayer that filed for protection under the Bankruptcy Code.

(e)   Estimated

*Source*: Department of the Treasury and the Authority.

The Puerto Rico Internal Revenue Code authorizes the Authority to pledge the entire amount of petroleum products tax allocated to the Authority (not to exceed $120 million in any fiscal year) to the payment of the principal of and interest on bonds and other obligations of the Authority or for any other lawful purpose of the Authority.  The Authority has pledged the petroleum products tax receipts to the holders of the Transportation Revenue Bonds, but such pledge is subject to the Constitution of Puerto Rico, which permits the Commonwealth to apply such tax receipts to the payment of certain Commonwealth debts to the extent other Commonwealth funds are insufficient therefor.  The Commonwealth has agreed and committed in the 1997 amendment to the Puerto Rico Internal Revenue Code not to eliminate or reduce the rates of excise tax on petroleum products in effect on the date of the amendment (which are the rates set forth above) or the amount of such taxes allocated to the Authority until all

27

obligations of the Authority secured by the pledge thereof, together with the interest thereon, are fully paid. Any petroleum product tax collected in excess of $120 million per fiscal year is not required to be allocated to the Authority and is not pledged by the Authority to the holders of Transportation Revenue Bonds.

*Tolls and Other Charges.* The Authority Act grants to the Authority plenary power to fix, impose, alter and collect tolls and other reasonable charges for the use of the Transportation Facilities operated by the Authority or for services rendered thereby. The Authority is obligated to take into account in setting or changing such tolls and other charges such factors as will promote the use of the Transportation Facilities in the broadest and most varied manner economically possible. Prior to fixing or altering such tolls or other charges, the Authority must hold a public hearing to receive comments with respect thereto.

Until the 1968 Resolution is repealed and canceled, all Existing Toll Facilities Revenues will constitute 1968 Resolution Revenues and are pledged to the payment of the Transportation Revenue Bonds only to the extent they become Excess 1968 Resolution Revenues. Upon the repeal and cancellation of the 1968 Resolution, the Existing Toll Facilities Revenues will constitute 1998 Resolution Revenues and will be pledged to the payment of the Transportation Revenue Bonds. To date, the only toll facility that provides toll revenues that are not Existing Toll Facilities Revenues, but that instead constitute 1998 Resolution Revenues, is PR-66, also known as Eastern Corridor Phase I, which was inaugurated in April 2006, with a minimum roundtrip toll of $3.00. PR-66 extends 6.2 miles connecting PR-3 and PR-26, and has one toll station and two ramps.

The Authority has not pledged the fare box revenues of Tren Urbano to the payment of the bonds issued under the 1998 Resolution or the 1968 Resolution, including the Reoffered Bonds.

*Excess 1968 Resolution Revenues.* Before the repeal and cancellation of the 1968 Resolution, the Excess 1968 Resolution Revenues (which consist of all unencumbered 1968 Resolution Revenues remaining after payment of debt service and required reserves on the outstanding Highway Revenue Bonds issued under the 1968 Resolution) are included as 1998 Resolution Revenues. After the payment or defeasance of all Highway Revenue Bonds and the repeal and cancellation of the 1968 Resolution, all 1968 Resolution Revenues will become 1998 Resolution Revenues.

*Investment Earnings.* Moneys held for the credit of the 1998 Senior Bond Service Account, the 1998 Senior Bond Redemption Account, the 1998 Subordinated Bond Service Account and the 1998 Subordinated Bond Redemption Account shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Government Obligations. Moneys held for the credit of the 1998 Senior Bond Reserve Account and each account in the 1998 Subordinated Bond Reserve Fund shall, as nearly as may be practicable, be continuously invested and reinvested at the written direction of the Authority in Investment Obligations. Such Government Obligations and Investment Obligations shall mature, or be subject to redemption, at the option of the holder, not later than the respective dates when moneys held for the credit of such Accounts will be required for the purposes intended; provided, however, that the amounts on deposit in the 1998 Senior Bond Reserve Account and each account in the 1998 Subordinated Bond Reserve Fund shall be invested in Investment Obligations which mature not later than the final maturity date of any Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds outstanding. Income from investments of moneys held for the credit of the 1998 Construction Fund is not considered 1998 Resolution Revenues under the 1998 Resolution.

*Historical Revenues*

The following table presents the Authority's revenues, debt service and debt service coverage ratio for the five fiscal years ended June 30, 2005 to June 30, 2009, as well as for the ten months ended April 30, 2010 and April 30, 2009. Under the 1998 Resolution, the Excess 1968 Resolution Revenues representing unencumbered funds in the 1968 Construction Fund must be deposited monthly in the 1998 Revenue Fund and are available for the payment of debt service on Transportation Revenue Bonds, for required deposits to the reserve accounts established thereunder and for other authorized purposes under the 1998 Resolution. See APPENDIX IV – SUMMARY OF CERTAIN PROVISIONS OF THE 1998 RESOLUTION."

28

HTA_STAY0056389

## HISTORICAL REVENUES AND DEBT SERVICE COVERAGE
### (dollars in thousands)

| | Fiscal Year Ended June 30, | | | | | Ten months ended April 30, | |
|---|---|---|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 | 2009 | 2009 | 2010 |
| **1968 Resolution Revenues:** | | | | | | | |
| Gasoline taxes | $185,883 | $178,932 | $181,642 | $174,727 | $174,539 | $146,488 | $144,388 |
| Gas oil and diesel oil taxes | 16,679 | 15,676 | 18,467 | 18,076 | 13,737 | 12,309 | 8,974 |
| Subtotal | $202,562 | $194,608 | $200,109 | $192,803 | $188,276 | $158,797 | $153,362 |
| Motor Vehicle license fees | 32,385 | 31,655 | 31,101 | 34,042 | 36,309 | 23,610 | 27,098 |
| Subtotal | $234,947 | $226,263 | $231,210 | $226,845 | $224,585 | $182,407 | $180,460 |
| Toll receipts | 146,286 | 189,618 | 203,154 | 193,932 | 186,754 | 155,882 | 157,773 |
| Investment Income | 9,858 | 9,923 | 9,803 | 8,512 | 7,679 | 6,591 | 4,878 |
| **Total 1968 Resolution Revenue** | $391,091 | $425,804 | $444,167 | $429,289 | $419,018 | $344,880 | $343,111 |
| Debt Service on Highway Revenue Bonds | $153,925 | $145,080 | $124,942 | $129,018 | $129,928 | $108,273 | $114,059 |
| 1968 Resolution Coverage Ratio | 2.54 | 2.93 | 3.55 | 3.33 | 3.23 | - | - |
| Excess 1968 Resolution Revenues | $237,166 | $280,724 | $319,225 | $300,271 | $289,090 | $236,607 | $229,052 |
| | | | | | | | |
| **1998 Resolution Revenues** | | | | | | | |
| Petroleum Products Tax | $110,262 | $102,206 | $102,763 | $ 99,038 | $101,317 | $ 85,241 | $ 82,142 |
| Excess 1968 Resolution Revenues | 237,166 | 280,724 | 319,225 | 300,271 | 289,090 | 236,607 | 229,052 |
| Toll Receipts | - | 3,430 | 16,799 | 18,784 | 19,722 | 16,240 | 16,135 |
| Investment Income | 16,692 | 16,801 | 14,466 | 18,850 | 16,070 | 12,061 | 9,937 |
| **Total 1998 Resolution Revenues** | $364,120 | $403,161 | $453,253 | $436,943 | $426,199 | $350,149 | $337,266 |
| Debt Service on Senior Transportation Revenue Bonds | $196,726 | $225,891 | $206,408 | $226,974 | $242,697 | $202,248 | $213,189 |
| 1998 Resolution Senior Coverage Ratio[1] | 1.85 | 1.78 | 2.20 | 1.93 | 1.76 | - | - |
| Debt Service on Subordinated Transportation Revenue Bonds | $ 20,398 | $ 24,018 | $ 28,267 | $ 30,363 | $ 30,319 | $ 25,266 | $ 25,287 |
| Total Debt Service on Transportation Revenue Bonds | $217,124 | $249,909 | $234,675 | $257,337 | $273,016 | $227,513 | $238,476 |
| 1998 Resolution Senior and Subordinated Coverage Ratio[2] | 1.68 | 1.61 | 1.93 | 1.70 | 1.56 | - | - |
| Aggregate Revenues[3] | $518,045 | $548,241 | $578,195 | $565,961 | $556,127 | $458,422 | $451,325 |
| Aggregate Debt Service[4] | $371,049 | $394,989 | $359,617 | $386,355 | $402,944 | $335,787 | $352,535 |
| Aggregate Coverage Ratio[5] | 1.40 | 1.39 | 1.61 | 1.46 | 1.38 | - | - |

(1) Equals ratio of Total 1998 Resolution Revenues to Debt Service on the Senior Transportation Revenue Bonds.

(2) Equals ratio of Total 1998 Resolution Revenues to Debt Service on the Senior Transportation Revenue Bonds and the Subordinated Transportation Revenue Bonds.

(3) Represents the sum of Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues).

(4) Represents the sum of Debt Service on all Highway Revenue Bonds and all Transportation Revenue Bonds.

(5) Aggregate Revenues divided by Aggregate Debt Service.

The Authority's aggregate 1968 Resolution Revenues and 1998 Resolution Revenues ("Aggregate Revenues") increased at a compound annual rate of 1.79% during the period from fiscal year 2005 through fiscal year 2009 due primarily to the growth in toll receipts, which accounted for approximately 37.1% of Aggregate Revenues for fiscal year 2009. Toll revenues grew by 50.4% from fiscal year 2005 to fiscal year 2007, increasing most dramatically in 2006 as a result of a 43% aggregate increase in toll rates implemented on September 10, 2005. Thereafter, toll revenues decreased for both fiscal year 2008 and fiscal year 2009. This decrease can be attributed to the negative impact of the economic downturn combined with the higher toll rates, a five cent reduction in the fares for express lanes, and the significant increase in the price of oil (West Texas Intermediate) from an average price of $48.40 in fiscal year 2005 to an average price of $96.84 per barrel in fiscal year 2008. Furthermore, in fiscal year 2009 the Authority's external auditor introduced a downward adjustment of $1.46 million in toll receipts for deferred income on account of amounts collected but not yet earned. Overall, toll revenues contracted by 6.13% in the aggregate during the period from fiscal year 2007 to fiscal year 2009.

29

Gasoline tax revenues accounted for approximately 41.7% of 1968 Resolution Revenues and 31.4% of Aggregate Revenues for fiscal year 2009. During the fiscal years 2005-2009, gasoline tax revenues decreased slightly. Gasoline tax revenues are closely related to gasoline consumption. Gasoline consumption in turn is affected by gasoline prices and by the number of vehicles in circulation. Although gasoline prices rose significantly during this five year period, the adverse impact on gasoline consumption was initially offset by an increase in the number of vehicles in circulation. However, the more dramatic increase in gasoline prices in the latter part of this period resulted in a small decrease in gasoline consumption in 2005 and 2006. Nevertheless, gasoline consumption and gasoline tax revenue showed significant resilience to the impact of negative factors, revealing low income and price elasticities.

Gas oil and diesel oil tax receipts accounted for approximately 3.3% of 1968 Resolution Revenues and 2.5% of Aggregate Revenues for fiscal year 2009. Gas oil and diesel oil tax receipts decreased from fiscal year 2005 to fiscal year 2006, then increased in fiscal year 2007. Gas oil and diesel oil tax receipts decreased in fiscal year 2009 after remaining essentially unchanged in fiscal year 2008. This decrease from fiscal year 2005 to fiscal year 2006 resulted primarily from the decision by the Puerto Rico Electric Power Authority to increase the amount of electricity purchased from private co-generation plants using natural gas and coal as fuels. The relatively high level of receipts in fiscal year 2007 and fiscal year 2008 was primarily due to increased consumption of fuel oils by the Puerto Rico Electric Power Authority following a fire at its Palo Seco generating plant.

Motor vehicle license fees accounted for approximately 8.7% of 1968 Resolution Revenues and 6.5% of Aggregate Revenues for fiscal year 2009. From fiscal year 2005 to fiscal year 2007, license fee collections declined, despite a significant increase in the number of sales of new automobiles. For fiscal years 2008 and 2009, the Authority received extraordinary payments relating to motor vehicle license fees for prior years. The Authority believes that the magnitude of these payments and of the increases in motor vehicle license fee revenues for fiscal years 2008 and 2009 could be due to institutional problems in the transfer of funds from the Puerto Rico Treasury Department which arose after certain private service stations were allowed to collect motor vehicle license fees.

The revenues allocated to the Authority from the petroleum products tax are capped at $120 million in each fiscal year. For fiscal years 2005 and 2006, the petroleum products tax collected amounted to $110.3 million and $102.2 million, respectively. This was due primarily to the rise in the price of petroleum products, which resulted in a lower tax rate and lower collections. After a slight increase in fiscal year 2007, petroleum product tax revenues decreased in both fiscal year 2008 and fiscal year 2009, primarily due to a drop in consumption of taxable products relating to the economic downturn and related energy crisis.

The foregoing discussion of past revenue growth is not intended to be predictive of future revenue growth. Economic conditions in Puerto Rico, as well as the price of oil and petroleum products and the levels of automobile registration and usage, will affect the Authority's revenues in the future.

*Projected 1968 Resolution Revenues and 1998 Resolution Revenues*

The following table presents the Authority's estimates of 1968 Resolution Revenues, 1998 Resolution Revenues, debt service on Highway Revenue Bonds and Transportation Revenue Bonds (including the Reoffered Bonds and other bonds expected to be issued during this period), and debt service coverage for each of the five fiscal years ending June 30, 2010 to June 30, 2014. The projected 1968 Resolution Revenues and 1998 Resolution Revenues shown below are based on toll rates, tax rates and allocations to the Authority now in effect, and debt service is based on Highway Revenue Bonds and Transportation Revenue Bonds currently outstanding and projected to be issued during the forecast period. Such projections are subject to periodic review and may be adjusted to reflect such factors as changes in general economic conditions, in the demand for gasoline and other petroleum products and in the levels of automobile registration and usage. The projections are based on assumptions that the Authority believes to be reasonable; however, there is no assurance that the projections will prove to be accurate. The projections have been prepared by, and are the responsibility of the management of the Authority. The Authority's auditors have neither examined nor compiled the projections, and accordingly they have not expressed an opinion or any other form of assurance with respect thereto.

30

CONFIDENTIAL

HTA_STAY0056391

**PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY**
**PROJECTED REVENUES AND DEBT SERVICE COVERAGE**
(dollars in thousands)

| | Fiscal Year Ending June 30, | | | | |
|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** |
| *1968 Resolution Revenues* | | | | | |
| Gasoline Taxes | $172,340 | $173,290 | $174,100 | $175,600 | $176,890 |
| Gas oil and diesel oil taxes | 11,000 | 11,000 | 10,500 | 10,000 | 10,000 |
| Subtotal | $183,340 | $184,290 | $184,600 | $185,600 | $186,890 |
| Motor vehicle license fees | 33,000 | 33,250 | 33,500 | 33,750 | 34,000 |
| Subtotal | $216,340 | $217,540 | $218,100 | $219,350 | $220,890 |
| Toll receipts | 190,410 | 194,900 | 200,420 | 206,040 | 211,170 |
| Investment Income | 6,076 | 6,054 | 6,067 | 6,060 | 6,067 |
| **Total 1968 Resolution Revenues** | $412,826 | $418,494 | $424,587 | $431,450 | $438,127 |
| Debt Service on Highway Revenue Bonds | $136,871 | $136,717 | $139,368 | $137,817 | $139,341 |
| 1968 Resolution Coverage Ratio | 3.02 | 3.06 | 3.05 | 3.13 | 3.14 |
| Excess 1968 Resolution Revenues | $275,956 | $281,778 | $285,219 | $293,633 | $298,786 |
| *1998 Resolution Revenues* | | | | | |
| Petroleum Products Tax | $ 98,230 | $ 98,780 | $ 99,240 | $100,090 | $100,830 |
| Investment Income | 14,270 | 14,555 | 14,606 | 14,847 | 15,168 |
| Eastern Corridor Toll Receipts | 19,590 | 19,790 | 19,980 | 20,180 | 20,380 |
| Subtotal 1998 Resolution Revenues | 132,090 | 133,125 | 133,826 | 135,117 | 136,378 |
| Excess 1968 Resolution Revenues | 275,956 | 281,778 | 285,219 | 293,633 | 298,786 |
| **Total 1998 Revenues** | $408,046 | $414,903 | $419,045 | $428,750 | $435,164 |
| Debt Service on 1998 Senior Transportation Revenue Bonds | $255,827 | $260,187 | $278,450 | $280,005 | $279,682 |
| 1998 Senior Coverage Ratio[1] | 1.60 | 1.59 | 1.50 | 1.53 | 1.56 |
| Available to Pay 1998 Subordinated Transportation Revenue Bonds[2] | $152,219 | $154,716 | $140,595 | $148,745 | $155,482 |
| Debt service on 1998 Subordinated Transportation Revenue Bonds | 30,344 | 30,343 | 30,364 | 30,324 | 30,344 |
| Senior and Subordinate Debt Service | 286,171 | 290,530 | 308,814 | 310,329 | 310,026 |
| Senior and Subordinate Debt Service Coverage Ratio[3] | 1.43 | 1.43 | 1.36 | 1.38 | 1.40 |
| Aggregate Revenues [4] | $544,916 | $551,620 | $558,414 | $566,567 | $574,505 |
| Aggregate Debt Service[5] | $423,042 | $427,247 | $448,182 | $448,146 | $449,366 |
| Aggregate Debt Service Coverage Ratio [6] | 1.29 | 1.29 | 1.25 | 1.26 | 1.28 |

(1)  Equals ratio of Total 1998 Resolution Revenues to debt service on the Senior Transportation Revenue Bonds in the fiscal year in question.
(2)  Represents total 1998 Resolution Revenues less debt service on the Senior Transportation Revenue Bonds.
(3)  Equals ratio of Total 1998 Resolution Revenues to debt service on the Senior Transportation Revenues Bonds and Subordinated Transportation Revenue Bonds.
(4)  Represents the sum of the Total 1968 Resolution Revenues and Total 1998 Resolution Revenues (less Excess 1968 Resolution Revenues) for the fiscal year in question.
(5)  Represents the sum of Highway Revenue Bonds, Transportation Revenue Bonds and Subordinated Transportation Revenue Bonds debt service for the fiscal year in question.
(6)  Aggregate Revenues divided by Aggregate Debt Service.

Total 1968 Resolution Revenues and 1998 Resolution Revenues for the period from fiscal year 2010 through fiscal year 2014 are projected to grow at a compound annual rate of 1.50% and 1.62%, respectively. The projections are based on econometric models prepared for the Authority by an independent firm.

**Recent Operating Results**

In fiscal year 2009, the Authority had gross revenues, consisting primarily of toll receipts, taxes, license fees and capital grants, of $732 million, and expenses of $1.002 billion, resulting in a reduction in net assets of $270 million, from $4.727 billion as of June 30, 2008, to $4.456 billion as of June 30, 2009. The Authority also suffered losses in each of the fiscal years 2006 through 2008. However, the Authority's expenses include a substantial

31

CONFIDENTIAL

losses in each of the fiscal years 2006 through 2008. However, the Authority's expenses include a substantial amount of non-cash expenses (depreciation and amortization). In fiscal year 2009, for example, expenses included $402 million of depreciation and amortization, which exceeds the reduction in net assets by $132 million. Revenues and debt service coverage ratios presented herein are calculated in accordance with the Resolutions, which provide that the Authority's bonds are payable from the gross revenues pledged thereunder, without deduction for operating and maintenance expenses.

The Authority has financed some of its recent capital expenditures and working capital requirements with Government Development Bank lines of credit, the repayment of which is subordinate to the Highway Revenue Bonds and the Transportation Revenue Bonds. In connection with such lines of credit, the Authority and Government Development Bank, which acts as the fiscal agent of the Commonwealth, have entered into a fiscal oversight agreement pursuant to which it has requested the Authority to implement a comprehensive expense reduction program, including fiscal oversight controls to improve the financial stability of the Authority. The Authority is required to provide certain financial and operational information to the Government Development Bank on a regular basis. The Authority intends to repay or refinance some or all of these lines of credit with the proceeds of future bond issuances (when and if it is able to do so in accordance with the Resolutions' additional bonds tests), the proceeds of public – private partnership transactions, and internally generated funds.

## Operating Expenses and Capital Expenditures

*Operation and Maintenance - Highway Facilities*

The Department of Transportation has the responsibility for maintaining Puerto Rico's highway system, except for the toll highways and related connecting roads, which are maintained by and at the expense of the Authority. The maintenance expenses of the Department are paid with moneys appropriated annually by the Legislature of Puerto Rico. On occasion, the Authority advances funds to pay the costs of emergency repairs that are the responsibility of the Department, and is subsequently reimbursed for these advances. To the extent funds are not provided by the Legislature, the Authority has agreed under the 1998 Resolution that it will pay from available moneys in the 1998 Construction Fund the costs of maintenance of the Traffic Facilities financed with proceeds of Highway Revenue Bonds and Transportation Revenue Bonds. The 1998 Resolution requires the Authority to pay from available moneys in the 1998 Construction Fund (and not from moneys in the 1968 Construction Fund) the costs of any necessary repairs to, or renewals or replacements of, Traffic Facilities financed with proceeds of Highway Revenue Bonds and Transportation Revenue Bonds, as recommended by the transportation engineers retained by the Authority.

The Authority's operation and maintenance expenses payable from available moneys in the 1998 Construction Fund consist of the expenses of operating and maintaining the toll highways and related roads and, beginning in fiscal year 2005, the expenses of operating and maintaining Tren Urbano. Under the 1998 Resolution, these expenses are payable from available moneys in the 1998 Construction Fund after payment of debt service on the Highway Revenue Bonds and Transportation Revenue Bonds and any required deposits to the 1998 Senior Bond Reserve Account and the accounts in the 1998 Subordinated Bond Reserve Fund. Certain other expenses of the Authority, including certain of its administration costs, are included in the Construction Improvement Program and are capitalized.

The following table sets forth the annual toll highway operation and maintenance expenses and beginning in 2006, the electronic toll collection expenses paid by the Authority from unencumbered moneys in the 1998 Construction Fund for each of the five fiscal years in the five-year period ended June 30, 2009, as well as the annual amount contributed by the Authority to the Department to help pay the cost of maintaining the non-toll highways (which amount is not reimbursed by the Department to the Authority). The table also sets forth the Authority's projected annual toll highway operation and maintenance expenses and electronic toll collection expenses to be paid by the Authority from unencumbered moneys in the 1998 Construction Fund for the five fiscal years ending June 30, 2014, as well as the projected contributions by the Authority to the Department for maintenance of non-toll highways.

32

HTA_STAY0056393

## HIGHWAY FACILITIES
### OPERATION AND MAINTENANCE EXPENSES
#### (in thousands)

| Fiscal Year Ended June 30 | Contributions of the Authority to the Department | Toll Highway Operation & Maintenance | Electronic Toll Collection | Total[1] |
|---|---|---|---|---|
| 2005 | 8,271 | 45,563 | - | 45,563 |
| 2006 | 9,250 | 53,315 | $11,933 | 65,248 |
| 2007 | 10,000 | 50,632 | 14,294 | 64,926 |
| 2008 | 10,000 | 46,119 | 15,075 | 61,194 |
| 2009 | 10,000 | 50,704 | 20,776 | 71,480 |
| 2010[p] | - | 48,464 | 18,932 | 67,396 |
| 2011[p] | - | 30,000 | 18,000 | 48,000 |
| 2012[p] | - | 31,500 | 18,000 | 49,500 |
| 2013[p] | - | 33,000 | 18,000 | 51,000 |
| 2014[p] | - | 34,500 | 18,000 | 52,500 |

(1)   Total does not include the contributions of the Authority to the Department.
(p)   Projected.

In certain years, emergency repairs to the highway system have been necessary, particularly as a result of storm or flood damage. The cost of these repairs is borne by the Department, except for the cost of repairs to the toll highways, which is borne by the Authority. The Department and the Authority generally have been reimbursed from the Federal Emergency Management Agency for some of the costs of such repairs attributable to federally designated disaster areas. The Legislature of Puerto Rico also appropriates funds from time to time for emergency repairs by the Department in addition to amounts appropriated for maintenance.

The traffic engineers retained by the Authority under the 1968 Resolution and 1998 Resolution conduct an annual evaluation of the level of maintenance of the highway system. The traffic engineers believe that the Authority's maintenance program represents an adequate level of maintenance to preserve the investment and provide an acceptable level of service. The results of the traffic engineers' most recent maintenance evaluation are summarized in the letter of such traffic engineers included as Appendix V.

*Operation and Maintenance - Tren Urbano*

Tren Urbano is a mass transit rail project for the San Juan Metropolitan area. The initial phase of Tren Urbano became fully operational in fiscal 2005. It consists of approximately 27 miles of trackway, running from Bayamón to Santurce, via Río Piedras and Hato Rey.

Tren Urbano is currently operated by Alternate Concepts, Inc. ("ACI") pursuant to an operation and maintenance agreement originally executed in 2005 between the Authority, Siemens Transportation Partnership Puerto Rico S.E., ACI and Juan R. Requena y Asociados, and amended and extended on May 28, 2010. Pursuant to the amendment, the contract was extended for a five year term expiring on June 5, 2015, and ACI remained as the sole operator. Under the agreement, ACI is responsible for operating and maintaining Tren Urbano and is entitled to receive for such services an annual base compensation. As part of the 2010 amendment, the original contract's inflation adjustment to the base compensation was eliminated. The base compensation does not include the cost of insurance and electricity which is paid separately by the Authority. In addition, the contractor is entitled to receive incentive compensation, and is subject to penalties, based on meeting or not meeting certain operating and maintenance performance measures.

In addition to the direct costs of operating Tren Urbano, the Authority funds the costs associated with the technical, administrative and contractual oversight of Tren Urbano and its intermodal operations, which is done through the Integrated Transportation Alternative (ATI, by its Spanish acronym), a division within the Authority. Additional costs related to Tren Urbano include a contract for security services with the Puerto Rico Police

CONFIDENTIAL

HTA_STAY0056394

Department, a subsidy of fixed-route feeder services for operators of private jitney services (carros públicos), and paratransit feeder bus services provided by the Metropolitan Bus Authority.

The Authority has made certain recent changes that are expected to reduce the cost to the Authority of operating Tren Urbano. These changes include (i) better coordination between the routes of Tren Urbano and the Metropolitan Bus Authority (MBA) with the goal of developing a trunk and feeder system to Tren Urbano and certain principal bus routes; (ii) the establishment of uniform fares in Tren Urbano and MBA's buses, which required a reduction of the one-way Tren Urbano fare from $1.50 to $0.75; (iii) an increase in the use of two-car trains in the off-peak hours, holidays and weekends, and a reduction in the operating hours and the number of attendants in some station entrances; and (iv) the improvement of the level of service. The Authority expects that these changes will increase ridership, which has been approximately 35,000 trips per day instead of the originally projected 57,000 trips per day, that the increase in ridership will partially offset the reduction in revenues caused by the reduction in fares, and that the expense reduction measures will result in lower overall Tren Urbano expenses.

The table below shows the Tren Urbano operating and maintenance expenses paid by the Authority in fiscal year 2009. The table also shows the Authority's estimate of the annual operating and maintenance expenses of Tren Urbano for the period from fiscal 2010 through fiscal 2014. These estimates are based upon the terms of the Authority's contract with ACI and include the Authority's estimate of the cost of insurance and electricity. They also include the costs of the ATI oversight organization, financial incentives for carros públicos, security services, and feeder bus services.

**Operating and Maintenance Expenses for
Tren Urbano and Intermodal Service
(in millions)**

| Fiscal Year | Estimated Annual Operating and Maintenance Expenses |
|---|---|
| 2009 | $75,510,088 |
| 2010[(p)] | 74,773,772 |
| 2011[(p)] | 61,500,000 |
| 2012[(p)] | 63,000,000 |
| 2013[(p)] | 64,500,000 |
| 2014[(p)] | 66,000,000 |

(p) Projected

The costs of operation and maintenance of Tren Urbano will be covered by available moneys in the 1998 Construction Fund and passenger fares, which currently cover approximately 10% of the operation and maintenance costs.

*Operation and Maintenance – Ferry Service*

Since July 2007, the Authority is no longer responsible for the operation and maintenance of the San Juan-Cataño ferry.

*Construction Improvement Program*

As required by the 1968 Resolution and the 1998 Resolution, the Authority has developed a master plan to serve as the basis for the long-term planning of Puerto Rico's transportation facilities, which it supplements as necessary. To implement the plan, the Authority prepares a five-year Construction Improvement Program that is updated annually. Since completing the construction of Tren Urbano in fiscal year 2005, the Authority has focused its current Construction Improvement Program on improving the primary and primary urban highway facilities, while also addressing the most essential needs of secondary and tertiary roads. The Authority has also included in

CONFIDENTIAL

its Construction Improvement Program the cost of repairs, renewals and replacements to the highway system bridges in the Puerto Rico strategic network, plans for dealing with urban congestion and for local improvements, and certain capitalized expenditures.

The current five-year Construction Improvement Program projects expenditures of approximately $1.46 billion from fiscal year 2010 through fiscal year 2014. Approximately $750 million (51%) of the funding for the Construction Improvement Program is expected to be provided by federal funds.

Federal aid for highway construction is received under a number of federal programs, including those directed to construction of new roads and repair and reconstruction of existing roads. The programs provide for matching federal assistance, ranging generally from 80% to 90% of the cost of a project. The level of federal highway aid is dependent upon Congressional authorizations that are apportioned or allocated to the states and the Commonwealth. The U.S. Department of Transportation has broad discretion to release funds for spending within the limits set by Congress. No assurance can be given that the level of federal highway aid will be maintained at the levels projected. In the event of material reductions in such aid, the Construction Improvement Program will be appropriately adjusted in the absence of internally generated funds, external financing or other sources of funds available to offset any such reductions.

The traffic engineers retained by the Authority under the 1968 Resolution and the transportation engineers under the 1998 Resolution, if different, annually review the Construction Improvement Program and the Authority's estimates of revenue sources available for its implementation. In their most recent evaluation, dated March 2009, the traffic engineers concluded that the Authority's 2007-2011 Construction Improvement Program is a reasonable response to the immediate and short-term transportation needs and is generally consistent with the Authority's long-term transportation master plan. The traffic engineers also concluded that revenue projections have been reasonably accurate and provide a sound basis for determining the size of future programs. The results of that review are summarized in the traffic engineers' letter included as Appendix V.

*Teodoro Moscoso Bridge*

The Teodoro Moscoso Bridge represents one of the links to San Juan's strategic highway network. In furtherance of its expanded powers to enter into concession agreements with private companies, the Authority entered into a concession agreement with Autopistas de Puerto Rico y Compañía, S.E. ("APR") for the design, construction, operation and maintenance of the Teodoro Moscoso Bridge, a bridge spanning the San Jose Lagoon from San Juan to Carolina. Pursuant to the concession agreement, as recently amended, APR constructed the bridge and is obligated to operate and maintain the bridge for a term of 50 years, subject to earlier termination by either party under certain circumstances. The bridge, which is owned by the Authority, opened in February 1994. The bridge does not constitute a Traffic Facility under the 1968 Resolution or a Transportation Facility under the 1998 Resolution.

Construction of the bridge was financed through the issuance by the Authority of Special Facility Revenue Bonds which were refunded by the Authority in October 2003 with its Special Facility Revenue Refunding Bonds, 2003 Series A (the "Special Facility Revenue Refunding Bonds") in the principal amount of approximately $153.2 million. The proceeds derived from the sale of the Special Facility Revenue Refunding Bonds were loaned by the Authority to APR, which agreed to repay the loan in amounts sufficient to pay the principal of and interest on the bonds. The Special Facility Revenue Refunding Bonds will be payable primarily from net toll revenues from the bridge collected by APR, after payment of bridge operating expenses.

Under the Special Facility Revenue Refunding Bonds, the Authority has covenanted that if net toll revenues, together with available reserves, are insufficient to pay the Special Facility Revenue Refunding Bonds, or if the concession agreement is terminated, the Authority will assume APR's obligation to pay the Special Facility Revenue Refunding Bonds. If the Authority assumes the obligation to pay the Special Facility Revenue Refunding Bonds, the Authority will be required to exchange the Special Facility Revenue Refunding Bonds for new Senior Transportation Revenue Bonds or Subordinated Transportation Revenue Bonds issued under the 1998 Resolution, provided it meets the requirements for the issuance of such new bonds. These new bonds would have the same interest rates, maturity dates and redemption provisions as the Special Facility Revenue Refunding Bonds. If the Authority cannot issue such new bonds in exchange for the Special Facility Revenue Refunding Bonds, the Special

CONFIDENTIAL

Facility Revenue Refunding Bonds would continue to be payable from revenues available to the Authority after payment of debt service on the Transportation Revenue Bonds.

Pursuant to certain amendments adopted in 2009, the Authority is now entitled to collect 5% of the gross revenues generated by the bridge, payable annually. In connection with the amendments, the Authority and APR settled certain litigation that had been pending relating to PR-66.

DEBT

**Debt of the Authority**

The following table sets forth the outstanding debt of the Authority as of May 31, 2010.

| | |
|---|---|
| Highway Revenue Bond[1] | $1,559,763,400 |
| Senior Transportation Revenue Bonds [1] | 4,246,731,506 |
| Subordinated Transportation Revenue Bonds | 362,425,000 |
| Grant Anticipation Bonds Res. 04-18 | 107,815,000 |
| Lines of Credit – Government Development Bank | 929,313,000 |
| Total | $7,206,047,906 |

(1)      Includes accretion on capital appreciation bonds.

*Government Development Bank Lines of Credit*

The Authority has outstanding $929 million in non-revolving lines of credit from the Government Development Bank as of May 31, 2010. Of this total, $851 million was used to fund capital expenditures and $78 million was used to fund working capital requirements. In addition, the Authority has a $20 million revolving line of credit related to projects funded with moneys provided under ARRA (which had a zero balance as of May 31, 2010) and an approved $63 million line of credit (which has not yet closed) to fund a payment relating to the settlement of pending litigation. The Authority is required to provide certain financial and operational information to the Government Development Bank on a regular basis. The Authority intends to repay or refinance some or all of these lines of credit with the proceeds of future bond issuances (when and if it is able to do so in accordance with the Resolutions' additional bonds tests), the proceeds of public – private partnership transactions, and internally generated funds.

CONFIDENTIAL

HTA_STAY0056397

**Principal and Interest Requirements of the Reoffered Bonds**

The Principal and Interest Requirements for the outstanding Highway Revenue Bonds and Transportation Revenue Bonds (excluding the Reoffered Bonds) and for the Reoffered Bonds for each of the fiscal years 2010 through 2046 are set forth in the following table:

| Years Ending June 30, | Outstanding Transportation Revenue Bonds and Highway Revenue Bonds[1] | The Reoffered Bonds | | | Total Debt Service |
|---|---|---|---|---|---|
| | | Principal | Interest | Total | |
| 2010 | $ 423,042,194 | - | - | - | $ 423,042,194 |
| 2011 | 412,048,859 | - | $ 15,198,115 | $ 15,198,115 | 427,246,974 |
| 2012 | 432,983,947 | - | 15,198,115 | 15,198,115 | 448,182,062 |
| 2013 | 432,947,987 | - | 15,198,115 | 15,198,115 | 448,146,102 |
| 2014 | 433,863,283 | $ 305,000 | 15,198,115 | 15,503,115 | 449,366,398 |
| 2015 | 433,854,139 | 315,000 | 15,181,493 | 15,496,493 | 449,350,632 |
| 2016 | 432,699,749 | 325,000 | 15,164,325 | 15,489,325 | 448,189,074 |
| 2017 | 432,644,882 | 335,000 | 15,146,613 | 15,481,613 | 448,126,494 |
| 2018 | 429,065,759 | 345,000 | 15,128,355 | 15,473,355 | 444,539,114 |
| 2019 | 423,555,033 | 360,000 | 15,109,553 | 15,469,553 | 439,024,586 |
| 2020 | 385,721,945 | 35,370,000 | 15,089,933 | 50,459,933 | 436,181,878 |
| 2021 | 348,657,231 | 54,090,000 | 13,337,268 | 67,427,268 | 416,084,498 |
| 2022 | 380,968,723 | 395,000 | 10,657,888 | 11,052,888 | 392,021,611 |
| 2023 | 305,127,075 | 32,205,000 | 10,636,360 | 42,841,360 | 347,968,435 |
| 2024 | 305,133,723 | 33,285,000 | 9,040,163 | 42,325,163 | 347,458,886 |
| 2025 | 305,100,984 | 34,395,000 | 7,390,430 | 41,785,430 | 346,886,414 |
| 2026 | 305,113,029 | 35,560,000 | 5,685,703 | 41,245,703 | 346,358,731 |
| 2027 | 338,419,094 | 3,495,000 | 3,804,110 | 7,299,110 | 345,718,204 |
| 2028 | 338,428,461 | 3,620,000 | 3,618,178 | 7,238,178 | 345,666,638 |
| 2029 | 329,638,710 | 3,740,000 | 3,425,590 | 7,165,590 | 336,804,300 |
| 2030 | 332,515,635 | 3,860,000 | 3,226,620 | 7,086,620 | 339,602,255 |
| 2031 | 332,506,647 | 3,995,000 | 3,021,268 | 7,016,268 | 339,522,915 |
| 2032 | 323,515,360 | 13,125,000 | 2,808,730 | 15,933,730 | 339,449,090 |
| 2033 | 324,033,460 | 13,035,000 | 2,098,780 | 15,133,780 | 339,167,240 |
| 2034 | 324,571,922 | 12,940,000 | 1,393,915 | 14,333,915 | 338,905,837 |
| 2035 | 325,102,497 | 12,850,000 | 694,408 | 13,544,408 | 338,646,905 |
| 2036 | 316,899,647 | - | - | - | 316,899,647 |
| 2037 | 261,619,297 | - | - | - | 261,619,297 |
| 2038 | 261,625,160 | - | - | - | 261,625,160 |
| 2039 | 196,795,235 | - | - | - | 196,795,235 |
| 2040 | 160,022,510 | - | - | - | 160,022,510 |
| 2041 | 160,018,903 | - | - | - | 160,018,903 |
| 2042 | 118,272,296 | - | - | - | 118,272,296 |
| 2043 | 84,921,848 | - | - | - | 84,921,848 |
| 2044 | 60,588,099 | - | - | - | 60,588,099 |
| 2045 | 60,595,352 | - | - | - | 60,595,352 |
| 2046 | 14,579,250 | - | - | - | 14,579,250 |
| Total | $11,287,197,926 | $297,945,000 | $232,452,138 | $530,397,138 | $11,817,595,064 |

(1) Excluding the Reoffered Bonds

Upon the reoffering of the Reoffered Bonds, the remaining average life of the Highway Revenue Bonds and the Transportation Revenue Bonds will be approximately 17.53 years.

37

## TAX EXEMPTION

*Opinion of Sidley Austin Brown & Wood LLP.*

In connection with the original issuance of the Reoffered Bonds, Sidley Austin Brown & Wood LLP (now, Sidley Austin LLP), as bond counsel to the Authority, stated the following with respect to the Reofferred Bonds, the Series G Transportation Revenue Bonds and the Series 2003 Subordinated Transportation Revenue Bonds (collectively, the "2003 Bonds"):

> The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements regarding the use, expenditure and investment of bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, which requirements the Authority must continue to meet after the issuance of the 2003 Bonds in order that interest on the 2003 Bonds is not included in gross income for federal income tax purposes. The Authority's failure to meet these requirements may cause interest on the 2003 Bonds to be included in gross income for federal income tax purposes, retroactive to their date of issuance. The Authority has covenanted to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the 2003 Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth, which would prevent the Authority from complying with the requirements of the Code.

> In the opinion of Sidley Austin Brown and Wood and subject to continuing compliance by the Authority with the tax covenant referred to above, under the provisions of the Acts of Congress and under regulations, rulings and court decisions then in force, interest on the 2003 Bonds will not be includable in gross income for federal income tax purposes. Interest on the 2003 Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. Interest on the 2003 Bonds, however, is includable in the computation of the alternative minimum tax on corporations imposed by the Code. Sidley Austin Brown & Wood LLP rendered no opinion on the effect of any action taken or not taken after the date of its opinion without its approval (except for such action or omission to act as is provided for in the documents pertaining to the 2003 Bonds) or in reliance upon the advice of counsel other than such firm on the exclusion from gross income of the interest on the 2003 Bonds for federal income tax purposes. Sidley Austin Brown & Wood LLP, as bond counsel, further opined that, under the provisions of the Acts of Congress then in force, the 2003 Bonds and the interest thereon were exempt from state, Commonwealth and local income taxation.

*Opinion of Nixon Peabody LLP.*

In the opinion of Nixon Peabody LLP, Bond Counsel to the Authority, under existing laws, the conversion of the Reoffered Bonds to the fixed rate mode and the reoffering of the Reoffered Bonds under the terms contained in the Resolutions and the resolution of the Authority relating to the conversion and reoffering of the Reoffered Bonds, will not cause the interest on the Reoffered Bonds to be includable in the gross income of owners for Federal income tax purposes. Bond Counsel has expressed no tax opinion as to any other event or matter occurring subsequent to the original issuance of the Reoffered Bonds and Bond Counsel expresses no opinion with respect to the treatment of the Reoffered Bonds and the interest thereon for purposes of state, Commonwealth of Puerto Rico and local taxation.

**Ancillary Tax Matters.**

Ownership of the Reoffered Bonds may result in other federal tax consequences to certain taxpayers, including, without limitation, certain S corporations, foreign corporations with branches in the United States, property and casualty insurance companies, individuals receiving Social Security or Railroad Retirement benefits, and individuals seeking to claim the earned income credit. Ownership of the Reoffered Bonds may also result in other federal tax consequences to taxpayers who may be deemed to have incurred or continued indebtedness to purchase or to carry the Reoffered Bonds; for certain bonds issued during 2009 and 2010, the American Recovery and Reinvestment Act of 2009 modifies the application of those rules as they apply to financial institutions. Prospective investors are advised to consult their own tax advisors regarding these rules.

38

CONFIDENTIAL

Commencing with interest paid in 2006, interest paid on tax-exempt obligations such as the Reoffered Bonds is subject to information reporting to the Internal Revenue Service (the "IRS") in a manner similar to interest paid on taxable obligations. In addition, interest on the Reoffered Bonds may be subject to backup withholding if such interest is paid to a registered owner that (a) fails to provide certain identifying information (such as the registered owner's taxpayer identification number) in the manner required by the IRS, or (b) has been identified by the IRS as being subject to backup withholding.

Bond Counsel is not rendering any opinion as to any federal tax matters other than those described in the opinion attached as Appendix II-A. Prospective investors, particularly those who may be subject to special rules described above, are advised to consult their own tax advisors regarding the federal tax consequences of owning and disposing of the Reoffered Bonds, as well as any tax consequences arising under the laws of any state or other taxing jurisdiction.

**Changes in Law and Post Issuance Events**

Legislative or administrative actions and court decisions, at either the federal or state level, could have an adverse impact on the potential benefits of the exclusion from gross income of the interest on the Reoffered Bonds for Federal or state income tax purposes, and thus on the value or marketability of the Reoffered Bonds. This could result from changes to federal or state income tax rates, changes in the structure of federal or state income taxes (including replacement with another type of tax), repeal of the exclusion of the interest on the Reoffered Bonds from gross income for federal or state income tax purposes, or otherwise. It is not possible to predict whether any legislative or administrative actions or court decisions having an adverse impact on the federal or state income tax treatment of holders of the Reoffered Bonds may occur. Prospective purchasers of the Reoffered Bonds should consult their own tax advisers regarding such matters.

Bond Counsel has not undertaken to advise in the future whether any events after the date of issuance and delivery of the Reoffered Bonds may affect the tax status of interest on the Reoffered Bonds. Bond Counsel expresses no opinion as to any federal, state or local tax law consequences with respect to the Reoffered Bonds, or the interest thereon, if any action is taken with respect to the Reoffered Bonds or the proceeds thereof upon the advice or approval of other counsel.

## REOFFERING AGREEMENT

The Underwriters have agreed, jointly and severally, subject to certain conditions, to purchase the Reoffered Bonds for reoffering at a price equal to their principal amount. In accordance with the Bond Resolution and the Reoffering Agreement, the Underwriters will be paid an aggregate reoffering fee of $1,736,644.12. The obligation of the Underwriters to purchase the Reoffered Bonds is subject to certain conditions precedent. The Underwriters will be obligated to purchase all the Reoffered Bonds, if any such bonds are purchased. The Underwriters may offer to sell the Reoffered Bonds to certain dealers (including dealers depositing the Reoffered Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed, from time to time, by the Underwriters. The Authority has agreed to indemnify the Underwriters, to the extent permitted by law, against certain liabilities, including liabilities under federal securities laws, or to contribute to payments that the Underwriters may be required to make in respect thereof.

J.P. Morgan Securities Inc. ("JPMSI"), one of the Underwriters of the Reoffered Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Reoffered Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS& Co. will purchase Reoffered Bonds from JPMSI at the original issue price less a negotiated portion of the selling concession applicable to any Reoffered Bonds that CS&Co. sells. JPMSI has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

CONFIDENTIAL

HTA_STAY0056400

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Reoffered Bonds as consideration for their professional services.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have agreed to cooperate with respect to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets, other than bond issuances offered exclusively in the Puerto Rico market, for the Commonwealth's governmental entities and other municipal bonds issuers. Compensation with respect to the underwriting of the securities will be allocated between them.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Reoffered Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets Corporation ("RBC") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Reoffered Bonds as part of the consideration for their professional services.

Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## LITIGATION

Siemens Transportation Project Puerto Rico S.E., ("STT") one of the main contractors involved in the design, construction and implementation of the Tren Urbano project, and other related parties filed suit against the Authority in 2003 for a variety of claims arising out of this project. Such claims included breach of contract and damages relating to withheld amounts and acceleration of work. The first claims totaled $50 million. In 2004 the Authority filed counterclaims for $100 million, the liquidated damages specified in the Tren Urbano contracts. The litigation process is currently stayed pending the outcome of settlement negotiations. As a result of amendments to the original claims and counterclaims, the plaintiffs and the Authority now seek approximately $114 million and $233 million, respectively. In addition, the Authority has claims pending against third party defendants of approximately $34 million, while third party defendants have filed their own counterclaims of approximately $211 million. As of June 10, 2010, a settlement had been reached with Siemens and Acciona/NESCO Entrecanales, the major parties to the litigation. Negotiations are underway with the two other remaining parties and are expected to conclude by the end of the year. The Authority does not expect the outcome of this case to have a material negative effect on its operations.

In 2001, Redondo Construction Corp. ("RCC") filed a complaint in the US District Court for the District of Puerto Rico. In the complaint, RCC alleged that the Authority, the Puerto Rico Public Buildings Authority and several officers of the Government of Puerto Rico had violated its civil rights by prohibiting RCC from bidding on and entering into contracts with the government of the Commonwealth and thus caused RCC damages in the amount of $50 million. Shortly after such filing, RCC filed for bankruptcy. In 2002 and 2003 RCC filed four different adversary proceedings against the Authority claiming in excess of $30 million plus interest. In 2008, the complaint filed in the US District Court was dismissed with prejudice in regard to its federal law claims and without prejudice in regards to its state law claims. In 2010, RCC filed an appeal to the US Court of Appeals seeking the reversal of the dismissal. This appeal is currently pending. In 2009, RCC also asserted its dismissed state law claims from the US District Court case in a complaint filed in local court seeking damages in excess of $50.0 million. This proceeding is still in the early stages. In 2010, the US Bankruptcy Court entered judgments relating to the adversary

CONFIDENTIAL

proceedings in amounts approximating $30 million plus interest. The Authority is currently appealing all four judgments.

In 2005 a class action lawsuit was filed against the Authority on behalf of approximately 300 irregular employees who were suspended or whose contracts were not renewed by the Authority, claiming that Law 172 of June 30, 2004 had the effect of naming them to regular positions. The plaintiffs are seeking damages, including retroactive payment of salaries and benefits. The total amount of the claims has not been determined but each identified plaintiff has filed a claim of at least $400,000.00. The next step in the case is a hearing to determine whether recurring funds existed in amounts sufficient to have allowed the Authority to hire any of the plaintiffs. Depending on the outcome of the hearing, the case may continue to the discovery phase. The Authority is defending this case actively and aggressively.

There is no pending litigation of any nature restraining or enjoining or seeking to restrain or enjoin the issuance, sale or delivery of the Reoffered Bonds or in any way contesting or affecting the validity of the Reoffered Bonds, the resolutions or the proceedings of the Authority taken with respect to the authorization, issuance or sale thereof, or the pledge or application of any moneys under the 1968 Resolution, the 1998 Resolution, or the existence or powers of the Authority.

The Authority is involved as defendant in various legal proceedings arising in the normal course of its business. Many of these proceedings involve claims against the Authority based on breach of contract, claims for additional compensation under construction contracts, claims for damages from automobile accidents allegedly caused by alleged defects in highway construction or maintenance, claims relating to condemnation of property, challenges to public bidding procedures conducted by the Authority, and employment related claims, among others. The Authority and its General Counsel do not believe that liability from any such legal proceedings, in excess of available insurance coverage and the provision for losses not covered by insurance, as shown on the financial statements, will have a material adverse effect on the financial condition of the Authority.

## ENVIRONMENTAL MATTERS

The Authority seeks compliance with Commonwealth and federal laws and guidance that require environmental evaluations for all National Environmental Policy Act ("NEPA") actions and approvals. When a NEPA document needs to be prepared, the Environmental Studies Office of the Authority conducts an evaluation and prepares the documentation, such as Categorical Exclusion Reviews, Finding of Not Significant Impacts, or Environmental Impacts Statements. In all cases, the documents are submitted to the FHWA for review, comments or approval. Consultations between the Puerto Rico Department of Transportation, FHWA, and State and federal agencies are performed in all projects and may be repeated or continued if major changes have occurred in the projects, or if a substantial time period elapses after the last major project action.

The Authority uses a computer management system in a systematic approach to identifying and managing its environmental obligations and issues that can complicate many aspects of the NEPA process. With this computerized system the Authority can increase its operating efficiency during the environmental phase, design phase and construction activities.

The Authority faces environmental issues typical for a government agency responsible for construction and maintenance of highways and related public works. As of the date of this Reoffering Circular, the Authority is in material compliance with federal and Commonwealth environmental laws and is not aware of any environmental issues which could have a material adverse effect on the Authority and its operations.

## LEGAL MATTERS

The forms of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, and the original opinions issued by Sidley Austin at the time of issuance of the Reoffered Bonds are set forth in Appendix II to this Reoffering Circular. Certain legal matters will be passed upon for the Underwriters by O'Neill & Borges, San Juan, Puerto Rico.

41

## LEGAL INVESTMENT

The Reoffered Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## GOVERNMENT DEVELOPMENT BANK

As required by Act No. 272 of the Legislature of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Authority in connection with the reoffering of the Reoffered Bonds. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Reoffered Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as Underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Series AA-1 Bonds (the Insured Bonds) have been rated "Aa3 (negative outlook)" by Moody's and "AAA (negative outlook)" by Standard & Poor's based on the Policy issued by AGM. The Series AA-2 Bonds have been rated "A2" by Moody's and "BBB+" by Standard & Poor's. The Series H Bonds have been rated "A3" by Moody's and "BBB" by Standard & Poor's.

The ratings reflect only the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that the ratings will continue for any given period of time or will not be revised downward or withdrawn entirely by any or all of such rating agencies. Any such downward revision or withdrawal of the ratings could have an adverse effect on the market prices of the Reoffered Bonds.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Authority, as specifically stated hereinbelow, will agree to the following:

1.    Each of the Authority and the Commonwealth will agree to file within 305 days after the end of each fiscal year, beginning with its fiscal year ending on June 30, 2010, with the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), core financial information and operating data for the prior fiscal year, including (i) its audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Authority and the Commonwealth, as the case may be, and information as to revenues, expenditures, financial operations and indebtedness of the Authority and the Commonwealth, as the case may be, in each case, generally found or incorporated by reference in this Reoffering Circular; and

2.    The Authority will agree to file, in a timely manner not in excess of ten business days of the occurrence of the event, with EMMA, notice of any failure to comply with paragraph 1 above and of the occurrence of any of the following events with respect to the Reoffered Bonds:

       (a)    principal and interest payment delinquencies;
       (b)    non-payment related defaults, if material;
       (c)    unscheduled draws on debt service reserves reflecting financial difficulties;
       (d)    unscheduled draws on credit enhancements reflecting financial difficulties;
       (e)    substitution of credit or liquidity providers, or their failure to perform;

42

(f)    adverse tax opinions or the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the security, or other material events affecting the tax-exempt status of the Bonds;

(g)    modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

(h)    bond calls, if material;

(i)    defeasances;

(j)    release, substitution, or sale of property securing repayment of the Bonds, if material;

(k)    rating changes;

(l)    bankruptcy, insolvency, receivership or similar events;

(m)    the consummation of a merger, consolidation, or acquisition involving an obligated person or the sale of all or substantially all of the assets of the obligated person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions other than pursuant to its terms, if material; and

(n)    appointment of a successor or additional trustee or the change of name of a trustee, if material.

With respect to the following events:

Events (c) and (d). For a description of the Reoffered Bonds, see "THE REOFFERED BONDS." The Authority does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Authority applies for or participates in obtaining the enhancement.

Event (e). For information on the tax status of the Reoffered Bonds, see "TAX EXEMPTION."

Event (g). The Authority does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if (i) the terms, dates and amounts of redemption are set forth in detail in this Reoffering Circular under "The Reoffered Bonds-Redemption of the Reoffered Bonds," (ii) the only open issue is which Reoffered Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondholders as required under the terms of the Reoffered Bonds, the 1968 Resolution or 1998 Resolution, and (iv) public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 3423856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Reoffered Bonds.

The Commonwealth expects to provide the information described in (1) above by delivering the first bond official statement of the Commonwealth or of any instrumentality of the Commonwealth that includes its financial statements for the preceding fiscal year and operating data generally containing the information set forth in the Commonwealth Report or, if no official statement is issued by the 305 day deadline, by delivering such Commonwealth Report and the Commonwealth Annual Financial Report by such deadline.

The Authority has complied with its continuing disclosure obligations during the five years preceding the date of this reoffering circular.

The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007, and 2008 were filed after the Commonwealth's filing deadline because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying the submission of the Commonwealth's audited financial statements. On May 1, 2010, the Commonwealth filed a notice with EMMA stating that the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 would not be provided on the date specified in the Commonwealth's continuing disclosure agreements, but would be filed on or before July 31, 2010. The Commonwealth Report for the 2009 fiscal year was filed on May 1, 2010.

The Authority may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above whether or not, such other events are material with respect to the Reoffered Bonds, but

43

the Authority does not undertake to provide any such notice of the occurrence of any event, except those events, if material, listed above.

The Commonwealth and the Authority acknowledge that their respective undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Reoffered Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of their respective undertakings shall be limited to a right to obtain specific enforcement of the Authority's or the Commonwealth's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Authority and the Commonwealth written notice of any request to cure such breach, and the Authority or the Commonwealth, as applicable, shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all Beneficial Owners of the outstanding Reoffered Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Sections 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth, and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Authority or the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Reoffered Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by parties unaffiliated with the Authority or the Commonwealth; or

(2)    all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Authority or the Commonwealth, as applicable, elects that the Covenants shall be deemed amended accordingly.

The Authority and the Commonwealth have further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

## MISCELLANEOUS

The foregoing references to and summaries of certain provisions of the 1968 Resolution and 1998 Resolution, the various acts and the Reoffered Bonds are made subject to all the detailed provisions thereof, to which reference is hereby made for further information, and do not purport to be complete statements of any or all of such provisions.

There are appended to this Reoffering Circular the audited financial statements of the Authority for the fiscal years ended June 30, 2008 and 2009 together with the report of Kevane Grant Thornton LLP (Appendix I), the proposed forms of opinions of Bond Counsel and the original opinion of Sidley Austin (Appendix II), the Summary of the 1968 Resolution (Appendix III), the Summary of the 1998 Resolution (Appendix IV), the letter of the Traffic Engineers (Appendix V), and specimen of the bond insurance policy insuring the Insured Bonds (Appendix VI).

CONFIDENTIAL

The financial statements of the Authority included in Appendix I and the Commonwealth Financial Statements have been audited by Kevane Grant Thornton LLP, San Juan, Puerto Rico, and KPMG LLP, San Juan, Puerto Rico, respectively, as set forth in their respective reports therein. The prospective financial information of the Authority included in this Reoffering Circular has been prepared by, and is the responsibility of the management of the Authority. Kevane Grant Thornton LLP has neither examined nor compiled the prospective financial information, and accordingly, Kevane Grant Thornton LLP does not express an opinion or any other form of assurance with respect thereto. The Kevane Grant Thornton LLP report included in Appendix I to this Reoffering Circular relates to the historical financial information of the Authority. Such report does not extend to any prospective financial information (whether or not contained in this Reoffering Circular) and should not be read to do so. The information in the Commonwealth Report was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is incorporated by reference in this Reoffering Circular on the authority of such officials or the authority of such publications as public official documents, respectively. The information pertaining to DTC was supplied by DTC. The remaining information set forth in this Reoffering Circular, except the information appearing in "REOFFERING AGREEMENT," was supplied by the Executive Director of the Authority in his official capacity and is included in this Reoffering Circular on his authority.

This Reoffering Circular will be filed with the MSRB through EMMA.

**PUERTO RICO HIGHWAYS AND
TRANSPORTATION AUTHORITY**

By: _____/s/ Rubén A. Hernández Gregorat_____
Secretary of Transportation and Public Works and
Executive Director PRHTA

CONFIDENTIAL

[THIS PAGE INTENTIONALLY LEFT BLANK]

CONFIDENTIAL