## LOAN AGREEMENT

This **LOAN AGREEMENT**, dated as of August 27, 2010 by and between the **PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY** (the "Authority" or the "Borrower") and **GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO** (the "Bank" or the "Lender"),

### WITNESSETH

**WHEREAS**, the Authority is in need of obtaining financing to satisfy its obligations to (i) pay certain costs incurred or to be incurred in the acquisition, construction, equipping, installation and development of certain capital improvements to the Authority's facilities including those in its Construction Improvement Program for fiscal year 2010 and 2011, and paying certain costs associated with the automatization of the Authority's toll collection systems (collectively, the "Project"), and (ii) pay certain other suppliers of the Authority;

**WHEREAS**, the Authority has requested that the Bank provide such financing on an interim basis;

**WHEREAS**, on July 29, 2010 the Bank issued its $151,259,000 Senior Notes, 2010 Series B (Issuer Subsidy Build America Bonds) (the "GDB Notes") to, among other things, fund a portion of this interim financing to be used to finance capital expenditures of the Authority;

**WHEREAS**, the Authority intends to repay this interim financing with the proceeds of a future bond issuance of the Authority, any proceeds available after the concession pursuant to the provisions of Act 29 of June 8, 2009, the Public Private Partnerships Act, of certain of its assets, or any other available resources of the Authority;

**WHEREAS**, the Bank is willing to provide such financing, but in an amount not to exceed $118,300,000 in accordance with the terms and conditions herein below set forth, which the Bank understands will be enough to cover the immediate and urgent need of funds of the Authority;

**WHEREAS**, the Borrower and the Lender intend that this Loan Agreement and the Loan be subject to the terms of the Fiscal Oversight Agreement, dated as of July 6, 2009, as may be amended from time to time, between the Lender and the Borrower (the "Fiscal Oversight Agreement");

**NOW, THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Subject to the terms and conditions contained herein, the Lender hereby agrees to make non-revolving advances to the Borrower (each, an "Advance") under a non-revolving line of credit in an aggregate principal amount not to exceed **ONE HUNDRED EIGHTEEN MILLION THREE HUNDRED THOUSAND DOLLARS ($118,300,000)** (the

"Loan") for the purpose of (i) paying certain costs incurred or to be incurred in the acquisition, construction, equipping, installation and development of certain capital improvements to the Authority's facilities, which shall not exceed $14,435,604.25 and $30,402,045 for fiscal years 2010 and 2011, respectively; and paying certain costs associated with the automatization of the Authority's toll collection systems, which shall not exceed $26,100,000 (collectively, the "Capital Expenditures"); and (iii) paying certain other operating expenses of the Authority, as authorized by the Lender, up to $47,362,350.75 (the "Operating Expenses" and, together with the Capital Expenditures, the "Permitted Expenses").

2. The Borrower shall use each Advance only for the payment or reimbursement of Permitted Expenses (as defined herein), as such Permitted Expenses are incurred by the Borrower and within the maximum limits established in the Borrower's Fiscal Improvement Plan (as defined in the Fiscal Oversight Agreement) and the 2010-2013 Plan (collectively, the "Borrower's Plan"). Permitted Expenses shall be deemed to have been "incurred" by the Borrower (i) when the labor has been performed or the materials have been supplied to the Borrower, (ii) payment therefor has been requested by the supplier thereof, and (iii) such supplier is entitled to the payment.

3. The Loan shall be evidenced by two Promissory Notes in an aggregate principal amount of not to exceed **ONE HUNDRED EIGHTEEN MILLION THREE HUNDRED THOUSAND DOLLARS ($118,300,000)**. One shall be used to fund the Capital Expenditures (the "HTA BAB Note") and the other to fund the Operating Expenses (the "HTA Operating Note") mentioned in Section 1 above. Both Promissory Notes shall be substantially in the form attached hereto as Exhibit A, subscribed on this same date by the Borrower and payable to the order of the Lender. Each borrowing made by the Borrower under Section 1 above (a "Borrowing") shall reduce the amount of the Loan ratably by the principal amount of such Borrowing.

4. Unless otherwise agreed to by the Lender, the Borrower may request an Advance in writing by not later than 11:00 a.m. (Puerto Rico time) at least three (3) Banking Days prior to the date of the proposed Advance by an authorized representative of the Borrower and shall specify the (i) requested date of such Advance, (ii) aggregate amount of such Advance, and (iii) a list of suppliers or service providers to be paid with the proceeds of such Advance, the address of each such supplier or service provider, the number or other method of identification of the invoices being paid and the amount being paid with respect to each such invoice, and shall include a copy of all such invoices. The Lender shall fund the requested Advance on the date requested in such notice (which must be a Banking Day) and indicate under which Note the Advance is been funded. Each request for an Advance given by the Borrower to the Lender shall be in the form attached hereto as Exhibit B. A request for an Advance from the Borrower, once received by the Lender, shall be irrevocable and binding on the Borrower. For the purposes of this Loan Agreement, "Banking Day" means any day on which commercial banks are open for business in San Juan, Puerto Rico.

5. The principal amount of the Loan shall mature and be due and payable on August 27, 2013. Said principal amount shall be payable solely from proceeds of bonds to be issued by the Authority pursuant to the provisions of the respective sections of the Resolutions; proceeds

25563

AAFAF_CONF_0003498

from the concession of any of the Authority's assets pursuant to the provisions of Act 29 of June 8, 2009, the Public Private Partnerships Act, or from any available resources of the Authority. Each Advance shall bear interest daily from the date of disbursement until paid in full at a fluctuating annual rate of interest equal to one and one half percent (1.5%) over and above the Prime Rate, as determined from time to time in good faith by the Lender, or, upon written notice to the Borrower, at a variable rate of interest, which interest rate may be revised quarterly, per annum equal to the Lender's cost of funding for variable rate loan transactions or the cost of any other obligations or source of funds used to fund the Advance. For purposes of the preceding sentence, the cost of funding shall mean the applicable cost of any source of funds used to fund the Loan, plus in either case, a required margin cost. Initially, this required margin cost will be equal to 150 basis points. The required margin cost may be revised from time to time by the Lender to such an extent that when added to the applicable cost of funds, the interest rate so determined and applicable to an Advance will provide for a total coverage of what the Lender determines to be its "all-inclusive" funding costs. For purposes of this Loan Agreement, the applicable interest rate shall not exceed twelve (12) percent and shall not be less than six (6) percent.

Anything hereunder to the contrary notwithstanding, and without prejudice to any remedies of the Lender provided hereunder or at law or in equity, the interest rate applicable to the outstanding principal amount of each Advance during any period when an Event of Default shall have occurred and be continuing shall be four percent (4.0%) over the otherwise applicable interest rate (the "Default Rate").



Interest shall be payable monthly in arrears not later than the tenth Banking Day following receipt from the Bank of the statement referred to in the next sentence of this paragraph, from any available moneys of the Authority. Each month the Bank shall furnish to the Authority a written statement showing the amount of interest due and payable by the Authority on all outstanding Advances for the preceding month. The Loan shall be junior and subordinate to outstanding bonds of the Authority and shall be subject to certain other terms and conditions, as set forth in this Loan Agreement. Payment of principal and interest on the Loan shall be made in any coin or currency of the United States of America, which at the time of payment shall be legal tender for the payment of public and private debts.

6. The Borrower will pay a fee equal to .25% of the principal amount of the Loan on or prior the closing date.

7. Notwithstanding anything else in this Loan Agreement, drawings under the Loan shall be conditioned on the retention by the Authority, at the Authority's expense, of (i) a financial consultant, (ii) an engineer consultant; (iii) a corporate reorganization consultant; and (iv) any other consultants deemed necessary and convenient by GDB, all reasonably acceptable to, and approved by, the Lender, to provide to the Bank a Fiscal Stabilization Plan for the Borrower, in form and substance acceptable to the Bank, not later than 90 days following the date of this Loan Agreement.

25563

8. If there is no disbursement activity on this Loan for a period of six months after its approval by the Board of Director of the Bank, the loan shall be cancelled automatically.

9. If the Borrower (i) issues and sells bonds, notes or other evidences of indebtedness; or (ii) enters into a concession agreement or other form of public-private partnership with respect to any of its assets pursuant to the provisions of Act 29 of June 8, 2009, the Public Private Partnerships Act; in each case in one or more transactions yielding aggregate net proceeds in an amount equal to or greater than the amount of then outstanding Advances, the Borrower shall on the day of such sale (or if a series of sales, on the day of each such sale), prepay all then outstanding advances; provided, however, that no prepayment shall be required in connection with the refunding of indebtedness existing on the date hereof and set forth in Schedule 9 and extensions, renewals or replacement of such indebtedness that do not increase the outstanding principal amount thereof.

    The Borrower shall use reasonable commercial efforts to issue and sell bonds, notes or other evidences of Indebtedness in one or more transactions yielding aggregate net proceeds sufficient to require the Borrower to prepay the outstanding principal amount of Loan as set forth above, as soon as practical but no later than the Maturity Date without the Lender's consent.

10. The Borrower shall have the right at any time and from time to time to prepay any Borrowing in whole or in part, without penalty or premium, subject to prior notice in accordance with the next sentence. The Borrower shall notify the Lender by telephone (confirmed by fax) of any prepayment hereunder not later than 11:00 a.m., Puerto Rico time, five (5) Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid. . Each prepayment of a Borrowing shall be made to the Lender and applied ratably to the Advances included in the prepaid Borrowing. Prepayments shall be applied first to interest due and payable if any, and then to principal of the Loan.

11. This Loan Agreement and the Loan are subject to the terms of the Fiscal Oversight Agreement. The Lender and the Borrower agree to execute any required amendments to the Fiscal Oversight Agreement to evidence their agreement. The Borrower shall from time to time, upon request by the Lender, promptly provide the Lender with such information as to its finances and operations as the Lender shall reasonably request pursuant to the terms of the Fiscal Oversight Agreement.

12. No amendment or waiver of any provisions of this Agreement or consent to any departure by the Borrower herefrom shall be effective unless the same shall be in writing and signed by the Lender and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

13. The representations and warranties made by the Borrower to the Lender under that certain Credit Agreement, dated as of July 6, 2009 (the "Credit Agreement"), by and between the Borrower and the Lender, as lender and administrative agent are hereby incorporated into this Loan Agreement as made on the date hereof.

25563

AAFAF_CONF_0003500

14. If any of the following events ("Events of Default") shall occur:

   (a) the Borrower shall fail to pay any principal of any Advance or any interest on any Advance when and as the same shall become due and payable, whether at the due date thereof or otherwise;

   (b) the Borrower shall fail to pay any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Loan Agreement when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three (3) Business Days;

   (c) the Borrower shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

   (d) the Borrower shall have defaulted in its obligations under the Fiscal Oversight Agreement, but only for so long as the Bank continues to be a lender hereunder; or

   (e) the occurrence of an event of default under the Credit Agreement, the Indenture or any Bond Resolution (as defined in the Credit Agreement); or any other financing provided by the Lender



then, and in every such event, and at any time thereafter during the continuance of such event, the Lender shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Loan immediately, and (ii) declare the Advances then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable) and thereupon the principal of the Advances and other amounts so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

In case of recourse to the courts by the Lender in order to collect the whole or any portion of the principal or interest due, the Borrower agrees to pay a liquidated sum equal to 10% of the amount of the Loan to cover expenses of such proceedings, court costs, disbursements and attorney's fees, which amount will become immediately due and payable upon the filing of such judicial proceedings.

15. The following tax covenants shall apply to HTA BAB Note funded with the proceeds of the GDB Notes:

   (a) The Bank and the Borrower understand that it is the intention hereof that the GDB Notes shall maintain their status as Build America Bonds under Section 54AA(g) of the U.S. Internal Revenue Code (the "Code") and that the Bank will be entitled to apply for and receive the interest subsidy provided under Section 6431 of the Code. In furtherance thereof, the Borrower agrees that it will take all action within its control

25563

AAFAF_CONF_0003501

which is necessary in order for the GDB Notes to retain their status as Build America Bonds and shall refrain from taking any action which results in the GDB Notes failing to continue to qualify as Build America Bonds.

(b) The Bank and Borrower understand that it is the intention hereof that the HTA BAB Note shall be a tax-exempt obligation the interest on which is excluded from gross income for federal income tax purposes under Section 103 of the Code. In furtherance thereof, the Borrower agrees that it will take all action within its control which is necessary in order for the interest on the HTA BAB Note to remain excluded from federal gross income and shall refrain from taking any action which results in such interest becoming included in federal gross income.

(c) The Borrower will coordinate with the Bank the execution and filing of an IRS Form 8038-G evidencing the issuance of the HTA BAB Note on the closing date of the HTA BAB Note. The Borrower agrees to file any additional reports that are required to be filed by the Borrower with the IRS with regard to the HTA BAB Note or the GDB Notes. The Borrower agrees to provide the Bank with all material and information necessary for the Bank to file all reports required under the Code to assure that the GDB Notes retain their status as Build America Bonds and that interest paid by the Borrower on the HTA BAB Note shall be excluded from federal gross income.

(d) The Borrower agrees that all proceeds derived from the HTA BAB Note, including any investment earnings thereon, shall be used only to pay costs of a type that are properly chargeable to the capital account of the Borrower (or would be so chargeable with a proper election or with the application of the definition of placed in service under Treas. Reg. Section 1.150-2(c)) under general Federal income tax principles.

(e) The Borrower will not use proceeds of the Loan to pay working capital expenditures, pay fees associated with the HTA BAB Note, pay principal or interest on any debt obligation or lease payment on any lease obligation, to make any grant, to make or finance any loan to any person or entity, or to establish a debt service reserve fund.

(f) The Borrower intends to use the proceeds of the Loan to obtain reimbursement for capital expenditures paid prior to the date of closing hereof. The Borrower will not use proceeds of the Loan to reimburse capital expenditures with respect to the Project unless: (i) the reimbursements are for capital expenditures paid after the date that is 60 days before the Borrower adopted a valid reimbursement resolution, or the capital expenditure qualifies as a "preliminary expenditure" or "de minimis expenditure" under Treas. Reg. Section 1.150-2, and (ii) the reimbursement allocation is made not later than 18 months after the later of the date the original capital expenditure was paid or the date the Project is placed in service or abandoned, but in no event more than 3 years after the original capital expenditure was paid.

(g) The Borrower is the owner of the Project for federal income tax purposes and expects to be the owner of the Project for the entire term of the Loan.

25563

AAFAF_CONF_0003502

(h) The Borrower reasonably expects that the HTA BAB Note will meet neither the private business tests of Section 141(b) of the Code, nor the private loan financing test of Section 141(c) of the Code, for the entire term of the HTA BAB Note. Except as otherwise advised by bond counsel, the Borrower will not enter into any lease with or otherwise grant special legal entitlements to any entity other than a governmental entity or any management or service contract with any entity other than a governmental entity for the operation of any portion of the Project unless the management or service contract complies with the requirements of Revenue Procedure 97-13 or such other authority as may control at the time.

(i) The Borrower agrees to calculate and pay any rebate or yield reduction payments at the times and in the amounts that are required to be made to the Internal Revenue Service under Section 148 of the Code and the Treasury Regulations thereunder with respect to gross proceeds of the HTA BAB Note.

(j) The Borrower will not take or omit to take any action which will adversely affect the exclusion from gross income of the interest on the HTA BAB Note under the Code, including any action or omission which will cause the HTA BAB Note to be an "arbitrage bond" within the meaning of Section 148 of the Code.

(k) The Borrower has entered into, or will enter into within six (6) months after the closing date, substantial binding obligations to a third party to expend an amount equal to at least five percent (5%) of the net proceeds of the Loan on the Project.



(l) The acquisition and construction of the Project and the allocation of the net proceeds of the Loan to expenditures will commence and will proceed with due diligence to completion.

(m) It is estimated that the Project will be acquired or constructed and ready for use by a date not later than three years from the closing date. All of the proceeds of the Loan are expected to be allocated to expenditures on the Project within three (3) years of the closing date.

(n) Any amounts deposited to accounts held or used by the Borrower for the payment of debt service on the HTA BAB Note will be used within 13 months of the date of deposit and any amounts received from the investment of such amounts will be used within one year from the date of receipt to pay debt service on or redeem the HTA BAB Note. Amounts so deposited will be used primarily to achieve a proper matching of revenue and debt service on the HTA BAB Note within each year. Amounts so deposited will be depleted at least once a year except for a reasonable carry over amount not to exceed the greater of (i) one year's earnings on such fund for the immediately preceding HTA BAB Note year or (ii) one-twelfth of annual debt service on the HTA BAB Note for the immediately preceding HTA BAB Note year.

(o) The Borrower does not expect to create or establish any sinking fund or similar fund with respect to the HTA BAB Note. No amounts in the accounts or funds of the Borrower are reserved or pledged for HTA BAB Note payments and it is not expected

25563

that any accounts or funds will be used, nor is there any reasonable assurance that any portion of any accounts or funds will be available for HTA BAB Note payments if the Borrower encounters financial difficulty.

(p) No amount of the proceeds of the Loan will be invested in nonpurpose investments having a substantially guaranteed yield for four years or more.

(q) The Borrower reasonably expects that the average maturity of the HTA BAB Note will not exceed one hundred and twenty percent (120%) of the average reasonably expected economic life of the Project based on when such Project is in fact acquired or constructed.

(r) The payment of principal and interest with respect to the HTA BAB Note will not be guaranteed (in whole or in part) by the United States or any agency or instrumentality of the United States. The proceeds of the HTA BAB Note, or amounts treated as proceeds of the HTA BAB Note, will not be invested (directly or indirectly) in federally insured deposits or accounts, except to the extent such proceeds (i) may be so invested for an initial temporary period until needed for the purpose for which the HTA BAB Note is being issued, (ii) may be so used in making investments of a bona fide debt service fund, or (iii) may be invested in obligations issued by the United States Treasury.

(s) The Borrower agrees to maintain all records and documents relating to the HTA BAB Note, including but not limited to, all records of expenditure and investment of proceeds, rebate exception analyses, rebate calculations, Forms 8038-T, rebate and yield reduction payments and any other records relevant to compliance with the requirements of the Code, for the period that the HTA BAB Note is outstanding and for the three year period following the final maturity or redemption date of any obligations issued to refund the HTA BAB Note.

16. The Borrower waives the requirements of demand, presentment, protest, notice of dishonor, and, in general, any other legal formality.

17. Any notices which may be given to either party hereunder shall be in writing, and if addressed to the Lender, sent to the offices of the Lender located at Roberto Sánchez Vilella Government Center, de Diego Avenue, San Juan, Puerto Rico, 00940, Attention: Executive Vice President of Financing and Treasury, or to such other address or person as the Lender may hereafter notify the Borrower in writing, and if addressed to the Borrower, sent to the address of the Borrower: Puerto Rico Highway and Transportation Authority, Roberto Sánchez Vilella Government Center, de Diego Avenue, San Juan, Puerto Rico, 00940, Attention: Executive Director, or such other address or person as the Borrower may hereafter notify the Lender in writing. Any such notice, if delivered personally or by facsimile transmission, shall be effective on the date when given, and if sent by mail, shall be effective three (3) Banking Days after posting.

18. This Loan Agreement, together with the Note, the authorizing resolutions and the other documents delivered by the parties in connection with the closing of the Loan, expresses the entire agreement of the parties with respect to the transactions contemplated hereby.

25563

AAFAF_CONF_0003504

19. This Loan Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns. The Lender may assign to any other financial institution all or any part of, or any interest in, the Lender's right hereunder and in the Advances, and to the extent of such assignment, such assignee shall have the same rights against the Borrower hereunder as does the Lender. The Borrower may not assign any of its rights nor delegate any of its obligations hereunder without the Lender's prior written consent. This Loan Agreement shall be governed by, and the rights and obligations of the parties hereunder shall be construed in accordance with, the laws of the Commonwealth of Puerto Rico.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

25563

AAFAF_CONF_0003505

IN WITNESS THEREOF, the Borrower and the Lender have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized, as of the date first above written.

| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | PUERTO RICO HIGHWAY AND TRANSPORTATION AUTHORITY |
|---|---|
| By: ~~Fernando L. Batlle~~ Juan C. Pavia<br>Executive Vice-President of ~~Financing and Treasury~~ Fiscal Agency | By: Rubén A. Hernández Gregorat<br>Secretary of Transportation and Public Works and Executive Director |

Affidavit No. 176

Acknowledged and subscribed before me by Rubén A. Hernández Gregorat as Secretary of Transportation and Public Works and Executive Director of the Puerto Rico Highway and Transportation Authority, of legal age, married and resident of Guaynabo, Puerto Rico, who is personally known to me.

In San Juan, Puerto Rico, on August 27, 2010.

_____
Notary Public

Affidavit No. 412

Juan C. Pavia Vidal

Acknowledged and subscribed before me by ~~Fernando L. Batlle Hernaiz~~, as Executive Vice President of ~~Financing and Treasury~~ Fiscal Agency of Government Development Bank for Puerto Rico, of legal age, married and resident of ~~San Juan~~ Guaynabo, Puerto Rico, who is personally known to me.

In San Juan, Puerto Rico, on August 27, 2010.

_____
Notary Public

25563

AAFAF_CONF_0003506